ZELDES & HAEGGQUIST, LLP
AMBER L. ECK (SBN: 177882)
HELEN I. ZELDES (SBN: 220051)
ALREEN HAEGGQUIST (SBN: 221858)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone:  (619) 342-8000
Fax:  (619) 342-7272
ambere@zhlaw.com
helenz@zhlaw.com
alreenh@zhlaw.com

ROBBINS GELLER
RUDMAN & DOWD LLP
RACHEL L. JENSEN (211456)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
Fax: (619) 231-7423
rjensen@rgrdlaw.com

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM, PATRICIA MURPHY and SHERI WINKELMANN, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> TRUMP UNIVERSITY, LLC, (aka Trump Entrepreneur Initiative) a New York Limited Liability Company, and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 10-CV-0940-IEG (WVG) <br><br> FIRST AMENDED CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

FIRST AMENDED CLASS ACTION COMPLAINT

*"When people are fearful, you should be greedy.  When people are greedy, you should be fearful."* – Warren Buffet

1.      This is a quote often recited by Trump University's speakers in its initial free seminar to persuade consumers that now is the time to sign up for Trump's $1,500 seminar to learn how to make money in real estate investing.  Unfortunately, Trump University has taken these words to heart, and is taking advantage of these troubled economic times to prey on consumers' financial fears for its own financial gain.  Students who purchase these Trump seminars learn only too quickly, but after it is too late for them to get their money back, that it is Trump who is greedy, and they who should have been fearful.

2.      Plaintiffs Tarla Makaeff, Brandon Keller, Ed Oberkrom, Patricia Murphy and Sheri Winkelmann (collectively "Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Trump University, LLC and DOES 1 through 50, inclusive (collectively "Defendant," "Trump University" or "Trump").[1]  Plaintiffs hereby allege, on information and belief, except as to those allegations which pertain to the named Plaintiffs, which allegations are based on personal knowledge, as follows:

## NATURE OF THE ACTION

3.      Trump University markets itself as a University driven by the mission to "train, educate and mentor entrepreneurs on achieving financial independence through real estate investing."  It is anything but.  In fact, rather than serving its students as a university or college, Trump University is more like an infomercial, selling non-accredited products, such as sales workshops, luring customers in with the name and reputation of its founder and Chairman, billionaire land mogul Donald J. Trump.   Trump and his so-called University promise "mentorships," urging consumers that it's the "next best thing" to being Donald Trump's next

---

[1] Trump University changed its name to Trump Entrepreneur Initiative on June 2, 2010 after the New York Department of Education insisted that the "use of the word 'university' by your corporation is *misleading and violates New York Education law* and the Rules of the Board of Regents."  However, as the corporation was named Trump University at the time the initial complaint was filed on April 30, 2010, Defendant is referred to as Trump University throughout.

FIRST AMENDED CLASS ACTION COMPLAINT

"Apprentice."  But as class members quickly find out, all Trump University provides is empty promises.  The primary lesson Trump University teaches its students is how to spend more money buying more Trump seminars.

4.      Plaintiffs and class members attended Trump University's real estate investing classes, were promised a "complete real estate education," a "one year apprenticeship," a one-on-one mentorship, practical and fail-safe real estate techniques, a "power team" consisting of real estate agents, lenders, personal finance managers, property managers and contractors, and were assured that although the seminars were costly, they would make the money back in their first real estate deal, and could make up to tens of thousands of dollars per month or more.  Plaintiffs and class members did not receive what they bargained for.

5.      Instead of a complete real estate education, students merely received an "infomercial" pushing additional seminars or workshops they were told they would need to take to succeed.  The "one year apprenticeship" they were promised was actually just a 3-day seminar; the one-on-one year-long mentorship consisted of no practical insights and no mentorship, but rather excursions to Home Depot and "mentors" who either recommend real estate deals that they stood to benefit from financially, raising a conflict of interest, or quickly disappeared and failed to return calls.

6.      Trump University representatives also told students during the 3-day seminar to raise their credit card limits 4 times during the break for "real estate transactions," and had students prepare detailed financial statements, presumably for real estate purchases.  In fact, Trump's real reason for having students increase their credit limits and provide detailed financial statements was to assess how much money each student had to spend on the next Trump seminar, and to persuade the students to use their increased credit limit to purchase the Trump Gold Program for $34,995.

7.      In attempting to publicly defend its reputation, Trump University has the audacity to compare itself to Harvard University – claiming that it does not guarantee real estate success, just as Harvard cannot guarantee a Rhodes scholarship.  Comparing Trump University to Harvard University is a bit like comparing a snake oil salesman to a brain surgeon.  First, Harvard is clearly an accredited institution while Trump is not; Harvard professors are educated in their field, while

FIRST AMENDED CLASS ACTION COMPLAINT

Trump instructors and mentors are trained in sales, not real estate; and when Harvard students pay for a 4-year education, they receive 4 years of teaching, whereas Trump students who pay for a 1-year real estate education receive 3 days of a hard-sell sales presentation.

8.      Plaintiffs are not bringing this action because they did not succeed in real estate – they are bringing this action because Trump University misrepresented what it was providing.  It claimed it was providing a year-long real estate education and mentorship, when in actuality, it was providing only a 3-day long infomercial, designed to confuse, rather than educate, its students, and to persuade them to purchase even more seminars.  The Program is actually designed to confuse students and fails to give them complete information or specific techniques, so that they do not feel confident to get involved in real estate investing on their own, and instead decide to purchase another seminar.  The program is not designed to educate, but to sell.

9.      **Attorney General Investigations -** Attorneys General in six states have received numerous complaints against Trump University, and at least two have either launched investigations or are in the process of reviewing complaints, according to the New York Daily News.[2]  In January, 2010, Texas Attorney General Greg Abbott's office launched a probe of Trump University's advertising and business practices after getting two dozen complaints.  The Texas Attorney General indicated he was probing "possibly deceptive trade practices" dating back to 2008.

10.      Florida Attorney General Bill McClollum's office is "reviewing" 20 complaints from people who paid up to $35,000 for various Trump seminars, according to the New York Daily News, and the New York and Illinois Attorneys General have received dozens of complaints. The Better Business Bureau has received at least 70 complaints of deceptive practices from students nationwide. *Id.*

11.      **Standardized scripts** – Representations made to consumers about the Trump seminars by Trump instructors and the Trump sales team were standardized.  When consumers

---

[2] *See* "Trump U Hit by Complaints from Those Who Paid up to 30G, and Say They Got Very Little in Return," by Douglas Feiden, New York Daily News (May 31, 2010).

made calls to or received calls from Trump University, they spoke with a member of the Trump sales team.  Each member of the sales team was given a 5-6 page sales script, and was required to stick to the script word-for-word.  Likewise, the in-person seminars were highly standardized. Speakers used the same slide presentation, the same script, and even had detailed instructions for the presentation, down to where the speakers and coordinators should stand, the temperature of the room and the music to be played during the Introduction – "Money, Money, Money" from the Apprentice show.

12.    **Targeting seniors** - In its advertising and seminars, Trump often targeted seniors, and specifically designed its sales pitch to scare seniors into attending and paying for additional seminars.  For example,  in the introductory seminar, the speaker would typically say, "how many times do you go into Walmart, and you're greeted by a guy or gal who is 70+ years old – do you want to be doing that when you're 70 years old, or do you want to be playing golf and enjoying your retirement?"  In its advertising and at its seminars, Trump University would throw around statistics (which may or may not be true) such as:

- Did you know that you will need $250,000 in savings to generate $1,000 monthly income during retirement?

- That means if you're expecting to maintain your lifestyle during retirement based on an annual income of $70,000, you need to have $1.75 million in liquid assets.

- The average savings of a 50-year old American is only $2,500.  That isn't wealth, that's poverty.

- If you're a retiree, unless you have $1 million in cash, if you spend $50,000 per year, you'll be broke by the time you're 85.

13.    **Student dissatisfaction** - While Trump has publicly claimed that 95% to 98% of students are satisfied with its course, this figure is far from the truth.  While it may be true that Trump University received some positive ratings in surveys given to the students while the seminars were in session or immediately afterward, at this point, many of the students actually still believe that they will eventually get the information and mentoring they need, since they have been promised a one-year apprenticeship or one-year mentorship.  Also, these surveys are not

4

anonymous, but have the students' names on them, and students are often reluctant to criticize the instructors and mentors who they have paid a lot of money to help them throughout the year.  It isn't until later, when students see that the help and information they need is never coming – that they realize they have been scammed.  Some Trump former employees responsible for taking consumer complaint calls estimate that as many as *50%* or more of students who take the Trump seminars are dissatisfied, and one former employee indicated that nearly ***everyone*** he spoke to who purchased the $35,000 elite seminar was dissatisfied with it.

14.     **The up-sell** – Insiders at Trump University confirm that the entire Trump University program is focused on the "up-sell" – the whole purpose of the free seminar is to get people to sign up for the $1,500 seminar. The purpose of the $1,500 seminar is to get people to sign up for the $35,000 seminar, and the entire purpose of that seminar is to get people to sign up for additional seminars, products and books.  Instructors were taught to be "armed with objections and rebuttals" and to "work the room with special attention to team members in ***possession of a credit card that needs to be run***."

15.     **Misrepresentation of instructors' and mentors' experience** - Contrary to Trump University's representations, many of its seminar instructors and mentors were not experienced in real estate – in fact, many had little to no personal real estate experience, and most had not engaged in the vast majority of the real estate techniques they were teaching.  In fact, these instructors and mentors were predominantly professional salespeople, hired for their ability to deliver a hard-sell sales presentation, and paid exclusively on commission based on the percent of sales they delivered. Trump's best speakers earn commissions of $30,000 or more per month.

16.     **Misrepresenting and fabricating testimonials** – Trump University enhances, misrepresents and in certain instances, completely fabricates, student testimonials. It also continues to use testimonials which it knows no longer are true.  In addition, Trump's testimonials often list gross profit rather than net profit which is highly misleading. Indeed, when expenses are taken into account, many of these "success stories" haven't really made any money at all.

17.     Plaintiffs thus bring this class action on behalf of themselves and all other similarly situated consumers who purchased seminars, workshops, mentorships, retreats and/or programs

(collectively "Seminars") from Trump University throughout the United States, asserting claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL" or "§17200"); the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq*. ("CLRA"); the False Advertising Law, Cal. Bus & Prof. Code § 17500 *et seq*. ("FAL" or "17500"); Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Money Had and Received; Negligent Misrepresentation; Fraud; False Promises, Financial Elder Abuse, Cal. Welf. & Inst. Code § 15600 *et seq*. ("Elder Abuse"); and § 39 of New York General Business Law ("Deceptive Acts and Practices"). Plaintiffs seek damages and equitable relief on behalf of the Class, which relief includes, but is not limited to, the following: refunding Plaintiffs and class members the full amount paid for Trump University Seminars; an order enjoining Trump from falsely marketing and advertising its Seminars; costs and expenses, including attorneys' fees and expert fees; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiffs and the Class.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367, because the Plaintiffs reside in various states, including California, Missouri, and New York,  and are therefore diverse from the Defendant Trump University who resides in New York.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

19.     This Court also has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), as to the named Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5 million, and members of the Class reside across the United States and are therefore diverse from Trump University.

20.     This Court has personal jurisdiction over Trump University because it is authorized to conduct business in California, it has significant minimum contacts with this state, and/or Trump University otherwise intentionally availed itself of the laws and markets of California through the promotion, marketing, and advertising of its Seminars in this state.

FIRST AMENDED CLASS ACTION COMPLAINT

21.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper under 28 U.S.C. §1391(a)(3), because Trump University is subject to personal jurisdiction in this District as it transacts a substantial amount of its business in this District. Indeed, Trump University has offered and continues to offer numerous Seminars in San Diego, California. Plaintiffs are filing concurrently herewith an affidavit stating facts showing that this action has been commenced in a proper county pursuant to Cal. Civ. Code § 1780(c).

## PARTIES

22.     **Plaintiff Tarla Makaeff -** Plaintiff Tarla Makaeff resides in Corona Del Mar, California. During the class period, in early August, 2008, Plaintiff Makaeff was introduced to Trump University through a friend who attended the free introductory seminar and invited her to attend the three-day Trump University "Fast Track to Foreclosure Training" workshop for approximately $1,495. During the three-day workshop, Plaintiff Makaeff was told to raise her credit card limits so she could enter into "real estate transactions." However, at the end of the session, Trump University told Plaintiff Makaeff and the other Seminar attendees to use that credit to purchase an additional Trump "Gold" seminar for $34,995. Based on Trump University's numerous misrepresentations, on or about August 10, 2008, Plaintiff Makaeff enrolled in Trump University's "Trump Gold Elite" Program ("Trump Gold Program") for $34,995, plus the variable APR finances charges, interest fees, and late fees she has to pay her credit card company. Plaintiff Makaeff ultimately spent nearly ***$60,000*** on Trump University Seminars, and/or seminars related to or endorsed by Trump University, over the course of one year.

23.     **Plaintiff Brandon Keller -** Plaintiff Brandon Keller is a San Diego resident who resides in Del Mar, California. During the class period, in the fall of 2009 Plaintiff Keller received an email advertisement about Trump University and, as a result thereof, on November 18, 2009 he attended the free introductory real estate seminar at the Marriott in La Jolla, California. At the free introductory seminar, Plaintiff Keller was lured by the Trump University speaker into purchasing a $1,500 three-day workshop, which he attended from Friday December 6, 2009 through Sunday December 8, 2009 at the San Diego Hilton Bay hotel. During the three-day workshop, Plaintiff

FIRST AMENDED CLASS ACTION COMPLAINT

Keller was told to raise his credit card limits so he could enter into "real estate transactions." However, at the end of the session, Trump University told Plaintiff Keller and the other Seminar attendees to use that credit to purchase the $35,000 Trump Elite seminar. Based on Trump University's numerous misrepresentations, on or about December 8, 2009, Plaintiff Keller enrolled in Trump University's Elite seminar for about $35,000, plus the variable APR finances charges, interest fees, and late fees he has to pay his credit card company. As set forth more fully below, contrary to Trump University's promises, Plaintiff Keller was never provided any assistance with real estate investing. Pursuant to Plaintiff Keller's requests, he was refunded his $35,000 for the Elite seminar; however, Trump University refuses to return to Plaintiff Keller his $1,500.

24. **Plaintiff Ed Oberkrom -** Plaintiff Ed Oberkrom is a 65-year old senior citizen who resides in St. Louis, Missouri. During the class period, in February, 2009, Plaintiff Oberkrom was lured by Trump's advertising into attending a "free" introductory Trump seminar, wherein Plaintiff Oberkrom purchased a three-day Trump University mentorship for two for approximately $1,495. During the three-day workshop, Plaintiff Oberkrom was told to raise his credit card limits so that he could enter into "real estate transactions." However, at the end of the session, Trump University told Plaintiff Oberkrom and the other Seminar attendees to use that credit to purchase an additional Trump Seminar. Based on Trump University's numerous misrepresentations, in March, 2009, Plaintiff Oberkrom enrolled in Trump University's Elite seminar for two for about $25,000, plus the variable APR finances charges, interest fees, and late fees he has to pay his credit card company. Despite Plaintiff Oberkrom's requests, Trump University refuses to refund any of Plaintiff Oberkrom's money.

25. **Plaintiff Patricia Murphy -** Plaintiff Patricia Murphy resides in Bronx, New York. During the class period, Plaintiff Murphy was lured into attending a free introductory Trump seminar by radio and/or television advertisements that Donald Trump was holding a free seminar. Plaintiff Murphy then purchased three Trump University weekend seminars, coaching sessions and software. Plaintiff Murphy took out her life savings and spent approximately $12,500 on these seminars, software and mentoring. As with the other Plaintiffs and the Class, Plaintiff Murphy did not realize she was being scammed until it was too late.

8

1   26.   **Plaintiff Sheri Winkelmann -** Plaintiff Sheri Wilnkelmann is a singer, award-

2   winning actress and entertainer who resides in Palatine, Illinois, outside of Chicago.  During the

3   class period, in or around January, 2010, Plaintiff Winkelmann saw an advertisement for Trump

4   University's free introductory real estate investing seminar on the internet.  In reliance on the

5   advertising and the promise of learning priceless real estate investing information from the master,

6   Donald Trump, she attended the free seminar on or about February 10, 2010 in Lombard, Illinois.

7   At the free introductory seminar, Plaintiff Winkelmann was lured by the Trump University speaker

8   into purchasing a $1,500 three-day workshop, which she attended from Friday February 26, 2010

9   through Sunday February 28, 2010 at the Lombard Westin outside of Chicago.  The $1,500 seminar

10  did not provide the real estate investing information promised; the instructor, Gerald Martin, just

11  talked in circles and didn't answer anyone's questions directly.  During the three-day workshop,

12  Plaintiff Winkelmann filled out a detailed personal financial information sheet under the guise that

13  Trump University representatives were going to review it and help assess the best real estate

14  investments for her.  She had to list her bank accounts, balances, any investments, all her credit

15  cards, and the credit limit and credit available on each.  She dutifully did so, believing this was to

16  benefit her, when in fact, Trump University was merely compiling this information so that it could

17  ascertain which students had enough money or credit available on their credit cards to purchase its

18  next $35,000 level seminar.  Sure enough, Winkelmann and others who had sufficient available

19  credit were called out for a "private consultation."  Trump representatives convinced her that she

20  should charge the $35,000 fee – spreading out the amount over *5 credit cards* – because she would

21  "make it back the first month," and it would "change her life."  Based on Trump University's

22  numerous misrepresentations, Plaintiff Winkelmann started filling out a contract for the $35,000

23  seminar, but she never signed it.  Trump did not let this fact get in the way of a sale – Trump

24  representatives simply ***forged her signature on the contract*** and charged her five credit cards for the

25  $35,000.  Winkelmann contacted her credit cards and requested the transaction be cancelled and

26  money refunded.  Winkelmann realized that Trump had forged her signature on the contract when

27  Trump responded by submitting to the credit card companies copies of the forged contract.  Her

28  credit cards each opened fraud investigations, and after Winkelmann provided them with the 2

9

1  copies of the contracts – the unsigned version and the version with her forged signature – they

2  refunded her the $35,000.  However, Winkelmann still seeks to recover the $1,500 she spent on the

3  initial seminar which Trump has refused to refund.

4          27.     **Defendant Trump University, LLC** - Defendant Trump University, LLC (aka

5  Trump Entrepreneur Initiative) is a New York limited liability company registered in New York.  In

6  response to demands by the New York Department of Education, and after the initial Complaint in

7  this action was filed, it changed its name to "The Trump Entrepreneur Initiative" on June 2, 2010.

8  Its executive offices and company headquarters are located in New York, New York.  Donald J.

9  Trump is the chairman of Trump University, as well as the chairman and president of The Trump

10 Organization.  Trump University conducts a substantial amount of business throughout the State,

11 including marketing, advertising, and hosting Seminars in San Diego County and all over California.

12         28.     The true names and capacities of defendants sued herein as Does 1 through 50,

13 inclusive, are presently unknown to Plaintiffs who therefore sue these defendants by fictitious

14 names.  Plaintiffs will amend this Complaint to show their true names and capacities when they have

15 been ascertained.  Each of the Doe Defendants is responsible in some manner for the conduct alleged

16 herein.

17                              **DEFENDANT'S UNLAWFUL CONDUCT**

18         29.     Trump University is an "education" company owned and founded by real estate

19 tycoon Donald J. Trump, Sr., as part of the Trump Organization.  It offers courses in real estate, asset

20 management, entrepreneurship and wealth creation.  It is not an accredited University.

21 Trump University lures consumers in with a free introductory Seminar, which turns out to be nothing

22 more than an infomercial used to "up-sell" and persuade students to purchase its $1,495 "one year

23 apprenticeship" course. If students purchase the $1,495 course, Trump University continues using

24 misleading, fraudulent and predatory practices to convince students to purchase Trump University's

25 $35,000 "Gold" course.  Even then, after investing nearly $36,500, students still do not receive the

FIRST AMENDED CLASS ACTION COMPLAINT

information or training they were promised. The three "tiers" to the Trump University program are as follows:

**First tier: the Free Introductory Course**

30.     Trump University advertises extensively in local media and online, such as online local newspapers, on Facebook, and radio for "Free" introductory courses, which take place in cities across the country.  In marketing the Trump University program, Donald Trump claims: "I'm going to give you 2 hours of access to one of my amazing instructors AND priceless information ... all for FREE."[3]  An advertisement in the L.A. Times, for example, quoted Donald Trump as saying that "investors nationwide are making millions in foreclosures . . . and so can you!" It also p**romised two hours of "priceless informat**ion . . . all for free."[4]  Other advertisements urged consumers to "Learn from the Master" – Donald Trump," that "It's the next best thing to being his Apprentice," and told consumers that they would learn "insider success secrets from Donald Trump."





[3] *See L.A. Times, "Trump Spins in Foreclosure Game,"* by David Lazarus, Dec. 12, 2009, http://www.latimes.com/business/la-fi-lazarus12dec12,0,7835610.column

[4] *See L.A. Times,* "*Trump's a grump about column on his 'priceless' tips"* by David Lazarus, Dec. 16, 2009, http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column. When L.A. times reporter David Lazarus attended the Pasadena Hilton Trump seminar, he: "learned by attending the seminar, the event was a two-hour sales pitch for a three-day workshop that would cost people $1,495." *Id.*

[5] Screen shot from http://www.trumprealestate.com/market-Phoenix.html?cid=726078 (last updated 2/3/2010).

[6] Screen shot from http://www.trumpuniversity.com/ (last updated 2/3/2010).

[7] Screen shot from http://www.trumptactics.com/ (last updated 2/3/2010).

FIRST AMENDED CLASS ACTION COMPLAINT

31.     At the free seminar, prospective customers are greeted by a large screen projector and two tall banners with Donald Trump's photo on them.  The speaker, who is following a Trump University script, begins addressing the audience with scare tactics.  A large portion of the audience is typically comprised of senior citizens, and the speaker plays on their fears, asking "How many of you lost a lot of your 401k investment in the market?  How many of you are retired or want to retire?  How many of you want to leave a legacy or property to your kids?"

32.     The speaker induces the audience to trust in the Trump name and "family" by walking through the history of the Trump Organization and Donald Trump's "humble beginnings."  He tells the audience that 76% of all millionaires are created from real estate – that "anyone can do it," and that "it's not easy, but it's simple if you know what you're doing, and we'll teach you what you need to know."  He states that the mission of Trump University is to "train, educate and mentor entrepreneurs on achieving financial independence through real estate investing."

 

33.     The speaker emphasizes that on the television show, "The Apprentice," Mr. Trump could only work with one person a year, so he created this University – not to make money for himself, but to teach others.  With this apprenticeship program, the speaker claims, "Mr. Trump takes you through an entire apprenticeship for one year."  The speaker emphasizes that ***Trump University is owned, lock, stock and barrel by Mr. Trump – it's his 'baby,' his company***, designed to help him accomplish his goal of leaving a legacy."  The presentation plays on consumers'

---

[8] These and the following slides are from the free online introductory Trump seminar.

reliance on the Trump name, Trump's Apprentice television show, the Trump reputation, Trump's wealth and Trump real estate expertise:

  

34.     The presentation claims that the real estate transactions taught are safe and conservative.  The speaker encourages members of the audience, including the elderly, to cash out their 401Ks so they can supposedly make a higher return. He tells them, "this is by the numbers, and the numbers don't lie.  This isn't speculative. It's a good idea."  These strategies will make you money – they are time tested strategies that have been in the Trump family for over 75 years. You can allegedly pay off your credit cards, pay off your cars, fully fund your retirement and send your kids to college.

 

35.     The whole presentation is essentially an "infomercial," designed to get members of the audience to sign up for the so-called one year Apprenticeship Program, which is purportedly going to be "A Comprehensive Real Estate Education."   However, what the "one year apprenticeship" program actually turns out to be is merely a three-day workshop plus a phone number to call a "client advisor" for $1,495.

36.     Trump University promises "12 months of training," because "there's no shortcut to success."  They also promise mentors who will be available for a ***full year***.  ***"Other people don't***

1  ***have anyone to call, but you've got Trump.  You'll call 40 Wall Street [Trump University], and***

2  ***they'll walk you through it."***  They claim that after this seminar, "you're going to be walking on

3  Cloud 9 because you get it; you know so much." The speaker says you can attend the first day and

4  then decide if the course is right for you.  Your "Satisfaction is 100% Guaranteed."  The speaker

5  even says he will give you his personal email; he wants that connection with you, so you can become

6  part of the Trump family.

7      37.     Trump University even promises that you will receive instructors and mentors who

8  were "***hand-picked by Trump***."  This is simply not true.  Trump did not hand-pick these instructors

9  and mentors.  In fact, in most cases he didn't even know who they were, and in many cases, he had

10  never even ***met*** them.

11  **Second Tier: the 1-year "apprenticeship" (actually a three-day infomercial)**

12      38.     **One Year Apprenticeship** – Defendant describes the second tier as a one year

13  "apprenticeship" that allegedly provides a, "comprehensive real estate education."  In actuality, it is

14  merely a three-day infomercial to sell more Trump products.  Trump University tells students at the

15  free seminar that this one-year apprenticeship is "all you need."  However, rather than teach students

16  actual real estate techniques and how to fill out the necessary contracts and forms (as promised in the

17  free seminar), the entire "apprenticeship" is a three-day long "infomercial" to "up-sell" students to

18  buy the Trump Gold Program for $34,995 to get a "full education."

19

20      39.     **Inducing students to increase credit card limits** - During the seminar, the speakers

21  demand that students raise their credit card limits by "4 times" their current limits on class breaks so

22  that they can be ready to immediately purchase property.  The speakers also ask each student to fill

23  out a detailed financial statement, presumably for real estate investment purposes, and personally sit

24  down with each student to review and assess their financial situation under the guise of helping them -

25  -- in fact, they assess how much money each student has to spend on the next Trump seminar.  At the

26  end of the workshop, Trump's real reason for urging attendees to extend their credit limits becomes

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

clear: the Trump representatives ask the students to use their increased credit to purchase the next level of buy-in, the Trump University "Gold Elite" seminar, for $34,995. Trump reps predominantly pushed the "Trump Gold Elite" program for $34,995, but if they were unable to persuade students to purchase at this level (or if students did not have sufficient credit), Trump would encourage the students to purchase the "Trump Silver Elite" program for $19,495 or the "Trump Bronze Elite" seminar for $9,995. Each of these prices were purported to be "one-day-only" price savings off their "regular" prices of $48,490, $23,490 and $10,995, respectively. *See* Ex. A, Trump Enrollment Form.

40.     Trump representatives don't tell students that they are likely to incur finance charges, interest fees and late fees by charging this expensive seminar on their credit cards. Trump also does not tell students that by increasing their credit limits, they could damage their credit scores. Trump representatives also never inform students that by "maxing out" their credit cards, their credit scores could drop even more significantly. In fact, when Plaintiff Makaeff "maxed out" her credit card, her previously high credit score immediately dropped.

41.     Instead, Trump representatives encourage students to max out their credit cards to pay the for the $35,000 seminar, telling them to "not worry," because "you'll make it back in 30 or 60 or 90 days." They knew that this was extremely unlikely, and that few, if any students did so.

42.     **Misrepresentations regarding calling student real estate "leads"** - students were also told at the free seminar that if they signed up for the $1,500 seminar, they could bring in five to ten real estate leads and Trump University representatives would call them during the seminar. Students were told: Go get 5 for-sale-by-owner leads (FSBOs) in lower-middle income areas, with a phone number and an address for each property, and 5 "for rent" ads. "***Our trainers, the best at Trump, will call these for you. If they close the deal, you get to keep the profits***. But at the very least, you get to watch and listen to the best deliver the correct words to get the right results, and you get to watch it happen. No one else will do that. But we do – we're Trump, we're bold; we're the

best."  However, at each $1,500 seminar, Trump reps would call the leads of only one or students, even if dozens of students had brought their leads in.

43.  **Mentorship -** Trump University promises students who purchase the $1,495 seminar an "entire year apprenticeship" --"one full year of expert, interactive support" where "you will be trained properly by the best."  But in actuality, students get only a three-day seminar and an 800-telephone number to call.  Trump does not provide the details, support or training the students need to actually engage in the real estate transactions mentioned.   Nor does it provide any mentorship.

44.  **Illegal practices** – Furthermore, the real estate practices touted by Trump University during the seminar include transactions that are illegal in certain states, including California, such as posting anonymous "bandit signs."  These are signs placed by the roadway that mimic yellow and black road warning signs and say, "WE BUY HOUSES, 619-222-2222."  Trump instructors also instructed students how to engage in real estate transactions which would be sanctionable as practicing real estate without a real estate license.

45.  **Conflict of interest** – As part of the $1,495 seminar, Trump University promises to introduce students to a Trump "power team" of mentors, real estate agents, brokers, contractors, attorneys and accountants, who were "***hand-picked by Donald Trump***," and will help the student make money in real estate.  However, these Trump "mentors" and power team members were not "hand-picked" by Donald Trump – he often does not even know who they are.  Even worse, these mentors and "power team" members often guide the students toward deals in which they have a personal financial interest at stake – creating a severe conflict of interest, so that the mentors profit while the student does not.

46.  **Money back guarantee and cancellation policy**– students consistently complain that they have timely requested refunds under Trump University's money-back guarantee, but that Trump University failed to refund them their money.  In addition, Trump deliberately has designed its

FIRST AMENDED CLASS ACTION COMPLAINT

program and cancellation policy so that once students realize they are not getting the information promised, it's too late to cancel. For example, in regard to the $1,500 seminar, students must cancel by the end of the first day (Friday) to get a full refund.  However, on Friday, students are told that all of the "good stuff" is going to happen on Saturday.  On Saturday, Trump reps will call the students' leads, they will review their financial profile to assess what real estate investments are appropriate, and will tell them about exclusive mentorship opportunities with Trump. Therefore, students are baited into waiting until the next day, and letting the cancellation period expire, to see if Trump will deliver – which it does not.

**Third tier – the $35,000 Mentorship Program**

47.     By the end of the $1,495 seminar, Trump University did not teach students practical real estate techniques.  Instead it merely gives them a high-pressure sales pitch to purchase another program from Trump: the $34,995 "Trump Gold Program." Plaintiffs and other students were clearly reluctant to spend approximately $35,000 more on an additional program, after already paying Trump nearly $1,500.  However, Plaintiff and the other students relied on the speakers' claims that they were "guaranteed success" if they followed the techniques they would learn in the Gold seminar.

48.     Trump University's representatives told Plaintiff and class members that with the real estate mentorship they would receive in the Trump Gold Program, they could create a real estate investing business that could earn up to tens of thousands of dollars of monthly income, and potentially much more.

49.     The same misrepresentations regarding the "on-going apprenticeship," "hands-on mentorship," conflicts of interest with the mentors and "power team," teaching of illegal real estate practices, and failure to refund money timely requested also occurred during the Trump Gold Program.

FIRST AMENDED CLASS ACTION COMPLAINT

50.   **Mentorship –** One of the biggest selling points of the Gold Program was the promise of a three-day Field Mentorship with real estate experts and investors.  Trump University represented to Plaintiff and class members that the value of this mentorship alone was worth $25,000.  *See* Ex. A (Contract for the Gold Program).  Plaintiff and class members were told that they would receive priceless insight and information from these mentors who were experts in the real estate industry, who would personally teach them what they would need to know.  Instead, during the 3-day mentorship, students typically spent two days looking at real estate properties (which they could have done with a realtor for free;  and were offered no unique insight or guidance), a half day at a local Home Depot and lunch, and an hour or so discussing numbers.  Mentors spent little to no time discussing the contracts essential to the real estate transactions mentioned in the seminar. After the 3-days, the mentors typically quickly disappeared, in complete contradiction to what was promised: an ongoing mentor who would personally assist the student for an entire year.

51.   During the Gold Program, there was still constant up-sell pressure to purchase various other Trump University affiliate programs and products, varying in price from $495 to $9,995.

52.   Makaeff and the other students in her class who signed up for the $34,995 seminar were told that deals would now be coming their way via e-mail and that "these deals are starting to POUR IN NOW."  However, few, if any deals came in, and those that did provided only minimal positive cash flow, generally not worth enough to make the deal worthwhile, and certainly not the "tens of thousands of dollars per month" promised by Trump.

53.   Trump University promised students that it would give them the contracts they needed to conduct various complex real estate transactions and teach them how to fill them out – they never did.  Even after the $35,495 program, and after numerous phone calls to Trump University, Plaintiff and other class members were not instructed how to use the contracts they would need to conduct the real estate transactions described.

FIRST AMENDED CLASS ACTION COMPLAINT

**Trump University receives D- rating from Better Business Bureau**

54.     In January, 2010, the Better Business Bureau gave Trump University a ***D-minus rating***.  In addition, the New York Department of Education has recently demanded that Trump University remove "University" from its title, insisting that the "use of the word 'university' by your corporation ***is misleading and violates New York Education Law*** and the Rules of the Board of Regents."[9]

**Complaints from Numerous Trump University Students Nationwide**

55.     Plaintiffs are not alone in their complaints regarding Trump University's misrepresentations and unscrupulous conduct.  Indeed, there are endless complaints nationwide on the internet that echo Plaintiffs' complaints, including, for example:

- This recent post on http://www.reviewopedia.com/trump-university.htm, from Susan in Michigan was posted on April 11th, 2010: "We purchased a mentor program for $19,000 in December 2008. ***We did not receive the promised materials or mentor service***. We canceled immediately, calling both Rochester NY & Boca Raton FL. Unfortunately we paid by check and did not have a credit card company to help us get our money back. We have made several call, emails, faxes, etc. ***We've been lied to, deceived***, promised the person with "authority" would call us back immediately (doesn't matter when you call, they are never in) and told there was a glitch in their system and our refund was being processed. ***We still do not have our refund*** and they continue to play the game. Does this sound like Donald Trump is an honest man concerned with helping you build wealth?"

- Charles from Florida posted this on September 21, 2009, "I was told that after taking the first 3 day seminar, which cost $1,500 I could go out start making deals. …***The only thing they want you to do is sign up for the next seminar*** which can cost up to $35,000." http://www.reviewopedia.com/trump-university.htm

- Joe from Florida posted this on September 18, 2009, "***What a SCAM*** I attended the three day seminar and ***really learned very, very little. [Their] goal is to talk you into joining the next seminar***, which can cost up to 35,000.  They use almost Gestapo tactics to sign for this

---

[9] *See* NY Daily News.com, "State Educracts Give Failing Grade to Donald Trump's 'Misleading' Trump University, by Douglas Feiden, April 16, 2010, and CBS MoneyWatch.com, "Is Trump University Flunking Out," by Lynn O'Shaughnessy, April 19, 2010.

FIRST AMENDED CLASS ACTION COMPLAINT

seminar. Any questions you ask are never answered." http://www.reviewopedia.com/trump-university.htm

- L. Heard from Georgia had this to say on June 23, 2009, "*I have been trying to get my money back* from attending one of the seminars and have yet to do so. *My contract stated that I had 3 days after date of purchase to cancel and I did so in 1 day*. I attended the seminar on March 22, 2009 and here it is June 22, 2009 all they can tell me is that they see that I have done all that I was supposed to do but they don't know what is taking so long to refund my money." http://www.reviewopedia.com/trump-university.htm

- Dorla from California posted this on, June 10, 2009, "Trump University is a major disappointment. *They charged me $35,000 for the program, which I would never have paid if I had known that the info given to me was not true*. I based my decision on that info! They would not return even a portion of my money after several long and tearful conversations, even after agreeing the info was outdated and they would have to do something about it. I would strongly suggest never using them. There are other gurus out there that are honest and don't cost as much !!! *I can't believe Donald Trump would allow such mis-behaving to be associated with his name. Run fast and keep running* where they are involved!" http://www.reviewopedia.com/trump-university.htm

- Yu from Los Angeles posted this on March 25, 2009, "I signed up the tax lien products & as the organization promised "Full Money Back Guarantee" within 10 days. I called at least 10 times the organization & they keep on telling me different time frame & story about why they delayed to refund me. It's been the 25th business days, have *NOT yet received my refund*. *I checked BBB & found they did have a lot of fraud issues*." http://www.reviewopedia.com/trump-university.htm

- Linda from Newark, California had this to say on March 6, 2009,  "I took several Trump classes and spent well over $15,000…. They give you a ton of information and then *leave you high and dry. No support what so ever!!!!*" http://www.reviewopedia.com/trump-university.htm

- Rhonda from Georgia claimed *her identity was used by Trump University without her permission* (post from September 30, 2009), "Just had someone write me and call that said that they graduated from Trump University's 3 day course and was led to me by *James Harris who said that I was a student there*. Okay - *that's not true*. Then, he also said that when I came to him as a student I was almost broke and that the course made me successful. Wrong again! I have never been a student of his or the school I and never been broke.  That is slander and I would watch someone who makes up stuff to make their product look better. Hopefully the success of the school is not based on lies. Whereas I am successful - #1 Real Estate Agent in Georgia, 6 years in a row, it was not because of Trump University or James Harris which I had no idea existed until it was brought to my attention." http://www.reviewopedia.com/trump-university.htm

- On December 13, 2009 another consumer that was scammed by Trump University wrote, "*Do not trust Trump University! This company is a well designed scam using the name of*

FIRST AMENDED CLASS ACTION COMPLAINT

***Donald Trump who apparently doesn't care*** how much more Americans get hurt this year and the next ones by a weak economy. Instead he's using it to take advantage of you. They will do whatever (and I mean, whatever) it takes to get you to open your pockets to invest in their company. I am sure there are tons of people like me who have lost precious money because of them. So if you have to borrow and have no credit to do this or even if you have good credit, don't! They will rob from you...***this is modern day robbery***...and then they will place in a very dangerous position. You could lose equity in your house if you have to borrow to attend, ***you could damage your credit*** if you have to max out your credit cards, or you could even lose your house like so many Americans because that last bit of money that was supposed to get you through another six months or year for mortgage payments is now gone based on a false promise! The scam in all of this is that the information always skims the surface. No matter the class, ***you get loads of advice on buying more classes, not advice on execution***. They will never tell you that it takes 1000 steps to do something and instead magnify the few positive points of real estate. Don't be fooled by them or their grand statements of flipping a house with 10 hours of work. They are full of it! I know because I have been through it….***Oh and when they tell you they'll be there for you, they'll scram as soon as they've collected the dough***. The instructors are there for their 3 day classes and then off to the next city to convince more unsuspecting prospects to drop 15-35G's…. http://trump-university.pissedconsumer.com/trump-university-reviews-20091213164344.html

- On January 20, 2010, another consumer wrote, "***Trump U preys on the elderly***.  This is the biggest SCAM I've ever seen!  ***My 82 year old father went to a free seminar*** promising to make him rich through real estate.  ***The seminar was solely for the purpose of upselling him into attending a $1500 three day workshop*** by promising him they would teach him how to buy and sell foreclosures for huge profits (which is totally unrealistic because the vast majority of foreclosures today are because people are upside down in their homes) Anyway, he goes to the 3 day workshop and when he comes home we find out that they pressured him into spending $35k MORE!  I don't care who you are there is no real estate course worth $35k.  Then he proceeds to tell us how ***the majority of people there were SENIORS like him!***  These aren't long term investors here, these are people being tricked into thinking they can make a quick profit!  ***If this isn't the definition of preying on the elderly then I don't know what is***." http://www.moneystance.com/trump-university-reviews

- On December 13, 2009 another consumer stated that, "***Trump University and their staff should be ashamed of themselves! They RUINED my credit!!!*** They told me I would get my large investment back in my first real estate deal because I would have access to amazing mentors and course content. I did what they told me in all of the courses and it was nonsense! ***I maxed out my credit cards*** because I thought Donald Trump wouldn't have such a sorry excuse for a school just to make more money. But he is a greedy man so I should have known.  ***Be aware that when they tell you to increase your credit limit to purchase real estate it's really to scam you out of tons of money*** that you've worked so hard for." http://www.complaintsboard.com/complaints/trump-university-c288699.html

- On November 3, 2008, another victim stated, "At the retreat, the only three things that happened: they pre-qualify you for their $35,000.00 GOLD PACKAGE, [2] ***they ask you to call all your credit card companies and request a credit limit increase (so you can pay for***

FIRST AMENDED CLASS ACTION COMPLAINT

*the 35K*), then during three days the sell you over and over their mentoring services and keep telling you that the information you are waiting to hear is coming… three days later nothing worth is mention. Their material is completely worthless. 100+ pages of content-empty power point print outs.  I requested a refund, both in person and in writing and was denied….BE    AWEARE,    THESE    ARE    MASTERS    OF    THE    SCAM…" http://www.complaintsboard.com/complaints/trump-university-c118292.html

- On February 27, 2009, Patt from Sacramento, California wrote: "*Trump University real estate programs are ALL scams*. I paid the $1500 for the 3 day course which turned out to be three days of them trying to get me to sign up for the $21,000 gold course. They *ask for all your financial information* (which fortunately I refused to give them) and then spend the remaining "class time" pulling people out to *hard close them on the gold program and private coaching*." http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-rip-off-of-th-99exd.htm

- On June 19, 2008, Truth from Brooklyn, New York stated:  "I wished I saw this site BEFORE I fell for paying the $1,500 at the free seminars.  *they will take your money and the 3 day event will be used to make you buy more stuff.  and even after you buy more stuff, they will sell you more*.  am not sure how much trump is making from this. But, i do feel that if he know what bull they are teaching, he would not authorize to use his name.  as you may know, this is the same things that other companies are doing to sell you more and more training.  the only difference in this situation is that they use trump name." http://www.ripoffreport.com/seminars/trump-university-tru/trump-university-trump-seminar-pcc44.htm

- On March 20, 2008, another consumer from Las Vegas, Nevada that was scammed by Trump University wrote: *Trump University will rip you off….They do not teach you what they say they will teach you and what you have paid for*. They also do not deliver what they say they will deliver and if you ask for a refund on something that you have not received they will not give it to you.  All that I can say is do your research." http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-is-a-scam-w-eba5e.htm

- On August 7, 2007, a real estate investor from New York, New York wrote: "*Trump University is the biggest scam EVER!!!* After speaking with most everyone employed *there only ONE yes, ONE person on their staff invests in real estate*. I have tried to blog several times asking if Mr. Michael Sexton (President of Trump University) has properties and I have never received a response.  I paid over $20,000.00 after they told me that I would get personalized service and all I got was a box filled with books to read and terrible software that costs under $500.00 when buying from Barnes & Noble. The live events were a total joke and even the main presenter there barely has investing experience. I fortunately have enough money to not go broke because of them but *almost everyone there took out loans or maxed out their credit cards to get this trash service*. It is just like every other late night infomercial and am disgusted by Mr. Trump being affiliated or supporting this program. I have talked to several different people there because each person I get handed off to quits or got fired from the organization. They don't know what they are doing *and are preying on the weak who are just trying to make it in life*!!!!!!!! SHAME ON YOU MR TRUMP AND

TRUMP   UNIVERSITY...."   http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-scam-to-steal-s3c7s.htm

## PLAINTIFFS' FACTS

**Plaintiff Tarla Makaeff**

56.     Tarla Makaeff purchased the three-day Trump University "Fast Track to Foreclosure Training" workshop for approximately $1,495.  Two people were permitted to attend for the $1,495 price, so Plaintiff Makaeff attended with a friend and split the cost.  During the three-day workshop, Plaintiff Makaeff was told to raise her credit card limits four times so she could enter in to "real estate transactions."  However, at the end of the session, Trump University revealed its real reason for pushing Plaintiff Makaeff and class members to extend their credit limits: to use that credit to purchase an additional $35,000 Trump seminar.  Based on Defendant's numerous misrepresentations, on or about August 10, 2008, Plaintiff Makaeff enrolled in Trump's Gold Program for $34,995, plus the variable APR finances charges, interest fees, and late fees she had to pay her credit card company.

57.     The day Plaintiff Makaeff signed up for the $34,995 program, James Harris immediately told Plaintiff Makaeff that he would now be personally available to her by phone and e-mail, and shortly thereafter e-mailed to her "we can do a ton together."  Then, she never heard from him again.

58.     **"Guarantee" that Plaintiff Makaeff's first deal would pay for her $35,000 seminar** - While Plaintiff Makaeff was on the fence about spending the additional money, Trump University speaker Tiffany Brinkman persuaded Plaintiff Makaeff to sign up by "guaranteeing" Plaintiff Makaeff that her first real estate deal would earn her in the ballpark of $35,000, so that she could immediately pay off her Trump University debt, leaving only profits for the future. Although Plaintiff Makaeff signed up for the seminar in reliance on this representation, it could not have been farther from the truth – Plaintiff Makaeff participated in *no* real estate deals, and never made *any* money.

FIRST AMENDED CLASS ACTION COMPLAINT

59.     **Mentors** - Plaintiff Makaeff was assigned two mentors, and initially, the mentors would return calls, but would only speak to Plaintiff Makaeff for 2-3 minutes, offering no practical advice.  After that, although they were supposed to provide "mentorship" to Plaintiff Makaeff for a full year, they mostly disappeared.  After Plaintiff Makaeff complained about the lack of assistance provided by her assigned mentors, Rick McNally and Mike Kasper, Tad Lignell, the mentor with the "power team," offered to help her personally, but then engaged in misappropriate conduct and misadvised her regarding a property in Las Vegas in which he had a personal financial interest.

60.     After spending approximately *$60,000* over the course of an entire year to attend numerous Trump University related or endorsed seminars, only two real estate deals ever came to Plaintiff Makaeff, and Plaintiff Makaeff did not accept either, as both were flawed and appeared unprofitable.

61.     In one of the two deals offered to Plaintiff Makaeff, Trump mentor Tad Lignell introduced Plaintiff Makaeff to a real estate agent, Noah Herrera of Las Vegas regarding a property purchase in Las Vegas. Lignell did not disclose to Plaintiff that he had a financial interest in referring Trump students to Noah Herrera. ***The Power Team then misquoted comps to Plaintiff Makaeff.*** Rather than making a profit on the deal, as she would have made if the comps had been correct, she would have likely suffered a 20% *loss* on the transaction.  When she discovered that the comps were incorrect and that she was likely to lose money on the deal, she looked for a way out.  As it turned out, Mr. Lignell's protégé fraudulently and illegally altered the real estate documents Plaintiff Makaeff had previously signed at the escrow office without Plaintiff Makaeff's authorization or approval.  As a result of this illegal and fraudulent conduct, Plaintiff Makaeff was permitted to void the transaction, which she did.

62.     The only other real estate transaction that came Plaintiff Makaeff's way involved a Houston property.  After being told by Trump representatives that the deals "are starting to POUR

1   IN NOW," the only deal that came in was a Houston deal.  It was outside of Trump University's

2   recommended guidelines for real estate investing, as it would provide only $40/month positive cash

3   flow, and Trump's own representative, Stephen Gilpin instructed Plaintiff Makaeff never to accept a

4   deal under $100/month positive cash flow.  Furthermore, this potential deal raised an inherent and

5   improper conflict of interest, as it was referred by a partner (Mike Kasper) to the Trump mentor,

6   Rick McNally, who stood to financially benefit from the deal.

7        63.      **Bandit signs** - Furthermore, certain real estate practices that Trump University

8   taught Plaintiff Makaeff and other class members during the Seminars included transactions that are

9   *illegal* in California and other states, such as posting anonymous "bandit signs."  These are the signs

10  that are posted by the side of the roadway, mimic black and yellow road warning signs and say, "WE

11  BUY HOUSES, 619-222-2222."  Plaintiff Makaeff was posting bandit signs, as taught by the Trump

12  seminars she attended, and had no idea they were illegal until she was contacted by the District

13  Attorney's Office and told that those techniques could subject her to *hundreds of thousands of*

14  *dollars in fines, a misdemeanor charge, and up to six months in jail*.  As a result, she was required

15  to retain a criminal attorney.  Makaeff suffered physical and emotional damage as a result of the

16  stress of the DA investigation, as well as continuing financial stress due to the substantial amount of

17  money she lost to Trump.

18        64.      **Makaeff's written and videotaped comments regarding Trump University** –

19  Trump University has attempted to tarnish Makaeff's credibility by stating to the press that Makaeff

20  gave Trump University good written reviews.  After the $35,000 seminar, Makaeff did write a

21  review saying positive things about the program, but her mentors who were supposed to be

22  providing her with a full year of one-on-one mentoring were right there looking over her shoulder,

23  so she did not want to offend them by writing anything negative.  Also, at this point, immediately

24  after the seminar, Makaeff actually believed she would still get the information and mentoring she

25  was promised by Trump.  Like most people who attend the seminar, she did not fully realize she had

26  been scammed until later on.  She kept thinking she would get the help and mentoring she was

27  promised, but it never came.  In regard to the videotape Trump University has referred to in the press

28  as a Trump "testimonial," at the last seminar Makaeff attended in July 2009 on "California specific

strategies," a cameraman shoved a camera in her face unexpectedly and started recording and asking questions.  Again, trying to be polite and not to offend her mentor, whom she still expected to help her with real estate deals, her recollection of the tape is that she replied in general terms that mentors in general are important (without reference to the Trump mentors specifically) and that she had some mentors in her life that had benefitted her.  She did say that she believe real estate knowledge is an important skill to have – and she still believes this – however, Trump's programs unfortunately did not provide her with the real estate knowledge she expected to receive.

**Plaintiff Ed Oberkrom**

65.     Ed Oberkrom is a 65-year old senior citizen who lives in St. Louis, Missouri and purchased the 3-day Trump Seminar for $1,500 in February, 2009 and then went on to purchase the $25,000 Elite seminar in March, 2009.  He attended the seminar after seeing and relying on Trump University advertisements.

66.     Ed and the students in his class were told that the first students to sign up for the $25,000 seminar would be the first to get the best properties on a list, and access to get the best buyers.  The speaker also told them that the first students to sign up would get the first access to an exclusive website of ***properties hand-picked by Donald Trump***.  As he later came to learn, these properties were ***not*** hand-picked by Donald Trump.  And the website was ***not*** "exclusive" at all – anyone could buy it for $39/month.

67.     The Trump University instructor, Steve Goff, sold Ed Oberkrom on the program by telling him that he had family in St. Louis and that he planned to come back to town frequently and would give him personal training. However, once he and Trump got Ed Oberkrom's money, Goff ***hasn't once been back*** to town – or at least he hasn't contacted Mr. Oberkrom.

68.     **Raising credit card limits** - As is standard in all Trump $1,500 seminars, the Trump instructor, Goff, asked all the students to raise their credit card limits – and then purchase the $25,000 or $35,000 "mentoring" program.  Each student was asked to fill out a "gold sheet" of financial information, real estate owned, credit info, etc.

69.     **Mentoring** – During the course of the 3-day seminar, Goff took Mr. Oberkrom out one afternoon to look at some properties, but it was completely unproductive. Goff said that he

1   would follow-up with him and tell him what to bid on the properties, but he never did tell Oberkrom

2   what to bid, and never followed up with him, and the deadlines to purchase the properties passed.

3          70.    **Refund refused** - Mr. Oberkrom was supposed to receive 2-1/2 more days of "in-

4   person" mentoring in regard to the supposed year-long mentorship, but it has been over a year, and

5   despite some discussion of trying to set a date, no mentoring has occurred (and none of the $25,000

6   refunded).  In fact, when Mr. Oberkrom asked for his money back from Trump University, since he

7   never received the mentoring he paid for, Trump told him that because he did not cancel within the

8   3-day rescission period, he was out of luck.

9   **Plaintiff Patricia Murphy**

10          71.    Patricia Murphy is a New York retired schoolteacher from the Bronx.  She was a

11   full-time school teacher for seven years.  After she was laid off and started making less money

12   substitute teaching, she began looking for a way to supplement her income.  She heard

13   advertisements on the radio and television that Donald Trump was having a free seminar and would

14   show her how to be successful and make money in real estate.  She took out her life savings and

15   spent about $12,500 on wealth building seminars, software and mentoring.  She didn't realize she

16   was being scammed until it was too late.

17          72.    According to Murphy, an educator, the seminars did not provide any kind of an

18   education – they were worthless.  Trump instructors promised they would get Murphy connected

19   with investors or banks and guaranteed that they would be at her side – but they never did anything

20   for her.  Hoping to get more individualized help, she paid for additional "mentoring," but her mentor

21   was just as bad – he basically told her to look at the real estate listings in the newspaper – not

22   especially valuable advice.

23          73.    In Murphy's own words, she says: "I took out most of my life's savings, maxed out

24   my credit cards and badly damaged my credit rating.  And what do I have to show for it?  Big bills,

25   interest payments, finance charges – an awful lot of stress."  In fact, the stress was so much, that she

26   had to be hospitalized over Christmas, and she is now in the worst financial condition she has ever

27   been in her life.

28   **Plaintiff Brandon Keller**

FIRST AMENDED CLASS ACTION COMPLAINT

74.     Plaintiff Brandon Keller is a San Diego resident who resides in Del Mar, has a degree in Business Administration/Finance from University of Arizona in Tucson and is currently going to school to become a nurse because he enjoys helping people.   He received an email advertisement about Trump University in the fall of 2009 and attended the free seminar on November 18, 2009 at the Marriott in La Jolla on La Jolla Village Drive.

75.     At the free introductory real estate seminar, the Trump University speaker went through the standard slides and presentation discussed above.   The speaker claimed that he personally made $50,000 after attending the 3-day $1,500 seminar and showed slide testimonials of people who claimed they made $90,000 after attending the $1,500 seminar.

76.     Keller paid for and attended the $1,500 seminar on Friday December 6, 2009 through Sunday, December 8, 2009 at the San Diego Hilton Bay hotel downtown.   He decided to take the seminar because Trump University promised it would teach students specifically how to make money in real estate without using any of their own money.   Trump representatives also promised students that with the $1,500 seminar, they would have access to a real estate coach and program director, Paul Reisner, for a full year – neither provided any assistance to Keller with real estate investing.

77.     **Misrepresentations regarding calling student real estate "leads"** – Keller and the students at his free introductory seminar were told that that if they signed up for the $1,500 seminar, they could bring in five to ten real estate leads and Trump University representatives would call them during the $1,500 seminar. Students were told: Go get 5 for-sale-by-owner leads (FSBOs) in lower-middle income areas, with a phone number and an address for each property, and 5 "for rent" ads.  "***Our trainers, the best at Trump, will call these for you.  If they close the deal, you get to keep the profits***.  But at the very least, you get to watch and listen to the best deliver the correct words to get the right results, and you get to watch it happen.  No one else will do that. But we do – "we're Trump, we're bold; we're the best."  However, at the $1,500 seminar, even though there were 30 people in the class, including Keller, who brought in potential real estate leads, Trump representatives called leads for only 2 of the 30 students.

FIRST AMENDED CLASS ACTION COMPLAINT

78.     The speaker at Keller's $1,500 seminar was Steve Goff.  He told students that at one point in his life he was homeless, but he found a real estate mentor, and that person taught him how to make money in real estate.  Goff said that after he had made a lot of money in real estate and did over 100 real estate deals, Donald Trump approached him and said he wanted Goff to work for him, so he left his lucrative real estate career to be a touring speaker for Donald Trump.

79.     **Money back guarantee and cancellation policy**– Keller knew that in order to request his money back under the Trump "satisfaction guarantee," he had to cancel after the first day (Friday) of his $1,500 seminar.  However, on Friday of the 3-day seminar, Keller and his class were told that all of the "good stuff" was going to happen on Saturday -- the Trump representatives would call his leads, review his financial profile to asses what real estate investments were appropriate for him, and he would learn about exclusive mentorship opportunities with Trump. Therefore, Keller felt he was basically forced to come on Saturday to get the information Trump promised, and by then, it was too late to cancel.

80.     **Mentorship** – during the $1,500 seminar, the Trump speaker told students over and over again that they really needed a mentor to succeed in real estate investing.  He repeatedly told them that you really have to have a mentor to make a lot of money in real estate and so you don't make mistakes. If you don't have a mentor, you can lose a lot of money and have a lot of problems. The speaker gave several examples of how he lost money in real estate before he had a mentor, and how he made a fortune in real estate once he had a mentor.  The speaker never mentioned the price of this "mentor" on Friday, when students still had time to cancel and receive their money back, but on Saturday, after it was too late to cancel, Trump eventually revealed that the price for this year-long mentorship (including 3 days in-person) was $35,000.  He assured students that although that may sound expensive, compared to Wharton Business School where Donald Trump attended, it's a bargain – Wharton is $35,000/year, and it's a four-year school -- they were better off going with Trump University he told them.

FIRST AMENDED CLASS ACTION COMPLAINT

81.    **Increasing credit card limits** – As is standard procedure during the $1,500 seminars, on Saturday, the Trump speaker told Keller and all the other students to increase the credit limits on all of their credit cards so that they would have more credit available to buy real estate. The speaker also asked every student to fill out a sheet of their personal financial information, including a list of all credit cards, the credit limit on each card and the available credit to charge, so that they could purportedly assess what real estate investments would be best for each student. Then, as is also standard procedure, Trump asked the students to use their increased credit limit to purchase the $35,000 Trump Elite seminar.  The speaker even told students they could spread the amount out over multiple credit cards.  This is what Keller did – he put $10,000 on each of two credit cards, and $15,000 on a third.  Keller believed that most students who purchased the $35,000 seminar from his class put the amount on 2-5 credit cards, depending on their credit limits.  Keller estimates that ***30-50% of the 30 students in his $1,500 seminar signed up for the $35,000 seminar***.

82.    **Trump guaranteed his real estate deals would pay for his seminars** –At the free seminar, Keller was told that if he signed up for the $1,500 seminar, he was guaranteed to make $5,000 to $10,000 within 30 days to cover the cost of the seminar.  He did not.  At the $1,500 seminar, Keller was told by the speaker that he was guaranteed to make $75,000 on the first deal to more than cover the cost of the $35,000 program. He did not.

83.    After Keller signed up for the $35,000 seminar, he was assigned Jeff Nolan in Arizona as his mentor.  Before the 3-day mentorship commenced, Keller wrote some e-mails to his mentor asking various real estate questions, but his mentor wouldn't answer his questions or give him any help or assistance.  Since this was not the mentor experience that had been described when he purchased the program, he called Trump University program director Paul Reisner and requested a refund of his $35,000.  Trump refunded him the money since he had never received the 3-day in-person mentorship.  Keller also asked that Trump refund the $1,500 he paid for the introductory seminar as it did not provide any of the education or instruction promised, but Trump refused.  The $1,500 Keller paid for the Trump introductory seminar still remains on his credit card, accruing interest charges.

**Plaintiff Sheri Winkelmann**

84.     Plaintiff Sheri Wilnkelmann is a singer, award-winning actress and entertainer who resides in Palatine, Illinois, outside of Chicago..  During the class period, in or around January, 2010, Plaintiff Winkelmann saw an advertisement for Trump University's free introductory real estate investing seminar on the internet.  In reliance on the advertising and the promise of learning priceless real estate investing information from the master, Donald Trump, she attended the free seminar on or about February 10, 2010 in Lombard, Illinois.  At the free introductory seminar, Plaintiff Winkelmann was lured by the Trump University speaker into purchasing a $1,500 three-day workshop, which she attended from Friday February 26, 2010 through Sunday February 28, 2010 at the Lombard Westin outside of Chicago.  The $1,500 seminar did not provide the real estate investing information promised; the instructor, Gerald Martin, just talked in circles and didn't answer anyone's questions directly.

85.     **Trump University required students to complete a detailed financial form**- During the $1,500 three-day workshop, the Trump speaker asked Plaintiff Winkelmann and each of the students to fill out a detailed personal financial information sheet under the guise that Trump University representatives were going to review the information and help assess the best real estate investments for each student.  Winkelmann had to list her bank accounts, balances, any investments, all her credit cards, and the credit limit and credit available on each.  She dutifully did so, believing this was to benefit her, when in fact, Trump University was merely compiling this information so that it could ascertain which students had enough money or credit available on their credit cards to purchase its next $35,000 level seminar.  Sure enough, Winkelmann and others who had sufficient available credit were called out for a "private consultation."  Trump representatives convinced her that she should charge the $35,000 fee – spreading out the amount over *5 credit cards* – because she would "make it back the first month," and it would "change her life."

86.     **Trump University representative forges Winkelmann's signature for the $35,000 seminar**- Relying on Trump University's numerous misrepresentations, Plaintiff Winkelmann started filling out a contract for the $35,000 seminar, but she never signed it.  Trump did not let this fact get in the way of a sale – Trump representatives simply *forged her signature on the contract* and charged her five credit cards for the $35,000.  When Winkelmann realized this, she

31

FIRST AMENDED CLASS ACTION COMPLAINT

immediately contacted her credit cards and requested the transaction be cancelled and money refunded.  Her credit cards each opened fraud investigations, and after Winkelmann provided them with the 2 copies of the contracts – the unsigned version and the version with her forged signature – they refunded her the $35,000.  However, Winkelmann still seeks to recover the $1,500 she spent on the initial seminar which Trump has refused to refund.

87.     Plaintiffs' experiences with Trump University are typical of the class and the many hundreds (if not thousands) of other Trump University students who have registered their complaints online and with Defendant.

88.     Plaintiffs have suffered injury in fact and loss of money or property.  They have been damaged by, *inter alia*, the amounts they have paid for Trump University Seminars.

## CLASS ALLEGATIONS

89.     Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

90.     The proposed class consists of all persons who purchased Seminars from Trump University throughout the United States from April 30, 2006 to the present.  Excluded from the Class are Trump University, its affiliates, employees, officers and directors, persons or entities that distribute or sell Trump University products or programs, the Judge(s) assigned to this case, and the attorneys of record in this case.  Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

91.     This action is properly brought as a class action for the following reasons:

(a)     the proposed class is so numerous and geographically dispersed throughout the United States that the joinder of all class members is impracticable.  While Plaintiffs do not know the exact number and identity of all class members, Plaintiffs are informed and believe that there are thousands, if not tens or even hundreds, of thousands of class members.  The precise number of members can be ascertained through discovery;

(b)     the disposition of Plaintiffs' and proposed class members' claims in a class action will provide substantial benefits to both the parties and the Court;

1       (c)      the proposed class is ascertainable and there is a well-defined community of

2  interest in the questions of law or fact alleged herein since the rights of each proposed class member

3  were infringed or violated in the same fashion;

4       (d)      there are questions of law and fact common to the proposed class which

5  predominate over any questions that may affect particular class members.  Such common questions

6  of law and fact include, but are not limited to:

7       (i)       Whether Trump University's conduct was unlawful, unfair or

8  fraudulent;

9       (ii)       Whether Trump University's advertising is likely to deceive the

10  public;

11       (iii)       Whether Trump University's conduct was false, misleading or likely

12  to deceive;

13       (iv)       Whether Trump University violated the UCL;

14       (v)       Whether Trump University violated the CLRA;

15       (vi)       Whether Trump University violated the FAL;

16       (vii)       Whether Trump University has received funds from Plaintiffs and

17  class members that they unjustly received;

18       (viii)       Whether Trump University is in breach of contract;

19       (ix)       Whether Trump University is in breach of the implied covenant of

20  good faith and fair dealing;

21       (x)       Whether Trump violated section 349 of New York's General

22  Business Law;

23       (xi)       Whether Trump University violated California Welfare & Institutions

24  Code Section 15600 *et seq.;*

25       (xii)       Whether Trump University is liable for intentional and/or negligent

26  misrepresentations;

27       (xiii)       Whether Trump University is liable for making false promises;

28

(xiv)       Whether Plaintiffs and proposed class members have been harmed and the proper measure of relief;

(xv)       Whether Plaintiffs and proposed class members are entitled to an award of punitive damages, attorneys' fees and expenses against Defendant; and

(xvi)       Whether, as a result of Defendant's misconduct, Plaintiffs are entitled to equitable relief, and if so, the nature of such relief;

(e)       Plaintiffs' claims are typical of the claims of the members of the proposed class.  Plaintiffs and all class members have been injured by the same wrongful practices of Defendant.  Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all class members and are based on the same legal theories;

(f)       Plaintiffs will fairly and adequately protect the interests of the proposed class in that they have no interests antagonistic to those of the other proposed class members, and Plaintiffs have retained attorneys experienced in consumer class actions and complex litigation as counsel;

(g)       A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(i)       Given the size of individual proposed class member's claims and the expense of litigating those claims, few, if any, proposed class members could afford to or would seek legal redress individually for the wrongs Defendant committed against them and absent proposed class members have no substantial interest in individually controlling the prosecution of individual actions;

(ii)       This action will promote an orderly and expeditious administration and adjudication of the proposed class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured; and

(iii)       Without a class action, proposed class members will continue to suffer damages, and Defendant's violations of law will proceed without remedy while Defendant continues to reap and retain the substantial proceeds of its wrongful conduct.

FIRST AMENDED CLASS ACTION COMPLAINT

(iv)  Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

92. Defendant has, or has access to, address information for the Class members, which may be used for the purpose of providing notice of the pendency of this class action.

93. Plaintiffs seek damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.

**FIRST CAUSE OF ACTION**

**(Violations of California Business and Professions Code § 17200)**

94. Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

95. California Business & Professions Code § 17200 prohibits acts of unfair competition, which means and includes any "unlawful, unfair or fraudulent business act or practice" and any act prohibited by Cal. Bus. & Prof. Code § 17500.

96. Defendant violated Cal. Bus. & Prof. Code § 17200's prohibition against engaging in an "**unlawful**" business act or practice by, *inter alia*, making the material misrepresentations regarding its Seminars as set forth more fully elsewhere in this Complaint, in violation of Cal. Civ. Code §§ 1572 (actual fraud), 1573 (constructive fraud), 1709 and 1710 (deceit), 1750 *et seq.* (the CLRA), Cal Bus. & Prof. Code §17500 (false advertising), Cal. Welf. & Inst. Code § 15600 (elder abuse), §349 of New York's General Business Law and the common law, including the breach of contract, breach the covenant of good faith and fair dealing and breach of the duty to disclose.

97. In addition to the foregoing, unlawful conduct Trump University has participated in includes: (1) instructing students to engage in real estate practices that are illegal, such as posting bandit signs and engaging in the practice of real estate without a real estate license; (2) issuing student testimonials which are misleading, and in some cases, completely fabricated by Trump employees; and (3) forging student signatures on seminar contracts when students have forgotten to sign the contracts.

98. Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts and practices.  Such conduct is ongoing and continues to this date.

99.     Defendant violated Cal. Bus. & Prof. Code § 17200's prohibition against engaging in a "**fraudulent**" business act or practice by, *inter alia,* disseminating, through common advertising, untrue statements about its Seminars that have a tendency to mislead the public and making numerous common material misrepresentations about its Seminars with the intent to induce reliance by consumers to purchase Defendant's Seminars.  Furthermore, Defendant violated § 17200 by issuing misrepresentations and untrue statements at the Trump University Seminars and by forging student signatures on seminar contracts when students have forgotten to sign the contracts..

100.    The foregoing conduct also constitutes **"unfair"** business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200.  Defendant's practices offend public policy and are unethical, oppressive, unscrupulous and violate the laws stated.  Defendant's conduct caused and continues to cause substantial injury to consumers and their property, including Plaintiffs and proposed class members.  The gravity of Defendant's alleged wrongful conduct outweighs any purported benefits attributable to such conduct.  There were also reasonably available alternatives to Defendant to further its business interests.

101.    Plaintiffs and Class members have suffered injury in fact and have lost money and/or property as a result of Defendant's unlawful, fraudulent and unfair business practices and are therefore entitled to the relief available under Cal. Bus. & Prof. Code §17200 *et seq*., as detailed below.

### SECOND CAUSE OF ACTION

**(Violations of the Consumer Legal Remedies Act,
California Civil Code § 1750 *et seq*.)**

102.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

103.    This cause of action arises under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq*.  Plaintiffs are consumers as defined by Cal. Civ. Code § 1761(d).  Defendant's Seminars constitute "services" and/or "products" as defined by Cal. Civ. Code § 1761(a) and (b).  At all times relevant hereto, Defendant constituted a "person" as that term is defined in Cal.

Civ. Code § 1761(c), and Plaintiffs' and class members' purchases of Defendant's Seminars constitute "transactions," as that term is defined in Cal. Civ. Code § 1761(e).

104.    Defendant violated and continues to violate the CLRA by engaging in the following deceptive practices specifically proscribed by Cal. Civ. Code § 1770(a), in transactions with Plaintiffs and class members that were intended to result or which resulted in the sale or lease of goods or services to consumers:

(a)    In violation of Cal. Civ. Code § 1770(a)(5), Defendant's acts and practices constitute misrepresentations that the Seminars in question have characteristics, benefits or uses which they do not have;

(b)    In violation of Cal. Civ. Code § 1770(a)(7), Defendant has misrepresented that the Seminars are of particular standard, quality and/or grade, when they are of another;

(c)    In violation of Cal. Civ. Code § 1770(a)(9), Defendant advertised the Seminars with the intent not to sell them as advertised or represented; and

(d)    In violation of Cal. Civ. Code § 1770(a)(10), Defendant advertised the Seminars with intent to not supply reasonably expectable demand.

105.    Defendant's uniform representations as set forth more fully elsewhere in this Complaint were false, deceptive, and/or misleading and in violation of the CLRA.

106.    Defendant knew or should have known that its conduct was directed to one or more senior citizens. Defendant's conduct has caused Plaintiff Oberkrom and the class (who are all age 65 or older) to suffer, *inter alia,* a substantial loss of property set aside for retirement, or for personal or family care or maintenance. These senior citizens are substantially more vulnerable than other members of the public to Defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial damage resulting from Defendant's conduct.   Thus, Plaintiff Oberkrom and the class (who are all age 65 or older) seek penalties against Defendant pursuant to Cal. Civ. Code § 1780(b)(1).

107.    Pursuant to Cal. Civ. Code § 1782, Plaintiffs notified Defendant in writing by certified mail of the particular violations of Cal. Civ. Code § 1770 alleged herein, and have demanded that Defendant rectify the problems associated with the actions detailed above and give

notice to all affected consumers of its intent to so act.  Plaintiffs sent this notice by certified mail, return receipt requested, to Defendant's principal place of business.

108.   Defendant has failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days after receipt of the Civil Code § 1782 notice, thus Plaintiffs seek actual damages and punitive damages for violation of the Act.

109.   In addition, pursuant to Civil Code § 1780(a)(2), Plaintiffs are entitled to, and therefore seek, a Court order enjoining the above-described wrongful acts and practices that violate Cal. Civ. Code § 1770.

110.   Plaintiffs and the class are also entitled to recover attorneys' fees, costs, expenses and disbursements pursuant to Cal. Civ. Code §§ 1780 and 1781.

### THIRD CAUSE OF ACTION

**(Untrue and Misleading Advertising in Violation of
Cal. Bus. & Prof. Code § 17500 *et seq.*)**

111.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

112.   California Business & Professions Code § 17500 prohibits various deceptive practices in connection with the dissemination in any manner of representations which are likely to deceive members of the public to purchase products and services such as the Trump University Seminars.

113.   Defendant disseminated, through common advertising, untrue statements about its Seminars and Defendant knew or should have known that the Seminars did not conform to the advertisements representations regarding the Seminars.  Defendant intended consumers to rely upon the advertisements and numerous material misrepresentations as set forth more fully elsewhere in the Complaint.  Plaintiffs and the Class relied upon the advertisements and misrepresentations to their detriment.

114.   As a result of the foregoing, Plaintiffs, and other Class members, and consumers are entitled to injunctive and equitable relief and damages in an amount to be proven at trial.

FIRST AMENDED CLASS ACTION COMPLAINT

**FOURTH CAUSE OF ACTION**

**(Breach of Contract)**

115.   Plaintiffs re-allege and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

116.   Contracts exist between Plaintiffs, class members and Trump University.  Plaintiffs and Class members entered into agreements with Trump University for a three-day Seminar for which they paid approximately $1,495.  Plaintiff Makaeff and some class members also entered into an agreement with Trump University for the Trump Gold Program for which they paid about $34,995, plus the variable APR finances charges, interest fees, and late fees they had to pay to their credit card companies.  Attached hereto as Exhibit A is a true and correct copy of a contract for the Trump Gold Program.

117.   Under Plaintiffs' and each Class member's contracts, Plaintiffs and the Class members were only required to pay the amount of the Seminar in each Class member's contract.

118.   All conditions precedent under the contracts have been performed by Plaintiffs and the Class, including the payment amount of the Seminars.

119.   Trump University breached the terms of its standardized contracts with Plaintiffs and the Class by failing to provide them with the promised products and services as contracted.

120.   As a result of Defendant's breach of its contracts, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

121.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

122.   The law implies a covenant of good faith and fair dealing in every contract.

123.   Defendant violated this covenant of good faith and fair dealing in its contract with Plaintiffs and members of the Class by, *inter alia,* misrepresenting to Plaintiffs and the Class the true nature of the Seminars as alleged more fully elsewhere in the Complaint.

FIRST AMENDED CLASS ACTION COMPLAINT

124.     Plaintiffs and members of the Class performed all, or substantially all, of the significant duties required under their agreements with Defendant.

125.     The conditions required for Defendant's performance under the contract agreements had occurred.

126.     Defendant did not provide and/or unfairly interfered with the right of Plaintiffs and Class members to receive the benefits under their agreements with Defendant.

127.     Plaintiffs and the Class have been damaged by Defendant's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Money Had and Received)

128.      Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

129.     Defendant improperly received and continues to improperly receive from Plaintiffs and class members millions of dollars as a result of the conduct alleged above.

130.     As a result, Plaintiffs and the class have conferred a benefit on Defendant to which Defendant is not entitled.  Defendant has knowledge of this benefit, wrongfully and deceptively obtained this benefit, and has voluntarily accepted and retained the benefit conferred on it. Defendant will be unjustly enriched if it is allowed to retain such funds and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Defendant and the money should be disgorged from Defendant, and returned to Plaintiffs and the class.

## SEVENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

131.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

132.     As alleged herein, Trump falsely represented to Plaintiffs and members of the Class that they would receive a "complete real estate education," a "one year apprenticeship," one-on-one mentorship, practical real estate techniques and contracts, a "power team" of real estate agents, lenders, personal finance managers, property managers and contractors, and were assured that

FIRST AMENDED CLASS ACTION COMPLAINT

although the seminars were costly, they would make the money back in their first real estate deal, and could make up to tens of thousands of dollars per month or more.

133.   Instead of a complete real estate education, students merely received an "infomercial" pushing additional seminars or workshops they were told they would need to take to succeed.  The "one year apprenticeship" they were promised was actually just a 3-day seminar; the one-on-one year-long mentorship consisted of no practical insights and no mentorship, but rather excursions to Home Depot and "mentors" who either recommend real estate deals that they stand to benefit from financially, raising a conflict of interest, or immediately disappeared and failed to return calls.

134.   Trump University representatives also told students during the 3-day seminar to raise their credit card limits 4 times during the break for "real estate transactions," and had students prepare detailed financial statements, presumably for real estate purchases, when in fact, Trump's real reason for this was to assess how much money each student had to spend on the next Trump seminar, and to persuade the students to use their increased credit limit to purchase the Trump Gold Program for $34,995.

135.   Trump's misrepresentations were supplied for the purpose of affecting Plaintiffs' and Class members' financial decisions.

136.   Trump had no reasonable grounds for believing that its misrepresentations were true.

137.   Trump failed to exercise reasonable care and/or diligence in communicating its misrepresentations.

138.   Trump's misrepresentations were objectively material to the reasonable consumer, and therefore reliance upon such representations may be presumed as a matter of law.

139.   Trump intended that Plaintiffs and members of the Class would rely on its misrepresentations.

140.   Plaintiffs and members of the Class reasonably and justifiably relied to their detriment on Trump's misrepresentations.

141.   As a proximate result of Trump's misrepresentations, Plaintiffs and members of the Class were damaged in an amount to be proven at trial.

142.     Trump directly benefited from, and was unjustly enriched by, its misrepresentations.

**EIGHTH CAUSE OF ACTION**

**(Fraud)**

143.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

144.     As alleged herein, Trump has intentionally and falsely represented to Plaintiffs and members of the Class that they would receive a "complete real estate education," a "one year apprenticeship," one-on-one mentorship, practical real estate techniques and contracts, a "power team" of real estate agents, lenders, personal finance managers, property managers and contractors, and were assured that although the seminars were costly, they would make the money back in their first real estate deal, and could make up to tens of thousands of dollars per month or more.

145.     Instead of a complete real estate education, students merely received an "infomercial" pushing additional seminars or workshops they were told they would need to take to succeed.  The "one year apprenticeship" they were promised was actually just a 3-day seminar; the one-on-one year-long mentorship consisted of no practical insights and no mentorship, but rather excursions to Home Depot and "mentors" who either recommend real estate deals that they stand to benefit from financially, raising a conflict of interest, or immediately disappeared and failed to return calls.  Trump's representations were false and Trump knew the representations were false when it made them, or made the representations recklessly and without regard for its truth.

146.     Trump University representatives also told students during the 3-day seminar to raise their credit card limits 4 times during the break for "real estate transactions," and had students prepare detailed financial statements, presumably for real estate purchases, when in fact, Trump's real reason for this was to assess how much money each student had to spend on the next Trump seminar, and to persuade the students to use their increased credit limit to purchase the Trump Gold Program for $34,995.

147.     Trump intended that Plaintiffs and the members of the Class rely on the representations.

FIRST AMENDED CLASS ACTION COMPLAINT

148.     Plaintiffs and members of the Class reasonably and justifiably relied to their detriment on Trump's misrepresentations.

149.     As a proximate result of Trump's misrepresentations, Plaintiffs and members of the Class were damaged in an amount to be proven at trial.

150.     Plaintiffs and members of the Class' reliance on Trump's representations were a substantial factor in causing their harm.

**NINTH CAUSE OF ACTION**

**(False Promise)**

151.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

152.     As alleged herein, Trump made a number of promises to Plaintiffs and members of the Class, which were important to Plaintiffs and members of Class' decision to purchase Trump's Seminars.

153.     Trump did not intend to perform these promises when it made them.

154.     Trump intended that Plaintiffs and members of Class rely on these promises and Plaintiffs and members of Class did reasonably rely on Trump's promises.

155.     Trump did not perform any of the promised acts.

156.     As a proximate result of Trump's failure to act on its promises, Plaintiffs and members of the Class were damaged in an amount to be proven at trial.

157.     Plaintiffs and members of the Class' reliance on Trump's promises were a substantial factor in causing their harm.

**TENTH CAUSE OF ACTION**

**(Financial Elder Abuse in Violation of Cal. Welf. & Inst. Code §15600 *et seq*.)**
**(On Behalf Of Plaintiff Oberkrom And All Class Members Age 65 or Older)**

158.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

159.     California Welfare and Institutions Code §15610.30(a) provides in relevant part:

(a)     "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

43

FIRST AMENDED CLASS ACTION COMPLAINT

(1)     Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(2)     Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

160.     Defendant's conduct constitutes financial abuse under Cal. Welf. & Inst. Code §15657.5 *et seq.*, as defined in Cal. Welf. & Inst. Code §15610.30.

161.     At all relevant times, Defendant took and/or assisted in the taking of property from Plaintiff Oberkrom and all Class members who are age 65 or older for its own wrongful use and/or with intent to defraud.  Plaintiff Oberkrom and Class members age 65 or older trusted and relied on Defendant.

162.     Defendant manipulated Plaintiff Oberkrom and Class members age 65 or older into purchasing Seminars.

163.     Defendant's wrongful acts were done maliciously, oppressively and with the intent to mislead or defraud, thereby warranting punitive and exemplary damages or appropriate in an amount to be ascertained according to proof pursuant to Cal. Civ. Code §3294 *et seq.*

164.     Under Cal. Welf. & Inst. Code §15657.5 *et seq.*, Defendant is liable for reasonable attorneys' fees and costs for investigating and litigating this claim.

165.     Under Cal. Civ. Code §3345, Defendant is liable for treble damages and penalties because: (a) Defendant knew or should have known its conduct was directed as to a senior citizen; (b) Defendant's conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) Plaintiff Oberkrom and Class members age 65 or older are senior citizens who are more vulnerable than others to Defendant's conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) Plaintiff Oberkrom and Class members age 65 or older actually suffered substantial physical, emotional and economic damages resulting from Defendant's conduct.

## ELEVENTH CAUSE OF ACTION

### (Deceptive Acts and Practices in Violation of
### Section 349 of New York's General Business Law)

FIRST AMENDED CLASS ACTION COMPLAINT

166.     Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

167.     Trump University's acts and practices as detailed herein constitute unlawful, unfair, deceptive and fraudulent business practices in violation of § 349 of New York's General Business Law ("GBL").

168.     Trump University's misleading and deceptive business practices adversely impacted Plaintiffs and the Class, and therefore constitutes consumer-oriented conduct under GBL §349, which resulted in a direct harm to Plaintiffs and the Class.

169.     Plaintiffs, on behalf of themselves and the Class, seek injunctive relief and damages under §349 of New York's General Business Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter a judgment against Trump University that:

A.     This action be certified and maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure and certify the proposed class as defined, appointing Plaintiffs as representatives of the Class, and appointing the attorneys and law firms representing Plaintiffs as counsel for the Class;

B.     Awards compensatory, statutory and/or punitive damages for Defendant's breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation and false promises, where such relief is permitted;

C.     Awards Plaintiffs and proposed class members the costs of this action, including reasonable attorneys' fees and expenses;

D.     Orders  Trump University to immediately cease its wrongful conduct as set forth above; enjoins  Trump University from continuing to falsely market and advertise, conceal material information, and conduct business via the unlawful and unfair business acts and practices complained of herein; orders  Trump University to engage in a corrective notice campaign, and requires  Trump University to refund to Plaintiffs and all of the class members the funds paid to Trump University for the subject Seminars;

FIRST AMENDED CLASS ACTION COMPLAINT

1    E.    Awards equitable monetary relief, including restitution and disgorgement of all ill-

2    gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of

3    Defendant's ill-gotten gains, to ensure that Plaintiffs and proposed class members have an effective

4    remedy;

5    F.    Awards pre-judgment and post-judgment interest at the legal rate; and

6    G.    Such further legal and equitable relief as this Court may deem just and proper.

7                              **JURY DEMAND**

8    Plaintiffs demand a trial by jury on all issues so triable.

9

10   DATED:  June 16, 2010                ZELDES & HAEGGQUIST, LLP
                                          AMBER L. ECK
11                                        HELEN I. ZELDES
                                          ALREEN HAEGGQUIST
12

13

14                                           /s/ Amber L. Eck
                                          AMBER L. ECK
15
                                          ZELDES & HAEGGQUIST, LLP
16                                        625 Broadway, Suite 906
                                          San Diego, California 92101
17                                        Telephone: (619) 342-8000
                                          Facsimile: (619) 342-7272
18
                                          ROBBINS GELLER
19                                        RUDMAN & DOWD LLP
                                          RACHEL L. JENSEN (211456)
20                                        655 West Broadway, Suite 1900
                                          San Diego, CA  92101
21                                        Telephone: (619) 231-1058
                                          Fax: (619) 231-7423
22                                        rjensen@rgrdlaw.com

23                                        Attorneys for Plaintiffs, Individually and On
24                                        Behalf of All Others Similarly Situated

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT