ROBBINS GELLER RUDMAN
   & DOWD LLP
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
PAULA M. ROACH (254142)
proach@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
625 West Broadway, Suite 906
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated, | ) ) ) No. 10-cv-00940-IEG(WVG) |
| Plaintiffs, | ) <u>CLASS ACTION</u> ) |
| vs. | ) PLAINTIFFS' OPPOSITION TO ) DEFENDANT TRUMP UNIVERSITY ) LLC'S MOTION TO DISMISS FIRST |
| TRUMP UNIVERSITY, LLC, et al., | ) AMENDED COMPLAINT ) |
| Defendants. | ) DATE: September 13, 2010 ) TIME:  10:30 a.m. |
| | CTRM: 1 JUDGE: Irma E. Gonzalez |

577176_1

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................1

II.    FACTUAL BACKGROUND AS ALLEGED IN THE COMPLAINT ...................2

    A.   Trump University Is Not an Accredited Educational Institution ............................2

    B.   Trump University's Standardized Promises and Misrepresentations ...................3

        1.   Misrepresentations About the Year-Long Mentoring Program ..................4

        2.   Misrepresentations About Three-Day Field Mentorship ...........................4

        3.   Misrepresentations About Instructors and Mentors ..................................5

        4.   Misrepresentations About Prior Student Experiences ...............................5

        5.   Misrepresentations About the Real Estate Training Provided...................5

    C.   Trump University Targets Senior Citizens ...........................................6

    D.   State Attorneys General and Better Business Bureau's Investigations .................6

    E.   Plaintiffs Were Harmed by Trump University's Misconduct................................6

        1.   Plaintiff Tarla Makaeff ...........................................................7

        2.   Plaintiff Ed Oberkrom...........................................................7

        3.   Plaintiff Brandon Keller.......................................................7

        4.   Plaintiff Sheri Winkelmann ..................................................8

        5.   Plaintiff Patricia Murphy ....................................................8

III.   APPLICABLE LEGAL STANDARD FOR MOTIONS TO DISMISS ...........................8

IV.    ARGUMENT ...............................................................9

    A.   The "Educational Malpractice" Doctrine is Inapplicable .......................................9

        1.   Trump University Is Not a School Protected Under Doctrine .................10

        2.   Plaintiffs' Consumer Claims Are Not the Types of Claims Barred..........12

    B.   Defendant's Other Arguments Concerning Plaintiffs' Claims Fail.....................14

        1.   Plaintiffs Adequately Allege Their Contract Claims ...............................14

        2.   Plaintiffs Adequately Allege Consumer Protection Claims.....................16

            a.   Plaintiffs Adequately Allege UCL Claims ...................................16

1

2                                                                            **Page**

3                      b.      Plaintiffs Adequately Allege CLRA Claims..................................19

4                      c.      Plaintiffs Adequately Allege False Advertising ...........................19

5                      d.      Plaintiffs Adequately Allege Elder Abuse ....................................19

6             3.      Plaintiffs Adequately Allege Their Fraud, Negligent
                      Misrepresentation, and False Promise Claims...........................................20
7
                      a.      Trump University's Vague Disclaimers Do Not Defeat
8                             Plaintiffs' Reasonable Reliance on Its Misrepresentations............20

9                      b.      Plaintiffs' Claims Are Alleged with Sufficient Particularity.........23

10         C.      Defendant's Class Certification Arguments Are Premature .................................24

11   V.      CONCLUSION.........................................................................................................25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*A&M Produce Co. v. FMC Corp.*,
    135 Cal. App. 3d 473 (1982) ...........................................................22, 23

*Acciard v. Whitney*,
    No. 2:07-cv-476-UA-DNF, 2008 WL 5120901
    (M.D. Fla. Dec. 4, 2008)..............................................................................11

*al-Kidd v. Ashcroft*,
    580 F.3d 949 (9th Cir. 2009) .........................................................................9

*Alsides v. Brown Inst., Ltd.*,
    592 N.W.2d 468 (Minn. Ct. App. 1999)........................................................13

*Ashcroft v. Iqbal*,
    --- U.S. ---, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)........................8, 9

*Bardin v. DaimlerChrysler Corp.*,
    136 Cal. App. 4th 1255 (2006) ......................................................................17

*Barker v. Riverside Cnty. Office of Educ.*,
    584 F.3d 821 (9th Cir. 2009) .........................................................................8

*Batwin v. Occam Networks, Inc.*,
    No. CV 07-2750 CAS (SHx), 2008 WL 2676364
    (C.D. Cal. July 1, 2008) .................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)....................8, 9

*Blake v. Career Educ. Corp.*,
    No. 4:08cv00821 ERW, 2009 WL 2567011
    (E.D. Mo. Aug. 18, 2009) .........................................................................11, 12

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) .........................................................................9

*Brawthen v. H&R Block, Inc.*,
    28 Cal. App. 3d 131 (1972) ...........................................................................15

*Broberg v. Guardian Life Ins. Co. of Am.*,
    171 Cal. App. 4th 912 (2009)....................................................................21, 22

*Chevlin v. Los Angeles Cmty. College Dist.*,
    212 Cal. App. 3d 382 (1989) .........................................................................10

**Page**

*Cohen v. DIRECTV, Inc.*,
   178 Cal. App. 4th 966 (2009) ...............................................................................24

*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*,
   4 Cal. App. 4th 963 (1992) ..................................................................................16

*CRST Van Expedited, Inc. v. Werner Enters.*,
   479 F.3d 1099 (9th Cir. 2007) .............................................................................17

*Davidson v. Countrywide Home Loans, Inc.*,
   No. 09-CV-2694-IEG (JMA), 2010 WL 2925440
   (S.D. Cal. July 23, 2010)...............................................................................17, 18

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
   176 Cal. App. 4th 697 (2009) ..............................................................................15

*Grisham v. Philip Morris U.S.A., Inc.*,
   40 Cal. 4th 623 (2007) .........................................................................................20

*Harazim v. Lynam*,
   267 Cal. App. 2d 127 (1968) ...............................................................................12

*In re Connectics Corp. Sec. Litig.*,
   No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515
   (N.D. Cal. Aug. 14, 2008)......................................................................................9

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ............................................................................18, 19, 24

*Jamieson v. Vatterott Educ. Ctrs., Inc.*,
   259 F.R.D. 520 (D. Kan. 2009)............................................................................12

*Kashmiri v. Regents of Univ. of Cal.*,
   156 Cal. App. 4th 809 (2007), *modified*, No. A1133662,
   2007 Cal. App. LEXIS 1859...........................................................................12, 15

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) .............................................................................23

*Lima v. Gateway, Inc.*,
   No. SACV 08-01366 DMG (MLGx), 2010 WL 1816806
   (C.D. Cal. Apr. 26, 2010)................................................................................16, 19

*Malone v. Academy of Court Reporting*,
   582 N.E. 2d 54 (Ohio Ct. App. 1990) ..................................................................13

**Page**

*McClaim v. Octagon Plaza, LLC*,
   159 Cal. App. 4th 784 (2008) ...................................................................15

*McKell v. Wash. Mut., Inc.*,
   142 Cal. App. 4th 1457 (2006) ...........................................................16, 17

*McLain v. Great Am. Ins. Cos.*,
   208 Cal. App. 3d 1476 (1989) .................................................................15

*Microsoft Corp. v. A-Tech Corp.*,
   855 F. Supp. 308 (C.D. Cal. 1994) .........................................................16

*Moore v. Kayport Package Express, Inc.*,
   885 F.2d 531 (9th Cir. 1989) ...................................................................23

*Moss v. United States Secret Serv. Agent*,
   572 F.3d 962 (9th Cir. 2009) ...................................................................25

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) .......................................................................23

*Nordberg v. Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ..................................................24

*Norwest Mortg., Inc. v. Superior Court*,
   72 Cal. App. 4th 214 (1999) ....................................................................24

*Nunn v. State of Cal.*,
   35 Cal. 3d 616 (1984) ..............................................................................10

*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*,
   157 Cal App. 4th 835 (2007) ...................................................................21

*People ex rel. Bill Lockyear v. Fremont Life Ins. Co.*,
   104 Cal. App. 4th 508 (2002) ..................................................................17

*Peter W. v. San Francisco Unified Sch. Dist.*,
   60 Cal. App. 3d 814 (1976) ........................................................10, 11, 12

*Ross v. Creighton Univ.*,
   957 F.2d 410 (7th Cir. 1992) .......................................................13, 14, 15

*Shin v. BMW of N. Am.*,
   No. 09-CV-398-AMH(AJWx), 2009 WL 2163509
   (C.D. Cal., July 16, 2009) .......................................................................21

1

2                                                                                          **Page**

3   *Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*,
        405 F. Supp. 2d 1141 (C.D. Cal. 2005) .................................................................24
4

5   *State ex rel. Corbin v. Challenge, Inc.*,
        725 P.2d 727 (Ariz. Ct. App. 1986) ...................................................................12
6
    *Utility Consumers' Action Network v. Sprint Solutions, Inc.*,
7       259 F.R.D. 484 (S.D. Cal. 2009) ........................................................................24

8   *Vasquez v. Superior Court of San Joaquin Cnty.*,
        4 Cal. 3d 800 (1971) ...................................................................................20, 21
9
    *VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*,
10      673 F. Supp. 2d 1073 (E.D. Cal. 2009)..............................................................17

11  *Watkinson v. MortgageIT, Inc.*,
        No. 10-cv-327-IEG (BLM), 2010 WL 2196083
12      (S.D. Cal. June 1, 2010)......................................................................................17

13
    *Wells v. One2One Learning Found.*,
14      39 Cal. 4th 1164 (2006) .........................................................................10, 12, 13

15  *Williams v. Gerber Prods.*,
        552 F.3d 934 (9th Cir. 2008) .........................................................................18, 21
16

17  **STATUTES, RULES AND REGULATIONS**

18  Federal Rules of Civil Procedure
        Rule 8(a)(2).........................................................................................................1, 9
19      Rule 9(b) ...........................................................................................................1, 23
        Rule 12(b)(6)...................................................................................................1, 8, 9
20      Rule 23 ...................................................................................................................24

21  California Business and Professions Code
        §17500 ....................................................................................................................19
22

23  California Civil Code Code
        §1770(a)(10) ..........................................................................................................19
24

25  California Welfare & Institutions Code
        §15610.30...............................................................................................................19
26      §15610.30(a)(1) .....................................................................................................20

27

28

1    Plaintiffs Tarla Makaeff, Brandon Keller, Ed Oberkrom, Patricia Murphy, and Sheri

2  Winkelmann (collectively "Plaintiffs") respectfully submit this memorandum in opposition to

3  Defendant Trump University, LLC's ("Defendant" or "Trump University") Motion to Dismiss First

4  Amended Complaint Under Rules 12(b)(6), 9(b), and 8(a)(2) ("Motion to Dismiss").

5  **I.      INTRODUCTION**

6    Plaintiffs' First Amended Class Action Complaint ("FAC" or "Complaint") adequately

7  pleads garden-variety consumer claims brought by Plaintiffs against Defendant upon discovering

8  they had been duped into paying for costly real estate seminars and mentoring services whose

9  features were objectively misrepresented and did not deliver what was promised.  Because Trump

10  University cannot prevail under well-settled law that a motion to dismiss is limited to the allegations

11  of the Complaint, Defendant improperly attempts to distract the Court with arguments based on the

12  faulty premise of 'its side of the story,' premature arguments about class certification, and

13  underhanded digs at Plaintiffs and their counsel.  Such arguments should not be countenanced.  The

14  Court should consider Defendant's motion only to the extent that it relates to well-plead allegations

15  of the Complaint and disregard any challenge that relies, expressly or implicitly, on Defendant's

16  improper 'version' of the facts.  Considered, as it must, in the light most favorable to Plaintiffs,

17  Defendant's motion to dismiss must be denied in its entirety.

18    Plaintiffs' 46-page FAC details factual allegations based on numerous sources about Trump

19  University's use of the name and reputation of Donald J. Trump, a successful real estate tycoon, as

20  well as deceptive representations, to lure unwitting consumers into purchasing costly real estate

21  seminars and mentoring.  Trump University represents that consumers will receive a ***year-long*** real

22  estate education and mentorship, a "3-Day Field Mentorship" worth $25,000, and seminars taught by

23  experienced real estate professionals "hand-picked" by Donald Trump.  However, what Plaintiffs

24  and other consumers actually received is a 3-day long infomercial taught by sales people and a 1-800

25  number, all designed to up-sell consumers to the next product.  Plaintiffs bring this action, not

26  because they were unsuccessful in real estate, as Defendant would have this Court believe, but

27  because they were duped into purchasing services whose features were grossly misrepresented.

28

1    This case presents the very situation that consumer protection laws are designed to redress.

2    Nevertheless, Trump University attempts to shield itself from liability because it refers to itself as a

3    "University."  Its ongoing attempt to characterize itself as an institution of higher learning is curious

4    in light of the New York Department of Education's admonishment that its use of the word

5    "University" was misleading (consequently, Defendant has since changed its name).  Defendant cites

6    no authority, nor can it, that an unaccredited for-profit business that misrepresents its educational

7    courses and services is protected by the educational malpractice doctrine.  To the contrary, even

8    under Defendant's own authorities, such claims are not barred.

9    Finally, Defendants fail to challenge that Plaintiffs sufficiently plead violations of New

10   York's consumer protection law.  On this basis alone, the FAC survives, at least in part.  In addition,

11   Defendant cannot meet its burden of demonstrating Plaintiffs have not sufficiently plead their other

12   claims at this stage of the case; thus, its motion to dismiss must be denied.

13   **II.      FACTUAL BACKGROUND AS ALLEGED IN THE COMPLAINT**

14   **A.      Trump University Is Not an Accredited Educational Institution**

15   Trump "University" is an unaccredited for-profit business founded and owned by real estate

16   tycoon, Donald J. Trump, Sr.  ¶¶3, 7.[1]  Yet, on its website and in advertisements and seminars,

17   Trump University purported to be a legitimate institution of higher education, with its own coat of

18   arms and university motto: "We teach success." ¶3; *see also* ¶30.  In fact, Trump University goes so

19   far as to compare itself to Harvard University.  ¶7.  However, it is nowhere close to a university.

20   Consumers never receive a real estate license, degree, credential, or anything else of value upon

21   completion of its programs.  ¶¶3, 7, 29.  In fact, the New York Department of Education demanded

22   that Trump University remove "University" from its title because it is "***misleading and violates New***

23   ***York Education Law***."  *See* ¶¶2 n.1, 54.  Trump University has since changed its name.  *Id.*

24   Trump University's business model is to lure consumers in with the name and reputation of

25   Donald Trump, then continually up-sell them to additional services and products rather than provide

26   the promised year-long education and mentorship by qualified real estate experts.  ¶¶3, 7, 9, 29, 35,

27

28   [1]      All references to "¶" and "¶¶" are to the FAC.

38.   To get consumers in the door, Trump University advertises "free" real estate investment seminars, which turn out to be high-pressure sales tactics designed to persuade consumers to attend its three-day $1,500 seminar.  ¶¶30-35.  When consumers purchase the three-day seminar, rather than receiving the training promised, Trump University instead provides a three-day infomercial delivered by professional salespeople (not real estate experts) who are paid on commission.  The primary focus is to up-sell consumers again to the "gold" level program.  ¶47.  Yet, after consumers purchase the "gold" level program to gain a "complete education" and year-long mentorship, they find themselves again without access to the services promised.

In fact, according to former employees, Trump University intentionally designs its real estate seminars and services to confuse consumers and provide incomplete information so that they will feel compelled to purchase another seminar where they will finally receive the information they need to start investing in real estate.  ¶47.  Former employees of Trump University confirmed that this is not a unique experience particular only to some students.  In fact, instructors were taught, not to make sure that students understand core real estate concepts, but instead, to "***work the room*** with special attention to [consumers] in ***possession of a credit card that needs to be run***." ¶14.

Accordingly, Trump University is less akin to a place of higher education and more like a high-pressure infomercial aimed at persuading consumers into spending their hard-earned funds or credit for services that never manifest as promised.  However, Plaintiffs did not discover they had been swindled until too late, which is why they now bring claims against Trump University.

### B.   Trump University's Standardized Promises and Misrepresentations

Trump University's sales tactics are based on standardized representations in written materials and scripted sales pitches by instructors (professional salespersons paid on commission).  ¶11.  Speakers are required to use the ***same PowerPoint presentation, same script, and same guidelines*** when giving seminars.  *Id*.  Former employees confirmed every presentation is virtually identical, regardless of presenter.  ¶11.  Each aspect of the seminars were scripted down to where speakers and coordinators stood, the temperature of the room and music to be played in the Introduction – "Money, Money, Money" from Donald Trump's "The Apprentice" show.  *Id*.  When consumers made calls to or from Trump University, they spoke with a member of the sales team,

1    each of whom had a 5-6 page sales script, which they were required to follow word-for-word. *Id.* In

2    the FAC, Plaintiffs identify numerous standardized misrepresentations and omissions that Defendant

3    made about its services and programs, such as those listed below.

### 1.    Misrepresentations About the Year-Long Mentoring Program

5            Through written materials and uniform presentations at the seminars, Trump University

6    represents that consumers will receive a year-long "apprenticeship" program if they purchase the

7    $1,995 program (perpetually on sale for "one-day only" at seminars for $1,495). ¶¶36, 38.  With the

8    aid of a Power point presentation, the speakers inform consumers they will receive "12 months of

9    training" and "one full year of expert, interactive support." *¶¶*36, 43.  Trump University speakers

10   represent: "***Other people don't have anyone to call, but you've got Trump.  You'll call 40 Wall***

11   ***Street [Trump University], and they'll walk you through it***."  ¶36.  Trump University promised

12   consumers a one-year mentorship with all the information, access, and contracts they needed – that

13   any time they had a question, they could call and Trump University would walk them through the

14   issue; that it would give them step-by-step training "by the numbers" on how to make money.  ¶¶4-5,

15   6, 8, 34-39, 42-45, 47, 50, 52, 53, 55.  When consumers did not get this information at the seminars,

16   Defendant promised it was still coming – they could get it from their mentors, from instructors, or

17   another program.  However, Defendant never delivered.

### 2.    Misrepresentations About Three-Day Field Mentorship

19           Trump University also represented in its contracts for the Trump Gold Elite program and in

20   other written materials that the "3 Day Field Mentorship" is worth $25,000.  ¶50.  For the $25,000

21   value, consumers were promised an exclusive three days with a "power team" of highly-

22   accomplished experts in the real estate industry to become their personal partners and teach them

23   insider tips for investing in real estate, including how to use the contracts essential to the real estate

24   transactions mentioned at the seminars.  *Id.*  Plaintiffs and class members were told that they would

25   receive priceless insight and information from these mentors who were experts in the real estate

26   industry, who would personally teach them what they would need to know.  *Id.*  Instead, the

27   "mentorship" consisted merely of two days looking at real estate properties with no unique insight or

28   guidance, a half day at a local Home Depot and lunch, and an hour of discussing numbers.  *Id.*

Mentors spent little to no time discussing the contracts essential to the real estate transactions mentioned in the seminar. Thereafter, the mentors typically quickly disappeared, in complete contradiction to what was promised: an ongoing mentor who would personally assist the student for an entire year.  *Id*.

### 3.    Misrepresentations About Instructors and Mentors

Trump University uniformly represented through seminars and written materials that its seminar instructors and mentors were experienced in real estate.  ¶15.  However, Trump University instructors and mentors had ***little to no*** personal experience, and most had not engaged in the vast majority of the real estate techniques purportedly taught.  *Id*.  In fact, the instructors and mentors were predominantly ***salespeople***, hired for their ability to deliver a hard-sell presentation, and paid exclusively on commission based on the percentage of sales delivered.  *Id*.  Defendant's best "speakers" earn commissions of $30,000 or more per month for sales of products and seminars.  *Id*.

Further, Trump University promised in written materials at free and paid seminars that its instructors and mentors were "hand-picked by Trump." ¶37.  These representations were critical because Trump University sold itself on promises that consumers would "Learn from the Master [Donald] Trump," it was "the next best thing to being his [Donald Trump's] Apprentice," and they would learn "Insider success secrets from Donald Trump."  ¶30.  However, consumers received nothing of the sort.  Trump did not hand-pick the instructors and mentors.  In fact, in most cases, Trump did not even know who they were.  ¶37.

### 4.    Misrepresentations About Prior Student Experiences

Trump University enhances, misrepresents and in certain instances, ***completely fabricates*** student testimonials to get consumers to sign up.  ¶16.  In addition, its testimonials often claim a person made a certain amount of money without taking into account their expenses, but when expenses are taken into account, many of these "success stories" actually lost money.  *Id*.  Plaintiffs relied on these 'trumped up' success stories in signing up for Trump University.  ¶¶16, 58, 75.

### 5.    Misrepresentations About the Real Estate Training Provided

Trump University represents to consumers that it will "teach you what you need to know" to be successful in real estate.  ¶32.  However, it not only fails to provide the detailed information that

1    consumers needed to know concerning real estate contracts and numbers, but it affirmatively led

2    them astray by teaching them to use tactics that are illegal in California and other states.  For

3    example, instructors told attendees to post "bandit signs" to generate business.  ¶¶44, 63.  These are

4    signs posted on the side of the roadway, intended to mimic black and yellow road warning and signs

5    and say "WE BUY HOUSES, 619-222-2222."  *Id.*  Trump University fails to inform consumers

6    these signs are illegal and can result in fines, criminal charges, and six months in jail.  *Id.*  Trump

7    University also encourages consumers to engage in transactions that would require a real estate

8    license – conduct that is also illegal in California and other states. ¶44.

9               **C.    Trump University Targets Senior Citizens**

10              Trump University also preys on seniors in its advertising and seminars.  As Plaintiffs allege,

11   and as its internal documents will confirm through discovery, Trump University ***specifically***

12   ***designed its sales pitch*** to scare seniors into purchasing its seminars and related products.  ¶12.  In

13   its free introductory seminar, for example, Defendant uses scare tactics about the amount of money

14   needed to retire and the indignity of becoming broke or working in retirement.  *Id.*

15              **D.    State Attorneys General and Better Business Bureau's Investigations**

16              Contrary to Trump University's suggestion, Plaintiffs are not disgruntled students who failed

17   at real estate and thus concocted these claims.  Attorneys General in six states have received

18   numerous complaints against Trump University, and at least two have either launched investigations

19   or are in the process of reviewing complaints similar to those made by Plaintiffs here.  ¶9.  In

20   January, 2010, the Texas Attorney General launched a probe into Trump University's advertising

21   and "possibly deceptive trade practices" dating back to 2008.  *Id.*  Florida Attorney General Bill

22   McClollum's office is also "reviewing" complaints from people who paid up to $35,000 for various

23   Trump University seminars. ¶10.  In addition, the New York and Illinois Attorneys General have

24   received dozens of complaints.  *Id.*  Similarly, the Better Business Bureau ("BBB") has received at

25   least 70 complaints of deceptive practices from customers nationwide.  ¶¶10, 54.  In response, the

26   BBB gave Trump University a ***D-minus rating***.  *Id.*

27              **E.    Plaintiffs Were Harmed by Trump University's Misconduct**

28              The facts regarding the named Plaintiffs and their experiences with Trump University are set

1   out in detail in ¶¶56-86.  Rather than repeat these allegations, Plaintiffs merely wish to correct and

2   clarify some of Defendant's inaccuracies, many of which improperly go outside the Complaint.

### 1.   Plaintiff Tarla Makaeff

4       Contrary to Defendant's contention that the Complaint "curiously fails to mention" that

5   Makaeff initially gave the seminars good reviews (Motion at 5), the Complaint specifically

6   acknowledged that Makaeff gave positive reviews at the beginning of the one-year mentorship

7   before she realized she had been duped.[2]  ¶64. Makaeff ultimately spent nearly $60,000 on Trump

8   University and related seminars recommended by representatives.[3]  ¶¶22, 60.

### 2.   Plaintiff Ed Oberkrom

10      As alleged in the Complaint, Ed Oberkrom signed up for a Trump Elite seminar for two

11  people for $25,000, along with a colleague, Michael Bahr. ¶¶24, 65-69.  Defendant improperly takes

12  issue not with Oberkrom, but with Bahr, who is mentioned nowhere in the FAC.[4]

### 3.   Plaintiff Brandon Keller

14      Defendant's primary argument regarding Keller is that he received a "full refund" for the

15  seminars he purchased.  Motion at 9.  While Keller did receive a refund for the $35,000 seminar

_____

[2]     Trump University's claim that Makaeff "rated her mentor as 'excellent' in a lengthy videotape" should be disregarded as not only contrary to the FAC, but also false.  Motion at 5. Makaeff did not volunteer to make the video–she had a video camera thrust in her face unexpectedly after a seminar and *did not* praise her mentor or Trump University, but instead said something polite about mentors generally, to the effect of "it's very important to have a mentor to help you in any business, and I have had some mentors in my life that have benefited me."  ¶64.

[3]     Defendant veers wildly from the allegations of the FAC to argue that Makaeff has brought this lawsuit because she fell upon financial difficulties unrelated to it.  These arguments must be completely disregarded by the Court as contrary to the FAC.  As will be shown in discovery, Makaeff fell upon hard times *precisely because* she spent tens of thousands of dollars to receive educational and mentorship services that were not delivered as promised.  ¶¶56-63.

        Further, Defendant repeatedly refers to Makaeff's "mythical" $60,000 expenditure.  Motion at 24.  As explained in the FAC, Makaeff spent over $60,000 on Trump University Seminars, and/or seminars related to or endorsed by Trump University. ¶¶22, 60.  These included payments to Trump University instructors (such as J.J. Childers) and courses they offered.  Makaeff paid a total of $35,750 directly to Trump University, but spent a total of $60,000 in reliance on Trump and additional expenditures on a criminal defense attorney.  ¶¶22, 56.

[4]     Defendant's contention that Bahr took the Gold Elite Program and was satisfied with it (Motion at 6) is outside the corners of the FAC and improper.  As for its veracity, Oberkrom parted ways with Bahr after the seminar, and has no knowledge whether Bahr took additional seminars.

1    because he cancelled before the 3-day mentorship commenced (¶83), he never received a refund for

2    the $1,500 Trump University seminar. *Id*. Also, Defendant's unsubstantiated assertion that Keller

3    was "completely satisfied with the program" (Motion at 5) must be disregarded because it directly

4    contradicts well-pleaded allegations of the Complaint that Trump University did not provide the

5    mentoring or information promised to Keller.[5] *Id*.

### 4.    Plaintiff Sheri Winkelmann

7        Defendant makes the same refund claims in regard to Sheri Winkelmann, who received a

8    refund of the $35,000 seminar from her credit card after Trump University forged her signature.¶86.

9    At the time the Complaint was filed, Winkelmann had not received a refund for her $1,500 three-day

10   seminar (¶86), but in July, 2010, Visa gave her a refund for this amount as well, based on its findings

11   that Winkelmann had not received what she had been promised. Accordingly, Plaintiffs concede that

12   Winkelmann no longer has standing to serve as a named Plaintiff.  ¶¶85-86.

### 5.    Plaintiff Patricia Murphy

14       Defendant argues that it has no records that Patricia Murphy attended Trump University

15   (Motion at 6).  The FAC alleges Murphy spent $12,500 on Trump University seminars, software,

16   and mentoring.  ¶¶71-72.  Murphy purchased seminars and products in Philadelphia and Florida

17   throughout 2007.  Plaintiffs will produce such documents in discovery at the appropriate time.

## III.    APPLICABLE LEGAL STANDARD FOR MOTIONS TO DISMISS

19       It "is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)."

20   *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *7 (C.D. Cal.

21   July 1, 2008).[6]  When considering a motion to dismiss, the Court must "accept as true the facts

22   alleged in the complaint," and "draw inferences in the light most favorable to the plaintiff." *Barker*

23   *v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009). "*Twombly* and *Iqbal* did not

---

5        Defendant contends that Keller enrolled in two additional programs (Motion at 6), again improperly attempting to insert facts outside the four corners of the FAC.  However, Defendant misleadingly fails to mention that these were ***free*** programs.  Keller attended them merely as a networking effort in an attempt to meet other real estate investors.

6        Unless otherwise noted, citations are omitted and emphasis is added.

1   change this fundamental tenet of Rule 12(b)(6) practice." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d

2   585, 595 (8th Cir. 2009); *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).

3       A complaint must contain "a short and plain statement of the claim showing that the pleader

4   is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To avoid dismissal, a complaint need not contain

5   detailed factual allegations, but must plead "enough facts to state a claim to relief that is plausible on

6   its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

7   A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw

8   the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

9   --- U.S. ---, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citing *Twombly*, 550 U.S. at 556).

10  "The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action,

11  but whether the plaintiff is entitled to offer evidence in support of the claim."  *In re Connectics*

12  *Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515, at *8 (N.D. Cal. Aug. 14,

13  2008).

14  **IV.   ARGUMENT**

15       **A.   The "Educational Malpractice" Doctrine is Inapplicable**

16       Trump University's principal argument in support of dismissal is that Plaintiffs' claims are

17  barred by the "educational malpractice" doctrine which California courts have applied to claims

18  against public schools for negligently failing to provide adequate instruction.  *See* Motion at 14.

19  This argument is entirely misplaced.  Trump University is not an accredited school, much less a

20  public school or university for which the bar is intended, and Plaintiffs' claims that Defendant

21  misrepresented its products and services are easily distinguishable from claims that a school

22  provided subjectively inadequate instruction.   Indeed, Defendant cites no cases where an

23  unaccredited for-profit business, like Trump University, has evaded liability pursuant to this defense.

24       Importantly, the New York Department of Education admonished Trump University for

25  using the term "university" in its title, as misleading and in violation of New York law.  ¶2, n.1.

26  Though it may have in the past mislead consumers into believing it was a legitimate institution of

27  learning, Defendant cannot hide behind its deceptive title of "university" to escape liability.

28

### 1.      Trump University Is Not a School Protected Under Doctrine

First, Trump University cannot seek refuge from Plaintiffs' claims because it is not the type of educational institution that is protected by the educational malpractice doctrine.  California courts have only barred claims against publicly-funded schools and their districts.[7]  As one court explained: "For policy reasons . . . the law refuses to hold a ***public school system*** liable to a student who claims he was inadequately educated."  *Chevlin v. Los Angeles Cmty. College Dist.*, 212 Cal. App. 3d 382, 389 (1989).  The policy reasons for shielding publicly-funded schools and school districts from liability are simply inapplicable to a for-profit business.

In *Peter W.*, the seminal California case, plaintiff alleged the public school district in which he received his childhood education negligently failed to provide him with "adequate instruction, guidance, counseling and/or supervision in basic academic skills."  60 Cal. App. 3d. at 817-18.  The Court of Appeals affirmed dismissal, reasoning no workable standard existed for determining whether plaintiff's inability to read or write resulted from defendant's negligence, not his own neurological, emotional, cultural or environmental factors.  *Id.*  More importantly, public policy counsel against holding public schools liable for failing to adequately teach students:

> To hold [public schools] to an actionable "duty of care," in the discharge of their academic functions, would expose them to the tort claims – real or imagined – of disaffected students and parents in countless numbers.  They are already beset by social and financial problems which have gone to major litigation, but for which no permanent solution has yet appeared.  The ultimate consequences, in terms of public time and money, would burden them – and society – beyond calculation.

*Id.* at 825.  "Upon consideration of the role imposed upon the public schools by law and the limitations imposed upon them by their publicly supported budgets . . . no such 'duty' [exists]."  *Id.*

These policy considerations that support a bar for educational malpractice claims against public school systems are not present here.  Trump University is not a public school or even a college or university.  Rather, Trump University is a private, unaccredited business that advertises and sells seminars and related products for a profit.  ¶27.  As the New York State Department of

---

[7]    *See, e.g.*, *Peter W. v. San Francisco Unified Sch. Dist.*, 60 Cal. App. 3d 814, 825 (1976) (school district); *see also, e.g.*, *Wells v. One2One Learning Found.*, 39 Cal. 4th 1164, 1210-11 (2006) (publicly funded charter school); *Nunn v. State of Cal.*, 35 Cal. 3d 616, 627-28 (1984) (community college district).

1   Education found, Trump University is **not** a university, and its use of this term was misleading and

2   illegal.  ¶¶2, n.1, 54.  Indeed, Trump University has no educational accreditation and confers no

3   license, degree, or any credential upon completion.  ¶¶44, 97.  As such, Trump University is not a

4   "university" or an educational institution under this doctrine.

5          Moreover, there is no concern of burdening an already overloaded publicly-supported budget

6   or imposing liability on a school whose public charge is to perform academic functions subject to the

7   political process.  *See Peter W.*, 60 Cal. App. 3d at 825.  Rather, in contrast, Trump University is a

8   for-profit business that is completely privately-funded.  ¶27.  Trump University made a business

9   decision to sell seminars and related products to the public and is not charged by the law to perform

10  academic functions.

11         Indeed, courts regularly allow claims like those asserted here to proceed against companies

12  that sell seminars and educational courses for a profit.  *Acciard v. Whitney*, No. 2:07-cv-476-UA-

13  DNF, 2008 WL 5120901 (M.D. Fla. Dec. 4, 2008), is illustrative.  In that case, plaintiffs were duped

14  into purchasing Millionaire University's real estate seminars.  *Id.*  During the seminars, plaintiffs

15  were "taught" how to identify real estate investments by instructors who built a relationship of trust

16  with them, then pitched real estate "opportunities" at the end of the seminars.  *Id.* at *1. Plaintiffs

17  were also taught they needed a "Power Team" consisting of a lender, real estate broker, contractor,

18  title company, and property manager, which Millionaire University purportedly provided to them at

19  a premium.  *Id.* at *2.  Plaintiffs were told that the investment opportunities that would be made

20  available would "pay back every dollar spent" for the seminars they had paid for.  *Id.*  After not

21  realizing the opportunities that were to be presented, Plaintiffs discovered they were duped and sued

22  Millionaire University for unfair and deceptive acts.  *Id.*  The court allowed the claims.[8]  *Id.*

23         Other cases allow claims to proceed against educational institutions where objective

24  misrepresentations are alleged.  *See, e.g.*, *Blake v. Career Educ. Corp.*, No. 4:08cv00821 ERW, 2009

25  WL 2567011, at *2 (E.D. Mo. Aug. 18, 2009) (educational malpractice did not bar student claims

---

26

27  [8]      In that case, defendants did not argue educational malpractice, perhaps realizing that such a

28  defense would not apply to a for-profit enterprise such as Millionaire (or Trump) University.

against educational institution for breach of contract, fraud or misrepresentation); *Harazim v. Lynam*, 267 Cal. App. 2d 127, 133 (1968) (reversing motion to dismiss where defendants solicited plaintiffs to enroll in "Science of Money Course" based on misrepresentations); *State ex rel. Corbin v. Challenge, Inc.*, 725 P.2d 727 (Ariz. Ct. App. 1986) (reversing summary judgment where defendants provided motivational courses). Likewise, Trump University is liable for its misrepresentations and omissions to consumers and cannot escape liability under the "educational malpractice" doctrine.

### 2. Plaintiffs' Consumer Claims Are Not the Types of Claims Barred

Moreover, even if Trump University could be considered a "school" protected by the "educational malpractice" doctrine, Plaintiffs' claims are not barred because they do not allege negligent failure to adequately instruct, but rather concern deceptive and unfair business practices.

Even as against schools protected by the doctrine, breach of contract, fraud and misrepresentation claims are permitted so long as adjudication does not require judgment about the methodology or subjective quality of the school's education. *See Wells*, 39 Cal. 4th at 1212 (permitting claims that publicly-funded charter school provided no education to students); *see also Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 826-27 (2007), *modified*, No. A1133662, 2007 Cal. App. LEXIS 1859 (permitting claims that public university misrepresented it would not increase fees).[9] Resolution of such claims "does not require judgments about pedagogical methods or the quality of the school's classes, instructors, curriculum, textbooks, or learning aids." *Wells*, 39 Cal. 4th at 1212.

In *Wells*, plaintiffs alleged that a publicly-funded charter school failed to provide computers, necessary software, textbooks, and reimbursement for out-of-pocket educational expenses as promised in its charters and promotional literature. 39 Cal. 4th at 1181. These claims were not barred by the educational malpractice doctrine because "nothing in the rationale of *Peter W.*

---

[9]    *See also, e.g.*, *Jamieson v. Vatterott Educ. Ctrs., Inc.*, 259 F.R.D. 520, 537 (D. Kan. 2009) (allowing claim that school misrepresented connections with companies that actively sought school's graduates); *Blake*, 2009 WL 2567011, at *2 ("'[A] student may bring an action against an educational institution for breach of contract, fraud, or misrepresentation, if it is alleged that the institution failed to perform on specific promises it made to the student and the claim would not involve an inquiry into the nuances of educational processes and theories.'").

1   precludes a claim . . . that a school operator failed to provide promised equipment and supplies, used

2   teachers who lacked necessary credentials, violated specific rules governing 'independent study'

3   programs, or caused students, parents, or guardians to incur improper fees or charges." *Id.* at 1212.

4        Moreover, Defendant does not point to any case in which statutory consumer protection

5   claims were barred under this doctrine.  To the contrary, courts permit consumer claims to proceed

6   against educational institutions.  *See, e.g.*, *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 474-75

7   (Minn. Ct. App. 1999) (applying consumer fraud statute against private for-profit computer trade

8   school); *Malone v. Academy of Court Reporting*, 582 N.E. 2d 54, 58-59 (Ohio Ct. App. 1990)

9   (applying consumer fraud statute against paralegal program not accredited to issue degree).

10        Even under Defendant's own authorities, it is clear Plaintiffs' claims are not of the type

11   barred by this doctrine.  Indeed, *Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992), which

12   Defendant extensively quotes, explicitly distinguished permissible claims for failure to provide

13   promised services, like the claims at issue here, from impermissible claims concerning "the general

14   quality of an education", which "require an inquiry into the nuances of educational processes and

15   theories."  Motion at 16 (quoting *Ross*, 957 F.2d at 416-17).  Here, too, the Court can adjudicate

16   Plaintiffs' claims without delving into complex educational processes of Trump University's real

17   estate services and without resort to the financial results ultimately obtained by Plaintiffs.  Like in

18   *Wells*, Plaintiffs assert that Defendant represented it would provide certain services and products but

19   failed to do so.  Specifically, Trump University misrepresented: (a) it would provide a year-long

20   "apprenticeship" program; (b) it would provide a "power team" of mentors, real estate agents,

21   brokers, contractors, attorneys and accountants "hand-picked by Donald Trump"; and (c) its "3-Day

22   Field Mentorship" would provide various services worth $25,000.  ¶¶4-6, 15-16, 30, 34, 36-43, 42-

23   45, 47-50, 53, 55.  Adjudication of these claims does not require inquiry into whether its pedagogical

24   methods were sound but whether it provided services as promised.

25        Accordingly, Plaintiffs' claims concerning Defendant's unfair and deceptive acts are not

26   barred under the "educational malpractice" doctrine.

27

28

**B.      Defendant's Other Arguments Concerning Plaintiffs' Claims Fail**

Outside the educational malpractice doctrine, Defendant launches only sparse attacks on Plaintiffs' FAC, relying on its 'version' of the story instead of the well-pleaded allegations of the FAC.   As a result, its arguments are based on faulty premises and unwarranted assumptions. Further, Trump University argues it could not have breached the parties' contracts because of its broad disclaimers in its contracts of adhesion.   However, its disclaimers went to the financial success of consumers; not to the services and related products promised as part of the parties' contracts.

**1.      Plaintiffs Adequately Allege Their Contract Claims**

Trump University does not contend that Plaintiffs failed to plead the requisite elements of their contract claims, including breach of contract, breach of implied covenant of good faith and fair dealing, and money had and received claims.   Instead, Trump University summarily concludes Plaintiffs got everything that they bargained for, based on its misplaced assumption that the form contracts detailed all terms of the parties' contracts, and then rehashes its educational malpractice argument because, in its view, Plaintiffs' only remaining complaint could be the quality of instruction. *See* Motion at 16.   Defendant is wrong.

As the *Ross* court acknowledged, where (as here) plaintiff's breach of contract claim is premised on "an identifiable contractual promise that the defendant failed to honor," it is permitted. 957 F.2d at 417.   That is exactly what Plaintiffs allege here.   Plaintiffs purchased real estate packages from Trump University that included, among other things, seminars and mentorships based on its promises about the services to be provided at the free introductory and three-day seminars. ¶¶56, 65, 71, 84-85.   However, as plead in the FAC, Defendant failed to honor its promises.

Trump University's contention that Plaintiffs received all the contracted-for items (Motion at 17), run directly contrary to well-pleaded allegations that Defendant failed to provide, *inter alia*, the promised features of the year-long mentoring program, three-day field mentorship, and experienced real estate instructors and mentors hand-picked by Donald Trump.   ¶¶4-6, 8, 35, 37-39, 42-47, 50, 52-53, 55.   These features were promised at the seminars to be part of the packages purchased by Plaintiffs. *See* Motion-Exs. 1-2, 4 (listing for "Gold Elite" the field mentorship, various retreats,

1   one-year membership and other services); Motion-Ex. 3 (listing for three-day training various

2   services, including 12-month premium membership).[10]

3          Simply because every detail of each service is not spelled out in Trump University's forms

4   does not mean that its promises concerning the features of those services did not form part of the

5   basis of the parties' bargain.  Indeed, Defendant does not argue its forms were integrated contracts,

6   nor could it, as they were one-page purchase forms drafted by Defendant.  Motion-Ex. 3.  As such,

7   oral and written representations made at the seminars before and after Plaintiffs' purchase may be

8   considered in interpreting the parties' contracts.  *McLain v. Great Am. Ins. Cos.*, 208 Cal. App. 3d

9   1476, 1485 (1989) (standardized forms are rarely integrated contracts) (citing *Brawthen v. H&R*

10  *Block, Inc.*, 28 Cal. App. 3d 131, 138-39 (1972)).  Plaintiffs' allegations of Defendant's broken

11  promises do not "flatly contradict the terms of the [form] application," but rather explain Plaintiffs'

12  reasonable expectations of the contracts of adhesion drafted by Defendant.  *See DVD Copy Control*

13  *Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 716 (2009) (describing judicial limitations

14  on enforceability of contracts of adhesion); ¶¶33-36.

15         Plaintiffs held up their end of the bargain by paying as required under the contract, and

16  Defendant promised it would "start providing services starts when full payment is received."  *Id.*,

17  Motion-Exs. 1-4.  However, Defendant failed to fulfill its end of the bargain even after Plaintiffs

18  paid.  ¶¶4-6, 8, 35, 37-39, 42-47, 50, 52-53, 55.  Thus, Plaintiffs claims are based on "an identifiable

19  contractual promise that [Trump] failed to honor" and, as such, their claims are not barred.  *Ross*,

20  957 F.2d at 417; *see Kashimiri*, 156 Cal. App. 4th at 826-27.

21         For the same reasons, Plaintiffs' claim for beach of implied covenant of good faith and fair

22  dealing must be upheld.  As Defendant acknowledges, the parties had a contractual relationship;

23  thus, the implied covenant worked to protect the purposes of the contract.  *McClaim v. Octagon*

24  *Plaza, LLC*, 159 Cal. App. 4th 784, 806 (2008).  Here, Plaintiffs alleged Defendant failed to act in

25  good faith to fulfill the terms of the contract and, in fact, never intended to fulfill its promises.  ¶¶4-

26

27  [10]    Sheri Winkelmann did not sign her contract; as alleged in the FAC, her signature was forged.

28  ¶26.

6, 8, 35, 37-39, 42-47, 50, 52-53, 55.  As with the breach of contract claim, the Court need not delve into the quality of Trump University's instruction; rather, the court need only decide whether Plaintiffs allege Defendant did not fulfill the terms of the contract in good faith.  ¶¶121-127.

Finally, Plaintiffs' claim for money had and received survives.  Again, Trump University does not argue Plaintiffs have failed to plead the elements of the claim, but that it is barred because Plaintiffs claim the "services were 'not good enough.'"  Motion at 18.  Trump University is wrong. Plaintiffs allege Trump University failed to provide the services as promised, not that the promised services were not good enough.  ¶¶4-6, 8, 35, 37-39, 42-47, 50, 52-53, 55, 128-130.

### 2.    Plaintiffs Adequately Allege Consumer Protection Claims

Importantly, Trump University does not challenge that Plaintiffs stated claims under New York General Law §349.  However, it misguidedly argues that Plaintiffs' statutory California consumer claims fail.  Motion at 20-25.  For the reasons explained herein, Defendant is wrong.

### a.    Plaintiffs Adequately Allege UCL Claims

Plaintiffs have stated claims under California's Unfair Competition Law ("UCL").  "[T]he primary purpose of the [UCL] is to protect the public from unscrupulous business practices." *Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*, 4 Cal. App. 4th 963, 975 (1992).  The UCL has four distinct "prongs": (1) unfair conduct; (2) unlawful conduct; (3) fraudulent conduct; and (4) false advertising.  A business practice need only violate one prong.  *See McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1471 (2006).  Claims "are governed by the 'reasonable consumer' test, under which a plaintiff must show that 'members of the public are likely to be deceived.'"  *Lima v. Gateway, Inc.*, No. SACV 08-01366 DMG (MLGx), 2010 WL 1816806, at *7 (C.D. Cal. Apr. 26, 2010).  "Whether a business practice is deceptive will usually present a question of fact and therefore dismissal of a UCL claim for failure to state a deceptive practice will be appropriate only in 'the rare case.'"  *Id.*

First, to allege an "unlawful" practice, a plaintiff need only identify the law violated and allege facts showing the violation.  *See, e.g.*, *Microsoft Corp. v. A-Tech Corp.*, 855 F. Supp. 308, 313 (C.D. Cal. 1994).  "Unlawful" business practices may include anything that can "properly be called a business practice and that at the same time is forbidden by law.'"  *McKell*, 142 Cal. App. 4th at

1474; *People ex rel. Bill Lockyear v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002) ("With respect to the unlawful prong, '[v]irtually any state, federal or local law can serve as the predicate for an action' under section 17200.").  Thus, the UCL renders violations of other laws as an unfair business practice.  *McKell*, 142 Cal. App. 4th at 1474-75; *CRST Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1107 (9th Cir. 2007) ("'Section 17200 "borrows" violations from other laws by making them independently actionable as unfair competitive practices.'"); *Watkinson v. MortgageIT, Inc.*, No. 10-cv-327-IEG (BLM), 2010 WL 2196083, at *5 (S.D. Cal. June 1, 2010) (Gonzalez, I.).  A violation of the underlying law is a *per se* violation of the UCL.  *See VP Racing Fuels, Inc. v. Gen. Petroleum Corp.*, 673 F. Supp. 2d 1073, 1081 (E.D. Cal. 2009).

Here, Plaintiffs allege that the unlawful predicate acts include violations of California Civil Code §§1572 (actual fraud); 1573 (constructive fraud); 1709 and 1710 (deceit); §1750 of the CLRA; California's false advertising law; California elder abuse law; New York's General Business Law; and common law violations.  ¶96.  Because Defendant does not challenge that Plaintiffs have stated violations of constructive fraud, deceit, and New York's General Business Laws, the UCL "unlawful" prong necessary survives.  Further, as discussed herein, Plaintiffs properly allege the remaining violations of law, thus the UCL unlawful counts must stand.  *See* §§IV(B)(2)-(3).

Plaintiffs also allege violations under the "unfair" prong.  As Defendant acknowledges, the definition of "unfair" acts in consumer actions is uncertain.  Motion at 20; *see Davidson v. Countrywide Home Loans, Inc.*, No. 09-CV-2694-IEG (JMA), 2010 WL 2925440, at *7 (S.D. Cal. July 23, 2010) (Gonzalez, I).  There are two opposing lines of California cases.  *Id.*  One line defines "unfair" as conduct that is "'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'"  *Id.* (citing *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (2006)).  "'The other line of cases holds that the public policy which is a predicate to a consumer unfair competition action under the "unfair" prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions.'"  *Davidson*, 2010 WL 2925440, at *7. (citing *Bardin*, 136 Cal. App. 1261)  However, this split in authority does not change the outcome because Trump University's misleading seminars and practices are "unfair" under either test.

As explained above as to the "unlawful" prong, Trump's conduct is unfair because it is alleged to violate numerous California statues and common law doctrines, as well as New York's General Business Law. *See* §§IV.B.2.-3.  In addition, Trump University's conduct was unfair under the former test weighing the gravity of the harm to the plaintiff.  As the Complaint details, Defendant promised consumers a one-year mentorship with all the access, information, and contracts they needed.  When consumers did not get this promised information at the seminars, Defendant promised that it was still coming – they could get it from their mentors, instructors, or another program.  ¶¶29, 46-47, 51-52, 79.  The truth is that Defendant never provided the services and training as promised.  ¶¶4-5, 6, 8, 35, 37-39, 42-45, 47, 50, 52-53, 55.  Contrary to Trump University's bald assertion that "Plaintiffs have suffered no harm at all," Motion at 20, Plaintiffs paid large amounts of money – $1,500 to $35,000 – for seminars and mentorships based on its misrepresentations.  ¶¶22-27, 56-86.  As Defendant's conduct constituted deceptive business practices, it is clearly outweighed by the financial harm suffered by Plaintiffs and other consumers.

Moreover, the "fraudulent" claim survives.  Plaintiffs "need only show that 'members of the public are likely to be deceived'" by misrepresentations.  *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009); *Davidson*, 2010 WL 2925440, at *7.  Whether the public is "'likely to be deceived'" is shown by the effect the representations would have on "the reasonable consumer."  *Williams*, 552 F.3d at 938 (2008).  Here, Trump University does not challenge that Plaintiffs have alleged misrepresentations, but argues the public could not possibly be deceived because the contracts included "broad disclaimers."  Motion at 21.  But, as discussed below, Plaintiffs' allegations do not concern their lack of success that Trump University purportedly disclaimed, but rather its objective promise of services.  *See infra*, §IV.B.3.a.  Additionally, it cannot be determined ***as a matter of law*** that the disclaimers precluded their reliance thereon.  *Id.*  As Plaintiffs pleaded the public is likely to be deceived by the representations (¶99), and that they suffered an injury in paying for services that were not as represented (¶101), the UCL "fraudulent" claims survive.

Further, Trump University broadly asserts that its misrepresentations were mere "puffery." Motion at 21.  However, Defendant has not identified any particular statement that it views to be puffery, and indeed, Plaintiffs' claims do not relate to the subjective value of its services, but

1  objective features that were misrepresented.  *Lima*, 2010 WL 1816806, at *7.  Moreover, the

2  misrepresentations contributed to Trump University's overall deceptive scheme to mislead

3  consumers into purchasing real estate seminars and mentoring services for thousands of dollars.  *Id.*

4  (finding representations actionable because "they contribute to the deceptive context of the

5  advertising as a whole").  Plaintiffs sufficiently plead deceptive conduct.

### b.  Plaintiffs Adequately Allege CLRA Claims

7  Defendant argues Plaintiffs do not state CLRA claims because they did not reasonably rely

8  on the misrepresentations, which were, in any case, mere puffery.  Motion at 21.  However, Plaintiffs

9  allege Defendant made misrepresentations about objective features of its services.[11]  ¶¶37, 45.  As

10  such, they are not puffery.  *Lima*, 2010 WL 1816806, at *7.  Moreover, as discussed below, it is a

11  question of fact whether Plaintiffs reasonably relied.  *See infra*, §IV.B.3.a.

### c.  Plaintiffs Adequately Allege False Advertising

13  Defendant erroneously argues Plaintiffs' claims under Cal. Bus. & Prof Code §17500, *et seq.*,

14  fail because they do not allege they saw advertisements.  However, all of the Plaintiffs besides

15  Makaeff allege they saw and relied on Defendant's deceptive advertisements in purchasing Trump

16  University's products and services.  ¶¶23-26, 56, 65, 71, 74, 84.

17  Further, §17500 makes it unlawful to make an advertisement which is "untrue, misleading,

18  and which is known, or which by the exercise of reasonable care should be known, to be untrue or

19  misleading."  Cal. Bus. & Prof. Code §17500.  A violation of the UCL's fraudulent prong is also a

20  violation of the False Advertising Law.  *Tobacco II*, 46 Cal. 4th at 312.  As discussed above, because

21  Plaintiffs properly plead a violation of the UCL's "fraudulent" prong, they also properly plead a

22  violation of the False Advertising Law.  *See supra* §IV.B.2.a.

### d.  Plaintiffs Adequately Allege Elder Abuse

24  Plaintiffs also properly plead violations of the elder abuse statute.  Section §15610.30

25  provides "'[f]inancial abuse' of an elder or dependent occurs when a person or entity . . . takes . . .

---

[11]  Plaintiffs concede the inapplicability of Cal. Civ. Code §1770(a)(10) to this case.  *See* Motion at 21.

real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud." Cal. Welf. & Inst. Code §15610.30(a)(1).  Plaintiffs allege Trump University took money from Oberkrom and other Class members aged 65 and older for its own wrongful use with the intent to defraud. ¶¶160-161.  Specifically, Plaintiffs allege Defendant preys on seniors in its advertising and seminars and manipulated them into purchasing services.  ¶¶12, 160-161.  As Defendant's internal documents will confirm through discovery, it *specifically designed its sales pitches* to scare seniors into purchasing its seminars and related products.  ¶12. In its free introductory seminar, for example, Defendant uses scare tactics about the amount of money needed to retire and the indignity of becoming poor or working at a place like Wal-Mart during retirement years.  *Id.*

Defendant argues that Oberkrom lacks standing to assert a claim under California's elder abuse law because he resides in Oregon.  Motion at 22.  If the Court finds that Oberkrom does not have standing, Plaintiffs request leave to add additional plaintiffs who are 65 and older and plead violation of elder abuse statutes for those states in which they reside.

### 3.  Plaintiffs Adequately Allege Their Fraud, Negligent Misrepresentation, and False Promise Claims

As with Plaintiffs' other claims, Defendant barely touches on the elements required for Plaintiffs' fraud, negligent misrepresentation, and false promise claims.  However, it argues primarily that Plaintiffs have failed to show reasonable reliance or plead fraud specifically.

### a.  Trump University's Vague Disclaimers Do Not Defeat Plaintiffs' Reasonable Reliance on Its Misrepresentations

First, Trump University's arguments concerning Plaintiffs' "reasonable reliance" in light of its purported disclaimers are misguided at the pleadings stage.  Motion at 18.  Whether Plaintiffs can prove "reasonable reliance" is a question of fact for the jury and cannot be decided on a motion to dismiss unless "'the facts permit reasonable minds to come to just one conclusion.'"  *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637-38 (2007).  Where false representations are made as to a material matter, an inference or presumption of reliance arises as to the entire class.  *Vasquez v. Superior Court of San Joaquin Cnty.*, 4 Cal. 3d 800, 814 (1971).

1    Here, reliance is presumed because Plaintiffs allege Trump University made material uniform

2    misrepresentations concerning the objective features of its products and services, as set forth in

3    §IV.B.2.  Each of the alleged misrepresentations was communicated through standardized sales

4    materials and standardized sales presentations.  ¶11.  Further, as alleged in the FAC, as a result,

5    Plaintiffs paid for costly seminars and mentorship programs.  ¶¶6, 14, 22-27, 56-57, 60, 65, 71, 76,

6    81, 84, 86.  Thus, reliance is presumed.  *Vasquez*, 4 Cal. 3d at 814.

7    Although Trump University repeatedly promised consumers during the introductory seminar

8    and over the course of the 3-day $1,500 and $35,000 seminars that it would give them one-on-one

9    assistance and step-by-step assistance over the course of a full year, that it would answer any

10   questions any time they called, and it and the "power team" would guide them through the real estate

11   investment process, it now argues that it disclaimed all of these promises in two broad disclaimers.

12   Motion at 19.  This is not what consumers believed or understood.  Consumers reasonably believed

13   that all of the promises and representations Trump University made to them over the course of the

14   seminars – including seminars for which they paid $1,500 to $35,000 – were true, and that Trump

15   would follow-through on these promises.  Plaintiffs in no way believed or understood that a few

16   lines of fine print at the bottom of their enrollment form would wipe away any obligation Trump

17   University had to follow through on its promises.

18   That this was a reasonable understanding for Plaintiffs to have is amply supported by case

19   law.  As the court held in *Shin v. BMW of N. Am.*, No. 09-CV-398-AMH(AJWx), 2009 WL

20   2163509, 1 (C.D. Cal., July 16, 2009), "the key issue with the disclaimer is whether its content is

21   likely to deceive a reasonable consumer." *Id*. (citing *Williams v. Gerber Prods.*, 552 F.3d 934, 939

22   (9th Cir. 2008) (discussing how reasonable consumers would view the description of ingredients on

23   packages of fruit juice snacks)); *see also Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App.

24   4th 912, 921 (2009) (plaintiff's reliance is not barred by disclaimer unless his reliance on the

25   representations, "'in light of his own information and intelligence, is preposterous and irrational.'");

26   *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal App. 4th 835, 865

27   (2007).

28

1    For example, in *Shin*, the court found "plaintiffs' pleading is adequate to permit them to try

2    to prove that, notwithstanding the BMW [disclaimer], a reasonable consumer was likely to be

3    deceived by BMW's conduct." 2009 WL 213509, at *2. Likewise, in *Broberg*, the court found it

4    was a question of fact whether plaintiff reasonably relied on representations by his agent that out-of-

5    pocket premiums were not required, despite disclaimers in the insurance policy. 171 Cal. App. 4th

6    at 922. Whether plaintiff read and understood the disclaimers and whether that language was

7    adequate to preclude reliance could not be determined as a matter of law. *Id.*

8    Here, too, it cannot be determined as a matter of law that the disclaimers put Plaintiffs on

9    notice that Trump University had no obligation to provide the goods and services as it had repeatedly

10   promise to provide them.[12] Moreover, when read together and in full context, the disclaimers

11   appear to be aimed at protecting Trump University against claims that students were guaranteed to

12   succeed in real estate by taking the program, which is not what Plaintiffs claim in this case.[13]

13   Rather, as explained repeatedly in the FAC, Plaintiffs claim that Trump University did not deliver its

14   services and products as they were promised to be. ¶8. Thus, Plaintiffs' claims do not directly

15   contradict the language of the disclaimer. *See* Motion at 19. Further, it cannot be determined as a

16   matter of law that Plaintiffs' reliance was unreasonable in light of all the repeated representations

17   made by Trump University about the objective features of its real estate seminars and mentorships.

18   *See Broberg*, 171 Cal. App. 4th at 922.

19   Additionally, if the disclaimers were to be construed so broadly as to disavow any

20   responsibilities of Trump University whatever as to its promised services, they are unconscionable

21   and should be stricken from the form contract. *See A&M Produce Co. v. FMC Corp.*, 135 Cal. App.

22

---

23   [12]   Trump University claims that Plaintiffs intentionally left off the "Terms of Service." Motion

24   at 10. However, the contract in Makaeff's possession did not contain this form, and she neither recalls seeing nor signing that form.

25   [13]   The "Terms and Conditions" state that Trump University "has not made any express or

26   implied representation or assurance regarding the potential profitability, chances of funding or likelihood of success of any transaction, investment, opportunity or strategy." Motion-Exs. 1-4.

27   Similarly, it separately disclaimed any "guarantees, promises, representations or warranties of any kind regarding specific or general benefits, monetary or otherwise [that] have been or will be made

28   by the Program." *Id.*

3d 473, 482-83 (1982).  In *A&M*, the court found a contract that disclaimed all warranties to be unconscionable, despite being conspicuous, because, among other things, the disclaimer was contained in a standard contract that could not be negotiated.  *Id.*  Here, too, to the extent that Trump University attempted to disavow any responsibility it had to perform the services as promised by use of vague disclaimers in its form contracts, the Court should find those disclaimers to be unconscionable and strike them from the contract.  Plaintiffs have adequately plead reliance.

> ### b.   Plaintiffs' Claims Are Alleged with Sufficient Particularity

Plaintiffs acknowledge that their common law fraud claim (Count No. 8) is governed by Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Ninth Circuit has stated:

> Rule 9(b) demands that the circumstances constituting the alleged fraud "be 'specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'"  "Averments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged."  A party alleging fraud must "set forth more than the neutral facts necessary to identify the transaction."

*Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009).

There is, however, an exception for facts that are "peculiarly within the defendant's knowledge or are readily obtainable by him."  *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993).  "[T]he general rule that allegations of fraud based on information and belief do not satisfy Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge. In such situations, plaintiffs can not be expected to have personal knowledge of the relevant facts." *Id.*  In *Moore v. Kayport Package Express, Inc*., 885 F.2d 531 (9th Cir. 1989), the Ninth Circuit explained:

> [I]n cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts.  "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded."

*Id.* at 540.

Here, Plaintiffs alleged sufficient facts to put Trump University on notice as to its alleged wrongful conduct.  Plaintiffs alleged the "who, what, where, when and how" of the misconduct charged.  Motion at 23.  The "who" is simple because there is only one defendant, Trump University,

and Plaintiffs allege specific representations by its instructors at the seminars based on customized scripts and Power points prepared by Trump University ¶¶11, 31-34, 36-37, 39, 41-50, 52-53.  The "what" are the false and misleading representations made by Trump, as detailed in the FAC.  ¶¶3-6, 8, 15-16, 29-46, 48-50, 52-53.  The "when" is also specified in the FAC, which was sufficient to put Defendant on notice as shown by their identification of accounts for each of the Plaintiffs, except for Murphy.[14]  ¶90.  Plaintiffs also describe the "where" and "how" Trump University deceived consumers – through advertising, free seminars, $1,500 seminars, and $35,000 seminars.  *See* §II.B.  Defendant also gratuitously adds the requirement of "why."  Motion at 23.  Plaintiffs are not required to allege a motive for Defendant's misconduct, other than to defraud.  Nonetheless, Plaintiffs allege that Defendant is motivated by greed.  ¶1.  Plaintiffs' fraud-related claims should be upheld.

**C.      Defendant's Class Certification Arguments Are Premature**

Defendant acknowledges that "[t]he pleading stage is not the time to consider class certification under Rule 23."  Motion at 24.  Nonetheless, Defendant goes on to argue that Plaintiffs will be unable to maintain a nationwide class action.  *Id.* at 23-25.  However, such an argument is completely improper at this stage of the proceedings.  The Court need only determine whether Plaintiffs' allegations sufficiently state a claim, which they do.

Indeed, virtually all the cases cited by Defendants are cases deciding class certification, not motions to dismiss.  *See, e.g.*, *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 227 (1999) (class certification); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 972 (2009) (class certification); *Utility Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 487 (S.D. Cal. 2009) (class certification).  The last two cases cited by Defendant, ***neither of which were class actions***, considered whether non-California residents had standing to assert UCL and/or CLRA

---

[14]      Plaintiffs are prepared to come forward with additional facts concerning Murphy's contracts and attendance of Trump University seminars should the Court require them.

1   claims, which is not at issue here.[15]   Further, UCL standing requirements apply only to the class

2   representatives, not to all unnamed class members.[16]   *Tobacco II*, 46 Cal. 4th at 306.

3   **V.      CONCLUSION**

4          For the foregoing reasons, Plaintiffs respectfully submit that the Court should deny Trump

5   University's Motion to Dismiss in its entirety.   However, should the Court decide to grant any

6   portion of Defendant's motion, Plaintiffs seek leave to amend their Complaint.[17]

7   DATED:  August 30, 2010                              Respectfully submitted,

8                                                        ZELDES & HAEGGQUIST, LLP
                                                         HELEN I. ZELDES
9                                                        ALREEN HAEGGQUIST
                                                         AMBER L. ECK
10

11
                                                                 s/ Amber L. Eck
12                                                            AMBER L. ECK

13                                                       625 West Broadway, Suite 906
                                                         San Diego, CA  92101
14                                                       Telephone:  619/434-0024
                                                         619/342-7878 (fax)
15

16

17

18

19

20   _____

21   [15]     *Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1147
     (C.D. Cal. 2005), was not a class action – it was an antitrust case brought by independent credit
22   reporting agencies and their trade organization against three credit reporting agencies, and the court
     merely dismissed UCL claims of named plaintiffs who were not California residents.  Likewise,
23   *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1096 (N.D. Cal. 2006), was not a class action,
     but a RICO case brought by individual plaintiffs where the court found that only plaintiffs who were
24   California residents had standing to assert CLRA claims.

25   [16]     As for Defendant's purported jurisdictional argument (Motion at 24), Plaintiffs have alleged
     jurisdiction under CAFA because the class contains more than 100 members, the amount in
26   controversy exceeds $5 million, and there is minimal diversity.  ¶19.  This suffices.

27   [17]     *Moss v. United States Secret Serv. Agent*, 572 F.3d 962, 972 (9th Cir. 2009) ("requests for
     leave should be granted with extreme liberality"; failure to dismiss "without leave to amend is
28   improper unless it is clear . . . that the complaint could not be saved by any amendment").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
PAULA M. ROACH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiffs

1

<u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on August 30, 2010, I authorized the electronic filing of the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4 the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5 caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6 CM/ECF participants indicated on the attached Manual Notice List.

7    I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on August 30, 2010.

9

10

                               s/ Amber L. Eck
                               AMBER L. ECK

11

                               ZELDES & HAEGGQUIST, LLP

12

                               625 West Broadway, Suite 906
                               San Diego, CA  92101
                               Telephone:  619/434-0024

13

                               619/342-7878 (fax)

14

                               E-mail:    ambere@zhlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 3:10-cv-00940-IEG -WVG

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Paula M. Roach**
  proach@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David Keith Schneider**
  dks@yslaw.com,dscardino@reedscardino.com,ewb@yslaw.com,mlokey@reedscardino.com,efb@yslaw.com,jjohnson@reedscardino.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)