# EXHIBIT B

1  ~~ZELDES & HAEGGQUIST, LLP~~
2  ~~AMBER L. ECK (177882)~~
   ~~ambere@zhlaw.com~~
3  ~~HELEN I. ZELDES (220051)~~
   ~~helenz@zhlaw.com~~
4  ~~ALREEN HAEGGQUIST (221858)~~
   ~~alreenh@zhlaw.com~~
5  ~~625 Broadway, Suite 906~~
   ~~San Diego, CA  92101~~
6  ~~Telephone:  619/342-8000~~
   ~~619/342-7878 (fax)~~
7
   ~~ROBBINS GELLER RUDMAN~~
8  ~~& DOWD LLP~~
   ~~RACHEL L. JENSEN (211456)~~
9  ~~rjensen@rgrdlaw.com~~
   ~~PAULA M. ROACH (254142)~~
10 ~~proach@rgrdlaw.com~~
   ~~655 West Broadway, Suite 1900~~
11 ~~San Diego, CA  92101~~
   ~~Telephone:  619/231-1058~~
12 ~~619/231-7423 (fax)~~

13 ~~Attorneys for Plaintiffs and the Proposed Class~~
   ZELDES & HAEGGQUIST, LLP
14 AMBER L. ECK (177882)
   HELEN I. ZELDES (220051)
15 ALREEN HAEGGQUIST (221858)
   AARON M. OLSEN (259923)
16 625 Broadway, Suite 906
   San Diego, CA 92101
17 Telephone:  (619) 342-8000
   Facsimile:  (619) 342-7878
18 ambere@zhlaw.com
   helenz@zhlaw.com
19 alreenh@zhlaw.com
   aarono@zhlaw.com
20
   ROBBINS GELLER RUDMAN
21   & DOWD LLP
   RACHEL L. JENSEN (211456)
22 THOMAS R. MERRICK (177987)
   655 West Broadway, Suite 1900
23 San Diego, CA  92101
   Telephone:  (619) 231-1058
24 Facsimile:  (619) 231-7423
   rjensen@rgrdlaw.com
25 tmerrick@rgrdlaw.com

26 Attorneys for Plaintiffs and the Proposed Class
27 =
                        UNITED STATES DISTRICT COURT
28

   590148_1

1                  SOUTHERN DISTRICT OF CALIFORNIA

2   TARLA MAKAEFF, BRANDON
    KELLER, ED OBERKROM, SONNY
3   LOW, J.R. EVERETT and ~~PATRICIA~~
    ~~MURPHY~~JOHN BROWN, on Behalf of
4   Themselves and All Others Similarly
    Situated,

5

6        _____Plaintiffs,

7       _____vs.

8   TRUMP UNIVERSITY, LLC, (aka The
    Trump Entrepreneur Initiative), LLC, a
    New York Limited Liability Company,
9   TRUMP UNIVERSITY CA LLC (aka
    The Trump Entrepreneur Initiative LLC),
10   a Delaware Limited Liability Company,
     DONALD J. TRUMP, and DOES 12
11   through 50, inclusive,

12       _____Defendants.

Case No. : 3:10-cvCV-00940-
        IEGCAB(WVG)

CLASS ACTION
SECOND
THIRD AMENDED CLASS ACTION
COMPLAINT

District Judge:    Hon. Cathy Ann
Bencivengo
Magistrate Judge:  Hon. William V. Gallo

13                                JURY TRIAL DEMANDED

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

590148_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 1 -

10-cv-00940-IEG(WVG)

*"When people are fearful, you should be greedy.  When people are greedy, you should be fearful."* – Warren Buffet

1.      This is a quote often recited by Trump University's speakers in its initial free seminar to persuade consumers that now is the time to sign up for Trump University's $1,500 seminar to learn how to make money in real estate investing.  Unfortunately, Trump University has taken these words to heart, and is taking advantage of these troubled economic times to prey on consumers' financial fears for its own financial gain.  Students who purchase these Trump University Seminars learn only too quickly, but after it is too late for them to get their money back, that it is Trump University who is greedy, and they who should have been fearful.

2.      Plaintiffs Tarla Makaeff, Brandon Keller, Ed Oberkrom, ~~and Patricia Murphy~~ Sonny Low, J.R. Everett and John Brown (collectively "Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated against Trump University, LLC, Trump University CA LLC (collectively "Trump University"), Donald J. Trump and Does ~~1~~2 through 50, inclusive (collectively "Defendants~~,~~" or "Trump University").[1]  Plaintiffs hereby allege, on information and belief, except as to those allegations which pertain to the named Plaintiffs, which allegations are based on personal knowledge, as follows:

**NATURE OF THE ACTION**

3.      Trump University markets itself as a University driven by the mission to "train, educate and mentor entrepreneurs on achieving financial independence through real estate investing."  It is anything but.  In fact, rather than serving its students as a university or college, Defendant Trump University is more like an infomercial, selling non-accredited products, such

---

[1]      Trump University changed its name to Trump Entrepreneur Initiative on June 2, 2010, after the New York Department of Education insisted that the "use of the word 'university' by your corporation is **misleading and violates New York Education Law** and the Rules of the Board of Regents."  However, as the corporation was named Trump University at the time the initial complaint was filed on April 30, 2010, Defendant Trump University is referred to as Trump University throughout.  Similarly, as Trump University CA LLC was named as a "Doe" Defendant at the commencement of this suit prior to its name change, it is also referred to as "University."

as sales workshops, luring customers in with the name and reputation of its founder and Chairman, billionaire land mogul Donald J. Trump.   Defendant Trump and his so-called University promise "mentorships," urging consumers that it's the "next best thing" to being Donald Trump's next "Apprentice."   But as class members quickly find out, all Defendants provide are empty promises.  The primary lesson Trump University teaches its students is how to spend more money by buying more Trump Seminars.

4.     Plaintiffs and Class ~~members~~Members who attended Trump University's real estate investing classes, were promised a "complete real estate education," a "one year apprenticeship," a one-on-one mentorship, practical and fail-safe real estate techniques, a "power team" consisting of real estate agents, lenders, personal finance managers, property managers and contractors, and were assured that although the Seminars were costly, they would make the money back in their first real estate deal, and could make up to tens of thousands of dollars per month or more.  Plaintiffs and Class ~~members~~Members did not receive what they bargained for.

5.     Instead of a complete real estate education, students merely received an "infomercial" pushing additional Seminars or workshops they were told they would need to take to succeed.  The "one year apprenticeship" they were promised was actually just a three-day seminar; the one-on-one year-long mentorship consisted of no practical insights and no mentorship, but rather excursions to Home Depot and "mentors" who either recommend real estate deals that they stood to benefit from financially, raising a conflict of interest, or who quickly disappeared and failed to return calls.

6.     Trump University representatives also told students during the three-day seminar to raise their credit card limits four times during the break for "real estate transactions," and had students prepare detailed financial statements, presumably for real estate purchases.  In fact, Trump's real reason for having students increase their credit limits and provide detailed financial statements was to assess how much money each student had to spend on the next Trump seminar, and to persuade the students to use their increased credit limit to purchase the Trump Gold Program for $34,995.

7.      In attempting to publicly defend its reputation, Trump University has the audacity to compare itself to Harvard University – claiming that it does not guarantee real estate success, just as Harvard cannot guarantee a Rhodes scholarship.  Comparing Trump University to Harvard University is a bit like comparing a snake oil salesman to a brain surgeon.  First, Harvard is clearly an accredited institution while Trump is not; Harvard professors are educated in their field, while Trump instructors and mentors are trained in sales, not real estate; and when Harvard students pay for a four-year education, they receive four years of teaching, whereas Trump students who pay for a one-year real estate education receive three days of a hard-sell sales presentation.

8.      Plaintiffs are not bringing this action because they did not succeed in real estate – they are bringing this action because Defendants misrepresented what Trump University was providing.  Trump University was represented as providing a year-long real estate education and mentorship, when in actuality, it was providing only a three-day long infomercial, designed to confuse, rather than educate, its students, and to persuade them to purchase even more Seminars.  The Program fails to give students complete information or specific techniques, so that they do not feel confident to get involved in real estate investing on their own, and instead decide to purchase another seminar.  In sum, the program is not designed to educate, but to sell.

9.      **Attorney General Investigations –** Attorneys General in six states have received numerous complaints against Trump University, and at least two have either launched investigations or are in the process of reviewing complaints, according to the New York Daily News.[2]  In January, 2010, Texas Attorney General Greg Abbott's office launched a probe of Trump University's advertising and business practices after getting two dozen complaints.  The Texas Attorney General indicated he was probing "possibly deceptive trade practices" dating back to 2008.

---

[2]      *See* Douglas Feiden, *Trump U Hit by Complaints from Those Who Paid up to 30G, and Say They Got Very Little in Return*, New York Daily News, May 31, 2010.

10.   The New York State Attorney General's Office is also investigating whether Trump University "has engaged in illegal business practices," according to the New York Times.[3]   The investigation was described by the New York Times as "the latest problem" in "a string of consumer complaints, reprimands from state regulators and a lawsuit from dissatisfied former students," and was prompted by about a dozen complaints concerning Trump University that the Attorney General, Eric T. Schneiderman, found to be "credible" and "serious."[4]

11.   Florida Attorney General Bill McClollum's office is "reviewing" 20 complaints from people who paid up to $35,000 for various Trump Seminars, according to the New York Daily News, and the New York and Illinois Attorneys General have received dozens of complaints. The Better Business Bureau has received at least 70 complaints of deceptive practices from students nationwide. *See* n.2.

12.   **Standardized scripts** – Representations made to consumers about the Trump Seminars were standardized.   When consumers made calls to or received calls from Trump University, they spoke with a member of the Trump sales team.  Each member of the sales team was given a five to six page sales script, and was required to stick to the script word-for-word. Likewise, the in-person Seminars ***were highly standardized***.  Speakers used the same slide presentation, the same script, and even had detailed instructions for the presentation, down to where the speakers and coordinators should stand, the temperature of the room and the music to be played during the Introduction – "Money, Money, Money" from the Apprentice show.

13.   **Targeting seniors** – Trump University targeted seniors, and specifically designed its sales pitch to scare seniors into attending and paying for additional Seminars.  For example, in the introductory seminar, the speaker would typically say, "how many times do you go into Walmart, and you're greeted by a guy or gal who is 70+ years old – do you want to be doing that when you're 70 years old, or do you want to be playing golf and enjoying your retirement?"  In

---

[3] *See* Michael Barbaro, *New York Attorney General Is Investigating Trump's For-Profit School*, New York Times, May 19, 2011.

[4] *Id.*

1  its advertising and at its Seminars, Trump University would throw around statistics (which may

2  or may not be true) such as:

3        • Did you know that you will need $250,000 in savings to generate $1,000 monthly
            income during retirement?

4

5        • That means if you're expecting to maintain your lifestyle during retirement based
            on an annual income of $70,000, you need to have $1.75 million in liquid assets.

6        • The average savings of a 50-year old American is only $2,500.  That isn't wealth,
            that's poverty.

7

8        • If you're a retiree, unless you have $1 million in cash, if you spend $50,000 per
            year, you'll be broke by the time you're 85.

9        14.    **Student dissatisfaction** – While Trump University's website– has publicly

10  claimed that 95% to 98% of students are satisfied with its course, this figure is far from the truth.

11  While it may be true that Trump University received some positive ratings in surveys given to

12  the students while the Seminars were in session or immediately afterward, at this point, many of

13  the students actually still believe that they will eventually get the information and mentoring they

14  need, since they have been promised a one-year apprenticeship or one-year mentorship.  Also,

15  these surveys are not anonymous, but have the students' names on them, and students are often

16  reluctant to criticize the instructors and mentors who they have paid a lot of money to help them

17  throughout the year.  It is not until later, when students see that the help and information they

18  need is never coming – that they realize they have been scammed.  Some Trump University

19  former employees responsible for taking consumer complaint calls estimate that as many as **50%**

20  or more of students who take the Trump Seminars are dissatisfied, and one former employee

21  indicated that nearly ***everyone*** he spoke to who purchased the $35,000 elite seminar was

22  dissatisfied with it.

23        15.    **The up-sell** – Insiders at Trump University have confirmed that the entire Trump

24  University program is focused on the "up-sell" – the whole purpose of the free seminar is to get

25  people to sign up for the $1,500 seminar.  The purpose of the $1,500 seminar is to get people to

26  sign up for the $35,000 seminar, and the entire purpose of that seminar is to get people to sign up

27  for additional Seminars, products and books.   Instructors were taught to be "armed with

28

1  objections and rebuttals" and to "work the room with special attention to team members in

2  ***possession of a credit card that needs to be run***."

3      16.     **Misrepresentation of instructors' and mentors' experience –** Contrary to

4  Defendants' representations, many of the seminar instructors and mentors were not experienced

5  in real estate – in fact, many had little to no personal real estate experience, and most had not

6  engaged in the vast majority of the real estate techniques they were teaching.   In fact, these

7  instructors and mentors were predominantly professional salespeople, hired for their ability to

8  deliver a hard-sell sales presentation, and paid exclusively on commission based on the percent

9  of sales they delivered. Trump's best speakers earn commissions of $30,000 or more per month.

10     17.     **Misrepresentations of "unlimited one-year mentorship" –** While consumers

11  who purchased the $35,000 seminar were promised unlimited mentoring for an entire year, in

12  fact, Trump University told its mentors it would not pay them for more than ***six one-hour***

13  mentoring sessions per consumer.   When one Trump University student became frustrated by the

14  lack of any value or information the mentor was providing and asked to meet twice per week, the

15  mentor eventually admitted that the "one year" of mentoring/consulting promised was really only

16  ***six one-hour*** coaching sessions.   Indeed, Trump University Corporate has admitted to these

17  consumers that the fact that only 6 sessions would be provided should have been disclosed.

18     18.     **Misrepresenting and fabricating testimonials –** Defendants enhance,

19  misrepresent and in certain instances, completely fabricate, student testimonials.   They also

20  continue to use testimonials which it knows are no longer true.  In addition, Trump's testimonials

21  often list gross profit rather than net profit which is highly misleading. Indeed, when expenses

22  are taken into account, many of these "success stories" have not really made any money at all.

23  Many of Trump University's testimonials violated FTC regulations and requirements.

24     19.     **Donald Trump's Involvement –** Donald Trump is personally liable due to his

25  public representations concerning Trump University and his involvement and role in the

26  misconduct:

27

28

(a)      Donald Trump is the founder and Chairman of Trump University – according to Trump University seminar presenters, Donald Trump owns Trump University "lock, stock and barrel," and it is his "baby, his company";

(b)      Donald Trump authorized Trump University to use his name, photos and quotes for all Trump University seminar presentations, website and advertising – the home page of the website displays a large photo of Donald Trump along with the message from him: "*Are YOU My Next Apprentice?  Prove it to me!*";*!*"

(c)      Print advertisements featuring Donald Trump and his image included quotes from him including: "***Don't think you can profit in this market? You can.  And I'll show you how****. Learn from my handpicked expert* how you can profit from the largest real estate liquidation in history."[5]

(d)      An email from Trump University to thousands or tens of thousands consumers featured Donald Trump's photo with the words: "*Are you My Next Apprentice*," and stated: "***76% of the world's millionaires made their fortunes in real estate.  Now it's your turn. My father did it, I did it, and now I'm ready to teach you how to do it too***."  The signature line at the bottom of the email reads, Donald J. Trump, Chairman, Trump University, and even includes his signature.

(e)      Trump University print advertisements were reviewed and authorized by Donald Trump before they were released and contained quotes from Donald J. Trump, himself, including: "I can turn anyone into a successful real estate investor, including you. – Donald Trump."[6]

(f)      Donald Trump sent signed letters to consumers nationwide, with Donald Trump's ***name and signature*** at the bottom, which stated: "*[N]o course offers the same ~~dept~~depth of insight, experience and support as the one bearing my name* . . . .  My hand-picked instructors and mentors will ***show you how to use real estate strategies to: [s]upplement***

---

[5]      *See* Trump University Advertisement, New York Post, March 2, 2009.

[6]      *See* Trump University Advertisement, New York Post, March 2, 2009.

Exhibit B
- 93 -

1  *or even replace your income*, [s]ecure your long-term financial future . . . [s]tart profiting today!

2  Now is the time to create your financial legacy.  *You can do it*, even if you only have five or ten

3  hours a week to spare.  With our simple instructions and practice exercises – *and ongoing*

4  *support from your own Trump Team of Experts – you'll have what you need to succeed!*"

5  (Emphasis in original).  The letter closes with Donald J Trump's name, signature, and Trump

6  University address, at 40 Wall Street, 32nd Floor, New York, NY 10005.

7            (g)      While consumers were in the midst of the Trump University $1,500

8  seminar and Trump University was trying to persuade them to sign up for the $35,000 course,

9  each of the participants received a personalized (addressed to them by name) letter from Donald

10  J. Trump.  The letter bore the Trump logo at the top of the letter and the words "From the Office

11  of Donald J. Trump."  The letters stated:

12        Success in real estate begins with great training and proven strategies.
      Without education you don't stand a chance.

13
        *I know how to make money in real estate.*  I've been doing it for a long
14      time with a lot of success.  *My family has been a leader in real estate* since my
      father – Fred Trump – started building residential homes in New York City 75
15      years ago.  My father was my mentor and he taught me a lot.  *Now I want to
      teach you how to make money in real estate.*  To be my apprentice you need to
16      Think BIG and really want to succeed.  More than anything, you need to take
      action.

17
        Do YOU have What It Takes to Be My Next Apprentice?
18
        I only work with people who are committed to succeed.  I founded Trump
19      University back in 2005 to teach go-getters how to succeed in real estate. My
      team at Trump University is filled with real estate experts . . . proven winners.
20      We're the best of the best and we know what works.  If you think you have what
      it takes to be my next apprentice, prove it to me.
21
        We've trained thousands of real estate investors over the years and we know you
22      will be most successful when you work with a partner. . . .

23        If you're serious about making money and safeguarding your future, *learn
      to invest in real estate.  Trump University will teach you how.  We'll give you
24      the best training* and the confidence to succeed.  If you think you've got what it
      takes to be my next Apprentice, come prove it to me and my team.
25
   The letter closes with "See you at the top!"  And, it is signed, "Donald J. Trump, Chairman,
26
   Trump University."

27

28

1           (h)     Donald Trump wrote 387 blogs posted on Trump University's website,

2   and stated that he intended to be actively involved with Trump University. Donald Trump wrote:

3       Trump University **grew out of my desire to impart my business knowledge,**
    **accumulated over the years**, and my realization that there is a huge demand for

4       practical, convenient education that teaches success.

5       **I want the people** who go to Trump University **to succeed, and I plan to do my**
    **part to help them. I'm not just putting my name on this venture; I plan to be an**

6       **active presence** in the curricula. The website, www.trumpuniversity.com, will
    include such features as **"Ask Mr. Trump," in which I answer your questions**;

7       the **blog** you're reading now; **video clips of me**; and more. **My words, ideas, and**
    **image will also be woven into the courses we create**. The reason I'm playing

8       such an active role in Trump University is that I truly believe in the power of
    education . . . . [T]he people who go to Trump University want to be successful,

9       and **I'm on their side**.[7]

10  In another blog, Trump wrote, "**I have to believe in whatever I put my name on**, and it has to

11  reflect who I truly am. To do otherwise would be a disservice to me, my loyal customers, and

12  prospective customers."[8]

13          (i)     Donald Trump personally financed Trump University;

14          (j)     Donald Trump personally reviewed Trump University's financials every

15  month with Trump University President, Michael Sexton;

16          (k)     Donald Trump personally reviewed all print, newspaper and direct mail

17  advertisements before they went out;

18          (l)     Trump University presenters told consumers that Donald Trump hand-

19  picked the Trump University instructors and mentors;

20          (m)    According to insiders, Donald Trump backed Trump University 100% and

21  intended to appear at a fall 2010 event; and

22

23  _____

24  [7]   ~~http://www.trumpinitiative.com/blog/post/2005/06/why-i-started-trump-university-a-~~
~~passion-for-learning.cfm~~ (last visited 10-18-10).

25     http://www.trumpinitiative.com/blog/post/2005/06/why-i-started-trump-university-a-
passion-for-learning.cfm (last visited 10-18-10).

26  [8]   ~~http://www.trumpinitiative.com/blog/post/2005/06/on-being-a-brand-whats-in-a-nam~~
~~e.cfm (last visited 10-18-10)~~   http://www.trumpinitiative.com/blog/post/2005/06/on-being-a-

27  brand-whats-in-a-nam e.cfm (last visited 10-18-10)

28

Exhibit B
- 95 -

1        (n)     Donald Trump held periodic live online Q&A Sessions with Trump

2  University students, according to Michael Sexton's interview with *Business Week*. Also,

3  according to the Trump University website, twice a month Donald Trump would personally

4  choose and answer the best questions from Trump members:

5
> ***Ask Donald Trump: Have you ever wanted to ask Donald Trump a question? Now's your chance! Mr. Trump loves hearing from Trump***
6
> ***University members***, especially members with great questions! But as you can probably guess, he's got a hectic schedule. That means Mr. Trump only has time
7
> for the most interesting and direct questions. ***Twice a month, he will choose the best questions and respond in true Donald Trump fashion***. Look for answers to
8
> your questions (if answered) and previous questions and answers posted on the Trump Blog.
9

10  (Last visited 5/4/10).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit B
- 96 -



20.     Plaintiffs bring this class action on behalf of themselves and all other similarly-situated consumers who purchased Seminars, workshops, mentorships, retreats and/or programs (collectively "Seminars") from Trump University throughout the United States, asserting claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq*. ("UCL" or "§17200"); the Consumer Legal Remedies Act, Cal. Civ. Code §1750, *et seq*. ("CLRA"); the False Advertising Law, Cal. Bus & Prof. Code §17500, *et seq*. ("FAL" or "17500"); Financial Elder Abuse in violation of Cal. Welf. & Inst. Code §15600, *et seq.*; Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Money Had and Received; Unjust Enrichment; Negligent Misrepresentation; Fraud; False Promises; and §39349 of New York General Business Law ("Deceptive Acts and Practices"). "); Florida Statute §501.201, *et seq.*; and Florida Stat. §817.41.

21.     Plaintiffs seek damages and equitable relief on behalf of the Class, which relief includes, but is not limited to, the following: refunding Plaintiffs and class members the full

Exhibit B
- 97 -

1    amount paid for Trump University Seminars; an order enjoining Trump from falsely marketing

2    and advertising its Seminars; costs and expenses, including attorneys' fees and expert fees; and

3    any additional relief that this Court determines to be necessary or appropriate to provide

4    complete relief to Plaintiffs and the Class.

5                              **JURISDICTION AND VENUE**

6              22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1332 and 1367,

7    because the Plaintiffs reside in various states, including California, Missouri, Florida, and New

8    York,  and are therefore diverse from Defendants Trump University and Donald Trump who

9    reside in New York.  The Court has supplemental jurisdiction over Plaintiffs' state law claims

10   pursuant to 28 U.S.C. §1367(a).

11             23.    This Court also has original jurisdiction over this action under the Class Action

12   Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), as to the named Plaintiffs and every

13   member of the Class, because the proposed Class contains more than 100 members, the

14   aggregate amount in controversy exceeds $5 million, and members of the Class reside across the

15   United States and are therefore diverse from Trump University and Donald Trump.

16             24.    This Court has personal jurisdiction over Trump University and Donald Trump

17   because they are authorized to conduct business in California, they have significant minimum

18   contacts with this State, and/or they otherwise intentionally availed themselves of the laws and

19   markets of California through the promotion, marketing, and advertising of Trump University

20   Seminars in this State and on the Internet to consumers in California.

21             25.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(2), because a

22   substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this

23   District.  Venue is also proper under 28 U.S.C. §1391(a)(3), because Defendants are subject to

24   personal jurisdiction in this District as they transact a substantial amount of business in this

25   District.  Indeed, until recently, Trump University has offered numerous Seminars in San Diego,

26   California.  Plaintiffs have filed affidavits showing that this action has been commenced in a

27   proper county pursuant to Cal. Civ. Code §1780(c).

28

**PARTIES**

26.   **Plaintiff Tarla Makaeff –** Plaintiff Tarla Makaeff resides in Corona Del Mar, California.  During the class period, in early August 2008, Plaintiff Makaeff was introduced to Trump University through a friend who attended the free introductory seminar and invited her to attend the three-day Trump University "Fast Track to Foreclosure Training" workshop for approximately $1,495.  During the three-day workshop, the attendees, including Plaintiff Makaeff, were told to raise their credit card limits so they could enter into "real estate transactions."  However, at the end of the session, Trump University told Plaintiff Makaeff and the other seminar attendees to use that credit to purchase an additional Trump "Gold" seminar for $34,995.  Based on Trump University's numerous misrepresentations, on or about August 10, 2008, Plaintiff Makaeff enrolled in Trump University's "Trump Gold Elite" Program ("Trump Gold Program") for $34,995, plus the variable APR finances charges, interest fees, and late fees she has to pay her credit card company.  Plaintiff Makaeff ultimately spent nearly ***$60,000*** on Trump University Seminars, and/or Seminars related to or endorsed by Trump University, over the course of one year.

27.   **Plaintiff Brandon Keller –** Plaintiff Brandon Keller is a San Diego resident who resides in Del Mar, California.  During the class period, in the fall of 2009, Plaintiff Keller received an email advertisement about Trump University and, as a result thereof, on November 18, 2009, he attended the free introductory real estate seminar at the Marriott in La Jolla, California.  At the free introductory seminar, Plaintiff Keller was lured by the Trump University speaker into purchasing a $1,500 three-day workshop, which he attended from Friday December 6, 2009, through Sunday December 8, 2009, at the San Diego Hilton Bay hotel.  During the three-day workshop, Plaintiff Keller and the other consumer attendees were told to raise their credit card limits so they could enter into "real estate transactions."  However, at the end of the session, Trump University told Plaintiff Keller and the other seminar attendees to use that credit to purchase the $35,000 Trump Elite seminar.  Based on Trump University's numerous misrepresentations, on or about December 8, 2009, Plaintiff Keller enrolled in Trump University's Elite seminar for about $35,000, plus the variable APR finances charges, interest

Exhibit B
- 99 -

1   fees, and late fees he has to pay his credit card company.  As set forth more fully below, contrary

2   to Trump University's promises, Plaintiff Keller was never provided any assistance with real

3   estate investing.  Pursuant to Plaintiff Keller's requests, he was refunded his $35,000 for the Elite

4   seminar; however, Trump University refuses to return to Plaintiff Keller his $1,500.

5       28.   **Plaintiff Ed Oberkrom –** Plaintiff Ed Oberkrom is a 65-year old senior citizen

6   who resides in St. Louis, Missouri.  During the class period, in February 2009, Plaintiff

7   Oberkrom was lured by Trump's advertising into attending a "free" introductory Trump seminar,

8   wherein Plaintiff Oberkrom purchased a three-day Trump University mentorship for two for

9   approximately $1,495.   During the three-day workshop, Plaintiff Oberkrom and the other

10  consumer attendees were told to raise their credit card limits so that they could enter into "real

11  estate transactions."   However, at the end of the session, Trump University told Plaintiff

12  Oberkrom and the other seminar attendees to use that credit to purchase an additional Trump

13  Seminar.  Based on Trump University's numerous misrepresentations, in March 2009, Plaintiff

14  Oberkrom enrolled in Trump University's Elite seminar for two for about $25,000, plus the

15  variable APR finances charges, interest fees, and late fees he has to pay his credit card company.

16  Despite Plaintiff Oberkrom's requests, Trump University refuses to refund any of Plaintiff

17  Oberkrom's money.

18      1.    Plaintiff Patricia Murphy –   **Plaintiff Patricia Murphy resides in Bronx, New**

19  **York.   During the class period, Plaintiff Murphy was lured into attending a free**

20  **introductory Trump seminar by radio and/or television advertisements that Donald Trump**

21  **was holding a free seminar.   Plaintiff Murphy then purchased three Trump University**

22  **weekend Seminars, coaching sessions and software.   Plaintiff Murphy took out her life**

23  **savings and spent approximately $12,500 on these Seminars, software and mentoring from**

24  **approximately January 27 through March 12, 2007.   As with the other Plaintiffs and the**

25  **Class, Plaintiff Murphy did not realize she was being scammed until it was too late.**

26      29.   **Sonny Low –** Plaintiff Sonny Low is a 71-year old senior citizen and San Diego

27  resident who resides in Chula Vista, California.   He retired in 2005 as a U.S. Foreign Service

28  Officer who served our country for 34 years.  Low took the free introductory Trump University

590148_1

- 15 -                     10-cv-00940-IEG(WVG)

1  seminar at the Westin Gaslamp in San Diego, California on or about November 18, 2009. Based

2  on representations made by defendants in the free seminar, Low paid for and attended the $1,500

3  seminar on or about December 6, 2009.  Defendants told Low that in order to succeed in real

4  estate he needed to have a mentor.  Defendants promised Low that by purchasing the Trump

5  Elite program for $25,000, he would receive his own mentor who would work "side-by-side"

6  with him to create a "customized investment plan that is based on [his] neighborhood or town,

7  [his] financial goals, and [his] level of comfort."  Low paid $25,000 for the Elite program on or

8  about December 6, 2009.  Low met with his Trump University mentor, Geoff Nowlin, February

9  19-21, 2010 in San Diego.  Low's "mentor," Nowlin, was not knowledgeable or experienced in

10  real estate investing, did not help Low create a "customized investment plan" or work "side-by-

11  side" with Low to successfully invest in real estate.  Despite Plaintiff Low's requests, Trump

12  University refuses to refund any of Plaintiff Low's money.

13      30.   **J.R. Everett** – Plaintiff J.R. Everett is a 68-year old resident of Tampa Florida,

14  who worked in system development for 30 years for a large communications company.  She took

15  the free introductory Trump University seminar in Tampa, Florida on or about October 7, 2009.

16  Based on representations made by defendants in the free seminar, Everett paid for the $1,500

17  seminar on October 7, 2012, and attended the seminar in Tampa, Florida on or about October 16-

18  18, 2009.  The primary speaker was Gerald Martin.  Based on written and oral representations

19  made in the $1,500 seminar, Everett paid $35,000 for the Elite program on or about October 16,

20  2009, and attended the seminar from December 4-6, 2009 in Orlando, Florida.

21      31.   **John Brown** – Plaintiff John Brown resides in New York, New York. Brown

22  took the free introductory Trump University seminar in New York, New York on or about

23  September 14, 2009, entitled "Profit From Real Estate Investing."  He learned about the seminar

24  from an advertisement he saw, either online or in the newspaper. He was attracted by Donald

25  Trump's name.  He thought that because of Donald Trump's involvement with Trump

26  University, it would not be a scam, but a legitimate opportunity to learn about how to make

27  money investing in real estate.  It was not.  Based on representations made by defendants in the

28  free seminar, on September 14, 2009, Brown paid for and attended the $1,500 three-day seminar

Exhibit B
- 101 -

1    at the New York Marriott East Side on or about September 25-27, 2009.  The material covered in

2    this seminar was very general, and much of it was no more than a "push" or "up-sell" to get

3    participants to sign up for the Trump Elite programs. Defendants told Brown that in order to

4    succeed in real estate he needed to have a mentor and promised him that by purchasing the

5    Trump Elite program, he would receive his own mentor who would work "side-by-side" with

6    him to create a "customized investment plan that is based on [his] neighborhood or town, [his]

7    financial goals, and [his] level of comfort."  Brown maxed out two credit cards to pay for the

8    $25,000 Elite program on or about September 26, 2009, as Trump University pressured him to.

9    For his $25,000, Brown did not receive a seminar, only mentoring.  Brown met his mentor in

10   Philadelphia, looked at some houses in or about November 2009, and had several phone

11   conversations with the mentor, but they were not helpful. His mentor relayed minimal

12   information and merely asked Brown if he had questions.

13        32.    **Defendant Trump University, LLC –** Defendant Trump University, LLC (now

14   The Trump Entrepreneur Initiative LLC) is a New York limited liability company registered in

15   New York.  In response to demands by the New York Department of Education, and after the

16   initial Complaint in this action was filed, it changed its name to "The Trump Entrepreneur

17   Initiative" on or around June 2, 2010.   Its executive offices and company headquarters are

18   located in New York, New York.  Donald J. Trump is the chairman of Trump University, as well

19   as the chairman and president of The Trump Organization.   Trump University conducts

20   substantial business throughout the State of California, including marketing, advertising, and

21   hosting Seminars in San Diego County and all over California.  Plaintiffs are further informed

22   and believe that at all times relevant hereto, Trump University acted for or on behalf of Donald

23   Trump in undertaking the acts and/or omissions alleged herein.

24        33.    **Defendant Trump University CA LLC –** Defendant Trump University CA LLC

25   (now The Trump Entrepreneur Initiative LLC) ("Trump U California") is a Delaware limited

26   liability company registered in Delaware.  In response to demands by the New York Department

27   of Education, and after the initial Complaint in this action was filed, Trump U California

28   changed its name to "The Trump Entrepreneur Initiative" on or around May 21, 2010.  Donald J.

1    Trump is an officer of Trump U California.   Trump U California has conducted substantial

2    business throughout the State of California, including marketing, advertising, and hosting

3    Seminars in San Diego County and all over California.   Plaintiffs are further informed and

4    believe that at all times relevant hereto, Trump U California acted for or on behalf of Donald

5    Trump in undertaking the acts and/or omissions alleged herein.

6        34.    Trump University LLC and Trump U California are collectively referred to herein

7    as Trump University.

8        35.    **Defendant Donald J. Trump –** At all times herein mentioned, defendant Donald

9    J. Trump was and is an individual residing in the State of New York, and at all times herein

10   mentioned, Plaintiffs are informed and believe Trump was doing business within the State of

11   California, as he posted blogs on Trump University website that were viewed by California

12   residents and reviewed and authorized advertisements that were directed to California residents.

13   At all times mentioned, Trump was a founder, chairman, officer, director, manager, managing

14   member, principal and/or controlling shareholder of Trump University, and in connection with

15   the matters set forth in this action, Defendant Trump had business dealings within the State of

16   California directly related to the subject of this Action. At all times herein mentioned, Defendant

17   Trump was also an officer, director, President and/or CEO of The Trump Organization.

18       36.    Defendant Trump profited from the funds paid to Trump University from

19   Plaintiffs and other Class Members through his shell companies, including DJT University

20   Managing Member LLC (now DJT Entrepreneur Managing Member LLC), a NY Limited

21   Liability Company, and DJT University Member LLC (now DJT Entrepreneur Member LLC), a

22   NY Limited Liability Company.

23       37.    At all times herein mentioned, Defendant Trump approved, authorized, either

24   specifically and/or tacitly directed, ratified and/or participated in the acts complained of herein

25   engaged in by Trump University.

26       38.    Trump University and Donald Trump are referred to herein collectively as

27   "Defendants."

28

Exhibit B
- 103 -

39.     The true names and capacities of Defendants sued herein as Does ~~1~~2 through 50, inclusive, are presently unknown to Plaintiffs who therefore sue these defendants by fictitious names.  Plaintiffs will amend this Complaint to show their true names and capacities when they have been ascertained.  Each of the Doe Defendants is responsible in some manner for the conduct alleged herein.

**DEFENDANTS' UNLAWFUL CONDUCT**

40.     Trump University is an "education" company owned and founded by real estate tycoon Donald J. Trump, as part of the Trump Organization.  It offers courses in real estate, asset management, entrepreneurship and wealth creation.  It is not an accredited University.

41.     Trump University lures consumers in with a free introductory Seminar, which turns out to be nothing more than an infomercial used to "up-sell" and persuade students to purchase its $1,495 "one year apprenticeship" course. If students purchase the $1,495 course, Trump University continues using misleading, fraudulent and predatory practices to convince students to purchase Trump University's $35,000 "Gold" course.  Even then, after investing nearly $36,500, students still do not receive the information or training they were promised. The three "tiers" to the Trump University program are as follows:

**First Tier: the Free Introductory Course**

42.     Trump University advertises extensively in local media and online, such as its website, online local newspapers, on Facebook, and radio for "Free" introductory courses, which take place in cities across the country.  In marketing the Trump University program, Donald Trump claims: "I'm going to give you 2 hours of access to one of my amazing instructors AND priceless information . . . all for FREE."[9]  An advertisement in the L.A. Times, for example, quoted Donald Trump as saying that "investors nationwide are making millions in foreclosures . .

---

[9]     David Lazarus, *Trump Spins in Foreclosure Game*, L.A. Times, Dec. 12, 2009 ~~http://www.latimes.com/business/la-fi-lazarus12dec12,0,7835610.column.~~ http://www.latimes.com/business/la-fi-lazarus12dec12,0,7835610.column.

Exhibit B
- 104 -

1    . and so can you!"  It also **promised two hours of "priceless information . . . all for free**."[10]

2    Other advertisements urged consumers to "Learn from the Master" – Donald Trump," that "It's

3    the next best thing to being his Apprentice," and told consumers that they would learn "insider

4    success secrets from Donald Trump."







10    David Lazarus, *Trump's a grump about column on his 'priceless' tips*, L.A. Times, Dec. 16, 2009, ~~http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column~~ http://www.latimes.com/business/la-fi-lazarus16dec16,0,1670633.column.    When L.A. times reporter David Lazarus attended the Pasadena Hilton Trump seminar, he "learned by attending the seminar, the event was a two-hour sales pitch for a three-day workshop that would cost people $1,495." *Id.*

11    Screen    shot    from    ~~http://www.trumpurealestate.com/market-Phoenix.html?eid=726078~~ http://www.trumpurealestate.com/market-Phoenix.html?cid=726078 (last visited 2/3/2010).

12    Screen shot from ~~http://www.trumpuniversity.com/~~ http://www.trumpuniversity.com/ (last visited 2/3/2010).

43.     At the free seminar, prospective customers are greeted by a large screen projector and two tall banners with Donald Trump's photo on them.  The speaker, who is following a Trump University script, begins addressing the audience with scare tactics.  A large portion of the audience is typically comprised of senior citizens, and the speaker plays on their fears, asking: "How many of you lost a lot of your 401k investment in the market?  How many of you are retired or want to retire?  How many of you want to leave a legacy or property to your kids?"

44.     The speaker induces the audience to trust in the Trump name and "family" by walking through the history of the Trump Organization and Donald Trump's "humble beginnings."  He tells the audience that 76% of all millionaires are created from real estate – that "anyone can do it," and that "it's not easy, but it's simple if you know what you're doing, and we'll teach you what you need to know."  He states that the mission of Trump University is to "train, educate and mentor entrepreneurs on achieving financial independence through real estate investing."

---

[13]     Screen shot from ~~http://www.trumptactics.com/~~http://www.trumptactics.com/ (last visited 2/3/2010).







45.    The speaker emphasizes that on the television show, "The Apprentice," Mr. Trump could only work one-on-one with one person a year, so he created this University – not to make money for himself, but so that he could teach others.  With this apprenticeship program, the speaker claims, "Mr. Trump takes you through an entire apprenticeship for one year."  The speaker emphasizes that "***Trump University is owned, lock, stock and barrel by Mr. Trump – it's his 'baby,' his company***, designed to help him accomplish his goal of leaving a legacy."  The

---

14    These and the following slides are from the free online introductory Trump seminar.

presentation plays on consumers' reliance on the Trump name, Trump's Apprentice television

show, the Trump reputation, Trump's wealth and Trump real estate expertise:

 

 



46.     The presentation claims that the real estate transactions taught are safe and

conservative.  The speaker encourages members of the audience, including the elderly, to cash

 

d                                          em, "this is by the

T                                          a."  Consumers are

o                                          at have been in the

u                                          credit cards, pay off

n

Exhibit B
- 108 -



47.     The whole presentation is essentially an "infomercial," designed to get members of the audience to sign up for the so-called one year Apprenticeship Program, which is purportedly going to be "A Comprehensive Real Estate Education."  However, what the "one year apprenticeship" program actually turns out to be is merely a three-day workshop plus a phone number to call a "client advisor" for $1,495.

48.     Trump University promises "12 months of training," because "there's no shortcut to success."  They also promise mentors who will be available for a ***full year***.  ***"Other people don't have anyone to call, but you've got Trump.   You'll call 40 Wall Street [Trump University], and they'll walk you through it***."  They claim that after this seminar, "you're going to be walking on Cloud 9 because you get it; you know so much."  The speaker says you can attend the first day and then decide if the course is right for you.  Your "Satisfaction is 100% Guaranteed."  The speaker even says he will give consumers– his personal email; he wants that connection with them, so they can become part of the Trump family.

49.     Trump University even promises that consumers will receive instructors and mentors who were "***hand-picked by Trump***."  But, in fact, in most cases he didn't even know who they were, and in many cases, he had never even ***met*** them.

**Second Tier: the One-Year "Apprenticeship"**
**(actually a three-day infomercial**)

50.     **One-Year Apprenticeship –** Defendants describe the second tier as a one-year "apprenticeship" that allegedly provides a "comprehensive ***real estate education***."  ***In actuality, it is merely a three-day infomercial to sell more*** Trump University products.  Students are told at the free seminar that this one-year apprenticeship is "all you need."  However, rather than

Exhibit B
– 109 –

1 teach students actual real estate techniques and how to fill out the necessary contracts and forms

2 (as promised in the free seminar), the entire "apprenticeship" is a three-day long "infomercial" to

3 "up-sell" students to buy the Trump Gold Program for $34,995 to get a "full education."

4      51.   **Inducing students to increase credit card limits –** During the seminar, the

5 speakers ~~demand that~~pressured students to raise their credit card limits by as much as "four

6 times" their current limits during class breaks so that they can be ready to immediately purchase

7 property.   The speakers also ask each student to fill out a detailed financial statement,

8 presumably for real estate investment purposes, and assess their financial situation under the

9 guise of helping them – in fact, they assess how much money each student has to spend on the

10 next Trump University seminar.  At the end of the workshop, Defendants' real reason for urging

11 attendees to extend their credit limits becomes clear: the Trump University representatives ask

12 the students to use their increased credit to purchase the next level of buy-in, the Trump

13 University "Gold Elite" seminar, for $34,995.  Trump University representatives predominantly

14 pushed the "Trump Gold Elite" program for $34,995, but if they were unable to persuade

15 students to purchase at this level (or if students did not have sufficient credit), Defendants would

16 encourage the students to purchase the "Trump Silver Elite" program for $19,495 or the "Trump

17 Bronze Elite" seminar for $9,995.  Each of these prices were purported to be "one-day-only"

18 price savings off their "regular" prices of $48,490, $23,490 and $10,995, respectively.  *See* Ex.

19 A, Trump University Enrollment Form.

20      52.   Trump University representatives do not tell students that they are likely to incur

21 finance charges, interest fees and late fees by charging this expensive seminar on their credit

22 cards.  Trump University also does not tell students that by increasing their credit limits, they

23 could damage their credit scores.  Trump University representatives also never inform students

24 that by "maxing out" their credit cards, their credit scores could drop even more significantly.  In

25 fact, when Plaintiff Makaeff "maxed out" her credit card, her previously high credit score

26 immediately dropped.

27      53.   Instead, Trump University representatives encourage students to max out their

28 credit cards to pay the for the $35,000 seminar, telling them to "not worry," because "you'll

1    make it back in 30 or 60 or 90 days." They knew that this was extremely unlikely, and that few,

2    if any students did so.

3         54.    **Misrepresentations regarding calling student real estate "leads"** – Students

4    were also told at the free seminar that if they signed up for the $1,500 seminar, they could bring

5    in five to ten real estate leads and Trump University representatives would call them during the

6    seminar. Students were told: Go get five for-sale-by-owner leads (FSBOs) in lower-middle

7    income areas, with a phone number and an address for each property, and five "for rent" ads.

8    "***Our trainers, the best at Trump, will call these for you.  If they close the deal, you get to keep***

9    ***the profits***. But at the very least, you get to watch and listen to the best deliver the correct words

10   to get the right results, and you get to watch it happen.  No one else will do that. But we do –

11   we're Trump, we're bold; we're the best."   However, at each $1,500 seminar, Trump

12   representatives called the leads of only one or two students, even if dozens of students had

13   brought their leads in.

14        55.    **Mentorship** – Trump University promises students who purchase the $1,495

15   seminar an "entire year apprenticeship" – "one full year of expert, interactive support" where

16   "you will be trained properly by the best."  But in actuality, students get only a three-day seminar

17   and an 800-telephone number to call.  Trump does not provide the details, support or training the

18   students need to actually engage in the real estate transactions mentioned.  Nor does it provide

19   any mentorship.   In fact, while Trump University promised consumers who purchased the

20   $35,000 seminar ***unlimited mentoring for an entire year***, Trump University told its mentors it

21   would not pay them for more than ***six one-hour mentoring sessions*** per consumer.  When one

22   Trump University student became frustrated by the lack of any value or information the mentor

23   was providing and asked to meet twice per week, the mentor admitted that the "one year" of

24   mentoring/consulting promised was really only six one-hour coaching sessions.  Students would

25   never have paid $35,000 for six one-hour sessions.   Indeed, Trump University Corporate

26   admitted that the limit of six sessions should have been disclosed.

27        56.    **Illegal practices** – Furthermore, the real estate practices taught during the

28   Seminars include transactions that are illegal in certain states, including California, such as

1  posting anonymous "bandit signs."  These are signs placed by the roadway that mimic yellow

2  and black road warning signs and say, "WE BUY HOUSES, 619-222-2222."  Trump University

3  instructors also instructed students how to engage in real estate transactions which would be

4  sanctionable as practicing real estate without a real estate license.

5         57.    **Conflict of interest –** As part of the $1,495 seminar, students are promised they

6  will meet a Trump "power team" of mentors, real estate agents, brokers, contractors, attorneys

7  and accountants who were "***hand-picked by Donald Trump***," and will help the student make

8  money in real estate.  However, these Trump University "mentors" and power team members

9  were not "hand-picked" by Donald Trump.  Even worse, these mentors and "power team"

10  members often guide the students toward deals in which they have a personal financial interest at

11  stake – creating a severe conflict of interest so that the mentors profit while the student does not.

12         58.    **Money back guarantee and cancellation policy–** Students consistently complain

13  that they have timely requested refunds under Trump University's money-back guarantee, but

14  that Trump University failed to refund them their money.  In addition, Trump deliberately

15  designed its program and cancellation policy so that once students realize they are not getting the

16  information promised, it is too late to cancel.  For example, in regard to the $1,500 seminar,

17  students must cancel by the end of the first day (Friday) to get a full refund.  However, on

18  Friday, students are told that all of the "good stuff" is going to happen on Saturday.  On

19  Saturday, Trump representatives will call the students' leads, they will review their financial

20  profile to assess what real estate investments are appropriate, and will tell them about exclusive

21  mentorship opportunities with Trump University. Therefore, students are baited into waiting

22  until the next day, and letting the cancellation period expire, to see if Trump University will

23  deliver – which it does not.

24  **Third tier – the $35,000 Mentorship Program**

25         59.    By the end of the $1,495 seminar, students still have not received practical real

26  estate techniques.  Instead, they only got a high-pressure sales pitch to purchase another program

27  from Trump University: the $34,995 "Trump Gold Program."  Plaintiffs and Class

28  ~~members~~Members were clearly reluctant to spend approximately $35,000 more on an additional

1  program, after already paying Trump nearly $1,500.  However, Plaintiffs and the other Class

2  ~~members~~Members relied on the speakers' claims that they were "guaranteed success" if they

3  followed the techniques they would learn in the Gold seminar.

4      60.    Trump University's representatives told Plaintiffs and Class ~~members~~Members

5  that with the real estate mentorship they would receive in the Trump Gold Program, they could

6  create a real estate investing business that could earn up to tens of thousands of dollars of

7  monthly income, and potentially much more.

8      61.    The same misrepresentations regarding the "on-going apprenticeship," "hands-on

9  mentorship," conflicts of interest with the mentors and "power team," teaching of illegal real

10  estate practices, and failure to refund money timely requested also occurred during the Trump

11  Gold Program.

12      62.    **Mentorship –** One of the biggest selling points of the Gold Program was the

13  promise of a three-day Field Mentorship with real estate experts and investors.    Trump

14  University represented to Plaintiffs and Class ~~members~~Members that the value of this mentorship

15  alone was worth $25,000.  Plaintiffs and Class ~~members~~Members were told that they would

16  receive priceless insights and information from these mentors who were experts in the real estate

17  industry and would personally teach them what they would need to know.  Instead, during the

18  three-day mentorship, students typically spent two days looking at real estate properties (which

19  they could have done with a realtor for free and were offered no unique insight or guidance), a

20  half day at a local Home Depot and lunch, and an hour or so discussing numbers.  Mentors spent

21  little to no time discussing the contracts essential to the real estate transactions mentioned in the

22  seminar.  After the three-days, the mentors quickly disappeared, in complete contradiction to

23  what was promised: an ongoing mentor who would personally assist the student for an entire

24  year.

25      63.    During the Gold Program, there was still constant up-sell pressure to purchase

26  various other Trump University affiliate programs and products, varying in price from $495 to

27  $9,995.

28

    10-cv-00940-IEG(WVG)

64. Plaintiff Makaeff and the other students in her class who signed up for the $34,995 seminar were told that deals would now be coming their way via email and that "these deals are starting to POUR IN NOW." However, few, if any deals came in, and those that did provided only minimal positive cash flow, generally not worth enough to make the deal worthwhile, and certainly not the "tens of thousands of dollars per month" of opportunity promised by Trump University.

65. Plaintiffs and other Class ~~members~~Members were promised that they would receive the contracts they needed to conduct various complex real estate transactions and teach them how to fill them out – they never did. Even after the $35,495 program, and after numerous phone calls to Trump University, Plaintiffs and other Class ~~members~~Members were not instructed how to use the contracts they would need to conduct the real estate transactions described.

**Trump University Receives D- Rating from Better Business Bureau**

66. In January of 2010, the Better Business Bureau gave Trump University a ***D minus rating***. In addition, the New York Department of Education demanded that Trump University remove "University" from its title, insisting that the "use of the word 'university' by your corporation ***is misleading and violates New York Education Law*** and the Rules of the Board of Regents."[15]

**Donald Trump is Liable for the Misrepresentations and Misconduct**

67. Donald Trump is personally liable because of his personal representations or representations purportedly made by him, as well as his involvement and role in Trump University:

(a) **Donald Trump is the founder and Chairman of Trump University –** Donald Trump is the founder and Chairman of Trump University. Donald Trump owns Trump

---

[15] *See* Douglas Feiden, *State Educracts Give Failing Grade to Donald Trump's "Misleading" Trump University*, NY Daily News.com, April 16, 2010, and Lynn O'Shaughnessy, *Is Trump University Flunking Out*, CBS MoneyWatch.com, April 19, 2010.

1   University "lock, stock and barrel" according to Trump University seminar presenters.  Trump

2   University is Donald Trump's "baby, his company," according to the Seminars.

3            (b)      Donald Trump allowed Trump University to use his name, photos and

4   quotes for all Trump University seminar presentations, advertising – Donald Trump's name,

5   image, and personal representations were used extensively in Trump University seminar

6   presentations and advertising.   Donald Trump's picture is on the home page of Trump

7   University's website, along with a personal message from him: "Are YOU My Next Apprentice?

8   Prove it to me!"  Other advertisements purported to provide "insider success secrets from Donald

9   Trump," and the opportunity to "Learn from the Master," next to Donald Trump's image.

10  Consumers are told that the seminar is based on the "investing experience of Donald Trump."



1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16          (c)      Print advertisements featuring Donald Trump and his image included

17   quotes from him including: "***Don't think you can profit in this market? You can.  And I'll show***

18   ***you how***.  ***Learn from my handpicked expert*** how you can profit from the largest real estate

19   liquidation in history."[16]

20          (d)      An email from Trump University to thousands or tens of thousands

21   consumers featured Donald Trump's photo with the words: "***Are you My Next Apprentice***," and

22   stated: "***76% of the world's millionaires made their fortunes in real estate. Now it's your turn.***

23   ***My father did it, I did it, and now I'm ready to teach you how to do it too***."  The signature line

24   at the bottom of the email reads, Donald J. Trump, Chairman, Trump University, and even

25   includes his signature.

26

27   _____

28   [16]      *See* Trump University Advertisement, New York Post, March 2, 2009.

590148_1                                    - 31 -                          10-cv-00940-IEG(WVG)

**From:** Trump University <email@info.trumpuniversity.com>
**To:** brandon
**Sent:** Thu, April 29, 2010 12:06:00 PM
**Subject:** Entrepreneurs Needed to be My Next Apprentice



## I want people who want success.

If you Think BIG and believe you've got what it takes to succeed, I want you!

**76% of the world's millionaires made their fortunes in real estate. Now it's your turn. My father did it, I did it, and now I'm ready to teach you how to do it too.**

**Register Now** ▶

My team of real estate experts at Trump University is coming to your area in the next few days to conduct my Free Intro Apprenticeship Workshop. If you think you've got what it takes to be my next Apprentice, step up and attend. You should also bring along a trusted partner. This is YOUR opportunity to create wealth and take control of your own financial future with proven strategies that work in the current real estate market.



**Attend the Free Intro Apprenticeship Workshop to learn how to:**

1. Buy properties from banks at DEEP discounts
2. Use short sales to CONTROL property
3. Increase your financial POWER with leverage
4. Negotiate PROFITABLE deals that meet your goals
5. Attend and learn how to develop the CONFIDENCE to succeed in real estate

I'm also going to give you my "Secrets of Real Estate Marketing" investor toolkit (a $50 value) absolutely FREE when you attend.

**Don't waste time - seating is very limited and my Trump Workshops always fill up fast.**

**Register Now** ▶

**See you at the top!**



Donald J. Trump
Chairman, Trump University

Exhibit B
- 117 -

**From:** Trump University <email@info.trumpuniversity.com>
**To:** brandon
**Sent:** Thu, April 29, 2010 12:06:00 PM
**Subject:** Entrepreneurs Needed to be My Next Apprentice



## I want people who want success.

If you Think BIG and believe you've got what it takes to succeed, I want you!

**76% of the world's millionaires made their fortunes in real estate. Now it's your turn. My father did it, I did it, and now I'm ready to teach you how to do it too.**

Register Now ▶

My team of real estate experts at Trump University is coming to your area in the next few days to conduct my Free Intro Apprenticeship Workshop. If you think you've got what it takes to be my next Apprentice, step up and attend. You should also bring along a trusted partner. This is YOUR opportunity to create wealth and take control of your own financial future with proven strategies that work in the current real estate market.

**Attend the Free Intro Apprenticeship Workshop to learn how to:**

1. Buy properties from banks at DEEP discounts
2. Use short sales to CONTROL property
3. Increase your financial POWER with leverage
4. Negotiate PROFITABLE deals that meet your goals
5. Attend and learn how to develop the CONFIDENCE to succeed in real estate

Register Now ▶

See you at the top!





Donald J. Trump
Chairman, Trump University



**I'm also going to give you my "Secrets of Real Estate Marketing" investor toolkit (a $50 value) absolutely FREE when you attend.**

**Don't waste time - seating is very limited and my Trump Workshops always fill up fast.**

Exhibit B
- 118 -

(e)     Trump University print advertisements were reviewed and authorized by Donald Trump before they were released and contained quotes from Donald J. Trump, including: "I can turn anyone into a successful real estate investor, including you. – Donald Trump."[17]

(f)     Donald Trump sent signed letters to consumers nationwide, with his **name and signature** at the bottom, which stated: "*[N]o course offers the same depth of insight, experience and support as the one bearing my name* . . . .  My hand-picked instructors and mentors will **show you how to use real estate strategies to: [s]upplement or even replace your income**, [s]ecure your long-term financial future . . . [s]tart profiting today! Now is the time to create your financial legacy.  **You can do it**, even if you only have five or ten hours a week to spare.  With our simple instructions and practice exercises – **and ongoing support from your own Trump Team of Experts – you'll have what you need to succeed!**"  (Emphasis in original). The letter closes with Donald J. Trump's name, signature, and at the Trump University address, at 40 Wall Street, 32nd Floor, New York, NY 10005.

(g)     While Plaintiffs and other Class ~~members~~Members were in the midst of the Trump University $1,500 seminar and Trump University was trying to persuade them to sign up for the $35,000 course, each of the participants received a personalized (addressed to them by name) letter from Donald J. Trump.  The letter bore the Trump logo at the top of the letter and the words "From the Office of Donald J. Trump."  The letters stated:

> Success in real estate begins with great training and proven strategies. Without education you don't stand a chance.
>
> **I know how to make money in real estate.**  I've been doing it for a long time with a lot of success.  **My family has been a leader in real estate** since my father – Fred Trump – started building residential homes in New York City 75 years ago.  My father was my mentor and he taught me a lot.  **Now I want to teach you how to make money in real estate.**  To be my apprentice you need to Think BIG and really want to succeed.  More than anything, you need to take action.
>
> Do YOU have What It Takes to Be My Next Apprentice?

---

[17]     *See* Trump University Advertisement, New York Post, March 2, 2009.

Exhibit B
- 119 -

1         I only work with people who are committed to succeed.  I founded Trump
2   University back in 2005 to teach go-getters how to succeed in real estate.  My
    team at Trump University is filled with real estate experts . . . proven winners.
3   We're the best of the best and we know what works.  If you think you have what
    it takes to be my next apprentice, prove it to me.

4   We've trained thousands of real estate investors over the years and we know you
    will be most successful when you work with a partner. . .
5
6         If you're serious about making money and safeguarding your future, **learn
    to invest in real estate.  Trump University will teach you how.  We'll give you
7   the best training** and the confidence to succeed.  If you think you've got what
    takes to be my next Apprentice, come prove it to me and my team.

8   The letter closes with "See you at the top!"  And, it is signed, "Donald J. Trump, Chairman,

9   Trump University."

10        (h)    Donald Trump wrote nearly 400 blogs posted on Trump University's

11  website, and stated that he intended to be actively involved with Trump University – Donald

12  Trump regularly posts blogs on the Trump University website – he has posted 387 blogs from

13  May 27, 2005, to as recently as August 18, 2010, and these blogs all remained on the website as

14  of October 18, 2010.[18]   In these blogs, Donald Trump stated that he intended to be actively

15  involved with Trump University and intended to personally help consumers who paid for Trump

16  University Seminars.  Donald Trump wrote: "I'm not just putting my name on this venture; I

17  plan to be an active presence in the curricula."  For example in the blog "*Why I Started Trump*

18  *University: A Passion for Learning*," Donald Trump explains that:

19      Trump University **grew out of my desire to impart my business knowledge,
    accumulated over the years**, and my realization that there is a huge demand for
20  practical, convenient education that teaches success

21  **I want the people** who go to Trump University **to succeed, and I plan to do my
    part to help them. I'm not just putting my name on this venture; I plan to be an
22  active presence** in the curricula. The website, www.trumpuniversity.com, will
    include such features as "**Ask Mr. Trump," in which I answer your questions**;
23  the **blog** you're reading now; **video clips of me**; and more. **My words, ideas, and
    image will also be woven into the courses we create**. The reason I'm playing
24  such an active role in Trump University is that I truly believe in the power of

25  _____
    [18]   ~~http://www.trumpinitiative.com/blog/author/donald-trump.cfm.~~
26  <ins>http://www.trumpinitiative.com/blog/author/donald-trump.cfm.</ins>  (After the name change,
    all references from Trump University were changed to Trump Entrepreneur Initiative, even in
27  earlier posts; for continuity, we use Trump University).

28

education . . . . [T]he people who go to Trump University want to be successful, and ***I'm on their side***.[19]

(i)    In the blog "*Trump University Lampooned: We're Laughing All the Way to the Bank*," Donald Trump acknowledges that much of the appeal and interest in Trump University is due to the fact that it has his name on it, and his name has become a "brand":

> Recently Gary Trudeau spent a week lampooning Trump University in his comic strip Doonesbury. The basic premise of each strip in the series revolved around the disparity between Trump University and a traditional university. . . . Trump University has also been mocked in one of Jay Leno's monologues, in the New York Post's Page Six cartoon, and probably in a lot of other places.
>
> ***It's nice to see that my new venture is making a splash in popular culture***. As they say, no press is bad press.

> *        *        *

> [W]hen you get big, especially ***when you become a brand, you become a target***. . . . So, if some people want to get a few cheap laughs at the expense of Trump University just because it has my name on it, that's fine.

(j)    Again in the blog "*On Being a Brand: What's in a Name?*" Donald Trump acknowledges that his name has become a brand name, and that people pay more money because of the association with him:

> I never planned on becoming a brand name. Nevertheless . . . ***Trump has ultimately become a great brand name due to my rigorous standards of quality***.

> *        *        *

> The Trump name carries with it a price tag: people pay a lot more to live or rent commercial space in my buildings because of the association with me and my ideals.

> *        *        *

> ***I have to believe in whatever I put my name on***, and it has to reflect who I truly am. To do otherwise would be a disservice to me, my loyal customers, and prospective customers.

(k)    **Donald Trump's blogs were written by Donald Trump, not by Trump University** – Donald Trump's blogs which were posted on the Trump University website were

---

[19]   ~~http://www.trumpinitiative.com/blog/post/2005/06/why i started trump university a passion for learning.cfm.~~   http://www.trumpinitiative.com/blog/post/2005/06/why-i-started-trump-university-a-passion-for-learning.cfm.

Exhibit B
- 121 -

1    written by him, or purported to be written by him; they were not written by Trump University.

2    These blogs were publicly posted on the Trump University website as public representations

3    concerning Trump University and its program and services.

4            (l)    **Donald Trump personally financed Trump University –** Unlike most

5    his other ventures, Donald Trump personally financed Trump University.  He remains one of the

6    primary investors in Trump University.  As Business Week reported, shortly after Trump

7    University began operations, "Plenty is at stake for The Donald: Unlike many of his past

8    ventures, he [Donald Trump] has funded this one [Trump University] all by himself."  *See* Brian

9    Hindo, *Trump University: You're Wired!*, Business Week, May 23, 2005.

10           (m)    **Donald Trump personally reviewed Trump University financials**

11   **every month –** Donald Trump was involved in and knowledgeable about Trump University and

12   its financial operations.

13           (n)    **Donald Trump personally reviewed all print and direct mail**

14   **advertisements before they went out –** Donald Trump was also involved in the advertising and

15   marketing of Trump University.  Donald Trump also received regular updates from Michael

16   Sexton.

17           (o)    **Donald Trump** **represented that he** hand-picked the Trump

18   **University instructors and mentors** ~~according to Trump~~which was also represented byTrump

19   University presenters during real estate investing Seminars.

20           (p)    **Donald Trump backed Trump University 100% and intended to**

21   **appear at fall 2010 events –** Donald Trump himself and Trump Organization "are backing

22   [Trump University] ~~1005~~100% and are even pushing for a very large scale event with Mr. Trump

23   in the near future," according to Trump University director April Neumann to President Michael

24   Sexton, Michael Bloom and other conference call team members on August 19, 2010.

25           (q)    **Donald Trump would hold periodic live online Q&A Sessions with**

26   **Trump University students –** According to Michael Sexton, Donald Trump would hold

27

28

1  periodic live online  Q&A sessions with Trump University students. [20]  Also, twice a month

2  Donald Trump would personally choose and answer the best questions from Trump members,

3  according to the Trump University website.  The website stated:

4          Ask Donald Trump: Have you ever wanted to ask Donald Trump a
       question?  Now's your chance!  Mr. Trump loves hearing from Trump University
5      members, especially members with great questions!  But as you can probably
       guess, he's got a hectic schedule.  That means Mr. Trump only has time for the
6      most interesting and direct questions.  Twice a month, he will choose the best
       questions and respond in true Donald Trump fashion.  Look for answers to your
7      questions (if answered) and previous questions and answers posted on the Trump
       Blog.

8  (Last visited 5/4/10).



27  [20]    *See* Brian Hindo, *Trump University: You're Wired!*, Business Week, May 23, 2005.

Exhibit B
- 123 -

**Complaints from Numerous Trump University Students Nationwide**

68.     Plaintiffs are not alone in their complaints regarding Trump University's misrepresentations and unscrupulous conduct.  Indeed, there are endless complaints nationwide on the internet that echo Plaintiffs' complaints, including, for example:

- This recent post on http://www.reviewopedia.com/trump-university.htm, from Susan in Michigan was posted on April 11th, 2010:

  > We purchased a mentor program for $19,000 in December 2008. **We did not receive the promised materials or mentor service**. We canceled immediately, calling both Rochester NY & Boca Raton FL. Unfortunately we paid by check and did not have a credit card company to help us get our money back. We have made several call, emails, faxes, etc. **We've been lied to, deceived**, promised the person with "authority" would call us back immediately (doesn't matter when you call, they are never in) and told there was a glitch in their system and our refund was being processed. **We still do not have our refund** and they continue to play the game. Does this sound like Donald Trump is an honest man concerned with helping you build wealth? . . .

- Charles from Florida posted this on September 21, 2009: "I was told that after taking the first 3 day seminar, which cost $1,500 I could go out start making deals. . . . **The only thing they want you to do is sign up for the next seminar** which can cost up to $35,000."

- Joe from Florida posted this on September 18, 2009: "**What a SCAM** I attended the three day seminar and **really learned very, very little. [Their] goal is to talk you into joining the next seminar**, which can cost up to 35,000.  They use almost Gestapo tactics to sign for this seminar . . . .   Any questions you ask are never answered."

- L. Heard from Georgia had this to say on June 23, 2009:

  > I have been trying to get my money back from attending one of the seminars and have yet to do so. My contract stated that I had 3 days after date of purchase to cancel and I did so in 1 day. I attended the seminar on March 22, 2009 and here it is June 22, 2009 all they can tell me is that they see that I have done all that I was supposed to do but they don't know what is taking so long to refund my money.

- Dorla from California posted this on June 10, 2009:

  > Trump University is a major disappointment. **They charged me $35,000 for the program, which I would never have paid if I had known that the info given to me was not true**. I based my decision on that info! They would not return even a portion of my money after several long and tearful conversations, even after agreeing the info was outdated and they would have to do something about it. I would strongly suggest never using them. There are other gurus out there that are honest and don't cost as much !!! **I can't believe Donald Trump would allow such mis-behaving**

*to be associated with his name. **Run fast and keep running*** where they are involved!

- Yu from Los Angeles posted this on March 25, 2009:

  > I signed up the tax lien products & as the organization promised "Full Money Back Guarantee" within 10 days. I called at least 10 times the organization & they keep on telling me different time frame & story about why they delayed to refund me. It's been the 25th business days, have ***NOT yet received my refund. I checked BBB & found they did have a lot of fraud issues***.

- Linda from Newark, California had this to say on March 6, 2009: "I took several Trump classes and spent well over $15,000 . . . . They give you a ton of information and then ***leave you high and dry. No support what so ever!!!!***"

- Rhonda from Georgia claimed ***her identity was used by Trump University without her permission*** (post from September 30, 2009):

  > Just had someone write me and call that said that they graduated from Trump University's 3 day course and was led to me by ***James Harris who said that I was a student there***. Okay – ***that's not true***. Then, he also said that when I came to him as a student I was almost broke and that the course made me successful. Wrong again! I have never been a student of his or the school I and never been broke.

  > That is slander and I would watch someone who makes up stuff to make their product look better. Hopefully the success of the school is not based on lies.

  > Whereas I am successful - #1 Real Estate Agent in Georgia, 6 years in a row, it was not because of Trump University or James Harris which I had no idea existed until it was brought to my attention.
  > ~~http://www.reviewopedia.com/trump-university.htm~~http://www.reviewopedia.com/trump-university.htm.

- On December 13, 2009, another Class member that was scammed by Trump University wrote:

  > ***Do not trust Trump University! This company is a well designed scam using the name of Donald Trump who apparently doesn't care*** how much more Americans get hurt this year and the next ones by a weak economy. Instead he's using it to take advantage of you.

  > They will do whatever (and I mean, whatever) it takes to get you to open your pockets to invest in their company. I am sure there are tons of people like me who have lost precious money because of them. So if you have to borrow and have no credit to do this or even if you have good credit, don't! They will rob from you . . . ***this is modern day robbery*** . . . and then they will place in a very dangerous position. You could lose equity in your house if

you have to borrow to attend, *you could damage your credit* if you have to max out your credit cards, or you could even lose your house like so many Americans because that last bit of money that was supposed to get you through another six months or year for mortgage payments is now gone based on a false promise!

The scam in all of this is that the information always skims the surface. No matter the class, *you get loads of advice on buying more classes, not advice on execution*. They will never tell you that it takes 1000 steps to do something and instead magnify the few positive points of real estate. Don't be fooled by them or their grand statements of flipping a house with 10 hours of work. They are full of it! I know because I have been through it.

\*        \*        \*

*Oh and when they tell you they'll be there for you, they'll scram as soon as they've collected the dough*. The instructors are there for their 3 day classes and then off to the next city to convince more unsuspecting prospects to drop 15-35G's. . . . ~~http://trump-university.pissedconsumer.com/trump-university-reviews-20091213164344.html~~http://trump-university.pissedconsumer.com/trump-university-reviews-20091213164344.html.

• On January 20, 2010, another consumer wrote:

*Trump U preys on the elderly*.

This is the biggest SCAM I've ever seen!  My 82 year old father went to a free seminar promising to make him rich through real estate.  The seminar was solely for the purpose of upselling him into attending a $1500 three day workshop by promising him they would teach him how to buy and sell foreclosures for huge profits (which is totally unrealistic because the vast majority of foreclosures today are because people are upside down in their homes) Anyway, he goes to the 3 day workshop and when he comes home we find out that they pressured him into spending $35k MORE!  I don't care who you are there is no real estate course worth $35k.  Then he proceeds to tell us how the majority of people there were SENIORS like him!  These aren't long term investors here, these are people being tricked into thinking they can make a quick profit!  If this isn't the definition of preying on the elderly then I don't know what is. ~~http://www.moneystance.com/trump-university-reviews~~http://www.moneystance.com/trump-university-reviews

• On December 13, 2009, another consumer stated that:

*Trump University and their staff should be ashamed of themselves! They RUINED my credit!!!* They told me I would get my large investment back in my first real estate deal because I would have access to amazing mentors and course content. I did what they told me in all of the courses and it was nonsense! *I maxed out my credit cards* because I thought Donald Trump

Exhibit B
- 126 -

wouldn't have such a sorry excuse for a school just to make more money. But he is a greedy man so I should have known.

> ***Be aware that when they tell you to increase your credit limit to purchase real estate it's really to scam you out of tons of money*** that you've worked so hard for. . . .
> http://www.complaintsboard.com      /complaints/trump-university-c288699.html.

- On November 3, 2008, another victim stated:

> At the retreat, the only three things that happened: they pre-qualify you for their $35, 000.00 GOLD PACKAGE, [2] ***they ask you to call all your credit card companies and request a credit limit increase (so you can pay for the 35K)***, then during three days the sell you over and over their mentoring services and keep telling you that the information you are waiting to hear is coming . . . three days later nothing worth is mention. Their material is completely worthless. 100+ pages of content-empty power point print outs.
>
> I requested a refund, both in person and in writing and was denied
>
> BE AWEARE, THESE ARE MASTERS OF THE SCAM. ~~http://www.complaintsboard.com/complaints/trump-university-c118292.html~~ http://www.complaintsboard.com/complaints/trump-university-c118292.html.

- On February 27, 2009, Patt from Sacramento, California wrote:

> ***Trump University real estate programs are ALL scams***. I paid the $1500 for the 3 day course which turned out to be three days of them trying to get me to sign up for the $21,000 gold course. They ***ask for all your financial information*** (which fortunately I refused to give them) and then spend the remaining "class time" pulling people out to ***hard close them on the gold program and private coaching***. ~~http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-rip-off-of-th-99exd.htm~~ http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-rip-off-of-th-99exd.htm.

- On June 19, 2008, Truth from Brooklyn, New York stated:

> I wished I saw this site BEFORE I fell for [p]aying the $1,500 at the free seminars. ***[T]hey will take your money and the 3 day event will be used to make you buy more stuff.  [A]nd even after you buy more stuff, they will sell you more***.  [A]m not sure how much trump is making from this. But, i do feel that if he know what bull they are teaching, he would not authorize to use his name.  [A]s you may know, this is the same things that other companies are doing to sell you more and more training. [T]he only difference in this situation is that they use trump name. ~~http://www.ripoffreport.com/seminars/ trump-university-tru/trump-~~

10-cv-00940-IEG(WVG)

university trump-seminar-pcc44.htm<u>http://www.ripoffreport.com/seminars/ trump-university-tru/trump-university-trump-seminar-pcc44.htm</u>.

- On March 20, 2008, another consumer from Las Vegas, Nevada that was scammed by Trump University wrote:

> *Trump University will rip you off*.

> *They do not teach you what they say they will teach you and what you have paid for*. They also do not deliver what they say they will deliver and if you ask for a refund on something that you have not received they will not give it to you.  All that I can say is do your research."
> http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-is-a-scam-w-eba5e.htm<u>http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-is-a-scam-w-eba5e.htm</u>.

- On August 7, 2007, a real estate investor from New York, New York wrote:

> *Trump University is the biggest scam EVER!!!* After speaking with most everyone employed *there only ONE yes, ONE person on their staff invests in real estate*. I have tried to blog several times asking if Mr. Michael Sexton (President of Trump University) has properties and I have never received a response.  I paid over $20,000.00 after they told me that I would get personalized service and all I got was a box filled with books to read and terrible software that costs under $500.00 when buying from Barnes & Noble. The live events were a total joke and even the main presenter there bar[e]ly has investing experience. I fortunately have enough money to not go broke because of them but *almost everyone there took out loans or maxed out their credit cards to get this trash service*. It is just like every other late night infomercial and am disgusted by Mr. Trump being affiliated or supporting this program. I have talked to several different people there because each person I get handed off to quits or got fired from the organization. They don't know what they are doing *and are preying on the weak who are just trying to make it in life*!!!!!!!!  SHAME ON YOU MR TRUMP AND TRUMP UNIVERSITY. . . ."
> http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-scam-to-steal-s3e7s.htm.<u>http://www.ripoffreport.com/seminar-programs/trump-university/trump-university-scam-to-steal-s3c7s.htm</u>.

## PLAINTIFFS' FACTS

**Plaintiff Tarla Makaeff**

69.    Tarla Makaeff purchased the three-day Trump University "Fast Track to Foreclosure Training" workshop for approximately $1,495.  Two people were permitted to attend

1    for the $1,495 price, so Plaintiff Makaeff attended with a friend and split the cost.  During the

2    three-day workshop, Plaintiff Makaeff was told to raise her credit card limit four times so she

3    could enter in to "real estate transactions."  However, at the end of the session, Trump University

4    revealed its real reason for pushing Plaintiff Makaeff and Class ~~members~~Members to extend

5    their credit limits: to use that credit to purchase an additional $35,000 Trump seminar.  Based on

6    Defendants' numerous misrepresentations, on or about August 10, 2008, Plaintiff Makaeff

7    enrolled in Trump's Gold Program for $34,995, plus the variable APR finances charges, interest

8    fees, and late fees she had to pay her credit card company.

9       70.    The day Plaintiff Makaeff signed up for the $34,995 program, James Harris

10   immediately told Plaintiff Makaeff that he would now be personally available to her by phone

11   and email, and shortly thereafter emailed to her "we can do a ton together."  Then, she never

12   heard from him again.

13      71.    **"Guarantee" that Plaintiff Makaeff's first deal would pay for her $35,000**

14   **seminar –** While Plaintiff Makaeff was on the fence about spending the additional money,

15   Trump University speaker Tiffany Brinkman persuaded Plaintiff Makaeff to sign up by

16   "guaranteeing" Plaintiff Makaeff that her first real estate deal would earn her in the ballpark of

17   $35,000, so that she could immediately pay off her Trump University debt, leaving only profits

18   for the future.  Although Plaintiff Makaeff signed up for the seminar in reliance on this

19   representation, which was a standard representation made by Trump University representatives,

20   it could not have been farther from the truth – Plaintiff Makaeff never made *any* money.

21      72.    **Mentors –** Plaintiff Makaeff was assigned two mentors, and initially, the mentors

22   would return calls, but would only speak to Plaintiff Makaeff for two to three minutes, offering

23   no practical advice.  After that, although the mentors were supposed to provide "mentorship" to

24   Plaintiff Makaeff for a full year, they mostly disappeared.  After Plaintiff Makaeff complained

25   about the lack of assistance provided by her assigned mentors, Rick McNally and Mike Kasper,

26   Tad Lignell, the mentor with the "power team," offered to help her personally, but then engaged

27   in misappropriate conduct and misadvised her regarding a property in Las Vegas in which he had

28   a personal financial interest.

Exhibit B
- 129 -

73.     After spending approximately *$60,000* over the course of an entire year to attend numerous Trump University related or endorsed Seminars, only two real estate deals ever came to Plaintiff Makaeff, and Plaintiff Makaeff did not accept either, as both were flawed and appeared unprofitable.

74.     In one of the two deals offered to Plaintiff Makaeff, Trump mentor Tad Lignell introduced Plaintiff Makaeff to a real estate agent, Noah Herrera of Las Vegas regarding a property purchase in Las Vegas. Lignell did not disclose to Plaintiff Makaeff that he had a financial interest in referring Trump students to Noah Herrera. *The Power Team then misquoted comps to Plaintiff Makaeff.* Rather than making a profit on the deal, as she would have made if the comps had been correct, she would have likely suffered a 20% *loss* on the transaction. When she discovered that the comps were incorrect and that she was likely to lose money on the deal, she looked for a way out. As it turned out, Mr. Lignell's protégé fraudulently and illegally altered the real estate documents Plaintiff Makaeff had previously signed at the escrow office without Plaintiff Makaeff's authorization or approval. As a result of this illegal and fraudulent conduct, Plaintiff Makaeff was permitted to void the transaction, which she did.

75.     The only other real estate transaction that came Plaintiff Makaeff's way involved a Houston property. After being told by Trump representatives that the deals "are starting to POUR IN NOW," the only deal that came in was the Houston deal. It was outside of Trump University's recommended guidelines for real estate investing, as it would provide only $40/month positive cash flow, and Trump's own representative, Stephen Gilpin instructed Plaintiff Makaeff never to accept a deal under $100/month positive cash flow. Furthermore, this potential deal raised an inherent and improper conflict of interest, as it was referred by a partner (Mike Kasper) to the Trump mentor, Rick McNally, who stood to financially benefit from the deal.

76.     **Bandit signs** – Furthermore, certain real estate practices that Trump University taught Plaintiff Makaeff and other class members during the Seminars included transactions that are *illegal* in California and other states, such as posting anonymous "bandit signs." These are the signs that are posted by the side of the roadway, mimic black and yellow road warning signs

and say, "WE BUY HOUSES, 619-222-2222."  Plaintiff Makaeff was posting bandit signs, as taught by the Trump Seminars she attended, and had no idea they were illegal until she was contacted by the District Attorney's Office and told that those techniques could subject her to ***hundreds of thousands of dollars in fines, a misdemeanor charge, and up to six months in jail***. As a result, she was required to retain a criminal attorney.  Makaeff suffered physical and emotional damage as a result of the stress of the DA investigation, as well as continuing financial stress due to the substantial amount of money she lost to Trump.

**Makaeff's written and videotaped comments regarding Trump University –** Trump University has attempted to tarnish Makaeff's credibility by stating to the press that Makaeff gave Trump University good written reviews.  After the $35,000 seminar, Makaeff did write a review saying positive things about the program, but her mentors who were supposed to be providing her with a full year of one-on-one mentoring were right there looking over her shoulder, so she did not want to offend them by writing anything negative.  Also, at this point, immediately after the seminar, Makaeff actually believed she would still get the information and mentoring she was promised by Trump.  Like most people who attend the seminar, she did not fully realize she had been scammed until later on.  She kept thinking she would get the help and mentoring she was promised, but it never came.  In regard to the videotape Trump University has referred to in the press as a Trump "testimonial," at the last seminar Makaeff attended in July 2009 on "California specific strategies," a cameraman shoved a camera in her face unexpectedly and started recording and asking questions.  Again, trying to be polite and not to offend her mentor, whom she still expected to help her with real estate deals, her recollection of the tape is that she replied in general terms that mentors in general are important (without reference to the Trump mentors specifically) and that she had some mentors in her life that had benefitted her. She did say that she believed real estate knowledge is an important skill to have – and she still believes this – however, Trump's programs unfortunately did not provide her with the real estate education she expected to receive.**Plaintiff Ed Oberkrom**

77.    Ed Oberkrom is a 65-year old senior citizen who lives in St. Louis, Missouri and purchased the three-day Trump seminar for $1,500 in February 2009 and then went on to

1    purchase the $25,000 Elite seminar in March 2009.  He attended the seminar after seeing and

2    relying on Trump University advertisements.

3          78.     Ed and the students in his class were told that the first students to sign up for the

4    $25,000 seminar would be the first to get the best properties on a list, and access to get the best

5    buyers.  The speaker also told them that the first students to sign up would get the first access to

6    an exclusive website of ***properties hand-picked by Donald Trump***.  As he later came to learn,

7    these properties were ***not*** hand-picked by Donald Trump.  And the website was ***not*** "exclusive"

8    at all – anyone could buy it for $39/month.

9          79.     The Trump University instructor, Steve Goff, sold Ed Oberkrom on the program

10   by telling him that he had family in St. Louis and that he planned to come back to town

11   frequently and would give him personal training.  However, once he and Trump got Ed

12   Oberkrom's money, Goff ***has not once been back*** to town – or at least he has not contacted Mr.

13   Oberkrom.

14          80.     **Raising credit card limits –** As is standard in all Trump $1,500 Seminars, the

15   Trump instructor, Goff, asked all the students to raise their credit card limits – and then purchase

16   the $25,000 or $35,000 "mentoring" program.  Each student was asked to fill out a "gold sheet"

17   of financial information, real estate owned, credit info, etc.

18          81.     **Mentoring –** During the course of the three-day seminar, Goff took Mr.

19   Oberkrom out one afternoon to look at some properties, but it was completely unproductive.

20   Goff said that he would follow-up with him and tell him what to bid on the properties, but he

21   never did tell Oberkrom what to bid, and never followed up with him, and the deadlines to

22   purchase the properties passed.

23          82.     **Refund refused –** Mr. Oberkrom was supposed to receive 2-1/2 more days of "in-

24   person" mentoring in regard to the supposed year-long mentorship, but it has been over a year,

25   and despite some discussion of trying to set a date, no mentoring has occurred (and none of the

26   $25,000 refunded).   In fact, when Mr. Oberkrom asked for his money back from Trump

27   University, since he never received the mentoring he paid for, Trump told him that because he

28   did not cancel within the three-day rescission period, he was out of luck.

Exhibit B
- 132 -

Plaintiff Patricia Murphy

2.      Patricia Murphy is a New York retired schoolteacher from the Bronx.  She was a full-time school teacher for seven years.  After she was laid off and started making less money substitute teaching, she began looking for a way to supplement her income.  She heard advertisements on the radio and television that Donald Trump was having a free seminar and would show her how to be successful and make money in real estate.  She took out her life savings and spent about $12,500 on wealth building Seminars, software and mentoring from approximately January 27 through March 12, 2007.  She did not realize she was being scammed until it was too late.

3.      According to Murphy, an educator, the Seminars did not provide any kind of an education—they were worthless.  Trump instructors promised they would get Murphy connected with investors or banks and guaranteed that they would be at her side—but they never did anything for her.  Hoping to get more individualized help, she paid for additional "mentoring," but her mentor was just as bad—he basically told her to look at the real estate listings in the newspaper—not especially valuable advice.

4.      In Murphy's own words, she says: "I took out most of my life's savings, maxed out my credit cards and badly damaged my credit rating.  And what do I have to show for it?  Big bills, interest payments, finance charges—an awful lot of stress."  In fact, the stress was so much, that she had to be hospitalized over Christmas, and she is now in the worst financial condition she has ever been in her life.

**Plaintiff Brandon Keller**

83.     Plaintiff Brandon Keller is a San Diego resident who resides in Del Mar, has a degree in Business Administration/Finance from University of Arizona in Tucson and is currently going to school to become a nurse.  He received an email advertisement about Trump University in the fall of 2009 and attended the free seminar on November 18, 2009, at the Marriott in La Jolla on La Jolla Village Drive.

84.     At the free introductory real estate seminar, the Trump University speaker went through the standard slides and presentation discussed above.  The speaker claimed that he

Exhibit B
- 133 -

1   personally made $50,000 after attending the three-day $1,500 seminar and showed slide

2   testimonials of people who claimed they made $90,000 after attending the $1,500 seminar.

3       85.    Keller paid for and attended the $1,500 seminar on Friday December 6, 2009

4   through Sunday, December 8, 2009, at the San Diego Hilton Bay hotel downtown.  He decided

5   to take the seminar because Trump University promised it would teach students specifically how

6   to make money in real estate without using any of their own money.  Trump representatives also

7   promised students that with the $1,500 seminar, they would have access to a real estate coach

8   and program director, Paul Reisner, for a full year – neither provided any assistance to Keller

9   with real estate investing.

10       86.    **Misrepresentations regarding calling student real estate "leads"** – Keller and

11   the students at his free introductory seminar were told that that if they signed up for the $1,500

12   seminar, they could bring in five to ten real estate leads and Trump University representatives

13   would call them during the $1,500 seminar. Students were told:  Go get five for-sale-by-owner

14   leads (FSBOs) in lower-middle income areas, with a phone number and an address for each

15   property, and five "for rent" ads.  "***Our trainers, the best at Trump, will call these for you.  If***

16   ***they close the deal, you get to keep the profits***.  But at the very least, you get to watch and listen

17   to the best deliver the correct words to get the right results, and you get to watch it happen.  No

18   one else will do that. But we do – we're Trump, we're bold; we're the best."  However, at the

19   $1,500 seminar, even though there were 30 people in the class, including Keller, who brought in

20   potential real estate leads, Trump University representatives called leads for only 2 of the 30

21   students.

22       87.    The speaker at Keller's $1,500 seminar was Steve Goff.  He told students that at

23   one point in his life he was homeless, but he found a real estate mentor, and that person taught

24   him how to make money in real estate.  Goff said that after he had made a lot of money in real

25   estate and did over 100 real estate deals, Donald Trump approached him and said he wanted Goff

26   to work for him, so he left his lucrative real estate career to be a touring speaker for Donald

27   Trump.

28

88.   **Money back guarantee and cancellation policy–** Keller knew that in order to request his money back under the Trump University "satisfaction guarantee," he had to cancel after the first day (Friday) of his $1,500 seminar.  However, on Friday of the three-day seminar, Keller and his class were told that all of the "good stuff" was going to happen on Saturday – the Trump University representatives would call his leads, review his financial profile to assess what real estate investments were appropriate for him, and he would learn about exclusive mentorship opportunities with Trump University. Therefore, Keller felt he was basically forced to come on Saturday to get the information Trump University promised, and by then, it was too late to cancel.

89.   **Mentorship –** during the $1,500 seminar, the Trump University speaker told students over and over again that they really needed a mentor to succeed in real estate investing. He repeatedly told them that you really have to have a mentor to make a lot of money in real estate and so you do not make mistakes. If you do not  have a mentor, you can lose a lot of money and have a lot of problems.  The speaker gave several examples of how he lost money in real estate before he had a mentor, and how he made a fortune in real estate once he had a mentor.  The speaker never mentioned the price of this "mentor" on Friday, when students still had time to cancel and receive their money back, but on Saturday, after it was too late to cancel, Trump University representatives eventually revealed that the price for this year-long mentorship (including three days in-person) was $35,000.  He assured students that although that may sound expensive, compared to Wharton Business School where Donald Trump attended, it is a bargain – Wharton is $35,000/year, and it is a four-year school – they were better off going with Trump University, he told them.

90.   **Increasing credit card limits –** As is standard procedure during the $1,500 Seminars, on Saturday, the Trump University speaker told Keller and all the other students to increase the credit limits on all of their credit cards so that they would have more credit available to buy real estate.  The speaker also asked every student to fill out a sheet of their personal financial information, including a list of all credit cards, the credit limit on each card and the available credit to charge, so that they could purportedly assess what real estate investments

Exhibit B
- 135 -

1    would be best for each student.  Then, as is also standard procedure, Trump University asked the

2    students to use their increased credit limit to purchase the $35,000 Trump Elite seminar.  The

3    speaker even told students they could spread the amount out over multiple credit cards.  This is

4    what Keller did – he put $10,000 on each of two credit cards, and $15,000 on a third.  Keller

5    believed that most students who purchased the $35,000 seminar from his class put the amount on

6    two to five credit cards, depending on their credit limits.  Keller estimates that ***30-50% of the 30***

7    ***students in his $1,500 seminar signed up for the $35,000 seminar***.

8         91.    **Trump University guaranteed his real estate deals would pay for his**

9    **Seminars –**At the free seminar, Keller was told that if he signed up for the $1,500 seminar, he

10   was guaranteed to make $5,000 to $10,000 within 30 days to cover the cost of the seminar.  He

11   did not.  At the $1,500 seminar, Keller was told by the speaker that he was guaranteed to make

12   $75,000 on the first deal to more than cover the cost of the $35,000 program. He did not.

13        92.    After Keller signed up for the $35,000 seminar, he was assigned ~~Jeff Nolan~~Geoff

14   Nowlin in Arizona as his mentor.  Before the three-day mentorship commenced, Keller wrote

15   some emails to his mentor asking various real estate questions, but his mentor wouldn't answer

16   his questions or give him any help or assistance.  Since this was not the mentor experience that

17   had been described when he purchased the program, he called Trump University program

18   director Paul Reisner and requested a refund of his $35,000.  Trump refunded him the money

19   since he had never received the three-day in-person mentorship.  Keller also asked that Trump

20   University refund the $1,500 he paid for the introductory seminar as it did not provide any of the

21   education or instruction promised, but Trump University refused.  The $1,500 Keller paid for the

22   Trump University introductory seminar still remains on his credit card, accruing interest charges.

23        93.    Plaintiffs' experiences with Trump University are typical of the class and the

24   many hundreds (if not thousands) of other Trump University students who have registered their

25   complaints online and with Trump University.

26        94.    Plaintiffs have suffered injury in fact and loss of money or property.  They have

27   been damaged by, *inter alia*, the amounts they have paid for Trump University Seminars.

28

Exhibit B
- 136 -

**Plaintiff Sonny Low**

95.     **Background** – Plaintiff Sonny Low is a 71-year old senior citizen and San Diego resident who resides in Chula Vista, California.  He retired in 2005 as a U.S. Foreign Service Officer who served our country for 34 years.  He managed multi-million dollar loan and technical assistance programs as part of the U.S. government's foreign assistance to Latin America, the Caribbean, and to Eastern Europe.  Low was commissioned by the U.S. Senate and appointed by President Reagan in 1985.  At the U.S. Agency for International Development, Low represented the U.S. government in implementing and evaluating the U.S. Housing Guaranty Program, which provided affordable housing and community infrastructure programs, benefitting thousands of poor families.  Low is fluent in Spanish, and managed this program from Washington headquarters and regional offices based in Panama, Honduras, Ecuador, and Guatemala.

96.     Prior to his Foreign Service career, Low graduated with a Bachelor of Science degree in Business Administration from the University of California, Berkeley, followed by a Master of Urban Planning degree from the University of Washington.  Having completed his University studies during the Vietnam War, Low was fortunate to win acceptance into a California Army National Guard unit.  He successfully completed Basic Training at Fort Ord, California, and served for two years before being honorably discharged to serve as a Peace Corps Volunteer in Chile, South America.  Upon his return from Chile in 1970, Low was hired by the City of San Diego's Model Cities Program where he monitored low income housing and community parks and recreation programs in the low income neighborhoods of Southeast San Diego and San Ysidro.  After four years in San Diego, from 1974 to 1979, Low won appointment to return to the Peace Corps where he managed the Program and Training staff and served as the Deputy Director of U.S. volunteer programs in Colombia and Costa Rica.

97.     **Free Seminar** – Low took the free introductory Trump University Seminar at the Westin Gaslamp on or about November 18, 2009, in San Diego, California.  He learned of it from advertisements in the newspaper, and he called Trump University for more information. The primary speaker was Jim Harris.

98.   **$1,500 seminar** – Based on representations made by defendants during the free seminar, Low paid for and attended the $1,500 seminar on or about December 6, 2009, in San Diego, California.  The primary speaker was Steve Goff.

99.   **Mentorship** – Defendants told Low and other class members that in order to succeed in real estate they needed to have a mentor.  Defendants promised Low that by purchasing the Trump Elite program for $25,000-$35,000, he would receive his own mentor who would work "side-by-side" with him to create a "customized investment plan that is based on [his] neighborhood or town, [his] financial goals, and [his] level of comfort."  Trump University also promised that this mentor would teach and show students step-by-step how to invest in real estate, including locating properties, negotiating with sellers and buyers, walking through properties to assess their potential, running the numbers, writing offers, and actually structuring the deal, including smart exit strategies.  Trump University promised Low and class members "Personalized Training & Guidance":

**In-Field Mentorship**

Nothing can accelerate a real estate investment more than having a Trump mentor.  Our Mentors fly into your market and in three action-packed days walk you through every step of a real estate transaction, from finding great properties, to running the numbers to making the offers.  You work hand in hand with the Mentor to learn how to invest the Trump way so that even when the Mentor is gone, you can continue to build your financial future.

100.   Trump University also promised Low and class members that the Trump mentor would help each student create a "customized investment plan":

Your mentorship is about hitting the streets and working one-on-one with a practiced, successful investor who takes you through each step of the real estate investing process.

Together with your Mentor, you'll work on a customized investment plan that is based on your neighborhood or town, your financial goals, and your level of comfort.  Your Mentor has already done the legwork.  He knows what works and what doesn't.  He will keep you motivated while showing you the fastest ways to get you investing and purchasing properties!

101.   **Elite $25,000 program/mentorship** – While attending the $1,500 course, on or about December 6, 2009, Low paid $25,000 for the Elite program.  Trump University promised Low and other class members that the mentors would help students prepare a customized real

Exhibit B
– 138 –

1    estate investment plan.  Low met with his Trump University mentor, Geoff Nowlin, February 19-

2    21, 2010 in San Diego.  Low's mentor, Nowlin, did not appear to be knowledgeable or

3    experienced in real estate investing.  Nowlin did not help Low create a "customized investment

4    plan based on [Low's] neighborhood" as promised.  Nowlin did not work "side-by-side" with

5    Low to show him "step-by-step" how to locate properties, negotiate with sellers and buyers, run

6    the numbers, write offers and structure deals.  Nowlin had not done any "legwork" for Low, and

7    in fact came completely unprepared.

8        102.   **Mentor action plan** – Nowlin mailed Low a letter in December, 2009, asking

9    him to do some pre-arrival "homework" before the in-person mentorship, and to answer

10   questions on 26 topics regarding real estate investing.  Nowlin promised in the letter that at the

11   end of the mentorship, he would leave Low with "an action plan that will be personalized for you

12   and your local market."  According to Trump University, the purpose of the homework was to

13   help the mentor "create a plan for your success."  It covered 26 different points, and was broken

14   down into sections, including: (1) Goals and Dreams; (2) Sources of Income; (3) List of

15   Assets/Liabilities; and (4) Savings.  Low completed the homework, answering the 26 questions

16   about his interests and ability in real estate investing, but Nowlin never asked to see this, either

17   before or during the mentorship.  When Nowlin left, he did not leave Low with an action plan

18   that was personalized for Low's goals, income, or the San Diego market.  Instead, Nowlin left

19   him with a one-page form photocopy called "Post Mentor Action Plan." It was ridiculously

20   general and vague, and nothing like the "customized" and "personalized" action plan, created

21   "one-on-one" with a mentor that Trump University had promised students.

22       103.   After expressing complete frustration with his assigned mentor, Nowlin, Trump

23   University assigned Low another mentor, Joe Lahore, who they promised would call Low every

24   week.  He did not.  After initial conversations with Lahore, Low learned that Lahore was not

25   experienced or knowledgeable about the San Diego County real estate market. In fact, Lahore's

26   real estate experience was primarily limited to a trailer park that he co-owned in the Midwest.

27   Low asked Trump University for Lahore's resume detailing his real estate experiences, which

28

1     they did not produce.  At this point, Low told Trump University he would not accept their offer

2     to substitute Lahore for his other useless mentor, and he asked Trump to refund him his $25,000.

3          104.     **Performance evaluation** – Low's Trump University mentor, Nowlin, specifically

4     asked Low to give him ratings of "all 5s" on his performance review, and accordingly, Low rated

5     his mentor higher than he felt Nowlin really deserved.  He actually believed he should have

6     given Nowlin failing grades on the "Field Mentor Evaluation Form" because Low was very

7     dissatisfied with the mentorship and felt it was a waste of time.

8          105.     **Trump Mentors are not your partners** – After Low had completed his Trump

9     University seminars and mentorship, one of Trump University's lead instructors, Steve Goff

10     wrote to Low on January 6, 2011, acknowledging that the Trump University mentors were not

11     actually "partners" with the students and did not necessarily have incentive to help the students:

12     "Trump and other companies charge up to $9,000 per day [for mentorships] and the mentors are

13     not your partners and don't have a vested interest in you making money or not."

14          106.     **Misrepresentations** – Defendants made the following misrepresentations to Low

15     and other class members:

16          (a)     **One-year of unlimited mentoring** – Defendants promised Low and other

17     class members that they would receive one-year of unlimited mentoring. Instead, Low's mentor

18     disappeared and stopped returning phone calls shortly after the mentorship began. On the few

19     occasions when Low did speak with his mentor, it was so meaningless and frustrating that Low

20     felt that further discussions would be pointless.

21          (b)     **Mentors and Instructors were not "hand-picked" by Donald Trump** –

22     Defendants promised Low and other class members that if they purchased the Trump University

23     seminars they would learn from Trump University instructors and mentors that were hand-picked

24     by Donald Trump.  This was false, as the instructors and mentors were not hand-picked by

25     Donald Trump.

26          (c)     **Mentors and Instructors were not real estate experts** – Defendants

27     represented to Low and other class members that the Trump University mentors and instructors

28     were all real estate experts, experienced in the real estate investing techniques that they were

1   teaching.  This was false.  The vast majority of Trump University's mentors and instructors were

2   not experts in real estate with personal experience in the real estate techniques they were

3   teaching, but instead were professional salespeople, hired because of their ability to deliver high-

4   pressure sales pitches and to close sales.

5           (d)    **Donald Trump's active involvement** – Defendants represented to Low

6   and other class members that Donald Trump would be actively involved in Trump University.

7   This was not true, as he was not actively involved.

8           (e)    **Trump University did not teach students Donald Trump's investing**

9   **secrets** – Defendants promised Low and other class members that they would learn Donald

10  Trump's investing secrets or real estate techniques, or learn the "Trump way" to real estate

11  investment.  This was not true, as the Trump University instructors and mentors did not teach

12  students Donald Trump's investing secrets or real estate techniques.

13          (f)    **Raising credit card limits** – During the $1,500 seminar, Steve Goff asked

14  Low and other class members to raise their credit card limits so that they would be ready to

15  invest in real estate, but then asked Low and the other students to use their credit cards, not to

16  purchase property, but to "invest" in the next level of Trump seminars – the Elite program.

17          (g)    **Guaranteed to make money back** – Defendants told Low that if he

18  signed up for the Trump University Elite program for $25,000, he was guaranteed to make his

19  money back within the first one or two deals. He did not.  In fact, three years later he is still

20  paying back his credit card for the purchase price of the program.

21  **Plaintiff J.R. Everett**

22      107.    **Background**: Plaintiff J.R. Everett is a 68-year old resident of Tampa Florida,

23  who worked in system development for 30 years for a large communications company.  She has

24  been a licensed real estate agent since 1987, and licensed real estate broker since 1996, and was

25  interested in Trump University to get back into the real estate market after the housing bust.

26      108.    **Free seminar** – Everett took the free introductory Trump University seminar in

27  Tampa, Florida on or about October 7, 2009.  She learned of the seminar from an invitation sent

28  out by Trump University. The primary speaker was John Jamison.

109.    **$1,500 seminar** – Based on representations made by defendants during the free seminar, Everett paid for the $1,500 seminar on October 7, 2012, and attended the seminar in Tampa, Florida on or about October 16-18, 2009.  The primary speaker was Gerald Martin. The session was primarily an "up-sell" to the next level – the Elite program.  Trump University told Everett and other students they could make money in real estate with "no money down," and Martin promised Everett he would personally work with her to do this.

110.    **Elite $35,000 Elite program/mentorship** – Defendants told Everett and other class members that in order to succeed in real estate they needed to have a mentor.  Defendants promised Everett that by purchasing the Trump Elite program for $35,000, she would receive her own mentor who would work "side-by-side" with her to create a "customized investment plan that is based on [her] neighborhood or town, [her] financial goals, and [her] level of comfort." Trump University also promised that this mentor would teach and show students step-by-step how to invest in real estate, including locating properties, negotiating with sellers and buyers, walking through properties to assess their potential, running the numbers, writing offers, and actually structuring the deal, including smart exit strategies.

111.    Everett paid $35,000 for the Elite program on or about October 16, 2009, and attended the seminar December 4-6, 2009 in Orlando, Florida.  Trump University assigned Chris Lombardo as her mentor.  Lombardo had recently been hired by Trump in 2009 and was not knowledgeable about the real estate investing techniques discussed in the seminar, so Everett turned down his services.  Trump University then assigned Mike Biglane as her mentor.  The Trump University seminar promised a mentor to walk her through "no money down" techniques that did not involve long-term investments, but Biglane did not do this.

112.    Everett called Trump University and asked representative Jack Mahoney for a refund from Trump.  After several very heated conversations, Mahoney convinced Everett to try Troy Peterson in Tampa, Florida.  Everett talked with Peterson by phone, but the real estate techniques he discussed were not practical.  While the Trump University seminars claimed that mentors would help students create real estate investing plans where they could successfully invest with no-money-down, Peterson's techniques did not track with this.  Instead, the

1   transactions he recommended to Everett would have required her to set up a full-blown business
2   with software, pre-foreclosure listing services, web page, and become a broker via the Thompson
3   rule (not offered in Tampa), etc.  This is not what Trump University pitched to students in selling
4   them costly mentorships.

5        113.   **$35,000 seminar –** For the $35,000 Everett paid, she was to receive four
6   workshops, which Trump University represented would take place in or near her hometown,
7   Tampa, Florida.  This was not true.  Only one of the four seminars took place near Tampa, the
8   "Quick Start Workshop," which Everett took in Orlando on December 4-6, 2009.  The rest of the
9   seminars took place on the East and West coasts, which would have involved airfare, hotel and
10   other travel costs to get to California, Boston, etc.  This is not what Trump University had
11   promised.  Trump University also promised that students would be taught Donald Trump's real
12   estate investing secrets.  That was not true.  The seminar was conducted by Chris Goff who
13   presented a two-day session on his own purported experiences in real estate, not Donald Trump's
14   real estate investing techniques or experiences.  Goff spent the majority of the third day trying to
15   pressure students into buying his own personal mentorship service and tapes for an additional
16   $1,500 to $2,000.

17        114.   **Misrepresentations –** Defendants made the following misrepresentations to
18   Everett and other class members:

19          (a)   **One-year of unlimited mentoring –** Defendants promised Everett and
20   other class members that they would receive one-year of unlimited mentoring. She did not
21   receive any mentoring.

22          (b)   **Mentors and Instructors were not "hand-picked" by Donald Trump –**
23   Defendants promised Everett and other class members that if they purchased the Trump
24   University seminars they would learn from Trump University instructors and mentors that were
25   hand-picked by Donald Trump.  This was false, as the instructors and mentors were not hand-
26   picked by Donald Trump.

27          (c)   **Mentors and Instructors were not real estate experts –** Defendants
28   represented to Everett and other class members that the Trump University mentors and

10-cv-00940-IEG(WVG)

1     instructors were all real estate experts, experienced in the real estate investing techniques that

2     they were teaching.  This was false.  The vast majority of Trump University's mentors and

3     instructors were not experts in real estate with personal experience in the real estate techniques

4     they were teaching, but instead were professional salespeople, hired because of their ability to

5     deliver high-pressure sales pitches and to close sales.

6               (d)     **Donald Trump's active involvement** – Defendants represented to Everett

7     and other class members that Donald Trump would be actively involved in Trump University.

8     This was not true, as he was not actively involved.

9               (e)     **Trump University did not teach students Donald Trump's investing**

10     **secrets** – Defendants promised Everett and other class members that they would learn Donald

11     Trump's investing secrets or real estate techniques, or learn the "Trump way" to real estate

12     investment.  This was not true, as the Trump University instructors and mentors did not teach

13     students Donald Trump's investing secrets or real estate techniques.  Defendants also promised

14     Everett and other class members that they would teach students how to make money with no-

15     money down, but they did not provide Everett or other students with reasonable, realistic

16     approaches to do so.

17               (f)     **Raising credit card limits** – During the $1,500 seminar, defendants asked

18     Everett and other class members to raise their credit card limits so that they would be ready to

19     invest in real estate, but then asked Everett and the other students to use their credit cards, not to

20     purchase property, but to "invest" in the next level of Trump seminars – the Elite program.

21               (g)     **Guaranteed to make money back** – Defendants told Everett that if she

22     signed up for the Trump University Elite program for $35,000, she was guaranteed to make her

23     money back within the first one or two deals, which would pay for the entire course. She did not.

24     **Plaintiff John Brown**

25     115.     **Background**: Plaintiff John Brown is a resident of New York City and has a B.A.

26     in Psychology and an M.S. in Education. He is 61 years old and paid for the Trump University

27     courses in the hopes that he could build a retirement fund that would protect him in the later

28     years of his life.

116.   **Free seminar** – Brown took the free introductory Trump University seminar in New York, New York on or about September 14, 2009, entitled "Profit From Real Estate Investing."   He learned of the seminar from an advertisement he saw, either online or in the newspaper. He was attracted by Donald Trump's name.   He thought that because of Donald Trump's involvement with Trump University, it would not be a scam, but a legitimate opportunity to learn about how to make money investing in real estate. Instead, it turned out to be a scam.

117.   **$1,500 seminar** – Based on representations made by defendants during the free seminar, Brown paid for and attended the $1,500 three-day seminar at the New York Marriott East Side on or about September 25-27, 2009.   The primary speaker was James Harris. The material covered in this seminar was very general, and much of it was no more than a "push" or "up-sell" to get participants to sign up for the Trump Elite programs.

118.   **Elite $25,000 Elite program/mentorship** – Defendants told Brown and other class members that in order to succeed in real estate they needed to have a mentor.  Defendants said, if you are only going to do one thing, do the mentorship. Defendants promised Brown that by purchasing the Trump Elite program for $35,000, he would receive his own mentor who would work "side-by-side" with him to create a "customized investment plan that is based on [his] neighborhood or town, [his] financial goals, and [his] level of comfort." Trump University also promised that this mentor would teach and show students step-by-step how to invest in real estate, including locating properties, negotiating with sellers and buyers, walking through properties to assess their potential, running the numbers, writing offers, and actually structuring the deal, including smart exit strategies.

119.   **Mentorship** – Brown maxed out two credit cards to pay for the course  to pay for the $25,000 Elite program on or about September 26, 2009, as Trump University representatives pressured him to.  On or about October 20, 2009, Brown talked to Trump University's Jason Schauer about his concerns that he would actually get what he was promised, and whether it was prudent to pay for this program based on his financial situation, and Schauer reassured him. Brown talked to Schauer again on October 29, 2009, and told them he was concerned that after

1   his three-day mentorship he would be left to fend for himself, and that paying for the program on

2   his credit cards would financially max him out, and he would not have any money left to invest

3   in real estate.  Again, Trump University persuaded him to go forward with the program and

4   assured Brown that he would receive a full-year of one-on-one mentoring in real estate investing.

5        120.   For his $25,000, Brown did not receive a seminar, only mentoring.  Brown had

6   several phone conversations with his mentor, Steve Gilpin, but they were not useful or helpful.

7   Brown's mentor did not relay or offer information, or teach Brown anything. The mentor merely

8   asked Brown if he had questions. On or about December 17, 2009, Brown called Trump

9   University to complain, stating that he was frustrated with the mentoring he was receiving and

10  that his mentor did not have time for him because of all of the other students he was mentoring.

11       121.   Trump University told Brown and the other students that the mentors would come

12  to their home town, but Brown's mentor did not come to New York.  Instead, his mentor told

13  Brown to come to Philadelphia.  Gilpin claimed Philadelphia was a "hot market," even though

14  Gilpin was not very familiar with the Philadelphia market.  So, Brown met his mentor in

15  Philadelphia, and looked at some houses in or about November 2009.

16       122.   **No-money down** – Trump University promised to teach Brown and other

17  students how to buy houses with "no money down" or "other people's money."  However, they

18  failed to provide any meaningful training in this regard.

19       123.   **Trump asked Brown to raise his evaluation ratings after-the-fact** – Brown

20  was not satisfied with his mentorship.  After the mentorship, his mentor asked him to evaluate

21  the mentorship on a scale of 1 to 5.  He rated the mentorship mostly average scores, because the

22  information they provided was basic and mediocre.   Thereafter, a Trump University

23  representative called Brown three times, asking Brown to change his average scores (around 3s –

24  "average") to 5s – "excellent."  Brown believes it was either Diego Guevera or Jason Schauer

25  who contacted him.  Brown refused the first two times.  Then, tired of the continuing phone

26  calls, Brown finally gave in and agreed that Trump University could change his ratings to 5s.

27  Brown complained of this in a letter to Trump University dated June 11, 2011 demanding a

28  refund.  The accuracy of Trump University's purported "98% satisfaction rate" is certainly called

1   into question if Trump University achieved these ratings by harassing and intimidating their

2   students, amongst other things.

3          124.    **Refund request** – Brown requested a refund from Trump University, but they

4   refused.  Instead, they offered to let him take the course again, but since it was pointless the first

5   time, he did not see any point in taking the course again.

6          125.    **Misrepresentations** – Defendants made the following misrepresentations to

7   Brown and other class members:

8                  (a)     **Mentors and Instructors were not "hand-picked" by Donald Trump** –

9   Defendants promised Brown and other class members that if they purchased the Trump

10  University seminars they would learn from Trump University instructors and mentors that were

11  hand-picked by Donald Trump.  This was false, as the instructors and mentors were not hand-

12  picked by Donald Trump.

13                 (b)     **Mentors and Instructors were not real estate experts** – Defendants

14  represented to Brown and other class members that the Trump University mentors and

15  instructors were all real estate experts, experienced in the real estate investing techniques that

16  they were teaching.  This was false.  The vast majority of Trump University's mentors and

17  instructors were not experts in real estate with personal experience in the real estate techniques

18  they were teaching, but instead were professional salespeople, hired because of their ability to

19  deliver high-pressure sales pitches and to close sales.

20                 (c)     **Donald Trump's active involvement** – Defendants represented to Brown

21  and other class members that Donald Trump would be actively involved in Trump University.

22  This was not true, as he was not actively involved.

23                 (d)     **Trump University did not teach students Donald Trump's investing**

24  **secrets** – Defendants promised Brown and other class members that they would learn Donald

25  Trump's investing secrets or real estate techniques, or learn the "Trump way" to real estate

26  investment.  This was not true, as the Trump University instructors and mentors did not teach

27  students Donald Trump's investing secrets or real estate techniques.  Defendants also promised

28  Brown and other class members that they would teach students how to make money with no-

Exhibit B
- 147 -

money down, but they did not provide Brown or other students with reasonable, realistic approaches to do so.

(e)     **Raising credit card limits** – During the $1,500 seminar, James Harris asked Brown and other class members to raise their credit card limits so that they would be ready to invest in real estate, but then asked Brown and the other students to use their credit cards, not to purchase property, but to "invest" in the next level of Trump seminars – the Elite program. Brown attempted to raise his credit card limits, but was unable to do so, so instead purchased the $25,000 Elite seminar, rather than the $35,000 seminar.

(f)     **Guaranteed to make money back** – Defendants told Brown that if he signed up for the Trump University Elite program for $25,000, he was guaranteed to make his money back within the first one or two deals, which would pay for the entire course. He did not; in fact, three years later he is still paying back the purchase price on his credit card.

## CLASS ALLEGATIONS

126.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

127.    The proposed Class consists of all persons who purchased Seminars from Trump University throughout the United States from April 30, 2006 to the present.  Excluded from the Class are Trump University, its affiliates, employees, officers and directors, persons or entities that distribute or sell Trump University products or programs, the Judge(s) assigned to this case, and the attorneys of record in this case.  Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

128.    This action is properly brought as a class action for the following reasons:

(a)     the proposed Class is so numerous and geographically dispersed throughout  the United States that the joinder of all class members is impracticable.  While Plaintiffs do not know the exact number and identity of all Class membersMembers, Plaintiffs are informed and believe that there are thousands, if not tens or even hundreds of thousands of

1  Class ~~members~~Members.   The precise number of Class ~~members~~Members can be ascertained

2  through discovery;

3        (b)      the disposition of Plaintiffs' and proposed Class ~~members'~~Members'

4  claims in a class action will provide substantial benefits to both the parties and the Court;

5        (c)      the proposed Class is ascertainable and there is a well-defined community

6  of interest in the questions of law or fact alleged herein since the rights of each proposed Class

7  member were infringed or violated in the same fashion;

8        (d)      there are questions of law and fact common to the proposed class which

9  predominate over any questions that may affect particular Class ~~members~~Members.   Such

10  common questions of law and fact include, but are not limited to:

11        i.      Whether Defendants' conduct was unlawful, unfair or fraudulent;

12        ii.      Whether Defendants' advertising is likely to deceive the public;

13        iii.      Whether Defendants' conduct was false, misleading or likely to

14  deceive;

15        iv.      Whether Defendants violated ~~the~~California's Unfair Competition

16  Law, Cal. Bus. & Prof. Code §17200 ("UCL");

17        v.      Whether Defendants violated ~~the~~California's Consumers Legal

18  ~~Redies~~Remedies Act, Cal. Civ. Code §1750 ("CLRA");

19        vi.      Whether Defendants violated ~~the~~California's False Advertising

20  Law, Cal. Civ. Code §17500 ("FAL");~~.~~

21        vii.      Whether Defendants violated California's Elder Abuse Statute,

22  Cal. Welf. & Inst. Code §15600;

23        viii.      Whether Defendants received funds from Plaintiffs and class

24  members that they unjustly received;

25        ix.      Whether Defendants breached  contracts;

26        x.      Whether Defendants breached  the implied covenant of good faith

27  and fair dealing;

28

1             xi.       Whether Defendants violated §349 of New York's General

2 Business Law;

3             xii.      Whether Defendants violated the Florida Deceptive and Unfair

4 Trade Practices Act, Fla. Stat. §501.201, *et seq.*;

5             xiii.     Whether Defendants violated the Florida Misleading Advertising

6 Law, Fla. Stat. §817.41;

7             xiv.     Whether Defendants are liable for intentional and/or negligent

8 misrepresentations;

9             xv.      Whether Defendants are liable for making false promises;

10             xvi.     Whether Plaintiffs and Class ~~members~~Members have been harmed

11 and the proper measure of relief;

12             xvii.    Whether Plaintiffs and Class ~~members~~Members are entitled to an

13 award of punitive damages, attorneys' fees and expenses against Defendants; and

14             xviii.   Whether, as a result of Defendants' misconduct, Plaintiffs and

15 Class ~~members~~Members are entitled to equitable relief, and if so, the nature of such relief;

16         (e)     Plaintiffs' claims are typical of the claims of the members of the proposed

17 Class.  Plaintiffs and Class ~~members~~Members have been injured by the same wrongful practices

18 of Defendants.  Plaintiffs' claims arise from the same practices and conduct that give rise to the

19 claims of all Class ~~members~~Members and are based on the same legal theories;

20         (f)     Plaintiffs will fairly and adequately protect the interests of the Class in that

21 they have no interests antagonistic to those of the other Class ~~members~~Members, and Plaintiffs

22 have retained attorneys experienced in consumer class actions and complex litigation as counsel;

23         (g)    A class action is superior to other available methods for the fair and

24 efficient adjudication of this controversy for at least the following reasons:

25             i.      Given the size of individual Class member's claims and the

26 expense of litigating those claims, few, if any, Class ~~members~~Members could afford to or would

27 seek legal redress individually for the wrongs Defendants committed against them and absent

28

1  Class ~~members~~Members have no substantial interest in individually controlling the prosecution

2  of individual actions;

3                  ii.       This action will promote an orderly and expeditious administration

4  and adjudication of the proposed Class claims, economies of time, effort and resources will be

5  fostered and uniformity of decisions will be insured;

6                  iii.      Without a class action, Class ~~members~~Members will continue to

7  suffer damages, and Defendant's violations of law will proceed without remedy while

8  Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

9                  iv.      Plaintiffs know of no difficulty that will be encountered in the

10  management of this litigation which would preclude its maintenance as a class action.

11      129.    Defendants have, or have access to, address information for the Class

12  ~~members~~Members, which may be used for the purpose of providing notice of the pendency of

13  this class action.

14      130.    Plaintiffs seek damages and equitable relief on behalf of the Class on grounds

15  generally applicable to the entire proposed class.

16                  **FIRST CAUSE OF ACTION**

17       **(Violations of California Business and Professions Code §17200)**

18      131.    Plaintiffs re-allege and incorporate by reference the allegations contained in the

19  paragraphs above as if fully set forth herein.

20      132.    California Business & Professions Code §17200 prohibits acts of unfair

21  competition, which means and includes any "unlawful, unfair or fraudulent business act or

22  practice" and any act prohibited by Cal. Bus. & Prof. Code §17500.

23      133.    Defendants violated Cal. Bus. & Prof. Code §17200's prohibition against

24  engaging in an "***unlawful***" business act or practice by, *inter alia*, making the material

25  misrepresentations regarding Trump University and its Seminars as set forth more fully

26  elsewhere in this Complaint, in violation of Cal. Civ. Code §§1572 (actual fraud), 1573

27  (constructive fraud), 1709 and 1710 (deceit), 1750 *et seq.* (the CLRA); Cal. Bus. & Prof. Code

28  §17500 (false advertising); Cal. Welf. & Inst. Code §15600 (elder abuse); §349 of New York's

Exhibit B
- 151 -

1  General Business Law; and the common law, including the breach of contract; breach of the

2  covenant of good faith and fair dealing; and breach of the duty to disclose.

3       134.  In addition to the foregoing, Defendants engaged in unlawful conduct by: (a)

4  instructing students to engage in real estate practices that are illegal, such as posting bandit signs

5  and engaging in the practice of real estate without a real estate license; (b) issuing student

6  testimonials which are misleading, and in some cases, completely fabricated by Trump

7  University employees; and (c) forging student signatures on seminar contracts when students

8  have forgotten to sign the contracts.

9       135.  Plaintiffs reserve the right to allege other violations of law which constitute other

10  unlawful business acts and practices.  Such conduct is ongoing and continues to this date.

11       136.  Defendants violated Cal. Bus. & Prof. Code §17200's prohibition against

12  engaging in a "*fraudulent*" business act or practice by, *inter alia,* disseminating, through

13  common advertising, untrue statements about Trump University and its Seminars that have a

14  tendency to mislead the public and making numerous common material misrepresentations with

15  the intent to induce reliance by consumers to purchase Trump University Seminars. Furthermore,

16  Defendants violated §17200 by issuing misrepresentations and untrue statements at the Trump

17  University Seminars and by forging student signatures on seminar contracts when students have

18  forgotten to sign the contracts.

19       137.  The foregoing conduct also constitutes "*unfair*" business acts and practices within

20  the meaning of Cal. Bus. & Prof. Code §17200.  Defendants' practices offend public policy and

21  are unethical, oppressive, unscrupulous and violate the laws stated.  Defendants' conduct caused

22  and continues to cause substantial injury to Plaintiffs and Class ~~members~~Members.  The gravity

23  of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such

24  conduct.  There were also reasonably available alternatives to Defendants to further their

25  business interests.

26       138.  Plaintiffs and Class ~~members~~Members have suffered injury in fact and have lost

27  money and/or property as a result of Defendants' unlawful, fraudulent and unfair business

28

practices and are therefore entitled to the relief available under Cal. Bus. & Prof. Code §17200, *et seq*.

### SECOND CAUSE OF ACTION

**(Violations of the Consumer Legal Remedies Act,
California Civil Code §1750 *et seq*.)**

139.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

140.    This cause of action arises under the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq*.  Plaintiffs are consumers as defined by Cal. Civ. Code §1761(d). Defendant's Seminars constitute "services" and/or "products" as defined by Cal. Civ. Code §1761(a) and (b).  At all times relevant hereto, Defendants constituted "persons" as that term is defined in Cal. Civ. Code §1761(c), and Plaintiffs' and Class ~~members'~~ Members' purchases of Trump University Seminars constitute "transactions," as that term is defined in Cal. Civ. Code §1761(e).

141.    Defendants violated and continues to violate the CLRA by engaging in the following deceptive practices specifically proscribed by Cal. Civ. Code §1770(a), in transactions with Plaintiffs and Class ~~members~~ Members that were intended to result or which resulted in the sale or lease of goods or services to consumers:

(a)    In violation of Cal. Civ. Code §1770(a)(5), Defendants' acts and practices constitute misrepresentations that the Seminars in question have characteristics, benefits or uses which they do not have;

(b)    In violation of Cal. Civ. Code §1770(a)(7), Defendants misrepresented that the Seminars are of particular standard, quality and/or grade, when they are of another; and

(c)    In violation of Cal. Civ. Code §1770(a)(9), Defendant advertised the Seminars with the intent not to sell them as advertised or represented.

142.    Defendants' uniform representations as set forth more fully elsewhere in this Complaint were false, deceptive, and/or misleading and in violation of the CLRA.

Exhibit B
- 153 -

143.     Pursuant to Cal. Civ. Code §1782, Plaintiffs notified Trump University in writing by certified mail of the particular violations of Cal. Civ. Code §1770 alleged herein, and have demanded that Trump University rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.  Plaintiffs sent this notice by certified mail, return receipt requested, to Trump University's principal place of business. Plaintiffs are notifying Defendant Donald Trump of same.

144.     Defendants have failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days after receipt of the Civil Code §1782 notice, thus Plaintiffs seek actual damages and punitive damages for violation of the Act.

145.     In addition, pursuant to Civil Code §1780(a)(2), Plaintiffs are entitled to, and therefore seek, a Court order enjoining the above-described wrongful acts and practices that violate Cal. Civ. Code §1770.

146.     Plaintiffs and the Class are also entitled to recover attorneys' fees, costs, expenses and disbursements pursuant to Cal. Civ. Code §§1780 and 1781.

### THIRD CAUSE OF ACTION

**(Untrue and Misleading Advertising in Violation of
Cal. Bus. & Prof. Code §17500 *et seq.*)**

147.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

148.     California Business & Professions Code §17500 prohibits various deceptive practices in connection with the dissemination in any manner of representations which are likely to deceive members of the public to purchase products and services such as the Trump University Seminars.

149.     Defendants disseminated, through common advertising, untrue statements about Trump University and its Seminars and Defendants knew or should have known that the Seminars did not conform to the advertisements or representations regarding the Seminars. Defendants intended Plaintiffs and the Class upon the advertisements and numerous material

Exhibit B
- 154 -

1  misrepresentations as set forth more fully elsewhere in the Complaint.  Plaintiffs and the Class

2  relied upon the advertisements and misrepresentations to their detriment.

3        150.   As a result of the foregoing, Plaintiffs, and the Class ~~members~~Members, are

4  entitled to injunctive and equitable relief and damages in an amount to be proven at trial.

5  **FOURTH CAUSE OF ACTION**

6  **(Breach of Contract against Trump University)**

7        151.   Plaintiffs re-allege and incorporates by reference the allegations contained in the

8  paragraphs above as if fully set forth herein.

9        152.   Contracts exist between Plaintiffs, Class ~~members~~Members and Trump

10  University.  Plaintiffs and Class ~~members~~Members entered into agreements with Trump

11  University for a three-day seminar for which they paid approximately $1,495.  Plaintiff Makaeff

12  and some Class ~~members~~Members also entered into an agreement with Trump University for the

13  Trump Gold Program for which they paid about $34,995, plus the variable APR finances

14  charges, interest fees, and late fees they had to pay to their credit card companies.  Attached

15  hereto as Exhibit A is a true and correct copy of a contract for the Trump Gold Program.

16        153.   Under Plaintiffs' and each Class member's contracts, Plaintiffs and the Class

17  ~~members~~Members were only required to pay the amount of the seminar in each Class member's

18  contract.

19        154.   All conditions precedent under the contracts have been performed by Plaintiffs

20  and the Class, including the payment amount of the Seminars.

21        155.   Trump University breached the terms of its standardized contracts with Plaintiffs

22  and the Class by failing to provide them with the promised products and services as contracted.

23        156.   As a result of Trump University's breach of its contracts, Plaintiffs and the Class

24  have been damaged in an amount to be determined at trial.

25

26

27

28

Exhibit B
- 155 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and
Fair Dealing against Trump University)**

157.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

158.    The law implies a covenant of good faith and fair dealing in every contract.

159.    Trump University violated this covenant of good faith and fair dealing in its contract with Plaintiffs and members of the Class by, *inter alia,* misrepresenting to Plaintiffs and the Class the true nature of the Seminars as alleged more fully elsewhere in the Complaint.

160.    Plaintiffs and the Class ~~members~~Members performed all, or substantially all, of the significant duties required under their agreements with Defendant.

161.    The conditions required for Trump University's performance under the contract agreements had occurred.

162.    Trump University did not provide and/or unfairly interfered with the right of Plaintiffs and class members to receive the benefits under their agreements with Trump University.

163.    Plaintiffs and the Class have been damaged by Trump University's breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**(Money Had and Received)**

164.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

165.    Defendants improperly received and continue to improperly receive from Plaintiffs and Class ~~members~~Members millions of dollars as a result of the conduct alleged above.

166.    As a result, Plaintiffs and the Class have conferred a benefit on Defendants to which Defendants are not entitled.  Defendants have knowledge of this benefit, wrongfully and deceptively obtained this benefit, and have voluntarily accepted and retained the benefit

Exhibit B
- 156 -

1  conferred on them.  Defendants will be unjustly enriched if they are allowed to retain such funds

2  and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by

3  Defendants and the money should be disgorged from Defendants, and returned to Plaintiffs and

4  Class ~~members~~Members.

5                          **SEVENTH CAUSE OF ACTION**

6                          **(Negligent Misrepresentation)**

7          167.   Plaintiffs re-allege and incorporate by reference the allegations contained in the

8  paragraphs above as if fully set forth herein.

9  Standardized Promises and Misrepresentations

10         168.   Defendants' sales tactics are based on standardized representations in written

11  materials and scripted sales pitches by instructors (professional salespersons paid on

12  commission).  Speakers are required to use the same PowerPoint presentation, same script, and

13  same guidelines when giving Seminars.  Former employees confirmed every presentation is

14  virtually identical, regardless of presenter.  Each aspect of the Seminars were scripted down to

15  where speakers and coordinators stood, the temperature of the room (no more than 68 degrees)

16  and music to be played in the Introduction – "Money, Money, Money" from Donald Trump's

17  "The Apprentice" show. Additionally, when Plaintiffs and Class ~~members~~Members made calls to

18  or from Trump University, they spoke with a member of the Trump sales team, each of whom

19  had a five to six page sales script, which they were required to follow word-for-word.

20  Defendants made numerous standardized misrepresentations and omissions including:

21  **Misrepresentations About the**
    **Year-Long Mentoring Program**

22

23         169.   Through written materials and uniform presentations at the free introductory

24  Seminars, Trump University represents that consumers will receive a year-long "apprenticeship"

25  program if they purchase the $1,995 program (perpetually on sale for "one-day only" at

26  Seminars for $1,495).  With the aid of a Power point presentation, the speakers inform

27  consumers that they will receive "12 months of training" and "one full year of expert, interactive

28  support."  Trump University speakers represent: "Other people don't have anyone to call, but

Exhibit B
- 157 -

1  you've got Trump.  You'll call 40 Wall Street [Trump University], and they'll walk you through

2  it."  Defendants promised Plaintiffs and Class ~~members~~Members a one-year mentorship with all

3  the access and contracts they needed; that any time Plaintiffs and Class ~~members~~Members had a

4  question, they could just call and Trump University would walk them through the issue; that

5  Trump University would give them step-by-step training "by the numbers" on how to make

6  money.  When Plaintiffs and Class ~~members~~Members did not get this promised information at

7  the Seminars, Defendants promised that it was still coming – they could get it from their

8  mentors, from Trump University instructors, or another program.  However, Defendants never

9  intended to, and did not, perform on this promise.  These misrepresentations were made to

10 Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008;

11 Brandon Keller on or about November 18, 2009, and December 6-8, 2009; Ed Oberkrom on or

12 about March 2009~~.~~; Sonny Low on or about November 18, 2009 and December 6, 2009; J.R.

13 Everett on or about October 7, and October 16-18, 2009; and John Brown on or about on or

14 about September 14, and September 25-27 2009.

15 **Misrepresentations About Number of Sessions**
   **Provided in One-Year of "Unlimited" Mentoring**
16
17      170.   Defendants represented to Plaintiffs and Class ~~members~~Members who purchased

18 the ~~$35,000~~Trump University "Elite" seminar for $25,000 - $35,000, that they would receive

19 ***unlimited mentoring for an entire year***.  This misrepresentation was made to Plaintiffs at

20 Seminars as follows: Tarla Makaeff on or about August 2008; Brandon Keller on or about

21 November 18, 2009, and December 6-8, 2009; and Ed Oberkrom on or about March 2009 ~~(in~~

22 ~~regard to a $25,000 seminar).~~; Sonny Low on or about November 18, 2009 and December 6,

23 2009; J.R. Everett on or about October 7, and October 16-18, 2009; and John Brown on or about

   on or about September 14, and September 25-27 2009.  These representations were false.  In fact,
24
   mentors were not paid for more than six one-hour mentoring sessions per consumer. Mentors
25
   were instructed to evade phone calls and emails from Plaintiffs and Class ~~members~~Members and
26
   provide evasive, unhelpful responses when they did speak to students to discourage the students
27
   from continuing to call.  This plan generally worked – Plaintiffs and Class ~~members~~Members
28

Exhibit B
- 158 -

became frustrated and dissatisfied by the mentor's advice, which most Plaintiffs and Class members Members describe as "worthless."  However, when one Trump University student became frustrated by the lack of any value or information the mentor was providing and asked to meet twice per week, rather than once, the mentor eventually admitted that the "one year" of mentoring/consulting promised was really only *six one-hour coaching sessions*.  The consumers were understandably outraged.  They never would have paid $35,000 for six one-hour sessions.  Indeed, Trump University Corporate admitted to Plaintiffs and Class members Members that only six sessions would be provided should have been disclosed.

**Misrepresentations About Three-Day Field Mentorship**

171.    Defendants also represented in standardized materials that if Plaintiffs and Class members Members purchased the $25,000 or $35,000 Gold Elite program, they would receive a "3 Day Field Mentorship" worth $25,000.  For the $25,000 value, students were promised an exclusive three days with a "power team" of highly-accomplished experts in the real estate industry to become their personal partners and teach them insider tips for investing in real estate, including how to use the contracts essential to the real estate transactions mentioned at the Seminars.  Plaintiffs and the Class were told that they would receive priceless insight and information from these mentors who were experts in the real estate industry, who would personally teach them what they would need to know.  These misrepresentations were made to Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008; Brandon Keller on or about November 18, 2009, and December 6-8, 2009; and Ed Oberkrom on or about March 2009 (in regard to a $25,000 seminar).; Sonny Low on or about November 18, 2009 and December 6, 2009; J.R. Everett on or about October 7, and October 16-18, 2009; and John Brown on or about on or about September 14, and September 25-27 2009.  Instead, the "mentorship" consisted merely of two days looking at real estate properties with no unique insight or guidance, a half day at a local Home Depot and lunch, and an hour of discussing numbers.  Mentors spent little to no time discussing the contracts essential to the real estate transactions mentioned in the seminar. Thereafter, the mentors typically quickly disappeared, in

1   complete contradiction to what was promised: an ongoing mentor who would personally assist

2   the student for an entire year.

3   **Misrepresentations About Instructors and Mentors**

4     172. Defendants uniformly represented through Seminars and written materials that its

5   seminar instructors and mentors were experienced in real estate.  These misrepresentations were

6   made to Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August

7   2008; Brandon Keller on or about November 18, 2009, and December 6-8, 2009; Ed Oberkrom

8   on or about March 2009; ~~and Patricia Murphy on or about  January 27 to March 12, 2007.~~Sonny

9   Low on or about November 18, 2009 and December 6, 2009; J.R. Everett on or about October 7,

10  and 16-18, 2009; and John Brown on or about September 14, and 25-27 2009.  However, Trump

11  University instructors and mentors had little to no personal experience, and most had not

12  engaged in the vast majority of the real estate techniques purportedly taught.   In fact, the

13  instructors and mentors were predominantly salespeople, hired for their ability to deliver a hard-

14  sell presentation, and paid exclusively on commission based on the percentage of sales delivered.

15  Trump University's best "speakers" earn commissions of $30,000 or more per month for sales of

16  products and Seminars.

17    173. Further, Defendants promised in written materials at free and paid Seminars that

18  instructors and mentors were "hand-picked by Trump."  These misrepresentations were made to

19  Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008;

20  Brandon Keller on or about November 18, 2009, and December 6-8, 2009; Ed Oberkrom on or

21  about March 2009; ~~and Patricia Murphy on or about  January 27 to March 12, 2007.~~Sonny Low

22  on or about November 18, 2009 and December 6, 2009; J.R. Everett on or about October 7, and

23  October 16-18, 2009; and John Brown on or about on or about September 14, and September 25-

24  27 2009.   These misrepresentations were critical because Trump University was sold on

25  promises that consumers would "Learn from the Master [Donald] Trump," it was "the next best

26  thing to being his [Donald Trump's] Apprentice," and they would learn "Insider success secrets

27  from Donald Trump."  However, Plaintiffs and Class ~~members~~Members received nothing of the

28  sort.  Trump did not hand-pick the instructors and mentors.

**Misrepresentations About Prior Student Experiences**

174.   Defendants enhance, misrepresent and in certain instances, completely fabricate student testimonials to get consumers to sign up.  In addition, testimonials often claim a person made a certain amount of money without taking into account their expenses.  Indeed, when expenses and costs are taken into account, many of these "success stories" actually lost money. These misleading testimonials were presented to Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008; Brandon Keller on or about November 18, 2009, and December 6-8, 2009; Ed Oberkrom on or about March 2009; and Patricia Murphy on or about January 27 to March 12, 2007 Sonny Low on or about November 18, 2009 and December 6, 2009; J.R. Everett on or about October 7, and October 16-18, 2009; and John Brown on or about on or about September 14, and September 25-27 2009.  Plaintiffs relied on these 'trumped up' success stories in signing up for Trump University.  Many of these testimonials also were illegal and/or improper in that they violated FTC regulations and/or requirements.

**Misrepresentations About the Real Estate Training Provided**

175.   Trump University represents to consumers that they will "teach you what you need to know" to be successful in real estate.  These misrepresentations were made to Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008; Brandon Keller on or about November 18, 2009, and December 6-8, 2009; Ed Oberkrom on or about March 2009; and Patricia Murphy Sonny Low on or about January November 18, 2009 and December 6, 2009; J.R. Everett on or about October 7, and October 16-18, 2009; and John Brown on or about on or about September 14, and September 25-27 to March 12, 2007 2009. However, it not only failed to provide the detailed information that Plaintiffs and Class members Members needed to know concerning real estate contracts and numbers, but it affirmatively led them astray by teaching them to use tactics that are illegal in California and other states.  For example, instructors told attendees to post "bandit signs" to generate business. These are signs posted on the side of the roadway, intended to mimic black and yellow road warning and signs and say "WE BUY HOUSES, 619-222-2222."  Trump University fails to

1  inform Plaintiffs and Class ~~members~~Members these signs are illegal and can result in fines,

2  criminal charges, and six months in jail.  These misrepresentations regarding bandit signs were

3  made to Plaintiff Makaeff on or about August 2008~~;~~ and Ed Oberkrom on or about March 2009~~;~~

4  ~~and Patricia Murphy on or about January 27 to March 12, 2007~~.  Trump University also

5  encourages Plaintiffs and Class ~~members~~Members to engage in transactions that would require a

6  real estate license – conduct that is also illegal in California and other states. These

7  representations regarding engaging in practices that require a real estate license were made to

8  Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008;

9  Brandon Keller on or about November 18, 2009, and December 6-8, 2009.

10  **Misrepresentations that Students Would**
    **Make Their Money Back in First Deal**

11

12      176.    Defendants routinely told potential students that, although the Seminars were

13  expensive, they should take the leap and just charge it on the credit card because they would

14  quickly make all their money back in their first real estate deal, and could make up to tens of

15  thousands of dollars per month or more after that.   These misrepresentations were made to

16  Plaintiffs at Trump University Seminars as follows: Tarla Makaeff on or about August 2008;

17  Brandon Keller on or about November 18, 2009, and December 6-8, 2009; Ed Oberkrom on or

18  about March 2009; ~~and Patricia Murphy on or about January 27 to March 12, 2007~~Sonny Low

19  on or about November 18, 2009 and December 6, 2009; J.R. Everett on or about October 7, and

20  October 16-18, 2009; and John Brown on or about on or about September 14, and September 25-

21  27 2009.  In fact, Defendants knew that it was extremely unlikely, and extremely rare that

22  Plaintiffs and Class ~~members~~Members would quickly make back the price they paid for the

23  Seminars.

24  **Misrepresentations that Consumers Should**
    **Raise Their Credit Card Limits During the**
    **Seminar to Be Ready for Real Estate Transactions**

25

26      177.    Trump University representatives routinely told students on the second day of the

27  three-day $1,500 seminar to raise their credit card limits four times during the break for "real

28  estate transactions," and had students prepare detailed financial statements, presumably for real

1   estate purchases. These misrepresentations were made to Plaintiffs at Trump University

2   Seminars as follows: Tarla Makaeff on or about August 2008; Brandon Keller on or about

3   November 18, 2009, and December 6-8, 2009; Ed Oberkrom on or about March 2009; and

4   Patricia Murphy on or about January 27 to March 12, 2007. Sonny Low on or about November

5   18, 2009 and December 6, 2009; J.R. Everett on or about October 7, and October 16-18, 2009;

6   and John Brown on or about on or about September 14, and September 25-27 2009.  In fact,

7   Defendants' real reason for this was to assess how much money each student had to spend on the

8   next Trump University seminar, and to persuade the students to use their increased credit limit to

9   purchase the Trump University Gold Program for $34,995.

10      178.    Defendants' misrepresentations were supplied for the purpose of affecting

11   Plaintiffs' and Class members' Members' financial decisions.

12      179.    Defendants had no reasonable grounds for believing that their misrepresentations

13   were true.

14      180.    Defendants failed to exercise reasonable care and/or diligence in communicating

15   their misrepresentations.

16      181.    Defendants' misrepresentations were objectively material to the reasonable

17   consumer, and therefore reliance upon such representations may be presumed as a matter of law.

18      182.    Defendants intended that Plaintiffs and members of the Class would rely on its

19   misrepresentations.

20      183.    Plaintiffs and Class members Members reasonably and justifiably relied to their

21   detriment on Defendants' misrepresentations.

22      184.    As a proximate result of Defendants' misrepresentations, Plaintiffs and Class

23   members Members were damaged in an amount to be proven at trial.

24      185.    Defendants directly benefited from, and were unjustly enriched by, their

25   misrepresentations.

26

27

28

**EIGHTH CAUSE OF ACTION**

(**Fraud**)

186.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

187.    As alleged herein, Defendants intentionally and falsely represented to Plaintiffs and Class ~~members~~Members that they would receive a "complete real estate education," a "one year apprenticeship," one-on-one mentorship, practical real estate techniques and contracts, a "power team" of real estate agents, lenders, personal finance managers, property managers and contractors, and were assured that although the Seminars were costly, they would make the money back in their first real estate deal, and could make up to tens of thousands of dollars per month or more.

188.    Instead of a complete real estate education, students merely received an "infomercial" pushing additional Seminars or workshops they were told they would need to take to succeed.  The "one year apprenticeship" they were promised was actually just a three-day seminar; the one-on-one year-long mentorship consisted of no practical insights and no mentorship, but rather excursions to Home Depot and "mentors" who either recommend real estate deals that they stand to benefit from financially, raising a conflict of interest, or immediately disappeared and failed to return calls.  Defendants' representations were false and Defendants knew the representations were false at ~~they~~the time they were made, or made the representations recklessly and without regard for its truth.

189.    Trump University representatives also told students during the three-day seminar to raise their credit card limits four times during the break for "real estate transactions," and had students prepare detailed financial statements, presumably for real estate purchases, when in fact, Defendants' real reason for this was to assess how much money each student had to spend on the next Trump University seminar, and to persuade the students to use their increased credit limit to purchase the Trump University Gold Program for $34,995.

190.    Defendants falsified and at times completely fabricated testimonials of students and posted testimonials that were in violation of FTC regulations and guidelines.

Exhibit B
- 164 -

191.   Defendants intended that Plaintiffs and Class ~~members~~Members rely on the representations.

192.   Plaintiffs and Class ~~members~~Members reasonably and justifiably relied to their detriment on Defendants' misrepresentations.

193.   As a proximate result of Defendants' misrepresentations, Plaintiffs and Class ~~members~~Members were damaged in an amount to be proven at trial.

194.   Plaintiffs and Class ~~members'~~Members' reliance on Defendants' representations were a substantial factor in causing their harm.

**NINTH CAUSE OF ACTION**

**(False Promise)**

195.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

196.   As alleged herein, Defendants made a number of promises to Plaintiffs and Class ~~members~~Members, which were important to Plaintiffs and Class ~~members'~~Members' decision to purchase Trump University's Seminars.

197.   Defendants did not intend to perform these promises when they made them.

198.   Defendants intended that Plaintiffs and Class ~~members~~Members rely on these promises and Plaintiffs and the Class did reasonably rely on Defendants' promises.

199.   Defendants did not perform any of the promised acts.

200.   As a proximate result of Defendants' failure to act on its promises, Plaintiffs and Class ~~members~~Members were damaged in an amount to be proven at trial.

201.   Plaintiffs and Class ~~members'~~Members' reliance on Defendants' promises were a substantial factor in causing their harm.

**TENTH CAUSE OF ACTION**

**(Deceptive Acts and Practices in Violation of §349 of New York's
General Business Law)**

202.   Plaintiffs reallege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

203.     Plaintiff John Brown is a resident of New York who purchased and attended Trump University Seminars in New York.

204.     Defendants' acts and practices as detailed herein constitute unlawful, unfair, deceptive and fraudulent business practices in violation of §349 of New York's General Business Law ("GBL").

205.     Defendants' misleading and deceptive business practices adversely impacted Plaintiffs and the ClassClass Members who purchased Seminars in New York, and therefore constitutes consumer-oriented conduct under GBL §349, which resulted in a direct harm to Plaintiffs and the Class.

206.     PlaintiffsPlaintiff John Brown, on behalf of themselveshimself and the Class, seek Members who attended Trump University Seminars in New York, seeks injunctive relief and damages under §349 of New York's General Business Law.

**ELEVENTH CAUSE OF ACTION**

**(Financial Elder Abuse in Violation of Cal. Welf. & Inst. Code §15600, *et seq.*)**

207.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

208.     Plaintiff Sonny Low is a 71-year old resident of California who attended Trump University Seminars in California.

209.     California Welfare and Institutions Code §15610.30(a) provides in relevant part:

(a)     "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

(1)     Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(2)     Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

210.     Defendants' conduct constitutes financial abuse under Cal. Welf. & Inst. Code §15657.5, *et seq.*, as defined in Cal. Welf. & Inst. Code §15610.30.

211.     At all relevant times, Defendants took and/or assisted in the taking of property from Plaintiff Low and all California Class Members who are aged 65 or older for its own wrongful use and/or with intent to defraud.  Plaintiff Low and California Class Members aged 65 or older trusted and relied on Defendants.

212.     Defendants manipulated Plaintiff Low and California Class Members aged 65 or older into purchasing Trump University Seminars.

213.     Defendants' wrongful acts were done maliciously, oppressively, and with the intent to mislead or defraud, thereby warranting punitive and exemplary damages or appropriate in an amount to be ascertained according to proof pursuant to Cal. Civ. Code §3294, *et seq.*

214.     Under Cal. Welf. & Inst. Code §15657.5, *et seq.*, Defendants are liable for reasonable attorneys' fees and costs for investigating and litigating this claim.

215.     Under Cal. Civ. Code §3345, Defendants are liable for treble damages and penalties because: (a) Defendants knew or should have known their conduct was directed to a senior citizen; (b) Defendants' conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) Plaintiff Low and California Class Members aged 65 or older are senior citizens who are more vulnerable than others to Defendants' conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) Plaintiff Low and California Class Members aged 65 or older actually suffered substantial physical, emotional and economic damages resulting from Defendants' conduct.

**TWELFTH CAUSE OF ACTION**

**(Violations of The Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. §501.201, et seq.)**

216.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

217.     Plaintiff J.R. Everett is a 68-year old and a "senior citizen" under Fla. Stat. §501.2077(a), which defines "senior citizens" as persons 60 years of age or older.  Everett is a resident of Florida and attended Trump University Seminars in Florida.

218.   This cause of action arises under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Fla. Stat. §501.204(1).   Under the FDUTPA, it is unlawful to engage in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fla. Stat. §501.204(1).   The FDUTPA does not define the elements of "unfair or deceptive," but in construing the act, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [the FTCA (15 U.S.C. §45(a)(1))]." Fla. Stat. §501.204(2).

219.   Plaintiff Everett and other Class Members are consumers as defined under the FDUTPA.  Fla. Stat. §501.203(7).

220.   "Trade or commerce" means "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated," and "shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."  Fla. Stat. §501.203(8).

221.   Defendants violated the FDUTPA by making material misrepresentations regarding Trump University and its seminars as set forth more fully above.   Defendants disseminated, through its seminars, advertising and marketing, common, untrue statements about Trump University and its Seminars that have a tendency to mislead the public, and made common material misrepresentations with the intent to induce reliance by consumers to purchase Trump University Seminars. Defendants' practices are unfair because they offend established public policy and are unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

222.   Defendants' conduct set forth herein caused Plaintiff Everett and other Class Members to suffer substantial injury.   The gravity of Defendants' alleged wrongful conduct outweighs any purported benefits attributable to such conduct.   There were also reasonably available alternatives to Defendants to further their business interests.

223.    Because Plaintiff Everett and Class Members have suffered injury in fact and have lost money and/or property as a result of Defendants' violations of the FDUTPA, they are entitled to damages.  Fla. Stat. §501.211.

224.    Plaintiffs and Class Members are also entitled to recover attorneys' fees, costs and expenses pursuant to Fla. Stat. §501.2105(1).

225.    Defendants willfully used a method, act or practice in violation of the FDUTPA, which method, act or practice victimized or attempted to victimize senior citizens.  Defendants committed such violation knowing that their conduct was unfair or deceptive, and are therefore liable for civil penalties in the amount of $15,000 for each such violation pursuant to Fla. Stat. §501.2077(2).

**THIRTEENTH CAUSE OF ACTION**

**(Violations of The Florida Misleading Advertising Law, Fla. Stat. §817.41)**

226.    Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

227.    Plaintiff Everett is a resident of Florida and attended Trump University Seminars in Florida.

228.    This cause of action arises under Florida's Misleading Advertising Law, Fla. Stat. §817.41. This Act provides that it "shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state . . . any misleading advertisement.  Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses." Fla. Stat. §817.41(1).

229.    Defendants violated the Misleading Advertising Law by making material misrepresentations regarding Trump University and its Seminars as set forth more fully above. Defendants disseminated, through its seminars, advertising and marketing, common, untrue statements about Trump University and its Seminars that have a tendency to mislead the public, and made common material misrepresentations with the intent to induce reliance by consumers to purchase Trump University Seminars.

230.   Defendants' conduct set forth in this Complaint caused Plaintiff Everett and other Class Members to suffer substantial injury.  Because Plaintiff Everett and Class Members have suffered injury in fact and have lost money and/or property as a result of Defendants' misleading advertising, they are entitled to damages. Fla. Stat. §817.41(6).

231.   Plaintiff Everett and other Class Members are also entitled to recover "costs, including reasonable attorney's fees, and may be awarded punitive damages in addition to actual damages proven." Fla. Stat. §817.41(6).

## FOURTEENTH CAUSE OF ACTION

### (Unjust Enrichment)

232.   Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

233.   A party cannot induce, accept or encourage another to furnish or render something of value to such party and avoid payment for the value received.

234.   As a result of the conduct describe above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs and the Class.

235.   Defendants have received, and are holding, funds belonging to Plaintiffs and the Class which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiffs and the Members of the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter a judgment against Defendants that:

A.   This action be certified and maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure and certify the proposed Class as defined, appointing Plaintiffs as representatives of the Class, and appointing the attorneys and law firms representing Plaintiffs as counsel for the Class;

B.   Awards compensatory, statutory and/or punitive damages for Defendants' breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation and false promises, where such relief is permitted;

1   C.  Awards Plaintiffs and Class ~~members~~<u>Members</u> the costs of this action, including

2 reasonable attorneys' fees and expenses;

3   D.  Orders  Defendants to immediately cease their wrongful conduct as set forth

4 above; enjoins Defendants from continuing to falsely market and advertise, conceal material

5 information, and conduct business via the unlawful and unfair business acts and practices

6 complained of herein; orders  Defendants to engage in a corrective notice campaign, and requires

7 Defendants to refund to Plaintiffs and all Class ~~members~~<u>Members</u> the funds paid for the subject

8 Seminars;

9   E.  Awards equitable monetary relief, including restitution and disgorgement of all

10 ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the

11 proceeds of Defendant's ill-gotten gains, to ensure that Plaintiffs and Class ~~members~~<u>Members</u>

12 have an effective remedy;

13   F.  Awards pre-judgment and post-judgment interest at the legal rate; and

14   G.  Such further legal and equitable relief as this Court may deem just and proper.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**JURY DEMAND**

2

Plaintiffs demand a trial by jury on all issues so triable.

3

DATED: ~~December 16, 2010~~July 31, 2012        ZELDES & HAEGGQUIST, LLP

4                                                                        AMBER L. ECK
                                                                        HELEN I. ZELDES

5                                                                        ALREEN HAEGGQUIST
                                                                        AARON M. OLSEN

6

7                                                                        s/ Amber L. Eck
                                                                        AMBER L. ECK

8
~~ZELDES & HAEGGQUIST, LLP~~
9                                                                625 Broadway, Suite 906

10   San Diego, ~~California~~CA  92101

11   Telephone: (619) 342-8000

12   Facsimile: (619) 342-~~7272 (fax)~~7878

13   ~~ROBBINS~~ROBBINS GELLER ~~RUDMAN~~RUDMAN
     & DOWD ~~LLP~~LLP
14   RACHEL L. JENSEN
     ~~PAULA M. ROACH~~THOMAS R. MERRICK
15   655 West Broadway, Suite 1900
     San Diego, CA  92101
16   Telephone: (619) 231-1058
     Facsimile: (619) 231-7423 ~~(fax)~~
17
     Attorneys for Plaintiffs and the Proposed Class
18

19

20

21

22

23

24

25

26

27

28

Exhibit B
- 172 -

CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2010, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 16, 2010.

s/ AMBER L. ECK
AMBER L. ECK

ZELDES & HAEGGQUIST, LLP
625 Broadway, Suite 906
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

E-mail: ambere@zhlaw.com