1　ROBBINS GELLER RUDMAN
　　　& DOWD LLP
2　RACHEL L. JENSEN (211456)
　　rjensen@rgrdlaw.com
3　THOMAS R. MERRICK (177987)
　　tmerrick@rgrdlaw.com
4　655 West Broadway, Suite 1900
　　San Diego, CA 92101
5　Telephone: 619/231-1058
　　619/231-7423 (fax)
6
　　ZELDES & HAEGGQUIST, LLP
7　AMBER L. ECK (177882)
　　ambere@zhlaw.com
8　HELEN I. ZELDES (220051)
　　helenz@zhlaw.com
9　ALREEN HAEGGQUIST (221858)
　　alreenh@zhlaw.com
10　AARON M. OLSEN (259923)
　　aarono@zhlaw.com
11　625 Broadway, Suite 906
　　San Diego, CA 92101
12　Telephone: 619/342-8000
　　619/342-7878 (fax)
13
　　Attorneys for Plaintiffs and Proposed Class
14

UNITED STATES DISTRICT COURT

15

SOUTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated, | No. 3:10-cv-00940-CAB(WVG) |
| Plaintiffs, | CLASS ACTION |
| vs. | PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES AND APPOINTMENT OF CLASS COUNSEL |
| TRUMP UNIVERSITY, LLC, et al., | |
| Defendants. | |

JUDGE:　Hon. Cathy Ann Bencivengo
DATE:　　February 12, 2013
TIME:　　2:30 P.M.
CTRM:　　2 – 4th Floor

Oral Argument Requested Subject to
Court Approval

**[REDACTED]**

767963_1

1

**TABLE OF CONTENTS**

2

**Page**

3  I.      INTRODUCTION ..............................................................................................1

4  II.     SUMMARY OF COMMON CLASSWIDE EVIDENCE ..................................4

5        A.    Common Evidence Will Show That Defendants Engaged in an "Up-sell"
                Scheme to Market and Sell Trump University Courses..............................4

6
7        B.    Common Evidence Will Show Defendants' Misrepresentations and
                Omissions Created a False Image of Trump University............................8

8              1.   Defendants Uniformly Misrepresented Mr. Trump's Involvement
                    in "Courses" Based Upon His Real Estate Expertise.........................9

9
10             2.   Defendants Uniformly Misrepresented that Speakers and Mentors
                    Were Trump's "Hand-Picked" Experts .......................................13

11       C.    Defendants Uniformly Misrepresented Trump University as a Legitimate
                and "Accredited" Academic Institution .....................................................14

12
13             1.   Common Evidence Will Show Defendants' Portrayal as a
                    "University" Misled Reasonable Consumers...............................14

14             2.   Common Evidence Will Show Trump University Is Not a
                    Legitimate Educational Institution...............................................15

15
16             3.   Common Evidence Will Show Trump University Had No
                    Standards for Its "Faculty" of "Expert" "Professors".................16

17       D.    Defendants Misrepresented that Students Would Receive a One-Year
                Comprehensive Real Estate Education With Unlimited Support and
18              Mentoring by Mr. Trump's Experts............................................................17

19       E.    Common Evidence Will Show the Testimonials Were Misleading .....................18

20       F.    Common Evidence Will Show Defendants Targeted Senior Citizens.................19

21  III.    CLASS CERTIFICATION IS PROPER AND WARRANTED .........................19

22       A.    Applicable Legal Standards ........................................................................19

23       B.    The Requirements of Rule 23(a) Are Readily Met...................................20

24             1.   Numerosity is Satisfied ................................................................20

25             2.   Questions of Law and Fact Are Common to All Class Members............20

26             3.   Plaintiffs Claims Are Typical of Those of the Class .................21

27             4.   Plaintiffs Will Fairly and Adequately Represent the Class .......21

28

|   |   |   |   | Page |
|---|---|---|---|---|

a.    Plaintiffs' Interests Do Not Conflict with the Interests of Other Class Members.................................................................22

b.    Plaintiffs Counsel Are Qualified to Serve as Class Counsel .........23

C.    Plaintiffs and the Class Satisfy the Requirements of Rule 23(b)(3) ......................23

    1.    Common Questions of Law or Fact Predominate.....................................23

        a.    Common Issues Predominate Because Many of the Legal and Factual Questions Here Will Be Resolved With Proof Common to all Class Members.................................................23

        b.    Defendants Records Will Be Used to Calculate Each Class Member's Individual Damages.......................................................26

        c.    Applying Multi-State Law Does Not Preclude Predominance.........................................................................26

            (1)    Unfair and Deceptive Trade Practices Act Subclasses ......................................................................28

            (2)    Senior Subclasses...............................................................30

            (3)    Unjust Enrichment Subclasses............................................31

            (4)    Fraud Subclasses.................................................................32

            (5)    Breach of Contract and Breach of Good Faith and Fair Dealing Subclasses ....................................................33

    2.    Class Litigation Is Superior to Other Methods of Adjudication ...............34

IV.    CONCLUSION.........................................................................................................35

1

**TABLE OF AUTHORITIES**

2

**Page**

3    **CASES**

4    *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,*
5        247 F.R.D. 156 (C.D. Cal. 2007) .................................................................22

6    *Amchem Prods. v. Windsor,*
         521 U.S. 591 (1997) ...............................................................3, 23, 24, 34
7
     *Bateman v. Am. Multi-Cinema, Inc.,*
8        623 F.3d 708 (9th Cir. 2010) .................................................................. 19

9    *Blackie v. Barrack,*
         524 F.2d 891 (9th Cir. 1975) .........................................................25, 26, 32
10
     *Cal-Tech. Comms., Inc. v. Los Angeles Cellular Tel. Co.,*
11       20 Cal. 4th 163 (1999) ...........................................................................29

12   *Chavez v. Blue Sky Nat. Bev. Co.,*
13       268 F.R.D. 365 (N.D. Cal. 2010) ..................................................26, 29, 30

14   *Colgan v. Leatherman Tool Grp., Inc.,*
         135 Cal. App. 4th 663 (2006) ..................................................................29
15
     *Crawford v. Honig,*
16       37 F.3d 485 (9th Cir. 1994) ....................................................................22

17   *Davis v. Powertel, Inc.,*
18       776 So. 2d 971 (Fla. Dist. Ct. App. 2000) ................................................30

19   *Edwards v. City of Long Beach,*
         467 F. Supp. 2d 986 (C.D. Cal. 2006) ......................................................34
20
     *Egwuatu v. South Lubes, Inc.,*
21       976 So. 2d 50 (Fla. Dist. Ct. App. 2008) ..................................................30

22   *Eisen v. Carlisle & Jacquelin,*
23       417 U.S. 156 (1974) ...............................................................................35

24   *Ellis v. Costco Wholesale Corp.,*
         657 F.3d 970 (9th Cir. 2011) ............................................................. 19, 21
25
     *F.T.C. v. John Beck Amazing Profits, LLC,*
26       No. 2:09-vc-04719-JHN-CW, 2012 U.S. Dist. LEXIS 70068
         (C.D. Cal. Apr. 20, 2012) .......................................................................29
27

28

**Page**

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...................................................................20, 23, 26

*Hartless v. Clorox Co.*,
  273 F.R.D. 630 (S.D. Cal. 2011) ...................................................................... 21, 23

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
  No. C 04-1511 CW, 2007 U.S. Dist. LEXIS 44459
  (N.D. Cal. June 11, 2007) ............................................................................31

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
  140 F.R.D. 425 (D. Ariz. 1992)...............................................................3, 24, 25

*In re Checking Account Overdraft Litig.*,
  No. 1:09-MD-02036-JLK, 2012 U.S. Dist. LEXIS 135062
  (S.D. Fla. Apr. 3, 2012) ..........................................................................27, 31, 33

*In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,
  270 F.R.D. 521 (N.D. Cal. 2010)..............................................................16, 33

*In re First Alliance Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) .................................................................*passim*

*In re Hitachi Telev. Optical Block Cases*,
  No. 08cv1746 DMS (LS), 2011 U.S. Dist. LEXIS 135 (S.D. Cal. Jan. 3, 2011) ....................... 24

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  267 F.R.D. 113 (D.N.J. 2010)............................................................................31

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
  268 F.R.D. 652 (S.D. Cal. 2010) .......................................................................31

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007)......................................................................26

*In re Terazonsin Hydrochloride Antitrust Litig.*,
  220 F.R.D. 672 (S.D. Fla. 2004)........................................................................31

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009)......................................................................................29

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
  2008 U.S. Dist. LEXIS 118344 (S.D. Cal. July 8, 2008) ........................................26

**Page**

*Kearney v. Hyundai Motor Co.*,
No. SACV 09-1298 DOS, 2010 U.S. Dist. LEXIS 68242
(C.D. Cal. June 4, 2000) .................................................................27

*Keegan v. Am. Honda Motor Co.*,
No. CV 10-09508 MMM (AJWx), 2012 U.S. Dist. LEXIS 91394
(C.D. Cal. June 12, 2012) ...............................................20, 28, 30

*Kielholtz v. Lennox Hearth Prods.*,
268 F.R.D. 330 (N.D. Cal. 2010)............................................26, 32

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ...............................................25, 27

*Maffei v. Alert Cable TV, Inc.*,
342 S.E.2d 867 (N.C. 1986).............................................................34

*McKenzie v. Fed. Express Corp.*,
275 F.R.D. 290 (C.D. Cal. 2011) ...................................................25

*McPhail v. First Command Fin. Planning, Inc.*,
247 F.R.D. 598 (S.D. Cal. 2007)..............................................3, 25

*Nat'l Fed'n of the Blind v. Target, Corp.*,
No. C06-1802 MHP, 2007 U.S. Dist. LEXIS 73547
(N.D. Cal. Oct. 2, 2007) .................................................................22

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
238 F.R.D. 482 (C.D. Cal. 2006) ...........................................24, 26, 31

*Nelson v. Mead Johnson Nutrition Co.*,
270 F.R.D. 689 (S.D. Fla. 2010).....................................................31

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
647 N.E.2d 741 (N.Y. Ct. App. 1995) ............................................30

*Pecover v. Elec. Arts Inc.*,
No. C08-2820 VRW, 2010 U.S. Dist. LEXIS 140632
(N.D. Cal. Dec. 21, 2010) ...............................................................20

*Pitts v. Am. Sec. Ins. Co.*,
550 S.E.2d 179 (N.C. Ct. App. 2001) .............................................34

*Poulos v. Badala*,
227 A.D. 2d 118 (N.Y. App. Div. 1996) .........................................26

**Page**

*Shaffer v. Cont'l Cas. Co.*,
   No. CV 06-2235-RGK (PWJx), 2007 U.S. Dist. LEXIS 96189
   (C.D. Cal. Jan. 26, 2007) ....................................................................30

*Slaven v. BP Am., Inc.*,
   190 F.R.D. 649 (C.D. Cal. 2000) ..........................................................20

*Smiley v. Citibank*,
   900 P.2d 690 (1995), *aff'd*, 517 U.S. 735 (1996) ...............................26

*Staton v. Boeing*,
   327 F.3d 938 (9th Cir. 2003) .................................................................21

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011), *cert denied sub nom.*,
   *Ticketmaster v. Stearns*, __ U.S. __, 132 S. Ct. 1970 (2012) .........23, 26

*Stutman v. Chem. Bank*,
   731 N.E. 2d 608 (N.Y. 2000) .................................................................30

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
   209 F.R.D. 159 (C.D. Cal. 2002) ...........................................................28

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*,
   593 F.3d 802 (9th Cir. 2010) .................................................................19

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ...........................................................34, 35

*Vasquez v. Superior Court*,
   484 P.2d 964 (1971) ..............................................................................29

*Wal-Mart Stores, Inc. v. Dukes*,
   __ U.S. __, 131 S. Ct. 2541 (2011) ............................................19, 20, 23

*Walter v. Hughes Commc'ns, Inc.*,
   No. 09-2136 SC, 2011 U.S. Dist. LEXIS 72290 (N.D. Cal. July 6, 2011)..................21

*Westways World Travel, Inc. v. AMR Corp.*,
   218 F.R.D. 223 (C.D. Cal. 2003) ......................................................24, 31

*Wolin v. Jaguar Land Rover North Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) .....................................................3, 21, 24

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) ........................................................25, 29

**Page**

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ................................................................34

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §45 ...........................................................................................................29
   §45(n) ......................................................................................................29

California Business & Professions Code
   §17200 .............................................................................................28, 29
   §17500 .....................................................................................................29

California Civil Code
   §1750 .......................................................................................................28

California Welfare & Institutions Code
   §15600 *et seq.* .......................................................................................30
   §15610.30(a)(1) ......................................................................................30

Florida Statutes
   §501.201, *et seq.* and §817.41 ............................................................28
   §501.2077(a) ...........................................................................................31

New York General Business Law
   §349 ..................................................................................................28, 30

Federal Rules of Civil Procedure
   Rule 23 ................................................................................................. *passim*
   Rule 23(a) ...........................................................................4, 19, 20, 23
   Rule 23(a)(1) ...........................................................................................20
   Rule 23(a)(2) ...........................................................................................20
   Rule 23(a)(3) ...........................................................................................21
   Rule 23(a)(4) ...........................................................................................21
   Rule 23(b) ................................................................................................23
   Rule 23(b)(3) .........................................................................4, 19, 23, 34
   Rule 23(b)(3)(A) .....................................................................................34
   Rule 23(b)(3)(B) .....................................................................................34
   Rule 23(b)(3)(C) .....................................................................................35
   Rule 23(c)(5) ...........................................................................................26
   Rule 23(g) .................................................................................................1
   Rule 30(b)(6) .....................................................................................4, 17
   Advisory Comm. Notes to 1966 Amend., (b)(3) ...............................32

**Page**

**SECONDARY AUTHORITIES**

4 *Newberg Class Actions* (3d ed. 1992)
　　§21.29.................................................................................................................34

*Restatement (Second) of Contracts* (1981)
　　§205....................................................................................................................33

1    Pursuant to Fed. R. Civ. P. 23, Plaintiffs John Brown, J.R. Everett, Tarla Makaeff, Sonny

2 Low, and Ed Oberkrom[1] ("Plaintiffs"), by and through their undersigned counsel, respectfully move

3 for class certification.  Plaintiffs also move to be appointed Class Representatives, and for their

4 counsel to be appointed as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

5 **I.    INTRODUCTION**

6    Defendants ensnared Plaintiffs and thousands of others around the country in a fraudulent "up-sell"

7 scheme whose misleading nature is embodied by its very name – "Trump University."  However, as

8 common evidence will show, in reality, Trump University is neither.  Defendants' documents, former

9 employees, and third-party documents reveal Trump University neither teaches Donald Trump's real estate

10 "secrets" as it purports to do, nor is it an institution of higher education.  As detailed herein, defendants'

11 centrally-orchestrated strategy to lure in consumers with misleading promises will be the "center of

12 gravity" in this action and thus is readily certifiable. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 991

13 (9th Cir. 2006).

14    Attaching his image and reputation to the face of his eponymous "University," Mr. Trump

15 bet consumers would be lured in by his reputation as the world's most famous real estate tycoon.

16 His bet paid off.  Thousands of consumers were duped into paying tens of millions of dollars in

17 hopes of learning Mr. Trump's "secrets" from his supposed "handpicked" "experts."  Trading on the

18 "University" moniker, though unaccredited and unlicensed to do so, defendants created a fabrication

19 that Trump University was a legitimate academic institution and touted itself as better than the

20 prestigious Wharton Business School. *See* Ex. 1; Ex. 2.[2]

21    When Mr. Trump's sleight of hand is revealed, however, all that Mr. Trump really

22

23 [1]    John Brown, J.R. Everett, and Sonny Low are Proposed Plaintiffs in the Proposed Third

24 Amended Complaint ("TAC"), which is the subject of Plaintiffs' Motion for Leave to Amend. (Dkt. No. 112.)  Plaintiff Brandon Keller does not seek to be a class representative at this time.

25 [2]    All references to "Ex." are to the exhibits attached to the Declaration of Amber L. Eck in

26 Support of Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel ("Eck

27 Decl."), filed concurrently herewith.  Citations are omitted and emphasis is added, here and throughout, unless otherwise noted.

28

1    contributed to the "University" was his name. ████████████████████

2    ██████████████████████████████████████████████

3    ██████████████████████████████████████████████

4    ██████████████████   Ex. 14 at 393:8-17.  And while Trump University promised "a

5    comprehensive, one-year program to train adults to be successful real estate investors," imparting

6    Mr. Trump's "secrets" by his "handpicked" experts, Mr. Trump admitted in his deposition that he

7    did not write or teach courses, did not know what courses were offered at his "University," did not

8    know whether students received a degree, did not "handpick" the mentors and instructors as

9    promised, did not know what his own so-called "foreclosure system" was, and did not personally

10   answer questions in the "Ask Donald Trump live" online forum.

11        Governmental agencies and the Better Business Bureau ("BBB") have found defendants' use

12   of the term "University" misleading to reasonable consumers.  The BBB gave Trump University a

13   failing grade after receiving many complaints from "students" and determined the false façade that

14   defendants created invoking an institution of higher learning through terms such as "accredited,"

15   "University," "faculty," and "professors" were misleading to reasonable consumers. Ex. 13 at BBB

16   NY 00501, 505.  Trump University was forced to stop operations in Texas due to an investigation,

17   and the New York Attorney General has an open investigation pending.[3]

18   ██████████████████████████████████████████████

19   ██████████████████████████████████████████████

20   ██████████████████████████████████████████

21   ██████████████████████████████████████████

22   ██████████████████████████████████████████

23   ██████████████████████████████████████████

24   ████████████████████████████████████

25

26   ─────────────────────

27   [3]        Plaintiff John Brown was asked to provide an affidavit to the New York Attorney General's
     Office as part of its investigation.  *See* Ex. 15.

28



Ex. 10, ¶¶14-15.

Ex. 16, at BLOOM 0519-20; Ex. 14, at 508:21-510:9; Ex. 12 at TU 53062.

The Trump University scan was predicated on these common predominant misrepresentations. Consumer fraud claims (like this one) based upon uniform misrepresentations and omissions are readily certifiable where the misrepresentations and causation are "susceptible to proof by generalized evidence," even if individualized issues remain. *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1173, 1176 (9th Cir. 2010) (reversing denial of class certification over defendant's objections tire defect cases involve "inherently individualized determinations"). The Supreme Court has emphasized that "predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). Moreover, the Ninth Circuit favors class treatment of fraud claims stemming from a "common course of conduct," as is alleged in this case. *See First Alliance*, 471 F.3d at 990.

Where as here the misrepresentations so permeate the enterprise's core "that its entire public image is distorted, it is sensible to presume that reasonable [consumers] relied on many material misrepresentations which, in aggregate, created a false image." *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 432-33 (D. Ariz. 1992) ("*ACC/Lincoln*") (cited in *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 609-10 (S.D. Cal. 2007)). Defendants' misleading representations and omissions about "Trump University" skewed consumers' perceptions, and the Court may presume that they relied on such statements. *ACC/Lincoln*, 140 F.R.D. 432-33.

Plaintiffs now move for class certification of their claims for violations of their respective

state law consumer protection statutes, financial elder abuse, fraud, unjust enrichment, and breach of contract and of the duty of good faith and fair dealing.[4]  On behalf of themselves, nearly 200 distressed consumers who have contacted Plaintiffs' counsel, the scores of others who complained, and thousands of consumers taken in by the scheme, Plaintiffs seek to certify the following Class:

> All persons in the United States who purchased a Trump University 3-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") within the applicable statute of limitations and have not received a full refund.[5] Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

Because all requisites of Fed. R. Civ. P. 23(a) and (b)(3) are satisfied, as explained below, Plaintiffs respectfully submit that the Court should grant their motion in its entirety.

## II.    SUMMARY OF COMMON CLASSWIDE EVIDENCE

Though discovery is ongoing, the evidence adduced to date establishes that classwide issues will predominate over individual questions.[6]  Below is a sampling of the types of evidence that Plaintiffs will present at trial to demonstrate how those common issues will be proven classwide.

### A.    Common Evidence Will Show That Defendants Engaged in an "Up-sell" Scheme to Market and Sell Trump University Courses

Ex. 17 at 64:19-22.

---

[4]      Plaintiffs do not seek to certify for class treatment their claims for money had and received, false promise, and negligent misrepresentation at this time.

[5]      *See* Ex. 12, at TU 52938.                                           Ex. 17, at 235:18-236:24.

*See* Ex. 12, at TU 52938.

[6]      Plaintiffs are still obtaining relevant documents from defendants and third parties and reserve their rights to cite additional evidence on reply.  Plaintiffs believe defendants have in their possession, custody or control additional documents.  Eck. Decl., ¶4.  Plaintiffs have been unsuccessful in serving subpoenas on former employees who are evading service. *Id.*

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14 at 393:8-17.

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 Ex. 17 at 75:17-76:2, 77:7-13. But, after watching their competition, defendants learned the money

6 was in conducting high-pressure "get rich quick" live events. Trump University started working

7 with Dynetech and others in the industry, and the fraudulent scheme was born: Trump University

8 would copy these "get rich quick" events by having them conduct seminars until it learned the game.

9 Starting in 2007, Trump University began to draw on the personnel and materials of such "get rich

10 quick" schemes to conduct "Live Events."[7]  What separated Trump University from others was

11 defendants' ability to trade on the famous Trump name to trick consumers into purchasing *its* Live

12 Events–representing them as teaching Donald Trump's "secret formula" for how he got rich in real

13 estate, and claiming the events were taught by his handpicked "real estate experts."

14 However, defendants' Live Events were not about teaching Donald Trump's "secret formula"

15 investing, but about up-selling consumers to more expensive courses by first luring consumers to

16 their "free" orientation (the "Preview"), used to push students to purchase the $1,495 3-day

17 _____

18 [7] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Ex. 17 at 77:14-80:6; Ex. 14 at 283:8-284:6; Ex. 18▮

20 ▮▮▮▮Ex. 17 at 85:12-86:8.▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 87:2-89:10.  In this action, defendant Trump University
moved to strike all references to former plaintiff Patricia Murphy in Plaintiffs' Second Amended

22 Complaint ("SAC") because she had taken courses from "Trump Institute," not Trump University,
which defendant misrepresented as "a completely separate corporation that has no affiliation with

23 Trump University." Dkt. No. 53 at 3.  It is now apparent that they were, in fact, affiliated.

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Ex. 17 at 148:20-151:10, 167:14-170:6; Ex. 14 at 285:22-

25 286:24.▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Ex. 19 at 104:15-105:4.▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮Ex. 14 at 288:7-10, 417:8-22.▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Ex. 12 at TU 53105.

28

1   workshop (the "Fulfillment"), which was used to up-sell students to purchase its Elite programs

2   (*e.g.*, $34,995 Trump Gold Elite, $19,495 Trump Silver Elite, and $9,995 Trump Bronze Elite).  The

3   up-sell scheme was tightly controlled.  *See* Ex. 12 at TU 52934; *see also* Ex. 11, ¶4.



4

5

6   Ex. 17 at 163:10-15; Ex. 14 at 306:7-12.

7

8   Ex. 17 at 161:23-163:9; *id.* at 196:16-198:10.

9

10

11   Ex. 12 at TU 52936.

12   Ex. 12.

13   *Id.*

14

15   *Id.* at TU 53059; Ex. 11 at ¶4

16

17

18   Ex. 12 at TU 52938.  Live Events were standardized,

19   *See id.* at TU

20   52948-58            ; *id.* at TU 52961-75            ; Ex. 22.

21

22

23   Ex. 12 at TU 52948-5; *id.* at TU 52961-64.

24

25   "  *Id.* at TU 52955.

26

27   *Id.* at TU 52955.

28



1   *Id.* at TU 52956.

2   *Id.* at TU 53043.

3

4

5   *Id.* at TU 53016.

6

7

8   *See, e.g.,* Ex. 23; Ex. 17 at 251:23-252:11.  Instructors represented to Plaintiffs and

9   the proposed Class that, although the seminars were expensive, they could just charge it on their credit

10  card because the students would quickly make their money back in real estate deals.  *See, e.g.,* Ex. 23

11  at TU 97153-57; Ex. 6, ¶3; Ex. 5, ¶¶4-5; Ex. 3, ¶¶4-5.

12

13

14

15  Ex. 12 at TU

16  52984-85.

17  *Id.* at TU 52969.

18

19  *Id.*

20

21  *Id.* at TU 52971-72.

22

23  *Id.* at TU 53061.

24  *Id.*

25  Further demonstrating that Trump University's entire program was developed based not on

26  education but on the "up-sell,"

27

28  *Id.* at

1  TU 53063.

2

3

4

5       The speakers were *not* required to master Mr. Trump's secret real estate techniques,

6

7                                                     *Id.* at TU 53032.

8

9                                              *See, e.g.*, Ex. 24 at TU 48770,

10  ¶2.02.

11                          *See* Ex. 26, at TU 48857.

12

13       Ex. 27, at TU 48961; Ex. 11, ¶9

14

15

16

17                          *Id.* at TU 48950.  In other words, even if any content in the presentations

18  varied (which it did not in any material way), the "hard-sell" component was uniform, as were the

19  misrepresentations, which were uniform and strictly controlled.

20       **B.    Common Evidence Will Show Defendants' Misrepresentations and
             Omissions Created a False Image of Trump University**

21

22       To carry out the scheme, defendants made the following common misrepresentations and

23  omissions about the nature of Trump University and its services in their ubiquitous advertising

24  campaign, standardized PowerPoint presentations at Live Events and through uniform sales scripts

25  which were followed word-by-word:[8] (1) Defendants would teach Donald Trump's "specialized"

26  "secret" process for real estate investing that took Mr. Trump his "entire career to develop"; (2)

27  ───────────────
    [8]    Ex. 9, ¶¶4-6, 10-13, 15-17.

28



1   Trump University's Live Event speakers (which it called "professors") and mentors were Mr.

2   Trump's "personal advisors" and "handpicked" by Mr. Trump; (3) Trump University's Live Event

3   speakers and mentors were "top real estate experts" with proven "success" teaching Mr. Trump's

4   "secret" formula for investing in real estate; (4) Trump University was a legitimate academic

5   institution; (5) Trump University would provide consumers with "unlimited," "comprehensive," and

6   "interactive" one-year of "expert" support and mentoring; and (6) Students could expect to see

7   certain results as depicted in testimonials that were not representative of actual results.

8          Such uniform misrepresentations and omissions painted a false picture of Trump University

9   and penetrated defendants' advertising campaign, its website and public statements, sales pitches,

10   and the standardized PowerPoint presentations during the "Preview" and "Fulfillment" seminars.

11   Such misrepresentations and omissions distorted the very character and nature of Trump University.

12            **1.      Defendants Uniformly Misrepresented Mr. Trump's Involvement
                        in "Courses" Based Upon His Real Estate Expertise**

13          Though common evidence overwhelmingly demonstrates Trump University's Live Events

14   were little more than copy-cat workshops created by the "get rich quick" real estate industry, Trump

15   University was marketed *entirely* around the prominence of its owner and Chairman, Donald

16   Trump.[9] Trump University closely identified itself with Mr. Trump as one of the world's most well-

17   known real estate magnates, blurring any line between Mr. Trump and his "University."

18          As the face of Trump University, Mr. Trump's name and image was *the* selling point of its

19   "Live Events" and was omnipresent on Trump University's website, advertising and marketing, at

20   seminars, and in written materials.  Defendants admitted that the "Trump" name brand was the

21   biggest asset of Trump University. Ex. 17 at 66:11-69:6, 114:12-116:18, 140:23-141:14, 163:16-

22   164:3; Ex. 28 at 50:23-51:2, 82:20-22. ████████████████████████████████████

23

24   ────────────────────

25   [9] ████████████████████████████████████████████████

26      *See* Dkt. No. 114, TU 01632.

27         ████████████████████████ *Id.*; Ex. 28 at 71:23-72:1.

         ████████████████████ Ex. 28 at 73:11-74:8.

28

1   ████████████████████████████████████████████████████ Ex. 17 at

2   66:11-69:6, 163:16-164:3.  In Mr. Trump's own words, "When I speak, people listen.  And, *when I*

3   *send out invitations, people attend* because they know that my invitation means one thing – there is

4   money to be made."  Ex. 29, at TU 62081; *see also* Ex. 30 at 373:9-20 (when asked whether Donald

5   Trump's involvement was a reason to purchase, plaintiff Oberkrom responded: "[I]t wasn't just a

6   reason.  It was *the* only reason.").  Defendants knew consumers would attend and pay a premium for

7   Trump University programs, and that Plaintiffs and the Class did.  Ex. 28 at 44:1-9, 82:20-22.

8        Trump University differentiated itself from its real estate competitors by associating itself

9   with Mr. Trump and his wealth: "There are many real estate investment seminars available but this is

10  the only one designed by Donald Trump's personal advisors."  Ex. 31.[10]  Defendants sent thousands

11  of students a "personal" invitation from Donald Trump inviting them to:

12        Come to my **free** class.  In just 90 minutes, *my hand-picked instructors* will
         share *my techniques*, which took my entire career to develop.  Then, just copy
13        exactly what I've done to get rich.  Ex. 32, at TU 25266.

14       Trump University blanketed the U.S. market with its uniform advertising campaign based on

15  the image, signature and brand of Mr. Trump by print media, online (*e.g.*, email, display

16  advertisements, and paid search), radio, direct mail and social media.  Ex. 17 at 228:24-229:19; *see*

17  Ex. 12 at TU 52938 (████████████) (████████████████████████████████

18  █████); Ex. 33, Rog. No. 7 & Ex. C (chart identifying dates and target locations of advertisements

19  and marketing).  ███████████████████████████████████ Ex. 14 at

20  396:25-397:7, 398:7-399:7; Ex. 28 at 136:4-138:15.

21       Plaintiffs will be able to prove that defendants had corporate policies and procedures in place

22  to ensure uniformity of its advertisements.  And all of the advertisements gave a uniform message: if

23  you attend a Trump University Live Event, it is like being Donald Trump's Apprentice and you will

24

25

26  ─────────────────────────

27  [10] ██████████████████████████████████████████. Ex. 14 at 449:13-17.

28

1 learn his insider success secrets about how he made his billions.[11]  Mr. Trump's personal letters

2 invited consumers to seminars by enclosing "two complimentary VIP tickets to give to you and a

3 guest the chance to learn how to create wealth *the Trump Way*." Ex. 38, at TU 62068.

4      Similarly, Live Events were standardized so as to maximize the "Trump Brand." ███

5 ████████████████████████████████████████████████████ Ex. 17,

6 Sexton Dep. I at 217:22-218:10. ████████████

7 ██████████████ (Ex. 12, Sexton Dep. Ex. 8, at TU 52954), featuring Mr. Trump

8 representing to attendees that they are going to learn from his "handpicked" experts that would

9 "teach you better than the business schools are going to teach you." Ex. 1, at TU 123460; *see also*

10 Ex. 2, TU-PLTF02441; Ex. 39, Rog. No. 2.  Trump University set the stage so the only thing

11 consumers could see, hear and feel was Trump.  *See, e.g.*, Ex. 40, at TU 59122-25.

12      Though students signed up in droves to get access to Mr. Trump and his best-kept real estate

13 secrets, they did not get any of these things.  Instead, they got platitudes like ████████

14 (Ex. 41, at TU 59008) and dangerous advice like, ██████████████████

15 ████████████████████████████████████

16 ████████████████ Ex. 23, at TU 97153 ██████████

17 ████████████████████████████████████

18 ██████████████████████. In a moment of total irony, Donald Trump

19 testified that one of his secrets was to teach people "not to buy real estate" – while "his" University's

20 "classes" were doing the exact opposite.  *See* Ex. 28 at 143:11-23.

21      This is because, contrary to defendants' misrepresentations and omissions, Donald Trump

22 has admitted he was not "deeply" and "actively" involved.  Trump University's Live Events were

---

[11]    *See, e.g.*, Ex. 34, at TU-PLTF00142-43 ("Are YOU My Next Apprentice?  Prove it to me!"; "My team at Trump University is filled with real estate experts ... proven winners.  We're the best of the best and we know what works.  If you think you have what it takes to be my next apprentice, prove it to me); Ex. 35, at TU-MAKAEFF3686 ("Do you want to be a part of Donald Trump's exclusive club"); Ex. 36, TU 69434 ("Learn from the Master"); Ex. 37, at TU 62096 ("Learn my proven, specialized Trump process for real estate investing.  My handpicked expert will show you how to find properties . . . .").

1   not remotely based on Donald Trump's expertise, ███████████████████

2   ███████████████████████ Ex. 14 at 393:8-17.  Trump testified that it was not he, but

3   Sexton, who compiled the course materials, and interviewed and hired speakers and mentors. Ex. 28

4   at 102:24-105:7. ███████████████████████████████████

5   ███████████████████████████████████████████

6   ███████████ Ex. 10, ¶9.[12]  Mr. Sexton and COO David Highbloom (who also lacked any real

7   estate experience) both verified these facts. Ex. 17 at 226:15-227:12; Ex. 14 at 380:18-384:7, 359:5-

8   15, 360:19-24, 463:25-464:16; Ex. 19 at 110:21-112:22.  In fact, Mr. Trump had no idea what

9   students received as part of the Fulfillment or Elite programs, or what his own purported

10  "foreclosure system" was. Ex. 28 at 107:10-110:12.  Mr. Trump could not identify the name of a

11  single Live Event offered by Trump University.  Ex. 28 at 86:15-24.   And even though these

12  instructors and mentors were his supposed "handpicked" "experts" and "personal advisors," Mr.

13  Trump did not know what the hiring requirements entailed.  Ex. 28 at 111:14-114:6.  Mr. Trump

14  could not name any of Trump University's primary instructors or mentors, the only names he could

15  recall – Gary Eldred, Don Sexton and Robert Kaplan – they wrote books and taught online courses;

16  however, he could not specifically recall if he had met any of them, and was not sure of their roles.[13]

17  Ex. 28 at 59:9-63:23, 162:7-165:5.  Mr. Trump did not even know whether "students" got a degree.

18  Ex. 28 at 120:1-4.  Mr. Trump could not recall whether he wrote the blog posts or the "Q&A with

19  Mr. Trump" on Trump University's website, ███████████████████████

20  ███████████ Ex. 14 at 442:12-444:3; Ex. 28 at 126:5-22.

21       Defendants also admitted Mr. Trump's lack of involvement in court filings.   To defeat

22  Plaintiffs' anti-SLAPP motion as to Trump University's defamation counterclaim, Trump University

23  avowed that Mr. Trump "simply" endorsed Trump University and allowed it to bear his name –

24

25  _____

    [12] ████████████████████████████████████████

26  ████████. Ex. 14 at 383:16-384:7.

27  [13]    In fact, none of these individuals were instructors of the live events, except Gary Eldred may

28  have taught one workshop in Las Vegas.

1    nothing more. *See* Answering Brief of Defendant-Counter-Claimant-Appellee Trump University,

2    LLC ("Answering Brief"), 9th Cir., No. 11-55016, Dkt. No. 28, at 21, 27; *see also* Dkt. No. 32 at 5-6

3    ("***Donald Trump's involvement is completely absent here.*** . . . . There is simply ***no evidence that***

4    ***Donald Trump was involved*** before, during or after the 'controversy.'"). ████████████████

5    █████████████████████████████████████   *See, e.g.*, Ex. 9, ¶14. It is apparent that

6    Mr. Trump's name was nothing more than a branding mechanism to carry out the scheme.

7         **2.    Defendants Uniformly Misrepresented that Speakers and Mentors**
              **Were Trump's "Hand-Picked" Experts**

8

9         One of the misrepresentations ubiquitously featured in the advertising campaign was the

10   opportunity to learn from Donald Trump's "hand-picked" expert mentors and instructors, which was

11   the next best thing to being Mr. Trump's "Apprentice." *See, e.g.*, Ex. 42; Ex. 43.[14] Defendants

12   promised that because Donald Trump hand-picked these experts, they would be the best. *Id.* ███████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████

16   █████████████[15] Ex. 12 at TU 53062. ████████████████████████████████

17   ███████████████ Ex. 12 at TU 52971.

18        But, admittedly none of Trump University's instructors or mentors was "handpicked" by Mr.

19   Trump. *See* Ex. 28 at 106:6-22. In most cases, Mr. Trump did not even know who the instructors or

20   mentors were, nor had he met them. *See* Ex. 11, ¶6; Ex. 9 at ¶¶13-14. Mr. Sexton was in charge of

21   interviewing, hiring and ultimately approving speakers and instructors that were "referred" for a fee

22   by Mark Dove and Steve Miller, experts in high-pressure sales. Ex. 28 at 106:11-22; Ex. 14 at

23   380:18-384:7. ████████████████████████████████████ (Ex. 19 at

24   ─────────────────

[14]    *See, e.g.*, Ex. 46 ("Donald Trump is sending one of his handpicked associates . . . to teach

25   you the necessary skills to Think Big."); Ex. 47, at TU 59243 (████████████████

            ██████).

26   [15]    Although Trump University represented that its mentors were "millionaires," Donald Trump

27   had no idea whether mentors were millionaires (Ex. 28 at 160:8-12), and Trump University never

     inquired as to whether they in fact were. Ex. 19 at 118:13-23.

28

1  129:19-21), ████████████████████ *Id.* at 96:24-97:18. ██████████████

2  ████████████████████████████████████████ *Id.* at 155:7-157:9.

3      **C.**    **Defendants Uniformly Misrepresented Trump University as a Legitimate and "Accredited" Academic Institution**

4

5          **1.**    **Common Evidence Will Show Defendants' Portrayal as a "University" Misled Reasonable Consumers**

6          Publicly, Trump University's mission is: "To train, Educate and Mentor Entrepreneurs on

7  achieving financial independence through Real Estate Investing." *See* Ex. 49, at TU-PLTF00324. Donald

8  Trump represented Trump University was better than Ivy League schools (Ex. 1, Ex. 2) and defendants

9  painted the picture of an admissions process through which only the chosen few would be selected. But,

10  evidence that is common to the Class shows that Trump University is not accredited, has no license to

11  operate as an institution for higher learning, and does not offer a degree or any other license or credits. *See,*

12  *e.g.,* Ex. 17 at 158:9-11; Ex. 13, at BBB NY 00501-02. Accordingly, in Spring 2010, the New York

13  Department of Education demanded that defendants change the name from Trump University, stating:

14  "Use of the word 'university' by your corporation is misleading . . . ."[16] ███████████████

15  ██████████████████████████████████████ Ex. 17 at 159:3-160:14. The

16  BBB denied accreditation because the use of "University" was inherently misleading to a reasonable

17  consumer:

18          Another factor contributing to your firm's ineligibility [for accreditation as a BBB business] is your firm's name "Trump University," which may potentially lead

19  reasonable consumers to believe that your firm is an academic institution. As you acknowledged in your correspondence dated 1/4/2010, your firm does not meet the

20  established definition of a "university." However, your instructors and program experts are referred to as "professors" and "faculty" in your promotional materials

21  and on your web site. Both terms are potentially *misleading* as they are generally reserved for the teaching and administrative staff and members holding academic

22  rank in an educational institution.

23  Ex. 13, at BBB NY 00505. The BBB also found Trump University's website misleading:

24          Trump University's School of Real Estate is accredited and we back up our assertions with unequalled educational and mentoring tools, such as retreats, phone

25  and email coaching and on-site coaching, where we actually send a Donald Trump recommended real estate professional to your town to work with you for 3 days.

26   

27  [16]    *See* Ex. 50; *see also* Ex. 17 at 164:4-166:7.

28

1  *Id.*   In addition, the BBB also found, that Trump University's classification as a

2  "School/Academy/College/University" is misleading:

> 3  [Trump University's] services, as listed in your promotional materials and on
> your web site, are ***inconsistent*** with the established definition for this classification
> 4  as you do not grant academic degrees or certification and do not appear to have
> recognized academic charter.   Further, your company does not appear to be
> 5  recognized as an academic institution that is accredited by accrediting agencies
> recognized by the Secretary of Education.

6  *Id.* at BBB NY00501-02.  For these reasons, along with numerous consumer complaints, the BBB

7  gave Trump University a "D-" rating, and only changed that status to "NR" (a notation for ["not

8  reviewed"]) after Mr. Trump and his lawyers threatened to sue the BBB. *Id.* at BBB NY 00542-45.[17]

9      Trump University is also subject to investigations by various states' Attorney General offices,

10  including the New York Attorney General. Ex. 17 at 6:9-7:20; Ex. 14 at 423:19-25; Ex. 51 (subpoena from

11  N.Y. AG's office). ████████████████████████████████████████████████████

12  ████████████████████████████ Ex. 14 at 413:2-10, 418:10-20; Exs. 52-53.

13       **2.      Common Evidence Will Show Trump University Is Not a**
14              **Legitimate Educational Institution**

15      As Plaintiffs will be able to show with common evidence, the findings by the BBB and state

16  regulators are accurate. ████████████████████████████████████████████

17  (Ex. 17 at 160:9-11), ████████████████████████" Ex. 12 at TU 52955. ███████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████ Ex. 40, TU 59125 ███████████

20  ████████; Ex. 54; Ex. 23 at TU 97150.

21      Defendants' internal documents portray a very different reality.  As outlined above, Plaintiffs

22  will be able to prove through the "████████" that Trump University is not a legitimate academic

23  institution, but a fraudulent up-sell scheme to separate its students from their money.  *See* §§II.A. &

24

25  _____

26  [17]     Threatening to sue is Donald Trump's *modus operandi*.  In addition to counter suing Plaintiff
27  Makaeff for defamation after filing the instant lawsuit, Mr. Trump has threatened to sue Plaintiffs'
counsel individually and her law firm at his recent deposition. Ex. 28 at 48:10-17.

28

C.2.  This is further bolstered by the testimony of Trump University's former employees, which also provides evidence that is common to the Class.  *See* Exs. 8-11.

### 3.   Common Evidence Will Show Trump University Had No Standards for Its "Faculty" of "Expert" "Professors"

Defendants uniformly misrepresented to consumers that they had a "faculty" of "experts" who would teach students Mr. Trump's real estate secrets and provide a comprehensive education. However, defendants materially omitted that Trump University did not require that its "faculty" be qualified in anything but sales. ████████████████████████ ████████████████████████████████████████ Ex. 19 at 126:9-127:1.  Many "professors" had little to no experience in real estate, were unemployed prior to working for Trump University, and were actually in debt.  For example, ███████████████████████████ ██████████████████████ ████████████████████████████████████████████ *See* Ex. 55, at TU 96114-16; Ex. 10 , ¶11 (████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████ ; Ex. 11, ¶5 (████).  ████████████████████████████ ████████████████████████ Ex. 19 at 155:7-157:9, 160:11-161:5.

Trump University sought out instructors and mentors not based on their real estate success or academic credentials, but on their *sales* ability.  ████████████████████████████████ ████████████████████████████████████████████" Ex. 10, ¶9; Ex. 11, ¶¶5-6 ("████████████████████████████████████████████████████ ██████").  ██████████████████████████████████████ Ex. 56, at TU 48784.

In short, common evidence will establish that, while defendants represented to the public that the Live Events were taught by proven real estate experts, Trump University had no real set of standards for the job other than being skilled at, and having no qualms about, high-pressure sales tactics for the up-sell scheme.  Ex. 12 at TU 53062

**D.    Defendants Misrepresented that Students Would Receive a One-Year Comprehensive Real Estate Education With Unlimited Support and Mentoring by Mr. Trump's Experts**

Another misrepresentation key was that students would receive a comprehensive one-year real estate education with a ███████████████████████████████████████ ████████████████████ *See, e.g.*, Ex. 40, at TU 59131; Ex. 46, TU 69463 ("After completing the program you will have ***direct*** access to your ***Mentor for 12 months*** to field any questions that may arise."). Through nationwide advertising and PowerPoint presentations, defendants portrayed the same message: consumers would receive ***year-long*** support if they purchased a "Fulfillment" program and direct access to a Trump mentor who would work side-by-side with them and hold their hand if they purchased an Elite program.[18]   Defendants got students to buy the up-sell by representing mentoring is a ***material*** component of its program: ██████████████ ████████████████████████ Ex. 12 at TU 52940.

Contrary to defendants' uniform advertising and presentations, it did not provide students with one-year of comprehensive real estate education with a "full year of expert, interactive support" or "direct access" to a Trump mentor for 12 months. ████████████████████

████████████████████████████████████████████████████

███████████ Ex. 17 at 261:3-12.

██████████████████████████████████ Ex. 17 at 263:13-15. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[18]   *See, e.g.*, Ex. 40, at TU 59113 ("█████████████████████████"); Ex. 47 at TU 59251 ("████████████████████████████████"); *id.* at 250 ("████████████████████ ████████████████████████"); Ex. 57 ("[E]very student in our Fast Track to Foreclosure Investing program is given a full year of ongoing support to ensure that they have every opportunity to achieve their goals."); Ex. 58 ("You really have two memberships. The first is with Trump University, it lasts forever. The second is an exclusive 12-month Premium Membership that includes a client advisor, weekly expert webinars, a comprehensive resource library, and much more."); *see also* Ex. 61 ("You work hand in hand with the Mentor to learn how to invest the Trump way so that even when the Mentor is gone, you can continue to build your financial future.").



1  ████████████████████████████████████████████████████████

2  ███████████████████████████████ Ex. 14 at 528:3-529:9.

3  ██████████████████████████████████████████████████████████

4  ███████████████████████████████████ Ex. 59.  An instructor revealed

5  to one Class member that the mentoring program was limited to a half-dozen sessions.  Ex. 60.  This

6  was not an accident.  █████████████████████████████████████████

7  ██████████████████████████████████████████████████████

8  █████████████████████████████████ *See* Ex. 59, at TU 129457-60.

9  Common evidence consisting of defendants' own admissions, internal operating documents, and the

10  nature of the mentors' pay structure, demonstrates the falsity of representations that students would

11  receive a "full year of expert, interactive support" or "direct access" to a mentor for 12 months.  Like

12  other Class members, Plaintiffs did not receive what they paid for.  Exs. 3-7.

13  **E.    Common Evidence Will Show the Testimonials Were Misleading**

14  Defendants used testimonials in its advertising and PowerPoint presentations at Live Events.

15  Ex. 19 at 205:24-206:18, 208:7-209:6.  Through the testimonials, Trump University represented that

16  students would closing their very first deals in short time frames earning them anywhere from

17  $20,000 to $7,000,000.  ████████████████████████████████

18  ██████████████████████████████████████████████████████

19  ██████ *Id.* at 224:3-13, 225:5-24.  ████████████████████████████

20  █████████████████████ *Id.* at 232:15-233:24, 234:23-236:21.  ████████████

21  ██████████████████████████████████████████████████████

22  ███████████████████████ *Id.* at 223:10-224:2; Ex. 8, ¶5.  ██████████████

23  ██████████████████████████████████████████████████████

24  ████████████████████████████████████████████ Ex. 45 at TU

25  60667.  Yet, when questioned, Mr. Trump did not know of any students who made one million

26  dollars in one year; however, he added mockingly that he had.  Ex. 28 at 129:22-130:6.

27

28

**F.     Common Evidence Will Show Defendants Targeted Senior Citizens**

Trump University targeted senior citizens to lure into its unlawful scheme. █████

████████████████████████████████████████████████████████. *See*

Ex. 16; Ex. 14 at 508:21-510:9. ████████████████████████████████

████████████████████████████████ Ex. 16, at BLOOM 0519-20. ██████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Ex. 12 at

TU 53062. ████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

## III.     CLASS CERTIFICATION IS PROPER AND WARRANTED

**A.     Applicable Legal Standards**

Courts certify class actions pursuant to Rule 23(a) of the Federal Rules of Civil Procedure if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a), and if the class satisfies Rule 23(b)(3)'s predominance and superiority.

The court conducts a "rigorous analysis," which may require it to "probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551 (2011). The district court considers the merits "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011). To consider whether the class will actually prevail would be to improperly "turn class certification into a mini-trial." *Id.* at 983 n.8; *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (court may inquire into substance of case to apply the Rule 23 factors, however, "[t]he court may not go so far . . . as to judge the validity of these claims"). Courts have broad discretion to grant class certification. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). Such certification should be granted here.

**B.      The Requirements of Rule 23(a) Are Readily Met**

**1.      Numerosity is Satisfied**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all class members is impracticable." Numerosity is generally satisfied when the class exceeds forty members. *See Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Here, the Class consists of thousands of persons who purchased a Trump University Live Event. This suffices.

**2.      Questions of Law and Fact Are Common to All Class Members**

The second element of Rule 23(a) requires "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is construed liberally and the existence of some common legal and factual issues is sufficient. *See Keegan v. Am. Honda Motor Co.*, No. CV 10-09508 MMM (AJWx), 2012 U.S. Dist. LEXIS 91394, at *42 (C.D. Cal. June 12, 2012). "This requirement is a low hurdle easily surmounted." *Pecover v. Elec. Arts Inc.*, No. C08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *37 (N.D. Cal. Dec. 21, 2010). Indeed, the showing to satisfy commonality is "minimal." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998). "For purposes of Rule 23(a)(2), the Supreme Court has agreed that "even a single common question will do." *Wal-Mart*, 131 S. Ct. at 2556. As explained in *Wal-Mart*, the plaintiff must demonstrate his claim and the claims of the class "depend upon a common contention," which "common contention" is "of such a nature that it is capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2545.

The central contention in this case turns on the nature of defendants' scheme and their purported misrepresentations. Plaintiffs contend that all Class members' claims involve the same fraudulent scheme and misrepresentations. Common issues here include, *inter alia*: (1) whether defendants engaged in a fraudulent "up-sell" scheme; (2) whether defendants misrepresented that Donald Trump would be actively involved in Trump University; (3) whether defendants misrepresented that Trump University's instructors and mentors were handpicked by Donald Trump; (4) whether defendants misrepresented that Trump University had a "faculty" of expert "professors" to instruct and mentor students; (5) whether defendants made misrepresentations about the year-long

1  mentoring program; and (6) whether defendants misrepresented students would learn Donald

2  Trump's proven formula and real estate secrets.  Plaintiffs and Class members fell victim to the same

3  up-sell scheme and common course of conduct.  Thus, commonality is met.

4  **3.  Plaintiffs Claims Are Typical of Those of the Class**

5  The typicality requirement of Rule 23(a)(3) is permissive and satisfied when plaintiffs' claims

6  are reasonably coextensive with those of absent class members' claims. *Staton v. Boeing*, 327 F.3d 938,

7  957 (9th Cir. 2003). "The test of typicality is whether other members have the same or similar injury,

8  whether the action is based on conduct which is not unique to the named plaintiffs, and whether other

9  class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984.  Typicality

10  does not require that plaintiffs share every fact in common with every class member. *Wolin*, 617 F.3d at

11  1175.  Rather, "it is enough if their situations share a common issue of law or fact and are sufficiently

12  parallel to insure a vigorous and full presentation of all claims for relief." *Walter v. Hughes Commc'ns,*

13  *Inc.*, No. 09-2136 SC, 2011 U.S. Dist. LEXIS 72290, at *23 (N.D. Cal. July 6, 2011).

14  Here, as explained above, Plaintiffs and each Class member were subjected to defendants'

15  fraudulent up-sell scheme and misrepresentations and omissions, including the false picture created by

16  the name "Trump University," and suffered damage as a result. *See* Exs. 3-7, *Hartless v. Clorox Co.*,

17  273 F.R.D. 630, 637 (S.D. Cal. 2011).  Moreover, Plaintiffs propose discrete subclasses to ensure the

18  proposed Class representatives' claims are materially identical to all other Class members they seek to

19  represent. *See* §III.C.1.c. As Plaintiffs and Class members' claims all stem from the same course of

20  conduct by defendants, typicality requirement is met. *See Hartless*, 273 F.R.D. at 637.

21  **4.  Plaintiffs Will Fairly and Adequately Represent the Class**

22  Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately

23  protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Courts consider two factors when

24  determining adequacy: (1) whether plaintiff and her counsel have any conflicts of interest with other

25  class members; and (2) whether plaintiff and her counsel will prosecute the action vigorously on

26  behalf of the class. *Staton*, 327 F.3d at 958.  Both factors are met.

27

28

a.    **Plaintiffs' Interests Do Not Conflict with the Interests of Other Class Members**

Adequacy is met where there is "'a sharing of interests between representatives and absentees.'" *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994). The existence of minor conflicts of interest between plaintiffs and the class will not defeat a party's claim to class certification. Conflicts must be "fundamental" to find class certification inappropriate. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007). "A conflict is 'fundamental' when it goes to the specific issues in controversy, or where . . . some plaintiffs claim to have been harmed by the same conduct that benefited other members of the class, preventing the named representatives from 'vigorously prosecuting the interests of the class through qualified counsel." *Id.* No such conflict exists here.

Here, Plaintiffs have been engaged participants in this litigation and do not have any interests antagonistic to the absent Class members. *See* Ex. 7, ¶¶7-8; Ex. 6, ¶¶7-8; Ex. 5, ¶¶10-11; Ex. 4, ¶¶10-11; Ex. 3, ¶¶10-11. The central issues in this case – the existence, unlawfulness, and effect of defendants' fraudulent scheme–are common to the claims of Plaintiffs and other Class members. Each Plaintiff, like each Class member, has a strong interest in proving Trump's scheme, establishing its unlawfulness, and obtaining redress. Indeed, Plaintiffs Makaeff and Oberkrom have already attended the ENE in this case, produced a substantial number of documents, and appeared for deposition (Oberkrom for a full day, and Makaeff for 2-1/2 days). Ex. 7, ¶¶7-8; Ex. 6, ¶¶7-8. And all proposed Class Representatives understand their duties, agree to consider the interests of the thousands of absent Class members, and have and will actively participate in the litigation.[19] *See* Ex. 7, ¶¶7-8; Ex. 6, ¶¶7-8; Ex. 5, ¶¶10-11; Ex. 3, ¶¶10-11; Ex. 4, ¶¶10-11.

---

[19]    In the event that the Court finds that one or more Plaintiffs are atypical or inadequate, Plaintiffs request thirty days' leave to file a renewed motion for class certification substituting new plaintiffs as class representatives. *Nat'l Fed'n of the Blind v. Target, Corp.*, No. C06-1802 MHP, 2007 U.S. Dist. LEXIS 73547, at *42-*43 (N.D. Cal. Oct. 2, 2007).

1     **b.**  **Plaintiffs Counsel Are Qualified to Serve as Class Counsel**

2    Class counsel must be qualified to represent the Class. "Although there are no fixed

3  standards by which 'vigor' can be assayed, considerations include competency of counsel . . . ."

4  *Hanlon*, 150 F.3d 1020. Plaintiffs' counsel are qualified lawyers experienced in the successful

5  prosecution of consumer class actions. *See Hartless*, 273 F.R.D. at 638 (appointing, *inter alia*,

6  Robbins Geller Rudman & Dowd as class counsel). As support, counsel submit their firm resumes

7  setting forth their experience and expertise in class actions. Eck Decl., Ex. 66; Declaration of Rachel

8  L. Jensen, filed concurrently herewith ("Jensen Decl."), Ex. 1. These firms stand ready, willing and

9  able to devote the resources necessary to litigate this case vigorously and see it through to an optimal

10  resolution. Eck Decl. ¶¶2-4; Jensen Decl. ¶¶2-4.

11   **C.**  **Plaintiffs and the Class Satisfy the Requirements of Rule 23(b)(3)**

12    In addition to satisfying the elements of Rule 23(a), Plaintiffs also must show that they

13  satisfy at least one of the conditions of Rule 23(b). *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013,

14  1019 (9th Cir. 2011), *cert denied sub nom.*, *Ticketmaster v. Stearns*, __ U.S. __, 132 S. Ct. 1970

15  (2012). Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can

16  be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022. Rule

17  23(b)(3) authorizes class certification where "questions of law or fact common to class members

18  predominate over any questions affecting only individual members," and "a class action would be

19  superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.

20  Civ. P. 23(b)(3); *Wal Mart*, 131 S. Ct. at 2549 n.2. Plaintiffs satisfy both elements.

21   **1.**  **Common Questions of Law or Fact Predominate**

22     **a.**  **Common Issues Predominate Because Many of the Legal
23       and Factual Questions Here Will Be Resolved With Proof
        Common to all Class Members**

24    Predominance tests whether classes are sufficiently cohesive to warrant adjudication by

25  representation. *Amchem*, 521 U.S. at 623. Courts hold "'there is clear justification for handling the

26  dispute on a representative rather than an individual basis'" if "'common questions present a significant

27  aspect of the case and they can be resolved for all members of the class in a single adjudication.'"

28  *Hanlon*, 150 F.3d at 1022. The "'central concern of the Rule 23(b)(3) predominance test is whether

1    "adjudication of common issues will help achieve judicial economy.""" *In re Hitachi Telev. Optical*

2    *Block Cases*, No. 08cv1746 DMS (LS), 2011 U.S. Dist. LEXIS 135, at *13 (S.D. Cal. Jan. 3, 2011).

3         Predominance is readily met in certain cases alleging consumer fraud. *Amchem*, 521 U.S. at

4    625.  Consumer fraud claims (like this one) based upon uniform misrepresentations and omissions

5    are readily certifiable where the misrepresentations and causation are "susceptible to proof by

6    generalized evidence," even if individualized issues remain. *Wolin*, 617 F.3d at 1173, 1176.

7         Moreover, the Ninth Circuit favors class treatment of fraud claims stemming from a

8    "common course of conduct," such as the up-sell scheme alleged in this case. *See First Alliance*,

9    471 F.3d at 990; *see, e.g.*, *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 492 (C.D. Cal.

10   2006) (finding common issues regarding fraudulent scheme predominated over questions affecting

11   individual members); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 239 (C.D. Cal.

12   2003) (finding predominance where defendants acted in a uniform manner toward class).

13        In this case, the evidence necessary to establish Plaintiffs' claims are common to both

14   Plaintiffs and all Class members.  Whether there was one plaintiff or 6,000 the evidence will be

15   largely the same.  That is because evidence of a "***centrally orchestrated strategy***" to up-sell

16   vulnerable consumers demonstrates that the center of gravity of the unlawful conduct transcends

17   specific details. *See First Alliance*, 471 F.3d at 991 (citing *ACC/Lincoln*, 140 F.R.D. at 430-31).

18   The gravamen of the wrongdoing is not limited to specific misrepresentations; rather, it is the

19   ***underlying scheme*** that demands attention – it is the predominant issue. *Id.*

20        Further, defendants engaged in a tightly controlled, uniform advertising campaign, approved

21   by Donald Trump, that contained the same misrepresentations and omissions, down to the false

22   image created by its name, "Trump University."  Similarly, defendants gave the same standardized

23   sales pitch containing the uniform material misrepresentations at Live Events.  Uniform PowerPoint

24   presentations touted that Trump University was a legitimate school where they would learn Donald

25   Trump's real estate secrets from his handpicked experts. Ex. 12 at TU 52934-3105; §II.B.2, *supra*.

26   ████████████████████████████████████████████████████

27   ███████████████████████████ Ex. 12, at TU 2945-75.  Thus, every Plaintiffs' and

28

1    Class members' claims arise out of defendants' scheme, which will be proven through evidence

2    relating to defendants' common course of conduct.

3        Once Plaintiffs prove defendants' common course of conduct, their Class claims will be

4    substantially advanced.  *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 299-300 (C.D. Cal.

5    2011).  Moreover, even if differences exist among Class members, "courts have taken the common

6    sense approach that the class is united by a common interest in determining whether a defendant's

7    course of conduct is in its broad outlines actionable, which is not defeated by slight differences in

8    class members' positions, and that the issue may profitably be tried in one suit."  *Blackie v. Barrack*,

9    524 F.2d 891, 902 (9th Cir. 1975).

10       Plaintiffs anticipate defendants will argue the Court cannot certify this Class due to

11   individual differences as to the experience of each "student" and individual reliance.[20]  Importantly,

12   there is no reason to look at the circumstances of each individual because the allegations are focused

13   on defendants' misrepresentations, and the factfinder need only determine if they would mislead a

14   reasonable consumer.  *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir.

15   2010).  Moreover, where corporate policies "constitute the very height of the plaintiffs'. . . claims, as

16   here, common issues will predominate because these policies 'would necessarily have to be re-

17   proven by every plaintiff.'"  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1257 (11th Cir. 2004).

18       As one court put it: "If an enterprise is so laden with fraud that its entire public image is

19   distorted, it is sensible to presume that reasonable [consumers] relied on many material

20   misrepresentations which, in aggregate, created a false image.  In this situation, the offending

21   misrepresentations are not merely presumed to compete successfully for the [consumer's] attention

22   amidst a mix of material, undistorted facts.  Rather, the entire picture of the company's . . . character

23   is skewed."  *ACC/Lincoln*, 140 F.R.D. at 432-33 (cited in *McPhail*, 247 F.R.D. at 609).

24

25
    _____

26   [20]    Defendants will likely argue that the seminars differed state to state and class to class based
     on different markets and instructors.  However, ████████████████████████████████████████

27   ████████████████████████████████████████  Ex. 17 at 204:13-207:9.  As to the
     misrepresentations alleged herein by Plaintiffs, they are uniform across the Class.

28

Here, too, the culmination of defendants' misrepresentations which went to the core of "Trump University" (including its name) skewed its very character. Thus, reliance may be presumed for Class members. *See Iorio v. Allianz Life Ins. Co. of N. Am.*, 2008 U.S. Dist. LEXIS 118344, at *92-*93 (S.D. Cal. July 8, 2008). Accordingly, common issues concerning defendants' fraudulent scheme and uniform misrepresentations will predominate.

### b.   Defendants Records Will Be Used to Calculate Each Class Member's Individual Damages

The existence of individual issues relating to damages does not defeat class certification. *Stearns*, 655 F.3d at 1026. "Where common questions predominate regarding liability, courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Negrete*, 238 F.R.D. at 494. *Blackie*, 524 F.2d at 905. "At class certification, plaintiff must present 'a likely method for determining class damages,' though it is not necessary to show that his method will work with certainty at this time." *Chavez v. Blue Sky Nat. Bev. Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010) (citing *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 652 (N.D. Cal. 2007)).

Here, Plaintiffs seek full refunds for the amounts paid to Defendants, plus interest.[21] Trump University maintains records of the amounts each Class member paid as well as records of refunds previously provided. Ex. 62, TU 102318-400. This information will be used to identify Class members and calculate the total, adverse impact to the Class. As Plaintiffs will be able to use Trump University's records to determine damages, common issues predominate.

### c.   Applying Multi-State Law Does Not Preclude Predominance

Rule 23 expressly authorizes subclasses: "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). Indeed, the Ninth Circuit recognizes that differences in state law can be appropriately managed in a class action when the core facts are common to the class. *Hanlon*, 150 F.3d at 1022; *Kielholtz v. Lennox Hearth*

---

[21]   Further, if permitted, Plaintiff will seek credit card interest and late fees. Where, as here, credit card charges are the natural and proximate result of a defendant's wrongdoing, plaintiffs may recover credit card interest, including late fees. *See, e.g.*, *Poulos v. Badala*, 227 A.D. 2d 118, 119 (N.Y. App. Div. 1996); *Smiley v. Citibank*, 900 P.2d 690, 705 (1995) (nothing excludes late fees from the term "interest"), *aff'd*, 517 U.S. 735 (1996).

1  *Prods.*, 268 F.R.D. 330, 343 (N.D. Cal. 2010); *Kearney v. Hyundai Motor Co.*, No. SACV 09-1298

2  DOS, 2010 U.S. Dist. LEXIS 68242, at *21-*22 (C.D. Cal. June 4, 2000); *In re Checking Account*

3  *Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2012 U.S. Dist. LEXIS 135062, at *75-*81 (S.D. Fla.

4  Apr. 3, 2012) (granting plaintiffs' motion for certification of 13 subclasses).

5      In certifying a multi-state class, the court need not find complete uniformity of state law, only that

6  there are no material conflicts among the laws grouped together into subclasses. *Checking Account*

7  *Overdraft*, 2012 U.S. Dist. LEXIS 135062, at *76.  "The court may authorize aggregate treatment of

8  multiple claims, or of a common issue therein, by way of a class action if the court determines that (1) a

9  single body of law applies to all such claims or issues; (2) different claims or issues are subject to different

10  bodies of law that are the same in functional content; or (3) different claims or issues are subject to different

11  bodies of law that are not the same in functional content but nonetheless present a limited number of

12  patterns that the court . . . can manage by means of identified adjudicatory procedures." *Id.* at *76-*77

13  (citing *Klay*, 382 F.3d at 1262) (stating that, "if applicable state laws can be sorted into a small number of

14  groups, each containing materially identical legal standards, then certification of subclasses embracing each

15  of the dominant legal standards can be appropriate").

16      In *Checking Account Overdraft*, the court endorsed the use of surveys of the law to

17  demonstrate that certain state laws, including claims for unjust enrichment and the implied duty of

18  good faith and fair dealing, are substantially similar.  The Court noted: "The proposed special verdict

19  forms and supporting surveys of law submitted by Plaintiffs with their Trial Plan illustrate that the

20  variations among the potentially applicable state laws are not material and can be managed to permit

21  a fair and efficient adjudication by the fact finder at trial. . . .  Each subclass groups the laws of the

22  relevant states accordingly." *Id.*, 2012 U.S. Dist. LEXIS 135062, at *77.

23      As explained below, each of Plaintiffs' claims are readily certifiable under the governing law

24  of the various states from which Plaintiffs and absent Class members hail and will be easily disposed

25  of under their states' laws.  Common issues of law and fact will remain the predominate focus of this

26  litigation, notwithstanding the potential application of multiple states' laws.  Plaintiffs submit in

27  Appendix I ("App. I") their Proposed Trial Plan for Trial of All Class Claims (the "Trial Plan"), which

28  contains an extensive analysis of violation of certain state unfair and deceptive trade practices acts,

1  fraud, unjust enrichment, financial elder abuse, and breach of contract/breach of the duty of good faith

2  and fair dealing.  *See* App. I.  The proposed special verdict forms and supporting surveys of law

3  submitted with the Trial Plan illustrate that the variations among the state laws are not material and can

4  be managed fairly and efficiently.  *See* App. I, Ex. 1-8.  In those few instances where variations are

5  material, Plaintiffs propose that the Court group state laws into subclasses, as follows.

6            **(1)     Unfair and Deceptive Trade Practices Act Subclasses**

7        Plaintiffs propose three unfair and deceptive trade practices act ("UDTPA") subclasses.  Plaintiffs

8  do not propose "groupings" of states but seek to certify three single-state subclasses applying their own

9  state's laws.  Specifically, Plaintiffs propose (1) a subclass for California Class members under Cal. Bus. &

10  Prof. Code §17200 *et seq.*; 17500 *et seq.*; and Cal. Civ. Code §1750 *et seq.*; (2) a New York Class member

11  subclass under §349 of New York's General Business Law; and (3) a Florida Class member subclass under

12  Fla. Stat. §501.201, *et. seq.* and §817.41.  *See Keegan*, 2012 U.S. Dist. LEXIS 91394, at *124-25

13  (certifying: (1) a California UCLA/CLRA class; (2) a New York General Business Law §349 class; and (3)

14  a Florida Deceptive and Unfair Trade Practices Act class).  The elements required to prove a violation of

15  these statutes are set forth in the Trial Plan.  *See* App. I at 2, 12.  Plaintiffs provide Special Verdict Forms

16  that encapsulate the salient elements of each claim.  *See* App. I at 2, Ex. G.

17        Claims under UDTPA laws based on uniform sales practices, such as those alleged here, are

18  precisely the type of cases that courts find present common issues of law and fact suitable for class

19  certification.  *Keegan*, 2012 U.S. Dist. LEXIS 91394, at *111-*12 ("The touchstone of each state's

20  law [California, New York and Florida] is whether a reasonable person would have found the

21  relevant omission misleading.").  Common issues predominate with respect to Plaintiffs' UDPTA

22  claims because they are predicated upon the same scheme and common course of wrongful and

23  deceptive marketing and sales practices by defendants.  Courts frequently find that common

24  questions of law and fact predominate when the focus of the proposed class action "will be on the

25  words and conduct of defendants rather than on the behavior of individual Class members." as it is

26  with Plaintiffs' state law claims here.  *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives &*

27  *Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002).

28        As alluded to above, defendants may try to argue that the overwhelming number of common issues

1  set forth above do not predominate due to individual issues regarding reliance.  However, where as here, the

2  UDTPA statutes consider the effect of misrepresentations "upon a reasonable consumer, not a particular

3  consumer, there are no individualized issues of reliance under Rule 23."  *Yokoyama*, 594 F.3d at 1094.

4  Indeed, "relief under the UCL is available without individualized proof of deception, reliance and injury." *In*

5  *re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009).  Because "[f]requently numerous consumers are exposed to

6  the same dubious practice by the same seller so that proof of prevalence of the practice as to one consumer

7  would provide proof for all," a case should be certified for class treatment if it appears that the defendant

8  engaged in a common course of conduct.  *Vasquez v. Superior Court*, 484 P.2d 964, 968 (1971).  Similarly

9  for CLRA claims, "reliance on the alleged misrepresentations may be inferred as to the entire class if the

10  named plaintiff can show that material misrepresentations were made to the class members.  *Chavez*, 268

11  F.R.D. at 376.  Additionally, false advertisements in violation of §17500 are suitable for class treatment

12  where, as here, defendant created, disseminated, and required its sales force to use standardized materials.

13  *See, e.g., Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 700 (2006) (class treatment of a

14  §17500 claim for fraudulent labeling of tools as "Made in U.S.A." was proper).  Common issues predominate

15  as the central legal and factual questions will be determined with reference to common proof.[22]

16      Florida and New York's consumer protection statutes also do not require plaintiffs to

---

18  [22]    Plaintiffs assert a number of violations of the "unlawful" prong of the UCL.  An act is
19  "unlawful" under §17200 if it violates an underlying state or federal statute or common law.  *See Cal-Tech. Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).  The Federal Trade
20  Commission ("FTC") Act, 15 U.S.C. §45 constitutes such a violation where a practice is unfair as it causes substantial injury, which injury is not outweighed by any countervailing benefits to
21  consumers or competition, and where the injury is one that consumers themselves could not reasonably have avoided.  *See* 15 U.S.C. §45(n).  In *F.T.C. v. John Beck Amazing Profits, LLC*, No.
22  2:09-vc-04719-JHN-CW, 2012 U.S. Dist. LEXIS 70068 (C.D. Cal. Apr. 20, 2012), plaintiffs filed suit against three "get-rich-quick" schemes for deceiving consumers with phony claims that they
23  could make easy money using the programs.  *See generally id.*  There, the court found the "overall net impression communicates to the viewer that a typical consumer can easily purchase high-valued
24  properties for pennies on the dollar and therefore quickly earn tens of thousand of dollars, if not hundred of thousands of dollars." *Id.* at *35.  The court found that no reasonable trier of fact could
25  conclude that the misrepresentations were not likely to mislead consumers acting reasonably under the circumstances.  *Id.* at *38-*47.  Trump University admittedly used testimonials that were not
26  representative of actual results.  *See* §II.C.4, *supra*.  Like *John Beck Amazing Profits*, the overall impression communicated purchasers could take Trump University classes and quickly earn back
27  tens of thousands of dollars.  *Id.*  Common questions of fact and law predominate and will be determined with reference to proof common to all Class members.

1   demonstrate reliance. *Egwuatu v. South Lubes, Inc.*, 976 So. 2d 50, 53 (Fla. Dist. Ct. App. 2008)

2   (holding plaintiffs need not prove reliance under the UDTPA statute); *Stutman v. Chem. Bank*, 731

3   N.E. 2d 608, 612 (N.Y. 2000) ("as we have repeatedly stated, reliance is not an element of a section

4   349 claim").   In Florida, "the question is not whether the plaintiff actually relied on the alleged

5   deceptive practice, but whether the practice was likely to deceive a consumer acting reasonably in

6   the same circumstances." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000).

7   And in New York, the deceptive practice must be "likely to mislead a reasonable consumer acting

8   reasonably under the circumstances."   *Oswego Laborers' Local 214 Pension Fund v. Marine*

9   *Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. Ct. App. 1995). The touchstone of both statutes is

10   whether a reasonable person would have found the misrepresentation or omission misleading under

11   the circumstances. *See Keegan*, 2012 U.S. Dist. LEXIS 91394, at *80-*83.

12        Plaintiffs will be able to prove that defendants' misrepresentations and omissions were made

13   uniformly to the Class. *See* §II *supra*.  Defendants misrepresented that Trump University was an

14   educational institution that was all about Trump.  Because any reasonable consumer would not likely

15   have purchased the product if they knew that Trump was not involved or they would be attending an

16   up-sell scheme rather than a legitimate academic institution, reliance may be inferred as to absent

17   Class members even if defendants attempt to argue that Class members may have purchased the live

18   seminars for different reasons.   *See Chavez*, 268 F.R.D. at 376 ("reliance on the alleged

19   misrepresentations may be inferred as to the entire class if the named plaintiff can show that material

20   misrepresentations were made to the class members").

21                    **(2)     Senior Subclasses**

22        Plaintiff also proposes two ***single-state*** subclasses for financial elder abuse – California and

23   Florida.  App. I at 6, 12 & Ex. H.  First, Plaintiffs allege violations of Cal. Welf. & Inst. Code

24   §15600 *et seq.*, on behalf of California senior citizens. *See* Cal. Welf. & Inst. Code §15610.30(a)(1).

25   Such claims are readily certifiable as liability focuses on the intent and conduct of defendants rather

26   than issues of individual reliance; thus, common issues will predominate over individual ones. *See,*

27   *e.g., Shaffer v. Cont'l Cas. Co.*, No. CV 06-2235-RGK (PWJx), 2007 U.S. Dist. LEXIS 96189 (C.D.

28   Cal. Jan. 26, 2007) (certifying senior class for scheme to induce purchase of long-term health

1   insurance plans); *Negrete*, 238 F.R.D. at 496 (certifying senior class for scheme to target seniors for

2   deferred annuities). Similarly, courts routinely certify classes under the FDUTPA where uniform

3   misrepresentations are involved. *See, e.g.*, *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689,

4   697 (S.D. Fla. 2010). Here, as explained above, Plaintiffs seek to certify claims under the FDUTPA,

5   and they seek additional civil penalties in the amount of $15,000 for each violation that injured a

6   Floridian Class member over 60 years-of-age. *See* Fla. Stat. §501.2077(a).

7                                 **(3)    Unjust Enrichment Subclasses**

8         Plaintiffs propose four unjust enrichment subclasses on behalf of Class Members who reside

9   in various states. *See* App. I at 8, 13. Plaintiffs provide surveys that group states into materially-

10   identical categories taking into account any differences among the state laws. App. I, Ex. B.

11   Plaintiffs' special verdict forms show that trial of these claims will be manageable. App. I, Ex. E.

12         Courts routinely certify multi-state classes for unjust enrichment claims. *See, e.g.*, *Westways*

13   *World Travel*, 218 F.R.D. at 240 (certifying nationwide class of unjust enrichment claims).

14   Furthermore, courts have recognized the differences in unjust enrichment laws can appropriately be

15   managed in a class action. In *re Terazonsin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697

16   (S.D. Fla. 2004), the court certified a 17-state unjust enrichment class, finding that unjust enrichment

17   law is "virtually identical" from state to state. *Id.*; *see also In re Mercedes-Benz Tele Aid Contract*

18   *Litig.*, 267 F.R.D. 113, 119 (D.N.J. 2010) (minor variations in the elements of unjust enrichment are

19   not material); *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. C 04-1511 CW, 2007 U.S. Dist.

20   LEXIS 44459, at *26 (N.D. Cal. June 11, 2007) (variations among some states unjust enrichment

21   laws do not significantly alter the central issue or the manner of proof). Recently, in *Checking*

22   *Account Overdraft*, the court certified the creation of three unjust enrichment subclasses. 2012 U.S.

23   Dist. LEXIS 135062. The court found that "courts often certify unjust enrichment claims because

24   'common questions predominate' and are 'all easily resolved classwide." *Id.* at *77 (citing *In re*

25   *Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 669 (S.D. Cal. 2010)).

26         Here, common evidence shows that plaintiffs conferred a benefit on defendants which was

27   unjust – namely, paying for courses based on a false impression that they would get "Trump

28   University" when it was neither. The focus is on the gain of the defendants, not the losses of

1   Plaintiffs. *Kielholtz v. Lennox Hearth Prods.*, 268 F.R.D. 330, 341-42 (N.D. Cal. 2010). Defendants

2   received tens of millions of dollars from Class members and any differences that exist among the

3   state laws can easily be taken into account by grouping them into subclasses. *See* App. I.

4                        **(4)      Fraud Subclasses**

5        Plaintiffs propose two subclasses for the fraud claims for which materially identical legal

6   standards apply to make the fraud subclass manageable, and for only those states that do not require

7   individualized reliance. App. I at 7, 14. As the surveys and special verdict forms demonstrate, any

8   differences that exist among the state laws can easily be taken into account. App. I, Exs. C & F.

9        As aforementioned, the Ninth Circuit favors class treatment of fraud claims stemming from a

10  "common course of conduct." *First Alliance*, 471 F.3d at 990; *see also Blackie*, 524 F.2d 902

11  ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar

12  misrepresentations, courts have taken the common sense approach that the class is united by a

13  common interest in determining whether a defendant's course of conduct is in its broad outlines

14  actionable, which is not defeated by slight differences in class members' positions.").

15       Plaintiffs' fraud claims are certifiable as liability focuses on defendants' scheme and common

16  course of conduct. Indeed, the Advisory Committee on Rule 23 considered the function of a class

17  action in the context of a fraud case and explained a "fraud perpetrated on numerous persons by the

18  use of ***similar misrepresentations*** may be an appealing case for a class action." Fed. R. Civ. P. 23,

19  Advisory Comm. Notes to 1966 Amend., (b)(3) (quoted in *First Alliance*, 471 F.3d at 990). In *First*

20  *Alliance*, the Ninth Circuit found that a class action was proper where there was "a centrally-

21  orchestrated scheme to mislead borrows through a standardized protocol the sales agents were

22  trained to perform, which resulted in a large class of borrowers entering into loan agreements they

23  would not have entered had they known the true terms." 471 F.3d at 991.

24       Here, as in *First Alliance*, defendants engaged in a centrally-orchestrated scheme to mislead

25  consumers through a uniform advertising campaign, standardized presentations that the speakers

26  were trained to perform, and sales scripts. ███████████████████████████

27  ███████████████████████████████████████████████████

28  ███████████████████████ Ex. 12, Sexton Dep. Ex. 8, TU 52934-3105. Even if

1  defendants' fraudulent system of inducing consumers to purchase defendants' products did not

2  consist "of a specifically-worded false statement" repeated verbatim, it does not make defendants

3  "immune to class-wide accountability." *First Alliance*, 471 F.3d at 992. "The class action

4  mechanism would be impotent if a defendant could escape much of his potential liability for fraud

5  by simply altering the wording or format of his misrepresentations across the class of victims." *Id.*

6                    **(5)    Breach of Contract and Breach of Good Faith and**
                              **Fair Dealing Subclasses**
7

8          Plaintiffs propose three contract-based subclasses on behalf of Class Members who reside in

9  various states. *See* App. I at 9, 14. Plaintiffs provide surveys that group states into materially-

   identical categories that take into account any differences among the states laws. App. I, Ex. A.
10
   Plaintiffs' proposed special verdict forms show that these claims will be manageable. App. I, Ex. D.
11

12         Indeed, every contract imposes a duty of good faith and fair dealing in its performance and in

13  its enforcement. *See Restatement (Second) of Contracts* §205 (1981). Recently, the Southern

    District of Florida certified three breach of good faith and fair dealing subclasses. *See Checking*
14
    *Account Overdraft*, 2012 U.S. Dist. LEXIS 135062, at *75. There the court stated "the law o[f]
15
    breach of the duty of good faith and fair dealing is relatively uniform between the three subclasses,
16
    with each requiring a valid contract, some level of unreasonable interference with the contract by the
17
    defendant, and resulting damages." *Id.* at *75-*76 n.12. The court found that "breach of the duty of
18
    good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad
19
    faith or objectively unreasonable conduct." *Id.* at *78. The Court in *In re Conseco Life Ins. Co.*
20
    *Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529 (N.D. Cal. 2010), certified a 48-state breach
21
    of contract class in a case involving form policy contracts and also found that "the law relating to the
22
    element of breach does not vary greatly from state to state." Here, Trump University's contracts
23
    were form contracts and materially the same for purposes of Plaintiffs' claims. Ex. 20, TU 96908;
24
    Ex. 21, TU 108275. Further, the breach will be shown by defendants' common course of conduct as
25
    described in detail herein. *See* §II. Accordingly, predominance is satisfied.
26

27

28

## 2.    Class Litigation Is Superior to Other Methods of Adjudication

Finally, a class action is the superior method of adjudication. Rule 23(b)(3) provides four factors: "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 992 (C.D. Cal. 2006).

First, Rule 23(b)(3)(A) weighs in favor of certifying a class because it would cost Class members much more to litigate an individual case then they could recover in damages. *See Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."). Moreover, although alternative means of recovery may be available, "classwide adjudication of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). "The desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit and the deterrent value of class litigation clearly render the class action a viable and important mechanism in challenging fraud on the public. *Pitts v. Am. Sec. Ins. Co.*, 550 S.E.2d 179, 189 (N.C. Ct. App. 2001) (citing 4 *Newberg Class Actions* §21.29 at 21-55 (3d ed. 1992)); *see also Maffei v. Alert Cable TV, Inc.*, 342 S.E.2d 867, 871 (N.C. 1986) (recognizing "one of the basic purposes of class actions is to provide a forum whereby claims which might not be economically pursued individually can be aggregated in an efficient and economically reasonable manner"). If this case were not certified as a class action, it would not be feasible for any Plaintiff to pay for an attorney to bring an individual lawsuit. *See* Ex. 7, Oberkrom Decl., ¶9; Ex. 6, Makaeff Decl., ¶9, Ex. 5, Low Decl., ¶12; Ex. 3, Brown Decl., ¶12; Ex. 4, Everett Decl., ¶12.

Second, consideration of prior litigation counsels in favor of finding a class action is superior. Fed. R. Civ. P. 23(b)(3)(B). If the court finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191 (9th

1  Cir. 2001).  Here, Plaintiffs are not aware of any earlier-filed individual suits by or against Class

2  members about defendants' misrepresentations other than the case before the Court. Eck Decl., ¶5.

3  As there is not a threat of multiplicity, class certification is proper.

4      Third, concentration of the litigation here encourages efficient resolution.  Fed. R. Civ. P.

5  23(b)(3)(C).  The Court is already familiar with Plaintiffs' claims, which the parties have litigated

6  over the last two years since it was filed in spring of 2010.  Further, many of Plaintiffs' claims arise

7  under California law, with which this Court is well acquainted.

8      Finally, manageability focuses on the "practical problems that may render the class action

9  format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).

10  "Where class-wide litigation of common issues will reduce litigation costs and promote greater

11  efficiency, a class action may be superior to other methods of litigation."  *Valentino*, 97 F.3d at

12  1234. Here, thousands of individual lawsuits would not be more manageable than a class action.

13  Plaintiffs counsel currently represent nearly 100 Class members.  In addition to those Class

14  members, Plaintiffs' counsel have been contacted by nearly 100 additional former Trump University

15  students expressing interest in this suit. Eck. Decl., ¶6.  A class action would prevent a multiplicity

16  of suits or inconsistent results.  Further, Plaintiffs do not foresee any serious manageability

17  problems.  As discussed herein, Plaintiffs' Trial Plan, the extensive analysis of applicable law

18  provided in the surveys and proposed Special Verdict Forms, these issues will be resolved based

19  upon common proof.  App. I & Exs. 1-8.  Simply put, this case can be tried in an effective and

20  efficient manner as a class action, thus superiority is met.

21  **IV.  CONCLUSION**

22      Plaintiffs respectfully request that: (1) the Court certify the Classes; (2) Court appoint

23  Plaintiffs as Class Representatives; and (3) Court appoint Plaintiffs' counsel as Class Counsel.

24  DATED:  September 24, 2012        Respectfully submitted,

25

26          s/ Rachel L. Jensen
        RACHEL L. JENSEN

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK
HELEN I. ZELDES
ALREEN HAEGGQUIST
AARON M. OLSEN
625 Broadway, Suite 906
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiffs and Proposed Class

CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2012, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 24, 2012.

                                    s/ Rachel L. Jensen
                                   RACHEL L. JENSEN

                                   ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101-3301
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   E-mail:rjensen@rgrdlaw.com

# Mailing Information for a Case 3:10-cv-00940-CAB-WVG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **David Keith Schneider**
  dks@yslaw.com,ewb@yslaw.com,efb@yslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)