# EXHIBIT 21
# [Filed Conditionally Under Seal]

Exhibit 21
-420-422-

# EXHIBIT 22

Exhibit 22
-423-

**TRUMP**
UNIVERSITY

## I. Trump University Mission Statement

Trump University's mission is to provide educational programs and tools to help our clients achieve financial independence. Our success is measured by the results that our clients achieve applying what they have learned from us in the real world.

## II. Trump University Methodology For 2009

Three Pillars of Success

I. Quality
II. Standardization
III. Customer Experience



Exhibit
PLts· 9 JD
Eileen Mulvenna 8/23/12

TU-PLTF00259

Exhibit 22
-424-

**TRUMP**
U N I V E R S I T Y

III. Trump University Divisions

      I. Corporate Office at 40 Wall
      II. Sales Office in Salt Lake City
      III. Independent Contractors Nationwide

IV. Trump University Partners

      I. Trump Institute

          a.  Lead generation
          b.  Wealth Building Weekend
          c.  Retreats
          d.  Coaching

      II. Prosper Learning

          a.  Lead generation
          b.  Coaching
          c.  Sales of Trump U products

V. Trump University Branding

      I. Trump University

      Brand name utilized for all programming within the United States (outside of the state of Maryland)

      II. Trump U

      Brand name utilized for all programming within the State of Maryland and DC

      III. Trump Education

      Brand utilized for all programming in Canada

Private & Confidential • Page 2

TU-PLTF00260

Exhibit 22
-425-



Live Events Programs & Services for 2009

**Profit From Real Estate: Orientation**
Alias: "The Preview," Profit From Foreclosure, "PFF," "The Front End"
Cost: Free (Open to Public, Advertised via Newspaper, Internet, and Mailings)
Duration: 90 minute preview

↓

**Profit From Real Estate: Workshop**
Alias: "The Fulfillment," Fast Track to Foreclosure, "FTF," "The Back End"
Cost: $1495+ Free Guest
Duration: 3 Day training

↓

**Trump Elite Packages**
• Trump Gold Elite
• Trump Silver Elite
• Trump Bronze Elite

**Trump Gold Elite**
Cost: $34,995

• 3 Day In- Person Field Coaching

• Creative Financing Retreat

• Wealth Preservation Retreat

• Quick Start Retreat

• Commercial & Multi- Unit Retreat

• Incorporate Your Business

• REIT: Real Estate Investor's Online Training Program

• One Year Membership: Foreclosure DealSource

**Trump Silver Elite**
Cost: $19,495

• Creative Financing Retreat

• Wealth Preservation Retreat

• Quick Start Retreat

• Commercial & Multi- Unit Retreat

• REIT: Real Estate Investor's Online Training Program

• Incorporate Your Business

**Trump Bronze Elite**
Cost: $9,995

• Wealth Preservation Retreat

• Quick Start Retreat

• Incorporate Your Business

Private & Confidential • Page 3

TU-PLTF00261

Exhibit 22
-426-



**TRUMP UNIVERSITY**

# TRUMP ELITE PACKAGES

| | EVENT PRICE | LIST | SAVINGS |
|---|---|---|---|
| **Trump Gold Elite:** | **$34,995** | **$49,415** | **29%** |
| • 3 Day In-Person Field Coaching | | $25,000 | |
| • Creative Financing Retreat | | $ 5,000 | |
| • Wealth Preservation Retreat | | $ 5,000 | |
| • Quick Start Real Estate Retreat | | $ 5,000 | |
| • Commercial & Multi-Unit Retreat | | $ 5,000 | |
| • Real Estate Investor Online Training Program | | $ 3,000 | |
| • Incorporate Your Business (State Licensing Fee Not Included) | | $  995 | |
| • Foreclosure DealSource Property Listing Service (One Year Membership) | | $  420 | |
| | | | |
| **Trump Silver Elite:** | **$19,495** | **$23,995** | **19%** |
| • Creative Real Estate Financing  Retreat | | $ 5,000 | |
| • Wealth Preservation Retreat | | $ 5,000 | |
| • Quick Start Real Estate Profits Retreat | | $ 5,000 | |
| • Commercial & Multi-Unit Retreat | | $ 5,000 | |
| • Real Estate Investor Online Training Program | | $ 3,000 | |
| • Incorporate Your Business (State Licensing Fee Not Included) | | $  995 | |
| | | | |
| **Trump Bronze Elite:** | **$9,995** | **$10,995** | **9%** |
| • Wealth Preservation Retreat | | $ 5,000 | |
| • Quick Start Real Estate Retreat | | $ 5,000 | |
| • Incorporate Your Business (State Licensing Fee Not Included) | | $  995 | |

TU-PLTF00262

Exhibit 22
-427-



**The Preview**

**Profit From Real Estate: Orientation**

This free, 90 minute presentation is open to the public, and covers the current trends of the real estate market, ways to still make money, as well as the following:

- How to find foreclosure opportunities in your geographic area and take advantage of hot real estate investing opportunities
- Credit and credit card repair: Use good credit standing to make money at every stage of the investing process
- Financing: How to benefit from specific sources of seed capital and put together creative financial deals
- The phases of foreclosure: When to make a move and how to capitalize at every stage of the process
- Capitalize without harm: Finding ways for sellers to move on without shame
- What to do once you have the property: Rent, renovate, or sell immediately? Learn what's best for your specific situation
- Goal setting: How to set realistic goals and attain them every time

Behind the Scenes Timeline: Before The Preview

| 8 Weeks Prior | Event Planning: Event Space is Contracted |
|---|---|
| 8 Weeks Prior | Marketing: Plan is Solidified |
| 4 Weeks Prior | Operations: Team Books Flights to Event Location |
| 3 Weeks Prior | Marketing: Email to TU Database |
| 2 Weeks Prior | Marketing: Email to TU Database |
| | Operations: Event Materials Ordered |
| | Marketing: Direct Mail (7-10 Days Prior to Event) |
| | Marketing: Newspaper Ad (7-10 Days Prior to Event) |
| 1 Week Prior | Marketing: Email to TU Database |
| 5 Days Prior | Operations: Itinerary Constructed & Sent to Event Team with Marketing Ads |
| 4 Days Prior | Operations: Spec Sheet Constructed & Sent to PC with Meeting Room Details |
| 3 Days Prior | Marketing: Reminder Email Sent to Registrants |
| | Operations: PC Orchestrates & Facilitates Phone Conference for Event Team (optional) |
| 2 Days Prior | Marketing: Reminder Email Sent to Registrants |
| 1 Day Prior | Service: Reminder Call to Registrants |
| | Marketing: Reminder Email Sent to Registrants |
| Day Of | Operations: Email Sent to No Shows by PCs via Dev |

TU-PLTF00263

Exhibit 22
-428-



**Sample Itinerary Sent to Event Team 5 Days Prior:**

# PREI - Orientation – Dallas, TX
# July 20 – 23, 2009

**Event Code:** *SEM_PFF-20090720A*

**Expected Attendee with Guests:** *250*
**Minimum Sales Goal:** $72,500 (20% of expected attendees (50) x $1495 = $72,500)

**Event Staffing:**

|  | Name | Phone Number | E-mail addresses |
|---|---|---|---|
| **Speaker** | James Harris | 678.939.1074 | moneymotivator@gmail.com |
| **Program Coordinator** | Tiffany Brinkman | 917.692.5420 | tbrinkman@trumpuniversity.com |
| **Sales Coordinator** | Noah Harris | 239.247.1907 | noahmharris@yahoo.com |
| **Sales Coordinator** | Cory Lignel | 801-755-8240 | teamliggy@aol.com |

**Event Locations**

**Embassy Suites Dallas - Frisco**
7600 John Q. Hammons Drive
Frisco, TX 75034
972-712-7200

Monday, Jul 20, 2009

○ 1:00 PM
○ 6:30 PM

**Renaissance Dallas-Richardson Hotel**
900 East Lookout Drive
Richardson, TX 75082
972-367-2000

Tuesday, Jul 21, 2009

○ 1:00 PM
○ 6:30 PM

**Doubletree Club Dallas - Farmers Branch**
11611 Luna Road
Farmers Branch, TX 75234
972-506-0055

Wednesday, Jul 22, 2009

○ 1:00 PM
○ 6:30 PM

**Hilton Arlington Texas**
2401 East Lamar Boulevard
Arlington, TX 76006
817-840-3322

Thursday, Jul 23, 2009

○ 1:00 PM
○ 6:30 PM

TU-PLTF00264

Exhibit 22
-429-



**Sleeping Accommodation**
**Embassy Suites Dallas - Frisco**
7600 John Q. Hammons Drive
Frisco, TX 75034
972-712-7200
Check In: Sunday, July 19
Check Out: Tuesday, July 21

| Sleeping Room Reservations Number | |
|---|---|
| James Harris | 84255921 |
| | (Checking in July 20) |
| Tiffany Brinkman | 87402641 |
| | (Checking in July 20) |
| Noah Harris | 82422129 |
| Cory Lignel | 81898065 |
| | (Checking in July 20) |

**Doubletree Club Dallas - Farmers Branch**
11611 Luna Road
Farmers Branch, TX 75234
972-506-0055
Check In: Tuesday, July 21
Check Out: Thursday, July 23

| Sleeping Room Reservations Number | |
|---|---|
| James Harris | 83062865 |
| Tiffany Brinkman | 81491025 |
| Noah Harris | 84899761 |
| Cory Lignel | 87521713 |

**Hilton Arlington Texas**
2401 East Lamar Boulevard
Arlington, TX 76006
817-840-3322
Check In: Thursday, July 23
Check Out: Friday, July 24

| Sleeping Room Reservations Number | |
|---|---|
| James Harris | 3351938000 |
| Tiffany Brinkman | 3353527015 |
| Noah Harris | 3353813537 |
| Cory Lignel | 3350890933 |

TU-PLTF00265

Exhibit 22
-430-



**TRUMP** UNIVERSITY

**Flights**

|  | Arrivals | Departures |
|---|---|---|
| James Harris | **Mon, July 20 - 8:31 am** | Fri, July 24 - 5:30 am |
| Tiffany Brinkman | **Mon, July 20 - 8:31 am** | Fri, July 24 - 6:00 am |
| Noah Harris | Sun, July 19 - 8:20 pm | Fri, July 24 - 10:40 am |
| Cory Lignel | **Mon, July 20 - 8:31 am** | Fri, July 24 - 7:00 am |

**Ground Transportation Options**

**Tiffany** - Please pick up the rental car at the Car Rental desk within DFW and make your way to the Embassy Suites Dallas - Frisco. Please facilitate your team members as much as possible with their ground transportation needs to and from DFW.

|  | Arrival Prices | Arrival Notes | Departure Prices | Departure Notes |
|---|---|---|---|---|
| Hotel Shuttle | N/A | - | $10 | 7 AM – 10 PM. Please contact a Front Desk agent for information |
| Super Shuttle | $24 | Per person, one way. Pick up Super Shuttle Info Phone in Baggage Claim to arrange pick up with dispatcher | $18 | Per person, one way. Arrange pick up by utilizing the 1-800-258-3826 (1-800 BLUE VAN) or by going on line at **www.supershuttle.com** please give at least 24 hrs notice. |
| Taxi | $60 | (Please share taxi rides if possible) | $35 | (Please share taxi rides if possible) |

**\*\*\*Please choose the most cost effective and appropriate method of transportation from the grid above. Your expense report will be cross checked with these options as a point of reference. \*\*\***

TU-PLTF00266

Exhibit 22
-431-



**Dallas, TX Workshop Information (July 31 – August 2, 2009)**

**Marriott Suites Dallas Market Center**
2493 North Stemmons Freeway
Dallas, TX 75207
214-905-0050

**Distances from PFF / Orientation events**

| | Mileage and Travel Time |
|---|---|
| **Embassy Suites Dallas - Frisco** | 22.5 miles – about 31 minutes (up to 55 minutes in traffic) |
| **Renaissance Dallas-Richardson Hotel** | 18.6 miles – about 21 minutes (up to 50 minutes in traffic) |
| **Doubletree Club Dallas - Farmers Branch** | 11.9 miles – about 16 minutes (up to 20 minutes in traffic) |
| **Hilton Arlington Texas** | 18.8 miles – 23 minutes |

TU-PLTF00267

Exhibit 22
-432-



**Spec Sheet Sent to Program Coordinator 4 Days Prior:**
Our Event Planner, Eleanor Daniels, is responsible for solidifying and confirming all event specifications for the Preview Team.  Example below:

Hi Tiffany,

Please find attached the Event Summary Sheet, Pre Con notes and your Shipping List for the **PREI – Orientation Dallas (July 20-23).** I have embedded the Event Specs into the email for you convenience. All the information was confirmed by our hotel contacts.

Please review the Event Summary Sheet as it details any purchased AV, set alteration costs and unusual hotel circumstances. Please also pay specific attention to the Shipping List as it contains the list of materials that were sent to the event.

**Embassy Suites Dallas Frisco**
- **Parking**
  - Staff Parking - Comp garage self parking is available for up to 3 staff members – Natalie to provide a code to be used during the program only.
  - Attendee Parking - Comp self park is first come, first served.  Garage self parking is $6.00 per car
- **Internet**– Please utilize your Verizon Card for internet purposes.

**Renaissance Dallas-Richardson**
- **Parking**
  - Staff Parking - 1 Complimentary park pass for TU onsite - Received at from Justin/Banquets
  - Attendee Parking - Self day parking is $5/ca
- **Internet**– Please utilize your Verizon Card for internet purposes

**Doubletree Club Hotel - Dallas Farmers Branch**
- **Parking** (Staff and Attendee)
  - Complimentary Parking for all!
- **Internet**– Please utilize your Verizon Card for internet purposes

**Hilton Arlington**
- **Parking** (Staff and Attendee)
  - Complimentary Parking for all!
- **Internet**– Please utilize your Verizon Card for internet purposes

Have a great rest of the week and don't work too hard!

**Eleanor**

| | |
|---|---|
| **Program Name:** | **PREI - O Dallas, TX** |
| **Speaker Name:** | **James Harris** |
| **Dates of Programs:** | **July 20-23, 2009** |

TU-PLTF00268

Exhibit 22
-433-

**TRUMP** UNIVERSITY

**Venue 1**
**Address:**          **Embassy Suites Dallas Frisco**
                     7600 John Q Hammons Drive
                     Frisco, TX  75034
**Phone:**            972-963-9164
**Event Times:**      1 PM - 3 PM / 6:30 PM - 8:30 PM
**Event Date:**       Monday, July 20, 2009

**Contact at**
**Venue:**            Natalie Storrs
**Contact email:**    natalie.storrs@jqh.com
**Direct Phone:**     972-963-9162
**Direct Fax:**       972-963-9164
**Meeting**
**Space:**            Frisco 3 & 4
**Room Rental:**      $1,000.00
**Sq Footage:**       3264 sq ft
**Ceiling Height:**   26 ft
**Location:**         1st Floor of Convention Center
**Max Capacity:**     250 theater
**Obstructions?:**    NONE
**Sleeping**
**Room Needs:**       YES
**Sleeping**
**Room Rate:**        $129.00
**Sleeping**
**Room Dates:**       7/19-21 (Some Vary)
**Deposit:**
**Direct Bill /**
**CC:**               CC
                     Comp garage self parking is available for up to 3 staff members – Natalie to provide a
**Staff Parking:**    code to be used during the program only.
**Attendee**
**Parking:**          Comp self park is first come, first served.  Garage self parking is $6.00 per car
**AV Purchased:**     Rear Projector @ $130.00
                     Audio House Patch @ $75
**Miscellaneous:**


**Venue 2 Address:**    **Renaissance Dallas-Richardson**
                       900 East Lookout Drive
                       Richardson, TX 75082
**Phone:**             972-367-2000
**Event Times:**       1 PM - 3 PM / 6:30 PM - 8:30 PM
**Event Date:**        Tuesday, July 21, 2009

**Contact at Venue:**  Shawna Abbott
**Contact email:**     shawna.abbott@jqh.com
**Direct Phone:**      972-367-6417

TU-PLTF00269

Exhibit 22
-434-

**TRUMP** UNIVERSITY

| | |
|---|---|
| Direct Fax: | 972-367-1600 |
| **Meeting Space:** | Harmony 1-2 |
| **Room Rental:** | $1,500.00 |
| **Sq Footage:** | 2288 sq ft |
| **Ceiling Height:** | 13 ft |
| Location: | Lobby Level - Conference Center |
| Max Capacity: | 200 theater |
| Obstructions?: | NONE |
| Sleeping Room Needs: | NO |
| Sleeping Room Rate: | N/A |
| Sleeping Room Dates: | N/A |
| Deposit: | |
| Direct Bill / CC: | CC |
| | 1 Complimentary park pass for TU onsite - Received at  from Justin/Banquets |
| Staff Parking: | |
| Attendee Parking: | Self day parking is $5/ca |
| AV Purchased: | Rear Projector @ $220.00 |
| | Audio House Patch @ $75.00 |
| | |
| **Venue 3 Address:** | **Doubletree Club Hotel - Dallas Farmers Branch** |
| | 11611 Luna Road |
| | Dallas, TX 75234 |
| Phone: | 972-506-0055 |
| | 1 PM - 3 PM / 6:30 PM - 8:30 |
| Event Times: | PM |
| Event Date: | Wednesday, July 22, 2009 |
| | |
| Contact at Venue: | Amber Wilson |
| Contact email: | Amber.Wilson@hilton.com |
| Direct Phone: | 214-496-2771 |
| Direct Fax: | 972-506-0030 |
| Meeting Space: | Cap Rock & Fall Creek |
| Room Rental: | $1,000.00 |
| Sq Footage: | 1450 sq ft |
| Ceiling Height: | 10 ft |
| Location: | Lobby Level - First Floor |
| Max Capacity: | 120 theater |
| Obstructions?: | NONE |
| Sleeping Room Needs: | YES |
| Sleeping Room Rate: | $119 |
| Sleeping Room Dates: | 7/21-23 |
| Deposit: | |
| Direct Bill / CC: | CC |
| Staff Parking: | Complimentary Parking for all! |

TU-PLTF00270

Exhibit 22
-435-

**TRUMP** UNIVERSITY

| | |
|---|---|
| **Attendee Parking:** | Complimentary Parking for all! |
| **AV Purchased:** | Rear Projector @ $30 |
| | Audio House Patch @ $ |
| **Miscellaneous:** | |

| | |
|---|---|
| **Venue 4 Address:** | **Hilton Arlington** |
| | 2401 East Lamor Boulevard |
| | Arlington TX 78008 |
| **Phone:** | 817-840-3322 |
| | 1 PM - 3 PM / 6:30 PM - 8:30 |
| **Event Times:** | PM |
| **Event Date:** | Thursday, July 23, 2009 |

| | |
|---|---|
| **Contact at Venue:** | Jennifer Forrest |
| **Contact email:** | Jennifer.Forrest@ihrco.com |
| **Direct Phone:** | 817-640-4712 |
| **Direct Fax:** | 817-652-0243 |
| **Meeting Space:** | Capitol Ballroom |
| **Room Rental:** | $1,300.00 |
| **Sq Footage:** | 2700 sq ft |
| **Ceiling Height:** | 12 ft |
| **Location:** | Lobby Level |
| **Max Capacity:** | 300 theater |
| **Obstructions?:** | NONE |
| **Sleeping Room Needs:** | YES |
| **Sleeping Room Rate:** | $139.00 |
| **Sleeping Room Dates:** | 7/23-24 |
| **Deposit:** | $650.00 |
| **Direct Bill / CC:** | CC |
| **Staff Parking:** | Complimentary Parking for all! |
| **Attendee Parking:** | Complimentary Parking for all! |
| **AV Purchased:** | Rear Projector @ $175 |
| | Audio House Patch @ $70 |
| **Miscellaneous:** | |

TU-PLTF00271

Exhibit 22
-436-

TRUMP
UNIVERSITY

**At The Preview**

**Event Team Ground Rules:**

- All Trump U Team Members will meet the evening prior to the preview to walk the space at the first preview location, setup the room, and ensure that all necessary materials that have been shipped to the hotel, have been located by the hotel staff.
- Team Members must arrive in the event space at the Preview hotel 2 hours prior to the event.
- All Trump U Team Members must be professionally dressed at least one-hour prior to the beginning of the Preview. Attire must always be neat, ironed and professional. All Trump U Team Members will always be dressed in a suit and must (with the exception of the Speaker) wear their jacket throughout the duration of the preview.
- Gold Trump name badges must be worn throughout all events.
- Trump U Team Members are not permitted to use cell phones during the preview. The only time cell phones are permitted is when be-backs are being contacted.
- Trump U Team Members are responsible for learning all parts of the preview set up process and working cohesively to do everything within their power to contribute to a successful event.
- Sales Coordinators are not permitted to have personal laptops at preview events. The only laptops that should be present are those of the Speaker and the Program Coordinator.

**Preview Registration Setup**

    I. Registration Area Guidelines

        i. This area should always be completed first to alleviate distractions and confusion for early preview attendee arrivals

        ii. First impressions are critical. Make sure the registration area is neat, organized, and free of any and all personal items such as drinking glasses, etc.

    III. Registration Area Setup

        i. Signage must be prominent and presentable

            a. Walk hotel space from the parking area to the event room and determine key locations for easels to hold directional signage along the way

            b. Place testimonial banners at registration table or on nearby cocktail tables for additional effect

        ii. Iron and place table banner on registration table

        iii. Place registration cards, guest registration cards, sharpies, and sticky name tags, and stapler under the table until you are ready to start welcoming guests

        iv. Setup music to run in event room during registration for easy transition to room when doors open

        v. Ensure water station is setup within close proximity, but across or down hall 15 feet to create "flow" during registration process.

TU-PLTF00272

Exhibit 22
-437-



**Preview Event Space Setup:**

    I.  Setup Sales Space

       i. Sales coral should be within close proximity to the door, so that attendees need to walk past sales tables in order to exit.

       ii. Remember to eliminate all clutter behind sales tables. The goal is to not let anything be a potential turnoff to a buyer or distract from the flow and presentation

    II. Setup PC's Laptop Computer:

      i. Confirm that Verizon card works within meeting space

      ii. Confirm power source

      iii. Connect credit card swiper

    III. Setup Speaker's Laptop Computer:

      i. Confirm power source

      ii. Confirm laptop sound

      iii. Confirm projector connection

    IV. Event Materials

      i. Retrieve all necessary paperwork for preview from shipped boxes

      ii. Locate and organize materials needed

      iii. Stow boxes out of sight of the preview attendees

      iv. Display materials as indicated by Trump University

      v. Be neat. Lack of organization and disorder reflects poorly on Trump University and will directly influence attendee confidence and impacts efficiency

    IV. Setup AV Equipment

      i. Visual

         a. Connect projector to power source and speaker laptop

         b. Confirm projector power source and that projection is clear and straight on screen

         c. Presentation check

            1. Check that wireless presenter is working

            2. Test video and presentation to eliminate any issues prior to event

      ii. Audio

         a. Connect mixer on back sales table to house sound and confirm power source

         b. Replace batteries in lavaliere microphone, connect to mixer and confirm receiver power source

         c. Connect iPod to mixer and confirm that it has been charged sufficiently

         d. Connect Speaker laptop sound to mixer

         e. Put new batteries in recorder and connect to mixer

         f. Sound check

            1. Lavalier microphone, adjust volume, synch as necessary, and check for hot spots

TU-PLTF00273

Exhibit 22
-438-

TRUMP
UNIVERSITY

      2. Ipod shuffle, adjust volume as necessary, and cue "Money, Money, Money" song (The O'Jays) for introduction if not imbedded in presentation

      3. Recorder through doing a "test" recording to ensure audibility

      4. Speaker laptop sound and adjust volume as necessary

      5. Handheld microphone, adjust volume, synch, and test for Speaker inro

V. Setup Front of Room

    i. Display banners on 6 foot tables or cocktail rounds on either side of screen

    ii. Ensure that table banner is ironed and straight

    iii. Display incentive product as indicated by Trump University

    iv. Check that the hotel has provided a bar stool for speaker

    v. Check that the hotel has provided three bottles of water for speaker

VI. Chair Setup

    i. Room to be set theatre style

    ii. Confirm that there are extra chairs available in neat stacks towards the back of the room. (As per diagram)

    iii. Chairs should be close enough together to give attendees sufficient space, while still maximizing the room and bringing attendees out of their comfort zone

    iv. Pens and pads should be placed on each chair. Extra pens and pads should be kept in the back so that they can be easily retrieved when chairs need to be added to the setup

VII. Overall Atmosphere

    i. Confirm that room temperature is no more than 68 degrees

    ii. Check to see if bulbs need to be removed from overhead lighting to avoid screen washout

    iii. Walk speaker space to ensure adequate spacing from screen to first row of chairs

TU-PLTF00274

Exhibit 22
-439-



**Preview Diagram:**



TU-PLTF00275

Exhibit 22
-440-

**TRUMP** UNIVERSITY

**Registration Goal & Procedure:**

I. Registration Goal: Utilize 3 Key Questions

    i. Welcome attendees and build a Trump-esque atmosphere

    ii. Find common ground and get attendees thinking about their future

    iii. Disarm any uncertainty

    iv. Peak interest and/or "set the hook."

II. Registration Cards v. Email Tickets

    i. If an attendee does not come with a printed email ticket with a scan bar, they MUST complete a registration card. All registration cards must follow the guidelines below:

        a. Name, email, phone number, and mailing address are required fields

        b. Each card should be reviewed for legibility and completion. If something is missing, request it nicely

III. Name Tags for Attendees

    i. Once an attendee has returned a completed registration card, they will be provided with a name tag, with their first name clearly written by a Trump University Team Member

    ii. Clarify spelling preferences– details count!

    iii. Ensure that names are written large and legibly on name tags

IV. Inform each attendee when you will open the doors to begin the Preview

    i. Direct the attendees toward the water station

    ii. Know where the restrooms are located so that you are able to direct attendees as necessary

    iii. Be able to accommodate any special requests (For example: if an attendee arrives and he is on crutches, he should be immediately accommodated with a chair so that he does not have to stand and wait for doors to open.)

TU-PLTF00276

Exhibit 22
-441-

**TRUMP**
UNIVERSITY

**3 Key Questions To Identify Buyers**

---

**1. What's your name?**
•Introduce yourself to each attendee at registration
• Establish rapport: shake hands, smile, and make eye contact
•Congratulate each attendee on making it out and taking their first step towards success

**2. What do you?**
•This can be brought up a number of ways, either by the look of pure exhaustion on an attendee's face after a long day or the way that they're dressed
•Let them know that you have an answer to their problems and a way for them to change their lifestyle
> *For example:*
> Attendee: "Do I really have to fill out this registration card? I've been writing all day!"
> TU Team Member: "Well, this is really a confirmation card so that we can confirm that all of your information is up-to-date in our system.  So you had had a long day at work, huh?  I think we just might have something to help you out of that 9-5 of yours!  What is it that you do?"

**3. What brought you out here today?**
•This will let you know how much initiative they've made and what their interest level is.
> *For example:*
> Low Initiative: "My husband dropped me off and said I had to come because I never leave the house."
> High Initiative: "I'm ready to make a change in my life because I want to provide a better life for my family."

**Remember:**
Once you've identified buyers, ask potentials to come and see you at the end of the presentation.

---

TU-PLTF00277

Exhibit 22
-442-

**TRUMP**
U N I V E R S I T Y

**Preview Event Timeline:**

|  | Speaker | Sales Coordinator #1 | Sales Coordinator #2 | Program Coordinator |
|---|---|---|---|---|
| Evening Prior: | | Event Team Meets, Walks the Event Space, and Discusses Plan of Action:<br>•Registration Roles<br>•Speaker Introduction<br>•Trigger Slide to Setup Sales Area<br>•Sales Roles | | |
| 2 Hours Prior: | Speaker Drops Off His Laptop To Hook Up to Audio Visual | Event Team Meets in Event Room to Setup Audio Visual, Banners, Directional Signage, Sales Coral, Front of Room, Tweak Chair Setup, and Locate Restrooms | | |
| 1 ½ Hours Prior: | | Registration Area Is Set with Ironed Tablecloth and Visual & Sound Checks Have Been Done to Confirm Connections for<br>•Power Point Presentation<br>•Speaker Laptop<br>• Speaker Mic<br>• Handheld Mic for Speaker Intro<br>• IPod Sound<br>•Recorder | | |
| 1 Hour Prior: | Speaker Returns to Meeting Room to Get In "Preview Mindset" | Event Team Begins Registration & "Registration Roles"<br>•One Team Member Mans Registration Table<br>•One Team Member Acts as "The Floater"<br>•One Team Member Acts As "The Informant" | | |

TU-PLTF00278

Exhibit 22
-443-



| | | | |
|---|---|---|---|
| 20 Minutes Prior: | Speaker and "The Informant"<br>•Adjust The Room As Necessary Based Upon Current Numbers At Registration<br>•"The Informant" also caters to any last minute speaker | Two Team Member Work Together At Registration to Identify Buyers and Register All Attendees | |
| 15 Minutes Prior: | •Welcome Announcement Is Made and Doors Open with Apprentice Song Playing<br>•All Attendees are Directed and Seated By Trump U Team Members in an Efficient and Organized Manner<br>•Apprentice Song Transitions Into Trump Video<br>•Registration is Continued Throughout by at least 1 Trump U Team Member | | |
| At Event Time: | •Speaker Begins Presentation | •Speaker Introduction Is Made By Team Member<br>  (If Warranted by Speaker Preference)<br>•Registration and Seating continues with 2 Team Members | |
| 10 Minutes Into Event: | •Presentation | •Sales Coordinator #1 Brings Registration Inside the Room and Registers and Seats Late Attendees while Watching for Buyer Signals (positive body language and responses to speaker questions)<br>•Sales Coordinator #2 Stands Outside the Meeting Space and Directs Latecomers Inside the Meeting Space to Registration | •Program Coordinator Enters All Registration Information Into the System<br>•Assists Sales Coordinator #1 with Registration & Seating If Necessary |
| 1 Hour Into Event: | | •Sales Coordinator #2 Returns To Meeting Space (Dependent Upon Number of Latecomers Still Arriving), Does Head Count, and Reports Number to PC<br>•Sales Coordinator #1 Watches Speaker for Signal (Too Hot, Needs Water, Cell Phones Ringing, Attendees Trying to Ask Questions, etc.) | •Program Coordinator Enters All Registration Information Into the System |

TU-PLTF00279

Exhibit 22
-444-



|  |  |  |  |
|---|---|---|---|
|  |  |  | •Program Coordinator Finishes Entering All Registration Information Into the System<br>•Sends "Take 90 Minutes" Email to No Shows<br>•Assists Sales Coordinators if Time Permits |
| 1 Hour, 15 Minutes Into Event |  | •Sales Coordinators Put Together Buyer Packages (Preview Kits & Breakthrough 2009 Inside Black Trump Bag)<br>•Write Appropriate Event Codes on Sales Forms |  |
| 1 Hour, 20 Minutes Into Event: |  | •Team Sets Up Sales Area with Enrollment Forms, Product & Chairs After Seeing "Trigger" Slide<br>•Display Free Premium (Reference Print Ad Sent with Itinerary) |  |
| At The Close: |  | •Team Mans The Sales Area, Stands Up, Is Attentive to Speaker and Attendee Movement, Gets in Sales Mindset, and is Ready to Sell, Sell, Sell! |  |
| During Sales Time: | •Stand Off To Side of Sales Table (Away From Door), Speak With Students Over Mic, Get Them Excited, and Get Them Seated at Sales Table | •Sales Coordinator #1 Closes Sales At Sales Table and Facilitates Enrollment Armed with Objection Rebuttals<br>•Sales Coordinator #2 Floats and Closes More Sales, Getting Additional Attendees Seated at Back Sales Table, Armed with Objection Rebuttals | •Program Coordinator is Armed with Objection Rebuttals and Works the Room with Special Attention To Team Members In Possession of a Credit Card that Needs to Be Run |
|  |  | •Once All Paperwork is Complete, Buyers Are Sent to the Pre-Determined location for "Orientation" |  |
| Orientation: |  | •One Staff Member Conducts Orientation<br>•One Staff Member Walks to Retrieve Signage with Special Attention to Solicitors (See Procedure in Compliance Section)<br>•One Staff Member Starts Striking the Set | •Program Coordinator checks to make sure Orientation Session is Being Recorded<br>•Program Coordinator Collects Remaining Payments, Completes Entry of Sales, Paperwork, and Sends Session Report |
| At the Close of Orientation: |  | •All Staff Members Congratulate and Shake Hands with Buyers |  |
| After the Event: |  | •All Staff Members Strike the Set and Pack Up as a Team |  |

**TRUMP**
UNIVERSITY

**Paperwork Procedure:**

I. The Enrollment Form

    i. The Buyers Role

        a. Enrollment forms must contain all buyer information: full name, address, email, and phone number

        b. Buyers will be encouraged to list a guest and all pertinent guest contact information

        c. The buyer must circle the form of payment that he/she wishes to pay with- ALL PAYMENTS MUST BE RECEIVED IN FULL

        d. The bottom of the enrollment form must be signed by the buyer

---

**Reminder!!!**

•Full payment of $1495 must be collected before paperwork is submitted to Trump U office after the Preview. Down payments are not an acceptable form of payment. If full payment is not received during preview event, the contract will be transferred to the inside sales department and will not be counted towards the final conversion. No exceptions.

•A post dated check is never accepted as a form of payment on a preview.

•Any cash payments received must be applied to hotel bill and include proper documentation that the cash was received by the hotel and will be deducted from bill. This documentation must include the signature of the hotel representative receiving, along with their title and contact information.

---

    ii. The Trump U Team Member Role

        a. Verify that all buyer information is present

        b. Encourage the buyer to list a guest if the field is blank

        c. Write the last four digits of the credit card number or the check number dependant on form of payment circled

        d. Verify that the bottom of the enrollment form is signed

        e. Verify that the top of the enrollment form indicates the team present and accurate event code

        f. Write the current date and the date that is concurrent with the three day cancellation policy on the back of the buyers pink enrollment form and the back of the white enrollment form.

II. The Terms & Conditions Form

    i. The Buyers Role

        a. Print, sign, and date where indicated

    ii. The Trump U Team Member Role

        a. Verify that the buyer has printed, signed, and dated appropriately

III. The Buyer Package

TU-PLTF00281

Exhibit 22
-446-



i. Once payment has been run through and confirmed, the buyer should be presented with the following:

    a. The pink copy of the Enrollment Form and the Terms & Conditions Form stapled together and tucked into their Trump folder (Preview Kit) containing all of the necessary event information

    b. The buyer incentive (currently: Goldmine)

    c. The above should be bundled together and placed in a black and gold Trump bag

    d. Direct them to a seat near the other buyers for orientation



**Between the Preview & the Fulfillment**

TU-PLTF00282

Exhibit 22
-447-



**At The Fulfillment**

**Event Team Ground Rules:**

- All Trump U Team Members (travel permitting) will meet the evening prior to the preview to walk the space, setup the room, and ensure that all necessary materials that have been shipped to the hotel, have been located by the hotel staff.

- Team Members must arrive at the Fulfillment hotel 2 hours prior to the event.

- All Trump U Team Members must be professionally dressed at least one-hour prior to the beginning of the Fulfillment. Attire must always be neat, ironed and professional. All Trump U Team Members will always be dressed in a suit and must wear their jacket throughout the first two hours of each day of the event.

- Name badges must be worn.

- Trump U Team Members are not permitted to use cell phones during the fulfillment.  The only time cell phones are permitted is when no-shows are being contacted or, in very limited circumstances, the Trump U Team Member has verbally indicated to the other Team Members that he/she must make an extremely important call.

- Trump U Team Members are responsible for learning all parts of the fulfillment set up process and working cohesively to do everything within their power to contribute to a successful event.

- Sales Coordinators are permitted to use their personal laptops during three day training events.  All Trump University Team Members will be required to have the below image as their desktop background at all Trump University Events.  Please follow the below instructions for setting this image as your desktop background on your laptop:



1. Double click the attachment in the email in which this image was sent to you, to open the image, and save the image to your computer so that you can reference and set as your desktop background as necessary.
2. Go into the start menu, in the lower left corner of your computer screen and click "My Computer."
3. Locate the "Control Panel" button and double click.
4. Locate the "Display" icon and double click.
5. Click the "Desktop" tab.
6. Click "Browse" and locate the image that you just saved to your computer.
7. Double click the image so that it appears on the computer icon in the popup box.
8. Click "apply" and then click "ok."

TU-PLTF00283

Exhibit 22
-448-



The above image will now be your desktop background.

**The Fulfillment**

**Behind the Scenes Timeline:**

| | |
|---|---|
| During Preview: | Operations: Live Events Coordinator Orders Materials for Fulfillment Training |
| Immediately Following the Preview: | Service: Buyer Receives Email Inviting Him to the Wealth Builder's Network Premium |
| Day After Preview: | Service: Welcome Email Sent |
| | Service: Webinar Orientation Email Sent |
| | Service: Welcome Call From Client Advisor |
| 1 Week Prior to Fulfillment: | Live Events: Buyer Receives Post Card from Preview Team |
| 5 Days Prior: | Operations: Itinerary Constructed & Sent to Event Team |
| 4 Days Prior: | Operations: Spec Sheet Constructed & Sent to PC with Meeting Room Details |
| 3 Days Prior: | Operations: PC Orchestrates & Facilitates Phone Conference for Event Team |
| 2 Days Prior: | Service: Reminder Call |
| Day Of: | Operations: Event Team Personally Calls No Shows In Attempt to Get Them to Training |

TU-PLTF00284

Exhibit 22
-449-

**TRUMP**
U N I V E R S I T Y

I. Egencia Corporate Travel Policy

All airline travel will be booked via Egencia Corporate Travel.  All airfare will be booked according to the lowest logistical fare available at the time of booking.  Out of policy flights require documentation in order to determine whether or not the flight chosen is justifiable.  TU will track the difference in flights chosen against the most cost effective flight offered and any pattern out of policy and reasoning.  The following options are currently available on the Egencia Corporate Travel website to communicate any reasonable difference in fare:

| Edit code | Description |
|---|---|
| AA | Was not provided schedule in timely manner |
| AR | Selected this flight for routing/connection reasons |
| AT | Selected this flight due to time of day constraints - Personal |
| BF | Baggage fees with lower fare are more expensive than this ticket |
| CC | I waited too long- Been busy |
| DA | Missed Flight |
| DD | Schedule was changed Last Minute |

Expedia Rules & Regulations

•All flights must be booked within 5 business days of receiving your schedule to not only ensure a cost-effective option, but to gives the traveler a greater opportunity of booking on their preferred carrier without having to book a multi-leg flight.

•If flights are booked less than 14 days from event date, Trump Team Members will be responsible for all additional costs incurred.

•All flights shall be coded to the event that the flight is physically going to.  Any flight transporting a Trump Team Member that is not going "to" an event, shall be coded to the event that the Trump U Team Member is coming "from."

•All flights shall be booked as round trip tickets, unless the Trump U Team Member is not returning to the city of origin.

•All flight approvals are to be sent to Eleanor Daniels (Event Planner), with both the appropriate event code and out of policy reason (if applicable) selected. Trump U Team Members are responsible for following up if their flight has not been approved within 24 hours.

•In the event that the fare selected is significantly higher than the lowest logistical fare, Trump U Team Members will be responsible for writing the reasoning in the "notes" area so that the traveler's logic is communicated to the approver.

•Emergency Travel Contacts:      Eleanor Daniels 917.692.3053
                                 April Neumann 917.692.8312

TU-PLTF00285

Exhibit 22
-450-



| Flight Notes |
|---|
| •*South West Airlines requires an individually specified flight search.  South West does not permit Expedia to post their flight fares in the company of their competitors.* |
| •*Trump U Team Members are not guaranteed the use of "preferred" airline carriers unless it falls within the set budget description.  Employees and independent contractors may pay for the difference in order to fly on a preferred carrier in certain, in limited instances.  However, since airfares are good only on the day they are quoted according to airline policies, travelers are responsible for making immediate arrangements for payments in those limited instances.* |

TU-PLTF00286

Exhibit 22
-451-



**EXPENSES & PAYMENT**

| EXPENSES FOR LIVE EVENT TEAM | |
|---|---|
| DEADLINE | •In order to be reimbursed, all expense reports MUST be received within 30 days of the corresponding event. |
| TIMELINE | •Payments for expense forms received by the 6th of the month will be mailed by the 15th of the month.<br>•Payments for expense forms received by the 22nd of the month will be mailed by the last day of the month.<br>•All expense checks will be mailed on the 15th of the month and on the last day of the month. |
| SUBMITTAL | •All expense forms must be inclusive of original receipts, and mailed to Trump University 40 Wall Street 32nd Floor New York NY 10005 Attn: Accounts Payable.<br>•The corresponding event code must be on each Expense Report Form.  This code can be found on the itinerary that is sent to the team before each event.<br>•Each event warrants its own Expense Report Form.  Expense Report Forms utilized for more than one event will not be processed.<br>•All receipts are to be originals and are to be taped to an additional page and stapled to the Expense Report Form. |
| EXPENSES INCURRED | **MILEAGE**<br>•If a personal vehicle is utilized for travel, mileage incurred will be reimbursed.<br>•The team member submitting will be responsible for attaching a mapquest.com detailed direction summary matching the total mileage being expensed.<br>•Mileage will be reimbursed using the standard IRS mileage rate (currently: $0.585/mile).<br><br>**RENTAL CARS**<br>•Rental cars may not be expensed unless prior approval has been granted.<br><br>**HOTEL CHARGES**<br>•Trump University will pay for hotel room and tax only.  All upgrades, unauthorized hotel moves, and incidental charges are at the expense of the traveler.<br><br>**TIPS**<br>•Tip monies are not given in advance.<br>•Tip monies dispensed may be submitted with an itemized description on the Expense Report Form.<br><br>**TRAVEL DAY PER DIEM**<br>•Any coordinator traveling over 1,300 miles on a day that is not an event day will receive half of their usual event per diem rate, once billed.<br>•All travel day per diems claimed must be accompanied by a detailed report of mileage traveled from www.airtimetable.com in order to receive reimbursement. |
| INQUIRIES | •Expense inquiries should be directed to payables@trumpuniversity.com, phone: (646) 810-7346, or fax (503) 217-7928. |

TU-PLTF00287

Exhibit 22
-452-



| COMPENSATION SCHEDULE FOR LIVE EVENTS TEAM | |
|---|---|
| TIMELINE | •Compensation for events concluded by the 6th of the month will be mailed by the 15th of the month.<br><br>•Compensation for events concluded by the 22nd of the month will be mailed by the last day of the month. |
| CHECKS MAILED | •All compensation checks will be mailed on the 15th of the month and the last day of the month. |
| INQUIRIES | •Payment inquiries should be directed to payables@trumpuniversity.com, phone (646) 810.7346, or fax (503) 217.7928. |

TU-PLTF00288

Exhibit 22
-453-



**TRUMP**
UNIVERSITY

Compliance

I. Media Guidelines

If you are approached by a reporter:

1. Politely inform the reporter that you are not an authorized media spokesperson. Ask for the reporter's name, media organization, phone number and deadline.
    a. Pull their registration card (preview only) and write "Media Contact" on the top.
    b. Immediately email Michael Sexton and April Neumann media information including name, media affiliation and phone number.
2. Refer the reporter to one of our authorized media spokesperson by giving them the appropriate media contact information and forward the reporter's information to the appropriate media agency via email as soon as possible. In addition copy Michael Sexton (msexton@trumpuniversity.com).
3. If they persist, say "I'm sorry all of your questions can be addressed by our authorized spokesperson."
4. Mail the reporter's registration card to the office with their business card stapled to it, if possible.

ALL MEDIA INQUIRIES SHOULD BE REFERRED TO:

Jim Dowd
The Dowd Agency
444 Park Avenue South
New York, NY 10016
Ph: 212-686-7777
Fx: 212-686-6439
http://www.dowdagency.com/
jim@dowdagency.com

TIPS:

- You don't have to deliver what the reporter wants.
- Once reporters are present it no longer matters why they are there.
- Expect to be scrutinized.
- Reporters are rarely on your side and they are not sympathetic.
- Never assume the conversation is off the record.
- A Trump University Associate or TU Independent Contractor is not at liberty to answer any questions from a reporter. The reporter should be referred to the proper media spokesperson.
- No matter how much confidence you have in Trump University, you should not say anything.
- Reporters use hidden cameras, placing them at odd angles in order to show a candid response, and the interviewee appears nervous and / or caught off guard.
- You can only control what you are capable of controlling.
- Remember, courtesy gets you a long way.

TU-PLTF00289

Exhibit 22
-454-



**PROPERTY RIGHTS:**

- Use property rights as leverage.
- Trump University leases a portion of the hotel's private property; therefore, Trump University controls that space.
- Trump University reserves the right to disallow video or audio recording during any event. It is Trump University's policy.
- A Trump University Associate or Independent Contractor does not have the right to take or hold a reporter's private property.
- If a problem arises, immediately contact the appropriate media spokesperson and / or Michael Sexton.
- Notify the hotel manager if the reporter insists on entering the facility.
- The hotel has the right to ask a reporter to leave the premises.
- Hotel staff should escort reporters to the exit, not a Trump University Associate or Independent Contractor.

**DISTRICT ATTORNEY:**

- If a district attorney arrives on the scene, contact the appropriate media spokesperson and April Neumann immediately.
- By law, you do not have to show them any personal information unless they present a warrant; however, you are expected to be courteous.

II. Solicitor Guidelines
- When a solicitor attends an event (usually marked by a fairly large stack of brightly colored flyers) the following protocol should be followed:
  1. If the solicitor is actively handing out flyers, have one of the Sales Coordinator's walk up to the solicitor and verbalize that we have paid for the space obtained and that that soliciting is not allowed.
  2. Notify the front desk, front desk manager, and security that there are solicitors on property. Give them a description of the solicitor.
  3. Scan or fax the solicitor's card to corporate so that the issue may be handled further.
  4. Check the ladies and gentleman's restrooms for flyers.
  5. Check the parking lot for flyers.
  6. Keep an eye on the hallway around sales time to diffuse any groups that may congregate for other purposes than discussing Trump University products.

III. Event Guidelines

Corporate should be notified immediately in the case that any one or a combination of the below occurs at an event. Please note in detail and send an email immediately to aneumann@trumpuniversity.com and dhighbloom@trumpuniversity.com:

- A personal story is used by a speaker that appears to be misconstrued or false.

TU-PLTF00290

Exhibit 22
-455-



- A speaker uses a testimonial from another course or program that implies the success or value of the TU Fast Track to Foreclosure course. This is an obvious violation of the FTC Act.
- A testimonial is used that is not a Trump University testimonial.
- Pricing of courses are not accurately stated or an un-approved price drops is advertised.
- A shortage close is used, for example: one cannot say that there are only 17 spots left or the like.
- An express or implied earnings claim is given or a guarantee.
- Use a shortage and be fined, fired or both. No exceptions

IV. Trump University Compliance Process

All Trump University events, inclusive of Seminars, Workshops, and Retreats will be recorded for compliance and training purposes.  All sessions will be recorded directly through the mixer to ensure the highest feasible sound quality for transcription and audibility purposes.  All Trump University events are recorded in the following manner:

### 90 MINUTE PREVIEW: PROFIT FROM REAL ESTATE: ORIENTATION

•All preview sessions are to be recorded separately and labeled appropriately. Rename recordings utilizing the standard preview recording format: "EVENT CODE_CITY-LAST NAME OF SPEAKER" For example, change from "WS116623.WMA" to "SEMPFF20080729n NEW YORK-GOFF.WMA" Orientation sessions given at the culmination of preview events must be recorded with its corresponding preview session for compliance purposes. Orientation speakers must use the microphone, regardless of the number of students at orientation. Rename recordings utilizing the standard preview recording format: "EVENT CODE_CITY-LAST NAME OF SPEAKER." For example, "WS116623.WMA" to "SEMPFF20080729n NEW YORK-GOFF.WMA-ORIENTATION." In the instance that someone other than the speaker presents the orientation portion, please label appropriately using the standard preview recording format and adding the last name of the orientation speaker: "EVENT CODE_CITY-LAST NAME OF SPEAKER+LAST NAME OF ORIENTATION SPEAKER-ORIENTATION." For example, change from "WS116623.WMA" to "SEMPFF20080729n NEW YORK-GOFF+BRINKMAN-ORIENTATION."

•Any 90 minute preview that is being presented by a new LIT (Lecturer in Training) is to be immediately emailed to msexton@trumpuniversity.com, david@entrende.com, aneumann@trumpuniversity.com and dong@trumpuniversity.com and labeled appropriately (see above for standard preview recording format) on the subject line with the conversion for that session.  For example: Subject: "SEMPFF20080729n NEW YORK-SPERRY-7%."

•At the culmination of the preview campaign, Program Coordinators are responsible for emailing all preview and orientation to dong@trumpuniversity.com and aneumann@trumpuniversity.com within 24 hours of the culmination of each session.  All recordings will live on the shared server so that they may be accessed by the management staff at 40 Wall.

•All preview and orientation sessions will be sent to corporate via www.yousendit.com within 48 hours of the culmination of the event.  A session and its corresponding orientation will be chosen at random and sent through the compliance process:

TU-PLTF00291

Exhibit 22
-456-

**TRUMP** UNIVERSITY

Recording→ Transcription→ Legal→ Operations→ Speakers

•Program Coordinators are responsible for immediately emailing any sessions containing questionable material with an explanation to aneumann@trumpuniversity.com and dong@trumpuniversity.com.  This refers to any material that encompasses, but is not necessarily limited to the below:

> •Testimonials that are associated with any other courses or programs
> *For example: A speaker uses a testimonial of a student that was theirs before they worked for Trump University, and implies that it is a TU student that has gone through the Fast Track to Foreclosure training.*

> • Guarantees implying success will be claimed
> *For example: "If you attend this training, you will be able to make $10k within the next 60 days."*

> • Price drops that are reflected incorrectly
> *For example: "After you walk out that door today, the price on this program is going to jump from $1495 to $1995. This is an event price only."*

> • Shortage closes
> *For example: "The first four of you to sign up will get this as an extra bonus" or "We only have five spots left today for this training."*

## 3 DAY TRAININGS: FULFILLMENTS, WORKSHOPS & RETREATS
## PROFIT FROM REAL ESTATE WORKSHOPS, AND ALL ADVANCED TRAINING RETREATS

•All three day trainings are to be recorded in their entirety. Trainings will be recorded in two or more sections per day and labeled appropriately.

•All staff lecturers shall be recorded separately and sessions labeled appropriately. Parts are numbered by the Program Coordinator so that all recordings are in order of the actual daily line-up. *Note: This is inclusive of any time Sales Coordinators and Program Coordinators speak.  Anything that is spoken from the front of the room must be recorded.*

•Under no circumstances should live phone calls with sellers be recorded. It is illegal to record the other party without their consent.

•All closes- whether they be a soft close or a hard close- shall be recorded separately and labeled appropriately.

TU-PLTF00292

Exhibit 22
-457-



•<u>All</u> recordings are to be labeled appropriately and emailed to <u>tmccarthy@trumpuniversity.com</u>; <u>ancumann@trumpuniversity.com</u>, at the culmination of that particular day.  Recordings will be chosen at random and sent through the compliance process:

<div align="center">

**Recording→ Transcription→ Legal→ Operations→ Speakers**

</div>

•All sessions are sent to corporate via <u>www.yousendit.com</u> and posted on the shared server within 48 hours of the culmination of the event so that the internal management staff at 40 Wall Street can access as necessary.

•Program Coordinators are responsible for immediately sending any sessions containing questionable material with notes to <u>tmccarthy@trumpuniversity.com</u> ; <u>ancumann@trumpuniversity.com</u>.  This refers to any material that encompasses, but is not necessarily limited to the below:

> •Testimonials that are associated with any other courses or programs
> *For example: A speaker uses a testimonial of a student that was theirs before they were with Trump University, and implies that it is a TU student that has gone through the Trump Elite Gold Package.*

> • Guarantees implying success will be claimed
> *For example: "If you enroll in the three day mentoring package, you will be able to make $40k on your first deal."*

> • Price drops that are reflected incorrectly
> *For example: "After you walk out that door today, the price on this program is going to jump from $35,995 to $48,490. This is an event price only."*

> • Shortage closes
> *For example: "The first four of you to sign up will get this as an extra bonus" or "We only have five spots left today for this training.*

**Recording In the Absence of a Program Coordinator:**

On occasion, a scheduling issue may present itself where a Program Coordinator needs to leave an event before it is complete.  In this case, a Sales Coordinator may be asked to complete the recording process and send to corporate.  The following are instructions to send a recording via <u>www.yousendit.com</u>:

All Trump University previews, fulfillments, workshops, and retreats will be recorded for compliance and training purposes.  All sessions will be recorded directly through the mixer to

<div align="center">

Private & Confidential   •   Page 35

</div>

TU-PLTF00293

Exhibit 22
-458-



ensure the highest feasibly sound quality for transcription and audibility purposes.  All recordings
that are in need of being sent via email will be sent via www.yousendit.com:

## TO CREATE AN ACCOUNT

• Go to **www.yousendit.com** and click the "Sign Up" tab.



• Select the free account labeled "Lite" that is in the column all the way to the right of the
browser.



TU-PLTF00294

Exhibit 22
-459-



**TRUMP**
U N I V E R S I T Y

•The below screen will populate.  Enter all personal information and be sure to record your user name and password so that you can reference it each time you log in to your You Send It account.  Click "Submit."



•You will get the following message, once your account has been created.  Look for an email to be sent to the email address that you listed with further details.



Private & Confidential   •   Page 37

TU-PLTF00295

Exhibit 22
-460-



---

## TO LOG IN AND SEND FILES
•Go to www.yousendit.com and click "Log In."



•Enter your email address and password from when you created your account.  Click the "Remember my email" button, and then click "Log In."



TU-PLTF00296

Exhibit 22
-461-



•Enter the email address of the person that you are sending the recording to.  The subject line will be the same name that you named the recording, as per the TU Recording Procedure.   To attach the file, click "Browse."



•Locate the recording that you are looking to send and double click.



Private & Confidential  •  Page 39

TU-PLTF00297

Exhibit 22
-462-



•Click "Send It" and wait for recording to upload.  This may take a few minutes.  You will receive an email verification once the recording transfer is completed.



## V. Disruptive Student Procedure

In the case that a student gets out of hand during class time, a Trump U Team Member should immediately call April Neumann: 646.367.3802/ 917. 692.8312 and present the problem.  Upon the result of the conversation, the team may be instructed to follow the steps below:

1. Quietly ask the student to speak with him/her outside the meeting room, taking care to keep tones friendly as to not disrupt the remainder of the class.

2. Explain the issue to the student outside of the meeting room and evaluate whether or not the student is able to sit through the rest of the class (willingly) without disrupting the other students.

3. In the case that the student is not fit to return to class, the team member will take the course of action that he/she was instructed to take in speaking with April Neumann.

4. The staff member that dealt with the disruptive student must email a detailed report of the occurrence to aneumann@trumpuniversity.com as soon as possible.

## VI. Road Etiquette

As a Trump U Team Member, you are expected to be the "creme de la creme" or simply "the best of the best." All of your actions should always support your professionalism, and that you are the best of the best. You never know who is watching.  All Trump University employees, mentors, coaches, speakers, and contractors having contact with Trump University customers (attendees and buyers) are expected to act in a professional, courteous manner and avoid even the implication of impropriety.  You are ambassadors of the Trump University brand and are thus:

• Prohibited from using illegal drugs at any time
• Prohibited from buying alcohol for students/clients at any time
• Prohibited from fraternizing with other employees

TU-PLTF00298

Exhibit 22
-463-



- Prohibited from fraternizing with clients
- Required to dress appropriately in concordance with the Trump University mandate
- Required to take care of your own incidentals and any additional personal charges incurred when staying in a hotel with Trump University
- Only authorized to offer courses, products and services as are set forth by Trump University and you may not offer any other programs or investments to students under any circumstance
- Required to comply with pricing established by Trump University and you may not change or modify pricing without prior approval
- Required to utilize TU presentations that are approved in advance, presentations/slides are not to be changed or modified without prior approval
- Specifically prohibited from speaking with any journalist, reporter, author, blogger, newspaper, or media outlet with regards to Trump University, the Trump Organization or Mr. Trump
- Specifically prohibited from compiling customer lists or data for any purpose, as client/customer information is confidential and proprietary
- Prohibited from directly or indirectly advising any client/customer of any likelihood of success, as Trump University makes no earning claims
- Required to accurately present product/service offerings
- Prohibited from sharing a personal story or testimonial unless and until appropriate documentation in support has been provided to TU and the story/testimonial has been approved in advance
- Prohibited directly or indirectly implying that you have purchased and/or used TU products/services unless that statement is true
- Prohibited from directly or indirectly implying that TU or Mr. Trump endorses any third-party offer, investment opportunity, etc
- Urged to use your common sense and business judgment to determine whether the purchase of TU products and/or services is appropriate for the particular customer

————————————

Violation of these policies may result, depending on the circumstance and in TU's discretion, in a fine, suspension, probation or termination.

TU-PLTF00299

Exhibit 22
-464-

# EXHIBITS 23-24
# [Filed Conditionally Under Seal]

# EXHIBIT 25
[Intentionally Omitted]

Exhibit 25
-506-

# EXHIBITS 26-27
# [Filed Conditionally Under Seal]

# EXHIBIT 28

Exhibit 28
-546-

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

    Plaintiffs,               Civil Action No.

       vs.                3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,    CAB(WVG)

    Defendants.

_____


Videotaped deposition of DONALD J. TRUMP, SR.

New York, New York

September 12, 2012


Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

Page 1

Exhibit 28
-547-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

BY MS. JENSEN:

Q   And who manages the Trump brand?

A   Many people.  Different people.  I have people that handle the real estate aspects.  I have people that handle the shirts and ties, which are tremendously successful.  I have people that handle different aspects -- totally different and totally unrelated people.

Q   Sure.  How about the real estate aspect of it?  Who manages the Trump brand for the real estate aspect?

A   As told you before, I think three times, I've had so many -- I have many deals, and individual people manage individual deals.  They don't necessarily work with each other.  They're individual deals, just like Trump University is an individual deal.

Q   And what does the Trump brand represent to you?

MR. SCHNEIDER:  Objection; vague.

THE WITNESS:  I think quality.  I think in terms of real estate, it really -- I think a lot of people -- it represents great location, great buildings, beautiful architecture.

Page 42

If you look all throughout New York and other places, you'll see very beautiful buildings in the best locations, and that is the Trump buildings.  So it really represents quality location, quality buildings in terms of real estate.

BY MS. JENSEN:

Q   Now, do you personally have any controls over the Trump brand?

MR. SCHNEIDER:  Objection; vague.

THE WITNESS:  I don't know if we have a book on controls, but, you know, certainly I like to see the right location, which I'd be involved in.  I like to see the right management of buildings built, that is managed properly.  I like to get the right architects.  So I don't think we have formal control, but we have certainly informal control.

BY MS. JENSEN:

Q   Is there any brand manager for the Trump brand?

A   No.

Q   Did you ever work with Brand Sense Marketing?

A   I don't know the name.  I might have.  We work with many companies.

Page 43

Q   And what do you believe is the value of the Trump brand?

A   Well, I don't know if I -- I should say.  But it's worth a lot of money.  The name is worth a lot of money.

Q   What would you estimate?

A   I don't know.  We've had estimates done.  And I think there was an estimate done of over $3 billion or $3 billion for the value of the brand.

Q   Would you say that the Trump brand is the most visible in the United States of any brand?

MR. SCHNEIDER:  Objection.

THE WITNESS:  No.  I think Coca-Cola is very visible.  I think Pepsi-Cola is very visible.  I think IBM is very visible and Trump is very visible.  There are many brands that are visible.  But it's certainly one of the very good brands.

BY MS. JENSEN:

Q   As to the real estate, is it the most visible brand?

A   Possibly.

Q   Going back to the value of the brand, who did the estimate of the brand?  You said it's the --

A   I don't know the name of the company.  I

Page 44

don't know what this has to do with this case, to be honest with you, but I can certainly, if my lawyer wants me to, I could give it to you.  I just don't know what it has to do with the case.

MR. SCHNEIDER:  You've asked the one question I was going to permit.  So the judge has made it clear about this issue.  I am not giving you more.

BY MS. JENSEN:

Q   What is a brand to you?  What does the word "brand" mean to you?

A   Brand is the value or the -- are you talking about -- when you say "What is a brand?" are you talking about the value or are you talking about just what is a brand per se?

Q   What is a brand?

A   It's a recognition of something.  It could be a recognition of luxury.  It could be a recognition of low-income quality -- for instance, low-income housing, which I've also built, and very successfully and very nice.

It could be a recognition of quality shirts, quality ties, quality soda, quality water, quality anything, or lack of quality.

Page 45

12 (Pages 42 to 45)

Exhibit 28
-548-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

| | |
|---|---|
| Page 46 | Page 47 |

1    It could be a recognition -- but it's a
2  recognition of something.  In my case, I think the
3  brand stands for many different things.
4     Q.  Now, how did you build this brand?  How
5  does one build a brand?
6     A.  Just taken years and years and I've had a
7  lot of success.  And over the years you become either
8  successful or not successful.  And some people have
9  built a good brand, but a lot of people don't know
10  better.  In my case they know about it.  But I think
11  it's just years of high-quality work that has
12  generally been very successful.
13     Q.  Now, in terms of managing a brand and the
14  recognition that you're talking about, how does one
15  manage that?  How have you managed that?
16     A.  I just don't know what this has to do
17  with Trump University.  You're asking these
18  questions, but I don't understand what this has to do
19  with this ridiculous lawsuit.
20     Q.  Sure.  Mr. Trump, like we talked about
21  earlier, I'm going to ask the questions.  If I could,
22  please, have --
23     A.  But I told you, I don't have a brand
24  manager.

**Page 46**

1     Q.  No, but I'm saying that how does one go
2  about managing a brand --
3        MR. SCHNEIDER:  What does that mean?
4        MS. JENSEN:  -- such as yours?
5        THE WITNESS:  I don't even know what the
6  question means.
7  BY MS. JENSEN:
8     Q.  Okay.  So, for instance, does -- in your
9  case, does brand -- being a successful brand require
10  people to trust your brand?
11     A.  I think --
12        MR. SCHNEIDER:  Objection; vague,
13  speculation.
14        THE WITNESS:  I think it's not a question
15  of trust.  It's a question, you build up over the
16  years a certain reputation.  And I've developed a
17  good reputation; and I think that certainly is a part
18  of the brand, yes.
19  BY MS. JENSEN:
20     Q.  And is part of the brand also the image
21  that people -- that people see or think of when they
22  think of Trump, they think of something in
23  particular?
24     A.  Even though you're trying to hurt the

**Page 47**

1  image, yeah, I think it could be.  I think that's
2  true.
3     Q.  Mr. Trump, again, just to go -- for the
4  deposition, I want to state for the record that
5  there's no reason for you to, you know, imply that
6  I'm here for any untoward reason or that I'm trying
7  to do anything to your brand.
8        MR. SCHNEIDER:  He thinks the lawsuit is
9  trying to hurt the brand.
10        THE WITNESS:  I think the lawsuit is
11  trying to hurt the brand, and I honestly look forward
12  to winning this case and suing your law firm for as
13  much as we can sue them for, and we will be doing
14  that.  We have a 97 percent approval rating.  Harvard
15  doesn't have a 97 percent approval rating.  And we
16  will be suing your law firm for as much as we can
17  possibly do.  That I can tell you.
18  BY MS. JENSEN:
19     Q.  Okay.
20     A.  And you individually.
21     Q.  Now, back to my question:  Does the Trump
22  brand invoke a particular image?
23     A.  You've asked me this question about four
24  times.

**Page 48**

1     Q.  Are you going to answer the question?
2     A.  No, I don't think so.  Because I've told
3  you about success.  I've told you about location.
4  How many times do I have to answer the question?
5     Q.  Now, you have a show called "The
6  Apprentice"; correct?
7     A.  Yes.
8     Q.  Okay.  And also called "The Celebrity
9  Apprentice"; correct?
10     A.  Yes.
11     Q.  Okay.  And why did you decide to start
12  that show?
13     A.  I didn't decide to start it.  Somebody
14  came and asked me to start it.  And I decided to do
15  it.
16     Q.  Do you think that a lot of people
17  associate you with "The Apprentice" TV show?
18     A.  Yes.
19     Q.  And what do you think people -- what do
20  you think that show has invoked for people?  What do
21  they think of when they think of that show?
22     A.  I think the reason they chose me was
23  because of my success.  Otherwise NBC would not have
24  wanted Trump, they would have used somebody else.

**Page 49**

13 (Pages 46 to 49)

**www.aptusCR.com**

Exhibit 28
-549-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

| | |
|---|---|
| 1  They have many people that have success, and they | 1          MR. SCHNEIDER:  Objection; foundation. |
| 2  could have used somebody else.  But I think the | 2          THE WITNESS:  Probably. |
| 3  reason they chose me was because of my success. | 3  BY MS. JENSEN: |
| 4  And -- that's why. | 4          Q   Do you think people are willing to pay |
| 5          Q   Do you think people want to learn from | 5  more because it was associated with your brand? |
| 6  you? | 6          A   Possibly. |
| 7          A   Yes. | 7          Q   Is the Trump brand -- is the Trump brand |
| 8          Q   Do you think people trust you? | 8  related to you personally? |
| 9          A   I think so. | 9          MR. SCHNEIDER:  What does that mean? |
| 10          Q   Do you believe that the Trump University | 10          THE WITNESS:  What does that mean? |
| 11  courses were more valuable than other competitor | 11  BY MS. JENSEN: |
| 12  courses? | 12          Q   Is the Trump brand -- when people think |
| 13          MR. SCHNEIDER:  Objection; foundation. | 13  of Trump -- Trump brand, do they think of you in |
| 14          THE WITNESS:  I don't know too much about | 14  particular? |
| 15  the other courses.  I do think that Trump University | 15          MR. SCHNEIDER:  Hold on a second.  You're |
| 16  was certainly a valuable education, as proven out by | 16  asking him what other people think? |
| 17  95 to 97 percent approval rating, including the | 17          MS. JENSEN:  Yes, to the extent that he |
| 18  highest marks from your terrible client who gave us, | 18  knows, absolutely. |
| 19  on tape, glowing reports. | 19          MR. SCHNEIDER:  Do you know what other |
| 20          So, yeah, I think it was -- was and maybe | 20  people think? |
| 21  will be very good, yes. | 21          THE WITNESS:  No. |
| 22  BY MS. JENSEN: | 22  BY MS. JENSEN: |
| 23          Q   And do you think that the name | 23          Q   So you have no idea what people think of |
| 24  recognition drew more people in? | 24  when they think of the Trump brand?  They might think |
| Page 50 | Page 51 |

| | |
|---|---|
| 1  of somebody else? | 1  instructors. |
| 2          A   No.  I think they think that it's a | 2          So I don't know if that's what you're |
| 3  company that's a successful -- very successful | 3  referring to.  But I've met numerous instructors, and |
| 4  company. | 4  I've also -- this is over a period of years.  And |
| 5          Q   And it's successful because of you; | 5  I've also seen the résumés of virtually everybody. |
| 6  correct? | 6          So that's where they sound familiar to |
| 7          A   Well, it's successful because of | 7  me; and in some cases, I know them better because |
| 8  transactions; and lots of transactions over a period | 8  I've met them. |
| 9  of years have added up to a great body of success, | 9          Q   Sure.  Which instructors did you meet? |
| 10  yes. | 10          A   I believe Donald Sexton and Mr. Caplan. |
| 11          Q   And you oversaw those transactions; | 11  I believe perhaps Childers. |
| 12  correct? | 12          I've met a number of them.  I don't know |
| 13          A   I did, yes. | 13  their names.  I mean, you're talking about years ago. |
| 14          Q   Do you know who Scott Leitzel is? | 14  This is actually years ago. |
| 15          A   I know the name.  I don't know him. | 15          But I've met a number of instructors.  I |
| 16          Q   How about Michael Hinson?  Do you know | 16  wanted to see -- I really was very insistent that we |
| 17  who that is? | 17  get good instructors for the classes. |
| 18          A   No. | 18          And I think the 97 percent bears that |
| 19          Q   How about Stephen Gilpin?  Do you know | 19  out, that we were successful in that regard. |
| 20  who that is? | 20          But the concept of getting proper |
| 21          A   I think these are names of people that I | 21  instructors was very important to me. |
| 22  taught where -- I think I know their names because I | 22          Q   Now, when did you meet Donald Sexton? |
| 23  saw résumés, and I would see résumés of instructors, | 23          A   I don't know.  Years ago. |
| 24  because it was important to me that we got good | 24          Q   How many times did you meet him? |
| Page 52 | Page 53 |

14  (Pages 50 to 53)

**www.aptusCR.com**

Exhibit 28
-550-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

| | |
|---|---|
| 1      A   Yes. | 1      A   I don't know.  I really don't know. |
| 2      Q   What was it? | 2      Q   Do you remember what the presentation |
| 3      A   I saw an instructor talking about real | 3   was -- what was the format of the presentation? |
| 4   estate. | 4      A   I don't know. |
| 5      Q   Okay.  And what in particular were they | 5      Q   Is there any other details that you can |
| 6   talking about?  Let's take the Florida -- let's go | 6   tell me about the -- |
| 7   through both times.  What were they speaking about? | 7      A   The only detail, as I left, I was very |
| 8      A   General real estate.  I can't remember | 8   impressed. |
| 9   specifically.  All I know is I left the rooms, the | 9      Q   Okay.  Now, you said that you had met -- |
| 10   individual rooms, very satisfied that it was a very | 10   previously you had met with Donald Sexton; is that |
| 11   good instructor -- because I wanted to see it.  That | 11   correct? |
| 12   the instructor was excellent. | 12      A   I believe so.  Again, there were -- I |
| 13          And again, I went to the Wharton School | 13   remember some names.  There was a Mr. Gordon, |
| 14   of Finance.  I know a lot about education.  And it | 14   Mr. Sexton, Mr. Childers, Mr. Caplan. |
| 15   doesn't take me a long time to see whether or not an | 15          There were four or five names -- I don't |
| 16   instructor is doing a good job or not. | 16   know, you know, when you add them all up, because |
| 17          So I'd be there just for a short period | 17   you're talking about years ago.  But some would come |
| 18   of time, but I wanted to see whether or not, you | 18   up to my office.  And I met with a number of the |
| 19   know, what I thought his presentation -- the stature | 19   professors -- one was a professor at Columbia |
| 20   of the instructor.  I left all three or four times | 20   University who was very impressive.  That may have |
| 21   really impressed with the instructor, as is borne out | 21   been Mr. Sexton. |
| 22   by your 97 percent approval. | 22          But I was very impressed with the people |
| 23      Q   Do you know whether it was Trump | 23   that we had and the people that I met.  But in all |
| 24   Institute? | 24   cases I looked at applications.  In other words, in |
| Page 58 | Page 59 |

| | |
|---|---|
| 1   some cases I didn't see them, but I'd look at their | 1      Q   And when you say the people who taught, |
| 2   application when they applied and before we hired | 2   who are you specifically referring to? |
| 3   them. | 3      A   The people that taught. |
| 4          And so I would be involved from that | 4      Q   Okay.  And taught in what way? |
| 5   standpoint.  It was very important to me to make sure | 5      A   I don't understand.  What are you asking |
| 6   that good people represented what we were doing. | 6   me? |
| 7      Q   In terms of the people that you met with | 7      Q   Okay.  So some people -- so, for |
| 8   in your office, would that be in your calendar? | 8   instance, let's see, Mr. Donald Sexton, I believe he |
| 9      A   No, it's so many years ago.  I don't have | 9   wrote a book; is that correct? |
| 10   calendars from that many years ago.  You're talking | 10      A   I believe so, and he had a great |
| 11   about years ago. | 11   reputation. |
| 12      Q   Okay.  So you didn't keep a calendar in | 12      Q   Okay.  Sure.  Now, did you review the |
| 13   2004? | 13   résumés for the people who wrote the books? |
| 14      A   I may have had a calendar, but I don't | 14          MR. SCHNEIDER:  He just said he met with |
| 15   keep them for 10 years later. | 15   Sexton, and you said, Did he write a book, and he |
| 16      Q   Okay.  Now, which résumés did you look | 16   said he did.  So he obviously met with somebody that |
| 17   at? | 17   wrote a book. |
| 18      A   I don't know.  But many. | 18          MS. JENSEN:  You can let your client |
| 19      Q   Sitting here, you can't remember? | 19   answer. |
| 20      A   No.  But many, many résumés. | 20          MR. SCHNEIDER:  He just testified to |
| 21      Q   Okay.  How many? | 21   that. |
| 22      A   Like -- I can't say all, but I would say | 22   BY MS. JENSEN: |
| 23   many of the people that taught, I, at a minimum, | 23      Q   You can answer. |
| 24   looked at résumés, yes. | 24      A   I just said that. |
| Page 60 | Page 61 |

                                    16  (Pages 58 to 61)

Exhibit 28
-551-

Donald J. Trump, Sr.                                    September 12, 2012

| | Page 62 | | | Page 63 |
|---|---|---|---|---|
| 1 | MS. ZELDES:  He wasn't sure he met with | | 1 | copy? |
| 2 | Mr. Sexton. | | 2 | A   I don't know.  They were sent to me in, |
| 3 | BY MS. JENSEN: | | 3 | you know, a few pages, like sitting right there. |
| 4 | Q   As to the others. | | 4 | MR. SCHNEIDER:  She's just saying paper |
| 5 | A   I told you I looked at their résumés, at | | 5 | versus some email or something. |
| 6 | a minimum. | | 6 | THE WITNESS:  I think they were -- I |
| 7 | Q   For the -- | | 7 | think they were more hard copy, yes. |
| 8 | A   I met numerous people. | | 8 | BY MS. JENSEN: |
| 9 | Q   Okay. | | 9 | Q   But sitting here right now, you can't |
| 10 | A   I also saw the résumés of many, many | | 10 | remember any of the résumés that you saw? |
| 11 | people.  Perhaps all of the people.  I don't know.  I | | 11 | A   I think I told you a number of names. |
| 12 | mean, some could have -- maybe I missed a résumé. | | 12 | Those are people that either I met or saw resumes. |
| 13 | But it was very important to me that we have good | | 13 | Q   Okay.  So -- |
| 14 | instructors.  That was an important thing to me. | | 14 | A   Again, you're talking about many years |
| 15 | So, at a minimum, I've seen résumés -- I | | 15 | ago. |
| 16 | met with instructors, but I also have seen résumés of | | 16 | Q   Okay.  Just to be clear, so you're |
| 17 | many of them. | | 17 | speaking of Mr. Sexton, Mr. Caplan, Mr. Gilcrest, |
| 18 | Q   Okay.  And how did you come to see these | | 18 | Mr. Gordon, Mr. Childers.  And any others? |
| 19 | résumés? | | 19 | A   Yes, many others.  I just don't remember |
| 20 | A   They'd be sent to me by the school. | | 20 | their names. |
| 21 | Q   How were they sent to you? | | 21 | Q   You can't remember any of the other |
| 22 | A   I think through Mr. Sexton, or somebody | | 22 | names? |
| 23 | would send them up to me. | | 23 | A   No, I can't. |
| 24 | Q   Okay.  And so you were sent them in hard | | 24 | Q   Okay.  And how do you know that they were |

| | Page 64 | | | Page 65 |
|---|---|---|---|---|
| 1 | résumés for instructors? | | 1 | whether he personally mentors people completely |
| 2 | A   What does that question mean?  I don't | | 2 | unrelated to Trump University? |
| 3 | understand your question. | | 3 | MS. JENSEN:  You can answer the question. |
| 4 | Q   They could have been for other positions | | 4 | MR. SCHNEIDER:  Wait, wait, wait.  Just |
| 5 | at Trump University. | | 5 | tell me how this has anything to do with the case. |
| 6 | A   No, they were for instructors. | | 6 | MS. JENSEN:  David, I have to tell you |
| 7 | Q   And these were -- the ones that you named | | 7 | every single question. |
| 8 | were instructors who wrote books; correct? | | 8 | MR. SCHNEIDER:  You do.  I think you're |
| 9 | A   I don't know if they all wrote books. | | 9 | just trying to burn time. |
| 10 | Some of them did write books, yes. | | 10 | MS. JENSEN:  I have other things I could |
| 11 | Q   Okay.  Have you ever personally mentored | | 11 | be doing with my time.  I am not here to try to -- |
| 12 | anyone in real estate investing? | | 12 | MR. SCHNEIDER:  You said twice "I want my |
| 13 | A   Yes. | | 13 | seven hours."  How he mentored other people in the |
| 14 | Q   And who is that? | | 14 | Trump University has nothing to do with your case. |
| 15 | A   My children. | | 15 | There's no -- there's no claim in this case that he |
| 16 | Q   Anyone else? | | 16 | did or didn't properly mentor people in the Trump |
| 17 | A   Probably everybody that works for me. | | 17 | Organization. |
| 18 | Q   And when you say "everyone who works for | | 18 | MS. JENSEN:  Let me just ask this |
| 19 | you," do you mean at all the Trump Organization | | 19 | question and then we'll see.  I'm not going to go |
| 20 | companies? | | 20 | down a whole line of questioning.  Just let's -- |
| 21 | A   Yes. | | 21 | let's get this question.  Okay. |
| 22 | Q   How did you mentor these various people? | | 22 | MR. SCHNEIDER:  No.  We're going to deal |
| 23 | What's your approach to mentoring? | | 23 | with my issue first. |
| 24 | MR. SCHNEIDER:  We could -- you're asking | | 24 | Tell me conceptually how this has |

17 (Pages 62 to 65)

Exhibit 28
-552-

**Donald J. Trump, Sr.**                              **September 12, 2012**

| | |
|---|---|
| 1  discussions took place? | 1  New York? |
| 2       A   My office. | 2       A   I don't know.  You'd have to ask my |
| 3       Q   Do you recall any specifics from those | 3  lawyers about that. |
| 4  discussions? | 4       Q   Do you know if there were any agreements |
| 5       A   No.  They just felt that it was a great | 5  that demonstrated what your role was going to be in |
| 6  thing to do.  I liked the idea because, again, if I | 6  Trump University? |
| 7  can help people, I like to be able to help people. | 7       A   I don't think so, but I just don't know. |
| 8           I thought it was an interesting idea. | 8       Q   Okay.  Any correspondence? |
| 9  And we pursued it, and we ended up doing the school. | 9       A   Not that I remember. |
| 10      Q   Was there a business plan? | 10      Q   Any other kind of documents? |
| 11      A   Not that I know of.  It wasn't a big | 11      A   I don't know. |
| 12  transaction for me.  It wasn't a make-or-break deal. | 12      Q   Do you recall that Trump University and |
| 13  It was just something that if we can educate people | 13  you, Mr. Trump, entered into a license agreement |
| 14  into the ways of real estate and finance, that's a | 14  whereby Trump University was -- had the right to use |
| 15  good thing -- and other things, that's a good thing. | 15  your name? |
| 16      Q   Do you know if there were any documents | 16      A   It's possible -- I think possibly that |
| 17  memorializing those discussions at the time? | 17  did take place.  You'd have to speak to my lawyers |
| 18      A   I don't believe so; not that I have. | 18  about it, though. |
| 19      Q   So Trump University filed its articles of | 19      Q   When you say "your lawyers," just to be |
| 20  organization with the New York Secretary of State; is | 20  clear, who are you speaking about? |
| 21  that correct? | 21      A   Well, I think Mr. Garten would be |
| 22      A   I don't know. | 22  appropriate. |
| 23      Q   Do you know whether Trump University was | 23      Q   Are you the owner of Trump University? |
| 24  registered to do business in any states other that | 24      A   I think I own around 90-something percent |
|                                                Page 70 |                                                Page 71 |

| | |
|---|---|
| 1  of it. | 1       A   I believe so, yes. |
| 2       Q   Are you familiar with the -- | 2       Q   And was it -- what was the business |
| 3       A   The actual owner is a corporation. | 3  purpose of that corporation? |
| 4       Q   And the actual owners -- you said -- I'm | 4       A   It's to open up a place where people |
| 5  sorry. | 5  could gain knowledge where they could -- where we can |
| 6           The record says the actual owner is the | 6  hire -- |
| 7  corporation? | 7       Q   Mr. Trump.  I'm sorry to interrupt you. |
| 8           MR. SCHNEIDER:  He said "a corporation." | 8  I just want to make sure, you said it was owned by a |
| 9           THE WITNESS:  A corporation. | 9  corporation. |
| 10  BY MS. JENSEN: | 10      A   Yes. |
| 11      Q   I wanted to make sure the record -- | 11      Q   And I know you weren't -- necessarily |
| 12      A   I said "a corporation." | 12  don't know by name that corporation. |
| 13      Q   That's what I heard too.  I just wanted | 13          I hope I just refreshed your recollection |
| 14  to make sure the record is clear. | 14  by naming the DJT University Member, LLC.  There's |
| 15          And when you say "a corporation," which | 15  also a DJT Managing Member, LLC. |
| 16  entity are you referring to? | 16          And just to keep a clean record, as it |
| 17      A   I don't know the name of it, but it's | 17  were, you're 100 percent owner of both of those |
| 18  owned in a corporate -- it's owned by a corporation. | 18  entities? |
| 19      Q   Okay.  Does DJT University Member LLC | 19      A   I don't know.  You'd have to ask |
| 20  sound familiar? | 20  Mr. Garten.  It could be.  I think so, but I just |
| 21      A   I don't know. | 21  don't know specifically, but you could ask |
| 22      Q   And for the corporate entity that you are | 22  Mr. Garten. |
| 23  referring to, are you 100 percent owner of that | 23      Q   Do you know whether those entities were |
| 24  corporate entity? | 24  formed for this specific purpose for Trump |
|                                                Page 72 |                                                Page 73 |

19 (Pages 70 to 73)

Exhibit 28
-553-

**Donald J. Trump, Sr.**                              **September 12, 2012**

| | |
|---|---|
| 1 University? | 1 individual corporations and corporations or a series |
| 2      A  I believe so, yes. | 2 of partnerships that have a veil of -- that we call, |
| 3      Q  Do you know if they had any other | 3 for convenience purposes, the Trump Organization. |
| 4 business purpose? | 4      But it's a series of many corporations |
| 5      A  I don't think so. | 5 and partnerships that comprise the Trump |
| 6      Q  Do you know whether they have any other | 6 Organization. |
| 7 assets? | 7      Q  Do you know approximately how many? |
| 8      A  I don't think so. | 8      A  Many.  I don't know.  I could get that |
| 9      Q  Any employees? | 9 information for you if it was really necessary.  I |
| 10      A  I don't think so.  Again, I'm not sure, | 10 don't know what it has to do with this case, but I |
| 11 but I don't think so.  I don't believe they have any | 11 could certainly get the information for you. |
| 12 assets, no. | 12      Q  Sure.  And is Trump University one of |
| 13      Q  Okay.  Going back to Trump Organization, | 13 those entities? |
| 14 are you the full owner of Trump Organization? | 14      A  Yes. |
| 15      MR. SCHNEIDER:  Hold on a second. | 15      Q  Now, do you have an email address? |
| 16      He's not going to talk about his | 16      A  My secretaries have an email address, |
| 17 ownership interest or his assets.  This isn't a | 17 yes. |
| 18 debtor's exam.  So what he owns or doesn't own in the | 18      Q  Does dtrump@trumporg.com sound familiar? |
| 19 Trump Organization, you're not getting into. | 19      A  I don't know. |
| 20 BY MS. JENSEN: | 20      Q  And if I emailed that email address, who |
| 21      Q  Could you describe the corporate | 21 might respond, if any? |
| 22 structure for Trump Organization. | 22      A  I guess you'd have to ask for either |
| 23      A  It's a series of -- under the Trump | 23 Lauren or Randi. |
| 24 Organization, a series of corporations mostly, | 24      Q  I'm sorry? |
| Page 74 | Page 75 |
| 1      A  Lauren or Randi. | 1      A  Yes. |
| 2      Q  Lauren's last name? | 2      Q  Does she make your appointments in your |
| 3      A  I don't know.  Lauren or Randi, two girls | 3 planners? |
| 4 that work in the office. | 4      A  They sort of all do. |
| 5      Q  Okay.  And what's Randi's last name? | 5      Q  Okay.  So not one person manages your |
| 6      A  I don't know.  Gleason, I believe. | 6 email addresses? |
| 7      Q  Gleason? | 7      A  No. |
| 8      A  Gleason, yes.  She's rather new. | 8      Q  Sitting here right now, can you think of |
| 9      Q  I'm sorry.  Glisson, G-L-I-S-S-O-N? | 9 any other email address that you had other than the |
| 10      A  E-A-S-O-N, I believe. | 10 dtrump@trumporg? |
| 11      Q  Okay.  I'm sorry.  I misheard you. | 11      MR. SCHNEIDER:  He didn't say he had an |
| 12      And you don't know what Lauren's last | 12 email address.  He said those were someone else's. |
| 13 name is? | 13      THE WITNESS:  No, I can't. |
| 14      A  No, I don't. | 14 BY MS. JENSEN: |
| 15      Q  Okay.  And you said that your secretaries | 15      Q  Do you have a smartphone? |
| 16 have an email address.  Who are you referring to | 16      A  No. |
| 17 there? | 17      Q  Did you send emails to prospective Trump |
| 18      A  No, I said -- I'm referring to the two. | 18 University students with a personal invitation to |
| 19      Q  Those two.  So you're not referring to | 19 RSVP in 2006? |
| 20 Rhona? | 20      A  I didn't.  But it's possible somebody did |
| 21      A  Well, you could also ask about Rhona, | 21 on my behalf.  For instance, Mr. Sexton. |
| 22 Rhona Graff. | 22      Q  Do you know whether Trump Organization |
| 23      Q  Rhona Graff.  And is she your head | 23 provides legal services to Trump University? |
| 24 secretary? | 24      A  I don't know what you mean by that.  You |
| Page 76 | Page 77 |

**www.aptusCR.com**

Exhibit 28
-554-

Donald J. Trump, Sr.                                    September 12, 2012

```
 1        Q   Do all the companies within the Trump
 2   Organization, do they all include the name Trump?
 3        A   No, I don't believe so.  Many do.
 4        Q   Okay.  Are there any ones that come to
 5   the top of your head that don't contain the name
 6   Trump?
 7        A   I have a lot of them I believe that don't
 8   contain -- Wembley.  I have a lot of different names
 9   that don't have the name Trump, but I have a lot that
10   do.
11        Q   Okay.  Do most companies -- in this case,
12   does Trump University use the name Trump because they
13   felt it was an asset?
14        A   Repeat.
15            MS. JENSEN:  Can you read that back.
16            (Record read.)
17            THE WITNESS:  Perhaps, or for
18   identification purposes.
19   BY MS. JENSEN:
20        Q   In this case, did you believe that the
21   name Trump would be an asset to Trump University?
22        A   Yes, I think so.
23        Q   Do you know why Trump University changed
24   its name to the Trump Entrepreneurial Initiative,
                                              Page 82
```

```
 1   LLC?
 2        A   No.  I think Mr. Sexton could answer that
 3   question.  I'm not exactly sure, but they did change
 4   the name somewhere along the line.
 5            I think we were requested to because of
 6   something having to do with the word "university."
 7        Q   You can't remember what --
 8        A   No, I don't remember exactly the details
 9   of it.  But Mr. Sexton was requested to at some point
10   along the way and he changed the name.
11        Q   Do you remember who requested it?
12        A   No, I don't.
13        Q   Do you remember seeing any letter from
14   the New York Department of Education about the use of
15   the word "university"?
16        A   No.  I think there was a negotiation that
17   went on for a period of time; and then Mr. Sexton
18   said rather than arguing about it, we'll change the
19   name.  It wasn't a big deal.
20        Q   Okay.  Do you know if any other -- if any
21   other states asked Trump University to change its
22   name?
23        A   That, I don't know.
24        Q   Now, at the beginning of Trump
                                              Page 83
```

```
 1   University's operations, do you recall what type of
 2   courses that it offered?
 3        A   You'd have to ask Mr. Sexton in terms of
 4   the details, but it was very well spelled out, as you
 5   know.
 6        Q   Okay.  So sitting here right now, you
 7   can't remember what the initial courses were?
 8        A   Courses primarily on real estate and real
 9   estate finance and even renovation and fix-up and
10   lots of different things having to do with real
11   estate.
12        Q   Sure.  Do you remember in what format
13   they took?
14        A   No, I don't.
15        Q   Do you remember if they were live events?
16        A   Well, originally it started as an online
17   concept.  And there were so many people that wanted
18   it to go to a class format, and I know a couple years
19   later they changed it over so it became a class
20   format also.
21        Q   Do you recall that Trump Institute first
22   took the live class form -- I'm sorry, excuse me --
23   the classroom form?
24        A   Yes.
                                              Page 84
```

```
 1        Q   Okay.  Do you know how much sooner Trump
 2   Institute started those classes than Trump
 3   University?
 4            MR. SCHNEIDER:  He's differentiating
 5   between another company.
 6            THE WITNESS:  No, I don't know.
 7            No, I don't.  It was a period of years.
 8   I don't know exactly what the time was.
 9   BY MS. JENSEN:
10        Q   Do you recall that Trump Institute was
11   fairly successful with the classroom format?
12        A   Yes, it was successful.
13        Q   And was that the reason that -- one of
14   the reasons, at least, that Trump University wanted
15   to move into that format?
16        A   No.  I think it was successful.  I think
17   their contract ran out.
18        Q   Do you recall making the decision to go
19   live?
20        A   "To go live," what does "live" mean?
21        Q   Into the classroom format.
22        A   It was a decision that was made primarily
23   by Mr. Sexton.
24            But I recall when he made that decision,
                                              Page 85
```

22 (Pages 82 to 85)

Exhibit 28
-555-

Donald J. Trump, Sr.                                    September 12, 2012

| | |
|---|---|
| 1 yes -- you mean to go away from Trump Institute? | 1     Q   And was Mr. Sexton responsible for |
| 2     Q   To go away from the online to the | 2 overseeing these courses? |
| 3 classroom? | 3     A   Yes, he was. |
| 4     A   Yeah, there was a period of time -- | 4     Q   Okay.  Do you recall whether Mr. Sexton |
| 5 people really wanted it, they loved it.  They liked | 5 was in charge of creating these courses? |
| 6 the online.  They really wanted to have classes.  And | 6     A   No.  He was -- he was in charge; but he |
| 7 they loved the classes.  I mean, they really loved | 7 did it also with some very talented professors and |
| 8 those classes. | 8 other people and teachers. |
| 9     Q   And do you recall what year it was that | 9     Q   Okay. |
| 10 you moved into live events? | 10     A   Instructors. |
| 11     A   I think it was a couple years later. | 11     Q   Could you name any of those people? |
| 12     Q   Okay.  Were the live events more | 12     A   Well, I already did.  I thought I gave |
| 13 profitable than the online courses? | 13 you a large list of names a while ago.  Do you want |
| 14     A   I don't know. | 14 me to name them again? |
| 15     Q   Could you list the classroom courses that | 15     Q   Okay.  So Mr. Donald Sexton; correct? |
| 16 Trump University offered? | 16     A   Yeah. |
| 17     A   Well, it was different -- I mean, I could | 17     Q   Okay.  And also, let's see, Mr. Caplan? |
| 18 get you a listing of them.  I've seen listings of | 18     A   I gave you the list before.  I'd rather |
| 19 them.  But just different -- different elements of | 19 not have to repeat it again. |
| 20 real estate and the world of real estate and | 20     Q   Okay.  So the people who are responsible |
| 21 business. | 21 for the courses -- |
| 22     Q   Can you recall any of the names, sitting | 22     A   No, not those people, but they had input. |
| 23 here today? | 23 Everybody had input.  Every instructor had input. |
| 24     A   No, no, no. | 24 And every class was different.  In other words, you |
|                     Page 86 |                     Page 87 |
| 1 have a class in California, and then you could have | 1     A   -- Iowa is different than California. |
| 2 another class in California that's totally different. | 2 They have different rules, regulations.  New York is |
| 3        The classes were all very different.  And | 3 different than California. |
| 4 I wanted that. | 4     Q   Sure. |
| 5     Q   In what ways were they different? | 5     A   Different cities are different.  So we |
| 6     A   They would talk about different life | 6 have different cities, different states, different |
| 7 stories.  The instructors were people that had life | 7 areas.  And you can't really tailor it as -- you |
| 8 stories, and they had stories to tell.  And they'd | 8 can't make it a one-blanket policy.  Everything was |
| 9 tell their stories as opposed to somebody else's. | 9 different.  But most importantly, the instructors and |
| 10 They weren't classes that were tailored to be exactly | 10 their stories were different. |
| 11 the same for every unit. | 11     Q   Sure.  And did you see -- did you see any |
| 12        We had places all over the country and | 12 of the presentations, the PowerPoint presentations |
| 13 every class was totally different.  When I say | 13 that were to be provided at the courses? |
| 14 "totally," I mean they talked real estate; but the | 14     A   I believe they were sent to me at certain |
| 15 live experience of people talking about their | 15 points, yes. |
| 16 experiences in the real estate business were | 16     Q   Okay.  And do you recall, sitting here |
| 17 different in virtually every instance. | 17 today, how those PowerPoints differed from state to |
| 18     Q   Sure.  So the instructors' stories were | 18 state? |
| 19 different? | 19     A   No, I don't. |
| 20     A   Absolutely, yes. | 20     MS. JENSEN:  All right.  Let's go ahead |
| 21     Q   And were there any other differences? | 21 and break.  Take a short break.  I don't know -- we |
| 22     A   I think -- I think it was different. | 22 can go off the record. |
| 23 Look -- | 23     THE VIDEOGRAPHER:  Off the record at |
| 24     Q   I'm asking -- | 24 12:06 p.m.  This marks the end of Tape No. 1. |
|                     Page 88 |                     Page 89 |

23  (Pages 86 to 89)

Exhibit 28
-556-

Donald J. Trump, Sr.                                    September 12, 2012

```
 1   about?
 2        A   No.  It was, I believe, a writer doing a
 3   story for Fortune Magazine.
 4        Q   About Trump University?
 5        A   I think so.
 6        Q   How about August 12th?  It's a meeting
 7   with Michael Sexton for five minutes.  Do you recall
 8   what that was about?
 9        A   Are you seriously asking me --
10        Q   Yes, I am.
11        A   This is serious what you're asking me;
12   right?
13        Q   Yes.  Are you going to answer?
14        A   Well, it's the same answer I've given you
15   for the last 20 minutes.
16        Q   Okay.  Hasn't been quite 20 minutes, but
17   that's okay.
18        A   Same harassing question.
19        Q   Okay.  August 31st, 4:00 p.m., Michael
20   Sexton.  Okay.
21            So sitting here looking at this calendar
22   for 2005, do you recall any other meetings that you
23   had about Trump University?
24        A   No.
```
                                                      Page 98

```
 1        Q   Okay.  And just thumbing through it,
 2   other than the initial meeting with David Winterford
 3   and the tape for Barnes & Noble and -- were there any
 4   other meetings that you see in here with other people
 5   about Trump University?
 6        A   Not that I've noticed.
 7        Q   Okay.  Now, 2006, do you see TU71959?
 8        A   Yeah.
 9        Q   Do you see that on January 4th, there
10   is a tape with Larry King about Trump University?
11        A   Yes.
12        Q   Now, other than the meetings here, do you
13   remember any other meetings in 2005?
14        A   No.
15        Q   Do you recall any other meetings other
16   than with Michael Sexton?
17        A   There may have been some, but I don't
18   seem to have it down here.  But there may have been
19   some.
20        Q   But if it isn't here, it likely didn't
21   happen; correct?
22        A   I don't know.  I don't know.
23        Q   Okay.  Now, as to the 16th of March, it
24   says "Trump University promo."  Do you remember that
```
                                                      Page 99

```
 1   meeting?
 2        A   No.
 3        Q   Did you at some point sit for a video?
 4        A   It's possible.
 5        Q   But sitting here now, you don't recall?
 6        A   No.
 7        Q   Now, for the 2007, do you see that
 8   document?  It's TU71971.  Do you see that?
 9        A   What page is it?
10        Q   I just told you it's 71971.
11        A   Yes.
12        Q   And do you recall any other meetings that
13   occurred in this -- during this year than are
14   recorded on your calendar?
15        A   No.
16        Q   Now, on 71972, it's the next page, you'll
17   see there "2:00, Michael Sexton."
18        A   Yes.
19        Q   Is that your handwriting?
20        A   Yes.
21        Q   Do you recall what you met about then,
22   Michael Sexton?
23        A   I think I've already told you about five
24   times.
```
                                                      Page 100

```
 1        Q   So you don't recall anything that you
 2   spoke to him about?
 3        A   Generally, for the good of the school.
 4        Q   Okay.  And do you know whether he took
 5   notes during any of your meetings?
 6        A   I don't know.
 7        Q   Okay.  As to 2008, it starts on 71976.
 8   Do you recall any meetings that are not recorded
 9   here?
10        A   No.
11        Q   Do you recall -- 71978 refers to a "Trump
12   University photo shoot" on the 21st of May.  Do you
13   recall that?
14        A   No.
15        Q   Okay.  For 2009, do you recall any other
16   meetings that occurred that were not recorded here?
17        A   No.
18        Q   And again, for the meetings with -- or
19   the meeting with Michael Sexton, do you recall
20   whether he took notes?
21        A   I don't know.
22        Q   You don't recall how long the meeting
23   was?  Okay.
24            And do you recall what the "Think Like a
```
                                                      Page 101

                                   26  (Pages 98 to 101)

Exhibit 28
-557-

Page 102

```
1    Champion" video was?
2         A   I remember vaguely, but I don't remember.
3         Q   What do you recall about it?
4         A   Just that I did a video.
5         Q   What was the video about?
6         A   "Think Like a Champion."
7         Q   What was it for?
8         A   I think it was for Michael Sexton for the
9    school, the students.
10        Q   Do you recall whether it was for an
11   online program?
12        A   No, I don't.  That I don't remember.
13        Q   2010, do you recall any other meetings
14   than were recorded here in this planner?
15        A   No.
16        Q   And do you recall any of the meetings
17   that are recorded here?
18        A   No.
19        Q   Do you know whether Michael Sexton took
20   any notes?
21        A   I don't know.
22        Q   Do you recall how long the meetings were?
23        A   No.
24        Q   Did you prepare any of the Trump
```

Page 103

```
1    University materials?
2         A   Not per se, no.  I would look at it as it
3    was prepared on occasion, and they would send it to
4    me because they wanted to get an approval.  But a lot
5    of it -- I'm not sure that I've looked at all of it;
6    probably not, but I've looked at some of it.
7         Q   Do you recall anything specifically you
8    looked at?
9         A   Just general material.
10        Q   What types of materials?
11        A   Instructional material and perhaps
12   promotional material.
13        Q   As to the promotional material, what did
14   you look at?
15        A   I don't remember.
16        Q   As to the instructional material, what
17   did you look at?
18        A   I think just the general basics of the
19   courses.  But you'd have -- if you presented it to
20   me, I could tell you whether or not I saw it, I
21   think.
22        Q   And what specifically are you talking
23   about?  Are you talking about for the online courses?
24        A   Maybe both.
```

Page 104

```
1         Q   Okay.  Sitting here, you don't recall any
2    specific materials that you looked at?
3         A   No.  I looked at material, but I don't
4    recall specific.
5         Q   Sure.  Now, do you know what the nature
6    of the materials were?  Were they books?
7         A   They could have been guides.  They could
8    have been -- in some cases I think I looked at books
9    done by certain instructors; and I think there was
10   also promotional material.
11        Q   So you looked at books and promotional
12   materials?
13            MR. SCHNEIDER:  And he said guides.
14   BY MS. JENSEN:
15        Q   What guides?
16        A   I said guides.
17        Q   What kind of guides?
18        A   Just the guides as to different
19   instructors doing different classes.
20        Q   So the list of products, perhaps?
21        A   Perhaps.
22        Q   Did you ever review a document called a
23   "playbook"?
24        A   I don't know.
```

Page 105

```
1         Q   Did you keep copies of any of the
2    documents that you looked at?
3         A   I don't think so, no.
4         Q   I believe earlier you stated that Trump
5    University was Michael Sexton's deal; is that
6    correct?
7         A   No, I don't think that's --
8         Q   Michael Sexton was in charge of Trump
9    University.
10        A   That's a lot different.
11        Q   Okay.  Michael Sexton was in charge of
12   Trump University?
13        A   That's right.
14        Q   Yes.
15            Did Michael Sexton report directly to
16   you?
17        A   Yes.
18        Q   How did he report to you?
19        A   Every once in a while call.  Every once
20   in a while come up with meetings.  He'd come up with
21   professors or educators to introduce me to them.  I'd
22   listen to what they had to say.  In that forum.
23            Not a huge amount of reporting.  He was a
24   capable guy.  But that's what would happen.
```

27 (Pages 102 to 105)

Exhibit 28
-558-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

---

Page 106

1      Q   And Mr. Sexton was in charge of creating
2   the course materials; correct?
3      A   Well, sort of indirectly.  I think the
4   different professors created their own material.  But
5   he oversaw that, yes.
6      Q   And was he -- as you said, maybe
7   different professors came up with different
8   materials.  But ultimately he was in charge of
9   approving that material; correct?
10     A   I would say so, yes.
11     Q   And did Mr. Sexton interview instructors?
12     A   Yes, he did.
13     Q   Did anybody else?
14     A   I don't know.  You'd have to ask him.
15     Q   Okay.  Did he interview the mentors?
16     A   I believe he did, yes.
17     Q   And he had the ultimate approval for the
18  hiring of the instructors; correct?
19     A   Yes, he did.
20     Q   And he had the ultimate approval for
21  hiring the mentors; correct?
22     A   Yes.
23     Q   What is DynaTech?
24     A   I don't know.

Page 107

1      Q   What is Prosper?
2      A   Is this the name of what?
3      Q   I'm asking you if --
4      A   I don't know.  You're asking me -- I
5   don't know what you're asking me, actually.
6      Q   Okay.  I wanted to see if you are
7   familiar with that entity, but if you're not, then we
8   don't need to continue on that line of questioning.
9      A   Okay.
10     Q   What did the students get for the $1,500
11  apprenticeship program?
12     A   You'd have to ask Mr. Sexton.
13     Q   So sitting here, you don't know?
14     A   No.
15     Q   Okay.  What did the students get for the
16  Gold Elite program?
17     A   You'd have to ask Mr. Sexton.
18     Q   So sitting here, you don't know?
19     A   He ran the school.
20     Q   Okay.  Did you personally recruit any
21  instructor?
22         MR. SCHNEIDER:  We've already talked
23  about this.
24  BY MS. JENSEN:

Page 108

1      Q   Okay.  What is your foreclosure system?
2      A   Where?
3          MR. SCHNEIDER:  What are you talking
4   about?
5   BY MS. JENSEN:
6      Q   Do you have a foreclosure system?
7          MR. SCHNEIDER:  What does that mean?  Are
8   you asking if Trump University --
9          THE WITNESS:  Do you know what that
10  means?
11         MR. SCHNEIDER:  I don't even know if you
12  know what that means.  What does that question mean?
13  BY MS. JENSEN:
14     Q   Do you have a foreclosure system?
15         MR. SCHNEIDER:  You're just repeating the
16  question.  What does that mean?
17         MS. JENSEN:  David, I'm asking the
18  question.
19         MR. SCHNEIDER:  But the witness doesn't
20  understand and I don't understand.  And you said, if
21  you don't understand a question, then ask -- wait a
22  minute.  Wait a minute.
23         At the beginning of the deposition, you
24  said, "If you answer a question we're going to

Page 109

1   presume that you understood the answer.  If you don't
2   understand it, then let me know."
3          He just said, "I don't understand it."
4   And three times you've repeated a question, but you
5   haven't explained what you're asking.
6   BY MS. JENSEN:
7      Q   Do you know what a foreclosure system is?
8      A   I don't understand.  Are you talking
9   about within the Trump Organization or within Trump
10  University?
11     Q   Within Trump Organization or Trump
12  University.
13     A   A foreclosure system?
14     Q   Yes.
15     A   You'd have to ask me the question
16  differently.  I don't think you understand, frankly,
17  what you're asking.
18     Q   Okay.  So sitting here, though, you don't
19  know what a foreclosure system means?
20         MR. SCHNEIDER:  He's asking for
21  clarification what you're asking.  Is it a term of
22  art?  Is it something they were teaching in a course?
23  Are you asking --
24         THE WITNESS:  Are you asking me what is a

28  (Pages 106 to 109)

Exhibit 28
-559-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

1  foreclosure, or are you asking me what is a
2  foreclosure system?
3  BY MS. JENSEN:
4      Q   System.
5      A   Are you asking it relative to what they
6  teach in the school?
7      Q   Yes.
8      A   It's a definition and a system of
9  foreclosures.  But you'd have to ask Michael Sexton
10 as to how it was taught.  And, frankly, you'd have to
11 ask all of the different instructors as to also what
12 their take on it is.
13     Q   Okay.  Did Trump University have any
14 criteria for its instructors?
15     A   Yeah, I think we've asked -- I mean, I
16 think I've answered this a number of times.
17     Q   Okay.  And what are the criteria?
18     A   We wanted to make sure they had a good
19 record, track record of having done a good job over a
20 period of time --
21     Q   Okay.
22     A   -- as instructors.
23     Q   As instructors?
24     A   Yeah.  And in some cases, in real-life

Page 110

1  situations.
2      Q   So they primarily had to have prior
3  teaching experience?
4      A   If they had a good reputation as a
5  developer, as an instructor, as a person that was
6  familiar with real estate.  We wanted to make sure we
7  had good people teaching the course.
8          And, obviously, we did, because we had a
9  97 percent approval rating.
10         MS. JENSEN:  I'm going to move to strike
11 the end of the answer after "had good people teaching
12 the course."
13 BY MS. JENSEN:
14     Q   Were there any educational requirements
15 for the instructors?
16     A   You'd have to ask Mr. Sexton.
17     Q   Okay.  But sitting here now, you don't
18 know?
19     A   Of course, they had to have educational
20 requirements, but you'd have to ask him specifically
21 what they were.
22     Q   Okay.  So do you know whether there was
23 any college requirement?
24     A   You'd have to ask Mr. Sexton.  We had

Page 111

1  requirements, but you'd have to ask.
2      Q   Sitting here right now, you don't know
3  what any of the requirements were?
4          MR. SCHNEIDER:  Rachel, here's the
5  problem:  He answers your question and then you ask
6  the same question two or three times.  He tells you
7  the same answer and you rephrase it, but you ask it
8  again.
9          I guarantee, if the court reporter reads
10 it back, you asked it at least four times.  "Do they
11 have educational requirements?"
12         And he said, "I'm sure they have some; go
13 ask Mr. Sexton."
14         "So as you sit here now, do they have
15 requirements?"
16         He said, "You'll have to ask Mr. Sexton."
17         So as you sit here now, do you know if
18 they have any educational" -- it's the three-time
19 question --
20         MS. JENSEN:  I'm entitled --
21         MR. SCHNEIDER:  You're not entitled to
22 harass the witness, and that's what you're doing.
23         MS. JENSEN:  I'm not harassing the
24 witness.

Page 112

1          MR. SCHNEIDER:  You absolutely are.
2          MS. JENSEN:  I'm not.  I'm trying to get
3  an answer as to Mr. Trump's knowledge.
4          MR. SCHNEIDER:  He testified he doesn't
5  know and ask Mr. Sexton.
6          MS. JENSEN:  If the answer is no -- if
7  you're representing that his answer was no, that is
8  fine.  We'll move on.
9          THE WITNESS:  What is the answer "no" --
10 What are you saying "no" for?
11         MR. SCHNEIDER:  It's okay.  I want her to
12 move on and ask you substantive questions.
13         THE WITNESS:  She also asked these
14 questions before, by the way.
15 BY MS. JENSEN:
16     Q   Did Trump University require the
17 instructors to have any specific licenses?
18     A   You'd have to ask Mr. Sexton.
19     Q   Did Trump University call any of their
20 references?
21     A   Yes, they did, but you'd have to ask
22 Mr. Sexton.  He was very high on these people.
23     Q   Okay.  Did Trump University take into
24 consideration any previous employment with a similar

Page 113

29 (Pages 110 to 113)

**www.aptusCR.com**

Exhibit 28
-560-

Donald J. Trump, Sr.                                                    September 12, 2012

| | Page 114 | | Page 115 |
|---|---|---|---|

**Page 114**

1  type of company?
2      A   You'd have to ask Mr. Sexton.
3      Q   Were the instructors or mentors ever
4  required to take any tests to demonstrate their
5  proficiency in teaching the courses?
6      A   Again, you'd have to ask Mr. Sexton.
7      Q   Earlier I believe that you testified that
8  you could not recall the specifics of the courses
9  that you attended; is that correct?
10     A   Of the courses?  No.  It was real estate
11  primarily.
12          When you say "specifics," no, not
13  specific.  I was there for a very short period of
14  time, in the back of the room.  I just wanted to get
15  a feel for it.
16     Q   And earlier I believe that you testified
17  that the courses were different from location to
18  location; is that correct?
19     A   The instructors were different, and the
20  courses were different based on location -- yeah,
21  because places are different.
22     Q   And those places are different because
23  they have different requirements?
24     A   Different instructors.

**Page 115**

1      Q   Different instructors.  Okay.
2          And do you know, sitting here, that the
3  materials, the PowerPoint presentations actually were
4  different?
5      A   You'd have to speak to Mr. Sexton.  But
6  the PowerPoint is one thing; but the instructors are
7  an entirely different thing and they would teach the
8  courses different ways.
9      Q   Okay.  But sitting here, you don't know
10  how they taught them in different ways?
11     A   Different people and they had different
12  experiences.  And a big part of what I wanted taught
13  was life -- real-life situations.  I thought that was
14  very important for people to hear.
15          PowerPoint was almost the least of it.  I
16  really thought that the real-life situations were
17  very important for people to hear.
18     Q   Do you have 10 steps of closing any real
19  estate deal?
20     A   Yes.  We wrote some out a long time ago.
21  I did something on that, yeah.
22     Q   What were those 10 steps --
23     A   I don't know now.  It's been a long time
24  ago.

**Page 116**

1      Q   Do you know if you wrote them down
2  somewhere?
3      A   I think I presented them to Mr. Sexton.
4      Q   Do you recall when?
5      A   Just conceptually I presented them.
6      Q   Do you know when you presented them to
7  him?
8      A   No.  Early on.
9      Q   Okay.
10     A   Years ago.
11     Q   Okay.  Do you recall what year?
12     A   At the beginning.
13     Q   2005?
14     A   I don't know.  At the beginning.
15     Q   Okay.  And do you know whether he took
16  any notes at that meeting?
17     A   Perhaps he did.
18     Q   But you don't know whether he did?
19     A   You'd have to ask him.
20          MS. JENSEN:  I'm going to hand to the
21  court reporter a document bearing the Bates stamp
22  62079 through TU62082, which I will ask to be marked
23  as Plaintiffs' Exhibit No. 41.
24          (Plaintiffs' Exhibit 41 was marked

**Page 117**

1          for identification.]
2  BY MS. JENSEN:
3      Q   Mr. Trump, have you seen this document
4  before?
5      A   It's not a document, it's a ticket.  You
6  have different things.  You have a ticket, and then
7  you have a document after the ticket; right?
8      Q   Okay.  Have you seen any of these
9  documents before?
10     A   This was written up by the people at the
11  school, and I'm sure that I must have seen it at some
12  point.  I don't remember it.  It's many years ago.
13     Q   Okay.  At the bottom of 62081, do you see
14  the bottom above the "P.S.," it says "Donald Trump"
15  and above that it appears to be a signature.
16     A   Yes.
17     Q   Is that your signature?
18     A   Yes.
19     Q   And did you approve this advertisement?
20     A   I guess conceptually.  This was done by
21  the staff.  This was written and done by the staff.
22  So I would imagine in some form I approved it.
23     Q   How were you -- how did you come about --
24  strike that.

30 (Pages 114 to 117)

Exhibit 28
-561-

Donald J. Trump, Sr.                                    September 12, 2012

| | |
|---|---|
| 1      Who presented you with documents such as<br>2 this?<br>3      A   Mostly Mr. Sexton, I would imagine.<br>4      Q   And do you believe it would have been<br>5 during one of the meetings that you had in your day<br>6 planner?<br>7      A   Possibly.  Possibly.<br>8      Q   And do you see in this letter, when it<br>9 says -- where it says "When I send out invitations,<br>10 people attend"?<br>11      A   Where is that?<br>12      Q   I'm -- it's actually -- I'll read here:<br>13 "Dear Friends, I'm personally inviting you and a<br>14 guest to a powerful wealth-building event that can<br>15 literally change your life and get you out of the rat<br>16 race forever."<br>17      Do you see that?<br>18      A   Yes.<br>19      Q   "When I speak, people attend.  And when I<br>20 send out invitations, people attend because they know<br>21 that my invitation means one thing:  There's money to<br>22 be made."<br>23      Do you see that?<br>24      A   Yes.<br><div align="right">Page 118</div> | 1      Q   And what was meant by people attend<br>2 because your "invitation means one thing:  There's<br>3 money to be made"?<br>4      A   Well, I think people respect what I say,<br>5 or if I'm giving instructions to people, what those<br>6 people would say.<br>7      Q   And specifically, does that mean that<br>8 there's money to be made by them?<br>9      A   Yeah, I think if they follow what we say,<br>10 there's certainly -- it's no different than going to<br>11 Harvard.  They say go to Harvard, great school, blah,<br>12 blah, blah, and I think this is -- except I think we<br>13 have a higher approval rating than Harvard if you<br>14 want to know the truth, based on the 97 percent<br>15 number.  So I think that's a fine statement.<br>16      Q   And at Harvard, do students get a degree?<br>17      A   Some do and some don't.<br>18      Q   And at Trump University, do students get<br>19 a degree?<br>20      A   You'd have to speak specifically to<br>21 Mr. Sexton about that.<br>22      Q   Do you know, sitting here, whether or not<br>23 students got a degree?<br>24      A   They take the courses.<br><div align="right">Page 119</div> |
| 1      Q   And did they get a degree?<br>2      A   I don't know.  You'd have to speak to<br>3 Mr. Sexton.  Depends on which courses we're talking<br>4 about.<br>5      Q   Could you tell me all of the types of<br>6 documents that you reviewed for Trump University?<br>7      A   No.<br>8      Q   Did you review the advertisements?<br>9      A   If you present them to me, I could tell<br>10 you whether or not I've seen it or remember seeing<br>11 it.  But there are many documents.  So you'd have to<br>12 present me with documents and I'd tell you whether or<br>13 not I saw it or don't remember it.<br>14      Q   Okay.  So sitting here right now, you<br>15 don't recall whether you reviewed advertisements,<br>16 generally?<br>17      A   Sometimes I would, yeah.<br>18      Q   How about testimonials?<br>19      A   Sometimes I would.<br>20      Q   How about the operating documents of<br>21 Trump University?<br>22      MR. SCHNEIDER:  Objection; vague.<br>23      THE WITNESS:  They may have been sent to<br>24 me.  Again, it depends.  If you showed me the<br><div align="right">Page 120</div> | 1 document, I can tell you whether or not I remember<br>2 it.<br>3      This was being run by Mr. Sexton.  It<br>4 wasn't being run by me.  It was being run by<br>5 Mr. Sexton.  He would review things with me on<br>6 occasion.  But this school was being run by<br>7 Mr. Sexton.<br>8 BY MS. JENSEN:<br>9      Q   Do you recall seeing an operating<br>10 agreement?<br>11      A   I don't even know what you mean by an<br>12 operating agreement.  What do you mean by an<br>13 operating agreement?  Do you want to show it to me<br>14 and I can tell you if I recall?<br>15      Q   I might do that later, then.<br>16      A   I hope you do.<br>17      Q   How about a budget?<br>18      A   I think he'd send me budgets.<br>19      Q   Any other financial documents?<br>20      A   Typical financial documents.  That would<br>21 be typical to any other business I would look at<br>22 briefly.<br>23      Q   When you say "typical," what do you mean?<br>24      A   Financial documents.<br><div align="right">Page 121</div> |

<div align="right">31 (Pages 118 to 121)</div>

**www.aptusCR.com**

Exhibit 28<br>-562-

**Donald J. Trump, Sr.**                                                    **September 12, 2012**

| | |
|---|---|
| 1     Q   Such as? | 1     A   Training for whom? |
| 2     A   How is it doing? | 2     Q   **Training for -- any training materials?** |
| 3     Q   **So P&L statements?** | 3     A   For whom? |
| 4     A   I think so.  But mostly that would be | 4     Q   **For employees.** |
| 5   sent to my accounting departments. | 5     A   I might have seen them, but I don't |
| 6     Q   **And who at your accounting department?** | 6   remember.  But if you show them to me, I'll let you |
| 7     A   Maybe Allen Weisselberg. | 7   know. |
| 8     Q   **Any other financial documents that you** | 8     Q   **Okay.  How about for any of the** |
| 9   **can remember, sitting here?** | 9   **contractors?** |
| 10     A   Not that I know of. | 10     A   If you show them to me, I'll let you |
| 11     Q   **How about any contracts?** | 11   know. |
| 12     A   I don't know.  Perhaps.  You show them to | 12     Q   **Okay.  I'm now going to hand to you a** |
| 13   me, I'll let you know. | 13   **document that bears the Bates range TU62027 through** |
| 14     Q   **Sitting here right now, can you recall** | 14   **056.  And it is marked as Plaintiffs' Exhibit No. 3;** |
| 15   **looking at any contracts?** | 15   **and, therefore, I don't think we need to mark it** |
| 16     A   No. | 16   **again.** |
| 17     Q   **Any vendor agreements?** | 17     **Have you seen this document before,** |
| 18     A   I told you this has been run by | 18   **Mr. Trump?** |
| 19   Mr. Sexton.  So these questions, I think, are much | 19     A   Yes. |
| 20   more appropriate for him than to me. | 20     Q   **What is this document?** |
| 21     Q   **Sitting here right now, you can't recall** | 21     A   I think it's basically an operating |
| 22   **any third-party vendor agreements?** | 22   agreement with respect to the company itself. |
| 23     A   No. | 23     Q   **And when you say "the company itself" --** |
| 24     Q   **How about training materials?** | 24     A   The people involved with the ownership of |
| Page 122 | Page 123 |

| | |
|---|---|
| 1   the company. | 1     A   Yes. |
| 2     Q   **When you say "the company," you mean** | 2     Q   **Do you see 4.1.6?** |
| 3   **Trump University?** | 3     A   Yes. |
| 4     A   Yes.  LLC. | 4     Q   **"Sexton shall prepare and deliver to the** |
| 5     Q   **So did you review that agreement at the** | 5   **manager in the time and manner set forth in the** |
| 6   **time it was signed?** | 6   **Sexton Employment Agreement, the operating budget and** |
| 7     A   Probably.  I mean, I have lawyers that do | 7   **business plan."** |
| 8   this.  I don't think I did it, but I have lawyers | 8     **Do you see that?** |
| 9   that do it, yes. | 9     A   Yes. |
| 10     Q   **Okay.  Do you see on Page TU62054 --** | 10     Q   **And when it says "to the manager," is** |
| 11     A   Uh-huh. | 11   **that referring to you?** |
| 12     Q   **Do you see near the top of the page, it** | 12     A   I don't know who it refers to.  You'd |
| 13   **says "DJT University Managing Member LLC"?  It says** | 13   have to ask my lawyers.  I don't know.  It's a legal |
| 14   **"By Donald J. Trump, President."** | 14   definition, so I just don't know. |
| 15     A   Yes. | 15     Q   **Did Sexton prepare and deliver to you an** |
| 16     Q   **Is that your signature?** | 16   **operating budget?** |
| 17     A   Yes. | 17     A   I don't know.  Perhaps, but I just don't |
| 18     Q   **And below that, do you see "DJT** | 18   know. |
| 19   **University Member LLC"?  It says "By Donald J. Trump,** | 19     Q   **Do you recall whether he prepared and** |
| 20   **President."** | 20   **delivered to you the business plan?** |
| 21     A   Yes. | 21     A   I don't know.  He might have.  I just |
| 22     Q   **Is that your signature?** | 22   don't remember it. |
| 23     A   Yes. | 23     Q   **Do you re- -- okay.** |
| 24     Q   **Continuing to Page 62037.** | 24     **Do you recall a Trump University blog?** |
| Page 124 | Page 125 |

32 (Pages 122 to 125)

Exhibit 28
-563-

Donald J. Trump, Sr.                                    September 12, 2012

```
 1        A   A blog?  What blog?
 2        Q   A blog.
 3        A   I don't recall specifically.  If you show
 4   it to me, I'd let you know.
 5        Q   Do you have a staff writer named Meredith
 6   McGiver?
 7        A   Yes.
 8        Q   Did she ordinarily draft blog entries for
 9   you?
10        A   Yes.
11        Q   Do you personally recall writing any blog
12   entries?
13        A   Yes.  I do it with Meredith or sometimes
14   she'd do it for me.  But yes, that was done mostly
15   with Meredith McGiver.
16        Q   And what is Meredith McGiver's
17   background?
18        A   She's mostly a writer -- I don't know her
19   exact background.  I'd have to look.  She's been with
20   me for a long time.  She writes well.
21        Q   Does she have a real estate background?
22        A   I don't know.  That I don't know.
23        Q   Did you ever attend a retreat for Trump
24   University?
```
                                              Page 126

```
 1        A   You'd have to give me when.
 2        Q   Do you recall going to Atlanta for a
 3   retreat with Trump University?
 4        A   You'd have to show me the dates.  I just
 5   don't know.  I go to many places for many different
 6   companies, and I don't know.  It's possible that I
 7   did, but I don't know.
 8        Q   Do you recall going to Las Vegas for a
 9   Trump University retreat?
10        A   I think so, yes.
11        Q   Do you recall the dates?
12        A   No.
13        Q   Would that be in your planner?
14        A   I don't know.  You'd have to check.
15        Q   But those types of engagements would
16   ordinarily be marked in your calendar; correct?
17        A   Perhaps.
18        Q   Is there a target market for Trump
19   University?
20        A   No, I don't think so.  I think mostly it
21   would be people that want to learn about whatever it
22   is they're looking to learn.  Probably the same
23   market that you have for many other companies that do
24   this.
```
                                              Page 127

```
 1        Q   When you say "companies that do this," do
 2   you mean other real estate --
 3        A   Teach.
 4        Q   -- seminars?
 5        A   That teach.
 6        Q   Companies that teach real estate?
 7        A   Yeah.
 8        Q   Do you know how many of the Trump
 9   University students were senior citizens?
10        A   No, I don't.
11        Q   Have you ever used a Bandit Sign in your
12   real estate deals?
13        A   Who?
14        Q   Bandit Signs?
15        A   I don't know what that is.
16        Q   So you've never used a Bandit Sign, to
17   your knowledge?
18        A   I don't know what you're even talking
19   about.
20        Q   Okay.  Do you recall sitting down for a
21   video made for Trump University?
22        A   No, but I'm sure I have.
23        Q   Okay.  So you don't recall, sitting here,
24   whether -- what year it was made?
```
                                              Page 128

```
 1        A   No.
 2        Q   Do you recall sitting down for multiple
 3   videos?
 4        A   I don't know.  I mean I did some videos
 5   for Trump University, but it was years ago.
 6        Q   So you don't remember whether it was one
 7   or more than one?
 8        A   No.
 9        Q   Earlier you testified that you had
10   attended for a few minutes a couple of live events.
11   Did you ever personally meet a Trump University
12   student?
13        A   Yes.
14        Q   And who was that?
15        A   I don't know.  They saw me in the room, a
16   couple of them.  One actually came back and shook my
17   hand and then went back immediately to the seat.  But
18   I don't really know the names.
19        Q   And so you didn't discuss anything?
20        A   I didn't hang around long.  I just wanted
21   to see how it was going conceptually.
22        Q   Do you know whether any of the students
23   made a million dollars or more using Trump
24   University's techniques?
```
                                              Page 129

                                    33 (Pages 126 to 129)

Exhibit 28
-564-

Donald J. Trump, Sr.                                          September 12, 2012

Page 130

```
 1        A   You'd have to ask Mr. Sexton.
 2            But I did.  I made a million dollars or
 3   more, and using my own techniques, unlike a lot of
 4   instructors that teach real estate and never made 10
 5   cents.
 6        MS. ZELDES:  I thought we weren't allowed
 7   to ask about that.
 8        THE WITNESS:  What?
 9        MR. SCHNEIDER:  She's just being a smart
10   aleck.
11        THE WITNESS:  That's okay.
12        MS. ZELDES:  So is he.
13   BY MS. JENSEN:
14        Q   Which of your real estate courses were
15   taught in the three-day seminar?
16        A   You'd have to ask Mr. Sexton.
17        Q   And which of your real estate secrets
18   were taught as part of the mentorship?
19        A   You'd have to ask Mr. Sexton.  He has all
20   that information.
21        THE WITNESS:  Want to take a break?
22        MS. JENSEN:  Let's go ahead and get
23   through one more thing and then we can take a break.
24        MR. SCHNEIDER:  We're ready to keep
```

Page 131

```
 1   going.  He thought you needed a break.  We can drive
 2   on unless you need a break.
 3        THE WITNESS:  No, that's fine.
 4        (Discussion off the stenographic
 5        record.)
 6        MS. JENSEN:  Let the record reflect that
 7   we're showing a YouTube video entitled "Trump
 8   University and Donald Trump."
 9            Can you see the screen?
10        THE WITNESS:  Uh-huh.
11        (Whereupon, YouTube video is
12        played.)
13        MR. SCHNEIDER:  What's the site on that?
14        MS. ECK:  It is www.YouTube -- hold on.
15        HTTP://www.YouTube.com/watch?feature=
16   player_detailpage&V=465TCEDzzoHO.  And I believe it
17   is similar or identical to other videos that were
18   produced and Bates-stamped, and we just weren't able
19   to access those here.
20   BY MS. JENSEN:
21        Q   Mr. Trump, do you recognize this video?
22        A   Yes.
23        Q   And what video is this?
24        A   Well, this was made for Trump University,
```

Page 132

```
 1   yes.
 2        Q   Do you recall when it was made for Trump
 3   University?
 4        A   No.
 5        Q   Do you recall the purpose?
 6        A   I was asked to do a video for Trump
 7   University.
 8        Q   Was there any specific purpose?
 9        A   Just a general -- I mean, if you look at
10   other colleges or if you look at other schools or if
11   you look at other training centers, they all do
12   videos and they say positive things, yeah.
13        Q   And was that video scripted?
14        A   No, I don't believe so.
15        Q   So that was in your words?
16        A   I think so.  It was -- I think it was in
17   my words, yes.  I don't believe it was scripted.
18        Q   Do you have involvement in advertising
19   and marketing of Trump University?
20        A   Not too much.
21        Q   Do you recall whose idea it was to use
22   your signature as part of the advertising?
23        A   I use it all the time.  It's part of
24   advertising.  I don't think it's anything unique.  So
```

Page 133

```
 1   does a lot of other people in business.  You use your
 2   signature, yeah.  It's used consistently by many,
 3   many people in many, many big corporations in
 4   advertising.
 5        MS. JENSEN:  I'm going to hand to the
 6   court reporter a document bearing the Bates stamp
 7   TU102422 to 426, which I will ask to be marked as
 8   Plaintiffs' Exhibit No. 42.
 9        (Plaintiffs' Exhibit 42 was marked
10        for identification.)
11   BY MS. JENSEN:
12        Q   Do you recognize this document?
13        A   I've seen it.  Vaguely, yes.
14        Q   And what is this document?
15        A   This is a document talking about
16   different locations, I believe, for the seminars.
17        Q   Okay.  And it's kind of a bad copy.  But
18   do you see the second page, 102423?
19        A   Yes.
20        Q   And is that your picture there on the
21   left?
22        A   Yes.
23        Q   And is that your signature below the
24   picture?
```

www.aptusCR.com

Exhibit 28
-565-

Donald J. Trump, Sr.                                              September 12, 2012

```
 1        A    Yes.
 2        Q    Does it say "I can turn anyone into a
 3   successful real estate investor"?
 4        A    Yes.
 5        Q    And below your signature, does it say
 6   "Donald J. Trump, Chairman, Trump University"?
 7        A    Yes.
 8        Q    And do you see the Page TU102425?
 9        A    Yes.
10        Q    And do you see there it states, "Learn to
11   invest like a billionaire"?
12        A    Yes.
13        Q    Pursuant to the Court's suggestion in
14   this case, plaintiffs Googled your net worth and
15   found that there's a controversy as to whether you're
16   a billionaire.  Would you agree?
17        A    No --
18        Q    Did you file a lawsuit against the
19   journalist who stated that you were worth in the
20   hundreds of millions and not the billions?
21        A    Yeah, I have -- yes, I did, actually.
22        Q    And what was the outcome of that suit?
23        A    Well, the suit was dismissed on the basis
24   that there were no -- what is the word? --
```
                                                        Page 134

```
 1   retribution or something -- animosity.
 2        It --
 3        Q    Actual malice?
 4        A    Malice, I guess.  Lack of.
 5        Q    Actual malice?
 6        A    Yeah, malice.  Not dismissed for any
 7   other reason.  It was dismissed for, essentially,
 8   malice.  And that was a long time ago.  It's been
 9   proven -- it's been proven by many other people.  But
10   that's okay.
11        Q    Did you approve ads that said "Learn to
12   invest like a billionaire"?
13        A    Did I what?
14        Q    Did you improve --
15        A    Yes.
16        Q    Let me ask it again, because I said
17   "improve" and not "approve."  But the answer is the
18   same?
19        A    Yeah.  Well, I am a billionaire, many
20   times over, by the way.
21        Q    And did you approve ads?
22        A    And the writer knew that, and the writer
23   knew that.  But again, that was a long time ago.  But
24   the writer knew that.  So, unfortunately, we didn't
```
                                                        Page 135

```
 1   get our day in court.
 2        Excuse me.  And if I wasn't, I wouldn't
 3   have sued him.
 4        Q    And did you approve ads that said "Learn
 5   from the master"?
 6        A    Yeah, probably.  It's more of an
 7   advertising thing.  But I would assume I did.
 8        MS. JENSEN:  I'm going to now hand to the
 9   court reporter a document bearing the Bates stamp
10   TU69463, which I will ask to be marked as Plaintiffs'
11   Exhibit No. 43.
12        (Plaintiffs' Exhibit 43 was marked
13        for identification.)
14        THE WITNESS:  Okay.
15   BY MS. JENSEN:
16        Q    Have you seen this document before?
17        A    I'm not sure if I remember it, but --
18        Q    Do you see the advertisement says "Donald
19   Trump is sending you one of his handpicked associates
20   to your area to teach you"?
21        A    Yes.
22        Q    And did you approve advertising that had
23   that language?
24        A    Possibly.  Possibly.
```
                                                        Page 136

```
 1        Q    Okay.  Sitting here now, you don't
 2   recall?
 3        A    No, I don't.
 4        MS. JENSEN:  Now, I am handing to the
 5   court reporter a document bearing the Bates stamp
 6   TU69434, which I will ask to be marked as Plaintiffs'
 7   Exhibit No. 44.
 8        (Plaintiffs' Exhibit 44 was marked
 9        for identification.)
10   BY MS. JENSEN:
11        Q    Mr. Trump, do you recognize this
12   document?
13        A    No.
14        Q    Do you see the -- do you see inside the
15   image it says, "Are you my next apprentice?  Learn
16   from the master"?
17        A    Right.
18        Q    Did you approve advertising that said
19   "Are you my next apprentice"?
20        A    I don't remember it, but I see nothing
21   wrong with it.
22        MS. JENSEN:  I'm going to hand to the
23   court reporter a document that bears the Bates stamp
24   TU62063, which I will ask to be marked as Plaintiffs'
```
                                                        Page 137

                                            35 (Pages 134 to 137)

Exhibit 28
-566-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

| | |
|---|---|
| 1    Exhibit No. 45. The Bates is very small on that. | 1    A   I don't remember it, but probably saw it |
| 2    (Plaintiffs' Exhibit 45 was marked | 2    someplace. |
| 3    for identification.) | 3    Q   Do you see it says the "Trump Blog"? |
| 4    BY MS. JENSEN: | 4    A   Trump brand? |
| 5    Q   Mr. Trump, do you recognize this | 5    Q   It says "Trump Blog." |
| 6    document? | 6    A   Where is that? |
| 7    A   No. I may have seen it, but I don't | 7    I see the Trump brand, here. The Trump |
| 8    recognize it. | 8    brand. |
| 9    Q   Do you know what this document is? | 9    Q   The Trump Blog? |
| 10    A   No. I mean, I can read it. I see what | 10    A   Oh, up top. Yes. |
| 11    it says, but I don't recognize this document. But I | 11    Q   Okay. Do you recognize what the Trump |
| 12    may have seen it. | 12    Blog is? |
| 13    Q   Okay. Now, when you -- if you reviewed | 13    A   Yes, I do. |
| 14    an advertisement, who would have provided it to you? | 14    Q   Okay. What is it? |
| 15    A   Mr. Sexton. | 15    A   It's my site. It's a site. |
| 16    MS. JENSEN: Now, I am handing the court | 16    Q   And what is the site? |
| 17    reporter a document bearing the Bates stamp TU64496 | 17    A   On the Internet. |
| 18    through 97, which I will ask to be marked as | 18    Q   And what is it -- specifically, what's |
| 19    Plaintiffs' Exhibit No. 46. | 19    the site? |
| 20    (Plaintiffs' Exhibit 46 was marked | 20    A   I don't know. You'd have to ask |
| 21    for identification.) | 21    Mr. Sexton. He set this up for the university. |
| 22    THE WITNESS: Okay. | 22    Q   But sitting here, you don't recognize it? |
| 23    BY MS. JENSEN: | 23    A   No. |
| 24    Q   Do you recognize this document? | 24    Q   Okay. |
| Page 138 | Page 139 |
| 1    MS. JENSEN: I'm now handing to the court | 1    Q   Do you know who? |
| 2    reporter a document that bears the Bates stamp | 2    A   Probably Mr. Sexton and his group. |
| 3    TU60667, which I'll ask to be marked as Plaintiffs' | 3    Q   Okay. Would you have approved it? |
| 4    Exhibit No. 47. | 4    A   I think it would be fine. |
| 5    (Plaintiffs' Exhibit 47 was marked | 5    Q   Did you ever answer any live questions |
| 6    for identification.) | 6    and answers from Trump University? |
| 7    BY MS. JENSEN: | 7    A   I don't know. |
| 8    Q   Do you recognize this document? | 8    MS. JENSEN: Now, I am handing the court |
| 9    A   I've seen it, yes. | 9    reporter a document bearing the Bates stamp TU25206 |
| 10    Q   What is this document? | 10    to TU25209, which I will ask be marked as Plaintiffs' |
| 11    A   It's a personal message from Donald | 11    Exhibit No. 48. |
| 12    Trump. | 12    (Plaintiffs' Exhibit 48 was marked |
| 13    Q   And personal message to whom? | 13    for identification.) |
| 14    (Simultaneous cross-talk.) | 14    BY MS. JENSEN: |
| 15    A   The students or potential students to | 15    Q   Mr. Trump, do you recognize this |
| 16    the -- yes, to the students. | 16    document? |
| 17    Q   To the students. Is it also to | 17    A   I may have seen it. I don't recognize |
| 18    prospective students? | 18    it, but I may have seen it. |
| 19    A   Well, let's see. I have to look at it. | 19    Q   Did you believe that students could go to |
| 20    It looks like it's to the students. | 20    the 90-minute class and learn all that they needed to |
| 21    Q   Okay. And did you draft this personal | 21    learn to get rich? |
| 22    message? | 22    Q   Where is that now? |
| 23    A   No, it was done by the executives in the | 23    Q   Now, in the middle of the page. It says, |
| 24    company. | 24    "Come to my free class. In just 90 minutes" -- |
| Page 140 | Page 141 |

36 (Pages 138 to 141)

Exhibit 28
-567-

Donald J. Trump, Sr.                                          September 12, 2012

| | | |
|---|---|---|
| 1 | A | Which page?  Second page? |
| 2 | **Q** | **Yes, the second page, I'm sorry.** |
| 3 | A | 07. |
| 4 | **Q** | **07, my fault.** |
| 5 | A | It doesn't say what you said, though. |
| 6 | **Q** | **Okay.** |
| 7 | A | I mean, I think the statement is okay, |

but it doesn't say what you said.

8    **Q    Do you believe that students could come**
10   **to the 90-minute free class and learn the techniques**
11   **and then copy exactly what you did and get rich?**
12        A    Sure.  In certain instances.  I did it.
13   I used my techniques and I've made a tremendous
14   amount of money.
15        **Q    And what are your techniques?**
16        A    Real estate techniques.  I discuss them.
17   Things that you read about in the course are my
18   techniques.  I -- you know, you could also say I'm
19   a student of myself in a sense.
20             But I've used my techniques, unlike other
21   people that talk about real estate and how they're
22   going to teach real estate, they've never done a deal
23   in their lives.  Those are the people you should be
24   suing, not Trump.

Page 142

1        I've used my techniques and they've been
2    very successful for me.  So if I can do it, so can
3    other people.
4        **Q    Could you tell me which tech books were**
5    **taught in the 90-minute course?**
6        A    Just my general feelings on locations, on
7    purchasing, on renovations, on rehabilitations, on
8    lots of different things.
9             A lot of things having to do with real
10   estate.
11       **Q    And when you say your "general feelings,"**
12   **what are your general feelings?**
13       A    Markets.  I've convinced a lot of people
14   not to buy real estate over the years when they would
15   have lost their shirt if they did.
16            In speeches I've told people "Don't buy
17   real estate."  I've told people "Don't use exploding
18   mortgages," "Don't use different forms of financing."
19   And a lot of people listened to me, and they didn't
20   do it.
21            And I've had, over the years, many, many
22   letters written to me thanking me for saving their
23   lives.
24       **Q    Were all those techniques taught in the**

Page 143

1    courses?
2        A    Some of them were.
3        **Q    Which ones?**
4        A    There was a period of time when I thought
5    buying real estate as not a good thing, early on, and
6    I was right about that.
7             And I know -- I let the professors know
8    that, and I think some of the professors actually
9    said that I don't feel that buying real estate right
10   now is a good thing.
11            And I was right.  My timing happened to
12   be right.
13       **Q    And what time frame was that?**
14       A    It was early on.
15       **Q    Around what year?**
16       A    I don't know.  Early on, during the --
17   during the time prior to the trouble in real estate.
18       **Q    And --**
19       A    And if people listened to me, they would
20   have saved a lot of their money.
21       **Q    And so the courses taught the students --**
22       A    Some of the courses did.  As I said, the
23   courses weren't all the same.  I wanted to have
24   professors make their points also.  I didn't want to

Page 144

1    make the single point.  I wanted to have professors
2    make their point also.
3             But I told -- over the years i've told
4    many people to buy and not to buy.  And my timing
5    turned out to be very propitious.
6        **Q    Okay.  So the not-to-buy version, was**
7    **that during the bubble, 2005/2006?**
8        A    Before the bubble, yeah.  Before the
9    explosion.
10       **Q    Before the bubble burst; right?**
11       A    Before the bubble burst.
12       **Q    To 2005 and 2006?**
13       A    Before the bubble burst.  And I felt very
14   negative about buying real estate, because I've seen
15   it before.  And I've made speeches -- unrelated to
16   Trump University.  But I've made speeches where I
17   told people "Do not buy.  This is not the right time
18   to buy."
19            I also talked about exploding mortgages,
20   mortgages that come due at a later date.  And I've
21   had many, many letters of people thanking me for
22   literally saving them.
23       **Q    And so the issue of exploding mortgage,**
24   **was that taught in the courses?**

Page 145

37 (Pages 142 to 145)

**www.aptusCR.com**

Exhibit 28
-568-

**Donald J. Trump, Sr.**                                    **September 12, 2012**

| | |
|---|---|
| 1      Q   Do you recognize this document, | 1      A   I don't know.  I'm not exactly sure.  A |
| 2  Mr. Trump? | 2  few months ago probably.  Four or five months.  I am |
| 3      A   No, I don't believe I've seen it, but I | 3  not exactly sure.  I haven't spoken to him in a long |
| 4  may have. | 4  time because we've become a little bit inactive with |
| 5      Q   Do you believe that you wrote this? | 5  respect to this, unfortunately. |
| 6      A   Maybe I had something to do with it.  I'm | 6      Q   And so you said "a few months ago |
| 7  not sure that I wrote it per se, but I might have had | 7  probably"? |
| 8  something to do with it.  I just don't recognize it | 8      A   I don't remember.  I would say -- no, |
| 9  at this moment. | 9  longer than that.  I would say for the most part he's |
| 10      Q   Do you see in the third paragraph, it | 10  been dealing with my people and my lawyers. |
| 11  says:  "The Trump name carries with it a price tag. | 11      I don't know.  Maybe six months ago. |
| 12  People pay a lot more to live or rent commercial | 12      Q   Okay.  Do you know what you spoke about |
| 13  space in my buildings because of the association with | 13  six months ago? |
| 14  me and my ideals." | 14      A   No, nothing much.  We have a very nice |
| 15      A   Yes. | 15  relationship. |
| 16      Q   Do you believe that that's true? | 16      Q   So what was -- do you remember whether he |
| 17      A   I do. | 17  called you? |
| 18      Q   What is your affiliation with Trump | 18      A   No, I don't remember.  I just vaguely |
| 19  Institute? | 19  remember having spoken to him quite some time ago. |
| 20      A   The Trump Institute?  I don't know what | 20      Q   It was about Trump University? |
| 21  the exact relationship is.  Again, you'd have to ask | 21      A   I don't know.  I don't really even know |
| 22  Mr. Sexton about that. | 22  that.  For the most part he's dealing with my |
| 23      Q   When was the last time you spoke with | 23  lawyers. |
| 24  Mr. Sexton? | 24      Q   Okay.  And did Mr. Sexton leave |
|                                   Page 158 |                                   Page 159 |
| 1  voluntarily? | 1      Q   Do you recall? |
| 2      A   I would say we became more and more | 2      A   Negative stuff -- I don't remember having |
| 3  inactive, because of schedules -- my schedule in | 3  made a call. |
| 4  particular, I guess. | 4      Q   Do you recall having that conversation? |
| 5      And we'll possibly start this up again in | 5      A   No, I don't.  I told you I don't. |
| 6  a heavy way.  But yes, I would say the word would | 6      Q   And do you recall what it was referring |
| 7  be -- he did leave voluntarily, yes. | 7  to when it says "negative stuff"? |
| 8      Q   Do you know whether one of the | 8      A   No.  That's what I'm trying to figure |
| 9  prerequisites for being an instructor or mentor was | 9  out.  I don't know what the word "stuff" means.  No, |
| 10  that they were millionaires? | 10  I don't really know what it means. |
| 11      A   No, I don't know that.  You'd have to ask | 11      Q   Do you know who he's referring to when he |
| 12  Mr. Sexton. | 12  says "Have the reputation management people made any |
| 13      Q   Now, handing to the court reporter a | 13  progress"? |
| 14  document bearing the Bates stamp TU102907, which is | 14      A   Have the reputation management people -- |
| 15  marked as Plaintiffs' Exhibit No. 19 and therefore | 15      I really don't know what he means. |
| 16  does not need to be re-marked. | 16      Q   So you don't know who the -- |
| 17      Do you recognize this document? | 17      A   No.  I know the reputation of this was |
| 18      A   No.  Let's see.  For Michael Bloom. | 18  very important and continues to be very important. |
| 19      No, I don't know what it represents. | 19      Q   Earlier I believe that we spoke about |
| 20      Q   Did you call Mr. Sexton on July 12th, | 20  J.J. Childers. |
| 21  2010, to talk to them about how much negative stuff | 21      A   Yes. |
| 22  there is out there? | 22      Q   Who is Mr. Childers? |
| 23      A   Negative -- press?  I don't know what | 23      A   I don't know.  He was one of the |
| 24  they're talking about. | 24  instructors, I believe. |
|                                   Page 160 |                                   Page 161 |

**www.aptusCR.com**

Exhibit 28
-569-

Donald J. Trump, Sr.                                    September 12, 2012

| | |
|---|---|
| 1     Q   And how do you know him? | 1     Q   And when you did meet with him, do you |
| 2     A   I don't know him.  But I believe he was a | 2   recall what you discussed? |
| 3   highly respected gentleman who worked for the school. | 3     MR. SCHNEIDER:  With Don Sexton? |
| 4     Q   And so you've never met him? | 4     MS. JENSEN:  Yes. |
| 5     A   I don't know.  I don't remember.  I may | 5     MR. SCHNEIDER:  He went through all this |
| 6   have, but I don't remember. | 6   this morning.  You went through the calendar, every |
| 7     Q   And Don Sexton?  Who is he? | 7   single day. |
| 8     A   I believe I did meet Mr. Sexton.  He's an | 8     MS. ZELDES:  Michael, that was Michael |
| 9   instructor.  Highly respected. | 9   Sexton. |
| 10    Q   When you say "instructor," do you mean he | 10    MR. SCHNEIDER:  I apologize.  Some of |
| 11   wrote a book? | 11   those were Don Sexton, actually, but -- do you |
| 12    A   No, I believe he taught classes. | 12   remember any specific -- |
| 13    Q   Okay.  Did he teach online courses; | 13    THE WITNESS:  Don Sexton was actually one |
| 14   correct? | 14   of them.  No, not specifically other than I -- I did |
| 15    A   I believe so, yes. | 15   say "I want everybody, including him, to do a great |
| 16    Q   He did not teach the live events; | 16   job." |
| 17   correct? | 17   BY MS. JENSEN: |
| 18    A   I don't know that.  You'd have to ask | 18    Q   Who is Robert Caplan? |
| 19   Mr. Sexton, Michael Sexton. | 19    A   I believe he was an instructor. |
| 20    Q   Do you remember how many times you met | 20    Q   When you say "instructor," it was online |
| 21   with him? | 21   courses; correct? |
| 22    A   No. | 22    A   Online, yes, but could be other also. |
| 23    Q   Don Sexton? | 23   You'd have to ask Michael. |
| 24    A   Yeah, no. | 24    Q   Okay.  And did you meet Mr. Caplan? |
| Page 162 | Page 163 |
| 1    A   I believe so.  But I'm not sure. | 1    A   I may have, yes. |
| 2    Q   Okay. | 2    Q   Okay.  But you can't recall specifically? |
| 3    A   Long time ago.  Many years ago. | 3    A   No.  Too many years ago. |
| 4    Q   You're not sure that you did? | 4    Q   And you don't recall what you discussed? |
| 5    A   I'm not sure that I did. | 5    A   No. |
| 6    Q   Right.  How about I believe you mentioned | 6    Q   Now, Mr. Trump, do you recall seeing any |
| 7   Gary Eldred? | 7   discovery responses in this case? |
| 8    A   Yes. | 8    A   No. |
| 9    Q   And who is Mr. Eldred? | 9    Q   Do you know who Mr. Roger Schank is? |
| 10    A   I don't remember; he's an instructor. | 10    A   No. |
| 11    Q   For the online courses? | 11    Q   Mr. John Vogel? |
| 12    A   I don't know.  I think it's online, but | 12    A   No.  I mean, I may have met these people, |
| 13   perhaps also the regular. | 13   but I don't remember them. |
| 14    Q   But you don't know? | 14    MS. JENSEN:  We're just going to take a |
| 15    A   I don't know what? | 15   quick break.  We'll be right back.  If you would, |
| 16    MR. SCHNEIDER:  He just told you what he | 16   we'll be right back. |
| 17   believes. | 17    (Discussion off the stenographic |
| 18   BY MS. JENSEN: | 18    record.) |
| 19    Q   Would I have to ask Mr. Sexton, Michael | 19    THE VIDEOGRAPHER:  Off the record. |
| 20   Sexton? | 20   3:20 p.m. |
| 21    A   Yes. | 21    (Recess taken.) |
| 22    Q   And did you ever meet him in person? | 22    THE VIDEOGRAPHER:  We are back on the |
| 23    A   Who? | 23   record at 3:32 p.m. |
| 24    Q   Mr. Eldred. | 24    MS. JENSEN:  I'm now going to hand to the |
| Page 164 | Page 165 |

42 (Pages 162 to 165)

Exhibit 28
-570-

# EXHIBIT 29

Exhibit 29
-571-

# TRUMP

40 Wall Street, 32nd Floor
New York, NY 10005

PRESORTED
STANDARD
U.S. POSTAGE
PAID
TRUMP UNIVERSITY

0000008610

35 * 45 *****AUTO**SCH 5-DIGIT 77064
563360
Frank Gonzales
8951 Windfern Trace Dr
Houston TX 77064-3137

*Frank, look inside for your exclusive invitation*



## ADMIT ONE: VIP TICKET

### FREE TRAINING

Bring and present this complimentary
ticket to the training class.

CALL **888-878-6709** To reserve your
seat and confirm
your reservation





## ADMIT ONE: VIP TICKET

### FREE TRAINING

Bring and present this complimentary
ticket to the training class.

CALL **888-878-6709** To reserve your
seat and confirm
your reservation





Dear Friends,

I am personally inviting you and a guest to a powerful wealth-building event that can literally change your life, and get you out of the rat race forever. When I speak, people listen. And, when I send out invitations, people attend because they know that my invitation means one thing – there is money to be made.

When the real estate bubble was building I told people not to buy, but many of them didn't listen to me and now they're paying the price. In today's down market I'm telling people to buy, buy, buy. In all my years investing in real estate, I think this **is one of the most lucrative investment opportunities ever.** Banks are selling foreclosed properties at pennies on the dollar. The trick is knowing how to invest profitably. And that's where I want to help you.

I am sending one of my world-class instructors from Trump University to your area to teach a class on how to **profit from today's real estate market.** You will learn how to:

- Find income producing properties right in your area, at up to 50% below market value
- Close deals in 30 days
- Fund your investments using other people's money
- Negotiate with banks the "Trump Way"
- Conquer your fear of getting started, by simply following my Real Estate System

My team at Trump University has developed a **proven system for profitable real estate investing** that anyone can use, right away, to score big profits in today's market. If you want to know the best ways - my ways - to buy low, sell high, and walk away rich, then clear your schedule and do whatever it takes to get to this exclusive, invitation-only event.

I have enclosed **two complimentary VIP tickets** to give you and a guest the chance to learn how to create wealth the "Trump Way" and I encourage you to attend. To confirm your reservation you must call **888-878-6709** or log onto **www.TrumpULive.com** Seating is limited so RSVP today.

Donald J. Trump

P.S. As a special gift I am giving every attendee a free copy of my blockbuster Catch the Wave CD-ROM (a $50 value).



TRUMP

*From Donald J. Trump*

*Special Invitation*

# Event Locations, Dates, and Times



### Hilton Houston NASA Clear Lake
3000 NASA Parkway • Houston, TX 77058 • Monday, September 15, 2008 • 1:00 PM and 6:30 PM

### Sugar Land Marriott Town Center
16090 City Walk • Sugarland, TX 77479 • Tuesday, September 16, 2008 • 1:00 PM and 6:30 PM

### Houston Marriott North at Greenspoint
255 North Sam Houston Parkway East • Houston, TX 77060 • Wednesday, September 17, 2008 • 1:00 PM and 6:30 PM

### Renaissance Houston Hotel Greenway Plaza
6 East Greenway Plaza • Houston, TX 77046 • Thursday, September 18, 2008 • 1:00 PM and 6:30 PM

*Doors open 30 minutes prior to scheduled start time.*

Call or go online to accept your **complimentary** invitation.
Seating is limited. To guarantee a place **call or log on today!**

# 888-878-6709 • TrumpULive.com

# EXHIBIT 30

Exhibit 30
-576-

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

TARLA MAKAEFF, BRANDON KELLER,

4    ED OBERKROM, and PATRICIA

MURPHY, on Behalf of Themselves          **ORIGINAL**

5    and All Others Similarly

6    Situated,

7              Plaintiffs,

8       vs.                         No. 10 CV 0940 IEG (WVG)

9    TRUMP UNIVERSITY, LLC, (aka

Trump Entrepreneur Initiative) a

10   New York Limited Liability

11   Company, DONALD J. TRUMP, and

12   DOES 1 through 50, inclusive,

13              Defendants.

     _____

14

15        DEPOSITION of EDWARD C. OBERKROM, JR.

16             San Diego, California

17          Wednesday, April 11, 2012

18                Volume I

19   Reported by:

20   Kae F. Gernandt

21   RPR, CSR No. 5342

22   Job No. 135652

23

24

25   PAGES 1 - 384

                                        Page 1

Exhibit 30
-577-

```
 1          A.   Yes, he did.                    06:20:59

 2          Q.   Did Donald Trump --

 3          MR. SCHNEIDER:  Let me interpose an

 4   objection.  It's leading.

 5   BY MS. ECK:                                 06:21:04

 6          Q.   Did Donald Trump and Trump University

 7   say that you would learn insider success secrets

 8   from Donald Trump?

 9          MR. SCHNEIDER:  Objection.  Leading.

10          THE WITNESS:  Yes, he did.           06:21:12

11   BY MS. ECK:

12          Q.   And did Donald Trump and Trump

13   University say that the instructors and mentors were

14   hand-picked from -- by Donald Trump?

15          MR. SCHNEIDER:  Objection.  Leading.  06:21:21

16          THE WITNESS:  That's correct.

17   BY MS. ECK:

18          Q.   Did Trump University and Donald Trump

19   tell you that the instructors and mentors were real

20   estate experts and were experienced in real estate  06:21:28

21   transactions?

22          MR. SCHNEIDER:  Objection.  Leading.

23          THE WITNESS:  Yes, it -- it was stated.

24   BY MS. ECK:

25          Q.   Did Trump University and Donald Trump  06:21:38
```

Page 372

Exhibit 30
-578-

```
 1    say that his hand-picked instructors and mentors        06:21:40
 2    would teach you Donald Trump's real estate investing
 3    strategies?
 4         A.   Yes.
 5         MR. SCHNEIDER:  Objection.  Leading.              06:21:50
 6    BY MS. ECK:
 7         Q.   Is one reason you took these two
 8    seminars or three seminars because -- strike that.
 9              Was the fact that these seminars were --
10    were offered by or associated with Donald Trump a       06:22:09
11    reason that you signed up for and took these
12    seminars?
13         A.   Well, it wasn't just a reason.  It was
14    the only reason.  'Cause I had an opportunity to go
15    to all these other seminars and be mentored from a      06:22:19
16    bunch of different people, but the name Donald Trump
17    was very alluring to me.  He had a reputation of
18    being a very powerful, knowledgeable person in real
19    estate.  And this was, I seen, as an opportunity to
20    benefit from some of that knowledge.                    06:22:41
21         MS. ECK:  Okay.  I don't have any further
22    questions.
23    / / /
24    / / /
25    / / /                                                   06:22:55

                                                    Page 373
```

Exhibit 30
-579-

```
 1                     FURTHER EXAMINATION              06:22:55

 2    BY MR. SCHNEIDER:

 3         Q.    Just a couple of follow-up on this, sir.

 4              Exhibit 1, which was the -- the letter,

 5    you understood this was a form letter, it wasn't      06:23:04

 6    addressed to you; is that correct?

 7              MS. ECK:  Objection.  Calls for speculation.

 8              THE WITNESS:  Yeah, it was addressed to me.

 9    BY MR. SCHNEIDER:

10         Q.    So, "Dear Friend," that was to you?      06:23:13

11         A.    Had my name on the envelope.

12         Q.    Sure.  Did he print out your name on the

13    envelope?

14              MS. ECK:  Objection.  Calls for speculation.

15              THE WITNESS:  Well, sure, he did, or else --  06:23:23

16    I don't know if he did personally.

17              MR. SCHNEIDER:  Well, that's what I'm asking.

18              THE WITNESS:  Somebody -- somebody did at his

19    request.  I'm sure that that's how, how I --

20    BY MR. SCHNEIDER:                                06:23:33

21         Q.    All right.  Did you understand that

22    Exhibit 1 was a form letter, or did you think that

23    he was writing this letter to Mr. Oberkrom?

24         A.    I did not -- yes, I understand that he

25    was directing it to potential students, encouraging  06:23:43
```

Page 374

Exhibit 30
-580-

# EXHIBIT 31

Exhibit 31
-581-

*Fast track* to
# FORECLOSURE
## INVESTING

# QUICK TURN REAL ESTATE PROFITS:
## *Wholesale/Lease Option Retreat*

### HOW YOU CAN QUICK TURN REAL ESTATE WITHOUT CASH OR CREDIT!

Want to invest in real estate but don't have the luxury of time, credit, or cash flow to cover the day-to-day expenses?

There are many real estate investment seminars available but this is the only one designed by Donald Trump's personal advisors, to show you step-by-step how to create quick cash immediately, and how to build a large monthly cash flow WITHOUT using any of your own money or credit. You'll learn how to wholesale, lease-option, and owner-finance properties in your own backyard for quick cash profits.

### THIS 3-DAY IMMERSIVE RETREAT EMPOWERS YOU TO:

Buy and sell real estate without using any of your money or credit

Buy potentially millions of dollars worth of property, or more without a down payment or a bank loan

Make money on properties you don't even own

Buy your dream home without going to the bank

Receive cash back at closing when you buy

Build a large monthly cash flow

And much more!

For more information visit us online at **TrumpUniversity.com**, or give us a call at **877-508-7867.**

**TU-MAKAEFF0308**

Exhibit 31
-582-

# EXHIBIT 32

Exhibit 32
-583-



TRUMP

*From Donald J. Trump*

*Special Invitation*

*Build Your Future In Real Estate*

## Event Locations, Dates, and Times

*Registration is 30 minutes prior to start of classes. Classes begin promptly at the scheduled time.*

| Sunday, September 27, 2009 | Monday, September 28, 2009 | Tuesday, September 29, 2009 | Wednesday, September 30, 2009 |
|---|---|---|---|
| 2:00 PM | 1:00 PM and 7:00 PM | 1:00 PM and 7:00 PM | 1:00 PM and 7:00 PM |
| **Houston Marriott North at Greenspoint** | **JW Marriott Hotel Houston** | **Hilton Houston NASA Clear Lake** | **Sugar Land Marriott Town Square** |
| 255 N Sam Houston Parkway East | 5150 Westheimer | 3000 NASA Parkway | 16090 City Walk |
| Houston, TX 77060 | Houston, TX 77056 | Houston, TX 77058 | Sugar Land, TX 77479 |

Call or go online to accept your **complimentary** invitation.
Seating is limited. To guarantee a place **call or log on today**!

# 888-878-6709 • TrumpULive.com

TU 25265

Exhibit 32
-584-

Dear Friend:

You may never have another opportunity this big or this life-changing as long as you live. In fact, this may be the single best moment to get into real estate investing. *Ever.*

But before you jump in, I want to give you the benefit of my experience – to show you what to do and *not do* in this fast-changing market, and how to use it to turbo charge your earning power.

As I write, three key factors are converging to create *the* optimum environment for getting seriously rich in real estate – *IF* you jump in before everyone else figures it out:

1. **U.S. housing prices have sunk at the fastest rate in 2 decades** – people are desperate to sell and they're slashing prices so you can buy on the cheap.
2. **Housing inventories are at a 24-year high** – the market's flooded and even great property can't move fast enough.
3. **Interest rates haven't been this low in over 40 years** – which means you can fund your investments for considerably less.

All this adds up to the **best prices** and **lowest carrying costs** on **your pick of high quality real estate**.

It doesn't get any better than this. But I would advise that, before you try to profit in real estate on your own, you get a plan, have an airtight strategy and learn from the best.

Come to my **free** class. In just 90 minutes, my hand-picked instructors will share my techniques, which took my entire career to develop. Then, just copy exactly what I've done and get rich.

The free class will give you 7 takeaways from my top-tier instructors, trained in my every investment strategy. You can actually start using your new-found knowledge right away to profit.

For example, you'll learn how you can:
- Build wealth faster and easier with real estate investing than via any other means.
- Profit from today's real estate market with little or no money.
- Make money while actually saving others from financial ruin.

Look, you've already got a pair of tickets in hand to a free class right in your area. You just need to reserve your spot. Typically, seats get snapped up within 1–2 days, so pick up the phone and call **1-888-TRUMP-09** (1-888-878-6709) or RSVP at **www.TrumpULive.com**.

Remember, you can still make a killing in real estate. I hope we'll see you in your free class so you learn to do it right.

Sincerely,

Donald Trump

REGISTER NOW – Call Toll-Free: 1-888-TRUMP-09 (1-888-878-6709)
Or register online at www.TrumpULive.com

**PS**-Attendees receive a **FREE** *Secrets of Real Estate Marketing* **CD-Rom—a $129 value—plus a bonus class on probate investing.**

# EXHIBIT 33
# [Filed Conditionally Under Seal]

Exhibit 33
-586-664-

# EXHIBIT 34

Exhibit 34
-665-

Advisor: _G.M._

# TRUMP 

Course Code: _2010 430 B_
Student ID: _1108369_

## CONTACT INFORMATION

| | |
|---|---|
| NAME _LAURE MARMONTEL_ | PARTNER NAME _Sherri Simpson_ |
| ADDRESS _2301 COLLINS AVE #1440_ | ADDRESS _33 NE 2 St Ste 101_ |
| CITY _MIAMI BEACH_ STATE _FL_ ZIP _33139_ | CITY _Fort Lauderdale_ STATE _FL_ ZIP _33301_ |
| EMAIL _FR LAUREMARMONTEL@ HOTMAIL.COM_ | EMAIL _sbsimpson@simpson-law-group.com_ |
| HOME PHONE _305 460 1417_ WORK CELL _305 223 2012_ | HOME PHONE _954 524 4141_ WORK _91 524 4141_ CELL _91 609-2794_ |

## ENROLLMENT

### ☒ Trump Gold Elite:

| | Retail Value | Event Special You Save | |
|---|---|---|---|
| • 3 Day In-Field Mentorship | $24,995 | | |
| • Wealth Preservation Retreat | $ 4,995 | | |
| • Quick Start Real Estate Retreat | $ 4,995 | | |
| • Creative Financing Retreat | $ 4,995 | | |
| • Commercial & Multi-Family Retreat | $ 4,995 | | |
| • Real Estate Investor Training Online Program | $ 2,995 | | |
| • Incorporate Your Business (State Licensing fees not Included) | $ 995 | **-30%** | |
| • Foreclosure DealSource Property Listing Service (One Year Membership) | $ 420 | | |
| | $49,385 | $34,995 | |

### ☐ Trump Silver Elite:

| | Retail Value | Event Special You Save | |
|---|---|---|---|
| • Wealth Preservation Retreat | $ 4,995 | | |
| • Quick Start Real Estate Retreat | $ 4,995 | | |
| • Creative Financing Retreat | $ 4,995 | | |
| • Commercial & Multi-Family Retreat | $ 4,995 | | |
| • Real Estate Investor Training Online Program | $ 2,995 | **19%** | |
| • Incorporate Your Business (State Licensing fees not Included) | $ 995 | | |
| | $23,970 | $19,495 | |

### ☐ Trump Bronze Elite (Please Select 2):

| | Retail Value Per Retreat | Event Special You Save | |
|---|---|---|---|
| ☐ Wealth Preservation Retreat | | | |
| ☐ Quick Start Real Estate Retreat | | | |
| ☐ Creative Financing Retreat | $ 4,995 | **9%** | |
| ☐ Commercial & Multi-Family Retreat | | | |
| • Incorporate Your Business (State Licensing Fees not Included) | $995 | | |
| | $10,985 | $9,995 | |

| | |
|---|---|
| **Total Due** | _34,995_ |
| **Paid at Enrollment** | _$17,497.50 Am. ✓_ _15,000 ✓_ _35,100 ✓_ |
| **Balance** | _7,497.50_ |
| **Balance Due Date and Notes** | _x-fer funds + again_ _balance the next cell pm_ _TUFE_ |

## PAYMENT

| ☒ Credit Card [VISA] [MasterCard] | NAME EXACTLY AS IT APPEARS ON THE CARD (Please Print) _LAURE MARMONTEL_ |
|---|---|
| CREDIT CARD NO ⬤⬤⬤⬤ ⬤⬤⬤⬤ _5100_ _5190B_ | BILLING ADDRESS (if Different From Above) _2301 COLLINS AVE #1440_ |
| EXP DATE _06/10_  SECURITY CODE _3291_ | CITY _Miami Bch_ STATE _FL_ ZIP _33139_ |
| ☐ Check | ACCOUNT NO                    CHECK NO |

You, the Buyer, may cancel this agreement without any penalty, at any time prior to midnight of the third business day after the date of this transaction. See cancellation notice on reverse side for explanation of this right.

All advanced training, mentoring and coaching must be completed within twelve (12) months of purchase. It is your responsibility to make certain that all sessions are scheduled within such twelve (12) months period and any exceptions to this policy must be requested in writing and will not be valid unless validated in writing by an authorized manager at TU. After the expiration of this twelve (12) months period, TU's obligation to fulfill these services shall be deemed fulfilled.

This Program is provided for information only and no guarantees, promises, representations or warranties of any kind regarding specific or general benefits, monetary or otherwise, have been or will be made by the Program, Program instructors, Trump U, their affiliates or their officers, principals, representatives, agents or employees (collectively, "Principals"). I acknowledge that each of the Principals is engaged in rendering financial, investment, legal, accounting, or other professional services or advice. If such professional advice or other expert services are required, I acknowledge that I should seek the services of a competent professional who can consider my particular circumstances. I acknowledge that none of the Principals is responsible for, and they shall have no liability for, my business success or failure, my acts and omissions, the appropriateness of my business decisions, or my use of or reliance on Program information. Trump U's obligation to start providing services starts when full payment is received.

By signing below, I ("Participant") acknowledge that I have read and agree to the provisions on the front and back of this Enrollment Form.

| SIGNATURE _[signature]_ | DATE | PARTNER'S SIGNATURE _[signature]_ | DATE _5/2/10_ |
|---|---|---|---|
| White Copy: TRUMP U | | Yellow Copy: STUDENT | |

02/2010
Trump U • The Trump Building • 40 Wall Street 32nd Floor, New York, NY 10005 • P: 212-248-1800 • F: 212-937-3830

## NOTICE OF CANCELLATION

Date: _____

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OF SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE MERCHANT OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE MERCHANT AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY IF YOU WISH TO COMPLY WITH THE INSTRUCTIONS OF THE MERCHANT REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE MERCHANT'S EXPENSE AND RISK.

IF YOU DO NOT AGREE TO RETURN THE GOODS TO THE MERCHANT, OR IF THE MERCHANT DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR FAX 212-937-3830, OR SEND A TELEGRAM, TO TRUMP U, 40 WALL STREET, NEW YORK, NY 10005 NOT LATER THAN MIDNIGHT OF _____.

I HEREBY CANCEL THIS TRANSACTION.

DATE: _____

_____
Buyer's Signature
Print Name: _____
Address: _____
_____
Telephone: _____

Trump U • The Trump Building • 40 Wall St. Fl. 32, New York, NY 10005 • 212-248-1800 • 212-937-3830

**TU-PLTF00137**

Exhibit 34
-667-

Advisor: _G·M._      Event Code: _I010 C+20 C._

## Terms & Conditions

Trump U Programs are provided for training and educational purposes only.

Trump U does not procure or identify specific real estate deals. You may be exposed to real estate deals at the Retreats, but it is your sole responsibility to evaluate and act on those properties for your personal investment. We do not recommend or guarantee any investment or property.

You acknowledge and agree that Trump U has not made any express or implied representation or assurance regarding the potential profitability, chances of funding or likelihood of success of any transaction, investment, opportunity or strategy. Further, you agree that Trump U is not endorsing your project and you shall not represent same to any third-party. Further, Trump U is not rendering legal or financial advice.

If you choose to pursue a transaction, it is your sole responsibility to seek independent advice from professionals such as Real Estate Agents and Brokers, Lawyers, Accountants and Mortgage Brokers.

All advanced training, mentoring and coaching must be completed within twelve (12) months of purchase. It is your responsibility to make certain that all sessions are scheduled within such twelve (12) month period and any exceptions to this policy must be requested in writing and will not be valid unless validated in writing by an authorized manager at Trump U. After the expiration of this twelve (12) month period, Trump U's obligation to fulfill these services shall be deemed fulfilled.

You must be current on payments to attend Retreats.

| | | |
|---|---|---|
| _Signature_ | LAURE MARMONTEL<br>Printed Name | 05/02/2010<br>Date |
| _Guest Signature_ | Sherri Simpson<br>Printed Name | 5/2/2010<br>Date |

Trump U • The Trump Building • 40 Wall St. Fl. 32, New York, NY 10005 • P: 212-248-1800 • F: 212-937-3830

02/2010

**TU-PLTF00138**

Exhibit 34
-668-

Advisor: _Sperry_





Course Code: _____
Student ID #: _____

## CONTACT INFORMATION

| | |
|---|---|
| **NAME** Sherri B. Simpson | **PARTNER NAME** Janet Leyva |
| **ADDRESS** 33 NE 2nd Street, Suite 101 | **ADDRESS** 33 NE 2nd St |
| **CITY** Ft. Lauderdale  **STATE** FL  **ZIP CODE** 33301 | **CITY** Ft. Laud  **STATE** FL  **ZIP CODE** 33301 |
| **EMAIL** sbsimpson@simpson-law-group.com | **EMAIL** sbsimpson@simpson-law-group.com |
| **HOME PHONE**   **WORK PHONE** 954-524-4141 | **HOME PHONE**   **WORK PHONE** 954-524-4141 |
| **CELL PHONE**   **FAX** 954-763-5117 | **CELL PHONE**   **FAX** 954-763-5117 |

## ENROLLMENT

| | | |
|---|---|---|
| **The Apprenticeship Program:** (12 Month Audit Privileges) | $1,995 | ~~$1,495.00~~ 1495.00 |
| **Guest or Business Partner** | Free Bonus | |
| **Premium Membership** (12 months) | Free Bonus | |
| **Foreclosure DealSource** Free Bonus* (Workshop attendance and credit card required to activate 30 Day Free Trial) | | *Deal Source Free Trial 30 Days Post-Training (Juan) |

## PAYMENT

☒ **Credit Card**  [VISA] [MasterCard] [ ] [ ]   NAME  EXACTLY AS IT APPEARS ON THE CARD (Please Print) _Sherri Simpson_

CREDIT CARD NO _2769_   BILLING ADDRESS (if different from above) _Same_

EXP DATE ____   SECURITY CODE ____   CITY ____   STATE ____   ZIP ____

☐ **Check**   ACCOUNT NO ____   CHECK NO ____

You may cancel this agreement without any penalty, at any time prior to midnight of the third business day after the date of this transaction. See cancellation notice on reverse side for explanation of this right. _____ Initials

You, the Buyer, may withdraw without penalty from the training class scheduled above by the end of the first day of the next regularly scheduled training class as specified above, or within (14) days from the enrollment date, whichever occurs first. If you attend at a subsequent time, the cancellation option will not apply.

*Data Subscription Fees: I hereby authorize Trump U to charge my bank account or credit card account, noted above, in the sum of $34.95 per month, payable monthly as if I had personally signed a check or sales draft slip to Trump U. This authorization shall remain in effect unless and until I notify Trump U in writing that I wish to cancel this subscription, which I may do at any time whatsoever. A record of my payment will be included in my bank or credit card statement and will serve as my receipt. This subscription can be cancelled at the first day of training. _____ Initials

**Guest Foreclosure DealSource Activation Fee (Optional):** I hereby authorize Trump U to charge my credit card account, noted below, in the sum of $34.95 per month, payable monthly as if I had personally signed a check or sales draft slip to Trump U. This authorization shall remain in effect unless and until I notify Trump U in writing that I wish to cancel this subscription, which I may do at any time whatsoever. A record of my payment will be included in my bank or credit card statement and will serve as my receipt. This subscription can be cancelled at the first day of training. _____ Initials

| ☐ **Credit Card** [VISA] [MasterCard] | NAME EXACTLY AS IT APPEARS ON CARD | CREDIT CARD NO. | EXP DATE | SECURITY CODE |
|---|---|---|---|---|

This training is provided for education only and no guarantees, promises, representations or warranties of any kind regarding specific or general benefits, monetary or otherwise, have been or will be made by the Program, Program instructors, Trump U, their affiliates or their officers, principals, representatives, agents or employees (collectively, "Principals"). I acknowledge that each of the Principals is engaged in rendering financial, investment, legal, accounting, or other professional services or advice. If such professional advice or other expert services are required, I acknowledge that I should seek the services of a competent professional who can consider my particular circumstances. I acknowledge that none of the Principals is responsible for, and they shall have no liability for, my business success or failure, my acts and omissions, the appropriateness of my business decisions, or my use of or reliance on Program information.

By signing below, I ("Participant") acknowledge that I have read and agree to the provisions on the front and back of this Enrollment Form.

| SIGNATURE | DATE 4/18/10 | PARTNER SIGNATURE | DATE 4/18/2010 |
|---|---|---|---|

White Copy: TRUMP U          Yellow Copy: STUDENT

03/2010

Trump U • The Trump Building • 40 Wall St Floor 32, New York, NY 10005 • 212-248-1800 • 212-937-3830

TU-PLTF00139

Exhibit 34
-669-

## NOTICE OF CANCELLATION

Date: _____

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OF SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE MERCHANT OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE MERCHANT AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY IF YOU WISH TO COMPLY WITH THE INSTRUCTIONS OF THE MERCHANT REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE MERCHANT'S EXPENSE AND RISK.

IF YOU DO NOT AGREE TO RETURN THE GOODS TO THE MERCHANT, OR IF THE MERCHANT DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR FAX 212-937-3830, OR SEND A TELEGRAM, TO TRUMP U, 40 WALL STREET, NEW YORK, NY 10005 NOT LATER THAN MIDNIGHT OF _____.

I HEREBY CANCEL THIS TRANSACTION.

DATE: _____

_____
Buyer's Signature
Print Name: _____
Address: _____
_____
Telephone: _____

**TU-PLTF00140**

Exhibit 34
-670-

Advisor: _____     **TRUMP**     Event Code: _____

## Terms & Conditions

Trump U Programs are provided for training and educational purposes only.

Trump U does not procure or identify specific real estate deals. You may be exposed to real estate deals at the Retreats, but it is your sole responsibility to evaluate and act on those properties for your personal investment. We do not recommend or guarantee any investment or property.

You acknowledge and agree that Trump U has not made any express or implied representation or assurance regarding the potential profitability, chances of funding or likelihood of success of any transaction, investment, opportunity or strategy. Further, you agree that Trump U is not endorsing your project and you shall not represent same to any third-party. Further, Trump U is not rendering legal or financial advice.

If you choose to pursue a transaction, it is your sole responsibility to seek independent advice from professionals such as Real Estate Agents and Brokers, Lawyers, Accountants and Mortgage Brokers.

All advanced training, mentoring and coaching must be completed within twelve (12) months of purchase. It is your responsibility to make certain that all sessions are scheduled within such twelve (12) month period and any exceptions to this policy must be requested in writing and will not be valid unless validated in writing by an authorized manager at Trump U. After the expiration of this twelve (12) month period, Trump U's obligation to fulfill these services shall be deemed fulfilled.

You must be current on payments to attend Retreats.

| | | |
|---|---|---|
| _Signature_ | Sherri Simpson<br>Printed Name | 4/18/2010<br>Date |
| _Guest Signature_ | Janet Leyva<br>Printed Name | 4-18-2010<br>Date |

TU-PLTF00141

Exhibit 34
-671-



**TRUMP**
From the Office of Donald J. Trump

Dear Sherri,

Two years ago before the real estate market collapsed, I stood up in front of a conference room filled with real estate investors and told them not to buy real estate. You wouldn't expect to hear that coming from me but I knew that prices were already through the roof and the only way they could go was down. I love telling this story because it amazes me how few people took my advice not to buy. Most people kept investing in a bad market. Look at them now.

I probably don't have to tell you how much the real estate market has changed over the last two years. I've never seen a market like this before. Prices have hit rock bottom and *may never be* this low again. Mortgage rates are at historic lows. The real estate market has always been cyclical—we've seen ups and downs time and again over the last 100 years. But this is the best buyer's market we've seen in a generation and I want you to listen carefully. Now I'm telling you to BUY real estate.

### The Time to Buy Real Estate is Now!

There are once-in-a-lifetime opportunities everywhere you look. You probably drive by some great investment properties every day without even realizing it. But in order to invest successfully you need to know what you're doing. Success in real estate begins with great training and proven strategies. Without education you don't stand a chance.

I know how to make money in real estate. I've been doing it for a long time with a lot of success. My family has been a leader in real estate since my father—Fred Trump—started building residential homes in New York City 75 years ago. My father was my mentor and he taught me a lot. Now I want to teach you how to make money in real estate. To be my Apprentice you need to Think BIG and really want to succeed. More than anything, you need to take action.

### Do YOU Have What It Takes to Be My Next Apprentice?

I only work with people who are committed to succeed. I founded Trump University back in 2005 to teach go-getters how to succeed in real estate. My team at Trump University is filled with real estate experts... proven winners. We're the best of the best and we know what works. If you think you have what it takes to be my next Apprentice, prove it to me.

My team is coming to your area in the next few days to conduct an Intro Apprenticeship Workshop. This Workshop is valued at $125 per person but you qualified for two complimentary VIP tickets. I want you to attend with your spouse, a friend, or a business associate you trust. We've trained thousands of real estate investors over the years and we know you will be most successful when you work with a partner. This

*continued on reverse*

40 Wall Street, 32nd Floor • New York, NY 10005

TU-PLTF00142

Exhibit 34
-672-

Workshop won't cost you anything but what you learn could be worth millions!

## Take Advantage of Proven Investment Strategies

Maybe you have a long-term investment horizon and want high ROIs and passive income. Maybe you need quick cash from buy and flip deals with no money down. Whether you're already a real estate investor or are just thinking about getting started, you'll be amazed by the strategies we will teach you at the Intro Apprenticeship Workshop. You'll learn the custom strategies that are right for you and you're going to learn a lot. In just 90 minutes you'll understand how to:

- ♦ Use short sales to CONTROL property
- ♦ Increase your financial POWER with leverage
- ♦ Buy FORECLOSED properties from banks at deep discounts

- ♦ Negotiate PROFITABLE deals that meet your goals
- ♦ Develop the CONFIDENCE to succeed in real estate

## Now is the Perfect Time to Attend My Intro Apprenticeship Workshop

Don't sit on the sidelines and miss this opportunity. Don't settle for low returns in CDs and bank accounts. If you're serious about making money and safeguarding your future, learn to invest in real estate. Trump University will teach you how. We'll give you the best training and the confidence to succeed. If you think you've got what it takes to be my next Apprentice, come prove it to me and my team. Take control of your future and attend our upcoming Trump Intro Apprenticeship Workshop right in your area. I'm giving you two complimentary tickets so there's no excuse.

## Seating Is Limited—Reserve Your Space and Claim Your Free Gift!

Reserve your seat today by calling **888-878-6709** or by registering online at **TrumpULive.com** right now. Don't waste time—seating is very limited and Trump Workshops always fill up fast. I'm also going to give you my "Secrets of Real Estate Marketing" investor toolkit absolutely FREE when you attend. It's worth $50 and is filled with lots of my strategies to get you started making money in real estate right away. Only YOU can make it happen.

See you at the top!

Donald J. Trump
Chairman, Trump University

P.S. Remember, I only want people who are committed to succeed and serious about making money in real estate. 76% of the world's millionaires made their fortunes in real estate. If you think you have what it takes to be my next Apprentice, attend a FREE Trump Intro Apprenticeship Workshop. Register today by calling **888-878-6709** or visiting **TrumpULive.com**. We'll reserve your seat and also give you my valuable real estate investor toolkit as a FREE gift worth $50 when you attend.

APR - 7 2010

TU-W

**TU-PLTF00143**

Exhibit 34
-673-

# EXHIBIT 35

Exhibit 35
-674-

| | |
|---|---|
| **From:** | Trump Wealth Builder's Network |
| **To:** | Tarla Makaeff |
| **Sent:** | 9/4/2008 8:55:05 PM |
| **Subject:** | Want Some Financial Advice? |

---

Wealth Builders Network

September 4, 2008

**An Exclusive Invitation to Be Part of the Greatest Success Story of All - Yours**

**I Accept!**

Dear Tarla,

I would like to ask you three questions.

1. If I told you that a limited number of memberships had just become available in one of the most exclusive clubs ever founded, would you want to join?

2. What if I assured you that if you joined, you would potentially undergo a personal financial rebirth in the next 12 months?

3. Suppose that as a member of this exclusive club, you would have the same kind of support staff that is usually retained by the ultra-rich?

Suppose I told you that all those benefits, plus more, could be yours for a monthly fee of $29.95?

That Club exists now, and you can join. It's called **The Wealth Builder's Network**. But before I formally invite you to become a member, you no doubt have a few questions of your own about it.

**How Can All Those Benefits Be Possible At That Price?**

More than a year ago, Donald J. Trump and his faculty of experts got together to plan **The Wealth Builder's Network**. They explored whether it was possible to provide all of the benefits listed above, even more, if possible, for a fee that would not exclude anyone.

They soon realized that it was possible to provide all those benefits for a reasonable price. How? Simply by allowing staff of experts to share their advice with a pool of members, instead of with just one paying client.

Do you want to be a part of Donald Trump's exclusive club? Do you want to have a team of financial experts you can turn to 24/7, **register online** to join or call **1(877) 508-7867.**

**The Benefits Get Even Better**

In addition to the exclusive benefits I describe above, here are some additional bonuses that we built into The Wealth Builder's Network:

- A subscription to The The Wealth Builder's Network (Valued at $10.00 an issue)

TU-MAKAEFF3686

Exhibit 35
-675-

- Personal financial hotlines (Valued at $29.00 monthly)
- Monthly teleconferences for members (Valued at $40.00 per teleconference)
- A members-only multimedia library with expert articles and videos (Valued at $89.00)
- A free copy of Donald Trump's landmark book, *Trump 101* (Valued at $15.00)

**Don't Let This Opportunity Pass You By!**

Join me in **The Wealth Builder's Network** online or call **1(877) 508-7867** (Monday - Friday, 9 am-9 pm, Saturday 9 am-5 pm EST). And before you or I know it, I will see you at the top. The journey will be tremendous.

Sincerely,
The Trump Wealth Builder's Network

To ensure that you continue to receive emails from us, add noreply@trumpuniversity.com to your address book today.

You are receiving this email from Trump University because you subscribed on our website, made a purchase, or were otherwise in contact with us. Thank you for your patronage.

Trump University, 160 Greentree Drive, Suite 101, Dover, Delaware 19904

# EXHIBIT 36

Exhibit 36
-677-

Loading, please wait...

If this video doesn't load, please make sure you have the latest version of Flash by visiting:
http://www.adobe.com/go/getflashplayer



Register Now
Let My Team Teach You How to:
Buy properties from banks at DEEP discounts
Negotiate PROFITABLE deals that meet your goals
Develop the CONFIDENCE to succeed in real estate



Free gift when you attend
This valuable investor tool is packed with my proven strategies to help you get started
immediately on your road to success!

Bring a guest, it's free!
What Our Students Are Saying:
"We're confident that our hard work coupled with the top-notch training from Trump Initiative
will prompt us toward greater financial success."

**- Ante and Marla C., St. Louis, Missouri**

"We attribute our wonderfully successful business to the training we got from Trump Initiative
and we look forward to our continued relationship."

**- Steve P., Saratoga, California**
A Word from Our Chairman
"It's virtually impossible to succeed without an education."



**Donald J. Trump** - Chairman

© 2011 The Trump Entrepreneur Initiative, all rights
reserved

**Register here for** Anchorage, AK **or call** (888) 407-5942
We're sorry. We have no events scheduled in **Anchorage, AK** at
this time. But please be sure to keep checking back with us. We
add new events and locations to the schedule often.
Mr. Trump will not be appearing at this event.

This training is for educational purposes only and successful
results are not guaranteed.

Attendees will be offered additional services and materials to
purchase at this event.

About Us
Success Stories
Trump Insider Newsletter
Course Catalog
Privacy Policy
FAQ
Contact Us

# EXHIBIT 37

Exhibit 37
-679-

**San Antonio Express-News**

**Publication Date: 10/08/2009**

This E-Sheet(R) is provided as conclusive evidence that the ad appeared in the publication noted on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

| | |
|---|---|
| Ad Number: | 690011401 |
| Insertion Number: | |
| Size: | 6 X 21 |
| Color Type: | B&W |

| | |
|---|---|
| Client Name: | NORTHCAL MEDIA, LLC |
| Advertiser: | TRUMP UNIVERSITY |
| Section/Page/Zone: | CITY/11A/ |
| Description: | THE TIME TO INVEST IN TE |



Register Now for Our New October 2009 Workshop!

# The time to invest in Texas real estate is *NOW!*

Learn from Donald Trump's handpicked experts how you can profit from the largest real estate liquidation in history. Attend our **FREE investor workshop!**

He's the most celebrated entrepreneur on earth. He's earned more in a day than most people do in a lifetime. He's living a life many men and women only dream about. And now he's ready to share—with Americans like you—the Trump process for investing in today's once-in-a-lifetime real estate market.

Come to this **FREE introductory class** and you'll learn from Donald Trump's handpicked instructors a systematic method for investing in real estate that anyone can use effectively. You'll learn foreclosure investing from the inside out. You'll learn how to finance your deals using other people's money. You'll learn how to overcome your fear of getting started.

" **I can turn anyone into a successful real estate investor, including you.** "
— Donald Trump

Today's financial crisis and credit crunch has politicians and bankers scrambling for answers. They've got bailouts and rescue packages but **who's helping you?** We'll help you by teaching you how to **profit from the billion dollar bailouts** that have opened the door for unprecedented investment opportunities.

With home prices dropping through the floor, historically low interest rates, and record high inventories, **2009 is the "perfect storm" for real estate investors** of every income and experience level. But you need to approach this with the kind of proven expertise contained in Donald Trump's powerful techniques and strategies.

### Cash in on the Greatest Property Liquidation in History!
#### Discover how to ...

✓ Buy real estate from banks—at up to 70% below market value!

✓ Finance your deals creatively in today's tight credit market!

✓ Buy the right properties at the right time—and know when to sell!

✓ Secure your retirement by generating passive income!

✓ Invest in real estate through your IRA—tax free!

✓ Find pre-foreclosures in your area!

" **Within six months I put a down payment on my first property which I bought for $107,900. I then rehabbed and flipped the 3,000+ square foot home for a profit of more than $30,000.** "

— Scott T.
Phoenix, Arizona
*Personal Results. Results not typical*



Attendees receive a **FREE**
*Secrets of Real Estate Marketing*
CD-Rom—a $179 value—
plus a bonus class on
probate investing!

## **3 DAYS ONLY!**

Act Now! Space is limited, reserve your seat today at TrumpUniversityTX.com or call 888-TRUMP-14 (888-878-6714).

| **MONDAY** | **TUESDAY** | **WEDNESDAY** |
|---|---|---|
| October 12th | October 13th | October 14th |
| 1:00 PM & 7:00 PM | 1:00 PM & 7:00 PM | 1:00 PM & 7:00 PM |
| **San Antonio Marriott Riverwalk** | **Hyatt Regency Hill Country Resort and Spa** | **Hilton San Antonio Airport Hotel** |
| 889 East Market Street San Antonio, TX | 9800 Hyatt Resort Drive San Antonio, TX | 611 Northwest Loop 410 San Antonio, TX |



TRUMP
UNIVERSITY

Registration begins 30 minutes prior to start of classes. Classes begin promptly at the scheduled time. Donald Trump will not appear at the event.

CALLER-TIMES ★ Sunday, December 6, 2009 ★ 5C



# Learn from the
# Master.

Let Trump's Experts teach you the master strategies from one of the world's most successful and most admired, real estate investors

## Attend a FREE Trump Real Estate Workshop and Learn How to:

- Buy Bank-Owned Properties at deep discounts.
- Invest for long-term gains, positive cash flows, and passive income.
- Generate quick cash with buy-and-flip deals.
- Get creative financing to invest without risk.
- Locate buyers and investors to create recession-proof income.
- Analyze deals, make offers, and negotiate like a professional.
- Identify profitable investments right in YOUR neighborhood.

"I can turn *anyone* into a successful real estate investor."



— Donald J. Trump
Chairman,
Trump University



**FREE GIFT WHEN YOU ATTEND**
Secrets of Real Estate Marketing
Yours FREE on CD!

*Prices in Texas will never be this low again!*

Last chance this year in the Corpus Christi area!
Make a change for next year today!
Space is limited, reserve your seat NOW!

**Monday, December 7th**
1:00 p.m. and 7:00 p.m.
**Omni Corpus Christi Hotel – Marina Tower**
707 North Shoreline Boulevard
Corpus Christi, TX

**Tuesday, December 8th**
1:00 p.m. and 7:00 p.m.
**Holiday Inn SunSpree Resort**
15202 Windward Drive
Corpus Christi, TX

Call or Go Online Today to Register:

# 888-TRUMP-14 (888-878-6714)
# TrumpUniversityTX.com



TRUMP
UNIVERSITY

TU 62092

Exhibit 37
-681-

To ensure that you continue to receive emails from us, add email@info.trumpuniversity.com to your address book today.



TRUMP
UNIVERSITY

## MY EXPERT TRAINERS ARE COMING
# RIGHT TO YOUR AREA

Prices and interest rates are at unprecedented lows and demand for real estate is on the rise.
**NOW is the perfect time to invest in real estate.**

Attend Trump's Profit from Real Estate Investing Class
and Learn How to Successfully Invest in this Historic
Buyer's Market:



- Get customized strategies to achieve YOUR long term OR
  short term personal investment goals
- Generate positive cash flow and passive income OR
  quick profits
- Find investment properties right in your neighborhood
- Learn simple negotiating strategies to help you close
  profitable deals
- Implement the Trump Blueprint for consistent gains



"Nobody on the planet can teach you how to
make money in real estate better than I can."

**Master Wealth Builder – Donald J. Trump**

**Click here to register now for your FREE
Profit from Real Estate Investing Class**

and learn Trump's proven strategies to help
you profit from today's extraordinary buyer's market.





To ensure that you continue to receive emails from us, add email@info.trumpuniversity.com to your address book today.




**Succeed with Trump.**

TRUMP
Donald J. Trump
Chairperson
Trump University

**REGISTER TO ATTEND**

# Unlock YOUR Personal Power Today!
## Learn the Secrets from Trump's Foremost Success Expert.

Experience this FREE 2-Day "Kick-Start Your Success" Event in Dallas on December 5-6 and you will learn how to:

 **Master the POWER TO INFLUENCE.**

 **Unlock YOUR MOTIVATION and Stay Motivated in 2010.**

 **Prepare for QUANTUM Performance Gains in the Next 90 Days.**

 **Implement 7 Keys for Maximum Personal Productivity.**



**Meet Your Success Coach, Omar Periu.**

Omar Periu is Donald J. Trump's Foremost Personal Success Trainer. Self-made multimillionaire at age 31, Mr. Periu has trained thousands of business leaders worldwide to achieve dramatic success.



**Join us in Dallas, Texas!**

**December 5-6, 9am-5pm**
Renaissance Dallas Hotel
2222 Stemmons Freeway
Dallas, TX 75207

**Bring Partners to Share in Your Dramatic Personal Growth!**

Whether your goals are to retire rich, pay for your child's education, or launch a profitable business, this event will help you succeed!

**REGISTER NOW ▶**

Kickstart-20091130_BrianTracy_PreReg

To ensure that you continue to receive emails from us, add email@info.trumpuniversity.com to your address book today.

# Unlock YOUR Personal Power Today!

**Confirm Your Registration NOW To Trump's Kick-Start Your Success Event**

Dear %%givenname%%,

Congratulations on successfully completing your recent Personal Development Event in Dallas and the first step of your training! You are well on your way to achieving both personal and professional success but it's equally important to build on the skills you have learned and complete your training experience. At that Event you received 4 FREE Tickets ($995 value) to attend Trump University's "Kick-Start Your Success", our Premier Success Event specifically designed to help you unlock YOUR Power to Influence Others. Whether your goals are to Retire Rich, Pay for your Child's Education, Achieve Financial Independence, Build a Legacy of Wealth, Improve Your Personal Performance, or Start a Profitable Business, this "Kick-Start Your Success" will help you succeed in achieving your goals.

Nobody is born with a mastery of POWER and INFLUENCE, these are critical success skills that are learned! At "Kick-Start Your Success" you will experience Donald J. Trump's Foremost Personal Success Trainer and self-made multimillionaire Omar Periu. Mr. Periu has trained thousands of business leaders worldwide to achieve dramatic success and now this exclusive opportunity is yours.

There is overwhelming demand for this Event and seats are limited to the first 200 confirmed attendees on a first-come, first-serve basis. Please take a moment now to confirm your information and plans to attend by clicking below and then again on the Registration Confirmation button that follows.

**CONFIRM YOUR REGISTRATION**

You are taking a powerful step in your personal development and joining thousands of other leaders worldwide who have attended Trump's Kick-Start Your Success Event and achieved dramatic success. If you have any questions about this Event please call our customer care team at 888-826-5953.

We look forward to seeing you on Saturday, December 5th at 9:00 AM, and Sunday, December 6th at 9:00 AM. Succeed with Trump!

To your success,

Michael Sexton
President
Trump University

TU 62095

Exhibit 37
-684-



## Don't think you can profit in this market? You can.

*Learn how in a FREE Real Estate Investing Class!*



%%Givenname%%, I've made my fortune buying when the market is low. Guess what? That "buy low" time is now and there are people getting rich today with my proven investment techniques. This market won't last forever. Why stand by as your neighbor gets rich?

and learn my proven, specialized Trump process for real estate investing. My **handpicked expert will** show you how to find properties in the Dallas and Forth Worth area before anyone else does and will reveal the secrets to funding investments without using a dime of your own money. Wait-until-tomorrow excuses just won't cut it anymore. Register today while historically rich opportunities are still available.

If you don't jump in now, someone else will. I guarantee it. Register today!

REGISTER FOR A FREE CLASS

Coming to Dallas and Fort Worth

Monday, July 20th in Frisco, TX

Tuesday, July 21st in Richardson, TX

Wednesday, July 22nd in Farmers Branch, TX

Thursday, July 23rd in Arlington, TX

" *This is the time that people should be going out and making unbelievable deals on Real Estate.*"





TU 62096

Exhibit 37
-685-



# TRUMP
UNIVERSITY

## %%Givenname%%, we've reserved two VIP tickets for you to our
# Real Estate Investing Class

Dear %%givenname%%,

Your prior attendance at a Trump University event was more than just a whim. You invested in yourself telling the economic meltdown—take a hike!

As a previous student, your continuing foreclosure education at Trump University is vital to your next level of success. Here's why:



- ✔ Brand new material will be showcased, including once-secret strategies you can use right way to invest in the Dallas and Fort Worth area

- ✔ Repetition is the best way to master ideas and concepts, and...

- ✔ Repeat students buy more properties and are more successful than those who come only once

- ✔ Get all the details on our new distressed property finder: Foreclosure DealSource

Rewarding serious and driven entrepreneurs like you is very important. That's why we reserved two VIP tickets to **our Real Estate Investing class.**

**%%Givenname%%, to register for your two VIP tickets, click here for all the details:**

### REGISTER NOW

By sharpening your real estate investment skills and redoubling your education efforts, I have no doubt you will b sending me your own real estate success story very soon!

To your success,

Michael Sexton
President
**Trump University**

P.S. With each Profit from Real Estate Investmenting workshop you attend, your odds of achieving a financially secure future increase dramatically. Register today!

Join us on: 🄵 Facebook 🄴 Twitter 🄫 Youtube

Share: 🄱 Bebo 🔖 Delicious 🟢 Digg 🄵 Facebook 🄸 LinkedIn 🄼 MySpace 🄾 Reddit 🄴 Twitter

TU 62097

Exhibit 37
-686-



## %%Givenname%%, there are incredible deals right in your own backyard. If you don't act now, someone else will!

### Attend A FREE Real Estate Class
The current down market has created incredible investment opportunities that are available immediately. Thousands of properties in the the Dallas area are selling for up to 50% below market value.

### Learn The Trump Way To Profit
Our real estate investment class get you started making money quickly. In a dynamic presentation, your instructor—handpicked by Donald Trump—will explain the proven Trump process for buying and selling distressed properties for profit.

**FREE ATTENDEE GIFT!**
**A $50 Value!**
This powerful CD compliments the strategies you'll learn in class. It includes essential strategies on how to make a fortune in today's real estate market.

**Includes 6 Bonus Reports!**



## UPCOMING EVENTS IN DALLAS

| MONDAY | TUESDAY | WEDNESDAY | THURSDAY |
|---|---|---|---|
| July 20th | July 21st | July 23rd | July 22nd |
| Frisco, TX | Richardson, TX | Farmers Branch, TX | Arlington, TX |

Join us on: ▉ Facebook ▉ Twitter ▉ Youtube

Share: ▉ Bebo ▉ Delicious ▉ Digg ▉ Facebook ▉ Linkedin ▉ MySpace ▉ Reddit ▉ Twitter

You are receiving this email from Trump University because you subscribed on our website, made a purchase, or were otherwise in contact with us. Thank you for your patronage. If you would rather not receive these emails, you can edit your email preferences.

Trump University, 160 Greentree Drive, Suite 101, Dover, Delaware 19904

## FTF_NEW_Dallas_20090716_3

To ensure that you continue to receive emails from us, add email@info.trumpuniversity.com to your address book today.



# Last Chance!

**This is your last chance to learn the Trump process for creating real estate wealth in the Dallas and Fort Worth area.**

**Register Today for a FREE Real Estate Investment Class.**

**This is truly a historical buyer's market. Don't miss your opportunity!**

**Four Days ONLY! Seating is Limited.
Monday, July 20th - Thursday, July 23rd.**

## CLICK HERE TO REGISTER



Join us on: ☐ Facebook  ☐ Twitter  ☐ Youtube

Share: ☐ Bebo ☐ Delicious ☐ Digg ☐ Facebook ☐ LinkedIn ☐ MySpace ☐ Reddit ☐ Twitter

You are receiving this email from Trump University because you subscribed on our website, made a purchase, or were otherwise in contact with us. Thank you for your

**TRUMP**
UNIVERSITY

%%MAILING_SEND_DATE%%

# Donald Trump's handpicked expert is going to show you how to get rich!

Dear %%givenname%%,

There are just a few days left so I'll keep this short. I've emailed you twice about Trump University's **FREE Foreclosure Investing class.** I believe that this is a class you must attend, and frankly would like to attend. But you've put it off. So, let's start fresh. It doesn't matter what you did last year; it doesn't matter what you did a month ago or even last week. What matters is today. Today is the opportunity you've been waiting for.

**%%givenname%%,** choose the Foreclosure class below that is the most convenient.

## Upcoming Events in Dallas:

  

**Select Your Class and Register Now!**

Foreclosures are the smartest, quickest way to get rich. And not years from now–but months. The current market is made for investors who are looking to make some real money. In fact, listen to Robin and David Little of Orlando, Maine who realized they simply couldn't afford not to act.

"Trump U gave us the confidence and knowledge to actually purchase our first piece of investment property. We successfully bought, rehabbed, and leased our first property, and we are preparing to sell it for a $44,000 profit! Thanks to the Trump U team for helping us to set our future in motion."

### Choose the Foreclosure class above that is the most convenient.

Robin and David are real people who used their dreams as a guide to success. With street-smart instruction that Donald Trump has perfected, you too can turn your dreams into a life of your choosing.

**%%givenname%%,** get started today!

To your success,

Michael Sexton
President
**Trump University**

# EXHIBIT 38

Exhibit 38
-690-

# TRUMP

40 Wall Street, 32nd Floor
New York, NY 10005

The economy has tanked...but the opportunity to create extraordinary wealth has not!

Nancy, learn how you can get your share, plus two complimentary
VIP tickets for you and a guest to a recession-busting, wealth-building event, inside!

**p1*T64***********AUTO**5-DIGIT 75243
Nancy Shoaf
9223 Coral Cove Drive
Dallas TX 75243-6145

||...|.||..|.|...|.|.||...||.||...||..||..||...||...||.||

B   14456

PRESORTED
STANDARD
U.S. POSTAGE
PAID
TRUMP UNIVERSITY

# TRUMP

40 Wall Street, 32nd Floor
New York, NY 10005

James, would you like to market-proof your financial future?
Exclusive event invitation from Donald Trump enclosed!

**P2*T71*************AUTO**5-DIGIT 75229
James Wimberley
28 Wimberley Court
Dallas TX 75229-6180

IIlmIl.ImIIIIlmIIIIIlmIImIIIIlmIIlmIIIIlmI

A   15020

PRESORTED
STANDARD
U.S. POSTAGE
PAID
TRUMP UNIVERSITY



## ADMIT ONE: VIP TICKET

**FREE TRAINING**
Bring and present this complimentary
ticket to the training class.

CALL **888-878-6709** To reserve your
seat and confirm
your reservation







## ADMIT ONE: VIP TICKET

**FREE TRAINING**
Bring and present this complimentary
ticket to the training class.

CALL **888-878-6709** To reserve your
seat and confirm
your reservation





Dear Friend,

How would you like to market-proof your financial future?

An extraordinary window of opportunity—that could very well improve your financial future—is now open for business. But history tells us it will not stay open forever! What am I referring to? **The largest real estate liquidation in history.** Banks are selling foreclosed properties for pennies on the dollar…home prices are dropping through the floor…interest rates are historically low…and there are record high inventories.

When the real estate bubble was building, I told people not to buy—but many did not listen—and unfortunately they are now paying the price. In today's market, I'm telling people to buy, buy, buy—I'd like to make sure you're one of them!

Please accept my invitation—for you and a guest—to a powerful wealth-building workshop that will demonstrate specific, proven and profitable strategies that you can use right away to score big profits within these current market conditions.

Today's so-called economic meltdown and credit crunch have politicians, traders and bankers scrambling for answers. They've got bailouts and rescue packages, but **who's helping you?** I will. There is no question in my mind I can turn you into a successful real estate investor. I've done it many times and I'll continue to do it for as long as there are interested people like you who want to **better their life, quit their job and be set for life!**

One of my world-class instructors from Trump University will be in your area and will teach you the specifics on how to profit from today's real estate market. You will learn how to:

✓ Conquer your fear of getting started by following my proven Real Estate System!
✓ Find income producing properties in your area—30-70% below market value!
✓ Fund your investments without using your own money!

I have enclosed two complimentary VIP tickets to give you and a guest the chance to learn how to create wealth the Trump Way. I encourage you to attend and to act quickly as seating is limited. To confirm your reservation you must call 1-888-878-6709 or log onto www.TrumpULive.com.

*Donald J. Trump*

Donald J. Trump

P.S. As a special bonus, I am giving every attendee a FREE copy of my blockbuster Catch the Wave CD—a $50 value!



TRUMP

*From Donald J. Trump*

*Special Invitation*

## Event Locations, Dates, and Times



| | | |
|---|---|---|
| Monday, February 16, 2009 | Tuesday, February 17, 2009 | Wednesday, February 18, 2009 |
| 1:00 PM and 6:30 PM | 1:00 PM and 6:30 PM | 1:00 PM and 6:30 PM |
| **Sheraton Dallas North Hotel** | **The Westin Stonebriar Resort** | **Hilton Arlington Texas** |
| 4801 Lyndon B. Johnson Freeway | 1549 Legacy Drive | 2401 East Lamar Boulevard |
| Dallas, TX 75244 | Frisco, TX 75034 | Arlington, TX 76006 |

*Registration is 30 minutes prior to start of classes. Classes begin promptly at the scheduled time.*

Call or go online to accept your **complimentary** invitation.
Seating is limited. To guarantee a place **call or log on today!**

# 888-878-6709 • TrumpULive.com

TU 62069

Exhibit 38
-695-

# EXHIBIT 39

Exhibit 39
-696-

1   ZELDES & HAEGGQUIST, LLP
    AMBER L. ECK (177882)
2   HELEN I. ZELDES (220051)
    ALREEN HAEGGQUIST (221858)
3   625 Broadway, Suite 906
    San Diego, CA 92101
4   Telephone: (619) 342-8000
    Facsimile: (619) 342-7878
5   ambere@zhlaw.com
    helenz@zhlaw.com
6   alreenh@zhlaw.com

7   ROBBINS GELLER RUDMAN
      & DOWD LLP
8   RACHEL L. JENSEN (211456)
    THOMAS R. MERRICK (177987)
9   655 West Broadway, Suite 1900
    San Diego, CA  92101
10  Telephone: (619) 231-1058
    Facsimile: (619) 231-7423
11  rjensen@rgrdlaw.com
    tmerrick@rgrdlaw.com
12
    Attorneys for Plaintiffs and the Proposed Class
13

14                    UNITED STATES DISTRICT COURT

15                  SOUTHERN DISTRICT OF CALIFORNIA

16  TARLA MAKAEFF, BRANDON          Case No.:  3:10-CV-00940-CAB (WVG)
    KELLER, ED OBERKROM, and
17  PATRICIA MURPHY, on Behalf of   CLASS ACTION
    Themselves and All Others Similarly
18  Situated,                        PLAINTIFFS' SUPPLEMENTAL
                                     RESPONSES TO DEFENDANT DONALD J.
19            Plaintiffs,            TRUMP'S FIRST SET OF
                                     INTERROGATORIES TO PLAINTIFFS
20            vs.

21  TRUMP UNIVERSITY, LLC, (aka Trump   District Judge:    Hon. Cathy Ann Bencivengo
    Entrepreneur Initiative) a New York   Magistrate Judge:  Hon. William V. Gallo
22  Limited Liability Company, DONALD J.
    TRUMP, and DOES 1 through 50,    Courtroom: 1, 4th Floor
23  Inclusive,

24            Defendants.

25                                   JURY TRIAL DEMANDED

26  PROPOUNDING PARTY:   DEFENDANT DONALD J. TRUMP
    RESPONDING PARTIES:  PLAINTIFFS TARLA MAKAEFF, BRANDON KELLER,
27                       ED OBERKROM AND PATRICIA MURPHY
    SET NUMBER:          FIRST SUPPLEMENTAL
28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-697-

1    Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Court's February

2    13, 2012 and March 2, 2012 Orders on Discovery Disputes ("Discovery Order"), Plaintiffs

3    Tarla Makaeff, Brandon Keller and Ed Oberkrom ("Plaintiffs") hereby answer and object to

4    Defendant Donald J. Trump's First Set of Interrogatories to Plaintiffs as follows.

5    **I.    PRELIMINARY STATEMENT**

6    These responses are made solely for the purpose of, and in relation to, this action.

7    Each answer is given subject to all appropriate objections (including, but not limited to,

8    objections concerning competency, relevancy, materiality, propriety and admissibility) which

9    would require the exclusion of any statement contained herein if the Interrogatory were asked

10   of, or any statement contained herein were made by, a witness present and testifying in Court.

11   All such objections and grounds therefore are reserved and may be interposed at the time of

12   trial.

13   The party on whose behalf the answers are given has not yet completed investigation of

14   the facts relating to this action, has not yet completed discovery in this action, and has not yet

15   completed preparation for trial.  Consequently, the following answers are given without

16   prejudice to the answering party's right to produce, at the time of trial, subsequently

17   discovered evidence relating to the proof of facts subsequently discovered to be material.

18   Except for facts explicitly admitted herein, no admission of any nature whatsoever is to

19   be implied or inferred.  The fact that any Interrogatory herein has been answered should not be

20   taken as an admission, or a concession of the existence, of any facts set forth or assumed by

21   such Interrogatory, or that such answer constitutes evidence of any fact thus set forth or

22   assumed.  All answers must be construed as given on the basis of present recollection.

23   **II.    GENERAL OBJECTIONS**

24   Plaintiffs incorporate the following general objections (the "General Objections") into

25   each and every one of their specific responses and objections set forth below.  Plaintiffs object

26   to each and every Interrogatory insofar as: (1) it seeks information that is protected by the

27   attorney-client and/or attorney-work product privileges and/or is otherwise privileged; (2) it

28   seeks information that is publicly available and/or uniquely or equally available to Defendant

*ZELDES & HAEGGQUIST, LLP*

1    No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-698-

from itself, its employees, or third parties; (3) it seeks information which predates or postdates or does not specifically refer to, the events which are the subject of this litigation; (4) it purports to impose an obligation on Plaintiffs to provide a response for or on behalf of any other person or entity and/or seeks information not in Plaintiffs' possession, custody, or control; (5) it seeks documents or information exclusively in the possession, custody, or control of Plaintiffs' lawyers; (6) it violates Plaintiffs' right to privacy; (7) it violates the privacy rights of third parties; (8) it is duplicative; (9) it is vague, ambiguous, and/or overbroad; and (10) it calls for legal conclusions and/or requires a lay person to decipher, respond to, and be bound by highly-technical legal terms.

Plaintiffs also object that the requests taken individually and as a whole seek irrelevant information and/or information that is not likely to lead to the discovery of admissible evidence and accordingly are not specified with sufficient particularity, overbroad, unduly burdensome, and propounded to vex, harass and/or intimidate Plaintiffs. Plaintiffs further object insofar as the interrogatories seek information already in the hands of Defendant and/or produced by Defendant to Plaintiffs in this action.

Finally, Plaintiffs object to these interrogatories to the extent that each allegation contained in Plaintiffs' complaint was alleged to be likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, and that these Interrogatories prematurely seek discovery about these allegations before Plaintiffs have had a reasonable opportunity for further investigation and discovery.

Subject to the foregoing Preliminary Statement and the General Objections and to the specific responses and objections set forth below, Plaintiffs will respond to the Interrogatories. Notwithstanding the foregoing, as noted, Plaintiffs have not completed their investigation of the facts and documents related to this action, have not fully completed discovery in this action, and have not completed their preparation for trial. Consequently, the following responses are provided without prejudice to Plaintiffs' right to supplement or further amend the responses and to produce evidence, documentary or otherwise, of any subsequently discovered facts and/or documents.

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-699-

III.     **RESPONSES TO INTERROGATORIES**

INTERROGATORY NO. 1:

Please state with specificity all facts which support plaintiffs' allegations in Paragraph 17 of the Second Amended Complaint that TRUMP UNIVERSITY testimonial(s) violated FTC regulations and requirements, including each actual testimonial plaintiffs contend violated FTC regulations and requirements, the name of the author or witness, the date of each, and the specific FTC regulation or requirement plaintiffs contend TRUMP UNIVERSITY violated for each.

RESPONSE TO INTERROGATORY NO. 1:

Plaintiffs specifically incorporate their General Objections set forth above as though fully set forth herein to the extent applicable to this interrogatory.  Plaintiffs object to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information in Defendants' possession, custody or control.

Plaintiffs further object to this interrogatory because it seeks information duplicative of information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil Procedure.  Plaintiffs have already identified all currently known documents and individuals who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

Plaintiffs further object to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews). This interrogatory improperly seeks, and if responded to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with counsel's legal theories and conclusions as outlined in the complaint.

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-700-

ZELDES & HAEGGQUIST, LLP

1    Plaintiffs also object to this interrogatory on the grounds that it calls for an expert

2    opinion, legal conclusion and/or legal statement of the law.

3    Plaintiffs also object on the grounds that such contention discovery is premature and

4    presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

5    investigation into the issues and witnesses pertaining to this action is still continuing.

6    SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:

7    Plaintiffs specifically incorporate their General and Specific Objections to

8    Interrogatory No. 1 set forth above as though fully set forth herein to the extent applicable to

9    this interrogatory.  Plaintiffs further object that Defendants' request for the specific FTC

10   regulations violated by Defendants calls for a legal conclusion and is an inappropriate subject

11   for an interrogatory.  Plaintiffs further object that this Interrogatory is impermissibly

12   compound and contains five discreet subparts, in that it asks Plaintiffs to identify: (1) all facts

13   which support plaintiffs' allegations that Trump University violated FTC regulations and

14   requirements; (2) actual testimonials which plaintiffs contend violated FTC regulations and

15   requirements, (3) the name of the author or witness; and (4) the date of each such testimonial;

16   and (5) the FTC regulation or requirement that was violated.

17   Subject to and without waiving the foregoing General and Specific Objections,

18   pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

19   Interrogatory, Plaintiffs respond as follows:

20   Plaintiffs are informed and believe that Trump University engaged in improper and

21   misleading practices and/or violated the FTC Act and/or FTC regulations and requirements,

22   including, *inter alia*, FTC Guides Concerning the Use of Endorsements and Testimonials in

23   Advertising, 16 CFR Part 255, §§255, 255.1, 255.2, 255.3 and 255.5, by: (1) having speakers

24   use personal stories that were false; (2) having Trump University speakers and representatives

25   misrepresent their real estate investing experience and financial status; (3) using testimonials

26   from consumers that were false or misleading, (4) using testimonials from students who did

27   not take Trump University courses (such as testimonials from students who took Trump

28   Institute courses or courses that the instructor taught prior to Trump University) and implying

Exhibit 39
-701-

ZELDES & HAEGGQUIST, LLP

1   that such testimonials supported the success or value of Trump University courses; (5)

2   fabricating testimonials; (6) using testimonials without the consumer's permission; (7) using

3   testimonials from consumers implying that they purchased or used certain Trump University

4   products or services, when that statement was not true, (8) inaccurately stating the pricing of

5   courses or advertising "price drops," (such as, "If you walk out that door today, the price of

6   this program is going to jump from $1,495 to $1,995 – this is a "one time deal" or an "event

7   only price"); (9) implying that there were a shortage of seminar spots available, such as saying

8   "we only have 10 spots left today for this seminar;" (10) promising or guaranteeing students

9   that they would make a certain amount of money (such as $35,000 in 30 or 60 days), or make

10  the money back that they spent for the course in their first deal; and (11) failing to disclose

11  material connections between Trump University and persons and entities who spoke and

12  recruited at Trump University Seminars, including Prosper, Childers and Trump Institute in

13  violation of 16 CFR Part §255.5 (Disclosure of Material Connections).

14      As an example of false and misleading personal stories by Trump University

15  representatives, Trump University mentor Mike Kasper, repeatedly told Trump University

16  students, including Makaeff, that he was worth $200 million in 2008.  This was not true.  In

17  fact, Mike Kasper declared bankruptcy in June 2009.  At that time, he had assets of $560,950

18  (mostly his house) and liabilities of over ***$165 million***.  His bankruptcy filing indicates that he

19  had an income of $42,552 in 2009 and $173,918 in 2008.  It also appears that he had three

20  properties foreclosed on in 2008 and two cars repossessed in 2007.

21      Discovery is continuing, but examples of false or misleading testimonials which may

22  violate the FTC Act and/or Regulations because they are deceptive, false and/or misleading

23  include:

24      **Kevin Andrews** – Trump University used a testimonial for student Kevin Andrews

25  which implied that Andrews endorsed Trump University and stated, "My wife and I made

26  $20,000 on our very first deal, and we helped a struggling homeowner." *See* TU 55685. TU

27  55930, TU 56174.

28

Exhibit 39
-702-

ZELDES & HAEGGQUIST, LLP

1   This testimonial was misleading, because, in fact, Andrews did not make $20,000.

2   After paying agent fees and taxes, he made a profit of only $6,000 - $7,000.  Furthermore, the

3   testimonial was misleading in implying that Andrews endorsed and was satisfied with Trump

4   University.  In fact, Andrews did not feel that he got what he was promised in regard to the

5   mentorship program.  He was promised access to a personal mentor who would go out in the

6   field with him and show him how to complete contracts and put together real estate deals.

7   Trump University promised that after the mentor helped him, he would have two or three

8   property deals under contract.  A mentor did come out and spend one day with Andrews, his

9   wife, and a real estate agent looking at properties but that was all.  After that, Andrews could

10  never get in touch with the mentor for help.  The mentor would not answer Andrews' emails or

11  phone calls.  The mentor never walked Andrews through any deals like he said he was going

12  to.  And once the mentor got back on a plane and left, Andrews and his wife were on their

13  own.  Andrews had to close the deal without any help from the mentor, and his mentor did not

14  return his phone calls or emails.

15  **Risa and Todd Madison** – Trump University used a testimonial for students Risa and

16  Todd Madison which implied that the Madisons endorsed Trump University and stated, "Our

17  mentor at Trump University showed us not only what to look for but HOW to look at

18  properties.  We got to see prospective properties through his eyes, a professional, seasoned,

19  successful investor.  We are now preparing to rehab two properties, with a goal of ten

20  properties in 2008.  With the training we have received through Trump University, and the

21  relationship we have with our mentor, we believe this is a very attainable goal." TU-58975.

22  This testimonial was misleading because although it stated that the Madisons believed they

23  would be able to rehab ten properties, in fact they did not rehab any properties, and were not

24  satisfied with Trump University.

25  In addition, the Madisons believed that Trump University misrepresented that there

26  was an "iron-clad money back guarantee," that if they did not make their money back within

27  the first couple of deals they would get a total refund.  The Madisons did ask for a refund, and

28  contrary to their promises, Trump University refused.

Exhibit 39
-703-

ZELDES & HAEGGQUIST, LLP

1   Furthermore, the Madisons felt that Trump University misrepresented the help they

2   would receive from their mentors.  Neither of their two mentors, Bill Barnett or Mike Biglane,

3   helped them make any deals.    Both times, the Madisons complained again to Trump

4   University but to no avail.

5   **Shirnette Blaine-Tarpeh** – Trump University used a testimonial for student Shirnette

6   Blaine-Tarpeh which implied that the she endorsed Trump University and stated, "I just sold

7   my first foreclosure for $20,000 profit."  TU-MAKAEFF0303.  In fact, this testimonial was

8   false and misleading because she did not sell a foreclosure for $20,000 profit.  She was

9   working on such a deal, but it fell through, never happened, and she made no money.

10   Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

11   Response upon the discovery of relevant, responsive and non-privileged information.

12   <u>INTERROGATORY NO. 2:</u>

13   Please state all facts which support plaintiffs contention that Donald J. Trump

14   personally made misrepresentations, including each and every alleged misrepresentation, the

15   date of each, location of each purported misrepresentation, and date each plaintiff relied on the

16   misrepresentation.

17   <u>RESPONSE TO INTERROGATORY NO. 2:</u>

18   Plaintiffs specifically incorporate its General Objections set forth above as though fully

19   set forth herein to the extent applicable to this interrogatory.  Plaintiffs object to this

20   interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

21   in Defendants' possession, custody or control.

22   Plaintiffs also object to this interrogatory on the grounds that the term "personally" is

23   vague and ambiguous.

24   Plaintiffs further object to this interrogatory on the grounds that it calls for an expert

25   opinion, legal conclusion and/or legal statement of the law.

26   Plaintiffs also object on the grounds that such contention discovery is premature and

27   presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

28   investigation into the issues and witnesses pertaining to this action is still continuing.

Exhibit 39
-704-

1    Subject to and without waiving the foregoing General and Specific Objections,

2    Plaintiffs respond as follows: Donald Trump's misrepresentations include the following, as set

3    forth in ¶59 of the Second Amended Complaint:

4    (a)    Donald Trump allowed Trump University to represent that he is the

5    founder and Chairman of Trump University, that he owned Trump University "lock, stock and

6    barrel," and that Trump University is his "baby, his company."

7    (b)    Donald Trump allowed Trump University to use his name, photos and

8    quotes for all Trump University seminar presentations, advertising, including on the home

9    page of Trump University's website, along with a personal message from him: "Are YOU My

10    Next Apprentice?  Prove it to me!"  Other advertisements purported to provide "insider

11    success secrets from Donald Trump," and the opportunity to "Learn from the Master," next to

12    Donald Trump's image.  Consumers are told that the seminar is based on the "investing

13    experience of Donald Trump."

14    (c)    Donald Trump approved print advertisements featuring his image and

15    quotes attributed to him including: "Don't think you can profit in this market? You can.  And

16    I'll show you how.  Learn from my handpicked expert how you can profit from the largest real

17    estate liquidation in history."

18    (d)    Donald Trump approved e-mails from Trump University to thousands or

19    tens of thousands consumers featuring Donald Trump's photo with the words: "Are you My

20    Next Apprentice," and stated: "76% of the world's millionaires made their fortunes in real

21    estate. Now it's your turn. My father did it, I did it, and now I'm ready to teach you how to do

22    it too."  The signature line at the bottom of the email reads, Donald J. Trump, Chairman,

23    Trump University, and even includes his signature.

24    (e)    Donald Trump represented in print advertisements containing his

25    signature that ""I can turn anyone into a successful real estate investor, including you. –

26    Donald Trump."

27    (f)    Donald Trump sent signed letters to consumers nationwide, with his

28    name and signature at the bottom, which stated: "[N]o course offers the same depth of insight,

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-705-

experience and support as the one bearing my name ….   My hand-picked instructors and mentors will show you how to use real estate strategies to: [s]upplement or even replace your income, [s]ecure your long-term financial future ... [s]tart profiting today! Now is the time to create your financial legacy.  You can do it, even if you only have five or ten hours a week to spare.  With our simple instructions and practice exercises – and ongoing support from your own Trump Team of Experts – you'll have what you need to succeed!"   (Emphasis in original).   The letter closes with Donald J. Trump's name, signature, and at the Trump University address, at 40 Wall Street, 32nd Floor, New York, NY 10005.

(g)     While Plaintiffs and other Class members were in the midst of the Trump University $1,500 seminar and Trump University was trying to persuade them to sign up for the $35,000 course, each of the participants received a personalized (addressed to them by name) letter from Donald J. Trump.  The letter bore the Trump logo at the top of the letter and the words "From the Office of Donald J. Trump."  The letters stated:

> Success in real estate begins with great training and proven strategies.  Without education you don't stand a chance.
>
> I know how to make money in real estate.  I've been doing it for a long time with a lot of success.  My family has been a leader in real estate since my father – Fred Trump – started building residential homes in New York City 75 years ago.  My father was my mentor and he taught me a lot.  Now I want to teach you how to make money in real estate.  To be my apprentice you need to Think BIG and really want to succeed.  More than anything, you need to take action.
>
> Do YOU have What It Takes to Be My Next Apprentice?
>
> I only work with people who are committed to succeed.  I founded Trump University back in 2005 to teach go-getters how to succeed in real estate. My team at Trump University is filled with real estate experts ... proven winners. We're the best of the best and we know what works.  If you think you have what it takes to be my next apprentice, prove it to me.
>
> We've trained thousands of real estate investors over the years and we know you will be most successful when you work with a partner….
>
> If you're serious about making money and safeguarding your future, learn to invest in real estate.  Trump University will teach you how.  We'll give you the best training and the confidence to succeed.  If you think you've got what it takes to be my next Apprentice, come prove it to me and my team.

The letter closes with "See you at the top!"  And, it is signed, "Donald J. Trump, Chairman, Trump University."

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-706-

1   (h)   Donald Trump wrote nearly 400 blogs posted on Trump University's

2   website, and stated that he intended to be actively involved with Trump University – Donald

3   Trump regularly posts blogs on the Trump University website – he has posted 387 blogs from

4   May 27, 2005, to as recently as August 18, 2010, and these blogs all remained on the website

5   as of October 18, 2010.  In these blogs, Donald Trump stated that he intended to be actively

6   involved with Trump University and intended to personally help consumers who paid for

7   Trump University Seminars.  Donald Trump wrote: "I'm not just putting my name on this

8   venture; I plan to be an active presence in the curricula."  For example in the blog "Why I

9   Started Trump University: A Passion for Learning," Donald Trump explains that:

> Trump University grew out of my desire to impart my business knowledge, accumulated over the years, and my realization that there is a huge demand for practical, convenient education that teaches success.  I want the people who go to Trump University to succeed, and I plan to do my part to help them. I'm not just putting my name on this venture; I plan to be an active presence in the curricula. The website, www.trumpuniversity.com, will include such features as "Ask Mr. Trump," in which I answer your questions; the blog you're reading now; video clips of me; and more. My words, ideas, and image will also be woven into the courses we create. The reason I'm playing such an active role in Trump University is that I truly believe in the power of education ....  [T]he people who go to Trump University want to be successful, and I'm on their side.

(i)   Donald Trump misrepresented in written and video advertisements that

students would learn from instructors, experts and mentors who would be "hand-picked" by

him.

(n)   Trump University website misrepresented that Donald Trump would

hold periodic live online Q&A Sessions with Trump University students, and twice a month

Donald Trump would personally choose and answer the best questions from Trump University

members.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO 2:

Plaintiffs specifically incorporate their General and Specific Objections to

Interrogatory No. 2 set forth above as though fully set forth herein to the extent applicable to

this interrogatory.

ZELDES & HAEGGQUIST, LLP

10   No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-707-

1   Subject to and without waiving the foregoing General and Specific Objections,

2   pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

3   Interrogatory, Plaintiffs respond as follows:

4   Plaintiffs identify the following specific oral misrepresentations by Defendant Trump:

5   *See* document Bates labeled TU 62975: "We are going to have professors and adjunct

6   professors that are absolutely terrific, terrific people, terrific brains, successful, the best. We

7   are going to have the best of the best." "These are all people that are hand-picked by me" and:

8   ***We are going to teach you about business, we are going to teach you better***
***than the business schools are going to teach you***. And I went to the best

9   business school. We are going to teach you better. It's going to be a shorter
process. It's not going to involve years and years of your life. It's going to be

10  less expensive and I think it's going to be a better education. And it's going to
be what you need to know. ***It's not going to be a lot of different theory that***

11  ***doesn't matter and will never be put to use***. It's going to be what you need to
know. So we are going to teach you business. We are going to teach you life.

12  We are going to teach you salesmanship. We are going to teach you what you
need to know.

13  Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

14  Response upon the discovery of relevant, responsive and non-privileged information.

15  INTERROGATORY NO. 3:

16  Please state with specificity all facts which support plaintiffs' contention that writing(s)

17  by Donald J. Trump contain false and/or misleading statements, including a description of

18  each writing, date of each writing, the specific portions plaintiffs contend contains false or

19  misleading statements and date each plaintiff relied on it.

20  RESPONSE TO INTERROGATORY NO. 3:

21  Plaintiffs specifically incorporate its General Objections set forth above as though fully

22  set forth herein to the extent applicable to this interrogatory.   Plaintiffs object to this

23  interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

24  in Defendants' possession, custody or control.

25  Plaintiffs further object to this interrogatory because it seeks information duplicative of

26  information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

27  Procedure.   Plaintiffs have already identified all currently known documents and individuals

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-708-

1   who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

2   Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

3    Plaintiffs further object to this interrogatory on the grounds that it seeks information

4   protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

5   *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

6   reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

7   and inferences drawn from interviews). This interrogatory improperly seeks, and if responded

8   to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

9   witnesses, the highlights of their testimony/factual knowledge, and would link any future

10  statements by the witnesses with counsel's legal theories and conclusions as outlined in the

11  complaint.

12   Plaintiffs also object to this interrogatory on the grounds that it calls for an expert

13  opinion, legal conclusion and/or legal statement of the law.

14   Plaintiffs also object on the grounds that such contention discovery is premature and

15  presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

16  investigation into the issues and witnesses pertaining to this action is still continuing.

17   Subject to and without waiving the foregoing General and Specific Objections,

18  Plaintiffs respond as follows: *See* Response to Interrogatory No. 2.

19  <u>SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3</u>:

20   Plaintiffs specifically incorporate their General and Specific Objections to

21  Interrogatory No. 3 set forth above as though fully set forth herein to the extent applicable to

22  this interrogatory.  Plaintiffs also object to this interrogatory on the grounds that the term "by"

23  is vague and ambiguous.  As set forth in Plaintiffs' Supplemental Response to Interrogatory

24  No. 6 herein below, Donald Trump personally reviewed all print ads.  In this sense, ***all*** ads by

25  Trump University could be considered to be "by" Donald Trump, in addition to the ads and

26  marketing which feature photographic images of Trump making declarations ***in the first-***

27  ***person***.

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-709-

Subject to and without waiving the foregoing General and Specific Objections, pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this Interrogatory, Plaintiffs respond as follows:

Defendant Donald J. Trump made the following false and/or misleading written statements, which were made **throughout** the United States and Canada **continuously** throughout the class period (*see* Exhibit C attached to Plaintiffs Supplemental Responses to Defendant Trump University, LLC's First Set of Interrogatories to Plaintiffs (chart identifying relevant documents of which identify dates and target locations of the advertisements and marketing materials)):

- "Learn from the Master";

- "Are YOU *My Next Apprentice*? Prove it to me!";

- "Learn *my proven, specialized Trump process* for real estate investing. *My handpicked expert* will show you how to find properties....";

- "*I* can turn anyone into a successful real estate investor";

- "...who's helping you? *I will*. There is no question in my mind *I can turn you into a successful real estate investor*";

- "Don't think you can profit in this market?  You can.  And *I'll show you how*";

- "*I'm deeply and actively involved* in Trump University ....";

- "76% of the world's millionaires made their fortunes in real estate. Now it's your turn.  My father did it, I did it, and now *I'm ready to teach you* how to do it too;

- "*I'm going to give you* 2 hours of access to one of *my* amazing instructors AND priceless information ....";

- "*I'm* sharing *my* proprietary 'Blueprint for Real Estate Success .... *My handpicked* instructors and mentors will show you how to use real estate strategies to ....";

- Learn "Insider success secrets *from Donald Trump*"; and

- Trump University represented to Plaintiffs and consumers that Donald Trump owns Trump University "lock, stock and barrel," and it is his "baby, his company."

The center of gravity of the fraudulent scheme was designed to, and did, make reasonable consumers, including Plaintiffs, want to sign up for Trump University Seminars for

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-710-

a specific reason: to "Learn *from the Master*," *Donald Trump*.  This was the primary reason Plaintiffs and consumers were drawn to and participated in Trump University and spent large sums of money, as is evidenced by Trump's own words: "*When I speak, people listen.  And, when I send out invitations, people attend because they know that my invitation means one thing – there is money to be made*."  *See, e.g.*, TU 62079.  Defendant Trump knows that the "'Trump' name is a powerful one."  With the "Trump stamp of approval comes immediate recognition and an expectation of quality and success."  *See* TU 64496.  In a blog post, Trump further states that "[t]he Trump name carries with it a price tag: people pay a lot more to live or rent commercial space in my buildings because of the association with me and my ideals."  "The Trump brand carries a promise that whatever bears the name will be elite."  *See* TU-PLT00199.  According to Trump University's President, Michael Sexton, "[u]ndoubtedly, the magic of the Trump name is largely responsible for [the] outpouring of interest" in Trump University.  (*See* TU 64475.)  As the face of Trump University, Donald Trump's image was omnipresent, appearing on, among other things, the Trump University website, in advertising and marketing, at seminars/workshops/retreats, and in the course materials.

The advertisements also took the form of *personal letters from Donald Trump*, with his name and signature at the bottom, which stated, among other things:

> My family has been a leader in real estate since my father – Fred Trump – started building residential homes in New York City 75 years ago …. Now *I want to teach you* how to make money in real estate.  To be *my Apprentice* you need to Think Big and really want to succeed ....

> Do YOU have what it takes to be *My* Next Apprentice?

> *I* only work with people who are committed to succeed.  *I* founded Trump University back in 2005 to teach go-getters how to succeed in real estate.  *My team* at Trump University *is filled with real estate experts ... proven winners*.  *We're the best of the best* and we know what works.  If you think you have what it takes to be *my next apprentice*, prove it to me.

> Now is the Perfect Time to Attend *My* Intro Apprenticeship Workshop

Trump personally invited consumers to the free workshops by enclosing "two complimentary VIP tickets to give to you and a guest the chance to learn how to create wealth *the Trump Way*."  *See, e.g.*, TU 62065 - TU 62069.

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-711-

ZELDES & HAEGGQUIST, LLP

1    Moreover, Trump wrote hundreds of blog posts on Trump University's website, stating

2    that he intended to be actively involved with Trump University.  Trump wrote, among other

3    things: "I want the people who go to Trump University to succeed, and I plan to do my part to

4    help them. *I'm not just putting my name on this venture; I plan to be an active presence in*

5    *the curricula*."  *See* TU-PLT00204-TU-PLT00205.

6    Trump also authored a number of books sold to students, one of which was entitled

7    "Trump 101, the Way to Success," wherein Trump states: "*I'm deeply and actively involved*

8    *in Trump University* because I firmly believe in the power of education and its function as an

9    engine of success," and "I want to help people, and, simply put, the Trump University students

10   want to be successful.  *I'm* on their side."  *See* TU_KELLER-575; TU-MAKAEFF0013.

11   Trump University, a for-profit "University," was built entirely around the prestige and

12   prominence of a single individual, Donald Trump. Trump University identified its program

13   with Donald Trump in his capacity as an ostentatious public figure, deliberately blurring any

14   line in the public mind between Donald Trump himself, and the University as an independent

15   entity. Yet, despite Defendants' extensive uniform advertising and marketing campaign

16   wherein Defendants shamelessly traded on the identification with Donald Trump's name,

17   reputation, and imaging – typically picturing Trump as speaking in the first person on its

18   behalf, Donald Trump, admittedly, was not "deeply" and "actively" involved, nor did

19   Plaintiffs or any other Trump University student become (or have a chance at becoming)

20   Trump's "next Apprentice," or learn from the Master himself or learn *his* master techniques.

21   In fact, Defendants admit that its aggressive advertising and marketing campaign contained

22   material misrepresentations, now stating in sworn statements to the judiciary that "Trump

23   University *is separate and distinct* from Donald Trump," and that Trump "simply" "endorsed"

24   Trump University and merely allowed Trump University to bear his name – *nothing more*.

25   *See also* Plaintiffs' Supplemental Response to Defendant Trump University's Interrogatory

26   No. 7, which is incorporated herein as if set forth in full.

27   Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

28   Response upon the discovery of relevant, responsive and non-privileged information.

Exhibit 39
-712-

ZELDES & HAEGGQUIST, LLP

INTERROGATORY NO. 4:

Please state with specificity all facts which support plaintiffs' contention that Donald J. Trump personally violated any law or statute, including each specific act by Mr. Trump, each specific law or statute plaintiffs contend he violated, the date of each and the IDENTITY of all witnesses who support plaintiffs' claims.

RESPONSE TO INTERROGATORY NO. 4:

Plaintiffs specifically incorporate its General Objections set forth above as though fully set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information in Defendants' possession, custody or control.

Plaintiffs further object to this interrogatory because it seeks information duplicative of information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil Procedure. Plaintiffs have already identified all currently known documents and individuals who may have discoverable information to support Plaintiffs' claims. *See* Plaintiffs' Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

Plaintiffs further object to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews). This interrogatory improperly seeks, and if responded to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with counsel's legal theories and conclusions as outlined in the complaint.

Plaintiffs also object to this interrogatory on the grounds that the term "personally" is vague and ambiguous.

Plaintiffs further object to this interrogatory on the grounds that it calls for an expert opinion, legal conclusion and/or legal statement of the law.

No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-713-

1    Plaintiffs also object on the grounds that such contention discovery is premature and

2    presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

3    investigation into the issues and witnesses pertaining to this action is still continuing.

4    Subject to and without waiving the foregoing General and Specific Objections,

5    Plaintiffs respond as follows: Plaintiffs contend that Donald Trump violated the Unfair

6    Competition Law ("UCL,"), Cal. Bus. & Prof. Code, §17200 (*see* Complaint, ¶¶96-103),[1] the

7    Consumer Legal Remedies Act ("CLRA,"), Cal. Civil Code §1750, *et seq.*) (*see* Complaint,

8    ¶¶104-111), and Cal. Bus. & Prof. Code §§17500, *et seq.* by disseminating untrue and

9    misleading advertising (*see* Complaint, ¶¶112-115).

10   INTERROGATORY NO. 4:

11   Plaintiffs specifically incorporate their General and Specific Objections to

12   Interrogatory No. 4 set forth above as though fully set forth herein to the extent applicable to

13   this interrogatory.

14   Subject to and without waiving the foregoing General and Specific Objections,

15   pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

16   Interrogatory, Plaintiffs respond as follows:

17   The following facts support Plaintiffs' contention that Defendant Trump violated, *inter*

18   *alia*, the Unfair Competition Law ("UCL,"), Bus. & Prof. Code, §§17200, *et seq.* (*see*

19   Complaint, ¶¶96-103), the Consumer Legal Remedies Act ("CLRA,"), Civil Code §§1750, *et*

20   *seq.*) (*see* Complaint, ¶¶104-111), and Bus. & Prof. Code §§17500, *et seq.* (*see* Complaint,

21   ¶¶112-115), as well as the consumer protection laws of the other 49 states.  Plaintiffs

22   incorporate their Supplemental Responses to Interrogatory Nos. 2 and 3 above.  *See* Exhibit C.

23   In addition to the oral and written misrepresentations set forth therein, Trump held

24   himself out to the public as being actively involved in Trump University.  Trump personally

25   financed Trump University and he remains one of the primary investors.  Trump personally

26   reviewed Trump University's financial statements, and he was involved in and knowledgeable

27

28
___
[1]    "Complaint" refers to Plaintiffs' Second Amended Class Action Complaint, filed December 16, 2010.

ZELDES & HAEGGQUIST, LLP

17                    No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-714-

ZELDES & HAEGGQUIST, LLP

1    about its financial operations.  As set forth in Plaintiffs' Supplemental Response to Donald

2    Trump's Interrogatory No. 6, Trump personally reviewed all print and direct mail

3    advertisements and marketing.  Trump also received regular updates from President Michael

4    Sexton.  Trump and the Trump Organization were "backing [Trump University] 100% and

5    [were] even pushing for a ***very large scale event*** with Mr. Trump in the near future," according

6    to Trump University director April Neumann to President Michael Sexton, Michael Bloom and

7    other conference call team members on August 19, 2010.  Trump also held (or at least

8    promised he would hold) periodic live online question-and-answer sessions with Trump

9    University Students to answer students' questions on the Trump University's website.

10    Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

11    Response upon the discovery of relevant, responsive and non-privileged information.

12    <u>INTERROGATORY NO. 5:</u>

13    Please state with specificity all facts which support plaintiffs' allegations in Paragraph

14    41 of the Second Amended Complaint that "in most cases [Mr. Trump] didn't even know who

15    [the instructors and mentors] were, and in most cases, he had never even met them," including

16    the IDENTITY of each witness who supports plaintiffs' allegations.

17    <u>RESPONSE TO INTERROGATORY NO. 5:</u>

18    Plaintiffs specifically incorporate its General Objections set forth above as though fully

19    set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

20    interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

21    in Defendants' possession, custody or control.

22    Plaintiffs also object to this interrogatory because it seeks information duplicative of

23    information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

24    Procedure.  Plaintiffs have already identified all currently known documents and individuals

25    who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

26    Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

27    Plaintiffs further object to this interrogatory on the grounds that it seeks information

28    protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

18                                      No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-715-

*v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews). This interrogatory improperly seeks, and if responded to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with counsel's legal theories and conclusions as outlined in the complaint.

Plaintiffs also object on the grounds that such contention discovery is premature and presumptively improper given that discovery in this case has only just begun. Plaintiffs' investigation into the issues and witnesses pertaining to this action is still continuing.

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

Plaintiffs specifically incorporate their General and Specific Objections to Interrogatory No. 5 set forth above as though fully set forth herein to the extent applicable to this interrogatory.

Subject to and without waiving the foregoing General and Specific Objections, pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this Interrogatory, Plaintiffs respond as follows:

Donald Trump did not hand-pick the Trump University mentors and instructors, and in most cases, he had never even met them." Witnesses aware of this fact include those listed on Exhibit B attached to Plaintiffs Supplemental Responses to Defendant Trump University, LLC's First Set of Interrogatories to Plaintiffs. Moreover, Defendants admit in sworn statements to the judiciary that "Trump University *is separate and distinct* from Donald Trump," and that Trump "simply" "endorsed" Trump University and merely allowed Trump University to bear his name – ***nothing more***. Furthermore, to date, Donald Trump has produced only one document showing his involvement in Trump University -- the organizational chart. He has produced no evidence that he handpicked the instructors or was deeply involved in Trump University.

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-716-

1    Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

2    Response upon the discovery of relevant, responsive and non-privileged information.

3    INTERROGATORY NO. 6:

4    Please state with specificity all facts which support plaintiffs' allegations in Paragraph

5    59(l) of the Second Amended Complaint that "Donald Trump personally reviewed all print and

6    direct mail advertisements before they went out," including the IDENTITY of all witnesses

7    who support plaintiffs' allegations.

8    RESPONSE TO INTERROGATORY NO. 6:

9    Plaintiffs specifically incorporate its General Objections set forth above as though fully

10   set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

11   interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

12   in Defendants' possession, custody or control.

13   Plaintiffs also object to this interrogatory because it seeks information duplicative of

14   information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

15   Procedure.  Plaintiffs have already identified all currently known documents and individuals

16   who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

17   Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

18   Plaintiffs further object to this interrogatory on the grounds that it seeks information

19   protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

20   *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

21   reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

22   and inferences drawn from interviews). This interrogatory improperly seeks, and if responded

23   to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

24   witnesses, the highlights of their testimony/factual knowledge, and would link any future

25   statements by the witnesses with counsel's legal theories and conclusions as outlined in the

26   complaint.

27

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-717-

1    Plaintiffs also object on the grounds that such contention discovery is premature and

2    presumptively improper given that discovery in this case has only just begun.   Plaintiffs'

3    investigation into the issues and witnesses pertaining to this action is still continuing.

4    SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:

5    Plaintiffs specifically incorporate their General and Specific Objections to

6    Interrogatory No. 6 set forth above as though fully set forth herein to the extent applicable to

7    this interrogatory.

8    Subject to and without waiving the foregoing General and Specific Objections,

9    pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

10   Interrogatory, Plaintiffs respond as follows:

11   Donald Trump did personally review all print and direct mail advertisements before

12   they went out. Witnesses aware of this fact include those listed on Exhibit B.

13   Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

14   Response upon the discovery of relevant, responsive and non-privileged information.

15   INTERROGATORY NO. 7:

16   Please state with specificity all facts supporting plaintiffs' allegation in Paragraph 52 of

17   the Second Amended Complaint that "mentors recommended real estate deals that they stood

18   to benefit from financially," including the name of each mentor who made the

19   recommendation, each specific "deal" and the date of each.

20   RESPONSE TO INTERROGATORY NO. 7:

21   Plaintiffs specifically incorporate its General Objections set forth above as though fully

22   set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

23   interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

24   in Defendants' possession, custody or control.

25   Plaintiffs also object to this interrogatory because it seeks information duplicative of

26   information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

27   Procedure.  Plaintiffs have already identified all currently known documents and individuals

28

ZELDES & HAEGGQUIST, LLP

21                    No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-718-

1   who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

2   Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

3       Plaintiffs further object to this interrogatory on the grounds that it seeks information

4   protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

5   *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

6   reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

7   and inferences drawn from interviews). This interrogatory improperly seeks, and if responded

8   to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

9   witnesses, the highlights of their testimony/factual knowledge, and would link any future

10  statements by the witnesses with counsel's legal theories and conclusions as outlined in the

11  complaint.

12      Plaintiffs also object on the grounds that such contention discovery is premature and

13  presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

14  investigation into the issues and witnesses pertaining to this action is still continuing.

15      Subject to and without waiving the foregoing General and Specific Objections,

16  Plaintiffs respond as follows: This interrogatory is duplicative of Trump University's

17  Interrogatory No. 10.  *See* Plaintiffs' response to Trump University's Interrogatory No. 10.

18  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

19      Plaintiffs specifically incorporate their General and Specific Objections to

20  Interrogatory No. 7 set forth above as though fully set forth herein to the extent applicable to

21  this interrogatory.

22      Subject to and without waiving the foregoing General and Specific Objections,

23  pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

24  Interrogatory, Plaintiffs respond as follows:

25      In mid to late August 2008, immediately following the "Fast track to Foreclosure

26  Seminar," James Harris wrote to Tarla Makaeff that deals would be coming her way via e-

27  mail, and that "these deals are starting to POUR IN NOW."  Harris introduced her to a

28  supposedly profitable deal involving Fountainview Duplexes in Houston.  Makaeff's mentors,

*ZELDES & HAEGGQUIST, LLP*

22       No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-719-

ZELDES & HAEGGQUIST, LLP

1    Kasper and McNally told her in October-November 2008 that she should "have no fear," "take

2    a risk" and "take the deal."  However, Makaeff learned that Kasper had a relationship with

3    Chief Denney, who was associated with the Houston Fountainview Duplexes deal, and

4    believed Kasper stood to receive a referral fee from Denney if Makaeff invested, because

5    Kasper told Makaeff that likewise, if she brought other students in, she would receive a

6    finders' fee or referral fee which she later discovered is illegal.  Accordingly, because Kasper

7    stood to personally benefit if Makaeff invested, Kasper sent Makaeff urgent emails asking her

8    if she was going to purchase the two properties she was contemplating.  Furthermore, Trump

9    University Instructor Stephen Gilpin instructed Makaeff never to accept a deal unless she

10   would receive at least $100 positive monthly income and, under this deal, Makaeff would

11   receive only $40 positive monthly income, which was not worthwhile or profitable according

12   to Gilpin.  Other Trump University students who invested and/or contemplated this "deal" also

13   later said the "deal" was not a deal at all and left them in a negative income position as some

14   necessary maintenance costs were not included in the deal projections provided by Denney.

15        In addition, sometime between January and July 2009, Tad Lignell introduced Makaeff

16   to Real Estate Agent Noah Herrera in relation to potential real estate investments in Las Vegas,

17   including a property located at 3531 Florrie Avenue.  Trump University student Robert Vargas

18   was also going to be an investor.  Lignell appeared to have a financial interest in referring

19   Trump University students to Herrera as Las Vegas was the only area of the country Lignell

20   mentored, even though Trump University represented that the mentors would travel to the

21   students' hometowns, and despite the fact that Lignell resided primarily in Utah.  Further,

22   Herrera was the only agent Lignell worked with in Las Vegas.  Herrera, introduced by Lignell

23   as part of his Trump University "Power Team," then further took advantage of Makaeff by

24   misquoting comps on the Florrie property to Makaeff, which she discovered after the deal was

25   already in progress when Lignell was supposed to be overseeing these deals.  It appeared

26   Lignell's only interest was perhaps receiving a kickback for introductions to Herrera.

27        Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

28   Response upon the discovery of relevant, responsive and non-privileged information.

Exhibit 39
-720-

ZELDES & HAEGGQUIST, LLP

INTERROGATORY NO. 8:

Please state all facts which supports plaintiffs' allegations in Paragraph 6 of the Second Amended Complaint that "Trump's real reason for having students increase their credit limits and provide detailed financial status was to assess how much money each student had to spend on the next Trump seminar, and to persuade the students to use their increased credit limit to purchase the Trump Gold Program for $34,995," including the IDENTITY of each witness who supports plaintiffs' allegations.

RESPONSE TO INTERROGATORY NO. 8:

Plaintiffs specifically incorporate its General Objections set forth above as though fully set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information in Defendants' possession, custody or control.

Plaintiffs also object to this interrogatory because it seeks information duplicative of information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil Procedure. Plaintiffs have already identified all currently known documents and individuals who may have discoverable information to support Plaintiffs' claims. *See* Plaintiffs' Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

Plaintiffs further object to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews). This interrogatory improperly seeks, and if responded to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with counsel's legal theories and conclusions as outlined in the complaint.

Exhibit 39
-721-

ZELDES & HAEGGQUIST, LLP

1  Plaintiffs also object on the grounds that such contention discovery is premature and

2  presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

3  investigation into the issues and witnesses pertaining to this action is still continuing.

4  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:

5  Plaintiffs specifically incorporate their General and Specific Objections to

6  Interrogatory No. 8 set forth above as though fully set forth herein to the extent applicable to

7  this interrogatory.

8  Subject to and without waiving the foregoing General and Specific Objections,

9  pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

10  Interrogatory, Plaintiffs respond as follows:

11  Trump University former employees, including one or more of those listed in Exhibit

12  B, confirmed, as part of Plaintiffs' counsel's work product investigation, that that the reason

13  for the financial worksheets was to find out how much money the students had to spend.

14  Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

15  Response upon the discovery of relevant, responsive and non-privileged information.

16  INTERROGATORY NO. 9:

17  Please IDENTIFY each and every "student" plaintiffs allege in Paragraph 13 of the

18  Second Amended Complaint who was "reluctant to criticize the instructors and mentors."

19  RESPONSE TO INTERROGATORY NO. 9:

20  Plaintiffs specifically incorporate its General Objections set forth above as though fully

21  set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

22  interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

23  in Defendants' possession, custody or control.

24  Plaintiffs also object to this interrogatory because it seeks information duplicative of

25  information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

26  Procedure.  Plaintiffs have already identified all currently known documents and individuals

27  who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

28  Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

Exhibit 39
-722-

1    Plaintiffs further object to this interrogatory on the grounds that it seeks information

2    protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

3    *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

4    reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

5    and inferences drawn from interviews).  This interrogatory improperly seeks, and if responded

6    to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

7    witnesses, the highlights of their testimony/factual knowledge, and would link any future

8    statements by the witnesses with counsel's legal theories and conclusions as outlined in the

9    complaint.

10    Plaintiffs also object on the grounds that such contention discovery is premature and

11    presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

12    investigation into the issues and witnesses pertaining to this action is still continuing.

13    SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:

14    Plaintiffs specifically incorporate their General and Specific Objections to

15    Interrogatory No. 9 set forth above as though fully set forth herein to the extent applicable to

16    this interrogatory.

17    Subject to and without waiving the foregoing General and Specific Objections,

18    pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

19    Interrogatory, Plaintiffs respond as follows:

20    Tarla Makaeff, Brandon Keller and Ed Oberkrom were reluctant to criticize their

21    mentors.  Many, if not all, of Trump University students, including those listed on Exhibit A

22    (attached to Plaintiffs Supplemental Responses to Defendant Trump University, LLC's First

23    Set of Interrogatories to Plaintiffs), as a matter of common sense may have been reluctant to

24    criticize mentors who they had just paid $35,000 to help them, but discovery is continuing and

25    Plaintiffs reserve the right to supplement/amend this Response upon the discovery of

26    additional relevant, responsive and non-privileged information.

27

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-723-

INTERROGATORY NO. 10:

Please IDENTIFY each and every person who supports plaintiffs' allegations in Paragraph 13 of the Second Amended Complaint that "nearly everyone he spoke to who purchased the $35,000 elite seminar was dissatisfied with it," including but not limited to each REPRESENTATIVE.

RESPONSE TO INTERROGATORY NO. 10:

Plaintiffs specifically incorporate its General Objections set forth above as though fully set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information in Defendants' possession, custody or control.

Plaintiffs also object to this interrogatory because it seeks information duplicative of information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil Procedure. Plaintiffs have already identified all currently known documents and individuals who may have discoverable information to support Plaintiffs' claims. *See* Plaintiffs' Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

Plaintiffs further object to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews). This interrogatory improperly seeks, and if responded to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with counsel's legal theories and conclusions as outlined in the complaint.

Plaintiffs also object on the grounds that such contention discovery is premature and presumptively improper given that discovery in this case has only just begun. Plaintiffs' investigation into the issues and witnesses pertaining to this action is still continuing.

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-724-

ZELDES & HAEGGQUIST, LLP

1    SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

2         Plaintiffs specifically incorporate their General and Specific Objections to

3    Interrogatory No. 10 set forth above as though fully set forth herein to the extent applicable to

4    this interrogatory.

5         Subject to and without waiving the foregoing General and Specific Objections,

6    pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

7    Interrogatory, Plaintiffs respond as follows:

8         Trump University former employees, including one or more of those listed in , B,

9    confirmed as part of Plaintiffs' counsel's work product investigation, that nearly everyone they

10   spoke to who purchased the $35,000 elite seminar was dissatisfied with it.

11        Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

12   Response upon the discovery of relevant, responsive and non-privileged information.

13   INTERROGATORY NO. 11:

14        Please state all facts which support plaintiffs' allegations in Paragraph 16 of the Second

15   Amended Complaint that "Trump University told its mentors it would not pay them for more

16   than six one-hour mentoring sessions per consumer," the "one year of mentoring/consulting

17   promised was really only six one-hour coaching sessions," and "Trump University Corporate

18   has admitted [this] should have been disclosed," including the IDENTITY of each witness

19   with facts supporting plaintiffs' allegations.

20   RESPONSE TO INTERROGATORY NO. 11:

21        Plaintiffs specifically incorporate its General Objections set forth above as though fully

22   set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

23   interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

24   in Defendants' possession, custody or control.

25        Plaintiffs also object to this interrogatory because it seeks information duplicative of

26   information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

27   Procedure.  Plaintiffs have already identified all currently known documents and individuals

28

Exhibit 39
-725-

1    who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

2    Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

3        Plaintiffs further object to this interrogatory on the grounds that it seeks information

4    protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

5    *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

6    reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

7    and inferences drawn from interviews). This interrogatory improperly seeks, and if responded

8    to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

9    witnesses, the highlights of their testimony/factual knowledge, and would link any future

10   statements by the witnesses with counsel's legal theories and conclusions as outlined in the

11   complaint.

12       Plaintiffs also object on the grounds that such contention discovery is premature and

13   presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

14   investigation into the issues and witnesses pertaining to this action is still continuing.

15   SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

16       Plaintiffs specifically incorporate their General and Specific Objections to

17   Interrogatory No. 11 set forth above as though fully set forth herein to the extent applicable to

18   this interrogatory.

19       Subject to and without waiving the foregoing General and Specific Objections,

20   pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

21   Interrogatory, Plaintiffs refer Defendants to respond as follows:

22       Plaintiffs refer Defendants to TU-PLTF 710-714.   Discovery is continuing and

23   Plaintiffs reserve the right to supplement/amend this Response upon the discovery of relevant,

24   responsive and non-privileged information.

25   INTERROGATORY NO. 12:

26       Please state all facts which support plaintiffs' allegations in Paragraph 17 of the Second

27   Amended Complaint that testimonials were enhanced, misrepresented and/or completely

28   fabricated, including each actual testimonial, author or witness, the specific portion YOU

ZELDES & HAEGGQUIST, LLP

29                    No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-726-

1    contend was enhanced, misrepresented and/or completely fabricated, the date of each, and the

2    IDENTITY of each witness.

3    RESPONSE TO INTERROGATORY NO. 12:

4         Plaintiffs specifically incorporate its General Objections set forth above as though fully

5    set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

6    interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

7    in Defendants' possession, custody or control.

8         Plaintiffs also object to this interrogatory because it seeks information duplicative of

9    information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

10   Procedure.  Plaintiffs have already identified all currently known documents and individuals

11   who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

12   Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

13        Plaintiffs further object to this interrogatory on the grounds that it seeks information

14   protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

15   *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

16   reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

17   and inferences drawn from interviews). This interrogatory improperly seeks, and if responded

18   to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

19   witnesses, the highlights of their testimony/factual knowledge, and would link any future

20   statements by the witnesses with counsel's legal theories and conclusions as outlined in the

21   complaint.

22        Plaintiffs further object to this interrogatory on the grounds that it calls for an expert

23   opinion, legal conclusion and/or legal statement of the law.

24        Plaintiffs also object on the grounds that such contention discovery is premature and

25   presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

26   investigation into the issues and witnesses pertaining to this action is still continuing.

27

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-727-

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:

Plaintiffs specifically incorporate their General and Specific Objections to Interrogatory No. 12 set forth above as though fully set forth herein to the extent applicable to this interrogatory.

Subject to and without waiving the foregoing General and Specific Objections, pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this Interrogatory, Plaintiffs respond that the following testimonials were false or misleading:

**Kevin Andrews** – Trump University used a testimonial for student Kevin Andrews which implied that Andrews endorsed Trump University and stated, "My wife and I made $20,000 on our very first deal, and we helped a struggling homeowner." *See* TU 55685. TU 55930, TU 56174.

This testimonial was misleading, because, in fact, Andrews did not make $20,000. After paying agent fees and taxes, he made a profit of only $6,000 to $7,000. Furthermore, the testimonial was misleading in implying that Andrews endorsed and was satisfied with Trump University. In fact, Andrews did not feel that he got what he was promised in regard to the mentorship program. He was promised access to a personal mentor who would go out in the field with him and show him how to complete contracts and put together real estate deals. Trump University promised that after the mentor helped him, he would have two or three property deals under contract. A mentor did come out and spend one day with Andrews, his wife, and a real estate agent looking at properties but that was all. After that, Andrews could never get in touch with the mentor for help. The mentor would not answer Andrews' emails or phone calls. The mentor never walked Andrews through any deals like he said he was going to. And once the mentor got back on a plane and left, Andrews and his wife were on their own. Andrews had to close the deal without any help from the mentor, and his mentor did not return his phone calls or emails.

**Risa and Todd Madison** – Trump University used a testimonial for students Risa and Todd Madison which implied that the Madisons endorsed Trump University and stated, "Our mentor at Trump University showed us not only what to look for but HOW to look at

No. 3:10-CV-00940 CAB(WVG)

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-728-

1   properties.  We got to see prospective properties through his eyes, a professional, seasoned,

2   successful investor.   We are now preparing to rehab two properties, with a goal of ten

3   properties in 2008.  With the training we have received through Trump University, and the

4   relationship we have with our mentor, we believe this is a very attainable goal." <u>TU-58975</u>.

5   This testimonial was misleading because although it stated that the Madisons believed they

6   would be able to rehab ten properties, but, in fact, they did not rehab any properties, and were

7   not satisfied with Trump University.

8           In addition, the Madisons believed that Trump University misrepresented that there

9   was an "iron-clad money back guarantee," that if they did not make their money back within

10  the first couple of deals they would get a total refund.  The Madisons did ask for a refund, and

11  contrary to their promises, Trump University refused.

12          Furthermore, the Madisons felt that Trump University misrepresented the help they

13  would receive from their mentors.  Neither of their two mentors, Bill Barnett or Mike Biglane,

14  helped them make any deals.    Both times, the Madisons complained again to Trump

15  University but to no avail.

16          **Shirnette Blaine-Tarpeh** – Trump University used a testimonial for student Shirnette

17  Blaine-Tarpeh which implied that she endorsed Trump University and stated, "I just sold my

18  first foreclosure for $20,000 profit."  TU-MAKAEFF0303.  In fact, this testimonial was false

19  and misleading because she did not sell a foreclosure for $20,000 profit.  She was working on

20  such a deal, but it fell through, never happened, and she made no money.

21          As part of Plaintiffs' counsel's work-product investigation, one or more of the

22  individuals listed in Exhibit B confirmed, as part of Plaintiffs' counsel's work product

23  investigation, that Trump University enhanced, misrepresented and/or completely fabricated

24  testimonials.

25          Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

26  Response upon the discovery of relevant, responsive and non-privileged information.

27

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-729-

ZELDES & HAEGGQUIST, LLP

INTERROGATORY NO. 14:

Please state all facts which support plaintiffs' allegation that the Better Business Bureau received, "70 complaints of deceptive practices" including the facts of each, the current status of each complaint and the IDENTITY of each witness with knowledge of such facts.

RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs specifically incorporate its General Objections set forth above as though fully set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information in Defendants' possession, custody or control.

Plaintiffs also object to this interrogatory because it seeks information duplicative of information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil Procedure.  Plaintiffs have already identified all currently known documents and individuals who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

Plaintiffs further object to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses, and inferences drawn from interviews).  This interrogatory improperly seeks, and if responded to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with counsel's legal theories and conclusions as outlined in the complaint.

Plaintiffs also object on the grounds that such contention discovery is premature and presumptively improper given that discovery in this case has only just begun.  Plaintiffs' investigation into the issues and witnesses pertaining to this action is still continuing.

Exhibit 39
-730-

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:

Plaintiffs specifically incorporate their General and Specific Objections to Interrogatory No. 14 set forth above as though fully set forth herein to the extent applicable to this interrogatory.

Subject to and without waiving the foregoing General and Specific Objections, pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this Interrogatory, Plaintiffs respond as follows: Plaintiffs refer Defendants to documents produced in this action, Bates labeled:

- BBB NY 00001 to BBB NY 00668; BBB FL 0001 to BBB FL 0086;

- TU-MAKAEFF2335 to TU-MAKAEFF2338; TU-MAKAEFF4042 to TU-MAKAEFF4077; TU-MAKAEFF4084 to TUMAKAEFF4103; TU-MAKAEFF4127 to TUMAKAEFF4133;

- TU-PLTF00355 to TU-PLTF00357; TU-PLTF00715 to TU-PLTF00721; and

- TU 01128 to TU 01326; TU 01455 to TU 01477; TU 61147 to TU 61158; TU 61206 to TU 61208; TU 61209 to TU 61214; TU 61237 to TU 61241; TU 61246 to TU 61251; TU 61370 to TU 61374; TU 61392 to TU 61412; TU 61446 to TU 61468; TU 61469 to TU 61481; TU 61482 to TU 61485; TU 61486 to TU 61494; TU 61495 to TU 61496; TU 61497 to TU 61502; TU 61639 to TU 61649; TU 61650 to TU 61720.

Discovery is continuing and Plaintiffs reserve the right to supplement/amend this Response upon the discovery of relevant, responsive and non-privileged information.

INTERROGATORY NO. 15:

Please state with specificity all facts which support plaintiffs' allegations that defendants instructed students to "engage in real estate without a real estate license," including the name of each TRUMP UNIVERSITY speaker, instructor, coach, mentor and/or REPRESENTATIVE involved, name of each "student" involved, the date of each, and the specific conduct/activity plaintiffs contend was illegal or improper.

RESPONSE TO INTERROGATORY NO. 15:

Plaintiffs specifically incorporate its General Objections set forth above as though fully set forth herein to the extent applicable to this interrogatory. Plaintiffs object to this

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-731-

1   interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

2   in Defendants' possession, custody or control.

3        Plaintiffs also object to this interrogatory because it seeks information duplicative of

4   information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

5   Procedure.  Plaintiffs have already identified all currently known documents and individuals

6   who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

7   Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

8        Plaintiffs further object to this interrogatory on the grounds that it seeks information

9   protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

10  *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

11  reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

12  and inferences drawn from interviews).  This interrogatory improperly seeks, and if responded

13  to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

14  witnesses, the highlights of their testimony/factual knowledge, and would link any future

15  statements by the witnesses with counsel's legal theories and conclusions as outlined in the

16  complaint.

17       Plaintiffs further object to this interrogatory on the grounds that it calls for an expert

18  opinion, legal conclusion and/or legal statement of the law.

19       Plaintiffs also object on the grounds that such contention discovery is premature and

20  presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

21  investigation into the issues and witnesses pertaining to this action is still continuing.

22  SUPPLEMENTAL RESPONSE TO NO. 15:

23       Plaintiffs specifically incorporate their General and Specific Objections to

24  Interrogatory No. 15 set forth above as though fully set forth herein to the extent applicable to

25  this interrogatory.

26       Subject to and without waiving the foregoing General and Specific Objections,

27  pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

28  Interrogatory, Plaintiffs respond as follows: Makaeff's mentor, Mike Kasper, told her in

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-732-

ZELDES & HAEGGQUIST, LLP

1    mentor Rick McNally's presence she could make a finder's/referral fee if she brought a buyer

2    together with the seller of Fountainview Duplexes in Houston, Texas.  Plaintiff Makaeff later

3    found out this was illegal, because it constituted acting as a real estate agent and requires a real

4    estate license.

5         Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

6    Response upon the discovery of relevant, responsive and non-privileged information.

7    INTERROGATORY NO. 16:

8         Please state with specificity all facts which support plaintiffs' allegations in Paragraph

9    114 of the Second Amended Complaint that "defendants disseminated through common

10   advertising ... untrue statements about Trump University and its Seminars," including each

11   specific untrue statement, the date and location of each untrue statement and the IDENTITY of

12   each author, speaker and/or publication.

13   RESPONSE TO INTERROGATORY NO. 16:

14        Plaintiffs specifically incorporate its General Objections set forth above as though fully

15   set forth herein to the extent applicable to this interrogatory.  Plaintiffs object to this

16   interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information

17   in Defendants' possession, custody or control.

18        Plaintiffs also object to this interrogatory because it seeks information duplicative of

19   information that Plaintiffs have disclosed under Rule 26(a)(1) of the Federal Rules of Civil

20   Procedure.  Plaintiffs have already identified all currently known documents and individuals

21   who may have discoverable information to support Plaintiffs' claims.  *See* Plaintiffs' Amended

22   Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1).

23        Plaintiffs further object to this interrogatory on the grounds that it seeks information

24   protected by the attorney-client privilege and/or attorney work product doctrine.  *See Hickman*

25   *v. Taylor*, 329 U.S. 495, 511 (1947) (work product protection is afforded to materials that

26   reveal an attorney's strategy, intended lines of proof, evaluation of strengths or weaknesses,

27   and inferences drawn from interviews).  This interrogatory improperly seeks, and if responded

28   to would reveal, Plaintiffs' counsel's opinions regarding the relative importance of these

Exhibit 39
-733-

1  witnesses, the highlights of their testimony/factual knowledge, and would link any future

2  statements by the witnesses with counsel's legal theories and conclusions as outlined in the

3  complaint.

4     Plaintiffs also object on the grounds that such contention discovery is premature and

5  presumptively improper given that discovery in this case has only just begun.  Plaintiffs'

6  investigation into the issues and witnesses pertaining to this action is still continuing.

7     Subject to and without waiving the foregoing General and Specific Objections,

8  Plaintiffs respond as follows: Defendants are, or should be, in possession of all such

9  advertisements, as well as the dates each advertisement ran, the location of these

10  advertisements, and the identity of the author, speaker or publication, but such advertisements

11  include those listed in Response to Interrogatory No. 2, as well as the following:

12     An email from Trump University to thousands or tens of thousands consumers featured

13  Donald Trump's photo with the words: "*Are you My Next Apprentice*," and stated: "*76% of the*

14  *world's millionaires made their fortunes in real estate. Now it's your turn. My father did it, I*

15  *did it, and now I'm ready to teach you how to do it too*."  The signature line at the bottom of

16  the email reads, Donald J. Trump, Chairman, Trump University, and even includes his

17  signature:



ZELDES & HAEGGQUIST, LLP

18
19
20
21
22
23
24
25
26
27
28

37                                          No. 3:10-CV-00940 CAB(WVG)

Exhibit 39
-734-

1  SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:

2      Plaintiffs specifically incorporate their General and Specific Objections to

3  Interrogatory No. 16 set forth above as though fully set forth herein to the extent applicable to

4  this interrogatory.

5      Subject to and without waiving the foregoing General and Specific Objections,

6  pursuant to the Court's Discovery Order, in addition to Plaintiffs' initial response to this

7  Interrogatory, Plaintiffs respond as follows:

8      *See* Plaintiffs' Supplemental Response to Defendant Trump University's Interrogatory

9  No. 7 (and corresponding Exhibit C), which is incorporated as if set forth in full herein. *See*

10  *also* Plaintiffs' Supplemental Response to Defendant Donald Trump's Interrogatory Nos. 2

11  and 3 above, which are incorporated as if set forth in full herein.

12      Discovery is continuing and Plaintiffs reserve the right to supplement/amend this

13  Response upon the discovery of relevant, responsive and non-privileged information.

14  DATED: March 20, 2012           ZELDES & HAEGGQUIST, LLP
                                AMBER L. ECK (177882)

15                                  HELEN I. ZELDES (220051)
                                ALREEN HAEGGQUIST (221858)

16

17

18                                      AMBER L. ECK

19                                625 Broadway, Suite 906
                              San Diego, CA 92101

20                                Telephone: (619) 342-8000
                              Facsimile: (619) 342-7878

21

22                                ROBBINS GELLER RUDMAN
                                & DOWD LLP

23                                RACHEL L. JENSEN
                              THOMAS R. MERRICK

24                                655 West Broadway, Suite 1900
                              San Diego, CA 92101

25                                Telephone: 619/231-1058
                              619/231-7423 (fax)

26                                Attorneys for Plaintiffs and the Proposed Class

27

28

                            38            No. 3:10-CV-00940 CAB(WVG)

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-735-

1

PROOF OF SERVICE
C.C.P. §1013(A), C.R.C. 2003(3), 2005(i)

2

3

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

4

I am employed in the County of San Diego, State of California. I am over the age of

5

18 and not a party to the within action; my business address is 625 Broadway, Suite 906, San

6

Diego, CA 92101.

7

1.     On March 20, 2012, I served the foregoing document described as

8

PLAINTIFFS' SUPPLEMENTAL RESPONSES TO DEFENDANT DONALD J. TRUMP'S

9

FIRST SET OF INTERROGATORIES TO PLAINTIFFS on all parties in this action by

10

attaching a true copy thereof to an email addressed to the parties listed below:

11

| David K. Schneider (139288)<br>YUNKER & SCHNEIDER<br>655 West Broadway, Suite 1400<br>San Diego, CA 92101<br>Telephone: (619) 233-5500<br>Facsimile: (619) 233-5535<br>dks@yslaw.com | Rachel L. Jensen (211456)<br>Thomas R. Merrick (177987)<br>ROBBINS GELLER RUDMAN<br> & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423<br>rjensen@rgrdlaw.com<br>tmerrick@rgrdlaw.com |
| --- | --- |
| Counsel for Defendants | Counsel for Plaintiffs |

12

13

14

15

16

17

18

2.     I declare that I am employed in the office of a member of the Bar of this Court,

19

at whose direction the service was made.

20

EXECUTED on March 20, 2012, at San Diego, California.

21

22

_____
RUTH A. CAMERON

23

24

25

26

27

28

ZELDES & HAEGGQUIST, LLP

Exhibit 39
-736-