1   David K. Schneider (CSB 139288)
    YUNKER & SCHNEIDER
2   655 West Broadway, Suite 1400
    San Diego, California 92101
3   Telephone:  (619) 233-5500
    Facsimile:   (619) 233-5535
4   Email:  dks@yslaw.com

5   Attorneys for Defendants TRUMP UNIVERSITY, LLC and
    DONALD J. TRUMP

6

7

8                   **UNITED STATES DISTRICT COURT**

9            **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  TARLA MAKAEFF, BRANDON                )   Case No. 10 CV 0940 CAB (WVG)
    KELLER, ED OBERKROM, SONNY            )
11  LOW, J.R. EVERETT and JOHN            )   CLASS ACTION
    BROWN, on Behalf of Themselves and    )
12  All Others Similarly Situated,        )   DEFENDANTS' MEMORANDUM OF
                                          )   POINTS AND AUTHORITIES IN
13                  Plaintiffs,           )   OPPOSITION TO PLAINTIFFS' MOTION
                                          )   FOR CLASS CERTIFICATION AND
14  v.                                    )   APPOINTMENT OF CLASS COUNSEL
                                          )
15  TRUMP UNIVERSITY, LLC, (aka           )
    Trump Entrepreneur Initiative, LLC, a )
16  New York Limited Liability Company,   )
    DONALD J. TRUMP, and DOES 2           )
17  through 50, inclusive,                )
                                          )   DATE:   February 12, 2013
18                  Defendants.           )   TIME:    2:30 p.m.
    _____ )   CTRM:   2 — 4th Floor

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...........................................................................................................1

II. SUMMARY OF ARGUMENT .......................................................................................1

III. KEY FACTS MISSTATED OR OMITTED BY PLAINTIFFS ......................................3

    A.  The Formation, Evolution, and Varied Programs of TU .........................................3

    B.  The Diversity of TU Students and Their Experiences with TU..............................4

    C.  The Stellar Student Evaluations of TU – Including By the
        Named Plaintiffs ......................................................................................................7

    D.  No Documentary Evidence of Any "Extensive and Long-Term
        Advertising Campaign" .............................................................................................8

    E.  No Documentary Evidence of Any "Centrally Orchestrated
        Strategy" ...................................................................................................................9

    F.  No Documentary Evidence of Any Objective
        "Misrepresentations".................................................................................................11

    G.  No Evidence At All of "Elder Abuse" ....................................................................13

    H.  No Evidence At All of "Personal Liability" for Mr. Trump..................................13

    I.  Plaintiffs' "Supporting Evidence" Is Frequently Exaggerated,
        Misstated, or Missing...............................................................................................14

        1.  Plaintiffs' Exhibits ........................................................................................14

        2.  Plaintiffs' Declarations ..................................................................................14

            a.  Declarations of Five Named Plaintiffs............................................14

            b.  Declarations of Four TU Ex-Employees.........................................14

        3.  Plaintiffs' Exaggerations of AG, NYSED, BBB, and
            Student Complaints.........................................................................................15

        4.  Plaintiffs' "Verbal Contracts" .......................................................................15

IV. A "RIGOROUS ANALYSIS" IS REQUIRED TO MEET THE
    STANDARDS OF RULE 23 ..........................................................................................15

Case No. 10 CV 0940 CAB (WVG)
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

**TABLE OF CONTENTS (cont.)**

Page

V. PLAINTIFFS FAIL THE COMMONALITY STANDARD OF RULE 23(a)(2) ................................................................................16

    A.    The Commonality Standard ................................................16

    B.    The TU Students Are Completely Diverse ........................17

VI. PLAINTIFFS FAIL THE TYPICALITY STANDARD OF RULE 23(a)(3) ................................................................................19

    A.    The Typicality Standard....................................................19

    B.    The Named Plaintiffs Are Not "Typical" of Diverse TU Students ............................................................................19

    C.    No Other Potential Class Representatives could be Typical of Diverse TU Students ........................................20

VII. PLAINTIFFS FAIL THE PREDOMINANCE STANDARD OF RULE 23(b)(3) ...............................................................................21

    A.    The Predominance Standard ..............................................21

    B.    Common Issues Do Not Predominate Because Individual Inquiry Is Required ..........................................21

        1.    The Diversity of TU Students Requires Individual Inquiry......................................................21

        2.    Even Assuming Some Common Issues, Proof Will Require Individual Inquiry..........................................24

        3.    Plaintiffs' Reliance on "Verbal Misrepresentations" Requires Individual Inquiry ........................................26

        4.    The "Presumption of Reliance" Does Not Apply to Prevent Individual Inquiry ..........................................26

            a.    The Applicable and Dispositive Cases Eliminate the Presumption ........................26

            b.    The Facts Do Not Support the Presumption .................................29

            c.    Plaintiffs' Inapplicable Cases Do Not Support the Presumption ........................30

            d.    Summary: The "Presumption of Reliance" Does Not Apply...........................................31

# TABLE OF CONTENTS

**Page**

VIII.   PLAINTIFFS FAIL THE SUPERIORITY STANDARD OF RULE
23(b)(3) ................................................................................................31

    A.   The Superiority Standard ..............................................................31

    B.   The Need for Individual Inquiry Means that a Class Action Is
Not Superior..................................................................................32

IX.   ADDITIONAL FATAL DEFECTS FOR CLASS CERTIFICATION ...........................32

    A.   Plaintiffs Fail to Justify Certification for Each Cause of Action ...........32

    B.   Plaintiffs Fail to Justify Certification for Each Defendant ...................32

    C.   The Subclasses Do Not Justify Certification ...........................................33

        1.   Numerosity Is Not Shown for Any Subclass .............................33

        2.   The Elder Abuse Subclasses Are Unsupported in Fact
and Law ....................................................................................33

        3.   The Consumer Statute Subclasses Still Require
Individual Inquiry ....................................................................33

        4.   The Common Law Subclasses Still Require Individual
Inquiry......................................................................................33

X.   CONCLUSION..............................................................................................35

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Products, Inc. v. Windsor,*
521 US 591 (1997)................................................................ 30

*Betts v. Reliable Collection Agency,*
659 F.2d 1000 (9th Cir. 1981) ........................................... 33

*Black Diamond Properties, Inc. v. Haines,*
940 So.2d 1176 (Fla.Ct.App. 2006).................................... 35

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) ............................................ 31

*Caro v. Proctor & Gamble Co.,*
18 Cal.App.4th 644 (1993) ................................................ 24

*Davis v. Homecomings Financial*
2006 WL 2927702, *7 (W.D. Wash. 2006)......................... 24

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ...................................... 15, 16

*Evans v. IAC/Interactive Corp.,*
244 F.R.D. 568 (C.D. Cal. 2007) ....................................... 14

*Gen. Tel. Co. v. Falcon,*
457 US 147 (1982)............................................................ 15

*Gomez v. Rossi Concrete, Inc.,*
270 F.R.D. 579 (S.D. CA 2010) ........................................ 33

*Gonzalez v. Millard Mall Services, Inc.,*
281 F.R.D. 455 (S.D. Cal. 2012) ......................................... 6

*Gonzalez v. Proctor & Gamble Co.,*
247 F.R.D. 616 (S.D. Cal. 2007) ................................... 28, 31

*Graham v. Securities S&L,*
125 F.R.D. 687 (N.D. Ind. 1989)....................................... 34

*Hanon v. Dataproducts Corp.,*
976 F.2d 497 (9th Cir. 1992) ............................................ 19

**TABLE OF AUTHORITIES (cont.)**

**Page**

*Hill v. Roll Intern. Corp.,*
        195 Cal.App.4th 1295, 1307 (2011) ....................................... 34

*In re American Cont. Corp./Lincoln S & L Securities Litig.,*
        140 F.R.D. 425 (D. Ariz. 1992) ............................................. 30

*In re First Alliance Mortgage Co.,*
        471 F.3d 977 (9th Cir. 2006) ......................................... 26, 30

*In re Wells Fargo Home Mortgage. Overtime Pay Litigation,*
        571 F.3d 953 (9th Cir. 2009) .............................................. 25

*Iorio v. Allianz Life Ins. Co. of NA,*
        2008 WL 8929013, (S.D. Cal. 2008) ................................... 31

*Johnston v. HBO Film Mgmt., Inc.,*
        265 F.3d 178 (3d Cir. 2001)......................................... 28, 29

*Klay v. Humana, Inc.,*
        382 F.3d 1241 (11th Cir. 2004) .......................................... 31

*Lease Crutcher Lewis WA, LLC v Nat'l Union Fire Ins. Co.,*
        2009 WL 3444762 (W.D. Wash. 2009)................................. 32

*Marascalco v. International Computerized Orthokeratology Soc., Inc.,*
        181 F.R.D. 331 (N.D. Miss. 1998)....................................... 34

*Mazza v. American Honda Motor Co., Inc.,*
        666 F.3d 581 (9th Cir. 2012) ........................ 16, 21, 26, 27, 33

*McCracken v. Best Buy Stores, LP,*
        248 F.R.D. 162 (S.D.N.Y. 2008) ........................................ 34

*McKenzie v. Fed. Express Corp.,*
        275 F.R.D. 290 (C.D. Cal. 2011) ........................................ 31

*McPhail v. First Command Fin. Planning, Inc.,*
        247 F.R.D. 598 (S.D. Cal. 2007) ........................................ 31

*Mullany v. Delta Airlines, Inc.,*
        258 F.R.D. 247 (S.D.N.Y. 2009) ........................................ 35

*Negrete v. Allianz Life Ins. Co. of NA,*
        238 F.R.D. 482 (C.D. Cal. 2006) ........................................ 30

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1

### TABLE OF AUTHORITIES (cont.)

2

<u>Page</u>

3

*Osborne v. Subaru of America, Inc.*,

4
    198 Cal.App.3d 646 (1988) ............................................. 29

5

*Philip Morris USA Inc., v. Scott*,
    __U.S.__; 131 S.Ct. 1 (2010)......................................... 32

6

7

*Poulos v. Caesar's World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ............................. 22, 23, 28

8

*Ramirez v. Smart Corp.*,

9
    371 Ill.App.3d 797 (2007) .............................................. 34

10

*Rollins, Inc. v. Butland*,
    951 S.2d 860 (D.C. Fla. 2006) ............................... 33, 34

11

12

*Schwartz v. Harp*,
    108 F.R.D. 279 (C.D. Cal. 1985) ................................ 19

13

*Small v. Lorillard Tobacco Co., Inc.*,

14
    94 N.Y.2d 43 (N.Y. Ct. App. 1999)............................. 33

15

*Stearns v. Ticketmaster Corp.*,

16
    655 F.3d 1013 (9th Cir. 2011) .................................... 32

17

*Tanedo v. East Baton Rouge Parish School Bd.*,
    2011 WL 7095434, *9 (C.D. Cal. 2011)...................... 24

18

19

*Van Asdale v. Int'l Game Technology*,
    577 F.3d 989 (9th Cir. 2009) ...................................... 14

20

*Wal-Mart Stores v. Lopez*,

21
    93 S.W.3d 548 (Tx.Ct.App. 2002)............................... 35

22

*Wal-Mart Stores, Inc. v. Dukes*,
    __ U.S. __; 131 S. Ct. 2541 (2011)........................ 16, 17, 18

23

24

*Westways World Travel, Inc. v AMR Corp.*,
    218 F.R.D. 223 (C.D. Cal. 2003)................................. 30

25

*Williams v. Veolia Transp. Svcs, Inc.*,

26
    379 Fed.Appx. 548 (9th Cir. 2010)........................ 24, 25

27

*Wolin v. Jaguar Land Rover NA, LLC*,

28
    617 F.3d 1168 (9th Cir. 2010) ............................... 30, 32

1

**TABLE OF AUTHORITIES (cont.)**

2

                                                                 <u>Page</u>

*Yokoyama v. Midland Nat'l Life Ins.* Co.,
    594 F.3d 1087 (9th Cir. 2010) ............................................................................... 31

*Zinser v. Accufix Research Inst., Inc.,*
    253 F.3d 1180 (9th Cir. 2001) ............................................................................... 32

**Statutes**

Rule 23(a)(3) ............................................................................................................... 19

Rule 23(b)(3) .......................................................................................................... 21, 31

Rule 23(b)(3)(D) ......................................................................................................... 32


**Other Authorities**

7B C.Wright, A.Miller & M.Kane, *Federal Prac. and Proc.* §1785.1 (1986) ................ 32

Nagareda, *Class Certification in the Age of Aggregate Proof*, 84
    N.Y.U.L.Rev. 97, 132 (2009) ............................................................... 17

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 10 CV 0940 CAB (WVG)
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

## I.     **INTRODUCTION**

This case cannot be certified as a class action because the potential class of students who paid for real estate investment training at Trump University ("TU") is completely diverse.  The TU students: (i) saw different ads and attended different "preview" lectures before signing different contracts at different prices; (ii) attended different courses and programs, ranging from 3 days to many months, given by different instructors and mentors, using different course materials and presentations, in different locations across the country; (iii) brought their own different motivations, expectations, abilities, experiences, backgrounds, and resources to the training; and (iv) got different results from their use of TU training.

Indeed, the only real "commonality" among students was that 97% of them gave TU programs rave reviews in over 10,000 written evaluations.  That includes five of the <u>six named Plaintiffs</u> who ███████████████████████████████████████████
████████████████████████████████  Moreover, the <u>lead named Plaintiff</u> gave TU a <u>videotaped testimonial</u> in which she stated that her mentor was "awesome" and available "24/7," her experience was "great," and "all [TU] speakers were really good."

Plaintiffs never mention these facts.  Instead, <u>Plaintiffs' entire documented record of purported "fraud"</u> boils down to some TU ads and sales materials saying that Mr. Trump "hand-picked" TU's "expert" faculty, that he was "involved" in TU, and that his "secrets" would be taught by TU.  Those statements are true, but even if debatable, they obviously require <u>individual inquiry</u> into each student's exposure to, understanding of, and expectations for those subjective terms.

The end result is that the complete diversity of TU students, plus Plaintiffs' total inability to document any objective, class-wide misrepresentation, is fatal to class certification under Rule 23.  The potential class fails to meet any of the standards for commonality, typicality, predominance, and superiority.  It also lacks adequate certification showings for each claim, defendant, and subclass.

## II.     **SUMMARY OF ARGUMENT**

- **No commonality:** ███████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1 ███████████████████████████████████████  Moreover,

2 the students signed different contracts, with different waivers, releases, and refund policies, and with

3 different prices starting as low as $995 for one basic 3-day seminar, and going up to $35,000 for five

4 advanced 3-day workshops, plus another three days of individual, one-on-one in-field mentoring and

5 year-long support.  Some students got full or partial refunds, both with and without disputes or

6 formal settlements.  All students had different motivations, goals, resources, local markets, and

7 personal circumstances.  Finally, some made money on subsequent real estate investments, some lost

8 money, and some never tried.

9 •       **No typicality:** All six named Plaintiffs chose TU programs costing $25,000 to $35,000.  This

10 puts them into a small minority of only 7.4% of TU students who ever went beyond a <u>free</u>

11 introductory 90-minute preview, and into an even smaller minority of 2.1% of TU students who ever

12 went beyond the basic 3-day seminar.  Three Plaintiffs never completed their programs (including

13 two who refused even to meet with their mentors), and two Plaintiffs got significant extra training

14 for free.  One Plaintiff never paid for a TU "live event," and does not even meet the class definition.

15 One Plaintiff got a full refund for his advanced program.  Most Plaintiffs also had different

16 instructors and mentors, thus giving them unique and different training experiences.

17 •       **No predominance:** Due to the variety of TU students and their experiences, <u>individual</u>

18 <u>inquiry</u> is required to determine each of the students' motivations, expectations, contract terms,

19 prices, programs, mentors, instructors, evaluations, real estate investments, gains and losses, and

20 effort levels. Recognizing this problem, Plaintiffs argue two scenarios hoping to avoid the need for

21 individual inquiry, and instead to allow a "presumption of reliance" on fraudulent misrepresentation,

22 but neither is supported by the facts:

23 o       **No "extensive and long-term advertising campaign":** Plaintiffs argue that TU's

24 advertisements made uniform misrepresentations on a nationwide basis, but TU's limited, regional,

25 sporadic, and changing advertisements do not nearly meet that standard in the California or federal

26 case law (i.e., five Plaintiffs saw different ads, and the lead Plaintiff saw no ads).  Moreover, the

27 <u>only</u> purported "misrepresentations" in some TU ads are that Mr. Trump "hand-picked" TU's

28 "expert" faculty, that he was "involved" in TU, and that his "secrets" would be taught.  All are true

and – even if any are debatable – individual inquiry is required to determine how students understood those subjective terms.  Finally, TU's ads invited students to a <u>free</u> "preview" lecture <u>only</u>, and hence there could be no fraud or damages even if reliance on the ads is assumed.

   o   **No "centrally orchestrated scheme":** Plaintiffs also argue that TU's teaching and sales materials were so uniform, and so reliant on step-by-step "Playbooks" and identical "scripts," that TU made uniform verbal misrepresentations.  However, the teaching and sales materials are quite varied, and – like the ad campaign – do not contain any objective misrepresentations.  Also, the crucial "scripts" do not even exist, which is why Plaintiffs submitted none.  Finally, there is no documentary evidence of any "scheme," and in fact TU had policies to prevent misrepresentations, and fired instructors who overstated.  The end result is that Plaintiffs are relying on <u>verbal</u> proof of <u>undocumented</u> "misrepresentations" needing individual inquiry, and unsuited for certification.

•   **No superiority, and other fatal defects:** A class action is not "superior" because individual inquiry makes trial impossible in that format.  Plaintiffs failed to justify certification for each cause of action or against each defendant – i.e., Mr. Trump.  The subclasses do not save certification for several reasons, including their numerosity is never shown and there is no showing of "elder abuse."

   Finally, TU's "up-selling" – so vilified by Plaintiffs – <u>is not even actionable</u>.  Up-selling *per se* is common, legal, and routine commerce.  It has been defined by the California courts as a "sales pitch for additional products or services" following a contact arising from an earlier sale.  *West Corp. v. Sup. Ct.*, 116 Cal.App.4th 1167, 1170 (2004).  Examples include a salesman offering an undercoat on a new vehicle, or a cashier at McDonald's asking if "you want fries with that."

### III.   KEY FACTS MISSTATED OR OMITTED BY PLAINTIFFS

**A. The Formation, Evolution, and Varied Programs of TU**

   TU was formed in 2004, and began operations in 2005.  It was the idea of educational entrepreneur Michael Sexton, who wanted to sell an on-line real estate education program for small investors ████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████

3       The on-line program had success, but students wanted live teaching for greater interactivity,

4 and TU introduced live seminars in 2007.  Then, again at student request, TU introduced the mentor

5 program involving individualized one-on-one training of students by experienced real estate

6 professionals and entrepreneurs. **(Ex. 1, ¶¶6 & 8)**  As the TU faculty grew, Mr. Trump continued to

7 meet many of the instructors, and he approved all of their resumes. **(Ex. 4)**

8 ███████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 █████████████████████████████████████████████████

18 **B.  The Diversity of TU Students and Their Experiences with TU**

19       **Different TU Programs:** ███████████████████████████████

20 ████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████

23 ██████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ███████████████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ███████████████████████████████████████████████████████

28 ██████████████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 ████████████████████ All students got lengthy workbooks with space for notes. **(Ex. 7)**

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████████

12 ████████████████████████████████████████████████

13     These wide differences in TU <u>classroom</u> programs were multiplied by the fact that students

14 who also bought a program <u>with mentoring</u> had very different experiences. ██████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 **Different TU Contracts:** ████████████████████████████

19 ████████████████████████████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22     Plaintiffs contend that some or all TU students had purported "oral contracts."  However, the

23 number, scope, terms, and effective dates of these oral contracts are not even hinted in the moving

24 papers, much less specified in detail or supported by documentary evidence.  Who supposedly bound

25 TU to the oral contracts, how or why they did so, and whether they had authority to do so, is another

26 mystery.  In short, there is no showing that any oral contracts ever existed, and yet the purported oral

27 contract provisions and related oral misrepresentations are the cornerstone of Plaintiffs' claims.  In

28 any event, the purported oral contracts clearly add individual issues for every student.

**Different TU Refunds and Other Accommodations:** TU had generous refund policies that affected a small minority of TU students in different ways. **(Ex. 9)** ███████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

For example, Plaintiff Keller got a full refund of $35,000 because <u>TU</u> determined he was incapable of doing the training. **(Ex. 10)**

**Different Student Evaluations and Experiences:** ███████████████

████████████████████████████████████

████████ The vast majority is very positive, but the point here is that they show great variety.

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

████████████████████████████████████

███████████████ Others simply had not yet had time to do so. **(Ex. 23)**

**In Summary:** There is enormous and material diversity in TU/student programs, contracts, refunds, and experiences.  Moreover, the 10,000 written evaluations and many other student inputs give the Court a rare and remarkable insight directly into the views, understanding, goals, motivations, and accomplishments of the students themselves.  Data of this type is admissible for class certification. *Gonzalez v. Millard Mall Services, Inc.*, 281 F.R.D. 455, 459-60 (S.D. Cal. 2012).  Nevertheless, none of these facts were even mentioned in Plaintiffs' papers.

**C.  The Stellar Student Evaluations of TU – Including By the Named Plaintiffs**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██  ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

Lead Plaintiff Makaeff also gave a videotaped testimonial for TU. **(Ex. 27)**  It was made <u>after</u> she completed <u>ten months</u> of TU seminars and mentoring – including five 3-day workshops, and seven days of in-field mentoring with three different mentors. **(Ex. 28)**  She said that her instructors and mentors were "*great*" and "*awesome*," and TU had given her "*an education in real estate, . . . a life skill that everyone should have irregardless [sic] of whether you want to be a full time investor.*"

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL



17     These and many other positive declarations were prepared <u>after</u> Plaintiffs sued to recover

18 refunds for all TU students, and <u>after</u> Plaintiffs' counsel blanketed class members with letters urging

19 them <u>not</u> to talk to defendants or their counsel. (**Ex. 31**)  The voluminous positive TU student input

20 shows a fundamental difference between what Plaintiffs say <u>now</u>, and what their proposed class (<u>and</u>

21 <u>Plaintiffs themselves</u>) said at the material time – a difference never mentioned in Plaintiffs' papers.

**D.  <u>No Documentary Evidence of Any "Extensive and Long-Term Advertising Campaign"</u>**

25     Plaintiffs' argument that TU conducted a "tightly controlled, uniform advertising campaign"

26 nationwide with "uniform written misrepresentations" is <u>absolutely critical</u> to evade the requirement

27 of proving individual reliance.  However,

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ███████████████████████████████████████

4    Plaintiffs' deposition testimony supports this lack of broad coverage and uniformity.  Lead

5 Plaintiff Makaeff never saw any TU ads before buying an Elite program. **(Ex. 32)**  Plaintiffs Keller

6 and Everett got email invitations which they produced (one of which contains no purported

7 misrepresentations), but Plaintiffs Low (alleged newspaper ad), Brown (alleged email invitation),

8 and Oberkrom (same) could not produce theirs to prove they saw an ad, or its contents. **(Ex. 33)**

9 ███████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████   Even assuming *arguendo* there was ever anything

12 "fraudulent" about TU's advertisements, that purely hypothetical "fraud" cost the "victims" nothing.

13 **E.  No Documentary Evidence of Any "Centrally Orchestrated Strategy"**

14    Plaintiffs' back-up argument that TU had a "centrally orchestrated strategy" to make uniform

15 oral misrepresentations is also <u>absolutely critical</u> to evade proving individual reliance.  The argument

16 claims that all TU "live events" followed a detailed "Playbook" exactly, began with an identical

17 video of remarks by Mr. Trump, and invariably used "uniform scripts" and "uniform PowerPoint

18 presentations."  Plaintiffs also refer repeatedly to two partial transcripts of the 3-day initial seminar,

19 and imply they are truly representative.  However, the reality is very different.

20 ██████████████████████████████████████████

21 ████████████████████████████████████████████

22 ███████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████

27 ███████████████████████████████████████████████

28 ████████████████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1  ████████████████████████████████████████████████████████████

2  ████████████████████████████ Consequently, only three of the six Plaintiffs ever saw

3  it. **(Ex. 37)**  Moreover, only some versions contain statements concerning "hand-picked experts,"

4  "involvement," and "secrets," and they contain no other purported misrepresentations.

5  ██████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████

8  █████████████████████

9      **The "Uniform PowerPoints":** Plaintiffs have submitted four PowerPoint exhibits, each of

10  which is different.  Three were for use at the free 90-minute preview (not a "live event" material to

11  the class definition), and one was for training TU salespeople and never shown to students.  None

12  contain any purported "misrepresentations," other than two making reference to Mr. Trump's "hand-

13  picked" experts.  The same is true of TU's nine much more representative PowerPoint exhibits for

14  the 3-day basic seminar, and for some advanced workshops. **(Ex. 39)**  Moreover, Plaintiffs have

15  never identified any other "misrepresentations" in any PowerPoint shown at any live event.  But

16  even if Plaintiffs found a PowerPoint with a purported misrepresentation, the PowerPoints obviously

17  are not uniform. ███████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19      **The Seminar Transcripts:** Plaintiffs' have submitted two partial transcripts of two different

20  3-day seminars, covering about 2 hours out of about 40 hours total at those two events.  All

21  surviving seminar recordings were produced to Plaintiffs, cover many seminars, and contain more

22  than 2,450 hours of TU teaching. **(Decl. of David K. Schneider in Oppo. to Mtn. Class Cert., ¶67**

23  **(hereinafter "DKS Decl."))**  This means Plaintiffs' two partial transcripts give the Court less than

24  0.08% of the pertinent evidence in Plaintiffs' possession. █████████████████████

25  ███████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

**In Summary:** Both the "centrally orchestrated strategy" and the "extensive and long-term advertising campaign" lack documentary evidence of purported "misrepresentations." To put this lack in perspective, this case has been pending for over two years, 13 depositions have been taken, and over 150,000 pages of documents have been produced. **(DKS Decl. ¶68)** Nevertheless, Plaintiffs' <u>only</u> non-verbal proof of <u>any</u> misrepresentations boils down to some TU ads and references to Mr. Trump's "hand-picked experts," his "involvement" in TU, and his "secrets." That evidence is specifically addressed and disposed of below.

**F.  No Documentary Evidence of Any Objective "Misrepresentations"**

The Court will search Plaintiffs' papers in vain for the definitive list of "misrepresentations" at issue, with specific reference to their supporting documentary evidence. Instead, the Court has a moving target of contenders including: (i) Mr. Trump "hand-picked" TU's "expert" faculty; (ii) Mr. Trump is "involved" in TU; (iii) Mr. Trump's "secrets" would be taught; (iv) student results were "guaranteed"; (v) TU was an "educational" entity and/or "accredited"; (vi) the mentoring program was "year-long"; (vii) many testimonials were "knowingly false"; (viii) unspecified "up-selling"; (ix) unspecified "targeting" of seniors; and (x) a catch-all that TU presented a "false image."**(Ex. 42)**

Of these purported "misrepresentations," <u>only three</u> are found in the documentary record, and all of them are totally undercut by other evidence. As often noted above, they are: <u>(i) Mr. Trump "hand-picked" TU's "expert" faculty; (ii) Mr. Trump is "involved" in TU; and (iii) Mr. Trump's "secrets" would be taught by TU</u>. Those representations are made in some but not all TU ads and sales materials. **(Ex. 43)** The problem with them for purposes of Plaintiffs' "fraud" claim is that they are <u>true</u>, or – <u>even if</u> they are debatable – they are <u>subjective</u>. The facts are as follows:

**"Hand-Picked" and "Expert" TU Faculty, and Mr. Trump's "Involvement"** – ████████

████████████████████████████████████████

████████████████████████████████████████

████████, and one even taught the lead Plaintiff. **(Ex. 46)** Moreover, the TU faculty resumes show that <u>most</u> instructors <u>were</u> "experts," including later arrivals. **(Ex. 47)**

**Mr. Trump's "Secrets"** – Mr. Trump's "secrets" for real estate investing were stated on the <u>free</u> DVD given to attendees at the <u>free</u> 90-minute introductory lecture. **(Ex. 48)** They were also

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1  covered in many subsequent seminars and mentoring sessions. ███████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  █████████████████████████████████████████████████

5  ███████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████

8  ███████████████████████████

9       The Trump "secrets" for student motivation are not a magic wand.  They are a mindset of

10  hard work and risk tolerance, and they take time to develop.  Not everyone can recognize them for

11  what they are, much less carry them out.  None of the Plaintiffs admitted to being taught them, and

12  none of the Plaintiffs carried them out either ██████████████████████████

13  ███████████████████████████████████████████████

14  ███████████████████████████████████

15       **"Hand-Picked," "Expert," "Involvement," and "Secrets" are Subjective** – TU contends

16  that these facts prove the truth of TU's three documented representations at issue.  But, the Court

17  need not make that determination in order to find that these purported misrepresentations will not

18  support certification.  This is so because – <u>even if</u> any of these representations are debatable — all

19  are <u>subjective</u>.  Whether the TU faculty was "hand-picked" and "experts," whether Mr. Trump was

20  "involved," and whether "secrets" were taught, are all matters of degree and judgment, and hence are

21  subjective.  In other words, their meaning and significance will <u>vary</u> among students.  █████████

22  █████████████████████████████████████████████████

23  ███████████████████████████████████  This shows the students

24  grasped the point of Trump's "secrets," regardless of the terminology they used.

25       **Individual Inquiry Required** – Consequently, if these representations raise a potential issue

26  of purported "fraud" for any TU students based their understanding, then individual inquiry is

27  required.  Which instructor taught which student, when and how that instructor joined the faculty,

28  whether that student heard, cared, and relied on the fact that the instructor was "handpicked" or an

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

"expert," and how the student understood those terms, are issues for individual inquiry.  The same is true for Mr. Trump's actual "involvement" in any aspect of an individual student's TU program (which may vary based on program content), or the teaching of Mr. Trump's "secrets" (which may vary based on student effort and perception).  Judge Gonzalez recognized the need for individual inquiry into this potential claim of fraud, "dubious as it may be," in her order of 5/16/11 ("[t]he test of the representation is its actual effect on the particular mind").  ECF 69, p. 5, ll. 13-19.

**G.  No Evidence At All of "Elder Abuse"**

Plaintiffs claim "elder abuse" under the pertinent California and Florida statutes, but make no showing to support it except for the following three exhibit excerpts, all cited without explanation:

But, 90% of preview attendees typically did not buy a TU program, and there is no mention of the age breakdown of the 10% of buyers, nor any further mention of seniors in the other 25 slides, nor any hint of abuse.

TU respectfully submits that this "factual" showing is not nearly probative of "elder abuse."

**H.  No Evidence At All of "Personal Liability" for Mr. Trump**

Plaintiffs make no factual showing anywhere in their papers to support certification of any claims against Mr. Trump personally.  Instead, plaintiffs attempt to blur the clear legal distinction between Mr. Trump and TU by implying that a claim against one must include the other.

However, Judge Gonzalez already ruled on 5/16/11 that there are no alter ego allegations here, and that Mr. Trump is not liable for anything done by TU "unless he participated in the wrong or authorized or directed that it be done."  ECF 69, p. 4, ll. 5-8.  There is no showing to that effect.

/ / /

Moreover, any possible showing to that effect would <u>directly contradict</u> Plaintiffs' basic contention that Mr. Trump was <u>not</u> involved with TU, and so it was "fraud" for TU to suggest that he was.  Plaintiffs cannot have it both ways.

## I.   **Plaintiffs' "Supporting Evidence" Is Frequently Exaggerated, Misstated, or Missing**

### 1.   **Plaintiffs' Exhibits**

Plaintiffs' Memorandum makes many sweeping assertions about the underlying facts, but many of those assertions often have <u>no</u> citation to exhibits.  Moreover, to a remarkable degree, when Plaintiffs <u>do</u> cite to exhibits, that "supporting evidence" is not supportive, or is incomplete, or is not representative, or is missing altogether.  Some of the most egregious of these failings are cited in TU's accompanying objections to Plaintiffs' evidence.

### 2.   **Plaintiffs' Declarations**

#### a.   **Declarations of Five Named Plaintiffs**

Five named Plaintiffs have submitted recent declarations.  The declarations recite the class contentions as "facts" in cookie-cutter fashion, and without proper foundation.  TU respectfully submits that Plaintiffs' pre-litigation writings – including their signed TU contracts, and especially their hand-written and videotaped evaluations of TU – are better evidence of the true facts at the material time.  *Cf. Van Asdale v. Int'l Game Technology*, 577 F.3d 989, 998-90 (9th Cir. 2009) ("sham affidavit rule" allows striking of affidavit which contradicts earlier testimony).

#### b.   **Declarations of Four TU Ex-Employees**

Plaintiffs have also submitted declarations of four TU ex-employees, and rely on them heavily.  However, their recent deposition testimony – taken <u>after</u> their declarations were submitted to the Court – reveals that the declarations are not consistent with their personal observations or opinions, lack foundation, were not written in their own words, and are not credible.  The utter 180° flip-flop of these witnesses is extraordinary.  The major discrepancies and key admissions obtained in their depositions are summarized in TU's accompanying motion to strike.  The District Courts in the Ninth Circuit have disregarded material portions of declarations filed in support of motions for class certification when contradicted by deposition testimony.  *See, e.g.*, *Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 571 (C.D. Cal. 2007).

**3.      Plaintiffs' Exaggerations of AG, NYSED, BBB, and Student Complaints**

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████     and (iv) only about 370 people were ever identified as having <u>any</u> "complaints" about TU, some as minor as a $39.95 billing error. (**DKS Decl. ¶69**)  Those 370 people are a tiny percentage compared to over 10,000 evaluations of which 97% were very positive.

**4.      Plaintiffs' "Verbal Contracts"**

Finally, as already noted above, Plaintiffs have submitted no evidence whatsoever – nor even any explanation – of the purported "verbal contracts" between TU and its students.  This factual void is not even filled in for the six named Plaintiffs, much less for the 6,500 potential members of the proposed class.  Nevertheless, the bulk of Plaintiffs' case is alleged verbal promises of "guarantees," "return on investment," "year-long mentorships," TU as an "accredited university," and the like.

**IV.      <u>A "RIGOROUS ANALYSIS" IS REQUIRED TO MEET THE STANDARDS OF RULE 23</u>**

Rule 23 requires a "rigorous analysis" for class certification.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980, (9th Cir. 2011), *citing Gen. Tel. Co. v. Falcon*, 457 US 147, 161 (1982).  The analysis includes consideration of the merits if they overlap with certification requirements.  *Ellis,* 657 F.3d at 981.  The analysis also includes an actual weighing of factual disputes that are essential to the certification decision.  *Id*. at 983.

In other words, the Court must resolve factual issues to the extent necessary to determine whether common issues of fact and law exist, but not to the extent necessary to determine who might actually prevail on the merits.  *Id*. at 986, n. 8.  This weighing test – while not dispositive on the merits – is still a "pass or fail" evaluation by the Court of the evidence exactly as it stands now.

At the certification stage, it is not enough for Plaintiffs to pose <u>common questions</u> – that is a mere pleading issue.  Rather, Plaintiffs must now show <u>common answers</u> supported by admissible

1   evidence.  *Ellis,* 657 F.3d at 981, *citing Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __; 131 S. Ct. 2541,

2   2551-52 (2011).  For reasons discussed above, TU respectfully submits that Plaintiffs' evidence does

3   not satisfy that requirement, and fails the rigorous analysis required for certification.

4   **V.      PLAINTIFFS FAIL THE COMMONALITY STANDARD OF RULE 23(a)(2)**

5   **A.  The Commonality Standard**

6          The commonality standard of Rule 23(a)(2) requires that "there are questions of law or fact

7   common to the class."  This test "only requires a single significant question of law or fact," and is

8   often described as a "limited burden."  *Mazza v. American Honda Motor Co., Inc.*, 666 F.3$^d$ 581, 589

9   (9th Cir. 2012).  Defendants who raise "individualized issues" to oppose certification typically

10  contest predominance under Rule 23(b)(3) rather than commonality.  *Id*.  Why does TU contest the

11  "low bar" of commonality here?

12         For two reasons: (i) the Supreme Court's recent reversal of certification in the *Wal-Mart* case

13  based on lack of commonality has raised that bar with detailed guidance; and (ii) Plaintiffs literally

14  show no material commonality, and so they cannot clear that bar whether raised or lowered.

15         *Wal-Mart* arose in the Northern District of California, and involved a nationwide class of 1.5

16  million female employees suing for gender discrimination by thousands of local store supervisors.

17  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. at 2547.  The plaintiffs alleged a "strong and uniform

18  'corporate culture'" of gender bias, "thereby making every woman at the company the victim of one

19  common discriminatory practice."  *Id*. at 2548.  The District Court granted certification, and the

20  Ninth Circuit affirmed *en banc*, but the Supreme Court reversed.  *Id*. at 2549-50 & 2556-57.

21         The Court reasoned that "[t]he crux of this case is commonality," requiring <u>not only</u> that all

22  class members "suffered a violation of the same provision of law," <u>but also</u> that they "suffered the

23  same injury."  *Id*. at 2550-51.  A mere claim that all class members suffered discrimination would

24  not suffice.  *Id*. at 2551.  Rather, their claims had to turn on a "common contention" that is "capable

25  of classwide resolution – which means that determination of its truth or falsity will resolve an issue

26  that is central to the validity of each one of the claims in one stroke."  *Id*.  The Court's illustration:

27         "What matters to class certification . . . is not the raising of common
        'questions' – even in droves – but, rather the capacity of a classwide

28         proceeding to generate common *answers* apt to drive the resolution of

                                16                    Case No. 10 CV 0940 CAB (WVG)

1    the litigation.  Dissimilarities within the proposed class are what have
the potential to impede the generation of common answers." *Id.,*
2    *quoting* Nagareda, *Class Certification in the Age of Aggregate Proof,*
84 N.Y.U.L.Rev. 97, 132 (2009) (emphasis in original).

3

4        The Court then noted that "Rule 23 does not set forth a mere pleading standard," but instead

5    requires a party seeking certification to "affirmatively demonstrate" and be "prepared to prove" full

6    compliance with the Rule.  *Id.*  After noting the "rigorous analysis" required of the District Court to

7    test Rule 23 compliance, and its obligation to delve into the merits as needed for that analysis, the

8    Court said the "crux of the inquiry" for certification in *Wal-Mart* was why "literally millions of

9    employment decisions at once" had gone against the female employees, and plaintiffs needed to

10   show "some glue holding the alleged reasons for all those decisions together." Id. at 2551-52.

11       The *Wal-Mart* Court then made two key determinations for purposes of this case: (i) local

12   Wal-Mart supervisors had discretion over employment matters, which was "just the opposite of a

13   uniform employment practice that would provide the commonality needed for a class action" (*id*. at

14   2554); and (ii) the class members were a varied group best described as follows:

15           "[They] held a multitude of different jobs, at different levels of
Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores,
16           sprinkled across 50 states, with a kaleidoscope of supervisors
(male and female), subject to a variety of regional policies that all
17           differed . . . .  Some thrived while others did poorly.  They have
little in common but their sex and this lawsuit." *Id.* at 2557
18           (quoting Justice Kozinski's dissenting opinion at Ninth Circuit).

19   **B.  The TU Students Are Completely Diverse**

20       Turning to this case, obviously it has fewer plaintiffs than *Wal-Mart*, but the basic lack of

21   commonality within the proposed classes is the same.  The lack of commonality here can be fairly

22   summarized by describing the proposed class using Justice Kozinski's summary of *Wal-Mart* above:

23           [They] attended a multitude of different TU programs, at different
levels of TU training, for variable lengths of time, in 434 cities,
24           sprinkled across 47 states, with a kaleidoscope of teachers and
mentors ("handpicked" and otherwise), subject to a variety of
25           regional presentations that all differed . . . .  Some made money
while others never tried.  They have little in common but their
26           deciding to pay for TU training and this lawsuit.

27       Prior discussion has shown the variety of TU programs, instructors, and mentors, and the

28   variety of the TU students themselves.  What "common contention" among the students could ever

17

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1   meet the *Wal-Mart* standard of resolving "an issue that is central to the validity of each one of the

2   [alleged] claims in one stroke?"  Plaintiffs must show at least one such "common contention" shared

3   by <u>every TU student</u>, or certification must be denied.

4          Plaintiffs cannot make that showing because what each TU student got was extremely <u>varied</u>

5   in programs, prices, contracts, content, markets, teachers, mentors, and resulting individual

6   performance. **(Exs. 11-14, 21, 25 & 27)**  A student who spent $995 for a three day seminar got

7   something very different than a student who spent $35,000 for months of multiple seminars, plus in-

8   field mentoring and subsequent year-long support.  The parallel comparison in *Wal-Mart* would be a

9   store greeter who worked part-time one summer, versus a multi-year full-time employee who

10  worked her way up to a supervisory job.  What those two employees got from Wal-Mart is different.

11  The same is true of what the comparable students got from TU.

12         Comparing Plaintiffs' claims today with the TU student evaluations at the material time

13  points out this difference in "what students got from TU" with tremendous clarity.  Plaintiffs now

14  claim fraud, and assert their training was worthless, and yet ████████████████████████████

15  ██████████████████████████████████████████████████████████████████████████████

16  Another direct comparison between *Wal-Mart* and this case is that the plaintiffs in both cases base

17  their claims on the independent actions of many different people nationwide, namely thousands of

18  Wal-Mart supervisors, and dozens of TU instructors, mentors, salespeople, and advertisers.  The

19  outcome in both cases should be the same as well: no commonality and no certification.

20         One last direct comparison between the *Wal-Mart* class and Plaintiffs here is that neither case

21  has a defendant with a "uniform [business] practice that would provide the commonality needed for

22  a class action."  Instead, both Wal-Mart and TU have policies <u>against</u> the conduct complained of.

23  "Wal-Mart's announced policy forbids sex discrimination."  *Wal-Mart*, 131 S.Ct. at 2553.  Likewise,

24  TU's announced policies forbid fraudulent misrepresentations, verbal promises, self-dealing, and

25  guarantees. ████████████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████

27         In short, *Wal-Mart* has reset the Rule 23(a)(2) commonality bar such that all proposed class

28  members must have "suffered a violation of the same provision of law," <u>and</u> have "suffered the same

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1   injury," and therefore have a "common contention" that – once decided to be true or false – will

2   resolve all of their class claims "in one stroke."  TU respectfully submits that the proposed class of

3   paying TU students cannot clear that bar because – like the *Wal-Mart* class – it is much too diverse.

4   **VI.    PLAINTIFFS FAIL THE TYPICALITY STANDARD OF RULE 23(a)(3)**

5   **A.  The Typicality Standard**

6           The typicality standard of Rule 23(a)(3) is that "the claims or defenses of the representative

7   parties are typical of the claims or defenses of the class."  The purpose is to ensure that the interests

8   of the class representatives are aligned with the interests of the class.  *Hanon v. Dataproducts Corp.*,

9   976 F.2d 497, 508 (9th Cir. 1992).  The actual criteria for the test is stated as: "whether other [class]

10  members have the same or similar injury, whether the action is based on conduct which is not unique

11  to the named plaintiffs, and whether other class members have been injured by the same course of

12  conduct."  *Id., citing Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985).

13          This is another "low bar," and usually is invoked only when potential class representatives

14  may be preoccupied with their own defense due to some peculiar situation, and hence might neglect

15  the interests of the class.  *Hanon*, 976 F.2d at 508.  The named Plaintiffs certainly have peculiar

16  situations, and hence are not typical, as explained below.  But TU has also raised the typicality issue

17  to make the broader point that no representatives could ever be "typical" of the diverse TU students.

18  The nominated class representatives illustrate that problem, and any replacements would face it too.

19  **B.  The Named Plaintiffs Are Not "Typical" of Diverse TU Students**

20          Plaintiffs claim that TU's "extensive and long-term advertising campaign" spread uniform

21  "misrepresentations" throughout the class, but Plaintiffs themselves do not support that claim.  Five

22  Plaintiffs saw different ads, one of those ads contains no purported misrepresentations, three are

23  missing and unverifiable, and Plaintiff Makaeff saw no ad. **(Ex. 55)**  Ms. Makaeff also did not attend

24  the free 90-minute "preview" at which oral misrepresentations supposedly were rife. **(Ex. 56)**  This

25  patchwork of actual experience cannot be typical of a class supposedly lured by "uniform" ads.

26          Turning to TU's programs, the class is defined to include all students who paid for the 3-day

27  introductory seminar, and/or paid for an "Elite" program.  However, only four Plaintiffs paid for the

28  introductory seminar, and only three Plaintiffs purchased an Elite program (one of them, Plaintiff

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1   Keller, got a full refund).  Plaintiff Oberkrom paid for <u>neither</u> the introductory program <u>nor</u> an Elite

2   program, so he does not even qualify as a class member!  He paid $25,000 for a mentorship

3   program, as did Plaintiffs Brown and Low, but the class does not include that program. **(Ex. 57)**

4         Even omitting Plaintiffs Oberkrom, Brown, and Low, the three remaining Plaintiffs

5   (Makaeff, Everett, and Keller) are still very different from the vast majority of paying TU students.

6   █████████████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████

8   ████████████████████████████   That means these three Plaintiffs decided to spend at least <u>17</u>

9   <u>times more money</u> than 72% of the students who purchased the three-day introductory seminar and

10  nothing more.  Were that not enough of a disparity, one of these three Plaintiffs – Mr. Keller – got a

11  full refund of $35,000, which was not a rare event, but certainly was not "typical" either. **(Ex. 59)**

12        Finally, all six Plaintiffs continued with their atypical behavior during and after their training:

13  (i) Plaintiffs Makaeff and Low received extra, <u>free</u> training far beyond anything typical, including

14  additional mentors, workshops, phone coaching, and advanced seminars; (ii) Plaintiffs Oberkrom

15  and Everett refused all in-person mentoring after paying for it; (iii) Plaintiffs Oberkrom, Everett (a

16  realtor), and Low never tried to invest using their training; (iv) Plaintiff Brown made one offer on

17  one property "using [his] TU training," was rejected, and never again attempted to invest; and (v)

18  ████████████████████████████████████████████████████

19  ███████████████████████████████████████

20        Not only do all six Plaintiffs not "have the same or similar injury" as most class members,

21  they do not even claim the same loss among themselves; i.e., some Plaintiffs claim they got no value

22  from TU, while others concede they got some value. **(Ex. 61)**  Also, all six Plaintiffs obviously dealt

23  with TU in ways that are "<u>unique</u> to the named plaintiffs," and <u>not typical</u> of most TU students'

24  programs, experiences with training, and subsequent "investing."  Finally, all six Plaintiffs are <u>no</u>

25  <u>longer typical</u> of 97% of students who rated TU highly.

26  **C.  <u>No Other Potential Class Representatives could be Typical of Diverse TU Students</u>**

27        We have just seen that the named Plaintiffs are not typical of the 6,500 potential class

28  members.  The point now is that <u>none</u> of those 6,500 students can be typical of <u>all</u> the others either.

The evidence is that <u>all</u> TU students: (i) likely had different exposure to TU's sporadic advertising; (ii) bought different TU programs with different content ranging in price from $995 to $35,000; (iii) had different instructors using different materials; (iv) had different or no exposure to mentoring; and (v) had varying experiences as students and investors.  Therefore, the students would have a wide variety of different claims against TU, and TU would have a wide variety of different defenses.

Whether five new representatives are chosen at random from this diverse group, or five are carefully selected (again) by Plaintiffs' counsel, <u>no selection of any reasonable number of people</u> could possibly represent <u>everyone else</u> in the proposed class.  A TU student who spent $995 is not typical of a student who spent $35,000.  A TU student who attended one 3-day seminar is not typical of a student who took TU classes for months.  A TU student who was mentored is not typical of a student who was not.  A TU student unhappy with the training is not typical of a student happy with it.  A TU student who wrote a good evaluation of TU is not typical of a student who wrote a bad one.  A student who made money with TU training is not typical of a student who never tried.

If a class cannot designate a reasonable number of truly "typical" representatives for all its members, the explanation must be that the class membership is too diverse for class certification.  TU respectfully submits that is exactly the situation here, and it will remain the situation regardless of who replaces the current – and obviously atypical – named Plaintiffs.

## VII.  PLAINTIFFS FAIL THE PREDOMINANCE STANDARD OF RULE 23(b)(3)

### A.  The Predominance Standard

Even if the Court gives Plaintiffs enormous benefit of the doubt, and permits them to hurdle the "low bars" of commonality and typicality, certification must certainly fail on predominance grounds under Rule 23(b)(3).  The pertinent provision of that Rule requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members" – an impossibly high bar for Plaintiffs here.

### B.  Common Issues Do Not Predominate Because Individual Inquiry Is Required

#### 1.  The Diversity of TU Students Requires Individual Inquiry

When individual inquiry is required, then individual issues predominate over common issues, and certification must be denied for lack of predominance.  *Mazza v. American Honda Motor Co.,*

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

*Inc.*, 666 F.3d at 596.  Due to the variety of TU students, individual inquiry is required to determine their exposure to and understanding of  TU advertising, their contract terms (written and "oral") and prices, and their individual programs, mentors, instructors, evaluations of TU, expectations, value received, real estate investments, and gains or losses, plus any waivers, refunds, or free training.

The need for individual inquiry here goes to the heart of this case as a purported consumer class action.  The classic consumer class members are faceless people who bought a fungible product with very little money and less thought.  Their personal knowledge, motivations, and expectations for that purchase are typically immaterial.  However, the proposed class of TU students does not fit that minimalist profile at all.  There are at most only 6,500 of them, all of whom spent at least $995 and devoted at least three days to TU, while some spent up to $35,000 and devoted many months to TU.  They did not buy a mislabeled jar of vitamins, or get overcharged 25 cents for a DVD rental.  Rather, they typically attended a 90-minute preview of TU, and then decided to spend varying amounts of time and money on a challenging program that might pay a good return, or might not.

The point is that the "knowledge, motivations, and expectations" of each TU student and potential class member are material, cannot be ignored, and must be subject to individual inquiry.  *Cf. Poulos v. Caesar's World, Inc.*, 379 F.3d 654, 655 (9th Cir. 2004) (discussed below).  Plaintiffs attempt to paint their class members as gullible fools who were tricked into spending their money on a hopeless quest to meet Donald Trump and get rich quick.  But, ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

The actual impact on TU students of the ads, materials, training, "up-selling," and every other key aspect of TU castigated by Plaintiffs must be determined.  That can only be done by individual inquiry into what ads – if any – they saw, what representations – if any – were made, what personal expectations they had, what courses they took and why, and how they used their training afterwards.  Plaintiffs have no interest in letting that inquiry happen, and indeed they want a class that – under the "presumption of reliance" – will prevent it.  Nevertheless, the "rigorous analysis" for certifying a class on predominance <u>requires</u> weighing individual factors against class-wide ones.

/ / /

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

The Ninth Circuit has provided excellent guidance for that weighing, and it favors individual inquiry in cases involving a class that is diverse in material ways – like this one.  The *Poulos* case just cited above held that a diverse group of potential claimants requires individual inquiry when that diversity includes differing "knowledge, motivations, and expectations." 379 F.3d at 655.  *Poulos* arose in Nevada, and involved RICO claims brought by a putative nationwide class of gamblers who used video poker or electronic slot machines.  *Id.* at 658.  The "misrepresentation" was that these devices looked like hand-dealt poker games and mechanical slot machines, but actually delivered pre-determined computer-driven outcomes unknown even to experienced gamblers.  *Id.* at 659-61.

The District Court denied class certification on the ground that individualized reliance issues related to proof of causation would predominate over common questions, and the Ninth Circuit affirmed.  *Id.* at 658.  The Circuit Court explained that the basic reason for individualized inquiry into reliance was "the rather obvious point that gambling is not a context in which we can assume that potential class members are always similarly situated":

> "Gamblers do not share a common universe of knowledge and expectations – one motivation does not 'fit all.'  Some players may be unconcerned with the odds of winning, instead engaging in casual gambling as entertainment or a social activity.  Others may have played with absolutely no knowledge or information regarding the odds of winning such that the appearance and labeling of the machines is irrelevant and did nothing to influence their perceptions.  Still others, in the spirit of a calculated risk, may have played fully aware of how the machines operate.  Thus, to prove proximate causation *in this case*, an individualized showing of reliance is necessary." *Id.* at 665-66 (emphasis in original).

The Ninth Circuit concluded that generalizations about gambling class members would not suffice:

> "Indeed, there may be no single, logical explanation for gambling – it may be an addiction, a form of escape, a casual endeavor, a hobby, a risk-taking money venture, or scores of other things.  The vast array of knowledge and expectations that players bring to the machines ensures that the 'value' of gambling differs greatly from player to player, with some people playing for 'entertainment value' or for any number of other reasons as much as to win.  Consequently, we conclude that classwide circumstantial evidence would not suffice to prove causation in this case." *Id.* at 668.

Earlier discussion has shown that the "knowledge, motivations, and expectations" of TU students varied.  The evidence and common sense are in accord on this obvious point.  For example, some came to learn a "life skill" (Plaintiff Makaeff), others to network and hone existing skills

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1 (Plaintiff Everett), others to increase their retirement income (Plaintiff Low).  **(Ex. 63)**  The Plaintiffs

2 and all 6,500 potential class members had varying "knowledge, motivations, and expectations"

3 before, during, and after their TU training.  Consequently, all may "value" their training differently,

4 just as the *Poulos* gamblers may have "valued" gambling differently.  The Ninth Circuit rejected

5 class-wide assumptions for the diverse group in *Poulos*.  The group here is <u>at least</u> equally diverse.

6 The guidance for the Court on this issue is not limited to *Poulos*.  Other courts in the Ninth

7 Circuit have insisted on individual inquiry into the individual motivations and decisions of potential

8 class members due to the unique nature of the class, claims, or facts at issue.  *See, e.g., Tanedo v.*

9 *East Baton Rouge Parish School Bd.*, 2011 WL 7095434, *9 (C.D. Cal. 2011) (Filipino teachers

10 recruited for US work, but then overcharged for purported visa fees by employer, denied

11 certification of fraud claims because individual inquiry was needed to determine their reasons for

12 immigrating and their willingness to pay more than represented); *Davis v. Homecomings Financial*,

13 2006 WL 2927702, *7 (W.D. Wash. 2006) (claimed reliance by class of home loan borrowers raised

14 issues of credibility and state of mind requiring individualized consideration).

15 California case law is also in accord, rejecting a potential class of "fresh" orange juice buyers

16 (the juice was made from concentrate) because individual inquiry was needed to determine "their

17 personal assumptions about the nature of the products they wanted to buy," such as "'premium',

18 'fresh' or 'from concentrate'."  *Caro v. Proctor & Gamble Co.*, 18 Cal.App.4[th] 644, 668-69 (1993).

19 **2.**     **Even Assuming Some Common Issues, Proof Will Require Individual Inquiry**

20 Another broad principle of predominance requiring individual inquiry here is that – <u>even if</u>

21 <u>common issues may exist</u> – the courts must look behind those issues to determine if individual

22 inquiry is needed <u>to prove or disprove them</u>.  This principle is explained in two Ninth Circuit cases

23 that reviewed California District Court rulings on certification.  Both reviews turned on the need to

24 look behind the substance of a common issue, and determine if individualized proof was necessary.

25 In *Williams v. Veolia Transp. Svcs, Inc.*, 379 Fed.Appx. 548 (9th Cir. 2010), the District

26 Court <u>denied</u> certification of a class of employees for lack of predominance despite plaintiff's claim

27 to have shown that each class member had been deprived of at least one rest period.  *Id.* at 549.  The

28 Ninth Circuit <u>upheld</u> the denial, rejected plaintiff's argument because it "oversimplifies the relevant

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

inquiry," and explained: "Analyzing the predominance requirement necessitates looking at both the substantive issues of the underlying claim and the proof relevant to each issue. . . . Consequently, the district court did not abuse its discretion when it looked past the question of whether each putative class member suffered an injury and instead focused on the proof necessary." *Id*. That proof required individual inquiry to prove violation of a wage and hour order. *Id*.

Likewise, in *In re Wells Fargo Home Mortgage. Overtime Pay Litigation*, 571 F.3d 953 (9th Cir. 2009), the District Court <u>granted</u> certification of a class of employees seeking overtime pay, primarily on the basis of the employer's uniform internal exemption policy, even though five other exemptions would require individual inquiry. *Id*. at 956. The Ninth Circuit <u>reversed</u> the certification due to lack of predominance, and explained: "In short, [the employer's] uniform exemption policy says little about the main concern in the predominance inquiry: the balance between individual and common issues. As such, we hold that the district court abused its discretion in relying on that policy to the near exclusion of other factors relevant to the predominance inquiry." *Id*. at 958-59.

The point is that – <u>even if</u> the Court considers Plaintiffs' showing to be adequate for some class-wide issues in theory – the predominance inquiry still requires analyzing "the proof relevant to each issue." If <u>any</u> proof requires individual inquiry, then Plaintiffs' class fails on predominance. Here are three concrete examples which will require individual inquiry:

- <u>Even if</u> some aspect of the TU advertising or marketing is assumed misleading, individual inquiry is still needed to determine which paying TU students actually saw and relied on it, and what they understood by it. (For example, TU ads citing "hand-picked" faculty were understood differently by different students: Plaintiff Low thought "hand-picked" meant the instructors were qualified and knowledgeable; while Plaintiff Brown thought "hand-picked" meant Mr. Trump chose resumes.) **(Ex. 64)**

- <u>Even if</u> some TU programs or products are assumed to have a value less than their sale price, individual inquiry is still needed to determine what value <u>was</u> actually obtained by students, including real estate investments good and bad, and whether they received refunds. ███

███

███

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

- <u>Even if</u> some TU sales or teaching materials, and/or instructors, are assumed misleading (i.e., the Trump video, PowerPoints, etc.), individual inquiry is still needed to determine which students were exposed to those materials and/or instructors.  (For example: Plaintiff Makaeff never saw a TU ad; and three of the six Plaintiffs never saw the Trump video.) **(Ex. 37)**

### 3.   Plaintiffs' Reliance on "Verbal Misrepresentations" Requires Individual Inquiry

We have seen that Plaintiffs do not have documentary evidence to prove either an "extensive and long-term advertising campaign" or a "centrally orchestrated scheme" involving purported misrepresentations.  Plaintiffs instead must prove <u>verbal</u> misrepresentations using only their dubious declarations "supporting" this motion – none of which are probative.  Moreover, certification of fraud claims based on verbal misrepresentations requires a "degree of uniformity among misrepresentations" clearly shown by a "common course of conduct" – typically using a "standardized sales pitch."  *See, e.g., In re First Alliance Mortgage Co.*, 471 F.3d 977, 990-91 (9th Cir. 2006) (upholding a jury verdict of class-wide fraud based on verbal misrepresentations).

Here, there is no showing of a "standardized sales pitch," nor a "common course of conduct," and so the "degree of uniformity" needed for class-wide verbal misrepresentations does not exist. That leaves only individual inquiry to establish what purported misrepresentations were made, and whether Plaintiffs reasonably relied on them.

### 4.   The "Presumption of Reliance" Does Not Apply to Prevent Individual Inquiry

#### a.   The Applicable and Dispositive Cases Eliminate the Presumption

The single most applicable case on the "presumption of reliance" issue here is also binding and dispositive: *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012).  Plaintiffs do not even mention the case.  *Mazza*  involved class claims of misrepresentation concerning the limitations of a Honda braking system, which claims were brought under the same California laws relied on by Plaintiffs in this case.  *Id.* at 587.  The *Mazza* class was certified by the District Court, but the Ninth Circuit reversed on several grounds.  *Id.* at 585.

The key ground for present purposes was the holding that an individual showing of reliance had to be made by plaintiffs.  *Id.* at 595-96.  Honda's advertising campaign consisted of brochures that changed over time, television commercials that ran for about eight months, magazine ads that

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1    ran for about seven months, videos viewed at dealerships, commentary on a Honda website, and one

2    article in a Honda magazine – some of which materials did not deny that the braking system had

3    limitations.  *Id.* at 586-87.  The *Mazza* court held that "the small scale of the advertising campaign

4    does not support a presumption of reliance" as erroneously ruled by the District Court.  *Id.* at 594.

5              The *Mazza* court explained:

6              "[W]e agree with Honda's contention that the misrepresentations at issue
               here do not justify a presumption of reliance.  This is so primarily because
7              it is likely that many class members were never exposed to the allegedly
               misleading advertisements, insofar as advertising of the challenged system
8              was very limited.  *Davis-Miller v. Automobile Club of So. Cal.* 201
               Cal.App.4th 106, 125 (2011 ('An inference of classwide reliance cannot be
9              made where there is no evidence that the allegedly false representations
               were uniformly made to all members of the proposed class.'); *Cohen v.*
10             *DIRECTV, Inc.,* 178 Cal.App.4th 966, 980 (2009 ('[California law does
               not] authorize an award . . . on behalf of a consumer who was never
11             exposed in any way to an allegedly wrongful business practice.')
               . . .
12             Honda's product brochures and TV commercials fall short of the
               'extensive and long-term [fraudulent] advertising campaign' at issue in
13             *Tobacco II*, 46 Cal.4th at 324-27, and this difference is meaningful.  And
               while Honda might have been more elaborate and diligent in disclosing
14             the limitations of the CMBS system, its advertising materials did not deny
               that limitations exist.  A presumption of reliance does not arise when class
15             members 'were exposed to quite disparate information from various
               representatives of the defendant.'  *See Stearns*, 655 F.3d at 1020 (9th Cir.
16             2011).  California courts have recognized that *Tobacco II* does not allow
               'a consumer who was never exposed to an alleged false or misleading
17             advertising . . . campaign' to recover damages under California's UCL.
               *Pfizer, Inc. v. Superior Court*, 182 Cal.App.4th 622, 632 (2010; *Davis-*
18             *Miller*, 201 Cal.App.4th at 633.  For everyone in the class to have been
               exposed to the omissions, as the dissent claims, it is necessary for
19             everyone in the class to have viewed the allegedly misleading advertising.
               Here the limited scope of that advertising makes it unreasonable to assume
20             that all class members viewed it.  *Pfizer, Inc.,* 182 Cal.App.4th at 633-34.
               . . .
21             In the absence of the kind of massive advertising campaign at issue in
               *Tobacco II*, the relevant class must be defined in such a way as to include
22             only members who were exposed to advertising that is alleged to be
               materially misleading."  *Id.* at 595-96 (West citations omitted).

23

24             TU's advertising was even more limited than Honda's.  Like Honda, ██████████

25    ████████████████████████████████████████████████████████████████████████████████

26    ████   The limits of TU's advertising are proven by the fact that no Plaintiffs saw the same ad, and

27    one of them saw no ads. **(Ex. 37)**  *Mazza* rejected the "presumption of reliance" based on Honda's

28    limited advertising.  The same result is due here because TU's advertising was even more limited.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1    Three other clearly applicable cases give the same guidance to the Court on the "presumption

2   of reliance" issue.  First, as already discussed above, the Ninth Circuit opinion in *Poulos* rejected the

3   "presumption of reliance" based on the "knowledge, motivations, and expectations" of a potential

4   class of gamblers, rather than ads they did or did not see.  *Poulos*, 379 F.3d at 665.  The end result

5   was the same: *Poulos* held that "an individualized showing of reliance is required."  *Id*. at 666.

6    Second, in *Gonzalez v. Proctor & Gamble Co*., 247 F.R.D. 616 (S.D. Cal. 2007), the court

7   denied certification to a class of consumer buyers of hair products claiming under the UCL, FAL,

8   CLRA, and fraud.  *Id*. at 619 & 627.  The claims were based on misrepresentations concerning the

9   "hair strengthening" aspects of the products, which were advertised nationally and abroad in a

10   variety of mass media.  *Id*. at 619.  The court ruled as follows:

11    "The Court finds there are significant individualized issues related to proof
          of reliance.  The evidence shows that Defendant employed a wide variety
12          of representations in its labeling, television commercials, website
          promotions, and other promotions as to a wide variety of [hair] products.
13          Class members may have relied on different representations, while some
          may not have relied on, or even have been exposed to, any of the allegedly
14          false representations.

15          Plaintiff directs the court's attention to California case law suggesting that
          in some consumer fraud class actions, reliance may be inferred on a class-
16          wide basis.  However, the Ninth Circuit has stated that presumption of
          reliance typically is only permitted in securities fraud cases, and only in
17          cases based on omissions as opposed to affirmative misrepresentations.
          . . .
18          The Court finds that this case is controlled by those California cases that
          refused to certify a class when the plaintiffs could not allege that the same
19          representations were specifically made to each class member, thus
          preventing the court from permitting an inference of reliance.
20          . . .
          Plaintiff, relying on *Vasquez*, argues that CLRA claims are subject to class
21          wide proof of liability and reliance without a need for individualized
          proof.  As previously discussed, however, *Vasquez* and its progeny only
22          permit an inference of common reliance when the allegations demonstrate
          that a single, material misrepresentation was directly made to each class
23          member."  *Id*. at 623-24 (citations omitted, emphasis added).

24    Third and last, in *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178 (3d Cir. 2001), the

25   District and Circuit Courts denied certification to a class of investors in movies claiming violations

26   of RICO and Pennsylvania state law for securities fraud, misrepresentation, and deceptive business

27   practices.  *Id*. at 180-81.  The claims were based on allegations remarkably similar to this case,

28   namely alleged "uniform marketing materials" (including a "script") that misrepresented film star

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1    Michael Douglas' personal participation in the film productions to be financed, when in fact he was

2    not under contract. *Id*. at 181-82. Also like this case, most of the selling to plaintiffs allegedly was

3    done verbally by a variety of salespeople. *Id*. at 187-90. The Third Circuit held that:

4
5
6
7
8

> "In cases raising issues similar to those here, it has become well settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action. For example, in *Seiler*, the court rejected as insufficient plaintiffs' allegations that the brokers allegedly relied upon uniform marketing materials because the record revealed that individual brokers made individual decisions about upon what to rely and what to say to customers." *Id*. at 190 (citations omitted).

9    The Third Circuit also rejected the "presumption of reliance." *Id*. at 191-94. The court

10    summarized the issue as "whether affirmative misrepresentations were made to particular investors,

11    <u>an inquiry that necessarily involved an individual review</u> of what each investor was told and what

12    information was provided." *Id*. at 186-87 (emphasis added).

13    California law is in accord. In *Osborne v. Subaru of America, Inc.*, 198 Cal.App.3d 646

14    (1988), certification was denied for many reasons to a potential class of buyers of vehicles with a

15    common design defect and a nationwide ad campaign. *Id*. at 650-52. Concerning the presumption

16    of reliance, the court held that – because three class members saw no ads before buying their

17    vehicles – "[t]here was no basis to draw an inference of classwide reliance without a showing that

18    representations were made uniformly to all members of the class." *Id*. at 661.

19       b.    **The Facts Do Not Support the Presumption**

20    Plaintiffs claim that TU made "common misrepresentations and omissions" in TU's

21    "ubiquitous advertising campaign, standardized PowerPoint presentations at Live Events and

22    through uniform sales scripts which were followed word-by-word."

23    As has been repeatedly shown above, the problem with this claim is that the facts do not

24    remotely support it: (i) the TU "advertising campaign" was not "ubiquitous" – indeed no Plaintiffs

25    saw the same ads, the lead Plaintiff saw none, and the ad seen by one Plaintiff contains <u>no</u> purported

26    "misrepresentations" (**Exs. 37 & 108**); (ii) the TU PowerPoint presentations were not

27    "standardized," were mere outlines for much more extensive and varied oral input by many

28    instructors, and – as shown by the four <u>different</u> PowerPoint presentations submitted by Plaintiffs

1  (plus nine additional ones submitted by TU) – were varied based on content (**Ex. 39**); and (iii) █

2  ███████████████████████████████████████

3  ### c.  **Plaintiffs' Inapplicable Cases Do Not Support the Presumption**

4  Plaintiffs cite <u>eleven</u> cases on this issue.  The first is *Amchem Products, Inc. v. Windsor*, 521

5  US 591 (1997), cited for: "[p]redominance is readily met in certain cases alleging consumer fraud."

6  *Id*. at 625.  *Amchem* upheld a <u>denial</u> of certification based in part on <u>lack</u> of predominance in a "mass

7  tort" case – totally unlike the facts here.  *Id*. at 591-94.  The quote by Plaintiffs is from the 1966

8  Notes for Rule 23(b)(3), which read in pertinent part: "a fraud case may be unsuited for treatment as

9  a class action if there was a material variation in the representations made or degrees of reliance."

10  Plaintiffs next cite *Wolin v. Jaguar Land Rover NA, LLC*, 617 F.3d 1168 (9th Cir. 2010) for

11  the proposition that "consumer fraud cases (like this one)" are "readily certifiable" when the

12  misrepresentations and causation are "susceptible to proof by generalized evidence."  *Id*. at 1173.

13  Only those last six words are actually found in *Wolin*, which reversed a denial of class certification

14  in a case involving concealment of "a single, defective alignment geometry" that uniformly caused

15  tire wear.  *Id*. at 1176.  That was an objective mechanical defect unlike anything in this case.

16  Plaintiffs next cite three cases purportedly opining that "the Ninth Circuit favors class

17  treatment of fraud claims stemming from a 'common course of conduct,' such as the up-sell scheme

18  alleged in this case."  But, all three turned on dispositive documents which do not exist here.  *In re*

19  *First Alliance Mortgage Company*, 471 F.3d at 990-91 ("standardized sales pitch" with "a script that

20  was required to be memorized"); *Negrete v. Allianz Life Ins. Co. of NA*, 238 F.R.D. 482, 491-92

21  (C.D. Cal. 2006) (signed "Statements of Understanding" confirming terms); *Westways World Travel,*

22  *Inc. v AMR Corp*., 218 F.R.D. 223, 237-40 (C.D. Cal. 2003) ("Debit Memos").

23  Plaintiffs' next case is *In re American Cont. Corp./Lincoln S & L Securities Litig.*, 140

24  F.R.D. 425 (D. Ariz. 1992) ("*ACC/Lincoln*").  It concerned securities fraud claims for consistent

25  verbal misrepresentations about the vast assets and solvency of ACC/Lincoln, which later failed.  *Id.*

26  at 430-31.  The "centrally orchestrated strategy" was shown by answer sheets for Frequently Asked

27  Questions, a "Bond Seminar Script," a "Bond Selling Tips" guide, a slide show, and <u>sixty-two</u>

28  examples of materially identical testimony from <u>both</u> bond sellers <u>and</u> buyers.  *Id*. at 430 & 435-41.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1      *ACC/Lincoln* does not apply for two reasons.  First, the evidence of a "centrally orchestrated

2  strategy" was overwhelming in *ACC/Lincoln*, but is non-existent here.  Second, *ACC/Lincoln*

3  involved securities fraud which typically allows the "presumption of reliance, but consumer fraud

4  does not.  *McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 613-15 (S.D. Cal. 2007);

5  *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. at 619.  Moreover, most facts of a trade in securities

6  end with that sale, whereas buying training in a career is just the beginning of endless, varied facts.

7      The remaining five cases were cited by Plaintiffs for generalities.  *McKenzie v. Fed. Express*

8  *Corp.*, 275 F.R.D. 290, 298-99 (C.D. Cal. 2011), never mentioned reliance.  *Blackie v. Barrack*, 524

9  F.2d 891, 905-08 (9th Cir. 1975), involved the unique rules for securities fraud.  *Yokoyama v.*

10  *Midland Nat'l Life Ins.* Co., 594 F.3d 1087, 1092 (9th Cir. 2010), involved a Hawaiian consumer

11  protection statute that presumed reliance.  *Id*. at 1092-93.  *Klay v. Humana, Inc.*, 382 F.3d 1241,

12  1257-59 (11th Cir. 2004), involved RICO and ERISA claims.  Finally, *Iorio v. Allianz Life Ins. Co. of*

13  *NA*, 2008 WL 8929013, *25-*28 (S.D. Cal. 2008), had facts exactly like *Negrete*.

14      In summary, Plaintiffs cite eleven cases in their argument for the "presumption of reliance,"

15  but two do not involve reliance (*Amchem*, *McKenzie*), five involve indisputable documentary or

16  mechanical proof of misrepresentations (*Wolin*, *First Alliance*, *Negrete*, *Westways*, *Iorio*), two

17  involve securities fraud with its special rules for reliance (*ACC/Lincoln*, *Blackie*), one involves a

18  statute that does not require individualized proof of reliance (*Yokoyama*), and one involves RICO

19  and ERISA claims (*Klay*).  None of these cases involve facts or law remotely similar to this case.

20          d.    **Summary: The "Presumption of Reliance" Does Not Apply**

21      As explained in detail in *Mazza*, the "presumption of reliance" cannot be applied to the facts

22  in this case under Ninth Circuit or California law.  *Mazza* is binding authority on the issue.  *Mazza* is

23  further supported within the Ninth Circuit by *Poulos* and *Gonzalez*, and outside the Circuit by

24  *Johnston* – the case most similar to this case out of all cases cited by either side.

25  **VIII.   PLAINTIFFS FAIL THE SUPERIORITY STANDARD OF RULE 23(b)(3)**

26  **A.  The Superiority Standard**

27      Plaintiffs' additional failure to meet the superiority standard of Rule 23(b)(3) needs only

28  brief discussion.  Rule 23(b)(3) provides that – assuming the predominance standard is met – then

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1   certification further requires that "a class action is superior to other available methods for fairly and

2   efficiently adjudicating the controversy."  Rule 23 list four pertinent factors, of which the last and

3   only applicable one is "the likely difficulties in managing a class action."  Rule 23(b)(3)(D).

4   **B.  The Need for Individual Inquiry Means that a Class Action Is Not Superior**

5          If a case requires individual inquiry – meaning that "each class member has to litigate

6   numerous and substantial separate issues to establish his or her right to recover individually – then a

7   class action is not 'superior,'"  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191-92 (9th

8   Cir. 2001).  That inquiry means class treatment is not efficient.  That is exactly the situation here.

9          **IX.     ADDITIONAL FATAL DEFECTS FOR CLASS CERTIFICATION**

10   **A.  Plaintiffs Fail to Justify Certification for Each Cause of Action**

11          The Ninth Circuit requires that <u>each class cause of action</u> must satisfy every requirement for

12   class certification.  *Cf. Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1027 (9th Cir. 2011) (affirming

13   certification for UCL claims, and denying it for CLRA and EFTA claims); *Wolin v. Jaguar Land*

14   *Rover N.A., LLC*, 617 F.3d 1168, 1172-74 (9th Cir. 2010) (reversing denial of certification under

15   statutory claims, and remanding for further consideration of warranty claims).  Plaintiffs offer no

16   discussion of any single cause of action in that regard, much less all of them.

17   **B.  Plaintiffs Fail to Justify Certification for Each Defendant**

18          Ninth Circuit courts have also cited with approval the Wright & Miller principle that <u>each</u>

19   <u>class defendant</u> must be separately evaluated for certification.  *Cf. Lease Crutcher Lewis WA, LLC v*

20   *Nat'l Union Fire Ins. Co.*, 2009 WL 3444762, *4 (W.D. Wash. 2009) (referencing 7B C.Wright,

21   A.Miller & M.Kane, *Federal Prac. and Proc.* §1785.1 at 148-50 (1986) (no class certification

22   against all defendants "if plaintiff class depends on facts peculiar to each defendant").  However,

23   Plaintiffs never differentiate between TU and Mr. Trump, much less attempt to make any showing

24   for certification against Mr. Trump individually.

25          This is important not only for class certification, but also for the due process right of <u>each</u>

26   defendant to present <u>every</u> available defense.  *Philip Morris USA Inc., v. Scott* __U.S.__; 131 S.Ct.

27   1, 3-4 (2010).  If class claims against Mr. Trump are never specified together with their supporting

28   evidence, then he cannot identify and present all his defenses to certification of those claims.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

**C.  The Subclasses Do Not Justify Certification**

Plaintiffs propose no less than 14 subclasses covering all 50 states with overlapping claims – five of which are statutory (all limited to their state of origin), and nine of which are common law (spread over various combinations of states supposedly having materially identical law).

**1.     Numerosity Is Not Shown for Any Subclass**

The Ninth Circuit requires that, "[w]hen a class is divided into subclasses, each subclass must independently meet Rule 23 certification requirements."  *Betts v. Reliable Collection Agency*, 659 F.2d 1000, 1005 (9th Cir. 1981).  Those requirements for subclasses specifically include numerosity. *Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 588 (S.D. CA 2010).  However, Plaintiffs have made no showing of numerosity for any subclass, whether by analysis, estimate, statistics, or otherwise.

**2.     The Elder Abuse Subclasses Are Unsupported in Fact and Law**

Prior discussion has shown that there is literally no factual or legal support for the "senior" subclasses.  Plaintiffs have not addressed any requirement for certification, including numerosity.

**3.     The Consumer Statute Subclasses Still Require Individual Inquiry**

Plaintiffs argue that the consumer protection statutes and related case law of California, New York, and Florida save them from proving individual reliance by the members of the three consumer protection statute subclasses in those states.  However, prior discussion has shown that is not true in the state or federal courts of California absent the "presumption of reliance."  *Mazza v. American Honda Motor Co., Inc.*, 666 F.3d at 595-96.  The same is generally true in New York and Florida. Both states ordinarily forego proof of individual reliance for class claims brought under their consumer protection statutes.  But, both states typically still require a showing that all class members were exposed to and/or harmed by the actionable business practice at issue.  *See, e.g.*, *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 55 (N.Y. Ct. App. 1999) (showing needed that deceptive act caused actual harm); *Rollins, Inc. v. Butland*, 951 So.2d 860, 872 (D.C. Fla. 2006) (showing needed of individual causation).  In short, these subclasses have the same failing as the class overall.

**4.     The Common Law Subclasses Still Require Individual Inquiry**

**Unjust Enrichment:** What each paying TU student got from his or her training will vary based on individual factors, as will the students' personal evaluation of its value.  Those objective

1    and subjective values must be weighed against the payment – another varying factor – in order to

2    determine if there is any claim for "unjust enrichment."  This is <u>not</u> merely a rote calculation of

3    damages per class member, but rather is a threshold <u>liability issue</u> needing individual inquiry to

4    establish if a claim of unjust enrichment even exists.

5         Moreover, some of the most populous states in Plaintiffs' unjust enrichment subclasses have

6    rejected that claim as not suitable for class action treatment (s*ee, e.g., Rollins v. Butland,* 951 So.2d

7    860, 877 (D.C. Fla. 2006) (unjust enrichment class cannot be certified when each class member must

8    prove performance under the contracts)), or when contracts exist between the parties (*Ramirez v.*

9    *Smart Corp.*, 371 Ill.App.3d 797, 809 (2007) (no claim for unjust enrichment when a specific

10   contract governs the relationship of the parties)), or even as a separate cause of action at all (*see,*

11   *e.g., Hill v. Roll Intern. Corp.*, 195 Cal.App.4th 1295, 1307 (2011) (unjust enrichment not a separate

12   cause of action)).  Each of those grounds for rejecting the unjust enrichment subclasses applies here.

13        **Fraud:** The element of reliance is crucial to common law fraud.  That is why federal courts

14   in some of the most populous states in Plaintiffs' fraud subclasses have generally rejected common

15   law fraud claims as suitable for class action treatment, particularly if they include allegations of

16   <u>verbal</u> misrepresentations as here.  *See, e.g.*, *McCracken v. Best Buy Stores, LP*, 248 F.R.D. 162, 168

17   (S.D.N.Y. 2008) (no certification for class based on oral misrepresentations); *Graham v. Securities*

18   *S&L*, 125 F.R.D. 687, 691 (N.D. Ind. 1989) (same); *Marascalco v. International Computerized*

19   *Orthokeratology Soc., Inc.*, 181 F.R.D. 331, 340 (N.D. Miss. 1998) (alleged oral misrepresentations

20   at multiple seminars in different states not suitable for certification).

21        **Breach of Contract and Breach of Covenant:** The written contracts between TU and its

22   paying students varied as to form, guarantees, waivers, and the nature and price of the TU services

23   purchased.  Student expectations and understanding of their contracts undoubtedly varied as well.

24   Individual inquiry into each of those factors is needed to determine if there was a breach of any

25   contract, or of its covenant of good faith, and whether TU and the student "substantially performed."

26        As for breach of any <u>oral</u> contract as alleged by Plaintiffs, they obviously cannot offer any

27   documentary evidence of such purported contacts.  Consequently, individual inquiry is the <u>only</u>

28   possible way to determine if any such contract even existed, much less was breached.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

1    These final two contract-based claims are yet one more example of those typically denied

2    class action treatment in some of the most populous states in Plaintiffs' breach of contract/covenant

3    subclasses: *See, e.g.*, *Mullany v. Delta Airlines, Inc.*, 258 F.R.D. 247, 278-79 (S.D.N.Y. 2009); *Wal-*

4    *Mart Stores v. Lopez*, 93 S.W.3d 548, 556 (Tx.Ct.App. 2002); *Black Diamond Properties, Inc. v.*

5    *Haines*, 940 So.2d 1176, 1178-79 (Fla.Ct.App. 2006).

6                                    **X.    CONCLUSION**

7    On the documented evidentiary record, this class fails on grounds of commonality, typicality,

8    predominance, and superiority.  It also fails based on the lack of any showing for certification for

9    each cause of action, or against each defendant.  The class is not saved by its defective subclasses.

10   Moreover, as shown by TU's objections to Plaintiffs' evidence, and TU's motion to strike four of

11   Plaintiffs' key declarations, even Plaintiffs' wholly deficient evidentiary showing is misleading in

12   many respects.  This motion certainly does not meet the standard of "rigorous analysis" required for

13   class certification, and certification is barred by the controlling authority of *Mazza* in any event.

14   The basic reason for the many failings of this proposed class is that the great diversity of TU

15   students and their TU experiences requires individual inquiry.  As noted at the outset of this analysis,

16   Plaintiffs seek to certify a class suing TU for purported "fraud" that is comprised 97% of students

17   who rated TU highly in written evaluations – including Plaintiffs themselves – plus a meaningful

18   percentage of students who gave glowing testimonials, did real estate deals, and made money.  The

19   remarkable difference between Plaintiffs' evaluations and their allegations simply confirms that

20   individual inquiry is needed into their 180º flip-flop.  The same is true of all other TU students

21   formerly happy and now supposedly outraged with TU – to say nothing of the unavoidable need to

22   establish all their individual experiences of representations, expectations, contract terms, programs,

23   instructors, investments, and outcomes.  TU respectfully requests that class certification be denied.

24   Dated:      November 30, 2012              YUNKER & SCHNEIDER

25

26                                       By:    _____/s/ David K. Schneider_____
                                               Attorneys for Defendant
27                                             TRUMP UNIVERSITY, LLC
                                               Email:  dks@yslaw.com
28

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL