David K. Schneider (CSB 139288)
YUNKER & SCHNEIDER
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone:  (619) 233-5500
Facsimile:   (619) 233-5535
Email:  dks@yslaw.com

Attorneys for Defendants TRUMP UNIVERSITY, LLC and
DONALD J. TRUMP

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM, SONNY LOW, J.R. EVERETT and JOHN BROWN, on Behalf of Themselves and All Others Similarly Situated,<br><br>         Plaintiffs,<br><br>v.<br><br>TRUMP UNIVERSITY, LLC, (aka Trump Entrepreneur Initiative, LLC, a New York Limited Liability Company, DONALD J. TRUMP, and DOES 2 through 50, inclusive,<br><br>         Defendants. | Case No. 10 CV 0940 CAB (WVG)<br><br>CLASS ACTION<br><br>DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED TRIAL PLAN FOR TRIAL OF CLASS CLAIMS<br><br><br><br>DATE:   February 12, 2013<br>TIME:   2:30 p.m.<br>CTRM:  2 — 4th Floor |

## I.   INTRODUCTION

Defendant Trump University ("TU") objects to Plaintiffs' trial plan on the grounds that it completely overlooks the need for individual inquiry in this case, and hence the plan is not realistic.

## II.   DISCUSSION

### A.   Plaintiffs' Trial Plan Simply Assumes Certification Rather Than Supporting It

Plaintiffs' Trial Plan relies on the same arguments and evidence that were summarized in Plaintiffs' Memorandum supporting their motion for class certification.  However, those arguments and that evidence do not establish the commonality, typicality, or superiority required for certification.  Moreover, the total lack of any showing for certification of each claim, or against each

defendant, is another fatal flaw in the proposed class.  None of these flaws are cured by Plaintiffs' <u>fourteen</u> subclasses, all of which have their own fatal flaws, including no showing of numerosity.  These issues were covered in TU's opposing Memorandum, and will not be repeated here.

The point for purposes of this objection is that Plaintiffs' trial plan does nothing to help the basic question of certification, and indeed the plan simply assumes it.  But that assumption, and the simplistic trial plan that flows from it, overlook a fundamental problem with this proposed class.  That problem is the unavoidable need for <u>individual inquiry</u>, which makes the class impossible to certify, and which likewise makes the trial plan totally unmanageable.

**B.     <u>The Need for Individual Inquiry Makes the Trial Plan Unmanageable</u>**

If a case requires individual inquiry such that "each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, then a class action is not 'superior,'" *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1191-92 (9th Cir. 2001).  That is exactly the situation here.  There are no efficiencies to be gained by class treatment because the need for individual inquiry means the larger the class, the more cumbrous the trial.

Here, with a potential class of several thousand, the trial would be completely unmanageable.  That is easily shown by a quick review of the witnesses and inquiries needed for just two of the key elements of proof in this case, namely the purported "misrepresentations," and purported "damages."

**1.     Proving and Disproving the Purported "Misrepresentations"**

The discussion in TU's opposing papers has shown that five named Plaintiffs did not see the same TU ads, that one of those Plaintiffs did not see any misrepresentations in the ads he saw, that two of those Plaintiffs cannot produce the ads they saw for corroboration, and that one of those Plaintiffs saw no ads.  This means Plaintiffs cannot prove "uniform misrepresentations" by TU's ad campaign without calling many more witnesses.  TU will then be forced to call at least an equal number of witnesses who saw different misrepresentations, or saw none, or saw no ads at all.

For the free 90-minute "previews" and the 3-day introductory lectures, TU has shown that there are no uniform scripts, teaching materials, or sales materials.  Consequently, any purported misrepresentations at those events can only be proven by testimony.  Once again, TU must call witnesses who heard differently at most if not all of the hundreds of those events.

DEFENDANTS' OBJECTION TO PLAINTIFFS' PROPOSED TRIAL PLAN FOR TRIAL OF CLASS CLAIMS

1    The next area of purported misrepresentations would be in the advanced seminars and mentor sessions. TU has shown that these events were generally "custom" for the seminars, and completely "custom" and individualized for the mentoring. More than 500 students had mentoring sessions with 35 different mentors that were tailored for them individually. Each of those sessions was unique and necessarily requires individual inquiry to address each student's goals and expectations, whether they were met, and why or why not.

Finally, every one of the witnesses called in each of the three areas just discussed would need further individual inquiry concerning their understanding of each purported misrepresentation, and whether it was material to them. TU has shown that the <u>only</u> documented "misrepresentations" concern some TU materials that stated that Mr. Trump "hand-picked" TU's "expert" faculty, that he was "involved" with TU, and that his "secrets" would be taught. Every one of those concepts is a matter of judgment and degree, and hence subjective – which means their meaning and import will vary from student to student. This morass of individual inquiry is shown by brief consideration of each purported, documented "misrepresentation":

**<u>The "hand-picked" TU faculty</u>** – Every TU student witness would need to establish exactly which TU faculty members taught him or her, what the witness understood the words "hand-picked" to mean, and whether the "hand-picked" status of the instructors was material to the witness. Then, the individual selection process for each faculty member in question would need to be established to determine if: (i) they met every reasonable definition of "hand-picked"; or (ii) they met the student's understanding of "hand-picked." Moreover, any of the 70 faculty members <u>not</u> already covered in this testimony would need to appear and have their individual selection process established, in order to show if there was a consistent material misrepresentation as to their "hand-picked" status.

**<u>The "expert" TU faculty</u>** – Here again, every TU student witness would need to establish exactly which TU faculty members taught him or her, what the witness understood the word "expert" to mean, and whether the "expert" status of the instructors was material to the witness. Then, the individual qualifications for each faculty member in question would need to be established to determine if: (i) they met every reasonable definition of "expert"; or (ii) they met the student's understanding of "expert." And again, any of the 70 faculty members <u>not</u> already covered in this

testimony would need to appear and have their individual qualifications established, in order to show if there was a consistent material misrepresentation as to their "expert" status.

**Mr. Trump's "involvement" with TU** – Every TU student witness would need to establish exactly which TU programs and instructors he or she had, what the witness understood Mr. Trump's involvement would be in those programs, and whether his involvement was material to the student. Then, Mr. Trump's personal involvement with each of the student's instructors, and each of the student's programs, would need to be established to determine if: (i) he met every reasonable definition of being "involved" with that student's instructors and courses; or (ii) he met the student's understanding of his involvement. Then, Mr. Trump's involvement with any of the 70 faculty members not already covered in this testimony, plus his involvement with any of the 200+ TU programs also not already covered in this testimony, would need to be established in order to show if there was a consistent material misrepresentation as to his involvement.

**Teaching of Mr. Trump's "secrets"** – Every TU student witness would need to establish exactly which TU courses and instructors he or she had, whether they taught Mr. Trump's secrets, and what the student understood those secrets to be. Then each of those instructors would need to be questioned, and each of those course materials would need to be analyzed, to determine if the secrets were taught. Finally, each student denying he or she was ever taught Mr. Trump's secrets would need to be cross-examined concerning their ability to recognize and employ the secrets, and whether they ever did so. Without that inquiry, they would have a "free pass" to claim misrepresentation, and deny the value of a significant component of their TU education, even if they used the secrets and even if they made money from them.

In short, the trial would be completely unmanageable even if the "misrepresentations" were limited to those discussed above. Nevertheless, Plaintiffs claim many more "misrepresentations," including purported guarantees, accreditation, year-long mentorships, false testimonials, etc. The Plaintiffs do not agree about those representations even among themselves; consequently, every one of those additional misrepresentations will require additional inquiry of additional witnesses.

For every witness called by Plaintiffs who saw or heard any purported misrepresentations, and who considered them material, and who thought themselves defrauded, TU will have to call a

witness who did not see or hear them, or did not consider them material, or did not consider themselves defrauded. This problem is not solved even if Plaintiffs abandon all subjective "misrepresentations," and instead rely strictly on purported verbal misrepresentations of "fact." Putting aside that apparently no such evidence even exists, TU must be given the opportunity to call at least an equal number of witnesses who will deny ever having heard such misrepresentations.

The fact that some witnesses may testify to hearing purported misrepresentations, considering them material, and thinking themselves defrauded, while others will deny ever hearing such misrepresentations, makes Plaintiff's trial plan defective. *See In re Wells Fargo Home Mortgage Overtime Pay Litigation,* 268 F.R.D. 604 (N.D. Cal. 2010) (holding that proceeding as a class action is inappropriate where "individual mini-trials" would result from a class that includes both injured and uninjured parties.).

Inevitably the Court will have to limit the number of witnesses, otherwise the trial would degenerate into a straw poll rather than a demonstration of proof. But what is a fair number for that limit? Fifty paying TU student witnesses for each side would be 100/5,950 = 1.6% of all paying TU students. Two hundred for each side still reaches only 6.7%. Neither percentage is probative, and yet the trial is already unmanageable at even the lower percentage.

**2.    Proving and Disproving the Purported "Damages"**

Plaintiffs' trial plan argues that damages can be easily established from TU's records of what each student paid, and then giving them a full refund. But this simplistic approach will not even work for the six named Plaintiffs, three of whom concede they got some value from their training.

Moreover, this approach will not account for free training, or refused training, either. Plaintiff Makaeff, for example, received three mentors and seven days of in-person, one-on-one, training for the price of one mentor and a 3-day mentorship. She also received, for free, 16 additional coaching sessions, plus an advanced workshop. It was at that additional workshop that she provided her video testimonial stating that her instructor was "awesome." Plaintiff Low received, for free, an additional $5,000 advanced workshop that he attended and then stated, in writing, that it was excellent. Plaintiffs Everett and Oberkrom bought mentorships and were offered multiple mentors, yet they both refused to meet with any of them.

1    The point is that the only way to establish what value each student received is to ask them – 2 both on direct and cross-examination. For complete fairness and accuracy, that inquiry needs to be 3 made for <u>every</u> class member. *See Wal-Mart Stores, Inc. v. Dukes,* ___U.S. ___; 131 S. Ct. 2541, 4 2560-61 (2011) (holding that it was a violation of due process to use a sample to arrive at the entire 5 class recovery without further individualized proceedings because the defendant was "entitled to 6 litigate its statutory defenses to individual claims.")

7    Nothing else will allow the fact-finder to determine what specific training each student got 8 among the wide variety available, what value each student placed on his or her training, whether 9 they got extra training for free (as did the two Plaintiffs noted above) or refused training (as did the 10 two other Plaintiffs noted above), whether they got a refund, whether there was a formal settlement 11 or informal accord and satisfaction, and what specific contractual terms might apply to limit or bar 12 their damages – including the varying terms for release, waiver, guarantee, and student performance.

13    Moreover, the individual inquiry cannot end there. It still remains to be determined what 14 each student "brought to the table." A student who slept through his or her seminars might consider 15 them "worthless," but the fact finder probably would not. Likewise, a student who never put his or 16 her training to use in actual real estate transactions might consider it "worthless," but the fact finder 17 will need to know <u>why</u> the student did nothing with it. If the reason is the student had no money, or 18 no initiative, or no time, or simply no desire to use the training, was it really "worthless?"

19    Finally, what about students who <u>did</u> put their training to use, and who made or lost money? 20 The fact finder will need to know why <u>each transaction</u> succeeded or failed, otherwise a huge offset 21 to <u>every</u> damages claim could be lost. Even assuming only one in ten paying TU students ever 22 entered into a real estate transaction, the Court would end up taking evidence on <u>over 500 "deals</u>."

23    Here again, the Court obviously will need to limit the number of witnesses. Even trying to 24 set up mini-trials of "representative damages claims," and apply those results to the "appropriate 25 subgroups" of class members is completely unworkable for at least two reasons. First, how many 26 "representative damages claims" are there, when the class is so diverse? Second, how could this 27 approach be fair, when the host of individual factors already outlined above will completely skew 28 the results in individual cases – even <u>within</u> "appropriate subgroups?"

1  The end result is that no efficiencies in proof of damages are gained by class action
2 treatment, because individual inquiry of damages issues and factors is still required.  Cases involving
3 individual inquiry are best brought by individuals, not classes.  And here, individual cases are
4 perfectly feasible because the purported claims include many which are $35,000, and many more are
5 in the $1,495 to $25,000 range.  This is not a case in which each class member will get a coupon
6 worth 50 cents, and hence a case which never could or would be brought individually.  To the
7 contrary, the claims in this case are perfectly viable as individual claims.

### III.  CONCLUSION

9  The need for individual inquiry in this case lawfully prevents certification because class
10 treatment is not "superior" to other methods of resolving this dispute, such as individual claims.  The
11 wisdom of that law is confirmed by considering a trial of this case as a class action.  Looked at
12 realistically, that trial would be completely unmanageable.  Plaintiffs' trial plan adds nothing useful
13 to this motion for class certification because it simply assumes certification, overlooks the need for
14 individual inquiry, and is completely unrealistic.

15 Dated:  November 30, 2012                    YUNKER & SCHNEIDER

17                                             By:      /s/ David K. Schneider
                                                    Attorneys for Defendants
18                                                  TRUMP UNIVERSITY, LLC and
                                                    DONALD TRUMP
19                                                  Email:  dks@yslaw.com