# EXHIBIT 71

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF CALIFORNIA

3   ----------------------------X

4   TARLA MAKAEFF, et al., on

5   Behalf of Themselves and All

6   Others Similarly Situated,

7                    Plaintiffs,

8      -vs-                   No. 3:10-CV-00940-CAB

9   TRUMP UNIVERSITY,  LLC,

10  et al,

11                   Defendants.

12  ----------------------------X

13

14  VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15              San Francisco, California

16              October 15, 2012

17

18

19

20

21

22

23  Reported by:

    Bonnie Pruszynski, RMR, CSR No. 13064

24  JOB NO. 54291

25

Ex. 71 - 5973

Page 100

1      A      I started my own real estate

2  business.

3      Q      What was that called?

4      A      Aglow Properties.

5      Q      A-G --

6      A      L-O-W.

7      Q      And what did Aglow Properties do?

8      A      We represented high net worth

9  individuals in acquiring rare pieces of property

10  globally.

11      Q      What was your general feeling when

12  you left Trump University?  Positive, negative?

13      A      I was disappointed.

14      Q      Did you believe that anybody at Trump

15  University ever did anything unethical while you

16  worked there?

17      A      No.

18      Q      To your knowledge, did anybody ever

19  make a statement that you thought was not truthful

20  while you worked there?

21             MS. ECK:  Objection.  Calls for

22      speculation.

23      Q      If you know.

24      A      Not to my knowledge.

25      Q      Do you know what Donald Trump's role

Ex. 71 - 5974

1    just saying that I had previously worked there,

2    and left there for, you know, personal ethical

3    reasons.

4         Q    At any time while you were at Trump

5    University, did you believe anything that Trump

6    University was doing was dishonest?

7         A    In a sense of stealing from people,

8    no.  I don't think that they were breaking a law

9    per se, in the sense of stealing from people.

10        Q    All right.  Did you --

11        A    But again, it breached my personal

12   ethics.  I didn't feel comfortable with what they

13   were doing.

14        Q    And you already gave the examples;

15   right?

16        A    I did.

17        Q    All right.  So, did you believe that

18   they were doing anything that -- whether or not

19   they were breaking any kind of laws, did you

20   believe that what they were doing was dishonest?

21        A    Sort of, yeah.

22        Q    What did they do that you thought was

23   dishonest?

24        A    Actually, dishonest, no, but -- and

25   who knows?  Maybe my personal ethics are held to a

1   different standard, but I didn't believe that it

2   was ethically right for me to continue working

3   there.

4        Q     And how about fraudulent?  Anything

5   that you saw that you thought was fraudulent while

6   you worked there?

7        A     No.

8        Q     Do you have any information since you

9   left your employment at Trump University that they

10  have done anything fraudulent?

11            MS. ECK:  Objection.  Calls for

12       speculation.

13       A     No.

14            MS. ECK:  And calls for a legal

15       conclusion.

16       Q     Other than the one exchange with

17  Ms. Makaeff, have you had any other communications

18  with her in any context?

19       A     No.

20       Q     Did you save that Facebook exchange

21  with her?

22       A     I have no idea.  I -- maybe it's on

23  my history of Facebook, but I don't know.

24       Q     Did you make any effort in response

25  to the request for documents to look?

1   talk to me much about it.  They just wanted me to

2   go observe and learn as much as I could about the

3   process of selling at a live event.

4        Q      And based on the three days that you

5   observed, did you find anything to be presented

6   that was not true?

7        A       No.

8        Q      Were you asked to provide information

9   to prospective purchasers that you thought was not

10  true?

11       A       No.

12       Q      And, in fact, did you provide any

13  information to prospective purchasers that was not

14  true?

15       A       No.

16       Q      Did you interact with prospective

17  purchasers?

18       A      I did.

19       Q      Can you recall any in particular?

20       A      There was one couple that I spoke

21  with, I don't remember off the top of my head

22  sitting here -- I'm drawing a blank as to what

23  their names were.  I believe their last names were

24  Moore, and another -- another couple of guys that

25  wanted to -- to partner together to do the -- to

# EXHIBIT 72

**Donald J. Trump, Sr.**                                    **September 12, 2012**

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

      Plaintiffs,                          Civil Action No.

          vs.                              3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,           CAB(WVG)

      Defendants.

_____


      Videotaped deposition of DONALD J. TRUMP, SR.

      New York, New York

      September 12, 2012


Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

Page 1

Ex. 72 - 5979

**Donald J. Trump, Sr.**                                    **September 12, 2012**

```
 1    of somebody else?
 2         A    No.  I think they think that it's a
 3    company that's a successful -- very successful
 4    company.
 5         Q    And it's successful because of you;
 6    correct?
 7         A    Well, it's successful because of
 8    transactions; and lots of transactions over a period
 9    of years have added up to a great body of success,
10    yes.
11         Q    And you oversaw those transactions;
12    correct?
13         A    I did, yes.
14         Q    Do you know who Scott Leitzel is?
15         A    I know the name.  I don't know him.
16         Q    How about Michael Hinson?  Do you know
17    who that is?
18         A    No.
19         Q    How about Stephen Gilpin?  Do you know
20    who that is?
21         A    I think these are names of people that I
22    taught where -- I think I know their names because I
23    saw résumés, and I would see résumés of instructors,
24    because it was important to me that we got good
```

Ex. 72 - 5980

**Donald J. Trump, Sr.**                                    **September 12, 2012**

1    instructors.

2                    So I don't know if that's what you're

3    referring to.   But I've met numerous instructors, and

4    I've also -- this is over a period of years.   And

5    I've also seen the résumés of virtually everybody.

6                    So that's where they sound familiar to

7    me; and in some cases, I know them better because

8    I've met them.

9        Q    Sure.   Which instructors did you meet?

10       A    I believe Donald Sexton and Mr. Caplan.

11   I believe perhaps Childers.

12                   I've met a number of them.   I don't know

13   their names.   I mean, you're talking about years ago.

14   This is actually years ago.

15                   But I've met a number of instructors.   I

16   wanted to see -- I really was very insistent that we

17   get good instructors for the classes.

18                   And I think the 97 percent bears that

19   out, that we were successful in that regard.

20                   But the concept of getting proper

21   instructors was very important to me.

22       Q    Now, when did you meet Donald Sexton?

23       A    I don't know.   Years ago.

24       Q    How many times did you meet him?

Ex. 72 - 5981

1          A    I don't know.

2          Q    Do you remember what you talked about?

3          A    Just, I would have talked to everybody

4    about the same thing.  I ask their experience.  I

5    also gave them concepts of what I would like to talk

6    about to students.

7               But I wanted each instructor to really do

8    their own thing.  I wanted people with experience

9    where they could talk about individual deals,

10   different deals.

11              Actually, the classes were very

12   different, because different instructors -- like when

13   you go to a college and you have different

14   instructors teaching, whether it's real estate or

15   something else, I wanted instructors to be able to

16   give individualized service based upon their

17   experiences, not based on one standard rule of thumb

18   because it's different.

19              As an example, different parts of the

20   country are different.  You may have a whole

21   different real estate mindset in Iowa than you do in

22   California.  So the classes were very, very

23   different.

24         Q    And did you attend any of the three-day

Ex. 72 - 5982

**Donald J. Trump, Sr.**                                    **September 12, 2012**

```
 1            A    I don't know.  I really don't know.
 2            Q    Do you remember what the presentation
 3      was -- what was the format of the presentation?
 4            A    I don't know.
 5            Q    Is there any other details that you can
 6      tell me about the --
 7            A    The only detail, as I left, I was very
 8      impressed.
 9            Q    Okay.  Now, you said that you had met --
10      previously you had met with Donald Sexton; is that
11      correct?
12            A    I believe so.  Again, there were -- I
13      remember some names.  There was a Mr. Gordon,
14      Mr. Sexton, Mr. Childers, Mr. Caplan.
15                 There were four or five names -- I don't
16      know, you know, when you add them all up, because
17      you're talking about years ago.  But some would come
18      up to my office.  And I met with a number of the
19      professors -- one was a professor at Columbia
20      University who was very impressive.  That may have
21      been Mr. Sexton.
22                 But I was very impressed with the people
23      that we had and the people that I met.  But in all
24      cases I looked at applications.  In other words, in
```

Ex. 72 - 5983

Donald J. Trump, Sr.                                          September 12, 2012

1    some cases I didn't see them, but I'd look at their

2    application when they applied and before we hired

3    them.

4              And so I would be involved from that

5    standpoint.  It was very important to me to make sure

6    that good people represented what we were doing.

7         Q    In terms of the people that you met with

8    in your office, would that be in your calendar?

9         A    No, it's so many years ago.  I don't have

10   calendars from that many years ago.  You're talking

11   about years ago.

12        Q    Okay.  So you didn't keep a calendar in

13   2004?

14        A    I may have had a calendar, but I don't

15   keep them for 10 years later.

16        Q    Okay.  Now, which résumés did you look

17   at?

18        A    I don't know.  But many.

19        Q    Sitting here, you can't remember?

20        A    No.  But many, many résumés.

21        Q    Okay.  How many?

22        A    Like -- I can't say all, but I would say

23   many of the people that taught, I, at a minimum,

24   looked at résumés, yes.

Ex. 72 - 5984

# EXHIBIT 73

Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3    ---------------------------X

4    TARLA MAKAEFF, et al., on

5    Behalf of Themselves and All

6    Others Similarly Situated,

7                 Plaintiffs,

8       -vs-                No. 3:10-CV-00940-CAB

9    TRUMP UNIVERSITY, LLC,

10   et al,

11               Defendants.

12   ---------------------------X

13

14   VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15              San Francisco, California

16              October 15, 2012

17

18

19

20

21

22

23   Reported by:

     Bonnie Pruszynski, RMR, CSR No. 13064

24   JOB NO. 54291

25

Ex. 73 - 5986

Page 175

1        Q       How do you know that?

2        A       Talking to them about it.

3        Q       Just the way they spoke?

4        A       No.  I believe that they told me that

5   they didn't have formal education.

6        Q       By that, you are talking about

7   college?

8        A       Correct.

9        Q       And how old was Rami?  How old would

10  you estimate?

11       A       Late 30s, early 40s maybe.

12       Q       And what were the Moores' education?

13       A       I don't know if I got into education

14  with them.

15       Q       The next part of that sentence says

16  that "Trump University preyed upon the elderly and

17  uneducated to separate them from their money."

18       A       I would say, I don't necessarily know

19  that "elderly" is accurate.  I would -- I would

20  stand by uneducated, with the two examples that I

21  just gave of the Moores potentially and Rami.

22       Q       And what did Trump University do to

23  prey on the uneducated?

24       A       The -- "demographic" is not the right

25  word.  Just the overall scene in the room of the

Ex. 73 - 5987

1    inquiries by consumers, you know, what they might

2    be interested in?

3        A       I did not.

4        Q       So, your statement about preying on

5    the uneducated, by that do you mean that it looked

6    like the room had a lot of uneducated people in

7    it?

8        A       Correct.   I don't know if they were

9    actually targeting those individuals, however.

10       Q       You don't have any information like

11   that?

12       A       I don't, no.

13              MR. SCHNEIDER:  Let's go off the

14       record.

15              THE VIDEOGRAPHER:  We are off the

16       record at 12:02 p.m.

17              THE VIDEOGRAPHER:  This is the end of

18       disk number two.  Volume one.  We are off

19       the record at 12:11 p.m.

20              (Recess taken.)

21              THE VIDEOGRAPHER:  This is the

22       beginning of disk number three, volume one.

23       We are back on the record at 12:14 p.m.

24              You may proceed.

25   BY MR. SCHNEIDER:

EXHIBIT 74

Pages: 5989-6003


[Filed Conditionally
Under Seal]

# EXHIBIT 75

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4      ----------------------------------X

       TARLA MAKAEFF, et al., on

5      Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

       all Others Similarly Situated,

6

                   Plaintiffs,

7

           v.

8

       TRUMP UNIVERSITY, LLC, et al,

9

                   Defendants.

10     ----------------------------------X

11

12               VIDEOTAPED DEPOSITION

13                       OF

14               CORINNE A. SOMMER

15               New York, New York

16            Wednesday, November 7, 2012

17

18

19

20

21

22

23

24     Reported by:

       ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25     JOB NO. 54530

1                        C. Sommer

2       testimonials from students?

3            A.    No.

4            Q.    Would that have been the marketing

5       department?

6            A.    That was Cheryl.

7            Q.    Are you aware of any testimonial that

8       was ever presented by Trump University that was

9       not true or accurate?

10           A.    I believe I remember Cheryl

11      complaining to me that they wanted her to

12      compile inaccurate ones.

13           Q.    Inaccurate ones?

14           A.    Yes.

15           Q.    That's what she told you?

16           A.    Yes.  And her big problem was that

17      was not what she was hired for.  She wasn't an

18      editor.

19           Q.    Did you discuss with any students at

20      any of the events or programs whether they liked

21      the programs that they went to?

22           A.    Did I discuss it during the program?

23           Q.    At any time.  You went to all these

24      events.

25           A.    Yes.

Page 89

C. Sommer

1

2    Q.    You went to free events, you went to

3    three-day workshops, you went to advanced

4    workshops, right?  So you were there interacting

5    with the students and people, right?

6    A.    Um-hmm.

7    Q.    Yes?  You have to answer audibly for

8    the court reporter.

9    A.    I'm sorry.  Yes.

10   Q.    What was the general feedback you

11   were getting?

12   A.    It varied.  I mean we had them fill

13   out forms at the end of the events saying

14   whether they enjoyed it or not.  I mean if

15   people came up and talked to you, it was either

16   they liked it or they didn't.  You know, you

17   always get sort of a mixed bag of nuts, but the

18   only time I really got phone calls about it was

19   if someone was unhappy with something they paid

20   for.

21   Q.    Would you review the surveys?

22   A.    I tallied them up and I sort of just

23   gave them to the marketing department.  I gave

24   them to customer service.

25   Q.    Who was that?

Ex. 75 - 6007

Page 90

C. Sommer

1

2      A.      Brad Schneider.

3      Q.      Did you ever discuss them with him?

4      A.      I don't remember.

5      Q.      Would you find at the same event that

6   some people would express to you that they liked

7   the event while others at that same event would

8   say that they didn't like it?

9      A.      Yes.

10     Q.      And were you able to determine that

11   why some people liked it and some people didn't

12   at the same event?

13             MS. ECK:   Objection.   Calls for

14      speculation.

15     A.      No.   I wasn't really going into full

16   detail with people and I don't remember

17   conversations, specific conversations.

18     Q.      Did you ask people hey, what did you

19   like about it or why didn't you like it?

20     A.      No.   If someone complained about

21   something, obviously I, you know, my job running

22   the event was to try to defuse the situation.

23     Q.      And your job would be to report to

24   somebody else at the company if somebody was

25   unhappy with their experience, right?

C. Sommer

2   A.    Yes.

3   Q.    Because Trump University told you

4   that they want to improve the way they deliver

5   education to the public, right?

6           MS. ECK:   Objection.   Lack of

7       foundation.

8   A.    That's not what they told me.   That's

9   just -- no.

10  Q.    Were you ever advised that Trump

11  University wanted to improve on its programs?

12  A.    I don't think it was necessarily

13  improve on his programs.   I think it was expand

14  on his programs.

15  Q.    Well, one way to expand is to have

16  people happy and liking the program, right?

17  A.    Um-hmm.

18  Q.    Would you agree with that?

19  A.    Yes.

20  Q.    Did anybody at Trump University ever

21  tell you hey, if people complain, just ignore

22  them, we're not going to deal with anything like

23  that?

24  A.    I'm not customer service, so that

25  would be a conversation they would have with

1                           C. Sommer

2    was supposed to be doing and then what Trump's

3    role was there, because I felt like they were

4    sort of stepping across the board sometimes.

5    When they weren't actually affiliated with our

6    company, they were just a sales team that were

7    brought on by Mark Dove and they were crossing.

8         Q.    What do you mean by crossing?

9         A.    Just I think it had something to do

10   with their sales techniques.  I don't remember,

11   I don't remember specifically, but I think it

12   had something to do -- something specifically

13   with me and Stamper, and Stamper was going

14   around me on something.  I don't remember what

15   it was.

16        Q.    So it was a territorial issue?

17        A.    I guess in --

18              MS. ECK:  Go ahead.

19        A.    I guess in the sense of that I was

20   supposed to be running the event and he was

21   making calls without informing me.

22        Q.    Now you said you gave feedback on the

23   speakers.

24              You would give that to David

25   Highbloom and Michael Sexton?

1                    C. Sommer

2        A.      Yes.

3        Q.      And this was based on your personal

4    observations of them making presentations?

5        A.      Yes.

6        Q.      And did you have different views on

7    different speakers?

8        A.      Yes.

9        Q.      Did you think some speakers were more

10   effective than others?

11       A.      I'm sure I did, but I don't remember

12   who specifically.

13       Q.      So give me an idea of some of the

14   types of comments or feedback you would give to

15   David Highbloom or to Michael Sexton about the

16   speakers.

17       A.      Well, for example, when the speakers

18   started trash talking Trump, called and said,

19   "We have an issue.  Why is this guy even

20   presenting?"

21       Q.      What else?

22       A.      Presenter is good.  The people liked

23   him.  He's energetic.  Something of that nature.

24       Q.      And how would you know that people

25   liked him?

Ex. 75 - 6011

Page 255

1                    C. Sommer

2          A.     The crowd really seemed excited.

3          Q.     And did you have other programs that

4    the crowd appeared not to like the speaker as

5    much?

6          A.     I think there were some presenters

7    that appealed to the crowd more.  Like I think

8    Denise really, a lot of people were attracted to

9    Denise's personality.  I think that's part of

10   being a presenter is you have to have that, you

11   know, personality and the ability to attract

12   people.

13         Q.     You liked her, didn't you?

14         A.     I did like her.

15                And also J.J.  I think people really

16   liked J.J. as well.

17         Q.     Did you have the impression that

18   people were being duped watching these programs?

19         A.     I don't think I started realizing

20   that it was sort -- well, as I said, I sort of

21   started thinking that it was a Ponzi scheme like

22   halfway in, because it was the up-sell, up-sell,

23   up-sell, and I think it was sort of like when

24   nobody was -- there was no responses coming from

25   the mentors and it seemed very disheveled after

Ex. 75 - 6012

# EXHIBIT 76

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3    ---------------------------X

4    TARLA MAKAEFF, et al., on

5    Behalf of Themselves and All

6    Others Similarly Situated,

7                    Plaintiffs,

8        -vs-                   No. 3:10-CV-00940-CAB

9    TRUMP UNIVERSITY,  LLC,

10   et al,

11                   Defendants.

12   ---------------------------X

13

14   VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15            San Francisco, California

16            October 15, 2012

17

18

19

20

21

22

23   Reported by:

     Bonnie Pruszynski, RMR, CSR No. 13064

24   JOB NO. 54291

25

Page 146

1  off of the instruction of the courses.

2        Q       When you say that he had the support

3  of Gary Eldred, what do you mean?

4        A       Gary Eldred wrote the curriculum.

5  Mark was just doing the class facilitation.  And

6  so, I didn't think that Mark had a real -- you

7  know, I didn't believe that he was an expert

8  himself.

9        Q       Did you ever see his resumé?

10       A       I did.

11       Q       And what would be the reason why you

12  would see that?

13       A       Because he was one of our

14  instructors.

15       Q       And did he present at the New York

16  live program?

17       A       He did not.

18       Q       Where did he present?

19       A       He did some of the classroom work for

20  the REIT program.

21       Q       You mean online?

22       A       Yes.  To my knowledge, he did not do

23  the actual instruction in market.  So I don't

24  think he was one of the guys in the seminars.

25       Q       Hold on.

Ex. 76 - 6015

Page 147

1         So, this Mark fellow, do you know

2   what his last name is?

3         A      I don't remember.  No, I don't

4   remember what it is.

5         Q      So, he was teaching Gary Eldred's

6   information; correct?

7         A      He was.  And that was separate, aside

8   from the -- from the seminars.  So I am just going

9   through why -- so the instructors, that is not in

10  relation to the seminars, that is just in general.

11        Q      Okay.  So, when you were talking in

12  this paragraph that you believe that most had

13  little or no personal experience, you were talking

14  about the online work?

15        A      For the instructors, yes.

16        Q      And the instructor you identified is

17  Mark, and he was teaching Gary Eldred's --

18        A      REIT program.

19        Q      REIT.

20        A      Yes.

21        Q      And you believe Gary Eldred is very

22  experienced in real estate; correct?

23        A      Yes.  The mentors --

24        Q      I'm sorry, just a minute.

25               And that was the online program, Gary

Ex. 76 - 6016

EXHIBITS 77-79

Pages: 6017-6046


[Filed Conditionally
Under Seal]

# EXHIBIT 80

Page 1

```
 1

 2              UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF NEW YORK

 4    ----------------------------------X

      TARLA MAKAEFF, et al., on

 5    Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

      all Others Similarly Situated,

 6

                   Plaintiffs,

 7

          v.

 8

      TRUMP UNIVERSITY, LLC, et al,

 9

                   Defendants.

10    ----------------------------------X

11

12              VIDEOTAPED DEPOSITION

13                     OF

14              CORINNE A. SOMMER

15              New York, New York

16         Wednesday, November 7, 2012

17

18

19

20

21

22

23

24    Reported by:

      ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25    JOB NO. 54530
```

Ex. 80 - 6048

1                           C. Sommer

2    40 years old?

3         A.    I have no idea of her age.  I

4    guess -- yes.

5         Q.    Have you ever seen a document or a

6    manual called The Playbook?

7         A.    Not that I recollect.

8         Q.    When you first started doing the

9    events, did you have any kind of manuscript

10   about how chairs were supposed to be set up in

11   the room?

12        A.    No.

13        Q.    How did you determine how to set up

14   the room?

15        A.    I was doing everything myself.  The

16   first event I went to was an event with

17   Dynetech.  They sent me down to Florida to see

18   how Dynetech was doing the events for them at

19   this time and so I basically took note of what

20   Dynetech had done and tried to recreate when I

21   started the event department without them.

22        Q.    Did you ever contact Dynetech?

23        A.    Yes.  I don't remember.  There was a

24   girl, a girl who was about my age and then there

25   was her boss, who was a male, but I don't

# EXHIBIT 81

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4

     --------------------------------X

5    TARLA MAKAEFF, et al., on

     Behalf of Themselves and       Case No. 3:10-CV-00940-CAB(WVG)

6    all Others Similarly Situated,

7                    Plaintiffs,

8          v.

9    TRUMP UNIVERSITY, LLC, et al,

10                   Defendants.

     --------------------------------X

11

12

13                 VIDEOTAPED DEPOSITION

14                        OF

15                  JASON NICHOLAS

16                New York, New York

17             Thursday, November 8, 2012

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54531

1          J. Nicholas

2     director so before he calls, he would have a

3     list of notes based off the previous call that I

4     had with them.

5          Q.    Why would you want to know if they

6     owed money on their cars?

7          A.    If you're financially stable and

8     then -- if your cars are paid off, then you have

9     more likelihood of -- or we didn't even ask what

10    kind of car or that type of stuff.  To gauge if

11    they're able to pay for the course or not.  If

12    they have a credit.  If they have credit limit.

13    I mean if you can afford -- I mean that's just

14    -- I'm done with that question.  I mean it's

15    just...

16         Q.    You're trying to ensure that someone

17    that might want the program has the ability to

18    afford it, right?

19         A.    Yes.

20         Q.    Have you ever seen a document or

21    booklet called the Playbook?

22         A.    If you showed it to me and it brought

23    back a memory I could say yes or no, but at this

24    time, no, I don't.

25         Q.    Did you ever use something called the

1                    J. Nicholas

2    Playbook in your sales?

3              It's about a 200-page manual called

4    the Playbook.

5        A.    This is all I used, script.   That's

6    what I'm pointing to.

7        Q.    Exhibit 2, right?

8        A.    Yes.   That is the Playbook.

9        Q.    Did you ever tell any people on the

10   phone that Trump University was an accredited

11   university?

12       A.    No.

13       Q.    And did you ever believe it was an

14   accredited university?

15       A.    No.

16       Q.    Anyone ever ask you?

17       A.    Yes.

18       Q.    And what did you tell them?

19       A.    No.   We -- I'm sorry.

20       Q.    Any estimate in the terms of

21   percentages of call-ins versus call-outs that

22   you were handling?

23       A.    I mean I would say it was -- it was

24   a situation where you have 10 to 15 sales

25   employees and I want to recall that there was



Hello (_____)

My name is <u>Jason Nicholas</u> from **<u>Trump University</u>**.

I've been assigned to your account.

I have some **QUESTIONS** and some Important **INFORMATION** for you.

Do you have a <u>few minutes</u> to speak with me?   **GREAT**


I have your **FILE** in front of me and it doesn't show a **<u>PARTNER</u>** or **<u>SPOUSE</u>**,
are you **MARRIED** or do you have a **PARTNER**?

Do you have any <u>experience</u> investing in **<u>REAL ESTATE</u>** besides your <u>own home</u> of course?

**\*\*\*If NO\*\*\*** what's <u>prevented</u> you from getting involved in **<u>REAL ESTATE</u>**?

If you knew how the **EXPERTS** were able to (_____) would that be of **INTEREST** to you?


(_____) there is something that I believe will **<u>INTEREST</u> <u>you in your</u> <u>SITUATION</u>**.

How would you like to work with **Donald Trump's Real Estate EXPERTS**?

This is **NOT** something we offer to just **ANYONE** ------and-------We <u>don't</u> want to work with just **ANYONE**

Mr. Trump is on a **MISSION** to create the <u>next wave of</u> Independently wealthy entrepreneurs in America.
**IS THAT YOU** (_____)???


Obviously (_____) if we're going to **CREATE** these <u>wealthy Entrepreneurs</u>, we **Only** want to work with
people who have **<u>CERTAIN QUALITIES</u>**...

So, we're actually going through an **INTERVIEWING** process, **"Looking to <u>SELECT</u> a <u>FEW</u> PEOPLE!"** that
we might be able to work with **1-on-1**.

We're **ONLY** looking for <u>Highly Motivated Individuals</u> that really want to be Aggressive with their Real
Estate projects & want to become <u>Profitable</u> **<u>RIGHT AWAY!</u>**
**IS THAT YOU?    GREAT!**

A lot of People have asked if **MR. TRUMP** can meet with them in person and show them
how he <u>finds</u> properties—how MR. TRUMP <u>evaluates</u> properties and--- how he uses <u>creative financing</u> to
acquire properties with little or *"preferably"*    **NO-MONEY-DOWN!**

TU-NICHOLAS0000001

Obviously, Mr. Trump can't meet w/everyone, nor does he want to.  So he has created (**Trump Univ.)** where we **ONLY** <u>invite a **select** group of people</u> that have been **hand-picked** by his Program Director.

In this (*course/retreat/program*) we offer **LIVE, HANDS-ON-TRAINING** with Donald Trump's <u>professional Real Estate Instructors</u>.
These instructors will be <u>holding your Hand</u>, showing you the way!
You will learn how to **SUCCEED "The TRUMP way!"**

These instructors are **Experts** in today's Real Estate world and teach all of the
non-traditional or unconventional ways of (buying & selling Real Estate)
I'm talking about the <u>latest strategies</u> and <u>techniques</u> in Real Estate.

Let me ask you (_____) is everything Donald Trump does, **the BEST**?
He wouldn't <u>put his name</u> on this if it wasn't,      right?
Do you feel that working with **<u>Mr. Trump's experts</u>** is something you would like to be <u>considered</u> for?

TU-NICHOLAS0000002

Ex. 81 - 6055

# EXHIBIT 82

Page 1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF CALIFORNIA

3   ---------------------------X

4   TARLA MAKAEFF, et al., on

5   Behalf of Themselves and All

6   Others Similarly Situated,

7               Plaintiffs,

8     -vs-              No. 3:10-CV-00940-CAB

9   TRUMP UNIVERSITY,  LLC,

10  et al,

11              Defendants.

12  ---------------------------X

13

14  VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15            San Francisco, California

16            October 15, 2012

17

18

19

20

21

22

23  Reported by:

    Bonnie Pruszynski, RMR, CSR No. 13064

24  JOB NO. 54291

25

Ex. 82 - 6057

1   properties.  I don't remember what it was.

2               And I believe they received some type

3   of coaching on how to use other people's money on

4   purchasing real estate.

5       Q     So, did you get any kind of written

6   materials about how to sell these programs?

7       A     I did not.

8       Q     There is a manual called the

9   playbook?  Have you ever seen that?

10      A     I have not.

11      Q     And you were not provided one?

12      A     No.  There were also some employees,

13  not Trump University employees.  I don't know how

14  the employment structure was handled.  But there

15  were other individuals that were selling these

16  programs at the New York City seminar.  I don't

17  know who they were employed by or what they were

18  doing.

19      Q     So, there were -- there were people

20  in attendance that you knew were not from Trump

21  University that were selling Trump University

22  programs?

23              MS. ECK:  Objection.

24      A     Correct.

25      Q     And you don't know who they are or

EXHIBITS 83-84

Pages: 6059-6065


[Filed Conditionally
Under Seal]

# EXHIBIT 85

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    TARLA MAKAEFF, BRANDON KELLER,
 5  ED OBERKROM, and PATRICIA
    MURPHY, on Behalf of Themselves
 6  and All Others Similarly
    Situated,
 7                                No. 10 CV 0940 IEG (WVG)
              Plaintiffs,
 8
       vs.
 9
    TRUMP UNIVERSITY, LLC, (aka
10  Trump Entrepreneur Initiative) a
    New York Limited Liability
11  Company, DONALD J. TRUMP, and
    DOES 1 through 50, inclusive,
12
              Defendants.
13
14  _____
15
16           DEPOSITION of TARLA MAKAEFF
17              San Diego, California
18            Monday, January 30, 2012
19                   Volume I
20
21
22  Reported by:
    Kae F. Gernandt
23  RPR, CSR No. 5342
24  Job No. 130455
25  PAGES 1 - 282
```

Page 1

Ex. 85 - 6067

1    and lease options and owner financing discussed, as    12:39:13

2    indicated on Item No. 13 in the table of contents?

3            A.   I believe so.

4            Q.   I'd like you to turn to TU-MAKAEFF 0354.

5    At the top of this page it's entitled "Locating    12:39:29

6    Pre-foreclosures," and there's some handwriting

7    under the "Notes" section.  Is all of the

8    handwriting yours?

9            A.   Yes.

10           Q.   Is all of this information under the    12:39:48

11   "Notes" section information that you received during

12   the three-day seminar?

13           A.   Let me take a moment to read this.

14                Yes, it's information that they had

15   spoken that I had written down.    12:40:09

16           Q.   Was any of this information concerning

17   the sale of other products by Trump University?

18           A.   Not on this particular page.

19           Q.   So, all the information that you wrote

20   down on this page concerned content regarding    12:40:23

21   foreclosures?

22           A.   Yes.

23           Q.   Would you turn the page to 355.  Are

24   those your notes?

25           A.   Yes, they are.    12:40:35

                                            Page 81

Ex. 85 - 6068

1      Q.   And does this pertain to the information        12:40:35

2   that was being provided to you on this subject,

3   lis pendens?

4      A.   It appears to be, yes.

5      Q.   All right.  And is all this content        12:40:42

6   base, it was concerning foreclosures, as opposed to

7   selling some other products?

8      A.   Yes.  However, a lot was sold during

9   this, including a 35,000-dollar seminar.

10      MR. SCHNEIDER:  Okay.  I'll object and move        12:40:52

11   to strike as nonresponsive.

12   BY MR. SCHNEIDER:

13      Q.   The information on this page, your notes

14   pertains to content that you wrote down of

15   information they were providing to you during the        12:40:59

16   seminar, correct?

17      A.   Yes.

18      Q.   If you'll turn to page 357, are these

19   your notes?

20      A.   Yes.        12:41:10

21      Q.   And is this content that they were

22   providing to you during the seminar?

23      A.   Yes.

24      Q.   Is there anything in these notes that

25   pertained to selling other products of Trump        12:41:16

Page 82

Ex. 85 - 6069

1    University?                                              12:41:18

2            A.    No.

3            Q.    If you'll turn to page 359, is all this

4    handwriting on this page yours?

5            A.    Yes.                                        12:41:28

6            Q.    Is all this information that you're

7    writing down that they are providing to you from the

8    seminar?

9            A.    Yes.

10           Q.    Is this all content pertaining to         12:41:35

11   foreclosures?

12           MS. ECK:   Object -- well, take a look at it.

13           THE WITNESS:   Yes.

14   BY MR. SCHNEIDER:

15           Q.    Would you look at page 361.   There's a    12:41:52

16   list here, and I believe -- first of all, is this

17   handwriting all yours?

18           A.    Yes.

19           Q.    And the first word, does that say

20   "leads"?                                                 12:42:08

21           A.    Yes.

22           Q.    And what is this referring to?

23           A.    I'm not certain.

24           Q.    Is the presenter telling you possible

25   places to find leads to locate foreclosure              12:42:19

                                                Page 83

Ex. 85 - 6070

```
 1    drawn an arrow from up at the top where it says        12:44:26

 2    "Know your exit strategy," and then you bring the

 3    arrow down about wholesaling, flipping, renting?

 4          A.   I'm assuming it must be, yes.

 5          Q.   All right.  So, this was content that       12:44:37

 6    was provided to you during the seminar, correct?

 7          A.   Correct.

 8          Q.   Would you look at page 379.  Are those

 9    your notes at the top?

10          A.   Yes.                                         12:44:47

11          Q.   Anything pertaining to those methods --

12    sorry.  Let me try that again.

13               Is the information up in this square

14    concerning the methods is your handwritten notes

15    pertaining to that topic area?                          12:44:58

16          A.   Yes.

17          Q.   And that was information that was

18    provided to you during the three-day seminar?

19          A.   Yes.

20          Q.   Can you turn to page 381.  Are those        12:45:05

21    your handwritten notes under the "Notes" section?

22          A.   Yes.

23          Q.   And is that pertaining to content that

24    was provided to you during the seminar?

25          A.   Yes.                                         12:45:18
```

Page 86

Ex. 85 - 6071

1        Q.   If you'll look on page 384, that's an        12:45:19

2   example of running numbers, correct?

3        A.   Yes.

4        Q.   Would you look on page 386.

5        A.   But this example doesn't tell you how to     12:45:41

6   do this.

7        MR. SCHNEIDER:   I'll move to strike as

8   nonresponsive after "yes."

9   BY MR. SCHNEIDER:

10        Q.   Can you turn to page 386.  Are these        12:45:52

11   your handwritten notes?

12        A.   Yes.

13        Q.   And is this pertaining to content that

14   you received at the three-day seminar?

15        A.   Yes.                                        12:46:00

16        Q.   Can you turn to page 391.  Actually,

17   392.  392 and 393, are all of these your handwritten

18   notes?

19        A.   Yes.

20        Q.   And do these all pertain to information     12:46:22

21   that was provided to you during the three-day

22   program?

23        A.   I believe so.

24        Q.   If you look on 393, there's a detail

25   under "EX," I'm presuming that means example,        12:46:33

Page 87

Ex. 85 - 6072

1  running numbers on that particular example, correct?     12:46:36

2          A.    Yes.    But again, there wasn't enough

3  explanation.

4          Q.    All right.    So, one of your criticisms

5  was that you wanted more explanation than what was     12:46:47

6  provided, correct?

7          A.    Yes.

8          Q.    On 395, are those your notes?

9          A.    Yes.

10         Q.    All right.    If you could just page     12:47:01

11 through and look at 396 and 397, 398 and 399.    Are

12 all of those your handwritten notes?

13         A.    Yes.

14         Q.    And you had testified earlier that you

15 are a college graduate.    Did you take notes when you     12:47:18

16 went to college?

17         A.    Yes.

18         Q.    And was it your practice to record in

19 notes information that you thought might be useful

20 or that you'd want to remember later?     12:47:26

21         A.    Yes.

22         Q.    And is that the reason why you took

23 notes at this seminar, to record the information in

24 writing so you could go back and refer to it later?

25         A.    Yes.     12:47:37

                                                Page 88

Ex. 85 - 6073

1          Q.    Can you turn to page 417.  If you'll          12:47:46

2     look at 417, 418 and 419, are all of those your

3     handwritten notes?

4          A.    Yes.

5          Q.    And are all of these notes from content     12:48:05

6     that was provided to you during the Fast Track

7     program for the three days?

8          A.    I mean, I know for sure 417.  I -- I

9     believe the four of the two, looks like they were

10    following.                                            12:48:21

11         Q.    Page 418 and 419?

12         A.    Yeah, I believe so.  There's no --

13    doesn't say "Fast Track."  So, if it's following in

14    sequence, then yes.

15         Q.    All right.  And any of these notes          12:48:30

16    pertain to any kind of selling that Trump University

17    was trying to get you to purchase more goods or

18    services?

19         A.    No.

20         Q.    Would you turn to page 449.  Are the        12:48:54

21    notes on 449, 450 and 451 all of your handwriting?

22         A.    Yes.

23         Q.    And are these all notes of content that

24    was being provided to you by the speaker at the Fast

25    Track program?                                        12:49:24

                                                            Page 89

Ex. 85 - 6074

1        A.    Yes.                                    12:49:25

2        Q.    Anything in those three pages of notes

3    concerning any sales that Trump University was

4    trying to get you to purchase, goods or services?

5        A.    No.   The sales came on the third day.    12:49:33

6        Q.    All right.   Page 453, is all the

7    handwriting on this page yours?

8        A.    Yes.

9        Q.    All right.   And it looks like this is

10   entitled "How to find motivated sellers."   Did I   12:49:48

11   read that correctly?

12       A.    Yes.

13       Q.    And it looks like Trump University

14   provided you 14 different ideas or concepts about

15   how to find motivated sellers, correct?            12:49:58

16       A.    Yes, in general terms.

17       Q.    All right.   And you wrote those down to

18   remember that information, correct?

19       A.    So that someone could expand upon it in

20   the future, yes.                                   12:50:12

21       Q.    If you'll look on page 456 and 457,

22   those are your notes?

23       A.    Yes.

24       Q.    And that's -- those were some examples

25   given with some -- some numbers --                 12:50:37

                                                   Page 90

Ex. 85 - 6075

1          A.    Yes.                                    12:50:39

2          Q.    -- is that true?

3                So, you all were working through some

4     examples, cranking some kind of numbers; is that

5     accurate?                                           12:50:45

6          A.    Yes.

7          Q.    Can you look at page 459.  Are those

8     your notes?

9          A.    Yes.

10         Q.    Is this all content based on information  12:50:53

11    provided to you by the speaker during the

12    foreclosure program?

13         A.    Yes.

14         Q.    Page 464, it's entitled "Short Sale

15    Example."  I'd like you to page through all the way  12:51:10

16    to 469.  So, six pages.  Are all of those your

17    notes?

18         A.    Yes.

19         Q.    And all these were taken by you or

20    written by you during the three-day program,        12:51:46

21    correct?

22         A.    That's correct.

23         Q.    And all of these notes, these pertain to

24    information that the speaker provided to you about

25    the topics discussed during that -- that three days,  12:51:55

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    right, foreclosures and the other items we looked    12:51:58
 2    at?
 3              A.    That's correct.
 4              Q.    Can you look at page 553.  That's a
 5    sample contract that Trump University provided to     12:52:26
 6    you, correct?
 7              A.    Yes.
 8              Q.    Can you look at page 561.  That's a
 9    sample Assignment of Contract of Sale that they
10    provided to you; is that correct?                     12:52:42
11              A.    Yes, but there was no explanation on any
12    of these.
13              Q.    They gave you the forms of the
14    contracts, correct?
15              A.    Yes.  But you have to know how to fill   12:52:50
16    them out.  Therefore, you needed instruction on
17    that, which was not provided.
18              Q.    Can you turn to page 629.  Can you tell
19    us what these notes pertain to?
20              A.    I'm reading it.                          12:53:26
21                    I don't know.
22              Q.    Do you know if they were taken by you
23    during the Fast Track program?
24              A.    I know this was my writing.  I don't
25    know -- I don't believe it was during the Fast Track   12:53:47
```

Page 92

Ex. 85 - 6077

```
 1    because it would have been on, probably, hotel        12:53:51

 2    letterhead that they gave us.

 3         Q.   Where was the program, what hotel?

 4         A.   The Fast Track?

 5         Q.   Yes.                                         12:54:05

 6         A.   The -- Universal City, I believe

 7    possibly the Hilton.

 8         Q.   All right.  So, can you look at page

 9    633, which is four pages back from where you are?

10         A.   Right.                                       12:54:16

11         Q.   That's on the Hilton stationery,

12    correct?

13         A.   Yes.

14         Q.   Did you take any other Trump University

15    programs at -- at a Hilton?                            12:54:22

16         A.   I can't say for sure.  There were

17    numerous different hotels that we went to.

18         Q.   Are you able to look at these

19    documents -- or these pages, let's say, starting

20    with 633 through 639, most of which have "Hilton" at   12:54:35

21    the top, and determine whether or not these were

22    notes that you took at the Fast Track program?

23         A.   I'll look at it now.  I believe these

24    were taken at that seminar, yes.

25         Q.   And are all these notes based on             12:55:41
```

Ex. 85 - 6078

1    information that you received from the speaker at        12:55:42

2    the Fast Track program?

3         A.   I believe so.

4         Q.   And all this is on content information,

5    correct?  In other words, it's information that the      12:55:53

6    speaker was providing to you about foreclosures?

7         A.   That was incorrect.  Yes, that was

8    incorrect.  The "profiting within 30, 90 days" on

9    the last page is not correct.

10        Q.   What do you mean, that's not correct?          12:56:06

11        A.   That you're promised to make tens of

12   thousands of dollars a month within 30, 60 or 90

13   days.  And it says right here, "Goals, 30 days, 90

14   days, 12 months."

15        Q.   All right.  So, the word "goals," does         12:56:18

16   that -- does that mean the same thing to you as

17   "guarantee"?

18        A.   No.  But they verbally guaranteed that.

19        Q.   They guaranteed what?

20        A.   That you would profit with tens of             12:56:27

21   thousands of dollars a month within 30, 60, 90 days.

22        Q.   Did you have a general understanding

23   that to make a profit in real estate, you would have

24   to do more than attend a seminar?

25        A.   Of course.                                     12:56:40

                                                    Page 94

Ex. 85 - 6079

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4   TARLA MAKAEFF, BRANDON KELLER,

5   ED OBERKROM, and PATRICIA

6   MURPHY, on Behalf of Themselves

    and All Others Similarly

7   Situated,

8                  Plaintiffs,

9      vs.                    No. 10 CV 0940 IEG (WVG)

10  TRUMP UNIVERSITY, LLC, (aka

11  Trump Entrepreneur Initiative) a

    New York Limited Liability

12  Company, DONALD J. TRUMP, and

13  DOES 1 through 50, inclusive,

14                 Defendants.

15  _____

16

17    CONTINUED VIDEOTAPED DEPOSITION of TARLA MAKAEFF

18             San Diego, California

19            Tuesday, January 31, 2012

20                  Volume II

21

22  Reported by:

    Kae F. Gernandt

23  RPR, CSR No. 5342

24  Job No. 133737

25  PAGES 283 - 591

                                    Page 283

Ex. 85 - 6080

```
 1          Q.   So, if we just were to spend a second to    12:10:06

 2   page through, start at the beginning, let's say, on

 3   page 1078.

 4               Are those your notes?

 5          A.   Yes.                                         12:10:16

 6          Q.   Okay.  And then just keep paging

 7   through, a page at a time, and tell me if these are

 8   your notes.  And start back on 1091.

 9          A.   I mean, I'm on 1099, and everything so

10   far -- I don't know how far you want me to go.          12:11:03

11          Q.   So, I suppose we could spot-check.

12               Will you look at 1116?

13          A.   That's my writing.

14          Q.   1117?

15          A.   That's my writing.                          12:11:17

16          Q.   1128?

17          A.   That's my writing.

18          Q.   1140?

19          A.   That's my writing.

20          Q.   On page 1140, for example, are these        12:11:40

21   notes that you took about information that was

22   provided to you concerning creative financing?

23          A.   Yes.

24          Q.   And is all of this content related to

25   creative financing?                                     12:11:49
```

Page 398

Ex. 85 - 6081

 1          A.    Yes.                                    12:11:52

 2          Q.    None of this is Trump University trying

 3    to sell any products or services, correct?

 4          A.    No, not at this point.

 5          Q.    All right.  Now, would you go back      12:12:02

 6    to 1070 -- let's see.

 7          A.    10 --

 8          Q.    1085.  This is entitled "Agenda, Day 1,"

 9    and there are five bullet points.

10               Were all those items -- "The process of  12:12:28

11    getting the deal," "Packaging," "Creating your

12    financial statement," the "20 different ways to

13    finance a deal, Part 1," and the "1031 exchange" --

14    were all of those discussed during the program?

15          A.    I don't recall.  I don't believe we went 12:12:41

16    over 20 different ways to finance a deal.  We may

17    have gone over several.  That sounds like quite a

18    few ways.  I don't think he covered that.

19          Q.    All right.  Would you turn the page to

20    "Agenda, Day 2."  There are five more bullet points, 12:12:54

21    entitled "20 Different Ways to Finance a Deal,

22    Part 2," "Find Money Partners in Your Hometown,"

23    "Work with Mortgage Brokers," "20 Different Ways to

24    Finance a Deal, Part 3," and "Work with Bank

25    Lenders."                                           12:13:11

                                              Page 399

Ex. 85 - 6082

1                    Are those all your handwritten notes?      02:16:11

2          A.    Yes.

3          Q.    And this is all information that you

4   received during that three-day program?

5          A.    Yes.  Going up to -- what page are you       02:16:21

6   looking at?

7          Q.    Well, if you just page forward, are all

8   of those handwritten notes yours?  Just keep turning

9   as many pages as you want.

10         A.    I -- yes.  It appears to be all my --        02:16:36

11  I'm at 1333.

12         Q.    All right.  Look at 1411.  Again, we'll

13  just sort of spot-check here.

14         A.    Yes.

15         Q.    Are all those yours, on the next page,       02:16:50

16  yours?

17         A.    The next page, yes.

18         Q.    And the next page?

19         A.    Yes.

20         Q.    All right.  How about 1430?                  02:16:59

21         A.    Yes.

22         Q.    And just keep turning pages.

23               The next five or ten pages all yours?

24         A.    Yes.

25         Q.    This is all content that was provided to     02:17:22

Page 474

Ex. 85 - 6083

1     you during the seminar, correct?                    02:17:24

2          A.    Yes.

3          Q.    No sales going on for services or

4     products, right?

5          A.    I don't see any, based on the pages I'm   02:17:31

6     looking at, no.

7          Q.    All right.  Would you look at page 1538.

8     You all were specifically walking through worksheets

9     with numbers, correct?

10         A.    Well, yes.  In this one, he was giving    02:17:51

11    us -- it's not a specific example, but how we would

12    complete something, yes.

13         Q.    How you complete this worksheet, right?

14         A.    Yes.

15         Q.    And then if you keep turning the pages,   02:18:05

16    all this is information that was provided on how to

17    fill out these sheets?

18         A.    You know, I don't know that this came

19    from this class.  I believe that this is actually --

20    I'm fairly certain this did not come out of this      02:18:21

21    class.

22              This is what I created, I believe, when

23    Rick and Mike were at my house because I asked them,

24    because I created my own notes in generalities with

25    percentages.  This is not from -- I'm pretty sure     02:18:34

                                              Page  475

# EXHIBIT 86

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4      -----------------------------------X

       TARLA MAKAEFF, et al., on

5      Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

       all Others Similarly Situated,

6

                      Plaintiffs,

7

            v.

8

       TRUMP UNIVERSITY, LLC, et al,

9

                      Defendants.

10     -----------------------------------X

11

12                  VIDEOTAPED DEPOSITION

13                          OF

14                   CORINNE A. SOMMER

15                   New York, New York

16              Wednesday, November 7, 2012

17

18

19

20

21

22

23

24     Reported by:

       ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25     JOB NO. 54530

Page 164

1                    C. Sommer

2      A.    No.

3      Q.    Is that right?

4      A.    Correct.

5      Q.    At any time did you ask anybody for

6   financial information that went to any of the

7   programs other than them giving you a credit

8   card to charge something?  In other words, did

9   you ask them to fill out financial information

10  about themselves?

11     A.    No.

12     Q.    Are you aware of anybody at Trump

13  University ever doing that?

14     A.    No.  There was the two guys in

15  Colorado, I don't know exactly what their scheme

16  was, but they were trying to get people to buy

17  into their company.  So I'm not sure what they

18  were asking those people to provide.

19     Q.    Okay.  Other than those two guys in

20  Colorado --

21     A.    No.

22     Q.    And that's for the free program, the

23  three-day workshop, all the ones that you went

24  to, right?

25     A.    Correct.

# EXHIBIT 87

Page 1

1

2             UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------X

     TARLA MAKAEFF, et al., on

5    Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

     all Others Similarly Situated,

6

                  Plaintiffs,

7

          v.

8

     TRUMP UNIVERSITY, LLC, et al,

9

                  Defendants.

10   ----------------------------------X

11

12            VIDEOTAPED DEPOSITION

13                    OF

14            CORINNE A. SOMMER

15            New York, New York

16        Wednesday, November 7, 2012

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54530

Page 110

                              C. Sommer

1

2       Q.     And then you all changed the

3   enrollment form?

4       A.     Yes.  After I brought up this issue,

5   they actually made one that was coherent.

6       Q.     How many different enrollment forms

7   or contracts did you all use during your five

8   months?

9       A.     It was that one and then the new one.

10      Q.     And the 100 percent satisfaction

11  guarantee refund policy, was that in effect

12  during your entire five months?

13      A.     I believe so.

14      Q.     I may have asked you this earlier.  I

15  just want to make sure.

16             At any time while you were working at

17  Trump University, are you aware of anyone that

18  requested a refund that did not get a refund?

19             MS. ECK:  Objection.  Asked and

20      answered.

21      A.     Not that I'm aware.

22      Q.     Typically at the free programs, what

23  would the size of the audience be?

24      A.     A few hundred.

25      Q.     And typically out of the few hundred,

# EXHIBIT 88

1              UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3

4   TARLA MAKAEFF, BRANDON KELLER,

5   ED OBERKROM, and PATRICIA

    MURPHY, on Behalf of Themselves

6   and All Others Similarly

7   Situated,

8                              No. 10 CV 0940 IEG (WVG)

9      vs.     Plaintiffs,

10  TRUMP UNIVERSITY, LLC, (aka

    Trump Entrepreneur Initiative) a

11  New York Limited Liability

12  Company, DONALD J. TRUMP, and

13  DOES 1 through 50, inclusive,

14              Defendants.

15  _____

16

17            DEPOSITION of BRANDON KELLER

18             San Diego, California

19           Tuesday, January 17, 2012

20                  Volume I

21  Reported by:

22  Kae F. Gernandt

    RPR, CSR No. 5342

23  Job No. 130453

24

25  PAGES 1 - 264

                                      Page 1

```
 1            Q.    That was a voluntary action by Trump        03:52:57
 2     University, wasn't it?
 3            A.    Yes.
 4            Q.    Had nothing to do with you thinking that
 5     you got scammed; this was something that Trump        03:53:03
 6     University did as a courtesy to you and your father,
 7     true?
 8            MS. ECK:   Objection.  Calls for speculation.
 9     BY MR. SCHNEIDER:
10            Q.    It's something that Trump University      03:53:11
11     initiated and did for you and your father, correct?
12            A.    They did it based on their concern, and
13     that was my understanding.
14            Q.    Right.
15            A.    They did it based on their concern.       03:53:19
16            Q.    All right.  And then your father spoke
17     with you about his conversation with Trump
18     University and Paul, right?
19            A.    He said Paul Reisner called him, and
20     that's what he told me.                               03:53:31
21            Q.    And did he express his concern that you
22     had gone to the three-day program without notifying
23     him?
24            A.    Yes.
25            Q.    And he told you that he was concerned     03:53:42
```

Page 206

Ex. 88 - 6093

1   about you signing up for the 35,000-dollar program?      03:53:44

2          A.    Yes.

3          Q.    And he advised you that Trump University

4   had agreed to fully refund your money, correct?

5          A.    Yes.                                          03:53:56

6          Q.    Even though it was outside of the

7   three-day period, correct?

8          A.    Correct.

9          Q.    In fact, that's what happened, isn't it?

10         A.    Yes.                                          03:54:01

11         Q.    Trump University returned every penny of

12   the $35,000?

13         A.    Yes.

14         Q.    Did you have any credit card expenses

15   related to the $35,000?  In other words, did you        03:54:06

16   have any late penalties or fees or interest charges?

17         A.    I don't recall because I -- I don't

18   recall if they credited the cards before the

19   payments were due.  If they did credit the cards

20   before the payments were due, then no.  If they         03:54:22

21   didn't, then yes.  But again, I can't remember the

22   dates they credited the credit card, and that would

23   determine if there was interest or no interest.

24         Q.    As you sit here today, are you aware of

25   any expense that you had to paid related to the         03:54:37

Page 207

Ex. 88 - 6094

# EXHIBIT 89

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------X

     TARLA MAKAEFF, et al., on

5    Behalf of Themselves and     Case No. 3:10-CV-00940-CAB(WVG)

     all Others Similarly Situated,

6

              Plaintiffs,

7

         v.

8

     TRUMP UNIVERSITY, LLC, et al,

9

              Defendants.

10   ----------------------------------X

11

12           VIDEOTAPED DEPOSITION

13                  OF

14           CORINNE A. SOMMER

15           New York, New York

16        Wednesday, November 7, 2012

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54530

C. Sommer

1

2      A.     Yes.

3      Q.     And of the 20 events, how many of

4   those would you say you actually listened to or

5   watched?

6      A.     I'd say at least 15.

7      Q.     So roughly 75 percent?

8      A.     Yeah.

9      Q.     All right.   And those presentations

10   had different slides by different presenters?

11            MS. ECK:  Objection.   Lacks

12         foundation.  Misstates the witness'

13         testimony.

14      A.     Some of them had different -- it

15   depended on the presentation.   They were all

16   focused -- there were classes focused on

17   different things, but if some of the presenters,

18   if they didn't have slides when they came in,

19   for example, if they were doing a class on

20   foreclosure and the guy didn't have a PowerPoint

21   on foreclosure, he'd never taught it before,

22   they would give him, for example, Denise's

23   slides.

24      Q.     And if they did have their own

25   slides, they would use their own?

1                          C. Sommer

2          A.      Yes.

3          Q.      Did you ever see any of them read

4    from a script from a stage?

5          A.      No.

6          Q.      Did you ever see any of them have a

7    script in their hand?

8          A.      No.

9          Q.      You said that there was different

10   courses being taught.

11                 Rattle off the different courses that

12   you can remember attending.

13                 You said foreclosure.

14                 What else did you see?

15         A.      The law one.  I didn't actually

16   attend it, but I know we were having -- I didn't

17   sit in any of J.J.'s classes, but I know that we

18   were doing it.  I don't remember any of the

19   names.

20         Q.      Was there one on tax liens?

21         A.      That may have been part of J.J.'s

22   presentation.

23         Q.      How about wealth preservation?

24         A.      That sounds familiar.

25         Q.      How about commercial real estate?

1                              C. Sommer
2          **A.      I believe so, yes.**
3          Q.      And were there some basic courses and
4     then some advanced courses in these topics?
5          A.      No.  It was sort of I guess the more
6     you signed up for, the more advanced it was
7     supposed to be, but it was really, you know,
8     different topics.  I don't think it was more
9     advanced.  You were just getting a different
10    topic that you signed up for.
11         Q.      And did the presenters appear to you
12    to stay on topic?  If you went to a tax lien
13    program, did they talk about tax liens?
14         A.      Yeah.  I don't think they gave all
15    the information because it's sort of the up-sell
16    at the end, you'll get more information if you
17    buy into the next package.
18         Q.      But based on the programs you saw,
19    was it all content?
20              MS. ECK:  Objection.  Vague.  Lacks
21         foundation.
22         A.      No, I don't think it was all content.
23         Q.      So how would you describe the
24    programs?
25         A.      It was -- there was some content and

EXHIBIT 90

Pages: 6100-6104


[Filed Conditionally
Under Seal]

# EXHIBIT 91

Page 1

1                   UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    _____

                                            )
4    TARLA MAKAEFF, BRANDON KELLER,         )
     ED OBERKROM, and PATRICIA MURPHY,      )
5    on Behalf of Themselves and All        )
     Others Similarly Situated,             )
6                                           )
               Plaintiffs,                  ) Case No.
7                                           ) 10 CV 0940 CAB (WVG)
          vs.                               )
8                                           )
     TRUMP UNIVERSITY, LLC, (aka Trump      )
9    Entrepreneur Initiative) a New         )
     York Limited Liability Company,        )
10   DONALD J. TRUMP, and DOES 1            )
     through 50, inclusive,                 )
11                                          )
               Defendants.                  )
12   _____)

13

14

15          Videotaped Deposition of Sonny Low

16          taken at 655 West Broadway, Suite 1900,

17          San Diego, California, commencing at

18          9:23 a.m., on Thursday, October 4, 2012,

19          before Kimberly S. Thrall, RPR, CSR No. 11594.

20

21

22

23   Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594

24               Job No.  54028

25

Page 114

1    the piece of paper in terms of what he was talking to

2    you about?

3         A.   Let me answer to you this way.

4         Q.   Sir, I -- I just want you to answer my

5    question, not what you want to answer.

6              Did you see --

7         A.   He left me --

8         Q.   Excuse me.

9         A.   He left me a post-mentor action plan.

10        Q.   Okay.  I'm not talking about that.  What --

11        A.   I want to talk about that --

12        Q.   Sir --

13        A.   -- because --

14        Q.   Mr. Low --

15        A.   -- that is what he left me.

16        Q.   Okay.  Mr. Low --

17             MS. ECK:  I think maybe we need to take a

18   break.

19             MR. SCHNEIDER:  I just want to finish this

20   area.

21   BY MR. SCHNEIDER:

22        Q.   Did you see any kind of script that he worked

23   through that he would stuck to, he would only talk about

24   the items on a piece of paper during your three-day

25   mentorship?

Ex. 91 - 6107

1      A.   No.

2      Q.   Did you go to Home Depot at any time with your

3 mentor?

4      A.   No.

5      Q.   Did he ever ask you to go to Home Depot or any

6 type of facility like Home Depot?

7      A.   No.

8           MR. SCHNEIDER:   All right.  Let's take a

9 break.

10          THE VIDEOGRAPHER:  Off the record at 1:03 p.m.

11          (The luncheon recess was taken at 1:03 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 92

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

```
  1
  2
  3  _____
                                            )
  4  TARLA MAKAEFF, BRANDON KELLER,         )
     ED OBERKROM, and PATRICIA MURPHY,      )
  5  on Behalf of Themselves and All        )
     Others Similarly Situated,             )
  6                                         )
             Plaintiffs,                    ) Case No.
  7                                         ) 10 CV 0940 CAB (WVG)
             vs.                            )
  8                                         )
     TRUMP UNIVERSITY, LLC, (aka Trump      )
  9  Entrepreneur Initiative) a New         )
     York Limited Liability Company,        )
 10  DONALD J. TRUMP, and DOES 1            )
     through 50, inclusive,                 )
 11                                         )
             Defendants.                    )
 12  _____)
 13
 14
 15          Videotaped Deposition of Joann Everett
 16          taken at 655 West Broadway, Suite 1900,
 17          San Diego, California, commencing at
 18          9:31 a.m., on Wednesday, October 3, 2012,
 19          before Kimberly S. Thrall, RPR, CSR No. 11594.
 20
 21
 22
 23
 24  Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594
 25               Job No. 54027
```

Ex. 92 - 6110

Page 234

1   detailed questions of mentors because I never got the

2   program off the ground.

3       Q.   And I gather that you didn't attempt to make

4   any investments?

5       A.   No, I did not.

6       Q.   You didn't buy any property?

7       A.   I didn't buy any property.

8       Q.   During the free program that you went to, did

9   the instructor use any kind of written script that you

10  could see?  Did he have any kind of document in his hand

11  it looked like he was reading from?

12      A.   You know, that is a -- I remember a slide

13  presentation, but I don't remember all the content

14  and -- and I -- I mean, he had a -- a ped- -- what do

15  you call those things?

16          MS. ECK:  A PowerPoint?

17          THE WITNESS:  No.  A --

18          MS. ECK:  Oh.  A pedestal?

19          THE WITNESS:  A pedestal.  So he could have had

20  written notes.  I -- I don't remember.

21  BY MR. SCHNEIDER:

22      Q.   Okay.  Nothing that you saw?

23      A.   Nothing that I saw.

24      Q.   And during the three-day -- well, during the

25  free program, did -- was there any discussion about

# EXHIBIT 93

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    _____
                                             )
 4    TARLA MAKAEFF, BRANDON KELLER,         )
      ED OBERKROM, and PATRICIA MURPHY,      )
 5    on Behalf of Themselves and All        )
      Others Similarly Situated,             )
 6                                           )
                   Plaintiffs,               ) Case No.
 7                                           ) 10 CV 0940 CAB (WVG)
              vs.                            )
 8                                           )
      TRUMP UNIVERSITY, LLC, (aka Trump      )
 9    Entrepreneur Initiative) a New         )
      York Limited Liability Company,        )
10    DONALD J. TRUMP, and DOES 1            )
      through 50, inclusive,                 )
11                                           )
                   Defendants.               )
12    _____)

13

14

15         Videotaped Deposition of John Brown

16         taken at 655 West Broadway, Suite 1900,

17         San Diego, California, commencing at

18         9:18 a.m., on Monday, October 8, 2012,

19         before Kimberly S. Thrall, RPR, CSR No. 11594.

20

21

22

23

24    Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594

25              Job No. 54027
```

1    Q.   Okay.  So what did you think of the free

2    program?

3    A.   It was -- I'm trying to remember now.  I think

4    it was exciting.  I was glad to be there because I felt

5    that it was a brand-new opportunity for me to expand my

6    investing experience.

7    Q.   Do you remember who the speaker was?

8    A.   Jim Harris was the speaker that day.

9    Q.   And what did Mr. Harris tell you about his

10   background in real estate?

11   A.   He told us that he was very successful, showed

12   us -- I believe he showed us a picture of his house,

13   talked a great deal about his children and how life was

14   so good for him.

15   Q.   Did it appear that he was reading from any type

16   of script?

17   A.   No.

18   Q.   And I'm sorry if I already asked you this.  Did

19   you attend that program alone?

20   A.   Yes.

21   Q.   How many people would you estimate were in the

22   free program?

23   A.   An estimate -- it wasn't a big room.  I would

24   say 50, 40 to 50.

25   Q.   Were there any other speakers besides

EXHIBIT 94

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------X

     TARLA MAKAEFF, et al., on

5    Behalf of Themselves and     Case No. 3:10-CV-00940-CAB(WVG)

     all Others Similarly Situated,

6

                  Plaintiffs,

7

          v.

8

     TRUMP UNIVERSITY, LLC, et al,

9

                  Defendants.

10   ---------------------------------X

11

12            VIDEOTAPED DEPOSITION

13                   OF

14            CORINNE A. SOMMER

15            New York, New York

16        Wednesday, November 7, 2012

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54530

Ex. 94 - 6116

1                    C. Sommer

2        A.    Yes.

3        Q.    Did you ever see any of them read

4   from a script from a stage?

5        A.    No.

6        Q.    Did you ever see any of them have a

7   script in their hand?

8        A.    No.

9        Q.    You said that there was different

10  courses being taught.

11            Rattle off the different courses that

12  you can remember attending.

13            You said foreclosure.

14            What else did you see?

15       A.    The law one.  I didn't actually

16  attend it, but I know we were having -- I didn't

17  sit in any of J.J.'s classes, but I know that we

18  were doing it.  I don't remember any of the

19  names.

20       Q.    Was there one on tax liens?

21       A.    That may have been part of J.J.'s

22  presentation.

23       Q.    How about wealth preservation?

24       A.    That sounds familiar.

25       Q.    How about commercial real estate?

Page 280

C. Sommer

1

2     Q.     Paragraph 9, "Trump University used a

3     standardized PowerPoint presentation..."

4             I believe we talked about this

5     earlier, but that's not true, is it?

6             MS. ECK:   Objection.   Misstates the

7         witness' testimony.   Asked and answered.

8     A.     Each event had different -- a

9     different presentation for each event.   And if

10    the presenter had their own, they would use

11    that, and if they didn't have it, they were

12    given one to use.

13    Q.     And the next part of that says,

14    "...and scripts were used for all seminars."

15            That's not true, is it?

16            (Document review.)

17            MS. ECK:   Objection.   Lacks

18        foundation.

19    A.     I think that has to do with the

20    presentation, what we just spoke about.

21    Q.     Okay.   But there were no scripts that

22    you ever saw, right?

23    A.     It wasn't a script, but I think

24    that's in the sense of if you're given someone

25    else's PowerPoint presentation to use, it's sort

Page 281

C. Sommer

1

2   of a script because you're being told what to

3   present on.

4       Q.    Al right.   So you separated this,

5   though, into PowerPoint presentations and

6   scripts.

7             So with regard to the scripts, you're

8   not aware of any scripts, are you?

9       A.    No.   It was just the script of the

10  PowerPoint presentation.   That's what was meant.

11  It wasn't specifically a separate script.

12      Q.    And we've already covered the line

13  about that the seminars were standardized and

14  substantially the same across the country,

15  right, we've already talked about that?

16            Do you have any more or different

17  information than what we've already talked

18  about?

19      A.    I don't believe so.

20      Q.    Paragraph 10, "Trump University did

21  not provide one year of real estate mentoring as

22  promised to the public."

23            Since you were only working for Trump

24  University for five months, you don't have any

25  idea whether or not they provided one year of

Ex. 94 - 6119

# EXHIBIT 95

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF CALIFORNIA

3   ----------------------------X

4   TARLA MAKAEFF, et al., on

5   Behalf of Themselves and All

6   Others Similarly Situated,

7              Plaintiffs,

8      -vs-              No. 3:10-CV-00940-CAB

9   TRUMP UNIVERSITY,  LLC,

10   et al,

11              Defendants.

12   ----------------------------X

13

14   VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15              San Francisco, California

16              October 15, 2012

17

18

19

20

21

22

23   Reported by:

    Bonnie Pruszynski, RMR, CSR No. 13064

24   JOB NO. 54291

25

1    higher-priced programs?

2         A     I did not -- oh, I might have sold

3    one.

4         Q     Because you thought it was a good

5    fit?

6         A     Correct.  I -- yeah, I did.  I

7    believe I sold one.  I can't remember if the

8    second person ever ended up purchasing or not.

9         Q     After the live event, were you

10   provided any kind of script in terms of what you

11   were supposed to say to people that you contacted?

12        A     I was not, no.

13        Q     After you left Trump University, what

14   did you do?

15        A     I -- I hung out in Central Park, just

16   tried to figure out what to do next.

17              I didn't have -- have an immediate

18   plan of what I was going to do when I left.

19        Q     And when did you develop a plan?

20        A     I'm still planning.  I just graduated

21   from business school.

22        Q     Did you obtain your license?

23        A     I did.

24        Q     When did you obtain that?

25        A     I don't recall, sometime after --

# EXHIBIT 96

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4

     --------------------------------X

5    TARLA MAKAEFF, et al., on

     Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

6    all Others Similarly Situated,

7                     Plaintiffs,

8          v.

9    TRUMP UNIVERSITY, LLC, et al,

10                    Defendants.

     --------------------------------X

11

12

13                 VIDEOTAPED DEPOSITION

14                        OF

15                   JASON NICHOLAS

16                 New York, New York

17            Thursday, November 8, 2012

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54531

Page 47

1                        J. Nicholas

2    stuff.

3            Anything else, if there was anything

4    else, it was something like, you know, hey, what

5    time for lunch or something stupid like that,

6    but nothing -- no documents or nothing other

7    than that.

8        Q.    All right.  So the only document that

9    you would have sent from work to your home

10   computer would be the script.

11       A.    To my knowledge, yes.

12       Q.    All right.  And in response to this

13   request for documents, I received a formal

14   response from Ms. Eck and in response to the

15   category which asked for any scripts, let me see

16   if I can find it, No. 25 and 26, "Any and all

17   scripts provided by Trump University and "Any

18   and all scripts required by Trump University"

19   and "Any and all scripts you used while working

20   at Trump University," No. 27, she said that you

21   were going to produce documents and she produced

22   one document, so I'm going to show you what that

23   is.  I've marked it as Exhibit 2.

24            (Defendants' Exhibit Nicholas 2,

25       Script, Bates stamped TU-NICHOLAS0000001

1            J. Nicholas

2       through 0002, marked for identification, as

3       of this date.)

4            (Document review.)

5  BY MR. SCHNEIDER:

6       Q.    Is that the script that you're

referring to?

8       A.    I mean if -- unless you guys did some

9  editing, I sent it to her and it's printed out.

10  I mean it is what it is.  Looking at it right

11  now when I see, you know, blah, blah.

12            MS. ECK:  I'll represent that that's

13       the document you sent to us.

14            THE WITNESS:  Okay.

15       A.    Well, that's if -- like I say, unless

16  you -- I'm not trying to -- it's not a big deal,

17  but if there was anything altered to my

18  knowledge, but if you want me to read through it

19  and check to make sure.

20       Q.    Sure.

21       A.    Okay.

22            (Document review.)

23       A.    Just generally skimming through it,

24  it's absolutely what I produced, yes.

25       Q.    All right.  And this is the script

Page 49

1                    J. Nicholas

2    that --

3         A.    Other than when it says, "My name is

4    Jason Nicholas," you know, obviously that was

5    blank for anyone to say, you know, their

6    personal name, but yeah, this is the script.

7         Q.    All right.   And this is the one that

8    you were required to follow word for word.

9         A.    Absolutely.   We were pounded in our

10   head that Mr. Trum -- whoever like I said, I

11   don't know who writes the checks behind closed

12   doors, but whoever paid for this, we were told

13   that this has been psychologically tested and

14   that it costs several thousand, I don't know the

15   exact figure, by somebody to basically create

16   this script, and that if we weren't on it, I

17   mean when I got hired the training groups, we

18   spent five to ten business days in a conference

19   room, you know, pounding this script, so when we

20   actually got onto a live phone, you better be

21   reading the script or else it's going to be a

22   problem, so this is what everybody used, yes.

23        Q.    So this Exhibit 2, this is what you

24   said word for word to the people you talked to

25   on the phone?

Page 50

J. Nicholas

1

2       A.      Were required to, yes, that's what we

3       were required to do.

4       Q.      All right.   And you didn't deviate

5       from this script.

6       A.      No, sir.   I mean listen, if you're

7       asking me if I said "the" or I said "is" or

8       something like that, then obviously that's just

9       personal, you know, that's just the human

10      element, but I mean this is it.

11          Q.      All right.   We'll talk about that in

12      a few minutes.

13          A.      Okay.

14          Q.      When you began working at Trump

15      University, how many other people were in the

16      sales department?

17          A.      Well, that's funny.   It's funny you

18      mention that.   When you say started working,

19      basically -- can I -- am I allowed to just recap

20      real quick?

21          Q.      Sure.

22          A.      When I was called in for an

23      interview, Mr. Schnackenberg, or however you

24      pronounce his name, was there, interviewed me in

25      a conference room, took me on a quick tour of

Ex. 96 - 6128

Hello (_____)

My name is Jason Nicholas from **Trump University**.

I've been assigned to your account.

I have some **QUESTIONS** and some Important **INFORMATION** for you.

Do you have a few minutes to speak with me?   **GREAT**


I have your **FILE** in front of me and it doesn't show a **PARTNER** or **SPOUSE**,
are you  **MARRIED** or do you have a **PARTNER**?

Do you have any experience investing in **REAL ESTATE** besides your own home of course?

**\*\*\*If NO\*\*\*** what's prevented you from getting involved in **REAL ESTATE**?

If you knew how the **EXPERTS** were able to (_____) would that be of **INTEREST** to you?


(_____) there is something that I believe will **INTEREST** you in your **SITUATION**.

How would you like to work with **Donald Trump's Real Estate EXPERTS**?

This is **NOT** something we offer to just **ANYONE** ------and-------We don't want to work with just **ANYONE**

Mr. Trump is on a **MISSION** to create the next wave of Independently wealthy entrepreneurs in America.
**IS THAT YOU (_____)**???


Obviously (_____) if we're going to **CREATE** these wealthy Entrepreneurs, we **Only** want to work with
people who have **CERTAIN QUALITIES**...

So, we're actually going through an **INTERVIEWING** process, **"Looking to SELECT a FEW PEOPLE!"** that
we might be able to work with **1-on-1**.

We're **ONLY** looking for Highly Motivated Individuals that really want to be Aggressive with their Real
Estate projects & want to become Profitable **RIGHT AWAY!**
**IS THAT YOU?     GREAT!**

A lot of People have asked if **MR. TRUMP** can meet with them in person and show them
how he finds properties—how MR. TRUMP evaluates properties and--- how he uses creative financing to
acquire properties with little or "*preferably*"        **NO-MONEY-DOWN!**

TU-NICHOLAS0000001
Ex. 96 - 6129

Obviously, Mr. Trump can't meet w/everyone, nor does he want to.  So he has created (**Trump Univ.**) where we **ONLY** invite a **select** group of people that have been **hand-picked** by his Program Director.

In this (*course/retreat/program*) we offer **LIVE, HANDS-ON-TRAINING** with Donald Trump's professional Real Estate Instructors.
These instructors will be holding your Hand, showing you the way!
You will learn how to **SUCCEED "The TRUMP way!"**

These instructors are **Experts** in today's Real Estate world and teach all of the
non-traditional or unconventional ways of (buying & selling Real Estate)
I'm talking about the latest strategies and techniques in Real Estate.

Let me ask you (_____) is everything Donald Trump does, **the BEST**?
He wouldn't put his name on this if it wasn't,      right?
Do you feel that working with **Mr. Trump's experts** is something you would like to be considered for?

TU-NICHOLAS0000002

Ex. 96 - 6130

EXHIBITS 97-99

Pages: 6131-6187


[Filed Conditionally
Under Seal]