# EXHIBIT 100

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4     ----------------------------------X

      TARLA MAKAEFF, et al., on

5     Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

      all Others Similarly Situated,

6

                   Plaintiffs,

7

          v.

8

      TRUMP UNIVERSITY, LLC, et al,

9

                   Defendants.

10    ----------------------------------X

11

12              VIDEOTAPED DEPOSITION

13                     OF

14              CORINNE A. SOMMER

15              New York, New York

16         Wednesday, November 7, 2012

17

18

19

20

21

22

23

24    Reported by:

      ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25    JOB NO. 54530

1                        C. Sommer

2       Q.      Paragraph 9, "Trump University used a

3   standardized PowerPoint presentation..."

4               I believe we talked about this

5   earlier, but that's not true, is it?

6               MS. ECK:  Objection.  Misstates the

7           witness' testimony.  Asked and answered.

8       A.      Each event had different -- a

9   different presentation for each event.  And if

10  the presenter had their own, they would use

11  that, and if they didn't have it, they were

12  given one to use.

13      Q.      And the next part of that says,

14  "...and scripts were used for all seminars."

15              That's not true, is it?

16              (Document review.)

17              MS. ECK:  Objection.  Lacks

18          foundation.

19      A.      I think that has to do with the

20  presentation, what we just spoke about.

21      Q.      Okay.  But there were no scripts that

22  you ever saw, right?

23      A.      It wasn't a script, but I think

24  that's in the sense of if you're given someone

25  else's PowerPoint presentation to use, it's sort

1                        C. Sommer

2    roller coaster through the day so you want to

3    buy something.

4         Q.    Now you reported back to Highbloom

5    and Sexton about your impressions of the

6    program, right?

7         A.    Yes, mostly to Highbloom.

8         Q.    And since you sat through a number of

9    these, you weren't mesmerized and taken in by

10   this because this was old hat to you after you

11   had been through a few, right?

12             MS. ECK:   Objection.   Vague.

13        A.    No.   I think every time it was sort

14   of exciting and you learned something new based

15   on the presenter.   Everyone had something new to

16   say, so I think every time was sort of new and

17   exciting.

18        Q.    And by learning something, you mean

19   something new about real estate?

20        A.    Yeah.

21        Q.    So even you who have gone through

22   program after program, you learned something new

23   each time?

24        A.    Well, because there were different

25   presenters, yes.

1                      C. Sommer

2        Q.    So it would depend on the presenter

3   what you learned?

4        A.    Yes.

5        Q.    And some you learned more than

6   others?

7        A.    Well, they all have different

8   techniques.

9        Q.    Different styles?

10       A.    Yes.

11       Q.    Different information they're

12   conveying?

13       A.    Yes.

14       Q.    Different slides in their PowerPoint?

15            MS. ECK:   Objection.   Misstates the

16       witness' testimony.

17       A.    No.   Well, it depends on some of the

18   presenters were using other people's, so some of

19   them had the same.

20       Q.    Some were the same and some were

21   different.

22       A.    Some were the same and some were

23   different.

24       Q.    All right.   And they had different

25   experiences and examples that they gave?

1                      C. Sommer
2        A.     Yes.
3        Q.     And you'd report back to Highbloom
4    and you would tell him, I thought this
5    particular presenter was very good or effective,
6    right?
7        A.     Yes.
8        Q.     And then other speakers you said not
9    so much, I didn't think this one was as
10   effective.
11       A.     Yes.
12       Q.     Did you make any attempt to see if
13   your own impressions and comments coincided with
14   the participants of that program?
15       A.     No.
16       Q.     How many purchasers of the elite
17   programs did you ever interact with either in
18   person, by phone or by email?
19       A.     I don't know an exact number.
20       Q.     Was it more than five?
21       A.     I don't know.
22       Q.     On line 24 you state, "After
23   purchasing the elite program, I saw many
24   students who realized that they did not get what
25   they are promised."

# EXHIBIT 101

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

      Plaintiffs,                              Civil Action No.

          vs.                                   3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,        CAB(WVG)

      Defendants.

_____


      Videotaped deposition of DONALD J. TRUMP, SR.

      New York, New York

      September 12, 2012


Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

**Donald J. Trump, Sr.**                                    **September 12, 2012**

1          I've used my techniques and they've been

2    very successful for me.  So if I can do it, so can

3    other people.

4          **Q   Could you tell me which tech books were**

5    **taught in the 90-minute course?**

6          A   Just my general feelings on locations, on

7    purchasing, on renovations, on rehabilitations, on

8    lots of different things.

9          A lot of things having to do with real

10   estate.

11         **Q   And when you say your "general feelings,"**

12   **what are your general feelings?**

13         **A   Markets.  I've convinced a lot of people**

14   **not to buy real estate over the years when they would**

15   **have lost their shirt if they did.**

16         **In speeches I've told people "Don't buy**

17   **real estate."  I've told people "Don't use exploding**

18   **mortgages," "Don't use different forms of financing."**

19   **And a lot of people listened to me, and they didn't**

20   **do it.**

21         **And I've had, over the years, many, many**

22   **letters written to me thanking me for saving their**

23   **lives.**

24         **Q   Were all those techniques taught in the**

Ex. 101 - 6196

Donald J. Trump, Sr.                                    September 12, 2012

1    courses?

2            A    Some of them were.

3            Q    Which ones?

4            A    There was a period of time when I thought

5    buying real estate as not a good thing, early on, and

6    I was right about that.

7                 And I know -- I let the professors know

8    that, and I think some of the professors actually

9    said that I don't feel that buying real estate right

10   now is a good thing.

11                And I was right.  My timing happened to

12   be right.

13           Q    And what time frame was that?

14           A    It was early on.

15           Q    Around what year?

16           A    I don't know.  Early on, during the --

17   during the time prior to the trouble in real estate.

18           Q    And --

19           A    And if people listened to me, they would

20   have saved a lot of their money.

21           Q    And so the courses taught the students --

22           A    Some of the courses did.  As I said, the

23   courses weren't all the same.  I wanted to have

24   professors make their points also.  I didn't want to

**www.aptusCR.com**

Ex. 101 - 6197

**Donald J. Trump, Sr.**                                          **September 12, 2012**

1    make the single point.   I wanted to have professors

2    make their point also.

3              But I told -- over the years I've told

4    many people to buy and not to buy.   And my timing

5    turned out to be very propitious.

6         Q    Okay.   So the not-to-buy version, was

7    that during the bubble, 2005/2006?

8         A    Before the bubble, yeah.   Before the

9    explosion.

10        Q    Before the bubble burst; right?

11        A    Before the bubble burst.

12        Q    To 2005 and 2006?

13        A    Before the bubble burst.   And I felt very

14   negative about buying real estate, because I've seen

15   it before.   And I've made speeches -- unrelated to

16   Trump University.   But I've made speeches where I

17   told people "Do not buy.   This is not the right time

18   to buy."

19              I also talked about exploding mortgages,

20   mortgages that come due at a later date.   And I've

21   had many, many letters of people thanking me for

22   literally saving them.

23        Q    And so the issue of exploding mortgage,

24   was that taught in the courses?

# EXHIBIT 102

Dear Friends,

I am personally inviting you and a guest to a powerful wealth-building event that can literally change your life, and get you out of the rat race forever. When I speak, people listen. And, when I send out invitations, people attend because they know that my invitation means one thing – there is money to be made.

When the real estate bubble was building I told people not to buy, but many of them didn't listen to me and now they're paying the price. In today's down market I'm telling people to buy, buy, buy. In all my years investing in real estate, I think this is **one of the most lucrative investment opportunities ever.** Banks are selling foreclosed properties at pennies on the dollar. The trick is knowing how to invest profitably. And that's where I want to help you.

I am sending one of my world-class instructors from Trump University to your area to teach a class on how to **profit from today's real estate market.** You will learn how to:

- Find income producing properties right in your area, at up to 50% below market value
- Close deals in 30 days
- Fund your investments using other people's money
- Negotiate with banks the "Trump Way"
- Conquer your fear of getting started, by simply following my Real Estate System

My team at Trump University has developed a **proven system for profitable real estate investing** that anyone can use, right away, to score big profits in today's market. If you want to know the best ways - my ways - to buy low, sell high, and walk away rich, then clear your schedule and do whatever it takes to get to this exclusive, invitation-only event.

I have enclosed **two complimentary VIP tickets** to give you and a guest the chance to learn how to create wealth the "Trump Way" and I encourage you to attend. To confirm your reservation you must call **888-878-6709** or log onto **www.TrumpULive.com** Seating is limited so RSVP today.

Donald J. Trump

P.S. As a special gift I am giving every attendee a free copy of my blockbuster Catch the Wave CD-ROM (a $50 value).

TU 62081

Ex. 102 - 6200

# EXHIBIT 103

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

     Plaintiffs,                        Civil Action No.

        vs.                             3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,       CAB(WVG)

     Defendants.

_____



     Videotaped deposition of DONALD J. TRUMP, SR.

     New York, New York

     September 12, 2012




Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

Ex. 103 - 6202

Donald J. Trump, Sr.                                    September 12, 2012

```
 1    of somebody else?
 2          A   No.  I think they think that it's a
 3    company that's a successful -- very successful
 4    company.
 5          Q   And it's successful because of you;
 6    correct?
 7          A   Well, it's successful because of
 8    transactions; and lots of transactions over a period
 9    of years have added up to a great body of success,
10    yes.
11          Q   And you oversaw those transactions;
12    correct?
13          A   I did, yes.
14          Q   Do you know who Scott Leitzel is?
15          A   I know the name.  I don't know him.
16          Q   How about Michael Hinson?  Do you know
17    who that is?
18          A   No.
19          Q   How about Stephen Gilpin?  Do you know
20    who that is?
21          A   I think these are names of people that I
22    taught where -- I think I know their names because I
23    saw résumés, and I would see résumés of instructors,
24    because it was important to me that we got good
```

Ex. 103 - 6203

**Donald J. Trump, Sr.**                              **September 12, 2012**

1    instructors.

2              So I don't know if that's what you're

3    referring to.  But I've met numerous instructors, and

4    I've also -- this is over a period of years.  And

5    I've also seen the résumés of virtually everybody.

6              So that's where they sound familiar to

7    me; and in some cases, I know them better because

8    I've met them.

9         Q    Sure.  Which instructors did you meet?

10        A    I believe Donald Sexton and Mr. Caplan.

11   I believe perhaps Childers.

12             I've met a number of them.  I don't know

13   their names.  I mean, you're talking about years ago.

14   This is actually years ago.

15             But I've met a number of instructors.  I

16   wanted to see -- I really was very insistent that we

17   get good instructors for the classes.

18             And I think the 97 percent bears that

19   out, that we were successful in that regard.

20             But the concept of getting proper

21   instructors was very important to me.

22        Q    Now, when did you meet Donald Sexton?

23        A    I don't know.  Years ago.

24        Q    How many times did you meet him?

Ex. 103 - 6204

Donald J. Trump, Sr.                              September 12, 2012

```
 1              A    I don't know.
 2              Q    Do you remember what you talked about?
 3              A    Just, I would have talked to everybody
 4     about the same thing.  I ask their experience.  I
 5     also gave them concepts of what I would like to talk
 6     about to students.
 7                   But I wanted each instructor to really do
 8     their own thing.  I wanted people with experience
 9     where they could talk about individual deals,
10     different deals.
11              Actually, the classes were very
12     different, because different instructors -- like when
13     you go to a college and you have different
14     instructors teaching, whether it's real estate or
15     something else, I wanted instructors to be able to
16     give individualized service based upon their
17     experiences, not based on one standard rule of thumb
18     because it's different.
19              As an example, different parts of the
20     country are different.  You may have a whole
21     different real estate mindset in Iowa than you do in
22     California.  So the classes were very, very
23     different.
24              Q    And did you attend any of the three-day
```

Page 54

Ex. 103 - 6205

1          A    I don't know.  I really don't know.

2          Q    Do you remember what the presentation

3     was -- what was the format of the presentation?

4          A    I don't know.

5          Q    Is there any other details that you can

6     tell me about the --

7          A    The only detail, as I left, I was very

8     impressed.

9          Q    Okay.  Now, you said that you had met --

10    previously you had met with Donald Sexton; is that

11    correct?

12         A    I believe so.  Again, there were -- I

13    remember some names.  There was a Mr. Gordon,

14    Mr. Sexton, Mr. Childers, Mr. Caplan.

15              There were four or five names -- I don't

16    know, you know, when you add them all up, because

17    you're talking about years ago.  But some would come

18    up to my office.  And I met with a number of the

19    professors -- one was a professor at Columbia

20    University who was very impressive.  That may have

21    been Mr. Sexton.

22              But I was very impressed with the people

23    that we had and the people that I met.  But in all

24    cases I looked at applications.  In other words, in

1    some cases I didn't see them, but I'd look at their

2    application when they applied and before we hired

3    them.

4            And so I would be involved from that

5    standpoint.  It was very important to me to make sure

6    that good people represented what we were doing.

7        Q    In terms of the people that you met with

8    in your office, would that be in your calendar?

9        A    No, it's so many years ago.  I don't have

10   calendars from that many years ago.  You're talking

11   about years ago.

12       Q    Okay.  So you didn't keep a calendar in

13   2004?

14       A    I may have had a calendar, but I don't

15   keep them for 10 years later.

16       Q    Okay.  Now, which résumés did you look

17   at?

18       A    I don't know.  But many.

19       Q    Sitting here, you can't remember?

20       A    No.  But many, many résumés.

21       Q    Okay.  How many?

22       A    Like -- I can't say all, but I would say

23   many of the people that taught, I, at a minimum,

24   looked at résumés, yes.

Ex. 103 - 6207

EXHIBIT 104

Pages: 6208-6251


[Filed Conditionally
Under Seal]

# EXHIBIT 105

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF CALIFORNIA

3   ---------------------------X

4   TARLA MAKAEFF, et al., on

5   Behalf of Themselves and All

6   Others Similarly Situated,

7                    Plaintiffs,

8       -vs-                    No. 3:10-CV-00940-CAB

9   TRUMP UNIVERSITY,  LLC,

10  et al,

11                  Defendants.

12  ---------------------------X

13

14  VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15              San Francisco, California

16              October 15, 2012

17

18

19

20

21

22

23  Reported by:

    Bonnie Pruszynski, RMR, CSR No. 13064

24  JOB NO. 54291

25

1        Q       So, sorry, I did it again in my

2   question.

3               Did you ever attend any Trump

4   University live programs in which people paid to

5   attend?

6        A       I did not.  My contact with Trump

7   University ended when I resigned.  I may have

8   talked to Mark Covais on the phone or something,

9   because, you know, we were friends, but other than

10  that, there was zero talk about Trump University.

11  Really it was more about how he was doing and

12  stuff.  I think I bumped into him once down on

13  Wall Street.

14       Q       What people did you talk to about

15  their experiences after purchasing a Trump

16  University program, a live program?

17       A       I talked to Rami, and I don't

18  remember the other gentleman's name, but they had

19  called me in a big panic of the decision that they

20  had made.

21       Q       All right.  So, Rami you identified

22  before.  He was at the live event.

23       A       He was.

24       Q       And you understand that he purchased

25  a Trump University live program after that?

1      Q      All right.  Would you look on page

2  two, paragraph nine.  The first sentence says,

3  "Trump University's live seminars and events were

4  not based on the content of Eldridge Real Estate

5  Investor Training Program."

6      A      Um-hum.

7      Q      Do you know what any of the live

8  seminars or events had in terms of content other

9  than the one free program you went to?

10     A      I don't know.  Well, as far as I had

11  understood, the content was created by the person

12  that was hired to speak.

13     Q      For the one event you went to; right?

14     A      Correct.

15     Q      And you have had no contact with

16  anybody from Trump University since then?

17     A      Correct.

18     Q      So, you can only talk about the very

19  first free live event program that you went to?

20     A      Correct.

21     Q      Then the next sentence states that

22  "instead, Mark Dove, who essentially owns the

23  front-end high-pressure speaker scam world,

24  provided speakers, instructors, mentors and

25  salespeople to Trump University."

1     A     I don't, no.

2     Q     Do you know what his background is?

3     A     I don't, other than that.

4     Q     Do you know what his experience in

5  real estate is?

6     A     I don't.

7     Q     And did you have any discussions with

8  him other than hello?

9     A     No.

10    Q     Have you done any research about Mark

11  Dove?

12    A     I have not.  Maybe I Googled him.  I

13  have no idea.

14    Q     And do you know what his role or

15  involvement was with Trump University?

16    A     I don't know.  I was told at the time

17  that he was going to be a resource for hiring

18  speakers.

19    Q     Who told you that?

20    A     I believe it was David Highbloom.

21    Q     And do you know whether or not he

22  actually had any such role?

23    A     I don't know.

24    Q     And are you able to identify any

25  particular speakers or presenters or mentors that

1      Q      All right.  So, for the Trump

2   University, the one live event program that you

3   attended, the free program --

4      A      It was my understand that Mark Dove

5   provided the speaker for that program.  But I

6   don't know that right now or I don't recall if

7   that's true and accurate.  But that was my

8   understand.

9      Q      So, you don't have any personal

10  knowledge of that fact.

11     A      No.

12     Q      And instructors, do you know what

13  instructors came from Mark Dove?

14     A      I believe -- and I don't -- I believe

15  David Stamper.  I believe he was a -- I believe he

16  was an instructor and also a front-end speaker

17  that worked for --

18     Q      Did you know Dave Stamper?

19     A      Yes.  I met him at some of the live

20  events.

21     Q      You only went to one live event.

22     A      He started working and doing sales

23  stuff starting for the Trump Power Summits.

24     Q      Okay.  So, I want to put the Trump

25  Power Summit aside, because that's --

Page 134

1   Excuse me.

2        Q      And do you know whether that

3   individual ever became a mentor for Trump

4   University?

5        A      I don't know.

6        Q      Do you know if any of the Trump

7   University mentors had anything to do with Mark

8   Dove?

9        A      It was my understanding that he was

10  providing all of them to Trump University, but I

11  don't know what contract they had agreed to or

12  where they came from.  That was just my

13  understanding.

14       Q      Right.

15       A      That's what I've been told.

16       Q      Do you have any personal knowledge

17  that any of the mentors that Trump University

18  actually used or hired actually came through Mark

19  Dove?

20             MS. ECK:  Objection.  Asked and

21       answered.

22             THE WITNESS:  Um, I don't -- I don't

23       know.

24       Q      And salespeople, what salespeople

25  came through Mark Dove?

EXHIBITS 106-107

Pages: 6259-6270

[Filed Conditionally Under Seal]

# EXHIBIT 108

**From:** Trump University <email@info.trumpuniversity.com>
**To:** brandon
**Sent:** Thu, April 29, 2010 12:06:00 PM
**Subject:** Entrepreneurs Needed to be My Next Apprentice



# I want people who want success.

If you Think BIG and believe you've got what it takes to succeed, I want you!

**76% of the world's millionaires made their fortunes in real estate. Now it's your turn. My father did it, I did it, and now I'm ready to teach you how to do it too.**

▸ Register Now ▸

My team of real estate experts at Trump University is coming to your area in the next few days to conduct my Free Intro Apprenticeship Workshop. If you think you've got what it takes to be my next Apprentice, step up and attend. You should also bring along a trusted partner. This is YOUR opportunity to create wealth and take control of your own financial future with proven strategies that work in the current real estate market.



I'm also going to give you my "Secrets of Real Estate Marketing" investor toolkit (a $50 value) absolutely FREE when you attend.

**Attend the Free Intro Apprenticeship Workshop to learn how to:**

1. Buy properties from banks at DEEP discounts
2. Use short sales to CONTROL property
3. Increase your financial POWER with leverage
4. Negotiate PROFITABLE deals that meet your goals
5. Attend and learn how to develop the CONFIDENCE to succeed in real estate

**Don't waste time - seating is very limited and my Trump Workshops always fill up fast.**

▸ Register Now ▸

See you at the top!



Donald J. Trump
Chairman, Trump University

---

Exhibit 3
Keller Vol. I
1/17/12
Kae Gernandt, CSR #5342

TU-PLTF00206

Ex. 108 - 6272

# EXHIBIT 109

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    TARLA MAKAEFF, BRANDON KELLER,
    ED OBERKROM, and PATRICIA
 5  MURPHY, on Behalf of Themselves
    and All Others Similarly
 6  Situated,
 7                            No. 10 CV 0940 IEG (WVG)
               Plaintiffs,
 8
       vs.
 9
    TRUMP UNIVERSITY, LLC, (aka
10  Trump Entrepreneur Initiative) a
    New York Limited Liability
11  Company, DONALD J. TRUMP, and
    DOES 1 through 50, inclusive,
12
               Defendants.
13
14  _____
15
16            DEPOSITION of TARLA MAKAEFF
17              San Diego, California
18             Monday, January 30, 2012
19                   Volume I
20
21
22  Reported by:
    Kae F. Gernandt
23  RPR, CSR No. 5342
24  Job No. 130455
25  PAGES 1 - 282

                                          Page 1
```

Ex. 109 - 6274

```
1   guest?                                          12:03:15

2        A.   No.  She was trying to get me to split

3   the cost with her.

4        Q.   And did you agree to do that before you

5   went to the program?                            12:03:22

6        A.   Yes.

7        Q.   What was her background in real estate,

8   if you know?

9        A.   She owns a triplex and had owned a house

10  prior to that and, I believe, had done some real 12:03:37

11  estate investing with her -- one of her brothers.

12  I'm not certain.  But she was quite knowledgeable.

13       Q.   And did you consider yourself a novice?

14       A.   Yes.

15       Q.   Is it an accurate statement that you     12:04:01

16  knew nothing about real estate other than purchasing

17  your own residence before attending Trump

18  University?

19       A.   That's correct.

20       Q.   Before you attended the -- the program   12:04:11

21  with her -- that was called Fast Track to

22  Foreclosure, correct?

23       A.   The one that I attended with her,

24  correct.

25       Q.   Before you attended that program, did    12:04:22
```

Page 64

Ex. 109 - 6275

```
 1    you are receive any information from Trump        12:04:24
 2    University?
 3          A.    No.
 4          Q.    Did you read any materials about Trump
 5    University before you attended the Fast Track to   12:04:31
 6    Foreclosure?
 7          A.    No.
 8          Q.    So, when you showed up for the three-day
 9    program, is it accurate that you had not reviewed or
10    seen any information about Trump University?        12:04:44
11          A.    No, I had not.
12          Q.    To your knowledge, did you sign any kind
13    of contract or agreement with Trump University
14    regarding Fast Track to Foreclosure?
15          A.    For the 1500-dollar aspect?              12:05:01
16          Q.    Right.
17          A.    I don't believe so.  I don't recall.
18          Q.    Do you have any memory of paying Trump
19    University any money for you to attend the Fast
20    Track to Foreclosure?                               12:05:14
21          A.    No.  I paid my friend $750.
22          Q.    That was some weeks later, right?
23          A.    It was -- yes, post the course.  I don't
24    recall the amount of weeks, but . . .
25          Q.    All right.  Let's -- let's talk about    12:05:42
```

Page 65

Ex. 109 - 6276

EXHIBIT 110

Pages: 6277-6280

[Filed Conditionally
Under Seal]

# EXHIBIT 111

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

     Plaintiffs,                          Civil Action No.

        vs.                                3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,        CAB(WVG)

     Defendants.

_____



     Videotaped deposition of DONALD J. TRUMP, SR.

New York, New York

September 12, 2012




Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

Ex. 111 - 6282

**Donald J. Trump, Sr.**                                         **September 12, 2012**

```
 1   of somebody else?

 2        A    No.  I think they think that it's a

 3   company that's a successful -- very successful

 4   company.

 5        Q    And it's successful because of you;

 6   correct?

 7        A    Well, it's successful because of

 8   transactions; and lots of transactions over a period

 9   of years have added up to a great body of success,

10   yes.

11        Q    And you oversaw those transactions;

12   correct?

13        A    I did, yes.

14        Q    Do you know who Scott Leitzel is?

15        A    I know the name.  I don't know him.

16        Q    How about Michael Hinson?  Do you know

17   who that is?

18        A    No.

19        Q    How about Stephen Gilpin?  Do you know

20   who that is?

21        A    I think these are names of people that I

22   taught where -- I think I know their names because I

23   saw résumés, and I would see résumés of instructors,

24   because it was important to me that we got good
```

Page 52

Donald J. Trump, Sr.                                September 12, 2012

1    instructors.
2              So I don't know if that's what you're
3    referring to.  But I've met numerous instructors, and
4    I've also -- this is over a period of years.  And
5    I've also seen the résumés of virtually everybody.
6              So that's where they sound familiar to
7    me; and in some cases, I know them better because
8    I've met them.
9         Q    Sure.  Which instructors did you meet?
10        A    I believe Donald Sexton and Mr. Caplan.
11   I believe perhaps Childers.
12             I've met a number of them.  I don't know
13   their names.  I mean, you're talking about years ago.
14   This is actually years ago.
15             But I've met a number of instructors.  I
16   wanted to see -- I really was very insistent that we
17   get good instructors for the classes.
18             And I think the 97 percent bears that
19   out, that we were successful in that regard.
20             But the concept of getting proper
21   instructors was very important to me.
22        Q    Now, when did you meet Donald Sexton?
23        A    I don't know.  Years ago.
24        Q    How many times did you meet him?

www.aptusCR.com

Ex. 111 - 6284

Donald J. Trump, Sr.                                    September 12, 2012

```
 1    foreclosure, or are you asking me what is a
 2    foreclosure system?
 3    BY MS. JENSEN:
 4          Q    System.
 5          A    Are you asking it relative to what they
 6    teach in the school?
 7          Q    Yes.
 8          A    It's a definition and a system of
 9    foreclosures.  But you'd have to ask Michael Sexton
10    as to how it was taught.  And, frankly, you'd have to
11    ask all of the different instructors as to also what
12    their take on it is.
13          Q    Okay.  Did Trump University have any
14    criteria for its instructors?
15          A    Yeah, I think we've asked -- I mean, I
16    think I've answered this a number of times.
17          Q    Okay.  And what are the criteria?
18          A    We wanted to make sure they had a good
19    record, track record of having done a good job over a
20    period of time --
21          Q    Okay.
22          A    -- as instructors.
23          Q    Okay.  As instructors?
24          A    Yeah.  And in some cases, in real-life
```

Ex. 111 - 6285

Donald J. Trump, Sr.                                    September 12, 2012

1    situations.

2           Q    So they primarily had to have prior

3    teaching experience?

4           A    If they had a good reputation as a

5    developer, as an instructor, as a person that was

6    familiar with real estate.  We wanted to make sure we

7    had good people teaching the course.

8                And, obviously, we did, because we had a

9    97 percent approval rating.

10              MS. JENSEN:  I'm going to move to strike

11   the end of the answer after "had good people teaching

12   the course."

13   BY MS. JENSEN:

14          Q    Were there any educational requirements

15   for the instructors?

16          A    You'd have to ask Mr. Sexton.

17          Q    Okay.  But sitting here now, you don't

18   know?

19          A    Of course, they had to have educational

20   requirements, but you'd have to ask him specifically

21   what they were.

22          Q    Okay.  So do you know whether there was

23   any college requirement?

24          A    You'd have to ask Mr. Sexton.  We had

Ex. 111 - 6286

EXHIBIT 112

Pages: 6287-6289


[Filed Conditionally
Under Seal]

# EXHIBIT 113

Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3    ---------------------------X

4    TARLA MAKAEFF, et al., on

5    Behalf of Themselves and All

6    Others Similarly Situated,

7                    Plaintiffs,

8       -vs-                    No. 3:10-CV-00940-CAB

9    TRUMP UNIVERSITY,  LLC,

10   et al,

11                   Defendants.

12   ---------------------------X

13

14   VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15              San Francisco, California

16              October 15, 2012

17

18

19

20

21

22

23   Reported by:

     Bonnie Pruszynski, RMR, CSR No. 13064

24   JOB NO. 54291

25

Ex. 113 - 6291

Page 144

1    deal.  I mean, and he just made it sound like that

2    was -- well, like he's done forever, which I

3    thought was not accurate.

4         Q     Did he talk about the one deal during

5    the presentation?

6         A     Briefly.  That was his only example

7    of how he had made so much money on an

8    income-producing property.

9         Q     And that's what he told the audience?

10        A     He did.

11              MS. ECK:  Objection.  Vague.

12        Q     And what did you see that Trump

13   University claimed that its teachers and mentors

14   were all experts in real estate?

15        A     I believe some of the marketing

16   materials that I had -- I had seen an e-mail

17   for -- for the seminar, I believe, that had stated

18   like, work with hand-picked experts or something

19   like that.

20        Q     Okay.  Right now, I'm just talking

21   about their experience.  What you state here is

22   that they claimed that they were all experts in

23   real estate.  That line.

24        A     I don't know, that might be partially

25   inaccurate, saying claimed, because I don't know

Ex. 113 - 6292

1   if they personally stood up there and said, "I am

2   an expert."  I don't -- I don't recall that detail

3   of the seminar.

4        Q     All right.  And then the next part of

5   that says, "I believe that most of the

6   instructors, mentors and coaches had very little

7   or no personal experience in the real estate

8   techniques that they were teaching."  I want to

9   focus on that part for a moment.

10       A     Okay.

11       Q     List for me all of the instructors

12  that that you are aware of that worked for Trump

13  University.

14       A     One of the instructors was -- I

15  believe his name was Mark.  The only experience

16  that he had was, he did graduate from NYU's real

17  estate program.  I don't know if he -- if it was a

18  bachelor's degree or what specific training it

19  was, but I know that he did do some real estate

20  instruction.

21             But he didn't have any properties

22  himself.  But then he also -- he had the support

23  of Gary Eldred, so that -- which Gary, I

24  understand, is -- is an expert.  But Mark was --

25  was the instructor that Trump had to execute most

1        So, this Mark fellow, do you know

2   what his last name is?

3        A     I don't remember.  No, I don't

4   remember what it is.

5        Q     So, he was teaching Gary Eldred's

6   information; correct?

7        A     He was.  And that was separate, aside

8   from the -- from the seminars.  So I am just going

9   through why -- so the instructors, that is not in

10  relation to the seminars, that is just in general.

11       Q     Okay.  So, when you were talking in

12  this paragraph that you believe that most had

13  little or no personal experience, you were talking

14  about the online work?

15       A     For the instructors, yes.

16       Q     And the instructor you identified is

17  Mark, and he was teaching Gary Eldred's --

18       A     REIT program.

19       Q     REIT.

20       A     Yes.

21       Q     And you believe Gary Eldred is very

22  experienced in real estate; correct?

23       A     Yes.  The mentors --

24       Q     I'm sorry, just a minute.

25             And that was the online program, Gary

Page 152

1    background and experience?

2         A     For the live events.

3               I believe she had done something in

4    real estate.  I think it was more in event

5    coordination, but I don't -- I never saw her

6    resumé.

7         Q     Don Sexton, you said you met him;

8    right?

9         A     I did.

10        Q     And he has background in real estate,

11   marketing?

12        A     Entrepreneurship, I believe.  I don't

13   think he has a background in real estate.

14        Q     And he wrote the materials on

15   entrepreneurship?

16        A     Correct.

17        Q     You think he's an expert in that

18   area?

19        A     Yes.

20        Q     Eric Brown?

21        A     No.

22        Q     Gary Eldred, you gave --

23        A     Gary Eldred I think is -- as far as

24   my experience with Gary, he was great.

25        Q     And experienced --

1      Q      James Harris?

2      A      No.

3      Q      James Shead?   S-H-E-A-D.

4      A      No.

5      Q      Jerry Foster?

6      A      No.

7      Q      Jim Fletcher?

8      A      No.

9      Q      Jim Guarino?

10     A      No.

11     Q      JJ Childers?

12     A      JJ Childers, I met at a Trump Power

13  Summit.  To my knowledge, he did not work in real

14  estate.  I want to say that he was an attorney and

15  dealt with wealth management.

16     Q      And do you know what his background

17  and experience is in wealth management?

18     A      I believe -- I don't know what

19  exactly he does in wealth management.  I think I

20  did -- I did see his resumé.  He didn't show it to

21  me.  I believe it was part of a presentation that

22  he gave.  I believe it was in Orlando.

23           But I don't believe he had -- he did

24  anything in real estate.

25     Q      Did he appear to be experienced in

Ex. 113 - 6296

1    wealth management?

2          A       Yeah, I think so.

3          Q       And do you know if he spoke at Trump

4    University programs about wealth management?

5          A       I don't know if he did or not.

6          Q       Joe Lahore?  L-A-H-O-R-E.

7          A       I don't know him.

8          Q       John Jamieson?

9          A       No.

10         Q       Johnny Horton?

11         A       No.

12         Q       Keith Sperry?  S-P-E-R-R-Y.

13         A       No.

14         Q       Kerry Lucas?

15         A       No.

16         Q       Kevin Dalgleish?  D-A-L-G-L-E-I-S-H.

17         A       No.

18         Q       Kevin Derrick?

19         A       No.

20         Q       Kevin Shortle?  S-H-O-R-T-L-E.

21         A       No.

22         Q       Koz Khosravani?

23         A       No.

24         Q       Lee Arnold?

25         A       No.

Ex. 113 - 6297

1   expert, no.  He may have dabbled in real estate,

2   but enough to -- to deem him as an expert,

3   definitely no.

4        Q     You are saying he said that or you

5   are concluding that?

6        A     He said that.

7        Q     He said he's not an expert in real

8   estate?

9        A     I don't know if he said those exact

10  words, but --

11       Q     Tim Gorsline?

12       A     No.

13       Q     Tim Sardinia?  S-A-R-D-I-N-I-A.

14       A     I recognize the name, but I don't

15  know who he is.

16       Q     Troy Peterson?

17       A     No.

18       Q     William Cannon?

19       A     No.

20       Q     So, the sum total of your knowledge

21  about the experience of the mentors and coaches

22  are the couple people that you just identified?

23       A     It is, yes.

24       Q     Out of those maybe 75 names?

25       A     Yes.  And I -- I have no idea when

1   those individuals joined in the company, and I

2   left in May of 2007.  So, up until May of 2007 are

3   the people that I would know, but I would be

4   willing to bet that those people joined after May

5   of 2007.

6        Q     All right.  So, your view of the

7   world of Trump University on the live programs

8   is --

9        A     Up until May of 2007.

10       Q     Right.  So one event when the -- when

11   the programs were just getting started; right?

12       A     Correct.

13       Q     And you have no information or idea

14   about anything after May of 2007?

15       A     No.

16       Q     Is that right?

17       A     Correct.

18       Q     Now, I just want to make sure I close

19   this part out.  On paragraph nine, when you talked

20   about the front-end high-pressure speaker scam

21   world, you had mentioned the Trump Institute, and

22   that you had gone to that program and that you

23   didn't like the way they had put on that program.

24   But what was it that this phrase comes from, "the

25   front-end high-pressure speaker scam world"?

# EXHIBIT 114

Page 1

1

2                UNITED STATES DISTRICT COURT

3               SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------X

     TARLA MAKAEFF, et al., on

5    Behalf of Themselves and    Case No. 3:10-CV-00940-CAB(WVG)

     all Others Similarly Situated,

6

               Plaintiffs,

7

          v.

8

     TRUMP UNIVERSITY, LLC, et al,

9

               Defendants.

10   ---------------------------------X

11

12            VIDEOTAPED DEPOSITION

13                    OF

14            CORINNE A. SOMMER

15            New York, New York

16        Wednesday, November 7, 2012

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54530

Ex. 114 - 6301

1                       C. Sommer

2          A.    No.

3          Q.    Did you ever meet J.J. Childers?

4          A.    Yes.

5          Q.    And do you know his background?

6          A.    He's a real estate lawyer.

7          Q.    Did you ever hear him present?

8          A.    Yes.

9          Q.    And what topics did he address?

10         A.    He, I believe he just did the real

11   estate law.

12         Q.    Do you remember the specific topics

13   he addressed?

14         A.    No.

15         Q.    Steve Miller, is that a name that

16   sounds familiar?

17         A.    The name sounds familiar, but I'm not

18   sure.  There was a lot of presenters at the end

19   of my time there that were coming in.

20         Q.    How about Wear (phonetic), W-a-r-r,

21   or Warr?

22         A.    No.

23         Q.    Did you ever look at any of the

24   resumés or background or experience of any of

25   the presenters?

C. Sommer

1

2      A.      Not that I'm aware.

3      Q.      Is it accurate that you would not

4  know whether any of the speakers or presenters

5  were qualified to present?

6      A.      Well, based on my conversations with

7  them.

8      Q.      And what conversations did you have

9  with -- which speakers did you talk with that

10  you have in mind?

11      A.      Well, it wasn't necessarily a

12  speaker, but the sales teams, the sales teams,

13  marked up sales team, not all of them had real

14  estate experience.

15      Q.      I'm sorry.  Say that again?

16      A.      The sales teams, the ones who were

17  selling after the speaking events, not all of

18  them had the real estate -- those are the ones

19  in particular I'm talking about.

20      Q.      All right.  So I'm talking about

21  something different.

22          I'm talking about the people that

23  were actually teaching the courses, the

24  presenters, instructors.

25          Do you have any information about

1                          C.  Sommer

2     whether or not they were qualified to teach or

3     present?

4          A.    The ones that I saw, the specific

5     presenters I saw and that I talked about

6     earlier, no.

7          Q.    All right.  Any other speakers that

8     you saw that you have any information whether or

9     not they're qualified?

10         A.    No.  I just had conversations that I

11    had with them.

12         Q.    Based on your conversations with

13    them, did you form any opinion as to whether or

14    not you thought they were qualified to teach?

15         A.    Some of them, yes, I did form an

16    opinion.

17         Q.    Which ones?

18         A.    That were qualified to teach?

19         Q.    Right.

20         A.    J.J., Denise.  Gary seemed -- I mean

21    he had been working there before, so I assumed

22    he had the real estate experience and he had

23    written a book, one of Donald Trump's brand new

24    books.  Those are the only names I can think of

25    in particular.

C. Sommer

1  University?

2

3     A.    I don't remember who was.

4     Q.    And other than Steve Goff and Denise

5  DeVoe, are you aware of any other mentors that

6  worked for Trump University?

7          MS. ECK:  Other than she's testified

8     to earlier?

9          MR. SCHNEIDER:  Well, I'm not sure

10     she talked about mentors.

11    A.    I'm not sure if Kasper ended up being

12  a mentor or Steve Miller.

13         And I think J.J. might have been a

14  mentor, but I'm not 100 percent sure.

15         It was sort of like any of the

16  presenters could have been a mentor.

17    Q.    Were any of the presenters that you

18  saw present, were any of them in your mind not

19  experienced or qualified in real estate?

20         MS. ECK:  Objection.  Calls for

21     speculation.

22    A.    No, but like I said, I didn't see

23  everyone and I didn't go to every event.

24    Q.    I understand.

25         Just the ones that you saw or the

Page 223

C. Sommer

1
2     events that you attended, were all of those
3     presenters or mentors qualified in real estate
4     to your knowledge?
5          A.    Yes.
6          Q.    Were you familiar with the term
7     "advantage hot line"?
8          A.    It sounds familiar.  Is that from the
9     Trump -- the magazine?
10         Q.    Yes.
11         A.    Yeah.
12         Q.    Do you know what that was?
13         A.    Cheryl dealt with the magazine.  I
14    mean I saw it and we gave it out at some of the
15    events I believe.
16         Q.    And was that something that was
17    available for people by subscription?
18         A.    I have no idea.
19              (Defendants' Exhibit Sommer 29,
20         Performance Review dated 10/2/07 and Sales
21         Compensation Plan Summary, Bates stamped
22         TU131804 through 810, marked for
23         identification, as of this date.)
24    BY MR. SCHNEIDER:
25         Q.    I've marked as Exhibit 29, a

Ex. 114 - 6306

Page 257

1                          C. Sommer

2          Q.    On line 18 in paragraph 4.  "Far from

3      providing a complete real estate education..."

4                 Are the words "complete real estate

5      education," were those your words that are in

6      quotes?

7          A.    No.

8          Q.    All right.  The last part of that

9      paragraph where you state, "I can recall

10     instances where consumers were asking for more

11     information and the presenter said there's other

12     programs and services available," we've have

13     already talked about that, right?

14         A.    Yes.

15         Q.    Paragraph 5, "During the time I was

16     employed at Trump University, many of the

17     speakers, instructors and mentors lacked real

18     estate experience."  So I think we covered this,

19     but let's just make sure here.

20                Identify which speakers were speakers

21     when you were there that you believe lacked real

22     estate experience?

23         A.    I think it was mostly the sales team.

24         Q.    Okay.  And none of them were

25     speakers, right?

                        C. Sommer

1

2        A.    Not to my knowledge.

3        Q.    All right.  Same question for

4   instructors.

5        A.    The instructors that I saw, as far as

6   I knew, they had experience.  I don't know.  I

7   don't know their background.

8        Q.    And the mentor, the one mentor that

9   you saw in action, you thought he was

10  experienced, right?

11       A.    Yes.

12       Q.    Are you aware of any mentors that

13  lacked real estate experience?

14       A.    Not that I know of.

15       Q.    The next line, "Many of them did not

16  even own houses."

17             Did you ask people about what they

18  owned?

19       A.    That was really David Stamper who I'm

20  not sure if he ended up speaking.  He was

21  telling me before on my last event with him that

22  he was going to be speaking at a future event.

23  So I don't know if he was a speaker, but he

24  didn't have real estate experience then.

25       Q.    Okay.  So this paragraph here is

EXHIBITS 115-116

Pages: 6309-6318


[Filed Conditionally
Under Seal]

# EXHIBIT 117

Page 1

1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF CALIFORNIA
2

   TARLA MAKAEFF, et al., on §
3  Behalf of Themselves and  §
   All Others Similarly      §
4  Situated,                 §
                             §
5          Plaintiffs        §
                             §   Civil Action No.
6  VS.                       §   3:10-CV-00940-CAB
                             §
7  TRUMP UNIVERSITY, LLC,    §
   et al.,                   §
8                            §
           Defendants        §
9  _____ §
10
11
12
13
14
15      VIDEOTAPED DEPOSITION OF CHERYL DONNELLY
16               Austin, Texas
17          Friday, November 2, 2012
18
19
20
21
22  Reported by:
23  MICHEAL A. JOHNSON, CRR
24  JOB 54334
25

1      A.   It says here the Wealth Builder's

2  Network.  At the time it was called Trump

3  Advantage.

4      Q.   And what is that?

5      A.   It is a magazine that has eight

6  pages of custom Trump content and 24 pages of

7  content that is also used by other marketing

8  companies.  It gives people access to 800

9  numbers to call and ask questions regarding

10  wealth building, insurance.

11      Q.   Were you familiar with the 800

12  numbers?

13      A.   From a marketing standpoint, yes.

14      Q.   Okay.  So if somebody had a

15  question about -- a content question and they

16  called the 800 number, was somebody available

17  to answer that question?

18      A.   To my knowledge, yes.

19      Q.   Did Trump University have different

20  800 numbers?

21      A.   Not that I can recall.

22      Q.   Were people directed to different

23  places by the same 800 number?

24          MS. ECK:  Objection, calls for

25  speculation.

1   conversation with J.B. Olson.  Typically to

2   get a testimonial from somebody, there are

3   several conversations.

4           Page 79 would be an article that

5   was -- let's see.  An interview with Richard

6   Parker, so this would've been an article I

7   would've received.  Looks like Barry Lenson

8   had interviewed him.  And that goes on to page

9   80.  There's an ad there for Trump.  So -- on

10  the back cover, which was pretty static.

11      Q.  On 131279, the article by Trump

12  University Professor Richard Parker, do you

13  know who he is?

14      A.  He's I believe one of the -- it

15  says here one of the professors, though.  I

16  believe I'd spoken with him actually too at

17  one point.  But the interview was conducted by

18  Barry Lenson, who was a staff writer for Trump

19  University.  I believe he was from New

20  Hampshire or Vermont or someplace up north.

21      Q.  All right.  Let's go back to the

22  second page of the document which is the

23  member services.

24      A.  Okay.

25      Q.  I had asked you earlier whether or

1    not there was more than one 800 number for

2    Trump University.   And if you look at these

3    three boxes, it looks like there's a number of

4    different either 800 or 877 or 888 numbers,

5    right?

6         A.    Uh-huh.   Correct.

7         Q.    And it depends whether you want

8    information regarding the hotline or member

9    services or Trump University itself or

10   specifically about insurance issues or

11   financial issues or stock issues or tax or

12   casualty, right?

13        A.    Correct.

14             MS. ECK:   Objection, compound,

15   calls for speculation, speaks for itself.

16   BY MR. SCHNEIDER:

17        Q.    Each of those has -- each of those

18   have their own separate 800 or 877 or 888

19   number, right?

20        A.    Correct.

21        Q.   Okay.   You can put that one aside.

22         I don't know whether I'm going to

23   mark this yet.   I'm going to ask you what it

24   is first.

25             (Witness Reviews Document.)

1    A.   They were the vendor who put

2  together the Trump Advantage magazine.  So

3  they would create the 24 pages of content that

4  would be used by other organizations as well,

5  and then we would have eight pages that were

6  unique to Trump that wrapped around that.

7  They also did the e-mail support for people

8  who would e-mail questions to those e-mail

9  addresses that were listed in Advantage and

10  they also answered the phones.  They also did

11  the teleseminars as well.

12    Q.   All right.  If you look at -- now,

13  did IAS provide coaching?

14    A.   It says here that they -- that the

15  call is with a specific support person, IAS

16  employee.

17    Q.   Right.  And do you know whether

18  that would involve real estate information

19  from the IAS person?

20    A.   I believe there was a real estate

21  800 number, so that they would receive that.

22    Q.   And if you look down underneath the

23  last bullet point, referral back to Steve

24  Goff, "Calls that are more advanced can be

25  referred to Steve Goff for the support

Page 139

1   needed."  Do you see that line?

2         A.   Yes.

3         Q.   And was that your understanding,

4   that if someone had a real estate question

5   that was more advanced, that Trump University

6   would refer it to Steve Goff?

7              MS. ECK:  Objection, calls for

8   speculation.

9         A.   I would assume so, yes.

10  BY MR. SCHNEIDER:

11        Q.   That's why you put it in this memo,

12  right?

13        A.   Yes.  This would've been based on

14  obviously a conversation between David

15  Highbloom, Michael Sexton, Josef and myself.

16        Q.   It was your understanding as of

17  July 11, 2007, when you wrote this that people

18  calling in with more advanced questions about

19  real estate would get referred to Steve Goff,

20  correct?

21        A.   Correct.

22        Q.   And it was your understanding that

23  he was an expert in real estate, correct?

24             MS. ECK:  Objection, calls for

25  speculation, lack of foundation.

EXHIBIT 118

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------X

     TARLA MAKAEFF, et al., on

5    Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

     all Others Similarly Situated,

6

              Plaintiffs,

7

         v.

8

     TRUMP UNIVERSITY, LLC, et al,

9

              Defendants.

10   ----------------------------------X

11

12              VIDEOTAPED DEPOSITION

13                    OF

14              CORINNE A. SOMMER

15              New York, New York

16         Wednesday, November 7, 2012

17

18

19

20

21

22

23

24   Reported by:

     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 54530

Page 283

C. Sommer

1

2      A.    I had nothing to do with the pay, but

3  I know that they were paid -- there was

4  commission paid and I know that it was before

5  the mentorship was completed.

6      Q.    Do you know if it was before the

7  in-field mentorship was completed?

8      A.    No, I don't know that.

9      Q.    And do you know what the mentor's

10  incentive was to call back consumers?

11      A.    No.

12      Q.    If a mentor didn't call back

13  consumers and consumers were unhappy with the

14  mentor, they wouldn't get any more students,

15  right?

16          MS. ECK:  Objection.  Calls for

17      speculation.

18      A.    That's not necessarily true.  This

19  wasn't really a word-of-mouth business.

20      Q.    What do you mean by that?

21      A.    Meaning --

22          THE WITNESS:  Can you say again what

23      he just said?

24          (Question was read back as follows:

25          "QUESTION:  If a mentor didn't call

# EXHIBIT 119

Page 1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF CALIFORNIA

3   ---------------------------X

4   TARLA MAKAEFF, et al., on

5   Behalf of Themselves and All

6   Others Similarly Situated,

7                   Plaintiffs,

8       -vs-                No. 3:10-CV-00940-CAB

9   TRUMP UNIVERSITY,  LLC,

10  et al,

11                  Defendants.

12  ---------------------------X

13

14  VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15              San Francisco, California

16              October 15, 2012

17

18

19

20

21

22

23  Reported by:

    Bonnie Pruszynski, RMR, CSR No. 13064

24  JOB NO. 54291

25

Ex. 119 - 6330

1        Q        How do you know that?

2        A        Talking to them about it.

3        Q        Just the way they spoke?

4        A        No.  I believe that they told me that

5    they didn't have formal education.

6        Q        By that, you are talking about

7    college?

8        A        Correct.

9        Q        And how old was Rami?  How old would

10   you estimate?

11       A        Late 30s, early 40s maybe.

12       Q        And what were the Moores' education?

13       A        I don't know if I got into education

14   with them.

15       Q        The next part of that sentence says

16   that "Trump University preyed upon the elderly and

17   uneducated to separate them from their money."

18       A        I would say, I don't necessarily know

19   that "elderly" is accurate.  I would -- I would

20   stand by uneducated, with the two examples that I

21   just gave of the Moores potentially and Rami.

22       Q        And what did Trump University do to

23   prey on the uneducated?

24       A        The -- "demographic" is not the right

25   word.  Just the overall scene in the room of the

# EXHIBIT 120

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4     ---------------------------------X
       TARLA MAKAEFF, et al., on
 5     Behalf of Themselves and    Case No. 3:10-CV-00940-CAB(WVG)
       all Others Similarly Situated,
 6
                      Plaintiffs,
 7
            v.
 8
       TRUMP UNIVERSITY, LLC, et al,
 9
                      Defendants.
10     ---------------------------------X
11
12              VIDEOTAPED DEPOSITION
13                      OF
14              CORINNE A. SOMMER
15              New York, New York
16          Wednesday, November 7, 2012
17
18
19
20
21
22
23
24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 54530
```

1                      C. Sommer

2      demographics of people that attended either the

3      free program or any of the paid programs?

4           A.     No.

5           Q.     Were you part of any discussions at

6      Trump University in which there was talk or

7      discussion about the types of people that Trump

8      University wanted to attend?

9           A.     No.

10          Q.     Are you aware of any effort to target

11     any particular group of people?

12          A.     No.

13          Q.     By age?

14          A.     No.

15          Q.     By gender?

16          A.     No.

17          Q.     By income level?

18          A.     No.

19          Q.     Anything else?

20          A.     No.

21          Q.     And during your 20 events that you

22     attended, did you personally attempt to target

23     any particular group of people?

24          A.     No.

25          Q.     And are you aware of anybody else at

# EXHIBIT 121

Page 1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF CALIFORNIA
2

     TARLA MAKAEFF, et al., on  §
3    Behalf of Themselves and    §
     All Others Similarly        §
4    Situated,                   §
                                 §
5          Plaintiffs            §
                                 §   Civil Action No.
6    VS.                         §   3:10-CV-00940-CAB
                                 §
7    TRUMP UNIVERSITY, LLC,      §
     et al.,                     §
8                                §
           Defendants            §
9    _____ §
10
11
12
13
14
15      VIDEOTAPED DEPOSITION OF CHERYL DONNELLY
16              Austin, Texas
17         Friday, November 2, 2012
18
19
20
21
22   Reported by:
23   MICHEAL A. JOHNSON, CRR
24   JOB 54334
25

Ex. 121 - 6336

Page 113

1   are our customers?"

2        A.   Okay.

3        Q.   Do you have any information whether

4   or not those bullet points are accurate or not

5   as to who the Trump University customers were?

6        A.   I do not know that this was

7   accurate information regarding -- this may be

8   ideal customers or -- but I do not recall.

9        Q.   The bullet point that says, "Head

10  of household, 40 to 54 years old," do you know

11  if that's true?

12       A.   I do not know.  I do know that

13  there were some older customers.  There may

14  have been younger ones as well.  This may be,

15  you know, a median.  I don't know.

16       Q.   While you worked at Trump

17  University, did you ever hear anybody say

18  anything which indicated that Trump University

19  was targeting senior citizens?

20       A.   Not that I can recall.  Senior

21  citizens typically have more disposable

22  income.  But specific conversations I cannot

23  recall at this time.

24       Q.   Any of the marketing material that

25  you prepared, was it geared towards senior

Ex. 121 - 6337

Page 114

1    citizens?

2         A.    Not that I can recall, no.

3         Q.    Any of the marketing material that

4    you saw while you worked at Trump University,

5    was it geared toward senior citizens or

6    anybody over 65?

7         A.    Not that I can recall.

8              (Deposition Exhibit 7 marked.)

9    BY MR. SCHNEIDER:

10        Q.    I've marked as Exhibit 7 a one-page

11   document which is Bates DONNELLY947 and it

12   is -- looks like a description and agenda for

13   a program by J.J. Childers in Orlando,

14   April 27 to 29.  First question is, do you

15   know why you have this document?

16        A.    I probably had been working on the

17   event, marketing it for marketing materials to

18   understand, you know, what was to come because

19   obviously ads would need to be placed.  And

20   generally this information was sent throughout

21   the company so that people were aware of what

22   was going on.

23        Q.    And on the right side it says

24   "Agenda."  Was it your understanding those

25   were the topics that would've been addressed