ZELDES & HAEGGQUIST, LLP
AMBER L. ECK (177882)
HELEN I. ZELDES (220051)
ALREEN HAEGGQUIST (221858)
AARON M. OLSEN (259923)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878
ambere@zhlaw.com
helenz@zhlaw.com
alreenh@zhlaw.com
aarono@zhlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN (211456)
THOMAS R. MERRICK (177987)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
rjensen@rgrdlaw.com
tmerrick@rgrdlaw.com

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>Defendants. | Case No.:  3:10-CV-00940-GPC(WVG)<br><br>CLASS ACTION<br><br>OPPOSITION TO DEFENDANTS' MOTION TO STRIKE DECLARATIONS OF SCHNACKENBERG, SOMMER, NICHOLAS, AND DONNELLY<br><br>Date:  June 28, 2013<br>Time:  1:30 p.m.<br>Ctrm:  9, 2nd Floor<br>Judge:  Honorable Gonzalo P. Curiel |

ZELDES & HAEGGQUIST, LLP

## TABLE OF CONTENTS

Page

I.      INTRODUCTION .......................................................................................... 1

II.     THERE IS NO LEGAL OR FACTUAL BASIS FOR STRIKING THESE
        DECLARATIONS ......................................................................................... 1

        A.      The Former Employees Confirmed the Majority of Their Declaration
                Statements During Their Depositions ................................................. 1

        B.      It Is Not Proper to Strike a Declaration Merely Because It Contradicts
                Certain Deposition Testimony ............................................................ 1

        C.      The Former Employees Had Personal Knowledge and Foundation for
                Their Statements ................................................................................. 2

        D.      Lay Opinions Are Proper for Declarations of Former Employees ..................... 2

III.    THE CORINNE SOMMER DECLARATION IS PROPER AND SHOULD
        NOT BE STRICKEN .................................................................................... 3

        A.      Background ......................................................................................... 3

        B.      Sommer Testified She Was Fired for Serving as a Military Reservist ............... 4

        C.      Sommer Worked with Plaintiff's Counsel to Prepare Her Declaration .............. 4

        D.      Sommer Confirmed the Statements Made In Her Declaration ........................... 4

IV.     THE JASON NICHOLAS DECLARATION IS PROPER AND SHOULD
        NOT BE STRICKEN .................................................................................... 9

        A.      Background ......................................................................................... 9

        B.      Personal Knowledge ......................................................................... 10

        C.      Nicholas Confirmed the Statements Made In His Declaration ......................... 10

V.      THE CHERYL DONNELLY DECLARATION IS PROPER AND SHOULD
        NOT BE STRICKEN .................................................................................. 14

        A.      Background ....................................................................................... 14

        B.      Donnelly Confirmed the Statements Made In Her Declaration ........................ 15

VI.     THE RONALD SCHNACKENBERG DECLARATION IS PROPER AND
        SHOULD NOT BE STRICKEN .................................................................. 17

        A.      Background ....................................................................................... 17

        B.      Schnackenberg Confirmed the Statements Made In His Declaration ............... 17

VII.    CONCLUSION ........................................................................................... 20

ZELDES & HAEGGQUIST, LLP

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Casida v. Sears Holdings Corp.*,
    No. 1:11-CV-01052 AWI JLT, 2012 WL 3260423
    (E.D. Cal. August 8, 2012) ................................................................. 1, 20

*Evans v. IAC/Interactive Corp.*,
    244 F.R.D. 568 (C.D. Cal. 2007) ........................................................ 2

*Fresenius Medical Care Holdings, Inc. v. Baxter International, Inc.*,
    No. C 03-1431, 2006 WL 1330000 (N.D. Cal. May 15, 2006) ............................ 2

*Kennedy v. Allied Mutual Ins. Co.*,
    952 F.2d 262 (9th Cir. 1991) ............................................................ 2

*Los Angeles Times Communications, LLC v. Department of Army*,
    442 F. Supp. 2d 880 (C.D. Cal. 2006) ..................................................... 2-3, 21

*Marlo v. United Parcel Service, Inc.*,
    639 F.3d 942 (9th Cir. 2011) ............................................................ 1-2

*Puffer v. Allstate Ins., Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009) ......................................................... 3

**STATUTES, RULES & REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23 ............................................................................... 2

ZELDES & HAEGGQUIST, LLP

## I.    INTRODUCTION

Plaintiffs submitted the declarations of four Trump University former employees in support of their motion for class certification – Ronald Schnackenberg, Corinne Sommer, Jason Nicholas, and Cheryl Donnelly.  Defendants now move to strike these declarations, purportedly on three grounds: (1) that the former employees recanted most of their statements at their depositions; (2) that the former employees lacked foundation or personal knowledge for their statements; and (3) that the declarations contained improper "lay opinions."  First, none of Defendants' grounds are legitimate legal bases for striking the declarations.  Second, this is entirely not true.  The former employees did not recant most of their statements or lack foundation for their statements.  As set forth in the charts below that compare each declarant's declaration statements with his or her deposition testimony, each former Trump University employee confirmed the testimony in his or her declaration.

## II.    THERE IS NO LEGAL OR FACTUAL BASIS FOR STRIKING THESE DECLARATIONS

### A.    The Former Employees Confirmed the Majority of Their Declaration Statements During Their Depositions

Contrary to Defendants' assertions, the former employees did not recant "most of their statements."  In fact, they confirmed most of the statements they made in their declarations, as set forth in the sections below specifically addressing Nicholas, Sommer, Donnelly, and Schnackenberg. However, even if their deposition testimony contradicts certain statements in their declaration, this is not grounds for striking the declarations.

### B.    It Is Not Proper to Strike a Declaration Merely Because It Contradicts Certain Deposition Testimony

Where deposition testimony contradicts prior declarations, there is no authority which supports the proposition that the declarations must be stricken.  *Casida v. Sears Holdings Corp.*, No. 1:11-CV-01052 AWI JLT, 2012 WL 3260423, at *4 (E.D. Cal. August 8, 2012).  Furthermore, "[c]ontradictions in the testimony affect the weight given to the evidence, rather than its admissibility, and at the class certification stage the Court is unable to weigh the evidence." *Casida*, 2012 WL 3260423, at *4.  *See also Marlo v. United Parcel Service, Inc.*,

ZELDES & HAEGGQUIST, LLP

639 F.3d 942, 949 (9th Cir. 2011) (characterizing the district court's statement that it "could not 'weigh the evidence'" when evaluating the requirements of Fed. R. Civ. P. Rule 23 as "a correct statement of law"); *Fresenius Medical Care Holdings, Inc. v. Baxter International, Inc.*, No. C 03-1431 SBA, 2006 WL 1330000, at *6 (N.D. Cal. May 15, 2006) (holding that "before a district court can disregard contradictory testimony, the court must make a specific finding of fact that the testimony is a 'sham'").   The two cases cited by Defendants are distinguishable.[1]

### C.   The Former Employees Had Personal Knowledge and Foundation for Their Statements

Contrary to Defendants' assertions, the former employees did have personal knowledge and foundation for their statements, as set forth in the below sections specifically addressing Nicholas, Sommer, Donnelly and Schnackenberg.   They were each employed by Trump University and their statements were made based on their experience working for Trump University.

### D.   Lay Opinions Are Proper for Declarations of Former Employees

While Defendants seek to strike the declarations of former employees on the grounds that they provide "improper lay opinions," this is not a legally valid ground to strike a declaration.   "[L]ay witnesses can testify to inferences or opinions that are drawn from a series of personal observations over time." *Los Angeles Times Communications, LLC v. Department of Army*, 442 F. Supp. 2d 880, 887 (C.D. Cal. 2006) (internal citations omitted). Moreover, "courts may allow lay witnesses to testify to opinions based on a combination of their personal observations regarding the incident in question and their specialized knowledge obtained through their vocation." *Id.*   These former Trump University employees are not purporting to

---

[1]   *See Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (finding that a party opposing a summary judgment motion, "cannot create an issue of fact by an affidavit contradicting his ***prior*** deposition testimony."   *Id.* at 266 (emphasis added)); *Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 571 (C.D. Cal. 2007) (finding that later deposition testimony would control over contradictory, cut-and-pasted declarations prepared by counsel where the majority of the named plaintiffs admitted in their depositions that they did not or could not recall reading the FAQs, Terms of Use or Privacy Policy, and thus, were not misled by these documents).

ZELDES & HAEGGQUIST, LLP

give "expert" opinions.  They are merely providing facts and information based on their experiences in working for Trump University. The one case cited by Defendants, *Puffer v. Allstate Ins., Co.*, 255 F.R.D. 450, 467-68 (N.D. Ill. 2009), a sex discrimination case, is inapposite. Contrary to Defendants' assertion, the court in that case found that the declarations were of little probative value because they referred to pre-class period events, were vague as to timeframe, or did not identify specific instances of discrimination. ***Not*** because they included improper lay opinions. *See id.* at 467.

## III.   THE CORINNE SOMMER DECLARATION IS PROPER AND SHOULD NOT BE STRICKEN

### A.   Background

Corinne Sommer graduated from the University of Connecticut in 2000 with a degree in Cultural Photography.  Eck Decl., Ex. 1, Sommer Depo. Tr. at 18:14-23.[2]  After pursuing photography for a year, Sommer served in the U.S. Army for four years, and was deployed to Iraq as a liaison for the U.S. and an Iraq Arabic translator.  Sommer Depo. Tr. at 18:24-19:24. Sommer then served as an Army Reservist for four years, from 2004-2008.  Sommer Depo. Tr. at 20:13-16.

Sommer joined Trump University in May 2007 as the Manager of Events Department for Trump University, a position she held until October 2007, at Trump University's main office at 40 Wall Street.  Sommer Decl., ¶2.  She was in charge of all seminars, or "live events" during the time she was at Trump, which took place nearly every week in different areas of the country.  *Id.* at ¶3.  When asked why she decided to get involved in this case, Sommer explained: "… ***I don't agree with the way the company was run***…. ***I started realizing it was a Ponzi scheme***."  Sommer Depo. Tr. at 60:6-12.  She explained that by "Ponzi scheme," she meant that "***it was a constant up-sell to the next course.  You never got***

---

[2]      "Eck Decl." refers to the Declaration of Amber L. Eck in Support of Opposition to Defendants' Motion to Strike Declarations of Schnackenberg, Sommer, Nicholas, and Donnelly, filed herewith.  "Sommer Depo. Tr." refers to the deposition transcript of Corinne A. Sommer, taken November 7, 2012.  "Sommer Decl." refers to the Declaration of Corinne Sommer in Support of Plaintiffs' Motion for Class Certification, which was attached to the Declaration of Amber L. Eck as Ex. 11 filed Under Seal on September 24, 2012 (Dkt. No. 122-3).

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

1  *the information that you had paid for*.  *You were always going to the next course*." Sommer

2  Depo. Tr. at 60:21-61:3.

3  **B.    Sommer Testified She Was Fired for Serving as a Military Reservist**

4  Sommer testified that: "I was fired because I was in the military," that she sued Trump

5  University and "won," meaning that "they settled with me. They found that there was probable

6  cause enough to settle." Sommer Depo. Tr. at 9:18-10:11. It was not due to poor performance.

7  Sommer Depo. Tr. at 14:17-15:3.  In fact, ***David Highbloom told Sommer that "it was a***

8  ***problem that [she] was in the military***." Sommer Depo. Tr. at 13:14-14:10. "He complained

9  when I would have to take days off to do my military service because I had to be at events on

10  the weekends …." Sommer Depo. Tr. at 13:18-21. To fulfill her reservist obligations, she had

11  to take weekdays off, because she was working every weekend for Trump University.

12  Sommer Depo. Tr. at 13:22-14:10.

13  **C.    Sommer Worked with Plaintiff's Counsel to Prepare Her Declaration**

14  Defendants' contention that the statements in Sommer's declaration were not "her

15  words" is disingenuous.  Sommer testified that she has spoken to Plaintiffs' counsel Amber

16  Eck approximately 20 to 30 times by phone over the past 2-1/2 years, and that although she

17  did not physically type up her declaration, "***I worked with Amber to prepare it***." Sommer

18  Depo. Tr. at 9:7-11; 15:4-9; 239:4-7.

19  **D.    Sommer Confirmed the Statements Made In Her Declaration**

20  Defendants seek to strike certain sentences from 12 paragraphs in Sommer's

21  declaration (¶¶2, 4-14) contending that during her deposition "Ms. Sommer retracted the

22  majority of the material statements in her declaration," and "had no basis or personal

23  knowledge for the bulk of her statements."  *See* Defs' Motion to Strike at 6, 7 seeking to strike

24  ¶¶2, 4-14); Schneider Decl., Exs. 3-4. [3]  This is simply not true.

25

26  [3]    "Defs' Motion to Strike" refers to Defendants' Memorandum in Support of Motion to

27  Strike Declarations of Schnackenberg, Sommer, Nicholas and Donnelly, filed November 30, 2012 (Dkt. No. 138-2).  "Schneider Decl." refers to the Declaration of David K. Schneider in

28  Support of Defendants' Motion to Strike Declarations of Schnackenberg, Sommer, Nicholas and Donnelly, filed November 30, 2012 (Dkt. No. 138-3).

In fact, as set forth in the chart below, Sommer confirmed that: (1) she worked at Trump University's headquarters at 40 Wall Street; (2) Trump University instructors tried to up-sell consumers to the next course using high-pressure sales tactics and saying they had to buy the next course to get the next bit of information; (3) the sales team and David Stamper (who had a background in jewelry) were not experienced in real estate; (4) Trump University instructors and mentors were not hand-picked by Donald Trump, and in fact complained to her that they had never met Donald Trump; (5) Trump University pressured students to call their credit cards, increase their limits and "max out" their credit cards, saying they would make the money back; (6) Trump University told students to open as many credit cards as they could to increase their credit score; (7) that when a homeless person came to a Trump University seminar, he could be sold a Trump University seminar if he had a credit card; (8) Trump University used PowerPoint presentations which served like a script for its seminars; (9) Trump University did not provide one year of mentoring; (10) she talked to students who complained about Trump University mentors who were not returning students' calls; (11) Trump University programs did not teach Donald Trump's real estate secrets, but mostly the presenters' real estate tips; (12) Donald Trump did not appear to have much to do with Trump University other than provide his name; (13) many students complained to Sommer that they were dissatisfied with Trump University; and (14) Trump University had a "huge problem" of mentors not returning students' phone calls.

| Sommer Declaration | Sommer Deposition Transcript |
|---|---|
| ¶2: "**I worked at Trump University's headquarters located at 40 Wall Street,** New York, New York, which is also where Trump Organization is located." | **Sommer confirmed that she worked at Trump University's headquarters, located at 40 Wall St.,** New York, New York, but stated that she did not know if Trump Organization was located there.  Tr. at 39:22-24; 240:8-18.<br><br>**The location of Trump Organization** (725 5th Ave., New York, NY) **is not material, as it is not disputed, nor at issue** in this case. |
| ¶4: "In my experience, the **focus of Trump University was on making sales rather than on providing quality educational services**.  Trump University would lure consumers into the | When asked for the basis for her statement that "the focus of Trump University was on **making sales rather than on providing real estate information**, Sommer explained it was based on the "hard selling" she had discussed earlier where presenters "would pull the people to the back [of the room] and say, "**Run up your credit cards.** |

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

| Sommer Declaration | Sommer Deposition Transcript |
|---|---|
| initial free course based upon the name and reputation of Donald Trump, and then once they were there, Trump University personnel would try to **up-sell consumers to the next course using high-pressure sales tactics**. Far from providing a 'complete real estate education,' as advertised, Trump University personnel **only provided enough information to get students to sign up for the next seminar** or program. I recall instances in which consumers had paid for a class to learn how to make money investing in real estate, ask for more information, and the teacher would say, '**if you want to get that, you have to buy the next package.**'" | But it, buy it, buy it." Tr. at 243:5-15.<br><br>She described the "hard-sell" as salespeople telling consumers: "**Max out your credit card. You'll make it back**." Tr. at 73:19-23. She thought this was "**high pressure sales**" tactics to say: "**Max out your credit cards. You'll make it back**." Tr. at 124:16-22.<br><br>In regard to not providing a complete real estate education, to get people to sign up for the next seminar, Sommer explained that "**you had to buy the next program to get the next bit of information**." Tr. at 243:23-25. If someone asked a question, **instructors would give a "yes or no answer, but they'd say for further detail … you have to … buy the next course …** that's what the next course talks about and it's only $1,495." Tr. at 245:5-22.<br><br>The **presenters "were always trying to up-sell to the next course … the presenters work on commission**…. [S]o there's always the incentive for them to sell." Tr. at 246:4-10. |
| ¶5: "During the time that I was employed at Trump University, **many of the speakers, instructors, and mentors lacked real estate experience**. Many of them did not even own houses, and had no experience buying or selling real estate. For example, I recall that **David Stamper had no real estate experience; he was a jewelry salesman**." | Sommer confirmed that **David Stamper "didn't have any real estate experience," that he was a "jewelry salesman**." Tr. at 57:22-58:4.<br><br>In addition, Sommer testified that **not all of the sales team members had real estate experience**. Tr. at 68:11-69:6.<br><br>**David Stamper told Sommer that he would be speaking at an upcoming Trump University event**, but she does not know if "he ended up speaking." Tr. 258:19-24. |
| ¶6: "Trump University **instructors and mentors were not hand-picked by Donald Trump**. I believe that in many instances **Donald Trump had neither met the instructors or mentors**, nor did he know who they were." | Sommer confirmed that "**I was told there was no involvement with Donald Trump selecting any of these people** besides maybe Gary Eldred. It was all Mark Dove and Denise [Devoe] came in I believe through Trump Institute." Tr. at 84:19-23.<br><br>She explained: "My opinion is based on the fact that **the presenters … and the sales team would complain to me that they had never met Donald Trump**." Tr. at 85:10-13.<br><br>She believed instructors and mentors were **not hand-picked by Donald Trump because she had "conversations with them that they'd never met him**…." Tr. at 260:11-15. She reiterated that "**everybody told me that they'd never met him**." Tr. at 261:25-262:2. |

ZELDES & HAEGGQUIST, LLP

| Sommer Declaration | Sommer Deposition Transcript |
|---|---|
| ¶7: "I am aware that instructors were trained to, and witnessed them, **asking students during the $1,500 seminars to call their credit card companies and raise their credit limits** two, three or four times so that they would be able to invest in real estate.  They would **tell students to max out their credit card because they would make their money back**…." | Sommer confirmed that during the seminars: "**I heard them say, 'Go outside, we're going to take a break and call your credit card company and raise your credit limit**.  See how much you can raise your credit limit.'"  Tr. at 271:16-19.<br><br>"**They'd say, 'You're going to make your money back**.'"  Tr. at 272:20-24.<br><br>Trump University told students: "**Max out your credit card.  You'll make it back**."  Tr. at 73:19-23.  She thought this was "high pressure sales" tactics to say: "**Max out your credit cards**.  You'll make it back."  Tr. at 124:16-22. |
| ¶8: "I recall that some **consumers had showed up who were homeless and could not afford the seminars**, yet I overheard Trump University representatives telling them, 'it's ok; just max out your credit card.'  I also witnessed representatives instructing consumers to charge the course to multiple credit cards if they lacked a high enough limit on one credit card to pay for the seminar.  In fact, I recall representatives **telling consumers to open up as many credit cards as they could to increase their credit score**." | Sommer confirmed that Trump University told students: "**Max out your credit card.  You'll make it back**."  Tr. at 73:19-23.  She thought this was "high pressure sales" tactics to say: "**Max out your credit cards.  You'll make it back**."  Tr. at 124:16-22.<br><br>Sommer testified that "when we were in Maryland, there was a homeless guy sleeping in the back of the class," and that "if they had a credit card, they could sign up," but that she **did not remember if Trump University tried to sell anything to this homeless person**.  Tr. at 74:20-78:4.<br><br>Sommer did testify that instructors told students to "**open as many [credit cards] as you can because you'll get a higher credit score**."  Tr. at 73:4-12. |
| ¶9: "Trump University used a **standardized PowerPoint presentation and scripts** for all of its seminars, so that the seminars were standardized and substantially the same across the country regardless of the particular speaker or location. A few speakers had their own, but those who did not were given presentations." | Although Trump University ultimately had uniform PowerPoint presentations, at the time Sommer was at Trump University in 2007, they were still in the process of creating the PowerPoint.<br><br>Sommer testified that some speakers, like Denise Devoe, had their own PowerPoint presentation and some did not.  **If speakers had their own PowerPoint, Trump** "put the **Trump branding on it**."  **If they did not, they were given a Trump PowerPoint**, such as Denise Devoe's.  Tr. at 102:19-104:23.<br><br>Sommer stated that the **PowerPoint was like "sort of a script, because you're being told what to present on**."  Tr. at 280:23-281:3. |
| ¶10: "**Trump University did not provide one-year of real estate mentoring** as promised to the public." | Sommer testified that she **did not know if mentors provided their "full one-year obligation**."  Tr. at 282:16-17. |

ZELDES & HAEGGQUIST, LLP

| Sommer Declaration | Sommer Deposition Transcript |
|---|---|
| "As a result, I recall that **mentors rarely returned phone calls from students** or spent much time talking with them. **I received calls from many angry students telling me that they had been trying to reach their mentor to no avail**."

"My understanding is that **mentors were paid up front on commission before the student completed their mentorship**. Because of the pay structure, mentors had no incentive to call consumers back or work with them once the consumer signed up and the mentor was paid. The focus of the mentors seemed to be on getting new sales and new commissions." | However, Sommer did testify that **she received phone calls from more than five students who were unhappy with the program**. "**A lot of them** ... **were complaining about the mentorship**." Tr. at 94:15-95:12.

Most of these people had "purchased the $35,000…package and they **couldn't reach their mentors**." Tr. at 95:9-12. She confirmed that **most of the complaint calls she received "were about the mentorship program" and "difficulty reaching their mentor**." Tr. at 97:22-98:23.

Sommer stated: "I don't know if they specifically said 'I'm angry,' but **they said, 'I can't reach my mentor. I've been trying to call and no one's calling me back**.'" Tr. at 286:25-287:12.

As for payment of mentors, Sommer testified that "**there was commission paid and I know that it was before the mentorship was completed**." Tr. at 283:2-5.

In regard to defense counsel's suggestion that **mentors would have incentive to call students back to get more students, Sommer stated: "That's not necessarily true**. This wasn't really a word-of-mouth business." Tr. at 283:18-19. |
| ¶11: "**I do not believe that Trump University taught Donald Trump's investing 'secrets.'**" Donald Trump came from a wealthy family and had resources at his disposal to purchase real estate – that is the secret – one that the average consumer could not replicate." | When asked what Donald Trump's investing secrets were, Sommer said she did not know. When asked how she knew if Trump University taught them, she said "**I don't think Trump University really had much to do with Donald Trump besides his name**." Tr. at 289:15-24.

When asked again how she would know whether Trump University taught Donald Trump's investing secrets if she did not know what they were, she responded: "… **I don't think this company really had much to do with Donald Trump besides his name, so I wouldn't say they were necessarily his investing secrets. I think it was more of whatever the presenters were presenting, it was more of their tips**." Tr. at 290:4-291:6. |
| ¶12: "At the seminars I attended, Trump University presenters **pressured consumers into purchasing the Elite program** because they said that **students would make their money back in the first deal** or two." | Sommer confirmed three times that Trump University told students: "**Max out your credit card. You'll make it back**." Tr. at 73:19-23. She thought this was "high pressure sales" tactics to say: "**Max out your credit cards. You'll make it back**." Tr. at 124:16-22. "**They'd say, 'You're going to make your money back**.'" Tr. at 272:23-24.

When asked specifically about this paragraph in her declaration, she affirmed that **Trump University pressured consumers through the "high-[pressure] sales techniques** that they used." Tr. at 294:4-7. |

| Sommer Declaration | Sommer Deposition Transcript |
|---|---|
| ¶13: "In the time that I worked for Trump University, **I only met Donald Trump once.** He was not an active presence there; though he occasionally went over numbers with Michael Sexton. Based upon my interaction with Donald Trump, **he seemed only concerned with Trump University's revenues** and profits." | Sommer confirmed in deposition that **she met Donald Trump only once.** Tr. 33:6-7. **He told her that "This [live events] is the only department actually making money,"** (Tr. 33:9-13) and that Trump University was going to put Trump Institute out of business, **which was the basis for her statement that he seemed only interested in revenues** and profits. Tr. at 294:21-295:7.<br><br>**Instructors, presenters and mentors all "told me that they'd never met Donald Trump."** Tr. 86:15-19. **"I don't think Trump University really had much to do with Donald Trump besides his name."** Tr. at 289:22-24. |
| ¶14: "In my experience, **many students were dissatisfied with Trump University.** " | Sommer testified that before she left Trump University, "**I know there was a huge issue**" of mentors "**not getting back**" to their mentees and the "[students] would call me…." Tr. at 306:5-12  Sommer received "**multiple calls from multiple students.**" Tr. 309:4-5.<br><br>These students "**called me to complain about the mentorship program**…." Tr. 295:16-18. She believed they were "**dissatisfied when they're calling [me] multiple times.**" Tr. 296:2-4. |

## IV.   THE JASON NICHOLAS DECLARATION IS PROPER AND SHOULD NOT BE STRICKEN

### A.   Background

Jason Nicholas is 33 years old.  He attended community college in Florida, worked to help put his wife though college at the University of Florida, then moved with her to New York City.  Eck Decl., Ex. 2, Nicholas Depo. Tr. at 20:9-22:2.[4]  He worked for Trump University as a salesman in their main office at 40 Wall Street from May through October, 2007. Nicholas Decl., ¶2.  He is now a sports agent, and has his own company representing male basketball players overseas.  Nicholas Depo. Tr. at 21:1-16.  When asked why he took the time to voluntarily submit this declaration and sit for deposition in a case where he does not have a stake, he responded that he had "some knowledge" about the issues in the case, and:

---

[4]      "Nicholas Depo. Tr." refers to the deposition transcript of Jason Nicholas, taken November 8, 2012.  "Nicholas Decl." refers to the Declaration of Jason Nicholas in Support of Plaintiffs' Motion for Class Certification, which was attached to the Declaration of Amber L. Eck as Ex. 9, filed Under Seal on September 24, 2012 (Dkt. No. 122-3).

ZELDES & HAEGGQUIST, LLP

1   "I just feel a moral obligation when called upon to act.  That's all."  Nicholas Depo. Tr. at
2   43:4-10.

3   **B.    Personal Knowledge**

4   Nicholas knew what was being taught at the live events, because Trump University
5   told the salespeople this at their weekly sales meetings: "in sales meetings we were educated
6   on what was being taught and said." Nicholas Depo. Tr. at 153:6-8.  He explained: "I am
7   aware of the summary of what was taught at the events, that it was provided to us …."
8   Nicholas Depo. Tr. at 155:23-156:2.  Also, due to the layout of the sales floor, and the close
9   proximity of the cubicles, he overheard everything that was being said.  Nicholas Depo. Tr.
10  298:4-301:12.

11  Trump University's sole remaining employee, Mark Covais, confirmed in his
12  deposition that the salespeople regularly overheard each other's conversations due to their
13  close proximity.  Covais stated that, as program director, he sat in the general vicinity of the
14  salespeople and listened to them making calls to potential students.  Eck Decl., Ex. 3, Covais
15  Depo. Tr.[5] at 89:24-90:2; 94:2-13.  The salespeople all worked together in a "big cubicle," and
16  Covais, as program director, sat in the same cubicle area as the "setter" salespeople, like
17  Nicholas – "literally this close" (gesturing an arm's length).  *Id.* at 90:5; 93:11-13.  Covais
18  stated that "when you sat with your setters, it was like this close; I mean, literally.… You
19  could touch them."  It was like sitting at the same table, you could spin your chair around and
20  "chitchat."  *Id.* at 92:23-94:2.

21  **C.    Nicholas Confirmed the Statements Made In His Declaration**

22  Defendants contend that "Mr. Nicholas retracted most of the material statements in his
23  declaration, or admitted he had no personal knowledge of them, or both."  Defs' Motion to
24  Strike at 6; Schneider Decl., Exs. 5-6.  That is simply not true.  To begin with, Nicholas has 25
25  paragraphs in his declaration, but Defendants challenge only ten of them (Nicholas Decl., ¶¶6,
26  8, 12-15, 21-24).  At a minimum, the 15 paragraphs that Defendants do not challenge should

ZELDES & HAEGGQUIST, LLP

27
28  _____
[5]     "Covais Depo. Tr." refers to the deposition transcript of Mark Covais, taken January
17, 2013.

not be stricken.  However, even in regard to these ten paragraphs, Nicholas did confirm these statements at his deposition and sufficiently demonstrated his basis for and knowledge of the statements.  This is set forth in the chart below, which briefly summarizes the ten paragraphs that Defendants challenge, and Nicholas' deposition testimony confirming the statements.

| Nicholas Declaration | Nicholas Deposition Transcript |
|---|---|
| ¶6: "Trump University salespeople, including me, **uniformly told consumers, from the script** that they would 'work with **Donald Trump's real estate experts**' and that these instructors were  '**experts in today's real estate** world and will teach all of the non-traditional or unconventional ways of buying and selling real estate.'"<br><br>This was not true.  **The Trump University instructors and mentors were a joke**.<br><br>**Most of them were not experts** in real estate and [were] **not experience[d] in the real estate techniques** they were teaching. | **The script Nicholas was given says exactly what Nicholas stated in his declaration**.  *See* Tr. at Ex. 2 (TU-NICHOLAS000001-2).<br><br>Nicholas explained that when he said they were a "joke" and that they were not "experts" he meant that Trump University "**made us portray the image that these people eat, slept and lived in the Trump Towers with Mr. Trump, and that they were his right-hand man** and they were going to help you, but some of these people … didn't actually live that lifestyle.  **They're just random people hired by Mr. Sexton** or whoever to come in because they have a **little bit of real estate experience or they may have done a couple of properties**.  Now all of sudden they're experts.  That's what I mean it's a joke." Tr. at 159:8-22.<br><br>Nicholas met an instructor who came into the Trump office (maybe Steve Goff or Chris Goff) who said he was new to Trump University, "had no real relationship with Mr. Trump," and had flipped a couple of properties, but he was **"by no means … elite or an expert**," at least "**not consistent with what … we're pitching on a script to people**." Tr. at 162:24-163:15; 164:22-25; 165:8-12; 176:7-11; 183:8-12.<br><br>Nicholas said that Goff's experience was "**Not to the level of what we're painting a picture of.  It's minimum** compared to what we're portraying.  We're portraying that these people are **experts walking around with Mr. Trump … that they're working side by side with him,** and this person does **not match up to that criteria**." Tr. at 165:15-21; 166:8-17.  "**[T]his guy is a joke … how is this guy even considered an expert**." Tr. 174:23-175:5.<br><br>Nicholas stated that he had **personal knowledge** about Goff's background and experience because he was in the office for three days, and Nicholas "gain[ed] knowledge" **from conversations of the sales staff with him**. Tr. at 167:19-168:3.  He came and sat with them in the cubicles and they talked and asked questions about his expertise.  Tr. at 168:9-16. |

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

| Nicholas Declaration | Nicholas Deposition Transcript |
|---|---|
| ¶8: "… Manager Paul Quintal, who was in charge of the entire Trump University sales team and live events, **said he had an MBA, when actually he did not have an MBA**." | Nicholas testified that in fact, fellow salesperson **Michael Aaron told him that Quintal represented on LinkedIn that he had an MBA, when in fact he might not have an MBA**. Tr. 35:15-36:10.  But Nicholas said he did not know or care whether Quintal actually had an MBA or not.  Tr. 37:2-5. |
| ¶12: Trump University promised in its script to teach **Donald Trump's real estate investing secrets**. "This was not true.  **Trump University did not teach Donald Trump's real estate investment secrets** or how Donald Trump found, evaluated and purchased properties. There were no big secrets.…" | **The script Nicholas was given says exactly what Nicholas stated in his declaration**.  *See* Tr. Ex. 2 (TU-NICHOLAS000001-2).  Nicholas testified that "the stuff that they're teaching" **was not Donald Trump's 'big secrets'** – it was the **same stuff that you would see in "another competitor's real estate book or** [if you] went to **Barnes & Noble**…."  Tr. 150:18-151:8. |
| ¶13: "Trump University salespeople, including me, uniformly told consumers, from the script, that they would be **working with Donald Trump's 'right-hand' man**, or someone **'hand-picked by Donald Trump'** to help them look at properties, pick them and buy them.  This was not true.  The **mentors and instructors were not Donald Trump's 'right-hand men' or hand-picked by Donald Trump**." | Nicholas testified that the instructors and mentors were **not "Donald Trump's right-hand man**," or hand-picked by Donald Trump. "**They're just random people hired by Mr. Sexton** …." Tr. at 159:8-22.  Goff admitted to Nicholas that he "had **no real relationship with Donald Trump**."  Tr. at 162:24-163:15.  Nicholas said the salespeople portrayed the instructors and mentors as "**experts walking around with Mr. Trump**…. [T]hat they're working side by side with him,** and [Goff did] **not match up to that criteria**."  Tr. at 165:15-21; 166:8-17.  Nicholas had **personal knowledge** of this from his conversations with Goff over his three days in the office. Tr. at 167:19-168:16, and from conversations with the sales team, the program director and the sales manager. Tr. at 220:15-20. |
| ¶14: "**Donald Trump was not actively in Trump University** as far as I could tell.  In the time that I worked at Trump University, **I only saw Donald Trump come in one time**, **for five to ten minutes**, to see Michael Sexton; he didn't talk with or interact with anyone else, as far as I could see, and his **body guard** wouldn't even permit Trump University employees to try to shake his hand." | This is exactly what Nicholas testified to: "**From the time that I was there…he came in one time**."  "**He was there for five, ten minutes** and walked out and left.  **That was his involvement from our standpoint**."  Tr. at 222:24-223:6.  "**We weren't allowed to approach him because he has bodyguards and we weren't allowed to shake his hand** or do anything like that."  Tr. at 224:7-17.  "An employee attempted to get up out of the cubicle and say 'Oh, hey, Mr. Trump.' The body guard stepped in and was like … 'Please don't ….'"  Tr. at 224:7-17. |
| ¶15: "Trump University salespeople, including me, uniformly told consumers, from the | The script says precisely this.  *See* Tr. at Ex. 2 (TU-NICHOLAS 1-2). |

ZELDES & HAEGGQUIST, LLP

| Nicholas Declaration | Nicholas Deposition Transcript |
|---|---|
| script, that: '**Instructors will be holding your hand**, showing you the way.'" This was not true. **The instructors and mentors ignored students and stopped returning calls** shortly after they were paid." | Nicholas confirms this: "I know that **complaints [about instructors ignoring students and not returning calls] were vivid and it happened often**. As **instructors** came on board, they **left, they were on vacation, they couldn't be reached … they quit**…. It was common that … **once or twice a week … these types of calls would come in**. Whether I fielded it, I mean everybody knew about it." Tr. at 226:4-19. "I know there was **definitely a gap where calls were not returned or ignored**, absolutely." Tr. at 229:6-12.<br><br>He has **personal knowledge** of this because he personally handled one to two calls, and also, "it's a very close knit floor … not a lot of space, so everybody knows everybody's business. So we know the results without actually being the person to pick up the phone." Tr. at 228:3-15. |
| ¶21: "Trump University used **testimonials that were false, misleading and fabricated**. Testimonials were not expected results and were not realistic." | Nicholas confirmed that **Trump University used testimonials that were false, misleading or fabricated**, based on what Mark Covais told him. Tr. at 239:16-22. "[T]hey're **false**. **They're fabricated**. **They're embellished**." Tr. at 240:18-241:5.<br><br>He also stated that it was "**common knowledge" that the testimonials were not expected results and were not realistic**. Tr. at 239:23-240:2.<br><br>His **personal knowledge** of this was based on consumer complaints on "**rip-off reports, people calling and complaining** … over a course of five months … **getting negative feedback,** so therefore some of the results that people are … expect[ing] [are] **false** … **not real**." Tr. at 240:18-241:5. |
| ¶22: "**Trump University did not provide one year of mentoring** as promised. In fact, there was so much fluctuation in mentors, people would come and go like **revolving door**, that **most mentors were not around long**, and Trump University **didn't even attempt to assign students new mentors** unless they complained." | Nicholas confirmed this. He said that Trump University "was a **revolving door**. People would **come and go. Mentors would stick or not stick**…. **Coaches or mentors** … **wouldn't return calls** and [students] want to know why. They're no longer here or they're no longer active." Tr. at 250:2-8.<br><br>**Personal knowledge** – Nicholas knew that students were not being provided new mentors from "reports from customer service, other salespeople." Tr. at 252:22-253:4. |
| ¶23: "**Trump University instructors told students that they were guaranteed to make their money back in their first deal or two,** even though this rarely, if ever, happened. | Nicholas confirmed this. He said that "**the script was written**" to tell students they would make their **money back** quickly. That "this is not going to be a long process. These guys are skilled and you're going to **make your money back on the first** … two or three deals. That's how it was sold and that's how |

ZELDES & HAEGGQUIST, LLP

| Nicholas Declaration | Nicholas Deposition Transcript |
|---|---|
| **Instructors told consumers to do whatever it took to come up with the money to pay for the course**…. They told students that if they paid for the $35,000 course, they would have the skills and information necessary to make money in real estate, and a mentor to walk them through it step by step. **That was a bunch of baloney, because you were on your own**…." | **we were instructed to sell …."** Tr. at 253:8-21. <br><br> When Mr. Schneider asked: "Did you ever hear an instructor tell a student that they were **guaranteed to make their money back in the first deal or two**?" Nicholas answered: "**It was part of their sales pitch, yes**." Tr. 253:24-254:4. <br><br> **Personal knowledge** –Nicholas heard instructors talk to students and make these representations on various conference calls. Tr. 255-262:7. |
| ¶24: "The **whole focus of Trump University was on selling, not on teaching information**." | Nicholas was hired as "an **aggressive salesperson to sell and up-sell** [Trump University's] products and services." Tr. at 26:5-12. <br><br> Nicholas stated numerous times that Trump University was focused on the **sell and upsell** (Tr. at 68:6-17, 87:19-88:3, 123:2-17). "The **whole purpose of a free live event is to … pitch them to another … live event**." Tr. at 123:13-17. <br><br> Customers complained to Nicholas that Trump University was a "**big marketing scam**" (Tr. at 235:14-236:14), and Nicholas stated that **"A lot of people felt cheated or [disappointed] of the lack of information** that was advertised that actually came out." Tr. at 123:2-9. "[T]hey go to the live events and they're not happy. The whole time they're there, **they're getting up-selled to go to … a more exclusive and smaller live event**…. And they're **always complaining that**, 'I'm paying money and **I'm getting shortchanged on the information, and it's being withheld from me to come to another live event** and pay more money…." Tr. at 233:8-21. <br><br> Nicholas estimated that **75% of people who paid for seminars had negative feedback: "I paid money but I still didn't walk away with the information that I thought I was going to receive** on the way out." Tr. at 125:2-8. |

## V.   THE CHERYL DONNELLY DECLARATION IS PROPER AND SHOULD NOT BE STRICKEN

### A.   Background

Cheryl Donnelly was the Senior Marketing Manager for Trump University from May 2007 through October 2007 at Trump University's main office at 40 Wall Street. Donnelly

Decl., ¶2.[6] She created testimonials of former Trump University students and edited the *Trump Advantage* magazine. *Id.* at ¶¶2-3. Donnelly stated that some of the testimonials used by Trump University were not testimonials that Trump University obtained directly, but were from a "third party vendor that specialized in creating success stories," who "called former students [to] come up with snippets of quotes." *Id.* at ¶5. She testified that her declaration had been prepared by counsel "based on our conversations, and I revised it and submitted it to her …." Eck Decl., Ex. 4, Donnelly Depo. Tr. at 8:3-6.

### B.   Donnelly Confirmed the Statements Made In Her Declaration

Out of the seven paragraphs in Donnelly's Declaration, Defendants seek to strike only two: ¶¶6, 7 (and in fact, only two of the five sentences in ¶6 and only 11 words out of one of the three sentences in ¶7). *See* Defs' Motion to Strike at 7; Schneider Decl., Exs. 7-8. Defendants contend that "Ms. Donnelly rectracted … statements [that]: (1) some testimonials were misleading; and (2) instructors were not chosen by Donald Trump." Defs' Motion to Strike at 6. This is not true.

In fact, as set forth in the chart below, Donnelly confirmed that: (1) she could not confirm that all Trump University testimonials were accurate, and (2) that instructors were not chosen by Donald Trump. In fact, ***Donnelly was instructed by Josef Katz or Michael Sexton that Trump University could no longer state in its advertising or marketing materials that experts were handpicked by Donald Trump, "because when you say handpicked, it's misleading to consumers*****."** *See* Donnelly Depo. Tr. at 209:17-210:6; Ex. 9 (TU-DONNELLY1211) (citing "Feedback on Flyer 4/23/07" which states "***We cannot say that the experts and gurus are handpicked by Donald***. This has been removed from our marketing efforts.").

| Donnelly Declaration | Donnelly Deposition Transcript |
| --- | --- |
| ¶6: "In my experience, **I cannot confirm that all of the testimonials** | Donnelly testified that: "**I cannot confirm that those stories [obtained by the third party vendor] were** |

---

[6]      "Donnelly Decl." refers to the Declaration of Cheryl Donnelly in Support of Plaintiffs' Motion for Class Certification, which was attached to the Declaration of Amber L. Eck as Ex. 8, filed Under Seal on September 24, 2012 (Dkt. No. 122-3). "Donnelly Depo. Tr." refers to the deposition transcript of Cheryl Donnelly, taken November 2, 2012.

ZELDES & HAEGGQUIST, LLP

| Donnelly Declaration | Donnelly Deposition Transcript |
|---|---|
| received from the other company **were substantiated**…." "**Some testimonials were misleading** because they stated a **student made money, when** in fact, after taking into account costs and expenses, **they did not make any profit** to date.  Other testimonials may have been true at the time they were made – such as the student expected to make money…." | **accurate**."  Tr. at 177:15-178:5. "The **testimonials I wrote I know were honest**. The **testimonials that were provided by a third-party vendor, I do not know**."  Tr. at 41:22-25. Donnelly stated that she **may have expressed concern to Michael Sexton that she did not know whether or not the testimonials were accurate**.  Tr. at 43:24-44:5. Michael Sexton "wanted numbers.  He wanted the million dollar story and they just were not there."  Tr. at 154:9-19. "**[N]obody had seen the success he wanted**."  Tr. at 155:4-17.  "So you can find somebody who is actually working the program, but **to say they're actually successful and making $100,000, those people weren't there**." Tr. at 173:1-8.  A testimonial that says "somebody's scheduled to make a net profit of X amount of dollars" might not take into account "**hard expenses**."  Tr. at 181:19-25. |
| **¶7**: "… To my knowledge, the **instructors were not chosen by Donald Trump**." | Donnelly confirmed that instructors were not chosen by Donald Trump, and in fact, **Donnelly was instructed by Josef Katz or Michael Sexton** that Trump University could **no longer state in its advertising or marketing materials that experts were handpicked by Donald Trump**. Tr. at 209:17-210:6; Ex. 9 (TU-DONNELLY1211) (citing "Feedback on Flyer 4/23/07" which states "**We cannot say that the experts and gurus are handpicked by Donald.  This has been removed from our marketing efforts**."). When asked why she was instructed to no longer state that instructors were hand-picked by Donald Trump Donnelly responded: "because **when you say handpicked, it's misleading to consumers.**" Tr. at 210:2-6. When asked why it was misleading, Donnelly explained: "Because people are buying into the program with the assumption that they are getting Donald Trump's best of the best and the[y] are people that are hand chosen by him."  Tr. at 210:12-19. |

ZELDES & HAEGGQUIST, LLP

16

## VI.   THE RONALD SCHNACKENBERG DECLARATION IS PROPER AND SHOULD NOT BE STRICKEN

### A.   Background

Ron Schnackenberg worked for Trump University from October 2006 through May 2007 as Sales Manager at Trump University's main office at 40 Wall Street.   Schnackenberg Decl. ¶2.[7]   He sold Trump University programs to consumers who called in to Trump University and to those who attended live events.   *Id.*

### B.   Schnackenberg Confirmed the Statements Made In His Declaration

Defendants seek to strike 8 of the 15 paragraphs of Schnackenberg's declaration (¶¶3, 4, 6, 9, 11, 13, 14 and 15) on the grounds that he recanted his statements. Defs' Motion to Strike at 4, 7; Schneider Decl. Exs. 1-2.  This is not true.  In fact, Schnackenberg confirmed the majority of his these statements, as set forth below.

| Schnackenberg Declaration | Schnackenberg Deposition Transcript |
|---|---|
| ¶3: "I resigned from my position in May of 2007 because **I believed that Trump University was engaging in misleading, fraudulent and dishonest conduct**.…" | Schnackenberg stated that Trump University's scheme was based on the **"front-end high pressure speaker scam world" model**, where a speaker at the front of the room "get the crowd … excited … then they offer some great deal today but only for the next half hour … [and] if you want to take part of this, go to the back of the room … and … sign up." Tr. at 161:18-162:11. Schnackenberg "**didn't feel that it was appropriate for the amount of money that people were spending**…. it was **too expensive for**…. **$35,000 programs** with no knowledge or understanding …." Tr. at 162:18-24.<br><br>Schnackenberg clarified that rather than saying Trump was a "fraudulent scheme" he would **say Trump University was an** "**unethical**" **scheme**. Tr. at 170:16-20.  He said it "**breached my personal ethics,**" because "**they pressured people** [to purchase programs that] … **would have no opportunity to successfully invest off of the programs that they were doing.**" Tr. at 171:3-10. |
| ¶4: "For example, at a live event in | Schnackenberg confirmed all of this.  He states that the |

[7]       "Schnackenberg Decl." refers to the Declaration of Ronald Schnackenberg in Support of Plaintiffs' Motion for Class Certification, which was attached to the Declaration of Amber L. Eck as Ex. 10, filed Under Seal on September 24, 2012 (Dkt. No. 122-3). "Schnackenberg Depo. Tr." refers to the deposition transcript of Ronald David Schnackenberg, taken October 15, 2012.  The excerpts of Schnackenberg's deposition transcript are attached to the Eck Decl., as Ex. 5.

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

| Schnackenberg Declaration | Schnackenberg Deposition Transcript |
|---|---|
| New York City in April 2007, I spoke to a couple whose names I believe are Chris and Carla (or Clara) Moore.  After the hard-sell sales presentation, they were considering purchasing the $35,000 Elite program.  **I did not feel it was an appropriate program for them because** of their precarious financial condition – **they had no money to pay for the program, but would have had to pay for the program using his disability income and taking out a loan** based upon equity in his apartment.  **Trump University reprimanded me for not trying harder to sell the program to this couple.** Another sales person, I believe his name was Tad Lignell, talked them into buying the $35,000 seminar after I refused to sell this program to them.  I was disgusted by this conduct and decided to resign." | Moores were considering purchasing the $35,000 Elite Program, but "**Mr. Moore had communicated to me that he was on disability and was unable to work**, and they were going to be using the equity in their home to pay for the program, **and I did not feel that was a reasonable program** for them to be in …."  Tr. at 68:4-11;70:2-8.  Moore said "**he was going to be purchasing the program with a refinance of their home.**" Tr. at 70:17-19.<br><br>After Schnackenberg "talk[ed] to them about the [] type of education that the Real Estate Investor Training Program offered, and the amount of investment that it took [$6,000], **they were very happy that I talked to them about the Real Estate Investor Training Program**. They were very excited about starting that program, and **felt that it was [a] much better option for them**, and they didn't know that option was available until speaking with me." Tr. at 72:16-25.<br><br>He later heard that **they had purchased the $35,000 Elite course** from another salesperson.  Tr. at 74:6-16.  He asked Tad Lignell "if he felt comfortable selling that program to the Moores considering their financial situation," and **Tad "said he didn't care about their financial situation.**" Tr. at 75:8-15.<br><br>Schnackenberg confirmed that he was "**reprimanded for not selling them the program**…." Tr. at 171:17-24; Tr. at 79:10-25.<br><br>Schnackenberg felt it would have been **unethical to "pressure them into a program that [was] not appropriate for them,**" based on "their personal situation." Tr. at 172:25-173:4. |
| ¶6: "In my experience, the **primary goal** of Trump University **was not to educate students** regarding real estate investing. The **primary focus seemed to make money**, as quickly and easily as possible. An example of this was the drastic discourse they took from their prior line of business." | Schnackenberg said exactly this in deposition.  He stated:  "[T]he **purpose was not to help them invest in real estate, but the purpose was to sell them a program.**" Tr. at 171:12-14.<br><br>Again, he said at the live seminar he attended, he felt the **primary goal was "to motivate to purchase the program, not to educate.**" Tr. at 183:13-15. |
| ¶9: "Trump University's **live seminars and events were not based on the content of Eldred's Real Estate Investor Training Program**. Instead, **Mark Dove**, who essentially owns that "**front-** | David Highbloom told Schnackenberg that **Mark Dove was going to provide speakers for Trump University**. Tr. at 116:14-20.  He believed that **Mark Dove provided David Stamper and Tad Lignell**. Tr. at 127-135. |

ZELDES & HAEGGQUIST, LLP

| Schnackenberg Declaration | Schnackenberg Deposition Transcript |
|---|---|
| end high-pressure speaker scam" world, **provided speakers, instructors, mentors and salespeople to Trump University**, and these people **brought with them their own programs**, which turned into Trump University's programs." | Schnackenberg testified that his statement that **Mark Dove**, owned the **"front-end high-pressure speaker scam world**," was based on "a Trump [Institute] presentation in New York City that I was told that **Mark Dove provided the speaker for that, and I was very unimpressed with** … **the speaker** from them." Tr. at 139:24-140:6.<br><br>It was **"a very similar format to what the Trump University seminar was going to be based** about … the speaker got up and pulled out his Black Card and asked the audience if any of them had a Black Card in their wallets, and asked why not, and he did, and so he's superior.  So, **I was just very unimpressed with how he was going about his sales process**." Tr. at 141:24-142:7. |
| ¶11: "While Trump University claimed that its teachers and mentors were all experts in real estate, I believe that **most of the instructors, mentors and coaches had very little or no personal experience in the real estate techniques** they were teaching, and that **Trump University misrepresented their experiences and successes** to the public.  I know this because I received complaints from Trump University students about this.<br><br>For example, **David Stamper was a mentor and front end speaker, but his background was in jewelry making** and he did not have any personal real estate experience when he was hired by Trump University." | An **instructor named Mark had no practical experience in real estate** – he did not personally own any properties.  Tr. at 145:14-146:1.<br><br>Another instructor with last name **Black had only "done one deal, but … one transaction isn't enough to be an expert in anything**."  Tr. at 149:4-13.<br><br>**David Stamper's background was in jewelry and training horses, not real estate**.  *See* Tr. at 131:7-15.  Schnackenberg had seen Stamper's resume.  Tr. 131:2.  Stamper told Schnackenberg that he (Stamper) was going to be a mentor and coach.  Tr. at 149:16-150:2.<br><br>**Rick McNally "didn't have a lot of experience transactionally in real estate**." Tr. at 157:6-158:9.<br><br>Schnackenberg said, "I **don't think [Tad Lignell] had transactionally a lot of real estate experience**." Tr. 159:9-14.  "**He may have dabbled in real estate but enough to -- to deem him an expert, definitely no**." Tr. at 159:23-160:3. |
| ¶13: "In my position as a sales manager, I received calls from many students after they had taken the Trump University seminars.  **In my experience, virtually all students who purchased a Trump University seminar were dissatisfied with the program they purchased**." | Schnackenberg said that "**Brad Schneider had made a comment that** … **the seminars were kind of a disaster** for him, and customer service, **because people were not happy with what was happening** …. [] I think he got **requests for refunds** …. That was just a comment that he had made." Tr. at 165:9-18.<br><br>Schnackenberg clarified that he personally spoke to two students after they had taken Trump University seminars, and that both were dissatisfied.  Thus, **all of the students he spoke with were dissatisfied.**  Tr. at 164:14-165:2. |

ZELDES & HAEGGQUIST, LLP

| Schnackenberg Declaration | Schnackenberg Deposition Transcript |
|---|---|
| ¶14: "Trump University's seminars were a **scheme involving a constant upsell**. Based upon my experience at Trump University, the whole **goal of the free seminar** was to persuade consumers to **sign up for the $1,500 seminar**. Also based upon my experience at Trump University, the whole **purpose of the $1,500 seminar** was to get people to s**ign up for the $35,000 Elite seminars**. And the whole purpose of the $35,000 Elite seminars was to get people to **buy additional books, seminars and products**." | Schnackenberg confirmed that the "**whole purpose of the $1500 seminar was to get people to sign up for the $35,000 Elite seminars**." He stated that it "was just kind of **the plan that they had put in place**." Tr. at 168:14-169:2. **Michael Sexton or David Highbloom "went through the structure of events, of here is what we can upsell**, and that was what they had laid out." Tr. at 168:21-169:2.

Trump University said, **"it's our goal to [get] every person that attends a live event to buy**. Those that don't buy we are going to try to sell them it back here in our office, and once they make the investment of a $1500 seminar, **we are going to be able to upsell them on additional seminars and materials."** Tr. at 169:5-11.

Schnackenberg stated that it was his **personal opinion that the whole purpose of the $35,000 Elite Seminar was to get people to buy books, seminars and products**. Tr. at 169:25-170:9. |
| ¶15: "Based upon my personal experience and employment, I believe that Trump University was a **fraudulent scheme,** and that it **preyed upon the elderly and uneducated** to separate them from their money." | Schnackenberg confirmed that **based on my personal experience and employment, I believe that Trump University was an unethical scheme**. Tr. at 170:16-20 (he said he would replace the word "fraudulent" with "unethical").

He said the Trump University scheme "**breached my personal ethics**," because "**they pressured people** [to purchase programs that] … **would have no opportunity to successfully invest off of the programs that they were doing**." Tr. at 171:3-10.

Schnackenberg did say when asked if Trump University preyed on the elderly and uneducated, that **"I don't necessarily know that 'elderly' is accurate. I would … stand by uneducated**, with the two examples I just gave of the Moores potentially and Rami." Tr. at 175:15-21. |

## VII.   CONCLUSION

The Declarations of former Trump University employees Ronald Schnackenberg, Corinne Sommer, Jason Nicholas and Cheryl Donnelly are entirely proper. Even though it is not proper to strike a declaration merely because later deposition testimony has certain inconsistencies with the prior declarations (*see Casida*, 2012 WL 3260423 at *4), during their depositions, these former employees largely confirmed and stood by the statements made in

ZELDES & HAEGGQUIST, LLP

1  their declarations.   The former employees also have sufficient personal knowledge for the

2  majority of material statements contained in their depositions, as set forth above.   Moreover,

3  the testimony of these former employees should not be stricken on the grounds that they

4  provide "improper lay opinions," as they do not purport to give expert opinions.   Their

5  statements and opinions are based on their experience working for Trump University, and are

6  entirely appropriate.  *Los Angeles Times Communications*, 442 F. Supp. at 887.   Accordingly,

7  Defendants' Motion to Strike Declarations of Schnackenberg, Sommer, Nicholas, and

8  Donnelly should be denied in its entirety.

9       Respectfully submitted,

10  DATED:  February 1, 2013                    ZELDES & HAEGGQUIST, LLP
11                                              AMBER L. ECK
                                                HELEN I. ZELDES
12                                              ALREEN HAEGGQUIST
                                                AARON M. OLSEN

13

14                                              s/Amber L. Eck
                                                AMBER L. ECK

15
                                                625 Broadway, Suite 906
16                                              San Diego, CA  92101
                                                Telephone:  (619) 342-8000
17                                              Facsimile:  (619) 342-7878

18                                              ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
19                                              RACHEL L. JENSEN
                                                THOMAS R. MERRICK
20                                              655 West Broadway, Suite 1900
                                                San Diego, CA  92101
21                                              Telephone:  (619) 231-1058
                                                Facsimile: (619) 231-7423

22                                              Attorneys for Plaintiffs and the Proposed Class

23

24

25

26

27

28

1

CERTIFICATE OF SERVICE

2       I hereby certify that on February 1, 2013, I electronically filed the foregoing with the

3  Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4  e-mail addresses denoted on the Electronic Mail Notice List.

5       I certify under penalty of perjury under the laws of the United States of America that

6  the foregoing is true and correct.  Executed on February 1, 2013.

7                                             s/Amber L. Eck
                                           AMBER L. ECK
8
                                  ZELDES & HAEGGQUIST, LLP
9                                 AMBER L. ECK (177882)
                                  AARON M. OLSEN (259923)
10                                625 Broadway, Suite 906
                                  San Diego, CA 92101
11                                Telephone:  619-342-8000
                                  Facsimile: 619-342-7878
12                                Ambere@zhlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZELDES & HAEGGQUIST, LLP