# EXHIBIT 1

```
                                                        Page 1
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4    ----------------------------------X
      TARLA MAKAEFF, et al., on
 5    Behalf of Themselves and       Case No. 3:10-CV-00940-CAB(WVG)
      all Others Similarly Situated,
 6
                   Plaintiffs,
 7
           v.
 8
      TRUMP UNIVERSITY, LLC, et al,
 9
                   Defendants.
10    ----------------------------------X
11
12              VIDEOTAPED DEPOSITION
13                       OF
14              CORINNE A. SOMMER
15               New York, New York
16           Wednesday, November 7, 2012
17
18
19
20
21
22
23
24    Reported by:
      ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25    JOB NO. 54530
```

Page 6

```
1            C. Sommer
2    CORINNE A. SOMMER, called as a
3        witness, having been duly sworn by a
4        Notary Public, was examined and testified
5        as follows:
6             *   *   *
7    EXAMINATION BY
8    MR. SCHNEIDER:
9        Q.   Please state your full name.
10       A.   Corinne Ashley Sommer.
11       Q.   Ms. Sommer, my name is David
12   Schneider and I am defending Trump University
13   and Donald Trump in a lawsuit which has been
14   brought out in San Diego by a woman named Tarla
15   Makaeff. Some others have joined her since and
16   there's a pending motion that Ms. Makaeff and
17   some other plaintiffs and their attorneys have
18   filed, and you filed a declaration or prepared a
19   declaration and signed it in support of that
20   motion, so I'm going to be asking you some
21   questions about that.
22            My understanding is that you worked
23   for Trump University for approximately five or
24   six months in 2007; is that right?
25       A.   Yes.
```

Page 7

```
1            C. Sommer
2        Q.   Are you currently working?
3        A.   Yes.
4        Q.   Where do you work?
5        A.   Vanguard Construction.
6        Q.   And what do you do for them?
7        A.   I'm an estimator.
8        Q.   How long have you been working for
9    them?
10       A.   I started in March.
11       Q.   Of this year, '12?
12       A.   Yes.
13       Q.   Since leaving your employment at
14   Trump University, where have you worked?
15       A.   Caldwell Wingate.
16       Q.   And what do they do?
17       A.   Construction. I was an estimator as
18   well.
19       Q.   And when did you work there?
20       A.   I worked there from leaving Trump to
21   March.
22       Q.   What were your dates of employment
23   for Trump University?
24       A.   I believe it was May 2007 to
25   October 2007.
```

Page 8

```
1            C. Sommer
2        Q.   So approximately five months?
3        A.   Five or six, yes.
4        Q.   And was there any time between when
5    you left Trump University and when you started
6    at Caldwell?
7        A.   Maybe a week, two.
8        Q.   Had you obtained the employment at
9    Caldwell while you were working at Trump?
10       A.   No.
11       Q.   Had you been looking for work while
12   you were working at Trump?
13       A.   Yes.
14       Q.   How long?
15       A.   A few weeks.
16       Q.   And why did you leave Caldwell?
17       A.   Just for a change of venue.
18       Q.   Was it voluntary?
19       A.   Yes.
20       Q.   What is your date of birth?
21       A.   9/9/78.
22            (Defendants' Exhibit Sommer 1, Notice
23       of Deposition, marked for identification,
24       as of this date.)
25   BY MR. SCHNEIDER:
```

Page 9

```
1            C. Sommer
2        Q.   I've marked as Exhibit 1, a notice
3    for your deposition, which included a subpoena
4    which your attorney accepted for you.
5             You're represented here by Ms. Eck?
6        A.   Yes.
7        Q.   When did you retain her or her firm?
8        A.   When she contacted me.
9        Q.   When was that?
10       A.   About probably two-and-a-half years
11   ago. Two, two-and-a-half years ago.
12       Q.   Do you know how it was that she found
13   you?
14       A.   I honestly don't know.
15       Q.   Were you looking for a lawyer at the
16   time?
17       A.   No.
18       Q.   And was there any reason when she
19   called you that you thought you needed legal
20   counsel?
21       A.   When she started asking me questions,
22   I had explained that I had already had a lawsuit
23   with Trump which I won and that I was concerned
24   about it. And she, you know, told me that in
25   this matter she would be my counsel.
```

Page 10

C. Sommer

Q. Now when you say you won, did that case go to trial?
A. No, we settled.
Q. What do you mean you won?
A. Well, they settled with me. They found that there was probable cause enough to settle.
Q. And what was the suit about?
A. I was fired because I was in the military.
Q. Did you make any claim for age discrimination?
A. I did as well.
Q. How old are you?
A. I'm 34 now.
Q. So your claim was that they fired you because you were too young or too old?
A. No. My claim was that they fired me because I was in the military, but one of the other issues I had at the same time was that they hired someone, Dee, I don't remember Dee's last name, above me based on my age.
Q. How old was Dee?
A. I have no idea. Over 40 probably.

Page 11

C. Sommer

Q. So you allege that you were discriminated because you were under 40?
A. Because I was in my 20s.
Q. All right. So it was your belief in that dispute with Trump University that you were fired in part because you were in your 20s?
A. No. My belief was I was fired because I was in the military, but there was also issues with being passed over because I was in my 20s.
Q. Well, we'll discuss this a little bit later today, but in general you were told you were fired for poor performance, correct?
A. Well, they gave me my evaluation, which was a five point evaluation. You're graded on five levels, meaning you have a one, two, three, four, five you can pick and they would circle three of them. So it was a poor evaluation. You can't give someone a two, three, four. That doesn't make sense. And then at the end of the evaluation they wrote it was an issue that I was in the military.
Q. They wrote in the evaluation that there was an issue that you were in the

Page 12

C. Sommer

military?
A. They wrote that it was a problem that I was in the military and I was actually called a weekend warrior in my review.
Q. Were you a reservist at the time?
A. Yes.
Q. Don't reservists call themselves weekend warriors?
A. I don't call myself -- I didn't call myself a --
Q. Have you ever heard any reservists call themselves weekend warriors?
A. I've heard of other people call reservists weekend warriors.
Q. Have you ever heard reservists call themselves weekend warriors?
A. Not that I know of.
Q. And you took that to mean that it was a pejorative term?
A. Yes. It's a derogatory term when it comes from someone else, especially when I'm an Iraqi veteran.
Q. Why would that be a derogatory term to you?

Page 13

C. Sommer

A. Because I served my time and I was being, I was being I guess put down for it.
Q. How were you put down?
   MS. ECK: Objection. Asked and answered. It's getting harassing.
BY MR. SCHNEIDER:
Q. How were you put down by the comment that you were a weekend warrior?
A. Well, I think it was also not just that comment, I think it was prior to that, the fact that they had already told me it was a problem that I was in the military.
Q. Who told you it was a problem that you were in the military?
A. David Highbloom.
Q. What did he say?
A. He said -- he complained when I would have to take days off to do my military service because I had to be at events on the weekends, so I'd have to take days off during the week.
Q. Now at the time you would take one weekend off a month, correct?
A. I wasn't taking. That's what I was supposed to have off a month to go to the

Page 14

```
 1                C. Sommer
 2   military and I didn't necessarily have those
 3   weekends off, so I would have to take days off
 4   during the week.
 5       Q.   Your commitment at the time as a
 6   reservist was two days a month?
 7       A.   Yes.
 8       Q.   And did you make all those days to
 9   fulfill your reservist obligations at that time?
10       A.   Yes, taking weekdays off.
11       Q.   At the time that you were fired, you
12   were told it was for poor performance, correct?
13            MS. ECK:  Objection.  Asked and
14       answered.
15   BY MR. SCHNEIDER:
16       Q.   You can answer the question.
17       A.   I don't particularly remember if it
18   was poor performance.
19            I came into the office.  I had
20   actually been on vacation and I was told, while
21   I was on vacation they called me and they told
22   me I had to come back and go to an event in
23   Colorado while I was in New Hampshire on
24   vacation and I told them no.
25            And when I came back from vacation,
```

Page 15

```
 1                C. Sommer
 2   they told me I was fired, so I don't think it
 3   was due to poor performance.
 4       Q.   Since Ms. Eck contacted you a couple
 5   years ago, how many times have you spoken with
 6   her?
 7       A.   Probably 20 to 30.
 8       Q.   All on the phone?
 9       A.   Yes.
10       Q.   Was the first time that you met her,
11   was that this week?
12       A.   Today.
13       Q.   Did you review any documents in
14   preparation for your deposition today?
15       A.   I reviewed the documents -- she
16   passed me the documents that you had given her
17   regarding me.
18       Q.   Did they refresh your recollection of
19   any of the events that transpired during the
20   last few years?
21       A.   I don't think they were relevant to
22   me really at all.  I mean in terms of pricing,
23   that was it.  There was only some documents
24   really based on pricing that had anything to do.
25   I wasn't really sure how they were relevant to
```

Page 16

```
 1                C. Sommer
 2   me.
 3       Q.   In Exhibit 1 in front of you, there
 4   are categories of documents that I requested on
 5   pages 2 through 4.  There's 25 categories and I
 6   want to ask you about what efforts you made to
 7   locate the documents on these 25 categories.
 8       A.   Okay.  To look at them or look for
 9   them?
10       Q.   Look for them.
11            First of all, before this morning,
12   have you seen this document before?  Have you
13   seen these 25 categories?
14       A.   I need to read it.
15            (Document review.)
16       A.   Yes.  Amber gave me a, I don't
17   know what it was -- I don't remember what it was
18   called.  She gave me some sort of paperwork,
19   just, you know, with this list on here.  It
20   might have been exactly the same, but it
21   definitely had these categories on it saying
22   that I hadn't seen them.  She had asked me to
23   look.
24       Q.   And what efforts did you make to see
25   if you had any documents responsive to these 25
```

Page 17

```
 1                C. Sommer
 2   categories?
 3       A.   I looked through my files, my
 4   personal files at home, and I also went through
 5   my personal email, my sent box mostly because I
 6   don't keep anything in my inbox.  So I looked at
 7   my inbox.  I didn't have anything so I just
 8   looked at my sent box and I gave Amber
 9   everything I found.
10       Q.   So for all of these categories, the
11   total sum of your responsive documents, as I
12   understand it, are four documents that she
13   produced this morning which comprise a total of
14   nine pages; is that right?
15       A.   Yes.
16       Q.   And these four documents or these
17   nine pages, this is everything you have
18   responsive to the 25 categories?
19       A.   I don't...
20            (Document review.)
21            THE WITNESS:  Was this one?  I don't
22       think I gave you this one.
23            MS. ECK:  It may have been an
24       attachment.
25            THE WITNESS:  Oh, okay.
```

Page 18

```
1              C. Sommer
2      A.  Yeah, that looks right then.
3      Q.  There is no other documents that
4  you're aware of responsive to these categories
5  that you haven't provided to Ms. Eck or brought
6  here?
7      A.  No.
8      Q.  All right.  Now tell me real briefly
9  about your educational background.
10         Did you graduate high school?
11     A.  Yes.
12     Q.  What year?
13     A.  1996.
14     Q.  And did you attend any college?
15     A.  Yes.
16     Q.  Where?
17     A.  University of Connecticut.
18     Q.  Did you obtain a degree?
19     A.  Yes.
20     Q.  What year?
21     A.  2000.
22     Q.  And what was the degree in?
23     A.  Cultural photography.
24     Q.  And what did you do after college?
25     A.  I did a mishmash of sorts.  I did
```

Page 19

```
1              C. Sommer
2  photography for a while and then I joined the
3  military.
4      Q.  What branch?
5      A.  Army.
6      Q.  And when did you join?
7      A.  When did I join?
8      Q.  Right.
9      A.  May of 2001.
10     Q.  And you said you were deployed to
11 Iraq?
12     A.  Yes.
13     Q.  What year?
14     A.  2003.
15     Q.  And how long were you in Iraq?
16     A.  A year.
17     Q.  And what did you do?
18     A.  Civil affairs.
19     Q.  What does that mean?
20     A.  I'm a liaison between our government
21 and other governments, and I was an Iraq Arabic
22 translator.
23     Q.  I'm sorry?
24     A.  Arabic translator.
25     Q.  Was there a conflict going on at the
```

Page 20

```
1              C. Sommer
2  time?
3      A.  Yes, we were in a war.
4      Q.  In 2003?
5      A.  Yes.
6      Q.  And where were you stationed?
7      A.  In Tikrit.
8      Q.  Were you in combat?
9      A.  Yes.
10     Q.  When did you return to the United
11 States?
12     A.  2004.
13     Q.  And how long have you been in service
14 full time?
15     A.  Full time I -- that was 2004 once I
16 got back, and then I was a reservist until 2008.
17     Q.  Honorably discharged?
18     A.  Yes.
19     Q.  And what was your discharge rank?
20     A.  Staff sergeant.
21     Q.  So when you joined the military you
22 enlisted?
23     A.  Yes.
24     Q.  Where did you work before Trump
25 University?
```

Page 21

```
1              C. Sommer
2      A.  American Power Conversion.
3      Q.  What did that company do?
4      A.  They do data centers, but I did
5  events for them.
6      Q.  What was your position?
7      A.  I did -- I don't remember the
8  specific name, but I did events for the
9  northeast region of the United States.
10     Q.  How many people were you planning
11 events for?
12     A.  Oh, well, it was just for the
13 company.  Just company events specific.
14     Q.  How many people?
15     A.  Up to -- some of the events had up to
16 probably 500 people.
17     Q.  And how long did you do that?
18     A.  A year, maybe a little over.
19     Q.  And why did you leave that job?
20     A.  Money.
21     Q.  You weren't making enough?
22     A.  Yes.
23     Q.  Where did you go next?
24     A.  I worked briefly for a company
25 called... I don't remember the name.  I don't
```

Page 30

C. Sommer

1
2  to deal with and then I, you know, I told her
3  about my review and...
4      Q.  And?
5      A.  And, you know, that I was going to
6  court over it.  Well, that I contacted the New
7  York State whatever board it was that deals with
8  minorities or women or, you know, military
9  issues, people who are fired for those issues.
10     Q.  What else did you all discuss
11 concerning your suit?
12     A.  That's really all I remember.
13     Q.  After the matter resolved, did you
14 call her?
15     A.  She normally calls me more than I
16 call her.  I don't normally call her.  She calls
17 me.
18     Q.  Did you call her after you resolved
19 your suit with Trump University?
20     A.  I don't remember.
21     Q.  Ms. Donnelly testified last week that
22 you called her after you resolved the suit to
23 tell her about the settlement; is that true?
24     A.  I don't remember.
25     Q.  Ms. Donnelly testified that you

Page 31

C. Sommer

1
2  called and told her that Trump University
3  settled for two times your annual salary; is
4  that true?
5      A.  No, that's not true because that's
6  not what they settled for me for.
7      Q.  Did you tell her that Trump
8  University paid you money?
9      A.  If I told her that they settled with
10 me, I told her they settled with me, but I
11 wouldn't tell her that they paid me double my
12 salary because they absolutely did not pay me
13 double my salary.
14     Q.  Did you tell her that Trump
15 University paid you money?
16     A.  I don't remember.
17     Q.  You understood that you had signed a
18 confidentiality provision, correct?
19     A.  Yes.
20     Q.  And you understood that you were not
21 permitted to tell anybody about any resolution
22 of the case, correct?
23     A.  Yes.  And I did not tell her that
24 amount because it's not even the right amount,
25 so I did not tell her that.

Page 32

C. Sommer

1
2      Q.  You told her that Trump University
3  paid you money to settle the case, correct?
4      A.  I don't remember telling her that.  I
5  don't believe that I did.
6          MS. ECK:  Was that confidentiality
7      agreement or Settlement Agreement produced
8      as part of defendants' documents?
9          MR. SCHNEIDER:  No.
10         MS. ECK:  Why not?
11         MR. SCHNEIDER:  Because it's a
12     confidential document.
13         MS. ECK:  Is it on defendants'
14     privilege log?
15         MR. SCHNEIDER:  It will be when we
16     produce our next privilege log.
17         MS. ECK:  I request that it be
18     produced with any confidential information
19     redacted.
20         MR. SCHNEIDER:  Okay.
21 BY MR. SCHNEIDER:
22     Q.  Before working for Trump University,
23 what was your knowledge of the company?
24     A.  I didn't have any.  Just the general
25 research you do before you go on a job

Page 33

C. Sommer

1
2  interview.
3      Q.  Had you ever seen any ads concerning
4  Trump University?
5      A.  No.
6      Q.  Have you ever met Donald Trump?
7      A.  Yes.
8      Q.  What were the circumstances?
9      A.  He came into the office.  I'm
10 assuming he was meeting with Highbloom and
11 Sexton, and he came into my office and he said,
12 "This is the only department actually making
13 money."
14     Q.  The events coordinator office is
15 making money?
16     A.  Yeah, the live events department was
17 the only one making money.
18     Q.  That's what he said to you?
19     A.  Yes.
20     Q.  Now did you review financials?
21     A.  No.
22     Q.  So do you know if that's a true
23 statement?
24     A.  No.
25     Q.  So he came in and introduced himself

```
                                    Page 38
 1              C. Sommer
 2      Q.   And during those events there was no
 3   video shown?
 4      A.   No.
 5      Q.   No video of any kind, right?
 6      A.   Not that I remember.
 7      Q.   And no video of Donald Trump, right?
 8      A.   No, not that I remember.  It was a
 9   PowerPoint presentation.
10      Q.   So you had the idea of hey, maybe
11   we'll have Donald Trump do a video and show it
12   at some of the live events?
13      A.   Right.
14           And then Highbloom came over to me
15   after, because I had been asking for this for a
16   few months, and Highbloom -- so I thought I'd go
17   right to the source.  Highbloom came over to me
18   after and he goes, "We already have that video."
19           And I was like, "Well, why didn't you
20   tell me?"
21           I guess they had done it the week
22   before and then they showed me this video the
23   next day.
24      Q.   Before you were fired, at any live
25   events that you attended, did you ever see the
```

```
                                    Page 39
 1              C. Sommer
 2   Trump video used?
 3      A.   I don't remember.  Actually I think
 4   the last event I was in was in Nevada I believe,
 5   and I believe they showed it at the beginning.
 6      Q.   And how long was the version?
 7      A.   I don't remember.
 8      Q.   Anything else that you can recall
 9   about your meeting with Donald Trump?
10      A.   No.
11      Q.   You didn't discuss any specific
12   numbers, right?
13      A.   No.
14      Q.   You didn't discuss numbers at all.
15      A.   No.
16      Q.   At any time did you take any of the
17   online courses?
18      A.   No.
19      Q.   Did you read any of the Trump
20   University books or books by Donald Trump?
21      A.   No.
22      Q.   Where did the meeting take place with
23   you and Mr. Trump?
24      A.   Forty Wall Street in my office.
25      Q.   And you said you shared an office
```

```
                                    Page 40
 1              C. Sommer
 2   with Ms. Donnelly?
 3      A.   Cheryl was fired by that time, by the
 4   time he came in.  I was sharing an office with
 5   Dee, I think her last name is Colwell, and April
 6   Neumann, and there was a guy but I don't
 7   remember the guy's name.  Dee brought him in.
 8      Q.   When Ms. Donnelly was still working
 9   for Trump University, did you all share an
10   office together?
11      A.   Yes.
12      Q.   And where was that office located in
13   relation to other people that were worked for
14   Trump University?
15      A.   Oh, we were just adjacent to the new
16   office we were in.  We were right there.  We
17   were still in the same space.
18      Q.   What do you mean adjacent to the new
19   office?
20      A.   Well, the way the office was set up,
21   there were sort of a pit where the sales team
22   was and then there was Cheryl and I had an
23   office on the exterior, and then when she was
24   fired, I moved over to this office to share with
25   Dee and April, and a sales team moved into this
```

```
                                    Page 41
 1              C. Sommer
 2   office, so we were still in the same space we
 3   were in.  It was just...
 4      Q.   Did your office have a door on it?
 5      A.   Yes.
 6      Q.   And did you all keep the door open?
 7      A.   Yes.
 8      Q.   So would you all listen to the
 9   salespeople?
10      A.   You could hear them sometimes, but
11   hardly ever.  There's the partitions, the
12   cubicle partitions, and you sort of tend to tune
13   people out and I listen to music when I work.
14      Q.   Open radio or a headset?
15      A.   Open on low.
16      Q.   So from your office was it possible
17   to hear the specifics of conversations that
18   salespeople were having with customers?
19      A.   No.  Unless they were yelling, no.
20      Q.   And would that be a common occurrence
21   where the salespeople were yelling?
22      A.   No.
23      Q.   And is it your understanding -- well,
24   let me try this again.
25           Were you already working for Trump
```

                                                              11

Page 54

C. Sommer

1
2  40 years old?
3     A.  I have no idea of her age.  I
4  guess -- yes.
5     Q.  Have you ever seen a document or a
6  manual called The Playbook?
7     A.  Not that I recollect.
8     Q.  When you first started doing the
9  events, did you have any kind of manuscript
10 about how chairs were supposed to be set up in
11 the room?
12    A.  No.
13    Q.  How did you determine how to set up
14 the room?
15    A.  I was doing everything myself.  The
16 first event I went to was an event with
17 Dynetech.  They sent me down to Florida to see
18 how Dynetech was doing the events for them at
19 this time and so I basically took note of what
20 Dynetech had done and tried to recreate when I
21 started the event department without them.
22    Q.  Did you ever contact Dynetech?
23    A.  Yes.  I don't remember.  There was a
24 girl, a girl who was about my age and then there
25 was her boss, who was a male, but I don't

Page 55

C. Sommer

1
2  remember their names.
3     Q.  Do you remember where the first event
4  was that you coordinated?
5     A.  On my own?
6     Q.  Right.
7     A.  No, I don't.  I think it was New York
8  actually.
9     Q.  Did Trump University put on something
10 called an Expo or a Summit?
11    A.  Was it a Power Summit?
12    Q.  Right.
13    A.  I don't know if they put that on.  I
14 don't recollect exactly what that was.
15        There was an event in Boston that
16 they were trying to do when I got there and with
17 a gentleman who worked in New Jersey who is an
18 event coordinator.  I don't know if that was the
19 Power Summit or not, and it was a fail and they
20 didn't actually do it.  I'm not sure if that is
21 was the Power Summit or...  I don't remember the
22 names of any of them.
23    Q.  Did you have any role in any event
24 called a Power Summit or Expo or anything like
25 that?

Page 56

C. Sommer

1
2     A.  I don't remember the names of the
3  events.
4     Q.  Do you recall any of the speakers or
5  presenters that you ever worked with for Trump
6  University?
7     A.  Yes.
8     Q.  Can you identify them?
9     A.  Kasper.
10    Q.  Mike Kasper?
11    A.  Yeah.
12    Q.  Anyone else?
13    A.  There was a guy, I don't remember his
14 name.  He had -- I guess he had throat surgery.
15 Oh, Rick McNally.  That was his name.  Denise
16 DeVoe.  Chris, I don't remember Chris' last
17 name.
18    Q.  Goff?
19    A.  I think it was -- wasn't it Steve
20 Goff?
21    Q.  Brothers.
22    A.  Oh.  Well, I wasn't -- no, I
23 wasn't -- Steve Goff was the only one and then
24 there was Chris who worked with Denise, but I
25 don't remember his last name.

Page 57

C. Sommer

1
2        And then Gary Eldred.
3        No, I don't -- I have to see a list
4  of names.
5     Q.  Did you ever see Gary Eldred present?
6     A.  I don't remember.
7     Q.  How about the others you identified?
8  Did you see Mike Kasper?
9     A.  Yes, I saw -- Steve Goff, I don't
10 remember what he looks like.  I'd have to see
11 what he looks like to see if I saw him present,
12 but Denise and Mike and Rick McNally, he was
13 working the events, and Chris.
14    Q.  What was Mike Kasper's background?
15    A.  He, from what I remember, he owned a
16 build -- he told me he did real estate
17 development and he owned a building, the last
18 one I remember was in Nevada, and when the
19 market hit, he was in foreclosure and I remember
20 having these conversations with him about that,
21 but other than that, I don't remember.
22        ==Well, Dave Stamper, he worked events,==
23 ==but he -- at the time I don't think he was==
24 ==presenting.  I know they had told him he was==
25 ==going to be presenting, but he was just a==

Page 58

```
1            C. Sommer
2   jewelry salesman.  He was one of Mark's sales
3   guys.  He didn't have any real estate
4   experience.
5       Q.   Yeah, we'll talk about that when we
6   get to your declaration.
7       A.   And then there was two guys in
8   Colorado that I don't remember their names, but
9   I remember there was an issue with them because
10  they were trying to sell their own products to
11  students, but I don't remember their names.
12      Q.   At any time while you were working at
13  Trump University, did you ever see Dave Stamper
14  present?
15      A.   No.
16      Q.   And do you know whether he actually
17  ever presented?
18      A.   I don't know if he actually ever.  I
19  know that he kept telling me that Highbloom told
20  him he was going to be presenting, or actually,
21  I don't know if it was Highbloom.  It was
22  probably Mark Dove.  He told me that he was
23  going to be presenting.
24      Q.   As far as you know, you have no
25  knowledge that he actually ever presented,
```

Page 59

```
1            C. Sommer
2   correct?
3       A.   No.
4       Q.   Is that correct?
5       A.   Yeah.
6       Q.   Do you know either of the two names
7   of the people in Colorado you mentioned?
8       A.   I don't remember their names.
9            MR. SCHNEIDER:  Let's go off the
10  record.  It's been an hour.
11           THE VIDEOGRAPHER:  The time is 10:00.
12  We're going off the record.
13           (Recess is taken.)
14           THE VIDEOGRAPHER:  The time is 10:19.
15  We're back on the record.
16  BY MR. SCHNEIDER:
17      Q.   Ms. Sommer, do you know anything
18  about Rick McNally's background?
19      A.   No.
20      Q.   Did you ever see a resumé of his?
21      A.   No.
22      Q.   How about Mike Kasper?
23      A.   Not that I remember.
24      Q.   How are you being compensated for
25  your day today?
```

Page 60

```
1            C. Sommer
2       A.   I'm not.
3       Q.   And how about the last 20 or 30 calls
4   that you had with Ms. Eck?
5       A.   I wasn't compensated.
6       Q.   Why are you involved in this case?
7       A.   Well, Amber called me and she was
8   asking me some questions, and I don't agree with
9   the way the company was run.  I sort of started
10  looking at other employment opportunities when I
11  started realizing it was a Ponzi scheme.  Those
12  are my words obviously for a Ponzi scheme.
13      Q.   When did you decide in your mind that
14  it was a Ponzi scheme?
15      A.   A few months in.
16      Q.   So by summer of 2007?
17      A.   Yes.
18      Q.   And you started looking for other
19  employment?
20      A.   Yes.
21      Q.   What do you mean you thought it was a
22  Ponzi scheme?
23      A.   I sort of felt it was sort of a
24  triangle scheme in the sense where it was a
25  constant up-sell to the next course.  You never
```

Page 61

```
1            C. Sommer
2   got the information that you had paid for.  You
3   were always going to the next course.
4       Q.   Did you coordinate any of the free
5   programs?
6       A.   Yes.
7       Q.   And were you involved in any
8   advertising or marketing for those programs?
9       A.   No.  That was the marketing
10  department.  I just did the pens and give-aways
11  at the event.
12      Q.   Did the free programs range from 90
13  minutes to several days?
14      A.   Well, they were normally we would do
15  several days in a city but at different
16  locations.
17      Q.   Some of the free events, though, were
18  three days long, weren't they?
19      A.   But they were -- as far as I
20  remember, they were in different locations.
21  There was a free event each day in a different
22  location in the same state, and they would do
23  the sales for the next event there.
24      Q.   Were any events that you participated
25  in three days long, such as a workshop that was
```

Page 66

```
 1              C. Sommer
 2      Q.   At any time did you hear any
 3   complaints from that man either that day or any
 4   time later about the mentorship?
 5      A.   That day, no.
 6           I don't know if later.  I don't
 7   remember who the man was.
 8      Q.   So to your knowledge, you never
 9   received any feedback or information from that
10   student either positive or negative about the
11   experience?
12           MS. ECK:  Objection.  Calls for
13   speculation.
14   BY MR. SCHNEIDER:
15      Q.   Is that correct?
16      A.   Not that I remember.
17      Q.   And other than that one day for six
18   hours, is that the only mentorship that you
19   attended or participated in?
20      A.   Yes.
21      Q.   Did the mentor attempt to sell the
22   student anything while you were there?
23      A.   No.
24      Q.   And do you know what they did the
25   next two days?
```

Page 67

```
 1              C. Sommer
 2      A.   No.
 3      Q.   Did you ever meet J.J. Childers?
 4      A.   Yes.
 5      Q.   And do you know his background?
 6      A.   He's a real estate lawyer.
 7      Q.   Did you ever hear him present?
 8      A.   Yes.
 9      Q.   And what topics did he address?
10      A.   He, I believe he just did the real
11   estate law.
12      Q.   Do you remember the specific topics
13   he addressed?
14      A.   No.
15      Q.   Steve Miller, is that a name that
16   sounds familiar?
17      A.   The name sounds familiar, but I'm not
18   sure.  There was a lot of presenters at the end
19   of my time there that were coming in.
20      Q.   How about Wear (phonetic), W-a-r-r,
21   or Warr?
22      A.   No.
23      Q.   Did you ever look at any of the
24   resumés or background or experience of any of
25   the presenters?
```

Page 68

```
 1              C. Sommer
 2      A.   Not that I'm aware.
 3      Q.   Is it accurate that you would not
 4   know whether any of the speakers or presenters
 5   were qualified to present?
 6      A.   Well, based on my conversations with
 7   them.
 8      Q.   And what conversations did you have
 9   with -- which speakers did you talk with that
10   you have in mind?
11      A.   Well, it wasn't necessarily a
12   speaker, but the sales teams, the sales teams,
13   marked up sales team, not all of them had real
14   estate experience.
15      Q.   I'm sorry.  Say that again?
16      A.   The sales teams, the ones who were
17   selling after the speaking events, not all of
18   them had the real estate -- those are the ones
19   in particular I'm talking about.
20      Q.   All right.  So I'm talking about
21   something different.
22           I'm talking about the people that
23   were actually teaching the courses, the
24   presenters, instructors.
25           Do you have any information about
```

Page 69

```
 1              C. Sommer
 2   whether or not they were qualified to teach or
 3   present?
 4      A.   The ones that I saw, the specific
 5   presenters I saw and that I talked about
 6   earlier, no.
 7      Q.   All right.  Any other speakers that
 8   you saw that you have any information whether or
 9   not they're qualified?
10      A.   No.  I just had conversations that I
11   had with them.
12      Q.   Based on your conversations with
13   them, did you form any opinion as to whether or
14   not you thought they were qualified to teach?
15      A.   Some of them, yes, I did form an
16   opinion.
17      Q.   Which ones?
18      A.   That were qualified to teach?
19      Q.   Right.
20      A.   J.J., Denise.  Gary seemed -- I mean
21   he had been working there before, so I assumed
22   he had the real estate experience and he had
23   written a book, one of Donald Trump's brand new
24   books.  Those are the only names I can think of
25   in particular.
```

Page 70

1        C. Sommer
2     Q.   And what was it about your
3  interaction with J.J. Childers, Denise DeVoe and
4  Gary Eldred that you thought they were qualified
5  to teach?
6     A.   Well, J.J. was a real estate lawyer,
7  so I felt he was qualified to teach a class on
8  real estate law.
9         Denise and I had a lot of
10 conversations and she explained her, you know,
11 background of how she got started in real estate
12 when she was like 18 and she bought her first
13 house, and, you know, she's been doing it ever
14 since. She seemed very knowledgeable and we had
15 a lot of conversations about property.
16        And Gary, like I had just said, I
17 assume that he had the knowledge because he
18 wrote the book. I never -- and he was there
19 before I got there doing the trainings.
20    Q.   We were talking earlier about your
21 interest in real estate investing.
22        Since leaving Trump University, have
23 you attempted to use any of the information that
24 you heard or learned through Trump University to
25 personally invest in real estate?

Page 71

1        C. Sommer
2     A.   No. I bought a house, but it's just
3  a house that I live in.
4     Q.   At any of the events that you
5  attended, did you personally guarantee any of
6  the students a particular outcome or result?
7     A.   No.
8     Q.   And did you understand that in the
9  contracts that the student signed, it
10 specifically stated that Trump University could
11 not and would not guarantee results?
12        MS. ECK: Objection. Calls for a
13    legal conclusion.
14    A.   It actually said in the contract when
15 I first got there that if they weren't 100
16 percent guaranteed, they weren't 100 percent
17 satisfied, they could get their money back.
18    Q.   Right. And we already talked about
19 that.
20    A.   Right.
21    Q.   Right.
22        Now what about in terms of results?
23 Did you ever personally guarantee any student
24 that if they took the program, they were going
25 to make X dollars or a certain amount of money?

Page 72

1        C. Sommer
2     A.   No.
3     Q.   Did you ever hear anybody else ever
4  make that representation?
5     A.   I heard them not in those exact
6  words. I heard them say, you know, "Max out
7  your credit cards because you'll make your money
8  back."
9     Q.   Did you ever hear any presenter or
10 speaker or salesperson guarantee that somebody
11 would make a certain result?
12        MS. ECK: Objection. Asked and
13    answered.
14 BY MR. SCHNEIDER:
15    Q.   You can answer the question.
16    A.   Yes. I heard them say that they
17 would make their money back if they maxed out
18 their credit cards and "Open as many credit
19 cards as you can."
20    Q.   And who did you hear make that
21 statement?
22    A.   The sales team.
23    Q.   So that wasn't something that the
24 presenter said from the stage or from the front?
25    A.   No. I did hear -- I don't remember

Page 73

1        C. Sommer
2  if the presenter specifically said that and
3  which presenter said that.
4        I do know that, I believe it was
5  Chris who works with Denise, I don't remember
6  his last name, when Chris was up there, he had
7  said something in regards to when they were
8  talking about credit scores, you know, "Open --
9  don't close your credit cards because it gives
10 you a higher credit score if you keep them open,
11 and open as many as you can because you'll get a
12 higher credit score."
13    Q.   And wasn't that the context that
14 that's -- wasn't that the context that in this
15 discussion about how to improve your credit
16 score, one of the techniques was if you open up
17 more credit cards, that has the ability to
18 increase your credit score?
19    A.   Well, that was the context, but then
20 the sales team would actually tell them, once
21 they were doing the hard sales would actually
22 tell them, "Max out your credit card. You'll
23 make it back."
24    Q.   Did you ever hear Denise DeVoe
25 represent to the group as a presenter or

Page 74

```
                C. Sommer
1
2    instructor any kind of statement that they would
3    make a certain amount of money back?
4        A.    No, I don't remember.
5        Q.    Did she ever make any kind of
6    assurances or guarantees that they would make
7    the tuition back?
8        A.    That was the general gist. I can't
9    say that it was verbatim said that way, but I
10   know that the presenters did say you'll make
11   your money back if you invest in this.
12       Q.    Now let's talk about the program.
13             The first program was a free program
14   open to the public, correct?
15       A.    Um-hmm.
16       Q.    Yes?
17       A.    Yes.
18       Q.    And was there any criteria about who
19   could come in and see the free program?
20       A.    No. There was actually when we were
21   in Maryland, there was a homeless guy sleeping
22   in the back of the class.
23       Q.    And did you have any discussion with
24   David Highbloom or anyone else about what you
25   were to do if there was homeless people coming
```

Page 75

```
                C. Sommer
1
2    in and eating the food or sleeping?
3        A.    No. There was no food.
4        Q.    There wasn't coffee available or any
5    sleeping at the hotel?
6        A.    Not that we provided.
7        Q.    Was there ever any discussion about
8    what to do with homeless people that came in?
9        A.    No.
10       Q.    Would you agree that was not the
11   target customer that Trump University was
12   looking for, someone homeless? Would you agree?
13       A.    Yes.
14       Q.    Because they likely did not have any
15   assets to go through the program, right?
16       A.    Yes.
17       Q.    And would you agree that there wasn't
18   an effort to recruit homeless people to go to
19   Trump University programs, right?
20       A.    No.
21       Q.    Did you have any -- is that right?
22       A.    Well, if they had a credit card, they
23   could sign up, but if they were homeless and
24   didn't have a credit card, then no.
25       Q.    Was that your experience, that a lot
```

Page 76

```
                C. Sommer
1
2    of homeless people had a lot of credit cards?
3        A.    I don't know what homeless people
4    have and what they don't have.
5        Q.    And the person sleeping in the back
6    of this particular hotel, how do you know they
7    were homeless?
8        A.    I speculated they were homeless
9    because they had many layers on and lots of
10   bags.
11       Q.    Did you talk to this person?
12       A.    No.
13       Q.    And did anybody from Trump University
14   talk to this person that you know of?
15       A.    No.
16       Q.    The one that you're thinking of, did
17   someone ask them if they had credit cards?
18       A.    No.
19       Q.    Did anybody ask them to buy a product
20   or service from Trump University?
21       A.    I don't know.
22       Q.    At any time did you hear any
23   presenter or salesperson ask somebody that you
24   knew was homeless to buy a Trump University
25   program?
```

Page 77

```
                C. Sommer
1
2        A.    I don't know how I would know that
3    they were homeless unless they were a bag
4    person, but specifically no.
5        Q.    And the only homeless person that you
6    recall being at an event is this person that had
7    a lot of layers of clothes, correct?
8             MS. ECK: Objection. Calls for
9        speculation.
10       A.    Yes.
11       Q.    So at one event out of the 20 that
12   you went to, one person came in and went to
13   sleep in the room, they had a lot of clothes and
14   you presumed they were homeless, right?
15       A.    Yes.
16       Q.    And that was the only occasion that
17   you saw somebody that you thought was homeless.
18       A.    Yes.
19       Q.    And to your knowledge, nobody from
20   Trump University spoke to that person.
21       A.    Well, they were sitting during the
22   presentation and after the presentation when
23   people are leaving, that's when they go up and
24   they try to sell the people on things so...
25       Q.    Did you see anybody from Trump
```

| Page 78 | Page 79 |
|---|---|
| 1           C. Sommer<br>2  University try to sell anything to this person<br>3  who you are speculating --<br>4    A.   I don't remember.<br>5    Q.   -- was homeless?<br>6         At any time did Dee Colwell serve as<br>7  your assistant or did she immediately start as<br>8  your supervisor?<br>9    A.   She immediately served as my<br>10 supervisor.<br>11   Q.   How was your relation with her?<br>12   A.   Strange.<br>13   Q.   Why is that?<br>14   A.   She was a -- she's not a -- she<br>15 wasn't a very friendly person.<br>16   Q.   How was your relation with<br>17 Ms. Neumann?<br>18   A.   Excellent.<br>19   Q.   Did you find Ms. Neumann to be<br>20 honest?<br>21   A.   Yes.<br>22   Q.   At any time did she do anything that<br>23 you thought was dishonest or unethical?<br>24   A.   No.<br>25   Q.   How about David Highbloom?  Did you | 1           C. Sommer<br>2  find him to be honest?<br>3    A.   Would I trust him?  No.<br>4         Honest?  No.<br>5    Q.   So tell me what did you see him do or<br>6  hear him do that you thought was dishonest?<br>7    A.   I didn't see him or hear him do<br>8  anything.  I just after our relation -- the<br>9  relationship that Highbloom had as, you know,<br>10 the longer I stayed there, some of the<br>11 conversations we had are just -- I didn't agree<br>12 with him so that's why I'm saying.<br>13   Q.   You didn't agree with him about what?<br>14   A.   I didn't agree with the way he was<br>15 running things.<br>16   Q.   What do you mean by that?<br>17   A.   I didn't -- well, obviously I didn't<br>18 agree with Dee being put over me but -- I'm<br>19 trying to think of an example.  I don't feel<br>20 like he took responsibility for -- he would try<br>21 to throw me under the bus a lot.<br>22   Q.   Other than your claim against Trump<br>23 University, have you filed any other claims in<br>24 your life?<br>25   A.   No. |

| Page 80 | Page 81 |
|---|---|
| 1           C. Sommer<br>2    Q.   Have you been a party to any<br>3  lawsuits?<br>4    A.   No.<br>5         Oh, actually with my ex.  That's it.<br>6    Q.   Just a divorce you mean?<br>7    A.   No.  I wasn't married.  We were in a<br>8  lawsuit over a house with my ex-fiance.<br>9    Q.   What's the basic gist of the suit?<br>10   A.   That he still lives in the house and<br>11 won't get out, and has all my stuff.<br>12   Q.   Is that ongoing right now?<br>13   A.   Yes.<br>14   Q.   Is Ms. Eck representing you in that<br>15 case?<br>16   A.   No.<br>17   Q.   Do you know Tiffany Brinkman?<br>18   A.   No.<br>19   Q.   Do you know Mark Dove?<br>20   A.   Yes.<br>21   Q.   What's your -- when did you meet him?<br>22   A.   Well, I started speaking to him right<br>23 away when I moved there, but I -- or when I<br>24 moved to that position, but I met him in person<br>25 in the office.  I don't know when I met him, but | 1           C. Sommer<br>2  several times in the course of my employment.<br>3    Q.   What is his background?<br>4    A.   I'm not sure.  He ran the sales team.<br>5  He ran the sales -- he had his sales guys<br>6  partake in not only Trump University, but other<br>7  real estate class lecture-type venues around the<br>8  country for other companies.<br>9    Q.   Who were his guys?<br>10   A.   J.J., Stamper, Kasper, Rick McNally.<br>11 I believe the two guys from Colorado that I<br>12 can't remember their names were -- I can't<br>13 remember anyone else.  J.J.'s dad had started<br>14 working there I think too.  He was part of them.<br>15   Q.   Started working where?<br>16   A.   At Trump University.  I met him one<br>17 day at an event.<br>18   Q.   Sorry.  I'm confused now.  I thought<br>19 that these were people that --<br>20   A.   Were Mark Dove's guys.<br>21   Q.   And what do you mean by Mark Dove's<br>22 guys?<br>23   A.   They were Mark Dove brought them in.<br>24   Q.   How do you know that?<br>25   A.   Because all the salespeople work |

Page 82

```
 1              C. Sommer
 2   through Mark Dove.
 3       Q.  Was J.J. Childers a salesperson?
 4       A.  No.  Well, he was a presenter, but he
 5   did presenters and sales team, and Denise I know
 6   was not part of him.
 7       Q.  So what information do you have that
 8   J.J. Childers became involved with Trump
 9   University through Mark Dove?
10       A.  Just -- I think there was just a
11   conversation and actually when I met -- one of
12   the times I met Mark Dove, he was with J.J.
13       Q.  Do you have any information that J.J.
14   Childers became involved with Trump University
15   because of Mark Dove?
16       A.  No, not specifically.
17       Q.  Do you have any information that Mike
18   Kasper became involved with Trump University
19   because of Mark Dove?
20       A.  Not specifically.  It was just verbal
21   knowledge.  You know, verbal this is Mark Dove's
22   guys, that's it.
23       Q.  Do you have any information that Rick
24   McNally became involved with Trump University
25   because of Mark Dove?
```

Page 83

```
 1              C. Sommer
 2       A.  No, I don't have any.
 3       Q.  Do you know what Donald Trump's
 4   involvement was in J.J. Childers becoming
 5   associated with Trump University?
 6       A.  No.
 7       Q.  Do you know if J.J. Childers and
 8   Donald Trump ever met?
 9       A.  They did meet at -- the first time
10   was the day that I met Mark Dove and J.J.
11   together.  It was during the summer.  They
12   hadn't met him up -- as far as I know, I know
13   Mark Dove definitely hadn't met him until that
14   day because Mark used to complain about it.
15   Actually a bunch of those guys would complain
16   that they had never met Donald Trump yet, and
17   how were they presenting and selling on behalf
18   of Donald Trump, they hadn't met him yet.
19       Q.  All right.  So Mark Dove told you
20   that he met Donald Trump?
21       A.  He met him that day at the end of the
22   summer that I saw him with J.J. Sexton took them
23   up to the midtown, midtown to meet them.
24       Q.  And J.J. Childers told you that that
25   was the first time he met him?
```

Page 84

```
 1              C. Sommer
 2       A.  No.  J.J. didn't tell me that.
 3           Mark Dove.  I know that was the first
 4   time Mark Dove met him.
 5       Q.  But you know when J.J. Childers met
 6   him.
 7       A.  No.
 8       Q.  And same question so just to check
 9   off the list, you don't have any information as
10   to what Donald Trump's role was in selecting
11   J.J. Childers to work at Trump University,
12   correct?
13       A.  No.
14       Q.  Is that correct?
15       A.  Yes.
16       Q.  And do you know what Donald's Trump
17   role was in Mike Kasper's involvement at Trump
18   University?
19       A.  No.  As far as I know, I was told
20   there was no involvement with Donald Trump
21   selecting any of these people besides maybe Gary
22   Eldred.  It was all Mark Dove and Denise came in
23   I believe through Trump Institute.
24       Q.  Who told you that Donald Trump was
25   not involved with selecting J.J. Childers?
```

Page 85

```
 1              C. Sommer
 2       A.  No one specifically told me that.
 3       Q.  Did someone make reference to
 4   something that you think that J.J. Childers
 5   wasn't selected by Donald Trump?
 6       A.  I don't believe Donald Trump knew who
 7   J.J. Childers was.
 8       Q.  What is that based on?  What is your
 9   opinion based on?
10       A.  My opinion is based on the fact that
11   the presenters, not specifically J.J., but the
12   presenters and the sales team would complain to
13   me that they had never met Donald Trump.
14       Q.  All right.  So I'm just taking these
15   one at a time rather than sort of a general
16   statement.
17       A.  Then no.
18       Q.  Okay.  So J. Childers, J.J. Childers,
19   you have no idea what Donald Trump's role or
20   involvement was in selecting him, correct?
21       A.  No.
22       Q.  Is that right?
23       A.  Yes.
24       Q.  And do you have any information as to
25   whether or not Donald Trump was involved in the
```

TSG Reporting - Worldwide    877-702-9580

22

Page 86

```
 1              C. Sommer
 2   selection of Mike Kasper?
 3      A.   No.
 4      Q.   Do you have any information what
 5   Donald Trump's role was in selecting Rick
 6   McNally?
 7      A.   No.
 8      Q.   And you said that Mark Dove met
 9   Donald Trump in the summer of '07, correct?
10      A.   Yes.
11      Q.   Do you have any information as to
12   Donald Trump's involvement in the selection of
13   Ms. DeVoe?
14      A.   No.
15      Q.   Do you know what Donald Trump's
16   involvement was with regard to the selection of
17   any of the instructors or presenters or mentors?
18      A.   No, besides the fact they told me
19   that they'd never met Donald Trump.
20           Denise specifically hadn't met Donald
21   Trump.
22      Q.   All right.  Who else besides Denise
23   told you they had never met him?
24      A.   The sales team, Kasper, Rick McNally.
25   J.J. I don't know off top of my head, but the
```

Page 87

```
 1              C. Sommer
 2   rest of them I spent more time with than J.J.
 3   so I specifically remember those conversations.
 4      Q.   And whether or not Donald Trump met
 5   with Rick McNally or Mike Kasper or Denise
 6   DeVoe, you don't know what his involvement would
 7   have been in the selection of these presenters,
 8   correct?
 9           MS. ECK:  Objection.  Asked and
10   answered.
11   BY MR. SCHNEIDER:
12      Q.   Is that right?
13           MS. ECK:  Harassing.
14      A.   No.
15      Q.   Is that right?
16      A.   Yeah, that's right.
17      Q.   Just to close out this area, you have
18   no personal knowledge whether David Stamper ever
19   was an instructor for Trump University, right?
20           MS. ECK:  Objection.  Asked and
21   answered.
22      A.   No.
23      Q.   Is that right?
24      A.   Yeah, that's right.
25      Q.   Did you have any role in creating any
```

Page 88

```
 1              C. Sommer
 2   testimonials from students?
 3      A.   No.
 4      Q.   Would that have been the marketing
 5   department?
 6      A.   That was Cheryl.
 7      Q.   Are you aware of any testimonial that
 8   was ever presented by Trump University that was
 9   not true or accurate?
10      A.   I believe I remember Cheryl
11   complaining to me that they wanted her to
12   compile inaccurate ones.
13      Q.   Inaccurate ones?
14      A.   Yes.
15      Q.   That's what she told you?
16      A.   Yes.  And her big problem was that
17   was not what she was hired for.  She wasn't an
18   editor.
19      Q.   Did you discuss with any students at
20   any of the events or programs whether they liked
21   the programs that they went to?
22      A.   Did I discuss it during the program?
23      Q.   At any time.  You went to all these
24   events.
25      A.   Yes.
```

Page 89

```
 1              C. Sommer
 2      Q.   You went to free events, you went to
 3   three-day workshops, you went to advanced
 4   workshops, right?  So you were there interacting
 5   with the students and people, right?
 6      A.   Um-hmm.
 7      Q.   Yes?  You have to answer audibly for
 8   the court reporter.
 9      A.   I'm sorry.  Yes.
10      Q.   What was the general feedback you
11   were getting?
12      A.   It varied.  I mean we had them fill
13   out forms at the end of the events saying
14   whether they enjoyed it or not.  I mean if
15   people came up and talked to you, it was either
16   they liked it or they didn't.  You know, you
17   always get sort of a mixed bag of nuts, but the
18   only time I really got phone calls about it was
19   if someone was unhappy with something they paid
20   for.
21      Q.   Would you review the surveys?
22      A.   I tallied them up and I sort of just
23   gave them to the marketing department.  I gave
24   them to customer service.
25      Q.   Who was that?
```

Page 94

```
 1                C. Sommer
 2   would go from one to the next to the next, so
 3   yes, I would take that as a sign as they were
 4   excited.
 5       Q.   So people -- you saw people that
 6   would repeat the course in the same city.
 7       A.   The free courses, yes.
 8       Q.   All right.  And your understanding is
 9   that if people were unhappy with the course,
10   that they would write those down in the surveys?
11       A.   Yes.
12           MS. ECK:  Objection.  Calls for
13   speculation.
14   BY MR. SCHNEIDER:
15       Q.   Did anybody tell you personally that
16   they did not like the program?
17       A.   On the phone.
18       Q.   Nobody in person told you that?
19       A.   Not that I recall.
20       Q.   And how many calls did you take on
21   the phone?
22       A.   Several.  I can't give you an
23   approximate number.
24       Q.   More than five?
25       A.   Yes.
```

Page 95

```
 1                C. Sommer
 2       Q.   And why would that -- why would these
 3   students make their way to you since you weren't
 4   in customer service?
 5       A.   Because they'd met me at the event,
 6   so they would ask for me when they called.
 7       Q.   And tell me what you can recall about
 8   these students.  What did they complain about?
 9       A.   A lot of them towards the end were
10   complaining about the mentorship.  They
11   purchased the $35,000 or whatever the amount was
12   package and they couldn't reach their mentors.
13       Q.   And what did you do with that
14   information?
15       A.   I gave it to customer service and I
16   spoke to Highbloom about it.
17       Q.   And what happened after that?
18       A.   One of the solutions was see if we
19   can give them a different mentor, but if the
20   person paid for a certain mentor, they didn't
21   want someone else to field their questions.
22       Q.   All right.  So you recall a call from
23   a student in which they were frustrated that
24   they weren't able to reach their mentor, right?
25       A.   Yes.
```

Page 96

```
 1                C. Sommer
 2       Q.   And you took that information to
 3   David Highbloom?
 4       A.   Yes.
 5       Q.   And he told you that he would take
 6   care of it?
 7           MS. ECK:  Objection.  Lacks
 8   foundation.
 9       A.   I didn't say that.
10       Q.   All right.  Did you stay involved
11   then?  Or once you --
12       A.   No.  I passed the information on to
13   Highbloom and customer service.  The solution I
14   was given was, you know, we'll see if they'll
15   take another mentor, but I generally tried to
16   pass it off to customer service, but the problem
17   was that the students had my name, my
18   information because they met me at the courses
19   so they would call me back.
20       Q.   All right.  So let's take this first
21   one as an example, that they complained that
22   they were unable to reach their mentor or their
23   mentor wasn't responding to their calls, right?
24       A.   Yes.
25       Q.   And you went and spoke with David
```

Page 97

```
 1                C. Sommer
 2   Highbloom and to Brad Schneider in customer
 3   service.
 4       A.   Yes.
 5       Q.   And they told you that they were
 6   going to try and find some resolution or
 7   solution possibly including to select another
 8   mentor for that person, correct?
 9       A.   Yes.
10       Q.   Did you have any further involvement
11   with that particular student or that issue?
12       A.   If they called me I did, otherwise I
13   don't recall specifically.
14       Q.   All right.  So do you know whether or
15   not it was resolved satisfactorily to the
16   student?
17           MS. ECK:  Objection.  Calls for
18   speculation.
19       A.   I don't know.
20       Q.   What other calls do you remember
21   besides that one?
22       A.   Those were generally the gist of all
23   the calls is that they had bought a program and
24   they weren't -- most of the calls I received
25   were about the mentorship program, that they,
```

Page 98

1          C. Sommer
2   you know, bought the premium package.
3     Q.   So the first one you identified, they
4   were having trouble reaching the mentor or
5   getting a call back, right?
6     A.   Um-hmm.
7     Q.   What other ones do you remember?
8     A.   That's specifically it, otherwise it
9   normally I could bring them to customer service
10  right away because they weren't promised a
11  person to respond to them with any of the other
12  packages in terms of, you know, having someone
13  who you could call up and ask about a bunch
14  questions to.  It was just a course you were
15  buying.  With the mentorship it was different
16  because you were getting a person's time as well
17  as a three-day intensive.  So those are most of
18  the calls I got.  The rest of them I could
19  pretty much field over to customer service.
20    Q.   So your recollection is that you had
21  more than one call from a student that had
22  difficulty reaching their mentor?
23    A.   Yes.
24    Q.   And were the other ones handled the
25  same way; that you brought the information to

Page 99

1          C. Sommer
2   Brad Schneider --
3     A.   Yes.
4     Q.   -- and to David Highbloom?
5     A.   Yes.
6     Q.   And that you had no follow-up after
7   that, right?
8     A.   Yes.
9     Q.   So you don't know if that student was
10  completely satisfied after it left your phone
11  call, right?
12    A.   I do not know.
13    Q.   All right.  And then what were the
14  issues with anyone other than the mentor not
15  returning calls?
16    A.   I don't know.  That would be a
17  question for customer service.
18    Q.   So if any other customer called you
19  concerning some other issue that you thought you
20  didn't need to take to David Highbloom, you just
21  referred it over to Brad Schneider?
22         MS. ECK:  Objection.  Vague.
23    A.   It depends on what the -- it depends
24  on what the question was or what they were
25  calling about.

Page 100

1          C. Sommer
2     Q.   And do you remember any of those
3   other issues?
4     A.   No.
5     Q.   And how many different students did
6   you talk to about mentors not returning their
7   calls?
8     A.   I don't remember the number.  It was
9   more than three.
10    Q.   Less than five?
11    A.   It was probably more than five.
12    Q.   So out of the thousands of students
13  that you came across in the 20 events, you had
14  somewhere around a handful of calls that you
15  dealt with concerning mentors not returning
16  calls?
17    A.   Yes, but there's only a handful of
18  people that signed up for a $35,000 package.
19    Q.   And you have no idea what happened
20  with those students after you passed on the
21  information, true?
22    A.   No.  True.
23    Q.   Was it your understanding that the
24  $35,000 package included a year's worth of
25  support?

Page 101

1          C. Sommer
2     A.   I don't remember the approximate time
3   for support, but I remember Denise DeVoe giving
4   people her, you know, that signed up for her,
5   her cell phone, her personal cell phone number.
6   They were definitely given the mentor's personal
7   cell phone number.  I don't know what the -- I
8   don't remember what the length of time is they
9   had.
10    Q.   The students that you spoke to, did
11  any of them have Denise DeVoe as a mentor?
12    A.   Yes.
13    Q.   And the ones that were complaining
14  that she wasn't returning calls?
15    A.   I don't specifically remember what
16  the students were or who the mentor was.  No, I
17  don't remember.
18    Q.   Do you remember any issue with her?
19    A.   No, I don't remember.
20    Q.   So this was a mentor to mentor issue,
21  correct?
22    A.   Yes.
23    Q.   You're not able to say that all the
24  mentors didn't return calls, are you?
25    A.   No.

Page 102

1        C. Sommer
2     Q.   It may have just been one or two
3  mentors?
4     A.   Correct.
5        MS. ECK: Objection. Calls for
6  speculation.
7  BY MR. SCHNEIDER:
8     Q.   And since you were only working at
9  Trump University for five months, is it accurate
10 to say that you have no idea what kind of
11 support they received for their yearlong
12 mentorship?
13    A.   Correct.
14    Q.   And other than the one day or one
15 mentorship that you attended as a photographer,
16 do you have any information as to any other
17 student's mentorship?
18    A.   No.
19    Q.   Did you have any role in the
20 preparation of any of the PowerPoint
21 presentations that were used?
22    A.   I don't remember specifically who did
23 that. I know that we had to take the
24 PowerPoints from the presenter like Denise and
25 then put the Trump branding on it.

Page 103

1        C. Sommer
2     Q.   Denise had some of her own slides,
3  correct?
4     A.   Yes.
5     Q.   And Mike Kasper had his own slides?
6     A.   I don't remember.
7        I know Denise did only because there
8  was -- she got a little upset when she found out
9  that other -- her slides were given to other
10 presenters.
11    Q.   Now different presenters use
12 different slides, correct?
13       MS. ECK: Objection. Vague as to
14 time.
15 BY MR. SCHNEIDER:
16    Q.   During the time that you worked there
17 and went to live events, you actually attended
18 and saw the presentations, right?
19    A.   Yes.
20    Q.   And you would sit in the room and
21 listen to the presenters make their
22 presentation.
23    A.   Not all the time.
24    Q.   Some of the time when you were the
25 coordinator?

Page 104

1        C. Sommer
2     A.   Yes.
3     Q.   And of the 20 events, how many of
4  those would you say you actually listened to or
5  watched?
6     A.   I'd say at least 15.
7     Q.   So roughly 75 percent?
8     A.   Yeah.
9     Q.   All right. And those presentations
10 had different slides by different presenters?
11       MS. ECK: Objection. Lacks
12 foundation. Misstates the witness'
13 testimony.
14    A.   Some of them had different -- it
15 depended on the presentation. They were all
16 focused -- there were classes focused on
17 different things, but if some of the presenters,
18 if they didn't have slides when they came in,
19 for example, if they were doing a class on
20 foreclosure and the guy didn't have a PowerPoint
21 on foreclosure, he'd never taught it before,
22 they would give him, for example, Denise's
23 slides.
24    Q.   And if they did have their own
25 slides, they would use their own?

Page 105

1        C. Sommer
2     A.   Yes.
3     Q.   Did you ever see any of them read
4  from a script from a stage?
5     A.   No.
6     Q.   Did you ever see any of them have a
7  script in their hand?
8     A.   No.
9     Q.   You said that there was different
10 courses being taught.
11       Rattle off the different courses that
12 you can remember attending.
13       You said foreclosure.
14       What else did you see?
15    A.   The law one. I didn't actually
16 attend it, but I know we were having -- I didn't
17 sit in any of J.J.'s classes, but I know that we
18 were doing it. I don't remember any of the
19 names.
20    Q.   Was there one on tax liens?
21    A.   That may have been part of J.J.'s
22 presentation.
23    Q.   How about wealth preservation?
24    A.   That sounds familiar.
25    Q.   How about commercial real estate?

Page 122

```
            C. Sommer
 1
 2      A.   It was briefly.  He wanted to have
 3   lunch but I couldn't make it, and it was -- I
 4   actually saw April and Rick for like five
 5   minutes in passing.  We just touched base and
 6   said hello.
 7      Q.   Was that something arranged or you
 8   just happened to bump into them on the street?
 9      A.   Well, we were supposed to do lunch
10   but I couldn't meet them, so they had lunch and
11   I met them after and just said hello on the
12   street, and then that was it.
13      Q.   And what were your thoughts about
14   Mr. McNally as an instructor?
15      A.   He was a nice person.  Sexton and
16   Highbloom didn't want him to present because he
17   had the throat issue and he talked through the
18   microphone, and they didn't -- I mean there was
19   really no opinion of mine.
20      Q.   And did you have any opinion about
21   him?
22      A.   He was a nice guy.
23      Q.   And any other thoughts about his
24   background or experience, qualifications?
25      A.   No.
```

Page 123

```
            C. Sommer
 1
 2      Q.   Did you have any role in the
 3   development of the curriculum?
 4      A.   No.
 5      Q.   Did students receive workbooks when
 6   they went to the paid programs?
 7      A.   I don't believe so.
 8      Q.   Were there any materials that were
 9   distributed to the students?
10      A.   I think there was a folder.  We gave
11   them a folder and a pen, and I think there was
12   notepad in it, but I don't remember any specific
13   materials related to the classes.
14      Q.   Did you attend any of the three-day
15   workshops?
16      A.   Which three-day workshops?
17      Q.   Any three-day workshop.
18      A.   Um-hmm.
19      Q.   Which one do you recall attending?
20      A.   I don't remember what the names were,
21   but I would often -- I mean I would go to and
22   sit through some of them, but some of them I
23   would leave, you know, during the presentations
24   and I would go to the gym at the hotel or go eat
25   or whatever.  I wasn't constantly in the room.
```

Page 124

```
            C. Sommer
 1
 2   I was only there for the sales at the end.
 3      Q.   And would that be on the third day?
 4      A.   Whatever.  I believe it was the third
 5   day if it was a three-day seminar, yes.
 6      Q.   And what would your role be on that,
 7   let's say the third day for sales?
 8      A.   Credit card.
 9          MS. ECK:  Objection.  Asked and
10       answered.
11   BY MR. SCHNEIDER:
12      Q.   All right.  So if somebody wanted to
13   purchase something, you would help run the
14   credit card?
15      A.   Yes.
16      Q.   Did you ever hear any statements that
17   you thought were high pressured sales by
18   salespeople?
19      A.   Yes.
20      Q.   What did you hear?
21      A.   "Max out your credit cards.  You'll
22   make it back."
23      Q.   Anything else?
24      A.   Specifically, no.
25      Q.   And who did you hear make that
```

Page 125

```
            C. Sommer
 1
 2   statement?
 3      A.   I don't recall who.
 4      Q.   How many occasions did you hear them
 5   make it?
 6      A.   I don't recall the number of times.
 7      Q.   What questions did you hear students
 8   ask instructors that they wouldn't answer?
 9          MS. ECK:  Objection.  Lack of
10       foundation.
11      A.   I don't have specific questions.  I
12   don't know.
13      Q.   Do you have any memory that students
14   asked instructors or presenters information and
15   the instructors or presenters would not answer?
16      A.   No.  I mean there were some times
17   where they would ask a question and they'd say,
18   oh, well, you'll get that information in
19   whatever course.
20      Q.   So, for example, if somebody was
21   attending a foreclosure seminar and they had a
22   question about tax liens, would the instructor
23   say, "We have a tax lien program, if you want to
24   go to that one, we can talk about that
25   information there"?
```