EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

TARLA MAKAEFF, et al., on

Behalf of Themselves and         Case No. 3:10-CV-00940-CAB(WVG)

all Others Similarly Situated,

        Plaintiffs,

   v.

TRUMP UNIVERSITY, LLC, et al,

        Defendants.

----------------------------------X


VIDEOTAPED DEPOSITION

OF

JASON NICHOLAS

New York, New York

Thursday, November 8, 2012


Reported by:

ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

JOB NO. 54531

Page 18

1  J. Nicholas
2  MS. ECK: Objection. Attorney-client
3  privilege.
4      Without waiver, you can answer.
5  A.  I mean it's pretty like Linked --
6  this is 2012. You got LinkedIn, you got all
7  kinds of different things to find employees.
8  Yeah, I know a couple friends, a couple people
9  that were in the university that of course I
10 shared some names with them.
11 Q.  Who did you tell them?
12 A.  Who did I tell, meaning what names?
13 Q.  Right.
14     MS. ECK: I'm going to object as to
15 this line of questioning on the grounds of
16 attorney-client privilege.
17     Instruct the witness not to answer.
18     This is inappropriate.
19     MR. SCHNEIDER: It's not
20 inappropriate. This is completely
21 discoverable until you represent him.
22     MS. ECK: And he's already indicated
23 and I have indicated that from our first
24 conversation he intended that I would
25 represent him in any involvement in this

Page 19

1  J. Nicholas
2  litigation.
3      MR. SCHNEIDER: That's not what he
4  said. That's not what he said at all.
5  That's exactly the opposite of what he
6  said.
7      And you can take that position, but
8  that's not the testimony.
9      MS. ECK: Well, I think that he
10 misspoke.
11     MR. SCHNEIDER: Okay. Are you
12 instructing him not to answer?
13     MS. ECK: I am.
14     MR. SCHNEIDER: Okay. So just mark
15 this part of the transcript.
16     And is that going to be your same
17 instruction for all of the conversations
18 and communications between you and him?
19     MS. ECK: Yes.
20     MR. SCHNEIDER: So we may be back,
21 Mr. Nicholas.
22     THE WITNESS: Okay.
23 BY MR. SCHNEIDER:
24 Q.  Tell me about your background. Let's
25 start with education.

Page 20

1  J. Nicholas
2  A.  Okay.
3  Q.  Do you have a high school degree?
4  A.  Yes, sir.
5  Q.  When did you obtain that?
6  A.  In 1998.
7  Q.  College degree?
8  A.  No, sir.
9  Q.  Did you attend college?
10 A.  Yes, sir.
11 Q.  Where did you go?
12 A.  Brevard Community College.
13     You want the city and all that too?
14 Q.  Sure.
15 A.  Cocoa, Florida and briefly at Sante
16 Fe Community College in Gainesville, Florida.
17 Q.  And what years did you go to those
18 colleges?
19 A.  Brevard from '98 to 2000 and then
20 Santa Fe would be I think from 2000 to maybe
21 part of 2001. I'm not quite sure on that.
22 Q.  How old are you?
23 A.  I'm 33 years old.
24 Q.  And are you working?
25 A.  I'm self-employed.

Page 21

1  J. Nicholas
2  Q.  And what do you do?
3  A.  I'm a sports agent.
4  Q.  And what kind of athletes do you
5  represent?
6  A.  Strictly male basketball players.
7  Q.  Any in the MBA?
8  A.  On the cusp, but not yet.
9  Q.  So your players are not --
10 A.  Mostly -- they're all overseas.
11 Q.  And how long have you been a sports
12 agent?
13 A.  Well, the term sports agent is
14 basically like I've been helping guys get
15 overseas for several years, but recently I made
16 it LLC, so however you want to word that.
17 Q.  After you finished your community
18 college until you went to work for Trump
19 University, what were you doing?
20 A.  Well, I was helping put my wife
21 through University of Florida and then in 2004
22 we moved to New York City, and for approximately
23 two-and-a-half years once we initially moved
24 here in February of 2004, I worked at Town
25 Sports International as a sales/corporate sales

Page 22

1  J. Nicholas
2  consultant.
3  Q. What were you doing for them? What
4  did you do day to day?
5  A. I mean to make it real blunt, started
6  out as a sales -- you walk -- it's a gym, New
7  York Sports Club. That's what the corporate is.
8  When you walk in, I was a membership consultant
9  and then before I finished, I was more on the
10 corporate side where I was going after
11 businesses, law firms, high-level places like
12 that.
13 Q. So when you started, you were selling
14 individual memberships to the gym?
15 A. Um-hmm.
16 Q. You have to answer with words.
17 A. Oh, sorry. Yes.
18 Q. Thanks.
19    It's a common --
20 A. Sorry.
21 Q. -- practice for witnesses and I'll
22 just ask you if that's a yes or no to make sure
23 that --
24 A. That's cool.
25 Q. -- she gets it down, all right?

Page 23

1  J. Nicholas
2     And then after that you were selling
3  memberships hopefully for bigger --
4  A. Right. I would come into a
5  conference room like this, get all your legal
6  team or whoever, whoever is involved, whatever
7  corporation, and do a group presentation and get
8  corporate memberships as opposed to doing the
9  day-to-day, you know, just single stuff.
10 Q. And how long did you do that?
11 A. I would say the last six to eight
12 months of the employment.
13 Q. And then did you have any other work
14 before Trump University?
15 A. Oh, I mean -- I mean in between?
16 Q. Yeah. So after you left the Town
17 Sports International, did you have other jobs or
18 did you go straight to Trump University?
19 A. I need a second to think. Let me
20 see.
21    I mean I just did like -- I was
22 always involved in basketball all my life and
23 that was something that I did on the side, so I
24 mean it was with five star basketball camp.
25 They did summer camps and stuff throughout the

Page 24

1  J. Nicholas
2  year where I would do recruiting and coaching,
3  but in terms of full-time employment, I don't
4  think so.
5  Q. How did you hear about the job at
6  Trump University?
7  A. It was five years ago. I honestly
8  don't remember whether -- I just know
9  Mr. Quintal and a guy named Schneck -- I don't
10 know how to pronounce his last name,
11 Schnackenberg. Rob I think. They contacted me.
12 It could have been Craig's List, could have been
13 Monster. I don't remember that part of it. I
14 don't think it was through a recruiter. I'm not
15 sure.
16 Q. How do you know Mr. Quintal?
17 A. Mr. Quintal is my sales, you know,
18 sales manager the whole time I was there.
19 Q. Did you know him before Trump
20 University?
21 A. No, I did not.
22 Q. So, I'm sorry, I thought you said
23 that you knew Mr. Quintal and Schnackenberg.
24 A. They called me or reached out to me.
25 That's what I mean by know.

Page 25

1  J. Nicholas
2  Q. So prior to one of them contacting
3  you, had you known anybody at Trump University?
4  A. No.
5  Q. And did you know anything about Trump
6  University?
7  A. No.
8  Q. Had you ever heard of it?
9  A. No.
10 Q. Ever seen the advertising for it?
11 A. No. I just knew obviously the Trump
12 name. That's about it.
13 Q. All right. Before one of them
14 contacted you about the position, had you ever
15 met Donald Trump?
16 A. No, sir.
17 Q. Had you ever been in Trump Tower?
18 A. Maybe to go to Starbucks. I mean I
19 don't know. That's about it.
20 Q. All right. But never been up to
21 Trump --
22 A. I have been -- I did go to Trump Taj
23 Mahal when I was younger, but that was about it.
24 Q. All right. And you've never been up
25 to the Trump organization?

Page 26

```
 1              J. Nicholas
 2      A.   No, sir.
 3      Q.   All right.  And what were you told
 4   about the position?
 5      A.   I mean it's pretty clear in one of
 6   the emails or one of the things you have where
 7   it was the invite letter of employment.  That
 8   means it's a sales position where they require,
 9   you know, an aggressive salesperson to sell and
10   up-sell their products and services.  That was
11   the initial, you know, sales pitch they gave me
12   about the job.
13      Q.   And when did you go to work for them?
14      A.   Like it was five years ago.  I don't
15   remember the -- I remember it was late spring.
16   Somewhere May, June.  I don't know.  April, May,
17   June.  Something like that.
18      Q.   Of 2007?
19      A.   Yes, correct.
20      Q.   When you started working there, where
21   were you physically working?  Where was the
22   location of your office?
23      A.   Oh, 40 Wall Street.  I can't remember
24   which floor.
25      Q.   And that was an office that you
```

Page 27

```
 1              J. Nicholas
 2   understood was Trump University?
 3      A.   Correct.
 4      Q.   Was there any other Trump businesses
 5   that were being run out of that office?
 6      A.   Yes.
 7           Oh, no, not that office.  Couple of
 8   floors below.
 9      Q.   All right.  But the floor where Trump
10   University, it was just Trump University, right?
11      A.   Correct, but I mean I know that one
12   of the employees was running, kind of running
13   their own business out of there as well.
14      Q.   Who was that?
15      A.   David Highbloom.
16      Q.   What was he running out of there?
17      A.   His own Highbloom Group or whatever
18   he calls it.  Everybody knew that he was
19   spending half his time doing that.
20      Q.   What kind of business is that?
21      A.   I don't know.
22      Q.   And how do you know that he was
23   spending half his time doing that work?
24      A.   Casual conversation among all the
25   employees, sales employees.
```

Page 28

```
 1              J. Nicholas
 2      Q.   Was it a merchandise company, a
 3   charity?
 4      A.   I didn't do any research because I
 5   didn't care.
 6      Q.   So you had just heard from casual
 7   talk that he had some separate business that he
 8   was doing out of there?
 9      A.   Right.  And I mean if you look on
10   LinkedIn or whatnot, if he reached out to you,
11   you reached out to him, it says Highbloom Group.
12   It doesn't say Trump University, so I mean
13   obviously it was his main focus.
14      Q.   So during the time that you were
15   working at Trump University, you saw online that
16   he was doing something with Highbloom Group?
17      A.   Correct.
18      Q.   And you don't have any idea what that
19   is?
20      A.   I didn't do -- I didn't care.  Like I
21   said, his name is Highbloom.  Highbloom Group.
22   You know, everybody whether it was my computer
23   or somebody else's computer, I mean there are
24   employees that were at Trump University in the
25   sales floor at my time who, for whatever their
```

Page 29

```
 1              J. Nicholas
 2   own personal reasons, seemed to do a lot of
 3   research on the executives, if you will, to get
 4   more information about them, and he was one of
 5   the people that were so-called, you know, COO,
 6   so they did research to see background on him,
 7   so that's one of the things that popped up.
 8      Q.   But you didn't do any of that
 9   research, right?
10           MS. ECK:  Objection.  Asked and
11      answered.
12      A.   I already answered that question.  I
13   said that I looked online, so if you want to
14   call it my research or the guy next to me, we're
15   sharing a cubicle and we're looking at it,
16   however you want to view that, it's up to you.
17      Q.   Mr. Nicholas, a large part of today
18   is going to be me trying to understand the
19   reasons and basis for things that you say and
20   things that you put in the declaration.
21      A.   Sure.
22      Q.   So we're going to, you know, to
23   overuse -- to use an overused expression, we're
24   going to drill down and find out the reasons and
25   basis for things.
```

Page 34

1  J. Nicholas
2  forced to obviously, because he lived in New
3  Hampshire and from my understanding, Trump or
4  whoever is paying the tab, flew him down weekly
5  and when he had his back issues, he could not do
6  the grind, and he actually had surgery so
7  therefore I'd say the last month,
8  month-and-a-half he was not there.
9       Q.   And who was your supervisor then?
10      A.   It was -- there was no assigned
11 supervisor at that point.  There was really no
12 interim.  I mean there was a kid who was one of
13 the leading salespeople named Michael Aaron, he
14 kind of was in charge, but he didn't have the,
15 what's the word I'm looking for.  Like when he
16 came in the area, he didn't have the title and
17 therefore nobody really respected any authority
18 that he would delegate or anything along those
19 lines.
20      Q.   What did you think of Mr. Quintal?
21      A.   Well, as a -- in terms of his
22 execution of what he did on a day-to-day basis,
23 on that, when we're talking about that
24 specifically, he was an aggressive sales manager
25 or whatever his title is, executive VP of sales,

Page 35

1  J. Nicholas
2  whatever it may be, where he came in, he
3  expected results.  You can use the word drill
4  sergeant.  You can use words like, you know,
5  accountability.  He commanded those things when
6  he was either in a group setting or one on one.
7  It doesn't matter.  He was an effective leader I
8  thought, but there are other things that I found
9  out over time I mean that I didn't know
10 specifically, but it was brought to my attention
11 by another employee that maybe some of his
12 credentials were a little bit, what's the word
13 I'm looking for.  Not accurate or embellished.
14      Q.   For example?
15      A.   Well, I can specifically remember
16 Michael Aaron, he stated that Mr. Quintal
17 potentially, like because I didn't do research
18 on this myself, but he said that he may not have
19 a master's degree and that he had said that he
20 did have a master's degree.
21      Q.   Did Mr. Quintal tell you he had a
22 master's degree?
23      A.   I can't recall.
24      Q.   All right.  So Mr. Aaron told you
25 that Mr. Quintal might not have a master's

Page 36

1  J. Nicholas
2  degree?
3       A.   Right, because whether it was on
4  LinkedIn, because Mr. Quintal actually is the
5  one who introduced me to LinkedIn, I didn't know
6  about it prior to that point, so at that point I
7  started exploring and looking on it and all that
8  stuff, and, you know whatever was listed, you
9  know, MBA this, BA that, you know, I don't
10 recall.
11      But I will say there was a question
12 because Michael Aaron was upset at one point
13 with Mr. Quintal and also the Trump executives,
14 Trump University executives, about some things,
15 so at this point his personal character and the
16 type of person he is is that he would like to go
17 and find out dirt or information about them and
18 gather it.
19      So whether he actually called
20 whatever school Mr. Quintal said that he got an
21 MBA from or not, you know, that's -- I wasn't
22 physically there when that happened.
23      However, it was generally everybody
24 in the office, and I mean that everybody, knew
25 that this might be a true statement.

Page 37

1  J. Nicholas
2       Q.   All right.  So you don't have any
3  personal knowledge whether it's true or not.
4       A.   No.  I mean I didn't really care, but
5  it's just, you know, it's kind of, you know.
6       Q.   What were you hired to do at Trump
7  University?
8       A.   I was hired to -- well, I mean the
9  thing is, the direct word is be a sales
10 consultant initially, but when you get in there,
11 there's multiple things that you have to do as a
12 sales consultant.
13           (Defendants' Exhibit Nicholas 1,
14      Notice of Taking Deposition of Jason
15      Nicholas and Production of Documents,
16      marked for identification, as of this
17      date.)
18 BY MR. SCHNEIDER:
19      Q.   All right.  I've marked as Exhibit 1,
20 a document that is entitled "Notice of Taking
21 Deposition of Jason Nicholas and Production of
22 Documents."
23           And if you'll look on pages 2, 3, 4
24 and 5, there are categories there that I've
25 requested that you produce documents regarding

### Page 42

          J. Nicholas
1  through the 31 categories before --
2     A.   I opened the email and when it got to
3  the point where it's talking about any
4  documents, I didn't have any.  When she
5  initially reached out to me, I said, you know,
6  on my own I looked through and I said do I have
7  anything that could help the cause or help
8  what's going on here?  And the only thing I was
9  able to find was the script.  So when it came to
10 documents produced, there was nothing else
11 there, so why bother to go through it?
12    Q.   All right.  So after you got through
13 the first category, you decided you didn't have
14 any other documents and you weren't going to
15 look.
16    A.   Correct.
17         MS. ECK:  Objection.  Misstates the
18    witness' testimony.
19         He indicated that he previously
20    looked for documents and the only document
21    he had was the script, which he provided to
22    us and which we produced to you.
23 BY MR. SCHNEIDER:
24    Q.   Mr. Nicholas, you said that you

### Page 43

          J. Nicholas
1  wanted to see what you could do to help the
2  cause.
3     Q.   Why are you assisting plaintiffs and
4  plaintiffs' counsel in this case?
5     A.   Because she called, requested
6  knowledge.  I have some knowledge about some of
7  the areas that she would like to bring forth and
8  I just feel a moral obligation when called upon
9  to act.  That's all.  It is what it is.
10    Q.   You were fired from Trump University,
11 right?
12    A.   Let go, fired, however you want to
13 call it, yes.
14    Q.   It wasn't voluntary.
15    A.   Correct.
16    Q.   So what did you do to look for any
17 documents that you might have concerning Trump
18 University?
19    A.   Type in my inbox Trump or anything
20 like that to see if anything popped up, because
21 obviously while we were there, we had our own,
22 you know, whatever -- the name Trump would have
23 brought something up.  I mean that's the extent.
24 I didn't spend massive amount of time searching

### Page 44

          J. Nicholas
1  and looking for stuff that I could really, you
2  know, lie.  You know, for what?  So...
3     Q.   During the time that you worked at
4  Trump University, did you have an email address?
5     A.   Of course.
6     Q.   And was it on your personal computer
7  or at work?
8     A.   No.  It was only -- you can only log
9  -- I mean I only had access privileges at the
10 job.  There was no remote.  Like if it did, I
11 didn't know how to use it or it never was given
12 to me to be able to go outside of work.  Never
13 had it on BlackBerries.  I don't know if
14 BlackBerries were in existence then.  No, it was
15 at my personal station at my job.
16    Q.   Okay.  So, for example, if
17 Mr. Quintal wrote you an email, you would only
18 be able to read that at work?
19    A.   If it was to J or Jason, whatever the
20 initials @trumpuniversity, anything with
21 @trumpuniversity.com, the only way I would be
22 able to read it is if it was on that specific
23 computer at my job, that I had skills to be able
24 to do.

### Page 45

          J. Nicholas
1     Q.   Okay.  And I just want to focus on
2  what you -- what documents --
3     A.   Sure.
4     Q.   -- you might have, okay?
5         And did you ever take any of those
6  emails from work and send them to your home PC?
7     A.   I was instructed by Mr. Quintal, who
8  was my direct sales manager, to, because the
9  scripts were -- the original scripts that were
10 handed out obviously were photocopied because
11 they had -- it was a revolving door, employees
12 coming in and out, in and out all the time, it
13 was just photocopy, photocopy.  So it wasn't
14 always clear, all the pages.  It's like I don't
15 know how many pages it was in this print, but it
16 was, you know, a couple of pages.
17         And being able to -- because the
18 whole job was if you're not reading a script,
19 then you're not doing your job and literally he
20 would pay somebody like you're not reading your
21 script, you're not staying on the script, stay
22 on the script.  I mean that was the extent of
23 the job.
24         So therefore me being somebody who

Page 66

J. Nicholas

1  
2  were supposed to be -- that you were told to go  
3  after?  
4     A.  I mean because of --  
5     Q.  Listen to my question.  
6         Did anybody at Trump University tell  
7  you that you should be targeting --  
8     A.  Yes.  
9     Q.  -- a certain age group?  
10    A.  Yes.  
11    Q.  Who told you?  
12    A.  The sales manager, Mr. Quintal.  
13    Q.  All right.  And what did he tell you?  
14    A.  To target people -- he said, in  
15 context he said the majority of people in the  
16 past who have spent money on this or who are  
17 considered more of a hot lead, he didn't  
18 discriminate and say okay, don't call this one  
19 because they're 23 or don't call this one  
20 because they're 73, he just said the majority of  
21 the people that are spending this are, you know,  
22 middle-aged, you know, mid to -- you know,  
23 middle-aged people.  
24    Q.  What does that mean, middle-aged?  
25    A.  35 -- like 40 to t5, 60.  That age  

Page 67

J. Nicholas

1  
2  bracket.  That was the bracket that was kicking  
3  out more money than everybody else.  So of  
4  course you as a sales manager want to close  
5  deals, so if you have that data available or you  
6  have those thoughts, I mean Mr. Quintal is a  
7  seasoned salesperson.  He knows sales, so  
8  obviously he's going to want you to target stuff  
9  that's going to get results.  
10    Q.  Did you ever attend a live event?  
11    A.  No, not at all.  
12    Q.  Did you ever see a presentation by  
13 any instructor?  
14    A.  Well, we had -- we were briefed like  
15 in terms of, we had a conference room which was  
16 no bigger than this room and whether it was the  
17 marketing team or the people that were going to  
18 the live events, before they would go, they  
19 would say hey, we're going to Vegas or Phoenix  
20 or Portland, Oregon or whatever and tell us, you  
21 know, some of the details that they were going  
22 to pitch.  
23        So the live events, I think it  
24 usually fell on a weekend.  You know, they would  
25 come in pre that we weekend and say we're going  

Page 68

J. Nicholas

1  
2  here, we're really going after, you know,  
3  entrepreneurship this weekend or we're going  
4  after marketing or going after real estate,  
5  whatever it was.  
6        ==And then after that weekend was over,==  
7  ==you know, they'd come in with the people that==  
8  ==actually showed interest.  You know, say there==  
9  ==was, you know, 100 people that showed up.  Out==  
10 ==of those 100, you know, if somebody bought a==  
11 ==book or they required someone to fill out a form==  
12 ==before they left, those people were considered a==  
13 ==hot lead from that event, so that we would==  
14 ==up-sell them to try to get, excuse me, more==  
15 ==business from them as opposed to just the person==  
16 ==that casually went in there and just, you know,==  
17 ==was hoping Mr. Trump would show up.==  
18    Q.  Well, I might be able to cut out a  
19 lot of my questions by --  
20    A.  Sure.  
21    Q.  -- this next line.  
22        Do you have any personal knowledge of  
23 any of the presentations that were actually made  
24 at live events?  
25    A.  Sure.  

Page 69

J. Nicholas

1  
2     Q.  And how do you know what  
3  presentations were made by instructors or --  
4     A.  We were told who the instructors were  
5  going to be, we were told what the topics were  
6  going to be and they came in and pretty much,  
7  you know -- as salespeople, we wanted to know  
8  what was being told, what was being sold, what  
9  was being said in order to when we get these  
10 leads, we're not out in left field saying, hey,  
11 you know, you went to an event, great.  We had  
12 to have prior knowledge.  
13    Q.  Okay.  So what instructors did you  
14 actually personally meet?  
15    A.  Personally meet?  
16    Q.  Right.  
17    A.  I mean unless you have a long list of  
18 names, we're talking about five years ago where  
19 a guy would casually come into the office, say  
20 hey, I'm so and so, I'm an instructor, and like  
21 you said, there were multiple instructors that  
22 came in and out.  So like I'd have to really  
23 have a name and it would have to trigger my  
24 memory, but there were people that would come in  
25 from time to time --

Page 86

1    J. Nicholas
2  to, did you discuss that software, that that's
3  something that they might be interested in
4  purchasing?
5    A.  Of course.  We discussed everything
6  that was on the plate.  Whether it was a book or
7  anything.  Anything to make money, that was
8  discussed.
9    Q.  Okay.  So that's what I want to find
10 out.
11   A.  Yes.
12   Q.  What were the different things that
13 you discussed with people that were available
14 for them to purchase?
15   A.  Okay.  The majority of things, and
16 I'll just run through the list.  If you want to
17 add or subtract, whatever it can be.  Real
18 estate investment course.  Obviously Mr. Trump
19 is, you know, he is what he is in the real
20 estate market and has the name, so therefore
21 that was obviously the top one that was pushed
22 because real estate, I mean it is what it is.
23 That's why they're inquiring because they want
24 to know about that.
25      However, there would be people that

Page 87

1    J. Nicholas
2  would inquire about, you know, small businesses,
3  how to grow that, so they had an
4  entrepreneurial, you know, online course and
5  then they also had a marketing.
6      Now as time went by, more -- they
7  gauged like okay, well, maybe entrepreneurial
8  and marketing aren't really doing as well, so
9  either A, they didn't do the classes often or
10 there just wasn't a large group of people that
11 would come on and be part of that, so those two
12 were kind of pushed to the side and real estate
13 was definitely by far the forefront.
14     We were also coaching.  I think it
15 was I want to say, you know, I can't remember
16 fully, but I want to say it was ten calls with a
17 personal coach.  That was something that we
18 could sell.
19     Then go to a live event, that was
20 another.  And then -- and when I say live event,
21 if people went to a live event, we would get
22 leads that were supposebly [sic] hot on, you
23 know, on a weekly basis or whatever, wherever
24 they had an event and we were to up-sell those
25 people from that live event to come back and pay

Page 88

1    J. Nicholas
2  even more money to get into a more exclusive
3  smaller pool of people to gain more knowledge.
4      And then obviously the big one was
5  the, you know, three days, you know, Donald
6  Trump's right-hand man, Donald Trump's, you
7  know, guys would come hold your hand and walk
8  you through the process, walk you through deals.
9  You're targeting somebody who has a boatload of
10 money and doesn't know what to do with it, and
11 they trust that Trump will come in, Trump and
12 his guys will come in and help you, you know,
13 whether it's buy a multifamily unit, buy, you
14 know, a strip mall, buy, you know, houses or
15 develop, whatever it may be.  You know, that was
16 a big sell.
17   Q.  You said Trump and his guys.
18     Did you ever tell --
19   A.  Not --
20   Q.  Hold on.  Let me finish my question.
21   A.  I'm sorry.
22   Q.  Did you ever tell anybody on the
23 phone that Donald --
24   A.  No.
25   Q.  -- Trump would be meeting with them?

Page 89

1    J. Nicholas
2    A.  No.
3      THE REPORTER:  Wait until he
4  finishes.
5      THE WITNESS:  I'm sorry.  I'm sorry.
6  BY MR. SCHNEIDER:
7    Q.  Did you ever suggest that Donald
8  Trump --
9    A.  No.
10   Q.  -- might be meeting with them?
11   A.  I'm sorry.  I'm sorry.
12     MS. ECK:  That's okay.  Just wait and
13 pause.
14     THE WITNESS:  Okay.  I'm sorry.
15     MS. ECK:  Let him finish his question
16 all the way, take a second and then give
17 your answer.
18     THE REPORTER:  I'll keep reminding
19 you.
20     THE WITNESS:  I know you will.
21 BY MR. SCHNEIDER:
22   Q.  So running down the list, you said
23 the first thing was the real estate courses.
24     Were those online courses that you
25 were selling?

Page 122

1      J. Nicholas
2    Q.  I just want to talk about things that
3  you have knowledge about, not something that you
4  heard from somebody who heard from somebody
5  else.  I want to find out what you personally
6  know.
7    A.  So 50/50.
8    Q.  All right.  And how many people would
9  you say you actually spoke to about their
10 experience going to a live event?
11   A.  Going to a live event.
12   Q.  Right.
13   A.  Okay.  That I spoke to?  Oh, I mean I
14 had databases of leads, so I'd say 15 to 20 per
15 live event.
16   Q.  All right.  And how many of those
17 told you about whether they liked or didn't like
18 the live event?
19   A.  Well, the live events actually had
20 more negative feedback than if you did a real
21 estate online course because -- and I'll get to
22 answer your question.  Online courses were also
23 the amount of effort you put into it.  Did you
24 attend a online course, did you log in, do your
25 work.

Page 123

1      J. Nicholas
2      On the live events, you're going for
3  a set amount of time and you have expectations
4  out of the event, and you paid, whether it's
5  free or we up-sell those people to another live
6  event, there was expectation.  A lot of people
7  felt cheated or discounted of the lack of
8  information that was advertised that actually
9  came out.
10   Q.  So for some of those you're talking
11 about people at the live event, I mean at the
12 free live event?
13   A.  Well, the whole purpose of a free
14 live event is to gauge out of that pool who we
15 can take out of that pool and pitch them to
16 another event, live event where it's a smaller
17 pool.
18   Q.  What I'm asking you is about the
19 feedback that you received from people that went
20 to the free live event.
21     Did you talk to some people?
22   A.  Yeah, of course.  It's a teaser
23 event.  Theres's not enough knowledge.  That was
24 the general feedback.
25   Q.  Okay.  So feedback that you got

Page 124

1      J. Nicholas
2  talking to people that went to the free live
3  event was that there wasn't enough information
4  provided.
5    A.  Correct.
6    Q.  That it was a teaser for other
7  events.
8    A.  Correct.
9    Q.  Okay.  And you understood that people
10 paid nothing and --
11   A.  Correct.
12   Q.  -- went to the free event.
13   A.  Of course.
14   Q.  All right.  Now did you also talk to
15 people that went to paid live events?
16   A.  Yes.
17   Q.  And did any of them talk to you about
18 their experiences or whether they liked it?
19   A.  Yes.
20   Q.  All right.  How many people would you
21 estimate that you spoke with about their
22 experience at a paid live event?
23   A.  Over the course of employment.
24   Q.  During your five-month employment.
25   A.  Ten to fifteen.

Page 125

1      J. Nicholas
2    Q.  And of those 10 to 15, what was the
3  feedback?
4    A.  I would say this one was even I'd say
5  more 75 percent of negative of I paid money but
6  I still didn't walk away with the information
7  that I thought that I was going to receive on
8  the way out.
9    Q.  Did you ever see or review any of the
10 evaluations or surveys that people filled out at
11 the live events?
12   A.  Yes.
13   Q.  And what was the reason why you
14 reviewed them?
15   A.  To gain feedback and knowledge
16 about -- anything that you can grab from the
17 form that they filled out that could help you
18 pitch the sale, then that was what -- that's why
19 you did it.
20   Q.  In fact the positive feedback from
21 people, you would use those to call them and see
22 if they were interested in other products and
23 services, right?
24   A.  Of course.
25   Q.  And you had lots of names from people

Page 150

J. Nicholas

1  like, for instance, car payments and stuff.
2  That was -- it was suggested that you write
3  notes internally. You weren't supposed to write
4  on your script, you were supposed to enter into
5  the system, but in terms of the words and the
6  order and the progression, then yes, absolutely.
7      Q.  Paragraph 6, the line that says that,
8  "The instructors were experts in today's real
9  estate world and will teach all the non
10 traditional or unconventional ways of buying
11 real estate, this was not true."
12     What do you mean by that statement?
13     A.  It pretty much speaks for itself. I
14 mean...
15     Q.  What was taught in the fast track of
16 foreclosure seminar?
17     A.  I mean these are general like in
18 terms of the context, like these people were
19 sold that they're going to get massive results,
20 they're going to have people hold their hands
21 and walk them through it and make them
22 successful. That's the sale. That's the
23 projection that you're painting to these people.
24     But this stuff rare -- you know, it's

Page 151

J. Nicholas

1  just not true. Like, you know, "...experts in
2  today's real estate world and will teach all the
3  nontraditional..." The stuff that they're
4  teaching was anybody who picked up another
5  competitor's real estate book or went to Barnes
6  & Noble, they could read that for themselves
7  there. There's no big secrets coming out.
8      Q.  All right. So let's talk about that.
9      The hand holding and working directly
10 with someone like a mentor, that was the higher
11 priced program, the 25 to $35,000 program,
12 right?
13     A.  I mean yes, yeah. Kind of, yeah.
14     Q.  If you paid 995 or $1,495 and went to
15 the three-day classroom seminar, that was the
16 full extent of the training you were going to
17 get plus support on a call-in number, right?
18     A.  The support is where --
19     Q.  Is that right?
20     A.  Yes, correct.
21     Q.  And you agree that's a very different
22 program and experience for someone going to a
23 three-day program compared to somebody flying
24 into your city and meeting with you.

Page 152

J. Nicholas

1      A.  Of course, but -- okay.
2      Q.  So the hand holding and so forth,
3  that was sold with the in-field mentorship where
4  somebody flies into your city and meets with
5  you, right?
6      A.  But...
7      MS. ECK: Go ahead and answer the
8  question.
9      A.  No. That applied to anybody because
10 supposebly [sic] the sell or the sales pitch
11 behind this is that all this stuff is Trump's
12 name, face, his experience and you're going to
13 get part of that knowledge and stuff going to be
14 dumped, deposited into your life at some form or
15 fashion. You know, whether it's just taking a
16 real estate course and getting a little bit of
17 nuggets or paying more money and getting more
18 nuggets, that that's the perception of picture
19 they're trying to paint here to anybody.
20     Q.  All right. So somebody that paid
21 $995 or $1,459 and went to the three-day
22 program, what were they taught?
23     A.  They were taught random things to get
24 them to pay more, to come --

Page 153

J. Nicholas

1      Q.  How do you know what they were taught
2  if you never attended the program?
3      MS. ECK: Objection. Asked and
4  answered.
5      A.  Asked and answered, because in sales
6  meetings we were educated on what was being
7  taught and said.
8      Q.  Did you ever watch an entire
9  three-day program?
10     A.  No.
11     Q.  Did you ever read the manuals or
12 books?
13     A.  They were provided to us. We had
14 data, like I told you earlier, an outline or a
15 summary of what was going to be said from time
16 to time.
17     Q.  Did you ever --
18     A.  Not every event, but most events.
19     Q.  Did you read through all of the
20 books?
21     A.  Skim, general knowledge.
22     Books?
23     Q.  All of the manuals and the
24 presentations -- let's start one at a time.

Page 154

J. Nicholas

2  Did you see the PowerPoint
3 presentations that were used at the three-day
4 program?
5  A.  No.
6  Q.  Do you know whether they're the same
7 or different at the different programs?
8  A.  No.
9  Q.  And did you look through the
10 workbooks that corresponded with the PowerPoint
11 presentations?
12  A.  They were made available.  We had
13 workbooks and printouts from time to time that
14 were available to look at, yes.
15  Q.  Did you actually read them and go
16 through them?
17  A.  Skimmed through, some of them.
18  Q.  So what information was in there that
19 people were receiving?
20  A.  We were given books that were, you
21 know, that were being sold or at Barnes & Noble,
22 wherever they were available to anybody.  Those
23 books were considered the textbook or the
24 database of the online courses or anything, and
25 I mean we were given those books.  We were able

Page 155

J. Nicholas

2 to have those books and read those books.  They
3 were -- we had like, just like there's books in
4 here, there was everything was all laid out of
5 what's available.  So we had access if you
6 wanted to or took the initiative, it wasn't
7 required, to go in and look at stuff and get
8 educated on it.
9  Q.  All right.  Well, I'm trying to
10 understand what you actually did.
11  A.  Yeah, I looked at -- listen, I've
12 seen an online course looking over people's
13 shoulders, like, you know, whoever, we were
14 logged in as, you know, Joe Test and just looked
15 through the course and see how it progressed,
16 and learned about the intricate details.  You
17 can't sell something unless you know what you're
18 selling and that's...
19  Q.  So what was taught during the
20 three-day program?
21  A.  It was five years ago.  I can't
22 recall the intricate details of what was taught.
23  However, I am aware of the summary of
24 what was taught at the events, that it was
25 provided to us, but I can't recall details about

Page 156

J. Nicholas

2 that.
3  Q.  All right.  In summary, what was
4 taught the three-day event?
5  MS. ECK:  Objection.  Asked and
6 answered.  Harassing.
7  A.  I have no more to say about it so
8 whatever that means in legal terms.
9  Q.  It means I'm entitled to your best
10 knowledge.
11  Do you remember anything that was
12 taught at the three-day event?
13  A.  Okay.  What type of three-day event?
14 Because there's different events.
15  Q.  Okay.  So is the information
16 different at different events?
17  A.  Well, if you're covering multifamily
18 units and then in the other one you're covering
19 something else, then of course it's going to be
20 different knowledge.
21  Q.  So let's take the multifamily units.
22 What was taught?
23  A.  How to -- I mean just common
24 knowledge.  How to acquire them using other
25 people's money, like OPM, that's what they call

Page 157

J. Nicholas

2 it, to acquire these properties.  You know, all
3 the ins and outs how to make money.  Like it's
4 just common stuff.
5  And people would leave those events
6 and that's why we would get complaints as I
7 alluded to earlier, because they didn't get the
8 nuggets that they think that they were supposed
9 to get or the secret hand holding of the tools.
10 That's why the people would call back
11 complaining.  That's why some would buy into it
12 and say, "Oh, it's great.  Let's pay more money
13 to get even more details" or "I'm upset.  I paid
14 my money and I didn't get what I was looking
15 for."  That's it.
16  Q.  And that was your experience; some
17 people --
18  A.  That was my experience.
19  Q.  Some people thought it was great and
20 some people thought they didn't get their
21 money's worth.
22  A.  Correct.
23  Q.  The next line, 24, "The Trump
24 University instructors and mentors were a
25 joke..."

Page 158

1    J. Nicholas
2    Tell me what instructors were a joke
3    to you.
4        A.   Like I said earlier, I don't know
5    everybody's names.  There's some that were --
6    just because you're qualified to, you know, do
7    the basis of an online course versus actually
8    having knowledge, you know, it was just -- I
9    don't know how to go with this.
10       Q.   I want you to identify the
11   instructors.
12       A.   I can't do that.  I cannot identify,
13   unless you produce names and photos, I cannot
14   provide answers as to which ones were on one
15   aside of the others.
16       Q.   All right.  Well, who did you have in
17   mind when you wrote this statement under penalty
18   of perjury?
19       A.   There was a guy that came in, I don't
20   know his name, and he came in and he was like,
21   he was more of a mentor, like the phone coach
22   type of person and he would actually go out to
23   different, whatchamacallit, go out to help
24   people flip properties or do whatever he wanted
25   to do.  He's on that side of it.

Page 159

1    J. Nicholas
2        He was like, I'm trying to use my
3    words properly.  Like when I say the word joke
4    meaning is like he wasn't all that he was
5    cracked up to be, not all that he was
6    advertised.  That's what I mean when I say he
7    was a joke.
8        What they portrayed, the people
9    behind closed doors, they made us portray the
10   image that these people eat, slept and lived in
11   the Trump towers with Mr. Trump, and that they
12   were his right-hand man and they were going to
13   help you, but some of these people and when I
14   say they were a joke, I mean they didn't
15   actually live that lifestyle.  They're just
16   random people hired by Mr. Sexton or whoever to
17   come in because they may have a little bit of
18   real estate experience or they may have done a
19   couple of properties.  Now all of a sudden
20   they're experts.  That's what I mean it's a
21   joke.  I don't -- that's what I mean by it
22   so... That's what I mean from that.
23       Q.   Can you identify any instructor that
24   taught a Trump University program that you
25   thought was not qualified in real estate or

Page 160

1    J. Nicholas
2    didn't have experience in real estate
3    techniques, which is what you state on page 1 on
4    lines 24 and 25?
5        MS. ECK:  Objection.  Asked and
6    answered.
7        He already indicated that if you give
8    him the names and photos, he'll try to
9    identify them, but otherwise he doesn't
10   remember.
11   BY MR. SCHNEIDER:
12       Q.   Can you identify any instructor that
13   -- let's just take your sentence.
14       Mr. Nicholas, you stated under
15   penalty of perjury that the "...mentors and
16   instructors were a joke and most of them were
17   not experts in real estate and did not have
18   experience in the real estate techniques they
19   were teaching."
20       Those are your words that you signed
21   under penalty of perjury, so are you able to
22   identify a single instructor or mentor that you
23   think was not an expert in real estate?
24       MS. ECK:  Objection.  Asked and
25   answered.

Page 161

1    J. Nicholas
2        And he already identified one person.
3        He didn't remember the person's name.
4        A.   It was a male.  He was, I don't know,
5    between 30 and 45.  Somewhere in there.  He came
6    into the office one time.  He expressed his --
7    what his involvement was.
8        And then also, and I know this is not
9    directly answering your question, but this is
10   what I'm going to say and leave it at that, and
11   you can go wherever you want to go with it.
12       Again, the talk amongst the office, the sales
13   team, who were directly responsible for selling
14   to people over the phone, had a general
15   knowledge, I use the word general, that some of
16   the people that were being used from time to
17   time, I said some, not all, were not at the
18   level as advertised.  That's what I mean
19   when you're an -- this is a joke, this is a
20   joke.  That's what I mean by saying this is a
21   joke.
22       Q.   Okay.  And what I want to find out --
23       A.   And then in terms of the person,
24   you're asking me to pin down and nail a person's
25   name who they are, I don't have that

```
                                    Page 162
 1            J. Nicholas
 2   information.  I can't recall at this time.
 3       Q.   Okay.  So the one person that you
 4   have in mind is a male that's 30 to 45 years
 5   old.
 6       A.   Somewhere in that range, yeah, at the
 7   time.
 8       Q.   All right.  And you think that he was
 9   doing phone coaching?
10       A.   Yes.
11       Q.   And what was --
12       A.   Also going out, used as a, you know,
13   one of those people that go out for the
14   three-day, you know, hey, pay me money and I'm
15   going to go out and help you locate properties
16   and walk you through deals.
17       Q.   All right.  And this person, did you
18   ever look at his resumé or know anything about
19   his background?
20       A.   No, other than what he stated
21   verbally amongst the sales team.
22       Q.   All right.  And what did he tell you
23   verbally?
24       A.   That he was, you know, in terms of he
25   was new with the com -- new with Trump
```

```
                                    Page 163
 1            J. Nicholas
 2   University, that he really hadn't -- he had no
 3   real relationship with Mr. Trump, which is
 4   that's why I say it's a joke because -- and
 5   that's why I used the context in there, is
 6   because if this is supposed to be somebody who
 7   on the phone our job is to say he's one of, you
 8   know, an expert, he's with Mr. Trump, he's one
 9   of his right-hand mans or blah, blah, blah, that
10   type of thing, and this person comes in the
11   office, yes, they may have real estate
12   experience or to whatever level, but they're not
13   consistent with what the sales, what we're
14   pitching on a script to people, to me, that's
15   what I mean by joke.
16       Q.   All right.  So I want to separate
17   those two.
18       A.   Okay.
19       Q.   Is your concern about the male that's
20   30 to 45 years old, that he didn't meet with
21   Mr. Trump or he didn't have background in real
22   estate or both?
23       A.   It has to deal with the level of
24   expertise compared to what we're selling to
25   people.
```

```
                                    Page 164
 1            J. Nicholas
 2       Q.   All right.
 3       A.   That's my concern.
 4       Q.   All right.  So what was his level of
 5   expertise and what did you tell people about his
 6   level?
 7       A.   I didn't.  I would never use his
 8   name and tell -- we weren't allowed to give out
 9   people -- really wouldn't tell people's names
10   about -- it wasn't in the script so we're not
11   spitting out, oh, this guy, this guy, this guy,
12   he's an expert, he's an expert, where?  We don't
13   use that.
14            So in terms of this person, I'm not
15   going to use their name.  I mean why would I do
16   that?
17       Q.   Okay.  So you mentioned that he told
18   you he was new to the company.
19            What did he tell you about his --
20       A.   He said he --
21       Q.   -- experience or expertise?
22       A.   He said he flipped a couple
23   properties and that he had, you know, some real
24   estate experience, and was just coming in to --
25   that's pretty much it, to start his role.  And
```

```
                                    Page 165
 1            J. Nicholas
 2   he was there to, you know, for the first time in
 3   New York to meet with people, you know, within
 4   the Trump University executives or whatnot,
 5   Mr. Sexton and all those people.
 6       Q.   Do you know how many deals he had
 7   done?
 8       A.   He had talked that he did, you know,
 9   a couple, several, you know.  A handful,
10   whatever word you want to use.  But by no means
11   was this person, you know, elite or an expert.
12   That's what I mean by it.
13       Q.   All right.  In your mind, what would
14   somebody have to do to be an expert?
15       A.   Have a -- well, define the word
16   expert.  They have to be a high-level individual
17   who's had A, time in the business, you know, has
18   a track record of success.  I mean along those
19   lines.  I mean the word expert, I mean I'm not
20   going to pull out a dictionary, but I mean
21   that's...
22       Q.   What was the word that you used?  Do
23   you know what this individual's track record of
24   success was?
25            MS. ECK:  Objection.  Asked and
```

Page 166

J. Nicholas
answered.
A. I said that already; not the level, the picture that we're painting on the script. It doesn't match.
Q. I asked you do you know what his level, his track record of success was.
A. Not to the level of what we're painting a picture of. It's minimum compared to what we're portraying. We're portraying that these people are experts walking around with Mr. Trump. This is the type of verbiage that we used, that we're out there, that these people have constant communication with him; that they're working side by side with him, and this person does not match up to that criteria. That's what I mean by that.
   MR. SCHNEIDER: I'll move to strike as nonresponsive.
BY MR. SCHNEIDER:
Q. My question was, do you know what his track record of success was.
A. Well, your --
   MS. ECK: Objection. Asked and answered.

Page 167

J. Nicholas
A. Your track record -- your definition of success for one person may be different than mine.
Q. Sir, I'm just asking if you know what his track record is.
A. In my view and other view, and other people's view within the sales team is that it's minimum. It was not expertise. It was just a step above entry level.
Q. Okay. And that's what I'm trying to find out is what you know, not how you're characterizing it.
A. No, I'm just...
Q. All right. So is it your sum total of number about this male's -- this individual's track record based on his one conversation with you?
A. He was there for a few days in the office.
Q. Did you talk to him more than once about his background?
A. As a group we're allowed to ask and talk to ask him questions so just, because Susie or Joe asked him a question, because I didn't

Page 168

J. Nicholas
ask him specifically, doesn't mean I didn't gain knowledge from the conversation about his level.
Q. Okay. So your understanding of his background is based on questions that were asked by the sales members --
A. Right.
Q. -- about what he's done.
A. Right. He came and sat with us within the cubes. Our cubes are rectang -- shaped like that, so he's in the middle and we're allowed to talk, to ask questions, blah, blah, blah about his expertise. And to me, the reason why I said a joke and everybody else is because it didn't match to the level of what we're saying. That's all I'm saying from it.
Q. Okay. Is the sum total of information that you have about this individual's background and experience, whatever he provided to the group while he was there?
A. Yes, verbally.
Q. All right. And other than this one male 30 to 45 years old, do you know about any other background or know the background of any other instructors that Trump University used?

Page 169

J. Nicholas
   MS. ECK: Objection. Vague.
BY MR. SCHNEIDER:
Q. Do you know the background and experience.
A. I didn't do research so why would I -- I mean there's --
Q. Sir, I don't want to argue with you.
A. No, I'm not arguing.
Q. Either you know or you don't know, so is the answer no, I don't know the background or experience of anyone else besides this one male?
   MS. ECK: Or if know and you don't remember their names, you can tell him that too.
A. I agree with that. I can't recall at this time. It's five years ago.
Q. Okay. So the one that you can recall is this one male aged 30 to 45 years old?
A. Because it stuck out to me, that's why. When I was putting this together and talking about this and putting it together, that person stuck out to me and just the whole operation in general of the whole company, the sales, the executives, it just fit, it fit in

Page 174

```
1            J. Nicholas
2   can just say yes or no.  It should go
3   quickly.
4            THE WITNESS:  Okay.
5            MS. ECK:  If you don't know --
6       A.   When you say recognize, meaning I've
7   heard of the name, I've seen their leads or I
8   know the instructor's name, I've read the
9   forward in a book that they wrote or a quote or
10  they're on the online website.  I mean is that
11  what you mean by --
12      Q.   No.  My question is if you, when I
13  read a name, if you know anything about their
14  background or experience in real estate.
15      A.   Okay.
16      Q.   All right.
17      A.   Well, but here's -- the only
18  stipulation is I'm not confident in the person's
19  name, so if I say you read his name and it's
20  actually the guy that I'm talking about and I
21  say no, then I don't want at a later date you
22  say well, Mr. Nicholas, you said you didn't know
23  this person and now you do.  Because that's why
24  before we go through a whole list of names, the
25  guy was in the office for three days, we talked
```

Page 175

```
1            J. Nicholas
2   with him and the information he provided was
3   everybody came away with like this guy is a
4   joke, he's not serious, like how is this guy
5   even considered an expert and that type of
6   thing.  If he's on that list, I can't -- it's
7   three days five years ago, I'm not going to
8   remember his name.
9            MS. ECK:  Well, all of this is to the
10  best of your recollection.
11           THE WITNESS:  Okay.
12           MS. ECK:  So you just give your
13  recollection now and if there's
14  something -- if you recall something
15  different later, then you do, but
16  everything is just as best as you can
17  recall.
18           THE WITNESS:  Okay.
19      A.   I mean go ahead.
20      Q.   Anthony Natoli.
21      A.   No.  What am I supposed to -- no.
22      Q.   Do you know anything about his
23  background or experience in real estate?
24      A.   No.
25      Q.   All right.  And the same question for
```

Page 176

```
1            J. Nicholas
2   all these people.
3            Bob Ventor.
4       A.   No.
5       Q.   Charles Newsome.
6       A.   No.
7       Q.   Chris Goff.
8       A.   That's him.  I have -- I'm not going
9   to say -- that feels like, that last name rings
10  a bell I think or he's one of the people that
11  while I was there fit that.  Bill, not sure.
12      Q.   And was he available for coaching on
13  the phone?
14      A.   I think so, yes.
15      Q.   And you think he taught live events?
16      A.   I can't recall, but that's just a
17  name that I knew was floated around the office.
18  Like I said, I need to match up a picture and
19  all that good stuff.
20      Q.   Chris Kuhel, K-u-h-e-l.
21      A.   No.
22      Q.   Chris Lombardo.
23      A.   No.
24      Q.   Chris Sanders.
25      A.   No.
```

Page 177

```
1            J. Nicholas
2       Q.   Dan Eckelman.
3       A.   Heard the name.  Don't know...
4       Q.   You don't know anything about his
5   background or experience?
6       A.   No.
7       Q.   Dan Swanson.
8       A.   No.
9       Q.   Denise DeVoe.
10      A.   No.
11      Q.   Don Sexton.
12      A.   Yes.
13      Q.   What do you know about him?
14      A.   Well, he's the father of Michael
15  Sexton.
16      Q.   Why do you think that?
17      A.   Or he's related to Michael Sexton.
18      Q.   Why do you think that?
19      A.   Well, wait a minute.  Hold on.  Let
20  me retract on that.
21           I know he was an integral part of
22  Trump University and I don't want to say that
23  he's related.  I take that back because I knew
24  he was part of the process and I can't recall
25  whether it was -- the names were in the office,
```

Page 182

|   |    | J. Nicholas |
|---|----|---|
| 1 |    | J. Nicholas |
| 2 | Q. | Medeth Webb? |
| 3 | A. | No. |
| 4 | Q. | Melvin Rich? |
| 5 | A. | No. |
| 6 | Q. | Michael Biglane? |
| 7 | A. | No. |
| 8 | Q. | Michael Dubin? |
| 9 | A. | No. |
| 10 | Q. | Michael Henson? |
| 11 | A. | No. |
| 12 | Q. | Michael Potter? |
| 13 | A. | No. |
| 14 | Q. | Mike Kasper? |
| 15 | A. | No. |
| 16 | Q. | Noel Wells? |
| 17 | A. | No. |
| 18 | Q. | Omar Periu? |
| 19 | A. | No. |
| 20 | Q. | Patrick or Rick McNally? |
| 21 | A. | No. |
| 22 | Q. | Roger LeFluer? |
| 23 | A. | Name sounds familiar, but no. |
| 24 | Q. | Sean Higgins? |
| 25 | A. | No. |

Page 183

|   |    | J. Nicholas |
|---|----|---|
| 1 |    | J. Nicholas |
| 2 | Q. | Scott Lietzell? |
| 3 | A. | No. |
| 4 | Q. | Steven Gilpin? |
| 5 | A. | No. |
| 6 | Q. | Steven Libman? |
| 7 | A. | No. |
| 8 | Q. | Steve Goff. |
| 9 | A. | Okay.  It might -- that Goff name rings a bell.  Like I said, I have to see their picture.  I don't know, you know, who's who or what's what. |
| 13 | Q. | Steve Miller? |
| 14 | A. | Name was floated around, but at my time while I was there, but I don't recall or know anything about him, no. |
| 17 | Q. | Tad Lignell. |
| 18 | A. | No. |
| 19 | Q. | Tim Gorsline. |
| 20 | A. | No. |
| 21 | Q. | Tim Sardinia. |
| 22 | A. | No. |
| 23 | Q. | Troy Peterson. |
| 24 | A. | No. |
| 25 | Q. | William Cannon. |

Page 184

```
 1          J. Nicholas
 2     A.   No.
 3     Q.   All right.  If you look on the next
 4  page, paragraph 7, the first part of the
 5  sentence says that, "They were unqualified
 6  people."
 7          Is the sum total of your knowledge
 8  the one person that you identified, the 35 to
 9  40-year-old male?
10     A.   No.  Well, here's what I mean by
11  this:  He was one of the primary people.
12  However, when I say this, I feel more like I'm
13  speaking for the salespeople that were involved
14  in the process.
15          And I know you're going to ask me
16  another question, but all those names in the
17  short time the company is around, like those
18  people, some of them are qualified, yes, but not
19  all.  And us as a sales team, we are constantly
20  on a daily basis saying that these people who
21  are going to help them, meaning help the
22  consumers, are all experts and they're all
23  Donald Trump's right-hand man, and that's just
24  not an accurate statement.
25          And that's all I can say about it.
```

Page 185

```
 1          J. Nicholas
 2  You want to ask questions, go ahead, but if
 3  you're saying it's based off one person
 4  physically that I saw and met, then it's off
 5  that.
 6          But if you're talking about the
 7  general consensus, my feelings and about what
 8  everybody else in the sales force was talking
 9  about and knowledge that was gathered by various
10  people in the sales process about some of all
11  these names, that they know based off the
12  complaints and the calls they were getting
13  incoming or speaking to or people that we sold
14  to, that it just wasn't adding up in terms of
15  the results.
16          So if you're telling me that, you
17  know, Don Sexton is one guy that obviously
18  stands out more than another guy and whenever
19  he's involved in something, then maybe those
20  consumers or those class, people in the class or
21  live event or whatnot, they may have more
22  nuggets or more success than somebody else who
23  is on that list that may not have been at his
24  level.  So that's what I mean by that, and if I
25  need to rewrite this thing to say that, great,
```

Page 218

1  J. Nicholas
2  and assess them, and then other times it turned
3  out to be, you know, a big waste of time and
4  money for everybody.
5         So it really had to do with the
6  individual involved and the person, their
7  knowledge prior to. Some people shouldn't have
8  purchase -- like should not -- were not equipped
9  to be purchased this $35,000 coach because they
10 weren't ready. They didn't need it. They
11 weren't at the level as opposed to some other
12 people, you know, they had the money, they were
13 ready to do it and it may have helped, but other
14 people, I can clearly see that it was a waste of
15 time and money.
16     Q.  So it was a very individualized
17 issue?
18         MS. ECK: Objection. Misstates the
19 witness' testimony.
20 BY MR. SCHNEIDER:
21     Q.  You're saying some people it was very
22 good for and some people it was very bad for.
23         MS. ECK: Objection. Calls for
24 speculation.
25 BY MR. SCHNEIDER:

Page 219

1  J. Nicholas
2     Q.  If you know.
3     A.  I don't have -- it's just -- I...
4     Q.  The feedback that you got is that it
5  was worthwhile for some and not worthwhile for
6  others?
7     A.  That's a fair statement.
8     Q.  What information do you have
9  regarding Donald Trump's involvement in the
10 selection of mentors or instructors?
11    A.  I have other -- I'd say limited
12 knowledge about it because from the outside
13 looking in, he looked like he was not actively
14 involved in the day-to-day operations. So in
15 terms of picking mentors and stories about guys,
16 you know, having met him yet and all that stuff,
17 yeah.
18    Q.  All right. Do you know any
19 particular instructors or mentors that he did or
20 did not pick?
21    A.  I don't have that -- no, I don't.
22    Q.  So line six it says, "The mentors and
23 instructors --
24    A.  On which page?
25    Q.  I'm on page 3.

Page 220

1  J. Nicholas
2     A.  Okay.
3     Q.  Paragraph 13, line 6.
4     A.  Right.
5     Q.  "The mentors and instructors were not
6  Donald Trump's right-hand men or handpicked by
7  him."
8         You don't know if that's true?
9     A.  No, that's correct.
10    Q.  That you do or do not know?
11    A.  That's a correct statement.
12    Q.  All right. What information do you
13 have that the mentors were not picked by Donald
14 Trump?
15    A.  ==Again, the conversations they are in
16 the office with the sales team, with the program
17 director, with the sales manager, not everybody,
18 that's what I was told and that's what I found
19 out, and that's where the basis of this answer
20 comes from.==
21    Q.  Okay. So what I want to find out,
22 we've been talking about this, in your
23 declaration that you filed, you said that you
24 have personal knowledge. On the first page you
25 said, "I could and would confidently testify to

Page 221

1  J. Nicholas
2  all facts within my personal knowledge."
3         So I want to find out what's within
4  your personal knowledge, all right?
5         Because that makes a difference in
6  the lawsuit, all right?
7         So if you have it, I want you to tell
8  me, and if you don't, I want you to tell me
9  that, all right?
10        Do you have personal knowledge of any
11 instructor that was or was not picked by Donald
12 Trump?
13        MS. ECK: Objection. Calls for a
14 legal conclusion.
15        He's telling you what this statement
16 is based on.
17        MR. SCHNEIDER: He can answer my
18 question.
19    A.  I don't know what to say.
20    Q.  Do you have any personal information
21 that you know that Mr. Goff was or was not
22 selected or picked by Donald Trump to work for
23 Trump University?
24    A.  Which Goff?
25    Q.  The one that you know.

Page 222

J. Nicholas

A. I don't know -- again, I don't know specifically out of the 40, 50 names you named, who was picked and not picked.

But as on the whole sales floor, we knew that there were several people, again, I don't know the names, that these people all have not met Mr. Trump, they have not all been handpicked by Mr. Trump to come on board and to do a live seminar on a weekend. Like this, it just -- that was common knowledge around the office. That's the premise of my statement and I can't go one way or the other on it. That's what I meant when I said what I said so...

Q. Okay. So whichever ones that may not have been selected by Donald Trump, whoever those people are, that's not something that you personally know, that's something that you heard from someone else in the sales area?

A. Right. The senior officials and the executives, yeah.

Q. What was Donald Trump's involvement with Trump University?

A. From the time that I was there, as I stated later, he came in one time. I mean I

Page 223

J. Nicholas

rarely ever missed work. He came in one time. We were prepped, you know, days in advance that he would come in. He was there for five, ten minutes and walked out and left. That was his involvement from our standpoint.

We didn't hear, when we had sales meetings or Mr. Sexton or Highbloom or Quintal or any of those guys came into a sales meeting, you know, on a weekly or monthly basis, that he was involved in the process other than his name was on the building, he was in forwards of books and his face was on stuff. In terms of what his day-to-day operations were, the percentage of his, you know, ownership and actual input as opposed to like a silent investor who's just saying okay, here's my name and, you know, go use it and make money, like that was -- that's the gist of his involvement.

We had -- he was not visibly, physically active and we were told that.

Q. All right. So as far as what Donald Trump was doing in his office, you have no idea, right?

A. I have no idea what's going on

Page 224

J. Nicholas

behind, no.

Q. Okay. So the involvement that you personally saw physically is that he came to Trump University one day for a few minutes and you met him, right?

A. I wouldn't use the word -- saw him. We weren't allowed to approach him because he has bodyguards and we weren't allowed to shake his hand or do anything like that. He just came in, went into Sexton's office, whatever they did, came out, did a little wave. An employee attempted to get up out of the cubicle and say, "Oh, hey, Mr. Trump." The body guard stepped in and was like, you know, "Please don't," and then all right, everybody, you know, keep up the good work and, you know, left.

That's the summary. That's how it unfolded. It was very vivid to me. Obviously, you know, he came one time, so obviously I'm going to remember that versus a general conversation.

Q. So yesterday Ms. Sommer testified that he came to the office and she spoke with him about doing a video, and talked with him

Page 225

J. Nicholas

about revenues and so forth.

That was a different experience than you had, right?

A. Could have been a different time, I wasn't there. Who knows. Yes.

Q. Your experience was that you could not get physically close to him to shake his hand.

A. Well, I could care less about that. I'm just from my base you're asking me was he involved in the day-to-day activities. From my base and what I saw and what I heard, the answer is no.

Q. What you saw of him was on one occasion, right?

A. Correct.

Q. You have no idea what actually is involved on a day-to-day.

A. No.

Q. All right. On paragraph 15, the last sentence says, "Instructors and mentors ignored students and stopped returning calls shortly after they were paid."

What instructors ignored students and

Page 226

```
1        J. Nicholas
2  stopped returning calls shortly after they were
3  paid?
4      A.  I don't know the specific name, but I
5  know that complaints were vivid and it happened
6  often.  As instructors came on board, they left,
7  they were on vacation, they couldn't be reached,
8  you know, they quit, whatever the situation was,
9  those -- we get a lot of those type of calls
10 coming into the office, whether it was from
11 former, you know, guys, you know, a month, two
12 months before I got there that made these things
13 or, you know, made these relationships or, you
14 know, while I was there.  It was common that,
15 you know, once or twice a week or something like
16 that that these types of calls would come in.
17 Whether I fielded it, I mean everybody knew
18 about it.  Whether I fielded the call or
19 somebody else, that was normal.
20     Q.  All right.  Once again I want to talk
21 about what you know --
22     A.  Um-hmm.
23     Q.  -- not what you heard about --
24     A.  Okay.
25     Q.  -- that occurred before you started
```

Page 227

```
1        J. Nicholas
2  working there.
3       So how many calls did you personally
4  participate in in which someone told you that
5  the instructors ignored them and stopped
6  returning their calls?
7      A.  Personally, one to two.
8      Q.  During the five months that you
9  worked there.
10     A.  Correct.
11     Q.  And how many people that you
12 personally spoke with said that mentors ignored
13 them and stopped returning their calls?
14     A.  I lump mentors and instructors...
15     Q.  Together?
16     A.  Kind of, yes.
17     Q.  All right.  And then did you direct
18 those people, those one to two people that you
19 spoke with, to customer service?
20     A.  Yes.
21     Q.  And after that you didn't have
22 anything to do with it?
23     A.  It's none of my business.
24     Q.  And is it accurate that you don't
25 know what happened with those students after you
```

Page 228

```
1        J. Nicholas
2  sent them to customer service?
3      A.  Other than like I say, I know you
4  don't like me saying this, but other than the --
5  like it's a very close knit floor.  Like it's
6  not a lot of space, so everybody knows
7  everybody's business.
8       So we know the results without
9  actually being the person to pick up the phone.
10 Like if somebody closed a deal, I know about it.
11 If this guy gets fired, I know about it and I
12 know why.  Like everybody knows everything.  So
13 I'd transfer a call to, you know, Brad or
14 whoever and we would know the results, whether
15 it was me or it was somebody else so --
16     Q.  All right.  So the one --
17     A.  -- to answer your question, yes.
18     Q.  Okay.  So for the one or two people
19 that you spoke to that you transferred to Brad,
20 how did they handle that customer issue?
21     A.  Time went by, maybe they assigned
22 them to somebody else.
23     Q.  I'm not asking about maybe, I'm just
24 asking if you know.
25     A.  Well, they weren't immediate.  What
```

Page 229

```
1        J. Nicholas
2  it says, they weren't -- they stopped returning
3  calls and they didn't immediately assign them a
4  new instructor or somebody new.  There was time
5  passed.
6       Now what happened if I was employed,
7  you said five months, if this happened in month
8  three-and-a-half, I may not know the result if
9  a new instructor came in and picked up the
10 calls, but I know there was definitely a gap
11 where calls were not returned or ignored,
12 absolutely.
13     Q.  Were you told by customer service
14 that some students were provided additional
15 mentors or instructors?
16     A.  The goal was to once somebody became
17 available, whatever time frame went by, that
18 that would be provided to them.
19     Q.  To the customer?
20     A.  Yes.
21     Q.  On paragraph 18, it starts line 25,
22 you stated that, "Trump University did not
23 provide a legitimate real estate education."
24      What does that mean?
25     A.  They do not.
```