Page 230

1  J. Nicholas
2  (Document review.)
3  A.  What I meant by it is if you read the
4  next sentence, that's what I meant by it.
5      In my opinion, it was just selling
6  false hopes and lies.  That was what I meant by
7  it.
8  Q.  What was the lie?
9  A.  The false hope and lie is the same
10 thing sandwiched together, meaning you're
11 painting a picture of success, of making money,
12 of whether it's in real estate,
13 entrepreneurship, marketing, whatever it is that
14 the your -- that the consumer is interested in
15 acquiring educationally and also by, you know,
16 internalizing this knowledge that they're going
17 to get it from us, meaning Trump University and
18 the instructors, and it was just not the case.
19 I mean...
20 Q.  Did you ever talk with anybody or
21 hear of anybody that had made money going
22 through the Trump University programs?
23 A.  I specifically did not.  Like I said,
24 successes don't, just like in any part world,
25 successes don't get reported as much as some the

Page 231

1  J. Nicholas
2  negativity from my base and what I experience --
3  I only got negative calls.  The majority of the
4  stuff was negative feedback, okay?
5      Some of the successes, if there were
6  any, I can't recall, but like I said before you,
7  on the ratios that I gave you, that's where I'm
8  going to stick to, you know, overall in the
9  office, the positives and the negatives.
10 Q.  No. 19 you state that you heard
11 numerous complaints from customers after they
12 attended seminars or live events.
13     Are you distinguishing between a
14 seminar and a live event there?
15 A.  I mean --
16 Q.  What I'm asking is by seminar, are
17 you referring to online or are you talking about
18 both of those live event issues?
19 A.  No, not both live event.  It's
20 everything, all inclusive, whether it's --
21 "heard numerous complaints from customers after
22 they attended seminars or live events."  I mean
23 this is -- I mean...
24 Q.  Right.  So I'm trying to understand
25 when you say seminars, you talking about online

Page 232

1  J. Nicholas
2  or you talking about something different?
3  A.  I'm talking more about -- I'm leaning
4  more toward the live events.
5  Q.  All right.  And the numerous
6  complaints, you're talking about the handful of
7  people that you spoke with during your five
8  months there, right?
9      MS. ECK:  Objection.  Misstates the
10     witness' testimony.
11     He's already gone over this.  Asked
12     and answered.
13 A.  I agree with what she says.  I mean
14 I've already told you specifically about, you
15 know, the number ratios and the office chatter,
16 and facts from sales meetings on, you know.
17 Q.  Well, this is different.  This says
18 that you received numerous complaints from
19 customers, so I want to just focus on the
20 customers that you spoke with.
21 A.  Right.
22 Q.  All right?
23     And you talked earlier about I think
24 you said there was three customers that you
25 remember speaking with.

Page 233

1  J. Nicholas
2  That sound right?
3  A.  Whatever you wrote, that's what it
4  is.
5  Q.  And what we talked about earlier,
6  that's the same issue you're talking about here,
7  right?
8  A.  The same issue.  The same issue.  I
9  mean I understand you're basing -- you're trying
10 to get information, but it's clearly stated.
11 You know, they go to the live events and they're
12 not happy.  The whole time they're there,
13 they're getting up-selled to go to more a more
14 exclusive and a smaller live event.  I mean
15 that's what it is.
16     And they were always complaining
17 that, "I'm paying money and I'm getting
18 shortchanged on the information, and it's being
19 withheld from me to come to another live event
20 and pay more money," so that's where I went with
21 this.
22 Q.  All right.  And the problem is that
23 you say things like "they're always complaining"
24 and I'm just trying to define that.
25     As I understand it, you talked to

Page 234

```
 1            J. Nicholas
 2   three customers that complained.
 3         MS. ECK:  Objection.  Asked and
 4   answered.
 5         He said on numerous occasions that
 6   it's based on what he's discussed with
 7   other salespeople and what he's heard on
 8   the sales floor, and he's repeated this
 9   over and over again.
10         MR. SCHNEIDER:  That's fine.
11   BY MR. SCHNEIDER:
12      Q.  And we're just going to drill down
13   and figure out what you know and what's hearsay
14   that's not admissible, so that's the difference
15   is that this isn't a discovery deposition.  You
16   filed a declaration under oath, under penalty of
17   perjury that the other side is using in their
18   case.  This is a very serious issue.
19      A.  Oh, I know it is.
20      Q.  So I want to make sure we know
21   exactly what you know and exactly what you don't
22   know.
23      A.  And I keep stating the same thing
24   over and over again.
25         MS. ECK:  Objection.
```

Page 235

```
 1            J. Nicholas
 2      A.  Like verbatim over.
 3         MS. ECK:  Asked and answered.  He's
 4   already answered it in regard to this
 5   particular paragraph in regard to this
 6   particular sentence, and now it's just
 7   getting harassing.
 8         MR. SCHNEIDER:  Well, I am going to
 9   address it but not with you.
10   BY MR. SCHNEIDER:
11      Q.  With you I'm going to address it, not
12   with your lawyer.
13      A.  You're going to get the same answer.
14      Q.  How many customers told you that they
15   thought it was a big marketing scam?
16      A.  "They complained it was a big
17   marketing scam."
18         They meaning the customers within our
19   team in sales meetings, in group discussions, on
20   the sales floor, they, the consumers were
21   complaining.
22      Q.  Okay.  So the --
23      A.  That's my base from the answer to
24   that.  If you want me to -- I don't know what
25   the legal terminology is to add to or to make
```

Page 236

```
 1            J. Nicholas
 2   the sentence more clear and we can edit it,
 3   fine, but this statement is true and that's what
 4   I mean by it.
 5      Q.  Okay.  Did any customers that you
 6   personally spoke with ever tell you that they
 7   thought it was a marketing scam?
 8      A.  Yes.
 9      Q.  How many?
10      A.  The amount of number that we have
11   there.
12      Q.  Three?
13      A.  Yeah, whatever.  Three, four,
14   whatever it is.  Now -- okay.  That's fine.
15      Q.  The next paragraph 20 says, "As part
16   of Trump University's up-sell campaign, Trump
17   University had a policy and practice that if a
18   student gave high ratings on an evaluation form,
19   we were supposed to immediately call them back
20   and try to up-sell them to get them to sign up
21   and pay for more seminars."
22         Is that true?
23      A.  Yeah.
24      Q.  All right.  So did you have a stack
25   of contacts that from students that gave high
```

Page 237

```
 1            J. Nicholas
 2   ratings?
 3      A.  Like I explained earlier, we're
 4   required to call all leads from the live event.
 5   However many employees are in the sales meeting
 6   that morning, there's a stack of papers that
 7   were all filled out from the live event.
 8   Everybody was dished out, you know, whatever,
 9   like this (indicating), you know, hey, here's 5
10   for you, 10 for you, 20 for you, 100 for you,
11   whatever it may be.  Given the leads.
12         We would go through the leads and it
13   was a priority that obviously we call of them
14   because they did attend the live event, they had
15   some interest level and we needed to try to sell
16   them something.  And the ones that had, like I
17   stated, we had to target those guys first
18   because the event just happened, it's a few days
19   removed and everything is fresh in their brain,
20   we wanted to attack them and try to up-sell them
21   some more.  I mean that's pretty clear.
22      Q.  So it sounds like this sentence is
23   only partially true; that you didn't just
24   contact students that gave high ratings, you
25   contacted every student that went to a program,
```

Page 238

1      J. Nicholas
2  right?
3      MS. ECK: Objection. Misstates the
4  witness' testimony and misstates the
5  document itself.
6      That document doesn't say that they
7  only called certain people. It says the
8  policy was to immediately call them back.
9  You're misrepresenting the document.
10 BY MR. SCHNEIDER:
11 Q.  Is my statement true, sir?
12     MS. ECK: Would you repeat the
13 question, please?
14     MR. SCHNEIDER: Sure.
15     MS. ECK: Unless you want to restate
16 the question yourself, David.
17     (Question was read back as follows:
18     "QUESTION: So it sounds like this
19 sentence is only partially true; that you
20 didn't just contact students that gave high
21 ratings, you contacted every student that
22 went to a program, right?")
23 A.  Whatever it says, that's what it is.
24 Q.  I'm asking what this says. I'm
25 asking is if in practice you contacted each

Page 239

1      J. Nicholas
2  student that went to a live program and not just
3  the one that gave high ratings.
4  A.  I don't know how many time I repeat
5  myself. We gave a stack -- every salesperson
6  was given a stack of all leads that were at the
7  event.
8      However, there were some that had
9  marks on it, asterisks, you know, high ratings,
10 that these people are hotter -- they're more of
11 a hot lead than some of the other people and we
12 were to call those people first. But we had to
13 call everybody, but those people were
14 specifically targeted in order to up-sell them
15 to anything.
16 Q.  Paragraph 21 on the testimonials, we
17 talked about the sum total of your information
18 regarding false, misleading and fabricated
19 testimonials earlier.
20     That was based on what Mark Covais
21 told you, right? Yes?
22 A.  Yes, correct.
23 Q.  The next line, "Testimonials were not
24 expected results and were not realistic."
25     Where is that information from?

Page 240

1      J. Nicholas
2  A.  This was common knowledge.
3  Q.  What knowledge do you have that the
4  testimonials were not expected results?
5      MS. ECK: Objection. Asked and
6  answered.
7      Go ahead.
8  A.  It's just -- oh, my God. I don't
9  know what you -- I don't know where to go with
10 this other than what it says.
11 Q.  Well, sir, I can say that your
12 shirt's blue. It's just common knowledge. You
13 know, you can say anything.
14     What I want to find out is what's the
15 reason. What's the basis for saying that the
16 testimonials were not expected results.
17     Did you see some testimonials?
18 A.  Yes. I told you this all before.
19 Rip-off reports, people calling and complaining.
20 Like this is over a course of five months
21 you're getting negative feedback, so therefore
22 some of the results that people are, you know,
23 expected, it's false. It's not real. It's not
24 happening. This is not -- like with weight loss
25 or whatever it is, like it's not expected or

Page 241

1      J. Nicholas
2  some of these pills that people buy, like the
3  results are not realistic. They're not, they're
4  not -- they're false. They're fabricated.
5  They're embellished.
6  Q.  Are you saying that the
7  testimonials -- I mean you mentioned what Mark
8  coach told you.
9      Are you saying that testimonials
10 about people that made money, they weren't true,
11 all of them weren't true?
12     MS. ECK: Objection. Misstates the
13 witness' testimony and asked and answered.
14 BY MR. SCHNEIDER:
15 Q.  You can answer. You said they're not
16 realistic.
17     Are you saying that --
18 A.  Not for everybody.
19 Q.  All right. Some people they were
20 true, right?
21 A.  It's not 100 percent. Of course
22 there's -- in anything there's people that
23 are -- whether, whether somebody, you know, if
24 100 people buy something and they're all
25 expecting the same results, it also has to do

Page 250

1  J. Nicholas
2  A. As we continue to read, it was a
3  revolving door. People would come and go.
4  Mentors would stick or not stick. You know,
5  like I said before, coaches or mentors or
6  whoever, they wouldn't return calls and they'd
7  want to know why. They're no longer here or
8  they're no longer active. You know, however you
9  want to report it. So that's why I said what I
10 said.
11 Q. Do you know of any mentors during
12 your five months that you were there that left,
13 that were no longer working at Trump University?
14 A. I know people left. I cannot recall
15 which names left and which not left. All I got
16 was the feedback.
17 Q. Do you have any estimate as to the
18 number of mentors that left during the time you
19 worked there?
20 A. No, I do not.
21 Q. Do you know how many mentors Trump
22 University had while you worked there?
23 A. Several, handful. I don't know the
24 specific number, but I mean I know, you know,
25 certain guys were assigned to real estate online

Page 251

1  J. Nicholas
2  courses, those guys were there, then the live
3  events. You know, guys -- people would come and
4  go with the live events and the coaching. It
5  was hired by -- excuse me, it was hired like on
6  a, basically on a per live event basis or per
7  coaching basis. Like some people didn't stick.
8  I mean it was just common knowledge around the
9  office.
10 Q. Again, I'm asking you what your
11 knowledge is, not the, quote, unquote, common
12 knowledge, all right? So I want to stick to
13 what you know.
14     The online coaching -- well, in your
15 mind, did you differentiate between coaching and
16 mentoring or are they the same to you?
17 A. When I lump instructors or mentors, I
18 lump all the people who were in charge of a
19 program, whether that's an online real estate
20 course, somebody that was at a, you know, headed
21 up a live event or a coach. That's what I mean
22 by that.
23 Q. The next part of the sentence says,
24 "Trump University didn't even attempt to assign
25 students new mentors unless they complained."

Page 252

1  J. Nicholas
2     How do you know that's true?
3     Well, first of all, why would a --
4  let's back up?
5     Why would a student need a new mentor
6  if they were happy?
7     Your statement says they don't even
8  attempt to assign a student new mentors unless
9  they complained.
10    They weren't complaining, why would
11 they get assigned a new mentor?
12    MS. ECK: Objection. The document
13 speaks for itself.
14    It says if the mentor left, they
15 wouldn't assign a new mentor unless they
16 complained.
17 BY MR. SCHNEIDER:
18 Q. Oh, is that your point, that if they
19 didn't have a mentor anymore?
20 A. Wait. What's written is what I
21 state.
22 Q. And what my question is is how do you
23 know? How do you know that students weren't
24 provided new mentors?
25 A. You're not going to be happy with the

Page 253

1  J. Nicholas
2  answer, but sales meetings, you know, reports
3  from customer service, other salespeople. It's
4  just --
5  Q. This is what you heard around the
6  office.
7  A. Yes.
8  Q. All right. What Trump University
9  instructor did you personally hear tell a
10 student that they were guaranteed to make their
11 money back in the first deal or two?
12    (Document review.)
13 A. I mean it was just, it was just how
14 they -- it was just how like the script was
15 written and it was just how like we were told to
16 portray that this is not going to be a long
17 process. These guys are skilled and you're
18 going to make your money back on the first, you
19 know, first two or three deals. That's how it
20 was sold and that's how we were instructed to
21 sell, so that's the base of that statement.
22 Q. So let me ask you what you actually
23 wrote.
24    Did you ever hear an instructor tell
25 a student that they were guaranteed to make

Page 254

J. Nicholas

2 their money back in the first deal or two?
3     A.   It was part of their sales pitch,
4 yes.
5     Q.   When did you hear an instructor ever
6 talk with a student?
7         MS. ECK: Objection. Asked and
8 answered. Harassing.
9     A.   I don't know how to elaborate more on
10 the question other than what's stated.
11     Q.   When did you ever hear an instructor
12 tell anything to a student?
13     A.   There was phone call -- there was
14 phone -- this is, again, this is not direct
15 like.
16     Q.   Listen to my question, Mr. Nicholas.
17 It's a very specific question?
18     A.   Um-hmm.
19     Q.   All right?
20         Trump University had instructors that
21 presented at live events, right?
22     A.   Correct.
23     Q.   And you didn't attend any of those,
24 so you obviously --
25     A.   Obviously.

Page 255

J. Nicholas

2     Q.   -- didn't hear the instructors at any
3 live events, true?
4     A.   I guess I'd said yes.
5     Q.   Okay. Were any of the instructors at
6 Trump University on the phone with customers
7 that you heard?
8     A.   I sold a deal and I was involved in
9 part of the conference call, not the whole call.
10 I did hear things along the lines leading to
11 project or to say that you're going to expect
12 immediate results in the first few deals.
13         I also -- and again, there are people
14 in sales meetings where we had to talk about our
15 day-to-day experiences out loud in front of
16 everybody and also with program directors who
17 were handling the stuff, sometimes they would
18 get one of the instructors on a conference call
19 and this is the message, and that's what I'm
20 saying, this is the message that was being
21 portrayed.
22         So you're asking me did I physically
23 hear with my ears. I can't say that it was
24 exactly, you know, this is what it's going to
25 be, but that was what is alluded to; that it was

Page 256

J. Nicholas

2 going to happen. That they were gonna -- if you
3 come on board, pay us this money, we are going
4 to go out and help you, hold your hand, that's
5 in the script, hold your hand and get stuff done
6 right away and help you make money.
7     Q.   That's the message you conveyed as a
8 salesperson, right?
9     A.   Correct.
10     Q.   All right. And my question is a
11 little bit different.
12         Did you ever hear any instructors,
13 Trump University instructors, not salespeople,
14 but instructors, tell students that they were
15 guaranteed to make their money back in the first
16 deal or two?
17         MS. ECK: Objection. Asked and
18 answered.
19         He already indicated that he heard
20 instructors on conference calls with
21 program directors.
22         MR. SCHNEIDER: Not make that
23 statement ever.
24         Look, just make your objection, okay?
25 It's totally improper what you do, Amber.

Page 257

J. Nicholas

2 You're trying --
3         MS. ECK: Well, you're making this
4 take all day.
5         MR. SCHNEIDER: You know why?
6 Because he won't answer the question.
7         MS. ECK: He did answer.
8         MR. SCHNEIDER: I'm not going to
9 argue. I'm not going to argue with you.
10 It's going to take two days if we don't get
11 through this.
12         THE WITNESS: No, it's not.
13 BY MR. SCHNEIDER:
14     Q.   Mr. Nicholas, did you ever hear an
15 instructor, you personally, hear an instructor
16 tell a student that they were guaranteed to make
17 their money back in their first deal or two?
18     A.   It was alluded to through the
19 marketing and through phone conversations,
20 conference calls, that that would happen.
21     Q.   And what you have in mind you
22 actually heard an instructor say those words?
23     A.   No, in a conference call. I can't
24 tell you -- I don't know who it is. I mean, you
25 know, I mean if -- I don't know how you proceed

Page 258

```
 1              J. Nicholas
 2   saying the same thing.
 3       Q.   Who's the instructor?  That's what
 4   I'm trying to find out.
 5       A.   I said I don't know.
 6       Q.   Why did you get an instructor on the
 7   line?
 8       A.   Because I just told you, because we
 9   sold a large deal or somebody next to me had
10   sold a large deal and they needed, in order to
11   close the deal, to give this person, you know,
12   excuse me, to give this person confidence in
13   order to commit that sum of money, it's not a
14   couple dollars, it's a lot of money, sometimes
15   an instructor was needed because the program
16   director might not be skilled enough or they
17   might not have had the -- enough, what's the
18   word I'm looking for, enough credibility that to
19   bring in an instructor to help close the deal,
20   they made those types of statements and they
21   also made it in their marketing material.
22       Q.   I'm not asking about marketing
23   material.
24       A.   Okay.  But if --
25       Q.   I'm not asking about your buddy next
```

Page 259

```
 1              J. Nicholas
 2   to you in the cubicle.  What I'm asking about is
 3   you, Mr. Nicholas.
 4            Did you participate in a conference
 5   call with an instructor from Trump University in
 6   which the instructor guaranteed to the person
 7   that they'd make their money back in two or
 8   three -- one or two deals?
 9       A.   I said yes and I said I don't
10   remember which instructor, but I said yes, I've
11   heard this happen, yes.
12       Q.   On one of your calls.
13       A.   Not -- one of my deals that I was
14   involved in, not like I pick up the phone and
15   I'm talking to this guy and I'm the only person
16   in the room that has this conference call, no.
17   It's me, program director, maybe Mr. Quintal,
18   other parties involved, put the guy on speaker
19   and the instructor would call in on a three-way,
20   and we try to get this deal closed, yes, I did.
21   I've heard that happen.
22       Q.   How many times did that happen?
23       A.   Once for me, but for others I've
24   heard it.
25       Q.   And was it the same call that the
```

Page 260

```
 1              J. Nicholas
 2   instructor told the consumer to do whatever it
 3   took to come up with the money to pay for the
 4   course; raise your credit card limit, put it on
 5   multiple credit cards, borrow from an uncle or a
 6   cousin?
 7       A.   That was -- did that and not just
 8   mine, but everybody's.
 9       Q.   No, I'm just talking about --
10       A.   Yes.
11       Q.   -- ones that you were involved in.
12       A.   Yes.
13       Q.   So that was the same one
14   conversation?
15       A.   Yes, sir.
16            THE REPORTER:  Wait until he
17   finishes.
18            THE WITNESS:  Sorry.  I'm just
19   getting a little frustrated talking about
20   the same thing.
21   BY MR. SCHNEIDER:
22       Q.   How many customers did you ever talk
23   to that had actually completed their in-field,
24   in-person mentorship?
25       A.   One personally, but again, a whole
```

Page 261

```
 1              J. Nicholas
 2   bunch of other people, I hear their
 3   conversations and hear their successes and also
 4   their failures.
 5            So, you know, the statements that are
 6   written here, whether like, again, I don't know
 7   the legal process about this, but if something
 8   needs to be more -- elaborated more to clarify,
 9   then I'm very cool with being able to add to
10   this.
11            These statements are correct, but
12   when I was writing these statements and saying
13   the things that were said, it was also not just
14   my own personal experiences, but it's my
15   experience as a whole that I can recall, that I
16   know about, that I heard, that I listened to,
17   that I communed with other people.  That's why
18   these statements are here.  I'm just telling
19   you --
20       Q.   I understand.  And that's why I'm
21   trying to figure out which ones are personal.
22       A.   Okay.  Okay.
23       Q.   Because in the beginning you stated
24   in the declaration they're personal.
25       A.   Well, it is personal.  If I know
```

Page 262

J. Nicholas

what's going on, whether it's me picking up the phone or, you know, it's her picking up the phone, it's personal. I can totally hear it. I can hear it, I'm involved with it, as a team we talk about it, so to me when I wrote this, that means personal.

Q. The one person that you spoke with that had gone through the mentorship program, did they tell you that -- what did they tell you about their experience?

A. It was an older gentleman and, you know, it was -- I could tell that --

Q. My question is what did he tell you, not what you could tell. I don't want you to interpret it. I want you to tell me the words he used.

A. He used that he was frustrated and he felt like he wasn't ready, but yet he had already committed his funds and went through the process.

Q. Had he done the in-person mentorship?

A. Yes, but I think I also had another sale where the person asked for a refund and backed out so...

Page 263

J. Nicholas

Q. Before he went through it?

A. Yes. So there's really technically two that did this, but one went through it and one of them I think backed out.

Q. Did they get a refund?

A. I don't know that. I don't know the answer. I think it was after I left.

Q. The last line on this paragraph, line 23 -- well, let me take the whole sentence. No. 21, "The mentor didn't take you through deals step by step.

You said earlier about someone had told you that they had gone through and looked at the properties and assessed each property, right?

A. Right.

Q. All right. So --

A. That's the initial stages of it. What I mean by that is mentor, the mentor didn't take you through deals step by step means the initial steps, meaning finding out what city you wanted to invest in, maybe what type of properties you were looking at, those are the initial steps.

Page 264

J. Nicholas

But where everything went awry and why everything throughout, there was a lot of confusion and upset people is the second half of the steps is not following up, not making sure deals were closed, not making sure that this person was successful.

And to me, you know, from a moral standpoint, it's not just the first steps, it's the complete process, and where I felt that there was a lack of responsibility was on the back end, following up, making sure this person, you know, went through the process and completed it.

That's why I said -- and some of these people didn't have -- like as I continue to state, they didn't have the finances to invest either, meaning they paid to come on board to sign up for this, but they were in way over their heads. They went through the process and they weren't able to complete it. That's what I meant by those couple sentences.

Q. By that you mean the students couldn't complete it.

A. Correct.

Page 265

J. Nicholas

Q. Did you ever look at any of the evaluations, the mentorship evaluations?

A. Mentorship. What do you mean by that?

Q. Sure.

After people went through their mentorships, they filled out evaluations just like they did when they went to the live programs.

Did you ever see those?

A. Like I said, I only was -- I only received what was the negative feedback. I didn't receive any of that.

So we're talking about personal coaching here, right, we're not talking about live events?

Q. Right. I'm talking about when someone pays 25 --

A. Right, right, right.

Q. -- or $35,000 and they get this in-person.

So you don't know what the data shows on that, do you?

A. No, I don't.

Page 298

1  J. Nicholas
2  information, we were able to be educated and
3  really hammer down, try to get some sales.
4      Q.  Where was your office?  You were in a
5  cubicle, right, an open cubicle?
6      A.  Yeah.  I can draw it for you if it
7  helps.
8      Q.  Sure.
9      A.  To make things easier.
10     Q.  Show me where everybody was situated.
11     A.  All right.  Cool.
12         (Witness drawing.)
13     A.  So basically this would be the --
14  this is the front door (indicating).  You walk
15  in, this is the conference room (indicating).
16         And then this was a row of cubes.
17  Approximately I would say eight to ten people
18  could fit on this side (indicating) and then
19  same setup on this side where you had cubes
20  (indicating), same amount.  This was sales.
21     Q.  All right.  So write sales in that
22  area?
23     A.  Okay.  Sales.
24         (Witness complies.)
25     A.  Sales.  HR, I guess that's what the

Page 299

1  J. Nicholas
2  role was, slash accounting.  I think his name
3  was Matejek or something like that.  I don't
4  know what his name is.
5         And then VP sales, so that was
6  Quintal's office right here (indicating).
7  Quintal.
8         This is a hallway right here
9  (indicating) so these are offices.
10        Then back here (indicating), the
11 corner office was Mr. Sexton.
12        And then over here (indicating) was
13 Highbloom.
14        And then this office right here
15 (indicating) was kind of a mix.  It had customer
16 service.  Customer service.  Sorry about that.
17 I'm just trying to go fast.  Customer service.
18 Also had your marketing, party or marketing.  I
19 can't remember his name.  If you said it, I'd
20 know it.  Marketing, and then the computer guy.
21 His name is Christopher Rugen.  He did like all
22 the -- you know, he managed the website and
23 everything so he was right there (indicating).
24        And then over here (indicating) was
25 more marketing and then there was also a small

Page 300

1  J. Nicholas
2  group of live events.  They would kind of sit in
3  here with the marketing.  They were kind of, you
4  know, more together in terms of on the same
5  page.
6      Q.  So put an X where he was at.
7         (Witness complies.)
8      A.  And then this was lunch room
9  (indicating).
10     Q.  And where did you sit?
11     A.  For the majority of the time I sat
12 right here (indicating).
13     Q.  And where was Mark Covais?
14     A.  His chair hit mine, so Covais was
15 right here (indicating).  So there was, there
16 was nothing here.  This was his desk
17 (indicating) and I was right here (indicating.
18 So that's me and then he was facing, he was
19 facing this way (indicating) and I was facing
20 this wall (indicating).
21     Q.  All right.  And could you hear from
22 where you were sitting, discussions going on in
23 the marketing area?
24     A.  No, because they had -- everybody
25 here had doors, so a couple of them left it open

Page 301

1  J. Nicholas
2  because it's like here, hot, cold, but no, it
3  wasn't like I was -- no.
4      Q.  All right.  It would be difficult to
5  hear their conversations?
6      A.  Absolutely.  I mean it was all about
7  these two pits and we could hear every -- I
8  could hear everything from over here to over
9  here (indicating).  Everybody here had doors.
10 It was just like us and everybody else was, you
11 know, barely even interacting unless they have
12 to go to the bathroom or go out to eat.
13     Q.  All right.  So just for the record,
14 when you said here and here, you come up with
15 two sales areas.
16     A.  Right.  The two sales pits of
17 cubicles.
18     Q.  Okay.
19     A.  So I mean I can do it clearer for
20 you.
21     Q.  That's fine.
22        MS. ECK:  Just mark that as
23 Exhibit 9.
24        (Defendants' Exhibit Nicholas 9,
25 Diagram of office layout by the witness,



Hello (_____)

My name is <u>Jason Nicholas</u> from <u>Trump University</u>.

I've been assigned to your account.

I have some **QUESTIONS** and some Important **INFORMATION** for you.

Do you have a <u>few minutes</u> to speak with me?   **GREAT**


I have your **FILE** in front of me and it doesn't show a <u>**PARTNER**</u> or <u>**SPOUSE**</u>, are you **MARRIED** or do you have a **PARTNER**?

Do you have any <u>experience</u> investing in <u>**REAL ESTATE**</u> besides your <u>own home</u> of course?

***If NO*** what's <u>prevented</u> you from getting involved in <u>**REAL ESTATE**</u>?

If you knew how the **EXPERTS** were able to (_____) would that be of **INTEREST** to you?


(_____) there is something that I believe will <u>**INTEREST** you in your **SITUATION**</u>.

How would you like to work with **Donald Trump's Real Estate EXPERTS**?

This is **NOT** something we offer to just **ANYONE** ------and-------We <u>don't</u> want to work with just **ANYONE**

Mr. Trump is on a **MISSION** to create the <u>next wave of</u> Independently wealthy entrepreneurs in America.
**IS THAT YOU (_____)???**


Obviously (_____) if we're going to **CREATE** these <u>wealthy Entrepreneurs</u>, we Only want to work with people who have **CERTAIN QUALITIES**...

So, we're actually going through an **INTERVIEWING** process, "Looking to <u>**SELECT**</u> a <u>**FEW**</u> **PEOPLE!**" that we might be able to work with **1-on-1**.

We're **ONLY** looking for <u>Highly Motivated Individuals</u> that really want to be Aggressive with their Real Estate projects & want to become <u>Profitable</u> **RIGHT AWAY!**
**IS THAT YOU?    GREAT!**

A lot of People have asked if **MR. TRUMP** can meet with them in person and show them how he <u>finds</u> properties—how MR. TRUMP <u>evaluates</u> properties and--- how he uses <u>creative financing</u> to acquire properties with little or "*preferably*"    **NO-MONEY-DOWN!**

TU-NICHOLAS0000001

Obviously, Mr. Trump can't meet w/everyone, nor does he want to. So he has created (**Trump Univ.**) where we **ONLY** invite a **select group of people** that have been **hand-picked** by his Program Director.

In this (*course/retreat/program*) we offer **LIVE, HANDS-ON-TRAINING** with Donald Trump's professional Real Estate Instructors.
These instructors will be holding your Hand, showing you the way!
You will learn how to SUCCEED "**The TRUMP way!**"

These instructors are **Experts** in today's Real Estate world and teach all of the non-traditional or unconventional ways of (buying & selling Real Estate)
I'm talking about the latest strategies and techniques in Real Estate.

Let me ask you (_____) is everything Donald Trump does, **the BEST**?
He wouldn't put his name on this if it wasn't,    right?
Do you feel that working with **Mr. Trump's experts** is something you would like to be considered for?

TU-NICHOLAS0000002