# EXHIBIT 3

UNITED STATES DISTRICT COURT OF CALIFORNIA
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, BRANDON
KELLER, ED OBERKROM and
PATRICIA MURPHY, on behalf
of themselves and all others
similarly situated,

   Plaintiffs,

  vs.

TRUMP UNIVERSITY, LLC (AKA
TRUMP ENTREPRENEUR
INITIATIVE) a New York
Limited Liability Company,
DONALD TRUMP and DOES 1
through 50, inclusive,

   Defendants.
------------------------------

Index No. 3:10-CV-00940-CAB

***CONFIDENTIAL***

VIDEOTAPED DEPOSITION OF MARK COVAIS

New York, New York

Thursday, January 17, 2013

Reported By:
Michelle Cox

Job No.: 10004857

Confidential

Mark Covais                                                                                                Makaeff v. Trump University

| | |
|---|---|
| 1  making sure that they were sticking to the script.<br>2  Because they had no background knowledge of the<br>3  program, and we didn't want them talking about what<br>4  we had to offer, the different products. And this<br>5  is, you know, probably 2007, 2008, 2009, like a<br>6  little later.<br>7     Q. That -- that your job duties for<br>8  telephone sales were?<br>9     A. So initially it was just me.<br>10    Q. Right.<br>11    A. And I was the guy and I knew everything.<br>12 And then as the company grew, we added more<br>13 programs, we went to -- it's called a setter-closer<br>14 model. And we would have people that would, you<br>15 know, it's like me calling back people who would<br>16 call in, or responding to e-mails, inquiring. We<br>17 would have setters do that. And their purpose was<br>18 to, you know, qualify potential students and find<br>19 out, you know, what they were interested in, what<br>20 their -- you know, what they wanted to accomplish.<br>21 And then, if they thought it -- it was going to be a<br>22 good fit or that I should speak to them, they would<br>23 set an appointment for me and I would call them.<br>24    Q. And so as the program director, you<br>25 mentioned that you sat in the general vicinity and<br><br>Page 89 | 1  listened to folks making these calls, correct?<br>2     A. Yes.<br>3     Q. Can you describe that setting where<br>4  everyone sat?<br>5     A. Like a cubicle. Like a big cubicle.<br>6     Q. Did all the salespeople sit in this<br>7  cubicle area?<br>8     A. No.<br>9     Q. Okay. Who didn't sit in the cubicle<br>10 area?<br>11    A. Well, again, like as time went on, and<br>12 the company kind of grew and changed, initially, the<br>13 office was split up so that one half was customer<br>14 service and the other half was sales.<br>15       And as the sales team grew, they went<br>16 into a separate office. And then as the sales team<br>17 grew, we even had an office in Utah.<br>18    Q. Did you go into the Utah sales office,<br>19 too?<br>20    A. I didn't.<br>21    Q. Okay.<br>22    A. I went --<br>23    Q. So then you're responsible for the<br>24 schedulers and setters.<br>25       What period of time were you responsible<br><br>Page 90 |
| 1  for them, from 2006 to 2008?<br>2     A. No. I mean it was later.<br>3     Q. Okay.<br>4     A. So 2006 until maybe March of 2007, it<br>5  was like -- you were kind of responsible for your<br>6  own thing. And then in that spring, we -- we<br>7  changed, kind of the way we did things.<br>8     Q. Spring of 2007 you changed.<br>9        How did it change?<br>10    A. We went to the setter-closer model.<br>11    Q. Okay. And that's when salespeople were<br>12 in this cubicle area; is that correct, when you went<br>13 to the setter-closer model?<br>14    A. We were in the cubicle area before that.<br>15    Q. Okay.<br>16    A. But it's just that the people that were<br>17 there, were kind of responsible for their own<br>18 setting and closing, I guess, their own sales.<br>19    Q. Okay. And then in 2000 -- when did you<br>20 move -- when was the sales group moved to a separate<br>21 office?<br>22    A. I don't recall.<br>23    Q. Approximately, 2009, '10?<br>24    A. No. I mean, it was probably in 2000 --<br>25 let's see, '08.<br><br>Page 91 | 1     Q. Okay. And what was that office like?<br>2        Was there also a cubicle set up, and<br>3  they had their own separate office?<br>4     A. Yeah. Same thing.<br>5     Q. And were you located there as well?<br>6     A. I have worked in every office in that --<br>7  in our office.<br>8     Q. Okay. To ensure -- when they moved to<br>9  the other office, how did you ensure that sales<br>10 folks did not misrepresent or overstate Trump<br>11 University's products?<br>12    A. The same -- you're in close proximity to<br>13 them.<br>14       MR. SCHNEIDER: For clarification, it<br>15 wasn't, you know, some different building; it<br>16 was the same office space.<br>17       MS. ZELDES: Okay.<br>18    A. Yeah. So like it was the difference<br>19 between here and next-door.<br>20    Q. Okay.<br>21    A. It was very close.<br>22    Q. Mm-hmm.<br>23    A. But what I'm saying -- when you sat with<br>24 your setters, it was like this close; I mean,<br>25 literally.<br><br>Page 92 |

23 (Pages 89 to 92)

Confidential

Mark Covais																					Makaeff v. Trump University

### Page 93

1   Q. Across --
2   A. You could touch them.
3   Q. Okay.
4   A. Not that -- you know --
5   Q. So it was your office in part of that
6   sales area?
7       Where the setters sat, was your office
8   where the setters were, in the same proximity?
9   A. Yeah. I mean, I didn't have an office.
10  We were all like in cubicles.
11  Q. Okay. And you were in the same cubicle
12  area as the setters?
13  A. Like literally this close.
14  Q. Great.
15      Sitting at the same table?
16  A. Yes.
17  Q. Okay.
18  A. Except -- so if you think about this
19  table, was the common area.
20  Q. Okay.
21  A. And everybody faced this way.
22  Q. Got it.
23  A. Right. But it's this close.
24  Q. So you could flip your chair around --
25  A. Yeah, yeah. It's spin, it's great. You

### Page 94

1   know, you chitchat.
2   Q. Great.
3       And so when you listened in on these
4   sales calls, can you tell me what your
5   responsibility was when you did that?
6       You said you had to ensure that they
7   didn't misrepresent.
8       So can you tell me more about that?
9   A. Well, we didn't want them talking about
10  any of the products, because that wasn't their
11  purpose. We didn't want them making any, you know,
12  promises or talking about, you know, the success of
13  people or the outcomes of taking our programs.
14      You know, it was strictly to find out
15  why they were contacting us, what their interest
16  level was, what program they were interested in, and
17  to set an appointment to speak to me.
18      And if, you know -- I would -- you would
19  overhear something like that. You'd be like, hey,
20  listen, you know, next time -- and also just the way
21  people -- you know, the language they used, you
22  know, might not sound as professional as you want on
23  the phone, depending on the person and experience
24  level. You know, just general kind of coaching them
25  through the call.

### Page 95

1   Q. So if you heard something that wasn't in
2   alignment with --
3   A. The script.
4   Q. -- the script, then you would approach
5   them and reprimand them or write them up?
6       Or what would you do to ensure that
7   they -- they --
8   A. Well.
9   Q. -- it's descriptive.
10  A. My personality, I don't take a
11  heavy-handed approach. But it would be like, hey,
12  great job. Lot of good information, but maybe next
13  time, you know, we need -- find out more information
14  or don't do this.
15      I mean, depending on, you know, what
16  they were saying and how far off the script they
17  went.
18      You know what I mean?
19      If it's something little. If it's just
20  a matter of like, you know, kind of paraphrasing it.
21  But if you come across someone like going into the
22  programs we have to offer -- because a lot of times
23  when people call in, they just want to know what --
24  you know, the program. But it's -- it's more than
25  that.

### Page 96

1       You know, we try to do -- you know, I
2   was hired to do a consultative sale. Meaning that I
3   want to spend the time talking to you understanding
4   what you want to do, what your goals are and -- and
5   really match something up, even create something for
6   you that's going to give you the -- the best
7   opportunity at reaching the goals that you had
8   initially identified to me.
9   Q. And as a -- as a program director, did
10  you report to anybody?
11  A. Sure.
12  Q. Who did you report to?
13  A. I've had multiple bosses. So
14  Brad Schneider was, I think -- actually -- so David
15  Highbloom was probably my first boss.
16      THE COURT REPORTER: What was the last
17  name?
18      MR. SCHNEIDER: H-I-G-H-B-L-O-O-M.
19  BY MS. ZELDES:
20  Q. Okay. And so besides Highbloom and
21  Schneider, did you have anybody else you reported
22  to?
23  A. Yeah. So David Highbloom was my boss;
24  Brad Schneider was my boss; Steve Matejek was my
25  boss; Michael Sexton, obviously my boss;