EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, et al., on §
Behalf of Themselves and §
All Others Similarly §
Situated, §
 §
      Plaintiffs §
 § Civil Action No.
VS. § 3:10-CV-00940-CAB
 §
TRUMP UNIVERSITY, LLC, §
et al., §
 §
      Defendants §
_____ §

VIDEOTAPED DEPOSITION OF CHERYL DONNELLY
Austin, Texas
Friday, November 2, 2012

Reported by:
MICHEAL A. JOHNSON, CRR
JOB 54334

Page 6

1  A. In 2010, I believe.
2  Q. And were you looking for a lawyer
3  at the time?
4  A. No, I was not.
5  Q. All right. And at the time that
6  she called you, did she tell you what she
7  wanted?
8  A. She gave me background on the case.
9  MS. ECK: I instruct you not to
10 answer what we discussed. And object on the
11 grounds of attorney-client privilege.
12 BY MR. SCHNEIDER:
13 Q. When did you hire her as your
14 lawyer?
15 A. I -- the official?
16 Q. Yes.
17 A. That would be I believe in
18 September.
19 Q. Of what year?
20 A. 2012.
21 Q. Okay. So last month?
22 A. Correct. But I was working with
23 her under the assumption she would represent
24 me.
25 Q. Okay. And why did you want a

Page 7

1  lawyer to represent you?
2  A. If there was a trial, I would need
3  an attorney.
4  Q. Why is that?
5  A. To represent me just in case
6  anything came up. I'm not aware of the whole
7  legal process.
8  Q. So you've been working with Ms. Eck
9  since 2010, the last two years?
10 A. Correct.
11 Q. And before today or yesterday have
12 you ever met Ms. Eck?
13 A. No.
14 Q. Just spoken with her on the phone
15 or through e-mails?
16 A. Correct.
17 Q. How much time would you estimate
18 that the two of you-all have spent either on
19 the phone or in e-mails?
20 A. I honestly do not know. Since 2010
21 cumulative maybe not even ten hours actual
22 speaking and e-mails. Maybe more, but I don't
23 track that.
24 Q. I've seen a declaration that you
25 signed that was filed with the court. We'll

Page 8

1  talk about that a little bit later today. Was
2  that prepared by Ms. Eck's firm or by Ms. Eck?
3  A. ==She wrote it based on our==
4  ==conversations and I revised it and submitted==
5  ==it to her because I had not been through the==
6  ==process before.==
7  Q. When did you work for Trump
8  University?
9  A. In 2007.
10 Q. And what were the months?
11 A. March through October.
12 Q. So approximately seven months
13 total?
14 A. Correct.
15 Q. And what was your job?
16 A. I worked in marketing.
17 Q. And what were your
18 responsibilities?
19 A. I worked on Trump Advantage, the
20 software program testimonials. I would help
21 out with, you know, marketing for events.
22 Just general marketing duties.
23 Q. What was your background in
24 marketing before working at Trump University?
25 A. I had been working in the industry

Page 9

1  for several years. I had been marketing
2  manager, product manager.
3  Q. Marketing manager where?
4  A. At Educational Communications.
5  Q. What do they do?
6  A. Publish Who's Who books.
7  Q. How long did you do that?
8  A. I believe two years and three
9  months.
10 Q. And how did you learn about the
11 position at Trump University?
12 A. Josef Katz.
13 Q. And did you know him?
14 A. Correct. Yes.
15 Q. How -- how did you know him?
16 A. I had worked with him through
17 Educational Communications.
18 Q. What was his position there?
19 A. He was actually at Kaplan, which
20 was a partner of Educational Communications.
21 Q. And did y'all work together?
22 A. We had a partnership.
23 Q. Did you and Mr. Katz work together?
24 A. Yes.
25 Q. Was he in a related company? Is

Page 38

1  experience?
2      A.  Basically that she had basically
3  been let go from her position, I believe, at
4  her old job, had taken another course with
5  another competitor, took this course and
6  started investing in property.
7      Q.  Did she talk about what the
8  competitor course was?
9      A.  She may have.  I do not recall the
10 name of that.
11     Q.  How did she compare it to Trump
12 University?
13     A.  She said she liked it -- or the
14 other one?  She didn't get as much
15 information, I believe.
16     Q.  So this student told you that she
17 got more information from Trump University?
18     A.  It may have been a cumulative
19 effect, but she said she got information that
20 helped her with her --
21     Q.  Information from the Trump
22 University program that helped her, correct?
23     A.  Correct.
24     Q.  What else did she say about her
25 experience with Trump University?

Page 39

1      A.  I honestly do not recall.  She was
2  excited about her investment.
3      Q.  What was her investment?
4      A.  I believe she had purchased real
5  estate.
6      Q.  Did she tell you that she was using
7  the information from -- that she had acquired
8  from Trump University to make that investment?
9      A.  Yes.
10     Q.  And at the time you spoke to her,
11 was she having success with that investment?
12     A.  I believe she was on her way to
13 having success at that time.
14     Q.  And did you write up a testimonial
15 based on your conversation with her?
16     A.  Yes, I did.
17     Q.  And were you truthful and accurate
18 with it?
19     A.  Yes, I was.
20     Q.  At any time did anybody from Trump
21 University ever ask you to fabricate a
22 testimonial?
23     A.  No, they did not.
24     Q.  At any time did anybody at Trump
25 University ever ask you to do anything

Page 40

1  dishonest about a testimonial?
2      A.  Michael wanted me to get the hard
3  numbers.
4      Q.  Did he ever tell you to use false
5  numbers?
6      A.  No.
7      Q.  Did he ever tell you to make up
8  numbers?
9      A.  No.
10     Q.  Did he ever tell you not to do
11 anything that wasn't accurate?
12     A.  He wanted the story to be about
13 getting more money.  So if somebody was going
14 to get a possible payback, that would be a
15 headline versus somebody who was making
16 $10,000 or the soft sell.
17     Q.  Okay.  And -- and we'll look at
18 some of the documents in which you talk about
19 that you had -- I think your declaration says
20 you liked the soft sell idea better and Trump
21 University wanted to use numbers.  Would you
22 agree that's just a difference in approach?
23         MS. ECK:  Objection, vague.
24     A.  I think it's when you don't have
25 the story there of the big headline, which is

Page 41

1  what they wanted, is there -- it's actually
2  the right approach to take.  We did not have
3  anybody making the big $100,000 deals.
4  BY MR. SCHNEIDER:
5      Q.  Okay.  So let me get back to my
6  earlier questions because I -- I want to be
7  very clear about this and I want you to be
8  very clear about this.
9          At any time did anybody from Trump
10 University ever say to you or suggest to you
11 or imply to you that you should use inaccurate
12 numbers in the testimonials?
13     A.  No, they did not.
14     Q.  At any time did anybody from Trump
15 University ever say to you or imply to you
16 that the testimonials should not be honest?
17     A.  No, they did not.
18     Q.  Are you aware of any testimonials
19 that you were personally involved in that were
20 published to anybody in the public that was
21 not honest?
22     A.  The testimonials I wrote I know
23 were honest.  The testimonials that were
24 provided by a third-party vendor, I do not
25 know.

Page 42

1  Q. All right. So every testimonial
2  that you personally were involved in, those
3  were all honest and accurate?
4  A. Correct.
5  Q. And who was the third-party vendor?
6  A. I believe they were out of Utah,
7  but I do not recall the exact name.
8  Q. What's the best you can recall?
9  A. I want to say Prosper, but I could
10 be wrong on that.
11 Q. And who was your contact there?
12 A. I do not recall.
13 Q. How often would you speak with
14 them?
15 A. Not that often. If I did, I
16 would've remembered his name.
17 Q. Okay. So do you think you spoke
18 with somebody there less than five times?
19 A. I would probably say -- agree to
20 that, but I do not recall.
21 Q. And this third-party vendor, was it
22 your understanding that they had direct
23 communications with students?
24 A. That is my understanding.
25 Q. And you did not follow up with

Page 43

1  those students personally?
2  A. I may have. I do not recall.
3  Q. So do you have any information that
4  the testimonials that this third-party vendor
5  provided to you to use was not accurate?
6  A. I'm sorry, can you repeat the
7  question?
8  Q. Sure. As I -- as I think I
9  understand your testimony, testimonials came
10 to you two different ways. One, you
11 personally contacted students and all of those
12 testimonials that you personally were involved
13 in you believe are accurate, correct?
14 A. Correct.
15 Q. And you also received testimonials
16 through this third-party vendor in Utah.
17 True?
18 A. Correct.
19 Q. And do you have any reason or any
20 information that the testimonials that were
21 provided to you by this third party were not
22 accurate?
23 A. I do not.
24 Q. And at any time did you raise any
25 concern to anybody at Trump University that

Page 44

1  you didn't know whether or not the
2  testimonials were accurate?
3  A. I may have mentioned that, yes,
4  to -- I believe it was Michael who told me to
5  contact them.
6  Q. Michael Sexton?
7  A. Yes.
8  Q. Told you to contact this company?
9  A. Uh-huh.
10 Q. To obtain testimonials?
11 A. Yes.
12 Q. Okay. And do you know the way in
13 which this third-party vendor obtained
14 testimonials?
15 A. To my recollection they had
16 basically an outbound call center that would
17 call people.
18 Q. And how did that work?
19 A. I don't know the specifics of how
20 that operation worked.
21 Q. Okay. Do you know who they called?
22 A. I believe former students.
23 Q. Okay. So similar to what you did,
24 right? You called former students?
25 A. Correct.

Page 45

1  Q. All right. So to some extent you
2  were an outbound call center too, right?
3  A. A little bit, yes.
4  Q. All right. So did they do anything
5  different than what you did, to your
6  knowledge?
7     MS. ECK: Objection, calls for
8  speculation.
9  A. I do not know.
10 BY MR. SCHNEIDER:
11 Q. I'm just trying to understand what
12 your understanding is. All right? So it
13 sounds like this third-party vendor called
14 former students and you called former
15 students, correct?
16 A. Correct.
17 Q. And you tried to get information
18 from the former students about their
19 experience?
20 A. Correct.
21 Q. And determined whether or not
22 you're going to write a testimonial?
23 A. Correct.
24 Q. And you don't know what this
25 third-party vendor did, right?

Page 154

1   Q. No, go ahead.
2   A. And if there was, then it would've
3   been based on projections because that's all
4   we could have at the time and that is
5   obviously based on these other e-mails from
6   Michael what he was getting on me about.
7   Q. That he didn't want projections,
8   right?
9   A. He wanted numbers. He wanted the
10  million-dollar story and they just were not
11  there. So it was a matter of find out how you
12  can position it, whether it's using other
13  people's money or projection and finding a way
14  to position it so that it would be a glorious
15  story to feature. But the thing is to me if
16  you don't have that money, then that's not
17  success. That's projected and at any given
18  moment that success can fall out from
19  underneath you.
20  Q. On item No. 4 up above, which is
21  Mr. Sexton's response to your e-mail, I wanted
22  to ask you about the second to the last
23  sentence in paragraph 4 that starts, "I also
24  asked for a list of questions that you would
25  be asking students during testimonial

Page 155

1   interviews."
2       Do you remember a discussion with
3   Mr. Sexton about that issue?
4   A. No, I do not, but based on the
5   other e-mails, there were already questions,
6   and I remember having the conversation with
7   Michael saying that these are more
8   conversations. You have to kind of go with
9   how the student takes you, which is where we
10  varied. It was more for me about the story
11  and how they got there, the softer sell.
12  Because nobody had seen the success he wanted.
13  He wanted hard numbers. He wanted the other
14  things. So I did ask for the information, but
15  the thing is to have a hard script to follow
16  is not ideal when you're asking for a
17  testimonial.
18      (Deposition Exhibit 16 marked.)
19  BY MR. SCHNEIDER:
20  Q. All right. Let me show you what
21  I've marked as Exhibit 16. It's a one-page
22  document Bates numbered TU 131541. It looks
23  like it's an e-mail from you to Jason Schauer
24  dated September 12, 2007, regarding a student
25  by the name of John Hancock?

Page 156

1   A. Yes.
2   Q. And your e-mail says, "I am working
3   on a testimonial for him and he said he was
4   denied access to the site." Do you remember
5   Mr. Hancock?
6   A. Yes, I do.
7   Q. And what -- what do you recall
8   about what programs he participated in?
9   A. Based on this it would have to be a
10  real estate program, I believe, because it's
11  based on RE maybe. He had a background in
12  finance and he was based out of California.
13  He ended up -- if memory serves me
14  correctly -- working with Trump on the
15  publication or a book or some type of article
16  after the fact.
17  Q. Did he go to any live programs?
18  A. To my knowledge, I cannot recall.
19  Q. And what was his -- what was the
20  testimonial going to be? In other words, what
21  was his success?
22  A. I cannot say from this e-mail.
23  Q. Do you remember off -- from your
24  memory as to what it was about?
25  A. I do not recall.

Page 157

1       MR. SCHNEIDER: Why don't we go off
2   the record.
3       THE VIDEOGRAPHER: We will go off
4   at 12:27.
5       (Recess Taken From 12:27 p.m. To
6   1:32 p.m.)
7       THE VIDEOGRAPHER: We're back on
8   the record. This is the beginning of tape 4.
9   It's 1:32.
10      (Deposition Exhibit 17 marked.)
11  BY MR. SCHNEIDER:
12  Q. Ms. Donnelly, I've marked as
13  Exhibit 17 a two-page document which is an
14  e-mail exchange, TU 131590 and 591. So it
15  looks to me like the second page has the
16  e-mail we already talked about, right, with a
17  Peter Dodsondance?
18  A. Correct.
19  Q. All right. So I wanted to focus on
20  the first page, which is your e-mail to
21  Mr. Sexton dated September 12. Item No. 2
22  states that "Gil" -- G-i-l -- "Remo" --
23  R-e-m-o -- "is the gentleman in New Jersey. I
24  have contacted him twice and I've spoken with
25  Steven twice."

Page 170

1   A.  Yes, I have.
2   Q.  And on the second page of this
3   document, is that your signature in -- your
4   handwriting on the date?
5   A.  Yes.
6   Q.  And was this a performance review
7   that was provided to you on September 9, 2007?
8   A.  Yes.
9   Q.  Was there anything in this
10  performance review that you disagreed with at
11  the time?
12  A.  The webinars was something that I
13  had disagreed with.  The Amazon account was an
14  interesting situation because that was an eBay
15  store.  They wanted an eBay store that would
16  be set up and an Amazon account.  The eBay
17  store was completed by -- and actually the
18  Amazon store were completed I believe by Ben
19  Roberts, the intern.
20      Amazon -- I believe this was at the
21  same time that they were getting some books --
22  Trump University books out, and they were --
23  actually at that time they were asking people
24  to write reviews about books that hadn't even
25  been released.  So I know that was one of the

Page 171

1   things with Amazon.
2       The podcast schedule in reviewing
3   of documents, yes, that had been set up, I
4   believe.  And I said that was something
5   that -- you know, that was basically something
6   that they probably weren't going to get.
7       And typically some of these things
8   are not items that a marketing person would
9   do, you usually have somebody in business
10  development do, or when it comes to situations
11  like the podcasts, putting together a
12  schedule, I would agree that that's marketing.
13  One of the things they wanted was for me to
14  actually do the reporting, which is not
15  something that a marketing person does.  You
16  get a producer to come in or somebody who is
17  trained to do that.
18  Q.  Anything else?
19  A.  I did have a solid testimonial
20  plan, and it was just not something that
21  Michael wanted.  Again, it goes back to not
22  having those testimonials that he wanted for
23  the site.
24  Q.  Anything else?
25  A.  I think when you do speak with

Page 172

1   somebody daily and you're communicating every
2   day what is going on, to actually say that
3   that has not been done is not true and
4   accurate.
5   Q.  There's a list of items on page 2
6   that requests that you accomplish by
7   October 5, which looks like it's about four
8   weeks away -- four weeks in the future of
9   this -- this date.  Do you have any
10  recollection as to whether or not you
11  accomplished some, all or none of those items
12  listed?
13  A.  The testimonial plan, like I said,
14  had been completed.  Actually getting the
15  success stories for -- new results-oriented
16  success stories each month.  Like I said,
17  those people were not available.  Producing
18  stories like John Hancock with 14,000, $15,000
19  in profit was absolutely not acceptable.
20  Could I produce those stories and find the
21  lower lying fruit?  Probably.  Or people who
22  were on their way?  I could've found those
23  people.  But the hundred thousand --
24  Q.  Could have found those people,
25  right?

Page 173

1   A.  Possibly could have found those.
2   If somebody is on their way to making success
3   or in the process -- projections are one
4   thing.  What actually nets out is another.  So
5   you can find somebody who is actually working
6   the program, but to say they're actually
7   successful and making $100,000, those people
8   weren't there.
9   Q.  How many students would you say you
10  spoke with to try and get testimonials?
11  A.  Well, after seeing some of these
12  new names, I would say it was probably well
13  over a dozen.  Constantly calling people,
14  e-mailing.  Some of them obviously I don't
15  remember because they just do not respond.
16  Q.  Would you say less than 20 people?
17  A.  It may be more than 20.  I honestly
18  do not know.  I know I was constantly
19  contacting people.
20  Q.  And what was your last day of
21  employment?
22  A.  I do not recall the actual date
23  itself.
24  Q.  Do you remember whether it was the
25  beginning, middle or end of October?

Page 174

1    A.  Maybe the first two weeks of
2  October.
3    Q.  On the second page it identifies in
4  the last bullet point that you must accomplish
5  these tasks by October 5, '07.  And I was
6  curious as to whether or not they gave you the
7  opportunity to meet that deadline.
8    A.  I believe they -- I don't know my
9  exact date of termination, so I would say it
10 would be fair to say, yes, they did.  But I do
11 not know the exact date.
12       (Deposition Exhibit 24 marked.)
13 BY MR. SCHNEIDER:
14   Q.  All right.  Let me show you what
15 I've marked as Exhibit 24, which is entitled,
16 "Declaration of Cheryl Donnelly in Support of
17 Plaintiffs' Motion for Class Certification."
18       Is this the document that you
19 prepared with assistance of counsel?
20   A.  Yes.
21   Q.  And do you know how many drafts you
22 went through?
23   A.  I had one draft.
24   Q.  Did it look like what you see here?
25   A.  It was very -- very close.  I

Page 175

1  believe the things I added, which were
2  basically production issues, would be in the
3  second portion on page 30, that it was a
4  32-page magazine.  The changes were fairly
5  minimal.  So it was eight sheets -- or eight
6  pages, four sheets, devoted exclusively for
7  Trump for the magazine itself.
8    Q.  Anything else that you can recall?
9    A.  Any changes that I had to make?
10   Q.  Right.
11   A.  For the most part this is pretty
12 much -- I mean, I went through it, read it and
13 made revisions.  The revisions, like I said,
14 were not major.  They were fairly minimal.  So
15 I would say there were -- I couldn't point out
16 exactly which ones.
17   Q.  All right.  So let me ask you some
18 specific questions.  On page 1, which is 30 on
19 the bottom, line 10 -- if you look on the side
20 you can see the lines are numbered.
21   A.  Okay.
22   Q.  -- it says, "My job duties included
23 not only editing the magazine but also
24 attempting to increase sales through
25 partners."

Page 176

1  What does that mean, sales through
2  partners?
3    A.  So that would be inclusive of like
4  the Trump Mortgage or any of the other
5  entities that we worked with.
6    Q.  So how did you -- how were you
7  involved in selling with Trump Mortgage?
8    A.  I went down and I had spoken with
9  them in the 40 Wall Street address.  I spoke
10 with them and asked them when they're dealing
11 with people if they met anybody or came across
12 anybody who wanted to learn more about real
13 estate, if they were thinking about investing,
14 to consider joining Trump Advantage.
15   Q.  And do you know if anybody came to
16 Trump Advantage through Trump Mortgage?
17   A.  Trump Mortgage was shut down within
18 months of probably my beginning of employment,
19 so to my knowledge, no.
20   Q.  Then the next part of that sentence
21 says, "through the Trump University call
22 center, potential students who called in to
23 Trump University."
24      So who was calling in?
25   A.  Potential students.

Page 177

1    Q.  On the 800 number?
2    A.  Those would be people who were
3  calling the salespeople that were in our
4  office.
5    Q.  So do you know how prospective
6  students called in?  You know, based on what?
7  They see an ad?  Did they go to a program?
8    A.  They may have seen an ad.  They may
9  have attended a seminar.  Sometimes word of
10 mouth.
11   Q.  So what was your role with people
12 that were calling in through the call center?
13   A.  I had no role.  I didn't speak with
14 them.
15   Q.  All right.  Paragraph 5, I think we
16 talked about this earlier, I just want to make
17 sure that -- as you read this paragraph -- or
18 I think as somebody would read that, I think
19 the inference is that -- that testimonials
20 that were obtained by this, quote/unquote,
21 outbound call center third-party vendor may
22 not have been credible.  I think that's sort
23 of the -- the inference from reading this
24 paragraph.  And as I understand your
25 testimony, you don't have any basis for -- for

Page 178

1  making that inference; is that true?
2      MS. ECK: Objection, misstates the
3  witness' testimony.
4      A. I would say I cannot confirm that
5  those stories were accurate.
6  BY MR. SCHNEIDER:
7      Q. You have no information at all,
8  right?
9      A. Just the word of the folks at
10 Prosper, that they captured that information.
11     Q. Okay. So you don't have any
12 information whether they're 100 percent true
13 or zero percent true, right?
14     A. Correct.
15     Q. The only information that you
16 actually received was from the vendor who told
17 you that they were accurate?
18     A. Correct.
19     Q. On line 8 on page 31 -- or 2 of
20 your declaration, it states, "I wanted to go
21 for the softer sell, the story of how somebody
22 came to Trump and what they were doing."
23     Have we discussed that at length
24 today?
25     A. I feel that we have.

Page 179

1      Q. All right. Is there anything else
2  in your mind about what you wanted to
3  accomplish about how they came to Trump that
4  we have not discussed?
5      A. You know, I think that we've pretty
6  much hashed that out, that there were
7  obviously differences of opinion of what made
8  success and how to actually capture that at
9  the time between Michael and myself.
10     Q. The next sentence starting on line
11 9 says, "Some testimonials were misleading
12 because they stated a student made money when,
13 in fact, after taking into account costs and
14 expenses, they did not make any profit to
15 date."
16     All right. First I want to start
17 with the testimonials that you personally were
18 involved in. Did any of the testimonials that
19 you prepared you believe were misleading?
20     A. No. I think it's the way that I
21 was advised to speak to them. So for
22 instance, if somebody was on their way to
23 potentially get a payout of 1.5 million, that
24 1.5 million speaks more, but what I wrote was
25 what I was told by the students, what I wrote

Page 180

1  and what they confirmed.
2      Q. Did you actually ever write any
3  testimonial that you thought was misleading?
4      A. No.
5      Q. Did you ever state in any
6  testimonial that you wrote that the
7  testimonial included information on profit
8  that you thought was not correct?
9      A. No, not to my knowledge.
10     Q. Did you ever see a testimonial that
11 was written and used by Trump University that
12 you thought was misleading?
13     MS. ECK: Objection, calls for
14 speculation, lacks foundation.
15     A. I think when it comes to the
16 Prosper testimonials, I don't know what was --
17 the foundation for those, so I cannot speak to
18 that. So I would say it's the way they may
19 spin it. They may have been more likely to
20 err to what Michael had wanted versus myself.
21 BY MR. SCHNEIDER:
22     Q. But you're just guessing, right?
23     A. I'm -- yes.
24     Q. Okay. Do you have -- have you seen
25 any testimonial in which you have information

Page 181

1  that the information in that testimonial was
2  not accurate concerning profit?
3      A. No, I do not see that.
4      Q. So just to make sure, this
5  statement from line 9 to 11, you have no basis
6  for that statement, correct?
7      MS. ECK: Objection, misstates the
8  witness' testimony, it lacks foundation, the
9  document speaks for itself.
10     MR. SCHNEIDER: Well, I agree it
11 lacks foundation. That's what I'm trying to
12 find out.
13 BY MR. SCHNEIDER:
14     Q. Do you have any basis for that
15 statement, any facts or information that
16 testimonials that you saw or wrote actually
17 stated a profit without taking into
18 consideration costs and expenses?
19     A. I think when -- and the thing is
20 not having all the testimonials in front of
21 me, I cannot say. But the thing is you can
22 say somebody's scheduled to make a net profit
23 of X amount of dollars and then not realize
24 they have to pay taxes or anything after that,
25 that there's going to be hard expenses.

Page 206

1  looking at a document that says visual
2  guidelines, not Trump messaging.
3      A.  The -- they should've been adhering
4  to anything.  So the expectation when you're
5  in marketing -- whenever you work with any
6  vendors, the expectation is that they will
7  adhere to every brand guideline and strategy
8  you put in place; otherwise, you just don't
9  need them.
10      MR. SCHNEIDER:  Objection, move to
11  strike as nonresponsive.
12  BY MS. ECK:
13      Q.  On page TU-DONNELLY14, with the
14  heading "Copy Guidelines," it states -- or
15  actually could you read what it states there.
16      A.  "The goal of our copy guidelines is
17  to ensure brand, tone and message consistency
18  across all Trump University's marketing
19  efforts.  If you are uncertain about messaging
20  or copy approach, please do not hesitate to
21  direct those questions to the Trump University
22  marketing department."
23      Q.  And what does that mean?
24      A.  That means if anybody has any
25  concerns with what they're writing for copy,

Page 207

1  they want to make sure everything is
2  consistent with the tone that is set in the
3  document.
4      Q.  Okay.  And that includes
5  consistency with copy, with the message; is
6  that right?
7      MR. SCHNEIDER:  Objection,
8  foundation.
9      A.  That would be consistency with
10  copy, with any type of -- even engagement with
11  consumers.  So when you're speaking with a
12  consumer, you should be speaking in the Trump
13  tone.  When you are presenting on behalf of
14  Trump, you should be presenting in the Trump
15  tone.  When you're producing materials, the
16  quality of those materials should be
17  consistent with what is expecting from --
18  expected from Trump.
19  BY MS. ECK:
20      Q.  If people have questions and they
21  were directed to contact the marketing
22  department, who in the marketing department
23  would they contact?
24      A.  I would say Josef.
25      Q.  Did anyone come to you with

Page 208

1  questions regarding complying with these copy
2  guidelines?
3      A.  Not that I can recall.
4      Q.  On page TU-DONNELLY15 it states
5  that, "Since 2005 Trump University has been
6  helping people achieve the privileged lives
7  they've always dreamed about and we will help
8  you too.  We guarantee it.  This is not a
9  guarantee we take lightly."
10      Are you aware of other guarantees
11  that Trump University made to its students?
12      A.  In writing, not that I can recall.
13      Q.  On page TU-DONNELLY17, under
14  "Tone," it states, "Think of Trump University
15  as a real university with a real admissions
16  process, i.e., not everyone who applies is
17  accepted."
18      Is that, you know, one of the
19  messages or one of the tones that Trump
20  University used?
21      A.  Absolutely.  That was the -- the
22  goal of the screeners was to ensure that they
23  were making people feel like you may not get
24  in.  And the salespeople too, to -- oh, let me
25  make sure you're, you know, good enough for

Page 209

1  this program.  That they took very seriously.
2      Q.  Was anyone who is willing and able
3  to pay for the program turned away or
4  rejected?
5      MR. SCHNEIDER:  Objection,
6  foundation.
7      A.  To my knowledge, no.
8  BY MS. ECK:
9      Q.  On page TU-DONNELLY18, there's an
10  IACET logo.  Is this the logo that you were
11  talking about?
12      A.  Yes.
13      Q.  And to your knowledge did Trump
14  University ever receive authorization to use
15  this logo?
16      A.  To my knowledge, no, they did not.
17      Q.  On Exhibit 9, which was introduced
18  earlier, TU-DONNELLY1211, where it states, "We
19  cannot say that the experts and gurus are
20  handpicked by Donald.  This has been removed
21  from our marketing efforts."
22      Do you recall who told you that you
23  can't say that the experts are handpicked by
24  Donald Trump?
25      A.  That would have been either Josef

Page 210

1  or Michael.
2      Q.  Do you know why they instructed you
3  that Trump University should no longer state
4  that experts were handpicked by Donald Trump?
5      A.  It would be because when you say
6  handpicked, it's misleading to consumers.
7          MR. SCHNEIDER:  Objection,
8  foundation, move to strike.
9  BY MS. ECK:
10     Q.  Why would it be misleading to
11 consumers?
12     A.  Because people are buying into the
13 program with the assumption that they are
14 getting Donald Trump's best of the best and
15 there are people that are hand chosen by him.
16 So Donald Trump is known for wanting the best.
17 Why wouldn't he put this forward with his
18 people that he is getting 25,000, $35,000 to
19 teach me how to invest in real estate.
20         MR. SCHNEIDER:  Objection,
21 foundation, move to strike, and improper
22 opinion.
23 BY MS. ECK:
24     Q.  When you were there, did you see
25 marketing materials that stated that Trump

Page 211

1  University instructors, mentors or experts
2  were handpicked by Donald Trump?
3      A.  I cannot recall, but since this was
4  something that had to be pointed out in
5  handwritten feedback and not verbally issued
6  to the team, that that must have been
7  something that was being relayed out to the
8  public.
9      Q.  Do you know whether some time after
10 this point Trump University again began
11 including in its marketing and advertising
12 that instructors, mentors or experts were
13 handpicked by Donald Trump?
14     A.  I cannot say if that was done in
15 hand printed materials or any type of
16 electronic; it may have been inferred by the
17 sales team verbally over the phone.
18     Q.  When you say hand printed or
19 electronic, what do you mean by those?
20     A.  So any type of maybe marketing ads.
21 They may not have put it in a printed ad or
22 promoted it via e-mail.  It would take going
23 through all of the e-mails that were produced
24 to see if they said that anymore.  But also
25 there's also what's on the site that you have

Page 212

1  to have access to.  I don't know -- I cannot
2  recall what was on there, but they may have
3  been saying that on the phone lines with
4  consumers.
5      Q.  But while you were there, you never
6  received contrary instruction that you were
7  now permitted to indicate in advertising and
8  marking that experts were handpicked by Donald
9  Trump?
10     A.  Not that I can recall.
11         MS. ECK:  I don't have any further
12 questions.
13         FURTHER EXAMINATION
14 BY MR. SCHNEIDER:
15     Q.  I have a few now.
16         MS. ECK:  Thought you would.
17 BY MR. SCHNEIDER:
18     Q.  All right.  So can you look at the
19 marketing document, which is Exhibit 4.  And
20 the first portion of this talks about the
21 visual guidelines, correct, that you're to
22 follow if you're using branding information,
23 that tells you how to write the name and the
24 logo to use and the size of font and color and
25 so forth, right?

Page 213

1      A.  Correct.  And to ensure that
2  everything is uniform.
3      Q.  Right.  You wouldn't want to see a
4  Coca-Cola sign written in the lettering of
5  Pepsi, right?  The idea is you want to keep a
6  brand consistent, right?
7          MS. ECK:  Objection, hypothetical.
8      A.  That would be correct for brand
9  name.
10 BY MR. SCHNEIDER:
11     Q.  As a marketing person you
12 understand the importance of a brand and
13 consistency, right?
14     A.  I do.  There are sometimes when you
15 can change it up from a branding perspective.
16 So, for instance, maybe Pepsi decides to do a
17 breast cancer awareness can, then in that
18 situation you can change your brand
19 guidelines.  But for the most part when it's
20 something like this that you don't have any
21 type of seasonality, you would keep it
22 consistent.
23     Q.  Right.  So this is standard
24 marketing 101 stuff, right?
25     A.  Correct.

## Feedback on Flyer 4/23/07

Flyer art presented to TU on 4/23.

### General Overview:
- We can not say that the experts & gurus are hand-picked by Donald. This has been removed from our marketing efforts.
- Possible oversell on advice they will give. Would like to set realistic expectations. We need to make sure these individuals know THEY have to do the work – we are just here to advise them. It's a fine line…
- Some of the fonts get lost on the darker backgrounds. Will need to add more heft to them so they pop.

### Heading
- Change the "Are you ready to attain real wealth? Put a team of Donald Trump's experts behind you…and change your future!" to something like "Everyone needs an advantage to get ahead financially. Get the Trump Advantage."

### Left side
- I would change the

### Right side
We will need to make changes to the copy….

Where do you turn for sound advice when making a decision that involves money? Most people turn to a trusted friend or family member. But what if you could get advice from a team of experts dedicated to providing you with unbiased answers to your most pressing questions?

The Trump Advantage Club is an exclusive membership club dedicated to helping you plan your path to building personal wealth. (additional content)



EXHIBIT 9
WIT: Donnelly
DATE: 11-2-12
Micheal A. Johnson, CSR, CRR