# EXHIBIT 80

Exhibit 80
- 396 -

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4

    ----------------------------------X

5    TARLA MAKAEFF, et al., on

    Behalf of Themselves and      Case No. 3:10-CV-00940-CAB(WVG)

6    all Others Similarly Situated,

7                    Plaintiffs,

8           v.

9    TRUMP UNIVERSITY, LLC, et al,

10                   Defendants.

    ----------------------------------X

11

12

13              VIDEOTAPED DEPOSITION

14                        OF

15                  JASON NICHOLAS

16               New York, New York

17             Thursday, November 8, 2012

18

19

20

21

22

23

24    Reported by:

    ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25    JOB NO. 54531

Exhibit 80
- 397 -

Page 46

J. Nicholas

1
2  wants to excel at the job and work hard and be
3  able to internalize the script better, my
4  learning tools and being able to project on the
5  phone was he told me that I was allowed to email
6  the copy of the script to my personal computer,
7  my personal email and go home, whether I was
8  doing it at the job or at the email,
9  combination, because it was time consuming to
10 retype the script and make the font larger,
11 okay?
12         They had the script on a piece of
13 paper.  It was not emailed to us, okay?  So in
14 order for me to enlarge the font, I had to line
15 by line type it up and then make the font
16 bigger, so me myself and any other employees I
17 offered to take the script that was larger and
18 paste it on our cubicles so we could be able to,
19 you know, when we had either a headset on or had
20 a headset on your phone, you're able to,
21 whether, you know, somebody is giving you
22 objections on the other line, you're able to
23 look up at your script and say okay, I need to
24 focus on this one.  That's the extent of any
25 documents that was, you know, going home on that

Page 47

J. Nicholas

1
2  stuff.
3         Anything else, if there was anything
4  else, it was something like, you know, hey, what
5  time for lunch or something stupid like that,
6  but nothing -- no documents or nothing other
7  than that.
8     Q.   All right.  So the only document that
9  you would have sent from work to your home
10 computer would be the script.
11    A.   To my knowledge, yes.
12    Q.   All right.  And in response to this
13 request for documents, I received a formal
14 response from Ms. Eck and in response to the
15 category which asked for any scripts, let me see
16 if I can find it, No. 25 and 26, "Any and all
17 scripts provided by Trump University and "Any
18 and all scripts required by Trump University"
19 and "Any and all scripts you used while working
20 at Trump University," No. 27, she said that you
21 were going to produce documents and she produced
22 one document, so I'm going to show you what that
23 is.  I've marked it as Exhibit 2.
24         (Defendants' Exhibit Nicholas 2,
25     Script, Bates stamped TU-NICHOLAS0000001

Page 48

J. Nicholas

1
2     through 0002, marked for identification, as
3     of this date.)
4         (Document review.)
5  BY MR. SCHNEIDER:
6     Q.   Is that the script that you're
7  referring to?
8     A.   I mean if -- unless you guys did some
9  editing, I sent it to her and it's printed out.
10 I mean it is what it is.  Looking at it right
11 now when I see, you know, blah, blah.
12    MS. ECK:  I'll represent that that's
13 the document you sent to us.
14    THE WITNESS:  Okay.
15    A.   Well, that's if -- like I say, unless
16 you -- I'm not trying to -- it's not a big deal,
17 but if there was anything altered to my
18 knowledge, but if you want me to read through it
19 and check to make sure.
20    Q.   Sure.
21    A.   Okay.
22        (Document review.)
23    A.   Just generally skimming through it,
24 it's absolutely what I produced, yes.
25    Q.   All right.  And this is the script

Page 49

J. Nicholas

1
2     that --
3     A.   Other than when it says, "My name is
4  Jason Nicholas," you know, obviously that was
5  blank for anyone to say, you know, their
6  personal name, but yeah, this is the script.
7     Q.   All right.  And this is the one that
8  you were required to follow word for word.
9     A.   Absolutely.  We were pounded in our
10 head that Mr. Trum -- whoever like I said, I
11 don't know who writes the checks behind closed
12 doors, but whoever paid for this, we were told
13 that this has been psychologically tested and
14 that it costs several thousand, I don't know the
15 exact figure, by somebody to basically create
16 this script, and that if we weren't on it, I
17 mean when I got hired the training groups, we
18 spent five to ten business days in a conference
19 room, you know, pounding this script, so when we
20 actually got onto a live phone, you better be
21 reading the script or else it's going to be a
22 problem, so this is what everybody used, yes.
23    Q.   So this Exhibit 2, this is what you
24 said word for word to the people you talked to
25 on the phone?

Exhibit 80
- 398 -

Page 50

J. Nicholas

1
2    A.    Were required to, yes, that's what we
3    were required to do.
4    Q.    All right.  And you didn't deviate
5    from this script.
6    A.    No, sir.  I mean listen, if you're
7    asking me if I said "the" or I said "is" or
8    something like that, then obviously that's just
9    personal, you know, that's just the human
10   element, but I mean this is it.
11   Q.    All right.  We'll talk about that in
12   a few minutes.
13   A.    Okay.
14   Q.    When you began working at Trump
15   University, how many other people were in the
16   sales department?
17   A.    Well, that's funny.  It's funny you
18   mention that.  When you say started working,
19   basically -- can I -- am I allowed to just recap
20   real quick?
21   Q.    Sure.
22   A.    When I was called in for an
23   interview, Mr. Schnackenberg, or however you
24   pronounce his name, was there, interviewed me in
25   a conference room, took me on a quick tour of

Page 51

J. Nicholas

1
2    the sales floor.  There was only a few people
3    there.  Whether they were out to lunch or, you
4    know, it was not a full sales floor when I
5    walked in.
6    When it was time to actually come in
7    to start working, I was with a training group of
8    say five to six people and once we were able to
9    get out live, then they did another hiring maybe
10   a week or two after we got on the phones where
11   there was I would say a smaller group, maybe
12   four or five people.  So at this point when I
13   initially came in, it was pretty vacant.
14   But when I came back, everybody came
15   to the group, it got full, but there was still a
16   couple of people who had been there for a longer
17   time that kind of told everybody what was going
18   on and why it was empty and now it was full and,
19   you know, what's been going on.  That's pretty
20   much my extent of the initial hiring and getting
21   into work.
22   Q.    Since you left Trump University, have
23   you had any conversations or communication with
24   Mr. Schnackenberg?
25   A.    No, sir.

Page 52

J. Nicholas

1
2    Q.    What was your understanding as to his
3    position when you started there?
4    A.    I don't really have -- because it was
5    so much, you know, gossip, if you will, I know
6    he was in a position where he wasn't just a
7    normal salesperson.  He was more of a, whether
8    it was a closer or somebody who was in charge of
9    the sales department.  He had a more of a, you
10   know, and even, you know, whether, I don't know
11   what role they actually used him in, because
12   like I say, when he interviewed me, when I came
13   to start working, he was fired.  I never saw him
14   after that.
15   So the information I got from him
16   during the interview process and then when I
17   came to actually work, I was like hey, what
18   happened to so and so.  He's gone, blah, blah,
19   blah.  That conversation went where oh, he flips
20   houses.  You know, he has his own real estate, I
21   think maybe I want to say Arizona, somewhere out
22   there.  I don't know.  That was pretty much it.
23   But in terms of his actual duties, it
24   wasn't a clear picture of what he, what he was
25   doing other than he interviewed and was part of

Page 53

J. Nicholas

1
2    the sales process, the sales team and had some
3    authority and decision-making process.
4    Q.    So after you met him the first time,
5    you never saw him again?
6    A.    If it was, it was one other time and
7    that was hey, where are you going, I'm out.
8    There was no multiple like long term.  I
9    honestly think it was just that one time.
10   Q.    And your understanding is that he was
11   fired?
12   A.    Correct.  Or -- well, my
13   understanding was there was a major disagreement
14   between the ultimate decision-maker there and
15   him, either what his role would be.  Now if he
16   quit or they fired, I just know they parted
17   ways.  I don't know the exact, you know, exact
18   what it was.
19   Q.    Now were there different job duties
20   for different people in the sales department?
21   A.    Correct.
22   Q.    And tell me what your job duty was.
23   A.    Well, like if this room, for
24   instance, it's a rectangle.  There's two pods of
25   about six to eight sales consultants and then

Exhibit 80
- 399 -

Page 54

J. Nicholas

1  with each one, initially, in each one of these
2  pods there was what they call a program director
3  and that person was basically the closer. That
4  would be Mark Covais on one side and on the
5  other side it would be Michael Aaron, and then
6  everybody else, the new salespeople who came on
7  board, it was our job to sift through leads that
8  were given to us and we were to take those
9  leads, qualify them using this script, and
10  anybody that had any interest or any money or
11  anything, you know, that was positive, we were
12  to set an appointment. We shared like an
13  Outlook type calendar where we could look at our
14  program director's calendar and say, you know,
15  I'm just going to use this name, Joe, Joe Blow,
16  he would be, you know, he sounded positive, he
17  sounded like he had a little money, sounded like
18  he had a little interest, he's a good person,
19  he's a hot lead.
20      And then I would slide it into, you
21  know, Mr. Covais initially because that was my
22  first person that I dealt with as a program
23  director, I would slide it into his box, saying
24  okay, you know, 9 a.m. on, you know, Wednesday,

Page 55

J. Nicholas

1  this guy is available. You have an opening.
2  You need to call him and try to close the deal
3  and sell him.
4      That was my -- whether it was, you
5  know, real estate online courses, it was
6  one-on-one coaching, it was, you know, send them
7  to a live event or, you know, the big one where
8  you get a coach to fly out for three days. You
9  know, it didn't matter. It was -- if you go
10  through the script and you actually, there's
11  portions in here where you're asking people,
12  you know, you're qualifying them like hey, you
13  know, have you had any real estate experience,
14  you know, how much money do you have, do you
15  have debt. You know, those types of questions,
16  you know, were important to know to be able to
17  which bucket you're supposed to pitch them in.
18  That's pretty much our job, to prequalify
19  everybody.
20      Q.   So was your job sometimes called a
21  scheduler or sometimes called a setter?
22      A.   A setter is what they called it. I
23  mean behind closed doors, yes.
24      Q.   Because you were setting

Page 56

J. Nicholas

1  appointments.
2      A.   Correct.
3      Q.   You weren't actually selling
4  anything, were you?
5      A.   Of course --
6      MS. ECK:  Objection.
7  Mischaracterizes --
8  BY MR. SCHNEIDER:
9      Q.   Did you actually sell anybody
10  anything?
11      In other words, if somebody on the
12  phone said, "You know what, I want to buy an
13  online," would you say, "Okay --
14      A.   We had the ability to sell it, yes.
15  In terms of if somebody -- if you're calling a
16  person and they're ready to whip out their
17  credit card, what's the purpose to give it to
18  somebody, to give it to a closer to close. It's
19  already closed. So we had the ability to say
20  hey, Joe or hey, Mark or hey, Aaron, you know,
21  this guy is ready to go, let's put it through,
22  click. You know, swipe the card. Or not swipe
23  the card. We'd take a phone, take a card and
24  stuff.

Page 57

J. Nicholas

1      And if you're talking about selling,
2  you know, I've been doing sales for a long time
3  and as soon as you call somebody, you're
4  selling. You're selling the Trump name. You're
5  selling what you're -- you're selling yourself.
6  You're selling everything that you're trained to
7  do is sales from the initial call.
8      So in terms of actually processing a
9  payment if that's what you mean by a sale or
10  selling the products, to make the closer's job
11  easy, you have to already sell this person.
12  They have to already be sold. They already have
13  to be excited about working with Trump
14  exclusive, you know, blah, blah, blah, blah, you
15  know, gaining knowledge, learning secrets, being
16  a part of this. You actually have to sell that
17  to them before they even get to the closer
18  because if you don't, when the closer calls,
19  he'll be like this guy is not even interested,
20  click, you know, so...
21      Q.   I want to find out what duties you
22  had.
23      Did you actually ever take anybody's
24  credit card?

15

Exhibit 80
- 400 -

Page 58

J. Nicholas

1
2    A.    We're talking five years ago.  I
3  couldn't recall if I physically, you know, put
4  it through the system.  I mean I don't know if
5  there's a way to -- a database to look that up.
6  I don't have the knowledge to know -- but I know
7  there was definitely several times where I had,
8  you know, in the course of my employment where
9  somebody was hot, that we sold them on the first
10 call and I was the one who made that first call
11 so...
12    Q.    All right.  I'm just trying to
13 understand if there's a call or caller that you
14 spoke to, eventually would go to a program
15 director to complete that process or if you
16 would take the call from start to end and when
17 you hung up the phone, someone had purchased
18 something and it never went to somebody else.
19    A.    It maybe happened once or twice.  It
20 was not a common thing.  We're talking, you
21 know, in a wide scope of things, on a day-to-day
22 basis, the people that were productive in my
23 role, were making 80 to 100 calls a day; 50, 80.
24 Depends on the quality of the call and how long
25 the conversation.  Obviously some days it's

Page 59

J. Nicholas

1
2  just -- it's a matter of the length of the calls
3  would determine how many calls you made out of
4  there.
5         And then you had other people that
6  were there just to get the base salary and could
7  care less about the incentives of trying to, you
8  know, get commission and whatnot, so they would
9  just sit around all day and make, you know, 10,
10 20 calls when somebody walked by to, you know,
11 to get -- so they wouldn't get in trouble so...
12    Q.    All right.  So it sounds like based
13 on the type of volume that you were doing, maybe
14 50 to 100 calls a day over several months that
15 you worked there, that it was very rare that you
16 would have taken a call from start to finish and
17 at the end of the call --
18    A.    Like I said, over the course of the
19 time, I mean you can calculate the math, that
20 volume, five days a week times how long I was
21 there, to actually process, it was very rare for
22 everybody to, so yes.
23    Q.    All right.  And part of this process
24 is I just want to understand --
25    A.    Yeah, sure.

Page 60

J. Nicholas

1
2    Q.    -- exactly what you did, all right?
3         Now were the calls that you were
4  involved in, were those people that called in to
5  Trump University or people that you called out
6  or both?
7    A.    Well, it was -- we'd get a -- we have
8  basically, everybody had their own line and
9  there was --
10    Q.    Phone line you mean?
11    A.    Phone line, correct.
12         And there was a, I don't know if it
13 would ring a different ring or if there was one
14 specific phone that was like a hot phone,
15 because people would go to live events or they
16 would get, you know, mass marketed about Trump
17 University to, you know, however they, however
18 they paid for their leads, you know, their lead
19 sources, these people would get pounded.
20         So there would be calls throughout
21 the day where there would be incoming calls.
22 Now that could be anybody from Nigeria calling
23 in or it could be, you know, a serious person
24 who wanted to gain knowledge about what we can
25 do to help them, supposedly help them.

Page 61

J. Nicholas

1
2         So yeah, there was incoming calls,
3  but the majority was this:  The sales manager
4  had a database of leads that were bought and/or
5  acquired through live events and he would
6  distribute the leads to the sales floor or to
7  what I should say the setter role, if that's
8  what you want to call it from here on out, and
9  we would have a database in our computer.  We
10 could take notes.  We try to, you know, Monday
11 at 9:00 they didn't pick up, so on Tuesday,
12 Wednesday when it's time to try to reach them
13 again, we call them in the afternoon.  You know,
14 we had staggered hours so we had a whole
15 database on how to reach out to these guys and
16 take notes, and that's how we would, you know,
17 assess the leads.
18    Q.    Did your database give any
19 information about the person other than the name
20 and phone number?
21    A.    Name, phone number, address.
22 Sometimes whether it was a live event or other
23 places, they had a questionnaire.  It really
24 depended on where the lead came from.  If it was
25 just a straight bought lead where somebody on,

Exhibit 80
- 401 -

Page 62

J. Nicholas

you know, white pages or white papers, or
whatever type of lead they bought it from,
Hoovers or, you know, people who were interested
in real estate, that's where there would be less
or more data available before the call.

Q.    Would you have information about the
person's income level before you called them?

A.    Like I said, it depends on where they
got their lead from, but also that was part of
our job to find out where the income is.  That
was absolutely one of the most -- a part of the
qualifying process, you know, is this guy, you
know, living in a trailer park in debt up to his
ears and just has false aspirations.

The biggest thing that Mr. Quintal
and everybody pounded is this person serious or
are they curious.  If they're curious, then do
they have money to do this or not, and if it's
just a false dream or false hope, then, you
know, dump it and go to the people that actually
show that they have some substance.

Now we call Colorado Springs or
something like that and, you know, this person
has, you know, half a million dollars, cars are

Page 63

J. Nicholas

paid off.  We had to ask these questions, cars
paid, how many do you have.  Wife, kid.  Okay,
great, blah, blah, blah, blah, blah.  And once
we gathered, we had a financial picture about
them, then it was our job to pass it over, you
know, after we qualified the leads, say yes, I'm
interested in this or, you know, I'm interested
in that, I want to know about this, great, this
person is a hot lead.  Pass them to the setter.

That setter would go in and say all
right, well, this person has, you know, this
person's qualified for, let's stick them in this
class or, you know, let's try to push them
towards coaching or let's try to push them
toward, you know, spending 25, 35, $50,000 for a
coach because they have the money.

And if they don't have the money, a
number of times we're talking about a guy would
say, your credit card limit, oh, you don't have
any more?  Why don't you ask your wife or
cousin, whoever.  Let's make sure we get that
limit increased so you can buy this because
you're going to be successful.

Q.    You never said that, right?

Page 64

J. Nicholas

A.    I didn't have to.  That's what the
closer's job was.

Q.    You never said that comment, right?

A.    I didn't need to, no.

Q.    Well, the answer would be no then,
right?

A.    I said no, yeah.

Q.    And it wasn't on the script to say
that, right?  It didn't say on the script to
talk about increasing your credit card limit,
did it?

A.    No, because the program directors had
a different script than we did.  They had their
own script.

Q.    Did you ever get a copy of that one?

A.    No, sir.

Q.    So did you work down the list of
names on your screen?

A.    Yeah, of course.

Q.    And did you ever look at a name and
think I'm not going to call them?

A.    No.  Why would I do that?

Q.    All right.  So you just worked
straight down the list.

Page 65

J. Nicholas

A.    Yeah.  I mean there's people --
Mr. Quintal when he was there was pretty
aggressive or he held people accountable for
turning over your leads, which means they go
into the system.  They say, you know, you've had
Mary or Joe Blow for two weeks, you know, it
looks like you only called them once.  You know,
he wanted us to always go through the leads and
either trash them or keep them or, you know,
just go through the leads, so yeah, it was part
of the job.

Q.    Did you target anybody in particular
on the list by age?

A.    Uh, I mean --

Q.    Did the list say if they were 54 or
25?

A.    Like I said, it depends on the
database, where they got their leads from.  From
a live event, they tried to at the door or they
would gather that knowledge as much as they
could to help us to try to sell, so I mean it
really depended on, excuse me, where the lead
came from.

Q.    Did you have any target age that you

Page 66

```
1            J. Nicholas
2  were supposed to be -- that you were told to go
3  after?
4     A.   I mean because of --
5     Q.   Listen to my question.
6          Did anybody at Trump University tell
7  you that you should be targeting --
8     A.   Yes.
9     Q.   -- a certain age group?
10    A.   Yes.
11    Q.   Who told you?
12    A.   The sales manager, Mr. Quintal.
13    Q.   All right.  And what did he tell you?
14    A.   To target people -- he said, in
15 context he said the majority of people in the
16 past who have spent money on this or who are
17 considered more of a hot lead, he didn't
18 discriminate and say okay, don't call this one
19 because they're 23 or don't call this one
20 because they're 73, he just said the majority of
21 the people that are spending this are, you know,
22 middle-aged, you know, mid to -- you know,
23 middle-aged people.
24    Q.   What does that mean, middle-aged?
25    A.   35 -- like 40 to t5, 60.  That age
```

Page 67

```
1            J. Nicholas
2  bracket.  That was the bracket that was kicking
3  out more money than everybody else.  So of
4  course you as a sales manager want to close
5  deals, so if you have that data available or you
6  have those thoughts, I mean Mr. Quintal is a
7  seasoned salesperson.  He knows sales, so
8  obviously he's going to want you to target stuff
9  that's going to get results.
10    Q.   Did you ever attend a live event?
11    A.   No, not at all.
12    Q.   Did you ever see a presentation by
13 any instructor?
14    A.   Well, we had -- we were briefed like
15 in terms of, we had a conference room which was
16 no bigger than this room and whether it was the
17 marketing team or the people that were going to
18 the live events, before they would go, they
19 would say hey, we're going to Vegas or Phoenix
20 or Portland, Oregon or whatever and tell us, you
21 know, some of the details that they were going
22 to pitch.
23          So the live events, I think it
24 usually fell on a weekend.  You know, they would
25 come in pre that we weekend and say we're going
```

Page 68

```
1            J. Nicholas
2  here, we're really going after, you know,
3  entrepreneurship this weekend or we're going
4  after marketing or going after real estate,
5  whatever it was.
6          And then after that weekend was over,
7  you know, they'd come in with the people that
8  actually showed interest.  You know, say there
9  was, you know, 100 people that showed up.  Out
10 of those 100, you know, if somebody bought a
11 book or they required someone to fill out a form
12 before they left, those people were considered a
13 hot lead from that event, so that we would
14 up-sell them to try to get, excuse me, more
15 business from them as opposed to just the person
16 that casually went in there and just, you know,
17 was hoping Mr. Trump would show up.
18    Q.   Well, I might be able to cut out a
19 lot of my questions by --
20    A.   Sure.
21    Q.   -- this next line.
22          Do you have any personal knowledge of
23 any of the presentations that were actually made
24 at live events?
25    A.   Sure.
```

Page 69

```
1            J. Nicholas
2     Q.   And how do you know what
3  presentations were made by instructors or --
4     A.   We were told who the instructors were
5  going to be, we were told what the topics were
6  going to be and they came in and pretty much,
7  you know -- as salespeople, we wanted to know
8  what was being told, what was being sold, what
9  was being said in order to when we get these
10 leads, we're not out in left field saying, hey,
11 you know, you went to an event, great.  We had
12 to have prior knowledge.
13    Q.   Okay.  So what instructors did you
14 actually personally meet?
15    A.   Personally meet?
16    Q.   Right.
17    A.   I mean unless you have a long list of
18 names, we're talking about five years ago where
19 a guy would casually come into the office, say
20 hey, I'm so and so, I'm an instructor, and like
21 you said, there were multiple instructors that
22 came in and out.  So like I'd have to really
23 have a name and it would have to trigger my
24 memory, but there were people that would come in
25 from time to time --
```

18

Exhibit 80
- 403 -

Page 70

J. Nicholas

1
2  Q.  All right.
3  A.  -- if they were in New York for
4  whatever reason, if even it had nothing do with
5  events, say hey, you know, I did it, you know,
6  six months ago, I was just stopping through
7  because I wanted to see the office and, you
8  know, say hello to Mr. Sexton or something like
9  that. I mea it wasn't like anything...
10  Q.  Okay. So Gary Eldred, does that name
11  sound familiar?
12  A.  Um-hmm.
13  Q.  Did you meet him?
14  A.  I don't think so, no.
15  Q.  Do you know what his background is?
16  A.  I think -- yeah. Entrepreneurship I
17  think. I mean if you say something, it might
18  refresh my memory in terms of, you know, what
19  his role was, but I know I -- the name was
20  very -- absolutely. I mean whether he was in a
21  book or... I mean the name was floating around
22  the office, absolutely.
23  Q.  All right. Do you know what his
24  background or experience is?
25  A.  I mean I don't know what type of

Page 71

J. Nicholas

1
2  degree he holds. Whether that's important or
3  not. Some people put a lot of value on degrees,
4  some don't.
5     Like I said, it's the type of thing
6  where as a salesperson, when you're there five
7  years ago, you're requesting this information,
8  but now we're five years ahead and I could care
9  less what he does, so like I really don't --
10  it's in my mind, but it's way back where I don't
11  care.
12     But yeah, obviously he had a role in
13  terms of whether it was coaching or being an
14  instructor on the entrepreneurial class or
15  whatever class it was, I can't remember,
16  entrepreneurial marketing. He was involved in
17  doing the online courses and that type of
18  situation.
19  Q.  Do you know if he taught any live
20  courses?
21  A.  I don't recall.
22  Q.  Do you know if he was -- in your
23  mind, was he an expert in whatever field he was
24  in?
25  A.  Well, I won't use the word brainwash,

Page 72

J. Nicholas

1
2  but we were told that everybody, every name that
3  was either at a live event or was a coach or did
4  an online, we were told that they were experts,
5  yes, but that doesn't necessarily mean that they
6  were.
7  Q.  All right. Do you have any
8  information that Gary Eldred is not an expert in
9  his field?
10  A.  Define expert.
11  Q.  Well, I'm asking you.
12  A.  That's relative to what you think an
13  expert is. I mean I could -- you know, I don't
14  know where to go with this question to be honest
15  with you.
16  Q.  We're going to go through your
17  declaration --
18  A.  Sure.
19  Q.  -- in some detail in a few moments,
20  but one of your comments was that the people
21  that were teaching were unqualified.
22  A.  Some of them were, yeah.
23  Q.  So what I'm asking you is was --
24  A.  I don't know --
25  Q.  -- Gary Eldred unqualified.

Page 73

J. Nicholas

1
2  A.  They would --
3  Q.  My question was is it your belief
4  that Gary Eldred was unqualified?
5  A.  He is not one of the persons in
6  question that I think -- I didn't do enough
7  research on him and like I said, it's five years
8  later. I don't know what his expertise was and
9  I don't know to what extent, you know, his -- I
10  don't know.
11     But you're talking like there was
12  other people that were, you know, coaches or
13  sold or supposedly Donald Trump's right-hand man
14  who would come into the office and I would be
15  like, "Have you ever met Mr. Trump?"
16     And they'd say, "No" or "I'm going to
17  meet him today for the first time."
18     I wouldn't define that as a
19  right-hand man and that's what the script says
20  that we're talking, that these people that are
21  paying money are going to be with Donald Trump's
22  right-hand man and they're going to hold their
23  hands and lead them how to be successful and
24  teach them secrets. I mean that's just not --
25  that to me is the basis of how I feel about

Exhibit 80
- 404 -

Page 74

J. Nicholas

1  who's an expert, who's not.
2      Q.   Where does it say in this script that
3  they're going to be taught Donald Trump's
4  secrets?
5      A.   Oh, man.
6          (Document review.)
7      A.   Let me...
8      Q.   Just point to the language for me.
9      A.   It says, "Obviously Mr. Trump can't
10 meet with everybody nor does he want to, so he
11 has created Trump University where he only
12 invites a select group of people that have been
13 handpicked by their program director."
14     Q.   Okay.  My question is different.
15     A.   Hold on.
16         MS. ECK:  Let him answer the
17 question.
18     A.   And then it says, "These instructors
19 will be holding your hand, showing you the way
20 and how to succeed the Trump way.  These
21 instructors are experts in today's real estate."
22         So experts, you want to use the
23 latest strategies or techniques, those to me are
24 things that you're not going to get by picking

Page 75

J. Nicholas

1  up an average book and that to me -- and secrets
2  were, that was a word that was thrown around the
3  office because it falls in line with the
4  direction of where we're going.
5      Q.   All right.  But you never used that
6  word, right, because you stuck with the script.
7      A.   Like I told you before, this is a
8  script that was heavily pounded into our heads.
9  People would, you know, Mr. Quintal or whoever
10 would walk around, make sure we're sticking to
11 the script.  But if you're having a 20 to
12 30-minute conversation, which is expected to
13 qualify a lead, then you can't physically, with
14 the human element, be able to stick -- there's
15 more than just a script and conversation, okay?
16 You're adding more to it than what is there.
17 You're adding what you've been taught in sales
18 meetings and conference rooms and you're
19 applying it to this.
20         When you're reading through a script
21 and you're going through it and somebody has an
22 objection, and the answer to that objection is
23 not on the script, you as a salespeople have to
24 provide an answer and then keep moving on to the

Page 76

J. Nicholas

1  script.  That's the best way to answer that
2  question.
3      Q.   All right.  And then I understand you
4  didn't stick to the script?
5      A.   I didn't say that.
6          MS. ECK:  Misstates the witness'
7  testimony.
8      A.   I didn't say that.
9          MS. ECK:  That's not what he said.
10 He said he stuck to the script and
11 added additional information.
12         You're putting words in his mouth.
13         THE WITNESS:  Exactly.
14 BY MR. SCHNEIDER:
15     Q.   So you did add things that weren't on
16 the script.  Is that what you're saying?
17         MS. ECK:  Objection.  Asked and
18 answered.
19 BY MR. SCHNEIDER:
20     Q.   You can answer the question?
21     A.   Okay.  I asked and answered that
22 question.
23     Q.   So I'm allowed to follow up, sir.
24         So are you saying that you were told

Page 77

J. Nicholas

1  to stick to the script but on some conversations
2  you didn't stick to the script?
3          MS. ECK:  Objection.  Misstates the
4  witness' testimony.  Asked and answered.
5          You can tell him again.
6      A.   Okay.
7      Q.   It's a yes or no question.
8      A.   You want me to say yes.  Okay.
9          MS. ECK:  He's entitled to give a
10 full response.
11     A.   Do you -- I mean --
12         MS. ECK:  And if he needs to do it in
13 more than yes or no, he can do that.  He's
14 entitled to give his accurate testimony.
15         Go ahead and answer.
16         MR. SCHNEIDER:  I'll ask the question
17 again.
18 BY MR. SCHNEIDER:
19     Q.   Are you saying that sometimes you
20 stuck to the script and sometimes you didn't?
21     A.   I'm saying that everybody in the
22 office in a human conversation was required to
23 go through the script word for word.  You were
24 required to make sure even if somebody asked you

20

Exhibit 80
- 405 -

Page 98

J. Nicholas

1
2  A.  Yeah.  Some of the stuff, yeah,
3  absolutely.  I mean I had a lot of knowledge
4  because I'm not going to say I have a
5  photographic memory, but like I'm able to recall
6  certain events and certain things as most people
7  can.  Some people can, some people can't.  But
8  reviewing, just even going over the script, I
9  mean going over the script, looking at those
10  emails brought back a lot of extra knowledge
11  that I had prior to even, you know, getting
12  involved in the process.
13  Q.  Which documents did you look at to
14  prepare for the deposition?
15  MS. ECK:  I haven't been able to find
16  someone that can print them yet, but I can
17  tell you the Bates numbers.
18  MR. SCHNEIDER:  Yeah.
19  MS. ECK:  TU134884, TU134870,
20  TU134887 and TU134899, and some of those
21  may have additional pages attached to them.
22  BY MR. SCHNEIDER:
23  Q.  Other than -- let me ask you this:
24  During the time that you were a setter at Trump
25  University, did any of the other setters go to

Page 99

J. Nicholas

1
2  live events?
3  A.  Well, there was one, there was one --
4  hold on.  Let me think.  There was -- I'm not
5  going to say kid, but he was very young at the
6  time.  He came in I think as a salesperson and
7  then the opportunity, whether somebody got fired
8  or left, presented itself where, you know, he
9  was a young guy, wasn't married, didn't have any
10  wife, kids or anything like that so he wanted to
11  travel a little bit.  So he -- his name was
12  Jason Shower, I think.  I don't know how to
13  spell his last name, but he, he and he was there
14  like for two seconds and then he switched over
15  to live events.  That's the only person.
16  I think, I can't -- I think Mark
17  Covais, but again, everything he says I wouldn't
18  trust, but I think he said that he hinted on
19  that he did go to a couple -- I think before I
20  got there, they may have had -- like some of the
21  older employees, they may have had -- there's
22  another guy, his name is Ted McElroy or
23  something along those lines, McElroy.  There
24  was -- I think they may have had a couple of
25  live events in New York or the greater New

Page 100

J. Nicholas

1
2  Yorker area that they may have went to attend,
3  but I don't -- that's the basis of my answer.
4  MR. SCHNEIDER:  Let's go off the
5  record.
6  THE VIDEOGRAPHER:  The time is 10:31.
7  We're going off the record.
8  (Recess is taken.)
9  THE VIDEOGRAPHER:  The time is 10:45.
10  We're back on the record.
11  BY MR. SCHNEIDER:
12  Q.  Do you have any personal knowledge
13  about what any of the salespeople told consumers
14  at the live events?
15  A.  Salespersons meaning?  Who is the
16  salespeople?
17  Q.  My understanding is is that at some
18  of the Trump University live events, there would
19  be --
20  A.  Right.
21  Q.  -- salespeople present --
22  A.  Okay.
23  Q.  -- right?  And they would meet with
24  some of the people there to see if they were
25  interested in buying other products and

Page 101

J. Nicholas

1
2  services?
3  A.  Um-hmm.
4  Q.  My understanding, since you weren't
5  at a live event, you obviously didn't hear the
6  conversations.
7  I'm trying to find out if you have
8  any personal of what was discussed between any
9  salespeople and consumers at live events.
10  A.  I wouldn't use personal, just general
11  conversations.  Summaries.  No like hey, I spoke
12  to Joe and, you know.
13  Q.  All right.  So it would be just
14  general information --
15  A.  But there were -- people would come
16  back, some of the salespeople would come back
17  from a live event and say, you know, out of this
18  pool of 20 hot leads, you know, Joe, Tom and
19  Susie and, you know, Jerome, these are your
20  hottest ones because we had conversations with
21  them, but like intimate details, no.
22  Q.  All right.
23  A.  But they were separated based off.
24  Q.  All right.  So you would get a list
25  of people that went to live events and you were

Exhibit 80
- 406 -

Page 102

J. Nicholas

1  asked to contact them to see if they are
2  interested in buying other products and
3  services?
4      A.   Correct, yes.
5      Q.   And if they expressed interest and
6  they looked like they had an interest in the
7  program and the ability to pay for it, then you
8  would pass that lead on to the program director?
9      A.   Correct.
10     Q.   Did you have any knowledge of Trump
11 University's refund policy?
12     A.   The refund policy, yes, I did.
13     Q.   What was your understanding of the
14 refund policy while you worked there?
15     A.   My understanding of the refund policy
16 was there was one, but either A, the program
17 director or whoever had the -- whoever's contact
18 information that this person had, whether it was
19 a setter or whoever they would try to get in
20 touch with to try to get a refund, A, you didn't
21 pick up the phone, B, you waited till the 30
22 days or however many days, I think it was 30,
23 expired and it was just like there was really no
24 such thing as a refund. But there was

Page 103

J. Nicholas

1  technically advertised or implemented that there
2  was one, but it was seldom used.
3      Q.   With an incoming call, how would you
4  know that the caller was interested in a refund?
5      A.   Because they have your phone number.
6      Q.   Right.
7           So if a call came in, would you take
8  calls if someone was looking for a refund?
9      A.   Well, as a program director or
10 myself, you would see the phone number that you
11 had spoken to and has caller ID, you see the
12 phone number. I mean...
13     Q.   Okay. Well, let's --
14     A.   And if you do --
15     Q.   Let's break this down.
16          Did you ever talk with anybody that
17 asked for a refund?
18     A.   Yes.
19     Q.   All right. And what did you do with
20 the call?
21     A.   I told them that so and so or whoever
22 had that lead is not available at the time.
23 Call back later or send somebody an email. You
24 brushed it off. That was -- you oh, okay, sir,

Page 104

J. Nicholas

1  okay. Yeah, yeah, I understand your whatever.
2  You just brushed it off. That was the extent of
3  it.
4      Q.   Right.
5           So you were trained if someone called
6  in --
7      A.   Absolutely.
8      Q.   -- with a -- requesting a refund was
9  to brush them off.
10     A.   Correct.
11     Q.   And who trained you to do that?
12     A.   The program director, because I did
13 have both at one point. I did have Mark Covais,
14 Michael Aaron. If -- you know, I'm gonna try to
15 paint a picture real quick. If I pick up the
16 phone and it's Joe and "I want my refund," you
17 know, "I'm unhappy with this," put it on hold.
18 Hey, you know, Mark, hey, Mr. Quintal, Joe wants
19 a refund. What do I do?
20          Hang up the phone. Put it back.
21 That's the type of -- tell them I'm not here or
22 tell them to call back in a week. That's how it
23 was handled. By whether it's Covais, Aaron,
24 Quintal, anybody who as us being a setter, being

Page 105

J. Nicholas

1  a non-decision-maker in the process, we would
2  say hey, this person wants a refund, put them on
3  hold or put the phone down and totally we were
4  told don't do it, no. That's how...
5      Q.   All right. So people -- how many
6  calls would you say you took from people that
7  were requesting a refund?
8      A.   In the time I was there, I would say
9  between four to five.
10     Q.   All right. And those four to five,
11 some of them you just hung up on?
12     A.   I wouldn't use the word hung up on,
13 but I'd use the word brushed off or say that the
14 person who makes that decision about a refund is
15 unavailable.
16     Q.   Did you take down their number?
17     A.   For what? There's no reason to call
18 them back.
19     Q.   All right. So you said they're
20 unavailable and you hung up the phone?
21     A.   You know, let's just do a mock one
22 real quick.
23          Hey, Jason, you know, blah, blah,
24 blah, I want a refund. I'm unhappy for whatever

27

Exhibit 80
- 407 -

Page 106

```
1              J. Nicholas
2   reason.  Is so and so available?  When I say so
3   and so meaning the person who ultimately took my
4   credit card, which was either Mark Covais,
5   Michael Aaron or whoever, I need them to refund
6   me.
7          Okay.  Hold on, sir or ma'am, let me
8   go see what's going on.
9          Hey, this guy wants a refund, what am
10  I going to do, blah, blah, blah.
11         And he's like, no, no, no.
12         Okay.  Sir, he's currently
13  unavailable.  Would you like to leave a
14  voicemail, would you like to email, whatever,
15  click, hang up.  Give them the phone number for
16  that person.
17         If the phone comes through, they
18  just -- they see the number come in, and just
19  let it go to voicemail and not return the call.
20         Like that's how it was done.  Like it
21  was totally I'm not giving you a refund like
22  this.  And that wasn't just for me, that was
23  for, you know, all the salespeople.  We're in
24  very tight cubes that would all fit like in this
25  room so...
```

Page 107

```
1              J. Nicholas
2      Q.   For the four or five people that you
3   spoke to during the four or five months that you
4   were there that wanted refunds, what were the
5   products or services that they were looking for
6   a refund for?
7      A.   Mostly online courses.  I think
8   maybe, like I said, I can't fully recall because
9   I don't want to say that, but it may have been a
10  one guy, an old man wanted something for the
11  coaching.
12         I know the majority of it, not just
13  for me, but for everybody, it was more of either
14  phone coaching or, you know, or the people who
15  sold the 25, $30,000, 35 and even sometimes 50,
16  like the whole office would stop if one of those
17  guys wanted to, guys or females, wanted to
18  refund.
19         Hey, I don't want you -- because
20  sometimes they would make a partial payment, so
21  it's $25,000 or $35,000, they would pay 10 or 15
22  to kind of as a deposit to hold it down and then
23  either when it got close to that date or before
24  they booked the plane tickets for whoever to fly
25  out to do it, then they would be responsible for
```

Page 108

```
1              J. Nicholas
2   that.
3          And if it never manifested like I
4   want my money back, it was a total shutdown of
5   everything it happened.
6      Q.   Did you ever talk to anybody that
7   bought a $25,000 or $50,000 program that wanted
8   a refund?
9      A.   I can't recall.
10     Q.   And since you never took payments,
11  how would you know this much person that you
12  didn't talk to put down?
13     A.   Because we had commission reports.  I
14  mean this is going to affect my money.  If this
15  person pays, you know, $3,000 or they're paying
16  $25,000, myself and everybody had a commission
17  report that everybody got on the whole sales
18  floor.
19         So I knew how much Joe was making, I
20  knew how much this guy on the sales team was
21  making, the deals that were assigned.  You know,
22  he made -- his revenue he brought in for the
23  month was $32,000.  Okay.  Well, one of those
24  was a $25,000 deal, one of them was $3,000.
25         And then we had weekly sales meetings
```

Page 109

```
1              J. Nicholas
2   and, you know, all that stuff was brought up and
3   reported, like hey, congratulations.  You know,
4   Joe Blow, you know, signed a $25,000 deal this
5   month.  Great, blah, blah, blah.
6          And then next week if we got oh, this
7   guy is calling me, he wants to cancel, he wants
8   a refund, then it was all discussed how to
9   handle the situation in sales meetings or just
10  generally shouting on the floor, sales floor.
11     Q.   So during the sales meetings, there
12  would be a discussion that John Smith called and
13  he wants to get a refund from his online
14  program?
15     A.   Sure.
16     Q.   All right.  So then you would go look
17  and see if --
18     A.   Not me personally.
19     Q.   If someone brought up an issue that
20  John Smith wanted a refund from an online
21  program, would you go and look at your list of
22  sets to see if that was going to affect your
23  commission?
24     A.   Well, why would I do that if it's not
25  my person?
```

Page 122

J. Nicholas

1    Q.   I just want to talk about things that
2  you have knowledge about, not something that you
3  heard from somebody who heard from somebody
4  else.  I want to find out what you personally
5  know.
6    A.   So 50/50.
7    Q.   All right.  And how many people would
8  you say you actually spoke to about their
9  experience going to a live event?
10    A.   Going to a live event.
11    Q.   Right.
12    A.   Okay.  That I spoke to?  Oh, I mean I
13  had databases of leads, so I'd say 15 to 20 per
14  live event.
15    Q.   All right.  And how many of those
16  told you about whether they liked or didn't like
17  the live event?
18    A.   Well, the live events actually had
19  more negative feedback than if you did a real
20  estate online course because -- and I'll get to
21  answer your question.  Online courses were also
22  the amount of effort you put into it.  Did you
23  attend a online course, did you log in, do your
24  work.

Page 123

J. Nicholas

1    On the live events, you're going for
2  a set amount of time and you have expectations
3  out of the event, and you paid, whether it's
4  free or we up-sell those people to another live
5  event, there was expectation.  A lot of people
6  felt cheated or discounted of the lack of
7  information that was advertised that actually
8  came out.
9    Q.   So for some of those you're talking
10  about people at the live event, I mean at the
11  free live event?
12    A.   Well, the whole purpose of a free
13  live event is to gauge out of that pool who we
14  can take out of that pool and pitch them to
15  another event, live event where it's a smaller
16  pool.
17    Q.   What I'm asking you is about the
18  feedback that you received from people that went
19  to the free live event.
20    Did you talk to some people?
21    A.   Yeah, of course.  It's a teaser
22  event.  There's not enough knowledge.  That was
23  the general feedback.
24    Q.   Okay.  So feedback that you got

Page 124

J. Nicholas

1  talking to people that went to the free live
2  event was that there wasn't enough information
3  provided.
4    A.   Correct.
5    Q.   That it was a teaser for other
6  events.
7    A.   Correct.
8    Q.   Okay.  And you understood that people
9  paid nothing and --
10    A.   Correct.
11    Q.   -- went to the free event.
12    A.   Of course.
13    Q.   All right.  Now did you also talk to
14  people that went to paid live events?
15    A.   Yes.
16    Q.   And did any of them talk to you about
17  their experiences or whether they liked it?
18    A.   Yes.
19    Q.   All right.  How many people would you
20  estimate that you spoke with about their
21  experience at a paid live event?
22    A.   Over the course of employment.
23    Q.   During your five-month employment.
24    A.   Ten to fifteen.

Page 125

J. Nicholas

1    Q.   And of those 10 to 15, what was the
2  feedback?
3    A.   I would say this one was even I'd say
4  more 75 percent of negative of I paid money but
5  I still didn't walk away with the information
6  that I thought that I was going to receive on
7  the way out.
8    Q.   Did you ever see or review any of the
9  evaluations or surveys that people filled out at
10  the live events?
11    A.   Yes.
12    Q.   And what was the reason why you
13  reviewed them?
14    A.   To gain feedback and knowledge
15  about -- anything that you can grab from the
16  form that they filled out that could help you
17  pitch the sale, then that was what -- that's why
18  you did it.
19    Q.   In fact the positive feedback from
20  people, you would use those to call them and see
21  if they were interested in other products and
22  services, right?
23    A.   Of course.
24    Q.   And you had lots of names from people

32

Exhibit 80
- 409 -

Page 150

J. Nicholas

1  like, for instance, car payments and stuff.
2  That was -- it was suggested that you write
3  notes internally.  You weren't supposed to write
4  on your script, you were supposed to enter into
5  the system, but in terms of the words and the
6  order and the progression, then yes, absolutely.
7      Q.   Paragraph 6, the line that says that,
8  "The instructors were experts in today's real
9  estate world and will teach all the non
10 traditional or unconventional ways of buying
11 real estate, this was not true."
12      What do you mean by that statement?
13      A.   It pretty much speaks for itself.  I
14 mean...
15      Q.   What was taught in the fast track of
16 foreclosure seminar?
17      A.   I mean these are general like in
18 terms of the context, like these people were
19 sold that they're going to get massive results,
20 they're going to have people hold their hands
21 and walk them through it and make them
22 successful.  That's the sale.  That's the
23 projection that you're painting to these people.
24      But this stuff rare -- you know, it's

Page 151

J. Nicholas

1  just not true.  Like, you know, "...experts in
2  today's real estate world and will teach all the
3  nontraditional..." The stuff that they're
4  teaching was anybody who picked up another
5  competitor's real estate book or went to Barnes
6  & Noble, they could read that for themselves
7  there.  There's no big secrets coming out.
8      Q.   All right.  So let's talk about that.
9      The hand holding and working directly
10 with someone like a mentor, that was the higher
11 priced program, the 25 to $35,000 program,
12 right?
13      A.   I mean yes, yeah.  Kind of, yeah.
14      Q.   If you paid 995 or $1,495 and went to
15 the three-day classroom seminar, that was the
16 full extent of the training you were going to
17 get plus support on a call-in number, right?
18      A.   The support is where --
19      Q.   Is that right?
20      A.   Yes, correct.
21      Q.   And you agree that's a very different
22 program and experience for someone going to a
23 three-day program compared to somebody flying
24 into your city and meeting with you.

Page 152

J. Nicholas

1      A.   Of course, but -- okay.
2      Q.   So the hand holding and so forth,
3  that was sold with the in-field mentorship where
4  somebody flies into your city and meets with
5  you, right?
6      A.   But...
7          MS. ECK:  Go ahead and answer the
8      question.
9      A.   No.  That applied to anybody because
10 supposebly [sic] the sell or the sales pitch
11 behind this is that all this stuff is Trump's
12 name, face, his experience and you're going to
13 get part of that knowledge and stuff going to be
14 dumped, deposited into your life at some form or
15 fashion.  You know, whether it's just taking a
16 real estate course and getting a little bit of
17 nuggets or paying more money and getting more
18 nuggets, that that's the perception of picture
19 they're trying to paint here to anybody.
20      Q.   All right.  So somebody that paid
21 $995 or $1,459 and went to the three-day
22 program, what were they taught?
23      A.   They were taught random things to get
24 them to pay more, to come --

Page 153

J. Nicholas

1      Q.   How do you know what they were taught
2  if you never attended the program?
3          MS. ECK:  Objection.  Asked and
4      answered.
5      A.   Asked and answered, because in sales
6  meetings we were educated on what was being
7  taught and said.
8      Q.   Did you ever watch an entire
9  three-day program?
10     A.   No.
11     Q.   Did you ever read the manuals or
12 books?
13     A.   They were provided to us.  We had
14 data, like I told you earlier, an outline or a
15 summary of what was going to be said from time
16 to time.
17     Q.   Did you ever --
18     A.   Not every event, but most events.
19     Q.   Did you read through all of the
20 books?
21     A.   Skim, general knowledge.
22     Books?
23     Q.   All of the manuals and the
24 presentations -- let's start one at a time.

Page 154

J. Nicholas

1    J. Nicholas
2        Did you see the PowerPoint
3    presentations that were used at the three-day
4    program?
5        A.   No.
6        Q.   Do you know whether they're the same
7    or different at the different programs?
8        A.   No.
9        Q.   And did you look through the
10   workbooks that corresponded with the PowerPoint
11   presentations?
12       A.   They were made available.  We had
13   workbooks and printouts from time to time that
14   were available to look at, yes.
15       Q.   Did you actually read them and go
16   through them?
17       A.   Skimmed through, some of them.
18       Q.   So what information was in there that
19   people were receiving?
20       A.   We were given books that were, you
21   know, that were being sold or at Barnes & Noble,
22   wherever they were available to anybody.  Those
23   books were considered the textbook or the
24   database of the online courses or anything, and
25   I mean we were given those books.  We were able

Page 155

1    J. Nicholas
2    to have those books and read those books.  They
3    were -- we had like, just like there's books in
4    here, there was everything was all laid out of
5    what's available.  So we had access if you
6    wanted to or took the initiative, it wasn't
7    required, to go in and look at stuff and get
8    educated on it.
9        Q.   All right.  Well, I'm trying to
10   understand what you actually did.
11       A.   Yeah, I looked at -- listen, I've
12   seen an online course looking over people's
13   shoulders, like, you know, whoever, we were
14   logged in as, you know, Joe Test and just looked
15   through the course and see how it progressed,
16   and learned about the intricate details.  You
17   can't sell something unless you know what you're
18   selling and that's...
19       Q.   So what was taught during the
20   three-day program?
21       A.   It was five years ago.  I can't
22   recall the intricate details of what was taught.
23            However, I am aware of the summary of
24   what was taught at the events, that it was
25   provided to us, but I can't recall details about

Page 156

1    J. Nicholas
2    that.
3        Q.   All right.  In summary, what was
4    taught the three-day event?
5            MS. ECK:  Objection.  Asked and
6    answered.  Harassing.
7        A.   I have no more to say about it so
8    whatever that means in legal terms.
9        Q.   It means I'm entitled to your best
10   knowledge.
11            Do you remember anything that was
12   taught at the three-day event?
13       A.   Okay.  What type of three-day event?
14   Because there's different events.
15       Q.   Okay.  So is the information
16   different at different events?
17       A.   Well, if you're covering multifamily
18   units and then in the other one you're covering
19   something else, then of course it's going to be
20   different knowledge.
21       Q.   So let's take the multifamily units.
22            What was taught?
23       A.   How to -- I mean just common
24   knowledge.  How to acquire them using other
25   people's money, like OPM, that's what they call

Page 157

1    J. Nicholas
2    it, to acquire these properties.  You know, all
3    the ins and outs how to make money.  Like it's
4    just common stuff.
5            And people would leave those events
6    and that's why we would get complaints as I
7    alluded to earlier, because they didn't get the
8    nuggets that they think that they were supposed
9    to get or the secret hand holding of the tools.
10   That's why the people would call back
11   complaining.  That's why some would buy into it
12   and say, "Oh, it's great.  Let's pay more money
13   to get even more details" or "I'm upset.  I paid
14   my money and I didn't get what I was looking
15   for."  That's it.
16       Q.   And that was your experience; some
17   people --
18       A.   That was my experience.
19       Q.   Some people thought it was great and
20   some people thought they didn't get their
21   money's worth.
22       A.   Correct.
23       Q.   The next line, 24, "The Trump
24   University instructors and mentors were a
25   joke..."

Page 158

J. Nicholas

1
2      Tell me what instructors were a joke
3  to you.
4      A.   Like I said earlier, I don't know
5  everybody's names.  There's some that were --
6  just because you're qualified to, you know, do
7  the basis of an online course versus actually
8  having knowledge, you know, it was just -- I
9  don't know how to go with this.
10     Q.   I want you to identify the
11 instructors.
12     A.   I can't do that.  I cannot identify,
13 unless you produce names and photos, I cannot
14 provide answers as to which ones were on one
15 aside of the others.
16     Q.   All right.  Well, who did you have in
17 mind when you wrote this statement under penalty
18 of perjury?
19     A.   There was a guy that came in, I don't
20 know his name, and he came in and he was like,
21 he was more of a mentor, like the phone coach
22 type of person and he would actually go out to
23 different, whatchamacallit, go out to help
24 people flip properties or do whatever he wanted
25 to do.  He's on that side of it.

Page 159

J. Nicholas

1
2      He was like, I'm trying to use my
3  words properly.  Like when I say the word joke
4  meaning is like he wasn't all that he was
5  cracked up to be, not all that he was
6  advertised.  That's what I mean when I say he
7  was a joke.
8      What they portrayed, the people
9  behind closed doors, they made us portray the
10 image that these people eat, slept and lived in
11 the Trump towers with Mr. Trump, and that they
12 were his right-hand man and they were going to
13 help you, but some of these people and when I
14 say they were a joke, I mean they didn't
15 actually live that lifestyle.  They're just
16 random people hired by Mr. Sexton or whoever to
17 come in because they may have a little bit of
18 real estate experience or they may have done a
19 couple of properties.  Now all of a sudden
20 they're experts.  That's what I mean it's a
21 joke.  I don't -- that's what I mean by it
22 so... That's what I mean from that.
23     Q.   Can you identify any instructor that
24 taught a Trump University program that you
25 thought was not qualified in real estate or

Page 160

J. Nicholas

1
2  didn't have experience in real estate
3  techniques, which is what you state on page 1 on
4  lines 24 and 25?
5      MS. ECK:  Objection.  Asked and
6  answered.
7      He already indicated that if you give
8      him the names and photos, he'll try to
9      identify them, but otherwise he doesn't
10     remember.
11 BY MR. SCHNEIDER:
12     Q.   Can you identify any instructor that
13 -- let's just take your sentence.
14     Mr. Nicholas, you stated under
15 penalty of perjury that the "...mentors and
16 instructors were a joke and most of them were
17 not experts in real estate and did not have
18 experience in the real estate techniques they
19 were teaching."
20     Those are your words that you signed
21 under penalty of perjury, so are you able to
22 identify a single instructor or mentor that you
23 think was not an expert in real estate?
24     MS. ECK:  Objection.  Asked and
25 answered.

Page 161

J. Nicholas

1
2      And he already identified one person.
3  He didn't remember the person's name.
4      A.   It was a male.  He was, I don't know,
5  between 30 and 45.  Somewhere in there.  He came
6  into the office one time.  He expressed his --
7  what his involvement was.
8      And then also, and I know this is not
9  directly answering your question, but this is
10 what I'm going to say and leave it at that, and
11 you can go wherever you want to go with it.
12 Again, the talk amongst the office, the sales
13 team, who were directly responsible for selling
14 to people over the phone, had a general
15 knowledge, I use the word general, that some of
16 the people that were being used from time to
17 time, I said some, not all, were not at the
18 level as advertised.  That's what I mean
19 when you're an -- this is a joke, this is a
20 joke.  That's what I mean by saying this is a
21 joke.
22     Q.   Okay.  And what I want to find out --
23     A.   And then in terms of the person,
24 you're asking me to pin down and nail a person's
25 name who they are, I don't have that

Page 230

J. Nicholas

1
2     (Document review.)
3     A.   What I meant by it is if you read the
4  next sentence, that's what I meant by it.
5         In my opinion, it was just selling
6  false hopes and lies.  That was what I meant by
7  it.
8     Q.   What was the lie?
9     A.   The false hope and lie is the same
10  thing sandwiched together, meaning you're
11  painting a picture of success, of making money,
12  of whether it's in real estate,
13  entrepreneurship, marketing, whatever it is that
14  the your -- that the consumer is interested in
15  acquiring educationally and also by, you know,
16  internalizing this knowledge that they're going
17  to get it from us, meaning Trump University and
18  the instructors, and it was just not the case.
19  I mean...
20     Q.   Did you ever talk with anybody or
21  hear of anybody that had made money going
22  through the Trump University programs?
23     A.   I specifically did not.  Like I said,
24  successes don't, just like in any part world,
25  successes don't get reported as much as some the

Page 231

J. Nicholas

1
2  negativity from my base and what I experience --
3  I only got negative calls.  The majority of the
4  stuff was negative feedback, okay?
5         Some of the successes, if there were
6  any, I can't recall, but like I said before you,
7  on the ratios that I gave you, that's where I'm
8  going to stick to, you know, overall in the
9  office, the positives and the negatives.
10     Q.   No. 19 you state that you heard
11  numerous complaints from customers after they
12  attended seminars or live events.
13         Are you distinguishing between a
14  seminar and a live event there?
15     A.   I mean --
16     Q.   What I'm asking is by seminar, are
17  you referring to online or are you talking about
18  both of those live event issues?
19     A.   No, not both live event.  It's
20  everything, all inclusive, whether it's --
21  "heard numerous complaints from customers after
22  they attended seminars or live events."  I mean
23  this is -- I mean...
24     Q.   Right.  So I'm trying to understand
25  when you say seminars, you talking about online

Page 232

J. Nicholas

1
2  or you talking about something different?
3     A.   I'm talking more about -- I'm leaning
4  more toward the live events.
5     Q.   All right.  And the numerous
6  complaints, you're talking about the handful of
7  people that you spoke with during your five
8  months there, right?
9         MS. ECK: Objection.  Misstates the
10  witness' testimony.
11         He's already gone over this.  Asked
12  and answered.
13     A.   I agree with what she says.  I mean
14  I've already told you specifically about, you
15  know, the number ratios and the office chatter,
16  and facts from sales meetings on, you know.
17     Q.   Well, this is different.  This says
18  that you received numerous complaints from
19  customers, so I want to just focus on the
20  customers that you spoke with.
21     A.   Right.
22     Q.   All right?
23         And you talked earlier about I think
24  you said there was three customers that you
25  remember speaking with.

Page 233

J. Nicholas

1
2         That sound right?
3     A.   Whatever you wrote, that's what it
4  is.
5     Q.   And what we talked about earlier,
6  that's the same issue you're talking about here,
7  right?
8     A.   The same issue.  The same issue.  I
9  mean I understand you're basing -- you're trying
10  to get information, but it's clearly stated.
11  You know, they go to the live events and they're
12  not happy.  The whole time they're there,
13  they're getting up-selled to go to a more
14  exclusive and a smaller live event.  I mean
15  that's what it is.
16         And they were always complaining
17  that, "I'm paying money and I'm getting
18  shortchanged on the information, and it's being
19  withheld from me to come to another live event
20  and pay more money," so that's where I went with
21  this.
22     Q.   All right.  And the problem is that
23  you say things like "they're always complaining"
24  and I'm just trying to define that.
25         As I understand it, you talked to

Exhibit 80
- 413 -

Page 234

J. Nicholas

1  three customers that complained.
2      MS. ECK:  Objection.  Asked and
3  answered.
4      He said on numerous occasions that
5  it's based on what he's discussed with
6  other salespeople and what he's heard on
7  the sales floor, and he's repeated this
8  over and over again.
9      MR. SCHNEIDER:  That's fine.
10 BY MR. SCHNEIDER:
11     Q.   And we're just going to drill down
12 and figure out what you know and what's hearsay
13 that's not admissible, so that's the difference
14 is that this isn't a discovery deposition.  You
15 filed a declaration under oath, under penalty of
16 perjury that the other side is using in their
17 case.  This is a very serious issue.
18     A.   Oh, I know it is.
19     Q.   So I want to make sure we know
20 exactly what you know and exactly what you don't
21 know.
22     A.   And I keep stating the same thing
23 over and over again.
24     MS. ECK:  Objection.

Page 235

J. Nicholas

1      A.   Like verbatim over.
2      MS. ECK:  Asked and answered.  He's
3  already answered it in regard to this
4  particular paragraph in regard to this
5  particular sentence, and now it's just
6  getting harassing.
7      MR. SCHNEIDER:  Well, I am going to
8  address it but not with you.
9  BY MR. SCHNEIDER:
10     Q.   With you I'm going to address it, not
11 with your lawyer.
12     A.   You're going to get the same answer.
13     Q.   How many customers told you that they
14 thought it was a big marketing scam?
15     A.   "They complained it was a big
16 marketing scam."
17     They meaning the customers within our
18 team in sales meetings, in group discussions, on
19 the sales floor, they, the consumers were
20 complaining.
21     Q.   Okay.  So the --
22     A.   That's my base from the answer to
23 that.  If you want me to -- I don't know what
24 the legal terminology is to add to or to make

Page 236

J. Nicholas

1  the sentence more clear and we can edit it,
2  fine, but this statement is true and that's what
3  I stand by it.
4      Q.   Okay.  Did any customers that you
5  personally spoke with ever tell you that they
6  thought it was a marketing scam?
7      A.   Yes.
8      Q.   How many?
9      A.   The amount of number that we have
10 there.
11     Q.   Three?
12     A.   Yeah, whatever.  Three, four,
13 whatever it is.  Now -- okay.  That's fine.
14     Q.   The next paragraph 20 says, "As part
15 of Trump University's up-sell campaign, Trump
16 University had a policy and practice that if a
17 student gave high ratings on an evaluation form,
18 we were supposed to immediately call them back
19 and try to up-sell them to get them to sign up
20 and pay for more seminars."
21     Is that true?
22     A.   Yeah.
23     Q.   All right.  So did you have a stack
24 of contacts that from students that gave high

Page 237

J. Nicholas

1  ratings?
2      A.   Like I explained earlier, we're
3  required to call all leads from the live event.
4  However many employees are in the sales meeting
5  that morning, there's a stack of papers that
6  were all filled out from the live event.
7  Everybody was dished out, you know, whatever,
8  like this (indicating), you know, hey, here's 5
9  for you, 10 for you, 20 for you, 100 for you,
10 whatever it may be.  Given the leads.
11     We would go through the leads and it
12 was a priority that obviously we call of them
13 because they did attend the live event, they had
14 some interest level and we needed to try to sell
15 them something.  And the ones that had, like I
16 stated, we had to target those guys first
17 because the event just happened, it's a few days
18 removed and everything is fresh in their brain,
19 we wanted to attack them and try to up-sell them
20 some more.  I mean that's pretty clear.
21     Q.   So it sounds like this sentence is
22 only partially true; that you didn't just
23 contact students that gave high ratings, you
24 contacted every student that went to a program,

60

Exhibit 80
- 414 -

Page 238

J. Nicholas

1    right?
2            MS. ECK:  Objection.  Misstates the
3    witness' testimony and misstates the
4    document itself.
5            That document doesn't say that they
6    only called certain people.  It says the
7    policy was to immediately call them back.
8    You're misrepresenting the document.
9    BY MR. SCHNEIDER:
10       Q.   Is my statement true, sir?
11           MS. ECK:  Would you repeat the
12   question, please?
13           MR. SCHNEIDER:  Sure.
14           MS. ECK:  Unless you want to restate
15   the question yourself, David.
16           (Question was read back as follows:
17           "QUESTION:  So it sounds like this
18   sentence is only partially true; that you
19   didn't just contact students that gave high
20   ratings, you contacted every student that
21   went to a program, right?")
22       A.   Whatever it says, that's what it is.
23       Q.   I'm asking what this says.  I'm
24   asking if in practice you contacted each

Page 239

J. Nicholas

1    student that went to a live program and not just
2    the one that gave high ratings.
3        A.   I don't know how many time I repeat
4    myself.  We gave a stack -- every salesperson
5    was given a stack of all leads that were at the
6    event.
7            However, there were some that had
8    marks on it, asterisks, you know, high ratings,
9    that these people are hotter -- they're more of
10   a hot lead than some of the other people and we
11   were to call those people first.  But we had to
12   call everybody, but those people were
13   specifically targeted in order to up-sell them
14   to anything.
15       Q.   Paragraph 21 on the testimonials, we
16   talked about the sum total of your information
17   regarding false, misleading and fabricated
18   testimonials earlier.
19           That was based on what Mark Covais
20   told you, right?  Yes?
21       A.   Yes, correct.
22       Q.   The next line, "Testimonials were not
23   expected results and were not realistic."
24           Where is that information from?

Page 240

J. Nicholas

1        A.   This was common knowledge.
2        Q.   What knowledge do you have that the
3    testimonials were not expected results?
4            MS. ECK:  Objection.  Asked and
5    answered.
6            Go ahead.
7        A.   It's just -- oh, my God.  I don't
8    know what you -- I don't know where to go with
9    this other than what it says.
10       Q.   Well, sir, I can say that your
11   shirt's blue.  It's just common knowledge.  You
12   know, you can say anything.
13           What I want to find out is what's the
14   reason.  What's the basis for saying that the
15   testimonials were not expected results.
16           Did you see some testimonials?
17       A.   Yes.  I told you this all before.
18   Rip-off reports, people calling and complaining.
19   Like this is over a course of five months
20   you're getting negative feedback, so therefore
21   some of the results that people are, you know,
22   expected, it's false.  It's not real.  It's not
23   happening.  This is not -- like with weight loss
24   or whatever it is, like it's not expected or

Page 241

J. Nicholas

1    some of these pills that people buy, like the
2    results are not realistic.  They're not, they're
3    not -- they're false.  They're fabricated.
4    They're embellished.
5        Q.   Are you saying that the
6    testimonials -- I mean you mentioned what Mark
7    coach told you.
8            Are you saying that testimonials
9    about people that made money, they weren't true,
10   all of them weren't true?
11           MS. ECK:  Objection.  Misstates the
12   witness' testimony and asked and answered.
13   BY MR. SCHNEIDER:
14       Q.   You can answer.  You said they're not
15   realistic.
16           Are you saying that --
17       A.   Not for everybody.
18       Q.   All right.  Some people they were
19   true, right?
20       A.   It's not 100 percent.  Of course
21   there's -- in anything there's people that
22   are -- whether, whether somebody, you know, if
23   100 people buy something and they're all
24   expecting the same results, it also has to do

Exhibit 80
- 415 -

# EXHIBIT 81

Exhibit 81
-  416 -

Page 1

1        IN THE UNITED STATES DISTRICT COURT

       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

2

  TARLA MAKAEFF, et al., on §
3 Behalf of Themselves and   §
  All Others Similarly       §
4 Situated,                  §
                             §
5        Plaintiffs          §
                             §   Civil Action No.
6 VS.                        §   3:10-CV-00940-CAB
                             §
7 TRUMP UNIVERSITY, LLC,     §
  et al.,                    §
8                            §
         Defendants          §
9 _____§

10

11

12

13

14

15    VIDEOTAPED DEPOSITION OF CHERYL DONNELLY

16              Austin, Texas

17         Friday, November 2, 2012

18

19

20

21

22 Reported by:

23 MICHEAL A. JOHNSON, CRR

24 JOB 54334

25

Exhibit 81
- 417 -

Page 2

1

2                           November 2, 2012

3                           9:09 a.m.

4

5

6       Videotaped deposition of CHERYL DONNELLY,

7    held at the offices of Slack & Davis,

8    2705 Bee Caves Road, Austin, Texas,

9    pursuant to Notice before Micheal A. Johnson,

10   a Certified Realtime Reporter and Notary

11   Public of the State of Texas.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 81
- 418 -

Page 94

1    you?

2         A.   Yes.

3         Q.   Okay.  And did the salespeople use

4    any kind of written scripts that you saw?

5         A.   I do know that there was a script

6    issued while I was there to make sure

7    everything was uniform.

8         Q.   Was that done by a salesperson or

9    by a setter?

10        A.   Excuse me.  I'm sorry, for the

11   actual screening?

12        Q.   The script.  Who used the script?

13        A.   I believe the script may have been

14   used by the screener as well as the sales

15   staff.

16        Q.   Did you ever see a sales staff

17   person using a script?

18        A.   No, I -- they were in their own set

19   of cubes and I was in an office, so I was not

20   watching what they were doing.

21        Q.   Did you ever see a script?

22        A.   Yes.

23        Q.   Okay.  And was it for a setter?

24        A.   I believe it was.  There may have

25   been information there for a salesperson.

Exhibit 81
- 419 -

Page 95

1    I -- that's -- I mean, it's five years.

2        Q.    Okay.  And the setter would

3    basically get some basic information about the

4    person to see which program might be more

5    suitable for them, right?

6        A.    Correct.  Based on their -- what

7    area they wanted to go into, of wealth

8    building, real estate marketing, et cetera,

9    and also check their credit basically.

10       Q.    And then if that person looked like

11   they might be appropriate for services or

12   products that Trump University was offering,

13   then the setter would transfer them to someone

14   in sales to take that call, right?

15       A.    Sometimes they would make an

16   appointment, and that's part of the idea of

17   making it seem like it's more prestigious,

18   that you have to make an appointment with

19   somebody to get their time to be assessed.

20       Q.    And then somebody else would take

21   over once the appointment was made?

22       A.    Correct.  Then the salesperson

23   would call.

24       Q.    Do you know what any of the

25   criteria were for salespeople to determine

Exhibit 81
- 420 -

Page 117

1        Q.    Do you know if the salespeople sold

2    live events?

3        A.    It would be my understanding that

4    they would.   They would try and get people to

5    these events.   You would hear them tell

6    people, hey, we're having an event in your

7    area, you should go.   And that's why these

8    types of documents, which would be 947 --

9    those types of documents are distributed out

10   to both marketing and obviously the sales

11   team, so that they can let people know like,

12   hey, this is exactly what I think you need to

13   attend.   So they were always trying to

14   cross-sell all of the products.

15       Q.    Did you find anything wrong with

16   that?

17       A.    I think the only issue would be

18   when somebody is trying to get somebody to

19   increase credit to attend an event.   Other

20   than that, cross-selling is normal marketing

21   practice.

22       Q.    So your concern or criticism is if

23   something's being sold to somebody that

24   doesn't seem to be able to have the financial

25   wherewithal to pay for it?

Exhibit 81
- 421 -

Page 118

1      A.   And to be persuaded to try and get

2   that.  It's -- it's the hard sell that is a

3   hard one to take because people get excited

4   about the Trump name.  They just do.  So they

5   want to be associated with that.  And then you

6   have a salesperson who is selling them on that

7   and why they want to be included in that and

8   convincing them that they should get their

9   credit increased.

10      Q.   All right.  Now, again, you don't

11   have any information that someone actually

12   said to a prospective customer to increase

13   their credit, do you?

14      A.   I -- it -- you would overhear the

15   conversations about -- it was on one of the

16   scripts, you know, let's check your credit,

17   you know, what's available on your credit.

18      Q.   Okay.  Well, checking your credit

19   and increasing your credit limit, those are

20   two different things, right?

21      A.   They are, yes.

22      Q.   All right.  And you said --

23      A.   But they want to get them into the

24   higher programs.

25      Q.   Okay.  But let's stick with what

Exhibit 81
- 422 -

Page 182

1          Q.    Sure.  You can say that.  I'm

2    asking you whether or not you actually saw any

3    testimonials in which you are aware that a

4    profit amount was stated that didn't take into

5    consideration costs and expenses.

6          A.    I cannot recall.

7          Q.    Item No. 7, "Trump University

8    focused on hard sell tactics."  What were the

9    hard sell tactics?

10         A.    When you have somebody on the phone

11   who is excited about a program and making them

12   go through this screening process that really

13   doesn't exist -- when you go to school there's

14   usually entry level exams you have to pass.

15   You have to have a certain score on your SAT.

16   That did not exist within Trump.  It really

17   exists in the fact that could you pay for the

18   program and did you actually -- were you

19   actually interested.

20              So to make a consumer feel like

21   it's tough to get into this and you're going

22   to be part of -- in their marketing brand

23   guidelines it's an elitist organization.  So

24   you're making people through your marketing

25   and sales efforts feel like they're joining

Exhibit 81
- 423 -

Page 183

1    this exclusive club.  Who doesn't want to be

2    part of an exclusive club?

3        Q.   And you believe that that's hard

4    sell tactics?

5        A.   When the foundation is how much can

6    you pay for a program, when there's really --

7    you know, the screening process does not

8    involve a certain business acumen or

9    foundation, it's just you're interested and

10   you have money.  To me that is.

11       Q.   All right.  So one of the hard sell

12   tactics is that Trump University made

13   consumers feel that it was difficult to -- to

14   get into Trump University, correct?

15       A.   Correct.

16       Q.   Any other hard sell tactics that

17   you're aware of?

18       A.   That would be the major one that I

19   can recall, yes.

20       Q.   All right.  Further down on No. 7,

21   line 15, it says, "but to my knowledge, the

22   instructors were not chosen by Donald Trump."

23   Do you see that sentence?

24       A.   Yes.

25       Q.   And I think we discussed this

Exhibit 81
- 424 -

Page 203

1          MS. ECK:  Okay.

2   BY MS. ECK:

3      Q.   And this is a document that you

4   produced called a consultant setter script.

5   Are you familiar with that document?

6      A.   Yes.  This was produced, I believe,

7   at the same time to the sales team as well as

8   marketing by Paul Quintal, again, to ensure

9   that everybody was uniform with what they were

10  saying to customers.

11     Q.   Do you know who prepared the

12  script?

13     A.   I would believe it would be Paul

14  Quintal.

15     Q.   Do you know who used the script?

16     A.   The -- for this one, it says

17  setters, so I would assume setters would've

18  used it.

19          MR. SCHNEIDER:  Objection,

20  foundation.

21  BY MS. ECK:

22     Q.   And what were setters, again?

23     A.   The setters were the screeners for

24  Trump University call center, if there were

25  outbound calls or incoming calls, to see how

Exhibit 81
- 425 -

Page 204

1      serious somebody was about wanting to get

2      involved with the university.  They were then

3      kind of there to bring people up and get them

4      excited and then kind of screen them to see,

5      you know, which sell would they be best for to

6      send over to the salesperson, and they would

7      set up appointments.

8           Q.   Were the setters located at 40 Wall

9      Street?

10          A.   Yes.

11          Q.   Do you know who the setters were at

12     the time you were there?

13          A.   I do not know exactly who was a

14     setter.  We had a couple of them, and then

15     they worked with the salespeople.  So I

16     believe they may have been teamed up.

17          Q.   Were they part of the sales team?

18          A.   I would say that they would be part

19     of the sales team because they all fell under

20     Paul's domain of the area, but they were also

21     very involved with the sales and screening

22     people.

23          Q.   In regard to the document

24     previously marked as Exhibit 4, the Trump

25     University marketing guidelines, was this a

Exhibit 81
- 426 -

Page 205

1    document that you prepared?

2          A.    No.

3          Q.    Who prepared this?

4          A.    This would have been prepared by

5    Christopher Rugen, our creative designer, with

6    information obtained from Josef, as well as

7    Michael Sexton.   And this was created to

8    ensure everybody was adhering to brand

9    guidelines and how we presented materials, and

10   this is standard for an organization to have.

11         Q.    Okay.   And it says, "Strict

12   compliance is required by our strategic

13   partners, third-party vendors and freelance

14   professionals."

15         Were partners, third-party vendors

16   and freelance professionals provided with a

17   copy of these marketing guidelines?

18         A.    To my knowledge, no, I do not -- I

19   cannot answer that question.   I don't know if

20   they were.

21         Q.    Were they informed of the necessity

22   of the uniformity of the Trump University

23   message?

24         MR. SCHNEIDER:   Objection,

25   foundation and misstates the document.   You're

Exhibit 81
- 427 -

Page 208

```
 1    questions regarding complying with these copy

 2    guidelines?

 3         A.   Not that I can recall.

 4         Q.   On page TU-DONNELLY15 it states

 5    that, "Since 2005 Trump University has been

 6    helping people achieve the privileged lives

 7    they've always dreamed about and we will help

 8    you too.  We guarantee it.  This is not a

 9    guarantee we take lightly."

10         Are you aware of other guarantees

11    that Trump University made to its students?

12         A.   In writing, not that I can recall.

13         Q.   On page TU-DONNELLY17, under

14    "Tone," it states, "Think of Trump University

15    as a real university with a real admissions

16    process, i.e., not everyone who applies is

17    accepted."

18         Is that, you know, one of the

19    messages or one of the tones that Trump

20    University used?

21         A.   Absolutely.  That was the -- the

22    goal of the screeners was to ensure that they

23    were making people feel like you may not get

24    in.  And the salespeople too, to -- oh, let me

25    make sure you're, you know, good enough for
```

Exhibit 81
- 428 -

Page 209

1   this program.  That they took very seriously.

2        Q.   Was anyone who is willing and able

3   to pay for the program turned away or

4   rejected?

5             MR. SCHNEIDER:   Objection,

6   foundation.

7        A.   To my knowledge, no.

8   BY MS. ECK:

9        Q.   On page TU-DONNELLY18, there's an

10  IACET logo.  Is this the logo that you were

11  talking about?

12       A.   Yes.

13       Q.   And to your knowledge did Trump

14  University ever receive authorization to use

15  this logo?

16       A.   To my knowledge, no, they did not.

17       Q.   On Exhibit 9, which was introduced

18  earlier, TU-DONNELLY1211, where it states, "We

19  cannot say that the experts and gurus are

20  handpicked by Donald.  This has been removed

21  from our marketing efforts."

22            Do you recall who told you that you

23  can't say that the experts are handpicked by

24  Donald Trump?

25       A.   That would have been either Josef

Exhibit 81
- 429 -

Page 210

1    or Michael.

2         Q.    Do you know why they instructed you

3    that Trump University should no longer state

4    that experts were handpicked by Donald Trump?

5         A.    It would be because when you say

6    handpicked, it's misleading to consumers.

7              MR. SCHNEIDER:   Objection,

8    foundation, move to strike.

9    BY MS. ECK:

10        Q.    Why would it be misleading to

11   consumers?

12        A.    Because people are buying into the

13   program with the assumption that they are

14   getting Donald Trump's best of the best and

15   there are people that are hand chosen by him.

16   So Donald Trump is known for wanting the best.

17   Why wouldn't he put this forward with his

18   people that he is getting 25,000, $35,000 to

19   teach me how to invest in real estate.

20             MR. SCHNEIDER:   Objection,

21   foundation, move to strike, and improper

22   opinion.

23   BY MS. ECK:

24        Q.    When you were there, did you see

25   marketing materials that stated that Trump

Exhibit 81
- 430 -