# EXHIBIT 110

Exhibit 110
- 804 -

**Customer Support**

| | |
|---|---|
| **From:** | David Highbloom |
| **Sent:** | Friday, July 20, 2007 5:09 PM |
| **To:** | Stephen Goff (sgoff@trumpuniversity.com) |
| **Cc:** | Cybelle Clevenger; Josef Katz; Corinne Sommer; 'Brad Schneider' |
| **Subject:** | FW: Retreat Outline |
| **Attachments:** | QUICK CASH WITH QUICK TURN REAL ESTATE.doc |

Steve,
As per our discussion today, we like the concept and retreat outline: next steps
I have let people know you are up and running n your new email: sgoff@trumpuniversity.com

1) Please develop it into a paragraph and send it to our copywriter Cybelle Clevenger (cclevenger@trumpuniversity.com ) and V.P. of Marketing Josef Katz (jkatz@trumpuniversity.com). I have included them in this email and can arrange a conference call next week?

2) Josef and Cybelle will work on a few names for the retreat (we can get it live on the web; we need a new product code). Prosper can sell this retreat- they will need information before the end of the month?

3) Corrine will schedule a few dates for the end of August (confirm Steve Goff"s availability) and get it into our system

4) Steve Goff can train the sales reps on the new program when he is in town

```
Cybelle Clevenger
Trump University
40 Wall Street
New York, NY 10005
http://www.TrumpUniversity.com
Phone: (212) 248-1800 x116
Fax: (212) 248-0782
cclevenger@TrumpUniversity.com


Josef Katz
Trump University
40 Wall Street
New York, NY 10005
212-248-1800 ext 104
jkatz@trumpuniversity.com
```

**David Highbloom**
Trump University
40 Wall Street, 32nd Floor
New York, NY 10005
http://www.trumpuniversity.com
Phone: (212) 248-1800 x102
Fax: (212) 248-0782
dhighbloom@trumpuniversity.com

**From:** Bcshomebuyers@aol.com [mailto:Bcshomebuyers@aol.com]
**Sent:** Thursday, July 19, 2007 8:34 PM
**To:** David Highbloom

5/23/2012

TU 102707

Exhibit 110
- 805 -

**Subject:** Retreat Outline

Dave,

Let me know what you think about this Retreat Outline.

Thanks,

Steve Goff

---

Get a sneak peek of the all-new AOL.com.

5/23/2012

TU 102708

Exhibit 110
- 806 -

# EXHIBIT 128

Exhibit 128
- 908 -

Page 1

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF CALIFORNIA

3    ---------------------------X

4    TARLA MAKAEFF, et al., on

5    Behalf of Themselves and All

6    Others Similarly Situated,

7              Plaintiffs,

8       -vs-                No. 3:10-CV-00940-CAB

9    TRUMP UNIVERSITY,  LLC,

10   et al,

11             Defendants.

12   ---------------------------X

13

14   VIDEOTAPED DEPOSITION OF RONALD DAVID SCHNACKENBERG

15            San Francisco, California

16             October 15, 2012

17

18

19

20

21

22

23   Reported by:

     Bonnie Pruszynski, RMR, CSR No. 13064

24   JOB NO. 54291

25

Exhibit 128
   -  909 -

**Page 2**

```
 1
 2
 3              October 15, 2012
 4                 8:11 a.m.
 5
 6
 7
 8         Videotaped deposition of RONALD DAVID
 9    SCHNACKENBERG, held at the offices of Robbins
10    Geller Rudman & Dowd, One Montgomery Street, Suite
11    1800, San Francisco, California, before Bonnie
12    Pruszynski, a Registered Professional Reporter,
13    Registered Merit Reporter, Certified LiveNote
14    Reporter and Certified Shorthand Reporter No.
15    13064.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            A P P E A R A N C E S:
 2    ZELDES & HAEGGQUIST
 3    Attorneys for Plaintiffs
 4         625 Broadway
 5         San Diego, California 92101
 6    BY:  AMBER ECK, ESQ.
 7
 8    YUNKER & SCHNEIDER
 9    Attorneys for Defendants
10         655 West Broadway
11         San Diego, California 92101
12    BY:  DAVID SCHNEIDER, ESQ.
13
14    ALSO PRESENT:   Alan Dias, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          THE VIDEOGRAPHER:  Good morning.  My
 2    name is Alan Dias from TSG Reporting.  This
 3    is the matter pending before the United
 4    States District Court for the Southern
 5    District of California, Number 10-CV-0940
 6    CAB.
 7          We are located today at One
 8    Montgomery Street, in the City of San
 9    Francisco, California.  Today is October 15,
10    2012, and the time is 8:11 a.m.
11          Counsel, would you please identify
12    yourself for the record?
13          MR. SCHNEIDER:  David Schneider for
14    defendants Trump University and Donald
15    Trump.
16          MS. ECK:  Amber Eck for plaintiffs.
17          THE VIDEOGRAPHER:  Will the court
18    reporter please swear in the witness?
19          (Witness sworn.)
20          THE VIDEOGRAPHER:  You may proceed.
21          MR. SCHNEIDER:  Thank you.
22    RONALD DAVID SCHNACKENBERG,
23          called as a witness, having been first
24          duly sworn, was examined and testified
25          as follows:
```

**Page 5**

```
 1    EXAMINATION
 2    BY MR. SCHNEIDER:
 3       Q    Please state your full name.
 4       A    Ronald David Schnackenberg.
 5       Q    Mr. Schnackenberg, my name is David
 6    Schneider.  We met just before the deposition
 7    started and I represent Trump University and
 8    Donald Trump in a lawsuit which has been brought
 9    by a woman, Tarla Makaeff, and some other
10    individuals that joined the lawsuit at a later
11    time, and I understand that you used to work for
12    Trump University some years ago; is that correct?
13       A    It is.
14       Q    I want to start with a little bit
15    about your background and employment and so forth.
16    Can you tell us what your educational background
17    is?
18       A    I have an undergraduate from the
19    University of Phoenix and a Masters of Business
20    Administration from IE Business School.
21       Q    And was the University of Phoenix
22    degree at a physical location or online?
23       A    Both.
24       Q    And what physical location?
25       A    Phoenix, Arizona.
```

Exhibit 128
- 910 -

Page 78

1   acquire that kind of demographic information?
2       A    I don't believe so, other than, you
3   know, the prospecting conversation of -- of what
4   they do for employment.
5       Q    All right.  So, David Highbloom asked
6   you why you didn't feel comfortable selling that
7   particular program, and you explained that you
8   didn't think that the potential buyers the,
9   Moores, had sufficient resources to pay for it?
10      A    Correct.
11      Q    And what did he say?
12      A    Actually, it's not even just about
13  the sufficient resources.  It's based on the
14  conversation that I had with them.  You know, it
15  wasn't my position to judge, you know, their
16  financial situation, but based off of the
17  conversation we had of their working situation,
18  what they were looking to do long-term, I didn't
19  feel that it was a -- it was an appropriate
20  purchase, as did they at the time.
21      Q    So, it sounds like it really wasn't a
22  money issue, it's just sound like you thought that
23  the REIT program was a better fit for them?
24      A    We both did, yeah.
25           And the ability to purchase real

Page 79

1   estate.  You know, that's what the goal of this
2   was.  So, through the consultative discussion that
3   we had, you know, if they were using all of their
4   money to purchase this program, you know, we both
5   felt that it wouldn't be possible for them to then
6   purchase an income property or a second property,
7   because they were using the money that they had
8   for the program instead of for purchasing
9   property.
10      Q    Did David Highbloom have any
11  response?
12      A    I don't remember if it was David
13  Highbloom or Michael Sexton.  I believe they were
14  both in the meeting.  I don't remember if it
15  was -- who, exactly, it was, but they expressed
16  some disappointment in my not taking the -- or
17  selling the Moores on the -- on the Elite program.
18      Q    Do you remember what either of them
19  said?
20      A    I don't remember exactly what they
21  said, no.
22      Q    Can you remember, in general, other
23  than disappointment?
24      A    Disappointment and that should not
25  happen again.

Page 80

1       Q    All right.  And you mentioned that
2   you spoke with another person or another couple
3   besides the Moores at that live event?
4       A    Yeah.  It was one person.  His name
5   was Rami.  I don't remember the other individual's
6   name.  He was a -- he was -- worked for -- he was
7   a manager at a hotel.
8       Q    And with regard to the Moores, the
9   live event was the one and only time that you
10  every spoke to them?
11      A    To my knowledge, yes.
12      Q    And you have no idea whether they
13  liked the program; true?
14      A    I have no idea.
15      Q    You have no idea if they invested in
16  real property?
17      A    No.
18      Q    You don't know if they made money?
19      A    No.
20      Q    And did you ever hear anything more
21  about the Moores from anyone?
22      A    I did not.  I resigned shortly
23  thereafter.
24      Q    How long after?
25      A    Probably a week or two.

Page 81

1       Q    And you resigned because Michael
2   Sexton and David Highbloom told you that they were
3   disappointed you didn't make that sale?
4       A    Not just that, but that did play into
5   my decision.
6       Q    What else?
7       A    Just the direction of where they were
8   taking the business.  They made it clear that the
9   future growth for the company was now going to be
10  in the seminar industry, instead of in the
11  programs that we were previously selling.
12      Q    All right.  So, tell me about Rami.
13      A    Rami, he and his wife, you know, had
14  expressed the interest of purchasing real estate.
15  They had given a one-day deal, you know, to where
16  they could by the $35,000 program and both of
17  them, essentially, get the full benefits of the
18  program.  So, it was essentially getting the
19  program for half price.  And they -- he and
20  another gentleman felt that this was good idea to
21  purchase, and they were also very -- they had a
22  very low income base on what they had told me
23  about their employment situations, and they also
24  were wanting to do the Real Estate Investor
25  Training Program after I had talked to them, and I

Exhibit 128
- 911 -

Page 222

```
1      Q    Or agent?
2      A    Correct.
3      Q    Are you a broker?
4      A    Yes.
5      Q    When did you get your broker's
6   license?
7      A    In 2008, I believe.
8      Q    Any other office issues that we
9   haven't talked about in terms of how the office
10  got along while you worked at Trump University?
11         MS. ECK: Objection. Vague.
12     Q    I'm really talking about the dynamics
13  of --
14     A    The dynamics was -- was pretty good.
15  We had a couple employees that were terminated due
16  to low performance, but nothing -- I don't think
17  there was any type of disgruntlement from any of
18  those employees. Everyone got along really well,
19  I think, as far as I knew.
20         MR. SCHNEIDER: All right. I don't
21     have anything else. I propose that we
22     relieve the court reporter of her
23     obligations under the code with regard to
24     retaining the original transcript. If you
25     will send that to Ms. Eck, and then she will
```

Page 223

```
1   forward it on to you, Mr. Schnackenberg.
2      Q    What is going to happen when you get
3   the transcript -- it might be a week or so when
4   you get it.
5      A    That's fine.
6      Q    Is, I would like you to review the
7   transcript, and if you have any changes to your
8   testimony, then make those in the transcript.
9   There will be a place for you to do that.
10     A    Okay.
11     Q    If you change your testimony, then
12  any of the attorneys can comment about that.
13     A    Okay.
14     Q    And that could affect your
15  credibility, and it could also be used for
16  impeachment. Do you understand that?
17     A    Sure.
18     Q    You can't change my questions, but
19  if -- if there is testimony that you change,
20  then I just want to caution you about that.
21     A    That's fine.
22     Q    Spellings and things like that aren't
23  a big deal. But if you change responses from yes
24  to no or material information, then --
25     A    That's fine.
```

Page 224

```
1      Q    -- then it can be used. All right?
2   And that will be in the transcript as well, so you
3   will have the second chance to read that.
4      A    Great.
5      Q    Then after you've reviewed the
6   transcript, if you sign it, towards the end there
7   will be a place for you to sign under penalty of
8   perjury, and return that to Ms. Eck, and then she
9   will notify me of your signature and of any
10  changes or corrections to the transcript, hang on
11  to the original and make it available upon
12  reasonable request.
13         MR. SCHNEIDER: And if the original
14     signed isn't available, we can use an
15     unsigned certified copy, and you'll notify
16     me within 30 days of your receipt of the
17     transcript?
18         MS. ECK: Yes.
19     Q    Does all that make sense?
20     A    Yes.
21     Q    And you understand that you have been
22  under oath all day today?
23     A    Yes.
24     Q    And you have done your best to tell
25  the truth?
```

Page 225

```
1      A    I have.
2      Q    And provide your most complete and
3   thorough responses?
4      A    I have.
5      Q    Thank you for your time.
6      A    Thanks.
7         THE VIDEOGRAPHER: This is the end of
8   today's deposition. We are off the record
9   at 1:07 p.m. The master disk will be held
10  by TSG Reporting.
11         oOo
```

57

Exhibit 128
- 912 -

Page 226

```
 1    STATE OF CALIFORNIA     )
 2    COUNTY OF SAN FRANCISCO )
 3          I wish to make the following changes
 4    for the following reasons:
 5    PAGE  LINE
 6    ____  ____    CHANGE:_____
 7                  REASON:_____
 8    ____  ____    CHANGE:_____
 9                  REASON:_____
10    ____  ____    CHANGE:_____
11                  REASON:_____
12    ____  ____    CHANGE:_____
13                  REASON:_____
14    ____  ____    CHANGE:_____
15                  REASON:_____
16    ____  ____    CHANGE:_____
17                  REASON:_____
18    ____  ____    CHANGE:_____
19                  REASON:_____
20    ____  ____    CHANGE:_____
21                  REASON:_____
22    ____  ____    CHANGE:_____
23                  REASON:_____
24          _____
25          R. Schnackenberg
```

Page 227

```
 1              C E R T I F I C A T E
 2
 3         I, BONNIE PRUSZYNSKI, a Certified
 4    Shorthand Reporter of the State of California,
 5    do hereby certify:
 6         That RONALD DAVID SCHNACKENBERG, the witness
 7    whose deposition is hereinbefore set forth,
 8    was duly sworn by me and that such deposition
 9    is a true record of the testimony given by
10    the witness.
11         I further certify that I am not related
12    to any of the parties to this action by
13    blood or marriage, and that I am in no way
14    interested in the outcome of this matter.
15         IN WITNESS WHEREOF, I have hereunto
16    set my hand this 22nd of October, 2012.
17
18
19         _____
19              Bonnie Pruszynski
20
21
22
23
24
25
```

Page 228

```
 1              I N D E X
 2    WITNESS                    PAGE
 3    RONALD DAVID SCHNACKENBERG
 4    BY MR. SCHNEIDER            4
 5
 6
 7              E X H I B I T S
 8    RS Exhibit 1 Notice of Taking       17
 9         Deposition and Production of
10         Documents
11    RS Exhibit 2 Declaration of Ronald   125
12         Schnackenberg
13    RS Exhibit 3 Three-page e-mail chain  185
14         dated June 13, 2007
15    RS Exhibit 4 One-page letter dated   187
16         May 23, 2007
17    RS Exhibit 5 LinkedIn info re Mr.    195
18         Schnackenberg
19    RS Exhibit 6 Makaeff 5016-5017       208
20
21
22
23
24
25
```

Exhibit 128
- 913 -

# EXHIBIT 129

Exhibit 129
- 914 -

This is Google's cache of http://www.linkedin.com/in/michaelibloom. It is a snapshot of the page as it appeared on Feb 8, 2011 02:11:40 GMT. The current page could have changed in the meantime. Learn more

These search terms are highlighted: trump entrepreneur initiative annual These terms only appear in Text-only version links pointing to this page: revenue

# Michael I. Bloom

Chief Marketing Officer in The Trump Organization

Greater New York City Area



→ **Contact Michael I. Bloom**

→ **Add Michael I. Bloom to your network**

| | |
|---|---|
| **Current** | • Chief Marketing Officer at The Trump Entrepreneur Initiative |
| **Past** | • General Manager, Datran Direct at Datran Media<br>• Chief Information Officer and VP Direct Marketing at Audio Book Club<br>• Director, Database Marketing at Time Warner Inc. |
| | 2 more... |
| **Education** | • State University of New York at Albany<br>• Cornell University |
| **Recommendations** |  14 recommendations |
| **Connections** | ❄ 500+ connections |
| **Industry** | Marketing and Advertising |

**Public profile powered by:** Linked in

Create a public profile: **Sign In** or **Join Now**

**View Michael I. Bloom's full profile:**

• See who you and **Michael I. Bloom** know in common
• Get introduced to **Michael I. Bloom**
• Contact **Michael I. Bloom** directly

[ View Full Profile ]

**Name Search:**

**Search for people you know** from over 90 million professionals already on LinkedIn.

(example: **Jeff Weiner**)

[          ] Search

## Michael I. Bloom's Summary

Chief Marketing Officer in The Trump Organization with 20+ years of online and traditional channel direct marketing experience; Consistently delivering successful results via email, display, search, e-commerce, social media, direct mail, print, radio, and telemarketing channels, at Fortune 500 and privately held companies including AT&T, Time Warner, Datran Media, Western Union, and Sony.

Google Keyword: "Michael Bloom Multichannel"

**Michael I. Bloom's Specialties:**

Integrated multichannel marketing strategy, online and traditional channel campaign management, consumer targeting and segmentation, brand development, performance optimization, team building.

## Michael I. Bloom's Experience

### Chief Marketing Officer

**The Trump Entrepreneur Initiative**

TU-PLTF00255

Exhibit 129
- 915 -

Michael I. Bloom - LinkedIn

(Privately Held; Professional Training & Coaching industry)

September 2009 — Present (1 year 6 months)

Manage all consumer acquisition and retention marketing programs, 8-person staff, 1.2 million record database, and $6 million annual budget, to promote geo-targeted live events, online webinars, and telemarketing sales, for the business education unit (formerly Trump University) of The Trump Organization.

Achievements:
• Create Donald Trump "Signature" campaigns including "Are YOU My Next Apprentice?" and "Learn from the Master"; Immediately increased campaign response rates by 54%.
• Launch high performance acquisition campaigns in email, display, search, social media, blogs, direct mail, print, radio, and telemarketing; Optimized campaigns and reduced consumer acquisition costs by 38%.
• Develop online lead generation programs and expand distribution network based on CPA performance.
• Re-engineered geo-targeting strategies with statistical models, radius mapping, and reverse IP locators.
• Partnered with NBC Universal ("The Apprentice"), created 3 new product lines, and expanded into Canada.

## General Manager, Datran Direct
**Datran Media**

(Privately Held; Marketing and Advertising industry)

June 2005 — September 2009 (4 years 4 months)

Managed sales, marketing, and operations for Datran Direct, the multichannel email, display, telemarketing, and direct mail unit of Datran Media, the industry leading email marketer with 2007 gross revenues exceeding $100 million.

Achievements:
• Launched Datran Direct new business unit in 2006; Generated $2 million in annual revenues by year two.
• Won Fortune 500 and key accounts including Disney, Equifax, Vonage, Walgreens, DirecTV, Rodale.
• Managed 16 full time marketing analysts across 3 departments and negotiated key vendor partnerships.
• Published articles, authored industry e-newsletter, and presented best practices at national conferences.
• Created multichannel marketing database of 175 million consumers for behavioral targeting campaigns.

## Chief Information Officer and VP Direct Marketing
**Audio Book Club**

(Marketing and Advertising industry)

July 2000 — July 2004 (4 years 1 month)

Managed email and direct mail campaigns for 5 club/continuity product lines at Audio Book Club, the leading marketer of audio books with 2003 revenues exceeding $50 million.
Achievements:
• Designed, developed, and launched new e-commerce website; Generated 300% increase in online revenues.
• Partnered with Experian to pioneer online credit scoring models; Immediately reduced bad debt by 50%.
• Created lifetime value campaign reporting systems to optimize media spends by partner/channel.

## Director, Database Marketing
**Time Warner Inc.**

Michael I. Bloom - LinkedIn

(Marketing and Advertising industry)

October 1997 — July 2000 (2 years 10 months)

American Family Publishers Subsidiary, Jersey City, NJ

Achievements:
• Managed 70 million record marketing database and 5-person database development team.
• Delivered targeted selections for 150 million direct mail promotions annually across 3 business lines.
• Increased customer retention by 34% through behavioral segmentation and statistical models.
• Eliminated $2 million per year in undeliverable mailing costs; Reengineered data quality processes.

### Manager, Consumer Segmentation
**AT&T**
(Marketing and Advertising industry)
August 1996 — October 1997 (1 year 3 months)

Achievements:
• Launched $65 million AT&T Phone Card brand with B2B segmentation, trade shows, and media plans.
• Chaired Data Quality Task Force to enable multi-product "bundled" offers across business units.
• Received AT&T Award for Outstanding Achievement (9/97).

### Product Manager, Consumer Loyalty Programs
**Western Union**
(Marketing and Advertising industry)
April 1993 — August 1996 (3 years 5 months)

Achievements:
• Managed loyalty campaigns for 5 million member Preferred Customer Program; Increased retention by 28%.
• Increased member reactivation rate by 62% through implementation of statistical "winback" models.

---

# Michael I. Bloom's Education

### State University of New York at Albany
MBA , Finance , 1984 — 1986

*Activities and Societies:* Dean's List, Full Merit Scholar

### Cornell University
BS , Industrial and Labor Relations , 1981 — 1984

*Activities and Societies:* Dean's List, Daniel Alpern Merit Scholar, Theta Chi Fraternity

---

# Additional Information

**Michael I. Bloom's Groups:**

Direct Marketing Association

**Michael I. Bloom's Honors:**

AT&T Award for Outstanding Achievement (1997)

**TU-PLTF00257**

Exhibit 129
- 917 -

# Michael I. Bloom's Contact Settings

**Interested In:**

- job inquiries
- business deals
- getting back in touch
- expertise requests
- reference requests

View Full Profile

LinkedIn member directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more   |   Browse members by country

LinkedIn Corporation © 2011   |   User Agreement   |   About LinkedIn   |   Privacy Policy

Use of this site is subject to express terms of use, which prohibit commercial use of this site. By continuing past this page, you agree to abide by these terms.

TU-PLTF00258

Exhibit 129
- 918 -

# EXHIBIT 130

Exhibit 130
- 919 -

UNITED STATES DISTRICT COURT OF CALIFORNIA
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, BRANDON
KELLER, ED OBERKROM and
PATRICIA MURPHY, on behalf
of themselves and all others
similarly situated,

    Plaintiffs,

      vs.

                                Index No. 3:10-CV-00940-CAB

TRUMP UNIVERSITY, LLC (AKA
TRUMP ENTREPRENEUR
INITIATIVE) a New York
Limited Liability Company,
DONALD TRUMP and DOES 1
through 50, inclusive,

    Defendants.

------------------------------

VIDEOTAPED DEPOSITION OF GEORGE SORIAL

New York, New York

Friday, January 18, 2013

Reported By:
Michelle Cox

Job No.: 10004858

Exhibit 130
- 920 -

**George Sorial**                                              **Makaeff v. Trump University**

| | |
|---|---|
| 1   THE VIDEOGRAPHER: This is Media No. 1<br>2  of the video deposition of George Sorial in<br>3  the matter, Tarla Makaeff, et. al, versus<br>4  Trump University, LLC, et. al, in the United<br>5  States District Court for the Southern<br>6  District of California.<br>7    This deposition is being held at Trump<br>8  Tower, 725 Fifth Avenue, New York, New York.<br>9  The time is 10:58 a.m. on January 18, 2013.<br>10 My name is Malta Yvette Hernandez, and I am<br>11 the legal video specialist. The court<br>12 reporter is Michelle Cox.<br>13    Will counsels please introduce<br>14 themselves, beginning with the party noticing<br>15 this proceeding.<br>16   MS. JENSEN: Good Morning.<br>17 Rachel Jensen from Robbins Geller Rudman &<br>18 Dowd on behalf of plaintiffs.<br>19   MS. ZELDES: Helen Zeldes from Zeldes &<br>20 Haeggquist on behalf of plaintiffs.<br>21   MR. SCHNEIDER: David Schneider for<br>22 defendants, Trump University and Donald Trump.<br>23    And I think, for the videographer, the<br>24 time is 9:58. You said 10:58.<br>25   THE VIDEOGRAPHER: Will the court<br><br>Page 5 | 1  reporter please swear in the witness.<br>2  G E O R G E   S O R I A L, called as a witness,<br>3  having been duly sworn by a Notary Public, was<br>4  examined and testified as follows:<br>5    THE COURT REPORTER: Your witness,<br>6  Counsel.<br>7    MS. JENSEN: Okay.<br>8 EXAMINATION BY<br>9 MS. JENSEN:<br>10   Q. Good morning, Mr. Sorial.<br>11   A. Good morning.<br>12   Q. We met off the record this morning. My<br>13 name is Rachel Jensen. I'm going to be taking your<br>14 deposition today.<br>15    Could you please state and spell your<br>16 name for the record.<br>17   A. George, G-E-O-R-G-E, middle initial A,<br>18 last name Sorial, S-O-R-I-A-L.<br>19   Q. Okay. And what is your place and date<br>20 of birth?<br>21   A. October 26th, 1968, Norwich, England.<br>22   Q. And what is your title with Trump<br>23 Organization?<br>24   A. Executive vice president and counsel.<br>25   Q. Have you ever had to testified before?<br><br>Page 6 |
| 1   A. I've testified in numerous proceedings.<br>2   Q. How many?<br>3   A. I've been practicing law for 17 years.<br>4 I couldn't tell you exactly.<br>5   Q. As a witness?<br>6   A. As a witness.<br>7   Q. How many?<br>8   A. I don't know.<br>9   Q. Okay. More than a 100?<br>10   A. I don't think so.<br>11   Q. Okay. More than 50?<br>12   A. Possibly.<br>13   Q. Okay. More than 75?<br>14   A. I don't know.<br>15   Q. Okay. Somewhere in that range, more or<br>16 less?<br>17   A. For whatever difference it makes, I've<br>18 been practicing law for 17 years. I've participated<br>19 in hearings before parliament in London, in<br>20 Edinburgh. I've testified at depositions. So I<br>21 think that answers your question.<br>22   Q. Have you been party to a -- to a lawsuit<br>23 before?<br>24   A. Personally, no.<br>25   Q. The court reporter has administered an<br><br>Page 7 | 1  oath to you.<br>2    Do you understand that you are<br>3 testifying today as though you were in a court of<br>4 law?<br>5   A. I am fully aware of that.<br>6   Q. Is there anything about your health<br>7 today that would interfere with your ability to give<br>8 your best testimony?<br>9   A. No.<br>10   Q. You aren't on any medications?<br>11   A. No.<br>12   Q. Any substances?<br>13   A. No.<br>14   Q. At some point Trump University changed<br>15 its name to Trump Entrepreneur Initiative.<br>16   A. Yes.<br>17   Q. Now, when I refer to Trump University<br>18 today, I'm going to be referring to both legal<br>19 entities.<br>20    Do you understand that?<br>21   A. Understood.<br>22   Q. Okay. How did you prepare for your<br>23 deposition today?<br>24   A. I read the declaration, and I spoke with<br>25 our counsel, David Schneider, about the matter over<br><br>Page 8 |

2 (Pages 5 to 8)

**www.aptusCR.com**

Exhibit 130<br>- 921 -

**George Sorial**                                    **Makaeff v. Trump University**

| | |
|---|---|
| 1   dinner. | 1   Documents," marked for identification as of |
| 2   **Q.   How long did you meet with** | 2   this date.) |
| 3   **Mr. Schneider?** | 3   MS. JENSEN:  You don't a courtesy copy, |
| 4   A.   We had dinner. | 4   do you? |
| 5   **Q.   An hour?** | 5   Here's one. |
| 6   A.   An hour, hour and a half, yes. | 6   MR. SCHNEIDER:  Thank you. |
| 7   **Q.   Did you talk to anybody else about your** | 7   BY MS. JENSEN |
| 8   **deposition?** | 8   **Q.   Okay.  Do you recognize this document?** |
| 9   A.   I did not. | 9   A.   I've probably seen it before, yes. |
| 10  **Q.   Did you review any other documents for** | 10  **Q.   What is this document?** |
| 11  **the deposition?** | 11  A.   A notice, your notice, taking a |
| 12  A.   I did not.  Aside from my declaration, I | 12  deposition of me. |
| 13  viewed no other documents. | 13  **Q.   Okay.  Do you also see that there's a** |
| 14  **Q.   Did you search for any documents in** | 14  **request for production of documents attached to this** |
| 15  **response to the subpoena?** | 15  **subpoena?** |
| 16  A.   No. | 16  A.   Yes, I do. |
| 17  MS. JENSEN:  I'm now handing to the | 17  **Q.   And it's your testimony today that you** |
| 18  court reporter a document that is a titled | 18  **did not search for any documents in response to the** |
| 19  "Plaintiffs' Notice of Taking Videotaped | 19  **subpoena?** |
| 20  Deposition of George Sorial and Request for | 20  A.   Yes, it is. |
| 21  Production of Documents," which I will ask to | 21  **Q.   Prior to the subpoena, had you** |
| 22  be marked as Exhibit No. 1. | 22  **previously searched for documents that might be** |
| 23  (Plaintiffs' Exhibit 1, Plaintiffs' | 23  **responsive to discovery in this case?** |
| 24  Notice of Taking Videotaped Deposition of | 24  A.   You're asking me personally.  I did not |
| 25  George Sorial and Request for Production of | 25  search for any documents. |
| Page 9 | Page 10 |

| | |
|---|---|
| 1   My involvement, as I'm sure we'll | 1   MR. SCHNEIDER:  His answer is his |
| 2   explore further, with Trump University has been | 2   answer. |
| 3   minimal. | 3   A.   I gave you my answer. |
| 4   It is within the realms of possibility | 4   BY MS. JENSEN |
| 5   that others that work for me searched for those | 5   **Q.   So you don't know?** |
| 6   documents, but I'm not aware of any documents that | 6   MR. SCHNEIDER:  His answer is his |
| 7   were responsive to your request. | 7   answer. |
| 8   **Q.   Okay.  And nobody ever asked you to** | 8   A.   I gave you my answer. |
| 9   **search for documents?** | 9   MS. JENSEN:  Are you instructing him not |
| 10  MR. SCHNEIDER:  Well, I don't want you | 10  to answer? |
| 11  to talk about any communications with anybody | 11  MR. SCHNEIDER:  He just did answer. |
| 12  in the legal department or me. | 12  MS. JENSEN:  You can just say asked and |
| 13  And furthermore, we've provided a formal | 13  answered, David. |
| 14  response to the request for production of | 14  MR. SCHNEIDER:  Ask your next question. |
| 15  documents. | 15  BY MS. JENSEN |
| 16  BY MS. JENSEN | 16  **Q.   I -- I didn't get it.** |
| 17  **Q.   Do you know whether your computer has** | 17  **So --** |
| 18  **been searched for responsive documents?** | 18  A.   I answered the question. |
| 19  A.   I assume that we have done whatever your | 19  **Q.   You don't personally know?** |
| 20  office has asked and whatever is required by us by | 20  **You don't know the answer?** |
| 21  the Court.  But I can't tell you, personally, | 21  A.   No.  I -- I gave you an answer.  That's |
| 22  exactly what's been done in that area. | 22  my answer. |
| 23  Certainly, I haven't, because I haven't | 23  **Q.   Okay.  So your answer is no?** |
| 24  needed to. | 24  A.   My answer is what I said -- |
| 25  **Q.   So is your answer no?** | 25  **Q.   Okay.** |
| Page 11 | Page 12 |

3 (Pages 9 to 12)

**www.aptusCR.com**

Exhibit 130
- 922 -

George Sorial                                          Makaeff v. Trump University

| | |
|---|---|
| 1 | A. -- not "no." |
| 2 | Q. Do you have a -- a computer at home that |
| 3 | you work on for Trump Organization? |
| 4 | A. I actually use my iPhone. |
| 5 | Q. Okay. So that's -- |
| 6 | A. That's all I use. |
| 7 | Q. Okay. No laptop? |
| 8 | A. No. |
| 9 | Q. No home computer? |
| 10 | A. No. I have a home computer, but I don't |
| 11 | use it for work purposes. |
| 12 | Q. Okay. When did you begin your |
| 13 | employment with Trump Organization? |
| 14 | A. I started to work full-time for The |
| 15 | Trump Organization, I believe it was |
| 16 | January 2 or 3, 2007. |
| 17 | Q. How did you come to work for The Trump |
| 18 | Organization? |
| 19 | A. I had participated -- I was a partner at |
| 20 | a law firm called DeCotiis FitzPatrick, who had |
| 21 | represented a group of Wall Street investors that |
| 22 | had purchased a piece of property in Bedminster, |
| 23 | New Jersey. That property was in the process of |
| 24 | being converted into a golf course. |
| 25 | To make a long story short: Trump came |

Page 13

| | |
|---|---|
| 1 | along and bought the property. So I initially was |
| 2 | adverse to him. |
| 3 | I ended up purchasing an apartment in |
| 4 | Trump World Tower -- I believe that was around 2001 |
| 5 | perhaps early 2002 -- and I got involved in the |
| 6 | building politics, was elected as president of the |
| 7 | board; and I found myself doing more and more work |
| 8 | with members of The Trump Organization and with |
| 9 | Mr. Trump. |
| 10 | And eventually I came onboard. I left |
| 11 | my legal practice and have been working for him |
| 12 | full-time ever since. |
| 13 | Q. What was your title when you first began |
| 14 | working with Trump Organization? |
| 15 | A. I believe my first title was assistant |
| 16 | general counsel. It was subsequently changed to |
| 17 | managing director, international development and |
| 18 | assistant general counsel, and it was further |
| 19 | amended to executive vice president and counsel. |
| 20 | Q. What was the time frame during which you |
| 21 | served as assistant GC when you first started? |
| 22 | A. Approximately, just -- I -- I -- |
| 23 | approximately, it was the first six months. I |
| 24 | could, you know, be wrong by a month or two; but it |
| 25 | was about that time. |

Page 14

| | |
|---|---|
| 1 | Q. So some time in '97? |
| 2 | A. No. 2007. |
| 3 | Q. Oh. Okay. I'm sorry. I wrote down. |
| 4 | That's right. 2007. Thank you. Sorry. |
| 5 | A. No problem. |
| 6 | Q. And then you became the -- the managing |
| 7 | director of international development; did you say? |
| 8 | A. Correct. |
| 9 | Q. And assistant GC? |
| 10 | A. Correct. |
| 11 | Q. And so that was some time in 2007? |
| 12 | A. That is correct. |
| 13 | Q. And what were your duties as -- in that |
| 14 | new role? |
| 15 | A. Obviously, first and foremost, I am a |
| 16 | lawyer, and I specialize in transactional matters, |
| 17 | real estate development, to some degree corporate. |
| 18 | But my primary responsibility in that |
| 19 | capacity is to take different projects through the |
| 20 | planning process -- it's really pretty much been |
| 21 | overseas for the past few years -- and at the same |
| 22 | time, supervise all aspects of construction and |
| 23 | development. |
| 24 | And I also am part of a small team that |
| 25 | goes all over the world looking for future sites to |

Page 15

| | |
|---|---|
| 1 | develop hotels and golf course properties. |
| 2 | So I actually spend a lot of my time |
| 3 | outside of the country. I did 14 trips to Europe |
| 4 | just last year, and I spend actually months out of |
| 5 | the United States in any given year. |
| 6 | So my involvement with this venture, |
| 7 | Trump University, is limited, and I had no |
| 8 | involvement with them until 2010. |
| 9 | Q. So the golf course in -- in Scotland, |
| 10 | in -- et cetera -- so you've been working on -- on |
| 11 | mostly international projects, then? |
| 12 | A. I've been running that project. |
| 13 | Q. Mm-hmm. |
| 14 | A. -- basically from inception. |
| 15 | Q. Mm-hmm. |
| 16 | A. And that does take a considerable amount |
| 17 | of my time. |
| 18 | Q. Mm-hmm. So you served in that capacity |
| 19 | until when? |
| 20 | A. I was given a change of job title, I |
| 21 | believe it's probably a little over a year ago, but |
| 22 | it really hasn't changed my role too much. I'm |
| 23 | still performing very similar functions; and again, |
| 24 | most of my focus for The Trump Organization is in |
| 25 | the area of real estate and development, overseas |

Page 16

4 (Pages 13 to 16)

Exhibit 130
- 923 -

**George Sorial**                                      **Makaeff v. Trump University**

1   real estate and development, specifically.
2       I do have domestic projects; but really,
3   the thrust of my work has been so far, in the United
4   Kingdom, Ireland, and other parts of Europe.
5       Q.   As to your domestic projects, what do
6   those include?
7       A.   They're real estate development
8   projects.  Specifically, we have a project in Seven
9   Springs, which is in Bedford, New York.  It's about
10  an hour north from here.  And I've been working on
11  that and looking at a number of other properties
12  throughout the United States.
13      Q.   So you said about a year ago.
14          So was that 2012, late 2011, early 2012?
15      A.   Yeah, late 2011, early 2012.  There was
16  a change in job title.
17      Q.   And I believe you said executive VP and
18  you're also --
19      A.   Counsel.
20      Q.   Is it assistant GC?
21      A.   No.  Counsel.
22      Q.   Okay.  So general counsel?
23      A.   No.  Counsel.
24      Q.   Okay.  Counsel.  Okay.
25          And in your capacity as counsel, to whom

                                        Page 17

1   do you report?
2       A.   I report directly to Mr. Trump.
3       Q.   And so there's -- there's not a GC?
4       A.   There is a GC.
5       Q.   Okay.
6       A.   We have different functions.
7       Q.   Okay.  Who's the GC?
8       A.   And the GC is Jason Greenblatt.
9           And, you know, from time to time --
10  we're in the same legal department -- I do confirm
11  with him on some matters; but I don't report to him.
12  I report to Mr. Trump.
13      Q.   And do you --
14      A.   And his son, Donald Trump, Jr.
15      Q.   And do you serve as personal counsel to
16  Donald Trump as well?
17      A.   From time to time, I'm asked to do
18  things for Mr. Trump personally.  I do them.
19      Q.   In this matter?
20      A.   In this matter I was -- what do you mean
21  by "in this matter"?
22      Q.   I mean did you -- have you represented
23  him individually in this matter?
24      A.   What do you mean by that?
25          I just explained it further.

                                        Page 18

1       Q.   You didn't --
2       A.   I'm happy to answer the question, but --
3       Q.   Sure.
4       A.   -- what do you mean by "individually"?
5       Q.   Is it -- is it -- he's a named defendant
6   in this action?
7       A.   Correct.
8           I have conferred with him on the matter;
9   but the primary representation, as you know, is
10  Mr. Schneider.
11      Q.   I believe that you said that your
12  involvement with -- with Trump University began in
13  2010?
14      A.   Correct.
15      Q.   What was that --
16      A.   Perhaps sometime in 2010.
17      Q.   Do you know what month?
18      A.   I can't give you an exact month, but I
19  would say sometime in the first quarter of the year.
20  That would be my best recollection.
21      Q.   And what occasioned your initial
22  involvement?
23      A.   My initial involvement began with -- a
24  letter had been issued by the New York State
25  Department of Education on the issue of Trump

                                        Page 19

1   University's use of the word "university."
2       Q.   Do you recall if that was in March?
3       A.   No.  It may have been, but I can't tell
4   you with certainty.  It was in the first quarter, is
5   the best of my recollection.  March is in the first
6   quarter or so.
7       Q.   Yeah.
8       A.   May be accurate.
9       Q.   Okay.  And so there was a letter that
10  was issued.
11          And how -- how did you get involved?
12      A.   I was given a copy of the letter.  I
13  believe it was by Mr. Trump, but it could have been
14  by Michael Sexton.  I was asked to review the matter
15  anyway by Mr. Trump.  So I read the letter.
16      Q.   And thereafter, were you -- were you
17  involved in communications with the New York
18  Department of Education?
19      A.   Yes.
20      Q.   Okay.  And what communications were
21  there?
22      A.   I had a couple of phone calls.  I can't
23  tell you if it was two or three, but I had several
24  phone calls.  I believe the individual's name was
25  Frey -- Mr. Frey, I think.

                                        Page 20

5 (Pages 17 to 20)

Exhibit 130
- 924 -

George Sorial                                    Makaeff v. Trump University

1       Q.   It sounds about right.
2       A.   Okay.
3       Q.   And the letter might have been on
4   March 30, 2010?
5       A.   I --
6           MR. SCHNEIDER: He told you twice he
7   doesn't remember the date.
8       A.   I indicated it was the first quarter. I
9   don't think it really matters. If you have the
10  letter, that's the date. That's the date.
11  BY MS. JENSEN:
12      Q.   Right. I was asking if it refreshed
13  your recollection.
14      A.   I look at a lot of letters. I can't
15  tell you --
16      Q.   Sure.
17      A.   -- the exact date of every letter I've
18  ever --
19      Q.   Sure.
20      A.   -- read in my life.
21      Q.   Sure.
22          And was it addressed to Donald Trump?
23      A.   I don't -- I -- I don't recall.
24      Q.   And was the person at the New York
25  Department of Education that you spoke to

Page 21

1   Joseph Frey?
2       A.   That's how I remember it to be --
3       Q.   Okay.
4       A.   -- yes.
5       Q.   And so you had two or three calls with
6   Mr. Frey.
7       A.   Correct.
8       Q.   Do you remember the time frame?
9       A.   It was -- it was resolved fairly
10  quickly. So I would guess that they occurred all
11  within a short period of time, perhaps a week or
12  less. But again, I don't remember.
13      Q.   And so did you resolve that over the
14  phone?
15      A.   Yes.
16      Q.   Was there subsequent correspondence with
17  Mr. Frey over the matter?
18      A.   I believe there was a phone call where
19  he indicated that, if we were willing to change the
20  name, there would no longer be any further
21  involvement from the State Department of Education.
22      Q.   Okay.
23      A.   I don't recall if that came in a letter
24  or a phone call; but in my mind, it was resolved.
25      Q.   Mm-hmm.

Page 22

1       A.   We had agreed to change the name, and
2   the matter was over with.
3       Q.   Mm-hmm.
4       A.   So . . .
5       Q.   And you agreed to change the name to
6   Trump Entrepreneur Initiative, correct?
7       A.   Correct.
8       Q.   And did you receive any further
9   correspondence from the New York Department of
10  Education?
11      A.   I -- I very well may have, or something
12  must have been forwarded to my client. But as -- as
13  far as I was concerned, the matter was resolved to
14  their satisfaction. So perhaps there was some
15  following-up correspondence to that effect.
16      Q.   I'm sorry. You said "to that effect."
17          Do you mean that it was resolved?
18      A.   Correct.
19      Q.   And do you recall any correspondence
20  from the New York Department of Education that said,
21  in -- in that, it was not resolved?
22      A.   I don't recall that.
23          In my mind, when we changed the name,
24  the matter was resolved, and it was finished. So
25  I -- I don't.

Page 23

1       Q.   So -- so it's not your testimony today
2   that it was resolved at that point?
3       A.   No.   It's my testimony that the matter
4   was ultimately resolved, which it was.
5           The exact dates and whether or not it
6   was followed up in writing --, I'm a thorough person,
7   I'm sure it was -- something may have been delivered
8   to my client, but it's my testimony that I had
9   several discussions with Mr. Frey.
10          After conferring with my client, it was
11  agreed that we would change the name and the name
12  was changed.
13      Q.   Okay.
14      A.   Which is public record, as I'm sure you
15  know.
16      Q.   Okay. Did you have any other
17  involvement with Trump University?
18      A.   That's too general a question here.
19      Q.   I'm sorry.
20      A.   "Other involvement," I mean, what --
21      Q.   You said that you --
22      A.   Yes, I have other involvement.
23      Q.   -- became involved in --
24      A.   Yes.
25      Q.   Okay. And what -- what was that

Page 24

6 (Pages 21 to 24)

Exhibit 130
- 925 -

George Sorial                                                    Makaeff v. Trump University

Page 25

1   involvement?
2       A.   Ask me specific questions, and I'll give
3   you specific answers.
4       You're asking me to say what involvement
5   that I have with Trump University.
6       What would I -- I don't know what you
7   mean.
8       Q.   Well, you said that you first became
9   involved in 2010.
10      A.   I had no --
11      Q.   And you -- and so you had something in
12  your mind when you said became involved.
13      A.   I had no involvement with the operations
14  and day-to-day running of Trump University.
15      Q.   Okay.
16      A.   But I think it's very clear from my
17  declaration that I did have additional involvement
18  with it.
19      If you want to go through, ask me
20  specific questions, I'm happy to answer them.
21      Q.   Well, I -- I'm asking you about your
22  earlier testimony when you said you got involved
23  in -- in 2010 with --
24      A.   Right.
25      Q.   -- Trump University.

Page 26

1       And I'm following up and asking, What
2   was that involvement?
3       So you had mentioned the New York
4   Department of Education?
5       A.   If you want to go through what I
6   provided in my declaration, I'm happy to discuss it.
7       Q.   No.
8       A.   But I'm not going to just speculate --
9       Q.   Mr. Sorial, I'm asking you --
10      A.   -- and give you vague answers.
11      Q.   -- I'm asking -- no. I'm asking you
12  questions. That's what I'm doing today.
13      A.   Okay. Well, I'm giving you an answer
14  then.
15      Q.   Okay. So --
16      A.   Ask me specific questions, and I'll
17  answer them.
18      Q.   So you were involved with the New York
19  Department of Education.
20      Were you involved with any other
21  government entities?
22      A.   I think I provided information to that
23  effect within my declaration.
24      Q.   No. I'm asking you for your testimony
25  today.

Page 27

1       A.   That's my testimony.
2       Q.   Were there other governmental --
3       A.   Yes.
4       Q.   -- agencies that you were involved with?
5       A.   Yes.
6       Q.   Okay. And what were those?
7       A.   Which one do you want to discuss first?
8       Since we're in New York, you want to
9   discuss New York?
10      Q.   Yes.
11      A.   We received a subpoena -- again, I
12  believe it was sometime in 2010, from the
13  New York State Attorney General's Office.
14      Q.   And what was your involvement there?
15      A.   I conferred with my client, and we
16  retained outside counsel, the law firm of
17  SNR Denton, specifically Avi Schick.
18      And we provided the subpoena to him, and
19  we turned over the matter to him and his firm.
20      Q.   So you had no -- no involvement after
21  that point?
22      A.   Status calls with my attorney, but he
23  handled the -- him and his firm handled the document
24  production and any subsequent depositions,
25  preparations for deposition. They were all handled

Page 28

1   externally by SNR Denton.
2       Q.   And so have you yourself had any
3   discussions with anyone at the New York depart --
4   I'm sorry -- the New York Attorney General's Office?
5       A.   The first day we received the subpoena,
6   I made one telephone call to the gentleman that
7   signed the subpoena. I believe his name was Mel.
8   I -- I just can't remember his last name.
9       But I just told him, "We've received the
10  subpoena, we're happy to cooperate, and we'll get
11  back to you."
12      That was the only discussion I had with
13  anybody from the attorney general's office in
14  New York.
15      Q.   So since that --
16      A.   Melvin -- I just can't remember his last
17  name. I'm sorry.
18      Q.   I'm sorry. Melvin --
19      A.   Goldberg, maybe --
20      Q.   Okay. Sure. Melvin -- yes.
21      It would be on the subpoena, you said?
22      A.   Yes.
23      It's whoever signed -- whatever attorney
24  signed the subpoena, I simply called them to say
25  that I had received it.

7 (Pages 25 to 28)

Exhibit 130
- 926 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1    Q. And so since your discussion, your | 1    Q. And I believe that you testified you had |
| 2 telephone call, with Melvin from the New York | 2 several discussions with various attorneys. |
| 3 Attorney General's office, you have had no | 3      Is it your testimony today that you |
| 4 subsequent communications with anybody at the | 4 don't remember any of those attorneys' names? |
| 5 New York Attorney General's Office? | 5    A. I spoke with several assistant attorney |
| 6    A. I have not. | 6 generals who were working for the Attorney General |
| 7    Q. Okay. What other government agencies? | 7 Greg Abbott in Texas, but I -- I don't -- I don't |
| 8    A. We had received a civil investigative | 8 remember their names. |
| 9 demand from the State Attorney General of Texas. | 9      And again, we had retained outside |
| 10      Again, we retained outside counsel. | 10 counsel to handle that matter. So my involvement |
| 11 Documents were provided to them. | 11 was fairly limited. |
| 12      I did have several discussions with | 12    Q. Okay. And leaving aside the fact that |
| 13 various attorneys in the Texas State Attorney | 13 you don't remember their names, what were the |
| 14 General's Office. Again, I'm just not able to -- if | 14 substance of those discussions? |
| 15 I remembered the names, I'd be happy to provide them | 15    A. Again, a willingness to cooperate, a |
| 16 to you, but I simply don't remember who they were. | 16 willingness to resolve the matter, an assurance that |
| 17 And they were fairly general discussions where we | 17 they would have our full cooperation. |
| 18 indicated a willingness to cooperate. | 18    Q. And nothing -- nothing further? |
| 19      Again, we retained outside counsel and | 19    A. There -- they took no further action. |
| 20 they handled the matter. | 20    Q. That's not my question. |
| 21      And to my knowledge, it was resolved. | 21      But in terms of the discussions that you |
| 22 And they took no further action. | 22 had with them? |
| 23    Q. Back to the attorney general. | 23    A. To the best of my knowledge, there was |
| 24      Attorney was Melvin Goldberg, correct? | 24 some discussion about the need to pay, I believe it |
| 25    A. Sounds correct, yes. | 25 was sales and use tax. |
| Page 29 | Page 30 |

| | |
|---|---|
| 1      After conferring with my client, looking | 1 University, and -- and I have no knowledge of what |
| 2 into it, we made the payment and haven't heard from | 2 they did in terms of registering -- |
| 3 them since. | 3    Q. So your answer is no? |
| 4    Q. Do you mean back taxes, right? | 4    A. -- for qualifying for business in Texas. |
| 5    A. They were some -- some taxes that were | 5    Q. So your answer is no? |
| 6 owed. Again, I don't want to mislead you or make | 6      MR. SCHNEIDER: His answer is his |
| 7 any misrepresentations; so let's just call them | 7 answer. |
| 8 taxes. | 8 BY MS. JENSEN |
| 9      The payments were made, and they were | 9    Q. So I believe that it was your testimony |
| 10 fairly minor. We're not talking about large sums of | 10 that you spoke to several assistant attorney |
| 11 money; but after reviewing it and conferring with my | 11 general? |
| 12 client, we made the payment and we haven't heard | 12    A. Assistant attorney generals, perhaps, |
| 13 from them since, and that was over two years ago. | 13 you know, a deputy attorney general. |
| 14    Q. And -- and you paid the taxes because | 14      Why don't we just say I spoke to several |
| 15 Trump University hadn't previously registered to do | 15 lawyers working for the attorney general's office. |
| 16 business in Texas, right? | 16      I don't think their job titles really |
| 17    A. I don't know. I don't remember. It's | 17 matter. |
| 18 not my -- wasn't my responsibility. | 18    Q. Do you remember an attorney named |
| 19    Q. Mm-hmm. | 19 Rick Berlin? |
| 20    A. I wasn't really involved in those | 20    A. Yes, that sounds familiar. |
| 21 matters, so . . . | 21    Q. Is that who you believe you might have |
| 22    Q. So sitting here, you don't know whether | 22 spoken to? |
| 23 or not Trump University ever registered to do | 23    A. I believe I did speak with him, yes. |
| 24 business in the State of Texas? | 24    Q. Okay. And you spoke to him once or more |
| 25    A. I never -- I don't work for Trump | 25 than once? |
| Page 31 | Page 32 |

8 (Pages 29 to 32)

Exhibit 130
- 927 -

**George Sorial**                                    **Makaeff v. Trump University**

1    A.   Several times.  I -- I don't know -- I
2  can't tell you how many times; but yes, more than
3  once.
4    Q.   And on -- on all of the calls that you
5  had with him, you said the discussion was only about
6  the willingness to cooperate and the resolving --
7    A.   Resolve the matter, correct.
8    Q.   Okay.  Do you recall what Mr. Berlin
9  said to you?
10   A.   I really don't.  Honestly, I don't.
11   Q.   Okay.  How about Carlos Fernandez?
12   A.   I don't recall speaking to a
13 Carlos Fernandez, but I'm not arguing.  But I
14 didn't -- I just don't remember that name.
15   Q.   And you never spoke to Mr. Abbot
16 himself?
17   A.   I did not.
18   Q.   Besides the New York Department of
19 Education, the New York Attorney General and the
20 Texas Attorney General, did you have any -- any
21 involvement in any other government investigation or
22 complaint?
23   A.   Yes.  I had some discussions and
24 reviewed some correspondences from the Illinois,
25 Maryland, and Florida Attorney General Offices.

Page 33

1    Unlike the cases of and New York, where
2  they were essentially subpoenaing my client, these
3  were, to the best of my memory -- and I honestly
4  can't tell you the specific names of the people
5  involved.  I just don't remember.  But they were
6  individual instances of former Trump University
7  students or individuals that had claimed they were
8  former Trump University students that had various
9  grievances.
10   So I read the correspondences.  In some
11 instances, I may have made a phone call or two from
12 the individuals at those respective state attorney
13 generals' offices that issued the letter.
14   And again, these were calls to say,
15 Look, we want to resolve the matter.  I'm conferring
16 with my client.
17   And to the best of my knowledge, those
18 matters were all resolved and there was no further
19 action and I had no further involvement with it.
20   Q.   Did you hire outside counsel for either
21 the Illinois, the Maryland or the Florida AG
22 communications?
23   A.   I -- to the best of my knowledge, we did
24 not.
25   Q.   Was there anybody else?

Page 34

1    A.   Again, I just want to be very clear that
2  I am not involved in Trump University, and it could
3  be possible that Michael Sexton or someone else
4  there conferred with another counsel.  I don't know
5  that to be true.  But to the best of my knowledge,
6  no.  I was able to resolve these matters myself.
7    And they were individual claims as
8  opposed to just broad requests for documents.  They
9  were letters that specifically dealt with grievances
10 from individual students.
11   Q.   I want to make sure that I understand
12 your answer.  I believe that --
13   A.   Sure.
14   Q.   -- you said that, to the best your
15 knowledge, you were able to resolve those matters
16 yourself?
17   A.   Yes.
18   Q.   And so --
19   A.   With my cooperation from my client, of
20 course.
21   Q.   Okay.  So let me -- let me sort of break
22 that down a little bit.
23   So are you saying that on the various
24 phone calls with the AGs' offices that you resolved
25 it during that phone call --

Page 35

1    A.   It may --
2    Q.   -- or was there a follow-up?
3    A.   It may have taken a follow-up call or
4  two --
5    Q.   Okay.
6    A.   -- but they were resolved ultimately
7  with minimal involvement from my part.
8    Q.   Let's take Illinois, just so I have a
9  clear understanding --
10   A.   Sure.
11   Q.   -- of the sequence of events.
12   A.   Sure.
13   Q.   So for Illinois your client received
14 correspondence from Illinois?
15   A.   I cannot recall or articulate the
16 specific students or the specific nature of their
17 grievances for any of those states.  Okay.  I
18 honestly don't remember the details.
19   But what I do remember is that they were
20 individual grievances from one student where a
21 letter had been generated by an employee.  I
22 actually think in a couple of instances they weren't
23 even lawyers, they were case workers that had
24 written to my client and saying we have a member of
25 the public that has a grievance for X, Y, and Z

Page 36

9 (Pages 33 to 36)

Exhibit 130
- 928 -

**George Sorial**                                   **Makaeff v. Trump University**

| | Page 37 | | Page 38 |
|---|---|---|---|

Page 37:

1 reasons. Okay?
2     So I -- I -- again --
3   Q.  So --
4   A.  -- I did not review these
5 correspondences in preparation for this. I'm just
6 telling you what I remember.
7   Q.  Did you --
8   A.  I mean they were all, you know, of a
9 much lesser magnitude than Texas and New York,
10 because they didn't really involve broad requests
11 for production of documents. They were isolated
12 cases.
13     So after conferring with my client, to
14 the best of my knowledge, they were all resolved,
15 and I have had no further communications with anyone
16 from those respective state attorney generals
17 office.
18   Q.  Did you review --
19   A.  That's -- that's my -- you know, that's
20 the best I remember.
21   Q.  Do you -- did you review the
22 correspondence for preparation of your declaration
23 that you submitted to the Court?
24   A.  I did not.
25     My declaration was prepared based on my

Page 38:

1 recollection of the events, as I'm trying to explain
2 them to you now.
3   Q.  Okay. So there were no other sources
4 other than your recollection for your declaration?
5   A.  Purely my recollection.
6   Q.  Let's take Illinois. So I just want to
7 go through the steps. I understand your answer that
8 you just provided.
9   A.  Sure.
10   Q.  And so I'm not asking for a level of
11 detail that you cannot recall.
12   A.  Okay.
13   Q.  But I just want to make sure I have a
14 clear understanding of what happened.
15   A.  Was there anything that I just explained
16 to you that wasn't clear?
17   Q.  It was very general. So I want to break
18 it down a little more.
19     Okay?
20   A.  I can't provide you anything else. I'm
21 happy to try.
22   Q.  Well, let's -- let's --
23   A.  But I -- I --
24   Q.  -- try.
25   A.  -- I gave you my answer.

Page 39:

1   Q.  Sure.
2   A.  And I think it was --
3   Q.  And I understand.
4   A.  Okay.
5   Q.  And -- and, you know --
6   A.  I'll try to answer your questions.
7   Q.  I understand. I -- so. Okay. Let's
8 just try.
9     So for Illinois --
10   A.  Right.
11   Q.  -- I understand that you or your client
12 received correspondence regarding a complaint from a
13 former student?
14   A.  Yes.
15   Q.  Okay. You don't remember the time
16 frame?
17   A.  No.
18   Q.  Okay. And after you -- your client
19 received the correspondence; is that correct?
20   A.  I believe so, yes.
21   Q.  Okay. Then you picked up the phone and
22 called somebody at the Illinois Attorney General's
23 Office?
24   A.  Correct.
25   Q.  Okay. And you don't remember who it

Page 40:

1 was?
2   A.  No.
3   Q.  And you spoke to somebody at the
4 Illinois Attorney General's Office, whom you can't
5 remember, and you talked about the complaint.
6     And at the end of an initial phone call,
7 it was resolved?
8   A.  I talked about the complaint. I, again,
9 assured them that this was something that we took
10 seriously, or my client took seriously and I would
11 look into it. And if I was able to get back to them
12 with a resolution, I would.
13     I conferred with my client, and the
14 matter was resolved.
15   Q.  Do you know whether there was a refund
16 that -- that resulted?
17   A.  I -- I don't -- I can't recall that.
18   Q.  Do you remember if it was one complaint
19 or multiple?
20   A.  I already told you that I have a general
21 memory of those -- my involvement with those
22 specific states, and I -- I don't remember
23 specifics.
24     You can ask me the question in ten
25 different ways, I'm going to give you the same

10 (Pages 37 to 40)

**www.aptusCR.com**

Exhibit 130
- 929 -

**George Sorial**                                    **Makaeff v. Trump University**

1  answer.
2      Q.  Sure.
3          So my question was:  Do you remember --
4  do you recall whether it was one complaint or
5  multiple complaints?
6      A.  I recall it to be one complaint.
7      Q.  So it's your testimony that you had only
8  one contact with the Illinois --
9      A.  No.
10     Q.  -- AG?
11     A.  It's my testimony that, to the best of
12  my knowledge, I had one contact.  And it is my
13  testimony that I had a series of discussions with
14  representatives from each of those respective state
15  attorney general's office and resolved the matters.
16         I want to be clear, because you're
17  constantly trying to get me to answer "yes" or "no";
18  and I'm not willing to do that.
19         I don't recall specifics of any of those
20  conversations beyond to what I've already explained
21  to you two or three times.
22     Q.  Let's take the Maryland AG.
23         So again there, did your client receive
24  some correspondence there?
25     A.  I think I -- I think I've answered those

                                      Page 41

1  questions, and I think you understand my
2  involvement.
3      Q.  No, I just --
4      A.  So, I -- I just --
5      Q.  I was asking about Illinois.  I'm going
6  to break it down a little bit more.
7      A.  I think I've answered the question, and
8  my answer to Illinois --
9      Q.  Mr. Sorial --
10     A.  I -- I --
11     Q.  -- are you refusing to answer my
12  questions?
13         MR. SCHNEIDER:  He's trying to get to
14  question right now.
15     A.  I've answered your question.
16  BY MS. JENSEN
17     Q.  Okay.  Well, now my -- my question is
18  new.
19         As to the Maryland attorney general --
20     A.  Okay.
21     Q.  -- did your client receive some
22  correspondence about a former student complaint?
23     A.  I believe it was about a former student
24  complaint, yes.
25     Q.  Do you remember whether it was one or

                                      Page 42

1  multiple?
2      A.  I can't recall.
3      Q.  And then you picked up the phone and
4  called somebody at the Maryland Attorney General's
5  Office?
6      A.  I spoke to the person that issued the
7  letter and had the same discussion with them:  I had
8  received the letter; it was something that my client
9  was taking seriously; and I would attempt to resolve
10  it myself.  And I would get back to them.
11         And to the best of my knowledge, that
12  matter was resolved, and there has been no further
13  action with Maryland.
14     Q.  And did you get back to them?
15     A.  Yes, I did.
16     Q.  And what did you get back to them with?
17     A.  I resolved the matter.
18     Q.  Was it --
19     A.  I don't remember the specifics.
20     Q.  You don't remember whether there was a
21  refund?
22     A.  I don't remember.  There may have been.
23  I don't remember.
24     Q.  And now the Florida attorney general.
25         So is it your recollection that your

                                      Page 43

1  client received correspondence from the Florida
2  Attorney General Office?
3      A.  I believe so, yes.
4      Q.  About one student complaint?
5      A.  I believe so, yes.
6      Q.  And so you don't believe it was
7  multiple?
8      A.  I -- to the best of my knowledge, it was
9  about one.  It could have been about two, as I've
10  answered before, yes.
11         But to the best of my knowledge, it was
12  an isolated incident, and it was not the type of
13  communication we received from Texas or New York.
14     Q.  And so you picked up the phone and
15  called somebody from the Florida Attorney General's
16  office?
17     A.  Correct.
18     Q.  And --
19     A.  Conferred with my client and resolved
20  the matter.
21     Q.  Okay.  And you spoke to somebody at the
22  Florida Attorney General's Office?
23     A.  Yes.
24     Q.  And you spoke to them once or multiple
25  times?

                                      Page 44

11 (Pages 41 to 44)

Exhibit 130
- 930 -

**George Sorial**                                                            **Makaeff v. Trump University**

| | |
|---|---|
| 1      A.  Could have been a couple of times. I | 1   honestly don't remember -- but I spoke with them, |
| 2   don't recall. | 2   meaning Trump University, and took guidance and |
| 3      Q.  And you spoke to them about the | 3   resolved the matter. |
| 4   complaint that was received? | 4      Q.  And when you resolved the matter, was -- |
| 5      A.  I spoke to them about the grievances | 5   were you speaking to, you know, Michael Sexton to |
| 6   that were expressed and their written correspondence | 6   make sure it was resolved, or who were you |
| 7   to my client. | 7   interfacing with? |
| 8      Q.  And to the best of your knowledge, that | 8      A.  Right.  I told you it could have been |
| 9   was resolved? | 9   Sexton; it could have been Covais, perhaps others. |
| 10      A.  To the best of my knowledge, it was | 10   But I just don't remember.  This is a very small |
| 11   resolved, and there is -- there has been no further | 11   focus of what I do. |
| 12   action from the state of Florida. | 12      Q.  Now, besides the New York Department of |
| 13      Q.  Do you know whether a refund was issued? | 13   Education, the New York attorney general, the Texas |
| 14      A.  I don't know.  The matter was resolved. | 14   attorney general, the Illinois attorney general, the |
| 15      Q.  And who would have the -- who | 15   Maryland attorney general and the Florida attorney |
| 16   else -- strike that. | 16   general, were there any other attorneys general or |
| 17      Who else from Trump University was | 17   department of educations or any similar state |
| 18   involved in these matters? | 18   agencies that you spoke to? |
| 19      A.  I don't know.  I don't remember whether | 19      A.  No.  To the best of my knowledge -- to |
| 20   it was Mr. Sexton or -- again, my involvement with | 20   the best of my recollection, no. |
| 21   Trump University was minimal.  Until 2010 it was | 21      Q.  No other governmental agencies? |
| 22   nonexistent. | 22      A.  To the best of my knowledge, to the best |
| 23      I don't know anything about how they ran | 23   of my recollection, no. |
| 24   and staffed their operations.  So Michael Sexton | 24      Q.  So that would include the DOJ? |
| 25   Mark Covais, whoever it might have been -- I | 25      A.  I think I answered your question |
|                                Page 45 |                                Page 46 |
| 1   already. | 1   their office to try to resolve -- it's my |
| 2      Q.  And the -- the FTC? | 2   recollection that there was a small number of |
| 3      A.  I think I answered your question | 3   outstanding complaints. |
| 4   already. | 4      We did -- I did have some discussions |
| 5      Q.  Did you have involvement with any of the | 5   with them with respect to -- I -- I wanted to get a |
| 6   BBBs, that being the Better Business Bureaus? | 6   better understanding of how they -- how their system |
| 7      A.  I had some discussions with the Better | 7   of ratings work. |
| 8   Business Bureau, yes. | 8      And again, to the best of my knowledge, |
| 9      Q.  And specifically, is that the New York | 9   a   aside from a couple of your clients, all those |
| 10   Department -- oh, I'm sorry.  Strike that. | 10   complaints have been resolved. |
| 11      And specifically, is that the New York | 11      But again, I'm not best suited to answer |
| 12   BBB? | 12   those questions.  You can just go online -- it's all |
| 13      A.  Yes. | 13   public information -- and have a look for yourself. |
| 14      Q.  Any other BBBs? | 14      Q.  Okay.  And I believe that you testified |
| 15      A.  No.  To the best of my knowledge, no. | 15   that you would facilitate the resolution of the |
| 16      Q.  And what were your discussions with the | 16   complaint? |
| 17   New York BBBs? | 17      A.  There were several -- I remember at the |
| 18      I'm sorry.  Strike that. | 18   time that there were several open matters, and I |
| 19      What were your discussions with the | 19   discussed them with my client.  And again, with the |
| 20   New York BBB? | 20   exception, I think of Ms. Makaeff, perhaps one or |
| 21      A.  I had some discussions about, again, our | 21   two of your clients, they were able to resolve them |
| 22   willingness to cooperate and resolve any outstanding | 22   to everyone's satisfaction. |
| 23   complaints.  I indicated to the individual that I | 23      But rather than to continue to ask me |
| 24   spoke to that I would do everything within my power | 24   questions about the Better Business Bureau, it's all |
| 25   to facilitate discussions between my client and | 25   public. |
|                                Page 47 |                                Page 48 |

12 (Pages 45 to 48)

Exhibit 130
- 931 -

**George Sorial**                    **Makaeff v. Trump University**

| | |
|---|---|
| Page 49 | Page 50 |

**Page 49**

1  Why don't you just go to their website
2  and get answers yourself?
3  Q.  And what were the -- what were the
4  complainants whose complaints were not resolved?
5  You said Ms. Makaeff.
6  A.  I -- I don't know. I --
7  Q.  You don't recall who else?
8  A.  I remember she's one of them. I don't
9  remember the others.
10  Q.  You don't remember the others. Okay.
11  A.  But again, go to their website. You can
12  get those answers yourself.
13  Q.  I understand, but I'm also taking your
14  deposition today.
15  A.  Okay. Well --
16  Q.  I'm asking you --
17  A.  That's my answer.
18  Q.  -- questions today. Okay.
19  A.  Go to the website. It's public, public
20  record.
21  Q.  And what were your discussions with the
22  BBB about the ratings?
23  A.  I just wanted to know the basis for
24  their ratings.
25  Q.  And what did they say?

**Page 50**

1  A.  They explained to me that it was a
2  matrix based on several factors, and that was really
3  a --
4  Q.  Do you consider what those factors were?
5  A.  No. It's on their website, too. That's
6  public record.
7  Q.  I understand.
8  A.  I'm not the best person to answer those
9  questions.
10  Q.  I'm asking about your recollection.
11  A.  I don't recollect, then.
12  Q.  And did you ever sue -- I'm sorry.
13  Did you ever threaten to sue the BBB?
14  A.  We took issue with a grade that they had
15  given us, and they changed the grade.
16  Q.  What did they change the grade to?
17  A.  I believe it was a "not rated."
18  Q.  Which is not a rating, correct?
19  A.  I don't know what is. You can look at
20  that criteria. Again, it's available on the
21  website.
22  I'm not the best guy to answer that
23  question.
24  Q.  So you didn't actually sue the BBB,
25  then, correct?

**Page 51**

1  A.  We did not, no. Any differences we had
2  were resolved, and I haven't spoke to them in quite
3  some time.
4  Q.  Do you know what the current rating is
5  for --
6  A.  I have no idea.
7  Q.  Okay. What other involvement did you
8  have with Trump University?
9  A.  None.
10  MS. JENSEN: Now I'm handing to the
11  court reporter a document entitled
12  "Declaration of George Sorial in Opposition to
13  Plaintiffs' Motion for Class Certification and
14  Appointment of Class Counsel," which I will
15  ask to be marked as Exhibit No. 2.
16  Thank you.
17  (Plaintiffs' Exhibit 2, Declaration of
18  George Sorial in Opposition to Plaintiffs'
19  Motion for Class Certification and Appointment
20  of Class Counsel," marked for identification
21  as of this date.)
22  BY MS. JENSEN:
23  Q.  Mr. Sorial, do you recognize this
24  document?
25  A.  Yes.

**Page 52**

1  Q.  And what is this document?
2  A.  My declaration.
3  Q.  Did you prepare this document?
4  A.  Yes, I did.
5  Q.  Did you type it?
6  A.  Someone typed it for me.
7  Q.  Who typed it for you?
8  A.  My -- one of my assistants.
9  Q.  Who's that?
10  A.  Could have been -- I have two
11  secretaries, Cynthia or Maria.
12  Q.  Okay. Were you asked by counsel to
13  submit this document?
14  MR. SCHNEIDER: Well, he's not going to
15  discuss what -- his discussions with counsel.
16  BY MS. JENSEN:
17  Q.  When did you -- oh, strike that.
18  MS. JENSEN: Okay. Okay. It's
19  actually -- it's 10:50 right now. We're going
20  to get on the call in ten minutes with the
21  Court.
22  So why don't we go ahead and break now?
23  And then I'm not sure, Mr. Sorial, how
24  long this hearing is going to take. I
25  apologize that we have to interrupt your --

13 (Pages 49 to 52)

Exhibit 130
- 932 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1   THE WITNESS:  No problem. | 1   of "university"? |
| 2   MS. JENSEN:  -- deposition. | 2   A.  I don't. |
| 3   But we're going to go ahead and go off | 3   Q.  And you state that -- that at that time |
| 4   the record now. | 4   the State of New York accepted TU's filing to |
| 5   THE VIDEOGRAPHER:  The time is 10:50, | 5   operate under the name "Trump University, LLC"? |
| 6   and this ends Media No. 1. | 6   A.  I think that's a public record.  You |
| 7   (Recess taken.) | 7   could look it up yourself. |
| 8   THE VIDEOGRAPHER:  The time is | 8   Q.  Okay.  So -- and you weren't involved in |
| 9   11:29 a.m., and this begins Media No 2 of the | 9   that, correct? |
| 10   video deposition of George Sorial. | 10   A.  I told you this morning that I had no |
| 11   BY MS. JENSEN | 11   involvement with Trump University until 2010, and I |
| 12   Q.  Mr. Sorial, welcome back. | 12   also told you that I didn't start working for The |
| 13   A.  Thank you. | 13   Trump Organization until 2007. |
| 14   Q.  We just started taking a look at your | 14   So I don't know why you're asking that |
| 15   declaration before we broke, and I have some | 15   question.  I answered it already. |
| 16   questions about your declaration. | 16   Q.  And -- and so for your declaration, what |
| 17   A.  I -- I think we've walked through line | 17   was -- what was your basis there? |
| 18   by line the declaration.  So I believe I've answered | 18   How did you know that they accepted |
| 19   all your questions. | 19   that, meaning that -- |
| 20   Q.  Okay.  You state on -- in Paragraph | 20   A.  It's a public record.  You can look it |
| 21   No. 3 that Trump University, LLC, began operations | 21   up yourself. |
| 22   in approximately 2005; is that correct? | 22   Q.  Did you review those documents? |
| 23   A.  That's correct.  I think we've been | 23   A.  I -- I probably did, yes. |
| 24   through this already, actually. | 24   Q.  But you're not sure? |
| 25   Q.  Do you know who decided to use the title | 25   A.  I probably looked at them and relied on |
|     Page 53 |     Page 54 |
| 1   information provided by my client. | 1   line on that stuff he's testified.  He told |
| 2   Again, as you know, certificates of | 2   you exactly everything in Paragraph 3. |
| 3   formation are public record. | 3   So move on, Rachel. |
| 4   There should be no -- I don't know why | 4   BY MS. JENSEN |
| 5   you're asking me that question. | 5   Q.  So what was the time frame during which |
| 6   Q.  Okay. | 6   they -- |
| 7   A.  You can verify that information | 7   MR. SCHNEIDER:  He's already told you |
| 8   yourself. | 8   that.  It was the first quarter.  He's |
| 9   Q.  Well, it's in your declaration; is that | 9   gone through all this with you.  He's not |
| 10   not correct? | 10   going to do it again. |
| 11   MR. SCHNEIDER:  He's not going to argue | 11   BY MS. JENSEN |
| 12   with you.  You know it's in the declaration. | 12   Q.  So it's your testimony that the first |
| 13   Ask your next question. | 13   time that -- |
| 14   MS. JENSEN:  Well, that's why I'm | 14   A.  I answered those questions this morning. |
| 15   asking. | 15   I'm not answering anything further. |
| 16   BY MS. JENSEN: | 16   If you have a different line of |
| 17   Q.  You state that the New York State | 17   questioning, I'm happy to sit here and talk to you. |
| 18   Department -- I'm sorry.  Strike that. | 18   But don't waste my time. |
| 19   You state that the New York State | 19   Q.  So sitting here, do you know when they |
| 20   Education Department subsequently requested that TU | 20   were first asked not to use the name "university"? |
| 21   no longer use "university" in its name; is that | 21   A.  I answered asked those questions |
| 22   correct? | 22   already.  I'm not answering anything further. |
| 23   MR. SCHNEIDER:  Hold on.  We -- he's | 23   Q.  Okay.  So it's your testimony that it |
| 24   already gone through this, and the judge has | 24   was -- |
| 25   said we're not going to go through it line by | 25   A.  No.  I answered those questions.  You |
|     Page 55 |     Page 56 |

14 (Pages 53 to 56)

Exhibit 130
- 933 -

George Sorial                                    **Makaeff v. Trump University**

| | |
|---|---|
| 1    can go with back and look at the record and see my | 1    questions so that I didn't waste anybody's |
| 2    testimony. I'm not changing anything. | 2    time. |
| 3          Please stop wasting my time. | 3          MR. SCHNEIDER: We started at 10:00 |
| 4      **Q.   So it's your testimony -- I'm -- I'm** | 4    today so you could do that. We started an |
| 5    **absolutely entitled to ask you questions,** | 5    extra hour -- |
| 6    **Mr. Sorial, about the contents of your --** | 6          MS. JENSEN: So after Mr. Sorial's -- |
| 7      A.   I've answered them. | 7          MR. SCHNEIDER: We started late. |
| 8          MR. SCHNEIDER: Hold on. Hold on, | 8          MS. JENSEN: -- testimony, David. |
| 9    George. | 9          MR. SCHNEIDER: Okay. Ask your next |
| 10         THE COURT REPORTER: Let me log you in. | 10    question. |
| 11         MS. JENSEN: Okay. | 11         MS. JENSEN: Could you please log me in |
| 12         THE COURT REPORTER: I'm sorry. | 12    to LiveNote. |
| 13         MR. SCHNEIDER: What -- what's the | 13         (Discussion off the record.) |
| 14    question -- | 14    BY MS. JENSEN |
| 15         THE COURT REPORTER: Wait. | 15      **Q.   Mr. Sorial, are you aware that the** |
| 16         MS. JENSEN: Wait to look at the -- the | 16    **New York State Education Department had advised** |
| 17    transcript and see which -- | 17    **Trump University in 2005 that its use of term** |
| 18         MR. SCHNEIDER: His earlier testimony? | 18    **"university" was illegal?** |
| 19    Yeah. We're not going to do this. I | 19      A.   I told you the extent of my knowledge -- |
| 20    mean, you -- we've taken 20-minute breaks. | 20      **Q.   Okay.** |
| 21    You're not prepared for the deposition. We | 21      A.   -- about the issue with respect to the |
| 22    took 40-minute breaks yesterday. You took a | 22    State Department of Education. Again, I told you my |
| 23    20-minute break today after one hour. | 23    involvement did not transpire until 2010. At that |
| 24         MS. JENSEN: David, I -- I wanted, after | 24    point we corrected the problem. I'm not aware of |
| 25    our last session, to reorganize some of my | 25    anything prior to that. |
| Page 57 | Page 58 |

| | |
|---|---|
| 1      **Q.   So you're not aware that Trump** | 1    Liability Company Act and just based on my prior |
| 2    **University operated for five years after it was** | 2    experience with some issues of this nature, there |
| 3    **informed that its use of the title "university" was** | 3    are certain terms that require certain approvals. |
| 4    **illegal?** | 4          Just by way of example, if you're going |
| 5      A.   I had nothing to do with Trump | 5    to use the term "medical," in order to effectuate |
| 6    University during that time. I didn't work for The | 6    that filing, you have to provide evidence to the |
| 7    Trump Organization during a substantial period of | 7    respective state board that you have a medical |
| 8    that time. | 8    license. I'm just trying to draw an analogy. |
| 9          So how would you possibly expect me to | 9          It was my understanding after looking at |
| 10    be aware of that? | 10    the act, that the term "university" had similar |
| 11     **Q.   And what is your understanding of why it** | 11    requirements. So I understood the nature of their |
| 12    **was impermissible to use the term "university" in** | 12    claim. |
| 13    **Trump University's name?** | 13         It's worth noting that the State of |
| 14         MR. SCHNEIDER: Are -- are you asking | 14    New York did accept that claim and processed the |
| 15    what somebody told him? | 15    filing and allowed my client to operate for five |
| 16    BY MS. JENSEN: | 16    years without raising this issue or commencing an |
| 17     **Q.   What's your understanding?** | 17    enforcement action. But be that as it may, we |
| 18         MR. SCHNEIDER: Well, this isn't based | 18    agreed to resolve the name. |
| 19    on your thoughts or opinions as a lawyer; and | 19     **Q.   In 2010?** |
| 20    it's not based on communications with client. | 20     A.   We agreed to change the name, correct. |
| 21    If -- if the -- if somebody else that's not a | 21     **Q.   By --** |
| 22    client told you -- | 22     A.   When I became involved, which was 2010, |
| 23         THE WITNESS: No, no. I don't have a | 23    it was a recent communication that was brought to my |
| 24    problem. | 24    attention, and we changed the name. |
| 25     A.   In -- in looking at the New York Limited | 25     **Q.   The State of New York did accept that** |
| Page 59 | Page 60 |

15 (Pages 57 to 60)

**www.aptusCR.com**

Exhibit 130
- 934 -

**George Sorial**                                    **Makaeff v. Trump University**

| | |
|---|---|
| 1   claim by way of -- by way of accepting its articles | 1   (Plaintiffs' Exhibit 3, Document Bates |
| 2   of incorporation. | 2   Stamped TU 129818 through TU 136023, marked |
| 3        Is that what you're saying? | 3   for identification as of this date.) |
| 4        A.   Whether there are articles of | 4        MR. SCHNEIDER:  Is there a question |
| 5   incorporation, I don't think it's a corporate | 5   pending? |
| 6   entity; it's a limited liability company.  So the | 6        MS. JENSEN:  No, not yet. |
| 7   proper way to do it would be to file an amendment to | 7   BY MS. JENSEN |
| 8   the certificate of formation, which I believe was | 8        Q.   If you could please review the document. |
| 9   done, and the name was changed, yes. | 9        MR. SCHNEIDER:  Ask the question. |
| 10       Q.   In 2010? | 10   BY MS. JENSEN |
| 11       A.   I believe so, yes. | 11       Q.   Turning to Page TU 129856 -- |
| 12       Q.   And there's a Trump University that's | 12       MR. SCHNEIDER:  It's the last page? |
| 13   also registered with the division of corporations in | 13       MS. JENSEN:  It's the second to last |
| 14   Delaware, correct? | 14   page. |
| 15       MR. SCHNEIDER:  Objection.  Foundation. | 15   BY MS. JENSEN |
| 16       A.   I don't know. | 16       Q.   Do you recognize this document? |
| 17   BY MS. JENSEN | 17       A.   It looks like a letter in 2010 from |
| 18       Q.   Do you know whether a Trump University | 18   Mr. Frey dealing with this issue of the name. |
| 19   was registered with any other state? | 19       Q.   And is this the letter that you were |
| 20       A.   I have no idea.  I know that -- | 20   referring to earlier in your testimony? |
| 21       MR. SCHNEIDER:  That's it. | 21       A.   It very well could be. |
| 22       MS. JENSEN:  Okay.  Now handing to the | 22       Q.   And do you see in this letter that |
| 23   court reporter a document bearing the Bates | 23   it's -- that the New York State Department Education |
| 24   Stamp TU 129818 through 136023 that I will ask | 24   says that the use of the word "university" is |
| 25   to be marked as Exhibit No. 3. | 25   misleading and violates New York State Education |
| Page 61 | Page 62 |

| | |
|---|---|
| 1   Law, Section 224 (1) and Section 3.29 of the Rules | 1        Q.   And do you see that that paragraph there |
| 2   of the Board of Regents? | 2   states that -- |
| 3        A.   If you're asking me if I'm able to read, | 3        A.   I'm able to read.  Okay? |
| 4   the answer is yes. | 4        Q.   It may be required to -- |
| 5        Q.   That -- that was -- that was your | 5        A.   I -- I'd appreciate if you've asked me |
| 6   understanding about what this letter was about, | 6   if I'd see -- |
| 7   correct? | 7        Q.   Please don't speak over me -- |
| 8        A.   If you're asking me -- you specifically | 8        A.   I -- I'm able to read. |
| 9   asked me if I noted this.  I'm -- I am able to read, | 9        Q.   -- Mr. Sorial. |
| 10   so thank you for pointing it out to me. | 10       A.   Okay.  Well, don't ask me stupid |
| 11       Q.   Okay.  And also do you see in the | 11   questions. |
| 12   paragraph below that it states that trade and | 12       Q.   Mr. Sorial, please don't speak over me. |
| 13   business schools are required to be licensed or | 13   I'm asking you questions, and I'd appreciate your |
| 14   registered by the State Education Department? | 14   answers in a professional manner. |
| 15       A.   Look, we didn't take issue with the | 15       A.   I have answered professionally. |
| 16   request, and we changed the name. | 16       MR. SCHNEIDER:  Okay.  Well, hold on a |
| 17       Q.   Sure. | 17   second. |
| 18       A.   So I -- I don't see a need to rehash | 18       Rachel, if you'll ask him questions, |
| 19   what the letter says or what the laws -- we changed | 19   that's fine.  But don't ask him just if he can |
| 20   the name. | 20   see in a letter something, just to say, "Can |
| 21       Q.   Sure. | 21   you see it?"  He can see the letter. |
| 22       A.   That's my involvement. | 22       MS. JENSEN:  Well, I can ask him |
| 23       My communications with Mr. Frey were | 23   questions about the letter, because otherwise |
| 24   amicable and, ultimately, we did what he wanted us | 24   you would say "lack of foundation" if I asked |
| 25   to do. | 25   him a question based on this letter without |
| Page 63 | Page 64 |

16 (Pages 61 to 64)

Exhibit 130
- 935 -

George Sorial                                          **Makaeff v. Trump University**

| | |
|---|---|
| 1   first establishing what the letter says. | 1   can't answer any questions on licensing. |
| 2     MR. SCHNEIDER: Okay. So just direct | 2     **Q. So did you have any discussions with** |
| 3   him to the letter and ask your question. | 3   **Mr. Frey about the licensing issue?** |
| 4     But you're asking, "Can you see here," | 4     A. My discussions with Mr. Frey were |
| 5   "Can you read this," "Did he say X." | 5   limited to the issue of changing the name. |
| 6     The letter says what it says. | 6     **Q. Do you --** |
| 7     MS. JENSEN: David, this is -- this | 7     A. I have no other -- |
| 8   is -- you know what, you're just going delay | 8     **Q. -- know whether --** |
| 9   the whole thing if you do -- | 9     A. No -- |
| 10     MR. SCHNEIDER: Ask the next question. | 10     **Q. -- know whether -- let me ask my** |
| 11     MS. JENSEN: -- every time you do this. | 11   **question.** |
| 12   So just let me ask my questions, and -- | 12     A. I'm sorry. Go ahead. |
| 13     MR. SCHNEIDER: Ask a question. | 13     **Q. That's okay.** |
| 14   You're just asking him if he can read | 14     **Do you know whether Trump University** |
| 15   the letter. | 15   **ever registered to do business?** |
| 16     MS. JENSEN: No. You're arguing with | 16     A. I have -- I don't know. |
| 17   me. | 17     **Q. What --** |
| 18     MR. SCHNEIDER: Ask your next question, | 18     A. Again, that all transpired prior to my |
| 19   please. | 19   employment with The Trump Organization. I simply |
| 20   BY MS. JENSEN | 20   don't know. |
| 21     **Q. Mr. Sorial, do you -- is it your** | 21     **Q. So in 2010, do you know whether Trump** |
| 22   **understanding that Trump University was required to** | 22   **University was licensed as -- as required pursuant** |
| 23   **be licensed in the State of New York?** | 23   **to Mr. Fray's --** |
| 24     A. I don't know anything about that. It's | 24     A. I don't know what the requirements of |
| 25   not my area of expertise. I never looked at it. I | 25   licensing are. It's not my area of expertise. |
| Page 65 | Page 66 |

| | |
|---|---|
| 1     **Q. Sure.** | 1   recognize this document? |
| 2     **And sitting here now do you --** | 2     A. Yes, I do. |
| 3     A. I -- I told you -- | 3     **Q. And what is this document?** |
| 4     **Q. Sure.** | 4     A. It's a letter from me to Mr. Frey where |
| 5     A. -- the extent of my knowledge and the | 5   I acknowledge the receipt of his letter dated |
| 6   extent of my involvement with this was limited to | 6   March 30th and advise him and the State Department |
| 7   changing the name. | 7   of Education that we will not use -- or intend to |
| 8     Okay. We didn't argue with them. We | 8   stop using the term "university." |
| 9   didn't fight with them. We took their request | 9     **Q. Did you also state that you intended to** |
| 10   seriously and changed the name. | 10   **change your name to Trump Education?** |
| 11     **Q. It --** | 11     A. Yes. And I -- I just don't -- I really |
| 12     A. And that's the extent of my involvement. | 12   don't remember the details of why we thought |
| 13   I -- I don't have any further knowledge. I was not | 13   "education"; but be that as it may, we gave it |
| 14   involved in licensing issues. | 14   another name, so . . . |
| 15     **Q. Okay. So you don't know whether they** | 15     **Q. Sure.** |
| 16   **were licensed thereafter?** | 16     So just to have a clear record, so it -- |
| 17     MR. SCHNEIDER: He's already answered | 17   it's not your testimony that -- that Trump |
| 18   that. | 18   University changed its name to Trump Education, |
| 19     Ask your next question. | 19   correct? |
| 20     A. I don't know what's required for the | 20     A. We never -- I -- I don't recall actually |
| 21   license. Yeah -- | 21   taking any steps to actually implement that change, |
| 22     MR. SCHNEIDER: He's answered this twice | 22   no. |
| 23   now. | 23     **Q. Turning to the page before that, who is** |
| 24   BY MS. JENSEN | 24   **Dan Borbet?** |
| 25     **Q. Turning to Page TU 129849, do you** | 25     A. Dan Borbet, at the time, was my |
| Page 67 | Page 68 |

17 (Pages 65 to 68)

Exhibit 130
- 936 -

George Sorial                                         Makaeff v. Trump University

| | |
|---|---|
| 1  assistant -- one of my assistants. | 1  from my -- my recollection and hearing about it from |
| 2  **Q.   No longer works with Trump Organization?** | 2  my client, I believe that was another matter that |
| 3  A.   No.  He works for The Trump Organization | 3  was ultimately resolved.  That's the best of my |
| 4  in a different capacity.  He still does some work | 4  recollection. |
| 5  for me from time to time. | 5  **Q.   Do you recall if it was resolved by** |
| 6  **Q.   Okay.  Turning to Page TU 129844, do you** | 6  **issuing a refund?** |
| 7  **recognize this document?** | 7  A.   I think I do.  I think that was how that |
| 8  A.   I actually don't.  I vaguely recall | 8  was resolved. |
| 9  hearing something about a Carmen Mendez.  That name | 9  But again, for the purpose of clarity |
| 10  does ring a bell. | 10  and for the purpose of providing an honest answer, I |
| 11  **Q.   Okay.** | 11  simply don't remember, you know, every single matter |
| 12  A.   But I -- I don't -- you know, I don't | 12  and how it was resolved and whether it was by refund |
| 13  recall seeing this letter. | 13  or by other means.  But I think, typically, that was |
| 14  Could I have seen it several years ago? | 14  what the students were looking for.  So it would |
| 15  Perhaps. | 15  make sense that refunds were issued if warranted. |
| 16  But you asked if I recall.  I don't. | 16  **Q.   I'm now going to draw your attention to** |
| 17  **Q.   That's fair.  That's an answer.** | 17  **an earlier portion of the document.** |
| 18  **Do you recall ever speaking to a BPS** | 18  A.   Mm-hmm. |
| 19  **supervising investigator Edward G. Kramer?** | 19  **Q.   It's TU 129823.** |
| 20  A.   Recall hearing about Kramer from my | 20  A.   Yes. |
| 21  client. | 21  **Q.   Do you recognize this document?** |
| 22  Again, I don't know specifically if I | 22  A.   I know it.  I'm just glancing at it. |
| 23  spoke to him; I may have.  But I can't remember any | 23  I -- I'm aware of what it is.  Again, I don't recall |
| 24  specifics about that discussion, if it ever | 24  if I ever actually saw this letter.  It was several |
| 25  occurred.  I think Mendez -- and again, just going | 25  years ago. |
| Page 69 | Page 70 |

| | |
|---|---|
| 1  Again, my involvement -- | 1  A.   I'm able to read what the letter says, |
| 2  MR. SCHNEIDER:  That's okay. | 2  yes. |
| 3  A.   -- was limited.  I may have seen it; I | 3  **Q.   Turning to the page -- two pages before** |
| 4  may have not seen it. | 4  **that, TU 129821.** |
| 5  BY MS. JENSEN: | 5  You see that this is a -- a -- an e-mail |
| 6  **Q.   And it refers in this letter -- it's to** | 6  chain at the top from Dan Borbet sent |
| 7  **Gillian Birnie, director of customer service.  It's** | 7  August 17, 2010, with some correspondence included |
| 8  **from the New York State Department of Education,** | 8  below? |
| 9  **signed by Edward G. Kramer, supervising** | 9  A.   I can.  Again -- |
| 10  **investigator.  That was the gentleman we referred to** | 10  **Q.   Okay.** |
| 11  **a little bit earlier.** | 11  A.   Yes, I'm able to see that. |
| 12  **Do you see in his letter that it says:** | 12  **Q.   Have you -- have you seen this document** |
| 13  **"In a letter dated May 27, 2005, copy enclosed, then** | 13  **before?** |
| 14  **Assistant Commissioner Frey notified Mr. Trump that** | 14  A.   I may have.  I don't remember. |
| 15  **the use of the word "university" in your** | 15  **Q.   Okay.** |
| 16  **institution's name is illegal and he asked that the** | 16  A.   Ultimately, again, I want to reiterate, |
| 17  **name 'Trump University' be" -- "be discontinued"?** | 17  I was involved and faced with a situation when we |
| 18  A.   Again, I can see what's in the letter. | 18  were being asked to change the name, we changed the |
| 19  **Q.   Okay.  You see that?** | 19  name.  That's the extent of my involvement. |
| 20  A.   Yes, I can read. | 20  **Q.   Okay.** |
| 21  **Q.   Okay.  And do you understand there that** | 21  A.   And it was an amicable -- it was a |
| 22  **there -- that the New York Department of Education** | 22  resolution -- |
| 23  **said that because Trump University has never** | 23  MR. SCHNEIDER:  Okay.  Let her -- |
| 24  **actually been an actual university that Ms. Mendez** | 24  A.   -- that was easy to -- |
| 25  **should be given her money back?** | 25  MR. SCHNEIDER:  Let her ask her next |
| Page 71 | Page 72 |

18 (Pages 69 to 72)

**www.aptusCR.com**

Exhibit 130
- 937 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1     question. Thank you. | 1     MR. SCHNEIDER: Right. |
| 2     BY MS. JENSEN | 2     MS. ZELDES: But he just -- |
| 3       **Q. Yeah. At -- what were you going to say,** | 3     MR. SCHNEIDER: Because he wasn't |
| 4     **Mr. Sorial?** | 4     answering the question anymore. |
| 5       A. Ask your next question, I guess. | 5     MS. ZELDES: That's -- that's not your |
| 6     I'll -- | 6     position -- |
| 7       **Q. Okay. You're -- yeah. I mean, it's --** | 7     MR. SCHNEIDER: So I don't want my |
| 8       A. I was going to say the discussions were | 8     witness -- |
| 9     amicable. I'm trying to emphasize the point -- | 9     MS. ZELDES: That's not a proper |
| 10       **Q. Okay.** | 10     objection. |
| 11       A. -- that -- | 11     MR. SCHNEIDER: Absolutely, my -- my -- |
| 12     MS. ZELDES: I just have to object on | 12     MS. ZELDES: You're instructing him not |
| 13     the record that you've done this for two days. | 13     to answer. |
| 14     And you cannot shut down a witness in the | 14     MR. SCHNEIDER: I'm telling the |
| 15     middle of an answer. | 15     witness -- |
| 16     You're -- you're coaching him. You're | 16     MS. ZELDES: And not to finish the |
| 17     instructing him how to answer in the middle of | 17     question? |
| 18     an answer. That's not a privileged question. | 18     MR. SCHNEIDER: -- when he's finished |
| 19     You cannot do that. | 19     with the response to the question, to stop. |
| 20     MR. SCHNEIDER: I have no idea what | 20     That is my job. |
| 21     you're talking about. I didn't coach him at | 21     MS. ZELDES: No, your job is not to -- |
| 22     all. I didn't say a word. | 22     you're going to instruct him to answer? |
| 23     MS. ZELDES: You keep stopping him. You | 23     MR. SCHNEIDER: I'm not going to argue |
| 24     keep putting your hand up to him to stop | 24     with you about it. No. He did answer the |
| 25     answering. | 25     question. |
| Page 73 | Page 74 |

| | |
|---|---|
| 1     MS. ZELDES: You're job is not to stop | 1     **from Edward Kramer -- do you see the last paragraph** |
| 2     him -- | 2     **that "Trump" -- "Trump is an unlicensed school and** |
| 3     MR. SCHNEIDER: Okay. Ask your next | 3     **they never should have been enrolled. As first** |
| 4     question. | 4     **notified in 2005, Trump should not have used the** |
| 5     MS. ZELDES: -- while he's speaking. | 5     **misleading word 'university' in its name"?** |
| 6     MR. SCHNEIDER: I'm not going to argue | 6       A. I see what the letter says, and I also |
| 7     with you about it. | 7     see that the letter was issued by Edward Kramer, who |
| 8     MS. JENSEN: He was going to give us a | 8     is not an attorney. I also am looking at this as a |
| 9     more complete answer. | 9     simple e-mail correspondence. |
| 10     MR. SCHNEIDER: So he was going to -- | 10     This is not the decision of a court. |
| 11     MS. ZELDES: You are instructing the | 11     This is not even the legal opinion of a law firm. |
| 12     witness. It's clear and it's on the record. | 12     This is simply a communication where a |
| 13     I suggest you stop. You did it all day | 13     representative from the State Department of |
| 14     yesterday. | 14     Education takes a position. |
| 15     MR. SCHNEIDER: Ask your next question. | 15       **Q. Mm-hmm.** |
| 16     THE WITNESS: Do you guys bill by the | 16       A. So it is not by any means a final |
| 17     hour or work on a contingency? | 17     conclusion. |
| 18     MS. ZELDES: Well -- but you do, don't | 18       **Q. Mm-hmm.** |
| 19     you? | 19       A. And I seriously don't see the point of |
| 20     THE WITNESS: I -- | 20     your line of questioning, because I've already told |
| 21     MR. SCHNEIDER: Okay. Let's stop. | 21     you my involvement was limited to the specific issue |
| 22     THE WITNESS: -- am fully employed. | 22     of changing the name. |
| 23     MR. SCHNEIDER: Let's stop. | 23     MR. SCHNEIDER: Here, George -- and I -- |
| 24     BY MS. JENSEN | 24     BY MS. JENSEN |
| 25       **Q. Do you see in this e-mail chain below** | 25       **Q. Do you see this --** |
| Page 75 | Page 76 |

19 (Pages 73 to 76)

**www.aptusCR.com**

Exhibit 130
- 938 -

George Sorial                                              Makaeff v. Trump University

| | |
|---|---|
| 1    MR. SCHNEIDER:  -- and I'm going to | 1    MS. JENSEN:  Well, let's get to that. |
| 2   instruct you just to answer the question.  So | 2    MR. SCHNEIDER:  -- you're interrupting |
| 3   when she asks you, "Do you see it" -- | 3   me -- that he had no involvement in it. |
| 4    A.  I see it.  Yes, I do see it. | 4    MS. JENSEN:  Let's get to -- |
| 5    MR. SCHNEIDER:  Okay.  And that's it. | 5    MR. SCHNEIDER:  So if you ask him to |
| 6   BY MS. JENSEN | 6   look at a paragraph and say, "Do you see where |
| 7    Q.  Okay. | 7   it says 'so and so?' Okay.  Now, turn to the |
| 8    MR. SCHNEIDER:  But I'm also -- | 8   next letter" -- |
| 9   BY MS. JENSEN | 9    MS. JENSEN:  Okay. |
| 10    Q.  All right.  The next thing -- | 10    MR. SCHNEIDER:  He's not obligated to |
| 11    MR. SCHNEIDER:  -- going to advise you | 11   sit here while you read through letters. |
| 12   that if you -- | 12   BY MS. JENSEN |
| 13    MS. JENSEN:  That's fine.  I'm going to | 13    Q.  Mr. Sorial, the next page -- |
| 14   ask my next -- | 14    A.  Yes. |
| 15    MR. SCHNEIDER:  -- let me -- let me | 15    Q.  -- on 822. |
| 16   finish my statement -- that if you continue to | 16    A.  Yes. |
| 17   show documents and ask him if he sees | 17    Q.  Okay.  Do you see there:  "All training |
| 18   something in the letter and then you move to | 18   in New York must cease until license is secured, and |
| 19   the next document, then we're going to end the | 19   refunds must be issued to Ms. Mendez and Mr. Rivera |
| 20   deposition. | 20   immediately"? |
| 21    He is not going to be required to sit | 21    Do you see that? |
| 22   here and just acknowledge that there's | 22    Did you have a meeting that -- |
| 23   information in a letter that he hasn't | 23    A.  I'm able to read.  I mean, I don't know |
| 24   received, wasn't sent to him, and he told | 24   how many times I'm going to give you -- you -- |
| 25   you -- | 25    Q.  Sure. |
| Page 77 | Page 78 |

| | |
|---|---|
| 1    A.  -- put a document in front of me -- | 1   copied on an e-mail from Dan Borbet? |
| 2    Q.  Sure. | 2    A.  Apparently, I was copied. |
| 3    A.  -- and I'm going to look at it, and | 3    Q.  Okay. |
| 4   you're saying, "Can you see this?" | 4    A.  I'm copied on many e-mails. |
| 5    I can read.  I'm not illiterate. | 5    Q.  Sure. |
| 6    Q.  Okay.  Did you receive this e-mail? | 6    And do you see that this was also part |
| 7    MR. SCHNEIDER:  That's been asked and | 7   of the same e-mail string? |
| 8   answered. | 8    A.  I don't recall having discussions on |
| 9   BY MS. JENSEN | 9   this matter.  I can see what you put in front of me |
| 10    Q.  Was -- do you see the next page, the | 10   and I'm not taking issue with it, but I think I've |
| 11   beginning of the document? | 11   answered your questions about my involvement with |
| 12    A.  Which -- | 12   this. |
| 13    Q.  TU . . . | 13    Q.  Okay.  And so you don't recall having a |
| 14    A.  Which -- which next page? | 14   meeting or a conference call with Mr. Frey on or |
| 15    Q.  The beginning of the document.  Right. | 15   about the -- on or about August of 2010 concerning |
| 16   Before. | 16   whether Trump University or, now, Trump Entrepreneur |
| 17    A.  Just tell me the page. | 17   Initiative, would be allowed to continue its |
| 18    Q.  The beginning of the page, TU 129 -- | 18   operations? |
| 19    A.  Twenty-one? | 19    A.  I honestly don't recall having |
| 20    Q.  -- B18. | 20   discussions with Mr. Frey beyond the name issue. |
| 21    MS. ZELDES:  It's on the -- | 21    Okay.  You're asking me what I |
| 22    Q.  It's on the front page. | 22   recollect.  That's what I recollect. |
| 23    A.  Yes, I see it. | 23    Q.  The New York AG investigation is |
| 24    Q.  Yes.  Okay. | 24   ongoing, correct? |
| 25    And do you see that you're-- you are | 25    A.  I -- we haven't had any communication or |
| Page 79 | Page 80 |

20 (Pages 77 to 80)

Exhibit 130
- 939 -

George Sorial                                  Makaeff v. Trump University

1    dialogue with them for months.  They have taken no
2    further action.  We've complied with their subpoena.
3    So you'd have to ask the New York Attorney General
4    that.  To the best of my knowledge, there -- there
5    has been no activity for months.
6         Q.   But it hasn't been closed; isn't that --
7    isn't that correct?
8         A.   I don't know.  You'd have to ask them.
9         Q.   Didn't you say that you had outside
10   counsel, Avi Schick --
11        A.   Schick, yes.
12        Q.   Schick.  Okay -- handling this matter?
13        A.   That's correct.
14        Q.   And so you have not been handling this
15   matter?
16        A.   I've been provided with updates, you
17   know, and the status of the matter; but no, I have
18   not.  It's been handled by Avi and his firm.
19        Q.   So you haven't been -- you haven't been
20   provided an update that says they've closed their
21   investigation; isn't that right?
22        A.   You'd have to ask -- you're asking me to
23   speculate on something that the attorney general may
24   or may not do.
25             I don't know if they've closed their

                                        Page 81

1    investigation.
2         I can just tell you that there's been no
3    further action.  We've provided and complied with
4    the terms of their subpoena.  There were some
5    requests for depositions.  I was not involved in the
6    preparation for those depositions.  I did not attend
7    the depositions, and there has been no further
8    action for months.
9         Q.   But as far as you know, it's an ongoing
10   investigation; isn't that right?
11        A.   I've answered that question already.
12        Q.   Isn't that right?
13        A.   You'd have to ask the attorney general.
14   I don't -- I can't speculate on the status of an
15   investigation being handled by an outside government
16   agency.
17        Q.   Okay.  The Texas Attorney General,
18   what's the status of their investigation?
19        A.   I answered that question earlier.  There
20   was no further action.  We've had no communications
21   with them for years.
22        Q.   Is -- has their investigation been
23   closed?
24        A.   You'd have to ask them that.
25        Q.   But to your knowledge, it's -- it has

                                        Page 82

1    not been closed; is that correct?
2         A.   There has been no further action.  I --
3    I'm not saying, "To the best of my knowledge, it's
4    closed."  I'm saying that they took no further
5    action.
6         If you want an accurate answer on the
7    status of a Texas attorney general matter, then ask
8    the State of Texas.  I can't speculate.
9         Q.   Do you know whether Trump University
10   agreed to suspend operations in Texas?
11        A.   I do not.
12        Q.   And so, then, you wouldn't know whether
13   they suspended and then started up again?
14        A.   To the best of my knowledge, there is
15   many states that they're not doing business in.
16        Again, that -- I am not part of the
17   operations team at Trump University.  I work for
18   Trump Organization.  I am a real estate development
19   person.  I don't know.
20        Q.   Do you know whose deposition was taken
21   by the New York Attorney General?
22        A.   I know that Michael Sexton was deposed.
23   I know that Steven Matejek was deposed.  There may
24   have been others, but those are the two that I can
25   say with certainty were deposed.

                                        Page 83

1         Q.   In addition to providing documents, do
2    you know whether any depositions were taken by the
3    Texas Attorney General?
4         A.   I don't think there were.
5         MS. JENSEN:  I'm now handing to the
6    court reporter a document bearing the Bates
7    Stamp TX FL 00519 through 20, which I will ask
8    to be marked as Exhibit No. 4.
9         (Plaintiffs' Exhibit 4, E-mail dated May
10   5, 2010 from Michelle Lokey to Rick Berlin,
11   marked for identification as of this date.)
12   BY MS. JENSEN
13        Q.   Mr. Sorial, do you recognize this
14   document?
15        A.   It appears to be, in looking at it, a
16   communication between Michelle Lokey, our counsel
17   with Reed & Scardino in Texas.  They are the law
18   firm that handled the Texas State Attorney General
19   investigation.
20        Q.   Okay.  And they are still retained as
21   your counsel in that matter?
22        A.   We haven't had any activity with the
23   state attorney general's office for years, so
24   there's been no need for further communication with
25   them on this matter.

                                        Page 84

21 (Pages 81 to 84)

Exhibit 130
- 940 -

George Sorial                                                     Makaeff v. Trump University

| | |
|---|---|
| 1 | Q.   Okay. |
| 2 | A.   The matter seems to be finished. |
| 3 | Q.   And sitting here, do you recall |
| 4 | receiving this e-mail from Michelle Lockey on or |
| 5 | about May of 2010, concerning certain matters in -- |
| 6 | regarding Trump University's operations in Texas? |
| 7 | A.   Well, I see that I was copied on it. |
| 8 | You know, do I remember the instant I |
| 9 | received it?  No.  But I see that I was copied on |
| 10 | it. |
| 11 | Q.   I mean, are you generally -- generally |
| 12 | recollect the matters in this -- this e-mail? |
| 13 | A.   I told you I -- I'm reading it now. |
| 14 | I -- I haven't seen this e-mail.  It was sent in |
| 15 | 2010.  I received a lot of e-mails.  I don't |
| 16 | remember, you know, the nature and content of every |
| 17 | e-mail.  But, yes, I see that I was copied on it. |
| 18 | Q.   Do you see -- do you see at the end of |
| 19 | the first paragraph, it says -- the last part of the |
| 20 | sentence -- that, parenthetically, We will continue |
| 21 | to suspend its workshops in Texas while we address |
| 22 | the remaining issues with your office? |
| 23 | A.   Again, I'm able read.  I see what it |
| 24 | says.  But my -- I was not part of the operations |
| 25 | team at Trump University.  So I simply can't answer |

Page 85

| | |
|---|---|
| 1 | questions on whether or not they were operating at |
| 2 | that time or they had any intentions to operate |
| 3 | going forward. |
| 4 | Q.   Okay. |
| 5 | A.   But I see what you're pointing to. |
| 6 | Q.   Okay.  So it doesn't refresh your |
| 7 | recollection as to whether Trump University |
| 8 | suspended its operations in Texas? |
| 9 | A.   I -- |
| 10 | MR. SCHNEIDER:  Rachel -- |
| 11 | A.   -- answered twice. |
| 12 | MR. SCHNEIDER:  -- he's answered at |
| 13 | least twice. |
| 14 | Hold on a minute.  Let me -- let me make |
| 15 | an objection. |
| 16 | This is really harassing.  He told you |
| 17 | two times, maybe three, he had no involvement |
| 18 | in the operations.  He doesn't know whether |
| 19 | they suspended operations.  He doesn't know |
| 20 | whether they continued operations.  He had no |
| 21 | involvement in it. |
| 22 | And then you asked him, "Does this |
| 23 | refresh your recollection, as to whether or |
| 24 | not they suspended operations"? |
| 25 | The judge specifically admonished you |

Page 86

| | |
|---|---|
| 1 | not to ask cumulative questions. |
| 2 | And he's responded at least twice on |
| 3 | that exact issue. |
| 4 | MS. JENSEN:  I was asking if it |
| 5 | refreshed his recollection. |
| 6 | MR. SCHNEIDER:  He's told you he had |
| 7 | nothing to do it.  He had no information about |
| 8 | it. |
| 9 | MS. JENSEN:  Okay.  I -- so you've made |
| 10 | your point, for the record. |
| 11 | Okay.  I'm now handing to the court |
| 12 | reporter a document bearing Bates Stamp |
| 13 | TU 61503 through 16, which I will ask to be |
| 14 | marked as Exhibit No. 5. |
| 15 | (Plaintiffs' Exhibit 5, Document |
| 16 | Entitled "Statement of Service by Mail and |
| 17 | Acknowledgment of Receipt by Mail of Subpoena |
| 18 | Duces Tecum To," marked for identification as |
| 19 | of this date.) |
| 20 | BY MS. JENSEN |
| 21 | Q.   Mr. Sorial, do you recognize this |
| 22 | document? |
| 23 | A.   Yes, I do. |
| 24 | Q.   What is this document? |
| 25 | A.   It's a subpoena from the New York State |

Page 87

| | |
|---|---|
| 1 | Attorney General's Office to Trump University or, |
| 2 | excuse me, Trump Entrepreneur Initiative. |
| 3 | Q.   And do you recognize that this is the |
| 4 | document that you were referring to earlier when we |
| 5 | spoke about the New York Attorney General's -- |
| 6 | A.   Yes, I do. |
| 7 | Q.   Okay.  And is it your understanding that |
| 8 | they were investigating possible violations of the |
| 9 | consumer protection statutes of New York? |
| 10 | A.   I can read what the subpoena says, to |
| 11 | the extent of what they're investigating. |
| 12 | Beyond that, how could I possibly |
| 13 | speculate? |
| 14 | Q.   And you see that it -- it is signed by |
| 15 | Melvin Goldberg? |
| 16 | A.   I think I already testified that I was |
| 17 | aware of that. |
| 18 | Q.   Do you understand that New York -- |
| 19 | New York attorney general's investigation includes |
| 20 | Trump Entrepreneur Initiative, Trump University, and |
| 21 | Trump Institute? |
| 22 | A.   I thought -- well, Trump Institute, yes. |
| 23 | I -- I believe I -- I'm aware of that, yes. |
| 24 | Q.   Do you know why they included Trump |
| 25 | Institute? |

Page 88

22 (Pages 85 to 88)

Exhibit 130
- 941 -

George Sorial                                                    Makaeff v. Trump University

| | |
|---|---|
| 1      A.   Just guessing, maybe because of the use | 1  marked as Exhibit No. 6. |
| 2  of the word "Trump." | 2      (Plaintiffs' Exhibit 6, Civil |
| 3      Q.   There's a lot of other Trump companies | 3  Investigative Demand, marked for |
| 4  that aren't listed here, right? | 4  identification as of this date.) |
| 5      MR. SCHNEIDER:  Is that really a | 5  BY MS. JENSEN |
| 6  question? | 6      Q.   Mr. Sorial, do you recognize this |
| 7      Ask -- | 7  document? |
| 8  BY MS. JENSEN | 8      A.   Yes, I do. |
| 9      Q.   Is that right? | 9      Q.   And what is this document? |
| 10      MR. SCHNEIDER:  Ask your next question. | 10      A.   Civil investigative demand issued by the |
| 11  The document speaks for itself. | 11  State of Texas Attorney General's Office. |
| 12  BY MS. JENSEN | 12      Q.   And do you recognize this as the -- the |
| 13      Q.   Trump Organization isn't listed there, | 13  demand for documents that you referred to earlier? |
| 14  right? | 14      A.   Yes, I do. |
| 15      MR. SCHNEIDER:  The document speaks for | 15      Q.   Okay.  And Rick Berlin is on Page 2 |
| 16  itself. | 16  there. |
| 17      MS. JENSEN:  It's my question to the | 17      It's his signature? |
| 18  witness. | 18      A.   Yes. |
| 19      A.   Read the document and you can answer | 19      Q.   And I believe you said you might have |
| 20  your own question.  I don't feel a need to sit here | 20  spoken to him? |
| 21  and regurgitate an answer questions about -- I told | 21      A.   Yes. |
| 22  you, I'm able to read. | 22      Q.   Did you have -- is your understanding |
| 23      MS. JENSEN:  Now I'm handing to the | 23  that Texas was investigating Trump University for |
| 24  court reporter a document bearing Bates Stamp | 24  possible violations of the state consumer statutes? |
| 25  TU 61745 through 50, which I will ask to be | 25      A.   I think what they're investigating is |
| Page 89 | Page 90 |

| | |
|---|---|
| 1  self-evident in the investigative demand. | 1  Initiative? |
| 2      MS. JENSEN:  I'm now handing to the | 2      MR. SCHNEIDER:  Well, on Page 84, a |
| 3  court reporter a document bearing the Bates | 3  bunch of them say they're invalid. |
| 4  Stamp BBB NY 00481 through 485, which I will | 4      If you know. |
| 5  ask to be marked as Exhibit No. 7. | 5      A.   I've never seen this document.  I don't |
| 6      (Plaintiffs' Exhibit 7, Document | 6  know anything about it. |
| 7  Entitled "The Trump Initiative Entrepreneur | 7  BY MS. ZELDES: |
| 8  Initiative - All Complaints," marked for | 8      Q.   So you don't have any personal knowledge |
| 9  identification as of this date.) | 9  as to how many complaints the BBB received as to |
| 10  BY MS. JENSEN | 10  Trump University, correct? |
| 11      Q.   Mr. Sorial, do you recognize this | 11      A.   I knew that there were the 28 that I |
| 12  document? | 12  referenced in my declaration.  If there's any |
| 13      A.   No. | 13  discrepancy, you'd have to ask the Better Business |
| 14      Q.   In your declaration you state that the | 14  Bureau about that. |
| 15  BBB received a total of 28 complaints? | 15      All those complaints are public record. |
| 16      A.   That's correct. | 16  So I'm not sure I understand -- |
| 17      Q.   And what was basis of that statement? | 17      Q.   Who -- who -- |
| 18      A.   Information provided to me by my client. | 18      A.   -- you know, what you're trying to ask |
| 19      Q.   Do you know where your client got that | 19  me. |
| 20  information from? | 20      Q.   Did you write this statement:  "The BBB |
| 21      A.   I'm assuming from their own records. | 21  received a total of 28 complaints"? |
| 22      Q.   I can represent to you that the BBB of | 22      A.   Yes. |
| 23  New York produced this -- this document. | 23      Q.   You yourself, personally? |
| 24      And do you see that there are about 40 | 24      A.   I -- I -- |
| 25  complaints listed here for Trump Entrepreneur | 25      MR. SCHNEIDER:  He told you it was typed |
| Page 91 | Page 92 |

www.aptusCR.com

Exhibit 130
- 942 -

George Sorial                                          Makaeff v. Trump University

| | |
|---|---|
| 1      by his secretary. | 1    before? |
| 2   BY MS. JENSEN: | 2        A.   There's a lot of documents in here. |
| 3        Q.   Did you look at -- | 3             Which one are you referring to? |
| 4        A.   I -- | 4        Q.   Sure. |
| 5        Q.   -- did you review any of the complaints | 5             Have you seen the document at the very |
| 6   in preparation for submitting this declaration to | 6    beginning of this -- this document -- or this |
| 7   the Court? | 7    exhibit, rather, the BBB application? |
| 8        A.   I already told you I didn't. | 8             Have you seen this document before? |
| 9        MS. JENSEN:   I'm now handing to the | 9        A.   If you're referring to this page that's |
| 10   court reporter a document bearing the Bates | 10   on the top -- |
| 11   Stamp BBB NY 00495 through 545, which I will | 11        Q.   Yes. |
| 12   ask to be marked as Exhibit No. 9. | 12        A.   -- 495, no, I don't think I've seen |
| 13        THE COURT REPORTER:   Eight.  Eight. | 13   this. |
| 14        MS. ZELDES:   Eight. | 14        Q.   Okay.  Were you aware that in |
| 15        MS. JENSEN:   Oh, 8. | 15   January of 2010 the BBB gave Trump University a |
| 16             You were reading my mind. | 16   "D minus" rating? |
| 17             (Plaintiffs' Exhibit 8, Document | 17        A.   I am aware that, at some point, that |
| 18   Entitled "Membership Application Checklist," | 18   rating was given.  I can't tell you if I was aware |
| 19   marked for identification as of this date.) | 19   of that in January or June or April.  But I'm aware |
| 20        MR. SCHNEIDER:   Do you have any | 20   that, at some point in time, the BBB gave that |
| 21   questions or -- | 21   grade. |
| 22        MS. JENSEN:   Yeah.  I was giving you a | 22        Q.   Could you please turn to BBB NY 00524. |
| 23   chance to review, out of courtesy. | 23        A.   Yes. |
| 24   BY MS. JENSEN | 24        Q.   And do you recognize this document? |
| 25        Q.   Mr. Sorial, have you seen this document | 25        A.   If you're referring to this e-mail -- |
| Page 93 | Page 94 |

| | |
|---|---|
| 1        Q.   Yes. | 1        A.   I -- I don't think so, no. |
| 2        A.   -- between myself and Susan McMillan -- | 2        Q.   Just phone conversation? |
| 3        Q.   Mm-hmm. | 3        A.   I believe so. |
| 4        A.   -- I don't remember writing it, but I'm | 4        Q.   And a handful of conversations, or do |
| 5   reading it.  It appears to be an e-mail from me to | 5   you remember how many? |
| 6   her. | 6        A.   No. |
| 7        Q.   Okay.  Who's Susan McMillan? | 7        Q.   Okay.  Did you ever speak to Rita Plate? |
| 8        A.   If my memory is correct, I -- I think | 8        A.   I think I did, yes. |
| 9   she's someone at the Better Business Bureau. | 9        Q.   Do you recall how many times? |
| 10        Q.   And she's copied, or -- I'm sorry, | 10        A.   No. |
| 11   you've copied someone named Rita Plate? | 11        Q.   It was all about the same matter of |
| 12        A.   Yes. | 12   the -- the grading system? |
| 13        Q.   Do you recognize that name? | 13        A.   The grading system and our desire to |
| 14        A.   I do. | 14   work with them to resolve any outstanding complaints |
| 15             My recollection is she -- again, I think | 15   and achieve a higher grade. |
| 16   that's someone that's employed with the Better | 16        Q.   Okay.  After your conversations with |
| 17   Business Bureau.  I don't know if she's a | 17   them, did the BBB accredit Trump University? |
| 18   subordinate of Susan, but the name is familiar. | 18        A.   What do you mean by "accredit"? |
| 19        Q.   Sure. | 19        Q.   Did they issue, like, an accreditation |
| 20             Did you did you ever have any meetings | 20   for Trump University? |
| 21   or conversations with Susan McMillan? | 21        A.   Define "accreditation." |
| 22        A.   Yes.  I testified earlier that we had | 22        Q.   Did they, you know, give them the |
| 23   taken issue with their system of grading. | 23   accreditation of the BBB. |
| 24        Q.   Did you have any in-person meetings with | 24        A.   I don't know what "accreditation of the |
| 25   Susan McMillan? | 25   BBB" means. |
| Page 95 | Page 96 |

24 (Pages 93 to 96)

Exhibit 130
- 943 -

George Sorial                                    **Makaeff v. Trump University**

| | |
|---|---|
| 1   **Q.**   The BBB stamp of approval. | 1   **Q.**   Was Trump University still operating at |
| 2   A.   I don't know. | 2   this time of the letter in July 26, 2011? |
| 3   **Q.**   In any form or fashion? | 3   A.   I don't know what you mean by |
| 4   A.   What do you mean? | 4   "operating." |
| 5     What -- what is a "BBB stamp of | 5     And again, you know, I'm not the person |
| 6   approval"? | 6   to ask about operations of Trump University because |
| 7   **Q.**   In -- | 7   it's simply not my responsibility. |
| 8   A.   It's just an area I'm not familiar with. | 8     So ask somebody else. |
| 9   **Q.**   Sure.  Sure. | 9   **Q.**   Do you see at the very last full |
| 10   A.   I -- | 10   paragraph, "Your failure to immediately comply with |
| 11   **Q.**   If -- if you're not aware, then | 11   our demand will force us to proceed with a legal |
| 12   that's -- | 12   action against you and the BBB"? |
| 13   A.   I'm happy to answer, but I just -- | 13   A.   I'm able to read, yes. |
| 14   **Q.**   That's okay. | 14   **Q.**   Okay.  And -- and so -- and that's |
| 15   A.   -- I don't know what that's defined as. | 15   true -- that this is -- |
| 16   **Q.**   That's okay.  If you're not aware, | 16   A.   I don't deny writing this e-mail. |
| 17   that's fine. | 17   **Q.**   Okay.  Earlier we talked about some of |
| 18     Turning to Page 540, do you recognize | 18   the complaints that were received through various |
| 19   this document? | 19   state agencies? |
| 20   A.   Yes. | 20   A.   Correct. |
| 21   **Q.**   And what is this document? | 21   **Q.**   And I understand that -- that you said |
| 22   A.   It is an e-mail correspondence from | 22   that there were individual instances of complaints |
| 23   myself to Susan McMillan, in which I've copied | 23   from other states? |
| 24   Rita Plate and Mark Covais, which sets forth our | 24   A.   No.  I said that they were -- my memory |
| 25   feelings about their grading system. | 25   was that they were individual instances from other |
| Page 97 | Page 98 |

| | |
|---|---|
| 1   states.  And I think I clarified what I meant by | 1   **Q.**   Okay.  And there -- do you know whether |
| 2   that by indicating they were actions not similar to | 2   Trump University received complaints through other |
| 3   Texas and New York. | 3   state AGs than the ones that you -- |
| 4   **Q.**   And the fact -- | 4   A.   Not -- |
| 5   A.   They were limited to grievances from | 5   **Q.**   -- recalled earlier? |
| 6   one, you know, perhaps two, students; but they were | 6   A.   No. |
| 7   specific -- I think I made the point to emphasize | 7   **Q.**   So you don't know? |
| 8   that, other than Texas and New York, these were | 8   A.   I don't know. |
| 9   specific instances as opposed to general requests | 9     MS. JENSEN:  Okay.  I'm now |
| 10   for the provision of documents. | 10   introducing -- or handing to the court |
| 11   **Q.**   And sitting here now, you don't know how | 11   reporter a document that bears the Bates Stamp |
| 12   many complaints were received through the various | 12   TU 6114 through 42, which I will ask to be |
| 13   state AGs; is that correct? | 13   marked as Exhibit No. 10. |
| 14   A.   I have not had a sudden change in memory | 14     MS. ZELDES:  I think it's 9. |
| 15   from two hours ago.  And I think I went out of my | 15     THE COURT REPORTER:  I think it's 9. |
| 16   way to be clear and attempt to provide you with | 16     MS. JENSEN:  Uh-oh.  My handy assistant |
| 17   accurate information. | 17   who's failed me. |
| 18     I said I remember them to be one. | 18     MS. ZELDES:  Anybody that has an |
| 19     Could it have been two?  No. | 19   assistant . . . |
| 20     But again, my point is, they were not | 20     MS. JENSEN:  Yeah, that's right. |
| 21   mass -- or they were not requests for numerous | 21     THE WITNESS:  It is -- it is 9. |
| 22   documents. | 22     (Plaintiffs' Exhibit 9, Three-Page |
| 23   **Q.**   Sure. | 23   Document Bates Stamped TU 61140 through TU |
| 24   A.   They were letters that just identified | 24   61142, marked for identification as of this |
| 25   specific problems with specific students. | 25   date.) |
| Page 99 | Page 100 |

25 (Pages 97 to 100)

Exhibit 130
- 944 -

George Sorial                                          Makaeff v. Trump University

| | |
|---|---|
| 1  BY MS. JENSEN | 1  Q.  Sure. |
| 2    Q.  Mr. Sorial, do you recognize this | 2    So you don't know, sitting here, who |
| 3  document? | 3  keeps tracks of the complaints along these lines for |
| 4    A.  It looks -- you know, I can't say with | 4  Trump University? |
| 5  certainty that I've seen it.  I think I understand | 5    A.  I -- I don't know if there's one |
| 6  what it is. | 6  specific person. |
| 7    It appears to be a document summarizing | 7    Again, just to be clear, the focus of my |
| 8  open issues with Trump University students.  I | 8  practice is elsewhere.  I am not a litigator.  I am |
| 9  don't -- I don't know if I -- you know, I may or may | 9  a transactional lawyer, and I focus on project |
| 10  not have seen this. | 10  management, development, and future site |
| 11    Q.  Do you -- | 11  development.  That's what I do.  I'm a real estate |
| 12    A.  If that's what you're asking. | 12  development person. |
| 13    Q.  Yes. | 13    So I'm not really involved too much in |
| 14    Do you know whether your legal | 14  the organization's litigation matters. |
| 15  department keeps charts like this for Trump | 15    Q.  Turning your attention to the fifth row |
| 16  University? | 16  of this document in terms of the names, so, you |
| 17    A.  I don't know. | 17  know, in terms of the complaints, the fifth |
| 18    Q.  Okay.  Who -- who in the legal | 18  complaint. |
| 19  department normally handles compiling complaints | 19    A.  The "Summary of Complaints" -- |
| 20  for, you know, particular Trump entities? | 20    Q.  Yes. |
| 21    A.  It -- it varies. | 21    A.  Is that what you're saying? |
| 22    I -- I'm -- again, my role in the legal | 22    Q.  So it's not -- I'm starting with the row |
| 23  department is a little different.  And I -- I | 23  below "complainants" -- |
| 24  don't -- we have a general counsel, but I -- I | 24    A.  I got it. |
| 25  just -- I can't answer that question. | 25    Q.  -- to be clear.  So that's -- it says |
|                                       Page 101 |                                       Page 102 |

| | |
|---|---|
| 1  Brandon Keller, right? | 1    A.  Yes, it does.  So -- |
| 2    A.  Yes. | 2    Q.  You may -- |
| 3    Q.  And do you see that the complaint was | 3    A.  Again, it's possible it was resolved.  I |
| 4  received through the State of California DOJ? | 4  may have had some involvement in this, but I -- I, |
| 5    A.  I see what this chart says, yes. | 5  again, specifically can't tell you exactly, you |
| 6    Again, I can read. | 6  know, to what extent.  But the name is familiar, and |
| 7    Q.  Okay.  You're -- you're not aware of | 7  perhaps I did participate in the facilitation of a |
| 8  being contacted through the State of California DOJ? | 8  resolution. |
| 9    A.  I have not have dealings, to the best my | 9    Q.  Okay.  So you might have talked to |
| 10  recollection, with the State of California.  And I | 10  somebody at the Arizona Attorney General's Office? |
| 11  believe Brandon Keller is represented by you. | 11    A.  I -- honestly, it does not -- I -- I |
| 12    Q.  Okay.  Turning to the next page, 61141. | 12  don't remember doing so. |
| 13    So the second complaint listed there? | 13    Q.  Okay.  But it's possible? |
| 14    A.  Yes. | 14    A.  But I talk to a lot of people every day, |
| 15    Q.  Do you see Deo Munter? | 15  so . . . |
| 16    A.  Yes. | 16    Q.  I understand.  I understand. |
| 17    Q.  And do you see that the complaint was | 17    Do you see below that, too, below that, |
| 18  received through the attorney general's office of | 18  Gary Shapiro? |
| 19  Arizona? | 19    A.  I do. |
| 20    A.  Yes, I do. | 20    Q.  And do you see that it appears that |
| 21    Q.  Okay.  And you weren't involved in any | 21  complaint came through the Maryland AG's office? |
| 22  way with the -- | 22    A.  Yes. |
| 23    A.  You know, the name Deo Munter actually | 23    Q.  And that would have been what we talked |
| 24  rings a bell to me. | 24  about earlier with Maryland, perhaps? |
| 25    Q.  Does it? | 25    A.  Yes. |
|                                       Page 103 |                                       Page 104 |

26 (Pages 101 to 104)

Exhibit 130
- 945 -

George Sorial                                        Makaeff v. Trump University

| | |
|---|---|
| 1 | Q. Okay. |
| 2 | A. And I do remember specifically speaking |
| 3 | with Maryland. |
| 4 | Q. Okay. Do you see Joseph Vidra below |
| 5 | that? |
| 6 | And do you see that that complaint came |
| 7 | through the Pennsylvania office of the attorney |
| 8 | general? |
| 9 | A. I see that, yes. |
| 10 | Q. Do you recall having any dealings with |
| 11 | the Pennsylvania Attorney General Office? |
| 12 | A. Again, the name Vidra is familiar. You |
| 13 | know, I may have heard about the dispute at some |
| 14 | point during some conversation, but I don't remember |
| 15 | speaking with anybody in Pennsylvania. But I do |
| 16 | note that, by this chart, it was resolved, so . . . |
| 17 | Q. Do you see the -- the next chart -- I'm |
| 18 | sorry, the next page of the chart, which is TU 6114? |
| 19 | A. I do. |
| 20 | Q. Do you see that there were two more |
| 21 | entries for Maryland complaints through the AG's |
| 22 | office there? |
| 23 | A. Yes. I see they were both refunded and |
| 24 | resolved. |
| 25 | Q. Sure. |

Page 105

| | |
|---|---|
| 1 | So that's Pat and Bruce Curry and |
| 2 | Patricia Thompson? |
| 3 | A. Yes. |
| 4 | Q. And so your dealings were the -- |
| 5 | Maryland's Attorney General's Office may have |
| 6 | pertained to do them as well. |
| 7 | A. Quite possibly. |
| 8 | Q. Okay. Below that, Raymond -- I'm going |
| 9 | to not say his name correctly, I'm sure, but |
| 10 | Raymond Tighomes? |
| 11 | Do you see the -- I'll spell it for the |
| 12 | record: T-I-G-H-O-M-E-S. |
| 13 | A. I've never heard of this matter. |
| 14 | Q. Okay. Do you see on the chart that it |
| 15 | says the complaint was received through the US DOJ? |
| 16 | A. Yes. And I had no discussions with the |
| 17 | United States Department of Justice. |
| 18 | Q. Okay. And you don't know whether |
| 19 | anybody else did? |
| 20 | A. I don't have no idea what other people |
| 21 | did. |
| 22 | Q. Okay. |
| 23 | A. I can only speak for myself. |
| 24 | Q. Do you see below that there are two |
| 25 | complaints that came in through the Illinois |

Page 106

| | |
|---|---|
| 1 | Attorney General's Office? |
| 2 | A. Yes, I do. |
| 3 | Q. Okay. And that -- along with |
| 4 | Daniel Carr on the first page of this chart, that |
| 5 | would be three complaints coming through the |
| 6 | Illinois AG's office. |
| 7 | A. That's correct. |
| 8 | Q. Does that sound about right? |
| 9 | Okay. Do you see a few below that -- |
| 10 | and I apologize they're not numbered, so I |
| 11 | understand that my references aren't very -- |
| 12 | A. No problem. |
| 13 | Q. -- precise -- Tim Picking? |
| 14 | A. I see Tim Picking on this chart, yes. |
| 15 | Q. Sure. |
| 16 | And do you see that that complaint came |
| 17 | in through the California DOJ? |
| 18 | A. I see that this chart says it came in |
| 19 | through the California DOJ. |
| 20 | Q. Okay. |
| 21 | A. I had no dealings with them. |
| 22 | Q. Okay. And then . . . |
| 23 | A. I'll also note that there -- that |
| 24 | appears to be resolved as well. |
| 25 | Q. Okay. Below that do you see |

Page 107

| | |
|---|---|
| 1 | Vallie Dean? |
| 2 | A. I can read, and I'll give you the same |
| 3 | answer, I had no contact -- |
| 4 | Q. Right. |
| 5 | A. -- with the U.S. Department of Justice. |
| 6 | Q. Okay. And then, finally, below that, |
| 7 | Wilhelmina -- Helmina Summers? |
| 8 | A. Yes. I've never heard of this person, |
| 9 | and I had no dealings with the Department of |
| 10 | Agriculture and Consumer Services. |
| 11 | Q. With the -- in Virginia? |
| 12 | A. I don't recollect. |
| 13 | Q. Okay. Turning to Paragraph 5 of your |
| 14 | declaration. |
| 15 | A. Yes. |
| 16 | Q. Do you see, "Of the 80,000-plus people |
| 17 | who attended TU/TEI programs," et cetera -- I'm just |
| 18 | going to focus on the first clause. |
| 19 | A. I wrote the declaration; so obviously, I |
| 20 | see it and remember it. |
| 21 | Q. Oh, okay. Okay. Thank you. |
| 22 | So do you know what the basis was for |
| 23 | your statement of the 80,000-plus people? |
| 24 | A. Yes. |
| 25 | Q. Okay. What was that? |

Page 108

27 (Pages 105 to 108)

Exhibit 130
- 946 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1   A.   I relied on information provided to me | 1   client's determination that all those customers were |
| 2   by my client. | 2   represented by plaintiff's counsel? |
| 3   Q.   Okay.  What information was that? | 3   A.   Yes. |
| 4   MR. SCHNEIDER:  Well, he's not going to | 4   MS. JENSEN:  Okay.  What I'd like to do |
| 5   disclose attorney-client privilege. | 5   now is, I would like to go through some other |
| 6   MS. JENSEN:  Okay. | 6   documents and see what I still need to get |
| 7   MR. SCHNEIDER:  But yesterday | 7   through. |
| 8   Mark Covais testified about it, and we | 8   I think we are able to short circuit |
| 9   provided the documents and source material for | 9   some of this through the testimony that |
| 10   you.  So you have it, also. | 10   Mr. Sorial has been -- provided. |
| 11   BY MS. JENSEN | 11   So it's up to you as to whether you'd |
| 12   Q.   I'm now looking at the last sentence in | 12   like to now take a half-hour for lunch or -- |
| 13   that paragraph. | 13   THE WITNESS:  Why don't we just keep |
| 14   A.   Yes. | 14   going? |
| 15   Q.   I'm sorry.  Yes, the last sentence, | 15   MS. JENSEN:  I mean that's what -- well, |
| 16   saying that they successfully resolved -- | 16   I'm saying I'm going to need a break. |
| 17   A.   Virtually all of them. | 17   What I'm trying to say in a sort of |
| 18   Q.   Next paragraph.  Okay.  Okay. | 18   polite way, is that I'm going to need a little |
| 19   Well, it says that "except for a few | 19   time to see what else I need to do here. |
| 20   customers who are represented by plaintiff's counsel | 20   And -- |
| 21   in this matter." | 21   MR. SCHNEIDER:  Well -- |
| 22   And where did you get that information | 22   MS. JENSEN:  -- so you can either have |
| 23   from? | 23   some lunch break or let's -- but I'm going to |
| 24   A.   My client. | 24   need more than two minutes. |
| 25   Q.   Okay.  And your -- and it was your | 25   MR. SCHNEIDER:  Okay.  So would ten |
| Page 109 | Page 110 |

| | |
|---|---|
| 1   minutes do it? | 1   THE VIDEOGRAPHER:  The time is |
| 2   MS. JENSEN:  I think I'd like -- I mean, | 2   1:13 p.m., and this begins Media No. 3 of the |
| 3   realistically, I'd like about 20 minutes. | 3   video deposition of George Sorial. |
| 4   MR. SCHNEIDER:  Okay. | 4   G E O R G E   S O R I A L, resumed and |
| 5   MS. JENSEN:  So -- | 5   testified as follows: |
| 6   MR. SCHNEIDER:  And then can we just | 6   EXAMINATION BY (Cont'd.) |
| 7   drive on? | 7   MS. JENSEN: |
| 8   MS. ZELDES:  It's a quarter to 1:00.  I | 8   Q.   Mr. Sorial, welcome back. |
| 9   mean, should we just break for lunch, take a | 9   A.   Thank you. |
| 10   half hour -- | 10   Q.   Earlier I believe that you testified |
| 11   MS. JENSEN:  Well, that's what -- | 11   that there were other -- other persons who were |
| 12   MR. SCHNEIDER:  I'd rather -- I'd rather | 12   involved with the various AG inquires or |
| 13   skip lunch and then just -- | 13   investigations.  I believe that you -- oh, excuse |
| 14   MS. JENSEN:  By the way, we can go off | 14   me. |
| 15   the record.  We can just -- | 15   Where did it go -- okay. |
| 16   THE VIDEOGRAPHER:  The time is 12:36, | 16   I -- strike that. |
| 17   and this ends Video No. 2. | 17   Earlier you testified that |
| 18   THE COURT REPORTER:  I'm sorry.  I | 18   Michael Sexton was involved with some of the -- the |
| 19   didn't get what she said. | 19   AG inquires; is that right? |
| 20   THE VIDEOGRAPHER:  12:36, and we're off | 20   A.   Michael Sexton, in his position as head |
| 21   the record. | 21   of the company, yes, was obviously involved. |
| 22   (Recess taken.) | 22   Q.   And he left the company around mid-2010; |
| 23   (Luncheon Recess:  12:38 p.m.) | 23   isn't that correct? |
| 24   A F T E R N O O N   S E S S I O N | 24   A.   Sounds correct.  I don't know the exact |
| 25   (Time noted:  1:14 p.m.) | 25   date. |
| Page 111 | Page 112 |

28 (Pages 109 to 112)

**www.aptusCR.com**

Exhibit 130
- 947 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1    Q.   Do you know whether he had any | 1    with outside counsel? |
| 2    continuing involvement after that time? | 2    A.   Correct. |
| 3    A.   He's currently a shareholder, so . . . | 3    Q.   Were there any others, to your |
| 4    Q.   So he -- he had further communications | 4    knowledge, who have been involved in any attorney |
| 5    with the AGs after he left? | 5    general investigation? |
| 6    A.   I don't know. | 6    A.   In -- in -- I think I had mentioned |
| 7    He was deposed by the New York State | 7    Dan Borbet and probably a couple of secretarial |
| 8    Attorney General.  I do know that. | 8    staff. |
| 9    But he is currently a shareholder.  You | 9    Q.   Okay. |
| 10   asked me a specific question about whether he was | 10   A.   Again, under the direction of |
| 11   involved.  He's a shareholder. | 11   Avi Schick.  So I -- beyond that, I don't know. |
| 12   Q.   And I also believe that you testified | 12   Q.   Okay.  And Alan Garten hasn't been |
| 13   that Mark Covais was also involved? | 13   available -- been involved? |
| 14   A.   Correct. | 14   A.   We -- no, Alan Garten has been involved. |
| 15   Q.   Okay.  And do you know whether -- | 15   He's another attorney I work with; so, yes, he's |
| 16   A.   Which attorney general investigation are | 16   been involved. |
| 17   we talking about? | 17   Q.   Okay.  And what has been his |
| 18   Q.   Any of the attorney general | 18   involvement? |
| 19   investigations. | 19   A.   Have to ask him. |
| 20   A.   He was involved with document production | 20   Q.   Okay.  So you don't know whether he's |
| 21   for New York. | 21   communicated with the AGs? |
| 22   Q.   Okay. | 22   A.   I have no -- I -- you can't ask me to |
| 23   A.   That's all I'm aware of. | 23   speculate on what somebody else has done. |
| 24   Q.   And when you say that "he was involved | 24   Q.   No.  I -- I'm only asking if you have |
| 25   with document production," that was in conjunction | 25   knowledge. |
| Page 113 | Page 114 |
| 1    A.   You can -- I, you know, can only speak | 1    A.   He's executive vice president and the |
| 2    for my own actions. | 2    chief financial officer of The Trump Organization. |
| 3    Q.   Well, I mean, if you have knowledge of | 3    Q.   Who is Jason Greenblatt? |
| 4    other people's actions, you can testify to that as | 4    A.   Executive vice president and general |
| 5    well. | 5    counsel to The Trump Organization. |
| 6    Are you -- are you -- | 6    Q.   We talked about him earlier, correct? |
| 7    MR. SCHNEIDER:  Do you know whether he | 7    A.   Yes. |
| 8    talked to the AG? | 8    Q.   Peter Hoppenfield? |
| 9    A.   I don't think he has spoken to the AG. | 9    A.   Peter Hoppenfield, I believe, was a |
| 10   Have we had communications with our | 10   lawyer for Trump University outside counsel. |
| 11   counsel? | 11   Q.   Is there a compliance department? |
| 12   Yes, but not to my knowledge. | 12   A.   I have no idea. |
| 13   Q.   And -- excuse me. | 13   I mean -- well, specifically, go back. |
| 14   As to the BBBs, is there anyone else | 14   What -- who are you asking about? |
| 15   who's had involvement with the various BBBs? | 15   What entity? |
| 16   A.   I don't know.  I believe at one point | 16   Q.   Did Trump University have access to any |
| 17   Mark Covais was communicating with them.  But, | 17   compliance department? |
| 18   again, that's all I know. | 18   A.   I have no idea. |
| 19   Q.   Okay.  Who is Allen Weisselberg? | 19   Q.   Does Trump Organization have a |
| 20   A.   Chief financial officer of The Trump | 20   compliance department? |
| 21   Organization, also executive vice president. | 21   A.   We have individuals that function in the |
| 22   Q.   Has he had any involvement with Trump | 22   areas of compliance. |
| 23   University? | 23   Is there a discrete department? |
| 24   A.   I don't know. | 24   I don't believe so. |
| 25   Q.   Is he also an advisor to Donald Trump? | 25   Q.   Who are the individuals who work on |
| Page 115 | Page 116 |

29 (Pages 113 to 116)

Exhibit 130
- 948 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1   compliance? | 1       MS. JENSEN:  Mr. Sexton.  He had access |
| 2       MR. SCHNEIDER:  What kind of -- | 2   to Trump Organization's -- |
| 3   compliance of what? | 3       MR. SCHNEIDER:  The lawyers, he said. |
| 4       MS. JENSEN:  Legal compliance. | 4   That's just the lawyers. |
| 5       A.  I don't think that's relevant to this | 5       MS. JENSEN:  So that's the compliance |
| 6   deposition.  I'm not answering that question. | 6   department. |
| 7   BY MS. JENSEN: | 7       MR. SCHNEIDER:  The lawyers. |
| 8       **Q.  Okay.** | 8       MS. JENSEN:  That's my -- |
| 9       A.  I don't know. | 9       MR. SCHNEIDER:  -- |
| 10       **Q.  On the basis of relevancy, you're not** | 10   He said there's no compliance |
| 11   **going to answer the question?** | 11   department. |
| 12       MR. SCHNEIDER:  Well, privilege, | 12       MS. JENSEN:  Wait.  Okay. |
| 13   probably.  The Trump Organization -- | 13       MR. SCHNEIDER:  Okay. |
| 14       MS. JENSEN:  Okay. | 14       MS. JENSEN:  Let's -- to the lawyers who |
| 15       MR. SCHNEIDER:  -- is not a party to the | 15   provide -- |
| 16   lawsuit. | 16       MR. SCHNEIDER:  Well, he's already |
| 17       MS. JENSEN:  Well, there's earlier | 17   testified that -- |
| 18   testimony -- | 18       MS. JENSEN:  Okay. |
| 19   BY MS. ZELDES: | 19       MR. SCHNEIDER:  -- he's been involved in |
| 20       **Q.  I can represent to you, Mr. Sorial, that** | 20   some of these issues. |
| 21   **there was earlier testimony in this case that Trump** | 21       MS. JENSEN:  Right. |
| 22   **University used Trump Organization's compliance** | 22   BY MS. JENSEN |
| 23   **department.  So --** | 23       **Q.  And so I'm -- I'm just wondering who** |
| 24       MR. SCHNEIDER:  That's not true. | 24   **were the other attorneys who are involved in --** |
| 25       Who testified to that? | 25       A.  I told you Alan Garten, and that's to |
|                     Page 117 |                     Page 118 |

| | |
|---|---|
| 1   the best of my knowledge.  You know, I -- I don't | 1       A.  Haven't we been over this a couple of |
| 2   know if any other our other lawyers were involved in | 2   times? |
| 3   this. | 3       **Q.  Okay.  And has -- does Trump University** |
| 4       **Q.  Do you know whether compliance was** | 4   **continue its operations today?** |
| 5   **involved in any of the early decisions in the -- in** | 5       A.  I'm not involved with anything ongoing |
| 6   **the name of Trump University?** | 6   with respect to operations, so . . . |
| 7       A.  I have no idea.  I didn't work for The | 7       **Q.  So what do you --** |
| 8   Trump Organization then. | 8       A.  You'd have to ask somebody else that |
| 9       **Q.  And you don't have -- sitting here, you** | 9   question.  I don't know. |
| 10   **don't know?** | 10       **Q.  So when you said "the company continued** |
| 11       A.  I don't know. | 11   **its operations," what did you mean?** |
| 12       **Q.  Okay.  Does -- do you know whether Trump** | 12       A.  What I -- it continues to function as |
| 13   **Organization's attorneys reviewed Trump University** | 13   Trump Entrepreneur Initiative.  I believe there are |
| 14   **contracts for --** | 14   still some students that access the website.  The |
| 15       A.  I have no idea. | 15   company has not shut down. |
| 16       **Q.  Okay.** | 16       But beyond the specifics of that, you |
| 17       THE COURT REPORTER:  That's not an iPad. | 17   know, I -- I don't know exactly.  I'm not -- again, |
| 18       MS. JENSEN:  I think I'm having a really | 18   you know, for -- I don't mean to be rude, but you |
| 19   hard time switching between my iPad and | 19   know, for the tenth time, I just don't -- I'm not |
| 20   regular laptops now. | 20   really that involved -- |
| 21   BY MS. JENSEN: | 21       MR. SCHNEIDER:  Rach- -- |
| 22       **Q.  Turning to your declaration, I believe** | 22       A.  -- with Trump University. |
| 23   **Paragraph 3 said -- says that "Trump University** | 23       MR. SCHNEIDER:  Rachel, the name changed |
| 24   **agreed to change its name, and -- "and the company** | 24   two years ago; and the company was still |
| 25   **continued its operations"; is that correct?** | 25   operating.  It said they changed the name and |
|                     Page 119 |                     Page 120 |

30 (Pages 117 to 120)

Exhibit 130
- 949 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1  continued operations. | 1  BY MS. JENSEN |
| 2      MS. JENSEN:  I was not asking for your | 2      Q.   So were you involved in the decision to |
| 3  testimony. | 3  cease live events in August of 2010? |
| 4      MR. SCHNEIDER:  Well, that's what the | 4      A.   I -- I was -- I don't work for Trump |
| 5  declaration -- | 5  University. |
| 6      MS. JENSEN:  I -- | 6      Q.   So were you involved? |
| 7      MR. SCHNEIDER:  -- says. | 7      A.   How do you define "involvement"? |
| 8      MS. JENSEN:  I'm not asking -- | 8      Q.   Were you in any meetings -- |
| 9      MR. SCHNEIDER:  So your question was | 9      MR. SCHNEIDER:  Well, as counsel -- |
| 10  improper. | 10  BY MS. JENSEN |
| 11      MS. JENSEN:  Well, I was reading it and | 11      Q.   -- concerning -- |
| 12  the witness was not interested in me reading | 12      MR. SCHNEIDER:  -- he's not going to |
| 13  his declaration, so . . . | 13  talk about anything that he would have |
| 14      MR. SCHNEIDER:  Well, we found out | 14  discussed as legal counsel. |
| 15  earlier -- | 15      MS. JENSEN:  He just testified that he |
| 16      MS. JENSEN:  I was trying to place -- | 16  didn't know.  So . . . |
| 17  give you some context for where I was.  And -- | 17      MR. SCHNEIDER:  Okay.  Well, now you |
| 18  and it's absolutely unnecessary -- | 18  have your answer.  So ask your next question. |
| 19      THE WITNESS:  Pardon me, I think -- | 19      MS. JENSEN:  Okay. |
| 20  think you have to concede -- | 20  BY MS. JENSEN |
| 21      MS. JENSEN:  -- for the attorney to try | 21      Q.   But were you in -- there were actually |
| 22  to testify for -- | 22  exhibits earlier that showed you were in meetings |
| 23      THE WITNESS:  We've asked -- I've | 23  with Mr. Frey and others. |
| 24  answered questions on this a couple of times | 24      A.   I'm not part of the decision to do what |
| 25  so . . . | 25  they did.  As I told you, I have nothing do with |
| Page 121 | Page 122 |
| 1  operations. | 1  told you that.  He has had no involvement on |
| 2      Q.   Okay. | 2  the business side. |
| 3      A.   I think I've made that point very clear. | 3      MS. JENSEN:  So are you instructing him |
| 4      Q.   So sitting here now, you don't though | 4  not to answer the question? |
| 5  why they stopped live events in August of 2010? | 5      MR. SCHNEIDER:  He's also answered.  So |
| 6      A.   It was obviously a business decision. | 6  ask your next question.  There's no pending |
| 7      Q.   But you were not involved in? | 7  question I've instructed him not to answer. |
| 8      THE WITNESS:  Well, if he was involved | 8      MS. JENSEN:  I don't think the client's |
| 9  in it, it would be protected by | 9  really viewed . . . |
| 10  attorney-client privilege. | 10  BY MS. JENSEN |
| 11      MS. JENSEN:  It wouldn't be because he | 11      Q.   So you my question was:  Were you |
| 12  just said it was a business decision. | 12  involved in the decision to cease live events? |
| 13      MR. SCHNEIDER:  If he was involved as | 13      My -- then, you said, He worked -- he |
| 14  legal counsel, it would have been protected, | 14  worked for Trump University.  I think that's Counsel |
| 15  his involvement. | 15  testifying. |
| 16      MS. JENSEN:  And for the record, he's | 16      And then you said -- then I asked, Were |
| 17  not only legal counsel, he's also executive | 17  you involved. |
| 18  VP.  That's quite clear. | 18      And then your answer was, How could do |
| 19      THE WITNESS:  Of Trump Organization. | 19  you define. |
| 20      MR. SCHNEIDER:  Not at Trump University. | 20      And so I'm -- my definition is, Were |
| 21  His -- his only role, that he's told you 15 | 21  you -- did you -- were you a decision-maker? |
| 22  times today in Trump University, has been as | 22      A.   I was not a decision-maker, no. |
| 23  legal counsel.  All these issues were legal | 23      Q.   Okay.  Were you part of meetings |
| 24  issues that he's been involved in.  Period. | 24  concerning the decision? |
| 25      He hasn't done any business-side.  He's | 25      A.   I'm sure at some point I was part of |
| Page 123 | Page 124 |

31 (Pages 121 to 124)

Exhibit 130
- 950 -

George Sorial                                    Makaeff v. Trump University

| | |
|---|---|
| 1 meetings, but it was not my decision. | 1 Institute other than at one point they were a |
| 2   **Q.   What is your understanding of why Trump** | 2 licensee. |
| 3 **University ceased live events?** | 3   **Q.   Turning back to Exhibit No. 1, that's** |
| 4     MR. SCHNEIDER:  Well, to the extent it's | 4 **the depo notice.** |
| 5 attorney-client information that your client | 5     A.   Yes. |
| 6 provided -- | 6   **Q.   And I'd like to turn your attention to** |
| 7     A.   I'd rather not.  There's no need for me | 7 **Page 4 of this exhibit, which includes document** |
| 8 to answer that question. | 8 **requests.** |
| 9 BY MS. JENSEN | 9     A.   Correct. |
| 10   **Q.   What's the relationship between Trump** | 10   **Q.   Okay.  And do you see No. 1 there, it's** |
| 11 **University and Trump Institute?** | 11 **"Documents referenced, supporting and/or review in** |
| 12     A.   My understanding was that Trump | 12 **the preparation of your declaration."** |
| 13 Institute was a licensee.  There was a licensing | 13     A.   Yes. |
| 14 agreement between the entity Trump University and a | 14   **Q.   Do you see that?** |
| 15 third party that was given the right to use that | 15     A.   Yes. |
| 16 name. | 16   **Q.   Are there any documents that exist** |
| 17     Beyond that, I wasn't involved in that. | 17 **that -- that relate to this document request?** |
| 18 That was prior to my time, and that's really all I | 18     A.   Three hours ago you asked me that |
| 19 know. | 19 question, and I'll give you the same answer:  I |
| 20     I also know, actually, that we | 20 looked at my declaration.  That was it.  The |
| 21 terminated that agreement. | 21 declaration was prepared from my memory of the |
| 22   **Q.   And you don't have any understanding as** | 22 facts. |
| 23 **to whether Trump Institute conducted any of Trump** | 23   **Q.   Are there any drafts of your declaration** |
| 24 **University's live events?** | 24 **or --** |
| 25     A.   I don't know anything about Trump | 25     MR. SCHNEIDER:  Okay.  I'll shortchange |
| Page 125 | Page 126 |

| | |
|---|---|
| 1 this.  We've already responded to this.  We've | 1     MR. SCHNEIDER:  How are you going to be |
| 2 already objected on attorney-client privilege; | 2 allowed -- |
| 3 so we've responded to each of these | 3     MS. JENSEN:  -- and if there aren't -- |
| 4 categories. | 4     MR. SCHNEIDER:  -- to get drafts of |
| 5     MS. JENSEN:  Well, I'm asking the | 5 documents between me and my client? |
| 6 witness whether such documents exist. | 6     MS. JENSEN:  But -- let me get through |
| 7     MR. SCHNEIDER:  Okay.  Well, whether | 7 this, and then we'll see if we need to ever -- |
| 8 there's drafts of his declaration, it's | 8     MR. SCHNEIDER:  No, I'm going to strike |
| 9 completely irrelevant and it's privileged. | 9 the answer whether there's drafts that would |
| 10 Whether there's drafts is not your business, | 10 be communications between me and my client. |
| 11 and it's privileged. | 11 BY MS. JENSEN |
| 12     MS. JENSEN:  No.  No.  That's -- no. | 12   **Q.   Okay.  Do you see Paragraph No. 3 for** |
| 13     MR. SCHNEIDER:  It is.  It's privileged. | 13 **all documents reviewed in preparation for the** |
| 14     MS. JENSEN:  Whether I can get them, | 14 **deposition?** |
| 15 absolutely, is -- | 15     A.   Yes. |
| 16     MR. SCHNEIDER:  Okay.  So what relevance | 16   **Q.   And are there any such documents?** |
| 17 is it whether he went through drafts? | 17     MR. SCHNEIDER:  He's already asked and |
| 18 Really? | 18 answered that question. |
| 19     MS. JENSEN:  No.  I want to -- because | 19     A.   I already answered that question. |
| 20 I want to know whether, if we fight with -- in | 20 BY MS. JENSEN |
| 21 front of the Court about this, whether there's | 21   **Q.   And the answer is no, correct?** |
| 22 any need to do so.  Maybe there's not. | 22     MR. SCHNEIDER:  He's already answered |
| 23     MR. SCHNEIDER:  How -- | 23 the question.  He's not answering it again. |
| 24     MS. JENSEN:  Let me just ask the witness | 24 BY MS. JENSEN |
| 25 whether there's documents -- | 25   **Q.   Okay.  Do you see No. 4, employment** |
| Page 127 | Page 128 |

32 (Pages 125 to 128)

www.aptusCR.com

Exhibit 130
- 951 -

George Sorial                                                  Makaeff v. Trump University

| | |
|---|---|
| 1    files? | 1        Do you have a file for your client? |
| 2        Do you have any such files in your | 2   BY MS. JENSEN: |
| 3    possession? | 3        Q.   Do you have any documents in your |
| 4        MR. SCHNEIDER:  We object on privacy | 4   possession? |
| 5    grounds, and I can represent there's no | 5        A.   That's -- it's -- it's a -- you have to |
| 6    employment agreement. | 6   be more specific. |
| 7        MS. JENSEN:  Employment files. | 7        Q.   Do you have any documents in -- |
| 8        MR. SCHNEIDER:  We've objected on | 8        A.   I have a file. |
| 9    privacy grounds, and I can represent there's | 9        Q.   Okay.  You have a file? |
| 10   no employment agreement. | 10       A.   I am a lawyer.  I have a file. |
| 11   BY MS. JENSEN | 11       Q.   Okay. |
| 12       Q.   Do you have any documents in your | 12       A.   Do you have a file for your client? |
| 13   possession, custody, or control concerning Trump | 13       Q.   And so -- |
| 14   University? | 14       A.   What's the relevance of that question? |
| 15       MR. SCHNEIDER:  We've already responded | 15       Q.   So you have a file? |
| 16   to that. | 16       A.   I answered your question. |
| 17   BY MS. JENSEN | 17       Q.   And on Trump University? |
| 18       Q.   You can answer. | 18       MR. SCHNEIDER:  Yeah.  We've already |
| 19       MR. SCHNEIDER:  Do you have any personal | 19   responded to the request, a formal response. |
| 20   documents? | 20   We've objected on privilege.  So go on to your |
| 21       A.   No. | 21   next questions, Rachel.  We're not going -- |
| 22       MS. JENSEN:  No.  That's not question. | 22   BY MS. JENSEN: |
| 23   It's all documents. | 23       Q.   So -- |
| 24       A.   Okay.  Well, you're asking me if I have | 24       MR. SCHNEIDER:  -- back through this. |
| 25   a file. | 25   He told you this morning's testimony and I've |
| Page 129 | Page 130 |

| | |
|---|---|
| 1    responded formally to the requests. | 1   any of the New York or Texas Attorney General? |
| 2    BY MS. JENSEN | 2        MR. SCHNEIDER:  We've already produced |
| 3        Q.   So, Mr. Sorial, so you have a file on | 3   the documents and he's responded to this this |
| 4    Trump University? | 4   morning. |
| 5        MR. SCHNEIDER:  Okay.  He's just asked | 5        MS. JENSEN:  First of all, David, let me |
| 6    and answered that.  He just testified about | 6   finish my question. |
| 7    that. | 7        MR. SCHNEIDER:  Okay.  It's all been |
| 8    BY MS. JENSEN | 8   asked and answered.  So I'm going to instruct |
| 9        Q.   You -- so you're saying that you have a | 9   him not to answer it again. |
| 10   file.  Okay.  You have a file. | 10       You went through this this morning, |
| 11       Any documents concerning these -- these | 11   specifically this request.  He answered it.  I |
| 12   Florida, Illinois, and Maryland inquiries or | 12   told him we provided a response.  We did. |
| 13   complaints? | 13   We've objected to it. |
| 14       MR. SCHNEIDER:  Everything's being | 14       MS. JENSEN:  I -- I'm asking him. |
| 15   produced, and you've gone through them today. | 15       MR. SCHNEIDER:  So this is the third |
| 16   BY MS. JENSEN | 16   time -- |
| 17       Q.   Any other documents? | 17       MS. JENSEN:  No. |
| 18       A.   I haven't reviewed the file. | 18       MR. SCHNEIDER:  -- you're going through |
| 19       Q.   All in the file.  Okay. | 19   it. |
| 20       Is that correct? | 20       MS. JENSEN:  No. |
| 21       MS. ZELDES:  He hasn't. | 21       MR. SCHNEIDER:  No.  He's not going to |
| 22   BY MS. JENSEN | 22   do it again. |
| 23       Q.   So you not -- oh, you have not reviewed | 23       MS. JENSEN:  Absolutely, I have not |
| 24   your file.  Okay. | 24   gotten -- gone through the document request to |
| 25       And then do you have any documents about | 25   see whether there are any documents there. |
| Page 131 | Page 132 |

33 (Pages 129 to 132)

Exhibit 130
- 952 -