# EXHIBIT 132

Exhibit 132
- 968 -

## The Trump Entrepreneur Initiative - All Complaints

| LastName | FirstName |
|---|---|
| Boutin | Bonita |
| Arroyave | Juliana |
| Benabib | Jack |
| Brown | Gloria |
| Andreu | Riguhey |
| Brozowski | Patricia |
| Leary | Myra |
| Mazo | Jeannine |
| LeClaire | Chris |
| Boguski | Robert |
| Savage | Terri |
| Clark | Marvin |
| Adams | Christina |
| Hamada | Cynthia |
| Patel | Devang |
| Krauss | Steve |
| LEARY | MYRA |
| Crail | Kimberly |
| Makaeff | Tarla |
| Mendez | Carmen |
| Raymond | William |
| Wells | James |
| andreev | krassin |
| Murrah | LTC Michael |
| Holcomb | Nelson |
| Munter | Deo |
| Jashnani | Girish |
| Tufenkian | Jeffrey |
| Henderson | Danielle |
| Thompson | Patricia |
| Gaudey | Carol |
| Page | Bettye |
| merriam | Walter |
| Durrani | Ali |
| Snyder | Debbie |
| Vidra | Joseph |
| lenihan | michael |
| Saigali | Antone |
| Brousseau | Lisa |
| Moore | Deneen |

| Address | Address 2 | City | State | Zip |
|---|---|---|---|---|
| 135 Shippeetown Rd. | | East Greenwich | RI | 2818 |
| 2556 CENTERGATE DR. | | Miramar | FL | 33025 |
| 3206 Calle Largo Dr | | Hollywood | FL | 33021 |
| 527 W Church Rd | | King Of Prussia | PA | 19406 |
| 908 ne 16th ave | | Fort Lauderdale | FL | 33304 |
| 15164 SW 13th place | | Sunrise | FL | 33326 |
| 125 S Dade | | Saint Louis | MO | 63135 |
| 2905 NW 25th Street | | Fort Worth | TX | 76106 |
| POB 1641 | | Marysville | WA | 98270 |
| 9725 Brewster Lane | | Keller | TX | 76248 |
| 809 Admiral Graverly Blvd | | Richmond | VA | 23225 |
| 809 Admiral Graverly Blvd | | Richmond | VA | 23225 |
| 4620 79th Ave Ct W | | University Place | WA | 98466 |
| 3214 Palos Verdes Court | | San Mateo | CA | 94403 |
| 5441 N East River Rd | | Chicago | IL | 60656 |
| 3435 Victor Avenue | | BROOKHAVEN | PA | 19015 |
| 125 S DADE | | Saint Louis | MO | 63135 |
| 285 Lowell Avenue | | FLORAL PARK | NY | 11001 |
| 3334 E Coast Hwy #423 | | CORONA DEL MAR | CA | 92625 |
| 2291 Utica Avenue | | BROOKLYN | NY | 11234 |
| 4516 Harwood Rd | | COLORADO SPRINGS | CO | 80906 |
| #2090 | 875 E Silverado Ranch Blvd | Las Vegas | - | 89183 |
| 3127 Atutumnjoy dr | | PEARLAND | TX | 77584 |
| 112 Mill Walk Court | | MADISON | AL | 35758 |
| 1433 Alma St | | PALO ALTO | CA | 94301 |
| 44 South Hawes Rd C-21 | | MESA | AZ | 85208 |
| 4962 Cappy Terrace | | New York | NY | 10022 |
| PO Box 97 | | Portland | OR | 97207 |
| 7137 E. Inglewood St. | | MESA | AZ | 85207 |
| 2644 Legends Way | | ELLICOTT CITY | MD | 21042 |
| 45-520 Puoni Place | | KANEOHE | HI | 96744 |
| 900 Andover Green | | LEXINGTON | KY | 40509 |
| 24001 muirlands #400 | | LAKE FOREST | CA | 92630 |
| 1508 Jetty Drive | | Richmond | CA | 94804 |
| 5836 E Fountain St | | MESA | AZ | 85205 |
| 510 Lincoln Avenue | | SPRINGDALE | PA | 15144 |
| 30 hyatt ave | | YONKERS | NY | 10704 |
| Po Box 641902 | | Los Angeles | CA | 90064 |
| 5806 W. Milada Dr | | LAVEEN | AZ | 85339 |
| 240 West 65th Street | Apt# 16 B | New York | NY | 0.1002 |

| Phone | Email | Cmpl ID | OpenDate | CloseDate |
|---|---|---|---|---|
| (401) 241-7320 | bonitag22@gmail.com | L780409 | 2/4/2008 | 3/4/2008 |
| (727) 688-1522 | julyarroyave@gmail.com | L782886 | 2/18/2008 | 3/4/2008 |
| (954) 962-6202 | jbenabib@bellsouth.net | L784071 | 2/25/2008 | 3/28/2008 |
| (610) 265-3466 | gdevabrown@aol.com | L784028 | 2/25/2008 | 4/9/2008 |
| (954) 319-3697 | riguheyandreu@comcast.net | L782722 | 2/17/2008 | 4/22/2008 |
| (954) 382-1502 | annabellesasha@yahoo.com | L785301 | 3/3/2008 | 5/5/2008 |
| | MYRA_DALLAS@YAHOO.COM | L792543 | 4/13/2008 | 6/16/2008 |
| (817) 500-8298 | jjmtm@yahoo.com | L808105 | 7/9/2008 | 7/15/2008 |
| (425) 772-1641 | ChrisLeClaire@hotmail.com | L818566 | 9/4/2008 | 9/25/2008 |
| (817) 395-2477 | robertboguski@yahoo.com | L819431 | 9/10/2008 | 10/24/2008 |
| (804) 674-3046 | terri.savage@vadoc.virginia.gov | L832931 | 12/4/2008 | 12/11/2008 |
| (804) 253-5034 | terri.savage@vadoc.virginia.gov | L832925 | 12/4/2008 | 12/30/2008 |
| (360) 286-9194 | yahcleel@yahoo.com | L842681 | 1/30/2009 | 2/10/2009 |
| (415) 225-0704 | cynthiahamada@gmail.com | L844732 | 2/11/2009 | 4/1/2009 |
| (630) 698-3674 | dvangstr@hotmail.com | L815456 | 8/15/2008 | 5/7/2009 |
| (215) 694-1289 | sjkts@hotmail.com | 7961204 | 8/18/2009 | 4/6/2010 |
| | MYRA_DALLAS@YAHOO.COM | 7972216 | 8/31/2009 | 9/11/2009 |
| (516) 216-1784 | kcrail@hotmail.com | 7986655 | 9/17/2009 | 5/26/2010 |
| (949) 387-8430 | tmakaeff@gmail.com | 7992638 | 9/24/2009 | 3/4/2010 |
| (347) 866-3580 | C_mendez09@verizon.net | 8012784 | 10/20/2009 | 11/5/2009 |
| (719) 459-4443 | billyr32@netzero.net | 8016366 | 10/25/2009 | 12/21/2009 |
| (702) 544-1958 | jwells@pivotalport.com | 8021284 | 10/30/2009 | 12/10/2009 |
| (281) 509-7439 | vessius@yahoo.com | 8071014 | 1/5/2010 | 5/12/2010 |
| (256) 289-1398 | murrahlr@yahoo.com | 8095726 | 2/4/2010 | 2/9/2010 |
| (650) 223-4757 | rob.holcomb@gmail.com | 8122007 | 3/3/2010 | 4/23/2010 |
| (480) 510-4111 | deomunter@yahoo.com | 8133541 | 11/1/2010 | 11/2/2010 |
| | jashnani18@gmail.com | 8168031 | 4/26/2010 | 2/7/2008 |
| (503) 954-1691 | jeffrey_tufenkian@yahoo.com | 8188318 | 7/6/2011 | 7/8/2011 |
| (480) 241-1304 | daniellehenderson@gmail.com | 8196808 | 11/18/2010 | 12/7/2010 |
| (410) 461-5949 | aprilpat@mac.com | 8199535 | 12/2/2010 | 12/3/2010 |
| (808) 247-3049 | caroleyan2002@yahoo.com | 8284277 | 9/4/2010 | 11/19/2010 |
| (859) 396-8763 | bettyepage@yahoo.com | 8358147 | 9/29/2010 | 11/19/2010 |
| (760) 908-7759 | bonniesonshine@gmail.com | 8362750 | 10/5/2010 | 12/13/2010 |
| | aadurrani@gmail.com | 8374751 | 10/19/2010 | 10/26/2010 |
| (602) 228-8391 | djsnyder@cox.net | 8394218 | 11/8/2010 | 5/16/2011 |
| (412) 953-0490 | jaedot@verizon.net | 8405145 | 11/16/2010 | 2/24/2011 |
| (914) 433-4273 | landmconstruction@live.com | 8490945 | 2/4/2011 | 4/6/2011 |
| | TESANC@verizon.net | 8565461 | 5/6/2011 | 7/14/2011 |
| (561) 762-5963 | gypsyrn@ymail.com | 8572703 | 4/20/2011 | 5/27/2011 |
| (973) 652-6570 x | DeeCeeMoore@Hotmail.com | 8606058 | 5/20/2011 | 6/9/2011 |

| Closed As | CloseCode | Nature | DollarValue |
|---|---|---|---|
| Resolved | 110 | Refund / Exchange Issues | |
| Resolved | 110 | Delivery Issues | |
| Information Only | 600 | Advertising Issues | |
| Administratively Judged Resolved | 121 | Refund / Exchange Issues | |
| Invalid | 999 | Advertising Issues | |
| Invalid | 999 | Service Issues | |
| Invalid | 999 | Advertising Issues | |
| Resolved | 110 | Customer Service Issues | |
| Resolved | 110 | Contract Issues | |
| Administratively Judged Resolved | 121 | Refund / Exchange Issues | |
| Beyond Purview | 500 | Contract Issues | |
| Administratively Judged Resolved | 121 | Contract Issues | |
| Beyond Purview | 500 | Refund / Exchange Issues | |
| Assumed Resolved | 111 | Contract Issues | |
| Assumed Resolved | 111 | Refund / Exchange Issues | |
| Assumed Resolved | 111 | Service Issues | |
| Invalid | 999 | Billing or Collection Issues | |
| Assumed Resolved | 111 | Refund / Exchange Issues | |
| Disputed | 122 | Refund / Exchange Issues | |
| Information Only | 600 | Service Issues | |
| Invalid | 999 | Refund / Exchange Issues | |
| Resolved | 110 | Refund / Exchange Issues | |
| Assumed Resolved | 111 | Advertising Issues | |
| Invalid | 999 | Sales Issues | |
| Assumed Resolved | 111 | Refund / Exchange Issues | |
| Resolved | 110 | Contract Issues | |
| Resolved | 110 | Refund / Exchange Issues | |
| Unresolved | 120 | Contract Issues | |
| Assumed Resolved | 111 | Refund / Exchange Issues | |
| Resolved | 110 | Product Issues | |
| Resolved | 110 | Refund / Exchange Issues | |
| Resolved | 110 | Refund / Exchange Issues | |
| Assumed Resolved | 111 | Service Issues | |
| Resolved | 110 | Refund / Exchange Issuesa | |
| Assumed Resolved | 111 | Refund / Exchange Issues | |
| Resolved | 110 | Product Issues | |
| Administratively Judged Resolved | 121 | Product Issues | |
| Unresolved | 120 | Advertising Issues | |
| Assumed Resolved | 111 | Sales Issues | |
| Assumed Resolved | 111 | Advertising Issues | |

BBB NY 00484

Exhibit 132
- 972 -

| Business ID |
| --- |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |
| 97075 |

# EXHIBIT 135

Exhibit 135
- 986 -

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3      _____

                                        )
4      TARLA MAKAEFF, BRANDON KELLER,   )
       ED OBERKROM, and PATRICIA MURPHY,)
5      on Behalf of Themselves and All  )
       Others Similarly Situated,       )
6                                        )
                Plaintiffs,             ) Case No.
7                                        ) 10 CV 0940 CAB (WVG)
            vs.                         )
8                                        )
       TRUMP UNIVERSITY, LLC, (aka Trump )
9      Entrepreneur Initiative) a New   )
       York Limited Liability Company,  )
10     DONALD J. TRUMP, and DOES 1      )
       through 50, inclusive,           )
11                                       )
                Defendants.             )
12     _____)

13

14

15          Videotaped Deposition of Joann Everett

16          taken at 655 West Broadway, Suite 1900,

17          San Diego, California, commencing at

18          9:31 a.m., on Wednesday, October 3, 2012,

19          before Kimberly S. Thrall, RPR, CSR No. 11594.

20

21

22

23

24     Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594

25              Job No. 54027

Exhibit 135
- 987 -

## Page 206

1    A.  Not in that -- in that term.  I -- we had
2  continued talking.  I was bringing up objections to how
3  I think he could help me in Tampa and exactly what the
4  plan would be and --
5    Q.  I'm sorry.  Did you say suggestions --
6    A.  We never formalized it.
7    Q.  -- or objections?  You were bringing up what?
8  I think you said --
9         MS. JENSEN:  She said, "Object-" --
10  BY MR. SCHNEIDER:
11    Q.  -- you were bringing up objections.
12         MS. JENSEN:  She said, "Objections."
13  BY MR. SCHNEIDER:
14    Q.  Did you mean suggestions how he could help you?
15    A.  Well --
16         MS. JENSEN:  Her testimony is her testimony,
17  Counsel.
18         THE WITNESS:  Yeah.
19         MR. SCHNEIDER:  Rachel, just make an objection.
20  BY MR. SCHNEIDER:
21    Q.  What -- what word were you trying to use?
22    A.  I was concerned that he could use what he was
23  using in Orlando and transfer it to Tampa in three days
24  and make any headway with finding properties, because I
25  had been looking for properties there and, you know,

## Page 207

1  doing some work previously in attempting to get this
2  thing off the ground, and I did not feel that he knew
3  much more than I did about locating a property.
4         And I didn't have any investors lined up.  He
5  didn't have any investors lined up.  So, you know, what
6  are you going to do?  How can you flip a property, you
7  know, in three days?  So I wasn't making headways on
8  steps to get to that point, and the way they would be --
9  I -- I planned on working with him, but after he told me
10  that the organization was collapsing, I pulled the plug
11  then.
12    Q.  Okay.  So until Troy Peterson told you that the
13  organization was collapsing, it was your intention to
14  continue to work with him?
15         MS. ECK:  Objection.  Misstates the witness's
16  testimony.
17  BY MR. SCHNEIDER:
18    Q.  Is that correct?
19         THE WITNESS:  I was having questions if -- how
20  effective it could be.  You know, it was 25,000.  I said
21  just take the 25,000 out of there and just not have any
22  mentor at all, you know, by -- by the time I got done
23  with it, so . . .
24  BY MR. SCHNEIDER:
25    Q.  Okay.  That's -- that's not my question.  Until

## Page 208

1  the time that Troy Peterson told you that
2  Trump University was collapsing, was it your intention
3  to continue on working with Troy --
4    A.  I don't know exactly what my intention was.
5         MS. ECK:  Objection.  Asked and answered.
6         THE WITNESS:  Yeah.  But --
7  BY MR. SCHNEIDER:
8    Q.  So you had not made a decision as to whether or
9  not you were going to continue --
10    A.  I had not.  I asked questions before then, and
11  I was becoming concerned about what we could accomplish
12  in that period of time, which is the basis of the whole
13  misrepresentation that I'm talking about.  The
14  infrastructure was not put in place by Trump University
15  and Donald Trump to make this an easy or a attainable
16  goal.  And the more I spoke with the mentors, the more
17  obvious this became to me, this is not going to work --
18    Q.  Okay.  What --
19    A.  -- in three days.
20    Q.  What -- well, what was -- what were you
21  expecting to work in three days?
22    A.  Well, the way -- I wish I would have thought of
23  that when I signed this.  I wouldn't have signed the --
24  the agreement.  I was led to believe that the experts
25  could come in and, you know, get started.  First of all,

## Page 209

1  you'd do some legwork at the beginning, get started, and
2  then have the year's support and work through the
3  various issues.
4         But they didn't have -- and I didn't know at
5  the time; I wasn't in real estate -- a title company
6  that was knowledgeable on flipping, because there's a
7  special technique that goes along with that.  You need
8  the investors.  I was shooting craps on that.  I didn't
9  have testimonials that I had been working with investors
10  like Troy had.  So I was not getting anywhere on that.
11         The investor clubs were down because of the
12  state of the real estate.  And the one that I did
13  attend, you know, there were no investors willing to buy
14  my properties.  They were actually doing the same thing
15  that I was doing, which was trying to locate properties.
16  So the steps that leading up to the program, they
17  weren't panning out.  So to pay 25,000 for a person to
18  come over for three days and do what?
19    Q.  The -- but the -- the fact is, is that you
20  don't know because you never went to the three days,
21  correct?
22    A.  I never went to the three days because there
23  wasn't sufficient information to know that I was -- I
24  could figure this out, that I couldn't make progress in
25  three days.  It would take much longer time than that.

Exhibit 135
- 988 -

Page 210

1   So to come over -- and then I -- I asked him one time
2   just out of curiosity, can you split the three days?
3   You know, can you do a day here and -- no, no, no, it
4   has to be all in three days.
5         So you have to come in, three days, crash, do
6   whatever you want to do, and attempt to buy a property
7   during that time.  Well, I haven't found a property.  I
8   haven't found an investor.  Two things you need to make
9   this work.
10      Q.   All right.  So you decided that you did not
11  want to spend three days with Troy Peterson for the
12  in-person mentorship, correct?
13      A.   I made that decision after I found out that the
14  organization was falling apart.  I -- I don't know what
15  term you want to use, but they were having difficulties.
16  And it was becoming apparent that people were going to
17  be laid off, and they were attempting in my opinion to
18  service and -- Troy told me this, to service the
19  contracts that are in place.
20        So what their game plan is now is to service
21  the contracts.  The year's support -- you know, because
22  my year was running out anyway, you know, there's not
23  going to be a support staff --
24      Q.   Okay.  Troy Peterson --
25      A.   -- and have a --

Page 211

1       Q.   Troy Peterson told you that Trump University
2   intended to continue servicing the people that had
3   purchased services, correct?
4       A.   Minimal service for this, you know, get your
5   three-day mentorship.  He said you need to get it in now
6   because it's going to be too late.
7       Q.   Okay.  And he offered to do that to you -- for
8   you, right, to give you the three-day, in-field --
9       A.   Yes.
10      Q.   -- in-person?
11        And you turned him down?
12      A.   Because there wasn't -- it didn't have the --
13  the -- a mentorship meant that you were going to look at
14  real estate and talk to an investor.  You can't do that
15  in three days if you haven't done that previously.
16  That's why I turned him down.
17        There was no way to accomplish anything in
18  three days.  I know how to write a contract.  I knew
19  everything he could tell me about doing the deal.  The
20  deal there was finding the -- getting the infrastructure
21  in place, finding the properties, getting an investor in
22  order to carry out the -- transaction.
23      Q.   All right.  So as a -- as a real estate person,
24  you already knew how to write a contract?
25      A.   I knew all -- I know all the -- you know, I

Page 212

1   passed all the tests, of course.
2       Q.   All right.  So didn't need help with writing
3   the contracts?
4       A.   No.
5       Q.   That wasn't an important part of the --
6       A.   No.
7       Q.   -- program for you, was it?
8       A.   No.
9       MS. ECK:  I think we've been going almost an
10  hour.  Could we take a break?  Are you almost done with
11  this line of questioning?
12      MR. SCHNEIDER:  We can take a break.
13      MS. ECK:  Okay.  Let's take a quick break.
14      THE VIDEOGRAPHER:  Off the record at 2:27 p.m.
15  (Recess.)
16      THE VIDEOGRAPHER:  We are back on the record at
17  2:52 p.m., and this marks the beginning of Tape 3.
18  BY MR. SCHNEIDER:
19      Q.   Ms. Everett, as part of the three-day, $1,500
20  workshop, were you advised that that $1,500 would
21  include a -- phone number that if you had questions or
22  needed help with things, you'd have a support -- you'd
23  have some support or customer service?
24      A.   For the three-day program --
25      Q.   Right.

Page 213

1       A.   -- that I signed up, that I really didn't use
2   other than the first two portions?
3       Q.   No, no.
4       A.   For the -- for the one year?
5       Q.   The $1,500 was the three-day Profit from Real
6   Estate workshop --
7       A.   Yeah.
8       Q.   -- you went to?
9       A.   Yeah.
10      Q.   Okay.  So for 1,495, you got the three-day
11  workshop, right?
12      A.   Right.
13      Q.   All right.  And was there any representation or
14  promise that you'd also have some kind of support for a
15  year or an 800 number to call if you had questions, that
16  sort of thing?
17      A.   As I recall, we didn't concentrate on the year
18  program with the three-day session.  And my impression,
19  even though I'm now looking at the contract and said
20  there was a year of support, I had never really absorbed
21  that for the three-day program.
22      Q.   All right.  So is that --
23      A.   So I don't remember a number being used as
24  being even appropriate at that time.
25      Q.   All right.  So is it accurate that your -- your

Page 214

1  recollection of the $1,495 program was that it was just
2  the three-day weekend?
3      A.  It was a three-day weekend to start that.  Then
4  I was -- I would have reviewed, you know, exactly what
5  was involved with it.  But in my mind, it was that
6  session.  And out of there, one would be able to start
7  the program, you know, sufficient detail.
8      Q.  All right.  And as I understand it, you didn't
9  actually start the program after the three days because
10 you immediately went into the Gold Elite program?
11     A.  I went into the Gold Elite.
12     Q.  Right.
13     A.  So I didn't -- and that's -- in my mind, I
14 don't remember those details.  I may have at that time,
15 but I don't because I went into the Elite program, which
16 superceded that.
17     Q.  As part of the Gold Elite program, were you
18 told that you would have a year's worth of support
19 available for you?
20     A.  Yes.
21     Q.  At any time did you attempt to seek support
22 and it was not provided for you?
23     A.  Seek support in what fashion?
24     Q.  Well, what did you understand the support would
25 be?  Actually, let me --

Page 215

1      A.  Once I started a transaction --
2      Q.  Let me -- let me withdraw the question.
3          What were you told the support would be?  What
4  was the representation?
5      A.  The representation is that we would select a
6  technique.  You'd have the mentor that would work with
7  you for that technique for three days, and you would
8  have a year's support from the University staff, the
9  handpicked experts.  It doesn't have to be one
10 individual.  It could be any number of individuals.
11 They're all knowledgeable and experts in the business.
12 And that one-year program, you would have access to
13 these individuals if you -- if you had any questions.
14     Q.  All right.  So --
15     A.  Now, most of the questions are going to occur
16 once you get started on the program.  That is, after you
17 started doing the transaction itself, one would have
18 more questions than what if --
19     Q.  All right.  So --
20     A.  -- prior to it.
21     Q.  So that's really where I'm going with this,
22 Ms. Everett, is I -- I'm trying to find out if you used
23 any of that one-year of support.  And you may have
24 answered it, that you would have anticipated using it
25 after you went to the three-day in-person mentorship,

Page 216

1  which you never did.  Is that fair?
2      A.  In my view, that is when I would have more
3  questions than hypothetical questions before the
4  transaction occurred.
5      Q.  Okay.  So --
6      A.  That's how I think of it today.
7      Q.  All right.  Now, so that's how you had it in
8  your mind at the time?
9      A.  That's how I have it --
10     Q.  All right.
11     A.  -- had it in my mind, so --
12     Q.  Okay.  So let me convert it back from what was
13 in your mind to what you actually may have ever tried to
14 do.  All right.
15         This question is whether or not you ever tried
16 to -- to get support from Troy Peterson or from any of
17 the other staff or experts or individuals at
18 Trump University and it was not available to you.  In
19 other words, you called somebody and said I have a
20 question about how to do this -- this flip, and they
21 said we're not going to help you with that, or you
22 called and said I need some forms and -- and someone
23 from Trump University said we're not going to assist you
24 with that.
25         I'm trying to find out if anything like that

Page 217

1  ever happened, where you looked for assistance and it
2  wasn't provided?
3      A.  Well, I tried to called Gerald Martin on the
4  session that he set up that he promised that I would be
5  part of once a month or once a week -- let's say once a
6  month.  And he said I'm talking to people around the
7  nation; you're not included in the session.  So that was
8  one time that I was not given --
9      Q.  Now, what do you mean you're not included in
10 the session?
11     A.  I wasn't included in the -- in the conference
12 call.  It's like those people were paying him a
13 special -- a consulting fee in order to participate in
14 it.  That's the impression that I had.  I don't know
15 that for a fact.  You'd have to ask him.
16     Q.  Okay.  So what was it that you were trying to
17 join with Mr. Martin?
18     A.  A investor -- circle of investors with
19 questions and techniques and discussing transactions.
20     Q.  All right.  And when did this occur?  In --
21     A.  October 27th was the first call.  He talked to
22 me like he didn't know who I was.  And we terminated the
23 contact, and I was never -- so I was turned down at that
24 time.
25     Q.  All right.  So this is right after you

Exhibit 135
- 990 -

Page 270

1  that's kind of regional.
2  Q.  Right.  But the process in which you evaluated
3  the properties, was that process --
4  A.  Not -- we never got a detailed process out.
5  MS. ECK:  Hold on a second, Ms. Everett.  Let
6  him finish his --
7  THE WITNESS:  I'm sorry.
8  MS. ECK:  -- question before you answer,
9  please.  Thank you.
10  BY MR. SCHNEIDER:
11  Q.  Here's what I'm trying to understand:  When you
12  were calling these properties, you were using criteria
13  to evaluate whether or not these properties might be
14  something that you want to invest in, correct?
15  A.  Uh-huh.
16  MS. ECK:  You need to answer yes or no.
17  THE WITNESS:  Yes.
18  BY MR. SCHNEIDER:
19  Q.  Okay.  Was the criteria all developed by you,
20  or was the criteria that you were using to evaluate the
21  properties all developed by Trump University, or was it
22  a combination?
23  A.  It could be a combination.  It was more or less
24  common sense by looking at the market and evaluating the
25  situation.

Page 271

1  Q.  Any information that you were using from
2  Trump University, did that come from the three-day
3  workshop that you attended?
4  A.  In very general terms, it -- it could have, but
5  not specifics.
6  Q.  All right.  If you'll look on the fourth page.
7  MS. ECK:  Oh.  Was there anything else on this
8  page that was inaccurate?
9  THE WITNESS:  Well, on the November 16th,
10  2009 --
11  MS. ECK:  That'll be at page TU-72071.
12  THE WITNESS:  It said, "Student is doing well
13  and" -- see, this is some of the background information.
14  I was -- no one ever conferred with me that they were in
15  touch with anyone and assigned Biglane, so it's -- I
16  mean, I -- I don't know what doing well is.  I hadn't
17  done really very much at that time, so . . .
18  BY MR. SCHNEIDER:
19  Q.  All right.  If you'll look on the fourth page
20  under "Tickets," there's a big paragraph right in the
21  middle.
22  A.  Uh-huh.
23  Q.  And it has Mark Covais, February 11, at
24  1:07 p.m.
25  A.  Uh-huh.

Page 272

1  Q.  Is -- is this the verbatim text of an e-mail
2  that you sent to Trump University?
3  A.  I'd have to verify it.  It sounds very similar.
4  Q.  Anything in there that looks like you didn't
5  write it?
6  A.  Not at -- not offhand.  It looks sufficiently
7  close to what I remember.
8  Q.  All right.  If you look towards the bottom of
9  this paragraph that starts:  "Mark Covais is still
10  attempting to."  Do you see that sentence?  It's about
11  six or seven lines up from the bottom.
12  A.  Yes.
13  Q.  "Mark Covais is still attempting to scam
14  individuals knowing there is a class action suit against
15  Trump."
16  A.  That was the point that I would say that I
17  found out obviously about the class action.  And I
18  found -- I'm just checking my notes now.  It was
19  September when I actually officialized the participation
20  in the class action.  I had --
21  MS. ECK:  Of what year?
22  THE WITNESS:  Of 2011.
23  And I had been reading other things on the --
24  online in addition to finding out the class action on
25  the situation at Trump.

Page 273

1  BY MR. SCHNEIDER:
2  Q.  So you were --
3  A.  That they thought it was going under and all of
4  that.  It wasn't just -- Peterson had -- had alluded to
5  that fact, but I was reading online at the time in
6  various posts that the Trump organization was in serious
7  trouble.
8  Q.  All right.  At the time that you wrote this,
9  you were aware of the lawsuit, right, obviously?
10  A.  Yeah.  Obviously, I was.
11  Q.  All right.  And --
12  A.  Yeah.
13  Q.  Did you see online any posts that advised
14  people about how to get their money back?
15  A.  There were several people that were successful
16  in getting it back, but they had started early on from
17  what I remember.  I don't remember the -- all the
18  specifics, but some were getting refunds with -- by
19  getting an attorney.  I remember one specific that said
20  it was well worth it.  But the -- the fact that the
21  president had left and things -- I was reading all
22  kinds -- that there were all kinds of notes on -- on
23  Trump at that particular time.
24  Q.  Mark Covais and Troy Peterson both told you
25  that Trump University was committed to fulfilling its

Exhibit 135
- 991 -

## Page 274

1    existing contracts, correct?
2        MS. ECK:  Objection.  Misstates the witness's
3    testimony.
4        THE WITNESS:  Yeah.  The -- from what I
5    remember Troy Peterson saying is they're going to
6    attempt to service the contracts, but the support and
7    all the infrastructure is gone.  They were going to do
8    the three-day -- what it was implied to me, we'll do the
9    three-day and then you're kind of on your own because
10   the organization is no longer going to be there, the --
11   as we knew -- as I knew it when I signed up.
12   BY MR. SCHNEIDER:
13       Q.  Did Troy Peterson say that he wouldn't be there
14   for you?
15       A.  I don't remember.
16       Q.  If you look on the next page, this is part of
17   an e-mail from you dated February 11 at 11:25 in the
18   morning.
19       A.  Uh-huh.
20       Q.  So it looks like on -- on February 11th, if you
21   look at the bottom of this section on "Tickets" --
22       A.  Uh-huh.
23       Q.  -- you sent a feedback comment at 1:11 p.m.,
24   and then on the same day you sent an e-mail at
25   2:18 p.m., and then on the same day you sent this letter

## Page 275

1    at 1:07 p.m; is that right?
2        MS. ECK:  Objection.  The document speaks for
3    itself, to the extent that it's accurate.
4    BY MR. SCHNEIDER:
5        Q.  Well, that's what I'm asking you.  Is that
6    accurate, that on the 11th of February, it looks like
7    you communicated at 1:07, 1:11, 2:18 with
8    Trump University?  Were you firing off e-mails and --
9    and feedback comments in rapid succession over a short
10   period of time?
11       A.  I -- well, I sent three e-mails.  I don't know
12   if rapid -- if it's -- this is the first e-mail.  This
13   is the second.  Where's the third one, or it's not in
14   here?
15       Q.  The top one at 1:07.
16       A.  Yeah.  I've got that one.
17       Q.  The e-mail from -- the e-mail from student at
18   2:18.  So one's at 1:07.  You sent another one at 2:18.
19       A.  Yeah.  Okay.  That one's here.
20       Q.  And then you created a feedback comment online
21   at 1:11.
22       MS. ECK:  What's a --
23       THE WITNESS:  What's a feedback?
24       MS. ECK:  Yeah.
25       THE WITNESS:  What is a feedback comment?

## Page 276

1    BY MR. SCHNEIDER:
2        Q.  Did you do anything online at 1:11?
3        A.  I -- don't know what that is.  I have no
4    knowledge of that.
5        Q.  How did you send these to the Trump University
6    organization?
7        A.  I sent the e-mails to either -- this one to
8    Mark Covais directly.  I don't have any feedback or --
9        Q.  All right.  Did you send two e-mails to him
10   that day?
11       A.  Yes.
12       Q.  Okay.
13       A.  According to this, I did, yes.  And I agree
14   with that.
15       Q.  Okay.  And the second e-mail on this -- on this
16   next page where it says -- it -- it starts at the very
17   top with the word "Support."
18       Do you have the right page?  It's right above
19   the line that says --
20       A.  Oh, yes, yes.  I got it.
21       Q.  Okay.  So if you look at the middle of this
22   page, it says, "You have permitted a contractor,
23   Troy Peterson, to manage my account."
24       What did you mean by that?
25       A.  Well, that it wasn't -- that he was working

## Page 277

1    independent and not with the Trump organization as a --
2    as a whole.  It was -- it was turned over to him to
3    manage and -- and work with me without other support.
4        Q.  Okay.  What's that --
5        A.  That's how I interpret it now.
6        Q.  What is that based on, that he didn't have any
7    support and he was managing your account?
8        A.  Because he was my only contact.  And when you'd
9    call the New York office, they -- they really didn't
10   have any information.  I mean, I wasn't -- I wasn't
11   working directly with them.
12       Q.  Okay.  This is -- this is quite a bit after you
13   decided that you weren't going to work with
14   Troy Peterson, isn't it?  This is February of 2011.
15       A.  This is about the time that -- that based on my
16   search of the Internet, that I found out they were in
17   deep trouble.  They had been -- they -- you know, they
18   changed their name.  They had a bad rating.  They had
19   people complaining all over the nation.
20       And so what I put here isn't -- it's just my
21   thoughts for the day.  I was upset.  I felt they were --
22   they had misrepresented themselves.  When you think of a
23   university like the University of Florida, you don't
24   think it's going to be around for two years and then
25   collapse where half the employees are gone or the

Exhibit 135
- 992 -

Page 278

1  president miss- -- is missing and things of that nature.
2  So I was upset about the -- I thought it was total
3  misrepresentation. This is a long-term company. It's
4  not a two-year company.
5      Q.  All right. Well, let's -- let's back up.
6  You -- you purchased the Gold Elite program in what
7  year?
8      A.  '09, and it started in '010 -- in '10.
9      Q.  Okay. So the one year -- had you started your
10 program in January of --
11     A.  Uh-huh.
12     Q.  -- of 2010 --
13     A.  Uh-huh.
14     Q.  -- you would have basically been done by
15 January of 2011, correct?
16     A.  Yeah. But you think the organization is still
17 available. There is some follow-up.
18     Q.  Okay. As far as what your contract was for,
19 the one year would have been over by January of 2011,
20 right?
21     A.  Yes.
22     Q.  All right. And you were offered Troy Peterson
23 back in the summer of 2010, right?
24     A.  Uh-huh.
25     Q.  You have to answer audibly.

Page 279

1      A.  Or the fall or something, yeah.
2      Q.  Okay. So when you're complaining about
3  Troy Peterson managing your account in February, that's
4  six or eight months later. You haven't done anything
5  with Trump University for at least a half year, correct?
6      MS. ECK:  Objection. Misstates the --
7      THE WITNESS:  I -- I don't remember when --
8      MS. ECK:  -- witness's testimony.
9      THE WITNESS:  Yeah.
10 BY MR. SCHNEIDER:
11     Q.  Okay. Well, let's -- let's get the chronology.
12 You told Troy Peterson that you didn't want to work with
13 him, and you told Trump University you didn't want to
14 work with Troy Peterson, correct?
15     A.  I explained when the org- -- when I felt based
16 on e-mails, website searches, and so forth, that the
17 organization as I knew it when I signed up was not going
18 to be there on a long-term basis for additional services
19 that maybe one could sign up for, I was upset.
20         And at that time, to try to work with a -- a
21 investor or a mentor for three days and then disappear
22 off the face of the earth, I didn't think it was worth
23 it.
24     Q.  Okay. Now, what --
25     A.  I didn't think I could accomplish anything out

Page 280

1  of it.
2      Q.  Okay. There's -- there's two points to this I
3  want to cover: When these events actually occurred and
4  what information you have that Troy Peterson was going
5  to fall off the face -- face of the earth. Okay. So
6  let's start with the second one.
7         What information do you have from Troy Peterson
8  or anybody that he was going to fall off the face of the
9  earth?
10     A.  This was an assumption that I made on my
11 behalf. This is just an e-mail that I'm writing. I --
12 I don't know if I can back up every statement in there.
13 I was upset. I just wrote it, my opinion at that time.
14     Q.  All right. Now --
15     A.  I don't know where I got all this information
16 other than reading the -- all the information online.
17 At that time I was searching heavily. That's when I
18 found out about the class action and found out all the
19 problems they were having --
20     Q.  All right. So what I want to --
21     A.  -- and and --
22     Q.  -- focus on is when you stopped working with
23 Troy Peterson. That was in 2010, correct?
24     A.  Yes.
25     Q.  All right. So some period of months, maybe a

Page 281

1  half a year goes by where you have no contact with
2  Trump University before you initiate these series of
3  e-mails in February of 2011, correct?
4      A.  I don't know if I had no contact with them.
5  Based on the log, the -- the main contact I had after
6  Mahoney was with Troy Peterson. I'd have to look
7  through the -- the exact dates.
8      Q.  So from these notes in the file, you're
9  communicating with Trump University in March of 2010?
10     A.  Right.
11     Q.  You have some communication with Biglane in May
12 of 2010?
13     A.  Okay.
14     Q.  And then you start with Troy Peterson to be
15 your mentor?
16     A.  Yes. Now, this would be around --
17     Q.  But just -- let me just finish, ma'am.
18     A.  Okay.
19     Q.  And you said that that went on for a -- a few
20 months, for a couple of months with Mr. Peterson, right?
21     A.  Right.
22     Q.  So by the end of summer -- or by early fall,
23 you decided you weren't going to work with Mr. Peterson,
24 correct?
25     A.  I don't remember when I decided that.

Exhibit 135
- 993 -