1   ROBBINS GELLER RUDMAN
        & DOWD LLP
2   RACHEL L. JENSEN (211456)
    rjensen@rgrdlaw.com
3   THOMAS R. MERRICK (177987)
    tmerrick@rgrdlaw.com
4   655 West Broadway, Suite 1900
    San Diego, CA  92101
5   Telephone:  619/231-1058
    619/231-7423 (fax)
6
    ZELDES & HAEGGQUIST, LLP
7   AMBER L. ECK (177882)
    ambere@zhlaw.com
8   HELEN I. ZELDES (220051)
    helenz@zhlaw.com
9   ALREEN HAEGGQUIST (221858)
    alreenh@zhlaw.com
10  AARON M. OLSEN (259923)
    aarono@zhlaw.com
11  625 Broadway, Suite 906
    San Diego, CA  92101
12  Telephone:  619/342-8000
    619/342-7878 (fax)
13
    Attorneys for Plaintiffs and Proposed Class

14

UNITED STATES DISTRICT COURT

15

SOUTHERN DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated, | No. 3:10-cv-00940-GPC(WVG) |
| Plaintiffs, | CLASS ACTION |
| vs. | PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO STRIKE DEFENDANTS' DECLARATIONS |
| TRUMP UNIVERSITY, LLC, et al., | |
| Defendants. | JUDGE:   Hon. Gonzalo P. Curiel<br>DATE:    June 28, 2013<br>TIME:    1:30 p.m.<br>CTRM:    9 (Schwartz) |

**REDACTED**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   DECLARATIONS OF CERTAIN EMPLOYEES SHOULD BE STRICKEN
      FOR LACK OF PERSONAL KNOWLEDGE AND AS MISLEADING .......................1

      A.    George Sorial's Declaration Should Be Stricken for Lacking Personal
            Knowledge, Misstating the Facts and Misleading the Court .............................2

            1.    Personal Knowledge of Facts ...................................................................2

            2.    NYSED Investigation ...............................................................................3

            3.    Attorney Generals' Investigations ...........................................................5

            4.    Better Business Bureau ("BBB") Investigations ....................................6

      B.    Portions of Michael Sexton's Declaration Should Be Stricken for Lack of
            Veracity and Personal Knowledge ....................................................................6

            1.    Paragraph 16: The Play Book ...................................................................6

            2.    Paragraphs 17 and 18: Scripts and PowerPoints Were Standardized .........7

            3.    Paragraph 6: Live Events Were Not an "Extension" of The Online
                  "Courses" .................................................................................................9

            4.    Paragraphs 4 and 5: Picking Instructors .................................................9

            5.    Paragraph 7: Form Contracts ................................................................10

            6.    Paragraph 10: Goals Sheet (aka Student Profile Sheets) ........................11

            7.    Paragraph 11: Refunds ..........................................................................12

            8.    Paragraph 12: Advertising Campaign ....................................................12

            9.    Paragraph 14: Mentorships ...................................................................14

            10.   Paragraph 15: Donald J. Trump Video ..................................................15

            11.   Paragraph 19: Donald Trump's "Secrets" ..............................................15

      C.    Portions of Mark Covais' Declaration Should Be Stricken for Lack of
            Personal Knowledge .......................................................................................16

            1.    Paragraph 7: Scripts ..............................................................................16

            2.    Paragraph 6: Testimonials and Student Satisfaction ...............................16

      D.    Portions of Troy Peterson's Declaration Should Be Stricken for Lack of
            Personal Knowledge .......................................................................................18

1

2                                                                                                    **Page**

3       E.   Portions of John Jamieson's Declaration Should Be Stricken for Lack of
             Personal Knowledge .................................................................................................19

4

III.   THE 14 STUDENT DECLARATIONS SHOULD BE STRICKEN DUE TO
5       DEFENDANTS' MISLEADING COMMUNICATIONS ...................................................20

6   IV.   CONCLUSION...................................................................................................................23

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2                                                                                                          Page

3  **CASES**

4  *Belt v. Emcare Inc.,*
5      299 F. Supp. 644 (E.D. Tex. 2003) ......................................................................20

6  *Casida v. Sears Holdings Corp.,*
       No. 1:11-cv-01052 AWI JLT, 2012 U.S. Dist. LEXIS 111599
7      (E.D. Cal. Aug. 8, 2012) ...........................................................................................1

8  *Jones v. Jeld-Wen, Inc.,*
9      250 F.R.D. 554 (S.D. Fla. 2008) ..............................................................20, 23

10 *Kennedy v. Allied Mut. Ins. Co.,*
       952 F.2d 262 (9th Cir. 1991) ......................................................................................1

11
   *Labrador, Inc. & Labrador II, Inc., vs. The IAMS Co.,*
12     No. CV 94-4463 DT(CTx), 1995 U.S. Dist. LEXIS 21149
       (C.D. Cal. Sept. 18, 1995) , *aff'd,* 1997 U.S. App. LEXIS 418
13     (9th Cir. Jan. 8, 1997) ................................................................................................1

14 *Longcrier v. HL-A Co., Inc.,*
15     595 F. Supp. 2d 1218 (S.D. Ala. 2008)..............................................20, 21, 23

16 *Maurey v. Univ. of S. Cal., et al.,*
       87 F. Supp. 2d 1021 (C.D. Cal. 1999),
17     *aff'd,* 12 Fed. Appx. 529 (9th Cir. 2001) ..............................................................2

18 *Mevorah v. Wells Fargo Home Mortg, Inc.,*
       No. C 05-1175 MHP, 2005 U.S. Dist. LEXIS 28615
19     (N.D. Cal. Nov. 17, 2005) .................................................................................20, 21

20 *Premier Displays & Exhibits v. Cogswell,*
21     No. SACV 09-354 JVS (ANx), 2009 U.S. Dist. LEXIS 119462
       (C.D. Cal. Dec. 23, 2009) ...........................................................................................1

22 *Villa v. United Site Servs. of Cal., Inc.,*
23     No. 5:12-cv-00318-LHK, 2012 U.S. Dist. LEXIS 162922
       (N.D. Cal. Nov. 13, 2012)........................................................................................21

24
   *Whittlestone, Inc. v. Handi-Craft Co.,*
25     618 F.3d 970 (9th Cir. 2010) ......................................................................................1

26

27

28

1

2                                                                                    **Page**

3    **STATUTES, RULES AND REGULATIONS**

4    Federal Rules of Civil Procedure
     Rule 12(f).............................................................................................................................1
5        Rule 23 ................................................................................................................................20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Plaintiffs respectfully submit this memorandum in support of their motion to strike.

2  I.    **INTRODUCTION**

3    Plaintiffs move to strike the declaration of George Sorial, and portions of the declarations of

4  TU current and former employees Michael Sexton, Mark Covais, Troy Peterson and John Jamieson

5  because they lack personal knowledge, misstate the evidence and/or attempt to mislead the Court.

6  Plaintiffs also move to strike the declarations of TU "students" Amy Hinderer, Mette Nielsen, Paula

7  Levand, Meena Mohan, Charles Lee, Jesus Castillo, Marla Colic, Kissy Gordon, Greg Leishman,

8  Stephen Nesbit, Paul Canup, Robert Mulack, Scott Talhelm and David Wright due to Defendants'

9  misleading communications to drum up support for their opposition to Plaintiffs' class certification

10  motion.  While many of the statements in the declarations go to merits issues that will be proven

11  with common evidence, lest the Court interpret Plaintiffs' silence as acquiescence, Plaintiffs seek to

12  correct the record.  Discovery in this case is incomplete, ongoing, and a discovery cut-off has not yet

13  been set.  Thus, the facts contained in this motion reflect the record only as developed to date.  For

14  the reasons stated herein, Plaintiffs respectfully request that the Court grant their motion to strike.

15  II.   **DECLARATIONS OF CERTAIN EMPLOYEES SHOULD BE STRICKEN**
       **FOR LACK OF PERSONAL KNOWLEDGE AND AS MISLEADING**
16
       The Federal Rules allow the court to remove material from a pleading that it finds
17
   "redundant, immaterial, impertinent, or scandalous" or defenses that it finds legally insufficient.
18
   Fed. R. Civ. P. 12(f).  The function of this motion is to avoid the expenditure of time and money that
19
   would arise from litigating spurious issues, by dispensing with those issues prior to trial.
20
   *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).
21
       In this Circuit, parties cannot create issues of fact by submitting declarations that contradict
22
   prior deposition testimony.  *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)
23
   (cited in *Casida v. Sears Holdings Corp.*, No. 1:11-cv-01052 AWI JLT, 2012 U.S. Dist. LEXIS
24
   111599, at *12-*14 (E.D. Cal. Aug. 8, 2012)); *Labrador, Inc. & Labrador II, Inc., vs. The IAMS Co.*,
25
   No. CV 94-4463 DT(CTx), 1995 U.S. Dist. LEXIS 21149, at *10 (C.D. Cal. Sept. 18, 1995) (courts
26
   disregard declarations that were directly contradicted by prior sworn deposition testimony), *aff'd*,
27
   1997 U.S. App. LEXIS 418 (9th Cir. Jan. 8, 1997); *Premier Displays & Exhibits v. Cogswell*, No.
28

- 1 -                          3:10-cv-00940-GPC(WVG)

1  SACV 09-354 JVS (ANx), 2009 U.S. Dist. LEXIS 119462, at *28-*29 (C.D. Cal. Dec. 23, 2009)

2  (disregarding plaintiff's declaration because it contradicts his earlier testimony, counsel's deposition

3  testimony, and was not disclosed during discovery); *Maurey v. Univ. of S. Cal., et al.*, 87 F. Supp. 2d

4  1021, 1037 n.25 (C.D. Cal. 1999) (disregarding allegations in declarations to the extent they

5  contradict his prior deposition testimony), *aff'd*, 12 Fed. Appx. 529 (9th Cir. 2001).

6    **A.    George Sorial's Declaration Should Be Stricken for Lacking Personal
         Knowledge, Misstating the Facts and Misleading the Court**

7         Plaintiffs respectfully move this Court to strike the declaration of George Sorial, an attorney

8  for Trump Organization, whose declaration lacks personal knowledge, misstates the facts and

9  attempts to mislead the Court.  Sorial, as an attorney, is an officer of the Court, and owes obligations

10  of truthfulness and candor.  Sorial fails to inform the Court that the New York AG investigation is

11  open and ongoing, understates the extent of the New York State Education Department ("NYSED")

12  investigation, fails to admit that other state and federal governmental agencies contacted Defendants

13  about consumer complaints, that the Texas AG's investigation resulted in Trump University

14  suspending their operations (and never resuming them) there, and understates the number of BBB

15  complaints.

16    **1.    Personal Knowledge of Facts**

17         Preliminarily, Sorial attests that he has personal knowledge of the facts stated in his

18  declaration.  DEx. 52, ¶1.[1]  Yet, Sorial testified repeatedly and adamantly his involvement with

19  "Trump University has been minimal."  Ex. 130 at 10:24-11:3, 45:17-22, 83:7-19 ("I work for

20  Trump Organization. I am a real estate development person. I don't know.").  Contradicting "facts"

21  in his declaration concerning Trump University's operations in 2005, Sorial testified during his

22  _____

23  [1]    Here, and throughout, unless otherwise noted, references to "Ex. 1-66" are to Exhibits to the
24  Declaration of Amber L. Eck in Support of Plaintiffs' Motion for Class Certification (Dkt. No. 122-
     2); references to "Ex. 67-137" are to the concurrently filed Declaration of Rachel L. Jensen in
25  Support of Plaintiffs' Reply in Support of Motion for Class Certification, Appointment of Class
     Representative and Appointment of Class Counsel; Plaintiffs' Response to Defendants Objection to
26  Plaintiffs' Proposed Trial Plan for Trial of Class Claims; Plaintiffs' Opposition to Defendants'
     Objection to Evidence in Plaintiffs' Motion for Class Certification; and Plaintiffs' Motion to Strike
27  Defendants Declarations ("Jensen Decl."); and references to "DEx." herein are to the Declaration of
     David K. Schneider in Opposition to Plaintiffs' Motion for Class Certification (Dkt. No. 138-1).
28  Further, emphasis is added and citations are omitted unless otherwise noted.

1   deposition that he was not involved with Trump University at all in any capacity until the first

2   quarter of 2010.  Ex. 130 at 19:11-20, 45:17-22.  Thus, for example, Sorial has no personal

3   knowledge about the *2005* filing with New York state because he had no involvement until 2010.

4   Ex. 130 at 19:11-20, 54:8-15, 58:15-25.  Sorial does not know whether Trump University is still

5   operating, the current status of investigations, or resolution of all the student complaints.  *See, e.g.*,

6   *id.* at 98:1-8 (as to TU operating in January 2011: "I'm not the person to ask about operations of

7   Trump University because it's simply not my responsibility.  So ask someone else."); *id.* at 120:3-9

8   (same as to present time).  Sorial did not even review documents to ensure the accuracy of his

9   statements.  *See, e.g., id.* at 9:10-13, 36:13-37:6, 37:21-24, 93:5-8, 126:10-22 (testifying that there

10   were no other sources for his declaration other than his recollection).

11                      **2.    NYSED Investigation**

12          While declaring under oath that the NYSED "requested that TU no longer use 'University' in

13   its name" and that "TU agreed to change its name, and the company continued its operations under

14   the new name Trump Entrepreneur Initiative," Sorial implies that TU fully and immediately

15   cooperated by agreeing █████████████

16   ██████████████████   DEx. 52, ¶3.  This is entirely misleading.  Sorial fails to disclose

17   that Defendants did not change their name in 2005 as the NYSED requested, but instead thwarted the

18   NYSED for *over five years*, continuing to call themselves a "University" from 2005 to 2010, and

19   operating without a license, out of their New York headquarters.

20          In May of 2005, the NYSED notified Donald Trump and his "University" "*that the use of*

21   *the word 'University' in your institution's name was illegal*" and requested the name 'Trump

22   University' be discontinued."  Ex. 68, NYSED 0000067.  At that time, the NYSED also put

23   Defendants on notice that TU was operating without a license and instructed Defendants on how to

24   obtain a license for "operation of a non-degree granting proprietary school[]."  *Id.*  An October 5,

25   2010 email from Carol Yates, the Bureau Director, to Sexton (which was produced pursuant to FOIA

26   request but not produced by Defendants) more accurately depicts Defendants' continuing *failure* to

27   cooperate:

28

1           It has now been a few weeks since your September 17th response to me [that
Mr. Sexton would check with Mr. Sorial and follow up].  You had indicated that you
2    would get back to me on Monday.

3           It seems to be a common theme that you will get back to us on Monday.  We
have yet to see that type of response.

4
       You also chose to skirt my inquiry about the complaints and the resolution.
5    We may be forced to make a refund through the Tuition Reimbursement Account,
which could result in a hearing.

6
Ex. 68, NYSED 000070.  Months earlier, ███████████████████ and June 15,
7
2010, the NYSED said Defendants must cease "all training by Trump in this state . . . until such time
8
that a license is obtained from the Bureau of Proprietary School Supervisions."  Ex. 68 at NYSED
9
000067-68.  Further: "All current students should be refunded."  *Id.*  NYSED reiterated this in
10
August 2010, resulting in a meeting with Sorial and others from Trump University, around which
11
time TU stopped holding new Live Events.  *See* Ex. 68 at NYSED 000067-68.
12
    As of 2011, Defendants had still failed to comply with the NYSED's requests regarding
13
complaints that it was investigating.  Ex. 68, NYSED 000076.  A January 3, 2011 letter from the
14
Bureau Director to Sexton states:
15
       Several attempts have been made to arrange a meeting between Trump
16   officials and staff at the New York State Education Department, Bureau of
Proprietary School Supervision, to discuss resolution of student complaints filed
17   against the former Trump University . . . .

18          Each attempt has been met with comments that the complaints will be
resolved or that a meeting is premature as Trump determines its next steps.  That is
19   unacceptable.

20          We are requesting that you make arrangements to attend a meeting at our
New York City office . . . .
21
       Failure to respond to this letter by January 14, 2011 will result in our
22   commencing disciplinary action in the form of an Order to Show Cause, signed by
the Commissioner of Education.  This will be followed by a hearing conducted by an
23   independent administrative officer, who will determine the merits of our action.

24   Ex. 68 at NYSED 00076 (Jan. 3, 2011 letter).

25       The actual facts are a far cry from Sorial's declaration attesting that the NYSED investigation
26   was only about the name and was resolved over the phone "fairly quickly . . . perhaps a week or
27   less."  Ex. 130 at 20:16-22:15; DEx. 52, ¶3.  The NYSED dealings spanned nearly six years.  ██████
28   ████████████████████████████████████████████████████████████████████████  ██

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ████████████████████████████████████████

**3.    Attorney Generals' Investigations**

5 ██████████████████████████████████████████

6 ███████████████████████████████████████████

7 ████████████ DEx. 52, ¶4.  Yet, during his deposition, Sorial admitted that he could not actually

8 recall how these matters were resolved, *i.e.*, whether refunds were issued (many times they were).

9 *See, e.g.*, Ex. 130 at 40:3-17, 43:20-23, 44:21-45:14, 70:5-15.   In fact, internal documents

10 demonstrate and documents produced pursuant to FOIA requests that other governmental agencies

11 contacted Trump University about consumer complaints, including the Arizona State Board for

12 Private Postsecondary Education, Arizona Office of the Attorney General, Oregon Department of

13 Justice Financial Fraud/Consumer Protection Section, Maryland Higher Education Commission,

14 California Department of Justice, United States Department of Justice, Virginia Department of

15 Agriculture and Consumer Services, Office of the Indiana Attorney General, and Pennsylvania

16 Office of Attorney General. ████████████████████

17 Moreover, the New York Attorney General investigation about violations of its consumer

18 protection statute *is still open*. Ex. 69, TU-PLTF02447-51 (FOIA Response); ████████████

19 ███████████. Outside counsel is handling the matter, and Sorial does not have personal

20 knowledge of the investigation's status. Ex. 130 at 80:23-81:18.

21 ███████████████████████████████████████████

22 ███████████████████████████████████████████

23 ███████████████████████████████ Again, outside counsel handled the

24 matter (Ex. 130 at 27:2-17; 28:2-29:6), and Sorial does not know the status. *See, e.g., id.* at 85:18

25 (answering that as to a letter to the Texas AG from outside counsel saying that Defendants would

26 "continue to suspend its workshops in Texas . . ." that "I was not part of the operations team at

27 Trump University. So I simply can't answer questions on whether or not they were operating at that

28 time or they had any intention to operate going forward.").

4.    **Better Business Bureau ("BBB") Investigations**

██████████████████████████████████████ (DEx. 52, ¶5), Sorial actually has no personal knowledge about the number of "student" complaints because he relied on his client for the numbers. *See* Ex. 130 at 91:14-21; 93:5-8; 108:22-109:2. There are at least 40 complaints recorded by the NY BBB alone, and Plaintiffs believe there were more nationwide. *See* Ex. 132, BBB NY 00481-485. Sorial does not have personal knowledge that TU/TEI ██████ ████████████████████████████████████ (DEx. 52, ¶5), except class members represented by Plaintiffs' counsel, as Sorial testified he did not know which customer complaints were outstanding other than Tarla Makaeff, but again relied on his client. *See* DEx. 52, ¶5; Ex. 130 at 109:19-110:3.

Notably, correspondence with the BBB shows that, in a similar pattern to Defendants' dealings with the NYSED, TU did not cooperate in a timely fashion. Ex. 131. Sorial personally threatened to sue the BBB when it gave TU a bad rating. Ex. 13 at BBB NY 00540; Ex. 130 at 98:9-16. Sorial has "no idea" what the current BBB rating is. Ex. 130 at 51:4-6.

For these reasons, Sorial either lacks personal knowledge for the statements in his declaration, as shown above, or is misleading to the Court.

B.    **Portions of Michael Sexton's Declaration Should Be Stricken for Lack of Veracity and Personal Knowledge**

Michael Sexton is the former President of Trump University. Sexton ██████████ ████████████████████ but is a current shareholder of TU ████████████████ ████████. *See* Ex. 130 at 112:17-113:11; ████████████████ The following portions of Sexton's declaration should be stricken as directly contradicting his earlier deposition testimony given before Defendants saw Plaintiffs' class certification motion:

1.    **Paragraph 16: The Play Book**

Paragraph 16 of Sexton's declaration should be stricken as clearly and directly contradicting Sexton's earlier deposition testimony concerning the use of the Play Book. Though Sexton's declaration implies ████████████████████████████████████████████ ████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████ At another point in his deposition, he testified that the ████████

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ██████████ Sexton also testified ███████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████

9       **2.**     **Paragraphs 17 and 18: Scripts and PowerPoints Were**
                       **Standardized**

10       Paragraph 17 should also be stricken as directly contradicting his deposition before

11 Defendants reviewed Plaintiffs' class certification motion. Though Sexton's declaration says that no

12 script was used (DEx. 1, ¶17), he testified at his deposition that ████████████████

13 █████████████████████████████████████████████████████

14 █████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████

16 ████████████████████████████████████

17       Contrary to Sexton's newfound suggestions that the presentations had great variability

18 (DEx. 1, ¶17), at his deposition, he testified that as to the ████████████████████

19 ███████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████

21 ████████████████████

22       █████████████████████████████████████████████████

23 ███████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████

25 █████████████████████████████████████ None of which pertain to

26 or defeat the common issues raised in Plaintiffs' Motion for Certification. Now, he states that ██

27 ████████████████████████████████████████████ (DEx. 1, ¶17), which is

28

1  contrary to his deposition testimony (and the PowerPoints themselves) unless those variations

2  pertained to these three categories.  Sexton also now states that the 3-day programs and the 3-day

3  advance workshops varied as much as 50% for the same programs.  DEx. 1, ¶17.  Again, these

4  statements contradict his earlier deposition testimony ███████████████████████████████████

5  ███████████████████████████████████████████████████████

6      Moreover, to the extent that any such variability existed, it was as to the speaker's personal

7  story or local markets, etc., and not whether or not Donald Trump's secrets were being shared, or the

8  uniform marketing and advertisements that is at issue here.  Indeed, what Sexton fails to mention is

9  that there was actually ██████████████████████████████████████████████████████

10 █████████████████████████████████████████████████  These

11 emanated from headquarters and were uniform across the Class Period.

12     Paragraph 17 is further undermined by Trump University's corporate documents, including,

13 *inter alia*, its Marketing Guidelines (Ex. 83), █████████████ and scripts.  Ex. 88 ███████

14 █████████████████████████████████████████████████████████

15 █████████████████████████████████████████  And

16 contrary to Sexton's assertion, in addition to the scripts in the Play Book, scripts were very much

17 used by salespersons *as a part of the Live Events*.  Salespersons (aka "setters" or "screeners") were

18 required to use scripts to call *all* students who had attended the free "advertisement" Preview (over

19 80,000 people according to Defendants) to up-sell them another product.  Ex. 80 at 236:24-237:21.

20 The salespersons were required to follow a script "word for word" because the scripts had been

21 "psychologically tested."  Ex. 80 at 49:7-50:10; Ex. 81 at 94:3-95:23 ("I do know that there was a

22 script issued while I was there to make sure everything was *uniform*."); █████████████████

23 ███████████████████████  The purpose of the script was "to ensure that everybody was

24 *uniform with what they were saying to customers*."  Ex. 81 at 203:3-10.

25     Because the "facts" in ¶17 are contradicted by Sexton's prior deposition testimony, ¶17

26 should be stricken in its entirety.

27

28

3. **Paragraph 6: Live Events Were Not an "Extension" of The Online "Courses"**

Sexton misleadingly states that that ██████████████████████████ ████████ (DEx. 1, ¶6), as if to create an inference that they are one and the same. This, too, contradicts Sexton's earlier deposition testimony before he saw Plaintiffs' class certification motion that, unlike the online program, the ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ As Sexton himself testified at his earlier deposition, ██████████████████████████████████████ It was only later ████████████████████████████████████████████████████████████ ████████████████████████████ Then, once TU got off the ground with their own implemented live events, they were ██████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ Similarly, another sales and marketing organization called ██████████████████████████████ Trump University former employee Ron Schnackenberg also testified that the Live Events were not an extension of the online programming. *See generally* Plaintiffs' Opposition to Defendants' Motion to Strike.

4. **Paragraphs 4 and 5: Picking Instructors**

Sexton says in his declaration, for the first time, that ████████████████ ████████ DEx. 1, ¶4. This is inconsistent with his prior sworn deposition testimony, Highbloom's (COO) former employee testimony, and internal documents.

During Sexton's deposition, Plaintiffs' counsel asked if anyone else had responsibility for selecting instructors other than himself. Sexton explained that ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Sexton also

1   testified that ███████████████████████████████████████

2   ████████████████████████████████████████████████████

3   ███████████████████████████████████████████  And when

4   asked what he met with Donald Trump about over the time Trump University was active, he

5   responded only that he ████████████████████████████████

6   ██████████████████████████████████████████████  Not

7   once did Sexton say that he met with Donald Trump about approval of new instructors.

8       Further, contrary to ¶5 of Sexton's declaration, the only original "faculty" member that

9   ████████████████████████████████████████████████████

10  ████████████████████████████  And Sexton's assertions in ¶¶4-5 of his declaration

11  are directly contradicted by Donald Trump's calendar, produced in this action, which Trump testified

12  contained all relevant entries for TU meetings and events (which he could no longer remember).  *See*

13  ██████████████; Ex. 97 at 91:17-18.

14      Finally, former employees have testified that Trump did not meet with or select the

15  instructors or mentors.  *See generally* Plaintiffs' Opposition to Defendants' Motion to Strike

16  Declaration of Schnackenberg, Sommer, Nicolas and Donnelly.

17          **5.      Paragraph 7: Form Contracts**

18      Sexton attests that TU's written contracts varied, including the release and waiver provisions,

19  incorporation clauses and cancellation periods.  Defendants cite to disclaimers and waivers dated

20  *after* it ceased offering Live Events in 2010, which documents they did not produce in this litigation.

21  *See, e.g.*, DEx. 8 at 379-80.  Others are unsigned and unauthenticated templates which are not

22  produced with any executed contracts.  *See, e.g.*, DEx. 8 at 377-78, 382.  The remaining "evidence"

23  consists of exemplars of standard Enrollment Form and Terms and Conditions, which include the

24  same operative language, as set forth in Plaintiffs' Exhibit 94, TU01396 (representative exemplar of

25  executed contracts produced).  Defendants produced all class members' contracts in this litigation.

26  Ex. 72 at 235:18-236:5.  The contracts executed by class members are form contracts consisting

27  predominantly of two forms: (1) Enrollment Form; and (2) The Terms & Conditions Forms. ██████

28  ████████████████████████████; Ex. 95 at 316:13-16 (consumers "all sign[ed] a

1   same or uniform contract"); ██████████████████████. The material

2   provisions are very similar and include similar language with respect to the disclaimer, waiver and

3   release. *See, e.g.,* Ex. 94 (exemplar contracts).

4      **6.  Paragraph 10: Goals Sheet (aka Student Profile Sheets)**

5     In ¶10, Sexton states: ████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ███████  DEx. 1, ¶10. Sexton then draws the conclusion from this statement that ████████

9   ███████████████  *Id.* Not only does Sexton not have personal knowledge regarding the

10  statements made in this paragraph, but they are entirely misleading.

11    Sexton was admittedly not in attendance at each and every Live Event and, thus, cannot offer

12  generalized statements regarding the "Goal" sheets (aka student "profile" sheets) circulated to

13  students at Live Events. Sexton offers no foundation that he reviewed every "Goal" sheet supplied

14  by students that purchased additional TU programs – nor can he. Neither are there any foundational

15  facts that he compared that set of "Goal" sheets with those students that failed to fill out a Goal sheet

16  but still purchased a TU program. On this ground alone, the facts based on no first hand personal

17  knowledge in ¶10 should be stricken.

18    Contrary to the inference Sexton seeks this Court to draw, Defendants sought this

19  information to determine how much consumers could pay. Defendants' own documents show how

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ███████████████████████; Ex. 107, TU-BROWN0000066-67 (Brown's Goal Setting Sheet);

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ███████████████████████████████████████████████  Once the team

1  members completed the █████████████████████████████████

2  ███████████████████████████████████████████████████ *Id.*

3  This is in line with TU's former employees' testimony, including its President, Michael Sexton, who

4  confirms that ████████████████████████████████████████████████

5  ███████████████████████████████████████████████. This

6  information was used to up-sell consumers.

7      **7.**    **Paragraph 11: Refunds**

8      Sexton self-servingly testifies TU had a generous refund policy that affected a small minority

9  of TU's students. DEx. 1, ¶11. Foremost, Sexton has not laid any foundation establishing he has

10 any personal knowledge with respect to refunds. And the actual evidence tells a far different story.

11 According to Defendants' numbers (DEx. 6, ¶6), █████████████████████

12 ██████████████████████████████. DEx. 6, ¶6. And these

13 refunds were not provided ████████ DEx. 1, ¶11; *see, e.g.,* █████████████

14 ██████████████████████████████████████████████████████

15 ██████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████

17 ██████████████████████████████████████████████████████

18 ██████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████████

20 ██████████████████████████████████████████████████████

21 ██████████████████████████████████████████████████████

22 ███████████████████████████████████████████

23     **8.**    **Paragraph 12: Advertising Campaign**

24     Paragraph 12 of Sexton's declaration states that ████████████████

25 █████████████████████████. DEx. 1, ¶12. This again

26 contradicts Sexton's prior deposition testimony. And, TU's advertising and marketing budget was

27 $6 million per year, according to TU's own Chief Marketing Officer, Michael Bloom. Ex. 129 (TU

28 PLTF00255-258).

1       First, Sexton's declaration ignores the core deception of its advertising and marketing

2   scheme: the use of Donald Trump and his brand.  As stated by Sexton during his deposition, the

3   ████████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████    And at his deposition, Sexton testified TU

7   portrayed an ████████████████████████████████████████████████████████████████

8   ████  This messaging did not change over time or by market.

9       Second, contrary to Sexton's declaration, advertising and marketing was extensive.  Sexton

10  testified that ███████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  █████████████████████    As to print, Sexton testified they ran advertisements across ██████

13  ████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████    This is consistent to the

16  large-scale advertising and marketing demanded via TU's core operating document, the ████████

17  ████████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████

19  ███████████████████████████████

20      Moreover, Sexton testified that the ██████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  Defendants state that ████████████████████████████████████████.  DEx. 6, ¶6.

24  These same 80,000 plus people were then all subjected to a "scripted" telephone call from TU's

25  salespersons – again a massive and uniform marketing effort.  Ex. 80 at 49:7-50:10, 236:24-237:21;

26  █████████████████████████████████████████████████    Finally, with respect to the

27  core misrepresentations at issue, the same deceptive message was demanded to be conveyed via

28

1    Defendants' operating policies, including its Marketing Guidelines, Play Book, scripts, personnel

2    agreements, and written and transcribed PowerPoint presentations.

3         Sexton's statements in ¶12 contradict his earlier testimony.  Plaintiffs request that the entire

4    paragraph be stricken.

5         **9.    Paragraph 14: Mentorships**

6         In ¶14, Sexton misstates the evidence where he states: ████████████████

7    ███████████████████████████   Sexton Decl., ¶14.  This is

8    contrary to his earlier deposition testimony.  At his deposition, Sexton said that the mentorship ██

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████   Even TU's only remaining employee says that the Live

13   Events were supposed to be ████████████████   DEx. 6, ¶6(d)).  In addition,

14   as demanded via the Play Book, Defendants sent emails saying ████████████████

15   ████████████████████████   To clarify what Defendants

16   meant by a full year of ongoing support, TU's website said: "After completing the [3-day] program

17   you will have **_direct access to your Mentor for 12 months_** to field any questions that may arise."

18   Ex. 46 at TU 69463.  Virtually all of Defendants' own transcribed recordings of Live Events

19   reviewed to date, ██████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████   Paragraph 14 also conflicts with Defendants' internal correspondence,

22   which evidences that as of **_May 2010_**, even ████████████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

26   ████████████████████████   This paragraph should be stricken.

27

28

1           **10.**    **Paragraph 15: Donald J. Trump Video**

2       Sexton now states that ████████████████████████████████████

3 ████████████████████████████. DEx. 1, ¶15. Sexton lacks personal

4 knowledge to make this unfounded statement.  When directly asked during his deposition what time

5 frames the video was used, he responded:

6       ████████████████████████████████████████████

7 ████████████████████████████████

8 ████████████████

9       Based on his deposition testimony and the fact that he purportedly attended only very few

10 Live Events, Sexton's statement lacks foundation, personal knowledge, and is based on nothing

11 more than unfounded speculation. Therefore, Plaintiffs request that ¶15 be stricken in its entirety.

12           **11.**    **Paragraph 19: Donald Trump's "Secrets"**

13       Heard only now for the first time, Defendants represent that Donald Trump's "secrets" were

14 revealed during the free 90-minute Preview (Opp. at 11-12), which Sexton now represents as Donald

15 Trump's business ██████████████ DEx. 1, ¶19.  This newly concocted "secret" as

16 to how Trump made his billions in real estate investing contradicts all the other evidence in this case.

17 *Prior* to seeing Plaintiffs' opening brief, Donald Trump's interrogatory responses said his "secrets"

18 were "course materials attendees were given access to after purchase, . . . lessons taught at the three-

19 day retreats, . . . coaching and lessons taught in the three-day in-field mentorships."  Ex. 105 (DJTs

20 Resp. to 2nd Set of Rogs).  Defendants' sales scripts said Trump's secrets were ██████████

21 ████████████████████████████████████████████

22 ██████████████████████████ And at his deposition, not once did Donald

23 Trump assert that his "secret" was a "philosophy" of "overcoming fear" or the like.  Rather, when

24 directly asked "which of your real estate secrets were taught as part of the mentorship," Trump

25 responded that "You'd have to ask Mr. Sexton.  He has all that information."  Ex. 28 at 130:14-20.

26 Donald Trump said he had no idea what students received, or even what his own purported

27 "foreclosure system" was.  Ex. 28 at 109:7-17.

28

### C. Portions of Mark Covais' Declaration Should Be Stricken for Lack of Personal Knowledge

Covais has worked for TU for six years, since 2006 as a sales person, in business development, customer service retention, and in 2010, as TU's live programs were winding down, Covais was TU's Director of Operations, which he remains until this day.

#### 1. Paragraph 7: Scripts

In ¶7 of his declaration, Covais claims that ███████████████████████ ████████. DEx. 6, ¶7. Covais states that ██████████████████████████ ██████████████████████ (*id.*); however, this evidence is not sufficient to establish that he had first-hand knowledge that scripts were not used or followed by those instructors or presenters. As he testified repeatedly at his subsequent deposition, Covais said he was ██████ ████████████████████████████. Covais was never a presenter at any of the Live Events he attended nor does he state that he discussed with presenters or instructors at each of the events whether they used scripts as part of the program presentation. Further, ████████████ ██████████████████████████████████. Because Covais only attended some live TU programs and workshops, he has no personal knowledge as to what scripts, if any, the presenters followed as part of the TU curriculum. Covais cannot assume he knows, he can only speculate. As discussed above, Trump University's governing documents, including, *inter alia*, the Play Book and personnel agreements, the Live Presentations, at least with respect to the deceptive message at issue, were very much scripted. Therefore, Plaintiffs move to strike Covais' testimony as to this matter from ¶7.

#### 2. Paragraph 6: Testimonials and Student Satisfaction

In ¶6(r), Covais states that ██████████████████████████████████ ████████████████████. DEx. 6, ¶6(r). However, Covais fails to include relevant information regarding the individuals that offered those testimonials. For example, Covais fails to disclose what program the student purchased and when the student enrolled in the program. This information is important to determine whether those testimonials are from individuals part of the

- 16 -                                              3:10-cv-00940-GPC(WVG)

1  relevant Class and thus relevant to this case.  Therefore, Plaintiff requests that this subparagraph be

2  stricken from his declaration.

3    Covais' statements concerning TU's purported 97% student satisfaction rating based upon

4  the student "evaluation" forms lacks foundation and is misleading.  Preliminarily, establishing that

5  Covais' statement lacks foundation, the numbers, based on "10,000 evaluations," simply do not add

6  up. ████████████████████████████████████████████████.

7  DEx. 6, ¶6.  As the evaluations include forms from the free seminar, the numbers are diluted many

8  times over.  *See* DEx. 49 at 25952 ████████████████████;

9  █████████████████████████████████████████████████████

10  ██████  Additionally, internal documents show ███████████████████

11  █████████████████████████████████████

12    Further, approximately ████████ of consumers who purchased a Live Event got a refund.

13  DEx. 6, ¶6.  These consumers are included in Defendants' "high" approval rating, as well as

14  hundreds of others who were dissatisfied enough to complain and seek a refund, including Plaintiffs.

15  ████████████████████████  Covais' statement and the evaluations are

16  meaningless because they were not obtained at the end of the one-year "program," but at the Preview

17  and 3-day Seminars, or Mentorships, ████████████████████████

18  ███████████████████████████████████████████████████

19  Ex. 93, ¶8; ███████████████████████████████████████████

20  █████████████████████████████

21    Moreover, in ¶9, Covais offers no foundational evidence, for example, about the number of

22  questions on the evaluation, which questions were answered, which questions TU considered and

23  included as part of the rate they calculated to determine TU's "customer's satisfaction" rate, or

24  whether the evaluation questions changed over time between 2007-2010.  In sum, Covais' statement

25  regarding TU's "satisfaction rate" should be stricken because it lacks and is otherwise, simply not

26  accurate.

**D.   Portions of Troy Peterson's Declaration Should Be Stricken for Lack of Personal Knowledge**

Troy Peterson's declaration focuses on TU "mentorships."  However, at TU, there was a bright line drawn between (1) *"mentorships"* which were an integral part of the $25,000-$35,000 Elite program (and/or sold as a separate Field Mentorship without the workshops), followed by a year of mentoring support, and (2) *"coaching"* which included 6 to 12 one-hour *phone coaching* sessions and cost a few thousand dollars.  Troy Peterson was primarily a phone coach and, therefore, his testimony bears little relevance to the mentoring that occurred as part of the Live Events.  *See* DEx. 22b, ¶11 ████████████████████████████████████████████████████████ ████████ . ████████████

Peterson says he forwarded information to a team of Maryland presenters and then carefully states that ████████████████████████████████████████████████████████████ ██████████████████   DEx. 22b, ¶5.  However, nowhere does he state that he attended the presentation, nor how he would have any knowledge at all as to what was actually taught.  As it was not based on personal knowledge, that portion of ¶5 should be stricken.

In addition, Peterson does not have personal knowledge to support statements regarding what other TU mentors taught their students.  In ¶7, Peterson speculates that *all* TU mentors prepared customized plans and strategies for their students.  Peterson states: ████████████████████ ████████████████████████████████████   DEx. 22b, ¶7.  Peterson can only offer evidence to support what he has personally discussed and prepared for his own phone coaching students, not what he believes or speculates other mentors (versus phone coaches) have discussed or reviewed with their own students.  Therefore, Plaintiffs move to strike all references in ¶7 where Peterson speculates that all mentors prepare customized plans and strategies for their students.

---

2 ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

Finally, Peterson does not have knowledge regarding many of the statements he makes regarding Plaintiff Tarla Makaeff (¶20) and Plaintiff Joann Everett (¶¶21-22), and his statements are directly contradicted by their deposition testimony which took place prior to the submission of his declaration, and Makaeff's supplemental declaration.[3]

**E.    Portions of John Jamieson's Declaration Should Be Stricken for Lack of Personal Knowledge**

John Jamieson is a former TU instructor and trainer.  Jamieson testifies as to matters concerning which he does not have first-hand personal knowledge.  For example, Jamieson speculates that ███████████████████████████████████████████████████████ ████████████████████████████████████████████ DEx. 22a, DEx. 22a, ¶8.  Jamieson does not provide the basis for this knowledge or say he was present at the time. Therefore, Plaintiffs move to strike these two sentences of ¶8 from Jamieson's declaration.

Jamieson also fails to offer sufficient evidence supporting the statement that he garnered well over a 95% satisfaction rate from students that submitted surveys.  For example, Jamieson fails to disclose information regarding the number of surveys he received and considered as part of the 95% satisfaction rate, which questions on the survey were related to the student's satisfaction with the mentorship, or how the 95% satisfaction rate was calculated.  Indeed, Jamieson does nothing more than speculate that he recalls ██████████████████████████████ and includes no foundation for his conclusions.  DEx. 22a, ¶9.  Plaintiffs move to strike any references to Jamieson's surveys and student satisfaction rate from ¶9.

In ¶4, Jamieson states: ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ DEx. 22a, ¶4.  This statement is flatly contradicted by the employment contract he signed, which states that

_____

[3]    Although Peterson contends that Ms. Everett ██████████████████████████ (DEx. 22b, ¶22), in fact, Ms. Everett testified that before she had her in-person field mentorship, Peterson informed her that TU was going out of business, and she (understandably) didn't want to go forward without the one year of support infrastructure that she had been promised.  Ex. 135 at 210:10-14.

1

2

3

4

5

6   **III.    THE 14 STUDENT DECLARATIONS SHOULD BE STRICKEN DUE TO
            DEFENDANTS' MISLEADING COMMUNICATIONS**

7           Plaintiffs move to strike the declarations submitted by Defendants of Amy Hinderer, Mette

8   Nielsen, Paula Levand, Meena Mohan, Charles Lee, Jesus Castillo, Marla Colic, Kissy Gordon,

9   Gregory Leishman, Stephen Nesbit, Paul R. Canup, Robert Mulack, Scott Talhelm and David

10  Wright, Jr. (hereinafter collectively referred to as "Student Declarations"). *See* DEx. 14a-n. These

11  declarations should be stricken as they constitute the fruit of Defendants' improper and misleading

12  communications with potential class members in connection with their Opposition to Plaintiffs'

13  Motion for Class Certification.

14          Courts have identified a range of communications as misleading or otherwise improper.

15  "Communications that have been found to be violative of the principles of Rule 23 include

16  misleading communications to class members regarding the litigation, communications that

17  misrepresent the status or effect of the pending action, communications that coerce prospective class

18  members into excluding themselves from the litigation, and communications that undermine

19  cooperation with or confidence in class counsel." *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 561 (S.D.

20  Fla. 2008); *Mevorah v. Wells Fargo Home Mortg, Inc.*, No. C 05-1175 MHP, 2005 U.S. Dist. LEXIS

21  28615, at *12-*16 (N.D. Cal. Nov. 17, 2005) (defendant's pre-certification communications were

22  misleading and improper where the defendant, through counsel, contacted potential plaintiffs and

23  informed them of the lawsuit but mischaracterized the nature of the litigation and its affects while

24  soliciting declarations); *see also Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1228 (S.D. Ala.

25  2008) (defendants mislead potential class members regarding the pending lawsuit, the purpose of the

26  survey and its affect); *Belt v. Emcare Inc.*, 299 F. Supp. 644, 667 n.4, 668 (E.D. Tex. 2003)

27  (defendant's communications with potential class members were misleading where defendant

28

1   mischaracterized suit and omitted information regarding damages available to class members).

2   Courts have stricken declarations obtained by defendants where they have "engaged in conduct that

3   would reasonably be expected to mislead and deceive the prospective plaintiffs concerning the

4   nature, purposes and implications of their participation." *Longcrier*, 595 F. Supp. 2d at 1227-28

5   (granting Plaintiffs' motion to strike 245 class member declarations submitted by defendants when

6   "[defendant's] lawyers *neither informed their employees that a class action lawsuit concerning the*

7   *very practices for which they were being 'surveyed' was pending, nor that those declarants were*

8   *themselves potential class members*").

9          Courts have found a defendant's pre-certification communications with potential class

10  members were misleading because defendant, amongst other things, solicited signed declarations

11  from these class members regarding facts that could be adverse to their interest in the litigation

12  "without their having been fully informed of all aspects of the case." *Mevorah*, 2005 U.S. Dist.

13  LEXIS 28615, at *15-*16; *see also Villa v. United Site Servs. of Cal., Inc.*, No. 5:12-cv-00318-LHK,

14  2012 U.S. Dist. LEXIS 162922,*46-*47 (N.D. Cal. Nov. 13, 2012) (refusing to consider class

15  member declarations submitted by defendants where defendants, amongst other things, made

16  misrepresentations or omissions to class members regarding the pending lawsuit).

17         Here, shortly before filing this motion, Plaintiffs' counsel were alerted by a putative Class

18  Member that she had received an "e-blast" from Trump University's Customer Support department,

19  asking that she provide "success stories," to them, and asking her to "please contact us

20  immediately . . . [o]ne of our representatives will contact you."[4] *See Ex. 100, TU PLTF02452-53.*

21  The email blasts were sent to class members ███████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████

25

26  _____

    [4]    Defendants did not reveal or produce these communications to Plaintiffs until after Plaintiffs

27  learned from this putative class member that Trump University had issued these "E-blasts" and
    specifically requested them.

28

The email blast read as follows:

> Dear Valued Customer, [y]ou have been identified as someone who has participated in our mentorship program and has had achievements to share. *We would love to hear and use your success stories. Please contact us immediately* by either responding to this email or by leaving us a voicemail at 646-810-7358 referencing this email. *One of our representatives will contact you back as soon as possible*.
>
> Thank You For Contacting Trump Entrepreneur Initiative!
>
> Trump Entrepreneur Initiative
> 40 Wall Street
> New York, NY 10005
> Phone: 646.810.7358
> Fax: 212.937.3830
> www.trumpinitiative.com

Ex. 100 (Pltfs TU-PLTF02452-53).

As is clear from this communication, Defendants did not inform Class Members of the purpose of their communication, but instead, the reasonable consumer would be led to believe that this was an e-mail from TU's marketing department, designed to gather testimonials to promote TU's business, and/or to follow-up with students as part of TU's ongoing customer support efforts. To the extent that the Student Declarations are the product of this email blast or other misleading communications, which did not fully apprise these individuals of: (1) how their declarations would be used; (2) what this lawsuit is about or why he/she is signing the declaration; (3) that they were potential class members and (4) that they may be entitled to refunds of some or all of their payments to TU if this action is successful.[5]

Defendants should not be entitled to "reap" the fruit of their misleading communications without properly explaining their adverse interests to the person on whose behalf they submitted

---

[5] Plaintiffs are informed and believe based upon conversations with the student declarants that, when Defendants contacted students individually to obtain declarations to be used in support of their opposition to class certification, their representative including Trump Organization paralegal Irene O'Halloran: (1) did not specifically advise how these declarations would be used or that they would be filed in opposing Plaintiffs' motion for class certification; (2) did not describe with any specificity this class action lawsuit, and may have stated or implied it was brought by one or several individuals, as opposed to as a class action; (3) did not inform the student declarants that they were potential class members in this lawsuit; and (4) did not inform the student declarants may be entitled to a refund through this lawsuit.

declarations. *See, e.g., Jones*, 250 F.R.D. at 561; *see also Longcrier*, 595 F. Supp. 2d at 1228. The Court should strike the 14 declarations of these former TU students.

## IV.      CONCLUSION

The aforementioned declarations submitted by Defendants improperly attempt to mislead the Court, fail to support their statements with first-hand knowledge and misstate evidence or make improper generalizations of the evidence.  Further, the declarations of TU's students were the product of misleading and improper communications from Defendants.   Plaintiffs respectfully request that the Court grant their motion in its entirety.

DATED: February 1, 2013                          Respectfully submitted,

                                      ZELDES & HAEGGQUIST, LLP
                                      AMBER L. ECK
                                      HELEN I. ZELDES
                                      ALREEN HAEGGQUIST
                                      AARON M. OLSEN


                                                s/ Amber L. Eck
                                      AMBER L. ECK

                                      625 Broadway, Suite 906
                                      San Diego, CA 92101
                                      Telephone: 619/342-8000
                                      619/342-7878 (fax)

                                      ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      RACHEL L. JENSEN
                                      THOMAS R. MERRICK
                                      655 West Broadway, Suite 1900
                                      San Diego, CA 92101
                                      Telephone: 619/231-1058
                                      619/231-7423 (fax)

                                      Attorneys for Plaintiffs and Proposed Class


## ECF CERTIFICATION

The filing attorney attests that she has obtained concurrence regarding the filing of this document from the signatories to this document.

Dated: February 1, 2013                   By:   s/ Rachel L. Jensen
                                                Rachel L. Jensen

<u>CERTIFICATE OF SERVICE</u>

1

2          I hereby certify that on February 4, 2013, I authorized the electronic filing of the foregoing

3   with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4   the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I

5   caused to be mailed the foregoing document or paper via the United States Postal Service to the non-

6   CM/ECF participants indicated on the attached Manual Notice List.

7          I certify under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.  Executed on February 4, 2013.

9

10                                              s/ Rachel L. Jensen
                                              RACHEL L. JENSEN

11                                              ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
12                                              655 West Broadway, Suite 1900
                                              San Diego, CA  92101-3301
13                                              Telephone:  619/231-1058
                                              619/231-7423 (fax)
14
                                              E-mail:rachelj@rgrdlaw.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:10-cv-00940-GPC-WVG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **David Keith Schneider**
  dks@yslaw.com,ewb@yslaw.com,efb@yslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)