1  David K. Schneider (CSB 139288)
   YUNKER & SCHNEIDER
2  655 West Broadway, Suite 1400
   San Diego, California 92101
3  Telephone:  (619) 233-5500
   Facsimile:   (619) 233-5535
4  Email:  dks@yslaw.com

5  Attorneys for Defendants TRUMP UNIVERSITY, LLC and
   DONALD J. TRUMP

6

7

8              **UNITED STATES DISTRICT COURT**

9        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  TARLA MAKAEFF, BRANDON          )  Case No. 10 CV 0940 GPC (WVG)
    KELLER, ED OBERKROM,            )
11  SONNY LOW, J.R. EVERETT and     )  CLASS ACTION
    JOHN BROWN, on Behalf of        )
12  Themselves and All Others       )  DEFENDANTS' OPPOSITION
    Similarly Situated,             )  TO PLAINTIFFS' MOTION TO
13                                  )  STRIKE DEFENDANTS'
                Plaintiffs,         )  DECLARATIONS
14                                  )
    v.                              )  DATE: 6/28/13
15                                  )  TIME:  1:30 p.m.
    TRUMP UNIVERSITY, LLC, (aka     )  CTRM: 2D
16  Trump Entrepreneur Initiative, LLC, )
    a New York Limited Liability    )
17  Company, DONALD J. TRUMP,       )
    and DOES 2 through 50, inclusive, )
18                                  )
                Defendants.         )
19                                  )
   _____ )
20                                  )
    AND ALL RELATED CROSS-          )
21  ACTIONS.                        )
                                    )
22  _____ )

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................1

II.     DISCUSSION.................................................................................2

     A.      Defendants' Staff and Instructor Declarations Have Adequate
         Foundation........................................................................2

          1.      George Sorial ........................................................2

               a.      Mr. Sorial Had Personal Contact with the New
                   York State Department of Education on the
                   "Trump University" Issue ........................................2

               b.      Mr. Sorial Had Personal Contacts with the
                   Attorneys General................................................4

               c.      Mr. Sorial Had Personal Contacts with the Better
                   Business  Bureau ................................................6

           2.      Michael Sexton .......................................................7

                a.      Mr. Sexton Testified that the "Playbook" was an
                   Administrative Guide with no Content for Students........8

                b.      Mr. Sexton Testified That There Were Many
                   Differing PowerPoints, and No Scripts ..........................8

                c.      Mr. Sexton Testified That TU Programs Were Not
                   Uniform or Standardardized, and in Fact, Were
                   Different.............................................................10

                d.      Mr. Sexton Testified That TU's Programs Were
                   Unique and Not Copies of Other On-Line
                   Programs ...........................................................11

                e.      Mr. Sexton Was Never Asked Whether Mr. Trump
                   Picked TU Instructors – Only Mr. Trump Was
                   Asked About Picking Instructors, and He Testified
                   How He Picked Them ......................................11

                f.      TU Used "Form Contracts," But They Differed ...........12

                g.      Mr. Sexton Had Personal Knowledge about the
                   Goals Sheets ......................................................12

                h.      There is No Contrary Evidence Regarding TU's
                   Refund Policy ....................................................13

                i.      Mr. Sexton's Testimony Regarding TU's
                   Advertising Campaign Is Consistent with His
                   Declaration........................................................13

j.     Mr. Sexton's Testimony about Mentorships is Consistent with the Evidence ..........................................14

k.     Mr. Sexton Had Personal Knowledge of the use of the Trump Video............................................................15

l.     Mr. Sexton Testified about Trump's Secrets Taught by TU ................................................................15

3.     Mark Covais....................................................................17

a.     Mr. Covais Had Personal Knowledge That Instructors and Mentors Never Used Scripts..................17

b.     Mr. Covais Has Personal Knowledge of the 80 Written and Video Testimonials That Praise TU Programs ..........................................................................17

c.     Plaintiffs Dispute Mr. Covais' Personal Knowledge of the 10,000 Evaluations by Misstating His Input and the Evidence ..........................18

4.     Troy Peterson ................................................................19

5.     John Jamieson ..............................................................20

B.     TU Student Declarations Are Not the "Poisoned Fruit" of Any Impropriety ..........................................................................21

1.     Trump University's Email to Former Students Seeking Declarations Was Completely Appropriate ..............................21

a.     13 of 14 Declarations Were Signed Before the Email Was Ever Sent ................................................22

b.     The Declarations Themselves Show that the Declarants Were Well Aware of the Litigation..............22

2.     Plaintiffs' "Poisoned Fruit" Cases Are Totally Inapplicable......................................................................22

3.     The Only Improprieties Concerning These Declarations Occurred When Plaintiffs' Posed as TU Representatives While Attempting to Get Retractions of the 14 Declarations ..............................................................................22

III.     CONCLUSION ..........................................................................25

# I.   __INTRODUCTION__

Plaintiffs move to strike 19 declarations that defendants submitted in opposition to plaintiffs' motion for class certification.  Their motion appears to be an attempted tit-for-tat based on defendants having moved to strike four declarations submitted by plaintiffs with their moving papers for class certification.  However, the two motions are not comparable, and plaintiffs' should be denied, for two basic reasons.

First, plaintiffs' motion attacks 5 declarations of current and former TU employees, mentors, and instructors on the basis that they lack foundation, and contradict the deposition testimony of those who were deposed.  However, the evidence is exactly the opposite: both the declarations and the deposition testimony show strong foundations of personal knowledge, and are completely consistent.

Second, plaintiffs' motion attacks 14 declarations of TU students on the basis that TU purportedly concealed this lawsuit from the students in a post-litigation email seeking student declarations, and so those declarations are "poison fruit" that must be stricken.  The evidence is, however, that the TU email was not misleading, was sent months after 13 of the 14 declarations were prepared and signed, and all declarations show specific knowledge of this lawsuit in any event.  Moreover, the "poison fruit" cases cited by plaintiffs are totally inapplicable.  In fact, the only impropriety involving these 14 declarations is that plaintiffs' counsel posed as a TU representative when contacting some if not all of the declarants to get retractions from them, and even so, plaintiffs got no retractions at all.

In short, plaintiffs mistakenly argue – contrary to the evidence – that 19 TU declarations are inadmissible because they lack foundation, or are inconsistent with deposition testimony, or were obtained improperly.  These arguments are particularly curious because plaintiffs also argue that "inadmissible" evidence is perfectly fine in the class certification context in their opposition to defendants' motion to strike four of plaintiffs' declarations.  Defendants respectfully submit that plaintiffs' motion must be denied due to their total disregard of the evidence.

# II.    DISCUSSION

**A.    Defendants' Staff and Instructor Declarations Have Adequate Foundation**

    **1.    George Sorial**

The Trump Organization's in-house counsel, George Sorial, provided a short declaration which addressed three issues: ███████████████████

███████████████████████████████████████

███████████████████████████████ ███ █ ███████

████████████████████████████████████████

███████████████████████████████████

Mr. Sorial personally was involved in each of these issues, said so in his declaration, and testified about his personal involvement in deposition.  Rather than address those three issues, plaintiffs spend five pages attempting to put before the Court irrelevant <u>new</u> facts and arguments disguised as "lack of personal knowledge."

    **a.    Mr. Sorial Had Personal Contact with the New York State Department of Education on the "Trump University" Issue**

Mr. Sorial confirmed in his declaration that █████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████ Mr. Sorial testified as follows:

██ ████████████████████████████████

██ ███████

---

[1]    Plaintiffs argue that 40 complaints were submitted.  A review of plaintiffs' pertinent Exhibit reveals that the BBB considered six to be "invalid," two to be for "information only," and two to be "beyond purview."  The BBB concluded that 27 were completely resolved or assumed resolved.  Plf. Ex. **132**-972.  Even assuming plaintiffs' larger – and unsupported – number of 40, it represents just .05% of all people who attended free or paid TU programs, and ½ of 1% of all TU students who paid for any live event program.



(Def. Ex. **131**)

**b.    Mr. Sorial Had Personal Contacts with the Attorneys General**

Similarly, Mr. Sorial both declared and testified that





Case No. 10 CV 0940 GPC (WVG)



(Def. Ex. **132**.)

      c.    **Mr. Sorial Had Personal Contacts with the Better Business Bureau**

Mr. Sorial testified that

Mr. Sorial's foundational testimony on the BBB issue was as follows:



(Def. Ex. **133**.)

## 2.   **Michael Sexton**

Former TU president Michael Sexton provided a lengthy declaration which addressed several material issues, including:

Plaintiffs attempt to overcome this powerful declaration by picking and choosing selected words and phrases from Mr. Sexton's deposition, thereby misleading the Court about both his testimony and his personal knowledge concerning these issues.  Mr. Sexton's declaration is entirely consistent with his testimony – which was taken <u>one month **before** plaintiffs filed their motion for class certification</u> – as detailed below.  Plaintiffs ignore all of his "inconvenient" testimony, and consistently misrepresent to the Court that the key facts in the Sexton declaration are "new," contradict his prior testimony, or that he doesn't have personal knowledge.  As detailed below, plaintiffs' arguments are meritless.

/ / /

### a. Mr. Sexton Testified that the "Playbook" was an Administrative Guide with no Content for Students

Mr. Sexton's declaration and deposition are <u>identical</u> on this issue, but plaintiffs fail to cite the Court to the pertinent testimony. It is as follows:



(Def. Ex. **134**.)

### b. Mr. Sexton Testified That There Were Many Differing PowerPoints, and No Scripts

Here again, Mr. Sexton's declaration and deposition are <u>identical</u> on these issues, but plaintiffs fail to cite the Court to the pertinent testimony. It is as follows:





Sexton Depo., p. 202:3-21 (emphasis added).) (Def. Ex. 135:



(Def. Ex. **90**.)

### c.   Mr. Sexton Testified That TU Programs Were Not Uniform or Standardardized, and in Fact, Were Different

Similarly, plaintiffs misrepresent to the Court that Mr. Sexton never previously stated that the preview seminars were different.  In fact, Mr. Sexton testified long before plaintiffs filed their motion as follows:

(Def. Ex. **136**.)

Mr. Sexton testified that

Plaintiffs mislead the Court by arguing that Mr. Sexton's testimony and declaration differ on this point, when in fact he addressed                                    In addition, 14 students and four instructor/mentors submitted declarations in which they                                                                 (see Def. Exs. **14** and **22**).  Moreover, <u>plaintiffs</u>' own declarant Sommer, who attended at

1  least 20 TU programs, testified that they were <u>different,</u> and included <u>different</u>

2  PowerPoint presentations (See Def. Ex. **89**.)  The Court also has 13 <u>different</u>

3  PowerPoints (Plf. Exs. 40, 41, 47 and 49; Def. Ex. **39**.)

      **d.**      **Mr. Sexton Testified That TU's Programs Were Unique and**
4                       **Not Copies of Other On-Line Programs**

5

6        Plaintiffs argue that Trump University simply copied on-line programs offered

7  by other training companies such as BSG and its "Trump Institute" programs.  This

8  statement is a complete fabrication.  Mr. Sexton testified to this very issue <u>one month</u>

9  <u>before</u> plaintiffs filed their motion, and stated the exact opposite, as follows:



(Def. Ex. **137**.)

      **e.**      **Mr. Sexton Was Never Asked Whether Mr. Trump Picked TU**
17                       **Instructors – Only Mr. Trump Was Asked About Picking**
18                       **Instructors, and He Testified How He Picked Them**

19        Plaintiffs argue that Mr. Sexton never testified that Mr. Trump approved new

20  instructors.  This is true, but totally misleading because <u>plaintiffs never asked him that</u>

21  <u>question</u>.  Nowhere do plaintiffs cite to a question and answer of Mr. Sexton even

22  touching on the issue.

23        However, Mr. Trump specifically addressed this issue in his deposition

24  testimony, which – like Mr. Sexton's – was taken <u>before</u> plaintiffs filed their motion

25  for class certification.  Plaintiffs mislead the Court by completely ignoring the only

26  TU testimony on instructor selection, which was as follows:

27            Q:     How about Stephen Gilpin?  Do you know who that
                   is?

28

A:    I think these are names of people that I taught where - - I think I know their names because I saw resumes, and I would see resumes of instructors, because it was important to me that we got good instructors.

So I don't know if that's what you're referring to. But I've met numerous instructors, and I've also - - this is over a period of years. And I've also seen the resumes of virtually everybody.

So that's where they sound familiar to me; and in some cases, I know them better because I've met them. (Def. Ex. **138**.)

### f.    TU Used "Form Contracts," But They Differed

Plaintiffs argue that "Mr. Sexton testified that ████████████████ and then attack his credibility on the basis that TU used "form contracts." In fact, both statements are perfectly true: TU used "form contracts," but they varied over time. Some had different release and waiver provisions. Some had incorporation clauses barring claims for misrepresentation. Cancelation deadlines for refunds varied. Finally, some versions had specific requirements that students complete programs within a specific time (Def. Oppo. Class Cert., Ex. **1**, ¶7 & Ex. **8**). Plaintiffs boldly cite some of this documentary evidence in their motion to strike, evidently assuming the Court will not actually look at it. When the Court does so, the differing forms will be obvious.

### g.    Mr. Sexton Had Personal Knowledge about the Goals Sheets

Plaintiffs argue that Mr. Sexton has no personal knowledge of the "goals sheets" filled out by TU students – apparently on the basis that he did not personally attend every presentation where they were used, nor personally assist in filling them out. This is nonsense – Mr. Sexton has the personal knowledge of the goals sheets that one would expect from the founder and CEO, namely their <u>basic purpose and content</u>:



(Def. Ex. **139**.)

**h.     There is No Contrary Evidence Regarding TU's Refund Policy**

Plaintiffs attack Mr. Sexton's testimony that TU's refund policy was generous by arguing that it is contrary to the evidence.  In doing so, plaintiffs cherry-pick an experience of only *one* student, whose refund took longer than normal, and they ignore the overwhelming evidence of other refunds (see Def. Ex. **6**, ¶ 6, m-o.)

Plaintiffs also misleadingly cite to the deposition testimony of Mark Covais to argue that he handled between five and 20 refund calls every day.  Mr. Covais actually testified that ████████████████████████████████████████████ ████████████████████████████ (Def. Ex **140**.)  He never testified that he handled 5-20 <u>refund</u> requests per day.

**i.     Mr. Sexton's Testimony Regarding TU's Advertising Campaign Is Consistent with His Declaration**

Plaintiffs also argue that Mr. Sexton's declaration regarding advertising is contrary to his deposition testimony.  However, plaintiffs use only selected phrases from Mr. Sexton's testimony and even they do not evidence any actual contradictions.

For example, plaintiffs attempt to argue that TU engaged in "uniform" large scale marketing by citing Mr. Sexton's statement that ████████████████████████

1 ██████████████████████████████████ His deposition testimony, however,

2 consistent with his declaration, explained that ████████████████████████████

3 ███████████████████████████████

4 █████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ████████████████████████████████████████████

7 ██████████████████ (Def. Ex. **141**.)

8 **j.    Mr. Sexton's Testimony about Mentorships is Consistent with the Evidence**

9          Plaintiffs misconstrue the evidence to argue that TU advertised "year-long" and

10 "life-long" mentorships despite Mr. Sexton's declaration to the contrary.  As

11 explained by Mr. Sexton in his deposition, consistent with his declaration, no such

12 advertising occurred.  Rather, TU's mentorship program was designed to allow for a

13 3-day in-field mentorship, followed by continued support:

14 ██  ████████████████████████████████████

15 ██  █████████████████████████████████

16 ██  ███████████████████████████████████████

17      ████████

18 ██  ████████████████████████████████████████████

19      ███████

20 ██  ████████████████████

21 ██  ████████████████████████████████████████

22 ██  █████████████████████████████████

23      ████████

24 ██  █████████████████████████████████████████

25      ████████

26 ██  ████████████████████████████████████

27 ██  ███████████████████████████████████████████

28      ████████████████████████████████████████████

████████████████████████████ (Def. Ex. **142**.)

**k.   Mr. Sexton Had Personal Knowledge of the use of the Trump Video**

Plaintiffs again pick one isolated statement by Mr. Sexton in his deposition –
i.e., ████████████████████████ – to argue that his declaration
regarding the <u>use</u> of the video lacks foundation.  Not only are plaintiffs objections
wrong based on the foundation in the declaration itself – including that Mr. Sexton
"attended dozens of live programs and the free 90-minute program and 3-day
seminars" – but his deposition testimony on the topic is extensive and <u>consistent</u> with
his declaration.  (Def. Ex. **143** – compare Sexton Dec. ¶ 15 with Sexton Depo.,
pp. 208:3-216:16).

**l.   Mr. Sexton Testified about Trump's Secrets Taught by TU**

Plaintiffs argue that Mr. Sexton never testified about Mr. Trump's secrets
taught in TU programs, and instead defendants "concocted" a theory of the secrets
after seeing plaintiffs' moving papers.  The supposedly "concocted" theory is that the
Trump secrets included developing an entrepreneurial mindset of overcoming fear,
getting started, learning by doing, and risk-taking.  To support their argument that this
theory was "concocted," plaintiffs <u>never</u> cite the Court to Mr. Sexton's deposition
testimony directly on point.  Mr. Sexton testified as follows:

██  ██████████████████████████████████
█████████████

██  ██████████████████████████████████
████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

15                    Case No. 10 CV 0940 GPC (WVG)



(Def. Ex. **144**.)

### 3.   **Mark Covais**

Mr. Covais has worked for TU since 2006 and currently serves as its Director of Operations.  He submitted a declaration addressing several material issues, including: ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████  Plaintiffs attack Mr. Covais' declaration with their usual argument of no foundation, and misstate the evidence he provided with the usual misrepresentations.

### a.   **Mr. Covais Had Personal Knowledge That Instructors and Mentors Never Used Scripts**

Plaintiffs attack the testimony in Mr. Covais' declaration that ████████████ ███████████████████████ claiming lack of foundation.  However, Mr. Covais' declaration on that point was based on his <u>personal</u> attendance at TU's free 90-minute preview programs, and at TU's three-day seminars and workshops (see Def. Ex. **6**, ¶7].  He was <u>present</u> at those programs, so he has an adequate foundation to offer evidence of his personal observations.[2]

### b.   **Mr. Covais Has Personal Knowledge of the 80 Written and Video Testimonials That Praise TU Programs**

Plaintiffs next attack Mr. Covais' declaration to the effect that Trump University received approximately 80 written and videotaped testimonials from students.  Plaintiffs <u>only</u> criticism is that the declaration fails to identify which

---

[2]    Plaintiffs' argument is particularly curious because <u>every</u> named plaintiff testified ████████████████████████████████████████████████ █████████████████████████ (see Def. Exs. **91**; **92**; and **93**.)  Likewise, four mentors and instructors ████████████████████████████████ (see Def. Ex. **22**a-d: Jamieson, ¶4, Peterson, ¶ 7, Horton, ¶ 7 and Guarino, ¶7).  Finally, three former TU employees (represented by <u>plaintiffs</u>) testified that instructors and mentors did not use scripts (see Def. Exs. **94**; **95**; **97**; and **96**).  In short, Mr. Covais' declaration on this issue is directly supported by every plaintiff and TU instructor witness.  There is no contrary evidence.

programs the students purchased, and when they enrolled in the program. Neither of those points is relevant, but both can be ascertained by reviewing the testimonials and videos (see Def. Ex. **13**) and the numerous spreadsheets defendants produced long ago to plaintiffs in the litigation which identifies each student and the date and programs they purchased – a point unmentioned by plaintiffs.

Plaintiffs also argue that they cannot determine whether the testimonials were from individuals who are part of the potential class. In fact, defendants gave plaintiffs the identity of each student who provided testimonials, and a list of the exact programs each took – all of which information was actually gathered by Mr. Covais from TU records and provided to plaintiffs <u>before</u> they filed this motion – another point unmentioned by plaintiffs.

      **c.**    **Plaintiffs Dispute Mr. Covais' Personal Knowledge of the 10,000 Evaluations by Misstating His Input and the Evidence**

To begin, plaintiffs argue that the 10,000 evaluations are "diluted many times over" on the theory that the 80,000 people who attended a free seminar filled out evaluations. Mr. Covais' declaration says nothing of the sort, and when he was specifically asked in his deposition about evaluations of free programs, he confirmed that ███████████████████████████████████ (See Def. Ex. **145**.) Plaintiffs offer only <u>one</u> such evaluation as their "evidence." Moreover, of the 10,000 evaluations provided to the Court, only 67 (well under 1%) are from "PRE" programs that were free. Thus, over **99%** of those evaluations were from non-PRE programs.

Plaintiffs' next argument that "many of the evaluations were not returned" is also false. Here again, there is nothing in the Covais declaration to that effect. Instead, plaintiffs cherry-pick <u>one</u> page from a TU survey which indicated that for that <u>one</u> program (out of hundreds of programs offered by TU) 56% of attendees returned evaluations. Defendants invite the Court to look at the <u>entire</u> survey (Def. Ex. **24**), which reflects a response rate typically between 80% and 100%.

/ / /

Plaintiffs next argue that 25% of TU students who purchased a live event received a refund, and therefore evaluations from those students should not be considered.  The Covais declaration provides the foundation for the percentage of refunds, but provides no support for plaintiffs' argument.  The declaration establishes that ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████  However, the declaration also establishes that ██████████████████████████████████████████████ █████████████████████████████████████  In short, students who received a refund after the first day never would have filled out an evaluation, and so plaintiffs' argument is baseless.

### 4.     Troy Peterson

Mr. Peterson was an experienced TU mentor who was highly sought after by the students.[3]  He provided a declaration which summarized ████████████ ████████████████████████████████████████████████ ███████████████████████████████

Plaintiffs first attack the Peterson declaration by arguing that "Troy Peterson was primarily a phone coach, and therefore his testimony bears little relevance to the mentoring that occurred as part of the live events."  Plaintiffs cite no evidence for that false statement.  Instead, they cite his declaration in which he stated directly to the contrary, ███████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████

---

[3]     In fact, after lead plaintiff Ms. Makaeff heard from her investing partner that he had an "excellent experience" with Mr. Peterson as his mentor, Plaintiff Makaeff specifically requested that Mr. Peterson be her mentor as well, which he was. Ms. Makaeff admitted in a video testimonial that Mr. Peterson was "awesome."  (Def. Ex. **27**).

1  ██████████████████████████████████████ After personally

2  experiencing the mentorship program, and after three years of litigation, plaintiffs

3  know <u>exactly</u> what the mentorship program included and Mr. Peterson's role.

4  Plaintiffs' argument is unsupported and intentionally misleading.

5        Plaintiffs next argue that Mr. Peterson does not have personal knowledge

6  regarding his statements concerning plaintiffs Makaeff and Everett.  This is also

7  directly contradicted by the declaration itself.  Mr. Peterson was a mentor to both

8  Makaeff and Everett, spoke to both by telephone, and also dealt with plaintff Makaeff

9  face-to-face.  He certainly has personal knowledge of his communications with each.

10      **5.**   **John Jamieson**

11       Mr. Jamieson was a TU mentor and teacher.  He provided a declaration which

12  described ████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████

14  █████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████ Defendants provided the data for the Court to see for itself.  (See

17  Def. Exs.**11**-798, 11-926-928, 11-1004, 11-1458; Def. Ex. **24**-5133-5134).

18       Plaintiffs also argue that Mr. Jamieson could not have been given great latitude

19  in his teaching because a sentence in his contract states that slide presentations must

20  be approved in advance.  However, Mr. Jamieson's contract was a standard form used

21  by TU for its teachers and mentors, and ignores the actual testimony by Mr. Jamieson

22  (and every other instructor and mentor whose declarations plaintiffs <u>do not</u> challenge),

23  ████████████████████████████████████ In short, plaintiffs have no

24  substantive argument for striking the Jamieson declaration, much less a valid one.

25  / / /

26  / / /

27  / / /

28  / / /

**B.**     **TU Student Declarations Are Not the "Poisoned Fruit" of Any Impropriety**

        **1.**     **Trump University's Email to Former Students Seeking Declarations Was Completely Appropriate**

The supposedly improper and misleading TU email relied on by plaintiffs is available to the Court (Plf. Ex. 100-744).  As the Court can see, it simply invited students to comment about their participation in Trump University programs.  There was nothing improper about that.  Students were free to express how they felt, and a handful stated that they were unhappy.  Significantly, of 1,000+ emails sent, only ten former students – i.e., 1% -- responded with complaints.  Plaintiffs do not mention that many of the responses were very <u>favorable,</u> and invited Trump University to contact those responding students to discuss their successes.[4]

Plaintiffs nevertheless argue that the email was somehow improper because it did not contain an explanation of this lawsuit, plaintiffs' contentions, their potential recovery on behalf of the declarants, or the intended use of declarations as evidence.  However, plaintiffs offer no explanation as to why that information supposedly would have changed the declarants' impressions of TU formed <u>years earlier</u>.  Plaintiffs also fail to provide any evidence that the declarants were not informed of the class action and their rights prior to obtaining declarations.  Moreover, plaintiffs also fail to admit that the declarations themselves completely undercut plaintiffs' argument for two obvious reasons: 13 of 14 pre-date the email, ███████████████████████

/ / /

/ / /

/ / /

---

[4]     For example, responses from former students to the same email included:  "the support I received was great," and "I would certainly endorse the Trump coaching I received and the materials were very valuable," and "your phone coaching program was a great help," and the website "had very valuable information that helped me as an investor," and "I'm definitely very grateful with what I learned . . . I truly believe I owe my success today to what I learned with you guys."

### a.  13 of 14 Declarations Were Signed Before the Email Was Ever Sent

The email in question was sent on November 13, 2012.  Thirteen of the 14 declarations in question were written and signed <u>months before</u> that date.  The Court can review Def. Ex. 14(a)-(n) to confirm that 13 of the 14 declarations were prepared and signed between May 2012 and September 2012, which was 2-6 months <u>before</u> TU sent the November email inviting <u>other</u> students to comment about their experience.

### b.  The Declarations Themselves Show that the Declarants Were Well Aware of the Litigation

All 14 declarants acknowledge ███████████████████████████ ████████████████████████████████ (Def. Ex. **14**(a)-(n)).  Consequently, even assuming the email could be criticized on the basis that it did not mention the lawsuit, that criticism obviously had been eliminated as a concern by the time the <u>one</u> student who received it <u>before</u> signing decided to prepare a declaration.

## 2.  Plaintiffs' "Poisoned Fruit" Cases Are Totally Inapplicable

Plaintiffs cite several cases for the proposition that the courts will frown on misleading communications with potential class members concerning the nature of ongoing class action litigation.  However, those cases cannot apply to a communication which <u>postdated</u> the members' declarations purportedly influenced by it.  Those cases also cannot apply to a communication which said <u>nothing</u> about litigation – especially when declarations of the members ██████████████████ ████████████████████  All 14 declarations in question fall into at least one of those two sets of circumstances, and 13 of them fall into both.  Plaintiffs' cases simply do not apply to any of the 14 declarations here.

## 3.  The Only Improprieties Concerning These Declarations Occurred When Plaintiffs' Counsel Posed as TU Representatives While Attempting to Get Retractions of the 14 Declarations

Plaintiffs' counsel attempted to undermine the 14 declarations by personally contacting each declarant in hopes that they would change their testimony.  Plaintiffs'

counsel of course are entitled to interview witnesses who are also potential class members, but they did not stop there.  Rather than identify themselves as representing <u>plaintiffs</u> in this case, plaintiffs' counsel actually tried to mislead the witnesses by suggesting that they were <u>part of Trump University</u>.  Plaintiffs' counsel also tried to twist the words of the witnesses to suggest that their original declarations were obtained by TU improperly.

Hard though this may be to believe, the additional student declarations submitted with these papers leave no doubt about it.  For example, former TU student and declarant Mette Nielsen explained plaintiffs' counsels' deceptive tactics as follows:



(Def. Ex. **146**, ¶¶ 4, 6.)

Another former TU student and declarant, Amy Hinderer, stated:



(Def. Ex. **147**, ¶ 5, 6.)

Similarly, former TU student and declarant Paula Levand stated:

(Def. Ex. **148**, ¶¶9,10).

Plaintiffs' counsel's attempts to convince Trump University students to change their positive testimony about their experience was not limited to telephone contact – they also conducted an email campaign <u>pressuring</u> these witnesses.  For example, former TU student Kissy Gordon wrote an email

(Def. Ex. **149.**)

Ms. Gordon even explained to plaintiffs' counsel that

(Def. Ex. **149**).

It is noteworthy that despite contacting all 14 TU declarants, and despite a truly remarkable attempt to deceive and pressure them, plaintiffs' counsel got no recantations from any of them.  The 14 student declarations should be considered by

the Court as probative, relevant and even more credible after plaintiffs' counsel tried to persuade them to change their testimony.

### III.   CONCLUSION

Defendants' 19 declarations attacked by this motion are their own best argument for being considered by the Court.  Each one recites concrete facts based on personal knowledge.  For those declarants who were also deposed, their deposition testimony is consistent with their declarations.

Moreover, the 14 student declarations attacked by this motion bear dates and/or recite facts which prove that no possible impropriety occurred when TU obtained them.  Finally, those students stood by their declarations when all of them were contacted and pressured by plaintiffs' counsel, and at least some of them were misled.

Defendants respectfully request that this motion be denied.

Respectfully submitted,


Dated:    April 26. 2013              YUNKER & SCHNEIDER


                                     By:      s/David K. Schneider
                                     Attorneys for Defendants
                                     TRUMP UNIVERSITY, LLC and
                                     DONALD J. TRUMP
                                     Email:  dks@vslaw.com

1

CERTIFICATE OF SERVICE

2        I hereby certify that on April 26, 2013, I authorized the electronic filing of the foregoing with

3   the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   e-mail addresses denoted on the attached Electronic Mail Notice List.

5        I certify under penalty of perjury under the laws of the United States of America that the

6   foregoing is true and correct.  Executed on April 26, 2013.

7

8                                          s/David K. Schneider
                                     DAVID K. SCHNEIDER
9
                                     YUNKER & SCHNEIDER
10                                   655 West Broadway, Suite 1400
                                     San Diego, CA  92101
11                                   Tel:    (619) 233-5500
                                     Fax:    (619) 233-5535
12
                                     Email: dks@yslaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:10-cv-00940-GPC-WVG

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **David Keith Schneider**
  dks@yslaw.com,ewb@yslaw.com,efb@yslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)