David K. Schneider (CSB 139288)
YUNKER & SCHNEIDER
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone: (619) 233-5500
Facsimile: (619) 233-5535
Email: dks@yslaw.com

Attorneys for Defendants TRUMP UNIVERSITY, LLC and
DONALD J. TRUMP

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM, SONNY LOW, J.R. EVERETT and JOHN BROWN, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>TRUMP UNIVERSITY, LLC, (aka Trump Entrepreneur Initiative, LLC,) a New York Limited Liability Company, DONALD J. TRUMP, and DOES 2 through 50, inclusive,<br><br>Defendants. | Case No. 10 CV 0940 GPC (WVG)<br><br>DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE AND OBJECTIONS TO IMPROPER EVIDENCE AND ARGUMENT IN PLAINTIFFS' CLASS CERTIFICATION REPLY PAPERS:<br><br>• New Evidence and Argument: Improper in Reply<br><br>• Known Adverse Evidence: Improperly Kept from Court<br><br>• Misstated Evidence: Improper Anytime |
| AND ALL RELATED CROSS-ACTIONS. | DATE: 6/28/13<br>TIME: 1:30 p.m.<br>CTRM: 2D |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT................................................................................................... 1

    A.   The New Evidence and Argument in Plaintiffs' Reply is
        Improper and Must be Stricken......................................................... 1

    B.   Known Adverse Evidence, Improperly Kept From the Court,
        Must Be Stricken................................................................................ 3

        1.   There Is No Probative Evidence of TU "Scripts,"
              "Guarantees," or Promises of "Year-Long Mentoring" ............ 3

              a.   Magistrate Gallo Ordered Plaintiffs to Disclose
                    Their Key "Evidence" ...................................................... 3

              b.   Plaintiffs' Key "Evidence" Did Not Exist, or Was
                    Not Probative, or Both...................................................... 4

              c.   Plaintiffs Nevertheless Still Argue As Though
                    They Have Key "Evidence" – Especially
                    Concerning the "Script" .................................................. 5

               d.   There Were No "Scripts" Ever Used by Any TU
                    Presenters......................................................................... 6

                   i.   Subterfuge #1: The Unused "Closer Script"..........7

                   ii.   Subterfuge #2: The Nonexistent
                        "Standardized" PowerPoint or Playbook .............. 8

        2.   The Regulatory Inquiries Into TU Were Orchestrated by
               Plaintiffs.................................................................................. 10

        3.   The Basic Theories of Plaintiffs' Case Have Changed
               Completely............................................................................... 11

    C.   Plaintiffs' Mischaracterizations of Defendant's Arguments, and
        Unfounded Attacks on Defendants Evidence, Should be
         Stricken.............................................................................................. 13

        1.   Plaintiffs Mischaracterize Three Defendant Arguments re
               Class Certification.................................................................. 13

        2.   Plaintiffs' Attacks on Defendants' Approval Rating............... 15

        3.   Plaintiffs' Attacks on Class Member Declarations ................. 18

III.  SUMMARY CHART OF OBJECTIONS....................................................... 20

IV.   CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Betts v. Reliable Collection Agency*
     659 F.2d 1000 (9th Cir. 1981) .........................................................13

*Gomez v. Rossi Concrete, Inc.*
     270 F.R.D. 579 (S.D. Cal. 2010) ...................................................13

*In Re Flash Memory Antitrust Litigation*
     2010 WL 2332081 (N.D. Cal. 2010) ...............................................1

*In Re Rains*
     428 F.3d 893 (9th Cir. 2005) ...........................................................2

*Provenz v. Miller*
     102 F.3d 1478 (9th Cir. 1996) .........................................................2

*Tovar v. U.S. Postal Service*
     3 F.3d 1271 (9th Cir. 1993) .............................................................2

*Zamani v. Carnes*
     491 F.3d 990, 997 (9th Cir. 2007) ..................................................1

## Rules

Federal Rule of Civil Procedure 12(f) ....................................................1

Case No. 10 CV 0940 GPC (WVG)

## I.    **INTRODUCTION**

Defendants object to plaintiffs' improper evidence submitted with their reply papers, and make this motion to strike such evidence.  Defendants do so because once again plaintiffs' reply papers are based on improper, misstated, or a complete lack of evidence.

In plaintiffs' reply papers supporting their motion for class certification, plaintiffs have:  (1) introduced new evidence and argument; (2) relied on evidence and arguments which are contrary to adverse evidence long known but previously kept from the Court by plaintiffs[1]; and (3) mischaracterized defendants' arguments and made unsupported attacks on defendants' evidence.  Based on all three of these improprieties in plaintiffs' briefing, defendants respectfully request that the Court strike several portions of plaintiffs' evidence and argument as discussed below.

## II.    **ARGUMENT**

Federal Rule of Civil Procedure 12(f) provides that a party may move to strike any "redundant, immaterial, impertinent, or scandalous matter."  Misstated, exaggerated, or missing evidence (i.e., evidence cited but either not in the record or nonexistent) is improper, objectionable, and should be stricken.  Nevertheless, just like plaintiffs' moving papers, their reply papers are filled with many examples of these improprieties.  Defendants will identify, object to, and move to strike only the most important or egregious of those examples, as follows.

## A.    **The New Evidence and Argument in Plaintiffs' Reply is Improper and Must be Stricken**

The District Court need not consider evidence or arguments raised for the first time in a reply brief.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  This is especially true in a motion for class certification.  *See, e.g., In Re Flash Memory Antitrust Litigation,* 2010 WL 2332081, at*15 (N.D. Cal. 2010), *citing In Re Rains,*

_____

[1]    This evidence was recently uncovered by defendants.

428 F.3d 893, 902 (9th Cir. 2005) ("since it is plaintiffs' initial burden to demonstrate the existence of an ascertainable class, such evidence should have been proffered with plaintiffs' moving papers in order to afford defendants a full and fair opportunity to respond").  *See also Tovar v. U.S. Postal Service*, 3 F.3d 1271, 1273 (9th Cir. 1993) (new information contained in reply papers is improper); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (new evidence introduced in reply papers should not be considered unless the opposing party has the opportunity to respond).

Plaintiffs totally disregarded this settled law on a grand scale.  They submitted 70 new exhibits (Exhibits 67-137) with their reply – more than the total number of exhibits submitted with their moving papers.

These newly submitted exhibits include documents available to plaintiffs long before they submitted their original moving papers many months ago.  Such documents include exhibits 68, 71, 74, 79, 80, 81, 82, 83, 85, 88, 91, 93, 94, 96, 97, 98, 99, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 125, 126, 127, 128, 129, 131, 132, 133, 134, 135, 136 and 137 (52 of the 70 new exhibits).  Supplemental Declaration of David K. Schneider ("Schneider Supp. Dec."), ¶ 2.

Such documents also include testimony from the named plaintiffs themselves.  Exhibits 80, 81, 95 and 128 are deposition transcripts of witnesses represented by plaintiffs' counsel "for years."  Exhibit 83 is a marketing document in the possession of a former TU employee who plaintiffs' counsel also has represented for years.  Exhibit 93 is a "supplemental" declaration of the lead plaintiff.  The information in those exhibits was also available to plaintiffs long before they filed their moving papers, and was probably available at least since the inception of the case.

Finally, the new "evidence" also includes Exhibits 74, 79, and 88, which are not even objective evidence, but rather are mere examples of argumentative attorney work product created by plaintiffs' counsel which have no foundation, authenticity or reliability.  Moreover, the underlying documents which purportedly form the basis for

these three "manufactured" Exhibits were also available to plaintiffs and in their possession <u>long before</u> submitting their moving papers. Once again, plaintiffs' belated submission of this new work product with their reply papers is inexplicable as well as improper.

Plaintiffs' attempted introduction of this new evidence on reply is entirely improper. Consequently, Defendants respectfully request that all 70 new exhibits submitted with plaintiff's reply papers (Exhibits 67-137) be stricken.

**B.** **<u>Known Adverse Evidence, Improperly Kept From the Court, Must Be Stricken</u>**

Plaintiffs' evidentiary lapses in the reply papers are not limited to what they say, but regrettably also include what they don't say. There are three key omissions from plaintiffs' evidence that should have been disclosed by them to the Court.

The first two of those omissions discussed below were only discovered by defendants within the last several weeks – well after their opposing papers were filed. The last omission discussed below has been developing since the case began, but it finally reached such a level in plaintiffs' reply papers that fair disclosure was needed. The three omissions are as follows.

**1.** **There Is No Probative Evidence of TU "Scripts," "Guarantees," or Promises of "Year-Long Mentoring"**

**a.** **Magistrate Gallo Ordered Plaintiffs to Disclose Their Key "Evidence"**

This case has been pending for three years, and throughout that time defendants have sought identification of plaintiffs' documents <u>actually evidencing</u> their persistent claims of fraud based on alleged uniformly deceptive TU "scripts," "guarantees" of earnings, and promises of "unlimited" or "year-long mentoring." Plaintiffs doggedly evaded any meaningful identification of those presumably crucial and dispositive documents in deposition, written discovery, document productions, letters and emails between counsel, endless "meet and confer" sessions, four iterations of their complaint, and two motions to compel – until 3/18/13 (Schneider Supp. Dec., ¶ 3).

1    That date was the deadline set by the 3/12/13 order of Magistrate Gallo, which

2    required plaintiffs to produce at least one example each of a "script," a "guarantee,"

3    and a promise of "year-long mentoring."  In the words of Judge Gallo, this order was

4    made after "preparation and submission of two joint Statements, at least two meet and

5    confer sessions, and two formal hearings before the Court," and after plaintiffs had

6    already "failed to comply" with an earlier order to the same effect because "none of

7    the documents produced could reasonably be interpreted as responsive."  (ECF 203,

8    pp. 5-7.)  Faced with the risk of serious evidentiary sanctions (*id*. at p. 7), plaintiffs

9    <u>finally</u> produced the purported documentary foundation of their entire case.

10           **b.    Plaintiffs' Key "Evidence" Did Not Exist, or Was Not
                      Probative, or Both**

11

12    What are those documents?  The <u>entire</u> production by plaintiffs consisted of a

13    declaration of lead plaintiffs' counsel (Def. Ex. **122**) and two documents (Plf. Exs. 86

14    and 88).  As is explained below, and as the Court can easily see for itself, it turns out

15    that plaintiffs have <u>no</u> "scripts" (see Plf. Ex. 86), <u>no</u> "guarantees" (see Def. Ex. **122**,

16    ¶ 5), and <u>no</u> promises of "year-long mentoring" (see Plf. Ex. 88).

17           The "script" (Plf. Ex. 86) turns out to be one example of several differing

18    PowerPoint outlines for the introductory "preview" program, devoid of any alleged

19    misrepresentations.  Why do plaintiffs call this simple visual outline a "script?"

20    Because it has "talking points" for some slides, also lacking any misrepresentations.

21           Plaintiffs' originally claimed that the "guarantee" was a one-page form letter

22    from Mr. Trump congratulating TU students who had <u>already</u> signed up for certain

23    programs – i.e., a letter obviously not relied on by students to make that decision.  In

24    the words of Judge Gallo, the letter "does not contain any guarantees, nor any

25    language that can reasonably be construed to be a guarantee," and consequently

26    plaintiffs had "failed to comply with the Court's Order."  (ECF 203, p. 6:4-9.)

27    Plaintiffs' counsel then finally conceded that there was no guarantee despite alleging it

28    in the original and three amended complaints.

For the promise of "year-long mentoring," Plaintiffs initially produced two one-page examples of TU marketing materials referring to continuing support of TU students <u>after completing their mentorships</u>.  In the words of Judge Gallo, "neither of [the two documents] reference year-long or unlimited mentoring," and consequently plaintiffs once more had "failed to comply with the Court's Order."  (ECF 203, p. 6:12-14.)  Plaintiffs then produced a lawyer-prepared table containing a "summary" of virtually identical type statements.

In short, after <u>three years</u> of plaintiffs alleging, swearing, testifying, and arguing that such key evidence exists, we learn that it doesn't exist at all – a fact that plaintiffs obviously knew all along.  That fact should have been disclosed to the Court from the outset, and certainly no later than the filing of plaintiffs' motion for certification.

### c.    Plaintiffs Nevertheless Still Argue As Though They Have Key "Evidence" – Especially Concerning the "Script"

Perhaps most egregious is the fact that even though plaintiffs have <u>now disclosed</u> in the discovery process that there is no probative evidence of TU "scripts," "guarantees," or promises of "year-long mentoring," plaintiffs still continue to argue in their reply papers as though there is such evidence.  Moreover, plaintiffs never disclose to this Court Judge Gallo's Order, nor the resulting paucity of "evidence" they identified, nor all of that "evidence" itself.

This pattern of unsupported argument, and concealment of contrary evidence, is consistent for each of the three original evidentiary pillars of plaintiffs' case: i.e., the non-existent "scripts," "guarantees," and promises of "year-long mentoring."  But Judge Gallo has <u>already ruled</u> that plaintiffs' "evidence" of the "guarantees" and "year-long mentoring" is <u>not probative</u>, and indeed is in violation of the Court's order requiring production of probative evidence on those two issues.  Consequently, plaintiffs have now tacitly dropped those non-issues without ever honestly conceding they have no merit – a point addressed in the discussion below concerning plaintiffs' ever-shifting theories of their case.

By contrast, plaintiffs have not dropped the "script" non-issue.  Instead, they have attempted to muddy the clear record made by Judge Gallo of their only purported "evidence" in that regard (i.e., Plf. Ex. 86).  They have also attempted to mislead the Court by continuing to argue that a "script" – never used by TU presenters – actually exists.  This misinformation campaign requires detailed discussion to be fully exposed and overcome by the actual evidence needed by the Court to decide this motion for certification.  That discussion follows immediately below.

### d.     There Were No "Scripts" Ever Used by Any TU Presenters

With respect to the alleged "scripts," plaintiffs mislead the Court by stating the following in their reply papers:

- "All initial sales calls, including calls to the 80,000-plus attendees of the free Preview, were done by script." (Reply, 2:6-7).

- ███████████████████████████████ (Reply, 11:5).

- "In addition, salespersons (aka "setter" or "screener" who are not simply "schedulers") used scripts to call all students who had attended the free Preview (over 80,000 people) to up-sell them to another product." (Reply, 5:18-20).

These statements are false and misleading for two main reasons.  First, plaintiffs cite no evidence for the representation that defendants called 80,000 preview session attendees.  TU had a call center from which it contacted a small minority of potential students.  In fact, none of the six named plaintiffs ever even spoke with the call center.

Second, the actual evidence demonstrates that there were no scripts whatsoever for presenters, instructors, mentors, or sales people.  (Def. Exs. **1**, ¶¶ 17-18; **90**; **6**, ¶7; **123**; **22** a-d:  Jamieson ¶ 4, Peterson ¶ 7, Horton ¶ 7, Guarino ¶ 7; and **94**.)  The only TU "script" ever used was by "setter" schedulers to "set up" phone calls for the sales department, and that two-page setter's script is not the basis of any of plaintiff's claims.  (Def. Ex. **96**.)

It was no accident that plaintiffs failed to submit any "script" with their original moving papers.  It was <u>defendants</u> who submitted the only TU "script" ever used – namely the irrelevant setter's script.  Thus, all the argument by plaintiffs about "scripts," and the mythical "orchestrated schemes" and purported misrepresentations supposedly based on the "scripts," are unsupported and untrue.

Accordingly, plaintiffs' misrepresentation claim cannot be determined by "common evidence" because there was no uniform "scripted" sales call or other presentation made to the attendees of the preview, or of any other TU presentation.  Furthermore, even the two page "setter's script" contains none of the purported misrepresentations.  It is also irrelevant to the vast majority of all TU students – including all six named plaintiffs – who never spoke with a "setter."

Plaintiffs' Reply does not concede or even address this adverse evidence on their key issue.  Plaintiffs do not tell this Court that – after being ordered by Judge Gallo – they have already disclosed in discovery that their only purported "evidence" of a presenter "script" is the PowerPoint outline and its "talking points" (Plf. Ex. 86).  To the contrary, plaintiffs apparently subscribe instead to the old adage:  "Desperate times call for desperate measures."  In hopes of papering over this gaping hole in their "evidence," plaintiffs now try to mislead the Court with two blatant subterfuges.

### i.    Subterfuge #1: The Unused "Closer Script"

The first subterfuge is that plaintiffs submitted a "closer script" with their reply papers (Plf. Ex. 82, cited at Reply, 5:26, n.5), passing off that document as purported evidence of a material TU presenter "script."  However, plaintiffs failed to tell the Court that the "closer script" is not a TU document, was not prepared by TU, and was never used by TU.

Plaintiffs were advised of these facts <u>before</u> they even filed their certification moving papers – i.e., many months ago during the deposition of TU executive Michael Sexton and before they filed their Reply during the deposition of TU employee Mark Covais.  Those witnesses testified that many third-party vendors often

sent similar documents to TU in hopes that TU would consider using them. (Def. Exs. **124** and **125**.)  TU <u>did not</u>, however, use them.  (Def. Exs. **126** and **127**.)

Plaintiffs <u>intentionally</u> attempted to mislead the Court by submitting the "closer script," and deceitfully implying that it was a TU document.  In fact, plaintiffs knew before submitting their original moving papers that the "closer script" was not even a TU document at all.  Furthermore, plaintiffs never submitted the "closer script" to Judge Gallo when required to produce their "evidence" of TU "scripts."  Nevertheless, plaintiffs have submitted it to this Court with their Reply.

### ii.    Subterfuge #2: The Nonexistent "Standardized" PowerPoint or Playbook

The second subterfuge is that, despite having known the dispositive evidence to the contrary for years, plaintiffs continue to pretend and argue to the Court that there was a "standardized" PowerPoint presentation which served as a "script," which plaintiffs now claim is plaintiffs' Ex. 86.  Alternatively, plaintiffs argue that the TU administrative "Playbook demonstrates a "standardized" presentation that was essentially "scripted."  In these regards, plaintiffs misrepresent to the Court that:

- "Defendants also admit 80,304 consumers were subjected to the 90-minute 'Preview' advertisement through <u>standardized</u> PowerPoint presentations . . . ." (Reply, 2:4-6).

- ███████████████████████████████████████
  ████████████████████████████████████████
  ███████████████ (Reply, 6:22-23).

- ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  (Reply, 4:20-22)

The reality is that no such "standardized" PowerPoint exists.  This dispositive fact is confirmed by plaintiffs' Exhibits 40, 41, 47, and 49 (four different

PowerPoints), and defendants' Exhibit **39** (nine different PowerPoints).  In fact, plaintiffs even <u>admit</u> in their motion to strike that the PowerPoints were <u>different</u>. (Plaintiffs' Oppo. Motion to Strike, p. 7 ¶ 9.)  The TU PowerPoint presentations were different and changed over time, different instructors used different PowerPoints, and mentors never used them.  (See Def. Exs. **1**, **89**, and **39**.)  Mr. Sexton and mentors and instructors all testified that the presentations and mentoring were different, and there was no standardized PowerPoint.  (Def. Exs. **1**, ¶¶ 17-18; **90**; **123**; **22**a-d: Jamieson ¶ 4, Peterson ¶ 7, Horton ¶ 7, Guarino ¶ 7; **94**.)  Even plaintiffs' client and declarant, former TU employee Ms. Sommer, testified that she attended over twenty live events, and the PowerPoint presentations were <u>different</u>.  (Def. Ex. **89**.)

Likewise, there was no one Playbook between 2006 and 2010.  In fact, there was no Playbook at all in 2006 or 2007.  There was a Sales Manual in 2007 and a Sales Playbook in 2008.  The 2009 Playbook is very different than the one in 2010. (Def. Ex. **83**.)  Even more to the point, <u>none</u> of the Playbooks in <u>any</u> iteration contains any alleged misrepresentations.  This is hardly surprising because the Playbooks are mere administrative guides for TU management of classes, expenses, billing practices, and the like – they had no substantive content to be taught to any TU students at all. This can be seen in even a very brief review of the 2010 Playbook, which is the one touted by plaintiffs as "the" Playbook.

In addition, many mentors and instructors have provided declarations that they never used <u>any</u> Playbook.  Plaintiff counsels' clients and former TU employees Sommer, Nicholas, and Donnelly also testified that they never saw or used any Playbook either.  (Def. Exs. **80** and **81**.)

In summary, plaintiffs' misinformation campaign on the "script" issue is a blatant attempt to distort the evidence and mislead the Court.  The actual evidence is uniformly contrary to plaintiffs' "script" arguments.  Plaintiffs' concealment and disregard of that contrary evidence, and their submittal of false and misrepresented "evidence" instead, should result in plaintiffs' "evidence' being stricken.

### 2.    The Regulatory Inquiries Into TU Were Orchestrated by Plaintiffs

The second key omission from plaintiffs' evidence is the fact that they covertly generated a bogus record now being used to "prove" their claims of wrongdoing by TU.  In short, plaintiffs prompted most of the regulatory inquiries into TU – inquiries which plaintiffs now pretend were spontaneous.

A consistent allegation of plaintiffs from the outset – and one which recently has become central to their case (see the following discussion of that truly remarkable evolution) – is that TU's "bad acts" have resulted in inquiries and investigations by state Attorneys General and the Better Business Bureau.  All four iterations of the complaint were filled with details in that regard, and plaintiffs have conducted extensive discovery and correspondence with those agencies.  The probative value of this regulatory interest in TU is zero because none of the inquiries or investigations have ever resulted in any determination against TU.  Nonetheless, plaintiffs are now trying to capitalize on the regulatory inquiries by arguing that a public investigation must mean that TU ought to be liable in this case.

However, defendants have just learned that the purported public outcry to the regulators has been stage-managed since 2009 by lead plaintiff Tarla Makaeff.  ███

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████   (Def. Ex. **128**).[2]

The blog itself specifically calls for the complaints and demands that plaintiffs have pretended for three years were spontaneous.  The blog also urges ex-TU students to seek complete refunds whether or not they have any complaint with TU.  In essence, the blog is a training and recruiting manual for plaintiffs' witnesses, and the

---

[2]    Plaintiffs initially objected to the single interrogatory which asked for the identity of the author of the blog.  Then plaintiffs stated that they were "investigating."  Only after the threat of a motion to compel did plaintiffs finally admit the truth that plaintiff Makaeff wrote and published the blog.

very similar complaints made to the regulators indicates that it served those purposes well.

Despite the fact that the truth has finally been revealed – namely that the regulatory scrutiny that plaintiffs rely on was trumped up by Ms. Makaeff – plaintiffs still argue in the reply papers as though the regulators are proving 'where there's smoke, there's fire!"  Indeed, that argument is now central to their case.  Yet, they never disclose that Ms. Makaeff is behind it all.

Those facts too should have been disclosed to the Court from the outset, and no later than the filing of the reply papers, especially now that these facts have become key to plaintiffs' case.  Accordingly, all references to inquiries and investigations by state Attorneys General and the Better Business Bureau should be stricken (See Reply, 1:10; 1:15-16; 1:24, n.1; 1:28, n.2; 2:27,n.3; 9:18-19).

**3.     The Basic Theories of Plaintiffs' Case Have Changed Completely**

The third and final key omission from plaintiffs' evidence is the frank and necessary admission to the Court that plaintiffs' theories of the case have not simply evolved, nor merely changed in minor detail, but instead have undergone radical changes and total reversals over the past three years.  Their current case as stated in the reply papers is completely different when compared with the original complaint, or the three amended complaints since.

Past "key" allegations and contentions basically dropped today include "oral contracts," "no education provided," "nationwide advertising" luring students to pay for "infomercials" (regional ads promoted free seminars only), training in "illegal" real estate practices (i.e., using "bandit" signs), mentorships consisting of excursions to Home Depot, mentors benefitting financially from recommended real estate transactions, TU failing "to give students complete information or specific techniques so that they feel confident to get involved in real estate investing . . .," plaintiff Low not receiving a "customized investment plan," broken promises that deals would "starting pouring in now," students not receiving "the contracts they needed to

1  conduct various complex real estate," TU's representatives illegally altering real estate

2  documents," failing to call plaintiff Keller's "leads," failing to teach plaintiff Brown

3  "how to buy houses with no money down," Mr. Trump's "total control" of the TU

4  program (he is now allegedly liable for <u>not</u> being involved), and those two formerly

5  crucial claims of "money back guarantees" and "year-long mentorships."  (See TAC

6  ¶¶ 5, 8, 29, 37, 56, 57, 58, 62, 64, 65, 67, 71, 74, 76, 86, 88, 99, 102 and 122.)

7       Even more crucially, plaintiffs have continued changing their case even <u>after</u>

8  filing their motion for class certification.  Their moving papers told the Court they

9  would prove the use of "identical scripts," a "centralized" scheme master-minded by

10  Mr. Trump, a "Playbook" used to manipulate students, an "unqualified" faculty of

11  hucksters unknown to Mr. Trump, and a vast diaspora of outraged ex-students anxious

12  to sue TU.  None of those basic but fundamentally necessary contentions have been

13  proved, most have effectively been abandoned, plaintiffs now downplay even the

14  crucial "scripts" as "not a magic word," and a main focus now of the reply papers is

15  that TU was investigated by regulators.

16       Plaintiffs have even come up with entirely new allegations in their reply, such

17  as: ████████████████████████████████████████████████████

18  ████████████████████ (Reply, 11:21-22).  Not only is this a new argument, but it is a

19  completely fabricated statement made to the Court without any evidentiary support.

20       These flip-flops in plaintiffs' basic theory of the case have caused confusion in

21  what plaintiffs purport to be able to prove for class certification purposes.

22  Consequently, defendants submit that the Court is owed honest disclosure by plaintiffs

23  concerning which theories have been abandoned, which remain, what evidence

24  specifically supports the latter, and hence what evidence must be analyzed by the

25  Court.  However, there is no such disclosure in the reply papers, which instead

26  improperly argue <u>new</u> issues and evidence, and misrepresent much of the existing

27  evidence.  Arguments which are based neither on the pleadings, nor on the evidence,

28  should be stricken.

**C.** **Plaintiffs' Mischaracterizations of Defendant's Arguments, and Unfounded Attacks on Defendants Evidence, Should be Stricken**

Plaintiffs attempt to mislead the Court into believing that Defendants somehow failed to contest several key criteria necessary for plaintiffs to meet their class certification burden.  Plaintiffs also mislead the Court concerning the actual arguments made by defendants on other keys issues.  Finally, plaintiffs attack portions of defendants' evidence by misleading the Court concerning its nature and purpose.  All such improper arguments should be stricken.

**1.** **Plaintiffs Mischaracterize Three Defendant Arguments re Class Certification**

Plaintiffs first argue that defendants do not contest numerosity (Reply, 2:16; 3:13).  Plaintiffs also argue – without any evidentiary support – that numerosity is met with respect to the senior subclasses (Reply, 14:22).   These arguments are completely false – and known to be false by plaintiffs.

For example, defendants specifically contested numerosity in their Opposition.  At page 33, Defendants argued that the Ninth Circuit requires that, "'[w]hen a class is divided into subclasses, each subclass must independently meet Rule 23 certification requirements.'  *Betts v. Reliable Collection Agency,* 659 F.2d 1000, 1005 (9th Cir. 1981).  Those requirements for subclasses specifically include numerosity.  *Gomez v. Rossi Concrete, Inc.,* 270 F.R.D. 579, 588 (S.D. Cal. 2010).  However, Plaintiffs have made no showing of numerosity for any subclass, whether by analysis, estimate, statistics, or otherwise."

Defendants also argued in their Opposition that plaintiffs provided literally no factual or legal support for the "senior" subclasses.  Plaintiffs did not address any requirement for certification of those subclasses in their moving papers, including providing evidence of numerosity.  The same is true in their reply papers, regardless of their pretense otherwise.  Mere false argument that numerosity already has been shown is not evidence of numerosity.

1    Second, plaintiffs pretend that "Defendants do not argue individualized reliance

2  must be shown as to plaintiffs' contract-based claims, unjust enrichment, senior abuse

3  claims . . . ." (Reply, 9:5-7.) Again, this is entirely false, as Defendants specifically

4  argued in their Opposition that the written contracts between TU and its paying

5  students varied as to form, guarantees, waivers, and the nature and price of the TU

6  services purchased. Defendants also argued that student expectations and

7  understanding of their contracts varied as well. Consequently, defendants specifically

8  argued that individual inquiry into each of those factors is needed to determine if there

9  was a breach of any contract, or of its covenant of good faith, and whether TU and the

10  student "substantially performed." (Oppo., pp. 33-34.)

11    Likewise, defendants also contested breach of oral contract, pointing out that

12  plaintiffs obviously cannot offer any documentary evidence of such purported

13  contracts, nor their purported terms. Consequently, defendants argued that individual

14  inquiry is the only possible way to determine if any such oral contracts even existed,

15  much less were breached. (Oppo., pp. 5, 22 and 34.)

16    Third, plaintiffs argue that whether class members received a refund is simply a

17  "damage issue," which does not defeat predominance. (See Reply, 13:15-22.) In

18  making this argument, plaintiffs also now change the potential class to include the

19  80,000 people who attended a free 90-minute seminar, and claim those individuals

20  were damaged by simply "showing up." (Reply, 13:17.)

21    Plaintiffs make this speculative and amorphous argument by misstating the

22  clearly expressed reason defendants commented on the refunds in their Opposition.

23  The reason was that the refunds were yet one more factor requiring individual inquiry,

24  because the reasons students sought refunds – and the reason TU sometimes paid them

25  – vary greatly from student to student. The refunds are not a "damage issue," but

26  rather are one of many factors explained at length in the Opposition that highlight how

27  individualistic each claim is – requiring individual inquiry.

28  / / /

### 2.    Plaintiffs' Attacks on Defendants' Approval Rating

Recognizing that the high approval rating TU received on its student evaluations is very damaging evidence for their case, Plaintiffs engage in a series of false and misleading attacks on that evidence without any foundation.

Plaintiffs do so by first incorrectly arguing that "Defendants' core defense is their '97%' approval rating based upon a subset of dubious 'student' evaluations" (Reply, 17:13-14), and "Defendants rely on their purported 97% approval rating to show no one was harmed." (Reply, 2:21.)

Plaintiffs misconstrue the reason TU offered the evaluations.  They were submitted to show how <u>individualized</u> each claim was, and that individual inquiry is required.  The Court can see that 97% of the students were extremely pleased and satisfied with TU's programs and seminars, wanted to attend more of them, and would recommend TU to others.  The student comments provide the Court with remarkable insight into exactly what the students thought about TU, its presentations and instructors, and their experiences with TU.  About 97% of students were very satisfied, which means that 3% of students were not satisfied.  The point is that the student experiences <u>differed</u>, and show that each student's claim is unique and individualized, and cannot be determined by any "common evidence."

Plaintiffs then attack the evidence showing the 97% approval rating by identifying <u>one</u> evaluation (out of 10,000) with a "PRE" code (i.e., submitted by a free "preview" attendee), and then falsely concluding that: ██████████████ ████████████████████████████████ (Reply, 17:23-24.)  Actually, there were a total of 67 evaluations with the code PRE, so more than **99%** of the 10,000 evaluations do not fall within this category.

███████████████████████████████████████ ████████████████████████████████████████ ████████████████ (Reply, 17:26-27.)  In fact, TU provided the Court with defense Exhibit 24 which contained in the survey analysis the total survey percentage

returned. The overwhelming majority of presentations reflected a "return" rate between 80% and 100%. There were two seminars that had a return rate between 50% and 56%, but most were much higher. A review of Def. Ex. **24** reflects the very high percentage returned. See, for example:

| | | |
|---|---|---|
| Ex. 24 – 4865: 87% | Ex. 24 – 4932: 98% | Ex. 24 – 4946: 93% |
| Ex. 24 – 4869: 89% | Ex. 24 – 4937: 94% | Ex. 24 – 5092: 100% |
| Ex. 24 – 4882: 81% | Ex. 24 – 4901: 86% | Ex. 24 – 5122: 96% |
| Ex. 24 – 4884: 87% | Ex. 24 – 4917: 90% | Ex. 24 – 5128: 100% |

(Reply, 18, n.19.)

(Def. Ex. **25**-5162)

(Def. Ex. **129**.) Plaintiffs ignore this damaging evidence concerning their own client.

(Reply, p. 18, n.19.)

(Def. Ex. **130**.)

In any event, the "psychographics" issue is irrelevant. There is no evidence that the TU attendees who filled out the 10,000 evaluations were untruthful or manipulated by "psychographics" to score TU programs higher than they actually believed. In fact, 84 written and video testimonials and 14 recent student declarations submitted to

1  the Court with the Opposition confirmed the exact opposite.  The same is true of the

2  declarations by TU mentors and instructors (see Def. Exs. **14**(a)-(n) and 22(a)-(d), and

3  the evaluations themselves) – also all submitted with the Opposition.

4       Finally, plaintiffs indirectly attack the 97% approval rating by falsely describing

5  those supporting declarations just listed.  According to plaintiffs: ████████████████

6  ███████████████████████████████████ (Reply, 2:22-23).  Without

7  support, plaintiffs argue that ████████████████████████████████████

8  ████████████████████████████████████████████

9  ████████████ (Reply, 18:14-16).  This is untrue.

10       The reality is that, on November 13, 2012, ████████████████████

11  ███████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████

14  ████████ (See Supp. Schneider Decl. ¶ 4.) ████████████████

15  ███████████████████████████████████████████

16  █████████████████████████████████████████████

17  ████████████████ (Plf. Ex. 73, p. TU 137814.)  Plaintiffs also fail to

18  mention many positive responses.  For example:

19  ████████████████████

20  ██████████████████████████

21  █████████████

22  ███████████████████

23  • ████████████████████████

24  █████████

25  █████████████████████████████

26  ████████████████████

27  (Plf. Ex. 73, pp. TU 137793 and TU 137795.)

28

Unlike plaintiffs cherry-picking of 10 comments, TU provided the Court with all 10,000 evaluations, all testimonials (written and video), plus all the mentor evaluations, surveys analyses, and recent student declarations.  The point was so the Court could see for itself the very positive responses from the overwhelming majority.

It is ironic that plaintiffs now rely on – and even quote – their 10 cherry-picked negative responses and argue they alone are probative.  TU agrees that they are probative, but so are the thousands and thousands of positive evaluations, as well as the positive testimonials and positive declarations.  For plaintiffs to focus on 10 responses and ignore 10,000 requires not only a highly "selective" approach to the evidence, but also a willingness to mischaracterize those 10,000 responses.

### 3. Plaintiffs' Attacks on Class Member Declarations

Plaintiffs argue that the Court should not consider the 14 student declarations submitted by defendants with the Opposition.  Plaintiffs make this argument based on the false contention that those declarations are somehow the "fruit of misleading communications" purportedly sent by TU to the declarants in an email dated November 13, 2012.  That email supposedly "concealed" this litigation and the planned use of the declarations herein.

Plaintiffs' contention is false for the simple reason that 13 of the 14 declarations were prepared and signed many months before the November 13, 2012 was even sent.  Moreover, each of the declarants acknowledged ██████████████████████ ████████████████████████████████████████ ████████████ (See Def. Ex. **14**(a-n); Declarations of (a) Amy Hinderer; (b) Mette Nielsen; (c) Paula Levand; (d) Meena Mohan; (e) Charles Lee; (f) Jesus Castillo; (g) Marla Colic; (h) Kissy Gordon; (i) Greg Leishman; (j) Stephen Nesbit; (k) Paul Canup; (l) Robert Mulack; (m) Scott Talhelm; and (n) David Wright.)

Plaintiffs also make misleading and unsupported attacks on some of the individual declarants.  For example, ████████████████████████████████████ ████████████████████████████████████████

1   ████████████████████████ (Reply, 19:21-22). ███

2   ████████████████████████████████████

3   █████████████████████████████████████

4   ███████████████████████████████████████

5   ████████████████████████████████████████

6   █████████████████████████ There is absolutely

7   no evidence or support for plaintiffs' inference of any impropriety.

8        Plaintiffs also argue that the declarations of Hinderer and Levand should be

9   disregarded, simply because they received partial refunds.  (Reply, 19:14-16).  It is

10  true that Hinderer and Levand received partial refunds for products and services they

11  did not use under TU's very generous refund policy.  Likewise, it is also true that

12  plaintiff Makaeff received a partial refund of $495 for a program she did not use.

13  Thus, following plaintiffs' logic, the declarations and experiences of plaintiff Makaeff

14  should be disregarded as well.

15        Finally, in perhaps the strangest statement in all of the reply briefing, plaintiffs

16  attempt to portray declarant and former TU mentor Johnny Horton in a bad light

17  because one of his former TU students, namely Jason Sanders, apparently embezzled

18  from his previous employer years before he ever paid for or attended a TU event.

19  (Reply, 19:18-19).  Mr. Sanders' pre-TU life is completely irrelevant, and plaintiffs'

20  implication that the Horton declaration is not probative because of that pre-TU life is

21  incomprehensible.  But, plaintiffs' needless and pointless mention of Mr. Saunders is

22  remarkable for two more reasons.

23        First, TU obviously cannot be responsible for the conduct of students outside of

24  TU, especially years prior to ever even attending a TU program.  Are plaintiffs now

25  suggesting that TU must conduct background checks on potential students to

26  determine whether they can attend a TU program?  Second, assuming the Jason

27  Sanders mentioned by Mr. Horton is even the same Jason Sanders identified by

28  plaintiffs, their counsel have now confirmed that no ethical boundary is sacred to

"score a point."  They literally dragged out for the world to see the criminal record of a purported putative class member (to whom they owe a fiduciary duty) in a desperate effort to make a mentor look bad.

Plaintiffs' handling of this non-issue is typical of their approach to the "evidence" throughout their reply papers, and indeed throughout their entire motion for class certification.  Exaggeration, spin, and outright misrepresentation of non-evidence - like Mr. Sanders' criminal record - are constant.  Careful, honest, and fair weighing of the real evidence - like 10,000 student evaluations including plaintiffs' - are absent.  The many examples of non-evidence cited herein cannot satisfy the "rigorous analysis" required for certification, and they should be stricken.

## III.   <u>SUMMARY CHART OF OBJECTIONS</u>

For the Court's convenience, and for ease of ruling on Defendants' objections and motion to strike, below is a chart referencing each exhibit or statement in plaintiffs' Reply that Defendants respectfully request be stricken, organized by section in which the argument for striking the statement appears in this briefing.

### II. A. <u>The New Evidence and Argument in Plaintiffs' Reply is Improper and Must be Stricken</u>

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| Exhibits 68, 71, 80, 81, 82, 83, 85, 91, 93, 94, 96, 97, 98, 99, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 125, 126, 127, 128, 129, 131, 132, 133, 134, 135, 136, 137 | New Evidence Previously Available and Improperly Introduced in Reply Papers. | Sustained:_____<br><br>Overruled:____ |
| Exhibits 74, 79, 88 | New Evidence Previously Available and Improperly Introduced in Reply Papers; Argumentative; Improper Evidence. | Sustained:_____<br><br>Overruled:____ |

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| Exhibits 69, 70, 72, 73, 74, 75, 76, 77, 78, 79, 84, 86, 87, 88, 89, 90, 92, 95, 100, 124, 128, 130 | New Evidence Improperly Introduced in Reply Papers | Sustained:_____ <br><br> Overruled:_____ |

### II. B. 1.  There Is No Probative Evidence of TU "Scripts," "Guarantees," or Promises of "Year-Long Mentoring"

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| "all initial sales calls, including calls to the 80,000-plus attendees of the free Preview, were done by script." (Reply, 2:6-7.) | False; No Foundation. | Sustained:_____ <br><br> Overruled:_____ |
| ███████████████████ <br> (Reply, 11:5.) | False; No Foundation. | Sustained:_____ <br><br> Overruled:_____ |
| "In addition, salespersons (aka "setter" or "screener" who are not simply "schedulers") used scripts to call all students who had attended the free Preview (over 80,000 people) to up-sell them on another product." (Reply, 5:18-20.) | False; No Foundation. | Sustained:_____ <br><br> Overruled:_____ |
| Plaintiffs improperly submit and reference "Ex. 82 (exemplar script produced in this action)" (Ex. 82, referenced in Reply, 5:26, n.5.) | No Foundation; Misleading. | Sustained:_____ <br><br> Overruled:_____ |
| "Defendants also admit 80,304 consumers were subjected to the 90-minute 'Preview' advertisement through standardized PowerPoint presentations…." (Reply, 2:4-6.) | False; No Foundation. | Sustained:_____ <br><br> Overruled:_____ |

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| ██████████████<br>████████████<br>██████████████<br>██████████████<br>(*Reply*, 6:22-23.) | False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |
| ██████████████<br>████████████<br>███████████████<br>███████████████<br>███████████████<br>████████ (*Reply*, 4:20-22.) | Misleading; No Foundation. | Sustained:_____<br><br>Overruled:_____ |
| "Individual instructors did not have discretion…" (*Reply*, 4:4-5.) | False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |

## II. B. 2  The Regulatory Inquiries Into TU Were Orchestrated by Plaintiffs

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| "like the Better Business Bureau ("BBB"), and state agencies. . ." (*Reply*, 1:10.) | Misleading. | Sustained:_____<br><br>Overruled:_____ |
| "The BBB gave Trump University a 'D-', and Texas' investigation led to Defendants shutting down in that State." (*Reply*, 1:15-16.) | Misleading; No Foundation. | Sustained:_____<br><br>Overruled:_____ |
| "The NY AG still has an investigation pending."  (*Reply*, 1:25, n. 1.) | Misleading. | Sustained:_____<br><br>Overruled:_____ |
| "*See* Ex. 70, TU 135883 (workshops suspended in 2010 in Texas as a result of investigation)." (*Reply*, 1:28, n.2.) | Misleading. | Sustained:_____<br><br>Overruled:_____ |

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| "*See* Ex. 71, TU-PLTF0006-18 'New York Attorney General is Investigating Trump's For Profit School,' May 19, 2011 *New York Times* article (students want to 'inject more Trump' into courses). . ." (Reply, 2:26-27, n.3.) | Misleading. | Sustained:_____<br><br>Overruled:_____ |
| "BBB and government correspondence" (Reply 9:18-19.) | Misleading. | Sustained:_____<br><br>Overruled:_____ |

### II. B. 3.  The Basic Theories of Plaintiffs' Case Have Changed Completely

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| ███████████<br>███████████<br>████████ (Reply 11:21-22.) | New Argument; False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |

### II. C.1.  Plaintiffs' Mischaracterizations of Defendants' Arguments and Unfounded Attacks on Defendants' Evidence Should be Stricken

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| Defendants do not contest numerosity. (Reply, 2:16, 3:13.) | False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |
| "Senior subclass are certifiable." (Reply, 14:22.) | False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |
| "Defendants do not argue individualized reliance must be shown as to plaintiffs' contract-based claims, unjust enrichment, senior abuse claims…." (Reply, 9:5-7.) | False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |
| Whether class members received a refund is a simply a "damage issue." (Reply, 13:15-22.) | False; No Foundation. | Sustained:_____<br><br>Overruled:_____ |

Case No. 10 CV 0940 GPC (WVG)

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| 80,000 people who attended a free 90-minute seminar were damaged by simply "showing up." (Reply, 13:17.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |

### II.C.2.  **Plaintiffs' Attacks on Defendants' Approval Rating**

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| "Defendants' core defense is their '97%' approval rating based upon a subset of dubious 'student' evaluations." (Reply, 17:13-14.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |
| "Defendants rely on their purported 97% approval rating to show no one was harmed." (Reply, 2:21.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |
| ██████████████████<br>██████████████████<br>██████ (Reply, 17:23-24.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |
| ██████████████████<br>██████████████████<br>████ (Reply, 17:26-27.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |
| ██████████████████<br>██████████████████<br>███████ (Reply, 18, n.19.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |
| ██████████████████<br>██████ (Reply, 18, n.19.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |
| ██████████████████<br>██████████ (Reply, 2:22-23.) | No Foundation; Misleading. | Sustained:_____<br><br>Overruled:____ |

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| ███████████<br>████████████<br>███████████<br>(Reply, 18:14-16.) | False; No Foundation. | Sustained:_____<br><br><br>Overruled:____ |

### II.C.3.  Plaintiffs' Attacks on Class Member Declarations

| Evidence/Argument | Objection | Ruling |
|---|---|---|
| ████████████<br>███████████<br>████████████<br>██████████<br>█████████ (Reply, 19:21-22.) | False; No Foundation. | Sustained:_____<br><br><br>Overruled:____ |
| ██████████ (Reply, 20, 12-14.) | False; No Foundation | Sustained:_____<br><br>Overruled:____ |
| Declarations of Hinderer and Levand should be disregarded, simply because they received refunds. (Reply, 19:14-16.) | False; No Foundation. | Sustained:_____<br><br>Overruled:____ |

## IV.   CONCLUSION

Defendants respectfully request that the Court sustain the above objections, and strike the cited statements and exhibits submitted by plaintiffs.

Respectfully submitted,

Dated:    April 26, 2013                    YUNKER & SCHNEIDER


                                      By:    _____s/David K. Schneider_____
                                             Attorneys for Defendants
                                             TRUMP UNIVERSITY, LLC and
                                             DONALD J. TRUMP
                                             Email:  dks@vslaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 10 CV 0940 GPC (WVG)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 26, 2013.

                              s/David K. Schneider
                              DAVID K. SCHNEIDER

                              YUNKER & SCHNEIDER
                              655 West Broadway, Suite 1400
                              San Diego, CA  92101
                              Tel:    (619) 233-5500
                              Fax:    (619) 233-5535

                              Email: dks@yslaw.com

# Mailing Information for a Case 3:10-cv-00940-GPC-WVG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **David Keith Schneider**
  dks@yslaw.com,ewb@yslaw.com,efb@yslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)