David K. Schneider (CSB 139288)
YUNKER & SCHNEIDER
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone: (619) 233-5500
Facsimile: (619) 233-5535
Email: dks@yslaw.com

Attorneys for Defendants,
TRUMP UNIVERSITY, LLC and
DONALD J. TRUMP

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>　　　Plaintiffs,<br><br>v.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>　　　Defendants. | Case No. 10cv0940GPC (WVG)<br><br>DEFENDANTS' RESPONSE TO PLAINTIFFS' SUBMISSION OF SUPPLEMENTAL DOCUMENTS: SCRIPT AND DEPOSITION EXCERPT<br><br>DATE:　　8/16/13<br>TIME:　　1:30 p.m.<br>CTRM:　　2D |

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ................................................................................................... 1

II. DISCUSSION ......................................................................................................... 2

    A.  The "New" Script ......................................................................................... 2

        1.  The "New" Script Is Not New ............................................................ 2

        2.  The "New" Script Is Not Probative ..................................................... 3

            a.  No Evidence of Any Relevant "Scripts" Used by TU ................ 4

            b.  No Evidence of Any Material Misrepresentations in Any "Script" .................................................................................. 5

            c.  No Case Law Support for Certification on These Facts ............. 6

        3.  The "New" Script Was Not Withheld From Discovery ....................... 9

    B.  The "Victim" Deposition ............................................................................ 11

        1.  TU's Actual Position on Mr. Trump's Involvement Is Misrepresented ................................................................................ 11

        2.  The Actual Purpose of the Deposition Was Plaintiffs' Unsuccessful Attack on the "Victim's" Declarations ........................ 13

III. CONCLUSION ..................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cottle-Banks v. Cox Communications, Inc.*
    2013 WL 2244333 (S.D. Cal., May 21, 2013) .................................................................. 8

*Fairbanks v. Farmers New World Life Ins. Co.*
    197 Cal.App.4th 544 (2011) ........................................................................................ 7, 8

*In re Countrywide Financial Corp. Marketing and Sales Practices Litigation*
    277 F.R.D. 586 (S.D. Cal. 2011) .................................................................................... 7

*Kaldenbach v. Mutual of Omaha*
    178 Cal.App.4th 830 (2009) ........................................................................................ 6, 7

## I. INTRODUCTION

Plaintiffs promise the Court that their belated filing of a purported "new" script, and of a one-page excerpt from a "victim's" 196-page deposition, will "cut through the flood of filings" and "confirm" their "case about a prototypical scam." That alleged "scam" has now boiled down to Mr. Trump promising "hand-picked" instructors, but delivering "salespeople" he did not pick. Plaintiffs' two supplemental documents supposedly justify their renewed hype of that "scam," and will support certification.

However, plaintiffs' two supplemental documents do neither:

- The "new" script is not new, but instead is exactly the same text – verbatim – as the TU introductory seminar PowerPoint "Talking Points" produced to plaintiffs fourteen months ago, and filed by plaintiffs as their Exhibit 86 five months ago.

- There is no evidence that the "new" script, the "Talking Points," or any other purported "script" was ever used by any TU instructors, much less all of them, at any one of hundreds of TU live events. The actual evidence is the opposite.

- Neither the "new" script – nor any other purported "script" for TU live events now in the record – contains a single purported "misrepresentation" by TU.

- The "victim's" deposition excerpt supposedly "proves" TU's counsel denied Mr. Trump had any involvement with TU in a pleading filed two years ago. But, the issue then was whether Mr. Trump was personally involved in a "controversy" (namely Makaeff's defamation of TU for SLAPP purposes), which he was not.

- The "victim" – former TU student Paula Levand – was actually deposed by plaintiffs in an attempt to get her to recant two declarations filed in support of TU. She refused to change anything, stood by her declarations, and praised TU.

The following discussion will address each of these points in detail. It will also refute plaintiffs' attack on TU and its counsel for purportedly "misleading" the Court and "concealing" the "new" script – neither of which is true. Most important, it will cover the case law on purported "scripts" used to support certification, and will show that neither the "new" script, nor any other purported "script" in evidence, supports certification here.

## II. DISCUSSION

### A. The "New" Script

#### 1. The "New" Script Is Not New

The "new" script consists of 35 pages of short blurbs keyed to slides for one version of a PowerPoint presentation designed for use at the TU free 90-minute Preview program (ECF 239-3 filed 6/26/13, Pltf. Ex. 2). The slides are not attached to the script.

However, those <u>exact</u> same blurbs verbatim – with the PowerPoint slides attached – were submitted to the Court by plaintiffs in their certification reply papers filed five months ago (ECF 195-1 filed 2/1/13, Pltf. Ex. 86 – the "Talking Points"). Consequently, the purportedly "new" and "withheld" script has been in the Court's file for months, and is not even new to the Court, much less to the parties.

In fact, TU produced the Talking Points to plaintiffs <u>fourteen months ago</u> in a TU document production on 5/29/12 (*see* Schneider Dec. submitted herewith, ¶ 1). That production included TU's copies of Pltf. Ex. 86 – both in a Bates-stamped hard copy of the slides, and in the original native electronic format with the Talking Points. However, plaintiffs evidently concluded that document was not important enough to be included in plaintiffs' certification moving papers filed on 9/24/12 – nearly four months after they first received Ex. 86.

Moreover, the only apparent reason Ex. 86 was later filed by plaintiffs with their reply papers was that TU strongly made the point in its opposition to certification that plaintiffs had <u>argued</u> there were TU "scripts," but had <u>failed to submit or cite</u> any "scripts" (*see, e.g*., ECF 211-1, p. 6; ECF 213, p. 5). Even then, plaintiffs made only passing reference to the Talking Points in their reply papers. They instead focused on a purported "closer script" (ECF 193-1, Ex. 82) which: (i) TU representatives had testified was not a TU document; (ii) had no evidence of ever being used; and (iii) by its terms was intended only for TU on-line programs, which are <u>excluded</u> from the class definition (*see, e.g*., ECF 211-1, pp. 7-8; ECF 213, pp. 4-6; ECF 230, pp. 2-3).

/ / /

Ex. 86 and its Talking Points became "important" to plaintiffs only after Judge Gallo ordered them on 2/22/13 to identify any one document they claimed was a "script" (ECF 203, p. 3). Plaintiffs then came up with Ex. 86 and the Talking Points (ECF 221-1, Ex. 143, pp. 2-3). But, at the same time, they actually distanced themselves from the entire "script" argument:

> "There is nothing magical about a document being formally entitled a "script" versus a document that is similarly used to ensure standardization, which is the point of ¶12 of the [Third Amended Complaint, which is entitled '**Standardized Scripts**' and alleges that: 'Each member of the sales team was given a five to six page sales script, and was required to stick to the script word-for-word']." (ECF 221-1, Ex. 143, p. 3.)[1]

Now, however, plaintiffs have flip-flopped once again. They argue vehemently to the Court that "new" Ex. 2 is indeed "magical" new evidence of a supposedly probative "script." Nevertheless, the exact same verbiage in the "old" Ex. 86 Talking Points apparently meant so little to the case that it did not get filed until plaintiffs' certification reply, and even then it was not emphasized.

The only differences between "new" Ex. 2, and the Talking Points of "old" Ex. 86, are that Ex. 2 has a different format, and is entitled "Preview Script." TU agrees that the "script" designation might be a material distinction, if that script ever had widespread use throughout the four year class period, and that script contained "misrepresentations" – neither of which is true as discussed below.

**2.    The "New" Script Is Not Probative**

There are three basic reasons why the "new" Ex. 2 "Preview Script" is not even probative common evidence for certification, much less the free pass to certification sought by plaintiffs.

///

---

[1]    Before and since then, plaintiffs have nominated a handful of other specious and irrelevant scripts as "THE script" (*again, see, e.g.*, ECF 211-1, pp. 7-8; ECF 213, pp. 4-6; ECF 230, pp. 2-3).

### a. No Evidence of Any Relevant "Scripts" Used by TU

First, there is no evidence that <u>any</u> "script" – including Ex. 2 and the Ex. 86 Talking Points – ever got <u>any</u> use by TU instructors when teaching TU students, to say nothing of "standardized" or "universal" use at the TU "live events" covered by the class definition. To the contrary, the evidence from <u>both</u> sides (TU executives, staff, instructors, mentors, and students on the one hand, and named plaintiffs and ex-TU employees on the other hand) is that no one used scripts, or saw anyone else use scripts. (*See, e.g*., Def. Ex. 1, ¶¶17-18; Ex. 6, ¶7; Ex. 22 (a at ¶4, c at ¶9, & d at ¶7); Ex. 38; and Def. MTS Ex. 4h.)

As explained by TU CEO Michael Sexton, TU's <u>goal</u> was eventually to standardize the "live event" presentations for quality control purposes, but that was <u>never achieved in practice</u>. (*See, e.g.,* Def. Ex. 1, ¶17). Standardization was prevented by the constant evolution of TU from on-line programs only starting in 2005, to live presentations starting in 2007, to experiments with the various formats at issue in this case from 2007 to 2010. The undisputed evidence is that TU's programs varied as much as 30-50% even when covering the same substantive material, which variance was due to different instructors, locations, student feedback, etc. (Def. Ex. 1, ¶17.)

Mr. Sexton's cover email for the Ex. 2 "Preview Script" reflects this reality as well. He was circulating a draft "script" for consideration by three TU instructors (of about 75 total) in April <u>2009</u> – <u>two years</u> after live programs began, <u>three years</u> after plaintiffs' proposed class period began, and roughly <u>one year</u> before TU <u>ended</u> operations (ECF 239-3, p. 1). This chronology is completely consistent with his deposition testimony that standardized live programs were a goal at TU, but never became a reality.

Moreover, even if the Ex. 2 "Preview Script" was used religiously from April 2009 on, that would affect only the 90-minute "Apprentice Program" preview, and not dozens of other TU programs. It would also exclude <u>three years</u> from the class period. The same is true of the Ex. 86 Talking Points, which PowerPoint was last modified in December 2009 (Schneider Dec, ¶2). Therefore, even if the Ex. 86 "Talking Points" were used equally religiously from December 2009 on, that too would affect only students who

attended the "Apprentice Program" preview, and would exclude nearly <u>four years</u> from the class period.  However, there is no evidence of <u>any</u> use of <u>either</u> "script," or any other relevant "script."

### b. No Evidence of Any Material Misrepresentations in Any "Script"

Second, none of the supposed live event "scripts" in evidence for certification – including the Ex. 2 "Preview Script" and Ex. 86 "Talking Points" – have any purported misrepresentations whatsoever in their text.  This is true whether we consider plaintiffs' original moving papers (which seemed to argue <u>five</u> different misrepresentations: (i) Mr. Trump "hand-picked" experts; (2) TU provided "unlimited mentoring"; (3) TU guaranteed success; (iv) TU was "accredited"; and (v) Mr. Trump was "involved" in TU) (ECF 138, pp. 11-12), or whether we consider plaintiffs' latest papers (which seems to argue only <u>one</u> misrepresentation: Mr. Trump promised teachers and provided salesmen) (ECF 239, pp. 1 & 6-7).

The Court will look in vain for any of those purported misrepresentations in all the live event "scripts" filed to date, after three years of litigation, 16 depositions, 64 TU document productions of 170,000 pages, and nine months of certification briefing.  TU respectfully invites the Court to inspect these "scripts" for itself, namely: (i) plaintiffs' "new" Ex. 2 ("Preview Script" – ECF 239-3, Ex. 2); (ii) plaintiffs' "old" Ex. 86 ("Talking Points" – ECF 195-1, Ex. 86); (iii) plaintiffs' Ex. 12 (2010 "Playbook" – ECF 122-3, p. 158 ("Preview Speaker Introduction")); and (iv) defendants' Ex. 81 ("setter script" – ECF 143-2, Ex. 81.)  The only other "script" in evidence is the "closer script" (ECF 193-1, Ex. 82), but it is not a TU document, nor ever intended for the material "live events" anyway.

Alternatively, the Court can consider why plaintiffs have never identified a single so-called "misrepresentation" in any purported "script" to date, including their latest nominee – namely "new" Ex. 2.  Plaintiffs' latest papers quote several lines from Ex. 2, and yet not one cite is made to a specific "misrepresentation" anywhere in it.

/ / /

/ / /

In short, even if every "script" had been in exclusive use throughout all TU operations, and there actually had been uniform and standardized presentations to every class member, plaintiffs still cannot survive the "rigorous analysis" needed for class certification. Why? Because their "key" evidence of the "scripts" does not prove any misrepresentations were made. In fact, if the "scripts" really were universally used, they would prove that <u>no</u> misrepresentations were made.

### c.    No Case Law Support for Certification on These Facts

Under federal and California case law, these facts are fatal to certification. The key state court case is *Kaldenbach v. Mutual of Omaha*, 178 Cal.App.4th 830 (2009), which denied certification because "none of the allegedly scripted or memorized sales materials covered the alleged misrepresentations." *Id*. at 645. Like here, the *Kaldenbach* case involved consumer UCL, CLRA, and common law fraud claims arising out of Mutual's sales of "vanishing premium" life insurance policies, and the plaintiff alleged that Mutual's sales operations and presentations "were uniform in every respect and Mutual utilized standardized training methods, materials, and scripts." *Id*. at 641.

However, the court concluded that "the evidence showed the opposite." *Id*. at 652. Mutual offered contrary evidence that "sales presentations were not uniform or scripted because each sale was adapted to the individual prospect's needs, goals, and experience," and that sales agents "were not required to attend training or use the prepared materials." *Id*. at 644-45. The appellate court upheld the trial court's finding of no commonality:

> "The court also found that Kaldenbach had not established commonality. Kaldenbach primarily relied upon uniformity in Mutual's sales materials, training, and illustrations, but there was no evidence linking those common tools to what was actually said or demonstrated in any individual sales transaction. The training materials and methods were not uniform throughout the class period. None of the allegedly scripted or memorialized sales materials covered the alleged misrepresentations. And there was no evidence that uniform training or sales materials were used with each putative class member." *Id.* at 645 & 647-52.

///

The *Kaldenbach* trial and appellate courts ultimately concluded that individualized issues predominated, including "what materials, disclosures, representations, and explanations were given to any given purchaser." *Id*. at 646 & 647-52.

The federal and state courts in California are in accord with *Kaldenbach*. Two cases which cited *Kaldenbach* at length, and denied certification despite allegations and evidence of "scripts," are *In re Countrywide Financial Corp. Marketing and Sales Practices Litigation*, 277 F.R.D. 586, 590-92 (S.D. Cal. 2011) (MDL consumer class action re subprime loan placement fraud involving "standardized sales scripts"), and *Fairbanks v. Farmers New World Life Ins. Co*., 197 Cal.App.4th 544, 895-99 (2011) (consumer class action re sale of universal life insurance involving "sales scripts").

In *Countrywide*, the lender admitted the use of scripts during sales calls to potential borrowers, and further admitted that one of its four pertinent divisions used sales scripts later in the process as well. 277 F.R.D. at 593 & 598. However, the court concluded that the "alleged nationwide scheme is not sufficiently supported by evidence of standardized or uniform fraudulent conduct," including the fact that at least two Countrywide divisions used independent brokers who "used no script." *Id*. at 601.

Moreover, despite the one division in which sales were "based on a scripted environment," and which "required its sales force to 'memorize the Sales Presentation,'" the *Countrywide* court concluded "that evidence does not establish a 'uniform sales pitch' or 'standardized marketing' affecting the entire sales force in all four divisions." *Id*. The finding of the trial court, upheld by the appellate court, was that "Plaintiffs have not established that a script or other mechanism designed to misrepresent and obfuscate was uniformly used by loan officers." *Id*. at 601-02.

*Fairbanks* was similar to this case in that there were endless replies, sur-replies, and supplemental filings for certification, including 4,200 pages filed by plaintiffs "attempting to demonstrate that Farmers agents learned about the policies from uniform scripts, and they, in turn, told their prospective policyholders about the policies in a uniform manner." *Id*. at 552-58. However, the appellate court concluded "*Kaldenbach* is indistinguishable

from this case," and upheld the following findings by the trial court:

> "The court expressly stated, '[t]here is no evidence that the same material misrepresentations have actually been communicated to each member of the class.'. . . In short, the trial court concluded that common questions of fact and law do not predominate because, among other things: (1) the representations made to prospective policyholders were not common; and (2) whether any particular misrepresentation was material was also not common, as resolution of the issue would depend on the particular needs of the prospective policyholder." *Id*. at 901-02.

This Court recently dealt with very similar issues when denying certification in a case involving "written scripts" used by customer service representatives ("CSRs") when taking customer orders for cable service on the telephone. *Cottle-Banks v. Cox Communications, Inc*., 2013 WL 2244333, *7 (S.D. Cal., May 21, 2013). Plaintiff argued that the CSRs were trained to use the scripts when handling such calls, and that the scripts proved the CSRs were "not trained or required to inform customers of equipment rental fees." *Id*. The evidence included 200 recordings of such calls, of which two did not show disclosure of the rental fees, and seven did. *Id*. at *9. This Court ruled as follows:

> "While Plaintiff argues that the CSRs utilize scripts which do not require the CSRs to inform customers about monthly equipment charges, Plaintiff has not demonstrated that the CSRs are required or regularly use those scripts. As Defendant argues, the call recordings show that the conversations between CSRs and customers vary. . . .
>
> Plaintiff's evidence merely establishes that certain CSRs deviate from Defendant's uniform policy and practice of informing customers of monthly charges. Plaintiff's evidence does not establish a uniform policy. Consequently, Plaintiff has failed to show a common core of facts or a shared legal issue that affects all class members with respect to this claim.
>
> Absent a uniform policy, the only means to determine whether customers were informed of the monthly charges and accepted them would necessarily involve a customer-by-customer inquiry. This would create a scenario of thousands of mini-trials which would not conserve judicial resources. All of the above demonstrates that a class action would not be a superior procedure to address the common questions before the Court." *Id*.

In this case, there is no evidence that every TU instructor used any "script," whether the "new" Ex. 2, or its previous "old" version Ex. 86, or any other "script." In fact, the evidence is to the contrary. Moreover, there also is no evidence that any live event TU "scripts" contain any material misrepresentations – a fact easily verified by a brief review of those "scripts" in evidence. On similar facts, *Kaldenbach*, *Countrywide*, *Fairbanks*, and this Court in *Cottle-Banks* all denied certification. TU respectfully submits that is the lawful result of the required "rigorous analysis" in this case as well.

### 3. The "New" Script Was Not Withheld From Discovery

Plaintiffs attack TU and its counsel by claiming that they intentionally "concealed" and "withheld" the Ex. 2 "Preview Script" from discovery for two years, and lied about it to Judge Gallo and this Court. This argument does nothing to overcome the evidentiary shortcomings of Ex. 2, namely: (i) its verbatim content is found in the Ex. 86 "Talking Points" produced to plaintiffs in May 20<u>12</u>; (ii) there is no evidence that it (or any other script) was used by TU in student presentations; and (iii) neither Ex. 2 nor any other TU "script" contains any material misrepresentations.

This argument is also untrue. The Court should know the true facts of TU's production of Ex. 2, which are verified by the accompanying Schneider Declaration (¶3). The reality can be summarized as follows:

- TU has delivered about 170,000 pages of documents to plaintiffs in 64 separate productions. They included the Ex. 86 PowerPoint slides and "Talking Points" – which have a different format but identical content to Ex. 2 – in May **2012**.
- The TU productions are handled primarily by <u>one</u> remaining TU employee among his many other responsibilities. Responding to plaintiffs' document demands often has been a full-time job for him for the past two years.
- The 63rd TU production on 6/4/13, which included Ex. 2, involved about 27,000 pages. Most resulted from word searches (through about 100 GB of data) requested by plaintiffs and done by TU <u>voluntarily</u>, without formal discovery.

/ / /

DEFENDANTS' RESPONSE TO PLAINTIFFS' SUBMISSION OF SUPPLEMENTAL
DOCUMENTS:  SCRIPT AND DEPOSITION EXCERPT

- Plaintiffs' requested searches included (among many others) the word "script" and "approval" of slides in PowerPoint presentations in former employees' email accounts. That resulted in TU locating <u>four copies</u> of the 36-page "Preview Script," and 16 pages of related Sexton emails, in mid-May 2013.

- Once the "Preview Script" was discovered, prompt investigation and inquiry confirmed that it was never implemented, exactly as testified by former TU CEO Mr. Sexton back in August 2012.

- Moreover, the investigation also promptly revealed that the content of Ex. 2 was <u>identical</u> to the Ex. 86 "Talking Points," which were produced <u>one year earlier</u>.

- Nevertheless, the scripts and cover emails were produced on 6/4/13, along with all 27,000 pages of other documents located as a result of the word searches requested by plaintiffs.

- Portions of two Sexton emails with business data were redacted, as was an entire email from Mr. Sexton to TU's outside counsel then reviewing all TU materials. The redactions were shown on a "redaction log" that was produced.

- Three identical copies of the "Preview Script" circulated among TU employees were produced without redaction. A fourth identical copy sent to TU outside counsel was redacted to avoid any waiver of the attorney-client privilege.

- Finally, all pages in question were Bates-stamped and marked "Confidential" due to being proprietorial to TU.

Plaintiffs' argument that Ex. 2 was "withheld" and "concealed" for two years is not true – it was actually produced about two weeks after TU counsel saw it for the first time. Likewise, plaintiffs' loaded suggestion that this careful document production may have been "inadvertent" is – to put it politely – nonsense.

In summary, the Ex. 2 "Preview Script" was not "concealed" or "withheld" by TU or its counsel. To the contrary, it was produced promptly upon being discovered – in three copies – and with all non-privileged cover emails as well.

/ / /

1    Nevertheless, it is true that TU and its counsel were previously unaware of Ex. 2
2    during this litigation.  Consequently, they had argued not only that nothing like it had ever
3    been used by TU, but also that nothing like it had ever existed.  In hindsight, it would
4    have been more accurate to argue only that nothing like it had ever been used by TU.
5    That remains TU's position today.

### B.   The "Victim" Deposition

#### 1.   TU's Actual Position on Mr. Trump's Involvement Is Misrepresented

Plaintiffs submitted one page out of Ms. Paula Levand's 196-page deposition to "prove" that TU counsel denied "the very representation he had made to the Court about Mr. Trump's lack of involvement with Trump University."  However, the reality is totally different.  Plaintiffs – perhaps inadvertently – have confused two entirely different issues.

Plaintiffs argue that TU counsel supposedly represented to the Court that Mr. Trump was "not involved" with TU.  In support, plaintiffs cut-and-pasted a one-line quote from TU's 2010 papers successfully opposing plaintiffs' Motion for Reconsideration of the denial of their anti-SLAPP motion (ECF 32).  Plaintiffs' one-line quote, given to this Court without any context or explanation, is as follows: "Donald Trump's involvement is completely absent here" (*id*. at p. 5, l. 27).

A reading of TU's actual pleading containing that statement will reveal that TU was not denying Mr. Trump's involvement with TU at all.  The statement concerns Mr. Trump's personal non-involvement in the <u>controversy</u> created by plaintiff Makaeff's defamatory statements before TU was sued.

The context is that plaintiff Makaeff argued nearly three years ago that TU was a "public figure," citing a case in which: (i) a company and its owner were so intertwined that defamation of one was defamation of both; and (ii) both the company and its owner had "injected themselves" into the controversy at issue before being defamed.  That argument led to the following response <u>in context</u> by TU:

/ / /

/ / /

> "The first case cited by Makaeff, *Hentzen Contractors, Inc. v. Wichita*, 1991 Kan.App.LEXIS 510, is an unpublished case of a lower court in Kansas. While the Kansas court assumed that the corporation and its owner/operator, Bud Hentzen, were so intertwined that both were public figures, the Court made clear that its decision was based on the key fact that <u>the company's owner played an integral role in the defamation by injecting himself into the controversy</u>. The court noted that: "[t]he only reason any of this was news was because Bud Hentzen, a Sedgwick County Commissioner, was involved. Hentzen talked to high- ranking political official, conducted a news conference from the county commission chambers, and used the opportunity to not only respond to the media coverage but to point out his believed deficiencies in the CID." *Id.* (emphasis added).
>
> By contrast, Donald Trump's involvement is completely absent here. Neither Donald Trump nor Trump University has spoken publically about this issue. Unlike Bud Hentzen, Donald Trump is not the operator of Trump University, and plays no part in the day-to-day operation of Trump University. There is simply no evidence that Donald Trump was involved before, during or after the "controversy." His ownership interest in Trump University does not convert the small private company into a public figure." (*Id*. at pp. 5-6, highlight added.)

In short, in the anti-SLAPP motion, TU argued that TU was not a public figure nor "converted" to public figure status due to its association with Mr. Trump. This was so because – unlike the company and owner in the *Hentzen* case –Mr. Trump was not operating TU on a day-to-day basis. This was also so because – also unlike the company and owner in the *Hentzen* case – neither TU nor Mr. Trump had personally "injected themselves" into the controversy with plaintiffs, nor spoken publicly about it, nor otherwise became involved in the controversy until they were sued by plaintiffs.

This three-year old argument about a SLAPP issue obviously had nothing to do with Mr. Trump's involvement during the founding of TU, or his selection of instructors. That involvement – which is the only involvement material to the motion for certification – was explained and supported with evidence cited in TU's papers opposing certification (*see, e.g.*, ECF 138, pp. 11-12).

///

### 2. The Actual Purpose of the Deposition Was Plaintiffs' Unsuccessful Attack on the "Victim's" Declarations

What were the other 195 pages of the "victim's" deposition about? Plaintiffs fail to tell the Court that <u>they</u> noticed and conducted her deposition, and that the vast majority of it concerned their very <u>unsuccessful</u> attempt to have Ms. Levand recant anything in her two declarations supporting TU in its opposition to certification (Schneider Dec., ¶4).

Ms. Levand instead stood by both her declarations, and confirmed that she was completely satisfied with her TU programs and instructors, is still in touch with her TU mentor years after her training, gained confidence and went into real estate as a result of her TU training, and never expected more personal "involvement" by Mr. Trump than his founding and general oversight of TU as a "superintendent" (*id*. at ¶5). Ms. Levand also confirmed that she had been badgered by plaintiffs' counsel to change her declaration, that plaintiffs' counsel did not clearly identify themselves or their side of the case when contacting her, and they led her to believe that they were affiliated with TU (*id*. at ¶6).

Ms. Levand's testimony and declarations confirm that she had a positive experience with TU, and is certainly not – as plaintiffs label her – a "victim." TU respectfully suggests that Ms. Levand is more representative of the putative class than any of the plaintiffs, which means certification must be denied.

### III. CONCLUSION

In the event the Court gives consideration to plaintiffs "new" exhibits, including the "new" Ex. 2 "Preview Script," TU wanted to ensure the Court did so with an accurate record of the underlying facts and legal arguments bearing on certification.

Respectfully submitted,

Dated: July 3, 2013
YUNKER & SCHNEIDER

By:     s/David K. Schneider
David K. Schneider
Attorneys for Defendants
Email: dks@yslaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 3, 2013.


        s/David K. Schneider

        YUNKER & SCHNEIDER
        655 West Broadway, Suite 1400
        San Diego, California 92101
        Telephone:  (619) 233-5500
        Facsimile:   (619) 233-5535

        Email: dks@yslaw.com