1  David K. Schneider (CSB 139288)
2  YUNKER & SCHNEIDER
   655 West Broadway, Suite 1400
3  San Diego, California 92101
   Telephone:  (619) 233-5500
4  Facsimile:   (619) 233-5535
   Email:   dks@yslaw.com
5
6  Attorneys for Defendants,
   TRUMP UNIVERSITY, LLC, et al.

7

8

9                     **UNITED STATES DISTRICT COURT**

10          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  TARLA MAKAEFF, et al., | Case No. 3:10-cv-0940-GPC (WVG) |
| 13       Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND** |
| 14  v. | |
| 15  TRUMP UNIVERSITY, LLC, et al., | JUDGE:     Hon. Gonzalo P. Curiel |
| 16       Defendants. | DATE:      8/30/13 |
| 17 | TIME:      1:30 PM |
| | CTRM:      2D (Schwartz) |

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.    SUMMARY OF ARGUMENT ................................................................ 1

    A.    This is a Truly Remarkable and Misleading Eleventh-Hour Motion ............ 1

    B.    Neither the Purported "Newly Discovered Evidence," Nor the "Predicate Facts" for the RICO Claims, are New ........................................... 2

    C.    Plaintiffs Cannot Meet the "Good Cause" Requirement of Rule 16 ............. 2

    D.    Plaintiffs Cannot Meet the "Interests of Justice" Requirement of Rule 15 ....................................................................................................... 2

II.    RELEVANT PROCEDURAL HISTORY ......................................... 3

III.    PLAINTIFFS HAVE LONG ALLEGED, KNOWN, OR HAD ALL THE PURPORTED "NEW" PREDICATE FACTS AND EVIDENCE ........................... 4

    A.    The 4th AC Does Not Allege Any New Facts ................................................. 4

    B.    Plaintiffs Allege New RICO Claims, but Their "Predicate Facts" Are Not New ........................................................................................................... 5

        1.    The "Scheme" Is Not New .................................................................. 6

        2.    The Mail Fraud "Materials" Are Not New ........................................ 9

        3.    The Wire Fraud "Materials" Are Not New ...................................... 10

            a.    Credit Card Transactions ...................................................... 10

            b.    Emails ................................................................................... 12

            c.    Video .................................................................................... 12

    C.    Plaintiffs Argue "Newly Discovered Evidence," But None Cited Is "New" ........................................................................................................... 14

        1.    The Content of the "3.0 Preview Script" Is Not New, Nor Relevant ............................................................................................. 14

        2.    The 7/29/08 "Makaeff's Friend" Email Is Not New, Nor Relevant ............................................................................................. 15

        3.    The NYSED Information is Not New, Nor Relevant ........................ 17

## TABLE OF CONTENTS (cont.)

**Page(s)**

4.   The Trump and Sexton Depositions Are Not "New," and Plaintiffs Chose to Take the Depositions after the Amendment Deadline ........................................................................................ 18

5.   The Post-July 2012 Document Productions are Not New, Nor Relevant ...................................................................................... 19

IV.   PLAINTIFFS FAIL TO MEET THE "GOOD CAUSE" STANDARD OF RULE 16(b) ................................................................................................ 20

A.   Rule 16 Controls Because Plaintiffs Seek to Amend After the Scheduling Order Deadline ................................................................ 20

B.   Plaintiffs Failed to Seek Modification of the Scheduling Order ................. 21

C.   Plaintiffs Fail to Meet the "Good Cause" Requirement to Amend ............. 21

V.   PLAINTIFFS FAIL TO MEET THE "INTERESTS OF JUSTICE" STANDARD OF RULE 15(a)(2) ............................................................................ 23

A.   Undue Delay in Seeking the Amendment ...................................................... 23

B.   Undue Prejudice to Defendants ..................................................................... 24

C.   Futility of the Amendment ............................................................................. 24

D.   Bad Faith by Plaintiffs ................................................................................... 25

VI.   CONCLUSION ................................................................................................ 25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Campion v. Old Republic Home Protection Co., Inc.*
861 F.Supp.2d 1139 (S.D. Cal. 2012).........................................................21, 22, 23, 24

*Capuano v. Kenneth Eisen & Assocs., Ltd.*
2012 U.S. Dist. LEXIS 86720, *11 (D. Ariz. June 22, 2011) .....................................23

*Foman v. Davis*
371 U.S. 178 (1962).........................................................................................................23

*Holmes v. Security Investor Prot. Corp.*
503 U.S. 258 (1992).........................................................................................................24

*Jauregui v. City of Glendale*
852 F.2d 1128 (9th Cir. 1988) ........................................................................................21

*Johnson v. Mammoth Recreations, Inc.*
975 F.2d 604 (9th Cir. 1992) .........................................................................2, 20, 21, 23

*Mansfield v. Midland Funding, LLC*
2011 WL 1212939, *4 (S.D. Cal. March 30, 2011) ................................................23, 24

*Miller v. Rykoff-Sexton, Inc.*
845 F.2d 209 (9th Cir. 1988) ..........................................................................................24

*U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*
768 F.2d 1099 (9th Cir. 1985) ........................................................................................21

## Statutes

F.R.C.P. 15 ..............................................................................................................2, 20, 23

F.R.C.P. 16 ....................................................................................................1, 2, 20, 21, 23

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

# I.   SUMMARY OF ARGUMENT

## A.   This is a Truly Remarkable and Misleading Eleventh-Hour Motion

Plaintiffs' motion to amend was filed only <u>two weeks before</u> the most recent certification hearing date (since continued), and more than <u>one full year after</u> the Court-ordered deadline to seek amendment.  To justify this belated and last-minute attempt to add RICO claims, Plaintiffs essentially concede that their class certification motion cannot meet the "rigorous analysis" standard for commonality, and likely will be denied:

> "In opposing class certification, Defendants have challenged the commonality of a nationwide class.  Thus, Plaintiffs believe their motion for class certification will be greatly simplified by a federal RICO claim that enables Plaintiffs to plead and prove a common scheme with common evidence, as the draft [Fourth Amended Complaint] demonstrates." (Plaintiffs' Memo Pts. & Auths. ("MPA") – ECF 248-1, p. 11, ll. 20-24).

If Plaintiffs were to be completely honest with the Court, they would simply admit that they want a "do-over," but that admission would not meet the "good cause" standard under Rule 16.  Plaintiffs evidently know that they cannot meet the requirements of Rule 23 based on the current Third Amended Complaint nor the evidence, and so they have decided – after 11 months of certification briefing and two years of very extensive discovery – that they want to try again with a new theory.

However, the proposed amendment calls for a wholesale metamorphosis of this case from contract and fraud-based consumer claims primarily against Trump University ("TU"), to RICO-based quasi-criminal claims primarily against Mr. Donald Trump.  The latest version of the complaint – now on its <u>fifth</u> rewrite – includes brand new allegations of a RICO "Scheme" (the purported "pattern of racketeering activity"), conspiracy, co-conspirators[1], and nationwide mail and wire fraud.

/ / /

---

[1]   The Trump Organization is named as a co-conspirator purportedly because it "shared a computer server" with Trump University.  However, former TU President Sexton testified to the exact opposite one year ago (see accompanying Schneider Dec., ¶ 2; **Ex. 1**).

**B.**   **Neither the Purported "Newly Discovered Evidence," Nor the "Predicate Facts" for the RICO Claims, are New**

Plaintiffs' explanation for their motion – namely that purported "newly discovered evidence" requires the new RICO claims – is completely false.  The "newly discovered evidence" is not new at all, but instead was known or produced <u>at least</u> eleven months ago for the only "recent" items (two depositions of TU executives), and years ago for all other items.  Likewise, all the purportedly "new" predicate facts alleged to support RICO have been alleged and argued by Plaintiffs for years – including with great detail in the current Third Amended Complaint last amended <u>one year ago</u>.

It is not surprising that none of the <u>facts</u> in the proposed Fourth Amended Complaint are new:  this case has had over three years of litigation, nearly two years of discovery, 11 months of certification briefing, over 170,000 pages of documents produced by TU, 16 depositions, over 75 subpoenas, and four previous iterations of the complaint.  Therefore, the substance of all the so-called "new evidence" was known to Plaintiffs long before this motion, and all the purported "new" predicate facts needed to support RICO claims have been alleged many times.  In short, Plaintiffs' own current complaint, other pleadings going back to 20<u>10</u>, verified discovery responses, and documents prove that Plaintiffs have long known all the "facts" and "evidence" they now claim are "new."

**C.**   **Plaintiffs Cannot Meet the "Good Cause" Requirement of Rule 16**

Consequently, Plaintiffs cannot meet the stringent diligence requirement of "good cause" under Rule 16(b), which is the applicable standard for a motion to amend brought after the Court-ordered deadline.  This ends the inquiry, and bars amendment.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).  Plaintiffs also failed to seek a modification of the scheduling order, which is likewise fatal to their motion.  *Id*.

**D.**   **Plaintiffs Cannot Meet the "Interests of Justice" Requirement of Rule 15**

Moreover, even if Plaintiffs could have met the Rule 16 standard, they still could not meet the <u>additional</u> "interests of justice" standard under Rule 15(a)(2).  *Id*.  This is true under each of the four elements of the Rule 15 standard:

**Undue Delay Seeking the Amendment** – Plaintiffs knew or claimed to know all key predicate facts now alleged to support their RICO claims <u>at least</u> by the time they last amended their complaint <u>one year ago</u>. This fatal bar to further amendment is shown by that complaint – namely the Third Amended Complaint ("TAC") – which contains all but one of those predicate facts alleged in detail. The one missing fact is no help to Plaintiffs because it was cited in their discovery responses months <u>before</u> Plaintiffs filed the TAC.

**Undue Prejudice to Defendants** – The proposed amendment is a complete "do over" of a three year-old case with a brand new, arcane, and far-fetched theory. This is particularly true for Mr. Trump, who is now suddenly and individually singled out as the main focus and target of the case. Plaintiffs' pretense that this basic flip-flop will not require any new discovery, to say nothing of the inevitable legal challenges, is absurd.[2]

**Futility of the Amendment** – RICO claims can only be alleged by parties who saw the purported mail or wire frauds, and were directly injured by them. Most Plaintiffs did not see, or were not affected by, the alleged TU communications in question. Moreover, Mr. Trump was not personally involved in those communications. Consequently, Plaintiffs lack RICO standing, and Mr. Trump lacks RICO exposure, as a matter of law.

**Bad Faith by Plaintiffs** – Considering the legal and factual flaws of this motion, Plaintiffs appear to have used the pretext of new RICO claims to give the current complaint a facelift by reshuffling the same facts in a new order, and tacking on a new theory. Their real purpose must be to delay the certification hearing, and gain time to conduct more discovery, in hopes of finally finding something helpful. That is bad faith.

## II.   RELEVANT PROCEDURAL HISTORY

Plaintiffs have filed four previous complaints in this case: the original complaint on 4/30/10; the First Amended Complaint on 6/17/10 (ECF 10 – "FAC"); the Second

---

[2] See MPA, pp. 6 & 14-16 (ECF 248-1). Notably, Plaintiffs made almost identical arguments concerning no real change to their case, no need for additional discovery, and no meaningful impact on the Court's scheduling, when Plaintiffs moved to amend the <u>SAC</u> and file the <u>TAC</u> one year ago (ECF 112-1, pp. 9-12). In reality, the TAC required extensive additional written discovery and depositions.

Amended Complaint on 12/17/10 (ECF 41 – "SAC"); and the Third Amended Complaint on 7/31/12 (ECF 112-4 – "TAC").  The proposed amended complaint at issue in this motion is Plaintiffs' <u>fifth</u> bite at the apple (ECF 248-3 – "4<sup>th</sup>AC" (the "FAC" acronym used in Plaintiffs' moving papers was already taken by their second bite back in 2010)).

The TAC was filed with Plaintiffs' motion to amend on the final Court-ordered deadline to seek amendment (ECF 108, Amended Scheduling Order dated 6/7/12, ¶ 1: "Any motion to join other parties, to amend the pleadings, or to file additional pleadings shall be filed on or before <u>July 31, 2012</u>.") (emphasis in original).  Defendants did not oppose that presumably "final" motion to amend.

Consequently, the TAC has been the operative complaint ever since the motion to amend deadline of 7/31/12 – just over one year ago.  At that point, the parties were well into the wide-ranging and voluminous discovery that has characterized this case since the outset (already summarized above – see accompanying Declaration of Attorney Schneider, ¶¶ 3) ("Schneider Dec.").  Also at that point, the parties were already working under the Court-ordered briefing schedule for Plaintiffs' certification motion (ECF 108, ¶ 2).

In other words, the deadline to amend was just over one full year ago, and Plaintiffs duly sought to amend at that time with no opposition from Defendants.  Thereafter, <u>all</u> certification discovery and briefing during the full year since was based on the TAC.

## III.   PLAINTIFFS HAVE LONG ALLEGED, KNOWN, OR HAD ALL THE PURPORTED "NEW" PREDICATE FACTS AND EVIDENCE

### A.   The 4<sup>th</sup>AC Does Not Allege Any New Facts

Plaintiffs argue the 4<sup>th</sup>AC offers "streamlined" allegations, "reduced" claims, and "35 fewer pages" than the TAC because "RICO better reflects the fraudulent scheme in which Trump engaged" (MPA, pp. 6, 13, & 15-16).  All this supposedly is due to "new evidence" (*id*. at pp. 6-11, 13 & 16), and will result in a "greatly simplified" certification motion (*id*. at p. 11).  In short, Plaintiffs argue that the 4<sup>th</sup>AC has been completely refocused from the TAC based on the new RICO claim, which in turn is based on "mail-

and wire-fraud predicates" supposedly never before known or alleged (*id*. at p. 16).

None of this is true, except that the 4[th]AC is shorter than the TAC.  It is shorter only because many pages stating the elements of five abandoned claims are deleted (Schneider Dec., ¶ 4(c) & **Ex. 2**, Plaintiffs' "blue line" of changes from the TAC to the 4[th]AC).[3]

Nevertheless, the basic <u>factual</u> allegations are <u>unchanged</u> between the TAC and the 4[th]AC.  Those same allegations in the 4[th]AC were simply moved to new paragraphs in a different order, and sometimes paraphrased, with a new emphasis against Mr. Trump.  In short, the 4[th]AC is based on the same alleged "facts" as the TAC, <u>including</u> the purported "mail- and wire-fraud predicates" supposedly just discovered (*id*.).

Plaintiffs have reshuffled the deck.  Nevertheless, they are still playing with the same factual cards they had <u>at least</u> one year ago when they last amended their complaint.

**B.**   **Plaintiffs Allege New RICO Claims, but Their "Predicate Facts" Are Not New**

The <u>only</u> new claims in the 4[th]AC not already alleged in the TAC are "mail fraud" (4[th]AC, ¶ 96(a) – ECF 248-3) and "wire fraud" (*id*. at ¶ 96(b)).  The RICO-required "materials" transmitted by mail are alleged as "letters promoting the Scheme and bearing Defendant Trump's signature or image" (*id*. at ¶ 96(a)).  The RICO-required "materials" transmitted by wire are alleged as "interstate credit card transactions, emails promoting the Scheme, and the Main Promotional Video" (*id*. at ¶ 96(b)).

However, once Plaintiffs' new names for old evidence are recognized as mere camouflage, it is obvious that Plaintiffs knew about or alleged the "Scheme," the "Main Promotional Video," and every item of the above "materials" long before this motion, and in most instances <u>for years</u>.  This will be shown by the following dispositive examples taken from <u>Plaintiffs'</u> own pleadings, verified discovery responses, and other materials

---

[3] Plaintiffs also state that they have dropped a named plaintiff, presumably Brandon Keller.  However, Plaintiffs already advised the Court in their class certification moving papers that Mr. Keller no longer sought to be a class representative, so their "offer" to drop him is meaningless.  TU submits the real reason Plaintiffs are dropping Mr. Keller is that he stated TU "training was excellent, best real estate training I have gone to," and that even <u>after joining the suit as a named plaintiff</u>, he tried to buy more TU programs and specifically requested that a TU mentor work with him (Schneider Dec., ¶ 5).

that long predate this motion to amend, of which the key pleading is the TAC amended one year ago.[4]  Consequently, <u>none</u> of the "predicate facts" for Plaintiffs' new claims of mail or wire fraud are themselves "new," and so those adding those claims now is barred.

### 1.    The "Scheme" Is Not New

The "Scheme" is defined in the 4[th]AC as follows:

> "Defendant Trump and others devised and executed a scheme to make tens of millions of dollars by marketing Trump University as both: (1) a learning institution with which Donald Trump was so integrally involved that students would effectively be learning from him because, among other reasons, they would be learning his real estate secrets from instructors whom he had handpicked; and (2) an actual university with a faculty of professors and adjunct professors" (4[th]AC, ¶ 32 – ECF 248-3).

However, every element of the "Scheme" appears in the TAC.[5]  Here are the quotes and cites showing where they appear – often verbatim – in the TAC filed one year ago:

- "Trump University is an 'education' company owned and founded by real estate tycoon Donald J. Trump, as part of the Trump Organization. . . .   It is not an accredited University" (TAC, ¶ 40 – ECF 112-4).

- "Trump University markets itself as a University driven by the mission to 'train, educate and mentor entrepreneurs'" (*id*. at ¶ 3).

---

[4] The original complaint, FAC, SAC, and other Plaintiff filings and discovery responses also contain many allegations of all the predicate facts, of which a representative sample are cited in the Schneider Dec.  However, this discussion focuses on the TAC because: (i) it is the most recent, operative complaint drafted with the benefit of the most discovery; and (ii) it was filed on the deadline for seeking amendments without opposition from TU, and hence should be the final complaint.  Nevertheless, where other Plaintiff filings and discovery responses are particularly revealing of the fact that nothing is new in the 4[th]AC, they are noted by footnote and citation to the Schneider Dec.

[5] In fact, Plaintiffs have been aware of, and alleged, the same facts since 2010.  Other earlier Plaintiff filings and documents clearly identifying the elements of the "Scheme" are cited in the Schneider Dec. (¶ 6; **Ex. 3**).  These filings include Ex. 79 submitted with Plaintiffs' certification moving papers, which is a counsel-prepared table listing elements of the "Scheme" and supporting evidence, with copies attached (Schneider Dec. ¶ 7; **Ex. 4**).

- "In addition, the New York Department of Education demanded that Trump University remove 'University' from its title, insisting that the 'use of the word 'university' by your corporation is misleading and violates New York Education Law and the Rules of the Board of Regents (*id*. at ¶ 64).

- "Mr. Trump wrote 387 [or nearly 400] blogs posted on Trump University's website, and stated that he intended to be actively involved with Trump University" (*id*. at ¶¶ 19(h) & 67(h)).

- "Trump University grew out of my desire to impart my business knowledge, accumulated over the years, and my realization that there is a huge demand for practical, convenient education that teaches success" (*id*., quoting Mr. Trump).

- "I want the people who go to Trump University to succeed, and I plan to do my part to help them.  I'm not just putting my name on this venture; I plan to be an active presence in the curricula" (*id*., quoting Mr. Trump).

- "My words, ideas, and image will also be woven into the courses we create. The reason I'm playing such an active role in Trump University is that I truly believe in the power of education" (*id*., quoting Mr. Trump).

- "'Mr. Trump takes you through an entire apprenticeship for one year.'  The speaker emphasizes that 'Trump University is owned lock, stock and barrel by Mr. Trump – it's his 'baby,' his company, designed to help him accomplish his goal of leaving a legacy'" (*id*. at ¶ 45, quoting TU speaker).

- "Donald Trump's picture is on the home page of Trump University's website, along with a personal message from him: 'Are you my next Apprentice?  Prove it to me!'  Other advertisements purport to provide 'insider success secrets from Donald Trump,' and the opportunity to 'Learn from the Master,' next to Donald Trump's image.  Consumers are told that the seminar is based on the 'investing experience of Donald Trump" (*id*. at ¶ 67(b), quoting from TU website and ads).

- "Defendants represented to [named plaintiffs Low, Everett, and Brown] and other class members that Donald Trump would be actively involved in Trump University.  This was not true, as he was not actively involved" (*id*. at ¶¶ 106(d), 113(d) & 125(c)).

- "Learn from my handpicked experts how you can profit from the largest real estate liquidation in history" (*id*. at ¶¶ 19(c) & 67(d), quoting from Mr. Trump in TU ad).

- "Other advertisements urged consumers to 'Learn from the Master – Donald Trump,' that 'It's the next best thing to being his Apprentice,' and told consumers they would learn 'insider success secrets from Donald Trump'" (*id*. at ¶ 42, quoting TU ads).

- "Trump University even promises that consumers will receive instructors and mentors who were 'hand-picked by Trump'" (*id*. at ¶ 49).

- "As part of the $1,495 seminar, students are promised they will meet a Trump 'power team' of mentors, real estate agents, brokers, contractors, attorneys and accountants who were 'hand-picked by Donald Trump'" (*id*. at ¶ 57).

- "My team of real estate experts at Trump University is coming to your area in the next few days to conduct my Free Intro Apprenticeship Workshop . . . . I'm also going to give you my 'Secrets of Real Estate Marketing' Investor toolkit (a $50 value) absolutely Free when you attend" (*id*. at page 29, quoting from email from Mr. Trump's office to Plaintiff Keller).

- "My hand-picked instructors and mentors will show you how to use real estate strategies . . . .  With our simple instructions and practice exercises – and ongoing support from your own Trump Team of Experts – you'll have what you need to succeed" (*id*. at ¶ 67(f), quoting from letter from Mr. Trump's office).

/ / /

- "Donald Trump represented that he hand-picked the Trump University instructors and mentors which was also represented by Trump University presenters during real estate investing seminars" (*id*. at ¶ 67(o)).

- "Mentors and Instructors were not 'hand-picked' by Donald Trump" (*id*. at ¶¶ 106(b), 113(b) & 125(a)).

- "Trump University did not teach students Donald Trump's investing secrets" (*id*. at ¶¶ 106(e), 113(e) & 125(d)).

## 2.   The Mail Fraud "Materials" Are Not New

The mail fraud "materials" are defined in the 4th AC as follows:

> "The materials include, but are not limited to, letters promoting the Scheme and bearing Defendant Trump's signature or image" (4th AC, ¶ 97(a) – ECF 248.3).

The TAC specifically alleges two sets of letters promoting the elements of the so-called "Scheme," and signed by Mr. Trump[6]:

- "Donald Trump sent signed letters to consumers nationwide, with Donald Trump's name and signature at the bottom, which stated: '[n]o course offers the same depth of insight, experience and support as the one bearing my name . . . . My hand-picked instructors and mentors will show you how to use real estate strategies . . . . With our simple instructions and practice exercises – and ongoing support from your own Trump Team of Experts – you'll have what you need to succeed! . . . The letter closes with Donald J. Trump's name, signature, and Trump University address . . . " (*id*. at ¶¶ 19(f) & 67(f)).

- "While consumers were in the midst of the Trump University $1,500 seminar and Trump University was trying to persuade them to sign up for the $35,000

---

[6] Plaintiffs were aware of, and alleged, the same facts since 2010.  Other earlier Plaintiff filings and documents clearly referring to letter solicitations are cited in the Schneider Dec. (¶ 8; **Ex. 5**).

course, each of the participants received a personalized (addressed to them by name) letter from Donald J. Trump.  The letter bore the Trump logo at the top of the letter and the words "From the Office of Donald J. Trump."  The letters stated: 'Success in real estate begins with great training and proven strategies.  Without education you don't stand a chance.  I know how to make money in real estate. . . .  Now I want to teach you how to make money in real estate.  To be my apprentice you need to Think BIG and really want to succeed. . . .  I founded Trump University back in 2005 to teach go-getters how to succeed in real estate.  My team at Trump University is filled with real estate experts. . . .  If you think you've got what it takes to be my next Apprentice, come prove it to me and my team.'  The letter closes with 'See you at the top!'  And, it is signed, 'Donald J. Trump, Chairman, Trump University" (*id*. at ¶¶ 19(g) & 67(g)).

### 3.    The Wire Fraud "Materials" Are Not New

The wire fraud "materials" are defined in the 4th AC as follows:

> "The materials transmitted and/or received include, but are not limited to, interstate credit card transactions, emails promoting the Scheme, and the Main Promotional Video" (4thAC, ¶ 97(b) – ECF 248.3).

#### a.    Credit Card Transactions

The TAC specifically refers to "**credit card transactions**" by TU students in general, and by Plaintiffs themselves in particular[7]:

- "Trump University representatives also told students during the three-day seminar to raise their credit card limits four times during the break for 'real estate transactions,' and had students prepare detailed financial statements, presumably for real estate purchases.  In fact, Trump's real reason for having

---

[7] Long before filing suit, Plaintiffs obviously were aware that they and others paid for TU programs with credit cards.  Other earlier Plaintiff filings and documents clearly referring to credit card transactions are cited in the Schneider Dec. (¶ 9; **Ex. 6**).

students increase their credit limits and provide detailed financial statements was to assess how much money each student had to spend on the next Trump seminar, and to persuade the students to use their increased credit limit to purchase the Trump Gold program for $34,995" (*id*. at ¶ 6).

- "During the three-day workshop, the attendees, including Plaintiff[s Makaeff, Keller, and Oberkrom], were told to raise their credit card limits so they could enter into 'real estate transactions.' However, at the end of the session, Trump University told Plaintiff[s Makaeff, Keller, and Oberkrom] and the other seminar attendees to use that credit to purchase [another TU seminar for about $35,000]. Based on Trump University's numerous misrepresentations, on or about [date], Plaintiff[s Makaeff, Keller, and Oberkrom] enrolled in [another TU seminar for about $35,000], plus the variable APR finances charges, interest fees, and late fees [they have] to pay [their] credit card company" (*id*. at ¶¶ 26-28; similar allegations paraphrased at ¶¶ 69, 90 & 92).

- "[Plaintiff] Brown maxed out two credit cards to pay for the $25,000 Elite program on [date], as Trump University pressured him to" (*id*. at ¶ 31).

- "Trump University representatives do not tell students that they are likely to incur finance charges, interest fees, and late fees by charging this expensive seminar on their credit cards. Trump University also does not tell students that by increasing their credit limits, they could damage their credit scores. Trump University representatives also never inform students that by 'maxing out' their credit cards, their credit scores could drop even more significantly" (*id*. at ¶ 52).

- "Raising credit card limits – During the $1,500 seminar, [TU representatives] asked [Plaintiffs Low, Everett and Brown] and other class members to raise their credit card limits so that they would be ready to invest in real estate, but then asked [Plaintiffs Low, Everett and Brown] and the other students to use

their credit cards, not to purchase property, but to 'invest' in the next level of Trump seminars – the Elite program" (*id*. at ¶¶ 106(f), 114(f) & 125(e)).

### b.   Emails

The TAC also specifically refers to "**emails**" promoting the elements of the so-called "Scheme," including one allegedly sent to Plaintiff Keller personally[8]:

- "An email from Trump University [was sent] to thousands or tens of thousands consumers featured Donald Trump's photo with the words: 'Are you My Next Apprentice,' and stated: '76% of the world's millionaires made their fortunes in real estate.  Now it's your turn.  My father did it, I did it, and now I'm ready to teach you how to do it too.'  The signature line at the bottom of the email reads, Donald J. Trump, Chairman, Trump University, and even includes his signature" (*id*. at ¶¶ 19(d) & 67(d)).

- "My team of real estate experts at Trump University is coming to your area in the next few days to conduct my Free Intro Apprenticeship Workshop . . . .  I'm also going to give you my 'Secrets of Real Estate Marketing' Investor toolkit (a $50 value) absolutely Free when you attend" (*id*. at page 31, showing copy of email from Mr. Trump's office to Plaintiff Keller).

### c.   Video

The "Main Promotional Video" is defined in the 4th AC as follows:

> "[A] promotional video for Trump University posted on YouTube, embedded in email blasts, and shown at Trump University Live Events" (4th AC, ¶ 3 – ECF 248-3).

The TAC does not specifically refer to the "**Main Promotional Video**," but the video in question was produced and cited in the case <u>long before the TAC</u>.  Moreover, the purported importance of the video for RICO purposes is that it was made available on the

---

[8] Plaintiffs have been aware of these emails since at least 2010.  Other earlier Plaintiff filings and documents clearly referring to email solicitations are cited in the Schneider Dec. (¶ 10; **Ex. 7**).

Internet, and hence purportedly was disseminated by "wire," but not one Plaintiff saw it on the Internet, and some Plaintiffs never saw it at all:

- The video was produced to Plaintiffs in January 2012: The "Main Promotional Video" is Plaintiffs' newly concocted name for a 2005 video of Mr. Trump promoting TU.  It was posted on the Internet between 2006 and 2008, and produced to Plaintiffs in January 2012 – six months before the amendment deadline (Schneider Dec., ¶ 12).

- Plaintiffs referenced and quoted the video in March 2012: A few weeks after the video was produced to Plaintiffs, they cited it and quoted from it in verified discovery responses served in March 2012.  They claimed it was evidence of misconduct by Mr. Trump – four months before the amendment deadline (Schneider Dec., ¶ 13).

- Plaintiffs filed and cited the video in their certification moving papers in September 2012: Two months after the amendment deadline, but ten months before bringing this motion, Plaintiffs actually filed the video with their moving papers seeking class certification, and referred to it in their moving papers (Schneider Dec., ¶14).

- None of the Plaintiffs ever saw the video online: For purposes of their new RICO wire fraud claim, Plaintiffs allege that the video was the "cornerstone" of the TU advertising campaign, and was "published to YouTube online so it would be viewed by prospective student-victims throughout the country" (4th AC, ¶ 33 – ECF 248-3).  The problem with this blatant attempt to shore up the RICO claim is that none of the Plaintiffs ever saw the video online at the material time (i.e., before purchasing TU products or services) (Schneider Dec., ¶ 15; **Ex. 10**).

- Some of the Plaintiffs never saw the video at all: The 4th AC alleges that Plaintiffs Makaeff, Oberkrom, and Brown saw the video at a TU "Live Event" seminar (4th AC, ¶¶ 14-15 & 18).  However, Plaintiffs Low and

Everett <u>denied</u> ever seeing it, and so did Plaintiff Makaeff when she was first deposed about it (Schneider Dec., ¶¶ 16-17; **Exs. 11 & 12**).

## C.   **Plaintiffs Argue "Newly Discovered Evidence," But None Cited Is "New"**

Just like Plaintiffs' "predicate facts" for their RICO claims are not "new," so too none of Plaintiffs' hodgepodge of purported "new evidence" listed in their moving papers is "new" either (MPA, pp. 3-5 – a TU "script," a TU email, NYSED information, the Trump and Sexton depositions, and post-July 2012 document productions re agency complaints). Moreover, even if every item in the hodgepodge had been "new," they are all irrelevant to the RICO claims. Consequently, none of those five disparate items justify Plaintiffs' belated filing of this motion to amend.

### 1.   **The Content of the "3.0 Preview Script" Is Not New, Nor Relevant**

For the third time in this case, Plaintiffs have trotted out the "3.0 Preview Script" produced by TU in June 2013 (TU 154667-154702). It was the main subject of Plaintiffs' supplemental filing on 6/27/13 (ECF 239). Then as now, they argue that the script is "new evidence" crucial to the case. (MPA, p. 3).

These arguments were addressed in TU's opposition to Plaintiff's supplemental filing (ECF 241), and so will not be covered again in the same detail here. A summary of the main reasons why the script is neither new nor crucial is as follows:

**The verbatim content of the script was produced by TU to plaintiffs 15 months ago**: With the filing of this opposition, Plaintiffs have now been reminded three times that the **verbatim** content of the script, with the corresponding PowerPoint slides, was produced to them by TU in May 20<u>12</u>. That was 15 months ago – long before the deadline to amend, and in fact, two months <u>before</u> Plaintiffs filed their TAC (Schneider Dec., ¶¶ 19-20; **Ex. 13**). Plaintiffs never honestly concede that key point to the Court, but it is fatal to their claims that the script is "new."

**The prior version of the script was filed by Plaintiffs as Ex. 86 with their certification reply papers six months ago**: Plaintiffs cannot pretend that they were not aware of the production of the prior version of the script, because they included it in their

reply papers for certification (Schneider Dec., ¶ 20 - ECF 195).  Plaintiffs now claim that the "substance" is vital (MPA, p.3 – ECF 248-1).  However, it is noteworthy that Plaintiffs did not include this supposedly "crucial" evidence with their certification moving papers, despite it being produced to them <u>four months</u> before those papers were due (*id.* at ¶ 20).  This is another key point never honestly conceded by Plaintiffs to the Court.  It is key because it proves that neither the original nor the latest versions of the script were "crucial" evidence until Plaintiffs had to find pretexts for delay, the latest of which is this motion to amend.

**For purposes of the motion to amend, the script adds nothing to Plaintiffs' case**: Even if the script <u>was</u> "new evidence," it would not provide support for this motion to amend.  The purported reason for the motion is to add Plaintiffs' RICO claims.  But, the script is completely irrelevant to those claims because – even assuming it was ever used – it would have been used by TU speakers at "Live Events," and not transmitted to TU students via mail or wire.

**The Sexton cover email to the script also adds nothing to Plaintiffs' case**: The Sexton cover email transmitting the script to three TU instructors for their review (ECF 239, Ex. 2; TU 154665) also provides no support for this motion.  The email was not a transmittal to Plaintiffs' purported "student-victims," but rather was to TU personnel.  So, that email does not provide the required direct relationship between alleged RICO-type misconduct and alleged injury to Plaintiffs – an issue addressed further under the heading "Futility of the Amendment" heading (*infra*, page 24).

Also, Mr. Trump had nothing to do with the Sexton email.  Plaintiffs concede the subject email was sent between Sexton and three instructors.  Plaintiffs cannot base a RICO claim against Mr. Trump personally based on an email that he neither wrote nor sent and which caused no injury, direct or otherwise, to Plaintiffs (*see also infra*, page 24).

**2.     The 7/29/08 "Makaeff's Friend" Email Is Not New, Nor Relevant**

Plaintiff Makaeff attended a 3-day TU seminar as the guest of her then-friend, Ms. Nguyen (Schneider Dec., ¶ 21; **Ex. 14**).  Prior to the seminar, Ms. Nguyen forwarded to

Makaeff an email dated 7/29/08 from TU to Ms. Nguyen confirming her attendance (*id*.). In that email was a link to what Plaintiffs assume is the so-called "Main Promotional Video" – i.e., the marketing video made by Mr. Trump in 2006 (*id*.). Despite this email supposedly being key "new evidence," Plaintiffs did not submit it to the Court, but TU has done so (**Ex. 14**).

By torturous connection of these obscure dots, Plaintiffs argue that the 7/29/08 email supports their RICO wire fraud claim. The theory is that anyone following its link to the video would have been notified of it by "wire," and since the video supposedly is now the "cornerstone" of the TU "Scheme," *voila* – wire fraud. Plaintiffs' argument that the email is "new" and that this was Plaintiffs' first notice of links to TU's website are demonstrably false.

**Plaintiff Makaeff has had the 7/29/08 email for over <u>five</u> years**: Buried in Plaintiffs' footnote 3 (MPA, page 9 – ECF 248-1) are the facts that the 7/29/08 email only came to light when TU got it via subpoena from Ms. Nguyen, and only then did Plaintiffs finally produce Plaintiff Makaeff's identical copy (Schneider Dec., ¶ 22). Although not forthcoming with the Court, Plaintiffs' "explanation" for their failure to produce the email is important for another reason: Makaeff had the 7/29/08 email in her possession since July 2008 – over <u>five years</u> ago. This is not "new evidence" by any stretch. In other words, to the extent the email could even support Plaintiffs' new claims, it has been in their possession for five years – even before filing the original Complaint in 2010.

**There is ample evidence that the link to TU's website was disseminated by TU in its advertising to the general public, and TU produced dozens if not hundreds of documents to Plaintiffs containing those links starting in early 2012, long before the deadline to amend**: TU had many URLs/domains that directed Internet visitors to the TU website (Schneider Dec., ¶ 23; **Ex. 15**). On that website, during various periods of time, visitors had access to the video. So, assuming a link to the TU website in a transmittal to some attendees of certain TU programs is evidence supporting Plaintiffs' claim of wire fraud, then it is old evidence, and no help to this motion. The link noted in Ms. Nguyen's

email to Makaeff turns out to be merely the <u>most recently identified link</u> of many that were previously identified much earlier in the case (Schneider Dec., ¶ ¶ 18 & 23).

### 3.    The NYSED Information is Not New, Nor Relevant

Plaintiffs argue that, about three months ago, they obtained a copy of an NYSED letter dated 5/27/05 warning Mr. Trump that "using the name 'university' was illegal without a license, and asking Trump to stop using the name 'Trump University.'"  (MPA, p. 9-10 – ECF 248-1).  Plaintiffs complain that TU has not produced a copy of that letter, and – in a complete *non sequitur* – Plaintiffs also state that similar communications from the NYSED were made as recently as 2010, and some called for refunds (*id*. at p. 10).

However, contrary to the "new evidence" argument, the NYSED complaints turn out to be among the oldest evidence in the case:

**Plaintiff Makaeff was communicating with the NYSED about the "University name" issue even <u>before</u> she filed this lawsuit**: As early as 4/28/10, Plaintiff Makaeff exchanged emails with the NYSED about the "University name" issue in communications probably stage-managed by her present counsel (Schneider Dec., ¶ 24; **Ex. 16**).

**In one of the earliest contested motions in the case, Plaintiffs argued the "University name" issue**: In Plaintiffs' unsuccessful anti-SLAPP motion filed on 6/30/<u>10</u>, they argued as follows: "The New York Department of Education also recently demanded that Trump University remove the word 'University' from its title, insisting that the 'use of the word 'university' by your corporation is misleading and violates New York Education Law and the Rules of the Board of Regents.'"  (Schneider Dec., ¶ 25).

**In the TAC, Plaintiffs alleged the "University name" issue**: In allegations very similar to earlier complaints (Schneider Dec., ¶ 26), the TAC alleged that:

- TU "changed its name to Trump Entrepreneur Initiative on June 2, 2010, after the [NYSED] insisted that the 'use of the word 'university' by your corporation is misleading and violates New York Education Law'" (TAC, ¶2, fn. 1 – ECF 112-4).

/ / /

- "In response to demands by the [NYSED], and after the initial complaint in this action was filed, [TU] changed its name to 'The Trump Entrepreneurial Initiative' on or around June 2, 2010" (*id*. at ¶ 32).

- "In addition, the [NYSED] demanded that Trump University remove 'University' from its title, insisting that the 'use of the word 'university' by your corporation is misleading and violates New York Education Law and the Rules of the Board of Regents" (*id*. at ¶ 66).

**For purposes of the motion to amend, the NYSED complaints add nothing to Plaintiffs' case**: Once again, even assuming the three-year old evidence of the NYSED complaints had been first discovered yesterday, it would not support the motion to amend because it is totally irrelevant to the RICO allegations.[9]

### 4. The Trump and Sexton Depositions Are Not "New," and <u>Plaintiffs</u> Chose to Take the Depositions after the Amendment Deadline

Plaintiffs' next argument for "new evidence" is that the depositions of Mr. Trump and TU's former President Mr. Sexton were taken after the 7/31/12 deadline to amend. That argument is completely overcome by two simple calendar analyses showing remarkable delay by <u>Plaintiffs</u>:

**The deposition of Mr. Sexton was on 8/22-23/12 (almost 1 year ago) and the deposition of Mr. Trump was on 9/12/12 (11 months ago)**: Assuming any revelations in either deposition alerted Plaintiffs to their RICO claims, or to any other issue requiring amendment, Plaintiffs then had between eleven months and one year to bring this motion before they actually did. Evidence purportedly resulting in a motion to amend <u>at least</u> 11 months later is not "new." Plaintiffs certainly could have brought this motion before filing their class certification motion on 9/24/12, which was based entirely on the TAC.

---

[9] Plaintiffs argue that documents produced seven months ago indicate that TU set up a fictitious business address in Delaware. Putting aside that Plaintiffs have known this fact for at least <u>seven</u> months and done nothing, they also fail to explain how that allegation has anything to do with <u>any</u> of the Causes of Action in the 4<sup>th</sup>AC, including the proposed RICO claims.

**The deposition schedule for Messrs. Trump and Sexton was set by <u>Plaintiffs</u> after their own repeated postponements**: Plaintiffs originally set the depositions of Mr. Sexton and Mr. Trump for the week of 6/25/12 (after nearly two years of litigation and nine months of discovery).  TU promptly agreed to make Messrs. Trump and Sexton available during that week, <u>as noticed</u>, and long before the deadline to amend.  (Schneider Dec., ¶ 27; **Ex. 17**).  However, <u>Plaintiffs</u> immediately canceled those depositions, and – despite being offered several additional dates in July, August, and September – <u>Plaintiffs</u> opted for the eventual deposition dates of 8/22 and 9/12 (*id.*).  Plaintiffs cannot complain about those dates when they delayed noticing the depositions for nine months, then postponed them two more months, and finally chose from the latest available dates.

### 5.	The Post-July 2012 Document Productions are Not New, Nor Relevant

Plaintiffs' final argument for "new evidence" is the following throw-away line, quoted in full: "Among the nearly 50,000 pages of documents produced since last July are other highly relevant documents that bolster Plaintiffs' claims, such as communications with the Better Business Bureau ("BBB"), the various Attorneys General, and other governmental agencies" (MPA, p. 10 – ECF 248-1).[10]  It can be quickly disposed of:

**Out of "50,000 pages," Plaintiffs do not specifically identify a single "highly relevant document"**: Plaintiffs have brought this motion to amend based largely on the "Preview Script – Version 3.0," and on the 7/29/08 TU email sent to Plaintiff Makaeff's friend Ms. Nguyen.  Plaintiffs obviously are not bashful about picayune detail, far-fetched connections, and torturous connection of dots.  Why the strange silence here about specific "highly relevant documents" among those 50,000 pages?

**The only details given by Plaintiffs concerning the purported "highly relevant documents" are that they concern "communications with the . . . BBB, the various**

---

[10] Plaintiffs fail to advise the Court that they served three more sets of Requests for Production with 26 extensive requests <u>after</u> the 7/31/12 deadline to amend.  Defendants produced voluminous documents in response to those requests, and to Plaintiffs' additional request in late 2012 to produce equally voluminous emails based on Plaintiffs' selected search terms, which defendants did voluntarily.  (Schneider Dec., ¶ 28)

**Attorneys General, and other governmental agencies," none of which are "new" or relevant to the RICO claims**: The TAC has many allegations concerning complaints to and by the BBB, the state AG offices, and "other governmental agencies" (*see, e.g.*, TAC, ¶¶ 2 fn 1, 9-11, 32 & 64 – ECF 112-4). Most of those allegations are unchanged from earlier iterations of the complaint.[11] There is nothing "new" about them.

**For purposes of the motion to amend, the BBB, AG, and other governmental agency complaints add nothing to Plaintiffs' case**: One last time, even assuming the old evidence of these administrative complaints had been first discovered yesterday, it would not support the motion to amend because it is totally irrelevant to the RICO allegations.

## IV.   PLAINTIFFS FAIL TO MEET THE "GOOD CAUSE" STANDARD OF RULE 16(b)

### A.   Rule 16 Controls Because Plaintiffs Seek to Amend After the Scheduling Order Deadline

Plaintiffs open their brief by arguing that Rule 15(a) requires the Court to "freely give leave [to amend] when justice so requires" (MPA, p. 6 – ECF 248-1). But, Rule 15 is <u>inapplicable</u> at the outset because Plaintiffs seek to amend <u>after</u> the scheduling order deadline. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).

Instead, Rule 16(b) initially governs, and so Plaintiffs must first show "good cause" for amendment under that Rule. *Id*. at 608. If the Rule 16 "good cause" standard is met, only then may the moving party attempt to demonstrate that amendment is also proper under Rule 15(a). *Id*. As the *Johnson* court summarized this law:

> "Disregard of the [scheduling] order would undermine the Court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier. Rule 16 was drafted to prevent this situation and its standards may not be short-circuited by an appeal to those of Rule 15." *Id*. at 610.

*Johnson* remains the dispositive law on these issues, as shown by recent extensive

---

[11] Other earlier Plaintiff filings and documents clearly referring to BBB, AG, and other governmental agency complaints are cited in the Schneider Dec. (¶ 29; **Ex. 18**).

citation in this District Court.  *See, e.g., Campion v. Old Republic Home Protection Co., Inc.*, 861 F.Supp.2d 1139, 1150-51 (S.D. Cal. 2012).

### B.  Plaintiffs Failed to Seek Modification of the Scheduling Order

After the amendment deadline in a scheduling order is passed, the "good cause" standard under Rule 16 requires the party seeking amendment to request modification of the scheduling order.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 608-09.  The Ninth Circuit in *Johnson* rejected the approach used by Plaintiffs here, which was to ignore that requirement, and simply move to amend the complaint.  *Id.*, citing *Jauregui v. City of Glendale*, 852 F.2d 1128, 1133-34 (9th Cir. 1988) and *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1104 (9th Cir. 1985).

Consequently, this motion should be denied because it failed to follow the proper procedure imposed by the Ninth Circuit when the deadline to amend in a scheduling order has been passed.  Plaintiffs have made no showing why they ignored the direction of the Ninth Circuit, and so – like in *Johnson* – this Court too should "see no reason to deviate from that approach here."  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 608-09.

### C.  Plaintiffs Fail to Meet the "Good Cause" Requirement to Amend

In another parallel to *Johnson*, Plaintiffs fail to satisfy the Rule 16 standard even if this motion "were treated as a *de facto* motion to amend the scheduling order rather than a motion to [amend the complaint] after the binding cut-off date for the motion had passed." *Id*. at 609.  Plaintiffs here, just like the plaintiff in *Johnson*, "failed to make an adequate showing under either standard."  *Id.*

The applicable analysis under the Rule 16 "good cause" standard "primarily considers the diligence of the party seeking the amendment."  *Id*.  "If that party was not diligent, the inquiry should end."  *Id.*  Here, Plaintiffs surely have not shown diligence in bringing their amendment to add the RICO claims.  As the exhaustive factual discussion above has shown, Plaintiffs had alleged, knew, or otherwise had in their possession every "predicate fact" needed for the RICO claims at least one year ago when their last motion to amend was filed.  Likewise, Plaintiffs' so-called "newly discovered evidence" mostly

pre-dates that previous motion as well.  The latest such evidence – the Trump and Sexton depositions – came after that previous motion, but Plaintiffs <u>chose</u> to wait until after the deadline to take those depositions, and even then both depositions were completed <u>over eleven months ago</u>.

Moreover, the factual discussion above has also shown that the "newly discovered evidence" is completely irrelevant to the RICO claims in any event.  Consequently, even if Plaintiffs are given the benefit of the doubt that some or all of that evidence is "new," that determination is no help to Plaintiffs on this motion to add the RICO claims.

The *Campion* case out of this Southern District provides some additional authority for denying this motion based on parallels with that case – in which an untimely motion to add claims also was denied.  *Campion v. Old Republic Home Protection Co., Inc.*, 861 F.Supp.2d at 1151-53.  First and most *apropos*, leave to add claims was denied in *Campion* in large part because "late amendments to add new theories are not viewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action."  *Id*. at 1152-53.  The *Campion* court's analysis of this situation is directly on point here:

> "Plaintiff's assertions have several fundamental flaws.  First, the new causes of action – fraud and concealment – are not "new" theories, but rather legal theories that have been manifest all along, and that could have been asserted from the outset, or if not, certainly by the deadline to amend pleadings, and in no event later than Plaintiff's first motion for leave to file an amended complaint. . . . There is no plausible reason, therefore, why these proposed "new" causes of action could not have been sought to be included long before now."  *Id*. at 1151.

Replace the words "<u>first</u> motion for leave to file an amended complaint" in *Campion* with the "<u>fourth</u>" such motion here, and the *Campion* analysis fits this case perfectly.

The *Campion* court also denied the motion to amend in that case because it was filed after substantial discovery had been completed, and after a summary judgment motion had been fully briefed: "These reasons also weigh in favor of denying Plaintiff's late motion to amend."  *Id*. at 1152.  In this case, massive discovery and certification

briefing was completed before Plaintiffs brought their late motion to amend.

In summary, Plaintiffs here have not been diligent.  So, they fail to meet the Rule 16 standard on substantive as well as procedural grounds.  That means "the inquiry should end," and the motion must be denied.  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 609; *Campion v. Old Republic Home Protection Co., Inc.*, 861 F.Supp.2d at 1150.

## V.   PLAINTIFFS FAIL TO MEET THE "INTERESTS OF JUSTICE" STANDARD OF RULE 15(a)(2)

If the Court determines that Plaintiffs somehow have met the diligence requirement under Rule 16, then their motion to amend must be tested by the "interests of justice" standard under Rule 15(a).  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d at 608.

The factors for that test are: (A) undue delay; (B) undue prejudice; (C) futility of amendment; and (D) bad faith.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  These factors are not equally weighed because possible delay alone will not justify denial of leave to amend; and the single most important factor is whether the opposing party is prejudiced. *Mansfield v. Midland Funding, LLC*, 2011 WL 1212939, *4 (S.D. Cal. March 30, 2011). Plaintiffs' motion fails on all four factors.

## A.   Undue Delay in Seeking the Amendment

To quote Plaintiffs on this factor: "When considering undue delay, courts inquire as to whether the movant knew or should have known of the facts and theories raised in their proposed amended complaint" (MPA, p. 14 – ECF 248-1).  Plaintiffs cite *Capuano v. Kenneth Eisen & Assocs., Ltd.*, 2012 U.S. Dist. LEXIS 86720, *11 (D. Ariz. June 22, 2011) for this proposition, albeit with the qualification that "this consideration by itself is not dispositive in denying a motion to amend." *Id.*

It may not be dispositive of the entire motion, but Plaintiffs certainly fail this factor egregiously.  They knew or had alleged all the "predicate facts" for their RICO claims when they sought to amend in July 2012, but they simply failed to add those claims then.  They then waited one year to bring this belated motion.  That is undue delay.

/ / /

**B.     Undue Prejudice to Defendants**

This District has found undue prejudice when a proposed late amendment will give rise to a "greatly expanded claim." *Mansfield v. Midland Funding, LLC*, 2011 WL 1212939 at *5. The same is true when a proposed late amendment came after "substantial discovery" and a pending summary judgment motion was "fully briefed." *Campion v. Old Republic Home Protection Co., Inc.*, 861 F.Supp.2d at 1152. All of those criteria apply here, with the immaterial difference that the fully briefed motion is for certification.

Moreover, the factual discussion above has shown that Plaintiffs' proposed RICO claims constitute a complete redirection of the case against Mr. Trump individually, on wholly new quasi-criminal theories that will need extensive testing for legal sufficiency by motion, and extensive discovery if they survive that testing. For example, all named Plaintiffs conceded that they never saw the video online. Plaintiff Makaeff also testified she never saw any TU ads or marketing materials before paying for TU live events. So, defendants would need to re-depose all six named Plaintiffs to learn exactly which "mail" or "wire" communications they claim they saw and relied on, and how it caused direct injury (Schneider Dec., ¶ 30(a)-(c)). At this late date in the case, significant prejudice to Mr. Trump and TU is inevitable, and it is the key factor of the four.

**C.     Futility of the Amendment**

A proposed amendment is futile if "no set of facts can be proved under the amendment to the pleadings that would constitute a valid claim or defense." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). This is a demanding factor, but due to the standing limitations of RICO claims, Plaintiffs fail it too.

In short, RICO liability requires that there be a "direct relationship" between the RICO-related bad acts of defendants, and the harm to plaintiffs – indirect harm will not suffice. *Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 273 (1992). Here, as noted in the factual discussion, the purported mail and wire frauds turn on "materials" that few or none of the Plaintiffs ever saw, much less were harmed by: (i) all TU solicitation letters and emails received by Plaintiffs were for the <u>free</u> seminar only; (ii) <u>none</u> of the

Plaintiffs saw the "Main Promotional Video" online as required for the RICO interstate component; (iii) <u>none</u> of the Plaintiffs saw or heard either the "3.0 Preview Script" or its cover email' and (iv) the confirmation email Makaeff's friend forwarded to her was not written by or sent by Mr. Trump, and Makaeff never followed the link to the video in any event.  Furthermore, Mr. Trump – the <u>only</u> RICO defendant – had <u>no direct relationship</u> at any time with any of the Plaintiffs.

**D.   <u>Bad Faith by Plaintiffs</u>**

Plaintiffs' eleventh-hour motion is inexplicable except for Plaintiffs' concession that the TAC and all their briefing and evidence does not meet the rigorous analysis required by Rule 23.  Consequently, the motion and 4<sup>th</sup>AC were intended to gain time, postpone the certification ruling, and prolong the case so Plaintiffs' ongoing discovery "fishing expeditions" could continue.  This is bad faith.

## VI.   CONCLUSION

Defendants respectfully submit that Plaintiffs' motion to amend should be denied.  It fails to meet the requirements of Rule 16 both procedurally, and in terms of diligence.  It also fails to meet the requirements of Rule 15 on all four factors that comprise the "interests of justice" analysis.

The motion is a last-minute attempt to stave off the certification hearing, so Plaintiffs can live to fight – i.e., conduct more discovery fishing expeditions – another day.  That is not a lawful basis to seek amendment more than one year after the Court's deadline to amend.

Respectfully submitted,

Dated:  August 16, 2013                    YUNKER & SCHNEIDER

                                           By:        s/David K. Schneider
                                                 David K. Schneider
                                                 Attorneys for Defendants
                                                 TRUMP UNIVERSITY, LLC, et al.
                                                 Email:  dks@yslaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 16, 2013.


s/David K. Schneider

David K. Schneider
YUNKER & SCHNEIDER
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone:  (619) 233-5500
Facsimile:   (619) 233-5535

Email:  dks@yslaw.com

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND