1                   UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

TARLA MAKAEFF, et al., on      .
4  Behalf of Themselves and All   .
Others Similarly Situated,     .
5                                 . Docket
               Plaintiffs,       . No. 10-cv-00940-GPC-WVG
6                                 .
                    v.            . August 30, 2013
7                                 . 1:30 p.m.
TRUMP UNIVERSITY, LLC,         .
8  et al.,                        .
                                  .
9              Defendants.       . San Diego, California
   . . . . . . . . . . . . . . . . .
10
                   TRANSCRIPT OF MOTION HEARING
11          BEFORE THE HONORABLE GONZALO P. CURIEL
                  UNITED STATES DISTRICT JUDGE
12
                   A-P-P-E-A-R-A-N-C-E-S
13  For the Plaintiffs:    Robbins Geller Rudman & Dowd LLP
                           655 West Broadway
14                         Suite 1900
                           San Diego, California 92101
15                         By:  JASON A. FORGE, ESQ.
                                RACHEL L. JENSEN, ESQ.
16                         - AND -
                           ZELDES HAEGGQUIST & ECK, LLP
17                         625 Broadway, Suite 1000
                           San Diego, California 92101
18                         By:  AMBER LEE ECK, ESQ.

19
   For the Defendants:    Yunker and Schneider
20                         655 West Broadway, Suite 1400
                           San Diego, California 92101
21                         By:  DAVID KEITH SCHNEIDER, ESQ.

22
   Court Reporter:        Chari L. Possell, RPR, CRR
23                         USDC Clerk's Office
                           333 West Broadway, Suite 420
24                         San Diego, California 92101
                           chari_possell@casd.uscourts.gov
25  Reported by Stenotype, Transcribed by Computer

1          SAN DIEGO, CALIFORNIA; AUGUST 30, 2013; 1:30 P.M.

2                              -o0o-

3          THE CLERK:  Number 16 on calendar, Case 10-cv-00940,

4     Makaeff v. Trump University, et al., for a motion hearing.

5          THE COURT:  Good afternoon.  Appearances, please.

6          MR. FORGE:  Jason Forge, Rachel Jenson, and Amber Eck

7     for the plaintiffs.

8          MR. SCHNEIDER:  David Schneider for defendant Donald

9     Trump and Trump University.

10         THE COURT:  Good afternoon.  We are here on a motion

11    to amend or correct pleadings, and at this time, the Court

12    notes that the motion is untimely according to the pre-trial

13    plan that was in place such that the Court is required to look

14    to Rule 16 to determine whether or not good cause is shown to

15    permit an amendment of, number one, the pre-trial plan, but

16    second of all, to permit an amended pleading.

17        Under the Ninth Circuit law, that's settled, good cause

18    requires the Court to look to the diligence that has been

19    exercised, or the lack of diligence, by the plaintiff.  The

20    fourth amended complaint that is proposed seeks to add a RICO

21    claim.  As we all know, RICO is a special law that requires as

22    an element a pattern of racketeering activity.  As to the

23    pattern of racketeering activity, 18 U.S.C. 1961 identifies

24    offenses that qualify as predicate acts.  In this case, it

25    appears that the plaintiffs rely on mail fraud and wire fraud

1    statutes as the predicate act offenses.  There's no question

2    that both of those statutes are properly viewed or alleged as

3    predicate offenses for a RICO pattern of racketeering activity.

4    The ultimate question is whether or not the plaintiffs were

5    diligent in taking approximately a year from the third amended

6    complaint to identify the RICO claim and to move to amend the

7    pleadings.

8        Looking at the fourth amended complaint, at paragraph 86,

9    there are a number of alleged wire and mail fraud violations,

10   and what I would like to do is, beginning at page 31, lines 4

11   through 12, inquire of plaintiff's counsel, as to these

12   transactions, is there any reason to believe that due diligence

13   would not have allowed the plaintiffs to identify these

14   transactions as possible predicate acts before the third

15   amended complaint was filed?

16       MR. FORGE:  Your Honor, the specific transactions at

17   page 31, we were aware of those specific transactions, those

18   actual wires.  Obviously, the other aspects of the wire fraud

19   claim -- specific intent and the evidence thereof -- that's

20   what we would say is the new evidence, the evidence that we

21   were pursuing diligently and we did not obtain until later.

22       But to address your question specifically, those actual

23   transactions, we -- we could have had those actual wire

24   transactions, but the other elements would have been tougher.

25       THE COURT:  For these two transactions to have been

1    relied upon, would you have had to show independently there was

2    a commission of wire or mail fraud violations?

3            MR. FORGE:  Yes, Your Honor.  We still would have had

4    to establish all the elements of the actual scheme itself.  And

5    that's really what we are talking about in terms of the big

6    difference between what we know now versus what we knew before.

7    And even though it is a big difference, it doesn't come from

8    necessarily a large volume of new evidence, but the evidence we

9    did obtain we think is of very, very high value.  And we are

10   talking about -- I can talk specifically as to the letter from

11   the New York State Education Department, and --

12           THE COURT:  And maybe you can walk me through some of

13   this.  But the way I see this is the scheme that was charged in

14   the third amended complaint and the scheme that is alleged in

15   the fourth amended complaint don't differ so much as to the

16   critical particulars.  At the end of the day, it's alleged that

17   Mr. Trump falsely represented to the world that he was actively

18   involved in molding the program, that he hand picked the

19   instructors, and that he wouldn't put his name on just

20   anything, and that he was intimately involved in the

21   development of the curriculum, and that in fact he wasn't; he

22   was, if not missing in action, he was not actively involved.

23       But it appears from the third amended complaint, those

24   allegations are made as well, aren't they?

25           MR. FORGE:  That is true, Your Honor.  But there are

1    other additional allegations to show not only did he make those

2    representations before, but they made much more affirmative use

3    of the video that really provided -- the video that Mr. Trump

4    did -- that really provided the blueprint or the framework for

5    all the presentations in terms of the representations and, in

6    our view, misrepresentations about his level of involvement.

7    Those all used interstate wires, and what I am referring to are

8    the e-mails with the link to them.

9           THE COURT:  Right.  And I guess let me move over to

10   those additional communications, transmissions, that are

11   referenced at page 30 of the proposed fourth amended complaint.

12       There's two mailings, it appears, that are referenced

13   between lines 5 and 12 involving Sonny Low and Ed Oberkrom, and

14   they are specifically specific invitations from Donald J. Trump

15   to attend previews.  And those are, as I understand it, actual

16   mailings to these two plaintiffs?

17          MR. FORGE:  That's correct, Your Honor.

18          THE COURT:  And then this would demonstrate that this

19   scheme relied upon the U.S. mails in order to advance its

20   unlawful purpose?

21          MR. FORGE:  That's correct, Your Honor.

22          THE COURT:  Let me ask as to the special invitations,

23   when specifically was it that the plaintiffs learned about the

24   existence of these special invitations?

25          MR. FORGE:  Your Honor, again, similar to the two on

1    page 31, we had the special invitations prior to July 31 of

2    last year.  I would point out that the four remaining

3    executions are all new, on the same page, 30.

4              THE COURT:  Right.  And I was going to move to that

5    next.

6              MR. FORGE:  So four are new; four are not new.  But I

7    am not going to try to pretend to Your Honor that it was this

8    specific -- one specific credit card transaction that tipped

9    the scale for us.  It is the other evidence that tipped the

10   scales for us in terms of, okay, is this something that we

11   could just allege or is this something that we have reasonable

12   probability of being able to prove.  And before we -- before

13   ramping up, and you can see -- I think fairly so -- Mr. Trump

14   characterized this as a quasi-criminal allegation against him,

15   and it is.  And before we stepped up to that level of

16   allegation, we wanted to be more confident and have more

17   evidence than simply just a bare allegation.  And it's really

18   the substance of proof underlying the scheme that focuses on

19   Mr. Trump -- not Trump University, on Mr. Trump.

20        And defendants point out repeatedly in the papers, now the

21   case focuses on Mr. Trump.  At several points in their papers,

22   they argue that is what the big change is.  And I agree, that

23   that is -- that focus on Mr. Trump is a big change, but it is a

24   change that came about because of the new evidence.

25             THE COURT:  Again, walk me through that new evidence.

1          MR. FORGE:  The first piece, I would say, is the

2    April 2013 letter from the New York State Education Department.

3    This is a letter -- I am sorry -- we received that April 13,

4    2013.  It is a letter that was from May of 2005, Your Honor.

5    And to this day, we still haven't received it from the defense.

6          This is -- this gets to the point I was making earlier

7    about the quality of evidence we received versus the quantity.

8          This a letter that was addressed to Mr. Trump personally,

9    not just to Trump University, not to Michael Sexton, but to him

10   personally.  This is the New York State Education Department

11   telling him, in May of 2005, what you have been calling "Trump

12   University" is not a university under the law, and, "I must ask

13   you" -- this is from the education department itself -- "I must

14   ask you to discontinue the use of the name Trump University."

15         Now, as far as evidence of specific intent to deceive, it

16   really doesn't get much stronger than this.  This is a letter

17   going directly to the defendant himself putting him on notice,

18   very clearly, that this is -- the use of the term "university"

19   is not mere puffery.  It's not just a marketing term that you

20   can throw about.  There are specific requirements laid out in

21   this letter, specific requirements that Trump University did

22   not meet, and he is specifically instructed to stop using it.

23         We didn't know about this letter until April 13, but we

24   did diligently pursue it.  We had already submitted a Freedom

25   of Information Act request through the state of New York.  We

 1    didn't receive the letter from the defense.

 2         What happened was based on the information we did receive

 3    from the defense, our request to the state of New York only

 4    went back to the year 2006.  So once we received that

 5    production from the state of New York, we saw a reference to an

 6    earlier letter.  We still didn't have the letter, but we saw a

 7    reference to the earlier letter, and we submitted another FOIA

 8    request.  And it's only by virtue of the second FOIA request

 9    that finally, in April of this year, we received this letter.

10         And of course, Mr. Trump's deposition, Mr. Sexton's

11    deposition, those both occurred after the cutoff under the

12    scheduling order for amending of the pleadings.  And those

13    depositions are extremely important to us because in both the

14    depositions -- I know the defense might have a different take

15    on it -- but I think their testimony is quite compelling that

16    Mr. Trump was not involved in selecting the instructors for the

17    live events.

18         And so we have those two -- the depositions, we have the

19    letter from the department of education.  And then when we move

20    on to the script itself -- this is a point that I don't think

21    can be overemphasized because the defense themselves

22    characterized the script as, "Plaintiffs' entire case is built

23    upon the erroneous premise that TU instructors and mentors used

24    a 'script'" -- that's in quotes -- "that they followed word for

25    word so that every presentation was identical and hence filled

1  with identical misrepresentations."

2      That's a pleading that the defense filed that is a reply

3  supporting objections to evidence in plaintiffs' motion for

4  class certification.  That's a pleading they filed last year,

5  late 2012, or early 2013.  So at that point, they were still

6  adamant not only that there was no script but the script was

7  the linchpin of our case.

8      So, having taken that position and now having actually

9  turned over the script in June of this year, I don't think it's

10  fair for the defense to now say, "Well, you have had it all

11  along."  We haven't had it all along, and if it was this

12  monumental earlier this year, it should be no less significant

13  today, no less significant in our calculation of whether or not

14  we can prove a, frankly, much more serious allegation, like a

15  RICO allegation.

16      THE COURT:  And this script mirrors a PowerPoint

17  presentation that had been previously furnished?

18      MR. FORGE:  What it is, Your Honor, there was a

19  PowerPoint presentation that had what are called talking points

20  in the margins.  We contend that those were the functional

21  equivalent of a script.  The defense basically ridiculed us for

22  that contention.  They denied there was ever a script.  They

23  said -- I am quoting -- that it was laughable for us to talk

24  about a script in relation to the talking points.  And those

25  talking points aren't verbatim on the script.

 1        And I think more importantly, this script is coming from

 2   Mr. Sexton himself, so it's coming from the person we have now

 3   alleged is the coconspirator.  So, talking about evidence not

 4   just against Mr. Trump, but critical evidence against his --

 5   the only individual alleged coconspirator, who submitted a

 6   declaration, Your Honor, back November 26 of 2012 saying,

 7   "Trump University used no scripts, uniform or otherwise, for

 8   any live event, whether free or paid."

 9        He also gave similar testimony in his deposition.

10        So now we have, Your Honor --

11             THE COURT:  Mr. Sexton?

12             MR. FORGE:  Yes.  Yes, sir.

13        So now we have a situation where not only do we have more

14   direct evidence of Mr. Trump's specific intent, but we have

15   what I think is devastating evidence against -- he is not pled

16   as a defendant, but he is pled as a coconspirator.  So we have

17   what is devastating evidence against a coconspirator.  We

18   didn't receive that until June of 2013.

19        So within approximately a month of receiving that

20   evidence, we submitted it to the Court and we put the defendant

21   on notice we were going to be seeking to amend the complaint.

22             THE COURT:  As far as the timing of the depositions,

23   I believe that the defense argues that you were not diligent in

24   even having the deposition held.  What is your response?

25             MR. FORGE:  Your Honor, we have thought -- and not

1    just to ourselves; we have expressed this in pleadings to the

2    Court -- all along that we were not getting all the documents

3    that were out there from the defense.  What would happen is we

4    would make a request to the defense.  They would produce

5    documents.

6         Then from a third party -- we have issued over 50

7    subpoenas to third parties.  From a third party, we would

8    obtain a document that to us would be a document that should be

9    produced by the defense.  That fed into our, frankly,

10   suspicions about whether or not we were getting complete

11   production from the defense.

12        It is true, we could have taken those depositions earlier,

13   but as it turns out, we took them too early even when we did

14   take them because since we have deposed these men, we have

15   received 50,000 more pages of discovery; a 20,000-page

16   production in June that included this script.  So the -- also,

17   the letter from the New York department of education.  So we

18   were not able to question these two witnesses about those

19   critical pieces of evidence because we took their depositions

20   when we did.

21        We were being diligent, but there's different ways in

22   which the diligence manifested itself.  We were being diligent

23   in pursuing the documents, which is the responsible thing to do

24   before you depose the key witnesses.

25             THE COURT:  And going back to the scheme that's

1    alleged specifically as to the Trump University claims, you

2    knew about Trump University being used as the moniker for this

3    enterprise from the beginning, and you, I understand, also

4    would have known going back some time now that Trump University

5    in fact hadn't been sanctioned or authorized by the New York

6    Board of Accreditation; is that correct?

7            MR. FORGE:  That's correct, Your Honor.  But again,

8    we are talking about shifting the focus to Mr. Trump himself.

9    The timing of it was off.  Because our understanding was that

10   was a phenomenon that began in the year 2010.

11        What we didn't know until April of this year is that not

12   only was that information, that ruling, given to Trump

13   University all the way back in 2005, it was given to Mr. Trump

14   himself.

15        And what we also didn't know is that to evade the effect

16   of that ruling, we didn't know that this whole -- I would say

17   shell game regarding setting up a corporation in Delaware, and

18   then still operating in New York, we weren't able to connect

19   those dots until we received this letter from the State of New

20   York in April of this year.

21        Again, the timing -- we knew in 2010 that the State of New

22   York was stating it is misleading to use that term, but there's

23   a considerable portion of the class that precedes that date,

24   and we didn't have that information.

25            THE COURT:  As to the e-mails that are referenced,

1    specifically Michael Sexton identified ones as to David Early,

2    Mark Anthony, those as I understand it were disclosed in June

3    of 2013; is that correct?

4              MR. FORGE:  That's correct, Your Honor.

5              THE COURT:  Were you diligent in trying to obtain

6    these e-mails?

7              MR. FORGE:  Your Honor, we had multiple hearings,

8    multiple pleadings, multiple meet-and-confers in which the

9    almost exclusive focus was on getting the scripts.

10        Most of that time, quite frankly, we were the ones being

11   put on our heels because the defense was pillorying us for not

12   having scripts and all along insisting that the reason why we

13   didn't have scripts, the reason why we couldn't show them to

14   Judge Gallo, the reason we didn't have a document with the word

15   "script" on it was because it didn't exist.

16        And so we were diligent in trying to obtain it, but the

17   results of those didn't bear fruit until June of this year.

18        And I do want to emphasize it is not just the fact that

19   the e-mails were used.  This is not an inadvertent -- this

20   isn't a one-off e-mail.  The text of the e-mail itself,

21   Mr. Sexton is talking about the script, talking about having

22   shown the script to people in the industry and gone over it

23   with them.  He's sending it to instructors.

24        So he is actively involved in the creation and

25   distribution of the script, and it's just something that, Your

1    Honor, we have been pushing for about as hard as anybody could

2    push all the way back to October of 2011, and the defense was

3    denying its existence as adamantly as anybody could deny the

4    existence of something.

5            THE COURT:  All right.  And one final question.  As

6    far as this letter that was provided by the New York

7    authorities in response to your FOIA request, I take it that

8    you had requested that specifically of the defendants; is that

9    correct?

10           MR. FORGE:  We had requested all communications with

11   the government agencies, including the state education

12   department.  That also goes back to October 2011, Your Honor.

13           THE COURT:  Let me begin my questioning of the

14   defense on that front.

15       As to this letter that appears to have been directed to

16   Mr. Trump itself, is there an explanation as to why it hadn't

17   been produced at an earlier time by the defense.

18           MR. SCHNEIDER:  Yes, Your Honor.  We don't have the

19   letter.  It is a May 2005 letter.  That letter was

20   identified -- referenced in a letter in 2010.  It says, "As" --

21   from the New York State Education Department.  It says, "As we

22   referenced in our earlier letter from '05, we believe that the

23   use of the term 'university' is illegal under the New York

24   statute."

25       So counsel is only partially accurate to suggest that this

1    '05 letter somehow changed the course of the case.  The actual

2    facts are as follows:  Since the first complaint was filed in

3    this matter -- in fact, before the first complaint was filed --

4    the lead plaintiff, Makaeff, was in communications by e-mail

5    with the New York state education department -- that's an

6    exhibit to our papers -- in which he is asking about the name

7    "university" and whether or not it is an appropriate name.

8         In the very first complaint that plaintiffs filed in April

9    of 2010, they alleged that the use of the term "university" was

10   improper and that the New York State Education Department had

11   warned defendants about using the name "university."  This

12   issue has been in every complaint since then.

13            THE COURT:  I am sorry.  That was in late -- that was

14   set out in the first complaint, that Trump University was

15   warned they should not use --

16            MR. SCHNEIDER:  The term "university," yes.

17        It was in the first amended complaint, the second amended

18   complaint, and the third amended complaint, this identical

19   issue, in which plaintiffs are alleging that defendants were on

20   notice that they were not permitted under the New York statute

21   to use the word "university."

22        Not only was it in their pleadings, it's been in the

23   discovery responses we provided to the Court that predate the

24   amendment deadline in this case.  It was discussed in the

25   moving papers for class certification.

1       And if I can, I want to differentiate between the cut-off

2  date for the third amended complaint and the class

3  certification, which was just 60 days later.  Virtually all the

4  things they were talking about were addressed in the moving

5  papers of September.  The deposition of Mr. Trump and the

6  deposition of Mr. Sexton, those occurred one year ago;

7  August 22 for Mr. Sexton, and September 12.

8       And what counsel states in their moving papers is that

9  those were revelations, in the deposition, as to how little

10 Mr. Trump was involved in Trump University.  We see that issue

11 differently, but for purposes of this discussion, whatever

12 revelations existed, they knew one year ago.

13      And not only did they know it, they argued it extensively

14 in their class certification papers.  The whole gist of their

15 class certification papers boils down to this one sentence --

16 it's their sentence -- it says, "Trump University was neither.

17 It was neither Trump nor university."  And the next 35 pages of

18 their brief talk about there was a scheme -- they use the word

19 "scheme" 45 times in the moving papers; this idea of a scheme

20 is nothing new -- involving Mr. Trump, that he used his name

21 and moniker to lure people into Trump University, and he was

22 not involved at all.

23      So this is not new facts in this case.  This has been

24 around no later than their depositions.

25      But on the specific New York SED issue, they examined

 1   Mr. Sexton extensively about this issue.  Mr. Sexton testified

 2   they had been involved in discussions since '05 with the New

 3   York State Education Department.  The plaintiffs never believed

 4   this issue first arose in 2010.  In fact, they asked in-house

 5   counsel, George Sorial, about it.  We submitted a declaration

 6   to the court with the class certification papers.  They asked

 7   Mr. Sexton about it.  They asked Mr. Trump about it.

 8        So this is not only not a new issue, the only thing

 9   different is that in one of the letters that we produced, a

10   2010 letter, it referenced an earlier attachment to a 2005

11   letter, which we don't have anymore.  I can't explain why.  My

12   clients have looked.  We explained to them, they asked for it

13   many times.  They said the 2010 letter references this earlier

14   letter.  We told them we looked and we don't have a copy of it.

15        They obtained a copy of it.  It's virtually identical to

16   the 2010 letter and all other communications.

17        And there wasn't this five-year gap.  There was a lot of

18   e-mails and correspondence between the New York State Education

19   Department and my clients during this interim between 2005 and

20   2010 about changing the name.

21        They examined Mr. Sexton extensively about this issue.

22   They took his deposition for two days.  So to suggest that they

23   now got the copy of the 2005 letter that changed something they

24   have been alleging from since before day one -- well, from day

25   one they have been alleging this is an issue about the name

18

1    "university."

2        How that adds a RICO claim for wire fraud because the

3    New York State Education Department told my client that they

4    can't use the term "university" under statute is still

5    confusing to me.

6            THE COURT:  And what about the e-mails that were

7    disclosed in June of 2013?  Do you have any response as to

8    whether or not the plaintiffs on their own should have located

9    and obtained those, or do you acknowledge that they were

10   disclosed, frankly, late?

11           MR. SCHNEIDER:  I am presuming these are the e-mails

12   that accompanied the script?

13           THE COURT:  These are the e-mails that are referenced

14   at page 30 of the proposed fourth amended complaint, at lines

15   21 through 25.

16           MR. SCHNEIDER:  Yes.  Those were recently located and

17   produced.  So those --

18           THE COURT:  Is there any explanation as to why it

19   took so long?

20           MR. SCHNEIDER:  Not other than this, Your Honor;

21   other than in the original discovery request, we advised

22   plaintiff's counsel there were about 100 accounts of former

23   employees and we were not going to search through all of the

24   accounts.  What we agreed to do was for them to come up with a

25   list of search terms of their choosing and we would voluntarily

1  run the search terms through the accounts.

2      We did, and it was through the searches that identified

3  the e-mails, and we produced those immediately.

4      The original searches were done through other databases,

5  accounting and customer service and so forth.  But we had told

6  them from discovery early on that we had not searched the 100

7  accounts of former employees.  When we did those searches, we

8  came up with these e-mails.

9          THE COURT:  Walk me through that.  These were part of

10  a former employee's e-mails that they had stored?

11          MR. SCHNEIDER:  Exactly.  Some of the e-mails were in

12  Michael Sexton's account.  He is no longer with the company.

13  Those e-mails had attachments of this preview script, this

14  draft script.

15          THE COURT:  But Michael Sexton wasn't just any

16  employee --

17          MR. SCHNEIDER:  He was the president.  Absolutely.

18          THE COURT:  So when you said you weren't going to

19  search all the former employees' e-mails, one can see why you

20  might not search through some administrator who may not have

21  had much to do with this.  But one would expect that

22  Mr. Sexton, who -- he is a defendant in this, isn't he?

23          MR. SCHNEIDER:  He is not a defendant.  But I agree,

24  Your Honor.  I think those searches -- what we agreed to do was

25  start with Mr. Sexton and Mr. Highbloom, and work our way down.

1    So I agree.  I think those should have been searched earlier.

2        I would like to address the content, though, for a

3    moment --

4            THE COURT:  Go ahead.

5            MR. SCHNEIDER:  -- and that's the script.  That there

6    is this -- I think there's some misperception that there's a

7    script and that's the linchpin of the case.  As the Court may

8    know, or soon find out in the class certification, there are a

9    lot of scripts, dozens and dozens of scripts that we produced

10   throughout this case.  There was a seller script.  There was a

11   buyer orientation script.  There was a opening "hello" script.

12   There was a telephone confirmation script.  Some of the scripts

13   were prepared by my clients.  Some of them were prepared by

14   third-party vendors asking if my client would use them and so

15   forth.

16       They asked for scripts that were used by Trump University.

17   We did not limit the request to that.  We produced every script

18   that we could find, whether or not we used it, whether or not

19   we prepared it, and we produced it to them long ago.

20       And they had a former employee, who is their client,

21   testify that he used a particular script, the seller script,

22   word for word.  It's a two-page script.

23       But the problem was that that script did not contain any

24   of the misrepresentations they allege in the lawsuit; said

25   nothing about hand-picked experts, said nothing about experts,

 1    unlimited mentoring, guaranteed rate of return, that sort of

 2    thing.

 3         And then they changed and said it's this closure script.

 4    That's going to be the script now, which we told them wasn't

 5    ours.  It wasn't prepared by us and we didn't use it.  And it

 6    pertained to on-line programming; doesn't even affect the

 7    potential punitive class.

 8         The latest script is a verbatim, word-for-word,

 9    slide-by-slide talking points for one particular program called

10    the Apprentice Program.  That script was going through

11    revisions as late as '09.  And the e-mails we are talking about

12    was Michael Sexton sending out to three of the 75 instructors

13    saying, "Hey, here is the latest.  We think it's final.  Take a

14    look at it.  We are going to try and incorporate this into the

15    future programs."

16         So for one program in '09, now they are talking about

17    trying to implement some kind of script.

18         Now, let's talk about that script.  That script, verbatim,

19    is exactly what we have produced to them in the PowerPoints.

20    We produced dozens, if not hundreds, of PowerPoints.  We have

21    produced them both in hard copy and in native file.  They asked

22    for them in native file so they could see if there was any

23    notes in there, specifically for that reason.

24         When we produced those PowerPoints to them 15 months ago,

25    in my cover letter to them, I said, "Look at the native file.

1    It has the talking points in it."  There's a footnote in

2    counsel's brief that suggests that they didn't know it was

3    there, they had to widen the margin, and they just now learned

4    there's these talking points.  We identified it for them in May

5    of 2012 -- 15 months ago -- and said, "Here is the talking

6    points."

7         Why is that important?  It's important for two reasons.

8    One is that they had in their possession what they are now

9    calling the critical piece.  The key piece of information in

10   this case is the script.  And the reality is I believe they are

11   using the production of this same document -- this one is

12   called a script -- as a pretext to add a RICO claim.

13        Because they had the exact same PowerPoint -- not just the

14   script, but it was with the PowerPoint.  So if you look at the

15   script and you look at Exhibit 86, which is their PowerPoint

16   with the talking points, you will see it is verbatim.  But it's

17   not just the verbiage; it is every slide with it in there so

18   they can see how it goes together.

19        This latest script didn't even have slides with it.  It

20   was just a document called a preview script.  But it says slide

21   one, slide two, slide three.  But 15 months ago, we produced

22   the actual slide with the talking points in it.  Each slide,

23   each talking point.

24             THE COURT:  The plaintiffs say you have ridiculed the

25   notion of the existence of a script.  But at this point, you

1    are saying you didn't ridicule it; in fact you embraced the

2    notion there's dozens, if not hundreds, of scripts?

3            MR. SCHNEIDER:  What we said was that Mr. Sexton

4    testified that the instructors never used scripts word for

5    word; that they got up there and they all said the same thing.

6        What he testified to was that there were some talking

7    points; that they all were provided PowerPoints.  The

8    PowerPoints were different.  They were based on the

9    instructor's personal experience, based on their own deals that

10   they had done.  It was based on market conditions.  It was

11   based on feedback from the community, and so forth.

12       So if you saw a program on tax liens in Dallas in '07, it

13   would be different than if you saw a program on tax liens in

14   New York by a different instructor in '09; that they varied by

15   as much as 30 to 50 percent because of all these different

16   things.

17           THE COURT:  So while you didn't deny the existence of

18   a script or more, you denied that there was one script applied

19   to all the plaintiffs or to the class members?

20           MR. SCHNEIDER:  Absolutely.  That's correct.

21       And we have produced scripts.  We have produced a lot of

22   scripts before the class certification even started.  And their

23   witness, Mr. Nichols, who used to work for Trump University,

24   testified, "I used this script, word for word, these two

25   pages."

1          THE COURT:  Is that the word they actually used,

2     "scripts," versus "talking points" or something else?  Did they

3     use that term, "scripts"?

4          MR. SCHNEIDER:  Mr. Nichols did.  He said he used

5     this particular selling script.  The PowerPoint doesn't have

6     the word "talking point" or "script" in it.  It's literally a

7     PowerPoint with the notes in each section.

8          The preview script actually has the word "script" in it,

9     but it shows slide one and slide two, so forth.

10          And the e-mails they are referring to are from Mr. Sexton

11     that say, "This goes with this particular PowerPoint program,

12     and here is the points."

13          Mr. Sexton testified that it still wasn't used but --

14     because I asked him.  I saw this preview script, and I wanted

15     to find out what is this because I had never seen this before.

16     And he said, "You know, our goal was ultimately to have

17     uniformity, and we were working towards that goal, but we were

18     a fledgling new company, and we were working on our

19     presentation all the time.  They were changing, and so forth."

20          So this was 12 months before Trump University ceased

21     operations, and they were still trying to get some kind of

22     uniformity developed.

23          Here is the last point on the script, Your Honor, and I

24     think this is the critical issue, that we can talk script,

25     script, script, but the bottom line is in the preview script

```
 1    that they have now from June -- or the talking points, that was

 2    identical; that was produced 15 months ago and it's been filed

 3    with the Court by them in the reply papers -- it doesn't

 4    contain hand-picked experts.  It doesn't contain unlimited

 5    mentoring.  It doesn't contain guarantee.  None of the five

 6    issues that they say are the key misrepresentations that

 7    everybody said word for word -- they don't appear in this

 8    document either.

 9         And I think that sort of, you know, an interesting point

10    to all this, that we produced that PowerPoint and talking

11    points in May of last year.  Five months later, they filed a

12    motion for certification.  They don't reference it.  They don't

13    submit it as evidence.  If this was the key, crucial evidence

14    of their case, why wasn't it submitted to the Court?

15         So then in our opposition, we said, "You know what?  They

16    talked about uniform scripts that were used by everybody.

17    Where is it?  Why aren't they submitting something that they

18    claim was used by everybody?"  We have Mr. Nichols saying it is

19    the two-page document.  We have plaintiffs saying maybe it is

20    this closing document.  In the reply, they say, "Okay, now we

21    say it's this document."  But it doesn't have any of the

22    misrepresentations in it.

23         So the recent production in June of the exact same

24    document doesn't advance the ball for them because it doesn't

25    have any of the claimed misrepresentations.  Now they have got
```

1    yet one more script that doesn't have the misrepresentations

2    that they are alleging were told to every single person in the

3    class.  So I don't know how that really advances the ball for

4    them especially on the RICO claims.

5              THE COURT:  Let me hear from you, Mr. Forge, in

6    response to that point.

7              MR. FORGE:  Your Honor, I will respond to that, and I

8    have a few other responses.

9         First of all, let's recount the defense's words prior to

10   today so Your Honor can hear the dramatic contrast.

11        We just heard, "We produced scripts -- script after script

12   after script after script."

13        This is defense counsel from February 22 of this year.

14   "We have declarations from instructors and mentors that said

15   there weren't any scripts, but they" -- plaintiffs -- "claim

16   that it's all scripted.  And so we said, 'Okay, produce the

17   script.'"  Later --

18             THE COURT:  I am sorry.  This is --

19             MR. FORGE:  February 22, this year, Your Honor.

20             THE COURT:  In a pleading?

21             MR. FORGE:  I am sorry.  A transcript.  It's the

22   transcript, a hearing before Judge Gallo.

23        Same hearing:  "Either they" -- referring to us,

24   plaintiffs -- "have the scripts or they don't.  And we know

25   that they don't.  They know that they don't."

1    That actually might be true.  They did know that we didn't

2  because they hadn't produced it to us.  They were still holding

3  on to it.

4    Same hearing:  "But this whole 15 months of discovery, we

5  have been trying to -- you know, it's laughable.  Where is the

6  script?"

7    Then in a pleading to this Court, Your Honor, in the

8  memorandum of opposition to our motion for class certification,

9  in bold, "The Uniform Scripts."  This is what they wrote.  This

10  is Docket Number 138 at page 10.  "Plaintiffs have no," quote,

11  "'uniform script,'" close quote, "exhibit for any live event."

12    And let me make sure that's clear.  That's what we are

13  talking about, a script for a live event, not a script for a

14  call center, talking about a script for a live event that was

15  used to draw people into this.

16    "This is because TU never" -- and they emphasize that --

17  "used any scripts for its instructors or mentors."

18    And yet another pleading filed this year -- this is Docket

19  Number 211-1, at page 6 -- in bold again, "There were no

20  scripts ever used by any TU presenters."  And then the text --

21    THE COURT:  So it's not a question there's these

22  multiple, hundreds of scripts, and we just don't have one

23  particular one for purposes of a class action proof-wise?

24    MR. FORGE:  Exactly, Your Honor.

25    THE COURT:  They are denying the existence of any

28

1    script?

2            MR. FORGE:  Exactly.  And it's probably even starkest

3    in Mr. Sexton's declaration.  This is what he said, paragraph

4    17, submitted to the Court in connection with the defendant's

5    opposition to plaintiffs' motion for class certification.  It's

6    Exhibit 1, from November of 2012 -- this is after the deadline,

7    Your Honor -- paragraph 17, "Trump University used no scripts,

8    uniform or otherwise, for any live event, whether free or

9    paid."

10            THE COURT:  How do you respond to the argument that

11   this June 2013 script doesn't even, in fact, set out the claims

12   of fraudulent statements or misrepresentations?

13            MR. FORGE:  Your Honor, this is what -- I think what

14   the defense is trying to do is trying to make it seem in order

15   to have a common scheme, there has to be a verbatim,

16   word-for-word repetition of the same exact presentation.

17   That's not the law.

18        The overarching scheme is to present this falsely as a

19   legitimate institution and one with which Mr. Trump was

20   integrally involved.  That theme is common throughout all of

21   these presentations.  That theme, Your Honor, is reflected in

22   the script.  Mr. Schneider said, "Oh, the script doesn't say

23   the instructors were hand picked."  It's true.  It doesn't say

24   hand picked.

25        Let me tell you what it does say, Your Honor.  This is a

1   script where they literally had brackets.  It says "insert

2   instructor name."  They have no idea who is going to be

3   presenting this script, yet here is one portion of it.  This is

4   what they are telling unknown instructors to tell a roomful of

5   people they are trying to lure into the university.

6       "I remember one time, Mr. Trump said to us over dinner, he

7   said," quote, "'Real estate is the only market that when

8   there's a sale going on, people run from the store.  You don't

9   want to run from the store.'"

10      So yes, they didn't say that the -- they didn't use the

11  exact language the instructors were hand picked by Mr. Trump;

12  instead, they told the people the instructors were dining with

13  Mr. Trump.  And we actually have the proof from the

14  presentations themselves that that line was used to these

15  retired school teachers and other people who were trying to

16  figure out whether this is something to pour tens of thousands

17  of dollars into.

18      So it is not a question of whether the exact words were

19  used; it is a question of whether or not the same theme was put

20  forth.  And there is no question about that.  It is the same

21  theme.

22          THE COURT:  And it has to be more than just the same

23  theme; it needs to be fraudulent in nature, correct?

24          MR. FORGE:  Same false scheme.  I apologize, Your

25  Honor.  Same fraudulent scheme.

1      Your Honor, if I may, I would like to return to the

2   New York education department letter.  One thing I wanted to

3   make clear, first of all -- I believe, and I don't have the

4   transcript with me, but I am pretty certain that Mr. Sexton in

5   his deposition said they heard about the New York State

6   Education Department's issue with Trump University in 2010, and

7   they acted immediately.  Now -- so he did not say, "We have

8   been battling them since 2005."  Now, of course, his deposition

9   was after the deadline also.

10      But I also want to make clear, even that 2010 letter, Your

11   Honor, which eventually led us to the 2005 letter, even that

12   letter itself we didn't receive until after the deadline.  So

13   the 2010 letter we didn't receive until after the deadline,

14   that led us to diligently pursue the earlier letter, and that

15   one we didn't receive until further after the deadline, April

16   of this year.

17      So when you are talking about a case where we have had

18   multiple motions to compel, dozens and dozens of

19   meet-and-confer letters, dozens of subpoenas, we have been

20   diligently pursuing this case, Your Honor.  But I just, I have

21   to -- I have done fraud cases before.  You just don't get

22   evidence like this, where you have a letter from a state agency

23   of the main defendant telling him what you are doing is wrong.

24   You can't overstate the significance of that.

25      And you don't get -- very rarely do you get fortunate

1   enough that the one individual alleged coconspirator makes a

2   statement as clear as Mr. Sexton made this statement, about

3   there being no scripts, uniform or otherwise, and then find,

4   seven months later, the defendants had a script that he was

5   working on.

6           MR. SCHNEIDER:  Your Honor, could I --

7           THE COURT:  Yes, very briefly, I will give you two

8   minutes.

9           MR. SCHNEIDER:  Thank you.  I would like to ask the

10  Court to take a proverbial step back and look at what this

11  issue is.  The issue is what did they know and when did they

12  know it.  And what they say in the reply papers I think is

13  telling.  I think it highlights the be-all, end-all.

14      The issue is did they know a year ago, after Mr. Trump's

15  deposition, everything they needed to know to bring a RICO

16  claim.  Whether it was July, on the deadline, or 30 or 60 days

17  later, we can talk about why they delayed the depositions.  But

18  given the benefit of the doubt, before class certification, by

19  September, they have taken the two depositions, they have

20  examined the witnesses extensively, and then we undertook 11

21  months of briefing on class certification.  And only after all

22  of that briefing was done, everybody laid all their cards out

23  on the table, everything is open and up, two weeks before, they

24  said, "We don't like the way the cards look, and we want a

25  do-over with the new cause of action."

1    Let me suggest the Court look at two parts of the reply

2    brief.  I think it sums it up perfectly.  The first is on

3    page 2, at the bottom.  It says -- and this is in response to

4    us showing the Court that all of the allegations they are

5    trying to make in the fourth amended complaint were all there

6    before in the third or before.

7    And what counsel states in the reply is that the common

8    allegations between the fourth and the third are, quote, "Are

9    proved nothing more than the unremarkable proposition that this

10   case is still about Trump's misrepresentations about his

11   integral involvement with the so-called university."

12   So they are saying the case has been and still is about

13   that one issue.

14   If you turn back one page, on page one of their brief, the

15   last three lines, it says, "The key document" -- which they put

16   in quotes and highlight in bold -- "The key document clearly

17   buttresses the false impression that Trump was integrally

18   involved with Trump U."  It is not only the same comment, it is

19   the same language, "integrally involved."

20   On page 2, they admit that the fourth and third are

21   identical because it is the same claim, and now they are

22   claiming the document they just got just further buttresses the

23   argument that he wasn't as involved as he said he was, which is

24   the exact same point they made in the class certification

25   brief.

 1          So counsel keeps saying, "Well, those depositions were

 2     after the deadline."  But Your Honor, that was still a year

 3     ago.  So by September 13, after they have completed both

 4     depositions, they had everything they possibly needed to know

 5     to add a RICO claim if they wanted to.  They were alleging

 6     scheme.  They were alleging mail fraud.  They were alleging

 7     wire fraud.  They literally put in their complaint the e-mail

 8     to Brandon Keller that came from Mr. Trump for the wire.  They

 9     knew about the organizational structure of the Trump

10     organization.  They knew about the shared -- what they claim

11     are maintained servers, about the quote/unquote enterprise.

12     All of those pieces, at the very latest date, were known by

13     September 12 of last year.  And then they argued it in the

14     class certification papers.

15          And I think what is significant here is if they thought

16     then, "We want to go with RICO," then we could have addressed

17     it then.  They have would have been 30 to 60 days after the

18     amendment deadline, but 11 months before all this briefing.

19     But we have gone through 11 months of briefing on the third

20     amended complaint.  And after all that, two weeks before a

21     decision, they say, "Wait.  Stop everything.  We want to change

22     directions.  How do we do it?  The way we do it is we just got

23     this document, the script document.  Let's use that as the

24     predicate to say this is all new."

25          And it turns out they had that same verbatim content 15

1    months ago.  Thank you.

2          THE COURT:  All right.  I am going to take this

3    matter under submission, take a closer look at the third and

4    proposed fourth amended complaint, and then we will get a

5    decision out hopefully within the next week or so.  All right.

6        Thank you.

7          MR. FORGE:  Thank you, Your Honor.

8          MR. SCHNEIDER:  Thank you, Your Honor.

9        (End of proceedings at 2:30 p.m.)

10                        -o0o-

11                C-E-R-T-I-F-I-C-A-T-I-O-N

12

13          I hereby certify that I am a duly appointed,

14   qualified and acting official Court Reporter for the United

15   States District Court; that the foregoing is a true and correct

16   transcript of the proceedings had in the aforementioned cause;

17   that said transcript is a true and correct transcription of my

18   stenographic notes; and that the format used herein complies

19   with rules and requirements of the United States Judicial

20   Conference.

21          DATED:  September 1, 2013, at San Diego,

22   California.

23

24                      /s/  Chari L. Possell

25                      _____
                        Chari L. Possell
                        CSR No. 9944, RPR, CRR