```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

   TARLA MAKAEFF, et al., on       .
 4 Behalf of Themselves and All    .
   Others Similarly Situated,      .
 5                                 . Docket
                 Plaintiffs,       . No. 10-cv-00940-GPC-WVG
 6                                 .
                      v.           . November 8, 2013
 7                                 . 1:30 p.m.
   TRUMP UNIVERSITY, LLC,          .
 8 et al.,                         .
                                   .
 9              Defendants.        . San Diego, California
   . . . . . . . . . . . . . . . . .
10                  TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE GONZALO P. CURIEL
11                   UNITED STATES DISTRICT JUDGE

12                        A-P-P-E-A-R-A-N-C-E-S
   For the Plaintiffs:     Robbins Geller Rudman & Dowd LLP
13                         655 West Broadway, Suite 1900
                           San Diego, California 92101
14                         By:  JASON A. FORGE, ESQ.
                                RACHEL L. JENSEN, ESQ.
15                         – AND –
                           ZELDES HAEGGQUIST & ECK, LLP
16                         625 Broadway, Suite 1000
                           San Diego, California 92101
17                         By:  AMBER LEE ECK, ESQ.

18
   For the Defendants:     Yunker and Schneider
19                         655 West Broadway, Suite 1400
                           San Diego, California 92101
20                         By:  DAVID KEITH SCHNEIDER, ESQ.
                           – AND –
21                         Trump National Golf Club, Los Angeles
                           One Trump National Drive
22                         Rancho Palos Verdes, California 90275
                           By:  JILL ANN MARTIN, ESQ.
23
   Court Reporter:         Chari L. Possell, RPR, CRR
24                         333 West Broadway, Suite 420
                           San Diego, California 92101
25 Reported by Stenotype, Transcribed by Computer
```

```
 1              SAN DIEGO, CALIFORNIA; NOVEMBER 8, 2013; 1:30 P.M.

 2                                  -o0o-

 3              THE CLERK:  Number 15 on calendar, Case

 4   No. 10-cv-0940, Makaeff v. Trump University, for a motion

 5   hearing.

 6              THE COURT:  Appearances, please.

 7              MS. JENSEN:  Good afternoon, Your Honor.  Rachel

 8   Jensen on behalf of the plaintiffs.

 9              MR. FORGE:  Good afternoon, Your Honor.  Jason Forge

10   on behalf of plaintiffs.

11              MS. ECK:  Good afternoon, Your Honor.  Amber Eck on

12   behalf of plaintiffs.

13              MS. MARTIN:  Good afternoon, Your Honor.  Jill Martin

14   on behalf of defendants.

15              MR. SCHNEIDER:  Good afternoon.  David Schneider on

16   behalf of defendants.

17              THE COURT:  Good afternoon.

18       We are here for a hearing on a motion to certify classes

19   and subclasses, and the Court has had an opportunity to review

20   the operative pleadings.

21       And I understand that the plaintiff has requested the

22   opportunity to introduce media into this hearing, and my

23   question is, at this point, did you -- let me ask.  Do you have

24   some video, or you just have some exhibits or documents?  What

25   is the nature of the media?
```

1          MS. JENSEN:  Your Honor, we have some video, and we

2     also have some additional documents and other slides we would

3     like to present as part of plaintiff's presentation motion

4     today.

5          THE COURT:  Let me let the parties know where I am as

6     a starting point.

7       I am concerned about the number of causes of action there

8     are.  I am concerned about the number of subclasses that are

9     requested.  And as a starting point, I would like to know the

10    position of plaintiffs as to how it's superior to proceed with

11    14 subclasses, and how that is manageable, how we can have a

12    streamlined proceeding which results in a two-week trial, with

13    the number of subclasses that are involved, the number of

14    jurisdictions under which the fraud and some of the other

15    allegations or causes of action are based on.  It seems to the

16    Court that just as a threshold matter, that the instructions to

17    sort out all of these various legal components, issues, will

18    take days.  So I just don't see where we would be able to do

19    this within 14 days.

20         Second of all, I wanted to inquire whether or not the

21    plaintiffs had described precisely the subclasses that they are

22    requesting the Court to certify.  I also have a question as to

23    whether or not the plaintiffs are entitled to a jury trial as

24    to the UCL claims, the 17200 and 17500 of the Business and

25    Profession Act.  And then with respect to the elder abuse cause

1    of action whether or not there's anything in the record that

2    quantifies or identifies the number of individuals that qualify

3    for this category that have been noted and which would

4    demonstrate numerosity for purposes of the multi-prong test

5    under Rule 23.

6         And then, when we have those issues addressed, I am going

7    to have some questions as to the defendant on a couple of

8    causes of action, as to why, as described by the plaintiff, we

9    aren't in a position to go forward with class actions for the

10   Civil Code Section 1750 claim, and most notably -- on the fraud

11   claim -- well, in addition, the fraud causes of action, to the

12   extent that it was confined to California.

13        Those are my opening comments, observations; that's what I

14   am most interested in at this point.  And so with that, I will

15   hear from the plaintiff.

16        MS. JENSEN:  Yes, Your Honor.  I would just like to

17   at this point present at least a portion of the presentation I

18   had planned --

19        THE COURT:  All right.

20        MS. JENSEN:  -- which will address, I think, some of

21   the issues Your Honor raised, if I could approach the bench

22   with a copy of the PowerPoint presentation.

23        THE COURT:  Yes.  Do you need for us to dim the

24   lights?

25        MS. JENSEN:  I don't think so.  Can you see it, Your

1    Honor?

2           THE COURT:  I am fine.

3           MR. SCHNEIDER:  Your Honor, before she starts, for

4    the record, I was not provided this or any indication as to

5    what kind of presentation they are going to make today.  I see

6    that, in the first page, they are offering information that's

7    not in the record.  Looks more like a trial argument than an

8    argument for class cert.  Until ten seconds ago -- this is the

9    first time I have seen it.

10          THE COURT:  Let me note that I have spent a number of

11   hours, if not days, reviewing e-mails, fliers, advertisements,

12   online and otherwise, transcripts, PowerPoints, playbooks, and

13   some of this involves matters that I have seen, so I am not

14   sure if we will be making the best use of your limited time to

15   go over each of those.

16          MR. SCHNEIDER:  I see, for example, they have

17   deposition testimony that was taken this week, and the

18   transcript hasn't even been prepared yet.  I understand a rough

19   draft has been prepared that says it cannot used or cited, and

20   they are quoting from Mr. Martin's deposition testimony.  So

21   that's not only not before the record, but it's completely

22   improper.  They are quoting information, testimony from a draft

23   transcript we haven't seen yet.

24          MS. JENSEN:  Your Honor, if I may -- Rachel Jensen.

25   And for at least my initial purposes, I would like to address

1   some of the questions Your Honor raised.

2          THE COURT:  Please.

3          MS. JENSEN:  And I do just for the record want to

4   note that for our presentation in chief that we have

5   prepared -- Mr. Schneider is correct; we have some excerpts of

6   a deposition that was taken this week, but it's only because we

7   have been trying to seek some depositions of the former

8   instructors, and it's -- since May of 2012, and just this week

9   was able to get it.  I understand the defendants may take issue

10  with that, but I think there's another explanation.

11         In any event, I want to address the points that Your Honor

12  has raised.

13         Your Honor, this is a classic case of promising one thing

14  and delivering quite another.  As Your Honor is aware,

15  plaintiffs allege that the defendants promised to deliver

16  Donald Trump's involvement through Trump University, but

17  delivered neither Donald Trump nor a university.

18         Now, I want to go through very briefly with Your Honor

19  some of the elements of the plaintiffs' claims, which I think

20  will address the issues how this is manageable.  It's very

21  simple because all of plaintiffs' claims boil down to two

22  fundamental questions:  Whether defendants promised all class

23  members one thing and did they deliver another, and we contend

24  that defendants' promised all class members Trump's integral

25  involvement in his elite university but provided neither.

1          And I would like to show you, Your Honor, how these

2    fundamental questions will prove the elements of all of

3    plaintiffs' class claims.

4          Now, in our trial plan, we set forth, as Your Honor

5    inferred, the various claims and the subclasses that were

6    involved.  And what I am trying to demonstrate to Your Honor is

7    that it's going to be simple to prove all of those claims

8    through the very same evidence.  And --

9          THE COURT:  I guess, here is the problem.  To the

10   extent to the Court finds that there is this common core of

11   evidence that is available to support one or more causes of

12   action, the question is why do we need 14 subclasses?  I think

13   you are familiar with the manual for complex litigation, and

14   the manual, which is written by individuals with far more

15   experience than I have in these areas, makes the observation

16   that a great number of subclasses by itself suggests that a

17   case isn't amenable to class treatment.

18         And number one, I would ask, have you ever seen a case of

19   this nature that has involved more than five or six subclasses?

20   And if so, could you identify it for me?  And I would be

21   interested in looking at it.  Because at this point, it just

22   seems to be at cross-purposes to have a class action which is

23   aiming to streamline and simplify, and then have 14 subclasses

24   which are made up of laws from states across the nation.  And

25   it just, to me, defies logic how that is manageable, how that

1    simplifies and streamlines.

2           MS. JENSEN:  Yes, Your Honor.  I would point your

3    attention to several cases, two we cited in our papers and one

4    is a case that's come out more recently.

5           THE COURT:  Which case is that?

6           MS. JENSEN:  I would recommend that Your Honor read

7    the bank overdraft cases, *In re Checking Account*.

8           THE COURT:  And how many subclasses were there?

9           MS. JENSEN:  Your Honor, I don't have the exact

10   number, but I know there were more than what we are proposing

11   here today.

12          THE COURT:  More than 14?

13          MS. JENSEN:  Yes, more than 14.  And we could provide

14   that information to you.

15          THE COURT:  I would be curious because we are talking

16   about 14 subclasses based on different causes of action?

17          MS. JENSEN:  Yes.  Yes, Your Honor.  I believe in

18   this case, there was the breach of the implied covenant of good

19   faith and fair dealing, which is one of the causes of action

20   that we have here today.  Also the unjust enrichment, and I

21   believe there was also -- may have been conversion.  But I know

22   that there was both the unjust enrichment and the good faith

23   and fair dealing and additional claims.

24       Also, the *Butler* case from the Seventh Circuit we have

25   cited, and *Butler v. Sears*, which is 702 F.3d 359.  That's a

1   Seventh Circuit case in 2012.  And in *Butler*, the Court

2   certified multi-state claims involving 27 models of washing

3   machines with five design changes across multiple states' laws.

4   I believe it was six different states' laws in that case.

5       The Second Circuit recently held in *U.S. Food Services*

6   *Pricing Litigation* -- that's 729 F.3d 108, a Second Circuit

7   case that came out August 30, 2013.  In this case, Your Honor,

8   I believe the Second Circuit upheld the certification of a

9   nationwide class for good faith and fair dealing; which there,

10  the defendants had objected and challenged more -- actually, in

11  more detail than defendants have here.  The defendants really

12  haven't challenged the groupings of states here nor really

13  explained why it wouldn't be manageable.  And there, the Second

14  Circuit said it was absolutely appropriate to certify those

15  claims.

16      Those are just a couple of cases I would refer Your Honor

17  to where it's been found to be manageable.

18          THE COURT:  And then as to the subclass descriptions,

19  have those been provided to the Court?

20          MS. JENSEN:  Yes, Your Honor.

21          THE COURT:  Where are they specifically?

22          MS. JENSEN:  They are in the trial plan.

23          THE COURT:  I looked at the trial plan.  I don't see

24  that the actual description was provided.  You provided an

25  identification of what the subclasses were and what the

1 elements are, but I don't see that there was a precise

2 description to the extent that there was a certification where

3 we would have who the subclass is made of.

4     MS. JENSEN:  So in other words, are you saying a

5 discrete class definition?

6     THE COURT:  Yes.

7     MS. JENSEN:  Your Honor, I believe what we provided

8 was a description along the lines of what Your Honor indicated,

9 which is that we have described to you what the groupings were,

10 which states were part of that grouping, and described how they

11 could be tried together, including setting forth with special

12 verdict forms all the elements and setting them out for the

13 fact-finder at trial.

14   But in terms of the actual setting forth of a discrete

15 class definition for each of the subclasses, I don't think we

16 set those forth separately.  But that's, of course, something

17 we could do very easily for Your Honor.

18     THE COURT:  And as to whether or not there's a right

19 to a jury trial under Section 17200 and 17500 of the Business

20 and Profession Act?

21     MS. JENSEN:  I believe that's a bench trial, Your

22 Honor.

23     THE COURT:  Because I notice, I think it was in the

24 trial plan, there were some jury instructions.

25     MS. JENSEN:  Your Honor, what we intended to portray

1    was there were special verdict forms for the fact-finder, be it

2    bench or jury trial.

3            THE COURT:  All right.  And then as to numerosity as

4    to the elder abuse cause of action, do we have anything in the

5    record that sheds some light on that?

6            MS. JENSEN:  Well, Your Honor, what we do have is a

7    document that shows some internal marketing documents by the

8    defendants that indicate that approximately a third of the

9    class were seniors.  And in addition, we just have --

10           THE COURT:  That's on an internal document that makes

11   that --

12           MS. JENSEN:  Yes.  And we submitted that in the

13   record, Your Honor.  That is Exhibit 16, I believe.  That's

14   just an approximate.  But even if you take that approximate, it

15   certainly meets the threshold of numerosity, which could be

16   more than a several dozen.  We know it's more than several

17   dozen.  And we know anecdotally, three of our five class

18   representatives are seniors.  So if that gives you an

19   indication, unless it is a strange aberration, which we don't

20   think is true.  But those two facts together demonstrate the

21   numerosity.

22       When it comes time for the -- for any judgment, we think

23   that would be something that can be easily determined through

24   the defendant's records.  And to the extent their records are

25   incomplete, that's a matter of simple proof through someone's

 1   identification.

 2          THE COURT:  And as to the Consumer Legal Remedies

 3   Act, it looks like there's a number of pieces of evidence that

 4   the plaintiff would be prepared to offer in support of their

 5   claims, and I have identified, if not all of them, some of

 6   them:  The playbook, the PowerPoint, and some, I expect,

 7   individuals who would testify that they were required to comply

 8   with or parrot what was otherwise in the PowerPoints and the

 9   playbook.  So I get the common evidence that would apply there.

10        But as to the misleading advertisements, what is the

11   common evidence that would be relied upon by the plaintiff?

12          MS. JENSEN:  Yes, Your Honor.  We have actually

13   submitted a summary exhibit that I think might be helpful to

14   Your Honor.  In that exhibit, we have set forth for Your Honor

15   all the various ads that were produced by the defendants that

16   we found.

17          THE COURT:  I guess I note that there's a wide

18   range -- if not a large number, there are a number of

19   advertisements which end up making the types of statements that

20   are at issue here, Donald Trump claiming -- or the

21   representation is that people who attend these seminars would

22   be trained by individuals who are hand picked by Donald Trump

23   and learning Donald Trump's secrets.  I recognize there is

24   this -- if not a body or universe of advertisements, but it

25   looks like the law, in terms of reliance, is prepared to set

 1   aside reliance to the extent that there was the exposure to the

 2   advertisements by a very large group of individuals.  And one

 3   thing I am trying to wrap my head around is how would the

 4   plaintiff be proposing to show that market to market or

 5   nationally, or how do you plan to proceed on that?

 6            MS. JENSEN:  Your Honor, we believe there was a

 7   nationwide advertising campaign, and it's not just plaintiffs'

 8   belief.  Judge Wardlaw's opinion is very helpful in the Ninth

 9   Circuit decision issued on April 17, 2013.  And in that

10   decision, Judge Wardlaw both described the national advertising

11   that occurred through the website, through various print ads,

12   through letters signed by Mr. Trump, that all conveyed the same

13   core misrepresentations regarding Mr. Trump's involvement which

14   were portrayed in two different ways.  One was through the hand

15   selection of the instructors, the live-event instructors, and

16   two, was through the active involvement in the curriculum.

17       So if you look at Judge Wardlaw's decision and opinion, if

18   I could just quote from that opinion --

19            THE COURT:  Yes.

20            MS. JENSEN:  "Trump University has not been shy about

21   touting its connection to its eponymous creator.  Evoking

22   Trump's well-known reality TV series, Trump University's

23   advertisements promise that enrolling in Trump University is

24   the next best thing to being a Trump's apprentice.  Its

25   advertisements prominently showcase Trump's photo, while urging

1  consumers to learn from the master and promising to teach

2  Trump's insider secrets.  The home page of Trump University's

3  website features Trump's photo next to the words, 'Are you my

4  next apprentice?  Prove it to me.'"

5      So I think in that, in Judge Wardlaw's opinion -- which is

6  the Ninth Circuit opinion -- she's already set forth the core

7  themes that are endemic through all the advertising media.

8      And as Your Honor may have seen, we put into the record

9  the marketing guidelines, which not only suggest but enforce

10  the rule that regardless of the media, this same common

11  message, brand and tone were to be used, and this was

12  nationwide.  So there's really no question that that was the

13  core.

14      And regardless of specific phraseology, those main themes,

15  overarching themes, are sufficient to find it was a national

16  campaign, that had the same themes, and therefore justifiable

17  reliance was permitted.

18      Not only that, but the Ninth Circuit went further and

19  found that not only were these types of advertisements used

20  very frequently and uniformly, but Judge Wardlaw also said in

21  the Ninth Circuit opinion, and found explicitly, "Trump

22  University conducted an aggressive advertising campaign in

23  which it made these claims.  This campaign included online,

24  social media, local and national newspaper, and radio

25  advertisements."

1          And Judge Wardlaw found that advertising campaign was

2    expensive enough and aggressive enough that it made Trump

3    University a limited public figure for purposes of the

4    anti-SLAPP motion.

5          So we believe that that finding alone by Judge Wardlaw

6    moots the defendants' argument that their advertising was

7    sporadic or local, such that that trigger of presumption of

8    reliance wasn't --

9               THE COURT:  All right.  Thank you.

10               MS. JENSEN:  Okay.

11               THE COURT:  You may proceed.

12               MS. JENSEN:  I am sorry?

13               THE COURT:  You may proceed.  Although, actually, let

14    me add another question to the equation.

15          As I understand it, at this point the attorney general in

16    New York has now filed an action and the question is, as a

17    result of that action, what or how does that action affect us

18    here as relates to the issue, question of superiority?

19               MS. JENSEN:  Yes, Your Honor.  Well, as Your Honor

20    suggested or referred to, the defendants had filed a motion for

21    an ex parte motion to brief that issue before Your Honor.  Your

22    Honor denied their request to do so.

23          We have taken a look at the cases that they cited in their

24    ex parte motion, and it's very clear that those lines of cases

25    or that line of cases -- which is only a few cases, really --

1    would only come into play if and when the AG actually entered

2    into a settlement with the defendants that fully resolved all

3    the plaintiffs' claims.  And that has not occurred.

4         And Your Honor, we think it's a little ironic that the

5    defendants are telling you here that you shouldn't certify this

6    class action as, you know, it may not be superior, while they

7    are telling the court in New York that the court should dismiss

8    these claims because they say that the attorney general blew

9    the statute of limitations by a period of years.

10        So they have moved to dismiss that action, they are

11   talking to you out of the other side of their mouth saying you

12   shouldn't certify the class action, but the truth of the matter

13   is they are trying to get out of both.

14             THE COURT:  All right.  And I guess let me take a

15   step back now to the question of the multiple subclasses.  You

16   pointed out that there was a *Butler* case from the Seventh

17   Circuit.  I haven't had chance to look at it.  But you

18   indicated it related to about 27 different models of

19   appliances, and as I am sitting here now, I am thinking it

20   makes sense in the context of that case to have the 27

21   subclasses approved to the extent that you have a general,

22   common nucleus which in results in a particular manufacturer, a

23   particular type of appliance, but then, by chance, you have

24   different model numbers.  So the only way that you would be

25   able to have the class members receive any relief is by

1    specifically identifying a particular model number, but, by and

2    large, you are going to have the same mechanics or the same

3    operations involved.

4        Here it doesn't seem like we have that issue.  Instead, we

5    have, if not for the most part, completely, class members who

6    to the extent that the Court finds there is an appropriate

7    class under 17200, that there's an appropriate one under 1750

8    of the Civil Code, that they are going to be receiving relief.

9        And the question is where the plaintiffs are in a position

10   to -- all of them, to receive relief under two or three

11   different causes of action, why do we need to pile on?  Why do

12   we need to engage in a version of overkill by having all 14

13   subclasses?

14           MS. JENSEN:  Well, Your Honor, the reason for that is

15   we want to make sure that every single class member across the

16   country gets the relief they are due.  And if it were the case

17   that Your Honor was only to certify the UCL claim, for

18   instance, then Your Honor would only be entertaining the claims

19   of California residents, and therefore 49 states and D.C. would

20   be excluded from this class action.  So therefore, because of

21   the nature of the claims and the fact that they relate under

22   state law, that's why courts now certify these multi-state

23   classes.

24       I will mention to Your Honor that for the fraud, which is

25   the element that I wanted to put in front of Your Honor a

1   little bit earlier, there's only two subclasses.  And so it

2   doesn't cover all the states.  It only covers the states where

3   the courts allow a presumption of reliance.  So therefore, you

4   don't get into the individualized reliance issues that can

5   cause a headache.

6       So we only have those states where the reliance can be

7   presumed, and that will cover -- sorry, I am just trying to

8   look -- that will cover approximately 27 states and D.C.  That

9   would be only two subclasses.

10      To get all 50 states, that's the unjust enrichment

11  subclass, and that would be able to -- we would be able to try

12  all 50 states with four subclasses.

13      Now, granted, Your Honor --

14          THE COURT:  Let me ask, unjust enrichment, that would

15  be an equitable case, so that would also be a bench trial?

16          MS. JENSEN:  That could be a jury trial, to my

17  knowledge, Your Honor.

18          THE COURT:  All right.

19          MS. JENSEN:  But I want to point out that, Your

20  Honor, that it's not as though these subclasses are so far

21  apart in terms of such diverse or divergent standards.  It's

22  that we are trying to be intellectually honest here, and we are

23  subclassing any state that has a materially nonidentical

24  requirement.  So for instance, with unjust enrichment, some

25  require that the plaintiff doesn't have a remedy at law, and

1    some of them require that there be proof of wrongdoing.

2        We think that we are going to readily prove it for all

3    states, for all class members, just on two fundamental

4    questions and that is as to whether defendants promised all

5    class members they would deliver Donald Trump's elite

6    university, and they delivered something else.  So we don't

7    think there is going to be any problem in that proof across the

8    subclasses.

9        But what we have done is we have provided these verdict

10   forms so that the fact-finder will easily be able to click off

11   those elements, and it shouldn't be a problem.

12       This is what we have shown you here with this.

13           THE COURT:  I keep hearing how easy it's going to be,

14   and I am sorry, I just don't see it playing out that way.  I

15   don't see it being that easy.  But let me ask you another

16   question.

17       There was recently filed a separate RICO action based on

18   the same underlying facts.  Will that RICO action be able to

19   capture any consumers from all 50 states, or what is your view

20   in terms of which consumers will be able to be included in that

21   proposed class?

22           MR. FORGE:  I drew the RICO straw, if it's okay with

23   Your Honor, I can address that question.

24           THE COURT:  All right.

25           MR. FORGE:  I will the answer the first part of

1  question:  Yes, that will address all 50 states.

2       THE COURT:  To the extent it does, would we really --

3  I guess we are ahead of ourselves.

4       MR. FORGE:  I think, as Your Honor probably recalls,

5  that was one of the reasons why we advanced forward justifying

6  the motion for leave to amend is we felt it would simplify

7  things.  Obviously we ended up on the wrong end of that

8  argument.  But the case is out there.  I think that ultimately

9  my guess is they will come together, and there will be the RICO

10 claim that does cover the entire country.  I don't want to

11 shoot ourselves in the foot as to these claims, but I think to

12 answer Your Honor's question, yes, it does cover.

13      THE COURT:  Thank you.

14 And you may proceed however you wish.  Just so you know, I

15 think you have for the most part answered the questions that I

16 had when I took the bench.  So unless you have something else

17 to point out, I am happy to hear from the defense.

18      MR. FORGE:  Your Honor, may I make one point?  There

19 is obviously an overlap between the RICO claims and the fraud

20 claims that we have here, and this gets lack to Ms. Jensen's

21 point regarding the some instances a very insignificant

22 difference between the subclasses.  We have, I believe, 27

23 states and the District of Columbia covered by the two fraud

24 subclasses.  The only distinction between those subclasses --

25 they are the same elements.  The only distinction between them

1    is that for one subclass, there is a preponderance standard,

2    for the other subclass, it is a clear and convincing standard.

3        I do think -- I understand Your Honor's point and I

4    respect that point that if you take all the subclasses, it's

5    possible that the different instructions could become

6    confusing.  But as to those 27 states and D.C., simply telling

7    the jury there's a preponderance of the evidence -- have we

8    proven these elements by a preponderance?  Yes or no?  Have we

9    proven them by clear and convincing?  Yes or no?  That's pretty

10   easily covered.  So we effectively get one class for all the

11   fraud claims.

12       And it's very similar for the good faith and the breach of

13   contract, good faith and fair dealing.  The only distinction

14   between those subclasses is for some -- and I really think it

15   is a distinction without a difference -- for some, the states

16   have specifically said there has to be a material breach,

17   whereas others, the instructions don't require a material

18   breach, but still require damages.  We would have no problem

19   with an element that requires the material breach as to

20   everyone.

21       So with that simple change, if you change that element to

22   a requirement to have a material breach, all those good faith

23   and fair dealing subclasses collapse into one.

24           THE COURT:  Wouldn't that adversely affect

25   individuals or members from states that don't have the

1   materiality?

2          MR. FORGE:  I don't think so, and here is why, your

3   Honor.  I think you wind up picking up with damages at

4   materiality standard in any event because you would still have

5   to show the breach caused some sort of damages to everyone.

6   Every state has the damages element.

7          And again, I think it really is just a distinction in the

8   way the elements are described, not in the way they are

9   actually applied.  I just don't see a situation in which --

10  don't see a situation in which any plaintiff could have damages

11  from a nonmaterial breach.  It's almost an oxymoron just to

12  describe it that way.  That's why I don't think it would be

13  counter to the best interest of any the individual plaintiffs.

14         THE COURT:  All right.  And I have a question as far

15  as how all of this would play out at trial, and I can't claim

16  that I have got it totally well-conceived in my brain to ask

17  it.  Here it goes.  Hope it comes out.

18         In terms of commonality and common proof, as I pointed

19  out, there are a number of forms of common proof:  The

20  playbook, the PowerPoint, and then you will have individual

21  witnesses who will indicate they complied with that.

22         Then there's also other forms of evidence that are

23  referenced throughout the pleading, and they include inquiries

24  by the state of New York, state of Texas, and just an assorted

25  kind of types of evidence.  And the question that I have is, to

1    the extent the Court were to conclude that there is this common

2    evidence made up of the playbook and the PowerPoint and the

3    witnesses who talk about how they were required to parrot

4    these, how much outside of that is the plaintiff going to be

5    offering at trial?

6        And to the extent that they do, in that case, how does

7    that affect this case in terms of manageability in terms of

8    being able to confine it to a two-week trial?

9            MR. FORGE:  I also drew the trial straw, Your Honor.

10   I will address that.

11       Your Honor, I think that it really -- those are strategic

12   decisions that I don't think are going to differ whether we try

13   one plaintiff or a class.  We talk about the evidence of the

14   different states' attorney general and other -- I wouldn't say

15   unique evidence, but more distinct types of evidence, along

16   those lines, all of that simply is going to go to show

17   Mr. Trump's intent, Mr. Trump's knowledge, which we have to

18   show regardless of whether we had one plaintiff or 1,000

19   plaintiffs.  So those are strategic decisions we would make,

20   and it would be the same outcome of whether it is a class or

21   whether it is one person.  It's really how much is enough.

22       Frankly, with that 2005 letter from the state, from the

23   New York State Education Department, looking at this from a

24   trial perspective, I don't think we are going to have to go

25   much beyond that.  When you look at that letter, and look at

1    Mr. Trump's testimony, we are not going to have to spend a

2    whole lot of time establishing that Mr. Trump knew they

3    shouldn't be using that name, "University," and establishing he

4    obviously knew he was not contributing in any substantive way

5    to the curriculum.

6        I don't think any of that -- I hate to call it extraneous,

7    but for trial purposes, it would be extraneous.  I don't think

8    any of that extraneous evidence is going to take up much, if

9    any, time at trial.

10             THE COURT:  For example, we have evidence referenced

11   regarding bandit signs and whether or not people were directed

12   to essentially be engaged in the real estate business without a

13   license, and there are all these upsells, and just a large

14   number of additional kind of claims that are in some ways

15   smaller but also have been important enough for the plaintiffs

16   to identify them, and I am wondering to what extent is the

17   plaintiff going to claim all of that should come in as well.

18             MR. FORGE:  Your Honor, I think Your Honor and I have

19   about the same length of time with this case, and I think that

20   we both have the benefit of what is an involved view of this

21   case from the plaintiffs' perspective.  We have come up -- we

22   have amassed enough evidence on the core themes that Ms. Jensen

23   has been discussing that we are not going to be getting into

24   those types of issues in the trial of this matter.  There's no

25   need to.  We are talking about bandit signs and things of that

1    nature -- those had a much greater significance at an earlier

2    stage in this case before we had far more compelling evidence

3    on the overarching issues of the case.

4            THE COURT:  Thank you.  Anything else?

5            MS. JENSEN:  Your Honor, if you would indulge me,

6    there were two things I wanted to show you.  Would Your Honor

7    be willing for me to show the Donald Trump promotional video

8    because I think that really encapsulates --

9            THE COURT:  The promotional video, this was something

10   played at the 90-minute free seminar?

11           MS. JENSEN:  Yes.

12           THE COURT:  All right.  Yes.

13       (Video played briefly.)

14           MS. JENSEN:  It will be better with sound.

15           THE COURT:  I think so.  Is there any need for the

16   court reporter to take this down?  No.

17           MS. JENSEN:  It's in the record, Your Honor.

18           THE COURT:  The record will so reflect.

19           MS. JENSEN:  Your Honor, this is Exhibit 2 to the

20   class cert motion, for the record.

21       (Video played.)

22           MS. JENSEN:  Your Honor, we believe that all the

23   claims are going to be proved just by two simple questions:

24   That is, whether the defendants promised Donald Trump and the

25   university, and whether they failed to provide that.  We think

1    you don't even need to go further than the name itself, which

2    we believe is misleading, because the 2005 letter from the

3    New York Department of Education said they couldn't use that

4    name.

5         But also, this video -- and there's ample evidence in

6    addition -- but this video right here was on the website and

7    YouTube throughout the class period.  It was in promotional

8    e-mails.  They used it at every opportunity, at the beginning

9    of preview seminars per the playbook, and also confirmed by

10   testimony by a former instructor this week.  You could hear

11   that he himself, Mr. Trump, was promising class members that

12   they could learn from him, they could learn from his

13   hand-picked instructors, and they are told it is a university.

14   So we think that's very powerful evidence.

15        Just one more thing, if Your Honor would indulge me once

16   more.  We just wanted to play a short snippet of the deposition

17   that was taken this week of a former instructor, Gerald Martin.

18   This isn't a rough transcript.  This is his testimony himself

19   that you can see.  We think it is important.  We had been

20   trying to get this deposition for a very long time.  We noticed

21   this deposition after we got the scripts, and the defendants

22   actually instructed him not to show up for his deposition two

23   weeks ago.  We flew all the way there.  They instructed him not

24   to show up.  And the middle district of Florida just ordered

25   him to show up this week.  That's why, Your Honor, this is

1   coming when it is.

2       With that, we just wanted to show you this video.  To the

3   extent that the defendants said there was no script, we now

4   know there was a script, and here is Mr. Martin showing that he

5   was required to follow it.

6           THE COURT:  All right.

7       (Video played.)

8           MR. FORGE:  Your Honor, just for the Court's

9   understanding, Exhibit 61 is a transcript of one of

10  Mr. Martin's actual presentations.

11          THE COURT:  All right.

12          MS. JENSEN:  Your Honor, thank you for indulging me.

13  If you have any other questions --

14          THE COURT:  I do not.

15          MS. JENSEN:  Thank you, Your Honor.

16          THE COURT:  Let me let me hear from the defense, and

17  if you want, as a starting point, respond to any points that

18  were made by the plaintiffs, then I will ask a couple of

19  questions.

20          MR. SCHNEIDER:  Thank you, Your Honor.  We have a

21  couple of areas Jill Martin is going to raise concerning

22  superiority, and I will address my issues, and if it's all

23  right with the Court we will switch places.

24          THE COURT:  All right.

25          MR. SCHNEIDER:  The Court just inquired whether this

```
 1    90-minute video was played at all the previews, and the

 2    evidence is just the opposite.

 3         The evidence before the Court, if the Court looks at

 4    Defendant's Exhibit Number 1, paragraph 15, the president of

 5    Trump University testified that the video wasn't used at all in

 6    '07, was used sporadically and '08 and '09, and wasn't used

 7    again at all in 2010.  And in addition, there were various

 8    versions of that video.

 9         What he testified in the deposition was that the video

10    actually is -- the Mr. Trump video -- is about 20 minutes, and

11    it's way too long to play at a 90-minute program.

12         So at times, they would have different pieces showing at

13    different events, but it definitely wasn't uniform, and it

14    wasn't played all the preview events, and we know that because

15    three of the six named plaintiffs have never seen the video.

16    They all testified they never saw the video.

17         So it's important that -- if I can make one overarching

18    point in this hearing that is memorable for the Court is this:

19    That today, plaintiffs must be able to establish that a uniform

20    misrepresentation was made to every class member.  That's what

21    Gonzalez, Proctor Gamble, Maza, and particularly Ninth Circuit

22    in Maza, said there must be a uniform misrepresentation made to

23    every class member, and if not, then you cannot presume

24    reliance.  You have to show individual reliance on an

25    individual basis and to an individual inquiry.  I will get into
```

1    the other line of cases, *Lincoln Savings* and so forth, if the

2    Court wants.

3         But that is a key issue here, that plaintiffs have not

4    presented any evidence that all of the plaintiffs were subject

5    to the same initial presentation.

6         And to be frank with the Court, it's been a little

7    difficult to find out what the misrepresentation is.  It keeps

8    changing.  The case started for a year or two as that

9    Ms. Makaeff didn't get a full real estate education; that she

10   went to Home Depot; that she was told to put up bandit signs.

11        Mr. Low testified that he didn't get his post-mentorship

12   action plan.  That was his complaint.  And so forth.

13             THE COURT:  Let me ask you, setting aside how things

14   may have evolved, but looking at the state of affairs as they

15   stand now, to the extent that the plaintiff is asserting that

16   we have this common evidence, and it consists of the playbook,

17   the PowerPoint, the testimony of a number of students and

18   instructors who will in fact demonstrate that there was this

19   uniform pitch that each member of the class received.  And

20   keeping in mind that it's disputed, but at the same time,

21   that's for the jury to decide whether or not the plaintiffs'

22   position is well taken or whether or not your position, which

23   is that, no, there was not this uniformity; there was just a

24   number of rogue types of salespeople doing whatever they felt

25   like given what day of the week it was.  But it sounds like

1    that's more for the jury to decide versus for the Court.

2        At this juncture, the Court is provided with what evidence

3    the plaintiffs intend to rely upon, and that it is a common

4    core of evidence, and then it will be up to the jury to decide

5    whether or not the plaintiff has met their burden of proof.

6            MR. SCHNEIDER:  Thank you.  Let me address that.

7        The plaintiffs' obligation as of today is to establish

8    that there was a uniform misrepresentation across the class,

9    not that the representation itself was true or false.  We

10   obviously can debate that.

11           THE COURT:  When you say establish, they are not

12   required to establish by preponderance of the evidence today,

13   are they?

14           MR. SCHNEIDER:  Well, they do hold the burden.  Yes.

15   Absolutely.

16           THE COURT:  But by preponderance of the evidence?  At

17   this time, are we having a mini trial with respect to whether

18   or not I should believe the plaintiffs' witnesses and their

19   presentations versus the defendants'?

20           MR. SCHNEIDER:  In the sense whenever a party has the

21   burden, they have to meet it by the Rule 23 requirements, yes,

22   if the burden is more likely than not.  I don't know exactly if

23   it's preponderance.  But they have the burden to establish

24   uniformity.  And here is what we know.  We have allegations

25   from the plaintiff in the complaint, and we have the evidence.

1    And it's interesting -- I want to dovetail two issues.

2        Ms. Jensen spent some time talking about what Judge

3    Wardlaw said in the Ninth Circuit, suggesting Judge Wardlaw had

4    made conclusions of fact on this quote/unquote national

5    advertising.  The reality is that we filed a cross-complaint,

6    and the plaintiffs filed an anti-SLAPP statute motion

7    immediately.  That issue was heard by Judge Gonzalez, and then

8    went up on appeal.  There was no discovery at all.

9        So what Judge Wardlaw relied on exclusively were the

10   allegations in plaintiffs' complaint, which alleged there was a

11   nationwide campaign, and that Mr. Trump did A, B, C, and so

12   forth.  But there was no evidentiary finding, no evidence

13   submitted at all, and no discovery conducted at all that was

14   before the Ninth Circuit.

15       So that entire discussion, I believe, left the Court with

16   the inference that there's been some determination there was a

17   nationwide campaign, and that is not accurate at all.

18       What I am saying is that Justice Scalia made it clear that

19   that standard doesn't work anymore.  The Court, in its rigorous

20   analysis, doesn't just look at the pleading; it now has to look

21   at what reality is.  And the reality is for example we have a

22   lot of ads -- the Court asked about the ads before -- a lot of

23   the ads have no misrepresentations at all.  They have listed,

24   they think, "hand-picked experts; you are going to learn my

25   secrets," so forth.  We know a lot of class members received a

1    set of ads that contained none of the misrepresentations.  So

2    we know by definition that all the class did not receive a

3    uniform misrepresentation.

4         That's what is key here.  Not that the plaintiffs can

5    claim it, but we have evidence now showing that we know

6    different people receive different things.

7         Ms. Makaeff is a perfect example.  Ms. Makaeff testified

8    that she never knew one thing about Trump University before she

9    purchased it.  She never saw a single ad.

10        The case law is very clear that if a plaintiff doesn't see

11   an ad or misrepresentation, they have no claim.  So the way

12   that the plaintiffs' want to get around that is the presumption

13   of reliance, but the problem is that they have got to rely on

14   three presumptions to get there.  First, they have to presume

15   that all the misrepresentations went to the whole class, and we

16   know that that's not true.  But what they argue in the paper is

17   let's use the tobacco case, which said you can assume that when

18   there is pervasive advertising -- for example, tobacco, for 40

19   years, on television, so forth -- taht it's not unreasonable to

20   presume that everybody saw an ad.

21        But *Maza* came in recently -- the Ninth Circuit said

22   tobacco may not even be a reliance case.  It might be a

23   standing case.  But in any event, whether there's much more

24   limited advertising, then you must show that each plaintiff

25   actually saw or heard the misrepresentation.  Otherwise,

1   there's not going to be a presumption of reliance.

2       So *Maza* essentially did away with this idea that you can

3   just assume that everyone saw an ad.  So the first assumption

4   that they must make is everybody saw the ad.  We know that's

5   not true.

6       The second assumption is that everybody relied on the ad.

7   And that presumption came in a case out of Arizona, the *Lincoln*

8   *Savings*, which is a securities case.  And the Ninth Circuit

9   here has said that's a very limited circumstance.  Typically,

10  you don't find those in consumer cases.  It's usually limited

11  to a securities case.

12      This Court actually looked at this issue in *Negrete* on the

13  consideration for the decertification of the *Negrete* case.  And

14  the Court was evaluating the certification and said, "You know

15  what?  In that case, we know that each class member received

16  the purported misrepresentation because they got it.  They

17  signed off and said they got it."

18      Not only does that not exist here, but we have 70

19  instructors saying different things with different PowerPoints

20  and so forth.  And I am sort of moving into this point about

21  the common evidence.  So we know the video was not shown two

22  out of four years, and sporadically the other years, and three

23  out of six plaintiffs have never seen it.

24      How about the playbook?  It didn't even exist in '07; a

25  different version existed in '08, and yet a different version

 1   existed in '09 and 2010.  It wasn't the same during the entire

 2   class period.

 3        Number two, the consumers never saw that playbook, so it's

 4   not a misrepresentation claim; it's whether or not the

 5   instructors were required to follow the playbook.

 6        This Court recently issued a decision in *Cottle-Banks* in

 7   which a very similar issue existed, and that is when you have a

 8   uniform presentation, is it actually being implemented that

 9   way?  Are the people using the scripts?  Are they using the

10   manuals and so forth?  And if not, you can't certify the class.

11        That's exactly what happened here.  We have evidence,

12   undisputed evidence from multiple instructors and mentors and

13   former employees represented by plaintiffs' counsel themselves.

14   Every one of them said they didn't use the playbook, never even

15   heard of a playbook.  We have four instructors.  We have

16   declarations, Exhibits 22, A through D.  Four instructors said

17   "I never saw it, never used it.  I had great latitude in what I

18   was teaching, how I was teaching, and I customized my

19   presentation to the needs of the students or the mentee," so

20   forth.

21        Ms. Summer was a coordinator for Trump University.  She

22   has been represented by plaintiffs' counsel for some time now.

23   She testified she attended 20-plus events.  In the 20-plus

24   events she attended, the presentations were different.  The

25   PowerPoint presentations were different.  They did not use

 1    scripts.  She said that even presentations by the same

 2    instructor on the same subject matter were different when you

 3    go to different programs.

 4        We know this isn't a situation where there was a uniform

 5    presentation to all people.  It's true that the first reliance

 6    case says it doesn't have to be word for word, but that has to

 7    be misrepresentation.  For example, if the Court looks at the

 8    chart prepared by Ms. Jensen's office that has the various ads

 9    and so forth, some of them have no misrepresentation or even

10    purported.  For example, the claim is that Donald Trump hand

11    picked some or all of the experts.

12        I agree that if he said, instead of hand picked, he

13    personally selected, or he hand selected, or personally met

14    with them.  I am not trying to nuance those words.  But that's

15    different than saying, "Trump University experts are going to

16    be in your area and teach you information."  That's a different

17    statement.

18        In the chart they have prepared, if the Court looks at

19    it -- I can cite to the references -- there are different

20    statements and representations made in the programs.  So they

21    are not all uniform and they don't all include the

22    misrepresentations.

23        So plaintiffs can allege it, but now we have the evidence.

24    We know exactly what was said in the programs because we 2500

25    hours of audiotape.  So we have gone through it, the plaintiffs

1  have gone through it, and they have identified the

2  misrepresentations, and many of them do not have the

3  misrepresentations they are claiming.  And the purpose for

4  today is if the same uniform misrepresentation was not made to

5  all a class members, the class can't can certified.

6      Also, the video, when it ever was played, was only played

7  at the 90-minute program.  Many people never went to the

8  90-minute program, including Ms. Makaeff herself.  She went as

9  a guest to the three-day program.

10     And I think this is an important part of why there's no

11 common evidence here.  How do people get to the program?  This

12 is not a case -- I guess the proverbial boat has to be filled

13 with all the same people.  This is not the *Blockbuster* case

14 where it doesn't matter what movie you got, whether or not you

15 actually watched it, whether you liked it, who referred you to

16 Blockbuster.  If they make a representation that if you keep

17 the move late, you will not be charged a late charge, and you

18 are charged a late charge, none of the other issues matter.

19     Here, people got to Trump University many different ways.

20 Some read Donald Trump's book and wanted to take one of the

21 programs.  Some took programs at Trump Institute and bought a

22 tax and lien seminar and went to that.  Some went to the

23 90-minute program.  Some bought a wealth program and decided to

24 buy another program and then decided to buy a mentorship.  Some

25 people just bought the mentorship.  But there's a lot of people

1   that never went to the 90-minute program.

2       So even assuming that the video was played at some of the

3   90-minute programs, a lot of people signed up for various

4   programs, courses, mentorships, et cetera, and never saw the

5   video because they never went to the 90-minute program.  The

6   video was never shown at the three-day program or any advanced

7   workshops.

8           THE COURT:  That's -- I am sorry.  Say the last

9   statement again.

10          MR. SCHNEIDER:  The Trump video was never shown at

11  the three-day workshop or any of the advanced programs.  So

12  when it was shown, it was only at the free program.

13          THE COURT:  Okay.  It wasn't shown at the three-day

14  or the -- it was only shown at the free program?

15          MR. SCHNEIDER:  There was maybe 200 different

16  programs that Trump University offered for sale, and it was

17  only shown sporadically, during a period of time, different

18  clips, at the 90-minute free program.

19          THE COURT:  Let me ask you this.  What if the

20  certified class limited itself to those individuals that did

21  attend the 90-minute free presentation?  What is your view as

22  to whether or not there would be sufficient uniformity so as to

23  justify a class?

24          MR. SCHNEIDER:  It would also have to be where the

25  video was shown, and they were there and heard the

1    representation, and they thought it was material.

2        This brings us to the next point about the Court's concern

3    about how this case is going to get tried.  Counsel said

4    whether it's one person or 6,000, it's going to be the same.

5    And I suggest that is completely inaccurate.

6        What is paramount here in this case is that the defendants

7    are entitled to defend the case.  And it is not just whether or

8    not the representation is true Donald Trump did or didn't

9    select experts and whether or not they are experts.  The

10   questions posed by plaintiff was either they were experts or

11   weren't experts.  Let me take that one first.  It's easy.

12       There are 70 instructors or mentors.  If there had been a

13   program that was only taught by one instructor for all the

14   programs for all four years, then perhaps there would be common

15   evidence to decide whether that instructor met some criteria to

16   decide if he or she is an expert.  You can look at their

17   background and decide that person -- can the jury figure out do

18   they measure up to whatever an expert is.

19       In this case, we have Dr. Elred, a professor at Stanford,

20   with a Ph.D. in real estate, who taught courses for a year.  We

21   have Dr. Hallor, who has done $2 billion in real estate

22   transactions and 50 -- $500 million -- or I am sorry --

23   financing, 2 billion; and 500 million in real estate

24   transactions.  The point is, very experienced.  We have many

25   other instructors that have different backgrounds.

1    But the point is that if the issue is either they were or

2    were not experts, how is that possibly evaluated on a

3    class-wide basis?  Because every person had different

4    instructors or a combination of people.  And the exact same is

5    true on the hand-picked issue.

6        And there's no dispute in the case, plaintiffs have

7    offered no evidence, that Donald Trump did not meet with the

8    first six people -- Dr. Eldred, Mr. Sexton, Dr. Kaplan,

9    J.J. Childers -- and selected these people, sat down, went

10   through the curriculum, so forth.  There's no dispute about

11   that, or no evidence disputing that.

12       Dr. Eldred taught for a year.  J.J. Childers taught for

13   four years.  So there cannot be common evidence when some of

14   the students clearly were taught by people that under any

15   definition were hand picked by Donald Trump.  Some people were

16   taught by people that he only reviewed resumes.  Some people

17   may have met Donald Trump, and they were taught by those

18   people.  And people may not have cared.

19       That's the next point, on materiality.  The class is so

20   diverse.  Someone pays $995 and goes to one weekend and says,

21   "Hey, I want to see what real estate is about."  They pay their

22   $995, they go and listen to the program.  They walk out and are

23   finished.  They think, "That was helpful information."  They

24   fill out the evaluation say, "I loved this.  This was really

25   good stuff."  And they never do anything again.  They go back

1   to their other job.  They never call Trump University.  They

2   are not looking for support or any help.  That's the end of the

3   relationship.

4        Compared to someone else in the class that goes to five

5   three-day workshop programs, has a mentor for three days, goes

6   and looks at property, figures out how to do rehabs, makes

7   offers on property, buys property, opens up a business, has an

8   LLC developed.  And then after all that, someone knocks on the

9   door and says, "You know what?  One of your instructors never

10  met Donald Trump.  Is that material to you?"  And the answer is

11  we don't know unless we ask because they are differently

12  situated compared to the first person, too.

13       And that's why this is not a common evidence case, where

14  everybody's the same.  They didn't buy the same bottle of

15  Nutella, where everybody got the same thing; either it does or

16  doesn't have what is represented on the outside of the label.

17       People purchased different things; they expected different

18  things; and they got different things.  And we know from the

19  declarations of the instructors that many of the programs were

20  highly individualized, specifically tailored to the needs of

21  the people.

22       On the PowerPoint -- I mentioned about the playbook.

23  There are -- I can't get an exact number, but there are dozens

24  and dozens and dozens of different PowerPoint presentations.

25  The Court has 13 of them.  Four were submitted by plaintiffs --

```
 1    Exhibit 40 and 41, and I can't remember the other one -- and

 2    defendants submitted nine more.  And the Court can see that

 3    they are different.  And they are different from the scripts,

 4    the seller scripts, which is different from Exhibit 86 by

 5    plaintiffs, which is the latest script.  It's different from

 6    the transcripts that the Court has of some of the programs.

 7              THE COURT:  And given that each one of them would

 8    obviously be different in some regard in some respect, and the

 9    plaintiffs are taking the position that the common germ, the

10    common element in all 13, are these misrepresentations as to

11    the hand-picked character of the instructors and the sharing by

12    Donald Trump of his secrets, is it your position that these

13    various versions of the PowerPoint do not in fact contain these

14    asserted or alleged common points?

15              MR. SCHNEIDER:  Yes.  That's absolutely correct.  All

16    those PowerPoints that are submitted do not include "my

17    hand-picked experts" or "learn my secrets."  One or two --

18              THE COURT:  Or a variation thereof?

19              MR. SCHNEIDER:  Right.  Right.

20         But depending on the variation -- if it says, "You are

21    going to learn from Trump University's experts," that is a very

22    different statement.

23              THE COURT:  Right.

24              MR. SCHNEIDER:  Yes.  The nine PowerPoints that we

25    submitted, the Court can look at.  And I know that they all do
```

1    not contain that, and maybe only one or two contain it.  And

2    that's really my point, Your Honor, is that different people

3    were told different things in different presentations.  So

4    there's no uniformity of misrepresentation.

5         That's consistent with what Michael Sexton, the president,

6    testified.  He said, "We wanted uniformity, but we were a long

7    way from getting there."  This was a brand-new company

8    basically in '07.  The idea -- it's really ironic about the

9    tobacco issue; for 40 years they had been advertising.  This is

10   a brand-new company, so whatever marketing they did in '07 was

11   brand new.  There was no ubiquitous nationwide campaign.

12        And the declaration of Michael Sexton described in detail

13   exactly what efforts were done.  And before they go into a

14   city, they would put an ad in the newspaper, might send out

15   e-mails, pretty limited.  And Ms. Makaeff never saw any

16   advertising before she went.

17        This is another point.  Brandon Keller was a named

18   plaintiff, and he was invited to the program through an e-mail,

19   which is Defense Exhibit 108.  And that e-mail has no

20   representation about "my hand-picked experts" or "learn my

21   secrets."  So he went to the program based on -- and he

22   testified, based on his receipt of an e-mail inviting him to go

23   for free to the 90-minute program, doesn't have those

24   misrepresentations.  The point is they were all different.

25   Everybody didn't get the same misrepresentation.

1          And the last point on the common evidence is that we have

2    testimony from four instructors, plus Michael Sexton, the

3    president, that says these programs varied -- the 90-minute

4    program varied as much as 30 to 35 percent.  The three-day

5    program on the same topic varied as much as 50 percent.

6          I understand the Court's question; subject matter I

7    understand, but is the core issue still there in every

8    presentation?  And if the Court looks at the nine PowerPoints,

9    it will not see the misrepresentations in all of them.

10              THE COURT:  I am sorry.  You said see these nine

11   PowerPoints?

12              MR. SCHNEIDER:  Yes.

13              THE COURT:  And I have a note here before you had

14   mentioned 13?

15              MR. SCHNEIDER:  The Court can look at the four

16   provided by plaintiffs.  I can give the Court the numbers,

17   exhibit numbers.

18              THE COURT:  So you are saying 13 in all; of the 13,

19   there are only four that shared the common elements the Court

20   has pointed to?

21              MR. SCHNEIDER:  I think less than that, Your Honor.

22        Plaintiffs submitted four under exhibits -- Plaintiffs'

23   Exhibits 40, 41, and 47.  I am missing one, so I don't know if

24   they have two included in the group or if I am missing one.

25   But they submitted four.

1          The defense, under the defense exhibits, Number 39, we

2    submitted nine more.  And even some of the ones that

3    plaintiffs' submitted don't all have those misrepresentations

4    in them, or the purported misrepresentations in them.

5               THE COURT:  And the ones that you pointed to as not

6    including these common elements are what exhibits, or which

7    exhibit?

8               MR. SCHNEIDER:  The PowerPoints, Your Honor?

9               THE COURT:  Yes.

10              MR. SCHNEIDER:  Defendant's Exhibit Number 39.

11       And then there was Plaintiffs' Exhibits 40, 41, and 47.

12              THE COURT:  I am sorry.  I thought you indicated that

13   you were nine videotapes that did not contain the common

14   elements?

15              MR. SCHNEIDER:  These are not videotapes, they are

16   the PowerPoints.

17              THE COURT:  I am sorry.  I am sorry.  The

18   PowerPoints.

19              MR. SCHNEIDER:  Exhibit 39 is all nine of them.

20              THE COURT:  I see.  I am sorry.

21              MR. SCHNEIDER:  I apologize.  So they just run back

22   to back.  And when the Court looks at them, it will be very

23   obvious they are different.  We actually -- they look

24   different, contain different information, and as the Court

25   looks at them, you will see they are different, really

1    different presentations.

2              THE COURT:  All right.

3              MR. SCHNEIDER:  I wanted to touch briefly on the

4    elder abuse question.  The evidence plaintiffs' suggest that

5    they included is a slide that indicates that at a preview

6    program, 30 percent of the audience was over 60 or 65 years

7    old.  That was a study conducted by an outside company that

8    took names of registration -- people that just register for the

9    free program, and tried to crosscheck and see what the

10   demographics look like.

11       There is no indication any of those people purchased

12   anything, and that is the sum total of the evidence on the

13   elder abuse.

14       The plaintiffs haven't actually offered any evidence of

15   elder abuse.  All they said is we targeted the elderly, but

16   offered no evidence other than a demographic saying here is

17   what this looks like.  This room had people that made this kind

18   of income, this kind of technical background.

19             THE COURT:  What exhibit is this reflected in?

20             MR. SCHNEIDER:  It was their Exhibit 16, Plaintiffs'

21   Exhibit 16.  It is a slide -- internal slide, that showed for a

22   preview program what the demographics were.  I think income,

23   gender, age, might have been something else, for, I think, '09.

24       But we don't -- here is the more important part, is Trump

25   University did not keep information on age.  So we actually --

1    this is an unascertainable event anyway, because when -- for

2    example, when Ms. Makaeff came, she didn't provide us -- unless

3    she wanted to provide us on the internet -- her age.  And when

4    she did, it would be a range.  It would be 35 to 45, or 45 to

5    55.  So we don't know who is 60 and over, so we obviously

6    didn't target them.  We don't even know how old they are.

7         But the point -- there's the suggestion by Ms. Jensen that

8    we know it's hundreds or thousands of people in Florida, that's

9    just baseless.  We have no idea how many seniors, over 60 years

10   old, actually purchased a program because we don't keep the age

11   information.

12          THE COURT:  So during the course of discovery, would

13   there have been any way for the plaintiff to identify from the

14   list of customers who is 60 years and older?

15          MR. SCHNEIDER:  No, not really.  We offer the

16   registration cards to them.  Anybody that registered, whether

17   or not they went to a free program or anybody else -- there's

18   85, 90,000 cards.  It had a space for age.  If they wanted to

19   put their age, they could.  If they didn't, they didn't.  That

20   information didn't make it into the system.  Nobody input into

21   the Trump University system that age.

22        So the cards are available.  We offered those to

23   plaintiffs.  They didn't want them, so they haven't reviewed

24   them.

25          THE COURT:  All right.

1          MR. SCHNEIDER:  This is a slight variation on an

2    argument I have made, but I think it is an important one.

3          There's two defendants here.  And one of the defendants,

4    Mr. Trump, plaintiffs are required as to Mr. Trump to make all

5    of the Rule 23 showings as to him, too.  And in the moving

6    papers, plaintiffs don't even mention him, not one word about

7    trying to establish the Rule 23 requirement as to him.

8          We pointed that out in the opposition, and in the reply,

9    counsel put in one paragraph, last paragraph, saying that is a

10   merits argument, whether or not he's responsible.

11         It's not a merits argument.  The issue is exactly the

12   same.  But even more difficult for plaintiffs is they have to

13   show Mr. Trump personally made misrepresentations to each class

14   member to get a certification against him.  This is a very

15   important point because we have already talked about the video.

16   So we know people many people didn't see the video, so that is

17   not common evidence they can establish that all people heard a

18   misrepresentation.  So what communications did he make to each

19   class member?  The answer is quite easy.

20         We know that Ms. Makaeff never had any communications with

21   Mr. Trump, ever, at any time.  She showed up for a three-day,

22   brought as a guest of her friend.

23         All six plaintiffs, named plaintiffs, have admitted they

24   have never spoken to or met Mr. Trump.  So the only

25   representations that could have been made in writing or the

1    video -- three of the six never saw the video.  And we know

2    that's true -- that might be the proportion for the class, that

3    at least 50 percent doesn't see it, might be more, never saw

4    the video.

5         And what about the written communications?  The written

6    communications, despite counsel's statements -- and we talked

7    about this earlier with the Ninth Circuit decision -- was not a

8    nationwide campaign.  There were specific letters or

9    invitations.  Some went out by Trump University, some went out

10   by Donald Trump, signed by him.  But there's no evidence that

11   every class remember received something from Donald Trump

12   before they purchased, and that's a key issue that they have

13   not shown some misrepresentation by Donald Trump personally to

14   every member of this class.

15        And we know for a fact that none were made to Brandon

16   Keller.  None were made to Ms. Makaeff.  Two of the named

17   plaintiffs saw an ad in the newspaper, but they don't have the

18   ad and don't remember what it said, but it was an ad by Trump

19   University.

20        Let me give you one more example of why the common

21   evidence is just non-existent.  In plaintiffs' reply papers,

22   they said, "Look, this case is going to be tried by common

23   evidence.  Either they were experts or they weren't."  And we

24   talked about the difficulty that permutations and combinations

25   of all the instructors and students, and so forth.

1      They said, "Either this was an accredited university of

2  higher learning or it wasn't."  And that will be showed by

3  common evidence.

4      But for purposes of class certification, the issue is was

5  a representation made to all class members that this was an

6  accredited university.  That's what the issue is.  And the

7  evidence is -- and we have submitted this to the Court; it's

8  Exhibit 35 -- Jason Nichols worked for Trump University, and he

9  was fired, and he came back and asked for a job, and that was

10  refused, and now he is a client of plaintiffs' counsel, Jason

11  Nichols.  And he worked in the sales office in Newark.

12      And he testified that he never told anyone that Trump

13  University was accredited.  And in fact, people asked him

14  whether it was accredited, and he told them no.

15      So we know that representatives from Trump University told

16  at least some people in this class that it was not an

17  accredited university.  So if plaintiffs' come up with someone

18  else that says so-and-so told these people it was, you don't

19  have commonality; you have different representations made to

20  this class.  And they haven't offered evidence anybody made the

21  representation and it was made to all the class members.

22      So it's just one more example of why there is no

23  commonality that different people were told different things by

24  different employees, instructors, and so forth.

25      We were going have Ms. Martin address the superiority

1    issue.  Was there anything else the Court had raised?

2          THE COURT:  No.  I believe you have addressed the

3    issued that I had.

4          MR. SCHNEIDER:  Thank you.

5          MS. MARTIN:  Your Honor, plaintiffs have virtually

6    admitted at three different points that this case is not a

7    superior mechanism for adjudicating this dispute.  First, just

8    weeks before the previous class certification hearing was

9    scheduled, plaintiffs attempted to amend -- asked the Court to

10   amend their complaint to streamline it to alleged RICO charges,

11   admitting this case should not be certified as a class.

12         Second, upon denial of the request, they went ahead and

13   filed an entirely new RICO action, which is currently pending,

14   so now we have two class actions in this court on behalf of the

15   same class.  And counsel here today virtually admitted that

16   RICO class action in his opinion is better suited to adjudicate

17   that case than a class action here.

18         And most importantly, that Your Honor touched on, after

19   years of pushing the attorney generals throughout the United

20   States and in New York, plaintiffs got their wish.  And on

21   August 24, 2013, the New York attorney general filed a petition

22   against Trump University and Mr. Trump.

23         Now, plaintiffs' counsel said today that CAM only is

24   applicable when there's a settlement agreement in place, and

25   that is incorrect.  Cases across the United States have

 1  followed CAM and found when there's the same controversy

 2  alleged, an attorney general action, an administrative action,

 3  is much better suited than a class action in federal court.

 4          THE COURT:  You say it is an administrative action.

 5  What exactly does the petition do?

 6          MS. MARTIN:  This petition is asking for the very

 7  same relief, brought the same claims as here.  It's asking to

 8  get every single person who purchased a program through Trump

 9  University to get their money back, exactly what they are

10  asking for here.  The difference with the AG action is the

11  attorney general will not be taking a large percentage of

12  recovery for himself or anyone else; whereas here, the

13  plaintiffs' attorneys here -- a substantial portion of the

14  recovery would go to the plaintiffs' attorneys.

15          THE COURT:  Did you say this is an administrative

16  type of proceeding, or is it equitable, or how does it work?

17          MS. MARTIN:  I believe an AG action is referred to as

18  an administrative proceeding; however, it is a petition brought

19  in the State of New York.  State of New York courts do have

20  jurisdiction over the claim.

21          THE COURT:  So it's akin to a complaint here?

22          MS. MARTIN:  It's akin to a complaint, except it is

23  an expedited procedure.  They have asked for summary

24  adjudication.  So if they got their wish, the New York attorney

25  general got their wish, it would be decided even before this

1    one.  And the harm of having both these actions pending at the

2    same time is a -- not only a waste of the Court's resources,

3    but also defense counsel.  They will be asking for the same

4    discovery, and they already have.

5        As an example of that, plaintiffs' counsel in this case

6    has incessantly demanded that defendants here produce every

7    single document that they have produced for the New York

8    attorney general.  They have also asked for every transcript

9    taken in the New York attorney general action.  So we are

10   simply duplicating effort.  And here plaintiffs' attorneys will

11   be taking a large recovery of the fees, and in New York, that

12   will not happen.

13           THE COURT:  You are saying the New York action would

14   be filed on behalf of any and all students that signed up for

15   the Trump University program throughout the United States?

16           MS. MARTIN:  That's correct.  And as an example of

17   that, some of the plaintiffs here have actually submitted

18   declarations to the New York attorney general; specifically

19   John Brown, which is -- Exhibit 15 is in the record,

20   plaintiffs' exhibits -- they submitted here the same

21   declaration they submitted to the New York attorney general

22   action.

23       As we speak, the New York attorney general is recruiting

24   additional individuals throughout the United States to

25   participate in that action.

53

 1          THE COURT:  And as far as the basis for the cause of

 2   action, is it any of the statutes referenced in the complaint

 3   in our case?

 4          MS. MARTIN:  Some of the New York statutes are

 5   duplicative.  The attorney general brought all of his claims

 6   under New York statutes; however, the very same controversy,

 7   which is the key the CAM Court focused on, the same controversy

 8   is what is alleged in the New York attorney general action as

 9   here.  He points to the same things, the same alleged

10   misrepresentations, that instructors were hand picked by Donald

11   Trump, or that it would provide a real estate education when it

12   was simply upsell.  It is almost mirror images reformatted into

13   New York statutes.

14          THE COURT:  All right.

15          MS. MARTIN:  And the last point I wanted touch on,

16   Your Honor, was with respect to the Gerald Martin testimony.

17   Not only is it improper to use the testimony here today -- and

18   although plaintiffs' counsel said they weren't going to cite

19   the rough transcript, which is prohibited -- specifically

20   written on the transcript -- they went ahead and did it anyway

21   on the video.  But the reason it would be improper to bring it

22   up here today is we can't see the entire testimony of

23   Mr. Martin.  They showed you little tidbits of what Mr. Martin

24   said.

25      And in fact, Mr. Martin said at his deposition that he

 1    wasn't good at following the script.  He acknowledged that he
 2    wasn't good at the 90-minute preview because he wasn't good at
 3    following the guidelines.  He veered from the guidelines.  So
 4    that goes to show another facet of why what everyone in the
 5    class heard was different.  They can put up tidbits of
 6    testimony, but that's not representative of the whole.
 7              THE COURT:  Thank you.
 8              MR. SCHNEIDER:  I have two more points.
 9              THE COURT:  Very briefly.
10              MR. SCHNEIDER:  Very briefly.
11        Two points, first is the Pala case, the gamblers' case.
12    The Court said in those kinds of cases -- not security
13    litigation, not on product misrepresentation on the Nutella
14    bottle -- but in those kind of cases where you are talking
15    about much more why people do things, why people go to Trump
16    University, you have got to look at the motivations, reasons,
17    expectations, and knowledge of the potential plaintiffs.
18        And in that case, the Ninth Circuit said it's not
19    appropriate to assume reliance; you have to look on an
20    individual basis.  That's the Pala case.
21        And the second point -- and this is also critical -- that
22    the defendants have very different defenses in this case for
23    every plaintiff.  And with a class action, we will lose the
24    right to present our case that each of the 6,000 people
25    basically has a unique story -- assuming really that 6,000

1    people would even bring this case.  The reality is 97 percent

2    said they loved what they received, so we are talking about a

3    small percent of people.

4         Let me take for example the named plaintiffs, how

5    completely different they are, how our defenses would be

6    completely different.

7         With Ms. Makaeff, she filled out an evaluation after she

8    went to the program and said she loved it.  And then she had

9    her mentorship and said she loved it.  And then a week later,

10   she wrote an e-mail to her mentors and said, "You guys took me

11   in like a father and a brother.  It was fantastic.  I learned

12   so much information," et cetera.

13        She went through the entire program, then said she needed

14   more help.  Trump University gave her 12 more coaching

15   sessions.  They gave her an extra seminar program and so forth.

16        Then she provides the videotape testimony -- I don't know

17   if the Court has seen that, Exhibit 27 -- but she provides the

18   videotape, actually on camera, talking about her mentors are

19   awesome, the program's great, the instructors are great, she

20   learned so much, et cetera.

21        All of that would be proper cross-examination to show what

22   did she get?  She is claiming she didn't get what she paid for.

23   There's a breach of contract claim in here.  She didn't get

24   what she bargained for.

25             THE COURT:  Let me ask you, to the extent there

1    wasn't a breach of contract class certified, how would that all

2    come in?

3          MR. SCHNEIDER:  It's the same with the fraud.

4    Ms. Makaeff was never told about the hand-picked experts; she

5    didn't see the video, and got no ads.  She is claiming -- one

6    of the claims is she didn't get a complete real estate

7    education.  That's part of the fraud, that she was told it was

8    an accredited university, and that she didn't get unlimited

9    mentoring.  One of the issues they claim is we promised

10   unlimited mentoring for a year --

11         THE COURT:  That's one of the questions I had of the

12   plaintiff before with respect to how much are we going to go

13   beyond these common elements.

14         MR. SCHNEIDER:  As I understood the answer, it's, "We

15   are not going to tell you right now; we are going to wait and

16   see what evidence we can get in at the time of trial and make a

17   tactical decision as to how we want to present the case."

18         THE COURT:  Actually, what I recall is that Mr. Forge

19   said they would confine themselves and limit themselves to

20   basically the common core, which I think, at this point, would

21   do a couple of things:  It would assert the position of the

22   plaintiffs, and then it would justify the Court in limiting the

23   scope of possible evidence at trial.

24         MR. SCHNEIDER:  But let me address that.  For

25   example, he talked about, "I don't think it will take much

1   evidence besides the New York Education Department's letter;

2   then we wouldn't go much past that."

3       But that's a good indication is what does that letter have

4   to do with Ms. Makaeff?  The New York State Education

5   Department has a statute that says you can't use the word

6   "university" unless you meet certain criteria.  That's

7   completely irrelevant to our defenses in the Makaeff matter, or

8   her claims against Trump University.  She has no cause of

9   action under New York law for the use of the word "university."

10  She wasn't any -- any purported violation in New York of that

11  statute doesn't affect her, or the 48 or 49 other states.

12      So there are a number of these issues that are

13  individual -- individualized, that cannot be addressed on a

14  class-wide basis.  They are not common to the class.

15      And the bandit sign, for example, here -- they say, "We

16  are not going to go with that.  We are basically just going to

17  go with hand picked and experts."  I mean, that is what they

18  are saying now, is either they were experts or not.  We talked

19  about how that's impossible in common evidence.  And either

20  they were hand picked or not.  And we have got the same

21  problem, we know some were specifically.

22          THE COURT:  All right.  And let me hear from the

23  plaintiffs on a couple of points, and most notably, with

24  respect to the assertions that we lack the common evidence as

25  to the playbook, the PowerPoints, and the individual

1   representatives.  That is, with respect to the playbook, that

2   it didn't exist until 2007; the PowerPoint, that we have 13

3   different versions, of which nine don't reference the common

4   elements; and three of the six representatives did not see the

5   video presentation.

6             MR. FORGE:  Your Honor, the playbook did not differ

7   in any substantive way during throughout the period of the

8   class.

9             THE COURT:  Refresh my memory.  The class would begin

10  as of what year, again?

11            MR. FORGE:  2007.  2007.

12            THE COURT:  All right.

13            MR. FORGE:  And it did not differ in any significant

14  way throughout that entire time it was used at the live events,

15  so that's a red herring.

16            THE COURT:  All right.

17            MR. FORGE:  The common evidence here -- and I

18  understand why -- but the defense is determined to try to make

19  this case about something that it's not.  They want to make

20  this case about the differences and what people received

21  instead of what they were promised.

22        We are going to put on a very simple case that people were

23  promised an actual university, and they didn't get one.  And

24  they were promised an actual university with which Donald Trump

25  was integrally involved, and he wasn't.  It's that simple.

 1      And regardless of what they received -- and Ms. Jensen

 2  chides me for my simplistic analogy, but it's like an

 3  autographed leather Michael Jordan basketball.  And people paid

 4  for a leather basketball autographed by Michael Jordan.

 5  Everybody gets their leather basketball, appears to have the

 6  name "Michael Jordan" written on it, and they put it in the

 7  display case, and they have it for years.  They enjoy it.  They

 8  like to bring people by and look at it.

 9      And as it turns out, it wasn't autographed by Michael

10  Jordan.  They were cheated.  It wasn't that.

11      Now, that doesn't mean -- it actually was signed by

12  hundreds of different people with different names, but they all

13  had one thing in common; they weren't Michael Jordan.

14      We are not going to put on a case, Your Honor, about the

15  individual qualifications of these experts, because they all

16  had one common thread:  Not a single one of them was hand

17  picked by Donald Trump.

18          THE COURT:  How do you respond to the argument that

19  we in fact do have at least six or seven professors, one from

20  Stanford, that wrote the on-line program --

21          MR. FORGE:  Exactly.

22          THE COURT:  -- who was hand picked, and they

23  indicated he was used for about four years?

24          MR. FORGE:  That's another way the defense counsel

25  are trying to make this case about something it is not.  Those

1    are instructors for webinars, for online training.  They are

2    not live-event instructors.

3        I defy defense counsel -- Your Honor has seen how many

4    forests were felled by the briefing in this case.  I defy them

5    to come forward with a single instructor for a live event that

6    was interviewed by Donald Trump, that ever met Donald Trump, or

7    that Donald Trump hand selected.  There is not one.  There is

8    not one.

9            THE COURT:  And then let me ask, there was the

10   argument that to the extent that the 90-minute program is of

11   great consequences, because that's where a number of

12   representations -- alleged misrepresentations were made, that

13   the plaintiffs have problems because there were a whole slew of

14   individuals that you are proposing to place in this class that

15   did not attend the 90-minute program.  How do you spend?

16           MR. FORGE:  First of all, I disagree there's a whole

17   slew of people that didn't attend it.

18           THE COURT:  Was there a handful?

19           MR. FORGE:  Even if there's a handful, the bottom

20   line is that video was used throughout the entire period on the

21   website.  That video was on YouTube.  There's nothing to refute

22   that, Your Honor.  And most importantly --

23           THE COURT:  But to the extent that it was on YouTube

24   and available in the alternate methods, you are not asserting

25   every plaintiff would have had occasion to view this video on

1    the internet or on YouTube?

2         MR. FORGE:  We are asserting that that was what was

3    put out there by defendants for everyone to see.  I am not

4    asserting everyone saw it because they don't need to actually

5    see the video because -- the video is very important.  And if

6    we make this case just about -- as Your Honor suggested, if it

7    was a single class for people who attended the preview

8    seminars, we would still have a class action.  There's no

9    question about that.  And there's no question that those people

10   would have seen the videos.  That is one very easy way to

11   define the class:  People who attended the video, and obviously

12   paid for additional upsells afterwards.

13        THE COURT:  Would that be the way to get around what

14   is otherwise argued are these different variations; that is,

15   that you had some people that bought into the Trump program

16   through these tax and lien programs, and others that came in

17   through other entrances?

18        MR. FORGE:  Your Honor, it certainly -- yes, it would

19   get around that altogether.  But there's two other bases to get

20   around that argument that aren't unique to the video.

21        First and foremost -- again, it's a simple case.  Trump

22   University, the name itself, is a lie.  This is not -- they

23   were not told by the New York -- strike that.

24        It's not about "they."  Donald Trump was not told by the

25   New York State Education Department to stop representing it was

 1    an accredited university.  The New York State Education

 2    Department specifically wrote Donald Trump individually and

 3    told him, "I must ask you to discontinue the use of the name

 4    Trump University."  In that letter, they explain why it is so

 5    utterly deficient to qualify as a university.

 6         Just their use of that name -- everybody, in every single

 7    seminar, no matter what they want to point to, everyone paid

 8    Trump University.  Everyone signed up for Trump University.

 9    That, in and of itself, was frankly a lie.  It just was.  And

10    that was -- that is underlying every single person who paid a

11    penny.

12         So the name alone gets the job done.  But beyond the name,

13    Your Honor -- and this gets to the point, the defense points to

14    their Exhibit 39.

15         Let me quote you from their papers.  This is their

16    opposition brief, page 10.  This is defendants saying --

17    talking about 90-minute previews -- "None contained any

18    purported misrepresentations other than two making reference to

19    Mr. Trump's hand-picked experts.  The same is true of TU's nine

20    much more representative PowerPoint exhibits for the three-day

21    basic seminar and for some advanced workshops."

22         That's page 10 of the opposition, citing Exhibit 39.

23         Defendants themselves say the PowerPoints, Exhibit 39, are

24    much more representative.

25         Your Honor, this is -- at page 2 of that -- page 2 -- page

1 of the PowerPoint, talks about Donald Trump being -- his

importance to the program.  But page 2, specifically

represents -- this is again what the defendants say is more

representative.

     "What makes Trump University different from all others?"

Very first one of the more representative PowerPoint, "The

founders hand pick each instructor."

     That's the more representative PowerPoint.  More

importantly, though, Your Honor, more substantively, the themes

of Donald Trump's integral involvement, and this being a

university, they have not pointed to a single ad.  They cannot

present Your Honor with a single presentation that did not

contain those two themes.

          THE COURT:  All right.  And with that, I am going to

have to conclude this hearing because we have a 3:30 matter as

well.  And I think I have given you an hour and a half, and

that, under the circumstances, will have to be sufficient.

          MR. SCHNEIDER:  Can I give you an exhibit number?  He

said, "I defy Mr. Schneider to show" --

          THE COURT:  He did defy you.  Do you have a response?

          MR. SCHNEIDER:  Yes.

     If the Court would look at Defense Exhibit 45, starting on

page 5709, it lists the speakers all the way down the column.

And the Court will see Childers, Eldred, Eldred, Childers.

Those are the ones that met with Mr. Trump.

1        He talked about curriculum.  Eldred also wrote the online,

2   but then he became a teacher in the classroom, also a mentor.

3   So counsel threw down the gauntlet, but there it is.  They did

4   it through '07, and Mr. Childers for four years.

5            THE COURT:  Thank you, Counsel.  I expect that you

6   know that we will be taking this matter under submission, and

7   issue a ruling hopefully not in the too-far-distant future.

8            ALL:  Thank you, Your Honor.

9        (End of proceedings at 3:34 p.m.)

10                            -o0o-

11                   C-E-R-T-I-F-I-C-A-T-I-O-N

12

13        I hereby certify that I am a duly appointed,

14   qualified and acting official Court Reporter for the United

15   States District Court; that the foregoing is a true and correct

16   transcript of the proceedings had in the aforementioned cause;

17   that said transcript is a true and correct transcription of my

18   stenographic notes; and that the format used herein complies

19   with rules and requirements of the United States Judicial

20   Conference.

21            DATED:  November 12, 2013, at San Diego,

22   California.

23

24                            /s/  Chari L. Possell

25                            _____
                              Chari L. Possell
                              CSR No. 9944, RPR, CRR