ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
THOMAS R. MERRICK (177987)
tmerrick@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
625 Broadway, Suite 1000
San Diego, CA 92101
Telephone: 619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiffs and Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> TRUMP UNIVERSITY, LLC, et al., <br><br> Defendants. | No. 3:10-cv-0940-GPC(WVG) <br><br> <u>CLASS ACTION</u> <br><br> PLAINTIFF/COUNTER DEFENDANT MAKAEFF'S SUPPLEMENTAL BRIEF REGARDING SPECIAL MOTION TO STRIKE DEFENDANT/ COUNTERCLAIMANT TRUMP UNIVERSITY'S COUNTERCLAIM PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §425.16 |

[Caption continued on following page.]

JUDGE:   Hon. Gonzalo P. Curiel
DATE:    March 28, 2014
TIME:    1:30 p.m.
CTRM:    2D (Schwartz)

**[REDACTED]**

916694_1

1 | TRUMP UNIVERSITY, LLC,    )

2 |                  Counterclaimant, )

3 |      vs.           )

4 | TARLA MAKAEFF, et al.,    )

5 |              Counter defendants. )

1

2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................. 1

II.   PROCEDURAL HISTORY ............................................................. 3

III.  STATEMENT OF FACTS ............................................................... 4

IV.   TRUMP UNIVERSITY HAS NOT, AND CANNOT, MEET ITS
      BURDEN TO SHOW THAT MAKAEFF MADE HER
      STATEMENTS WITH ACTUAL MALICE ...................................... 5

      A.   Actual Malice Is a Demanding Standard ............................... 5

      B.   The Ninth Circuit Has Largely Rejected Trump University's
           Arguments that Makaeff Had Actual Malice ......................... 7

           1.   Makaeff's "Reviews" Do Not Prove Actual Malice ............ 7

           2.   Makaeff's Refund Request Does Not Prove Actual
                Malice ....................................................................... 8

           3.   A Purported Failure to Investigate Does Not Prove
                Actual Malice ............................................................ 9

           4.   Makaeff's Financial Woes Do Not Prove Actual Malice ........ 10

      C.   There Is No Clear and Convincing Evidence that Makaeff Made
           the Alleged Statements with Actual Malice ......................... 11

           1.   "Fraudulent Business Practices," "Deceptive Business
                Practices," "Outright Fraud", and "Fraudulent Business
                Practices Utilized for Illegal Material Gain"
                (Counterclaim ¶¶22(a), (b), (h), (l)) .......................... 13

           2.   "Illegal Predatory High Pressure Tactics" (Counterclaim
                ¶22(c)) ..................................................................... 15

           3.   "Business Practices Are Criminal" (Counterclaim ¶22(d)) ..... 15

           4.   "Clear Practice of Personal Financial Information Fraud"
                (Counterclaim ¶22(e)) ............................................... 16

           5.   "Illegal to Bait and Switch" (Counterclaim ¶22(f)) ............ 16

           6.   "[Like] a Brainwashing Scheme" and "Brainwashing"
                (Counterclaim ¶¶22(g), 23(c)) .................................... 17

           7.   "Grand Larceny" (Counterclaim ¶22(i)) ........................ 18

           8.   "Identity Theft" and "Unsolicited Taking of Personal
                Credit and Trickery into Opening Credit Cards Without

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Page**

My Approval or Understanding" (Counterclaim ¶¶22(j), (k)) .......................................................................................... 20

9.   "Felonious Teachings" and "Outright Criminal" Teachings (Counterclaim ¶¶22(m), (n)) ................................. 22

10.  "Neurolinguistic Programming and High Pressure Sales Tactics Based on the Psychology of Scarcity" (Counterclaim ¶22(o)) ............................................................... 23

11.  "Unethical Tactics" (Counterclaim ¶22(p)) ............................ 23

12.  "Gargantuan Amount of Misleading, Fraudulent, and Predatory Behavior" (Counterclaim ¶22(q)) ............................ 23

13.  "Blatant Lies" (Counterclaim ¶23(a)) ..................................... 24

14.  "Fraudulent and Misleading Tactics" (Counterclaim ¶23(b)) .................................................................................... 25

V.   CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Annette F. v. Sharon S.*,
119 Cal. App. 4th 1146 (2004)..................................................................... 19, 22

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984) ...................................................................................... 6, 19

*Greenbelt Coop. Publ'g. Ass'n v. Bresler*,
398 U.S. 6 (1970) ................................................................................................ 11

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .............................................................................................. 6

*Hinojos v. Kohl's Corp.*,
718 F.3d 1098 (9th Cir. 2013)............................................................................ 15

*Hustler Magazine v. Falwell*,
485 U.S. 46 (1988) ................................................................................................ 7

*Kashian v. Harriman*,
98 Cal.App.4th 892, 120 Cal. Rptr. 2d 576 (2002)............................................ 18

*Makaeff v. Trump Univ., LLC*,
715 F.3d 254 (9th Cir. 2013)......................................................................*passim*

*Makaeff v. Trump Univ., LLC*,
736 F.3d 1180 (9th Cir. 2013)..................................................................... 1, 2, 5

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ................................................................................................ 11

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ......................................................................................... 2, 6

*Old Dominion Branch No. 496 v. Austin*,
418 U.S. 264 (1974) .............................................................................................. 7

*Roe v. Doe*,
No. C 09-0682 PJH, 2009 U.S. Dist. LEXIS 59440
(N.D. Cal. June 30, 2009)................................................................. 6, 11, 18, 19

| | Page |
|---|---|

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) ........................................................... 6

*Standing Comm. v. Yagman,*
   55 F.3d 1430 (9th Cir. 1995) ............................................ 11

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,*
   330 F.3d 1110 (9th Cir. 2003) .......................................... 11

**STATUTES, RULES AND REGULATIONS**

18 United States Code
   §1028(a)(7) ........................................................................ 20

California Code of Civil Procedure
   §425.16 ........................................................................... 1, 5
   §425.16(a) ........................................................................... 3
   §425.16(c)(1) ...................................................................... 4

California Penal Code Code
   §484(a) ............................................................................... 18
   §487(a) ............................................................................... 18
   §490a .................................................................................. 18
   §530.5(a) ............................................................................ 20

**SECONDARY AUTHORITIES**

Robert D. Sack,
   *Sack on Defamation* (4th ed. 2013)
   §5:5.1 ................................................................................. 19

Rodney A. Smolla,
   *Law of Defamation* (2013)
   §3:84 .................................................................................. 19

## I.    INTRODUCTION

After taking all the money Tarla Makaeff had, Trump University[1] threatened to take all the money she would ever have.  The Honorable Kim McLane Wardlaw and Consuelo Maria Callahan of the Ninth Circuit put it best when they observed that, "Trump University's counterclaim was obviously designed to overwhelm Makaeff by making it more burdensome and expensive for her to pursue her deceptive business practices claims against Trump University."  *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1185 (9th Cir. 2013) ("*Trump II*") (Wardlaw, J. and Callahan, J., concurring from denial of en banc rehearing, with Fletcher, J. and Gould, J., joining concurrence).

Makaeff moved to strike the counterclaim as a "Strategic Litigation Against Public Participation" (a "SLAPP" suit).  Makaeff argued that Trump University was a public figure who must prove her statements were both false (they were not) and she made them with "actual malice" (she did not).  The Honorable Irma E. Gonzalez did not see Trump University as a public figure and denied Makaeff's motion without determining whether Trump University established actual malice.  Dkt. Nos. 24, 40.

The Ninth Circuit reversed, holding "Trump University is a limited [purpose] public figure, and, to prevail here, must demonstrate that Makaeff acted with ***actual***

---

[1]    Another fatal flaw in Trump University's counterclaim is it was not even capable of being defamed as damages are an element of a defamation claim, and Trump University cannot allege any recoverable damages because its entire existence was illegal.  In fact, although "Trump University, LLC" is the entity that purported to counter sue Makaeff, its legal name was "Trump Entrepreneur Initiative LLC" as of May 21, 2010.  *See* Exs. 11 & 13.  Trump University was forced to change its name after the New York Department of Education ("NYSED") wrote to Trump on March 30, 2010, demanding that he "immediately" stop using the title "university," which he and others at Trump University had done illegally for five years, despite an earlier 2005 warning from the NYSED.  *See* Exs. 10 & 12.  Because the operation of "Trump University" was always illegal, all of its revenues were proceeds of unlawful activity.  Therefore, any effort to recover its lost revenues is nothing more than an effort to recover lost proceeds of unlawful activity.  A drug dealer whose sales went down after a someone called him a murderer would hardly have a viable claim for damages.  Neither does "Trump University."  Here, and throughout, "Ex." references are to the Declaration of Rachel L. Jensen in Support of Makaeff's Supplemental Brief Regarding Special Motion to Strike Trump University's Counterclaim Pursuant to California Code of Civil Procedure §425.16 ("Jensen Decl."), filed concurrently herewith, unless otherwise noted.

*malice*" under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 258 (9th Cir. 2013) ("*Trump I*").[2]  The court remanded the case for the purpose of determining "whether Trump University has a reasonable probability of proving, by clear and convincing evidence, that Makaeff made her critical statements with actual malice." *Id.* at 271. "If, upon remand, Trump University cannot make such a showing, it has no possibility of success on the merits and the district court should grant Makaeff's special motion to strike." *Id.* at 265.

Trump University has not, and cannot, meet this "***demanding standard***" of proving actual malice. *See Trump II*, 736 F.3d at 1185 n.5 (Wardlaw & Callahan, JJ., concurring).  There is no clear and convincing proof of actual malice for one simple reason:  Makaeff believed her statements to be true.  She still does.  And she is far from alone.  Each of Makaeff's specific statements is addressed below, but they are all symptoms of one alleged disease:  Trump University was a scam.  As Trump University itself has argued to this Court, that is the essence of a complaint that the Attorney General for the State of New York ("NY AG") filed nearly four years after Makaeff made her allegedly defamatory statements.  If Makaeff acted with actual malice, so must have the NY AG – after a years-long investigation.  Although Makaeff lacked the NY AG's investigative resources, she had a basis for her allegations that the NY AG lacked: her personal experiences with Trump University.

Makaeff's personal experiences culminated with a letter she received from the Orange County District Attorney on June 18, 2009, warning her that she could face jail time for her using the bandit sales signs that Trump University had taught her to use. The Orange County District Attorney's ("DA") letter pulled back the curtain for Makaeff and allowed her to begin to realize that she had been had.  She spent time reflecting on her experiences and doing her own investigation by gathering information from other former students, talking to friends and family, and doing

---

[2]  Here, and throughout, emphasis is added, and internal citations and quotation marks are omitted unless otherwise noted.

1  online research. She then took steps to expose the scam and recover her money.

2      Although Trump University's counterclaim is limited to certain phrases

3  Makaeff used, the counterclaim fails to acknowledge that Trump University plucked

4  those phrases from lengthy letters that contained hyperbolic opinions and provided

5  enough context to allow the readers make their own assessment. In fact, Makaeff's

6  letters even disclosed Trump University's response to her complaints, including the

7  alleged high ratings she had given in her evaluations. In doing so, Makaeff's letters

8  made it perfectly clear that there were two sides to this story. This is not malice. This

9  is an earnest individual who sincerely believed what she wrote and had good reason

10 for her beliefs. Trump University has not, and cannot, show otherwise. Not by a

11 preponderance of the evidence and certainly not by clear and convincing evidence.

12 Accordingly, Makaeff respectfully requests that the Court grant her motion to strike.

13 **II.    PROCEDURAL HISTORY**

14     The road to resolution of Makaeff's motion to strike has been long and arduous,

15 despite the anti-SLAPP statute's intent to provide immunity from lawsuits brought to

16 chill free speech. *See* Cal. Code Civ. P. §425.16(a). As this Court did not preside

17 over the prior proceedings, a recap is appropriate.

18     Within weeks of filing Makaeff's suit (but not before), Trump University filed a

19 million-dollar counterclaim against Makaeff for defamation. Dkt. No. 4. On June 30,

20 2010, Makaeff filed an anti-SLAPP motion as her statements were protected free

21 speech. Dkt. No. 14. After briefing and argument, the Court denied the motion on the

22 basis Trump University was not a public figure and thus not required to prove actual

23 malice. Dkt. Nos. 15, 17-18, 20-21, 24. Makaeff filed a motion for reconsideration,

24 which the Court denied. Dkt. Nos. 31-32, 34-35, 40.

25     On January 3, 2011, Makaeff filed a notice of appeal.[3] Dkt. No. 43. On

26 May 26, 2011, Makaeff filed her opening brief and request for judicial notice ("RJN")

27

28 [3] Trump University moved to stay the entire action pending the appeal, which Plaintiffs opposed, arguing that any stay should be limited to the counterclaim. Dkt.

1   with the Ninth Circuit.  App. Dkt. Nos. 11-12.  On June 2, 2011, the Consumer

2   Attorneys of California ("Consumer Attorneys") and the American Civil Liberties

3   Union ("ACLU") of San Diego and Imperial Counties filed *amici curiae* briefs.  App.

4   Dkt. Nos. 17-18.  On June 8, 2011, Trump University opposed the RJN, and Makaeff

5   filed her RJN reply on June 15th.  App. Dkt. Nos. 26-27.  On August 15, 2011, Trump

6   University filed its answering brief.  App. Dkt. No. 28.  On September 27, 2011,

7   Makaeff filed her reply brief and a supplemental RJN, which Trump University

8   opposed on October 5, 2011.  App. Dkt. Nos. 35-37.

9          On January 18, 2012, the Ninth Circuit, through Chief Judge Kozinski and

10  Judges Wardlaw and Paez, heard argument.  On April 17, 2013, the Court, in a

11  published opinion by Judge Wardlaw, reversed denial of the anti-SLAPP motion on

12  the basis Trump University was a limited-purpose public figure and remanded to this

13  Court for the limited purpose of deciding "whether Trump University has a reasonable

14  probability of proving, by clear and convincing evidence, that Makaeff made her

15  critical statements with actual malice."  App. Dkt. No. 60-1.  On April 30, 2013,

16  Trump University filed a petition for rehearing en banc, to which Makaeff responded

17  on June 13, 2013.  App. Dkt. Nos. 61, 65.  On November 27, 2013, the Ninth Circuit

18  denied Trump University's petition, and the mandate followed on December 10th.[4]

19  **III.   STATEMENT OF FACTS**

20         Makaeff made her allegedly defamatory statements in a series of letters that she

21  sent to Bank of America ("BofA") and the Better Business Bureau ("BBB"), starting

22  approximately three months after she received a June 18, 2009 letter from the DA,

23  warning her that the use of bandit signs (a practice taught at Trump University) was a

24

_____

25  Nos. 46, 48.   On February 11, 2011, the Court stayed Trump University's
    counterclaim pending the outcome of the appeal.  Dkt. No. 58.

26  [4]   App. Dkt. Nos. 73-74.  On December 10, 2013, Makaeff filed an unopposed
27  motion to transfer the issue of her appellate attorneys' fees and costs to this Court to
    adjudicate if and when Plaintiff's motion is granted pursuant to Cal. Code Civ. P.
28  §425.16(c)(1).  App. Dkt. No. 75.  On December 20th, the Ninth Circuit granted her
    request.  App. Dkt. No. 76.

1   crime in the State of California. Makaeff Decl., ¶3[5] & Jensen Decl., Exs. 1-2.

2        Makaeff's letters themselves contain explanations for her statements and reflect

3   her opinions as a distraught consumer. *Id.* Beyond those explanations, Makaeff based

4   her statements on her personal experiences with representatives of Trump University

5   and its many related entities. *Id.* She spent time investigating the statements before

6   making them. *Id.* For example, she spoke to other students and reviewed students'

7   complaints posted online at "rip off" reports, the BBB website, complaintsboard.com,

8   and pissedconsumer.com, among other possible sites. *Id.* She also talked to loved

9   ones, friends, and attorneys and did online research. None of her statements was, to

10   her knowledge and recollection, inconsistent with her experiences, the grievances of

11   other students, or feedback from others. *Id.* To the contrary, based on her experience

12   and investigation, she believed, and still believes, in the truth of her statements. *Id.*

## IV. TRUMP UNIVERSITY HAS NOT, AND CANNOT, MEET ITS BURDEN TO SHOW THAT MAKAEFF MADE HER STATEMENTS WITH ACTUAL MALICE

15        The narrow question on remand is whether Trump University has a reasonable

16   probability of proving, by clear and convincing evidence, that Makaeff made her

17   critical statements with actual malice. *Trump I*, 715 F.3d at 271. That, it cannot do.

### A. Actual Malice Is a Demanding Standard

19        Trump University faces the "demanding standard" of proving actual malice.

20   *Trump II*, 736 F.3d at 1185 n.5 (Wardlaw & Callahan, JJ., concurring). Trump

21   University has acknowledged this is a tough thing to prove. *See* Ex. 3, 8/4/10 Hearing

22   Tr. at 29:8-11 (Trump University counsel stated at the anti-SLAPP hearing: "I agree

23   it's a much tougher call to get inside of Miss Makaeff's head and know at the time

24   that she did not reasonably believe the statements that she was making were true.").

25        Trump University must prove Makaeff made her statements with "knowledge of

---

27 [5] "Makaeff Decl." refers to the Declaration of Tarla Makaeff in Support of
28 Supplemental Brief Regarding Special Motion to Strike Trump University's Counterclaim Pursuant to California Code of Civil Procedure §425.16, filed concurrently herewith.

1  their falsity or reckless disregard of their truth" at the time that the statements were

2  made. *Trump I*, 715 F.3d at 280. "[W]e have made clear that the defendant must have

3  made the false publication with a 'high degree of awareness of . . . probable falsity,' or

4  must have 'entertained serious doubts as to the truth of his publication.'" *Harte-*

5  *Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666-67 (1989). This demands

6  proof of actual malice with "convincing clarity." *Bose Corp. v. Consumers Union*,

7  466 U.S. 485, 514 (1984). "*To meet the clear and convincing standard, the evidence*

8  *must be such as to command the unhesitating assent of every reasonable mind.*"

9  *Roe v. Doe*, No. C 09-0682 PJH, 2009 U.S. Dist. LEXIS 59440, at *38 (N.D. Cal.

10  June 30, 2009). "This heightened standard of proof must be taken into account in

11  deciding a defendant's motion to strike a claim for defamation under [§] 425.16." *Id.*

12        Actual malice is a *subjective*, not an objective, standard. *See St. Amant v.*

13  *Thompson*, 390 U.S. 727, 731 (1968). As the Supreme Court has emphasized,

14  "reckless conduct is not measured by whether a reasonably prudent man would have

15  published, or would have investigated before publishing. There must be sufficient

16  evidence to permit the conclusion that the defendant in fact entertained serious doubts

17  as to the truth of his publication."[6]  *Id.*  And actual malice cannot be shown "merely

18  through a showing of ill will or malice in the ordinary sense of the term." *Harte-*

19  *Hanks Commc'ns*, 491 U.S. at 666-67. The Supreme Court has noted, "[t]he phrase

20  'actual malice' is unfortunately confusing in that it has nothing to do with bad motive

21  or ill will." *Id.* at 666 n.7; *see also Roe*, 2009 U.S. Dist. LEXIS 59440, at *13, *41

---

[6]  The Supreme Court has said the subjective standard of actual malice may be criticized as putting "a premium on ignorance, encourag[ing] the irresponsible publisher not to inquire, and permit[ing] the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." *Id.* "But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *Id.* at 731-32. And, "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *Id.* at 732. This gives the "breathing space" that is needed to protect the sanctity of free speech. *N.Y. Times*, 376 U.S. at 271-72.

1  ("[I]ll-will, personal spite or bad motive . . . are insufficient to demonstrate the

2  requisite malice required to withstand defendants' special motion to strike."); *Old*

3  *Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 281 (1974) ("[I]ll will toward the

4  plaintiff, or bad motives, are not elements of the *New York Times* standard."). The

5  First Amendment extends even to speech that is "slashing and one-sided." *Hustler*

6  *Magazine v. Falwell*, 485 U.S. 46, 54 (1988).

7  **B.    The Ninth Circuit Has Largely Rejected Trump University's Arguments that Makaeff Had Actual Malice**

8  Though the Ninth Circuit remanded the final determination of actual malice to

9  this Court, the Court weighed in on the arguments put forward by Trump University.

10  Specifically, Trump University contended that the following showed actual malice:

11  (1) Makaeff previously wrote positive evaluations and made positive statements on

12  videotape; (2) Makaeff had written an earlier email to Trump University where she did

13  not make the statements; (3) the statements were not based on personal experience, but

14  criticisms Makaeff read online; and (4) Makaeff's own financial woes showed that her

15  statements were not based on a good faith belief in the veracity of her statements. The

16  Ninth Circuit found these arguments unpersuasive.

17  **1.    Makaeff's "Reviews" Do Not Prove Actual Malice**

18  The Ninth Circuit rejected Trump University's argument Makaeff had given

19  positive "reviews" of Trump University, explaining:  "[I]t is plausible that Makaeff

20  sincerely believed in Trump University's offerings when she submitted her written

21  and videotaped testimonials." *Trump I*, 715 F.3d at 271.  The Court continued: "The

22  gist of Makaeff's complaint about Trump University is that it constitutes an elaborate

23  scam.  As the recent Ponzi-scheme scandals involving onetime financial luminaries

24  like Bernard Madoff and Allen Stanford demonstrate, victims of con artists often sing

25  the praises of their victimizers until the moment they realize they have been fleeced."

26  *Id.*  As such, "Makaeff's initial enthusiasm for Trump University's program is not

27  probative of whether she acted with actual malice."  *Id.*

28

1    That is exactly right.  When Makaeff submitted the reviews and responded to

2    questions posed on video, she was still hoping to receive what had been promised, and

3    she did not want to offend or risk alienating the same Trump University personnel who

4    were promising to help her.  *See, e.g.*, Dkt. No. 17-2 at 2-3 (7/26/10 Makaeff Decl., ¶¶4,

5    6).  It was not until the DA contacted Makaeff on June 18, 2009, that she realized

6    Trump University had not only broken promises but was actually teaching students to

7    engage in criminal conduct.  *See, e.g.*, Dkt. No. 17-2 at 5 (7/26/10 Makaeff Decl., ¶12).

8    Moreover, Makaeff acknowledged her prior reviews in her letter to BofA, but explained

9    why they did not prove she was a satisfied customer.  *See* Ex. 1 at 10 (BofA letter); Dkt.

10   No. 17-2 at 3 (7/26/10 Makaeff Decl., ¶6).  Makaeff's acknowledgment of her early

11   "positive reviews" is not consistent with Defendant's argument that Makaeff was lying.

12   Makaeff's "reviews" are not probative of actual malice.

        **2.    Makaeff's Refund Request Does Not Prove Actual
               Malice**

13

14      The Court was also skeptical of Trump University's argument that Makaeff's

15   "initial [April 13, 2009] email [to Trump University] omitted the complaints of Trump

16   University's alleged conduct that she later published to third parties," finding it

17   "proves little."  *Trump I*, 715 F.3d at 271.  The Court reasoned: "Makaeff's first email

18   to Trump University was a request for a refund.  It is possible that Makaeff chose to

19   take a more conciliatory tone at this early stage of their increasingly acrimonious

20   dialogue in the hopes of getting her money back."  *Id.*  The Court found that "the

21   district court may find that this initial email is consistent both with Makaeff's later,

22   supposedly defamatory statements, and her contemporaneous goal of persuading

23   Trump University to give her a refund."  *Id.*

24      Indeed, in her communications with Trump University in seeking a refund,

25   Makaeff did not want to alienate Trump University when she was asking for help.  It

26   was not until after she faced possible criminal charges for following what she believed

27   to be Trump University's teachings that she abandoned hope of Trump University

28

1   doing the right thing. *See, e.g.*, Dkt. No. 17-2 at 5 (7/26/10 Makaeff Decl., ¶12); *id.* at

2   2 (no contact with Trump University between June 18, 2009, when the DA contacted

3   Makaeff, until September 10, 2009 letters). Makaeff then began doing research,

4   reading online complaints, and consulted with others, including loved ones and

5   counsel, about what happened to her and steps to take. This process culminated in her

6   letters to BofA, then a complaint to the BBB, and finally, her complaints to regulators.

### 3.   A Purported Failure to Investigate Does Not Prove Actual Malice

7

8       The Ninth Circuit found unpersuasive Trump University's argument Makaeff

9   "republished the unverified complaints of anonymous third parties on the Internet."

10  *Trump I*, 715 F.3d at 271. Even "[i]f Makaeff was simply republishing a third party's

11  allegations, mere proof of her *failure to investigate* the veracity of such allegations

12  does not establish reckless disregard for the truth." *Id.* at 270. "Trump University

13  would then need to show obvious reasons to doubt the truthfulness of the original

14  speaker, or the accuracy of [her] statements." *Id.* at 270-71. The Ninth Circuit opined

15  that this Court could find "Makaeff's statements were not based wholly on the

16  anonymous Internet postings but were instead based on Makaeff's own educational

17  experience." *Id.* at 271. And, the fact "[t]hat Makaeff herself was disenchanted with

18  Trump University may explain why she would not think that critical postings of others

19  were inherently improbable." *Id.* "Nor would the circumstances of the Internet

20  postings necessarily give Makaeff obvious reasons to doubt them – the postings were

21  made on an Internet message board that offered no particular benefit to those who

22  published statements criticizing Trump University." *Id.*

23      The Ninth Circuit is again correct. Here, Makaeff has explained in sworn

24  declarations that her statements were based upon her own personal experiences, not the

25  anonymous internet postings of others. Dkt. Nos. 14-2 at 1 (6/30/10 Makaeff Decl., ¶4)

26  & 17-2 at 3 (7/26/10 Makaeff Decl., ¶7). That said, Makaeff also talked to other

27  students and researched other complaints online, and she found that these complaints

28

bolstered her own views.  Dkt. No. 17-2 at 2 (7/26/10 Makaeff Decl., ¶3).  Makaeff spoke to many people, including lawyers, visited complaint boards, and conducted research.  Makaeff Decl., ¶3.  Thus, far from being "inherently improbable," the evidence points to the reliability of third-party complaints *from Makaeff's perspective*.

### 4.   Makaeff's Financial Woes Do Not Prove Actual Malice

Discussing whether Makaeff's statements were protected free speech, the Ninth Circuit also expressed skepticism about Trump University's arguments that Makaeff's statements were all made in a desperate attempt to obtain a refund.  As the Court found, it was plausible that Makaeff was speaking out "with the goal of stopping Trump University from defrauding other consumers."  *Trump I*, 715 F.3d at 263. Indeed, Makaeff submitted a sworn declaration stating that she posted her opinions online "to alert other consumers of my opinions and experience with Trump University." Dkt. No. 14-2 at 2 (6/20/10 Makaeff Decl., ¶7); *see also  Trump I*, 715 F.3d at 263.  Similarly, the Ninth Circuit had "doubts" about Trump University's argument that Makaeff contacted the BBB "with purely private motives."  *Trump I*, 715 F.3d at 263.  Indeed, the BBB's mission is to provide consumers with information about businesses, not provide refunds.  *See id.*  And, "Makaeff's posts on anonymous third-party websites could not have resolved her private dispute with Trump University." *See id.*  As such, Trump University's contention that Makaeff must have had actual malice based on her anger and a desperate attempt to recoup tens of thousands of dollars taken from her are insufficient to meet its high burden.

Accordingly, all of Trump University's purported bases for finding actual malice have been called into serious question by the Ninth Circuit.  Thus, based on the record before it, prior to the appeal, this Court should find that Trump University has not, and cannot, meet its burden of showing with clear and convincing evidence that Makaeff made the alleged statements with actual malice and grant the motion.

**C.   There Is No Clear and Convincing Evidence that Makaeff Made the Alleged Statements with Actual Malice[7]**

In addition to confirming the Ninth Circuit's skepticism regarding Trump University's counterclaim in general, Makaeff's unrebutted explanations for each of her allegedly defamatory statements demonstrate that Trump University cannot establish a reasonable possibility, let alone the required ***probability***, of proving actual malice by clear and convincing evidence.

Trump University has the burden of pleading the alleged defamatory statements with particularity; that is, each statement must be specifically identified if not set forth verbatim in the counterclaim. *See Roe*, 2009 U.S. Dist. LEXIS 59440, at \*42-\*43 n.3 (where complaint made "a vague reference to other allegedly defamatory statements,"

---

[7]   For purposes of its malice analysis on remand, the Court may assume the statements were false. *Trump I*, 715 F.3d at 270 n.13. "Because a showing of actual malice necessarily depends on the falsity of the statements at issue, the district court may assume the falsity of the statements and proceed directly to the actual malice inquiry.   If it concludes that Trump University cannot establish a reasonable probability of proving actual malice, ***it need not inquire whether the statements were actually false*** for purposes of ruling on the motion to strike." *Id.*

But, here, there is ample evidence that many, if not all, of Makaeff's statements were true.  For example, there were hundreds of other complaints online and news stories concerning the alleged practices, the BBB gave Trump University a D-minus rating, the NY Department of Education reprimanded Trump University for using the title "University," and the NY AG sued several Trump entities. Dkt. No. 122-2 (Eck Decl. re Class Cert.), Ex. 13, Ex. 17 at 159:3-160:14, Exs. 52-53; Dkt. No. 195-1 (Jensen Decl. re Class Cert. Reply), Ex. 67 at TU 129823-24, TU 129850-51, Ex. 68, Ex. 70. Thus, Makaeff is in no way alone in her belief that Trump University engaged in fraudulent and unlawful conduct.

Moreover, Makaeff's letters explain the bases for her statements.   Thus, her statements are constitutionally protected opinions. *See Greenbelt Coop. Publ'g. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of the term "blackmail" in articles reporting on public debates at city council not reasonably understood as charging plaintiff with a crime); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1117 (9th Cir. 2003) (Kozinski, J., dissenting from denial of en banc rehearing) ("'Where a publication sets forth the facts underlying its statement of opinion . . . and those facts are true, the Constitution protects that opinion from liability for defamation.'") (quoting *Standing Comm. v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995)). "The logic behind the rule is straightforward and unassailable:  When a publisher prints an opinion but doesn't state the basis for it, the reader may infer a factual basis that doesn't exist. But when a publisher accurately discloses the facts on which he bases his opinion, the reader can gauge for himself whether the factual basis adequately supports the opinion." *Suzuki Motor Corp.*, 330 F.3d at 1117 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20-21 (1990)).  Because this issue is outside the scope of the Ninth Circuit's remand, if necessary, Makaeff will pursue summary judgment on it.

1   non-movant failed to "sufficiently allege actual malice or produce any evidence" to
2   withstand the motion to strike).  Here, Trump University's counterclaim did not
3   specifically identify the documents in which Makaeff's allegedly defamatory
4   statements were contained.  In the prior briefing on the anti-SLAPP motion, Trump
5   University submitted Makaeff's September 10, 2009 letter to Bank of America
6   ("BofA") and her complaint to the Better Business Bureau ("BBB").  *See* Exs. 1-2.
7   Though Trump University's counterclaim vaguely references internet postings, it did
8   not submit any as exhibits and omitted mention of internet postings on appeal.  *See*
9   *Trump I*, 715 F.3d at 263 n.5.  As such, the statements at issue are limited to the BofA
10  letter and BBB complaint.

11       Also, the counterclaim contains allegations of certain snippets of statements
12  without including any context.  But, viewing the letters in full, it is clear that Makaeff
13  was not just referring to Trump University, but at times, related entities which were
14  indistinguishable in her mind at that time.  This is because, Makaeff believed a number
15  of business names, including Trump University, Trump University Coaching, Trump
16  Institute, Profit Publishing Group, and Prosper, Inc., referred to either one company or
17  interrelated entities.  Thus, she used the company names interchangeably at times.  For
18  purposes of consistency with Makaeff's statements, the term "Trump Entities" refers to
19  these entities here, too, unless otherwise indicated.  *See* Makaeff Decl., ¶2.

20       For example, Makaeff believed "Trump University Coaching" was part of
21  Trump University for several reasons: (1) both entities' names contain the words
22  "Trump University"; (2) payment was made to "Trump University"; (3) Trump
23  University Coaching personnel, Justin Kramer, said he was with "Trump University's
24  Educational Department" (Ex. 4 (TU-MAKAEFF5029 at 30)); (4) Trump University
25  Coaching shared the same name, logo, coat of arms and company branding (Ex. 5
26  (TU-PLTF02078)); (5) there was a link to "Trump University Coaching" on the
27  Trump University website (Ex. 7 (Makaeff Dep. Vol. IV at 21:5-10)); and (6) the
28  Trump Entities routinely promoted each other to students.  *See* Makaeff Decl., ¶2.

Thus, it is eminently reasonable that Makaeff believed Trump University Coaching (aka Prosper) was part of Trump University in making her statements.

1.   **"Fraudulent Business Practices," "Deceptive Business Practices," "Outright Fraud", and "Fraudulent Business Practices Utilized for Illegal Material Gain" (Counterclaim ¶¶22(a), (b), (h), (l)[8])**

Ms. Makaeff had many reasons for believing Trump University engaged in fraudulent and deceptive business practices. First, Trump University did not deliver on promises that it was a "university" teaching Mr. Trump's real estate secrets. Makaeff Decl., ¶5. Though Makaeff believed she would learn from Trump through his world-class "handpicked" "professors," the instructors were high-pressure salespeople who constantly tried to sell her more programs. *Id.* For example, Trump University said the 3-day seminar would provide the real estate instruction she needed, but then at the 3-day seminar, stated she needed the $34,995 Gold Elite program. *Id.* Even after purchasing the $34,995 program, Makaeff was subjected to constant upselling at retreats. *Id.* Trump University personnel told students, including Ms. Makaeff, to raise their credit card limits so they could invest in real estate, but then turned around and sold students the $34,995 program with that credit. *Id.*

In addition, Trump University's James Harris pressured Makaeff and the other students into taking advantage of the "one-time" price of $34,995 for the Gold Elite – a special deal for "today only" – when in fact, it was the standard price. These were false representations as reflected in the PlayBook. Ex. 6 at TU 52938-39.

Further, Trump University obtained Ms. Makaeff's personal financial information under the guise of helping her plan for investing, when in reality, it surreptitiously used the information to assess which programs Ms. Makaeff could afford. Makaeff Decl., ¶5. That Makaeff's statement was true is corroborated by

---

[8]   "Counterclaim ¶__" refers to allegations of the Counterclaim of Defendant and Counterclaimant Trump University, LLC, filed on May 26, 2010 (Dkt. No. 4). However, to the extent that the Counterclaim misquotes the statement, Plaintiff refers to the actual quote used in the BofA and BBB letters. *See generally* Exs. 1-2.

1  Trump University's PlayBook, which demonstrates that ████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████. Ex. 6 at TU

4  52969 (████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████), TU 53061-63.

7       Trump University also misrepresented its programs, including the Gold Elite

8  mentorship program.  Makaeff bought a one-year mentorship that turned out to be

9  largely a 3-day excursion to drive around looking at properties and going to Home

10  Depot, which she could have done for free with a real estate agent. Makaeff Decl. ¶5.

11       And, though it called itself a "university," Trump University preyed on the

12  vulnerabilities of students, like Makaeff, in the great recession and ████████████

13  ████████████████████████████████. Ex. 6 at TU 52969, 53061,

14  53063.  Makaeff's belief was accurate as these hard sale tactics are made manifest in

15  the PlayBook. *Id.* at TU 53063 (████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████) & TU 53064-68.

21       Finally, Trump University's personnel made grandiose promises about what

22  Makaeff and other student-victims would learn and how easy it would be to recoup

23  their money so that the steep purchase price would be a "wash" and students would

24  gain a significant income stream, but turned around afterwards and claimed to Ms.

25  Makaeff there was no guarantee based upon the fine print. Makaeff Decl., ¶5.

26       Again, it is not the Court's task to determine whether Trump University did, in

27  fact, engage in fraudulent or deceptive business practices.  Rather, the question is

28  whether Trump University is likely to be able to prove, by clear and convincing

1    evidence, Makaeff did not genuinely believe it did.  In light of the abundant evidence
2    upon which Makaeff based these statements, there is a clear absence of malice here.

### 2.    "Illegal Predatory High Pressure Tactics" (Counterclaim ¶22(c))

The basis for Ms. Makaeff's statement was that Trump University pressured
students, including her, to use the new credit that she supposedly obtained in order to
buy real estate instead to buy the Gold Elite program at a "one-time" price of $34,995.
Makaeff Decl., ¶5.  Instructor James Harris urged Makaeff and other students to act
immediately, saying this special deal was available for "today only," and they could not
take advantage of that "deal" after leaving the seminar.  *Id.*, ¶6.  These were false
representations because, in truth, it was the standard price for the program.  *See* §IV.C.1.

Ms. Makaeff believed – and still believes – that using false representations to
create a false sense of urgency in order to convince someone to buy something is
illegal.  Makaeff Decl., ¶6.  Makaeff's belief is accurate.  *See, e.g., Hinojos v. Kohl's
Corp.*, 718 F.3d 1098, 1101, 1107 (9th Cir. 2013) ("Retailers, well aware of
consumers' susceptibility to a bargain, therefore have an incentive to lie to their
customers by falsely claiming that their products have previously sold at a far higher
'original' price in order to induce customers to purchase merchandise at a purportedly
marked-down 'sale' price.").  Therefore, her statement regarding illegal high-pressure
sales tactics was not malicious.

### 3.    "Business Practices Are Criminal" (Counterclaim ¶22(d))

Ms. Makaeff believed that the Trump Entities engaged in practices that were
"criminal in nature" for the reasons detailed in her BofA letter.  Makaeff Decl., ¶7.
For example, Makaeff understood that the Trump Entities' practices were criminal "as
they fall under the Fraud statutes of all states and the Federal government."  *Id.*  In
other words, her lay understanding was that fraud is a crime and thus the practices that
she believed to be fraudulent (for example, those described above), were also
criminal.  *Id.*  In addition, Ms. Makaeff found out from the DA on June 18, 2009, that

1   the bandit signs Trump University taught her to use were a misdemeanor in California

2   exposing her to potential jail time. *See id.* & Exhibit 1.  Makaeff's belief was accurate

3   as fraud may be prosecuted criminally, and the bandit sign practice is illegal in

4   California. *Id.*  There is no malice here.

### 4.  "Clear Practice of Personal Financial Information Fraud" (Counterclaim ¶22(e))

6   Makaeff believed that Trump University was engaging in financial information

7   fraud by obtaining her and other students' personal financial information under the

8   guise of helping them plan for investing when, in reality, Trump University misused

9   that information without her permission to assess which program she could afford and

10  push that on her with hard sale tactics.  Makaeff Decl., ¶8.  Trump University asked

11  for information about Makaeff's income, assets, and liabilities at the 3-day seminar,

12  then Trump University representative, Tad Lignell, pulled Makaeff aside in the

13  hallway to go over her information in detail. *Id.*  Makaeff observed Trump University

14  personnel pulling other students aside to go over their financial information as well.

15  *Id.*  And after seeing Makaeff's information, Lignell said the $1,500 program was not

16  sufficient and she needed more knowledge to complete her real estate education, so

17  Makaeff was sold the $34,995 Gold Elite package. *Id.*

18  Makaeff's belief was accurate.  The PlayBook shows that this is exactly what

19  Trump University did, surreptitiously, with the profiles provided by students. §IV.C.1.

20  More importantly, for the Court's present purposes, Makaeff sincerely believed Trump

21  University engaged in personal financial-information fraud by obtaining such

22  information under false pretenses as to its purpose.  Again, there is no actual malice.

### 5.  "Illegal to Bait and Switch" (Counterclaim ¶22(f))

24  Based on research into California law, Makaeff believed Trump University

25  engaged in an "illegal bait and switch" by advertising that students would receive a

26  real estate education at the 3-day seminar, but then at the 3-day seminar, selling

27  Makaeff the $34,995 program as what she really needed, and even after that,

1  subjecting her to constant upselling.   Makaeff Decl., ¶9 & Exhibit 2 at TU-
2  MAKAEFF5600-01; *supra*, §IV.C.1.  Makaeff believed that these were illegal bait-
3  and-switch tactics because each time, Trump University's representatives had given
4  the impression that she would be purchasing a complete real estate education, but then
5  switched to tell her that she needed more.  *Id.*  Makaeff also believed Trump
6  University personnel "baited" her into increasing her credit limit for real estate
7  transactions, but then in the final hours of the 3-day seminar "switched" to persuading
8  her and other students to use that credit to buy the Gold Elite program.  Makaeff
9  Decl., ¶9.  Makaeff also thought it was a "bait and switch" that Trump University
10  personnel represented that, if she spent the $34,995 on the Gold Elite program, she
11  would make that money back quickly, but it made her go into debt instead.  *Id.*

12      Makaeff is not alone in believing that Trump University engaged in illegal bait-
13  and-switch practices.  In fact, as Trump University has raised previously, the NY AG
14  recently sued Trump and related entities, claiming they engaged in a bait and switch,
15  defrauding the students.  But again, more importantly, Makaeff sincerely believed that
16  Trump University engaged in an illegal bait and switch.  There is no actual malice.

### 6.  "[Like] a Brainwashing Scheme" and "Brainwashing" (Counterclaim ¶¶22(g), 23(c))

17

18      Makaeff's actual statement was:  "*I can only liken it* to a brainwashing
19  scheme."  Makaeff Decl., ¶10.  The reason why Makaeff likened Trump University's
20  tactics to a brainwashing scheme is because its instructors were so effective at high-
21  pressure sales and manipulating her into feeling like she *needed* Trump University to
22  succeed and to act fast or lose the opportunity of a lifetime.  *Id.*  Even worse, Trump
23  University personnel manipulated Makaeff into believing that, if she didn't take
24  advantage of the opportunity immediately, she was flawed in some way.  *Id.*

25      The tactics shown in the PlayBook corroborate Makaeff's opinion, as
26  ████████████████████████████████████████████████████████████
27  ███████████████████████.  §IV.C.1.
28

### 7.    "Grand Larceny" (Counterclaim ¶22(i))

Makaeff is not a lawyer and, in her BofA letter, she specifically stated that the "particulars on the law are for you to judge." Ex. 1 at 13; Makaeff Decl., ¶12. However, Makaeff's lay understanding of the term "grand larceny" was akin to "grand theft" and is committed when someone takes something of significant value, including money, from someone else without their consent or by tricking them into parting with their money or property. Makaeff Decl., ¶12. This definition is consistent with California law, which defines grand theft (or larceny) to include taking money exceeding $950. *See* Cal. Pen. Code §487(a) (grand theft); *id.*, §484(a) ("Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money . . . obtains possession of money . . . is guilty of theft."); *id.*, §490a (larceny is synonymous with theft). Makaeff believed that the Trump Entities stole tens of thousands of dollars from her based upon false promises as explained above, and thus believed it committed grand larceny or theft. Makaeff Decl., ¶12; Ex. 7 (Makaeff Dep. Vol. IV at 13:7-18) (Rough Tr.)).

*Roe* is instructive here. There, the former head coach of the Dallas Mavericks, Don Nelson, filed a defamation case against the owner, Mark Cuban, claiming Cuban said "Nelson had attempted to deceive, rip-off and defraud [Cuban] and the [Mavericks], and that Nelson, in his contractual dealings, . . . had been less than truthful." 2009 U.S. Dist. LEXIS 59440, at *12 (ellipses in original). The court held Nelson was a public figure and had to prove the statements were made with actual malice. *See id.* at *37. The court concluded Nelson did not establish that Cuban either knew were false or believed were likely to be false, regardless of the evidence of ill-will. *See id.* at *39-*41. The court granted the anti-SLAPP motion, reasoning:

> **[T]he evidence, at most, tends to suggest that Cuban's statements were an inaccurate characterization of the contract dispute, which is insufficient to demonstrate actual malice.** *See Kashian v. Harriman*, 98 Cal.App.4th 892, 931, 120 Cal. Rptr. 2d 576 (2002) (To show malice it is not sufficient to show that the objectionable statements were inaccurate, or even unreasonable; rather, a plaintiff must show willful falsity or recklessness.). As such, Nelson failed to establish a probability

1    that he can produce clear and convincing evidence that the allegedly
     defamatory statements were made with knowledge of their falsity or with
2    reckless disregard of their truth or falsity such as to command the
     unhesitating assent of every reasonable mind.

3  *Id.* at *42.

4       Here, Makaeff correctly characterized what she believed to be the theft of tens

5  of thousands of dollars from her as "grand larceny." But, even if she had identified

6  the wrong crime, that would not satisfy Trump University's burden of showing actual

7  malice. *See id.*; *see also Bose Corp.*, 466 U.S. at 513 ("[Otherwise] any individual

8  using a malapropism might be liable, simply because an intelligent speaker would

9  have to know that the term was inaccurate in context, even though he did not realize

10 his folly at the time."); Rodney A. Smolla, *Law of Defamation*, §3:84 (2013) ("Errors

11 of a technical nature in the use of language, particularly errors in the use of legal

12 terminology, normally do not create an issue of actual malice.").

13      That there is an ineluctable element of truth to Makaeff's statement – *i.e.*, a

14 substantial amount of money was taken from her under false pretenses, also renders

15 the statement "logically less susceptible" to a finding of actual malice. *See, e.g.*,

16 *Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1170 (2004) (no actual malice where

17 statement that former partner Annette "was a 'convicted perpetrator of domestic

18 violence' was not so far from the truth as to permit an inference of actual malice").

19      Finally, Makaeff's statement about "grand larceny" should be read in the

20 context of her entire letter, which set out the bases for her complaints against Trump

21 University. The "gist" of Makaeff's letter was to convey that Trump University was a

22 scam, and her reference to "grand larceny" was supportive of her opinion that Trump

23 University had defrauded her and she was entitled to a refund. *See* Robert D. Sack,

24 *Sack on Defamation* §5:5.1 (4th ed. 2013). This, she firmly believed then, and

25 believes to this day. There was no actual malice.

26

27

28

8. **"Identity Theft" and "Unsolicited Taking of Personal Credit and Trickery into Opening Credit Cards Without My Approval or Understanding" (Counterclaim ¶¶22(j), (k))**

Makaeff is not a lawyer and, in her letter to Bank of America, she specifically said that the "particulars on the law are for you to judge." Ex. 1 at 13; Makaeff Decl., ¶12. But, Makaeff's lay understanding of the term "identity theft" was it is illegal to use one's personal information for an unauthorized purpose, or to give one's personal information to someone else without authorization. Makaeff Decl., ¶13 & Exhibit 2 at TU-MAKAEFF5611. Because this misuse of Makaeff's identifying information helped advance the Trump Entities' fraudulent scheme, Makaeff's lay view of the law was consistent with the definition of identity theft under 18 U.S.C. §1028(a)(7), which makes it a crime to "knowingly . . . use[], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." *Id.* And California law makes it a crime to obtain someone's "personal identifying information" and "use[] that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person." Cal. Pen. Code §530.5(a).

As to the basis of her statements, Makaeff believed a Trump Entity gave her personal information to a credit-card company – HSBC – to open a credit card account in order to fraudulently sell her another $9,495 in Trump services. *See* Makaeff Decl., ¶13. Specifically, after Makaeff submitted personal identifying information to Trump University Coaching, she had a lengthy phone "interview" with Trump University Coaching representatives during which they asked her private questions about her financial situation and then tried to sell her a $9,495 coaching package. *Id.* Makaeff said she could not afford it, especially after already paying over $35,000 to Trump University. *Id.* But, as Makaeff recalls, Trump University Coaching said not to worry

1    about payment as she was "pre-approved" for a HSBC/Prosper Learning credit card.
2    *See id.*  Makaeff believed this meant they opened a HSBC credit card for her.  *Id.*;
3    Ex. 7 (Makaeff Dep. Vol. IV at 22:24-25 (Rough Tr.)).  Makaeff believed Trump
4    University Coaching shared her personal information with HSBC without
5    authorization, because HSBC had sufficient information to "pre-approve" her for a
6    credit card, and she had not authorized Trump University Coaching to give HSBC her
7    personal information.  *Id.* at 22:4-10; Makaeff Decl., ¶13.

8         In referring to the incident with HSBC in her letter to BofA, Makaeff mentioned
9    several Trump Entities, including "Trump University, Trump Institute, Trump
10   subsidiaries such as Prosper, Inc., and any party related to the aforementioned." Ex. 1
11   at 3.  Makaeff's statement was made specifically in regard to her experience with
12   Trump University Coaching (aka Prosper), which she understandably believed to be
13   the coaching arm of Trump University as discussed above.[9]  *See* §IV.C at 12-13.

14        Makaeff believed, based upon her experience, that the conduct could constitute
15   "identity theft."  Makaeff Decl.,¶13 & Ex. 2.  Moreover, when she complained to
16   Trump University Coaching, they gave her a refund and, to her recollection, did not
17   refute her claims about the HSBC credit card.  Makaeff was also informed that HSBC
18   had stopped doing business with the Trump Entities due to all the consumer
19   complaints. Ex. 1 at 3.  And finally, around the time of the letters at issue, Makaeff
20   saw an internet posting by a consumer who said Trump University had stolen her
21   identity because it was using her name and information for a false testimonial.  Ex. 7
22   (Makaeff Dep. Vol. IV at 30:22-32:10 (Rough Tr.)).  These facts bolstered Makaeff's
23   view that identity theft had occurred.  But even if her use of the term "identity theft"

24

25   [9]    Previously, Makaeff mistakenly indicated the statements about grand larceny,
26   identity theft, and opening credit cards referred only to Profit Publishing
     Group/Childers Financial Group/JJ Childers as the paragraph immediately preceding
27   that statement in the BofA letter was addressing her dealings with Childers and Profit
     Publishing Group, Profit Publishing had also engaged in similar practices, and she was
28   confused about the relationships between and among the various Trump Entities. *See*
     Ex. 1 at 3; Makaeff Decl., ¶2.

1  was an inaccurate characterization, that does not prove her statement was made with

2  actual malice. *See* §IV.C.7.

3      In addition, Makaeff believed Trump University took her personal financial

4  information, which included her assets, credit cards, and other sensitive financial

5  information, under the guise of ascertaining which real estate investments would be

6  best suited for her. Makaeff Decl., ¶13; *see also* Ex. 8 (███████████) (TU-

7  MAKAEFF2317 at 18). But then, Trump University used her information for a

8  different purpose without Makaeff's permission: to assess how much money she had,

9  so they could sell her the most expensive program she could afford. Makaeff Decl.,

10  ¶13 & Exhibit 2 at TU-MAKAEFF5611-12. Once again, Trump University cannot

11  reasonably contest Makaeff's sincerity or even the accuracy of her characterization.

12  But even if it tries to challenge Makaeff's characterization of what happened, that

13  does not constitute actual malice. *See* §IV.C.7. There is no malice here.

### 9.   "Felonious Teachings" and "Outright Criminal" Teachings (Counterclaim ¶¶22(m), (n))

15      Makaeff's understanding of the word "felonious" was that it meant "criminal."

16  *See* Ex. 7 (Makaeff Dep. Vol. IV at 72:24-73:2) (Rough Tr.)). Makaeff's belief that

17  Trump University was teaching criminal activities was based, in part, on DA's letter

18  warning that the bandit signs Trump University taught her to use were punishable by

19  up to six months of jail time, fines and penalties. Makaeff Decl., Exhibit 1. In

20  addition, Makaeff believed that Trump University was teaching other illegal practices,

21  such as acting as a real estate broker or agent without a license, and asset-protection

22  teachings that could be considered tax evasion. *See id.*, Exhibit 2 at TU-

23  MAKAEFF5609-11; Ex. 1 at 14-15. Makaeff's own experiences confirm not only her

24  belief in the accuracy of her statements, but that her statements were accurate. Trump

25  University cannot prove malice under such circumstances. *See, e.g., Annette F.*, 119

26  Cal. App. 4th at 1170.

27

28

**10.    "Neurolinguistic Programming and High Pressure Sales Tactics Based on the Psychology of Scarcity" (Counterclaim ¶22(o))**

Makaeff understood the term "neurolinguistic programming" to mean subconscious manipulative techniques. Makaeff believed this term applied to the sales tactics at the 3-day seminar, including creating the false sense of urgency that the $34,995 price tag for the Gold Elite program was a "one-time offer," making Makaeff feel that she *needed* Trump University to be successful, and Trump University's "bait-and-switch" tactics.  Makaeff Decl., ¶16; §IV.C.1.  Another tactic was falsely portraying Trump University as having limited spots for the chosen few who would join the Trump family and learn Trump's secrets that made him a mogul.  Makaeff Decl., ¶16; Ex. 9 at TU-DONNELLY0000017 ("Think of Trump University as a real University, with a real Admissions process – *i.e.*, not everyone who applies is accepted.").  Makaeff admitted she was vulnerable to these tactics as she expected the best from the Trump name.  Makaeff was keen in her perception; personnel were trained to use these tactics as revealed in the PlayBook.  §IV.C.1.  And, these are just a few examples of the manipulative tactics used, any one of which amply demonstrates Makaeff's sincere belief in her statements and, therefore, an absence of malice.

**11.    "Unethical Tactics" (Counterclaim ¶22(p))**

Here, Makaeff was referring to the fraudulent and deceptive practices described above, in which students were encouraged to raise their credit card limits and fill out financial profiles for the purpose of preparing us to invest in real estate, whereas the true purpose was to sell more Trump University programs.  Makaeff Decl., ¶17.  Trump University simply has no evidence that undermines, let alone clearly and convincingly disproves, Makaeff's belief as to the Trump Entities' unethical tactics.

**12.    "Gargantuan Amount of Misleading, Fraudulent, and Predatory Behavior" (Counterclaim ¶22(q))**

Makaeff's opinion was based upon her experience in observing Trump University's practices, including persuading students to raise their credit card limits

1  and fill out financial profiles, the hard-sell tactics, pressure of buying before the so-
2  called "one-time offer" expired, the many promises that Makaeff believed were
3  broken, and the constant upselling. Makaeff Decl., ¶18. She believed Trump
4  University preyed on people, like her, who were vulnerable to their high-pressure
5  sales tactics in the tough economy. *Id.* As previously pointed out, Makaeff is not
6  alone in her belief. *See supra* n.7. Thus, even if the statement were not literally true,
7  there is every reason to recognize Makaeff's belief that it was true.

8          **13.   "Blatant Lies" (Counterclaim ¶23(a))**

9          In her BofA letter, Makaeff used the phrase "blatant lies" in several contexts.
10 Ex. 1. The first is a reference to Trump University personnel misrepresenting to
11 Makaeff that "there were no other unhappy students," which she believed to be false
12 from her experience in speaking to other students at the seminars, as well as from
13 Trump University student Robert Vargas, who emailed Makaeff on July 25, 2009,
14 saying that there were "many unhappy students" at the Trump seminar he was
15 attending in Los Angeles. Makaeff Decl., ¶19. Makaeff also knew there were many
16 unhappy students from reading complaints and rip off reports online. *Id.* Further,
17 Makaeff believed it was a "blatant lie" when Trump University said she had received
18 a $1,500 coaching session from Troy Peterson at a seminar, as she only spoke to him
19 for five minutes. *Id.* And Makaeff believed that Tiffany Brinkman lied to her by
20 saying she would quickly make the money back from the $34,995 program, but
21 changed her story after the seminar and said no promises were made. *Id.* Also, the
22 day Makaeff signed up for the Gold Elite program, James Harris lied by saying he
23 would be personally available to Makaeff, and emailed that "we can do a ton
24 together." *Id.* Then, Makaeff never heard from him again. *Id.* She also believed that
25 she was lied to about the mentorship. §IV.C.1. Makaeff's statement, therefore, was
26 both accurate and sincere – either of which defeats the counterclaim.

27
28

### 14.    "Fraudulent and Misleading Tactics" (Counterclaim ¶23(b))

This statement refers to Makaeff's experience with Trump University personnel who made promises that were not kept. Makaeff Decl., ¶20. For example, Makaeff was told the Gold Elite program would provide a year-long program of mentoring, but her mentors all-but disappeared after the three days in-field. *Id.* Makaeff was never taught Donald Trump's real estate secrets at a "university" or received the promised comprehensive education. *Id.* Instead, she received general information and was subjected to constant upselling to more programs. *Id.* Thus, Makaeff believed in good faith that she had been subjected to fraudulent misleading tactics. As previously discussed, Makaeff was not alone in this belief, and the evidence in this case and elsewhere confirms both that Makaeff lacked actual malice and that spoke the truth. Trump University has no chance of clearly and convincingly proving the opposite.

## V.    CONCLUSION

For all these reasons, Plaintiff urges the Court to find that Makaeff did not make her critical statements with actual malice and grant her Anti-SLAPP motion.

DATED: February 14, 2014                    Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
RACHEL L. JENSEN
THOMAS R. MERRICK


                                           s/ Rachel L. Jensen
                                    ────────────────────────
                                           RACHEL L. JENSEN

                                    655 West Broadway, Suite 1900
                                    San Diego, CA 92101
                                    Telephone: 619/231-1058
                                    619/231-7423 (fax)

916694_1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
HELEN I. ZELDES
ALREEN HAEGGQUIST
AARON M. OLSEN
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiffs and Proposed
Class

916694_1

3:10-cv-0940-GPC(WVG)

CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 14, 2014.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: rachelj@rgrdlaw.com

916248_1

3:10-cv-0940-GPC(WVG)

# Mailing Information for a Case  3:10-cv-00940-GPC-WVG Makaeff v. Trump University, LLC et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jill Ann Martin**
  jmartin@trumpnational.com,lvincent@trumpnational.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **David Keith Schneider**
  dks@yslaw.com,ewb@yslaw.com

- **Stephen F Yunker**
  sfy@yslaw.com,ewb@yslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)