ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
THOMAS R. MERRICK (177987)
tmerrick@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Attorneys for Plaintiffs and Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>      vs.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>                              Defendants. | No. 3:10-cv-0940-GPC(WVG)<br><br>CLASS ACTION<br><br>DECLARATION OF TARLA MAKAEFF IN SUPPORT OF SUPPLEMENTAL BRIEF REGARDING SPECIAL MOTION TO STRIKE TRUMP UNIVERSITY'S COUNTERCLAIM PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §425.16 |

[Caption continued on following page.]

914293_1

1 | TRUMP UNIVERSITY, LLC, )

2 |                           Counterclaimant, )

3 |        vs. )

4 | TARLA MAKAEFF, et al., )

5 |                     Counter defendants. )

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

914293_1

I, Tarla Makaeff, declare as follows:

1.      I am one of the Plaintiffs in the above-captioned case.  I submit this declaration in support of Supplemental Brief Regarding Special Motion to Strike Defendant/Counterclaimant Trump University's Counterclaim Pursuant to California Code of Civil Procedure §425.16 ("Anti-SLAPP Motion").  The facts stated in this declaration are true and based upon my own personal knowledge and, if called to testify to them, I would competently do so.

2.      Trump University's Counterclaim (the "Counterclaim") concerns certain portions of statements that I made ("My Excerpted Statements").  At the time I made these statements, I was under the impression that a number of business names, including Trump University, Trump University Coaching, Trump Institute, Profit Publishing Group, and Prosper, Inc., were all essentially interchangeable because they promoted one another's programs.  Because I perceived these business names as either one company or interrelated companies, throughout this Declaration, I will use the term "Trump Entities" to refer to these entities without distinguishing one from another, unless otherwise indicated.

3.      The complete statements from which My Excerpted Statements were taken contain explanations for my statements.  Beyond those explanations, I based My Excerpted Statements upon my own personal experiences with representatives of the Trump Entities.  I spent time investigating the statements before making them.  For example, I spoke to other students and reviewed students' complaints posted online at "rip off" reports, Better Business Bureau website ("BBB"), complaintsboard.com, and pissedconsumer.com, among other possible sites.  Also, some of my statements were based on my communications with the Office of the District Attorney, which advised me on or about June 18, 2009, that the use of bandit signs (a practice taught at Trump University) was illegal.  *See* Ex. 1.  I also talked to family, friends, and attorneys and did online research.  None of My Excerpted Statements were, to my knowledge and recollection, inconsistent with my experiences, the grievances of other students, or

1   feedback from others.  To the contrary, based on my investigation, I believed, and still

2   believe, in the truth of my statements.  In my July 26, 2010 Supplemental Declaration

3   ("Supplemental Declaration"), I set forth many of the bases for My Excerpted

4   Statements.

5        4.      This declaration provides additional bases, but it is not intended to

6   present an exhaustive list of all the bases for My Excerpted Statements.  Although I

7   have organized this declaration by separating My Excerpted Statements, the bases for

8   My Excerpted Statements often overlap.  Accordingly, certain explanations set forth

9   below may apply to an Excerpted Statement other than the one(s) identified at the

10  outset of each paragraph.

11       5.      "Fraudulent business practices" and "deceptive business practices":

12  Trump University did not deliver on promises that it was a "university" that taught

13  Mr. Trump's real estate secrets.  I thought I'd effectively learn from Trump through

14  his world-class "handpicked" "professors" when in fact the instructors were high-

15  pressured salespeople who constantly tried to sell me more programs.  For example,

16  Trump University said the 3-day seminar provided the real estate instruction we

17  needed, but then at the 3-day seminar, said we really needed the $34,995 Gold Elite

18  program.  Even after purchasing the $34,995 program, I was subjected to constant

19  upselling at retreats.  Trump University personnel told us students to raise our credit

20  card limits so we could invest in real estate, but then turned around and told us to buy

21  the $34,995 Gold Elite program with that same credit.   In addition, Trump

22  University's James Harris pressured us into taking advantage of the "one-time" price

23  of $34,995 for the Gold Elite – a special deal for "today only" – when in fact, it was

24  the standard price.  Further, Trump University obtained our personal financial

25  information under the guise of helping us plan for investing, when in reality, it used

26  the information to assess which program(s) we could afford.  In addition, Trump

27  University misrepresented the mentorship.  I bought a one-year mentorship that turned

28  out to be largely a 3-day excursion to drive around looking at properties and going to

1  Home Depot, which I could have done for free with a real estate agent. And, though it
2  called itself a "university," Trump University preyed on the vulnerabilities of students,
3  like me, in the recession and said we needed Trump University to succeed without
4  regard to our best interests. Trump University's personnel made grandiose promises
5  about what we would learn and how easy it would be to recoup the money so that the
6  steep purchase price would be a "wash" and we would gain a significant income
7  stream, but turned around afterwards and claimed there was no guarantee based upon
8  the fine print.

9      6.    "Illegal predatory high pressure tactics": Trump University pressured
10  students, including me, to use the new credit that we supposedly obtained in order to
11  buy real estate instead to buy the Gold Elite program at a "one-time" price of $34,995.
12  James Harris said we had to act immediately, saying this special deal was available for
13  "today only," and we could not take advantage of that "deal" after we left the seminar
14  that day. These were false representations because, in truth, it was the standard price
15  for the program. I understood, and still understand, that using false representations to
16  create a false sense of urgency in order to convince someone to buy something, is
17  illegal.

18      7.    "Business practices are criminal": I believed that the Trump Entities
19  engaged in practices that were "criminal in nature" for the reasons detailed in my
20  Bank of America Letters. I understood that the Trump Entities practices were
21  criminal "as they fall under the Fraud statutes of all states and the Federal
22  government." In other words, my lay understanding was that fraud is a crime under
23  state and federal law and thus the practices that I believed to be fraudulent (for
24  example, those described in this Declaration), were also criminal. Also, I found out
25  from the District Attorney that the bandit signs sales practice Trump University taught
26  us to use was a misdemeanor in California. *See* Ex. 1.

27      8.    "Clear practice of personal financial information fraud": Trump
28  University obtained my and other students' detailed personal financial information

1  under the guise of helping us plan for investing.  But in reality, Trump University

2  misused that information without my permission to assess which program I could

3  afford so it could push that on me.  Trump University asked for detailed information

4  about our income, assets, and liabilities at the 3-day seminar, and one of their

5  personnel, Tad Lignell, pulled me aside in the hallway to go over my information in

6  detail.  Trump University personnel pulled out other students to go over their financial

7  information as well.  It seemed somewhat suspicious at the time as the personnel are

8  not financial advisors or CPAs.  And after seeing my information, Tad said that the

9  $1,500 program was not sufficient and I needed more knowledge to complete my

10  education, so I was sold the $34,995 Gold Elite package.

11      9.      "Illegal bait and switch":  I believed Trump University engaged in an

12  "illegal bait and switch" by advertising that we would receive a real estate education

13  at the 3-day seminar, but then at the 3-day seminar, they sold us the $34,995 program

14  as what we really needed.  Even after purchasing the $34,995 program, I was

15  subjected to constant upselling at the retreats.  I believed, and still believe, that these

16  were illegal bait and switch tactics because each time, Trump University's

17  representatives had given me the impression that I would be purchasing a $34,995

18  complete real estate education, but then switched to tell me that I needed more.

19  Trump University personnel also "baited" me into increasing my credit limit

20  supposedly for the purpose of my own real estate transactions, but then in the final

21  hours of the 3-day seminar "switched" to persuading me and other students to use that

22  credit to buy Trump University courses.  I also thought it was a "bait and switch" that

23  Trump University personnel said, if I spent the $34,995 on the Gold Elite program, I

24  would make that money back quickly, but it made me go into debt instead.

25      10.     "Brainwashing scheme" and "Brainwashing tactics":  As explained in my

26  Supplemental Declaration, the actual quote is "*I can only liken it* to a brainwashing

27  scheme."  The reason why I likened Trump University's tactics to a brainwashing

28  scheme is because its instructors were so effective at high-pressure sales and

1  manipulating me and other students into feeling like we **needed** Trump University to

2  be successful and to act fast or lose the opportunity of a lifetime.  Even worse, Trump

3  University personnel manipulated us into believing that, if we didn't take advantage of

4  the opportunity immediately, we were flawed in some way.  Also, Trump University

5  personnel kept saying we would get certain information but then it turned out we

6  needed to buy more and more programs to obtain that knowledge.  I kept holding out

7  hope that I would finally get what I had been promised, but I never did.  I did not

8  figure this out until much later.  I was vulnerable to these tactics as I expected the best

9  from the Trump name.  It was not until after the District Attorney wrote to me and

10  advised that I could be prosecuted and subjected to jail time for using the bandit signs

11  that Trump University had taught me to use that I started to put the pieces together and

12  realize the gravity of their actions.  *See* Ex. 1.

13      11.    "<u>Outright fraud</u>":  Trump University did not deliver on promises that it

14  was a "university" that taught Mr. Trump's real estate secrets through his

15  "handpicked" "professors."  Trump University personnel told us students to raise our

16  credit card limits so we could invest in real estate, but then turned around and told us

17  to buy the $34,995 Gold Elite program with that credit.  In addition, Trump

18  University's James Harris pressured us into taking advantage of the "one-time" price

19  of $34,995 for the Gold Elite – a special deal for "today only" – when in fact, it was

20  the standard price.  Trump University obtained our personal financial information

21  under the guise of helping us plan for investing, when in reality, it used the

22  information to assess which program we could afford.  In addition, Trump University

23  misrepresented that I would receive a one-year mentorship, which I did not receive.

24      12.    "<u>Grand larceny</u>":  I'm not an attorney, and I said so in my letters.

25  However, my lay understanding of the term "grand larceny" was that it is committed

26  when someone takes something significant (either a lot of money or something worth

27  a lot of money) from someone else, without consent or by tricking someone to part

28  with their money or property.  I believed, and still believe, that the Trump Entities

1    stole thousands of dollars from me for profit based upon false promises, thus I
2    believed that the term applied.

3        13.    "Identity theft" and "Unsolicited taking of personal credit and trickery
4    into opening credit cards without MY approval or understanding":  I'm not an
5    attorney, and I said so in my letters.  But my lay understanding of the term "identity
6    theft" was that it was illegal to use one's personal information for an unauthorized
7    purpose, or to give one's personal information to someone else without authorization.
8    I believed, and still believe, that the Trump Entities gave my personal financial
9    information to a credit card company – HSBC – so that they could qualify me for a
10   credit card to purchase more Trump products.  Specifically, when I was talking on the
11   phone with Trump University Coaching, they were trying to sell me additional
12   "Trump University Coaching."  When I explained that I couldn't afford it, they told
13   me that I didn't have to worry about payment because I was "pre-approved" by
14   HSBC, and Trump transferred or "hot flashed" me to HSBC, who I recall told me that
15   I had been pre-approved for a HSBC credit card.  I believed, and still believe, that
16   Trump University Coaching shared my personal information with HSBC without my
17   authorization, because HSBC had sufficient financial information about me to "pre-
18   approve" me for their credit card, and I never authorized Trump to give HSBC my
19   information. In addition, I believed that Trump University obtained my personal
20   financial information from me under the guise of ascertaining what real estate
21   investments would be best for me, based on my financial situation, but then it used my
22   information for a different purpose without my permission: to assess which program I
23   could afford so it could push that on me.

24       14.    "Fraudulent business practices utilized for illegal material gain":  My
25   statement to Bank of America in disputing the charges was directed at "Trump
26   Institute/Prosper Learning, et al.," not Trump University.  That said, throughout this
27   declaration, I have set forth examples of Trump University's fraudulent business
28   practices.

15.    "Felonious teachings" and "outright criminal" teachings:  As I set forth in my Bank of America Letters, the basis of my statement was Trump University taught students, including myself, to post bandit signs, which is a misdemeanor potentially involving jail time in the State of California.  I found this out the hard way when the District Attorney's office wrote to me on June 18, 2009, warning that use of bandit signs was a misdemeanor, punishable by up to six months of jail time, fines and penalties per violation.  *See* Ex. 1.  As a result, I had to hire a criminal defense attorney.  In addition, based upon research, I believed that Trump University was teaching me and other students other illegal practices, such as acting as a real estate broker or agent without a license.  *See* Ex. 2.

16.    "Neurolinguistic programming and high pressure sales tactics based on the psychology of scarcity":  I understood the term "neurolinguistic programming" to mean subconscious manipulative techniques.  Certainly, I believed this to be true of James Harris' tactics.  As explained above, Harris sold the Gold Elite program's price tag of $34,995 as a "one-time offer" that would not be available the next day so I did not have enough time to think through the large purchase I was making.  The instructors made me feel that I ***needed*** Trump University to be successful and to act fast or lose the opportunity of a lifetime.  If we didn't take advantage of the opportunity immediately, we were flawed in some way.  Also, Trump University personnel kept saying we would get the information we needed, but then it turned out we needed to buy more and more programs to obtain that knowledge.  I was vulnerable to these tactics as I expected the best from the Trump name.  It was not until after the District Attorney wrote to me and advised that I could be prosecuted and subjected to jail time for using the bandit signs that I was taught to use by Trump University that I started to put the pieces together and realize the gravity of their actions.  *See* Ex. 1. Another tactic was falsely portraying Trump University as having limited spots for only the chosen few who would join the Trump family and having the limited "one-time" offer to learn Trump's secrets that made him a mogul, the

1   opportunity of a lifetime.  Trump University's tactic of telling us students to raise our

2   credit cards and fill out financial profiles to prepare us for real estate investing, when

3   it was really to assess how much they could upsell us and to get us credit to purchase

4   the upsold programs, are examples of the manipulative tactics used.

5          17.    "Unethical tactics":    Again, I was referring to the fraudulent and

6   deceptive practices described above, in which students like myself were encouraged to

7   raise our credit card limits and fill out financial profiles for the purpose of preparing

8   us to invest in real estate, whereas the true purpose was to sell more Trump University

9   programs.

10         18.    "Gargantuan amount of misleading, fraudulent, and predatory behavior":

11  My conclusion was based upon my experience in observing Trump University's

12  practices, including persuading students to raise their credit card limits and fill out

13  financial profiles, the hard-sell tactics, pressure of buying before the "one-time offer"

14  expired, promises that were not kept, and the constant upselling.  I believed that

15  Trump University preyed on people, like me, who were vulnerable to their high-

16  pressure sales tactics in the tough economy, and made to believe that we needed

17  Trump University in order to succeed.

18         19.    "Blatant lies":  In my Bank of America Letters, I used the phrase "blatant

19  lie" in several contexts.  The first is a reference to Trump University's personnel

20  misrepresenting "there were no other unhappy students," which I knew to be false

21  from my experience in speaking to other students at the seminars, from Trump

22  University student Robert Vargas who emailed me on July 25, 2009, that there were

23  "many unhappy students" at the Trump seminar he was attending in Los Angeles.

24  (TU-MAKAEFF4583).  I also knew this was false, and that there were many unhappy

25  students from reading complaints and rip off reports posted by other students online.

26  Further, I believed it was a "blatant lie" when Trump University said I had received a

27  $1,500 coaching session from Troy Peterson at a seminar, as I only spoke to him for

28  five minutes.  And I believed that Tiffany Brinkman lied to me as she had assured me

1  that I would quickly make the money back from the $34,995 purchase price of the
2  Gold Elite program, but quickly changed her story after the seminar and said no
3  promises had been made.  Also, the day I signed up for the Gold Elite program, James
4  Harris lied to me by telling me he would now be personally available to me by phone
5  and email, and even emailed me that "we can do a ton together." Then, I never heard
6  from him again.  I also believed that I was lied to about the mentorship as I understood
7  it would be a full year of access to the mentor, but it turned out to be a 3-day
8  excursion largely looking at properties and going to Home Depot, which I could have
9  done for free with a real estate agent.

10      20.    "Fraudulent misleading tactics": This statement refers to my experience
11  with Trump University personnel who made promises that were not kept.  For
12  example, I was told the Gold Elite program would provide a year-long program of
13  mentoring, but my mentors all-but disappeared after the three days in-field.  I was
14  never taught Donald Trump's real estate secrets or the comprehensive education
15  promised.  Instead, I received general information and was subjected to constant
16  upselling to more programs and services.

17      21.    Attached hereto are true and correct copies of the following Exhibits:

| Exhibit | Document Description |
| --- | --- |
| Exhibit 1 | June 18, 2009 Letter from the Office of the District Attorney to Tarla Makaeff |
| Exhibit 2 | Research into Legal Codes |

22      22.    I declare under penalty of perjury under the laws of the United States of
23  America that to the best of my knowledge the foregoing is true and correct.
24      Executed this 10th of February, 2014, at Los Angeles, CA.

27      TARLA MAKAEFF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2014, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 14, 2014.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:rachelj@rgrdlaw.com

914293_1

3:10-cv-0940-GPC(WVG)

# Mailing Information for a Case 3:10-cv-00940-GPC-WVG Makaeff v. Trump University, LLC et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jill Ann Martin**
  jmartin@trumpnational.com,lvincent@trumpnational.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **David Keith Schneider**
  dks@yslaw.com,ewb@yslaw.com

- **Stephen F Yunker**
  sfy@yslaw.com,ewb@yslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

EXHIBIT 1



OFFICE OF THE

# DISTRICT ATTORNEY

ORANGE COUNTY, CALIFORNIA
**TONY RACKAUCKAS, DISTRICT ATTORNEY**

**JIM TANIZAKI**
SENIOR ASSISTANT D.A.
VERTICAL PROSECUTIONS/
VIOLENT CRIMES

**WILLIAM FECCIA**
SENIOR ASSISTANT D.A.
SPECIAL PROJECTS

**MARY ANNE McCAULEY**
SENIOR ASSISTANT D.A.
BRANCH COURT OPERATIONS

**JOSEPH D'AGOSTINO**
SENIOR ASSISTANT D.A.
GENERAL FELONIES/
ECONOMIC CRIMES

**DONALD BLANKENSHIP**
CHIEF
BUREAU OF INVESTIGATION

**LISA BOHAN - JOHNSTON**
DIRECTOR
ADMINISTRATIVE SERVICES

June 18, 2009

<u>By Personal Delivery</u>

Ms. Tarla Anne Makaeff    (DOB: 8/22/73)
d.b.a. "We Buy Houses Redacted " et. al.
14 Arborside, Irvine, CA 92603
And/or 3334 E. PCH #423, Corona Del Mar, CA 92625

Re:  Nuisance Signage / Unlawful Advertising Constituting Unfair Business Practices

Dear Ms. Makaeff:

It recently came to our attention that you, your corporation, your company, your employee(s), or your agent(s) are placing or maintaining <u>numerous</u> commercial advertising signs on public property, rights-of-way, traffic signals, and utility poles throughout County of Orange, inviting customers to contact "We Buy Houses 949-226-8949" for purposes of doing business with you and/or retaining related services.

It is illegal in the State of California to place or maintain, or cause to be placed or maintained without lawful permission upon any public or private property, signs and commercial advertising materials.  Such acts can be prosecuted as misdemeanor offenses punishable by a fine up to $1,000.00 plus penalties, costs, restitution, fees, and assessments as well as possible incarceration in County Jail for up to six (6) months <u>per violation</u>. For your convenience, I am enclosing a copy of Penal Code section(s) 556-556.4.

In addition to being expressly declared a nuisance by statute, such commercial activities and unlawful practices provide violators with an unfair advantage over market competitors and also constitute a violation of Business & Professions Code section 17200 which authorizes my office to seek <u>injunctive relief and civil penalties up to $2,500.00 for each violation</u>.  A copy of this statute is likewise enclosed.

For purposes of resolving this matter, a meeting has been scheduled for **June 30, 2009 at 2 P.M.** in our conference room located at **900 North Broadway, 5th Floor, Santa Ana, California**.  We respectfully ask that you and your legal counsel be in attendance.

Sincerely,

TONY RACKAUCKAS
DISTRICT ATTORNEY

James A. Young
Deputy District Attorney

CONSUMER / ENVIRONMENTAL PROTECTION UNIT
CODE ENFORCEMENT - DDA JAMES A. YOUNG

☒ MAIN OFFICE
401 CIVIC CENTER DR W
P.O. BOX 808
SANTA ANA, CA 92701
(714) 347-0634

☐ NORTH OFFICE
1275 N. BERKELEY AVE.
FULLERTON, CA 92831
(714) 773-4480

☐ WEST OFFICE
8141 13TH STREET
WESTMINSTER, CA 92683
(714) 896-7281

☐ SOUTH OFFICE
30143 CROWN VALLEY PKWY.
LAGUNA NIGUEL, CA 92677
(949) 249-5025

☐ HARBOR OFFICE
4601 JAMBOREE RD.
NEWPORT BEACH, CA 92660
(949) 476-4650

WEB PAGE: www.OrangeCountyDA.com

☐ JUVENILE OFFICE
341 CITY DRIVE SOUTH
ORANGE, CA 92668
(714) 935-7624

☐ CENTRAL OFFICE
700 CIVIC CENTER DR. W
P.O. BOX 808
SANTA ANA, CA 92701
(714) 834-3600

**TU-MAKAEFF2037**

EXHIBIT 2

**Federal and State Statutes Where the Methods Taught and Various Products or Services Sold by Trump University, and its Affiliates and "Required for Success in the Program" can result in Civil, or Criminal Investigation negating the Indemnification Portion of any Contract and the Indemnification of all aforementioned parties Requiring them to Return Investment for Services Rendered or Inadequate Services Provided.  In addition, there are several areas of the Statutes which Trump University, its Affiliates, Speakers and Mentors could face legal repercussions as a result of violating both Federal and State Law/Code.**

The so called services sold, ranging from real estate literature, mentorships, retreats, legal advice, legal work, by the aforementioned were inadequate or included practices which were illegal, yet considered necessary in order to be "successful" in the various "wealth generating programs" they were directly part of, agents of, affiliates of or partners of.  These programs are predatory in nature and hide behind a serious of corporate and legal veils.  Thus, it is crucial for the financially damaged person such as me to step forward and fight back so other consumers, banking customers and tax payers are not damaged by these groups.  They must be stopped and the fraudulently acquired investments in these services must be returned.

As a result of following the methods taught by the aforementioned parties and also identical methods taught by their affiliate groups, there have been investigations by various state and federal enforcement agencies of methods "Required" by the program for success.  I ended up being contacted by an agency and could have been charged either as committing misdemeanor Real Estate Marketing violations or for civil violations.  This required me to consult a criminal attorney and attend a deposition but *it was quickly established that I was a victim of a non-accredited so called Trump University, and their affiliates, that use many illegal tactics to sell services, which are not of value in California (where I paid for the program and reside) or other states because they include many illegal methods governed by State, Federal, County, and the Department of Real Estate.*  In fact they are teaching many methods that are illegal across the country.  Many of the techniques taught can actually result in misdemeanors or even felonies for both the student and also the organization thus the many current investigations of Trump University and its Affiliates by many different enforcement agencies from BBB's to Federal Agencies across the nation.  My attorney Vincent Labarbera **www.labarberalaw.com** can be contacted regarding the specific nature of these issues, however, I was never charged as it was concluded that I was duped by the teaching of illegal methods though I could have could have faced hundreds of thousands in fines and up to six months in jail.  As the law clearly states, an inexperienced purchaser of a service is not held liable for illegal methods required by the seller to recoup an investment that is stated, implied or recommended by the seller.  The Seller of the Service is in violation by victimizing those with limited knowledge of a subject and due to the fact that methods taught are illegal everywhere in California and other states, the services sold are not of value and a full refund must be given.  Because potential legal violations are taught, the statute of limitations for a full refund is null and void as written in the contract and must be paid even if years have gone by as the programs often stretch out over years.  This has resulted in the investigation immediately shifting towards those that are teaching these methods; Trump University, and their Speakers, Mentors and Affiliates.  This was an emotionally, mentally, physically, stressful and expensive issue for me as I had to defend myself for following what was taught.  Quickly, the investigators saw that the educators were at fault not me and the investigation was closed on me, but continues with departments around the country looking at these non-accredited "Real Estate" and "Investor Colleges" and "Wealth Generation Programs" such as the services I paid for from the aforementioned parties.

If the services sold to a consumer uneducated in real estate are in many instances illegal in the state that they do business in if not the whole country, then the provisions of the Trump University indemnifications are null and void as the contract is violated by teaching methods that violate the law and therefore it would not be possible for the student to make money using the methods taught without breaking many laws.  This is strictly forbidden and there is ample evidence of the laws copied below and included documentation.

Bait and switch

California has a **bait** and **switch** law. It is part of the law BUSINESS AND PROFESSIONS CODE SECTION 17500-17509.

"17500. It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine."

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=bpc&group=17001-18000&file=17500-17509

Told place in Universal City, CA.

**They did this by implying serious of $1,000+ seminars would give me the techniques to become educated in the investment of real estate with the promise that I would make around $10,000-$30,000 with the knowledge, books and support I would need to do so.  In reality, they then told me I would need to spend over $50,000 books, seminars, legal services etc. which were ultimately of no use to me and in fact problematic.  When they had me fill out a PERSONAL INFORMATION FORM OF MY PERSONAL FINANCIAL INFORMATION and then telling me AFTER THE FACT that the introductory $1,000+ programs were not sufficient and I needed more knowledge to complete the package. I paid the $50,000+ because I was guaranteed and told in person it was all I would need to learn the many arrays of real estate investing when in fact when I got in their "retreats" on each of the 5 occasions it became an infomercial of them up selling me at every corner turn possible. And in reality I was left without the knowledge I needed for a high investment of $50,000. In other words they "baited" me with a $50,000 full real estate investing education the price of a costly university tuition while calling themselves a university: Trump University, and then they "switched" their story later saying I needed to buy numerous other courses to get the full education. Because I did not, I did not receive the full education they promised!  This group of affiliated entities and persons, Violated many of the California Codes and Laws listed below in addition to the bait and switch.**

Bandit signs laws - CA (DA-take codes from letter)

**I have included information from the Trump course, discussing public advertising methods including Billboards or Bandit sign laws.  Though they say seek counsel to see if it is legal to do so in your city, it is illegal in all of CALIFORNIA to post the signs they taught me to post so why would they teach such tactics in a California course where I signed my contract?  This is another instance of misleading information in which the Trump Organization and I were investigated and they are hot on the trail of the Trump University right now for these types of violations.  As stated**

TU-MAKAEFF5601

**above, it is illegal in California to enter into a contract with someone in which they will need to violate legal code, statutes etc. in order to benefit from the services rendered.**

```
CALIFORNIA CODES
BUSINESS AND PROFESSIONS CODE
SECTION 17200-17210
```

**17200.**  As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and **Professions Code**.

17201.  As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons.

17201.5.  As used in this chapter:
   (a) "Board within the Department of Consumer Affairs" includes any commission, bureau, division, or other similarly constituted agency within the Department of Consumer Affairs.
   (b) "Local consumer affairs agency" means and includes any city or county body which primarily provides consumer protection services.

17202.  Notwithstanding Section 3369 of the Civil **Code**, specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition.

17203.  Injunctive Relief--Court Orders
   Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the **Code** of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.

TU-MAKAEFF5602

17204.  Actions for Injunctions by Attorney General, District
Attorney, County Counsel, and City Attorneys
    Actions for relief pursuant to this chapter shall be prosecuted
exclusively in a court of competent jurisdiction by the Attorney
General or a district attorney or by a county counsel authorized by
agreement with the district attorney in actions involving violation
of a county ordinance, or by a city attorney of a city having a
population in excess of 750,000, or by a city attorney in a city and
county or, with the consent of the district attorney, by a city
prosecutor in a city having a full-time city prosecutor in the name
of the people of the State of California upon their own complaint or
upon the complaint of a board, officer, person, corporation, or
association, or by a person who has suffered injury in fact and has
lost money or property as a result of the unfair competition.



17205.  Unless otherwise expressly provided, the remedies or
penalties provided by this chapter are cumulative to each other and
to the remedies or penalties available under all other laws of this
state.


17206.  Civil Penalty for Violation of Chapter
    (a) Any person who engages, has engaged, or proposes to engage in
unfair competition shall be liable for a civil penalty not to exceed
two thousand five hundred dollars ($2,500) for each violation, which
shall be assessed and recovered in a civil action brought in the name
of the people of the State of California by the Attorney General, by
any district attorney, by any county counsel authorized by agreement
with the district attorney in actions involving violation of a
county ordinance, by any city attorney of a city having a population
in excess of 750,000, by any city attorney of any city and county,
or, with the consent of the district attorney, by a city prosecutor
in any city having a full-time city prosecutor, in any court of
competent jurisdiction.
    (b) The court shall impose a civil penalty for each violation of
this chapter. In assessing the amount of the civil penalty, the court
shall consider any one or more of the relevant circumstances
presented by any of the parties to the case, including, but not
limited to, the following: the nature and seriousness of the
misconduct, the number of violations, the persistence of the
misconduct, the length of time over which the misconduct occurred,
the willfulness of the defendant's misconduct, and the defendant's
assets, liabilities, and net worth.
    (c) If the action is brought by the Attorney General, one-half of
the penalty collected shall be paid to the treasurer of the county in
which the judgment was entered, and one-half to the General Fund. If
the action is brought by a district attorney or county counsel, the
penalty collected shall be paid to the treasurer of the county in
which the judgment was entered. Except as provided in subdivision
(e), if the action is brought by a city attorney or city prosecutor,
one-half of the penalty collected shall be paid to the treasurer of

TU-MAKAEFF5603

the city in which the judgment was entered, and one-half to the treasurer of the county in which the judgment was entered. The aforementioned funds shall be for the exclusive use by the Attorney General, the district attorney, the county counsel, and the city attorney for the enforcement of consumer protection laws.

(d) The Unfair Competition Law Fund is hereby created as a special account within the General Fund in the State Treasury. The portion of penalties that is payable to the General Fund or to the Treasurer recovered by the Attorney General from an action or settlement of a claim made by the Attorney General pursuant to this chapter or Chapter 1 (commencing with Section 17500) of Part 3 shall be deposited into this fund. Moneys in this fund, upon appropriation by the Legislature, shall be used by the Attorney General to support investigations and prosecutions of California's consumer protection laws, including implementation of judgments obtained from such prosecutions or investigations and other activities which are in furtherance of this chapter or Chapter 1 (commencing with Section 17500) of Part 3.

(e) If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of any reasonable expenses incurred by the board shall be paid to the Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund, the moneys shall be paid to the Treasurer. The amount of any reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality or county that funds the local agency.

(f) If the action is brought by a city attorney of a city and county, the entire amount of the penalty collected shall be paid to the treasurer of the city and county in which the judgment was entered for the exclusive use by the city attorney for the enforcement of consumer protection laws. However, if the action is brought by a city attorney of a city and county for the purposes of civil enforcement pursuant to Section 17980 of the Health and Safety **Code** or Article 3 (commencing with Section 11570) of Chapter 10 of Division 10 of the Health and Safety **Code**, either the penalty collected shall be paid entirely to the treasurer of the city and county in which the judgment was entered or, upon the request of the city attorney, the court may order that up to one-half of the penalty, under court supervision and approval, be paid for the purpose of restoring, maintaining, or enhancing the premises that were the subject of the action, and that the balance of the penalty be paid to the treasurer of the city and county.


17206.1.  (a) (1) In addition to any liability for a civil penalty pursuant to Section 17206, any person who violates this chapter, and the act or acts of unfair competition are perpetrated against one or more senior citizens or disabled persons, may be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which may be assessed and recovered in a civil action as prescribed in Section 17206.

TU-MAKAEFF5604

(2) Subject to subdivision (d), any civil penalty shall be paid as prescribed by subdivisions (b) and (c) of Section 17206.

(b) As used in this section, the following terms have the following meanings:

(1) "Senior citizen" means a person who is 65 years of age or older.

(2) "Disabled person" means any person who has a physical or mental impairment that substantially limits one or more major life activities.

(A) As used in this subdivision, "physical or mental impairment" means any of the following:

(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss substantially affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; or endocrine.

(ii) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

"Physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech, and hearing impairment, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, and emotional illness.

(B) "Major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(c) In determining whether to impose a civil penalty pursuant to subdivision (a) and the amount thereof, the court shall consider, in addition to any other appropriate factors, the extent to which one or more of the following factors are present:

(1) Whether the defendant knew or should have known that his or her conduct was directed to one or more senior citizens or disabled persons.

(2) Whether the defendant's conduct caused one or more senior citizens or disabled persons to suffer: loss or encumbrance of a primary residence, principal employment, or source of income; substantial loss of property set aside for retirement, or for personal or family care and maintenance; or substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of the senior citizen or disabled person.

(3) Whether one or more senior citizens or disabled persons are substantially more vulnerable than other members of the public to the defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct.

(d) Any court of competent jurisdiction hearing an action pursuant to this section may make orders and judgments as may be necessary to restore to any senior citizen or disabled person any money or property, real or personal, which may have been acquired by means of a violation of this chapter. Restitution ordered pursuant to this subdivision shall be given priority over recovery of any civil penalty designated by the court as imposed pursuant to subdivision (a), but shall not be given priority over any civil penalty imposed

TU-MAKAEFF5605

pursuant to subdivision (a) of Section 17206. If the court determines
that full restitution cannot be made to those senior citizens or
disabled persons, either at the time of judgment or by a future date
determined by the court, then restitution under this subdivision
shall be made on a pro rata basis depending on the amount of loss.


17207.   (a) Any person who intentionally violates any injunction
prohibiting unfair competition issued pursuant to Section 17203 shall
be liable for a civil penalty not to exceed six thousand dollars
($6,000) for each violation. Where the conduct constituting a
violation is of a continuing nature, each day of that conduct is a
separate and distinct violation. In determining the amount of the
civil penalty, the court shall consider all relevant circumstances,
including, but not limited to, the extent of the harm caused by the
conduct constituting a violation, the nature and persistence of that
conduct, the length of time over which the conduct occurred, the
assets, liabilities, and net worth of the person, whether corporate
or individual, and any corrective action taken by the defendant.
   (b) The civil penalty prescribed by this section shall be assessed
and recovered in a civil action brought in any county in which the
violation occurs or where the injunction was issued in the name of
the people of the State of California by the Attorney General or by
any district attorney, any county counsel authorized by agreement
with the district attorney in actions involving violation of a county
ordinance, or any city attorney in any court of competent
jurisdiction within his or her jurisdiction without regard to the
county from which the original injunction was issued. An action
brought pursuant to this section to recover civil penalties shall
take precedence over all civil matters on the calendar of the court
except those matters to which equal precedence on the calendar is
granted by law.
   (c) If such an action is brought by the Attorney General, one-half
of the penalty collected pursuant to this section shall be paid to
the treasurer of the county in which the judgment was entered, and
one-half to the State Treasurer. If brought by a district attorney or
county counsel the entire amount of the penalty collected shall be
paid to the treasurer of the county in which the judgment is entered.
If brought by a city attorney or city prosecutor, one-half of the
penalty shall be paid to the treasurer of the county in which the
judgment was entered and one-half to the city, except that if the
action was brought by a city attorney of a city and county the entire
amount of the penalty collected shall be paid to the treasurer of
the city and county in which the judgment is entered.
   (d) If the action is brought at the request of a board within the
Department of Consumer Affairs or a local consumer affairs agency,
the court shall determine the reasonable expenses incurred by the
board or local agency in the investigation and prosecution of the
action.
   Before any penalty collected is paid out pursuant to subdivision
(c), the amount of the reasonable expenses incurred by the board
shall be paid to the State Treasurer for deposit in the special fund
of the board described in Section 205. If the board has no such
special fund, the moneys shall be paid to the State Treasurer. The
amount of the reasonable expenses incurred by a local consumer
affairs agency shall be paid to the general fund of the municipality

TU-MAKAEFF5606

or county which funds the local agency.

17208.  Any action to enforce any cause of action pursuant to this
chapter shall be commenced within four years after the cause of
action accrued. No cause of action barred under existing law on the
effective date of this section shall be revived by its enactment.

17209.  If a violation of this chapter is alleged or the application
or construction of this chapter is in issue in any proceeding in the
Supreme Court of California, a state court of appeal, or the
appellate division of a superior court, each person filing any brief
or petition with the court in that proceeding shall serve, within
three days of filing with the court, a copy of that brief or petition
on the Attorney General, directed to the attention of the Consumer
Law Section at a service address designated on the Attorney General's
official Web site for service of papers under this section or, if no
service address is designated, at the Attorney General's office in
San Francisco, California, and on the district attorney of the county
in which the lower court action or proceeding was originally filed.
Upon the Attorney General's or district attorney's request, each
person who has filed any other document, including all or a portion
of the appellate record, with the court in addition to a brief or
petition shall provide a copy of that document without charge to the
Attorney General or the district attorney within five days of the
request. The time for service may be extended by the Chief Justice or
presiding justice or judge for good cause shown. No judgment or
relief, temporary or permanent, shall be granted or opinion issued
until proof of service of the brief or petition on the Attorney
General and district attorney is filed with the court.

17210.  (a) For purposes of this section, "hotel" means any hotel,
motel, bed and breakfast inn, or other similar transient lodging
establishment, but it does not include any residential hotel as
defined in Section 50519 of the Health and Safety **Code**. "Innkeeper"
means the owner or operator of a hotel, or the duly authorized agent
or employee of the owner or operator.
   (b) For purposes of this section, "handbill" means, and is
specifically limited to, any tangible commercial solicitation to
guests of the hotel urging that they patronize any commercial
enterprise.
   (c) Every person (hereinafter "distributor") engages in unfair
competition for purposes of this chapter who deposits, places,
throws, scatters, casts, or otherwise distributes any handbill to any
individual guest rooms in any hotel, including, but not limited to,
placing, throwing, leaving, or attaching any handbill adjacent to,
upon, or underneath any guest room door, doorknob, or guest room
entryway, where either the innkeeper has expressed objection to
handbill distribution, either orally to the distributor or by the
posting of a sign or other notice in a conspicuous place within the
lobby area and at all points of access from the exterior of the

premises to guest room areas indicating that handbill distribution is
prohibited, or the distributor has received written notice pursuant
to subdivision (e) that the innkeeper has expressed objection to the
distribution of handbills to guest rooms in the hotel.
    (d) Every person (hereinafter "contractor") engages in unfair
competition for purposes of this chapter who causes or directs any
other person, firm, business, or entity to distribute, or cause the
distribution of, any handbill to any individual guest rooms in any
hotel in violation of subdivision (c) of this section, if the
contractor has received written notice from the innkeeper objecting
to the distribution of handbills to individual guest rooms in the
hotel.
    (e) Every contractor who causes or directs any distributor to
distribute, or cause the distribution of, any handbills to any
individual guest rooms in any hotel, if the contractor has received
written notice from the innkeeper or from any other contractor or
intermediary pursuant to this subdivision, objecting to the
distribution of handbills to individual guest rooms in the hotel has
failed to provide a written copy of that notice to each distributor
prior to the commencement of distribution of handbills by the
distributor or by any person hired or retained by the distributor for
that purpose, or, within 24 hours following the receipt of the
notice by the contractor if received after the commencement of
distribution, and has failed to instruct and demand any distributor
to not distribute, or to cease the distribution of, the handbills to
individual guest rooms in any hotel for which such a notice has been
received is in violation of this section.
    (f) Any written notice given, or caused to be given, by the
innkeeper pursuant to or required by any provision of this section
shall be deemed to be in full force and effect until such time as the
notice is revoked in writing.
    (g) Nothing in this section shall be deemed to prohibit the
distribution of a handbill to guest rooms in any hotel where the
distribution has been requested or approved in writing by the
innkeeper, or to any individual guest room when the occupant thereof
has affirmatively requested or approved the distribution of the
handbill during the duration of the guest's occupancy.

CALIFORNIA CODES
**PENAL CODE**
SECTION **556-556.4**


**556.**  It is a misdemeanor for any person to place or maintain, or
cause to be placed or maintained without lawful permission upon any
property of the State, or of a city or of a county, any sign,
picture, transparency, advertisement, or mechanical device which is
used for the purpose of advertising or which advertises or brings to
notice any person, article of merchandise, business or profession, or
anything that is to be or has been sold, bartered, or given away.


**556.**1.  It is a misdemeanor for any person to place or maintain or
cause to be placed or maintained upon any property in which he has no

TU-MAKAEFF5608

estate or right of possession any sign, picture, transparency,
advertisement, or mechanical device which is used for the purpose of
advertising, or which advertises or brings to notice any person,
article of merchandise, business or profession, or anything that is
to be or has been sold, bartered, or given away, without the consent
of the owner, lessee, or person in lawful possession of such property
before such sign, picture, transparency, advertisement, or
mechanical device is placed upon the property.

556.2.  Sections **556** and **556**.1 do not prevent the posting of any
notice required by law or order of any court, to be posted, nor the
posting or placing of any notice, particularly pertaining to the
grounds or premises upon which the notice is so posted or placed, nor
the posting or placing of any notice, sign, or device used
exclusively for giving public notice of the name, direction or
condition of any highway, street, lane, road or alley.

556.3.  Any sign, picture, transparency, advertisement, or
mechanical device placed on any property contrary to the provisions
of Sections **556** and **556**.1, is a public nuisance.

556.4.  For purposes of this article, information that appears on
any sign, picture, transparency, advertisement, or mechanical device
such as, but not limited to, the following, may be used as evidence
to establish the fact, and may create an inference, that a person or
entity is responsible for the posting of the sign, picture,
transparency, advertisement, or mechanical device:
    (a) The name, telephone number, address, or other identifying
information regarding the real estate broker, real estate brokerage
firm, real estate agent, or other person associated with the firm.
    (b) The name, telephone number, address, or other identifying
information of the owner or lessee of property used for a commercial
activity or event.
    (c) The name, telephone number, address, or other identifying
information of the sponsor or promoter of a sporting event, concert,
theatrical performance, or similar activity or event.

**Taking over payments laws - CA (DRE?)**

This is a grey area, but I was instructed to do this illegally so I will pass on that attachment to you as well

**Transactions that only realtors should be doing, unlicensed people to do licensed work as Real Estate Agents in California include many of the methods taught by the aforementioned groups where students are taught to represent buyers or sellers of property.  Trump University makes this conveniently sound like finding investors, but in reality, it is strictly forbidden by Federal, California and other State Laws, and Department of Real Estate to act as a Real Estate Broker**

TU-MAKAEFF5609

**without a being licensed.   Another way it is impossible to make money under the Trump Program violating their agreement which further negates their legal disclaimers.**

California Code

10131.1.  (a) A **real estate** broker within the meaning of this part is also a person who engages as a principal in the business of making loans or buying from, selling to, or exchanging with the public, **real** property sales contracts or promissory notes secured directly or collaterally by liens on **real** property, or who makes agreements with the public for the collection of **payments** or for the performance of services in connection with **real** property sales contracts or promissory notes secured directly or collaterally by liens on **real** property.
    (b) As used in this section:
    (1) "In the business" means any of the following:
    (A) The acquisition for resale to the public, and not as an investment, of eight or more **real** property sales contracts or promissory notes secured directly or collaterally by liens on **real** property during a calendar year.
    (B) The sale to or exchange with the public of eight or more **real** property sales contracts or promissory notes secured directly or collaterally by liens on **real** property during a calendar year. However, no transaction negotiated through a **real estate** licensee shall be considered in determining whether a person is a **real estate** broker within the meaning of this section.
    (C) The making of eight or more loans in a calendar year from the person's own funds to the public when those loans are held or resold and are secured directly or collaterally by a lien on residential **real** property consisting of a single dwelling unit in a condominium or cooperative or on any parcel containing only residential buildings if the total number of units on the parcel is four or less. However, no transaction negotiated through a **real estate** broker who meets the criteria of subdivision (a) or (b) of Section 10232 shall be considered in determining whether a person is a **real estate** broker within the meaning of this section.
    (2) "Sale," "resale," and "exchange" include every disposition of any interest in a **real** property sales contract or promissory note secured directly or collaterally by a lien on **real** property, except the original issuance of a promissory note by a borrower or a **real** property sales contract by a vendor, either of which is to be secured directly by a lien on **real** property owned by the borrower or vendor.
    (3) "Own funds" means either of the following:
    (A) Cash, corporate capital, or warehouse credit lines at commercial banks, savings banks, savings and loan associations, industrial loan companies, or other sources that are liability items on the person's **financial** statements, whether secured or unsecured.
    (B) Cash, corporate capital, or warehouse credit lines at commercial banks, savings banks, savings and loan associations, industrial loan companies, or other sources that are liability items on the **financial** statement of an affiliate of the person, whether secured or unsecured.
    (4) "Own funds" does not include funds provided by a third party to fund a loan on condition that the third party will subsequently purchase or accept an assignment of the loan.

TU-MAKAEFF5610

10131.2.  A **real estate** broker within the meaning of this part is
also a person who engages in the business of claiming, demanding,
charging, receiving, collecting or contracting for the collection of
an advance fee in connection with any employment undertaken to
promote the sale or lease of **real** property or of a business
opportunity by advance fee listing, advertisement or other offering
to sell, lease, exchange or rent property or a business opportunity,
or to obtain a loan or loans thereon.

10130.  It is unlawful for any person to engage in the business, act
in the capacity of, advertise or assume to act as a **real estate**
broker or a **real estate** salesman within this state without first
obtaining a **real estate** license from the department.
    The commissioner may prefer a complaint for violation of this
section before any court of competent jurisdiction, and the
commissioner and his counsel, deputies or assistants may assist in
presenting the law or facts at the trial.
    It is the duty of the district attorney of each county in this
state to prosecute all violations of this section in their respective
counties in which the violations occur.


10131.  A **real estate** broker within the meaning of this part is a
person who, for a compensation or in expectation of a compensation,
regardless of the form or time of payment, does or negotiates to do
one or more of the following acts for another or others:
    (a) Sells or offers to sell, buys or offers to buy, solicits
prospective sellers or puchasers of, solicits or obtains listings of,
or negotiates the purchase, sale or exchange of **real** property or a
business opportunity.
    (b) Leases or rents or offers to lease or rent, or places for
rent, or solicits listings of places for rent, or solicits for
prospective tenants, or negotiates the sale, purchase or exchanges of
leases on **real** property, or on a business opportunity, or collects
rents from **real** property, or improvements thereon, or from business
opportunities.
    (c) Assists or offers to assist in filing an application for the
purchase or lease of, or in locating or entering upon, lands owned by
the state or federal government.
    (d) Solicits borrowers or lenders for or negotiates loans or
collects **payments** or performs services for borrowers or lenders or
note owners in connection with loans secured directly or collaterally
by liens on **real** property or on a business opportunity.
    (e) Sells or offers to sell, buys or offers to buy, or exchanges
or offers to exchange a **real** property sales contract, or a promissory
note secured directly or collaterally by a lien on **real** property or
on a business opportunity, and performs services for the holders
thereof.

**In addition, Trump University, and their affiliates take personal information for use that is
prohibited by California Law.  It is against the law to take credit cards or open credit accounts
without telling the consumer how they will be used and where the information will be sent.  Trump
University distributes this information to its affiliates so they are able to extract the highest rate of**

TU-MAKAEFF5611

**payment from prospective students based upon the STATEMENT OF PERSONAL FINANCIAL INFORMATION that they require the students to fill out prior to telling them how much programs will cost.  They then use high pressure sales tactics with multiple sales men convincing the prospective student that this is a onetime offer and not allowing for sufficient time for the student to review the materials or go to the seminar so a 3 day cancellation policy is null and void as there is NO POSSIBLE WAY FOR THE STUDENT TO RENDER AN ACCURATE DECISION MAKING OPINION OF THE VALIDITY OF THE SERVICES AS THEY ARE NOT RENDERED UNTIL WEEKS, MONTHS, AND YEARS LATER…clearly a violation of law.  In addition to teaching illegal tactics such as posting bandit signs,  legally grey areas such as taking over payments, setting up corps to take phone calls from illegally solicited offers to buy or sell properties by mail, and email…this is a gross case of clear fraud and there is THE LAW IS 100% CLEAR AS TO THE VIOLATIONS MEANING THAT ALL FUNDS SHOULD BE CREDITED TO THE STUDENT IMMEDIATELY.**

http://www.leginfo.ca.gov/cgi-bin/waisgate?WAISdocID=0264678337+35+0+0&WAISaction=retrieve

- **California Civil Code § 1747.08.** Requiring identification information as condition of acceptance

(a) Except as provided in subdivision (c), no person, firm, partnership, association, or corporation which accepts credit cards for the transaction of business shall do either of the following:
(1) Request, or require as a condition to accepting the credit card as payment in full or in part for goods or services, the cardholder to write any personal identification information upon the credit card transaction form or otherwise.
(2) Request, or require as a condition to accepting the credit card as payment in full or in part for goods or services, the cardholder to provide personal identification information, which the person, firm, partnership, association, or corporation accepting the credit card writes, causes to be written, or otherwise records upon the credit card transaction form or otherwise.
(3) Utilize, in any credit card transaction, a credit card form which contains preprinted spaces specifically designated for filling in any personal identification information of the cardholder.

(b) For purposes of this section "personal identification information," means information concerning the cardholder, other than information set forth on the credit card, and including, but not limited to, the cardholder's address and telephone number.

(c) Subdivision (a) does not apply in the following instances:
(1) When the credit card is being used as a deposit to secure payment in the event of default, loss, damage, or other similar occurrence.
(2) Cash advance transactions.
(3) When the person, firm, partnership, association, or corporation accepting the credit card is contractually obligated to provide personal identification information in order to complete the credit card transaction or is obligated to collect and record the personal identification information by federal law or regulation.
(4) When personal identification information is required for a special purpose incidental but related to the individual credit card transaction, including, but not limited to, information relating to shipping, delivery, servicing, or installation of the purchased merchandise, or for special orders.

(d) This section does not prohibit any person, firm, partnership, association, or corporation from requiring the cardholder, as a condition to accepting the credit card as payment in full or in part for goods or services, to provide reasonable forms of positive identification, which may include a driver's license or a California state identification card, or where one of these is not available, another form of photo identification, provided that none of the information contained thereon is written or recorded on the credit card transaction form or otherwise.If the cardholder pays for the transaction with a credit card number and does not make the credit card available upon request to verify the number,

TU-MAKAEFF5612

the cardholder's driver's license number or identification card number may be recorded on the credit card transaction form or otherwise.

(e) Any person who violates this section shall be subject to a civil penalty not to exceed two hundred fifty dollars ($ 250) for the first violation and one thousand dollars ($ 1,000) for each subsequent violation, to be assessed and collected in a civil action brought by the person paying with a credit card, by the Attorney General, or by the district attorney or city attorney of the county or city in which the violation occurred. However, no civil penalty shall be assessed for a violation of this section if the defendant shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error made notwithstanding the defendant's maintenance of procedures reasonably adopted to avoid such an error. When collected, the civil penalty shall be payable, as appropriate, to the person paying with a credit card who brought the action, or to the general fund of whichever governmental entity brought the action to assess the civil penalty.

(f) The Attorney General, or any district attorney or city attorney within his or her respective jurisdiction, may bring an action in the superior court in the name of the people of the State of California to enjoin violation of subdivision (a) and, upon notice to the defendant of not less than five days, to temporarily restrain and enjoin the violation. If it appears to the satisfaction of the court that the defendant has, in fact, violated subdivision (a), the court may issue an injunction restraining further violations, without requiring proof that any person has been damaged by the violation. In these proceedings, if the court finds that the defendant has violated subdivision (a), the court may direct the defendant to pay any or all costs incurred by the Attorney General, district attorney, or city attorney in seeking or obtaining injunctive relief pursuant to this subdivision.

(g) Actions for collection of civil penalties under subdivision (e) and for injunctive relief under subdivision (f) may be consolidated.

(h) The changes made to this section by Assembly Bill 1316 of the 1995-96 Regular Session of the Legislature apply only to credit card transactions entered into on and after January 1, 1996. Nothing in those changes shall be construed to affect any civil action which was filed before January 1, 1996.

[**Notes:**
The civil penalty provision of the Song-Bervely Credit Card Act of 1971 (*CC § 1747.8(e)*) does not mandate fixed penalties; rather, it sets maximum penalties of $ 250 for the first violation and $ 1,000 for each subsequent violation, thus providing an entire range of available penalties. *Linder v Thrifty Oil Co. (2000) 23 Cal 4th 429, 447, 97 Cal Rptr 2d 179, 2 P3d 27.*

Retailer violated the Song-Beverly Credit Card Act by requesting a consumer's telephone number before ringing up purchases on a credit card because the addition of the word "request" to *Cal. Civ. Code § 1747.8* prohibited the retailer from seeking such information before the transaction; therefore, a trial court erred in granting the retailer's motion to dismiss the consumer's action. Florez v Linens '*N Things, Inc. (2003, 4th Dist) 108 Cal App 4th 447, 133 Cal Rptr 2d 465.*]

```
Civil Code Section

1798.82.  (a) Any person or business that conducts business in
California, and that owns or licenses computerized data that includes
personal information, shall disclose any breach of the security of
the system following discovery or notification of the breach in the
```

TU-MAKAEFF5613

security of the data to any resident of California whose unencrypted **personal information** was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

(b) Any person or business that maintains computerized data that includes **personal information** that the person or business does not own shall notify the owner or licensee of the **information** of any breach of the security of the data immediately following discovery, if the **personal information** was, or is reasonably believed to have been, acquired by an unauthorized person.

(c) The notification required by this section may be delayed if a law enforcement agency determines that the notification will impede a criminal investigation. The notification required by this section shall be made after the law enforcement agency determines that it will not compromise the investigation.

(d) For purposes of this section, "breach of the security of the system" means unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of **personal information** maintained by the person or business. Good faith acquisition of **personal information** by an employee or agent of the person or business for the purposes of the person or business is not a breach of the security of the system, provided that the **personal information** is not used or subject to further unauthorized disclosure.

(e) For purposes of this section, "**personal information**" means an individual's first name or first initial and last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted:

(1) Social security number.

(2) Driver's license number or California Identification Card number.

(3) Account number, credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's **financial** account.

(4) Medical **information**.

(5) Health insurance **information**.

(f) (1) For purposes of this section, "**personal information**" does not include publicly available **information** that is lawfully made available to the general public from federal, state, or local government records.

(2) For purposes of this section, "medical **information**" means any **information** regarding an individual's medical history, mental or physical condition, or medical treatment or diagnosis by a health care professional.

(3) For purposes of this section, "health insurance **information**" means an individual's health insurance policy number or subscriber identification number, any unique identifier used by a health insurer to identify the individual, or any **information** in an individual's application and claims history, including any appeals records.

(g) For purposes of this section, "notice" may be provided by one of the following methods:

(1) Written notice.

(2) Electronic notice, if the notice provided is consistent with

TU-MAKAEFF5614

the provisions regarding electronic records and signatures set forth
in Section 7001 of Title 15 of the United States Code.
   (3) Substitute notice, if the person or business demonstrates that
the cost of providing notice would exceed two hundred fifty thousand
dollars ($250,000), or that the affected class of subject persons to
be notified exceeds 500,000, or the person or business does not have
sufficient contact **information**. Substitute notice shall consist of
all of the following:
   (A) E-mail notice when the person or business has an e-mail
address for the subject persons.
   (B) Conspicuous posting of the notice on the Web site page of the
person or business, if the person or business maintains one.
   (C) Notification to major statewide media.
   (h) Notwithstanding subdivision (g), a person or business that
maintains its own notification procedures as part of an **information**
security policy for the treatment of **personal information** and is
otherwise consistent with the timing requirements of this part, shall
be deemed to be in compliance with the notification requirements of
this section if the person or business notifies subject persons in
accordance with its policies in the event of a breach of security of
the system.


1798.83.  (a) Except as otherwise provided in subdivision (d), if a
business has an established business relationship with a customer and
has within the immediately preceding calendar year disclosed
**personal information** that corresponds to any of the categories of
**personal information** set forth in paragraph (6) of subdivision (e) to
third parties, and if the business knows or reasonably should know
that the third parties used the **personal information** for the third
parties' direct marketing purposes, that business shall, after the
receipt of a written or electronic mail request, or, if the business
chooses to receive requests by toll-free telephone or facsimile
numbers, a telephone or facsimile request from the customer, provide
all of the following **information** to the customer free of charge:
   (1) In writing or by electronic mail, a list of the categories set
forth in paragraph (6) of subdivision (e) that correspond to the
**personal information** disclosed by the business to third parties for
the third parties' direct marketing purposes during the immediately
preceding calendar year.
   (2) In writing or by electronic mail, the names and addresses of
all of the third parties that received **personal information** from the
business for the third parties' direct marketing purposes during the
preceding calendar year and, if the nature of the third parties'
business cannot reasonably be determined from the third parties'
name, examples of the products or services marketed, if known to the
business, sufficient to give the customer a reasonable indication of
the nature of the third parties' business.
   (b) (1) A business required to comply with this section shall
designate a mailing address, electronic mail address, or, if the
business chooses to receive requests by telephone or facsimile, a
toll-free telephone or facsimile number, to which customers may
deliver requests pursuant to subdivision (a). A business required to
comply with this section shall, at its election, do at least one of
the following:
   (A) Notify all agents and managers who directly supervise
employees who regularly have contact with customers of the designated

TU-MAKAEFF5615

addresses or numbers or the means to obtain those addresses or numbers and instruct those employees that customers who inquire about the business's privacy practices or the business's compliance with this section shall be informed of the designated addresses or numbers or the means to obtain the addresses or numbers.

(B) Add to the home page of its Web site a link either to a page titled "Your Privacy Rights" or add the words "Your Privacy Rights" to the home page's link to the business's privacy policy. If the business elects to add the words "Your Privacy Rights" to the link to the business's privacy policy, the words "Your Privacy Rights" shall be in the same style and size as the link to the business's privacy policy. If the business does not display a link to its privacy policy on the home page of its Web site, or does not have a privacy policy, the words "Your Privacy Rights" shall be written in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention to the language. The first page of the link shall describe a customer's rights pursuant to this section and shall provide the designated mailing address, e-mail address, as required, or toll-free telephone number or facsimile number, as appropriate. If the business elects to add the words "Your California Privacy Rights" to the home page's link to the business's privacy policy in a manner that complies with this subdivision, and the first page of the link describes a customer's rights pursuant to this section, and provides the designated mailing address, electronic mailing address, as required, or toll-free telephone or facsimile number, as appropriate, the business need not respond to requests that are not received at one of the designated addresses or numbers.

(C) Make the designated addresses or numbers, or means to obtain the designated addresses or numbers, readily available upon request of a customer at every place of business in California where the business or its agents regularly have contact with customers.

The response to a request pursuant to this section received at one of the designated addresses or numbers shall be provided within 30 days. Requests received by the business at other than one of the designated addresses or numbers shall be provided within a reasonable period, in light of the circumstances related to how the request was received, but not to exceed 150 days from the date received.

(2) A business that is required to comply with this section and Section 6803 of Title 15 of the United States Code may comply with this section by providing the customer the disclosure required by Section 6803 of Title 15 of the United States Code, but only if the disclosure also complies with this section.

(3) A business that is required to comply with this section is not obligated to provide **information** associated with specific individuals and may provide the **information** required by this section in standardized format.

(c) (1) A business that is required to comply with this section is not obligated to do so in response to a request from a customer more than once during the course of any calendar year. A business with fewer than 20 full-time or part-time employees is exempt from the requirements of this section.

(2) If a business that is required to comply with this section adopts and discloses to the public, in its privacy policy, a policy of not disclosing **personal information** of customers to third parties for the third parties' direct marketing purposes unless the customer

TU-MAKAEFF5616

first affirmatively agrees to that disclosure, or of not disclosing the **personal information** of customers to third parties for the third parties' direct marketing purposes if the customer has exercised an option that prevents that **information** from being disclosed to third parties for those purposes, as long as the business maintains and discloses the policies, the business may comply with subdivision (a) by notifying the customer of his or her right to prevent disclosure of **personal information**, and providing the customer with a cost-free means to exercise that right.

(d) The following are among the disclosures not deemed to be disclosures of **personal information** by a business for a third party's direct marketing purposes for purposes of this section:

(1) Disclosures between a business and a third party pursuant to contracts or arrangements pertaining to any of the following:

(A) The processing, storage, management, or organization of **personal information**, or the performance of services on behalf of the business during which **personal information** is disclosed, if the third party that processes, stores, manages, or organizes the **personal information** does not use the **information** for a third party's direct marketing purposes and does not disclose the **information** to additional third parties for their direct marketing purposes.

(B) Marketing products or services to customers with whom the business has an established business relationship where, as a part of the marketing, the business does not disclose **personal information** to third parties for the third parties' direct marketing purposes.

(C) Maintaining or servicing accounts, including credit accounts and disclosures pertaining to the denial of applications for credit or the status of applications for credit and processing bills or insurance claims for payment.

(D) Public record **information** relating to the right, title, or interest in real property or **information** relating to property characteristics, as defined in Section 408.3 of the Revenue and Taxation Code, obtained from a governmental agency or entity or from a multiple listing service, as defined in Section 1087, and not provided directly by the customer to a business in the course of an established business relationship.

(E) Jointly offering a product or service pursuant to a written agreement with the third party that receives the **personal information**, provided that all of the following requirements are met:

(i) The product or service offered is a product or service of, and is provided by, at least one of the businesses that is a party to the written agreement.

(ii) The product or service is jointly offered, endorsed, or sponsored by, and clearly and conspicuously identifies for the customer, the businesses that disclose and receive the disclosed **personal information**.

(iii) The written agreement provides that the third party that receives the **personal information** is required to maintain the confidentiality of the **information** and is prohibited from disclosing or using the **information** other than to carry out the joint offering or servicing of a product or service that is the subject of the written agreement.

(2) Disclosures to or from a consumer reporting agency of a customer's payment history or other **information** pertaining to transactions or experiences between the business and a customer if that **information** is to be reported in, or used to generate, a consumer report as defined in subdivision (d) of Section 1681a of

TU-MAKAEFF5617

Title 15 of the United States Code, and use of that **information** is limited by the federal Fair Credit Reporting Act (15 U.S.C. Sec. 1681 et seq.).

(3) Disclosures of **personal information** by a business to a third party **financial** institution solely for the purpose of the business obtaining payment for a transaction in which the customer paid the business for goods or services with a check, credit card, charge card, or debit card, if the customer seeks the **information** required by subdivision (a) from the business obtaining payment, whether or not the business obtaining payment knows or reasonably should know that the third party **financial** institution has used the **personal information** for its direct marketing purposes.

(4) Disclosures of **personal information** between a licensed agent and its principal, if the **personal information** disclosed is necessary to complete, effectuate, administer, or enforce transactions between the principal and the agent, whether or not the licensed agent or principal also uses the **personal information** for direct marketing purposes, if that **personal information** is used by each of them solely to market products and services directly to customers with whom both have established business relationships as a result of the principal and agent relationship.

(5) Disclosures of **personal information** between a **financial** institution and a business that has a private label credit card, affinity card, retail installment contract, or cobranded card program with the **financial** institution, if the **personal information** disclosed is necessary for the **financial** institution to maintain or service accounts on behalf of the business with which it has a private label credit card, affinity card, retail installment contract, or cobranded card program, or to complete, effectuate, administer, or enforce customer transactions or transactions between the institution and the business, whether or not the institution or the business also uses the **personal information** for direct marketing purposes, if that **personal information** is used solely to market products and services directly to customers with whom both the business and the **financial** institution have established business relationships as a result of the private label credit card, affinity card, retail installment contract, or cobranded card program.

(e) For purposes of this section, the following terms have the following meanings:

(1) "Customer" means an individual who is a resident of California who provides **personal information** to a business during the creation of, or throughout the duration of, an established business relationship if the business relationship is primarily for **personal**, family, or household purposes.

(2) "Direct marketing purposes" means the use of **personal information** to solicit or induce a purchase, rental, lease, or exchange of products, goods, property, or services directly to individuals by means of the mail, telephone, or electronic mail for their **personal**, family, or household purposes. The sale, rental, exchange, or lease of **personal information** for consideration to businesses is a direct marketing purpose of the business that sells, rents, exchanges, or obtains consideration for the **personal information**. "Direct marketing purposes" does not include the use of **personal information** (A) by bona fide tax exempt charitable or religious organizations to solicit charitable contributions, (B) to raise funds from and communicate with individuals regarding politics and government, (C) by a third party when the third party receives

TU-MAKAEFF5618

**personal information** solely as a consequence of having obtained for consideration permanent ownership of accounts that might contain **personal information**, or (D) by a third party when the third party receives **personal information** solely as a consequence of a single transaction where, as a part of the transaction, **personal information** had to be disclosed in order to effectuate the transaction.

(3) "Disclose" means to disclose, release, transfer, disseminate, or otherwise communicate orally, in writing, or by electronic or any other means to any third party.

(4) "Employees who regularly have contact with customers" means employees whose contact with customers is not incidental to their primary employment duties, and whose duties do not predominantly involve ensuring the safety or health of the business's customers. It includes, but is not limited to, employees whose primary employment duties are as cashier, clerk, customer service, sales, or promotion. It does not, by way of example, include employees whose primary employment duties consist of food or beverage preparation or service, maintenance and repair of the business's facilities or equipment, direct involvement in the operation of a motor vehicle, aircraft, watercraft, amusement ride, heavy machinery or similar equipment, security, or participation in a theatrical, literary, musical, artistic, or athletic performance or contest.

(5) "Established business relationship" means a relationship formed by a voluntary, two-way communication between a business and a customer, with or without an exchange of consideration, for the purpose of purchasing, renting, or leasing real or **personal** property, or any interest therein, or obtaining a product or service from the business, if the relationship is ongoing and has not been expressly terminated by the business or the customer, or if the relationship is not ongoing, but is solely established by the purchase, rental, or lease of real or **personal** property from a business, or the purchase of a product or service, and no more than 18 months have elapsed from the date of the purchase, rental, or lease.

(6) (A) The categories of **personal information** required to be disclosed pursuant to paragraph (1) of subdivision (a) are all of the following:

(i) Name and address.
(ii) Electronic mail address.
(iii) Age or date of birth.
(iv) Names of children.
(v) Electronic mail or other addresses of children.
(vi) Number of children.
(vii) The age or gender of children.
(viii) Height.
(ix) Weight.
(x) Race.
(xi) Religion.
(xii) Occupation.
(xiii) Telephone number.
(xiv) Education.
(xv) Political party affiliation.
(xvi) Medical condition.
(xvii) Drugs, therapies, or medical products or equipment used.
(xviii) The kind of product the customer purchased, leased, or rented.
(xix) Real property purchased, leased, or rented.
(xx) The kind of service provided.

TU-MAKAEFF5619

(xxi) Social security number.
(xxii) Bank account number.
(xxiii) Credit card number.
(xxiv) Debit card number.
(xxv) Bank or investment account, debit card, or credit card balance.
(xxvi) Payment history.
(xxvii) **Information** pertaining to the customer's creditworthiness, assets, income, or liabilities.
(B) If a list, description, or grouping of customer names or addresses is derived using any of these categories, and is disclosed to a third party for direct marketing purposes in a manner that permits the third party to identify, determine, or extrapolate any other **personal information** from which the list was derived, and that **personal information** when it was disclosed identified, described, or was associated with an individual, the categories set forth in this subdivision that correspond to the **personal information** used to derive the list, description, or grouping shall be considered **personal information** for purposes of this section.
(7) "**Personal information**" as used in this section means any **information** that when it was disclosed identified, described, or was able to be associated with an individual and includes all of the following:
(A) An individual's name and address.
(B) Electronic mail address.
(C) Age or date of birth.
(D) Names of children.
(E) Electronic mail or other addresses of children.
(F) Number of children.
(G) The age or gender of children.
(H) Height.
(I) Weight.
(J) Race.
(K) Religion.
(L) Occupation.
(M) Telephone number.
(N) Education.
(O) Political party affiliation.
(P) Medical condition.
(Q) Drugs, therapies, or medical products or equipment used.
(R) The kind of product the customer purchased, leased, or rented.
(S) Real property purchased, leased, or rented.
(T) The kind of service provided.
(U) Social security number.
(V) Bank account number.
(W) Credit card number.
(X) Debit card number.
(Y) Bank or investment account, debit card, or credit card balance.
(Z) Payment history.
(AA) **Information** pertaining to creditworthiness, assets, income, or liabilities.
(8) "Third party" or "third parties" means one or more of the following:
(A) A business that is a separate legal entity from the business that has an established business relationship with a customer.
(B) A business that has access to a database that is shared among

TU-MAKAEFF5620

businesses, if the business is authorized to use the database for direct marketing purposes, unless the use of the database is exempt from being considered a disclosure for direct marketing purposes pursuant to subdivision (d).

(C) A business not affiliated by a common ownership or common corporate control with the business required to comply with subdivision (a).

(f) (1) Disclosures of **personal information** for direct marketing purposes between affiliated third parties that share the same brand name are exempt from the requirements of paragraph (1) of subdivision (a) unless the **personal information** disclosed corresponds to one of the following categories, in which case the customer shall be informed of those categories listed in this subdivision that correspond to the categories of **personal information** disclosed for direct marketing purposes and the third party recipients of **personal information** disclosed for direct marketing purposes pursuant to paragraph (2) of subdivision (a):

(A) Number of children.
(B) The age or gender of children.
(C) Electronic mail or other addresses of children.
(D) Height.
(E) Weight.
(F) Race.
(G) Religion.
(H) Telephone number.
(I) Medical condition.
(J) Drugs, therapies, or medical products or equipment used.
(K) Social security number.
(L) Bank account number.
(M) Credit card number.
(N) Debit card number.
(O) Bank or investment account, debit card, or credit card balance.

(2) If a list, description, or grouping of customer names or addresses is derived using any of these categories, and is disclosed to a third party or third parties sharing the same brand name for direct marketing purposes in a manner that permits the third party to identify, determine, or extrapolate the **personal information** from which the list was derived, and that **personal information** when it was disclosed identified, described, or was associated with an individual, any other **personal information** that corresponds to the categories set forth in this subdivision used to derive the list, description, or grouping shall be considered **personal information** for purposes of this section.

(3) If a business discloses **personal information** for direct marketing purposes to affiliated third parties that share the same brand name, the business that discloses **personal information** for direct marketing purposes between affiliated third parties that share the same brand name may comply with the requirements of paragraph (2) of subdivision (a) by providing the overall number of affiliated companies that share the same brand name.

(g) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

(h) This section does not apply to a **financial** institution that is subject to the California **Financial Information** Privacy Act

TU-MAKAEFF5621

(Division 1.2 (commencing with Section 4050) of the **Financial** Code)
if the **financial** institution is in compliance with Sections 4052,
4052.5, 4053, 4053.5, and 4054.6 of the **Financial** Code, as those
sections read when they were chaptered on August 28, 2003, and as
subsequently amended by the Legislature or by initiative.
   (i) This section shall become operative on January 1, 2005.


1798.84.  (a) Any waiver of a provision of this title is contrary to
public policy and is void and unenforceable.
   (b) Any customer injured by a violation of this title may
institute a civil action to recover damages.
   (c) In addition, for a willful, intentional, or reckless violation
of Section 1798.83, a customer may recover a civil penalty not to
exceed three thousand dollars ($3,000) per violation; otherwise, the
customer may recover a civil penalty of up to five hundred dollars
($500) per violation for a violation of Section 1798.83.
   (d) Unless the violation is willful, intentional, or reckless, a
business that is alleged to have not provided all the **information**
required by subdivision (a) of Section 1798.83, to have provided
inaccurate **information**, failed to provide any of the **information**
required by subdivision (a) of Section 1798.83, or failed to provide
**information** in the time period required by subdivision (b) of Section
1798.83, may assert as a complete defense in any action in law or
equity that it thereafter provided regarding the **information** that was
alleged to be untimely, all the **information**, or accurate
**information**, to all customers who were provided incomplete or
inaccurate **information**, respectively, within 90 days of the date the
business knew that it had failed to provide the **information**, timely
**information**, all the **information**, or the accurate **information**,
respectively.
   (e) Any business that violates, proposes to violate, or has
violated this title may be enjoined.
   (f) A prevailing plaintiff in any action commenced under Section
1798.83 shall also be entitled to recover his or her reasonable
attorney's fees and costs.
   (g) The rights and remedies available under this section are
cumulative to each other and to any other rights and remedies
available under law.

**In addition, the Trump University, and their affiliates, imply, promise or suggest that
students who follow their program (including the illegal teachings and practices) will reap
back their investment.  In addition, they promised that the first month would produce
$30,000 in returns equally about ½ of the total investment the Student paid for the services.
The Student had no former training in the Real Estate market and was relying on the
promises of return on their investment for training and continuing services to replace the
initial investment in the aforementioned groups books, seminars, retreats, legal services
and ongoing mentor training.  In reality, because the books, seminars, retreats and ongoing
mentor training required that the student violate California Codes in order to "potentially"
make money in real estate transactions acting as a Real Estate Agent in Violation of DRE,
Federal, and California Code in addition to Nevada Law, Arkansas Law, Florida Law, and
New York Law.  This is clearly a violation of the code below again requiring that THE**

**STUDENT BE REFUNDED ALL MONEY SPENT ON THE REAL ESTATE PROGRAM by the AFOREMENTIONED PARTIES.**

```
CALIFORNIA CODES
CIVIL CODE
SECTION 1812.200-1812.221

Broad Fraud Federal and State Provisions
```

*Prohibited Acts and Practices*

Most state deceptive trade practices statutes include broad restrictions on "deceptive" or "unfair" trade practices. These states often include prohibitions against FRAUDULENT practices and unconscionable practices. The Federal Trade Commission, when interpreting the FTCA, does not require that the person committing an act of deception have the intent to deceive. Moreover, the FTC does not require that actual deception occur. The FTC merely requires that a party have the capacity to deceive or commit an unfair trade practice. If a business or individual has this capacity or tendency to deceive, the FTC under the FTCA may order the company to cease and desist the deceptive or unfair practice. State statutes similarly do not require that a company specifically intends to deceive, nor must a company always have knowledge that a statement is false to be liable for misrepresentations made to a consumer.

A consumer who has been victimized by a potential deceptive or unfair trade practice should consult the deceptive trade practice statute in that state, plus consult CASE LAW applying this statute, to determine whether he or she has a cause of action. In addition to the broad prohibition against deception, most state statutes also include a list of practices that are defined as deceptive. Under the Uniform Deceptive Trade Practices Act, if a business or person engages in the following, the action constitutes a deceptive trade practice:

- Passes off goods or services as those of another
- Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services
- Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another
- Uses deceptive representations or designations of geographic origin in connection with goods or services

TU-MAKAEFF5623

- Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsor-ship, approval, status, affiliation, or connection that he does not have
- Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or second-hand
- Represents that goods or services are of particular standard, quality, or grade, or that goods are of particular style or model, if they are of another
- Disparages the goods, services, or business of another by false or misleading misrepresentation of fact
- Advertises goods or services with intent not to sell them as advertised
- Advertises goods or services with intent not to supply reasonably expected public demand, unless advertisement discloses a limitation of quantity
- Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions
- Engages in any other conduct which similarly creates the likelihood of confusion or of misunderstanding

Most states include similar items in their lists of deceptive trade practices violations, even if those states have not adopted the uniform act. In addition, the FTC and many states prohibit other unfair practices, including the following:

- Unfair provisions in contracts of adhesion
- Coercive or high-pressure tactics in sales and collection efforts
- Illegal conduct
- Taking advantage of bargaining power of vulnerable groups
- Taking advantage of emergency situations
- Unconscionable activities, including outrageous and offensive conduct by a business in the sale of goods or services

```
1812.200.  (a) The Legislature finds and declares that the widespread sale of
seller assisted marketing plans, often connected with the sale of vending
machines, racks or work-at-home paraphernalia, has created numerous problems
in California for purchasers which are inimical to good business practice.
Often purchasers of seller assisted marketing plans are individuals
inexperienced in business matters who use their life savings to purchase the
seller assisted marketing plan in the hope that they will earn enough money
in addition to retirement income or salary to become or remain self-
sufficient. Many purchasers are the elderly who are seeking a way to
supplement their fixed incomes. The initial payment is usually in the form of
a purchase of overpriced equipment or products. California purchasers have
```

TU-MAKAEFF5624

suffered substantial losses when they have failed to receive full and complete information regarding the seller assisted marketing plan, the amount of money they can reasonably expect to earn, and the previous experience of the seller assisted marketing plan seller. Seller assisted marketing plan sellers have a significant impact upon the economy and well-being of this state and its local communities. The provisions of his title relating to seller assisted marketing plans are necessary for the public welfare.

(b) It is the intent of this title to provide each prospective seller assisted marketing plan purchaser with the information necessary to make an intelligent decision regarding seller assisted marketing plans being offered; to safeguard the public against deceit and **financial** hardship; to insure, foster and encourage competition and fair dealing in the sale of seller assisted marketing plans by requiring adequate disclosure; to prohibit representations that tend to mislead; and to prohibit or restrict **unfair** contract terms. This title shall be construed liberally in order to achieve the foregoing purposes.


1812.201.  For the purposes of this title, the following definitions shall apply:

(a) "Seller assisted marketing plan" means any sale or lease or offer to sell or lease any product, equipment, supplies, or services that requires a total initial payment exceeding five hundred dollars ($500), but requires an initial cash payment of less than fifty thousand dollars ($50,000), that will aid a purchaser or will be used by or on behalf of the purchaser in connection with or incidental to beginning, maintaining, or operating a business when the seller assisted marketing plan seller has advertised or in any other manner solicited the purchase or lease of the seller assisted marketing plan and done any of the following acts:

(1) Represented that the purchaser will earn, is likely to earn, or can earn an amount in excess of the initial payment paid by the purchaser for participation in the seller assisted marketing plan.

(2) Represented that there is a market for the product, equipment, supplies, or services, or any product marketed by the user of the product, equipment, supplies, or services sold or leased or offered for sale or lease to the purchaser by the seller, or anything, be it tangible or intangible, made, produced, fabricated, grown, bred, modified, or developed by the purchaser using, in whole or in part, the product, supplies, equipment, or services that were sold or leased or offered for sale or lease to the purchaser by the seller assisted marketing plan seller.

(3) Represented that the seller will buy back or is likely to buy back any product made, produced, fabricated, grown, or bred by the purchaser using, in whole or in part, the product, supplies, equipment, or services that were initially sold or leased or offered for sale or lease to the purchaser by the seller assisted marketingplan seller.

(b) A "seller assisted marketing plan" shall not include:

(1) A security, as defined in the Corporate Securities Law of 1968 (Division 1 (commencing with Section 25000) of Title 4 of the **Corporations Code**), that has been qualified for sale by the Department of **Corporations**, or is exempt under Chapter 1 (commencing with Section 25100) of Part 2 of Division 1 of Title 4 of the **Corporations Code** from the necessity to qualify.
(2) A franchise defined by the Franchise Investment Law (Division5 (commencing with Section 31000) of Title 4 of the **Corporations Code**) that is registered with the Department of **Corporations** or is exempt under Chapter 1 (commencing with Section 31100) of Part 2 of Division 5 of Title 4 of the **Corporations Code** from the necessity of registering.

TU-MAKAEFF5625

(3) Any transaction in which either the seller or purchaser or the lessor or lessee is licensed pursuant to and the transaction is governed by the Real Estate Law, Division 4 (commencing with Section 10000) of the Business and **Professions Code**.

(4) A license granted by a general merchandise retailer that allows the licensee to sell goods, equipment, supplies, products, or services to the general public under the retailer's trademark, trade name, or service mark if all of the following criteria are satisfied:

(A) The general merchandise retailer has been doing business in this state continually for five years prior to the granting of the license.

(B) The general merchandise retailer sells diverse kinds of goods, equipment, supplies, products, or services.

(C) The general merchandise retailer also sells the same goods, equipment, supplies, products, or services directly to the general public.

(D) During the previous 12 months the general merchandise retailer's direct **sales** of the same goods, equipment, supplies, products, or services to the public account for at least 50 percent of its yearly **sales** of these goods, equipment, supplies, products, or services made under the retailer's trademark, trade name, or service mark.

(5) A newspaper distribution system distributing newspapers as defined in Section 6362 of the Revenue and Taxation **Code**.

(6) A sale or lease to an existing or beginning business enterprise that also sells or leases equipment, products, supplies, or performs services that are not supplied by the seller and that the purchaser does not utilize with the equipment, products, supplies, or services of the seller, if the equipment, products, supplies, or services not supplied by the seller account for more than 25 percent of the purchaser's gross **sales**.

(7) The sale in the entirety of an "ongoing business." For purposes of this paragraph, an "ongoing business" means a business that for at least six months previous to the sale has been operated from a particular specific location, has been open for business to the general public, and has had all equipment and supplies necessary for operating the business located at that location. The sale shall be of the entire "ongoing business" and not merely a portion of theongoing business.

(8) A sale or lease or offer to sell or lease to a purchaser (A) who has for a period of at least six months previously bought products, supplies, services, or equipment that were sold under the same trademark or trade name or that were produced by the seller and, (B) who has received on resale of the product, supplies, services, or equipment an amount that is at least equal to the amount of the initial payment.

(9) The renewal or extension of an existing seller assisted marketing plan contract.

(10) A product distributorship that meets each of the following requirements:

(A) The seller sells products to the purchaser for resale by the purchaser, and it is reasonably contemplated that substantially all of the purchaser's **sales** of the product will be at wholesale.

(B) The agreement between the parties does not require that the purchaser pay the seller, or any person associated with the seller, a fee or any other payment for the right to enter into the agreement, and does not require the purchaser to buy a minimum or specified quantity of the products, or to buy products for a minimum or specified period of time. For purposes of this paragraph, a "person associated with the seller" means a person, including an individual

TU-MAKAEFF5626

or a business entity, controlling, controlled by, or under the same
control as the seller.

(C) The seller is a corporation, partnership, limited liability
company, joint venture, or any other business entity.

(D) The seller has a net worth of at least ten million dollars
($10,000,000) according to audited **financial** statements of the seller
done during the 18 months preceding the date of the initial sale of
products to the purchaser. Net worth may be determined on a
consolidated basis if the seller is a subsidiary of another business
entity that is permitted by generally accepted accounting standards
to prepare **financial** statements on a consolidated basis and that
business entity absolutely and irrevocably agrees in writing to
guarantee the seller's obligations to the purchaser. The seller's net
worth shall be verified by a certification to the Attorney General
from an independent certified public accountant that the audited
**financial** statement reflects a net worth of at least ten million
dollars ($10,000,000). This certification shall be provided within 30
days following receipt of a written request from the Attorney
General.

(E) The seller grants the purchaser a license to use a trademark
that is registered under federal law.

(F) It is not an agreement or arrangement encouraging a
distributor to recruit others to participate in the program and
compensating the distributor for recruiting others into the program
or for **sales** made by others recruited into the program.

(c) "Person" includes an individual, corporation, partnership,
limited liability company, joint venture, or any business entity.

(d) "Seller" means a person who sells or leases or offers to sell
or lease a seller assisted marketing plan and who meets either of the
following conditions:

(1) Has sold or leased or represents or implies that the seller
has sold or leased, whether in California or elsewhere, at least five
seller assisted marketing plans within 24 months prior to a
solicitation.

(2) Intends or represents or implies that the seller intends to
sell or lease, whether in California or elsewhere, at least five
seller assisted marketing plans within 12 months following a
solicitation.

For purposes of this title, the seller is the person to whom the
purchaser becomes contractually obligated. A "seller" does not
include a licensed real estate broker or salesman who engages in the
sale or lease of a "business opportunity" as that term is used in
Sections 10000 to 10030, inclusive, of the Business and **Professions
Code**, or elsewhere in Chapter 1 (commencing with Section 10000),
Chapter 2 (commencing with Section 10050), or Chapter 6 (commencing
with Section 10450) of Part 1 of Division 4 of the Business and
**Professions Code.**

(e) "Purchaser" means a person who is solicited to become
obligated or does become obligated on a seller assisted marketing
plan contract.

(f) "Equipment" includes machines, all electrical devices, video
or audio devices, molds, display racks, vending machines, coin
operated game machines, machines that dispense products, and display
units of all kinds.

(g) "Supplies" includes any and all materials used to produce,
grow, breed, fabricate, modify, develop, or make any product or item.

(h) "Product" includes any tangible chattel, including food or

living animals, that the purchaser intends to:
   (1) Sell or lease.
   (2) Use to perform a service.
   (3) Resell or attempt to resell to the seller assisted marketing plan seller.
   (4) Provide or attempt to provide to the seller assisted marketing plan seller or to any other person whom the seller suggests the purchaser contact so that the seller assisted marketing plan seller or that other person may assist, either directly or indirectly, the purchaser in distributing, selling, leasing, or otherwise disposing of the product.
   (i) "Services" includes any assistance, guidance, direction, work, labor, or services provided by the seller to initiate or maintain or assist in the initiation or maintenance of a business.
   (j) "Seller assisted marketing plan contract" or "contract" means any contract or agreement that obligates a purchaser to a seller.
   (k) "Initial payment" means the total amount a purchaser is obligated to pay to the seller under the terms of the seller assisted marketing plan contract prior to or at the time of delivery of the equipment, supplies, products, or services or within six months of the purchaser commencing operation of the seller assisted marketing plan. If the contract sets forth a specific total sale price for purchase of the seller assisted marketing plan which total price is to be paid partially as a downpayment and then in specific monthly payments, the "initial payment" means the entire total sale price.
   (l) "Initial cash payment" or "downpayment" means that portion of the initial payment that the purchaser is obligated to pay to the seller prior to or at the time of delivery of equipment, supplies, products, or services. It does not include any amount financed by or for which financing is to be obtained by the seller, or financing that the seller assists in obtaining.
   (m) "Buy-back" or "secured investment" means any representation that implies in any manner that the purchaser's initial payment is protected from loss. These terms include a representation or implication of any of the following:
   (1) That the seller may repurchase either all or part of what it sold to the purchaser.
   (2) That the seller may at some future time pay the purchaser the difference between what has been earned and the initial payment.
   (3) That the seller may in the ordinary course buy from the purchaser items made, produced, fabricated, grown, bred, modified, or developed by the purchaser using, in whole or in part, the product, supplies, equipment, or services that were initially sold or leased to the purchaser by the seller.
   (4) That the seller or a person to whom the seller will refer the purchaser may in the ordinary course sell, lease, or distribute the items the purchaser has for sale or lease.


1812.202.  (a) An offer to sell or offer to lease a seller assisted marketing plan shall occur in this state whenever:
   (1) The offer to sell or offer to lease is made in this state;
   (2) The purchaser resides in this state at the time of the offer; or
   (3) The offer to sell or offer to lease either originates from this state or is directed by the seller or lessor to this state and

TU-MAKAEFF5628

received at the place to which it is directed.
   (b) A sale or lease of a seller assisted marketing plan shall
occur in this state whenever:
   (1) The offer to sell or offer to lease is accepted in this state;
   (2) The purchaser resides in this state at the time of the sale;
or
   (3) The acceptance is communicated to a seller situated in this
state.


1812.203.  (a) The seller of any seller assisted marketing plan
shall pay an annual fee in the amount of one hundred dollars ($100)
and annually file with the Attorney General a copy of the disclosure
statements required under Sections 1812.205 and 1812.206, as well as
a list of the names and resident addresses of those individuals who
sell the seller assisted marketing plan on behalf of the seller. The
first filing shall be made at least 30 days prior to placing any
advertisement or making any other representations to prospective
purchasers. The first filing shall not be deemed to be effective
until a notice of filing has been issued by the Attorney General. The
seller may not make any advertisement or other representation to
prospective purchasers until a notice of filing has been issued by
the Attorney General. The disclosure statements on file shall be
updated through a new filing and payment of a fee in the amount of
thirty dollars ($30), whenever material changes occur during the year
following the annual filing and the updated filing shall include all
disclosure statements required by Sections 1812.205 and 1812.206 and
a list of the names and resident addresses of all current
salespersons and all salespersons who have acted on behalf of the
seller since the previous filing, whether the annual filing or an
updated filing, indicating which salespersons are still active and
which no longer act on behalf of the seller. Each seller of a seller
assisted marketing plan shall file the annual renewal filing, whether
or not any update filings have been made, at least 10 days before
one year has elapsed from the date of the notice of filing issued by
the Attorney General, and at least 10 days before the same date every
year thereafter. The annual renewal filing shall include all
disclosure statements required by Sections 1812.205 and 1812.206 and
a list of the names and addresses of the residences of all current
salespersons and all salespersons who have acted on behalf of the
seller since the previous filing (whether the annual filing or an
updated filing), indicating which salespersons are still active and
which no longer act on behalf of the seller. The annual renewal
filing fee shall be one hundred dollars ($100). If an annual renewal
filing is not filed as required, the previous filing shall be deemed
to have lapsed and the seller shall be prohibited from placing any
seller assisted marketing plan advertisements or making any other
representations to prospective purchasers of seller assisted
marketing plan until a new annual filing is made and a new notice of
filing has been issued by the Attorney General.
   (b) The Attorney General may send by certified mail to the address
set forth in the seller assisted marketing plan filing an intent to
issue a stop order denying the effectiveness of or suspending or
revoking the effectiveness of any filing if he or she finds the
following:
   (1) That there has been a failure to comply with any of the

TU-MAKAEFF5629

provisions of this title.
   (2) That the offer or sale of the seller assisted marketing plan
would constitute a misrepresentation to, or deceit of, or fraud on,
the purchaser.
   (3) That any person identified in the filing has been convicted of
an offense under paragraph (1) of subdivision (b) of Section
1812.206, or is subject to an order or has had a **civil** judgment
entered against him or her as described in paragraphs (2) and (3) of
subdivision (b) of Section 1812.206, and the involvement of that
person in the sale or management of the seller assisted marketing
plan creates an unreasonable risk to prospective purchasers.
   (c) The notice referred to shall include facts supporting a
suspension or revocation. If the seller assisted marketing plan does
not submit to the Attorney General, under penalties of perjury signed
by an owner or officer of the seller assisted marketing plan, within
10 days of receipt of the intent to issue a stop order, a refutation
of each and every supporting fact set forth in the notice, and each
fact not refuted shall be deemed, for purposes of issuance of the
order, an admission that the fact is true. If, in the opinion of the
Attorney General, and based upon supporting facts not refuted by the
seller assisted marketing plan, the plan is offered to the public
without compliance with this title, the Attorney General may order
the seller to desist and refrain from the further sale or attempted
sale of the seller assisted marketing plan unless and until a notice
of filing has been issued pursuant to this section. Until that time,
the registration shall be void. The order shall be in effect until
and unless the seller assisted marketing plan files a proceeding in
superior court pursuant to Section 1085 or 1094.5 of the **Code** of
**Civil Procedure** or seeks other judicial relief and serves a copy of
the proceeding upon the Attorney General.


1812.204.  In selling, leasing, or offering to sell or lease a
seller assisted marketing plan in this state, sellers shall not:
   (a) Use the phrase "buy-back" or "secured investment" or similar
phrase orally or in writing when soliciting, offering, leasing, or
selling a seller assisted marketing plan if the "security" is the
value of the equipment, supplies, products or services supplied by
the seller to the purchaser.
   (b) Use the phrase "buy-back" or "secured investment" or similar
phrase orally or in writing when soliciting, offering, leasing, or
selling a seller assisted marketing plan unless there are no
restrictions or qualifications whatsoever preventing or limiting a
purchaser from being able to invoke the "buy-back" or "secured"
portion of the seller assisted marketing plan contract at any time
the purchaser desires during the one-year period following the
contract date. Upon invocation of the "buy-back" or "security"
provision, the minimum amount a purchaser shall be entitled to have
returned to him is the full amount of his initial payment, less the
amount actually received by him from the operation of the seller
assisted marketing plan. The "amount actually received" means either
the amount the purchaser actually obtained from the seller for any
product resold to the seller or the amount of money the purchaser
received for use of the purchaser's product, equipment, supplies or
services, less any amount: (1) the purchaser has paid the owner or
manager of the location at which the purchaser's products, equipment,

TU-MAKAEFF5630

supplies or services are placed; and (2) the purchaser has paid to obtain other items needed in order to sell, make, produce, fabricate, grow, breed, modify, or develop the item which the seller assisted marketing plan purchaser intends to sell, lease, distribute, or otherwise dispose of.

(c) Represent that a purchaser's initial payment is "secured" in any manner or to any degree or that the seller provides a "buy-back" arrangement unless the seller has, in conformity with subdivision (b) of Section 1812.214, either obtained a surety bond issued by a surety company admitted to do business in this state or established a trust account at a federally insured bank or savings and loan association located in this state.

(d) Represent that the seller assisted marketing plan provides income or earning potential of any kind unless the seller has data to substantiate the claims of income or earning potential and discloses this data to the purchaser at the time the claim is made, if made in person, or if made through written or telephonic communication, at the first in-person communication thereafter and, when disclosed, the data is left with the purchaser. A mathematical computation of the number of **sales** multiplied by the amount of profit per sale to reach a projected income figure is not sufficient data to substantiate an income or earning potential claim. Income or earning potential claims cannot be made or implied at all unless they are based on the experience of at least 10 purchasers from the seller assisted marketing plan being offered. The data left by the seller must, at a minimum, disclose:

(1) The length of time the seller has been selling the particular seller assisted marketing plan being offered;

(2) The number of purchasers from the seller known to the seller to have made at least the same **sales**, income or profits as those represented; and

(3) The percentage the number represents of the total number of purchasers from the seller.

(e) Use the trademark, service mark, trade name, logotype, advertising or other commercial symbol of any business which does not either control the ownership interest in the seller or accept responsibility for all representations made by the seller in regard to the seller assisted marketing plan, unless the nature of the seller's relationship to such other business entity is set forth immediately adjacent to and in type size equal to or larger than that used to depict the commercial symbol of such other business. If a member of a trade association, the seller may use the logo or registration mark of the trade association in advertisements and materials without regard to this subdivision.

(f) Place or cause to be placed any advertisement for a seller assisted marketing plan which does not include the actual business name of the seller, and if it differs, the name under which the seller assisted marketing plan is operated and the street address of the principal place of business of the seller.


1812.205.  At the first in-person communication with a potential purchaser or in the first written response to an inquiry by a potential purchaser, whichever occurs first, wherein the seller assisted marketing plan is described, the seller or his or her representative shall provide the prospective purchaser a written

TU-MAKAEFF5631

document, the cover sheet of which is entitled in at least 16-point
boldface capital letters "DISCLOSURE REQUIRED BY CALIFORNIA LAW."
Under the title shall appear in boldface of at least 10-point type,
the statement: "The State of California has not reviewed and does not
approve, recommend, endorse or sponsor any seller assisted marketing
plan. The information contained in this disclosure has not been
checked by the state. If you have any questions about this purchase,
see an attorney or other **financial** adviser before you sign a contract
or agreement." Nothing shall appear on the cover sheet except the
title and the statement required above. The disclosure document shall
contain the following information:
   (a) The name of the seller, the name under which the seller is
doing or intends to do business and the name of any parent or
affiliated company that will engage in business transactions with
purchasers or accept responsibility for statements made by the
seller.
   (b) A statement of the initial payment to be paid by the purchaser
to the seller, or when not known, a statement of the approximate
initial payment charged, the amount of the initial payment to be paid
to a person inducing, directly or indirectly, a purchaser to
contract for the seller assisted marketing plan.
   (c) A full and detailed description of the actual services the
seller will undertake to perform for the purchaser.
   (d) When the seller makes any statement concerning earnings or
range of earnings that may be made through the seller assisted
marketing plan, he must comply with subdivision (d) of Section
1812.204 and set forth in complete form in this disclosure statement
the following:
   "No guarantee of earnings or ranges of earnings can be made. The
number of purchasers who have earned through this business an amount
in excess of the amount of their initial payment is at least _____,
which represents ___ percent of the total number of purchasers of
this seller assisted marketing plan."
   (e) If training of any type is promised by the seller, a complete
description of the training and the length of the training.
   (f) If the seller promises services to be performed in connection
with the placement of the equipment, product or supplies at a
location from which they will be sold or used, the full nature of
those services as well as the nature of the agreements to be made
with the owner or manager of the location at which the purchaser's
equipment, product or supplies will be placed, must be set forth.
   (g) If the seller represents orally or in writing when soliciting
or offering for sale or lease or selling or leasing a seller assisted
marketing plan that there is a "buy-back" arrangement or that the
initial payment is in some manner protected from loss or "secured,"
the entire and precise nature of the "buy-back", "protection" or
"security" arrangement shall be completely and clearly disclosed.


1812.206.  At least 48 hours prior to the execution of a seller
assisted marketing plan contract or agreement or at least 48 hours
prior to the receipt of any consideration, whichever occurs first,
the seller or his or her representative shall provide to the
prospective purchaser in writing a document entitled "SELLER ASSISTED
MARKETING PLAN INFORMATION SHEET." The seller may combine the
information required under this section with the information required

TU-MAKAEFF5632

under Section 1812.205 and, if done, shall utilize the single title
"DISCLOSURES REQUIRED BY CALIFORNIA LAW," and the title page required
by Section 1812.205. If a combined document is used, it shall be
given at the time required by Section 1812.205, provided that this
time meets the 48-hour test of this section. The information sheet
required by this section shall contain the following:

(a) The name of and the office held by the seller's owners,
officers, directors, trustees and general or limited partners, as the
case may be, and the names of those individuals who have management
responsibilities in connection with the seller's business activities.

(b) A statement whether the seller, any person identified in
subdivision (a), and any other company managed by a person identified
in subdivision (a):

(1) Has been convicted of a felony or misdemeanor or pleaded nolo
contendere to a felony or misdemeanor charge if the felony or
misdemeanor involved an alleged violation of this title, fraud,
embezzlement, fraudulent conversion or misappropriation of property.

(2) Has been held liable in a **civil** action by final judgment or
consented to the entry of a stipulated judgment if the **civil** action
alleged a violation of this title, fraud, embezzlement, fraudulent
conversion or misappropriation of property or the use of untrue or
misleading representations in an attempt to sell or dispose of real
or personal property or the use of **unfair**, unlawful or deceptive
business **practices**.

(3) Is subject to any currently effective agreement, injunction,
or restrictive order, including, but not limited to, a "cease and
desist" order, an "assurance of discontinuance," or other comparable
agreement or order, relating to business activity as the result of an
action or investigation brought by a public agency or department,
including, but not limited to, an action affecting any vocational
license.

The statements required by paragraphs (1), (2) and (3) of this
subdivision shall set forth the terms of the agreement, or the court,
the docket number of the matter, the date of the conviction or of
the judgment and, when involved, the name of the governmental agency
that initiated the investigation or brought the action resulting in
the conviction or judgment.

(4) Has at any time during the previous seven fiscal years filed
in bankruptcy, been adjudged a bankrupt, been reorganized due to
insolvency, or been a principal, director, officer, trustee, general
or limited partner, or had management responsibilities of any other
person, as defined in subdivision (b) of Section 1812.201, that has
so filed or was so adjudicated or reorganized, during or within one
year after the period that the individual held that position. If so,
the name and location of the person having so filed, or having been
so adjudged or reorganized, the date thereof, the court which
exercised jurisdiction, and the docket number of the matter shall be
set forth.

(c) The length of time the seller:

(1) Has sold seller assisted marketing plans.

(2) Has sold the specific seller assisted marketing plan being
offered to the purchaser.

(d) If the seller is required to secure a bond or establish a
trust account pursuant to the requirements of Section 1812.204, the
information sheet shall state either:

(1) "Seller has secured a bond issued by

TU-MAKAEFF5633

_____,
     (name and address of surety company)

   a surety company admitted to do business in this state. Before
signing a contract to purchase this seller assisted marketing plan,
you should check with the surety company to determine the bond's
current status," or
   (2) "Seller has deposited with the office of the Attorney General
information regarding its trust account. Before signing a contract to
purchase this seller assisted marketing plan, you should check with
the Attorney General to determine the current status of the trust
account."
   (e) A copy of a recent, not more than 12 months old, **financial**
statement of the seller, together with a statement of any material
changes in the **financial** condition of the seller from the date
thereof. That **financial** statement shall either be audited or be under
penalty of perjury signed by one of the seller's officers,
directors, trustees or general or limited partners. The declaration
under penalty of perjury shall indicate that to the best of the
signatory's knowledge and belief the information in the **financial**
statement is true and accurate; the date of signature and the
location where signed shall also be indicated. Provided, however,
that where a seller is a subsidiary of another corporation which is
permitted by generally accepted accounting standards to prepare
**financial** statements on a consolidated basis, the above information
may be submitted in the same manner for the parent if the
corresponding **financial** statement of the seller is also provided and
the parent absolutely and irrevocably has agreed to guarantee all
obligations of the seller.
   (f) An unexecuted copy of the entire seller assisted marketing
plan contract.
   (g) For purposes of this section, "seller's owners" means any
individual who holds an equity interest of at least 10 percent in the
seller.


1812.207.  Every contract for sale or lease of a seller assisted
marketing plan in this state shall be in writing and shall be subject
to the provisions of this title. A copy of the fully completed
contract and all other documents the seller requires the purchaser to
sign shall be given to the purchaser at the time they are signed.



1812.208.  The purchaser shall have the right to cancel a seller
assisted marketing plan contract for any reason at any time within
three business days of the date the purchaser and the seller sign the
contract. The notice of the right to cancel and the procedures to be
followed when a contract is canceled shall comply with Section
1812.209.



1812.209.  Every seller assisted marketing plan contract shall set
forth in at least 10-point type or equivalent size if handwritten,
all of the following:

TU-MAKAEFF5634

(a) The terms and conditions of payment including the initial payment, additional payments, and downpayment required. If the contract provides for the seller to receive more than 20 percent of the initial payment before delivery to the purchaser of the equipment, supplies or products or services to be furnished under the terms of the contract, the contract shall clearly set forth for the escrow account established pursuant to subdivision (b) of Section 1812.210 and the name and address of the escrow account holder, as well as the institution, branch, and account number of the escrow account. If the contract provides for payment of any amount in excess of 20 percent of the initial payment prior to delivery of the equipment, supplies or products or services to be furnished under the terms of the contract, the contract shall set forth that payment of the amount in excess of 20 percent shall be by separate instrument made payable to the escrow account.

(b) Immediately above the place at which the purchaser signs the contract the following notification, in boldface type, of the purchaser's right to cancel the contract:

"You have three business days in which you may cancel this contract for any reason by mailing or delivering written notice to the seller assisted marketing plan seller. The three business days shall expire on

_____
   (last date to mail
   or deliver notice)
and notice of cancellation should be mailed or delivered to
_____.
(seller assisted marketing
   plan seller's name and
   business street address)
If you choose to mail your notice, it must be placed in the United States mail properly addressed, first-class postage prepaid, and postmarked before midnight of the above date. If you choose to deliver your notice to the seller directly, it must be delivered to him by the end of his normal business day on the above date. Within five business days of receipt of the notice of cancellation, the seller shall return to the purchaser all sums paid by the purchaser to the seller pursuant to this contract. Within five business days after receipt of all such sums, the purchaser shall make available at his address or at the place at which they were caused to be located, all equipment, products and supplies provided to the purchaser pursuant to this contract. Upon demand of the seller, such equipment, products and supplies shall be made available at the time the purchaser receives full repayment by cash, money order or certified check."

(c) A full and detailed description of the acts or services the seller will undertake to perform for the purchaser.

(d) The seller's principal business address and the name and the address of its agent, other than the Secretary of State, in the State of California authorized to receive service of process.

(e) The business form of the seller, whether corporate, partnership or otherwise.

(f) The delivery date or, when the contract provides for a staggered delivery of items to the purchaser, the approximate delivery date of those products, equipment or supplies the seller is

TU-MAKAEFF5635

to deliver to the purchaser to enable the purchaser to begin or
maintain his business and whether the products, equipment or supplies
are to be delivered to the purchaser's home or business address or
are to be placed or caused to be placed by the seller at locations
owned or managed by persons other than the purchaser.

(g) A complete description of the nature of the "buy-back",
"protection", or "security" arrangement, if the seller has
represented orally or in writing when selling or leasing, soliciting
or offering a seller assisted marketing plan that there is a
"buy-back" or that the initial payment or any part of it is
"protected" or "secured."

(h) A statement which accurately sets forth a purchaser's right to
void the contract under the circumstances and in the manner set
forth in subdivisions (a) and (b) of Section 1812.215.

(i) The name of the supplier and the address of such supplier of
the products, equipment, or supplies the seller is to deliver to the
purchaser to enable the purchaser to begin or maintain his business.


1812.210.  (a) No seller assisted marketing plan contract shall
require or entail the execution of any note or series of notes by the
purchaser which, when separately negotiated, will cut off as to
third parties any right of action or defense which the purchaser may
have against the seller.

(b) If the contract referred to in Section 1812.209 provides for a
downpayment to be paid to the seller, the downpayment shall not
exceed 20 percent of the initial payment amount. In no event shall
the contract payment schedule provide for the seller to receive more
than 20 percent of the initial payment before delivery to the
purchaser, or to the place at which they are to be located, the
equipment, supplies or products, unless all sums in excess of 20
percent are placed in an escrow account as provided for in
subdivision (c) of Section 1812.214. Funds placed in an escrow
account shall not be released until the purchaser notifies the escrow
holder in writing of the delivery of such equipment, supplies or
products within the time limits set forth in the seller assisted
marketing plan contract. Notification of delivery by the purchaser to
the escrow holder shall not be unreasonably withheld.


1812.211.  Any assignee of the seller assisted marketing plan
contract or the seller's rights is subject to all equities, rights
and defenses of the purchaser against the seller.


1812.212.  No seller shall make or authorize the making of any
reference to its compliance with this title.


1812.213.  Every seller shall at all times keep and maintain a
complete set of books, records and accounts of seller assisted
marketing plan **sales** made by the seller. All documents relating to

TU-MAKAEFF5636

each specific seller assisted marketing plan sold or leased shall be
maintained for four years after the date of the seller assisted
marketing plan contract.


1812.214.  (a) Every seller of seller-assisted marketing plans other
than a California corporation shall file with the Attorney General
an irrevocable consent appointing the Secretary of State or successor
in office to act as the seller's attorney to receive service or any
lawful process in any noncriminal suit, action or proceeding against
the seller or the seller's successor, executor or administrator,
which may arise under this title. When service is made upon the
Secretary of State, it shall have the same force and validity as if
served personally on the seller. Service may be made by leaving a
copy of the process in the office of the Secretary of State, but it
shall not be effective unless:
   (1) The plaintiff forthwith sends by first-class mail a notice of
the service upon the Secretary of State and a copy of the process to
the defendant or respondent at the last address on file with the
Attorney General; and
   (2) The plaintiff's affidavit of compliance with this section is
filed in the case on or before the return date of the process, if
any, or within such further time as the court allows.
   (b) If, pursuant to subdivision (c) of Section 1812.204, a seller
must obtain a surety bond or establish a trust account, the following
procedures apply:
   (1) If a bond is obtained, a copy of it shall be filed with the
Attorney General; if a trust account is established, notification of
the depository, the trustee and the account number shall be filed
with the Attorney General.
   (2) The bond or trust account required shall be in favor of the
State of California for the benefit of any person who is damaged by
any violation of this title or by the seller's breach of a contract
subject to this title or of any obligation arising therefrom. The
trust account shall also be in favor of any person damaged by these
**practices**.
   (3) Any person claiming against the trust account for a violation
of this title may maintain an action at law against the seller and
the trustee. The surety or trustee shall be liable only for actual
damages and not the punitive damages permitted under Section
1812.218. The aggregate liability of the trustee to all persons
damaged by a seller's violation of this title shall in no event
exceed the amount of the trust account.
   (4) The bond or the trust account shall be in an amount equal to
the total amount of the "initial payment" section of all
seller-assisted marketing plan contracts the seller has entered into
during the previous year or three hundred thousand dollars
($300,000), whichever is less, but in no case shall the amount be
less than fifty thousand dollars ($50,000). The amount required shall
be adjusted twice a year, no later than the tenth day of the first
month of the seller's fiscal year and no later than the tenth day of
the seventh month of the seller's fiscal year. A seller need only
establish a bond or trust account in the amount of fifty thousand
dollars ($50,000) at the commencement of business and during the
first six months the seller is in business. By the tenth day of the
seller's seventh month in business, the amount of the bond or trust

TU-MAKAEFF5637

account shall be established as provided for herein as if the seller had been in business for a year.

(c) If, pursuant to subdivision (b) of Section 1812.210, a seller utilizes an escrow account to receive those portions of the downpayment in excess of 20 percent of the initial payment before delivery to the purchaser of the equipment, supplies or products or services to be furnished under the terms of the contract, the following procedures shall apply:

(1) The holder of the escrow account shall be independent of the seller, and the seller shall not have any authority to direct disbursements from the escrow account by the holder except upon written notification by the purchaser to the holder of the escrow account of the delivery of the equipment, supplies, or products as required by and within the time limits set forth in the seller assisted marketing plan contract.

(2) The name and address of the escrow account holder, the name of the institution, the branch and account number of the escrow account shall be reported to the Attorney General by the seller.

(3) Any person claiming against the escrow account for a violation of this title may maintain an action at law against the seller and the escrow account holder. The escrow account holder shall be liable only for actual damages and not the punitive damages permitted under Section 1812.218. The aggregate liability of the escrow account holder to all persons damaged by a seller's violation of this title shall in no event exceed the amount of the escrow account.


1812.215.  (a) If a seller uses any untrue or misleading statements to sell or lease a seller assisted marketing plan, or fails to comply with Section 1812.203, or fails to give the disclosure documents or disclose any of the information required by Sections 1812.205 and 1812.206, or the contract does not comply with the requirements of this title, then within one year of the date of the contract at the election of the purchaser upon written notice to the seller, the contract shall be voidable by the purchaser and unenforceable by the seller or his assignee as contrary to public policy and the purchaser shall be entitled to receive from the seller all sums paid to the seller when the purchaser is able to return all equipment, supplies or products delivered by the seller; when such complete return cannot be made, the purchaser shall be entitled to receive from the seller all sums paid to the seller less the fair market value at the time of delivery of the equipment, supplies or products not returned by the purchaser, but delivered by the seller. Upon the receipt of such sums, the purchaser shall make available to the seller at the purchaser's address or at the places at which they are located at the time the purchaser gives notice pursuant to this section, the products, equipment or supplies received by the purchaser from the seller. Provided, however, if the seller inadvertently has failed to make any of the disclosures required by Section 1812.205 or 1812.206 or the contract inadvertently fails to comply with the requirements of this title, the seller may cure such inadvertent defect by providing the purchaser with the correct disclosure statements or contract if at the time of providing such correct disclosures or contract the seller also informs the purchaser in writing that because of the seller's error, the purchaser has an additional 15-day period after receipt of the correct disclosures or contract within

TU-MAKAEFF5638

which to cancel the contract and receive a full return of all moneys
paid in exchange for return of whatever equipment, supplies or
products the purchaser has. If the purchaser does not cancel the
contract within 15 days after receipt of the correct disclosures or
contract, he may not in the future exercise his right to void the
contract under this section due to such noncompliance with the
disclosure or contract requirements of this title.
  (b) If a seller fails to deliver the equipment, supplies or
product within 30 days of the delivery date stated in the contract,
unless such delivery delay is beyond the control of the seller, then
at any time prior to delivery or within 30 days after delivery, at
the election of the purchaser upon written notice to the seller, the
contract shall be voidable by the purchaser and unenforceable by the
seller or his assignee as contrary to public policy.
  The rights of the purchaser set forth in this section shall be
cumulative to all other rights under this title or otherwise.


1812.216.  (a) Any waiver by a purchaser of the provisions of this
title shall be deemed contrary to public policy and shall be void and
unenforceable. Any attempt by a seller to have a purchaser waive
rights given by this title shall be a violation of this title.
  (b) In any proceeding involving this title, the burden of proving
an exemption or an exception from a definition is upon the person
claiming it.


1812.217.  Any person, including, but not limited to, the seller, a
salesman, agent or representative of the seller or an independent
contractor who attempts to sell or lease or sells or leases a seller
assisted marketing plan, who willfully violates any provision of this
title or employs, directly or indirectly, any device, scheme or
artifice to deceive in connection with the offer or sale of any
seller assisted marketing plan, or willfully engages, directly or
indirectly, in any act, practice or course of business which operates
or would operate as a fraud or deceit upon any person in connection
with the offer, purchase, lease or sale of any seller assisted
marketing plan shall, upon conviction, be fined not more than ten
thousand dollars ($10,000) for each unlawful transaction, or
imprisoned in the state prison, or imprisoned in county jail for not
more than one year, or be punished by both such fine and
imprisonment.

1812.218.  Any purchaser injured by a violation of this title or by
the seller's breach of a contract subject to this title or of any
obligation arising from the sale or lease of the seller assisted
marketing plan may bring any action for recovery of damages. Judgment
shall be entered for actual damages, plus reasonable attorney's fees
and costs, but in no case shall the award of damages be less than
the amount of the initial payment provided the purchaser is able to
return all the equipment, supplies or products delivered by the
seller; when such complete return cannot be made, the minimum award
shall be no less than the amount of the initial payment less the fair

market value at the time of delivery of the equipment, supplies or
products that cannot be returned but were actually delivered by the
seller. An award, if the trial court deems it proper, may be entered
for punitive damages.


1812.219.  The provisions of this title are not exclusive. The
remedies provided herein for violation of any section of this title
or for conduct proscribed by any section of this title shall be in
addition to any other procedures or remedies for any violation or
conduct provided for in any other law.
     Nothing in this title shall limit any other statutory or any
common law rights of the Attorney General, any district attorney or
city attorney, or any other person. If any act or practice proscribed
under this title also constitutes a cause of action in common law or
a violation of another statute, the purchaser may assert such common
law or statutory cause of action under the procedures and with the
remedies provided for in such other law.


1812.220.  If any provision of this act or if any application
thereof to any person or circumstance is held unconstitutional, the
remainder of the title and the application of such provision to other
persons and circumstances shall not be affected thereby.


1812.221.  (a) When a deposit has been made in lieu of bond pursuant
to paragraph (1) of subdivision (b) of Section 1812.214 and Section
995.710 of the **Code** of **Civil Procedure**, the person asserting a claim
against the deposit shall, in lieu of the provisions of Section
996.430 of the **Code** of **Civil Procedure**, establish the claim by
furnishing evidence to the Attorney General of a money judgment
entered by a court together with evidence that the claimant is a
person described in paragraph (2) of subdivision (b) of Section
1812.214.
     (b) When a person has completely established the claim with the
Attorney General, the Attorney General shall forthwith review and
approve the claim and enter the date of approval thereon. The claim
shall be designated an "approved claim. "
     (c) When the first claim against a particular deposit account has
been approved, it shall not be paid until the expiration of a period
of 240 days after the date of its approval by the Attorney General.
Subsequent claims which are approved by the Attorney General within
the same 240-day period shall similarly not be paid until the
expiration of the 240-day period. Forthwith upon the expiration of
the 240-day period, the Attorney General shall pay all approved
claims from that 240-day period in full unless there are insufficient
funds in the deposit account in which case each approved claim shall
be paid a proportionate amount to exhaust the deposit account.
     (d) When the Attorney General approves the first claim against a
particular deposit account after the expiration of a 240-day period,
the date of approval of that claim shall begin a new 240-day period
to which subdivision (c) shall apply with respect to the amount

TU-MAKAEFF5640

remaining in the deposit account.
    (e) After a deposit account is exhausted, no further claims shall
be paid by the Attorney General. Claimants who have had their claims
paid in full or in part pursuant to subdivisions (c) and (d) shall
not be required to make a contribution back to the deposit account
for the benefit of other claimants.
    (f) When a deposit has been made in lieu of bond, the amount of
the deposit shall not be subject to attachment, garnishment, or
execution with respect to an action or judgment against the seller,
other than as to an amount as no longer needed or required for the
purpose of this title which would otherwise be returned to the seller
by the Attorney General.

Civil Code Section

1770.  (a) The following **unfair** methods of competition and **unfair** or
deceptive acts or **practices** undertaken by any person in a
transaction intended to result or which results in the sale or lease
of goods or services to any consumer are unlawful:
    (1) Passing off goods or services as those of another.
    (2) Misrepresenting the source, sponsorship, approval, or
certification of goods or services.
    (3) Misrepresenting the affiliation, connection, or association
with, or certification by, another.
    (4) Using deceptive representations or designations of geographic
origin in connection with goods or services.
    (5) Representing that goods or services have sponsorship,
approval, characteristics, ingredients, uses, benefits, or quantities
which they do not have or that a person has a sponsorship, approval,
status, affiliation, or connection which he or she does not have.
    (6) Representing that goods are original or new if they have
deteriorated unreasonably or are altered, reconditioned, reclaimed,
used, or secondhand.
    (7) Representing that goods or services are of a particular
standard, quality, or grade, or that goods are of a particular style
or model, if they are of another.
    (8) Disparaging the goods, services, or business of another by
false or misleading representation of fact.
    (9) Advertising goods or services with intent not to sell them as
advertised.
    (10) Advertising goods or services with intent not to supply
reasonably expectable demand, unless the advertisement discloses a
limitation of quantity.
    (11) Advertising furniture without clearly indicating that it is
unassembled if that is the case.
    (12) Advertising the price of unassembled furniture without
clearly indicating the assembled price of that furniture if the same
furniture is available assembled from the seller.
    (13) Making false or misleading statements of fact concerning
reasons for, existence of, or amounts of price reductions.
    (14) Representing that a transaction confers or involves rights,
remedies, or obligations which it does not have or involve, or which
are prohibited by law.
    (15) Representing that a part, replacement, or repair service is
needed when it is not.
    (16) Representing that the subject of a transaction has been
supplied in accordance with a previous representation when it has

TU-MAKAEFF5641

not.

(17) Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

(18) Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer.

(19) Inserting an unconscionable provision in the contract.

(20) Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product. This subdivision shall not apply to in-store advertising by businesses which are open only to members or cooperative organizations organized pursuant to Division 3 (commencing with Section 12000) of Title 1 of the **Corporations Code** where more than 50 percent of purchases are made at the specific price set forth in the advertisement.

(21) Selling or leasing goods in violation of Chapter 4 (commencing with Section 1797.8) of Title 1.7.

(22) (A) Disseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.

(B) This subdivision does not apply to a message disseminated to a business associate, customer, or other person having an established relationship with the person or organization making the call, to a call for the purpose of collecting an existing obligation, or to any call generated at the request of the recipient.

(23) The home solicitation, as defined in subdivision (h) of Section 1761, of a consumer who is a senior citizen where a loan is made encumbering the primary residence of that consumer for the purposes of paying for home improvements and where the transaction is part of a pattern or practice in violation of either subsection (h) or (i) of Section 1639 of Title 15 of the United States **Code** or subsection (e) of Section 226.32 of Title 12 of the **Code** of Federal Regulations.

A third party shall not be liable under this subdivision unless (A) there was an agency relationship between the party who engaged in home solicitation and the third party or (B) the third party had actual knowledge of, or participated in, the **unfair** or deceptive transaction. A third party who is a holder in due course under a home solicitation transaction shall not be liable under this subdivision.

(24) (A) Charging or receiving an unreasonable fee to prepare, aid, or advise any prospective applicant, applicant, or recipient in the procurement, maintenance, or securing of public social services.

(B) For purposes of this paragraph, the following definitions shall apply:

(i) "Public social services" means those activities and functions of state and local government administered or supervised by the State Department of Health Care Services, the State Department of Public

TU-MAKAEFF5642

Health, or the State Department of Social Services, and involved in providing aid or services, or both, including health care services and medical assistance, to those persons who, because of their economic circumstances or social condition, are in need of that aid or those services and may benefit from them.

(ii) "Unreasonable fee" means a fee that is exorbitant and disproportionate to the services performed. Factors to be considered, when appropriate, in determining the reasonableness of a fee, are based on the circumstances existing at the time of the service and shall include, but not be limited to, all of the following:

(I) The time and effort required.

(II) The novelty and difficulty of the services.

(III) The skill required to perform the services.

(IV) The nature and length of the professional relationship.

(V) The experience, reputation, and ability of the person providing the services.

(C) Paragraph (24) shall not apply to attorneys licensed to practice law in California, who are subject to the California Rules of Professional Conduct and to the mandatory fee arbitration provisions of Article 13 (commencing with Section 6200) of Chapter 4 of Division 3 of the Business and **Professions Code**, when the fees charged or received are for providing representation in administrative agency appeal proceedings or court proceedings for purposes of procuring, maintaining, or securing public social services on behalf of a person or group of persons.

(b) (1) It is an **unfair** or deceptive act or practice for a mortgage broker or lender, directly or indirectly, to use a home improvement contractor to negotiate the terms of any loan that is secured, whether in whole or in part, by the residence of the borrower and which is used to finance a home improvement contract or any portion thereof. For purposes of this subdivision, "mortgage broker or lender" includes a finance lender licensed pursuant to the California Finance Lenders Law (Division 9 (commencing with Section 22000) of the **Financial Code**), a residential mortgage lender licensed pursuant to the California Residential Mortgage Lending Act (Division 20 (commencing with Section 50000) of the **Financial Code**), or a real estate broker licensed under the Real Estate Law (Division 4 (commencing with Section 10000) of the Business and **Professions Code**).

(2) This section shall not be construed to either authorize or prohibit a home improvement contractor from referring a consumer to a mortgage broker or lender by this subdivision. However, a home improvement contractor may refer a consumer to a mortgage lender or broker if that referral does not violate Section 7157 of the Business and **Professions Code** or any other provision of law. A mortgage lender or broker may purchase an executed home improvement contract if that purchase does not violate Section 7157 of the Business and **Professions Code** or any other provision of law. Nothing in this paragraph shall have any effect on the application of Chapter 1 (commencing with Section 1801) of Title 2 to a home improvement transaction or the financing thereof.

TU-MAKAEFF5643

TU-MAKAEFF5644