# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Herself and All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>    vs.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>          Defendants.<br><br>AND RELATED COUNTERCLAIM | Case No. 3:10-cv-0940-GPC-WVG<br><br>**ORDER:**<br><br>**1) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CLASS ACTION, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL**<br><br>[Dkt No. 122.]<br><br>**2) DENYING MOTIONS TO STRIKE**<br><br>[Dkt. Nos. 138-2, 196, 211.] |

    Plaintiffs Tarla Makaeff, Brandon Keller, Ed Oberkrom, Sonny Low, J.R. Everett and John Brown have filed a putative class action complaint against Trump University, LLC ("TU")[1] and Donald J. Trump ("Donald Trump"). The gravamen of the action is that Defendants made false representations in advertisements, mailings and programs regarding Donald Trump's involvement in TU and the

---

[1] After the filing of this action, the New York Department of Education demanded that Trump University remove the word "University" from its title. Trump University changed its name to Trump Entrepreneur Initiative, LLC. As the complaint was filed prior to the change in name, and as neither party requested to substitute Defendants, the Court continues to refer to the Defendant as Trump University.

contents of the programs that students would receive. On September 24, 2012, Plaintiffs filed a motion for class certification, appointment of class representatives, and appointment of class counsel. (Dkt. No. 122, "Pl. Mtn.") The proposed nationwide class is comprised of:

> All persons in the United States who purchased a Trump University 3-day live "Fulfillment" workshop and/or a "Elite" program ("LiveEvents") within the applicable statute of limitations and have not received a full refund. Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

(Pl. Mtn. at 13.)

Plaintiffs also propose the certification of 14 subclasses, including three single-state subclasses represented by Plaintiffs who reside in California, New York, and Florida alleging violations of deceptive practices laws in their home states. (Dkt. No. 122-7, "Proposed Trial Plan.") [2]

The motion has been fully briefed. (Dkt. Nos. 138, 195.) In addition to the pending motion for class certification, the parties have filed and fully briefed several related motions to strike and objections to evidence. (Dkt. Nos. 138-4, "Def. Obj. to Evidence," 195-9, 213; Dkt. Nos. 138-2, "Def. Mtn. to Strike," 192, 212; Dkt. Nos. 196, "Pl. Mtn. to Strike," 210, 233; Dkt. Nos. 211, "Def. Obj. to Reply," 221, 230.)

A hearing was held on November 8, 2013. Following careful consideration of the parties' oral arguments, legal briefings and applicable law, and for the reasons set forth below, the Court hereby **GRANTS** in part and **DENIES** in part Plaintiffs' motion.

---

[2] Plaintiffs filed a notice of correction following the November 8 hearing, providing an amended proposed class definition and six potential subclasses. (Dkt. No. 279.) Defendants replied. (Dkt. No. 280.) To the extent that Plaintiffs fail to cite any basis for the Court to allow ex parte amendments to the proposed class definition, the Court declines to address any amended proposed class definitions absent formal motion and the opportunity for full briefing.

10cv940

# I.     BACKGROUND

## A.  Procedural Background

On April 30, 2010, Plaintiff Tarla Makaeff ("Makaeff") filed a class action complaint against Trump University, LLC, alleging violations of California, New York, and Florida consumer statutes as well as several common law causes of action. (Dkt. No. 1.) On May 26, 2010, Defendant Trump University, LLC, filed a counterclaim against Plaintiff Makaeff for defamation. (Dkt. No. 4.)[3]

The complaint has been amended a number of times, ultimately resulting in the current operative pleading, the third amended complaint (TAC), filed September 26, 2012. (Dkt. No. 128.) The TAC named Plaintiffs include Tarla Makaeff, Brandon Keller, Ed Oberkrom, Sonny Low, J.R. Everett, and John Brown. Defendants include Trump University, LLC, Donald J. Trump, and DOES 2 through 50 ("Defendants"). On January 30, 2013, the case was transferred to the undersigned judge. (Dkt. No. 190.)

## B. Complaint's Allegations

The TAC alleges the following causes of action: (1) unlawful, fraudulent and unfair business practices in violation of Cal. Bus. & Prof. Code section 17200; (2) deceptive practices and misrepresentation in violation of the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code section 1750 *et seq*.; (3) untrue and misleading advertisement in violation of Cal. Bus. & Prof. Code section 17500 *et seq*.; (4) breach of contract against Trump University; (5) breach of the implied covenant of good faith and fair dealing against Trump University; (6) money had and received; (7) negligent misrepresentation; (8) fraud; (9) false promise; (10)

---

[3] On June 30, 2010, Plaintiff Maekoff filed a motion to strike Defendant's counterclaim against her pursuant to California Code of Civil Procedure section 425.6, anti-SLAPP statute, which the Court denied. (Dkt. Nos. 14, 24.) Following Plaintiff's appeal, the U.S. Court of Appeals for the Ninth Circuit reversed this Court's order denying Plaintiff's motion to strike and remanded to the District Court for further proceedings. (USCA Case No. 11-55016; App. Dkt. No. 60.) Defendant/Appellee Trump University, LLC, filed a petition for en banc rehearing, which the Ninth Circuit granted. (App. Dkt. No. 61.) On November 27, 2013, the Ninth Circuit issued an order denying rehearing en banc. (Dkt. No. 281.)

deceptive acts and practices in violation of § 349 of New York's General Business Law; (11) financial elder abuse in violation of Cal. Welf. & Inst. Code § 15600, *et seq.*; (12) unfair competition, practices, or acts in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*; (13) misleading advertisement in violation of the Florida Misleading Advertising Law, Fla. Stat. § 817.41; and (14) unjust enrichment. [4]

Plaintiffs bring this action on behalf of all individuals who purchased Trump University, LLC ("TU") real estate investing seminars. Plaintiffs' allegations involve three tiers of programs: (1) the free preview; (2) a three-day fulfillment seminar; and (3) Trump Elite programs.[5] The TAC alleges that the Defendants made material misrepresentations in advertisements, mailings, promotions and the free preview to lead prospective customers to purchase Defendants' fulfillment and elite programs. The named Plaintiffs paid anywhere from $1,495 for a three-day fulfillment seminar up to $35,000 for the "Trump Gold Elite Program."

Plaintiffs allege TU and Donald Trump made the following common misrepresentations in invitations, advertisements, and at the free program and fulfillment seminar: (1) Trump University was an accredited university; (2) students would be taught by real estate experts, professors and mentors hand-selected by Mr. Trump; and (3) students would receive one year of expert support and mentoring. [6]

### 1. Allegations Against Donald J. Trump

Defendant Donald Trump is a businessman, "real estate tycoon," author, television personality and former presidential candidate. According to Mr. Trump,

---

[4] Unless otherwise indicated, each cause of action names both Trump University and Donald J. Trump as a defendant, and all factual allegations are taken from the third amended complaint. (Dkt. No. 128, "TAC.")

[5] The parties also refer to the TU seminars and programs as "Live Events."

[6] In the Third Amended Complaint, Plaintiffs alleged additional misrepresentations or instances of deceptive behavior by TU instructors. However, in their recent filings and at the November 8, 2013 hearing, Plaintiffs have narrowed their focus to the "core" misrepresentations of Mr. Trump and whether Trump University was a "university."

estimates of the monetary value of the "Trump" brand have exceeded three billion dollars. (Dkt. No. 122-4 at 49, "Trump Depo.") Plaintiffs contend Defendant Donald Trump is personally liable for the misrepresentations and misconduct at issue because of his representations and involvement in Trump University. Plaintiffs point to the following connections between Donald Trump and Trump University:

- Donald Trump is the founder and Chairman of Trump University, and authorized TU to use his name, photos, and quotes for all TU seminar presentations;
- Print advertisements, email correspondence, letters, and TU website content prominently feature Donald Trump's quotes, image, logo, and signature;
- Donald Trump reviewed and authorized TU advertisement and content;
- Donald Trump personally financed Trump University, reviewed all TU financial statements and print and mail advertisements; and
- Donald Trump represented that he personally hand-picked the TU instructors and mentors.

### 2. Advertising, Website and Invitations to Free Preview

Plaintiffs allege TU relied on free introductory previews throughout the United States in order to ensnare prospective customers through the use of deception and misrepresentations.  The free previews were preceded by an orchestrated outreach campaign utilizing mailed invitations as well as a TU website, Facebook page, radio, and newspaper advertising. (TAC ¶ 40; Dkt. No. 122-4 at 7, "Timeline for Preview.") While the content of the materials varied, Plaintiffs allege that all of the marketing materials uniformly referred to the business as "Trump University." Further, the materials uniformly claimed that Donald Trump was integrally involved in the teaching of students at Trump University. (TAC ¶¶ 40, 43.)

For example, print advertisements sent by TU included quotes such as "I can turn anyone into a successful real estate investor, including you," and "I'll show you how." (TAC ¶¶ 19(c), (e).) The home page of the TU website displayed a large photograph of Mr. Trump and the message: "Are YOU My Next Apprentice?

Prove it to me!" Emails sent by TU to thousands stated "76% of the world's millionaires made their fortunes in real estate . . . I'm ready to teach you how to do it too." (TAC ¶ 19(d).) Print advertisements and letters signed by Mr. Trump told prospective customers that they would be shown real estate strategies by Mr. Trump's "hand-picked experts." (TAC ¶¶ 19(c), (f).)

### 3. The Free Preview

Plaintiffs assert that the purpose of the free preview was to "up-sell" attendees to the $1,495 Fulfillment Seminar, and that the goal of the $1,495 Fulfillment Seminar was to up-sell participants to the Elite programs. (TAC ¶ 15.) To advance the "up-sell" scheme, Defendants allegedly promised participants that they would learn Trump's secrets from Trump's hand-picked instructors over the course of a one-year apprenticeship. (TAC ¶ 43.) Plaintiffs cite to numerous excerpts from transcripts of the free preview and three-day programs where instructors repeated the claim that Mr. Trump hand-picked the instructors and mentors. (Dkt. No. 195-3, "Pl. Reply, Ex. 88" at 594-605.)

However, Plaintiffs claim TU instructors and mentors were not hand-picked by Mr. Trump. During discovery, Plaintiffs requested the names of Trump University speakers, instructors and mentors that were hand-picked by Mr. Trump. In interrogatory responses, Mr. Trump stated that he "personally was involved in the selection of Don Sexton, Gary Eldred, Michael Gordon and Jack Kaplan. Additionally, most if not all speakers, instructors and mentors were selected by Trump University representatives . . .". (Dkt. No. 195-5, "Jensen Decl. Ex. 105" at 5) (Response to Interrogatory No. 13). Don Sexton, Gary Eldred, Michael Gordon, and Jack Kaplan are current or former professors who drafted and developed Trump University course materials. (Id. at 3) (Response to Interrogatory No. 10).

### 4. Fulfillment Seminar

Individuals who paid for the Fulfillment Seminar were promised a three-day seminar and one full year of expert interactive support. (TAC ¶ 53; Dkt. No. 195-3,

"Pl. Reply, Ex. 88" at 606-20.) Plaintiffs allege the seminar and year-long support was actually a three-day infomercial accompanied by a phone number to call a "client advisor." (Id.) The TAC also claims that rather than teach customers concrete real estate information, the Fulfillment Seminars were focused on trying to "up-sell" customers the Trump Gold Elite Program for $34,995 to get the "full education." (TAC ¶ 48.) At the Fulfillment Seminar, Plaintiffs allege TU representatives pressured customers to raise their credit card limits to purchase Trump Elite Programs. (TAC ¶ 49.)

### 5. Trump Gold Elite Package

Trump Gold Elite participants were allegedly promised unlimited mentoring for an entire year. (TAC ¶ 53.) Plaintiffs allege that, in fact, Trump University told its mentors that it would not pay them for more than six one-hour mentoring sessions per consumer. (Id.)

## C. The Plaintiffs[7]

The TAC was filed on behalf of six named plaintiffs located in California, Missouri, Florida, and New York. The Plaintiffs are:

- Tarla Makaeff, a citizen of California, who purchased the three-day fulfillment seminar in August 2008;

- Ed Oberkrom, a 65-year old senior citizen of St. Louis, Missouri, who purchased the three-day seminar in February 2009 and the $25,000 Elite seminar in March 2009. He attended the free preview after reading and relying on Trump University advertisements;

- Sonny Low, a 71-year old senior citizen of San Diego, California, who attended the free preview on or about November 18, 2009 after learning about it in advertisements. Based on representations made at the free preview, Low purchased the three-day seminar on or about

---

[7] The Court does not include Plaintiff Keller, as he does not seek to be a class representative at this time. (Pl. Mtn. at 1.)

December 6, 2009 and then paid for the $25,000 Elite seminar in December 2009;

- J.R. Everett, a 68-year old senior citizen of Tampa, Florida, who received an invitation to the free preview from Trump University which he attended on October 7, 2009. He then purchased the three-day seminar on or about October 7, 2009 and the $35,000 Elite seminar on October 16, 2009; and

- John Brown, a 61 year old resident of New York, New York, who learned about the free preview in an advertisement and attended the free preview on September 14, 2009. He purchased the three-day seminar on or about September 14, 2009, and the $25,000 Elite seminar on or about September 26, 2009. (TAC ¶¶ 26-31, 95-96, 106.)

Although Plaintiffs' specific experiences with TU seminars and programs vary, each Plaintiff allegedly purchased the Fulfillment Seminar and/or a Trump Elite program after exposure to representations made at a free preview.[8] Plaintiffs contend that their experiences are typical of the proposed class, which consists of all persons who purchased TU Fulfillment Seminars or Elite programs throughout the United States from April 30, 2006 to the present. (Dkt. No. 195, "Pl. Reply," at 1-2.)

**D. Proposed Common Evidence**

**1. Promotion of Trump University**

From its inception in 2004 until 2010 when it changed its name to the Trump Initiative, "Trump University" was the chosen name for the real estate education business operated by Mr. Trump. A review of TU advertisements demonstrates that Trump University utilized various forms of recognizable signs to appear to be an accredited academic institution. TU used a school crest that was ubiquitous and

---

[8] Although named plaintiff Tarla Makaeff did not personally attend a free preview, she was invited to a Fulfillment seminar for no cost to her by a friend who attended a free preview. At the Fulfillment seminar, Makaeff allegedly enrolled in an Elite program.

used on TU letterhead, power point presentations, promotional materials and advertisements. (TAC ¶¶ 19, 42.)

In fact, Plaintiffs allege TU was never an accredited academic institution of higher learning and that it was pressed by the New York Board of Education to cease any claim to being a "university" in 2010. (TAC ¶ 2 n.1.)

## 2. The Playbook

Plaintiffs point to TU's Playbook as the "single most important" common evidence that the Live Events (TU seminars and programs) were standardized, tightly controlled schemes with the goal to up-sell students. (Pl. Mtn at 6; Pl. Reply at 11.)[9] The 2010 Playbook is separated into three parts: (1) the "Preview Playbook," which addresses the free seminar; (2) the "Fulfillment Playbook," which addresses the three-day Fulfillment Seminar; and (3) the "Sales Playbook," which offers guidelines to sell TU products. (Dkt. No. 122-3, Ex. 8, "2010 Playbook.")

The Preview Playbook includes timelines for advertising the free seminar in the relevant market as well as detailed instructions for preparation and execution of the free seminar. (Id. at TU 52945-52958.) The Fulfillment Playbook similarly provides an overview and the administrative requirements to run a three-day Fulfillment Seminar. (Id. at TU 52960.)

The Sales Playbook provides several guidelines for TU salespersons to sell TU programs, including tips and scripts to help pitch TU products and services. (Id. at TU 53061-53072.) For example, the Sales Playbook offers two scripts for the salesperson to utilize during the seminars. The "Team Door Introduction Script," welcomes registrants with the following language: "Good Afternoon/Evening! I would like to congratulate you on making it out today . . .

---

[9] Plaintiffs provide a copy of TU's Playbooks for the years 2007, 2008, 2009 and 2010. (Pl. Mtn., Ex. 12, 2010 Playbook; Pl. Reply, Exs. 75-77.) Although the Playbooks have some differences, they utilize similar guidelines, instructions and techniques. The 2009 Playbook incorporates sample TU advertisements and communications to market the Live Events that are not included in the 2010 Playbook.

We have all been hand selected by Trump U and are experts in real estate investing." (Id. at TU 53040.) In a second script, the salesperson introduces the TU instructor with the following language: "It is now my pleasure to introduce one of Donald Trump's top instructors. He has been hand selected because of his expertise and knowledge in the real-estate business." (Id. at TU 53041.) The 2010 Sales Playbook includes a script containing representations that the instructor was "hand-picked" by Donald Trump. (Id. at TU 53041, 53062-63.) The 2009 Playbook includes sample advertisements that include the representation that Donald Trump "handpicked" "world-class instructors." (2009 Playbook at TU 130434, 130436.)

In addition, the Sales Playbook provides extensive talking points for the salesperson to use during one-on-one sessions to sell additional TU products. (2010 Playbook at TU 53042-53053.) The Playbook further directs instructors to rank attendees as potential buyers based on their liquid assets. (Id. at TU 52969.)

TU required its Members to abide by all TU policies and instructions – including the Playbook – regardless of whether individual employees in fact followed specific TU policies. (See Pl. Mtn., Ex. 17, "Sexton Deposition I," 196:16-198:10) (former TU President Michael Sexton testified that all instructors, mentors and salespeople received the Playbook and were required to review the contents); (Pl. Mtn. at 8; Pl. Mtn., Exs. 24, 27) (independent contractor agreements requiring compliance with all TU directives, policies, and instructions).

### 3. PowerPoint Presentations and Scripts

As further common evidence of material misrepresentations, Plaintiffs offer PowerPoint presentations and scripts that TU allegedly required instructors to communicate a consistent message at all TU seminars. (Pl. Mtn. at 26; Pl. Reply at 6-7; Dkt. No. 239, "Supp. Doc.," Ex. 2.) While the presentations vary depending on the instructor and location of the seminar, the presentations share common messages. Most PowerPoint presentations and/or scripts for the free orientation and

three-day Fulfillment Seminar: (1) bear the Trump University logo and promote an image of Donald Trump; (2) state that the instructors were "hand-picked" or "hand selected" by the Donald Trump or the "TU founders;" and (3) advertise the three-day fulfillment seminar, one-year apprenticeship program, or Trump Elite packages. (Dkt. No. 138, "Def. Opp.," Ex. 39; Pl. Mtn., Exs. 40, 86, 87; Supp. Doc., Ex. 2.) A small sampling of transcribed TU seminar recordings indicates that several instructors made key statements at issue here, including the alleged misrepresentation that instructors were "hand-picked" by Donald Trump and students would receive one year of unlimited mentorship. (Pl. Reply, Ex. 88.)

## II. DISCUSSION

### A. Class Certification Standards

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. In order to justify a departure from that rule, a class representative must be a part of the class and possess the same interest and suffer the same injury as the class members." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citations omitted). To fit within the exception, "a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with [Federal Rule of Civil Procedure] 23." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Dukes, 131 S. Ct. at 2551–52).

Rule 23 contains two sets of requirements. First, "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." Dukes, 131 S. Ct. at 2550 (internal quotation marks and citations omitted). Second, "[w]here a putative class satisfies all four requirements of 23(a), it still must meet at least one of the three

additional requirements outlined in 23(b)." <u>United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO, CLC v. ConocoPhillips Co.</u>, 593 F.3d 802, 806 (9th Cir. 2010).

On a motion for class certification, the Court is required to "examine the merits of the underlying claim . . . only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 981 n. 8 (9th Cir. 2011) (citations omitted).

To create a nationwide class, Plaintiffs have woven a quilt made up of causes of action from all fifty states. The Plaintiffs' trial plan seeks certification of fourteen subclasses for deceptive trade practices, state elder abuse, and common law claims of fraud, breach of contract, breach of covenant of good faith and fair dealing, and unjust enrichment. (Dkt. No. 122-7.) Plaintiffs move to certify a nationwide class of persons who purchased a Trump University 3-day live "Fulfillment" workshop and/or a "Elite" program (collectively, "LiveEvents") within the applicable statute of limitations and have not received a full refund. (Pl. Mtn at 4.)

For the reasons set out below, the Court will certify a class and five subclasses of persons residing in California, New York and Florida who purchased a Trump University 3-day live "Fulfillment" workshop and/or a "Elite" program ("LiveEvents") within the applicable statute of limitations and have not received a full refund.

### 1.   Rule 23(a)

The Court examines Plaintiffs' showing on each of the requisite prongs of Federal Rule of Civil Procedure 23, starting with Rule 23(a) requirements of numerosity, commonality, typicality, and adequate representation.

///

///

### a. Numerosity

To justify class certification, the Court must first find that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. Proc. 23(a)(1). "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or inconvenience in joining all members of the class." Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913–14 (9th Cir. 1964) (internal quotations omitted). As a general rule, "classes of 40 or more are numerous enough." Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258, 262 (S.D. Cal. 1988) (internal quotations and citations omitted).

Here, Plaintiffs estimate that potential class members of a nationwide class number in the thousands. (Pl. Mtn. at 20) ("thousands of persons"); (Def. Opp. at Ex. 6 ¶¶ a-c, Declaration of Mark Covais, Director of TU Operations, "Covais Decl.") (5,950 students paid between $995 and $1,995 for a three-day introductory seminar). Based on both parties' representations of the potential class size, the Court concludes that the proposed class is sufficiently numerous.

Defendants assert that Plaintiffs have failed to make any showing of numerosity for any subclass, whether by analysis, estimate, statistics, or otherwise. Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981) ("[w]hen a class is subdivided into subclasses, each subclass must independently meet Rule 23 certification requirements."). Plaintiffs estimate that the smallest proposed subclass numbers "in the hundreds." (Pl. Reply at 14.) The Court concludes that the proposed subclasses are sufficiently numerous to make joinder impractical. See Ornates-Hernandez v. Smith, 541 F. Supp. 351, 369 (C.D. Cal. 1982) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.").

### b. Commonality

Rule 23(a)(2) requires Plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To show commonality,

class members must have "suffered the same injury." <u>Dukes</u>, 131 S. Ct. at 2551 (quoting <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 157 (1982)). The commonality requirement demands only that "class members' 'situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.' " <u>Wolin v. Jaguar Land Rover N. Am., LLC</u>, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting <u>Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.</u>, 917 F.2d 1171, 1175 (9th Cir. 1990)). Plaintiffs must demonstrate "the capacity of classwide proceedings to generate common answers" to common questions of law or fact that are "apt to drive the resolution of the litigation." <u>Dukes</u>, 131 S. Ct. at 2551. "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." <u>Id.</u>

The Plaintiffs submit that all of the putative class members suffered financial loss resulting from the purchase of TU Live Event programs following exposure to deceptive advertisements and promotional statements. The following questions are common to the proposed class: (1) whether Defendants misrepresented that Trump University was an accredited university; (2) whether Defendants misrepresented that Donald Trump was heavily involved in TU and "hand-picked" the TU instructors; and (3) whether Defendants made misrepresentations about the "year-long" mentoring and interactive support. These questions of fact are at the heart of Plaintiffs' common contention that Defendants misrepresented the benefits of TU's programs and services.

Defendants argue no common contention is shared by the potential class members because TU student experiences varied by program, price, contract, content, market, teacher, mentor and resulting individual performance. (Def. Opp. at 18.) Defendants further contend that not all TU instructors or representatives utilized the Playbook or spoke directly from TU talking points or scripts. However, standing alone, this does not defeat commonality. <u>See</u> <u>In re First Alliance Mortg. Co.</u>, 471 F.3d 977, 990 (9th Cir. 2006) (concluding that misrepresentations for a

claim of fraud do not require verbatim recitation from a script to each class member to satisfy the commonality threshold).

As further developed in the predominance discussion, the Court finds that the tightly orchestrated promotional campaign exposed class members to the alleged deceptive and misleading representations that are at issue here. A class action has the ability to determine on a class wide basis whether misrepresentations were made and whether they were material. Class treatment of the claims will allow these common issues to be decided efficiently and economically.

### c. Typicality

The Court must determine whether the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal citation omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Id.

Plaintiffs argue their claims are typical because each proposed class member was subjected to Defendants' fraudulent up-sell scheme and alleged misrepresentations. (Pl. Mtn. at 30.) In response, Defendants contend Plaintiffs are unique class representatives because: (1) each named Plaintiff purchased different TU programs at prices that varied from most proposed class members; (2) each named Plaintiff viewed different TU advertisements; and (3) each named Plaintiff received different benefits from the TU programs. (Def. Opp. at 19-20.)

Upon review of the evidence, the Court concludes the Plaintiffs are not unique class representatives. First, each proposed class representative purchased TU's three-day fulfillment seminar for anywhere between $750 and $1,495. In addition, the proposed class representatives purchased additional TU programs and services. [10] These purchases are sufficiently typical of the 1,661 other potential class members who purchased additional TU products or services beyond the three-day seminar. (Covais Decl. at ¶ 6(c).) Although the specific program, benefit, or price of each TU product may vary, the nature of the claims are the same and Plaintiffs' purchases of TU programs are typical to that of the proposed class members.

Moreover, the nature of the claim is based on conduct which is not unique to the proposed class representatives. Here, Plaintiffs' claim centers around Defendants' allegedly fraudulent scheme to misrepresent the value and benefits of TU's programs and services. The fact that each Plaintiff may have seen a different advertisement, or no advertisement at all, does not defeat typicality. See Hanon, 976 F.2d at 508 ("Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought") (internal citations and quotations omitted). As further explained in the predominance analysis, the key in determining typicality and predominance is determining the scope of the advertising and promotions and whether it is likely that all class members were exposed to the allegedly material misrepresentations.

---

[10] (See Def. Opp., Ex. 55, Makaeff Deposition; Def. Opp., Ex. 57-5844, Low Deposition; Def. Opp., Ex. 57-5848, Everett Deposition; Def. Opp., Ex. 58-5865, Oberkrom Enrollment Form.) Some, in addition to the three-day seminar, purchased a form of "Elite" program. Plaintiffs Oberkrom, Brown and Low paid anywhere between $25,000 and $25,995 for the Field Mentorship program, a part of the Trump Elite program. (Def. Opp., Ex. 58-5867, Oberkrom Enrollment Form; Def. Opp., Ex. 58-5869, Brown Enrollment Form; Def. Opp., Ex. 64-5942, Low Deposition.) Similarly, Plaintiffs Makaeff and Everett purchased the Trump Gold Elite package for $34,995.[10] (Def. Opp., Ex. 58-5857, Makaeff Enrollment Form.) These purchases are typical of the 5,950 other potential class members who paid up to $1,495 for TU's three-day seminar. (Covais Decl. at ¶ 6(b).)

1  Defendants' conduct is not unique to the named Plaintiffs and the Court concludes

2  Plaintiffs have satisfied the typicality element of Rule 23(a).

3  ### d. Adequate Representation

4  Rule 23(a)(4) requires the representative parties to fairly and adequately

5  protect the interests of the class. Fed. R. Civ. P. 23(a)(4). "Adequate representation

6  'depends on the qualifications of counsel for the representatives, an absence of

7  antagonism, a sharing of interests between representatives and absentees, and the

8  unlikelihood that the suit is collusive.'" Crawford v. Honig, 37 F.3d 485, 487 (9th

9  Cir. 1994) (quoting Brown v. Ticor Title Ins. Co., 982 F.2d 386, 390 (9th Cir.

10 1992). Plaintiffs assert they are adequate class representatives who will protect the

11 interests of the class and class counsel will litigate this case vigorously. (Pl. Mtn. at

12 31.) Defendants do not dispute this element. The Court concludes that Plaintiffs,

13 except Ed Oberkrom, have sufficiently shown the representative parties will

14 protect the interests of the class.[11]

15 ### 2.  Rule 23(b)(3)

16 Under Rule 23(b)(3), a plaintiff must show (i) "that the questions of law or

17 fact common to class members predominate over any questions affecting only

18 individual members," and (ii) that a class action is "superior to other available

19 methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

20 23(b)(3). The Rule lists factors pertinent to a court's assessment of the

21 predominance and superiority criteria: (A) the interest of members of the class; (B)

22 the extent and nature of any litigation concerning the controversy already

23 commenced by or against members of the class; (C) the desirability of

24 concentrating the litigation of the claims in the particular forum; (D) the

25 difficulties likely to be encountered in the management of a class action. Fed. R.

26 Civ. P. 23(b)(3).

---

27  [11] As further developed below, the Court finds that this case is not suitable for a

28  nationwide class action. Thus, proposed Plaintiff Ed Oberkrom, a resident of Missouri, is not an adequate class representative for the approved California, New York and Florida classes.

### a. Whether Common Issues Predominate

The central Rule 23(b)(3) inquiry is whether "the proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 594 (1997). If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998). " '[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.' " Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535–39 (1986)).

Because the predominance requirement is "more demanding" than Rule 23(a)'s commonality requirement, the Court analyzes each claim for relief and proposed subclass separately. See Amchem, 521 U.S. at 624.

### i. Unfair and Deceptive Trade Practices

Plaintiffs seek to certify three subclasses under California, New York and Florida state unfair competition statutes: (1) a subclass for California class members for violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; California's False Advertising Law ("FAL"), Bus. & Prof. Code § 17500 *et seq.*; and California's Consumers Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750 *et seq.*; (2) a subclass for New York class members under § 349 of New York's General Business Law; and (3) a subclass for Florida class members under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* and § 817.41.

///

### aa. California Subclass

Plaintiffs first propose a California subclass for unfair and deceptive trade practices under California's UCL, CLRA, and FAL. (Dkt. No. 126-14, "Plaintiffs' Trial Plan" at 12.) Each of the claims under these statutes is predicated upon the alleged common misrepresentations identified above.

*California UCL and FAL*

California's UCL provides a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Cal. Bus. & Prof. Code § 17200 *et seq.* A cause of action under the "fraud" prong of the UCL requires only a showing that members of the public are "likely to be deceived," Podolsky v. First Healthcare Corp., 50 Cal. App. 4th 632, 647-48 (1996), rather than "actually deceived or confused by the conduct or business practice in question," Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1167 (2000). Relief under the UCL is available without any proof of deception, reliance, or damages. Brakke v. Econ. Concepts, Inc., 213 Cal. App. 4th 761, 772 (2013).

Similarly, California's FAL makes it unlawful for any business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. "In determining whether a statement is misleading under the statute, the primary evidence in a false advertising case is the advertising itself." Colgan v. Leatherman Tool Grp., Inc., 135 Cal. App. 4th 663, 679 (2006) (citing Brockey v. Moore, 107 Cal. App. 4th 86, 100 (2003)) (internal quotation marks omitted). Whether an advertisement is "misleading" must be judged by the effect it would have on a reasonable consumer. Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087 (9th Cir. 2010) ("consider the effect of misrepresentations upon a reasonable consumer, not a particular consumer") (internal quotation marks omitted); Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008). Liability under either the specific false advertising provisions

of the FAL or the broader provisions of the UCL may be found without any individualized proof of deception and solely on the basis a defendant's conduct was likely to deceive customers. Mass. Mutual Life Ins. Co. v. Superior Ct., 97 Cal. App. 4th 1282, 1289 (2002).[12]

Defendants argue that the Plaintiffs have failed to provide documentary proof of any "misrepresentation" and, instead, have provided a moving target of claimed misrepresentations. (Def. Opp. at 11.) In addition, Defendants assert that TU advertisements and promotional materials changed frequently, making it unlikely that all of the putative class members were exposed to the same representations. (Def. Opp. Ex. 135, "Sexton Depo." at 202:3-21.)

A review of the record reveals substantial evidence of common misrepresentations made to all putative class members. These representations are (1) Trump University was an accredited university; (2) students would be taught by real estate experts, professors and mentors that were hand-picked by Donald Trump; and (3) students would receive one year of expert support and mentoring.

Plaintiffs have provided evidence to show that Trump University was not an accredited university; that the seminars were taught by individuals who were not handpicked by Mr. Trump; and that the mentoring claims were false. In view of the above, there is sufficient evidence that these common misrepresentations were deceptive and misleading.

---

[12] First, the California Supreme Court has held that plaintiffs need not show individualized reliance to assert violations of California's UCL and FAL. In re Tobacco II Cases, 46 Cal. 4th 298, 312 (2009). "[W]hile a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct." Id. at 328. Thus, under California law, it "is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where [sic] misrepresentations and false statements were part of an extensive and long-term advertising campaign." Id. Accordingly, "to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." In re Tobacco II Cases, 46 Cal. 4th at 312. The Ninth Circuit has affirmed the California rule " 'that relief under the UCL is available without individualized proof of deception, reliance and injury.' " Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1021 (9th Cir. 2011) (quoting In re Tobacco II, 46 Cal. 4th at 320).

Next, individualized determinations as to reliance and causation are not required as long as certain facts exist to trigger the inferences and presumptions. A key issue in all three consumer claims is whether class members were exposed to the allegedly misleading advertisements. <u>Davis–Miller v. Auto. Club of S. Cal.</u>, 201 Cal. App. 4th 106, 125 (2011) ("An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class."); <u>Cohen v. DIRECTV, Inc.</u>, 178 Cal. App. 4th 966, 980 (2009) ("[California law does not] authorize an award . . . on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice."). The Ninth Circuit has observed that "in the absence of the kind of massive advertising campaign at issue in <u>Tobacco II</u>, the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading." <u>Mazza v. Am. Honda Motor Co., Inc.</u>, 666 F.3d 581, 596 (9th Cir. 2012). In <u>Mazza</u>, the Ninth Circuit found defendant Honda's limited advertising campaign, in which "many class members were never exposed to the allegedly misleading advertisement," did not justify a presumption of reliance. <u>Id.</u> In vacating class certification, the Ninth Circuit concluded that the district court had certified an overly broad class where "an individualized case must be made for each member showing reliance." <u>Id.</u>

Defendants claim that there were no scripts or uniform promotional materials containing any material misrepresentation. (Def. Opp. Ex. 135, "Sexton Depo." at 202:3-21; Dkt. No. 138-1, "Def. Opp, Ex. 22" a-d: Jamison ¶ 4, Peterson ¶ 7, Horton ¶ 7 and Guarino ¶ 7.) As such, Defendants argue (1) the diversity of TU students requires individualized inquiries; (2) individualized inquiries are needed to prove each claim; (3) reliance on alleged verbal misrepresentations requires individualized inquiry; and (4) the "presumption of reliance" does not apply to prevent individual inquiry. (Def. Opp. at 21-30.)

1    The critical question in this case, as posed in <u>Tobacco II</u>, is whether the

2    putative class members were exposed to the same alleged misrepresentations. On

3    one hand, the advertising and promotional activities in the instant case were not

4    part of a massive advertising campaign. On the other hand, unlike the limited

5    advertising in <u>Mazza</u>, there is evidence that the TU multi-media promotional

6    campaign was uniform, highly orchestrated, concentrated and focused on its

7    intended audience.[13] While it was not a long-term campaign as in <u>Tobacco II</u>, it

8    was much more targeted, concentrated, and efficient than <u>Tobacco II</u>. (<u>See</u> Pl.

9    Reply, Ex. 79, "Advertisement Chart.") The effect of this campaign was to make it

10   highly likely that each member of the putative class was exposed to the same

11   misrepresentations. There is substantial evidence that class members paid for TU

12   seminars for reasons that track the advertising and promotional information

13   provided in the highly orchestrated campaign. The Court finds substantial evidence

14   that members of the California subclass were "likely to be deceived" by TU's

15   advertisements. <u>See</u> <u>In re Tobacco II Cases</u>, 46 Cal. 4th at 298.

16   *California CLRA*

17       The CLRA prohibits "unfair methods of competition and unfair or deceptive

18   acts or practices." Cal. Civ. Code § 1770(a). The statute requires that plaintiffs in a

19   CLRA action "show not only that a defendant's conduct was deceptive but that the

20   deception caused the harm." <u>In re Vioxx Class Cases</u>, 180 Cal. App. 4th 116, 129

21   (2009). In a class action alleging violation of the CLRA, "[c]ausation, on a

---

23   [13] This evidence includes: (1) Letters signed by Donald Trump advertising the free
24   preview (Pl. Mtn., Exs. 29, 32, 34, 38); (2) Promotional videos of Donald Trump used at TU
     seminars (Pl. Mtn., Exs. 1-2); (3) Website advertisements, (Pl. Mtn., Ex. 36), and Newspaper
25   ads, (Pl. Mtn., Ex. 37), featuring Donald Trump; and (4) Email advertisements (Pl. Mtn., Ex. 47).
     (<u>See</u> Dkt. No. 122-7, Proposed Trial Plan at 3, n. 2.). In addition, the Playbook provides a two-
26   month timeline to advertise the free seminar in the relevant market. (2010 Playbook at TU
     52946.) The "Pre-Event Timeline" includes the following instructions: 8 weeks prior to the
27   event, "Team Analyzes Market Data and History;" 3 and 2 weeks prior to the event, "Email sent
     to TU Database;" 7-10 days prior to Event, "Direct Mail" and "Newspaper Ad;" and 1 week
     prior to event: "Email to TU Database." (<u>Id.</u>) This timeline shows TU had a uniform strategy to
28   advertise the free seminar in each market by way of direct mail, email, and newspaper
     advertisements.

classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." Id. Stated differently, "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to the class members." Chavez v. Blue Sky Natural Bev., 268 F.R.D. 365, 376 (N.D. Cal. 2010). Under California law, a misrepresentation or omission is material:

> if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1022 (9th Cir. 2011) cert. denied, 132 S. Ct. 1970 (2012) (internal citations omitted).

Defendants submit that there were no scripts or uniform promotional materials containing any material misrepresentation and dispute that there is any documentary evidence of any objective "misrepresentation." (Def. Opp. at 11; Def. Opp. Ex. 135, "Sexton Depo." at 202:3-21.)

As fully discussed in the preceding section, there is substantial evidence that TU made common misrepresentations to all of the class members.  A jury could find that a reasonable person would attach importance to these claims in deciding to purchase a TU Live Event program. Consequently, the jury will be required to decide this question of fact.

### bb. New York and Florida Subclasses

The New York General Business law declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." N.Y. Gen. Bus. Law § 349 (a). "As a threshold matter, plaintiffs claiming the benefit of section 349 . . . must charge conduct of the

defendant that is consumer-oriented." <u>Oswego Laborers' Local 214 Pension Fund</u> <u>v. Marine Midland Bank, N.A.</u>, 85 N.Y.2d 20, 25 (1995). "A prima facie case requires as well a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." <u>Id.</u> (internal citations omitted). New York courts have adopted "an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances. <u>Id.</u> Moreover, "reliance is not an element of a section 349 claim." <u>Stutman v. Chem. Bank</u>, 95 N.Y.2d 24, 29 (2000) (internal citations omitted).

Under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," are considered unlawful. Fla. Stat. Ann. § 501.204 (1). A "consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." <u>Rollins, Inc. v. Butland</u>, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). "The Florida Supreme Court has noted that deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." <u>Zlotnick v. Premier</u> <u>Sales Grp., Inc.</u>, 480 F.3d 1281, 1284 (11th Cir. 2007) (internal quotation marks and citations omitted).

This Court agrees with the California Central District that "[w]ith small differences in wording, all three states [California, New York and Florida] appear to employ the same causation and reliance standard [in their unfair trade and competition laws]." <u>Keegan v. Am. Honda Motor Co., Inc.</u>, 284 F.R.D. 504, 541 (C.D. Cal. 2012) <u>leave to appeal denied</u>, 12-80138, 2012 WL 7152289 (9th Cir.

Nov. 9, 2012). Based on the same showing of the UCL claims, the Court concludes common issues predominate for alleged violations of New York General Business law and the FDTUPA.

### ii. Financial Elder Abuse

Plaintiffs propose two subclasses for financial elder abuse: (1) a California subclass for violations of California Welfare & Institutions Code section 15610.30 (a)(1); and (2) a Florida subclass for violations of Florida Statutes section 501.2077(a).

As relevant here, California Welfare & Institutions Code section 15610.30 states in part:

> (a) 'Financial abuse' of an elder occurs when a person or entity does any of the following: (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud; (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both; or (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence.

Cal. Welf. & Inst. Code § 15610.30 (a). For purposes of this section, "elder" means any person residing in the state of California who is 65 years of age or older. Cal. Welf. & Inst. Code § 15610.27. The statute defines two ways a person can "take, secrete, appropriate, obtain or retain property." The first is when "the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult," and the second is "when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult." Id. § 15610.30(b), (c).

Under the FDUTPA, "[a] person who is willfully using, or has willfully used, a method, act, or practice in violation of this part which victimizes or attempts to victimize a senior citizen or a person who has a disability is liable for a civil penalty of not more than $15,000 for each such violation if she or he knew or should have known that her or his conduct was unfair or deceptive." Fla. Stat. Ann. § 501.2077(2). For purposes of this section, "senior citizen" means a person who is 60 years of age or older. Id. § 501.2077(1)(a).

In the TAC, Plaintiffs allege that "Defendants took and/or assisted in the taking of property from Plaintiff Low and all potential California class members who are aged 65 or older with the intent to defraud." (TAC ¶ 209.) To support the FDUTPA claim, Plaintiffs allege Defendants "caused Plaintiff Everett and other [Florida] class members to suffer substantial injury . . . [and] willfully used a method, act or practice in violation of the FDUTPA, which . . . victimized or attempted to victimize senior citizens." (TAC ¶¶ 220, 223.)

Since the California Elder Abuse claim is premised on the same acts as the UCL violations, discussed *supra*, the Court again finds that common questions predominate. See, e.g., In re Nat'l W. Life Ins. Deferred Annuities Litig., 268 F.R.D. 652, 669 (S.D. Cal. 2010) (finding common questions predominate where California Elder Abuse claim was premised on the same acts for the UCL violations). Similarly, violations of the FDUTPA allows for "a heightened civil penalty if a senior citizen or handicapped person is victimized by fraud or attempted fraud in a consumer transaction in violation of FDUTPA." In re Miller, 418 B.R. 406, 412 (Bankr. N.D. Fla. 2009). As such, the Court finds common issues predominate on both senior citizen subclasses.

### iii. Damages

Defendants argue that individualized determinations will be required for the Plaintiffs to establish damages. Defendants submit that even if some TU programs are assumed to have a value less than their sale price, individual inquiry is still

needed to determine what value was actually obtained by students. (Defendant's Opposition, p. 25.)

"At class certification, plaintiff must present a likely method for determining class damages, though it is not necessary to show that his method will work with certainty at this time." Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010) (internal quotations and citation omitted). Moreover, the amount of damages, even if it is an individual question, does not defeat class certification. Leyva v. Medline Indus. Inc., 716 F.3d 510, 513-14 (9th Cir. 2013)

At trial, Plaintiffs will seek a total, single monetary sum based on the amount Plaintiffs and other class members paid, plus interest. (Proposed Trial Plan at 1.) After trial, Plaintiffs propose a post-judgment administrative proceeding where Defendants' records will be used to distribute checks to class members based on the amount that they paid. Id.

When adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied even if damages are not provable in the aggregate. See Advisory Committee's 1966 Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App. at 141 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class."); Wright, Miller, & Kane, 7AA Fed. Prac. & Proc. Civ. § 1781, at 235–37; 2 W. Rubenstein, Newberg on Class Actions § 4:54 at 205 (5th ed. 2012) (ordinarily, "individual damage[s] calculations should not scuttle class certification under Rule 23(b)(3)").

The Court finds that Plaintiffs' proposed method of calculating damages does not defeat predominance or render the case unmanageable.

///

///

### iv. Additional Common Law Claims

Plaintiffs seek certification of subclasses based on common law causes of action for the following claims: (1) breach of contract (fourth cause of action) and breach of implied covenant of good faith and fair dealing (fifth cause of action); (2) fraud (eighth cause of action); and (3) unjust enrichment (fourteenth cause of action).[14]

Plaintiffs bear the burden of showing uniformity or the existence of only a small number of applicable standards (i.e. "groupability") among the laws of the fifty states. See, e.g., Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986) (Ruth Bader Ginsburg, J.). A district court must consider how variations in state law affect predominance and superiority. Id. at 1012. A proponent of a multi-state class action must "creditably demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.'" Id. at 1017 (relying on In re School Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986)); see also Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 401–03 (D.N.J. 1998) (distinctions amongst members of the Class may be "compounded exponentially" by the application of law from various forums). In a multi-state class action, variations in state law may swamp any common issues and defeat predominance." Castano v. Am. Tobacco Co., 84 F.3d 734, 741 (5th Cir. 1996); Sikes v. Teleline, Inc., 281 F.3d 1350, 1367 n. 44 (9th Cir. 2002) (assuming trial court was correct in ruling that the laws of all fifty states apply, that alone would render the class unmanageable).

As summarized by the Defendants, "Plaintiffs propose no less than 14 subclasses covering all 50 states with overlapping claims – five of which are statutory (all limited to their state of origin) and nine of which are common law (spread over various combinations of states supposedly having materially identical

---

[14] Plaintiffs do not seek class certification for the claims for money had and received (sixth cause of action), negligent representation (seventh cause of action), and false promise (ninth cause of action). (Pl. Mtn. at 13 n. 4.)

law)." (Def. Opp. at 33.) Given the wide range of claims and variance in state laws, Defendants argue the class is unmanageable and therefore not the superior method to adjudicate the action. (Id.)

As to all of Plaintiffs' common law claims, the Court agrees with Defendants and further finds that common legal issues do not predominate. Plaintiffs seek to certify the following subclasses:

- Two subclasses for fraud in the 28 states and the District of Columbia that "permit reliance to be shown on a classwide basis."
- Four subclasses for unjust enrichment for all 50 states and the District of Columbia, with each subclass grouped to correspond to "materially identical legal standards."
- Three subclasses for breach of implied covenant of good faith and fair dealing in 29 states in which "the good faith and fair dealing claims are subject to the elements of that state's breach of contract claims."

(Proposed Trial Plan at 13-15.)

As a preliminary matter, Plaintiffs have failed to offer sufficient factual and legal support to satisfy all prerequisites of Rules 23(a) and (b)(3) for these common law claims. See Fed. Judicial Ctr., Manual for Complex Litigation (4th ed.) at § 21.23. Plaintiffs have provided a survey of the applicable common law of the 50 states and proposed verdict forms for the subclass causes of action. (Dkt. No. 122-7, Exs. A-H.) However, the proposed verdict forms gloss over the differences in the elements of each cause of action among the 50 states. Plaintiffs provide little, if any, analysis to justify proposed verdict forms that do not track the elements of the state causes of action. It is insufficient to merely refer the district court to densely worded articles, graphs, and charts pertaining to each state's laws. Tylka v. Gerber Prods. Co., 178 F.R.D. 493, 498 n. 3 (N.D. Ill. 1998) (proponents of fifty-state class "should not expect the court to ferret through, disseminate, and craft manageable schemes" from "densely worded articles, graphs, and charts, well in

1  excess of 100 pages" in support of such materials when that burden "clearly rests"

2  with the proponents).

3      Moreover, the Court finds the difficulties in class management are

4  compounded by several differences in substantive law for each state common law

5  claim. Manual for Complex Litigation § 21.222 ("The difficulties posed by

6  [differences in law] are likely to be compounded in nationwide or multistate class

7  action litigation raising state law claims or defenses. Differences in applicable law

8  and the number of divergent interests may lead a court to decline to certify a

9  class.").

10      For example, Plaintiffs seek to certify two subclasses for common law fraud

11  claims in states that do not require individualized reliance. (Pl. Mtn. at 41.)

12  Plaintiffs claim that differences that exist among laws of various states can be

13  easily taken into account, and seek to rely on the Ninth Circuit's approval of class

14  treatment for fraud claims that arise out of a "common course of conduct." (Id.)

15  (quoting In re First Alliance Mortg. Co., 471 F.3d 977, 990 (9th Cir. 2006)).

16  Defendants respond that the element of reliance is crucial to common law fraud

17  and that individualized reliance issues defeat predominance for common law fraud.

18  (Def. Opp. at 42) (citing New York, Indiana, and Mississippi federal district court

19  cases).

20      The Court finds that although the Ninth Circuit has followed an approach

21  that "favors class treatment of fraud claims stemming from a common course of

22  conduct," other circuits have "adopted somewhat different standards in identifying

23  the degree of factual commonality required in the misrepresentations to class

24  members in order to hold a defendant liable for class-wide fraud." In re First

25  Alliance Mortg. Co., 471 F.3d at 990. In particular, the Ninth Circuit "common

26  course of conduct" approach differs from that of the Second and Third Circuits,

27  which both highlight "the importance of uniformity among representations made to

28  class members" to allow generalized proof to establish reliance. Id. at 990 n.3

1   (citing Moore v. PaineWebber, Inc., 306 F.3d 1247, 1255 (2d Cir. 2002); In re

2   LifeUSA Holding, Inc., 242 F.3d 136, 138-40 (3d Cir. 2001)). Although the

3   certification of subclasses may be appropriate where "applicable state laws can be

4   sorted into a small number of groups, each containing materially identical legal

5   standards," Klay v. Haumana, Inc., 382 F.3d 1241 (11th Cir. 2004), the Court finds

6   that subclass certification for the fraud claim in this case is inappropriate.

7        In addition, as to the unjust enrichment claims, the common law in various

8   states is conflicting and would make trial unmanageable. The court in In re

9   Conagra Foods Inc., 908 F. Supp. 2d 1090, 1113-15 (C.D. Cal. 2012), surveyed the

10  conflicts in the law in California, Texas and Illinois as to whether unjust

11  enrichment constituted an independent claim or a remedy.[15] These differences and

12

---

[15] **California -** See Ghirardo v. Antonioli, 14 Cal. 4th 39, 50, 54 (1996) (holding that a plaintiff
was "entitled to seek relief under traditional equitable principles of unjust enrichment" where
other remedies were unavailable and that a claim " 'for payment of money' . . . rest[ed] on a
theory of unjust enrichment"); Melchior v. New Line Prod., Inc., 106 Cal. App. 4th 779, 793
(2003) ("The phrase 'unjust enrichment' does not describe a theory of recovery, but an effect: the
result of a failure to make restitution under circumstances where it is equitable to do so.")
(quoting Lauriedale Assocs. Ltd. v. Wilson, 7 Cal. App. 4th 1439, 1448 (1992)).

**Texas** – A number of Texas courts have concluded that unjust enrichment is not an independent
claim under state law. See Show Serv., LLC v. Amber Trading Co. LLC, No. 3:09-CV-2385-D,
2010 WL 4392544 at *2 (N.D. Tex. Oct. 29, 2010) (citing, inter alia, Redwood Resort Props.,
LLC v. Holmes Co., No. 3:06-CV-1022-D, 2006 WL 3531422 at *9 (N.D. Tex. Nov. 27, 2006));
Celanese Corp. v. Coastal Water Auth., 475 F. Supp. 2d 623, 639 (S.D. Tex. 2007) (holding that
"[r]estitution and unjust enrichment are remedies, not causes of action"); Wood v. Gateway, Inc.,
No. 5:03-CV-007-C, 2003 WL 23109832 at *12 (N.D. Tex. Dec. 12, 2003). Others have treated
unjust enrichment as a cause of action. Pepi Corp. v. Galliford, 254 S.W.3d 457, 460 (Tex. App.
2007) ("Unjust enrichment is an independent cause of action"). The Texas Supreme Court has
not addressed the question directly, but has spoken of unjust enrichment as if it were an
independent cause of action. See HECI Exploration Co. v. Neel, 982 S.W.2d 881, 885 (Tex.
1998) (recognizing that a two-year statute of limitations governs "unjust enrichment" claims).

**Illinois -** As with California and Texas, Illinois courts appears divided as to whether unjust
enrichment is an independent cause of action. Compare Allstate Ins. Co. v. Morgan Guar. Trust
Co. of New York, No. 93 C 6527, 1994 WL 48585 at *4 (N.D. Ill. Feb. 16, 1994) ("unjust
enrichment is not a cognizable separate cause of action under Illinois law") with Peddinghaus v.
Peddinghaus, 295 Ill. App. 3d 943, 949 (1998) ("Defendants contend Illinois does not recognize
an independent cause of action for unjust enrichment. We disagree. Our supreme court has
expressly held that to 'state a cause of action based on a theory of unjust enrichment, a plaintiff

conflicts would require the Court to decide the applicable state law on unjust enrichment claims in fifty states.

Similarly, the Court finds that the differences in the law and the facts relating to the claims for breach of contract and breach of covenant of good faith and fair dealing defeat the predominance that is required to certify a class. The three proposed subclasses are based on states that recognize the breach of the covenant of good faith as a separate cause of action and those that do not.

Given the numerous differences that exist as to the common law throughout the fifty states and the number of proposed subclasses, the Court concludes that common legal issues do not predominate as to the proposed common law subclasses and nationwide class certification is not the superior method of adjudicating these state common law claims.

**b. Whether Class Action is Superior to Other Methods of Adjudication**

Rule 23(b)(3) requires that class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1023 (9th Cir. 1998) (internal citation omitted). Two of the key factors to determining superiority are the "extent and nature of any litigation concerning the controversy already commenced by or against members of the class," and "the likely difficulties in managing a class action." and Fed. R. Civ. P. 23(b)(3)(B), (D).

As noted above, Plaintiffs here have failed to show that a class action is the superior method for litigating the state common law causes of action. However, the Court does find that class litigation is superior to other methods of adjudication for

---

must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience,' ") (quoting HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill. 2d 145, 160 (1989)).

two categories of claims: (1) claims for violations of California, New York and Florida unfair and deceptive practices acts (first, second, third, tenth, twelfth and thirteenth causes of action); and (2) financial elder abuse (eleventh and twelfth causes of action). The Court notes that while individual class members' interests are not minuscule, they have little interest in individually controlling actions based on the potential amount in damages. Furthermore, because two of the subclasses involve California consumers and California law, it is desirable to concentrate the litigation in California.

As to the New York subclass, the Court notes that the New York Attorney General has filed a recent case against TU. On October 10, 2013, Defendants filed an ex parte request to file supplemental briefing on the issue of whether the pending action in New York affects the superiority analysis for class certification in this case.[16] (Dkt. No. 272 at 2.) Defendants argue that the pending suit by the New York Attorney General, seeking nationwide relief, defeats superiority for Plaintiffs claims. (Id.) (citing <u>Kamm v. Cal. City Dev. Co.</u>, 509 F.2d 205 (1975)). However, <u>Kamm</u> involved the dismissal of a class action where the Attorney General and the Real Estate Commissioner of California had brought a previous suit that had already resulted in restitution to many class members; a permanent injunction; and final judgment on a settlement agreement. 509 F.2d at 212. At this time, no such lawsuit affects this current action.

The Court also notes that Plaintiffs' counsel has filed a related case, <u>Cohen v. Trump</u>, 13-cv-2519-GPC-WVG, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). The Court acknowledges that Rule 23(b)(3)(B) "is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits . . . If the court

---

[16] Defendants further filed a Notice of Supplemental Authority and Request for Judicial Notice raising the same concern on January 31, 2014. (Dkt. No. 287.) Plaintiffs responded, (Dkt. No. 288), and Defendants replied, (Dkt. No. 289). As Plaintiffs do not object to the propriety of taking judicial notice of Defendants' offered authority, the Court grants the request for judicial notice.

10cv940

finds that several other actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1191 opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001) (internal citations and quotations omitted). However, courts "often certify class actions arising from similar facts." Cartwright v. Viking Indus., Inc., 2009 WL 2982887, *15 (E.D. Cal. 2009) (certifying a class for CLRA, UCL, fraudulent concealment, unjust enrichment, and warranty claims despite a concurrent state court class action certified for warranty claims); see also In re Wells Fargo Home Mortgage Overtime Pay Litig., 527 F. Supp. 2d 1053, 1069 (N.D. Cal. 2007) (concurrent FLSA and UCL class actions). Overall, the Court finds that class-wide litigation on these claims will reduce litigation costs and promote greater efficiency. As such, the Court finds the superiority requirement of Rule 23(b) is satisfied for these claims.

### 3. Rule 23(g)

Rule 23(g)(1) requires the Court to appoint class counsel. Rule 23(g) provides, *inter alia,* that courts must consider the following factors in appointing class counsel: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g).

The Court is satisfied that Plaintiffs' counsel of record Zeldes Haeggquist & Eck, LLP and Robbins Geller Rudman & Dowd LLP meet the criteria of Rule 23(b) and should serve as co-class counsel. (See Dkt. No. 122-6.)

### B. Evidentiary Objections

In addition to the pending motion for class certification, the parties have filed and fully briefed several related motions and objections:

1.  Defendants' objections to evidence in Plaintiffs' motion for class certification, (Dkt. No. 138-4, "Def. Obj. to Class Cert. Mtn.," 195-9, 213);

2.  Defendants' motion to strike Plaintiffs' declarations, (Dkt. Nos. 138-2, "Def. Mtn. to Strike," 192, 212);

3.  Plaintiffs' motion to strike Defendants' declarations, (Dkt. Nos. 196, "Pl. Mtn. to Strike," 210, 233);

4.  Defendants' motion to strike and objections to improper evidence in Plaintiffs' reply briefs supporting class certification, (Dkt. Nos. 211, "Def. Obj. to Reply Mtn.," 221, 230).

A motion to certify a class is a preliminary procedure. As such, courts do not require strict adherence to the Federal Rules of Procedure or the Federal Rules of Evidence. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974). Evidence presented in support of class certification need not be admissible at trial. Ralston v. Mortg. Investors Grp., 2012 WL 629238, *4 (N.D. Cal. 2012) Mazza v. Am. Honda, 254 F.R.D. 273, 279 (C.D. Cal. 2008) (same); Amalgamated Transit Union Local 1309 v. Laidlaw, 2009 WL 249888, *3 (S.D. Cal. 2009) (same).

In this matter, the parties have filed motions to strike declarations and lodged evidentiary objections to evidence. At this stage of the proceedings, the Court DENIES the motions to strike and overrules the evidentiary objections.

### III. CONCLUSION AND ORDER

In accordance with the foregoing, Plaintiffs' motion for class certification is **GRANTED** in part and **DENIED** in part. The Court hereby **GRANTS** Plaintiffs' motion for class certification for the following class and subclasses:

All persons who purchased a Trump University three-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") in California, New York and Florida, and have not received a full refund, divided into the following five subclasses:

(1) a California UCL/CLRA/Misleading Advertisement subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in California within the applicable statute of limitations;

(2) a California Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 65 years of age and purchased the program in California within the applicable statute of limitations;

(3) a New York General Business Law § 349 subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in New York within the applicable statute of limitations;

(4) a Florida Misleading Advertising Law subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in Florida within the applicable statute of limitations; and

(5) a Florida Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 60 years of age and purchased the program in Florida within the applicable statute of limitations.

Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

Additionally, the Court appoints Tarla Makaeff, Sonny Low, J.R. Everett and John Brown as class representatives. Since Ed Oberkrom is not a resident of California, New York, or Florida, the Court declines to appoint him as a class representative. The Court appoints Robbins Geller Rudman & Dowd LLP and Zeldes Haeggquist & Eck, as class counsel.

**IT IS SO ORDERED.**

Date: February 21, 2014

HON. GONZALO P. CURIEL
United States District Judge