# EXHIBIT 1

Exhibit 1
- 1 -

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK (177882)
HELEN I. ZELDES (220051)
ALREEN HAEGGQUIST (221858)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone:  (619) 342-8000
Facsimile:  (619) 342-7878
ambere@zhlaw.com
helenz@zhlaw.com
alreenh@zhlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN (211456)
THOMAS R. MERRICK (177987)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423
rjensen@rgrdlaw.com
tmerrick@rgrdlaw.com

Attorneys for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM, and PATRICIA MURPHY, on Behalf of Themselves and All Others Similarly Situated, <br><br>      Plaintiffs, <br><br>        vs. <br><br> TRUMP UNIVERSITY, LLC, (aka Trump Entrepreneur Initiative) a New York Limited Liability Company, DONALD J. TRUMP, and DOES 1 through 50, Inclusive, <br><br>      Defendants. | Case No.:   3:10-CV-00940-IEG(WVG) <br><br> CLASS ACTION <br><br> PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS INTERROGATORIES TO DEFENDANTS TRUMP UNIVERSITY, LLC AND DONALD J. TRUMP <br><br> Judge:   Honorable Irma E. Gonzalez <br> Courtroom:  F, First Floor <br><br><br> JURY TRIAL DEMANDED |

PROPOUNDING PARTIES: PLAINTIFFS TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM AND PATRICIA MURPHY

RESPONDING PARTIES:   DEFENDANTS TRUMP UNIVERSITY, LLC AND DONALD J. TRUMP

SET NUMBER:        ONE

Exhibit 1
- 2 -

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rules of this Court, Plaintiffs Tarla Makaeff, Brandon Keller, Ed Oberkrom and Patricia Murphy (collectively "Plaintiffs") request that defendants Trump University, LLC and Donald J. Trump (collectively "Trump" or "Defendants") produce for inspection and copying the documents described below. These documents are to be produced within 30 days from the date of service of this request at the law office of Zeldes & Haeggquist, LLP, 625 Broadway, Suite 906, San Diego, California 92101, or at a mutually convenient time, date and location agreed to by the parties. These requests are continuing under Fed. R. Civ. P. 34 and all your answers must thus be supplemented in accordance with Fed. R. Civ. P. 26(e).

## I.    INSTRUCTIONS

1.    In responding to these requests, you shall furnish all responsive documents within your possession, custody or control as specified in Fed. R. Civ. P. 34.

2.    You are under a duty to supplement or correct your responses pursuant to Fed. R. Civ. P. 26(e).

3.    In producing documents, you are requested to produce the *original* of each document together with all non-identical copies and drafts of that document. If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the *original*.

4.    Documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in the request. All documents shall be produced in the file folder, envelope or other contained in which the documents are kept or maintained. All documents shall be produced intact in their *original* files, without disturbing the organization of documents employed during the conduct of the ordinary course of business.

5.    Each request should be responded to separately; however, a document which is responsive to more than one request may, if the relevant portion is so marked or indexed, be produced and referred to in the later response.

Exhibit 1
- 3 -

6. Each document requested shall be produced in its entirety and without deletion or excisions, regardless of whether you consider the entire document to be relevant or responsive to this request. If you have redacted any portion of a document based upon attorney-client or work privilege grounds, stamp the word "REDACTED" on each page of the document which you have redacted.

7. If any document responsive to these requests is not produced in full or is redacted on the grounds that it is privileged or otherwise claimed to be protected against production, you are requested to provide the following information with respect to each such document or redaction:

a. the date such document redaction was prepared;

b. the document's author, signatory and every other person who prepared or participated in its participation, and their affiliation at that time (*e.g.*, in-house attorney, executive, outside party);

c. the type of document (*e.g.*, letter, chart, memorandum, etc.) and its page length;

d. a description of the document's subject matter and purpose that is sufficient to challenge the purported privilege;

e. a list of those persons and entities to whom the document was disseminated, together with their affiliation (*e.g.*, in-house attorney, executive, outside party);

f. Each and every person having possession, custody or control of the document and all copies thereof; and

g. the nature of the privilege or other rule of law relied upon and any facts supporting your position in withholding production of each document.

8. In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by Trump or its employees, sales agents, managers, affiliates, contractors, investigators or attorneys (or its agents, employees, representatives or investigators).

Exhibit 1
- 4 -

9.      If an otherwise responsive document was, but is no longer in existence or in your possession, custody or control, identify its current or last known custodian and describe in full the circumstances surrounding its disposition from your possession or control.  All documents shall be deemed to be in your control if you have the right to secure the document or copy thereof from another person or private entity having possession or custody thereof.

10.     If any documents requested herein have been altered, lost, discarded or destroyed, they shall be identified as completely as possible and shall include the following information:

        a.      the date of alteration or disposal;

        b.      the manner of alteration or disposal;

        c.      the reason for alteration or disposal;

        d.      the person authorizing alteration or disposal; and

        e.      the person altering or disposing of the document or documents in question.

## II.   DEFINITIONS

The following definitions shall apply to each of the requests for documents set forth and are deemed to be incorporated in each of the requests:

1.      "All documents" shall mean every document within the custody, possession or control of you, your national, regional and local offices, and any of your attorneys, representatives, employees and/or agents, whether an original or copy, as defined above, known to you, and every such document or writing which you can locate or discover through reasonably diligent efforts.

2.      "Class Members" means all persons who purchased seminars, workshops, mentorships, retreats and/or programs (collectively "Seminars") from Trump University.

3.      "Class Period" means April 30, 2006 to the present.

4.      "Course" or "seminars" means courses, seminars, workshops, mentorships, retreats and/or programs from Trump University.

Exhibit 1
- 5 -

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

1      5.     "Document" or "documents" shall be interpreted in the broadest possible sense

2 and includes, without limitation, all written, recorded, printed, typed, transcribed, filmed,

3 digitized or graphic matter and all other tangible things and media upon which any

4 handwriting, typing, printing, drawing, representation, electrostatic or other copy, sound or

5 video recording, magnetic or electrical impulse, visual reproduction or communication is

6 recorded, reproduced or represented, including each and any book, record, correspondence,

7 report, memoranda, electronic mail, contract, table, tabulation, graph, chart, diagram, plan,

8 schedule, appointment book, calendar, diary, time sheet, report, study, analysis, draft,

9 telegram, teletype or telecopy message, file, telephone log, telephone message, check,

10 microfilm, microfiche, picture, photographs, printout, electronic data compilation, tape,

11 diskette, drive, removable media, note, minutes or transcript of proceedings, including, but not

12 limited to, minutes of meetings, or other communications of any type, including interoffice

13 communications, questionnaires, surveys, charges, newspapers, booklets, circulars, work

14 papers, bulletins, notices, instructions, resolutions, reports, records, papers, bills or invoices,

15 books of account, financial statements, working papers, deeds, loan agreements, notes, ledgers,

16 security agreements, financing statements, tax returns, checks, receipts, journals and data of

17 every description and shall include each and any original produced or reproduced by any

18 method, all non-identical copies (whether different from the original because of notes made in

19 or attached to such copy, or otherwise), all other data compilations from which information

20 can be obtained (translated, if necessary, into usable form), and any preliminary versions,

21 drafts or revisions of any of the foregoing.

22      6.     "Regarding," "concerning" or "relating" shall mean documents which explicitly

23 or implicitly, in whole or in part, compare, were received in conjunction with, or were

24 generated as a result of the subject matter of the request, including all documents which

25 reflect, record, specify, memorialize, discuss, describe, consider, concern, relate to, constitute,

26 embody, evaluate, analyze, review, report on, comment on, impinge upon or impact the subject

27 matter of the request.

28

<div align="center">4</div>

No. 3:10-CV-00940-IEG(WVG)

Exhibit 1
- 6 -

7.   "Trump University" means Trump University, aka Trump Entrepreneur Initiative, any predecessors, successors, agents, employees, officers, directors, independent contractors, attorneys, accountants, or representatives or other persons occupying similar positions or performing similar functions.

### III.   RELEVANT TIME PERIOD

Unless otherwise stated, these interrogatories seek information concerning the period of time from April 30, 2006 to the present.

### IV.   DOCUMENT REQUESTS

REQUEST FOR PRODUCTION NO. 1:

All documents setting forth, in whole or in part, names and contact information of all persons who have taken Trump University courses or seminars, description of the course taken, dates of the course, and their contact information.

REQUEST FOR PRODUCTION NO. 2:

All documents concerning the amount paid by every person who has taken Trump University courses or seminars.

REQUEST FOR PRODUCTION NO. 3:

All documents setting forth any partial or full refunds given for Trump University seminars or courses, including, but not limited to, documents referring to whether the refund was awarded by the consumer's credit card company or Trump University, and the basis or reason for the refund.

REQUEST FOR PRODUCTION NO. 4:

All documents concerning or relating to Defendant Donald Trump's involvement and role in Trump University, including, but not limited to, any internal memoranda, reports, board minutes, blogs, agendas, notes, correspondence or e-mails.

REQUEST FOR PRODUCTION NO. 5:

Exemplars of all advertisements promoting Trump University and its products and services to consumers, including, but not limited to, print, internet, television and radio advertisements, promotional blog postings, and marketing materials.

ZELDES & HAEGGQUIST, LLP

Exhibit 1
- 7 -

REQUEST FOR PRODUCTION NO. 6:

Trump University's website, including all versions and revisions.

REQUEST FOR PRODUCTION NO. 7:

All evaluations, surveys or other documents completed by students who have taken any Trump University courses or seminars (both in person or online).

REQUEST FOR PRODUCTION NO. 8:

All documents concerning or relating to the credentials of instructors and mentors, the selection process for same, and all contracts with instructors and mentors.

REQUEST FOR PRODUCTION NO. 9:

Scripts, PowerPoint presentations, manuals, forms, and all other written materials used in Trump University workshops, seminars, and courses, or used by Trump University instructors, representatives, or mentors.

REQUEST FOR PRODUCTION NO. 10:

All documents concerning or relating to Trump University's credentials and public statements concerning same.

REQUEST FOR PRODUCTION NO. 11:

All documents concerning or relating to customer complaints, including, but not limited to, summaries, memoranda, spreadsheets, reports, telephone call logs or audio recordings regarding customer complaints and/or requests for refunds and communications with Trump University students.

REQUEST FOR PRODUCTION NO. 12:

All documents concerning or relating to customer service call scripts.

REQUEST FOR PRODUCTION NO. 13:

All documents concerning or relating to any communications with, inquiry or investigation by the Better Business Bureau or any governmental agency regarding Trump University.

No. 3:10-CV-00940-IEG(WVG)

ZELDES & HAEGGQUIST, LLP

Exhibit 1
- 8 -

1    **REQUEST FOR PRODUCTION NO. 14:**

2        All documents concerning or relating to the number of consumers who paid for Trump

3    University products and services, by product or service and how much they paid.

4    **REQUEST FOR PRODUCTION NO. 15:**

5        All documents concerning Defendants' revenues, profits, liabilities, assets, and net

6    worth.

7    **REQUEST FOR PRODUCTION NO. 16:**

8        All documents concerning all monies paid from Trump University to Donald Trump,

9    whether directly or indirectly.

10    **REQUEST FOR PRODUCTION NO. 17:**

11        Organizational charts and documents sufficient to identify every current and former

12    employee of Trump University, and their role and involvement.

13    **REQUEST FOR PRODUCTION NO. 18:**

14        All documents concerning any ongoing activities of Trump University.

15    **REQUEST FOR PRODUCTION NO. 19:**

16        All communications with, or about, the named Plaintiffs, their partners (if any) in the

17    Trump University seminars, and/or their parents.

18    **REQUEST FOR PRODUCTION NO. 20:**

19        All documents concerning or relating to the relationship between Trump University

20    and Trump Institute.

21    **REQUEST FOR PRODUCTION NO. 21:**

22        Financial worksheets completed by consumers during seminars and all contracts signed

23    by consumers for Trump University seminars.

24    **REQUEST FOR PRODUCTION NO. 22:**

25        All documents supporting your assertion that Trump University is not profitable,

26    including, but not limited to, profit and loss and income statements, tax returns, bank

27    statements, board minutes, internal memorandum.

28

ZELDES & HAEGGQUIST, LLP

Exhibit 1
- 9 -

1    REQUEST FOR PRODUCTION NO. 22:

2        All documents supporting your assertion that Trump University is not profitable,

3 including, but not limited to, profit and loss and income statements, tax returns, bank

4 statements, board minutes, internal memorandum.

5    REQUEST FOR PRODUCTION NO. 23:

6        All documents that support your affirmative defenses.

7    REQUEST FOR PRODUCTION NO. 24:

8        All documents regarding any and all witnesses listed in your Rule 26(a) initial

9 disclosures.

10 DATED: October 11, 2011            ZELDES & HAEGGQUIST, LLP
                                 AMBER L. ECK (177882)

11                                  HELEN I. ZELDES (220051)
                                 ALREEN HAEGGQUIST (221858)

12

13

14                                  AMBER L. ECK

15

16                                  625 Broadway, Suite 906
                                 San Diego, CA 92101

17                                  Telephone: (619) 342-8000
                                 Facsimile: (619) 342-7878

18                                  ROBBINS GELLER RUDMAN
                                   & DOWD LLP

19                                  RACHEL L. JENSEN
                                 THOMAS R. MERRICK

20                                  655 West Broadway, Suite 1900
                                 San Diego, CA 92101

21                                  Telephone: 619/231-1058
                                 619/231-7423 (fax)

22

23                                  Attorneys for Plaintiffs and the Proposed Class

24

25

26

27

28

               8                    No. 3:10-CV-00940-IEG(WVG)

Exhibit 1
- 10 -

<div style="margin-left:2em;">ZELDES & HAEGGQUIST, LLP</div>

<center>PROOF OF SERVICE<br/>C.C.P. §1013(A), C.R.C. 2003(3), 2005(i)</center>

<center>STATE OF CALIFORNIA, COUNTY OF SAN DIEGO</center>

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 625 Broadway, Suite 906, San Diego, CA 92101.

1.    On October 11, 2011, I served the foregoing document described as PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS INTERROGATORIES TO DEFENDANTS TRUMP UNIVERSITY, LLC AND DONALD J. TRUMP on all parties in this action by placing a true copy thereof enclosed in sealed envelopes and addressed as stated below:

| David K. Schneider (139288)<br/>YUNKER & SCHNEIDER<br/>655 West Broadway, Suite 1400<br/>San Diego, CA 92101<br/>Telephone: (619) 233-5500<br/>Facsimile: (619) 233-5535<br/>dks@yslaw.com | Rachel L. Jensen (211456)<br/>Thomas R. Merrick (177987)<br/>ROBBINS GELLER RUDMAN<br/>& DOWD LLP<br/>655 West Broadway, Suite 1900<br/>San Diego, CA 92101<br/>Telephone: (619) 231-1058<br/>Facsimile: (619) 231-7423<br/>rjensen@rgrdlaw.com<br/>tmerrick@rgrdlaw.com |
|---|---|
| Attorneys for Defendants | Attorneys for Plaintiffs |

**BY HAND DELIVERY AND BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at San Diego, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. Executed this 11th day of October, 2011, at San Diego, California.

<center>RUTH A. CAMERON</center>

<center>9    No. 3:10-CV-00940-IEG(WVG)</center>

Exhibit 1<br/>- 11 -

# EXHIBIT 2

Exhibit 2
- 12 -

1   ZELDES & HAEGGQUIST, LLP
    AMBER L. ECK (177882)
2   HELEN I. ZELDES (220051)
    ALREEN HAEGGQUIST (221858)
3   AARON M. OLSEN (259923)
    625 Broadway, Suite 906
4   San Diego, CA 92101
    Telephone: (619) 342-8000
5   Facsimile: (619) 342-7878
    ambere@zhlaw.com
6   helenz@zhlaw.com
    alreenh@zhlaw.com
7   aarono@zhlaw.com

8   ROBBINS GELLER RUDMAN
      & DOWD LLP
9   RACHEL L. JENSEN (211456)
    THOMAS R. MERRICK (177987)
10  655 West Broadway, Suite 1900
    San Diego, CA 92101
11  Telephone: (619) 231-1058
    Facsimile: (619) 231-7423
12  rjensen@rgrdlaw.com
    tmerrick@rgrdlaw.com

13
    Attorneys for Plaintiffs and the Proposed Class
14
                    UNITED STATES DISTRICT COURT
15
                   SOUTHERN DISTRICT OF CALIFORNIA
16

| 17 | TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated, | Case No.: 3:10-CV-00940-IEG(WVG) |
|----|------|------|
| 18 | | CLASS ACTION |
| 19 | Plaintiffs, | PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS TRUMP UNIVERSITY, LLC AND DONALD J. TRUMP |
| 20 | vs. | |
| 21 | TRUMP UNIVERSITY, LLC, et al., | |
| 22 | Defendants. | Judge:        Hon. Cathy Ann Bencivengo Magistrate Judge: Hon. William V. Gallo |

23
24  PROPOUNDING PARTIES: PLAINTIFFS TARLA MAKAEFF, BRANDON KELLER
                         AND ED OBERKROM
25
    RESPONDING PARTIES:   DEFENDANTS TRUMP UNIVERSITY, LLC AND
26                        DONALD J. TRUMP

    SET NUMBER:           TWO
27
28

*(vertical left margin)* ZELDES & HAEGGQUIST, LLP

Exhibit 2
- 13 -

ZELDES & HAEGGQUIST, LLP

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

.  Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rules of this Court, Plaintiffs Tarla Makaeff, Brandon Keller, and Ed Oberkrom (collectively "Plaintiffs") request that defendants Trump University, LLC and Donald J. Trump (collectively "Trump" or "Defendants") produce for inspection and copying the documents described below.  These documents are to be produced within 30 days from the date of service of this request to the law office of Zeldes & Haeggquist, LLP, 625 Broadway, Suite 906, San Diego, California 92101, or at a mutually convenient time, date and location agreed to by the parties.  These requests are continuing under Fed. R. Civ. P. 34 and all your answers must thus be supplemented in accordance with Fed. R. Civ. P. 26(e).

**I.    INSTRUCTIONS**

1.    In responding to these requests, you shall furnish all responsive documents within your possession, custody or control as specified in Fed. R. Civ. P. 34.

2.    You are under a duty to supplement or correct your responses pursuant to Fed. R. Civ. P. 26(e).

3.    In producing documents, you are requested to produce the *original* of each document together with all non-identical copies and drafts of that document.  If the original of any document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the *original*.

4.    Documents shall be produced as they are kept in the ordinary course of business or shall be organized and labeled to correspond with the categories in the request.  All documents shall be produced in the file folder, envelope or other container in which the documents are kept or maintained.  All documents shall be produced intact in their *original* files, without disturbing the organization of documents employed during the conduct of the ordinary course of business.

5.    Electronically stored information must be produced in their native format.

Exhibit 2
- 14 -

1    6.    Each request should be responded to separately; however, a document which is
2  responsive to more than one request may, if the relevant portion is so marked or indexed, be
3  produced and referred to in the later response.

4    7.    Each document requested shall be produced in its entirety and without deletion
5  or excisions, regardless of whether you consider the entire document to be relevant or
6  responsive to this request.  If you have redacted any portion of a document based upon
7  attorney-client or work-product privilege grounds, stamp the word "REDACTED" on each
8  page of the document which you have redacted.

9    8.    If any document responsive to these requests is not produced in full or is
10  redacted on the grounds that it is privileged or otherwise claimed to be protected against
11  production, you are requested to provide the following information with respect to each such
12  document or redaction:

13      a.    the date such document redaction was prepared;

14      b.    the document's author, signatory and every other person who prepared
15  or participated in its preparation, and their affiliation at that time (*e.g.*, in-house attorney,
16  executive, outside party);

17      c.    the type of document (*e.g.*, letter, chart, memorandum, etc.) and its page
18  length;

19      d.    a description of the document's subject matter and purpose that is
20  sufficient to challenge the purported privilege;

21      e.    a list of those persons and entities to whom the document was
22  disseminated, together with their affiliation (*e.g.*, in-house attorney, executive, third party);

23      f.    Each and every person having possession, custody or control of the
24  document and all copies thereof; and

25      g.    the nature of the privilege or other rule of law relied upon and any facts
26  supporting your position in withholding production of each document.

27    9.    In producing documents and other materials, you are requested to furnish all
28  documents or things in your possession, custody or control, regardless of whether such

ZELDES & HAEGGQUIST, LLP

2        No. 3:10-CV-00940-IEG(WVG)

Exhibit 2
- 15 -

1   documents or materials are possessed directly by Trump or their employees, sales agents,

2   managers, affiliates, contractors, investigators or attorneys (or their agents, employees,

3   representatives or investigators).

4       10.    If an otherwise responsive document was, but is no longer in existence or in

5   your possession, custody or control, identify its current or last known custodian and describe

6   in full the circumstances surrounding its disposition from your possession or control. All

7   documents shall be deemed to be in your control if you have the right to secure the document

8   or copy thereof from another person or private entity having possession or custody thereof.

9       11.    If any documents requested herein have been altered, lost, discarded or

10   destroyed, they shall be identified as completely as possible and shall include the following

11   information:

12           a.    the date of alteration or disposal;

13           b.    the manner of alteration or disposal;

14           c.    the reason for alteration or disposal;

15           d.    the person authorizing alteration or disposal; and

16           e.    the person altering or disposing of the document or documents in

17   question.

18   **II.**    **DEFINITIONS**

19       The following definitions shall apply to each of the requests for documents set forth

20   and are deemed to be incorporated in each of the requests:

21       1.    "All documents" shall mean every document within the custody, possession or

22   control of you, your national, regional and local offices, and any of your attorneys,

23   representatives, employees and/or agents, whether an original or copy, as defined above,

24   known to you, and every such document or writing which you can locate or discover through

25   reasonably diligent efforts.

26       2.    "Document" or "documents" shall be interpreted in the broadest possible sense

27   and includes, without limitation, all written, recorded, printed, typed, transcribed, filmed,

28   digitized or graphic matter and all other tangible things and media upon which any

<div style="text-align:center">3        No. 3:10-CV-00940-IEG(WVG)</div>

ZELDES & HAEGGQUIST, LLP

Exhibit 2
- 16 -

ZELDES & HAEGGQUIST, LLP

1  handwriting, typing, printing, drawing, representation, electrostatic or other copy, sound or

2  video recording, magnetic or electrical impulse, visual reproduction or communication is

3  recorded, reproduced or represented, including each and any book, record, correspondence,

4  report, memoranda, electronic mail, contract, table, tabulation, graph, chart, diagram, plan,

5  schedule, appointment book, calendar, diary, time sheet, report, study, analysis, draft,

6  telegram, teletype or telecopy message, file, telephone log, telephone message, check,

7  microfilm, microfiche, picture, photographs, printout, electronic data compilation, tape,

8  diskette, drive, removable media, note, minutes or transcript of proceedings, including, but not

9  limited to, minutes of meetings, or other communications of any type, including interoffice

10  communications, questionnaires, surveys, charges, newspapers, booklets, circulars, work

11  papers, bulletins, notices, instructions, resolutions, reports, records, papers, bills or invoices,

12  books of account, financial statements, working papers, deeds, loan agreements, notes, ledgers,

13  security agreements, financing statements, tax returns, checks, receipts, journals and data of

14  every description and shall include each and any original produced or reproduced by any

15  method, all non-identical copies (whether different from the original because of notes made in

16  or attached to such copy, or otherwise), all other data compilations from which information

17  can be obtained (translated, if necessary, into usable form), and any preliminary versions,

18  drafts or revisions of any of the foregoing.

19      3.    "Consisting of" "reflecting" or "relating to" shall mean documents which

20  explicitly or implicitly, in whole or in part, compare, were received in conjunction with, or

21  were generated as a result of the subject matter of the request, including all documents which

22  reflect, record, specify, memorialize, discuss, describe, consider, concern, relate to, constitute,

23  embody, evaluate, analyze, review, report on, comment on, impinge upon or impact the subject

24  matter of the request.

25      4.    "Seminar" means courses, seminars, workshops, mentorships, retreats and/or

26  programs from Trump University.

27      5.    "Trump University" means Trump University, aka Trump Entrepreneur

28  Initiative, any predecessors, successors, agents, employees, officers, directors, independent

4                    No. 3:10-CV-00940-IEG(WVG)

Exhibit 2
- 17 -

1  contractors, attorneys, accountants, or representatives or other persons occupying similar

2  positions or performing similar functions.

3  **III.    RELEVANT TIME PERIOD**

4        Unless otherwise stated, these interrogatories seek information concerning the period

5  of time from April 30, 2006 to the present.

6  **IV.    DOCUMENT REQUESTS**

7  REQUEST FOR PRODUCTION NO. 25:

8        All documents consisting of or relating to Trump University's insurance policies that

9  provide coverage for legal claims against Trump University, its officers and directors, Donald

10  Trump, Trump Organization, or any of its officers and directors.

11  REQUEST FOR PRODUCTION NO. 26:

12        All documents relating to Trump University's retention, maintenance and/or

13  destruction policies for documents, including computer data policies, as well as the name and

14  the title of the person(s) primarily responsible for the adoption, implementation, or revision of

15  same.

16  REQUEST FOR PRODUCTION NO. 27:

17        All documents identified, referred to, or used by Trump University in preparing its

18  responses to Plaintiffs' first and second set of Interrogatories to Defendants.

19  REQUEST FOR PRODUCTION NO. 28:

20        All documents identified, referred to, or used by Donald Trump in preparing his

21  responses to Plaintiffs' first and second set of Interrogatories to Defendants.

22  REQUEST FOR PRODUCTION NO. 29:

23        For all persons who purchased a seminar from Trump University, all documents that

24  constitute or evidence such person's "Profile" similar to the "Profiles" already produced for

25  the named Plaintiffs, Bates-numbered TU 01532-TU 01545.

26  REQUEST FOR PRODUCTION NO. 30:

27        The complete student files of all persons who purchased a Trump University seminar.

28

*ZELDES & HAEGGQUIST, LLP* (left margin)

Exhibit 2
- 18 -

ZELDES & HAEGGQUIST, LLP

1    REQUEST FOR PRODUCTION NO. 31:

2        If Trump University contends that Trump University's speakers, instructors and/or

3    mentors were hand-picked by Donald Trump, all documents supporting that contention.

4    REQUEST FOR PRODUCTION NO. 32:

5        If Trump University contends that Trump University's speakers, instructors and/or

6    mentors were real estate experts, all documents supporting that contention.

7    REQUEST FOR PRODUCTION NO. 33:

8        If Trump University contends that its speakers, instructors and/or mentors were hand-

9    picked by Donald Trump, all documents relating to the process by which Donald Trump hand-

10   picked such speakers, instructors and mentors.

11   REQUEST FOR PRODUCTION NO. 34:

12       All documents reflecting or relating to any litigation hold put into place in this

13   litigation.

14   REQUEST FOR PRODUCTION NO. 35:

15       To the extent that any of your responses to any of Plaintiffs' requests for admissions is

16   other than an unqualified admission, produce all documents memorializing each such fact.

17   REQUEST FOR PRODUCTION NO. 36:

18       All documents that reflect Trump University's process for developing its curriculum,

19   as well as the name and job title of the person(s) primarily responsible for same.

20   REQUEST FOR PRODUCTION NO. 37:

21       All documents concerning the pricing of Trump University seminars, courses, and

22   mentorships.

23

24

25

26

27

28

Exhibit 2
- 19 -

1    REQUEST FOR PRODUCTION NO. 38:

2            All documents reflecting training and policies for Trump University speakers,

3    instructors, and mentors, including without limitation, documents reflecting monitoring of

4    speakers, instructors and mentors and production requirements.

5    DATED: March 30, 2012                    ZELDES & HAEGGQUIST, LLP
                                               AMBER L. ECK
6                                              HELEN I. ZELDES
                                               ALREEN HAEGGQUIST
7                                              AARON M. OLSEN

8

9                                                   AARON M. OLSEN

10

11                                             625 Broadway, Suite 906
                                               San Diego, CA 92101
12                                             Telephone: (619) 342-8000
                                               Facsimile: (619) 342-7878

13                                             ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
14                                             RACHEL L. JENSEN
                                               THOMAS R. MERRICK
15                                             655 West Broadway, Suite 1900
                                               San Diego, CA 92101
16                                             Telephone: (619) 231-1058
                                               Facsimile: (619) 231-7423
17

18                                             Attorneys for Plaintiffs and the Proposed Class

19

20

21

22

23

24

25

26

27

28

                                        7              No. 3:10-CV-00940-IEG(WVG)

Exhibit 2
- 20 -

ZELDES & HAEGGQUIST, LLP

<u>PROOF OF SERVICE</u>
C.C.P. §1013(A), C.R.C. 2003(3), 2005(i)

STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 625 Broadway, Suite 906, San Diego, CA 92101.

1.    On March 30, 2012, I served the foregoing document described as PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS TRUMP UNIVERSITY, LLC AND DONALD J. TRUMP on all parties in this action by placing a true copy thereof enclosed in sealed envelopes and addressed as stated below:

| David K. Schneider (139288)<br>YUNKER & SCHNEIDER<br>655 West Broadway, Suite 1400<br>San Diego, CA 92101<br>Telephone: (619) 233-5500<br>Facsimile: (619) 233-5535<br>dks@yslaw.com | Rachel L. Jensen (211456)<br>Thomas R. Merrick (177987)<br>ROBBINS GELLER RUDMAN<br>& DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423<br>rjensen@rgrdlaw.com<br>tmerrick@rgrdlaw.com |
|---|---|
| Attorneys for Defendants | Attorneys for Plaintiffs |

BY HAND DELIVERY AND BY MAIL: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at San Diego, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made. Executed this 30th day of March, 2012, at San Diego, California.

RUTH A. CAMERON

Exhibit 2
- 21 -

# EXHIBIT 3

Exhibit 3
- 22 -

**Donald J. Trump, Sr.**                                        **September 12, 2012**

```
        IN THE UNITED STATES DISTRICT COURT

         SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

     Plaintiffs,              Civil Action No.

        vs.                   3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,    CAB(WVG)

     Defendants.

_____



     Videotaped deposition of DONALD J. TRUMP, SR.

     New York, New York

     September 12, 2012






Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489
```

**www.aptusCR.com**

Exhibit 3
- 23 -

**Donald J. Trump, Sr.**                                    **September 12, 2012**

1    court reporter a document which is a portion of a
2    PowerPoint presentation produced by Trump University,
3    which bears the Bates stamp TU59124, which I will ask
4    be marked as Plaintiffs' Exhibit No. 51.
5              (Plaintiffs' Exhibit 51 was marked
6              for identification.)
7    BY MS. JENSEN:
8         Q   Do you recognize this document?
9         A   I think I do, yes.
10        Q   And what is this document?
11        A   It's various properties that I've built,
12   owned, or something.  But it's a list of properties
13   that I've been involved with.
14        Q   And would you say that this slide
15   contains images of buildings that are representative
16   in your real estate portfolio?
17        A   Yes.
18        Q   And would you say that you've been
19   primarily involved in large-scale real estate
20   projects?
21        A   Yes, among other things.  Yes.
22        Q   Do you currently have any ownership or
23   licensing interest in any other real estate investing
24   courses other than Trump University?

Page 166

1         A   No, other than speeches, which is
2    separate.
3         Q   Do you recall that when Michael Sexton
4    first came to you about Trump University, he had
5    originally offered a licensing agreement?
6         A   No.  It's possible that that happened,
7    but I don't remember.
8         Q   Are you familiar with a New York Real
9    Estate Institute?
10        A   New York Real Estate Institute?  Not
11   particularly, no.
12        Q   So you don't have any type of interest in
13   the New York Real Estate Institute?
14        A   You'd have to speak to my lawyers.  It
15   doesn't sound like it, unless it's an offshoot or
16   something.  But you'd have to speak to my lawyers.
17        MS. JENSEN:  That's all my questions for
18   now.  Plaintiffs will reserve their right to reopen
19   this deposition in the event that the Court rules
20   that the topic for which Mr. Trump was designated
21   should be testified by him; or in addition to the
22   extent that the defendants have not provided all
23   relevant documents, plaintiffs also reserve our
24   rights.

Page 167

1         MR. SCHNEIDER:  That concludes the
2    deposition.
3              THE WITNESS:  Thank you.  Thank you.
4              THE VIDEOGRAPHER:  This concludes the
5    testimony of Donald J. Trump.  We are going off the
6    record at 3:06 p.m.  This concludes Tape No. 3.
7              (Videotaped deposition concluded
8              at 3:06 p.m.)
9
10
11
12        C E R T I F I C A T I O N
13
14
15        I hereby certify that I have read the
16   foregoing transcript of my deposition testimony, and
17   that my answers to the questions propounded, with the
18   attached corrections or changes, if any, are true and
19   correct.
20
     -----------------------------------
21        DONALD J. TRUMP, SR.
22
23
24

Page 168

1         CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, Registered
4    Diplomate Reporter, Certified Realtime Reporter,
5    Certified Shorthand Reporter (CA) and Notary Public,
6    the officer before whom the foregoing proceedings
7    were taken, do hereby certify that the foregoing
8    transcript is a true and correct record of the
9    proceedings; that said proceedings were taken by me
10   stenographically and thereafter reduced to
11   typewriting under my supervision; and that I am
12   neither counsel for, related to, nor employed by any
13   of the parties to this case and have no interest,
14   financial or otherwise, in its outcome.
15
16
17
18        _____
         Gail Inghram Verbano, CSR, RDR, CRR
19        CA-CSR No. 8635
20
21
22
23

Page 169

43 (Pages 166 to 169)

Exhibit 3
- 24 -

# EXHIBIT 4

Exhibit 4
- 25 -

*Makaeff v. Trump University*, No. 10-cv-0940 (S.D. Cal.)

**SAMPLING OF KEY DOCUMENTS PRODUCED AFTER DEFENDANTS' DEPOSITIONS**

| CATEGORY | EXAMPLES OF DOCUMENTS[1] | DATE REQUESTED | DATE RECEIVED |
|---|---|---|---|
| **Scripts, PowerPoints and Manuals Used at Trump University Live Events**<br><br>(RFP No. 9) | 4/14/2009 email from Sexton to multiple parties re: New PPT Script and attaching Script. *See Cohen* Ex. 18[2] & *Makaeff* Ex. 145[3] (TU 154665-702). | 10/11/2011 | 6/4/2013 |
| | 2009 PlayBook. *See Cohen* Ex. 21 & *Makaeff* Ex. 75 (TU 130419-550). | 10/11/2011 | 10/22/2012 |
| | 2008 PlayBook. *See Cohen* Ex. 27 & *Makaeff* Ex. 76 (TU 130393-418). | 10/11/2011 | 10/22/2012 |
| | 2007 PlayBook. *See Cohen* Ex. 28 & *Makaeff* Ex. 77 (TU 130294-340). | 10/11/2011 | 10/22/2012 |
| **Documents and Communications Regarding Investigations or Inquiries by Governmental Agencies** | 5/27/2005 letter from NYSED to Donald Trump re: illegal use of title "university" and licensing requirements. *See Cohen* Ex. 1 & *Makaeff* Ex. 138 (NYSED 000106-07). | 10/11/2011 | Still have not received from defendants; received on 4/26/2013 from NYSED pursuant to a |

---

[1]   In the interest of not burdening this Court with voluminous exhibits, plaintiffs do not attach each of the documents referenced, but are happy to provide them upon request.

[2]   "*Cohen* Ex." references are to Exhibits 1-44 in support of Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel ("*Cohen* Class Cert."), filed June 16, 2014 in *Cohen v. Trump*, No. 3:13cv2519-GPC (WVG) (S.D. Cal. Dkt. Nos. 39 through 39-7), and to Exhibits 45-49 in support of the Reply *Cohen* Class Cert., filed August 1, 2014 in *Cohen* (Dkt. Nos. 46 through 46-2).

[3]   "*Makaeff* Ex." references are to Exhibits 1-66 to the Declaration of Amber L. Eck (Dkt. No. 122-2) in support of plaintiffs' motion for class certification, Exhibits 67-137 to the Declaration of Rachel L. Jensen (Dkt. No. 195-1) in support of plaintiffs' reply in support of class certification, Exhibits 138-144 to the Declaration of Rachel L. Jensen (Dkt. No. 219-1) in support of plaintiffs' opposition to defendants' motion to strike, and Exhibits 145-153 to the Declaration of Amber L. Eck (Dkt. No. 233-1) in support of plaintiffs' reply motion to strike.

Exhibit 4
- 26 -

| (RFP No. 13) | | | second FOIA request |
| --- | --- | --- | --- |
| | 6/7/2005 letter from NYSED to Sexton re: cease operations (NYSED 000101). | 10/11/2011 | Still have not received from defendants; received from NYSED on 4/26/2013 pursuant to a second FOIA request |
| | 6/15/2005 email from Sexton to Weisselberg re: fictitious office. *See Makaeff* Ex. 140 (TU 137770). | 10/11/2011 | 1/25/2013 |
| | 6/28/2005 email from Sexton to Frey re: NYSED inquiry.  *See Makaeff* Ex. 133 (NYSED 000100, TU 129810-817). | 10/11/2011 | 9/17/2012 |
| | 2/5/2010 email from Sam Stubbs of Pillsbury to Rick Berlin of Texas AG re: TU (TU 135883 – *Makaeff* Ex. 70). | 10/11/2011 | 12/20/2012 |
| | Michael Sexton's sworn testimony in the NYAG investigatory proceedings. | 10/11/2011 | Still have not received from defendants; pulled from public docket on 8/24/2013 |
| **Documents Concerning or Relating to Customer Complaints** (RFP No. 11) | Sampling of Student Complaints. *See Makaeff* Ex. 91 (TU 135903-04, 135884-88, 135761-62). | 10/11/2011 | 12/20/2012 |

982758_1

Exhibit 4
- 27 -

# EXHIBIT 5

Exhibit 5
- 28 -



**THE STATE EDUCATION DEPARTMENT** / THE UNIVERSITY OF THE STATE OF NEW YORK

Bureau of Proprietary School Supervision
Investigations and Audit Unit
116 West 32nd Street, 5ᵗʰ Floor,
New York, New York 10001

Tel. (212) 643-4760
Fax (212) 643-4765
E-mail: ekramer@mail.nysed.gov
Web site: www.highered.nysed.gov/bpss

June 7, 2005

Michael Sexton, President
Trump University
40 Wall Street, 33ʳᵈ Floor
New York NY 10005

Dear Mr. Sexton:

The Bureau of Proprietary School Supervision (BPSS) has been advised that your organization is providing student training as a trade, business or computer training facility that may be required to be licensed pursuant to Section 5001(1) of the Education Law. If this is the case, you may be subject to Section 5003(6)(b) of the Education Law which states in part that "the commissioner may impose a civil penalty not to exceed fifty thousand dollars for any of the following violations: (1) operation of a school without a license in violation of section five thousand one of this article." In addition, for-profit organizations providing instruction in preparation for high school equivalency examinations or English as a Second Language (ESL) must also be licensed pursuant to Section 5001(2)(b) of the Education Law.

If you are currently providing instruction, your school must cease operating unless you are in compliance with the Education Law. Further information, as well as license applications, instructions, the Education Law, and the Commissioner's Regulations can be obtained by visiting the BPSS web site at www.highered.nysed.gov/bpss.

Please respond to this letter in writing stating your intentions regarding compliance with the relevant school licensing provisions of the Education Law and the Commissioner's Regulations. You should read the licensing information on the BPSS web site and access the section on "School Licensing/Registration Process" to submit the appropriate school license application forms.

Sincerely,

Edward G. Kramer
Supervising Investigator

# EXHIBIT 6

Exhibit 6
- 30 -

# Exhibit B

Exhibit 6
- 31 -

Page 1

1

2  ------------------------------------------x

3  In re

4  TRUMP UNIVERSITY INVESTIGATION

5  ------------------------------------------x

6                            July 25, 2012

                             10:15  a.m.

7

8          Examination of MICHAEL SEXTON

9  under oath, pursuant to subpoena held at

10  the offices of The New York State Attorney

11  General, 120 Broadway, New York, New York,

12  before Debbie Zaromatidis, a Shorthand

13  Reporter and Notary Public of the State of

14  New York.

15

16

17

18

19

20

21

22

23

24

25

Exhibit 6
- 32 -

Page 2

```
 1
 2   A  P  P  E  A  R  A  N  C  E  S  :
 3
 4        STATE  OF  NEW  YORK
 5        OFFICE  OF  THE  ATTORNEY  GENERAL
 6        ERIC  T.  SCHNEIDERMAN
 7               120  Broadway
 8               New  York,  New  York
 9        BY:    MELVIN  L.  GOLDBERG,  ESQ.
10               TRISTAN  SNELL,  ESQ.
11               JANE  AZIA,  ESQ.
12               LAURA  LEVINE,  ESQ.
13               TANYA  TRAKHT,  ESQ.
14
15        SNR  DENTON  US  LLP
16        Attorneys  for  the  witness
17               1221  Avenue  of  the  Americas
18               New  York,  New  York  10020
19        BY:    ARI  SCHICK,  ESQ.
20               BEN  DELFINA,  ESQ.
21               MELANIE  McCAMMON,  ESQ.
22
23
24
25
```

Exhibit 6
- 33 -

Page 3

1                    SEXTON

2    M I C H A E L    S E X T O N,

3    having first been duly sworn by a Notary

4    Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY MR. GOLDBERG:

7         Q.    Thank you for appearing today,

8    Mr. Sexton.

9         A.    You are welcome.

10        Q.    If at any time you need to take

11   a break for any reason, just let me know,

12   and we will accommodate you obviously.

13             You are here today pursuant to a

14   subpoena that was sent to you.  You are

15   aware of that?

16        A.    Yes, I am.

17             MR. GOLDBERG:  Okay.  I have a

18   copy of that subpoena here.  I would like

19   it to be marked as Exhibit 1.

20             (Exhibit 1 marked for

21   identification.)

22             (Document handed to witness.)

23        Q.    You received that subpoena?

24        A.    Yes, I did.

25        Q.    And you aware of it?

Exhibit 6
- 34 -

Page 12

1                    SEXTON

2    company?

3         A.    I am not.

4         Q.    And what happened in late 2004?

5         A.    So in 2004 I went to start Trump

6    University.

7         Q.    How did that happen?

8         A.    So the business was going well,

9    and -- the Katon Partners business.  We

10   were looking to expand services beyond

11   recruitment to our clients, and one of the

12   areas we were looking at was continuing

13   ed, required continuing ed requirements

14   for healthcare professionals, and I did an

15   analysis of that industry because it would

16   have been attractive, and found that while

17   it was attractive the acquisition costs to

18   acquire a new customer was prohibitively

19   expensive and highly competitive.  That is

20   probably more than you need to know --

21   more than you want to know, but we got

22   into thinking about using E learning as a

23   way to deliver those services, and as part

24   of that process we expanded the scope of

25   the concept to say if you could license a

Exhibit 6
- 35 -

Page 13

```
 1              SEXTON
 2    business -- a brand name in continuing
 3    education it would be able to reduce our
 4    acquisition cost to acquire a new customer
 5    and then make the model more competitive,
 6    and that was kind of the gateway to saying
 7    -- this is when The Apprentice was on its
 8    first season, and we started thinking -- I
 9    started thinking maybe there is a broader
10    opportunity in the marketplace to deliver
11    broad range of business subject area
12    curriculum to small and midsized business
13    owners across the country.
14        Q.    And the idea was to do this
15    online at that time?
16        A.    Entirely online.
17        Q.    Online streaming or by CDs or --
18        A.    No.  No.  So it is a simulation
19    based E learning experience or
20    experiential E learning delivered online.
21        Q.    So how did you then develop the
22    idea of the Trump U?
23        A.    So once I expanded the concept
24    and identified a need in my opinion for
25    this kind of education in the marketplace,
```

Exhibit 6
- 36 -

Page 14

1               SEXTON

2     again I went back to -- it will help you

3     market that product or service if you have

4     a recognizable brand name, and at the time

5     with all the hoopla around the

6     original -- I think it was the first or

7     maybe it was the second is Apprentice

8     season, Trump -- there were business

9     school classes being taught around various

10    episodes of the Apprentice.  So there was

11    a fairly robust what I thought was

12    transition for the Trump brand beyond real

13    estate into a broader entrepreneurial

14    business-oriented brand, and that was the

15    plan that we developed.

16        Q.    Was there a formal business plan

17    or proposal?

18        A.    Not initially.  So one of -- my

19    partner's brother-in-law knew Donald

20    Trump, had golfed with him a number of

21    times and arranged for us to go in and

22    have a very brief conceptual discussion

23    about the -- about the idea.

24        Q.    Who was that?

25        A.    Who was my partner?

Exhibit 6
- 37 -

Page 15

1                    SEXTON

2        Q.     Yes.   Who was the man that you

3   just referred to or the person that you

4   just mentioned?

5        A.     Sorry.   My partner's name was

6   Richard Kaskel and his brother-in-law, who

7   had the relationship with Trump, was

8   Jonathan Spiltano.

9        Q.     And how did Mr. Spiltano have a

10  relationship with Mr. Trump?

11       A.     I don't know.

12       Q.     So when was that meeting that

13  you had with Mr. Trump?

14       A.     I don't recall specifically, but

15  it would have been sometime in the August,

16  September time frame of 2004, perhaps a

17  little earlier.

18       Q.     Was there anything in writing

19  that was presented to Mr. Trump?

20       A.     No.   It was conceptual.

21       Q.     So it was all just an oral

22  discussion?

23       A.     A discussion of a vision, yes.

24       Q.     And what was the pitch that you

25  made to him?

Exhibit 6
- 38 -

Case 3:10-cv-00940-GPC-WVG   Document 355-2   Filed 11/07/14   Page 39 of 207

Page 16

1                    SEXTON

2        A.      Really what I just shared with

3   you, the idea that we can build a world

4   class E learning business with his brand

5   on it and through a licensing arrangement,

6   which was our proposal, be able to make

7   the economics favorable because that would

8   reduce our marketing costs, and we would

9   be able to service small and midsized

10  business owners, who were historically

11  underserved by training and education

12  companies.

13       Q.      So the idea at that time was

14  that it would be just a license?

15       A.      Correct.

16       Q.      Would you license the Trump

17  name?

18       A.      Correct.

19       Q.      The Trump brand.  But would you

20  then farm it out to a licensee to actually

21  produce the curriculum and whatnot?

22       A.      No.  So we -- we would launch

23  the business that would be responsible for

24  everything soup to nuts, and we would just

25  license the Trump brand to go to market

Page 17

```
 1                    SEXTON
 2  with.
 3       Q.      But you yourself and your people
 4  would actually develop the curriculum and
 5  do all of the work?
 6       A.      We would hire the team, raise
 7  the capital, hire the team necessary to
 8  execute the vision and the business plan
 9  that we had put together under the Trump
10  brand.
11       Q.      Were terms discussed as to what
12  would be an appropriate license fee at
13  that time at that meeting?
14       A.      I don't believe in the initial
15  meeting.
16       Q.      But a discussion was held that
17  generally you would license the name, and
18  there would be a license fee?
19       A.      Yes.
20       Q.      And were any numbers thrown
21  around at that meeting in terms of what
22  the potential was for this type of an
23  operation?
24            MR. SCHICK:   Objection.   Can
25  you clarify?
```

Exhibit 6
- 40 -

Page 18

1                    SEXTON
2        A.    Potential in terms of?
3        Q.    The economic potential.
4        A.    No.
5        Q.    How long was that meeting for?
6        A.    Very brief.  Ten minutes.
7        Q.    And how was it left?
8        A.    It was left that Donald Trump
9    had interest.  He thought it was a
10   compelling vision, and he asked us to
11   explore it further.
12       Q.    And this was, as you said, just
13   small and midsized companies that you were
14   going to produce this service for; is that
15   correct?
16       A.    Correct.
17       Q.    It wasn't directly to consumers?
18       A.    No, it was not.
19       Q.    And what type of companies --
20   did you have a broad range of companies or
21   was it health related or --
22       A.    No.  No.  We made no industry
23   specific target on our segmenting of the
24   market.
25       Q.    It wasn't real estate geared?

Exhibit 6
- 41 -

Page 19

```
1                    SEXTON
2        A.     Real estate businesses?
3        Q.     Yes.
4        A.     No.
5        Q.     So did you have -- set a
6    timetable for when you would get back to
7    him or how was it left?
8        A.     I don't recall.
9        Q.     When did you get back to him?
10       A.     It was relatively quickly.
11       Q.     Still in 2004?
12       A.     Yes, still in 2004?
13       Q.     And how did you get back to him?
14   Was there a formal document or did you set
15   up another meeting? How was it --
16       A.     We definitely set up another
17   meeting.  We would have prepared -- we
18   went in there initially with the concept.
19   We would have prepared a little more in
20   depth report in terms of what our specific
21   plan was at that point.  I don't believe
22   that at that next meeting we had a fully
23   fleshed out business plan.
24       Q.     Was there something in writing
25   for that next meeting?
```

Exhibit 6
- 42 -

Page 20

```
 1                    SEXTON
 2        A.    I recall a very brief Power
 3   Point presentation.
 4        Q.    Do you still have copies of
 5   that?
 6        A.    I do not.
 7        Q.    Do you know if anybody has
 8   copies of that?
 9        A.    I -- I do not.
10        Q.    Did you produce that to Mr.
11   Trump or his people?
12        A.    We handed him a hardcopy of it.
13             MR. SCHICK:   In 2004 you mean?
14             THE WITNESS:   In 2004.
15        Q.    In 2004.
16             MR. GOLDBERG:   I would ask if
17   that is available that that be made
18   produced.
19        Q.    Were other people at the meeting
20   either at the first meeting that you had
21   with Mr. Trump or this next meeting that
22   had you with him that you recall?
23        A.    Richard Kaskel came to I believe
24   both of those meetings, and I believe
25   Jonathan Spiltano came to at least one.
```

Exhibit 6
- 43 -

Page 21

1                    SEXTON

2        Q.     Were there any other people from

3   the Trump Organization at either of those

4   meetings?

5        A.     I don't recall those meetings

6   specifically.

7        Q.     Was Mr. Weiselberg at either of

8   those meetings?

9        A.     I can't recall specifically.

10       Q.     So tell me about what happened

11  at the second meeting.

12       A.     So the first meeting was very

13  conceptual, really ten minutes, maybe

14  less.  Here is the idea and do you like it

15  or not.  Is it directionally correct?

16            This next meeting, you know,

17  again would have provided more detail

18  around how we were going to actually build

19  the business out, what kind of subject my

20  experts were going to work with to provide

21  the content and a little more I

22  would again, and I'm speculating because I

23  don't recall the specific nature of the

24  meeting, but it would have been more about

25  how we are going to operationalize that

Exhibit 6
- 44 -

```
1              SEXTON
2  vision.
3      Q.    And who how long did that
4  meeting take?
5      A.    Again, it was very brief.  Maybe
6  fifteen minutes.
7      Q.    And then how was that left?
8      A.    At some point we were asked to
9  provide a -- you know, effectively a
10 contract that would detail the objections
11 of -- of both parties.
12     Q.    And were you to draft that?
13     A.    Yes, that was -- that was on our
14 plate.
15     Q.    And at that second meeting, was
16 the license or fees discussed?
17     A.    Again, I am speculating a bit,
18 but I would imagine they were.
19     Q.    You don't recall any numbers
20 that were discussed?
21     A.    I don't recall.
22     Q.    Okay.  Were Mr. Trump or the
23 Trump Organization going to prepare
24 anything at the end of that meeting?
25     A.    I don't believe so.
```

Page 23

```
 1                    SEXTON
 2        Q.    So your instructions then were
 3    to go back and to draft a contract that
 4    would set up the operation; is that
 5    correct?
 6        A.    Well, the terms of the
 7    relationship between the two parties and
 8    what their responsibilities would be.
 9              MR. SCHICK:   A term sheet? More
10    of a term sheet?
11        A.    More of a term sheet.
12        Q.    And did you do that?
13        A.    Yes, we did.
14        Q.    And do you have a copy of that?
15        A.    I do not.
16        Q.    Did you ever give that to Mr.
17    Trump or the Trump Organization?
18        A.    Yes, we did.
19              MR. GOLDBERG:   Again, we would
20    request that it be provided.
21              MR. SCHICK:   Again, at the
22    beginning of 2004.
23              THE WITNESS:   2004.
24              MR. GOLDBERG:   2004.
25              MR. SCHICK:   I understand.   I
```

Exhibit 6
- 46 -

Page 24

```
 1                    SEXTON
 2   just want to make sure the record is
 3   clear.
 4        Q.    And do you recall what the term
 5   sheet looked like?  What was -- what were
 6   the terms that you proposed?
 7        A.    I don't recall the specifics.
 8        Q.    Do you recall in general what
 9   you proposed?
10        A.    I do.  So we would -- the basic
11   structure was we would go raise the money
12   to fund the business and have control over
13   what the business did, and we would
14   license the Trump brand for a set fee.
15   I -- I don't recall the exact percentage,
16   but it laid out the basic terms.
17        Q.    Do you recall the -- in general
18   what the percentage was? Was it more than
19   10 percent?  Was it less than 5 percent?
20        A.    It was a minority -- so it was
21   clearly less than 50 percent.  I don't
22   recall the exact amount.
23        Q.    And where did you propose that
24   you were going to raise the money to start
25   this firm?
```

Exhibit 6
- 47 -

Page 25

1                    SEXTON

2      A.     That was something that my

3   partners and I were responsible for.   So

4   we would go to traditional sources of

5   capital, venture capital, private equity,

6   individual investors.

7      Q.     And who were your partners at

8   that point?

9      A.     At that point it was Richard

10  Kaskel and Jonathan Spiltano.

11     Q.     So you knew Mr. Spiltano

12  yourself?

13     A.     I did not.  I was

14  introduced -- well, I think I might have

15  met him once socially prior to -- to this

16  interaction.

17     Q.     And when did you present that

18  contract --

19            MR. SCHICK:   The term sheet.

20            MR. GOLDBERG:   The term sheet.

21  Excuse me.

22     A.     Sometime in the fall of 2004.

23     Q.     Was there a meeting to discuss

24  the term sheet then?

25     A.     Yes, there was.

Exhibit 6
- 48 -

```
 1                    SEXTON
 2       Q.    And who was at that meeting?
 3       A.    Certainly Spiltano and Mr.
 4  Kaskel and myself and Mr. Trump.  Beyond
 5  that I can't say.  I imagine somebody else
 6  was there, but I -- I can't remember.
 7       Q.    Other people from Trump
 8  Organization?
 9       A.    Yes.
10       Q.    Do you recall whether they were
11  attorneys or whether they were financial
12  people or --
13       A.    I don't recall.
14       Q.    Okay.  But you think there were
15  other people there besides Mr. Trump
16  himself?
17       A.    That is for sure.
18             MR. SCHICK:   I think he said
19  one other person perhaps.  The record says
20  what it says.
21             MR. GOLDBERG:   Correct.
22       Q.    And what was the result of that
23  meeting where you discussed the term
24  sheet?
25       A.    I believe after that it was
```

Exhibit 6
- 49 -

Page 27

1                    SEXTON

2    placed in the hands of an attorney at the

3    Trump Organization to work with us to

4    refine it.

5         Q.    Do you recall who that was?

6         A.    It was Jason Greenblatt.

7         Q.    And he was an attorney with the

8    Trump Organization?

9         A.    Correct.

10        Q.    And were there discussions then

11   between yourself and your partners and Mr.

12   Greenblatt over the term sheet?

13        A.    There were.

14        Q.    And what was the nature -- you

15   don't have to go into the details of that,

16   but what was the general nature of those

17   discussions?

18        A.    I don't recall.  I imagine you

19   know having gone through that process many

20   times it boils down to haggling over

21   details like the licensing percentage,

22   going back and forth until everybody is

23   comfortable.

24        Q.    At some point there was

25   something called the Trump University LLC

Exhibit 6
- 50 -

```
 1                    SEXTON
 2    that was formed.  Take me from that term
 3    sheet, which, as I understand it, was a
 4    discussion or a proposal where you would
 5    be running the show with a license --
 6         A.     Correct.
 7         Q.     -- to something which is quite
 8    different, as I understand it, in Trump
 9    University, LLC?
10         A.     That's correct.
11         Q.     How did that happen over that
12    period of months?
13         A.     So we had completed the back and
14    forth with Jason Greenblatt to a point
15    where we were comfortable with the term
16    sheet and scheduled a meeting to
17    effectively get it signed by Mr. Trump,
18    and Spiltano, Kaskel, and I went in to sit
19    down with him and review it, and
20    that -- at that meeting Kaskel and I were
21    asked to leave after we had presented the
22    details of it and wait in the lobby, and
23    Spiltano came out after five minutes in
24    the room, and again I don't recall
25    specifically who else besides Spiltano and
```

Exhibit 6
- 51 -

Page 29

1                    SEXTON
2    Mr. Trump were in that room, but when
3    Spiltano came out to get us in the lobby,
4    you know, he took us aside, and he said
5    look.  The whole deal has changed now.
6    You know, it is not a licensing deal any
7    more.
8          Q.     And when was that meeting?
9          A.     That would have been late 2004.
10         Q.     And then what did -- did Mr.
11   Spiltano explain to you how it was going
12   to be changed?
13         A.     He did.
14         Q.     What did he say?
15         A.     The specifics were Trump did not
16   want us to go out to the market and raise
17   money because he felt -- felt this was a
18   very good business, and he wanted to put
19   his own money into it.  He would put a
20   total of -- commit a total of 3 million
21   dollars to it.  Kaskel was out as a
22   partner, and I think there was some
23   discussion of giving him a small broker's
24   fee or something along those lines, and I
25   was -- and I had to be -- or I was asked

Exhibit 6
- 52 -

Page 30

1                    SEXTON

2    to be the CEO, and they set me salary at

3    that point as well.

4         Q.    Okay.  Do you have any

5    information as to why Kaskel was out?

6         A.    I believe it was a

7    personal -- personality issue.

8         Q.    Mr. Trump just didn't like him?

9         A.    I believe.

10        Q.    And do you know why they asked

11   that you should be the CEO?

12        A.    One other thing they did

13   stipulate --

14        Q.    Sure.

15        A.    -- was the equity breakdown, who

16   the three partners now would have been

17   myself, Mr. Trump, and Jonathan Spiltano,

18   and it was stipulated at that time what

19   the equity breakdown was.

20        Q.    And what was the proposed

21   stipulation of that breakdown?

22        A.    It was 90 percent owned by

23   Donald Trump, 5 percent owned by myself, 4

24   percent owned by Mr. Spiltano, and 1

25   percent held aside for future members of

Exhibit 6
- 53 -

Page 31

1                          SEXTON

2     the management team.

3          Q.    And what was your salary that

4     was going to be -- that was proposed?

5          A.    250,000 dollars a year.

6          Q.    And were you going to put in any

7     money into this?

8          A.    I was not.

9          Q.    Was anybody else other than Mr.

10    Trump going to put money into it?

11         A.    No.

12         Q.    But the equity was nevertheless

13    broken down 90, 5, 4 and 1?

14         A.    Correct with a -- in my case an

15    earnout over a period of years.

16         Q.    And what was the earnout?

17         A.    I think -- I don't recall the

18    specifics.

19         Q.    In general.

20         A.    In general, a percent a year

21    vested over a five-year period.

22         Q.    And you were going to be the

23    CEO.  Was Mr. Spiltano going to work there

24    as well?

25         A.    Not an active role, no.

Exhibit 6
- 54 -

1            SEXTON

2       Q.    And how about a passive role?

3    Was he supposed to be doing anything?

4       A.    Mr. Trump wanted him to keep

5    abreast of the business but arm's length.

6       Q.    So how is it that he was going

7    to get 4 percent of the equity if he was

8    going to be at most doing very limited

9    amounts of work?

10      A.    He had a preexisting

11   relationship with Mr. Trump.

12      Q.    And that was the basis for it

13   it?

14      A.    I believe.  I wasn't part of

15   that discussion.

16      Q.    Did Mr. Spiltano ever do

17   anything for Trump University?

18      A.    No.  Well, I would -- I mean I

19   should -- he played obviously a critical

20   role in the launching of the business.

21      Q.    But after that?

22      A.    No.

23      Q.    From that meeting then how did

24   the actual drafting of the Trump

25   University LLC operational agreement

Exhibit 6
- 55 -

```
 1                    SEXTON
 2   happen?
 3             MR. SCHICK:    Objection.    I
 4   don't know that there is a foundation that
 5   there is such an agreement.
 6        Q.    Is there such an agreement?
 7        A.    Yes, there is.
 8        Q.    Okay.  And how did that get to
 9   be created?
10        A.    At that point it was entirely in
11   the hands of the Trump legal team.
12        Q.    And who was that, if you can
13   recall?
14        A.    Well, I knew -- I don't know the
15   entire team, but I do know Jason
16   Greenblatt took the lead on that.
17        Q.    And how long did that take, that
18   process?
19        A.    Fairly quickly.  I would say 30
20   days, 30 to 60 days.
21        Q.    And ultimately the percentages
22   were a little different than what you just
23   described.  How did that happen?  To
24   refresh your memory --
25        A.    No.  No, I understand.
```

Exhibit 6
- 56 -

1                    SEXTON

2        Q.     Okay.

3        A.     Somehow I -- I don't recall the

4    specifics, but I do know that somehow

5    Jonathan and I got docked a half a

6    percentage point each, and again I don't

7    recall the specifics.  I believe it was

8    tied to kind of a disagreement over

9    whether Kaskel -- you know, what, if

10   anything, Kaskel should get out of it I

11   believe, but that triggered us getting a

12   half percentage point docked.

13       Q.     And Mr. Trump's percentage on

14   the agreement is 91.9 percent through DJT

15   University Member LLC and point 1 percent

16   through DJT University Managing Member

17   LLC.

18              How did that change?  How did

19   that 1 percent that was held in abeyance

20   for future partners get shifted over to

21   Mr. Trump?

22       A.     I don't know.

23       Q.     And do you understand what the

24   distinction is, because I don't, between

25   DJT University Member LLC and DJT

Exhibit 6
- 57 -

1                SEXTON

2    University Managing Member LLC?

3         A.     I do not.

4         Q.     Under that agreement, it refers

5    to a Sexton employment agreement.  Do you

6    have such an agreement or did you have

7    such an agreement?

8         A.     I did.

9              MR. GOLDBERG:   Have we gotten a

10   copy of that? If not, I would request a

11   copy of the Sexton employment agreement.

12        Q.     Do you recall what the terms of

13   that employment agreement were?

14        A.     I do roughly.

15        Q.     Yes.

16        A.     It covered the management fee

17   that -- the 250,000 dollar a year fee.

18        Q.     That was payable biweekly or

19   bimonthly, twice a month?

20        A.     I believe twice a month.

21        Q.     Twice a month.

22        A.     And then other particulars that

23   I don't recall.

24        Q.     And there was reference to a

25   business plan in that.  Did you have a

Exhibit 6
- 58 -

Page 36

```
 1                SEXTON
 2   business plan at the time that the Trump
 3   University LLC document was signed?
 4        A.    We did.  So yes.
 5        Q.    And is that what you had
 6   produced before to them or was this
 7   something more detailed?
 8        A.    This was something much more
 9   detailed.
10              MR. GOLDBERG:  I request a copy
11   of the business plan that was a part of
12   the Trump University LLC document.
13        Q.    Could you explain as best you
14   can remember what was in the business
15   plan?
16        A.    Certainly.  It reflected what we
17   have discussed earlier that the business
18   was going to be a purely E learning based
19   business that was going to focus on a
20   broad range of business subject areas,
21   such as marketing, finance for
22   nonfinancial managers, sales
23   effectiveness, what we perceived as most
24   critical needs for a smaller, midsized
25   business owner or manager, and then it
```

1              SEXTON

2    went into detail around different aspects

3    of how we would build the business.

4        Q.    And at this point it was

5    entirely E commerce that you were talking

6    about?

7        A.    Entirely E learning.

8        Q.    E learning.

9        A.    Yes.

10       Q.    And focused towards businesses,

11   not individual consumers?

12       A.    I would say the only exception

13   was we certainly understood that real

14   estate education should be part of

15   anything with the Trump brand on it.  So

16   with the exception of that as -- you know,

17   and again if I recall correctly we viewed

18   it more as a -- more as a niche, but it

19   wasn't central to the -- to the business.

20       Q.    But you think that real estate

21   education of consumers was specifically

22   mentioned in the business plan document?

23       A.    I believe so.

24       Q.    But no other particular target

25   for consumers other than real estate

Exhibit 6
- 60 -

Page 38

1                    SEXTON

2    education?

3              MR. SCHICK:   Consumers?

4         Q.    Individual consumers.

5         A.    No, but just to clarify many

6    small business owners are sole

7    proprietors.  So it is a definitional

8    issue, so you could view them as a

9    consumer or a business, but we were going

10   to market them as a business owner.

11        Q.    Okay.  And do you recall when

12   the Trump University document was signed?

13        A.    I don't recall specifically, but

14   it would have been very late in 2004.

15        Q.    I have it here.  I am not sure

16   it has a date on it.

17              Under the agreement, were there

18   supposed to be minutes of meetings that

19   were held under the -- the LLC, as I

20   understand it, is a separate corporation;

21   is that right?

22        A.    Yes.

23        Q.    It is an independent

24   organization, independent from Trump Org?

25        A.    Yes.

Page 40

1                    SEXTON

2      we are going to be asking for all the

3      documents back.

4               (Exhibit 2 marked for

5      identification. )

6               (Document handed to witness.)

7      A.      So again, decision is a very

8      broad term.

9      Q.      Well, if you look on page 12,

10     matters requiring approvals on management.

11              MR. SCHICK:   What section?

12     Q.      4.3 on page 12, matters

13     requiring approval of members, limitations

14     on manager, and 4.4.1 says approval by the

15     members, notice of meetings to the

16     members.

17              Do you recall ever receiving

18     notice of meetings?

19     A.      No, I do not.

20     Q.      Do you recall ever having

21     meetings?

22     A.      Yes.

23     Q.      And what meetings do you recall

24     having?

25     A.      With whom?

Page 41

1                    SEXTON

2     Q.    Pardon?

3     A.    With whom?

4     Q.    In regard to Trump -- with other

5  members of Trump University LLC.

6            MR. SCHICK:   Just for the

7  record, can you state what the members are

8  as reflected --

9            MR. GOLDBERG:  As reflected on

10  the last page.

11            MR. SCHICK:   Page 28.

12            MR. GOLDBERG:   That's correct.

13            MR. SCHICK:   So there are four

14  members, DJTU Member, LLC, DJTU Managing

15  Member, LLC, Jonathan Spiltani, and

16  Michael Sexton.

17            MR. GOLDBERG:   That is correct.

18     A.    I don't recall a formal meeting

19  between the three of us ever.

20     Q.    Well, it does say that you can

21  use a conference telephone and similar

22  equipment on page 13, 4.4, one or more

23  members may participate in a meeting.

24            Do you recall any conference

25  meetings?

Page 42

1                    SEXTON
2        A.    Nothing specific.
3        Q.    Anything in general?
4        A.    With the three of us.
5        Q.    Yes.
6        A.    No.
7        Q.    With the members of Trump
8    University, LLC?
9        A.    No, not all the members.
10       Q.    Do you recall that anybody under
11   4.5 gave consent by written consent?
12       A.    No.
13       Q.    You don't recall any meetings
14   that were followed by the process that is
15   outlined in section 4 of this agreement;
16   is that correct?
17       A.    I do not.
18       Q.    Okay.  How much did Mr. Trump
19   ultimately put into the business?
20            MR. SCHICK:    Objection.   The
21   LLCs?
22            MR. GOLDBERG:  DJT University
23   Managing Member, LLC and DHT University
24   Member, LLC.
25       Q.    Do you recall how much Mr.

Page 43

1                    SEXTON
2    Trump's contributions were through those
3    entities to Trump University, LLC?
4         A.     So there was a commitment of 3
5    million dollars, but we never drew down
6    the entire amount.   The entire amount that
7    we drew down would have been 2 million
8    dollars and -- 2 point something million
9    dollars.   I don't recall the exact amount.
10        Q.     Now, if you look at
11   appendix -- I'm sorry -- Schedule A, at
12   the very end after the signature page.   Do
13   those numbers reflect what Mr. Trump
14   through those entities contributed in
15   terms of capital contributions to your
16   understanding?
17             MR. SCHICK:   Objection.   Does
18   the document say --
19             MR. GOLDBERG:   I am asking Mr.
20   Sexton a question.
21        Q.     Does that reflect what the
22   capital contributions to Trump University,
23   LLC were that is identified in section 5,
24   "Capital Contributions"?
25             MR. SCHICK:   Can he look at the

Exhibit 6
- 65 -

1                    SEXTON

2      Q.    And what were those techniques

3  that he would teach that Donald Trump had

4  used?

5      A.    Well, like we mentioned the idea

6  that Donald Trump invested in foreclosed

7  properties.  That was part of Dr. Eldred's

8  courses.

9      Q.    Okay.

10     A.    So investing in foreclosures.

11     Q.    Any other techniques that you

12  can recall?

13     A.    Not that I can recall.

14     Q.    So tell me how then you started

15  the Webinar business.

16     A.    So E learning proved to be very

17  expensive and time consuming to create

18  these courses.  They were fairly

19  sophisticated and very innovative for

20  their time.  Faced with uncertainty around

21  the reception in the marketplace of new

22  subject areas and a desire to shorten

23  those cycle times, we -- and to address

24  the issue of many people not being

25  comfortable with that learning modality,

Exhibit 6
- 66 -

 1                    SEXTON

 2    we experimented with Webinar only courses

 3    as certainly a quicker way to bring a

 4    course to market and one that probably had

 5    a better chance of success given the

 6    comfort level with the technology.

 7         Q.     And did you hire specific

 8    instructors for the Webinars?

 9         A.     For the Webinar courses, yes, we

10    did.

11         Q.     Who were those?

12         A.     I don't recall specific names.

13    These were much more -- you know, we made

14    an investment, and it contracts with our

15    course subject matter experts.   The

16    courses I believe you are referring to

17    that were Webinar based with supporting

18    materials.   Those were more transactional

19    in nature.

20         Q.     What do you mean by that?

21         A.     I mean they were more let's test

22    a new subject area like negotiation.   If

23    it doesn't sell, we are not going to

24    invest or market it.   So it was much

25    shorter relationships with people.

Exhibit 6
- 67 -

```
 1                    SEXTON
 2      Q.     So did you have Webinars on real
 3  estate investing?
 4      A.     Yes, we did.
 5      Q.     And who were the teachers for
 6  those?
 7      A.     So are you talking about -- we
 8  had Webinars for a great deal of purposes.
 9  We use Webinars both for supporting E
10  learning courses, Webinar only courses,
11  and then we gave a whole lot of Webinars
12  out as one off events.  So are you talking
13  about all of that?
14      Q.     I am talking about the early
15  days in 2005, 2006 and the transition away
16  from E learning, and as I understood it
17  you transitioned away from E learning and
18  towards Webinars at that time, but if that
19  is not correct then correct it?
20      A.     I wouldn't characterize it that
21  way.  We remained committed to E learning.
22  We continued to invest in developing the E
23  learning courses.  In addition to this, we
24  experimented with other types of delivery
25  methods for courses including Webinars.
```

Exhibit 6
- 68 -

Page 90

1                    SEXTON

2          Q.    I see.  And what were the other

3     types of delivery methods that you were

4     experimenting with at that time?

5          A.    I believe we experimented with a

6     teleconference only.  We experimented with

7     additional home study, physical home study

8     products.

9          Q.    You would receive a DVD or CD

10    ROM and books?

11         A.    Yes, through -- through retail

12    distribution channel.  Through Barnes &

13    Nobles specifically we sold those.

14         Q.    Okay.

15         A.    Again, the emphasis was on

16    distance learning, so we experimented with

17    different types of distance learning.

18         Q.    And who were the teachers for

19    the real estate courses, all of those

20    various modalities of --

21         A.    As much as we can we stuck with

22    our core guys, so that we -- we had

23    continuity of content, but we just changed

24    the delivery mechanism.  So Gary Eldred is

25    a great example.  He did a physical home

Exhibit 6
- 69 -

Page 102

1                    SEXTON

2       A.      I believe so.

3       Q.      Do you recall whether you were

4   at that meeting?

5       A.      No, I was not at that meeting.

6   I believe our publisher at Wiley worked to

7   coordinate those meetings between the

8   authors and Mr. Trump and others.

9       Q.      Who is the contact at Wiley, if

10  you recall?

11      A.      I do know it.  I just don't

12  recall.

13      Q.      If you don't recall, that is

14  fine.

15              So the same for all the others,

16  the other books? Did Mr. Trump met with

17  each one of authors --

18      A.      He did meet with them but

19  not -- I don't believe to discuss content.

20  We made an introduction.  Certainly in the

21  early ones he did.  Subsequent titles that

22  were released later I don't know.

23      Q.      Okay.  How did you decide to go

24  into live -- producing and presenting live

25  seminars?

Exhibit 6
- 70 -

Page 103

```
 1                    SEXTON
 2      A.      Very reluctantly.  You know,
 3  our --
 4      Q.      Why so?
 5      A.      Well, our business was built on
 6  distance learning, which is -- you know,
 7  that was our business.  So there are many
 8  things that are very compelling about
 9  distance learning.  You can absolutely
10  control the outcome each and every time.
11  You can deliver it cost effectively to
12  anyone anywhere.  There was no logistics
13  complexity.  You didn't require a great
14  number of people as a business model.
15  That is how we built the business, and we
16  wanted very much to kind of see that
17  through, but, you know, the market --
18  based on the market's receptivity to it,
19  which was you know, luke warm, we had to
20  explore what they were asking for, which
21  was live events.
22      Q.      When you were making transitions
23  from E commerce to other modalities and
24  from other modalities to live events, were
25  you discussing these business decisions
```

Exhibit 6
- 71 -

1                   SEXTON

2    with people at Trump Org?

3         A.      Periodically.

4         Q.      Who would you be talking to? E

5    learning.  Thank you.  Thank you, Avi.

6               MR. GOLDBERG:    Exhibit No. 27.

7               MR. SCHICK:  Just say E, and we

8    will know what it means.

9               MR. GOLDBERG:    I stand

10   corrected.  Thank you.

11              MR. SCHICK:    I didn't want to

12   interrupt.

13        Q.      When you were changing from one

14   modality to another and you were looking

15   at what the market was asking for, would

16   you have had discussions with people at

17   Trump Org about a shift in your focus at

18   Trump U?

19        A.      I wouldn't characterize it as

20   changing because we didn't abandon those

21   other modalities.  I would consider it

22   adding additional distribution channels.

23   I know specifically we talked to Allen

24   Weisselberg about that switch because we

25   had -- we did have a meeting, myself and

Exhibit 6
- 72 -

Page 105

1                        SEXTON

2    David Highbloom, and Allen about

3    specifically when this company is going to

4    start making money, and that was part of

5    our plan of things we were going to test.

6         Q.    When was that meeting?

7         A.    I don't recall.

8         Q.    Was it in 2006 to the best of

9    your recollection?

10        A.    It would have been late 2005 or

11   early 2006 I would imagine.

12        Q.    And this was a meeting to

13   discuss the possibility of adding the new

14   modalities of live events?

15        A.    Correct.  But probably broader

16   than that.  You know, it was about what

17   are -- what are the things we are going to

18   be exploring going forward that, you know,

19   could potentially generate revenue.

20        Q.    And at that time, had any

21   distributions been made to the members of

22   Trump U LLC?

23        A.    No.

24        Q.    At that time at that meeting?

25        A.    No.

Exhibit 6
- 73 -

Page 106

1                        SEXTON
2        Q.    So you had not received -- you
3    had been receiving your salary, your
4    250,000 a year?
5        A.    Correct.
6        Q.    But Mr. Trump had not received
7    at that point any distribution --
8        A.    No.
9        Q.    -- from his investment?
10       A.    No, we were still drawing down
11   on the investment at that point.
12       Q.    And what was decided at that
13   meeting?
14             MR. SCHICK:  If anything.
15       Q.    If anything.
16       A.    I don't think A decision -- I
17   mean there is a -- Allen was happy that we
18   had a plan going forward and supported us
19   testing these new -- these new channels.
20       Q.    Did you present anything to Mr.
21   Weisselberg in writing?
22       A.    No.  I don't -- I don't believe
23   so.
24       Q.    Were there any spreadsheets or
25   financial analyses that were discussed at

```
1                    SEXTON
2    that meeting?
3        A.    I am sure there were.  I am sure
4    there were financials discussed at that
5    meeting, yes.
6              MR. GOLDBERG:   If we don't have
7    copies of that yet, I request that you
8    produce copies.
9        A.    Just to be clear, it would have
10   been a balance sheet kind of document,
11   financial document.
12       Q.    As of that point in time?
13       A.    Correct.
14       Q.    And what was discussed in terms
15   of how you would enter into the field of
16   live seminars?
17       A.    Well, we had done at that point
18   a fair amount of research into what it
19   took to conduct large scale live events.
20   We had looked at some of the larger
21   companies in that -- in that space.
22       Q.    Which ones did you look at?
23       A.    We looked at Dynatech.
24       Q.    Right.
25       A.    We looked at I think it was
```

212-267-6868          www.veritext.com          516-608-2400

Exhibit 6
- 75 -

Page 108

1               SEXTON

2   called Whitney Education at that point.

3   We looked at a company called National

4   Grants Conferences.  Those were really the

5   big ones at the time.

6         Q.    And what did you conclude from

7   your research?

8         A.    Well, it -- it reaffirmed our

9   belief that this was a very different

10  business than everything we had done to

11  this point in time, and it was a business

12  that we knew very little about.  It was a

13  business that was operationally complex.

14  It was a business that clearly required a

15  fair amount of investment up front, and it

16  was a business like everyone that would

17  benefit greatly from institutional

18  knowledge about what it took to actually

19  make it work.

20        Q.    And so you concluded what? What

21  was your recommendation to Mr.

22  Weisselberg?

23        A.    Well, our plan going forward --

24              MR. SCHICK:    Objection.

25        A.    Our plan was to contract with

Exhibit 6
- 76 -

1                    SEXTON

2    one of these companies to launch a live

3    event business to meet what we understood

4    to be demand in the marketplace for that.

5    As part of that process we would try to

6    learn everything we can about what it took

7    to run this kind of business successfully.

8    You know, kind of a good -- what we felt

9    they were doing good and what we felt we

10   could improve upon, and at some point it

11   was our idea to bring it back in-house

12   once we felt confident that we understood

13   the business and not just the economics of

14   it but every component of it.

15        Q.    So the idea was you would

16   contract with somebody, license the Trump

17   name so that they could go out and do live

18   events using the Trump brand, learn from

19   them, and then eventually if it seemed

20   reasonable to bring it in-house?

21        A.    Correct.

22        Q.    Is that what you ultimately

23   decided to do?

24        A.    Yes.

25        Q.    And was that decision yours

Exhibit 6
- 77 -

Page 112

1                    SEXTON
2       Q.      What makes you think that that
3   is case?
4       A.      Because I -- I imagine -- it is
5   conjecture, but I imagine Allen followed
6   up our meeting and shared the contents
7   with Mr. Trump.
8       Q.      Because that is what Mr.
9   Weisselberg did in general as far as you
10  know? Is that the basis of your
11  conjecture?
12      A.      Yes.
13      Q.      And how did that go forward from
14  that point?
15          MR. SCHICK:   How did that go
16  forward?
17      Q.      How did the contracting with
18  another company that was in this business,
19  which is as I understand what the plan
20  was, go forward from that meeting?
21      A.      We -- I did an internal
22  evaluation of the three candidates that we
23  thought could manage that business
24  successfully.  We did site visits to each
25  of one of those businesses and eventually

Exhibit 6
- 78 -

Page 113

1                    SEXTON

2    received proposals from each one of those

3    three -- two out of three.

4        Q.    What were the three businesses

5    that you were considering?

6        A.    Whitney, Dynatech, and National

7    Grants conferences.

8        Q.    And which were the two that

9    presented proposals to you?

10       A.    National Grants Conferences and

11   Dynatech.

12       Q.    And you did site visits of all

13   three or --

14       A.    No.  Let me amend that.  We had

15   a meeting at our facility with Russ

16   Whitney and members of his management

17   team, and based on that we didn't proceed.

18       Q.    Because?

19       A.    We were not comfortable

20   with -- with Russ Whitney as a person, and

21   we didn't feel that they would be an

22   effective steward of the Trump brand.

23       Q.    What made you think that? Not

24   the personal aspect but why did you think

25   that they wouldn't be good a steward of

Exhibit 6
- 79 -

```
1                    SEXTON
2    the Trump brand?
3         A.    It didn't take too much due
4    diligence to look online and see the line
5    of complaints about their business
6    practices for us to feel uncomfortable.
7    If they didn't stay true to their own
8    brand, we didn't have a tremendous amount
9    of confidence that they would treat ours
10   any better.
11        Q.    So they got knocked out, and
12   that left Dynatech and what was the other
13   one?
14        A.    National Grants Conferences.
15        Q.    National Grants Conferences.
16   Did you then do site visits with those
17   two?
18        A.    We spent a day down in Dynatech.
19   We spent time with the leadership of
20   National Grants.  I am just -- I don't
21   recall whether it was up here or down
22   there.  I imagine it was down there.
23        Q.    Down there being in?
24        A.    Their headquarters in Boca
25   Raton, Florida.
```

Page 115

1                    SEXTON

2        Q.      And where is Dynatech

3    headquartered?

4        A.      Orlando, Florida.

5        Q.      And who met with them from Trump

6    U?

7        A.      It would have been myself and

8    David Highbloom.

9        Q.      And ultimately you chose who?

10       A.      National Grants Conferences.

11       Q.      And what was the reason for

12   that?

13       A.      Dynatech's business model was to

14   license a brand name and bring it to

15   market.  So they effectively were a

16   platform that could deliver live events

17   under somebody else's brand very

18   effectively, and they at that time were

19   working with -- I don't specifically

20   recall -- four or five -- six or seven

21   different brands across a range of subject

22   areas including financial investing, and

23   some of those brands were proprietary to

24   them.  They had a real estate brand.  They

25   had other brands, and our belief was we

Exhibit 6
- 81 -

Page 116

1                    SEXTON

2    wouldn't command -- as opposed to

3    business -- as opposed to National Grants

4    Conferences that they really grew up

5    managing just their own business, and our

6    feeling was that we didn't want to be one

7    of six or seven different brands that are

8    all scrambling for resources and

9    management attention at Dynatech, although

10   we felt they had -- you know, they had

11   good controls in place, and we thought it

12   would not be to our advantage to enter

13   into that kind of arrangement.  You know,

14   whereas National Grants only had their

15   proprietary brand, and they would, you

16   know, effectively -- we would be their

17   first kind of outsource -- license

18   partner, and we thought we would get a lot

19   more attention from the members of

20   National Grants.

21       Q.    What was their proprietary

22   brand?

23       A.    They went to market as National

24   Grants Conferences.  I don't know what the

25   legal entity was.

Page 117

1                    SEXTON
2        Q.    But that is what they were known
3    as?
4        A.    Correct.
5              MR. GOLDBERG:   If we don't have
6    a copy of the contract with National
7    Grants Conferences, we would request a
8    copy of that.
9              MR. SCHICK:   If it is not
10   requested in the subpoena, you are
11   supplementing it by this request.
12             MR. GOLDBERG:   I think it is
13   certainly covered in the four corners of
14   the subpoena, but, yes, we are
15   supplementing.  If you would like a second
16   subpoena, we are happy to supply it to
17   you.
18       Q.    So when did they start working
19   for Trump U?
20             MR. SCHICK:   Objection.  I
21   don't think that is accurate.
22       Q.    Did they ever start working for
23   you?
24             MR. SCHICK:   With or for?
25       Q.    For.

Exhibit 6
- 83 -

Page 118

```
 1                    SEXTON
 2       A.      They being National Grants
 3   Conferences?
 4       Q.      Yes.
 5       A.      They were a licensee of ours
 6   under the Trump Institute brand, and that
 7   relationship -- I don't know the specific
 8   date, but I believe it was -- it commenced
 9   in 2006.
10       Q.      And it terminated when?
11       A.      I believe 2009.
12       Q.      Do you know when in 2009?
13       A.      Honestly I am not even positive
14   it was 2009.  It could have been 2008.
15       Q.      At that point, was there any
16   time between when they terminated doing
17   live events and Trump U started doing live
18   events? Was there a period of time in
19   between?
20       A.      Where we were both in the market
21   conducting live events at the same time.
22       Q.      Or when you were -- was there a
23   time when neither of you were in the
24   market conducting live events?
25       A.      No.
```

Page 119

1                    SEXTON

2         Q.     So one -- Trump Institute ended

3    and Trump U started doing it?

4         A.     No.

5         Q.     No? How did it work?

6         A.     It overlapped.

7         Q.     It overlapped?

8         A.     Correct.

9         Q.     And how long did it overlap once

10   that began?

11        A.     I don't recall.

12        Q.     Do you recall when

13   Trump -- Trump U started doing live

14   events?

15        A.     I believe 2007.

16        Q.     And do you think that there

17   was -- how long of a period do you think

18   there was when you went live? Was it less

19   than a year, more than a year?

20        A.     Just to be clear, there are

21   different kinds of live events.

22        Q.     Okay.  Let's go through that.

23        A.     So there is the what I would

24   call the industry standard live events.

25   That is a preview of a three or two-day

Exhibit 6
- 85 -

Page 120

1                    SEXTON

2    training.

3        Q.      A preview of the training.

4        A.      Correct.

5        Q.      This would be like the 90-minute

6    free seminar?

7        A.      Correct.  So we felt it was a

8    preview of what you would get in the

9    three-day training, in some cases two days

10   whatever it is.  That is one model.  When

11   we first experimented with -- I believe

12   we -- so there are other events.  Right.

13   We had other event formats.  We could do a

14   one-day event.  We could do a three-day,

15   you know, free event or a two-day free

16   event.  We experimented with

17   different -- different models.

18              If your question is when

19   we -- when did we enter into kind of what

20   I call the industry standard preview to a

21   workshop, I think I believe it was 2007,

22   and we probably ended up overlapping for a

23   year give or take.

24       Q.      Well, there was never a time

25   when you were just doing a 90-minute

Exhibit 6
- 86 -

Page 126

1                    SEXTON

2        A.     Gary Eldred.

3        Q.     Well, he was -- he was

4    contracted? He wasn't an employee, but you

5    felt he was part of Trump U?

6        A.     He was an integral part of the

7    company.

8        Q.     So did he review the live events

9    for Trump Institute?

10       A.     I don't recall.

11       Q.     Do you recall who might have

12   reviewed them?

13       A.     I don't.

14       Q.     Did anybody at Trump Org review

15   the curriculum that Trump Institute was

16   putting out?

17       A.     I don't believe so, no.

18       Q.     You don't recall ever sending

19   materials from Trump Institute over to

20   people at Trump Org to review it?

21            MR. SCHICK:    Asked and

22   answered.

23       A.     I don't recall ever any content

24   going up there.

25       Q.     What do you recall going up

Exhibit 6
- 87 -

Page 127

```
 1                    SEXTON
 2    there?
 3         A.    Marketing materials.
 4         Q.    Marketing.
 5               Do you recall whether Mr. Trump
 6    ever reviewed any of the Trump Institute
 7    curriculum?
 8         A.    No.  I am sorry.  He did not.
 9         Q.    He did not do that?
10         A.    No.
11         Q.    You know that?
12         A.    I know that.
13         Q.    How do you know that?
14         A.    Because he would never do that.
15         Q.    Because?
16         A.    Mr. Trump is not going to go
17    through a 300-page, you know, binder of
18    content.  It is not -- look, I may be
19    wrong.  Maybe I am overstating that.
20         Q.    But in your experience with Mr.
21    Trump, that is not the type of thing that
22    he would do?
23         A.    Correct.
24         Q.    Did they do mentorships as well
25    as the three days?
```

Exhibit 6
- 88 -

Page 136

1                    SEXTON

2    City one week, and a month later you could

3    be in New York City giving a seminar, and

4    they would be under the Trump Institute

5    name, and you would be under the Trump U

6    name; is that correct?

7        A.    We -- when we committed to going

8    out weekly, a sustained effort at previews

9    and workshops, we collaborated with them,

10   so that we weren't in any one market too

11   frequently because the responsiveness of

12   the marketing materials would decrease.

13   So your example of four weeks is probably

14   not realistic.  It would be a longer

15   period of time between visits from either

16   one of us.

17       Q.    And one would be called Trump

18   Institute and one would be called Trump

19   University?

20       A.    That's correct.

21       Q.    And who developed the curriculum

22   for your programs, your workshops, for the

23   Trump U live events?

24       A.    Initially when we contracted

25   with am instructor every instructor has

Exhibit 6
- 89 -

Page 137

```
 1                    SEXTON
 2   their own materials out there.  When we
 3   were testing, we relied on the
 4   instructor's materials as the base for our
 5   curriculum.
 6        Q.     These are the same people we
 7   talked about before or these are
 8   additional people now?
 9        A.     These would have been different
10   people -- everybody we talked with before
11   really was for the distance learning
12   portion.
13        Q.     Right?
14        A.     And what we found is there is a
15   difference -- you need a different set of
16   skills to do live training in education as
17   opposed to distance training education.
18   So --
19        Q.     You need motivational speakers?
20             MR. SCHICK:    Objection.
21        A.     I am not comfortable -- I don't
22   know what that means.
23        Q.     Your answer before was with
24   respect to motivational speakers, and you
25   seemed to understand at that time.  You
```

Exhibit 6
- 90 -

```
 1                    SEXTON
 2      Q.     Was Mr. Martin hand picked by
 3  Donald Trump?
 4      A.     No, he was not.
 5      Q.     Mr. Lippman, did he ever meet
 6  with Donald Trump?
 7      A.     I don't believe so.
 8      Q.     Was he hand picked by Donald
 9  Trump?
10      A.     No, he was not.
11      Q.     Were there any speakers that you
12  can think of who were -- who ever met with
13  Donald Trump?
14      A.     When you say speakers, you
15  mean --
16      Q.     Not only for the preview events
17  but also for the three-day events.
18      A.     So were there any
19  instructors --
20      Q.     Yes.
21      A.     -- for live events that were
22  hand picked by Donald Trump?
23      Q.     No.  The first question is:  Did
24  they ever meet with him?
25      A.     I know John Childress did.
```

Exhibit 6
- 91 -

1              SEXTON
2      Q.    Okay.  His name is J.J.
3   Childress.
4      A.    J.J. Childress.  I think John is
5   his father's name.
6      Q.    Okay.
7      A.    I -- I can't speak with
8   certainty, but I don't believe anybody
9   else did.
10     Q.    And were any of these other
11  speakers at any of those events hand
12  picked by Donald Trump?
13     A.    None of our instructors at the
14  live events were hand picked by Donald
15  Trump.
16     Q.    Who prepared the curriculum for
17  the live events?
18     A.    It evolved over time.  Like I
19  said, we --
20          MR. SCHICK:   I am sorry.  Are
21  we talking about the preview class or the
22  three-day classes?
23          MR. GOLDBERG:  Both of them, the
24  preview class as well as the three-day
25  classes.

Page 160

1                    SEXTON

2              MR. GOLDBERG:  He was, but he

3    also did some stuff earlier, as I

4    understand.  Let me ask the question.

5        Q.    Did Mr. Hoffenfeld provide

6    services to you other than legal services

7    going back to early 2008?

8              MR. SCHICK:   I note that in

9    itself calls for a legal determination.  I

10   think we have already gone through this

11   with you a number of times.

12             MR. GOLDBERG:  I am just asking

13   did he do any marketing also.

14       A.    Only -- if he did, it was from a

15   legal perspective.  Is the language we are

16   using compliant?

17       Q.    Okay.  And did anybody at Trump

18   Org, the Trump Organization, review any of

19   the materials that you were preparing at

20   Trump U for use in the preview sessions?

21       A.    I don't believe so.

22       Q.    Did Donald Trump ever review any

23   of the materials that you prepared at

24   Trump U to be used at the preview

25   sessions?

1                    SEXTON

2        A.      I don't believe so.

3        Q.      Switching over then to the

4   three-day session workshops, seminars, who

5   prepared the materials for those?

6        A.      We started with materials and

7   structures we have with them that we were

8   comfortable using.  Things were pretty

9   straightforward, real estate 101.  It was

10  introductory type of classes.  There

11  wasn't anything sophisticated about it.

12  We did put our own touches on it.

13  Eventually we had our -- we grew quite a

14  bit during this time frame.  You know,

15  eventually we had our approved sets of

16  curriculum that went into our approved

17  workbook that was locked down, formatted,

18  and authored by us, and our goal was

19  always though when you are with somebody

20  for three days you do want to let the

21  instructor have some latitude in -- in

22  providing some content of their own

23  whether it is a case study of a particular

24  project they worked on or something of

25  that nature.

Exhibit 6
- 94 -

Page 162

1                     SEXTON

2              So we -- our goal was 80 percent

3     you've got to stick with the company

4     program.  You can, you know, up to 20

5     percent make it your own.  So there was

6     some customization at the instructor

7     level.

8         Q.     And who presented -- who

9     prepared at Trump U that 80 percent?  Was

10    that you and Mr. Highbloom?

11        A.     No.  I don't recall.  It went

12    through a number of iterations.  I know we

13    worked with Steve Miller on it for a

14    portion of it.

15        Q.     Who is Mr. Miller?

16        A.     Steve Miller was a experienced

17    real estate investor who taught our

18    commercial real estate investing workshop,

19    and I -- he was also a mentor for us, and

20    he also evaluated -- evaluated mentors for

21    us as well.

22        Q.     Who else worked on the

23    curriculum for the three-day workshops?

24        A.     I -- I don't recall.

25        Q.     Did --

Exhibit 6
- 95 -

Page 163

1                    SEXTON

2       A.      But there would have been

3   others.

4       Q.      Did anybody at Trump

5   Organization work on the curriculum for

6   the three-day workshops?

7       A.      No, they did not.

8       Q.      Did Mr. Trump himself

9   participate in the creation of the

10  materials used at the three-day workshops?

11      A.      No, he did not.

12      Q.      Did the materials that were used

13  at the three-day real estate workshops

14  incorporate Mr. Trump's real estate

15  techniques?

16      A.      Yes.

17      Q.      In what sense?

18      A.      It goes back to what we were

19  talking about earlier.  Mr. Trump has made

20  investments with foreclosures.  We cover

21  investing with foreclosures.

22      Q.      Did he have a particular way of

23  dealing with investing in foreclosures

24  that was unique to him as opposed to other

25  people that bought foreclosed properties?

Exhibit 6
- 96 -

Page 164

```
 1                 SEXTON
 2      A.     I don't know.
 3      Q.     So is there more to it than we
 4  covered foreclosures, and Mr. Trump bought
 5  a foreclosed property?
 6      A.     It was using strategies that Mr.
 7  Trump used to illustrate a specific
 8  strategy that any investor could use, and
 9  many do in the curriculum.
10      Q.     What particular strategies did
11  Mr. Trump use?
12           MR. SCHICK:   He testified
13  several times about case studies.
14           MR. GOLDBERG:   I understand the
15  case studies.  We are talking now about
16  the Trump U three-day courses.  We were
17  not talking about that before.  I am
18  limiting myself to what was taught in the
19  Trump U three-day courses, not what was
20  taught on E learning, thank you, and not
21  what was taught in Webinars, and I don't
22  think that we have covered that before.
23           MR. SCHICK:   So you are asking
24  whether case studies were covered again in
25  three days?
```

Exhibit 6
- 97 -

```
 1                    SEXTON
 2             MR. GOLDBERG:  I am asking
 3    whether there was something unique about
 4    the Trump strategies in dealing with
 5    foreclosures that was taught in the
 6    three-day real estate courses.
 7        A.     I don't know.
 8        Q.     Were there other Trump
 9    strategies or techniques besides those
10    dealing with foreclosures that were taught
11    in the three-day real estate courses?
12        A.     I don't recall any.
13             MR. SCHICK:   I'll just note we
14    provided numerous transcripts to you of
15    those sessions, and presumably you have in
16    your records the ability to view them.
17             MR. GOLDBERG:   We have numerous
18    transcripts.  I agree.  I am just asking
19    Mr. Sexton if he can recall --
20             MR. SCHICK:  You agree you
21    actually have transcripts of those.
22             MR. GOLDBERG:   We have many
23    transcripts.  I am not sure we have all
24    the transcripts, and I am to this date not
25    sure you provided all the transcripts, and
```

Exhibit 6
- 98 -

```
 1                     SEXTON
 2   as you well know, Avi, we have asked
 3   specifically a number of times Mr.
 4   Delfina as well as you I asked you before
 5   this, has Trump University, your client,
 6   turned over everything responsive to our
 7   subpoena, and you did not answer that
 8   question yet.  In fact, I've asked over a
 9   several month period now, and if there are
10   additional transcripts that have not been
11   turned over we request that they be turned
12   over.
13            MR. SCHICK:   I just wanted the
14   record to reflect that, number one, in
15   your opinion there is nothing unique about
16   Mr. Trump's success in real estate, and
17   you presumably have replicated that
18   success, and you chose to work here
19   despite your great success in real estate
20   and the number of units you bought and
21   sold.  You are asking this witness to
22   search his memory for what might have been
23   the curriculum at that time created half a
24   decade ago even though you do have
25   numerous transcripts that reflect it, and
```

Exhibit 6
- 99 -

Page 167

1                    SEXTON

2      I don't know whether you are trying to ask

3      whether there were case studies in there

4      or if sitting here today you want to see

5      what he remembers from five years ago.

6              The records are there.  If you

7      have the transcripts, you can look at them

8      and see if that jogs his memory.

9              MR. GOLDBERG:  Okay.  Thank you.

10         Q.    Did David Early participate in

11     preparing the curriculum for the Trump U

12     three-day workshops or did somebody else

13     at Trump U do it?

14         A.    It was really only him there I

15     believe.

16         A.    I certainly would imagine we

17     asked for his opinion and feedback on it,

18     whether he actually helped author it I

19     couldn't tell you.

20         Q.    And Mr. Trump did not

21     participate in the development of

22     that -- of those curriculum?

23              MR. SCHICK:  You are asking

24     since the last time you asked if it

25     changed or are you just repeating the

Exhibit 6
- 100 -

Page 168

1                    SEXTON
2    question you asked?
3            MR. GOLDBERG:   Thank you.   I am
4    just asking.
5            MR. SCHICK:   Again.
6            MR. GOLDBERG:   If it is again,
7    it is again.
8       A.    He did not.
9       Q.    What percentage -- I know that
10   at the -- earlier you talked about the
11   percentage of the previous session that
12   dealt with providing content and percent
13   of sales.
14            I have the same question with
15   regard to the three-day events.   What
16   percentage of that was content and how
17   much of it was sales?
18       A.    The three-day I would say it is
19   95 percent content, and we view that quite
20   differently than a free event where
21   somebody was coming to it on their own.
22   They pay for content.   We gave them
23   content.   We limited the sales to a
24   presentation of the advanced training
25   options from the front of the room, that

Exhibit 6
- 101 -

Page 169

1                      SEXTON
2    the speaker would present what were the
3    options for those who wish to continue
4    with their training and education in real
5    estate, and if they wanted to learn more
6    specifically about it there were
7    one-on-one sessions conducted with both
8    the instructor and the team members, but
9    those were conducted after the regular
10   hour of the -- the regular hours of
11   the -- of the workshop ended.  So those
12   would typically commence at 5 or 6 o'clock
13   in the afternoon.
14        Q.    You wouldn't pull people while
15   instruction was going on to meet with
16   somebody one on one?
17        A.    We would at times, and we
18   stopped that process to limit it to
19   after -- after the workshop day had ended
20   because people complained that they were
21   missing, you know, fifteen minutes of
22   content, and that was a valid issue.
23        Q.    How did that process go on
24   before you stopped it?
25        A.    I would only be guessing.

Exhibit 6
- 102 -

1          SEXTON

2      Q.     What is your best guess?

3      A.     A year.

4      Q.     So you started in 2007 sometime

5  with live events, and you did it sometime

6  in 2008, and then in 2008 sometime you

7  think you might have stopped pulling

8  people away during the sessions? Is that

9  fair?

10     A.     I don't -- I don't know exactly

11 when we started the one-on-one.  So I am

12 fairly certain we didn't start those

13 immediately, and I am not a hundred

14 percent sure we pushed those to after

15 hours, but again we are talking about a

16 maximum of one on one for the last fifteen

17 minutes.  So if you are missing fifteen

18 minutes out of the effectively three-hour

19 days, and sometimes they ran longer,

20 eight-hour days from our point it wasn't a

21 significant issue.

22     Q.     But people complained about it,

23 and you stopped it?

24     A.     We had a process of continuous

25 improvement.  We surveyed anybody that

Exhibit 6
- 103 -

Page 171

1                    SEXTON

2    ever attended any of our events, and the

3    purpose of those surveys was to look for

4    an prioritize improvements that we could

5    make in our process, and that one made our

6    list.  It wasn't a priority.  Eventually

7    it did change.

8        Q.    You weren't doing -- even early

9    on when you were doing three-day events

10   you were doing up sells to other programs,

11   were you not, the gold program, silver

12   program, and the bronze program?

13           MR. SCHICK:   Are you referring

14   to mentorships?.

15       Q.    Some of them included

16   mentorships.  I am not sure if the bronze

17   included mentorship.  Correct me if I am

18   wrong, my understanding is the gold

19   included mentorship and hand holding, but

20   the silver and bronze did not.  Is my

21   understanding correct?

22       A.    That's correct.  I want to be a

23   little careful here.

24       Q.    Sure.

25       A.    Because we had advanced training

Exhibit 6
- 104 -

Page 172

1                    SEXTON
2    programs, the components of which and the
3    number of which and the nature of which
4    and the names of which changed over time.
5    Certainly I would say the biggest part of
6    time when we were -- you know, we tinkered
7    with it quite a bit to figure out what the
8    right -- you know, what the right mix was
9    on everything from naming to pricing to
10   components, and -- I mean you're referring
11   to a period when we were doing a bronze,
12   silver, and gold I think it was, and the
13   gold did include a mentorship.  Silver did
14   not, and bronze did not.
15        Q.    And --
16        A.    But when we launched -- when we
17   launched these live trainings, we
18   didn't -- we did not have the full range
19   of advanced training products that we did
20   at the end.  So that the advanced training
21   options would have been fairly limited.
22        Q.    But when you launched you did
23   have some options to go beyond --
24        A.    We did have some.
25        Q.    -- to go beyond the 1495 or

Exhibit 6
- 105 -

Page 173

1                    SEXTON

2    whatever it was for the three-day?  You

3    had some ability to go on after that?

4        A.    Yes.

5        Q.    And there was some sales

6    component in -- even at the beginning; is

7    that correct?

8        A.    That's correct.

9        Q.    And those three-day events did

10   go on to something else.

11             What were people told is the

12   reason that they should go on to something

13   beyond the three-day event?

14             MR. SCHICK:   Objection.  You

15   haven't established whether it was told

16   there were reasons.

17       Q.    Were there reasons that people

18   were told to go on beyond the three-day

19   event?

20       A.    I really don't understand what

21   you mean by told.  The process --

22       Q.    Was anything said to them at the

23   three-day event to inspire them, a

24   consumer, to go on beyond that three-day

25   event?

Exhibit 6
- 106 -

1                    SEXTON

2        A.     Yes.

3        Q.     And what was that?

4        A.     We tried to make it -- we tried

5    to make it clear that three days is really

6    an opportunity for an individual to make

7    the decision is real estate investing

8    something that I am actually going to

9    pursue, and if you are going to pursue it

10   you only can teach so much in three days.

11   I think we all acknowledge that.  If

12   somebody is going to pursue it and put

13   real dollars behind it, we encourage them

14   to know everything they can about what

15   they are about to do, and if they are

16   going to do it and you had resources it

17   makes sense to before you spend your hard

18   earned money on owning an investment

19   property to continue your education, so

20   you minimize your risk of making mistakes,

21   and you increase the chances that you are

22   going to make a successful -- a successful

23   transaction.

24       Q.     Going back to the previous

25   sessions, what were people told there of

Exhibit 6
- 107 -

Page 191

1                    SEXTON

2    some context for, you know, why you should

3    talk to -- investor education, why you

4    should maybe think about Trump for real

5    estate education or why you may think

6    about so and so for whatever it was.  So

7    that was a different model.

8         Q.    Is this the Expos or is this

9    something different?

10        A.    I believe we called them the

11   Expos.

12        Q.    And did you ever actually put on

13   one of these?

14        A.    Yes, we did.

15        Q.    And when was that?

16        A.    It would have started I imagine

17   in the spring of 2010.

18        Q.    So March, April 2010, something

19   like that?

20        A.    Somewhere in there.

21        Q.    And were those successful?

22        A.    Yes and no.  Some were.  Some

23   were not.  I think they showed promise.

24        Q.    And were there discussions then

25   with people at Trump Org about the success

Exhibit 6
- 108 -

1                    SEXTON

2    or lack thereof of the new model?

3         A.    Yes, there were.

4         Q.    And who was that with?

5         A.    George Sorial and Allen

6    Weisselberg.

7         Q.    Anybody else?

8         A.    There was a gentleman, and

9    I -- I don't know the names.  I believe he

10   was somebody -- a business contact of

11   Allen Weisselberg that he brought in that

12   had some experience in some aspect of

13   education, who was present at at least two

14   of these meetings I believe.

15        Q.    And what was decided?  Did you

16   go forward or pull back?

17        A.    Well, so during that time it was

18   fairly critical, the cash flow situation.

19   So the Trump Organization funded us only

20   through a certain number of these pilots,

21   and then we would kind of stop and say,

22   all right, did this -- where are we?  Are

23   we on the path to profitability or not,

24   and I think we had a couple of those kind

25   of status meetings, and then ultimately it

Exhibit 6
- 109 -

Page 193

```
 1                    SEXTON
 2   was decided that if -- it is going to take
 3   too long -- given the current market
 4   conditions and given the progress on these
 5   events it is not worth investing in it on
 6   an ongoing basis.
 7       Q.    When was that decision made?
 8       A.    Probably July of 2010.
 9       Q.    And at that point, there was
10   essentially a wind down operation?
11       A.    A fulfillment, yes.
12       Q.    A fulfillment.  You weren't
13   doing more programs? You weren't doing
14   more seminars, no Expos, more --
15       A.    No.  I --
16             MR. SCHICK:   When did you
17   leave?
18             THE WITNESS:  My last day was
19   the end of July in 2010.
20       Q.    So you wouldn't know anything
21   beyond that?
22       A.    No.
23       Q.    Okay.
24       A.    I mean I -- I provided kind of
25   some help, but I don't recall -- we
```

Page 196

```
 1                    SEXTON
 2   question.  So I know there weren't any
 3   preview events.  I am fairly certain.  Was
 4   there fulfillment?  I don't believe so.
 5        Q.    So for the three-day you don't
 6   believe there were three-day events, the
 7   1495 dollar events after that as far as
 8   you know?
 9        A.    I don't.  Yes, I don't know.
10        Q.    When was the name Trump U
11   changed to Trump Entrepreneur Initiative?
12   Was that when you were there?
13        A.    Yes, it was.
14        Q.    When do you recall?
15        A.    It was right around the same
16   time frame, April 2010 give or take a
17   month.
18        Q.    And there was a separate Trump
19   Entrepreneur Initiative, LLC formed at
20   that time?
21        A.    Yes.
22        Q.    It wasn't just a name change,
23   just a d/b/a?
24        A.    I wasn't involved in the -- on
25   that side of that at all.
```

```
1                    SEXTON
2        Q.    You are not a member of Trump
3   Entrepreneur Initiative, LLC? That is a
4   question.
5        A.    That is a really good question.
6   I never received any documents.  The only
7   document I received from a members
8   standpoint was the one you showed a copy
9   to us a little earlier.
10       Q.    So if you are a member, it is
11  news to you?
12       A.    Yes, it is -- it is an excellent
13  question.
14       Q.    And what was the reason for
15  changing the name?
16       A.    We got a letter from the -- from
17  Joseph Fray at the Board of Education.
18       Q.    The state board -- State
19  Department of the Education?
20       A.    State Department of Education.
21            MR. SCHICK:   The State
22  Education Department.
23            MR. GOLDBERG:   Yes, New York
24  State Education Department.
25       A.    -- New York State Education
```

Exhibit 6
- 112 -

1                    SEXTON

2              MR. SCHICK:   Or Bates numbers

3    if you have it already?

4              MR. GOLDBERG:   Or Bates numbers

5    if we have it already.  Absolutely.  I

6    have not seen it.

7              MR. SCHICK:   Okay.

8              MR. GOLDBERG:   I haven't seen

9    it from the state either.

10             MR. SCHICK:   That is your

11   client.

12             MR. GOLDBERG:   That is not my

13   client, but I would be happy to take a

14   look at it.

15       Q.   And what changed in 2010 that

16   you feel that the State of Department of

17   Education reneged on whatever agreement

18   they had entered into with you back in

19   2005?

20             MR. SCHICK:   Objection.

21       Q.   Can you answer the question?

22   What changed in 2010 to your knowledge to

23   make you decide it is time to change the

24   name?

25       A.   Part of the original agreement

Exhibit 6
- 113 -

```
 1            SEXTON
 2  was that in 2005 we had no interest in
 3  ever doing a live event anywhere, and part
 4  of that agreement was don't do live events
 5  in the State of New York, and, you know,
 6  between 2005, May 27, 2005 and April 2010
 7  we started doing live events, and candidly
 8  we forgot about that stipulation.  You
 9  know, we were operating under our grant
10  and growing rapidly, and the last thing we
11  thought of was, you know, an e-mail from
12  2005.  It was an oversight.
13       Q.    And you're saying that there was
14  no communication from the State Education
15  Department between 2005 and 2010 on this
16  topic?
17       A.    No.
18       Q.    Okay.  Did you ever receive
19  anything from the State Education
20  Department regarding operating as an
21  educational institution of higher learning
22  in 2005? Not the issue of using the word
23  university but whether you were operating
24  as an educational institution?
25       A.    We -- we were informed in 2010
```

Exhibit 6
- 114 -

Page 214

1                    SEXTON

2        A.    Well, we -- we would not for her

3    to work on, but -- but as an -- she was

4    kind of the point person to get copy

5    approved oftentimes or get feedback on it

6    from Mr. Trump.

7        Q.    So sometimes Mr. Trump himself

8    would see the ad copy?

9        A.    He would -- he would -- he would

10   always see the ad copy.

11       Q.    He would always see the ad

12   coach? So he approved, he personally

13   approved all ads that were in the

14   newspapers?

15       A.    He personally approved all the

16   ads that were in the newspaper, yes.

17       Q.    Selma Langer, who is Selma

18   Langer?

19       A.    I don't know.

20       Q.    The name doesn't ring a bell?

21       A.    No.

22       Q.    David Horwitz?

23       A.    No.

24       Q.    Rona Graff?

25       A.    Rona.

Exhibit 6
- 115 -

Page 228

1                    SEXTON
2    wants to set up a meeting as soon as
3    possible.
4         A.    Yes.  I don't recall what the
5    specific meeting was.
6         Q.    Okay.  You don't recall what it
7    was about?
8         A.    No.
9         Q.    Does the timing of this resonate
10   in any way?
11        A.    Well, it would have been at a
12   pretty critical time at the company so,
13   you know, in the spring of 2010.
14        Q.    So it might have been to discuss
15   the future of the company, but you don't
16   know?
17             MR. SCHICK:   Objection.
18        A.    I don't know.
19        Q.    Were the signatures on
20   the -- Trump U had bank accounts; is that
21   correct?
22        A.    Correct.
23        Q.    It had its own bank accounts?
24        A.    Correct.
25        Q.    Who were the signatories on

Page 229

1                    SEXTON

2    those accounts?

3        A.    Who could sign a check?

4        Q.    Yes.

5        A.    Allen Weisselberg.

6        Q.    And that was it as far as you

7    knew?

8        A.    As far as I knew.

9        Q.    And was Mr. Weisselberg an

10   employee of Trump U?

11       A.    No, he was not.

12       Q.    He was an employee of Trump Org?

13       A.    Presumably.

14       Q.    He was in fact the CFO of Trump

15   Org, right?

16       A.    Yes.

17       Q.    Okay.

18             MR. GOLDBERG:    This is Exhibit

19   11.

20             (Exhibit 11 marked for

21   identification.)

22             (Document handed to witness.)

23       Q.    This is an e-mail between Mr.

24   Matejek and Christine Studley.  You are

25   not CC'd on it, but you are mentioned on

Exhibit 6
- 117 -

```
1                    SEXTON
2   it.
3        A.    Yes.
4        Q.    It says that they needed to get
5   at least one check back today.  That is
6   for Michael Sexton's credit card, which is
7   is due Saturday.
8              Was that your personal credit
9   card that they are talking about?
10       A.    It -- my personal card was used
11  for all the basic operating expenses of
12  the company.  So all the travel, that all
13  the teams went on, hotels, airfare, meals.
14       Q.    And was there a reason for that?
15  This was in 2008?
16       A.    The Trump Organization I was
17  told when I joined they don't believe in
18  corporate cards, so we didn't have any
19  other recourse, so it was all on my card,
20  and it was reimbursed to me.
21       Q.    And so did that continue until
22  you left?
23       A.    It -- yes, I mean my exposure
24  continued after I left just to pay down,
25  you know -- there was a big, very big
```

Exhibit 6
- 118 -

Page 231

1                    SEXTON
2  expense every month, hundreds of thousands
3  of dollars.
4      Q.    And it all went through your
5  personal credit card?
6      A.    Yes.
7            MR. SNELL:   How did that work
8  logistically?  Did other people have cards
9  with your name that were issued to them?
10           THE WITNESS:  No.  The only
11 person that had a card -- one of my cards
12 was Steven Matejek, who was our
13 controller, and we would essentially book
14 all airfare and hotels for everybody
15 and -- and, you know, meeting venues and
16 everything was placed on the card.
17           MR. SNELL:   All the hotels and
18 travel and all that?
19           THE WITNESS:  Correct.
20     Q.    Trump U never had control of
21 their own bank accounts; is that correct?
22           MR. SCHICK:   Objection.
23     Q.    Well, in the sense of being able
24 to sign checks for their own bank
25 accounts, did they have ever the authority

Page 236

1                      SEXTON
2        A.     Did this run?
3        Q.     It was in the New York Metro on
4   September 7, 2009.
5        A.     Whoever spoke at that event
6   would not have been hand picked by Trump.
7        Q.     Underneath where it says "Come
8   to this Free introductory class and you'll
9   learn from Donald Trump's hand picked
10  instructors a systematic method for
11  investing in real estate that anyone could
12  use effectively," the same question
13  specifically referring to the word hand
14  picked?
15       A.     Well, first that would not have
16  been accurate.
17       Q.     And would they have learned a
18  systematic -- at the free class mind you,
19  would they have have learned a systematic
20  method for investing in real estate that
21  anyone can use effectively? Would that
22  have been taught in that 90-minute
23  preview?
24       A.     It is kind of a qualitative
25  question.  Could you have -- could you

Exhibit 6
- 120 -

Page 249

1                    SEXTON

2      Q.      By Brad Schneider.  It wasn't

3  Jack Mahoney or April Newman

4           MR. SCHICK:    Are either of

5  those people Brad Schneider?

6           MR. GOLDBERG:  I am just asking.

7      A.      No, I would recognize his unique

8  writing style.

9      Q.      The third page, Trump 003168, at

10  the bottom of the page it says there are

11  two documents we need to put together.

12  One is real estate geography and your real

13  estate history, what deals you have done

14  in the past.  What deals you are working

15  on, et cetera.  Was a real estate resume

16  not required before this time or was it

17  required and just not enforced or what?

18      A.      The process evolved.  Eventually

19  it was very structured, and we required

20  documentation -- not just a resume but

21  documentation to support what was on the

22  resume and interviews with the person we

23  designated as a real estate expert to make

24  sure that their teaching skills and

25  content expertise behind the deals that

Exhibit 6
- 121 -

1                    SEXTON

2    they -- they put forth as evidence of

3    their expertise.  Early on we didn't

4    have -- that was a pretty comprehensive

5    program.  Early on we did not have that in

6    place.  We relied on individuals, and

7    again we didn't have many at the

8    beginning.  So we relied on them for

9    personal references and them sitting in an

10   interview, showing us their resume that

11   included deals on their -- but we didn't

12   formalize that process until later.

13        Q.    So this is September of 2009.

14   How long had you been offering mentors at

15   this point?

16        A.    I would think -- September of

17   2009.  Probably a little under two years.

18        Q.    Around two years.  You said

19   earlier that you started in about 2007?

20        A.    Right.

21        Q.    So for a period of about two

22   years you weren't requiring the mentors to

23   present to you a resume that documented

24   all of the deals that they claimed to do?

25             MR. SCHICK:  Objection.  Please

Exhibit 6
- 122 -

Page 276

```
1                    SEXTON
2        A.    I don't.
3        Q.    Okay.  What happened with Texas?
4   Did you -- as I understand it, Texas sent
5   a subpoena to Trump University, and at
6   some point you decided to drop out of
7   programs in Texas.
8              Were those two events connected?
9        A.    I believe so.
10       Q.    And what is the basis for your
11  belief?
12       A.    It is -- I recall now that you
13  just mentioned that, but I know we had an
14  inquiry.  They were -- they requested
15  quite a bit of data.  We supplied it.  It
16  was -- we, you know, paid back taxes I
17  believe, a few thousand dollars in tax
18  obligations.  We had forgotten --
19  inadvertently not registered to do
20  business in the state, and I think -- I
21  don't specifically recall -- recall why we
22  decide not to go back into Texas.
23       Q.    There was no written agreement
24  with the authorities in Texas?
25       A.    I didn't handle any of the -- I
```

Page 277

```
 1                    SEXTON
 2   didn't -- Trump legal handled all the
 3   dialogue.  I spoke to the attorneys
 4   at -- that dealt with it, but I didn't see
 5   any -- I didn't see any final resolution.
 6        Q.    And the Trump attorneys you are
 7   referring to are the people at Trump Org
 8   or at Trump U?
 9        A.    At Trump Org as well as external
10   counsel.
11        Q.    And who at Trump Org handled
12   that?
13        A.    George Sorial.
14        Q.    Anybody else?
15        A.    I don't believe so.
16        Q.    And at some point were you told
17   by anybody at Trump Org that you are not
18   going to be doing any more programs in
19   Texas?
20             MR. SCHICK:    Asked and
21   answered.
22             MR. GOLDBERG:    I don't
23   understand --
24        Q.    I understand that you stopped
25   doing it, but the question I have was were
```

Exhibit 6
- 124 -

Page 278

```
 1              SEXTON
 2   you told by people at Trump Org.
 3              MR. SCHICK:   He said he doesn't
 4   recall whether the two were connected
 5   but --
 6              MR. GOLDBERG:   I understand.
 7       A.   I know we stopped.  I don't
 8   recall specifically.
 9       Q.   You don't recall the specific
10   reasons, and you don't know whether there
11   was any piece of paper with an agreement;
12   is that correct?
13       A.   I don't believe I ever saw
14   anything come out of the that -- the
15   resolution of that inquiry.
16       Q.   And who was external counsel?
17       A.   I don't know the name of the
18   firm, but --
19       Q.   Was it a Texas firm?
20       A.   It was.  It was -- the office
21   was in Texas.
22              MR. SCHICK:   For the record we
23   produced to you the entirety of what we
24   produced to the Texas Attorney General's
25   office.
```

Exhibit 6
- 125 -

1                    SEXTON

2          THE WITNESS:  I wouldn't know

3    that.

4          MR. SNEE:  But there were never

5    any other additional infusions of capital

6    from the 2005, 2006 time frame to 2010?

7          THE WITNESS:  No, there wasn't.

8    Actually going back to my previous

9    statement, there was a capital call, so

10   every partner -- every member of the LLC

11   was required to put in based on their

12   ownership a certain amount of dollars.  I

13   think before I left I participated in

14   three.  I don't know the total value

15   though.

16          MR.  SNEE:  Ballpark figure of

17   all or --

18          THE WITNESS:  150,000.

19          MR. SCHICK:  That was your

20   participation?

21          THE WITNESS:  No, I had 4 and a

22   half percent.

23          MR.  SNEE:  Did you ever

24   receive any capital distributions from

25   Trump university LLC?

Exhibit 6
- 126 -

# EXHIBIT 7

Exhibit 7
- 127 -

**Paula Levand**                                             **Makaeff v. Trump University**

**Page 1**

```
 1        UNITED STATES DISTRICT COURT OF CALIFORNIA

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  TARLA MAKAEFF, BRANDON        )
    KELLER, ED OBERKROM and       )
 5  PATRICIA MURPHY, on behalf    )
    of themselves and all others  )
 6  similarly situated,           )
                                  )
 7             Plaintiffs,        )  Index No.
                                  )  3:10-CV-00940-CAB
 8        VS.                     )
                                  )
 9  TRUMP UNIVERSITY, LLC, (AKA   )
    TRUMP ENTREPRENEUR            )
10  INITIATIVE), a New York       )
    Limited Liability Company,    )
11  DONALD TRUMP, and DOES 1      )
    through 50, inclusive,        )
12                                )
               Defendants.        )
13  _____)

14

15

16

17           DEPOSITION OF PAULA LEVAND

18            Los Angeles, California

19            Monday, June 17, 2013

20

21

22

23

24  Reported by:  NIKKI ROY
    CSR No. 3052
25  Job No.: 10006477
```

**Page 1**

Exhibit 7
- 128 -

**Paula Levand**                                          **Makaeff v. Trump University**

Page 102

1    Q.   Okay.
2    A.   She was someone I really liked, that's all.
3    Q.   And where was that?
4    A.   It was at the Quick Start seminar with Chris
5  Goff.
6    Q.   Where?
7    A.   I believe it was in Southern California.
8    Q.   Do you remember what city?
9    A.   No, I don't remember.
10   Q.   Quick start with Chris Goff?
11   A.   Chris Goff, G-o-f-f.
12   Q.   Now, when she said the best person backing
13 you, I assume you meant Donald Trump?
14   A.   Yes.
15   Q.   And how long after you submitted that,
16 whatever it is you wrote, did you have the conference
17 call with Donald Trump?
18   A.   About a week and a half.
19   Q.   Did he call you or --
20   A.   Well, it wasn't Donald Trump.  He wasn't --
21 I wasn't having a conversation one-on-one.  It was --
22 it was -- at the time I wrote it she said my -- my
23 boss, the person over me, will meet with you.  And
24 you don't have to worry, this won't go to anywhere
25 else.

Page 103

1         Well, it -- he did have hands-on.  I do
2  feel -- I can't prove anything, but I -- he didn't
3  say I'm Donald Trump.  I just thought I recognized
4  his voice.  And there were about three, four other
5  people there I was talking to.
6    Q.   And when you say he did have hands-on --
7    A.   It was a phone conference.
8    Q.   When you said he did have hands-on, and I'm
9  not trying to push, I just want to put a name to the
10 pronoun, you're talking about Donald Trump?
11   A.   Yes.
12   Q.   Okay.  What made you think Donald Trump had
13 hands-on?
14   A.   I heard his voice.
15   Q.   In the call?
16   A.   Yes.
17   Q.   Okay.  Did anybody refer to -- did anybody
18 say Donald --
19   A.   No.
20   Q.   -- or Mr. Trump?
21   A.   No.
22   Q.   So other than his voice, is there any reason
23 why you believed he was on that conference call?
24   A.   Just The Apprentice, how he was in the
25 boardroom.  And I never wanted to be in a boardroom.

Page 104

1    Q.   Oh, you were in the boardroom?  You were in
2  a boardroom with him as well?
3    A.   No.  I never wanted to be in a boardroom.  I
4  felt like I was.
5    Q.   Okay.  So when you say you felt like you
6  were in a boardroom, what do you -- I'm just trying
7  to understand you.
8    A.   Well, there were more than one person.  And
9  I was -- they were asking me about my -- what I had
10 written, which I was comfortable with what I wrote
11 being accurate.
12   Q.   Did the person who you thought was Donald
13 Trump address your concerns during that call?
14   A.   You know, it was more like he made a comment
15 or something.  I just recognized his voice.  So I
16 believed, I feel very strongly he was in that room.
17   Q.   As best as you can recall, what -- he made a
18 comment along what lines?  I'm not asking for the
19 exact language he used, but along what lines did he
20 make a comment?
21   A.   Something about you enjoyed the mentorship,
22 you had fun, you liked coming to Florida.  Because
23 one of the questions where -- was why did I come to
24 Florida when they strongly -- when they recommend
25 buying in your area.

Page 105

1    Q.   I see.  So --
2    A.   And I had said that I'd asked my mentor, can
3  we meet in Arizona?  And he had said, well, if you
4  want to meet in Arizona?  Why don't you come to
5  Florida.  I know this market.  This is a good -- good
6  place to invest.  Well, I had never been to Florida
7  and it sounded exciting to me.
8    Q.   So is this a conversation that took place
9  after you had sold that property or?
10   A.   Not after.  It was -- it was in --
11        MR. LUSBY:  Ongoing.
12        THE WITNESS:  Ongoing.  It was rehabbed, the
13 situation.
14 BY MR. FORGE:
15   Q.   So some point in the latter half of 2009?
16   A.   Yes.  Maybe like September, August.
17   Q.   In dealing with Irene and putting together
18 your declaration, did you ask her to verify whether
19 Donald Trump was participating in that conversation?
20   A.   No, I didn't.
21   Q.   Did she mention anything to you about that
22 aspect of the declaration?
23   A.   No.
24   Q.   Did you discuss it at all?
25   A.   No.

**Page 102..105**

Exhibit 7
- 129 -

# EXHIBIT 8

Exhibit 8
- 130 -

```
                 Gunn Non-Confidential Portion Rough Draft.TXT
 1                  NONCONFIDENTIAL PORTION OF THE DEPOSITION

 2                                 * * *

 3       THE VIDEOGRAPHER:  This is the videotaped deposition

 4   of Michelle Gunn, taken by the defense in the platter of

 5   Tarla Makaeff, et al. versus Trump University et al. in

 6   the U.S. District Court, for the Southern District of

 7   California, case number one owe CV 00940.  We are in the

 8   offices of Kramm Court Reporting, Discovery Conference

 9   Centre, at 401 West A Street, Suite 750, in San Diego,

10   California.  Today's date is October 28, 2014, and the

11   time is 9:11 a.m.

12           My name is Patrick Allen.  I am from the firm of

13   AJL Litigation Media at 655 West Broadway, 17th floor, in

14   San Diego, California.  I am the videotape operator.

15           The certified shorthand reporter is Lindy DeBoer

16   in association with Kramm Court Reporters at 2224 Third

17   Avenue in San Diego, California.

18           Video and audio recording will take place at all

19   times during the deposition unless all counsel have

20   specifically requested to go off the record.

21           Counsel will now introduce themselves.

22       MS. JENSEN:  Good morning.  Rachel Jensen, from

23   Robbins Geller Rudman & Dowd, on behalf of plaintiffs and

24   the class.

25       MS. LENDZION:  Lauren lens '81 from Robbins Geller
```

```
                                                                1
♀        1  Rudman & Dowd, on behalf of plaintiffs and the class.

         2      MS. STAGG:  Nancy Stagg of Foley & Lardner, on behalf

         3   of the defendants.

         4      MR. MORRIS:  Benjamin Morris of Foley & Lardner on
                              Page 1
```

Exhibit 8
- 131 -

Gunn Non-Confidential Portion Rough Draft.TXT

12     A    Yes.

13     Q    -- when you were in L.A.?

14     A    Yes.

15     Q    That would have been about right?

16          In the testimonial, I believe you said that you

17  had just recently received the the endorsement from

18  Donald Trump is that sound like it was --

19     A    Without quoting my exact words and just hearing

20  it, yes, something along the lines of he has just

21  received an incredible endorsement from his book from

22  Donald Trump.

23     Q    Does that help refresh your recollection as to

24  the time frame in which you got the -- or let me let me

25  ask that question again because I kept saying you and

                                                        121

1  it's actually Houston.

2          So does that refresh your recollection as to the

3  approximate time frame when Houston received the

4  endorsement from Donald Trump?

5     A    Well I know it was before then but again if you

6  want an exact date I would have to look up that date.

7     Q    When you use language like we just you know we

8  just received this recommendation do you think it would

9  have been within the last couple of weeks before that?

10    A    Not if the book was originally going to come out

11  October 1.  Could have possibly been a month or so before

12  then.

13    Q    But probably in in September or October?

14    A    Within probably August 15 to October 1 would be

                        Page 108

Exhibit 8
- 132 -

Gunn Non-Confidential Portion Rough Draft.TXT

15  my best guesstimate without looking and having the

16  reference of an exact date.

17      Q    So it was right around the time of this e-mail

18  exchange that you had with mark Covais in any event,

19  right?

20      A    Yes.  Because this was on August 28.

21      Q    Okay so it was around this time either you know

22  just before or maybe a little bit afterwards when Houston

23  received the endorsement from Donald Trump for the book

24  is that right?

25      A    Rephrase that one more time.


                                                    122

ᵠ       1      Q    Sure.  So this this time frame being August 28,

        2  2013, that would have been right around the time either

        3  you know just before or weeks afterwards that Mr. Trump

        4  gave the endorsement to Houston for his book right.

        5      A    Yes.  We had submitted the manuscript or the

        6  done version so that he could look at the interview he

        7  gave Houston for the book.  The book was complete with

        8  that interview that had taken months, probably February

        9  or March months before.  So then when he had it done with

       10  the final copy it was submitted in.  With this coming

       11  after, again reaching back out, someone read the book,

       12  connected the Trump university.

       13      Q    And this this e-mail exchange here is related to

       14  you Trump -- this lawsuit, right?  In other words mark

       15  Covais is asking you for your feedback for possible use

       16  for declaration in this lawsuit right?

       17      A    At that time it was not for a lawsuit.  The

       18  reach out to me was simply as oaf you know do you know

                              Page 109

Exhibit 8
- 133 -

# EXHIBIT 9

Exhibit 9
- 134 -

1  ZELDES & HAEGGQUIST, LLP
   AMBER L. ECK (177882)
2  ambere@zhlaw.com
   HELEN I. ZELDES (220051)
3  helenz@zhlaw.com
   ALREEN HAEGGQUIST (221858)
4  alreenh@zhlaw.com
   625 Broadway, Suite 906
5  San Diego, CA  92101
   Telephone:  619/342-8000
6  619/342-7878 (fax)

7  ROBBINS GELLER RUDMAN
     & DOWD LLP
8  RACHEL L. JENSEN (211456)
   rjensen@rgrdlaw.com
9  THOMAS R. MERRICK (177987)
   tmerrick@rgrdlaw.com
10 655 West Broadway, Suite 1900
   San Diego, CA  92101
11 Telephone:  619/231-1058
   619/231-7423 (fax)

12
   Attorneys for Plaintiffs and Proposed Class
13
                  UNITED STATES DISTRICT COURT
14
               SOUTHERN DISTRICT OF CALIFORNIA
15
16 TARLA MAKAEFF, et al., on Behalf of   )   No. 3:10-cv-00940-CAB(WVG)
   Themselves and All Others Similarly Situated, )
17                                        )   CLASS ACTION
                        Plaintiffs,       )
18                                        )   NOTICE OF TAKING OF VIDEOTAPED
          vs.                             )   DEPOSITION OF TRUMP UNIVERSITY,
19                                        )   LLC PURSUANT TO FEDERAL RULE OF
   TRUMP UNIVERSITY, LLC, et al.,         )   CIVIL PROCEDURE 30(b)(6)
20                                        )
                        Defendants.       )
21 _____)
22
23
24
25
26
27
28

709308_1

Exhibit 9
- 135 -

1  TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

2          PLEASE TAKE NOTICE THAT, pursuant to Rules 26 and 30(b)(6) of the Federal Rules of

3  Civil Procedure, plaintiffs Tarla Makaeff, Ed Oberkrom and Brandon Keller ("plaintiffs") in the

4  above captioned action, by and through their undersigned attorneys, will take the deposition upon

5  oral examination of defendant Trump University, LLC ("Trump University" or "defendant"), at

6  9:00 a.m. on July 24, 2012, at the offices of Robbins Geller Rudman & Dowd LLP, 655 West

7  Broadway, Suite 1900, San Diego, California 92101, or at another date, time and/or location

8  mutually agreed upon by the parties regarding the subject matters set forth below.

9          PLEASE TAKE FURTHER NOTICE that the deposition will continue from day to day,

10  excluding weekends and holidays, until completed.  The deposition will be before a person

11  authorized by law to administer oaths and will be recorded by using the stenographic method,

12  through the instant visual display of testimony, and the deposition will be recorded by audio and

13  videotape technology.

14          Pursuant to Rule 30(b)(6), defendant is requested to designate and produce for deposition one

15  or more officers, directors, managing agents, employees or other persons to appear on its behalf and

16  to testify at this deposition who are most knowledgeable about and who consent to testify as a

17  corporate designee on its behalf as to all matters known or reasonably available to defendant

18  concerning the matters set forth in Exhibit A.

19          PLEASE TAKE FURTHER NOTICE that defendant shall provide the names and titles of the

20  designees to plaintiffs *at least 10 days prior to the deposition*, and set forth the subject matter for

21  which each person will testify.  Each such designee produced to testify has an affirmative duty to

22  have first reviewed all documents, reports and other matters known or reasonably available to Trump

23  University, along with familiarizing themselves with all potential witnesses known or reasonably

24  available (not just current employees) to provide informed, binding answers at the deposition.

25          PLEASE TAKE FURTHER NOTICE that the deposition will be taken in accordance with,

26  and for all purposes permissible under, the Federal Rules of Civil Procedure.

27

28

709308_1                                    - 1 -                    3:10-cv-00940-CAB(WVG)

Exhibit 9
- 136 -

1    PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 30(b)(2) of the Federal Rules of

2  Civil Procedure, defendant is required to produce documents at the deposition.  The documents to be

3  produced are described in the Rule 30(b)(2) document request set forth below in Exhibit A.

4  DATED:  May 18, 2012                          ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
5                                                 RACHEL L. JENSEN
                                                  THOMAS R. MERRICK
6

7

8                                                        RACHEL L. JENSEN

9                                                 655 West Broadway, Suite 1900
                                                   San Diego, CA  92101
10                                                 Telephone:  619/231-1058
                                                   619/231-7423 (fax)
11
                                                   ZELDES & HAEGGQUIST, LLP
12                                                 AMBER L. ECK
                                                   HELEN I. ZELDES
13                                                 ALREEN HAEGGQUIST
                                                   625 Broadway, Suite 906
14                                                 San Diego, CA  92101
                                                   Telephone:  619/342-8000
15                                                 619/342-7878 (fax)

16                                                 Attorneys for Plaintiffs and Proposed Class

17

18

19

20

21

22

23

24

25

26

27

28

709308_1

Exhibit 9
- 137 -

**EXHIBIT A**

**I.    DEFINITIONS**

The following definitions apply to this Notice of Deposition and are deemed incorporated into each subject and document request listed below:

1.    "You," "Your" and "Trump University" mean Trump University, LLC, and any of its parents, predecessors, successors, subsidiaries, divisions, affiliates, officers, directors or managing partners, agents, attorneys, representatives (including attorneys, accountants, consultants, investment advisors or bankers), and all other persons acting or purporting to act on Trump University's behalf.

2.    "Advertisement" shall mean any written, oral, visual, audible, or electronic communication, information or material that is published or used in any electronic or other public media, including any website, newspaper, magazine or other periodical, radio, television, telephone or tape recording, videotape display, signs or billboards, motion pictures, or telephone directories (other than routine listings).  In addition, "Advertisement" also means any written or electronic communication or information that is generally distributed or made available to customers or the public, including circulars, research reports, market flyers, flyers, performance reports or summaries, form letters, or any other advertisement, sales literature or published articles, and press releases concerning your products or services.

3.    "Agreement" shall mean all understandings, agreements, contracts, and arrangements, which refer to regional, national, and international arrangements, whether written or oral.

4.    "Communication" means every method and manner of transmitting or receiving data, opinions, thoughts, images, representations, and any other information whether orally, in writing or otherwise, between two or more persons or entities.  Communications include drafts and other written information intended for communicating to another person, even if not ultimately transmitted to or received by another person.

5.    "Course" or "seminars" means and explicitly shall include all courses, seminars, workshops, mentorships, retreats and/or programs offered by Trump University.

6.    "Customer" means a person or entity to whom you have sold and/or provided one or more of your products or services.

- 1 -

709310_1

Exhibit 9
- 138 -

7.     "Document" is coextensive with the meaning of the terms "documents" and "tangible things" in Federal Rule of Civil Procedure 34, and shall have the broadest possible meaning ascribed to those terms, including, but not limited to, all originals and drafts, in any and all languages, of any nature whatsoever, in your possession, custody or control, regardless of where located, and include, but are not limited to, letters, correspondence, logs, drafts, contracts, prospective contracts, agreements, records, studies, surveys, resolutions, tabulations, notes, summaries, memoranda, Electronically Store Information ("ESI"), electronic mail ("email"), calendar or diary entries, handwritten notes, working papers, work sheets, spreadsheets, diagrams, minutes, agenda, bulletins, periodicals, circulars, advertisements, notices, announcements, invoices, statements, checks (front and back), bank statements, ledgers, orders, vouchers, instructions, drawings, charts, graphs, manuals, brochures, pamphlets, schedules, telegrams, teletypes, photographs, audio tapes, voice-mail messages, electronic recordings, facsimile transmissions, and information of whatever kind either stored on computers, including computer disks, hard drives and other media, or contained in any computer or information retrieval devices.  A draft or non-identical copy is a separate document with the meaning of this term.

8.     "Employee" means any person who, at any time during the Relevant Time Period (whether the person is a current or former employee), acted or purported to act on behalf of another person or persons, including all past and present directors, officers, executives, agents, representatives, attorneys, accountants, independent contractors, advisors, and consultants of such other person(s).

9.     The term "electronic data" or "data" means the original (or identical duplicate when the original is not available) and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial, or work-in-progress or "in development"), programming notes or instructions, activity listings of email receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files,

- 2 -

Exhibit 9
- 139 -

1  charts, graphs and outlines, email, operating systems, source code of all types, websites or webpage,

2  intranet, blog entries, Twitter entries, Facebook content, any other social network content, peripheral

3  drivers, PIF files, batch files, ASCII files, pdf (portable document format) files, and any and all

4  miscellaneous files and/or file fragments, regardless of the media on which they reside and

5  regardless of whether said electronic data consists in an active file, deleted file or file fragment.

6  Electronic data includes any and all items stored on computer memories, hard disks, floppy disks,

7  CD-ROMs, removable media such as Zip disks, Jaz cartridges, Bernoulli Boxes and their equivalent,

8  magnetic tapes of all types, microfiche, punched cards and tape, computer chips, including, but not

9  limited to, EPROM, PROM, RAM and ROM, on or in any other vehicle for digital data storage

10  and/or transmittal. The term also includes the file, folder tabs and/or containers and labels appended

11  to, or associated with, any physical storage device associated with each original and/or copy. The

12  terms "data" and "information" shall be construed to mean the same thing.

13       10.   "Meeting" means the contemporaneous presence of any natural persons whether in

14  person or by teleconferencing, video conferencing or otherwise, and whether or not such presence

15  was by chance or prearranged, and whether or not the encounter was formal or informal or occurred

16  in connection with some other activity.

17       11.   "Person" means natural persons, proprietorships, joint ventures, firms, joint owners,

18  partnerships, corporations, groups, trusts, estates, associations, organizations, governmental agencies

19  and all other entities.

20       12.   "Trump University" means Trump University, aka Trump Entrepreneur Initiative, any

21  predecessors, successors, agents, employees, officers, directors, independent contractors, attorneys,

22  accountants, or representatives or other persons occupying similar positions or performing similar

23  functions.

24       13.   The connectives "and" and "or" shall be construed either disjunctively or

25  conjunctively as necessary to bring within the scope of the discovery request all responses that might

26  otherwise be construed to be outside its scope.

27       14.   "All" means "any and all," and the word "any" means "any and all."

28

709310_1

Exhibit 9
- 140 -

15. "Concern(s)," "concerned" and "concerning" mean relating to, referring to, discussing, describing, memorializing, evidencing, comprising, mentioning, enumerating, pertaining to, being connected with, summarizing, reflecting, or consulting.

16. "Including" means "including, but not limited to."

17. The use of any singular form of a word includes the plural and vice versa.

18. The use of any tense of any verb shall also include within its meaning all other tenses of that verb.

## II.    RELEVANT TIME PERIOD

All requests herein refer to the period from January 1, 2004 to the present, unless otherwise specifically indicated, and shall include all information that relates to such period even though prepared or published outside of the Relevant Time Period.

## III.    RULE 30(b)(6) SUBJECT MATTERS

1. Customer complaints and inquiries concerning Trump University's courses, including, but expressly not limited to:

       (a)    Your policies, practices and procedures for investigating, reviewing and responding to customer complaints, including training for customer service personnel;

       (b)    Any scripted or suggested responses or telephone call guidelines for responding to customer complaints or inquiries;

       (c)    Remedies provided to customers as a result of their complaints;

       (d)    Any releases provided to you as a result of remedies provided to customers;

       (e)    Records concerning customer complaints and remedies provided thereto; and

       (f)    Total amount of refunds to customers for each course as a result of their complaint(s).

2. The personnel, organization, operations, reporting structure, ownership interests, and location of Trump University, as well as any parent company, subsidiary, and/or affiliate.

3. The design, creation, approval, and modification of all Trump University course products and curriculum, advertisements and promotional materials.

- 4 -

Exhibit 9
- 141 -

4.     The design, creation, approval, and dissemination of program materials, including scripts, course requirements, guidelines, outlines, and/or PowerPoint presentations provided to instructors and/or mentors.

5.     The design, creation, approval and revision of advertising and marketing for Trump University, including any communications pertaining to the same, or any communications regarding the use of various statements in advertisements and marketing materials.

6.     Your communications with defendant Donald J. Trump concerning the advertising, marketing, sales, courses, instructors, mentors, and/or customer complaints concerning Trump University and Donald J. Trump's role in Trump University, including, but expressly not limited to, reviewing and/or approving Trump University marketing or advertising.

7.     The identity, job title, duties and job responsibilities of all officers or employees of Trump University who have or have had any authority or responsibility for the advertising and/or marketing for the Trump University courses and the nature of such authority or responsibility.

8.     Your public statements concerning Trump University including any press releases, advertisements, websites, and public appearances relating to the sale of your courses, or in drafts of same.

9.     Your public statements about the involvement of defendant Donald J. Trump in Trump University, including press releases, advertisements, marketing materials, letters, blog entries, websites, social media, course materials, and public appearances.

10.     Sales of the Trump University courses in the United States, including:

(a)     The name and product number (or SKU) of each course;

(b)     The price of each course;

(c)     The quantity of each course sold;

(d)     The total amount of revenues and profits from the sale of each course sold, broken out by course name and/or SKU; and

(e)     The total number and amount of refunds given for each course, broken out by course name and/or SKU.

- 5 -

709310_1

Exhibit 9
- 142 -

1    11.    Information provided to sales representatives, including scripts, PowerPoint

2 presentations, advertisements, or marketing materials, and any correspondence regarding the scripts,

3 advertisements, or marketing materials provided to the sales representatives.

4    12.    Any training or training materials provided to employees, sales representatives,

5 mentors, instructors, and/or contractors.

6    13.    The credentials for your mentors and instructors.

7    14.    Statements made by Donald J. Trump concerning Trump University, either in person,

8 on videotape, audio recording, in writing, or otherwise.

9    15.    Promotional or marketing materials created by, or at the direction of, Donald J.

10 Trump, or disseminated by, or at the direction of, Donald J. Trump.

11    16.    Any compensation received by Donald J. Trump from Trump University.

12    17.    Customer testimonials used in Trump University advertisements, marketing or sales

13 materials, including, but not limited to, communications pertaining to solicitation, casting, and

14 authorization to use of the various customer testimonials.

15    18.    The form, content, and use of your course forms and related documents in effect

16 during the Relevant Time Period, including your Enrollment Form, Terms and Conditions form and

17 Subscription Agreement form.

18 **IV.    RULE 30(b)(2) DOCUMENT REQUEST**

19    1.    All documents reviewed in preparation for the deposition(s) to be conducted pursuant

20 to this notice.

21

22

23

24

25

26

27

28

709310_1

- 6 -

Exhibit 9
- 143 -

1

<u>DECLARATION OF SERVICE</u>

2

    I, the undersigned, declare:

3

    1.    That declarant is and was, at all times herein mentioned, a citizen of the United States

4

and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested

5

party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San

6

Diego, California 92101.

7

    2.    That on May 18, 2012, declarant caused the NOTICE OF TAKING OF

8

VIDEOTAPED DEPOSITION OF TRUMP UNIVERSITY, LLC PURSUANT TO FEDERAL

9

RULE OF CIVIL PROCEDURE 30(b)(6) and Exhibit A thereto to be personally served on the

10

following party:

11

        David Keith Schneider
        Yunker & Schneider

12

        655 W. Broadway, Suite 1400
        San Diego, CA 92101

13

        619/233-5500
        Counsel for Defendant

14

    3.    That on May 18, 2012, declarant served the NOTICE OF TAKING OF

15

VIDEOTAPED DEPOSITION OF TRUMP UNIVERSITY, LLC PURSUANT TO FEDERAL

16

RULE OF CIVIL PROCEDURE 30(b)(6) and Exhibit A thereto via Electronic Mail on the

17

following party:

18

19

        Zeldes & Haeggquist, LLP
        Helen I. Zeldes         Email:   helenz@zhlaw.com

20

        Amber L. Eck         Email:   ambere@zhlaw.com
        625 Broadway, Suite 906
        San Diego, CA 92101

21

        Counsel for Plaintiffs

22

    That there is a regular communication by mail between the place of mailing and the places so

23

addressed.

24

    I declare under penalty of perjury that the foregoing is true and correct. Executed on May 18,

25

2012, at San Diego, California.

26

27

                               MELISSA A. BACCI

28

                                      3:10-cv-00940-CAB(WVG)

Exhibit 9
- 144 -

# EXHIBIT 10

Exhibit 10
- 145 -

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

      Plaintiffs,

                                  CASE NO.: 10 CV 0940 EIG (WVG)

  -against-


TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

      Defendants.


--------------------------------------------

VIDEOTAPED DEPOSITION of MICHAEL SEXTON

August 22, 2012

New York, New York


Reported by:
Eileen Mulvenna
CSR/RMR/CRR
Job No. 10003486

Exhibit 10
- 146 -

**C O N F I D E N T I A L**

Michael Sexton                                                    **Makaeff v. Trump University**

---

```
        ** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
----------------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

        Plaintiffs,
   -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

        Defendants.
----------------------------------------x
        August 22, 2012
        9:57 a.m.

    VIDEOTAPED DEPOSITION of MICHAEL SEXTON,
30(b)(6) Witness in the above-captioned matter,
taken by Plaintiffs, held at 725 Fifth Avenue,
New York, New York, before Eileen Mulvenna,
CSR/RMR/CRR, Certified Shorthand Reporter,
Registered Merit Reporter, Certified Realtime
Reporter and Notary Public of the State of
New York.
                                          Page 1
```

```
 1        ** CONFIDENTIAL ** CONFIDENTIAL **
 2   A P P E A R A N C E S :
 3
 4
 5      ROBBINS GELLER RUDMAN & DOWD, LLP
          Attorneys for Plaintiffs
 6          655 West Broadway
            Suite 1900
            San Diego, California  92101
 7      BY:  RACHEL L. JENSEN, ESQ.
            rachelj@rgrdlaw.com
 8
 9            -and-

10
      ZELDES & HAEGGQUIST, LLP
11        625 Broadway
          Suite 906
12        San Diego, California  92101
      BY:  AMBER L. ECK, ESQ.
13          ambere@zhlaw.com
          AARON M. OLSEN, ESQ.
14          aarono@zhlaw.com
15
16
      YUNKER & SCHNEIDER
17        Attorneys for Defendants
          655 West Broadway
18        Suite 1400
          San Diego, California  92101
19      BY:  DAVID K. SCHNEIDER, ESQ.
            dks@yslaw.com
20
21
      A L S O   P R E S E N T :
22
23        Richard Ramos, Videographer
24
25
                                          Page 2
```

```
 1        ** CONFIDENTIAL ** CONFIDENTIAL **
 2            STIPULATIONS
 3
 4        IT IS HEREBY STIPULATED AND AGREED,
 5   by and between the attorneys for the respective
 6   parties herein, that filing and sealing be and
 7   the same are hereby waived.
 8
 9        IT IS FURTHER STIPULATED AND AGREED
10   that all objections, except as to the form of the
11   question, shall be reserved to the time
12   of the trial.
13
14        IT IS FURTHER STIPULATED AND AGREED
15   that the within deposition may be signed and
16   sworn to before any officer authorized to
17   administer an oath, with the same force and
18   effect as if signed and sworn to before the
19   officer before whom the within deposition was
20   taken.
21
22
23
24
25
                                          Page 3
```

```
 1            SEXTON - CONFIDENTIAL
 2        THE VIDEOGRAPHER:  Good morning.
 3   This is Tape No. 1 of the videotaped
 4   deposition of Michael Sexton in the matter
 5   of Tarla Makaeff, et al., versus Trump
 6   University LLC, et al., in the United
 7   States District Court for the Southern
 8   District of California.
 9        This deposition is being held at The
10   Trump Organization located at
11   725 5th Avenue, New York, New York 10022 on
12   August 22, 2012, at approximately 9:57 a.m.
13        My name is Richard Ramos and I'm the
14   legal video specialist.  The court reporter
15   is Eileen Mulvenna.
16        Will counsel please introduce
17   themselves beginning with the party
18   noticing this proceeding.
19        MS. JENSEN:  Yes.  Good morning.  My
20   name is Rachel Jensen from Robbins Geller
21   Rudman & Dowd, and I'm here representing
22   the plaintiffs.
23        MS. ECK:  Amber Eck of Zeldes &
24   Haeggquist representing the plaintiffs.
25        MR. OLSEN:  Aaron Olsen, Zeldes &
                                          Page 4
```

1 (Pages 1 to 4)

Exhibit 10
- 147 -

C O N F I D E N T I A L

**Michael Sexton**                                           **Makaeff v. Trump University**

| | |
|---|---|
| SEXTON - CONFIDENTIAL | SEXTON - CONFIDENTIAL |

1       SEXTON - CONFIDENTIAL
2              Now, the court reporter has
3   administered an oath to you.  Do you understand
4   that you're here testifying as though you were in
5   a court of law?
6        A.    Yes, I do.
7        Q.    Are you represented here by counsel
8   today?
9        A.    Yes, I am.
10       Q.    And who is your counsel?
11       A.    David Schneider.
12       Q.    And who is paying for your legal
13  representation today?
14             MR. SCHNEIDER:  That's not relevant.
15  And it's attorney-client privilege.
16             MS. JENSEN:  We may come back to
17  that one.
18  BY MS. JENSEN:
19       Q.    When were you first contacted about
20  this case?
21       A.    We received a mailing, I believe, in
22  the spring of 2010.
23       Q.    And did you receive that mailing
24  directly or did somebody else convey it to you?
25       A.    Somebody else conveyed it to me.  I
Page 9

1        SEXTON - CONFIDENTIAL
2   was traveling at the present time.
3        Q.    Who conveyed that information to
4   you?
5        A.    Michael Bloom.
6        Q.    And what did Michael Bloom say?
7        A.    He called to let me know that we had
8   been served with a lawsuit and briefly I think
9   skimmed over the contents of the document.
10       Q.    Did he say anything else about the
11  lawsuit?
12       A.    No.
13       Q.    Did you say anything else to him
14  about the lawsuit?
15       A.    We talked about the contents of the
16  document, but -- and then obviously I instructed
17  him to make sure that our counsel was aware of
18  it.
19       Q.    Did you opine at all on the merit of
20  the lawsuit?
21       A.    At that time, no.
22       Q.    Did Michael Bloom?
23       A.    I don't believe so.
24       Q.    Is there anything about your health
25  that would interfere in any way with your ability
Page 10

1        SEXTON - CONFIDENTIAL
2   to give your best testimony today?
3        A.    No.
4        Q.    Any medications?
5        A.    No.
6        Q.    When I ask you a question today, I'm
7   going to assume that you understand my question
8   unless you specify otherwise.
9              Is that fair?
10       A.    Yes.
11       Q.    If there's anything that you don't
12  understand, please ask me to rephrase.  I want to
13  make sure we have clear communications today.  So
14  by all means, please whatever I can do to help,
15  just let me know.
16             Whenever I ask you a question, I'm
17  entitled to your best recollection.  I'm entitled
18  to your best estimate.  So even if you don't have
19  it exact, information, I would prefer the most
20  exact facts you can give me and then beyond that
21  I'm entitled to your best estimation.
22             Is that fair?
23       A.    Understood.
24       Q.    Now, your attorney may, as he has
25  already, be making some objections throughout the
Page 11

1        SEXTON - CONFIDENTIAL
2   course of your deposition.  However, whenever he
3   does make an objection, I'm still entitled to
4   your answer unless you are directly instructed
5   not to answer.
6              Is that fair?
7        A.    Okay.
8        Q.    Also, at any point today if there's
9   anything you need, if you need a break, let me
10  know.  The only exception there is please let
11  me -- if I have a pending question, please go
12  ahead and answer that question before we take the
13  break.
14             Is that fair?
15       A.    Yes.
16       Q.    Before we get into the substantive
17  portion of the deposition, is there anything that
18  you would like to ask me?  Do you have any
19  questions?
20       A.    No.
21             MS. JENSEN:  I'd like to mark as the
22  first exhibit in this deposition the notice
23  of taking videotaped deposition of Trump
24  University LLC pursuant to Federal Rule of
25  Civil Procedure 30(b)(6).
Page 12

3 (Pages 9 to 12)

Exhibit 10
- 148 -

CONFIDENTIAL

Michael Sexton                                          Makaeff v. Trump University

| | |
|---|---|
| 1      SEXTON - CONFIDENTIAL | 1      SEXTON - CONFIDENTIAL |

1      SEXTON - CONFIDENTIAL
2          And, David, if you'd be so kind as
3  to pull out of these binders -- Binder
4  No. 1, the first tab should be the 30(b)(6)
5  notice.
6          (Plaintiffs' Exhibit 1, No Bates
7          numbers, Deposition Notice, marked for
8          identification.)
9  BY MS. JENSEN:
10      Q.    Throughout the deposition, I'm going
11  to be addressing your attention to particular
12  documents that are going to be in these binders,
13  just so you know the lay of the land.
14      A.    Okay.
15      Q.    Mr. Sexton, have you seen this
16  document before?
17      A.    Yes, I have.
18      Q.    And under -- or when did you see
19  this document?
20      A.    I believe this was the initial
21  document that was sent to the office.  Or this is
22  the subpoena.  I'm sorry.  I saw this -- it was
23  forwarded to me by counsel.
24      Q.    When was it forwarded to counsel --
25  by counsel?

                                                  Page 13

1      SEXTON - CONFIDENTIAL
2      A.    Sometime in the spring of this year,
3  I believe.
4      Q.    And what is your understanding of
5  what this document is?
6      A.    I'm to be -- as a representative of
7  the company, provide information as part of the
8  litigation.
9      Q.    Before I go further with this
10  document, I understand -- or it's my
11  understanding that at some point, Trump
12  University LLC changed its name to -- the Trump
13  Entrepreneur Initiative LLC; correct?
14      A.    Correct.
15      Q.    And so throughout this deposition,
16  whenever I say "Trump University," I mean to
17  include the Trump Entrepreneur Initiative.
18          Is that fair?
19      A.    Understood, yes.
20      Q.    And how did you come to be
21  designated to speak as the company's
22  representative today?
23          MR. SCHNEIDER:  Objection.
24      Foundation.  It may call for
25      attorney-client privilege.

                                                  Page 14

1      SEXTON - CONFIDENTIAL
2          I don't want you to discuss anything
3      that you have discussed with any counsel on
4      this issue.  So if that would be the sum of
5      your knowledge, then --
6          THE WITNESS:  Yeah, that's --
7  BY MS. JENSEN:
8      Q.    So counsel told you?
9          MR. SCHNEIDER:  Well, unless you
10      have information outside of counsel.
11          THE WITNESS:  I don't.
12          MS. JENSEN:  That's fine.
13  BY MS. JENSEN:
14      Q.    Did you discuss your deposition
15  today with anybody at Trump University?
16      A.    No, I did not.
17      Q.    Did you speak to anybody else other
18  than counsel about your deposition today?
19      A.    I mentioned it in a call with a
20  former colleague last week.
21      Q.    And who is that former colleague?
22      A.    David Highbloom.
23      Q.    And what did you all discuss?
24      A.    Just that we would both be coming in
25  and what days.

                                                  Page 15

1      SEXTON - CONFIDENTIAL
2      Q.    Did you discuss your deposition with
3  anybody else?
4      A.    No.
5      Q.    In providing information today as
6  the company's representative, did you seek out to
7  speak to anybody else who used to work with Trump
8  University to get any information?
9      A.    No, I did not.
10          To prepare for this deposition?
11      Q.    Yes.
12      A.    No, I did not.
13      Q.    Now, in turning to the document
14  itself, I'd like you to turn to page No. 4.
15      A.    In the exhibit?
16      Q.    Yes.  Oh -- yes.
17          (Witness peruses the exhibit.)
18      Q.    Do you see where it says the
19  Rule 30(b)(6) subject matters?
20      A.    Yes, I do.
21      Q.    Great.
22          Now, Topic No. 1.  Do you see Topic
23  No. 1 starts with customer complaints?
24      A.    Yes, I do.
25      Q.    Now, did you prepare for your

                                                  Page 16

4 (Pages 13 to 16)

Exhibit 10
- 149 -

**C O N F I D E N T I A L**

Michael Sexton                                    **Makaeff v. Trump University**

| | |
|---|---|
| 1      **SEXTON - CONFIDENTIAL**<br>2 **deposition to speak as to customer complaints**<br>3 **today?**<br>4      MR. SCHNEIDER:  I can identify the<br>5 categories.<br>6      MS. JENSEN:  Actually, I'd like to<br>7 ask him.<br>8      MR. SCHNEIDER:  The witness won't<br>9 know who the company is making available<br>10 for this category.  So I can represent to<br>11 you, as we discussed before the deposition,<br>12 after I meet with my clients, I'll be able<br>13 to tell you which categories.<br>14      So the witness isn't going to be<br>15 able to tell you any categories we are<br>16 designating him as the 30(b)(6) witness,<br>17 but I can.<br>18      MS. JENSEN:  Well, I'm actually<br>19 asking him, so I'm entitled to ask those<br>20 questions.<br>21 BY MS. JENSEN:<br>22    **Q.**   **So is it your understanding that you**<br>23 **are here to testify today as to Topic No. 1?**<br>24    A.  I don't believe so.<br>25      MR. SCHNEIDER:  Objection.<br><div align="right">Page 17</div> | 1      SEXTON - CONFIDENTIAL<br>2 Foundation.<br>3      Just so the record is clear, I can<br>4 tell you who he's going to be here on<br>5 behalf of, and asking the witness may or<br>6 may not be accurate.  So you can ask him if<br>7 he's here on number 1 or not, but -- he can<br>8 say he is, but I will tell you whether or<br>9 not he's here as the 30(b)(6)<br>10 representative for that category.<br>11      So it's not relevant if the witness<br>12 believes or not believes what he's here<br>13 for.  It matters what the company, as the<br>14 defendant, represents to you he's here for.<br>15 But you can spend your time with him as you<br>16 wish.<br>17      MS. JENSEN:  Thank you.<br>18      Just for the record, the plaintiffs<br>19 had asked the defendants a number of months<br>20 ago as to the topics that this witness<br>21 would -- would be testifying to.  We've<br>22 repeatedly asked since then in a number of<br>23 e-mails and correspondence.  The defendants<br>24 have refused to identify which topics this<br>25 witness is here to speak to.<br><div align="right">Page 18</div> |
| 1      SEXTON - CONFIDENTIAL<br>2      And so, consequently, the plaintiffs<br>3 sent a letter to defendants early this week<br>4 informing them that because they were not<br>5 informed as to which topics this witness<br>6 would be testifying as to, that they will<br>7 proceed as to their best understanding of<br>8 which topics this witness would have<br>9 knowledge of.  And that's how I intend to<br>10 proceed today.<br>11      MR. SCHNEIDER:  That's fine.  Since<br>12 we're making a record, I also advised you<br>13 that since neither Mr. Sexton, nor<br>14 Mr. Highbloom are still employees or<br>15 independent contractors of Trump<br>16 University, that I did not know the<br>17 categories until I met with them.  I met<br>18 with them this week, as I advised you.<br>19      I spent the first two days of this<br>20 week meeting with them to understand who<br>21 would be best responding to these<br>22 categories.  I advised you of that weeks<br>23 ago.  You continued to ask me to identify<br>24 the categories.  I again told you that I<br>25 need to meet with them to find out and,<br><div align="right">Page 19</div> | 1      SEXTON - CONFIDENTIAL<br>2 when I found out, I would advise you and<br>3 let you know.<br>4      That is very customary at the<br>5 beginning of a 30(b)(6) deposition, to<br>6 identify the categories that the witness is<br>7 going to be addressing.<br>8      I also suggested that you look at<br>9 the Rule 26 disclosure, which specifically<br>10 identified the areas of testimony by the<br>11 witnesses and what their areas of expertise<br>12 were, that it was no surprise what the<br>13 general areas of these witness' knowledge<br>14 was as their positions.<br>15      So if you had looked at the Rule 26,<br>16 you certainly would have known.  But again,<br>17 Rachel, if you want to spend your seven<br>18 hours asking things that -- you want to<br>19 take the long way around the block, that's<br>20 up to you.  I'm offering on the record to<br>21 tell you exactly what categories witnesses<br>22 will be responsive to.  You can ask the<br>23 witnesses now.  You can get that<br>24 information.  It may or may not be<br>25 accurate, but that's up to you.<br><div align="right">Page 20</div> |

5 (Pages 17 to 20)

Exhibit 10
- 150 -

CONFIDENTIAL

**Michael Sexton**                                        **Makaeff v. Trump University**

| | |
|---|---|
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  MS. JENSEN:  Again, I just want to | 2  I'll just instruct him not to answer |
| 3  state for the record that, you know, to the | 3  specific questions if it's not in his area. |
| 4  extent that you're representing that you | 4  You make it sound as if you write |
| 5  met with your clients or the witnesses in | 5  out a question and you're not sure whether |
| 6  the last couple of days, that you did not | 6  to ask that question of Mr. Sexton or |
| 7  e-mail us or otherwise convey to us which | 7  Mr. Highbloom, who will be here on Friday. |
| 8  topics they were going to speak to today | 8  So I'm not sure how this has caused any |
| 9  until this very moment, so -- | 9  tremendous consternation. |
| 10  MR. SCHNEIDER:  Just so the record's | 10  If, for example, one witness is |
| 11  clear, I finished meeting with them last | 11  going to address the complaint issue, then |
| 12  night in the late hours going through this | 12  you can ask that witness about the |
| 13  and again this morning.  So either way, | 13  complaint issue.  So it's not as if your |
| 14  it's before the deposition or at the | 14  preparation was completely different |
| 15  beginning of the deposition.  And I'm | 15  whether or not the first witness or the |
| 16  prepared to tell you.  If you don't want | 16  second witness addressed Category 1. |
| 17  the information, you can ask the witness. | 17  MS. JENSEN:  I -- you know, I |
| 18  As I said, it may or may not be | 18  disagree with many of your comments there, |
| 19  accurate.  The witness may not know which | 19  but suffice it to say that for purposes of |
| 20  categories he is responsive to.  And if a | 20  this deposition, I'm going to be asking |
| 21  witness tells you that he's going to | 21  questions.  And if you're instructing your |
| 22  respond to a particular category and you | 22  witness not to answer on the basis of |
| 23  ask him about that, I will continue making | 23  objections other than attorney-client and |
| 24  a representation that he is not here as a | 24  work product, it's going to be a problem |
| 25  30(b)(6) representative on that topic, and | 25  and, you know, we're going to have to |
| Page 21 | Page 22 |

| | |
|---|---|
| 1  SEXTON - CONFIDENTIAL | 1  SEXTON - CONFIDENTIAL |
| 2  consider going to Gallo on it. | 2  Q.  Topic No. 9? |
| 3  So, you know, that being said, I | 3  A.  Yes. |
| 4  don't want to create a problem in the | 4  Q.  Topic No. 10? |
| 5  abstract.  Let's see how it goes, but I'm | 5  A.  Yes. |
| 6  just letting you know that, of course, any | 6  Q.  Topic No. 11? |
| 7  instruction not to answer on those grounds | 7  A.  I'm not sure. |
| 8  would be completely improper. | 8  Q.  Topic No. 12? |
| 9  BY MS. JENSEN: | 9  A.  No. |
| 10  Q.  Okay.  Mr. Sexton, is it your | 10  Q.  Topic No. 13? |
| 11  understanding that you are here to testify as to | 11  A.  No. |
| 12  Topic No. 2? | 12  Q.  Topic No. 14? |
| 13  A.  Yes, it is. | 13  A.  Yes. |
| 14  Q.  How about Topic No. 3? | 14  Q.  Topic No. 15? |
| 15  A.  Yes, it is. | 15  A.  Yes. |
| 16  Q.  Topic No. 4? | 16  Q.  Topic No. 16? |
| 17  A.  Yes, it is. | 17  A.  I don't know. |
| 18  Q.  Topic No. 5? | 18  Q.  Topic No. 17? |
| 19  A.  Yes. | 19  A.  I believe so. |
| 20  Q.  Topic No. 6? | 20  Q.  And, finally, number 18? |
| 21  A.  Yes. | 21  A.  I don't believe so. |
| 22  Q.  Topic No. 7? | 22  Q.  I have a couple of follow-up |
| 23  A.  Yes. | 23  questions here as to the topics that you are not |
| 24  Q.  Topic No. 8? | 24  here to testify as to -- and let me make sure |
| 25  A.  Yes. | 25  that I get this list right.  That would be |
| Page 23 | Page 24 |

6 (Pages 21 to 24)

Exhibit 10
- 151 -

CONFIDENTIAL

Michael Sexton                                                    Makaeff v. Trump University

| | |
|---|---|
| 1   SEXTON - CONFIDENTIAL<br>2  number -- would include number 1.  Do you know<br>3  who is -- who is going to be testifying about<br>4  Topic No. 1?<br>5       A.   I believe David Highbloom.<br>6       Q.   And I believe the next topic that<br>7  you said no to is Topic No. 12.  Do you know who<br>8  will be testifying as to Topic No. 12?<br>9       A.   I believe 11.<br>10      Q.   Okay.  That was a question mark.<br>11      A.   Yes.<br>12           I believe David Highbloom.<br>13      Q.   And 12?<br>14      A.   I believe David Highbloom.<br>15      Q.   And 13?<br>16      A.   I believe David Highbloom.<br>17      Q.   Number 16?<br>18      A.   I don't know.<br>19      Q.   And number 18?<br>20      A.   I believe David Highbloom.<br>21      Q.   Thank you.<br>22           I think you did well on that.<br>23           MS. JENSEN:  You didn't give your<br>24  client enough credit.<br>25<br>Page 25 | 1    SEXTON - CONFIDENTIAL<br>2  BY MS. JENSEN:<br>3       Q.   How did you prepare for your<br>4  deposition today?<br>5       A.   I spent time yesterday with counsel.<br>6       Q.   Was it yesterday only?<br>7       A.   Yesterday -- yesterday only.  Maybe<br>8  a couple brief phone calls, but actually not in<br>9  preparation for this deposition.  It was really<br>10  yesterday.<br>11      Q.   Okay.  And how long did you meet<br>12  yesterday?<br>13           MR. SCHNEIDER:  You're not going to<br>14      get into how long we met or what we<br>15      discussed or what we reviewed or what we<br>16      did.<br>17           MS. JENSEN:  How long we met is not<br>18      attorney-client privileged.  I understand<br>19      that -- the actual communications, I<br>20      understand.  I'm not going there.<br>21           MR. SCHNEIDER:  The duration of our<br>22      preparation is --<br>23           MS. JENSEN:  Yes.<br>24           MR. SCHNEIDER:  -- not --<br>25           MS. JENSEN:  That is not<br>Page 26 |
| 1    SEXTON - CONFIDENTIAL<br>2  attorney-client privileged.<br>3           MR. SCHNEIDER:  -- your business.<br>4  It's not your business.  It is<br>5  attorney-client privileged.  What we do and<br>6  how long we met --<br>7           MS. JENSEN:  That is absolutely<br>8  wrong.  I mean, really.  The number of<br>9  hours?<br>10           MR. SCHNEIDER:  What does how long<br>11  we met --<br>12           MS. JENSEN:  It is not a<br>13  communication.  It is not a communication.<br>14  BY MS. JENSEN:<br>15      Q.   Mr. Sexton, how long did you meet<br>16  with your attorney yesterday?<br>17           MR. SCHNEIDER:  No, Rachel, this has<br>18      nothing to do with the case, how long we<br>19      met to prepare for the deposition.<br>20           MS. JENSEN:  The preparation for the<br>21      deposition, especially when it's a 30(b)(6)<br>22      deposition, is absolutely relevant.<br>23           MR. SCHNEIDER:  How long a<br>24      witness --<br>25           MS. JENSEN:  Yes.<br>Page 27 | 1    SEXTON - CONFIDENTIAL<br>2           MR. SCHNEIDER:  -- meets with his<br>3  client is relevant?<br>4           MS. JENSEN:  Yes.<br>5           MR. SCHNEIDER:  How is that<br>6  relevant?<br>7           MS. JENSEN:  I'm not going to argue<br>8  with you.  I'm not going to argue with you.<br>9  The question is pending.<br>10           MR. SCHNEIDER:  I'm going to<br>11  instruct him not to answer unless you tell<br>12  me how it's relevant or likely to lead to<br>13  discovery of admissible evidence.<br>14           MS. JENSEN:  How long you met<br>15  yesterday is absolutely relevant to the<br>16  preparation for a 30(b)(6) deposition.  And<br>17  to the extent, you know -- if it comes to<br>18  pass that the witness has not been<br>19  adequately prepared, I want to know how<br>20  long he met with counsel.<br>21           MR. SCHNEIDER:  Well, if that's an<br>22  issue, we can address it then.<br>23           MS. JENSEN:  Well, we'll reserve on<br>24  that one, but that's -- you know, that's<br>25  very improper.<br>Page 28 |

7 (Pages 25 to 28)

Exhibit 10<br>- 152 -

C O N F I D E N T I A L

Michael Sexton                                                    Makaeff v. Trump University

```
 1         SEXTON - CONFIDENTIAL
 2   to do.  We were the exact opposite.
 3         And that was our position, was it's
 4   not about ivy tower.  It's about practical, at
 5   the time very cost-effective, very, very
 6   high-quality education delivered tactically and
 7   quickly to your computer.  You know, so, no, I
 8   don't -- we went to great pains to make it clear
 9   this wasn't my intent, it wasn't traditional
10   education.
11         Q.    It was for e-learning?
12         A.    Correct.  Not only e-learning, this
13   is continuing ed for working adults.  And this is
14   very practically focused education to help build
15   specific skills that could help business people
16   achieve their goals.
17         Q.    And you've used the term "continuing
18   education" a couple of times.  To be clear, did
19   Trump University offer any credits for continuing
20   legal requirements -- I mean, continuing
21   education requirements?
22         A.    "Continuing education" is a very
23   broad term.  It doesn't -- a portion of it infer
24   continuing ed credits; but continuing ed is --
25   you can go to a learning annex and you can take
```
                                                              Page 157

```
 1         SEXTON - CONFIDENTIAL
 2   continuing ed course; right?
 3         We -- we were certified by the -- by
 4   IACAT to offer continuing ed credits.  It's
 5   I-A-C-A-T.  I forget what the acronym stands for,
 6   but we went through that certification process
 7   and received -- received approval grant
 8   continuing ed credits for -- for our courses.
 9         Q.    Did Trump University ever seek
10   accreditation to become a university?
11         A.    No, never.
12         Q.    And besides the names Trump
13   University LLC, Trump University CA LLC, and
14   Trump Entrepreneur Initiative LLC, did Trump
15   University ever operate under another name?
16         A.    I believe there's another name in
17   Canada.  Again, I believe that Delaware Corp. --
18   there was a Canadian -- they don't call them LLCs
19   out there, they call them something else.
20   Something else.  But I believe that fed into the
21   Delaware Corp.  And I believe we called it Trump
22   Education in Canada.  So that would be the only
23   other name that would appear, that I can recall.
24         Q.    Was it Trump Education, perhaps?
25         A.    Trump Education, but it's Trump
```
                                                              Page 158

```
 1         SEXTON - CONFIDENTIAL
 2   Education like U -- ULC or something.
 3         Q.    Was the brand name Trump U used in
 4   Maryland and the D.C. area?
 5         A.    We did use Trump U in certain
 6   states.
 7         Q.    Why was that term used in certain
 8   states?
 9         A.    I believe the states that used that
10   were additional states that regulated the word
11   "university."
12         Q.    When you say "additional states," do
13   you mean besides New York?
14         A.    Yes.
15         Q.    Why did you feel the need to use
16   Trump U instead of Trump University in those
17   states?
18         A.    I think in Maryland, we may have
19   gotten a call from the education department,
20   something like that.  I guess Massachusetts,
21   probably something similar.  And we just agreed
22   to change, and the -- and the state was happy
23   with that.
24         Q.    So to be clear, did you start off
25   using the term "Trump University" in those states
```
                                                              Page 159

```
 1         SEXTON - CONFIDENTIAL
 2   and then you changed that --
 3         A.    Yes, we did.
 4         Q.    -- after you got that phone call?
 5         A.    Yes.
 6         Q.    And in -- in New York, it's my
 7   presumption you didn't get a call until May of
 8   2010, or did you get a call before then from --
 9         A.    No, we got a call -- if it's --
10   spring of 2010, sometime in that time frame.
11         Q.    Right.
12         A.    Yes.  And it was brought to our
13   attention that there was an issue with the name
14   and we quickly changed it.
15         Q.    Do you have an understanding of
16   why -- why they waited until spring of 2010?
17         MR. SCHNEIDER:  Objection.  Calls
18   for speculation.
19         THE WITNESS:  When was this -- when
20   was this lawsuit filed?
21         MR. SCHNEIDER:  April or May of
22   2010.
23         THE WITNESS:  I would suspect that
24   was the cause for . . .
25
```
                                                              Page 160

40 (Pages 157 to 160)

Exhibit 10
- 153 -

C O N F I D E N T I A L

Michael Sexton                                      Makaeff v. Trump University

1          SEXTON - CONFIDENTIAL
2    BY MS. JENSEN:
3        **Q.    Was only allowed to work --**
4        A.    Was only allowed to work --
5             MR. SCHNEIDER:  By Trump University?
6             MS. JENSEN:  By Trump University.
7             THE WITNESS:  Yes, that would
8    surprise me, that we would cap it on a
9    daily basis.
10   BY MS. JENSEN:
11       **Q.    Who -- I'm sorry, who would have --**
12   **who would have been in charge of working with the**
13   **mentors on their pay structures or the amount**
14   **that they could work?**
15       A.    Well, ultimately I determined
16   what -- if there should be a cap because they're
17   being too aggressive.  And Brad Schneider would
18   have communicated that to them.
19       **Q.    Who was in charge of agreements with**
20   **the mentors?**
21       A.    Steven Matejek -- well, Steven
22   Matejek was responsible for making sure all the
23   paperwork was completed and they signed the
24   agreement.  So he was ultimately responsible.
25       **Q.    Did Trump University receive**
                                                      Page 269

1          SEXTON - CONFIDENTIAL
2    **complaints from students about not receiving a**
3    **full 12 months of mentorship for the gold elite**
4    **program?**
5        A.    I'm having trouble with "mentorship"
6    because mentorship is three days.  So it is
7    literally impossible to get a year of mentorship.
8    And we would never sell -- you can't sell a year
9    of somebody working with you in-field, right.
10   The mentorship was a very specific component of
11   the gold package.  It included three days working
12   with the student in-field plus some pre work and
13   some post work.
14       **Q.    How did Trump University decide**
15   **where to hold its live events?**
16       A.    By "where" do you mean what city?
17       **Q.    By what city and by what location in**
18   **that city.**
19       A.    So the cities were selected based on
20   size.  And we experimented.  Not all cities
21   were -- were successful.  Some were much better
22   than others.  Locations were very much based on
23   to some degree trial error, to a large degree
24   data.  We would look at maps to see census data,
25   which would allow us to target areas that had
                                                      Page 270

1          SEXTON - CONFIDENTIAL
2    populations that met our target market and that
3    were also dense enough so that we had a
4    concentration of our target population in a
5    specific area.  And then we would select a hotel
6    in that area and try it.
7        **Q.    And that data about the census and**
8    **the target market, was that the subject of -- of**
9    **e-mail correspondence?**
10       A.    No, I don't believe so.  We would
11   typically bring up census data on a screen.
12   We would look at it.  And at that point, it's
13   fairly self-evident where you should be.  And
14   then we would instruct the team that selected the
15   hotels to go and select a hotel in that
16   geographic area.
17       **Q.    So were you involved in selecting**
18   **the locations then?**
19       A.    I was actually, yes, at times.
20       **Q.    Okay.  Anybody else?**
21       A.    Sure.  The whole marketing team and
22   then the events team were all involved to one
23   degree or another.
24            MS. JENSEN:  We are at 6:05.  We
25   said we'd go till 6:00.  So I think at this
                                                      Page 271

1          SEXTON - CONFIDENTIAL
2    point let's go ahead and break for the
3    evening.  We'll start back again tomorrow
4    at 9 a.m. to complete the topics on the
5    30(b)(6) notice.
6             I also want to reserve on the -- to
7    the extent that we had disagreements
8    about -- about the subject matter on which
9    the witness could testify or would testify,
10   I want to reserve plaintiffs' rights to
11   come back as to those topics.
12            Also, many of the documents that
13   have been provided were provided without
14   attachments.  So -- which is an issue that
15   we raised with defense counsel.  So I'm
16   going to reserve our rights to the extent
17   that we're relying on documents that didn't
18   have attachments and so forth.
19            And that's --
20            MR. SCHNEIDER:  I'm not sure what
21   that one comment meant about you will
22   finish tomorrow on 30(b)(6).  Tomorrow's --
23   you're going to be finished with
24   Mr. Sexton.  So whatever non-30(b)(6)
25   issues you have with him also, plan to get
                                                      Page 272

68 (Pages 269 to 272)

**www.aptusCR.com**

Exhibit 10
- 154 -

# EXHIBIT 11

Exhibit 11
- 155 -

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

      Plaintiffs,

                               CASE NO.: 10 CV 0940 EIG (WVG)

  -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

      Defendants.

--------------------------------------------
VIDEOTAPED DEPOSITION of MICHAEL SEXTON

Volume II

August 23, 2012

New York, New York

Reported by:
Eileen Mulvenna
CSR/RMR/CRR
Job No. 10003487

Exhibit 11
- 156 -

C O N F I D E N T I A L

**Michael Sexton**                                                                                        **Makaeff v. Trump University**

---

** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
--------------------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,

        Plaintiffs,
  -against-

TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,

        Defendants.
--------------------------------------------x
        August 23, 2012
        9:14 a.m.

    CONTINUED VIDEOTAPED DEPOSITION of
MICHAEL SEXTON, 30(b)(6) Witness in the
above-captioned matter, taken by Plaintiffs, held
at 725 Fifth Avenue, New York, New York, before
Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand
Reporter, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the State
of New York.

Page 279

---

1     ** CONFIDENTIAL ** CONFIDENTIAL **
2    A P P E A R A N C E S :
3
4
    ZELDES & HAEGGQUIST, LLP
5     Attorneys for Plaintiffs
     625 Broadway
6     Suite 906
     San Diego, California  92101
7   BY:  AMBER L. ECK, ESQ.
     ambere@zhlaw.com
8     AARON M. OLSEN, ESQ.
     aarono@zhlaw.com
9
10
    YUNKER & SCHNEIDER
11   Attorneys for Defendants
     655 West Broadway
12    Suite 1400
     San Diego, California  92101
13   BY:  DAVID K. SCHNEIDER, ESQ.
     dks@yslaw.com
14
15
   A L S O  P R E S E N T :
16
17    Richard Ramos, Videographer
18
19
20
21
22
23
24
25

Page 280

---

1       SEXTON - CONFIDENTIAL
2      THE VIDEOGRAPHER:  Good morning.
3     This is the continuation of the
4   videotaped deposition of Michael Sexton in
5   the matter of Tarla Makaeff, et al., versus
6   Trump University LLC, et al., on 8/23/2012
7   at approximately 9:14 a.m.
8     My name is Richard Ramos, the video
9   specialist.  The court reporter is Eileen
10  Mulvenna.
11     Will the court reporter please swear
12  in the witness, please.
13  MICHAEL SEXTON,
14    having been duly resworn by Eileen Mulvenna,
15    a Notary Public of the State of New York,
16    was examined and testified further as
17    follows:
18  EXAMINATION (Cont'd)
19  BY MS. ECK:
20     **Q.   Good morning, Mr. Sexton.**
21    A.   Good morning.
22     **Q.   My name is Amber Eck.  I'm one of**
23  **the attorneys for the plaintiffs in this matter.**
24  **We're continuing your 30(b)(6) deposition from**
25  **yesterday.**

Page 281

---

1       **SEXTON - CONFIDENTIAL**
2     **You mentioned yesterday that Trump**
3  **University entered into a licensing agreement**
4  **with BSG; is that correct?**
5    A.   That's correct.
6     **Q.   I'd like you to turn to page**
7  **TU129757 in the binders.**
8     MR. SCHNEIDER:  129757?
9     MS. ECK:  Right.
10     I'd like to mark this as Exhibit
11  No. 7.  Actually, you know what, that was
12  his employment agreement we marked
13  yesterday.  Let's mark -- it's TU 1581
14  through TU 1602.  We'll mark that as
15  Exhibit 7.
16     (Plaintiffs' Exhibit 7, Bates Nos.
17  TU001581 through 1602, Licensing Agreement
18  between Trump University and Business
19  Strategies Group, marked for
20  identification.)
21  BY MS. ECK:
22     **Q.   Do you recognize this document?**
23     (Witness peruses the exhibit.)
24    A.   Yes, I do.
25     **Q.   What is it?**

Page 282

---

1 (Pages 279 to 282)

Exhibit 11
- 157 -

**C O N F I D E N T I A L**

Michael Sexton                                          **Makaeff v. Trump University**

SEXTON - CONFIDENTIAL

1      SEXTON - CONFIDENTIAL
2    the record, those were nonparty third-party
3    subpoenas that you never served and that I
4    agreed to accept service and got the
5    documents and, a month ago, told you that
6    they would be produced on that date.
7         But in any event, I believe that the
8    deposition is concluded.  You have had two
9    full solid days with -- with Mr. Sexton.
10   So we're not agreeing to make him available
11   again.  And I understand that you may try
12   and seek additional testimony from him.
13        On the attachments, I went back and
14   looked at your letter.  There's three or
15   four letter sets of attachments.
16   They're -- from what I can tell.  I think
17   we've been able to locate one or two.
18   They're almost nothing.
19        MR. OLSEN:  Just to clarify too,
20   those were examples.
21        MR. SCHNEIDER:  You all are going to
22   have to identify what's not there because
23   I'm not going to go back through 130,000
24   pages of produced documents to figure out
25   if there's an attachment not there.  So if
                                            Page 511

1      SEXTON - CONFIDENTIAL
2    you identify what you're missing, we'll
3    look for it.  But it's not our job to go
4    back through 130,000 pages to figure out if
5    there's an attachment that you think's not
6    there.
7         MS. ECK:  We'll prepare a meet and
8    confer letter with the documents that we
9    believe are missing that we've requested.
10   And we can meet and confer and take it from
11   there.
12        MR. SCHNEIDER:  Okay.  I do have
13   just a couple of quick questions for
14   Mr. Sexton before we close this up.
15   EXAMINATION
16   BY MR. SCHNEIDER:
17        Q.   Mr. Sexton, at any time, did Trump
18   University provide its instructors or mentors
19   with scripts to use for the 90-minute preview
20   presentation?
21        A.   No, we did not.
22        Q.   At any time, were scripts used by
23   instructors or speakers in the 90-minute
24   presentation?
25        A.   No, they were not.
                                            Page 512

1      SEXTON - CONFIDENTIAL
2        Q.   Did you personally attend any of the
3    90-minute presentations?
4        A.   I did.
5        Q.   Can you estimate how many you
6    personally attended?
7        A.   Thirty, 35.
8        Q.   Were any scripts provided by Trump
9    University to instructors or presenters or
10   speakers for the three-day fast track to
11   foreclosure?
12       A.   No.
13       Q.   And to your knowledge, were any
14   scripts used by instructors or speakers or
15   presenters at the three-day fast track to
16   foreclosure?
17       A.   No, they were not.
18       Q.   And how about for the profit from
19   real estate three-day program, the $1495
20   program -- I understand the pricing changed -- at
21   any time did Trump University provide its
22   speakers, presenters or instructors with any kind
23   of scripts to use?
24       A.   No, at no time.
25       Q.   And to your knowledge, did the
                                            Page 513

1      SEXTON - CONFIDENTIAL
2    presenters, speakers or -- presenters ever use a
3    script at those?
4        A.   I don't believe they ever did, no.
5        Q.   And how about the advanced training
6    workshops that were part of the -- either the
7    bundled other programs, either the bronze or
8    silver or elite, or any of those advanced
9    workshops; were scripts provided by Trump
10   University for the presenters, speakers,
11   instructors to use?
12       A.   No, they were not.
13       Q.   And to your knowledge, were scripts
14   ever used by those speakers or presenters?
15       A.   I don't believe they were.
16       Q.   Of the approximately 30
17   presentations -- the 90-minute presentations that
18   you saw, the 90-minute presentations, did they
19   vary from location to location?
20       A.   They did.
21       Q.   And was the content that was
22   provided different at those?
23       A.   It was.
24       Q.   Can you estimate what the -- if you
25   heard a 90-minute program in one city and weeks
                                            Page 514

59 (Pages 511 to 514)

Exhibit 11
- 158 -

# EXHIBIT 12

Exhibit 12
- 159 -

1   David K. Schneider (CSB 139288)
    YUNKER & SCHNEIDER
2   655 West Broadway, Suite 1400
    San Diego, California 92101
3   Telephone: (619) 233-5500
    Facsimile: (619) 233-5535
4   Email: dks@yslaw.com

5   Attorneys for Defendants TRUMP UNIVERSITY, LLC and
    DONALD J. TRUMP
6

7

8                       **UNITED STATES DISTRICT COURT**

9              **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  TARLA MAKAEFF, BRANDON              )   Case No. 10 CV 0940 IEG (WVG)
    KELLER, ED OBERKROM, and            )
11  PATRICIA MURPHY, on Behalf of       )
    Themselves and All Others Similarly )   DEFENDANTS TRUMP UNIVERSITY,
12  Situated,                           )   LLC'S AND  DONALD J. TRUMP'S
                                        )   SUPPLEMENTAL INITIAL
13              Plaintiffs,             )   DISCLOSURES PURSUANT TO RULE
                                        )   26(a)(1)
14  v.                                  )
                                        )
15  TRUMP UNIVERSITY, LLC, (aka         )
    Trump Entrepreneur Initiative) a New)
16  York Limited Liability Company,     )
    DONALD J. TRUMP, and DOES 1         )
17  through 50, inclusive,              )
                                        )
18              Defendants.             )
                                        )
19  _____ )
    AND ALL RELATED CROSS-ACTIONS.      )
20  _____ )

21          Defendants Trump University, LLC and Donald J. Trump, by their undersigned counsel,

22  hereby provide the following supplemental initial disclosures pursuant to Federal Rule of Civil

23  Procedure 26(a)(1).

24      1.  Disclosure Pursuant to 26(a)(1)(A):

25      **A.**     Defendants identify the following parties and witnesses likely to have discoverable

26  information that defendants may use to support their claims or defenses, unless the use would be

27  solely for impeachment.  Please note that defendants' counsel will represent the current and former

28  employees and contractors listed below so plaintiffs' counsel are not authorized or permitted to

                                        1              Case No. 10 CV 0940 IEG (WVG)
       DEFENDANTS TRUMP UNIVERSITY, LLC'S AND  DONALD J. TRUMP'S SUPPLEMENTAL INITIAL
                        DISCLOSURES PURSUANT TO RULE 26(a)(1)

Exhibit 12
- 160 -

1   contact them. Defendants have identified the non-party witnesses that defense counsel does not

2   currently represent.

3   | **Name** | **Subject matters include but are not limited to:** |
|---|---|
| Michael Bahr<br>2425 Peggy Place<br>St. Charles, MO 63301<br>636-723-6083 | Participation in Trump University programs.<br>[Not represented by Defense Counsel] |
| Michael Biglane<br>7727 NW 14th Street<br>Ocala, FL 34482<br>239-826-7051 | Trump University programs, mentors and attendee satisfaction. |
| Michael Bloom<br>37 Forest Rd.<br>Randolph, NJ 07869<br>973-895-2464 | Trump University operations, marketing, advertising, courses, materials, instructors, mentors, data analysis and attendee satisfaction. |
| Tiffany Brinkman<br>208 Floyd Avenue, Apt. 1<br>Modesto, CA 95350 | Trump University programs, courses and attendee satisfaction. |
| Mark Covais<br>1 Bronxville Rd. Apt. 5A<br>Bronxville, NY 10708<br>914-374-8355 | Trump University operations, marketing, advertising, courses, materials, instructors, mentors, data analysis and attendee satisfaction. |
| Kevin Derrick<br>4439 113th Street Pleasant<br>Prairie, WI 53158<br>262-620-2527 | Trump University mentors and attendee satisfaction. |
| Gary Eldred<br>1515 Northwest 18th St.<br>Gainesville, FL 32605<br>352-336-1366 | Trump University materials, speaker and mentor. |
| Steve Gilpin<br>540 Ocean Parkway, Apt. 6B<br>Brooklyn, NY 11218<br>646-789-6023 | Trump University mentors and attendee satisfaction. |
| Alex Grist<br>4409 Hoffner Avenue #162<br>Orlando, FL 32812<br>407-342-8838 | Trump University speakers, mentors and attendee satisfaction. |

Case No. 10 CV 0940 IEG (WVG)
DEFENDANTS TRUMP UNIVERSITY, LLC'S AND DONALD J. TRUMP'S SUPPLEMENTAL INITIAL
DISCLOSURES PURSUANT TO RULE 26(a)(1)

Exhibit 12
- 161 -

| **Name** | **Subject matters include but are not limited to:** |
|---|---|
| Gene Guarino<br>800 W. San Marcos<br>Chandler AZ 85225<br>602-430-5382 | Trump University mentors and attendee satisfaction. |
| Howard Haller<br>10606 N. Windham Ct.<br>Spokane, WA 99208<br>818-298-0000 | Trump University mentors and attendee satisfaction. |
| David Highbloom<br>37 Deer Ridge<br>Millwood, NY 10546<br>914-923-3359 | Trump University operations, programs, instructors, mentors, and attendee satisfaction. |
| Michael Hinson<br>3207 Diamond Knot Circle<br>Tampa, FL 33607<br>850-294-7950 | Trump University mentors, speakers and attendee satisfaction. |
| Jonny Horton<br>P.O. Box 1033<br>Hereford, TX 79109<br>806-236-5203 | Trump University speakers, mentors and attendee satisfaction. |
| John Jamieson<br>54898 Danielle<br>New Baltimore, MI 48047<br>586-716-3645 | Trump University speakers, mentors and attendee satisfaction. |
| Josef Katz<br>1069 Allessandrini Ave, New Milford, NJ 07644<br>201-921-3292 | Trump University operations, marketing, advertising, courses, materials, instructors, mentors, data analysis and attendee satisfaction. |
| Brandon Keller | Mr. Keller is a named plaintiff in this matter. |
| Mr. & Mrs. Keller<br>Contact Information Unknown | Brandon Keller's background, training, experience, participation in Trump University and other programs and liability, causation and damage issues.<br>[Not represented by Defense Counsel] |
| Roger LeFleur<br>4931 Turtle Creek Trail<br>Oldsmar, FL 34677<br>727-487-4108 | Trump University speakers, mentor and attendee satisfaction. |

Exhibit 12
- 162 -

| **Name** | **Subject matters include but are not limited to:** |
|---|---|
| Scott Leitzell<br>209 Roseville Place<br>Milton, GA 30004<br>678-365-1473 | Trump University speakers, mentors, sales and attendee satisfaction. |
| Jack Mahoney<br>752E 2730N<br>Provo, Utah 84604<br>801-368-8167 | Trump University attendee satisfaction and fulfillment. |
| Tarla Makaeff | Ms. Makaeff is a named plaintiff in this matter. |
| Steven Matejek<br>312 Partridge Run<br>Mountainside, NJ 07092<br>908-337-9391 | Trump University human resources, financial, and attendee satisfaction. |
| Patricia Murphy | Ms. Murphy is a named plaintiff in this matter. |
| April Neumann<br>609 Superior Ave.<br>Tampa, Fl 33606<br>646-770-7575 | Trump University operations, instructors, speakers, mentors and attendee satisfaction. |
| Dwin Ngo | Ms. Ngo's and Ms. Makaeff's participation in Trump University programs.<br>[Not represented by Defense Counsel] |
| Ed Oberkrom | Mr. Oberkrom is a named plaintiff in this matter. |
| Denise Ong<br>85-5A Apt. 2, 57th Ave.<br>Elmhurst, NY 11373<br>845-300-4236 | Trump University event planning, operations, sales, mentors, and attendee satisfaction. |
| Troy Peterson<br>14013 Spruce Creek Lane<br>Orlando, FL 32828<br>407-382-2371 | Trump University programs, mentors and attendee satisfaction. |
| Michael Potter<br>4075 S. Durango Dr. Ste 111-58<br>Las Vegas, NV 89147<br>702-463-3788 | Trump University speakers, mentors and attendee satisfaction. |

DEFENDANTS TRUMP UNIVERSITY, LLC'S AND DONALD J. TRUMP'S SUPPLEMENTAL INITIAL
DISCLOSURES PURSUANT TO RULE 26(a)(1)

Exhibit 12
- 163 -

| Name | Subject matters include but are not limited to: |
|---|---|
| Paul Reisner<br>41 West 86th St. Apt. 7M<br>New York, NY 10024<br>914-557-6501 | Trump University programs, sales, customer service and attendee satisfaction. |
| Fred Rewey<br>7512 Dr. Phillips Blvd<br>Suite 50-250<br>Orlando, FL 32819<br>407-909-0825 | Trump University speakers and attendee satisfaction. |
| Greg Saunders<br>305 W. Marion St.<br>Arlington Heights, IL 60004<br>847-394-8149 | Construction and management of Trump University database, webinar, course materials, quality of programs and attendee satisfaction. |
| Jason Schauer<br>813-390-9697 | Trump University programs, services, instructors, mentors, purchases, customer service and attendee satisfaction. |
| Brad Schneider<br>4 Lakeland Dr.<br>Lake Ariel, PA 18436<br>347-645-8026 | Trump University programs, sales, customer service and attendee satisfaction. |
| Don Sexton<br>52 White Street<br>New York, NY 10013 | Trump University materials. |
| Michael Sexton<br>31 Rye Road<br>Rye, NY 10580<br>914-552-7970 | Trump University operations, marketing, advertising, courses, materials, instructors, mentors, data analysis and attendee satisfaction. |
| Bob Steenson<br>1609 Wood Duck Drive<br>Winter Springs, FL 32708-5510<br>407-341-4631 | Trump University speakers, mentors and attendee satisfaction. |
| Gary Sturgeon<br>153 Sanford Ave.<br>Debary, FL 32713<br>407-616-6166 | Trump University course materials, speakers, mentoring, coaching and attendee satisfaction. |
| Donald Trump | Mr. Trump is a defendant in this matter. |

5                          Case No. 10 CV 0940 IEG (WVG)
DEFENDANTS TRUMP UNIVERSITY, LLC'S AND DONALD J. TRUMP'S SUPPLEMENTAL INITIAL
DISCLOSURES PURSUANT TO RULE 26(a)(1)

Exhibit 12
- 164 -

10-06-11  11:38am  From-LAW Offices                         6192395535            T-640   P.07/09   F-280

| Name | Subject matters include but are not limited to: |
|------|------------------------------------------------|
| Robert Vargas<br>11415 Darcy Street<br>Santa Fe Springs, CA 90670<br>562-404-7255 | Mr. Vargas' and Ms. Makaeff's participation in Trump University and other programs, plaintiff's investments and attendee satisfaction.<br>[Not represented by Defense Counsel] |
| Medeth Webb<br>PO Box 270003<br>Oklahoma City, OK 73137<br>405-520-2722 | Trump University speakers, mentors and attendee satisfaction. |

B.   Attendees of Trump University Programs: Names and contact information included on Contracts, Registration Cards and Evaluations, to be produced once attendees authorize disclosure of their private and confidential information.

C.   Former Defendant Employees and Contractors.

D.   Persons employed by or affiliated with programs, companies and workshops attended by plaintiffs.

E.   Persons employed by or affiliated with plaintiffs' financial institutions.

F.   Persons who have knowledge of the conduct, claims and/or damages alleged in the Second Amended Complaint and whose names are unknown to defendants at this time, but shall be revealed through discovery in this matter.

2.   Disclosure Pursuant to 26(a)(1)(B):

Defendants are prepared to produce the following:  Trump University Contracts, Enrollment Forms and Terms of Conditions with plaintiffs; Evaluations by plaintiffs Makaeff, Keller and Oberkrom's partner Michael Bahr; Video testimonial by plaintiff Makaeff; Emails between plaintiff Makaeff and defendants; Enrollment Form, Terms and Conditions, check and evaluation and testimonial by plaintiff Makaeff's related to non-defendant programs; Email exchange and documents between plaintiff Makaeff and Robert Vargas; Notice of Default and related documents concerning plaintiff Makaeff's property; Correspondence between plaintiff Makaeff and financial institutions and Better Business Bureau; Correspondence between defendant Trump University and Makaeff, Attorney General of New York Giancarlo Malinconico and the Better Business Bureau Jihan Varisoco and and Documents reflecting plaintiff Murphy's participation in Trump Institute,

6                                 Case No. 10 CV 0940 IEG (WVG)
DEFENDANTS TRUMP UNIVERSITY, LLC'S AND DONALD J. TRUMP'S SUPPLEMENTAL INITIAL
DISCLOSURES PURSUANT TO RULE 26(a)(1)

Exhibit 12
- 165 -

1    Bates stamped TU 000001-000220.  Defendants are prepared to produce their documents

2    immediately when plaintiffs properly produce their documents.

3           Additional categories of documents include contracts, evaluations, testimonials by attendees

4    and course materials, all in defendants' possession.  These documents and others listed in the Joint

5    Discovery Plan includes attendees' confidential and private information including income levels,

6    assets, financial information, credit card numbers, personal contact information, etc.  Defendants

7    will produce those documents after attendees authorize the disclosure of their private and

8    confidential information.  See, *Pioneer Electronics, Inc. v. Superior Court* (2007) 40 Cal. 3d 360;

9    *Nguyen v. Baxter Healthcare Corp.*, 2011 WL 2183993 (C.D. Cal. 2011); and *Stone v. Advance*

10   *America*, 2009 WL 4722924 (S.D. Cal. 2009).

11          3.     Disclosure Pursuant to 26(a)(1)(C):

12          Counter-Complainant Trump University seeks damages based on Counter-Defendant Tarla

13   Makaefi's defamatory statements.  Discovery is stayed pending appeal.

14          4.     Disclosure Pursuant to 26(a)(1)(D):

15          Defendants are not aware of any applicable liability insurance for this claim.

16

17                                              Respectfully submitted,

18   Dated:     October 6, 2011               YUNKER & SCHNEIDER

19                                            By:  _____

20                                              Attorneys for Defendants and Counterclaimant
                                                TRUMP UNIVERSITY, LLC and
21                                              DONALD J. TRUMP
                                                E-mail: dks@vslaw.com

22

23

24

25

26

27

28

                                       7                    Case No. 10 CV 0940 IEG (WVG)
         DEFENDANTS TRUMP UNIVERSITY, LLC'S AND  DONALD J. TRUMP'S SUPPLEMENTAL INITIAL
                              DISCLOSURES PURSUANT TO RULE 26(a)(1)

Exhibit 12
- 166 -

1    MAKAEFF v. TRUMP UNIVERSITY, LLC, et al.
     USDC Case No. 10 CV 0940 IEG (WVG)
2

3                              **PROOF OF SERVICE**

4

5          I am employed in the City and County of San Diego, State of California.  I am over the age

6    of 18 and not a party to the within action.  My business address is 655 West Broadway, Suite 1400,

7    San Diego, California 92101.

8          On October 6, 2011, I caused to be served the attached:

9    DEFENDANTS TRUMP UNIVERSITY, LLC'S AND  DONALD J. TRUMP'S

10   SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO RULE 26(a)(1)

11        ☒    [BY FACSIMILE] The document stated herein was transmitted by facsimile

12             transmission and the transmission was reported as complete and without error.  A

13             transmission report was properly issued by the transmitting facsimile machine and a

14             copy of said transmission report is attached to the original proof of service indicating

15             the time of transmission.

16        ☒    [BY HAND-DELIVERY] on the party in this action by personally delivering by hand

17             as notated below.

18   Amber L. Eck, Esq.                        Rachel L. Jensen, Esq.
     ZELDES & HAEGGQUIST, LLP                  Thomas R. Merrick, Esq.
19   625 Broadway, Suite 906                   ROBBINS GELLER RUDMAN & DOWD, LLP
     San Diego, CA 92101                       655 West Broadway, Suite 1900
20   Tel:    (619) 342-8000                    San Diego, CA  92101
     Fax:   (619) 342-7878                     Tel:    (619) 231-1058
21                                             Fax:    (619) 231-7423
     Attorneys for Plaintiffs TARLA MAKAEFF,
22   BRANDON KELLER, ED OBERKROM &             Attorneys for PlaintiffsTARLA MAKAEFF,
     PATRICIA MURPHY                           BRANDON KELLER, ED OBERKROM &
23   [VIA FACSIMILE]                           PATRICIA MURPHY
                                               [VIA PERSONAL DELIVERY]
24         I declare that I am employed in the office of a member of the bar of this court at whose

25   direction the service was made.

26   Executed on October 6, 2011, at San Diego, California.

27

28
                                    _____
                                    Betsy Bertrand
                                          1
                                    PROOF OF SERVICE

Exhibit 12
- 167 -

# EXHIBIT 13

Exhibit 13
- 168 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: ___11\1\11___

------------------------------------------------------------X

In re:  Pilot Project Regarding Case Management      :           STANDING ORDER

Techniques for Complex Civil Cases in the            :               M10-468

Southern District of New York                        :

                                                     : **11 MISC 00 388**

------------------------------------------------------------X

    1.     This case is hereby designated for inclusion in the Pilot Project Regarding Case Management Techniques for Complex Civil Cases in the Southern District of New York (the "Pilot Project"), unless the judge to whom this case is assigned determines otherwise.

    2.     This case is designated for inclusion in the Pilot Project because it is a class action, an MDL action, or is in one of the following Nature of Suit categories: 160, 245, 315, 355, 365, 385, 410, 830, 840, 850, 893, or 950.

    3.     The presiding judge in a case that does not otherwise qualify for inclusion in the Pilot Project may nevertheless designate the case for inclusion in the Pilot Project by issuing an order directing that the case be included in the Pilot Project.

    4.     The description of the Pilot Project, including procedures to be followed, is attached to this Order.

SO ORDERED:

*Loretta A. Presko*

Loretta A. Preska
Chief United States District Judge

Dated:  October _31_ , 2011
       New York, New York

Exhibit 13
- 169 -

**REPORT OF THE**
**JUDICIAL IMPROVEMENTS COMMITTEE**

**PILOT PROJECT REGARDING CASE MANAGEMENT**
**TECHNIQUES FOR COMPLEX CIVIL CASES**

**October 2011**

Exhibit 13
- 170 -

## TABLE OF CONTENTS

**Page**

Preface.................................................................................................................... ii

JIC Advisory Committee Roster ....................................................................... iii

Subcommittee Rosters ....................................................................................... iv

Initial Pretrial Conference Procedures ............................................................1

Discovery Procedures ........................................................................................4

Motion Procedures .............................................................................................8

Final Pretrial Conference Procedures ...........................................................10


Exhibits:

       A.  Initial Pretrial Conference Checklist

                                                                        15

       B.  Joint Electronic Discovery Submission

                                                                        18

       C.  Order of Reference to a Magistrate Judge

                                                                        30

-i-

Exhibit 13
- 171 -

## PREFACE

Beginning in early 2011, the Judicial Improvements Committee of the Southern

District of New York ("JIC"),[1] chaired by Judge Shira A. Scheindlin, began to consider a pilot

project to improve the quality of judicial case management.  The impetus for this project was

the "Duke Conference" sponsored by the Judicial Conference Advisory Committee on Civil

Rules.  Judge John G. Koeltl, a member of the Advisory Committee, was Chair of the Planning

Committee for the Duke Conference.  The JIC decided to focus on complex cases and to

develop procedures that would be implemented by the judges of the Court for an eighteen-

month trial period.  To assist in this effort the Chair of the JIC appointed an Advisory

Committee of experienced attorneys, representing a broad diversity of the bar to develop

proposals.  The Advisory Committee, joined by members of the JIC, formed four

subcommittees to consider and recommend best practices for the management of complex civil

cases.  Each of the four subcommittees submitted a report to the JIC which was adopted in

substance by the JIC.  The JIC then presented its proposal to the Board of Judges.  On

September 28, the Board of Judges approved the proposal, albeit with some suggestions for

implementing the final version of the pilot project.  The following report is the pilot project

that the Court has adopted.  It will take effect on November 1, 2011.  The Court is deeply

grateful to all of the JIC Members and Advisory Committee members who worked so hard to

bring this project to fruition.

---

[1]     The members of the Judicial Improvements Committee include: Judge Denise Cote, Judge Thomas Griesa, Judge Kenneth Karas, Judge John Koeltl, Judge Victor Marrero, Judge Shira Scheindlin, Judge Sidney Stein, Judge Robert Sweet, Judge James Cott, Judge Theodore Katz, Judge Henry Pitman and Judge Lisa Smith.

Exhibit 13
- 172 -

## JIC ADVISORY COMMITTEE ROSTER

Samuel F. Abernethy
*Menaker & Herrmann LLP*


James Batson
*Liddle & Robinson, LLP*


Steven Bennett
*Jones Day*


James Bernard
*Stroock & Stroock & Lavan LLP*


John Boston
*Legal Aid Society*


Vince (Vernon) Broderick
*Weil, Gotshal & Manges LLP*


Susanna Buergel
*Paul, Weiss, Rifkind, Wharton & Garrison LLP*


Dale Cendali
*Kirkland & Ellis LLP*


Melanie Cyganowski
*Otterbourg, Steindler, Houston & Rosen, P.C.*


Maura Grossman
*Wachtell, Lipton, Rosen & Katz*


Gregory Joseph
*Gregory P. Joseph Law Offices LLC*


Gregg Kanter
*Sprague & Sprague*


Marilyn Kunstler
*Boies, Schiller & Flexner LLP*

Exhibit 13
- 173 -

Mei Lin Kwan-Gett
*Willkie Farr & Gallagher LLP*


Sara Moss
*Estee Lauder*


Tai Park
*Park & Jensen LLP*


Jon Pines
*Deputy Chief, General Litigation Division of NY City Law Department*


Debra Raskin
*Vladeck, Waldman, Elias & Engelhard, P.C.*


Theodore O. Rogers, Jr.
*Sullivan & Cromwell LLP*


Scott Rosenberg
*Legal Aid Society, General Counsel*


Susan Saltzstein
*Skadden Arps Slate Meagher & Flom*


Paul Saunders
*Cravath, Swaine & Moore LLP*


Andrew Schilling
*Chief of the Civil Division, US Attorneys Office, SDNY*


Lorna Schofield
*Debevoise & Plimpton LLP*


Amy Schulman
*Pfizer Corporation*


Penny Shane
*Sullivan & Cromwell LLP*


-iv-

Exhibit 13
- 174 -

Kent Stauffer
*Executive Deputy Attorney General*

Guy Miller Struve
*Davis Polk & Wardwell LLP*

Steve Susman
*Susman Godfrey LLP*

Ariana Tadler
*Milberg, LLP*

Mary Kay Vyskocil
*Simpson, Thacher & Bartlett LLP*

Peter Wang
*Foley & Lardner LLP*

-v-

Exhibit 13
- 175 -

<u>**SUBCOMMITTEE ROSTERS**</u>

**Initial Pretrial Case Management Subcommittee**

Co-Chairs:

Amy Schulman, Paul Saunders

Committee Members:

Judge John Koeltl, Judge Sidney Stein, Judge Henry Pitman, John Boston, Marilyn Kunstler, Sara Moss, Andrew Schilling, Penny Shane, Kent Stauffer, Sam Abernethy

Also participating:

Judge Shira Scheindlin


**Discovery Subcommittee**

Co-Chairs:

Greg Joseph, Debra Raskin

Committee Members:

Judge Thomas Griesa, Judge James Cott, Judge Lisa Smith, Jim Batson, Steven Bennett, Mei Lin Kwan-Gett, Maura Grossman, Jon Pines, Theodore Rogers, Scott Rosenberg, Kent Stauffer, Ariana Tadler

Also participating:

Judge Shira Scheindlin

-vi-

Exhibit 13
- 176 -

**Motions Subcommittee**

Co Chairs:

Susan Saltzstein, James Bernard

Committee Members:

Judge Victor Marrero, Judge Robert Sweet, Gregg Kanter, Tai Park, Guy Struve, Dale Cendali, Susanna Buergel, Melanie Cyganowski, Lorna Schofield

Also participating:

Judge Shira Scheindlin

**Final Pretrial Conference Subcommittee**

Co-Chairs:

Steve Susman, Mary Kay Vyskocil

Committee Members:

Judge Denise Cote, Judge Kenneth Karas, Judge Theodore Katz, Vernon Broderick, Peter Wang, Guy Struve, Andrew Schilling, Paul Saunders

Also participating:

Judge Shira Scheindlin

Exhibit 13
- 177 -

## I.  Initial Pretrial Case Management Procedures

A.          **Initial Report of Parties before Pretrial Conference.**  No later than 7 days before the initial pretrial conference, the parties shall file an Initial Report that includes the following:

1.   The parties' positions on the applicable topics of the "Initial Pretrial Conference Checklist" (*see* Exhibit A, annexed hereto) including whether initial disclosures pursuant to Rule 26(a)(1) should be made in whole or in part and whether there is some readily identifiable document or category of documents that should be produced immediately in lieu of initial disclosures.

2.   The parties' proposed schedule for fact and expert discovery including:

a.   Any recommendations for limiting the production of documents, including electronically stored information.

b.   .Any recommendations for limiting depositions, whether by numbers or days of depositions,[2] and by the elimination of expert depositions.

c.   A protocol and schedule for electronic discovery, including a brief description of any disputes regarding the scope of electronic discovery.

d.   Whether the parties recommend that expert discovery precede or follow any summary judgment practice.

e.   Whether the parties agree to allow depositions preceding trial of trial witnesses not already deposed.

3.   Whether the parties propose to engage in settlement discussions or mediation and, if so, when would be the best time to do so.  The parties should also identify what discovery should precede such discussions.

B.   **Pretrial Conference Procedures.**  The Court shall make its best effort to hold an in-person, initial pretrial conference within 45 days of service on any defendant of the complaint.  If the Government is a defendant, the Court shall make its best effort to schedule the initial conference within 60 days of service.  If a motion to dismiss is pending, the Court may consider postponing the initial pretrial conference until the motion is decided.

---

[2]      Note:  In some complex cases the parties have limited depositions by agreeing on a maximum number of days a party may depose witnesses.  The party may use those days to take two half-day or one full-day deposition per witness.

-1-

Exhibit 13
- 178 -

1.      Lead counsel for each party must attend.

2.      The Court should address the contents of the Initial Report and the applicable topics contained in the "Initial Pretrial Conference Checklist" (*see* attached Exhibit A) with the parties.

3.      The parties shall provide the Court with a concise overview of the essential issues in the case and the importance of discovery in resolving those issues so that the Court can make a proportionality assessment and limit the scope of discovery as it deems appropriate.  The Court may also wish to consider the possibility of phased or staged discovery.

4.      The Court should consider setting a deadline for any amendments to the pleadings and joinder of additional parties.

5.      The Court should set a schedule for the completion of fact discovery, the filing of the Joint Preliminary Trial Report, the Case Management Conference (*see* Final Pretrial Conference Procedures), and the exchange of expert reports.  If appropriate, the Court should also consider setting dates for the filing of dispositive motions and the filing of the Joint Final Trial Report.

6.      If appropriate, the Court should set a trial-ready date or a trial date contingent on the resolution of dispositive motions.

7.      If appropriate, the Court should schedule any motion for class certification and associated discovery.

8.      The Court should consider setting a maximum limit for any adjournment requests, both as to length and number, whether or not the parties jointly request an adjournment.

9.      If the parties agree, the Court should confirm that prior to trial the parties will be permitted to depose any trial witnesses who were not deposed prior to the filing of the Joint Final Pretrial Report.  If the parties cannot agree on this procedure, the Court should consider whether to issue such an order.

10.    The District Judge shall advise the parties if it will be referring the case to a Magistrate Judge and, if so, for what purposes.  If the District Judge makes such a referral for the purpose of pretrial supervision (as opposed to settlement or the disposition of dispositive motions), the District Judge and the Magistrate Judge are encouraged to communicate and coordinate regarding the pretrial progress of the case.

Exhibit 13
- 179 -

11.    The Court shall determine whether and when additional pretrial conferences should be held to address the issues raised in items 4 through 8 above.

-3-

Exhibit 13
- 180 -

## II.  <u>Discovery Procedures</u>

**A.  Stay of Certain Discovery upon Service of Dispositive Motion.**  Unless the Court orders otherwise, following service of a motion to dismiss pursuant to Rule 12(b)(6) or 12(c) (if made immediately after the filing of an answer) of the Federal Rules of Civil Procedure, discovery of documents, electronically stored information and tangible things may proceed pursuant to Rule 34 but all other discovery with respect to any claim that is the subject of the motion is stayed pending the Court's decision on the motion.

**B.  Discovery Disputes Not Involving Assertion of Privilege or Work Product.**  Unless the Court determines otherwise, any discovery dispute — other than a dispute arising in the course of a deposition or involving invocation of a privilege or work product protection — will be submitted to the Court by letter as follows:

1.  The movant will submit to the Court, in a manner permitted by the Judge's Individual Practices, and to opposing counsel by hand delivery, fax or email, a letter of not more than 3 single-spaced pages setting forth its position and certifying that the movant has in good faith conferred or attempted to confer with the party or person failing to make discovery in an effort to obtain it without court action.  All disputes that the movant intends to raise at that time must be submitted in a *single* letter.

2.  The responding party or person may submit a responsive letter of no more than 3 single-spaced pages within 3 business days with a copy to opposing counsel.

3.  If the Court permits a reply, it should not exceed 2 single-spaced pages and should be submitted within 2 business days of the responding letter.

4.  The Court will make its best effort to render a decision no later than fourteen days from its receipt of the final letter.  The Court may resolve the dispute prior to its receipt of the responsive letter if it has otherwise provided the person or party an opportunity to be heard.

-4-

Exhibit 13
- 181 -

C. *In Camera* **Sampling of Assertions of Privilege.**  A party or person who raises a question as to the assertion of a privilege or work product protection with respect to documents (including electronically stored information) may request a ruling from the Court as follows:

1. The requesting party or person will submit to the Court, in a manner permitted by the Judge's Individual Practices, and to opposing counsel by hand delivery, fax or email, a letter of not more than 3 single-spaced pages (a) setting forth its position, (b) certifying that it has in good faith conferred with the opposing party or person in an effort to resolve the issues without court action, and (c) indicating whether there is consent to *in camera* inspection.

2. If the requestor is the party or person invoking privilege or work product protection, it may attach to its letter to the Court no more than 5 representative documents that are the subject of its request. The documents are to be attached only to the copy of the letter directed to the Court, for *in camera* review, and not to the copy of the letter directed to the opposing party or person.

3. Any opposing party or person may submit a responsive letter of no more than 3 single-spaced pages within 3 business days with a copy to opposing counsel.

4. If the Court permits a reply, it should not exceed 2 single-spaced pages and should be submitted within 2 business days of the responding letter.

5. Unless the Court requires a more extensive submission, within fourteen days from its receipt of the responsive letter or, if later, its receipt of the documents, the Court will make its best effort to determine whether the submitted documents must be produced.  The Court may issue its decision prior to its receipt of the responsive letter if it has otherwise provided any opposing party or person an opportunity to be heard.

Exhibit 13
- 182 -

**D. Documents Presumptively Not to Be Logged on Privilege Log.** The following documents presumptively need not be included on a privilege log:

    1.  Communications exclusively between a party and its trial counsel.

    2.  .Work product created by trial counsel, or by an agent of trial counsel other than a party, after commencement of the action.[3]

    3.  Internal communications within (a) a law firm, (b) a legal assistance organization, (c) a governmental law office or (d) a legal department of a corporation or of another organization.

    4.  .In a patent infringement action, documents authored by trial counsel for an alleged infringer even if the infringer is relying on the opinion of other counsel to defend a claim of willful infringement.[4]

**E. Privilege Log Descriptions of Email Threads**. For purposes of creation of a privilege log, a party need include only one entry on the log to identify withheld emails that constitute an uninterrupted dialogue between or among individuals; provided, however, that disclosure must be made that the e-mails are part of an uninterrupted dialogue. Moreover, the beginning and ending dates and times (as noted on the emails) of the dialogue and the number of emails within the dialogue must be disclosed, in addition to other requisite privilege log disclosure, including the names of all of the recipients of the communications.

---

[3]

    *See* D. Conn. Local Rule 26(e) ("This rule requires preparation of a privilege log with respect to all documents *** except the following:  *** the work product material created after commencement of the action"). D. Colo. Local Rule 26.1(g)(3)(c), S.D. Fla. Local Rules Gen Rule 26.1(g)(3)(C), E.D. Okla. Local Rule 26.2(b), and N.D. Okla. Local Rule 26.2(b) are substantively identical D. Conn. Local Rule 26(e). Note that this proposal is more limited than these local rules because it does not exempt from logging documents created by the client at counsel's suggestion, to avoid abuse.

[4]

    *See In re Seagate Tech.*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc) (reliance on opinion of counsel does not waive the privilege or work product protection of trial counsel on the same subject matter); N.D. Cal. Local Patent Rule 3-7(c) ("Serve a privilege log identifying any other documents, except those authored by counsel acting solely as trial counsel, relating to the subject matter of the advice which the party is withholding on the grounds of attorney-client privilege or work product protection."). D.N.J. Local Patent Rule 3.8(c), E.D. Mo. Local Patent Rule 3-9(c), W.D. Wash. Local Patent Rule 140, S.D. Tex. Patent Rule 3-8, E.D. Tex. L. Patent Rule 3-7(b), D. Idaho L. Patent Rule 3.8, S.D. Cal. Local Patent Rule 3.8(b) and other local patent rules are substantively identical to N.D. Cal. Local Patent Rule 3-7(c).

-6-

Exhibit 13
- 183 -

**F. Requests for Admission.**  Unless otherwise stipulated or ordered by the Court, a party may serve on any other party no more than 50 requests for admission pursuant to Federal Rule of Civil Procedure 36(a)(1)(A); no such request for admission may exceed 25 words in length; except that no limit is imposed on requests for admission made pursuant to Rule 36(a)(1)(B) relating to the genuineness of any described documents.

**G. Subpoenaed Material.**  Unless the Court orders otherwise, whenever documents, electronically stored information, or tangible things are obtained in response to a subpoena issued pursuant to Rule 45 of the Federal Rules of Civil Procedure, the party responsible for issuing and serving the subpoena shall promptly produce them to, or make them available for inspection and copying by, all parties to the action.

**H. Joint Electronic Discovery Submission.**  A joint electronic discovery submission and proposed Order is annexed as Exhibit B.  Among other things, it includes a checklist of electronic discovery issues to be addressed at the Rule 26(f) conference.

**I. Revised Order of Reference to Magistrate Judge.**  A revised form of Order of Reference to Magistrate Judge is annexed as Exhibit C.  Among other things, it provides that in the case of urgent discovery disputes — *e.g.*, in mid-deposition — litigants may approach the assigned Magistrate Judge when the District Judge is unavailable.

-7-

Exhibit 13
- 184 -

## Motion Procedures

**A.      Pre-Motion Conferences.**

1.   Pre-motion conferences should be held for all motions **except** motions for reconsideration, motions for a new trial, and motions *in limine*.   For discovery disputes, see the procedures set forth at Part II. B, *supra.*

2.   A party intending to file a motion governed by the preceding paragraph (other than Rule 12(b) motions) must request by letter no longer than 3 single-spaced pages, a pre-motion conference in advance of filing any such motion.  The moving party's letter shall be submitted at least 7 business days prior to a proposed or scheduled conference date, or at any time if no such date has been proposed or scheduled.  Within 3 business days of receipt of the letter, each opposing party may submit a written response of no more than 3 single-spaced pages in length.  No further letters will be accepted by the Court.  The Court will, as soon as possible thereafter, hold the pre-motion conference.

3.   The filing of a pre-motion letter shall automatically stay the time by which the motion must be made.  In the event the law imposes a filing deadline, the requirement of a pre-motion letter and conference will not apply, unless the Court extends the deadline for filing a motion.

4.   Motions pursuant to Rule 12(b) are subject to a different procedure. The Court may consider one of the following options: (a) Not requiring a pre-motion conference; (b) requiring the parties to exchange letters (with or without a copy to the court) **prior to** filing a motion to dismiss, addressing any deficiencies in the complaint, in the hope that such deficiencies might be cured by the filing of an amended complaint; or (c) holding a conference **after** the motion is made at which the plaintiff will be given an opportunity to either amend the complaint or oppose the motion.  If plaintiff does not choose to amend, the plaintiff shall be given no further opportunity to amend the complaint to address the issues raised by the pending motion.  In the event there is no amendment, the Court will determine whether any discovery shall proceed during the pendency of the motion.  The time for opposing the Rule 12(b) motion will be stayed until the conference, at which time the Court will schedule the further briefing of the motion.

**B.      Page Length for Motions.**  No memorandum of law in support of or in opposition to a motion may exceed 25 pages (double-spaced).  Any memorandum in excess of 10 double-spaced pages shall also include a table of contents and table of authorities.  Reply memoranda may not exceed 10 pages.

Exhibit 13
- 185 -

Any party may request additional pages by seeking leave of the Court after having sought the consent of the adverse party or parties.

C.    **Oral Argument.**  Oral arguments should be held where practicable and in the Court's view useful, on all substantive motions, unless the parties agree otherwise.  Five calendar days in advance of oral argument, the Court should consider notifying the parties of those issues of particular concern.

D.    **56.1 Statements (Statement of Material Fact).**  At the request of the parties, and if approved by the Court, no Local Rule 56.1 Statement shall be filed in connection with motions made pursuant to Rule 56 of the Federal Rules of Civil Procedure.  If the Court requires that the parties file Rule 56.1 statements, such statements shall not exceed 20 pages per party.

Exhibit 13
- 186 -

<u>**IV.  Final Pretrial Conference Procedures**</u>

**A.      Joint Preliminary Trial Report on Close of Fact Discovery.**  Within 14 days after the completion of fact discovery, the parties shall file a Joint Preliminary Trial Report, unless the Court concludes that such a report is not necessary in a particular case, which shall include the following:

      1.      The full caption of the action.

      2.      The name, address, telephone number, fax number and email address of each principal member of the trial team, and an identification of each party's lead trial counsel.

      3.      A brief statement identifying the basis for subject matter jurisdiction, and, if that jurisdiction is disputed, the reasons therefore.

      4.      A list of each claim and defense that will be tried and a list of any claims and defenses asserted in the pleadings that are not to be tried.

      5.      An identification of the governing law for each claim and defense that will be tried and a brief description of any dispute regarding choice of law.

      6.      The number of days currently estimated for trial and whether the case is to be tried with or without a jury.

      7.      A statement indicating whether all parties have consented to trial by a magistrate judge, without identifying which parties do or do not consent.

      8.      A brief description of any summary judgment motion a party intends to file, including a statement identifying whether expert testimony will be offered in support of the motion.

**B.      Case Management Conference Procedure.**  Within 14 days of the filing of the Joint Preliminary Trial Report, the Court should make its best effort to hold a Case Management Conference to discuss the contents of the Joint Preliminary Trial Report and to finalize the schedule for the remainder of the litigation.

      1.      Lead trial counsel for each party must attend.

      2.      The parties should be prepared to discuss the substance of any summary judgment motion any party intends to file.  During the

Exhibit 13
- 187 -

conference, the Court will determine whether any existing
schedule should be modified, including whether the period for
summary judgment motions will precede or follow expert
disclosures and discovery.

3.       If it has not already done so, the Court should set a schedule for
expert disclosures and discovery, the briefing of any summary
judgment motions, the briefing of any *Daubert* motions, the date
for the filing of the Joint Final Trial Report and a firm trial date.

a.   In the event summary judgment motions will be filed, the
Court should consider providing the parties with its best
estimate of the date by which it expects to render a
decision on the motions and should advise the parties
whether there will be a further opportunity for settlement
discussions or mediation following the decision.  The
date that the Court selects during the Case Management
Conference for the filing of the Joint Final Trial Report
shall be no earlier than 28 days following the Court's
decision on the summary judgment motions.  Similarly,
the firm trial date set by the Court at the Case
Management Conference shall be no earlier than 8 weeks
following the Court's decision on summary judgment
motions.

4.       The Court shall encourage (and, in appropriate cases, may order)
the parties to participate in settlement discussions or mediation
before a forum and by a date chosen by the Court based on its
consultations with the parties during the conference.  Such
settlement discussions or mediation efforts shall not stay the
schedule for the completion of the litigation.

C.     **Joint Final Trial Report.**  On the date set at the Case Management Conference,
but in any event not later than 28 days preceding the date set for the
commencement of the trial, the parties shall file a Joint Final Trial Report,
unless the Court concludes that such a report is not necessary in a particular
case, which shall include the following:

1.       In the event that there has been a ruling on summary judgment
motions, a list of any claims and defenses from the Joint
Preliminary Trial Report that the parties had intended to try but
that they will no longer try.

2.       A list by each party of its trial witnesses that it, in good faith,
presently expects to present.  The list shall indicate whether the

-11-

Exhibit 13
- 188 -

witness will testify in person or by deposition, and the general subject matter areas of the witness's testimony.  In the event that any such witness has not been deposed, and provided the Court has previously approved (*see* Initial Pretrial Case Management Procedures at 2 ¶ 9), the witness will be made available for deposition before the commencement of trial.  The parties will also provide an agreement as to how and when they will give notice to each other of the order of their trial witnesses.

3.      A list by each party of exhibits that it, in good faith, presently expects to offer in its case in chief, together with any specific objections thereto other than on grounds of relevancy.  Any objection not included on this list will be deemed waived, other than for good cause shown.  Prior to filing the Joint Final Trial Report the parties will meet and confer in order to eliminate or narrow disputes about the admissibility of exhibits, to agree upon exhibits that can be utilized during opening statements at the trial, and to facilitate the filing of any *in* limine motions.

4.       In the case of bench trials, the parties' recommendation on whether the direct testimony of fact and expert witnesses who testify in person at trial will be submitted by affidavit to the Court in advance of trial.

5.       The parties' recommendation on the time limits for the length of the trial, and, if appropriate, the division of time between or among the parties and the protocol for tracking the time.

6.       All stipulations or statements of fact or law on which the parties have agreed and which will be offered at trial shall be appended to the Joint Final Trial Report as exhibits.

7.       An agreed schedule by which the parties will exchange deposition designations and counter-designations, notify each other of objections to such designations, consult with each other regarding those objections, and notify the Court of any remaining disputes.  In any event, the parties must notify the Court of any remaining dispute no later than 48 hours before the deposition testimony is offered at trial.

8.       An agreed schedule by which the parties will exchange all demonstratives not otherwise listed in Paragraph C.3 that the parties intend to use at trial during opening statements or otherwise, notify each other of any objections thereto, consult

-12-

Exhibit 13
- 189 -

with each other regarding those objections and notify the Court of any remaining disputes.

9.    The parties' recommendation on the number of jurors and any agreement on whether a verdict can be rendered by fewer than all jurors.

10.    A brief report on whether the outcome of any settlement discussions or mediation ordered at the Case Management Conference impacts any of the claims or issues remaining to be tried.

11.    All other matters that the Court may have ordered at the Case Management Conference or that the parties believe are important to the efficient conduct of the trial, such as bifurcation or sequencing of issues to be tried, or use of interim summations, etc.

**D.**    **Filings to Accompany Joint Final Trial Report.**  The Joint Final Trial Report shall be accompanied by the following documents:

1.    In all bench trials, unless directed otherwise at the Case Management Conference, each party shall submit a trial memorandum.

2.    Any motions *in limine.* An *in limine* motion does not include a motion for summary judgment or a *Daubert* motion, which must be filed pursuant to the schedule fixed under Paragraph B.3. Opposition to *in limine* motions must be filed within 7 days; no reply will be allowed absent leave of court.

3.    Any proposed juror questionnaire.

4.    Any requested questions to be asked by the Court during the voir dire.

5.    A joint description of the case to be provided to the venire during the voir dire.

6.    Any proposed substantive instructions on the issues to be tried to be given by the Court to the jury prior to opening statements.

**E.**    **Final Pretrial Conference Procedures.**  Subsequent to the filing of the Joint Final Trial Report, and in no event less than 7 days before the commencement of trial, the Court shall hold a Final Pretrial Conference which must be attended

-13-

Exhibit 13
- 190 -

by lead trial counsel for each party.  At that Conference the Court shall take the following actions:

1.   Determine the length of the trial and the division of time between or among the parties.

2.   Determine the method by which the jury will be selected, including whether a juror questionnaire will be used and its contents.

3.   Rule on any disputes among the parties identified in the Joint Final Trial Report.

4.   Rule, if possible, on any motions *in limine* that remain outstanding.

5.   Advise the parties of any substantive instructions it will give to the jury prior to opening statements.

6.   Notify counsel of a schedule for submission of proposed final jury instructions.

-14-

Exhibit 13
- 191 -

## EXHIBIT A

## INITIAL PRETRIAL CONFERENCE CHECKLIST

Proportionality assessment of "the needs of the case, amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues" (see Rule 26(b)(2)(C) (iii))

1.       Possible limitations on document preservation (including electronically stored information)

2.    Appropriateness of initial disclosures pursuant to Rule 26(a)(1)

   a.    Is there some readily identifiable document or category of documents that should be produced immediately in lieu of initial disclosures?

3.    Possibility of a stay or limitation of discovery pending a dispositive motion

4.    Possibility of communication/coordination between the Magistrate Judge and District Judge with respect to pretrial matters

5.    Preliminary issues that are likely to arise that will require court intervention

6.    Discovery issues that are envisioned and how discovery disputes will be resolved

7.    Proposed discovery including:

   a.    limitations on types of discovery beyond those in the Rules (i.e., waiver of interrogatories, requests for admission, expert depositions)

   b.    limitations on scope of discovery

   c.    limitations on timing and sequence of discovery

   d.    limitations on restoration of electronically-stored information

   e.    agreement to allow depositions of trial witnesses named if not already deposed

   f.    preservation depositions

-15-

Exhibit 13
- 192 -

       g.     foreign discovery and issues anticipated

8.    Schedule (as appropriate and possibly excluding public agency cases) including:

       a.     date(s) for completion of discovery

       b.     date(s) for dispositive motions

       c.     date(s) for exchange for expert reports

       d.     date(s) for exchange of witness lists

       e.     date (s) for Joint Preliminary Trial Reports and Final Joint Trial Reports

       f.     date for Case Management Conference

9.    Issues to be tried

       a.     ways in which issues can be narrowed to make trial more meaningful and efficient

       b.     whether there are certain issues as to which a mini-trial would be helpful

10.    Bifurcation

11.    Class certification issues

12.    ADR/mediation

13.    Possibility of consent to trial before a Magistrate Judge

14.    Pleadings, including sufficiency and amendments, and the likelihood and timing of amendments

15.    Joinder of additional parties, and the likelihood and timing of joinder of additional parties

16.    Expert witnesses (including necessity or waiver of expert depositions)

17.    Damages (computation issues and timing of damages discovery)

18.    Final pretrial order (including possibility of waiver of order)

Exhibit 13
- 193 -

19.     Possible trial-ready date

20.     Court logistics and mechanics (e.g., communication with the court, streamlined motion practice, pre-motion conferences, etc.)

21.     The need for additional meet and confer sessions, to continue to discuss issues raised at the initial conference among counsel.

-17-

Exhibit 13
- 194 -

## EXHIBIT B

**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| _____, | ) ) ) |
| Plaintiff(s) | ) ) |
| -against- | ) ) |
| _____, | ) ) |
| Defendant(s) | ) ) ) |

No.: _____CV_____

**Joint Electronic Discovery Submission No.
___ and [Proposed] Order**

One or more of the parties to this litigation have indicated that they believe that relevant information may exist or be stored in electronic format, and that this content is potentially responsive to current or anticipated discovery requests.  This Joint Submission and [Proposed] Order (and any subsequent ones) shall be the governing document(s) by which the parties and the Court manage the electronic discovery process in this action. The parties and the Court recognize that this Joint Electronic Discovery Submission No. ___ and [Proposed] Order is based on facts and circumstances as they are currently known to each party, that the electronic discovery process is iterative, and that additions and modifications to this Submission may become necessary as more information becomes known to the parties.

**(1)       Brief Joint Statement Describing the Action, [e.g., "Putative securities class action pertaining to the restatement of earnings for the period May 1, 2009 to May 30, 2009"]:**

_____

_____

_____

_____

_____

-18-

Exhibit 13
- 195 -

    **(a)**                **Estimated amount of Plaintiff(s)' Claims:**

        __ Less than $100,000
        __ Between $100,000 and $999,999
        __ Between $1,000,000 and $49,999,999
        __ More than $50,000,000
        __ Equitable Relief
        __ Other (if so, specify) _____

    **(b)**    **Estimated amount of Defendant(s)' Counterclaim/Cross-Claims:**

        __ Less than $100,000
        __ Between $100,000 and $999,999
        __ Between $1,000,000 and $49,999,999
        __ More than $50,000,000
        __ Equitable Relief
        __ Other (if so, specify) _____

(2)    **Competence.**  Counsel certify that they are sufficiently knowledgeable in matters relating to their clients' technological systems to discuss competently issues relating to electronic discovery, or have involved someone competent to address these issues on their behalf.

(3)    **Meet and Confer.**  Pursuant to Fed. R. Civ. P. 26(f), counsel are required to meet and confer regarding certain matters relating to electronic discovery before the Initial Pretrial Conference (the Rule 16 Conference).  Counsel hereby certify that they have met and conferred to discuss these issues.

    Date(s) of parties' meet-and-confer conference(s): _____

(4)    **Unresolved Issues:**  After the meet-and-confer conference(s) taking place on the aforementioned date(s)**,** the following issues remain outstanding and/or require court intervention:  __ Preservation;  __ Search and Review;  __ Source(s) of Production; __ Form(s) of Production;  __ Identification or Logging of Privileged Material; __ Inadvertent Production of Privileged Material;  __ Cost Allocation; and/or __ Other (if so, specify) _____.  To the extent specific details are needed about one or more issues in dispute, describe briefly below.

_____

_____

_____

_____

_____

_____

As set forth below, to date, the parties have addressed the following issues:

<div align="center">-19-</div>

Exhibit 13
- 196 -

(5)   **Preservation.**

   (a)   **The parties have discussed the obligation to preserve potentially relevant electronically stored information and agree to the following scope and methods for preservation, including but not limited to:   retention of electronic data and implementation of a data preservation plan; identification of potentially relevant data; disclosure of the programs and manner in which the data is maintained; identification of computer system(s) utilized; and identification of the individual(s) responsible for data preservation, etc.**

   Plaintiff(s):

   _____

   _____

   _____

   _____

   _____

   Defendant(s):

   _____

   _____

   _____

   _____

   _____

   (b)   **State the extent to which the parties have disclosed or have agreed to disclose the dates, contents, and/or recipients of "litigation hold" communications.**

   _____

   _____

   _____

   _____

   _____

-20-

Exhibit 13
- 197 -

(c)     The parties anticipate the need for judicial intervention regarding the following issues concerning the duty to preserve, the scope, or the method(s) of preserving electronically stored information:

_____

_____

_____

_____

_____

_____

**(6)     Search and Review**

(a)     The parties have discussed methodologies or protocols for the search and review of electronically stored information, as well as the disclosure of techniques to be used.  Some of the approaches that may be considered include:  the use and exchange of keyword search lists, "hit reports," and/or responsiveness rates; concept search; machine learning, or other advanced analytical tools; limitations on the fields or file types to be searched; date restrictions; limitations on whether back-up, archival, legacy, or deleted electronically stored information will be searched; testing; sampling; etc.  To the extent the parties have reached agreement as to search and review methods, provide details below.

Plaintiff(s):

_____

_____

_____

_____

_____

_____

-21-

Exhibit 13
- 198 -

Defendant(s):

_____

_____

_____

_____

_____

_____

    **(b)** **The parties anticipate the need for judicial intervention regarding the following issues concerning the search and review of electronically stored information:**

_____

_____

_____

_____

_____

_____

**(7)**    **Production**

    (a)    Source(s) of Electronically Stored Information.  **The parties anticipate that discovery may occur from one or more of the following potential source(s) of electronically stored information [e.g., email, word processing documents, spreadsheets, presentations, databases, instant messages, web sites, blogs, social media, ephemeral data, etc.]:**

       Plaintiff(s):

_____

_____

_____

_____

_____

_____

-22-

Exhibit 13
- 199 -

Defendant(s):

_____

_____

_____

_____

_____

**(b)**  Limitations on Production.  **The parties have discussed factors relating to the scope of production, including but not limited to: (i) number of custodians; (ii) identity of custodians; (iii) date ranges for which potentially relevant data will be drawn; (iv) locations of data; (v) timing of productions (including phased discovery or rolling productions); and (vi) electronically stored information in the custody or control of non-parties.  To the extent the parties have reached agreements related to any of these factors, describe below:**

Plaintiff(s):

_____

_____

_____

_____

_____

Defendant(s):

_____

_____

_____

_____

_____

**(c)**     **Form(s) of Production:**

-23-

Exhibit 13
- 200 -

**(1)     The parties have reached the following agreements regarding the form(s) of production:**

Plaintiff(s):

_____

_____

_____

_____

_____

Defendant(s):

_____

_____

_____

_____

_____

**(2)     Please specify any exceptions to the form(s) of production indicated above (e.g., word processing documents in TIFF with load files, but spreadsheets in native form):**

_____

_____

_____

_____

_____

**(3)     The parties anticipate the need for judicial intervention regarding the following issues concerning the form(s) of production:**

-24-

Exhibit 13
- 201 -

_____

_____

_____

_____

_____

_____

**(d)** Privileged Material.

    **(1)**    **Identification.  The parties have agreed to the following method(s) for the identification (including the logging, if any, or alternatively, the disclosure of the number of documents withheld), and the redaction of privileged documents:**

_____

_____

_____

_____

    **(2)**    **Inadvertent Production / Claw-Back Agreements.  Pursuant to Fed R. Civ. Proc. 26(b)(5) and F.R.E. 502(e), the parties have agreed to the following concerning the inadvertent production of privileged documents (e.g. "quick-peek" agreements, on-site examinations, non-waiver agreements or orders pursuant to F.R.E. 502(d), etc.):**

_____

_____

_____

_____

    **(3)**    **The parties have discussed a 502(d) Order.  Yes __; No __**

-25-

Exhibit 13
- 202 -

**The provisions of any such proposed Order shall be set forth in a separate document and presented to the Court for its consideration.**

(e)    Cost of Production. **The parties have analyzed their client's data repositories and have estimated the costs associated with the production of electronically stored information.  The factors and components underlying these costs are estimated as follows:**

   **(1)      Costs:**

Plaintiff(s):

_____

_____

_____

_____

_____

_____

Defendant(s):

_____

_____

_____

_____

_____

   **(2)      Cost Allocation.  The parties have considered cost-shifting or cost-sharing and have reached the following agreements, if any:**

_____

_____

_____

_____

_____

-26-

Exhibit 13
- 203 -

        **(3)**    **Cost Savings.  The parties have considered cost-saving measures, such as the use of a common electronic discovery vendor or a shared document repository, and have reached the following agreements, if any:**

    **(f)**    **The parties anticipate the need for judicial intervention regarding the following issues concerning the production of electronically stored information:**

**(8)**    **Other Issues:**

-27-

Exhibit 13
- 204 -

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**The preceding constitutes the agreement(s) reached, and disputes existing, (if any) between the parties to certain matters concerning electronic discovery as of this date.  To the extent additional agreements are reached, modifications are necessary, or disputes are identified, they will be outlined in subsequent submissions or agreements and promptly presented to the Court.**

**Party:** _____    **By:** _____

**Party:** _____    **By:** _____

**Party:** _____    **By:** _____

**Party:** _____    **By:** _____

**Party:** _____    **By:** _____

**The next scheduled meet-and-confer conference to address electronic discovery issues, including the status of electronic discovery and any issues or disputes that have arisen since the last conference or Order, shall take place on: _____.**

-28-

Exhibit 13
- 205 -

**The next scheduled conference with the Court for purposes of updating the Court on electronic discovery issues has been scheduled for _____ .  Additional conferences, or written status reports,  shall be set every 3 to 4 weeks, as determined by the parties and the Court, based on the complexity of the issues at hand.  An agenda should be submitted to the Court four (4) days before such conference indicating the issues to be raised by the parties.  The parties may jointly seek to adjourn the conference with the Court by telephone call 48 hours in advance of a scheduled conference, if the parties agree that there are no issues requiring Court intervention.**

**__   Check this box if the parties believe that there exist a sufficient number of e-discovery issues, or the factors at issue are sufficiently complex, that such issues may be most efficiently adjudicated before a Magistrate Judge.**

**Additional Instructions or Orders, if any:**

_____

_____

_____

_____

_____

_____

**Dated: _____, 20___**                    **SO ORDERED:**

_____
**United Stated District Judge**

-29-

Exhibit 13
- 206 -

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
Plaintiff,                                              :
                                                        :      **ORDER OF REFERENCE**
                         v.                             :      **TO A MAGISTRATE**
                                                        :      **JUDGE**
Defendant,                                              :
                                                        :            **(   )(   )**

-------------------------------------------------------- x

The above entitled action is referred to the designated Magistrate Judge for the following

purpose(s):

☐   **General Pretrial (includes scheduling,**        ☐   **Consent under 28 U.S.C. §636(c) for all**
    **discovery, non –dispositive pretrial motions,**      **purposes (including trial)**
    **and settlement)**

☐   **Specific Non-Dispositive**                      ☐   **Consent under 28 U.S.C. §636(c)**
    **Motion/Dispute\***                                   **for limited purpose (e.g., dispositive**
    _____                 **motion, preliminary injunction)**
    _____                 **Purpose: _____**
    _____

☐   **If referral is for discovery disputes <span style="color:red">for a</span>**   ☐   **Habeas Corpus**
    **<span style="color:red">specific period</span> when the District Judge is**
    **unavailable, the time period  of the referral:**

☐   **<span style="color:red">Referral for discovery disputes requiring</span>**   ☐   **Social Security**
    **<span style="color:red">prompt attention at any time when the</span>**
    **<span style="color:red">District Judge is not immediately available</span>**
    **(e.g. on trial or out of town)**

☐   **Settlement\***                                  ☐   **Dispositive Motion (i.e., motion requiring**
                                                          **a Report and Recommendation)**
                                                          **Particular Motion: _____**
                                                          **_____**

☐   **Inquest After Default/Damages Hearing**         ☐   **All such motions: _____**

---

**\*Do not check if already referred for general pretrial.**

**Dated _____**

                                                      **SO ORDERED:**

                                                      _____
                                                      **United States District Judge**

-30-

Exhibit 13
- 207 -