# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    TARLA MAKAEFF, BRANDON KELLER,
 5  ED OBERKROM, and PATRICIA
    MURPHY, on Behalf of Themselves
 6  and All Others Similarly
    Situated,
 7                              No. 10 CV 0940 IEG (WVG)
              Plaintiffs,
 8
 9        vs.

10  TRUMP UNIVERSITY, LLC, (aka
    Trump Entrepreneur Initiative) a
11  New York Limited Liability
    Company, DONALD J. TRUMP, and
12  DOES 1 through 50, inclusive,

13            Defendants.
14  _____

15
16          DEPOSITION of TARLA MAKAEFF
17             San Diego, California
18           Monday, January 30, 2012
19                  Volume I
20
21
22  Reported by:
    Kae F. Gernandt
23  RPR, CSR No. 5342
24  Job No. 130455
25  PAGES 1 - 282
```

                                            Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    TARLA MAKAEFF, BRANDON KELLER,
 5  ED OBERKROM, and PATRICIA
    MURPHY, on Behalf of Themselves
 6  and All Others Similarly
    Situated,
 7                            No. 10 CV 0940 IEG (WVG)
              Plaintiffs,
 8
        vs.
 9
    TRUMP UNIVERSITY, LLC, (aka
10  Trump Entrepreneur Initiative) a
    New York Limited Liability
11  Company, DONALD J. TRUMP, and
    DOES 1 through 50, inclusive,
12
              Defendants.
13
14
15
16  ─────────────────────────────────────
17
18          Deposition of TARLA MAKAEFF, Volume I, taken
19  on behalf of defendants, at 655 West Broadway,
20  20th Floor, San Diego, California, beginning at
21  10:03 a.m. and ending at 5:10 p.m, on Monday,
22  January 30, 2012, before Kae F. Gernandt, RPR, Certified
23  Shorthand Reporter No. 5342.
24
25
                                            Page 2
```

```
 1   APPEARANCES:
 2
 3   For Plaintiffs:
 4        ZELDES & HAEGGQUIST, LLP
          BY:  AMBER L. ECK
 5        625 Broadway, Suite 906
          San Diego, California  92101
 6        619.342.8000
          ambere@zhlaw.com
 7
 8        ROBBINS, GELLER, RUDMAN & DOWD
          BY:  THOMAS R. MERRICK
 9             LAUREN LENDZION
          655 West Broadway, Suite 1900
10        San Diego, California  92101
          619.231.1059
11        tmerrick@rgrdlaw.com
12
13   For Defendants Trump University, LLC, and Donald J.
     Trump:
14
          YUNKER & SCHNEIDER
15        BY:  DAVID K. SCHNEIDER
          655 West Broadway, Suite 1400
16        San Diego, California  92101
          619.233.5500
17        dks@yslaw.com
18
19   Also Present:
20        Jill A. Martin, Trump National Golf Club
21   Videographer:
22        Scott Tanaka, Veritext
23
24
25
```

Page 3

```
 1                    I N D E X
 2                   VOLUME I
 3
 4    MONDAY, JANUARY 30, 2012
 5
 6    WITNESS
 7    TARLA MAKAEFF
 8
 9
10
11    EXAMINATION BY                              PAGE
12    Mr. Schneider . . . . . . . . . . . . . . . . .7
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page  4
```

```
1                    DEPOSITION EXHIBITS
2                TARLA MAKAEFF, Volume I
3
4       NUMBER        DESCRIPTION                IDENTIFIED
5     Exhibit 1     Amended Notice of Taking          8
                    Deposition of Tarla Makaeff
6
      Exhibit 2     Trump Enrollment Form dated      136
7                   8/10/08 (TU 01526-01527)
8     Exhibit 3     Trump University Field Mentor    249
                    Evaluation Form dated 9/28/08
9                   (TU 01530)
10    Exhibit 4     E-mail string dated 9/28/08,     260
                    subject:  Thank you, thank you
11                  (TU-MAKAEFF4933)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                            Page 5
```

```
 1        SAN DIEGO, CALIFORNIA, MONDAY, JANUARY 30, 2012

 2                      10:03 A.M.

 3

 4        THE VIDEOGRAPHER:  Good morning.  We are on

 5   the record at 10:03 a.m. on January 30th, 2012.        10:03:44

 6   This is the video-recorded deposition of Tarla

 7   Makaeff.  My name is Scott Tanaka, here with our

 8   court reporter, Kae Gernandt.  We're here from

 9   Veritext National Deposition & Litigation Services

10   at the request of counsel for the defendant.           10:04:00

11        This deposition is being held at

12   655 West Broadway, Suite 1900, San Diego, California

13   92101.  Caption of this case is Tarla Makaeff versus

14   Trump University, LLC, Case No. 10-cv-0940-IEG

15   (WVG).                                                 10:04:24

16        Please take note that audio and video

17   recording will take place unless all parties agree

18   to go off the record.  Microphones are sensitive and

19   may pick up whispers, private conversations and

20   cellular interference.                                 10:04:34

21        At this time, will counsel please

22   identify themselves for the record.

23        MS. ECK:  Amber Eck for plaintiffs.

24        MR. MERRICK:  Tom Merrick, Robbins, Geller,

25   Rudman & Dowd, for the plaintiff.                      10:04:47
```

                                                    Page 6

```
1          MR. SCHNEIDER:  David Schneider for        10:04:52

2    defendants Trump University, LLC and Donald Trump.

3          THE VIDEOGRAPHER:  Court reporter, please

4    swear in the witness.

5          MR. NASH:  Kelly Nash, attending on behalf of  10:04:57

6    a third-party subpoenaed entity, Prosper, Inc.

7          THE VIDEOGRAPHER:  Court reporter, please

8    swear in the witness.

9

10              TARLA MAKAEFF,                        10:05:12

11   having been administered an oath, was examined and

12   testified as follows:

13

14              EXAMINATION

15   BY MR. SCHNEIDER:                                10:05:12

16        Q.   Please state your name.

17        A.   Tarla Makaeff.

18        Q.   Have you ever gone by any other name?

19        A.   No.

20        Q.   Miss Makaeff, you understand that you    10:05:22

21   are under oath to provide truthful testimony today?

22        A.   Yes.

23        Q.   When did you first retain counsel

24   pertaining to anything related to Trump University

25   or Donald Trump?                                 10:05:32
```

Page 7

```
 1          Q.   All right.  I'd like you to look at      12:32:29

 2    Bates No. 315.  This is entitled "Fast Track to

 3    Foreclosure Investing, Three-Day Training," and it's

 4    the table of contents.  Are you on the same page?

 5          A.   Yes.                                      12:32:49

 6          Q.   On the first day, it says the agenda has

 7    six items.  The first one is entitled "Introduction

 8    and Overview," and it has three bullet points of

 9    items to be discussed.  And the same exists all the

10    way down.  There's a No. 2, "Understanding the        12:33:04

11    foreclosure process."  So, I'm going to ask you

12    about -- about those.  Are you with me right now?

13          A.   Uh-huh.

14          Q.   Is that yes?

15          A.   Yes.                                      12:33:12

16          Q.   Okay.   So, under No. 1, it says,

17    "Introduction and Overview," and the items on the

18    table of contents that are going to be discussed

19    include, "A look at foreclosure statistics, what

20    causes foreclosure and market advantages in this     12:33:21

21    economy."

22               Were those items discussed during the

23    three-day Fast Track to Foreclosure program?

24          A.   Yes, in very general manners --

25          Q.   Each of those --                          12:33:34
```

Page 74

1     A.   -- not -- not in specifics.                    12:33:35

2     Q.   All right.  Each of those topics were

3   discussed, correct?

4     A.   In general manners, not in specifics.

5     Q.   All right.  Each of the topics were          12:33:41

6   discussed; is that true?

7     MS. ECK:  Objection.  Asked and answered.

8     THE WITNESS:  I believe I answered your

9   question.

10  BY MR. SCHNEIDER:                                     12:33:46

11    Q.   Well, you're actually answering

12  something a little bit different that you want to

13  answer.  My question was:  Were the topics

14  discussed?

15    A.   I believe that they were.  I cannot        12:33:54

16  vouch for every single point on here because the

17  instructor did skip over slides.

18    Q.   All right.  No. 2, "Understanding the

19  foreclosure process, types of foreclosures, judicial

20  timeline and nonjudicial timeline," were those items   12:34:06

21  discussed during the three-day program?

22    A.   Yes, I believe so.

23    Q.   No. 3, "Locating great deals.  What

24  makes a property a bargain.  Finding real estate

25  with motivated sellers, and analyzing lis pendens,"    12:34:17

Page 75

1   were these items discussed during the seminar?      12:34:20

2        A.   I believe so.

3        Q.   No. 4, "Choosing an area, determining

4   factors for choosing an area, categorizing

5   neighborhoods as A, B, C or D, and creating a      12:34:28

6   functional plan," were those discussed during the

7   three-day program?

8        A.   I believe so.

9        Q.   No. 5, "Finding properties."   There's

10  three methods:   The shotgun method, the laser      12:34:39

11  method, and the advertising method.   Were those

12  discussed during the program?

13       A.   I believe so.

14       Q.   No. 6, "Contacting owners.   Outbound

15  calls, inbound calls, and in-person meetings," were      12:34:51

16  those contents discussed during the three-day

17  program?

18       A.   I believe so.

19       Q.   Was anything else discussed on day one

20  that we did not just go through on those six items?   12:34:59

21       A.   I don't have a recollection.   Whatever I

22  wrote in my notes that you've received.

23       Q.   Were any representations made during day

24  one that you can recall that you believe were not

25  true?                                              12:35:13

Page 76

```
 1          A.    I don't know what day it was of the       12:35:16

 2    three days, but I know that we were promised insider

 3    secrets from Donald Trump.  We were promised a

 4    one-year apprenticeship, even with the 1500-dollar

 5    course where you would have someone to talk to        12:35:34

 6    through an 800 number for a year.

 7               I believe on the -- well, this is for

 8    the third day.  I don't know if you want me to

 9    answer that.  I -- I don't recall exactly what was

10    discussed on day one.  It was more general.           12:35:47

11          Q.    All right.  Let's go to day two.  Under

12    the table of contents, on day two, it indicates that

13    the information was going to concern Item No. 7,

14    which is working with people, and that included

15    "Options for homeowners in foreclosure, foreclosure   12:36:01

16    attitudes and behaviors, and items you must get."

17    Were those items discussed on day two?

18          A.    I believe so.  Possibly.  I -- I can't

19    say for sure.

20          Q.    Next item, "Structuring the deal,         12:36:15

21    establishing property value, determining AVR [sic],

22    and contact -- contract requirements," were those

23    issues discussed?

24          A.    I believe so.

25          Q.    What is AVR?                               12:36:25
```

Page 77

```
 1          A.   ARV.                                12:36:26

 2          Q.   ARV, I'm sorry.

 3          A.   Something about the retail value.  I

 4    forget what the A stands for.  I don't know.

 5          Q.   Was that discussed during the seminar?   12:36:35

 6          A.   Again, I -- I believe so.  However,

 7    slides were skipped over, so I can't say with a

 8    hundred-percent certainty.

 9          Q.   When you say "slides were skipped over,"

10    you mean they were shown, and then the speaker would   12:36:45

11    just move past them and talk about different ones?

12          A.   I mean, the speaker would skip past

13    slides and skip through portions of the books in

14    various of these seminars.

15          Q.   Who was the speaker for this three-day   12:36:57

16    program?

17          A.   James Harris.

18          Q.   Were there any other speakers?

19          A.   No, not to my knowledge.

20          Q.   Of all the Trump University programs   12:37:06

21    that you attended, was James Harris only the speaker

22    at this Fast Track to Foreclosure program that you

23    attended?

24          A.   Yes.

25          Q.   No. 9, "Building a buyers list, ways to   12:37:18
```

Page 78

1     find buyers, showing properties, and assigning the          12:37:21

2     deal," were those issues discussed at the three-day

3     program?

4              A.    I believe so.

5              Q.    No. 10, "Understanding short sales, why        12:37:27

6     banks sell short, what you need to negotiate a short

7     sale, and the short sale process," were those items

8     and issues discussed during the three-day program?

9              A.    I believe so.

10             Q.    No. 11, "Investing in bank REOs" --           12:37:41

11    what's an REO?

12             A.    It's a bank-owned property.

13             Q.    Did you know that before you attended

14    the program?

15             A.    No, I did not.                                 12:37:51

16             Q.    And did they discuss the secrets to REO

17    success, offer language in government REOs?

18             A.    I'm really not certain on any of these

19    what specifically was discussed.

20             Q.    All right.  On day three, "Commercial         12:38:03

21    financing, when to use commercial financing," was

22    that addressed?

23             A.    Possibly.

24             Q.    "The lender's view of LTV versus true

25    LTV" -- what does LTV mean?                                   12:38:16

Page  79

1       A.    I don't know.                              12:38:18

2       Q.    "Working with banks and mortgage

3   brokers," did you all you discuss that during the

4   three days?

5       A.    Possibly.                                  12:38:24

6       Q.    "Quick-turning real estate, five ways to

7   quick turn real estate, the differences between

8   wholesaling and retailing," were those discussed?

9       A.    I'm not certain.  Again, wherever I took

10  notes in the book, it's where things were discussed.   12:38:36

11      Q.    And when you took notes in the book,

12  were those of information that was provided to you

13  during the seminar?

14      A.    It's what they were saying, correct.

15      Q.    "Wholesaling," what does that mean?       12:38:47

16      A.    I believe you act as a bird dog between

17  you -- I'm not sure exactly, to be honest.  I don't

18  remember.

19      Q.    Did you ever contemplate doing

20  wholesaling?                                          12:39:02

21      A.    Yes, I did.

22      Q.    Had you -- were you familiar with that

23  term before you attended Trump University?

24      A.    No.

25      Q.    Was wholesaling, retailing and option     12:39:11

Page  80

1    and lease options and owner financing discussed, as          12:39:13

2    indicated on Item No. 13 in the table of contents?

3            A.    I believe so.

4            Q.    I'd like you to turn to TU-MAKAEFF 0354.

5    At the top of this page it's entitled "Locating          12:39:29

6    Pre-foreclosures," and there's some handwriting

7    under the "Notes" section.    Is all of the

8    handwriting yours?

9            A.    Yes.

10            Q.    Is all of this information under the          12:39:48

11    "Notes" section information that you received during

12    the three-day seminar?

13            A.    Let me take a moment to read this.

14                  Yes, it's information that they had

15    spoken that I had written down.          12:40:09

16            Q.    Was any of this information concerning

17    the sale of other products by Trump University?

18            A.    Not on this particular page.

19            Q.    So, all the information that you wrote

20    down on this page concerned content regarding          12:40:23

21    foreclosures?

22            A.    Yes.

23            Q.    Would you turn the page to 355.    Are

24    those your notes?

25            A.    Yes, they are.          12:40:35

Page  81

1    Q.   And does this pertain to the information   12:40:35

2    that was being provided to you on this subject,

3    lis pendens?

4    A.   It appears to be, yes.

5    Q.   All right.   And is all this content   12:40:42

6    base, it was concerning foreclosures, as opposed to

7    selling some other products?

8    A.   Yes.   However, a lot was sold during

9    this, including a 35,000-dollar seminar.

10    MR. SCHNEIDER:   Okay.   I'll object and move   12:40:52

11    to strike as nonresponsive.

12    BY MR. SCHNEIDER:

13    Q.   The information on this page, your notes

14    pertains to content that you wrote down of

15    information they were providing to you during the   12:40:59

16    seminar, correct?

17    A.   Yes.

18    Q.   If you'll turn to page 357, are these

19    your notes?

20    A.   Yes.   12:41:10

21    Q.   And is this content that they were

22    providing to you during the seminar?

23    A.   Yes.

24    Q.   Is there anything in these notes that

25    pertained to selling other products of Trump   12:41:16

Page  82

1    University?                                         12:41:18

2         A.    No.

3         Q.    If you'll turn to page 359, is all this

4    handwriting on this page yours?

5         A.    Yes.                                     12:41:28

6         Q.    Is all this information that you're

7    writing down that they are providing to you from the

8    seminar?

9         A.    Yes.

10        Q.    Is this all content pertaining to        12:41:35

11   foreclosures?

12        MS. ECK:   Object -- well, take a look at it.

13        THE WITNESS:   Yes.

14   BY MR. SCHNEIDER:

15        Q.    Would you look at page 361.   There's a  12:41:52

16   list here, and I believe -- first of all, is this

17   handwriting all yours?

18        A.    Yes.

19        Q.    And the first word, does that say

20   "leads"?                                            12:42:08

21        A.    Yes.

22        Q.    And what is this referring to?

23        A.    I'm not certain.

24        Q.    Is the presenter telling you possible

25   places to find leads to locate foreclosure          12:42:19

1    properties?                                          12:42:24

2         A.   Probably.

3         Q.   And were all of those items that you

4    listed there, was that information provided to you

5    by the speaker at Trump University?                 12:42:30

6         A.   I'm not sure if this is with Trump

7    University.

8         Q.   Where do you think this would have been?

9         A.   Possibly Elite Mentoring.

10        Q.   So, if you turn back to page 360, it       12:42:43

11   says, "Choosing an area."

12        A.   Okay.

13        Q.   The next page is 361.

14        A.   Okay.   Then it was --

15        Q.   Trump University, correct?                 12:42:51

16        A.   It just doesn't say on the page, so I'm

17   assuming, yes.

18        Q.   It's sandwiched in between two sheets

19   that are entitled "Fast Track to Foreclosure."

20   Would you agree with that?   If you look at 359, it  12:43:00

21   states on the top of the document "Fast Track to

22   Foreclosure."

23        A.   Okay.   There -- right.

24        Q.   All right.   And then the next page says

25   "Choosing an area," and then the next page has your  12:43:13

Page 84

1  handwriting notes, and then the next page shows  12:43:16

2  "Fast Track to Foreclosure."

3           A.   As long as this is in order, then yes,

4  it was from Trump University.

5           Q.   All right.  Can you look at page 373.  12:43:23

6  Are these all your notes under the "Notes" section?

7           A.   Yes.

8           Q.   This discussion is concerning

9  identifying properties as A, B and C properties,

10 correct?                                          12:43:51

11          A.   Yes.

12          Q.   Had you ever heard those terms before?

13          A.   No.

14          Q.   Is there any information on this sheet

15 in your notes which discusses purchasing additional 12:44:00

16 products from Trump University?

17          MS. ECK:  Objection.

18          THE WITNESS:  No.

19          MS. ECK:  Vague and ambiguous.

20 BY MR. SCHNEIDER:                                  12:44:10

21          Q.   Would you look a page 375.  Are these

22 notes yours --

23          A.   Yes.

24          Q.   -- the handwritten portions?

25               And is this pertaining to what you've  12:44:24

Page 85

1    drawn an arrow from up at the top where it says                    12:44:26
2    "Know your exit strategy," and then you bring the
3    arrow down about wholesaling, flipping, renting?
4         A.   I'm assuming it must be, yes.
5         Q.   All right.  So, this was content that        12:44:37
6    was provided to you during the seminar, correct?
7         A.   Correct.
8         Q.   Would you look at page 379.  Are those
9    your notes at the top?
10        A.   Yes.                                          12:44:47
11        Q.   Anything pertaining to those methods --
12   sorry.  Let me try that again.
13             Is the information up in this square
14   concerning the methods is your handwritten notes
15   pertaining to that topic area?                          12:44:58
16        A.   Yes.
17        Q.   And that was information that was
18   provided to you during the three-day seminar?
19        A.   Yes.
20        Q.   Can you turn to page 381.  Are those          12:45:05
21   your handwritten notes under the "Notes" section?
22        A.   Yes.
23        Q.   And is that pertaining to content that
24   was provided to you during the seminar?
25        A.   Yes.                                          12:45:18

Page 86

1      Q.    If you'll look on page 384, that's an                12:45:19

2   example of running numbers, correct?

3      A.    Yes.

4      Q.    Would you look on page 386.

5      A.    But this example doesn't tell you how to             12:45:41

6   do this.

7            MR. SCHNEIDER:   I'll move to strike as

8   nonresponsive after "yes."

9   BY MR. SCHNEIDER:

10     Q.    Can you turn to page 386.   Are these                12:45:52

11  your handwritten notes?

12     A.    Yes.

13     Q.    And is this pertaining to content that

14  you received at the three-day seminar?

15     A.    Yes.                                                 12:46:00

16     Q.    Can you turn to page 391.   Actually,

17  392.   392 and 393, are all of these your handwritten

18  notes?

19     A.    Yes.

20     Q.    And do these all pertain to information             12:46:22

21  that was provided to you during the three-day

22  program?

23     A.    I believe so.

24     Q.    If you look on 393, there's a detail

25  under "EX," I'm presuming that means example,           12:46:33

Page 87

```
 1    running numbers on that particular example, correct?    12:46:36
 2            A.    Yes.    But again, there wasn't enough
 3    explanation.
 4            Q.    All right.    So, one of your criticisms
 5    was that you wanted more explanation than what was      12:46:47
 6    provided, correct?
 7            A.    Yes.
 8            Q.    On 395, are those your notes?
 9            A.    Yes.
10            Q.    All right.    If you could just page       12:47:01
11    through and look at 396 and 397, 398 and 399.    Are
12    all of those your handwritten notes?
13            A.    Yes.
14            Q.    And you had testified earlier that you
15    are a college graduate.    Did you take notes when you   12:47:18
16    went to college?
17            A.    Yes.
18            Q.    And was it your practice to record in
19    notes information that you thought might be useful
20    or that you'd want to remember later?                    12:47:26
21            A.    Yes.
22            Q.    And is that the reason why you took
23    notes at this seminar, to record the information in
24    writing so you could go back and refer to it later?
25            A.    Yes.                                        12:47:37
```

Page 88

1     Q.    Can you turn to page 417.  If you'll     12:47:46

2     look at 417, 418 and 419, are all of those your

3     handwritten notes?

4     A.    Yes.

5     Q.    And are all of these notes from content     12:48:05

6     that was provided to you during the Fast Track

7     program for the three days?

8     A.    I mean, I know for sure 417.  I -- I

9     believe the four of the two, looks like they were

10    following.                                       12:48:21

11    Q.    Page 418 and 419?

12    A.    Yeah, I believe so.  There's no --

13    doesn't say "Fast Track."  So, if it's following in

14    sequence, then yes.

15    Q.    All right.  And any of these notes         12:48:30

16    pertain to any kind of selling that Trump University

17    was trying to get you to purchase more goods or

18    services?

19    A.    No.

20    Q.    Would you turn to page 449.  Are the       12:48:54

21    notes on 449, 450 and 451 all of your handwriting?

22    A.    Yes.

23    Q.    And are these all notes of content that

24    was being provided to you by the speaker at the Fast

25    Track program?                                   12:49:24

Page 89

1        A.   Yes.                                    12:49:25

2        Q.   Anything in those three pages of notes

3   concerning any sales that Trump University was

4   trying to get you to purchase, goods or services?

5        A.   No.   The sales came on the third day.   12:49:33

6        Q.   All right.   Page 453, is all the

7   handwriting on this page yours?

8        A.   Yes.

9        Q.   All right.   And it looks like this is

10  entitled "How to find motivated sellers."   Did I   12:49:48

11  read that correctly?

12       A.   Yes.

13       Q.   And it looks like Trump University

14  provided you 14 different ideas or concepts about

15  how to find motivated sellers, correct?         12:49:58

16       A.   Yes, in general terms.

17       Q.   All right.   And you wrote those down to

18  remember that information, correct?

19       A.   So that someone could expand upon it in

20  the future, yes.                                  12:50:12

21       Q.   If you'll look on page 456 and 457,

22  those are your notes?

23       A.   Yes.

24       Q.   And that's -- those were some examples

25  given with some -- some numbers --                12:50:37

Page 90

1      A.   Yes.                                    12:50:39

2      Q.   -- is that true?

3           So, you all were working through some

4   examples, cranking some kind of numbers; is that

5   accurate?                                        12:50:45

6      A.   Yes.

7      Q.   Can you look at page 459.  Are those

8   your notes?

9      A.   Yes.

10      Q.   Is this all content based on information  12:50:53

11   provided to you by the speaker during the

12   foreclosure program?

13      A.   Yes.

14      Q.   Page 464, it's entitled "Short Sale

15   Example."  I'd like you to page through all the way  12:51:10

16   to 469.  So, six pages.  Are all of those your

17   notes?

18      A.   Yes.

19      Q.   And all these were taken by you or

20   written by you during the three-day program,       12:51:46

21   correct?

22      A.   That's correct.

23      Q.   And all of these notes, these pertain to

24   information that the speaker provided to you about

25   the topics discussed during that -- that three days,  12:51:55

Page 91

```
 1   right, foreclosures and the other items we looked      12:51:58
 2   at?
 3           A.   That's correct.
 4           Q.   Can you look at page 553.  That's a
 5   sample contract that Trump University provided to       12:52:26
 6   you, correct?
 7           A.   Yes.
 8           Q.   Can you look at page 561.  That's a
 9   sample Assignment of Contract of Sale that they
10   provided to you; is that correct?                        12:52:42
11           A.   Yes, but there was no explanation on any
12   of these.
13           Q.   They gave you the forms of the
14   contracts, correct?
15           A.   Yes.  But you have to know how to fill      12:52:50
16   them out.  Therefore, you needed instruction on
17   that, which was not provided.
18           Q.   Can you turn to page 629.  Can you tell
19   us what these notes pertain to?
20           A.   I'm reading it.                              12:53:26
21             I don't know.
22           Q.   Do you know if they were taken by you
23   during the Fast Track program?
24           A.   I know this was my writing.  I don't
25   know -- I don't believe it was during the Fast Track    12:53:47
```

Page 92

ERRATA SHEET

Deposition of Tarla Makaeff taken January 30, 2012-January 31, 2012

| Page | Line | Change |
|------|------|--------|
| 54 | 25 | Change "No," to "Yes, I did have an internet marketing mentor, but I'm not sure if it was prior to June of 2008 or after." |
| 361 | 17 | Change "Yes," to "No; I set up an account, but it was a Myspace account, not a Facebook account." |
| 554 | 5 | No," to "I didn't ask Internet Marketing Company for a refund. I did ask Online Trading Academy for a partial refund, but only in regard to courses I had not yet taken; when they declined, I did not pursue it." |

Subject to the above changes, I certify that the transcript is true and correct.

_____            4/13/2012
Signature                                              Date

Exhibit 1 - Page 31

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken before

7   me at the time and place herein set forth; that any

8   witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14         I further certify that I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date subscribed

18  my name.

19

20  Dated:   2/13/2012

21

22

23      —   _____
                Kae F. Gernandt, CSR No. 5342

24

25

                                            Page 282