ROBBINS GELLER RUDMAN
 & DOWD LLP
JASON A. FORGE (181542)
jforge@rgrdlaw.com
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Class Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>      vs.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>                              Defendants. | No. 3:10-cv-0940-GPC(WVG)<br><br>CLASS ACTION<br><br>PLAINTIFFS' OMNIBUS OPPOSITION TO TRUMP DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT<br><br>DATE:      April 3, 2015<br>TIME:      1:30 p.m.<br>CTRM:      2D (Schwartz)<br>JUDGE:    Hon. Gonzalo P. Curiel |

**[REDACTED VERSION]**

1011477_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   STATEMENT OF RELEVANT FACTS ......................................... 2

    A.    Trump Was the Lone Star of TU's Ad Campaign Promising Trump's Integral Involvement in His "University" ............................ 2

    B.    Trump Utterly Failed to Deliver on His Promises ............................ 4

        1.    Trump Admitted His Involvement Was Completely Absent ................................................................................ 4

        2.    Trump's "University" Was Anything But ................................ 6

        3.    What Trump Actually Delivered Was a Scam ........................ 9

III.  THE CLASS WILL CONTINUE TO TRIAL REGARDLESS OF WHAT HAPPENS TO INDIVIDUAL REPRESENTATIVES ................... 13

IV.  THE FACT FINDER WILL NEED TO RESOLVE FACTUAL DISPUTES AS TO PLAINTIFFS' CLAIMS ............................................. 14

    A.    Applicable Legal Standards ................................................ 14

    B.    Trump May Not Disavow Liability to Students He Ensnared In His Web of Deception ...................................................... 16

    C.    Trump Made the Misrepresentations at the Heart of this Case ......... 18

    D.    This Court Rightly Embraced Plaintiffs' Full-Refunds Damages Model ................................................................ 18

        1.    Only Full Refunds Will Return Plaintiffs to the Position They Were in Prior to Being Ensnared in this Illegal Scam.................................................................... 19

        2.    This Is Not an Imperfect Labeling Case ............................ 22

        3.    No Expert Opinion Necessary .......................................... 24

    E.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs Makaeff, Low, and Keller's UCL/FAL Claims ................. 26

        1.    Plaintiffs Prevail on the "Unlawful" Prong of the UCL for the Illegal Operation of TU ........................................ 26

        2.    Plaintiffs Prevail on the "Unfair" and "Fraudulent" Prongs of the UCL for Defendants' Fraudulent Scheme ......... 27

        3.    Plaintiffs Have Demonstrated that Trump's Misrepresentations Caused Their Injuries ............................ 28

1

2                                                                                        **Page**

3

4.      Plaintiffs Are Entitled to Injunctive Relief under the UCL ..... 32

5.      Plaintiffs Are Entitled to Full Restitution under the UCL ....... 33

F.      Factual Disputes Exist as to Plaintiff Low's Elder Abuse Claim....... 34

G.      Defendants Are Not Entitled to Summary Judgment on
        Plaintiffs' CLRA Claims........................................................... 36

        1.      Under the CLRA's Broad Definition of "Transaction,"
                There Is an Actionable Transaction Between Plaintiffs
                and Trump.................................................................. 36

        2.      Plaintiffs Have Established Causation for the CLRA
                Claims ....................................................................... 38

        3.      Plaintiffs Are Entitled to an Injunction Under the CLRA........ 39

        4.      Plaintiffs Are Entitled to Full Refunds under the CLRA ......... 40

H.      Defendants Are Not Entitled to Summary Judgment on
        Everett's Claims................................................................... 41

        1.      Everett's FDUTPA Claims Should Proceed to Trial............... 41

        2.      Trump Violated Florida's Misleading Advertising Law.......... 43

I.      Trump Is Not Entitled to Summary Judgment on Plaintiff
        Brown's New York Gen. Bus. Law §349 Claim ............................... 47

J.      Factual Questions Remain as to the Other Plaintiffs' Claims ........... 49

V.      CONCLUSION ............................................................................ 51

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Allen v. Hyland's Inc.*,
5
    300 F.R.D. 643 (C.D. Cal. 2014) ........................................................ 21

6

*Anderson v. Liberty Lobby, Inc.*,
7
    477 U.S. 242 (1986) ............................................................................ 15

8

*Astiana v. Ben & Jerry's Homemade, Inc.*,
    No. C 10-4387 PJH, 2014 U.S. Dist. LEXIS 1640
9
    (N.D. Cal. Jan. 7, 2014) ...................................................................... 23

10

*Bates v. UPS, Inc.*,
11
    511 F.3d 974 (9th Cir. 2007) .............................................................. 14

12

*Bryant v. Farmers Ins. Exch.*,
13
    432 F.3d 1114 (10th Cir. 2005) .......................................................... 25

14

*Cal. Serv. Station v. Union Oil Co.*,
15
    232 Cal. App. 3d 44 (1991) ................................................................ 32

16

*Celotex Corp. v. Catrett*,
17
    477 U.S. 317 (1986) ............................................................................ 15

18

*Chamberlan v. Ford Motor Co.*,
    No. C 03-2628 CW, 2003 U.S. Dist. LEXIS 27912
19
    (N.D. Cal. Aug. 6, 2003) .............................................................. 36, 37

20

*Cirulli v. Hyundai Motor Co.*,
21
    No. SACV 08-0854 AG (MLGx),
    2009 U.S. Dist. LEXIS 124670 (C.D. Cal. Nov. 9, 2009) .................. 38
22

23

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) .............................................................. 16
24

25

*Colgan v. Leatherman Tool Grp., Inc.*,
    135 Cal. App. 4th 663 (2006) ........................................................ 23, 24

26

*Crewe v. Rich Dad Educ., LLC*,
27
    884 F. Supp. 2d 60 (S.D.N.Y. 2012) .................................................... 6

28

1

2                                                                              **Page**

3

4
*Day v. AT & T Corp.*,
    63 Cal. App. 4th 325 (1998)..................................................................33

*Dei Rossi v. Whirlpool Corp.*,
    No. 2:12-cv-00125, 2013 U.S. Dist. LEXIS 153682
    (E.D. Cal. Oct. 25, 2013)...............................................................37, 38

*Delarosa v. Boiron*,
    275 F.R.D. 582 (C.D. Cal. 2011) ........................................................40

*Doyle v. Chrysler Group*, SACV 13-00620 JVS (ANx),
    2014 U.S. Dist. LEXIS 93157 (C.D. Cal. July 3, 2014) .....................31

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
    431 U.S. 395 (1977) ............................................................................13

*Edwards v. Angeles Abbey Mem. Park*,
    No. 09-02441 DDP, 2009 U.S. Dist. LEXIS 61996
    (C.D. Cal. July 2, 2009)......................................................................14

*Fitzpatrick v. General Mills*,
    263 F.R.D. 687 (S.D. Fla. 2010) .........................................................42

*Fletcher v. Sec. Pac. Nat'l Bank*,
    23 Cal. 3d 442 (1979)..........................................................................33

*Foraker v. Schauer*,
    No. 04-cv-00363-EWN-OES, 2005 U.S. Dist. LEXIS 46071
    (D. Colo. Sept. 8, 2005)......................................................................25

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
    104 Cal. App. 4th 508 (2002)..............................................................26

*FTC v. Figgie Int'l*,
    994 F.2d 595 (9th Cir. 1993)...................................................19, 20, 49

*FTC v. Int'l Diamond Corp.*,
    1983-2 Trade Cases ¶65,506 (N.D. Cal. 1983) ..................................19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                                                                  **Page**

3
4    *FTC v. Mylan Lab., Inc.,*
        99 F. Supp. 2d 1 (D.D.C. 1999) ........................................................ 43

5
    *Fulford v. Logitech,*
6        No. C-08-2041, 2008 U.S. Dist. LEXIS 95175
7        (N.D. Cal. Nov. 14, 2008), *dismissed, in part,*
        2009 U.S. Dist. LEXIS 30735 (N.D. Cal. Mar. 26, 2009) ................................ 38

8
    *Galvan v. KDI Distribs., Inc.,* No. SACV 08-0999 JVS(ANx),
9        2011 U.S. Dist. LEXIS 127602 (C.D. Cal. Oct. 25, 2011) ................................ 31

10
    *Gray v. BMW of N. Am.,*
11       No.: 13-cv-3417-WJM-MF, 2014 U.S. Dist. LEXIS 133337
12       (D.N.J. Sept. 23, 2014) ........................................................ 37

13   *Groupon, LLC v. Groupon, Inc.,*
        859 F. Supp. 2d 1067 (N.D. Cal. 2012) ........................................ 17
14
    *Hahn v. Massage Envy Franchising, LLC,*
15       No. 12cv153 DMS (BGS), 2014 U.S. Dist. LEXIS 147899
16       (S.D. Cal. Sept. 25, 2014) .................................................... 16, 20, 21

17   *Henderson v. Gruma Corp.,*
18       No. CV 10-04173 AHM, 2011 U.S. Dist. LEXIS 41077
        (C.D. Cal. April 11, 2011) .................................................... 39
19
    *Hewlett v. Squaw Valley Ski Corp.,*
20       54 Cal. App. 4th 499 (1997) .................................................... 32
21
    *Hill v. Opus Corp.,*
22       464 B.R. 361 (C.D. Cal. 2011) ................................................ 17

23   *In re Duncan,*
24       713 F.2d 538 (9th Cir. 1983) ................................................ 50

25   *In re eBay Litig.,*
26       No. 07-cv-2198 RMW, 2012 U.S. Dist. LEXIS 128616
        (N.D. Cal. Sept. 10, 2012), *aff'd,* No. 12-17251,
27       2015 U.S. App. LEXIS 1161 (9th Cir. Jan. 26, 2015) .................................... 24

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Page**

*In re Facebook, Inc., PPC Adver. Litig.*,
   282 F.R.D. 446 (N.D. Cal. 2012) ................................................................ 24

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) .......................................................... 28, 29, 31

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009) ................................................. 20, 24, 38

*Jones v. AIG Risk Mgmt.*,
   726 F. Supp. 2d 1049 (N.D. Cal. 2010) ............................................. 29

*Karpierz v. Easley*,
   68 S.W.3d 565 (Mo. Ct. App. 2002) ................................................. 51

*KC Leisure, Inc. v. Haber*,
   972 So. 2d 1069 (Fla. 5th DCA 2008) .............................................. 42

*Keilholtz v. Superior Fireplace Co.*,
   No. C 08-00836 CW, 2009 U.S. Dist. LEXIS 30732
   (N.D. Cal. Mar. 30, 2009) ................................................................. 37

*Koehler v. Litehouse, Inc.*,
   No. CV 12-04055 SI, 2012 U.S. Dist. LEXIS 176971
   (N.D. Cal. Dec. 13, 2012) ................................................................. 39

*Kramer v. Unitas*,
   831 F.2d 994 (11th Cir. 1987) ........................................................... 45

*Krueger v. Wyeth, Inc.*,
   No. 03CV2496 JAH (AJB), 2011 U.S. Dist. LEXIS 154472
   (S.D. Cal. Mar. 30, 2011) ................................................................. 22

*Kwikset Corp. v. Superior Ct.*,
   51 Cal. 4th 310 (2011) ...................................................................... 32

*Larsen v. Trader Joe's*,
   No. C 11-05188 SI, 2012 U.S. Dist. LEXIS 162402
   (N.D. Cal. June 14, 2012) ................................................................. 39

1

2                                                                              **Page**

3

4

*Lee v. Carter-Reed Co., L.L.C.*,
    4 A.3d 561, 577 (2010)..............................................................21

*Leroy v. Great West. United Corp.*,
    443 U.S. 173 (1979) ................................................................50

*Little v. Morris*,
    967 S.W.2d 685 (Mo. Ct. App. 1998) .................................................50

*Makaeff v. Trump Univ., LLC*,
    715 F.3d 254 (9th Cir. 2013) ...........................................2, 18, 49

*Mass. Mut. Life Ins. Co. v. Superior Ct.*,
    97 Cal. App. 4th 1282 (2002).......................................................38

*Matter of People of the State of N.Y. v. Trump Entrepreneur Initiative LLC*,
    No. 451463/13, 2014 N.Y. Misc. LEXIS 4533
    (N.Y. Sup. Ct. Oct. 8, 2014)........................................................9

*Matter of People v. Applied Card Sys., Inc.*,
    41 A.D.3d 4 (N.Y. App. 2007) ......................................................49

*McAdams v. Monier, Inc.*,
    182 Cal. App. 4th 174 (2010)..................................................36, 37

*McAnaney v. Astoria Fin. Corp.*,
    No 04-CV-1101 (JFB) (WDW), 2007 U.S. Dist. LEXIS 67552
    (E.D.N.Y. Sept. 12, 2007) ..........................................................14

*McKell v. Wash. Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006).....................................................26

*Mikol v. Vlahopoulos*,
    340 P.2d 1000 (Ariz. 1959) ........................................................22

*Morgan v. AT&T Wireless Servs., Inc.*,
    177 Cal. App. 4th 1235 (2009).................................................27, 28

*Nat'l Fed'n of the Blind v. Target Corp.*,
    582 F. Supp. 2d 1185 (N.D. Cal. 2007) ............................................14

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                                                                          **Page**

3
*Negrete v. Fid. & Guar. Life Ins. Co.*,
   444 F. Supp. 2d 998 (C.D. Cal. 2006) ............................................................... 35

*Nelson v. City of Davis*,
   571 F.3d 924 (9th Cir. 2009) ............................................................................. 15

*Nordberg v. Trilegiant Corp.*,
   445 F. Supp. 2d 1082 (N.D. Cal. 2006) ........................................................... 38

*Office of the Attorney Gen. v. Wyndham Int'l, Inc.*,
   869 So. 2d 592 (Fla. 1st DCA 2004) ................................................................. 41

*Ogden v. Bumble Bee Foods, LLC*,
   No. 5:12-CV-01828-LHK, 2014 U.S. Dist. LEXIS 565
   (N.D. Cal. Jan. 2, 2014) ..................................................................................... 23

*Openwave Sys. v. Fuld*,
   No. C 08-5683 SI, 2009 U.S. Dist. LEXIS 48206
   (N.D. Cal. June 6, 2009) ..................................................................................... 16

*Ortega v. Natural Balance, Inc.*,
   300 F.R.D. 422 (C.D. Cal. 2014) ....................................................................... 20

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
   647 N.E.2d 741 (N.Y. 1995) ......................................................................... 47, 48

*People ex rel. Harris v. Sarpas*,
   225 Cal. App. 4th 1539 (2014)............................................................... 16, 31, 33

*People ex rel. Kennedy v. Beaumont Invest., Ltd.*,
   111 Cal. App. 4th 102 (2003)............................................................................. 33

*People v. Superior Court*,
   9 Cal. 3d 283 (1973)........................................................................................... 33

*People v. Telehublink Corp.*,
   301 A.D.2d 1006 (N.Y. App. 2003).................................................................... 49

*People v. Toomey*,
   157 Cal. App. 3d 1 (1984)................................................................................... 32

1

2                                                                    **Page**

3

*PMC, Inc. v. Kadisha,*
   78 Cal. App. 4th 1368 (2000)..................................................... 16, 32

*Reis v. Peabody Coal Co.,*
   997 S.W.2d 49 (Mo. Ct. App. 1999) ................................................. 50

*Rikos v. P&G,*
   No. 1:11-cv-226, 2014 U.S. Dist. LEXIS 109302
   (S.D. Ohio June 19, 2014) ......................................................... 19, 21

*Saunders v. Superior Court,*
   27 Cal. App. 4th 832 (1994) ............................................................ 26

*Schikore v. BankAmerica Supp. Ret. Plan,*
   269 F.3d 956 (9th Cir. 2001) ........................................................... 27

*Segal v. Rhumbline, Int'l, Inc.,*
   688 So. 2d 397 (Fla. 4th DCA 1997) ................................................ 45

*Siever v. BWGaskets, Inc.,*
   669 F. Supp. 2d 1286 (M.D. Fla. 2009) ........................................... 41

*Small v. Lorillard Tobacco Co.,*
   720 N.E.2d 892 (N.Y. 1999) ........................................................... 49

*Sosna v. Iowa,*
   419 U.S. 393 (1975) ....................................................................... 13

*Stearns v. Ticketmaster Corp.,*
   655 F.3d 1013 (9th Cir. 2011)..................................................... 33, 40

*Steroid Hormone Product Cases,*
   181 Cal. App. 4th 145 (2010)................................................ 20, 38, 39

*Suntree Techs. v. Ecosense Int'l, Inc.,*
   No. 6:09-cv-1945-Orl-28GJK, 2010 U.S. Dist. LEXIS 20347
   (M.D. Fla. Mar. 8, 2010) ................................................................ 42

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,*
   809 F.2d 626 (9th Cir. 1987)........................................................... 15

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2 **Page**

3

*Taubert v. Office of the AG,*
    79 So. 3d 77 (Fla. 1st DCA 2011) ........................................................ 42

*Ticconi v. Blue Shield of Cal. Life & Health Ins.,*
    160 Cal. App. 4th 528 (2008) .............................................................. 27

*Tri-County Plumbing Servs. v. Brown,*
    921 So. 2d 20 (Fla. 3d DCA 2006) ...................................................... 42

*United States Parole Comm'n v. Geraghty,*
    445 U.S. 388 (1980) ............................................................................ 13

*United States v. Austin,*
    54 F.3d 394 (7th Cir. 1995) ................................................................ 19

*United States v. Grizaffi,*
    471 F.2d 69 (7th Cir. 1972) ................................................................ 25

*United States v. Kennedy,*
    726 F.3d 968 (7th Cir. 2013) .............................................................. 19

*United States v. Powers,*
    578 Fed. Appx. 763 (10th Cir. 2014) ............................................. 24, 25

*United States v. Reis,*
    366 Fed. Appx. 781 (9th Cir. 2010) (unpublished) ............................ 16

*United States v. Sheinbaum,*
    136 F.3d 443 (5th Cir. 1998) .............................................................. 22

*Uvanile v. Denoff,*
    495 So. 2d 1177 (Fla. 4th DCA 1986) ................................................ 45

*Werdebaugh v. Blue Diamond Growers,*
    No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575
    (N.D. Cal. May 23, 2014) ............................................................... 22, 23

*Wineberg v. Whatcom Cnty.,*
    241 F.3d 746 (9th Cir. 2001) .............................................................. 40

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Page**

*Wyatt v. Union Mortgage Co.,*
    24 Cal. 3d 773 (1979) ................................................................................ 16

*Zimmer v. Nawabi,*
    566 F. Supp. 2d 1025 (E.D. Cal. 2008) ............................................... 35

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 56(a) ............................................................................................... 14

California Business & Professions Code
    §17200 ..................................................................................................... 26
    §17203 ............................................................................................... 32, 33
    §17535 ..................................................................................................... 33

California Civil Code
    §1760 ....................................................................................................... 36
    §1761(e) ............................................................................................ 36, 38
    §1770(a) ................................................................................................... 40
    §1780(a) ................................................................................................... 38
    §1780(a) and (a)(2) ................................................................................. 39
    §1780(a), (e) ............................................................................................ 40
    §1781(a) ................................................................................................... 40
    §3345(b)(1) .............................................................................................. 35

California Welfare & Institutions Code
    §15610.30 ................................................................................................ 34
    §15610.30(a) ........................................................................................... 34
    §15610.30(2)(b) ................................................................................. 34, 35

Florida Statutes
    §501.202 ........................................................................................... *passim*
    §501.2077 ................................................................................................ 41
    §817.40(5) ................................................................................................ 43
    §817.41 ..................................................................................................... 43
    §817.41(4) ................................................................................. 43, 44, 47

1

2                                                                                        **Page**

3
New York General Business Law
4        §349 ................................................................................................47, 49

5
New York State Education Law
6        §224 ................................................................................................26, 27

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.   INTRODUCTION

Defendant Donald J. Trump ("Trump") and his eponymous "university" ("TU") have filed separate motions for summary judgment ("MSJs") that share a common lack of merit.  Trump, the king of reality TV, bases his entire motion on the unreal assertions that he did not personally make the core misleading statements at issue here, or at least he is not accountable because he did not personally make them to the class representatives.  If either side is entitled to summary judgment on Trump's accountability, however, it would be plaintiffs.  Trump made the core misleading statements as the lone star of a promotional video that kicked off all of TU's free "Preview" seminars and served as the center of TU's universe of promotional materials – all of which prominently featured Trump's name, face, words, and/or signature, and all of which he approved.

TU's motion does not contest liability, but rather seeks summary judgment based on damages.  Rivaling its founder's detachment from reality, TU's entire motion depends on the Court reversing its prior acceptance of plaintiffs' full-refund damages model.  If the Court reverses itself, TU demands summary judgment because plaintiffs have not designated a damages expert.  Even if there were a justification for the Court to reverse its prior holding (and there is not), TU previously agreed and expressly represented to the Court that no expert discovery was necessary here.  Also, there is no "market" or "market value" for instruction from an entity unlawfully operating as a "university," so there really is no need for an expert.  Moreover, multiple lay witnesses will testify that TU offered less help than realtors and mortgage brokers provide for free.

Plaintiffs respectfully submit that the Court should deny defendants' MSJs and allow this case to proceed to trial.[1]

---

[1]   Here, and throughout, unless otherwise noted, references to "CC Ex." are to the Exhibits filed in support of Plaintiffs' Motion for Class Certification (*see* Dkt Nos. 122-2, 195-1, 221-1); and references to "Ex." are to the Exhibits attached to the Declaration of Rachel L. Jensen ("Jensen Decl."), filed concurrently herewith.

## II.     STATEMENT OF RELEVANT FACTS[2]

### A.     Trump Was the Lone Star of TU's Ad Campaign Promising Trump's Integral Involvement in His "University"

Despite his efforts to now distance himself from the core misrepresentations, in reality, Trump was the only star of TU's advertising campaign aimed at leveraging his celebrity to hook his biggest fans.   Glossy advertisements – all of which were approved by Trump[3] – featured Trump as TU's sole selling point:

> Trump University has not been shy about touting its connection to its eponymous creator. Evoking Trump's well-known reality television series, Trump University's advertisements promise that enrolling in Trump University is "the next best thing to being [Trump's] Apprentice." Its advertisements prominently showcase Trump's photo while urging consumers to "[l]earn from the Master," and promising to teach Trump's "insider success secrets." The home page of Trump University's website features Trump's photo next to the words: "Are YOU My Next Apprentice? Prove it to me!" Trump University students are shown a slide depicting Trump University as the latest of Donald Trump's achievements, alongside such feats as buying the "Taj Mahal" casino in Atlantic City and completing the "Trump Tower" in Manhattan.

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 258-59 (9th Cir. 2013).

TU's 30(b)(6) designee Sexton testified that the consistent marketing theme was the "overarching messaging of Donald Trump's an expert in real estate."[4]  Trump marketed his "university" as one of a kind, providing his unique insights into real

---

[2]   The facts and evidence cited herein represent a mere sampling of the evidence that plaintiffs intend to put on at trial of their class claims.   Plaintiffs incorporate by reference the facts and evidence set forth in their Responses to Defendants' Separate Statements of Facts, filed concurrently herewith.

[3]   Michael Sexton instructed TU Chief Marketing Officer Michael Bloom that all print ads had "to be approved by Mr. Trump," and Bloom "followed that instruction." Ex. 1 (Bloom Tr.) at 79:23-80:7.  Bloom had to physically bring a copy of every newspaper advertisement to Trump's assistant Rhona, and she or someone from Trump's office would notify Bloom when Trump had reviewed and approved the ad. Ex. 1 (Bloom Tr.) at 78:16-79:22.  For example, in regard to the "Are YOU my next APPRENTICE" "Come prove it to me" ad, which Bloom believed was ███████ ████████████████████████████████████████████████████  *See* Ex. 2 at TRUMP 00165047.

[4]   Ex. 3 (Sexton Tr.) at 459:3-18.   TU distinguished itself based on Trump's involvement. Ex. 4 (Martin Tr.) at 154:19-156:16, 182:6-19.  *See* Ex. 3 (Sexton Tr.) at 163:16-164:3 (testifying that the Trump "brand was critical to the business").

1    estate that he had accumulated over his career, knowing that consumers trust him and

2    want to learn from him.[5]  The Main Promotional Video featuring Trump – played at

3    the Previews and posted on the website – touted this unique opportunity:

> Donald Trump is ***without question the world's most famous businessman***. . . . Now Donald Trump brings ***his years of experience*** to the world of business education.  With the launch of Trump University, ***he*** makes the very best of America's business education available to you and others like you who seek a life of success, fulfillment and prosperity.

7    CC Ex. 2.[6]  In this video, played at the start of the Previews, Trump speaks directly

8    into the camera to prospective student-victims:

> We're going to have ***professors and adjunct professors*** that are absolutely terrific.  Terrific people, terrific brains, successful. . . .  The best.  We are going to have the best of the best and honestly if you don't learn from them, if you don't learn from me, if you don't learn from the people that we're going to be putting forward – ***and these are all people that are handpicked by me*** – then you're just not going to make in terms of the world of success.  . . . we're going to teach you better than the business schools are going to teach you and I went to the best business school.[7]

14       In addition, "Special Invitation[s] from Donald J. Trump" with glossy VIP

15    tickets urged consumers:

> Come to ***my*** free class.  In just 90 minutes, ***my hand-picked instructors*** will share ***my techniques***, which took my entire career to develop.  Then, just copy exactly what I've done to get rich.

18    CC Ex. 32 at TU 25265-66.   Advertisements in mainstream newspapers also

19    proclaimed: ███████████████████████████████████████████

20    █████████████████████████████████████████████████████ and

21    assured prospective students that, "***I*** can turn anyone into a successful real estate

---

[5]   Ex. 5 (DJT Tr.) at 50:5-9, 50:23-51:2.  *See, e.g.,* CC Ex. 40 at TU 59131, TU 59154, TU 59156, TU 59163.  Ads proclaimed: Trump is ██████████████████ ████████████  CC Ex. 75 at TU 130436.

[6]   Here, and throughout, all emphasis is supplied, and internal citations and quotation marks omitted unless otherwise noted.

[7]   CC Ex. 2; *see also* CC Ex. 12 at TU 52954 ██████████████ ██████████████).  Former instructor Gerald Martin confirmed that the Main Promotional Video was played at the beginning of every Preview seminar. Ex. 4 (Martin Tr.) at 109:10-19.

investor, including **you**."[8] TU's website promised students they would "Learn from the Master" and that it was the "next best thing to being [Trump's] Apprentice" because students would have access to "Insider success **secrets from Donald Trump**."[9]

At the Live Events, PowerPoint slides emphasized Trump's involvement:

- "Trump Real Estate Investing System. " CC Ex. 40 at TU 59136.
- "Trump's 2010 real estate strategies – A once in a lifetime opportunity!" *Id.* at TU 59152.
- "The Trump Philosophy: 'I can train anybody to be a successful real estate investor. . . .'" *Id.* at TU 59154.
- "Learn Trump's step-by-step system for profiting in real estate." *Id.* at TU 59156.

Talking points accompanying these slides further reinforced his involvement:

- "[W]hat he knows about real estate you will learn when you become part of Trump University." Ex. 6 at TU 154668.
- "[Fast Track to Foreclosure Investing] is based on Mr. Trump's years and years of experience." *Id.* at TU 154675.
- "First, we will show you Donald Trump's negotiating system." *Id.* at TU 154696.

Trump hooked his fans with these promises. Plaintiff Ed Oberkrom testified Trump's involvement with TU "wasn't just a reason. **It was the only reason**" he purchased.[10]

## B.   Trump Utterly Failed to Deliver on His Promises

### 1.   Trump Admitted His Involvement Was Completely Absent

Contrary to his promises, Trump utterly failed to deliver on his promises of involvement, delivering a worthless upsell assembled from recycled scams. Trump

---

[8]   CC Exs. 43, 75 at TU 130436.

[9]   CC Ex. 64 at TU-PLTF00364-66.

[10]   Ex. 7 (Oberkrom Tr.) at 373:9-22; *see also* Ex. 8 (Everett Tr.) at 84:2-3 ("The Trump name played a huge role in my decision [to purchase the Fulfillment]."); Ex. 9 (Makaeff Tr.) at 100:23-102:10 (Q. "So, it was important to you to be in a program that had his name on it because of his reputation? A. Yes.").

1   has made the judicial admission that his **involvement was "completely absent**."[11]

2   Indeed, Trump did not participate in the Live Events, did not teach or mentor students,

3   could not identify a single program or what students received as part of any program,

4   and does not even know if students received a degree.[12]   As Sexton has since

5   admitted: "None of our instructors at the live events were handpicked by Donald

6   Trump."[13]   Trump admitted as much in his interrogatory answers – as this Court has

7   previously recognized.[14]   And, though Trump's lawyer represented to this Court at the

8   class certification hearing that Trump "sat down" with J.J. Childers, Childers put that

9   to rest, testifying he has **never** had any substantive discussions with Trump, much less

10  any about Trump's real estate secrets.[15]

11       And, despite telling students that Trump would teach them his investing secrets

12  that "took my entire career to develop," the instructors have since testified that they

13

14

---

15  [11]   Dkt. No. 32 at 5-6; *see also, e.g.*, Ex. 3 (Sexton Tr.) at 442:12-444:3 (Sexton
16  testified that Meredith McIver was Trump's ghostwriter, authoring the introductions
    to Trump's books, blog posts Trump University's "Q&A with Mr. Trump," and
17  content for Trump University newsletters.).

18  [12]   Ex. 5 (DJT Tr.) at 86:15-24, 107:10-19, 119:18-120:1-4, 130:14-20; Ex. 15
    (Sexton NYAG Exam.) at 160:22-161:2, 163:8-11, 167:20-168:8; Ex. 4 (Martin Tr.) at
19  58:14-20.

20  [13]   Ex. 15 (Sexton NYAG Exam.) at 157:13-15.  None of the other instructors testified
    they had ever met Trump. *E.g.* Ex. 4 (Martin Tr.) at 45:13-19 (Q. Have you ever met
21  with Donald Trump? A. No. Q. Have you ever talked with Donald Trump on the
    phone? A. No."); Ex. 16 (Sperry Tr.) at 29:18-30:16 ("Q. [P]rior to signing the
22  contract, did you meet with Donald Trump? A. No. Q. Did you ever meet with Donald
    Trump? A. No.").

23  [14]   Dkt. No. 298 at 6 ("Trump stated that he 'personally was involved in the selection
24  of Don Sexton, Gary Eldred, Michael Gordon and Jack Kaplan.").  Sexton, Gordon
    and Kaplan were not speakers at any Live Event, and of the more than 2000 Live
25  Events, the evidence suggests that Eldred presented at no more than one in 2007. *See,
    e.g.*, Ex. 17 (TU 102277-315).

26  [15]   *Compare* Dkt. No. 290 (11/8/13 Tr.) at 39:6-11 and 63:22-25 *with* Ex. 18 (Childers
27  Tr.) at 45:18-20 ("Q.  Have you ever had a substantive conversation with Mr. Trump?
    A.  No.").  Childers testified that his interaction with Trump was simply a photo op
28  arranged because he's a "huge fan."  Ex. 18 (Childers Tr.) at 44:2-10.

1   did not teach Trump's real estate techniques.[16]   Instead, the materials at the 3-day

2   Fulfillment and Elite Programs were recycled from other get-rich-quick scams.[17]

3             **2.      Trump's "University" Was Anything But**

4             TU began unsuccessfully with web-only content in 2005, before shifting to "get

5   rich quick" live events in 2007.   In going "live," Trump initially partnered with

6   notorious outfits, such as Dynetech, "Trigrent" (a licensee of "Rich Dad Poor Dad")

7   and Prosper, Inc., drawing on their personnel and materials.[18]   Trump set out to

8

9

10  ─────────────────

11  [16]   *Compare* CC Ex. 32 at TU 25266 *with* Ex. 4 (Martin Tr.) at 58:10-24 (Q. "You
    weren't teaching Donald Trump's real estate investing techniques, were you?   A.
    No."); Ex. 19 (Miller Tr.) at 55:24-56:1 ("Q. Donald Trump never told you what his
12  real estate investing secrets or techniques were, did he?  A. No.").

13  [17]   For example, a former employee testified she was tasked to Dynetech events and
    tasked with trying to "recreate" them for Trump.  Ex. 20 (Sommer Tr.) at 54:13-21,
14  197:8-13.   Another former employee, Jason Nicholas, testified that "the stuff that
    they're teaching" was not Trump's "big secrets" – it was the same stuff that you
15  would see in "another competitor's real estate book or [if you] went to Barnes &
    Noble." Ex. 21 (Nicholas Tr.) at 150:18-151:8.
16
    [18]   *See* Ex. 3 (Sexton Tr.) at 148:20-151:10, 167:14-170:6, 285:22-286:24.   When
17  scheduling  TU  events,  the  PlayBook  dictated  ███████ ██ ███ ███████

18  ███████████████████"  CC Ex. 12 at TU 53005.   While Rich Dad relegated most lawsuits to
    arbitration, its operation sounds strikingly similar.  *See Crewe v. Rich Dad Educ.,*
19  *LLC*, 884 F. Supp. 2d 60, 70 (S.D.N.Y. 2012).  The media has also commented Robert
    Allen's seminar scam:
20
                    There's an ad for a free seminar. The crowd gets hyped with tales
21              of fabulous wealth. High-pressure sales staff are on hand to sign you up
                for more courses for thousands of dollars. ***Each successive "course" has***
22              ***little information, just fluff and hype and a push to get to the next level***
                ***where the real secrets will be revealed.*** There's a few thousand for the 3-
23              day course. Some more thousands for the mentor hot-line and one-on-
                one coaching. More thousands for the at-home study course. Many more
24              thousands for the weekend retreat where Robert Allen himself might
                appear. ***Then, if you really want the big juicy secret that will make you***
25              ***millions instantly, it'll just be $29,999 for the mastery class. Don't***
                ***worry, you'll make that all back, they say***.
26
    Ben Popken, *Despite Subprime Implosion, Robert Allen's Troops Still Pitch "Get Rich*
27  *in Real Estate with No Money Down"* (*available at* http://consumerist.com/2008/10/
    21/despite-subprime-implosion-robert-allens-troops-still-pitch-get-rich-quick-in-real-
28  estate-with-no-mo/) (last visited on Mar. 4, 2015).

1  distinguish his "University" from other seminar companies by marketing it as a once-

2  in-a-lifetime opportunity to learn *his* secrets, leveraging *his* name and *his* fan base.[19]

3         Trump held out TU as an elite "University" rivaling Ivy League schools.  As

4  this Court observed:  "A review of TU advertisements demonstrates that Trump

5  University utilized various forms of recognizable signs to appear to be an accredited

6  academic institution:  TU used a school crest that was ubiquitous and used on TU

7  letterhead, power point presentations, promotional materials and advertisements."[20]

8  Defendants utilized indicia of an accredited university on TU's website,

9  advertisements, presentations, main promotional video and scripts with references to

10 "faculty," "professors and adjunct professors," "curriculum," "accredit[ed]," and

11 "tuition."[21]  Trump University's "Marketing Guidelines" were designed to "ensure

12 brand, tone and *message consistency* across all Trump University's marketing efforts"

13 and required an "Elitist" "Tone" that makes one "Think of Trump University as a real

14 University, with a real Admissions process – *i.e.*, not everyone who applies, is

15 accepted," and used terminology like "Ivy League quality," "faculty," and "staff."[22]

16 In truth, the sole qualification for "admission" was having the means to pay,[23] even if

17 ────────────────

18 [19]  Ex. 10 at TRUMP 00161480 ███████████████████████████ ██ ███████████

19 ████████████████████

20 [20]  Dkt. No. 298 at 8-9.

21 [21]  *See, e.g.*, CC Ex. 13; CC Ex. 83 (Marketing Guidelines); CC Ex. 77 (2007
   PlayBook) at TU 130313-18 ███████████████████████████████████████████

22 ████████████████████████████████████████████

23 ███████████████████████████

24 [22]  CC Ex. 83 (Marketing Guidelines) at TU-DONNELLY0000014, TU-
   DONNELLY0000002 (purpose was to "define and establish [TU]'s branding strategy

25 across *all* communication mediums both in visual and copy form"), TU-
   DONNELLY0000015-17.

26 [23]  *See* CC Ex. 10 (Schnackenberg Decl.), ¶12; CC Ex. 9 (Nicholas Decl.), ¶¶10-11.

27 The playbook instructed employees: ██████████████████████████████████████████████

28 █████████████████  CC Ex. 12 (2010 PlayBook) at TU 53063.

1   that meant a "student" had to raise their credit limits to do so, as Trump's personnel

2   urged them to do.  *See, e.g.*, CC Ex. 6, ¶3.

3        But Trump's presentation of his enterprise as a "university" was illegal, and he

4   knew it.  In 2005, Assistant Commissioner of the Office of Higher Education Office of

5   Quality Assurance, Joseph Frey ("Frey") wrote to Trump personally and warned him

6   it was illegal to: (1) call his business a "university," as it was unqualified to do so; and

7   (2) operate without a license.[24]  Instead of complying, Trump's personnel lied to the

8   NYSED, claiming TU was relocating to Delaware, ███████████████, and in

9   2007, started the Live Events using the university title – while continuing to be run out

10  of New York.[25]  At his deposition, Frey testified about the role of the NYSED in

11  enforcing laws that reserve the "university" title for qualified institutions in order to

12  ensure they are "quality programs."[26]  And after watching the promotional video by

13  Trump about his "University," Frey testified that Trump conveyed the message TU

14  was a university by having "university" in the name, holding it out as providing

15  "business education," and comparing it to "other schools of business."[27]  Similarly, the

16  BBB found representations on TU's website that it "*is accredited*" to be misleading.[28]

17  For these reasons, along with numerous consumer complaints, the BBB gave TU a

18  "D-" rating, and only changed that status to "Not Reviewed" after Trump threatened

19  to sue the BBB.[29]

---

20  [24]  Ex. 11 at TU-PLTF03744-45.  Ex. 12 (Frey Tr.) at 53:9-54:3.  The affidavit of
21  Carole Yates, Director of the NYSED's Bureau of Proprietary School Supervision,
    presents a compelling chronology of Trump's defiance regarding his marketing of his
22  "university" from 2005 to 2010.  *See* Ex. 13(Yates Affidavit), ¶¶6-37; *see also*
    Plaintiffs' Statement of Additional Material Facts to Further Preclude Summary
23  Judgment ("PSOF"), Nos. 12-16, filed concurrently herewith.

24  [25]  CC Exs. 139 & 140.

25  [26]  Ex. 12 (Frey Tr.) at 33:25-40:6.

26  [27]  *See id.* at 74:15-77:3.

27  [28]  CC Ex. 13 at BBB NY 00505.

28  [29]  *Id.* at BBB NY 00542-45.

1    In 2010, an investigation by the Texas Attorney General resulted in TU

2  suspending operations there.[30] TU was effectively shut down by the NYSED in mid-

3  2010, though Trump says he will start up again after this lawsuit. *See, e.g.*, Ex. 5

4  (DJT Tr.) at 80:19-22. Indeed, on August 13, 2010, the NYSED wrote ████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ████████████████" and ordered Trump to cease live events in that state and provide full

7  refunds to all current students.[31] On August 24, 2013, the NYAG's office sued Trump

8  for his role in TU, and a New York state court has since made a summary

9  determination that Trump was operating TU without a license. *See Matter of People*

10 *of the State of N.Y. v. Trump Entrepreneur Initiative LLC*, No. 451463/13, 2014 N.Y.

11 Misc. LEXIS 4533, at 26-27 (N.Y. Sup. Ct. Oct. 8, 2014).

12        **3.    What Trump Actually Delivered Was a Scam**

13    ***Not*** delivering what Trump promised was critical to the scheme, as consumers

14 were to get ████████████████████████████████."[32] Trump University had a

15 detailed step-by-step "PlayBook" for Live Events that leaves no doubt its purpose was

16 to mislead customers for profit. At the 90-minute "Preview," the PlayBook dictated

17 that ████████████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████████████████

19 ████████████████████████████████████[33] Speakers told a false story of "advice"

20 learned over dinner with Trump – despite having never met him (much less had dinner

21

22

23 ───────────────────────
   [30] Ex. 3 (Sexton Tr.) at 413:2-17, 418:10-20; CC Ex. 70 at TU 135883 (TU has
24 "indefinitely postponed all Texas free presentations"); *see also* CC Exs. 52-53.

25 [31] CC Ex. 67 at TU 129819-20; Ex. 14 at NYSED 000067-68.

26 [32] CC Ex. 12 (2010 PlayBook) at TU 53059; CC Ex. 11 (Sommer Decl.), ¶4 ("[TU]
   personnel only provided enough information to get students to sign up for the next
27 seminar or program.").

28 [33] CC Ex. 12 (2010 PlayBook) at TU 53041.

1    with him).   Former instructor Gerald Martin explained this false anecdote was

2    provided by TU.[34]

3            Contrary to the picture painted of Trump's "handpicked" instructors, the

4    Preview speakers were high-pressure salesmen working on a commission to hit targets

5    for selling the three-day $1,495 "Fulfillment" Seminar.  At the close of the Preview,

6    the entire Trump ███████████████████████████████████████

7    ██████████████ █████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ███████████████████ ██████████████████████████████████████

11   ████████████████████████████████████████[37]

12           Once hooked, the $1,495 Fulfillment Seminar was more of the same – three

13   days designed to provide attendees with incomplete information and apply high-

14   pressure sales tactics to persuade consumers to purchase the $34,995 Gold Elite

15   mentorship program as what they *really* needed.[38]  At the Fulfillment, personnel did

16   *not* convey Trump's real estate secrets, nor could they, as they were never privy to

17

18

19   ―――――――――――――――――――
     [34]   Ex. 4 (Martin Tr.) at 152:15-153:15.  Former instructor Sperry similarly testified

20   that "Donald Trump's involvement" was the "theme that you were instructed to hit the
     hardest."   Ex. 16 (Sperry Tr.) at 36:10-21, 43:13-16, 48:21-49:13 (Sperry described

21   his 700 presentations as "pretty much the same presentation each time"); *id.* at 57:11-
     13 ("[Q:] And did you always hit Mr. Trump's involvement the same way? [A:] Tried

22   to, yes.").

23   [35]   CC Ex. 12 (2010 PlayBook) at TU 52955.

24   [36]   *Id.* at TU 52956.

25   [37]   *Id.* at TU 53043.

26   [38]   Quotes from Harris's 3-day Fast Track to Foreclosure: ██████████████████

27   ██████ █ ██████" Ex. 22 at TU 97184.

28   █████████████████████████████████████ *Id.* at TU 97188.

1   them.[39]  Instead, the speakers (paid on commission) were trained to ██████████

2   ████████████████████████████████████████████████████[40]   All

3   personnel had to follow these procedures because:

4-6   ███████████████████████████████████████████████████████████████

7   CC Ex. 12 (2010 PlayBook) at TU 53059-60.  Consumers were asked to fill out

8   financial profile sheets under the pretext of analyzing their ability to buy property, but

9   Trump used these sheets to █████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ███████.[41]  Students were instructed to raise their credit card limits for investing

12   in real estate, and when it came time to pitch the $34,995 Elite Program, the new

13   limits were ripe for the picking, as students were assured: █████████████

14   ████████████████████████████████████████████████████

---

[39]   Sperry, who never met Trump, was asked: "Do you have any basis whatsoever for saying that you were made aware of Donald Trump's personal real estate investing techniques?  A. Not from the source, no.  I – *I never was taught by Donald Trump how to invest in real estate.  Had he offered, I would have taken him up on that*." Ex. 16 (Sperry Tr.) at 31:5-21. Steven Miller provided the same response:  "Q. Have you ever met Donald Trump? A.  No. Q. Donald Trump never told you what his real estate investing secrets or techniques were, did he?  A. No."  Ex. 19 (Miller Tr.) at 55:22-56:1.

[40]   CC Ex. 12 (2010 PlayBook) at TU 53059; CC Ex. 11 (Sommer Decl.), ¶4 ("[TU] personnel only provided enough information to get students to sign up for the next seminar or program.").

[41]   CC Ex. 12 at TU 52969; *see also* Ex. 10 at TRUMP 00161478 (Bloom on marketing goals: ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████ CC Ex. 12 at TU 53045-46; *see also* CC Ex. 9 (Nicholas Decl.), ¶16 (phone script used by sales "had been psychologically designed and tested to convince consumers to agree to sign up for the courses . . . script was designed to play on people's emotions, needs and desires").

1    ████████████ . . . ."[42]  "If they still hesitate[d]" on ponying up $35,000, the

2    PlayBook had scripts to close the deal:

3

4

5

6

7    ████████████████████████████████████████████

8    CC Ex. 12 at TU 53063.  TU stands in stark contrast to a real estate course that

9    provides something of marketable value – an actual real estate license – for a couple

10   hundred dollars.[43]  Even for $34,995, Trump failed to make good on his promises of a

11   year-long mentorship with a "hand selected Trump certified multimillionaire

12   mentor,"[44] instead providing fly-by-night "mentors" who offered no more than a real

13   estate agent would do for free.[45]  Makaeff testified that her mentor provided "generic

14   real estate information that I could have gotten from the Barnes & Noble's book for

15   $25 instead of $35,000."[46]  Low testified about his mentorship:  "I was so

16   flabbergasted with the waste of time . . . .  They sent over a clown that I paid $25,000

17   for."[47]  And even Elite "students" were subjected to more selling by mentors and

18   _____

19   [42]  *See* CC Ex. 23 at TU 97153; CC Ex. 3 (Brown Decl.), ¶4; CC Ex. 5 (Low Decl.), ¶5; CC Ex. 6 (Makaeff Decl.), ¶¶3-4.

20   [43]  *See, e.g.*, Ex. 23 (Declaration of J.R. Everett ("Everett Decl.")), ¶3 (paid $200-$250 for an eight-week course in Florida to get her real estate license).

21   [44]

22   ██████████████████████████████████. Ex. 24 at TU 96116.

23   [45]  *See, e.g.*, Ex. 9 (Makaeff Tr.) at 120:9-22 ("I could have hired a real estate agent to take me around to properties for free for two days . . . ."); Ex. 25 (Brown Tr.) at 121:5-14 ("my real estate agent . . . could have done the same thing"); Ex. 23 (Everett Decl.), ¶¶6-9; CC Ex. 73 at TU 137810 ███████████████████████PSOF Nos. 17-18.

26

27   [46]  Ex. 9 (Makaeff Tr.) at 120:9-22.

28   [47]  Ex. 26 (Low Tr.) at 94:12-18, 98:19-99:2.

1   instructors, such as J.J. Childers, who admitted his "retreat" involved selling

2   additional products to TU "students."[48]

3         Finally, TU "mentors" put plaintiffs at risk of criminal fines and penalties by

4   "teaching" them illegal practices, such as bandit signs, and transactions that cannot be

5   legally undertaken without a real estate license, an essential tool to the practice of real

6   estate that TU never provided to students.[49]   As one former student summarized,

7   Trump's so-called "university" left him ██████████████████."[50]

8   **III.   THE CLASS WILL CONTINUE TO TRIAL REGARDLESS OF WHAT HAPPENS TO INDIVIDUAL REPRESENTATIVES**

9

10         At the outset, this case should proceed to trial on the absent class members'

11   claims even if summary judgment is granted on one or more of the named plaintiffs'

12   individual claims.  As the Supreme Court observed in *Sosna v. Iowa*, 419 U.S. 393,

13   399 (1975):  "When the District Court certifie[s] the propriety of the class action, ***the***

14   ***class of unnamed persons described in the certification acquire[] a legal status***

15   ***separate from the interest asserted by [the named plaintiff]***."  *Id.*; *see also United*

16   *States Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) (extending *Sosna* to hold a

17   class action does not become moot upon expiration of the named plaintiff's

18   substantive claim even when class certification was denied in the district court); *E.*

---

19   [48]  *See* Ex. 18 (Childers Tr.) at 71:20-72:4 (Childers sold his own products during TU
20   retreats and paid Trump a 20% royalty on these sales).  Makaeff spent $4,995 on
Childers' "offerings," only to find she had been taken again. Ex. 9 (Makaeff Tr.) at
386:3-8.

21   [49]  CC Ex. 93, ¶5 (Makaeff had to retain criminal defense attorney after DA
22   threatened fines and jail time over "posting bandit signs as [she] was taught to do by
Trump University").  Kerry Lucas "setup" Art Cohen (plaintiff in the related *Cohen*
23   case) with two local brokers that he said would allow Cohen to get a referral fee – an
arrangement Cohen later learned was illegal. Ex. 27 (Cohen Tr.) at 39:5-40:24; Ex. 28
24   (TU-COHEN0000531); The California Department of Real Estate ("DRE") warned of
the dubious legality of "cash-to-buyer" transactions as early as 1981 and sought to
25   punish those licensed agents who entered into such deals without full disclosure to the
seller – who was typically placed in a poor situation in which they could lose all
26   equity in their home if the buyer simply walked away. Unsurprisingly, the DRE noted
the increase in popularity of this scam was attributable to another real estate scam
27   artist, Robert Allen.  Ex. 29 (DRE 1981 Real Estate Bulletin).

28   [50]  CC Ex. 73 at TU 137803.

1   *Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977) (it would be

2   erroneous to dismiss class allegations where court had already certified a class and

3   "only later had it appeared that the named plaintiffs were not class members or were

4   otherwise inappropriate class representatives").  Courts in this Circuit have since

5   applied *Sosna*'s rationale in refusing to dismiss a class action after a named plaintiff's

6   claims later become moot.  *See, e.g.*, *Bates v. UPS, Inc.*, 511 F.3d 974, 987 (9th Cir.

7   2007) (even if class representative's claim "later became moot or nonredressable, an

8   identifiable member of the class" has standing).

9        Even in the unlikely event that the Court grants defendants' motions as to one

10  or more plaintiffs, plaintiffs should be permitted to substitute a new class

11  representative.  Indeed, dozens of absent class members have contacted Class Counsel

12  expressing a willingness to serve as class representatives.  *See* Jensen Decl., ¶3; *Nat'l*

13  *Fed'n of the Blind v. Target Corp.*, 582 F. Supp. 2d 1185, 1204 (N.D. Cal. 2007)

14  (granting defendant's MSJ on the named plaintiff's claim but allowing substitution of

15  another plaintiff); *Edwards v. Angeles Abbey Mem. Park*, No. 09-02441 DDP (RCx),

16  2009 U.S. Dist. LEXIS 61996, at *2 (C.D. Cal. July 2, 2009) (granting leave to

17  substitute new class representatives after granting defendants' MSJ as to class

18  representatives and finding as "not well-taken" defendants' argument that the entire

19  lawsuit should be dismissed); *McAnaney v. Astoria Fin. Corp.*, No 04-CV-1101 (JFB)

20  (WDW), 2007 U.S. Dist. LEXIS 67552, at *51-*53 (E.D.N.Y. Sept. 12, 2007)

21  (allowing for substitution or intervention of a new class representative after

22  defendants' MSJ granted on the named plaintiffs' claims).  As such, this case will

23  continue to trial on the class claims regardless of the outcome of defendants' MSJs.

24  **IV.  THE FACT FINDER WILL NEED TO RESOLVE FACTUAL**
    **DISPUTES AS TO PLAINTIFFS' CLAIMS**

25       **A.  Applicable Legal Standards**

26       This Court cannot grant summary judgment unless defendants show there is "no

27  genuine dispute as to ***any*** material fact."  Fed. R. Civ. P. 56(a).  As the movants,

28

defendants bear a substantial burden of "show[ing] that there is no genuine issue as to any material fact and [defendants are] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Had defendants met their burden – which they did not – plaintiffs need only "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 257 (1986) ("[T]he plaintiff, to survive the defendant's motion [for summary judgment] need only present evidence from which a jury **might** return a verdict in his favor.").

Due to the extreme nature of summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  The court's "function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.  """Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.""" *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009) (quoting *Anderson*, 477 U.S. at 255).  "If direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv.*, 809 F.2d at 631.  The court "must deny summary judgment if any rational trier of fact could resolve an issue" in favor of the non-moving party. *Nelson*, 571 F.3d at 927.  Further, if "reasonable minds could differ as to the import of the evidence," summary judgment is improper.  *Anderson*, 477 U.S. at 250. Defendants have not met their burden, and plaintiffs' claims should proceed to trial.

## B.   Trump May Not Disavow Liability to Students He Ensnared In His Web of Deception

It is well established that Trump was *the* selling point for TU.  His name.  His words.  His face.  His signature.  His promises.  He was the only draw for prospective students.  Yet, he contends that, despite this Court's prior orders denying his motions to dismiss and overruling his objections to class certification, because he never directly met, spoke to, or personally signed a contract with plaintiffs, their claims "indisputably fail."  Dkt. No. 375-1 ("DJT Mem.") at 1; *see also* Dkt. Nos. 33, 69, 70, 298.  But there is no requirement that plaintiffs must have spoken to Trump directly – or even entered into a contract with him – to recover from him for their claims of consumer fraud based on the scheme that Trump devised and directed.

To the contrary:  "A corporate officer or director is, in general, personally liable for all torts which he *authorizes or directs or in which he participates* . . . ."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999).[51]

Further, Trump's argument that he cannot be liable for restitution because he did not contract with plaintiffs, who paid TU, contradicts the relevant case law:

> Liability under the UCL and FAL must be based on the defendant's participation in or control over the unlawful practices found to violate section 17200 or 17500.  Although a UCL claim cannot be predicated on vicarious liability, liability under the UCL may be imposed against those who aid and abet the violation.  Liability may be imposed if the defendant knows the other's conduct constitutes a breach . . . and gives substantial assistance or encouragement to the other to so act.

*People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1563 (2014).[52]  For example, in *Hahn v. Massage Envy Franchising, LLC*, No. 12cv153 DMS (BGS), 2014 U.S.

---

[51]   *See, e.g.*, *United States v. Reis*, 366 Fed. Appx. 781, 782 (9th Cir. 2010) (unpublished) ("Reis was an actual participant in the acts giving rise to liability.  He 'cannot hide behind the corporation.'"); *Openwave Sys. v. Fuld*, No. C 08-5683 SI, 2009 U.S. Dist. LEXIS 48206, at *25 (N.D. Cal. June 6, 2009) (rejecting argument that directors were not liable because they did not "utter[] the misrepresentations," as "[they] may become liable if they directly *ordered, authorized or participated* in the tortious conduct'") (quoting *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 785 (1979)); *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1380 (2000) ("A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts.").

Dist. LEXIS 147899, at *36 (S.D. Cal. Sept. 25, 2014), the court found the defendant franchisor could be held liable for its franchisee's misconduct even though it did not have a contract with the customer.[53]

Here, there can be no honest debate that Trump is personally liable for his part in the fraudulent scheme.  As this Court observed in its class certification order, plaintiffs have pointed to a number of facts supporting personal liability, including: (1) Trump is the founder and Chairman and authorized the use of his name, photos, and quotes for seminar presentations; (2) TU's print advertisements, email correspondence, letters, and TU website content prominently featured Trump's quotes, image, logo, and signature; (3) Trump reviewed and authorized advertisements; (4) Trump provided financing and reviewed financials; and (5) Trump represented he hand-picked the TU instructors and mentors.  Dkt. No. 298 at 5.

All these contentions have been borne out in discovery.  Trump made himself the star of "Trump University's" advertising campaign, featuring his promotional video.  *Supra* at 3.  Trump also blanketed the country with special invitations purportedly from his desk.  *Supra* at 3-4.  Trump may not have personally licked the envelopes and mailed the invitations, but he does not contest that "it's possible somebody did on my behalf"[54] – and those invitations bore ***his*** signature.  Having

---

[52]  Plaintiffs need not rely on vicarious liability, as suggested by DJT's Mem. at 14 n.16, as the case law recognizes his liability as a participant and controller of the unlawful activity.

[53]  The cases relied on by defendants are not persuasive.  *Groupon, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067 (N.D. Cal. 2012), is a trademark case that contains no relevant analysis as there was no evidence of trademark infringement or lost profits. *Hill v. Opus Corp.*, 464 B.R. 361, 394-95 (C.D. Cal. 2011), found restitution unavailable to plaintiffs who had merely an "attenuated expectancy interest" in an unfunded deferred employee compensation plans of a bankrupt company.

[54]  Ex. 5 (DJT Tr.) at 77:17-21.  When shown an ad that bore his signature, Trump admitted it was his signature and when asked whether he had approved the ad, he testified:  "I guess conceptually. This was done by the staff. This was written and done by the staff.  So I would imagine in some form I approved it."  Ex. 5 (DJT Tr.) at 117:13-22.   Trump also testified he reviewed ads, possibly including one that represented he was personally sending "his handpicked associates to your area to

1   devised, controlled, and participated in the illegal scheme, Trump cannot complain

2   about being accountable for it.

### C.   Trump Made the Misrepresentations at the Heart of this Case

4          It is no exaggeration to say that Trump is seeking summary judgment based on

5   arguments this Court has already rejected.  In addition to arguments addressed above,

6   Trump re-argues that he made no misrepresentations because his statement about

7   "handpicked" instructors was "true," and he never told plaintiffs TU was "accredited"

8   or that they would receive a year of mentoring.  *See* DJT Mem. at 4.  This Court has

9   already determined that "the record reveals substantial evidence of common

10  misrepresentations made to all putative class members." Dkt. No. 298 at 20.  Among

11  those misrepresentations were Trump's own statements that "students would be taught

12  by real estate experts, professors and mentors that were hand-picked by Donald

13  Trump."  *Id.*  And as the Court found: "Plaintiffs have provided evidence to show that

14  Trump University was not an accredited university; ***that the seminars were taught by***

15  ***individuals who were not handpicked by Mr. Trump***; and that the mentoring claims

16  were false."  *Id.*  Trump's displeasure with this Court's findings is no justification for

17  turning them upside down, which is what Trump's motion demands.

### D.   This Court Rightly Embraced Plaintiffs' Full-Refunds Damages Model

19          Defendants suggest that even if plaintiffs have an airtight case of liability, they

20  can escape liability because plaintiffs have not proved how much value they

21  purportedly received.  Defendants miss the point – plaintiffs say there was none.

22  Indeed, the Court certified a class based on plaintiffs' refund theory, and the Court's

23  ruling is amply supported by the law and evidence.  Nothing less than full refunds

24  suffices here.

25

26

27  teach you." *Id.* at 120:14-19, 136:18-24; *see also id.* at 136:4-7.  Sexton also testified

28  that Trump reviewed all the print ads.  Ex. 3 (Sexton Tr.) at 396:25-397:3, 398:7-20.

#### 1. Only Full Refunds Will Return Plaintiffs to the Position They Were in Prior to Being Ensnared in this Illegal Scam

First, as this Court recognized in certifying *Cohen* based on the same facts, plaintiffs analogize TU to a counterfeit piece of art that is deemed worthless. *See Cohen* Dkt. No. 53 at 19 (citing *United States v. Kennedy*, 726 F.3d 968, 974 (7th Cir. 2013)). In *United States v. Austin*, 54 F.3d 394, 402 (7th Cir. 1995), a seller of forged art argued for purposes of determining his offense level that the paintings had value. In rejecting this contention, the court found:

> This factually unsupported speculation does little to counter the government's proof that even if the pieces . . . were not completely worthless, $0 was the best estimate of their worth.

> \*       \*       \*

> [Defendant's] inventory . . . contained almost nothing but worthless forgeries, . . the value of what [defendant] had sold his customers: ***nothing***. Therefore, the government reasoned, the loss [defendant] inflicted on his customers equaled the sales price.

*Id.* at 402. In *FTC v. Figgie Int'l*, 994 F.2d 595, 606 (9th Cir. 1993), the Ninth Circuit explained why full restitution is proper for in cases involving counterfeits:

> To understand why, we return to the hypothetical dishonest rhinestone merchant. Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some. . . . . The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them.

The court also explained that, where "'the loss suffered by the victim is greater than the unjust benefit received by the defendant, the proper measure of restitution may be to restore the status quo.'" *Id.* at 606-07 (citing *FTC v. Int'l Diamond Corp.*, 1983-2 Trade Cases ¶65,506, at 68,459 (N.D. Cal. 1983)). "As between the innocent purchaser and the wrongdoer who, though not privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo." *Id.* at 607; *see also Rikos v. P&G*, No. 1:11-cv-

1   226, 2014 U.S. Dist. LEXIS 109302, at *51 (S.D. Ohio June 19, 2014) (citing *Figgie*

2   in certifying UCL, CLRA, and FDUTPA claims on a refund theory of damages).

3       Secondly, refunds are appropriate in cases, like this, where the product or

4   service is unlawful.  For example, in *Ortega v. Natural Balance, Inc.*, 300 F.R.D. 422,

5   430 (C.D. Cal. 2014), plaintiffs brought a putative class action on behalf of consumers

6   who purchased "Cobra Sexual Energy," a dietary supplement, alleging violations of

7   the UCL, FAL, and CLRA.  *See id.* at 425.  Plaintiffs alleged defendants "'falsely

8   market[ed] [Cobra] as having beneficial health and aphrodisiac properties and being

9   scientifically formulated to improve virility, despite that none of the ingredients in

10  Cobra, individually or in combination, provide such benefits.'"  *Id.*  Defendants

11  objected to plaintiffs' claims for full refunds, arguing "each plaintiff's monetary

12  recovery should be reduced to account for the actual value of the product to him."  *Id.*

13  at 430.  The court rejected this argument, certifying the class based on plaintiffs'

14  argument that "***the product was valueless because it provided none of the advertised***

15  ***benefits and was illegal***.  As such, plaintiffs contend, they should recover their full

16  purchase price."  *Id.*  Similarly, in *Steroid Hormone Product Cases*, 181 Cal. App. 4th

17  145, 159-60 (2010), the court found plaintiffs did not need to provide a valuation of

18  bodybuilding products containing androstenediol (a substance that is unlawful without

19  a prescription).  The court distinguished cases where plaintiffs merely over-paid more

20  for a valuable product due to misrepresentations, such as the *Vioxx* case cited by

21  defendants.  *See id.* (distinguishing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116

22  (2009)).  Here, however, plaintiffs have provided evidence that TU was an illegal

23  scam.  *Supra* at 8-9.  This is enough for plaintiffs to get to a jury on their full refunds

24  theory of damages.

25      Thirdly, full restitution is appropriate because plaintiffs did not receive any of

26  the advertised benefits and any value is speculative.  In *Hahn*, 2014 U.S. Dist. LEXIS

27  147899, Judge Sabraw granted plaintiffs' MSJ for restitution under the UCL.  *See id.*

28  at *53.  In that consumer class action involving "massage memberships," plaintiffs

1   sought full restitution for forfeited pre-paid massages. *See id.* at *46. Defendants

2   argued plaintiffs must offset the restitution by the value of additional membership

3   benefits that were provided. *See id.* In rejecting defendants' argument, the court held:

4   "***To the extent such benefits are not gratuitous, Plaintiffs maintain they have***

5   ***speculative value, if any***." *Id.* As such, the court granted plaintiffs' motion for

6   restitution, reserving the amount of restitution to be awarded at trial.[55] *See id.* at *47.

7   Here, too, plaintiffs received none of the advertised benefits of TU – instead of getting

8   access to Trump's real estate secrets from his right-hand men, plaintiffs received

9   pitches and incomplete information by professional salesmen paid on commission.

10   *Supra* at 9-13. Moreover, plaintiffs did not emerge with anything of marketable value,

11   such as a degree, a real estate license, or credits. TU "mentors" did not provide any

12   services that a realtor could not provide for free. *Supra* at 12. Not only did TU ***not***

13   ***provide value***, it exposed students to liability, as it "taught" dubious or illegal

14   practices that subjected plaintiffs to the risk of criminal fines and penalties. *See supra*

15   at 13; PSOF No. 19.

16         Finally, full refunds are appropriate because Trump held TU out as a one-of-a-

17   kind offering. "Because there was no competing product in the marketplace, plaintiff

---

[55]   Similarly, in *Allen v. Hyland's Inc.*, 300 F.R.D. 643 (C.D. Cal. 2014), the court granted class certification for UCL, CLRA, and FAL (among others) consumer claims against makers and sellers of homeopathic products that allegedly did not work as advertised. *See id.* at 651. The court approved plaintiffs' full refund damages model as consistent with "their theory that Defendants are liable because the products' active ingredients are too diluted – across the board as to all the affected products – to be effective." *Id.* In doing so, the court rejected defendants' argument for an offset based on the positive results that some customers experienced. *See id.* at 671 & n.2.

In *Rikos*, 2014 U.S. Dist. LEXIS 109302, the court certified UCL, CLRA, and FDUTPA (among others) consumer claims regarding over-the-counter probiotic supplements on a full refund theory. In so doing, the court observed: "Consumer happiness is not the touchstone in a false advertising case. The question is whether the defendant falsely advertised the product . . . ." *Id.* at *10. As plaintiffs alleged the supplements did not work, full refunds were appropriate. *See id.* at *50-*51.

In *Lee v. Carter-Reed Co., L.L.C.*, 4 A.3d 561, 577 (2010), the court found full refunds appropriate for classwide damages where plaintiff alleged a belly fat reduction pill Relacore "offers none of the benefits advertised" and the "marketing scheme is nothing more than a web of lies." "Under that scenario, all Relacore purchasers would have bought the product based on at least one of the false benefits promised." *Id.* "[T]he ascertainable loss here is the ***cost of a bottle of broken promises***; each container of Relacore – not refunded – is an out-of-pocket loss." *Id.* at 564.

1  had the option to buy Wyeth's HRT drugs or buy no drug at all." *Krueger v. Wyeth,*

2  *Inc.*, No. 03CV2496 JAH (AJB), 2011 U.S. Dist. LEXIS 154472, at *45 (S.D. Cal.

3  Mar. 30, 2011).  Trump marketed TU as a once-in-a-lifetime opportunity to learn the

4  coveted knowledge and experience of "the world's most famous businessman" (CC

5  Ex. 2), with his "years and years of experience." Ex. 6 at TU 154675.

6        Defendants have known about plaintiffs' full-refund damages model for years,

7  yet they have chosen not to rebut that model with admissible evidence of any

8  purported "value" provided.  *See generally Mikol v. Vlahopoulos*, 340 P.2d 1000,

9  1001 (Ariz. 1959) ("However, where these two measures of damage are possible, and

10  the plaintiff gives evidence as to one of them, it is up to the defendant, who has the

11  burden of showing a reduction in damages, to show that the other measure would be

12  less."); *cf. United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998) ("burden of

13  establishing any offset to a restitution order should fall on the defendant").

14          **2.**    **This Is Not an Imperfect Labeling Case**

15        Defendants' argument against refunds instead relies on inapt case law from a

16  strain of "All Natural" and other mislabeling cases where plaintiffs put valuation at

17  issue by alleging they paid more than they otherwise would have.  But this is not a

18  mislabeling case where plaintiffs received essentially what they set out to buy, with

19  some lesser attribute lacking.  Rather, plaintiffs have consistently alleged this was a

20  fraudulent scheme that delivered nothing of what was promised:  a unique opportunity

21  to learn Trump's "secrets" acquired over the course of his career from instructors he

22  had handpicked.  Trump himself bragged there was nothing else like it. *Supra* at 7;

23  PSOF Nos. 4, 5.

24        For example, defendants rely on *Werdebaugh v. Blue Diamond Growers*, No.

25  12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575 (N.D. Cal. May 23, 2014), in which

26  plaintiffs alleged the maker of almond milk products misleadingly listed the sweetener

27  "not as 'sugar,' . . . but as 'evaporated cane juice,'" and said the products were "All

28  Natural," despite containing some trace amount of potassium citrate. *See id.* at *3, *7.

However, plaintiffs did not allege they were deprived of the essence of what they were promised: almond milk; that the alleged imperfection rendered the almond milk worthless; or that there was no comparable product. They only alleged it was mislabeled in a minor way. Under these circumstances, the court held: "The proper measure of restitution *in a mislabeling case* is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Id.* at *77. Under this analysis, a plaintiff "attaches a dollar value to the '"consumer impact or advantage"' and "determine[s] the price premium attributable to . . . use of the labeling statements '"All Natural"' and '"Evaporated Cane Juice."'" *Id.* at *77-*78. This analysis has no applicability here – plaintiffs did pay a "price premium" for Trump's handpicked professors and the secrets he developed over his entire career – that was *all* they paid for, and yet they received none of it.

Defendants' cases follow this basic fact pattern – plaintiffs alleged they paid *too much* for a product that was essentially provided, based on a relatively minor mislabeling allegation. *See, e.g.*, *Ogden v. Bumble Bee Foods, LLC*, No. 5:12-CV-01828-LHK, 2014 U.S. Dist. LEXIS 565, at *6 (N.D. Cal. Jan. 2, 2014) (label said canned tuna was an "Excellent Source Omega-3"). In *Astiana v. Ben & Jerry's Homemade, Inc*., No. C 10-4387 PJH, 2014 U.S. Dist. LEXIS 1640, at *13-*14 (N.D. Cal. Jan. 7, 2014), cited by defendants, the court expressed skepticism that the mislabeling had any impact on the product's value.

The other cases cited by defendants are equally inapt. In *Colgan v. Leatherman Tool Grp., Inc*., 135 Cal. App. 4th 663 (2006), defendant misrepresented its multi-function pocket tools as "Made in the U.S.A." when only part of the manufacturing process occurred here. *See id.* at 673. Like other mislabeling cases, plaintiffs needed to "quantify either the dollar value of the consumer impact or the advantage realized by Leatherman." *Id.* at 700. While the court recognized restitutionary damages were the appropriate remedy to "restore the purchasers to the status quo ante," plaintiffs had

1  "*no* evidence" as to restitutionary damages.  *Id.*  Cases where plaintiffs generally

2  received the benefit of the bargain, like *Colgan*, do not dictate the result here.

3  And in *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009), plaintiffs alleged

4  that, contrary to the manufacturer's representations, the name-brand pain reliever

5  Vioxx was no more effective and yet was less safe than a generic pain-relieving

6  alternative. *Id.* at 122.  Plaintiffs advanced a theory of damages seeking the difference

7  in value between Vioxx and a generic "comparator" drug.  *See id.* at 136.  The court

8  rejected this as a measure of class-wide damages, as the value of a "proper

9  comparator" was "patient-specific" and presented individualized issues not suitable

10  for class treatment.[56]  *Id.*  In contrast, here, the Court has approved a class-wide theory

11  of damages based upon the purchase price.  As such, defendants' cases are unavailing.

12  ### 3.   No Expert Opinion Necessary

13  To add insult to injury, defendants argue that plaintiffs must abandon their

14  Court-approved full-refund model by paying an expert to concoct a value for the

15  worthless unlawful service defendants sold them.  Plaintiffs fell for an unlawful scam

16  and their measure of damages is the amount paid, plus interest, minus any refund

17  obtained to date.  *See* Dkt. No. 298 at 26-27.  This will only require simple arithmetic.

18  No expert testimony is necessary to establish damage models that are based on "basic

19  math." *United States v. Powers*, 578 Fed. Appx. 763, 774 (10th Cir. 2014) (collecting

20  cases).  Indeed, no expert testimony is necessary for a fact finder to award plaintiffs a

---

[56]   Defendants also cite two technology-related cases that are factually distinguishable because they did not concern a fundamental fraud as is at issue here.  In *In re eBay Litig.*, No. 07-cv-2198 RMW, 2012 U.S. Dist. LEXIS 128616 (N.D. Cal. Sept. 10, 2012), *aff'd*, No. 12-17251, 2015 U.S. App. LEXIS 1161 (9th Cir. Jan. 26, 2015), plaintiffs sought to recover a pro-rata amount of their listing fees for a brief (*i.e.*, a few hours) delay that occurred while eBay indexed their listing.  As evidence demonstrated that a pro-rata recovery did not accurately reflect the damages, if any, experienced by the plaintiffs, the court rejected the theory in the absence of expert testimony. *See id.* at *9-*11.  In *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 460 (N.D. Cal. 2012), plaintiffs who purchased advertising on Facebook alleged they were billed for some number of "clicks" by viewers that were fraudulent.  There, the court found the case unsuitable for class certification because the plaintiffs failed to identify a sufficient means to identify the fraudulent clicks.  *Id.*

1    sum based on simple arithmetic computations, like "debt-to-income ratios," "lost
2    income," or the "mean of 103 numbers." *Id.* (citing *Bryant v. Farmers Ins. Exch.*, 432
3    F.3d 1114, 1124 (10th Cir. 2005) (such computation is "well within the ability of
4    anyone with a grade-school education")).   For example, courts find no expert
5    testimony is necessary to calculate "debt-to-income ratios [as it] simply involves
6    dividing the loan applicant's monthly debts by her monthly income – a calculation."
7    *Id.*; *see also Foraker v. Schauer*, No. 04-cv-00363-EWN-OES, 2005 U.S. Dist.
8    LEXIS 46071, at *24 (D. Colo. Sept. 8, 2005) (jury may award future losses to
9    plaintiffs without expert opinion because it would be "little more than a mathematical
10   computation").   Indeed, courts **exclude** experts who do "no more than make basic
11   arithmetical computations," as it is well "within the realm of jurors' comprehension."
12   *United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972).

13           Up until now, defendants have agreed that no experts were necessary.   The
14   scheduling order reflects that: "The parties jointly agree that no expert discovery is
15   necessary." Dkt. No. 309 at 1. Defendants' contention – only now put forward after
16   the discovery cut-off – is clearly a "gotcha" argument.   The Court should not reward
17   such sandbagging.  Even if the Court were to allow defendants to reverse their earlier
18   position, the proper course would not be to grant summary judgment, but to allow the
19   parties leave to conduct expert discovery (which will only confirm that TU provided
20   less than what real estate agents and mortgage brokers provide for free).

21
22
23
24
25
26
27
28

### E. Defendants Are Not Entitled to Summary Judgment on Plaintiffs Makaeff, Low, and Keller's UCL/FAL Claims[57]

#### 1. Plaintiffs Prevail on the "Unlawful" Prong of the UCL for the Illegal Operation of TU

At the outset, plaintiffs' UCL claims must proceed to trial on the "unlawful" prong of the UCL, which provides a cause of action for business practices that are unlawful, unfair, or fraudulent. *See* Cal. Bus. & Prof. Code §17200, *et seq.*[58] The "unlawful" prong prohibits anything that can "properly be called a business practice and that at the same time is forbidden by law." *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1474 (2006). Accordingly, "[t]he 'unlawful' practices prohibited by section 17200 are ***any*** practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994). In other words, "'[v]irtually any state, federal or local law can serve as the predicate for an action' under section 17200." *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002).

Here, the evidence overwhelmingly establishes that Trump operated TU illegally. In May 2005, the NYSED sent Trump a personal directive to immediately cease operating TU because the "University" title violated New York State Education Law §224, and he needed a license.[59] *Supra* at 8; PSOF Nos. 12-16. Section 224

---

[57] Class Representatives Brown, Everett, Low, and Makaeff have agreed to dismiss their uncertified individual claims. Plaintiffs Brandon Keller and Ed Oberkrom have agreed to dismiss their individual claims so long as they are permitted to participate in any class recovery in this case or in the related *Cohen* case, if and when such class recovery becomes available.

[58] Defendants assert there are "no allegations . . . outside of the advertising and marketing context." DJT Mem. at 11 n.13. To the contrary, plaintiffs allege defendants engaged in unlawful conduct, including instructing students to engage in illegal practices. Dkt. No. 128 (Third Amended Complaint. ("TAC")), ¶132. Defendants have not moved for summary judgment on claims arising out of the "unlawful" prong.

[59] The May 2005 NYSED letter was addressed to Trump personally, and the natural inference of his knowledge must be drawn in plaintiffs' favor. Frey testified that the letter was properly mailed to Trump following the usual procedures employed by the NYSED. Ex. 11 (TU-PLTF03742-48); Ex. 12 (Frey Tr.) at 53:9-54:3. Thus, there is an evidentiary presumption that Trump received the letter that he has not, and cannot,

1  prohibits companies from doing business under the name of university or college,

2  unless authorized to do so by the Board of Regents.  *See* N.Y. Ed. Law §224.  Trump

3  violated the NYSED's directive for ***five years***, setting up a ████████████" in

4  Delaware, and later offering Live Events in New York and elsewhere.  *Supra* at 8.

5  Just last fall, a New York Supreme Court found Trump ***personally liable*** for

6  ***knowingly operating*** TU without a license.  *Supra* at 9.  As the violation of "virtually

7  any law" serves as the basis of "unlawful conduct" under the unlawful prong, Trump's

8  illegal operation of TU violates the UCL.

### 2.   Plaintiffs Prevail on the "Unfair" and "Fraudulent" Prongs of the UCL for Defendants' Fraudulent Scheme

10  Defendants are also liable under the "unfair" and "fraudulent" prongs of the

11  UCL for their fraudulent scheme.  The "unfair" prong of the UCL provides an

12  independent basis for relief.  "This standard is intentionally broad, thus allowing

13  courts ***maximum discretion*** to prohibit new schemes to defraud."  *Ticconi v. Blue*

14  *Shield of Cal. Life & Health Ins*., 160 Cal. App. 4th 528, 539 (2008).  An "unfair"

15  business practice is defined by some courts as one that "'offends an established public

16  policy or where the practice is immoral, unethical, oppressive, unscrupulous or

17  substantially injurious to consumers.'"  *Id*.  Under that definition of "unfair," courts

18  must "weigh the utility of the defendants' conduct against the gravity of the harm to

19  the alleged victim."  *Id*.  Other courts define "unfair" as requiring that the practice be

20  tethered to specific constitutional, statutory, or regulatory provisions.  *See Morgan v.*

21  *AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (2009) (explaining the split

22  in authority).  Plaintiffs will prevail at trial regardless of which test is applied.

23  Here, Trump's deceptive scheme scammed student-victims out of as much

24  money as possible while providing nothing of what was promised.  Trump lured

25

26  rebut.  *Schikore v. BankAmerica Supp. Ret. Plan*, 269 F.3d 956, 961 (9th Cir. 2001)

27  ("The mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the

28  usual time.  It is a settled feature of the federal common law.").

1   students in with his involvement and the false picture created by the university name
2   to attend the Preview, which was used to upsell to the $1,495 Fulfillment Seminar,
3   which in turn was a bait-and-switch to sell Elite Programs. *Supra* at 10. The blueprint
4   for defendants' "unscrupulous" and "unethical" scheme is laid out in detail in the
5   Playbook, which reveals that the entire purpose of TU was not to educate, but to sell.
6   CC Ex. 12. Plaintiffs will also prevail under the narrower definition of "unfair," as
7   defendants conduct violated numerous consumer protection and state laws. Also in
8   the related *Cohen* case, this Court has already sustained the sufficiency of the
9   allegations of Trump's violation of the RICO Act.

10   Finally, plaintiffs' UCL claims are also based on defendants' "fraudulent"
11   business practices. To prevail on this prong, plaintiffs need only establish members of
12   the public are likely to be deceived. *See* Dkt. No. 298 at 19; *Morgan*, 177 Cal. App.
13   4th at 1255. Here, members of the public were, in fact, deceived by defendants'
14   fraudulent business practices. *Supra* at 4 & n.10. That is more than enough to
15   proceed to trial.

16   **3.    Plaintiffs Have Demonstrated that Trump's Misrepresentations Caused Their Injuries**
17
18   Trump contends plaintiffs Makaeff and Low were not misled by him personally.
19   But plaintiffs need ***not*** "demonstrate individualized reliance on specific
     misrepresentations to satisfy the reliance requirement." *In re Tobacco II* Cases, 46
20   Cal. 4th 298, 327 (2009). Such is the case where, as here, plaintiffs were exposed to
21   Trump's misrepresentations by way of TU's "highly orchestrated, concentrated and
22   focused" multi-media promotional campaign. Dkt. No. 298 at 22; *see also Tobacco*
23   *II*, 46 Cal. 4th at 328. As the evidence establishes, and as this Court has recognized,
24   TU employed a highly-orchestrated ad campaign using direct mail invitations, a
25   website, Facebook page, and radio and newspaper ads that Trump approved and that
26   featured him exclusively. Dkt. No. 298 at 5.
27
28

1      Plaintiffs Makaeff and Low testified that they purchased Trump programs for

2  reasons that tracked Trump's misrepresentations, including his substantive

3  involvement and to learn his real estate "secrets" from his "hand-picked" experts.  For

4  example, Makaeff's friend recruited her to attend the Fulfillment after attending the

5  Preview and relaying the core representations of Trump's "university."[60]  CC Ex. 93,

6  ¶2.   Once at the Fulfillment, Makaeff found herself in a high-pressure sales

7  environment in which promises of Trump's real estate secrets and handpicked

8  instructors took center stage.[61]  Ex. 9 (Makaeff Tr.) at 76:23-77:6, 122:18-123:16,

9  154:17-155:9.  Makaeff also viewed a PowerPoint slide that quoted Trump as stating:

10  "This is the next best thing to being *my* apprentice" and "you'll learn ***inside secrets***

11  ***from me***" from "[my] hand-picked instructors."   Ex. 9 (Makaeff Tr.) at 100:19-

12  101:20.   Makaeff said it was important to her to be a part of TU because it had

13  Trump's name and reputation behind it. Ex. 9 (Makaeff Tr.) at 102:4-7.  Low saw an

14  ad in the local paper before attending the Preview and testified he believed he would

15  be learning Trump's "secrets" from Trump himself.  Ex. 26 (Low Tr.) at 25:5-27:25,

16  35:11-24.  These facts are more than sufficient to establish causation.  *See Tobacco II*,

17  46 Cal. 4th at 327 (plaintiff is not required to prove "individualized reliance on

18  specific misrepresentations" or false statements in context of ad campaign).

19      Defendants ignore this critical evidence and instead cherry-pick excerpts from

20  Makaeff's and Low's depositions in an attempt to deny that they were exposed to

21  Trump's misrepresentations or that Trump's misrepresentations caused their harm.

---

[60]   Defendant may be liable for misrepresentations to a person expecting to induce third-party reliance.  *See Jones v. AIG Risk Mgmt.*, 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010) (citing *Restatement (Second) of Torts* §533).  Makaeff was recruited to attend the Fulfillment by a friend who saw an ad, attended the Preview, and invited Makaeff as her guest, which TU urged attendees of the Preview to do, thus widening its net for ensnaring other consumers based on misrepresentations at the Preview.

[61]   A material question of fact exists as to whether Makaeff viewed the Trump video during the Fulfillment.  While defendants distort her testimony to claim, definitively, that she did not see the video, Makaeff testified that she may have seen it and believes (consistent with the actual content of the video) that in it Trump discussed his "insider secrets" and handpicked experts.  *See* Ex. 9 (Makaeff Tr.) at 110:24-111:6.

1    Defendants' distortion of the record aside, Trump was responsible for the
2    misrepresentations both Makaeff and Low heard: Trump's "secrets" at his
3    "university" from his "handpicked" "professors" and mentors. *See, e.g.*, CC Exs. 5-6.
4    Makaeff testified Trump's "hand-picked experts" were important to her because
5    "that's a promise [Trump] made, and I would think that he would have the ability to
6    pick the best people since that's his expertise." Ex. 9 (Makaeff Tr.) at 103:5-9. And,
7    though the elderly Sonny Low could not quote word-for-word the full-page ad he saw
8    in the *San Diego Union Tribune* (which is not required), he remembered the "gist":
9    "learn from [*my*] secrets;" "[i]f you want [to] secure your income, come to one of *my*
10   free seminars." Ex. 26 (Low Tr.) at 25:5-27:25. Low testified that the fact that the
11   seminar was offered by "Donald Trump caught [his] attention." *Id.* Low also
12   received a signed letter from Trump touting his "hand-picked experts and mentors"
13   and stating that "no course offers the same depth of insight, experience, and support as
14   the one bearing my name." Ex. 30 (TU-LOW0000058-59); Ex. 26 (Low Tr.) at
15   42:12-21; *id.* at 198:12-16 (Trump would "share secrets in real estate"), 204:4-16
16   (Low considered all TU communications as coming from Trump).

17          These misrepresentations influenced Makaeff's and Low's purchase decisions.
18   For example, when asked if Trump said anything to cause her to purchase the Elite
19   Program, Makaeff responded "***everything he said***," including his "insider secrets, real
20   estate secrets, that it was going to be the next-best thing to being his apprentice [and]
21   that he was going to provide his hand-picked instructors." Ex. 9 (Makaeff Tr.) at
22   101:6-19. Low testified the letter signed by Trump was ***the number one reason*** he
23   purchased the programs. Ex. 26 (Low Tr.) at 35:11-24; *id.* at 42:18-43:2 ("Donald
24   Trump was going to share his secrets, real estate investing. I took it as being very
25   significant that he signed it. ***I got that from him***."); *id.* at 204:4-16. Low also thought
26   Trump had guaranteed the quality of the information and the "secrets" he was going to
27   share, and believed he would be learning Trump's secrets. *Id.* at 35:21-36:9.

28

1    Makaeff and Low testified they would not have purchased Trump programs had

2    they known the truth.  CC Exs. 5-6; Ex. 9 (Makaeff Tr.) at 118:18-119:5 ("I think I've

3    been damaged because I relied upon the whole fact that he was the one who had the

4    university and it was his name.  And I, therefore, would not have spent $35,000 if it

5    was someone I had never heard about.").  This evidence gives rise to a genuine issue

6    of material fact.  *See Tobacco II*, 46 Cal. 4th at 326 (causation may be established by

7    showing that, absent the misrepresentation, plaintiff "in all reasonable probability"

8    would not have engaged in the injury-producing conduct); *see also Doyle v. Chrysler

9    Group*, SACV 13-00620 JVS (ANx), 2014 U.S. Dist. LEXIS 93157, at *27-*28 (C.D.

10   Cal. July 3, 2014) (denying summary judgment on CLRA and UCL claims because

11   plaintiff's testimony gave rise to a genuine dispute of material fact regarding reliance).

12   Moreover, "a presumption, or at least an inference, of reliance arises wherever

13   there is a showing that a misrepresentation was material."  *Tobacco II*, 46 Cal. 4th at

14   327; *see Galvan v. KDI Distribs., Inc.*, No. SACV 08-0999 JVS(ANx), 2011 U.S.

15   Dist. LEXIS 127602, at *31-*32 (C.D. Cal. Oct. 25, 2011).  "A misrepresentation is

16   [deemed] 'material' if a 'reasonable man would attach importance to its existence or

17   nonexistence'" in making his purchase decision.  *Tobacco II*, 46 Cal. 4th at 327.

18   Based on the evidence, a jury could conclude that a "reasonable person" would attach

19   importance to Trump's misrepresentations about learning his "secrets" from his

20   "handpicked" experts and professors at a "university" on par with the country's top

21   business schools.  *Supra* at 3-4; PSOF Nos. 4-7.  Further, materiality is "generally a

22   question of fact."  *Tobacco II*, 46 Cal. 4th at 327.  Thus, this determination should go

23   to a fact finder.

24   Finally, Trump cannot escape liability for misrepresentations made by TU, as

25   "liability under the UCL may be imposed against those who aid and abet the

26   violation."  *Sarpas*, 225 Cal. App. 4th at 1563.  As Low testified, TU told him that, for

27   the $25,995 he paid, he would be receiving a mentor handpicked by Trump, "using

28   whatever criteria that Donald J. Trump AND Trump University used in selecting these

1   mentors."   Ex. 26 (Low Tr.) at 70:4-22, 98:11-99:2; CC Ex. 5, ¶4.   Additionally,

2   Trump personally made misrepresentations, reviewed and approved advertisements,

3   was a ██████ owner of TU, and regularly reviewed its financial statements.   *Supra* at 17;

4   *infra* at 45 n.78; Ex. 52.   As such, Trump is jointly and severally liable with TU for

5   misrepresentations made to the named plaintiffs.   *See PMC, Inc. v. Kadisha*, 78 Cal.

6   App. 4th 1368, 1379 (2000).

7        **4.**     **Plaintiffs Are Entitled to Injunctive Relief under the UCL**

8        Section 17203 permits courts to enjoin "[a]ny person who engages, has

9   engaged, ***or proposes to engage*** in unfair competition."   Cal. Bus. & Prof. Code

10   §17203.   "The remedial power granted under this section is '***extraordinarily broad***.'"

11   *Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 540 (1997).

12        An injunction should issue in this case to ensure that others do not suffer similar

13   harm. [62]   Indeed, Trump has stated, both under oath and publicly, that he intends to

14   restart TU in the future.   During his deposition, Trump testified: "***[D]o we plan to***

15   ***start [TU] again after this lawsuit is won and after we bring the lawsuit against your***

16   ***firm.  I would say probably, yeah***."   Ex. 5 (DJT Tr.) at 80:19-22.   In a May 13, 2011

17   *New York Times* article, Trump told reporters that TU was merely on "hiatus."   *See*

18   Ex. 31.

19        Given these statements from Trump's own mouth, an injunction should issue.[63]

20   *See Cal. Serv. Station v. Union Oil Co.*, 232 Cal. App. 3d 44, 57 (1991) (affirming

21   injunction even though defendant stated at trial it did not intend to violate the statute);

22   *People v. Toomey*, 157 Cal. App. 3d 1, 20 (1984) (affirming issuance of an injunction

23

24

---

25   [62]   Plaintiffs acknowledge that TU has changed its name to the Trump Entrepreneur
Initiative, but it should nevertheless be enjoined from re-starting its business given
26   Trump's statements that he plans to start up TU again.

27   [63]   There can be no honest debate that plaintiffs Makaeff and Low have standing for
injunctive relief, as "lost money or property – economic injury – is itself a classic
28   form of injury in fact."   *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011).

1   where there was evidence that appellant's misleading and unfair trade practices would

2   continue).

3         **5.    Plaintiffs Are Entitled to Full Restitution under the UCL**

4         Defendants argue plaintiffs are not entitled to restitution.  But the UCL and

5   FAL authorize this Court to issue "such orders or judgments . . . as may be necessary

6   to restore to any person in interest any money or property, real or personal, which may

7   have been acquired by means of . . . unfair competition."  Cal. Bus. & Prof. §§17203,

8   17535.   "A court of equity may exercise its full range of powers 'in order to

9   accomplish complete justice between the parties, restoring if necessary the status quo

10  ante as nearly as may be achieved.'"  *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442,

11  452 (1979).  The goal is "to make whole, equitably, the victim of an unfair practice."

12  *Day v. AT & T Corp.*, 63 Cal. App. 4th 325, 339 (1998).  Further, the UCL "keys on

13  the wrongdoing of [defendants] and is designed to protect the public."  *Stearns v.*

14  *Ticketmaster Corp.*, 655 F.3d 1013, 1021 & n.13 (9th Cir. 2011) ("One might even

15  say that, in effect, California has created what amounts to a conclusive presumption

16  that when a defendant puts out tainted bait and a person sees it and bites, the

17  defendant has caused an injury; restitution is the remedy.").  In crafting restitution,

18  "courts are not concerned with restoring the violator to the status quo ante. The focus

19  is on the victim."  *People ex rel. Kennedy v. Beaumont Invest., Ltd.*, 111 Cal. App. 4th

20  102, 134 (2003).  The statute is not "intended as a punitive provision, though ***it may***

21  ***fortuitously have that sting when properly applied to restore a victim to wholeness*.**"

22  *Day*, 63 Cal. App. 4th at 339.  By way of illustration, the seminal California case,

23  *People v. Superior Court*, 9 Cal. 3d 283, 286-88 (1973), held that purchasers

24  defrauded by door-to-door encyclopedia salesmen with misleading "sales dialogues"

25  could rescind their agreements and obtain full refunds.  Indeed, where customers are

26  "fraudulently induced to make payments" for services "they never received," like in

27  this case, restitution requires full refunds.  *Sarpas*, 225 Cal. App. 4th at 1562.  Here,

28

1    as shown above, plaintiffs have come forward with ample evidence to allow the Court

2    to award full refunds as restitution under the UCL and FAL.

3        **F.    Factual Disputes Exist as to Plaintiff Low's Elder Abuse Claim**

4            California's financial elder abuse statute protects senior citizens from scams

5    like TU.  *See* Cal. Wel. & Inst. Code §15610.30 and .30(a).  Defendants are not

6    entitled to summary judgment for several reasons.  First, TU did, in fact, take, obtain

7    and retain money from Low, a senior citizen, and Trump did the same through his

8    ownership stake in TU.  Low paid $1,495 for the Fulfillment, at which he was up-sold

9    the $25,000 Elite Program.  *See* CC Ex. 5, ¶¶5-6.  And, as Low testified, he purchased

10   Trump programs after being exposed to the misrepresentations by Trump and TU.

11   *Supra* at 29-31; Ex. 26 (Low Tr.) at 35:11-36:9, 37:20-23, 70:4-71:1, 98:11-99:2.[64]

12           Second, the evidence shows Trump and TU "should have known" their conduct

13   was likely to harm elders; it is not required that Trump ***knew*** his conduct would result

14   in harm to elders.  *See* Cal. Wel. & Inst. Code §15610.30(2)(b).  Nor is an "intent to

15   defraud" seniors (DJT Mem. at 20) required, as long as the personal property was

16   taken for "wrongful use" or with "intent to defraud," as is the case here.  *See* Cal. Wel.

17   & Inst. Code §15610.30(a).  Here, a substantial percentage of student-victims were

18   seniors according to an internal document, and thus Trump and TU should have

19   known that victims included elders.  Ex. 32  (BLOOM 0513-0564 at 0519-520).

20   Additionally, TU collected information about the demographics of its students,

21   including age (Ex. 33 (TU 211309 & TU 212059).  TU's sales scheme preyed on the

22   fears of senior citizens, ███████████████████████████████████

23   ██████████████████████████████████████████████████████████████

24   ████████████████████████████.[65]  TU also sent letters to Low and

25   _____

26   [64]  That Low has never met or spoken to Trump does not preclude liability under Cal.
     Wel. & Inst. Code §15610.30(a), and defendants cite no authority to the contrary.

27   [65]  ████████████████████████████████████████████████████████

28   ███████████████████████████████████████ █ █ ███████████████████

1   senior citizens like him, stating that TU was "excited" to help Low "ensur[e] a worry-

2   free retirement" and that TU's students often included "retirees looking for a second

3   career." Ex. 37 (TU-LOW0000893).

4       Further, TU encouraged students – many of whom were senior citizens like

5   Low – to increase credit limits and max out credit cards to purchase Trump programs

6   for tens of thousands of dollars. CC Ex. 5, ¶5. As a result, many were left in a

7   precarious financial situation (made even more precarious by their age), forced to pay

8   finance charges, interest fees and late fees to their credit card companies. *See* CC Ex.

9   5, ¶7. Under the guise of helping students find the best real estate investments, TU

10  also obtained detailed financial information from senior citizens, including their

11  assets, bank accounts and credit cards, and used that information to identify ████

12  ███████████████████████████████████████████ CC Ex. 12 (2010

13  PlayBook) at TU 52969.

14      Defendants are liable because they took in income from Low's property due to

15  the deceptive scheme. *See, e.g.*, *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp.

16  2d 998 (C.D. Cal. 2006) (defendant's sales scheme lulled senior citizens into

17  purchasing annuities); *Zimmer v. Nawabi*, 566 F. Supp. 2d 1025, 1034 (E.D. Cal.

18  2008) (granting plaintiff's MSJ on financial elder abuse claim against brokerage

19  company, where defendant's employee made false statements to plaintiff). At the

20  least, there is a genuine dispute of material fact for a fact finder to resolve.[66]

21

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  [66] TU contends Low is not entitled to treble damages (Dkt. No. 277-1 ("TU Mem.")
    at 9), but the very first of the multiple alternative triggers for trebling damages is if
26  "defendant[s] knew or should have known that [their] conduct was directed to one or
    more senior citizens." Cal. Civ. Code §3345(b)(1). Because that trigger for treble
27  damages is actually an element of Low's elder-abuse claim (Cal. Wel. & Inst. Code
    §15610.30(2)(b)), if Low proves his claim, he will be automatically eligible for treble
28  damages. Treble damages are, therefore, appropriate.

**G.     Defendants Are Not Entitled to Summary Judgment on Plaintiffs' CLRA Claims**

**1.     Under the CLRA's Broad Definition of "Transaction," There Is an Actionable Transaction Between Plaintiffs and Trump**

The purpose of the CLRA is to "protect consumers against unfair and deceptive business practices." Cal. Civ. Code §1760. The CLRA mandates that it "shall be *liberally* construed and applied to promote its underlying purposes." *Id.*; *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 181 (2010) ("'The self-declared purposes of the act are "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."'"). To that end, the CLRA broadly defines "transaction" as "an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance to, that agreement." Cal. Civ. Code §1761(e). While defendants contend there is no actionable "transaction" between plaintiffs and Trump, this argument fails (yet again) for several reasons.[67]

Contrary to defendants' argument, the fact that plaintiffs did not sign a written enrollment contract with Trump directly or "allege the existence of a contract" with Trump does not undermine the "transaction" element.[68] Indeed, "[n]othing in the language of the CLRA states that only a defendant who directly engaged in a completed transaction with a plaintiff may be liable to that plaintiff." *Chamberlan v. Ford Motor Co.*, No. C 03-2628 CW, 2003 U.S. Dist. LEXIS 27912, at *20 (N.D. Cal. Aug. 6, 2003). Rather, "viewed in light of the provision to construe the statute liberally, the broad language of the statute suggests that the legislature intended the CLRA to cover a wide range of business activities." *Id.* at *21. Thus, "a cause of

---

[67]   Trump raised an identical argument at the motion to dismiss stage, which the Court soundly rejected, stating that "the fact that Plaintiffs entered into a transaction with Trump University rather than Trump himself does not require dismissal of the CLRA claims." Dkt. No. 69 at 7.

[68]   That plaintiffs have not asserted claims against Trump for breach of contract has absolutely no bearing on Trump's liability under the CLRA, and defendants have no authority to support this argument. *See* DJT Mem. at 18.

1    action under the CLRA may be established ***independent of any contractual***

2    ***relationship*** between the parties." *McAdams*, 182 Cal. App. 4th at 186 (plaintiff not

3    atypical because he bought defective roof tiles from third-party distributor).

4        Here, there is evidence that Trump engaged in a transaction, *i.e.*, an

5    "agreement," with students that was "intended to result" and did, in fact, result in the

6    sale of TU products and services. As discussed above, Trump told students they

7    would be learning his insider "secrets" – *i.e.*, he agreed to give his "students" his

8    business and real estate knowledge, imparted by his "hand-picked" professors and

9    mentors, at his university. In other words, Trump's statements, made in radio ads,

10    emails, and letters he personally signed, and the video of him speaking, were all

11    intended to, and did result, in the sale of Live Events to students.

12        Given the "broad" definition of "transaction" and the mandate that the CLRA

13    be "liberally construed and applied," courts have found liability where the

14    "transaction" between plaintiffs and defendant was more remote than the transaction

15    at issue here.[69] *See, e.g.*, *Gray v. BMW of N. Am.*, No.: 13-cv-3417-WJM-MF, 2014

16    U.S. Dist. LEXIS 133337, at *13-*14 (D.N.J. Sept. 23, 2014) (refusing to dismiss

17    CLRA claims against BMW Germany where plaintiffs purchased vehicles from BMW

18    dealers of North America); *McAdams*, 182 Cal. App. 4th at 186 (finding CLRA

19    "transaction" where plaintiff purchased defendant's roof tiles from third-party

20    distributor); *Chamberlan*, 2003 U.S. Dist. LEXIS 27912, at *20 (finding Ford's

---

21   [69] Defendants' attempt to distinguish cases finding CLRA liability even where there
22   was no completed transaction directly between plaintiffs and defendants should be
     rejected. *See* DJT Mem. at 18 n.18. While those cases involve plaintiffs purchasing
23   defective products from someone other than the manufacturer, they should not be read
     in the narrow view defendants urge. Rather, those cases make clear the CLRA must
24   be "interpreted liberally to promote its underlying purposes," that a "transaction"
     under the CLRA is "broadly defined" and that there need not be a "completed
25   transaction" between plaintiff and defendant. *See, e.g.*, *Chamberlan*, 2003 U.S. Dist.
     LEXIS 27912, at *21 (the legislature intended the CLRA to "cover a wide range of
26   business activities"); *Keilholtz v. Superior Fireplace Co.*, No. C 08-00836 CW, 2009
     U.S. Dist. LEXIS 30732, at *9 (N.D. Cal. Mar. 30, 2009) (term "transaction" is
27   "broadly defined" and CLRA is "liberally construed and applied"); *Dei Rossi v.*
     *Whirlpool Corp.*, No. 2:12-cv-00125, 2013 U.S. Dist. LEXIS 153682, at *28 (E.D.
28   Cal. Oct. 25, 2013) ("a direct sale is not required to allege a CLRA claim").

1   concealment of defects from plaintiffs constituted a CLRA transaction even though

2   plaintiffs bought their cars used, not from Ford); *Dei Rossi*, 2013 U.S. Dist. LEXIS

3   153682, at *28 (rejecting argument that CLRA claim failed where plaintiffs bought

4   refrigerators from third-party vendors).

5        Here, Trump was founder and owner of TU who **personally** and **directly** made

6   the misrepresentations that induced the purchases.  This is enough to get to trial.[70]

7        **2.**    **Plaintiffs Have Established Causation for the CLRA Claims**

8        The CLRA allows recovery when a consumer "suffers **any** damage as a result"

9   of the unlawful practice.  *See* Cal. Civ. Code §1780(a).  As discussed above, the

10   evidence shows Trump's misrepresentations caused the harm.  *See* §II.B.3; *see, e.g.*,

11   *Steroid Hormone Prods. Cases*, 181 Cal. App. 4th 145, 157 (2010) (CLRA "damages"

12   include "any damage" and "encompass[es] harms other than pecuniary damages").

13        And, while the CLRA requires a plaintiff to prove that a defendant's deceptive

14   conduct caused the harm, causation may be established by proving materiality.  *See*

15   *Mass. Mut. Life Ins. Co. v. Superior Ct.*, 97 Cal. App. 4th 1282, 1292 (2002)

16   ("plaintiffs satisfy their burden of showing causation as to each by showing

17   materiality as to all"); *Steroid*, 181 Cal. App. 4th at 156 (plaintiff may establish

18   causation by showing material misrepresentations).

19   

---

20   [70]  The cases defendants cite are inapposite.  In *Cirulli v. Hyundai Motor Co.*, No.
SACV 08-0854 AG (MLGx), 2009 U.S. Dist. LEXIS 124670, at *10 (C.D. Cal.
21   Nov. 9, 2009), plaintiffs asserted violations of the CLRA based strictly on a failure to
disclose, which claim requires a direct relationship between plaintiff and defendant
22   giving rise to a duty to disclose the defect.  The court noted that such a relationship
typically stems from a transaction (*e.g.*, seller-buyer, employer-employee, or
23   contractual agreement), but did not address the broad definition of "transaction" under
§1761(e).  *Id.*; *see also Fulford v. Logitech*, No. C-08-2041, 2008 U.S. Dist. LEXIS
24   95175, at *2 (N.D. Cal. Nov. 14, 2008) (dismissing, without analysis, plaintiff's
CLRA claim where plaintiff failed to allege that defendant engaged in unfair or
25   deceptive acts or practices), *dismissed, in part*, 2009 U.S. Dist. LEXIS 30735 (N.D.
Cal. Mar. 26, 2009).  *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082 (N.D. Cal.
26   2006), actually supports plaintiffs' position.  The court applied a "liberal construction
of 'transaction,'" finding plaintiff's communications to defendants that she did not
27   want to participate in defendants' membership program, defendants' reassurances that
she would not be charged a fee, and the subsequent billing of plaintiff for membership
28   services, was an "agreement" sufficient for a CLRA transaction.  *Id.* at 1096-97.

1      Here there is more than enough evidence from which a jury could conclude that

2   a reasonable person would find it important to know, when determining whether to

3   purchase Trump programs, that they would not be learning Trump's "real estate"

4   secrets, that the instructors were not "professors" "hand-selected" by Trump but high-

5   pressure salesmen, and that, rather than receiving a top-notch education from a

6   "university" on par with Ivy League institutions, in reality TU was an illegal

7   operation.  *See Steroid*, 181 Cal. App. 4th at 157 (a misrepresentation is "material" if a

8   "reasonable man" would attach importance to its existence or nonexistence).  In any

9   event, because "materiality is generally a question of fact" inappropriate for summary

10  judgment, defendants motion should be denied.  *Steroid*, 181 Cal. App. 4th at 157.

11         **3.      Plaintiffs Are Entitled to an Injunction Under the CLRA**

12      The CLRA expressly provides for injunctive relief, as it allows "[a]ny consumer

13  who suffers any damage as a result of the use or employment by any person of a

14  method, act or practice declared to be unlawful by Section 1770" to obtain "[a]n order

15  enjoining the methods, acts, or practices."  *See* Cal. Civ. Code §1780(a) and (a)(2).

16      TU argues an injunction is not available, as Makaeff and Low did not testify

17  that they intend to purchase additional programs.  *See* TU Mem. at 7.  Federal courts

18  in California routinely reject similar arguments:

19         If the Court were to construe Article III standing for FAL and
           UCL [and CLRA] claims as narrowly as the Defendant advocates,
20         federal courts would be precluded from enjoining false advertising under
           California consumer protection laws because a plaintiff who had been
21         injured would always be deemed to avoid the cause of the injury
           thereafter ("once bitten, twice shy") and would never have Article III
22         standing.

23  *Henderson v. Gruma Corp.*, No. CV 10-04173 AHM (AJWx), 2011 U.S. Dist. LEXIS

24  41077, at *19-*20 (C.D. Cal. April 11, 2011) (plaintiffs had standing to pursue

25  injunctive relief under the UCL, FAL and CLRA despite no allegation they would buy

26  defendant's product in the future); *Larsen v. Trader Joe's*, No. C 11-05188 SI, 2012

27  U.S. Dist. LEXIS 162402, at *10-*12 (N.D. Cal. June 14, 2012) (adopting the

28  reasoning of *Henderson*); *Koehler v. Litehouse, Inc.*, No. CV 12-04055 SI, 2012 U.S.

1    Dist. LEXIS 176971, at *15-*16 (N.D. Cal. Dec. 13, 2012) (same); *see also Stearns*,

2    655 F.3d at 1022-23 (showing that defendant's conduct was deceptive and caused

3    plaintiffs' harm "is all that is necessary to obtain injunctive relief" under the CLRA).

4    **4.    Plaintiffs Are Entitled to Full Refunds under the CLRA**

5    The CLRA prohibits various "unfair methods of competition and unfair or

6    deceptive acts or practices" in the sale of goods and services.  Cal. Civ. Code

7    §1770(a).  Defendants challenge plaintiffs' CLRA damages with the same arguments

8    defendants raised with respect to restitution under the UCL/FAL.  These arguments

9    are no more compelling the second time around, as there is sufficient evidence to

10    demonstrate a genuine issue of fact as to plaintiffs' damages under the CLRA.[71]  *See*

11    *Delarosa v. Boiron*, 275 F.R.D. 582, 592 (C.D. Cal. 2011) (CLRA damages included

12    amount spent in purchasing packages of Coldcalm product; in that case, "the amount

13    of restitution under the UCL and actual damages under the CLRA is the same").

14    Further, the CLRA is not limited to restitutionary and injunctive relief, but

15    extends to the pursuit of actual and punitive damages.  *See* Cal. Civ. Code §1780(a),

16    (e).  The CLRA states:  "Any consumer entitled to bring an action under [the CLRA]

17    may . . . bring an action on behalf of himself and such other consumers to recover

18    damages or obtain other relief."  Cal. Civ. Code §1781(a).  Plaintiffs have proffered

19    sufficient evidence of their damages in the amount of the purchase price, and

20    defendants make no argument that summary judgment is appropriate with respect to

21    punitive damages, which will be an issue reserved for trial.

22

23

24

25

26

27    ───────────────
     [71]   Defendants cite *Wineberg v. Whatcom Cnty.*, 241 F.3d 746, 751-52 (9th Cir. 2001),

28    but that case did not even involve a CLRA claim.

**H.    Defendants Are Not Entitled to Summary Judgment on Everett's Claims**

**1.    Everett's FDUTPA Claims Should Proceed to Trial**[72]

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") "protect[s] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. §501.202.  As this Court has found in granting class certification, a claim under the FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages.  Dkt. No. 298 at 24.  Deceptive or unfair conduct is defined by "'[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices.'"  *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 n.1 (M.D. Fla. 2009).  An "unfair" practice is one that "'offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'"  *Id.* at 1293 n.2.  A deceptive practice is one "likely to deceive" consumers "acting reasonably in the same circumstances."  *Office of the Attorney Gen. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004).

Trump is not entitled to summary judgment on Everett's FDUTPA claims for a number of reasons.  First, Trump personally made the misrepresentations at issue.  *See supra* at 3, 18.  Moreover, the evidence demonstrates Trump's liability under the

---

[72]  As defendants' motions demonstrate, FDUTPA's elements do not include an "elder" requirement.  *See, e.g.*, DJT Mem. at 22.  Everett qualifies as a senior citizen under the FDUTPA, but that qualification simply opens the door to enhanced penalties pursuant to Fla. Stat. §501.2077.  This means that Everett's FDUTPA claim inherently raises an FDUTPA claim for Florida class members of all ages.  TU's motion recognizes as much.  *Cf.* TU Mem. at 10 ("because Everett's FDUTPA claim against TU fails, her elder abuse claim also fails").  Plaintiffs should have made this clearer in their motion for class certification and clarified this point when the Court issued its class certification order.  *See* Dkt. No. 298 at 36.  Plaintiffs will seek clarification as to the Florida Subclass in the Court's class certification order, but this is irrelevant for purposes of these motions because, as to the Florida claims, defendants' motions seek summary judgment against Everett alone.

1  FDUTPA for the misrepresentations made by TU.  Specifically, Trump admitted that

2  he approved the ads; this, combined with other evidence (*see, e.g.*, Ex. 43)

3  demonstrate he was a "direct participant in the actions that constituted a violation of

4  the FDUTPA."  *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th DCA

5  2008); *see also Suntree Techs. v. Ecosense Int'l, Inc.*, No. 6:09-cv-1945-Orl-28GJK,

6  2010 U.S. Dist. LEXIS 20347, at *5-*6 (M.D. Fla. Mar. 8, 2010) (rejecting argument

7  that defendant CEO not liable under the FDUTPA where he directed advertising and

8  marketing efforts of company); *Taubert v. Office of the AG*, 79 So. 3d 77, 79 (Fla. 1st

9  DCA 2011) (affirming judgment that defendant violated the FDUTPA for receiving

10  payments based on phony invoices his company sent to over 1,000 corporations).

11        Second, a "deceptive act" can be established via "a representation, omission, or

12  practice that is likely to mislead the consumer acting reasonably in the circumstances,

13  to the consumer's detriment."  *Fitzpatrick v. General Mills*, 263 F.R.D. 687, 694 n.5

14  (S.D. Fla. 2010).  Trump's core misrepresentations were not only likely to mislead

15  reasonable consumers, they ***did*** mislead reasonable consumers.

16        Third, though framed as a "causation" argument, Trump also argues Everett

17  cannot demonstrate reliance.  *See* DJT Mem. at 24.  But, as this Court has found,

18  proof of individualized reliance is not required under the FDUTPA.  *See* Dkt. No. 298

19  at 24.  Everett is only required to prove, as the evidence in this case demonstrates, that

20  the deceptive practice would – in theory – deceive a reasonable consumer.  This Court

21  has already found that plaintiffs have brought this type of evidence forward.  *See* Dkt.

22  No. 298 at 23, 25.  In any event, Everett has testified that "[t]he Trump name, the

23  Trump reputation, the Trump-backed program is the only reason" she purchased

24  Trump programs.  Ex. 8 (Everett Tr.) at 84:1-3, 85:13-17; *id*. at 245:18-20 ("without

25  the Trump name, I would not have been there at all").

26        Fourth, under the FDUTPA, defendants are not entitled to an offset, because

27  what Trump delivered was rendered valueless by virtue of the fact that TU delivered

28  nothing of what Trump promised.  *See, e.g.*, *Tri-County Plumbing Servs. v. Brown*,

1  921 So. 2d 20, 22 (Fla. 3d DCA 2006) (defendant's incomplete work was valueless).

2  Moreover, the Court is free to award full restitution under the FDUTPA, as "the broad

3  remedial language of the Florida Act suggests that the Florida Legislature intended to

4  provide a full range of equitable monetary relief." *FTC v. Mylan Lab., Inc.*, 99 F.

5  Supp. 2d 1, 6 (D.D.C. 1999). Here, as shown above, only a full refund will make

6  Everett whole. *See* Ex. 23 (Everett Decl.), ¶¶5, 9.

7      Finally, defendants move for summary judgment on Everett's elder abuse

8  penalty solely on the ground that she has not proved her FDUTPA claim. As set forth

9  above, however, there is a genuine issue of material fact on Everett's claim under the

10  FDUTPA. Thus, Everett's claim for an elder penalty must also proceed to trial.[73]

11          **2.    Trump Violated Florida's Misleading Advertising Law**

12      Florida's Misleading Advertising Law ("FMAL") prohibits untrue *or*

13  misleading advertisements.[74]  *See* Fla. Stat. §817.41.[75]  Here, Trump challenges

14  Everett's FMAL claim based on the unpersuasive argument, that he did not make the

15  misrepresentations. However, as explained through this brief, the evidence of

16  Trump's responsibility for his misrepresentations is overwhelming. *See* CC Ex. 4, ¶7.

17  Indeed, Everett received a personal letter signed by Trump inviting her to attend the

18  Preview, in which Trump told her he wanted to give her "the benefit of *my*

19  *experience*," and wanted her to "learn from the best" at "*my* free class" in which his

20  "hand-picked instructors" would share the techniques "which took *my* entire career to

21

22  [73]  To the extent defendants argue on reply that there are other grounds for granting their motion on Everett's elder abuse claim, any such arguments have been waived.

23  [74]  Under Fla. Stat. §817.40(5), "'misleading advertising'" includes "any statements
24  made, or disseminated, *in oral, written, or printed form* or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable
25  care or investigation could or might have been ascertained, to be untrue *or* misleading."

26  [75]  Trump's only argument is limited to his contentions that he did not make a material
27  misrepresentation and that Everett's reliance was not justified. Therefore, for purposes of his motion, Trump does not dispute that there is at least a triable issue as
28  to the other elements necessary to prevail on her claim under Fla. Stat. §817.41.

1    develop." *See* Ex. 40 TU-EVERETT0000005 & 08; Ex. 8 (Everett Tr.) at 26:23-28:2.

2    The letter was accompanied by a "personal invitation" from Trump, stating "*I* can turn

3    anyone into a successful real estate investor."[76]  Ex. 40 TU-EVERETT0000005 & 08.

4    Everett also testified that Trump's use of "university" implied it was an educational

5    program with a full staff of "handpicked" experts knowledgeable about real estate

6    training.  Ex. 8 (Everett Tr.) at 163:1-11, 247:13-19, 250:21-25.  Everett made her

7    decision to attend the Preview based on the letter she received "from" Trump.  Ex. 8

8    (Everett Tr.) at 72:18-23.  Everett also believed that Trump – through TU – promised

9    a one-year mentorship with all the support she needed.[77]  *See* Ex. 8 (Everett Tr.) at

10   145:14-146:2.

11        Trump knew or should have known these statements were false and misleading,

12   as he personally approved TU's ads.  *Supra* at 2 n.3; PSOF No. 4; Dkt. No. 298 at 5.

13   And, Fla. Stat. §817.41(4) creates a rebuttable presumption "that the person named in

14   or obtaining the benefits of any misleading advertisement or any such sale is

15   responsible for such misleading advertisement or unlawful sale."  The personal

16   invitation and letter Everett received purported to be "from" Trump and included his

17   name, signature, and image, thereby giving rise to a rebuttable presumption that

18   Trump was responsible for the misleading ads.  *See* Ex. 40 (TU-EVERETT0000005 &

19   08).  Trump failed to present any evidence rebutting this presumption, and any

20   argument by Trump that he did not personally mail the advertisements should be

21

22

23

24   [76]  Everett subsequently received more letters from Trump that contained many of the
     same misrepresentations.  *See, e.g.*, Ex. 41 (TU-EVERETT 0000016).

25   [77]  As a lay person, Everett could not testify whether the contract she signed was with
26   TU or Trump (as it calls for a legal conclusion), but she believed she was entering into
     a contract with Trump, "with the Trump name that he backed with all kinds of
27   literature and information . . . [w]hen I signed up for Trump University . . . he would
     be aware of it and approve of it."  Ex. 8 (Everett Tr.) at 140:20-141:8, 145:14-3,
28   148:2-6.

1   rejected, as he conceded "it's possible somebody did on my behalf."[78]  *Supra* at

2   17 n.54.

3       Trump is also liable for the misrepresentations TU made to Everett regarding

4   the ongoing year of expert mentorship and support.  Naturally, Everett believed that it

5   was Trump, through TU, who promised she would receive a one-year mentorship with

6   "all the support she needed."  Ex. 8 (Everett Tr.) at 145:14-146:2; *id.* at 59:18-60:10,

7   162:14-163:11, 164:25-165:2; Ex. 42 (TU-EVERETT0000048-49) ("[A]t Trump

8   University all of our programs offer ***one full year of ongoing support . . . [y]our one***

9   ***year of support begins today***.").  TU made representations to Everett that "clearly this

10  was a year program for $35,000 with a staff from the university to assist and answer

11  any questions you have with the real estate investing technique you've chosen."  Ex. 8

12  (Everett Tr.) at 167:10-20.

13      Trump is liable for these misrepresentations even if he did not personally utter

14  them to Everett.  Here, Trump was the founder who was involved in the overarching

15  deceptive scheme, and allowed his name and likeness to be associated with all of the

16  misrepresentations made by TU.  *See, e.g.*, *Segal v. Rhumbline, Int'l, Inc*., 688 So. 2d

17  397 (Fla. 4th DCA 1997) (rejecting argument that chairman and director could not be

18  liable for fraud where sales agents made misrepresentations about his infusion of

19  capital into the company and where he orchestrated the false representations to

20  plaintiffs and allowed his name to be associated with the representations).

21      Everett was completely justified in relying on Trump's material

22  misrepresentations.[79]  As set forth above, Everett attended the Preview because of

---

[78]  Trump's reliance on *Kramer v. Unitas*, 831 F.2d 994 (11th Cir. 1987), is misguided, as the facts are readily distinguishable.  In *Kramer*, Johnny Unitas, a former NFL player, was hired to act as the spokesman for First Fidelity Financial Services, Inc.  In radio ads Unitas identified himself as a famous football player, then introduced his "friends at First Fidelity."  *Id.* at 995.  A First Fidelity representative then made certain misrepresentations.  The Eleventh Circuit affirmed the grant of Unitas' MSJ, finding that Unitas did not make any misrepresentations, but merely invited further inquiries.  *Id.* at 998-99.  Here, Trump is not merely a celebrity spokesperson of TU, but 92% owner who personally made the misrepresentations.  Ex. 52.

1    Trump's letter and then paid $1,495 for the Fulfillment Seminar.  *See* TAC, ¶106; Ex.

2    40 (TU-EVERETT0000005 & 08); Ex. 8 (Everett Tr.) at 26:23-28:2.  The Trump

3    name played a "huge role" in her decision to purchase Trump programs.  Ex. 8

4    (Everett Tr.) at 84:1-3, 85:13-17 ("The Trump name, the Trump reputation, the

5    Trump-backed program is **the only** reason I [purchased the $1,500 program].");  *id*. at

6    113:2-9 (testifying that she was "banking so heavily on the Trump name"); *id*. at 76:1-

7    4 (describing the huge pictures of Trump); *id*. at 245:18-20 ("without the Trump

8    name, I would not have been there at all").   Indeed, Everett was left with the

9    impression that "I'm working with Donald Trump, with his university, and that the

10   program is legitimate."  Ex. 8 (Everett Tr.) at 163:1-11 (testifying that a "university"

11   generally "implies it isn't a three-day workshop," but that there is "an available staff

12   to assist" of "handpicked experts that understand real estate investing"); *id*. at 247:13-

13   19 (same); *id*. at 251:5-9 (Everett thought TU was a "special school that has

14   certifications and follows certain guidelines for the state").   Everett also testified it

15   was important to her that the instructors were handpicked by Trump and she would

16   not have purchased the $1,500 seminar if "it were not backed by an individual that

17   had . . . a good reputation and knowledge in real estate."  Ex. 8 (Everett Tr.) at 84:1-8,

18   240:10-14.  To be sure, Everett purchased the Gold Elite Program **because** she wanted

19   mentoring and one year of support and **because** she believed that the mentors were

20   "representing Trump" and "using his strategies" "[t]hrough the representation of the

21   Trump name."  Ex. 8 (Everett Tr.) at 95:10-18, 115:18-116:12, 140:20-141:8, 142:11-

22   144:15 (Trump made promise of one-year of support and she signed the contract with

23   Trump and TU), *id.* at 147:21-148:6 (same), *id.* at 158:24-160:25 (led to believe she

24   would receive mentoring for an entire year).

25

26   [79]   Trump cites *Uvanile v. Denoff*, 495 So. 2d 1177, 1180 (Fla. 4th DCA 1986), to
     argue Everett cannot "blindly rely" on his misrepresentations (DJT Mem. at 22), but

27   that case involved a completely different scenario – oral misrepresentations about a
     written contract in a single, arm's length transaction between two estranged, former

28   business partners, as opposed to the common fraudulent scheme at issue here.

1    Had Everett known of the true nature of TU, she would not have purchased the

2    programs.  CC Ex. 4.  Thus, Everett's injury, *i.e.*, the loss of over $35,000, was the

3    direct result of Trump's misrepresentations.  *See, e.g.*, Ex. 8 (Everett Tr.) at 84:1-3,

4    85:13-17, 113:6-9, 245:18-20.  Everett has more than sufficient evidence to proceed to

5    trial on her FMAL claim.

6       **I.    Trump Is Not Entitled to Summary Judgment on Plaintiff Brown's
             New York Gen. Bus. Law §349 Claim**

7

8        Couched as yet another "causation" argument, Trump argues summary

9    judgment is warranted because plaintiff Brown did not rely on his misrepresentations.

10   *See* DJT Mem. at 26.  As this Court has already expressly recognized, N.Y. Gen. Bus.

11   Law §349 does ***not*** require proof of reliance.  *See* Dkt. No. 298 at 24.  To prevail on a

12   claim under §349, plaintiff need only prove: (1) that the act, practice or advertisement

13   was consumer oriented; (2) that the act, practice, or advertisement was misleading in a

14   material respect; and (3) that the plaintiff was injured as a result of the deceptive act,

15   practice or advertisement.[80]  *See Oswego Laborers' Local 214 Pension Fund v.*

16   *Marine Midland Bank*, 647 N.E.2d 741, 744-45 (N.Y. 1995) (outlining elements for a

17   claim under §349 and noting statute is modeled on FTC statute).  The standard for

18   whether an act or practice is misleading is ***objective***, requiring a showing that a

19   reasonable consumer would have been misled by the defendant's conduct.  *Id.*

20       Trump concedes that Brown viewed the Main Promotional Video but contends

21   summary judgment is appropriate merely because Brown could not recall at a

22   deposition three years later the exact details of the video.[81]  But Brown ***did*** recall what

23   Trump said in the video – that the instructors were "handpicked" by him and that

24   "[t]hey're the best of the best."  Ex. 25 (Brown Tr.) at 182:25-183:9; *see also id.* at

25   _____

26   [80]  Trump does not move for summary judgment on the first two elements and, as
     such, concedes there is a genuine issue of material fact on those elements.

27   [81]  Brown also saw an advertisement for TU via email or mail and what interested him
     about the advertisement was that "Mr. Trump's name was on it."  Ex. 25 (Brown Tr.)
28   at 16:23-17:22.

1   98:6-99:5, 221:2-8, 227:18-22, 238:6-8, 274:3-5.  Brown testified it was important to

2   him that the instructors were handpicked by Trump as that was what he wanted.  *Id.* at

3   98:24-99:5.  Brown also testified Trump said that an education from TU "would be as

4   good as the Wharton School of Business" and would "make you a success."  *Id.* at

5   186:23-187:6.

6         Trump also incorrectly asserts that Brown did not think TU was a university.

7   DJT Mem. at 26.  To the contrary, Brown testified that he thought TU was a

8   university that would be held in a classroom-type setting (possibly at 40 Wall Street)

9   with experienced professors who would teach Brown what he needed to know.  Ex. 25

10  (Brown Tr.) at 99:21-100:15.  And though no one expressly represented to him that

11  TU was accredited, Brown testified: "But doesn't it imply it when it says university?

12  Wouldn't you think that they had gone through an accreditation process and called

13  themselves a university . . . ***when it says Trump University, don't you expect it to be***

14  ***a university, an actual university***?"  Ex. 25 (Brown Tr.) at 103:6-25, 106:12-17,

15  142:2-11, 148:20-23, 157:16-19, 220:8-10.  Brown also thought he would receive, for

16  his $25,000, "one full year of mentoring from the person that I was supposed to have

17  the mentorship with" based on representations made by TU.  Ex. 25 (Brown Tr.) at

18  156:11-13, 158:3-8, 184:11-185:9.  Given the evidence of Brown's exposure to

19  Trump's misrepresentations, Trump's MSJ should be denied.

20        Summary judgment must also be denied because the evidence on which Trump

21  relies relates solely to Brown's ***subjective*** view of defendants' misrepresentations.

22  The proper inquiry, however, is whether a "***reasonable consumer***" could have been

23  misled.  *See Oswego*, 647 N.E.2d at 744.  There is more than enough evidence to

24  defeat defendants' MSJs as to whether a reasonable consumer could have been misled

25  by defendants' acts, practices and advertisements.  *See* Dkt. No. 298 at 23.

26        Brown also suffered actual injury as a result of defendants' deceptive acts,

27  practices and advertisements, as he paid $25,000, maxing out two credit cards in the

28

1   process.  CC Ex. 3, ¶5.  Although he called TU to complain that he did not receive

2   what he paid for, TU refused to give him a refund.  *Id.*, ¶6.

3          Brown should be able to recover his full purchase price because what he

4   received from TU was, at most, of *de minimis* value.  Defendants rely on a line of

5   irrelevant mislabeling cases.[82]  §IV.D.2.  However, where, as here, plaintiffs did not

6   receive the advertised service, courts award full restitution under NY Gen. Bus. Law

7   §349.  "Consumers have been entitled to a full refund when they purchase a product or

8   service which they do not ultimately receive or which cannot be used to the extent or

9   for the purpose purchased."  *Matter of People v. Applied Card Sys., Inc.*, 41 A.D.3d 4,

10  9 (N.Y. App. 2007).  As the court explained:  "Acknowledging that there may be

11  some value in a credit card with a low limit which is subject to a large initial fee, *these*

12  *consumers acquired de minimis value in the credit card they received, when*

13  *compared to the limit advertised*.  Moreover, they incurred substantial charges in

14  connection with that deception."  *Id.* (citing *Figgie*, 994 F.2d at 606); *People v.*

15  *Telehublink Corp.*, 301 A.D.2d 1006, 1007 (N.Y. App. 2003) (ordering restitution

16  where consumers paid money for a credit card but "received credit card applications,

17  discount coupons, a merchandise catalog card, and a credit repair manual").  Brown is

18  entitled to argue to a fact finder that he deserves his money back.

19      **J.**      **Factual Questions Remain as to the Other Plaintiffs' Claims**[83]

20          Plaintiffs Brandon Keller and Ed Oberkrom are entitled to full refunds based on

21  the same evidence as set forth above.  With respect to Oberkrom's fraud and negligent

22  misrepresentation claims, Trump argues Oberkrom "never met or spoke[] with Mr.

---

[82]  Indeed, *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999), which defendants rely upon, states explicitly: "Generally, claims under the statute are available to an individual consumer who falls victim to misrepresentations made by a ***seller of consumer goods*** through false or misleading advertising."

[83]  Though their claims survive summary judgment, plaintiffs Keller and Oberkrom have agreed to dismiss their claims so long as defendants stipulate and the Court approves that Keller can participate in any class recovery in *Makaeff* and *Cohen* and Oberkrom can share in any *Cohen* class recovery.

1    Trump," and Trump was not present when he purchased the mentorship.  DJT Mem.

2    at 29 n.29.  Trump's myopic argument overlooks the law.  *Reis v. Peabody Coal Co.*,

3    997 S.W.2d 49, 73 (Mo. Ct. App. 1999) ("'one who participates in a fraud is of course

4    guilty of fraud'").  Oberkrom saw the Main Promotional Video at the Preview and

5    specifically recalled Trump's misrepresentation "[t]hat he had hand-picked these

6    instructors, so we should listen to them." [84]  Ex. 7 (Oberkrom Tr.) at 91:18-92:5.

7    Oberkrom described his reliance on those misrepresentations:  Trump's association

8    "was the only reason" he purchased TU seminars.[85]  Ex. 7 (Oberkrom Tr.) at 373:9-

9    20.  Defendants' contentions regarding the calculation of damages fail for the same

10   reasons as stated above.[86]  DJT Mem. at 29; *Little v. Morris*, 967 S.W.2d 685, 686

11   (Mo. Ct. App. 1998) ("victim of fraud . . . can return what he purchased and get his

12   money back (rescission)").

13          Moreover, Oberkrom's unjust enrichment claim survives.[87]  TU's only argument

14   specifically directed at Oberkrom is that he is a resident of Missouri, and thus venue is

15   improper.  *See* TU Mem. at 12 n.7.  However, "[v]enue is a privilege that is waived if

16   not timely asserted."  *In re Duncan*, 713 F.2d 538, 543 (9th Cir. 1983) (citing *Leroy v.*

17   *Great West. United Corp.*, 443 U.S. 173, 180 (1979)).  Despite filing multiple motions

18

---

19   [84]   Defendants advance the same argument against Keller, which also fails, as he too
20   saw the Main Promotional Video.  Ex. 44 (Keller Tr.) at 112:11-16.  The suggestion
     that Keller received a refund is misleading – while he received a refund for the Gold
     Elite Program, he has not been refunded for the Fulfillment.  *Id.* at 211:14-213:10.

21   [85]   Any suggestion that Trump did not "intend to defraud" purchasers must wait for
22   trial.  DJT Mem. at 29.  Plaintiffs have presented more than sufficient evidence to
     show that Trump knew that use of the term "university" violated the law and that his
23   statements regarding his own involvement were knowingly false as were the
     comparisons to top-flight business schools.

24   [86]   Trump's sole argument against false promise is that it requires a misrepresentation
25   of intent to perform future acts.  DJT Mem. at 29-30.  Exactly such a
     misrepresentation was made here when Trump blanketed the country with mass
26   mailers promising to teach students his real estate secrets, which took him his entire to
     career to develop (when in fact no content came from Trump at all).

27   [87]   TU's motion does not address Oberkrom's unjust enrichment claim, which will
28   thus advance to the jury.  *See* TU Mem. at 13.

1   to dismiss and multiple answers, defendants have never once raised the issue of venue.

2   *See, e.g.*, Dkt. No. 132 (defendants' Answer to TAC).  At this late stage, defendants

3   have waived any objection to venue in relation to Oberkrom's claims.  Trump's

4   remaining argument, that he obtained no benefit, is contradicted by his ownership of

5   ███ of TU.  Ex. 52.  Trump relies on the same theory in opposing Oberkrom's money

6   had and received claim – *i.e.*, he had no contract with Oberkrom.[88]  DJT Mem. at 27.

7   But contractual privity is not a required element of that claim.[89]  *See Karpierz v.*

8   *Easley*, 68 S.W.3d 565, 570 (Mo. Ct. App. 2002).

9   **V.     CONCLUSION**

10          For all the foregoing reasons, plaintiffs respectfully request that the Court deny

11   defendants' motions for summary judgment in their entirety and allow this case to

12   proceed to a trial on the merits.

13   DATED:  March 6, 2015                    Respectfully submitted,

14                                            ROBBINS GELLER RUDMAN
                                               & DOWD LLP
15                                            JASON A. FORGE
                                             RACHEL L. JENSEN
16

17                                                   s/ Rachel L. Jensen
18                                             RACHEL L. JENSEN

19                                           655 West Broadway, Suite 1900
                                             San Diego, CA  92101
20                                           Telephone:  619/231-1058
                                             619/231-7423 (fax)
21

22

23

24   _____
     [88]  The positions of Trump and TU on money had and received cannot be reconciled.
25   Trump seeks to avoid liability for the absence of a contract, whereas TU seeks to
     avoid it for the presence of one.  DJT Mem. at 27; TU Mem. at 12.

26   [89]  The arguments advanced by TU with respect to these individual claims are all
27   based upon its erroneous claim that plaintiffs have not come forward with evidence of
     damages.  TU Mem. at 14-15.  As set forth herein, plaintiffs have proffered sufficient
28   evidence to proceed to a jury on a full refund theory.  §IV.D.1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
MAUREEN E. MUELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
HELEN I. ZELDES
ALREEN HAEGGQUIST
AARON M. OLSEN
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Class Counsel

CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 6, 2015.

s/ Rachel L. Jensen
RACHEL L. JENSEN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:        rachelj@rgrdlaw.com

# Mailing Information for a Case 3:10-cv-00940-GPC-WVG Makaeff v. Trump University, LLC et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeffrey L. Goldman**
  jgoldman@bbwg.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jill Ann Martin**
  jmartin@trumpnational.com,lvincent@trumpnational.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Benjamin James Morris**
  bmorris@foley.com,vgoldsmith@foley.com

- **Maureen E. Mueller**
  mmueller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **Daniel Jacob Pfefferbaum**
  dpfefferbaum@rgrdlaw.com

- **Nancy L. Stagg**
  nstagg@foley.com,smoreno@foley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)