NANCY L. STAGG CA Bar No. 157034
nstagg@foley.com
BENJAMIN J. MORRIS CA BAR No. 260148
bmorris@foley.com
**FOLEY & LARDNER LLP**
3579 VALLEY CENTRE DRIVE, SUITE 300
SAN DIEGO, CA 92130-3302
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

JILL A. MARTIN CA Bar No. 245626
jmartin@trumpnational.com
C/O **TRUMP NATIONAL GOLF CLUB LOS ANGELES**
ONE TRUMP NATION DRIVE
RANCHO PALOS VERDES, CA 90275
TELEPHONE: 310.303.3225
FACSIMILE: 310.265.5522

Attorneys for Defendants Trump University, LLC and Donald J. Trump

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

TARLA MAKAEFF, SONNY LOW, J.R. EVERETT, AND JOHN BROWN, on behalf of themselves and all others similarly situated, ED OBERKROM, and BRANDON KELLER, individually,

Plaintiffs,

v.

TRUMP UNIVERSITY, LLC (aka Trump Entrepreneur Initiative), a New York Limited Liability Company, DONALD J. TRUMP, and DOES 1 through 50, inclusive,

Defendants.

Case No. 10-cv-00940 GPC (WVG)

**CLASS ACTION**

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DONALD J. TRUMP'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

**DATE:** **April 3, 2015**
**TIME:** **1:30 p.m.**
**CRTM:** **2D (2nd Floor – Schwartz)**

**JUDGE:** **Hon. Gonzalo P. Curiel**

# TABLE OF CONTENTS

Page(s)

I. DONALD TRUMP IS ENTITLED TO SUMMARY JUDGMENT ........................ 1

II. PLAINTIFFS CANNOT EXPAND THE CASE BEYOND THE CORE MISREPRESENTATIONS THE COURT USED TO CERTIFY THE CLASSES ........................ 2

III. THERE IS NO EVIDENTIARY SUPPORT FOR RESTITUTION OR DAMAGES AND THE FULL REFUND THEORY DOES NOT APPLY ............. 3

IV. THE UNDISPUTED FACTS ESTABLISH MR. TRUMP DID NOT MAKE THE CORE MISREPRESENTATIONS AND PLAINTIFFS CANNOT ESTABLISH CAUSATION TIED TO MR. TRUMP'S CONDUCT ....................... 7

A. The California Classes ........................ 7

1. Plaintiffs Improperly Import New York Law Under The UCL ............ 7

2. Plaintiffs' Aiding And Abetting Argument Fails ........................ 7

3. Plaintiffs Are Required to Prove Causation/Reliance ........................ 8

4. No Injunctive Relief Under The UCL, FAL, or CLRA ........................ 9

5. There Was No CLRA "Transaction" With Mr. Trump ........................ 9

6. The California Elder Abuse Claim Fails ........................ 10

B. The Florida Classes ........................ 10

C. The New York Class ........................ 12

V. THE CASE SHOULD NOT CONTINUE TO TRIAL IF SUMMARY JUDGMENT IS GRANTED ........................ 12

VI. RULING ON THIS MOTION MUST BE DELAYED ........................ 13

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Campion v. Old Republic Home Prot. Co.*, 861 F. Supp. 2d 1139 (S.D. Cal. 2012) (J. Adler) .......... 9

*Dash v. Seagate Tech (US) Holdings, Inc.*, 27 F. Supp. 3d 357 (E.D.N.Y. June 30, 2014) .......... 7

*Dietz v. Comcast Corp.*, 2006 U.S. Dist. LEXIS 94333 (N.D. Cal. Dec. 21, 2006) .......... 9

*Gest v. Bradbury*, 443 F.3d 1177 (9th Cir. 2006) .......... 9

*Hahn v. Massage Envy Franchising*, 2014 U.S. Dist. LEXIS 147899 (S.D. Cal. Sept. 25, 2015) .......... 4, 8

*Laster v. T-Mobile USA, Inc.*, 2009 U.S. Dist. LEXIS 116228 (S.D. Cal. Dec. 14, 2009) .......... 9

*McGlinchy v. Shell Chem. Co.*, 845 F.2d 802 (9th Cir. 1988) .......... 6

*Oscar v. BMW of N. Am., LLC*, 2012 U.S. Dist. LEXIS 84922 (S.D.N.Y. June 19, 2012) .......... 12

*Perez v. Nidek Co.* 711 F.3d 1109 (9th Cir. 2013) .......... 9

*In re POM Wonderful, LLC*, 2014 U.S. Dist. LEXIS 40415 (C.D. Cal. Mar. 25, 2014) .......... 3

*Suntree Techs. v. Ecosense Int'l, Inc.*, 2010 U.S. Dist. LEXIS 20347 (M.D. Fla. Mar. 8, 2010) .......... 12

*United States v. Austin*, 54 F.2d 595 (9th Cir. 1993) .......... 5

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

**State Cases**

*Colgan v. Leatherman Toll Group, Inc.*,
135 Cal. App. 4th 663 (2006) .......... 4, 6

*KC Leisure, Inc. v. Haber*
972 S. 2d 1069 (Fla. 5th DCA 2008) .......... 11

*People ex rel. Harris v. Sarpas*,
225 Cal. App. 4th 1539 (2014) .......... 8

*People of the State of N.Y. v. Trump Entrepreneur Initiative LLC*,
2014 N.Y. Misc. LEXIS 4533 (N.Y. Sup. Ct., Oct. 8, 2014) .......... 5

*Segal v. Rhumbline, Int'l, Inc.*,
688 So. 2d 397 (Fla. 4th DCA 1997) .......... 12

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .......... 8

*Urling v. Helms Exterminators, Inc.*,
468 So. 2d 451 (Fla. 1st DCA 1985) .......... 6

## I. DONALD TRUMP IS ENTITLED TO SUMMARY JUDGMENT

Mr. Trump filed a separate motion for summary judgment to ensure that his alleged conduct was considered separately from that of Trump University ("TU"). However, Plaintiffs did not oppose Mr. Trump's motion separately on the merits and did not come forward with evidentiary proof on key issues. Instead they continue to use sleight of hand in an attempt to blur any distinction between Mr. Trump and TU.[1] In their "omnibus" Opposition, Plaintiffs seek to hold Mr. Trump liable for conduct performed "through" TU and by TU or TU contractors. Plaintiffs continue to rely on the allegations in their complaint, which is insufficient on summary judgment. Plaintiffs try to create factual disputes where none exist by grossly mischaracterizing the evidence and by expanding their claims beyond the "core" misrepresentations which were the sole basis for class certification. Despite Plaintiffs' ploy, the Court must draw the distinction between the conduct of Mr. Trump and of TU. Each Defendant is entitled to separate consideration. While Plaintiffs ask the Court to fall back on non-merits determinations earlier in the case, the Court must now perform a rigorous analysis of the merits of the each claim against each Defendant.

Finally, Plaintiffs have not cured their failure to submit admissible evidence to support their claims for restitution and/or damages. Lacking the necessary evidence, Plaintiffs implore the Court to flip the burden of proof to require Mr. Trump to come forward with evidence regarding the valuation of the TU seminars and mentorships. This is not Mr. Trump's burden. Plaintiffs' full refund damages model is not applicable to the facts or the claims of this case. Plaintiffs' failure to come forward with evidence that

---

[1] Plaintiffs are so desperate to try to pin liability on Mr. Trump that they try to influence the Court with rhetoric and exhibits related to real estate and wealth planning seminars run by other companies, such as Rich Dad and Robert Allen. *See e.g.* Opp. at n 18. These cites—which have nothing to do with this case—are blatantly improper and completely inadmissible. However, these references to other programs completely undercut Plaintiffs' argument that full refunds should be allowed because were no competing products in the marketplace. Opp. at 21.

TU's seminars and mentorships were valueless or had a value less than Plaintiffs paid is fatal to their claims. There is no evidence from which the trier of fact could calculate restitution or damages, even assuming liability could be established. As a result, Mr. Trump is entitled to summary judgment on all causes of action asserted against him.[2]

## II. PLAINTIFFS CANNOT EXPAND THE CASE BEYOND THE CORE MISREPRESENTATIONS THE COURT USED TO CERTIFY THE CLASSES

Plaintiffs fall back on the uncertified allegations in the TAC to try and expand the case beyond the "core" misrepresentations that are the basis for the Court's class certification order. Dkt. No. 298 at 4. Plaintiffs try to hold Mr. Trump individually responsible for all of TU's actions, arguing that Mr. Trump concocted TU as a knowingly illegal scheme to defraud the American public.[3] Opp. at 8. However, Plaintiffs have no evidence to support this assertion. Mr. Trump testified that his intent in forming TU was to help people by providing them with real estate investing education and knowledge to make their lives better (SOF 1). Plaintiffs seek to hold Mr. Trump individually liable because: (1) he authorized the use of his name, photos, and quotes for seminar presentations; (2) TU advertisements featured Mr. Trump's image, logo, and signature; (3) Mr. Trump reviewed print advertisements for TU; and (4) Mr. Trump provided initial financing to TU and periodically may have reviewed TU financials. Opp. at 17. This conduct is far from the day-to-day control over TU legally required to impose individual liability. This lack of evidence is particularly notable because when it suits them Plaintiffs also argue–out of the other side of their mouths–that Mr. Trump's involvement with TU was "completely absent." Opp. at 5. Plaintiffs cannot have it both ways.

Plaintiffs also argue that Mr. Trump made the misrepresentations at the heart of this case (Opp. at 18). However, Plaintiffs ignore the lack of evidence that Mr. Trump

---

[2] Plaintiffs have agreed to dismiss all of their individual non-certified claims. *See* Dkt. No. 389, Joint Motion and Stipulation of Dismissal With Prejudice.

[3] Despite Plaintiffs' vilification of Mr. Trump and TU, 98% of TU's students gave TU great evaluations after attending and TU's current rating with the BBB is an "A."

ever made two of the three "core" misrepresentations: (1) that TU was an "accredited" university; or (2) that "students would receive one year of expert support and mentoring." As to the third alleged "core" misrepresentation, that Trump "hand-picked" the TU instructors, the only evidence is that it was a true statement. Plaintiffs now try to re-define "hand-picked" to require that Mr. Trump had to have personally met, sat down with, and had substantive discussions with the TU live event instructors and mentors (*see e.g.* Opp. at 5) to qualify as "hand-picked." Mr. Trump testified at his deposition that he reviewed the resumes or applications of TU's instructors. SOF 6. Plaintiffs present no evidence to contradict that Mr. Trump performed these acts. The undisputed evidence supports that Mr. Trump did hand-pick instructors. In an effort to hold Mr. Trump in this case, Plaintiffs once again seek to improperly expand this case beyond the conduct that was the basis for class certification. There is no admissible evidence, let alone a triable issue of fact, to support Plaintiffs' claim that Mr. Trump is properly a defendant in this case based on the certified "core" misrepresentations.

## III. THERE IS NO EVIDENTIARY SUPPORT FOR RESTITUTION OR DAMAGES AND THE FULL REFUND THEORY DOES NOT APPLY

This is not a case of counterfeit artwork or a supplement with no active ingredient. *See* Opp. at 19-20. This is a false advertising case about whether the quality of the seminars and mentorships provided by TU were as advertised. This has always been the gravamen of Plaintiffs' four complaints. In this type of case, Plaintiffs are not entitled to a windfall of the value of the seminars and mentorships—whatever that value was *if* less than what was paid—and a full refund.[4] *See In re POM Wonderful, LLC*, 2014 U.S. Dist.

[4] The Court previously recognized that the full refund model is not appropriate in cases involving restitution. *See Cohen* Dkt. No. 53 at 21 ("Although some courts have found a 'full refund' model of damages inappropriate where the plaintiff's theory of liability seeks restitutionary damages, *see Werdebaugh v. Blue Diamond Growers*, No. 12-cv-02724-LHK, 2014 WL 2191901 at *22 (N.D. Cal. Oct. 2, 2013), Plaintiff brings this claim under RICO, which provides for statutory trebled damages, attorney's fees, and cost of suit, 18 U.S.C. § 1964(c).").

LEXIS 40415 at *14 (C.D. Cal. Mar. 25, 2014) ("Because the Full Refund model makes no attempt to account for benefits conferred upon Plaintiffs, it cannot accurately measure classwide damages."). The law is clear that Plaintiffs must prove the existence of a "measurable amount" of restitution supported by admissible evidence. *Colgan v. Leatherman Toll Group, Inc.*, 135 Cal. App. 4th 663, 698-700 (2006). Plaintiffs have not met this burden. They have no evidence "to quantify either the dollar value of the consumer impact or the advantage realized by [defendants]" if the misrepresentations are false. *Id*. at 700.

On summary judgment Plaintiffs can no longer just argue that their full refund model matches their liability theory, as they did to survive class certification. Plaintiffs had to come forward with admissible evidence to establish an entitlement to a full refund, and they have not. Knowing that they lack evidence to support their claim that TU's seminars and mentorships were worthless[5] (or any other valuation between zero and what was paid), Plaintiffs simply implore the Court to find that the TU real estate seminars and mentorships were an illegal scam that failed to provide <u>any</u> instruction or value regarding strategies and actions related to real estate investing. Plaintiffs want the Court to equate TU's programs with fake artwork and supplements that have no intrinsic value if the ingredients don't provide the benefits advertised.[6] However, even the main case relied on

---

[5] Plaintiffs and other class members have admitted that the TU programs had some value, if not great value. *See* Dkt. No. 380-1 at 6-9 & 11-13.

[6] All of the cases cited by Plaintiffs on this issue are distinguishable and inapplicable. *See Rikos, Ortega, Steroid Hormone, Allen* and *Hahn* at Opp. 20-22. First, *Rikos, Ortega, Steroid Hormone*, and *Allen* were all decisions at class certification (or review of class certification decisions) where, as here, the Court allowed the full refund model to survive <u>at certification</u>; not a determination of whether Plaintiffs had proven with admissible evidence that they could satisfy the damages model. Second, all of these case involved products in which the only value was the single benefit represented: OTC probiotic supplement alleged to benefit digestive health (*Rikos*), sexual virility supplement (*Ortega*), bodybuilding supplement containing controlled steroid (*Steroid Hormone*), homeopathic remedies with insufficient amount of active ingredients (*Allen*); and forfeited pre-paid massages (*Hahn*). None of these cases are similar to the TU seminars

by Plaintiffs for this argument based its determination that the artwork had no value on testimony by the government's **experts** who extrapolated the value of what defendant have sold. *See United States v. Austin*, 54 F.2d 595, 606 (9th Cir. 1993). Plaintiffs Opposition concedes all they have are "lay witnesses." Opp. at 1.

Moreover, Plaintiffs now insist that TU could not have provided any value unless students emerged from the programs with a degree, real estate license or credits (Opp. at 21)—none of which were ever promised by TU and none of which are at issue in this case. Even if a full refund model were allowed, Plaintiffs failed to provide evidence that none of TU's seminars or mentorships had any value at all to justify a full refund.

Plaintiffs also argue that a full refund is appropriate because TU was offering an unlawful service. However, there is nothing inherently unlawful about providing real estate investment seminars, training, and mentorships.[7] Moreover, there is nothing inherently unlawful about selling these programs by introducing people to them at a free event and then offering additional instructional opportunities for additional cost to those that attend the initial 3-day workshops and wanted additional training. And even if TU ran afoul of New York's licensing regulations that is not prima facie evidence of a deceptive business practice. *People of the State of N.Y. v. Trump Entrepreneur Initiative LLC*, 2014 N.Y. Misc. LEXIS 4533 at *21 (N.Y. Sup. Ct., Oct. 8, 2014). Plaintiffs have also presented no evidence that either California or Florida have similar licensing

---

and mentorships at issue. The seminars and mentorships happened; TU's programs were not illusory. Plaintiffs have not proved that the seminars/mentorship had no other intrinsic value or did not provide real estate investing education, even if the seminars/mentorships were not presented by an "accredited" university, by instructors not selected by Mr. Trump, and that did not provide support from the NYC office and in-person mentorship as represented so as to justify application of the full refund model. Absent proof that TU's programs had no intrinsic value a full refund cannot be allowed without creating an improper windfall for Plaintiffs.

[7] This is contrary to the *Steroid Hormone* case cited by Plaintiffs in which defendants were selling a controlled substance that was by definition illegal to possess without a prescription. 181 Cal. App. 4th 145 (2010).

requirements or restrictions on the use of the term "university" to allow for any argument that TU's operation in those states was inherently unlawful to justify a full refund.

Finally, it is Plaintiffs' burden to prove their entitlement to restitution and/or damages and to prove the amount of restitution and/or damages that should be awarded. *Colgan*, 135 Cal. App. 4th at 698-700. It is not Mr. Trump's burden to advise Plaintiffs how to prove their damages case or to inform Plaintiffs they need a damages expert to prove their case. Plaintiffs' argument that Defendants agreed that no experts were necessary is a red herring; Defendants simply did not alert Plaintiffs to this defect. It is not a "gotcha" argument for Mr. Trump to point out the evidentiary failure of Plaintiffs, when Plaintiffs carry the evidentiary burden. Plaintiffs were free to litigate this case as they saw fit. Also, Mr. Trump does not contest that the fact finder is able to do basic math; however, Mr. Trump does contend that determining the value of TU's programs and mentorship to even allow for a basic mathematic calculation requires the specialized knowledge, skill or education that a lay-person could not provide. Absent an expert to provide such an evaluation, there is no evidentiary basis for the fact-finder to make a determination on restitution and/or damages. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) ("[S]ummary judgment is appropriate where appellants have no expert witness or designated documents providing competent evidence from which a jury could fairly estimate damages.") This failing entitles Mr. Trump to summary judgment on all of the causes of action asserted against him in the TAC.[8]

---

[8] Mr. Trump's arguments apply to each claim for restitution and damages; however, a few specifics are worth noting: (1) Everett does not contest that the proper measure of damages under FDUPTA or MAL is "the difference in market value of the product or service in the condition it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451, 454 (Fla. 1st DCA 1985).[8] Rather she, like the other Plaintiffs, simply argues without evidentiary support that TU seminars and mentorships (which she refused to participate in) were valueless and therefore she is entitled to a complete refund. As discussed in detail in Mr. Trump's opening brief and above, Everett is not entitled to a full refund; and (2) Brown's claim is just the type of false advertising

## IV. THE UNDISPUTED FACTS ESTABLISH MR. TRUMP DID NOT MAKE THE CORE MISREPRESENTATIONS AND PLAINTIFFS CANNOT ESTABLISH CAUSATION TIED TO MR. TRUMP'S CONDUCT

### A. The California Classes

#### 1. Plaintiffs Improperly Import New York Law Under The UCL

Without citing any authority for the proposition that the law of a foreign jurisdiction, here New York, can be imported to support a claim under the "unlawful" prong of the UCL, Plaintiffs do just that.[9] Plaintiffs urge the Court to find that New York's Education Law should be imported under the UCL when Plaintiffs have identified no such California law which similarly regulates the use of "university" or would have required TU be licensed in California. Absent a showing by Plaintiffs that California similarly regulates the use of "university," Plaintiffs' argument that a licensing violation in New York supports this claim under California law (or any claim under Florida law when Plaintiffs have identified no similar statute in Florida) lacks merit. The UCL may have a broad reach, but cannot regulate conduct that the federal government or California has not deemed unlawful.

#### 2. Plaintiffs' Aiding And Abetting Argument Fails

Plaintiffs consistently ask the Court to ignore the separate legal status of Mr. Trump and TU and hold Mr. Trump liable under a theory of aiding and abetting (Opp. at

---

claim that falls within the holdings of *Dash v. Seagate Tech* and *Small v. Lorillard Tobacco* -- which bar claims for full refunds when "consumer may nevertheless receive—and retain the benefits of—something of value, even if it is not precisely what they believed they were buying." *Dash v. Seagate Tech (US) Holdings, Inc.*, 27 F. Supp. 3d 357, 361-62 (E.D.N.Y. June 30, 2014). *Small* does not bar Brown from seeking the difference in value between what he received and what he paid for TU, but like the other Plaintiffs, Brown has no admissible evidence of value to support that result.

[9] None of the cases cited by Plaintiffs in their Opposition at page 26 found that a foreign state's law that was in potential conflict with California law could be the basis for a UCL "unlawful" prong claim. Instead, *McKell*, *Saunders*, and *People ex rel. Bill Lockyer* all involved violation of either federal law or other California laws. Mr. Trump does not contest that federal laws, other California laws, or local laws can support a claim under the "unlawful" prong.

31). Plaintiffs also want the Court to ignore the fact that Mr. Trump does not directly own any stake in TU.[10] The fact that Mr. Trump reviewed and approved advertisements, had an ownership stake in TU indirectly through two other LLCs, and periodically reviewed TU's financial statements, however, is far from the level of control of the day-to-day operations of the company that has justified other courts finding aiding and abetting liability under the UCL in other cases.[11] There is no dispute that Mr. Sexton and others controlled the day-to-day operations of TU. Mr. Trump can only be held responsible for the "core" misrepresentations if he made them and they were false regardless of whether Plaintiffs considered TU communications as coming from Trump. The Court must draw a line between conduct of Mr. Trump and TU, a line Plaintiffs hope the Court will ignore.

**3. Plaintiffs Are Required to Prove Causation/Reliance**

Plaintiffs try to skirt the causation requirements of the UCL and FAL and the reliance requirements of the CLRA. While Plaintiffs may not have to prove reliance on a specific misrepresentation from Mr. Trump, they still need to prove his conduct—here allegedly making the "core" misrepresentations—versus the conduct of TU caused their harm. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326-27 (2009). Plaintiffs did not make this showing because Plaintiffs provided no evidence that Mr. Trump made two of the "core" misrepresentations and no evidence that he did not hand-pick the instructors by reviewing

---

[10] As evidenced by Plaintiffs' Exhibit 52, TU's membership is made up of two other individuals and two New York LLCs, of which Trump is the controlling member.

[11] In *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539 (2014), cited by Plaintiffs, the court extended UCL liability to the owner of the company based on a finding that he had drained substantial assets from the corporation and was involved in the day-to-day management of the business at a significant level. *Id.* at 1564. Additionally, in *Hahn v. Massage Envy Franchising*, 2014 U.S. Dist. LEXIS 147899 (S.D. Cal. Sept. 25, 2015), the court held the franchisor liable for the conduct of franchisees because the franchisor required the use of the membership agreement and cancellation forms at issue, had wide reaching control over the franchisors' day-to-day operations, had originated the business practice at issue, and exercised tight control to ensure it was implemented. *Id.* at *35-36. Here, Plaintiffs have otherwise consistently argued that Mr. Trump involvement with TU was "completely absent."

their resumes. TU's conduct is irrelevant to the causation analysis as to Mr. Trump.

**4. No Injunctive Relief Under The UCL, FAL, or CLRA**

The California Plaintiffs are not entitled to injunctive relief because they lack Article III standing to pursue such relief under the UCL, FAL, and CLRA. Plaintiffs have not proven a definitive likelihood of further purchases from Trump (or TU). *See Perez v. Nidek Co.* 711 F.3d 1109, 1114 (9th Cir. 2013).[12] Plaintiffs are not realistically threatened with a repetition of any violation. *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006). Mr. Trump's intentions regarding TU are irrelevant to Article III standing analysis in light of the lack of evidence that Plaintiffs are threatened with future harm.[13]

**5. There Was No CLRA "Transaction" With Mr. Trump**

Undisputed facts show there was no transaction or agreement between Mr. Trump and the California Plaintiffs upon which to base a CLRA claim. Plaintiffs try to argue that statements in TU advertising created an agreement between Mr. Trump and Plaintiffs so as to allow CLRA liability. However, the cases cited by Plaintiffs do not support this proposition. All of the cases relied on by Plaintiffs for this argument (Opp. at 36-38) are factually and legally distinguishable because while they did allow CLRA claims to stand against parties that did not have direct interaction with Plaintiffs, in each of those cases, the defendant had engaged in a transaction somewhere within the distribution chain that resulted in the sale of goods or services to the plaintiffs. While the reach of CLRA may be broad enough to extend to participants in the chain of distribution cases, Plaintiffs fail to provide any support for their position that Mr. Trump was involved in a transaction within a distribution chain relating to TU. None of Plaintiffs' cited cases was based on a shareholder or membership interest in a company involved in a transaction. Plaintiffs do

---

[12] *See also Campion v. Old Republic Home Prot. Co.*, 861 F. Supp. 2d 1139, 1149-50 (S.D. Cal. 2012) (J. Adler); *Laster v. T-Mobile USA, Inc.*, 2009 U.S. Dist. LEXIS 116228, at 3-4 (S.D. Cal. Dec. 14, 2009) (J. Sabraw); *Dietz v. Comcast Corp.*, 2006 U.S. Dist. LEXIS 94333, at 9-11 (N.D. Cal. Dec. 21, 2006).

[13] Plaintiffs conflate standing to assert a UCL claim with Article III standing to seek injunctive relief in federal court.

not deny that they never met with or spoke to Mr. Trump. Plaintiffs provided no evidence of any communications from Plaintiffs to Mr. Trump that could form the basis for an agreement with Mr. Trump. Rather they attested to an agreement with TU to provide the seminars and mentorships. The CLRA claim against Mr. Trump fails as a result.

**6. The California Elder Abuse Claim Fails**

Mr. Trump is not liable for elder abuse because he did not "take" anything from Low as required by the statute to impose liability. Instead, Low argues that Mr. Trump is liable because TU took money from Low and, therefore, Mr. Trump is liable because of his indirect ownership interest in TU. Opp. at 34. And the attempt to gloss over the distinction between the two Defendants does not end there. Low tries to hold Mr. Trump personally liable for elder abuse based on other alleged acts of TU, none of which contradict Mr. Trump's testimony that he had no knowledge of the age demographic of TU students (SOF 8) or which establish that Mr. Trump should have known his conduct would harm seniors. Low provided no evidence that Mr. Trump was involved in any way with TU's collection or analysis of demographic information, or even knew about it. Rather Low argues that all knowledge of TU should be imputed to Mr. Trump and TU's conduct is the conduct of Mr. Trump. Opp. at 34. Additionally, Low has failed to prove damages due to the lack of evidence of the value of services received versus what he paid for TU seminars and mentorship. Mr. Trump is not liable for financial elder abuse.

**B. The Florida Classes**

Everett's testimony proves Mr. Trump did not cause her harm. As with the other Plaintiffs, Everett also failed to present any evidence that Mr. Trump ever represented to Everett that TU was an "accredited" university or that she would receive one year of expert support or mentoring. Everett does not dispute that she never spoke to Mr. Trump and that he never made any oral representations to her prior to her purchase of the $1,500 program. SOF 35. In fact, the Opposition concedes that it was TU, not Mr. Trump, that "promised a one-year mentorship with all the support she needed." Opp. at 44. The only written representation purportedly from Mr. Trump (but in reality sent by TU) Everett

reviewed prior to purchase was the invitation to the free seminar. But that invitation did not contain a representation from Mr. Trump that TU was "accredited" or that TU provides students with one year of expert support or mentoring. In any event, Everett specifically disclaimed that it caused her to spend any money on TU programs. SOF 40. Plaintiffs try to twist the evidence and argue that because of the letter Everett attended the free preview and then purchased the $1,500 program. However, this ignores additional testimony by Everett, cited in Plaintiffs' papers (see Resp. to SOF 41), that her decision to purchase the $1,500 seminar was not based on representations by Mr. Trump, but rather by representations made by Mr. Jamison at a Preview and the "Trump name, the Trump reputation, the Trump-backed program is the reason I moved ahead – and only for that reason." SOF 41; Opp. at 42. Everett also concedes that her purchase of the Gold Elite package was "based on the Trump name and representations Trump made through TU" and "based on the representations made in the $1,500 seminar." Resp. SOF 42. Unable to get around these admissions, Everett resorts to arguing that Trump is liable under FDUTPA and MAL because Trump is responsible for misrepresentations made by TU. Opp. at 41-42 & 44-45. This proposition is not supported by the evidence or case law. Plaintiffs have not proved that Mr. Trump was a direct participant in the conduct of TU that they allege constitutes a violation of FDUTPA or MAL. There is no evidence that Mr. Trump directed the conduct of TU at the seminars or directed the day-to-day operations of TU. Plaintiffs wants the Court to find that Mr. Trump is responsible for the entirety of TU's advertising campaign simply because he reviewed print ads.[14] That is

---

[14] The cases cited by Plaintiffs also do not support such a finding; they merely state the proposition that Plaintiffs would like the Court to apply. For example, in *KC Leisure, Inc. v. Haber*, on review of a motion to dismiss, the court found that plaintiff had stated a claim against the individual shareholder/officer defendant when he alleged that defendant had actual knowledge of a violation of the FTC Franchise rule and intentionally ignored the rule by personally drafting documents that violated the rule, personally concocted a scheme to avoid FTC disclosure obligations, and assisted in the preparation of financial reports with full knowledge of their inaccuracy. 972 S. 2d 1069, 1075 (Fla. 5th DCA

insufficient as a matter of law.

**C. The New York Class**

While reliance may not need to be specifically proven as part of Brown's §349 claim, he cannot escape the requirement to prove causation: that plaintiff was injured as a result of the deceptive act, practice or advertisement. *See Oscar v. BMW of N. Am., LLC,* 2012 U.S. Dist. LEXIS 84922 at *8-9 (S.D.N.Y. June 19, 2012). Brown cannot meet this standard because two of the three core misrepresentations were undisputedly not made by Mr. Trump or by Mr. Trump to Brown (SOF 55-56) and Plaintiffs have submitted no evidence to contradict that Mr. Trump reviewed the resumes of TU instructors (SOF 6). Moreover, Brown admits that no one expressly represented that TU was "accredited" (let alone Mr. Trump) and states that the "one full year of mentoring" representation was made by someone at TU. Opp. at 48. Additionally, despite testimony cited by Plaintiffs in the Opposition which attempts to redefine Brown's definition of a "university," Brown clearly admitted at his deposition that before he purchased the 3-day seminar he knew TU was not a university: "Q. So you thought it was going to be a university, right? A. **No**." SOF 58. Mr. Trump's conduct did not cause Brown's alleged harm.

## V. THE CASE SHOULD NOT CONTINUE TO TRIAL IF SUMMARY JUDGMENT IS GRANTED

Contrary to Plaintiffs' argument, once summary judgment is granted as to the Plaintiffs' claims against Mr. Trump, those claims are extinguished as to the Classes. Mr. Trump's arguments are not just directed to the class representatives' claims, but are applicable to the Classes as a whole. None of the cases cited by Plaintiffs allowed a class

---

2008). In *Suntree Techs. v. Ecosense Int'l, Inc.*, again reviewing a motion to dismiss, the court found plaintiff had stated a claim by alleging defendant personally directed the companies entire advertising and marketing efforts. 2010 U.S. Dist. LEXIS 20347 at *5-6 (M.D. Fla. Mar. 8, 2010). Finally, in *Segal v. Rhumbline, Int'l, Inc.*, Plaintiffs conflate the court's discussion of the facts and the holding of a case , which merely reversed a grant of summary judgment in favor of defendant to determine the extent of his involvement in the alleged fraud. 688 So. 2d 397, 399-400 (Fla. 4th DCA 1997).

action to continue with new plaintiffs when a summary judgment ruling in favor of defendants undermined the claims of the entire class.[15] For example, because Mr. Trump did not make two of the certified "core" misrepresentations and the third is true, no putative class member could come forward with class-wide evidence to the contrary. More importantly, the improper full refund model and the failure to present admissible evidence of restitution/damages is fatal to the class as well. Even if the Court allowed substitution of plaintiffs, fact and expert discovery is now closed and good cause does not exist to reopen it. Plaintiffs did not move to reopen discovery before the dispositive motion cutoff. The Court should not reward Plaintiffs for making strategic decisions to litigate the case in the manner they have which would now prejudice Mr. Trump.

## VI. RULING ON THIS MOTION MUST BE DELAYED[16]

Plaintiffs have created a procedural conundrum for the Court and prejudiced Mr. Trump and TU by waiting almost a year after class certification was granted to seek approval for notice to the putative class. To avoid running afoul of the "one-way intervention rule" the Court must defer ruling on Defendants' summary judgment motions until after the Plaintiffs' proposed class notice is approved, sent, and the period for opt-outs has expired or the need for notice is mooted by a ruling granting decertification. A ruling on the motion before the opt-out period expires would severely prejudice Defendants by allowing the absent class members to await a ruling on the summary judgment motions and then remain in the Class or opt-out in the manner most favorable to their interests.

DATED: March 13, 2015

**FOLEY & LARDNER LLP**

By: *s/ Nancy L. Stagg*
NANCY L. STAGG
Attorneys for Defendants

---

[15] The facts of *Fed'n of the Blind*, *Edwards*, and *McAnaney* (Opp. at 14) are distinguishable and require a different result in this case.

[16] Defendants intend to brief this issue in more detail for the Court prior to the hearing on Defendants' Motions for Summary Judgment.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on **March 13, 2015** to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.

*s/ Nancy L. Stagg*
Nancy L. Stagg