ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
jforge@rgrdlaw.com
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
HELEN I. ZELDES (220051)
helenz@zhlaw.com
ALREEN HAEGGQUIST (221858)
alreenh@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Class Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>   vs.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>                    Defendants. | No. 3:10-cv-0940-GPC(WVG)<br><br>CLASS ACTION<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR DECERTIFICATION OF CLASS ACTION<br><br>DATE:     May 22, 2015<br>TIME:     1:30 p.m.<br>CTRM:   2D (Schwartz)<br>JUDGE:  Hon. Gonzalo P. Curiel |

**[REDACTED]**

1

# TABLE OF CONTENTS

2

**Page**

3  I.    INTRODUCTION ...................................................................................... 1

4  II.   PROCEDURAL HISTORY ...................................................................... 2

5  III.  ARGUMENT ............................................................................................ 3

6        A.   In Arguing Decertification "as a Matter of Law," Defendants
             Provide No New Law or Evidence that Requires a Different
7             Outcome ......................................................................................... 3

8        B.   Plaintiffs' Damages Theory Is Consistent with *Comcast* ................... 7

9        C.   Refunds Are Available to California Class Members ......................... 8

10             1.    Only Full-Refunds Will Return Victims to the Position
                    They Were in Before Being Ensnared in Defendants'
11                   Scam ........................................................................................ 9

12             2.    This Is Not an Imperfect Labeling Case .................................... 17

13       D.   Florida and New York Class Members Are Entitled to Full
            Refunds ......................................................................................... 20

14  IV.   DEFENDANTS' INADEQUACY ARGUMENT IS MERITLESS ............ 23

15  V.    CONCLUSION ......................................................................................... 25

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen v. Hyland's Inc.*,
  300 F.R.D. 643 (C.D. Cal. 2014) ...................................................................... 8, 17

*Allen v. Similasan Corp.*,
  No. 12-cv-376 BAS (JLB), 2015 U.S. Dist. LEXIS 43748
  (S.D. Cal. Mar. 30, 2015) ...................................................................................... 12

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
  242 F.3d 290 (5th Cir. 2001) ................................................................................. 17

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) .................................................................................... 6

*Brinker Rest. Corp. v. Superior Court*,
  53 Cal. 4th 1004 (2012) ............................................................................................ 6

*Caldera v. J.M. Smucker Co.*,
  No. CV 12-4936-GHK, 2014 U.S. Dist. LEXIS 53912
  (C.D. Cal. Apr. 15, 2014) ................................................................................. 18, 19

*Chavez v. Blue Sky Natural Beverage Co.*,
  No. C 06-06609 JSW, 2011 U.S. Dist. LEXIS 109738
  (N.D. Cal. Sept. 27, 2011) ......................................................................................... 5

*Cohen v. Trump*,
  No. 3:13-cv-02519-GPC(WVG) .................................................................... *passim*

*Colgan v. Leatherman Tool Grp., Inc.*,
  135 Cal. App. 4th 663 (2006) ................................................................................. 18

*Comcast Corp. v. Behrend*,
  __U.S.__, 133 S. Ct. 1426 (2013) ................................................................. *passim*

*Day v. AT & T Corp.*,
  63 Cal. App. 4th 325 (1998) ...................................................................................... 8

*Donovan v. Philip Morris USA, Inc.*,
  No. 06-12234-DJC, 2012 U.S. Dist. LEXIS 37974
  (D. Mass. Mar. 21, 2012) ......................................................................................... 5

**Page**

*Fletcher v. Sec. Pac. Nat'l Bank*,
   23 Cal. 3d 442 (1979) ............................................................................. 8

*Foraker v. Schauer*,
   No. 04-cv-00363-EWN-OES, 2005 U.S. Dist. LEXIS 46071
   (D. Colo. Sept. 8, 2005) ......................................................................... 20

*FTC v. Figgie Int'l*,
   994 F.2d 595 (9th Cir. 1993) ......................................................... 9, 10, 22

*FTC v. Int'l Diamond Corp.*,
   No. 82-0878 WAI (JSB), 1983 U.S. Dist. LEXIS 15504
   (N.D. Cal. July 12, 1983) ....................................................................... 10

*FTC v. Ivy Capital, Inc.*,
   No. 2:11-CV-283 JCM (GWF), 2013 U.S. Dist. LEXIS 42369
   (D. Nev. Mar. 26, 2013) ................................................................... 10, 15

*FTC v. Mylan Lab., Inc.*,
   99 F. Supp. 2d 1 (D.D.C. 1999) ............................................................. 21

*Gonzales v. Arrow Fin. Servs. LLC*,
   489 F. Supp. 2d 1140 (S.D. Cal. 2007), *aff'd*, 660 F.3d 1055
   (9th Cir. 2011) ......................................................................................... 4

*Guadiana v. State Farm Fire & Cas. Co.*,
   No. CIV 07-326 TUC FRZ (LAB), 2014 U.S. Dist. LEXIS 33460
   (D. Ariz. Mar. 13, 2014) ......................................................................... 4

*H&J Paving of Fla., Inc. v. Nextel, Inc.*,
   849 So. 2d 1099 (2003) .......................................................................... 20

*Hahn v. Massage Envy Franchising, LLC*,
   No. 12cv153 DMS (BGS), 2014 U.S. Dist. LEXIS 147899
   (S.D. Cal. Sept. 25, 2014) ............................................................... 8, 9, 12

*In re Apple iPod iTunes Antitrust Litig.*,
   No. 05-CV-0037 YGR, 2014 U.S. Dist. LEXIS 165254
   (N.D. Cal. Nov. 15, 2014) .............................................................. 1, 3, 4

**Page**

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
268 F.R.D. 652 (S.D. Cal. 2010)........................................................................17

*In re Nat'l West. Life Ins. Deferred Annuities Litig.*,
No. 3:05-cv-1018-GPC-WVG, 2013 U.S. Dist. LEXIS 20314
(S.D. Cal. Feb. 14, 2013) (Curiel, J.) ....................................................................4

*In re POM Wonderful LLC Mktg. & Sales Practices Litig.*,
No. ML 10-02199 DDP, 2012 U.S. Dist. LEXIS 141150
(C.D. Cal. Sept. 28, 2012) ...................................................................................18

*In re POM Wonderful, LLC*,
No. ML 10-02199 DDP, 2014 U.S. Dist. LEXIS 40415
(C.D. Cal. Mar. 25, 2014)....................................................................................18

*In re Vioxx Class Cases*,
180 Cal. App. 4th 116 (2009)..............................................................................11

*Iorio v. Allianz Life Ins. Co. of N. Am.*,
No. 05CV633 JLS (CAB), 2008 U.S. Dist. LEXIS 118344
(S.D. Cal. July 8, 2008) ....................................................................................5, 6

*Jones v. Conagra Foods, Inc.*,
No. C 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292
(N.D. Cal. June 13, 2014)..............................................................................18, 19

*Kraus v. Trinity Mgmt. Servs., Inc.*,
23 Cal. 4th 116 (2000)...........................................................................................8

*Krueger v. Wyeth, Inc.*,
No. 03CV2496 JAH (AJB), 2011 U.S. Dist. LEXIS 154472
(S.D. Cal. Mar. 30, 2011) ....................................................................................14

*Lanovaz v. Twinings N. Am., Inc.*,
No. C-12-02646-RMW, 2014 U.S. Dist. LEXIS 57535
(Apr. 24, 2014) ...............................................................................................17, 19

*Lee v. Carter-Reed Co., L.L.C.*,
4 A.3d 561, 564, 577, 580 (2010) .......................................................................12

**Page**

*Levya v. Medina Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013)...................................................................6, 7

*Makaeff v. Trump Univ., LLC*,
   715 F.3d 254 (9th Cir. 2012).......................................................................16

*Marlo v. UPS*,
   251 F.R.D. 476 (C.D. Cal. 2008) .................................................................3

*Marlo v. UPS, Inc.*,
   639 F.3d 942 (9th Cir. 2011) .......................................................................3

*Matter of People of the State of N.Y. v. Trump Entrepreneur Initiative LLC*,
   No. 451463/13, 2014 N.Y. Misc. LEXIS 4533
   (N.Y. Sup. Ct. Oct. 8, 2014) .....................................................................12

*Matter of People v. Applied Card Sys., Inc.*,
   41 A.D.3d 4 (2007)......................................................................................22

*Mendez v. Radec Corp.*,
   260 F.R.D. 38 (W.D.N.Y. 2009) ....................................................23, 24, 25

*Oosterhuis v. Palmer*,
   137 F.2d 322 (2nd Cir. 1943) .....................................................................22

*Ortega v. Natural Balance, Inc.*,
   300 F.R.D. 422 (C.D. Cal. 2014) .........................................................10, 11

*Otsuka v. Polo Ralph Lauren Corp.*,
   No. C 07-027801 SI, 2010 U.S. Dist. LEXIS 12867
   (N.D. Cal. Jan. 25, 2010)..............................................................................5

*People ex rel Harris v. Sarpas*,
   225 Cal. App. 4th 1539 (2014)......................................................................9

*People ex rel. Kennedy v. Beaumont Invest., Ltd.*,
   111 Cal. App. 4th 102 (2003)........................................................................9

*People v. Superior Court of Los Angeles County*,
   9 Cal. 3d 283 (1973)......................................................................................9

**Page**

*People v. Telehublink Corp.*,
  301 A.D.2d 1006 (2003) ..................................................................................22

*Red v. Kraft Foods, Inc.*,
  No. CV 10-1028-GW(AGRx), 2012 U.S. Dist. LEXIS 186948
  (C.D. Cal. Apr. 12, 2012) ..........................................................................18, 19

*Ries v. Ariz. Bevs. USA LLC*,
  No. 10-01139 RS, 2013 U.S. Dist. LEXIS 46013
  (N.D. Cal. Mar. 28, 2013) ................................................................................18

*Rikos v. P&G*,
  No. 1:11-cv-226, 2014 U.S. Dist. LEXIS 109302
  (S.D. Ohio June 19, 2014) .........................................................................10, 12

*Rollins, Inc. v. Heller*,
  454 So. 2d 580 (1984) .......................................................................................21

*Sheinberg v. Sorensen*,
  606 F.3d 130 (3rd Cir. 2010) ............................................................................24

*Sheinberg v. Sorensen*,
  No. 00-6041 (JLL), 2007 U.S. Dist. LEXIS 9544
  (D.N.J. Feb. 8, 2007) ........................................................................................24

*Slaven v. BP Am., Inc.*,
  190 F.R.D. 649 (C.D. Cal. 2000) .....................................................................20

*Small v. Lorillard Tobacco Co.*,
  94 N.Y.2d 43 (1999) ..........................................................................................22

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ............................................................................8

*Steroid Hormone Prod. Cases*,
  181 Cal. App. 4th 145 (2010) ...........................................................................11

*Stiller v. Costco Wholesale Corp.*,
  298 F.R.D. 611 (S.D. Cal. 2014) (Curiel, J.) .....................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page

*Tri-County Plumbing Servs. v. Brown*,
   921 So. 2d 20 (2006) ......................................................................... 22

*United States v. Grizaffi*,
   471 F.2d 69 (7th Cir. 1972) .............................................................. 20

*United States v. Kennedy*,
   726 F.3d 968 (7th Cir. 2013) ............................................................. 9

*United States v. Powers*,
   578 F. App'x 763 (10th Cir. 2014) .................................................. 20

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575
   (N.D. Cal. May 23, 2014) .................................................................. 19

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
   Rule 23 .............................................................................. 1, 3, 4, 5
   Rule 23(f) ................................................................................. 2, 3

California Business & Professions Code
   §17203 ......................................................................................... 8
   §17535 ......................................................................................... 8

California Civil Code
   §1780(a) ....................................................................................... 8
   §1780(e) ....................................................................................... 8
   §1781(a) ....................................................................................... 8

New York General Business Law
   §349 ........................................................................................... 22

## I.     INTRODUCTION

If there were ever a dispute where no stone was left unturned, it was the issue of whether this case should be certified as a class action.  The seemingly never-ending flurry of filings began on September 24, 2012 (Dkt. No. 122) and culminated with the Court's February 21, 2014 Order certifying this case as a class action, consisting of five subclasses of consumers in California, New York and Florida under various consumer protection laws of those states.  *See* Dkt. No. 298 (the "Class Cert. Order").

Now, because the Ninth Circuit dismissed as untimely their petition to appeal the Class Cert. Order, defendants demand that this Court reverse itself.  Defendants' motion for decertification does little more than recycle the same arguments, cases, and evidence this Court rejected the first time around.  Indeed, the only truly "new" aspect of defendants' motion is the law firm that prepared it.  But a replacement law firm for the man best known for the phrase, "You're fired!" simply does not satisfy the requisite "'change, unforeseen at the time of the class certification, that makes alteration of the initial certification decision necessary.'"  *In re Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037 YGR, 2014 U.S. Dist. LEXIS 165254, at *17 (N.D. Cal. Nov. 15, 2014).[1]  Defendants have never liked plaintiffs' full-refund damages model and they still do not like it.  However, Rule 23 does not permit "do-overs," and defendants are not entitled to a second bite at the apple simply because they are displeased with the outcome.  Likewise, Trump has never liked class counsel; as Trump said at his deposition:  "[W]e will be suing your law firm for as much as we can possibly do.  That I can tell you. . . .  And you individually."  Ex. 1 (DJT Tr.) at 48:10-20.[2]  And Trump still does not like class counsel, but Rule 23 does not measure

---

[1]     Here, and throughout, citations and internal quotations are omitted, and emphasis is added, unless otherwise noted.

[2]     Here, and throughout, unless otherwise noted, references to "Ex." are to the Declaration of Rachel L. Jensen ("Jensen Decl."), filed concurrently herewith; References to "CC Ex." are to the Exhibits filed in support of Plaintiffs' Motion for Class Certification (*See* Dkt. Nos. 122-2, 195-1, 221-1); and references to "SJ Ex." are

1   class counsel's adequacy by how much they please defendants. This is so even when

2   a defendant expresses his displeasure with baseless arguments such as the one here

3   that class counsel were dilatory for filing their motion for approval of class notice

4   within three weeks of the Ninth Circuit rejecting Trump's 23(f) petition in the related

5   *Cohen v. Trump*, No. 3:13-cv-02519-GPC(WVG) case. The motion should be denied.

## II.   PROCEDURAL HISTORY

7            On September 24, 2012, plaintiffs filed their motion for class certification in

8   this case, seeking certification of a nationwide class of consumers who purchased

9   Trump University's ("TU") Live Event programs. *See* Dkt. No. 122. In opposing

10   plaintiffs' class certification motion, defendants submitted over 200 pages of briefing

11   and over 6,700 pages of exhibits, totaling over 6,900 pages of evidence.[3] Briefing on

12   plaintiffs' class certification motion was finally completed on July 3, 2013 (*see* Dkt.

13   No. 241), and the Court heard argument on November 8, 2013.

14            On February 21, 2014, the Court granted plaintiffs' motion for class

15   certification in part, certifying a class of persons who purchased Trump University

16   Live Events in California, New York and Florida, and have not received a full refund,

17   divided into five state law subclasses.[4] Dkt. No. 298 at 35-36. On March 10, 2014,

18   defendants filed with the Ninth Circuit a Petition for Permission to Appeal under Rule

19   23(f). Dkt. No. 307. On April 10, 2014, the Ninth Circuit rejected as untimely

20   defendants' petition. Dkt. No. 318.

---

22   to the Exhibits filed in support of Plaintiffs' Omnibus Opposition to Trump Defendants' Motions for Summary Judgment (*see* Dkt. No. 388).

23   [3]   *See* Docket entries 138-143, 210-213, 230 and 241. To say defendants' briefing on

24   class certification was exhaustive is an understatement. In addition to filing an opposition to plaintiffs' motion for class certification (Dkt. No. 138), defendants filed

25   *six* other briefs relating to the issue of class certification. *See* Dkt. Nos. 138-2, 210, 211-1, 212, 230 and 241.

26   [4]   "Excluded from the class are Defendants, their officers and directors, families and

27   legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate

28   families." Dkt. No. 298 at 36.

On June 16, 2014, plaintiff Art Cohen filed a motion for class certification in the related *Cohen* case, seeking certification of a single national class for a RICO claim. *Cohen* Dkt. No. 39. On October 27, 2014, this Court granted Cohen's motion and certified the *Cohen* case as a class action with a single national class under RICO. *Cohen* Dkt. No. 53. On November 10, 2014, Trump filed a Petition for Permission to Appeal under Rule 23(f). On February 2, 2015, the Ninth Circuit denied Trump's Rule 23(f) petition. *Cohen* Dkt. No. 59.

On February 12 and 17, 2015, Trump and TU filed MSJs against the individual named plaintiffs. Dkt. Nos. 375, 377. On February 19, 2015, defendants moved for decertification of the class. Dkt. No. 380. On February 20, 2015, plaintiffs moved the Court for approval of class notice and directing class notice procedures. Dkt. No. 381.

## III.   ARGUMENT

### A.   In Arguing Decertification "as a Matter of Law," Defendants Provide No New Law or Evidence that Requires a Different Outcome

Defendants, in moving for decertification, bear the burden of "show[ing] that the class no longer meets Rule 23's certification requirements." *Apple*, 2014 U.S. Dist. LEXIS 165254, at *16 (placing burden on defendant and denying motion to decertify for failure to meet burden).[5] Defendants face a "heavy burden" on their class

---

[5]   Defendants cite *Marlo v. UPS, Inc.*, 639 F.3d 942 (9th Cir. 2011), for the proposition that it is plaintiffs, in opposing decertification, who bear the burden. *See* Dkt. No. 380-1 ("Defs' Mem.") at 2. However, *Marlo* made only an "ancillary reference to burden," and did not "squarely address[] the issue," which is why many courts continue to place the "heavy" burden of demonstrating decertification *on the moving party*. *Apple*, 2014 U.S. Dist. LEXIS 165254, at *16-*17; *see also Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 622 (S.D. Cal. 2014) (Curiel, J.) ("Just as the party moving for class certification bears the burden of demonstrating that the proposed class satisfies the elements of Rule 23, the *party moving for class decertification . . . bears the burden* of demonstrating that an element of Rule 23 is not satisfied."). After all, it is *defendants* who filed this motion, the opening brief, and will get the benefit of a reply brief. As is true for all motions (*e.g.*, motions to dismiss, MSJs, etc.), and for trial, the party who bears the burden of proof speaks first and last. Moreover, the Ninth Circuit decided *Marlo* in a completely different context than this case presents. In *Marlo*, the district court had granted summary judgment for defendants, was reversed, and almost immediately upon remand, a series of pretrial sessions gave the district court concerns, and the court then *sua sponte* invited briefing on decertification. *See Marlo v. UPS*, 251 F.R.D. 476, 479 (C.D. Cal. 2008); *see also Marlo*, 639 F.3d at 948 (observing the "district court first noted changes that had

decertification motion, as "doubts regarding the propriety of class certification should be resolved in favor of certification." *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007) (placing burden on defendants), *aff'd*, 660 F.3d 1055 (9th Cir. 2011).  Decertification is only appropriate if there is "some change, unforeseen *at the time of the class certification*, that makes alteration of the initial certification decision necessary." *Apple*, 2014 U.S. Dist. LEXIS 165254, at *17. Thus, defendants must point to some "subsequent development[] in the litigation" that warrants decertification.  *See, e.g.*, *In re Nat'l West. Life Ins. Deferred Annuities Litig.*, No. 3:05-cv-1018-GPC-WVG, 2013 U.S. Dist. LEXIS 20314, at *7-*8 (S.D. Cal. Feb. 14, 2013) (Curiel, J.); *Guadiana v. State Farm Fire & Cas. Co.*, No. CIV 07-326 TUC FRZ (LAB), 2014 U.S. Dist. LEXIS 33460, at *8 (D. Ariz. Mar. 13, 2014) ("in the absence of materially changed or clarified circumstances courts should not condone a series of rearguments on the class issues").

Here, defendants re-argue their opposition to class certification, pointing to no new facts, no new binding law, and no new developments that justify decertification. All of the named plaintiffs had been deposed by the time defendants filed their opposition, and nearly all of the evidence and cases defendants cite now, including *Comcast Corp. v. Behrend*, __U.S.__, 133 S. Ct. 1426 (2013), were available at the time the class was certified.  Instead, defendants rehash the same arguments, based on the same previously-cited cases and evidence, regarding the full-refund model and the purported "value" that students obtained.  But, in opposing class certification, defendants had argued, just as they do now, that the full-refund model failed to take into account the "value" students obtained from TU programs, and that determining what value each student received created individualized inquiries that defeated predominance.  *See, e.g.*, Dkt. No. 138 at 20, 25 (arguing that individualized inquiry

occurred since its certification order").  Nevertheless, even if the Court wanted to review *de novo* its own class certification decision, for all the same reasons that the Court embraced class certification the first time around in this case, and in the related *Cohen* case, it is clear that this case satisfies the requirements of Rule 23.

will be required to determine what value was actually obtained by students); Dkt. No. 138-5 at 5-7 (objecting to plaintiffs' proposed trial plan for establishing damages because it failed to account for the "value" students received); Dkt. No. 211-1 at 14. Defendants also relied on *Comcast*, just as they do now, to argue against plaintiffs' method for calculating damages. *See* Dkt. No. 230 at 9 (arguing that plaintiffs did not provide a credible class-wide method for calculating damages).

In short, defendants want a "do-over," but that is not permitted under Rule 23. *See, e.g.*, *Chavez v. Blue Sky Natural Beverage Co.*, No. C 06-06609 JSW, 2011 U.S. Dist. LEXIS 109738, at *25 (N.D. Cal. Sept. 27, 2011) (denying motion to decertify where defendants sought to have the court reconsider the same legal arguments addressed in its class certification order); *Otsuka v. Polo Ralph Lauren Corp.*, No. C 07-027801 SI, 2010 U.S. Dist. LEXIS 12867, at *15-*16 (N.D. Cal. Jan. 25, 2010) (denying motion to decertify where defendants re-raised arguments the court had rejected in certifying a class); *Iorio v. Allianz Life Ins. Co. of N. Am.*, No. 05CV633 JLS (CAB), 2008 U.S. Dist. LEXIS 118344, at *84 (S.D. Cal. July 8, 2008) (finding improper, on a motion for decertification, to "resurrect[] the same deposition testimony" that defendant previously presented in opposing class certification).

In deciding to certify the class, this Court undertook a rigorous analysis into whether the requirements of Rule 23 were met, including the "more demanding" predominance requirement.  Dkt. No. 298 at 18.  As part of its analysis, the Court considered – and rejected – the arguments and evidence defendants proffer again here, including over 200 pages of briefing and 6,700 pages of evidence submitted by defendants in connection with plaintiffs' motion for class certification.[6] *See* Appendix

---

[6]   In fact, defendants rely on nearly identical evidence, testimony and absent class member declarations here that they cited in opposing class certification.   *See* Appendix A attached hereto.  Additionally, the testimony of Paula Levand and Mette Nielsen merely echoes the declarations they submitted in support of defendants' opposition to class certification and, as a result, does not constitute "new" evidence. *See Donovan v. Philip Morris USA, Inc.*, No. 06-12234-DJC, 2012 U.S. Dist. LEXIS 37974, at *27 (D. Mass. Mar. 21, 2012) ("The argument raised here in support of the decertification motion is an echo of the argument made in opposition to the plaintiffs'

A (chart demonstrating that defendants' evidence submitted in support of decertification is **not** new); *supra* at 2 & n.3.  In accepting plaintiffs' full-refund model of damages, this Court correctly recognized "the amount of damages, even if it is an individual question, does not defeat certification."  Dkt. No. 298 at 27 (citing *Levya v. Medina Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013)).  Concluding that "[p]laintiffs' proposed method of calculating damages does not defeat predominance or render the case unmanageable," this Court explicitly rejected defendants' argument "that individual inquiry is still needed to determine what value was actually obtained by students."[7]  *Id.* at 26-27.  Further, in granting class certification, this Court relied on well-settled Ninth Circuit precedent that "damage calculations alone cannot defeat certification."  *Levya*, 716 F.3d at 513.  In *Levya*, the Ninth Circuit reiterated that:

> In almost every class action, factual determinations of damages to individual class members must be made.  Still we know of no case where this has prevented a court from aiding the class to obtain its just restitution.  Indeed, *to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device*.  Thus, [t]he amount of damages is invariably an individual question and does not defeat class action treatment.

*Id.* at 513-14 (citing *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012), and *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)).  Because defendants have identified no new binding case law, evidence, or arguments that were not available to them at the time of class certification, their motion should be denied.

---

certification motion . . . and is one that the Court has already rejected.").  Further, plaintiffs have already shown why Levand's declaration should be disregarded here and in the related *Cohen* case.  *See* Dkt. No. 233 at 8-9 n.6; *Cohen* Dkt. No. 46 at 4.  Finally, instructor Gerald Martin's deposition testimony is irrelevant, as it provides no details about the so-called "competitor" real estate seminars he attended and/or worked for sufficient to determine whether they are comparable to TU, which claimed it was one-of-a-kind.

[7]   In the related *Cohen* action, this Court similarly rejected the argument that plaintiffs' full-refund damages model does not comport with *Comcast* before concluding, just as in this case's class certification order, "that individualized questions as to damages do not defeat predominance."  *Cohen* Dkt. No. 53 at 21.  In his 23(f) petition, Trump attacked this aspect of the Court's class-certification decision, and the Ninth Circuit rejected his petition on the merits.

### B.      Plaintiffs' Damages Theory Is Consistent with *Comcast*

Were this Court to revisit its decision, plaintiffs' full-refund damages theory readily comports with *Comcast*.  In *Comcast*, the Supreme Court held that a plaintiff's proposed damages model must "measure only those damages attributable to [the plaintiff's] theory [of liability]."   133 S. Ct. at 1429; *Levya*, 716 F.3d at 514 (recognizing that, under *Comcast*, "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability").  The Supreme Court reiterated that "[c]alculations need not be exact," but held that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'"  *Comcast*, 133 S. Ct. at 1433.

As the Court expressly found in the related *Cohen* case, plaintiffs' model of damages here – full refunds – is consistent with, and in fact directly tied to, plaintiffs' theory of liability.  *Cohen* Dkt. No. 53 at 20-21.  Plaintiffs' theory of liability in these two related cases is, and has always been, that TU was a fraudulent scheme that provided speculative or no value.  *See, e.g.*, Dkt. No. 1, ¶1 (initial complaint alleging: "The primary lesson Trump University teaches its students is how to spend more money buying more Trump seminars[]" and demanding full refunds), ¶5.  In truth, student-victims got ***none*** of what they paid for:  not Trump, not his "secrets," not his "hand-picked" professors, not a yearlong mentorship with a Trump "certified" expert, and certainly not anything approaching a university.  *See, e.g.*, CC Ex. 32 at TU 25266 (promises of Trump's "hand-picked instructors" who would "share [his] techniques, which took [his] entire career to develop"); CC Ex. 2 (TU-PLTF02441) ("we're going to teach you better than the business schools are going to teach you and I went to the best business school").  Instead, TU was a bait-and-switch scam that operated illegally under the guise of a "university," with Trump serving as the lone star of its promotional campaign that never delivered on his promises.  *See generally* Dkt. No. 386 at 4-13.  "Accordingly, Plaintiffs' damages theory – predicated on the notion that class members are entitled to full restitution for products with no value – is consistent

1   with Plaintiffs' liability theory." *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D.

2   Cal. 2014) (certifying a class under the UCL, FAL and CLRA based on a theory of

3   full refunds, which was consistent with plaintiffs' theory of liability and thus

4   comported with *Comcast*); *Hahn v. Massage Envy Franchising, LLC*, No. 12cv153

5   DMS (BGS), 2014 U.S. Dist. LEXIS 147899, at *52 (S.D. Cal. Sept. 25, 2014)

6   (denying motion for decertification of a class seeking full refunds under the UCL and

7   rejecting defendants' argument that plaintiffs had no evidence to calculate the

8   "benefit" received from massage memberships).

9       **C.    Refunds Are Available to California Class Members[8]**

10      It is well within this Court's equitable power to award full refunds to California

11  class members, as the UCL and FAL authorize the Court to issue "such orders or

12  judgments . . . as may be necessary to restore any person in interest any money or

13  property, real or personal, which may have been acquired by means of . . . unfair

14  competition."[9]   Cal. Bus. & Prof. Code §§17203, 17535; *Kraus v. Trinity Mgmt.*

15  *Servs., Inc.*, 23 Cal. 4th 116, 151 (2000) (noting the statute "provid[es] courts with

16  broad equitable powers to remedy violations").  "A court of equity may exercise its

17  full range of powers in order to accomplish complete justice between the parties,

18  restoring if necessary the *status quo ante* as nearly as may be achieved." *Fletcher v.*

19  *Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 452 (1979).  The goal is "to make whole,

20  equitably, the victim of an unfair practice." *Day v. AT & T Corp.*, 63 Cal. App. 4th

21  325, 339 (1998).  Further, the UCL "keys on the wrongdoing of [defendants] and is

22  designed to protect the public." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1021

23
24  [8]   Defendants do not challenge certification of the California Financial Elder Abuse subclass and, thus, regardless of the outcome of their motion, that subclass stands.

25  [9]   Contrary to defendants' suggestion, the CLRA is not limited to restitution, but
26  extends to actual and punitive damages.  *See* Cal. Civ. Code §§1780(a), (e).  The CLRA states: "Any consumer entitled to bring an action under [the CLRA]
27  may . . . bring an action on behalf of himself and such other consumers to recover damages or obtain other relief . . . ." Cal. Civ. Code §1781(a).  Plaintiffs are entitled to damages in the amount of the price they paid for TU programs, plus interest, and
28  may seek punitive damages under the CLRA as well.

& n.13 (9th Cir. 2011) ("One might even say that, in effect, California has created what amounts to a conclusive presumption that when a defendant puts out tainted bait and a person sees it and bites, the defendant has caused an injury; restitution is the remedy."). In crafting restitution, "courts are not concerned with restoring the violator to the status quo ante. The focus is on the victim." *People ex rel. Kennedy v. Beaumont Invest., Ltd*., 111 Cal. App. 4th 102, 134 (2003); *Hahn*, 2014 U.S. Dist. LEXIS 147899, at *41 (observing that restitution under the UCL is "measured by what was taken from the plaintiff"). Thus, defendants' feigned concern of a "windfall" should be rejected. *See* Defs' Mem. at 3. By way of illustration, the seminal California case, *People v. Superior Court of Los Angeles County*, 9 Cal. 3d 283, 286-88 (1973), held that purchasers defrauded by door-to-door encyclopedia salesmen with misleading "sales dialogues" could rescind their agreements and obtain full refunds. Indeed, where customers are "fraudulently induced to make payments" for services "they never received," like in this case, restitution requires full refunds. *People ex rel Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1562 (2014).

### 1. Only Full-Refunds Will Return Victims to the Position They Were in Before Being Ensnared in Defendants' Scam

Defendants contend that plaintiffs' full-refund model fails because it does not provide for an offset for the "value" provided by TU. *See* Defs' Mem. at 5. Defendants miss the mark – plaintiffs' theory is, and has always been, that there was none. Indeed, as this Court recognized in certifying *Cohen* based on the same facts, plaintiffs have analogized TU to a counterfeit piece of art that is deemed worthless. *See Cohen* Dkt. No. 53 at 19 (citing *United States v. Kennedy*, 726 F.3d 968, 974 (7th Cir. 2013)). In *FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993), for example, the Ninth Circuit explained why full restitution is proper in cases involving counterfeits:

> To understand why, we return to the hypothetical dishonest rhinestone merchant. Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the

truth, perhaps they would not have bought rhinestones at all or only some. . . .   The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them.

*Id.* at 606.

The court also explained that, where "'the loss suffered by the victim is greater than the unjust benefit received by the defendant, the proper measure of restitution may be to restore the status quo.'" *Id.* at 606-07 (citing *FTC v. Int'l Diamond Corp.*, No. 82-0878 WAI (JSB), 1983 U.S. Dist. LEXIS 15504, at * 10 (N.D. Cal. July 12, 1983)). "As between the innocent purchaser and the wrongdoer who, though not privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo." *Id.* at 607; *see also Rikos v. P&G*, No. 1:11-cv-226, 2014 U.S. Dist. LEXIS 109302, at *51 (S.D. Ohio June 19, 2014) (citing *Figgie* in certifying UCL, CLRA and FDUTPA claims on a refund theory of damages); *see also FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF), 2013 U.S. Dist. LEXIS 42369, at *17, *48-*49 (D. Nev. Mar. 26, 2013) (equity required full refunds to consumers ensnared in a similar upsell coaching scam where the "services, coaching, and products sold by defendants amounted to nothing more than simple common sense that any person could find and learn through elementary research on their own").

Full refunds are also appropriate in cases, like this, where the product or service is unlawful.  In *Ortega v. Natural Balance, Inc.*, 300 F.R.D. 422, 430 (C.D. Cal. 2014), plaintiffs alleged defendants "'falsely market[ed] [Cobra],'" a dietary supplement, "'as having beneficial health and aphrodisiac properties and being scientifically formulated to improve virility, despite that none of the ingredients in Cobra, individually or in combination, provide such benefits.'" *Id.*  Defendants argued "each plaintiff's monetary recovery should be reduced to account for the actual value of the product to him." *Id.* at 430.  The court rejected this argument, certifying the class based on plaintiffs' argument that "***the product was valueless because it***

1 | ***provided none of the advertised benefits and was illegal***.  As such, [p]laintiffs

2 | contend, they should recover their full purchase price." *Id.*  Similarly, in *Steroid*

3 | *Hormone Prod. Cases*, 181 Cal. App. 4th 145 (2010), plaintiffs did not need to

4 | provide any valuation of bodybuilding products containing androstenediol (a

5 | substance that is unlawful without a prescription) to establish damages.  *See id.* at 159-

6 | 60.  The court distinguished cases where plaintiffs put valuation at issue by alleging

7 | they paid more due to the misrepresentation, such as the *Vioxx* case cited by

8 | defendants, as plaintiff "allege[d] that he bought a product that was illegal to sell or

9 | possess."  *Id.* (distinguishing *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009)).

10 | Defendants attempt to soften the blow of *Ortega* and other cases allowing full

11 | refunds for worthless and illegal products by arguing they are "limited factually to

12 | products such as medicinal products that have no inherent value if they do not provide

13 | the advertised benefits."  Defs' Mem. at 5.  But, those cases involved the peddling of

14 | ***illegal*** products, just as defendants did here.  *See, e.g.*, *Ortega*, 300 F.R.D. at 430

15 | (selling allegedly illegal supplements); *Steroid*, 181 Cal. App. 4th at 149 (selling

16 | product containing substance illegal to sell or possess without a prescription).[10]

17 | There is ample evidence that TU was an illegal scam.  In 2005, the New York

18 | State Education Department ("NYSED") wrote to Trump personally and warned him

19 | it was illegal to: (i) call his business a "university," as it was unqualified to do so; and

20 | (ii) operate without a license.[11]  Instead of complying, Trump's personnel lied to the

21 | NYSED, claiming TU was relocating to Delaware, set up a fictitious office, and in

22 | 2007, started the Live Events using the "university" title, while continuing to operate

---

10 | The *Steroid* court adopted plaintiffs' full-refund theory of restitution even though plaintiffs did not allege that the supplements failed to deliver the advertised benefits, rejecting defendants' argument '"the existence and manner of incurring damages' for each class member would depend upon each class member's subjective belief regarding the 'actual value'" of the supplement. *See* 181 Cal. App. 4th at 156.

11 | *See* SJ Ex. 11 at TU-PLTF03744-45; SJ Ex. 13, ¶¶6-37 (providing chronology of Trump's defiance regarding his marketing of his "university" from 2005 to 2010).

out of New York.[12]   In 2010, an investigation by the Texas AG resulted in TU suspending operations there.[13]   TU was effectively shut down by the NYSED in mid-2010 and, in August 2013, the New York AG sued Trump.  In October 2014, a New York state court made the summary determination that Trump was operating TU without a license.  *See Matter of People of the State of N.Y. v. Trump Entrepreneur Initiative LLC*, No. 451463/13, 2014 N.Y. Misc. LEXIS 4533, at *26-*27 (N.Y. Sup. Ct. Oct. 8, 2014).  As the NYSED aptly stated when it demanded full refunds for all current students, "Trump is an ***unlicensed school***" offering "***illegal training***" in which students "should never have been enrolled."  SJ Ex. 14 at NYSED 000069.

Further, where, as here, plaintiffs did not receive the advertised benefits and any value is "speculative," full refunds are appropriate.  In *Hahn*, 2014 U.S. Dist. LEXIS 147899, a consumer class action involving "massage memberships," plaintiffs sought full restitution for forfeited pre-paid massages.  *Id.* at *46.  Defendants argued plaintiffs must offset the restitution by the value of benefits provided.  *See id.*  In rejecting this argument, the court held:  "To the extent such benefits are not gratuitous, ***Plaintiffs maintain they have speculative value, if any***."  *Id.*  As such, the court granted plaintiffs' motion for restitution.[14]  *See id.* at *47.

---

[12]   CC Exs. 139 & 140.

[13]   Ex. 3 (Sexton Tr.) at 413:2-17, 418:10-20; CC Ex. 70 at TU 135883 (TU has "indefinitely postponed all Texas free presentations").

[14]   *See also Rikos*, 2014 U.S. Dist. LEXIS 109302, at *50-*51 (certifying UCL, CLRA, and FDUTPA (among others) consumer claims regarding over-the-counter probiotic supplements on a full refund theory where plaintiffs alleged the supplements did not work as advertised); *Lee v. Carter-Reed Co., L.L.C.*, 4 A.3d 561, 564, 577, 580 (2010) (finding full refunds appropriate for classwide damages where plaintiff alleged a belly fat reduction pill Relacore "offer[] none of the benefits advertised" and the "marketing scheme is nothing more than a web of lies" where "the ascertainable loss here is the ***purchase price of a bottle of broken promises***. Each container of Relacore – not refunded – is an out-of-pocket loss."); *Allen v. Similasan Corp.*, No. 12-cv-376 BAS (JLB), 2015 U.S. Dist. LEXIS 43748, at *36 (S.D. Cal. Mar. 30, 2015) (finding plaintiffs' full-refunds damages model "consistent with the theory of their case," which was that the products were ineffective and therefore worthless).

Trump's involvement with TU was **the** selling point, and Trump set out to distinguish his "university" from other seminar companies by marketing it as a once-in-a-lifetime opportunity to learn his secrets from his handpicked experts, leveraging his name and his fan base.[15] *See, e.g.*, Ex. 4 (Makaeff Tr.) at 100:23-102:10 (Q. "So, it was important to you to be in a program that had his name on it because of his reputation? A. Yes."); CC Ex. 6, ¶2; Ex. 5 (Everett Tr.) at 84:2-3 ("The Trump name played a huge role in my decision [to purchase the fulfillment]."); CC Ex. 4, ¶2; Ex. 6 (Low Tr.) at 25:5-27:25 (testifying that the fact that the seminar was offered by "Donald Trump caught [his] attention"); CC Ex. 5, ¶4; Ex. 7 (Brown Tr.) at 16:23-17:22 (testifying that what interested him about the advertisement for TU he saw was that "Mr. Trump's name was on it"); CC Ex. 3, ¶2.[16]

Plaintiffs received **none** of the advertised benefits of TU – instead of being educated on Trump's real estate secrets and techniques from his closest advisors, plaintiffs received generic sales pitches and deliberately incomplete information from professional salesmen paid on commission based on upsells to the next TU product.[17]

---

[15] As Sexton confirmed, the goal was to capitalize on the Trump brand, which was "the most compelling brand out there" that would "be accessible to a broad range of people who would understand kind of instantly when you put that name what it stood for." Ex. 3 (Sexton Tr.) at 115:17-21, 163:16-164:3 ("the brand was critical to the business"). TU's promotional and Live Event materials focused on learning ***Trump's*** real estate techniques from a university with which he was integrally involved, not some generic, no-name real estate education course such as "learn creative financing" or "lease wholesaling classes." Because of the strength and recognition of the Trump name and brand, TU's target audience signed up, but they got no Trump in substance. As such, none of the core content was delivered.

[16] As instructor Stephen Goff testified, during Live Events he assured student-victims TU was no "scam," like other companies in the seminar industry:

> The reason I'm working for this man right here is because I do not have to worry about this being a scam. I will tell you that right now Donald Trump is worth $4 billion he is not going to be out here taking advantage of people and I feel comfortable with Donald . . . .

Ex. 8 (Goff Tr.) at 189:20-25; *see id.* at 189:11-16 (conveying Trump's involvement added legitimacy to TU and it was not a "scam").

[17] Discovery confirms Trump did not hand-pick the Live Event instructors and none of the techniques were actually Trump's. *See, e.g.*, Ex. 9 (Martin Tr.) at 45:13-19,

1    Indeed, far from "The next best thing to being his Apprentice" (CC Ex. 43), TU

2    "instructors" recycled generic content from other scams – devoid of any input from

3    Trump – and were evaluated solely on their "closes."   Ex. 13 at TU 51670

4    (requirement of ████ close rate).  Moreover, plaintiffs did not emerge with anything of

5    marketable value, such as a degree, a real estate license, or credits.  *See* Dkt. No. 386

6    at 12.  TU "mentors" did not provide any services that a realtor would not provide for

7    free.[18]  Not only did TU not provide value, it provided ***negative value*** as it cost

8    students their time and exposed them to liability, as it "taught" dubious or illegal

9    practices that subjected plaintiffs to the risk of criminal fines and penalties.[19]

10         Defendants cite cherry-picked excerpts from plaintiffs' depositions and a

11    recycled declaration previously filed in opposition to class certification in an effort to

12    point to the "value" provided by Trump University.[20]  *See* Defs' Mem. at 6-9.  The

---

13

14    58:10-24; Ex. 10 (Sperry Tr.) at 29:18-30:16, 31:5-21; Ex. 11 (Miller Tr.) at 55:22-
      56:1; Ex. 12 (Sexton NYAG Exam.) at 157:13-15 (admitting that "[n]one of our
15    instructors at the live events were hand picked by Donald Trump").

16    [18] ████████████████████████████████████████████████████████

17    ████████████████████████████████████████████████████████████

18    ████████████████████████████████████████████████████████████

19    [19]  Dkt. No. 386 at 12-13; *see also* Ex. 14 at BBB NY 00069 ("I would go to jail in the
      state of NY using Trump's 'Quick Turn' Techniques. . . .  The product they are selling
20    is defective and fraudulently described."); *id.* at BBB NY 00075 ("Unfortunately, the
      products I had received . . . are of questionable legality in my state. . . .  Trump's
21    representative, my Mentor, went so far as to encourage me to commit fraud with
      another Trump student . . . .").
22

23    [20]  Defendants also claim that the full-refund model is inappropriate because many of
      TU's instructors or mentors worked for TU's competitors in the real estate seminar
24    business before or after working for TU.  *See* Defs' Mem. at 9 n.6.  This argument is
      belied by defendants' misrepresentations, which uniformly touted TU as a once-in-a-
25    lifetime opportunity to learn the coveted experience of the "world's most famous
      businessman" with his "years and years of experience."  *See* CC Ex. 2 (TU-
26    PLTF02441); SJ Ex. 6 at TU 154675; SJ Ex. 30 at TU-LOW0000058-59 ("no course
      offers the same depth of insight, experience, and support as the one bearing my
27    name"); CC Ex. 31 at TU-MAKAEFF0308 ("There are many real estate investment
      seminars available, but this is the only one designed by Donald Trump's personal
28    advisors . . . ."); *Krueger v. Wyeth, Inc.*, No. 03CV2496 JAH (AJB), 2011 U.S. Dist.
      LEXIS 154472, at *45 (S.D. Cal. Mar. 30, 2011) (certifying a class seeking full

1   Court already considered and rejected this evidence in certifying a class.   *See*
2   Appendix A. Plaintiffs' testimony confirms that any "value" they received is purely
3   speculative.   Makaeff testified that she learned "very little" at the three-day
4   Fulfillment, which was really "a precursor" to the $35,000 Gold Elite program.[21]
5   Ex. 4 (Makaeff Tr.) at 66:24-67:4, 69:15-70:5.   She also testified that the
6   "information" provided during the Fulfillment was very generalized, without enough
7   explanation and "wasn't anything of substance."  *See* Ex. 4 (Makaeff Tr.) at 74:16-
8   75:4, 87:1-88:3, 92:4-17 (no instruction on how to fill out sample contracts), 96:12-16
9   (never received instruction on how to obtain money through private investors, despite
10  being promised as much), 131:1-5 ("didn't have the knowledge necessary" to
11  implement the information provided during the three-day workshop), 178:11-17,
12  197:7-12.   With respect to the mentorship, Makaeff testified that she could have
13  "hired a real estate agent to take me around to properties for free for two days" and
14  that her mentor only provided "generic real estate information that I could have gotten
15  from the Barnes & Noble's book[store] for $25 instead of $35,000." Ex. 4 (Makaeff
16  Tr.) at 120:9-22; *see also id.* at 141:4-9, 143:6-12, 169:1-10, 177:15-21. Even worse,
17  the information actually taught was illegal and exposed Makaeff to the risk of criminal
18  prosecution.  *Id.* at 346:22-349:20.

19      When asked whether he received any value from the $1,495 three-day
20  Fulfillment, Low testified he was "not certain" what, if any value, he received. Ex. 6
21  (Low Tr.) at 66:13-16 ("Q: Did you believe that you got value from your $1,495? A:

---

22  refunds where there was no competing product in the marketplace). And, defendants
23  provide no evidence that those other "competitor" companies are not also illegal
    scams that provided speculative or no value.

24  [21]  Defendants put much emphasis on the "extensive amount of content" provided at
25  the three-day Fulfillment, such as the "workbooks" distributed to students. *See* Defs'
    Mem. at 6, 11.  But, even that information was worthless or of speculative value
26  because it is publicly available for free and did not contain Trump's real estate
    investing secrets, which is what students paid for and thought they would receive. *See*
27  *Ivy Capital*, 2013 U.S. Dist. LEXIS 42369, at *17.  As Art Cohen's testimony
    confirms, because the techniques "taught" at TU were not actually Trump's, there was
28  no value to the information defendants provided. Ex. 15 (Cohen Tr.) at 135:5-22.

1   Not certain."). With respect to the "handpicked" mentor he paid $25,000 for, Low

2   testified: "I was so flabbergasted with the waste of time . . . . They sent over a clown

3   that I paid $25,000 for." *Id.* at 94:12-18, 98:11-23, 100:15-101:3 (testifying that he

4   did not learn anything from the "mentor" TU provided), 106:9-17 (testifying that he

5   felt he "had been cheated" by the end of the mentorship); *see also* CC Ex. 5, ¶6. Low

6   also testified that he could have found the same information provided by TU on the

7   Internet for free. Ex. 6 (Low Tr.) at 181:23-182:6, 210:12-22.

8         Additionally, while class member Art Cohen may have initially been satisfied

9   with the three-day Fulfillment, he testified to his dissatisfaction when he later learned

10  he was not actually taught Trump's techniques and that the program "was all just a

11  giant fraud." Ex. 15 (Cohen Tr.) at 37:13-22, 72:23-73:8 ("At the time I thought I got

12  value. . . . [T]oday I feel I was – I was misled, I was cheated, because the information

13  that was provided was not directly from Donald Trump, you know. He had nothing to

14  do with the program . . . yet he said that he did."), 75:18-24. As the Ninth Circuit

15  observed in reversing denial of Makaeff's anti-SLAPP motion, "victims of con artists

16  often sing the praises of their victimizers until the moment they realize they have been

17  fleeced." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 271 (9th Cir. 2012)

18  (analogizing TU to the "Ponzi-scheme scandals involving onetime financial

19  luminaries like Bernard Madoff and Allen Stanford"). Moreover, defendants

20  conveniently ignore the portions of Cohen's deposition wherein he testifies as follows:

21   Q: I believe near the end of Counsel's questioning you said as you sit
22   here today, knowing what you know about Mr. Trump's lack of any
     substantive involvement with Trump University, you don't feel that
     either of these programs that you paid for have any value whatsoever; is
23   that true?

24   A: That is true.

25   Q: In discussing the program taught by . . . James Harris, you mentioned
     that he did a good job of explaining techniques. At the time when he
26   was explaining techniques, whose techniques did you think he was
     explaining?

27   A: Donald Trump's.

28

1       Q: Now that you know that Donald Trump did not have substantive
2 involvement with the curriculum at Trump University, do you think those techniques have any value to you?

3       A: *No*.

4 Ex. 15 (Cohen Tr.) at 135:5-22; *see also id.* at 95:7-16, 108:21-109:4, 114:25-115:7,

5 137:3-139:3. Adding insult to injury, as Cohen testified, the "advice" his "mentor"

6 taught him turned out to be illegal and thus unusable. *Id.* at 39:5-40:24, 57:22-58:3.

7       In *Allen*, defendants argued, just as defendants do here, that plaintiffs' full-

8 refund damages model "fail[ed] to account for the benefit that consumers do obtain

9 from the [homeopathic] products." 300 F.R.D. at 671. The court rejected this

10 argument as plaintiffs' theory was "that the products [were] entirely ineffective and

11 thus any purported 'benefit' customers experience can be attributed to the ***placebo***

12 ***effect***." *Id.* Like the placebo effect in *Allen*, to the extent a handful of students (*e.g.*,

13 Meena Mohan) may have made some money in real estate, any such "benefit" was

14 simply the by-product of pushing people into the real estate sphere at an opportune

15 time (*e.g.*, at the height of the housing market crisis when foreclosures were at an all-

16 time high), and not due to any "inherent value" actually provided by TU. In any

17 event, to the extent those class members are truly satisfied, they can simply opt out of

18 the suit. *See Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir.

19 2001) ("dissatisfied class members have the right to opt out of the class"); *In re Nat'l*

20 *W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 658 (S.D. Cal. 2010)

21 (certifying class despite defendant's submission of class member declarations stating

22 that they were satisfied).

23       **2.    This Is Not an Imperfect Labeling Case**

24       Defendants' continued efforts to shoehorn this case into an improper labeling

25 one should be rejected.[22] *See* Dkt. Nos. 375-1 at 13-17, 377-1. This is not a product

26

27 ———————————————
[22] Defendants cite a string of district court mislabeling cases decided in 2014 in an apparent attempt to argue this "new" case law supports decertification. But these
28 decisions rely on pre-2014 cases regarding the measure of restitution in mislabeling cases and are not "new" binding law. *See, e.g., Lanovaz v. Twinings N. Am., Inc.*, No.

1   mislabeling case where plaintiffs received essentially what they set out to buy, but

2   allege some lesser attribute lacking.  Rather, as shown above, plaintiffs have alleged

3   all along that TU was a fraudulent scheme that delivered nothing of what was

4   promised:  a unique opportunity to learn Trump's "secrets" acquired over the course

5   of his career from his "handpicked" experts at his elite "university."

6        For example, defendants rely on *In re POM Wonderful*, *LLC*, No. ML 10-02199

7   DDP (RZx), 2014 U.S. Dist. LEXIS 40415 (C.D. Cal. Mar. 25, 2014), in which the

8   plaintiffs alleged that defendants falsely and misleadingly advertised that certain "Pom

9   juice products" provided a variety of health-related benefits, including "heart health"

10  and "longevity," and that these health claims were supported by tens of millions of

11  dollars in medical research.  *See id.* at *12; *In re POM Wonderful LLC Mktg. & Sales*

12  *Practices Litig.*, No. ML 10-02199 DDP (RZx), 2012 U.S. Dist. LEXIS 141150, at

13  *15 (C.D. Cal. Sept. 28, 2012).  In decertifying a class, the court concluded that

14  plaintiffs' full refund damages model failed to take into account the other benefits

15  from consuming the juice, like hydration, vitamins and minerals, even if the juice did

16  not contain the advertised health benefits.  *See POM Wonderful*, 2014 U.S. Dist.

17  LEXIS 40415, at *12.  In *POM Wonderful*, however, the juice was, in fact, 100%

18  pomegranate juice, even if the additional claimed health benefits were lacking in some

19  way.  By contrast here, plaintiffs bargained for Trump's real estate "secrets" from his

20  handpicked instructors at his elite university, but defendants delivered on ***none*** of

21  those core promises.  *See, e.g.*, CC Ex. 32 at TU 25266 (promising "my techniques");

22  CC Ex. 42 (advertising "the Trump process for investing"); CC Ex. 57 ("Learn

23  Donald Trump's Foreclosure System").

24  C-12-02646-RMW, 2014 U.S. Dist. LEXIS 57535 (Apr. 24, 2014) (citing *Colgan v.*
    *Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663 (2006)); *Jones v. Conagra Foods,*
25  *Inc.*, No. C 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014)
    (citing *Ries v. Ariz. Bevs. USA LLC*, No. 10-01139 RS, 2013 U.S. Dist. LEXIS 46013
26  (N.D. Cal. Mar. 28, 2013)); *Caldera v. J.M. Smucker Co.*, No. CV 12-4936-GHK
    (VBKx), 2014 U.S. Dist. LEXIS 53912, at *9-*10 (C.D. Cal. Apr. 15, 2014) (citing
27  *Red v. Kraft Foods, Inc.*, No. CV 10-1028-GW(AGRx), 2012 U.S. Dist. LEXIS
    186948 (C.D. Cal. Apr. 12, 2012)).
28

*Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 U.S. Dist. LEXIS 71575 (N.D. Cal. May 23, 2014), another case defendants cite, reveals the flaw in the argument that plaintiffs' damages model must account for the "benefits" to consumers. There, plaintiffs alleged the maker of almond milk products misleadingly listed the sweetener "not as 'sugar,' . . . but as 'evaporated cane juice,'" and said the products were "All Natural," despite containing some trace amounts of potassium citrate. *See id.* at *3, *7. However, plaintiffs did not allege they were deprived of the essence of what they were promised: almond milk; that the alleged imperfection rendered the almond milk worthless; or that there was no comparable product. They only alleged it was mislabeled in a minor way. Under these circumstances, the court held: "The proper measure of restitution ***in a mislabeling case*** is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Id.* at *77. Under this analysis, a plaintiff "attaches a dollar value to the 'consumer impact or advantage'" and "determine[s] the price premium attributable to . . . use of the labeling statements 'All Natural' and 'Evaporated Cane Juice.'" *Id.* at *77-*78. The analysis in *Werdebaugh* and other mislabeled product cases defendants cite have no applicability here – plaintiffs did not merely pay a "price premium" for Trump's secrets and mentoring from handpicked professors at his elite university – that was ***all*** defendants marketed and all students paid for, yet received ***none*** of it.[23]

---

[23] The other food product mislabeling cases defendants cite are inapposite, inasmuch as all involved food products that were what defendants marketed them to be, but minor marketing details were allegedly misleading. *See, e.g.*, *Lanovaz*, 2014 U.S. Dist. LEXIS 57535, at *2-*3 (alleging that consumers paid a premium for tea, which was in fact tea, but misleadingly labeled as providing a "Natural Source of Antioxidants"); *Jones*, 2014 U.S. Dist. LEXIS 81292 (alleging that Hunt canned tomato products labeled "100% Natural" or "Free of artificial ingredients & preservatives" contained citric acid and/or calcium chloride; that 100% Natural PAM cooking spray contained significant quantities of undisclosed petrochemicals; and that Swiss Miss hot cocoa was improperly labeled as containing a "Natural Source of Antioxidants"); *Caldera*, 2014 U.S. Dist. LEXIS 53912, at *9-*10 (shortening and uncrutstable sandwiches improperly labeled as "all-vegetable" and "wholesome" when they contained trans fat and/or high fructose corn syrup and plaintiff failed to offer ***any*** method of proving damages on a classwide basis); *Red*, 2012 U.S. Dist.

Because this is not a minor mislabeling case, calculating the amount of damages owed to plaintiffs will only require simple arithmetic: the amount paid, plus interest, minus any refund obtained to date. *See* Dkt. No. 298 at 26-27.  As defendants have conceded, "the fact finder is able to do basic math" (Dkt. No. 391 at 4) and as such, no expert testimony is necessary.[24]  *United States v. Powers*, 578 F. App'x 763, 774 (10th Cir. 2014) (collecting cases standing for the proposition that no expert testimony is necessary to establish damages based on "basic math"); *Foraker v. Schauer*, No. 04-cv-00363-EWN-OES, 2005 U.S. Dist. LEXIS 46071, at *24 (D. Colo. Sept. 8, 2005) (jury may award future losses to plaintiffs without expert opinion because it would be "little more than a mathematical computation"); *United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir. 1972) (excluding experts who do "no more than make basic arithmetical computations," as it is well "within the realm of jurors' comprehension").[25]

**D.     Florida and New York Class Members Are Entitled to Full Refunds**

Full refunds are also appropriate for Florida and New York class members as TU was worthless or of *de minimis* value.  Under Florida law, the "purchase price is the appropriate measure of actual damages" when the "product is rendered valueless as a result of the defect." *H&J Paving of Fla., Inc. v. Nextel, Inc.*, 849 So. 2d 1099,

---

LEXIS 186948 (alleging consumers paid a premium for certain Kraft food products that were marketed as "healthy" despite containing high levels of partially hydrogenated vegetable oil and other unhealthy ingredients).

[24]  In an about-face, defendants claim decertification is necessary because plaintiffs have failed to provide admissible expert testimony supporting their damages methodology. Defs' Mem. at 3.  Up until now, however, defendants have agreed that no experts were necessary. *See* Dkt. No. 309 at 1.  And despite hundreds of pages of briefs opposing plaintiffs' motion for class certification, defendants never argued that plaintiffs' damages model was inadequate due to the lack of supporting expert testimony.  Even if the Court entertained defendants' suggestion of reversal, principles of fairness require allowing plaintiffs leave to introduce expert testimony on the issue of damages rather than decertifying the class.

[25]  In the unlikely event that the Court reverses itself and rejects plaintiffs' full-refund model of damages, the class should only be decertified on the issue of damages and should continue as a class action on the issue of liability, which defendants all but concede. *See Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 657 (C.D. Cal. 2000) (decertifying a class for purposes of the causation and damages phase but retaining a class on the issue of liability).

1101 (2003) (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (1984)). Furthermore, nothing limits the court from awarding full restitutionary damages under the FDUTPA as "the broad remedial language of the Florida Act suggests that the Florida Legislature intended to provide a full range of equitable monetary relief." *FTC v. Mylan Lab., Inc.*, 99 F. Supp. 2d 1, 6 (D.D.C. 1999).

Defendants again resort to citing cherry-picked or incomplete deposition testimony in an effort to convince the Court – which has already rejected the same tired argument – that there was some "value" in TU programs.[26]  In truth, Everett testified that "there was not sufficient information from the three days [$1,495 Fulfillment] to do much of anything," as it was merely "an upsell technique to move to the next program."  Ex. 5 (Everett Tr.) at 99:13-22.  In fact, Everett never even received the "in-field mentorship" for which she paid $35,000, as TU was unable to provide a mentor who could deliver on the promises made.  *See* SJ Ex. 23 (Everett declaration in opposition to MSJ), ¶6; CC Ex. 4, ¶¶3-5.  Instead, all of the information her "mentors" provided was basic information of the type a real estate agent would provide for free, or that Everett, as a realtor herself, would provide to her clients.  *See* SJ Ex. 23, ¶6; CC Ex. 4, ¶¶3-5.  Further, contrary to defendants' assertion that she had five "substantive" conversations with a TU mentor (Defs' Mem. at 11), Everett agreed to speak to that mentor, Troy Peterson, only after TU refused to refund her money.  SJ Ex. 23, ¶7; CC Ex. 4, ¶5.  Even then, Troy Peterson taught his own "techniques" that would cost additional outlays to implement rather than the Trump system promised and had little knowledge of the Tampa real estate market where Everett lived.  SJ Ex. 23, ¶7; Ex. 5 (Everett Tr.) at 288:10-12.  Because defendants' failure to deliver on their promises rendered the TU programs worthless, Everett and other Florida subclass

---

[26]  Defendants also rely on the deposition of Mette Nielsen, but Ms. Nielsen has affirmatively opted out of the Florida subclass in this case.  *See* Ex. 16 (Nielsen Tr.) at 9:13-20.  As such, besides this evidence not being new because it is based on her prior declaration, Nielsen's testimony should be disregarded for this additional reason. Additionally, to the extent class members Charles Lee and Robert Mulack believe they were not damaged by TU, they can also opt out.  *See supra* at 17.

1   members are entitled to full refunds.  *See, e.g.*, *Tri-County Plumbing Servs. v. Brown*,

2   921 So. 2d 20, 22 (2006) (defendant's incomplete work was valueless).

3          Brown and other members of the New York subclass can also recover their full

4   purchase price under N.Y. Gen. Bus. Law §349 because the products they received

5   from TU were worthless or of *de minimis* value.  Where, as here, plaintiffs did not

6   receive the advertised service, courts award full refunds under N.Y. Gen. Bus Law

7   §349.[27]  "Consumers have been entitled to a full refund when they purchase a product

8   or service which they do not ultimately receive or which cannot be used to the extent

9   or for the purpose purchased."  *Matter of People v. Applied Card Sys., Inc.*, 41 A.D.3d

10  4, 9 (2007).  As the court explained: "Acknowledging that there may be some value in

11  a credit card with a low limit which is subject to a large initial fee, these consumers

12  acquired ***de minimis value in the credit card they received, when compared to the***

13  ***limit advertised***.  Moreover, they incurred substantial charges in connection with that

14  deception."  *Id.* (citing *Figgie Intl.*, 994 F.2d at 606); *see also People v. Telehublink*

15  *Corp.*, 301 A.D.2d 1006, 1007 (2003) (ordering restitution where consumers paid

16  money for a credit card but "received credit card applications, discount coupons, a

17  merchandise catalog card, and a credit repair manual").

18         Defendants' citation to incomplete portions of Brown's deposition is misleading

19  and should be disregarded.  For example, defendants claim that Brown received

20  "[v]alue" by "learning" the term "wholesaling."  *See* Defs' Mem. at 11-12 (citing

21  Brown Tr. at 86:19-87:10).  Defendants improperly exclude from this "excerpt" this

22  testimony: "One was wholesaling.  I didn't know what that was.  I gave you that as an

23  example. ***But to pay $1,500 to learn about wholesaling, which you can explain to***

24

---

25  [27]   Defendants cite *Oosterhuis v. Palmer*, 137 F.2d 322 (2nd Cir. 1943), but that case
26  dealt with damages for common law fraud, not a claim for deceptive business
    practices under §349.  The other cases they rely on are also irrelevant consumer
26  product cases.  Indeed, *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43 (1999), states
    explicitly: "Generally, claims under the statute are available to an individual consumer
27  who falls victim to misrepresentations made by a ***seller of consumer goods*** through
    false or misleading advertising."  *Id.* at 55.
28

1    *someone in 10 minutes, is not value for me*."   Ex. 7 (Brown Tr.) at 87:2-5.

2    Moreover, Brown's testimony confirms that any "value" he received from TU was *de*

3    *minimis*, at best.  Brown testified that the "mentor" he received from TU for $25,000

4    gave the same "very general information" that a real estate agent would provide for

5    free: "As a matter of fact, my real estate agent in Pennsylvania could do that and has

6    done that.  It was nothing more than that.  ***It was nothing more than what a real***

7    ***estate agent would do***."  Ex. 7 (Brown Tr.) at 213:10-20, 214:2-4 ("It was very vague.

8    It was what a real estate agent would do.").  Brown also testified that the information

9    provided at the three-day Fulfillment seminar was "minimal" and "basic or less."  *Id.*

10   at 105:10-17, 163:12-164:1; *see also id.* at 168:12-20 (the information taught was "too

11   basic" and Brown "wasn't getting anything" he wanted for the $1,500 he paid); *see*

12   *also* CC Ex. 3, ¶¶2-3, 5.

13         Finally, defendants' contention that plaintiffs failed to provide any evidence of

14   their actual damages is completely unfounded.  *See* Defs' Mem. at 10.  Everett paid

15   $35,000 for a mentorship that she never received because defendants could not deliver

16   on the promises they made.  Adding insult to injury, Everett ultimately had to

17   withdraw $25,000 from her retirement IRA in order to pay off part of the credit card

18   she used to purchase the Gold Elite program.  *See* SJ Ex. 23, ¶5.  Similarly, Brown

19   paid $25,000 for the upsold TU program, maxing out two credit cards in the process

20   and subjecting himself to massive credit card debt.  CC Ex. 3, ¶5.

21   **IV.   DEFENDANTS' INADEQUACY ARGUMENT IS MERITLESS**

22         Defendants contend that class counsel has proven to be inadequate because

23   notice has not yet been provided to the class.  Their argument is disingenuous, as

24   defendants' obstructionist tactics have caused delay in sending out the class notice.[28]

25

26   ───────────────
     [28]  Courts have observed that "objections by defendants to the adequacy of class
27   counsel sometimes need to be taken 'with a grain of salt,'" because "[i]f defendants
     carp about the alleged shortcomings of plaintiffs' counsel, then, it is probably not out
     of any particular solicitude for class members themselves."  *See, e.g., Mendez v.*
28   *Radec Corp.*, 260 F.R.D. 38, 43 (W.D.N.Y. 2009) (collecting cases).

1   *See* Dkt. No. 381-1 at 2-4.  Moreover, plaintiffs and their counsel acted in the best

2   interest of the classes in this case and in *Cohen* by refraining from inviting confusion

3   and taxing class members with the expense of issuing and processing multiple sets of

4   thousands of notices until after resolution of defendants' 23(f) petition in this case, the

5   motion for class certification in *Cohen*, and Trump's 23(f) petition in the *Cohen* case.

6   Defendants' empty rhetoric about plaintiffs' supposed "intentional[] delay[]" in

7   seeking approval of class notice is belied by the undeniable (though omitted) fact that

8   plaintiffs filed their motions for approval of class notice in this case (Dkt. No. 381)

9   and in the *Cohen* case (*Cohen* Dkt. No. 61) less than three weeks after the Ninth

10  Circuit rejected Trump's 23(f) petition in *Cohen* (*Cohen* Dkt. No. 59), which

11  concluded nearly a year of Trump's failed fight against class certification in the two

12  cases.  By exercising restraint, plaintiffs are now in a position to complete class notice

13  through a single process with no lingering uncertainties.

14  The only case defendants cite in support of their argument, *Sheinberg v.*

15  *Sorensen*, No. 00-6041 (JLL), 2007 U.S. Dist. LEXIS 9544 (D.N.J. Feb. 8, 2007), is

16  easily distinguishable.[29]   There, the court decertified a class on inadequate

17  representation grounds after class counsel failed to send out the court-approved class

18  notice, almost *five years* after the class was certified and after the court had *twice*

19  directed class counsel to send notice to class members.  *See id*. at *1-*4, *10

20  (decertifying because "[t]he prosecution of this action has not been competent,

21  responsible or vigorous"); *cf. Mendez*, 260 F.R.D. at 50 (distinguishing *Sheinberg v.*

22  *Sorensen* and observing that cases in which a class has been decertified due to failure

23  to send notice generally "involve counsel's failure to carry out the court's order

24  directing the issuance of notice" rather than counsel's delay in moving for such an

25

26  [29]   In subsequent proceedings, the Third Circuit confirmed that "a district court's decision to certify a class must *precede* the appointment of class counsel." *Sheinberg*
27  *v. Sorensen*, 606 F.3d 130, 132 (3rd Cir. 2010) (emphasis in original).  Thus, in the unlikely event the Court agrees with defendants' adequacy argument, the proper
28  remedy is not to decertify the class, but to appoint new class counsel.

1  order).  Here, Court-appointed class counsel has vigorously prosecuted this case since

2  its inception, and the class of student-victims would certainly not be served by

3  decertification.  *See Mendez*, 260 F.R.D. at 50.  Moreover, defendants' argument is

4  now moot, as plaintiffs have moved the Court for approval of class notice and notice

5  procedures (after defendants refused to agree to what should have been an

6  uncontroversial procedural step in the litigation).  *See* Dkt. No. 381.

7       Defendants also argue that the failure to send class notice has created the

8  possibility that the rule against one-way intervention will be violated.  Defs' Mem. at

9  14.  This argument (albeit a red herring) is not grounds to decertify the class, as the

10 Court has now postponed the hearing on defendants' motions for summary judgment.

11 *See* Dkt. No. 403.

12 **V.    CONCLUSION**

13      For the foregoing reasons, defendants' motion to decertify should be denied.

14 DATED:  April 10, 2015                    Respectfully submitted,

15                                           ROBBINS GELLER RUDMAN
                                               & DOWD LLP
16                                           JASON A. FORGE
                                             RACHEL L. JENSEN
17

18                                                    s/ Rachel L. Jensen

19                                              RACHEL L. JENSEN

20                                           655 West Broadway, Suite 1900
                                             San Diego, CA  92101
21                                           Telephone:  619/231-1058
                                             619/231-7423 (fax)
22
                                             ROBBINS GELLER RUDMAN
23                                             & DOWD LLP
                                             DANIEL J. PFEFFERBAUM
24                                           Post Montgomery Center
                                             One Montgomery Street, Suite 1800
25                                           San Francisco, CA  94104
                                             Telephone:  415/288-4545
26                                           415/288-4534 (fax)

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
MAUREEN E. MUELLER
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK
HELEN I. ZELDES
ALREEN HAEGGQUIST
AARON M. OLSEN
625 Broadway, Suite 1000
San Diego, CA  92101
Telephone:  619/342-8000
619/342-7878 (fax)

Class Counsel

1

<u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on April 10, 2015, I authorized the electronic filing of the

3   foregoing with the Clerk of the Court using the CM/ECF system which will send

4   notification of such filing to the e-mail addresses denoted on the attached Electronic

5   Mail Notice List, and I hereby certify that I caused to be mailed the foregoing

6   document or paper via the United States Postal Service to the non-CM/ECF

7   participants indicated on the attached Manual Notice List.

8          I certify under penalty of perjury under the laws of the United States of America

9   that the foregoing is true and correct.  Executed on April 10, 2015.

10                                              s/ Rachel L. Jensen
                                            RACHEL L. JENSEN

11
                                            ROBBINS GELLER RUDMAN
12                                              & DOWD LLP
                                            655 West Broadway, Suite 1900
13                                          San Diego, CA  92101-8498
                                            Telephone:  619/231-1058
14                                          619/231-7423 (fax)

15                                          E-mail:      rachelj@rgrdlaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:10-cv-00940-GPC-WVG Makaeff v. Trump University, LLC et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,robyns@zhlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeffrey L. Goldman**
  jgoldman@bbwg.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,llendzion@rgrdlaw.com,mbacci@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jill Ann Martin**
  jmartin@trumpnational.com,lvincent@trumpnational.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Benjamin James Morris**
  bmorris@foley.com,vgoldsmith@foley.com

- **Maureen E. Mueller**
  mmueller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **Daniel Jacob Pfefferbaum**
  dpfefferbaum@rgrdlaw.com

- **Nancy L. Stagg**
  nstagg@foley.com,smoreno@foley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`