# EXHIBIT 1

Exhibit 1
- 1 -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

    Plaintiffs,                    Civil Action No.

      vs.                         3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,      CAB(WVG)

    Defendants.

_____



    Videotaped deposition of DONALD J. TRUMP, SR.

    New York, New York

    September 12, 2012



Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

Exhibit 1
- 2 -

Donald J. Trump, Sr.                          September 12, 2012

```
 1    image, yeah, I think it could be.  I think that's
 2    true.
 3         Q   Mr. Trump, again, just to go -- for the
 4    deposition, I want to state for the record that
 5    there's no reason for you to, you know, imply that
 6    I'm here for any untoward reason or that I'm trying
 7    to do anything to your brand.
 8              MR. SCHNEIDER:  He thinks the lawsuit is
 9    trying to hurt the brand.
10              THE WITNESS:  I think the lawsuit is
11    trying to hurt the brand, and I honestly look forward
12    to winning this case and suing your law firm for as
13    much as we can sue them for, and we will be doing
14    that.  We have a 97 percent approval rating.  Harvard
15    doesn't have a 97 percent approval rating.  And we
16    will be suing your law firm for as much as we can
17    possibly do.  That I can tell you.
18    BY MS. JENSEN:
19         Q   Okay.
20         A   And you individually.
21         Q   Now, back to my question:  Does the Trump
22    brand invoke a particular image?
23         A   You've asked me this question about four
24    times.
```

**www.aptusCR.com**

Exhibit 1
- 3 -

# EXHIBIT 2
[Intentionally Omitted]

Exhibit 2
- 4 -

# EXHIBIT 3

Exhibit 3
- 5 -

**C O N F I D E N T I A L**

**Michael Sexton**                                    **Makaeff v. Trump University**

---

```
        ** CONFIDENTIAL ** CONFIDENTIAL **
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
CASE NO.: 10 CV 0940 EIG (WVG)
-------------------------------------------x
TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
and PATRICIA MURPHY, on Behalf of Themselves
and all others Similarly Situated,


                    Plaintiffs,

     -against-


TRUMP UNIVERSITY, LLC (AKA TRUMP
ENTREPRENEUR INITIATIVE) a New York
Limited Liability Company, DONALD J. TRUMP,
and DOES 1 through 50, inclusive,


                    Defendants.
-------------------------------------------x
                    August 22, 2012
                    9:57 a.m.


   VIDEOTAPED DEPOSITION of MICHAEL SEXTON,
30(b)(6) Witness in the above-captioned matter,
taken by Plaintiffs, held at 725 Fifth Avenue,
New York, New York, before Eileen Mulvenna,
CSR/RMR/CRR, Certified Shorthand Reporter,
Registered Merit Reporter, Certified Realtime
Reporter and Notary Public of the State of
New York.
```

---

**www.aptusCR.com**

Exhibit 3
- 6 -

**C O N F I D E N T I A L**

**Michael Sexton**                                    **Makaeff v. Trump University**

```
 1              SEXTON - CONFIDENTIAL
 2    it was for brand purposes.  Can you explain that
 3    a little bit more?
 4         A.    We thought it was a very
 5    aspirational and inspirational brand that could
 6    motivate people.  And going back to the earlier
 7    testimony, at this point in time, the Trump brand
 8    really transcended real estate.
 9              And there was actually a survey --
10    we'd done a fair amount of research into what
11    brands really do represent the best of
12    entrepreneurship in America.  And there was a
13    survey done by a recognized company, I forget,
14    maybe it was Microsoft, and Trump was the number
15    two recognized brand for entrepreneurship very
16    specifically in America.
17              And we felt it was the most
18    compelling brand out there that would -- that
19    would be accessible to a broad range of people
20    who would understand kind of instantly when you
21    put that name what it stood for.
22         Q.    Did you keep that survey in your
23    records?
24         A.    I don't recall.  I'm sure it was
25    referenced in -- you know, in early documents.
```

**www.aptusCR.com**

Exhibit  3
- 7 -

C O N F I D E N T I A L

**Michael Sexton**                                    **Makaeff v. Trump University**

```
 1                SEXTON - CONFIDENTIAL
 2        A.    Yes.
 3        Q.    New Orleans in 2008?
 4        A.    Yes.
 5        Q.    And Las Vegas in 2009?
 6        A.    Thank you, yes.  That also solves
 7   the mystery.
 8        Q.    You threw me off there.
 9        A.    Those dates are killing me.
10        Q.    Okay.  And what was the purpose of
11   the playbook?
12        A.    It was -- it was an aggregation of
13   all the standard operating procedures, rules,
14   regulations that governed how we as an
15   organization behaved and acted out in the field.
16        Q.    Going back to the name, when you
17   were changing the name to Trump Entrepreneur
18   Initiative, did you consider any names that did
19   not have Trump in them?
20        A.    No, we did not.
21        Q.    And why was it important to retain
22   the name Trump?
23        A.    We believed it had brand equity.
24   There was value to it.  Certainly from a
25   continuity standpoint, it made a tremendous
```

www.aptusCR.com

Exhibit  3
- 8 -

**C O N F I D E N T I A L**

**Michael Sexton**                                        **Makaeff v. Trump University**

```
 1                  SEXTON - CONFIDENTIAL
 2    amount of sense; but at the end of the day, the
 3    brand was critical to the business.
 4          Q.     When the New York Department of
 5    Education contacted Trump University, do you know
 6    whether it did so by letter?
 7          A.     It did so by letter, yes.
 8          Q.     And to whom was it addressed?  Do
 9    you know?  Was it addressed to you?
10          A.     I believe it was.  I believe it was.
11          Q.     What did Trump University do in
12    response to the letter?
13          A.     We spoke to Joseph Frey at the
14    Department of Education.
15          Q.     Can you spell Joseph's name for the
16    record?
17          A.     Last name F-R-E-Y.
18                 We obviously referred it immediately
19    to counsel as well.
20          Q.     By "counsel," who do you mean?
21          A.     George Sorial.
22          Q.     George Sorial, for the record, is
23    with?
24          A.     Trump Organization.
25          Q.     And did you -- did you -- did you
```

www.aptusCR.com

Exhibit 3
- 9 -

**C O N F I D E N T I A L**

**Michael Sexton**                                   **Makaeff v. Trump University**

```
        ** CONFIDENTIAL ** CONFIDENTIAL **
   UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF CALIFORNIA
   CASE NO.: 10 CV 0940 EIG (WVG)
   -------------------------------------------x
   TARLA MAKAEFF, BRANDON KELLER, ED OBERKROM
   and PATRICIA MURPHY, on Behalf of Themselves
   and all others Similarly Situated,

                    Plaintiffs,

       -against-

   TRUMP UNIVERSITY, LLC (AKA TRUMP
   ENTREPRENEUR INITIATIVE) a New York
   Limited Liability Company, DONALD J. TRUMP,
   and DOES 1 through 50, inclusive,

                    Defendants.
   -------------------------------------------x
                    August 23, 2012
                    9:14 a.m.


        CONTINUED VIDEOTAPED DEPOSITION of
   MICHAEL SEXTON, 30(b)(6) Witness in the
   above-captioned matter, taken by Plaintiffs, held
   at 725 Fifth Avenue, New York, New York, before
   Eileen Mulvenna, CSR/RMR/CRR, Certified Shorthand
   Reporter, Registered Merit Reporter, Certified
   Realtime Reporter and Notary Public of the State
   of New York.
```

**www.aptusCR.com**

Exhibit 3
- 10 -

**C O N F I D E N T I A L**

**Michael Sexton**                                    **Makaeff v. Trump University**

```
1                    SEXTON - CONFIDENTIAL

2               Is that correct, that the Texas AG

3      asked Trump University to suspend all of its

4      programs in Texas?

5           A.    I don't recall that request being

6      made.  I know we did suspend them all in Texas.

7           Q.    Did Trump University suspend its

8      operations in Texas about this time?

9           A.    Well, I know we suspended them

10     specifically because of this inquiry, yes.

11          Q.    Did Trump University ever continue

12     operations in Texas, or was that the end of its

13     operation in Texas?

14          A.    The timing was right when we're

15     stopping those programs, period.  So it was -- it

16     was almost irrelevant.  We were stopping the

17     preview programs.

18               MS. ECK:  I'd like to mark as

19          Exhibit 13 a civil investigative demand

20          from the Attorney General of Texas.  It's

21          Bates Nos. TU61745 through 61750.

22               (Plaintiffs' Exhibit 13, Bates Nos.

23          TU 61745 through 50, 1/6/10 Civil

24          Investigation Demand, marked for

25          identification.)
```

**www.aptusCR.com**

Exhibit 3
- 11 -

C O N F I D E N T I A L

**Michael Sexton**                                    **Makaeff v. Trump University**

```
 1              SEXTON - CONFIDENTIAL
 2    Institute?
 3          A.     No, I don't believe so.
 4          Q.     Steven Goff is referenced by name
 5    two times.  Do you know why they were
 6    particularly looking into Steven Goff?
 7          A.     I don't.  I -- he lived in Texas,
 8    but I don't know specifically why they were
 9    targeting him.
10          Q.     Did the Texas Attorney General's
11    office take any action after receiving these
12    documents?
13          A.     What kind of action?
14          Q.     Did they take disciplinary action or
15    impose a fine?
16          A.     No, the only -- the only action was
17    we filed to do business in the state of Texas
18    late and paid a small amount of back taxes that
19    were due for activities in Texas, and that was
20    the only consequence.
21          Q.     When you were you first contacted by
22    the New York Attorney General's office?
23          A.     I don't recall.
24                 MS. ECK:  I'd like to mark Exhibit
25          No. 14, Subpoena from the New York Attorney
```

www.aptusCR.com

Exhibit 3
- 12 -

# EXHIBIT 4

Exhibit 4
- 13 -

```
 1              UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4
    TARLA MAKAEFF, BRANDON KELLER,
 5  ED OBERKROM, and PATRICIA
    MURPHY, on Behalf of Themselves
 6  and All Others Similarly
    Situated,
 7                              No. 10 CV 0940 IEG (WVG)
                Plaintiffs,
 8
       vs.
 9
    TRUMP UNIVERSITY, LLC, (aka
10  Trump Entrepreneur Initiative) a
    New York Limited Liability
11  Company, DONALD J. TRUMP, and
    DOES 1 through 50, inclusive,
12
                Defendants.
13
14  _____
15
16            DEPOSITION of TARLA MAKAEFF
17              San Diego, California
18            Monday, January 30, 2012
19                   Volume I
20
21
22  Reported by:
    Kae F. Gernandt
23  RPR, CSR No. 5342
24  Job No. 130455
25  PAGES 1 - 282
```

Page 1

Exhibit 4
- 14 -

```
 1    the Fast Track to Foreclosure.  That was your --      12:05:44
 2    your very first interaction with anything related to
 3    Trump University, correct?
 4         A.   Yes.
 5         Q.   All right.  And where was the seminar?      12:05:53
 6         A.   I believe it was in Universal City at --
 7    I don't know if it was a Hilton.  It was near
 8    Universal Studios at a big hotel in a ballroom.
 9         Q.   And it was three days?
10         A.   Yes.                                        12:06:10
11         Q.   And did you stay at or near the hotel
12    each night or did you go home?
13         A.   I'm not sure.  I think I went home -- I
14    think I went home.
15         Q.   And approximately what was the schedule     12:06:26
16    each day time-wise?
17         A.   I believe it was something like 8:00 or
18    9:00 to 5:00.
19         Q.   And did you attend all three days?
20         A.   Yes.                                        12:06:40
21         Q.   What did you think of the program?
22         A.   At the time I thought what they were
23    promising sounded good.  But I don't think that now.
24         Q.   The actual information that you received
25    during those three days, what did you think of the   12:07:00
```

Page 66

Exhibit 4
- 15 -

```
 1    information that you received?                    12:07:03

 2         A.   It was very powerful motivational

 3    speaking, designed to persuade you to move on with

 4    their program.

 5         MS. ECK:  You know, it's about 10 after       12:07:26

 6    12:00.  I'm wondering if we could -- depends on how

 7    you're doing.  Do you want to take a break, or do

 8    you want to keep going?

 9         THE WITNESS:  Sure, we can take a break.

10         MR. SCHNEIDER:  Sure.                         12:07:37

11         MS. ECK:  Let's go off the record.

12         THE VIDEOGRAPHER:  Going off the record.  The

13    time is 12:07 p.m.

14              (A brief recess was taken.)

15         THE VIDEOGRAPHER:  Back on the record.  The    12:23:40

16    time is 12:23 p.m.

17    BY MR. SCHNEIDER:

18         Q.   Did you ever attend any free Trump

19    University programs before you went to the

20    three-day?                                         12:23:50

21         A.   No.

22         Q.   Had you ever heard about them?

23         A.   My friend on the phone said she had gone

24    to a free seminar.

25         Q.   What did she tell you about her           12:23:59
```

Page 67

Exhibit 4
- 16 -

```
 1    I was told, that in order to learn the complete      12:25:17

 2    materials, receive the complete real estate

 3    education, I needed to sign up for the 35,000-dollar

 4    Trump Gold Elite program.

 5    BY MR. SCHNEIDER:                                     12:25:34

 6         Q.   Did you believe that you received any

 7    information during the three-day program that you

 8    thought was interesting or useful?

 9         A.   I thought the information made big

10    promises and was very general but enticing.          12:25:45

11         MR. SCHNEIDER:  My question was a little bit

12    different.  I'm going to move to strike as

13    nonresponsive.

14    BY MR. SCHNEIDER:

15         Q.   My question is:  During the three days     12:25:58

16    at the Fast Track to Foreclosure, did you learn any

17    information that you thought was interesting or

18    useful?

19         MS. ECK:  Objection.  Vague and ambiguous.

20         THE WITNESS:  Not really, because it was a      12:26:10

21    precursor to where the information was supposed to

22    come to the 35,000-dollar program.

23    BY MR. SCHNEIDER:

24         Q.   All right.  So, at the end of the three

25    days, you felt that you had received no useful       12:26:20
```

Page 69

Exhibit 4
- 17 -

```
 1    information about foreclosures; is that your          12:26:23

 2    testimony?

 3          A.   I felt I received very little

 4    information, not what I expected, for an investment

 5    of my $750.                                           12:26:34

 6          Q.   All right.  I have in front of you a

 7    binder with documents that you've produced in the

 8    case.  And I'd like you to look at TU-MAKAEFF 0271.

 9    They're numbered on the bottom.

10          This is entitled "Fast Track to                 12:27:07

11    Foreclosure Investing."  Was this document provided

12    to you during the three-day program?

13          A.   I believe so.  If it was, it was in the

14    book.

15          Q.   All right.  And you brought with you a      12:27:23

16    folder, and maybe we can have the videographer --

17          MS. ECK:  I think it's actually the next one,

18    the Jump Start Guide.

19    BY MR. SCHNEIDER:

20          Q.   Right.  You brought three folders,          12:27:35

21    entitled "Fast Track to Foreclosure Investing," the

22    "Jump Start Guide" -- are these the three folders

23    that were provided to you during the seminar?

24          A.   Yes.

25          Q.   All right.  And how about the actual        12:27:48
```

Page 70

Exhibit 4
- 18 -

```
1        Q.   All right.  I'd like you to look at        12:32:29
2   Bates No. 315.  This is entitled "Fast Track to
3   Foreclosure Investing, Three-Day Training," and it's
4   the table of contents.  Are you on the same page?
5        A.   Yes.                                       12:32:49
6        Q.   On the first day, it says the agenda has
7   six items.  The first one is entitled "Introduction
8   and Overview," and it has three bullet points of
9   items to be discussed.  And the same exists all the
10  way down.  There's a No. 2, "Understanding the       12:33:04
11  foreclosure process."  So, I'm going to ask you
12  about -- about those.  Are you with me right now?
13       A.   Uh-huh.
14       Q.   Is that yes?
15       A.   Yes.                                       12:33:12
16       Q.   Okay.  So, under No. 1, it says,
17  "Introduction and Overview," and the items on the
18  table of contents that are going to be discussed
19  include, "A look at foreclosure statistics, what
20  causes foreclosure and market advantages in this     12:33:21
21  economy."
22            Were those items discussed during the
23  three-day Fast Track to Foreclosure program?
24       A.   Yes, in very general manners --
25       Q.   Each of those --                           12:33:34
```

Page 74

Exhibit 4
- 19 -

```
 1          A.    -- not -- not in specifics.              12:33:35

 2          Q.    All right.  Each of those topics were

 3    discussed, correct?

 4          A.    In general manners, not in specifics.

 5          Q.    All right.  Each of the topics were      12:33:41

 6    discussed; is that true?

 7          MS. ECK:  Objection.  Asked and answered.

 8          THE WITNESS:  I believe I answered your

 9    question.

10    BY MR. SCHNEIDER:                                    12:33:46

11          Q.    Well, you're actually answering

12    something a little bit different that you want to

13    answer.  My question was:  Were the topics

14    discussed?

15          A.    I believe that they were.  I cannot      12:33:54

16    vouch for every single point on here because the

17    instructor did skip over slides.

18          Q.    All right.  No. 2, "Understanding the

19    foreclosure process, types of foreclosures, judicial

20    timeline and nonjudicial timeline," were those items 12:34:06

21    discussed during the three-day program?

22          A.    Yes, I believe so.

23          Q.    No. 3, "Locating great deals.  What

24    makes a property a bargain.  Finding real estate

25    with motivated sellers, and analyzing lis pendens,"  12:34:17
```

Page 75

Exhibit 4
- 20 -

1        Q.   If you'll look on page 384, that's an        12:45:19

2    example of running numbers, correct?

3        A.   Yes.

4        Q.   Would you look on page 386.

5        A.   But this example doesn't tell you how to      12:45:41

6    do this.

7        MR. SCHNEIDER:   I'll move to strike as

8    nonresponsive after "yes."

9    BY MR. SCHNEIDER:

10       Q.   Can you turn to page 386.   Are these        12:45:52

11   your handwritten notes?

12       A.   Yes.

13       Q.   And is this pertaining to content that

14   you received at the three-day seminar?

15       A.   Yes.                                          12:46:00

16       Q.   Can you turn to page 391.   Actually,

17   392.   392 and 393, are all of these your handwritten

18   notes?

19       A.   Yes.

20       Q.   And do these all pertain to information      12:46:22

21   that was provided to you during the three-day

22   program?

23       A.   I believe so.

24       Q.   If you look on 393, there's a detail

25   under "EX," I'm presuming that means example,          12:46:33

Page 87

Exhibit 4
- 21 -

```
 1    running numbers on that particular example, correct?   12:46:36

 2        A.   Yes.  But again, there wasn't enough

 3    explanation.

 4        Q.   All right.  So, one of your criticisms

 5    was that you wanted more explanation than what was    12:46:47

 6    provided, correct?

 7        A.   Yes.

 8        Q.   On 395, are those your notes?

 9        A.   Yes.

10        Q.   All right.  If you could just page          12:47:01

11    through and look at 396 and 397, 398 and 399.  Are

12    all of those your handwritten notes?

13        A.   Yes.

14        Q.   And you had testified earlier that you

15    are a college graduate.  Did you take notes when you   12:47:18

16    went to college?

17        A.   Yes.

18        Q.   And was it your practice to record in

19    notes information that you thought might be useful

20    or that you'd want to remember later?               12:47:26

21        A.   Yes.

22        Q.   And is that the reason why you took

23    notes at this seminar, to record the information in

24    writing so you could go back and refer to it later?

25        A.   Yes.                                        12:47:37

                                                  Page 88
```

Exhibit 4
- 22 -

```
 1    right, foreclosures and the other items we looked        12:51:58

 2    at?

 3           A.   That's correct.

 4           Q.   Can you look at page 553.  That's a

 5    sample contract that Trump University provided to         12:52:26

 6    you, correct?

 7           A.   Yes.

 8           Q.   Can you look at page 561.  That's a

 9    sample Assignment of Contract of Sale that they

10    provided to you; is that correct?                        12:52:42

11           A.   Yes, but there was no explanation on any

12    of these.

13           Q.   They gave you the forms of the

14    contracts, correct?

15           A.   Yes.  But you have to know how to fill       12:52:50

16    them out.  Therefore, you needed instruction on

17    that, which was not provided.

18           Q.   Can you turn to page 629.  Can you tell

19    us what these notes pertain to?

20           A.   I'm reading it.                              12:53:26

21                I don't know.

22           Q.   Do you know if they were taken by you

23    during the Fast Track program?

24           A.   I know this was my writing.  I don't

25    know -- I don't believe it was during the Fast Track     12:53:47
```

Page 92

Exhibit 4
- 23 -

1    Trump University?                                    12:57:40

2         A.   I'm not certain.  I know I learned it

3    through Elite Mentoring.  But they discussed private

4    investors.

5         Q.   All right.  So, did you attempt to         12:57:49

6    wholesale any property during the first 30, 60 or 90

7    days after going to the Fast Track program?

8         A.   My intention was to; however, I did not.

9         Q.   How about retail a properly during the

10   first 30, 60 or 90 days?                             12:58:05

11        A.   Yes, I looked into that.

12        Q.   Did you actually purchase anything to

13   retail?

14        A.   No.  I didn't have the money because

15   they told me that they would instruct us how to get  12:58:14

16   private investors, which they never did.

17        Q.   All right.  So, you attended the Fast

18   Track program in early August of '08, correct?

19        A.   That's correct.

20        Q.   All right.  And the very next thing that   12:58:34

21   you did with Trump University, the very next thing

22   you did was the end of September, correct?  That was

23   your mentoring program?

24        A.   That's correct.

25        Q.   All right.  So, what efforts did you       12:58:44

Page 96

Exhibit 4
- 24 -

```
 1          A.   I believe that's everything.            01:02:31

 2          Q.   Did Donald Trump make any appearance at

 3     the Fast Track to Foreclosure three-day seminar?

 4          A.   No.

 5          Q.   Was there ever any representation or     01:02:41

 6     promise that he would appear?

 7          A.   I believe that there was some discussion

 8     that he might appear at some event at some point.  I

 9     don't clearly recall.

10          Q.   Did -- did they show any videotape of --  01:02:55

11     well, first of all, was there any type of live

12     statement by Donald Trump, if it was via Internet or

13     Skype or something, where you could actually see

14     him, and he was talking with anybody at the program?

15          A.   No.                                      01:03:11

16          Q.   Was there any type of video recording of

17     him at the three-day foreclosure workshop?

18          A.   There may have been.  I don't recall.

19          Q.   Can you remember any representations

20     that Donald Trump made during the three-day Fast    01:03:21

21     Track to Foreclosure program to you?

22          A.   You mean in written --

23          Q.   Writing, verbal, live, taped.

24          A.   In my book, there are no ads that I see;

25     however, I believe that there were ads on the slides  01:03:40
```

Page 100

Veritext National Deposition & Litigation Services
866 299-5127

Exhibit 4
- 25 -

```
 1    with, you know, "This is the next best thing to        01:03:46

 2    being my apprentice.  You'll learn inside secrets

 3    from me.  I've been in the real estate business for

 4    75 years.  I'm passing this on because I want to

 5    help others."  Things to that effect.                  01:04:00

 6          Q.   All right.  Were there any statements

 7    that you attribute to Donald Trump that caused you

 8    to go into the Elite program?

 9          A.   Everything that he said.

10          Q.   Okay.  So, list for me those items that    01:04:14

11    he said.

12          A.   That he was going to provide insider

13    secrets, real estate secrets, that it was going to

14    be the next-best thing to being his apprentice, that

15    he was going to provide his hand-picked instructors,  01:04:32

16    that no other real estate course could be as

17    comprehensive as his was, and his was basically the

18    best of the best.  And also, of course, just his

19    name and his reputation as a land mogul.

20          Q.   What do you mean, his name and his          01:05:00

21    reputation?

22          A.   Well, he's known for real estate deals.

23    I mean, everyone across the world knows him for

24    that.  So, I would think someone with his name who's

25    starting any kind of educational, as he termed,        01:05:11
```

Page 101

Exhibit 4
- 26 -

```
 1   university would be the right type of person to        01:05:14

 2   divulge the correct information to you that you

 3   would need since he's an expert.

 4        Q.   So, it was important to you to be in a

 5   program that had his name on it because of his         01:05:25

 6   reputation?

 7        A.   Yes.

 8        Q.   And, in fact, you were in a program with

 9   his name on it, correct?

10        A.   Yes.                                          01:05:31

11        Q.   All right.  And do you know whether any

12   of the information that was provided to you during

13   the five seminars was -- was information from Donald

14   Trump?

15        MS. ECK:  Objection.  Calls for speculation.      01:05:44

16        THE WITNESS:  Yeah, I can't say.  I would not

17   have knowledge of that.

18   BY MR. SCHNEIDER:

19        Q.   All right.  So, do you know whether or

20   not you were provided any of the insider secrets       01:05:52

21   from Donald Trump?

22        A.   I don't believe I was.

23        Q.   How do you know?

24        A.   Because nothing was addressed as coming

25   from him.  Nothing was addressed as "This is what      01:06:02
```

Page 102

Exhibit 4
- 27 -

```
 1         Q.   But if it turns out it's a true          02:01:28

 2    statement, then you don't have a claim on that

 3    issue; would you agree?

 4         MS. ECK:  Objection.  Calls for a legal

 5    conclusion.                                         02:01:33

 6         THE WITNESS:  No.  If -- okay.  Please repeat

 7    the last question.  If he --

 8    BY MR. SCHNEIDER:

 9         Q.   If Donald Trump was the founder of Trump

10    University, what is your complaint?                 02:01:44

11         A.   That I didn't receive any of his insider

12    secrets, it wasn't the next best thing to being his

13    apprentice.  It was generic real estate information

14    that I could have gotten from the Barnes & Noble's

15    book for $25 instead of $35,000.                    02:02:01

16              And I could have hired a real estate

17    agent to take me around to properties for free for

18    two days, and I could have talked to a

19    representative at Home Depot to show me where the

20    carpets were for a dollar a square foot for free.   02:02:14

21    So, I would have ended up spending $25 instead of

22    35,000.

23         Q.   All right.  I'm talking about this

24    statement that you said may not be accurate, that it

25    was founded by Trump -- Donald Trump.               02:02:27
```

Page 120

Exhibit 4
- 28 -

```
 1        Q.    Did you make any effort to implement any    02:14:26
 2   of the ideas and things that you discussed during
 3   the foreclosure workshop?
 4        A.    Again, I didn't have the knowledge
 5   necessary, so how was I supposed to do that?          02:14:35
 6        Q.    Did you make an attempt to contact
 7   realtors to look at property?
 8        A.    No, because that's what I was supposed
 9   to be doing with my mentors.
10        Q.    Did you make --                             02:14:48
11        A.    I had no idea what properties I would
12   even be looking for.
13        Q.    Did you make any effort to find out if
14   there was any foreclosure properties?
15        A.    No.  Again, because that's what my          02:14:55
16   mentors were supposed to do with me.
17        Q.    Did you try and look through the
18   foreclosure workbook and information that was
19   provided to implement any of the information in the
20   foreclosure materials?                                 02:15:08
21        MS. ECK:  Objection.  Asked and answered.
22             You can answer again.
23        THE WITNESS:  No.  As I was advised by Trump
24   University staff, Tiffany Brinkman and James Harris,
25   I was not to do anything until the mentorship came.    02:15:22
```

Page 131

Exhibit 4
- 29 -

```
 1          Q.   Did you receive a three-day field        02:24:36

 2    mentorship?

 3          A.   If that's what you want to call it.

 4          Q.   You spent three days with Mike Kasper

 5    and Rick McNally, correct?                           02:24:44

 6          A.   Visiting homes that I could have done

 7    with a real estate agent for free; and going to Home

 8    Depot, which I could have had a Home Depot rep do

 9    for free.  So, it was not worth $25,000.  But yes, I

10    did receive what they called a "mentorship," which I  02:24:59

11    don't agree is a mentorship.

12          Q.   All right.  And then each of the next

13    items, three, four, five, those are -- or four

14    programs, I'm sorry, the Wealth Preservation

15    Retreat, the QuickTurn Real Estate Retreat, the      02:25:12

16    Creative Finance Retreat, and the Commercial &

17    Multifamily Retreat -- those were each three-day

18    programs provided by Trump University, correct?

19          A.   That's correct.

20          Q.   And you attended each of those four       02:25:24

21    programs; is that correct?

22          A.   That's correct.

23          Q.   And each of them were three days, and

24    you went all three days for each of those programs?

25          A.   Yes.                                      02:25:31
```

                                                    Page 141

Exhibit 4
- 30 -

```
 1          MR. SCHNEIDER:  You can answer.              02:26:23

 2          THE WITNESS:  That's -- that's correct.

 3  There wasn't enough -- I don't know what you just

 4  said now, no.  Sorry.

 5  BY MR. SCHNEIDER:                                    02:26:30

 6          Q.   There wasn't enough detail; you wanted

 7  more detail?

 8          A.   I wanted instruction on how to actually

 9  do these things, not a piece of paper with no

10  instruction.  That's what a mentor is supposed to   02:26:41

11  be, is someone who walks you through a process hand

12  by hand.

13          Q.   All right.  Would you look on the next

14  page, which is TU 1527.  It's entitled "Terms &

15  Conditions."  Are you on that sheet?                02:26:56

16          A.   Yes.

17          Q.   And is that your signature and your

18  printed name at the bottom?

19          A.   Yes, it is.

20          Q.   And there's a date next to it of        02:27:05

21  August 10, 2008.  Is that approximately when you

22  signed this document?

23          A.   Yes.

24          Q.   The first sentence of the Terms &

25  Conditions states that, "Trump U programs are       02:27:12
```

Page 143

Exhibit 4
- 31 -

```
 1          Q.   At least this document we're looking at,    02:54:50

 2    there's a 12-day program telling you exactly on

 3    Day 2 --

 4          A.   Okay.  On --

 5          Q.   -- Step 1, develop a business name for     02:54:55

 6    your new company.

 7          A.   Okay.  Why don't we go back to 3255,

 8    which is "Nine Methods for Marketing, Signs" --

 9          Q.   Miss Makaeff --

10          A.   -- it's blank.                             02:55:02

11          Q.   Miss Makaeff, I'm not going to argue

12    with you.  I'm just going to ask you questions and

13    have you answer them.

14               This -- what they provided to you in

15    advance of your mentorship was a 12-day program that  02:55:10

16    they wanted you to start taking these steps laid out

17    in this -- in this program, correct?

18          MS. ECK:  Objection.  Asked and answered.

19          THE WITNESS:  Yes.

20          MS. ECK:  You can answer.                       02:55:21

21          THE WITNESS:  Which I -- I cannot take, not

22    knowing half of the information.

23    BY MR. SCHNEIDER:

24          Q.   All right.  Do you know whether you did

25    any of the items?  There's probably 50 items in       02:55:26
```

Page 169

Exhibit 4
- 32 -

```
 1          THE WITNESS:  I don't know how else to        03:02:56

 2    answer.  I'm giving you an answer, but you don't

 3    want to take it.

 4    BY MR. SCHNEIDER:

 5          Q.   Well, what you're saying is "I'm excited  03:03:00

 6    about the future."  But what you wrote is "I'm

 7    excited about the past."  So, what I'm asking is --

 8          A.   No.  I'm saying that I was excited that

 9    I signed up for the $35,000.  That happened during

10    that weekend.                                       03:03:11

11          Q.   Okay.  So, when you said amazing --

12          A.   So, what was I going to say, "I had an

13    amazing Sunday"?  I mean, it's just -- it's all

14    encompassed together so I said "weekend."

15          Q.   Okay.  So, when you said, "I had an       03:03:18

16    amazing weekend," you did not mean the Fast Track to

17    Foreclosure?

18          A.   I didn't feel like I learned what I

19    needed to learn.  I felt I had an amazing weekend

20    because I was supposed to learn all these amazing    03:03:27

21    things to come.

22          Q.   All right.  So, let's look at the last

23    sentence.  "That's what all that information did,

24    drained my brain power."  Do you see that sentence?

25          A.   Yes.                                      03:03:40
```

                                             Page 177

Exhibit 4
- 33 -

```
1          Q.   "All that information," that's the        03:03:40

2     information you learned at the Fast Track to

3     Foreclosure, correct?

4          A.   I'm reading this.  One moment.

5               What I meant by that is, at the time, I    03:03:55

6     felt that there was a lot of papers that they had

7     given us, so it was overwhelming to me.  That's what

8     I meant by "it drained my brain power."  But I

9     thought it was the beginning of good things to come

10    where there would be more detailed information.      03:04:14

11         Q.   When you said "all that knowledge,"

12    you're talking about the knowledge that you obtained

13    at the Fast Track to Foreclosure, correct?

14         A.   I was thinking at the time that I was

15    getting some knowledge.  But looking back, there     03:04:26

16    really wasn't anything of substance -- you know, of

17    substance.

18         Q.   Okay.  So, as of August 15, 2008, it was

19    your belief at the time you wrote this e-mail that

20    you had received a lot of knowledge from the Fast    03:04:41

21    Track to Foreclosure program, correct?

22         MS. ECK:  Objection.  Misstates the witness's

23    testimony.

24         THE WITNESS:  I can only go back to what I

25    wrote, and I don't remember exactly what I was       03:04:54
```

                                              Page 178

Exhibit 4
- 34 -

```
 1    and advertising?                                03:38:21

 2         Q.   Well, didn't you go through the program

 3    and it specifically had information on how to locate

 4    properties, how to contact people that might have

 5    foreclosure properties?                          03:38:29

 6         A.   That's what my mentors were there for.

 7         Q.   Okay.  Did you ever go back and look at

 8    the materials and try and think, "All right, how do

 9    I start making this marketing plan?"

10         A.   When the material is so general that    03:38:41

11    there's no specific information, you're unable to do

12    that.

13         Q.   Okay.  Did you make any effort to do it?

14         A.   Again, I was waiting for my mentors, as

15    instructed by Tiffany Brinkman, James Harris and    03:38:50

16    Rick McNally himself.

17         Q.   Did you contact any businesses in the

18    community?

19         A.   What businesses in the community?

20         Q.   Realtors, chamber of commerce.          03:39:02

21         A.   As part of my package that the

22    mentorship -- they were supposed to set up a power

23    team for me.  It was their duty to provide me with

24    realtors, contractors and all the people in the

25    industry.  It was not my duty to do that.  That's   03:39:14
```

Page 197

Exhibit 4
- 35 -

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   TARLA MAKAEFF, BRANDON KELLER,

 5   ED OBERKROM, and PATRICIA

 6   MURPHY, on Behalf of Themselves

     and All Others Similarly

 7   Situated,

 8                  Plaintiffs,

 9      vs.                     No. 10 CV 0940 IEG (WVG)

10   TRUMP UNIVERSITY, LLC, (aka

11   Trump Entrepreneur Initiative) a

     New York Limited Liability

12   Company, DONALD J. TRUMP, and

13   DOES 1 through 50, inclusive,

14                  Defendants.

15   _____

16

17     CONTINUED VIDEOTAPED DEPOSITION of TARLA MAKAEFF

18                  San Diego, California

19                Tuesday, January 31, 2012

20                      Volume II

21

22   Reported by:

     Kae F. Gernandt

23   RPR, CSR No. 5342

24   Job No. 133737

25   PAGES 283 - 591
```

Veritext National Deposition & Litigation Services
866 299-5127

Exhibit 4
- 36 -

```
 1          A.   I've never heard of that.            10:52:20

 2          Q.   Did you use their conference call

 3    services?

 4          A.   I've never heard of any of these things

 5    you're talking about.                           10:52:27

 6          Q.   Did you use the audio conference

 7    presentations?

 8          A.   Again, I've never -- nobody told me

 9    about any of this.  I've never heard of any of this.

10          Q.   How about the real estate investment  10:52:35

11    review courses?

12          A.   Never heard of it.

13          Q.   Would you look at -- you had testified

14    before we took a break that you essentially cut off

15    all contact with Trump University after someone from  10:52:46

16    the district attorney's office showed up at your

17    door?

18          A.   Yes.  About that -- at sometime around

19    that time.

20          Q.   When was that?                        10:52:58

21          A.   It was June or July 2009.  Yeah, 2009.

22          Q.   And the issue was that you had put out

23    bandit signs, and someone came to you and said that

24    you can't use those bandit signs?

25          A.   Yes.                                   10:53:15
```

Page 346

Exhibit 4
- 37 -

```
 1          Q.   And you had -- you hired a college        10:53:15

 2     student to put those out in approximately June of

 3     2009?

 4          A.   Or May perhaps, yes.

 5          Q.   All right.  Would you take a look at --    10:53:24

 6     in the Prosper documents there, TUC 374.

 7               Just so I'm clear, the bandit signs

 8     you're talking about, those said things like "We buy

 9     homes," is that right, with a phone number?

10          A.   That's correct.                           10:53:52

11          Q.   All right.  Will you look at the

12     paragraph underneath the sign there on "We buy

13     homes."  There's a paragraph, and it states, "The

14     only potential problems with signs is that some

15     cities have ordinances against putting up signs.    10:54:05

16     Make sure you check with the city first because you

17     could have your signs removed or a potential fine."

18               Do you see that language?

19          A.   Yes.

20          Q.   So, you had this document about eight or   10:54:15

21     nine months before you put up the bandit signs,

22     correct?

23          A.   If it was in the book that was provided

24     to me.

25          Q.   What effort did you make to contact the   10:54:25
```

Page 347

Exhibit 4
- 38 -

```
 1    city to see if signs were permitted in the way in      10:54:27

 2    which you were going to put them up?

 3         A.   I don't know if I saw this document

 4    prior to doing that.  Had I known that I would have

 5    been put in danger -- first of all, this mentions      10:54:35

 6    "You may have your signs removed or potential fine."

 7    It doesn't say anything about going to jail or being

 8    accused of a misdemeanor.

 9         Q.   Mrs. Makaeff, you didn't go to jail, did

10    you?                                                   10:54:50

11         A.   I was accused and told that I could go

12    to jail in the letter from the DA --

13         Q.   Miss Makaeff --

14         A.   -- and I could be --

15         Q.   Miss Makaeff, you didn't go to jail, did    10:54:56

16    you?

17         A.   No.  But I was threatened with that

18    possibility.

19         Q.   And you weren't fined, were you?

20         A.   Yes.  Actually, I was.                      10:55:03

21         Q.   You paid a fine?

22         A.   I paid -- my fine that I paid was -- I

23    was told to pay a fine to a charitable organization,

24    and I chose Amnesty International.

25         Q.   You didn't pay a fine to any government     10:55:14
```

Page 348

Exhibit 4
- 39 -

```
 1    entity, correct?                                    10:55:16

 2         A.   No.  The DA told me to pay that fine to

 3    a charitable organization, so it was because of

 4    them.

 5         Q.   Have you produced that citation in which   10:55:23

 6    the district attorney ordered you to make a

 7    charitable contribution?

 8         A.   I -- I produced the letters.  I don't

 9    know where that would be.  You can contact my

10    criminal attorney, who can vouch for that.          10:55:37

11         Q.   Did you contact the city --

12         A.   And I have a receipt from the Amnesty

13    International I can provide.

14         Q.   Did you contact the city or anybody to

15    determine whether or not you could put up "We buy   10:55:51

16    houses" signs in the areas and in the place that you

17    put them?

18         A.   No.  Because Rick and Mike, who

19    suggested I put up bandit signs -- as well as James

20    Harris -- never told me that I needed to do that.   10:56:00

21         Q.   Okay.  So, your answer is no, you didn't

22    make any contact with any city first to see if it's

23    permitted?

24         A.   No.  I wasn't aware that I needed to do

25    that.                                               10:56:10
```

                                                      Page 349

Exhibit 4
- 40 -

# EXHIBIT 5

Exhibit 5
- 41 -

Page 1

1                    UNITED STATES DISTRICT COURT

2                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3       _____

                                                )
4       TARLA MAKAEFF, BRANDON KELLER,          )
        ED OBERKROM, and PATRICIA MURPHY,       )
5       on Behalf of Themselves and All         )
        Others Similarly Situated,              )
6                                               )
                 Plaintiffs,                    ) Case No.
7                                               ) 10 CV 0940 CAB (WVG)
             vs.                                )
8                                               )
        TRUMP UNIVERSITY, LLC, (aka Trump       )
9       Entrepreneur Initiative) a New          )
        York Limited Liability Company,         )
10      DONALD J. TRUMP, and DOES 1             )
        through 50, inclusive,                  )
11                                              )
                 Defendants.                    )
12      _____)

13

14

15              Videotaped Deposition of Joann Everett

16              taken at 655 West Broadway, Suite 1900,

17              San Diego, California, commencing at

18              9:31 a.m., on Wednesday, October 3, 2012,

19              before Kimberly S. Thrall, RPR, CSR No. 11594.

20

21

22

23

24      Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594

25                    Job No. 54027

Exhibit 5
- 42 -

Page 84

1    A.    As a result of attending that Trump session,

2  yes, with the Trump name.  The Trump name played a huge

3  role in my decision.

4    Q.  Did you --

5    A.    If it were not backed by an individual that

6  had, you know, a good reputation and knowledge in real

7  estate, I wouldn't have moved forward, period, based on

8  this individual.

9    Q.    All right.  Did you have any expectation that

10 Donald Trump was personally going to appear at the free

11 seminar?

12   A.    Oh, I didn't know.

13   Q.    Did anybody ever represent to you that he would

14 be there?

15   A.    No.

16   Q.    Did anybody represent to you that he would

17 personally be attending the three-day workshop that you

18 were buying?

19   A.    No.

20   Q.    Did you have any belief that you would be

21 working with Donald Trump personally?

22   A.    Working through his handpicked associates.  I

23 had that opinion.

24   Q.    Okay.  Did you have any expectation that you

25 were going to be working directly with Donald Trump?

Exhibit 5
- 43 -

1   the --

2       A.   Yes.

3       Q.   -- training, right?

4       A.   Yes.

5       Q.   All right.  So did you understand at the end of

6   the first day, if you didn't like it, you could ask for

7   a full refund?

8       A.   And there were things -- yes, I understood

9   that.

10      Q.   Okay.  And at the end of the first day, did you

11  like what you had heard the first day?

12      A.   Yes.  I liked what I heard.

13      Q.   And was the first day all content?

14      A.   It was like a -- bullets of infor- -- of things

15  you do, not specifically enough to implement it.  It was

16  definitely convincing one that -- in my opinion an

17  upsell technique to move to the next program.  I wasn't

18  aware there was a program there, but it was building up

19  to that block, because once we finished the three days,

20  it was clear that one could not -- there was not

21  sufficient information from the three days to do much of

22  anything.

23          There were several individuals in the class

24  that were very disappointed because they had no credit

25  and could not purchase the additional programs.

Exhibit 5
- 44 -

Page 288

1    just don't walk off the street and say, okay, let's try

2    to find a house and an investor.  I mean, that's too

3    vague.  They needed a tool set to assist.

4          If they're going to sell these techniques

5    and -- and think you can do something in three days, you

6    certainly have to have more than just a -- a mentor

7    generally flown in from another part of the country that

8    has no knowledge of the -- of the marketplace -- of the

9    local marketplace.

10    Q.   Did Troy Peterson have a knowledge of the

11   marketplace?

12    A.   He did not have a knowledge of Tampa.

13    Q.   How about of Florida?

14    A.   He had -- well, Florida is different.  He

15   worked in Orlando.

16    Q.   How far is Orlando from Tampa?

17    A.   Orlando is completely different.

18    Q.   How far is Orlando from Tampa?

19    A.   It's about 75 miles.

20    Q.   Okay.  And did he have an understanding of

21   the --

22    A.   I don't know if he had an understanding.

23   That's where he worked.  I don't know what he had as far

24   as an understanding.

25    Q.   Do you know what his understanding was of those

Exhibit 5
- 45 -

# EXHIBIT 6

Exhibit 6
- 46 -

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3    _____

                                             )
4    TARLA MAKAEFF, BRANDON KELLER,          )
     ED OBERKROM, and PATRICIA MURPHY,       )
5    on Behalf of Themselves and All         )
     Others Similarly Situated,              )
6                                            )
             Plaintiffs,              ) Case No.
7                                     ) 10 CV 0940 CAB (WVG)
             vs.                             )
8                                            )
     TRUMP UNIVERSITY, LLC, (aka Trump       )
9    Entrepreneur Initiative) a New          )
     York Limited Liability Company,         )
10   DONALD J. TRUMP, and DOES 1             )
     through 50, inclusive,                  )
11                                           )
             Defendants.                     )
12   _____)

13

14

15        Videotaped Deposition of Sonny Low

16        taken at 655 West Broadway, Suite 1900,

17        San Diego, California, commencing at

18        9:23 a.m., on Thursday, October 4, 2012,

19        before Kimberly S. Thrall, RPR, CSR No. 11594.

20

21

22

23   Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594

24              Job No.  54028

25

Exhibit 6
- 47 -

Page 25

1    was --

2         A.    No.

3         Q.    -- to live in it, right?

4         A.    Yes.

5         Q.    All right.  And how did you first hear about

6    Trump University?

7         A.    Full-page advertisements he had in the

8    San Diego Union-Tribune.

9         Q.    And do you still have a copy of that

10   advertisement?

11        A.    No.

12        Q.    Do you remember what it said?

13        A.    I remember the gist of what it said.  I cannot

14   quote word by word.

15        Q.    What's your best memory of what the ad --

16        A.    My best memory -- I cannot be literal with

17   this.  I can give you the gist.  In 2009, we were having

18   a crisis in this country in terms of real estate.

19   Mr. Trump's ads stated profit from real estate

20   investing.  Learn from me secrets.  If you want sec- --

21   secure your income, come to one of my free seminars.

22   That was the gist of the important stuff that caught my

23   attention.  Free seminar.

24        Q.    Did that part particularly interest you, that

25   it was free?

Exhibit 6
- 48 -

Page 26

1      A.    It was free, and it was going to secure my

2  income.  I'm a retired person on a fixed pension.

3      Q.    Was there anything about that ad that you

4  believed was geared towards someone that was over

5  65 years old or over 60 years old?

6      A.    Donald Trump caught my attention.

7      Q.    In response to my question, was there anything

8  about the advertisement that when you read it, you

9  thought this looks like it's focused towards someone

10  that's over 60 or 65 years old?

11     A.    Yes.

12     Q.    What was it?

13     A.    Improving your income, make it more secure.

14     Q.    And what was it that you believed that that

15  would pertain to someone over 60 more than someone that

16  was 55, let's say?

17     A.    I cannot answer your question.  I do not

18  understand what your -- what your question is.

19     Q.    Sure.  I'm -- I'm trying to understand when you

20  read the advertisement, did it appear to you that that

21  ad was focused on a particular age group of people to go

22  to its seminar?

23     A.    Yes.  As a retired person, I have time.  I want

24  to learn something.  If Trump was going to teach me

25  something with his worldwide reputation in real estate

Exhibit 6
- 49 -

1    investing, let's learn from the best.

2        Q.    Was there anything in the ad that specifically

3    mentioned or addressed anything about people of certain

4    age?

5        A.    Retired people.

6        Q.    You think the ad was addressed to retired

7    people?

8        A.    Among the categories.

9        Q.    So what is it that you recall?

10       A.    Retired, that word, "retired" people.

11       Q.    What other categories?

12       A.    Housewives.

13       Q.    Any other categories?

14       A.    Free eight to ten hours a day -- a week.

15       Q.    Anything else?

16       A.    That's it.

17       Q.    When's the last time that you saw the

18   advertisement?

19       A.    I don't remember.

20       Q.    Was it about the time that you first saw it,

21   was that the last time you saw it as well?

22       A.    No.

23       Q.    Okay.  When have you seen it since?  What was

24   the circumstance?

25       A.    2010.

Exhibit 6
- 50 -

1    attend another Trump University seminar?"

2         And what did you respond?

3    A.   "Yes."

4    Q.   No. 4 stated:  "Would you recommend

5    Trump University seminars to a friend?"

6         And what did you state?

7    A.   "Yes."

8    Q.   And why would you recommend Trump University

9    seminars to a friend?

10   A.   Why?

11   Q.   Yes.

12   A.   Offered information.

13   Q.   Did you believe that you got value for your

14   $1,495?

15        MS. ECK:  Objection.  Vague.

16        THE WITNESS:  Not certain.

17   BY MR. SCHNEIDER:

18   Q.   Why is that?

19   A.   Because real estate investing is a very complex

20   business.

21   Q.   Is that your complete answer?

22   A.   That's my complete answer.

23   Q.   Well, what is it about the fact that real

24   estate investing is very complex that you're not sure if

25   you got value from the seminar?

Exhibit 6
- 51 -

1        A.    I expected Mr. Nowlin to talk to me about my

2   personal situation.   I prepared a profile of my goals

3   and my dreams and my assets.  Mr. Nowlin never asked to

4   see that.   He never talked to me about what exit

5   strategy that I was interested in pursuing.

6        Q.    At the end of --

7        A.    Mr. Nowlin, I was expecting him to do that day

8   one.

9        Q.    At the end of day one, did you say, hey,

10  Mr. Nowlin, I'd like to talk to you about what my goals

11  are here?

12       A.    At the end of day one, I was so flabbergasted

13  with the waste of time, and I knew that I was going to

14  have to see him another two days.  I just wanted to go

15  home.  Because Mr. Nowlin, it was obvious from step one,

16  that he knew nothing about success -- potential success

17  in real estate investing in San Diego County, because he

18  never came over here.

19            When he started by saying, "Do you have a

20  realtor with properties to look at?  Please get him to

21  provide me a list," I scratched my head.  I believe I've

22  been scammed.  If Mr. Nowlin was a Trump mentor,

23  handpicked by Mr. Trump, if Mr. Trump was such -- is

24  such a real estate-investing mil- -- billionaire, you're

25  going to choose Geoff Nowlin to be a mentor, share with

Exhibit 6
- 52 -

Page 94

1    A.    I expected Mr. Nowlin to talk to me about my

2  personal situation.  I prepared a profile of my goals

3  and my dreams and my assets.  Mr. Nowlin never asked to

4  see that.  He never talked to me about what exit

5  strategy that I was interested in pursuing.

6    Q.    At the end of --

7    A.    Mr. Nowlin, I was expecting him to do that day

8  one.

9    Q.    At the end of day one, did you say, hey,

10  Mr. Nowlin, I'd like to talk to you about what my goals

11  are here?

12    A.    At the end of day one, I was so flabbergasted

13  with the waste of time, and I knew that I was going to

14  have to see him another two days.  I just wanted to go

15  home.  Because Mr. Nowlin, it was obvious from step one,

16  that he knew nothing about success -- potential success

17  in real estate investing in San Diego County, because he

18  never came over here.

19        When he started by saying, "Do you have a

20  realtor with properties to look at?  Please get him to

21  provide me a list," I scratched my head.  I believe I've

22  been scammed.  If Mr. Nowlin was a Trump mentor,

23  handpicked by Mr. Trump, if Mr. Trump was such -- is

24  such a real estate-investing mil- -- billionaire, you're

25  going to choose Geoff Nowlin to be a mentor, share with

Exhibit 6
- 53 -

Page 98

1   mentorship is that he did not ask to see the profile

2   that you prepared about yourself; is that correct?

3          MS. ECK:  Objection.  Misstates the witness's

4   testimony.

5          THE WITNESS:  That was part of my

6   dissatisfaction.

7   BY MR. SCHNEIDER:

8      Q.   All right.  What else?

9          MS. ECK:  Objection.  Asked and answered.

10          You can repeat what you said earlier.

11          THE WITNESS:  I paid $25,000 for an in-field

12   mentor, who presumably, according to Donald J. Trump's

13   materials, was going to come -- he had already done the

14   legwork.  He was going to come and prepare for me a

15   customized investment plan of my neighborhood and my

16   town based on my financial goals at my level of comfort.

17   That's what I was to get from Trump University --

18   BY MR. SCHNEIDER:

19      Q.   All right.  So you --

20      A.   -- by a mentor who was handpicked by

21   Donald Trump possibly, I would expect, according to

22   Donald Trump's standards.  They sent over a clown that I

23   paid $25,000 for.

24      Q.   Now, when you say he was a clown, what do you

25   mean?

Exhibit 6
- 54 -

1    BY MR. SCHNEIDER:

2        Q.    You can answer.

3        A.    If he had it, he was keeping a secret, didn't

4    share any of it with me, because we can go back to

5    Exhibit 6.  Is there anything in here, sir, that he

6    shows that this would work in San Diego County?

7        Q.    Is there --

8        A.    I want you to answer that, sir.

9        Q.    Is there some reason that you believe that the

10   strategies that were taught to you were not going to

11   work in San Diego County?

12       A.    That's why I chose a mentor.  It says very

13   clearly, mentor will walk through with you to see what

14   will work and what will not work.

15       Q.    So what did he teach in terms of his strategies

16   that you tried that didn't work?

17       A.    He never taught me any strategies.

18       Q.    So he didn't teach you to look at the property

19   and figure out what needed to be repaired?

20       A.    I knew that before he came.  I was seeing that

21   with my handyman.

22       Q.    So all of the information in the 42 pages of

23   notes, that was all known to you beforehand?

24       A.    Yes.

25       Q.    And before you had any involvement with Trump

Exhibit 6
- 55 -

1    University, you said that you had no real estate

2    experience, correct, other than buying your own home?

3         A.   Yes.

4         Q.   You knew how to locate hard-money lenders

5    before?

6         A.   I know there are hard-money lenders.

7         Q.   Have you ever attempted to located hard-money

8    lenders before you had gone through any Trump University

9    programs?

10        A.   No.

11        Q.   Did Mr. Nowlin talk to you about how to locate

12   hard-money lenders?

13        A.   He named one person.

14        Q.   Did you contact that one person?

15        A.   Yes.

16        Q.   And when did you do that?

17        A.   After Mr. Nowlin's departure.

18        Q.   And did you contact the hard-money lender in

19   order to get financing to purchase property?

20        A.   I called the hard-money lender.

21        Q.   For what reason?

22        A.   To find out what interest rate he was going to

23   charge.  And, number two, since he was recommended by

24   Mr. Nowlin, as to why Mr. Nowlin would not return my

25   phone calls when I wanted to contact him regarding the

Exhibit 6
- 56 -

1      A.   We had lunch together.

2      Q.   Anything else?

3      A.   That was pretty much it.

4      Q.   And on the third day, did you all -- it was the

5  just the two of you together?

6      A.   (Witness nods head.)

7      Q.   Yes?

8      A.   Yes.

9      Q.   So at -- at the end of the third day, you were

10 unhappy with the -- with the in-person mentorship,

11 correct?

12     A.   Yes.

13     Q.   You -- you were actually furious about it,

14 correct?

15     A.   I was furious about it.

16     Q.   You felt like you had been cheated?

17     A.   I had been cheated.

18     Q.   You were angry at Mr. Nowlin?

19     A.   Mr. Schneider, I'm a professional person.  I

20 respect people for being human beings.  Mr. Nowlin is a

21 human being, but I did tell him precisely, "What I want

22 is one to one with you."

23     Q.   What -- what did you mean by that, "I want one

24 to one"?

25     A.   That is what a mentor is.  He is the person I

Exhibit 6
- 57 -

1   The other part of the answer is a mentor who's committed

2   to the particular person, in my case in real estate

3   investing.

4       Q.   All right.  So your criticism is that the

5   mentor wasn't passionate about Sonny Low and he wasn't

6   responsive to Sonny Low, and he didn't know the -- and

7   you don't believe he knew the San Diego market, correct?

8       A.   And also I do not believe that he even knows

9   what will work and what will not work because he didn't

10  do his legwork.

11      Q.   And by that, you mean he didn't come up with a

12  list of properties to look at, correct?

13      A.   That is one indication, yes.

14      Q.   Anything else?

15      A.   Or what strategy would work.  In other words,

16  would flipping really work or would it not.  Mr. Goff

17  talked about equitable title to a piece of property.  I

18  called a hard-money lender, one that I found myself,

19  hard-money lender kept on coming back to me.  You mean

20  equitable -- equitable title, you have control?  The

21  hard-money lender told me that, hey, that is collateral;

22  I would never give you -- lend you any money for that.

23          So when I talked about Mr. Nowlin knowing

24  enough, why I considered -- and also I also questioned a

25  lot of the other information that was given to us and

Exhibit 6
- 58 -

Page 182

1    the profiting and -- and the real estate investing.

2    There was information provided, but I questioned whether

3    any of it was applicable, because I began to realize

4    afterwards -- when I was unhappy, I went to the

5    Internet.  I could find the same information, and it was

6    free for me.

7        Q.   At any time during the three-day program, the

8    1,495 program that you purchased, were you asked to

9    raise your credit limit?

10       A.   I myself personally, no.

11       Q.   Have you made any complaints to the Better

12   Business Bureau?

13       A.   Yes, sir.

14       Q.   When did you do that?

15       A.   I began -- when I sent my April letter, 2010, I

16   called the California Department of Consumer Affairs.

17       Q.   And have you reported any complaints to any

18   government agency?

19       A.   Do you know what they call it?  FTC, Federal

20   Trade Commission.

21       Q.   All right.  Did you report something about your

22   experience with the FTC?

23       A.   With the FTC, I complained about this

24   experience with Trump University.

25       Q.   Who else?  Better Business Bureau, FTC.

Exhibit 6
- 59 -

Page 210

1    profitable -- Profit in Real Estate Investing, and a

2    thousand dollars for my lawyer, who I hired to do the

3    demand letter, and $25,000 for the in-field mentorship,

4    of which you subtract 7,500 that I've gotten back.

5        Q.   Now, the $995 for the LLC, you received what

6    you paid for for that, didn't you?

7            MS. ECK:  Objection.  Lack of foundation.

8            THE WITNESS:  The LLC was created.

9    BY MR. SCHNEIDER:

10       Q.   And that's what you paid for, right?

11       A.   Yes.

12       Q.   Okay.  And the $1,495 program, you participated

13   in that and enjoyed it, correct?

14           MS. ECK:  Objection.  Lack of foundation.

15   Misstates the witness's testimony.

16           THE WITNESS:  I attended it, but I found out

17   subsequently I could have gotten the same information, a

18   lot of it, from the Internet, and also the examples

19   which Steve Goff talked about were relevant for Texas.

20   And there was no indication that it would be -- it's

21   general information.  So I question the value of the

22   1,495.

23   BY MR. SCHNEIDER:

24       Q.   Do you believe you got any value from it?

25       A.   Very little, minimal.

Exhibit 6
- 60 -

# EXHIBIT 7

Exhibit 7
- 61 -

Page 1

 1                 UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3     _____
                                          )
 4     TARLA MAKAEFF, BRANDON KELLER,     )
       ED OBERKROM, and PATRICIA MURPHY,  )
 5     on Behalf of Themselves and All    )
       Others Similarly Situated,         )
 6                                        )
                     Plaintiffs,          ) Case No.
 7                                        ) 10 CV 0940 CAB (WVG)
             vs.                          )
 8                                        )
       TRUMP UNIVERSITY, LLC, (aka Trump  )
 9     Entrepreneur Initiative) a New     )
       York Limited Liability Company,    )
10     DONALD J. TRUMP, and DOES 1        )
       through 50, inclusive,             )
11                                        )
                     Defendants.          )
12     _____)

13

14

15            Videotaped Deposition of John Brown

16            taken at 655 West Broadway, Suite 1900,

17            San Diego, California, commencing at

18            9:18 a.m., on Monday, October 8, 2012,

19            before Kimberly S. Thrall, RPR, CSR No. 11594.

20

21

22

23

24     Reported by:  Kimberly S. Thrall, RPR, CSR. No. 11594

25              Job No. 54027

Exhibit 7
- 62 -

Page 16

1       A.   I was able to do the upgrades on both units,

2   and I was able to sell the upper unit.  I still hold the

3   lower unit.

4       Q.   So were you working for the kidney foundation

5   at the time that you first became involved in the

6   New Hope condo project?

7       A.   Yes.

8       Q.   At the time that you were working for the

9   Kidney Foundation, was that a full-time position?

10      A.   Uh-huh.

11      Q.   Yes?

12      A.   Uh-huh.  Yes.

13      Q.   And were you a salaried employee?

14      A.   Yes.

15      Q.   And approximately how many hours a week would

16  you estimate you were working as the director of the

17  National Kidney Foundation?

18      A.   On average, I would say 40.

19      Q.   Any other experience in -- in real estate

20  besides reading some books and investing in the New Hope

21  property?

22      A.   No.

23      Q.   When did you first hear anything about

24  Trump University?

25      A.   The first time I heard something was -- I can't

Exhibit 7
- 63 -

1   remember exactly whether it was an e-mail or if it -- or

2   if it was an announcement in the mail.  It might have

3   been an announcement.

4        Q.   Do you have a copy of that e-mail or

5   announcement?

6        A.   I don't, no.

7        Q.   Are you married?

8        A.   No.

9        Q.   Do you live alone?

10       A.   I do.

11       Q.   At the time that you received the e-mail or

12   announcement, were you living alone?

13       A.   Yes.

14       Q.   And do you live in Manhattan?

15       A.   Yes.

16       Q.   And what was it about the e-mail or

17   announcement that interested you, if anything?

18       A.   I think the thing that was most interesting to

19   me was that Mr. Trump's name was on it, and I felt that

20   he was a legitimate person who had made a lot of money

21   in real estate, and that was -- I -- I felt like that

22   would be a great opportunity, to hear from him.

23       Q.   Had you ever seen him prior to receiving an

24   announcement, in person?

25       A.   No, not in person.

Exhibit 7
- 64 -

Page 87

1     Q.   -- were new to you, correct?

2     A.   One was wholesaling.  I didn't know what that

3     was.  I gave you that as an example.  But to pay $1,500

4     to learn about wholesaling, which you can explain to

5     someone in 10 minutes, is not value for me.

6     Q.   Did you run through examples during the three

7     days, monetary examples, look at a piece of property

8     and -- and run through different figures about purchase

9     price, rehab prices, that sort of thing?

10    A.   I vaguely remember something about that, yes.

11    Q.   Did you review contracts?

12    A.   Not -- I don't remember.

13    Q.   All right.  So you were meeting with people in

14    the back of the room and expressing an interest, but you

15    also expressed your -- your concerns about whether or

16    not you wanted to go forward with purchasing other

17    Trump University products?

18    A.   Right.

19    Q.   And you expressed your concern about whether or

20    not the company was shady.

21    A.   I told them it -- I told them it doesn't feel

22    quite right to me, plus it's expensive.  It's very

23    expensive.

24    Q.   And in response, at least on the expense side,

25    somebody told you that one of the ways that you can pay

Exhibit 7
- 65 -

```
1      A.    Uh-huh.

2      Q.    -- that talked about real estate --

3      A.    Uh-huh.

4      Q.    -- and personal experiences, and so forth --

5      A.    Uh-huh.

6      Q.    -- Mr. Harris, correct?

7      A.    Uh-huh.

8      Q.    You have to -- you have to answer audibly.

9      A.    Yes.

10     Q.    All right.  Then you went to this three-day

11   program.  You paid $1,495.  And for three days, you sat

12   in a classroom, were in room, and somebody presented

13   information to you about real estate for three days,

14   correct?

15     A.    I sat in a hot- -- a hotel ballroom, and

16   someone talked about real estate for three days with

17   minimal information.

18     Q.    All right.  So then you thought that you were

19   going to go to some different building?

20     A.    Yes.

21     Q.    Okay.  And did somebody tell you from --

22   starting now, you're going to go to some different

23   location, and you're going to be in some different

24   structure and -- and -- and everything that you just

25   went through, your next step starting tomorrow is
```

Exhibit 7
- 66 -

Page 163

1      A.   There -- I'm sorry.  There are many different

2   levels that people are at in this particular area.  So

3   there could have been someone there that had something

4   to offer, but not me.  I was a beginner.

5      Q.   The second paragraph on the last page states

6   that:  "My motivation for this e-mail is that I'm

7   finding that I have learning gaps" --

8      A.   Uh-huh.

9      Q.   -- "and accompanying unanswered questions in

10  the program."

11          What were your learning gaps as of this time?

12     A.   You know, I -- actually, I don't remember, but

13  I can -- well, I -- I used the example of wholesaling.

14  I didn't know what wholesaling was.  And after I got the

15  definition of what it was, I didn't know how to use

16  wholesaling or how to make use of it.  I'm not sure how

17  to say that.  But that's -- that's an example.

18     Q.   Did you --

19     A.   That was a learning gap that I had.

20     Q.   All right.  Anything else?

21     A.   I can't think of any- -- anything specifically.

22  Well, basically what was happening was I think that --

23  and I said this before -- there was vague information.

24  It was minimal.  It was basic or less.  And that left me

25  with a lot of unanswered questions because I wanted more

Exhibit 7
- 67 -

Page 164

1    information.

2        Q.    Well, let me show you what you produced in the

3    case.  It's Bates Nos. BROWN68 through BROWN375.

4        A.    Uh-huh.

5        Q.    Is this the materials that you were saying were

6    copied that were Power- -- oh, let's stop right there.

7              That -- that slide you just opened to where it

8    said, "Questions" --

9        A.    Look at this.  This is ridiculous.

10       Q.    That it stopped and asked people if they had

11   questions?

12       A.    No.  The -- look at this.  "Questions?"  Okay.

13   Now, this was in there, then.  I didn't -- I didn't

14   remember this.

15       Q.    Okay.  Now, this -- this workbook that you're

16   looking at or this copy of the slides --

17       A.    Yes.

18       Q.    -- that you think is ridiculous --

19       A.    Uh-huh.

20       Q.    -- this is over 300 pages.

21             This was given to you for free at the free

22   program, wasn't it?

23             MS. ECK:  Objection.  Lacks foundation.

24   BY MR. SCHNEIDER:

25       Q.    Isn't that the workbook that you got for free?

Exhibit 7
- 68 -

1    Q.   Sure.  By the end of the second day, you felt

2  that you had not received what you wanted?

3    A.   No, no totally.

4    Q.   Okay.  Did you ask for a refund at the end of

5  the second day?

6    A.   No.

7    Q.   Did you talk with anybody about you not feeling

8  satisfied with the program at the end of the second day?

9    A.   I think that's when I said something about this

10  all sounds pretty shady to me.

11    Q.   And what was it that sounded shady?

12    A.   Just the way it was being presented and just

13  some of the statements that were being made.  I don't

14  remember what they were, of course.  But it just -- it

15  just didn't sound right and -- I'm just looking at all

16  of this now.  It's -- it just didn't sound right.

17         And although we were going through these things

18  one at a time and -- it just all seemed too basic.  It

19  was too basic.  I wasn't -- for $1,500, I wasn't getting

20  anything about what I wanted.

21    Q.   All right.  So why didn't you ask for a refund

22  at the end of the second day?

23    A.   Because I was waiting to see what would happen

24  the third day.

25    Q.   All right.  So at the end of the third day, how

Exhibit 7
- 69 -

1       Q.    And then actually structuring the deal, that

2    didn't happen because you didn't make an offer, right?

3       A.    Correct.

4       Q.    Okay.  If you could turn the page to page 2,

5    under paragraph No. 5 --

6       A.    Uh-huh.

7       Q.    -- the last statement is:  "My mentor did not

8    seem to be knowledgeable in the techniques we were to

9    learn."

10           What's the basis that you didn't believe that

11   Mr. Gilpin was knowledgeable in those techniques?

12      A.    That he didn't seem to be knowledgeable?

13      Q.    Right.

14      A.    He -- when we were going through the

15   properties, he was giving me very general information

16   that a real estate agent would have done.  As a matter

17   of fact, my real estate agent in Pennsylvania could do

18   that and has done that.  It was nothing more than that.

19   It was nothing more than what a real estate agent would

20   do.

21           So as a -- an investor, I wanted him to be able

22   to point things out to me.  I wanted him to tell me how

23   to do the repairs, how much it would cost, how to put

24   teams together.  I wanted all of that information.  And

25   now -- I mean, looking back at it, that's what I wanted,

Exhibit 7
- 70 -

Page 213

1      Q.   And then actually structuring the deal, that

2   didn't happen because you didn't make an offer, right?

3      A.   Correct.

4      Q.   Okay.  If you could turn the page to page 2,

5   under paragraph No. 5 --

6      A.   Uh-huh.

7      Q.   -- the last statement is:  "My mentor did not

8   seem to be knowledgeable in the techniques we were to

9   learn."

10          What's the basis that you didn't believe that

11  Mr. Gilpin was knowledgeable in those techniques?

12     A.   That he didn't seem to be knowledgeable?

13     Q.   Right.

14     A.   He -- when we were going through the

15  properties, he was giving me very general information

16  that a real estate agent would have done.  As a matter

17  of fact, my real estate agent in Pennsylvania could do

18  that and has done that.  It was nothing more than that.

19  It was nothing more than what a real estate agent would

20  do.

21          So as a -- an investor, I wanted him to be able

22  to point things out to me.  I wanted him to tell me how

23  to do the repairs, how much it would cost, how to put

24  teams together.  I wanted all of that information.  And

25  now -- I mean, looking back at it, that's what I wanted,

Exhibit 7
- 71 -

1   but I didn't know what to ask at that point in time.

2   And it was just all (snapping fingers).  And it was very

3   general.  It was very vague.  It was what a real estate

4   agent would do.  And it was fast.  It was really rapid

5   fire.

6       Q.   As I understood your earlier testimony, he went

7   through item by item in the house on -- on things that

8   he recommended would need to be done to rehab the

9   property, correct?

10      A.   He went through the things that he wanted to go

11  through.  Right.  When I wanted to -- to talk -- stop

12  and talk about something, he didn't want to do that.

13      Q.   So you'd ask him to talk about something, and

14  he would say no?

15      A.   I did -- I did ask him to stop and -- what

16  about the electrical?  What about this?  What about

17  that?

18          He said, "Well, we -- we'll do that in a

19  minute.  We'll go out here first.  And we'll do this.

20  We'll go down to the basement.  We'll do that first."

21  But when it came right around to it, we didn't do those

22  things.

23      Q.   Okay.  So as an example, you would ask about --

24      A.   They were -- they were either forgotten -- he

25  forgot them in the heat of the moment or whatever was

Exhibit 7
- 72 -

# EXHIBIT 8

Exhibit 8
- 73 -

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


ART COHEN, Individually    )
and on Behalf of All       )
Others Similarly           )   No. 3:13-cv-02519-GPC-WVG
Situated,                  )
                           )   CLASS ACTION
          Plaintiff,       )
                           )
VS.                        )
                           )
DONALD J. TRUMP,           )
                           )
          Defendant.       )




ORAL AND VIDEOTAPED DEPOSITION OF

STEPHEN GOFF

Thursday, March 19, 2015

1200 Smith, 16th Floor

Houston, Texas







Reported By:
RENE WHITE MOAREFI
CSR, CRR, RPR

Job No.: 10015241

Exhibit 8
- 74 -

Page 189

1   synopsis, could you explain to me as best you can what

2   each of these lines here represents?

3       A.   Okay.  So there was 40 people attend, there was

4   nine that was sold, there was 124,470 collected at the

5   event -- I believe that's right -- and then percent --

6   well, percentage of revenue collected, 81 percent.  The

7   conversion was 23 percent.  The revenue per head, payments

8   to collect and pendings to collect.

9       Q.   So on -- on this -- on this training, you --

10  you've exceeded your -- your target?

11      A.   Yeah.  Like I previously said, the goal was 2500

12  a head.

13      Q.   Right.  And here you brought in over 3,000?

14      A.   In this event, yes.

15      Q.   Yeah.  Turning to page 79, could you read for me

16  under -- where it says 00:40:00, could you read the

17  transcript from there?

18      A.   Underneath that?

19      Q.   Uh-huh.

20      A.   The reason I'm working for this man right here is

21  because I do not have to worry about this being a scam.  I

22  will tell you that right now, Donald Trump is worth four

23  billion dollars.  He is not going to be out here taking

24  advantage of people, and I feel comfortable with Donald,

25  this is the reason I am with this company right now.

Exhibit 8
- 75 -

# EXHIBIT 9

Exhibit 9
- 76 -

**Gerald Martin**                                    **Makaeff vs. Trump University**

```
1              UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF FLORIDA
2

3    TARLA MAKAEFF, et al.,

4      Plaintiffs,

5      vs.                        CASE NO. 10CV0940GPC(WVG)

6    TRUMP UNIVERSITY, LLC, et
     al.,
7
       Defendants.
8    _____/

9

10

11

12              VIDEOTAPED DEPOSITION OF

13                   GERALD MARTIN

14                   Orlando, FL

15               November 05, 2013

16

17

18

19

20

21

22   Reported By:

23   Lori Bundy

24   RMR, FPR, RPR, CRR, CLR

25   Job No. 10008504
```

**Page 1**

Exhibit 9
- 77 -

**Gerald Martin**                                    **Makaeff vs. Trump University**

1     A.   I'm sorry, I meant David Highbloom.  Did I say --

2     Q.   **David Early?**

3     A.   I'm sorry, Highbloom.

4     Q.   **So you met with Michael Sexton?**

5     A.   David Highbloom, and Dee Colwell.

6     Q.   **Anyone else?**

7     A.   I don't recall.  I don't think -- I don't think I

8 did.  I was only there for a day -- actually, only for a

9 couple hours.

10    Q.   **When you were there, did you meet with Donald**

11 **Trump?**

12    A.   No, I did not.

13    Q.   **Have you ever met with Donald Trump?**

14    A.   No.

15    Q.   **Have you ever talked with Donald Trump on the**

16 **phone?**

17    A.   No.

18    Q.   **Have you ever had dinner with Donald Trump?**

19    A.   No.

20         MS. ECK:  I would like to mark as Exhibit

21    54 a Trump University employment questionnaire, Gerald

22    Martin with Bates number TU 172247 through TU 172251.

23         (Plaintiff's Exhibit 54, Bates number TU

24    172247 through TU 172251, was marked for

25    identification.)

Page 45

Exhibit 9
- 78 -

Gerald Martin                                    **Makaeff vs. Trump University**

1      question?

2            THE WITNESS:  Yes.  Yes, annual sales meeting,

3      yes.

4            MS. ECK:  Okay.  Thank you.

5            VIDEOGRAPHER:  We're off the record at 10:30 a.m.

6            (A break was taken.)

7            VIDEOGRAPHER:  We're back on the record at 10:39

8      a.m.

9   BY MS. ECK:

10     Q.   As part of your training, did Trump University

11    teach you what Donald Trump's real estate investing

12    techniques were?

13     A.   I don't recall.

14     Q.   So when you were teaching real estate techniques

15    to the students who signed up for the seminars, did you

16    understand that you were teaching general real estate

17    techniques?

18     A.   Yes, with -- yes.

19     Q.   You weren't teaching Donald Trump's real estate

20    investing techniques, were you?

21     A.   No.

22     Q.   Have you done any real estate transactions with

23    Donald Trump?

24     A.   No.

25     Q.   Did you interview with Donald Trump?

Page 58

Exhibit 9
- 79 -

EXHIBIT 10

```
 1          UNITED STATES DISTRICT COURT OF CALIFORNIA

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   TARLA MAKAEFF, BRANDON KELLER, ED
     OBERKROM and PATRICIA MURPHY, on
 5   behalf of themselves and all others
     similarly situated,
 6
                     Plaintiffs,
 7
             vs.                          Index No. 3:10-CV-00940-CAB
 8
     TRUMP UNIVERSITY, LLC, (AKA TRUMP
 9   ENTREPRENEUR INITIATIVE), a New
     York Limited Liability Company,
10   DONALD TRUMP, and DOES 1 through
     50, inclusive,
11
                     Defendants.
12   _____

13

14

15          VIDEOTAPED DEPOSITION OF KEITH SPERRY

16                San Diego, California

17                September 4, 2014

18

19

20

21

22
     Reported By:
23   Debby M. Gladish
     RPR, CLR, CCRR, CSR No. 9803
24   NCRA Realtime Systems Administrator

25   Job No.: 10012341
```

Exhibit 10
- 81 -

**Keith Sperry**                                    **Makaeff vs. Trump University**

1      A.    Yes.   That was my understanding.

2      Q.    Okay.  And you did receive feedback from time

3   to time; is that right?

4      A.    Yes.

5      Q.    Okay.  Prior to signing this contract, with

6   whom did you meet from Trump University?

7      A.    Prior to signing it, I don't know that I met

8   with anybody.  I think -- I -- I -- now, I could be

9   wrong, but I don't believe I actually met anyone at that

10  time.

11     Q.    Did you -- you spoke with David Highbloom?

12     A.    Spoke with David Highbloom.  I spoke with

13  Michael Sexton.  Everything was over the phone.

14     Q.    Did you speak with anyone other than

15  Mr. Highbloom and Mr. Sexton?

16     A.    Um, no.  I mean, maybe Mr. Hoppenfeld, Peter.

17  Just kind of . . .

18     Q.    Did you -- did you ever -- did -- prior to

19  signing the contract, did you meet with Donald Trump?

20     A.    No.

21     Q.    Did you ever meet with Donald Trump?

22     A.    No.

23     Q.    Did you ever have any contact with him

24  whatsoever?

25     A.    Other than an actual signature on a check I got

Exhibit 10
- 82 -

**Keith Sperry**                                    **Makaeff vs. Trump University**

1   one time in a settlement, that was the closest thing I

2   ever came to meeting Donald Trump, so I copied it.

3        **Q.   And so no -- no -- no contact?**

4        A.   No.

5        **Q.   I take it, then, Donald Trump never shared with**

6   **you his secret real estate techniques?**

7        A.   Just through the -- the manuals, you know,

8   the -- the material I was giving.  I mean, those

9   techniques that I was teaching.

10       **Q.   Well, but I'm saying Donald -- but Donald Trump**

11  **never shared with you any of his personal --**

12       A.   Not directly.

13       **Q.   Okay.  Did he ever share with you his personal**

14  **system for real estate transactions?**

15            MS. MARTIN:  Objection.  Vague.

16            THE WITNESS:  Not direct.

17  BY MR. FORGE:

18       **Q.   Did -- do you have any personal knowledge of**

19  **him indirectly sharing with you?**

20            MS. MARTIN:  Objection.  Vague.

21            THE WITNESS:  You know, just I -- just as, you

22  know, the material that -- that Trump organization was

23  giving me on this, that's all.

24  BY MR. FORGE:

25       **Q.   And so because it was from Trump University you**

Exhibit 10
- 83 -

**Keith Sperry**                                    **Makaeff vs. Trump University**

1   assumed it was from Donald Trump?

2      A.   I don't know that I -- I -- I don't know.

3   Honestly, I don't know that I put those -- that direct

4   connection.

5      Q.   And that's what I'm getting at.  Do you have

6   any basis whatsoever for saying that you were made aware

7   of Donald Trump's personal real estate investing

8   techniques?

9      A.   Not from the source, no.  I -- I never was

10  taught by Donald Trump how to invest in real estate.

11  Had he offered, I would have taken him up on that.

12     Q.   And do -- but do you have any basis whatsoever

13  to -- on -- on which to assume that you received Donald

14  Trump's actual real estate techniques?

15     A.   Yeah, I guess an assumption could be made that

16  this material that I'm supposed to be teaching, which

17  came from the Trump people, was possibly from Donald

18  Trump, sure.

19     Q.   And that's all it is.  Is just a possibility?

20     A.   Honestly, sure.  Yes.  That's -- that would be

21  my -- my, uh, feelings on that.

22     Q.   Did James Harris ever tell you he had met with

23  Donald Trump?

24     A.   I'm not sure.  I don't recall.  Maybe, but I'm

25  not sure.  I -- if I had to swear on the stack of

Exhibit 10
- 84 -

# EXHIBIT 11

Exhibit 11
- 85 -

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA


TARLA MAKAEFF, et al.,          )
                                )
            Plaintiffs,         )
                                )
      vs.                       )  Case Number
                                )  10-CV-0940GPC(WVG)
TRUMP UNIVERSITY, LLC, et       )
al.,                            )
                                )
            Defendants.         )




Videotaped Deposition of STEVEN MILLER

Chicago, Illinois

Thursday October 30, 2014




Reported By:

Rachel F. Gard

Job No.: 10012685

Exhibit 11
- 86 -

Page 55

1   quick break?  I'm not saying now, but before you

2   move on?

3       MS. ECK:  Sure.  Yep, let's take a quick break.

4   Thank you.

5       THE VIDEOGRAPHER:  Off the record.  The time is

6   10:16 a.m.

7                (A short break was had.)

8       THE VIDEOGRAPHER:  This begins Disc No. 2.

9   Back on the record at 10:39 a.m.

10  BY MS. ECK:

11      Q.  Mr. Miller, you understand you're still

12  under oath?

13      A.  Yes.

14      Q.  Donald Trump didn't interview you, did he?

15      A.  No.

16      Q.  You didn't meet Donald Trump before you

17  started working for Trump University, did you?

18      A.  No.

19      Q.  Did you meet Donald Trump after you

20  started working for Trump University?

21      A.  No.

22      Q.  Have you ever met Donald Trump?

23      A.  No.

24      Q.  Donald Trump never told you what his real

25  estate investing secrets or techniques were, did he?

Exhibit 11
- 87 -

Page 56

1      A.   No.

2      Q.   So then you didn't teach students Donald

3   Trump's real estate investing secrets, right?

4      MS. MARTIN:  Objection.  Vague.

5   BY THE WITNESS:

6      A.   This keeps coming up.  Can you define a

7   secret or technique?  What do you mean by that?

8      Q.   You didn't teach students any real estate

9   investing techniques that you knew were unique to

10  Donald Trump; is that right?

11     MS. MARTIN:  Objection.  Vague.

12  BY THE WITNESS:

13     A.   I don't know how to answer that.  I mean,

14  like I said, there's standardized things that we

15  use, and there are techniques we use.

16     Q.   Okay.

17     A.   So ...

18     Q.   So the techniques that you taught were

19  standard real estate techniques?

20     MS. MARTIN:  Objection.  Vague.

21  BY THE WITNESS:

22     A.   Some of my -- some of the instruction was

23  standard.  Some of it was more advanced.

24     Q.   Did you know any other presenters who had

25  met Donald Trump?

Exhibit 11
- 88 -

# EXHIBIT 12

Exhibit 12
- 89 -

Page 1

1

2   ----------------------------------------x

3   In re

4   TRUMP UNIVERSITY INVESTIGATION

5   ----------------------------------------x

6                                July 25, 2012

                               10:15  a.m.

7

8           Examination of MICHAEL SEXTON

9   under oath, pursuant to subpoena held at

10   the offices of The New York State Attorney

11   General, 120 Broadway, New York, New York,

12   before Debbie Zaromatidis, a Shorthand

13   Reporter and Notary Public of the State of

14   New York.

15

16

17

18

19

20

21

22

23

24

25

Exhibit 12
- 90 -

Page 157

1                       SEXTON
2        Q.     Okay.  His name is J.J.
3    Childress.
4        A.     J.J. Childress.  I think John is
5    his father's name.
6        Q.     Okay.
7        A.     I -- I can't speak with
8    certainty, but I don't believe anybody
9    else did.
10       Q.     And were any of these other
11   speakers at any of those events hand
12   picked by Donald Trump?
13       A.     None of our instructors at the
14   live events were hand picked by Donald
15   Trump.
16       Q.     Who prepared the curriculum for
17   the live events?
18       A.     It evolved over time.  Like I
19   said, we --
20            MR. SCHICK:   I am sorry.  Are
21   we talking about the preview class or the
22   three-day classes?
23            MR. GOLDBERG:  Both of them, the
24   preview class as well as the three-day
25   classes.

Exhibit 12
- 91 -

# EXHIBIT 13
[Filed Under Seal]

# EXHIBIT 14

Exhibit 14
- 109 -

**12/07/2009**
**Ms. Kimberly Crail**

The business's response does not resolve my complaint.

Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID 7986655, and have determined that this does not resolve my complaint.

To assist the BBB in bringing this matter to a close, please explain why this does not resolve your complaint:Trump University's letter is dated 11/23/09, yet I just received this on 12/7/09.

As a former Chief Financial Officer and Certified Public Accountant I am well-versed in business practices.  Trump University provides what appears to be good information when you are in the class, but then you go out in the real world and find out IT DOES NOT WORK.  In fact, I would go to jail in the state of NY using Trump's "Quick Turn" Techniques.  Trump University did not address any of my complaints in their response.  In fact, they make no mention of their very low success rate with mentorships.  Let's get the facts.  The product they are selling is defective and fraudulently described.

My note to Troy Petersen, which is quoted by Trump, followed a very emotional scene on the last day, in which (in tears) I am complaining bitterly about the lack of preparedness, and the lack of substance for the 3-day $25,000 experience.  Troy Petersen is a Christian minister, and my note to him was on a more personal note, and, frankly, as a woman, I felt bad that I had cried before his departure.  Moreover, the fact that Trump University offered me a "repeat" of the mentorship speaks volumes.

I would like to hear from Jason Schauer about my "satisfaction" with the program.  He was there.  At my expense.  Trump sent an employee out on my dime, and it ruined any semblance of a useful experience.

I will be filing a complaint with the NY State Attorney General, as it is clear that Trump "University" is as fraudulent and fake as Donald Trump's "hair".  I have spoken to numerous other dissatisfied Trump students, and so I am not alone in my views on Trump "University".

I require a full refund, as well as reimbursement for my costs to undo the damage done to my credit rating by Trump "University".  That cost me $3,150.

Please contact me by telephone to discuss further.

Sincerely,

Kimberly Crail

BBB NY 00069

Exhibit 14
- 110 -

**02/21/2010**
**Ms. Kimberly Crail**

The business's response does not resolve my complaint.

Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID 7986655, and have determined that this does not resolve my complaint.

To assist the BBB in bringing this matter to a close, please explain why this does not resolve your complaint:

Trump
sold me mentoring services - specifically "quick turn" real estate
techniques - for use in NY where the classes were taught.  That is what I
paid for.  I paid $38,000 for a package of services designed to allow
me to make money without my own money or credit (Trump was aware that I
had neither).  Their sales rep, Steven Goff, "corralled" me with his
story of living in his car and making this work at a "free seminar", which then fed the paid event where they get
you to sign up for the really big ELITE package!  So, I used my last
dime of credit and paid up.  Unfortunately, the products I had received
were workable and are of questionable legality in my state!  And so, the $25,000 mentorship I received from Trump
was focused on buying REO properties, which require money or credit.  (AGAIN - they were all aware that I had
neither money nor credit available).  Trump
COULD NOT provide mentorship on their Quick Turn techniques in NY state
after all!  At least not the ones that don't require money or credit!!!!  So, I was fraudulently led to believe that these techniques
and products would work for me in my home state, where these classes
were taught.  Trump's representative, my  Mentor, went
so far as to encourage me to commit fraud with another Trump student,
in order to allow me to make offers on these REO properties we saw on day 2 of the mentorship, which I
was NOT qualified to purchase.  He encouraged another Trump
student to provide me with a fraudulent proof of funds letter!  (We spent all of Day 1 of the Mentorship trying
to find a hard money lender to loan me money or get me an approval letter.  We were unsuccessful, thus Trump
encouraged the fraudulent proof of funds letter.)  In
fact, one Trump employee actually told me that Trump's Lease Options, the key
"Quick Turn" technique that Mr. Goff used and which sold me on the program, does not work in NY.  (Which explains why we
were unable to do one with our prior mentor, Mr. Steve Gilpin, who is a
NY resident, and who told my former business partner who he was also
mentoring at the time "you aren't going to be able to do this, are
you?"  That was not helpful.  At which point we switched mentors, which
is why there were more

BBB NY 00075

Exhibit 14
- 111 -

mentoring sessions on record for this account!  I later learned that
Mr. Gilpin's wife was dying of cancer during that time.  I was sorry for his loss.  Yet, he was
really not focused on our mentorship, also contributing to the larger
number of sessions on record.  Quantity does not mean quality.  Then
they rushed to get me to complete
the 3-day mentorship with Troy Peterson, probably so I wouldn't ask for
a refund then!!!)  That way they can say I've "used" all the of products and should be denied a refund.

The products I paid for were not the products I received.
Pure and simple.  Trump is fraudulently teaching classes to NY
residents and selling them services that they KNOW will not work and/or
will violate NY state law.

They aide and abet fraud when they can no longer cover the original
fraud of the products themselves.  Yes, they offered me a refund for
products and services I have never received.  Of course!  Why would I pay for something I don't have?  Yet they want
me to sign a release just for that?  And, what about the defective and
fraudulent mentorship they sold me at a price of $25,000 on top of the
$9,000 refund they are offering me!  And that doesn't include the
$5,000 cost of the bogus commercial "retreat" with Omar Periu, whose
only qualification I could see was his existing wealth and salesmanship
abilities.  Barely 2 hours of educational content at this 3-day
retreat.  And, no refreshments other than ice water and the hotel hard
candy.  $5,000?  Please!  This is outrageous!

My next step is to engage with the New York State Attorney General's
office, on the advice of my attorney.  They will have the resources to
do this matter the justice it deserves.  And, I am also going to ask
that they look into the relationship between Trump and the BBB, given
the recent and very favorable changes to the BBB records on the Trump
University scorecard/rating.  I hope that Mr. Cuomo will be able to get
to the bottom of this behavior.

I would be satisfied with a complete refund from Trump University and
am willing to sign a release of liability and agree to refrain from any
future legal action, including involving the attorney general's
office.  This matter needs to be resolved without further delay.  Please fell free to contact me by telephone at
516.426.9459.

I will be mailing my letter via Certified Mail to Mr. Cuomo's office on March 8, 2010 if this matter has not been
resolved by that date.

Sincerely,

Kimberly Crail

BBB NY 00077

Exhibit 14
- 113 -

# EXHIBIT 15

Exhibit 15
- 114 -

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____
ART COHEN, Individually and on Behalf   )
of All Others Similarly Situated,       )
                                        )
            Plaintiff,                  )
                                        ) Case No.:
      vs.                               ) 3:13-cv-02519-GPC-WVG
                                        )
DONALD J. TRUMP,                        )
                                        )
            Defendant.                  )
_____)

Videotaped Deposition of ART COHEN

Volume I (Page Nos. 1 through 157, Inclusive)

Thursday, May 29, 2014

Reported by Lindy DeBoer, RPR, CSR No. 5405

Exhibit 15
- 115 -

Deposition of Art Cohen                                    COHEN, et al. vs. TRUMP

| | | |
|---|---|---|
| 10:47:31 | 1 | whether it be Silver or Gold or whatnot. |
| 10:47:32 | 2 | Q    Did you feel that your expectations for that |
| 10:47:35 | 3 | three-day workshop had been met at the conclusion of that |
| 10:47:37 | 4 | workshop? |
| 10:47:39 | 5 | A    Yes. |
| 10:47:40 | 6 | Q    Did you have any complaints whatsoever about |
| 10:47:44 | 7 | that three-day Fast Track to Foreclosure workshop at the |
| 10:47:47 | 8 | end of that workshop? |
| 10:47:49 | 9 | A    No.  No. |
| 10:47:50 | 10 | Q    At some point later in time did you become |
| 10:47:53 | 11 | dissatisfied with the workshop?  Again, the three-day. |
| 10:47:59 | 12 | A    No. |
| 10:47:59 | 13 | Q    All right.  Why are you suing Donald Trump with |
| 10:48:05 | 14 | regard to that workshop in your lawsuit? |
| 10:48:09 | 15 | A    Well, I learned in 2011 that Donald Trump had |
| 10:48:17 | 16 | nothing to do with this workshop, that he -- that what |
| 10:48:23 | 17 | was being taught were not Donald Trump's techniques, |
| 10:48:28 | 18 | secrets, or whatnot.  It was all just a giant fraud.  He |
| 10:48:34 | 19 | wasn't involved in the program at all, yet they were |
| 10:48:37 | 20 | using his name to entice me to invest $35,000 |
| 10:48:41 | 21 | additionally in a program that he had nothing do with. |
| 10:48:45 | 22 | So that's why he's being sued. |
| 10:48:48 | 23 | Q    Okay.  So you're suing Donald Trump because he |
| 10:48:51 | 24 | had nothing to do with the program that you attended? |
| 10:48:55 | 25 | A    Because he perpetrated a fraud through -- |

KRAMM COURT REPORTING                                              Page: 37

Exhibit 15
- 116 -

Deposition of Art Cohen                                    COHEN, et al. vs. TRUMP

10:50:41  1   program as a whole.  There had been certain things that I

10:50:45  2   was disappointed about.

10:50:50  3       Q    What were those things you were disappointed

10:50:57  4   about?

10:50:57  5       A    Well, when I met with the mentor, he gave

10:50:59  6   advice, who was supposedly handpicked by Donald Trump

10:51:02  7   himself, that later turned out to be not legal to do.  So

10:51:11  8   that was unfortunate.

10:51:14  9       Q    Okay.  Anything else?  And then we're going to

10:51:18 10   come back to that in more detail.

10:51:20 11            But tell me anything -- prior to hearing about

10:51:22 12   the Makaeff lawsuit in 2011, any other disappointments or

10:51:29 13   dissatisfactions prior to that time with your experience

10:51:32 14   with Trump?

10:51:35 15       A    That was the main disappointment.  Because that

10:51:37 16   did not enable me to do certain transactions that I

10:51:41 17   thought were possible that I had learned through the

10:51:44 18   Trump University program.

10:51:48 19       Q    Let's go into that in more detail, then.  What

10:51:51 20   was it that you learned from the mentor?  And who was

10:51:55 21   that?

10:51:56 22       A    Kerry Lucas.

10:51:58 23       Q    Okay.  And what was it that you learned that you

10:52:02 24   later learned was illegal?

10:52:06 25       A    I -- Kerry Lucas introduced me to two real

KRAMM COURT REPORTING                                              Page: 39

Exhibit 15
- 117 -

10:52:10  1  estate brokers, handpicked by him, and he wanted me to

10:52:19  2  work with those real estate brokers in a manner that I

10:52:24  3  would receive some compensation for referring new clients

10:52:30  4  to them and assisting those clients in purchasing

10:52:34  5  properties.

10:52:38  6      Q    And who were the brokers; do you recall?

10:52:42  7      A    I don't recall their -- their names right at the

10:52:45  8  moment.

10:52:46  9      Q    Two Bay area brokers?

10:52:49 10      A    Two Bay area brokers, yes.

10:52:51 11      Q    And you believed you could refer clients to

10:52:55 12  those brokers and somehow share in the fees; is that your

10:52:59 13  testimony?

10:53:02 14      A    My testimony is that's what I was told by Kerry

10:53:05 15  and -- that these brokers would work with me to be able

10:53:11 16  to close deals for my potential clients.

10:53:15 17      Q    All right.  And then what did you learn about

10:53:16 18  that that you say is illegal?

10:53:20 19      A    Well, the brokers told me that they could not

10:53:25 20  strike a contract with me because I'm not a licensed real

10:53:28 21  estate broker.

10:53:30 22      Q    Anything else?

10:53:33 23      A    That was the main issue from the real estate

10:53:36 24  licensed brokers.

10:53:39 25      Q    Was that the only idea that was provided to you

Exhibit 15
- 118 -

| | | |
|---|---|---|
| 11:14:09 | 1 | engage in any transactions with those people? |
| 11:14:11 | 2 | A   I called them back, but we never -- it never |
| 11:14:15 | 3 | amounted to a deal closing. |
| 11:14:17 | 4 | Q   What were you trying to do in connection with |
| 11:14:20 | 5 | those -- those deals? |
| 11:14:24 | 6 | A   Structuring lease-to-own deals. |
| 11:14:29 | 7 | Q   Okay.  So people called you interested in |
| 11:14:32 | 8 | engaging in those types of transactions? |
| 11:14:35 | 9 | A   Correct. |
| 11:14:36 | 10 | Q   All right.  And can you tell me why you never |
| 11:14:40 | 11 | entered into any of those deals. |
| 11:14:46 | 12 | A   The only reason that I could think of, is that |
| 11:14:53 | 13 | the people that I was working with weren't interested in |
| 11:14:55 | 14 | the deal.  I mean it's not as if I didn't try to make |
| 11:15:00 | 15 | those deals happen.  But, you know, they -- they |
| 11:15:06 | 16 | weren't -- they weren't interested in it.  Furthermore, |
| 11:15:11 | 17 | it became somewhat of a mute issue because of the real |
| 11:15:15 | 18 | estate brokers that I was working with, Kerry Lucas |
| 11:15:20 | 19 | recommended, they wouldn't be able to compensate me |
| 11:15:23 | 20 | for -- for the way this was being structured.  So -- so |
| 11:15:27 | 21 | there were -- there were two parts to it. |
| 11:15:29 | 22 | Q   Okay.  So part of it, though, was that you could |
| 11:15:31 | 23 | not be compensated in the way that you wanted to be |
| 11:15:35 | 24 | compensated by the brokers you were working with? |
| 11:15:42 | 25 | A   The brokers couldn't do it because they said |

Exhibit 15
- 119 -

| | | |
|---|---|---|
| 11:15:43 | 1 | that it wasn't legally possible -- |
| 11:15:43 | 2 | Q    Right.  That's -- |
| 11:15:44 | 3 | A    -- because I'm not a real estate agent. |
| 11:15:45 | 4 | Q    Did you ever consider becoming a real estate |
| 11:15:46 | 5 | agent? |
| 11:15:47 | 6 | A    No. |
| 11:15:47 | 7 | Q    Never at anytime in your life? |
| 11:15:51 | 8 | A    No, I did not consider being a real estate |
| 11:15:53 | 9 | agent. |
| 11:15:54 | 10 | In fact, it's funny you mention that, because |
| 11:15:56 | 11 | James Harris talked about -- talked down on real estate |
| 11:16:01 | 12 | agents during his presentation. |
| 11:16:03 | 13 | Q    Okay. |
| 11:16:03 | 14 | A    And how being a real estate -- you don't want to |
| 11:16:05 | 15 | be -- you want to be a real estate investor.  So he |
| 11:16:08 | 16 | promoted that.  So -- there was a negative bent towards |
| 11:16:13 | 17 | real estate agents.  You don't want to be a real estate |
| 11:16:16 | 18 | agent, is what he basically said, you want to be an |
| 11:16:19 | 19 | investor. |
| 11:16:21 | 20 | Q    Did you ever invest after attending -- let me |
| 11:16:24 | 21 | ask it a different way. |
| 11:16:25 | 22 | After attending the three-day workshop that |
| 11:16:28 | 23 | James Harris gave, did you ever invest in any of the |
| 11:16:35 | 24 | deals that came through any of the communications you |
| 11:16:39 | 25 | received on the toll-free number? |

Exhibit 15
- 120 -

| | | |
|---|---|---|
| 11:33:26 | 1 | notes.  My meeting with Mr. Kerry Lucas was -- he did |
| 11:33:34 | 2 | provide certain information.  Yes. |
| 11:33:36 | 3 | BY MS. STAGG: |
| 11:33:38 | 4 | Q    As you sit here today, even assuming all your |
| 11:33:41 | 5 | allegations are true, how much would you have paid to |
| 11:33:46 | 6 | attend -- to attend the Trump events that you attended? |
| 11:33:51 | 7 | MS. ECK:  Objection.  Calls for a legal conclusion. |
| 11:33:54 | 8 | THE WITNESS:  I'm not sure I understand your |
| 11:33:55 | 9 | question. |
| 11:33:55 | 10 | BY MS. STAGG: |
| 11:33:55 | 11 | Q    Sure.  You testified earlier that at the end of |
| 11:33:59 | 12 | the three-day workshop, you had no complaints, correct? |
| 11:34:03 | 13 | A    Correct. |
| 11:34:03 | 14 | Q    Did you believe that you got $1,495 worth of |
| 11:34:07 | 15 | value out of that program? |
| 11:34:11 | 16 | MR. FORGE:  I am just going to object as to |
| 11:34:12 | 17 | vagueness.  You said earlier assume all the allegations |
| 11:34:17 | 18 | in the Complaint are true.  Are you still saying -- |
| 11:34:20 | 19 | you're confusing.  You're switching -- |
| 11:34:22 | 20 | MS. STAGG:  Sure.  Let me -- |
| 11:34:22 | 21 | MR. FORGE:  -- times and switching assumptions. |
| 11:34:25 | 22 | MS. STAGG:  Sure.  Okay. |
| 11:34:30 | 23 | Q    You paid $1,495 for the Fast Track to |
| 11:34:33 | 24 | Foreclosure workshop, correct? |
| 11:34:36 | 25 | A    That's correct. |

Exhibit 15
- 121 -

| | | |
|---|---|---|
| 11:34:37 | 1 | Q    All right.  Do you -- as you sit here today, do |
| 11:34:40 | 2 | you believe you got any value out of that workshop? |
| 11:34:44 | 3 | A    At the time I thought I got value.  Today I |
| 11:34:50 | 4 | thought -- today I feel I was -- I was misled, I was |
| 11:34:54 | 5 | cheated, because the information that was provided was |
| 11:34:56 | 6 | not directly from Donald Trump, you know.  He had nothing |
| 11:35:01 | 7 | to do with the program, yet he used -- yet he said that |
| 11:35:05 | 8 | he did. |
| 11:35:05 | 9 | Q    Okay.  So some -- I'm sorry.  Sometime between |
| 11:35:08 | 10 | the conclusion of the three-day workshop -- the end of |
| 11:35:12 | 11 | the three-day workshop, you agree you believed it was |
| 11:35:16 | 12 | worth the money that you paid for it, correct? |
| 11:35:22 | 13 | A    I -- it was an investment that I thought I was |
| 11:35:28 | 14 | going to get a good return on that investment someday. |
| 11:35:30 | 15 | So I thought at the time that it was a good investment. |
| 11:35:32 | 16 | Otherwise, why would I have made it?  You know, I was |
| 11:35:35 | 17 | scammed.  So, okay, I made -- I made a -- you know, |
| 11:35:37 | 18 | that's what happened at the time. |
| 11:35:39 | 19 | Q    All right.  But after the conclusion of the |
| 11:35:43 | 20 | program, you didn't believe that the information you gave |
| 11:35:46 | 21 | didn't have any value, correct? |
| 11:35:48 | 22 | MS. ECK:  Objection.  Vague. |
| 11:35:51 | 23 | THE WITNESS:  Repeat the question again. |
| 11:35:52 | 24 | BY MS. STAGG: |
| 11:35:52 | 25 | Q    Sure.  It wasn't until 2011 when you read about |

Exhibit 15
- 122 -

Deposition of Art Cohen                                    COHEN, et al. vs. TRUMP

11:37:11   1        A    My wife.

11:37:12   2        Q    Anybody else?

11:37:15   3        A    No.  I didn't raise any concerns to other people

11:37:18   4    about it.

11:37:19   5        Q    Did you call up anybody at Trump University and

11:37:21   6    say, "Hey, Kerry Lucas gave me some information that I

11:37:24   7    can't use"?

11:37:25   8        A    No, I did not.

11:37:25   9        Q    Okay.  Did you ask for a refund for any or all

11:37:28  10    of your purchase price for the Gold Elite program?

11:37:32  11        A    I didn't.  And the reason I did not was because

11:37:36  12    the contract was -- by that time, I looked at the

11:37:40  13    contract and it said you have three days to get a refund,

11:37:44  14    and I'm busy in other businesses and trying to earn a

11:37:50  15    living, I'm, you know -- so it was clear by the contract

11:37:54  16    that I had no recourse.

11:37:57  17        Q    So --

11:37:58  18        A    It was not until 2011 I realized, Oh, my God,

11:38:01  19    Trump wasn't even involved in this program, this was just

11:38:04  20    a -- you know, this was just a, you know, make-pretend

11:38:10  21    program.  So, you know, I was just, you know, suckered

11:38:12  22    into putting money into something.  If Trump's name

11:38:15  23    wasn't on it, I and most of the students, if not all the

11:38:19  24    students, would not have invested in the program.

11:38:26  25        Q    Have you ever talked to any of the other

KRAMM COURT REPORTING                                              Page: 75

Exhibit 15
- 123 -

Deposition of Art Cohen                                           COHEN, et al. vs. TRUMP

12:18:54   1   and you have an MBA.

12:18:57   2            When you heard of Trump University, what was

12:19:01   3   your understanding as to what that meant to you?

12:19:07   4       A    It meant that this was an organization -- Trump

12:19:13   5   University was a university that was sanctioned by Trump

12:19:17   6   and that it was a certified university.

12:19:22   7       Q    What do you mean by "certified university"?

12:19:26   8       A    A university that you go to like San Jose State

12:19:30   9   or Drexel University, both of which I attended.  This was

12:19:34  10   something that was -- an organization that could issue at

12:19:39  11   the end of it a certificate or some document that had

12:19:45  12   value.

12:19:47  13       Q    You said you got a certificate, correct?

12:19:49  14       A    Yeah.  But it has no value.

12:19:51  15       Q    Who told you that?

12:19:53  16       A    That's what I think.  It has no value now.

12:19:55  17       Q    Did you think it had value at some other point

12:19:57  18   in time?

12:19:58  19       A    When I received the certificate, I thought it

12:20:00  20   did, yes, because I thought that this was a Trump

12:20:06  21   University program.

12:20:14  22       Q    Anything else that the word "university" means

12:20:16  23   to you?

12:20:22  24       A    A school.

12:20:23  25       Q    Okay.  And what about the university was not a

Exhibit 15
- 124 -

12:37:02  1    "Note - I already had very high expectations!  He did a

12:37:06  2    great job," is that your handwriting?

12:37:10  3        A    Yes.

12:37:10  4        Q    All right.  And you're referring to James Harris

12:37:13  5    as the speaker?

12:37:14  6        A    Yes, I am.

12:37:14  7        Q    Because you have a little -- you gave him a 4

12:37:16  8    rating out of 5 --

12:37:18  9        A    That's correct.

12:37:18 10        Q    -- with an asterisk.

12:37:20 11        A    Yes.

12:37:21 12        Q    Okay.  And you said -- the question -- or the

12:37:24 13    survey criteria was, "James Harris exceeded my

12:37:28 14    expectations as a subject matter expert who presented the

12:37:32 15    material clearly," correct?

12:37:35 16        A    Correct.

12:37:35 17        Q    And you gave him a 4 out of 5?

12:37:37 18        A    Correct.

12:37:37 19        Q    With an asterisk and the note?

12:37:40 20        A    Correct.

12:37:42 21        Q    Okay.  When you say, "I already had very high

12:37:44 22    expectations," what did you mean?

12:37:49 23        A    Well, what I meant was, understanding that this

12:37:52 24    was a handpicked Trump University program, I expected

12:37:59 25    that James Harris was going to be an expert.

Exhibit 15
- 125 -

12:38:04   1      Q     Okay.   And so now you don't think he was an

12:38:07   2   expert?

12:38:11   3      A     I don't value now today.   At the time I did.

12:38:16   4   But now, today, I realize that I was scammed.

12:38:20   5      Q     In what way were you scammed?

12:38:25   6      A     We were -- we were -- I was scammed, as well as

12:38:28   7   every student that ever attended a class there, because

12:38:31   8   we were told that the instructors were handpicked by

12:38:35   9   Donald Trump and that Donald Trump was passing through

12:38:40  10   his instructors, his professors, expertise and experience

12:38:47  11   that was related to Donald Trump, and none of it was.

12:38:51  12      Q     And you base the "none of it was" on what?

12:38:57  13      A     Based on the -- learning of the Complaint in

12:39:01  14   2011 and the declarations that Donald Trump himself said

12:39:06  15   that, Hey, I had nothing to do with this program.

12:39:09  16      Q     Anything else?

12:39:11  17      A     No.

12:39:14  18      Q     Is that your signature on the second page?

12:39:19  19      A     Yep.   That is my sloppy signature.   Yes.

12:39:22  20      Q     And the other handwritten comments on the second

12:39:24  21   page are also your handwriting?

12:39:31  22      A     Yes.

12:39:32  23      Q     I noticed on No. 2, it said, "What topics would

12:39:38  24   you like to see covered in future Trump University

12:39:40  25   seminars?" and you wrote, "Provide PowerPoint

Exhibit 15
- 126 -

| | | |
|---|---|---|
| 12:45:33 | 1 | Q    And that was the amount that was charged? |
| 12:45:35 | 2 | A    Correct. |
| 12:45:35 | 3 | Q    Okay.  So you're not claiming a |
| 12:45:37 | 4 | misrepresentation over the amount that you were charged, |
| 12:45:39 | 5 | correct? |
| 12:45:41 | 6 | A    Correct. |
| 12:45:42 | 7 | Q    You're disputing what you got for that amount? |
| 12:45:48 | 8 | You're disputing the education that you got, and you have |
| 12:45:53 | 9 | made claims that we have talked about today in the |
| 12:45:55 | 10 | deposition regarding your claims of misrepresentation, |
| 12:45:57 | 11 | correct? |
| 12:45:58 | 12 | A    You are going to have to rephrase the question. |
| 12:46:01 | 13 | It seems you're not -- it's -- please rephrase the |
| 12:46:05 | 14 | question. |
| 12:46:05 | 15 | Q    Sure.  You're not contending that you were |
| 12:46:09 | 16 | charged a different amount than what was represented to |
| 12:46:11 | 17 | you at the time, correct? |
| 12:46:13 | 18 | A    That is correct. |
| 12:46:13 | 19 | Q    Okay.  In your mind, do you have an |
| 12:46:17 | 20 | understanding as to what you think you should have been |
| 12:46:19 | 21 | charged for what you got? |
| 12:46:24 | 22 | A    I'm not sure what you mean -- |
| 12:46:26 | 23 | Q    Sure. |
| 12:46:26 | 24 | A    -- by that question. |
| 12:46:26 | 25 | Q    Do you think you got any value out of the |

Exhibit 15
- 127 -

| | | |
|---|---|---|
| 12:46:29 | 1 | programs you attended from Trump University? |
| 12:46:33 | 2 | A    Now is your question? |
| 12:46:34 | 3 | Q    Sure. |
| 12:46:35 | 4 | A    Then, yes.  Now, no. |
| 12:46:38 | 5 | Q    Okay. |
| 12:46:40 | 6 | A    At the time I thought there was -- there was |
| 12:46:42 | 7 | some value at the time.  Now I realize there is no value. |
| 12:46:47 | 8 | Q    And that's based on what you learned in 2011? |
| 12:46:52 | 9 | A    That is correct. |
| 12:46:57 | 10 | MS. STAGG:  All right.  Hang on.  Just a second. |
| 12:47:08 | 11 | We are going to conclude the deposition for |
| 12:47:08 | 12 | today. |
| 12:47:09 | 13 | THE WITNESS:  Okay. |
| 12:47:09 | 14 | MS. STAGG:  There may be a time in which you come |
| 12:47:10 | 15 | back and we'll do some more.  But I appreciate your time. |
| 12:47:11 | 16 | I'll propose a stipulation for the handling of |
| 12:47:13 | 17 | the transcript.  I'll ask that the court reporter -- |
| 12:47:16 | 18 | MR. FORGE:  Nancy, before you go on, we have just |
| 12:47:18 | 19 | some follow-up questions that we'll ask now.  So we can |
| 12:47:22 | 20 | do the stipulations at the end. |
| 12:47:23 | 21 | MS. STAGG:  Well, I thought we agreed on a two-hour |
| 12:47:26 | 22 | limit.  There was an order for two hours that I had to |
| 12:47:28 | 23 | question him. |
| 12:47:30 | 24 | MR. FORGE:  You had two hours.  There was no -- |
| 12:47:31 | 25 | MS. STAGG:  So you -- |

Exhibit 15
- 128 -

Deposition of Art Cohen                                    COHEN, et al. vs. TRUMP

02:22:39   1   you, or the same type of damages for all members of the

02:22:43   2   class?

02:22:44   3       A    The same type of damages for all members of the

02:22:46   4   class.

02:22:48   5       Q    I believe near the end of Counsel's questioning

02:22:51   6   you said that as you sit here today, knowing what you now

02:22:59   7   know about Mr. Trump's lack of any substantive

02:23:00   8   involvement with Trump University, you don't feel that

02:23:04   9   either of these programs that you paid for have any value

02:23:07  10   whatsoever; is that true?

02:23:08  11       A    That is true.

02:23:12  12       Q    In discussing the program taught by David

02:23:14  13   Harris -- I'm sorry, James Harris, you mentioned that he

02:23:17  14   did a good job of explaining techniques.

02:23:20  15            At the time when he was explaining techniques,

02:23:22  16   whose techniques did you think he was explaining?

02:23:25  17       A    Donald Trump's.

02:23:27  18       Q    Now that you know that Donald Trump did not have

02:23:29  19   substantive involvement with the curriculum at Trump

02:23:33  20   University, do you think those techniques have any value

02:23:36  21   to you?

02:23:37  22       A    No.

02:23:41  23       Q    One of the things you mentioned in responding to

02:23:44  24   Ms. Stagg's questions was that it wouldn't be reasonable

02:23:47  25   to expect Donald Trump himself to be teaching the

Exhibit 15
- 129 -

02:28:21  1 | time is 2:28 p.m.

02:28:24  2 | BY MR. FORGE:

02:28:24  3 |     Q    Mr. Cohen, earlier when Ms. Stagg was

02:28:26  4 | questioning you, she asked you a number of questions

02:28:28  5 | about your satisfaction or happiness with various

02:28:32  6 | programs through Trump University.

02:28:34  7 |          Would you have been satisfied after that free

02:28:38  8 | seminar if you had known the truth about the use of the

02:28:41  9 | name "University"?

02:28:43 10 |     MS. STAGG:  Objection.  Lacks foundation; vague and

02:28:44 11 | ambiguous.

02:28:45 12 |     THE WITNESS:  No, I wouldn't have been satisfied.

02:28:46 13 | BY MR. FORGE:

02:28:46 14 |     Q    Would you have been satisfied after that free

02:28:49 15 | seminar if you had known that the instructors for the

02:28:53 16 | free seminar really weren't handpicked by Donald Trump?

02:28:57 17 |     MS. STAGG:  Lacks foundation.

02:28:58 18 |     THE WITNESS:  No, I wouldn't have been satisfied.

02:29:00 19 | BY MR. FORGE:

02:29:00 20 |     Q    Would you have been satisfied if you had known

02:29:06 21 | that the instructors from Trump University weren't

02:29:06 22 | teaching Donald Trump's unique techniques?

02:29:09 23 |     A    No.  I never would have invested.

02:29:12 24 |     Q    Is that true -- for the $1500 seminar, would you

02:29:16 25 | have been satisfied with that $1500 seminar if you had

Exhibit 15
- 130 -

02:29:19   1    known the truth about the use of the term "university"?

02:29:24   2        A    No.

02:29:25   3        MS. STAGG:   Objection.   Lacks foundation; vague and

02:29:26   4    ambiguous.

02:29:26   5    BY MR. FORGE:

02:29:26   6        Q    Would you have been satisfied if you had known

02:29:28   7    the truth about Donald Trump's lack of involvement with

02:29:31   8    selecting Mr. Harris and the other instructors?

02:29:34   9        MS. STAGG:   Same objection.

02:29:35  10        THE WITNESS:   No, I would not have been satisfied

02:29:36  11    if -- yeah.

02:29:37  12    BY MR. FORGE:

02:29:38  13        Q    Would you have been satisfied if you had known

02:29:39  14    the truth about Mr. Trump's lack of involvement in

02:29:43  15    shaping the curriculum for Trump University?

02:29:45  16        MS. STAGG:   Same objections.

02:29:47  17        THE WITNESS:   I wouldn't have participated in the

02:29:48  18    program at all if I had known that Trump was not involved

02:29:51  19    in it.   His name was all over it.

02:29:53  20    BY MR. FORGE:

02:29:54  21        Q    But had you gone through that program without

02:29:56  22    knowing it and then found out immediately after the

02:29:58  23    program, would you have been satisfied?

02:30:00  24        A    No.

02:30:00  25        Q    Would you have given the same ratings after that

Exhibit 15
- 131 -

| | | |
|---|---|---|
| 02:30:03 | 1 | $1500 program if, prior to filling out that evaluation, |
| 02:30:09 | 2 | you had been told all those things? |
| 02:30:12 | 3 | A    No. |
| 02:30:15 | 4 | Q    Do you understand as class representative, |
| 02:30:17 | 5 | you're not supposed -- you're not just a passive |
| 02:30:21 | 6 | participant in this lawsuit? |
| 02:30:22 | 7 | A    I understand that. |
| 02:30:23 | 8 | Q    Have you actively participated in the lawsuit? |
| 02:30:25 | 9 | A    Yes. |
| 02:30:26 | 10 | Q    Did you review multiple drafts of the Complaint |
| 02:30:30 | 11 | before it was filed? |
| 02:30:31 | 12 | A    I did. |
| 02:30:32 | 13 | Q    Did you make suggestions? |
| 02:30:33 | 14 | A    I did. |
| 02:30:33 | 15 | Q    Were any of your suggestions rejected? |
| 02:30:36 | 16 | A    No. |
| 02:30:39 | 17 | Q    Did you -- after making those suggestions and |
| 02:30:41 | 18 | consulting with counsel, did you make the decision as to |
| 02:30:45 | 19 | whether or not to proceed with filing the Complaint? |
| 02:30:47 | 20 | A    Yes. |
| 02:30:48 | 21 | Q    Was that your decision alone? |
| 02:30:50 | 22 | A    Yes. |
| 02:30:53 | 23 | Q    As class representative, have you also gathered |
| 02:30:56 | 24 | documents? |
| 02:30:57 | 25 | A    Yes. |

Exhibit 15
- 132 -

# EXHIBIT 16

Exhibit 16
- 133 -

```
 1                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF CALIFORNIA
 2                CASE NO.:  10-cv-00940 GPC (WVG)
                            CLASS ACTION
 3    TARLA MAKAEFF, SONNY LOW, J.R.
      EVERETT, and JOHN BROWN, on behalf of
 4    themselves and all others similarly
      situated, ED OBERKROM, and BRANDON
 5    KELLER, individually,

 6
           Plaintiffs,
 7
      -vs-
 8
      TRUMP UNIVERSITY, LLC (a/k/a Trump
 9    Entrepreneur Initiative), a New York
      Limited Liability Company,
10    DONALD J. TRUMP, and
      DOES 1 through 50, inclusive,
11
           Defendants.
12    _____/

13

14
                VIDEOTAPED DEPOSITION OF METTE NIELSEN
15

16

17                Friday, December 19, 2014
                   9:07 a.m. - 1:25 p.m.
18
                     One Biscayne Tower
19               2 South Biscayne Boulevard
                         Suite 1900
20                 Miami, Florida 33131

21

22

23
                Stenographically Reported By:
24                Barbie Gallo, RMR-CRR
                      www.kramm.com
25                    800-939-0080
```

Exhibit 16
- 134 -

1      a class at any time.

2           MS. MUELLER:  Well, legally you were

3      considered a part of the class when the class

4      was certified.  You have the legal right to opt

5      out of the class, which you have done.  But

6      prior to the time that you made the formal

7      opting out of the class --

8           THE WITNESS:  Maybe I need to be explained

9      then.  Because people that form a class may --

10     must be the people that are the class.  How can

11     people that are not --

12  BY MS. MARTIN:

13     Q.    Let me break it down a little bit further.

14  At any time have you wanted to be part of a class of

15  students who is suing Trump University?

16     A.    No.

17     Q.    And at any time have you wanted to be

18  represented by counsel who was representing the

19  students who are suing Trump University?

20     A.    No.

21          MS. MARTIN:  Okay.  So let me go back to my

22     original question, because now she's established

23     that she has not at any time sought

24     representation or authorized representation by

25     counsel for the plaintiffs or the class.

Exhibit 16
- 135 -