```
 1                    UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   TARLA MAKAEFF, et al., on      .
     Behalf of Themselves and All   .
 4   Others Similarly Situated,     .
                                    . Docket
 5             Plaintiffs,          . No. 10-cv-00940-GPC-WVG
                     v.             . No. 13-cv-02519-GPC-WVG
 6                                  .
     TRUMP UNIVERSITY, LLC, et al., .
 7             Defendants.          . San Diego, California
     . . . . . . . . . . . . . . .  .
 8   ART COHEN, Individually and on .
     Behalf of All Others Similarly .
 9   Situated,                      .
                                    . May 22, 2015
10             Plaintiff,           . 1:00 p.m.
                     v.             .
11   DONALD J. TRUMP,               .
                Defendant.          .
12   . . . . . . . . . . . . . . .  .

13                   TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE GONZALO P. CURIEL
14                   UNITED STATES DISTRICT JUDGE

15                   A-P-P-E-A-R-A-N-C-E-S
     For the Plaintiffs:    Robbins Geller Rudman & Dowd LLP
16                          655 West Broadway, Suite 1900
                            San Diego, California 92101
17                          By:  JASON A. FORGE, ESQ.
                            - AND -
18                          ZELDES HAEGGQUIST & ECK, LLP
                            625 Broadway, Suite 1000
19                          San Diego, California 92101
                            By:  AMBER LEE ECK, ESQ.
20
     For the Defendants:    Foley & Lardner, LLP
21                          3579 Valley Centre Drive, Suite 300
                            San Diego, California 92130
22                          By:  NANCY L. STAGG, ESQ.
                                 BENJAMIN J. MORRIS, ESQ.
23
     Court Reporter:        Chari L. Possell, RPR, CRR
24                          333 West Broadway, Suite 420
                            San Diego, California 92101
25                          chari_possell@casd.uscourts.gov
     Reported by Stenotype, Transcribed by Computer
```

```
 1            SAN DIEGO, CALIFORNIA; MAY 22, 2015; 1:00 P.M.

 2                            -o0o-

 3            THE CLERK:  Number 8 and Number 9 on calendar.

 4    Number 8 is case 10-cv-0940, Makaeff versus Trump University,

 5    and Number 9 is 13-cv-2519, Cohen versus Trump, both for a

 6    motion hearing.

 7            THE COURT:  Good afternoon.  Appearances, please.

 8            MR. FORGE:  Good afternoon, Your Honor.  Jason Forge

 9    on behalf of the plaintiffs in both cases.

10            MS. JENSEN:  Good afternoon, Your Honor.  Rachel

11    Jensen on behalf of the plaintiffs.

12            MS. ECK:  Amber Eck on behalf of the plaintiffs.

13            MS. STAGG:  Good afternoon, Your Honor.  Nancy Stagg

14    on behalf of the defendants.

15            MR. MORRIS:  Good afternoon, Your Honor.  Benjamin

16    Morris on behalf of the defendants.

17            THE COURT:  Good afternoon to you all.  We are here

18    on a number of motions in both the Makaeff and Cohen case.  One

19    is with respect to the motion for decertification in the

20    Makaeff case, and second, with respect to the motion for

21    approval of class notice in both Makaeff and Cohen.  And then

22    we also have pending motions for summary judgment that were

23    filed in Makaeff that we have stayed pending further

24    determinations by the Court.  We also have the recently filed

25    ex parte application to shorten time for briefing and a hearing
```

1  related to the objections to magistrate judge's ruling on

2  discovery.  We will take that up here as well.

3      With respect to the motion for decertification, there are

4  a number of threshold questions as to the burden of proof.  And

5  the Court's reviewed the *Marlo* case, has also reviewed the

6  recent *Apple* case decided by Judge Gonzalez, up in the Bay

7  Area.  And I understand why Judge Gonzalez would not have

8  necessarily followed *Marlo* under the view that perhaps *Marlo*

9  wasn't as clear as could be on this issue of the burden of

10  proof in a decertification motion.

11      Suffice it to say that, at this point, the Court is of the

12  view that it does maintain the inherent authority, discretion,

13  power, to revisit issues regarding certification, and I am

14  prepared to do that here.  This is an unusual case as far as

15  the full refund theory and whether or not it applies to our

16  case.  We appear to have a couple of different bins that have

17  been created with respect to this full refund theory.  We have

18  cases involving foods, juices, snacks, sandwiches, where the

19  courts have uniformly found, no, full refunds are not

20  appropriate when it comes to these foodstuffs.

21      Then we have another category, involving snake oil, where

22  there's remedies for whatever ails you and in fact they don't

23  fix anything, and so they are basically worthless.  And then a

24  companion to that is illegal substances, illegal or counterfeit

25  products.

1        Here, I appreciate that the plaintiff is asserting there's

2   an illegal component to the Trump University, to the extent it

3   was operated without the blessings of the New York Board of

4   Education or superintendent -- I am not sure who would have

5   provided the authorization.  So there's an illegality present

6   with respect to Trump University.

7        And I understand that as far as the defendant, defendants

8   are agreeing that California and Florida don't have a law that

9   would have made it illegal for Trump University to fashion

10  itself -- to pass itself off as a university in Florida or

11  California.  At most, you might have this illegality issue in

12  New York.

13       What we have here is in many respects something that is

14  one of a kind.  We have essentially a school and a school

15  that's making certain promises that aren't delivered upon.

16  There's been reference to FTC cases, which at this point I

17  don't see that California courts have adopted or embraced their

18  logic in terms of the full refund theory.

19       But I do believe this is -- if not fascinating, it's a

20  unique issue, and it requires a lot of attention to the details

21  of how the courts have found that a full refund is not

22  appropriate or a full refund is appropriate.  That's my

23  starting point as I am coming into this hearing, that I

24  appreciate that there's a number of procedural issues that have

25  been raised as to *Marlo* and who has the burden, but I don't

1    think I even really have to find one way or another before I

2    recognize that we do have an issue that requires full

3    consideration of all of the cases addressing this.

4         And so with that, I will hear from the parties.  And

5    during the course of your presentations, I will ask questions

6    that will hopefully assist the Court in arriving at its

7    decision that's before the Court.

8         So let me turn to Mr. Forge first.  If you would like to

9    address what I have already spoken about.

10             MR. FORGE:  Sure, Your Honor.  It's hard to come up

11   with new arguments.  As Your Honor knows, this is the third

12   time we have essentially argued this issue.

13        The one thing Your Honor did not touch upon in your

14   preliminary remarks is the fact that we are talking, here --

15   the fact that we are just talking about damages means we are

16   really talking about a fairly limited inquiry vis-a-vis the

17   class certification of this case because, as Your Honor has

18   pointed out in two different orders, under the *Leyva* case,

19   under the *Jimenez* case, the Ninth Circuit has made it crystal

20   clear that damages issues do not preclude class certification.

21             THE COURT:  And looking closer at *Leyva* and *Jimenez*,

22   it seems to me those cases didn't present the precise issue we

23   have here.  Those cases were wage-and-hour cases where the

24   damage model was pretty simple to address and recognize and

25   ultimately address.  And that's what makes our case different,

1   this damage model.

2        And at the end of the day, I don't see *Comcast* as

3   dictating a particular result one way or the other.  *Comcast*

4   just speaks in terms of your model has to reflect or mirror the

5   theory of liability.  I understand that the plaintiff has

6   offered a damage model, and the question just becomes whether

7   or not that's a legitimate or valid model given the concerns

8   about windfalls, given what the various cases have identified

9   as considerations.

10            MR. FORGE:  I agree 100 percent, Your Honor, with the

11   fact that *Comcast* doesn't come into the equation here.  I don't

12   think there is any dispute we have a singular theory of

13   liability here.  And all the damages -- however you calculate

14   them, all of the damages flow from that one theory of

15   liability.  So we are not in a *Comcast* situation.

16        And we are also not in a situation here where there's an

17   inherent need.  It seems to be what the defense is talking

18   about is -- the only subsequent development they are talking

19   about is the fact that discovery is closed without expert

20   notice.

21            THE COURT:  And I think they also point to

22   depositions that have been taken where class members have

23   asserted that, in fact, they received some benefits.

24            MR. FORGE:  The problem is the vast majority of those

25   depositions and the declarations all occurred prior to class

 1    certification.  And we pointed that out in our Appendix A.  So

 2    I understand they make that assertion in their reply, but I

 3    don't think it necessarily withstands comparison to the record

 4    in the case.

 5        So if we are talking about just the situation of there are

 6    grievances that we don't have an expert who is going to get up

 7    on the stand and say, "This program is worthless," I don't

 8    think that carries the day for them for two reasons.  First of

 9    all, that's not a new development.  That is something that the

10    parties agreed to back on March 14 of 2014, that experts

11    weren't necessary.

12            THE COURT:  Just so you know, I don't buy into the

13    notion that you have to have an expert that would testify,

14    "Yes, I am an expert in this field, and I have conducted

15    analysis and reviewed this, and I find that this has no value."

16            MR. FORGE:  Okay.

17            THE COURT:  I think that's kind of artificial.

18    Ultimately, the question becomes is this full refund theory

19    valid, given the product that we have.

20            MR. FORGE:  Let me try to bridge the gap between the

21    multiple bins that Your Honor was talking about.

22        I think what it boils down to in these cases is if the

23    essence of the product is what is the subject of the fraud,

24    then the full refund model is viable.  So, taking it outside of

25    the snake oil category and the *Garner v. Healy* case, where you

1    are talking about a car wax product that wasn't wax at all,

2    well, the full refund model was appropriate.

3         Here, I am quite confident that if a case like the *Pom*

4    *Wonderful* case, which dealt with 100 percent pomegranate juice,

5    and the alleged fraud was the supposed heart benefits from the

6    100 percent pomegranate juice -- I am very confident that case

7    would have been decided differently if, instead of 100 percent

8    pomegranate juice, it would have been Kool-Aid.  Then we would

9    have been talking about a different thing.

10        You can take all the defense arguments here and apply them

11   to any of the cases that come up with an approved worthless

12   model.  The *Ortega v. Natural Balance* case, where you are

13   talking about the Cobra sexual energy supplement; I can only

14   imagine the individualized discovery that Mr. Trump would say

15   would be necessary to find out about the benefits individuals

16   may have received from the product.

17        But we know from that case, we know from the *Allen v.*

18   *Hyland's* case, that they can't take advantage of a placebo

19   effect.  And when we come back around to what they offer here

20   and what they delivered, the only thing -- even when we talk

21   about these individual purported, or at least on paper, class

22   members -- they may opt out or may not -- who say they thought

23   it was great, when you actually got down to deposing these

24   folks, to a person, every one of them, it boiled down to just a

25   placebo effect.  Trump University gave them the confidence.

1    Their realtors found the properties, or they found the

2    properties.  They did the work.  Their mortgage broker found

3    them the lending.  Trump University did not find them the

4    lending.

5         So when we get back to the essence of what is being

6    marketed here, the exclusive focus of the marketing here was

7    Donald Trump, was Donald Trump's integral involvement, his

8    hand-picked instructors, his secrets at his university.  That's

9    the essence.  That's the 100 percent pomegranate juice here,

10   and it was Kool-Aid.  It was Kool-Aid because it wasn't Donald

11   Trump.

12        This aspect of the case only gets stronger every time we

13   sit down and depose somebody.  We deposed Michael Sexton, the

14   former president, last week.  In addition to admitting at least

15   five separate sworn statements that were false, he confirmed,

16   Donald Trump never reviewed any of the presentation materials,

17   didn't go over them with him, he didn't write them.  So the

18   essence of what they promised was not delivered.  That is

19   overwhelmingly clear.

20        They will probably try to argue some way of muddying those

21   waters, but that allegation remains, and the allegation is the

22   sense of what they were offering, the exclusive focus of the

23   marketing campaign, that was false.  And that's why I think you

24   bridge the divide between those bins of cases.

25             THE COURT:  Is there a case that uses that precise

1    verbiage, where you are denied the essence of a product, you

2    are entitled to a full refund?

3            MR. FORGE:  I haven't seen a case that talked about

4    the essence of it, but cases do talk about it was marketed

5    based on this, and let me give you an example.  *Ortega* and the

6    *Steroid Hormone* -- in the *Ortega* case, Your Honor -- and that's

7    the *Ortega v. Natural Balance*.  What it says here is that --

8    this is at page 429, 300 F.R.D.

9        "Plaintiffs have nevertheless advanced a tenable theory

10   that monetary relief can be ascertained on a class-wide basis.

11   Whether a term restitution or out-of-pocket costs, plaintiffs

12   are seeking to recover what they spent on Cobra."  And it

13   explains how defendants think there should be some accounting

14   for that, what they received, the actual value.  And the Court

15   says, "But plaintiffs argue that the product was valueless

16   because it provided none of the advertised benefits and was

17   illegal."

18       So it's the reference to the fact that it provided "none

19   of the advertised benefits."

20       All of the advertised benefits here, Your Honor, were tied

21   to Donald Trump, everything.  In fact, they expressly

22   distinguished their -- because the defense is going to say,

23   "Oh, no.  We advertised real estate school and gave real estate

24   school."

25       No.  That's not true.  They expressly distinguished what

1   they were offering from all other real estate schools, and the

2   only basis for that distinction was Donald Trump.  That is it.

3        And in terms of the illegality, the fact of the matter is

4   whether they are selling this to students in Florida,

5   California, or New York, it was illegal for them to do so using

6   40 Wall Street, which they used in both of those locations, and

7   illegal for them to do so operating out of New York.  So it

8   doesn't matter that Trump University could have potentially

9   created an LLC in California called Trump University.  That is

10  not what they were marketing.  They were marketing Trump

11  University out of New York, located on Wall Street.  That was

12  illegal irrespective of where they were selling it.

13            THE COURT:  Let me go back to *Ortega*.  The Court

14  referenced or relied upon the fact that this product was

15  ultimately valueless; it was worth zero.  So to the extent it's

16  worth zero, it has no value.  Then ultimately, to the extent

17  that you are a victim of this misleading advertisements, you

18  are entitled to the difference.  If the value is zero, and you

19  paid $10, you get your full refund.

20       Here we are talking about a product that is basically

21  confined to, I guess -- I don't know if it is a pill --

22            MR. FORGE:  A capsule.

23            THE COURT:  And so it's pretty limited in terms of,

24  you take it, and then you are supposed to have the intended

25  effect.

1       Whereas, with a real estate program, it's not something

2    that is just confined temporally in terms of timewise or in

3    terms of the essence of it.  You ultimately are learning about

4    the real estate business, which is not monopolized by

5    Mr. Trump, but you are supposedly learning about the real

6    estate business with Mr. Trump's wisdom, reportedly, or at

7    least by the advertisements, his expertise, his inside

8    knowledge.

9       So to the extent that you don't receive the Trumpness of

10   what is being advertised, the defendants argued, "Well, but you

11   are still getting an education regarding what is involved in

12   identifying a good deal, how to go about thereafter in terms of

13   maybe bargaining down the price; then later on, fixing it."  So

14   you are getting something.  And temporally-wise, we are talking

15   about a much larger view of things.

16      Do you believe that this *Ortega* valueless factor is one

17   that fits into the Trump analysis?

18          MR. FORGE:  I do, Your Honor, and here is why.  It is

19   an additional reason I hadn't mentioned earlier.

20      We will have testimony, and we have had testimony, that

21   just like the fact that even these supposedly satisfied

22   students could not point to anything that Trump University

23   actually did for them other than give them confidence, which is

24   the placebo effect, and it was in fact the realtors and

25   themselves who found the property -- we will have other

```
 1   testimony that points out very clearly that everything -- all
 2   of the supposed education was simply telling them things that
 3   realtors provide for free or that mortgage brokers provide for
 4   free.  And most importantly, going through these so-called
 5   classes did not eliminate the need for a realtor or for a
 6   mortgage broker.
 7        And so again, we have to go back -- and this is true in
 8   all these cases.  And I would point out also, Your Honor, the
 9   Ivy Gate case.  That's an FTC case, but it is business
10   coaching.  That was business coaching, which is -- that's
11   pretty darn close to coaching on Trump's special real estate
12   techniques.  It's certainly not something that's ingested.  So
13   that's a little bit closer to this model.
14            THE COURT:  Although, as far as the law that was
15   applied in Ivy Capital -- do you know of any California case or
16   any Ninth Circuit case which has employed the FTC type of
17   analysis employed in the case such as what we have?
18            MR. FORGE:  I certainly don't know of anyone that's
19   done it in this context.  I agree with Your Honor; I know as
20   far as the actual facts of this case, we are in uncharted
21   territory.  I don't think that means it's implausible.
22        What it boils down to for me is, under the facts of the
23   case, under the extent of the fraud that is alleged, could a
24   reasonable jury determine what was being sold was worthless?
25   That's what it really boils down to.
```

1       THE COURT:  Let me ask you.  To the extent that the

2  Court can conditionally certify a class, the Court can perhaps

3  bifurcate liability from damages, and most notably in the area

4  of 17200 and 17500, would it be proper, to the extent a jury is

5  employed for any of the causes of action, to require a

6  determination through a special verdict that the offered

7  product was worthless, it was valueless?

8       MR. FORGE:  You are talking about under a situation

9  where we are bifurcating, Your Honor?  It certainly --

10       THE COURT:  So we won't go to the second phase

11  unless.

12       MR. FORGE:  It certainly wouldn't be necessary as to

13  the first phase.  As to the second phase, that certainly is an

14  option.  I don't think it would be inappropriate to ask the

15  jury that.  That would certainly -- I think that would cut off

16  any need for any further inquiry in the second phase.  For

17  example, if the jury finds liability; and then, the second

18  phase, the jury says yes or no, was it worthless.

19       THE COURT:  Well, so, what I am asking is you would

20  have a bifurcated proceeding where the first portion would

21  involve the jury determining whether or not there was liability

22  as to the different causes of action, whether or not there was

23  these misrepresentations and whether or not there were, to the

24  extent required, reliance; but that, in addition, then the

25  jury, at the end of that first half of the trial, would be

1   called upon to decide, "Do you find that the Trump University

2   program had any value?"

3       And if they responded yes, then at that point, now we have

4   an issue as to whether or not continued certification would be

5   appropriate.  If they held no, then we would be in a position

6   to move forward into the damages phase?

7           MR. FORGE:  Exactly, Your Honor.  I am not saying

8   there wouldn't necessarily -- that second phase could involve

9   some presentation of evidence that is pretty much narrowed down

10  to just the value or lack thereof.  And that would depend on

11  how Your Honor wanted to run the trial.  A lot of that

12  evidence -- most of it would come in during the trial.

13      But I would -- my suggestion would be that we would

14  have -- at least discuss whether or not there's additional

15  evidence that would go to that determination and whether or not

16  there would be additional argument as to that determination.

17  But ultimately I agree with exactly what you are saying, which

18  is that would be an additional stopgap that Your Honor would

19  have where we would say, "Okay.  If the jury says, 'No, we

20  don't find that this is valueless,'" then at that point, yes,

21  Your Honor can revisit the class certification status for the

22  damages and figure out a new procedure for determining damages.

23      Either way -- either way, we are really far down the

24  field.  And that's what is really emphasized in the *Jimenez*

25  case.  What is important is can we be efficient by using a

1   class action mechanism?  Will that truly relieve the Court, and

2   the system, of a burden?

3       And here, in a case like this, taking care of liability --

4   it would be a tremendous relief because the alternative would

5   be everybody has to prove up liability in a separate trial.

6           THE COURT:  Let me ask you as to your view on which

7   cause of action at this point are ones that can be tried by the

8   Court.  Do you have a view -- besides the 17200 and 17500, are

9   there any of these others, from New York and Florida, that are

10  suitable for bench trials?

11          MR. FORGE:  I think they are all suitable for bench.

12  I think the 17200 has to be a bench trial, but they are all

13  suitable for a bench trial, Your Honor.

14          THE COURT:  The ones that you would waive a jury

15  trial, then?

16          MR. FORGE:  We would waive a jury trial if that's

17  necessary, sure.

18          THE COURT:  I am just trying to look forward and

19  trying to see if this is manageable.  And so that was one of

20  the questions I had on that issue.

21      I interrupted you.  Why don't you continue.

22          MR. FORGE:  I apologize.  Your Honor started to

23  correct me.  It's *Ivy Capital*.  I had *Ivy Gate* in my head

24  because that was the name of a case I had in the U.S.

25  Attorney's office.  *Ivy Capital* was the business coaching case.

1    Your Honor mentioned something earlier about the fact that

2   this is real estate schooling.  This is only real estate

3   schooling by name.  They are calling it real estate schooling.

4   I remember there was a Judge Trott opinion several years ago

5   where he said calling it -- if you call Scotch tape scotch

6   whiskey, you can't get drunk off of it.  Just calling it a real

7   estate school doesn't make it a real estate school.  You have

8   to look at what it was they were truly marketing and what it

9   was they were offering.

10    That brings us back, again, we are not offering just basic

11   real estate instruction.  In fact, they were putting down basic

12   real estate instruction.  This wasn't just Donald Trump in kind

13   of a drive-by situation.  This was, "You are getting" -- "This

14   is the next best thing" -- the actual phrase they use -- "the

15   next best thing to being his apprentice."  And that's how

16   integral he was to this.  "You aren't learning basic real

17   estate principles; you are learning Trump real estate

18   principles.  And they are different.  They are unique.  That's

19   what you are learning here."

20    And that is what they marketed and that's why I go back to

21   cases like *Ortega* or even the *Pom Wonderful* case.  The *pom*

22   *Wonderful* case, in the Court's decision decertifying, says

23   nobody can reasonably say -- this gets to the point of whether

24   a jury can say it's valueless.  Nobody can reasonably say that

25   delivering 100 percent pomegranate juice, when you promised 100

1  percent pomegranate juice, did not confer the benefits of

2  refreshment and actually giving 100 percent pomegranate juice.

3       It does boil down to -- it's almost a directed verdict

4  type of analysis for Your Honor, which is basically, "I hear

5  everything you are saying, Plaintiffs.  You are saying they

6  promised Trump.  They promised Trump's hand-picked instructors,

7  Trump's secrets, Trump's university, and it delivered nothing

8  about Trump, an illegal institution, and everything they gave

9  was something that realtors and mortgage brokers offer for

10 free."

11      Accepting all of that as true, could a jury reasonably

12 determine this was valueless?  And I would submit, Your Honor,

13 the answer to the question is yes.

14      Everything else, every counter argument by the defense, is

15 an argument they could make to the jury, but it's not an

16 argument -- there's nothing they have that is dispositive on

17 this issue.  There's nothing they can say -- they cannot say,

18 "Because we did X, no reasonable jury could find this was

19 valueless."

20      And that's what I think this boils down to and why I think

21 that there's no reason not to move forward with that Phase I

22 and no reason not to pose that question, at what could be the

23 start and finish of Phase II -- what could be the start or what

24 could be the finish of Phase II.  We are unquestionably saving

25 time.  Even if you just take the named plaintiffs in this

1    case -- five, six different cases -- we are better off with

2    just one, proving liability.  And we have dozens and dozens of

3    other people who would be happy to be named plaintiffs.  So we

4    are saving time.  We are saving resources.  And all of that

5    evidence as to liability is going to be the same.

6              THE COURT:  All right.  Thank you.

7         Ms. Stagg?

8              MS. STAGG:  Thank you, Your Honor.

9         The problem with the plaintiff's argument is that *Comcast*

10   *v. Behrend* says they must satisfy through evidentiary proof --

11   not conjecture about what could be put on at trial, but today

12   and now, they must show through evidentiary proof that they can

13   maintain the requirements under Rule 23 to maintain the

14   certification.

15        What we have here is the Court originally certified the

16   class over a year ago based on, at the time, what plaintiff

17   said, in the future through the discovery of the case, they

18   could prove.  And so there was talk about the theory of damages

19   that was adequate to maintain certification.

20        Now, we come to the court a year later.  Discovery has

21   closed.  There was no expert.  And I agree with the Court in

22   the sense that an expert isn't required in many cases, but

23   here, the plaintiff has admitted -- it's in their opposition

24   papers to the motion -- they have put all their eggs in one

25   basket.  They are only seeking a damages methodology that is

1    based on the full refund theory.  They don't have any other

2    theory that they are propounding to the Court on this motion or

3    in this case.  So we really just need to focus on that.

4        So now what they have to do is they have to identify how

5    are they going to do that?  How can they do that through the

6    record?  And what I heard Mr. Forge talking about was a lot of

7    conjecture, what could be done at trial, but we -- this is --

8    there's not going to be an expert.

9        So unlike the *Werdebaugh* case and the *Pom Wonderful* --

10   both of these cases even had expert testimony that was in large

11   part rejected by Judge Koh and Judge Pregerson in those two

12   cases -- here we don't even have an expert.  And if we look at

13   the record, because the record is what we have at this point in

14   time, where is that evidentiary proof that is required under

15   *Comcast* to show that there's a class-wide basis on which the

16   Court can determine damages?

17       And I want to focus for a minute -- I want to respond to a

18   couple of things Mr. Forge said.

19       First of all 17200, the UCL and the FAL claims, those are

20   not jury claims, those are bench claims.  So the Court is the

21   trier of fact in those cases.

22            THE COURT:  Right.

23            MS. STAGG:  I believe under the New York business law

24   as well, that may also be a bench trial.

25       The Florida and the CLRA claims, those do appear to be

1  jury trials.

2      But I heard Mr. Forge saying, and I think it's worth

3  repeating if the Court is concerned about the trial, there

4  hasn't been a motion for bifurcation by the plaintiffs or

5  defendants.  I don't want to get off the subject, but I wanted

6  to comment on it since it was raised during oral argument.

7      He admitted, essentially, the testimony about the worth,

8  which is really the damages analysis, would have to come in in

9  order for a jury to answer the verdict questions the Court was

10  posing.  I mean, you put the same evidence on.

11      So essentially, there really can't be a motion -- there

12  really can't be a valid bifurcation without really at least

13  infringing on the defendant's due process rights to do that.

14  We don't have experts.

15      And again, I want to point out, there was not agreement by

16  the parties about experts.  Magistrate Judge Gallo, in the

17  scheduling order, asked if there needed to be dates for

18  experts.  If the plaintiff doesn't want an expert, defendant

19  doesn't need to have an expert.  That's not an agreement or

20  some waiver on behalf of the defendant that lightens the burden

21  for the plaintiff in terms of what they have to prove.

22      So we can talk about the individual cases, but I think

23  really under the *In Re: Vioxx* case that we have cited in our

24  papers, California has said, for these California claims, they

25  really have to have a measure of damages that is attributable

1    to the defendant's conduct, and that's what we are missing

2    here.  That's the nexus that's really missing in the

3    plaintiff's argument.

4        And I heard a lot about, "Not enough Trumpness; Mr. Trump

5    said these things; it was unique."  The Court was very clear in

6    its order certifying the Makaeff case, Docket 298, at page 4.

7    There are only three core misrepresentations that we are

8    dealing with at this point in time.  We are dealing with a

9    misrepresentation allegation that TU was an accredited

10   university; two, that students would be taught by real estate

11   experts, professors, and mentors hand selected by Mr. Trump;

12   and students would receive one year of expert support and

13   mentoring.  That's it.  That is what has been certified as the

14   core misrepresentations that are proceeding.

15       So all the discussion about all the other advertisements,

16   that is not what this case is about, as conceded by the

17   plaintiffs, as put forth by the plaintiffs, and as certified by

18   the Court.

19           THE COURT:  Let me go back to *In Re: Vioxx* that you

20   referenced and you relied upon.  As I understand, *In Re: Vioxx*,

21   that was a case regarding a prescription pain relief drug, and

22   in that case, the plaintiff placed valuation at issue, and that

23   resulted in the court decision with respect to this burden of

24   establishing the value.

25       In this case, again, we go to the plaintiffs' measure of

1    damages, and it is not based upon valuation, that they received

2    something less than what they paid for, but rather that they

3    essentially paid for something that was valueless.

4          MS. STAGG:  Well, I think what *In Re: Vioxx* says is

5    they have to have evidence of the actual value they received.

6       I understand the Court saying, "Okay.  Well, credit" --

7          THE COURT:  That was because of the theory the

8    plaintiffs offered.  They placed the value at issue.  And I

9    believe that was one of the observations made by the *Steroid*

10   *Hormone Products* case, that in *Steroid Hormone Products*, the

11   plaintiff did not put the value or valuation at issue, and

12   meanwhile, in *Vioxx*, they did.

13      And in this case, it does not appear that the plaintiffs

14   ever affirmatively placed value at issue, other than to assert

15   that there is no value in the product.

16         MS. STAGG:  That is the value.  They have asserted it

17   is zero, for their full refund model.

18         THE COURT:  Right.

19         MS. STAGG:  What I am saying here is that, since

20   the -- both *Comcast*, at the Supreme Court level, under

21   Rule 23(b), is requiring evidentiary proof in order to satisfy

22   the predominance aspect of Rule 23(b)(3) with regard to

23   damages.  And then *In Re: Vioxx* and *Colgan v. Leatherman* cases,

24   both California cases that are dealing with the UCL and the FAL

25   and the CLRA, say that you have to have evidence of the actual

1    value of what they received, *In Re: Vioxx*.  And *Colgan* actually

2    said the evidence required is expert testimony quantifying

3    either the dollar value of the consumer impact caused by the

4    misrepresentation or the advantage realized by the defendant.

5          What I am saying is they have the obligation at this point

6    in time to explain to the Court and show through evidence how

7    they are going to do that, to move forward, and they can't,

8    because -- well, one, they don't have an expert who has done

9    any kind of survey or analysis --

10         THE COURT:  I am sure if they did, you would then

11   come back and say that that expert's testimony is worthless, is

12   valueless.

13         MS. STAGG:  Sure.  And again, I am not saying that's

14   the only issue.  I am saying here -- here, it is not even a

15   hard case, because they don't even have an expert.

16         But two, as we put in the evidence in this motion, they

17   themselves -- the plaintiffs themselves, as well as other class

18   members in those classes, have admitted that there is value.

19         So although they keep saying, "We can prove it," the

20   evidentiary proof doesn't support it.

21         And so, as we put in our papers at pages 7 and 8 and then

22   extensively in the -- attached to my declaration in support,

23   Paula Levand says:  "Are the materials that you received of

24   value to you?"

25         "Yes, they are of value."

 1          It goes on, "Did you take notes?  Did you refer to the

 2     written materials and you found them to be valuable for that

 3     purpose?"

 4          "Yes.  And notes I took."

 5          So there's lots of testimony, and that's one cite.

 6          Mr. Cohen, who is also the plaintiff in the other case but

 7     is a class member here, gave extensive testimony saying that it

 8     was a good program, he thought that he got good information

 9     from there.

10          So then, if we look at the cases of *Pom Wonderful* and the

11     *Werdebaugh v. Blue Diamond*, the Court there -- I don't think

12     they are going out on a limb at all; I think they are looking

13     at classic UCL, FAL, CLRA case law underlying it -- are saying,

14     "You got something.  You got the almond juice.  You got the pom

15     juice.  You paid for something.  You got something.  What you

16     needed to do was come in and explain to the Court what was the

17     difference in the value between what you paid and what you

18     thought you were going to receive."

19          And that's what is missing in this case and can't be fixed

20     at this point in time because here we are, past the dispositive

21     motion cutoff date, past the expert -- past any discovery point

22     in time, and the record simply doesn't support what the

23     plaintiffs are claiming, that there was no value, particularly

24     if you look at the limited nature of the alleged

25     misrepresentations.

```
 1          THE COURT:  Let me ask you something.  The plaintiff,

 2   at page 12 of their opposition to the motion, at lines 3

 3   through 8 or so, they reference the matter of People of the

 4   State of New York v. Trump Entrepreneur Initiative, and they

 5   state that, "As the NYSED aptly stated when it demanded full

 6   refunds for all current students, Trump is an unlicensed school

 7   offering illegal training in which students should never have

 8   been enrolled."

 9       Does that allegation by the NYSED, is that based upon some

10   settled New York law that provides for a full refund for this

11   type of conduct?

12          MS. STAGG:  That is their current allegation.  It's

13   not been resolved.

14          THE COURT:  So with respect to that allegation, they

15   don't cite any particular New York case which upholds that

16   proposition that you know of?

17          MS. STAGG:  No.  I mean, not a case, per se.  And I

18   believe we have addressed the issue in the motion for summary

19   judgment, in Makaeff, on all the cases.  So I apologize to the

20   Court that I can't cite you to the analysis under the general

21   business law, but that's just simply their allegation.  And it

22   hasn't been resolved at this point.

23          THE COURT:  Let me ask you.  I think in Chamberlain

24   v. Ford, in the CLRA action, there was a holding there's no

25   showing of pecuniary loss required to recover statutory
```

1    damages.  If, at the end of the day, the plaintiff -- if the

2    Court were to reject this full refund model of damages, would

3    certification still be appropriate, at least under the CLRA, to

4    the extent that statutory damages would be available without a

5    particularized showing as to damages?

6             MS. STAGG:  Well, I don't believe the plaintiffs in

7    this case have asserted statutory damages under the CLRA.  I

8    would have to look at the complaint.  I know that they have

9    always been pleading their actual damages.

10       Obviously, like the Cohen RICO case, which has, I would

11   argue, a form of statutory damages not equivalent to the CLRA,

12   that is a different measure, which is not the measure that they

13   are seeking here.

14            THE COURT:  Please continue.

15            MS. STAGG:  I just wanted to comment, with regard to

16   the cases about the illegal substances and the illegality

17   issue, again, there is absolutely no prohibition on Trump

18   University in the states of California and Florida using that.

19   I mean, there are tons of other -- there's the Union Tribune

20   University.  There are many, many, many types of programs that

21   use the phrase "university."

22       So I did want to comment on that because obviously one of

23   the claims is that they were an accredited university, and the

24   Court has certified that claim.  But in terms of analogizing

25   that to the California cases on the FAL, UCL, or CLRA claims

1    with regards to worthless products -- steroids and hormones and

2    other products that are not legal to be sold for human

3    consumption, for example -- the analysis is completely

4    different because first of all, that can't be -- there has been

5    no offer by the plaintiffs and we are aware of no cases that

6    would apply New York State's specific law with regard to the

7    use of the word "university" extraterritorially to California

8    and Florida.

9              THE COURT:  So, as to the New York cause of action,

10   do you believe that, given the law that's developed with

11   respect to illegal products, that, at least as to the New York

12   cause of action, the Court can just conclude that, given the

13   determination made that Trump University was operating as a

14   university without authorization, that the Court can employ the

15   logic and the holdings in those cases where there's been an

16   illegal product?

17             MS. STAGG:  Well, the cases that were cited are all

18   under the California statute and not the New York business law,

19   so I don't think they are applicable in this case.  But even if

20   that were the case, as we have contended, in New York, that's a

21   licensing issue and actually the subject of a separate action,

22   and so the allegation itself doesn't bear on the damages issue.

23   In other words, you know, we haven't moved to decertify based

24   on that issue, but I don't think the Court can apply or should

25   apply California cases talking about illegal substances under

```
 1  the UCL and the FAL when, as a factual predicate, that is not
 2  what is going on here.  You know, there is no illegality under
 3  California law.  And so it simply wouldn't be appropriate to
 4  apply it to the New York case when the New York business law is
 5  essentially -- what we would say is it's a licensing issue.
 6              THE COURT:  All right.
 7              MS. STAGG:  The FTC cases, as the Court noted, the
 8  Ivy Capital case and the Figgie case that are cited in the
 9  plaintiff's opposition, those are FTC Act cases, and they don't
10  touch on the issues that are present here, which is how -- we
11  have these largely California -- Florida, we have cited in our
12  papers the case law under the Florida Deceptive Trade Practices
13  Act is very similar.
14      But here, their cases, under the FTC Act, don't really
15  apply and are really distinguishable because those are
16  government actions brought under the FTC Act, not brought under
17  this statutory scheme as classes.
18              THE COURT:  From your view or review of the enabling
19  statutes that the FTC has operated under, do you see that the
20  FTC enabling statutes contain language that specifically
21  provides for this full refund method of damages versus what we
22  have in California?
23              MS. STAGG:  Well, the FTC has broad -- under the
24  enabling act, they have broad discretion to fashion the remedy.
25  And we don't have the FTC here at all in terms of in this
```

action. And actually, what we have here is, under the statutes
that are asserted here -- the UCL, the FAL, the CLRA
specifically with regard to California -- we have limited --
there are no damage remedies available under the UCL and FAL.
There's only an equitable remedy of restitution that is
permitted here.

So I think it's a lot different than saying we are going
to analogize what the Court can do in this instance under these
claims as to what broad enforcement actions the FTC has under
the FTC Act.

Essentially, in summary on those -- and I am happy to
answer any other questions that the Court has -- but the time
is now, not at some trial in the future. The discovery is
closed. So the record is clear that what we have is -- we have
got all the evidence we are going to have at the trial in this
case.

We have put the evidence forward that even the named
plaintiffs have admitted, in some way, shape, or form, from
Ms. Makaeff, on to Sonny Low, to Mr. Cohen, who is another
class member, not a named plaintiff in this case -- the named
plaintiff in the Cohen case -- each one of them have testified
under oath that they did receive some benefit.

And so the problem for the Court is, you know, if we had a
bunch of individual claims, they could put that forward. But
here, the Court is really tasked with fashioning what is the --

 1    what can be done on a class-wide basis.  That is the burden the

 2    plaintiffs have in order to maintain certification here.  And

 3    they kicked the can down the road on the initial motion because

 4    discovery wasn't closed and they were putting forward a theory,

 5    and the Court appropriately said, "Okay.  That's something that

 6    can be certified."  But here we are a year later, and the

 7    record is very clear.  They can't kick the can down the road

 8    anymore.  They have to be able to, under the *Comcast* case,

 9    satisfy through evidentiary proof they can satisfy Rule 23B,

10    and they must identify -- they have identified a valid

11    methodology, but they haven't shown how we are going to measure

12    only the damages -- and that's really what I want to focus on

13    as I conclude -- only the damages attributable to the

14    defendant's conduct.  That is those three alleged

15    misrepresentations.

16        And there's absolutely nothing that is going to allow the

17    trier of fact, be it the Court or a jury, on a class-wide basis

18    in this case, to do that.

19            THE COURT:  So normally, the Court won't look at the

20    underlying merits on a Rule 23 certification motion proceeding,

21    but there are occasions where the Court will probe a little bit

22    deeper.  So you are arguing that the Court should in this case

23    probe a little bit deeper because even if the Court were to

24    find that this full refund model is one that has been

25    recognized by the law, that, number one, it really shouldn't

1   apply in this case; but even if you applied it in this case,

2   one would conclude that there's insufficient evidence to

3   support and derive such a model?

4          MS. STAGG:  Right.  The model doesn't work here

5   because they have admitted there's some value, and then they

6   don't have any other methodology to put anything on at trial in

7   this case.

8       And yes, the Court, under *Wal-Mart v. Dukes*, under *Comcast*

9   *v. Behrend* -- a rigorous Rule 23 analysis does require the

10  Court at times -- and this is one of those times where we are

11  at the end of the case, before trial, essentially, and the

12  record is set; the positions have been taken; the theories have

13  been advanced; and they are required now to -- similar to a

14  summary judgment, to come forward with that evidentiary proof

15  and show the Court exactly how they can satisfy the Rule

16  23(b)(3) predominance requirement to prove damages on a

17  class-wide basis.

18      Otherwise, the defendants here are incurring enormous

19  expense, exposure, length of time, having this hang over their

20  heads.  When we get to trial -- and I heard Mr. Forge talking a

21  lot about we can do liability.  It doesn't matter.  Because

22  what we are saying to the Court is they are not going to be

23  able to do it.  The record is fixed.  The Court should -- as we

24  have cited in our papers, there's testimony by every one of the

25  plaintiffs is that there was some value.  So their allegation

1  that there was no value is really contradicted by their

2  testimony, the testimony of what happened.

3       This isn't a situation where there was like -- a little

4  bit what I read in the business coaching of the FTC case, which

5  I don't think applies.  But I want the Court to understand our

6  position is this wasn't that people showed up and got nothing.

7  This isn't that people showed up and they, you know, were

8  called by people and gave their credit card over the phone

9  number, and they showed up, and there was nothing there.

10      They went to schools.  They got materials.  They got

11  coaching.

12      I am hearing Mr. Forge talk about the various quality

13  issues.  That's not what this case is about.  The Court has

14  certified what the core misrepresentations are, and they have

15  not tied their claim of damages to any of those

16  misrepresentations in any kind of way that we can move forward

17  on this case on a class-wide basis.  They just have not been

18  able to attribute any premium value.  They haven't even been

19  able to value what they got.

20      If you have the bottle of Pom Wonderful juice, you could

21  put on testimony about what the cost of another juice is.  We

22  don't have any of that.

23      What we have, to the contrary, is that they did receive a

24  school.  They did receive coaching, if they bought the

25  coaching, and there was value in it.  And they have never been

```
 1    able to tie the allegations of misrepresentation to some part
 2    of the purchase price.  And that's where the failure is and
 3    that's why the Court should decertify the class.
 4              THE COURT:  Thank you.
 5         Mr. Forge?
 6              MR. FORGE:  Your Honor, a few things I want to
 7    clarify.
 8              THE COURT:  Are you asking for statutory damages
 9    under the CLRA?
10              MR. FORGE:  We did not specifically set forth
11    statutory damages.  They are available.  We did expressly seek
12    statutory damages under the Florida statute, and they are
13    $15,000 per senior citizen, Your Honor.
14         I want to, first of all, point out that all of those
15    deposition cites that Ms. Stagg raised -- except for
16    Mr. Cohen's -- were pre class certification.  Mr. Cohen, in
17    that very same deposition, said, unequivocally, "Now that I
18    know the truth, I don't think they provided any value at all."
19         The other deponents, the other plaintiffs who testified,
20    all said whatever they received -- to the extent they received
21    something, it's nothing they couldn't have gotten or didn't get
22    from a realtor for free.
23         So this is another instance where it's kind of like the
24    "hand picked" thing.  Do you remember?  We had quibbling
25    whether they used the exact phrase "hand picked" or instead
```

1   instructed the presenters to tell students, "The other night,

2   we were having dinner with Mr. Trump, and he said," such and

3   such.

4       So for the students to say in a cherrypicked portion of

5   the deposition, "Yeah, I got something," and then when they say

6   later on in the deposition, "Yeah, but it was nothing I

7   couldn't get from a realtor.  It was nothing I couldn't get

8   just looking on line.  It was nothing" -- that is what it means

9   when we say valueless.

10      And I think, time and again, Ms. Stagg comes back to this

11  theory that, to me, is just so upside down; that, here, we are

12  the ones that were defrauded.  We are the ones that were lied

13  to.  We are the ones that were tricked into borrowing money on

14  our credit cards to pay for something that absolutely,

15  positively was not what they promised it was.  And then -- we

16  are the victims, and we have to -- we have to -- we can't move

17  forward unless we determine some positive value for their

18  product?

19      So just because we think this thing is worthless because

20  it is so disparate from what they offered and nothing that they

21  "taught" -- and I am using air quotes for that -- wouldn't be

22  given for free or wouldn't be available for free, because we

23  think it's worthless, we are just out of luck?  That's just not

24  what the law is.

25      What it boils down to -- and I agree with Ms. Stagg on

1    this front -- is whether or not the evidence that is in the

2    record could support a determination that this service,

3    product, whatever you want to call it, was worthless.

4         And I submit that there was abundant evidence in the

5    record, time and again, comparing what was promised to what was

6    delivered, that would unquestionably support a jury finding

7    that this was worthless.  Again, going back to the language

8    from the cases, Your Honor, comparing -- Your Honor asked for a

9    case applying any of these FTC cases to the UCL and the CLRA.

10        And Ms. Jensen pointed out that one of the cases we did

11   cite does in fact do that, and that's the *Rikos v. Procter &*

12   *Gamble* case.  It is a Southern District of Ohio case.  But it

13   cites the *FTC v. Figgie* case to support the notion a full

14   refund measure of damages, quote, "would likely be appropriate

15   here where the products in question have no intrinsic value

16   other than the advertised use."  And that's what we are talking

17   about here.

18        The advertisements -- it's easy.  The defense -- they have

19   no choice but to run away from their own advertisements now.

20   But clearly, they invested millions of dollars for that ad

21   campaign that was completely false.  And so if you -- if they

22   were promising that and they didn't deliver that, you take the

23   average guy off the street, that's a pretty simple question to

24   answer:  If you were promised you were going to get Mr. Trump's

25   secrets from his hand-picked instructors, and you got nothing

1    that he blessed, endorsed, or even knew you were going to get,

2    had nothing do with any of his techniques, from somebody he had

3    never met, seen, never even looked at a resume, what do you

4    think?  Did you get your money's worth?  Did you get nothing?

5         It's nothing.  You get nothing.

6         It's certainly not the job of the plaintiffs to, just for

7    checking off a box, to come up with some positive value.

8         And regarding this notion that somehow these arguments

9    undermine class certification of liability, there's nothing.

10   There's no basis for that.

11        And I would point to the language that the Ninth Circuit

12   quoted in the *Jimenez* case.  This is from the Sixth Circuit

13   case.  These are all cases that the Ninth Circuit held that --

14   "We conclude that these cases are compelling."  So this is from

15   *Jimenez*, which is 765 F.3d, at 1167.  And they are referring

16   now to the *In Re: Whirlpool* case, from the Sixth Circuit.  In

17   that case, the Sixth Circuit held, quote, "No matter how

18   individualized the issue of damages may be, determination of

19   damages may be reserved for individual treatment with the

20   question of liability tried as a class action, a position that

21   it said held true even when some consumers might have no harms

22   at all."

23        They then went to the Seventh Circuit, in the *Butler v.*

24   *Sears Roebuck* case, and quoted Judge Posner, who stated, in his

25   opinion in that case, "It would drive a stake through the heart

1  of the class action device to require that every member of the

2  class have identical damages."  He noted that the existence of

3  a, quote, "single central common issue of liability," close

4  quote, was sufficient to support class certification, and the

5  defendant was free to address complications with the district

6  court during the damages phase.

7       Now, Your Honor, that is all that *Comcast* requires, is a

8  single theory of liability.  In *Comcast*, there were four

9  different theories of antitrust liability, and not one of them

10  covered all of the damages claimed.  That is why *Comcast* does

11  not apply here.  Even the defense has to concede, or at least

12  they didn't dispute, we have one theory of liability here.

13            THE COURT:  Let me ask you, with respect to the NYSED

14  prayer demanding full refunds for all current students because

15  Trump was an unlicensed school offering illegal training, is

16  that prayer or that request based upon New York law?

17            MR. FORGE:  Your Honor, it is not based on a statute

18  that said there must be full refunds.  It is based on the

19  practice of the way they respond to institutions that are

20  violating the New York law by operating without a license and

21  operating illegally.  And that is their standard practice;

22  there has to be a full refund.  And Your Honor --

23            THE COURT:  That is driven by the authority that the

24  NYSED has specifically versus a private litigant or a class

25  member?

```
 1          MR. FORGE:  I don't think there is anything in
 2    New York that makes it unique to the NYSED.  My understanding,
 3    in talking with a lawyer there, from the NYSED, is that the
 4    theory is that to allow the defendant to retain a benefit from
 5    operating illegally would implicitly license them to have done
 6    what they are doing, and that's just not their practice.
 7          THE COURT:  So is it a form of disgorgement, then?
 8          MR. FORGE:  I mean, it is a form of disgorgement.
 9    And Your Honor raises that term.  I would point out that I
10    think Ms. Stagg might have misspoke.  When Your Honor was
11    talking about the FTC remedies, which -- they don't bless full
12    refund any more than the other statute does.  And Ms. Stagg's
13    statement was the FTC provides for a wide range of options for
14    the Court.
15       Well, Your Honor, under the 17203 of the California
16    Business and Professions Code, I don't think you could have any
17    broader power than, "The Court may make such orders or
18    judgments as may be necessary to restore any person in interest
19    any money which may have been acquired by means of such unfair
20    competition."  I am jumping around in the statute -- I am not
21    jumping around in a misleading way, Your Honor will see.
22    "Whatever orders or judgments are necessary to restore somebody
23    money they shouldn't have paid."  Your Honor has every bit as
24    much discretion.
25          THE COURT:  We don't have too much time left.  I have
```

```
 1   a 2:30 matter that I am going to have to get to.  But is there
 2   anything else that you absolutely have to cover?
 3              MR. FORGE:  I don't know if the phrase is "absolutely
 4   have to," but I will say the New York attorney general -- we
 5   have different periods of time we are dealing with than they
 6   are now.  But they are unquestionably -- they are
 7   unquestionably seeking, for a period that post-dates ours,
 8   refunds for all students throughout the entire country.  So the
 9   New York attorney general is taking the same position we are
10   taking, so whether they are operating -- whether they are
11   actually offering the service in California or Florida, if they
12   are doing it out of the state of New York and they are
13   representing themselves to be a New York university, located on
14   40 Wall Street, they are operating illegally wherever they go.
15   So it is illegal in California, and it is illegal in Florida.
16              THE COURT:  Thank you.
17              MS. STAGG:  No, Your Honor.  That's fine.
18              THE COURT:  Let's move on to the next issue that I
19   identified, and it's an issue that's shared in both the Makaeff
20   and Cohen case.  That's the motion for approval of class notice
21   and directing class notice procedures.
22        From what I can tell, the biggest hiccup or hangup here is
23   whether this should be one or two separate notices.  My
24   tentative is to find it would make more sense to have one
25   notice.  It would make sense both economically, in terms of how
```

 1   much would be paid out, and second of all, it would make it

 2   more likely that the recipients of these notices would actually

 3   review it and not discard it.  There's a danger, in the Court's

 4   view, if you had two separate notices that both involve Donald

 5   Trump and both otherwise involve similar allegations, and to

 6   the extent that you have unsophisticated individuals who

 7   received these notices and then just assume that this is the

 8   same as the last one and just toss it out, there's a danger

 9   that, ultimately, what we are trying to do, provide notice,

10   will not be delivered.  So that would be my tentative.

11        I will hear from Ms. Stagg.

12            MS. STAGG:  Obviously, again, we are in unique

13   territory because there really have not been cases where

14   someone's waited a year to give notice and then tried to

15   combine it with another class.

16        We would say that combined notice is not as clear and

17   straightforward as is required under the Federal Rules or the

18   manual for federal litigation because what has happened is

19   that -- first of all, Trump University isn't a defendant in

20   both cases.  There's going to be some confusion.  You are going

21   to send one notice nationwide -- because Cohen is nationwide

22   class -- that is going to have a lot of language about the

23   Makaeff cases, which also in turn have subclasses related to

24   individuals who are over the age of 65 in Florida, maybe 55 in

25   California.  And so you are going to have a lot of language

1    that is not relevant to the Cohen case that's going out to

2    everyone.

3         And we would submit -- and I agree there's no case law on

4    this because we haven't seen it -- that it's confusing to have

5    people get a notice that's going to be very lengthy and has to

6    go through the allegations of both cases.  And I think there's

7    just as much concern that people who are not in the Makaeff

8    case but in the Cohen case are going to get confused by seeing

9    all this talk about New York and Florida, and if they are in a

10   different state, they are going to throw it out.

11        I don't know that there's any evidence, and certainly the

12   plaintiffs didn't put forward any evidence from their class

13   administrator, proposed class administrator, suggesting that a

14   combined notice was going to be clear and straightforward.  I

15   think there's confusion there.

16             THE COURT:  Isn't there confusion in the Makaeff case

17   as far as notice to the extent there's a number of different

18   causes of action that look to California, Florida, and New York

19   law?

20             MS. STAGG:  Right.  And they are separate subclasses.

21   Frankly, the Court could order a New York notice, a Florida

22   notice, and a California notice to those subclasses.  We didn't

23   raise that issue as our main objection, but if the Court is

24   concerned there's going to be a lot of issues there, really,

25   the law is -- and the reason we want that notice is we are the

```
 1    defendants.  Although we have not agreed with the concept of

 2    the certification, if the notice is going to go out, the notice

 3    needs to give appropriate notice so that whatever happens later

 4    on in the case, the class members have no basis to come to the

 5    Court and object or say, "We weren't given adequate notice."

 6            THE COURT:  Are you aware of any cases where separate

 7    notices have been given in order to give notice to separate

 8    subclasses?

 9            MS. STAGG:  What we did reference in our papers, at

10    the bottom -- it starts at the bottom of page 3, and going on

11    to page 4 of our opposition, in the In Re: Fedex case,

12    In Re: Fedex Ground Package System, an MDL, cited at page 3 at

13    approximately line 21 of our opposition, which is Docket 408,

14    the Court rejected plaintiff's proposal to send two separate

15    notices to a Kansas class and a national ERISA class in the

16    same case.

17        So the Court there also specifically ordered the

18    plaintiffs to omit reference to the other cases pending in the

19    MDL litigation to avoid the appearance that the reach of the

20    case was greater than it was and to ensure that each case

21    maintained its individual identity.

22            THE COURT:  That's different than what we have here?

23    That is an MDL case, so you have separate cases filed

24    throughout the land, and there's different -- I would assume

25    different allegations, although there is a common core of
```

 1  facts, perhaps.  But for a plaintiff, then, to request to lump

 2  together all of the state claims sounds like that would be

 3  confusing.  That would be unnecessary.

 4      Here we are talking about one case.  And in the one case,

 5  we do have seven or eight different causes of action, a number

 6  based on California law, a number based on Florida law.  But at

 7  the end of the day, the underlying facts are the same.  As far

 8  as the representations that have been referenced as being the

 9  ones that plaintiff is relying upon, they are pretty limited,

10  and they apply to everyone.  So, given that, I am not sure if

11  there would be a likelihood of confusion.

12          MS. STAGG:  If the Court actually looks at the

13  notices that are submitted -- and again, because the concept of

14  trying to object to it line by line when conceptually we are

15  objecting to the concept of it -- for example, if you look at

16  exhibit -- it's attached to Ms. Jensen's declaration,

17  Docket 61-3.  You know, first of all, the length of the full

18  notice, which is what Exhibit 1 is, is exceptionally long in

19  the sense that it does go through each of the cases and says,

20  you know, the Cohen case, nationwide action; Makaeff,

21  California, Florida, New York.  And it actually interrelates

22  them.

23      So, for example, therefore, under basic information, why

24  are these lawsuits class actions, it's combining them.  It's

25  talking about Mr. Cohen's claims are typical, and Mr. Brown,

1    Mr. Everett, Sonny Low -- they are typical.

2         It really just pushes them both together, and I don't

3    think it is as clear as it could be because of the need to go

4    through each of the subclasses on Exhibit 1, page 6 of that

5    exhibit.  It has five different subclasses in there, and goes

6    through the Cohen case on the other page.

7              THE COURT:  All right.

8              MS. STAGG:  One of the problems is, then, when we get

9    into some of other exhibits, including the postcard, about

10   whether people are of the right age, in the elder abuse

11   classes -- it actually doesn't even talk about what their age

12   was when they made the purchase versus what their age is now.

13        So overall, you know, it just seems that there is very

14   little cost at this point in time to send another notice as

15   these cases go.  The numbers that are put forward, as much as

16   they are, are not significant in the scheme of a nationwide or

17   three-state class action.

18        So really, to make sure that we don't have people thinking

19   they are opting out -- you could have people who want to opt

20   out of Makaeff because they think they are in Makaeff, but they

21   are in Cohen.  It just -- the practicalities of it, having done

22   it, is that we are all going to get a ton of phone calls;

23   people are going to ask a lot of questions; they are going to

24   have to go back to the class administrator, whereas if just the

25   people who are in Cohen get the Cohen notice and just the

```
 1   people in Makaeff get those notices, you will at least

 2   eliminate that confusion.

 3              THE COURT:  Is there any real difference between who

 4   qualifies as a member of the Cohen case versus the Makaeff

 5   case?

 6              MS. STAGG:  All the states, yeah.

 7              THE COURT:  As far as California and New York and

 8   Florida, as to the class members or putative class members in

 9   those three states, is there any difference?

10              MS. STAGG:  Well, generally speaking, both of the

11   classes, as certified, relate to people who purchased after

12   January of 2007 one of the live events -- I can look at the

13   order, but essentially that's what it is.

14              THE COURT:  As to those three states, there's an

15   identity of interest; there's a mirroring of the class members

16   and Makaeff and Trump; it's just that with the RICO case, we

17   have national coverage?

18              MS. STAGG:  That's right.

19       Our position is that it seems that, for the minimal extra

20   cost to do two notices, that should occur.  That will also,

21   actually, at least with the Cohen case, eliminate the confusion

22   over whether they are in one of the subclasses.

23       Now, admittedly, someone like the plaintiff, Mr. Cohen, is

24   going to get two notices, but then they are in both of those

25   cases.
```

```
 1              THE COURT:  Numbers-wise, do we have an estimate?

 2              MS. STAGG:  I think total is something like 7,000

 3    nationwide, and something like 1800 --

 4              MR. MORRIS:  Approximately 40 percent is the overlap.

 5              MS. STAGG:  40 percent is the overlap, according to

 6    Mr. Morris.

 7              THE COURT:  So then the problem lies, in some ways,

 8    as to the RICO class, that is nationwide, so we have 47

 9    additional states that are going to receive notice.  If they

10    receive the same notice as the California, New York, and

11    Florida folks, they will have a very long recitation of the

12    various causes of action and perhaps the various qualifying

13    conditions, so that could potentially be a problem.

14        How do you respond to that, Mr. Forge?

15              MR. FORGE:  Ms. Jensen.

16              THE COURT:  Or Ms. Jensen?

17              MS. JENSEN:  Good afternoon, Your Honor.  I will try

18    to keep it brief.

19        One question -- one question I wanted to address was

20    whether there is evidence as to whether it would be more or

21    less confusing.  We actually did submit some evidence, and that

22    is in the declaration of Cameron Azari.  That is in the Makaeff

23    case, Document 411-2, paragraph 11.  And he states based on his

24    experience as a class notice administrator, "Given that the

25    nexus of class membership in each class is so similar --
```

1    purchase of a Trump University live program -- it is my opinion

2    that it would be much less confusing to send a combined notice

3    to each unique class member."

4        We are talking about 40 percent of the class.  And

5    moreover, besides the cost issue, it would also -- there's also

6    less risk of error, and that is because the class member data

7    that we have provided to the class administrator -- in other

8    words, the names of the class members with their contact

9    information -- doesn't state which product or live event they

10   purchased.

11       So about 15 percent of the folks in the class -- and I

12   mean the overall class -- have moved since they purchased the

13   program according to the class notice administrator.  So you

14   can't actually just send it out to the folks you think belong

15   in one class or the other; you would actually have to send out

16   both notices to everybody, because we are not 100 percent sure

17   which class they fall in based on this data.

18       Now, we could cross-reference other documents, and we

19   could do so, but that combined with the greater cost of over

20   $20,000, two settlement websites, two *USA Today* publications,

21   two separate track mailings, et cetera, et cetera, all these

22   things combined, we think it is not even a close call; that you

23   should do one singular notice program.

24       And the courts that have looked at this have said that

25   when you have two nearly identical class notices -- which is

```
 1   what we would have here -- yes, you have to also define the
 2   Makaeff class, but otherwise, they are identical.  So when you
 3   have that close identity of the class notice, you just send
 4   one.  It is much less confusing to do so, less costly, and less
 5   risk of error.
 6            THE COURT:  All right.  I will take the first two
 7   motions under submission.
 8        And then we have a question as to shortening time for
 9   briefing of hearing in objection to Judge Gallo's May 13 order.
10   I am inclined to grant that request so we can move forward as
11   expeditiously as possible.  And I am not sure if anyone wishes
12   to be heard any further other than what they otherwise have in
13   their papers, but do you wish to be heard any further?
14            MR. MORRIS:  Just briefly, Your Honor.
15        As plaintiffs have stated in their papers, we would
16   request a few additional days to respond.  So they have asked
17   us to respond in six days, including this holiday weekend, with
18   our briefing due on Tuesday.
19        We would be willing to file our briefing on Friday; have a
20   short turnaround time for reply; and a hearing the end of the
21   following week or at some point in time thereafter, if the
22   Court even feels a hearing is necessary, which we are not clear
23   at this point it is.  But we would like an additional 72 hours,
24   through the end of next week, to file.  That would be all I
25   would have to say on that.
```

```
1              THE COURT:  We will issue an order on that.

2              MR. FORGE:  Your Honor, we have no problem with the

3    shortened time for our reply.  We just want to get it in front

4    of Your Honor, fully briefed, as soon as possible.

5              THE COURT:  Thank you so much for your enlightening

6    arguments.

7              MS. STAGG:  Thank you, Your Honor.

8              MR. FORGE:  Thank you, Your Honor.

9         (End of proceedings at 2:26 p.m.)

10                             -o0o-

11                   C-E-R-T-I-F-I-C-A-T-I-O-N

12

13         I hereby certify that I am a duly appointed,

14   qualified and acting official Court Reporter for the United

15   States District Court; that the foregoing is a true and correct

16   transcript of the proceedings had in the aforementioned cause;

17   that said transcript is a true and correct transcription of my

18   stenographic notes; and that the format used herein complies

19   with rules and requirements of the United States Judicial

20   Conference.

21             DATED:  June 3, 2015, at San Diego, California.

22

23                        /s/  Chari L. Possell
                           _____
24                         Chari L. Possell
                           CSR No. 9944, RPR, CRR
25
```