# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, on Behalf of Herself and All Others Similarly Situated, | Case No. 10cv0940 GPC (WVG) |
| | **ORDER:** |
| Plaintiffs, | **GRANTING IN PART AND DENYING IN PART MOTION TO DECERTIFY CLASSES;** |
| v. | [ECF No. 380] |
| | **GRANTING PLAINTIFFS' UNOPPOSED *EX PARTE* APPLICATION FOR CLARIFICATION OF THE COURT'S CLASS CERTIFICATION ORDER** |
| TRUMP UNIVERSITY, LLC, (aka Trump Entrepreneur Initiative) a New York Limited Liability Company, DONALD J. TRUMP, and DOES 1 through 50, inclusive, | |
| Defendants. | [ECF No. 410] |

On February 19, 2015, Defendants Trump University LLC and Donald J. Trump filed a Motion for Decertification of Class Action. (ECF No. 380.) On May 15, 2015, Plaintiffs filed an Unopposed *Ex Parte* Application for Clarification of the Court's Class Certification Order. (ECF No. 410). The Motion for Decertification has been fully briefed. (ECF Nos. 405 & 409.) Defendant's motion challenges the Plaintiffs' full-recovery model for damages under *Comcast v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013). Defendants assert that a full-recovery model is unworkable, unjust and requires decertification. Following careful consideration of the parties' oral arguments, legal briefings and applicable law, and for the reasons set forth below, the Court hereby

DENIES the motion for decertification of the class action on the issue of liability; GRANTS the motion for decertification of the class action on the issue of damages; and GRANTS the application for clarification of the Court's class certification order.

## BACKGROUND

The relevant facts in this case having been included in several prior orders, the Court will not reiterate them in depth here.  In short, this is a class action lawsuit on behalf individuals who purchased Trump University, LLC ("TU") real estate investing seminars, including the three-day fulfillment seminar and the Trump Elite programs. (*See* ECF No. 298, at 4.)  Plaintiffs allege in their Third Amended Complaint that Defendants made material misrepresentations in advertisements, mailings, promotions, and free previews to lead prospective customers to purchase Defendants' fulfillment and elite programs.  (*See* ECF No. 128.)  The named Plaintiffs paid anywhere from $1,495 for a three-day fulfillment seminar up to $35,000 for the "Trump Gold Elite Program." (*Id.* ¶ 39.)  Plaintiffs allege TU and Donald Trump made the following core misrepresentations: (1) Trump University was an accredited university; (2) students would be taught by real estate experts, professors and mentors hand-selected by Mr. Trump; and (3) students would receive one year of expert support and mentoring.  (*See* ECF No. 298, at 4.)

On February 21, 2014, this Court certified the following class and subclasses:

All persons who purchased a Trump University three-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") in California, New York and Florida, and have not received a full refund, divided into the following five subclasses:

(1) a California UCL/CLRA/Misleading Advertisement subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in California within the applicable statute of limitations;
(2) a California Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 65 years of age and purchased the program in California within the applicable statute of limitations;
(3) a New York General Business Law § 349 subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in New York within the applicable statute of limitations;

(4) a Florida Misleading Advertising Law subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in Florida within the applicable statute of limitations; and
(5) a Florida Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 60 years of age and purchased the program in Florida within the applicable statute of limitations.

Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

(ECF No. 298 at 35–36.)[1]   The Court appointed Tarla Makaeff, Sonny Low, J.R. Everett and John Brown as class representatives and appointed Robbins Geller Rudman & Dowd LLP and Zeldes Haeggquist & Eck, as class counsel. (*Id.* at 36.)

## LEGAL STANDARD

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) ("A district court may decertify a class at any time"). In deciding whether to decertify a class, a court may consider "subsequent developments in the litigation." *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160 (1982). However, "actual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *Id.*

## DISCUSSION

### A.   Standard of Proof

The standard is the same for class decertification as it is with class certification: a district court must be satisfied that the requirements of Rules 23(a) and (b) are met to allow plaintiffs to maintain the action on a representative basis. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011); *see also O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 410 (C.D. Cal. 2000) (in evaluating whether to decertify the

---

[1] While the Court found class certification appropriate as to Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), the court's order granting certification inadvertently excluded the FDUTPA subclass in the class description. The omission has been noted and will be corrected at the end of this order.

1   class, the court applies the same standard used in deciding whether to certify the class

2   in the first place).  A motion to decertify a class is not governed by the standard applied

3   to motions for reconsideration.  *Ballard v. Equifax Check Serv., Inc.*, 186 F.R.D. 589,

4   593 n. 6 (E.D. Cal.1999) ("Because the court has the power to alter or amend the

5   previous class certification order under Rule 23(c)(1), the court need not consider

6   whether 'reconsideration' is also warranted under Fed. R. Civ. P. 60(b) or [local rules

7   governing reconsideration].").  In deciding whether to decertify, the Court will consider

8   "subsequent developments in the litigation," *Gen. Tel. Co. of Southwest v. Falcon*, 457

9   U.S. 147, 160 (1982), and "the nature and range of proof necessary to establish the

10  class-wide allegations," *Marlo v. UPS*, 251 F.R.D. 476, 479 (C.D. Cal. 2008).

11       Given the subsequent developments in this litigation and applicable law, the

12  Court finds it appropriate to consider whether Plaintiffs' full-recovery (also referred

13  to as "full-refund") measure of damages may be applied in the instant case.

14  **B.     Compliance with *Comcast***

15       In their trial plan, Plaintiffs proposed a total, single monetary sum based on a

16  full-recovery theory of damages (i.e., the amount Plaintiffs and other class members

17  paid, plus interest).  (ECF No 122-7, at 1.)  In its order approving class certification,

18  the Court found that Plaintiffs proposed full-recovery model did not "defeat

19  predominance or render the case unmanageable." (ECF No. 298, at 27.) Following the

20  filing of Defendants' opposition to the motion for class certification, the U.S. Supreme

21  Court decided *Comcast v. Behrend*, __ U.S. __, 133 S. Ct. 1426 (2013).  In *Comcast*'s

22  terms: "The first step in a damages study is the translation of the legal theory of the

23  harmful event into an analysis of the economic impact of that event." *Comcast*, 133

24  S.Ct. at 1435 (quoting Federal Judicial Center, Reference Manual on Scientific

25  Evidence 432 (3d ed. 2011).  Defendants argue that Plaintiffs' damages theory is

26  flawed as a matter of law because it fails to satisfy the standard set forth in *Comcast*.

27       In *Comcast*, the plaintiffs alleged four antitrust violations against the provider

28  of cable television services. *Comcast*, 133 S. Ct. at 1430-31.  The plaintiffs' damages

expert had devised a method for calculating what the competitive prices would have been but for the four antitrust violations so that damages could be calculated by comparing that baseline to the actual charges incurred. *Id.* at 1434. However, when the district court certified only one of the antitrust violations for class treatment, the plaintiffs did not revise their damages calculation. *Id.* The district and appellate courts found no error with the plaintiffs' failure to tie each antitrust theory to a specific damages calculation. *Id.* As the appellate court explained, because the plaintiffs had "'provided a method to measure and quantify damages on a classwide basis,' [] it [was] unnecessary to decide 'whether the methodology [was] a just and reasonable inference or speculative.'" *Id.* (quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 206 (3rd Cir. 2011)). The Supreme Court disagreed, concluding that "[u]nder that logic, at the class-certification stage any method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* The Court concluded that the district court must conduct a "rigorous analysis" to ensure that the plaintiffs' damages case is consistent with its liability case. *Id.* at 1433 (quoting *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 131 S. Ct. 2541, 2551–52 (2011) (internal quotation marks omitted).

In the aftermath of *Comcast*, a number of California district court decisions have rejected the full-recovery model in product misbranding cases. *See In re POM Wonderful, LLC*, No. ML 10-02199 DDP (Rzx), 2014 WL 1225184, at *1 (C.D. Cal. Mar. 25, 2014); *Werdebaugh v. Blue Diamond Growers*, No. 12-CV-02724 LHK, 2014 WL 7148923, at *8 (N.D. Cal. Dec. 15, 2014); *Caldera v. The J.M. Smucker Co.*, 2014 WL 1477400, at *4 (C.D.Cal. April 15, 2014). Armed with these cases, Defendants assert that a full-recovery model is unworkable, unjust and requires decertification. (ECF No. 380-1, at 6.)

Here, Defendants argue that Plaintiffs' full-refund damages model does not comport with the substantive law governing their claims. (ECF No. 380-1, at 2.)

Specifically, they take issue with the full-refund model's failure to provide any offset for any value received by the TU student.  (*Id.* at 3.)  Plaintiffs counter that what Defendants provided was worthless, and thus the full-refund theory is consistent with their theory of liability—namely, that the "student-victims got **none** of what they paid for: not Trump, not his 'secrets,' not his 'hand-picked' professors, not a yearlong mentorships with a Trump 'certified' expert, and certainly not anything approaching a university." (ECF No. 405, at 7.) (emphasis in original).  For this reason, Plaintiffs contend that their damages theory is in keeping with *Comcast*.  (*Id.*)

### 1.   The California Claims

#### a.   General Principles

The California Unfair Competition Law ("UCL"), California False Advertising Law ("FAL"), and California Consumer Legal Remedies Act ("CLRA") all authorize courts to award restitution, and the standards are the same under all three statutes.[2] *See* Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(3); *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 96 n.15 (Cal. Ct. App. 2009); *Colgan v. Leatherman Tool Grp.*, 38 Cal. Rptr. 3d 36, 58 & n.22 (Cal. Ct. App. 2006). "The word 'restitution' means the return of money or other property obtained through an improper means to the person from whom the property was taken." *Clark v. Superior Court*, 235 P.3d 171, 176 (Cal. 2010).  Restitutionary relief is an equitable remedy, and its purpose is "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003).

Defendants assert that "[t]he proper measure of restitution is the 'difference between what the plaintiff paid and the value of what the plaintiff received.'" (ECF No. 380-1 at 3 (quoting *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009)).

---

[2]  The CLRA also provides for actual and punitive damages and allows the prevailing plaintiff to recover costs and attorneys' fees. Cal. Civ. Code § 1780(a), (e).

Under this standard, Defendants contend that any calculation of restitutionary damages must include a deduction for any benefits or "value" the class members received from their TU courses. *Id.* at 4. In support of their position, Defendants quote deposition testimony from class members who expressed some satisfaction with the TU programs and felt they learned valuable information in the classes. *Id.* at 7–9.

Plaintiffs counter that the goal of restitution is to return the victims to the position they were in before the violation occurred. (ECF No. 405 at 8–9.) Plaintiffs assert that unlike *Vioxx*, they have not placed valuation at issue and, instead, claim the Trump University education was worthless. *Cf. In re Steroid Hormone Prod. Cases,* 104 Cal. Rptr. 3d 329, 341 (2010) (*Vioxx* did not apply where plaintiff did not put valuation at issue when he alleged that he bought product that was illegal to sell). Plaintiffs argue that only a full refund will return the students to the position they were in before the violation occurred because what they paid for was Trump and what they received was nothing of what was promised. (ECF No. 405 at 7–23.)

The Court finds that Defendants' interpretation of *Vioxx* is overly restrictive. In *Vioxx*, on which Defendants rely, the plaintiffs put valuation at issue by alleging that due to the alleged misrepresentations they paid more for a medication that it was worth. Consequently, the court held that "[t]he difference between what the plaintiff paid and the value of what the plaintiff received is *a* proper measure of restitution." *Vioxx*, 103 Cal. Rptr. 3d at 96 (emphasis added); *see also Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-cv-4387-PJH, 2014 WL 60097, at *12 (N.D. Cal. 2014) ("*One method* of quantifying the amount of restitution to be awarded is computing the effect of unlawful conduct on the market price of a product purchased by the class." (emphasis added)). If this measure will not effectively return the plaintiff to the status quo, the court may exercise its broad discretion to craft a restitutionary remedy that will. *See Colgan*, 38 Cal. Rptr. 3d at 59.

Here, Plaintiffs' theory of liability is premised on the core misrepresentations of Trump University being a university whose students would learn Donald Trump's

unique secrets to success.  Plaintiff asserts that absent Donald Trump's secrets, the "university" education was worthless. (ECF. No. 405 at 15.)  Plaintiffs' damage model seeks full recovery of all funds paid for the alleged worthless program.  According to Plaintiffs, only a full-refund will return them to the position that they were in before being ensnared in Defendants' scam. *Id*. at 17.  In theory, the damages model measures restitutionary damages attributable to their theory.  In addition, the damages are capable of being measured on a classwide basis.  However, *Comcast* rejected the logic that "at the class-certification stage any method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." 133 S. Ct. at 1433.  As a result, the question posed here is whether a full-refund model of restitutionary damages is unacceptable as an arbitrary measurement.

### b.    Consumer Cases Approving Full-Refunds

Defendants rely on cases involving food and tangible items to argue that the full-refund model is unacceptable.  Plaintiffs rely on cases involving illegal and ineffective medications to support their full-refund model.  However, the Court finds that both of these sets of cases provide only limited support in the instant case, for reasons discussed below in sections c. and d.

The Court finds that claims filed under the FTC Act are most analogous to the instant case.  Plaintiffs rely on *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993) (per curiam) to support a full-refund model.  *Figgie* was brought by the FTC under the FTC Act, 15 U.S.C. § 57b.  While it does not purport to interpret California law, both the FTC Act and California law on restitution provide for the "return of property" resulting from unfair or deceptive acts. *Clark v. Superior Court*, 235 P.3d at 176;  15

U.S.C. § 57b(b).[3]  In addition, the *Figgie* court analyzed the full-refund under general restitutionary principles. 994 F.2d at 606–607.

In *Figgie*, the Federal Trade Commission sought consumer redress for Figgie's dishonest and fraudulent practices in selling heat detectors.  The trial court awarded the consumers a full-refund for redress even though the FTC had previously found that the heat detectors had some value.  The defendant challenged the full-refund award and the denial of an offset equal to the value of the heat detectors.  *Id.* at 606.  The Ninth Circuit upheld the full-recovery award because the injury the restitution sought to redress was "the amount consumers spent on the heat detectors that would not have been spent absent Figgie's dishonest practices." *Id.*  The court explained its reasoning by analogizing to a counterfeit diamond case:

> To understand why, we return to the hypothetical dishonest rhinestone merchant.  Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back.  We would not limit their recovery to the difference between what they paid and a fair price for rhinestones.  The seller's misrepresentations tainted the customers' purchasing decisions.  If they had been told the truth, perhaps they would not have bought rhinestones at all or only some.  The district court implied this notion of a tainted purchasing decision with its qualification "given the misrepresentations recommended by Figgie and made by distributors to consumers."  The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them.

*Id.*

As in *Figgie*, Plaintiffs assert the fraud was in the selling by TU, not in the value of the thing sold.  That is, students paid for TU programs because they believed the misleading representations that Trump had hand-picked the instructors and would share his secrets to his success.  *Cf. United States v. Kennedy*, 726 F.3d 968, 974 (7th Cir. 2013) (full-recovery of what was paid for victim who received counterfeit art that

---

[3] 15 U.S.C. § 57b(b) permits a court to "grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be.  Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair and deceptive act or practice, as the case may be."

possessed intrinsic beauty and value).  According to Plaintiffs, the issue is not the value or appeal of the classes they did not sign up for (i.e., the rhinestones) — the issue is that they did not receive what they thought they were buying (i.e., the diamonds).

Defendants argue that *Figgie* is distinguishable because the consumers were eligible for a full refund only if they returned their heat detectors, whereas TU students cannot return the knowledge and experience they obtained at TU.  (ECF No. 409, at 8.) Allowing them to retain this knowledge *and* obtain a full refund would be an undue windfall in Defendants' view.  (ECF No. 409, at 9–10.)  However, in approving full-refunds, the *Figgie* court did not condition it upon a return of the heat detectors. Instead, the court focused on the fraud in the selling, not the value of the product, in upholding full refunds.

Similarly, *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM (GWF), 2013 WL 1224613 (D. Nev. 2013), supports Plaintiffs' position.  *Ivy Capital* involved deceptive marketing of a business coaching program designed to help students develop on-line businesses. Among the deceptive practices were misrepresentations as to the quality of the coaches and what the coaches could provide.  The *Ivy Capital* court permitted full-recovery and held that where consumers suffer economic injury resulting from the defendants' violations of the FTC Act, equity required monetary relief in the full amount lost by consumers. *Id.* at *17 (citing *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)).

Thus, the Court finds that Plaintiffs' proposed method of calculating restitutionary damages is not an arbitrary measurement and is consistent with the Plaintiffs' theory of liability. The method provides a baseline for the "return of money obtained through an improper means to the person from whom the property was taken" *Clark v. Superior Court*, 235 P.3d 171, 176 (Cal. 2010), and aims "to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d at 947.

**c.    Defendants' Analogies to Food and Intangible Items Cases**

As noted, a number of cases cited by Defendants have addressed whether a full-refund model is plausible in the context of products such as food and tangible items. For example, in *In re POM Wonderful, LLC*, 2014 WL 1225184, at *1, the plaintiffs contended that POMWonderful LLC ("POM") falsely and misleadingly advertised its juices as having various scientifically proven health benefits. (*See* ECF No. 380-1, at 4–9; ECF No. 409, at 10–11.)  In decertifying the class, the court concluded that a full-refund model failed to account for other value consumers received from POM juices, including hydration, vitamins, flavor, energy, or anything else of value. *POM Wonderful*, 2014 WL 1225184, at *3 & n.2.

Plaintiffs respond that whereas the juice in *POM Wonderful* was, in fact, 100% pomegranate juice (even if it lacked the additional claimed health benefits), the experiences Plaintiffs received in this case did not include any of the core elements (an accredited university, instructors hand-picked by Trump, one year of expert support and mentoring) they purchased. (*See* ECF No. 405 at 18.)

Meanwhile, in *Werdebaugh v. Blue Diamond Growers*, 2014 U.S. Dist. LEXIS 71575, another case Defendants cite, Plaintiffs alleged the maker of almond milk products misleadingly listed the sweetener "not as 'sugar,' . . . but as 'evaporated cane juice,'" and said the products were "All Natural," despite containing some trace amounts of potassium citrate. *See id.* at *3, *7.  Plaintiffs respond that there were no allegations that plaintiffs were deprived of the essence of what they were promised (i.e., almond milk); that the alleged imperfection rendered the almond milk worthless; or that there was no comparable product.  (ECF No. 405 at 19.)

The Court finds that the food misbranding cases are distinguishable.  Food cases involve a tangible product obtained for sustenance. *Cf. Allen v. Hyland's Inc.,* 300 F.R.D. 643, 671 n.25 (C.D. Cal. 2014) (food products are readily distinguishable because they have some inherent nutritional value, and thus, are not worthless).  Moreover, there is no question that food products have intrinsic value

even when stripped of some advertised quality such as being "all natural."  On the other hand, TU essentially marketed intellectual property based upon the singular experiences of Donald Trump.  While the food products may have been missing a particular premium quality, Plaintiffs contend that TU was missing its reason for existing, i.e., Donald Trump's knowledge and experience.  According to Plaintiffs, TU's promotional and Live Event materials focused on learning Trump's real estate techniques from a university with which he was integrally involved, not a generic, no-name real estate education course such as "learn creative financing" or "lease wholesaling classes."  In fact, students allegedly received none of the advertised benefits of TU — instead of being educated on Trump's real estate secrets and techniques from his closest advisors, plaintiffs received generic sales pitches.  (ECF No. 405 at 13.)

The Defendants also rely on the holding in *Colgan*, 38 Cal. Rptr. 3d at 58 & n.22 (Cal. Ct. App. 2006) where Plaintiffs sought restitution from a manufacturer of tools that were misrepresented to be  "Made in U.S.A."  At trial, Plaintiffs offered two damages models based upon recovery of retail prices paid and gross profits realized.  After trial, the trial court found it would be "inequitable" to return to consumers the entire purchase price paid for the tools or the entire gross profit Leatherman received from the tools because, "although the purchasers did not receive entirely what they bargained for, which was a tool made in the USA, Plaintiffs and these Class members did benefit from the quality, usefulness, and safety of these multi-purpose tools."  *Id*. at 44.  *Colgan* is distinguishable in that it involved a tangible product and a determination following trial.  While the trier of fact in this case may ultimately conclude that the TU programs possessed value, the Court merely finds that Plaintiff's theory that they did not receive any of what they bargained for is plausible.

> **d.**     **Plaintiffs' Analogies to Illegal Substance and Ineffective Medication Cases**

First, to support a full-refund theory, Plaintiffs rely on *In re Steroid Hormone Prod. Cases,* 104 Cal. Rptr. 3d 329 (2010)*,* where the court upheld a full-refund model of recovery in a supplement/drug case.  In *In re Steroid*, the defendant sold a banned and illegal substance without a prescription.  The court approved a full-refund to customers finding that to permit an offset in such a case would legitimatize the illegal sale.  *Ortega v. Natural Balance, Inc.,* 300 F.R.D. 422, 430 (C.D. Cal. 2014) (full-refund model was sufficient where dietary supplement "was valueless because it provided none of the advertised benefits and was illegal").

In the present case, Plaintiffs asserts that TU was illegal based upon evidence that in 2005, the New York State Education Department ("NYSED") wrote to Trump personally and warned him it was illegal to: (i) call his business a "university," as it was unqualified to do so; and (ii) operate without a license. Afterwards, in October 2014, a New York state court reportedly determined that Trump was operating TU without a license.  *See Matter of People of the State of N.Y. v. Trump Entrepreneur Initiative LLC,* No. 451463/13, 2014 N.Y. Misc. LEXIS 4533, at *26-*27 (N.Y. Sup. Ct. Oct. 8, 2014).  There is no suggestion that it was illegal for TU to call itself a university or to operate without a license in California.  Accordingly, the Court finds that the reasoning of *Ortega* does not apply to the California and Florida causes of action where TU was not illegally operated in California or Florida based upon its claim of being a university.

Second, Plaintiffs argue that California federal courts have also approved a full-refund in cases involving drugs that were ineffective.  *Allen v. Hyland's Inc.,* 300 F.R.D at 671 n.25 (where homeopathic drugs marketed as remedies for various ailments but were completely ineffective, a full-refund model was appropriate).  In *Hyland*, Plaintiffs sought full restitution claiming that the products they paid for were worthless because they did not provide any of the advertised benefits, and that any incidental benefits were the product of a "placebo effect."  300 F.R.D. at 671.

1  Plaintiffs claim the TU program was worthless because they were not

2  provided with the advertised benefits of Donald Trump's experience and any

3  incidental benefits amount to a "placebo effect."  A number of class members have

4  testified to being satisfied with their TU investment and to having obtained some

5  value from their education, despite the alleged absence of the promised Trump

6  benefits.  (ECF No. 380-1 at 6–9; ECF No. 409 at 8–9.)  Plaintiffs assert that

7  statements of such satisfaction represent a placebo effect.[4]  In addition, Plaintiffs

8  argue that like the placebo effect identified in *Allen*, to the extent a handful of

9  students (e.g., Meena Mohan) may have made some money in real estate, any such

10  "benefit" was simply the by-product of pushing people into the real estate sphere at

11  the height of the housing market crisis when foreclosures were at an all time high,

12  and not due to any "inherent value" actually provided by TU.

13  The Court finds that cases addressing the "placebo effect" of medications

14  provide limited support in cases involving promised educational experiences.

15  While the "placebo effect" involves a subjective response to an inert substance, it is

16  easier to establish the actual ineffectiveness of a drug than a real estate program.

17  **e.    Conclusion**

18  Under *Comcast*, the Court finds that Plaintiffs' proposed method of

19  calculating restitutionary damages is not an arbitrary measurement and is consistent

20  with the Plaintiffs' theory of liability.  However, *Wal-Mart* also requires that a

21  defendant is allowed to litigate its statutory defenses to individual claims. *Wal-*

22  *Mart*, 131 S. Ct. at 2561.  This issue is addressed below in section 3.

23  **2.    The Florida and New York Claims**

24

25

26  [4] Class member Art Cohen stated that he was initially satisfied with the three-day program but reported his dissatisfaction when he later learned he was not actually taught Trump's techniques. ECF No. 405, Ex. 15 (Cohen Tr.) at 37:13-22, 72:23-73:8 ("At the time I thought I got value. . . . [T]oday

27  I feel I was — I was misled, I was cheated, because the information that was provided was not directly from Donald Trump, you know. He had nothing to do with the program . . . yet he said that he did."),

28  75:18-24.

Unlike the restitutionary remedy available in California, which focuses on what is required to return the plaintiff to the status quo before the misrepresentation was made, the Florida Misleading Advertising Law, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and the New York deceptive practices statute provide for recovery of actual damages. *See* Fla. Stat. Ann. § 817.41(6) (West, Westlaw through 1st Reg. Sess.) ("Any person prevailing in a civil action for violation of this section shall be awarded costs, including reasonable attorney's fees, and may be awarded punitive damages in addition to actual damages proven."); Fla. Stat. Ann. § 501.211(2) (West, Westlaw through 2015 1st. Reg. Sess.) ("In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs . . . ."); N.Y. Gen. Bus. Law § 349(h) (McKinney, Westlaw through L.2015) ("[A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.  The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section.  The court may award reasonable attorneys' fees to a prevailing plaintiff.").  In so doing, the statutes clearly put valuation of the good or service at issue.  For instance, in a FDUTPA action, Florida law holds that:

> [T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. A notable exception to the rule may exist when the product is rendered valueless as a result of the defect-then the purchase price is the appropriate measure of actual damages.

*H & J Paving of Florida, Inc. v. Nextel, Inc.*, 849 So. 2d 1099, 1101 (Fla. Dist. Ct. App. 2003) (quoting *Rollins, Inc. v. Heller,* 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)); *see also  Foster v. Chattem, Inc.*, No. 6:14–CV–346–ORL–37, 2014 WL

1  3687129, at *2 (M.D. Fla. July 24, 2014) (claim that product that falsely promised

2  to rebuild enamel was valueless due to misbranding was plausible).

3       Likewise, New York law holds that "[w]ith respect to injury, it is well-settled

4  that a consumer is not entitled to a refund of the price of a good or service whose

5  purchase was allegedly procured through deception under Sections 349 and 350 of

6  the New York General Business Law." *Dash v. Seagate Tech. (U.S.) Holdings, Inc.*,

7  27 F. Supp. 3d 357, 361-62 (E.D.N.Y. 2014).  "The rationale for this is that

8  'deceived consumers may nevertheless receive — and retain the benefits of —

9  something of value, even if it is not precisely what they believed they were

10  buying.'" *Id.* (citations omitted).  "A plaintiff under section 349 must prove three

11  elements: first, that the challenged act or practice was consumer-oriented; second,

12  that it was misleading in a material way; and third, that the plaintiff suffered injury

13  as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)

14  (citations omitted); *accord Maurizio v. Goldsmith*, 230 F.3d 518, 521–22 (2d Cir.

15  2000).  "In addition, a plaintiff must prove 'actual' injury to recover under the

16  statute, though not necessarily pecuniary harm." *Stutman*, 95 N.Y.2d at 29.

17       Defendants argue the Florida and New York claims must also be decertified

18  for lack of a viable damages model where Plaintiffs cannot argue that TU's products

19  were valueless.  (ECF No. 381-1 at 13.)  Plaintiffs respond that they are entitled to

20  recover a full refund in both states because the products they received from TU

21  were worthless or of *de minimis* value.  (ECF No. 405, at 20–22.)

22       For its FDUTPA claim, Plaintiffs rely on the holding in *H & J Paving of*

23  *Florida*, 849 So. 2d at 1101, that allows for refund of the purchase price "when the

24  product is rendered valueless as a result of the defect."  For its New York claim,

25  Plaintiffs rely on *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 41 A.D.3d 4, 9

26  (2007), wherein the court explained:

27       Consumers have been entitled to a full refund when they purchase a
         product or service which they do not ultimately receive or which
28       cannot be used to the extent or for the purpose purchased (*see Matter of*

*People v Telehublink Corp.*, 301 AD2d 1006, 1007 [2003]).  However, a consumer is required to show some injury apart from and connected to that initial deception (*see Small v Lorillard Tobacco Co.*, supra at 56; *see also Federal Trade Commn. v Peoples Credit First, LLC*, 2005 WL 3468588, *8, 2005 US Dist LEXIS 38545, *30 [MD Fl 2005]; *Federal Trade Commn. v Figgie Intl., Inc.*, 994 F2d 595, 606 [1993], cert denied 510 US 1110 [1994]).  Acknowledging that there may be some value in a credit card with a low limit which is subject to a large initial fee, these consumers acquired *de minimis* value in the credit card they received, when compared to the limit advertised.  Moreover, they incurred substantial charges in connection with that deception.

Defendants point out that New York class representative John Brown testified that while he did not feel that TU's three-day course was worth $1,500, "[he] would have paid $199 for it maybe or $200."  (ECF No. 380-1, at 12; ECF No. 380-6 (Brown Tr.), Ex. 10 at 460:24-25.)[5]  Plaintiffs argue that the "value" Brown received was *de minimis*, at best.  Plaintiffs highlight that Brown described the information from the three-day course as "minimal" and "basic or less."  (ECF No. 405 at 23; ECF No. 405-3 (Brown Tr.), Ex. 7 at 67:24.)

As with the California causes of action, the Court finds that Plaintiffs' damages model is aligned with the theory of liability under New York and Florida law.  In addition, the damages model is plausible by providing a baseline for a damages determination.  What remains is the defense of offset which is addressed in the next section.

### 3.    Due Process Right to Raise Available Defenses

The fact that Plaintiff's theory of liability and damages model are consistent does not end the inquiry regarding the suitability of class certification.  It merely permits Plaintiffs to proceed with their case-in-chief with a plausible damages model.  Meanwhile, issues regarding valuation and offset relate to available defenses and raise due process concerns.

---

[5]  Page number citations such as this one are to the page numbers reflected on the Court's CM/ECF system and not to page numbers assigned by the parties.

Defendants assert that the Court should consider the value of the information actually imparted and the materials provided to the students. Plaintiffs respond that the information and materials were generic and were worthless or of speculative value because it was publicly available for free and did not contain Trump's real estate investing secrets, which is what students paid for and thought they would receive.

Plaintiffs may be right, or Defendants may be correct. Ultimately, to comport with due process, the court must "preserve" the defendant's right "to raise any individual defenses it might have at the damages phase." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1168 (9th Cir. 2014); *see also Wal-Mart*, 131 S. Ct. at 2561 (holding that "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims").

As recognized by *FTC v. Kuykendall*, a baseline of full-recovery is the starting point in the damages analysis because, to accurately calculate actual loss, the defendants must be allowed to put forth evidence supporting an offset. *FTC v. Kuykendall*, 371 F.3d 745, 765–66 (10th Cir. 2004)*, citing FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997). Defendants will be afforded the right to support an offset. *Cf. Mahoney v. Farmers Ins. Exch.,* No. 4:09–cv–2327, 2011 WL 4458513, at *9 (S.D. Tex. Sept. 23, 2011) (damages concern over the extent to which each plaintiff may have been paid for overtime hours can be resolved through bifurcation of the trial into a liability stage and a damages stage).

Bifurcation will permit available defenses to be litigated and economies of class certification to be realized. In *Jimenez*, the court approved class certification on liability issues, which were bifurcated from the damages issue because it preserved defendant's right to present its damages defenses on an individual basis. The *Jimenez* court approvingly cited *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801–02 (7th Cir. 2013), where the Seventh Circuit affirmed class certification

for a group of plaintiffs whose damages were different.  In *Butler*, Judge Posner observed that:

> It would drive a stake through the heart of the class action device, in cases in which damages were sought . . . to require that every member of the class have identical damages.  If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.  Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Id.*

In the instant case, the Court has found that issues of liability are common and can be decided based on common proof.  In addition, Plaintiffs have a theory of damages which aligns with their theory of liability and provides a baseline for damages.  In the event that Plaintiffs prevail at trial on liability issues, Defendants will be afforded the right to support an offset at the damages phase.

Therefore, the Court **DENIES** Defendants' motion to decertify the California, New York, and Florida subclasses on the issue of liability, and **GRANTS** the motion to decertify the subclasses on the issue of damages.[6]  The Court will bifurcate the liability and damages issues and proceed with the liability phase of the class trial first.

## C.     Elder Abuse Sub-Classes

Plaintiffs note in a footnote to their opposition that Defendants did not challenge certification of the California Financial Elder Abuse subclass.  (ECF No. 405 at 8 n.8.)  Defendants respond in a footnote that they seek to decertify all of the classes.  (ECF No. 10 n.8.)  Neither party provides any argument or citation in regard to the California and Florida elder classes.  Given the lack of any argument

---

[6] In light of the Court's finding, the Court need not further address Defendants' argument that Plaintiffs' lack of expert testimony on damages is fatal to Plaintiffs claims because even Defendants concede that an expert is not required to calculate full-refund amounts.  (*See* ECF No. 409, at 12 ("Defendants certainly do not contest that the fact finder is able to do basic math . . . ."))

1   on this issue the Court will limit its consideration of the motion to decertify to the

2   issues addressed in this order.

3   **D.      Adequacy of Counsel**

4          Defendants' initial basis for moving to decertify the classes based on the

5   inadequacy of Plaintiffs' counsel was that counsel had invited violation of the one-

6   way intervention rule.  (ECF No. 380-1 at 14-15.)  "'One-way intervention' occurs

7   when the potential members of a class action are allowed to 'await . . . final

8   judgment on the merits in order to determine whether participation [in the class]

9   would be favorable to their interests.'"  *London v. Wal-Mart Stores, Inc.*, 340 F.3d

10  1246, 1252 (11th Cir. 2003) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S.

11  538, 547 (1974)).  However, because this Court postponed the hearing on the

12  parties' motions for summary judgment (ECF No. 403), the parties acknowledge

13  that this issue is no longer a concern (ECF No. 405, at 25; ECF No. 409, at 14 n.11).

14         Defendants' next grounds for arguing that Plaintiffs' counsel are inadequate

15  is that they delayed in providing class notice for a year after the class was certified,

16  resulting in the Court having to delay ruling on the pending summary judgment

17  motions.  (ECF No. 380-1, at 14; ECF No. 409, at 14.)  In support of their argument

18  that the class should be decertified because of counsel's delay in providing notice,

19  Defendants cite to *Steinberg v. Sorensen*, 2007 WL 496872, at *3 (D.N.J. Feb. 8,

20  2007).

21         In *Steinberg*, the court only decertified the class after counsel waited almost

22  *five* years to send notice and *ignored* the court's repeated directions to notify the

23  class.  *Steinberg*, 2007 WL 496872, at *2–4.  Such is not the case here.  Further, as

24  Plaintiffs point out, in distinguishing *Steinberg*, the court in *Mendez v. The Radec*

25  *Corp.*, 260 F.R.D. 38, 50 (W.D.N.Y. 2009), highlighted that cases where the court

26  decertified based on failure to send notice generally "involve[d] counsel's failure to

27  carry out the court's order directing the issuance of notice, rather than counsel's

28  failure to move for such an order."  *Mendez*, 260 F.R.D. at 50 (denying motion to

decertify despite several years delay in serving notice, where "[c]ounsel have otherwise been diligent in prosecuting this action, and the interests of the class would not be served in any way by decertification"). Here, the Court has not expressly ordered service and only one year has passed since the Court certified the class. During that year, Plaintiffs' counsel have diligently litigated numerous issues, obtained certification of the class in the related case of *Cohen v. Trump*,[7] and filed a motion for approval of class notice in this case. The Court finds that counsel's representation has been adequate under the authority cited and Rule 23(a)(4) and, therefore, declines to decertify the class on this basis.

## CONCLUSION

For the foregoing reasons, the Court hereby:

1. **DENIES** Defendants' motion to decertify the class action on liability issues as to all causes of action;

2. **GRANTS** Defendants' motion to decertify on damages issues as to all causes of action and bifurcates the damage issues to follow trial on the liability phase; and

3. **GRANTS** Plaintiffs' application for clarification of the Court's class certification order, and clarifies that the class definition going forward shall be:

---

[7] Defendants argue that the decision by Plaintiffs' counsel to postpone notice in this case until the Court certified the *Cohen* class (so that a joint notice could be sent) demonstrates that Plaintiffs are willing to sacrifice one class for the other. (ECF No. 409 at 14.) For this reason, Defendants contend that Plaintiffs' counsel has a conflict of interest and may not represent two classes against the same defendants. (*Id.* (citing *Sullivan v. Chase Inv. Services of Boston, Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978) (conditioning finding of adequacy of class counsel on counsel withdrawing from representing plaintiffs in a related case)). However, the *Sullivan* case involved two cases against one company that was likely to have insufficient assets and insurance to cover its liability in both cases. *Sullivan*, 79 F.R.D. at 258. Because the plaintiffs in each case had conflicting interests (namely, in being first to obtain a judgment against those assets), attorney professional responsibility rules barred counsel from representing plaintiffs in both cases. *Id.* Here, Plaintiffs' counsel made a strategy decision to serve joint notice so as to save money and avoid confusion in both cases. (*See* ECF No. 405 at 24.) While the Court declines at this time to pass judgment on the advisability of that decision, the Court finds that counsel's reasoned strategy decision is not tantamount to a conflict of interest.

All persons who purchased a Trump University three-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") in California, New York and Florida, and have not received a full refund, divided into the following five subclasses:

(1) a California UCL/CLRA/Misleading Advertisement subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in California within the applicable statute of limitations;
(2) a California Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who were over the age of 65 years of age when they purchased the program in California within the applicable statute of limitations;
(3) a New York General Business Law § 349 subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in New York within the applicable statute of limitations;
(4) a Florida Deceptive and Unfair Trade Practices Act (FDUTPA)/Misleading Advertising Law subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in Florida within the applicable statute of limitations; and
(5) a Florida Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who were over the age of 60 years of age when they purchased the program in Florida within the applicable statute of limitations.

Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families.

**IT IS SO ORDERED.**

DATED:  September 18, 2015

HON. GONZALO P. CURIEL
United States District Judge