1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Herself and All Others Similarly Situated, | Case No. 10cv0940 GPC (WVG) |
| | **ORDER:** |
| Plaintiffs, | **(1) GRANTING IN PART AND DENYING IN PART DEFENDANT DONALD J. TRUMP'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT;** |
| v. | |
| | [ECF No. 375] |
| | **(2) GRANTING IN PART AND DENYING IN PART DEFENDANT TRUMP UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| TRUMP UNIVERSITY, LLC, (aka Trump Entrepreneur Initiative) a New York Limited Liability Company, DONALD J. TRUMP, and DOES 1 through 50, inclusive, | |
| Defendants. | [ECF No. 377] |

Presently before the Court are two Motions for Summary Judgment, or in the

Alternative Partial Summary Judgment, filed by Defendants Trump University, LLC

("Trump University" or "TU")[1] and Donald J. Trump ("Donald Trump" or "Mr. Trump"). (ECF Nos. 375, 377.) The Parties have fully briefed the motions. (ECF Nos. 386-88, 390-92, 398.) The Court decides the motion on the papers without oral argument pursuant to Civil Local Rule 7.1.d.1.

For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Trump University's motion, and **GRANTS IN PART** and **DENIES IN PART** Defendant Donald Trump's motion.

## FACTUAL BACKGROUND

### A.     Defendants Donald Trump and Trump University

Donald Trump is a real estate magnate, television personality, and author. In 2004, Mr. Trump helped found Trump University, a private, for profit entity offering real estate seminars and purporting to teach Mr. Trump's "[i]nsider success secrets." (D Ex. 1 (Sexton Decl.), ECF No. 375-3 at 3; D Ex. 2 (Sexton Depo.), ECF No. 375-3 at 15-16; CC Ex. 64, ECF No. 122-5 at 50-52.)[2] TU began with web-only content in 2005, and shifted to live events in 2007. (D Ex. 1 (Sexton Decl.), ECF No. 375-3 at 3.)

For TU's live events, consumers were first invited to a ninety-minute Free

---

[1]After the filing of this action, the New York Department of Education demanded that Trump University remove the word "University" from its title. Trump University changed its name to Trump Entrepreneur Initiative, LLC. As the complaint was filed prior to the change in name, and as neither party requested to substitute Defendants, the Court continues to refer to the Defendant as Trump University.

[2]Page number citations such as this one are to the page numbers reflected on the Court's CM/ECF system and not to page numbers assigned by the parties. "D Ex." refers to Defendants' exhibits submitted in support of Defendant Donald Trump's motion for summary judgment. "P Ex." refers to Plaintiffs' exhibits submitted in support of Plaintiffs' opposition. "CC Ex." refers to Plaintiffs' exhibits submitted in support of their motion for class certification.

Preview, which was preceded by an orchestrated marketing campaign using mailed invitations as well as a TU website, radio, and newspaper advertising. (CC Ex. 22, ECF No. 122-4 at 7.) For example, consumers were sent "Special Invitation[s] from Donald J. Trump" which included a letter signed by Mr. Trump that stated "[m]y hand-picked instructors and mentors will show you how to use real estate strategies." (P Ex. 30, ECF No. 388-26 at 2-3; P Ex. 40, ECF No. 388-29 at 2-3; P Ex. 41, ECF No. 388-30 at 2.) Newspaper advertisements displayed a large photograph of Mr. Trump, stating "[l]earn from Donald Trump's handpicked expert," and quoted Mr. Trump as saying: "I can turn anyone into a successful real estate investor, including you." (CC Ex. 43, ECF No. 122-5 at 5.) Similarly, TU's website displayed large photographs of Mr. Trump and included statements such as "Learn from the Master," "It's the next best thing to being his Apprentice," and "Insider success secrets from Donald Trump." (CC Ex. 64, ECF No. 122-5 at 50-52.) Further, TU advertisements "utilized various forms of recognizable signs to appear to be an accredited academic institution" such as a "school crest that was ubiquitous and used on TU letterhead, power point presentations, promotional materials and advertisements." (ECF No. 298 at 8-9; *see also* CC Ex. 83 (Marketing Guidelines), ECF No. 195-4 at 2.) Plaintiffs have provided evidence that Mr. Trump reviewed and approved all advertisements. (P Ex. 1 (Bloom Depo.), ECF No. 388-1 at 7; P Ex. 3 (Sexton Depo.), ECF No. 388-2 at 17-19; P Ex. 5 (Trump Depo.), ECF No. 388-4 at 22, 24, 27.)

At the beginning of each Free Preview, a promotional video was played in which Mr. Trump stated:

We're going to have professors and adjunct professors that are absolutely terrific. Terrific people, terrific brains, successful. . . . The best. We are going to have the best of the best and honestly if you don't learn from them, if you don't learn from me, if you don't learn from the people that we're going to be putting forward – and these are all people that are handpicked by me – then you're just not going to make in terms of the world of success. . . . we're going to teach you better than the business schools are going to teach you and I went to the best business school.

(ECF No. 386 at 16 (citing CC Ex. 2, ECF No. 122-3 at 4).)

Individuals were then invited to attend a $1,495 Fulfillment Seminar. (TAC, ECF No. 128 ¶ 53.) Those who paid for the Fulfillment Seminar were allegedly promised a three-day seminar and one year of expert interactive support. (*Id.*)

After the Fulfillment Seminar, individuals were invited to sign up for the Trump Elite Program for up to $34,995. (*Id.* ¶¶ 48-49.) Elite Program participants were allegedly promised unlimited mentoring for an entire year. (*Id.* ¶ 53.)

**B.    Class Representative Plaintiffs**

The named Plaintiffs include Tarla Makaeff, Sonny Low, J.R. Everett, and John Brown.[3] Plaintiffs purchased, and were dissatisfied with, TU programs.

Tarla Makaeff ("Makaeff") is a resident of Los Angeles, California. (CC Ex. 6 (Makaeff Decl.), ECF No. 122-3 at 22 ¶ 1.) She did not attend the Free Preview, but in August 2008 she purchased the three-day Fulfillment Seminar after being invited by a friend who attended the Free Preview. (*Id.* ¶ 2.) Makaeff also purchased the Trump Elite Program for $34,995 on or about August 10, 2008. (*Id.* ¶ 4.)

---

[3]The Court does not include Plaintiffs Brandon Keller ("Keller") and Ed Oberkrom ("Oberkrom") because they are not class representatives and, as discussed below, their individual claims have been dismissed. (ECF No. 394.)

Sonny Low ("Low") is a 70-year-old resident of Chula Vista, California. (CC Ex. 5 (Low Decl.), ECF No. 122-3 at 17 ¶ 1.) He attended the Free Preview on or about November 18, 2009, based on a newspaper advertisement. (*Id.* ¶ 3.) Low then purchased and attended the three-day Fulfillment Seminar on or about December 6, 2009. (*Id.* ¶ 4.) Low also paid $25,000 for the Trump Elite Program on December 6, 2009. (*Id.* ¶ 6.)

J.R. Everett ("Everett") is a 68-year-old resident of Tampa, Florida. (CC Ex. 4 (Everett Decl.), ECF No. 122-3 at 12 ¶ 1; *see also* ECF No. 128 at 16 ¶ 30.) She attended the Free Preview on October 7, 2009. (CC Ex. 4 (Everett Decl.), ECF No. 122-3 at 12 ¶ 2.) She then purchased the three-day Fulfillment Seminar on or about October 7, 2009, and paid $35,000 for the Trump Elite Program on or about October 16, 2009. (*Id.* ¶¶ 2-3.)

Finally, John Brown ("Brown") is a resident of New York, New York. (CC Ex. 3 (Brown Decl.), ECF No. 122-3 at 7 ¶ 1.) He attended the Free Preview on September 14, 2009, after learning about it in an advertisement. (*Id.* ¶ 2.) He purchased the three-day Fulfillment Seminar on or about September 14, 2009. (*Id.* ¶ 3.) Brown then paid $25,000 for the Trump Elite Program on or about September 26, 2009. (*Id.* at 8 ¶ 5.)

## PROCEDURAL BACKGROUND

On April 30, 2010, Plaintiff Makaeff filed a class action complaint against TU, alleging violations of California, New York, and Florida consumer statutes as well as several common law causes of action. (ECF No. 1.) On May 26, 2010, Defendant TU

filed a counterclaim against Plaintiff Makaeff for defamation.[4] (ECF No. 4.)

The complaint has been amended a number of times, ultimately resulting in the current operative pleading, the third amended complaint ("TAC"), filed September 26, 2012.[5] (ECF No. 128.) The TAC named Plaintiffs include Makaeff, Low, Everett, Brown, Keller, and Oberkrom. Defendants include TU and Donald Trump. The TAC alleges the following causes of action: (1) unlawful, fraudulent and unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (2) deceptive practices and misrepresentation in violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (3) untrue and misleading advertisement in violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; (4) breach of contract against TU; (5) breach of the implied covenant of good faith and fair dealing against TU; (6) money had and received; (7) negligent misrepresentation; (8) fraud; (9) false promise; (10) deceptive acts and practices in violation of § 349 of New York's General Business Law; (11) financial elder abuse in violation of Cal. Welf. & Inst. Code § 15600 *et seq.*; (12) unfair competition, practices, or acts in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201

---

[4]On June 30, 2010, Plaintiff Makaeff filed a motion to strike Defendant's counterclaim against her pursuant to California's anti-SLAPP statute, California Code of Civil Procedure § 425.16, which the Court denied on August 23, 2010. (ECF Nos. 14, 24.) Following Plaintiff's appeal, the Ninth Circuit reversed this Court's order denying Plaintiff's motion to strike and remanded to this Court for further proceedings. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013). On June 16, 2014, this Court granted Makaeff's motion to strike. (ECF No. 328.)

[5]On January 30, 2013, the case was transferred to the undersigned judge. (ECF No. 190.)

*et seq.*; (13) misleading advertisement in violation of Florida's Misleading Advertising Law ("MAL"), Fla. Stat. § 817.41; and (14) unjust enrichment.

On February 21, 2014, the Court granted in part and denied in part Plaintiffs' motion for class certification. (ECF No. 298.) The Court noted that Plaintiffs alleged that Defendants made the following "core" misrepresentations: "(1) Trump University was an accredited university; (2) students would be taught by real estate experts, professors and mentors hand-selected by Mr. Trump; and (3) students would receive one year of expert support and mentoring." (*Id.* at 4.) The Court granted Plaintiffs' motion for class certification for the following class and five subclasses:

> All persons who purchased a Trump University three-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") in California, New York and Florida, and have not received a full refund, divided into the following five subclasses:
> (1) a California UCL/CLRA/Misleading Advertisement subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in California within the applicable statute of limitations;
> (2) a California Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 65 years of age and purchased the program in California within the applicable statute of limitations;
> (3) a New York General Business Law § 349 subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in New York within the applicable statute of limitations;
> (4) a Florida Misleading Advertising Law subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in Florida within the applicable statute of limitations; and
> (5) a Florida Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who are over the age of 60 years of age and purchased the program in Florida within the applicable statute of limitations.

(*Id.* at 35-36.) For the remaining claims, the Court either denied, or Plaintiffs did not

10cv0940 GPC (WVG)

seek, class certification.[6]  (*Id.* at 28-32 & n.14.)

On February 12, 2015, Defendant Donald Trump filed a Motion for Summary Judgment, or in the Alternative Partial Summary Judgment.  (ECF No. 375.)  On February 17, 2015, Defendant TU filed its own Motion for Summary Judgment, or in the Alternative Partial Summary Judgment.  (ECF No. 377.)  Plaintiffs filed a single omnibus opposition to both motions on March 6, 2015.[7]  (ECF Nos. 386-88.)  Defendants replied on March 13, 2015.[8]  (ECF Nos. 390-91.)

On February 19, 2015, Defendants filed a Motion for Decertification of Class Action.  (ECF No. 380).  On April 10, 2015, Plaintiffs filed their opposition to the Motion for Decertification.  (ECF No. 405).  On April 24, 2015, Defendants replied.  (ECF No. 409).

On February 20, 2015, Plaintiffs filed a Motion for Approval of Class Notice and Directing Class Notice Procedures.  (ECF No. 381).  On April 17, 2015, Defendants filed their opposition.  (ECF No. 408).  On April 24, 2015, Plaintiffs filed their reply.  (ECF No. 409).

_____

[6]On March 16, 2015, the Court granted the Parties' joint motion to dismiss Plaintiffs' non-certified individual claims for breach of contract (fourth cause of action); breach of implied covenant of good faith and fair dealing (fifth cause of action); money had and received (sixth cause of action); negligent misrepresentation (seventh cause of action); fraud (eighth cause of action); false promise (ninth cause of action); and unjust enrichment (fourteenth cause of action).  (ECF No. 394.)

[7]Defendant Donald Trump and Plaintiffs both filed unopposed applications to file documents under seal pursuant to Civil Local Rule 79.2 and prior protective orders entered in the case. (ECF Nos. 373, 384.)  The Court granted both applications.  (ECF No. 395.)

[8]Defendants also filed evidentiary objections to Plaintiffs' opposition, to which Plaintiffs responded.  (ECF Nos. 392, 398.)  As discussed below, the Court overrules the objections as moot because it did not rely on the challenged evidence.

On April 1, 2015, the Court granted Defendants' *ex parte* motion to delay issuance of any ruling on Defendants' summary judgment motions until after the Court either decertifies the Classes or approves a class notice and the notice is provided to the Classes and the "opt-out" period has expired. (ECF No. 403.)

On May 1, 2015, Plaintiffs filed an unopposed *ex parte* motion for clarification of the Court's Class Certification Order. (ECF No. 410.)

On September 18, 2015, the Court granted in part and denied in part Defendants' motion for decertification of the class action (ECF No. 418.) The Court denied the motion to decertify on liability issues as to all causes of action, but granted the motion on damages issues as to all causes of action, and bifurcated the damages issues to follow trial on the liability phase. (*Id.* at 21.) The Court also granted Plaintiffs' motion to clarify the Court's class certification order, and clarified that the class definition going forward would be:

> All persons who purchased a Trump University three-day live "Fulfillment" workshop and/or a "Elite" program ("Live Events") in California, New York and Florida, and have not received a full refund, divided into the following five subclasses:
> (1) a California UCL/CLRA/Misleading Advertisement subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in California within the applicable statute of limitations;
> (2) a California Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who were over the age of 65 years of age when they purchased the program in California within the applicable statute of limitations;
> (3) a New York General Business Law § 349 subclass of purchasers of the Trump University Fulfillment and Elite Seminars who purchased the program in New York within the applicable statute of limitations;
> (4) a Florida Deceptive and Unfair Trade Practices Act (FDUTPA)/Misleading Advertising Law subclass of purchasers of the

Trump University Fulfillment and Elite Seminars who purchased the program in Florida within the applicable statute of limitations; and (5) a Florida Financial Elder Abuse subclass of purchasers of the Trump University Fulfillment and Elite Seminars who were over the age of 60 years of age when they purchased the program in Florida within the applicable statute of limitations.[9]

(*Id.* at 22.)

On September 21, 2015, the Court granted in part and denied in part Plaintiff's motion for approval of class notice and directing class notice procedures. (ECF No. 419.) On November 15, 2015, the opt-out period expired. (*See id.* at 11.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can

---

[9] Excluded from the class are Defendants, their officers and directors, families and legal representatives, heirs, successors, or assigns and any entity in which Defendants have a controlling interest, any Judge assigned to this case and their immediate families. (ECF No. 418 at 22.)

satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In making this determination, the court must "view[ ] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

//

//

**DISCUSSION**

Defendants TU and Donald Trump have each filed separate motions for summary judgment. The Court first addresses Defendant TU's motion, and then turns to Defendant Donald Trump's motion.

**A.    Defendant Trump University's Motion for Summary Judgment**

Defendant TU primarily argues that it is entitled to summary judgment as to the California, Florida, and New York subclasses because Plaintiffs failed to produce sufficient evidence of restitution or damages. (ECF No. 377-1 at 9.) TU also argues that Plaintiffs have not shown they are entitled to injunctive relief under the UCL, FAL, and CLRA. (ECF No. 377-1 at 11-16.)

**1.    Injunctive Relief**

The UCL, FAL, and CLRA all provide for injunctive relief. Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(2). Defendant TU argues that Plaintiffs are not entitled to injunctive relief for two reasons.

First, TU contends that Plaintiffs are not entitled to an injunction because TU has discontinued its allegedly wrongful conduct. (ECF No. 377-1 at 12.) *See Cal. Serv. Station v. Union Oil Co.*, 283 Cal. Rptr. 279, 285 (Ct. App. 1991) ("Injunctive relief will be denied if at the time of the order of judgment, there is no reasonable probability that the past acts complained of will recur, i.e., where the defendant voluntarily discontinues the wrongful conduct."). TU relies on the facts that: (1) it ceased enrolling students in classes after July 2010; and (2) it changed its name to the Trump Entrepreneur Initiative on June 2, 2010. (ECF No. 377-1 at 12.) Plaintiffs counter that

they are entitled to an injunction because Defendant Donald Trump has stated, both at

his deposition and publicly, that he intends to restart TU in the future. (ECF No. 386

at 45.) Specifically, Mr. Trump testified at his deposition, taken on September 12,

2012: "Do we plan to start [TU] again after this lawsuit is won and after we bring the

lawsuit against your firm. I would say probably yeah." (P Ex. 5, ECF No. 388-4 at

11.) In addition, in a May 13, 2011 *New York Times* article, Mr. Trump told reporters

that TU was "on hiatus." (P Ex. 31, ECF No. 388-27 at 7.) The Court finds that

Plaintiffs have raised a genuine dispute of material fact as to whether "there is no

reasonable probability that the past acts complained of will recur." *Cal. Serv. Station*,

283 Cal. Rptr. at 285. As such, TU has failed to show that Plaintiffs are not entitled to

injunctive relief on the ground that it has ceased its allegedly wrongful conduct.

Second, TU argues that Plaintiffs are not entitled to injunctive relief because

named Plaintiffs Makaeff and Low do not face "a real or immediate threat of

irreparable injury" as neither testified that they intended to further purchase TU

seminars or mentorships.[10] (ECF No. 377-1 at 15; ECF No. 391 at 9-10.) TU relies on

the Ninth Circuit's decision in *Perez*, which held that the plaintiff did not have Article

III standing to sue for injunctive relief under the CLRA regarding eye surgery because

_____

[10]In their motion, TU only raises this argument regarding Plaintiffs' CLRA
claim, but in its reply it expands this argument to Plaintiffs' UCL and FAL claims.
(ECF No. 377-1 at 15; ECF No. 391 at 9-10.) Courts generally decline to consider
legal arguments raised for the first time in the reply brief. *Zamani v. Carnes*, 491 F.3d
990, 997 (9th Cir. 2007). However, the Court will also consider whether Plaintiffs
have Article III standing to pursue injunctive relief for their UCL and FAL claims
because Plaintiffs are not prejudiced since the same argument applies to their CLRA
claim. Moreover, even if TU had not raised the argument, the Court would have been
required to do so sua sponte because standing is a threshold matter central to subject
matter jurisdiction. *See Perez v. Nidek Co.*, 711 F.3d 1109, 1114 (9th Cir. 2013).

he did not allege that he intended to have further surgery. *Perez*, 711 F.3d at 1114. Plaintiffs counter that many district courts within this Circuit have rejected TU's argument, and held that a plaintiff had standing to sue for injunctive relief under the UCL, FAL, and CLRA despite no allegation that they would buy the defendant's product in the future. (ECF No. 386 at 52-53.) *See, e.g., Henderson v. Gruma Corp.*, No. 10-cv-4173-AHM, 2011 WL 1362188, at *7 (C.D. Cal. Apr. 11, 2011).

However, Plaintiffs do not address the Ninth Circuit's decision in *Perez* (or other Ninth Circuit and Supreme Court authority regarding Article III standing), and there is a split among district courts in this Circuit regarding whether a plaintiff has Article III standing to seek injunctive relief regarding allegedly misleading advertising if they do not claim that they are still interested in buying the defendant's product. *See In re 5-hour ENERGY Mktg. & Sales Practices Litig.*, No. 13-MDL-2438-PSG, 2014 WL 5311272, at *10-11 (C.D. Cal. Sept. 4, 2014) (noting split and collecting cases); *Mason v. Nature's Innovation, Inc.*, No. 12-cv-3019-BTM (DHB), 2013 WL 1969957, at *2-5 (S.D. Cal. May 13, 2013) (same).

The plaintiff bears the burden of showing that the Article III standing requirements are met. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974 (9th Cir. 2007). In a class action, standing is satisfied if at least one of the named plaintiffs meets the requirements. *Id.* Article III standing requires that: (1) the plaintiff suffered an injury in fact; (2) the injury is "fairly traceable" to the challenged conduct; and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations marks and citations omitted). To

establish standing for prospective injunctive relief, the plaintiff must demonstrate that

"he has suffered or is threatened with a 'concrete and particularized' legal harm . . .

coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'"

*Bates*, 511 F.3d at 985 (citation omitted). As to the second inquiry, the plaintiff must

establish a "real and immediate threat of repeated injury." *Id.* (internal quotation marks

and citation omitted). Although past wrongs are evidence relevant to whether there is

a real and immediate threat of repeated injury, past wrongs do not in and of themselves

amount to a real and immediate threat of injury sufficient to make out a case or

controversy. *Id.*

As noted above, district courts in this Circuit are split over whether a plaintiff

seeking to enjoin allegedly misleading advertising must show that they would likely

purchase the item again to establish standing. *See In re 5-hour ENERGY Mktg. & Sales

Practices Litig.*, 2014 WL 5311272, at *10-11. Some district courts have held that a

plaintiff is not required to make such a showing based on policy grounds.[11] *See, e.g.,

Henderson*, 2011 WL 1362188, at *7 ("If the Court were to construe Article III

standing for FAL and UCL [and CLRA] claims as narrowly as the Defendant

advocates, federal courts would be precluded from enjoining false advertising under

California consumer protection laws because a plaintiff who had been injured would

---

[11]Some district courts have also found Article III standing for UCL, FAL, and CLRA claims if the plaintiff has indicated that he or she is interested in purchasing the product in the future. *See, e.g., Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533-34 (N.D. Cal. 2012) ("Should plaintiffs encounter the denomination "All Natural" on an AriZona beverage at the grocery store today, they could not rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress."). However, that approach is not applicable here since Makaeff and Low have not indicated that they are interested in purchasing Defendants' products in the future.

10cv0940 GPC (WVG)

always be deemed to avoid the cause of the injury thereafter ('once bitten, twice shy') and would never have Article III standing.").  Other district courts have concluded that such an approach does not square with Article III's standing requirements.  *See, e.g., Burns v. Tristar Prods., Inc.*, No. 14-cv-749-BAS (DHB), 2014 WL 3728115, at *3 (S.D. Cal. July 25, 2014) ("[T]his Court declines to follow *Henderson*, and Plaintiff must demonstrate a real and immediate threat of repeated injury in order to have standing to pursue injunctive relief."); *In re 5-hour ENERGY Mktg. & Sales Practices Litig.*, 2014 WL 5311272, at *11 ("The federal courts are not empowered to set aside the standing requirements of Article III in the name of public policy, even when that policy is laudable."); *Mason*, 2013 WL 1969957, at *4 ("Guided by the Ninth Circuit's interpretation of Article III's standing requirements, this Court agrees with the courts that hold that a plaintiff does not have standing to seek prospective injunctive relief against a manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the plaintiff would suffer future harm from the defendant's conduct – i.e ., the plaintiff is still interested in purchasing the product in question.").

This Court concludes that Supreme Court and Ninth Circuit precedent are clear that for a plaintiff to have standing to pursue injunctive relief, there must be a real and immediate threat of repeated injury.  *See Lujan*, 504 U.S. at 650; *Perez*, 711 F.3d at 1114; *Bates*, 511 F.3d at 985.  As such, this Court declines to follow *Henderson*, and holds that Plaintiffs must demonstrate a real and immediate threat of repeated injury in order to have Article III standing to pursue injunctive relief.  Here, Plaintiffs have

10cv0940 GPC (WVG)

failed to raise a genuine dispute of material fact that the named Plaintiffs, Makaeff and Low, intend to again purchase TU's seminars or mentorships in the future.

Therefore, Plaintiffs lack Article III standing to pursue their claims for injunctive relief under the UCL, FAL, and CLRA. Accordingly, the Court **GRANTS** Defendant TU's motion for summary judgment on Plaintiffs' claims for injunctive relief under the UCL, FAL, and CLRA.

**2.    Other Claims**

Defendant TU makes a number of other arguments centering around the idea that Plaintiffs have not established a viable damages methodology. First, Defendant TU argues that it is entitled to summary judgment on Plaintiffs' claims for restitutionary relief under the UCL, FAL, and CLRA because Plaintiffs "have no admissible evidence establishing a valid methodology for restitution or the amount of restitution." (ECF No. 377-1 at 12, 15.) Second, TU argues that Plaintiffs are not entitled to monetary damages under the CLRA for the same reasons it raised regarding restitution. (ECF No. 377-1 at 15-16.) Third, for named Plaintiff Low's financial elder abuse claim, Defendant TU argues that "Low has failed to provide damages due to the lack of evidence of the value of services received versus what he paid for the TU seminars and mentorships." (ECF No. 377-1 at 16-17; ECF No. 391 at 10.) Fourth, for the Florida subclass's MAL, FDUTPA, and financial elder abuse claims, Defendant TU argues named Plaintiff Everett has not established damages as she has not provided evidence that TU's seminars and mentorships were worthless. (ECF No. 377-1 at 17-18; ECF No. 391 at 10-11.) Fifth, for the New York subclass's § 349 of New York's General

Business Law claim, Defendant TU argues that New York law does not provide for a full refund, and named Plaintiff Brown has not established damages as he has not provided evidence that TU's seminars and mentorships were worthless. (ECF No. 377-1 at 19-20; ECF No. 391 at 11.)

These arguments were addressed in the Court's September 18, 2015 Order on Defendants' Motion to Decertify and are thus moot. (*See* ECF No. 418 (granting decertification on damages issues as to all causes of action and bifurcating the damage issues to follow trial on the liability phase)). Accordingly, the Court **DENIES** Defendant TU's motions for summary judgment regarding: (1) Plaintiffs' claims for restitution under the UCL, FAL, and CLRA; (2) Plaintiffs' claim for monetary damages under the CLRA; (3) Plaintiffs' financial elder abuse claim; (4) the Florida subclass; and (5) the New York subclass.

In sum, the Court **GRANTS** Defendant TU's motion for summary judgment regarding Plaintiffs' claims for injunctive relief under the UCL, FAL, and CLRA, but **DENIES** Defendant TU's motion for summary judgment in all other respects.

## B.    Defendant Donald Trump's Motion for Summary Judgment

Defendant Donald Trump primarily argues that he is entitled to summary judgment because he did not personally make the alleged "core" misrepresentations to the class representatives, nor did the class representatives rely on misrepresentations made by him. (ECF No. 375-1 at 11.) Mr. Trump also argues that the representation that he "hand-picked" TU instructors is true, and repeats Defendant TU's arguments that Plaintiffs failed to produce sufficient evidence of restitution or damages. (*Id.*)

### 1.    Representation that Mr. Trump "Hand-Picked" Instructors

As a preliminary matter, because it relates to all three subclasses's claims, the Court considers Mr. Trump's argument that the representation that he "hand-picked" or "hand-selected" the TU instructors was true and, therefore, is not a misrepresentation.  (ECF No. 375-1 at 14, 21 n.14, 32-33, 36 n.23; ECF No. 390 at 7.) Mr. Trump relies on his own interrogatory responses and deposition testimony that he "attended periodic meetings with various experts responsible for drafting and developing Trump University course materials" and he saw resumes of instructors. (D Ex. 3 (Supp. Resp. Interrogatories Nos. 10 & 14), ECF No. 375-3 at 25-26, 28-29; D Ex. 4 (Trump Depo.), ECF No. 375-3 at 41-45.)

However, Plaintiffs counter that Mr. Trump also stated in his interrogatory responses that he "personally was involved in the selection of Don Sexton, Gary Eldred, Michael Gordon and Jack Kaplan.  Additionally, most if not all speakers, instructors and mentors were selected by Trump University representatives . . . ." (ECF No. 386 at 18 & n.14; CC Ex. 105 (Resp. Interrogatory No. 13), ECF No. 195-5 at 72.) Sexton, Eldred, Gordon, and  Kaplan are current or former professors who drafted and developed Trump University course materials.  (CC Ex. 105 (Resp. Interrogatory No. 10), ECF No. 195-5 at 70.)  Sexton, Gordon, and Kaplan were not speakers at any of the Live Events, although Eldred was a speaker for at least one event. (P Ex. 17, ECF No. 388-15.)  Further, several instructors testified that they never met with Mr. Trump. (P Ex. 4 (Martin Depo.), ECF No. 388-3 at 3; P Ex. 16 (Sperry Depo.), ECF No. 388-14

at 4-6; P Ex. 18 (Childers Depo.), ECF No. 388-16 at 4; P Ex. 19 (Miller Depo.), ECF No. 388-7 at 3-4.)

Based on the foregoing evidence, the Court concludes that Plaintiffs have raised a genuine dispute of material fact as to whether the representation that students would be taught by real estate experts, professors and mentors "hand-picked" by Mr. Trump was true.[12] As such, Mr. Trump is not entitled to summary judgment on this ground.

## 2. California Subclass

### a. Remedies

Mr. Trump largely relies on the same arguments as Defendant TU regarding Plaintiffs' alleged failure to show their entitlement to the available remedies.

#### i. Injunctive Relief

Like Defendant TU, Mr. Trump argues that Plaintiffs are not entitled to an injunction under the UCL, FAL, and CLRA. (ECF No. 375-1 at 22-23; ECF No. 390 at 13.) For the same reasons discussed above with respect to TU, the Court concludes that Plaintiffs lack Article III standing to pursue their claims for injunctive relief under the UCL, FAL, and CLRA because they have failed to raise a genuine dispute of material fact that the named Plaintiffs, Makaeff and Low, intend to again purchase TU's seminars or mentorships in the future.

---

[12]Plaintiffs also rely on a statement by Sexton at a deposition taken by the New York State Attorney General's Office, and Defendants object to this evidence. (ECF No. 386 at 18 & n.13; P Ex. 15, ECF No. 388-13 at 3; ECF No. 392.) Plaintiffs argue that Defendants' objections are unfounded and should be overruled. (ECF No. 398.) The Court does not rely on this evidence, and therefore overrules Defendants' objection as moot.

10cv0940 GPC (WVG)

Accordingly, the Court **GRANTS** Defendant Donald Trump's motion for summary judgment on Plaintiffs' claims for injunctive relief under the UCL, FAL, and CLRA.

### ii.    Restitutionary Relief and Monetary Damages

Like Defendant TU, Mr. Trump argues that Plaintiffs are not entitled to restitution under the UCL, FAL, and CLRA, or monetary damages under the CLRA, because Plaintiffs have failed to provide sufficient evidence that TU's programs were worthless.  (ECF No. 375-1 at 22-27, 29; ECF No. 390 at 7-10.)  For the same reasons discussed above with respect to TU, the Court finds these arguments unpersuasive.

Mr. Trump's only additional argument is that restitution is improper for the UCL and FAL claims because named Plaintiffs Makaeff and Low contracted with and paid money to TU, not Mr. Trump himself, and therefore requiring Mr. Trump to repay the money would not be restitutionary in nature.  (ECF No. 375-1 at 23-24.)  Mr. Trump contends that restitutionary relief allows for "'money or property identified as belonging in good conscience to the plaintiff [that can] clearly be traced to particular funds or property in the defendant's possession,'" and here Mr. Trump never directly obtained any money from Makaeff and Low.  (*Id.* (quoting *Colgan*, 38 Cal. Rptr. 3d at 62).)

Plaintiffs counter that liability under the UCL and FAL "'may be imposed against those who aid and abet the violation,'" and here there is evidence that Mr. Trump personally participated in the alleged misrepresentations and misconduct. (ECF No. 386 at 29-31 (quoting *People v. Sarpas*, 172 Cal. Rptr. 3d 25, 48 (Ct. App.

2014).) *See also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." (internal quotation marks and citation omitted); *Hahn*, 2014 WL 5100220, at *13 (holding that the defendant franchiser could be liable for its franchisee's alleged unlawful practices even though the defendant franchiser did not have a contract with the plaintiff consumers). Plaintiffs point to the following connections between Mr. Trump and TU: (1) Mr. Trump is the founder and Chairman of TU, and authorized TU to use his name, photos, and quotes for all TU seminars and presentations; (2) TU's print advertisements, email correspondence, letters, and TU website content prominently feature Mr. Trump's quotes, image, logo, and signature; (3) Mr. Trump reviewed and authorized advertisements; (4) Mr. Trump personally financed TU and reviewed financials; and (5) Mr. Trump represented that he hand-picked the TU instructors and mentors. (ECF No. 386 at 30.)

Mr. Trump replies that – even though he reviewed and approved advertisements, had an ownership stake in TU indirectly through two other limited liability companies (of which he is the controlling member), and periodically reviewed TU financial statements – Mr. Trump is not personally liable because he did not control the day-to-day operations of TU. (ECF No. 390 at 11-12 & n.10.) Mr. Trump notes that in the cases cited by Plaintiffs, aiding and abetting liability under the UCL was based on significant involvement in day-to-day operations. (*Id.* at 390 at 12 n.11.) *See Hahn*,

2014 WL 5100220, at *13 (defendant franchiser "exercised wide-reaching control over its franchisees' day-to-day operations"); *Sarpas*, 172 Cal. Rptr. 3d at 48 (individual defendant "ran and 'oversaw' the company's day-to-day operations").

Based on the foregoing, the Court concludes that Plaintiffs have raised a genuine dispute of material fact as to whether Mr. Trump can be personally liable for the alleged misrepresentations and misconduct. For example, Plaintiffs have provided evidence that Mr. Trump reviewed and approved all advertisements. (ECF No. 386 n.54; P Ex. 3 (Sexton Depo.), ECF No. 388-2 at 17-19; P Ex. 5 (Trump Depo.), ECF No. 388-4 at 22, 24, 27.) These advertisements included the alleged core misrepresentations, such as that Mr. Trump "hand-picked" the instructors and mentors. (CC Ex. 43, ECF No. 122-5 at 5; P Ex. 30, ECF No. 388-26 at 2-3.)

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' UCL, FAL, and CLRA claims on the ground that Plaintiffs have failed to show that they are entitled to restitution or damages.

### b. UCL and FAL Claims

Mr. Trump argues that summary judgment is appropriate on the UCL and FAL claims because named Plaintiffs Makaeff and Low both testified at their depositions that they were not exposed to the alleged core misrepresentations by Mr. Trump himself, and their decision to purchase the TU programs was caused by reliance on misrepresentations made by TU rather than Mr. Trump. (ECF No. 375-1 at 20-22.) Plaintiffs respond that Mr. Trump "cherry-pick[s]" excerpts from Makaeff's and Low's

depositions, and ignores evidence that Mr. Trump's misrepresentations caused their injuries. (ECF No. 386 at 42.)

To have standing to bring a class action under the UCL based on fraud or the FAL, the class representatives must show "actual reliance" on a misrepresentation. *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009); *see also Kwikset Corp. v. Superior Court*, 246 P.3d 877, 883-84 (Cal. 2011). However, the plaintiff need not show "that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct." *In re Tobacco II Cases*, 207 P.3d at 40. Further, where "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." *Id.* "[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* at 39 (internal quotation marks and citation omitted). "A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question', and as such materiality is generally a question of fact." *Id.* (internal quotation marks and citation omitted).

Mr. Trump argues that named Plaintiff Makaeff admitted at her deposition that he did not personally make to her any of the three core misrepresentations, and that her decision to purchase the Trump Elite Program was not caused by reliance on any misrepresentation by Mr. Trump. (ECF No. 375-1 at 14-15, 20-22.) He points to Makaeff's testimony that: (1) she did not attend a Free Preview but was recruited by

a friend who did so; (2) she "didn't have any communication from Trump University" or "read any materials about Trump University" before she went to the three-day Fulfillment Seminar; (3) she did not see any statements by Mr. Trump "in writing"; (4) she did not visit the TU website or see any of Mr. Trump's blog posts prior to her purchase of the Elite Program; (5) she did not recall whether any video recordings of Mr. Trump were shown at the Fulfillment Seminar; (6) Mr. Trump was not present at Makaeff's Fulfillment Seminar; and (7) she relied on statements by TU instructors and representatives in deciding to purchase the Elite Program. (D Ex. 5 (Makaeff Depo.), ECF No. 375-3 at 76-78, 82-87, 91-95, 97; D Ex. 6 (Makaeff Depo.), ECF No. 375-3 at 108-09, 111; D Ex. 7 (Makaeff Depo.), ECF No. 375-3 at 122-27.)

However, Plaintiffs counter that Makaeff also testified that at the Fulfillment Seminar she viewed slides with statements by Mr. Trump, including that "[t]his is the next best thing to being my apprentice," "[y]ou'll learn inside secrets from me," and "he was going to provide his hand-picked instructors," and that these statements caused her to sign up for the Elite Program. (ECF No. 386 at 42-43; P Ex. 9 (Makaeff Depo.), ECF No. 388-8 at 9-10.) In addition, Makaeff testified that it was important to her that Mr. Trump would hand-pick the instructors because "that's a promise he made, and I would think that he would have the ability to pick the best people since that's his expertise." (ECF No. 386 at 43; P Ex. 9 (Makaeff Depo.), ECF No. 388-8 at 12.) Plaintiffs further argue that there is a material question of fact as to whether Makaeff viewed the video of Mr. Trump during the Fulfillment Seminar because she testified

she was "not certain" whether she saw the video, but that she "possibly" saw a video in which Mr. Trump stated that "[y]ou'll get my insider secrets," "you'll learn from the best," and "I've handpicked instructors." (ECF No. 386 at 42 n.61; P Ex. 9 (Makaeff Depo.), ECF No. 388-8 at 14-16, 31-32.)

Mr. Trump similarly argues that named Plaintiff Low admitted at his deposition that Mr. Trump did not personally make to him any of the three core misrepresentations, and that his decision to purchase the three-day Fulfillment Seminar and the Elite Program was not caused by reliance on any misrepresentation by Mr. Trump. (ECF No. 375-1 at 15-16, 20-22.) Mr. Trump points to Low's testimony that: (1) Low first heard about Trump University in a local newspaper advertisement and did not describe the advertisement as containing a representation by Mr. Trump that he hand-picked instructors; (2) the only representation in writing from Mr. Trump concerning the Fulfillment Seminar prior to Low purchasing it was "big pictures of Donald Trump" at the Free Preview; (3) Low never met or spoke with Mr. Trump, and Mr. Trump never made any oral representations to Low; (4) Low did not "recollect[]" seeing any video of Mr. Trump regarding Trump University; (5) other than Mr. Goff, nobody from Trump University made any representations to Low about a mentorship before he purchased it; and (6) at the Fulfillment Seminar, Low was told "by Trump University" that in the Elite Program he would receive a "Trump University handpicked mentor" which he believed "would be somebody handpicked using

10cv0940 GPC (WVG)

whatever criteria Donald J. Trump and Trump University used in selecting these mentors." (D Ex. 9 (Low Depo.), ECF No. 375-3 at 179, 180-184, 187.)

However, Plaintiffs counter that Low also testified that the "gist" of the newspaper advertisement which caused him to attend the Free Preview was "Learn from m[y] secrets. If you want [to] secure your income, come to one of my free seminars," and that "Donald Trump caught [his] attention." (ECF No. 386 at 42-43; P Ex. 26 (Low Depo.), ECF No. 388-22 at 3-5.) In addition, Low testified that he received a letter signed by Mr. Trump which included the statement that "[m]y hand-picked instructors and mentors will show you how to use real estate strategies," that the signed letter was the "[n]umber one" reason why Low decided he wanted to buy a TU program, and that Low "took it as being very significant that [Mr. Trump] signed it" because "I got that from him." (ECF No. 386 at 43; P Ex. 26 (Low Depo.), ECF No. 388-22 at 6, 23-24; P Ex. 30 (Letter), ECF No. 388-26 at 2-3.) Low further testified that he considered all TU communications as coming from Mr. Trump. (ECF No. 386 at 43; P Ex. 26 (Low Depo.), ECF No. 388-22 at 18.)

Moreover, Plaintiffs argue that they were exposed to Mr. Trump's misrepresentations though TU's highly orchestrated advertising campaign, which featured Mr. Trump, and which Mr. Trump reviewed and approved. (ECF No. 386 at 41, 45; *see also* ECF No. 298 at 22 (class certification order stating that "there is evidence that the TU multi-media campaign was . . . highly orchestrated").)

10cv0940 GPC (WVG)

Based on the foregoing evidence, the Court concludes that Plaintiffs have raised a genuine dispute of material fact as to whether named Plaintiffs Makaeff and Low were exposed to and relied on core misrepresentations made by Mr. Trump. For instance, even though they did not rely solely on misrepresentations by Mr. Trump himself, Makaeff and Low both provided evidence that they saw misrepresentations by Mr. Trump which influenced their purchase decisions. *See In re Tobacco II Cases*, 207 P.3d at 40 (a plaintiff is not required to show that the "misrepresentations were the sole or even the decisive cause of the injury-producing conduct"). Further, there is evidence that the core misrepresentations occurred in TU advertisements featuring and approved by Mr. Trump. *See Sarpas*, 172 Cal. Rptr. 3d at 48 (liability under the UCL and FAL "may be imposed against those who aid and abet the violation").

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' claims under the UCL and FAL.

### c. CLRA Claim

Mr. Trump argues that Plaintiffs' CLRA claim fails because: (1) he was not personally involved in a "transaction" with Makaeff or Low; and (2) there is no evidence that Makaeff and Low relied on core misrepresentations he made. (ECF No. 375-1 at 27.)

### i. Transaction

The CLRA protects consumers against "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a *transaction* intended to

- 28 -

10cv0940 GPC (WVG)

result or which results in the sale or lease of goods or services to any consumer . . . ." Cal. Civ. Code § 1770(a) (emphasis added). "Transaction" is defined as "an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id.* § 1761(e). The CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Id.* § 1760.

Mr. Trump argues that Plaintiffs' CLRA claim fails because there was no "transaction" between himself and Makaeff or Low as they signed enrollment contracts with TU, not Mr. Trump himself. (ECF No. 375-1 at 27-28 (citing *Cirulli v. Hyundai Motor Corp.*, No. 08-cv-0854-AG, 2009 WL 4288367, at * 4 (C.D. Cal. Nov. 9, 2009) (dismissing CLRA claim by consumer against defendant car manufacturer for failure to disclose a defect because no alleged transaction between the consumer and the manufacturer and therefore no relationship giving rise to a duty to disclose the defect)).)

Plaintiffs counter that given the CLRA's broad definition of "transaction" and the mandate that the CLRA be "liberally construed and applied," there is an actionable transaction between Plaintiffs and Mr. Trump, even though they did not sign a contract with him directly. (ECF No. 386 at 49-51.) Plaintiffs rely on *Chamberlan v. Ford Motor Co.*, No. 03-cv-2628-CW, 2003 WL 25751413, at *7 (N.D. Cal. Aug. 6, 2003),

10cv0940 GPC (WVG)

which noted that "[n]othing in the language of the CLRA states that only a defendant who directly engaged in a completed transaction with a plaintiff may be liable to that plaintiff." Rather, "[v]iewed in light of the provision to construe the statute liberally, the broad language of the statute suggests that the legislature intended the CLRA to cover a wide range of business activities." *Id.* (denying motion to dismiss CLRA claim by consumer against defendant car manufacturer for failure to disclose defect even though consumer did not purchase used car directly from the defendant manufacturer because the defendant engaged in transactions with authorized dealerships to sell cars); *see also McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704, 712-13 (Ct. App. 2010) (noting that "a cause of action under the CLRA may be established independent of any contractual relationship between the parties" and reversing denial of class certification in CLRA action against manufacturer of allegedly defective roof tiles purchased from third-party distributor).[13]

Plaintiffs further argue that there is evidence here that Mr. Trump engaged in a "transaction" (i.e., an "agreement") that was "intended to result," and did in fact result, in the sale of TU products and services to consumers. (ECF No. 386 at 50.) Plaintiffs point to evidence, as discussed above, that Mr. Trump made misrepresentations, such

---

[13]Mr. Trump contends that Plaintiffs' cited cases are distinguishable because even though there was not a transaction directly between the plaintiff consumer and the defendant manufacturer, there was a prior transaction somewhere in the distribution chain between the defendant manufacturer and third-party distributor that was intended to result in the sale of goods or services to consumers, and the defendant manufacturer had exclusive knowledge of a defect. (ECF No. 375-1 at 28 n.18; ECF No. 390 at 13-14.) Plaintiffs respond that the cited cases still stand for general propositions supporting that there is an actionable transaction here, and that Mr. Trump's cited cases are distinguishable. (ECF No. 386 at 50 n.69, 51 n.70.)

10cv0940 GPC (WVG)

as his signed letter that "[m]y hand-picked instructors and mentors will show you how to use real estate strategies," that were intended to, and did result, in the sale of TU programs to consumers.  (P Ex. 30 (Letter), ECF No. 388-26 at 2-3.)

The Court previously rejected Mr. Trump's "transaction" argument at the motion to dismiss stage, stating that "the fact that Plaintiffs entered into a transaction with Trump University rather than [Mr.] Trump himself does not require dismissal of the CLRA claims."  (ECF No. 69 at 7 (citing *Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) (reaffirming conclusion in prior order that omissions were actionable under the CLRA against defendant car manufacturer "despite the fact that [the plaintiffs] never entered into a transaction directly with Defendant.")).)  The Court concludes that Mr. Trump has shown no grounds for the Court to reconsider its conclusion in its prior order.  Plaintiffs have raised a genuine dispute of material fact as to whether there was an actionable "transaction" between themselves and Mr. Trump under the CLRA.

### ii.    Causation/Reliance

"As with the UCL, consumers seeking to recover damages under the CLRA based on a fraud theory must prove 'actual reliance on the misrepresentation and harm.'" *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 794 (9th Cir. 2012) (citation omitted); *see also Cohen v. DIRECTV, Inc.*, 101 Cal. Rptr. 3d 37, 47-48 (Ct. App. 2009) ("[A]ctual reliance must be established for an award of damages under the CLRA."); *Vioxx*, 103 Cal. Rptr. 3d at 94 ("[P]laintiffs in a CLRA action [must] show

not only that a defendant's conduct was deceptive but that the deception caused them harm." (internal quotation marks and citation omitted)).

Like the UCL and FAL claims, Mr. Trump repeats that summary judgment is appropriate on the CLRA claim because named Plaintiffs Makaeff and Low both testified at their depositions that they were not exposed to the alleged core misrepresentations by Mr. Trump himself, and their decision to purchase the TU programs was caused by reliance on misrepresentations made by TU rather than Mr. Trump. (ECF No. 375-1 at 29.) The Court again finds Mr. Trump's arguments unpersuasive because there is a triable dispute.

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' CLRA claim.

### d. Financial Elder Abuse Claim

Under California law, financial abuse of an elder occurs when a defendant "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . for a wrongful use or with intent to defraud, or both" or "assists" in doing so. Cal. Welf. & Inst. Code § 15610.30(a)(1)-(2). The statute defines "wrongful use" as if the defendant "knew or should have known that this conduct is likely to be harmful to the elder . . . ." *Id.* § 15610.30(b). An "elder" is defined as any person residing in California who is "65 years of age or older." *Id.* § 15610.27.

Mr. Trump argues that he is entitled to summary judgment on named Plaintiff Low's financial elder abuse claim because Mr. Trump did not "take" money from Low

10cv0940 GPC (WVG)

because Low contracted with and paid money to TU, and Mr. Trump did not "assist in taking" money from Low because Low admitted at his deposition that Mr. Trump did not make misrepresentations to Low. (ECF No. 375-1 at 30.) However, the Court already determined above that Plaintiffs have raised a genuine dispute of material fact as to whether Low was exposed to misrepresentations made by Mr. Trump. As such, Plaintiffs have raised a triable dispute as to whether Mr. Trump "assisted in taking" money from Low.

Mr. Trump also argues that he is entitled to summary judgment on Low's financial elder abuse claim because there is no evidence that he knew, or should have known, that the conduct was likely to harm elders. (ECF No. 375-1 at 30; ECF No. 390 at 14.) Mr. Trump points to his own testimony that he did not know how many TU students were senior citizens and there was no "target market" for TU, and notes that there is no evidence that Mr. Trump knew Low was a senior citizen or was aware of TU's collection of demographic information of its students. (D Ex. 4 (Trump Depo.), ECF No. 375-3 at 57-58.) However, Plaintiffs provided evidence that TU advertisements could be interpreted, and were interpreted by Low, as targeting seniors, and that Mr. Trump approved all advertisements. (P Ex. 1 (Bloom Depo.), ECF No. 388-1 at 7; P Ex. 3 (Sexton Depo.), ECF No. 388-2 at 17-19; P Ex. 5 (Trump Depo.), ECF No. 388-4 at 22, 24, 27; P Ex. 26 (Low Depo.), ECF No. 388-2 at 26.) As such,

Plaintiffs have raised a triable dispute as to whether Mr. Trump "should have known" the conduct was likely to harm elders.[14]

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' California financial elder abuse claim.

### 3. Florida Subclass[15]

#### a. Misleading Advertising Law

Florida's MAL prohibits misleading advertising. Fla. Stat. § 817.41. Under the MAL, the plaintiff must "prove reliance on the alleged misleading advertising, as well as each of the other elements of the common law tort of fraud in the inducement." *Smith v. Mellon Bank*, 957 F.2d 856, 858 (11th Cir. 1992). "To state a cause of action for fraud in the inducement, the Plaintiff must allege (a) a misrepresentation of a material fact; (b) that the representor of the misrepresentation knew or should have known of the statement's falsity; (c) that the representor intended that the representation would induce another to rely and act on it; and (d) that the plaintiff

---

[14]Like Defendant TU, Mr. Trump further argues that Low is not entitled to treble damages pursuant to Cal. Civ. Code § 3345 in relation to his financial elder abuse claim because "[t]here is no evidence that Low was more vulnerable than others because of his age, impaired understanding, impaired health, restricted mobility, or disability, as required by the statue." (ECF No. 375-1 at 30 n.19.) However, as with TU, the Court finds this argument unavailing because the treble damages statute only requires that "the defendant knew or should have known that his or her conduct was directed to one or more senior citizens," and the Court has found that Plaintiffs have raised a triable dispute as to whether Mr. Trump "should have known" his conduct was directed to senior citizens. Cal. Civ. Code § 3345(b)(1); *see also id.* § 1761 (defining "senior citizen" as "a person who is 65 years of age or older").

[15]Like Defendant TU, Mr. Trump argues that the Florida subclass's claims fail because Plaintiffs failed to provide sufficient evidence that TU's programs were valueless. (ECF No. 375-1 at 32 n.21, 34.) For the same reasons discussed above with respect to Defendant TU, the Court finds this argument unpersuasive.

10cv0940 GPC (WVG)

suffered injury in justifiable reliance on the representation." *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 497 (Fla. Dist. Ct. App. 2001).

Similar to the California claims, Mr. Trump argues that he is entitled to summary judgment on the MAL claim because he did not personally make the alleged core misrepresentations to named Plaintiff Everett, nor did Everett reasonably rely on the misrepresentations.   (ECF No. 375-1 at 31-32.)   Mr. Trump points to Everett's testimony that: (1) she never met or spoke with Mr. Trump; (2) she could not remember whether a video of Mr. Trump was played at the Free Preview; (3) she did not visit the TU website or see any of Mr. Trump's blog posts prior to her purchase of TU programs; (4) the invitation she received signed by Mr. Trump did not state that TU was "accredited" or that TU provided one year of unlimited mentoring; (5) the invitation she received signed by Mr. Trump was for the Free Preview and did not "directly" cause her to later spend money on TU programs; (6) she purchased the three-day Fulfillment Seminar and the Elite Program after TU representatives described the programs; and (7) she did not think that TU was a "full scale" university like the University of Florida, but that it was "like a real estate school or a special school that has   certification," and she did not remember anyone representing that it was

10cv0940 GPC (WVG)

"accredited."[16]  (D Ex. 10 (Everett Depo.), ECF 375-3 at 200-17, 220-22; P Ex. 40 (Letter), ECF No. 388-29 at 3.)

However, Plaintiffs counter that Everett also testified that she received multiple signed letters from Mr. Trump inviting her to the Free Preview, along with a "Special Invitation from Donald J. Trump," which stated "my hand-picked instructors will share my techniques, which took my entire career to develop" and "I can turn anyone into a Successful Real Estate Investor," and she decided to attend the Preview based on the information she received in the mail.  (ECF No. 386 at 56-57; P Ex. 8 (Everett Depo.), ECF No. 388-7 at 3-4, 15; P Ex. 40 (Invitation & Letter), ECF No. 388-29 at 2-3; P Ex. 41 (Letter), ECF No. 388-30 at 2.)  In addition, Everett testified that the "Trump name, the Trump reputation, the Trump-backed program" played a "huge role" in and was the "only . . . reason" for her decision to purchase TU programs, and it was important to her that she would be working with Mr. Trump's "handpicked" instructors and mentors. (ECF No. 386 at 59; P Ex. 8 (Everett Depo.), ECF No. 388-7 at 18-19, 25, 50-51.)  She further testified that the name "University" implies an "educational program" with a "full staff of . . . handpicked experts that understand real estate investing" and she thought it was "like a real estate school or a special school that has certification and

_____

[16]Mr. Trump also contends that it is true that Everett received one year of mentoring because Everett admitted that TU agreed to restart the clock on her one year of support after she complained about her mentor, but Everett chose not to avail herself of this opportunity.  (ECF No. 375-1 at 32 n.20; D Ex. 10 (Everett Depo.), ECF No. 375-3 at 210, 218-19.)   However, Everett testified that she refused the in-field mentorship because the mentors she was assigned did not "meet the requirements as promised."  (P Ex. 8 (Everett Depo.), ECF No. 388-7 at 14, 23-24, 28-29; P Ex. 23 (Everett Decl.), ECF No. 388-20 ¶¶ 6-9.)  As such, there is a dispute of material fact as to whether this representation was true.

follows certain guidelines for the state." (ECF No. 386 at 57; P Ex. 8 (Everett Depo.), ECF No. 388-7 at 46, 52-54.)

Based on the foregoing evidence, the Court concludes that Plaintiffs have raised a genuine dispute of material fact as to whether named Plaintiff Everett was exposed to and reasonably relied on core misrepresentations made by Mr. Trump. For instance, Everett testified that she received a letter signed by Mr. Trump stating that "my hand-picked instructors will share my techniques," and that it was important to her that she would be working with Mr. Trump's "handpicked" instructors and mentors. Further, as discussed above regarding the California subclass, there is evidence that the core misrepresentations occurred in TU advertisements featuring and approved by Mr. Trump. *See Segal v. Rhumbline Int'l, Inc.*, 688 So. 2d 397, 399-400 (Fla. Dist. Ct. App. 1997) (reversing grant of summary judgment because the defendant chairman of the board could be individually liable for fraud even though he had never met the plaintiff investors if the defendant had orchestrated and allowed his name to be associated with the misrepresentations). The instant case is distinguishable from Mr. Trump's cited case of *Kramer v. Unitas*, 831 F.2d 994, 995, 998-99 (11th Cir. 1987) – which held that a famous football player (with no specialized financial acumen) who promoted a mortgage/investment broker was not liable for the broker's misrepresentations since the football player did not make them himself – because here there is a triable dispute whether Mr. Trump made the misrepresentations.

10cv0940 GPC (WVG)

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' MAL claim.

### b.      Florida Deceptive and Unfair Trade Practices Act

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce " Fla. Stat. § 501.204; *see also id.* § 501.202 (FDUTPA purpose). A "consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). "The Florida Supreme Court has noted that deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment. This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (internal quotation marks and citations omitted).

Mr. Trump repeats that he is entitled to summary judgment on the FDUTPA claim because he did not personally make the alleged core misrepresentations to Everett, nor did Everett rely on the misrepresentations. (ECF No. 375-1 at 33-34.) The Court again finds Mr. Trump's argument unpersuasive because there is a triable dispute.

10cv0940 GPC (WVG)

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' FDUTPA claim.

### c.     Financial Elder Abuse

The FDUTPA provides "a heightened civil penalty if a senior citizen . . . is victimized." *In re Miller*, 418 B.R. 406, 412 (Bankr. N.D. Fla. 2009). Specifically, under the FDUTPA, "[a] person who is willfully using, or has willfully used, a method, act, or practice in violation of this part which victimizes or attempts to victimize a senior citizen or a person who has a disability is liable for a civil penalty of not more than $15,000 for each such violation if she or he knew or should have known that her or his conduct was unfair or deceptive." Fla. Stat. § 501.2077(2). For purposes of this section, "senior citizen" means "a person who is 60 years of age or older." *Id.* § 501.2077(1)(e).

Like Defendant TU, Mr. Trump solely argues that Plaintiffs' elder abuse claim fails because summary judgment is appropriate on the underlying FDUTPA claim. (ECF No. 375-1 at 35 (citing *Borden v. Saxon Mortg. Servs., Inc.*, No. 08-cv-61851, 2010 WL 3834590, at *10 (S.D. Fla. Sept. 28, 2010).) Because the Court has found there is a triable dispute on the FDUTPA claim for Mr. Trump, it also finds there is a triable dispute on the financial elder abuse claim. (ECF No. 386 at 56.)

Accordingly, the Court **DENIES** Defendant Donald Trump's motion for summary judgment on Plaintiffs' Florida financial elder abuse claim.

1       ### 4.    New York Subclass[17]

2       The New York General Business law declares unlawful "[d]eceptive acts or

3       practices in the conduct of any business, trade or commerce or in the furnishing of any

4       service in th[e] state." N.Y. Gen. Bus. Law § 349(a). "A private plaintiff suing under

5       § 349 'must allege that a defendant has engaged in (1) consumer-oriented conduct that

6       is (2) materially misleading, and that (3) plaintiff suffered injury as a result of the

7       allegedly deceptive act or practice.'" *Oscar v. BMW of N. Am., LLC*, No. 09-cv-11-

8

9       PAE, 2012 WL 2359964, at *3 (S.D.N.Y. June 19, 2012) (quoting *City of New York v.*

10      *Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009)). "Although § 349 'does

11

12      not require proof of justifiable reliance, a plaintiff seeking compensatory damages must

13      show that the defendant engaged in a material deceptive act or practice that *caused*

14

15      actual, although not necessarily pecuniary, harm.'" *Id.* (quoting *Oswego Laborers'*

16      *Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y.

17      1995) (emphasis added)). New York courts have adopted "an objective definition of

18

19      deceptive acts and practices, whether representations or omissions, limited to those

20      likely to mislead a reasonable consumer acting reasonably under the circumstances."

21      *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745.

22      Similar to the California and Florida subclasses, Mr. Trump argues that he is

23

24      entitled to summary judgment on the § 349 claim because named Plaintiff Brown

25      _____

26      [17]Like Defendant TU, Mr. Trump argues that the New York subclass's claims fail
        because Plaintiffs failed to provide sufficient evidence that TU's programs were of de
27      minimis value. (ECF No. 375-1 at 36-37.) For the same reasons discussed above with
        respect to TU, the Court finds this argument unpersuasive.

28

admitted that he was not exposed to misrepresentations by Mr. Trump, and that such misrepresentations did not cause his injury. (ECF No. 375-1 at 35-36.) Mr. Trump points to Brown's testimony that: (1) Brown first learned of TU through an e-mail or an announcement in the mail, but could not remember its content other than that Mr. Trump's name was on it; (2) Brown did not see any writings from Mr. Trump about the "$1,495 program" before he purchased it; (3) in a response to document requests for "each TRUMP UNIVERSITY advertisement and/or marketing material deponent relied on before purchasing" TU programs and any document "that reflects any promise or representation that TRUMP UNIVERSITY provides one year of in-person mentoring or year-long mentoring," Brown did not produce any documents personally from Mr. Trump; (4) Brown did not see any literature about the in-field mentorship before he purchased it; he was just "told" that it would be phone calls prior to three days of in-person mentoring; (5) Brown did not believe Mr. Trump said the "words" that he would be provided with unlimited one year of expert support and mentoring, and that representation was made by people there when he signed the contract; (6) he did not visit the TU website prior to his purchase; (7) nobody represented that TU was an "accredited university," but it was "impl[ied]" by calling itself a "university"; (8) Brown did not expect the Fulfillment Seminar to be in a "university-type setting" because it was just a "seminar," and he did not think "it was going to be a university"; (9) Brown did not think that Mr. Trump said TU was a "legitimate academic institution," but "he implied that it was"; (10) Brown never met or spoke with Mr.

- 41 -

10cv0940 GPC (WVG)

Trump, and Mr. Trump did not attend the Free Preview or Fulfillment Seminar; (11) in the promotional video which Brown saw, Mr. Trump did not say what Brown would receive "[f]or a particular program," but generally said that he "would receive top notch people to work with [him], handpicked by Mr. Trump"; (12) Brown could not remember other details of the Mr. Trump video; and (13) when asked why he decided to purchase the Fulfillment Seminar, Brown did not identify any of the core misrepresentations, but rather stated "I wanted to continue making money. I felt that more education would be able to help me make better judgments and better choices – or maybe not better, but the best choices." (ECF No. 375-1 at 17-1; D Ex. 12 (Brown Depo.), ECF No. 375-4 at 8-14, 16-20, 23-31, 34-40; D Ex. 13 (Request to Produce Docs at Depo., Nos. 3, 6), ECF No. 375-4 at 46-47; D Ex. 14 (Produced Docs), ECF No. 375-4 at 51-68.)

However, Plaintiffs counter that Mr. Trump concedes that Brown viewed the promotional video in which Mr. Trump appeared, and that Brown recalled that Mr. Trump said in the video that the instructors were "handpicked" by him and that "[t]hey're the best of the best." (ECF No. 386 at 60-61; P Ex. 25 (Brown Depo.), ECF No. 388-21 at 11-12, 25, 33-34, 36, 39.) Brown understood this to mean that the instructors were "selected individually and personally by Donald Trump," which is what Brown "wanted." (ECF No. 386 at 61; P Ex. 25 (Brown Depo.), ECF No. 388-21 at 11-12.) Brown also testified that Mr. Trump said that TU "would be as good as the Wharton School of Business." (ECF No. 386 at 61; P Ex. 25 (Brown Depo.), ECF No.

10cv0940 GPC (WVG)

388-21 at 28.)  Brown further testified that Mr. Trump described the instructors and mentors as "professors," and that by calling TU a "university," he believed that it would be the same "caliber" as a "university-type education" and that he would be learning in a "classroom" setting.  (ECF No. 386 at 61; P Ex. 25 (Brown Depo.), ECF No. 388-21 at 14-15, 37.)  Moreover, Plaintiffs argue that the proper inquiry is whether a "reasonable consumer" was likely to be misled, not Brown's subjective view of the misrepresentations.  (ECF No. 386 at 61 (citing *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745).)

Based on the foregoing evidence, the Court concludes that Plaintiffs have raised a genuine dispute of material fact as to whether Plaintiff Brown was exposed to core misrepresentations made by Mr. Trump, and whether a "reasonable consumer" could have been misled.  For instance, Brown testified that he watched a promotional video in which Mr. Trump said that he had "handpicked" the mentors and instructors, that they were "professors," and that TU was akin to "the Wharton School of Business." Further, as discussed above, there is evidence that the core misrepresentations occurred in TU advertisements featuring and approved by Mr. Trump.

Accordingly, the Court **DENIES** Defendant Mr. Trump's motion for summary judgment on Plaintiffs' claim under New York General Business Law § 349(a).

In sum, the Court **GRANTS** Defendant Donald Trump's motion for summary judgment regarding Plaintiffs' claims for injunctive relief under the UCL, FAL, and

CLRA, but **DENIES** Defendant Donald Trump's motion for summary judgment in all other respects.

## CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

(1)     the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Donald Trump's Motion for Summary Judgment or, In the Alternative, Partial Judgment (ECF No. 375);

(2)     the Court **GRANTS IN PART** and **DENIES IN PART** Defendant Trump University's Motion for Summary Judgment or, In the Alternative, Partial Judgment (ECF No. 377);

(3)     the Court **GRANTS** summary judgment as to Plaintiffs' claims for injunctive relief under the UCL, FAL, and CLRA;

(4)     the Court **DENIES** summary judgment as to all other claims.

**IT IS SO ORDERED.**

DATED:  November 18, 2015

HON. GONZALO P. CURIEL
United States District Judge

10cv0940 GPC (WVG)