# EXHIBIT 1

Exhibit 1
- 1 -

  Subscribers

# Courthouse News Service

Monday, April 20, 2015    Last Update: **7:23 AM PT**

**$798,000 Award Against Trump University**
By REBEKAH KEARN

Like | Tweet | g+1 | ShareThis



SAN DIEGO (CN) - Donald Trump's profit-seeking business college must pay $798,000 in legal fees to a former student, for filing an anti-SLAPP suit, a federal judge ruled.

Tarla Makaeff sued Trump University and Donald Trump in 2010, in a proposed class action alleging deceptive business practices. Makaeff claimed she shelled out $60,000 for a real estate program that consisted of seminars that were little better than infomercials.

Trump University countersued , accusing Makaeff of defaming it in online postings and elsewhere.

Makaeff moved to strike the counterclaim under California's anti-SLAPP law.

U.S. District Judge Irma Gonzalez denied the motion, but the 9th Circuit reversed in 2013.

After the district court granted Makaeff's motion to strike in June 2014, she asked for $1.3 million in attorneys' fees and costs. Her attorneys claimed they'd spent 2,226 hours on the case, a number Trump's attorneys disputed.

The case is no longer a class action and Donald Trump himself no longer is a defendant.

U.S. District Judge Gonzalo Curiel on April 9 awarded Makaeff $798,779.24 in fees and costs.

Makaeff's attorneys sought hourly rates of $250 to $440 for associates and $600 to $825 for partners, citing a 2007 survey in the National Law Journal and their experience handling class actions.

Trump's attorneys called these rates unreasonable and pushed for a blended hourly rate of $300 on the grounds that Makaeff's attorneys had no anti-SLAPP litigation experience and assigned too many partners to a "simple motion."

Curiel found the rate requests for associates and partners reasonable, but denied Makaeff's request for staff attorney and paralegal fees because she did not provide enough evidence to support the requested hourly rates or give enough background information to enable the court to determine an appropriate prevailing rate.

Trump University argued that the hours submitted by Makaeff's attorneys should be reduced because they often lumped together multiple tasks, duplicated hours by appointing more than one attorney to a task and committed staffing improprieties.

Curiel scaled back the number of hours expended on most of the plaintiffs' 25 proceedings by 20 percent, others by 50 percent and some he declined entirely, reducing the fees award by $542,920.85 to $790,083.40.

The judge also cut $513.46 in requested costs for an award of $8,695.81.

Curiel denied Makaeff's motion to apply an upward multiplier to offset any reduction in fees because he said she "has not met her burden that a contingency fee enhancement is appropriate here."

The Trump Organization told Courthouse News it will appeal.

"Despite Trump University being rated as 'excellent' by 98% of its students and having an 'A' rating with the BBB [Better Business Bureau], Tarla Makaeff engaged in a campaign to defame it in her quest to obtain an unjustified refund. As a result, we believe that the court's most recent ruling was in error and plan to appeal," Trump's assistant general counsel Jill Martin said.

Makaeff was represented by Aaron M. Olsen and Amber Lee Yeck with Zeldes, Haeggquist & Eck.

Makaeff's counsel did not return requests for comment by the close of business hours Friday.

Exhibit 1
- 2 -

# EXHIBIT 2

Exhibit 2
- 3 -



# NATIONAL REVIEW

# Did Donald Trump Run a Scam University?

(Timothy A. Clary/AFP/Getty)

Aa

by JILLIAN KAY MELCHIOR

*July 16, 2015 4:00 AM*

@JILLIANKAYM

In June 2009, Richard and Shelly Hewson paid the Trump Entrepreneur Initiative, an educational venture owned by businessman and now–presidential candidate Donald Trump, $21,490 for classes that promised to teach them how to flip homes for profit. They ponied up the high price "because we had faith in Donald Trump," Richard wrote in a January 2015 affidavit. "We thought that if this was his program, we would be learning to do real estate deals from his people who knew his techniques."

What did the New Jersey couple get for shelling out more than $20,000 to a business bearing the famous Trump name? An instructor took them on a field trip to see dilapidated homes in rough Philadelphia neighborhoods, never bothering to explain how to reliably find properties to sell for a profit.

"We realized that Trump was not teaching us how to find these needles in a haystack," Richard Hewson's affidavit says. "We concluded that we had paid over $20,000 for nothing, based on our

Exhibit 2
- 4 -

belief in Donald Trump and the promises made at the [organization's] free seminar and three-day workshop."

"We never tried to get our money back because at that point we thought the whole thing was a scam and that we would not be able to fight Donald Trump," Hewson wrote.

Now Trump is fighting more than a dozen other candidates for the Republican presidential nomination, making his pitch on his business record and the respect it's garnered him from millions of voters. But will his image as a peerless, productive entrepreneur suffer because of allegations that one of his businesses — one that promised to help ordinary Americans achieve success like his — amounted to a scam?

> ## A class-action lawsuit in California and an ongoing civil suit brought by New York allege that Trump University defrauded up to 5,000 students.
>
> _____



The Hewsons are not alone: A class-action lawsuit in California and an ongoing civil suit brought by New York State allege that the now-defunct Trump University, later known as the Trump Entrepreneur Institute, defrauded up to 5,000 students, who paid as much as $35,000 to learn Trump's real-estate investment strategies and techniques.

The venture was, as Trump enterprises go, not especially large — the New York complaint alleges

Exhibit 2
- 5 -

Trump University earned about $40 million in revenue between 2005 and 2011. It's just one of many businesses whose main selling point is Trump's brand, a successful synthesis of prestige and up-by-your-bootstraps American entrepreneurship, quite at odds with the picture that recipients of a Trump education paint.

**RELATED: Donald Trump's Surprisingly Progressive Past**

Last October, a New York trial court ruled that Trump University and Donald Trump personally were liable for restitution for all students who had taken the course since May 2010, "because it was operating illegally without a state license," according to the attorney general's office.

Trump representatives claim "there's no merit to these allegations whatsoever." Alan Garten, executive vice president and general counsel for the Trump Organization, says former students brought suit "completely [out of] a financial motivation."

The courses, he says, were "done in a first-class manner, and the materials were high-quality and first-rate."

## MORE *DONALD TRUMP*



**RICK PERRY COMPARES TRUMP TO CANCER, KNOW-NOTHINGS, AND JOE MCCARTHY IN DOUBLE-BARRELED D.C. SPEECH**

**TRUMP'S TOUGH GUY APPEAL**

**DONALD TRUMP AND JEREMY
CORBYN ARE RUNNING THE SAME
CON ON VOTERS**

According to the lawsuits, Trump University aggressively marketed a 90-minute free seminar that would reveal Trump's real-estate investing secrets. "My hand-picked instructors will share my techniques, which took my entire career to develop," said one mass mailer bearing Trump's signature and offering two free VIP tickets to the event.

At the seminar, sales representatives were waiting, reportedly tasked with persuading attendees to pay an additional $1,495 for a three-day conference (which the Hewsons signed up for) that would provide "the last real-estate education you will ever need for the rest of your life." According to New York State's complaint, "Trump University speakers repeatedly insinuated that Donald Trump would appear at the three-day seminar, claiming that he 'is going to be in town' or 'often drops by' and 'might show up' or had just left."

But instead of getting a personal lesson from Trump, both cases claim, those who signed up got to take a picture with a cardboard cutout of him — and then, the "faculty" allegedly subjected them to another sales pitch, aimed at persuading attendees to sign up for a $34,995 "Gold Elite Program," which they said would include special training, mentorship, and access to alternative financing sources for real-estate deals.

**RELATED:** [The Trump Sideshow Plays Right Into the Democrats' Hands](#)

Using high-pressure techniques, the complainants allege, salesmen tried to pressure attendees into charging the $34,995 to their credit cards.

## The complainants allege
## salesmen tried to
## pressure attendees into

Exhibit 2
- 7 -

# charging the $34,995 to their credit cards.



"Trump University even provided handouts with scripted talking points for students to use in their phone calls with credit-card companies, explicitly encouraging people to falsify their current income, 'add[ing] projected income from our future real estate venture[s],' and to deceive credit card companies by declaring income streams from corporate entities that had not been created, with the script telling students: 'If they ask you to prove income, inform them that it will be too much trouble to put all the paperwork together,'" New York State's complaint says.

Garten says: "There was no high-pressure sales techniques — that's crazy. . . . Were there efforts to sell the course? Yes. . . . We think it provides people with real benefits. [But] no one was compelled or coerced to do that. It's laughable. People can make their own decision."

New York State alleges that some students wiped out their savings or went heavily into debt to cover the cost of the courses, which seem to have rarely delivered on the lofty promises.

**RELATED:** **Donald Trump Loves Gold, as a Matter of Home Decor and Monetary Policy**

The New York suit, led by Democratic attorney general Eric Schneiderman, says many of the so-called faculty "came to Trump University from jobs having little to do with real estate investments, and some came to Trump University shortly after their real-estate investing caused them to go into bankruptcy." (Garten says the course materials were "prepared by leaders in the field," including Ivy League professors.)

Trump's camp points to surveys conducted by attendees that reportedly show a 98 percent approval rating, but New York State alleged that some students felt pressured by their teachers to provide high

Exhibit 2
- 8 -

rankings or were asked to rate the course before they had even completed it.

***GET FREE EXCLUSIVE NR CONTENT***

| | |
|---|---|
| | **Submit** |

NATIONAL REVIEW did find some former students who said they were satisfied with their Trump University experience.

"It gave me the guidelines and knowledge to enter real-estate investment, and it was helpful for me," says Jorge Carlos Guillen, a realtor in Virginia and Maryland. "For me, it was not a scam. I paid $10,000 for it, and I got that money back pretty quickly."

Mark Gordon, owner of MG Real Estate Solutions and Mark Gordon Properties Inc., says he paid for the whole $34,995 class and was satisfied: "Helpful would be an understatement."

"You pay your money and take your chances, and you'd better go into these kinds of things with your eyes wide open," Gordon says. "I don't think [Trump is] a scam artist, and I don't have a beef with this. Some people are very unhappy, and I get that: They spent a lot of money. [But] there was never any implied guarantee that you take their training and you're going to make millions. I never got that."

**RELATED: Trump Fans, It's Time for an Intervention**

New York State has alleged that Trump's for-profit educational company operated there between 2005 and 2011 despite repeated warnings from the state's education department that it's illegal to run an unchartered, unlicensed university. The state court has not yet determined how much restitution Trump University will have to pay. The trial court authorized Trump's legal team to depose each of the estimated 5,000 consumers potentially eligible for money.

The Trump Organization maintains that it was upfront about what the school was. "At no time did we

Exhibit 2
- 9 -

ever represent that it was a certified institution," Garten says. "It's not like we were operating in the dark. We were open and notorious. We advertised it quite extensively. People knew exactly what we were doing, including the [state] department of education, and they were fine with it."

## *MORE DONALD TRUMP*



**RICK PERRY COMPARES TRUMP TO CANCER, KNOW-NOTHINGS, AND JOE McCARTHY IN DOUBLE-BARRELED D.C. SPEECH**

**TRUMP'S TOUGH GUY APPEAL**

**DONALD TRUMP AND JEREMY CORBYN ARE RUNNING THE SAME CON ON VOTERS**

In October, New York State supreme-court justice Cynthia S. Kern decided that that Trump had violated state education law, writing, "It is undisputed that Mr. Trump never complied with licensing requirements." Because of the statute of limitations, the state could not seek restitution throughout the entire time Trump operated without a license, just from 2010 onward.

The ongoing lawsuits against Trump University may prove uncomfortable for Donald Trump as he embarks on a presidential campaign. Many of his businesses, like Trump University, derive their success from his brand, and yet other Trump business practices — such as his unsuccessful casinos in New Jersey's Atlantic City and his firms' alleged hiring of illegal immigrants on construction projects

Exhibit 2
- 10 -

— have come under scrutiny, too. A number of Trump ventures have gone bankrupt in spectacular fashion, and even his net worth has been a matter of controversy: In a recent press release, Trump claimed his worth to be $10 billion, but *Forbes* magazine has pegged it at just $4 billion.

The press release was prompted by Trump's filing financial-disclosure forms with the Federal Election Commission, which is required for participation for the first Republican presidential debate, on August 6. There's more news forthcoming, though, thanks to the Trump U lawsuits: A California federal judge ruled earlier this month that Trump has to testify on August 10 about both his net worth and his earnings from the real-estate classes.

— *Jillian Kay Melchior writes for* NATIONAL REVIEW *as a Thomas L. Rhodes Fellow for the Franklin Center.*

VIEW COMMENTS

Exhibit 2
- 11 -

# EXHIBIT 3

Exhibit 3
- 12 -

POLITICS

# What the Legal Battle Over Trump University Reveals About Its Founder

**Steven Brill** | 8:12 AM ET

**Inside the litigation**

*Read about "Trump's Most Useful Enemy" in the Nov. 16 issue of TIME.*

On May 22, at an afternoon hearing to go over a pretrial procedural issue, U.S. District Judge Gonzalo Curiel in San Diego mused over exactly what kind of consumer-fraud case he was dealing with. Was it analogous to another suit involving something called the Cobra Sexual Energy supplement, which had been alleged, the judge recalled, to be "worth zero"? Or was it was more like the case involving a fruit drink that consumers were deceived into thinking had more pomegranate juice than it actually did?



Mario Tama—Getty Images

Trump at a news conference in New York City on May 23, 2005, announcing the establishment of Trump University.

The distinction would determine whether the plaintiffs' lawyers would be allowed to sue the marketer of the allegedly bogus product on behalf of thousands of customers at the same time, or whether the cases would have to be fought one by one, making them worthless for the lawyers to pursue, because the payoff for each individual client would not be worth the time and cost of going to trial.

So the stakes were high. Yet it was a dreary, highly technical argument–an unremarkable session on the eve of Memorial Day weekend. What was remarkable, however, was that in this hearing–as in multiple other hearings and court filings extending over five years –the lawyers defending the product, while maintaining that it had some value, seemed to concede that it had not been what its marketers claimed it was. Therefore, the question to be decided if and when the case came to trial would be whether and how much the customers were entitled to recover in damages, because what they got wasn't what it touted to be.

Even the owner and name behind the product–the man whose promotional materials claimed that his personal know-how and hands-on involvement constituted the core value of the product–had already conceded in his own deposition and his lawyers' filings that, though he had been intimately involved in how the product was promoted, he had had little to do with deciding its ingredients and, despite the marketing claims, had been "completely absent" from the company bearing his name that produced and sold it.

Exhibit 3
- 13 -

What was still more remarkable was that the owner of the product likened by both sides and the judge that afternoon to the Cobra Sexual Energy pill or to adulterated fruit juice was soon to become No. 1 in the Republican presidential polls: Donald Trump.

Politicians often charge their opponents with selling snake oil when they overpromise. But in litigation that has been meandering through court for five years, Trump is being accused of actually selling snake oil. That term was used intermittently with Cobra Sexual Energy supplements during the hearing as shorthand for describing a worthless product that would more easily lend itself to a class-action case, because all the buyers would be entitled to a full refund. However, if Trump's allegedly deceptive product was more like adulterated juice, which is what Trump's lawyers claimed, that would require individual cases, because the juice had had some value, albeit not the full value, which would have to be gauged case by case.

The snake oil or adulterated juice that Trump is accused of selling has to do with Trump University, a series of adult-education classes offering Donald Trump's real estate investing methods and secrets. At its core, the accusation is that the name was deceptive on both counts: there were no distinctive Trump methods or secrets actually provided. And despite its use of terms like professors, adjunct professors and tuition, it was never a university.



One of a series of checks and wire transfers from Trump University made out to
and signed by Trump from court documents.

Trump and his university–which operated from 2005 through 2010, when it was shut down as the San Diego suits and multiple state attorneys general investigations were beginning–lured approximately 7,000 consumers into paying $1,495 to $34,995 for courses where, as the promotional material put it, Donald Trump's "handpicked instructors" would teach them Trump's "insider success secrets" of how to invest in real estate.

Trump "created, funded, implemented and benefited from a scam that cost them … thousands, even tens of thousands of dollars each," the lawyers suing him have argued.

Trump told me recently, in a rare discussion about the details of the case, that he "loves talking about this," because the courses were "fantastic." He has surveys filled out by students, he said, showing a "98% satisfaction rate" that is "better than Harvard's." He is "dying to go to court," he insisted. However, his lawyers so far have thrown five years' of procedural roadblocks in front of a trial. And at least one key decision–in which the judge in that hearing in May potentially sidelined a class action by coming down more on the side of the adulterated-juice analogy–may ultimately keep a jury from hearing the case.

Trump maintains that the lawyers' focus on procedural issues so far does not reflect the merits of his case and the "scam" the plaintiffs are trying to pull off. But the documents that have piled up in court during the pretrial wrangling–even those produced by Trump's own side–tell a story of a school that fell well short of fantastic. Even the claimed satisfaction rates are undercut by Trump's own documents.

A similar case against Trump and Trump University was brought in 2013 by New York State attorney general Eric Schneiderman. But Schneiderman's drive to attract early publicity for his case has far exceeded his skill in prosecuting it. It has also been undermined by his own alleged ethical lapses in going after Trump while soliciting campaign donations from Trump's daughter and one of his lawyers (see sidebar).

It is the two less-noticed, related civil cases in San Diego, filed on behalf of thousands of Trump's customers, that provide proof that a leading presidential candidate is in court

Exhibit 3
- 14 -

Case 3:10-cv-00940-GPC-WVG   Document 443-4   Filed 02/08/16   Page 15 of 25

(and scheduled to sit for another deposition next month) defending a product that shortchanged thousands of vulnerable consumers, a large portion of whom were elderly, targeted with messages that Trump University was their ticket to avoiding spending their final years working as greeters at their local Walmart.

Even if the trials actually happen, they are still probably a year away. But the internal Trump University records already sitting in the case files could become a weapon wielded by Trump's 2016 opponents. They could argue that Trump's foray into enticing aspiring entrepreneurs to tap their credit cards to pay for get-rich-quick classes—where Trump's actual input, other than the marketing, was restricted to a life-size poster of the mogul mounted in front of the room so they could take pictures with it—says a lot about the man under the Make America great again hat.

**"The Next Best Thing"**

It is "The Next Best Thing" to being Donald Trump's "apprentice," the Trump University ads promised, drawing on what was then the runaway popularity of Trump's television show, The Apprentice. Mentors would be "handpicked by me," Trump promised in a promotional video; and, his other promotional materials promised, they would teach students Trump's "secrets," then guide them through get-rich-quick real estate deals and even find them lenders so that their deals could be financed with "other people's money."

The court documents tell a different story. Michael Sexton, who was hired by Trump to be president of Trump University, testified in a 2012 pretrial deposition that "none of our instructors ... were handpicked by Donald Trump" and that the curriculum was written by an outside adult-education firm.

The record is replete with evidence that many of the supposed "expert" teachers and mentors—who were mostly paid only sales commissions—had backgrounds in sales rather than experience in real estate investing, let alone successful investing. Two had filed for personal bankruptcy during the time they were mentoring.

Trump has testified in a deposition (after promising to sue the lawyers suing him) that he had no direct role in creating the curriculum or hiring the teachers. He did not know, he said, if his "university" conferred degrees. (It didn't.) And he could not explain what the sales materials were referring to when they touted Trump's "foreclosure system" for flipping distressed properties.

So far, Trump's only courtroom defense beyond the procedural wrangling has been that these kinds of apparent misrepresentations are the kind of general puffery involved in any commercial marketing. A case his lawyers have cited is one in which Allstate insurance successfully defended its slogan "You're in good hands with Allstate."

**More Than a Tough Businessman**

Mitt Romney was attacked in ads in his U.S. Senate campaign and then in his presidential run for being involved in private-equity plays that caused workers to lose jobs while he made millions. Carly Fiorina suffered the same broadsides during her U.S. Senate race, stemming from her ill-fated tenure as CEO of Hewlett-Packard. But neither was accused of defrauding people or otherwise breaking the law; the rap against them was that they were hard-hearted businesspeople. As Trump advances in the 2016 contest, he could face charges of an entirely different magnitude.

The records indicate, for example, that Trump University collected approximately $40 million from its students—who included veterans, retired police officers and teachers—and that Trump personally received approximately $5 million of it, despite his claim, repeated in our interview, that he started Trump University as a charitable venture.

One of the two San Diego cases has been allowed by the judge to be brought under the Racketeer Influenced and Corrupt Organizations Act, or RICO. This means that, fairly or unfairly, opponents will be able to say that a large group of everyman voters, many of them elderly, have accused a leading contender for the Oval Office of being a racketeer.

**The Trump Playbook**

Exhibit 3
- 15 -

The Trump University "curriculum" was actually a sales funnel. At the top were a series of free 90-minute real-estate-industry workshops conducted across the country in 700 locations. They were promoted by newspaper ads and mass mailings in the form of personal invitations signed by Trump. According to the lawsuits and to Trump University's own business plans–including an elaborate 135-page "playbook," on file as evidence in the suit–free sessions were meant to persuade attendees to buy a $1,495 ticket to a three-day workshop, touted to those attending the free sessions as being "all you need" to start getting rich.

In the foreword to one of the materials handed out at these sessions, Trump University president Sexton wrote, "Other organizations try to sell help alone, without the proven expertise to back it up, and just when you realize that the advice you paid for is ... ineffective–they try to sell you more expensive products. They hook you on promises and never deliver. Neither I nor our chairman Donald J. Trump would stand for that at Trump University."

Yet the playbook spells out how that session was meant to up-sell those $1,495 attendees into mentorship programs costing $9,995 to $34,995. It even uses the term set the hook to describe the process of luring people at the free preview session to take the three-day $1,495 course. Once their quarry was on the hook for $1,495, the message to be hammered home beginning on the second day of that program was that three days wasn't nearly enough time to get the students out there making Trump-like deals. Only the more expensive mentorships could do that.

Scripts directed teachers to remind students of their instructors' close association with Trump. "I remember one time Mr. Trump had us over for dinner," the script read, after which the instructor recounted how Trump had confided some nugget of real estate wisdom to him.

"No, I didn't have dinner with him," conceded Gerald Martin, when questioned in a 2013 deposition about a recorded presentation in which he mouths the script's dinner-with-Trump line. "I was just trying to be as close to the [script] as possible."

"I don't know who you're talking about," Trump told me when asked about Martin's dinner tale. "But I will tell you I met many of the professors, and I also studied just about all the résumés. I'm very much into academics. You know, I was a good student."

**The "Terrific People" Promise**

"We're going to have ... terrific people, terrific brains ... the best of the best." That sounds like Trump promising voters in Iowa that in his Administration, winners like Carl Icahn would be deployed to deal with China. But it's from a 2008 video that Trump appeared in, which was used to convince students attending the three-day session of why they should step up to the mentorship program.

The best lecturer for these sessions, it turns out, was James Harris. As with all the other presenters at the free or $1,495 sessions, Harris was paid a straight 10% of whatever up-sell tickets he sold. Harris' up-sell rate was so good that Trump University executives distributed a transcript of one of his sessions, so that they could learn from the winning elements of his unscripted Q&A at the end, where the master pitchman closed his sales.

Among the highlights of Harris' winning presentation was his promise that Trump "only wants to leave a legacy ... He does not need your $1,500."

Trump, too, told me that "all money that I made was going to go to charity." His marketing mailings similarly promised that he was launching the program as a way of "leaving a legacy." However, documents and testimony in the court file indicate that Trump collected approximately $5 million in profit in a series of wire transfers and checks written to him personally by the university–and signed on behalf of the university by Trump.

Trump explained that to me by saying that he had planned to make the charitable donations from his personal accounts, but that because the university had had to shut down and was still paying legal expenses, those donations "never happened." According to Trump lawyer Alan Garten, Trump returned the money to the university from his personal funds once the legal troubles started.

Exhibit 3
- 16 -

Harris also promised in his presentation that "I can show you how to do no money, no credit, no license, no loan real estate ... We make money on every single deal." Following a riff on the frustration of "working for someone else," he offered an alternative scenario that he explained to his students could be theirs if they had the courage to part with $1,495: "I work in my robe a couple of hours a week. Folks, full time for you is going to be six to eight or 10 hours a week. That is it."

Near the end of the session, Harris scolded an 18-year-old who said he might not be able to make the $1,495 class starting on a Friday because he was still in high school. "Take the day off," he told the high schooler. "This is more important ... This is a billionaire, and I work for him and am going to show you how to buy and sell real estate."

According to court records filed in the cases, Harris, who boasted in his presentation about not having a college degree, has no known record of real estate success but a long record of being involved in the financial self-help speaking circuit. (The background report Trump University paid for on him simply listed multiple years of "self-employment.")

Harris' cell phone urges that people wanting to reach him send an email via newwealthgenerator@gmail.com. He did not return two requests for comment about his real estate background that I sent to that address.

**Tapping Out Credit Cards**

The instructors in the $1,495 course told students to fill out forms detailing their personal assets. The ostensible purpose was so that the instructors could counsel them on the best investments. The real purpose, according to court filings, was to ascertain whether they might be targets for the Elite $34,995 up-sell or for less expensive Silver or Gold up-sells. The instructors told their students to contact their credit card companies during a lunch break in order to get their credit limits raised–not so that they could buy properties, as the script said they were to be told, but so that they could charge the mentorship programs to those credit cards.

Kevin Scott, 46, told me that he sat in on Harris' 90-minute presentation at a hotel in Westchester County, New York, in 2008. He then enrolled in the $1,495 course, also run by Harris, where he was persuaded to buy a $25,000 Elite package. Scott, who works for a pharmaceutical company, recalled that he was attracted by the "picture Harris painted" of being able to reap quick profits "by flipping distressed properties" using "other people's money."

Scott said his mentor accompanied him on a weekend tour of properties in Westchester. At first he was impressed. But when he tried to make a deal to buy and flip the houses, he was told each time by the banks that owned the properties that he had to have financing in place before they would consider his offers. And the nonbank "hard money" lenders who Harris had promised would be made available to him by Trump University were "nowhere to be found," he said.

"It all amounts," Scott said, to a "whole lot of nothing." He adds that because he tapped out his credit cards to pay the tuition, "I ended up being one of those distressed properties; I now have to rent out my house and live in a small apartment." Scott is now one of what are likely to be nearly 7,000 plaintiffs in the class actions.

Exhibit 3
- 17 -

**Polling and Image Above All Else**

As a presidential candidate, Trump claims to eschew the dependence on pollsters and obsession with image that he says disqualify his opponents. But court filings show university employees were regularly reminded that the marketing messages and dialogue they were instructed to use had been rigorously market-tested to create a carefully crafted image. The teachers were always to be called "faculty." A crest that looked like it was borrowed from Yale or Harvard was embedded in the logo. An "admissions department" was listed on the website. The marketing guidelines had sections called "catchphrases/buzzwords" and "tone" that encouraged the use of language such as "elitist," "Ivy League" and "Think of Trump University as a real university with a real admissions process–i.e., not everyone who applies is accepted."

Trump's executives made sure that the address of the university–40 Wall St., a Trump-owned building–was included on everything because it added credibility. One of the answers scripted in the playbook to handle a potential student's objection that the Trump price was higher than those of competing financial self-help programs (like Rich Dad, Poor Dad coaching) put it this way: "Mr. Trump's building is not in Cape Coral, Fla., or in the middle of Salt Lake City somewhere. Don't buy a Kia when you can have a Bentley."

The Wall Street address would eventually add to Trump University's legal troubles. New York State law requires that anything calling itself a university must apply, be vetted, have all instructors vetted and then be certified, none of which Trump did. Despite repeated warnings from state education regulators beginning in 2005, Trump persisted in operating out of 40 Wall St. until winding down operations in 2010. That is what allowed the state attorney general to bring his suit. While still not resolved, it seems like a slam dunk in terms of the charges related to unauthorized operation of a university, even if its claims to recover the students' tuitions have been undermined by the attorney general's miscues.

**Tapping Insecurity and Aspirations**

"So you had a long day at work, huh? I think we might just have something to help you out of that 9-5 of yours."

That's an instruction in the playbook for dialogue designed to get people to take the plunge and buy the $1,495 course. "Let them know that you've found an answer to their problems and a way for them to change their lifestyle," the playbook explains.

Those directions come from the playbook's marketing section, titled "Building Rapport and Planting Seeds." It's aimed at up-selling people from the $1,495 course to the $34,995 version. (Again, in Trump's deposition, he says he personally approved marketing and advertising materials but not the actual curriculums.)

"Give them credit for taking a great first step," the playbook says. "But don't let them think three days will be enough to make them successful ... People will always take the path of least resistance; do not give them the option."

My interviews with six of those who paid Trump tuition are consistent with the apparent demographic target of the promotional campaigns. They seem to be middle-class or lower-middle-class people anxious about their financial situations and aspiring to do better. In other words, they are the exact group that Trump the candidate is trying to appeal to.

Boyce Chait, 84, and his wife Evelyn, 80, live in New Jersey. They demanded but were refused a refund after their $34,995 mentorship proved, Boyce says, "to be worth nothing. When it came to the nitty-gritty, there was nothing there."

Nonetheless, Boyce said he and his wife would still "vote for Trump over Hillary Clinton," because they are members of the Tea Party.

**Hiding Behind Legalisms**

The crux of the suits is that Trump defrauded customers by claiming he was handpicking the faculty and arming them to teach his personal secrets, when in fact his only

Exhibit 3
- 18 -

involvement had to do with approving marketing and promotional materials. That would seem to require his lawyers to present as much evidence as possible of his personal involvement in the overall operations of Trump University.

On the other hand, because the suits named him personally (in addition to the corporate entity that owns the university), his lawyers have had a strong incentive to distance Trump the person from Trump the venture. That way they could get him dismissed from the suits while they continued on against the university, thereby shielding his personal assets from a damages award.

The lawyers have walked this tightrope in ways that are at times laughable. For example, although the marketing pitches promised students that Trump owned the university "lock, stock and barrel," in seeking to get Trump dismissed personally, his lawyers have declared that he was "completely absent" from the university and owned none of the stock in the company.

The lawyers' ownership claim is true, technically: The stock of the for-profit Trump University was owned not by Trump but by a for-profit limited-liability corporation. The catch is that two of Trump's personally owned limited-liability corporations in turn owned 92% of that other corporation's stock. That would explain why Trump, his daughter, one of his sons and his parent company's chief financial officer were the only ones authorized to sign checks drawn on the university's account.

Based on evidence like that, as well as Trump's admitted hands-on role in the marketing of the program, the judge denied the motions to dismiss Trump personally.

**"Rave Ratings"**

In the press, Trump has had a two-pronged strategy for defending himself. First, attack the attackers: the lawyers on the plaintiffs' side are "known scam artists," he told me, and New York Attorney General Schneiderman is a "known lightweight" who, Trump alleges, behaved unethically. Trump has also sued one of the first plaintiffs for slander for filing complaints with the Better Business Bureau and her credit-card company, a case which has already been thrown out and which resulted in the court's awarding the woman $790,000 in legal fees last April.

The second part of the strategy is to develop an alternative set of facts and then sell the narrative around them relentlessly. Thus, Trump's answer so far to reporters' inquiries about the suits is that, as he told me, "98% of the students that took the course gave it rave ratings."

Trump is referring to questionnaires that he and his lawyer say were filled out by their customers. In court, his lawyers have cited the surveys to prove that even if Trump University was neither a university nor had anything to do with conveying Trump's personal real estate methods, the students think they got something of value–as in, juice, that might have been adulterated but was still juice.

The plaintiffs claim the surveys are not credible because they were not anonymous and were filled out while the instructors looked over the students' shoulders, causing their clients to feel pressured into giving positive reviews. Besides, any number of surveys might have been discarded, they contend.

The plaintiffs' lawyers also refute Trump's other argument–that many of the plaintiffs themselves filled out favorable surveys and changed their minds, as Trump told me, only after "the plaintiffs' lawyers got to them." The plaintiffs' lawyers' briefs point out that, as with Kevin Scott in Westchester, it was well after the first days of the mentorship program, which is when the surveys were collected, that their clients realized they had not gotten what they paid for. As federal Ninth Circuit Court of Appeals Judge Kim Wardlaw put it in ruling on one of the appeals that Trump has already lost, the fact that one of the named plaintiffs filled out a positive survey and even has videotaped right after the class giving a testimonial is not persuasive because "the recent Ponzi-scheme scandals involving onetime financial luminaries like Bernard Madoff ... demonstrate [that] victims of con artists often sing the praises of their victimizers until the moment they realize they have been fleeced."

Exhibit 3
- 19 -

Those kinds of arguments lend themselves to a he said/she said debate. Accordingly, stories about the dispute have for the most part quoted those suing Trump and then Trump or his defenders citing the 98% satisfaction surveys.

But again the court record suggests that there are facts not in dispute that shed more light. When Trump's director of operations Mark Covais filed a sworn affidavit with the San Diego court in 2013, he declared that the satisfaction percentages were taken from "about 10,000" surveys of Trump University customers. Yet in the same affidavit Covais said that there were 7,611 tickets sold to Trump University programs, while a total of 80,308 people had attended one or more of 2,000 free, 90-minute preview sessions.

How could Trump have 10,000 "rave" surveys from paying customers if there were only 7,611 paying customers? Doesn't that mean that people who showed up for the free session must also have filled out questionnaires? Presumably those nonpaying attendees would have had little to complain about that related to the suits filed by customers who felt cheated out of their money.

Trump told me he was not familiar with the numbers but promised to have one of his lawyers get back to me. Trump in-house counsel Garten later told me that the answer must be that satisfied students filled out more than one survey but that "to the best of my knowledge" only paying customers were given questionnaires.

Trump and his people have pushed the 98% narrative so aggressively that they established a website for it, 98percentapproval.com, where the surveys are posted. But even a quick review reveals multiple questionnaires filled out by people who attended free sessions.

The more apparent inconsistency is that Covais–seeking to demonstrate that Trump University had an accommodating refund policy–declared that the company had issued 2,144 refunds to 6,698 attendees of the $1,495 three-day program, or 32%. That a third of the customers demanded refunds is hard to reconcile with a claimed 98% satisfaction rate, especially since the mass of plaintiffs now suing claimed that they, too, wanted refunds but were, they claimed, told they could not get them because they did not ask for them within 72 hours of the first day of participating in a program. Similarly, the refund rate for the $34,995 program, which according to the lawsuits was tougher on giving money back, was 16%. If at least 31% of one group and 16% of the other were so instantly dissatisfied that they immediately demanded refunds, how could 98% have been satisfied?

"That's because we had such a generous refund policy," Trump said, maintaining that even students who gave his university high marks in their questionnaires could always get their money back if they asked. "I told my guys I don't need the money," Trump told me. "If they're unhappy, give them their money back."

Trump's lawyers pointed me to 14 declarations filed in court by satisfied customers. But also in the court record is a protest by the plaintiffs' lawyers that those declarations were obtained from an "email blast" to all Trump customers asking them to supply success stories but not telling them about the pending litigation and that they might be compromising their right to a recovery if they responded positively. Nonetheless, according to the protest filed by the plaintiffs' lawyers–who subpoenaed all of the responses to the email blast once they learned of it–what they called the "self-serving" email blast "backfired" because the Trump lawyers got back so many negative responses from a mailing list comprised of those who had replied positively to the initial questionnaires.

Of the 14 people who did file declarations of support for Trump, I could reach only two who would comment. They both said they stood by their positive assessments, though one conceded he had since filed for bankruptcy as a result of the investments he made. One whom I did not reach, a retired schoolteacher, revealed in a subsequent deposition that the declaration that a paralegal working for Trump drafted and had her sign did not tell the full story. It excluded the fact, she testified, that after expenses on renovations, she had lost money on the investment her mentor guided her to and that was touted in the declaration as a profitable deal. She also said that, contrary to the declaration she had signed, she had not spoken to Trump on a conference call during one of her mentorship sessions.

Exhibit 3
- 20 -

Trump told me that the plaintiffs' lawyers have been "dying to settle" the cases, especially given recent rulings by the judge.

The judge did rule that the class action on the bedrock issue of whether the students were defrauded could continue, because the students all claim the same fraud—that they were deceived by the representations of Trump's personal involvement. That was a major defeat for Trump. He will now have to prove the opposite of what he contended when the lawyers tried and failed to get him dismissed personally—when he argued that except for tight control over the marketing, he was "completely absent" from the venture.

But the judge also ruled that once that first issue of whether the plaintiffs were defrauded by Trump's lack of involvement is decided, each plaintiff would have to prove the amount of damages personal to them. If not overturned on appeal, that would mean a separate trial for each student, something that would make the case impossible for the plaintiffs to continue.

"I could settle these cases for peanuts ... but I'm not a settler," Trump said. "When you become known as a settler, everybody sues you." Trump maintained that his side has "signed letters," even from the plaintiffs, "saying how great the course was ... I have a hundred people who will testify ... I want a jury to hear that. "

"These cases will go to trial next year," replied Jason Forge, a partner handling the case at the Robbins Geller Rudman & Dowd plaintiffs' firm. "So there's no point in posturing."

**Managing Smart**

The court papers do suggest a potential saving grace in a Trump campaign and presidency. The tight financial controls, including granular revenue and expense reports regularly reviewed by Trump, and the playbook—which specifies everything from the room temperature (68 degrees) of the classrooms to positioning the up-sell sales tables so that everyone had to walk by them—show that there is a meticulously managed enterprise behind the bluster. Washington could use some of that. More immediately, that could be a sign that Trump may have a surprise leg up in organizing the chaotic Iowa caucuses.

©2015 Time Inc. All rights reserved.

© 2015 Time Inc. All rights reserved.
Powered by WordPress.com VIP

Exhibit 3
- 21 -

# EXHIBIT 4

Exhibit 4
- 22 -

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


TARLA MAKAEFF, et al., on Behalf of

Themselves and All Others Similarly

Situated,

    Plaintiffs,                              Civil Action No.

       vs.                                 3:10-CV-00940-

TRUMP UNIVERSITY, LLC, et al.,        CAB(WVG)

    Defendants.

_____


    Videotaped deposition of DONALD J. TRUMP, SR.

New York, New York

September 12, 2012


Reported by:

Gail L. Inghram Verbano:

RDR, CRR, CSR-CA (No. 8635)


Job No. 10003489

Exhibit 4
- 23 -

```
 1    image, yeah, I think it could be.  I think that's

 2    true.

 3         Q   Mr. Trump, again, just to go -- for the

 4    deposition, I want to state for the record that

 5    there's no reason for you to, you know, imply that

 6    I'm here for any untoward reason or that I'm trying

 7    to do anything to your brand.

 8              MR. SCHNEIDER:  He thinks the lawsuit is

 9    trying to hurt the brand.

10              THE WITNESS:  I think the lawsuit is

11    trying to hurt the brand, and I honestly look forward

12    to winning this case and suing your law firm for as

13    much as we can sue them for, and we will be doing

14    that.  We have a 97 percent approval rating.  Harvard

15    doesn't have a 97 percent approval rating.  And we

16    will be suing your law firm for as much as we can

17    possibly do.  That I can tell you.

18    BY MS. JENSEN:

19         Q   Okay.

20         A   And you individually.

21         Q   Now, back to my question:  Does the Trump

22    brand invoke a particular image?

23         A   You've asked me this question about four

24    times.
```

Exhibit 4
- 24 -

# EXHIBIT 5
## [Filed Under Seal]