# EXHIBIT 1



**Exhibit 1**
3



To my
Mary and

Copyright © 2007 by Trump University. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or
transmitted in any form or by any means, electronic, mechanical, photocopying,
recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the
1976 United States Copyright Act, without either the prior written permission of the
Publisher, or authorization through payment of the appropriate per-copy fee to the
Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923,
(978) 750-8400, fax (978) 646-8600, or on the web at www.copyright.com. Requests to
the Publisher for permission should be addressed to the Permissions Department,
John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax
(201) 748-6008, or online at http://www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used
their best efforts in preparing this book, they make no representations or warranties with
respect to the accuracy or completeness of the contents of this book and specifically
disclaim any implied warranties of merchantability or fitness for a particular purpose. No
warranty may be created or extended by sales representatives or written sales materials.
The advice and strategies contained herein may not be suitable for your situation. You
should consult with a professional where appropriate. Neither the publisher nor author
shall be liable for any loss of profit or any other commercial damages, including but not
limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support,
please contact our Customer Care Department within the United States at
(800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that
appears in print may not be available in electronic books. For more information about
Wiley products, visit our web site at www.wiley.com.

ISBN-13: 978-0-470-04710-1

ISBN-10: 0-470-04710-0

Printed in the United States of America.

10  9  8  7

Exhibit 1
4



"Don't Waste Your Life on Work You Don't Love; Passion Will Help You Do Better."

"I've known people who had fantastic ideas, but couldn't get them off the ground because they approached everything weakly. They thought that their ideas would somehow take off by themselves, or that just coming up with an idea was enough. Let me tell you something—it's not enough. It will never be enough. You have to put the idea into action. If you don't have the motivation, and enthusiasm, your great idea will simply sit on top of your desk or inside your head and go nowhere. Lack of passion is often the difference between failure and success."

—From *Trump 101*

**TRUMP**
UNIVERSITY

1807
WILEY
2007

ISBN 978-0-470-04710-1
51995

9 780470 047101

**Exhibit 1**
5

# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, SONNY LOW, J.R. EVERETT  )
AND JOHN BROWN, on behalf of themselves )
and all others similarly situated, ED   )
OBERKROM, and BRANDON KELLER,           ) Case No.
individually,                           ) 10-cv-00940 GPC
                                        ) (WVG)
                    Plaintiffs,         )
                                        )
-vs-                                    )
                                        )
TRUMP UNIVERSITY, LLC (aka TRUMP        )
Entrepreneur Initiative), a New York    )
Limited Liability Company, DONALD J.    )
TRUMP, and DOES 1 through 50, inclusive,)
                                        )
                    Defendants.         )
_____)

VIDEOTAPED DEPOSITION OF PAUL CANUP

NOVEMBER 10, 2014

Reported by:  Tricia Rosate, RDR, CRR, CSR No. 10891

**Exhibit 2**
**6**

```
 1                          APPEARANCES

 2      FOR THE PLAINTIFFS:

 3           ZELDES HAEGGQUIST & ECK
             BY:  AMBER L. ECK, ESQ.
 4                  -and-
                 HELAINA CHINN, ESQ.
 5           625 Broadway, Suite 1000
             San Diego, California  92101
 6           (619) 342-8000
             ambere@zhlaw.com
 7           helainac@zhlaw.com

 8

 9      FOR THE DEFENDANTS:

10           FOLEY & LARDNER, LLP
             BY:  BENJAMIN J. MORRIS, ESQ.
11           3579 Valley Centre Drive
             Suite 300
12           San Diego, California  92130
             (858) 847-6700
13           bmorris@foley.com

14

15      THE VIDEOGRAPHER:

16           AJL LITIGATION MEDIA, INC.
             BY: JOHNIE JOHNSON, The Videographer
17           655 West Broadway, 17th Floor
             San Diego, California.
18           (800) 425-5843

19

20

21

22

23

24

25
```

**Exhibit 2**

7

Deposition of Paul Canup                                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 11:45:20 | 1 | seminars with an expectation that Mr. Trump would be |
| 11:45:23 | 2 | personally present? |
| 11:45:23 | 3 | A   No. |
| 11:45:25 | 4 | Q   Did you ever have an expectation that |
| 11:45:26 | 5 | Mr. Trump would be presenting any information |
| 11:45:30 | 6 | personally at any of these seminars? |
| 11:45:32 | 7 | A   No.  And I believe it was clear to me even in |
| 11:45:41 | 8 | the early CDs that -- that his process and his |
| 11:45:45 | 9 | approach was to select other people to make those |
| 11:45:48 | 10 | presentations. |
| 11:46:02 | 11 | Q   Based on your experiences at |
| 11:45:59 | 12 | Trump University, what is or what are Mr. Trump's |
| 11:46:04 | 13 | approaches to real estate investing? |
| 11:46:08 | 14 | MS. ECK:  Objection.  Calls for speculation. |
| 11:46:12 | 15 | THE WITNESS:  One of the primary tenets of |
| 11:46:15 | 16 | his approach is education and to -- to learn about the |
| 11:46:20 | 17 | specific area that you have interest and to be sure |
| 11:46:24 | 18 | that you're in the area that is of your interest and |
| 11:46:28 | 19 | your passion so that you will have the impetus to |
| 11:46:39 | 20 | continue with it and the interest in it to learn about |
| 11:46:43 | 21 | it. |
| 11:46:45 | 22 | And there were many different areas, and you |
| 11:46:47 | 23 | tried to look at -- the Trump University tried many |
| 11:46:55 | 24 | different approaches so that they could present |
| 11:46:57 | 25 | something to each student that would be in an area |

**Exhibit 2**
**8**

| | | |
|---|---|---|
| 11:46:59 | 1 | that hopefully would be of their interest.  He covered |
| 11:47:04 | 2 | basically everything.  So -- |
| 11:47:05 | 3 | BY MR. MORRIS: |
| 11:47:13 | 4 | Q   Did Trump University represent that one of |
| 11:47:15 | 5 | Donald Trump's approaches to real estate investing was |
| 11:47:21 | 6 | hard work? |
| 11:47:22 | 7 | A   Absolutely.  That was repeated many times, |
| 11:47:24 | 8 | that -- that you never were successful without lots of |
| 11:47:29 | 9 | hard work.  And it was real clear that when you went |
| 11:47:34 | 10 | through the -- the seminars and the retreats that the |
| 11:47:38 | 11 | information came at such a pace that it was mental |
| 11:47:43 | 12 | overload, and it's not just mental overload during |
| 11:47:47 | 13 | that time.  If you exercise those approaches, you will |
| 11:47:53 | 14 | have to work very hard and put a good bit of time in |
| 11:47:57 | 15 | in order to achieve it.  Otherwise, it doesn't -- |
| 11:48:02 | 16 | doesn't go anywhere. |
| 11:48:04 | 17 | Q   Did Trump University represent during the |
| 11:48:08 | 18 | programs that you participated in that one of |
| 11:48:12 | 19 | Mr. Trump's approaches to real estate investing was to |
| 11:48:15 | 20 | get out of your comfort zone? |
| 11:48:17 | 21 | MS. ECK:  Objection.  Calls for speculation. |
| 11:48:20 | 22 | And foundation. |
| 11:48:26 | 23 | THE WITNESS:  Absolutely.  One of the things |
| 11:48:27 | 24 | that was brought out in basically every seminar -- I |
| 11:48:34 | 25 | believe it was every seminar that we had -- is that |

**Exhibit 2**

**9**

Deposition of Paul Canup                                           MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 11:48:36 | 1 | not only did you need to present the ideas to the -- |
| 11:48:40 | 2 | the instructor needed to present the ideas, but that |
| 11:48:43 | 3 | the individuals needed to actually act.  So the word |
| 11:48:47 | 4 | "act" was used many times.  Now you've learned.  Now |
| 11:48:50 | 5 | you need to act.  You need to take action.  You need |
| 11:48:53 | 6 | to take the next step to learn.  The next step to |
| 11:48:57 | 7 | learn is you have to actually do it yourself.  Just |
| 11:48:59 | 8 | hearing about it is one thing, but you have to be able |
| 11:49:02 | 9 | to act to learn the rest. |
| 11:49:04 | 10 | And there's no way that you can learn |
| 11:49:06 | 11 | everything that you need to learn by sitting in a |
| 11:49:08 | 12 | class.  You can get the beginnings of it, but you |
| 11:49:12 | 13 | actually have to go do it so that you not only |
| 11:49:16 | 14 | understand how it all fits together, but you learn the |
| 11:49:19 | 15 | other things that they don't have time to teach you in |
| 11:49:22 | 16 | that three-day seminar. |
| 11:49:24 | 17 | BY MR. MORRIS: |
| 11:49:24 | 18 | Q    Were there any other -- when you attended the |
| 11:49:29 | 19 | Trump University seminars, were there any other |
| 11:49:32 | 20 | Donald Trump approaches or beliefs about real estate |
| 11:49:36 | 21 | investing that were taught by Trump University? |
| 11:49:39 | 22 | MS. ECK:  Objection.  Calls for speculation. |
| 11:49:41 | 23 | Object as to form. |
| 11:49:45 | 24 | THE WITNESS:  Could you repeat the question? |
| 11:49:50 | 25 | /// |

**Exhibit 2**

**10**

Deposition of Paul Canup                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 11:49:50 | 1 | BY MR. MORRIS: |
| 11:49:50 | 2 |     Q    During your time at Trump University, are you |
| 11:49:53 | 3 | aware of any other of Donald Trump's approaches or |
| 11:49:58 | 4 | techniques for investing in real estate that were |
| 11:50:02 | 5 | taught? |
| 11:50:02 | 6 |         MS. ECK:  Same objections. |
| 11:50:04 | 7 |         THE WITNESS:  You used the word |
| 11:50:06 | 8 | "Donald Trump" there, so it didn't fit.  That's the |
| 11:50:08 | 9 | reason I asked for the clarification.  He always |
| 11:50:10 | 10 | presented that he was going to -- to vet the experts |
| 11:50:16 | 11 | in the fields and he was going to have them present |
| 11:50:20 | 12 | their ideas of how they did the work.  So you never |
| 11:50:23 | 13 | got a statement that said, "This is what Donald Trump |
| 11:50:30 | 14 | does.  This is not Donald" -- I never got the |
| 11:50:33 | 15 | statement that said, "This is Donald Trump's |
| 11:50:35 | 16 | approach."  That never occurred.  The only thing that |
| 11:50:38 | 17 | occurred was, I'm going to -- from Donald Trump was, |
| 11:50:44 | 18 | I'm going to find the expert in the field that fits |
| 11:50:48 | 19 | the students that he expected to have, and he was |
| 11:50:51 | 20 | going to provide the experts to help those students. |
| 11:50:55 | 21 |      I never got a course on how to buy a $250 |
| 11:50:59 | 22 | million building.  I mean, maybe -- maybe it was |
| 11:51:04 | 23 | buried in there somewhere, but I had a little |
| 11:51:07 | 24 | difficulty on the 250 million.  So he tailored |
| 11:51:11 | 25 | everything to the people that were expected to be in |

**Exhibit 2**
**11**

# EXHIBIT 3

1            UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4   TARLA MAKAEFF, BRANDON KELLER,

5   ED OBERKROM, and PATRICIA

6   MURPHY, on Behalf of Themselves

    and All Others Similarly

7   Situated,

8              Plaintiffs,

9      vs.                  No. 10 CV 0940 IEG (WVG)

10  TRUMP UNIVERSITY, LLC, (aka

11  Trump Entrepreneur Initiative) a

    New York Limited Liability

12  Company, DONALD J. TRUMP, and

13  DOES 1 through 50, inclusive,

14              Defendants.

15  _____

16

17    CONTINUED VIDEOTAPED DEPOSITION of TARLA MAKAEFF

18              San Diego, California

19            Tuesday, January 31, 2012

20                  Volume II

21

22  Reported by:

    Kae F. Gernandt

23  RPR, CSR No. 5342

24  Job No. 133737

25  PAGES 283 - 591

                                        Page 283

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4        ZELDES & HAEGGQUIST, LLP
          BY:  AMBER L. ECK

 5        625 Broadway, Suite 906
          San Diego, California  92101

 6        619.342.8000
          ambere@zhlaw.com

 7

          ROBBINS, GELLER, RUDMAN & DOWD

 8        BY:  THOMAS R. MERRICK
               LAUREN LENDZION

 9        655 West Broadway, Suite 1900
          San Diego, California  92101

10        619.231.1059
          tmerrick@rgrdlaw.com

11

12    For Defendants Trump University, LLC, and Donald J.
      Trump:

13

          YUNKER & SCHNEIDER

14        BY:  DAVID K. SCHNEIDER
          655 West Broadway, Suite 1400

15        San Diego, California  92101
          619.233.5500

16        dks@yslaw.com

17    For Prosper, Inc.

18        HILL, JOHNSON & SCHMUTZ
          BY:  WM. KELLY NASH (morning session only)

19        RiverView Plaza, Suite 300
          4844 North 300 West

20        Provo, Utah  84604
          801.375.6600

21        knash@hjslaw.com

22    Also Present:

23        Jill A. Martin, Trump National Golf Club (morning

24    session)

25    Videographer:Scott Tanaka, Veritext
```

Page 285

**Exhibit 3**

**13**

1           A.   With a one-year -- well, it was actually   12:20:19

2    one year; that you had three days in person and one

3    year to stay in contact with your mentors.

4           Q.   So, what you're saying is what you would

5    like is you'd like a seven-day mentorship, correct?   12:20:29

6           A.   I asked for that because -- well, I

7    didn't ask them for it.  I mentioned this because I

8    felt the three days, they did not nearly cover what

9    I thought they would, including contracts and

10   numbers.                                              12:20:42

11          Q.   Okay.  But you thought you were buying a

12   three-day mentorship plus the one year of support.

13   And you got a three-day mentorship.  And you're only

14   into about 60 days into your first year, correct?

15          A.   That's correct on what I bought.  But     12:20:54

16   they did not cover what they nearly needed to in

17   three days.

18          Q.   Okay.  For you, there was more

19   information that you personally needed to be able to

20   do these transactions, correct?                       12:21:02

21          A.   That's correct, but it was also for

22   other students who told me the same thing.

23          MR. SCHNEIDER:  Okay.  So, what you wanted --

24   I'll move to strike after the word "correct."

25   / / /

                                           Page 407

```
1    BY MR. SCHNEIDER:                                    12:21:13

2         Q.   What you're stating is, to meet your

3    goals, you would like a seven-day mentorship, right?

4         A.   Yes.

5         Q.   All right.  But my question was a little   12:21:19

6    bit different:  That as of November 2, you thought

7    that the two three-day weekend classes that you had

8    gone to were great, correct?

9         A.   I thought that they were taking me down

10   a good path.                                         12:21:33

11        Q.   You thought they were "great," to use

12   your own words, correct?

13        A.   That's the word I used here, yes.

14        Q.   How many phone conversations did you

15   have with Tim Gorsline?                              12:22:20

16        A.   We -- I called him.  He called me.  I

17   don't believe we ever spoke on the phone.  I believe

18   we missed each other.

19        Q.   What did you call him for?

20        A.   After the creative financing seminar, I    12:22:37

21   told him that I needed more help because I had not

22   received it through my mentorship, and I didn't feel

23   I was getting it anywhere else.

24             And he sat down with me after the

25   three-day mentorship -- in the lobby of the hotel --  12:22:53
```

Page 408

```
 1    and told me that -- he talked with me for              12:22:55

 2    maybe 20, 30 minutes before he left and told me that

 3    he was -- don't worry, he was going to be there for

 4    me and help answer any of my questions and stay in

 5    contact with me after the class.                        12:23:07

 6         Q.   When did you have your coaching sessions

 7    with Steve Gilpin?

 8         A.   I don't know.  I'd have to refer to the

 9    e-mails.  It could have been early November of 2008.

10    I'm not certain.                                        12:23:19

11         Q.   And what kind of things did you discuss

12    with Steve Gilpin?

13         A.   Steve Gilpin sent me an onslaught of

14    papers with very little direction.  However, I felt

15    that he was one of the better of the instructors       12:23:35

16    because he sent me some detailed forms.

17         Q.   You talked to him on several occasions

18    by phone, correct?

19         A.   I believe I briefly spoke with him by

20    phone.  I'm not 100 percent certain on that.           12:23:51

21         Q.   Didn't he provide some mentoring,

22    coaching sessions with you by phone?

23         A.   I recall him sending me quite a few

24    documents, one after the other in a row.  I don't

25    really recall conversations with him that much.  We    12:24:09
```

Page 409

```
 1    purchase real estate too complicated for you, these     01:40:58

 2    two pages?

 3         MS. ECK:  Objection.  Asked and answered.

 4    BY MR. SCHNEIDER:

 5         Q.   If this is what you had to fill out,          01:41:02

 6    would this be too complicated for you?

 7         A.   I would not know -- I would not know how

 8    much earnest money they're supposed to deposit.  I

 9    would not know how to select the title company.

10    There were things on here that I would not know how    01:41:16

11    to do.

12              Of course I know how to fill out

13    someone's name and address.  I don't know how to do

14    some of these other things on here.

15         Q.   Is that difficult to look in the phone        01:41:25

16    book and find a title company and call them up and

17    see if they want to be the title company for the

18    sale?

19         A.   No.  But how would you know how much

20    earnest money to deposit?  You're trying to make       01:41:33

21    this sound as though this is purchasing a dress.

22    This is hundreds of thousands of dollars you're

23    dealing with.  I was not about to put myself in

24    another position of losing more money than I already

25    felt I was basically out at this point.               01:41:50
```

Page 445

1          Q.    Okay.  The one transaction that you        01:41:53

2     actually entered into with Robert Vargas, you

3     invested $30,000, correct?

4          A.    That was my mother's money, correct.

5          Q.    Okay.  It wasn't a                          01:42:02

6     hundreds-of-thousands-of-dollars transaction.  Would

7     you agree with that?

8          A.    No.  When I referred to hundreds of

9     thousands of dollars, I'm speaking of the value of

10    the property.                                          01:42:11

11         Q.    Okay.  And that particular property, you

12    and Mr. Vargas purchased for about $56,000, right?

13         A.    Somewhere around that ballpark.

14         Q.    And the concept was that you were going

15    to do some rehab to it.  Robert was going to take      01:42:22

16    care of that side of it.  And then you were going to

17    sell it, and you were going to spilt the profits

18    based on some agreed proportion, right?

19         A.    That's correct.

20         Q.    All right.  We'll get back to that in       01:42:33

21    just a few minutes.

22               If you'll look at 3645.  This is an

23    e-mail from Stephen Gilpin to you, also dated 11/10,

24    with some attached documents.

25               Did you receive this at about that same     01:43:07

Page 446

```
 1    time?                                             01:43:09

 2         A.   I most likely received this.  He sent me

 3    a lot of documents.  I'm not sure these are the

 4    specific ones, but it appears to be the case, yes.

 5         Q.   Let me ask you just more broadly --      01:43:18

 6    maybe we can get through this quickly -- I show that

 7    he sent you documents on the 10th of November,

 8    probably about an inch stack, Bates-stamped 3374

 9    through 3523, 3645 through 3674, 3626 through 3644,

10    3558 through 3589.  Let's just start with those.    01:44:03

11              Any reason to believe that you produced

12    these in this case with your Bates numbers on them

13    from him to you on that date -- is it your belief

14    that he probably sent those to you around that time?

15         A.   He -- he sent me maybe a dozen e-mails    01:44:27

16    with attachments on them.

17         Q.   All right.  Did you look at any of the

18    information that he included in here?

19         A.   Yes, I did.

20         Q.   Did you read it all?                      01:44:36

21         A.   I don't know that I read every single

22    page of it.

23              But I signed up, not to have a book, but

24    to have a mentor.  This is like purchasing a book at

25    Barnes & Noble.                                     01:44:48
```

                                                    Page 447

```
1    properties in Vegas that were in a similar category.    03:30:23

2         Q.   All right.  So, you invested in the

3    Florrie property without ever seeing it, correct?

4         A.   I saw pictures of it, but I had not

5    physically been there, I don't believe.                03:30:31

6         Q.   Your understanding was that Robert

7    Vargas was going to be responsible for doing the

8    rehab on the property?

9         A.   Yes.  That's what he told me.

10        Q.   And he was going to spend his money on    03:30:47

11   that, correct?

12        A.   No.  We were going to split that.

13        Q.   So, he was going to tell you what the

14   rehab cost -- and then you were going to split any

15   profits that were made?                                03:30:56

16        A.   That's my recollection, yes.

17        Q.   And during this process, at some point,

18   you received word from a realtor that the property

19   may not sell for as much as you all had anticipated,

20   correct?                                               03:31:08

21        A.   Yes.

22        Q.   And at that point, would it be accurate

23   to say that you wanted out of the deal?

24        A.   Yes.

25        Q.   And the reason you wanted out is 'cause    03:31:15
```

                                                    Page 534

```
1    you thought you might lose money on it, correct?      03:31:17

2         A.   Yes.

3         Q.   And Robert Vargas advised you to hang in

4    there; that he thought that you all would make a

5    profit on the property, correct?                       03:31:23

6         A.   I don't remember what Robert Vargas

7    advised me.

8         Q.   Do you remember at any time him

9    suggesting that you just hang in there and be

10   patient; that he thought you would make money on the  03:31:35

11   property?

12        A.   I don't really recall what he was saying

13   to me.  If you have e-mails that you'd like me to

14   look at.

15        Q.   Right.  At some point, did you have         03:31:46

16   somebody representing themselves as a lawyer leave

17   messages on Robert Vargas's voice mail stating that

18   they represented you and that they were demanding

19   that you -- that they buy your interest back out?

20        A.   That they buy my -- demanding that he       03:32:01

21   buy my interest back out?

22        Q.   Robert Vargas.

23        A.   I had somebody call, yes.

24        Q.   Was it a lawyer?

25        A.   It was not an attorney.  They never         03:32:09
```

Page 535

```
 1     referred to themselves as an attorney.              03:32:11

 2          Q.    Who was it that called for you?

 3          A.    That was my boyfriend.

 4          Q.    And what's his name?

 5          A.    Walter Grieves.                           03:32:19

 6          Q.    And it's your belief that he did not

 7     represent himself as an attorney?

 8          A.    I don't believe he did.

 9          Q.    All right.  Did you hear the message

10     that he left for Mr. Vargas?                         03:32:29

11          A.    A portion of it.  I think I was walking

12     in and out of the room.

13          Q.    And why did you have Mr. Grieves call?

14          A.    I don't remember at what point he

15     called, but Robert was sending me very contentious   03:32:41

16     e-mails and was really sending me demeaning e-mails

17     when I was trying to exit the deal.  And so, my

18     boyfriend felt protective of me.

19          Q.    You contacted Robert and told him that

20     you thought that he had committed fraud, didn't you?  03:32:58

21          A.    I don't know that I contacted him and

22     told him that.  I know that I told that to the --

23     the -- I'm sorry, title company.

24          Q.    And what is it that you thought Robert

25     Vargas did that was fraudulent?                      03:33:17
```

Page 536

```
 1            A.    I signed one version of paperwork with      03:33:20

 2     the 50/50 percent that we had agreed upon, and he

 3     did not sign the same version of paperwork.  The

 4     version of paperwork I signed said that we were

 5     agreeing to a 50/50 percent, which is what he had      03:33:31

 6     told me all long.

 7            And he also switched on there that the

 8     paperwork should be sent to him in Las Vegas,

 9     whereas I had put "please send paperwork to each of

10     us."  He signed a completely different copy that I      03:33:44

11     never looked at and I never reviewed.

12            Q.    Did his version have different terms

13     than your version?

14            A.    What -- his writing, the terms were

15     different in his writing.  He was saying that the      03:33:59

16     percentages would be different on our split.  He was

17     saying that to send him the paperwork and not send

18     it to me when I was supposed to be considered an

19     equal partner and be kept in the loop.

20            Q.    Now, in your complaint, you allege that      03:34:14

21     the realtor "misquoted comps" to you.

22            What does that mean?

23            A.    Noah Herrera, I don't know the exact

24     numbers without looking at the e-mails, but I

25     believe he quoted these properties as being worth      03:34:28
```

Page 537

1                  UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3      TARLA MAKAEFF, BRANDON KELLER,

4      ED OBERKROM, and PATRICIA

5      MURPHY, on Behalf of Themselves

6      and All Others Similarly

7      Situated,

8                  Plaintiffs,        No. 10 CV 0940 IEG (WVG)

9          vs.

10     TRUMP UNIVERSITY, LLC, (aka

11     Trump Entrepreneur Initiative) a

12     New York Limited Liability

13     Company, DONALD J. TRUMP, and

14     DOES 1 through 50, inclusive,

15                  Defendants.

16     _____

17         VIDEOTAPED DEPOSITION of TARLA MAKAEFF

18                  San Diego, California

19                  Friday, April 13, 2012

20                      Volume III

21     Reported by:

22     Kae F. Gernandt

23     RPR, CSR No. 5342

24     Job No. 135653

25     PAGES 592 - 734

                                            Page 592

Exhibit 3
24

```
1    APPEARANCES:

2

3      For Plaintiffs:

4           ZELDES & HAEGGQUIST, LLP

5           BY:  AMBER L. ECK

6           625 Broadway, Suite 906

7           San Diego, California  92101

8           619.342.8000

9           ambere@zhlaw.com

10

11     For Defendants Trump University, LLC, and Donald J.

12     Trump:

13

14           YUNKER & SCHNEIDER

15           BY:  DAVID K. SCHNEIDER

16           655 West Broadway, Suite 1400

17           San Diego, California  92101

18           619.233.5500

19           dks@yslaw.com

20     Also Present:

21     Videographer:

22     Alex Payan, Veritext

23

24

25
```

Page 594

**Exhibit 3**
**25**

1          MS. ECK:  Please answer this question, and          02:26:06

2     then we're going to take a break.

3     BY MR. SCHNEIDER:

4          Q.   Okay.  Ms. Makaeff, how much did

5     Mr. Kasper tell you that he was worth?                   02:26:11

6          A.   Over 125 million.

7          Q.   Is that the amount of money that he used

8     when he told you?

9          A.   Yes.  I didn't just pull it out of

10    nowhere.                                                 02:26:22

11         MR. SCHNEIDER:  All right.

12         MS. ECK:  All right.  Let's take a break.

13         THE VIDEOGRAPHER:  Okay, Counsel?

14         MR. SCHNEIDER:  Sure.

15         THE VIDEOGRAPHER:  Going off the record.  The        02:26:31

16    time is 2:26 p.m.

17              (A brief recess was taken.)

18         THE VIDEOGRAPHER:  Back on the record.  The

19    time is 2:36 p.m.

20    BY MR. SCHNEIDER:                                        02:36:20

21         Q.   Ms. Makaeff, we're looking at page 3093

22    of your letter.  And on that same paragraph --

23         A.   Oh, sorry.

24         Q.   That's all right.  So, it's the first

25    paragraph on this page at the bottom.  The sentence      02:36:31

                                              Page 611

```
 1    states, "After the mentorship."  Top paragraph.        02:36:34

 2         A.   I think it's in this copy.  Hold on.

 3         Q.   Are you on page 3093?

 4         A.   Yeah, after the -- where are you at?

 5         Q.   On the top paragraph.                         02:36:45

 6         A.   Okay.

 7         Q.   The last -- the second to last sentence

 8    that begins "After the mentorship," do you see that?

 9         A.   Yes.

10         Q.   Okay.  It says, "After the mentorship,        02:36:50

11    Mr. McNally and Mr. Kasper disappeared, other than a

12    couple of short two-minute phone calls while they

13    were on other mentorships."  Do you see that

14    sentence?

15         A.   Yes.                                          02:36:59

16         Q.   That's not a true sentence, is it?

17         MS. ECK:  Objection.  Assumes facts not in

18    evidence, misstates the witness' testimony.

19         THE WITNESS:  When I wrote this, I believed

20    that was the case, but you brought up a steak         02:37:07

21    dinner.

22    BY MR. SCHNEIDER:

23         Q.   Okay.  In addition to a steak dinner,

24    didn't you communicate with those mentors at least a

25    month after your mentorship in which they were        02:37:14
```

Page 612

```
 1    discussing possible deals, the Fountainview deal,        02:37:16

 2    Chief, Mr. McNally or Mr. Kasper offered to partner

 3    with you on some other transactions?

 4         MS. ECK:  Objection.  Vague and ambiguous and

 5    compound.                                                02:37:29

 6    BY MR. SCHNEIDER:

 7         Q.   Do you remember those communications

 8    over the next course of a month after your

 9    mentorship?

10         A.   We communicated a few times by e-mail,        02:37:35

11    with general responses.  I don't know what you're

12    referring to on partnering -- with which deals?  If

13    I could see that document.

14         MR. SCHNEIDER:  Sure.  I'll mark it as

15    Exhibit 8.                                               02:37:47

16              (Deposition Exhibit 8 marked for

17    identification.)

18    BY MR. SCHNEIDER:

19         Q.   This is an e-mail exchange between Mike

20    Kasper and you, dated October 24, 2008, in which        02:38:00

21    Mr. Kasper says, "I'm looking for someone to partner

22    up with and thought of you."  Do you see that

23    sentence?

24         A.   Yes.  This is regarding MonaVie.

25         Q.   Right.  So, you were still in               02:38:12
```

Page 613

**Exhibit 3**

**28**

```
 1    communication with him a month after your            02:38:13
 2    mentorship, correct?
 3           MS. ECK:  Objection.  Misstates the witness'
 4    testimony, assumes facts not in evidence.  This
 5    isn't in relation to real estate.                    02:38:22
 6           THE WITNESS:  This doesn't have anything to
 7    do with Trump University.
 8           MR. SCHNEIDER:  All right.  I'll mark as
 9    Exhibit 9 -- 8 is Bates-stamped Makaeff 4900 through
10    4902.  Exhibit 9 is 4899 and 4900.  It's dated       02:38:48
11    November 5, 2008, and it's between you and Mike
12    Kasper.
13            (Deposition Exhibit 9 marked for
14    identification.)
15    BY MR. SCHNEIDER:                                    02:39:04
16           Q.  And here you're discussing the
17    Fountainview project, correct, in both of these
18    e-mails?
19           A.  Yes, it appears so.
20           Q.  And he is -- you're telling him about     02:39:13
21    whether or not you're going to go forward with
22    Fountainview, and he's telling you that he's going
23    to be talking with Chief tonight and see if there's
24    some other projects that might be suitable for you,
25    correct?                                             02:39:26
```

**Exhibit 3**
**29**

# EXHIBIT 4

**[FILED UNDER SEAL]**

# EXHIBIT 5

**To:**     tarla[ Redacted ][tarla[ Redacted ]]
**From:**    Mike Kasper
**Sent:**     Wed 11/5/2008 3:03:51 PM
**Subject:**   Re: Fountainview
_ AVG certification _.txt

When you live your life in feat it is not worth living at all.

You got into Real Estate to create wealth not to make a living.

Jump in and do not look back:)

Mike Kasper
Cell: 760-707-6119
Fax: 253-799-6119


On Nov 4, 2008, at 7:05 PM, tarla[ Redacted ] wrote:


> Thanks, luv. And thank you thank you thank you for even involving me in this deal
> and making the introductions to begin with. You are an angel :)
>
> I appreciate you understanding. I'm sure I'll get past this hump..it just seems now like
> there is no light at the end of the tunnel and I have to get out of that mindframe. I
> think it's b/c I hear different opinions and it confuses me..then my hope is crushed
> when I have no idea what path to take and I end up feeling more discouraged. I'd like
> to do the assignments and wholesaling then flips etc and do baby steps. But of
> course I am all ears in hearing Chief's plan (how kind of him) and any of your
> wisdom.
>
> It's nice to know you can relate even if it was long ago, Monsieur Argent! :)
> Sometimes I just feel so alone in the whole thing because I think I need handholding
> or even shadowing to know what you all do. It all seems like Chinese..even more so
> when the instructions are simple because I need the details that I have no clue about
> to actually get out there and execute and avoid this fear paralysis!
>
> Anyway I'm honored to know you and have you on my side. I'm just a 'lil scared kitty
> cat now and I know with actual experience I'll get past that. Bear with me...I'm still in
> the making :)
>
> Talk soon,
> T
>
>
> Sent via BlackBerry by AT&T

TU-MAKAEFF4885

**Exhibit 5**
**63**

**From**: Mike Kasper <seminarspeaker@yahoo.com>
**Date**: Tue, 4 Nov 2008 18:35:56 -0800 (PST)
**To**: <tarla    **Redacted**    >
**Subject**: Re: Fountainview

T,

No worries.
I talked with Chief tonight and he said you might me backing out of FV.
He has a plan for you to help put money in your pocket on small cookie cutter deals
that will give you the confidence and down the road you can buy something like FV.
I understand and I once felt that way before.  Realize we are here to help you
through this.
Realize in our market is more exspensive than FV.  you need to have more
confidence in what you want to and I think the small High cashflow or you can fip a
few of the small 17-21k deals make 5-10k quickly.

Mike Kasper
Cell:760-707-6119
Fax:253-799-6119

**From:** "tarla    **Redacted**    " <tarla    **Redacted**    }>
**To:** Mike Kasper - cell - Trump mentor <mike@mikekasper.com>
**Sent:** Tuesday, November 4, 2008 6:24:41 PM
**Subject:** Fountainview

Hi sweetie pie,

I hope your conference last week went wonderful! :)

On a more serious note, I wanted to let you know that I decided to bow out from
Fountainview :( I know, I know... It is a great opp and you are all such lovely people.
I just started to get a bad gut feeling last week for myself personally and where I'm
at. I've been really really stressed, hun. I'm sure you can't tell but I've thought that I
might lose my house and literally cried myself to sleep some nights. I just never saw

TU-MAKAEFF4886

**Exhibit 5**
**64**

myself in this financial position.

Anyways, I realized I need to go back to my original goal in joining Trump in the first place...making money now. Adding the stress of possible lost rent above and beyond the subsidy and unexpected repairs on the unrehabbed sides..well, that's just kinda crazy. If I had the income I used to, I wouldn't think twice but I don't. So my plan is to work with all you guys on buy and holds like these when I have a few wholesales and flips under my belt and some cash coming in...a cushion...

Speaking of which I spoke to Rick earlier re a lease option or corporate lease on my house. I am seriously thinking about looking into that now to release myself from the situation without losing my home :( I'm also interested in doing assignments/wholesaling for immediate income. Chief didn't seem to think it was doable other than flipping REO's but I wanted your opinion since you're local and probably more in tune with the CA market.

Hope you understand all this. I'll call you in the next day or so to talk more to you.

Miss you guys.
T

Sent via BlackBerry by AT&T

TU-MAKAEFF4887

Exhibit 5
65

# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____

TARLA MAKAEFF, SONNY LOW, J.R. EVERETT, )
AND JOHN BROWN, on behalf of themselves )
and all others similarly situated, ED   )
OBERKROM, and BRANDON KELLER,           )
individually,                           )
                                        )
            Plaintiffs,                 )
                                        ) Case No.:
        vs.                             ) 10-cv-00940 GPC (WVG)
                                        )
TRUMP UNIVERSITY, LLC (aka Trump        )
Entrepreneur Initiative), a New York    )
Limited Liability Company, DONALD J.    )
TRUMP, and DOES 1 through 50, inclusive,)
                                        )
            Defendants.                 )
_____     )

Videotaped Deposition of TROY L. PETERSON

Friday, October 17, 2014

Reported by Lindy DeBoer, RPR, CSR No. 5405

Exhibit 6
66

Deposition of Troy L. Peterson                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 10:38:51 | 1 | that on? |
| 10:38:51 | 2 | A    A lot of her desires were typical, but the |
| 10:38:54 | 3 | follow-through was not. |
| 10:38:56 | 4 | Q    What were her desires, as you recall? |
| 10:38:58 | 5 | A    She wanted to earn money.  Those were typical |
| 10:39:02 | 6 | desires we would have -- everybody always had their |
| 10:39:05 | 7 | motivations.  They wanted to do it for one reason.  It |
| 10:39:08 | 8 | was usually a monetary gain. |
| 10:39:10 | 9 | Q    Did she have any specific goals that you were |
| 10:39:13 | 10 | going to coach her with? |
| 10:39:15 | 11 | A    I don't recall any specifics. |
| 10:39:18 | 12 | Q    When you spoke to the personnel at Trump |
| 10:39:20 | 13 | University about doing the additional coaching sessions |
| 10:39:25 | 14 | with her, did you have an understanding of what her |
| 10:39:28 | 15 | experience had been with Trump University at that point |
| 10:39:31 | 16 | in time? |
| 10:39:32 | 17 | A    I know she had other coaching, but I don't know |
| 10:39:35 | 18 | to what level. |
| 10:39:38 | 19 | Q    Do you remember in your conversations with her |
| 10:39:40 | 20 | on phone coaching, had she ever complained to you about |
| 10:39:43 | 21 | her experience with Trump University? |
| 10:39:48 | 22 | A    No direct complaints, no. |
| 10:39:50 | 23 | Q    Indirect complaints? |
| 10:39:53 | 24 | A    There was -- I can't really even call it a |
| 10:39:58 | 25 | complaint.  There was kind of a typical whine of, "I |

**Exhibit 6**
**67**

Deposition of Troy L. Peterson                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 10:40:04 | 1 | don't know what I'm doing.  How can I be successful at |
| 10:40:07 | 2 | this?" |
| 10:40:07 | 3 | But no direct complaints, no. |
| 10:40:10 | 4 | Q    When you say "typical whine," do you mean her or |
| 10:40:13 | 5 | students in general? |
| 10:40:14 | 6 | A    I would say students in general. |
| 10:40:16 | 7 | Q    Okay.  And were you -- in your experience with |
| 10:40:20 | 8 | other students, were you able to overcome their -- what |
| 10:40:24 | 9 | you call the typical whine? |
| 10:40:26 | 10 | A    Yes.  It was more of a frustration based on |
| 10:40:28 | 11 | really not knowing what to do.  And so we'd get to the |
| 10:40:33 | 12 | root of the frustration and then give some specific steps |
| 10:40:36 | 13 | to take to accomplish that. |
| 10:40:38 | 14 | Q    And did you attempt to do that with Ms. Makaeff? |
| 10:40:41 | 15 | A    Yes, I did. |
| 10:40:41 | 16 | Q    All right.  And from your perspective, were you |
| 10:40:45 | 17 | able to accomplish that? |
| 10:40:47 | 18 | A    No. |
| 10:40:47 | 19 | Q    Why not? |
| 10:40:48 | 20 | A    She did not put forth the steps to complete the |
| 10:40:51 | 21 | tasks that were put out there and she did not follow |
| 10:40:54 | 22 | through and maintain her appointments and actually put |
| 10:40:57 | 23 | the effort forth to do what was put in front of her. |
| 10:41:00 | 24 | Q    Can you give us an example of what you were |
| 10:41:03 | 25 | requesting that she do. |

**Exhibit 6**
**68**

| | | |
|---|---|---|
| 10:41:06 | 1 | A      A typical example would be, "I want you to --" |
| 10:41:10 | 2 | if she's looking at properties, okay, "I want you to |
| 10:41:13 | 3 | develop this relationship with a realtor who can bring |
| 10:41:19 | 4 | you this.  Here's how you're going to go about finding |
| 10:41:20 | 5 | the right real estate agent to bring you this particular |
| 10:41:21 | 6 | type of property." |
| 10:41:22 | 7 | Q      And to your knowledge, did she ever do that when |
| 10:41:24 | 8 | you were doing the phone coaching? |
| 10:41:27 | 9 | A      No.  She got distracted in another training that |
| 10:41:29 | 10 | she started doing with another company during the time |
| 10:41:51 | 11 | that we were -- |
| 10:41:55 | 12 | Q      All right.  And so you said you had a total of |
| 10:41:58 | 13 | maybe three telephone sessions with her? |
| 10:42:00 | 14 | A      Two or three.  Yes. |
| 10:42:04 | 15 | Q      Okay.  And then do you know what happened -- you |
| 10:42:05 | 16 | thought you were going to have more sessions with her, |
| 10:42:06 | 17 | correct? |
| 10:42:07 | 18 | A      I expected to have more sessions with her, yes. |
| 10:42:09 | 19 | Q      All right.  And then how did it end? |
| 10:42:10 | 20 | A      The last conversation that I recall having with |
| 10:42:13 | 21 | Tarla, I actually met her at an event that Trump did in |
| 10:42:17 | 22 | Marina Del Rey, California. |
| 10:42:19 | 23 | Q      And what was the event? |
| 10:42:21 | 24 | A      It was some kind of a wealth retreat.  There was |
| 10:42:23 | 25 | a myriad of different speakers presenting different |

**Exhibit 6**
**69**

# EXHIBIT 7

# Attorney Client Privilege

From: **Walter Grieves** <epartnersinc@ Redacted
Date: Tue, Apr 20, 2010 at 10:14 AM
Subject: Re: Robert
To: Tarla Makaeff <tmakaeff@ Redacted

It looks a bit suspect. Vegas is dead as ever.
------Original Message------
From: Tarla Makaeff
To: epartnersinc@ Redacted
Subject: Re: Robert
Sent: Apr 20, 2010 10:12 AM

I don't think so. It was a Hispanic guy prob from that poor area in
Vegas. I was wrong though-more than 20-25k profit...still...could it
be the market rebounded that fast...WTF?

On 4/20/10, Walter Grieves <epartnersinc@ Redacted wrote:
> Well he probably rolled it to another trump student on a phony appraisal so
> unless you want a big felony hanging over your head.
> -----Original Message-----
> From: Tarla Makaeff <tmakaeff@ Redacted
> Date: Tue, 20 Apr 2010 01:59:48
> To: Eventide Partners<epartnersinc@ Redacted
> Subject: Robert
>
> Btw, I found out two months after I signed off the house in Vegas that we
> bought he made a 35k profit....it's public record. Guess I could have banked
> 15k so probably should have held on to it....
>
>

1

TU-MAKAEFF5531

**Exhibit 7**
**70**

# EXHIBIT 8



Helen I. Zeldes, Partner

Zeldes & Haeggquist, LLP

625 Broadway, Suite 906, San Diego, CA 92101

tel: 619/342-8000 fax: 619/342-7878

www.zhlaw.com

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

---

**From:** Tarla Makaeff [mailto:tmakaeff@ Redacted
**Sent:** Friday, February 05, 2010 4:30 PM

**To:** Aaron Olsen
**Cc:** Helen Zeldes
**Subject:** Re: Web site message from www.zhlaw.com : Contact

Hi Aaron,

I just wanted to check in with you and see if you had any other questions to decide if this is a class action your firm would like to pursue.

Thank you,

Tarla

TU-MAKAEFF5557

**Exhibit 8**
**71**

# EXHIBIT 9

**[FILED UNDER SEAL]**

# EXHIBIT 10

## [FILED UNDER SEAL]