# EXHIBIT 1

**Transcription of Clip from Arkansas Rally 2/26/16**

That's right…Thank you.  But just remember this – Politicians are never going to get you to the promise land.  They're never, ever going to get you to the promise land.  And things were said in previous speeches – and probably by Cruz also – but I didn't get to see Cruz, which is just false. So many things I've done so well.  For instance, they talked Trump University.  It's a small deal – very small.  But, I got sued by a lawyer who sues – they sue – because they want to see if they can get some money back.  I could have settled this suit numerous times – I could settle it now. But I don't like settling suits because when you settle lawsuits everybody sues you – it's a little business story.  I have friends, they settle lawsuits and they can't understand why are they always sued.  I don't settle lawsuits.  We have people at Trump University that wrote – most of them – that wrote statements – and they wrote the statement where "I loved the school, I love this."  For some reason, I never saw this before, we call them report cards.  They did, like, report cards, essentially report cards, where at the end of the class – at the end of the period of time – they did a study – they did a report card on how you like it.  Some even did film clips where they actually would film them saying great things.  The person that started the suit wrote a great statement saying it was fantastic and did a film clip saying that it was fantastic and they just asked that she be taken out of the case.  She doesn't want to be in the case anymore.  And the reason they want is because she's a terrible plaintiff because she said all these great things about Trump University and she's on film saying how great it is.  So, they put in a motion, which the papers don't write this, they put in a motion saying to take her – her name is "Tarloff" or something – take her out of the case.  The reason they want her out of the case is she is a horrible, horrible, witness.  She's got in writing that she loves it.  And I could have settled it and when I saw her documentation, I said why would I give her money, she loved the case and she's on tape.  Why would I give her money?  Probably should have settled it, but I just can't do that.  Mentally I can't do it.  I'd rather spend a lot more money and fight it.  We [crowd cheering]…No you got to – you go to. Hey, would have been much easier if I settled.  Would have probably been cheaper, but I don't care.  It would have been much easier – it would have been cheaper – it would have been much easier – but just so you understand – so these people – all of this is people put up something and now they get letters, oh, can you get your money back, oh, we'll get our money back, yeah, let's join.  The attorney-general of New York – this is all a civil case by the way – a simple civil case – the attorney-general of New York, meets with Barack Obama in Syracuse.  The following day he sues me.  What they don't say is, I believe, $15,000 or a lot of money was paid to the attorney general by the law firm in California that's suing me.  See, I'm giving you sort of a life experience because it's, isn't this more interesting than talking about trade?  A trade is easy for us.  Trade is easy, but this is sort of like, this is almost like a story on success.  Because this is the way the world works.  This is sort of the way the world works.  So, the attorney general gets a campaign contribution from the law firm that's suing me.  All of a sudden the attorney-general, his name is Eric Schneiderman – not respected in New York, doing a terrible job, probably is not electable in New York but who knows.  And, he meets with Obama, gets the campaign contribution, I think – I think it's $15,000, and all of a sudden he meets with Obama in I believe Syracuse, and the following day or two he brings a lawsuit against me.  Now, much of that lawsuit has been won by me.  He's appealing it – it's on appeal right now.  But much of that case – it's a long time already – but much of that case, we won.  It's won.  I don't mean we settled – we've won much of that case.  They missed the statute of limitations and most of it is going away but nobody writes that – nobody wants to write that.  The rest of it we're doing very well.

We have a very hostile judge because to be honest with you the judge should have thrown the case out on summary judgment but because it was me and because there's a hostility towards me by the judge – tremendous hostility – beyond belief – I believe he happens to be Spanish, which is fine – he's Hispanic, which is fine, and we haven't asked for recusal, which we may do, but we have a judge who's very hostile.  It should have been thrown out, wasn't thrown out, and I say I'd rather go to court.  Because when you go to court and you have witnesses get up there and then they have to say but why did you sign a document saying that you loved the school, etc. etc., why shouldn't you pay money for that.  So, I just wanted to give you a little bit of the parameters because you keep hearing about Trump University, so, it's a civil case, it's a sleazebag law firm that does these class action cases – they're very routine – and, I will win the case at the end.  I just didn't want to be forced to settle and I could have settled it before I did this and I knew somebody would try and to use it for publicity, but I believe I can turn it around just to show you how dishonest these people are.  And that's the case. [Crowd Cheers]  And, just to finish, if I didn't have a hostile judge in California this case would have ended years ago – would have ended a long time ago.  Okay, are you ready?  So, that took place with Rubio, Rubio is going nowhere.  I think he's going nowhere.  Hasn't won at all.  They're fighting.  Now what they want to do is they want to take Trump on individually.  They're all fighting and I saw this morning "we should get out this…….[recording ends].

EXHIBIT 2

```
 1                UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   ART COHEN, Individually)
     and on Behalf of All   )
 5   Others Similarly       )No. 3:13-cv-02519-GPC-WVG
     Situated,              )
 6                          )   CLASS ACTION
              Plaintiff,    )
 7                          )
     VS.                    )
 8                          )
     DONALD J. TRUMP,       )
 9                          )
              Defendant.    )
10

11         ** CONFIDENTIAL ** CONFIDENTIAL **

12          ORAL AND VIDEOTAPED DEPOSITION OF

13                  DONALD J. TRUMP

14            Thursday, December 10, 2015

15             725 Fifth Avenue, 16th Floor

16                 New York, New York

17

18

19

20

21   Reported By:

22   EILEEN MULVENNA, CSR/RMR/CRR

23   Job No. 10020374

24

25
```

**Confidential**

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4   ART COHEN, Individually)
    and on Behalf of All    )
5   Others Similarly        )No. 3:13-cv-02519-GPC-WVG
    Situated,               )
6                           )   CLASS ACTION
            Plaintiff,      )
7                           )
    VS.                     )
8                           )
    DONALD J. TRUMP,        )
9                           )
            Defendant.      )

10

11

12

13      VIDEOTAPED DEPOSITION of DONALD J. TRUMP,

14   Defendant in the above-captioned matter, taken

16   by Plaintiffs, held at the offices of the Trump

17   Organization, 725 Fifth Avenue, New York, New

18   York, beginning at 10:05 a.m. and ending 5:02

19   p.m., on December 10, 2015, before Eileen

20   Mulvenna, CSR/RMR/CRR, Certified Shorthand

21   Reporter, Registered Merit Reporter, Certified

22   Realtime Reporter and Notary Public of the State

23   of New York.

24

25

```
 1    A P P E A R A N C E S:

 2

 3
           ROBBINS GELLER RUDMAN & DOWD, LLP
 4         Attorneys for Plaintiffs
               655 West Broadway
 5             Suite 1900
               San Diego, California  92101
 6         BY:   JASON FORGE, ESQ,
                 jforge@rgrdlaw.com
 7               DANIEL PFEFFERBAUM, ESQ.
                 dpfefferbaum@rgrdlaw.com
 8               RACHEL JENSEN, ESQ.
                 rjensen@rgrdlaw.com
 9

10

11         O'MELVENY & MYERS, LLP
           Attorneys for Defendant
12             Century City
               1999 Avenue of the Stars, 7th Floor
13             Los Angeles, California 90067
           BY:   DANIEL PETROCELLI, ESQ.
14               dpetrocelli@omm.com

15

16

17    A L S O   P R E S E N T:

18

19         Ryan Asanas, Videographer

20

21

22

23

24

25
```

1    opened.

2          Q.     And that was sometime -- some number

3    of years after it opened; correct?

4          A.     I believe so, yes.

5          Q.     Can you identify a single person who

6    was a live events instructor for Trump

7    University?

8          A.     You'd have to give me a list.  You'd

9    have to show me the list.  I actually went -- I

10   would go and just walk in and just stand in the

11   back of the room on occasion just to see how they

12   were doing, but it's been so many years, I

13   wouldn't be able to do that.

14         Q.     Let me just give you some names and

15   you tell me whether this could be a live events

16   instructor, a student, neither --

17         A.     Okay.

18         Q.     -- any of those three.

19         A.     Fine.

20                MR. PETROCELLI:  What's the

21         question, Jason?

22   BY MR. FORGE:

23         Q.     The question is, this individual I'm

24   saying here, can you tell me whether this person

25   is a student, live events instructor or neither?

```
 1                    Johnny Harris.
 2        A.     Too many years.
 3        Q.     Tim Gorsline.
 4        A.     Too many years.
 5        Q.     Mike Dubin.
 6        A.     It sounds very familiar.  Names --
 7   the names sound familiar, just too many years.
 8        Q.     Darren Liebmann.
 9        A.     The name sounds familiar, but it's
10   too many years.
11        Q.     Johnny Burkins.
12        A.     I don't know.
13        Q.     Johnny Horton.
14        A.     Too many years.
15        Q.     Tim Voss.
16        A.     Again, you can go through this whole
17   list.  And I'm sure you'd like to so you can take
18   this for a long time, but these are -- some of
19   those names sound familiar to me, but it's too
20   many years ago.
21        Q.     Chris Goff?
22        A.     Are you going to go through a whole
23   list of names?
24        Q.     You're the one that said give me a
25   list.
```

**Confidential**

**Donald Trump**                                      **Art Cohen, et al. vs. Donald J. Trump**

```
1              MR. PETROCELLI:  Do you want to show
2        it to him?
3              THE WITNESS:  You're right.
4              MR. PETROCELLI:  Do you want to show
5        it to him?
6              MR. FORGE:  I'm going through the
7        names.
8              THE WITNESS:  If you want to show it
9        to me, I can save you a lot of time.
10   BY MR. FORGE:
11        Q.    I'll go through the list.
12              We left off with Chris Goff.
13   Instructor, student --
14        A.    Again, some of those --
15        Q.    -- neither?
16        A.    Some of these names sound familiar
17   to me.  It's too many years ago.
18        Q.    Sound familiar as in might have been
19   an instructor, might have been a student --
20        A.    Could have been.  Could have been.
21        Q.    Could have been neither?
22        A.    No, it would have been more likely
23   instructors.  I would have known the instructors
24   much more so than the students.  We have -- we'll
25   have a lot of students testifying, but we have --
```

**Confidential**

Donald Trump                                      Art Cohen, et al. vs. Donald J. Trump

```
 1   but as far as that list is concerned, I would

 2   have -- the name's familiar, it's just too --

 3              MR. PETROCELLI:  When you say "that

 4        list," we don't have any document to --

 5              THE WITNESS:  I don't know what

 6        you're reading from.

 7              MR. PETROCELLI:  The lawyer is just

 8        reading from a piece of paper --

 9              MR. FORGE:  I'm just --

10              THE WITNESS:  Shouldn't you have a

11        document before --

12              MR. PETROCELLI:  -- that's not --

13              Excuse me.

14              -- that has not been put in front of

15        you.  The record will reflect that and the

16        testimony will be evaluated in light of his

17        refusal to let you see a list or represent

18        what the list means.  So just answer his

19        questions and we'll take it from there.

20              Next question, please.

21   BY MR. FORGE:

22        Q.    Ken Berry.

23        A.    Too many years.

24        Q.    James Webb.

25        A.    I don't remember the names -- don't
```

Confidential

Donald Trump                                    Art Cohen, et al. vs. Donald J. Trump

```
 1   remember the name.

 2        Q.    James Casper.

 3        A.    Too many years.  Too many years.

 4        Q.    Mike Casper.

 5        A.    Too many years.

 6        Q.    Kerry Martin.

 7        A.    Some of the names, by the way, sound

 8   familiar, but too many years to know.

 9        Q.    Paul Lucas.

10        A.    Same thing.

11        Q.    Kerry Lucas.

12        A.    Same answer.

13        Q.    Mike Peterson.

14        A.    Same answer.

15        Q.    Troy Peterson.

16        A.    Same answer.

17        Q.    Chris Gillem.

18        A.    Same answer.

19        Q.    Steve Gilpin.

20        A.    Same answer.

21        Q.    Scott Miller.

22        A.    Same answer.

23        Q.    Steve Miller.

24        A.    Are you going to do this all day?

25        Q.    Same answer?
```

**Donald Trump**                    Confidential                    **Art Cohen, et al. vs. Donald J. Trump**

```
 1        A.    Same answer.

 2        Q.    Derek McNulty.

 3        A.    Same answer.

 4        Q.    Rick McNally.

 5        A.    How many more do you have?  How many

 6   more names do you have?

 7        Q.    Mr. Trump, you're the one who wants

 8   to get through this quickly.  Just answer the

 9   questions and we'll get through it quickly.

10        A.    You're not going to get anything

11   through quickly.  You don't want to get anything

12   through quickly.

13              Same answer.

14        Q.    Jerry Stanton.

15        A.    Same answer.

16        Q.    Johnny Burkins.

17        A.    Same answer.

18        Q.    Gerald Martin.

19        A.    Same answer.

20        Q.    Chris Lefrance.

21        A.    Same answer.

22        Q.    Steve Goff.

23        A.    Same answer.

24        Q.    James Webb.

25        A.    Same answer to your harassment
```

**Page 105**

```
 1   questions.
 2        Q.     Chris Lombardo.
 3        A.     Same answer to your harassment
 4   questions.
 5        Q.     Keith Holley.
 6        A.     Same answer.
 7        Q.     Keith Sperry.
 8        A.     Same answer.
 9        Q.     Howard Bell.
10        A.     Same answer.
11        Q.     Howard Haller.
12        A.     Same answer.
13        Q.     Bob Serafine.
14        A.     Same answer.
15        Q.     Bob Steenson.
16        A.     Same answer.
17        Q.     Jerry Moore.
18        A.     Same answer.
19        Q.     Joe Labore.
20        A.     Same answer.
21        Q.     Mike --
22        A.     Same answer.
23        Q.     Mike McMenamy.
24        A.     Same answer.
25        Q.     Rick McNally.
```

**Confidential**

**Donald Trump**                                      **Art Cohen, et al. vs. Donald J. Trump**

```
 1        A.    Same answer.

 2        Q.    Mike Casper.

 3        A.    Same answer.

 4        Q.    Tim Gorsline.

 5        A.    Same answer.

 6        Q.    Geoff Nowlin.

 7        A.    Same answer.

 8        Q.    Steve Gilpin.

 9        A.    Same answer.

10        Q.    James Christ.

11        A.    Same answer.

12        Q.    Alex Grist.

13        A.    Same answer.

14        Q.    Mike Weber.

15        A.    Same answer.

16        Q.    Don Sexton.

17        A.    Same answer -- well, I know the

18   name, but same answer.  Still a long time.

19             MR. PETROCELLI:  Don Sexton -- could

20        you repeat the question just so he has it

21        in mind.

22             THE WITNESS:  I heard the question.

23   BY MR. FORGE:

24        Q.    Don Sexton, do you know if he was a

25   live events instructor, a student or neither?
```

**Confidential**

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

```
 1        A.      I remember the name, but it's many

 2   years ago.  I'd have to check the facts.

 3        Q.      Gary Stanton.

 4        A.      Same answer.

 5        Q.      Gary Sturgeon, S-T-U-R-G-E-O-N.

 6        A.      Same answer.

 7              MR. FORGE:  Tab 9.  Let's mark this

 8        as Exhibit 475.

 9              (Plaintiffs' Exhibit 475, No Bates

10        numbers, Sheet of Photographs, marked for

11        identification.)

12   BY MR. FORGE:

13        Q.      Mr. Trump, let's get away from the

14   names and see if you recognize any faces.  I've

15   placed in front of you a photo lineup marked as

16   Exhibit 475 with three rows of eight photos per

17   row, so that's a total of 24 photos.

18              Do you recognize any of the people

19   depicted on this exhibit?

20        A.      What year was this picture taken?

21        Q.      Different years.

22        A.      I think I should be entitled to know

23   what year it was taken.  When were they taken?

24   How many years ago?

25        Q.      Different years.
```

```
 1          A.      Well, I think you should find out.
 2     I mean --
 3          Q.      Do you recognize any of the --
 4                  THE WITNESS:  Are you allowed to
 5          find out --
 6          Q.      -- people whose pictures --
 7                  THE WITNESS:  Are you allowed to
 8          find out when they were taken?
 9                  MR. PETROCELLI:  You know, you just
10          have to answer the questions and get
11          through this.
12                  THE WITNESS:  Okay.
13                  MR. PETROCELLI:  These questions are
14          what they are.  If you're not able to
15          recognize someone because he won't tell you
16          when the pictures are taken, that's on him.
17          Okay.
18     BY MR. FORGE:
19          Q.      Do you recognize anyone whose photo
20     is on here?
21          A.      No.  No, I don't.
22          Q.      Do you know whether any of these
23     individuals are students?
24          A.      No, I don't.
25          Q.      Do you know whether any of these
```

1    **individuals are live events instructors?**

2         A.    I can't -- I can't tell from these

3    small pictures now.  And they were taken

4    obviously many, many years ago.

5         **Q.    Why is that obvious?**

6         A.    Because you can't give me the

7    answer.

8         **Q.    Why does that make it obvious it was**

9    **taken many, many years ago?**

10        A.    Because if they were taken recently,

11   you'd probably remember.

12        **Q.    When did I say I didn't remember?**

13        A.    I don't know.  You wouldn't give me

14   the answer.

15        **Q.    So why is it obvious they were**

16   **taken --**

17        A.    I would like to know when the

18   pictures were taken.

19        **Q.    So why is it obvious they were taken**

20   **many years ago?**

21        A.    Because if they were taken recently,

22   you would remember, I would imagine.

23        **Q.    When did I say I couldn't remember?**

24        A.    Well, then tell me who they are,

25   tell me when they were taken.

1        **Q.      Did I ever say that --**

2        A.      Tell me when they were taken.

3        **Q.      Did I say I can't remember?**

4        A.      Tell me when they were taken.  How

5    many years ago were they taken?

6        **Q.      I told you they were different**

7    **years, Mr. Trump.**

8        A.      Are you sure about that?

9        **Q.      And you don't recognize --**

10       A.      Are you sure about that?

11       **Q.      You don't recognize any of them;**

12   **right?**

13       A.      Are you sure that they're different

14   years?

15       **Q.      Yes.**

16       A.      You're sure about that?

17       **Q.      Sure.**

18       A.      Okay.  Okay.  We'll find out.

19       **Q.      Do you recognize any of them?**

20       A.      I don't, no.

21              (Discussion off the record.)

22              MR. FORGE:  Eileen, if you could

23       mark this 476.

24              (Plaintiffs' Exhibit 476, No Bates

25       number, Color Photograph, marked for

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

```
1    know?

2         A.    No.

3         Q.    We've tried names.  We've tried

4    pictures.  Let's try voices now.

5              MR. PETROCELLI:  You don't need the

6         editorial comments about we tried.  I

7         object.  It's inappropriate.  Just ask

8         questions, please.

9              MR. FORGE:  Oh, so no editorial?

10        That's what you're saying?

11             MR. PETROCELLI:  By you, correct.

12             MR. FORGE:  Only you.

13             MR. PETROCELLI:  That's not your

14        role.

15             MR. FORGE:  Could we get 201, 202

16        and 203, please.

17             The next document we're going to

18        use -- next exhibit, I'm sorry, we're going

19        to use is Exhibit 477.

20             Dan, we have a number of audio/video

21        exhibits.  My intention is to give you a

22        disc of each one individually because I

23        don't know how many we're going to go

24        through.  And then the court reporter will

25        get all of them on a flash drive just so
```

1        it's easier for her to maintain them.

2        So --

3                MR. PETROCELLI:  What are you

4        marking this as?

5                MR. FORGE:  This is going to be

6        Exhibit 477.

7                (Plaintiffs' Exhibit 477, No Bates

8        numbers, Video Clip, marked for

9        identification.)

10               (Plaintiffs' Exhibit 478, No Bates

11       numbers, Video Clip, marked for

12       identification.)

13   BY MR. FORGE:

14       **Q.    Mr. Trump, I'm going to play for you**

15   **this video.  And just tell me -- it's short.**

16   **Tell me whether you recognize this individual.**

17               MR. PETROCELLI:  Can you turn it to

18       face us.

19               MR. FORGE:  Sure.

20               (Video is played.)

21               MR. FORGE:  Just for the record,

22       that's going to be Exhibit 478.  Dan, what

23       I handed you is 477.  This is 478.

24               MR. PETROCELLI:  Is what you just

25       played, which says, "Jay Morrison - How to

```
 1        Get Rich in Real Estate," Exhibit 478?
 2             MR. FORGE:  Yes.
 3   BY MR. FORGE:
 4        Q.    Mr. Trump, can you tell me whether
 5   or not that individual was a student at Trump
 6   University, a live events instructor or neither?
 7        A.    Well, it looked like -- I don't know
 8   him, but I don't disagree with what he was
 9   saying, either, by the way.  But he would look
10   like he was an instructor more than a student,
11   but I don't know him.  But I don't disagree with
12   what he was saying, and I thought his
13   presentation was quite interesting, actually.
14        Q.    But you don't know whether he was an
15   actual instructor at Trump University?
16        A.    I don't know, but I might have -- if
17   you showed me his résumé, perhaps I could tell
18   you.
19             MR. PETROCELLI:  Mr. --
20             MR. FORGE:  Now I'm going to play
21        477.
22             MR. PETROCELLI:  Time out.
23             MR. FORGE:  Sure.
24             MR. PETROCELLI:  Miss Reporter, are
25        you transcribing the words?  You're just
```

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

```
1          waiting for the flash drive; right?  Okay.
2          Thank you.
3               He's not making any -- don't make
4          any assumptions about what you're seeing.
5               THE WITNESS:  No, I'm just looking.
6               MR. PETROCELLI:  There's been no
7          representation --
8               THE WITNESS:  I found it very
9          interesting, actually, to be honest with
10         you.
11              MR. PETROCELLI:  Now you're going to
12         play 478?
13              MR. FORGE:  477.  I played them out
14         of order.  The first one was 478.  This one
15         is 477.
16              MR. PETROCELLI:  Okay.
17              (Video is played.)
18    BY MR. FORGE:
19         Q.    Do you recognize that individual as
20    a Trump University live events instructor,
21    student or in any other way?
22         A.    I'd have to see the résumé.
23         Q.    You don't know whether or not he was
24    a Trump University instructor?
25         A.    No.
```

**Confidential**

**Donald Trump**                                         **Art Cohen, et al. vs. Donald J. Trump**

```
 1   instructor?

 2        A.     Based on his experience as opposed

 3   to --

 4        Q.     You mean if his résumé said, I was

 5   an instructor with Trump University, that would

 6   help you put it together?

 7        A.     If his résumé said he's been in the

 8   real estate for many years, it's unlikely he'd be

 9   a student, which is what you're asking me.

10        Q.     But make sure you understand.

11               With these videos, it's not

12   necessarily an either/or.  I said it's -- I'm

13   asking you whether the person was a live events

14   instructor, a student or neither one.

15               MR. PETROCELLI:  In other words,

16          they could be a guy off the street or an

17          actor.

18               MR. FORGE:  Yeah.

19   BY MR. FORGE:

20        Q.     Yeah, exactly.

21        A.     I don't know.

22        Q.     Okay.

23               MR. PETROCELLI:  Or -- or a

24          convicted felon.

25               MR. FORGE:  Yes, could be that too.
```

1    you.

2         Q.    **Okay.**

3              MR. PETROCELLI:  I think you're

4         being pitched another television show.

5              THE WITNESS:  Yeah.

6              MR. FORGE:  This is 479.

7              (Plaintiffs' Exhibit 479, No Bates

8         numbers, Video Clip, marked for

9         identification.)

10              (Video is played.)

11   BY MR. FORGE:

12        Q.    **Mr. Trump, do you recognize the**

13   **individual depicted in Exhibit 479 as a Trump**

14   **University instructor, student or neither?**

15        A.    I don't recognize him.

16        Q.    **One of the names I mentioned to you**

17   **earlier was James Harris.  You said you didn't**

18   **recognize that name?**

19              MR. PETROCELLI:  To be clear, when

20         did you mention his name?

21              MR. FORGE:  In the list, one of the

22         names I mentioned in the list, James

23         Harris.

24              THE WITNESS:  No, I didn't recognize

25         it.

```
 1   BY MR. FORGE:
 2        Q.     Do you know or have you known anyone
 3   named James Harris?
 4        A.     I don't know, but I don't recognize
 5   that name.
 6        Q.     Do you know whether or not any Trump
 7   University instructors were caught cussing out
 8   and verbally berating a group of elderly
 9   students?
10        A.     No, I don't.
11               MR. FORGE:  Let's do 20 and 21.
12               (Pause from the record.)
13               MR. FORGE:  Mark this as 480.
14               (Plaintiffs' Exhibit 480, Bates Nos.
15        TU154580 through 86, E-mail Chain, marked
16        for identification.)
17   BY MR. FORGE:
18        Q.     Mr. Trump, I've placed in front of
19   you a document marked as Exhibit 480, which is a
20   document that you have produced in discovery in
21   this case.  The Bates number for the first page
22   is TU154580.
23               MR. PETROCELLI:  When you said
24        "you," do you mean Trump University
25        produced it?
```

**Donald Trump**                                          Art Cohen, et al. vs. Donald J. Trump

```
 1          A.      No, I don't.
 2          Q.      The ultimate hiring authority at
 3   Trump University was Mr. Sexton; correct?
 4          A.      Yes, that's correct.
 5                  MR. FORGE:  Tab 11, please.  This
 6          will be 481.
 7                  (Plaintiffs' Exhibit 481, No Bates
 8          numbers, Transcript Excerpt, marked for
 9          identification.)
10   BY MR. FORGE:
11          Q.      Mr. Trump, I've --
12                  MR. PETROCELLI:  Can you identify
13          this.
14   BY MR. FORGE:
15          Q.      -- placed in front of you a document
16   marked as Exhibit 481, which is an excerpt from
17   Mr. Sexton's sworn testimony to the Office of the
18   New York State Attorney General.
19                  If you could, please, direct your
20   attention to the second page, which is page 157.
21                  At line 10, Mr. Sexton is asked:
22                  "QUESTION:  And were any of those --
23          any of these other speakers at any of those
24          events handpicked by Donald Trump?"
25                  Mr. Sexton's answer:
```

**Confidential**

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

```
 1              "ANSWER:  None of our instructors at
 2        the live events were handpicked by Donald
 3        Trump."
 4              Do you have any basis to dispute
 5   Mr. Sexton's testimony in this regard?
 6        A.    No.  That's correct.
 7              MR. PETROCELLI:  The question is
 8        vague.
 9              MR. FORGE:  You can take out --
10              THE WITNESS:  I looked at résumés
11        and things, but I didn't pick the speakers.
12              MR. FORGE:  -- 12.
13   BY MR. FORGE:
14        Q.    Again, Mr. Trump, I want to make
15   sure that you are distinguishing -- you're
16   understanding the distinction between the Trump
17   University instructors when it was a distance
18   learning --
19        A.    Yeah.
20        Q.    -- versus live events.
21        A.    Okay.
22              THE WITNESS:  Just off the record,
23        I'm sure we're going to take some breaks
24        also in addition to lunches because I have
25        to make calls also, so --
```

1  BY MR. FORGE:

2       **Q.    Well, I've just got to --**

3       A.    This is the longest deposition I've

4  ever done in terms of no break.  So I need breaks

5  because I have to make some calls.

6       **Q.    No problem.  We haven't taken a**

7  **break because you want to get through this.**

8       A.    We do, but breaks are very standard,

9  so --

10       **Q.    We'll do one more.**

11       MR. FORGE:  This we're going to mark

12       as Exhibit 482.

13       (Plaintiffs' Exhibit 482, No Bates

14       numbers, Transcript Excerpt, marked for

15       identification.)

16       MR. FORGE:  Just for the record,

17       Exhibit 482 is an excerpt from deposition

18       testimony of Michael Sexton.

19  BY MR. FORGE:

20       **Q.    And if you could, please -- in this**

21  **case, if you could, please, turn to page -- what**

22  **is page 161 of the deposition.**

23       A.    Paragraph line?

24       **Q.    I'll -- again keeping in mind the**

25  **distinction between the remote learning**

**Confidential**

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

```
 1   instructors and live events instructors --

 2         A.     Okay.

 3         Q.     -- if you see, beginning at line 14:

 4                "QUESTION:  Mr. Sexton, you

 5         mentioned Donald Trump did not review any

 6         of the auditions of the instructors;

 7         correct?

 8                "ANSWER:  That's correct."

 9                Do you have any basis to dispute

10   that testimony?

11                MR. PETROCELLI:  With respect to the

12         live events?

13                MR. FORGE:  Yes, this is live events

14         instructors.

15                THE WITNESS:  No, I didn't.  And

16         that's correct.  What he said is correct.

17   BY MR. FORGE:

18         Q.     Again, these are all focusing on

19   live events instructors, Mr. Trump.

20         A.     Okay.

21         Q.     Next:

22                "QUESTION:  To your knowledge, he

23         didn't review any of their school

24         transcripts; correct?

25                "ANSWER:  That's correct."
```

1          Any basis to dispute that?

2          A.     I would say that's correct.

3   Generally speaking, I might have seen something,

4   but mostly correct, yes.

5          **Q.     Are there any live events**

6   **instructors whose school transcripts you believe**

7   **you saw?  Live events instructors.**

8          A.     Well, transcripts -- I don't know.

9   Are you talking about résumés or transcripts?

10         **Q.     We'll get to résumés, but I'm saying**

11  **live -- anyone who was actually hired as a live**

12  **events instructor.**

13         A.     Yeah.  What do you mean by

14  "transcripts"?

15         **Q.     School transcripts.  You know, the**

16  **grades -- transcript from your school that tells**

17  **the classes that you took, the semester and the**

18  **grade.**

19         A.     Oh, I think I've seen them, but not

20  in particular, no.  Not in particular.

21         **Q.     What he says here is Mr. Trump**

22  **didn't review any of their school transcripts.**

23         A.     Yeah, "review" is a different word.

24  But I think -- you know, I would see.  I mean,

25  they had transcripts -- when you say

**Confidential**

Donald Trump                                    Art Cohen, et al. vs. Donald J. Trump

1   "transcripts," you're talking about the grades of

2   students and things like that?

3        Q.     **Grades and classes taken.**

4        A.     I'd see stuff around, but I

5   didn't -- yeah, I didn't -- I didn't know the

6   students.

7        Q.     **(Reading):**

8              "QUESTION:  He did not" --

9              Next question, line 21:

10             "QUESTION:  He did not review any of

11        the real estate deals; correct?

12             "ANSWER:  That's correct."

13             Do you have any basis to dispute

14   that part of his testimony?

15        A.     No, not at all.

16        Q.     **Line 24.  Again, we're talking live**

17   **events instructors.**

18             "QUESTION:  He did not review their

19        résumés?

20             "ANSWER:  That's correct."

21        A.     No, I saw résumés.  I would see

22   résumés.  They would come to me.  I mean, I would

23   dispute that because I would see -- I also met

24   with instructors prior to their hiring or around

25   the time of their hiring.

**Donald Trump**                                      **Art Cohen, et al. vs. Donald J. Trump**

```
1   different, but the word "quality" I think would
2   have to stay there.  And I think the quality -- I
3   think the quality remained.  I think it was very
4   important to Mr. Sexton to have the quality
5   remain.
6        Q.    You did not do any sort of quality
7   control over the materials, did you --
8        A.    Well --
9        Q.    -- personally?
10        A.    -- look, the original concepts and
11   everything else.  But we would give, as you
12   presented to me, different statements.  I mean, I
13   did things like that.  I think that's very
14   important, right.
15        Q.    What I'm getting at is -- I just
16   want to confirm one way or the other -- you did
17   not actually do a quality control -- you, Donald
18   Trump, personally did not do a quality control --
19        A.    Most of that would be Mr. Sexton and
20   his staff.
21        Q.    And Mr. Sexton, he had no background
22   in terms of buying and selling real estate for
23   profit, did he?
24             MR. PETROCELLI:  Lacks foundation.
25        Lacks foundation.
```

**Confidential**

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

```
 1                THE WITNESS:  He was more of an
 2      educational person.
 3   BY MR. FORGE:
 4        Q.     As far as you knew, he did not have
 5   any background buying and selling real estate?
 6        A.     I -- it was long time ago that I
 7   talked to him.  You're talking about many, many
 8   year ago.  But he was a -- he's a high-quality
 9   person who -- frankly, who was very much into the
10   world of education.
11        Q.     But as you sit here today, do you
12   know whether or not he had any experience buying
13   and selling --
14        A.     It was limited.  It was limited.  I
15   think it was much more so in the school world
16   rather than the real estate world.
17        Q.     Do you have any understanding as to
18   whether he had ever run a school before this?
19        A.     That I don't -- it's too long ago.
20   I don't remember.
21        Q.     Do you have any understanding as to
22   whether he'd ever been an actual teacher before
23   this?  And "this" being Trump University.
24        A.     I had the information many, many
25   years ago, and I was very impressed with him.
```

**Confidential**

Donald Trump                                    Art Cohen, et al. vs. Donald J. Trump

1   bad example for the students -- for the

2   instructors?

3                   MR. PETROCELLI:  Improper opinion

4           testimony, lacks foundation, improper

5           hypothetical, vague and ambiguous.

6                   You can answer.

7                   THE WITNESS:  It might be hyperbole

8           where he just is talking, bragging or

9           something, but I don't think it has any

10          impact on the student whatsoever.  I think

11          the instructor -- it's probably hyperbole.

12   BY MR. FORGE:

13       Q.     That's still not what I'm asking you

14   mean.

15       A.     Go ahead.  Try again.

16       Q.     Encouraging an instructor to lie to

17   the students, do you believe that sets a good or

18   a bad example for the instructor?

19                   MR. PETROCELLI:  Same objections.

20                   THE WITNESS:  I didn't encourage

21          anybody.  I don't even know who the

22          instructor is.  So, you know, I didn't

23          encourage anybody.

24   BY MR. FORGE:

25       Q.     You have no idea what Gerald Martin

**Confidential**

Donald Trump                      Art Cohen, et al. vs. Donald J. Trump

```
 1    represented to students; right?
 2         A.     No, I don't know that.
 3         Q.     You have no idea what James Harris
 4    represented to students; right?
 5         A.     No, I didn't -- I don't know that.
 6    I don't know that.
 7         Q.     And you have no idea what Keith
 8    Sperry represented to students; correct?
 9         A.     No.
10         Q.     You have no idea what Steve Goff
11    represented to students; correct?
12         A.     I know you're in classes for hours
13    and hours.  No, I don't know what they said to
14    the various students.
15         Q.     You don't know what Chris Goff --
16         A.     Many people are very happy with the
17    courses, I know that.
18         Q.     You don't know what Chris Goff
19    represented; correct?
20         A.     No.
21         Q.     You don't know what any of these
22    live events instructors represented to students;
23    correct?
24         A.     Well, they represented real estate
25    and real estate knowledge.  That's what they
```

Page 186

1    represented.  And many people are very happy with

2    those classes.

3         Q.    Do you have personal knowledge of

4    **anything these live events instructors**

5    **represented to students?**

6         A.    I must tell you I had it for a long

7    time and I had very few complaints.

8         Q.    Do you have personal knowledge of

9    **anything an instructor --**

10        A.    Usually if people have problems with

11   something that I have, I will be inundated with

12   letters and phone calls and other things.  I

13   received almost nothing for years from Trump

14   University.

15        Q.    Just try to focus on my question --

16        A.    I'm just telling you, I received

17   very few complaints over years with thousands of

18   students.

19        Q.    Do you have personal knowledge of

20   **any of the representations that the live events**

21   **instructors made to the students?**

22             MR. PETROCELLI:  By "personal

23        knowledge," do you mean did he hear them

24        himself?

25             MR. FORGE:  Hear them, read them.

**Confidential**

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

1                    THE WITNESS:  Hear them myself, no.

2          Read them myself, no.

3    BY MR. FORGE:

4          Q.     **Have you ever -- have you ever been**

5    **deceived?**

6          A.     Yes.  Sure.

7          Q.     **Have there ever been instances in**

8    **which you didn't realize you had been deceived**

9    **until some time later?**

10         A.     I can't think of any.  I mean,

11   normally -- I can't think of any.

12         Q.     **But you agree with me that there's**

13   **typically a period -- if you're deceived, it**

14   **takes time before you realize you've been**

15   **deceived; correct?**

16                 MR. PETROCELLI:  Improper

17          hypothetical, lacks foundation, improper

18          opinion testimony.

19                 THE WITNESS:  Yeah, I really can't

20          answer a question like that.  I mean,

21          deceived -- I can't even -- I'd have to

22          think about even being deceived, first of

23          all.  And then after that, I'd have to

24          start thinking about timing.

25                 MR. FORGE:  Can we have Tab 65, 208

**Page 188**

1       MR. PETROCELLI:  Excuse me.

2           In my [sic] book, I don't know what

3       that means.  I object to that on vague and

4       ambiguous.

5   BY MR. FORGE:

6       **Q.    Do you consider that to be**

7   **potentially an acceptable --**

8       A.    It depends on the materials --

9           MR. PETROCELLI:  Improper opinion

10      testimony, vague and ambiguous.

11          THE WITNESS:  The instructors have

12      great materials to work with.  It depends

13      on the materials they use.  It depends on

14      the books they've been given.  It depends

15      on a lot of other information.

16  BY MR. FORGE:

17      **Q.    So construct for me a scenario --**

18      A.    And we did have a lot of very good

19  instructors.  I mean, you can always find someone

20  who's maybe not so good or --

21      **Q.    Can you name for me one good live**

22  **events instructor?**

23          MR. PETROCELLI:  Objection; asked

24      and answered.

25          THE WITNESS:  I don't know the

**Donald Trump**                    Art Cohen, et al. vs. Donald J. Trump

```
 1        instructors.
 2   BY MR. FORGE:
 3        Q.    Do you know a single good live
 4   events instructor?
 5             MR. PETROCELLI:  Asked and answered.
 6   BY MR. FORGE:
 7        Q.    Do you?
 8             THE WITNESS:  Am I supposed to
 9        answer that?
10             MR. PETROCELLI:  You've answered it
11        many times.
12             THE WITNESS:  All I can say is --
13             MR. PETROCELLI:  Answer it again.
14             THE WITNESS:  All I can say is it's
15        many years ago.  I've had very, very few
16        complaints -- until this whole thing
17        started, I've had very, very few complains.
18        And I always have complaints if there's a
19        problem with something I'm involved in.
20        I've had very, very few complaints over the
21        years having to do with this.
22   BY MR. FORGE:
23        Q.    Mr. Trump, I'm just asking you to
24   back up your own words.  You said, we --
25             MR. PETROCELLI:  Time out.
```

**Donald Trump**                                    Art Cohen, et al. vs. Donald J. Trump

1    accurately describe your thoughts on promotion

2    and bravado?

3              A.    Sure.

4                   MR. PETROCELLI:  Vague and

5         ambiguous.

6                   THE WITNESS:  Sure.

7    BY MR. FORGE:

8         Q.    Mr. Trump, you never reviewed the

9    scripts that were provided to the live events

10   instructors, did you, sir?

11             A.    I don't believe so, no.

12        Q.    Did you -- did you ever instruct

13   Mr. Sexton to deny the existence of those

14   scripts?

15             A.    No.  Scripts?  No.  I don't even

16   know about scripts.  I'm not -- I'm not familiar

17   with the scripts.

18                  MR. FORGE:  Can I have Tab 27, 28

19        and 29, please.  Mark this as Exhibit 492.

20                  (Plaintiffs' Exhibit 492, Bates Nos.

21        TU154665 through 702, E-mail dated 4/14/09

22        from Sexton to Harris with attachments,

23        marked for identification.)

24   BY MR. FORGE:

25        Q.    Mr. Trump, I've placed in front of

1    BY MR. FORGE:

2           Q.     **Is this consistent --**

3           A.     As I said about five times, I didn't

4    know about it.

5           Q.     **Understood.**

6                  **But were you -- did you approve this**

7    **type of false statement being made to students?**

8           A.     No.  Nobody ever asked me about it,

9    but, no.

10          Q.     **Did you convey to Michael Sexton**

11   **that it would be okay to engage in this type of**

12   **false representation to students?**

13          A.     No, but I don't remember ever having

14   even talked to him about something like this.

15          Q.     **That's because you don't know what**

16   **representations Mr. Sexton was encouraging people**

17   **to make; correct?**

18          A.     I don't.  I don't.

19          Q.     **You don't know anything that any of**

20   **the live events instructors said to the students;**

21   **correct?**

22                 MR. PETROCELLI:  Asked and answered.

23                 THE WITNESS:  No, I wasn't involved

24        in the -- in the classes.

25                 MR. PETROCELLI:  Question's also

1    answer my question.

2          A.     I'm trying to.

3          Q.     What I'm asking you, is this -- this

4    information about Mr. Sexton's lack of background

5    in real estate, is that consistent with your

6    understanding back when Trump University was

7    operating?

8          A.     Yes, because he was -- he was a

9    manager.

10         Q.     So that's a yes?

11         A.     Yeah.  I knew he didn't have much of

12   a background in real estate, yes.

13         Q.     Or any background in real estate?

14         A.     Or -- yes, I think any background.

15   Just like -- I mean, I could give you examples.

16   I won't waste your time, but many times people

17   get hired -- they build cars and now they're

18   building airplanes.  You know, there are --

19   people are competent, they're competent.  And he

20   had a very high reference.

21         Q.     From somebody you can't remember.

22         A.     From somebody -- if I can find it,

23   I'll let you know.

24         Q.     Mr. Trump, you never did anything to

25   certify any of the Trump University mentors, did

1   you?

2                   MR. PETROCELLI:  Question is vague.

3                   THE WITNESS:  Me personally?

4   BY MR. FORGE:

5         Q.     Yes.

6         A.     No.

7         Q.     Can we go back to Exhibit 475.

8   That's the photo spread.

9               Mr. Trump, looking at that photo

10  spread, which is Exhibit 475, do you know if

11  there are any top Trump certified mentors in that

12  exhibit?

13        A.     I can't tell from these pictures,

14  no.

15        Q.     Do you recognize Kerry Lucas in

16  those pictures?

17        A.     No.

18              MR. FORGE:  Tab 58, please.

19              This is now 496.

20              (Plaintiffs' Exhibit 496, No Bates

21        numbers, Transcript Excerpt, marked for

22        identification.)

23  BY MR. FORGE:

24        Q.     Mr. Trump, I've handed you

25  Exhibit 496, which contains excerpts from the

```
 1                  MR. PETROCELLI:  He indicated it was

 2        a mentor.

 3   BY MR. FORGE:

 4        Q.     It could be both.  It could be

 5   neither.

 6        A.     No.  No.  Is this person a mentor or

 7   an instructor?

 8        Q.     You don't know; right?

 9        A.     I don't know.

10        Q.     Okay.  So do you know any of the

11   mentors that worked for Trump University?

12        A.     No, I don't.  That was up to

13   Mr. Sexton.

14        Q.     Did you do anything personally to

15   confirm the expertise of any of the Trump

16   University mentors?

17        A.     No, I didn't.

18        Q.     Did you do anything personally to

19   confirm the qualifications of any of the Trump

20   University mentors?

21        A.     There was Mr. Sexton.

22        Q.     So that's a no for you?

23        A.     No for me, yes.

24        Q.     Did you do anything personally to

25   confirm the qualifications of any of the Trump
```

**Confidential**
**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

1   the fact -- to dispute testimony that you did not

2   meet with the live events instructors?

3                    MR. PETROCELLI:  Asked and answered.

4                    THE WITNESS:  Again, I can't

5        differentiate between the live and the pre

6        live.

7   BY MR. FORGE:

8        Q.    And you can't differentiate based on

9   name?

10       A.    That's right.

11       Q.    And you can't differentiate --

12       A.    Too many years ago.

13       Q.    And you can't differentiate based on

14  the face?

15       A.    Too many years ago.

16       Q.    So no.

17       A.    It's ancient history.

18       Q.    So no, you can't differentiate based

19  on the name.

20       A.    That's right.

21       Q.    No, you can't differentiate based on

22  the face.

23       A.    That's right.  Too long ago.

24       Q.    So going back to Kerry Lucas and his

25  testimony that he -- prior to working for Trump

1    University, he had no experience buying and

2    selling real estate --

3                MR. PETROCELLI:  Again, you're

4         representing that he testified to that.

5                MR. FORGE:  I am.  I am representing

6         that.

7                MR. PETROCELLI:  We haven't seen

8         that --

9                MR. FORGE:  I'm representing that.

10               MR. PETROCELLI:  -- except that you

11        showed that us.

12   BY MR. FORGE:

13        Q.    Prior to working as an instructor or

14   mentor with Trump University, he had no

15   experience buying or selling real estate.

16        A.    I think he was a mentor, not -- I

17   think he was not -- you said --

18               MR. PETROCELLI:  He was a mentor.

19               THE WITNESS:  You said he was a

20        mentor.

21   BY MR. FORGE:

22        Q.    You don't think he was also an

23   instructor?

24        A.    I don't know.  But I think you said

25   that he was a mentor, the first top certified

1    mentor.

2        Q.      I'm asking you.  You don't know,

3    though?

4        A.      I don't know.  I don't know who he

5    is.

6        Q.      Is that the type of qualification

7    that you were looking for for a Trump University

8    mentor?

9              MR. PETROCELLI:  Assumes facts not

10            in evidence.

11            THE WITNESS:  An instructor, no.  As

12            a mentor, I think it's -- a mentor takes

13            people around.  I think it's a little bit

14            different.

15   BY MR. FORGE:

16       Q.      Do you know that it cost

17   significantly more money for the student to work

18   with a mentor than to sit in with an instructor?

19            MR. PETROCELLI:  Assumes facts not

20            in evidence.

21            THE WITNESS:  I think it's a

22            different -- it's a whole different feel.

23            But there was a certain mentoring program.

24            I don't have the numbers in front of me,

25            no.

1    BY MR. FORGE:

2         **Q.    Do you have any idea?**

3         A.    About what?

4         **Q.    How much it costs for a three-day**

5    **mentorship with a Trump University mentor?**

6         A.    No, I don't.  It was a long time

7    ago.  I don't know.  I don't know currently.

8         **Q.    For someone who had no experience**

9    **buying or selling real estate, do you consider**

10   **that person to be qualified to charge tens of**

11   **thousands of dollars for a three-day real estate**

12   **mentorship?**

13             MR. PETROCELLI:  It assumes many

14        facts not in evidence and is argumentative.

15        And it's an improper hypothetical and seeks

16        improper opinion testimony.

17             Subject to my objections, you may

18        answer.

19             THE WITNESS:  I really -- I really

20        can't answer.  I don't know what his

21        background is.  I really don't know.  Maybe

22        he's a super genius in so many ways.  I

23        don't know.  I mean, I can't tell you.  I

24        just can't tell you that.  I would think

25        that you'd really have to ask that question

**Confidential**

```
 1          of Mr. Sexton because --
 2   BY MR. FORGE:
 3          Q.     So you have no idea if he was
 4   qualified or not?
 5          A.     I don't know.  I don't know.  I
 6   don't know anything about him.  I never met him.
 7          Q.     You don't know if he's qualified to
 8   be an instructor?
 9          A.     I never met him.
10          Q.     So you don't know if he was
11   qualified to be an instructor?
12          A.     No, because I never met him.
13          Q.     And you don't know if he's qualified
14   to be a mentor?
15          A.     I never met him.
16          Q.     How about Keith Sperry; do you know
17   if he --
18          A.     Who?
19          Q.     Keith Sperry.
20          A.     I don't know who that is.
21          Q.     So you don't know if he was
22   qualified to be an instructor?
23          A.     Don't know.
24          Q.     Don't know if he was qualified to be
25   a mentor?
```

```
 1          A.      Don't know.
 2          Q.      Chris Goff, do you know if he was
 3   qualified to be an instructor?
 4          A.      Okay.  No, I don't.
 5          Q.      Qualified to be a mentor?
 6          A.      I don't know.
 7          Q.      Steve Goff, do you know if he was
 8   qualified to be an instructor?
 9          A.      I don't know who they are.
10          Q.      Do you know if he was qualified to
11   be a mentor?
12          A.      I don't know who they are.
13          Q.      James Harris, do you know if he was
14   qualified to be an instructor?
15          A.      I don't know who it is.
16          Q.      So that's a no?
17                  (Reporter seeks clarification.)
18          A.      I don't know who he is.
19          Q.      And therefore you don't know if he
20   was qualified to be an instructor?
21          A.      I don't know.
22          Q.      Okay.  So you don't know.
23          A.      I don't know the people.  I wasn't
24   running it.  I don't know the people.
25          Q.      And you don't know whether they were
```

1   qualified?

2        A.    I don't know that because I was not

3   running it.  I don't know who the people are.

4        Q.    **And you also don't know whether they**

5   **were qualified.**

6        A.    I don't know whether or not they

7   were qualified, no.

8        Q.    **Now, do you know whether or not**

9   **instructors with Trump University had prior**

10  **judgments entered against them from former**

11  **students?**

12       A.    No, I don't.

13       Q.    **Is that the type of --**

14       A.    You mean former students, before me?

15       Q.    **Before Trump University, yes.**

16       A.    That I don't know.

17       Q.    **Okay.  Is that the type of --**

18             MR. PETROCELLI:  Can you repeat the

19       question?  I'm sorry.

20             MR. FORGE:  Sure.

21   BY MR. FORGE:

22       Q.    **Instructor with Trump University had**

23   **a judgment entered against him by former**

24   **students.**

25             MR. PETROCELLI:  A former student

1      A.     Or resolve the matter -- or to

2   resolve the matter, yes.

3      Q.     Do you recall Mr. Sexton bringing to

4   your attention in 2005 issues with the New York

5   State Department of Education regarding the

6   legality of using the name "University" in the

7   State of New York?

8      A.     Very vaguely, but I thought he had

9   it all worked out.

10     Q.     So you remember the issue coming up

11  back then, but you thought he worked it out?

12     A.     I thought he worked it out.  I

13  remember the issue, but I thought it was all

14  worked out.

15     Q.     And what -- what do you recall him

16  doing to work out the issue back in 2005?

17     A.     It wasn't a question of what he did.

18  But I just thought he had it worked out.  I

19  didn't know what he did, but I did not think it

20  was an issue.

21     Q.     So from 2005 -- from 2006 forward,

22  you thought that issue had been resolved?

23     A.     I did not think it was an issue.  I

24  remember hearing about the issue, but I thought

25  that it was all worked out.  Unfortunately, maybe

**Donald Trump**                     **Confidential**          **Art Cohen, et al. vs. Donald J. Trump**

1  it wasn't.

2      Q.    What, if anything, did you do to

3  verify that it had been resolved in 2005?

4      A.    Nothing.  I thought it was worked

5  out.

6      Q.    Okay.  And you thought it was worked

7  out based on what?

8      A.    Just based on the fact that I didn't

9  hear much about it anymore, if anything.  Until

10  later, I didn't hear about it.  I thought that

11  this is -- I mean, this is a thing that is not

12  very difficult to work out one way or the other,

13  and I would have assumed that Mr. Sexton would

14  have been able to work that out.

15      Q.    So other than assuming he would have

16  been able to work it out, did you actually do

17  anything to confirm --

18      A.    No.

19      Q.    -- whether or not it had been worked

20  out?

21      A.    No, because I didn't think it was

22  necessary.  I thought he was -- he was in charge,

23  he was doing a job.  And I thought he would have

24  gotten this taken care of.

25      Q.    And you later learned that was not

1  the case; correct?

2       A.    Well, I later learned it was

3  continuing onward, which -- I was surprised

4  because I thought it was something that could

5  have been routinely handled.

6       **Q.    But you understand now that it was**

7  **not, in fact, resolved in 2005; correct?**

8       A.    I guess it wasn't, but -- I thought

9  it was, but I guess it wasn't.  And I heard that

10 only later on.

11      **Q.    And so do you believe Mr. Sexton's**

12 **failure to resolve this in 2005 is consistent**

13 **with him being competent and capable?**

14           MR. PETROCELLI:  Vague, improper

15      opinion testimony.

16           THE WITNESS:  I only know I was

17      surprised that it wasn't worked out because

18      it's not a hard thing to work out.

19 BY MR. FORGE:

20      **Q.    Were there any repercussions for**

21 **Mr. Sexton once you found out that it had not**

22 **actually been worked out?**

23      A.    Well, I think it was years later

24 that I actually found out.  Yeah, I was not

25 happy.  I was not happy.  Because it's so easy to

1   work out.  It's not like a big deal.

2       Q.     Did you express your displeasure to

3   anyone?

4       A.     Maybe to Mr. Sexton.  Maybe to

5   Mr. Garten.  Could have been Mr. Garten.

6       Q.     Anyone else you can think of?

7       A.     No.  I think it was mostly to

8   Mr. Garten actually, a lawyer.

9              MR. PETROCELLI:  Don't talk about

10       your communications with --

11  BY MR. FORGE:

12      Q.     Approximately when was that?

13      A.     When I found out it wasn't worked

14  out.  I assumed this was worked out a long -- I

15  don't know.

16      Q.     Give me a year.

17      A.     Years ago.  I have no idea, but

18  years ago.

19      Q.     So years -- let me make sure because

20  we're talking about a pretty wide span of time.

21             2005 you found out there was an

22  issue; right?

23      A.     Yes.

24      Q.     You think that issue is resolved.

25      A.     I don't know --

1    Q.      You assume that issue is --

2    A.      I don't know if it was 2005, but I

3  heard there was an issue a long time ago.  I

4  heard the issue was worked out.  It wasn't hard

5  to work out.  It's not even a big penalty if you

6  don't work it out, but it's something that wasn't

7  hard to work out.

8           And I would have assumed they worked

9  it out, and then I found out they didn't work it

10 out.  I think I spoke to my lawyer about it.  I

11 think I spoke to Sexton about it.

12   Q.      What I'm trying to place is, when

13 did you find out that they hadn't worked it out,

14 what year?

15           MR. PETROCELLI:  Asked and answered.

16           THE WITNESS:  Years ago, but

17     ultimately they made the name change or

18     something.

19 BY MR. FORGE:

20   Q.      2010?  I'll tell you that 2010 is

21 when the name change came into effect.

22   A.      Sometime prior to that.

23   Q.      So sometime prior to then you found

24 out that it hadn't been resolved?

25   A.      That's right.

1    that you didn't approve; correct?

2         A.    I don't know.  I mean, I don't know

3    what the -- I can't answer that question.  I

4    think I looked at these two.

5         Q.    Are you aware of any marketing

6    materials for Trump University bearing your name

7    that you didn't approve?

8         A.    I'm not aware.

9         Q.    Any marketing materials for Trump

10   University bearing your picture that you did not

11   approve?

12        A.    I'm not aware of any, no.

13        Q.    Any marketing materials for Trump

14   University bearing your signature that you did

15   not approve?

16        A.    I'm not aware of any, no.

17        Q.    If you turn, please, to

18   page 10921 -- 102921.  This is -- it appears to

19   be an ad for fast-track foreclosure investing

20   seminars that were going to take place in Saddle

21   Brook, New Jersey in March of 2008.

22              Do you see that at the bottom?

23        A.    Yes.  Okay.

24        Q.    Mr. Trump, you have no idea who the

25   instructor was for these seminars, do you?

1   A.   I don't know that, no.

2   Q.   **And you have no idea whether they**

3   **presented any of your personal real estate**

4   **strategies, do you?**

5   A.   Well, I certainly think they

6   probably did.  Again, you'd have to ask that

7   question of Mr. Sexton.

8   Q.   **Okay.  So -- but I'm asking it to**

9   **you now.**

10          Do you have any personal

11   knowledge --

12   A.   No.

13   Q.   **-- as to whether or not they**

14   **presented any of your actual real estate**

15   **strategies?**

16   A.   No.  I would think Mr. Sexton would

17   be able to give you that answer.

18   Q.   **And you are not able to?**

19   A.   You're talking about years ago.  In

20   2007, you're talking about many, many years ago.

21   Q.   **But even at the time, you didn't do**

22   **anything to make sure you knew exactly what they**

23   **were going to be presenting; correct?**

24   A.   Well, I would discuss things with

25   Mr. Sexton and with, you know, attorneys at the

1   time and Mr. Weisselberg, et cetera, et cetera,

2   Alan Weisselberg.  And, you know, I knew -- I

3   knew generally speaking, but, no.  Mr. Sexton was

4   in charge of the school.

5        **Q.     So you did not know what was being**

6   **presented at this seminar; correct?**

7        A.     I told you you'd have to ask

8   Mr. Sexton.

9        **Q.     I realize that, Mr. Trump, but I**

10  **still have to get on the record you did not know;**

11  **correct?**

12       A.     I was not aware of the exact

13  details, no.

14       **Q.     You weren't aware of any of the**

15  **details; correct?**

16       A.     Probably true.  Again, it's a long

17  time ago, I'd have to check, but probably --

18       **Q.     But as far as you know, you weren't**

19  **aware --**

20       A.     As far as I know, that's right.

21       **Q.     Do you have any sort of unique**

22  **foreclosure investing system?**

23              MR. PETROCELLI:  The question is

24       vague.

25              THE WITNESS:  I think more than

1   money back.  I would sign up too.  Give me my

2   money back, even if I liked it.

3          Q.     **Mr. Trump, my question was, do you**

4   **know the identity of the instructors for any of**

5   **these --**

6          A.     It's too many years ago.

7          Q.     **So that's a no; right?**

8          A.     I guess, yes.  It's too many years

9   ago.

10         Q.     **So it's a no?**

11         A.     It's ancient history.

12         Q.     **You don't know whether the**

13  **instructors for these seminars ever bought and**

14  **sold real estate prior to giving these**

15  **presentations; correct?**

16         A.     You have to -- don't forget.  It

17  wasn't only about the instructors; it was about

18  the material that the instructors gave out.  That

19  was a very important element --

20         Q.     **Is that correct, Mr. Trump?**

21         A.     -- the material that they gave out.

22                Yes, that's correct.

23         Q.     **That's correct you don't know**

24  **whether they bought or sold real estate?**

25         A.     No.

```
 1              first.
 2                      MR. PETROCELLI:  Of Michael Sexton's
 3              examination?
 4                      MR. FORGE:  Yes, the Michael Sexton
 5              examination.
 6      BY MR. FORGE:
 7          Q.      The next portion begins at line 22:
 8                      "QUESTION:  Did Donald Trump ever
 9              review any of the materials that you
10              prepared at Trump U to be used at the
11              preview sessions?
12                      "ANSWER:  I don't believe so."
13                      Again, do you have any personal
14      knowledge that -- as to the accuracy or
15      inaccuracy of that testimony?
16          A.      I'd have to see the materials.
17                      MR. PETROCELLI:  Asked and answered.
18      BY MR. FORGE:
19          Q.      Next question.  This is page 161.
20          A.      You're -- you used the word
21      "prepare" or did you use the word "review" the
22      materials?
23          Q.      It said:
24                      "QUESTION:  Did Donald Trump ever
25              review any of the materials that you
```

**Confidential**

Donald Trump                                    Art Cohen, et al. vs. Donald J. Trump

1      prepared at Trump U to be used at the

2      preview sessions?"

3            MR. PETROCELLI:  Meaning that

4      Michael Sexton prepared.

5  BY MR. FORGE:

6      **Q.    And the answer is:**

7            "ANSWER:  I don't believe so."

8      A.    I would have to look at the material

9  before I could answer that question.

10     **Q.    Got it.  Okay.**

11           **So without looking at materials, you**

12  **can't --**

13     A.    I can't --

14     **Q.    -- refute or confirm that?**

15     A.    That is correct.  I have to see the

16  material.

17     **Q.    (Reading):**

18           "QUESTION:  Switching over then to

19     the three-day workshops/seminars" --

20           MR. PETROCELLI:  Let the record

21     reflect you're still reading from the

22     testimony?

23           MR. FORGE:  Yes.  This is now

24     page 161, line 3.

25

1    ago.

2            Q.     Line 4, page 163:

3                   "QUESTION:  Did anybody at Trump

4            Organization work on the curriculum for the

5            three-day workshops?

6                   "ANSWER:  No, they did not."

7                   Do you have any basis to dispute --

8    any personal knowledge to dispute that testimony?

9            A.     No.  I would have to see the

10   information you're talking about, but other than

11   that, no.

12                  MR. PETROCELLI:  I also would like

13           the record to reflect, since we don't have

14           a copy of the testimony in front of us and

15           Mr. Forge read that out loud from his

16           mobile device and it was a lengthy, lengthy

17           passage --

18                  MR. FORGE:  That last passage wasn't

19           lengthy.

20                  MR. PETROCELLI:  Well, the whole

21           thing you read was pretty long.

22                  MR. FORGE:  That's just because I

23           wanted to make sure --

24                  MR. PETROCELLI:  I know, it's all

25           context.

1        MR. FORGE:  -- I was putting it in

2     context.

3        MR. PETROCELLI:  It's all context.

4   BY MR. FORGE:

5      **Q.    Next question and answer -- this is**

6   **on page 163, line 8:**

7        "QUESTION:  Did Mr. Trump himself

8     participate in the creation of the

9     materials used at the three-day workshops?

10        "ANSWER:  No, he did not."

11        Do you have any basis or personal

12   knowledge to dispute that testimony?

13      A.    No, I don't.  I'd have to look at

14   the material, but I don't.

15        MR. FORGE:  Can we get Tab 47,

16     please.  This is Exhibit 500.

17        (Plaintiffs' Exhibit 500, Bates Nos.

18     TU102409 through 415, E-mail dated 10/27/08

19     from Sexton to Graff with attachments,

20     marked for identification.)

21   BY MR. FORGE:

22      **Q.    Mr. Trump, I've placed in front of**

23   **you a document marked as Exhibit 500.  It begins**

24   **at TU102409 and continues to TU102415.**

25        **Do you see that?**

**Confidential**

Donald Trump                                    Art Cohen, et al. vs. Donald J. Trump

1          MR. FORGE:  I'm sorry.  Let me be

2      more specific.

3   BY MR. FORGE:

4      **Q.    Did you ever instruct any of the**

5   **Trump University live events instructors or**

6   **mentors to represent to students that you had**

7   **handpicked them?**

8      A.    Again, I can't differentiate between

9   the live event and the other.  I mean, I met with

10  numerous instructors --

11     **Q.    Okay.**

12     A.    -- but I don't know the dates.  I

13  don't know whether, as you say, it's live events

14  or other events.  But I met with numerous people

15  over the years.

16     **Q.    Let's pull 483 out again,**

17  **Exhibit 483.**

18          MR. PETROCELLI:  Is that the 2012

19      interrogatories?

20  BY MR. FORGE:

21     **Q.    Again, referencing at page 3, those**

22  **individuals listed there, that's -- you can --**

23  **did you ever instruct any of those individuals to**

24  **represent to students that you had handpicked**

25  **them?**

```
 1         A.     I don't believe so.  I mean, I don't
 2    think -- I'm not sure that I used that
 3    expression.  I don't think I said, oh, you've
 4    been handpicked.  But -- and, again, it's many
 5    years ago and I recognize the names and I had
 6    people up to my office.
 7         Q.     Other than --
 8         A.     I think to my office, but I met
 9    people beyond the office, I think.  But, anyway,
10    go ahead.
11         Q.     Beyond these folks, who are the only
12    ones listed that you met -- beyond these folks,
13    some of the names you mentioned earlier -- Joe
14    Martin, the guy who was talking about the dinner,
15    did you ever authorize him to represent to
16    students that he had been handpicked by you?
17         A.     I don't really know who he is.  It's
18    too long ago.
19         Q.     Keith Sperry, did you ever authorize
20    him to represent --
21         A.     I don't know.  Too long ago.
22         Q.     So the answer is no as to all?
23         A.     I did meet with people.
24         Q.     Did you authorize anyone to falsely
25    represent to students that they had been
```

**Donald Trump**                                    **Art Cohen, et al. vs. Donald J. Trump**

 1   handpicked by you?

 2        A.    No.  I would never do that.

 3        Q.    So if Steve Goff represented he had

 4   been handpicked by you and admitted that that

 5   wasn't true, is that something you would not have

 6   authorized?

 7        A.    Say it again --

 8              MR. PETROCELLI:  Improper -- time

 9        out.

10              Improper opinion testimony.

11   BY MR. FORGE:

12        Q.    If Steve Goff has admitted that he

13   was not handpicked by you --

14        A.    He had said he wasn't.

15        Q.    He's admitted that he was not

16   handpicked by you.  But we have recordings of him

17   saying differently to the students.

18              What I'm saying is, him representing

19   differently to the students, is that something

20   that wouldn't have been authorized by you?

21              MR. PETROCELLI:  You can answer

22        that.

23              THE WITNESS:  What?

24              MR. PETROCELLI:  You can answer the

25        question whether you authorized this fellow

**Confidential**

Donald Trump                                      Art Cohen, et al. vs. Donald J. Trump

1               to say he was handpicked by you.

2                    THE WITNESS:  Well, I don't know

3               because, you know, it depends on the

4               definition of what that means, handpicked.

5               I wanted very good instructors.  So on the

6               basis of good instructors, if he's a good

7               instructor and if he was -- you know, if he

8               was in there, then he was a good

9               instructor.

10                   So I don't know.  I mean, I don't

11              know what he said, but as far as I'm

12              concerned, I just -- I wanted good

13              instructors.  And I wanted good material.

14              And I wanted books.  I wanted them to study

15              the books.

16     BY MR. FORGE:

17          **Q.    But you never actually sat down with**

18     **these live events instructors to make sure they**

19     **were good?**

20          A.    I don't know.  Because I sat down

21     with instructors.  I don't know who they were.

22     It was so many years ago that I don't know who

23     they were.

24          **Q.    They've testified they never met**

25     **you.**

```
 1          A.     Oh, that's fine.

 2                 MR. PETROCELLI:  You know, we don't

 3          have the testimony --

 4    BY MR. FORGE:

 5          Q.     So for someone like Steve Goff, do

 6    you have any basis to dispute his testimony that

 7    he never met you?

 8                 MR. PETROCELLI:  Lacks foundation.

 9                 THE WITNESS:  I don't think I would,

10          no.

11                 MR. FORGE:  Let's go to Tab 205.

12                 MR. PETROCELLI:  Is that a new

13          exhibit?

14                 MR. FORGE:  Yes.  I'll give it an

15          exhibit number in a minute.

16                 MR. PETROCELLI:  We're up to 501.

17                 MR. FORGE:  This is going to be a

18          video and audio exhibit or maybe just

19          audio.  Let's see.  I'm going to play

20          what's going to be Exhibit 501.

21                 So, Eileen, we will get that on the

22          drive to you, and that's on the disc.

23                 (Plaintiffs' Exhibit 501, No Bates

24          numbers, Audio Clip, marked for

25          identification.)
```

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   ART COHEN, Individually)
     and on Behalf of All   )
 5   Others Similarly       )No. 3:13-cv-02519-GPC-WVG
     Situated,              )
 6                          )  CLASS ACTION
             Plaintiff,     )
 7                          )
     VS.                    )
 8                          )
     DONALD J. TRUMP,       )
 9                          )
             Defendant.     )
10

11

12

13

14            CONFIDENTIAL TRANSCRIPT

15      VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

16          VOLUME II (Pages 371 to 485)

17              January 21, 2016

18              Las Vegas, Nevada

19

20

21

22   Reported By:

23   Gale Salerno

24   RMR, CSR No. 12375

25   Job No.: 10021313
```

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4   ART COHEN, Individually)
    and on Behalf of All    )
5   Others Similarly        )No. 3:13-cv-02519-GPC-WVG
    Situated,               )
6                           )   CLASS ACTION
              Plaintiff,    )
7                           )
    VS.                     )
8                           )
    DONALD J. TRUMP,        )
9                           )
              Defendant.    )

10

11

12

13

14

15      VIDEOTAPED DEPOSITION OF DONALD J. TRUMP

16           VOLUME II (Pages 371 to 485)

17

18

19  Deposition of DONALD J. TRUMP, taken on behalf of the

20  Class Counsel at 2000 Fashion Show Drive, Room 6104,

21  Las Vegas, Nevada, 89109, beginning at 8:01 a.m. and

22  ending at 10:53 a.m. on Thursday, January 21, 2016,

23  before Gale Salerno, Registered Merit Reporter,

24  Certified Shorthand Reporter No. 12375.

25

```
 1   APPEARANCES:

 2   For the Plaintiff and the Class:

 3           JASON A. FORGE, ESQUIRE
             RACHEL L. JENSEN, ESQUIRE
 4           CHARLES M. McCUE, ESQUIRE
             Robbins Geller Rudman & Dowd, LLP
 5           655 West Broadway, Suite 1900
             San Diego, California  92101
 6           (619) 231-1058
             jforge@rgrdlaw.com
 7           rjensen@rgrdlaw.com
             chuckmccue@rgrdlaw.com
 8

 9   For the Defendant, Donald J. Trump:

10           DANIEL PETROCELLI, ESQUIRE
             O'Melveny & Myers, LLP
11           1999 Avenue of the Stars, 7th Floor
             Los Angeles, California  90067
12           (310) 246-6850
             dpetrocelli@omm.com
13

14   For the Defendant, Mr. Trump and Trump University:

15           JILL A. MARTIN, ESQUIRE
             Trump National Golf Club
16           One Trump National Drive
             Rancho Palos Verdes, California  90275
17           (310) 303-3225
             jmartin@trumpnational.com
18

19   Also Present:

20           MS. BECKY ULREY, Videographer

21

22

23

24

25
```

Page 373

```
 1  Plaintiff and the Class.
 2          MR. PETROCELLI:  Daniel Petrocelli, for
 3  Mr. Trump.
 4          MS. MARTIN:  Jill Martin, for Mr. Trump and
 5  Trump University.
 6                      -    -    -
 7                  DONALD J. TRUMP,
 8          having been first duly sworn, was
 9          examined and testified as follows:
10                      -    -    -
11
12                  EXAMINATION RESUMED
13  BY MR. FORGE:
14      Q.  Good morning, Mr. Trump.
15      A.  Good morning.
16          MR. FORGE:  If I could ask the court
17  reporter to please mark this document as
18  Exhibit 504.
19              (Exhibit 504 was marked for
20              identification.)
21  BY MR. FORGE:
22      Q.  I have just handed to you Exhibit 504.
23  It's a National Review article from December 8th,
24  2015, which is titled, "No one was more influential
25  than Donald Trump this year."
```

1              Are you familiar with that article?

2        A.    No, I'm not.

3        Q.    Do you consider yourself an influential

4    person?

5        A.    Yes.

6        Q.    And in what way are you influential?

7        A.    Well, I think I've set a certain standard.

8    I think I have certain leadership abilities.  I think

9    in business I'm respected, and I would say that I

10   guess now in politics I'm respected, because I'm the

11   leading candidate on the Republican side.

12       Q.    Do you want people to consider you

13   trustworthy?

14       A.    Yes.

15       Q.    Do you want people to consider you

16   reliable?

17       A.    Yes.

18       Q.    Did you get a sense that your level of

19   influence grew after The Apprentice show started?

20             MR. PETROCELLI:  The question is vague.

21             THE WITNESS:  I would say not really.  The

22   reason I was chosen for The Apprentice is my level of

23   influence.

24             But it possibly -- I think not necessarily

25   influence, I think I became even better known.

```
 1   BY MR. FORGE:

 2        Q.    And by "better known," do you have fans?

 3        A.    Yeah, I do.

 4        Q.    And if you consider someone to be a fan,

 5   what does that mean to you?

 6        A.    People that really like a person and

 7   respect a person.  I guess generally respect, but

 8   certainly like.

 9        Q.    Now, over the years you've promoted a

10   variety of products, properties and services; is that

11   fair to say?  Golf courses?

12        A.    Yes.

13        Q.    Resorts?

14        A.    Correct.

15        Q.    Condominium projects?

16        A.    Right.

17        Q.    Books?

18        A.    Yes.

19        Q.    Products such as ties?

20        A.    Uh-huh.

21        Q.    Is that a yes?

22        A.    Yes.

23        Q.    Chocolates?

24        A.    Yes.

25        Q.    And a fragrance, I believe?
```

1              identification.)

2    (Playing Video From Thumbdrive Marked Exhibit 509.)

3   BY MR. FORGE:

4       Q.   Mr. Trump, you shot that video to promote

5   Trump University, right?

6       A.   Yes.  A long time ago.

7       Q.   So you made that video to influence people

8   to enroll in Trump University?

9       A.   Yes.

10       Q.   Now, at one point you mentioned that there

11   would be professors and adjunct professors.  Do you

12   have any idea what, if any, criteria determined who

13   would be a professor versus an adjunct professor?

14       A.   Well, I see resumes, but mostly that was up

15   to Michael Sexton, who was the president who ran

16   Trump University.

17       Q.   So that's not a decision process you were

18   involved in, who would be a professor versus --

19       A.   I would see resumes, but I told him, you

20   know, I want very good people, yes.

21       Q.   But in terms of determining this person

22   will be a professor versus an adjunct professor --

23       A.   No, that was not me.

24       Q.   Do you know if any of the adjunct

25   professors at Trump University were ever promoted to

 1   become professors?

 2       A.   That I wouldn't know.  I was not running

 3   the school.

 4       Q.   **Do you know the identities of any of the**

 5   **adjunct professors?**

 6       A.   I know names, but I really don't know the

 7   identities, no.

 8       Q.   **Were all the instructors at Trump**

 9   **University either a professor or an adjunct**

10   **professor?**

11       A.   I would rather have you ask Mr. Sexton.  He

12   ran the school.

13       Q.   **So you personally don't know?**

14       A.   No, I don't know that.

15       Q.   **You mentioned in there that the people at**

16   **Trump University that you were going to be putting**

17   **forward were going to be the best of the best.**

18           **What does that mean to you?**

19       A.   Well, I mean, they had to be good

20   instructors.  And I wanted them to be good

21   instructors, and I so instructed the people.

22           I instructed Mr. Sexton we want to really

23   have really great people working there.  He was

24   running it.  I wasn't running it, but I wanted to

25   have really good people.

```
 1      A.   Right.

 2      Q.   Are there -- do any of those names, have

 3  you had a recognition of any of those names?  Any of

 4  those names come to mind now as we sit here?

 5      A.   No.

 6      Q.   So same memory or lack thereof, whatever

 7  your answers were still stand?

 8      A.   It's a long time.

 9           THE WITNESS:  Just off the record for a

10  second.

11           (A discussion was held off the record.)

12           MR. FORGE:  If we could please mark this

13  next exhibit as 510.

14                (Exhibits 510, 511 and 512 were

15                 marked for identification.)

16  BY MR. FORGE:

17      Q.   Mr. Trump, starting with Exhibit 510, does

18  that appear to be a true copy of a special invitation

19  from Donald J. Trump, and an attached letter that

20  begins Dear Friend?

21      A.   It does seem to be.  I don't remember this,

22  but it does seem to be, yes.

23      Q.   And that appears to be your signature at

24  the bottom of that invitation on the second page?

25      A.   Yes.
```

1       Q.    And this invitation is all part of the

2    promotion of Trump University; is that fair to say?

3       A.    It looks like it.

4       Q.    So again, this is something that was

5    intended to influence people to enroll in Trump

6    University?

7       A.    It would look that way, yes.

8       Q.    Were you personally aware of any sort of

9    proven real estate system that students would be

10   learning at Trump University?

11           MR. PETROCELLI:  The question is vague.

12           THE WITNESS:  Well, what I did is we gave a

13   lot of big packages out.  Again, it's a long time

14   ago, but -- and including books that I've written,

15   et cetera, et cetera.  You have the information.

16           But there is -- you know, there are methods

17   that have been very successful for me, and that's

18   what I would talk about.  And, you know, starting

19   with location.  Starting with, you know, various

20   forms of debt.  We talked about the kind of debt you

21   can put on properties.

22           And we talked about a lot of different

23   things.  You can look at the books.  But I've

24   always -- and very strongly told them to stress

25   location.

1       Q.    You don't know how much the mentorship

2   cost?

3       A.    I don't know.

4       Q.    And you don't know what was provided during

5   that three-day one-on-one mentorship?

6       A.    No.  And I don't know Mr. Cohen.

7       Q.    Or Mr. Lucas?

8       A.    Or Mr. Lucas, no.

9             MR. FORGE:  I'm going to play for you

10  now -- we're going to mark this as -- this is going

11  to be 515.  Mr. Trump, I'll warn you in advance, it's

12  about 13 and a half minutes of Mr. Lucas' deposition

13  testimony.  So if you want to make some calls before

14  we do it, you tell me.

15      A.    Let's do it after.  We'll take off after.

16            MR. PETROCELLI:  What's the file number?

17            MR. FORGE:  The file number is 213.

18            THE WITNESS:  He's a mentor, not a

19  professor, is what you're saying?  He's not a class

20  person?

21            MR. FORGE:  I think he was brought in for

22  both.  But with Mr. Cohen, he was a mentor.

23            MR. PETROCELLI:  This is Kerry Lucas'

24  deposition?

25            MR. FORGE:  This is Kerry Lucas'

1  give financing for things that I've bought.

2          I feel strongly about seller financing.

3  And you don't have to pay points.  You don't have to

4  pay big legal fees.  But you know, a lot of the

5  institutions wanted points.  With seller financing,

6  rarely does the seller ask for points.  So good

7  thing.

8          Okay.  Go ahead.  I'll watch this.

9              (Playing video.)

10          MR. PETROCELLI:  Just to be clear, we're

11  not listening to a continuous examination?

12          MR. FORGE:  Exactly.

13          MR. PETROCELLI:  These are edited clips?

14          MR. FORGE:  Exactly.  But they're complete

15  questions and answers.

16          MR. PETROCELLI:  Okay.  Because I noticed

17  the time code is jumping around.

18          MR. FORGE:  Yeah, it jumps around.  But

19  none of the questions or answers are --

20          MR. PETROCELLI:  You'll give me the file?

21          MR. FORGE:  Yes.

22          MR. PETROCELLI:  The CD, and then I can go

23  back and review the transcript?

24          MR. FORGE:  Yes.

25          MR. PETROCELLI:  Thank you.

```
 1                    (Playing video.)

 2          MR. PETROCELLI:  Take our break now?

 3          THE WITNESS:  Do you want to go through

 4  this first?

 5          MR. FORGE:  Let me ask just a few

 6  questions.

 7          THE WITNESS:  I would rather go through

 8  this.

 9  BY MR. FORGE:

10      Q.   And I think you were chomping at the bit to

11  say this, but Mr. Trump, you did not select this man

12  to be a Trump University instructor or mentor, did

13  you?

14      A.   No, I didn't.

15      Q.   And you did not consider him to be a top

16  certified mentor, did you?

17      A.   No.

18      Q.   You did not certify him in any way, did

19  you?

20      A.   No, I didn't.

21      Q.   Now, you could have actually insisted upon

22  meeting and interviewing each of the mentors, right?

23      A.   I could have.  Other than I'm doing,

24  running a massive company that everybody knows that.

25      Q.   But so you could have, but you didn't?
```

1      A.    I did not, no.

2      **Q.    And so you didn't know that a man with this**

3  **kind of background was being held out as a top Trump**

4  **certified mentor, did you?**

5      A.    No.  But in watching, it sounded to me like

6  he would have embellished his record and he slipped

7  through the cracks.  Frankly, I think he probably,

8  just by the way he had answered a couple of the

9  questions reminded me of Saturday Night Live.

10           But I think he probably embellished his

11  record to the people that did the hiring.  And

12  nevertheless, they all got the materials, and they

13  got very good advice as far as real estate is

14  concerned.

15           And I have to say this, and I was just

16  thinking it as I was going by, some of the biggest

17  real estate developers in the country, and I can tell

18  you in New York and elsewhere, don't have licenses.

19  They build.  They're developers.  And they build.

20  And they never went to school, and they never went

21  for licensing and they didn't do all of the things,

22  many of the things that you're asking.

23           That's not to say anything positive or

24  negative.  But I will say that many, many real estate

25  people don't have licenses.  They're not salesmen,

1 they're not brokers, and they just don't have

2 licenses.  They just build.

3     **Q.   But he also lacked experience?**

4     A.   He doesn't have great experience, no.

5     **Q.   He doesn't have any experience buying or**

6 **selling?**

7     A.   He has a little with his house or whatever

8 it was, but not a lot.

9     **Q.   And this is not someone you would have**

10 **found to be fairly described as a top Trump certified**

11 **mentor?**

12     A.   No, I would not have hired him.

13     **Q.   Now, were you aware that Trump University**

14 **charged Mr. Cohen and others tens of thousands of**

15 **dollars for three days of one-on-one walking around**

16 **looking at properties with this man?**

17     A.   Well, you know, frankly, the fact that he's

18 not -- if he took the advice of this particular sheet

19 right here, Mr. Cohen would have made a fortune.  He

20 would have bought real estate.

21     **Q.   Putting that aside --**

22     A.   They're walking around looking at property,

23 and somebody has to walk around.

24     A real estate broker oftentimes will

25 use children.  I mean, they will use people that are

1    A.   No.

2    Q.   **Now, as you mentioned, Mr. Lucas could have**

3    **slipped through the cracks in getting into Trump**

4    **University as an instructor or mentor; is that right?**

5    A.   I don't know how.  I mean, I don't know

6    how.  I think he could have embellished.  Or maybe

7    they thought he did a good job.

8         You said he worked for another company for

9    quite a while.  Maybe he did a great job there.

10        I don't know exactly why they hired him or

11   how they hired him.  But I know that he worked for

12   another company named Dyna-something.

13   Q.   **Dynatech?**

14   A.   Dynatech.  And perhaps he was outstanding

15   at Dynatech.  So you would really have to ask the

16   people.  I mean, maybe he was really good at what he

17   did.  I just don't know.

18   Q.   **And you don't know whether other people**

19   **slipped through the cracks to get in as live event**

20   **instructors or mentors, do you?  Personally?**

21   A.   In every business, people slip through the

22   cracks.  No matter how well run a business, people

23   come in and they're not good, and you wonder, you

24   know, how did they get there, et cetera.  No matter,

25   you can take the best business where they just come

1  back and, you know, they embellish or they for some

2  reason something happens.

3           But there's no business in America where

4  people don't slip through the cracks.

5       Q.   So you don't know, for example, if

6  Steve Goff is one of the guys who slipped through the

7  cracks?

8       A.   I don't know.

9       Q.   You don't know if Chris --

10      A.   It happens.  It does happen.

11      Q.   And you don't know if Chris Goff is one of

12  the guys that --

13      A.   I don't know him.

14      Q.   James Harris, you don't know if he slipped

15  through the cracks?

16      A.   Don't know him.

17      Q.   So you don't know if he slipped through the

18  cracks?

19      A.   Don't know.

20      Q.   So you don't know one way or the other?

21      A.   No.  I know we had very good people, too.

22  We have a lot of good people.  But some people, you

23  know, when you're running a business, it happens that

24  you don't always get tens.

25      Q.   Gerald Martin, you don't know if he slipped

1   through the cracks?

2        A.   Don't know him.

3        Q.   **And if I didn't say, Keith Sperry, you**

4   **don't know if he slipped through the cracks?**

5        A.   Don't know him.

6        Q.   **Mr. Trump, you could have sat down and**

7   **personally interviewed each of these folks, correct?**

8        A.   I think from a time standpoint, I think it

9   would have been very difficult.  Because of my

10  schedule and because of the fact that I am doing many

11  deals all over the world, I think it would have been

12  very tough.

13            I mean, this was a very important thing for

14  me.  It wasn't a big monetary thing, the Trump, the

15  school.  But it was very important to me.

16            And actually, more important to -- you

17  know, you can impart certain wisdom that you learn

18  the hard way.  And you can impart that to people.  I

19  love the idea of the educational aspect of it.

20            But to be honest, I wouldn't have had the

21  time to interview everybody because my business is

22  too big.

23            I don't do it on any business.  I hire

24  people, and hopefully they're the right people at the

25  top, and they'll hopefully do a good job.

1      Q.   And I'm just going to ask you to accept

2   this as true.  You can check your own records to

3   confirm it, but there were fewer than -- there were a

4   half a dozen or so people who did the majority of the

5   live events for Trump University.

6           And accepting that as true, I'm not asking

7   you to endorse it, but you certainly had time to do a

8   final interview of six people, right?

9      A.   Well, look, I have people at the top who I

10  know.  And, you know, as an example, Mr. Sexton, who

11  I have confidence in.  And I would have assumed they

12  would have done that.  And frankly, I got so many

13  good reviews, and I would see the reviews a lot.  You

14  know, they would send me, when people leave the

15  course, they would send -- I call them report cards.

16  I don't know what the official name is, but they

17  would give us so many good marks.

18           I actually thought that people were very

19  happy at the school.  I was very surprised.  That's

20  why I didn't settle this case, which I could have

21  settled very easily a long time ago.

22     Q.   And we'll get to the reviews and the

23  settlement.  All --

24     A.   I'm just saying it seemed like things were

25  going very good.

1      Q.   But you certainly had time to do a, conduct

2   a final interview for the six most prolific live

3   events?

4      A.   It didn't seem necessary, because I always

5   thought the school was doing well.

6           You know, when I have a job that's not

7   going well, people tell you.  Like if you have

8   unhappy tenants, or if you have unhappy -- an office

9   building where the tenants aren't happy, or an

10  apartment house where tenants -- you always find out.

11  They write you letters.

12          I just -- I've heard so -- I heard so many

13  good things about the school that I honestly thought

14  that it was really being well, you know, well run.

15          Even since then, I still have people

16  calling saying they love the school.

17     Q.   But I'm talking about before they're

18  actually being put out --

19     A.   There's a reason I didn't do that.  I could

20  have found the time, but the reason I didn't do that

21  is I heard the school was running very well.

22     Q.   But I'm talking about before being put out

23  as instructors.  Before you say my handpicked

24  instructor is going to be there, you could have sat

25  down and personally interviewed the person, right?

1        A.   I guess I could have.  I just thought that

2   the school was doing so well, you know, from all of

3   the reviews it's gotten.  And, you know, just people

4   telling me.

5             I don't know that I've ever heard one

6   person, you know, back then say anything bad about

7   it.

8        **Q.   But you realize that the school shifted**

9   **models.  It shifted models from an Internet learning**

10  **model to a live events model.  Do you understand**

11  **that?**

12       A.   Right, sure.

13       **Q.   And do you understand that there's a**

14  **complete disparity between the instructors for the**

15  **Internet model versus the new wave of instructors for**

16  **the live events?**

17            MR. PETROCELLI:  The question is vague.

18            THE WITNESS:  Well, to me it's one school,

19  though.  I understand what you're saying.  And I

20  heard great things about the Internet.  And to me

21  it's one school, Jason.

22            You know, I mean, it was just overall, it

23  was a positive experience, I felt.  And I didn't feel

24  they needed a lot of more guidance, other than I

25  would tell them, you know, like this ad, talking

1  happy with something.  Another way is that they'll

2  see you.  They'll say --

**3       Q.   That's certainly --**

4       A.   People will see you.  They say, Mr. Trump,

5  I live in your building here, and it's not good.  The

6  superintendent is not good, and it's not clean.  And

7  I'll go and check and I'll make sure.

8            With this, I had so many positive reports,

9  especially when the people leave the course, they

10 were writing these beautiful reports.

**11      Q.   But you understand though, generally**

**12 speaking, one way of expressing dissatisfaction, say**

**13 with the stay at a hotel, is to request a refund?**

14      A.   Yeah.

**15      Q.   Okay.  And --**

16      A.   And by the way, we did give refunds.

**17      Q.   Well, do you know what the percentage was**

**18 of the refunds --**

19      A.   No, I didn't.  I know we gave a lot of

20 refunds, yeah.

**21      Q.   But did you know -- hold on, Mr. Trump.**

**22 Did you know it was over 25 percent?**

23      A.   I didn't know what the percentage, but I

24 know we gave them.

25            By the way, most people wouldn't give them.

1  There was no reason to give them.  We could have let

2  you sue for the rest of our lives.

3      **Q.   But when you say you're not familiar with**

4  **any sort of expressions of dissatisfaction, you**

5  **weren't aware that over 25 percent of the people who**

6  **paid for live --**

7      A.   I heard --

8      **Q.   -- received refunds?**

9      A.   I heard people received refunds.  But I

10  think that's instinctual.  If people think they can

11  get a refund, they're going to ask.

12          And I probably foolishly gave it to them.

13  I shouldn't have given it to them because, frankly,

14  they could have been tied up all in this litigation

15  and, you know, whatever happens happens.

16          I viewed that as a lot of times that

17  happens.  You go to the Home Shopping Network,

18  whatever it's called.  The refunds are unbelievable.

19  The people use the product, wear the product, and

20  then they send it back.

21          The refunds are massive.  That's their

22  biggest problem is the refunds.

23          So you know, when people were asking for

24  their money back, frankly -- and I would have these

25  good reports, but people would ask for their money

```
 1  back.  We gave them their money back.

 2          I shouldn't have given their money back.  I

 3  gave back millions of dollars because I'm an honest

 4  guy.  I should have said I'm not giving it back, and

 5  you would have it in your litigation.

 6      Q.   We're here in one of your hotels right now,

 7  right?

 8      A.   Right.

 9      Q.   Would you be satisfied with the performance

10  of this hotel if it had a refund rate of 25 percent?

11      A.   But it's different, though.  It's

12  different.

13      Q.   Would you be satisfied?

14      A.   With Home Shopping Network, if you look,

15  their refunds are tremendous.  They're tremendous.

16  They buy a dress, and you're allowed to give it back.

17  I don't know what they call it.  They send it back.

18  They just send it back.  They give their money back.

19  I don't know if they use the dress, if they don't use

20  the dress.  Probably they do, but it's different.

21          And with this one, they take the course,

22  and they'll ask for a refund.  But why do so many

23  people, why have so many people, including your

24  client on this case, signed these letters that were

25  so beautiful about the course?
```

```
 1              I mean, I think, I'm not sure, but I
 2  haven't read it in a long time, but I think your
 3  client on this case, and certainly your client on the
 4  other cases, signed these incredible letters about
 5  how good the course was.
 6       Q.   And, Mr. Trump, you're an interesting guy.
 7  I could talk to you all day long.  But I have to ask
 8  you specific questions I need to get answers for.
 9              So what I'm asking you now is would you be
10  satisfied if the refund rate at your hotel was
11  25 percent?
12              MR. PETROCELLI:  The question is vague, and
13  lacks foundation.
14              THE WITNESS:  It doesn't happen.  It
15  doesn't happen.  It's a different business.  It
16  doesn't happen.  With hotels it doesn't happen.
17  BY MR. FORGE:
18       Q.   So you would find that to be unacceptable?
19       A.   No.  People wouldn't come back to the
20  hotel.  They wouldn't ask for a refund because they
21  wouldn't get it.  You wouldn't give a refund on a
22  hotel.  But they won't come back.  And your number
23  would go way up.  Your vacancy number.  Your
24  unoccupied --
25       Q.   Would you consider it acceptable if the
```

1   rate of requesting refunds was 25 percent of

2   people who were staying in the hotel?

3        A.   Wouldn't happen.  They don't come back.  In

4   the hotel business, they don't come back.

5        Q.   But would you be satisfied if that

6   happened?

7        A.   The Home Shopping Network they give

8   refunds.

9             No, because -- yeah, I would be unhappy if

10  they didn't come back, and my vacancy factor would go

11  up, up, up, up, and then all of a sudden the hotel

12  would do very badly.

13       Q.   And you would have to change something to

14  satisfy them?

15       A.   Yeah, well, it's a different thing.  It's a

16  different business.

17       Q.   But the bottom line is if you found out one

18  of your hotels had a rate of refunds being requested

19  at 25 percent, you would not consider that to be

20  acceptable?

21       A.   I told you, they don't do that with the

22  hotel business.  They don't ask for refunds.  They

23  don't come back.

24       Q.   But what I'm asking you, though, is if that

25  happened --

1        A.    You can't go after it.  It's not in that

2    business.  It's a different business.  Home Shopping

3    Network has tremendous percentages of refunds, and

4    yet it's a very successful enterprise.

5        **Q.    How about Wharton, do you think that the**

6    **folks -- where you attended, do you think the folks**

7    **at Wharton would be happy, would be satisfied if the**

8    **students requested refunds at a 25 percent rate?**

9        A.    Well, again, it's a much different kind of

10   a thing.  It's a school where you go and you go.

11              I mean, we had a lot of -- a lot of people

12   started complaining after they heard about the

13   lawsuit because they figured they can get their money

14   back.  That's a natural business instinct.

15       **Q.    So Wharton and the hotel is over here, and**

16   **the Home Shopping Network --**

17       A.    I think it's more Home Shopping Network.

18   It's a short-term situation.  You're not staying at

19   the school and living there and everything else.

20                    (Exhibit 516 was marked for

21                     identification.)

22   BY MR. FORGE:

23       **Q.    Mr. Trump, I'm handing you an exhibit**

24   **that's been marked as Exhibit 516.  It's an index of**

25   **materials from Trump University's live events.  And**

 1            And you said earlier, you could have

 2   settled this case very early on.

 3            Did you express that sentiment --

 4       A.   Yes.

 5       Q.   -- to Mr. Brill, the plaintiff's lawyer?

 6       A.   Yes.

 7       Q.   And what is that basis --

 8       A.   I said that's based on what Mr. Garten told

 9   me.

10            MR. PETROCELLI:  Well, we can't get into

11   what --

12   BY MR. FORGE:

13       Q.   It's based on conversations with

14   Alan Garten?

15       A.   With a lawyer, yes.

16       Q.   And you don't know the basis of --

17       A.   No.  It's what I was told.

18       Q.   Mr. Trump, are you aware that one of the

19   benefits that students were promised at Trump

20   University was networking opportunities?

21            MR. PETROCELLI:  Assumes facts.

22            THE WITNESS:  I would say that that would

23   be a natural benefit, yeah.

24   BY MR. FORGE:

25       Q.   Are you aware that one of the promises that

 1    was made to students that the Trump University

 2    mentors would be their mentors for life?

 3        A.   I wasn't aware of that.  But it depends on

 4    the mentor.  Some of the mentors may have become

 5    friendly with them.  I mean, you never know.

 6             But, no, I wasn't aware of it.

 7        Q.   **Are you aware that the surveys were not**

 8    **anonymous?**

 9        A.   What does that mean?

10             MR. PETROCELLI:  Assumes facts.

11    BY THE WITNESS:

12        Q.   **The surveys that Trump University took,**

13    **they were not anonymous?  They had students actually**

14    **put their names on them?**

15        A.   Oh, yeah.  Well, that's much better, I

16    think.

17        Q.   **So in other words, if the students said**

18    **something critical about an instructor or about**

19    **someone who is supposed to be their mentor for life,**

20    **that person would see the critical comment?  You're**

21    **aware of that?**

22        A.   Oh, I think the other way, they don't mean

23    anything, actually.  I think it's much better when a

24    student puts their name on it.

25             You mean they don't want to hurt anybody's

1  feelings, is what you're saying?

2      Q.   Well, Trump University, one of the selling

3  points was networking, and another one was having a

4  mentor for life.

5           And so if the mentor for life was someone

6  you had just got done criticizing --

7      A.   Only a lawyer could think of that.

8      Q.   So you don't think that anticipating --

9      A.   I think the surveys are much more important

10 with a signature.  I think it's -- it's more

11 meaningful.

12     Q.   You don't think the anticipation of

13 possibly needing help from these folks in the future

14 would influence the students to --

15     A.   You mean that's why they said such great

16 things about the school?

17     Q.   Yeah.

18     A.   I don't think so.  I think they really

19 meant it was very good.  Until they found out they

20 could get their money back.  And then they said,

21 Oh, wow, you got money back?  Let's get our money

22 back.

23     Q.   Do you think Bill Clinton was a great

24 president?

25     A.   He had moments.  He had some moments.  But

1   overall, he was hurt very badly by Monica Lewinsky

2   and all of the scandal.  I think it hurt his

3   presidency very much.

4        Q.   **But do you think he was a great president?**

5        A.   Well, I think it's inappropriate for here,

6   because we're not talking about politics now.  We're

7   talking about something else.

8             So I don't think that's a question that

9   pertains to this.  But I would say that he was hurt

10  by the scandal.

11       Q.   **But do you think he was a great president?**

12            MR. PETROCELLI:  Just for the record, I

13  would object to this line of questioning as

14  completely irrelevant, and the kind of examination

15  that should be subject to a protective order.

16            I would let it continue.  The Magistrate

17  has indicated to me that only instructions based on

18  privilege can be made, a ruling with which I

19  disagree, but will abide by at the moment.

20            So you can continue your examination, but

21  it's subject to my continuing objection.

22            MR. FORGE:  Thank you.

23  BY MR. FORGE:

24       Q.   **Do you believe Bill Clinton was a great**

25  **president?**

1   A.   I think he was hurt very badly by the

2   scandals, his escapades.  I think it hurt him very

3   badly.  I think that, you know, I have no feeling one

4   way or the other, but I think he was hurt very badly

5   by the scandals.

6   **Q.   So aside from the scandals, do you think he**

7   **was a great president?**

8   A.   I can't say aside.  It's part of his

9   legacy.  I mean, the scandals were devastating.  He

10  was impeached.  He was impeached.  He was brought

11  before Congress.  I mean, he was impeached.  And that

12  was -- very few people -- very few presidents that

13  were impeached.  So that hurt him very much.

14         The scandals were a big part of his legacy,

15  unfortunately, for him.

16                 (Exhibit 519 was marked for

17                 identification.)

18         THE VIDEOGRAPHER:  We are off the video

19  record.  The time is 9:58 a.m.

20                 (A recess was taken from 9:58 a.m.

21                 to 10:13 a.m.)

22         THE VIDEOGRAPHER:  We are back on the video

23  record, and the time is 10:13 a.m.

24  BY MR. FORGE:

25  **Q.   Welcome back, Mr. Trump.**

```
 1        A.    Thank you.

 2        Q.    Mr. Trump, you have Exhibit 519 in front of

 3   you.  Does it appear to be a true and correct copy of

 4   a Trump blog --

 5        A.    Yes.

 6        Q.    -- that you posted on December 2nd, 2008?

 7        A.    Seems to be.  It's a long time ago.

 8              Shall I read it?  Shall I read the whole

 9   thing?

10        Q.    I'm going to direct your attention to the

11   fourth paragraph, but you're welcome to read whatever

12   you want.

13              The fourth paragraph you wrote of Hillary

14   Clinton:  "Hillary is smart, tough and a very nice

15   person and so is her husband."

16              And then you wrote, "Bill Clinton was a

17   great president."

18              Did you believe that sentiment when you

19   wrote it in this blog?

20        A.    When was this done?

21        Q.    December 2nd, 2008.

22        A.    It was a long time ago.  I mean, at the

23   time -- I mean, I was fine with it at the time.  I

24   think in retrospect, looking back, it was not a great

25   presidency because of his scandals.  That was 2008.
```

1  I say that's a long time ago.

2      Q.   So you posted it, but you believed it then,

3  but you don't believe it now?  Or you didn't believe

4  it then and you still don't believe it?

5      A.   I might have said it.  I don't think it was

6  a very important statement made then.  I wasn't in

7  politics.  It didn't matter to me.

8          If I was to think about it with all that he

9  went through, I would probably not call him a great

10  president anymore because of all of the scandal and

11  the turmoil that he had.  It was a very tumultuous

12  period of time, and then he was impeached.

13          I mean, I would probably say that it's not

14  something I gave very much thought to then because I

15  wasn't in politics.  But if you were asking me the

16  question now, too much turmoil.

17      Q.   But all that turmoil and the impeachment

18  and the scandal, that all predated your posting of

19  this blog, though?  But you're saying you just didn't

20  think about it that much?

21      A.   It's something I wouldn't have thought

22  about.  I've been thinking about a lot of things over

23  the last couple of years when I was deciding to do

24  this.

25      Q.   How about Hillary Clinton, do you think she

1   would make a great vice president?

2          MR. PETROCELLI:  Is there a reference to

3   that in here, Jason?

4          MR. FORGE:  I'm just -- you can put that

5   aside.  It doesn't matter.

6          MR. PETROCELLI:  Again, I have my

7   continuing objection to this line of questioning.

8          And you're required to answer at this

9   juncture.

10  BY MR. FORGE:

11      Q.   Do you believe that Hillary Clinton would

12  make a great vice president, Mr. Trump?

13      A.   No.

14      Q.   Did you believe she would make a great vice

15  president back in 2008?

16      A.   I don't know.  Did I say that here?

17      Q.   Not in here, no.  I'm just asking you, did

18  you believe that back in 2008?

19      A.   No, I didn't think I said that.

20          No, I don't think she would be a good vice

21  president.

22      Q.   Do you believe she would make a great

23  president?

24      A.   Did I say that in here?

25      Q.   No, not in here.

1          MR. PETROCELLI:  "In here," we're talking

2   about Exhibit 519?

3          MR. FORGE:  Correct.

4          THE WITNESS:  Do I think she would make a

5   great president?

6   BY MR. FORGE:

7       Q.   Yes.

8       A.   No.  No, I don't.

9       Q.   Back in the year 2008, did you think she

10   would be a great president?

11      A.   I don't think I said anything.  I don't say

12   it here.

13          Let's see, if we go back many, many years

14   ago, do I think she would have?  Probably not.  I

15   don't think she's got the gravitas.

16          MR. PETROCELLI:  Jason, I'm marking this

17   transcript confidential again.  We're going to have

18   to, I guess --

19          THE WITNESS:  I don't want those answers

20   to --

21          MR. PETROCELLI:  I guess we're going to

22   have to work out a designation process.

23          MR. FORGE:  We actually have a designation

24   process, and I don't think that fits within it,

25   but --

```
 1              MR. PETROCELLI:  But you know what, I'll --

 2              MR. FORGE:  We can discuss that later.

 3              MR. PETROCELLI:  Correct.

 4              MR. FORGE:  For the time being, you are

 5   designating this as confidential, and we will treat

 6   it accordingly.

 7              MR. PETROCELLI:  Whatever the court order

 8   requires, we will comply with it in terms of the

 9   designation process.

10              MR. FORGE:  Let's mark this as Exhibit 520,

11   please.

12                   (Exhibit 520 was marked for

13                    identification.)

14              MR. PETROCELLI:  I did note that maybe one

15   or two of the exhibits were marked "confidential for

16   counsel only" also.

17              MR. FORGE:  Most of them have been

18   de-designated, although the financial ones probably

19   were not.  That was the only one that --

20              MR. PETROCELLI:  Those were the ones that

21   were --

22              MR. FORGE:  Yeah.

23   BY MR. FORGE:

24       Q.   Mr. Trump, does Exhibit 520 appear to be a

25   true and accurate copy of a Trump blog that you
```

1    posted on March 13th, 2008?

2         A.   Yes.

3         Q.   Now, if you look at the end of the second

4    paragraph, you wrote, "I know Hillary, and I think

5    she would make a great president or vice president."

6              You do know Hillary Clinton, correct?

7         A.   Yes.

8         Q.   And you knew her back in 2008?

9         A.   Yeah.   Pretty much.

10        Q.   So did you believe this sentiment when you

11   expressed it in March of 2008?

12        A.   Well, I didn't think too much about it.

13             Where are you asking me to read?

14        Q.   If you look at the end of the second

15   paragraph, there's a parenthetical at the end of it.

16   And it says, "I know Hillary, and I think she would

17   make a great president or vice president."

18        A.   Yeah, at the time I might have.  I didn't

19   give it a lot of thought, because I was in business.

20   And as a businessman, I think it was something I

21   never really gave much thought to.

22             Now that I see what she's done and how

23   she's handled herself and how she's handled her

24   e-mails and all of the problems that she's got, I

25   would say she wouldn't make a very good vice

1  president or president.

2        Q.    So but back then you thought she would?

3        A.    Well, back then -- how long ago was that?

4  How many years ago?

5        Q.    That's March of '08.

6        A.    That was a long time ago.

7        Q.    Almost eight years ago.

8        A.    It's something I didn't give much thought

9  to.

10       Q.    But you did express it in this blog

11 posting?

12       A.    It's just something I wouldn't have thought

13 about.  I mean, I expressed it.  But where is it?

14       Q.    The last sentence of the first paragraph --

15 or second paragraph.

16       A.    After -- when I looked at the history of

17 the Clintons, I think that they've really let the

18 country down.

19       Q.    So you think they've let the country down

20 since March of 2008?

21       A.    Well, since I've really started to watch

22 and study politics as opposed to just thinking about

23 business and not thinking about politics.

24       Q.    Now, you've said of Jeb Bush previously

25 that he is exactly the kind of political leader this

1  country needs now, and we very much need in the

2  future.  He's bright, tough and principled.

3          Was that an honest sentiment when you

4  expressed that about Jeb Bush?

5      A.   No, I didn't know him very well when I said

6  that.  I mean, I hardly knew him at all.  Now I know

7  him well, and I think he would be a disaster as

8  president, frankly.

9      Q.   So did you not believe it when you said it

10  before?  Or you just simply didn't have a basis and

11  you --

12      A.   I didn't have much of a basis.  But I said

13  it to be nice, and it didn't matter, but I said it to

14  be nice and to be respectful.  But I didn't really

15  know him.

16          Now that I've gotten to know him, I think

17  he would be not very good at all.

18      Q.   Of George Pataki, you said he was the most

19  underrated guy in American politics.

20          Is that a sentiment that you said to be

21  nice, but not because you necessarily believed that?

22      A.   He had a period of time when he was doing a

23  good job, but I think he ended badly.  And then when

24  I got to know him -- because I didn't know him very

25  well -- when I got to know him, I'm not a fan.

1   Q.   So when you said he was the most underrated

2   guy in American politics, did you believe it

3   sincerely or was that --

4        A.   No, I think I would have believed it at the

5   time.  But I'm not a fan, you know, as I got to know

6   him.  I didn't know him very well.  But as I got to

7   know him and I got to see him when I became political

8   and involved politically, as opposed to not knowing

9   people in business, I would say that no, he's not --

10  I don't think he would be very good.

11       Q.   So you didn't have a basis for what you

12  said, but once you educated yourself more --

13       A.   But now I've gotten to know people a lot

14  better.  I've gotten to know the political system a

15  lot better.  I've gotten to know the ins and outs of

16  politics, and I've gotten to know the history of

17  politics a lot better.  And I think he would not

18  have -- I do not think he was very good.

19       Q.   Rick Perry, you've said that he was a very

20  effective governor?

21       A.   Where is that?

22       Q.   Where did you say that about Rick Perry?

23       A.   Where is it again?  Can you find it?

24       Q.   Yeah.  Hold on a second.

25       A.   Well, I thought he was a nice guy.  I

1  thought Rick Perry was a very nice guy.  But, you

2  know, obviously he didn't do too well when he ran for

3  president.  And you get to know people better under

4  pressure.  Under pressure they're not so good.

5       **Q.   So you formed a different opinion of him**

6  **later?**

7       A.   Yeah, as I got to know him.

8            MR. PETROCELLI:  Also for the record,

9  Jason, the reference to Jeb Bush, who -- there was

10 apparently a document, but not shown to the witness,

11 I don't know where you were reading from.  But just I

12 want the record to be clear there was nothing in

13 front of him on that.

14           MR. FORGE:  I just need to find the

15 exhibit number.

16           THE WITNESS:  It's okay.  It doesn't

17 matter.  Who cares?

18 BY MR. FORGE:

19      **Q.   Mr. Trump, I have the transcript and the**

20 **video of this appearance on this.  Let's start with**

21 **the transcript.  And if you want to actually see it**

22 **and hear it --**

23      A.   Of what?

24      **Q.   Of your appearance on This Week.**

25      A.   When?

1      Q.    With John Carl, from I guess December 5th.

2      A.    Of last year?

3      Q.    Yeah.

4      A.    Okay, I can see the transcript.

5      Q.    Hold on one second.  Sorry, I apologize.

6  These pages are not Bates numbered.  I want to get to

7  the right point.  But you're welcome to look through

8  whatever you want.

9            Okay.  This was previously marked as

10  Exhibit 489 to your deposition.  Again, if you want

11  to look at any other portion, Mr. Trump, that is

12  absolutely your right and entitlement.

13            (Exhibit 489 was identified.)

14  BY MR. FORGE:

15      Q.    I have opened this up to the fifth page,

16  and it's near the bottom of the page, where it

17  begins, you said of Jeb Bush, and there's a quote.

18      A.    When is this?  How long ago is this?

19      Q.    This is a month and a half ago.

20            And if you go to the next page for your

21  response.

22      A.    This is him asking me the question?

23      Q.    Yeah, him asking you the question about

24  your past praise for --

25      A.    It's already been out there.

```
 1              MR. PETROCELLI:  What page are you on?
 2              MR. FORGE:  The fifth page, now to the
 3   sixth.
 4              MR. PETROCELLI:  Okay.  After he talks
 5   about the America We Deserve, the book?
 6              MR. FORGE:  Yeah.
 7   BY MR. FORGE:
 8       Q.   Your response, Mr. Trump, was it's -- your
 9   response to the questions about your praise for these
10   folks that you no longer have praise for is, "It's a
11   very simple answer to that.  I was a businessman all
12   my life.  I've made a tremendous fortune.  I had to
13   deal with politicians and I would contribute to them
14   and I would deal with them and certainly I'm not
15   going to say bad things about people because I needed
16   their support to get projects done.  I needed their
17   support for lots of things, or I may have needed
18   their support, put it another way.  I mean, you're
19   not going to say horrible things and then go in a
20   year later and say, Listen, can I have your support
21   for this project or this development or this
22   business?  So I say nice about almost everybody, and
23   I contributed to people because I was a smart
24   businessman.  I built a tremendous company, and I did
25   that based on relationships."
```

1               Was your response there that I just read

2      honest?  Was it true?

3          A.   That's true.  And you view people

4      differently.  When you're in business you view

5      people -- you don't think about it.  Whereas when

6      you're in politics, you think about the qualities of

7      a person, and the -- you really think much deeper

8      about a politician.

9               I could -- like a Jeb Bush as a governor of

10     Florida and say, you know, because I don't think

11     about it.

12         **Q.   So one of the reasons why you said these**

13     **nice things about people like Jeb Bush and Hillary**

14     **Clinton was because you didn't think about it that**

15     **much, and because you might need their help for**

16     **something in the future?**

17         A.   You want to always be friendly with

18     politicians.  If you're a businessman, I'm a

19     businessman, you always -- you want to be as nice as

20     you can to politicians whenever possible.

21         **Q.   Because you might need their assistance?**

22         A.   Well, you don't want to have them go

23     against you.  You want to have -- I don't think about

24     Jeb Bush one way or the other, frankly.  But when I

25     was in business, I had no problems with Jeb Bush.

 1              So if somebody would ask me, I would

 2      think -- now, when you're in politics, and you get to

 3      know them better, because you get to know these

 4      people better, and you see what you're dealing with,

 5      you can answer a question I think a lot more

 6      accurately.

 7          Q.   **So you didn't want these people against**

 8      **you?**

 9          A.   No, you don't want them against you.

10          Q.   **And you would rather have them on your**

11      **side?**

12          A.   You would rather have them on your side,

13      politicians.  When you're in business, you would like

14      to have the politicians on your side.

15          Q.   **And so you say nice things about them?**

16          A.   You don't want to say bad about them,

17      ideally you don't want to say badly.

18              And you don't think about it as deeply

19      either.  I mean, when you asked me about different

20      people, they're nice, they're very good, they could

21      be very good.

22              When you start thinking about people in a

23      much deeper fashion, when it's updated and you've

24      seen what they've done, you've seen where they've

25      been, you can answer it I think much different

1  politically than you would as a businessman.  As a

2  businessman, you're not thinking that much about it.

3  You want them to like you, and that's pretty

4  important for business.

5      **Q.   Mr. Trump, when we spoke last month, you**

6  **mentioned that within your Trump organization, you**

7  **generally delegate to other people the task of**

8  **selecting and hiring people; is that true?**

9      A.   Yeah.  Largely.

10     **Q.   And you said that you didn't personally**

11 **select most of the people that work within Trump**

12 **organization; is that true?**

13     A.   Generally speaking, yes.

14     **Q.   Can you think of anyone that you did**

15 **personally select to work for you?**

16     A.   Yeah.  Mr. Garten, lawyer.

17     **Q.   He's your general counsel?**

18     A.   Yeah.  Lawrence Glick.

19     **Q.   What's his --**

20     A.   He's an attorney.

21          Allen Weisselberg.

22     **Q.   He's your CFO?**

23     A.   Right.  Jason Greenblatt, an attorney.

24          Matthew Calamary, a security person;

25 security people.  And others.

1  thing that they see and then they found out that they

2  made a mistake.

3           So see as many -- even if it's 25 or

4  30 things, see as many as you can.

5       **Q.   Before you buy?**

6       A.   Before you buy, yeah.

7       **Q.   Don't rush in?**

8       A.   Don't rush.  I mean, rush if you think

9  you're making a great deal on something, but it would

10 be good if you knew some comparables.

11      **Q.   So do your homework?**

12      A.   Do your homework.

13                (Exhibit 521 was marked for

14                 identification.)

15 BY MR. FORGE:

16      **Q.   Mr. Trump, does Exhibit 521 appear to be a**

17 **true and correct --**

18      A.   Yes.

19      **Q.   -- copy of a collection of ads for Trump**

20 **University?**

21      A.   Looks like it.

22      **Q.   We can go through as many as you want or as**

23 **few as you want.**

24      A.   I take your word.

25      **Q.   Okay.  I'm just going to represent to you**

1    that these are ads for 2009 seminars, live events.

2              You do not know who the instructors were

3    for these individual events, correct?

4         A.   I may know the names, but I don't know the

5    individual instructors.

6         Q.   You didn't personally select these

7    instructors, correct?

8         A.   No.

9         Q.   That's correct?

10        A.   That is correct.

11        Q.   And you don't personally know what they

12   told the students at these events, correct?

13        A.   I think we have concepts and ideas, but no,

14   I don't.  Every instructor has a different method of

15   teaching.

16        Q.   And you don't know what they told the

17   students before these events?

18        A.   No.

19        Q.   Now, you could have called them in and

20   said, Okay, present to me what you're going to

21   present to the students?

22        A.   Well, but that's what I had Michael Sexton

23   and the people -- that's what you have management

24   for.

25        Q.   So you use other people to do that?

1    A.    I do.

2    **Q.    You did not do that yourself?**

3    A.    I did not.

4    **Q.    But you could have?**

5         MR. PETROCELLI:  The question is vague and

6    ambiguous.  Lack of foundation.

7         THE WITNESS:  Well, I could have; I guess

8    I could have.  But I think, you know, I have

9    management.  And again, I was getting good marks on

10   what we saw.

11        So, you know, I guess I could have.  But

12   the management seemed to me to be doing a very good

13   job.

14        MR. FORGE:  Let's take a quick break.

15        THE VIDEOGRAPHER:  We are off the video

16   record at 10:38 a.m.

17             (A recess was taken from 10:38 a.m.

18              to 10:50 a.m.)

19        THE VIDEOGRAPHER:  We are back on the video

20   record.  The time is 10:50 a.m.

21   BY MR. FORGE:

22   **Q.   Mr. Trump, at any time during the period**

23   **that Trump University was offering classes, did you**

24   **ever ask anyone to provide you with information as to**

25   **what percentage of students were requesting refunds?**

1       A.   Not as to a percentage.  I knew they were

2   requesting refunds, and I told my accounting people

3   if they wanted the refunds, and it was in the period

4   of time for the refunds, to give it to them.

5            And I paid millions.  I don't know exactly

6   what the numbers -- you would know.  But I paid

7   millions and millions of dollars in refunds.  I mean,

8   frankly, if I would have known that I was going to be

9   in litigation, probably I wouldn't have done it,

10  although it was the honorable thing to do.

11       **Q.   And you knew that in realtime you were**

12  **paying millions of dollars in refunds?**

13       A.   I was paying a lot in refunds.  Yeah, I

14  knew that.  And I also understand why.  I mean, you

15  do it because people want to get their money back.

16  It's one of those things.

17       **Q.   Like you said, it's the honorable thing to**

18  **do?**

19       A.   I did the honorable thing.

20                  (Exhibit 522 was marked for

21                  identification.)

22  BY MR. FORGE:

23       **Q.   Mr. Trump, I will represent to you that**

24  **Exhibit 522 is a printout of an e-mail chain that**

25  **your representatives provided to us in discovery.**

# EXHIBIT 3

**San Antonio Express-News**

**Publication Date: 10/08/2009**

This E-Sheet(R) is provided as conclusive evidence that the ad appeared in the publication noted on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

| Ad Number: | 690011461 | Client Name: | NORTHCAL MEDIA, LLC |
| Insertion Number: | | Advertiser: | TRUMP UNIVERSITY |
| Size: | 6 X 21 | Section/Page/Zone: | CITY/11A/ |
| Color Type: | B&W | Description: | THE TIME TO INVEST IN TE |



# The time to invest in Texas real estate is *NOW!*

Learn from Donald Trump's handpicked experts how you can profit from the largest real estate liquidation in history. Attend our FREE investor workshop!

He's the most celebrated entrepreneur on earth. He's earned more in a day than most people do in a lifetime. He's living a life many men and women only dream about. And now he's ready to share—with Americans like you—the Trump process for investing in today's once-in-a-lifetime real estate market.

Come to this FREE introductory class and you'll learn from Donald Trump's handpicked instructors a systematic method for investing in real estate that anyone can use effectively. You'll learn foreclosure investing from the inside out. You'll learn how to finance your deals using other people's money. You'll learn how to overcome your fear of getting started.

*"I can turn anyone into a successful real estate investor, including you."*
– Donald Trump

Today's financial crisis and credit crunch has politicians and bankers scrambling for answers. They've got bailouts and rescue packages but who's helping you? We'll help you by teaching you how to **profit from the billion dollar bailouts** that have opened the door for unprecedented investment opportunities.

With home prices dropping through the floor, historically low interest rates, and record high inventories, 2009 is the "perfect storm" for real estate investors of every income and experience level. But you need to approach this with the kind of proven expertise contained in Donald Trump's powerful techniques and strategies.

### Cash in on the Greatest Property Liquidation in History!
*Discover how to . . .*

✓ Buy real estate from banks—at up to 70% below market value!

✓ Finance your deals creatively in today's tight credit market!

✓ Buy the right properties at the right time—and know when to sell!

✓ Secure your retirement by generating passive income!

✓ Invest in real estate through your IRA—tax free!

✓ Find pre-foreclosures in your area!

*"Within six months I put a down payment on my first property which I bought for $107,900. I then rehabbed and flipped the 3,000+ square foot home for a profit of more than $30,000."*
— Scott T.
Phoenix, Arizona
*Personal Results. Results not typical.*



Attendees receive a FREE *Secrets of Real Estate Marketing* CD-Rom—a $129 value—plus a bonus class on probate investing!

## 3 DAYS ONLY!

**Act Now! Space is limited, reserve your seat today at TrumpUniversityTX.com or call 888-TRUMP-14 (888-878-6714).**

| MONDAY | TUESDAY | WEDNESDAY |
|---|---|---|
| October 12th | October 13th | October 14th |
| 1:00 PM & 7:00 PM | 1:00 PM & 7:00 PM | 1:00 PM & 7:00 PM |
| San Antonio Marriott Riverwalk | Hyatt Regency Hill Country Resort and Spa | Hilton San Antonio Airport Hotel |
| 889 East Market Street San Antonio, TX | 9800 Hyatt Resort Drive San Antonio, TX | 611 Northwest Loop 410 San Antonio, TX |



TRUMP
UNIVERSITY

Registration begins 30 minutes prior to start of classes. Classes begin promptly at the scheduled time. Donald Trump will not appear at this event.

TU 62091

# EXHIBIT 4

ZELDES & HAEGGQUIST, LLP
AMBER L. ECK (177882)
HELEN I. ZELDES (220051)
ALREEN HAEGGQUIST (221858)
625 Broadway, Suite 906
San Diego, CA 92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878
ambere@zhlaw.com
helenz@zhlaw.com
alreenh@zhlaw.com
aarono@zhlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN (211456)
THOMAS R. MERRICK (177987)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
rjensen@rgrdlaw.com
tmerrick@rgrdlaw.com

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARLA MAKAEFF, et al., on Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>              vs.<br><br>TRUMP UNIVERSITY, LLC, et al.,<br><br>        Defendants. | Case No.:  3:10-CV-00940-CAB(WVG)<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF CORINNE SOMMER DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>District Judge:     Hon. Cathy Ann Bencivengo<br>Magistrate Judge:  Hon. William V. Gallo |

ZELDES & HAEGGQUIST, LLP

I Corinne Sommer, hereby declare and state as follows:

1.     I am a resident of New York, New York.  If called as a witness, I could and would competently testify as to all facts within my personal knowledge.

2.     I worked for Trump University from May 2007 through October 2007.  My title was Manager of Events Department.  I worked at Trump University's headquarters located at 40 Wall Street, New York, New York, which is also where Trump Organization is located.  My job duties as Manager of the Events Department included the coordination of Trump University live events, seminars and training.

3.     The first Trump University live event took place in Florida in May of 2007, and the second one took place in Los Angeles, California approximately one month later.  Before these two live events, my understanding is that Trump University "courses" were only offered online.  These two events had approximately 500 attendees each.  After that, Trump University held live seminars nearly every week in different areas of the country.

4.     In my experience, the focus of Trump University was on making sales rather than on providing quality educational services.  Trump University would lure consumers into the initial free course based upon the name and reputation of Donald Trump, and then once they were there, Trump University personnel would try to up-sell consumers to the next course using high-pressure sales tactics.  Far from providing a "complete real estate education," as advertised, Trump University personnel only provided enough information to get students to sign up for the next seminar or program.  I recall instances in which consumers had paid for a class to learn how to make money investing in real estate, ask for more information, and the teacher would say, "if you want to get that, you have to buy the next package."  I don't remember who said it, but this is the general gist of things.

5.     During the time that I was employed at Trump University, many of the speakers, instructors, and mentors lacked real estate experience.  Many of them did not even own houses, and had no experience buying or selling real estate.  For example, I recall that David Stamper had no real estate experience; he was a jewelry salesman.  However, after

ZELDES & HAEGGQUIST, LLP

working for Trump University for approximately a year on the sales team, he began speaking as an instructor at seminars.

6.      Trump University instructors and mentors were not hand-picked by Donald Trump.  I believe that in many instances Donald Trump had neither met the instructors or mentors, nor did he know who they were.  Instead, I recall that Trump University hired its speakers and mentors through Mark Dove in New Hampshire who hired and trained a number of real estate salespeople that he provided to Trump University.  These people did not necessarily have real estate experience, but they were skilled at high-pressure sales.  I recall that Trump University fired two of Mike Dove's salespeople because they kept trying to get Trump University students to invest in their own personal businesses.

7.      I am aware that instructors were trained to, and witnessed them, asking students during the $1,500 seminars to call their credit card companies and raise their credit limits two, three or four times so that they would be able to invest in real estate.  They would tell students to max out their credit card because they would make their money back.  They couldn't raise their limit and use it the same day.

8.      While Trump University's advertisements claimed it wanted to help consumers make money in real estate, in fact, based upon my experience, I believe that Trump University was only interested in selling every person the most expensive seminars they could possibly buy on credit.  I recall that some consumers had showed up who were homeless and could not afford the seminars, yet I overheard Trump University representatives telling them, "it's ok; just max out your credit card."  I also witnessed representatives instructing consumers to charge the course to multiple credit cards if they lacked a high enough limit on one credit card to pay for the seminar.  In fact, I recall representatives telling consumers to open up as many credit cards as they could to increase their credit score.

9.      Trump University used a standardized PowerPoint presentation and scripts for all of its seminars, so that the seminars were standardized and substantially the same across the country regardless of the particular speaker or location. A few speakers had their own, but those who did not were given presentations.

ZELDES & HAEGGQUIST, LLP

ZELDES & HAEGGQUIST, LLP

10.    Trump University did not provide one-year of real estate mentoring as promised to the public.  My understanding is that mentors were paid up front on commission before the student completed their mentorship.  Because of the pay structure, mentors had no incentive to call consumers back or work with them once the consumer signed up and the mentor was paid.  The focus of the mentors seemed to be on getting new sales and new commissions.  As a result, I recall that mentors rarely returned phone calls from students or spent much time talking with them.  I received calls from many angry students telling me that they had been trying to reach their mentor to no avail.

11.    I do not believe that Trump University taught Donald Trump's investing "secrets."  Donald Trump came from a wealthy family and had resources at his disposal to purchase real estate – that is the secret – one that the average consumer could not replicate.

12.    At the seminars I attended, Trump University presenters pressured consumers into purchasing the Elite program because they said that students would make their money back in the first deal or two.  They told students that even though $25,000 or $35,000 for the Elite program sounded like a lot of money, "Don't worry, you'll get your money back right away in your first deal, or first two deals."

13.    In the time that I worked for Trump University, I only met Donald Trump once.  He was not an active presence there; though he occasionally went over numbers with Michael Sexton.  Based upon my interaction with Donald Trump, he seemed only concerned with Trump University's revenues and profits.

14.    In my experience, many students were dissatisfied with Trump University.  When consumers first signed up and took the course, they were hyped up due to the high-drama atmospherics of the seminars, and they tended to give positive reviews as they were asked for them.  But, after purchasing the Elite Program, I saw many students who realized they did not get what they were promised, and they were unable to get through to their mentor, and then they became more and more dissatisfied over time.

1    I declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct. Executed this ⟨19⟩ day of September, 2012, at New York,

3    New York.

4    _____

5                          CORINNE SOMMER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ZELDES & HAEGGQUIST, LLP