```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   SONNY LOW, ET AL.,            .
                                  . Docket
 5            Plaintiffs,         . No. 10-cv-0940-GPC(WVG)
                     v.           .
 6   TRUMP UNIVERSITY, LLC,       .
     ET AL.,                      .
 7            Defendants.         .
     . . . . . . . . . . . . . . .
 8   ART COHEN, Individually and  .
     on Behalf of All Others      .
 9   Similarly Situated,          .
                                  . Docket
10            Plaintiff,          . No. 13-cv-2519-GPC(WVG)
                     v.           .
11   DONALD J. TRUMP,             . July 22, 2016
              Defendant.          . 1:30 p.m.
12   . . . . . . . . . . . . . . . . San Diego, California

13                  TRANSCRIPT OF MOTIONS HEARING
                BEFORE THE HONORABLE GONZALO P. CURIEL
14                  UNITED STATES DISTRICT JUDGE

15

16                  A-P-P-E-A-R-A-N-C-E-S

17   For the Plaintiffs:   Robbins Geller Rudman & Dowd LLP
                           655 West Broadway, Suite 1900
18                         San Diego, California 92101
                           By:  JASON A. FORGE, ESQ.
19                              RACHEL L. JENSEN, ESQ.
                                XAVIER JAY ALVAREZ, ESQ.
20                              DANIEL J. PFEFFERBAUM, ESQ.
                           - and -
21                         Zeldes Haeggquist & Eck, LLP
                           225 Broadway, Suite 2050
22                         San Diego, California 92101
                           By:  AMBER LEE ECK, ESQ.
23
     For the Defendants:   O'Melveny & Myers LLP
24                         1999 Avenue of the Stars, Suite 700
                           Los Angeles, California 90067
25                         By:  DAVID L. KIRMAN, ESQ.
                                DANIEL M. PETROCELLI, ESQ.
```

```
1                   A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

2    Also For the Defendants:
                             JILL ANN MARTIN, ESQ.
3                            Trump National Golf Club, Los Angeles
                             One Trump National Drive
4                            Rancho Palos Verdes, California 90275

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:         Chari L. Possell, RPR, CRR
                             333 West Broadway, Suite 420
23                           San Diego, California 92101
                             chari_possell@casd.uscourts.gov
24
     Reported by Stenotype, Transcribed by Computer
25
```

1          SAN DIEGO, CALIFORNIA; JULY 22, 2016; 1:30 P.M.

2                          -o0o-

3          THE CLERK:  Number 11 on calendar, case 10-cv-0940,

4    Low v. Trump University, for a motion hearing, and Number 12 on

5    calendar, case 13-cv-2519, Cohen v. Trump, for a motion

6    hearing.

7          THE COURT:  Appearances, please.

8          MR. FORGE:  Good afternoon, Your Honor.  Jason Forge

9    on behalf of the plaintiffs in both cases.  Seated with me at

10   counsel table are Rachel Jensen, Amber Eck, Dan Pfefferbaum,

11   and Jay Alvarez is seated behind us and also will be addressing

12   the Court today.

13         THE COURT:  Good afternoon.

14         MR. PETROCELLI:  Good afternoon, Your Honor.  Daniel

15   Petrocelli for defendants in both cases.

16         MR. KIRMAN:  Good afternoon, Your Honor.  David

17   Kirman on behalf of defendants in both cases.

18         MS. MARTIN:  Good afternoon, Your Honor.  Jill Martin

19   on behalf of defendants in both cases.

20         THE COURT:  Good afternoon.  We are here on a great

21   number of motions.  What I intend to do is to begin with the

22   motions pending in Low and advise the parties how I intend to

23   proceed, and then we will take it from there.

24       In case 10-cv-940, we have three motions pending.  One is

25   the defendant TU, Trump University's, motion for leave to file

1    renewed motion for decertification.   The Court intends to take

2    that matter under submission.

3        Next is defendant Trump University's motion to

4    amend/correct protective order.   That has already been taken

5    under submission on July 13.

6        Next is the plaintiff's motion to modify scheduling order

7    to file a motion to clarify or amend the Court's class

8    certification orders.

9        At this time, I am prepared to deny the portion where

10   there's a request to clarify the description or the meaning of

11   the term "university" in the class certification order.   First,

12   it's unclear what clarification is being sought, and

13   ultimately, the Court does not believe that it would be

14   appropriate at this juncture to define or give some specific

15   meaning to that term at this point.   In addition, within the

16   motion, there is an issue raised which the Court believes is a

17   legitimate issue that has to be addressed and that relates to

18   what will happen in the event that the plaintiffs prevail at

19   trial on the issue of liability to the extent that the Court

20   has decertified the damages class or the class as it relates to

21   damages.

22       This is how I see it, and to the extent that the parties

23   have any additional views, I am happy to entertain them.   In

24   the event that the defendants prevail, then obviously it is a

25   moot point.   To the extent that the plaintiffs prevail, then

1   what I would anticipate is that we would issue, provide notices

2   to the class members advising them of the fact that liability

3   has been determined in this case against the defendants and

4   that they will be given a certain period of time to provide a

5   notice to the Court of their intention to pursue damages in the

6   case.   And then it would be my expectation, to the extent that

7   there's someone who seeks to recover damages, that they will

8   retain counsel.

9        One of them could retain Robbins Geller or one of the

10  other firms representing the plaintiffs, and at that point,

11  then, Robbins Geller can return into the case.   Theoretically,

12  it's possible that none of the class members would, but I can't

13  believe that that would happen given the plaintiffs' counsel's

14  involvement in the case.   So at that point, we won't have this

15  question about who is going to proceed representing the

16  interests of the now-successful class members.

17       So those are my thoughts.   I don't know if either side has

18  any additional thoughts or sees any deficiencies or problems

19  with what I have proposed.

20            MR. FORGE:   Thank you, Your Honor.   I will take them

21  in reverse order, starting with the last point Your Honor

22  raised.   And I don't think anything more is necessary.   We are

23  just trying to confirm that -- essentially that the effective

24  date of the decertification of damages would be after the

25  liability phase.   We just wanted to make sure that we are still

1    representing the entire class up until that point.

2         So for example, Your Honor said the first step, if there

3    was a finding of liability, would be sending out notices to the

4    class members.  And we just want to make sure that, for

5    example, in that step, we would be able to speak on behalf of

6    the class members in terms of submitting proposals, interacting

7    with defense counsel to come up with a joint proposal for what

8    the notice should include.  There was a little back-and-forth

9    between the sides as far as whether we can speak for class

10   members on damages issues because of the Court's order, and

11   that's what we really wanted to clarify on that front.

12         THE COURT:  If further clarification is necessary,

13   then we will take the steps to provide that at the appropriate

14   time; but I expect, if the plaintiffs were to prevail at trial,

15   there's obviously going to be post-trial motions, and then the

16   Court would be prepared to recognize plaintiffs' counsel in

17   some capacity in terms of how we proceed to the next step.

18         MR. FORGE:  That's fine, Your Honor.  That's all we

19   really wanted to confirm.

20         On the first issue, Your Honor, I do want to make sure

21   it's clear -- because I don't think it was, given Your Honor's

22   comments -- what it is we are seeking and what it is we are

23   hoping to seek if we were given permission to file a motion.

24         It's clear from the papers what defendants' position is,

25   and this only arose in the past few months because up until

1    then, we thought it was understood by both sides that the

2    "university" aspect of this case is and was as it is described

3    in the class notice; that the plaintiffs allege that one of the

4    misleading aspects of this scheme was to -- and I will quote

5    from the notice itself.  "Plaintiffs allege that Trump

6    University and Trump uniformly marketed and misrepresented" --

7    and I will skip the part that doesn't matter -- "at an elite

8    university, and that the representation was false, and that the

9    New York State Education Department warned Trump not to use the

10   university title or to continue operating without a license."

11       So that's how we have always viewed that aspect of the

12   case.  Now, the class certification order uses the term

13   "accredited," and as defendants point out and as we

14   acknowledge, there are a number of adjectives that have been

15   used by both sides, by the Court, to describe what has always

16   been the same thing: a legitimate, a lawful, a real university,

17   an actual university.

18       The gravamen of all that has always been that it was

19   misleading to hold out this enterprise as a university when in

20   fact it not only was not a university but it was so far from

21   being a university that it New York State Education Department

22   had told them, "It's unlawful to refer to yourself as a

23   university."

24       So that's what came across pretty clearly in the class

25   notice.  And then when new counsel arrived, understandably,

1    they looked at just the literal language of the class

2    certification order without the context and without regard for

3    the class notice, and they seem to be taking the position that,

4    "No.  It's literally -- the representation is limited to

5    representing that this is an accredited university."  Not

6    "accredited" as a synonym for "legitimate" or "lawful" or

7    "real" or "actual," but literally, "accredited."  It -- the

8    case in that regard is limited to whether or not it was

9    actually accredited.  And that, frankly, Your Honor, has never

10   been our position.

11       And so that's -- and it wasn't -- there was no need to

12   clarify that point before because, as I indicated, in the class

13   notice, it was clear that everybody understood that we were

14   using -- the "university" aspect of this case was really

15   talking about the legitimacy of the university, not formal

16   accreditation.  That's all the clarification we were seeking,

17   Your Honor.

18       I think we -- if the defendants are right, then, A, we

19   have a problem with the class notice because that's certainly

20   not what people were told when they were told to make a

21   decision as to whether to opt out.  And even if they are right,

22   I would urge the Court to reconsider and certify, define the

23   certified class as one that encompasses the "university" aspect

24   that we have been talking about all along and that we discuss

25   in the class notice.  The only clarification we are seeking is

1    that the class notice accurately reflects the quote/unquote

2    "university" aspect of this case.

3            THE COURT:  How would that occur or how would that

4    result?  It would be the removal of the term "accredited," and

5    it would just be left as the term "university"?

6            MR. FORGE:  When you say "how would that be

7    resolved" -- in terms of the class certification order?

8            THE COURT:  Yes, what you are proposing.

9            MR. FORGE:  What I would be proposing, Your Honor --

10   and we can submit a proposed order -- but it is really just as

11   simple as the Court confirming that the nature of plaintiffs'

12   certified claims are as described in the class notice.  And so

13   we could actually take that language and put it in the order or

14   there could be that reference to it, but we are really not

15   asking for anything more than that.

16           THE COURT:  Thank you.

17      Mr. Petrocelli?

18           MR. PETROCELLI:  Thank you, Your Honor.

19      It will come as no surprise that we respectfully disagree

20   with counsel's position.  This heavy reliance on the class

21   notice, I think, is unfounded.  The class notice, first of all,

22   pertains to both cases, and the certified issues in both cases

23   are somewhat different.

24      Secondly, the class notice has headings that says what is

25   the case about in pretty simple terms.  It does not purport to

1    identify the specific issues that the Court certified as common

2    issues among the class.  The Court certification order in this

3    case, docket 418, at page 2, says, quote, "Trump University was

4    an accredited university; two, students would be taught by real

5    estate experts, professors, and mentors hand-selected by

6    Mr. Trump; and three, students would receive one year of expert

7    support and mentoring," end of quotes.

8        And that's what it says, and that's what -- at least since

9    we have been involved, that's what we have been focused on in

10   the limited discovery that we have been able to participate in.

11   And I don't think there's any basis now to expand that,

12   particularly given that in some of the discovery that has

13   happened recently it's become quite clear that the folks

14   deposed did not believe that this was an accredited university

15   and that that representation is not provable or that

16   misrepresentation is not provable by the plaintiffs.  So now

17   they want to expand it to be something far more amorphous and

18   broad, which was never the subject of the Court's prior order.

19   So we would rest on the record before the Court.

20              THE COURT:  All right.  Thank you.

21              MR. PETROCELLI:  Thank you.

22              THE COURT:  So then we will look at that a little bit

23   closer before we issue our ultimate ruling.

24       And then moving on to Cohen v. Trump, 13-cv-2519, the

25   first motion that I am prepared to address is the motion for

1   summary judgment or, in the alternative, partial summary

2   judgment.  My tentative is to deny that motion.  It appears to

3   me that the elements of 18 USC Section 1962(c) have been met;

4   first, that there exists an enterprise, at least so that

5   there's a disputed issue of fact on these elements as to the

6   existence of an enterprise; and the enterprise affected

7   interstate commerce; that the defendant was employed by or

8   associated with the alleged enterprise; that the defendant

9   participated either directly or indirectly in the conduct of

10  the affairs of the enterprise; and that, lastly, the defendant

11  participated through a pattern of racketeering activity.

12      With respect to that pattern of racketeering activity and

13  the predicate acts, then we focus on the mail and wire fraud

14  elements.  The Court does believe at this point there's

15  sufficient evidence to get us to a trial on whether or not the

16  defendant knowingly participated in a scheme to defraud by

17  means of misrepresentations or promises; and then in addition,

18  that the statements made or facts omitted were material; that

19  the circumstantial evidence in this case, with respect to the

20  actions of Mr. Trump, would support the conclusion that he

21  intended to defraud; and that in this case, it's clear that

22  there was the use of mails or wires during the course of the

23  alleged scheme.

24      So that's my tentative, but I am happy to hear any further

25  arguments.

1              MR. PETROCELLI:  Thank you, Your Honor.  And I

2    appreciate that one is typically swimming uphill when you are

3    advancing a motion for summary judgment, especially when the

4    tentative is to deny the motion.  I know that you have put in a

5    lot of hard work and thought into this, but let me just see --

6    let me just take a shot at seeing if I can illuminate a couple

7    of issues as to why we think the motion should be granted.

8         What we have here, Your Honor, at the highest level -- and

9    it's sort of a reality check, at least the way I look at it --

10   is that the plaintiffs are seeking to hold Mr. Trump personally

11   responsible for what is essentially the alleged conduct of

12   Trump University.  And the way they do that is by singling out

13   Mr. Trump as the person who directed the affairs of Trump

14   University.  But Trump University is not the enterprise, Your

15   Honor.  The enterprise is this alleged marketing scheme, as

16   they call it.  And I -- it really bothers me even to use these

17   sorts of words, but I am dealing with what we have in front of

18   us.

19        And when you really look and you strip away a lot of the

20   personal attacks, a lot of overheated rhetoric, which I am sure

21   the Court did, and you really focus on what is the conduct of

22   Mr. Trump in relation to this alleged enterprise, this alleged

23   marketing scheme, there's very little there, Your Honor, and

24   that's what I really want to focus on.

25        The U.S. Supreme Court, in the *Reeves* case, made clear

1   that, to establish that an individual is conducting an

2   enterprise, we have to see whether he is leading it, running

3   it, managing it, or directing it.  And those are the words that

4   come right out of the court's opinion.  When you focus on what

5   is the conduct that they actually identify that Mr. Trump did

6   with respect to the marketing, there's -- there's, on the one

7   hand, conduct that I would suggest to you has nothing to do

8   with the so-called enterprise but simply has to do with his

9   fully appropriate role in acting as a shareholder, a

10  nonexecutive chairman of a company that is receiving somewhat

11  periodic reports from the management of the company who ran the

12  company.  He did not run Trump University.  He was not the

13  chief operating officer.  He did not direct the day-to-day

14  affairs.

15      He sat down with Michael Sexton in 2004 and 2005 and

16  created this as an online program, and it got launched.

17  Several years later, they morphed into doing live events.  And

18  by this period of time, Mr. Trump was much less involved than

19  he was in the very beginning, when in fact he did interview

20  professors from different colleges that would participate in

21  these online seminars, some of whom continued on to these live

22  events.

23      And remember, their case is focused on class period

24  conduct which starts in 2007.  By 2007, the company had been

25  formed several years already, and Mr. Trump's involvement was

1    fairly minimal, the same involvement that we would have at the

2    highest level of managing or overseeing a number of his other

3    companies.

4            THE COURT:  All right.  You have focused on whether

5    or not Mr. Trump conducted the enterprise affairs.  But in

6    fact, isn't that an overly restrictive view of Section 1962?

7    Because 1962 speaks in terms of "to conduct or participate

8    directly or indirectly in the conduct of such enterprise's

9    affairs."

10       So in this case, as I understand it, Mr. Trump had an

11   ongoing participation in the running of Trump University.  At a

12   minimum, he reviewed the advertisements, the marketing

13   materials, to ensure that his brand was not being besmirched or

14   somehow or another being diluted.  So he had an ongoing role in

15   that manner.  So wouldn't 1962 view that as participating at

16   least directly or indirectly?

17           MR. PETROCELLI:  Your Honor, I believe that was

18   precisely the question put to the Supreme Court in the *Reves*

19   case, in the *Reves v. Ernst & Young* case, and they went through

20   a careful analysis of these words, including the word

21   "participate," and they said exactly what I just read to you,

22   that this has to be a leadership role, and --

23           THE COURT:  But isn't it leadership for Mr. Trump to

24   ultimately have the ultimate say?

25           MR. PETROCELLI:  No, Your Honor.  A leadership role

1   of the RICO-forbidden conduct.  Not even a leadership role of a

2   company that may be involved in RICO-forbidden conduct, but the

3   enterprise here is the marketing scheme.  He has to be the

4   leader, the director, of the so-called fraudulent marketing

5   scheme.

6        And there's another case that we cited, Central District

7   of California, last year, *Gomez v. Guthy Renker*, which says one

8   must have some part in directing the enterprise's affairs.

9        THE COURT:  I guess we just disagree as to whether or

10  not Mr. Trump's actions in this case equate to that.

11        MR. PETROCELLI:  What they have, Your Honor -- one of

12  the things they feature -- let me just give you an example of

13  just trying to cut through a lot of the noise in this case.

14        They talk about this video that was shown in all these

15  live events, where Mr. Trump said, "I hand-picked all these

16  people."  And then they point out later on many years, when he

17  was deposed and asked about a whole bunch of these folks who

18  were instructors, and he didn't know who they were, the

19  suggestion being that he deliberately lied when he made that

20  video.

21        Your Honor, that video was made in 2005 for the online

22  seminar, and it only pertained to the online seminar, and there

23  were professors that he had interviewed, including from

24  University of Virginia, Stanford, and I believe Dartmouth.

25        Years later, Your Honor, that video, that 20-minute

1    video -- and it was an interview by a fellow named John Ward.

2    It was an interview.  Years later, clips were taken from that

3    video and put into, like, a four-minute piece that was then

4    shown at the live events.

5        There's not even any evidence in the record that Mr. Trump

6    knew that that had happened, that an interview that he gave in

7    2005, in which his statements are not even alleged to be

8    false -- and it's before the class period of the case -- is

9    then used later on by the marketing people running this

10   company.  This is my point; this idea that he somehow is in the

11   center of it is not supported by the evidence in the case.

12           THE COURT:  But is there any real question from 2005

13   all the way to 2010 there are repeated marketing tools or

14   brochures, mailings, that went out, saying the same thing,

15   basically that what we have here is Trump University and

16   because of his desire to help people learn about real estate,

17   he's going to share his secrets through his hand-picked

18   instructors?  Didn't that remain true --

19           MR. PETROCELLI:  To be sure.  To be sure, there was

20   material to that effect that went out or was posted on the

21   website or used for these online courses.  But he has to be the

22   person directing that activity or involved in activity.  And

23   the suggestion of these papers is that, you know, he's the

24   center of all of this, he knows all the stuff is going out,

25   he's reviewing it all, he's editing it, he's running the

1    campaign.  That's not established by this record.  I know

2    that's the impression they are trying to create, Your Honor.

3            THE COURT:  And you may be able to establish that at

4    trial, with the jury.  But the question is, at this point,

5    whether or not there's a dispute of fact on this issue.

6            MR. PETROCELLI:  Well, really, what this comes down

7    to, in my view, is his testimony at his deposition that he

8    reviewed advertising that went out for branding purposes

9    because he wanted to make sure his picture looked right, or it

10   wasn't on page 2 but page 3 of the newspaper because that's the

11   better -- the odd-numbered pages are better than the

12   even-numbered pages, those sorts of things.

13       There's no evidence he was writing text.  There's no

14   evidence he was editing.  There is no evidence he was directing

15   people to say some of these things.

16       Not to mention, Your Honor, that -- I mean, are we going

17   to do a RICO case on "hand-picked" and "secrets"?

18       I mean, we have also the puffery argument in here, Your

19   Honor.  And last time this was made to you, on the motion to

20   dismiss -- before our time -- but you indicated that that's

21   something that would have to be established factually, and you

22   denied it -- or not you.  It must have been the predecessor

23   judge.

24           THE COURT:  Judge Gonzalez.

25           MR. PETROCELLI:  Yes.  I apologize.  The prior judge

1   on the case.   It was denied and said this is a matter of

2   factual proof.

3       And Your Honor, I mean, are we really going to extend RICO

4   to the point where someone is being put on trial individually

5   for the conduct of a company because he knew about some ads

6   that said, "I am going to share real estate secrets, with

7   hand-picked instructors"?

8           THE COURT:   Well, certainly, the train has left the

9   station with respect to mail fraud and wire fraud being

10  accepted as predicate acts for purposes of civil RICO and any

11  number of Courts of Appeal and even Supreme Court Justices have

12  expressed some concern about how far civil RICO has been used

13  and applied, and ultimately the Supreme Court has spoken very

14  clearly.

15          MR. PETROCELLI:   Well, no case has ever gone this

16  far.   And the marketing cases that they have cited Your Honor,

17  those are off-label cases.   That's against the law, the Food

18  and Drug and Cosmetic Act; it is a felony.   Or a cigarette

19  company hiding the fact that you could get cancer and people

20  could die.

21      Those are the few examples when these marketing issues

22  have worked their way into RICO law, but there has been nothing

23  remotely like this case, Your Honor, where a defendant is being

24  personally sued -- treble damages, attorney's fees -- based on

25  testimony that he reviewed ads that said, "I will share my

1    secrets, and I hand-picked some instructors."

2        Even if that were untrue -- especially given this record

3    here, where he was not the person running this company.  He

4    founded it, he set it up, and he went off, and he let other

5    people run it, Your Honor.

6        They have a point here that he was the -- I have a chart

7    here.  I have a chart.  "Donald Trump owned a majority stake in

8    Trump University."  That's one of the facts that they cite.

9    "Donald Trump was the lone star of the main promotional video."

10   There's no evidence there linking him to directing some

11   marketing fraud.  As I told you, on this video, that was done

12   in 2004 and 2005.  And the fact that his name and his picture

13   are used all over the place, that's how the program was

14   branded, off of his name and picture, just like any other

15   celebrity endorser.

16       The danger that this case presents -- and I gave this a

17   lot of thought, Your Honor.  It would be hard to find a

18   principal distinction between this case and any case against a

19   large company -- whether it's General Mills or General Motors;

20   you pick it -- where there's a consumer advertising claim

21   brought, and you claim that there's a marketing scheme or scam

22   going on in the company because they are putting out some false

23   and misleading ads and then you name the CEO or you name the

24   chief marketing officer.  That would subject any individual to

25   liability, at least getting to a jury, on facts like this.  And

1   I really believe at the end of the day this is a gross

2   overreach.

3       And I understand the summary judgment standard is what it

4   is, and I appreciate that Your Honor is working through this

5   with all the elements, and it's difficult to sort of make a

6   call with so many different facts flying all over the place.

7   But I do think, when you strip it down, Your Honor, it's not

8   there.

9           THE COURT:  All right.  Thank you.

10          MR. PETROCELLI:  Thank you for the time that you gave

11  it.

12          THE COURT:  You are welcome, Mr. Petrocelli.

13      Mr. Forge?

14          MR. FORGE:  Thank you, Your Honor.

15      There are a few points that bear correcting.  I think the

16  overarching theme of this motion and of many of the positions

17  the defense has taken in this case is that somehow belligerence

18  trumps substance, that if we say it loudly enough or forcefully

19  enough, we can make it so just by sheer force of will.  And I

20  will start with the main promotional video, because

21  Mr. Petrocelli made some pretty strong statements about that

22  main promotional video, about what there is or is not in the

23  record, and he just couldn't be more wrong.

24      This is one of the reasons why we submitted to Your Honor

25  video excerpts of Mr. Trump's deposition, because one of those

1    excerpts that we submitted includes us playing for him the

2    entire main promotional video.  That's what we are talking

3    about in this case.  That main promotional video is about two

4    and a half minutes long.  We played the entire video, start to

5    finish, for Mr. Trump.  And at the end of playing that video,

6    that video that was used exclusively for the live events,

7    Mr. Trump was asked, "So you made that video to influence

8    people to enroll in Trump University?"

9         His answer:  "Yes."

10        He didn't say, "Oh, no.  I have never seen that before.  I

11   might have recorded something ten times longer than that, years

12   earlier, and maybe somebody else cut it down."

13        No.  He saw, he listened to that video, in its entirety,

14   and he said that video, yes, was made to influence people to

15   enroll in Trump University.

16        And Your Honor hit the nail on the head.  In addition to

17   the video, he set the tone.  He set the tone for the fraudulent

18   portrayal of this university as being something that was the

19   functional equivalent of learning from Donald Trump because he

20   was so integrally involved in it.  That's why all of the ads --

21   which he also saw and he also approved -- all of the ads

22   contain the same representation about his hand-picked

23   instructors, his secret techniques, learn what it took him his

24   entire career to develop.

25        And again, reference to his deposition testimony.  This is

1    Exhibit D, page 125.

2              "Question:  Are you aware of any marketing

3              materials for Trump University bearing

4              your name that you didn't approve?

5         "Answer:  I am not aware.

6         "Question:  Any marketing materials for

7              Trump University bearing your picture that

8              you did not approve?

9         "Answer:  I am not aware of any, no.

10        "Question:  Any marketing materials for

11             Trump University bearing your signature

12             that you did not approve?

13        "Answer:  I am not aware of any, no."

14        And you can see, at Exhibit E to our opposition, Your

15   Honor, we showed this to Mr. Trump in his deposition.  There's

16   a stack of these newspaper ads.  And the most prominent thing

17   is his picture, and then there's usually is probably about an

18   18-point font print about something, "Now is the time to

19   invest."  And the next biggest font on there is "Trump's

20   hand-picked instructors."  That's in these ads.  He is not

21   aware of a single one that he didn't approve.

22        The personal invitations are even clearer.  They have his

23   signature on it -- on them, Your Honor.  And it is on the same

24   page that he signs that says his "hand-picked instructors."

25        "My hand-picked instructors are going to teach you the

1    techniques which took" –– "will share my techniques which took

2    my entire career to develop."  This is Exhibit F of our

3    opposition.

4         So it's abundantly clear, and we have –– it's abundantly

5    clear that he was the top man.  He exercised that authority.

6    He had that authority in the marketing scheme that is at issue

7    here.

8         Now, Mr. Petrocelli makes his policy argument about RICO,

9    but again, he's way off the mark.  *Kushner v. King*, one of the

10   seminal Supreme Court cases on RICO –– that is the individual,

11   Don King, being sued, with treble damages and all of the other

12   bells and whistles that go with a RICO action, for using his

13   entity, Don King productions –– Don King Promotions, through

14   which to execute a RICO scheme, a fraud scheme.

15        And Mr. Petrocelli attempts to distinguish cases like the

16   *Neurontin* marketing case, and other off–label promotion cases

17   with the argument that, "Well, off–label promotion, that's as

18   felony."  Actually, to correct Mr. Petrocelli, off–label

19   promotion can be a misdemeanor or can be a felony.  But there

20   are two crimes that are always felonies, and that's mail fraud

21   and wire fraud.  So if Mr. Petrocelli's definition of what is

22   sufficient to constitute a RICO case must be a felony, well,

23   then, we are certainly qualifying here because we have got mail

24   and wire fraud.

25        And there are numerous cases, including, Your Honor, cases

1    that they cite, in which it's mail and wire fraud are the --

2    are the predicate acts.

3        And before I sit down, I just want to read one quick

4    portion from *United States Fires Insurance*, which is a case

5    that they cite.  This is the judge relying on other decisions,

6    a case the defendants embrace, so they asked the Court to rely

7    on this.  This is talking about another case in which Judge

8    Sand made a decision.  And it's talking about two members of --

9    that are high-ranking, like Mr. Trump.  "Though Tese and

10   Sinclair did not operate or manage the enterprise in the sense

11   of involving themselves in the day-to-day processing of

12   fraudulent trades and communications with investors and outside

13   auditors, neither were they the sort of unwitting foot soldiers

14   whose liability was at issue in *United States v. Viola*.  They

15   allegedly enabled the partnerships to function effectively by

16   providing their own company, TSM, as the partnership's

17   corporate trading partner."

18       That -- the same exact argument Mr. Petrocelli is making

19   here, that a lack of day-to-day involvement in the mechanical

20   running of an enterprise somehow immunizes Mr. Trump from RICO

21   liability, had been considered in the case they rely on and

22   rejected.

23       There's a reference to the *Azrielli v. Cohen Law Offices*

24   case, from the Second Circuit.

25       And that first reference I had, Your Honor, was

1  303 F.Supp.2d, at page 452.

2      In the *Azrielli* case, the Second Circuit upheld a

3  Section 1962(c) claim against a defendant whose only alleged

4  participation in a real estate tax shelter was that of allowing

5  his name to be used on a bogus contract and showing up at the

6  closing of the fraudulent property sale.

7      So the record is -- the case law is crystal clear that we

8  have not just enough but overwhelming evidence of Mr. Trump's

9  participation and conduct in this marketing scheme that's at

10  issue.

11      If Your Honor has any other questions, I am happy to

12  address them, but I know there are many other motions.  Thanks.

13          THE COURT:  Mr. Petrocelli, would you like to reply?

14          MR. PETROCELLI:  Just very briefly, Your Honor.

15      Just the cases -- like the *King* case, the *Don King* case,

16  these are cases where the Court is identifying that an

17  individual can be distinct from the enterprise and must be

18  distinct from the enterprise; in order to satisfy RICO, there

19  has to be two things: a person, the person being sued, and the

20  enterprise.  And all those cases are saying -- like the *King*

21  case was about extortion, that you can't commit extortion and

22  shield yourself from RICO liability by running it through a

23  company.  And that has nothing -- no application to this

24  situation at all, Your Honor.

25      And the second point I want to make is, for example, this

1    idea that Mr. Trump somehow made some admission that he knew

2    about the use of this video.  Mr. Forge turns on the video, and

3    says to Mr. Trump, "Did you say those things in order to induce

4    people to enroll in the university?"

5         He goes, "Yes."

6         Completely true statement, because he made the video in

7    '05, and there was no explanation in the questions, "By the

8    way, what I am playing you are excerpts from something that was

9    done later on in time but originally filmed back in 2004 or

10   2005."

11        So it's this kind of confusion that is sown throughout

12   this presentation, Your Honor.  And I know where the Court is

13   headed on this, but I feel very strongly that when you cut

14   through all of this, there is very little there that supports

15   the imposition of a RICO trial on a personal defendant in this

16   circumstance.  I believe this case would be unprecedented, and

17   I would believe it would be stretching the law beyond the

18   breaking point.

19        Thank you.

20            THE COURT:  Thank you.

21        So we will take that under submission.

22        And that brings us, then, to the motion for

23   decertification in case Number 13-cv-2519.  And at this point,

24   we have addressed, under the guise of the motion for summary

25   judgment, whether or not there are disputed issues of fact on a

1    number of elements relating to RICO.  But in the context of the

2    motion for decertification, the Court wants to focus on one

3    particular element, and that is causation.  And the defendants

4    had previously challenged certification on causation, arguing

5    that this element necessarily was going to involve

6    individualized determinations.  The defense relied upon *Poulos*.

7    And the Court concluded that because of the nature of the

8    alleged scheme, that there was sufficient facts to drive an

9    inference of causation.

10        One of the things that I didn't do back when we first

11   heard this motion was to, I guess, maybe dig and probe a little

12   bit further into the questions of precisely how will the trial

13   proceed as it relates to causation?  On one hand, the common

14   evidence that the plaintiffs intend to offer consists of

15   offering evidence on the statements, on their falsity, on the

16   uniformity of the statements.  But the question becomes:  How

17   will the defendant be allowed to defend against those

18   allegations, against that evidence?

19        And I am trying to figure out who I should ask first.  Let

20   me ask Mr. Petrocelli, what do you believe is, at this point,

21   the scope, the range of evidence that you should be entitled to

22   offer on this question of causation?

23            MR. PETROCELLI:  This is a very complicated question,

24   Your Honor, because it is inextricably intertwined with the

25   question of damage.  And in addition, it is directly linked to

1    whether or not the Court can adopt a class-wide, commonsense

2    presumption or inference that apply in certain cases.  I think

3    the classic example is that you buy car wax to wax your car.

4    You don't buy it for any other reason.  Turns out, there's no

5    wax.  Or you buy a hair product to make your hair grow, and

6    that's the only reason you buy it, and you are out of luck.

7             THE COURT:  I am.

8             MR. PETROCELLI:  I wasn't intending anything personal

9    by that, Your Honor.

10        You know, one time I had a case about a trademark

11   infringement case -- I am diverting now, Your Honor -- about

12   one of those hair dryers in the hotel rooms that you pick up

13   off the wall, and I was defending the company that made it.

14   And as I said to the judge, a federal judge -- I will spare his

15   name -- but I said, "When you use these things, as Your Honor

16   knows" -- and it turns out the judge was completely bald.

17            THE COURT:  He didn't know.

18            MR. PETROCELLI:  He didn't know.  And he denied my

19   motion, by the way.  In any event --

20            THE COURT:  So you haven't started out well.

21            MR. PETROCELLI:  But getting back to this, as we

22   pointed out in the brief, this is a situation where people --

23   we would call witnesses, Your Honor, to testify, as students

24   who took these courses, as to why they took the course, what

25   their interest was, what motivated them, to what degree were

1    they influenced by the Trump brand, the fact that it was

2    associated with Donald Trump, to what degree -- did you think

3    you were actually going to a real college or university, to get

4    a degree?  Did you think this was more like a business seminar?

5         We would be asking all these kinds of questions in order

6    to establish that -- even if you assumed false and/or

7    misleading representation, that they didn't cause anybody to

8    lose any money.  They didn't rely on them.  There are all kinds

9    of different reasons.

10        And I know the last time, Your Honor dealt with the *Poulos*

11   case and the *Countrywide* case, and you distinguished those

12   cases.  But we think, with the record that's now been

13   established, with the additional deposition testimony that we

14   pointed out, that there are all sorts of reasons why people

15   signed up for these courses.  Some of them had taken the online

16   course.  Some of them had read Trump materials.  Not to mention

17   the fact, Your Honor, that we would elicit from witnesses that

18   they actually sat through a 90-minute, free presentation.  It's

19   not like they had to sign on the dotted line and pay before

20   they could see what they were getting.  They got 90 minutes to

21   see what they were getting and ask questions, and every one of

22   these live events was different, with different dialogue and

23   conversation going on.  So we would be establishing that there

24   were a whole host of reasons.

25        I am sure we would be asking to decertify the case again

1    at some point at trial depending on the how the evidence came

2    out, assuming it wasn't decertified now, because this is the

3    kind of evidence that we believe would be not consistent with

4    trying to treat this case as a one-shoe-fits-all class action.

5    But that would be the sort of evidence that we would seek to

6    elicit.

7         On the damage side, we would seek to elicit the fact that,

8    even if the people were influenced by some of the Trump stuff,

9    that they are talking about, to go sign up for the course, that

10   they got tremendous to value out of it.

11        They have an expert that they are trying to put on in the

12   Cohen case, who says that -- he does an analysis -- Paul Habibi

13   is his name -- comparing it to other universities and saying

14   that essentially people got no quality education compared to a

15   real college.

16        Well, we would be putting on evidence showing the value

17   people did get relative to other business seminars, other

18   market-based seminars that are out there that compete with this

19   one on real estate matters.

20             THE COURT:  One second, Mr. Petrocelli.  (Pause.)

21        All right, Mr. Petrocelli.

22             MR. PETROCELLI:  I am not sure I am being totally

23   responsive to Your Honor, but I am trying to give Your Honor a

24   sense of the kind of evidence that we would seek to elicit and

25   why we would seek to do so.  It would show that people didn't

1    rely -- there was no causation, which is a central requirement

2    of RICO, and also that they weren't damaged because you have to

3    suffer a property damage.  RICO doesn't cover, of course,

4    personal injury, but it covers property damage, and the

5    property damage has to be valued by the difference of what you

6    paid versus what you received, what you got.  So we would have

7    to get into all of those issues, just like in the Low case.

8         THE COURT:  All right.  So at this time, let me hear

9    from Mr. Forge, and let me have you -- or Ms. Jensen, and have

10   you respond to this assertion that the defendants would be

11   entitled to offer these individuals to testify, these

12   individual class members to testify regarding what motivated

13   them to sign up for Trump University.

14        MS. JENSEN:  Yes, Your Honor.

15      Your Honor already, we believe, addressed this issue in

16   the class certification order that was issued on October 27,

17   2014.  And after the Court went through its analysis on *Poulos*

18   and why *Poulos* was not applicable to this case, the Court

19   concluded that the plaintiff had produced enough evidence of

20   the uniform marketing of the misrepresentations such that the

21   commonsense link was appropriate in this case.

22      And then the Court went on -- and this is page 15 of the

23   order -- and recited that at the class certification hearing

24   the defendant had argued pretty much what Mr. Petrocelli just

25   argued, which was that their defense would require

1    individualized inquiries into reliance; again, what did they

2    think was important?  Why did they purchase?  And so on.

3         And the Court found the argument unpersuasive, finding

4    that an inference of reliance is appropriate and may only be

5    rebutted by evidence that can be properly generalized to the

6    case as a whole.  And Your Honor cited to a number of cases

7    that have held on this issue that the defense does need to

8    limit its rebuttal evidence to what can be generalized to the

9    class as a whole.

10        And the rationale behind that makes perfect sense, Your

11   Honor, because otherwise, it really would up-end the class

12   action device.

13        Your Honor, in certifying the class, in appointing

14   Mr. Cohen as the class representative, took the time and

15   effort -- as did the parties in briefing the matter -- to

16   ensure that Mr. Cohen was a typical class member, that Art

17   Cohen was an adequate class representative, and so he met the

18   criteria of Rule 23 in order to be a class representative in

19   this case.

20        We consider, for purposes of the class action trial, that

21   Mr. Cohen of course would be subject to cross-examination as to

22   what was important to him.  Did he believe that Mr. Trump was

23   going to deliver on his promise of being integrally involved?

24   Did he believe that it was a legitimate university?  Did he

25   know about the NYSED warning that it was illegal to call it a

1    university?  And so on.

2        Of course, the defendant will be able to vigorously

3    cross-examine him on those matters.  But for the defense to

4    suggest that they can trot up a few handful of former students

5    who may or may not be class members, may be opt-outs, may have

6    attended Trump Entrepreneur Initiative instead of Trump

7    University -- that they could trot out those people and ask

8    them questions when they are statistically insignificant and

9    haven't been vetted by this Court we think would be an improper

10   way to rebut this presumption under both the law of the case --

11   Your Honor's class certification order -- and the cases upon

12   which this Court relied.

13           THE COURT:  All right.  Well, Judge McKeown, in

14   *Poulos*, addressed the plaintiff's arguments seeking to connect

15   the dots between the alleged deception and causation, and Judge

16   McKeown addressed the argument that a presumption should be

17   afforded.  And the court found that, to that point,

18   presumptions had been limited to securities cases, and the

19   court wasn't prepared in that particular case, of *Poulos*, to

20   find that a presumption was appropriate.

21       And then next, with respect to inference, the court held

22   that its view was essentially that inference and a presumption

23   were one and the same.

24       What is your view with respect to the difference between a

25   presumption and inference, and if there is a difference,

1    whether or not that affects the Court's analysis?

2         MS. JENSEN:  Certainly, Your Honor.  We have debated

3    that internally as well because the cases, as Your Honor

4    suggests, aren't always entirely clear and sometimes use those

5    terms interchangeably.

6         The presumption does appear to be something that would

7    arise and that they could rebut, versus an inference is

8    something the Court or the jury could use to infer, not

9    necessarily with the burden going back and forth.  But I have

10   to confess, Your Honor, that I don't think the case law has

11   been entirely clear on that.

12        But I would say, based on your class certification order,

13   and the law upon which it relies, I think does indicate that it

14   is something that the defendants could come back and rebut,

15   with some constraints on what that would look like in order for

16   an orderly class action trial to proceed.

17        THE COURT:  And part of what troubles or confounds us

18   is that we are talking about anticipating how a class action

19   trial would actually be tried because so few of us, if any of

20   us, have ever had a class action trial.  And as much as I am

21   sure all of us have researched the law to identify what class

22   action trials have gone to trial and how they did it, there are

23   very few.  And so at the same time, this Court is told that it

24   has to look at how this case will unfold by looking at the

25   elements, by looking at the common proof, by looking at what

1    the defenses will be, and then within that outline, then

2    identify, "Okay.  All right.  So what will the evidence be?"

3    And to the extent that the evidence will be a certain thing,

4    well, now we have individualized determinations overwhelm the

5    case and so that we don't have predominance.

6         And so I went back and I read *Iorio v. Allianz* and

7    *Plascencia v. Lending 1st*.  And I know that a lot of times,

8    when we are looking at these cases, we are looking at cases

9    that themselves may not have been a RICO case, but they were a

10   state fraud case, so there was an inference applied in that

11   particular case, and it is not clear how it will be contested

12   or offset.

13        To the extent there is this language that the presumption

14   can only be rebutted on a class-wide basis, that is, the

15   evidence that can be properly generalized to the class as a

16   whole, can you think of any such evidence that could be

17   available in this case?

18        MS. JENSEN:  Certainly, Your Honor.  There are

19   experts in this Cohen matter.  And for instance, the

20   plaintiffs' expert has conducted a consumer survey that asks

21   consumers what was -- sorry -- did these particular

22   representations -- were they important to you?  And the results

23   were overwhelming; close to 90 percent said that these

24   representations impacted their decision to enroll.  That's the

25   type of evidence that would be objective and would be properly

1    generalized.

2         Now, the defendants also have their experts, and I know we

3    are going to be hearing about whether the experts will be

4    allowed to testify.  But certainly, that's one area.

5         And then also, I think the Court, although I can't -- I

6    can't read into what the Court was thinking, it seems that

7    these decisions are oftentimes also about the advertising.

8    Right?  So, in other words, whether it predominantly or

9    prominently features these representations.  The courts look at

10   that and say consumers are entitled to rely.  So it really can

11   be also shown through the defendants' advertising campaign as

12   well.

13            THE COURT:  All right.  And I think it was in *Iorio*

14   where Judge Wilkins identified the type of evidence that could

15   be relied upon by the defendant, and one was to cross-examine

16   the plaintiff and second was to, I guess, take on the basis for

17   the presumption itself; that is, show that the statements

18   weren't material and to assert that the statements weren't

19   uniformly made.  And so that was, I guess, another form of

20   evidence that the defendants were recognized to have available

21   to themselves to challenge these inferences.

22        Mr. Petrocelli?

23            MR. PETROCELLI:  Just briefly, Your Honor.  I

24   appreciate that all of us are in the same boat, trying to play

25   out how a class action trial would look.  But the reason we

1    brought this motion now for decertification is because we

2    think, based on the current record and based on the evidence

3    that we submitted, where you have the students who testified so

4    far saying that they enrolled in Trump University because of

5    interest in real estate, interest in business seminars,

6    opportunity for networking, quality of the program compared to

7    others, uncertainty in the real estate market, so forth; that

8    there isn't a single logical explanation which is what drove

9    the decision in cases like *Poulos*, where the only logical

10   explanation for such behavior that the class members relied on

11   defendant's representation.

12          THE COURT:  And I am not sure if that would be the

13   correct pronouncement of law or observation, that it has to be

14   the only, the one and only, versus a significant or

15   substantial --

16          MR. PETROCELLI:  Well, remember, the consequence, the

17   consequence of that proposition is drastic because RICO

18   requires causation, and whether you call it reliance or

19   whatever --

20          THE COURT:  But it talks about proximate cause,

21   correct?

22          MR. PETROCELLI:  Right.  But the statute says "by

23   reason of," and that means that you were damaged by reason of

24   this conduct.

25      And we are talking about extending this on a class basis,

1   where we are being prohibited from challenging whether people

2   were damaged by reason of this conduct, in a situation where

3   even their own expert -- even he says 10 percent.  And the

4   record shows that there's multiple reasons why people enrolled

5   in this class.

6        So there isn't a single, unifying, predominant -- even if

7   you wanted to say principal purpose, which is not what triggers

8   the presumption here; the presumption can only be triggered

9   when there's really no other option, like in my car wax

10  situation or the hair situation.  That's when the presumption

11  is available, not in a case like this, when there are a variety

12  of reasons that impel a person to sign up and stay in the

13  course.

14          THE COURT:  As far as Judge Wilkins' view that once

15  there is a presumption of reliance, it can only be rebutted by

16  class-wide type of evidence, how do you respond to that?

17          MR. PETROCELLI:  Well, that would be -- that would be

18  bad news for us.  It would put us in a real bind, Your Honor.

19  I think we'd to have to almost rely just on expert testimony.

20          THE COURT:  Do you have an expert at this point?

21          MR. PETROCELLI:  We do.  That is not my part of the

22  case, but we do.

23          THE COURT:  That would testify with respect to the

24  fact that, in this case, these representations were --

25          MR. PETROCELLI:  Can Mr. Kirman address that?

1          THE COURT:  We are going to move on to the experts in

2     a moment.

3          MR. PETROCELLI:  Is the answer yes?

4          MR. KIRMAN:  Yes.

5          MR. PETROCELLI:  The answer is yes.

6          THE COURT:  Okay.  Okay.

7     And is it an expert other than one of the experts that's

8     referenced in the motions?

9          MR. PETROCELLI:  No.

10         THE COURT:  It's a different expert?

11         MR. PETROCELLI:  No.  It's one of the experts.

12         THE COURT:  It is one of the experts.  Okay.  All

13    right.

14    So then at this time, we will take this issue under

15    submission as well and then move on to the remaining motions

16    that focus on experts and --

17         MR. PETROCELLI:  Your Honor, before I sit down --

18    because I am not on the expert motions -- I am not going to

19    argue it because you didn't invite argument, but I would ask

20    the Court to take a close look on the statute of limitation

21    issue given that this case can only go back to 2009 and there's

22    so much evidence before then, Your Honor.

23         THE COURT:  And I have looked at that closely, and it

24    seems to me that, as far as the type of evidence that the

25    defendants are relying upon as constituting the means of

1    showing the class members, that there was this cause of action,

2    that it's pretty much uniform.  It's common evidence.  And so I

3    am currently of the view that the statute of limitations is

4    something that could be addressed on a class-wide basis.

5        If you wish to be heard on that, I am happy to entertain

6    further argument.

7            MR. PETROCELLI:  Well, Your Honor, there are a number

8    of specific examples that we gave when people read various

9    things on posts, when people wrote various letters.  Now, there

10   are some newspaper articles and some public -- remember that

11   virtually all of this class is pre October 2009, and anything

12   before then is barred by the statute.

13           THE COURT:  And here is my concern or problem with

14   what's been tendered in terms of a number of letters, of people

15   complaining, that there doesn't seem to be a lining up of what

16   they were complaining about and then what this case is about.

17       Let me give you an example.  There were a certain number

18   of people that were complaining about mentorships.  There were

19   people that complained about how, when this seminar was sold,

20   they were told that their son, who was in college, could

21   complete the course materials in six to eight hours a month,

22   when in fact it took many more hours.

23       To the extent that those are the complaints, it doesn't

24   seem to me that places somebody on notice that, "Hey, not for

25   nothing, but there's a potential RICO case here; there's a

1    potential based upon misrepresentations by Mr. Trump as to

2    whether or not he had an integral role in the running of Trump

3    University or whether or not these representation about how he

4    appointed or selected instructors was true or not." So that's

5    my problem is that these letters that you have referenced --

6    they don't seem to line up with what this case is about.

7            MR. PETROCELLI:  Okay, Your Honor.  Well, there's

8    quite a bit of it acknowledging folks knew they weren't going

9    to some university, for example, all before 2009, and that's

10   one of the key things they are relying on in this case, and

11   there's no record of it there.

12           THE COURT:  In terms of -- well, and I guess with

13   respect to people at a deposition testifying that "When I took

14   this course, I knew it wasn't a university," I don't think it

15   is a matter that they knew because they had researched it

16   versus that, in their mind, their knowledge or their

17   expectation was that this wasn't a true university because they

18   perhaps hadn't applied for admission, because of the fact that

19   this education was being provided in a hotel; that, given those

20   factors, that they, in their mind, concluded that, "Well, this

21   isn't a real university," versus actually knowing because they

22   investigated and determined that in New York they had already

23   been dinged or had been called out for representing themselves

24   as a university.

25           MR. PETROCELLI:  Well, I don't believe the law would

1  require that they would have to know a specific piece of

2  evidence like that.  Their contention is that this was billed

3  as some university, and as Your Honor is pointing out from some

4  of the evidence in the record, people knew immediately that it

5  wasn't a real university, that it was a business seminar.  They

6  didn't need to know about a licensing issue in New York in

7  order to have knowledge to trigger the accrual of the statute.

8         THE COURT:  Thank you.

9     So, I will be frank.  I haven't read all of the materials

10 with respect to the experts.  There's -- if not thousands of

11 pages, there's hundreds of pages of materials, and I endeavored

12 to read all of the points and authorities.  I have reviewed in

13 its entirety the declaration of Michael Kamins.  And my initial

14 thoughts with respect to Mr. Kamins is -- he has four opinions.

15 I believe he should be entitled to testify on the issue of what

16 the 98 percent approval means.  I think he should be entitled

17 to testify regarding the marketing of Trump University, how it

18 was put together and how it relied upon Mr. Trump and relied

19 upon these connections to his integral involvement, to his

20 hand-selection of instructors.

21    There's also an opinion that's based on a survey.  I

22 haven't looked very, very closely at that.  I have read it as

23 far as what is being offered.  But I think that, with surveys,

24 that's the most technical aspect here and the one that's

25 perhaps most subject to an attack for the methodologies that

1    were employed.  So I am prepared to look at that a little bit

2    closer.  And given that this is an issue that ultimately I

3    don't think has to be addressed for purposes of the pending

4    motions, I don't believe -- but you can correct me if I'm

5    wrong -- the Court is considering deferring a ruling on this

6    until the motions in limine.  But I am going to look at all of

7    these expert motions following this hearing, and it may be that

8    we rule on one or more.

9        With respect to Habibi, I have some concerns regarding the

10   relevance of a portion of the opinions, the need for this

11   side-by-side comparison between Trump University and Wharton

12   School of Business.  It seems to me that some of this could

13   create a mini trial.  It could confuse the issues.

14       Because ultimately, as it relates to Trump University, the

15   question isn't so much the quality of the program that was

16   provided versus the misrepresentation that this was in fact

17   either accredited or that it was operated like a university,

18   that it was misrepresented, and that it was a material

19   misrepresentation.

20       Although, having said that, I think the jury would be

21   entitled to have evidence regarding, kind of, the overall

22   nature of the education so that they would be able to determine

23   that the education provided in this case was not university

24   grade but without getting too bogged down in describing all of

25   the various differences.

1       So those are my thoughts at this point.  Let me begin by

2   allowing the defense to address their motion to exclude the

3   opinions and testimony of Michael Kamins.

4           MR. KIRMAN:  Thank you, Your Honor.

5       Your Honor, Michael Kamins was put forward by the

6   plaintiff in this case to establish materiality, and the

7   primary purpose of his testimony, which was the point that you

8   mentioned last, was the materiality survey that he offers to

9   prove that the plaintiffs relied -- that the defendant's

10  statements were material.  And he goes forward and puts forward

11  this survey.  As a survey expert, the Ninth Circuit is very

12  clear that he needs to follow the accepted principles of a

13  survey.

14      And Your Honor, the defendants submit that he didn't

15  follow any accepted principles, starting with the most basic,

16  which is trying to determine the effect of the alleged

17  misrepresentations on the students.  And to do that, Your

18  Honor, you need a control group.  You need to have one survey

19  that contains the representation that Mr. Trump hand-picked the

20  students and another one that says Jane Doe hand-picked the

21  students -- the experts, or just plain experts, to determine

22  whether or not the actual certified misrepresentation in this

23  case caused people to purchase.  And Mr. Kamins failed to do

24  that.

25          And interestingly, Your Honor --

1          THE COURT:  Let me ask you, with respect to what the

2    Ninth Circuit has said as far as following accepted principles

3    or methodologies, is there a particular case where the Ninth

4    Circuit found that the lack of a control group was fatal for

5    purposes of an expert's opinion?

6          MR. KIRMAN:  Your Honor -- a Ninth Circuit case, no.

7    But there are many district court cases that exclude on this

8    very basis.  For example, Mr. Kamins himself was excluded in

9    this *Munchkin* case, in the Central District of California, by

10   Judge Matz, because he was trying to determine the effect of

11   the marketing of a diaper pail in one way against the other.

12   And Judge Matz said you can't determine the cause without a

13   control group, and yet, Mr. Kamins did the exact same thing

14   here.

15        But, Your Honor, that's not the only lack of accepted

16   principles.  The next thing is target universe.  This is 101 of

17   surveys.  Even if you are asking the right questions, if you

18   are not asking them to the right people, your survey is not

19   going to be reliable.

20        In this case, Mr. Kamins surveyed anybody who was over the

21   age of 21 that hadn't heard of Trump University.  But in fact,

22   Trump University didn't market to the entire universe; it

23   focused on people who had a prior interest in entrepreneurship

24   and business seminars, and it did that by buying mailing lists

25   and sending mailers to those targeted populations.

1   And Your Honor, there are multiple cases that have

2   excluded a survey on this basis alone.  One of them, in the

3   Central District, *Kournikova v. General Media* case, where a

4   woman's picture was used in a magazine with her name, but it

5   didn't turn out to be her, and the general public was surveyed

6   whether or not that picture caused confusion.  And the court

7   said, "Well, the general public might have been confused, but

8   the readers of that magazine might not have."  And on that

9   basis, Your Honor, that survey was excluded.

10   In the *Skecher* case, a survey related to tennis shoes.

11   These particular tennis shoes were directed more for women than

12   for men, but the survey included both women and men, and it

13   also focused on athletes, where the footwear was more for

14   fashion footwear.  And on that ground, Your Honor, again, the

15   Central District Court excluded.

16   So there are many, many cases that find that the wrong

17   target universe, in and of itself, is sufficient.

18   There's a third reason, Your Honor, which is that the

19   survey was completely out of context.

20   What Mr. Kamins does is he showed the survey individuals a

21   copy of an ad and a short TV clip.  Well, that's not what

22   happened at Trump University, Your Honor.  They might have seen

23   an advertisement and seen a TV clip, but then they came in, and

24   they received a free 90-minute seminar.  And it's on that

25   universe of information that the students would, generally,

1    ultimately make their buying decision.  Mr. Kamins didn't

2    provide that context.  And in fact, a court in the Northern

3    District of Illinois -- called *Sears* -- excluded his testimony

4    for the very same reason.  In that case, instead of showing an

5    entire Sears commercial, Mr. Kamins showed an excerpt.  And

6    that, too, Your Honor, was sufficient.

7        Other aspects of the context are also at issue here.  For

8    example, Your Honor, at the time these ads were shown, the

9    country was in the midst of a real estate crisis.  People were

10   paying far more attention to foreclosures, and people were

11   paying far less attention to Mr. Trump, who, as we all know,

12   has risen in prominence.  So when he asks a group of people in

13   2016 whether or not Mr. Trump is more important in this ad, he

14   is going to get a different answer than he would have in 2008

15   or 2009.

16       In addition, Your Honor --

17           THE COURT:  Although, is there anything, then, that

18   one could do to regulate or somehow or another be able to

19   address this matter that, "Well, Mr. Trump is now more famous

20   than he ever has been"?  And I guess that's true, but at the

21   same time, does that mean we would never be able to have any

22   surveys?  Because at this point, now, we are six years or eight

23   years past the time when these students were exposed to these

24   materials.

25           MR. KIRMAN:  Your Honor, I think, yes, there is.

1   Number one, he could have tried to build the context as much as

2   he could.  Show all the ads, go through a 90-minute free

3   preview, and then, for example, ask them whether or not this

4   would have influenced their decision making in 2008.  He could

5   have said 2008, 2009, 2010.  There's a number of things he

6   could have done.  The point here is, Your Honor, he didn't even

7   try.  He didn't even make an effort to meet these minimum

8   accepted principles.

9       He also created a demand effect, Your Honor, which is

10  something where he is suggesting to the individuals who are

11  surveyed the answers.  He shows an ad prominently featuring

12  Mr. Trump and then asked, "Hey, did Mr. Trump influence your

13  buying decision?"  He didn't try to hide what he was looking

14  for.

15      He could have said, "Does the word 'foreclosure' impact

16  your buying decision?  Does the word 'free' impact your buying

17  decision?"  He have could have asked multiple questions in the

18  survey, but yet, contrary to even the most basic principles, he

19  suggests the answer.  There is only one question and one

20  answer.

21          THE COURT:  Isn't that, by the way, the same argument

22  that plaintiffs have used to challenge the 98 percent approval

23  rating, that there were suggestive questions posed?  And then

24  doesn't the defendant seek to defend those questions, but here,

25  they are taking kind of an opposite tack?

1          MR. KIRMAN:  I think it is a little bit different.

2     They take issue with the way the questions were phrased, Your

3     Honor, in the sense that they are phrased in a way to elicit

4     what they claim is a positive answer.

5          But the defendants submit that those surveys were for

6     internal purposes, and when they were created, they were

7     created for quality control.  So what was being solicited

8     was -- Trump University wanted the truth and they wanted to

9     discover people that were dissatisfied so they could improve

10     their programming over time.

11          And, you know, those surveys weren't put together for

12     litigation.  They are evidence that the defendants intend to

13     use, but they weren't litigation-driven surveys in this case.

14          THE COURT:  All right.

15          MR. KIRMAN:  One other really important point, Your

16     Honor, is the defendants don't have the vast majority of the

17     survey that Mr. Kamins put together.  He hired somebody else to

18     do the survey, and they offered a survey out and said, "Are you

19     likely to enroll in a real estate investing seminar if it's

20     close to your house?"  And yada, yada, yada.

21          He -- there was a scale of one to ten that the individuals

22     could answer, and what he did is he didn't even consider one

23     through six.  He only took seven through ten.  126 people.  He

24     doesn't even know how many people might not have been

25     interested.  The defendants don't know.  He doesn't have the

1   raw data.

2       And this point is crucial because not only does Rule 26

3   require that the plaintiffs disclose all the raw data from the

4   survey, but it also avoided a problem that Mr. Kamins has been

5   having with the surveys; that when there's too many "I don't

6   know" answers, courts are disinclined to admit.  So what he did

7   is he eliminated the range of potential answers four through

8   six, which are sometimes interpreted as neutral, or "I don't

9   know," and he avoided us being able to make the argument that

10  the survey was flawed because of the "I don't know" answers.

11      And he was actually excluded on that basis in a case in

12  the Northern District of Texas, *Cottonwood v. Cash Store*, which

13  was excluded based on "I don't know" answers.

14      So, Your Honor, I think certainly --

15          THE COURT:  Let me see if I understand what you are

16  saying.

17      So there were individuals who were asked about their

18  interest in this program, and they gave a score of one through

19  six -- one through ten.  But as far as the survey moving

20  forward, the survey was only then completely given to those

21  that gave a score between seven and ten?

22          MR. KIRMAN:  Or six to ten.  Yes, Your Honor.

23  Exactly.

24          THE COURT:  As to the one through six, they didn't

25  say "I don't know," versus the level of interest that they

1   demonstrated was, in the eye of the survey provider, such that

2   they wouldn't be properly within the target universe?

3           MR. KIRMAN:  Your Honor, we don't know because

4   Mr. Kamins doesn't know.

5       Another issue is he didn't have control over the survey.

6   He essentially outsourced.  We don't know how many "I don't

7   knows" or neutral --

8           THE COURT:  It doesn't sound to me like these people

9   were saying "I don't know" versus they gave their level of

10  interest to the survey takers and that, ultimately, because of

11  the methodology that was applied by the survey takers, that

12  they ultimately determined that, for their purposes, the target

13  universe should be comprised of individuals who expressed

14  interest of seven to ten.  Because otherwise, you would end up

15  having a target universe that was made up of people that would

16  not look like, act like, or be like the individuals who showed

17  interest in Trump University.

18          MR. KIRMAN:  Your Honor, it wasn't showing interest

19  in Trump University.  It was more general than that.

20      But sometimes, the way the numbers are laid out, one

21  through four is "not interested"; five through seven is "I

22  don't know," or "possibly interested"; and seven through ten is

23  "would be interested."  So there is a step to take between the

24  *Cottonwood* case, where the answers were truly "I don't know,"

25  to the number scale.  But it is the same general principle.

1       And Your Honor, I would also say any one of these would be

2  enough from the defendants' perspective to exclude the survey,

3  but certainly, cumulatively, it's really junk science.  It's

4  really unreliable, and it should not be admitted at trial.

5       So Your Honor, moving on to the other issues that you

6  raised -- and you started with the 98 percent approval rating.

7  Your Honor, there's nothing expert that Dr. Kamins did with

8  respect to the 98 percent.  First of all, with respect to all

9  of these other opinions -- and this is unprecedented.

10  Dr. Kamins assumed all of the allegations in the complaint are

11  true, and he relied on those allegations.

12       Keeping in mind sometimes damages experts are allowed to

13  do that, so damages experts will assume liability is

14  established; if that liability is established, then this is

15  what the damages are, so they don't to have go back to the

16  damages.

17       But here, part of the allegation that he assumed was that

18  the material mis-reps were material.  He assumed the very truth

19  of the thing he was being asked to opine on.

20       So when you look at the rest of his opinions, they are

21  extremely unreliable on that basis, and I submit really they

22  are not expert testimony at all.

23            THE COURT:  So what should he have done with respect

24  to these allegations?  Should he have conducted an

25  investigation?  Should he have given an independent view of

1  whether or not he believes the allegations are well-founded?

2        MR. KIRMAN:  Your Honor, that's a great point.  He

3  should do what every other expert does and review the evidence.

4        THE COURT:  He did say that he reviewed --

5        MR. KIRMAN:  He reviewed some evidence, but he

6  reviewed it all with a skewed eye as a result of also assuming

7  the truth of the very thing he was asked to opine on.

8        THE COURT:  At the beginning of his declaration,

9  doesn't he just put front and center that, "I have reviewed

10  these various materials, and for purposes of my opinion, I have

11  accepted as true the allegations contained within the

12  complaint"?  He puts that right out there.

13        MR. KIRMAN:  He does, Your Honor.  It is astonishing.

14  I am aware of -- and I have looked -- no case, other than for a

15  damages expert, where somebody is opining on an element of the

16  offense, other than damages, where they would assume the

17  allegations are true.

18        THE COURT:  But it seems to me that, at the end of

19  the day, to the extent he has accepted these allegations and

20  then the evidence doesn't support those allegations, that at

21  that point the expert has basically thrown himself out of

22  consideration because it's founded upon something that the jury

23  has expressly rejected.

24        MR. KIRMAN:  I think it should prohibit him from

25  testifying in this case because some of the points that he

1    makes -- he actually cites to the complaint as evidence.  It's

2    unprecedented other than in the damages field.

3         Your Honor, I just say that as a preface to the other

4    points because the first point that Your Honor mentioned is the

5    98 percent that he calls into question.  But if Your Honor

6    looks at what he actually says, he is just making arguments

7    that would more properly be made in closing.  He is not

8    performing any expert function.

9         So for example, if we just go briefly to the actual

10   criticisms of the 98 percent, the first one -- the example is

11   there's a refund rate.  Well, Your Honor, I would expect an

12   expert isn't necessary for the defendants to be able to argue

13   that the 98 percent needs to be viewed in light of the refund

14   rate.  Mr. Kamins is adding nothing to that.

15        That they were anonymous.  Again, what expert function --

16   to the extent -- and by the way, Your Honor, the defendants

17   disagree with, actually, his factual predicates on all of

18   these.  But just assuming that they are true, assuming that it

19   is anonymous, that is something that the plaintiffs are very

20   capable of arguing as a fact to undermine the 98 percent.

21   There's nothing expert to it.

22             THE COURT:  I would tend to agree with you, that to

23   the extent that there were any number of refunds that were

24   obtained and people fell out of the pool of students by virtue

25   of requesting refunds, that that on its face would be apparent

1    to the jury and the jury may not need an expert to tell them

2    that that's of consequence.

3        But with respect to anonymity and what effect, if

4    anything, that would have on the accuracy of the surveys, it

5    seems to me that someone who has a background in marketing

6    would have additional knowledge as it relates to how you end up

7    administering a survey.

8        MR. KIRMAN:  Your Honor, I think that is such a

9    commonsense point, that people are more likely to be honest in

10   a survey if their name is not connected to it than if they have

11   to put their name on it.  He is adding nothing to that.

12       But if you go through the other points, one is that

13   there's 10,000 surveys but only 7600 paying customers, so he's

14   trying to suggest some of these were made up.  But in reality,

15   Trump University offered students who paid to bring somebody

16   for free.  So you know, there's factual explanations for all

17   these things and arguments that can be made.

18       For example, one of the things is these surveys shouldn't

19   have been given after the close of the class; they should have

20   been given three years from now, after people had a chance to

21   assess the worth and the techniques that they learned.

22       Again, nothing expert about that.  The facts are all

23   there.  He's -- just as he assumed the allegations in the

24   complaint, he is just making arguments in the guise of expert

25   testimony, and he is not bringing anything to the table here.

1        Had he done a survey appropriately, then there is some

2   sense that he is bringing to bear his knowledge, his expertise,

3   and applying it to the facts of the case.  But here, he is just

4   pulling facts out of discovery, drawing a legal conclusion that

5   they are not reliable, and the defendant would submit that

6   that's just not real expert testimony.

7        Then again, just as he failed to produce the underlying

8   data in his survey, he also failed to produce the data on which

9   surveys he actually reviewed.  He didn't state in his report

10  which surveys he looked at.

11       At his deposition, he admitted he actually went to the

12  98 percent website, which is Mr. Trump's website that has

13  blacked-out versions of all these.  But he didn't record how

14  many he looked at, which ones he looked at, and so the

15  defendants really have no ability to challenge his views on

16  these things because he didn't produce the data.

17       And I think there's a district court case, *Rinehart*

18  *Racing*, where this type of evidence was excluded for this very

19  reason.

20       And if Your Honor doesn't have any more questions on the

21  98 percent, I will move on to the other points.

22            THE COURT:  All right.

23            MR. KIRMAN:  Same main principle with this thing that

24  Mr. Trump targeted his biggest fans.  The defendants dispute

25  that fact.  It is the Trump brand, but Trump University was

1    targeting people that were interested in business seminars and

2    entrepreneurship, who wanted to make money.  But that aside, to

3    the extent that he is deriving that information from the ads

4    themselves, that is a jury question.  They could look at the

5    ads.  He is not adding any sort of expertise to the analysis on

6    that point.

7        So there is -- the last issue, he tries to make an expert

8    opinion, but as I will explain, the defendants submit that it's

9    insufficient.

10       So the one area, aside from the survey, where he does try

11   to make an expert opinion is this thing called the System 1

12   versus System 2 processing, and his basic point is that Trump

13   University encouraged people to make quick, emotional decisions

14   to buy its product.  So there's two types of selling.  One is

15   you want people to just make a gut reaction.  If you are at the

16   checkout at the grocery store, and there's gum there, you don't

17   really think about it; you just grab it.  Or there's a

18   magazine.  And then there's System 2, where people are more

19   deliberate and think about it and make a decision.

20       And his premise there, as he runs through the survey, is

21   that System 1 is this type of analysis, and then they says,

22   "And Trump University encouraged System 1-level thinking."  But

23   he does no analysis to tie this theory, which actually would be

24   or could be actually expert opinion, to the facts of this case.

25       And for example, there is no quick decision making going

1    on here.  Trump University is giving people a free 90-minute

2    seminar.  And then, if they do buy something, they have up to

3    through the first day of class to refund -- or before they go

4    to the first day of class, which could be weeks later, to make

5    a refund.

6        So to the extent there is a gut reaction, it is

7    neutralized by these extensive periods.  And Mr. Kamins doesn't

8    try to tie these legal theories to the facts of the case.

9            THE COURT:  Let me ask you about something you just

10   said.  You said that if they ended up buying and decided to

11   essentially opt out before attending the class, even if that

12   was weeks later, they were entitled to do that?

13           MR. KIRMAN:  Your Honor, they could get a full

14   refund.  So typically, somebody would go to the free preview,

15   90-minutes, and they would buy a three-day foreclosure seminar.

16   They were entitled to a full refund up to the first full day of

17   the actual seminar.

18           THE COURT:  Did I read somewhere that there was some

19   reference to three days to opt out, or is that something

20   different?

21           MR. KIRMAN:  Your Honor, there might have been some

22   variations in it.  The point being, whether it's three days or

23   through the first day of the seminar, this isn't something

24   where there's a gut reaction and you don't have a chance to go

25   back and reflect and return it.

1    And so Mr. Kamins, while he does lay out a theory that

2    could be expert opinion, he really struggles to tie it to the

3    facts of the case.

4        Again, Your Honor, I think there's a case out of the Tenth

5    Circuit, the *Heer* case, where somebody was injured by a step

6    stool.  And an expert, who was a mechanical engineer, was

7    retained, and kind of laid out the principles of the mechanical

8    aspects of the stool, but they didn't apply the principles to

9    the facts of the case, and as a result, it was found to not be

10   applicable.

11       Really, just to summarize Mr. Kamins, Your Honor, I think

12   the survey -- really unreliable.  Two of the three other

13   opinions really don't add anything of expert quality.  And then

14   the only one that he does really, kind of, doesn't address the

15   core issues and isn't tied enough to the facts of the case to

16   be relevant.

17            THE COURT:  Thank you.

18       And who will speak for the plaintiff?

19            MR. PFEFFERBAUM:  Good afternoon, Your Honor.  Dan

20   Pfefferbaum, Your Honor, from Robbins Geller, for plaintiffs.

21            THE COURT:  Mr. Pfefferbaum.

22            MR. PFEFFERBAUM:  While we heard pretty much the

23   entirety of defendants' *Daubert* motion against Mr. Kamins, I

24   would like to start with the issues Mr. Kamins didn't produce

25   the data for his survey simply because it's such a -- it's an

1    argument they have been making that I think has no credibility

2    whatsoever.

3        Mr. Kamins surveyed people, adults over the age of 21, as

4    part of his materiality survey, and he had some small

5    carve-outs for people that had heard of Trump University,

6    people who worked for polling companies.  Those carve-outs are

7    undisputed.

8        He then showed those people an ad from Trump University as

9    it appeared in a newspaper.  He also showed them the full

10   two-and-a-half-minute main promotional video.  I think

11   Mr. Kirman referred to it as a television ad or something.

12   That is the main promotional video shown at the start of all

13   the previews.

14       People were then asked, "If Trump University was holding a

15   course close to your home and offered to pay for itself

16   quickly, how likely would you be to attend?"  And it asked

17   people to rate their likelihood of attendance on a scale of one

18   to nine.

19       The only people that were allowed to participate in the

20   survey were those that answered six, seven, eight or nine.  And

21   we keep hearing from defendants that there's all of this data

22   that hasn't been produced.  The people that recorded one to

23   five did not participate in the survey.  There is no data.

24   They didn't answer the questions.

25       We don't know what influenced their decision

1   because -- well, frankly, if we included them in the survey, we

2   would be hearing from defendants, "You included people in the

3   survey that aren't interested in attending Trump University."

4          Defendant got all the data on the 126 people.  He knows

5   how they answered.  There's nothing to -- Dr. Kamins isn't

6   hiding data.  The polling company that was used didn't fail to

7   turn over data.  Everyone that answered the questions that make

8   up the survey in his report, that data has been produced.

9          THE COURT:  How do you respond to the argument that

10  your experts failed to follow accepted principles, specifically

11  as they relate to the need for a control group?

12         MR. PFEFFERBAUM:  Certainly, Your Honor.

13         Dr. Kamins performed a survey to assess materiality, and

14  defendants' brief refuses to accept the distinctions between a

15  survey that looks at causation and a survey that looks at

16  materiality.

17         And in situations where you are looking at causation,

18  that's typically in a consumer confusion case.  Those are

19  typically trademark cases that are brought under the Lanham

20  Act.  Those cases often require follow-up questions because the

21  relevant issue isn't just is there consumer confusion about the

22  product, but why is there consumer confusion, and what is

23  causing that consumer confusion.

24         Here, this is a materiality survey.  The question is did

25  the opportunity to learn from Trump's hand-picked professors

1   and to learn his techniques and secrets have a positive impact,

2   a negative impact, or no impact at all.  There may have been

3   other things which impacted students' decision to enroll, but

4   Mr. Kamins is looking only at this issue.  And if the

5   opportunity to make money also influenced students, that would

6   not detract from the materiality of the representations that

7   were studied in this case.

8        And I would really -- I would stress this, because

9   defendants cite "The Reference Guide on Survey Research," by

10  Shari Diamond.  It is cited in their brief.  I will read to you

11  from a section they cite.  The heading, Section F, page 397, is

12  "If the survey was designed to test a causal proposition, did

13  the survey include an appropriate control group or question?"

14       And so in other words, the use of a control is only

15  necessary where you are doing a survey that's looking at a

16  causal connection.

17       Now, further, I would -- we have provide the Court with

18  multiple cases in which the lack of a control group is not --

19  is considered an issue that goes to weight and not

20  admissibility.  And I believe, Your Honor, one of those cases

21  was actually affirmed by the Ninth Circuit.  That was the

22  *Mattel v. MCA Records* case.  Also, the *Moroccanoil v. Marc*

23  *Anthony Cosmetics*, 2015 District Lexis 184585.  That case also

24  looks at a survey that did not have a control and found that an

25  omission of a control goes to weight and not admissibility of a

1    survey.

2            THE COURT:  And how do you respond to the assertion

3    that there was something fundamentally wrong with this

4    declaration given that there's just been a wholesale embracing

5    of all of the allegations contained within the complaint?

6            MR. PFEFFERBAUM:  Your Honor, we provided the Court

7    with a number of cases in which experts have assumed certain

8    allegations for purposes of drafting their reports or forming

9    their opinions.

10       First of all, the Federal Rules specifically authorize the

11   adoption of certain assumptions provided by counsel in the

12   drafting of reports.  That's in FRCP 26(b)(4)(C).  The expert

13   has to disclose any assumption provided by counsel.  So

14   clearly, this is not a radical idea, as defense counsel has

15   suggested.

16       Now, a couple other points, here.  First of all,

17   Dr. Kamins did look at the evidence that supports the

18   assumption, and as he clarified at his deposition, there's a

19   lot in the complaint that is not relevant to Dr. Kamins's

20   opinions.  The assumptions that he adopted in forming his

21   opinions were that plaintiff would demonstrate that the

22   misrepresentations concerning the hand-picked instructors and

23   the techniques and secrets, that those were -- those

24   representations to students were false.  And he also assumed

25   that the use of the "university" moniker was illegal.

1    And just for clarification, he provides that in his

2    deposition at page 177, and page 305 and 306.  Those are the

3    limited assumptions he adopted in forming his opinions.

4    Now, we have provided the Court with multiple cases in

5    which experts have adopted assumptions provided by counsel, and

6    it's quite evident here why Mr. Kamins adopted those

7    assumptions, because we see it with defendants' rebuttal

8    expert, the problems he runs into when he tries to wade into

9    the truth or falsity of these misrepresentations.

10   Dr. Steckel is trying to get evidence in the record that

11   maybe Mr. Trump did hand-pick these professors.  He is not an

12   expert in what Mr. Trump -- he is not an expert in this case.

13   He is not an expert in Trump University.  He is not an expert

14   in real estate.  Dr. Kamins is a marketing expert.  He has

15   no -- he is not an expert in the facts of this case.  He has no

16   business weighing in on whether or not those alleged

17   misrepresentations are in fact false.

18   However, just to buttress his opinion, he does cite, at

19   paragraph 48 of his report, the primary evidence that

20   plaintiffs would put on, that -- Mr. Sexton's testimony that

21   Mr. Trump was not involved in hand-picking the instructors, and

22   Mr. Trump's testimony that he didn't know what was taught in

23   the classes.

24   THE COURT:  All right.

25   MR. PFEFFERBAUM:  Your Honor, if I may address the

1     target market issue with the survey.

2              THE COURT:  Yes.

3              MR. PFEFFERBAUM:  The defendants lead with the

4     argument in their brief -- I am not sure why did they did not

5     start with it today -- is that Dr. Kamins did not survey the

6     correct target market.

7         First of all, again, this is another issue that would go

8     toward weight and not admissibility of Dr. Kamins' opinions,

9     but it's really a remarkable argument.  They have glommed on to

10    a single piece of testimony from Michael Bloom, who was the

11    chief marketing officer for exactly one year at Trump

12    University.  In Mr. Bloom's depo, he states that in the course

13    of purchasing direct mailing lists or renting direct mailing

14    lists, at one point Trump University looked for lists of people

15    that had attended other real estate seminars.

16        Apparently based on that one snippet of deposition

17    testimony, defendant has adopted the position the target

18    audience was only people who had previously attended real

19    estate seminars or had an interest in entrepreneurial pursuits.

20        There's no utterly no factual support for this, starting

21    with the fact that they ran these advertisements in newspapers

22    across the country.  Michael Sexton testified that they looked

23    for the broadest distribution of their ads as possible.

24        We provided the court with the *Cairns v. Franklin Mint*,

25    case 24 F.Supp. 23 -- that's -- I am sorry; I will have to

1    check that cite -- the *Cairns v. Franklin Mint* cite, which says

2    when a company advertises publicly, the general public may very

3    well be an adequate representation of the relevant market for

4    the purposes of a survey.

5        I would also point out, Your Honor, that in another brief,

6    in the Low case, defendant asserted as undisputed fact that

7    Trump University had no target market.  So it's entirely

8    contradictory of the position they have taken here with respect

9    to the Kamins report.

10       As far as Mr. Kirman raised the -- taking the

11   advertisements or the materials out of context the --

12           THE COURT:  Let me ask you about that.  There was the

13   argument as to the apples-and-oranges nature of how these

14   materials were submitted; that on one hand, the survey provided

15   the -- I guess the letters or the invitation to apply to Trump

16   University and this short video, but they didn't then also take

17   into account this 90-minute preview, and that that would create

18   some white noise or would skew the results.

19           MR. PFEFFERBAUM:  Certainly.  Again, the *POM*

20   *Wonderful* case, 769 F.Supp.2d 188, says issues of context, very

21   similar to this, would not be grounds for exclusion; it would

22   go to weight, not applicability.  In that case, the surveyor

23   was confused as to whether something was a web advertisement

24   versus a television advertisement.  He actually cut the

25   advertisement, and the Court still allowed that to come in,

1   obviously subject to cross-examination.

2          THE COURT:  Here, it is not so much context; it is

3   the amount of information that's presented to the target

4   members.

5          MR. PFEFFERBAUM:  Your Honor, in performing the

6   survey, there are obviously going to be some time constraints,

7   and we have cited "McCarthy on Trademarks," who says if you

8   have to replicate the purchasing experience precisely, you are

9   essentially eliminating survey evidence from litigation.  You

10  are not going to have an opportunity to have 126 people sit

11  through a 90-minute preview for purposes of a litigation survey

12  without extreme cost.

13      In this case, the participants were shown an advertisement

14  for Trump University that ran in a newspaper.  They were also

15  then shown the three-minute main promotional video that was

16  shown at the preview.  And I would put to you, Your Honor, that

17  those two advertisements contain the key misrepresentations and

18  the key themes that were repeated throughout that 90-minute

19  process.  It was that you were getting Donald Trump's

20  hand-picked instructors.

21      Right after that video, according to the playbook, someone

22  comes out from Trump University and says, "And here is your

23  hand-picked instructor."  They are getting invitations to join

24  the Trump family.  They are getting -- they are hearing about,

25  you know, they are going to get the rest of the Trump secrets

1   if they come to the three-day.

2       It is true that the purchasing decision in some cases,

3   though not all, was made after the 90-minute preview.

4       I think that the advertisements shown to the survey

5   participants were a reasonable and efficient approximation of

6   the decision they would have made.

7           THE COURT:  All right.

8           MR. PFEFFERBAUM:  To the same effect, Mr. Kirman

9   raised the issue of the fact that we were in a real estate

10  crisis during 2008.  People had a different interest in

11  foreclosures.

12      Dr. Kamins does address that in his report.  His -- he

13  points out that it's his opinion that the result probably would

14  have been stronger in 2008 than they were in 2015, when he

15  conducted the report, as Mr. Trump was known more for real

16  estate alone at that time, and now, obviously, is a political

17  figure in addition his real estate pursuits.

18      As far as the issue of Dr. Kamins' controlling his study,

19  the case that defendants rely on involved an omnibus study.

20  Dr. Kamins was excluded in that case.

21      An omnibus study is one in which the survey or polling

22  company attempts to mimic the U.S. population.  Dr. Kamins

23  explained in his deposition that that is proprietary

24  information, proprietary to the polling company.  That is their

25  algorithms in terms of how they intend or how they try to

1    represent certain demographics, ages, whatnot, in the -- across

2    the U.S.

3         It has no relevance to this case.  He did not conduct an

4    omnibus survey.  It was not trying to mimic a certain

5    population with respect to any proprietary formulas in that

6    regard.

7         And also, Your Honor, we cite some case law, the *UGG*

8    *Holding* case, that it's standard protocol for an expert like

9    Dr. Kamins to engage a polling company that actually handles --

10   Dr. Kamins created the questions and the survey.  But it's very

11   typical in litigation that someone like Dr. Kamins would engage

12   a third party that assists in the actual physical conducting of

13   the survey, setting up the electronic interface, actually

14   sending out the information to the participants.

15        So I would like to turn Your Honor to the 98 percent

16   approval opinion.

17             THE COURT:  Okay.

18             MR. PFEFFERBAUM:  Mr. Kirman said the 98 percent

19   opinion testimony had no expert testimony or expert analysis to

20   it, which I found to be surprising, because if you look at the

21   98 percent approval opinion -- first of all, this is where

22   Dr. Kamins provides eight reasons why this so-called 98 percent

23   approval rating is not a reliable measure of customer

24   satisfaction.

25        And starting with the very first reason, the refund rate

1  of 25 percent, Dr. Kamins quotes or relies upon academic

2  research.  This Brohan article from 2013 discussing how the

3  25 percent return rate is significantly above the median return

4  rate for online merchants, which was 3 percent.

5       So right off the bat, you have got Dr. Kamins applying his

6  expertise in the field of marketing and consumer behavior to

7  the 25 percent approval rating.  That's paragraph 111.

8       The same thing for the paragraph 112, addressing whether

9  the evaluations could have been impacted by their lack of

10 anonymity.  He cites an article by Huang from 2006 in which the

11 academic research supports the fact that anonymous surveys are

12 more reliable than nonanonymous surveys.

13      And it goes on.  In 117, he applies the assimilation

14 contrast theory.

15      So I would strongly disagree with Mr. Kirman's assessment

16 that there was no expert analysis with respect to the

17 98 percent approval rating opinion.

18      Mr. Kirman dropped some other arguments in there, for

19 example, that, in paragraph 115, that the survey was

20 administered before students knew the truth about the

21 hand-picked misrepresentation or the techniques and strategies

22 misrepresentation, or the fact that Trump University had been

23 told not to use the "university" moniker.

24      It's true -- Dr. Kamins does say "See Complaint" in

25 paragraph 115, but it's also true that, throughout his report,

1    he cites the evidence that backs up that those are

2    misrepresentations.  I think I mentioned that earlier.  That's

3    in paragraph 48 of his report.

4        As far as the inability, again, for defendants to figure

5    out which surveys he reviewed, in paragraph 112 -- first of

6    all, in paragraph 110, he does mention the 98 percent approval

7    website.

8        It's probably the first time you heard defendant

9    acknowledge, today, that that is his website that he maintains.

10   If you were to read his papers, you would hear only that it is

11   a website that might exist on the internet.  That's obviously

12   something the defendant put up to -- put up himself.

13       And in paragraph 112, Dr. Kamins cites to TU 25712.  That

14   is 4,507 pages of surveys.  I don't know if defendant just

15   didn't look at those.  Those are the same surveys that appear

16   on the website.  And it says "e.g.," in front of that, because

17   in the production following that, there are about four more of

18   those.  They are all exactly the same as the ones that appear

19   on the internet.

20       I don't know why defendant believes that Dr. Kamins didn't

21   disclose what data he reviewed in forming this opinion.

22       And he certainly was not prejudiced by it at all because

23   his expert has the same surveys in his report from both the

24   unredacted produced versions and the redacted versions that are

25   on line.

1        As far as the factual -- we heard a bunch of factual

2    arguments about why Dr. Kamins should be excluded on the

3    98 percent.  For example, the -- this issue of guests.

4    Dr. Kamins points out there are 10,000 surveys but only 7,000

5    paying attendees.  At his deposition, he added that, in the

6    event those are guests, that further undermines the credibility

7    of the 98 percent approval rating because they are now mixing

8    both people that paid for Trump University and people that got

9    to attend for free.  To the extent that there are 3,000 people

10   that got to attend for free, that only further strengthens his

11   opinion.

12        With respect to opinions one and two -- do you have

13   anything further with respect to opinion three, Your Honor?

14            THE COURT:  No.

15            MR. PFEFFERBAUM:  With respect to opinions one and

16   two, certainly I would agree with Your Honor that those are

17   relevant and reliable opinions and they will assist the jury in

18   their analysis.

19        Dr. Kamins has more than 30 years of experience in

20   consumer research and marketing.  He has -- his qualifications

21   in this matter go unchallenged.  He reviewed a very large set

22   of documents, more than 175 documents.  And, really, opinions

23   one and two go essentially unchallenged by defendants.  There

24   are a few things that Mr. Kirman raised today, again suggesting

25   that these are -- that these are opinions that are within the

1   realm of a layperson and the jury wouldn't benefit from hearing

2   Dr. Kamins.

3       I think some of the easiest counterexamples for that are

4   the issue of temperature that Trump University used, and music.

5       Dr. Kamins cites, at paragraph 60 and 61, the use of music

6   is shown in the academic literature to increase System 1

7   thinking and -- which he connects to rapid, impulsive

8   decision-making processes.  The same thing for the use of

9   temperature.  He cites to this Hadi, King, and Block paper,

10  which describes how keeping the room temperature below

11  68 degrees, keeping people cold, is more likely to induce

12  System 1 thinking.

13      System 1 thinking is the rapid, gut-level, emotive style

14  of thinking.  It makes people less cognizant of being deceived.

15  It makes them think faster.  And it makes people more likely to

16  accept representations, which defendants want to say are

17  puffery and that no one would rely on.

18      The other point that Mr. Kirman raised was that the

19  existence or the opportunity to get refunds would somehow

20  undermine all of opinions one and two; that the opportunity to

21  get refunds would undo any System 1 processing.  They are

22  welcome to cross-examine Dr. Kamins on that issue.

23      There's no challenge to his methodology at all.  If

24  they -- they don't present anything that suggests that the

25  opportunity to get refunds would undue the effects of System 1

1    thinking.

2         In fact, in Dr. Kamins' report, he actually provides an

3    interesting analysis of how this opportunity to get a refund on

4    the first day of the three-day seminar was actually a selling

5    trick they used.  And he talks about -- at paragraph 85, he

6    talks about the commitment-trust theory, and it is an idea in

7    marketing that if you give someone something for free, like the

8    first day of the seminar, they will be less likely to ask for a

9    refund even if they are entitled to it.

10        So he actually likened it almost to like a second bite at

11   the piñata; that you convince someone to buy the three-day with

12   the failsafe that they can get a refund.  But the reality is,

13   once you get them there, they are much less likely to ask for

14   the refund.  And he supports that opinion with citations to the

15   academic literature as well.

16        Your Honor, I have nothing further on Dr. Kamins unless

17   you have any questions for me.

18             THE COURT:  No.  We have already been in session now

19   for more than two hours, and so I guess we probably need to try

20   to move along and wrap this up.  So I won't entertain any

21   rebuttal at this point.

22        We will take that motion under submission as well.

23        We have the motion to exclude -- let me ask.  With respect

24   to the motions for leave to object to evidence filed, are there

25   any motions that it would make sense to talk about right now,

1    in the context of Mr. Kamins?

2            MR. KIRMAN:  Your Honor, we submitted a request for

3    judicial notice of some court records in connection with his

4    expert report, of the prior cases in which he's been excluded,

5    that weren't available on Lexis or Westlaw, things like that.

6            THE COURT:  That is part of which motion?

7            MR. KIRMAN:  It was filed separately, Your Honor.

8            THE COURT:  A motion for judicial notice?

9            MR. KIRMAN:  Yes.

10           THE COURT:  What number is that motion?

11           MR. KIRMAN:  Your Honor, it's document Number 186.

12           THE COURT:  For some reason, I don't have that on my

13   list.

14           THE CLERK:  It was filed as a request, Your Honor.

15           THE COURT:  So it doesn't have a gavel next to it?

16   So to the extent it didn't have a gavel next to it, I didn't

17   copy that.

18       We will take a further look at that.

19       Let's take under the defendant's motion to exclude the

20   opinions and testimony of Paul Habibi.

21           MR. KIRMAN:  Thank you, Your Honor.  I hope to be

22   much shorter on this one because there is a huge elephant in

23   the room with respect to Mr. Habibi's report.

24       So Mr. Habibi was noticed by the plaintiffs as a damages

25   expert, and his entire opinion reaches the conclusion that

1    Trump University is valueless, meaning it's worth zero dollars.

2    However, to reach that conclusion, Mr. Habibi has to do

3    something that is prohibited even by the most basic language

4    from *Daubert*, which essentially says that an expert's opinion

5    needs to fit the facts of the case.  And the facts of this

6    case, as Your Honor knows, relate to misrepresentations related

7    to Mr. Trump's involvement in Trump University and use of the

8    word "university."

9        Mr. Habibi does not analyze how those two mis-reps equate

10   to damages.  Instead, he sets up what is an astonishing

11   strawman.  He says, "What I am going to do is I am going to

12   compare Trump University to the ten leading undergraduate

13   business schools" -- and we are talking Wharton, University of

14   Michigan, New York University, University of Southern

15   California, and so on -- "and we are going to compare the

16   curriculum, the quality of the textbooks, the quality of the

17   professors."

18       Your Honor, even their expert, Michael Kamins, in his

19   deposition -- their expert said that is an unfair comparison.

20   It's apples to oranges.  And Your Honor, you know what?

21   Mr. Kamins is right.  Different universities, four years, lead

22   to an undergraduate degree.  Trump University program, three

23   days.

24       You need to apply and take the SAT and get good grades to

25   go to these schools.  Trump University was open to anyone who

1   wanted to learn.

2      Costs.  Most Trump University courses cost $1,500.  USC

3   could cost 30 or $40,000 a year.

4      USC provides degrees.  Trump University does not.

5      And the list of things that are different go on.  Trump

6   University could be part-time.  Most of these undergraduate

7   universities are full-time.

8      Most of these universities have campuses.  Trump

9   University takes place from three days, from a Friday to

10  Sunday, in a Double Tree Hotel or a Marriott.

11     There's really very little in common with respect to Trump

12  University and leading universities.

13     On the other hand, Trump University is not alone in its

14  business model.  There are literally dozens of competing

15  companies that do the exact same thing and that charge similar

16  amounts of money.  And I am talking about companies like Rich

17  Dad, Poor Dad and Armando Montelongo, and Telegenics.  If you

18  turn on your TV, Your Honor, at night, sometimes you could see

19  ads for these things, and they still go on today.  And they are

20  similar in their availability to the public.  They are similar

21  in pricing.  They are similar in duration.  They are similar in

22  subject matter.  They are similar -- a lot of them teach

23  foreclosure, the same exact thing.

24     But instead of comparing Trump University in its market,

25  it chooses to compare Trump University to these leading

1    academic institutions.  And of course, the natural of result of

2    that strawman is going to be zero.

3        Now, Your Honor, *Daubert* says the expert has to fit the

4    facts of this case.  And their response to this is, "Well, you

5    know what?  It's a fair comparison because Trump University

6    marketed itself as a Wharton University in three days."  That's

7    their basis for the comparison.

8        Well, there is a number of problems with that.  Number

9    one, that statement on its face shouldn't be taken literally.

10   You can't get a Wharton University full education in three

11   days.

12       But even if that's true, Your Honor, they could have moved

13   to certify this case on that representation, and they would

14   have had to have proven that it was uniform, that it was made

15   across the class, and all the other Rule 23 elements.  And if

16   they made it through all those hoops and Your Honor found that

17   it was uniform and it was common and it was otherwise

18   appropriate for Rule 23, Your Honor could have certified that

19   mis-rep, that Trump University deceived its students by

20   comparing itself to Wharton, but Your Honor didn't certify

21   that.

22       This expert report has no bearing, none whatsoever, on the

23   issues in this case.  It is measuring something completely

24   different.

25       And courts frequently look to the fit of an expert's

1   analysis to the facts of the case.  And if the fit isn't there,

2   courts frequently exclude.  An example, the *Paoli Railroad*

3   case.  We cited it to Your Honor.  It is a Third Circuit case.

4   You can't use animal cancer studies to evaluate cancer in

5   humans.  There's a district court failsafe.  You can't evaluate

6   companies in the wrong market.  The *Reeves v. Commonwealth* we

7   cited to Your Honor; you can't measure contamination in the

8   surface water when the case is really about the groundwater.

9   And the *Oracle v. Google* case; you can't use noncomparable

10  licenses to assess damages.

11      And there's some other cases that use the apples to

12  oranges, that we reference in the brief, like the *Superman*

13  case, *Siegel v. Warner Bros.*  You can't evaluate the value of

14  *Superman* against *Annie* and *My Fair Lady*.  You need to use big

15  comic-book characters.

16          THE COURT:  Let me hear from the plaintiffs' counsel.

17          MR. ALVAREZ:  Thank you, Your Honor.  I am not going

18  to take up much time because we have been here a long time.

19      But let me just start with that *Superman* case, that they

20  were just talking about right now.  What was the appropriate

21  remedy in that case?  It wasn't to exclude the expert.  He was

22  not excluded.  And that's one of the cases that they cite.

23      So basically, here, in a nutshell, is that, yes,

24  Mr. Habibi's ultimate opinion is that, based on TU live event

25  materials, presentation slides, speaker transcripts, depo

1    testimony, mentorship materials -- he reviewed all that.  I

2    don't think they are disputing his qualifications.  He reviewed

3    all that.  He has got training and experience and teaches real

4    estate.  Based on all of that, there's no value that was

5    provided.

6         Now, the only reason that he is comparing TU to these

7    universities -- it's not -- he never says -- he doesn't contend

8    that the top-tier schools represent the best comparison to TU.

9    He is only testing them because that's what Trump said.

10        Trump says -- in the main promotional video, he makes

11   comparisons to a Wharton School of Business education.  He uses

12   terms in all these ads like "tuition, professors, admissions,

13   Ivy League quality, word-class education, using professors and

14   adjunct professors hand-picked by Trump to give students a

15   better education from top business schools."

16        So it's not that apples-to-oranges comparison that they

17   say we are making.  He's only testing what Trump said.

18             THE COURT:  But his argument is that he may have said

19   that, but that's not what brings us here; that ultimately what

20   brings us here are alleged representations regarding Trump

21   being a university -- Trump University being a university, and

22   Mr. Trump's integral involvement to the extent of hand

23   selecting instructors.

24        So that's what brings us here.  It is not that there was a

25   representation along the way that Trump University compared

1   favorably with Wharton School of Business or some other school.

2           MR. ALVAREZ:  But this all goes to falsity and the

3   damages.  Ultimately, his ultimate opinion is that there was no

4   value.

5           THE COURT:  One of the things that counsel stated was

6   that this individual, Habibi, was noticed as a damages expert,

7   is that correct, that that's what he is being called upon --

8           MR. ALVAREZ:  He is being called, as I said, what his

9   ultimate opinion was; there was no value.  He is going to

10  value.  Yes.  There was no value.

11          THE COURT:  So damages versus materiality?

12          MR. ALVAREZ:  Correct.

13      But, see, and I know -- I don't want to get bogged down

14  here, but I don't know if Your Honor has had an opportunity to

15  review their expert, Wallace's, opinion.  And because what they

16  are saying, and what counsel had just said, is that they are

17  saying that the proper comparison should be these other

18  business schools or other business seminars.

19      And -- but if you look at Mr. Wallace's report, he has

20  certain issues himself, and those are all those businesses that

21  he is comparing -- I think there's like 12 -- half of them have

22  nothing do with real estate.  They have to do with insider

23  trading, with other marketing things.

24          THE COURT:  Granted, all of these experts have

25  something that's of concern to the Court.

1          MR. ALVAREZ:  Right.  But I guess, ultimately --

2          THE COURT:  The one I have the most concern with I

3    think is Habibi because I tend to agree with this argument that

4    the opinion doesn't seem to match up with the theory of the

5    case or to an issue that exists in this case.

6          MR. ALVAREZ:  But that is -- that comparison is,

7    like, one small portion of the report, so -- but result of his

8    entire report goes to the value of it.

9      So -- and ultimately, I think what -- the cases that they

10   have cited, if you look at those cases, and we have responded

11   to them and cited other cases in our papers, and I am not going

12   to get bogged down with all that because you could read those

13   at a different date.

14     But if you are inclined to -- I guess what I am trying to

15   say is that the appropriate remedy would be just to

16   cross-examine him on outline that, not to exclude him on that

17   particular opinion.

18         THE COURT:  All right.  Well, as I stated at the

19   outset when we turned over to experts, my initial review of

20   these declarations left me with some serious questions relating

21   to Mr. Habibi, and so I continue to entertain some serious

22   questions about Mr. Habibi, but --

23         MR. ALVAREZ:  Well, is there any other question that

24   we could respond -- specific questions that you have?

25         THE COURT:  I guess the most important one was

1   related to this lining up of the theory of the plaintiffs'

2   case, and then with respect to the opinions rendered,

3   specifically as it relates to this comparison between Trump

4   University and then these leading schools of business.  I mean,

5   yeah, that's my biggest concern.

6            MR. ALVAREZ:  Okay.  But I think it all comes back to

7   what I talked about before.  This all -- everything in his

8   report, it goes to damages by reason of the scheme to defraud,

9   and that's the scheme to defraud, because he is saying, "Hey,

10  you are going to get -- this is the type of education you are

11  going to get."  That's the entire scheme that they had.

12       So that's why -- and the only reasonable he is looking at

13  is because that's what Mr. Trump said.  If he wouldn't have

14  said those things, obviously we wouldn't be looking at it;

15  therefore, there's no apples-to-oranges concern.  That is the

16  argument that they are trying to make to exclude him.  This is

17  all part of one big scheme.

18            THE COURT:  All right.  And I think, based upon what

19  you just said, that this is part of the scheme and in

20  evaluating the scheme and determining whether or not the scheme

21  lines up with the damages expert, that the Court may not

22  necessarily want to limit itself to only these two

23  misrepresentations but look at the entire scheme that's been

24  apparently offered.

25            MR. ALVAREZ:  Correct.  Correct.  That's correct.

1           THE COURT:  All right.

2           MR. ALVAREZ:  And with respect to the other experts,

3    have you had an opportunity to review those?

4       Because one of the other issues that we had, Your Honor,

5    is one of their experts, Mr. McDuff -- they never designated

6    anybody as an affirmative expert at all.  So they took the

7    risk.  That was their strategy.  And then now, when we get

8    Mr. McDuff's opinion, he is making the affirmative opinion and

9    doing calculations about damages, which are totally different

10   than what Mr. Habibi is even talking about.

11      So I don't know --

12          THE COURT:  You know, what we might need to do is

13   reschedule a hearing on these additional motions.  There were a

14   lot of them.

15          MR. ALVAREZ:  No, I understand that.  And with

16   respect to that, if you would have some other issues or

17   something, or maybe concerns with Habibi, we can address them

18   then.

19          THE COURT:  You know what?  I think it's probably

20   more fair to fully review Habibi and then fully review the

21   responses and challenges to Habibi, rather than trying to, kind

22   of, rush to have a hearing on all of these motions.  There were

23   a lot.  And so I don't want to deny you the opportunity to

24   address the Court's concerns.

25          MR. ALVAREZ:  Okay.

85

1          MR. KIRMAN:  Your Honor, may I just address the last

2    point about McDuff?

3          THE COURT:  Sure.

4          MR. KIRMAN:  Dr. McDuff was designated as a rebuttal

5    expert on damages.  If the Court excludes Mr. Habibi's opinion

6    that Trump University is worth zero based on this comparison to

7    leading universities, the defendants concede that Dr. McDuff

8    would have nothing to respond to and will not testify in this

9    case; however, if Dr. Habibi is allowed to opine that Trump

10   University is worth zero, our rebuttal is that he analyzed it

11   incorrectly and it has value.  It's pure rebuttal.  It's

12   100 percent pure rebuttal.  Defendants aren't taking the

13   position if Dr. Habibi doesn't testify, McDuff goes up there.

14   It couldn't be more direct.  Habibi says zero; McDuff says

15   value.  It's that simple.

16         MR. ALVAREZ:  Your Honor -- and I am not going to

17   belabor the last point.  But see, what they haven't told Your

18   Honor is that Mr. Wallace, their other expert -- he basically

19   says the opposite of Mr. Habibi.  He says, "I have looked at

20   all this stuff, and you know what?  Based on all that stuff,

21   based on my training and experience, there is value."  They

22   don't need Mr. McDuff.  He is cumulative and he is making an

23   affirmative opinion now that's way too late in the game.

24         MR. KIRMAN:  Your Honor, that misstates Mr. Wallace.

25         THE COURT:  All right.  Well, at this point --

1           MR. KIRMAN:  Thank you, Your Honor.

2           THE COURT:  You all had two and a half hours to

3    impress me with your legal knowledge and skills, and I

4    appreciate your time.  And what we will do is we will look at

5    our calendar and set a further proceeding to address these

6    expert questions probably in around two weeks, but I need to

7    take a closer look at my calendar and then talk with my staff

8    and see where we stand.  All right?

9        So that will conclude today's proceedings.

10          MR. ALVAREZ:  Thank you, Your Honor.

11          MR. KIRMAN:  Your Honor, may I make one point?

12          THE COURT:  Yes.

13          MR. KIRMAN:  We are currently in the middle of

14   pretrial designations in this case.  Today, the parties are

15   required to exchange the exhibits for the Cohen case, and

16   starting next week, the parties, according to the current

17   schedule, are supposed to meet and confer about the trial plan.

18          THE COURT:  On Cohen?

19          MR. KIRMAN:  On Cohen.  And I think, Your Honor,

20   given today, given the uncertainties with the certification,

21   with the experts, it really would be a huge waste of time to

22   come up with a trial plan before the, kind of -- I guess the

23   allegations and the certifications are even set.

24        So defendants would ask that Your Honor continue that

25   pending resolution of these motions.  And right when that's

1    done, we will act expeditiously and get this thing done so as

2    not to delay any trial date that Your Honor might set.

3              THE COURT:  Mr. Forge?

4              MR. FORGE:  Agreed.

5              THE COURT:  Well, that's great.

6              MR. FORGE:  We will submit a joint -- I am cautiously

7    optimistic we can agree on a proposal, but we can submit a

8    joint motion next week to move those dates.

9              THE COURT:  I am prepared to grant that.  Thank you.

10         (End of proceedings at 4:00 p.m.)

11                                -o0o-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11              DATED:  July 24, 2016, at San Diego, California.

12

13                       /s/  Chari L. Possell
                        _____
14                      Chari L. Possell
                        CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25