# EXHIBIT 1

**Exhibit 2**
**Witnesses Plaintiffs Reserve the Right to Call at Trial**

| Witness | Summary of Anticipated Testimony |
|---|---|
| Michael Bloom | He was Chief Marketing Officer at Trump University beginning in September 2009.  Trump University did AB testing for ads in order to determine which of two different versions would be more effective in getting students to attend Trump University seminars.  Each Trump University print ad was supposed to be reviewed and approved by Mr. Trump.  Trump University's marketing conveyed a theme of success associated with Mr. Trump. |
| Kevin Breier | He enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  He attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program.  Had he known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, he would not have enrolled.  Had he known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, he would not have enrolled. |
| Art Cohen | Mr. Cohen enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  Mr. Cohen attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program.  Had Mr. Cohen known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, he would not have enrolled.  Had he known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, he would not have enrolled. |
| William Conroy | Mr. Sexton contracted with Mr. Conroy to improve the script for Trump University's Preview presentations.  For years prior to contracting with Trump University, Mr. Conroy worked for Dynetech.  Trump University's Preview presentations were scripted along the lines of standard get-rich-quick themes used by Dynetech and other real estate seminar providers. |
| Mark Covais | "Last man standing" at Trump University.  He has worked extensively with Trump University's Live Events' database, which includes data concerning the locations and instructors for Trump University's Live Events and the students who enrolled.  These data reflect that over 92% of people who attended a Trump University Preview presentation did not |

| Witness | Summary of Anticipated Testimony |
|---|---|
|  | purchase any Live Events products; that 27% of the students who purchased Trump University's three-day Live Event program requested and received a refund; and that over 25% of Live Events' purchasers requested and received refunds.  Trump University's headquarters were located at 40 Wall Street, New York, New York, from September 2006 to August 2013. |
| David Early | While working at real-estate seminar company, Dynetech, Mr. Early met with Mr. Sexton, and Dynetech's President told Mr. Sexton that it was ill-advised to use the term "university" because it would require licensing.  Mr. Early had no real estate experience, but Trump University contracted him to train speakers and shape educational content. |
| Gary Eldred | Mr. Eldred started working for Trump University when it was offering only instruction over the Internet.  Sometime later, Trump University began to focus on in-person instruction ("Live Events"), but after presenting a couple of his own Live Event seminars, Mr. Eldred informed Trump University that he did not want to sell, and Trump University never again asked him to present.  Mr. Eldred reviewed materials from dozens of other Live Events and could not believe that Trump University put forward something so terrible.  The get-rich-quick emphasis was a stark contrast to his teachings and even Mr. Trump's own writings. |
| Michelle Eylar | She enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  She attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program.  Had she known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, she would not have enrolled.  Had she known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, she would not have enrolled. |
| Steve Eylar | He enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  He attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program.  Had he known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, he would not have enrolled.  Had he known that Messrs. |

| Witness | Summary of Anticipated Testimony |
|---------|----------------------------------|
| | Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, he would not have enrolled. |
| Chris Goff | Mr. Goff, who had no formal real estate training, worked as a Trump University sales coordinator, performed Trump University Previews and paid seminars – in particular the "Quick Turn Retreat" – and was a Trump University mentor. Per instructions from Trump University, the Previews always began with the Main Promotional Video and repeated the theme of Mr. Trump's integral involvement, including Mr. Trump's handpicking of instructors and mentors to teach his real estate secrets and techniques. Nevertheless, Mr. Goff never met Mr. Trump and did not teach his real estate secrets or techniques. |
| Amy H. | Ms. H enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques. Ms. H attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program. Had Ms. H known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, she would not have enrolled. Had she known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, she would not have enrolled. |
| James Harris | Performed hundreds of Trump University Previews and paid seminars. Per instructions from Trump University, the Previews always began with the Main Promotional Video, and the Previews and paid seminars repeated the theme of Mr. Trump's integral involvement, including Mr. Trump's handpicking of instructors and mentors to teach his real estate secrets and techniques. Nevertheless, Mr. Harris never met Mr. Trump and did not teach his real estate secrets or techniques. |
| David Highbloom | Trump University's Chief Operating Officer, with no prior real estate experience, but bore primary responsibility for interviewing and hiring Trump University's Live Events' instructors and mentors – though Michael Sexton had the ultimate hiring authority. David Early and others, who had worked at providers of real-estate seminars, provided guidance in the hiring process and referred instructors/speakers to Trump University. Mr. Early also, along with Mr. Highbloom, worked on PowerPoints and scripts for Trump University's speakers. |

| Witness | Summary of Anticipated Testimony |
|---|---|
| David Lazarus | *Los Angeles Times* reporter attended Stephen Goff Preview seminar in 2007, and wrote in a December 2007 column that it was just a two-hour sales pitch for Trump University's $1,500 Fulfillment seminar.  Shortly thereafter, Mr. Trump called him and threated to "sue your ass off." Trump then submitted a letter that he wanted the *Los Angeles Times* to publish in extra-large print. |
| Ryan Lotman | Mr. Lotman worked as a sales coordinator and secondary speaker for Trump University at Live Events.  He engaged in one-on-one meetings with student-victims.   He drafted portions of the Trump University PlayBook, including the sales rebuttals utilized by Trump University staff to overcome common objections from potential purchasers.  Mr. Lotman also was responsible for attempting to "save" sales when student-victims attempted to cancel or obtain refunds. |
| Steve Matejek | Trump University's Controller, who interviewed for the job with David Highbloom, Michael Sexton, and Jeffrey McConney (the Trump Corp. Controller).   All of Trump University's expenditures (checks, wire transfers, etc.) had to be approved by Trump Corp. (a/k/a Trump Org.), and Trump University's checks were signed by Mr. Trump's CFO, Allen Weisselberg.  The only signatories for Trump University's bank accounts were Mr. Trump, Mr. Trump's CFO, and Mr. Trump's three adult children. |
| Jeffrey McConney | Controller for Trump Corporation, which is 100% owned by Donald Trump.  Responsible for watching over Mr. Trump's investment in Trump University.   Allen Weisselberg (Mr. Trump's CFO) served as Mr. Trump's eyes and ears over Trump University's funding.  In response to issues with the New York State Education Department concerning Trump University's use of the term "university," Trump University set up an LLC in Delaware to serve as a fictitious office. |
| Mina Santos | Ms. Santos enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  Ms. Santos attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program. Had Ms. Santos known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, she would not have enrolled.   Had she known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, she would not have |

| Witness | Summary of Anticipated Testimony |
|---|---|
| | enrolled. |
| Ron Schnackenberg | Trump University salesperson, primarily responsible for calling and soliciting students to enroll in Trump University's programs.  He expressed to Messrs. Sexton and Highbloom discomfort selling a $35,000 Elite program to a couple whose only income consisted of disability benefits.  They expressed disappointment in his unwillingness to sell the $35,000 program to this couple, and he resigned shortly thereafter because he was not comfortable with how Trump University was executing its Live Events business. |
| Corinne Sommer | Ms. Sommer worked as a Trump University Live Events coordinator.  Trump University's Live Events' program was an upselling scheme in which Trump University instructors and other salespeople urged student-victims max out and open new credit cards and promised they would make back the money.  But Trump University would upsell the students to the next course and provide students with same information Dynetech would provide, rather than what they had paid for. |
| Liz Talmadge | She enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  She attended a free Preview and paid $26,500 for a Fulfillment seminar and an Elite program.  Had she known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, she would not have enrolled.  Had she known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, she would not have enrolled. |
| Jeffrey Tufenkian | He enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  He attended a free Preview and paid approximately $37,000 for a Fulfillment seminar and an Elite program. Had he known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, he would not have enrolled.  Had he known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, he would not have enrolled. |

| Witness | Summary of Anticipated Testimony |
|---|---|
| Cassandra Williams | She enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  She attended a free Preview and paid $26,500 for a Fulfillment seminar and an Elite program.  Had she known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, she would not have enrolled.  Had she known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, she would not have enrolled. |
| Dan Williams | He enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  He attended a free Preview and paid $26,500 for a Fulfillment seminar and an Elite program.  Had he known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, he would not have enrolled.  Had he known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, he would not have enrolled. |
| Beth Wood | She enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  She attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program.  Had she known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved in the classes, she would not have enrolled.  Had she known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, she would not have enrolled. |
| Bill Wood | He enrolled in Trump University on the promise of Donald Trump's personal involvement, including, most importantly, the promise that Mr. Trump handpicked the best of the best instructors and mentors to teach his real estate secrets and techniques.  He attended a free Preview and paid $36,500 for a Fulfillment seminar and an Elite program.  Had he known that Mr. Trump did not handpick Trump University's instructors, or even meet them, did not know what they were teaching, and was not involved |

| Witness | Summary of Anticipated Testimony |
|---------|----------------------------------|
|         | in the classes, he would not have enrolled.  Had he known that Messrs. Trump and Sexton unlawfully promoted Trump University as a "university," in defiance of a directive from the New York State Education Department, he would not have enrolled. |

# EXHIBIT 2

1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF CALIFORNIA
2

3

4
ART COHEN, individually and )
5   on behalf of all others    )
similarly situated,         )
6                              )
        Plaintiffs,        )No. 13-CV-2519 GPC (WVG)
7                              )
vs.                         )
8                              )
DONALD J. TRUMP,            )
9                              )
        Defendant.        )
10

11

12

13                  DEPOSITION OF MARLA RAINS COLIC

14            TAKEN ON BEHALF OF THE DEFENDANT

15                       May 19, 2015

16

17

18

19

20

21

22

23

24

25

Case 3:10-cv-00940-GPC-WVG  Document 505-2  Filed 08/26/16  Page 11 of 69

Deposition of Marla Rains Colic                                    COHEN vs. TRUMP, et al.

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MISSOURI
 2                           EASTERN DIVISION

 3

 4    ART COHEN, individually and )
      on behalf of all others     )
 5    similarly situated,         )
                                  )
 6           Plaintiffs,          )No. 13-CV-2519 GPC (WVG)
                                  )
 7    vs.                         )
                                  )
 8    DONALD J. TRUMP,            )
                                  )
 9           Defendant.           )

10

11    DEPOSITION OF MARLA RAINS COLIC, produced, sworn and examined on

12    May 19, 2015, between the hours of nine o'clock in the forenoon

13    and 1:06 o'clock in the afternoon of that day, at the offices of

14    Midwest Litigation Services, 711 North 11th Street, St. Louis,

15    Missouri, before Bobbi L. Hamlin, a Certified Court Reporter

16    (MO)and Certified Shorthand Reporter (IL), Registered Merit

17    Reporter in a certain cause now pending in the United States

18    District Court, Eastern District of Missouri, Eastern Division,

19    between ART COHEN, individually and on behalf of all others

20    similarly situated, Plaintiffs, vs. DONALD J. TRUMP, Defendant;

21    on behalf of the Defendant.

22

23

24

25
```

| | | |
|---|---|---|
| 11:34:14 | 1 | Number 16, which is a one -- |
| 11:34:15 | 2 | A    Oh, my goodness.  I've never seen this. |
| 11:34:18 | 3 | Q    A one page document Bates stamped Trump 00167070. |
| 11:34:22 | 4 | My first question for you was going to be:  Have you |
| 11:34:25 | 5 | ever seen this before? |
| 11:34:26 | 6 | A    No, I've never seen this. |
| 11:34:32 | 7 | Q    I'll represent to you that this was -- the content of |
| 11:34:36 | 8 | this was provided to Trump University by Mr. Early after he |
| 11:34:41 | 9 | talked with you in April or May of 2010 based on discussions we |
| 11:34:47 | 10 | had with him a few weeks ago. |
| 11:34:49 | 11 | Is this a picture of you on this document? |
| 11:34:52 | 12 | A    That is. |
| 11:34:52 | 13 | Q    And Marla R would refer to you? |
| 11:34:57 | 14 | A    Uh-huh.  Yes. |
| 11:34:58 | 15 | Q    You are from St. Louis, Missouri? |
| 11:34:59 | 16 | A    Yes. |
| 11:35:00 | 17 | Q    Could you just take a quick look at this document and |
| 11:35:04 | 18 | tell me if there's anything on here that you don't think is |
| 11:35:07 | 19 | accurate? |
| 11:35:08 | 20 | A    That is all correct. |
| 11:35:17 | 21 | Q    And on the middle of this document is a quote |
| 11:35:22 | 22 | purportedly from you that said:  I spent four years getting a |
| 11:35:26 | 23 | degree in PR from a private university.  I made more on my first |
| 11:35:27 | 24 | deal with Trump U training than I've ever made with my degree in |
| 11:35:32 | 25 | PR. |

EXHIBIT 2
12

| | | |
|---|---|---|
| 11:35:32 | 1 | Is that a true statement? |
| 11:35:33 | 2 | A    At one given time, yes.  I mean, okay.  Bachelor's |
| 11:35:37 | 3 | degree opens the door so that you make money and, you know, you |
| 11:35:41 | 4 | have a job and resume, whatever.  But I never made -- I had |
| 11:35:44 | 5 | never made that much money at one time from anything I had done |
| 11:35:50 | 6 | in pharmaceutical sales or public relations. |
| 11:35:52 | 7 | Q    And this quote from you on the right side of this |
| 11:35:57 | 8 | document about mistakes in the first investment property, this |
| 11:36:00 | 9 | was the Dammert property that we were talking about -- |
| 11:36:02 | 10 | A    That is the Dammert property. |
| 11:36:03 | 11 | Q    -- that you purchased before? |
| 11:36:04 | 12 | A    Oh, yeah.  And if I could put a 2015 addendum we wasted |
| 11:36:08 | 13 | way more than $25,000 on that house. |
| 11:36:11 | 14 | Q    But again, you purchased that property before you |
| 11:36:13 | 15 | attended Trump University? |
| 11:36:14 | 16 | A    Yes. |
| 11:36:14 | 17 | Q    Correct? |
| 11:36:14 | 18 | A    We did, yes. |
| 11:36:15 | 19 | Q    Have you made similar mistakes with properties you |
| 11:36:23 | 20 | purchased after attending Trump University as did you on the |
| 11:36:26 | 21 | Dammert purchase you reference here? |
| 11:36:27 | 22 | A    No. |
| 11:36:27 | 23 | Q    Do you attribute that to attending Trump University? |
| 11:36:32 | 24 | MR. PFEFFERBAUM:  Objection to form. |
| 11:36:34 | 25 | THE WITNESS:  To fairly answer that I attribute it |

EXHIBIT 2
13

| | | |
|---|---|---|
| 11:36:37 | 1 | to, yes, Trump and being more educated, so... |
| 11:36:41 | 2 | BY MR. MORRIS: |
| 11:36:42 | 3 | Q   And you received your first real estate education from |
| 11:36:44 | 4 | Trump University, correct? |
| 11:36:45 | 5 | A   Yes, I did.  Uh-huh.  Yes, I did. |
| 11:36:47 | 6 | Q   Were you ever told by anyone at Trump University that |
| 11:36:53 | 7 | Trump University was accredited university? |
| 11:36:55 | 8 | A   No. I was never told that. |
| 11:36:57 | 9 | Q   Were you ever told by anyone at Trump University that |
| 11:37:00 | 10 | Trump University was a licensed university? |
| 11:37:03 | 11 | A   No. |
| 11:37:03 | 12 | Q   Did you ever -- do you remember ever seeing any |
| 11:37:05 | 13 | advertisements that stated that Trump University was either an |
| 11:37:07 | 14 | accredited or a licensed university? |
| 11:37:10 | 15 | A   No. |
| 11:37:10 | 16 | Q   Did you think that you were attending an accredited |
| 11:37:14 | 17 | university when you took the courses from Trump University? |
| 11:37:17 | 18 | A   No, I did not think I was attending an accredited |
| 11:37:20 | 19 | university. |
| 11:37:20 | 20 | Q   Did you have any expectation at all that you were |
| 11:37:23 | 21 | attending a university when you signed up for the three-day |
| 11:37:25 | 22 | seminar? |
| 11:37:25 | 23 | A   No. |
| 11:37:26 | 24 | Q   Did you have any expectation that you were attending a |
| 11:37:31 | 25 | university when you purchased your mentorship? |

 EXHIBIT 2

| | | |
|---|---|---|
| 11:37:33 | 1 | A    No. |
| 11:37:33 | 2 | MR. PFEFFERBAUM:  Objection to form. |
| 11:37:35 | 3 | BY MR. MORRIS: |
| 11:37:35 | 4 | Q    Was it clear to you when you signed up for your |
| 11:37:38 | 5 | three-day seminar or sorry, your two-day seminar with Trump |
| 11:37:41 | 6 | University that Trump University was a seminar business and not |
| 11:37:44 | 7 | a university? |
| 11:37:45 | 8 | MR. PFEFFERBAUM:  Objection to form. |
| 11:37:46 | 9 | THE WITNESS:  You have to be pretty thick-skulled |
| 11:37:50 | 10 | to think it was a university.  For goodness sales.  I mean, |
| 11:37:53 | 11 | a university is a four-year degree.  I knew it was a |
| 11:37:54 | 12 | business seminar. |
| 11:37:56 | 13 | BY MR. MORRIS: |
| 11:37:56 | 14 | Q    Have you ever lived in New York? |
| 11:38:00 | 15 | A    Have I ever lived in New York? |
| 11:38:02 | 16 | Q    Yeah. |
| 11:38:02 | 17 | A    No. |
| 11:38:03 | 18 | Q    Did you attended any Trump University programs in New |
| 11:38:05 | 19 | York? |
| 11:38:05 | 20 | A    No. |
| 11:38:06 | 21 | Q    Do you recall any representations made by anyone at |
| 11:38:13 | 22 | Trump University regarding Mr. Trump's involvement with the |
| 11:38:16 | 23 | Trump University seminars? |
| 11:38:18 | 24 | MR. PFEFFERBAUM:  Objection to form. |
| 11:38:20 | 25 | THE WITNESS:  The only involvement that I had that |

EXHIBIT 2
15

11:38:23  1    I could see of Mr. Trump with Trump University was a big fat

11:38:26  2    poster of him when we took the two-day seminar.  I believe

11:38:29  3    that was September the 18th and 19th, 2009.  There was a big

11:38:34  4    cut-out form of him standing there.  But no one said

11:38:38  5    anything about him having any involvement with the actual

11:38:42  6    university.

11:38:42  7  BY MR. MORRIS:

11:38:42  8    Q    Did you expect Mr. Trump to be present at any of the

11:38:45  9  seminars?

11:38:45 10    A    No, I did not.

11:38:46 11    Q    Did you expect that Mr. Trump had personally selected

11:38:51 12  any of the instructors or mentors for the seminars or the

11:38:53 13  mentorship's?

11:38:54 14    A    I didn't know if he had or not.  That's not a question

11:39:00 15  I actually asked.  I didn't expect that, to answer your

11:39:05 16  question.

11:39:05 17    Q    Did Mr. Trump make any representations or promises to

11:39:10 18  you about the Trump University seminars?

11:39:10 19    A    I have never spoken to Mr. Trump, so there's no way he

11:39:14 20  could make a promise to me.

11:39:16 21    Q    What were your expectations regarding Mr. Trump's

11:39:19 22  involvement with Trump University?

11:39:21 23            MR. PFEFFERBAUM:  Objection to form.

11:39:22 24            THE WITNESS:  Okay.  So, I had for years been very

11:39:29 25    interested in money making opportunities.  So, Rob Key,

EXHIBIT 2
16

| | | |
|---|---|---|
| 11:39:35 | 1 | Donald Trump, a lot of the people that write books about |
| 11:39:39 | 2 | wealth generations, I had been kind of attracted to those -- |
| 11:39:42 | 3 | those sorts of books.  And I had read a lot of Donald |
| 11:39:45 | 4 | Trump's books and been interested in what he had |
| 11:39:48 | 5 | accomplished.  I didn't know a lot, but I knew enough to |
| 11:39:52 | 6 | know that this is somebody who, minus the celebrity part, |
| 11:39:54 | 7 | was somebody that had taken really not a lot and made it |
| 11:39:58 | 8 | into an empire.  So, I was curious about that. |
| 11:40:03 | 9 | But I fully understood that I wasn't going to meet |
| 11:40:05 | 10 | the man.  I was just attending a seminar that was part of |
| 11:40:09 | 11 | his umbrella of companies.  So I expected excellence and |
| 11:40:13 | 12 | that's what I got.  That's what we got.  It was an |
| 11:40:15 | 13 | excellent -- I felt like it was an excellent mentorship and |
| 11:40:18 | 14 | program. |
| 11:40:19 | 15 | BY MR. MORRIS: |
| 11:40:19 | 16 | Q    Do you feel like the instructors and the mentors that |
| 11:40:23 | 17 | were provided to teach you were experts in the subject matters |
| 11:40:26 | 18 | they were presenting? |
| 11:40:27 | 19 | MR. PFEFFERBAUM:  Objection to form. |
| 11:40:28 | 20 | THE WITNESS:  Yes, and I expected nothing less than |
| 11:40:31 | 21 | that. |
| 11:40:32 | 22 | BY MR. MORRIS: |
| 11:40:37 | 23 | Q    Do you recall any representations made by Trump |
| 11:40:40 | 24 | University that you would be learning Donald Trump's personal |
| 11:40:42 | 25 | real estate secrets? |

EXHIBIT 2
17

| | | |
|---|---|---|
| 11:40:44 | 1 | A    Well, I don't think his secrets are really secrets. |
| 11:40:50 | 2 | But I think somebody said something about that.  I remember |
| 11:40:53 | 3 | hearing that phrase.  And listen, that's a bunch of marketing |
| 11:40:58 | 4 | BS.  Because nobody's secrets are truly secrets.  This |
| 11:41:02 | 5 | information is out.  But the thing is, is that not everybody |
| 11:41:08 | 6 | accesses the information. |
| 11:41:09 | 7 | Accessing the information is difficult to do.  And my |
| 11:41:11 | 8 | husband and I both knew that we needed to gain those secrets |
| 11:41:17 | 9 | from someone that -- that really knew the business, and the |
| 11:41:24 | 10 | information is out there, but it takes someone with a lot of |
| 11:41:27 | 11 | courage to actually execute this. |
| 11:41:29 | 12 | The real estate information is out there, but it takes |
| 11:41:32 | 13 | hard work, determination, a back bone and the ability to do what |
| 11:41:36 | 14 | other people don't want to do.  I would rather have spent that |
| 11:41:39 | 15 | money -- I've spent so much money on real estate and these |
| 11:41:41 | 16 | courses I could have bought myself many luxury cars since then. |
| 11:41:45 | 17 | So, it's just a matter of making the choices that you want to. |
| 11:41:49 | 18 | This is an investment, right, for the future. |
| 11:41:51 | 19 | Q    Do you feel like Trump University packaged the |
| 11:41:56 | 20 | information that they provided you in a digestible manner? |
| 11:42:00 | 21 | MR. PFEFFERBAUM:  Objection to form vague. |
| 11:42:02 | 22 | THE WITNESS:  Yes.  It was digestible.  It was -- |
| 11:42:06 | 23 | it was very quick moving.  It was -- they wasted no time. |
| 11:42:12 | 24 | So they -- they went at a kind of a break-neck -- break-neck |
| 11:42:17 | 25 | speed, but it was very digestible for sure. |

Deposition of Marla Rains Colic                                           COHEN vs. TRUMP, et al.

```
 1                     CERTIFICATE OF REPORTER

 2

 3   I, Bobbi Hamlin, MO CCR, do hereby certify that the witness

 4   whose testimony appears in the foregoing deposition was duly

 5   sworn by me; that the testimony of said witness was taken by me

 6   to the best of my ability and thereafter reduced to typewriting

 7   under my direction; that I am neither counsel for, related to,

 8   nor employed by any of the parties to the action in which this

 9   deposition was taken, and further that I am not a relative or

10   employee of any attorney or counsel employed by the parties

11   thereto, nor financially or otherwise interested in the outcome

12   of the action.

13

14

15

16

17                    [signature]

18              Certified Shorthand Reporter

19              IL CSR #084-002797

20

21

22

23

24

25
```

EXHIBIT 2
19

# EXHIBIT 3

Case 3:10-cv-00940-GPC-WVG   Document 505-2   Filed 08/26/16   Page 21 of 69

Deposition of Paul Canup                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

TARLA MAKAEFF, SONNY LOW, J.R. EVERETT    )
AND JOHN BROWN, on behalf of themselves   )
and all others similarly situated, ED     )
OBERKROM, and BRANDON KELLER,             ) Case No.
individually,                             ) 10-cv-00940 GPC
                                          ) (WVG)
                       Plaintiffs,        )
                                          )
-vs-                                      )
                                          )
TRUMP UNIVERSITY, LLC (aka TRUMP          )
Entrepreneur Initiative), a New York      )
Limited Liability Company, DONALD J.      )
TRUMP, and DOES 1 through 50, inclusive,  )
                                          )
                       Defendants.        )
_____)

VIDEOTAPED DEPOSITION OF PAUL CANUP

NOVEMBER 10, 2014

Reported by:  Tricia Rosate, RDR, CRR, CSR No. 10891

EXHIBIT 3
20

| 09:40:53 | 1 | Q   How much of his half would you say was |
| 09:40:56 | 2 | substantive real estate information versus his |
| 09:40:59 | 3 | discussion of other Trump University programs that |
| 09:41:01 | 4 | were available for purchase? |
| 09:41:02 | 5 | A   Almost all of it was his experience and what |
| 09:41:05 | 6 | he had done and how he had used those techniques, so |
| 09:41:14 | 7 | there was very little on the selling part.  It was |
| 09:41:16 | 8 | offered as -- as a way to continue what he was |
| 09:41:23 | 9 | presenting. |
| 09:41:32 | 10 | Q   Did you feel pressured by Mr. Martin to make |
| 09:41:35 | 11 | any purchase of any subsequent Trump University |
| 09:41:38 | 12 | products? |
| 09:41:38 | 13 | A   No.  No. |
| 09:41:49 | 14 | Q   Do you remember Mr. Martin making any |
| 09:41:50 | 15 | representation to you or the class about how he was |
| 09:41:53 | 16 | selected to be a presenter for that program? |
| 09:42:04 | 17 | A   I recall that he made some -- gave a |
| 09:42:09 | 18 | description of how Mr. Trump selected the people that |
| 09:42:14 | 19 | spoke for him and that there was a vetting process; |
| 09:42:19 | 20 | that they had to be successful and among the best in |
| 09:42:27 | 21 | their specific fields for that area of real estate and |
| 09:42:34 | 22 | that they were -- their background was closely looked |
| 09:42:36 | 23 | into. |
| 09:42:39 | 24 | Q   Did he describe any details of that selection |
| 09:42:43 | 25 | or vetting process or just describe it generally? |

EXHIBIT 3
21

| 09:42:47 | 1 | A    Generally.  It's about what I said.  There |
| 09:42:50 | 2 | may be some details, but I don't recall what details |
| 09:42:54 | 3 | those were. |
| 09:42:55 | 4 | Q    Did he make any distinction between Mr. Trump |
| 09:42:57 | 5 | doing that personally or Trump University doing that |
| 09:43:01 | 6 | vetting? |
| 09:43:06 | 7 | MS. ECK:  Objection.  Calls for speculation. |
| 09:43:14 | 8 | THE WITNESS:  I don't recall the exact |
| 09:43:15 | 9 | details of how that vetting process took place, but -- |
| 09:43:28 | 10 | yeah, I don't -- I don't recall how that -- how that |
| 09:43:31 | 11 | took place. |
| 09:43:39 | 12 | BY MR. MORRIS: |
| 09:43:39 | 13 | Q    At the end of the preview seminar that you |
| 09:43:43 | 14 | attended in July 2009, did you make a decision to |
| 09:43:48 | 15 | purchase any other programs from Trump University? |
| 09:43:50 | 16 | A    Yes, I did. |
| 09:43:51 | 17 | Q    What did you decide to purchase? |
| 09:43:53 | 18 | A    There was a Profit From Real Estate |
| 09:43:57 | 19 | Investing, which was a three-day seminar -- I believe |
| 09:44:00 | 20 | that was the name of it -- and it was going to be held |
| 09:44:02 | 21 | in the next two or three weeks after that. |
| 09:44:10 | 22 | Q    And just so we don't get confused in my |
| 09:44:13 | 23 | questioning, I will refer to -- when I refer to the |
| 09:44:17 | 24 | three-day, I'm going to be talking about that seminar |
| 09:44:18 | 25 | that you purchased at that time.  I understand there |

| | | |
|---|---|---|
| 09:44:21 | 1 | were other later programs from Trump University that |
| 09:44:28 | 2 | were also three days, but I just want to make sure |
| 09:44:31 | 3 | that we understand that we're going to be talking |
| 09:44:33 | 4 | about that one. |
| 09:44:34 | 5 | When Mr. Martin was talking at the preview, |
| 09:44:36 | 6 | do you remember him making any representations to you |
| 09:44:38 | 7 | about Donald Trump selecting the instructor for that |
| 09:44:43 | 8 | upcoming preview -- I'm sorry -- that upcoming |
| 09:44:46 | 9 | three-day seminar? |
| 09:44:47 | 10 | A    There was no details with that specific one, |
| 09:44:49 | 11 | no. |
| 09:44:50 | 12 | Q    Was there an announcement of who would be |
| 09:44:51 | 13 | teaching that seminar? |
| 09:44:59 | 14 | A    I don't know that there was an announcement, |
| 09:45:01 | 15 | no.  I don't recall that detail. |
| 09:45:04 | 16 | Q    Did you have any expectation that Mr. Trump |
| 09:45:09 | 17 | was personally meeting and interviewing with the |
| 09:45:12 | 18 | instructors or presenters for these seminars? |
| 09:45:21 | 19 | A    Not at that time. |
| 09:45:22 | 20 | Q    How much did you pay for the three-day |
| 09:45:24 | 21 | seminar, if you remember? |
| 09:45:26 | 22 | A    Around 1,495. |
| 09:45:39 | 23 | Q    Can you tell me all the reasons that you |
| 09:45:40 | 24 | decided to purchase the three-day seminar at the end |
| 09:45:43 | 25 | of that preview event? |

| | | |
|---|---|---|
| 09:45:44 | 1 | A    When Mr. Martin presented his creative |
| 09:45:49 | 2 | financing section that described different ways to |
| 09:45:57 | 3 | obtain funding for real estate, that was one of the |
| 09:46:02 | 4 | real obstacles that I had is you have to have money to |
| 09:46:07 | 5 | buy real estate, and that was very interesting.  So |
| 09:46:10 | 6 | with that, I certainly wanted to learn more, and that |
| 09:46:12 | 7 | was one of the driving factors for that. |
| 09:46:14 | 8 | Q    Were there any other factors based on what |
| 09:46:18 | 9 | was presented at the preview that helped you make that |
| 09:46:24 | 10 | decision to purchase the three-day seminar? |
| 09:46:34 | 11 | A    I don't recall any. |
| 09:46:51 | 12 | Q    After you signed up for the preview seminar, |
| 09:46:53 | 13 | did you receive any further advertisements or e-mails |
| 09:46:56 | 14 | from Trump University offering other programs that you |
| 09:47:00 | 15 | could purchase? |
| 09:47:08 | 16 | A    I don't believe so. |
| 09:47:11 | 17 | Q    So other than the mailer or the e-mail that |
| 09:47:16 | 18 | we discussed earlier and whatever was said to you at |
| 09:47:21 | 19 | the preview seminar, was there any other information |
| 09:47:25 | 20 | or representations made to you by Trump University |
| 09:47:28 | 21 | prior to your purchase of the three-day program? |
| 09:47:35 | 22 | A    No, because it was all at the preview. |
| 09:47:42 | 23 | Q    And it was -- you said that the primary |
| 09:47:45 | 24 | driver was to get more information about these |
| 09:47:48 | 25 | creative financing techniques that Mr. Martin had been |

Deposition of Paul Canup                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 11:36:28 | 1 | BY MR. MORRIS: |
| 11:36:29 | 2 | Q   I want to step back just for a second. |
| 11:36:31 | 3 | Earlier we had talked about prior to you attending the |
| 11:36:35 | 4 | preview seminar, that you had received a mailer or an |
| 11:36:39 | 5 | e-mail advertising that seminar. |
| 11:36:47 | 6 | Do you remember receiving any other mailers |
| 11:36:48 | 7 | or e-mails from Trump University advertising either |
| 11:36:50 | 8 | the preview or the three-day seminar? |
| 11:36:55 | 9 | A   In which time period? |
| 11:36:56 | 10 | Q   In the 2009 time frame.  I believe you said |
| 11:37:01 | 11 | you attended the preview in July 2009. |
| 11:37:05 | 12 | So either just prior to the preview in July |
| 11:37:07 | 13 | 2009 or in the two-week time frame between the preview |
| 11:37:11 | 14 | and the three-day, do you remember receiving any other |
| 11:37:13 | 15 | mailers or e-mails from Trump University offering |
| 11:37:18 | 16 | those programs? |
| 11:37:21 | 17 | A   It's been a long time.  I do remember that I |
| 11:37:25 | 18 | -- I do remember receiving e-mails that would tell me |
| 11:37:28 | 19 | about those, and that's how they communicated with me. |
| 11:37:33 | 20 | I don't remember getting a telephone call, but I did |
| 11:37:36 | 21 | get a number of e-mails from Trump University |
| 11:37:39 | 22 | describing what was being offered. |
| 11:37:41 | 23 | Q   And were those e-mails that you're talking |
| 11:37:43 | 24 | about prior to the preview or in the two-week |
| 11:37:48 | 25 | time frame between the preview and the three-day, if |

KRAMM COURT REPORTING

EXHIBIT 3
25

| | | |
|---|---|---|
| 11:37:51 | 1 | you recall? |
| 11:37:53 | 2 | A   It was both.  I believe I got e-mails as part |
| 11:37:57 | 3 | of the communication to tell me that they were going |
| 11:37:59 | 4 | to be there and when and how to sign up, how to go on |
| 11:38:05 | 5 | the Internet and register, so they did send those |
| 11:38:07 | 6 | e-mails out. |
| 11:38:08 | 7 | Q   Other than what you just told me about those |
| 11:38:09 | 8 | e-mails and what they told you, do you remember |
| 11:38:12 | 9 | anything else specific about what those e-mails said |
| 11:38:15 | 10 | about the programs? |
| 11:38:18 | 11 | A   Not specifically.  They just generally |
| 11:38:21 | 12 | outlined the main topic.  When I say, "outlined," they |
| 11:38:27 | 13 | may have mentioned one or two or three lines of the -- |
| 11:38:30 | 14 | the subject matter. |
| 11:38:35 | 15 | Q   Were you ever told by anyone at |
| 11:38:37 | 16 | Trump University that Trump University was an |
| 11:38:39 | 17 | accredited university? |
| 11:38:42 | 18 | MS. ECK:  Objection.  Calls for a legal |
| 11:38:46 | 19 | conclusion.  Foundation. |
| 11:38:44 | 20 | THE WITNESS:  No. |
| 11:38:47 | 21 | BY MR. MORRIS: |
| 11:38:47 | 22 | Q   Were you ever told by anyone at |
| 11:38:49 | 23 | Trump University that Trump University was a licensed |
| 11:38:51 | 24 | university? |
| 11:38:52 | 25 | MS. ECK:  Objection as -- as to form and |

EXHIBIT 3
26

Deposition of Paul Canup                        MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 11:38:56 | 1 | calls for a legal conclusion. |
| 11:38:57 | 2 | THE WITNESS:  No. |
| 11:38:58 | 3 | BY MR. MORRIS: |
| 11:38:58 | 4 | Q   Did you ever see any Trump University |
| 11:39:01 | 5 | advertisements, whether mail, e-mail, or newspaper |
| 11:39:06 | 6 | that stated that Trump University was an accredited |
| 11:39:11 | 7 | university? |
| 11:39:12 | 8 | MS. ECK:  Same objections. |
| 11:39:14 | 9 | THE WITNESS:  No. |
| 11:39:14 | 10 | BY MR. MORRIS: |
| 11:39:14 | 11 | Q   Did you ever see any Trump University |
| 11:39:17 | 12 | advertisements, mail, e-mail, or newspaper that stated |
| 11:39:20 | 13 | that Trump University was a licensed university? |
| 11:39:22 | 14 | MS. ECK:  Same objections. |
| 11:39:23 | 15 | THE WITNESS:  No. |
| 11:39:26 | 16 | BY MR. MORRIS: |
| 11:39:26 | 17 | Q   Did you think that you were earning any sort |
| 11:39:29 | 18 | of educational degree when you attended either the |
| 11:39:32 | 19 | preview -- when you attended the preview seminar at |
| 11:39:36 | 20 | Trump University? |
| 11:39:37 | 21 | A   No.  It was clear from the start that it was |
| 11:39:40 | 22 | a number of different classes by experts in the field |
| 11:39:47 | 23 | that didn't sound like a university environment.  To |
| 11:39:51 | 24 | me, it didn't. |
| 11:39:54 | 25 | Q   Did you think that by attending the three-day |

EXHIBIT 3
27

Deposition of Paul Canup                          MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 11:39:56 | 1 | seminar, that you were earning any sort of educational |
| 11:39:58 | 2 | degree from a university? |
| 11:40:00 | 3 | A   No. |
| 11:40:04 | 4 | Q   Did you think that by purchasing and |
| 11:40:07 | 5 | attending the seminars and the mentorship that were |
| 11:40:09 | 6 | part of the Gold Elite program, you were earning any |
| 11:40:12 | 7 | sort of educational degree from a university? |
| 11:40:15 | 8 | A   No. |
| 11:40:18 | 9 | Q   Did you ever have any belief that you were |
| 11:40:20 | 10 | attending an accredited university when you went to |
| 11:40:23 | 11 | Trump University's programs? |
| 11:40:24 | 12 | A   No, I did not. |
| 11:40:25 | 13 | Q   Same question:  Did you ever have any belief |
| 11:40:27 | 14 | that you were attending a licensed university when you |
| 11:40:29 | 15 | went to any of Trump University's programs? |
| 11:40:32 | 16 | A   No, I did not. |
| 11:40:41 | 17 | Q   Was it clear to you when you signed up for |
| 11:40:48 | 18 | the three-day seminar that Trump University was a |
| 11:40:51 | 19 | real estate seminar business and not a university? |
| 11:40:53 | 20 | MS. ECK:  Objection.  Calls for a legal |
| 11:40:55 | 21 | conclusion. |
| 11:40:56 | 22 | THE WITNESS:  It was clear that the topic was |
| 11:40:58 | 23 | talking about real estate purchases, investing, and |
| 11:41:01 | 24 | how to be successful in real estate. |
| 11:41:07 | 25 | /// |

KRAMM COURT REPORTING                                                    Page: 97

EXHIBIT 3
28

| | | |
|---|---|---|
| 11:41:07 | 1 | BY MR. MORRIS: |
| 11:41:07 | 2 | Q   I believe earlier you had testified that you |
| 11:41:08 | 3 | had a BS in mechanical engineering when you had |
| 11:41:13 | 4 | attended college. |
| 11:41:14 | 5 | Did you have any belief that Trump University |
| 11:41:18 | 6 | programs were similar to the institution that you |
| 11:41:21 | 7 | attended where you received your BS degree? |
| 11:41:25 | 8 | MS. ECK:  Objection.  Vague.  Calls for a |
| 11:41:26 | 9 | legal conclusion. |
| 11:41:28 | 10 | THE WITNESS:  No, I didn't feel like it was |
| 11:41:34 | 11 | related to a university. |
| 11:41:35 | 12 | BY MR. MORRIS: |
| 11:41:35 | 13 | Q   At any time during your attending classes at |
| 11:41:40 | 14 | Trump University, have you been a resident of the |
| 11:41:42 | 15 | State of New York? |
| 11:41:43 | 16 | A   No. |
| 11:41:44 | 17 | Q   Did you attend the free preview in New York? |
| 11:41:48 | 18 | A   No. |
| 11:41:49 | 19 | Q   Did you attend the three-day seminar taught |
| 11:41:51 | 20 | by Gerald Martin in New York? |
| 11:41:54 | 21 | A   No, I did not. |
| 11:42:17 | 22 | Q   Do you recall any representations made to you |
| 11:42:18 | 23 | by anyone at Trump University regarding Donald Trump's |
| 11:42:23 | 24 | involvement with the Trump University seminars? |
| 11:42:25 | 25 | MS. ECK:  Objection.  Vague as to whether |

EXHIBIT 3
29

| | | |
|---|---|---|
| 11:42:28 | 1 | they were written or oral representations. |
| 11:42:31 | 2 | THE WITNESS:  Could you clarify that |
| 11:42:32 | 3 | question? |
| 11:42:34 | 4 | BY MR. MORRIS: |
| 11:42:34 | 5 | Q   Do you recall any oral representations made |
| 11:42:37 | 6 | by anyone at Trump University at the preview seminar |
| 11:42:43 | 7 | regarding Donald Trump's involvement with the |
| 11:42:45 | 8 | subsequent TU seminars? |
| 11:42:49 | 9 | MS. ECK:  Objection.  Object as to form. |
| 11:42:54 | 10 | THE WITNESS:  No.  There was -- there was |
| 11:42:56 | 11 | nothing oral that said that Donald Trump was involved |
| 11:42:59 | 12 | in those other than the selection of the instructors. |
| 11:43:14 | 13 | BY MR. MORRIS: |
| 11:43:14 | 14 | Q   And that was the vetting process that we had |
| 11:43:15 | 15 | discussed earlier this morning? |
| 11:43:17 | 16 | A   Correct, uh-huh. |
| 11:43:18 | 17 | Q   Do you recall any written representations |
| 11:43:20 | 18 | made to you by Trump University regarding |
| 11:43:24 | 19 | Donald Trump's involvement with either the three-day |
| 11:43:29 | 20 | or the Elite Package seminars? |
| 11:43:36 | 21 | A   No. |
| 11:43:40 | 22 | Q   Did Donald Trump ever make any written |
| 11:43:42 | 23 | representations to you about his involvement in the |
| 11:43:46 | 24 | Trump University seminars? |
| 11:43:48 | 25 | MS. ECK:  Objection.  Vague as to whether |

STATE OF CALIFORNIA    )
                       )   ss.
COUNTY OF SAN DIEGO    )

        I, Sheena Odorico, on behalf of Kramm Court Reporting and the Certified Shorthand Reporter who reported said proceedings, hereby certify that Paul Canup, the witness in the attached deposition, was sent a letter dated November 21, 2014, to notify said witness of the availability of the original deposition for review and signing pursuant to Rule 30 of the Federal Code.

        As of December 29, 2014, the witness has failed to appear to review and sign the original deposition.

_SmOdorico_

_____
Sheena M. Odorico, Kramm Court Reporting

EXHIBIT 3
31

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF CALIFORNIA
 2            CASE NO.:  10-cv-00940 GPC (WVG)
                      CLASS ACTION
 3   TARLA MAKAEFF, SONNY LOW, J.R.
     EVERETT, and JOHN BROWN, on behalf of
 4   themselves and all others similarly
     situated, ED OBERKROM, and BRANDON
 5   KELLER, individually,

 6
         Plaintiffs,
 7
     -vs-
 8
     TRUMP UNIVERSITY, LLC (a/k/a Trump
 9   Entrepreneur Initiative), a New York
     Limited Liability Company,
10   DONALD J. TRUMP, and
     DOES 1 through 50, inclusive,
11
         Defendants.
12   _____/

13

14
          VIDEOTAPED DEPOSITION OF METTE NIELSEN
15

16

17            Friday, December 19, 2014
              9:07 a.m. - 1:25 p.m.
18
              One Biscayne Tower
19          2 South Biscayne Boulevard
                   Suite 1900
20            Miami, Florida 33131

21

22

23
            Stenographically Reported By:
24            Barbie Gallo, RMR-CRR
                 www.kramm.com
25               800-939-0080
```

EXHIBIT 4
32

1    A.    So, no, I don't have -- and even before

2    then, before that year I worked as an investor, and

3    that was all due to my -- it started at Trump

4    University, yes.

5    Q.    Prior to working as an investor, did you

6    have any employment outside of self-employment since

7    you've come to the United States?

8    A.    What I did, I'm -- again, certificates and

9    employment and all this is not really -- I worked in

10   a -- in a -- or a few of them actually, substitute

11   agency, and I would go as administrative secretary

12   or -- yeah, as, what do you call it -- gosh.  That's a

13   long time ago.  -- receptionist and things like that.

14   I would go out and work for different companies and be

15   offered jobs and was fine not having any routine like

16   that.

17   Q.    So it sounds like you said that was quite a

18   while ago that you were doing that stuff?

19   A.    That was quite a while.

20   Q.    Do you remember approximately what year you

21   stopped doing the work for the substitute agency?

22   A.    When I had my children.  When -- and that's

23   13, 13 years ago.

24   Q.    So would it be fair to say approximately

25   2001?

```
1        A.      Yeah.

2        Q.      So since 2001, no formal employment for

3   another company or individual?

4        A.      No.

5             MS. MARTIN:   I'm going to mark the next

6         document in order, Defendants' Exhibit No. 2.

7         (Defendants' Exhibit No. 2 for i.d.)

8   BY MS. MARTIN:

9        Q.      Miss Nielsen, go ahead and take your time

10  and read through this document, and when you've had a

11  chance to do so, just let me know.

12       A.      Yes.  Yes.  That's the first one.  Uh-huh.

13  Um-hum.

14       Q.      All right.  If you'll look on the third page

15  of what we've marked as Exhibit 2, the last line there

16  you'll see there's handwriting above a line with the

17  name "Mette Nielsen" below it.  Is that your signature?

18       A.      That's my signature.

19       Q.      And is this a copy of a Declaration that you

20  signed on November 15th, 2012?

21       A.      Right.

22       Q.      Before you signed the document that we

23  marked as Exhibit 2, did you have a chance to review

24  it?

25       A.      I did, yeah.
```

EXHIBIT 4
34

1    Q.    And did you review it before you signed it?

2    A.    I certainly did, yeah.

3    Q.    And you had an opportunity to make any

4    changes if you wanted to before signing it, correct?

5    A.    I did, and I did make changes, yeah.

6    Q.    And you understood when you signed this

7    document that you you were making the statements in the

8    Declaration under penalty of perjury, correct?

9    A.    Yes.

10   Q.    And as you sit here today -- and I know just

11   had a chance to look through the Declaration -- is

12   there anything you that you see in there that is

13   inaccurate.

14   A.    No, not at all.

15   Q.    And when you signed this Declaration that

16   we've marked as Exhibit 2, you did so freely and

17   voluntarily, correct?

18   A.    I did, yes.

19   Q.    All right.  And I marked this just in case

20   you needed to refer back to it for timing and stuff

21   like that because I'm going to start asking you some

22   questions about Trump University.  Do you remember when

23   you first got involved with Trump University?

24   A.    That was in 2009.  I had seen an

25   advertisement online, and I was at a crossroad of

1   sorts.  I didn't really know what to do with myself.  I

2   had just lost some money in investment -- investment

3   money.  I had spent my savings being with my children

4   instead of working.  I had decided to stay with them,

5   and my mother had made that very comfortable for me.

6            She had died, and she had left me money, and

7   I had invested, and it wasn't -- I mean, I just -- I

8   lost.  And I needed to do something, and I needed -- I

9   wanted to change everything around.

10           When I saw Trump University's advertisement,

11  it was a free three-day trial.  Three -- a free

12  three-day introduction, and I decided to go.

13       Q.    Okay.  Now you said at the time when you saw

14  this advertisement for Trump University, you had lost

15  money for investments.  Were any of those investments

16  real estate related?

17       A.    No.

18       Q.    So at that time getting involved in real

19  estate investing was something completely new for you?

20       A.    Entirely new, yes.

21       Q.    Now you said you first found out about Trump

22  University from an online advertisement, correct?

23       A.    Yes.

24       Q.    Do you remember where you saw that online

25  advertisement?  I know it's a long time ago.

1    A.    I don't remember.  I just -- it was just one

2    of those pop-up advertisements.

3    Q.    Do you remember what about that

4    advertisement attracted your attention?

5    A.    I don't remember if I had thought about real

6    estate before then.  Maybe I did.  I don't know.

7          And then it was just -- I mean, the name

8    "Trump" grabs your attention, no doubt about that, and

9    since it was -- and it was recurring, too.  It wasn't

10   the first time.  When it came on the first time, I

11   didn't pay attention to it other than -- and I guess

12   the word "free" that I could go there and see or learn

13   something or get interested in or whatever it is, that

14   worked for me too.

15         Like I said, I was looking.  I had no idea

16   what I was going to do at the time.

17   Q.    Okay.  So would it be fair to say when you

18   saw the advertisement, it was a combination of things.

19   You saw the name "Trump."  You saw something was free.

20   A.    Um-hum.

21   Q.    And you saw this was about real estate.

22   A.    Um-hum.

23   Q.    And that was something that you thought

24   would be interesting to you at the time.

25   A.    Maybe, um-hum.  No, you know what it was,

EXHIBIT 4
37

1  too?  I remember -- I was really angry at myself for

2  not knowing money, and that was the craziness of that

3  pop-up that I get one from Trump, and I'm sitting here

4  being very upset about not knowing money at all and

5  that it just -- I really, to lose money in that

6  quantity and just not having a clue.  And I think that

7  was really what -- that was what got me thinking of

8  going there.

9      Q.    Okay.  Now do you remember -- I know you

10  mentioned there was a three-day seminar.  Do you

11  remember that the -- that you first attended a -- the

12  free seminar that was shorter program, like a 90-minute

13  seminar?

14      A.    Yes.  I'm sorry.  That's exactly how it was.

15  It was the 90 minutes, and then it was the three days.

16  Sorry.  The free part was the 90 minutes, and the three

17  days was after that, yes.

18      Q.    And do you remember was it approximately

19  October 2009 when you went to the free seminar?

20      A.    That sounds right, um-hum.  It was right

21  around Halloween because James Harris who was the

22  mentor, he was -- he was telling that instead of being

23  with his children for Halloween, he was there with us.

24  But, no, that was the three days again.  Sorry.

25      Q.    Okay.  So the first one, probably a little

EXHIBIT 4

1  earlier than Halloween?

2      A.     Earlier, a little earlier, yeah.  Earlier in

3  the month and then the three days started.

4      Q.     Later in the month.  Okay.

5             So let's go to that first free seminar.

6      A.     Yeah.

7      Q.     Do you remember who was the person who spoke

8  at that free seminar you attended?

9      A.     Unfortunately, not.  I really wanted to

10  because initially he was -- he was the one that

11  motivated me enough to go to the next.

12      Q.     Okay.

13      A.     And I know why I don't remember him.  It was

14  because of the three following days.  James Harris is

15  one intense character.  I mean, he takes up a lot of

16  space.  And I think that's what he wants.  That's part

17  of it that you forget everything else that you've ever

18  been involved with, and you do what he wants you to do.

19  I mean, that's what it is.  And you're supposed to take

20  it in that way for things to work for you, um-hum.

21      Q.     Do you remember at the free seminar that you

22  attended, did you see any videos of Donald Trump at

23  that seminar?

24      A.     I don't remember seeing any videos.  I

25  remember the music, the "Money" music.  And there may

EXHIBIT 4

 1          it.

 2   BY MS. MARTIN:

 3      Q.     And same thing for the three-day seminar,

 4   did you believe that you would earn a degree by

 5   attending that?

 6              MS. MUELLER:  Objection; form.

 7              THE WITNESS:  No.

 8   BY MS. MARTIN:

 9      Q.     And you do think that you received some kind

10   of certificate --

11      A.     Yeah.

12      Q.     -- from the three-day seminar?

13      A.     I was going to say it was part of, I'm

14   pretty sure actually that it was in the introduction

15   both -- or at least with James Harris.  He started the

16   whole three days with describing what we would go

17   through and what we would end up with at the time.  And

18   he said that we would be able to have a certificate.

19   We started with a name tag, and then you end up with a

20   certificate at the end of it.

21      Q.     And is it fair to say that certificate

22   wasn't something that you thought was important?

23              MS. MUELLER:  Objection; leading.

24              THE WITNESS:  No.  No, it wasn't.  I mean,

25          it was -- it was -- it was a matter of -- it was

1          a participation.

2     BY MS. MARTIN:

3          Q.    So you looked at the certificate as

4     something that just noted you participated in the

5     seminar, correct?

6               MS. MUELLER:   Objection; leading.

7               THE WITNESS:   How much can you learn in

8          three days?  I mean, how -- how much can you

9          rake in in three days?  What is it that you can

10         do with it?  So is it -- and, I'm sorry, again,

11         to say this, this is America, and America is

12         very different from Denmark.  In Denmark, you

13         have to work for a certificate.  You have to

14         produce.  You have to -- you have to put

15         yourself out there, and you have to prove

16         yourself for years sometimes before any

17         certificates.

18              Here, my kids come home with trophies from

19         school.  I'm like, what is that from?  And, you

20         know, it's just very freely given for anything.

21         So, no, the certificate was a piece of paper you

22         were there, and it had my name on it.  Very

23         good.  So now it's my turn.

24     BY MS. MARTIN:

25         Q.    Right.  So just so I kind of have it clear

```
 1   for the record, you weren't attending that three-day

 2   seminar because you wanted the certificate, correct?

 3       A.    Oh, goodness, no.

 4             MS. MUELLER:  Objection; leading.

 5   BY MS. MARTIN:

 6       Q.    At the free seminar you attended did anyone

 7   make a representation to you that Trump University was

 8   an accredited school?

 9             MS. MUELLER:  Objection to form.

10             THE WITNESS:  No.

11   BY MS. MARTIN:

12       Q.    At any time did you think it was an

13   accredited school?

14       A.    No.

15             MS. MUELLER:  Objection to form.

16             THE WITNESS:  Certainly because his name is

17       in it "Donald Trump" and he has a certain space

18       in real estate, like I said, to begin with, that

19       got my attention, but that was about it.

20   BY MS. MARTIN:

21       Q.    At the time you attended Trump University,

22   at any time you attended Trump University, did you

23   believe it was a licensed educational institution?

24             MS. MUELLER:  Objection to form.

25             THE WITNESS:  I never thought of it -- I
```

1          never thought of it like that.  I'm sorry.

2     BY MS. MARTIN:

3          Q.    And just so -- give her a minute.  I'll ask

4     a question.  Then she's going to possibly interject

5     with an objection.  So just take a pause so that the

6     court reporter can keep up with all of us.

7          A.    Yes.

8          Q.    Okay.  So kind of just going back, you said

9     you never thought of it as a licensed educational

10    institution, correct?

11              MS. MUELLER:  Objection; leading.

12              THE WITNESS:  I never thought of it.

13    BY MS. MARTIN:

14         Q.    And you understood that Trump University was

15    a business, correct?

16              MS. MUELLER:  Objection; leading.

17              THE WITNESS:  What I saw it as was a space

18         created for people to grab opportunity with a

19         name tag on it.  Opportunities are everywhere

20         all the time.

21              This particular opportunity was created in

22         the light of Trump, and it had to do with real

23         estate.

24              All the materials that was -- that were

25         given out for people to use and to learn from,

1    there were CDs, and there were informational and

2    motivational CDs; there were books; there were

3    all kinds of, this is all -- that was -- you

4    have to take what you get and run with that and

5    do your own.  That's what I keep coming back to.

6    I mean, you cannot just walk through the door

7    and expect to walk out again as Donald Trump or

8    anything like it or James Harris or any of the

9    other people.  Everybody put in to become what

10   they are and what they do.

11        And that's it.  You're given information.

12   You're given materials.  And it's for you to

13   pick them up and get familiar and use them.

14   BY MS. MARTIN:

15      Q.    And did you feel that Trump University made

16   that point clear, that you had to go out and do

17   something?

18      A.    Over and over again.

19           MS. MUELLER:  Objection to form.

20           THE WITNESS:  In quotes.  In quotes and from

21   other people that had made it in whatever.  Not

22   just in this industry but other industries,

23   successful people.  You get up and you do, most

24   important thing.

25   BY MS. MARTIN:

| | |
|---|---|
| 1 | MS. MUELLER:  Objection; vague. |
| 2 | BY MS. MARTIN: |
| 3 | Q.    Either by video or phone? |
| 4 | MS. MUELLER:  Objection; vague; compound. |
| 5 | THE WITNESS:  Maybe -- maybe -- I kind of |
| 6 | recall there was some sort of recording of -- |
| 7 | but not necessarily about real estate again, |
| 8 | funny enough.  That was more motivational.  It |
| 9 | was all about doing. |
| 10 | BY MS. MARTIN: |
| 11 | Q.    And Donald Trump was the person speaking in |
| 12 | that recording? |
| 13 | A.    He was speaking, yes. |
| 14 | Q.    Do you remember where you saw that or heard |
| 15 | that? |
| 16 | A.    I don't think that -- it's very -- I just |
| 17 | kind of remember.  I seem to remember him -- I seem to |
| 18 | remember James Harris put something on Donald Trump was |
| 19 | saying, but I'm really -- I can't remember specifics of |
| 20 | it or anything. |
| 21 | Q.    Okay. |
| 22 | MS. MUELLER:  Do you think you're going to |
| 23 | be ready to take a break any time in the next |
| 24 | couple minutes? |
| 25 | MS. MARTIN:  Probably, we can do it in a |

```
 1              couple minutes.  Let me just finish this line.

 2                   MS. MUELLER:  Okay.

 3    BY MS. MARTIN:

 4         Q.    Did anyone at any of the seminars you

 5    attended make any representations to you about what

 6    Donald Trump's involvement in Trump University was?

 7                   MS. MUELLER:  Objection to form.

 8                   THE WITNESS:  No, not that I recall.

 9    BY MS. MARTIN:

10         Q.    Did anyone at any of the Trump University

11    seminars you attended represent that Donald Trump had

12    selected personally instructors or mentors for Trump

13    University?

14                   MS. MUELLER:  Objection to form.

15                   THE WITNESS:  Possibly.

16    BY MS. MARTIN:

17         Q.    Do you recall that happening?

18         A.    Yeah.  And I -- I've -- yes, I remember

19    that, because I tied it in with the Trump name.  I

20    mean, if you are presenting learning material with

21    Mr. Trump's name on it, then he must have had some sort

22    of input into who is presenting this material.  That

23    was my thought.  And that was -- James Harris was

24    saying that each of them had, I don't know if

25    hand-picked as much as they had been -- they have the
```

 1   material.  They are -- they must have been okayed by

 2   Mr. Trump to use his name for what he was doing.

 3       Q.    So you understood that Trump University had

 4   the right to use Mr. Trump's name, correct?

 5       A.    Yeah, yeah.

 6       Q.    Did you have an expectation that Mr. Trump

 7   had handpicked the instructors?

 8             MS. MUELLER:  Objection; form; foundation.

 9             THE WITNESS:  It -- it could have been.  I

10       mean, I've -- I would find it very hard to

11       believe, again, anybody using the materials and

12       his -- his branding, the songs or the music and

13       everything without them being specifically put

14       to -- not necessarily put to work by him but at

15       least he's endorsing it.

16   BY MS. MARTIN:

17       Q.    So I just want to be clear on this.  So it

18   was your expectation that Mr. Trump was endorsing Trump

19   University, correct?

20             MS. MUELLER:  Objection; leading.

21             THE WITNESS:  Yes.

22   BY MS. MARTIN:

23       Q.    But did you have an expectation beyond that

24   that he was doing more than just endorsing?

25       A.    No, no.

```
 1              MS. MUELLER:  Objection; form.

 2   BY MS. MARTIN:

 3      Q.    Did you have an expectation that he had met

 4   with James Harris?

 5              MS. MUELLER:  Same objection and foundation.

 6              THE WITNESS:  I'm thinking he almost must

 7         have.  I don't think he ever said anything about

 8         meeting him.  It's not -- again, it goes in the

 9         bucket with the certificates.  It wasn't really

10         important to me.  I had value.  I was -- I had

11         value.  I didn't have to sit and think about, is

12         it -- when is he going to show up?  When is

13         Donald Trump going to walk through the door?

14         When are we going to shake hands?  It wasn't

15         important to me.  I was -- I had value.

16   BY MS. MARTIN:

17      Q.    So would it be fair to say that whether

18   Mr. Trump had met with the instructors, mentors

19   personally, that's not something that mattered to you,

20   correct?

21              MS. MUELLER:  Objection; leading.

22              THE WITNESS:  No, because they had the

23         knowledge.  They had his branding.  They had --

24         I didn't think that -- I didn't think about it

25         like that, no.  One of the books were his own
```

1        book, Donald Trump's own book.

2             Actually, thinking of the books, I think

3        that in one of the instructional books it said

4        about the picking instructors.  I'm not certain,

5        but it just kind of...

6   BY MS. MARTIN:

7        Q.    Did anyone tell you that those materials --

8   For example, you talked about the pages of notes you

9   took from James Harris's presentation.  Did you think

10  that James Harris's presentation was created by

11  Donald Trump?

12            MS. MUELLER:  Objection; form; foundation.

13            THE WITNESS:  No.  That was his -- he did

14       that.

15  BY MS. MARTIN:

16       Q.    You knew that was James Harris's materials?

17       A.    Oh, yeah, um-hum.  He spent time telling

18  everybody what he had to go through to put those three

19  days together.  You don't just get up in the morning

20  and walk through the door and present.

21       Q.    And you felt that learning what James Harris

22  had to say was valuable information, correct?

23       A.    Yes.

24            MS. MUELLER:  Objection; form.

25            MS. MARTIN:  Okay.  We can go ahead and take

1      a quick break.  Let's go off the record.

2           THE VIDEOGRAPHER:  Going off the record.

3       The time is 1:28.

4      (A recess was taken from 10:44 a.m. to 10:50 a.m.)

5           THE VIDEOGRAPHER:  The time is 10:50 a.m.

6       This is the beginning of tape number two.  We're

7       back on the record.

8  BY MS. MARTIN:

9       Q.    All right.  Miss Nielsen, we talked a little

10 bit earlier about the fact that you made significantly

11 more money than you invested in Trump University

12 investing in real estate.  Would it be fair to say you

13 think you got your money's worth from Trump University?

14      A.    Yes.

15           MS. MUELLER:  Objection; leading.

16 BY MS. MARTIN:

17      Q.    And as you sit here today, do you think that

18 what you learned from Trump University was useful

19 information?

20           MS. MUELLER:  Objection; form.

21           THE WITNESS:  Yes.

22 BY MS. MARTIN:

23      Q.    Do you think that what you learned from

24 Trump University was valuable information?

25      A.    Absolutely.

EXHIBIT 4
50

1          MS. MUELLER:   Objection to form.

2     BY MS. MARTIN:

3          Q.    Aside from Trump University, have you had

4     any other experience taking any other types of

5     seminars?

6          A.    Paying into, no, because I didn't really

7     feel like I needed it after.  I mean, I was given the

8     foundation, and the rest of it was just me tagging

9     along with people that were doing something that I

10    would like to do in real estate, and by doing, I

11    learned whatever I needed, the rest of it.

12         Q.    Was there anything that you felt Trump

13    University promised to you?

14         A.    And then my -- I'm sorry.  My agent.  My

15    license.  My real estate license, of course, that

16    was -- that's school in itself.

17         Q.    Okay.

18         A.    So, um-hum.

19         Q.    Was there anything that you felt that Trump

20    University promised to you but didn't give to you?

21              MS. MUELLER:   Objection to form; foundation.

22              THE WITNESS:   No.  They promised me that if

23         I chose to -- if I chose that line of business,

24         it was a lot of work, and it was exactly that.

25              And eventually, once I became familiar with

CERTIFICATE OF REPORTER


THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )


        I, Barbie Gallo, RMR-CRR, Registered Merit
Reporter-Certified Realtime Reporter, certify that I
was authorized to and did stenographically report the
deposition of METTE NIELSEN, pages 1 through 177; that
a review of the transcript was requested; and that the
transcript is a true and complete record of my
stenographic notes.

        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.


        DATED this 22nd day of December 2014.




                    *Barbara Gallo*


        Barbie Gallo, RMR-CRR

EXHIBIT 4
52

# EXHIBIT 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_____
TARLA MAKAEFF, SONNY LOW, J.R. EVERETT, )
AND JOHN BROWN, on behalf of themselves )
and all others similarly situated, ED   )
OBERKROM, and BRANDON KELLER,            )
individually,                            )
                                         )
         Plaintiffs,                     )
                                         ) Case No.:
     vs.                                 ) 10-cv-00940 GPC (WVG)
                                         )
TRUMP UNIVERSITY, LLC (aka Trump         )
Entrepreneur Initiative), a New York     )
Limited Liability Company, DONALD J.     )
TRUMP, and DOES 1 through 50, inclusive,)
                                         )
         Defendants.                     )
_____)

Videotaped Deposition of MICHELLE GUNN

NONCONFIDENTIAL PORTION

(Page Nos. 1-179, 192-222, 226-244)

Tuesday, October 28, 2014

Reported by Lindy DeBoer, RPR, CSR No. 5405

EXHIBIT 5
53

Deposition of Michelle Gunn                    MAKAEFF, et al. vs. TRUMP UNIVERSITY, LCC, et al.

| | | |
|---|---|---|
| 09:52:59 | 1 | And then, of course, I guess the word would be the |
| 09:53:02 | 2 | "close," with then the offer for the three-day event. |
| 09:53:04 | 3 | BY MS. STAGG: |
| 09:53:10 | 4 |    Q   Did you that evening make a purchase of the |
| 09:53:12 | 5 | three-day event? |
| 09:53:14 | 6 |    A   Yes. |
| 09:53:15 | 7 |    Q   Tell me all the reasons that you based your |
| 09:53:17 | 8 | decision to purchase the three-day event.  What -- what, |
| 09:53:21 | 9 | in your mind at that time, caused you to purchase the |
| 09:53:25 | 10 | three-day event? |
| 09:53:28 | 11 |    MS. JENSEN:  I object to form. |
| 09:53:29 | 12 | BY MS. STAGG: |
| 09:53:29 | 13 |    Q   You can answer. |
| 09:53:30 | 14 |    A   Okay.  We -- "we," being I guess my mother and |
| 09:53:34 | 15 | I, even though I was the purchaser, that she was |
| 09:53:37 | 16 | attending there, talked about it briefly for a minute |
| 09:53:41 | 17 | between us.  Again, I relooked at my planner and saw that |
| 09:53:45 | 18 | it was a free weekend, I didn't have anything that |
| 09:53:47 | 19 | weekend.  If I had, it obviously would not have been a |
| 09:53:50 | 20 | purchase.  And from what we had saw, learned, |
| 09:53:54 | 21 | experienced, even the point of meeting other people and |
| 09:53:56 | 22 | other real estate investors in the room -- I always look |
| 09:54:01 | 23 | at an event as an opportunity to network as well.  So |
| 09:54:06 | 24 | with that playing into key, and also learning a little |
| 09:54:09 | 25 | bit more about real estate and the changing market, what |

KRAMM COURT REPORTING                    NON-CONFIDENTIAL                    Page: 40

EXHIBIT 5
54

| | | |
|---|---|---|
| 09:54:15 | 1 | I was looking for was gathering a little more knowledge, |
| 09:54:16 | 2 | because in 2010 the real estate market was completely |
| 09:54:19 | 3 | different than what we were used to for years and years |
| 09:54:23 | 4 | and years before.  And we were trying to come up with |
| 09:54:27 | 5 | gathering, I guess, information to see how do we stay in |
| 09:54:31 | 6 | the real estate game. |
| 09:54:34 | 7 | Q     Okay.  Any other reasons that caused you to |
| 09:54:38 | 8 | purchase the three-day seminar? |
| 09:54:49 | 9 | A     That caused me to purchase it? |
| 09:54:50 | 10 | Q     Sure.  Any factors that went into your decision |
| 09:54:53 | 11 | while you were there.  In other words, I'm not trying to |
| 09:54:55 | 12 | have you think back now. |
| 09:55:00 | 13 | At the time, what were you, in your mind, |
| 09:55:01 | 14 | relying on to make the purchase? |
| 09:55:07 | 15 | A     I would say, number one, because it was real |
| 09:55:12 | 16 | estate-related, so we had an interest to it.  It wasn't |
| 09:55:15 | 17 | selling me Tupperware or, you know, something that I |
| 09:55:17 | 18 | didn't do.  Number two, the date, the availability, and |
| 09:55:22 | 19 | the location.  I didn't have to travel.  Number three, |
| 09:55:26 | 20 | between my mother and I, we kind of thought, "Yeah, let's |
| 09:55:28 | 21 | go hear more or learn more."  And number four would |
| 09:55:32 | 22 | probably be -- I don't know, I've attended a lot of |
| 09:55:38 | 23 | events -- I guess I make sure before I go to an event |
| 09:55:42 | 24 | that I just want to follow my gut. |
| 09:55:44 | 25 | So it would be kind of the gut feeling of, |

EXHIBIT 5

| | | |
|---|---|---|
| 09:55:46 | 1 | "Yeah, I want to learn more.  Let's take the next step |
| 09:55:48 | 2 | and go to the next three days."  And so we went forward. |
| 09:55:55 | 3 | Q    Okay.  Did you believe that you were earning any |
| 09:56:04 | 4 | kind of educational degree by attending either the free |
| 09:56:09 | 5 | seminar or the three-day seminar? |
| 09:56:13 | 6 | A    Not whatsoever. |
| 09:56:19 | 7 | Q    Did you understand anyone to make any |
| 09:56:22 | 8 | representations at the seminar that you would earn an |
| 09:56:27 | 9 | educational degree of any kind by attending either the |
| 09:56:31 | 10 | free seminar or the three-day seminars? |
| 09:56:34 | 11 | MS. JENSEN:  I am going to object to form. |
| 09:56:35 | 12 | THE WITNESS:  No. |
| 09:56:35 | 13 | BY MS. STAGG: |
| 09:56:39 | 14 | Q    Do you recall anyone making any representations |
| 09:56:42 | 15 | about Trump University or Trump Entrepreneur Initiative |
| 09:56:48 | 16 | being an accredited school of any kind? |
| 09:56:52 | 17 | A    No, I do not recall that.  It was pretty clear |
| 09:56:55 | 18 | to me it was a seminar and it would be a conference or a |
| 09:56:59 | 19 | seminar-style setting.  With the real estate world, I |
| 09:57:05 | 20 | don't know of a program or university that teaches a real |
| 09:57:08 | 21 | estate -- or gives a real estate degree even if you get a |
| 09:57:11 | 22 | real estate license.  So I wouldn't have had that |
| 09:57:14 | 23 | assumption. |
| 09:57:17 | 24 | Q    Was that anything that was of concern to you as |
| 09:57:19 | 25 | you attended the free seminar or the three-day seminar? |

EXHIBIT 5
56

| | | |
|---|---|---|
| 09:57:23 | 1 | A    Not at all. |
| 09:57:25 | 2 | Q    You've talked a little bit about having attended |
| 09:57:31 | 3 | other types of seminars or conferences.  Can you describe |
| 09:57:33 | 4 | for me what your experience was prior to going to this |
| 09:57:37 | 5 | Trump event in terms of attending similar types of |
| 09:57:43 | 6 | conferences or seminars. |
| 09:57:47 | 7 | A    Sure.  I have attended numerous, too many to |
| 09:57:51 | 8 | even keep count probably, business seminars, conferences, |
| 09:57:55 | 9 | classes, workshops, whether they've been in connection |
| 09:57:59 | 10 | with Chamber of Commerces or different -- in the dance |
| 09:58:06 | 11 | industry, different things I was involved with there, the |
| 09:58:08 | 12 | real estate industry, other gurus, events.  Gosh, all the |
| 09:58:13 | 13 | way down to social media marketing. |
| 09:58:16 | 14 | I flew with my older son to Chicago for about |
| 09:58:19 | 15 | five days, years ago, right when social media started |
| 09:58:23 | 16 | coming out.  We bought brand-new laptops, put bells and |
| 09:58:27 | 17 | whistles on them, and I boarded a plane and told my son, |
| 09:58:29 | 18 | "Come on.  You're better on the computer than I am. |
| 09:58:31 | 19 | We're going to go here and learn how to do all the social |
| 09:58:34 | 20 | media and social media marketing for not only our |
| 09:58:36 | 21 | businesses, but, you know, just with the changing wave of |
| 09:58:39 | 22 | business." |
| 09:58:40 | 23 | So I've been to them in many different ranges |
| 09:58:43 | 24 | and -- I kind of know what to expect when you attend an |
| 09:58:47 | 25 | event, and this was no different. |

EXHIBIT 5
57

| | | |
|---|---|---|
| 09:58:54 | 1 | Q     Now let's turn a little bit and -- before we |
| 09:58:57 | 2 | finish.  So, again, on the free seminar, when -- tell us |
| 09:59:04 | 3 | when the sales pitch to purchase the three-day occurred. |
| 09:59:08 | 4 | Was it at the beginning?  Was it during?  Was it |
| 09:59:11 | 5 | throughout?  Was it at the end?  If you recall. |
| 09:59:15 | 6 | A     I don't know that I recall that.  I could not |
| 09:59:17 | 7 | recall where it took place in the evening.  I just recall |
| 09:59:20 | 8 | it not being a red flag or not seeming, like I said, |
| 09:59:24 | 9 | overly done or sleazy, like I've seen some other |
| 09:59:28 | 10 | presenters or speakers, I would call it, pitch. |
| 09:59:32 | 11 | Q     Can you describe what you mean by that. |
| 09:59:34 | 12 | A     Pitch? |
| 09:59:35 | 13 | Q     Well, sort of the hard sleazy pitch -- |
| 09:59:38 | 14 | A     Yes. |
| 09:59:38 | 15 | Q     -- that you've experienced at other seminars. |
| 09:59:40 | 16 | A     I have seen at some other seminars or classes or |
| 09:59:43 | 17 | conferences where literally within the first five |
| 09:59:45 | 18 | minutes, "This is why you're here today.  If you're not |
| 09:59:48 | 19 | here today for this, we'll give you the chance to leave |
| 09:59:50 | 20 | now" type of a thing, and I mean it's just really |
| 09:59:53 | 21 | hard-core and pressure's on or it's talked about the |
| 09:59:56 | 22 | whole time through. |
| 09:59:58 | 23 |       But then on the other hand, I've been to a lot |
| 10:00:01 | 24 | where they are more professionally done and you're there |
| 10:00:04 | 25 | getting content information, you know, hearing the |

EXHIBIT 5
58

1        I, Lindy DeBoer, Certified Shorthand Reporter

2   licensed in the State of California, Certificate No.

3   5405, hereby certify that the deponent was by me first

4   duly sworn, and the foregoing testimony was reported by

5   me and was thereafter transcribed with computer-aided

6   transcription; that the foregoing is a full, complete,

7   and true record of said proceeding.

8        I further certify that I am not of counsel or

9   attorney for either or any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of the

13  original transcript will render the reporter's

14  certificate null and void.

15       In witness whereof, I have hereunto set my hand

16  this 8th day of November, 2014.

17       ___X___ Reading and signing was requested.

18       _____ Reading and signing was waived.

19       _____ Reading and signing was not requested.

20

21

22

23       *Lindy DeBoer*

24  _____

     LINDY DeBOER, CSR No. 5405

25

EXHIBIT 5
59

# EXHIBIT 6

```
 1                    UNITED STATES DISTRICT COURT

 2               FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   SONNY LOW, ET AL.,              .
                                     . Docket
 5             Plaintiffs,           . No. 10-cv-0940-GPC(WVG)
                        v.           .
 6   TRUMP UNIVERSITY, LLC,          .
     ET AL.,                         .
 7             Defendants.           .
     . . . . . . . . . . . . . . . . .
 8   ART COHEN, Individually and     .
     on Behalf of All Others         .
 9   Similarly Situated,             .
                                     . Docket
10             Plaintiff,            . No. 13-cv-2519-GPC(WVG)
                        v.           .
11   DONALD J. TRUMP,                . July 22, 2016
               Defendant.            . 1:30 p.m.
12   . . . . . . . . . . . . . . . . San Diego, California

13                  TRANSCRIPT OF MOTIONS HEARING
               BEFORE THE HONORABLE GONZALO P. CURIEL
14                  UNITED STATES DISTRICT JUDGE

15

16               A-P-P-E-A-R-A-N-C-E-S

17   For the Plaintiffs:    Robbins Geller Rudman & Dowd LLP
                            655 West Broadway, Suite 1900
18                          San Diego, California 92101
                            By:   JASON A. FORGE, ESQ.
19                                RACHEL L. JENSEN, ESQ.
                                  XAVIER JAY ALVAREZ, ESQ.
20                                DANIEL J. PFEFFERBAUM, ESQ.
                            - and -
21                          Zeldes Haeggquist & Eck, LLP
                            225 Broadway, Suite 2050
22                          San Diego, California 92101
                            By:   AMBER LEE ECK, ESQ.
23
     For the Defendants:    O'Melveny & Myers LLP
24                          1999 Avenue of the Stars, Suite 700
                            Los Angeles, California 90067
25                          By:   DAVID L. KIRMAN, ESQ.
                                  DANIEL M. PETROCELLI, ESQ.
```

EXHIBIT 6

60

34

1    whether or not that affects the Court's analysis?

2         MS. JENSEN:  Certainly, Your Honor.  We have debated

3    that internally as well because the cases, as Your Honor

4    suggests, aren't always entirely clear and sometimes use those

5    terms interchangeably.

6         The presumption does appear to be something that would

7    arise and that they could rebut, versus an inference is

8    something the Court or the jury could use to infer, not

9    necessarily with the burden going back and forth.  But I have

10   to confess, Your Honor, that I don't think the case law has

11   been entirely clear on that.

12        But I would say, based on your class certification order,

13   and the law upon which it relies, I think does indicate that it

14   is something that the defendants could come back and rebut,

15   with some constraints on what that would look like in order for

16   an orderly class action trial to proceed.

17        THE COURT:  And part of what troubles or confounds us

18   is that we are talking about anticipating how a class action

19   trial would actually be tried because so few of us, if any of

20   us, have ever had a class action trial.  And as much as I am

21   sure all of us have researched the law to identify what class

22   action trials have gone to trial and how they did it, there are

23   very few.  And so at the same time, this Court is told that it

24   has to look at how this case will unfold by looking at the

25   elements, by looking at the common proof, by looking at what

EXHIBIT 6

61

35

1    the defenses will be, and then within that outline, then

2    identify, "Okay.  All right.  So what will the evidence be?"

3    And to the extent that the evidence will be a certain thing,

4    well, now we have individualized determinations overwhelm the

5    case and so that we don't have predominance.

6         And so I went back and I read *Iorio v. Allianz* and

7    *Plascencia v. Lending 1st*.  And I know that a lot of times,

8    when we are looking at these cases, we are looking at cases

9    that themselves may not have been a RICO case, but they were a

10   state fraud case, so there was an inference applied in that

11   particular case, and it is not clear how it will be contested

12   or offset.

13        To the extent there is this language that the presumption

14   can only be rebutted on a class-wide basis, that is, the

15   evidence that can be properly generalized to the class as a

16   whole, can you think of any such evidence that could be

17   available in this case?

18             MS. JENSEN:  Certainly, Your Honor.  There are

19   experts in this Cohen matter.  And for instance, the

20   plaintiffs' expert has conducted a consumer survey that asks

21   consumers what was -- sorry -- did these particular

22   representations -- were they important to you?  And the results

23   were overwhelming; close to 90 percent said that these

24   representations impacted their decision to enroll.  That's the

25   type of evidence that would be objective and would be properly

EXHIBIT 6

62

1    generalized.

2         Now, the defendants also have their experts, and I know we

3    are going to be hearing about whether the experts will be

4    allowed to testify.  But certainly, that's one area.

5         And then also, I think the Court, although I can't -- I

6    can't read into what the Court was thinking, it seems that

7    these decisions are oftentimes also about the advertising.

8    Right?  So, in other words, whether it predominantly or

9    prominently features these representations.  The courts look at

10   that and say consumers are entitled to rely.  So it really can

11   be also shown through the defendants' advertising campaign as

12   well.

13             THE COURT:  All right.  And I think it was in *Iorio*

14   where Judge Wilkins identified the type of evidence that could

15   be relied upon by the defendant, and one was to cross-examine

16   the plaintiff and second was to, I guess, take on the basis for

17   the presumption itself; that is, show that the statements

18   weren't material and to assert that the statements weren't

19   uniformly made.  And so that was, I guess, another form of

20   evidence that the defendants were recognized to have available

21   to themselves to challenge these inferences.

22        Mr. Petrocelli?

23             MR. PETROCELLI:  Just briefly, Your Honor.  I

24   appreciate that all of us are in the same boat, trying to play

25   out how a class action trial would look.  But the reason we

EXHIBIT 6

63

1    brought this motion now for decertification is because we

2    think, based on the current record and based on the evidence

3    that we submitted, where you have the students who testified so

4    far saying that they enrolled in Trump University because of

5    interest in real estate, interest in business seminars,

6    opportunity for networking, quality of the program compared to

7    others, uncertainty in the real estate market, so forth; that

8    there isn't a single logical explanation which is what drove

9    the decision in cases like *Poulos*, where the only logical

10   explanation for such behavior that the class members relied on

11   defendant's representation.

12          THE COURT:  And I am not sure if that would be the

13   correct pronouncement of law or observation, that it has to be

14   the only, the one and only, versus a significant or

15   substantial --

16          MR. PETROCELLI:  Well, remember, the consequence, the

17   consequence of that proposition is drastic because RICO

18   requires causation, and whether you call it reliance or

19   whatever --

20          THE COURT:  But it talks about proximate cause,

21   correct?

22          MR. PETROCELLI:  Right.  But the statute says "by

23   reason of," and that means that you were damaged by reason of

24   this conduct.

25       And we are talking about extending this on a class basis,

EXHIBIT 6

64

1          C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11          DATED:  July 24, 2016, at San Diego, California.

12

13                    /s/  Chari L. Possell

14                    _____
                      Chari L. Possell
                      CSR No. 9944, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 6
65