ROBBINS GELLER RUDMAN & DOWD LLP
PATRICK J. COUGHLIN (111070)
patc@rgrdlaw.com
X. JAY ALVAREZ (134781)
jaya@rgrdlaw.com
JASON A. FORGE (181542)
jforge@rgrdlaw.com
RACHEL L. JENSEN (211456)
rjensen@rgrdlaw.com
DANIEL J. PFEFFERBAUM (248631)
dpfefferbaum@rgrdlaw.com
BRIAN E. COCHRAN (286202)
bcochran@rgrdlaw.com
JEFFREY J. STEIN (265268)
jstein@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

ZELDES HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
ambere@zhlaw.com
AARON M. OLSEN (259923)
aarono@zhlaw.com
225 Broadway, Suite 2050
San Diego, CA 92101
Telephone: 619/342-8000

Class Counsel

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONNY LOW, J.R. EVERETT and JOHN BROWN, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TRUMP UNIVERSITY, LLC, a New York Limited Liability Company and DONALD J. TRUMP,<br><br>Defendants. | No. 3:10-cv-0940-GPC(WVG)<br><br>CLASS ACTION<br><br>PLAINTIFFS' MOTION *IN LIMINE* NO. 7: MOTION TO EXCLUDE EVIDENCE AND ARGUMENT ABOUT TRUMP UNIVERSITY'S PURPORTED APPROVAL RATING AND STUDENT-VICTIM EVALUATIONS<br><br>DATE: November 10, 2016<br>TIME: 1:30 p.m.<br>CTRM: 2D<br>JUDGE: Hon. Gonzalo P. Curiel |

1198265_1

Plaintiffs Sonny Low, J.R. Everett, and John Brown ("plaintiffs") respectfully move to exclude from Phase 1 of trial any testimony, exhibits, questions, commentary, references, statements, and arguments regarding defendant Trump University, LLC's ("TU") purported "98% approval rating" ("Rating") or student-victim evaluations.

## I. INTRODUCTION

Throughout this case, defendant Donald J. Trump ("Trump") has used TU's Rating as smoke and mirrors to deflect from the real issues at hand: namely, did he mislead consumers in the advertising and promotion of TU? (He did). Trump's diversionary tactics have no place in Phase 1 of trial. Even if true (it is not), students' "'positive experience' has nothing to do with any affirmative defense and little to do with any of the elements to these causes of action." Dkt. 472 at 9. In other words, TU's Rating is irrelevant to whether defendants promised, but failed to deliver, the next best thing to learning from Trump directly: learning from his "handpicked" experts at a legitimate "university"; or whether those promises were material to a reasonable person's purchasing decision.

But relevance is not the only basis to exclude it. The evaluation forms, and the Rating supposedly derived from them, are rank hearsay and similar to other types of customer feedback routinely excluded by courts. Moreover, survey evidence must meet the reliability standards set forth under Federal Rule of Evidence ("FRE") 702. But the record is devoid of a reliable methodology; indeed, the origins of the Rating are so elusive that Trump's own expert in *Cohen* has no idea how it was calculated. Neither does Trump. What little evidence does exist suggests defendants concocted the Rating post-Class Period to undercut the cascade of consumer complaints, though the percentage has inexplicably crept-up over time, even after TU went dormant.[1]

Moreover, the evaluations were neither designed nor administered to objectively measure satisfaction. Whatever percentage defendants claim, it is

---

[1] Though defendants are inconsistent about the actual percentage, plaintiffs adopt the "98%" figure because Trump has made that the centerpiece of his out-of-court, court-of-public opinion defense campaign. *See* Dkt. 443-1 at 5 (citing 98% website).

1  unreliable because, among other reasons, 25% of students obtained refunds (many
2  others, like plaintiffs, requested them but were refused); defendants did not reveal the
3  truth before administering the evaluation; instructors encouraged students to give them
4  high scores; the evaluations were not anonymous and students were simultaneously
5  hoping to get help from their instructors; "positive" scores include free events; and
6  some student-victims filled out multiple forms, while 20% of all students-victims
7  turned in none.

8  Finally, TU's Rating is misleading, confusing, and unfairly prejudicial.  If
9  anything, student-victims' positive evaluations confirm the success of the scam.
10 Allowing defendants to tout a Rating that depended on their ability to keep students in
11 the dark is unfairly prejudicial.  In addition to providing a patina of legitimacy and
12 mathematical precision, the Rating suggests students were satisfied when, in reality,
13 thousands got refunds and many more requested them.  Fast forward, TU's true rating
14 looks to be less than "1%," as only 13 of 7,600 Class Members opted out.  Evidence
15 and argument about the Rating and student evaluations should be excluded.

16 **II.    ARGUMENT**[2]

17    **A.    TU's Rating and Student-Victim Evaluations Are Irrelevant**

18 This Court bifurcated trial into liability and damages phases – with only
19 evidence relevant to liability to be admitted in the first phase ("Phase 1"). Dkt. 418.
20 Evidence is relevant if "it has any tendency to make a fact more or less probable than
21 it would be without the evidence" and "the fact is of consequence in determining the
22 action."  FRE 401.  Evidence that is not relevant is not admissible.  FRE 402.

23 Here, Phase 1 will address the common liability elements of plaintiffs' class
24 claims.  These claims focus on defendants' misrepresentations and/or omissions in
25 advertising the TU live events, and the materiality of the same. *See, e.g.*, Dkt. 298 at
26 19-22.  Relief is available without individualized proof of deception, reliance, or

---

[2] The legal standards governing motions *in limine* are set forth in plaintiffs' Motion *In Limine* to Limit Evidence to Class Eligible Purchases, filed concurrently.

damages. *See id.* at 19-20. Plaintiffs also seek relief from defendants' misconduct as senior citizens under California and Florida statutes. *See, e.g.*, *id.* at 26.

TU's Rating and unverified student evaluation forms have no bearing on these common liability issues. As this Court has previously held: "A review of the California causes of action that . . . Low represent[s] reveal[s] that "'[plaintiff's] positive experience' has nothing to do with any affirmative defense and little to do with any of the elements to these causes of action." Dkt. 472 at 9. And while "Defendants seek to show that [plaintiff] was not deceived or injured by the mentoring representation . . . under California law, the test for reliance and causation focus on the materiality of the widely made representation versus the subjective and personalized experience of one class member." *Id.* Thus, a student's "positive" experience – either individually or in the aggregate – is irrelevant for Phase 1.

This evidence is also irrelevant to materiality because the jury must decide this issue based on information available at the time of purchase, such as the content of the advertisement, not what a student may have later discovered. *See, e.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (misrepresentation or omission is material "'if a reasonable man would attach importance to its existence or nonexistence ***in determining his choice of action*** in the transaction in question'").[3] In other words, materiality is not decided in the rearview mirror. *See id.* Regardless of whether any (or all) students gave high marks after-the-fact is irrelevant to whether defendants' representations or omissions were material when the student signed up.

Assuming *arguendo* that the Rating, or any positive evaluation, is relevant at all, it could only be relevant to damages. Defendants' description of Trump's anticipated testimony at trial demonstrates why: "TU's 98% approval rating . . . confirmed Mr. Trump's belief that ***TU provided significant value*** to individuals who attended." Ex. 1 at Ex. A.[4] While this praise proves the success of the deception,

---

[3] Citations and footnotes are omitted and emphasis is added unless otherwise noted.
[4] All Exhibits cited herein are attached hereto unless otherwise noted. Pursuant to

damages is the only issue to which such subjective praise could possibly relate. Further, while defendants cite "Mr. Trump's belief," the Rating cannot absolve Trump of responsibility because this claim was not concocted until late in the game to ward off complaints, a D- from the Better Business Bureau, and litigation. Dkt. 122-3, Ex. 13; Ex. 2 at 836. Thus, the Court should exclude evidence of the Rating and evaluation forms as irrelevant to Phase 1 of trial.

### B. TU's Student-Victim Evaluations and the Rating Purportedly Derived from Them Are Inadmissible Hearsay

The Court should exclude evidence of the Rating and any evaluation forms because they constitute rank hearsay. *See* FRE 801. The evaluation forms are unverified, out-of-court statements (some of which are unsigned) concerning students' experiences to prove that students actually had the stated experiences. *See* FRE 801(c)(2). The Rating purportedly derived from these surveys fares no better.

In *Shimozono v. May Dep't Stores Co.*, No. 00-04261 WJR (AJWx), 2002 U.S. Dist. LEXIS 28478, at *40 (C.D. Cal. Nov. 19, 2002), the court excluded "customer survey response cards" and the business records incorporating them as "inadmissible hearsay" and rejected efforts to classify them as business records under FRE 803(6) because the exception "applies only if the person furnishing the information is 'acting routinely, under a duty of accuracy, with employer reliance on the result, or in short "in the regular course of business."'" *Id.* (citing *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983)). The exception is available only "'"if it is shown that the business's standard practice was to verify the information provided"'" because "the customer is under no duty to report accurately." *Id.* at *40-*41; *see also Hendricks v. Ford Motor Co.*, No. 4:12cv71, 2012 U.S. Dist. LEXIS 139293, at *4 (E.D. Tex. Sept. 27, 2012) ("Customer complaints in a company's files are out-of-court statements. If they are offered to prove the truth of the matter asserted . . . they are hearsay and are

---

the Court's August 2, 2016 Order (Dkt. 502), Plaintiffs have limited their attachments to this motion to 10 pages. Plaintiffs are prepared to provide the Court with complete versions of any attached document or copies of any documents referenced herein upon request.

inadmissible."). Nothing about the evaluations in this case dictates a different result: They are out-of-court responses of attendees of TU live events who were under no duty of accuracy and TU made no effort to verify the information provided. To the contrary, the statements appear to have been prompted by instructors in order to generate positive responses. Nor are these evaluations (or the Rating derived from them) subject to any other hearsay exception, as defendants are attempting to use these statements to prove that, in fact, students were satisfied.

### C. TU's Rating Is Not the Product of Any Accepted Principle or Methodology and Is Unreliable

Defendants have held TU's Rating out as a product of their "student surveys" at the Live Events. *See Cohen* Dkt. 180-1 at 5 n.5. To be admissible, TU's Rating must meet the requirements of FRE 702 as survey evidence is subject to the standards for expert testimony. *See In re Conagra Foods, Inc.*, 302 F.R.D. 537, 560 (C.D. Cal. 2014) ("*Daubert* governs the admissibility of survey data."). A survey must be designed and conducted by someone with sufficient "knowledge, skill, experience, training or education" and must be "conducted according to accepted principles." FRE 702; *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992). While typically "'[t]echnical unreliability goes to the weight accorded a survey,'" defendants' inability to produce documentary or testimonial evidence concerning the methodology or analysis by which 11,800 evaluations – containing both open ended questions and using a 1-5 rating scale – were distilled to a single percentage figure renders the Rating inadmissible. *See E &J. Gallo*, 967 F.2d at 1292.

Whereas a jury may assess shortcomings in some surveys, it would be an impossible task for the jury here as defendants have failed to put forth a witness with personal knowledge of the design, execution, or methodology of the Rating. Without an opportunity for vigorous cross-examination of the proponent, courts exclude such evidence. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993); *In re TMI Litig. Cases Consol. II*, 922 F. Supp. 1038, 1048 (M.D. Pa. 1996) (excluding survey

where opposing party lacked "opportunity to influence the amount of weight that the jury might accord to the study" due to lack of evidence).

The methodology behind the Rating remains elusive, and even Trump's expert in *Cohen*, who was retained to defend the Rating, confessed: "I don't know how Trump University conducted their study to come up with that number." Ex. 3 at 269:17-19. While defendants appear to rely on the "analysis" in a single-page, unauthenticated document, titled "The Trump Entrepreneur Initiative Customer Satisfaction Summary," that document not only post-dates the name change to TEI it is woefully incomplete, listing only 28 of 47 states in which TU held Live Events.[5] *See* Dkt. 138 at 7 (citing to TU 48483). And while defendants may point to the declaration of former TU Program Director Mark Covais (Dkt. 138-1, Ex. 6), Covais is not qualified to opine on survey evidence. Indeed, Covais has no personal knowledge of how the evaluation was developed or conducted, including whether unsatisfied student-victims left without filling them out or whether "bad" evaluations were discarded (a serious concern given that 80,000 people attended the live events), nor can he fully explain how TU concocted a single numerical "approval rating" from 11,800 multi-question forms.[6]

In addition to being the product of unknown methods and analysis (if any), the Rating suffers from myriad deficiencies that render it unreliable – much more so than

---

[5] Elsewhere, defendants have asserted TU had a 95, 97 or 98% rating with no citation at all (*see, e.g.*, *Cohen* Dkt. 180-1 at 2), all but admitting that the Rating lacks support: "Plaintiffs challenge the veracity of the student surveys and TU's 97% approval rating. *See, e.g.*, *Makaeff* Dkt. 195 at 17. **However, there is no evidence in the record that Defendant had any reason to question the accuracy of this information**." *Cohen* Dkt. 180-1 at 5 n.5. This argument is notable. First, it offers no defense of the accuracy of the Rating. Second, it presumes, without any evidence that the Rating claim existed at a time when TU was putting on Live Events and that Trump was aware of it.

[6] The Covais declaration states that: "TU compiled the data from the evaluations which is summarized in the surveys, which I also collected and produced in the litigation. 97% of TU students who provided written evaluations rated TU programs 4.85 or higher on a 1-5 scale . . . ." Dkt. 138-1, Ex. 6 (Covais Decl.), ¶9. Covais does not, however, claim to have calculated the Rating, nor has any other witness claimed responsibility for any calculation supporting it.

the survey put forth by plaintiff's expert in *Cohen* that defendant resisted vigorously. *See Cohen* Dkts. 181-1, 245. First and most glaringly, TU issued 2,539 refunds to 7,611 retained students (a refund rate of approximately 25%), which suggests a ceiling of 75% approval. *See* Dkt. 138-1, Ex. 6 (Covais Decl.), ¶¶6(m)-(o). This refund rate is more than eight times the 3% average for on-line retailers, yet defendants' rating fails to account for refunds.[7]

Second, TU's evaluations and Rating should be excluded because TU failed to limit the "survey" to the correct target universe, *i.e.*, members of the Class. As defendants previously argued, the target universe must consist of "all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent." *Cohen* Dkt. 181-1 at 5 (citing Shari S. Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence 376 (Fed. J. Ctr. 3d ed. 2011)). Here, the Rating is purportedly based on approximately 11,800 live-event evaluations yet there are only 7,600 paying Class Members. *See* Dkt. 138-1, Ex. 6 (Covias Decl.), ¶¶6(b)-(c). Defendants attribute the additional evaluations to free "guests," but this only undermines the reliability of the Rating – free guests are not class members and have different perspectives than purchasers. *Cohen* Dkt. 181-1 at 21. Moreover, hundreds of evaluations are from free events (like the Trump Entrepreneur Expo) or Canadian events – neither of which is relevant to this action. *See, e.g.*, *Cohen* Dkt. 49-5, Ex. 36; Ex. 4. Even more confounding, defendants stated that 20% of attendees did not fill out an evaluation form at all – raising serious questions whether the evaluations were administered in any systematic way. Ex. 2. In sum, the 11,800 evaluations appear to be at once over-inclusive and under-inclusive and consist of an undefined hodgepodge nowhere close to approximating the Class or providing a reliable basis for the Rating.

Third, student-victims filled out the evaluation forms without any disclosure

---

[7] Brohan, Mark, www.internetretailer.com/2013/05/29/reducing-rate-returns (May 29, 2013) (last visited Oct. 20, 2016).

1  that defendants misrepresented TU's offerings, nor did defendants endeavor to cure
2  any such deception.  Compounding the Rating's unreliability, the questions were
3  phrased to elicit positive results, like:   "[Speaker] James Harris exceeded my
4  expectations as a subject matter expert who presented the material clearly." *See, e.g.*,
5  Dkt. 195-1, Ex. 84.  Elsewhere, defendants have adamantly argued that questions like
6  these create a demand effect and are grounds for exclusion.  *Cohen* Dkt. 181-1 at 14
7  (citing *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind.
8  2000)).  Defendants' own expert conceded there are "problems" with these "bad"
9  questions.  *Cohen* Dkt. 184-2, Ex. 6 at 37 n.93.

10  Fourth, the bias toward favorable results was further aggravated by instructors
11 who directed student-victims to give them high marks on non-anonymous evaluations,
12 and did so at a time when student-victims were still seeking assistance from these
13 same instructors.  Dkts. 195 at 18 n.19 & 122-2 (Brown Decl.), ¶7.  The fact that the
14 evaluations were not anonymous adds to the bias.[8]  *See, e.g.*, Dkt. 195-1, Ex. 13.

15  These shortcoming in the evaluations and Rating go well beyond mere
16 "[t]echnical unreliability" (*Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150,
17 1156 (9th Cir. 1982)), and constitute "substantial deficiencies in the design or
18 execution of a survey [which] is grounds for its complete exclusion." *Gibson v. Cty.*
19 *of Riverside*, 181 F. Supp. 2d 1057, 1067 (C.D. Cal. 2002).

20  **D.    Trump Lacks Personal Knowledge to Testify About TU's Rating or Student-Victim Evaluations**
21
22  Trump should be specifically forbidden from testifying about TU's Rating
23  because he lacks any personal knowledge of it.  His anticipated testimony includes:

24  > Mr. Trump's role in TU decreased after it was formed, but TU's 98% approval rating and other factors demonstrated TU's quality and confirmed Mr. Trump's belief that TU provided significant value to individuals who attended and had the drive to apply what they learned.
25

26  Defs. Proposed PTO, Ex. A at 5 (submitted via email on April 29, 2016).

27
---
[8]   Huang, Hsiu M., *Do print and Web surveys provide the same results?* 22(3)
28  Computers in Human Behavior, 334-350 (2006).

1   This description is consistent with Trump's strategy at his deposition in
2   sidestepping questions about his misconduct by deflecting to TU's Rating. *See* Ex. 5
3   at 50:15-17 ("Trump University was certainly a valuable education, as proven out by
4   95 to 97 percent approval rating"); *id.* at 53:15-19 ("I really was very insistent that we
5   get good instructors for the classes. And I think the 97 percent bears that out, that we
6   were successful in that regard."); *id.* at 111:6-9 ("[O]bviously, we did, because we had
7   a 97 percent approval rating.").

8   But Trump lacks the requisite personal knowledge to testify about this issue.
9   "A witness may testify to a matter only if evidence is introduced sufficient to support
10  a finding that the witness has personal knowledge of the matter." FRE 602; *Latman v.*
11  *Burdette*, 366 F.3d 774, 787 (9th Cir. 2004) ("'A witness may testify only about
12  matters on which he or she has first-hand knowledge.'"). Trump already confessed
13  that he has no first-hand knowledge of TU's Rating or basis:

> [A:] I had heard that we have a 95 to 97 percent approval rating, and I just asked that that be confirmed. And it was confirmed, that we had an approval rating from the various people that took the course of 95 to 97 percent.
>
> And I did ask because I wasn't sure what the number was. I had heard it was very high, but I wasn't sure. Other than that, I didn't do any preparation.
>
> Q: Who did you ask about that?
>
> A: I asked – I asked George Sorial about that.
>
> Q: And do you know where he looked to get that information?
>
> A: No. No. He has the information, but I don't know.
>
> Q: Sure. Do you know what that approval rating was based on?
>
> A: No. I just asked what the approval rating was.
>
> Q: And he collected that information for you?
>
> A: He was able to give it to me.
>
> Q: Sitting here, you don't know what that approval rating was based on?
>
> A: No.

Ex. 5 at 17:20-19:7. This testimony demonstrates that, with respect to TU's Rating, Trump has not "'actually perceived or observed that which he testifies to.'" *Latman*, 366 F.3d at 787. Trump has no personal knowledge of the Rating or the data, analysis, or methodology behind it. Nor can Trump testify based on Sorial's (or anyone else's) statement, as it remains hearsay. *See* FRE 801; *see supra* at 9.

### E. Evidence of TU's Rating and Student-Victim Evaluations Are Misleading, Confusing, and Unfairly Prejudicial

Even assuming the Rating and/or the unverified evaluations are minimally relevant, they should be excluded because any "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." *See* FRE 403; *United States v. W.R. Grace*, 504 F.3d 745, 759 (9th Cir. 2007). The Rating risks misleading the jury that the vast majority of student-victims are satisfied and thus plaintiffs must be outliers. The truth is the opposite: 25% of students received refunds, many more (like plaintiffs) were denied refunds, and only 13 out of 7,600 students opted out. *See, e.g.*, Dkt. 509-1, Exs. 1-50; Dkt. 195 at 18-19. If defendants are allowed to put on evidence of TU's Rating, plaintiffs would have to parade before the jury hundreds of student-victims to blunt the prejudice.

Under FRE 403's balancing test, the Rating adds nothing to the jury's consideration of falsity or materiality. On the other hand, the arbitrary Rating could confuse the jury by injecting improper questions about student-victims' subjective experiences post-purchase into the trial. In sum, the Rating is not even minimally probative to the liability element, whereas there is a substantial risk that it could confuse the issues and mislead the jury. Thus, if the Court does not exclude the evidence as irrelevant, unreliable hearsay, it should exercise its discretion to exclude the evidence as misleading, confusing, and/or unfairly prejudicial.

DATED: October 20, 2016

Respectfully submitted,
ROBBINS GELLER RUDMAN
 & DOWD LLP

s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

| | |
|---|---|
| 1 | |
| 2 | ROBBINS GELLER RUDMAN |
| |   & DOWD LLP |
| 3 | PATRICK J. COUGHLIN |
| | X. JAY ALVAREZ |
| 4 | JASON A. FORGE |
| | RACHEL L. JENSEN |
| 5 | DANIEL J. PFEFFERBAUM |
| | BRIAN E. COCHRAN |
| 6 | JEFFREY J. STEIN |
| | 655 West Broadway, Suite 1900 |
| 7 | San Diego, CA 92101 |
| | Telephone: 619/231-1058 |
| 8 | 619/231-7423 (fax) |
| 9 | ZELDES HAEGGQUIST & ECK, LLP |
| | AMBER L. ECK |
| 10 | AARON M. OLSEN |
| | 225 Broadway, Suite 2050 |
| 11 | San Diego, CA 92101 |
| | Telephone: 619/342-8000 |
| 12 | 619/342-7878 (fax) |
| 13 | Class Counsel |

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 20, 2016.

 s/ Daniel J. Pfefferbaum
DANIEL J. PFEFFERBAUM

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:    dpfefferbaum@rgrdlaw.com

1198418_1

3:10-cv-0940-GPC(WVG)

**Mailing Information for a Case 3:10-cv-00940-GPC-WVG Low v. Trump University, LLC et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Xavier Jay Alvarez**
  jaya@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Patrick J Coughlin**
  patc@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanm@rgrdlaw.com

- **Amber Lee Eck**
  ambere@zhlaw.com,winkyc@zhlaw.com,nadiak@zhlaw.com

- **Jason A Forge**
  jforge@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jeffrey L. Goldman**
  jgoldman@bbwg.com

- **Alreen Haeggquist**
  alreenh@zhlaw.com,winkyc@zhlaw.com,nadiak@zhlaw.com

- **Rachel L Jensen**
  rjensen@rgrdlaw.com,lmix@rgrdlaw.com,llendzion@rgrdlaw.com,e_file_sd@rgrdlaw.com,hbrown@rgrdlaw.com,mbacci@rgrdlaw.com,JayA@rgrdlaw.com,KLavelle

- **David Lee Kirman**
  dkirman@omm.com,awyman@omm.com,tmoore@omm.com,iyanniello@omm.com,hleewong@omm.com,sbrown@omm.com

- **Jill Ann Martin**
  jmartin@trumpnational.com,lvincent@trumpnational.com

- **Thomas R. Merrick**
  tmerrick@rgrdlaw.com

- **Maureen E. Mueller**
  mmueller@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Aaron M. Olsen**
  aarono@zhlaw.com,winkyc@zhlaw.com

- **Daniel M. Petrocelli**
  dpetrocelli@omm.com

- **Daniel Jacob Pfefferbaum**
  dpfefferbaum@rgrdlaw.com

- **Jeffrey J. Stein**
  JStein@rgrdlaw.com

- **Helen Irene Zeldes**
  helenz@zhlaw.com,winkyc@zhlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`