1              UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    SONNY LOW, ET AL.,          .
                                 . Docket
5             Plaintiffs,        . No. 10-cv-0940-GPC(WVG)
                                 .
6                  v.            .
                                 .
7    TRUMP UNIVERSITY, LLC,      . November 10, 2016
     ET AL.,                     . 1:30 p.m.
8                                .
              Defendants.        . San Diego, California
9    . . . . . . . . . . . . . . .

10

              TRANSCRIPT OF MOTIONS IN LIMINE HEARING
11          BEFORE THE HONORABLE GONZALO P. CURIEL
                 UNITED STATES DISTRICT JUDGE
12

13                  A-P-P-E-A-R-A-N-C-E-S

14   For the Plaintiffs:    Robbins Geller Rudman & Dowd LLP
                            655 West Broadway, Suite 1900
15                          San Diego, California 92101
                            By:  JASON A. FORGE, ESQ.
16                               RACHEL L. JENSEN, ESQ.
                                 PATRICK J. COUGHLIN, ESQ.
17                               DANIEL J. PFEFFERBAUM, ESQ.
                                 AARON M. OLSEN, ESQ.
18                               BRIAN E. COCHRAN, ESQ.
                            – and –
19                          Zeldes Haeggquist & Eck, LLP
                            225 Broadway, Suite 2050
20                          San Diego, California 92101
                            By:  AMBER LEE ECK, ESQ.
21

22   For the Defendants:   O'Melveny & Myers LLP
                           1999 Avenue of the Stars, Suite 700
23                         Los Angeles, California 90067
                           By:  DANIEL M. PETROCELLI, ESQ.
24                              DAVID L. KIRMAN, ESQ.
                                DAVID MARROSO, ESQ.
25                              WALLACE MOORE ALLAN, ESQ.
     ///

```
 1                    A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

 2   Also for the Defendants:
                              JILL ANN MARTIN, ESQ.
 3                            Trump National Golf Club, Los Angeles
                              One Trump National Drive
 4                            Rancho Palos Verdes, California 90275

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:         Chari L. Possell, RPR, CRR
                             333 West Broadway, Suite 420
23                           San Diego, California 92101
                             chari_possell@casd.uscourts.gov
24

25   Reported by Stenotype, Transcribed by Computer
```

```
 1          SAN DIEGO, CALIFORNIA; NOVEMBER 10, 2016; 1:30 P.M.

 2                              -o0o-

 3          THE CLERK:  Calling item Number 11 on the calendar,

 4   Case Number 10-cv-940, Low v. Trump University, on for a

 5   miscellaneous hearing and a motions in limine hearing.

 6          THE COURT:  Appearances, please.

 7          MR. FORGE:  Good afternoon, Your Honor.  Jason Forge,

 8   on behalf of the plaintiffs.  With me at counsel table is

 9   Patrick Coughlin, Rachel Jensen, and Dan Pfefferbaum.

10          THE COURT:  Good afternoon.

11          MR. PETROCELLI:  Good afternoon, Your Honor.  Daniel

12   Petrocelli; with David Marroso, whom you have not met before;

13   and David Kirman; Jill Martin; and Ted Allan, whom you also

14   have not met before.  And we are here for defendants Trump

15   University and President-elect Donald J. Trump.

16          THE COURT:  Good afternoon.

17      We are here for a number of proceedings.  First off, we

18   are here on motions in limine.  With respect to the motions in

19   limine, I have issued a tentative with respect to the Court's

20   rulings.  With respect to those tentative rulings, they reflect

21   the Court's philosophy on motions in limine.  The Court views

22   them as being ways for the parties to raise issues that are

23   potentially so inflammatory, so prejudicial, and grounds exist

24   to exclude the evidence, that they are taken up before trial to

25   avoid having that information being conveyed to the jury.
```

1          So I have found that, with respect to that primary purpose

2     of motions in limine, that there are a couple of areas where

3     preliminary threshold determinations are necessary.  There are

4     others that the Court has decided to defer or to deny the

5     motions, finding that they don't rise to the level of being

6     that inflammatory or, in the alternative, really, they are so

7     fact-specific, they are so context-dependent, that it's

8     impossible at this moment to offer a ruling with respect to

9     those motions in limine.

10         So with that being said, I have provided each side with

11    the tentative order, and what I am prepared to do is allow each

12    side to address any of the rulings that they would like, and

13    then once they identify that particular issue, then I will turn

14    to the other side to see what their response is.

15         So let me begin with the plaintiffs, since the plaintiffs

16    bear the burden of proof, and Mr. Forge, you and Mr. Coughlin,

17    do you wish to address any of the tentatives that I have

18    issued?

19              MR. FORGE:  Your Honor, if I may, it's not a motion

20    in limine, but it is the first issue Your Honor addressed in

21    the tentative.

22              THE COURT:  Yes.  It has a relation to any number of

23    the motions in limine.

24              MR. FORGE:  Exactly.

25         With respect to the nonrepresentative student tentative,

1    the only point that I was hoping to clarify with the Court is

2    whether Your Honor was -- I know you limited the areas of

3    testimony for the nonrepresentative students to rebutting the

4    uniformity.  And what I was wondering is whether Your Honor was

5    anticipating that that would be further limited to

6    nonrepresentative former students from the states at issue in

7    this case, those being California, Florida, and New York.

8         THE COURT:  Versus any of the other states?

9         MR. FORGE:  Exactly.  Versus calling somebody from

10   some other state to talk about what advertisement he or she saw

11   to rebut the presumption.

12        THE COURT:  That sounds reasonable to me, that as far

13   as nonrepresentative class members that would be allowed to

14   testify on the issue of uniformity, that they would necessarily

15   need to be part of the overall putative class, and so I would

16   be happy to limit it to that.  But at the same time, I am happy

17   to hear from the parties.

18        MR. FORGE:  That's the only point I wanted to clarify

19   or confirm with that issue.

20        THE COURT:  All right.  So then let me hear a

21   response and I expect perhaps further argument with respect to

22   that ruling.

23        MR. PETROCELLI:  Your Honor, I feel obligated to

24   inform the Court that before we address these motions, as I

25   indicated to Mr. Forge this morning, that we will be seeking to

1    continue the trial.

2            THE COURT:  What is the reason?

3            MR. PETROCELLI:  In view of Mr. Trump's election as

4    president of the United States, Your Honor.  We will be filing

5    a motion to that effect either tomorrow or Monday, and Your

6    Honor can address it.  But the principal grounds will be that

7    he ought not have to proceed to trial at this moment in time

8    given that he only has 70 days, now that he's been elected

9    president, to perform the extraordinary task of going through

10   the transition process and picking cabinet members.  There are

11   over 3,000 appointees.  All of that is not going to get done

12   before the inauguration.  But they are following a long and

13   exhausting and hard-fought campaign.  The good news is that he

14   was elected; the bad news is that he has even more work to do

15   now.

16       And we feel like there is a compelling justification to

17   ask that the Court put this trial off until after the

18   inauguration, particularly given, Your Honor, that we have a

19   second trial, the Cohen case, in which Mr. Trump is the sole

20   defendant.  And the idea that we would have two of these

21   trials --

22            THE COURT:  Certainly, that's not going to go to

23   trial before he is president, and so I don't think we have to

24   worry about that.

25            MR. PETROCELLI:  Well, it's going to go to trial,

1    unless something happens, while he is president.

2          THE COURT:  I wouldn't worry about that.  What we

3    would want to worry about is this case.

4          MR. PETROCELLI:  Well, I was just pointing out,

5    though, Your Honor, that there's an efficiency to be gained in

6    putting this off because we have another case.  But putting

7    that aside --

8          THE COURT:  I will let you file the papers; but one

9    thing I would like you to address head-on is the question with

10   respect to the plaintiffs that have filed this action and who

11   have already waited six and a half years to have this matter

12   set for trial.  And I expect that you are not proposing that we

13   have a trial in the middle or the beginning of President

14   Trump's administration, and you would be asking the Court to

15   set it off for four years or possibly eight years?

16         MR. PETROCELLI:  No, Your Honor.  No.  And let me

17   address that, Your Honor.

18      First of all, I am very understanding of the rights and

19   interests of the plaintiffs in this case to have their claims

20   resolved.  I am also mindful that one of the three plaintiffs

21   is in his 70s, Plaintiff Sonny Low, who is the California

22   representative and also the representative for the elder class

23   as well under the California claim.  We are not proposing that

24   the case be put off indefinitely, but we are proposing that it

25   be put off until the early part of next year.

1          There's another significant issue that relates to this and

2     that's whether Mr. Trump, President-elect Trump, can actually

3     become available to testify.  And I would like to address that

4     issue in our papers with the Court, about whether there may be

5     another mechanism to take his testimony, as has been done in

6     other cases.

7          There has never been a case in the history of our country

8     where a sitting president had has been required to come into a

9     courtroom or to my knowledge --

10          THE COURT:  That's right.  And that's what we are

11     trying to avoid.

12          MR. PETROCELLI:  -- or to my knowledge a

13     president-elect, Your Honor, to come into a courtroom and have

14     to testify against -- in a case, in a personal case against

15     him, or in any case.

16          There are -- I think we all have -- and I know the Court

17     is, I am sure, extremely and keenly mindful of all of this and

18     trying to balance all of these interests.  I understand the

19     situation the Court is facing.  But we are in uncharted

20     territory, and I think we need a little bit of a time-out,

21     here, to see whether there is any way to resolve these claims,

22     whether by private resolution, whether by ADR or some other

23     process, that wouldn't require one, let alone two, trials

24     against Mr. Trump.

25          And so, for those reasons among other reasons, I am going

1    to ask for the Court's indulgence to review our submission and

2    give consideration to putting the trial off until the early

3    part of next year.  When?  I would think it would make sense

4    sometime in the early part of the year, in February, March or

5    April, generally in that time frame.  I had told you the last

6    time that we talked about this that I thought February might

7    make good sense.  Your Honor wanted to do it right afterwards,

8    in the event Mr. Trump were elected and to avoid the

9    circumstance that you are dealing with a sitting president, but

10   his obligations right now are just monumental, and for him to

11   be able to --

12          THE COURT:  I understand that the president-elect has

13   any number of obligations.  At the same time, with respect to

14   what you are asking or what you will be asking for, certain

15   accommodations to permit President-elect Trump to testify by

16   video, at this point, I haven't heard any response from the

17   plaintiffs, but I would be inclined to offer President-elect

18   Trump that accommodation, at a minimum.  And so I am not going

19   to require and I don't expect that you would even be having

20   President Trump sitting at counsel table throughout the course

21   of the trial, would you?

22          MR. PETROCELLI:  Well, you know --

23          THE COURT:  You have right now stated that you would

24   like him to testify by video.

25          MR. PETROCELLI:  It does not seem that is a

1    possibility, Your Honor.  But given the circumstances, where he

2    is being sued personally for punitive damages, no less, in two

3    lawsuits, no less, I can't take lightly his right and

4    obligation to be able to -- if he can't sit here, to work with

5    us, to defend himself.  And it's not -- it's not just his

6    ability to testify from a remote location.  There's more to it

7    than that, Your Honor.

8          And I appreciate this is a difficult circumstance.  I am

9    not pointing the fingers at anybody.  I am just saying here is

10   where we are, and it's not an easy choice, and I just wanted to

11   let the Court know that.

12          THE COURT:  I appreciate your candor.

13         And since you raised it, I will follow up on it at this

14   point.  You had mentioned possible efforts to try to resolve

15   the case, and what I was going to say is, you know, motions in

16   limine do a number of things:  It lets you know who you are

17   going to be able to call as witnesses, it lets you know a

18   little bit what the trial is going to look like, and in that

19   process, it also gives you a better sense of being able to size

20   up your case.  And ultimately, from my experience, I have found

21   that it helps parties settle the case because they see that,

22   "Maybe my case isn't as strong as I thought it was.  There's

23   going to be certain evidence that's going to come in that's

24   going to hurt me."  If you are a defendant, "Wow, that evidence

25   is going to come in.  That's going to be an 'ouch.'  That's

1    going to really hurt us."  So it lets people size up their case

2    better.  Towards that end, I hope that's what happens as a

3    result of the rulings that the Court issues in this matter.

4        I have spoken to Judge Jeffrey Miller, who, as you

5    undoubtedly know, is a very experienced district court judge

6    here, one of the most respected, I think, civil district court

7    judges that we have.  He's offered to lend his services towards

8    trying to settle the case, and I would hope that you would take

9    him up on his offer, take him up on the Court's offer.  But I

10   will leave that to you, and I will leave it to -- next week,

11   you can let the Court know whether or not --

12         MR. PETROCELLI:  I can tell you right now, I am all

13   ears, Your Honor.  And Mr. Forge and I -- I will say this.  We

14   were contacted yesterday by Magistrate Gallo on this issue, and

15   we had an initial discussion, and he also extended his

16   services, graciously.  And yes, I think it's incumbent upon us

17   to explore any and all possibilities, to see if we can avoid

18   having to engage in these protracted trial proceedings.

19         THE COURT:  I agree.  And I think it would be wise

20   because there's no certainty in these proceedings.  There's no

21   certainty that a jury will be able to render a unanimous

22   verdict.  There's no certainty that, even if there is a

23   verdict, that the Court of Appeals will uphold that.  So we are

24   talking about the possibility of millions and millions of

25   dollars, hours being spent on these matters.  It would be wise

1    for the plaintiffs, for the defendants, to look closely at the

2    prospect of trying to resolve this case, given all else that's

3    involved.

4         So I am happy, then, if plaintiff will take me up on it,

5    to let Judge Miller know that you will be prepared to meet with

6    him to try to resolve this case.

7         And so at this point, then, let's move to the substance of

8    the motions in limine.

9         And Mr. Petrocelli?

10         MR. PETROCELLI:  I got distracted.  Can I turn to --

11    by the way, Your Honor, you still have under submission the

12    decertification ruling?

13         THE COURT:  I do.  I do.

14         MR. PETROCELLI:  That was my note.

15         Your Honor, the absent class member issue is very

16    troubling and the Court's tentative ruling is very troubling to

17    us.  And I know that the Court has given this also a lot of

18    thought.  Where I think that the Court is in error in its

19    reasoning is the notion that, because this is a class

20    representative case, and we -- we are by no means trying to

21    conduct a trial that circumvents the class representation

22    nature of this proceeding.  But just because it's a class

23    representative case and just because we are dealing with some

24    objective standards -- many of the key issues, at least in the

25    liability phase, are judged by objective standards:  Whether a

1    reasonable person would have been misled by these

2    representations, how these statements might have been

3    understood by the reasonable person, whether the reasonable

4    person would have thought these were important or not in making

5    a decision to purchase, and so forth.

6          But just because we are dealing with an objective test,

7    Your Honor, does not mean that individuals cannot testify about

8    what they saw, what they heard, impressions, contexts,

9    circumstances; and indeed, that's the very evidence we are

10   going to hear from the three named plaintiffs, who have been

11   carefully selected by the plaintiffs' counsel and the

12   plaintiffs working together, as their representatives.

13         There are 7,000 potential people in this class.  The idea

14   that we can't call one of them -- and bear in mind, Your Honor,

15   I am mindful about the comment Mr. Forge just made about

16   limiting it to these three states.  We don't have access to

17   them.  We are not allowed to talk to them.  We only can talk to

18   the handful of opt-outs.  So we don't even have the ability to

19   talk to these people and ask if they would be willing to

20   testify for us.  But there are a handful of opt-outs, about

21   five or six of them, who are willing to testify and --

22              THE COURT:  On the uniformity issue?

23              MR. PETROCELLI:  On all of the issues.

24              THE COURT:  But specifically --

25              MR. PETROCELLI:  But including uniformity, yes, Your

1    Honor.

2            THE COURT:  All right.

3            MR. PETROCELLI:  And I think one or two of them may

4    be from the three states in question -- Florida, New York, and

5    California -- although I would have to check on that, Your

6    Honor.  Plaintiffs' counsel do know the names of these folks as

7    well, I believe, from our witness list.

8        But getting back to the point here, Your Honor, the fact

9    that you have three named representatives does not mean that

10   they have the exclusive monopoly on the evidence that the jury

11   will hear to judge the reasonableness of these various issues

12   under the objective standard.  It is no less irrelevant coming

13   from another class member than it is from the named

14   representative.  The fact that you have deemed these

15   individuals to be typical and adequate representatives of the

16   class does not mean that they are the sole messengers for

17   delivery of the evidence.

18       And we are talking about the other people who heard these

19   same presentations, who went to these same programs, who

20   purchased these same programs, who saw these same

21   advertisements.  I don't know whether any of them were

22   literally, Your Honor, in the same course, the same time, in

23   the same room, in the same hotel room.

24       But I am reading the Court's order to mean that, because

25   we are dealing with various objective standards, that the

1   individual testimony from class members must therefore be
2   subjective.  But I don't think that that's a proper comparison,
3   Your Honor, because perhaps some testimony that we might hear
4   might be what you would call subjective; indeed, we are likely
5   to hear that from the plaintiffs, the named plaintiffs.  They
6   are going to say, "I thought -- when I saw 'handpicked,' I
7   thought that meant personally selected by Donald Trump."
8        Suppose another person who went to the preview sessions,
9   who saw the same set of circumstances and materials, had an
10  understanding in the context that these were instructors who
11  were part of the Trump University organization, of which Donald
12  Trump was in charge of, or the head of.  Who is to say that
13  their interpretation of what these words even mean is the sole
14  evidence that the jury is going to hear from any of the
15  students?  Why would they be forbidden from hearing from other
16  students about what they saw and heard and what their
17  impressions are?
18       Now, one of the arguments back is that, "Well, if they get
19  to call five or six, then we should be able to call 600," if we
20  use the ratios that they put together.  That's sort of
21  unproductive, Your Honor.  Of course Your Honor has the ability
22  to control and regulate the number of witnesses, if testimony
23  gets to be repetitive or redundant, but we are talking about a
24  few witnesses, Your Honor.  We are not talking about blowing up
25  the trial with dozens and dozens of people.  But the jury

1   surely should be able to hear from more than just the three

2   people selected by the plaintiffs.

3       And furthermore, beyond the objective standard, you

4   have -- in addition to uniformity, you have the issue of truth

5   or falsity.  One of the issues in this case -- well, we have

6   two core representations: whether instructors were handpicked

7   by Mr. Trump -- whatever that means -- and the way your

8   certification order reads, Your Honor, is whether this

9   university was accredited, and now, from the presentations that

10  we have seen, there's the suggestion that that means legitimate

11  or elite.  Well, how are we going to prove the truth or falsity

12  of that without being able to call our witnesses, the people

13  who attended these courses, who purchased and who believed that

14  they got a high-quality real estate education that was worth

15  the money they paid?

16      And I just don't think that we can put on any meaningful

17  defense to these claims if we are denied the opportunity to

18  call other witnesses who are members of the class -- or who

19  were before they opted out, at least -- but other firsthand

20  percipient witnesses.

21      Even the cases Your Honor cited, the *Plascencia* case, the

22  *Plascencia* case and --

23          THE COURT:  I think that's a case you had cited

24  yourself.

25          MR. PETROCELLI:  We cited it.  Right.

1        But Your Honor correctly pointed out that in *Plascencia* --

2    and you actually mentioned this at a prior hearing -- while you

3    can't use individual class member testimony to rebut the

4    presumption of reliance, for example, you can use individual

5    class member testimony to attack the predicates that have to be

6    established before the presumption can be triggered, those

7    predicates being uniformity and materiality.

8        And indeed, in the *Iorio* case, I think it's called, as

9    well as *Plascencia*, these were discovery cases where the courts

10   allowed absent class member discovery, and it didn't limit the

11   absent class member discovery, Your Honor, to just uniformity.

12   The cases are clear that they were allowed discovery on the

13   issue of materiality and uniformity of the misrepresentations.

14   Why would the court allow absent class member discovery on

15   materiality, for example, if it were forbidden at trial?

16       And it goes without saying that there is no case that's

17   been cited by the plaintiffs to say that in class actions --

18            THE COURT:  Or the defense.  There's no cases that

19   you cite.

20            MR. PETROCELLI:  You know, we have looked high and

21   low, and we have given Your Honor the best.  We may have missed

22   some.

23       We actually did miss one case I will mention to Your

24   Honor, a Hawaii case.  It's 2012, Westlaw 3444138.  And it's a

25   class action case against the Department of Education.  And I

1    will read you the relevant quote:  "Evidence about specific

2    efforts the individual DOE employees made and evidence about

3    the teachers' basic background are relevant to the objective

4    inquiry."

5         And there isn't any case that forbids the calling of

6    absent class members.  And I think it's just kind of a

7    commonsense relevancy issue, Your Honor.

8              THE COURT:  It does seem like it's common sense,

9    where you have a reasonable person standard, that you would

10   determine whether or not the facts would have rendered a

11   reasonable person to conclude that this is material versus

12   asking individuals, the most sophisticated or the least

13   sophisticated, "What do you think?"

14             MR. PETROCELLI:  But Your Honor, the jury -- this is

15   not an academic, laboratory exercise, where they are shown

16   these things and the jury just has to sort of figure it out.

17   They have to determine materiality as well as all these other

18   issues that we cited in our papers --

19             THE COURT:  And they will.  They will.

20             MR. PETROCELLI:  -- by the context and circumstances

21   in which the statements were made.

22        And Your Honor yourself pointed out in the decertification

23   hearing -- you know, look, I am playing catch-up.  I am not as

24   up to speed as Your Honor and the other people involved in this

25   case.  But I did do a very good job, I think, of reading the

19

1    Court's rulings and the prior proceedings in which I was not

2    present, and the transcripts.  And one of the things Your Honor

3    noticed is that this case is sui generis; it doesn't fit into

4    the other buckets or baskets of cases.  And that in one way

5    it's different -- it's not like you buy a product off the

6    shelf -- you see a representation, you buy it, and then you

7    figure out, "Okay.  This doesn't work," or, "It works."

8        This was a temporal, long-term temporal process.  They see

9    the ads or they don't see ads.  They come into a 90-minute

10   preview.  They are confronted with a lot of information and

11   material.  They decide whether or not they are going to go

12   forward and pay for a Fulfillment course.  They go to a

13   Fulfillment course.  That is that two- or three-day experience.

14   They decide whether or not they are going to pay to go further.

15       The jury needs to hear a fair representation of those

16   circumstances and not just from the three --

17              THE COURT:  I agree with you as far as the jury needs

18   to have some context.  And you will note one of the things that

19   the plaintiffs have tried to do is limit all of this to just

20   the three-day program and in terms of what was taught at that

21   three-day program in terms of determining whether or not the

22   plaintiffs received what they bargained for; that is,

23   instructors handpicked by Mr. Trump, or this university.

24       I am not prepared to limit it to that, and I have already

25   indicated that in my tentative.  As to how far I am prepared to

1    go, I haven't decided that.  I have to await the parties'

2    introducing their evidence and I have to kind of have a context

3    of where does this fit.

4        But I agree with you that you shouldn't be just prohibited

5    from offering a defense.  Obviously, you have to be allowed to

6    offer a defense.  But the question is, based upon the elements,

7    based upon the purpose of a representative action, where does

8    the Court draw the line?

9            MR. PETROCELLI:  Well, I think that I completely

10   agree with the Court; it's a line-drawing exercise.  And what I

11   am saying, Judge, it's really unfair to the defense to draw the

12   line so rigidly so that we can't even call a single absent

13   class member except on one point, on the point of uniformity,

14   when we have all these other issues in play.  And there's no

15   authority that says that the jury can't hear from a fair number

16   of people what happened, the basic story of this case, so that

17   they can make a judgment whether it was reasonable or not,

18   along these various lines.

19           THE COURT:  All right.  Thank you.

20           MR. PETROCELLI:  Thank you, Your Honor.

21           THE COURT:  Just a very quick response.

22           MR. FORGE:  Your Honor, I do agree wholeheartedly

23   with the reasoning in the tentative.

24       Just to address a few points that Mr. Petrocelli made --

25   and I will start with the last one -- "hear from a fair number

1   of people."  That is the whole point of the lengthy, as Your

2   Honor knows -- you suffered through it longer than I did -- the

3   lengthy class certification process, is to determine what is

4   the fair number of people and who are the fair people to put

5   forward as representatives of the class.

6        We didn't threaten 600 to 1 if they call a

7   nonrepresentative former student.  It wasn't a prop or a

8   gimmick.  It was to put in context what we are talking about,

9   and this relates to the fairness that Mr. Petrocelli just

10  mentioned.  It is not fair to give the jury a skewed

11  perspective, that an individual who has not been vetted by the

12  Court, who has not run that gauntlet of being approved as a

13  class representative, for that person to get up on the stand

14  when we know, objectively, mathematically, that person is an

15  outlier -- that is, one of less than two-tenths of one percent

16  of the class members hold that person's view.  So that's why it

17  wouldn't be a fair number to put any of those folks on the

18  stand.

19       As Your Honor pointed out -- and on this point, the cases

20  are unanimous, and Mr. Petrocelli would agree -- materiality is

21  an objective standard.  There's no question about that.  The

22  *Plascencia* court knows that.  Every court that's ruled on these

23  issues is aware of that.  And the *Plascencia* court only allowed

24  nonrepresentative class members on the one issue of uniformity

25  because that's the only issue that individual testimony could

1    potentially rebut.  Materiality is not one, because that is an

2    objective standard.  And they will have ample opportunity and

3    ample evidence -- the same that we will have -- to argue why or

4    why not this information would be material, these

5    representations would be material.

6         So neither side has an advantage on that front.  The

7    primary objective on this issue for us is to maintain this case

8    as a class action for trial.  When Mr. Petrocelli says that he

9    doesn't want to change it from a representative case, that's

10   kind of true, but what he is really meaning -- and I don't mean

11   this in any pejorative way -- but what he is really trying to

12   do is change the representatives because -- think about this

13   from the perspective of the jurors.  If one former student gets

14   up there that we call, there's no blessing that the Court gives

15   that says, "Ladies and gentlemen, this is a class

16   representative."  They see "former student."  If the defense

17   calls somebody else, the jury sees "former student."

18        We now have, effectively, two class representatives, one

19   of whom has been vetted and passed through a very rigorous

20   gauntlet, the other who has not.  And the one who has not does

21   not represent the interest of 99.8 percent of the class

22   members.

23             THE COURT:  All right.  At this point, as you can

24   imagine, I have looked at this not only closely but over and

25   over and over again because I don't want to go through all of

1    this just so that I end up getting it wrong.  I may have gotten

2    it wrong, but at this time, I am satisfied that the tentative

3    that I have issued on this decision is a reflection of the law

4    in the Ninth Circuit, is a proper taking into account of

5    Rule 23 and what Rule 23 is designed to do.  So at this point,

6    I am prepared to confirm my ruling with respect to this issue.

7         So now, turning to you, would you like to address any of

8    the other motions in limine rulings that I have made?

9              MR. FORGE:  Yes, Your Honor.  If I may pass the mic

10   to Mr. Coughlin to address the first in limine.

11             MR. COUGHLIN:  Good afternoon, Your Honor.  I will

12   address the plaintiffs' first motion in limine, and it had to

13   do with basically the structure of the process that we were

14   going to go through, and Your Honor then went through the six

15   things that we suggested, and there was only agreement on the

16   final Number 6 between the parties.

17             THE COURT:  Say that again.

18             MR. COUGHLIN:  There was only agreement between the

19   parties on Number 6.

20             THE COURT:  Yes.

21             MR. COUGHLIN:  Really, I only want to address

22   Number 2, which deals with whether -- if we put on somebody's

23   deposition, whether then the defendants will call that person

24   live.  And Your Honor basically was prepared to deny

25   plaintiffs' motion that we requested that the defense bring

1    these people live so that we can only put them on once so the

2    jury can see them live and we are not duplicating the process

3    here by putting on deposition testimony, rebuttal to that, and

4    then all of a sudden somebody shows up live in their case.  And

5    understandably, Your Honor wanted to know, "Who is that?  Are

6    they critical witnesses?"

7        And we thought of that also.  And we called the defense,

8    and we said, "As far as we can tell, there's really only two

9    critical witnesses that we are really talking about, and that's

10   Donald Trump and Sexton."  And those are the two witnesses that

11   we are talking about that we think should be here live.

12       Now, I just heard Mr. Petrocelli say, well, maybe

13   President-elect Trump would try to sit somewhere else and be

14   questioned somewhere else and maybe a live video screen into

15   here, and that's the first I have heard something like that.

16       But, for example, nobody designated -- everybody assumed

17   President-elect Trump would be here, and so there was no

18   deposition testimony designated at all -- which is another

19   issue that we have to address, the objections to the deposition

20   testimonies that have been designated.

21       So to narrow that down, we would be requesting that both

22   Mr. Trump and Mr. Sexton, if they are going to appear in their

23   case and they are under their control, that they be brought

24   live so that we only have them on once.

25       They have said, well, that would prevent Mr. Trump from

1    getting back up in their case, and so I have read their

2    argument about that.  If they want to bring him back and the

3    Court thinks it's not duplicative, we won't make any objection

4    at that time.  But we would request, at this time, that at

5    least as to those two critical witnesses -- and the case law is

6    on our side on this, as Your Honor knows -- that they be

7    brought to -- and we will work with them on the schedule -- but

8    they be brought live just one time in our case in chief so that

9    we get that done, so we are not playing hours of deposition

10   just to see them show up a day and a half later.

11          THE COURT:  Is there a reason why the identity of

12   these witnesses wasn't identified in the moving papers?

13          MR. COUGHLIN:  There were more witnesses.  There are

14   other instructors that are on both sides, you know.  But after

15   they filed their papers, we called them and said, "Hey, how

16   about these two witnesses?"  So just so the Court knows, that's

17   what we are limiting it to.

18          THE COURT:  Well, at this point, I am prepared to

19   confirm the tentative.

20          MR. COUGHLIN:  I understand.

21          THE COURT:  Any other -- I am sure there are.  The

22   next motion in limine you would like to be heard on?

23          MR. FORGE:  Your Honor, regarding -- I think we are

24   going to have some comments on 2 through -- more than one

25   before in lim Number 6, but I want to address Number 6,

1    plaintiffs' in limine Number 6, briefly, Your Honor.

2        And specifically, I wanted to talk about, in Your Honor's

3    tentative -- near the bottom of page 14 of the tentative, Your

4    Honor recognizes that "Plaintiffs maintain that 14 witnesses

5    were disclosed for the first time in defendants' October 6,

6    2016 disclosures, less than two months before trial."  And then

7    in the next sentence, the Court says that, "Based on review of

8    defendants' chart illustrating plaintiffs' contacts with the 14

9    disputed witnesses, the Court finds that defendants' untimely

10   disclosure of four of those witnesses would exclude them from

11   trial."

12       I wasn't quite sure what the Court's -- why the Court

13   distinguished these four from the remaining ten.  And I would

14   also like to speak to the additional witnesses who were first

15   disclosed earlier this year because I think -- I don't think

16   the fact that -- I don't think that February or March, versus

17   October, makes a difference here.  I think the difference is

18   whether they were disclosed before or after the discovery

19   cutoff and how far after the discovery cutoff because the

20   difference -- and you look at a case such as *Allegro*, which we

21   cited, which is I think Judge Lorenz's case, in which Judge

22   Lorenz wrote -- this is talking about witnesses disclosed after

23   the discovery cutoff, before trial but after the discovery

24   cutoff -- "If these witnesses were allowed to testify at trial,

25   Almquist" -- the party in that case -- "would have no time to

1    depose them and prepare for trial.  This would work a

2    substantial hardship if it were even possible."

3        And I put all of these witnesses -- and I am separating

4    the witnesses who were deposed in the Cohen case.  I understand

5    Your Honor's point on that.  I am talking about witnesses who

6    were not disclosed by the defendants in this case, were not

7    deposed in this case, and were not deposed in the Cohen case.

8    We have basically 21 witnesses who fall in that category.

9        Let me give you a quick example as to why it's not enough

10   to say, "Oh, a lot of these folks are class members, so they

11   are plaintiffs' clients, so plaintiffs can just call them."

12   That is -- that is fraught with peril in this case, where you

13   have over 7,000 class members, a very high-profile -- now even

14   higher profile -- defendant, and defendants who -- again, I am

15   not meaning this in a pejorative way -- but they went on a very

16   aggressive campaign to solicit students and to get students

17   basically on board with their perspective in the case before

18   this case was even certified.

19       So, generally speaking -- this is true almost across the

20   board, but generally speaking, any student that makes his or

21   her way to defendants' witness list is someone with whom they

22   have already had contact, sometimes with lawyers -- and again,

23   I am not saying that there's anything wrong with that; it could

24   be years earlier, before certification -- and/or students who

25   have expressed some -- made some complimentary statement

1    about Trump University.

2        My point in saying that is these are not prototypical,

3    neutral cold calls we are making to these folks.  Oftentimes,

4    these calls aren't returned.  Oftentimes -- and ironically,

5    this is how I got involved in the case, Your Honor.  We had

6    contacted a former student.  The defendants submitted

7    declarations saying, "Oh, the plaintiffs' counsel are

8    contacting former students and giving the students the

9    impression that they represent Trump University."  I wasn't

10   even involved in the case when that dispute arose.  That's how

11   I got involved in the case, deposing one of those individuals,

12   so we could clarify that there was no such false impression

13   given.

14       But my point in using that example is it's not as simple

15   as just picking up a phone and saying, "Oh, hey, tell me all

16   about it."

17       We have no way to obtain documents from these folks

18   after -- the discovery in this case ended in December of 2014.

19   We are not -- this isn't a "gotcha" exercise.  I am not saying,

20   "Oh, they are two weeks late."  We can't get documents from

21   these folks.  We can't take their depositions.  And that's true

22   for all these former students.

23       And I know one of these individuals, who has recently been

24   identified, is Roger Schank, and their description just says

25   "instructor."  So given Your Honor's reference to the

1    defendants' table, I thought that that description may not have

2    apprised the Court of the fact that he is not a live events

3    instructor.  And so he was an online instructor, the first

4    iteration that is not part of this case.

5        So number one, yes, we did know he was an online person,

6    so he is not part of this case and he wasn't disclosed as a

7    witness in the case.  So did we know of his existence?  Yes.

8    But we had absolutely no reason to depose this gentleman.  And

9    to tell us about an intention to call him -- this is someone

10   they have known about since the year 2005.  And to tell us in

11   the year 2016 that they intend to call him at trial -- the

12   prejudice is obvious.  I mean, we don't have a chance to depose

13   him.  We can't take any discovery from him, no documents.

14       And on the former student front, since they would be

15   testifying as to uniformity, we can't obtain their documents,

16   we can't obtain the ads they saw, we can't play videos for

17   them, we can't play audios for them, we can't question them

18   under oath before they appear in front of the jury.

19       So that really is the definition of a trial by ambush

20   because that's the whole point of having these discovery rules

21   is so we get the opportunity to get people's sworn statements

22   before trial.  That's the issue on the witness front.

23       And very briefly, on the document front, Your Honor, there

24   were a few documents that were not on the Court's list as far

25   as being documents that are excluded, and it's the first five

1    on the table.  These are all described as case studies.  And

2    this is an issue that has a fairly long history.  About the

3    only contribution defendants have maintained over the years

4    that Mr. Trump had to the actual curriculum was that he gave

5    case studies of his actual deals.

6        And we litigated this in front of Judge Gallo, and we

7    actually litigated it in the very context of providing

8    documents.  And the defense's position was, "Oh, these case

9    studies all come from publicly available books, publicly

10   available materials."  And Judge Gallo said, "No.  No.  That's

11   not good enough.  I am not saying you necessarily have to

12   produce the book if it's publicly available, but you have to

13   describe it to them, describe what you are talking about, the

14   case study, in sufficient detail so they know what you are

15   talking about."

16       These first five exhibits, Your Honor –– these all pertain

17   to new case studies.  Mr. Trump provided interrogatory

18   responses identifying four, maybe five, specific case studies.

19   Just those.  Those were the only ones.  In his deposition, I

20   specifically asked him if there were any others, and he said

21   no.  So we locked that down as firmly as we could.  And then

22   now they are putting in these exhibits saying, "Oh, here is a

23   couple more case studies."  So that's why we think those should

24   be excluded.

25           THE COURT:  All right.

```
1              MR. FORGE:  And then the last one, Your Honor, is
2    Defendants' Exhibit 4577, if I -- may I approach, Your Honor?
3              THE COURT:  Yes.
4              MR. FORGE:  You can't really tell -- you can't really
5    tell from the defendants' table what this exhibit is because in
6    their table, they just say the Trump University.com website.
7         Well, if you look at the actual exhibit -- this is the
8    exhibit.  This is the exhibit in its entirety.  "Defendants
9    reserve the right to present TU's website by live demonstration
10   or archived excerpts."
11        First of all, if they have the code, if they have the
12   actual electronic version of the website, that in and of itself
13   is a discovery violation because they didn't produce it to us.
14   And it should go without saying there's no way the Court or the
15   plaintiffs can possibly regulate this.  We have no idea -- they
16   could bring in a computer and call up a web page with
17   absolutely no ability -- we would have no ability to verify
18   that, to have questioned anybody about it, to know whether --
19   if it's some code somebody entered the day before.
20        So it seems innocuous, just given that one-line
21   description; but when you actually see the exhibit, it is --
22   it's a Trojan horse, basically.  So those additional exhibits,
23   Your Honor, I would ask to be excluded for the very same
24   reasons Your Honor points out in the tentative.
25              THE COURT:  All right.  Thank you.
```

1           MR. MARROSO:  Good afternoon, Your Honor.  David

2    Marroso.  It's a pleasure to be before you.

3           THE COURT:  Thank you.  You may proceed.

4       Let's take up this last matter first, as far as the

5    information on the website.  The argument is that we don't even

6    know what it is today.  Why should the defense be entitled to

7    offer it at trial?

8           MR. MARROSO:  Sure, Your Honor.  Two answers to that.

9    First, with respect to static images that were taken from the

10   website at the time, both sides have examples of that on their

11   website.

12      With respect to the slipsheet that was just presented to

13   you, there's no other way to present what a live demonstration

14   would look like.  We -- we are giving them notice that we

15   intend to do so.  We obviously will need to lay the proper

16   foundation for that at the time and --

17          THE COURT:  Have you shared the portion or the -- I

18   am not sure if it's -- if we are talking about static images or

19   we are talking about videos.  What are we talking about

20   precisely that you include in this presentation?

21          MR. MARROSO:  We would like to call up on the screen

22   for the jury, show them what the website looked like at the

23   time, perhaps run them through -- we mentioned in several of

24   our motions in limine the Empire City, virtual city, that was

25   available to students so they could practice real estate

1  transactions in what was called a safe environment.

2        THE COURT:  Let me ask you.  That Empire City, as I

3  understand it, that was made available to all students,

4  regardless if they were in the three-day Fulfillment or in the

5  Elite program?

6        MR. MARROSO:  No, Your Honor.  It was more limited.

7        THE COURT:  It was more limited?

8        MR. MARROSO:  Yes.

9        THE COURT:  So was it made available to any of the

10  three-day Fulfillment students?

11        MR. MARROSO:  Are you referring to students who only

12  purchased the three-day Fulfillment?

13        THE COURT:  Yes.  Yes.

14        MR. MARROSO:  Not to my knowledge, but I would need

15  to double-check to say with certainty.  But it was definitely

16  made available to people who purchased Elite programs, or even

17  a la carte, beyond that.

18     And there's no secret code that we have access to that has

19  not been presented to the defendants -- it's not like we have

20  some drive somewhere that contains what the website looked like

21  in 2007 that we have not turned over to them.

22     We will need to lay the foundation by going to things like

23  the Wayback Machine and various other admissible ways to

24  introduce what a website looked like historically.

25        THE COURT:  Certainly, at this point, the plaintiffs

1    are at a disadvantage in not knowing precisely what it is you

2    intend to offer.  So I would have thought that, at a minimum,

3    there would have been a meet-and-confer where the defense would

4    have alerted or advised the plaintiffs, "Okay.  Come on over.

5    Let's go over what we would like to present."

6          And then they are in a position to go, like, "Well, no,

7    that's inflammatory."  Or, "No, that's not even relating to any

8    of the issues."  They would be in a position to size it up

9    before trial, and even in a scenario like we are at here, where

10   they would be able to move in limine to exclude all or parts of

11   that presentation.  What is your response to that?

12         MR. MARROSO:  There's no mystery about what we would

13   like to do with the website.

14         THE COURT:  Well, it is them.  As I understand it,

15   they don't know precisely what it is you would like to offer.

16         MR. MARROSO:  It is the online versions of some of

17   the course materials they have sought --

18         THE COURT:  They don't know what course materials.

19         MR. MARROSO:  Real estate investment training, Empire

20   City.  It is the online materials that are the subject of their

21   motion in limine to exclude the online materials.  Their

22   argument is those are online, not live, and because they are

23   online, they are not relevant to this case.  It's those very

24   materials.

25         We don't plan to do some journey -- indiscriminate journey

35

1    through the website, clicking on every single page.  This is

2    about the course materials which we want to demonstrate to the

3    jury which shows that a quality education was provided, and

4    that many of these materials were prepared by people that,

5    under their definition of handpicked, met Mr. Trump, were

6    selected by him, provided content that was similar to or

7    derived from, originated from, Mr. Trump himself.

8         Your Honor, did you want me to address the witness issues?

9         THE COURT:  I will permit you to address whatever

10   issue that is a part of this ruling, and most notably, those

11   points that were raised by Mr. Forge.

12        MR. MARROSO:  Yes, Your Honor.

13        Your ruling, as I understand it -- the reason you chose

14   those four specific witnesses to exclude was because they did

15   not fit within one of the other categories that we mentioned,

16   either identified in the Cohen disclosures or deposed in the

17   other case.  And three of those witnesses are students, and one

18   of them is Meredith McIver, who is a co-author of Mr. Trump on

19   several of his books.

20        To the extent Your Honor continues with its ruling with

21   respect to absent class member testimony not being admissible

22   except for uniformity, we don't have much of an argument with

23   respect to the three class members that you are excluding.

24   Ms. McIver, however, is different.  She is a co-author of

25   several of the books that we intend to introduce into this

1    case, primarily to show -- to rebut the argument of the

2    plaintiffs that the plaintiffs were promised Trump and they got

3    no Trump.

4         Well, how do we prove that what was provided to these

5    students -- online, live, or otherwise -- came from Mr. Trump?

6         Well, part of what we plan to do is demonstrate that some

7    of the theories, principles, tactics, techniques that are in

8    his book, cowritten by Ms. McIver, made their way into the

9    Trump University education program.  They quoted from these

10   books in their discovery to us.  There's no mystery.  There is

11   no prejudice.  There is harmlessness -- excuse me -- this is

12   not harmful at all.

13            THE COURT:  Why were they disclosed so late?

14            MR. MARROSO:  You mean Ms. McIver?

15            THE COURT:  Yes.

16            MR. MARROSO:  The truth of the matter is, Your Honor,

17   we have only recently met with her, and we liked what she has

18   to stay in terms of demonstrating what Mr. Trump provided to

19   the book.

20            THE COURT:  And that's, I guess, the very reason why

21   the plaintiffs are seeking to exclude her, because what makes

22   you like her testimony makes them dislike it, and they haven't

23   had enough time to get up to speed, to depose her, to really

24   address what she has to say.

25            MR. MARROSO:  First of all, it's not any prejudice to

1    them about the content of what is in the books.  Ms. McIver's

2    testimony will be extremely confined: that she sat with

3    Mr. Trump to learn the information that she helped cowrite.

4    This is not an expansive examination of many witnesses.  This

5    is one witness who will say, "This stuff in this book came from

6    Mr. Trump."

7         Second, if Your Honor wanted to make her testimony

8    conditional on some short deposition prior to trial, we would

9    have no objection to that.

10             THE COURT:  Well, given the date, I am not looking to

11   reopen discovery for you all, but I will consider that.  I am

12   just thinking that it's kind of late in the game.  It's kind of

13   late in the game.

14        All right.  Would you like to address any other point?

15             MR. MARROSO:  I believe the only other point --

16             THE COURT:  The case studies, was that -- the five

17   exhibits relating to the case studies?

18             MR. MARROSO:  Your Honor, I am not up to speed on the

19   historical statement that Mr. Forge made.

20             THE COURT:  Okay.  Anything else?

21        I am going to probably confer -- well, I am probably going

22   to stay with what I have tentatively decided, but I may flesh

23   this out a little bit more given some of the questions that

24   were raised.

25        Mr. Forge, would you like to address another motion?

```
 1              MR. FORGE:  I think Mr. Coughlin will.  I am sorry
 2    for the musical chairs, Your Honor.  We split things up.
 3              THE COURT:  That's fine.
 4         Mr. Coughlin?
 5              MR. COUGHLIN:  Yes, Your Honor.  I was going to
 6    address our motion in limine Number 4.  Really, only -- the
 7    only aspect -- there might be two aspects I will address, but
 8    it has to do with James Harris.  And we sought for years to
 9    take his depo.  You know, Magistrate Gallo found that we were
10    at a time -- at a certain point in time, when we finally were
11    able to serve him -- we served him twice where he didn't show
12    up, and one time where we all showed up -- and so finally we
13    got a stipulation that we take his depo, and the magistrate
14    said no, it's after the time.
15         Your Honor asked -- the Court notes the plaintiffs were
16    not provided any information about Mr. Harris's current
17    whereabouts or any related correspondence regarding attempts to
18    procure his presence at trial.
19         We had a conversation with him in August of 2015, where he
20    said he would be responsive to us.  We have been trying for at
21    least the last several weeks to get in contact with him, at
22    least over a month.
23              THE COURT:  Have you located him?
24              MR. COUGHLIN:  We have located him.  He actually
25    started responding to us in the last two days.
```

1    And so he says he is in Asia.  He could not -- he could

2    not make it to this hearing.  We weren't asking him, of course,

3    to come today.  And he said, "Good luck.  Cool."  But he is,

4    unfortunately, not available to attend the meeting in

5    California this week, but should we consider another time to

6    speak with him, you know, we can contact, as we understand it,

7    the woman that he is currently living with.  She said that he

8    is in Asia right now.

9    What we would like to do, of course, is we would like to

10   have him -- he may come to trial.  We will keep trying to ask

11   him to do that.  But if he does not come to trial, he is an

12   important enough witness that we would like to do a video

13   conference live, during the trial here, of Mr. Harris.  And of

14   course, we also had the CNN video, which Your Honor thought was

15   too cut up.  So we cut it down to just the question and

16   answers, and it was something that has been allowed in a couple

17   of cases out of New York recently, in the terrorism cases, to

18   show that.

19   He is such an important witness, and when he talks on the

20   CNN video, he talks about how he never had dinner with

21   Mr. Trump.  And, of course, that's part of the -- Mr. Trump

22   didn't hire him and didn't handpick him.

23       THE COURT:  Mr. Trump himself acknowledges that,

24   doesn't he?

25       MR. COUGHLIN:  He does acknowledge that.  He said he

```
 1    doesn't -- basically, he didn't have dinner with them.  He

 2    didn't have dinner with any of them.

 3         But in the script that was provided and told to students,

 4    the instructors were told, "Hey, tell these students that you

 5    just had dinner with Mr. Trump last night and then impart some

 6    advice that he gave."  So that was a lie.

 7              THE COURT:  It sounds like the plaintiffs are

 8    prepared to offer testimony regarding those representations,

 9    and then it also appears that Mr. Trump is prepared to

10    acknowledge, "No, I never had dinner with these people."

11         So in terms of where Mr. Harris provides the missing link,

12    it really doesn't.  Perhaps it provides it in the context of an

13    instructor who was very important in this endeavor, but at the

14    same time, it's not critically important to establish something

15    that's in dispute, correct?

16              MR. COUGHLIN:  Yes.  I don't think it -- you are

17    exactly right.

18         But as to everything that has been discussed today, it is

19    the context.  This was the number one instructor.  He did 54

20    live events.  And to see him make those presentations and those

21    admissions puts it in context for the jury.

22              THE COURT:  I am sympathetic to the position that you

23    are in given these previous successful attempts to avoid being

24    deposed.  At the same time, I don't see a game plan in place at

25    this point that is concrete enough where I can say, "Okay.
```

1    He's prepared to make himself available in Atlanta, Georgia,"

2    or somewhere.  Right now, he is in Asia, which I think is

3    outside the subpoena range for this court or any court, and

4    it's not clear if he is coming back before the end of the

5    month.  And so, given all of that uncertainty, it just seems

6    like a lot to ask that we will authorize that procedure.

7        So at this point, I am prepared to confirm that.  And if

8    it turns out that you are able to develop further information

9    about his cooperation and such, I am prepared to reconsider my

10   ruling.  But as of this moment, I am prepared to confirm it.

11          MR. COUGHLIN:  Your Honor -- I understand Your

12   Honor's ruling.  I am wondering if we can't move -- since the

13   trial -- we are almost there -- if we move forward with the

14   trial subpoena in Georgia, for him to appear at a certain

15   place, just in case Your Honor allows that type of video

16   testimony for the trial, and so that we are not scrambling at

17   trial.

18       In other words, if we could take steps now -- our

19   understanding is he is coming back into the country shortly --

20   to serve him with a trial subpoena, so if he shows up

21   somewhere, so that we are ready, and Your Honor can make that

22   ruling during trial.

23          THE COURT:  Yeah, I am inclined to say yes to that,

24   although I am not sure if I have the authority.

25       So is this a subpoena issued by the court in Georgia?

1           MR. COUGHLIN:  Yes.  It is not --

2           THE COURT:  So wouldn't it be necessarily a request

3   that would be directed to the court in Georgia?

4           MR. COUGHLIN:  It will be, Your Honor.  But I think

5   because of the subject of these motions, we thought it prudent,

6   and with what happened to us in front of Magistrate Gallo, to

7   tell you what we intend to do.  Last time, we didn't inform

8   Magistrate Gallo we entered into stip with the defendants to

9   have this depo taken after the discovery.  And so we will take

10  those steps that are necessary in that forum, in Georgia, and

11  move on from there.

12          THE COURT:  All right.  Well, let me hear from the

13  defense.

14          MR. MARROSO:  Just very briefly, Your Honor, in light

15  of your comments.  There's still been no evidentiary showing

16  that would qualify under Rule 43, just vague statements about

17  Asia and Georgia, like you said.

18      Harkening back to the last motion we just discussed, we

19  would be forced to cross-examine Mr. Harris without having a

20  deposition in this case either.

21          THE COURT:  But that wouldn't be so unfair, given

22  that this was a Trump University employee.

23          MR. MARROSO:  He is not under our control.  He won't

24  speak to us.

25          THE COURT:  He was, at the time of the events that

1  would be inquired about, employed by Trump University, correct?

2          MR. MARROSO:  He was -- he wasn't employed, no.  He

3  was an independent contractor.  But I understand the point you

4  are making.

5      But I don't think it addresses our point, which is we need

6  to have a record preserved so that if he gets on the stand and

7  says something that we disagree with, we would be able to

8  impeach him with his testimony.  It is the same issue.

9          MR. FORGE:  Your Honor --

10         THE COURT:  Don't interrupt.

11         MR. MARROSO:  And to be clear about what Magistrate

12  Gallo found previously -- we have cited it in our papers -- the

13  magistrate concluded that he was not going to allow discovery

14  to be reopened because they had not acted diligently.

15     Mr. Harris evaded.  I think there's no dispute about that.

16  I think -- I wasn't in the case at the time, but I believe they

17  served him with a subpoena.  Both sides, counsel was there, and

18  he didn't show up.  But it was from that point forward that

19  Magistrate Gallo said the plaintiffs did not act reasonably.

20  That's why he did not reopen discovery.

21         THE COURT:  And I get that.  I mean, it's something

22  that the Court takes into account.  But at the same time, if

23  the plaintiffs are able to demonstrate that he is going to be

24  available, I think his testimony is of such consequence --

25         MR. MARROSO:  That's exactly why he should be here in

1    person, talking to the jury, not in some courthouse in Georgia.

2            THE COURT:  Well, given that I am inclined to

3    accommodate President-elect Trump if he requires -- if he would

4    like to testify by video, I am not sure that I would conclude

5    that Mr. Harris is so important that we couldn't take advantage

6    of Rule 43.

7        But at this point, I agree with you.  Conditions aren't

8    ripe to pass on this one way or another.  So at this point, I

9    will confirm my ruling on this.

10           MR. MARROSO:  Thank you, Your Honor.

11           MR. FORGE:  The only thing I wanted to add was we

12   disclosed Mr. Harris as a witness, so Mr. Marroso's point is

13   not apt.  It's not apples to oranges; it's apples to Twinkies.

14   We disclosed him.  We are not under any obligation to force

15   them to depose somebody who we disclosed.  They not only chose

16   not to depose him, they opposed our efforts to do so.  It is

17   not the same thing.

18           THE COURT:  All right.  Any other motions you would

19   like to address?

20           MR. FORGE:  No, Your Honor.

21           THE COURT:  Let me turn to the defense.  Would you

22   like to address any of my rulings, my tentative rulings?

23           MR. PETROCELLI:  I would like to address some of the

24   plaintiffs' motions that we didn't get a chance to argue.

25           THE COURT:  I am happy to hear from you on any motion

1    in limine that you would like to be heard on.

2            MR. PETROCELLI:  Thank you.

3            THE COURT:  And that was also as to the plaintiffs,

4    that you were allowed to address any of the motions in limine.

5            MR. FORGE:  Thank you, Your Honor.  We will speak to

6    the defendants' in limines when we get there.

7            THE COURT:  All right.

8            MR. PETROCELLI:  Your Honor, there's a -- there's an

9    issue that's running through this entire trial, a gating

10   issue --

11           THE COURT:  It's a what issue?

12           MR. PETROCELLI:  A gating, G-A-T-I-N-G, issue, in my

13   way of thinking.  It has to do with this daunting issue of

14   worthlessness.  And the reason I bring it up, Your Honor, is

15   because I have, again, paid a lot of attention to this and

16   studied your rulings very carefully.  And I believe, based on

17   the proposed jury instructions that both sides have submitted,

18   and the verdict forms, that there's a systemic disagreement

19   between the two sides over the scope of Phase One on this

20   issue.  And the reason why I think it is important to address

21   and to seek clarification from the Court is because it does

22   bear on the relevance of the evidence in Phase One that has

23   informed Your Honor's tentative rulings.  For example, on

24   issues -- putting aside the absent class member issue for now,

25   but on the issue of some of these course materials, and we will

1   get to this one about the customer surveys.  But I do not know

2   what Your Honor intends to include in Phase One on this issue.

3       I will tell you what my view is of Your Honor's rulings

4   and the law, which I have taken a great deal of care to study

5   as best as I can.  And my view is that the plaintiffs submitted

6   a class-wide damage model that Your Honor determined was

7   plausible and nonarbitrary, within the meaning of the *Comcast*

8   case, and on that basis refused to decertify the class as to

9   liability, having concluded that their model was consistent

10  with their theory of liability, their theory of liability being

11  that they ended up getting nothing of value because of these

12  alleged misrepresentations and therefore their damage theory

13  was that they got zero value in return, so it wasn't going to

14  involve, on their side, any computations or calculations or an

15  expert who would have to come in and do these valuations.

16      That said, Your Honor, it still remains the burden on

17  plaintiffs to prove that what they received had zero value on a

18  class-wide basis.  They simply cannot establish, if they were

19  to prevail, that there were these material misrepresentations

20  and met the other elements of these claims, and then go into a

21  Phase Two on an individual basis with some baseline that they

22  are entitled to a full refund without having established in

23  Phase One that they have to earn the right to the finding of a

24  full refund, which requires them to prove that what they paid,

25  less what was received -- again, class-wide, what they paid --

1    they can put that number up pretty simply -- what was

2    received -- that's based on another objective reasonable man

3    test, based on the value of the products and services delivered

4    in the eyes of the reasonable consumer.

5        If they subtract those two numbers and the result is zero,

6    then we get to go to Phase Two, and then we have individual

7    issues with respect to these individual plaintiffs.  But if

8    they don't establish --

9            THE COURT:  Let me stop you for one second.

10       You had mentioned something about that, at the damages

11   stage, the follow-up trier of fact, jury, special master, would

12   begin with the baseline of a full refund?

13           MR. PETROCELLI:  That's what the plaintiffs' view is.

14           THE COURT:  That may be what their view is, but

15   that's not what the Court is prepared to do.

16       My view is that liability means liability.  Are there

17   sufficient facts to satisfy the elements, other than the

18   damages, but the elements of these causes of action?

19       To the extent that the jury concludes that, yes, there is

20   evidence that has been provided by the plaintiffs that meets

21   their burden of proof on each of these questions as far as the

22   nature of the representation, the deceptiveness of the

23   representation, the materiality of the representation, and that

24   it would have caused some harm.

25       But in terms of worthlessness, that's something that would

1    be taken up at stage two.

2              MR. PETROCELLI:  I disagree with that, Your Honor.

3              THE COURT:  I know, and I understand that.

4              MR. PETROCELLI:  I would like to just make sure, if

5    we go into Phase Two, based on what -- and maybe I am mistaken

6    about this, and I would love to be corrected.

7         But if we go into Phase Two, the way I read Your Honor's

8    ruling is that we are going to Phase Two in order to give the

9    defendant an opportunity to litigate offsets against the full

10   refund.

11        Where does the full refund come from?  They have to

12   establish that they are entitled to a full refund before we

13   have any obligation to do anything.  And in order to win a full

14   refund on a classwide basis, they have to demonstrate in

15   Phase One not only the things Your Honor indicated, but they

16   also have to demonstrate that this class paid X dollars for

17   these items and we got back nothing in return.  And that's

18   going to require evidence concerning the course materials and

19   course content and course instruction that they did receive.

20             THE COURT:  And I think at this point, we are ahead

21   of ourselves, because what the Court did in its ruling on

22   decertification and I did decertify the class when it came to

23   damages, so that means that each of you is on your own.  Each

24   of you has to demonstrate how you were damaged.  So in that

25   way, the defense has maintained their due process right to

1   challenge each of these individual class members.  And so it's

2   not like we begin with this presumption of, "You all are

3   entitled to a full refund."  That's not how it's going to

4   proceed.

5           MR. PETROCELLI:  Okay.  Well, you have clarified one

6   thing for me in that regard.

7       I want the record to be clear, however -- even though I

8   think Your Honor has made clear your ruling -- that we believe

9   that given that Your Honor declined to decertify based on

10  *Comcast* --

11          THE COURT:  Decertify the entire class as to all

12  issues --

13          MR. PETROCELLI:  Yes.  Exactly.  Because you thought

14  their classwide damage model was consistent with their

15  classwide liability theory.  It is their obligation to prove

16  the model on a classwide basis.  If Your Honor --

17          THE COURT:  As part of the case on liability.

18          MR. PETROCELLI:  Exactly.

19      And the cases make clear, Your Honor, including in the

20  Ninth Circuit cases, that, following *Comcast*, if a plaintiff

21  does not want to submit to the certification process on a

22  class-wide basis a damage model, the plaintiff can proceed to

23  try to get certain issues -- certain issues certified for

24  certification purposes.

25          These plaintiffs did not do that, not initially and not

50

```
 1   again when decertification -- otherwise, there would have been
 2   no need for Your Honor to deal with *Comcast*.  Your Honor could
 3   have simply said, "I am certifying some liability issues.  You
 4   are all on your own on damages.  I don't have to worry about
 5   *Comcast*."  You only deal with *Comcast* when you are testing
 6   whether the classwide damage model that is going to be proven
 7   at trial by plaintiffs is consistent with the classwide
 8   liability theory.  That's the only purpose for which you would
 9   have gone through that exercise.
10        So that's why I believe, given my understanding of the
11   state of the law -- which of course could always be
12   erroneous -- but my studied analysis of the issue and Your
13   Honor's rulings, that I believe they have the burden to show on
14   a classwide basis that this was valueless before we go off into
15   Phase Two.
16             THE COURT:  All right.
17             MR. PETROCELLI:  Do you want me to -- did you want to
18   hear from opposing counsel on that before I proceed to the next
19   issue?
20             THE COURT:  I don't think I need to hear from the
21   plaintiffs on that.  I think I have made clear just by my
22   comments at this point where I land on that.  You may proceed.
23             MR. PETROCELLI:  Thank you.
24        I want to address -- I believe, Your Honor, it is their
25   motion in limine Number 7, is it, to keep out the customer
```

1    surveys?

2            THE COURT:  Let's see.  Their Number 7?

3            MR. PETROCELLI:  Yeah.  I think it's their Number 7.

4            THE COURT:  Number 7 is exclude evidence and argument

5    about Trump University's purported approval rating and

6    student-victim evaluations.  Yes.

7            MR. PETROCELLI:  Your Honor, again, we strongly

8    disagree with the Court's tentative on this issue.  This is an

9    extremely important issue, and it goes directly to a number of

10   issues, perhaps the most important of which is the knowledge

11   and the state of mind of the defendants, both Trump University

12   and the people who were running it, and individually Mr. Trump,

13   because these were not records that were created after the

14   fact, in litigation.  These were realtime contemporaneous

15   records that all the witnesses testified -- Mr. Sexton,

16   Mr. Highbloom -- that were used as an important vehicle in

17   their endeavor to make sure that the students were getting what

18   they wanted.

19           THE COURT:  All right.  So let me ask you something.

20      How does this survey provide evidence regarding the

21   knowledge and state of mind of these individuals as it relates

22   to, number one, the representation of whether or not Trump

23   University was a university, and number two, whether or not the

24   instructors that were instructing the class members were in

25   fact hand-selected by Donald Trump?  How does that do that?

1            MR. PETROCELLI:  Very simply, Your Honor.  They have

2      been filling out these forms all along.  If people thought --

3            THE COURT:  Quote from these forms where they say

4      something along the lines of, "I knew Donald Trump did not

5      handpick the instructors.  I knew it wasn't a university."  Do

6      you have anything like that?

7            MR. PETROCELLI:  Of course not.  The form does not

8      say that, Your Honor.  But what --

9            THE COURT:  That's my problem, I guess.

10            MR. PETROCELLI:  But, Your Honor, that's -- that's

11      taking an extremely restrictive view of what I think is crucial

12      evidence to defend ourselves in this case.

13            THE COURT:  They are basically saying they are happy,

14      they are happy with the program, but does it really address --

15            MR. PETROCELLI:  Yes, it does.

16            THE COURT:  -- the questions that we're --

17            MR. PETROCELLI:  It does, Your Honor.  It says

18      quality of the presentation, relevance of the topics covered,

19      usefulness of the information.  If people thought that they

20      were getting scammed and the education was of no value, they

21      didn't learn anything, you could pick it up off the street, you

22      could walk into a real estate office get it for free, all the

23      arguments that they are making -- it was gimmickry -- do you

24      think for three years they would have filled out these forms?

25            This is important information that is going to Mr. Trump,

1    it's going to Mr. Sexton.  They are seeing, "Oh, students are

2    satisfied."  They are not thinking, "Oh, students say this is

3    awful."  I mean, if the presentation was just an upsell for

4    three days or 90 minutes or whatever it was, you don't think

5    you would see something on the form?

6         They say, "Well, they were forced to give good grades."

7    That just goes to the weight, Your Honor.

8         But this is information that went directly to the

9    defendants in the case.  These are realtime business records.

10   It is incomprehensible to me that these could be excluded from

11   evidence.

12            THE COURT:  And I understand why you would have that

13   view as it relates to these theories of upselling, and maybe

14   mentorship, because initially, certainly, the plaintiffs'

15   complaint was very wide-ranging and very broad in terms of what

16   they were challenging, and a big part of the original complaint

17   complained of this upsell scheme.

18        This Court did not certify, as part of this class action,

19   the issue regarding upselling schemes.  And to the extent that

20   the plaintiffs were to proceed and seek to make this case at

21   all about the upselling schemes, the objections would be

22   sustained.  Any objections that you made would be sustained

23   because that's not what this case is about.

24        What this case is about is the representations regarding

25   Mr. Trump and whether or not he hand-selected these

1    instructors, his role in the development of the curriculum, and

2    then with respect to Trump University, whether or not this was

3    a university.

4        And there are questions with respect to what role would

5    the jury have in determining precisely what "university" means.

6    The plaintiffs will have a theory as to what "university"

7    means, and you will have a theory as to what "university"

8    means.  They will oppose it.  They will probably -- and they

9    have already -- moved to exclude that evidence.

10       Well, I am not going to exclude it.  Both sides have the

11   opportunity to present their respective cases.  With respect to

12   that term "university" and what it means, it is not going to be

13   up to the plaintiffs to define it.  Both sides will be able to

14   weigh in on that.

15       So I understand your argument, but at the end of the day,

16   I don't see how it corresponds to the two issues that are --

17           MR. PETROCELLI:  Because you are measuring relevance

18   very strictly and, if I may say, according to the plaintiffs'

19   view of those words.

20       We don't think "handpicked" meant -- we don't think

21   "handpicked" meant for one second that Donald Trump personally

22   interviewed all these people.  And we think the people in that

23   school understood exactly what it meant; that Mr. Trump -- this

24   was his school, he had a stamp of his approval on it, these

25   were his people.  And if they thought the instructors were

55

1    lousy, if they thought the instructors were awful -- all of

2    these questions are about the -- half of them are about the

3    instructors.

4         Let me ask you a question.  What is the relevance of the

5    case at all if Donald Trump didn't personally interview some

6    instructor but he was fabulous and taught a lot of information?

7    Would that -- what those statements mean in context, according

8    to the defense at least -- and we are not asking anybody to

9    agree with this, but this is our theory of the case -- is that

10   they were quality instructors who provided fair and quality

11   information to the students, and that was the feedback that was

12   coming back.  And for that reason, Donald Trump and Trump

13   University saw no reason to strike references in future

14   advertising, to change their marketing campaign, or to

15   continue -- to the opposite, they continued with their

16   marketing campaign because the feedback they were given was

17   consistent with it.  This isn't the one-time advertisement in

18   2007 --

19             THE COURT:  But there's a disconnect there.

20             MR. PETROCELLI:  What is the disconnect?

21             THE COURT:  The feedback isn't about whether these

22   people are handpicked by Donald Trump.  The feedback isn't

23   regarding, "Wow, this university level of education was -- was

24   just like I received when I was in college."  It didn't address

25   those issues.  It was just yea or nay, "Do I like this

1   program?"

2       And to the extent it is a yes, up, or down, no, I have

3   problems in seeing how these answers correspond to the issues

4   that have been certified.

5           MR. PETROCELLI:  This information -- Your Honor, when

6   you said there's a disconnect, you just used the plaintiffs'

7   view of the word "handpicked."

8           THE COURT:  You know what?  I have oftentimes sided

9   with one side or other in terms of how you analyzed the law,

10  and to the extent that I have, that's -- that's how it goes.

11      But in terms of "university," I have told you.  They have

12  tried to shut down what you will be entitled to offer.  That's

13  not going to happen.  But in terms of exactly what it is that's

14  going to be coming into evidence, we will decide it at trial.

15      But I understand your argument.  I understand it.  I just

16  disagree with it.

17          MR. PETROCELLI:  Well, Your Honor, what about on the

18  university issue, quality of the presentation, relevance of the

19  topics, usefulness of the information -- how can that not go to

20  the idea of whether or not this program is teaching a quality,

21  university-type material?  It goes directly to that.  There's

22  no disconnect at all there.

23          THE COURT:  It doesn't go directly.  Certainly it

24  doesn't go directly.

25          MR. PETROCELLI:  What would the question be?

1          THE COURT:  You know what --

2          MR. PETROCELLI:  I have to make one --

3          THE COURT:  I have given you my indication in my

4   tentative.

5          MR. PETROCELLI:  Your Honor --

6          THE COURT:  Wait.  Wait.  Wait.

7      I have given you my tentative.  And this is the time where

8   you have the opportunity to address it.  And so, to the extent

9   that you want to say something to address it, fine, although at

10  this point, I think you have, and at this time, we are just

11  kind of going in circles.

12         MR. PETROCELLI:  There's one other point I want to

13  make.  Mr. Trump is being sued personally.  An issue with

14  respect to every one of the claims against him is he directly

15  participated in wrongdoing.  Knowledge is an element of all the

16  claims against him and it's also an element in the claims

17  against Trump University.  And this goes to their knowledge,

18  Your Honor.  It goes their knowledge, that they were getting

19  positive feedback about the school and about the program.

20      I mean, they are trying to sue this guy --

21         THE COURT:  It needs to be knowledge that this in

22  fact isn't a university, knowledge that these instructors

23  aren't being selected by Donald Trump.

24         MR. PETROCELLI:  Your Honor, I suggest that, if at

25  all, goes to the weight of the evidence and is not a basis to

1    exclude it altogether.

2            THE COURT:  All right.  Would you like to address any

3    other issue, anyone?

4            MR. COUGHLIN:  No, Your Honor.  Not right now.

5            THE COURT:  Defense?

6            MR. PETROCELLI:  One second, Your Honor.

7        (Counsel confer.)

8            MR. PETROCELLI:  We are going to have a few more.

9            THE COURT:  Have at it.

10           MR. KIRMAN:  Good afternoon, Your Honor.

11           THE COURT:  Good afternoon.

12           MR. KIRMAN:  I would like to briefly address

13   defendants motion in limine Number 3, the motion in limine to

14   exclude the article by *LA Times* columnist David Lazarus.  And

15   we have reviewed the tentative and understand the Court's view

16   that those are not coming in for the truth, but the Court --

17           THE COURT:  And keeping in mind, it's going to be

18   very limited in terms of what Mr. Lazarus would be able to

19   testify, and it goes to the point that was just made in terms

20   of knowledge.  And so, to the extent that there's this question

21   about whether or not Mr. Trump had knowledge that people were

22   instructing and it turns out he didn't even know them, then

23   that would support the plaintiffs' view that these weren't

24   Donald Trump's hand-selected instructors.

25           MR. KIRMAN:  Your Honor, I understand the Court's

1   order.  But the question, I think, raises, knowledge of what?

2   What knowledge is this article probative of?  That a guy named

3   Stephen Goff taught a class in Pasadena.  That is not probative

4   of any knowledge on Mr. Trump's part.  Mr. Trump has thousands

5   of people that work for him.  He is not going to necessarily

6   recognize a name in an article, and the fact that he does

7   recognize it doesn't mean that he handpicked them, and the fact

8   that he doesn't recognize them didn't mean he didn't handpick

9   them.  So it really has very little probative value.

10      In addition, Your Honor, if you look at the article

11   itself, it doesn't even include the word "handpicked."  And I

12   am going to read --

13          THE COURT:  I understand.  And I did look very

14   closely at the article in order to figure out where, if

15   anywhere, it would fit in the case.

16          MR. KIRMAN:  Your Honor, if I could read, it says --

17   this is the representation made to Mr. Lazarus.  "I am going to

18   give you two hours of access to one of my amazing instructors

19   and priceless information."

20      Your Honor, the article -- Mr. Lazarus didn't even use the

21   word "handpicked," which as Your Honor has stated, is the

22   certified language in this case.  So nothing in that article

23   would put Mr. Trump on notice that that word was used or he

24   represented this particular instructor was handpicked, even

25   under the plaintiffs' very narrow interpretation of that word.

1    In addition, Your Honor, I think, really, this is a Trojan

2   horse.  If you look at the plaintiffs' pretrial submission,

3   they state very plainly the purpose of this testimony.  And it

4   was to show that TU was a two-hour infomercial, a commercial

5   that provided no content, and that's really the substance of

6   the article.

7         THE COURT:  And Mr. Lazarus would not be allowed to

8   testify about that.

9         MR. KIRMAN:  Your Honor, I would submit if he's not

10   allowed to testify about that, there's really no probative

11   value.  And the little probative value that would be accounted

12   for is offset by Rule 403.

13    This is a columnist, Your Honor, an *LA Times* reporter.  He

14   goes into the class with an agenda.  He wants to write a story,

15   which he does.  And in so doing, he is not a consumer.  He

16   doesn't make a purchase.  He didn't go to the Fulfillment.  He

17   didn't receive any TU materials.  He never learned course

18   content.  The issue of the "university" is not an issue in the

19   article.  And so he really has very little connection to this

20   case.

21    And as Your Honor mentioned in the last motion, this

22   evidence can also be proven in other ways.  Mr. Trump is going

23   to testify.  He's been deposed.  They asked him if he knows

24   Mr. Goff.  He's already answered.  This is cumulative of that

25   testimony.  And while being cumulative, it also implicates all

1    of the negative connotations, the sarcasm of this particular

2    reporter.  And Mr. Trump's response as well, which in this case

3    was to threaten to sue Mr. Lazarus, criticizing the *LA Times* --

4            THE COURT:  And that obviously would not come in.

5            MR. KIRMAN:  So, Your Honor, I think, really, there's

6    nothing here, other than a lot of prejudice.

7            THE COURT:  Let me hear from the plaintiffs.  This is

8    close, under 403, whether or not this would come in.

9        Good afternoon.

10           MR. COCHRAN:  Good afternoon, Your Honor.  Brian

11   Cochran on behalf of plaintiffs.

12       Your Honor, just a brief comment.  I think between the

13   last issue and this issue, I think the difference is clear.

14   The issues that the Court has certified relating to

15   handpicked -- this goes directly to the issue.

16       The article discusses Mr. Trump's instructor from a

17   percipient witness at a free preview event.  The certified

18   misrepresentations relate to those very same seminars here in

19   California.  So plaintiffs --

20           THE COURT:  Certainly, there's relevancy, and the

21   question, I guess, is whether or not it becomes cumulative and

22   it opens up the door to undue prejudice, because you have

23   someone who is obviously not a fan of Donald Trump, and to the

24   extent that they are not, whether or not that would introduce

25   an element that ends up offsetting the relevancy and the need

1    for the testimony.  Could you address that?

2         MR. COCHRAN:  And plaintiffs are willing to limit the

3    evidence as laid out in the tentative, Your Honor, to address

4    those very concerns.

5         THE COURT:  Let me look some more at that one.

6       Did you want to be heard further?

7         MR. KIRMAN:  Yes, Your Honor, really briefly, just to

8    paint the whole picture.

9       The current state of the tentatives, Your Honor, is to

10   keep out these thousands of surveys that Mr. Trump and others

11   reviewed, that goes to their knowledge of the quality, but to

12   admit the single reference in this one article to Mr. Goff --

13        THE COURT:  Again, because there's a connection

14   between the knowledge as it relates to the certified issues.

15   The certified issues relate to hand-selected instructors, and

16   so then you had some evidence relating to an instructor who it

17   turns out was not hand-selected, and that whose identity was

18   made known to Mr. Trump by this article, and then Mr. Trump

19   responded.  And so it moves the ball forward in that way, and

20   there's this -- there's not a disconnect; there's a connection.

21      But I do grant you that it may not be necessary given, I

22   think, the valid concerns that you have expressed.

23        MR. KIRMAN:  Thank you, Your Honor.

24      I would like to address defendants' motion in limine

25   Number 4, which is the Better Business Bureau.

1          THE COURT:  Yes.

2          MR. KIRMAN:  Your Honor, and -- with respect to this

3    motion, obviously we have reviewed the Court's tentative.  We

4    understand that the Court has stated that this evidence is also

5    not coming in for its truth, but it's coming in to show

6    Mr. Trump's notice and knowledge.

7        And again, Your Honor, with respect to this, I would say

8    notice of what?  Trump University had 80,000 students attend a

9    preview.  Approximately 10,000 students went to a Fulfillment

10   seminar.  And of those, about ten percent -- these are rough

11   numbers, Your Honor -- 1,000 students, bought an Elite package.

12   Of the 80,000, the 10,000, the 1,000, there were approximately

13   40 complaints to the Better Business Bureau.  That is an

14   extremely small fraction.  And of those 40, almost none

15   involved whether or not they thought the professors were

16   handpicked, or whether or not this was a university.

17          THE COURT:  There was one, wasn't there?

18          MR. KIRMAN:  One.  One out of 10,000.

19          THE COURT:  And based upon that, then the Better

20   Business Bureau itself undertook an investigation of sorts, and

21   then they agreed that these attempts to pass off itself as a

22   university were deceptive.

23          MR. KIRMAN:  No, Your Honor.  The Better Business

24   Bureau did not undertake an investigation.  Trump University

25   affirmatively took steps to become -- using another word,

1   "accredited."

2          THE COURT:  Accreditation, right.

3          MR. KIRMAN:  So they apply to the Better Business

4   Bureau.

5          THE COURT:  Right.  And the accreditation was denied

6   partly because of the fact that the use of this term

7   "university" was deceptive.

8          MR. KIRMAN:  Your Honor, they didn't say it like

9   that.  The Better Business Bureau is a consumer protection

10  agency.  It has the pillars that it uses to analyze business

11  practices -- 11 pillars in this case it uses to decide.  So it

12  has its own internal ways to categorize the names of companies.

13  That doesn't mean that the reasonable consumer would interpret

14  them in that way.  It's a specialized application of a name to

15  an internal set of criteria.

16      That is completely different than the elements in the jury

17  instructions that Your Honor is going to give.  Regardless of

18  which side Your Honor approaches, it's going to be different

19  than the jury instructions that are going to be read to this

20  jury.

21      So, Your Honor, I think the only notice is that, "You were

22  denied accreditation because they disagreed with your name."

23  But it's not like a defect, where you are put on notice of a

24  car that has a faulty airbag and you need to fix it or do a

25  recall.  They were just on notice that they were denied

1    accreditation.

2        And then, Your Honor, when you kind of weave all of that

3    into it, to get into these BBB issues, you have a 701 issue,

4    which is really an expert-type opinion.  And I will read from

5    one of the letters from the BBB.  It says, "The information

6    taught was questionable from a legal standpoint and even more

7    questionable from a moral standpoint."

8        Legal conclusions, you know, very difficult, specialized

9    types of language.  And Your Honor, that's exactly the type of

10   language that courts regularly exclude when it's coming from a

11   lay witness.  That's the type of thing that needs to be noticed

12   as expert testimony.

13       So, Your Honor, I think to the extent that Your Honor has

14   said that the jury is going to have to decide the meaning of

15   these words, the BBB's interpretation of it, using their own

16   set of criteria from somebody who's working for a

17   quasi-governmental agency, that exists to help consumers, that

18   applies different elements than Your Honor is going to instruct

19   the jury, really has no place in this trial.

20       And I think, like the Mr. Lazarus piece of evidence, it is

21   just fraught with so much prejudice, and the hook, Your Honor,

22   of the notice is just so small, especially given all the ways

23   that it's undercut, that it will create this huge mini trial.

24   For example, Your Honor, this issue alone has 30 exhibits that

25   are identified by the plaintiffs.

1          THE COURT:  Well, I think I have made clear by my

2     tentative that we wouldn't be having 30 exhibits come in with

3     respect to this testimony.

4          MR. KIRMAN:  Well, Your Honor, I think the notice

5     issue, though -- this issue needs to be fleshed out.  The

6     testimony can't be that the BBB found this misleading.  No.  It

7     was that Trump University applied for accreditation.  Here is

8     where the prior complaints were.  Here is the name.  Here is

9     the criteria that was applied.

10         It is a little mini trial within itself.

11         And ultimately, what the BBB decides is -- would sort of

12     be supplanting the role of the jury, which, as the fact-finder,

13     is itself going to be asked, "What is the meaning of these

14     terms based on a reasonable consumer?"  Not based on some

15     New York branch of a national organization -- which, by the

16     way, Your Honor, at the time, there was questions about

17     payments and whether or not it favored companies that paid the

18     fees.

19         So there's just a lot going on here that adds very little

20     in terms of relevance, especially with respect to notice,

21     because what notice it's providing is very unclear.

22          THE COURT:  All right.  Let me hear from the

23     plaintiff on this.  And let me have you address the question of

24     whether or not the Better Business Bureau's definition of

25     "university" would be something that would basically lead the

1  jury to a shortcut that, "Well, I don't really have to think

2  about what a university is.  Here is the Better Business

3  Bureau.  They are out to protect me.  I trust them.  And they

4  said it is not a university, so the issue is done.  I have made

5  up my mind."

6        MS. JENSEN:  Yes, Your Honor.  Good afternoon.

7  Rachel Jensen.

8        So I think here we are not talking about some jargon,

9  specialized jargon, they way that, perhaps, Mr. Kirman

10  suggested.  And I would like to read from the actual letter for

11  Your Honor so you can hear the words that it said.  These are

12  very commonly understood.  There was no specialized, by the

13  way, criteria for a university that the BBB was using, and I

14  think it's apparent from the passage I am about to read.

15        It first says that they have held themselves out as

16  accredited.  It says, "Another factor contributing to your

17  firm's ineligibility is your firm's name, Trump University,

18  which may potentially lead reasonable consumers to believe that

19  your firm is an academic institution.  As you acknowledged in

20  your correspondence dated 1/4/2010" -- this is a January 22,

21  2010 letter -- "your firm does not meet the established

22  definition of a university."  So, Your Honor, it's really the

23  defendants' admission as well.  "However, your instructors and

24  program experts are referred to as professors and faculty in

25  your promotional materials and on your website.  Both terms are

1    potentially misleading as they are generally reserved for the

2    teaching and administrative staff and members holding an

3    academic rank in an academic institution."

4        So, Your Honor, in other words, there's no potential for

5    misleading or confusing the jury as to jargon.

6            THE COURT:  I guess the question is that to the

7    extent they are pointing to these considerations, that

8    "university" has the regular definition, that "instructors" and

9    "professors" are kind of part and parcel of "university," and

10   for those reasons we find that it's deceptive, isn't that

11   encroaching on the jury's job?  Aren't these things you are

12   going to be in a position to present at trial, and you can

13   argue to the jury, "Listen, these folks are passing themselves

14   off as a university.  They have a crest.  They have these

15   people that -- they talk about professors, but they are not.

16   They are just folks off the street, and they are just people

17   that are not at all at a university level."

18       What is wrong with just letting you present your case to

19   the jury in that way, versus having to piggyback on or having

20   to rely upon the Better Business Bureau definition?

21           MS. JENSEN:  Sure.  I don't think that the Better

22   Business Bureau had a particular definition but I --

23           THE COURT:  Or their position.

24           MS. JENSEN:  Right.

25       Your Honor correctly pointed out in the tentative that it

1    was really for notice.  And here, I would say it's really

2    notice to the defendants of the deceptiveness of their

3    marketing campaign.

4              THE COURT:  All right.

5              MS. JENSEN:  And, Your Honor, we cited some FTC

6    cases, on pages three and four of our brief, that I think bear

7    on this issue, where the notice of deception is admissible for

8    that purpose.

9        I would say in addition that we understand Your Honor is

10   not letting all of the BBB evidence come in.  We do think,

11   however, that this January 22, 2010 letter and some related

12   correspondence should come in.

13       And Your Honor, we have included with our papers a

14   declaration of a custodian of business records that established

15   the various prongs for letting it come in as a business record.

16   We also have testimony from Claire Rosenzweig, who is the

17   president of the New York BBB, who also testified and satisfied

18   all the prerequisites for letting it come in as a business

19   record.

20       And in particular, for that point, I think it should come

21   in for the truth of the fact that the defendants were holding

22   this out as a university.  As you can see in this letter, the

23   author is making reference to the website, and so that is a

24   public portrayal.

25       So one point the defendants made was, "Oh, this isn't a

1  consumer who was at the live event."  This is evidence that

2  they were holding Trump University out as a university, even

3  with their words, "accredited university," on the website.  So

4  I think it goes to the truth of the representation.

5          THE COURT:  All right.

6          MR. KIRMAN:  Your Honor, briefly?

7          THE COURT:  Yes.

8          MR. KIRMAN:  Your Honor, I would just like to

9  highlight that, in addition to all the things previously

10  mentioned, this letter was written on January 22, 2010, which

11  as Your Honor knows is towards the end of the class period.  So

12  to the extent there's any minimal relevance even on this notice

13  point, which defendants submit there is not, it would only

14  apply to a very narrow slice of the testimony.

15      In addition, Your Honor, the defendants have not agreed to

16  admit the business records by declaration and in fact strongly

17  believe this is not a business record.  This is a type of

18  litigation.  The parties are writing back and forth their

19  relative positions, which is not the type of business record --

20  it's not made in the ordinary course of business.  It is not

21  reflecting just a mechanical application.

22      In fact, the surveys are far closer to business records

23  made at the time, in the ordinary course of business, sent and

24  maintained.

25          This is a letter.  It is complete hearsay.  To the extent

1    Ms. Jensen wants to offer it for its truth, which Your Honor

2    has already in its tentative refused to do, but to the extent

3    she does, it's clearly hearsay and would not fall within an

4    exception.

5         And finally, Your Honor, I would note that even the author

6    of this letter is not on the witness list, a woman named Susan

7    McMillan, who we would not have the ability to cross-examine.

8         For all those reasons, Your Honor, the defendants believe

9    that the BBB has no part in this case.

10              THE COURT:  All right.  Thank you.  I will take a

11   closer look at this tentative ruling.

12        Anything else?

13              MR. MARROSO:  Yes, Your Honor.  I would like to

14   address defendants' motion in limine Number 1.  This is the

15   motion in limine concerning what we called noncertified

16   misrepresentations.  Two of the three issues that we raised in

17   that motion have been deemed moot because of the plaintiffs'

18   representations they do not intend to introduce them at trial.

19        The third one, which I will call the dinner story,

20   following Your Honor's lead, I would like to address.

21        As I address that, I would like to contextualize this for

22   a moment.  I think there's three issues that are running

23   through several of these motions in limine.  And it's important

24   that -- and I know Your Honor is certainly trying to do this --

25   we apply consistently across the aisles, here.

1          Issue number one is the representative nature of the class

2    action, and that was the fundamental reason and basis for your

3    ruling regarding absent class members and the limited nature

4    for which it would be provided.

5          Issue number two is the limited nature of the certified

6    misrepresentations in this case.  Your Honor made clear that

7    when this case was first pled, it had all kinds of other

8    alleged misrepresentations.  And to put that in perspective, it

9    was during the certification phase that you said, "How are you

10   going to prove all of these misrepresentations uniformly?"

11         And the plaintiffs said, "Your Honor, we are going to pare

12   back our cases.  It is no longer the broad scheme.  It's the

13   core three" -- one of which is out -- "'university' and

14   'handpicked.'"

15         And the third issue that's running through is the notice

16   issue, complaints about Trump University, like the BBB -- I am

17   going to address the New York Department of Education

18   momentarily -- that's coming in to show notice, our notice,

19   that it was potentially misleading and deceptive to use the

20   term "university."

21         But contra evidence, the absence of notice, things like

22   the customer surveys, nobody complaining in those surveys,

23   where you had the ability to the qualitatively write things, is

24   being excluded.

25              THE COURT:  But it's hard to talk about absence of

1    notice regarding things that have been hidden from the class

2    members.

3              MR. MARROSO:  It's impossible to hide "university."

4         "Handpicked," I concede the logical argument that a person

5    sitting in the hotel room, listening to one of these

6    instructors, might not know whether he or she was handpicked by

7    Donald Trump, however you define that.

8         Now, they certainly had the opportunity to ask questions

9    of these instructors, to inquire, to have a discussion.  "Hey,

10   have you met Mr. Trump?  What is he like?  What was the

11   audition like?"  But I take your point that, analytically, a

12   person might not know that question.

13        A person sitting in a meeting room at a Hilton in

14   San Diego would either think or not think he was at

15   a legitimate, an elite, an accredited, a real -- whatever

16   adjective you want to put before the word "university" -- you

17   can't hide that.

18        To the extent that one of these -- that a class member saw

19   an advertisement.  Trump University, with a crest, comparing it

20   to Wharton business school, "I am going to teach you better

21   than Wharton," and they thought, "Hey, for 1500 bucks, I am

22   going to get a university diploma," when they went to the hotel

23   for three days and got that education, they would know full

24   well that was not a university.  And if they were upset, if

25   they thought they had been deceived, it is reasonable to think

1    they would put that in their surveys.

2        The absence of that -- even though there's no question,

3    "Did you think this was a university," the absence of those

4    complaints is the flipside of allowing consumers to submit a

5    complaint to the Better Business Bureau saying, "I am upset.  I

6    want a refund.  I thought this was a university."

7        Why does that come in while, on the other hand, thousands

8    of people who didn't feel that way is excluded?  It's notice

9    in, notice out.  You can't have it both ways.

10       And that's the issue here that I want to address with

11   respect to the dinner story, bilateral rulings.  Your Honor

12   excluded the surveys on the ground -- you were very clear.  I

13   listened closely.  You said, "The words" -- "I looked at those

14   surveys.  It doesn't say the word 'hand-picked' or

15   'hand-selected,' and it doesn't say 'university.'  It doesn't

16   ask those questions, so there's a disconnect."

17       What does the dinner story say about "university" or

18   "handpicked"?  "Handpicked" isn't in there.  There's no logical

19   connection between those two.  Somebody could have dinner with

20   Donald Trump and hear the story and not be handpicked.

21   Somebody could be handpicked by Donald Trump, whatever that

22   definition is, without going to dinner.

23       The reason they want to bring that in is they say, "It is

24   a variant.  It's similar to the handpicked.  That's why you

25   said it; you wanted to mislead people into thinking there was

1   this close connection between Mr. Trump and the instructors."

2       That's not with precision.  You're holding us to a level

3   of precision with respect to the surveys.  They are not being

4   held to the same level of precision.

5       And there's a strawman being set up on this point.  We

6   don't claim the actual word "handpicked" is the only thing

7   that's at issue.  Frankly, given the debate about what it

8   means, there really should be more exactitude demanded of the

9   advertisements.  I think the case law supports that, although I

10  do acknowledge the first *Allianz* case, which you rely on and

11  they rely on, says exactitude is not required, but they have to

12  be materially the same.

13      They can't just say, "I shook Mr. Trump's hand one time.

14  That means handpicked." Or, "I was in the same room with him.

15  That implies handpicked.  I heard him tell a story once.

16  That's handpicked." And it's all coming in to show a false

17  representation.  That is exactly what Your Honor said they

18  could not do on a uniform basis.

19      Making matters worse, as far as I know -- and I am sure

20  they will correct me if this is an incorrect recitation of the

21  record -- none of the three named plaintiffs that I am aware of

22  has testified or has knowledge of hearing a dinner story.

23      Moreover, the exhibits that we have identified in our

24  motion to strike about this -- again, as far as I know, and

25  they will correct me if my understanding of the record is

1    wrong -- are from places like Puerto Rico.

2        If we can't bring in absent class members from states

3    other than California, Florida, and New York -- which, to be

4    clear, we think would be erroneous -- but if we were going to

5    be held to that standard, dinner stories from Puerto Rico can't

6    come in.

7        The representative nature of this class, Your Honor, the

8    fact that there's only two certified misrepresentations, we

9    would ask that Your Honor reconsider the tentative with respect

10   to the one open issue that remains.

11           THE COURT:  And keeping in mind, as stated, the

12   evidence doesn't come in as a standalone, without the basis for

13   impeachment, and it's being viewed as admissible as impeachment

14   evidence.  And so then, that requires a witness to testify in a

15   way that's inconsistent with this information regarding having

16   dinner with Mr. Trump and then it becoming relevant in that

17   manner and then becoming used to impeach a witness.

18       In this ruling, I am not saying that in the case in chief

19   of the plaintiffs that they are automatically entitled to point

20   to this as evidence, and so it's limited in that sense.

21           MR. MARROSO:  Well, that's a helpful clarification.

22       If what you are saying is if an instructor is on the

23   stand, and they say, "Hi, Instructor.  Did you tell Mr. Low

24   that you had dinner with Donald Trump and that he told you this

25   story?"  And that instructor says, "No, I did not."  And then

1    they want to impeach with -- I don't know -- a transcript or

2    some audio of him saying that, that's a different issue.

3    That's not what they are seeking to introduce it for.

4         THE COURT:  Let's hear from the plaintiffs and find

5    out precisely how they are offering this.

6         MR. FORGE:  Thank you, Your Honor.

7      Let's be clear about this, because I don't think

8    Mr. Marosso -- and I don't mean this as a criticism.  He

9    couldn't possibly know the history of the scripts in this case,

10   which goes back years, years of denials from the defendants

11   that they existed, and then sworn statements by Mr. Sexton

12   denying they existed, elicited by Mr. Sexton and Mr. Trumps'

13   original lawyer in this case, denying the existence of these

14   scripts.

15      These scripts were compiled and assembled and distributed

16   from New York by Mr. Sexton to all the principal preview event

17   speakers with the directive to use them.

18      Now, it's true the defendants have destroyed many of the

19   audiotapes of these presentations so we don't have all of them.

20   They did that by design.  Some of the -- in fact, the ones that

21   we have basically slipped through the cracks because their plan

22   was to destroy them after, I think, about 30 days.  So we only

23   have audiotapes by mistake.  Clearly -- and even those are

24   damning.  The ones we don't have -- who knows?  They could be

25   even worse.

1    But the point of this vignette -- and Mr. Marroso

2  mentioned it in passing, as if it's not important or not

3  controlling, when in fact it is critical and controlling.

4    The first *Allianz* case couldn't be any clearer about the

5  fact that there is no talismanic formula or requirement for, to

6  use Mr. Marroso's word for it, exactitude.  We do not have to

7  have the exact same language.

8    This was not a reference to a dinner with Mr. Trump that

9  segued into a discussion about how much Mr. Trump likes fried

10 chicken.  This was a specifically scripted vignette about a

11 dinner with Mr. Trump in which he expressed his insights on

12 real estate.

13   There's an undeniable connection and reinforcement of the

14 misrepresentation that Mr. Trump had hand-selected each of

15 these instructors by virtue of this vignette, that this

16 individual standing before them is dining with Mr. Trump and

17 talking real estate with Mr. Trump.  The two go hand in hand.

18 They are interchangeable.  They are the same message.

19   And that came up specifically in our argument with the

20 Court during this case.  I remember vividly, in one hearing,

21 talking about, "Oh, yeah, they didn't say handpicked this time;

22 they simply said, 'I had dinner with Mr. Trump, and we talked

23 about real estate.'"  So we really -- we have always viewed

24 this particular vignette as interchangeable.

25   And it is admissible, Your Honor, I believe, in our case

1    in chief.  Again, Mr. Sexton has admitted that it was false.

2    Mr. Trump has admitted that it was false.  And Mr. Sexton has

3    admitted that, despite knowing it was false, he sent it to the

4    instructors with the understanding that they were being

5    directed to use it.  And we have an instructor who has

6    confirmed he used it.  We have multiple instructors who have

7    used it by virtue of transcripts and class member testimony.

8    So we have checked off every box we could as far as being able

9    to admit this evidence.

10       So if Your Honor has any other questions about it, I am

11   happy to address it, but I do --

12           THE COURT:  All right.  I am going to take another

13   look at this, and I will issue my final decision on it when I

14   issue my final.  I will take into account both sides' argument

15   that was presented today.

16           MR. FORGE:  Thank you, Your Honor.

17           THE COURT:  Next?

18           MR. MARROSO:  Your Honor, just briefly, before we

19   depart from that one, I would like to give Your Honor a

20   citation to the transcript, Docket Number 290, page 56.

21           THE COURT:  290, page 56?

22           MR. MARROSO:  Yes, sir.

23       And you wrote -- actually, what I recall is that Mr. Forge

24   said they would confine themselves and limit themselves to

25   basically a common core, which I think at this point would do a

1    couple of things.  It would assert the position of the

2    plaintiffs, and then it would justify the Court in limiting the

3    scope of possible evidence at trial.

4        That was said in the context of paring back

5    representations that they would be unable to prove had been

6    shown to the class on a uniform basis.

7        Turning to defendants' motion in limine Number 5, this is

8    the motion in limine concerning New York-related evidence.  And

9    we obviously agree with Your Honor's part of the tentative

10   excluding attorney general paperwork and enforcement actions.

11   And of course, we also agree with the legal conclusion that

12   Your Honor drew that any violation of the New York statute

13   would not be a proper predicate for the UCL.

14       Your Honor concluded, however, that Mr. Frey's testimony

15   and certain correspondence exchanged between Mr. Frey and Trump

16   University would come in for a limited purpose.  The limited

17   purpose being of, quote, "demonstrating defendants' knowledge

18   and notice of the misrepresentations."  And to harken back to

19   what Mr. Kirman said, knowledge and notice of what?  The

20   existence of a New York regulation concerning steps that

21   businesses should take in order to use the term "university" in

22   the state of New York.  That's the only thing this could

23   possibly give notice of.

24       Not that using the word "university" would mislead

25   somebody in California or Florida or anywhere else in New York

1    absent the connection between showing that class members, on a

2    uniform basis, or let's just say the named plaintiffs, had

3    knowledge of the regulation and that we had not gone through

4    whatever the steps that Mr. Frey said we needed to go through

5    in order to do so.

6         So what they are really doing is they are saying that the

7    regulation is a proxy for misleading.  The regulation is a

8    proxy for "You violated the regulation."  And by the way, Your

9    Honor, there's no adjudication with respect to that particular

10   part of the New York enforcement action.  There's an

11   adjudication against Trump University on a different license

12   issue.

13            THE COURT:  Let me ask you a question.  You say that

14   the existence of the New York regulation as to the steps that

15   have to be taken to make use of the term "university" in

16   New York is something that should not be imparted to the jury

17   as somehow having relevance as to the cause of action across

18   the board.

19       Do you also take that position with respect to the

20   New York-law-based causes of action?

21            MR. MARROSO:  Yes, Your Honor, to answer your

22   question directly.  It is totally irrelevant to the California

23   and Florida classes.  And to the extent this comes in at all,

24   we would request an instruction.

25       As to New York -- as to New York, the reason we say it is

```
 1   not relevant to that class is the absence of any connection

 2   between class members having knowledge of the regulation and

 3   that failure --

 4            THE COURT:  But why is that necessary that they do or

 5   do not have the knowledge of the regulation in terms of the

 6   element of notice and knowledge provided to Trump University

 7   and Donald Trump?

 8            MR. MARROSO:  For a few reasons.  First, this isn't

 9   an omission case.  Your Honor has made that clear.

10            THE COURT:  We talked about knowledge, and I think

11   you all have argued that that is a critical part of this,

12   correct?

13            MR. MARROSO:  Sure.

14            THE COURT:  That there has to be knowledge on the

15   part of Trump University and Donald Trump?

16            MR. MARROSO:  Knowledge of deception, knowledge that

17   your conduct -- that calling yourself Trump University, using

18   the crest, whatever evidence they want to use -- would deceive

19   a reasonable consumer.

20            THE COURT:  Right.  Right.

21            MR. MARROSO:  There's no connection between a

22   regulation that says you need to have your place of

23   operation --

24            THE COURT:  There's no connection?

25            MR. MARROSO:  I don't think so, no.  Unless you can
```

1   show that the class members understood that in order to call

2   yourself a university, you must do these things.

3       And to be -- I do want to -- if I may contextualize this,

4   because perhaps my argument may sound artificial, but you have

5   to put it in context.  These communications occurred in 2005,

6   before there were any live events.

7       It's interesting.  They want to keep everything out that

8   was before Trump University went live because that's not

9   relevant, but they want this to come in even though this

10  communication occurred in 2005, when we were online.

11      And what the communications say -- I don't know if Your

12  Honor has them or had a chance to review them -- it said, "You

13  need to move offices to Delaware, and then you can do it.  Then

14  you can be University."

15      And I want to make something clear.  We don't agree with

16  their -- the New York Department of Education's interpretation.

17  We didn't agree with what they said.  We were trying to avoid

18  having to enter into a regulatory or administrative fight with

19  them in how we responded.  But who is to say that Mr. Frey

20  speaks for the reasonable consumer?  Who is to say that

21  Mr. Frey says, "If you use the term 'university,' it's

22  misleading," but the people who actually sat in the room and

23  didn't think it was misleading, that's not relevant?

24      This is very similar to the BBB situation.  If it's only

25  coming in for the purpose of saying some third party -- BBB,

1    Department of Education, Joseph Frey -- only coming in to say,

2    "You, defendant, somebody told you the use of that term could

3    be misleading," then it must be the case that the thousands of

4    people who didn't say that, that also has to come in.  They

5    can't have it both ways.  They cannot have control of the

6    knowledge proof.

7         The final point I will make on this is why does New York

8    have a monopoly on the use of the term "university"?  Do we

9    need to go through a 50-state survey to the jury to identify

10   for them what each state's regulations say or doesn't say?  Do

11   we need to call and introduce evidence of what other states did

12   or didn't do with respect to Trump University?  Why does

13   New York have a monopoly on this?  It's only because they wrote

14   a letter saying, "We have this particular view."  I get that.

15   That's why they want it to come in.

16        Well, how about the 49 other states for two years that

17   didn't send a similar letter?

18             THE COURT:  Basically, you are saying unless you can

19   have all 50 states write a letter that would give notice of a

20   possible problem here, that the fact that you do have one state

21   that provides that notice, that we shouldn't let the jury know

22   about that?

23             MR. MARROSO:  No.  I don't mean to phrase it that

24   way.  What I am saying is the New York State Department of

25   Education is not the reasonable consumer.  And if they are

1    being used as the reasonable consumer to determine what is

2    misleading, and if the BBB is being considered the reasonable

3    consumer to give knowledge that the reasonable consumer,

4    Mr. Trump, Trump University -- the reasonable consumer, as

5    personified by the Department of Education, as personified by

6    the BBB, they think this could be misleading, then everything

7    else -- every other state should come in, and every student.

8         And I don't -- I take Mr. Petrocelli's point.  We are not

9    trying to blow this case up into where we are going to call

10   hundreds of people.  We have half a dozen people from across

11   the country at different periods of time who will testify as to

12   their experience.  They will testify as to, "We saw the word

13   'university.'  This is -- this is what we observed.  We went to

14   a hotel.  It was in a meeting room.  This is what was taught to

15   us.  We were given these materials.  This is what was said.

16   This is what I wrote down.  This is what I wrote on my survey."

17        And they are free to cross-examine them.  "When you first

18   paid, did you think you were going to the equivalent of

19   University of" --

20             THE COURT:  I think we are going back to a motion in

21   limine that we have fully addressed.

22             MR. MARROSO:  Thank you for your patience, Your

23   Honor.

24             THE COURT:  Response?

25             MS. JENSEN:  Your Honor, there's a number of points I

1   would like to address, but I would like to start with the

2   question posed by counsel, which I guess was a rhetorical

3   question, "Why New York?"  The answer is very clear.  It's

4   because Trump University was located within the state of

5   New York.  And the New York State Education Department was the

6   regulator of domiciled companies there.  And that is why, Your

7   Honor -- unlike some of the other cases that the defendants

8   have cited, that is why the case that we cite, the process --

9   the case that we cite says you can apply the law of another

10  state where it is specific to the domiciles of that state.

11  That's why it should apply here for the UCL.

12          THE COURT:  As far as a predicate?

13          MS. JENSEN:  A predicate.  That's right.

14      I think here, too, it is a little bit of fantasyland to

15  think, "There's this regulation.  Nobody knows about it.  And

16  so what harm does it do?"

17      Well, I can tell you, it does a lot of harm, and the laws

18  are there for a reason.  And Mr. Frey, in his testimony, went

19  through all of the reasons why New York education law

20  Section 224 and the regs 2001 to 2005, I believe, were put into

21  place, and it is not just for red tape.  It's in order to be

22  able to check on the quality of the education being provided.

23  The New York State Education and the affiliated regulatory

24  bodies would be checking to see what the curriculum said, how

25  the instructors -- whether the instructors were properly

1    credentialed, whether they were paid on commission, which in

2    this case we know they were.

3         And so, for all of those reasons, it was of utmost

4    importance that Trump and Trump University went through the

5    proper steps to become a legitimate university, or otherwise,

6    when the New York State Education Department told them to stop

7    in 2005, then they should have stopped.

8         Now, as to the point of them just being able to move to

9    Delaware, that is not at all what Mr. Frey testified.  He said,

10   "Look, I am New York.  If you go somewhere else, I don't have

11   jurisdiction over you."

12        But I can tell you that the New York attorney general, and

13   the documents and declarations that have been signed in that

14   case, show that the NYSED believes they had jurisdiction and

15   the New York attorney general believed they had jurisdiction

16   over the activities of Trump University wherever they operated,

17   around the country, so not just New York.

18        When they were in California, here, they were subject to

19   the New York standards because they were operating out of

20   New York.  In other words, the illegal conduct was happening at

21   its headquarters, in New York, and that illegal conduct, which

22   I don't think anybody questions was illegal, harmed people here

23   in California when they went to California.  And that is why,

24   Your Honor, the New York law applies to the UCL, and that is

25   why what counsel said I must respectfully disagree with

```
 1    entirely.
 2        Now, the other thing I wanted to say --
 3            THE COURT:  Let me ask you a question regarding the
 4    effect of an alleged violation of this New York statute.
 5        Is there a UCL counterpart in New York that would utilize
 6    this violation as a condition precedent for purposes of
 7    liability?
 8            MS. JENSEN:  Your Honor, if you are asking whether
 9    there is a California law --
10            THE COURT:  No.  No.  No.  One or two of the statutes
11    that -- or one of the two causes of action that's being
12    presented is based upon New York law, correct?
13            MS. JENSEN:  Correct.  That's right.  It's New York
14    law, Section 224, and then the regs.
15            THE COURT:  Are there two causes of action, elder
16    abuse and a separate one, or is it just --
17            MS. JENSEN:  I am sorry.  The New York claim is
18    general business practices 349.
19            THE COURT:  That's somewhat akin to a UCL?
20            MS. JENSEN:  Correct, Your Honor.
21            THE COURT:  Does New York law provide that a
22    violation of a law such as this law would constitute a
23    condition precedent or a predicate?
24            MS. JENSEN:  It is a little different than the UCL in
25    that respect, Your Honor.  There's not a specific violation for
```

1    "unlawful" in the way the UCL has an "unlawful" prong.  The

2    courts, however, do look to whether it's unfair and deceptive,

3    and certainly if it's illegal, that might be something you want

4    to look at a little more closely.  In other words, I think it's

5    "relevant to."  I don't think it is sufficient to show.

6         I did want to address one thing, Your Honor, which is the

7    defendants have made a very bold representation to this Court

8    in their papers, that California and Florida do not have any

9    laws and so therefore no one's harmed in those states.  And we

10   have now been able to find in the regs of California -- and

11   it's 5 CCR 7150 -- there's a provision in the regulations that

12   say you cannot use the word "university" in the name or in

13   connection with the description of itself or its educational

14   programs unless the institution is a university, as defined

15   above, or which is --

16             THE COURT:  Is that a recent change in the law?

17             MS. JENSEN:  It is not, Your Honor.  We went back --

18             THE COURT:  Did it apply in 2010 and 2011?

19             MS. JENSEN:  Yes, it did, Your Honor.  Yes, it did.

20        And also we -- it also says that -- or if it uses other

21   words in conjunction with university, to prevent that from

22   becoming deceptive.

23        In other words, the defendants have pointed to McDonald's

24   University, things like that, in the course of this litigation,

25   where it's clear that it's not an educational institution,

1    California law does carve that out.  But obviously, here, where

2    you have got Mr. Trump referring to Wharton business school and

3    saying this is better than that, it's pretty clear it does

4    apply.

5         Also, there's a Florida statute on point, which is Florida

6    Statute Section 1005.03, which also says that an entity may not

7    use the designation "university" in its name in Florida without

8    approval.

9         So I think that addresses those points.

10        One thing that I thought -- counsel said earlier that you

11   can't hide whether it's university, and I disagree with that

12   premise.  But I can tell you, I don't think anybody can

13   disagree that you can hide whether a regulatory agency told you

14   not to use the term because it is illegal and misleading and

15   you did it anyway.

16        So in that regard, I think this "omission" idea is a false

17   dichotomy.  It's really the flipside of the same coin.  You

18   can't omit a fact that renders a statement misleading.  So I

19   think that's on point here.

20             THE COURT:  All right.  Thank you.

21        Any other motion?  Any other motion in limine that you

22   would like to address?

23             MR. MARROSO:  I would just like to briefly respond to

24   that.

25             THE COURT:  That's fine.

1          MR. MARROSO:  And I believe there's one more.

2          THE COURT:  Okay.

3          MR. MARROSO:  I will confine my remarks to

4    Ms. Jensen's, and I will try to keep it in the same order.

5          THE COURT:  Sure.

6          MR. MARROSO:  The first is Ms. Jensen said that what

7    Mr. Frey said in the testimony that they intend to introduce is

8    that he went through the regulations and explained in detail

9    why they are in place, and what their purpose is, and what they

10   mean.  That's exactly what we said they were intending to

11   introduce.  That's impermissible legal opinion.  That's

12   encroaching on the province of the Court, to tell the jury what

13   regulations mean.

14       If he -- if they wanted to introduce this -- and I

15   understood your ruling to be much more confined than that, to

16   be that Mr. Frey could testify about his communications with

17   Trump University: "I sent a letter on this date.  I spoke to

18   Mr. Sexton.  This is what I said to him.  This is what he said

19   to me."  For the reasons I stated before, we think that would

20   be inappropriate.

21       But the broader approach about Mr. Frey explaining to the

22   jury why these regulations are important, what they mean and

23   the deceptive nature of Trump University in his opinion, that's

24   impermissible opinion and clearly not allowed under Rule 701

25   and 702.

```
 1        Second, I think the argument that was made where Mr. Frey
 2   said, "Hey, if you move to Delaware, you won't be within our
 3   jurisdiction," that proves our point that this isn't -- they
 4   weren't applying a reasonable man standard.  They were applying
 5   what the New York legislature and regulators had determined
 6   were the steps that somebody needs to take to use "university"
 7   if you do so in a certain way in New York.  That is not the
 8   reasonable man standard that the jury will be instructed on.
 9   And it's extremely prejudicial to allow a regulator to come in
10   and say, "Regulations consider this to be misleading."
11        Now, a reasonable person that's -- and you will give a
12   limiting instruction, that he is not speaking for the
13   reasonable person.  That is highly, highly prejudicial.
14        Turning to the statutes that Ms. Jensen mentioned at the
15   end, I would be remiss to not notify the Court, these were the
16   statutes that they asked the Court to take judicial notice of,
17   we moved to strike, and Your Honor granted that.
18        We have not had an opportunity to respond to it.
19   Preparing for today, we did a little bit of research.  And to
20   the extent Your Honor is inclined in any way to rely on those
21   statutes, we would respectfully request the opportunity to
22   brief --
23             THE COURT:  For purposes of this motion in limine
24   proceeding, correct?
25             MR. MARROSO:  For any reason.
```

```
 1          THE COURT:  Well, to the extent that they ask the
 2   Court to judicially notice something at trial, then you would
 3   be in a position to respond and explain why the Court shouldn't
 4   accept judicial notice of that particular fact, correct?
 5          MR. MARROSO:  If they raise it at another time, we
 6   obviously would have an opportunity to respond.  My point was,
 7   prior to this request for judicial notice, a couple of days
 8   ago, this regulation in California and the statute in Florida
 9   have never been asserted in any case to my knowledge.
10          THE COURT:  Okay.
11          MR. MARROSO:  So this would be a very different --
12          THE COURT:  So I think you are basically saying that,
13   in considering this motion, I should not take into account
14   these statutes because, number one, they weren't referenced in
15   the papers, and now, number two, to try to bootstrap it into
16   the proceedings would be unfair?
17          MR. MARROSO:  Correct.
18      And just briefly, our preliminary research indicates that
19   the regulation from California that was cited was not only
20   found unconstitutional by Judge Moore in 2008 but had actually
21   sunsetted effective July 1, 2007.  It was not an effective law.
22   It wasn't operative.  It's part of the Private Post-Secondary
23   and Vocational Education Reform Act of 1989.  And part of a law
24   made it inoperative on July 1, 2007, and it was repealed on
25   January 1, 2008.  It came back as an operative regulation
```

1   January 1, 2010.  So for roughly two and a half years, nearly

2   overlapping with the class period here but not entirely, this

3   was inoperable.

4       The Florida statute has been the subject of a decision,

5   and the decision is called *Philip Crosby Associates*.  The

6   citation is 506 So.2d 490, Florida Court of Appeals, 1987.  And

7   in that case, the argument is exactly the argument that the

8   plaintiffs advance here, that there is a regulation that says

9   you can't use the word "university" unless you are approved by

10  the Bureau of Education, because they are looking out for

11  consumers.

12      The Court of Appeals rejected that very argument.  "That

13  interpretation would prohibit the use of 'college' and its

14  counterpart 'university' by any other person or entity for any

15  other purpose.  Such an interpretation would mean that the

16  Roman Catholic College of Cardinals would be required to seek

17  permission of the board before it could convene in Florida, and

18  that permission would have to be denied based on the board's

19  precedent in this case.  All the businesses and shops that

20  surround the University of Florida and call themselves college

21  or university would have to change their names.  There could be

22  no kiddie college day care centers or preschools, barber

23  colleges, and the Ringling Brothers clown college likewise

24  would be in violation of the law.  Anheuser-Busch could no

25  longer sell University Budweiser T-shirts to students on spring

```
 1   break."
 2        This is a fundamental difference that we have in this
 3   case.  What did "university" mean?  We still don't know.  You
 4   will see in the jury instructions -- I think you are going to
 5   turn to that shortly -- there's a --
 6             THE COURT:  Actually, I am not.
 7             MR. MARROSO:  Okay.  You will turn to that at some
 8   point.
 9             MR. PETROCELLI:  Thank you, Your Honor.
10             MR. MARROSO:  This underscores my point and why
11   New York's, Mr. Frey's -- even the New York State Department of
12   Education's view is not an appropriate proxy for the reasonable
13   person standard.
14        And I will just conclude with the last point she made,
15   which is it's certainly misleading not to tell people that you
16   had been warned by New York not to use this.
17        This is not an omission case.  They tried.  Your Honor
18   said no in July, said it was too late the change the case then;
19   it's too late to change the case now.
20             THE COURT:  All right.  Thank you.  All right.  I
21   think one more.
22        Haven't we already had a point/counterpoint on the last
23   one?
24             MS. JENSEN:  Yes, Your Honor.  Can I just make one
25   quick point?
```

```
 1              THE COURT:  Sure.  Sure.  Sure.
 2              MS. JENSEN:  Just to address counsel's point, I
 3    wanted to make it clear for the record that Trump University
 4    was operating in 2007 in California -- there were live events
 5    in Los Angeles and elsewhere -- and then obviously again in
 6    2010.
 7         And then Florida, it's the exact exception that I was
 8    describing, where it's not reasonably likely to mislead.  That
 9    is an exception, and it wouldn't apply here.
10         Thank you, Your Honor.
11              THE COURT:  Thank you.
12              MR. KIRMAN:  Thank you, Your Honor.  I think this is
13    the last one, and it will be short.  Motion in limine Number 6.
14         The defendants moved to exclude all evidence and testimony
15    related to the students' financial condition.  And Your Honor,
16    this is really just a straight 401/403 analysis.  Admission of
17    that type of evidence can only serve one purpose here, Your
18    Honor, which is to inflame the jury and to cause them to rule
19    based on sympathy or some other type of emotion for a plaintiff
20    who may have spent some of their last money on Trump
21    University.
22         And I cited, for example, Your Honor, Exhibit 103, which
23    is the statement from named plaintiff John Brown, which he
24    stated that, after paying for TU, he had little remaining in
25    savings, and "All of my paycheck now goes to pay bills."
```

1          Your Honor, that testimony has no relevance whatsoever to

2     any of the elements of any of the claims, doesn't relate to

3     whether or not the statement was made, uniform, false,

4     material, or relied upon.  And so it would only serve one

5     purpose, which is to inflame the jury and cause prejudice to

6     Mr. Trump.

7              THE COURT:  All right.  Let me hear a response.

8              MR. PFEFFERBAUM:  Good afternoon, Your Honor.  Dan

9     Pfefferbaum.

10         Your Honor, you issued a very clear and tailored order on

11    motion in limine Number 6.  And as we pointed out, there are --

12    it's a very overbroad request to exclude all information going

13    to students' financial condition.  And we pointed out certain

14    examples of why that was the case.  First of all, there are

15    multiple claims that require a plaintiff to show that they

16    engaged in a transaction or that they were relieved of money.

17    John Brown testifying that he put Trump University on three

18    credit cards would go to satisfying that element.

19         But more than that, Your Honor, you correctly noted in

20    your order that it goes to reliance, and the issue of reliance

21    here -- what defense counsel didn't read to you was what John

22    Brown said after he informed an employee of Trump University

23    that he would be maxing out three credit cards.  What he said

24    is, "I am putting all of my trust in Trump."

25         Now, the issue of reliance will be supported with evidence

1    that shows that these misrepresentations were a substantial

2    factor in the plaintiffs' purchasing decision, and the issues

3    of "handpicked by Mr. Trump" being a statement that was relied

4    on will be supported by evidence just like this; that Mr. Brown

5    was maxing out three credit cards and explaining to an employee

6    of Trump University that he was doing that because he was

7    putting his trust in Mr. Trump.

8         And you have also noted, Your Honor, that you would

9    reserve any relevancy or 403 considerations for trial if there

10   were any particular issues on precise documents, so I think

11   your tentative is -- should stand.

12            THE COURT:  All right.  Thank you.

13        All right.  So there's a number of these that I am going

14   to look at a little bit closer, and we will issue our final

15   order on this probably next Monday afternoon.  And at this

16   point, let's address jury instructions.

17        I reviewed them, and it's clear to me that the parties are

18   miles apart as to what the substantive elements, what the

19   substantive instructions are with respect to our cause of

20   action, and in fact so far apart that, at this point, what I am

21   prepared to do -- much as I did with the motions in limine -- I

22   am going to provide you all with tentative jury instructions,

23   and then we will have a jury instruction conference, and then I

24   will let both of you weigh in as to your position on my

25   instructions.  But at this point, we are not even close enough

1    where it would make sense for us to kind of try to arrive

2    either at a consensus or be able to pare down the number of

3    disagreements on this.  So that's why I said a minute ago we

4    are not going to be talking about jury instructions today.

5          And at this point, let me bring up or move to the trial.

6          At this point, we are scheduled to begin November 28th.

7    And just so you know, this is what I have on tap.  The jury

8    will be arriving on the morning of the 28th.  They will receive

9    a jury orientation.  Then I will end up addressing the full

10   jury, the panel, and at this time we expect upwards of 100 or

11   more prospective jurors who will fill out the questionnaires.

12   Before they do that, I am going to address them and impress

13   upon them the importance of them being forthright, being honest

14   about their positions and the importance of them not having

15   contact with anyone about their possible service as a juror in

16   this case, and directing them not to talk amongst themselves,

17   not to tell anyone that they are even being considered as a

18   juror in this case.  And I am going to take those extra

19   precautions because I want to make sure that from the point

20   that they even see these questionnaires that they know what

21   their obligations are.  And that won't take that long.

22         But after I make that statement, that admonishment,

23   provide that admonishment, then they will have an hour to an

24   hour and a half or so to fill out the jury questionnaires, and

25   then we are going to have them copied for each side.  And so we

 1    will make about seven copies.  We will provide three copies per

 2    side.  And then I will give you a couple of hours or so to

 3    review those answers to the questionnaires.  And then we will

 4    convene in court in order to address the answers and to address

 5    whether or not there are certain jurors that we can at that

 6    point all agree cannot be fair jurors in our case.  And my plan

 7    is that we will be here until the cows come home.  We are going

 8    to be here until we finish that process on Monday, Monday

 9    evening.

10         And then on Tuesday morning, the jury -- which will have

11    been excused on Monday after they completed their

12    questionnaires, again with an admonishment -- will then return

13    on Tuesday morning.  We will hopefully be in a position to be

14    able to identify which jurors aren't going to be needed over

15    here so they aren't going to make the walk over here,

16    hopefully.  My goal is we will have enough prospective jurors

17    that we will be able to come up with nine jurors.  The law only

18    requires six.  There's been a request for 12.  I am going to

19    use nine.

20         And then we will be take all the steps we can to ensure we

21    protect those jurors from outside influences so that they can

22    participate in the jury deliberations and we can have six at

23    the point jury deliberations begin.

24         And so it's my expectation that we will begin with trial

25    on Wednesday.

1    And going back to jury selection, I am prepared to give

2    each side attorney-conducted voir dire.  And I haven't

3    decided -- it will be between an hour and two hours.

4    To the extent that we have selected a jury on Tuesday

5    before 2:00 or 3:00 p.m., my plan as of this moment is to have

6    opening statements on Tuesday, but that's not etched in stone.

7    We will see where things are and how we all feel.  But my aim

8    is certainly to begin the trial by Wednesday morning.

9    And then with respect to the length of the trial, given

10   the current state of the rulings, of the motions in limine, I

11   am prepared to have the evidence concluded by the 13th or

12   14th -- I will be more precise when we start the trial -- and

13   with the aim that the jury will have this case on the 14th or

14   15th.  And that's how I see the case playing out as of this

15   moment.

16   For the media, we will be posting our rules, listing our

17   accommodations that we will be making.  We do intend to have an

18   overflow courtroom, and that at this point will be next door,

19   which is courtroom 2C.  That will be outfitted with additional

20   chairs in the well, and hopefully we will be able to

21   accommodate all the individuals.  But we will be reserving

22   certain seating for the media and then certain seating for the

23   public.  We will have a protocol as to how it is that people

24   will line up.  And so we are trying to accommodate the needs of

25   the media in order to permit access to the court, permit

1    reporting regarding this important trial.

2         And so at this time, I think that's all I have.

3         We do have the issue about Judge Miller.  Does the

4    plaintiff wish to meet with the Judge Miller for settlement

5    discussions?

6              MR. FORGE:  Sure, Your Honor.  I echo the Court's

7    comments.  We hold Judge Miller in the highest esteem.  And we

8    have spoken, and despite how aggressive we are on both sides,

9    we get along well outside of court.

10             THE COURT:  Is that true, Mr. Petrocelli?

11             MR. PETROCELLI:  It is.  And we will both put our

12   best efforts into it.

13        May I address some of your comments, Your Honor?

14             THE COURT:  Yes.

15             MR. PETROCELLI:  As the Court's -- has the Court

16   already finalized the jury questionnaire?  I haven't seen one

17   yet.

18             THE COURT:  You know what?  I was prepared to give

19   the one that you had jointly agreed upon, although, to be

20   frank, there's been quite a few of these motions in limine that

21   I have been addressing and simultaneously trying to anticipate

22   the protocols as to the media and public, so I have had a lot

23   on my plate.  But I will look at those on Monday, and I don't

24   expect that I am going be adding that much, I wouldn't think.

25   And so I will make sure that you all have copies of the final

1    jury questionnaires by Tuesday.

2            MR. PETROCELLI:  Is the overflow, by the way, audio

3    only, or audio and video?

4            THE COURT:  It's going to be both, audio and video.

5    And we will have two cameras, one directed at the witness

6    stand, and then a second would be positioned in a way that it

7    will capture the attorneys and perhaps the Court.  But it will

8    make sure that the jurors are not shown.

9            MR. PETROCELLI:  Is Your Honor intending to examine

10   the jurors for hardship?

11           THE COURT:  Well, at this point, we will have

12   inquired of the jury whether or not they would be able to serve

13   on a four-week trial.  I gave them a time limit.  That was an

14   overestimate just in case it went that long.  But at this time,

15   we have a jury panel that has advised us that they are prepared

16   to serve for four weeks, so I am hoping that we won't have to

17   address hardships.

18           MR. PETROCELLI:  I would like the Court to at least

19   take into account two requests that we, on the defense, are

20   making.  One is that we get an overnight with the jury

21   questionnaires so that we get the copies and we can go back to

22   our offices and study them and come back in the next morning.

23      Second, that we would request the opportunity --

24           THE COURT:  Overnight, versus just providing them on

25   e-mail?

```
 1              MR. PETROCELLI:  No.  In other words, as I understood

 2     the Court, you are going to make the copies and give them to

 3     us, and maybe we have an hour or two, and we have to come back

 4     in.  And I wanted the benefit to have them overnight.

 5              THE COURT:  What do you mean?  The answers?

 6              MR. PETROCELLI:  Yeah, the --

 7              THE COURT:  They are not going to answer them until

 8     Monday morning.

 9              MR. PETROCELLI:  I meant after they answer them and

10     you copy them and you hand out the copies --

11              THE COURT:  And you will be here.

12              MR. PETROCELLI:  -- then we would not resume jury

13     selection until the next morning.  That's what I am asking.  So

14     that we have the rest of the afternoon and the evening -- as I

15     understand it, we are going to get how many questionnaires?

16     About 100?

17              THE COURT:  Yeah.  Yeah.

18              MR. PETROCELLI:  So it is a lot of material to digest

19     and review.  So I just thought we would have the benefit of

20     more time -- both sides, that is, of course -- to review that

21     material.

22         Apologies if I was unclear.

23              THE COURT:  It was me.  I misunderstood you.  When

24     you said overnight, I thought you meant overnight the jury

25     questionnaire that I was going to finalize.  I thought you were
```

1    talking about that.

2        Mr. Coughlin?

3            MR. COUGHLIN:  I don't think we need that time, but

4    we are not opposed to it.

5        I had something else to bring up.

6        You had one more?

7            MR. PETROCELLI:  One more.

8        The second issue, Your Honor, is we would ask for the

9    right to conduct individual voir dire outside the presence of

10   other jurors given the unique circumstances in this case, and I

11   have done that on other occasions where we put the -- some of

12   these folks are going to be -- it may become clear just from

13   the questionnaires and the answers to the questionnaires

14   whether maybe both sides and Court can agree some people can be

15   excused.

16       And then we have them coming in in a particular order; is

17   that correct?  So it will be --

18           THE COURT:  They will be -- by the way, I didn't

19   mention this, but they will be identified by number.  They will

20   not be identified by name.

21           MR. AMES:  Correct.  By number.  Right.

22       So starting with the first person, let's say -- Juror

23   Number 1, right?  We would like the opportunity to have the

24   voir dire of the jurors conducted outside the presence of the

25   other jurors.  So for example, you put Juror Number 1 on the

```
 1   witness stand, and the other folks would be next door or

 2   outside.  And then -- it wouldn't have to be every juror, but

 3   the ones we really want to question because it prevents --

 4   allows them to answer more candidly and prevents a

 5   contamination effect, especially given the unique circumstances

 6   of the case.  And we would ask Your Honor give some

 7   consideration to that.

 8            THE COURT:  Any response from the defense?

 9            MR. COUGHLIN:  A lot of times, that will lengthen the

10   process quite a bit.

11            THE COURT:  As far as essentially having

12   individualized attorney-conducted voir dire as to some of the

13   prospective jurors?

14            MR. COUGHLIN:  Some is just fine, but the problem is

15   if we did that all the way through for over 100, 130 -- we

16   can't do that because in process, voir dire is always or mostly

17   done in large groups, so you are finding out more -- you are

18   watching everybody when you are asking the questions, and they

19   are being informed by those questions, and by -- and not

20   infected, I wouldn't think.

21            THE COURT:  Yeah.  And I know that there's

22   occasionally a contamination concern, but my experience has

23   also been that sometimes when you have people fess up to

24   something, then the others feel like, "Okay.  I can say that

25   myself.  I feel the same way."  And it oftentimes helps with
```

1    respect to candor.

2         But when it's plain that we are headed on a path where

3    there's very inflammatory types of comments, in those cases I

4    make it a point to go sidebar and further inquire because of

5    the concern of cross-contamination.

6              MR. COUGHLIN:  A final housekeeping matter.  In Your

7    Honor's comments a few weeks ago about the objections to the

8    depo designations, it seemed like Your Honor was saying that

9    you would undertake some -- some work there.  And so the

10   parties have been unable to address that.

11        I think that it should be clear that we should be working

12   to get rid of as many objections as possible right now so we

13   know what we can actually play or not --

14             THE COURT:  You mean right now, today, in this

15   proceeding?

16             MR. COUGHLIN:  No.  As soon as we walk out of here,

17   just so we get going on that, so it doesn't come down to the

18   last minute.  Your Honor wants us to be working on that, right?

19             THE COURT:  Absolutely.

20        And I have to share with you, it has been disappointing,

21   at least from my vantage point, the minimal amounts of

22   agreement as to so many matters, including things such as a

23   statement of the case.  And you know, at the same time, I

24   understand the stakes are high for both sides.  I had half a

25   mind to order you all to come back here and engage in a

1  meet-and-confer until you came up with a joint pretrial

2  conference, but I elected not to and to take the approach that

3  I am taking, which is I am going to hear your respective

4  positions, and then I will issue my tentatives, and I will hear

5  you.  And it seems to me that it will just be much more smooth

6  that way.

7       But ultimately, though, in terms of gaining the respect of

8  the Court, the Court has the maximum respect for lawyers that

9  are able to work out the little issues, the little problems,

10  the things that most attorneys can work out amongst themselves.

11  And to the extent that you value your reputation, I would hope

12  that you would take that into account when you are meeting and

13  conferring regarding any aspect of this case.

14       MR. COUGHLIN:  We will do that, Your Honor.  And we

15  will work with them on any scheduling issues for

16  President-elect Trump.

17       THE COURT:  Anything else?

18       MR. PETROCELLI:  No, Your Honor.  Thank you.

19       THE COURT:  All right.  Thank you all for your time.

20  And we will reach out to you with respect to Judge Miller and

21  his availability and then determine your availability.  All

22  right?

23       MR. FORGE:  Thank you, Your Honor.

24       (End of proceedings at 4:15 p.m.)

25                      -o0o-

1              C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11              DATED:  November 14, 2016, at San Diego,

12   California.

13

14                         /s/  Chari L. Possell
                           _____
15                         Chari L. Possell
                           CSR No. 9944, RPR, CRR
16

17

18

19

20

21

22

23

24

25