UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONNY LOW, J.R. EVERETT and JOHN BROWN, on Behalf of Themselves and All Others Similarly Situated, | Case No.: 3:10-cv-00940-GPC-WVG |
| | Case No.: 3:13-cv-02519-GPC-WVG |
| Plaintiffs, | **ORDER:** |
| v. | |
| | **(1) GRANTING JOINT MOTION FOR FINAL APPROVAL OF THE PROPOSED CLASS ACTION SETTLEMENT;** |
| TRUMP UNIVERSITY, LLC, a New York Limited Liability Company, and DONALD J. TRUMP, | |
| Defendants. | **AND** |
| ART COHEN, Individually and on Behalf of All Others Similarly Situated, | **(2) GRANTING PLAINTIFFS' MOTION FOR APPROVAL OF CLASS REPRESENTATIVE AWARDS** |
| Plaintiff, | |
| v. | **[10cv940, ECF Nos. 589, 590.]** |
| DONALD J. TRUMP, | **[13cv2519, ECF Nos. 294, 295.]** |
| Defendant. | |

On February 17, 2017, the Parties in the above-captioned, related actions (collectively, "Actions"; individually, "*Low*" and "*Cohen*") jointly moved the Court for

final approval of the proposed class action settlement ("Settlement").[1]  (*Low*, Dkt. No. 589; *Cohen*, Dkt. No. 294.)[2]  Plaintiffs also moved for approval of class representative awards.  (*Low*, Dkt. No. 590; *Cohen*, Dkt. No. 295.)  Defendants do not oppose the motion.

The Court held a final approval hearing on March 30, 2017.  (*Low*, Dkt. No. 617; *Cohen*, Dkt. No. 304.)  Amber Eck, Jason Forge, Patrick Coughlin, Rachel Jensen, Daniel Pfefferbaum, and Jeffrey Stein appeared on behalf of Plaintiffs.  (*Id.*)  David Kirman, Daniel Petrocelli, and Jill Martin appeared on behalf of Defendants.  (*Id.*)  Gary Friedman and IIann Maazel appeared on behalf of objector Sherri B. Simpson.  (*Id.*)

The Court has now considered: (1) the memorandum submitted in support of the Joint Motion for Final Approval of Class Action Settlement ("Final Approval Motion"); (2) the declarations submitted in support of the Final Approval Motion; (3) the declaration submitted in support of the Service Award Motion; (4) the Stipulation of Class Action Settlement, including its Exhibits (collectively, "Agreement"); (5) the Objection of Sherri B. Simpson, accompanying declarations, and responses thereto; (6) the entire record in these Actions, including, but not limited to, the Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Motion"), and the declarations and exhibits submitted in support thereof; (7) the oral presentations at the Fairness Hearing; (8) the Court's findings and conclusions contained in its Preliminary Approval Order; (9) this Court's experiences and observations while presiding over these Actions, and the Court's file herein; and (10) the relevant law.

Having considered the above, the Court **GRANTS** the Parties' joint motion for final approval of the Settlement and **GRANTS** Plaintiffs' motion for approval of class representative awards.

---

[1] This Order incorporates the Agreement and the Court's findings of fact and conclusions of law contained in its preliminary approval Order.  Unless otherwise defined, all terms used herein have the same meanings as set forth in the Stipulation of Class Action Settlement ("Agreement").

[2] All citations to the record are based upon the pagination generated by the CM/ECF system.

## RELEVANT PROCEDURAL BACKGROUND[3]

On December 19, 2016, the Parties entered into a Stipulation of Class Action Settlement ("Agreement"), after arm's-length settlement negotiations overseen by the Honorable Jeffrey T. Miller. (*Low*, Dkt. No. 583; *Cohen*, Dkt. No. 281.) On December 20, 2016, the Court, after determining the proposed Settlement to be fair, reasonable, adequate, and within the range of possible approval, entered an Order (1) preliminarily approving the Settlement, (2) directing dissemination of the Class Notice, and (3) setting a final approval hearing. (*Low*, Dkt. No. 584; *Cohen*, Dkt. No. 282.)

On December 29, 2016, Defendants effectuated the notice required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b), to all appropriate federal and state officials. (*See Low*, Dkt. No. 585; *Cohen*, Dkt. No. 283). On January 4, 2017, the Better Business Bureau of Metropolitan New York ("Settlement Administrator") mailed and emailed the Long-form Notice and Claim Form to 8,253 potential Class Members and published the Summary Notice in *USA Today*. (*See Low*, Dkt. No. 589-3, Declaration of Edward A. Wulff in Support of Joint Motion for Final Approval of Class Action Settlement ("Wulff Decl.") ¶¶ 6, 11; *Cohen*, Dkt. No. 294-3, Wulff Decl. ¶¶ 6, 11.)

On January 17, 2017, Trump University's ("TU's") successor entity, Trump Entrepreneur Initiative ("TEI"), paid the full $25 million Settlement Amount to the Escrow Agent. (*See Low*, Dkt. No. 589-2, Declaration of Rachel L. Jensen in Support of Joint Motion for Final Approval of Class Action Settlement ("Jensen Decl.") ¶ 14; *Cohen*, Dkt. No. 294-2, Jensen Decl. ¶ 14.) The Escrow Agent distributed $4 million to the New York Attorney General ("NYAG") for settlement of the NYAG action pursuant to the Agreement and the Memorandum of Agreement. (*See id.*) The remaining $21

---

[3] The Parties recounted at length the procedural history of the Actions in their joint motion for preliminary approval. (*See Low*, Dkt. No. 583 at 8–10; *Cohen*, Dkt. No. 281 at 8–10.) The Court will limit its recitation of the Actions' procedural history to relevant background for purposes of this Order.

3

million has been invested and is earning interest for the benefit of Class Members.  (*See id.*)

The Claims Deadline and Objection Date expired on March 6, 2017.  The Settlement Administrator received a total of 4,090 Claim Forms from potential Class Members submitted or postmarked by March 6, 2017.  (*Low*, Dkt. No. 612-2, Reply Declaration of Edward A. Wulff ("Wulff Reply Decl.") ¶ 5; *Cohen*, Dkt. No. 301-2, Wulff Reply Decl. ¶ 5.)  Only one procedurally valid objection was filed.[4]  (*Low*, Dkt. Nos. 592–97.)

## LEGAL STANDARD

The Ninth Circuit adheres to a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution[.]").  "[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge[.]"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

Federal Rule of Civil Procedure 23(e) provides that a court may approve a proposed settlement "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *see also Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003).  In making this determination, a district court must consider a number of factors, including, but not limited to:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (internal citation and quotation marks omitted).

---

[4] *See infra* Part I.G.

In examining the settlement for "overall fairness," a court must review the settlement "as a whole, rather than the individual component parts." *Hanlon*, 150 F.3d at 1026. A court cannot "delete, modify or substitute certain provisions." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982). Rather, "[t]he settlement must stand or fall in its entirety." *Hanlon*, 150 F.3d at 1026.

## DISCUSSION

## I.    The Settlement is Fair, Adequate, and Reasonable

The Court concludes that the Settlement is fair, adequate, and reasonable in light of the following factors.

### A. The Strength of Plaintiffs' Case

The Settlement reflects both the strength of Plaintiffs' case and the strength of Defendants' defense. Having adjudicated numerous dispositive motions in both Actions, and having concluded all pretrial proceedings in *Low*, the Court has been "exposed to the litigants, and their strategies, positions and proofs," and is duly "aware of the expense and possible legal bars to success." *Officers for Justice*, 688 F.2d at 626 (quoting *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971)). Plaintiffs survived substantive hurdles, including class certification, motions to dismiss, motions for summary judgment, and motions for decertification. Defendants likewise zealously litigated the Actions, ultimately securing the decertification of damages issues in *Low*. Moreover, the Court concludes that the proposed Settlement, reached after arm's-length negotiations overseen by the Honorable Jeffrey T. Miller, was "not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Id.* at 625. Based on the Court's evaluation of the Actions, the Court concludes that this factor weighs in favor of final approval of the Settlement.

/ / / /

/ / / /

**B. The Risk, Expense, Complexity, and Likely Duration of Further Litigation; and the Risk of Maintaining Class Action Status Throughout the Trial**

Settlement is favored where a case is "complex and likely to be expensive and lengthy to try." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009). Beyond the "inherent risks of litigation," *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993), there were numerous risks specific to the instant Actions. Class Counsel acknowledges that in *Low*, Plaintiffs faced challenges, including: obtaining a unanimous jury verdict on liability against then-President Elect Trump, if the trial began as scheduled, or against President Trump, if the trial were continued; prevailing in thousands of individual damages proceedings, which, by any estimate, would have taken several years to complete; collecting a judgment against TU; and prevailing in a lengthy appeal process, with the corresponding risk that Class Members would receive no recovery. (*Low*, Dkt. No. 589-2, Jensen Decl. ¶ 7; Dkt. No. 294-2, Jensen Decl. ¶ 7.) Class Counsel further acknowledges that in *Cohen*, Plaintiff risked the possibilities that: the Court would grant Defendant's motion for decertification in its entirety, or decertify damages as it did in *Low*; the Court would stay the proceedings during President Trump's tenure; Plaintiff would be unable to obtain a unanimous jury verdict against President Trump on his civil RICO claim; and Plaintiff may not prevail in a lengthy appeal process, with the corresponding risk that Class Members would receive no recovery. (*Low*, Dkt. No. 589-2, Jensen Decl. ¶ 8; Dkt. No. 294-2, Jensen Decl. ¶ 8.)

In light of the above, the Court concludes that the risks, expense, complexity, and likely duration of further litigation weigh in favor of final approval.

**C. The Amount Offered in Settlement**

A settlement is not judged against only the amount that might have been recovered had the plaintiff prevailed at trial; nor must the settlement provide full recovery of the damages sought to be fair and reasonable. *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998). "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each

6

give up something they might have won had they proceeded with litigation." *Officers for Justice*, 688 F.2d at 624 (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." *Id.* at 628.

In granting the Parties' joint motion for preliminary approval, the Court concluded that the amount offered in settlement was fair, reasonable, and adequate. (*See Low*, Dkt. No. 584 at 3–5; *Cohen*, Dkt. No. 282 at 3–5.) At the time the Court preliminarily approved the Settlement, it was estimated that Eligible Class Members would receive recovery amounting to 50% of what they spent on TU Live Events, less any refunds received. (*Low*, Dkt. No. 583 at 11; *Cohen*, Dkt. No. 281 at 11.) The Court further observed that Eligible Class Members may potentially recover more than 50% of what they spent: if any money remains in the Net Settlement Fund after the initial distribution, the Settlement Administrator will make additional *pro rata* distributions to Eligible Class Members who have cashed their Award checks, until the Net Settlement Fund is exhausted. (*Low*, Dkt. No. 583-1 ¶ III.8; *Cohen*, Dkt. No. 281-1 ¶ III.8.)

Presently, the Court confirms its preliminary finding in light of updated information from the Parties. The recovery rate for Eligible Class Members is likely to greatly exceed the 50% recovery rate preliminarily approved by the Court. According to the Parties' and the Settlement Administrator's records, it is estimated that Eligible Class Members will receive over 80%—with 80% being a conservative estimate—of their Net Purchase Amounts.[5] (*Low*, Dkt. No. 612 at 8; *Cohen*, Dkt. No. 301 at 8.) At the final approval hearing, Class Counsel represented to the Court that Eligible Class Members are likely to receive at least 90% of their Net Purchase Amounts.

---

[5] Plaintiffs qualify that the Settlement Administrator is continuing to process Claim Forms. (*Low*, Dkt. No. 612 at 8; *Cohen*, Dkt. No. 301 at 8.) The estimated recovery rate cannot be finalized until claimants have been given a chance to cure deficiencies, and until processing has concluded. (*Id.*) As of March 23, 2017, 2,741 unique purchases, amounting to a total of $21.3 million, have been verified by cross-checking Defendants' purchase data records. (*Id.* at 8.) Still, Plaintiffs anticipate that the total amount of verified purchasers could rise to $25 million and still yield an 80% recovery rate. (*Id.*)

As the Court previously noted, courts have approved settlements with recovery rates far lower than provided for in the instant Settlement.  *See, e.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) (approving settlement where the "common fund represent[ed] between 27 percent and 11 percent of the total potential recovery"); *Greko v. Diesel U.S.A., Inc.*, No. 10-CV-02576 NC, 2013 WL 1789602, at *5 (N.D. Cal. Apr. 26, 2013) (approving settlement in which the average settlement payment amounted to under 3% of the gross settlement value); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement in which class received payments in excess of 6% of potential damages); *Glass v. UBS Fin. Servs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007), *aff'd*, 331 F. App'x 452 (9th Cir. 2009) (approving settlement in which amount of settlement amounted to 25% to 35% of potential damages).

Here, the amount offered in settlement provides significant and immediate recovery for Eligible Class Members.  The extraordinary amount of recovery for Eligible Class Members—an estimated 80%, and potentially higher—is all the more exceptional when viewed in light of the risk of establishing liability at trial, the likelihood of appeal, the possibility of reversal, the complexity of conducting thousands of individual damages determinations, and the likely lengthy duration of further litigation.  Moreover, none of the amount offered in settlement will inure to Class Counsel's benefit, as Class Counsel do not seek any fees or costs.  The Court finds that the amount offered in settlement is fair, adequate, and reasonable, and accordingly concludes that this factor weighs in favor of final approval.

### D. The Extent of Discovery Completed and the Stage of the Proceedings

Where a "case is near trial, and the parties have conducted extensive discovery" and thoroughly litigated the issues, the extent of discovery and the stage of the proceedings weigh in favor of the proposed settlement.  *Cervantez v. Celestica Corp.*, No. EDCV 07-729-VAP, 2010 WL 2712267, at *4 (C.D. Cal. July 6, 2010).  Here, the Parties conducted extensive fact discovery for four years, including propounding and responding

to hundreds of requests for production of documents, special interrogatories, and requests for admission; reviewing half of a million pages of produced documents; taking and defending sixty-five depositions; and briefing and arguing over a dozen discovery disputes.  (*Low*, Dkt. No. 589-2, Jensen Decl. ¶¶ 4–5; Dkt. No. 294-2, Jensen Decl. ¶¶ 4–5.)  The Parties also completed expert discovery in *Cohen*, including taking and defending expert depositions, and briefing and arguing the Parties' five motions to exclude expert testimony.  (*Id.*)  In total, the Parties briefed 156 motions before executing the Settlement Term Sheet on November 18, 2016.  (*Id.*)

Moreover, all pretrial proceedings had concluded in *Low*.  The Court ruled on fifteen substantive and procedural motions *in limine*, and the liability phase of trial was scheduled to commence on November 28, 2016.  (*Low*, Dkt. Nos. 502, 572.)  When the Parties settled the Actions on the eve of trial, (*Low*, Dkt. No. 577), the Parties were in a position to clearly and frankly evaluate the strengths and weaknesses of their respective cases.  In sum, the Court concludes that the extent of discovery and the stage of the proceedings weigh in favor of final approval of the Settlement.

**E. The Experience and Views of Counsel**

Where "[b]oth Parties are represented by experienced counsel," the recommendation of experienced counsel to adopt the terms of the proposed settlement "is entitled to great deal of weight."  *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1174 (S.D. Cal. 2007).  In particular, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (internal citation and quotation marks omitted).

As the Court noted in preliminarily approving the Settlement, both Parties are represented by experienced, able counsel, and counsel on both sides believe that the Settlement provides a fair, adequate, and reasonable recovery for Class Members.  Moreover, not only have Class Counsel (Robbins Geller Rudman & Dowd LLP ("RGRD") and Zeldes Haeggquist & Eck, LLP ("ZHE")) actively litigated the instant Actions for nearly seven years, they have significant experience prosecuting class actions

9

and handling complex litigation.  (*Low*, Dkt. No. 583 at 17–18; *Cohen*, Dkt. No. 281 at 17–18.)  After carefully evaluating the strengths and weaknesses of the Parties' positions in both Actions, Class Counsel attest to their "confiden[ce] that the Settlement represents a favorable resolution, which is in the best interests of Class Members."  (*Low*, Dkt. No. 589-2, Jensen Decl. ¶ 9; Dkt. No. 294-2, Jensen Decl. ¶ 9.)  In light of the foregoing, the Court concludes that this factor weighs in favor of final approval of the Settlement.

**F.  The Presence of a Governmental Participant**

After the Court preliminarily approved the Settlement, Defendants sent CAFA notices to the Attorneys General of all states, territories, and the District of Columbia, as well as to the Attorney General of the United States.  (*Low*, Dkt. No. 613 at 2; *Cohen*, Dkt. No. 302 at 2.)  Defendants informed the Court that to Defendants' knowledge, no government entity has objected to the Settlement.  (*See id.*)  Accordingly, the Court finds that Defendants are in full compliance with CAFA, 28 U.S.C. § 1815, and concludes that this factor weighs in favor of final approval.  *See, e.g.*, *Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 685 (N.D. Cal. 2016) ("[N]either state nor federal officials lodged any objection after receiving notice of the Settlement Agreement.  Thus, this factor favors the Settlement Agreement.").

**G.  The Reaction of the Class Members to the Proposed Settlement**

Finally, the reaction of Class Members to the proposed Settlement weighs in favor of final approval.  After mailing and emailing, to the extent email addresses were available, a total of 8,253 Long-form Notices and Claim Forms to all potential Class Members, the Settlement Administrator received a total of 4,090 Claim Forms from potential Class Members submitted or postmarked by March 6, 2017.  (*Low*, Dkt. No. 612-2, Wulff Reply Decl. ¶¶ 3, 5; *Cohen*, Dkt. No. 301-2, Wulff Reply Decl. ¶¶ 3, 5.)

Only one individual, Sherri B. Simpson, submitted a procedurally valid objection.[6]  (*Low*, Dkt. Nos. 592–97.)  One other individual, Harold Doe, submitted an objection that

---

[6] Two other individuals, Leeland O. White and Michael De Cesare, submitted objection letters to the Court.  (*Low*, Dkt. Nos. 582, 603.)  However, because these individuals are not Class Members, the

1   failed to comply with the requirements set forth in the Court's preliminary approval

2   Order.[7]  (*Cohen*, Dkt. No. 299.)  Although the Court may overrule an objection solely for

3   failure to comply with the procedural requirements for objecting to the Settlement, *see,*

4   *e.g.*, *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, 2013 WL 4610764, at *12

5   (N.D. Cal. Aug. 28, 2013), the Court nonetheless rejects Doe's objection on the merits as

6   well.  That only one procedurally valid objection was filed, after 8,253 potential Class

7   Members received notice of the Settlement and the opportunity to object, is indicative of

8   the fairness, adequacy, and reasonableness of the Settlement.  "It is established that the

9   absence of a large number of objections to a proposed class action settlement raises a

10  strong presumption that the terms of a proposed class settlement action are favorable to

11  the class members."  *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221

12  F.R.D. 523, 529 (C.D. Cal. 2004).

13      "If objections are filed, the district court is to evaluate whether they suggest serious

14  reasons why the settlement proposal might be unfair."  *Californians for Disability Rights,*

15  *Inc. v. California Dep't of Transp.*, No. C 06-5125 SBA, 2010 WL 2228531, at *2 (N.D.

16

17  Court declines to consider their objections.  *See, e.g.*, *Chavez v. PVH Corp.*, No. 13-CV-01797-LHK,
18  2015 WL 9258144, at *3 (N.D. Cal. Dec. 18, 2015) (declining to consider objections of individuals who
    do not appear to be class members).  In addition, White's objection letter was prematurely submitted
19  prior to the Court's preliminary approval Order.  (*Low*, Dkt. No. 582.)  His intervention motion has been
    adjudicated in a separate Order.  (*Cohen*, Dkt. No. 303.)  Class Counsel additionally notes that two Class
20  Members sent objection letters to Class Counsel, but did not file them with the Court.  (*Low*, Dkt. No.
    612 at 7 n.2; *Cohen*, Dkt. No. 301 at 7 n.2.)  Ramona Kleeman faxed a letter, requesting more money.
21  (*See id.*)  Carolyn Class wrote to express her satisfaction with her TU purchases and her disagreement
    with the lawsuit.  (*See id.*)  Because the objections were not properly filed, the Court declines to
22  consider them.  Notwithstanding their procedural infirmity, to the extent the objections are cognizable,
    Kleeman's objection is overruled for the same reasons Doe's objection is overruled.  Class's objection
23  does not comment substantively on the Settlement, but opposes the basis of lawsuit—in fact, Class's
    objection is adverse to the Class, and is accordingly overruled.  *See Ko v. Natura Pet Prods., Inc.*, No. C
24  09-02619 SBA, 2012 WL 3945541, at *6 (N.D. Cal. Sept. 10, 2012) ("[A]n objection based on a
    concern for the Defendants and an apparent non-substantive assessment of the frivolity of the action are
25  not germane to the issue of whether the settlement is fair.").

26  [7] The objection did not comply with the requirements set forth in the Court's preliminary approval
    Order.  (*Low*, Dkt. No. 584; *Cohen*, Dkt. No. 282.)  There was no certificate of service indicating that
27  the objection had been served on counsel for the Parties.  (*Cohen*, Dkt. No. 299.)  The objection did not
    include the telephone number of the objector or a statement of whether the objector intended to appear at
28  the final approval hearing, in person or through counsel.  (*Id.*)

Cal. June 2, 2010) (citing *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984)).  For the reasons that follow, the Court concludes that neither objection presents serious reasons indicating that the Settlement is unfair, inadequate, or unreasonable.

### 1.  Amount in Settlement

Harold Doe objects to the Settlement primarily on grounds that the amount offered in settlement is insufficient.  (*Cohen*, Dkt. No. 299.)  Doe states that he is entitled to treble damages, premised on full restitution, amounting to at least $120,000.  (*Id.*)  However, as explained earlier in this Order, *supra* Part I.B, Plaintiffs faced the risk that they would be unable to obtain a unanimous jury verdict against Defendants.  And even if Plaintiffs prevailed on the issue of liability, Plaintiffs risked the possibility of reversal on appeal, in which case Class Members would receive no recovery, and faced the potential challenge of collecting a judgment against TU.  Moreover, even if liability were found, Doe would have to establish in individual damages proceedings that he was entitled to full restitution.  "That certain Class Members evaluate the risks differently, or would prefer to go to trial despite those risks, does not prevent the Court from granting final approval to the Settlement."  *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *6 (N.D. Cal. Feb. 16, 2016), *appeal dismissed* (Aug. 16, 2016).  Doe's objection does not disturb the Court's finding that the amount offered in settlement is unfair, and is accordingly overruled.  *See Officers for Justice*, 688 F.2d at 623 ("Of course, the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  (internal citations and quotation marks omitted)).

### 2.  Further Opportunity to Opt Out

Sherri B. Simpson objects to the lack of opportunity to opt out at the settlement stage.  (*Low*, Dkt. No. 593.)  Paragraph VII.1 of the Settlement Agreement provides, in pertinent part:

> In Fall 2015, Notices of Pendency of Class Action were sent to Class Members in the Actions, providing a right to opt out of one or both Actions by November 16, 2015.  Because all individuals who did not opt out are deemed to be Class

1   Members for all purposes, the Parties agree that no new opportunity to opt out will
2   be provided as a part of this Settlement.

3   (*Low*, Dkt. No. 583-1 at 24; *Cohen*, Dkt. No. 281-1 at 24.)  Simpson first asserts that the
4   proposed Settlement violates the due process rights of absent class members to opt out of
5   a damages class action lawsuit.  (*Low*, Dkt. No. 593 at 10–11.)  Simpson next argues, in
6   the alternative, that the Court should exercise its discretion to require a settlement-stage
7   opt-out opportunity pursuant to Federal Rule of Civil Procedure 23(e)(4).  (*Id.* at 11–15.)
8   However, Simpson's arguments are unavailing, and Simpson's objection is accordingly
9   overruled.

10       **a.  Standing**

11       "Simply being a member of a class is not enough to establish standing.  One must
12   be an aggrieved class member."  *In re First Capital Holdings Corp. Fin. Prod. Sec. Litig.*,
13   33 F.3d 29, 30 (9th Cir. 1994).  The aggrieved class member must also establish
14   redressability.  To illustrate, "[i]f modifying the fee award would not 'actually benefit the
15   objecting class member,' the class member lacks standing because his challenge to the
16   fee award cannot result in redressing any injury."  *Glasser v. Volkswagen Of Am., Inc.*,
17   645 F.3d 1084, 1088 (9th Cir. 2011) (quoting *Knisley v. Network Assocs., Inc.*, 312 F.3d
18   1123, 1126 (9th Cir. 2002)).  Here, Simpson has not shown how allowing for a further
19   opportunity to opt out would redress any injury.  In submitting her Claim Form on
20   February 1, 2017, Simpson affirmed, "I understand that I am bound by the terms of any
21   judgment in these actions and may not bring a separate lawsuit for these claims."  (*Low*,
22   Dkt. No. 612-2 at 6–7; *Cohen*, Dkt. No. 301-2 at 6–7.)  Having affirmed that she "may
23   not bring a separate lawsuit," Simpson has not shown how being allowed to opt out of the
24   Settlement would permit her to redress any injury, including her desire for a higher
25   damages award, ensuing from the foregone opportunity to sue Defendants separately.
26   Rather, she has accepted the financial settlement offered by Defendants as complete
27   redress for her injuries.
28   / / / /

### b. Due Process

Even assuming Simpson has standing, her due process objection lacks merit.  First, there is no blanket rule that due process requires a settlement-stage opt-out opportunity.  In fact, there is clear precedent to the contrary.  In *Officers for Justice*, the Ninth Circuit rejected an objection from a class member who chose not to opt out after receiving notice of the class action, but later sought a second opportunity to opt out of the settlement.  *See* 688 F.2d at 635.  In doing so, the Ninth Circuit stated that due process does not compel a settlement-stage opt-out opportunity:

> [W]e have found no authority of any kind suggesting that due process requires that members of a Rule 23(b)(3) class be given a second chance to opt out.  We think it does not.  [The objector]'s rights are protected by the mechanism provided in the rule: approval by the district court after notice to the class and a fairness hearing at which dissenters can voice their objections, and the availability of review on appeal.  Moreover, to hold that due process requires a second opportunity to opt out after the terms of the settlement have been disclosed to the class would impede the settlement process so favored in the law.  "[A]llowing objectors to opt out would discourage settlements because class action defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger claims opting out to pursue their individual claims separately."

*Officers for Justice*, 688 F.2d at 635 (quoting *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981)).  Here, like the objector in *Officers for Justice*, Simpson had the opportunity to opt out after she received the 2015 Class Notice, and could have moved the Court to opt out even after the deadline had passed.  (*See Cohen*, Dkt. Nos. 166, 231, 278.)  She chose not to do so, and cannot now belatedly argue that due process compels a further opt-out opportunity.

As Simpson observes, the Supreme Court has held that "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); *accord Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011) ("In the context of a class action

14

predominantly for money damages we have held that absence of notice and opt-out violates due process."). However, consistent with *Phillips Petroleum* and *Dukes*, absent class members were provided notice and afforded the opportunity to opt out of both Actions after class certification, pursuant to Federal Rule of Civil Procedure 23(c)(2). (*See Low*, Dkt. No. 419 at 9–11; Dkt. No. 411-1 at 3–11; Dkt. No. 381-3 at 12–13, 15; *see also Cohen*, Dkt. No. 130 at 9–11; Dkt. No. 71-1 at 3–11; Dkt. No. 61-2 at 12–13, 15.) The Court granted three opt-out requests from absent class members, even after the opt-out deadline had passed. (*Cohen*, Dkt. Nos. 166, 231, 278.) There was thus undoubtedly an opportunity to opt out after the Court directed dissemination of the 2015 Class Notice.

At the final approval hearing, Simpson's counsel advanced the argument that a parenthetical in Section 13 of the 2015 Long-form Class Notice guaranteed a second opt-out opportunity, and that the Settlement Agreement's denial of a new opportunity to opt out rendered the 2015 Class Notice constitutionally infirm.

To comport with due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "The notice must be of such nature as reasonably to convey the required information, . . . [b]ut if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met the constitutional requirements are satisfied. 'The criterion is not the possibility of conceivable injury[.]'" *Id.* at 314–15 (quoting *American Land Co. v. Zeiss*, 219 U.S. 47, 67 (1950)). Federal Rule of Civil Procedure 23(c)(2)(B) further provides, in pertinent part, that notice at the class certification stage "must clearly and concisely state in plain, easily understood language that the court will exclude from the class any member who requests exclusion[, and] the time and manner for requesting exclusion." Fed. R. Civ. P. 23(c)(2)(B)(v)–(vi).

The Court first examines the entire 2015 Class Notice.  The Mailed Notice expressly informed Class Members of how to opt out, as well as the legal consequences of doing so:

> If you remain in either or both Classes, you will be legally bound by all orders and judgments the Court makes.  If you do not want to be a part of either or both lawsuits, you must take steps to exclude yourself (sometimes called "opting-out"). If you exclude yourself, you cannot receive money from the lawsuit – if any is won – but you will not be bound by any Court orders or judgments.  *If you want to start or continue your own lawsuit against Trump University and Trump regarding their Live Events, you must exclude yourself*.

(*Low*, Dkt. No. 381-3 at 13 (emphasis added).)  The Summary Notice included the same language.  (*Low*, Dkt. No. 381-3 at 15.)  The 2015 Long-form Notice advised Class Members, on the very first page, that they had the option to "Do Nothing" or "Ask to Be Excluded."  (*Low*, Dkt. No. 411-1 at 3.)  Specifically, the Notice informed Class Members of the consequences of choosing to "do nothing": "By doing nothing, you keep the possibility of getting money or benefits that may come from a trial or settlement.  *But, you give up any rights to sue Trump University and Trump separately about the same legal claims in these lawsuits*."  (*Id.* (emphasis added).)  Conversely, "[i]f you ask to be excluded from these lawsuits and money or benefits are later awarded, you will not share in those monies or benefits.  *But, you keep any rights to sue Trump University and Trump separately about the same legal claims in these lawsuits*."  (*Id.* (emphasis added).)  And the preamble to Section 13 states unequivocally: You have to decide whether to stay in the Classes or ask to be excluded before the trial, and *you have to decide this now*."  (*Id.* at 9 (emphasis added).)  The 2015 Class Notice provided, in no uncertain terms, notice of the right to opt out, and of the binding consequences of not electing to opt out.  It clearly apprised Class Members that if they wished to bring a separate lawsuit against Defendants, they had to elect to opt out immediately.

Despite the clear language throughout the 2015 Class Notice, Simpson nonetheless maintains that a ten-word parenthetical in Section 13 conferred upon her a right to a second opt-out opportunity.  Section 13 states:

> You don't have to do anything now if you want to keep the possibility of getting money or benefits from these lawsuits.  By doing nothing, you are staying in one or both of the Classes.  If you stay in and the Plaintiffs obtain money or benefits, either as a result of the trial or a settlement, you will be notified about how to obtain a share (or how to ask to be excluded from any settlement).  Keep in mind that if you do nothing now, regardless of whether the Plaintiffs win or lose the trial, you will not be able to sue (by way of separate lawsuit) Trump University and Trump about the same legal claims that are the subject of these lawsuits.  You will also be legally bound by all of the Orders and judgments the Court makes in these class actions.

(*Id.*)  A plain reading of the parenthetical that Simpson seizes upon—"or how to ask to be excluded from any settlement"—does not objectively give rise to the conclusion that Simpson had an unequivocal right to opt out of the Settlement.  *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, No. 07-CV-9901 SHS, 2014 WL 3610988, at *7 (S.D.N.Y. July 21, 2014), *aff'd sub nom. Burgess v. Citigroup Inc.*, 624 F. App'x 6 (2d Cir. 2015) ("Because [the objector's] misunderstanding ignored explicit language in the notice, his mistake was not objectively reasonable.  The settlement notice afforded him the benefit of due process.  He cannot now take refuge in a subjective and unsupported misunderstanding of the notice.").  At most, the plain language of Section 13 confers on Simpson a right to be notified of how to *ask* the Court to exclude her from the Settlement.  Any right to "ask to be excluded" does not equate to a right to opt out.  Indeed, by Simpson's counsel's own admission at the final approval hearing, Simpson, who is an attorney, did not read or understand the Section 13 parenthetical to guarantee her a second opt-out opportunity. Simpson's belief that she is entitled to a settlement-stage opt-out opportunity was not based on an objective reading of the Notice's language.  Nor was it based on a subjective misunderstanding of the Notice's language.  Rather, Simpson did not identify the Section 13 parenthetical as important in any way, until she conferred with counsel.  This

admission sheds light on what an objective reading of Section 13 entails—an average Class Member (and here, an attorney, no less) would not objectively understand the parenthetical to guarantee a settlement-stage opt-out opportunity that would allow absent class members to pursue separate litigation against Defendants.

Even entertaining Simpson's counsel's argument that the phrase "ask to be excluded" must be read in light of parallel language in Sections 14 and 15 of the 2015 Long-form Notice, Simpson's interpretation of the Section 13 parenthetical cannot stand. In contrast to the ten-word parenthetical in Section 13, Section 14 states in clear, thorough language the effect of electing to opt out:

> If you exclude yourself from one or both Classes – which also means to remove yourself from the Classes, and is sometimes called "opting-out" of the Classes – you will not get any money or benefits from these lawsuits even if the Plaintiffs obtain them as a result of the trial or from any settlement (which may or may not be reached). However, you may then be able to sue or continue to sue Trump University and Trump regarding their Live Events. If you exclude yourself, you will not be legally bound by the Court's judgments in these class actions. If you start your own lawsuit against Trump University and Trump regarding their Live Events after you exclude yourself, you will have to hire and pay your own lawyer for that lawsuit, and you will have to prove your claims. If you do exclude yourself so you can start or continue your own lawsuit against Trump University and Trump regarding their Live Events, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

(*Low*, Dkt. No. 411-1 at 9.) Simpson has not shown how the Section 13 parenthetical is ambiguous, much less how the ten-word clause defeats the clear language in the rest of the 2015 Class Notice.

Furthermore, the legal effect of a request to opt out depends on the timing and circumstances of the request. At the class certification stage, Federal Rule of Civil Procedure 23(c)(2)(b)(v) provides that "the court *will* exclude from the class any member who requests exclusion." Fed. R. Civ. P. 23(c)(2)(b)(v) (emphasis added). In contrast, Federal Rule of Civil Procedure 23(e)(4), which applies to proposed settlements, provides that "[i]f the class action was previously certified under Rule 23(b)(3), the court *may*

refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." Fed. R. Civ. P. 23(e)(4) (emphasis added).  Rule 23(e)(4) expressly confers discretion, rather than a mandate, upon a district court to refuse to approve a settlement that does not allow for an opportunity to opt out.  Indeed, *Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006), a case which Simpson herself cites, emphasizes that due process does not require a second opt-out period, and that Rule 23(e) does not require a court to allow a new opportunity to opt out at the settlement stage.

> Neither due process nor Rule 23(e)(3) [now Rule 23(e)(4)] requires, however, a second opt-out period whenever the final terms change after the initial opt-out period.  Requiring a second opt-out period as a blanket rule would disrupt settlement proceedings because no certification would be final until after the final settlement terms had been reached.  As the Advisory Committee Notes make clear, "Rule 23(e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision . . . ." Adv. Comm. 2003 Notes to Fed. R. Civ. P. 23(e)(3).  However, the court is under no obligation to do so: "The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion." *Id.*

*Denney*, 443 F.3d at 271.  It is untenable to read Section 13 as divesting the Court of its discretion under Rule 23(e)(4).  At most, Section 13 gives Simpson a right to ask the Court to exercise its discretion and exclude her from the Settlement and the Class.  This is precisely what has transpired in this case: Simpson has requested the Court to exercise its discretion under Rule 23(e)(4) to exclude her from the Settlement and accordingly reject the Settlement.  Section 13 does not compel the Court to exercise its discretion and reject the Settlement.

Finally, Simpson's citations to *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995), and *Litwin v. iRenew Bio Energy Sols., LLC*, 172 Cal. Rptr. 3d 328, 329 (Cal. Ct. App. 2014), *as modified* (May 29, 2014), do not bolster her objection.  The 2017 Long-form Notice and Summary Notice provided Class Members notice of their options with respect to the Settlement, including information on how to

19

object to the Settlement.  (*See Low*, Dkt. No. 583-1 at 51–61; *Cohen*, Dkt. No. 281-1 at 51–61.)  Simpson has not shown how the Long-from Notice and Claim Form failed to fairly apprise her of the terms of the proposed Settlement and of her options in relation to the Settlement.  In fact, Simpson's submission of her Claim Form suggests otherwise— she received notice of the Settlement, and chose to submit a claim for a share of the Settlement fund.

### c.  Federal Rule of Civil Procedure 23(e)(4)

Finally, none of Simpson's four arguments persuades the Court to exercise its discretion to refuse to approve the Settlement pursuant to Federal Rule of Civil Procedure 23(e)(4).  Simpson first contends that there was no settlement on the horizon at the time the initial opt-out period expired.  Following Simpson's argument to its logical conclusion, a court must reject a class action settlement for lack of a settlement-stage opt-out opportunity each time a class action's initial opt-out period elapses before a settlement materializes.  This line of reasoning runs contrary to the Ninth Circuit's reasoning that "[r]equiring a second opt-out period as a blanket rule would disrupt settlement proceedings because no certification would be final until after the final settlement terms had been reached."  *Officers for Justice*, 688 F.2d at 635.

Simpson next contends that the 2015 Class Notice assured Class Members that they would have an opportunity to request exclusion from the Settlement.  As explained above, Simpson has had an opportunity to do just that—she has objected to the Settlement in order to request exclusion from the Settlement.

Third, Simpson argues that the Court's decision to decertify damages issues in *Low* diminished Class Members' incentives to opt out.  As detailed above, *supra* Part I.B, Plaintiffs faced the risk of losing their case for liability, either at trial or after appeal. That the Court declined to decertify *Low* with respect to liability issues does nothing to mitigate that risk.  If anything, the complex process (a process that would have spanned several years) of administering thousands of individual damages determinations rendered the possibility of a settlement more likely.  Moreover, at the time the Parties settled the

20

1    Actions, the Court had not yet ruled on the motion for decertification pending in *Cohen*,

2    exposing Class Members to the potential risk that the Court would decertify *Cohen*

3    entirely.

4        Fourth, Simpson objects that the Settlement releases Defendants from liability on

5    claims that the Class could not pursue, foreclosing individual Class Members'

6    opportunities to bring suit separately.  As a starting matter, "[t]he weight of authority

7    holds that a federal court may release not only those claims alleged in the complaint, but

8    also a claim 'based on the identical factual predicate as that underlying the claims in the

9    settled class action even though the claim was not presented *and might not have been*

10   *presentable in the class action.*'"  *Class Plaintiffs*, 955 F.2d at 1287 (quoting *TBK*

11   *Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)) (emphasis in

12   original).  Simpson notes that the Court declined to certify a common law fraud claim

13   under Florida law, and that Simpson, who is a Florida resident, would have been able to

14   pursue such a claim against Defendants, but for the Settlement.  However, even setting

15   aside potential collateral estoppel or *res judicata* issues, Simpson had the opportunity to

16   bring such a claim on her own behalf as soon as the Court declined to certify the Florida

17   common law fraud claim.  She chose not to do so then, and she cannot do so now.[8]

18       Having considered each objection and the arguments made at the final approval

19   hearing, the Court overrules the objections.  Neither of the two objections warrants

20   rejection of the Settlement.  Accordingly, the Court concludes that the reaction of Class

21   Members weighs in favor of final approval.

22   **II.    The Notice Plan**

23       Where there is a proposed settlement, Federal Rule of Civil Procedure 23(e)(1)

24   provides that "[t]he court must direct notice in a reasonable manner to all class members

25   who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Due process requires

26

27   _____

     [8] Even if Simpson had not waived her ability to sue separately, Simpson does not address the likelihood
28   that a common law fraud claim under Florida law would be time-barred.  Simpson purchased and
     attended TU Live Events in 2010, six years prior to the Settlement.  (*See* Dkt. No. 595.)

                                                   21

notice to be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.  Rule 23 "accords a wide discretion to the District Court as to the form and content of the notice." *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1350–51 (9th Cir. 1980) *disapproved of on other grounds by Evans v. Jeff D.*, 475 U.S. 717 (1986).

The Court previously found in its preliminary approval Order that the Settlement's notice plan complied with Rule 23 and the requirements of due process.  (*Low*, Dkt. No. 584 at 8; *Cohen*, Dkt. No. 282 at 8.)  The Court directed the Settlement Administrator to compile a list of names and addresses of purchasers of TU programs as they appeared in the Parties' records; update and monitor the Settlement Website, post all Settlement-related documents, list a mailing address and the toll-free telephone number, and provide for the online submission of Claim Forms; update and monitor the toll-free telephone number for Class Members to call for additional information; send through U.S. First-Class mail and email, to the extent email addresses were available, within fifteen days of the Court's preliminary approval Order, the Long-form Notice and Claim Form to all potential Class Members whose contact information was available in the Parties' records; publish on one occasion in the national edition of *USA Today* the Summary Notice, within fifteen days of the Court's preliminary approval Order; and provide the Long-form Notice and/or Claim Form to Class Members who requested them.  (*Id.* at 9–11.)  The Long-form Notice and Summary Notice provided Class Members notice of their options with respect to the Settlement, including information on how to object to the Settlement. (*See Low*, Dkt. No. 583-1 at 51–61; *Cohen*, Dkt. No. 281-1at 51–61.)

The Settlement's notice plan has since been implemented in accordance with the terms of the Agreement and the Court's Order.  The Parties provided the Settlement Administrator with the most current list of names and email and physical addresses of Class Members.  (*See Low*, Dkt. No. 589-3, Wulff Decl. ¶¶ 4–5; *Cohen*, Dkt. No. 294-3, Wulff Decl. ¶¶ 4–5.)  This list was compiled from information from Defendants' records,

potential Class Member inquiries, the Notice Administrator's updated records from the Notice of Pendency, and the NYAG.  (*Id.* ¶¶ 4–8.)  On January 4, 2017, the Settlement Administrator mailed and emailed, to the extent email addresses were available, the Long-form Notice and Claim Form to 8,253 potential Class Members.  (*Id.* ¶ 6.)  The Settlement Administrator also published the Summary Notice in the national edition of *USA Today* on January 4, 2017.  (*Id.* ¶ 11.)  For mailings that were returned as undeliverable, the Settlement Administrator and Class Counsel attempted to update the addresses, and the Settlement Administrator resent them accordingly.  (*Id.* ¶ 9.)  The Settlement Website and toll-free telephone number have been updated and maintained as ordered.  (*Id.* ¶¶ 12–13.)  Finally, although not required by the Court's Order, the Settlement Administrator sent a reminder letter on February 14, 2017 to 6,837 potential Class Members.  (*Id.* ¶ 10.)

Accordingly, the Court concludes that the distribution of the Class Notices has been implemented in accordance with the terms of the Agreement and the Court's preliminary approval Order.  Furthermore, the Court confirms its finding that through the mailing, emailing, and publication of the Class Notices in the form and manner ordered by the Court, Class Members have received the best practicable notice of the Settlement, the Fairness Hearing, and of their rights and options, including their rights to participate in the Settlement, object to the Settlement, and/or to appear at the Fairness Hearing in support of a properly submitted objection, and of the binding effect of the Orders and Judgment in this Action, whether favorable or unfavorable, on all Class Members.  The Class Notices fully satisfied all notice requirements under the law, including the Federal Rules of Civil Procedure and due process rights under the U.S. Constitution and California Constitution.

## III.   Attorney's Fees

Notably, Class Counsel do not seek any compensation at all for their representation of Plaintiffs and Class Members.  Instead, Class Counsel are voluntarily representing Plaintiffs and Class Members on a *pro bono* basis, including paying all of their litigation

expenses.  (*Low*, Dkt. No. 589-2, Jensen Decl. ¶ 10; Dkt. No. 294-2, Jensen Decl. ¶ 10.) Class Counsel's exceptional decision to provide nearly seven years of legal services to Class Members on a *pro bono* basis evidences not only a lack of collusion, but also that Class Counsel are in fact representing the best interests of Plaintiffs and the Class Members in this Settlement.  Instead of seeking compensation for fees and costs that they would otherwise be entitled to, Class Counsel have acted to allow maximum recovery to Plaintiffs and Class Members.  Indeed, that Eligible Class Members may receive recovery of 90% or greater is a testament to Class Counsel's representation and dedication to act in their clients' best interest.  The Court commends Class Counsel for their *pro bono* representation of Plaintiffs and the Class Members.

## IV.   Request for Class Representative Incentive Awards

Plaintiffs seek incentive awards of $15,000 for each Class Representative: John Brown, Art Cohen, J.R. Everett, Sonny Low, and former plaintiff Tarla Makaeff.  (*Low*, Dkt. No. 590-1 at 5; *Cohen*, Dkt. No. 295-1 at 5.)

Incentive awards are designed to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez*, 563 F.3d at 958–59.  "Incentive awards are fairly typical in class action cases," but are ultimately "discretionary."  *Id.* at 958.

In deciding whether to approve an incentive award, courts consider factors including:

> 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995). The district court must evaluate incentive awards individually. *See Staton*, 327 F.3d at 977.[9]

### A. Risk

Plaintiffs highlight the risk of defeat, as discussed above, *supra* Part I.B, and the unique financial and reputational risks ensuing from commencing the Actions, citing, as an example, TU's counterclaim against Makaeff. (*Low*, Dkt. No. 590-1 at 14–15; *Cohen*, Dkt. No. 295-1 at 14–15.) Plaintiffs maintain that in light of these risks, the incentive awards are reasonable, citing comparable incentive awards in this District. *See, e.g.*, *Mirkarimi v. Nevada Prop. 1, LLC*, No. 12CV2160 BTM (DHB), 2016 WL 795878, at *6 (S.D. Cal. Feb. 29, 2016) (approving $30,000 incentive award where class representative "took a financial risk" by taking time away from his law practice, and spent "a total of 120 hours of work, both preparing for and participating in the litigation"); *Smith v. CRST Van Expedited, Inc.*, No. 10-CV-1116-IEG WMC, 2013 WL 163293, at *6 (S.D. Cal. Jan. 14, 2013) (awarding $15,000 to representatives who settled employment class action during class certification, noting risk to class representatives' reputations and future employability).

### B. Notoriety and Personal Difficulties

Plaintiffs assert that the Class Representatives were subjected to significant public scrutiny as a result of heightened public interest and coverage of the Actions. (*Low*, Dkt. No. 590-1 at 9; *Cohen*, Dkt. No. 295-1 at 9.) Moreover, each of the Class Representatives devoted their time and energy to represent the interests of the Class Members. (*See Low*, Dkt. No. 590-2, Declaration of Rachel L. Jensen in Support of

---

[9] The Ninth Circuit has articulated a number of relevant factors that district courts may use in evaluating whether representative plaintiffs are entitled to incentive awards. They include: "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (alterations in original) (quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)). These general factors dovetail with the more specific *Van Vranken* factors enumerated above.

1  Plaintiffs' Motion for Approval of Class Representative Service Awards ("Jensen Decl.")

2  ¶ 5; *Cohen*, Dkt. No. 295-2, Jensen Decl. ¶ 5.)

3        **C. Amount of Time and Effort**

4        Plaintiffs assert that each Class Representative expended significant amounts of

5  time and effort in order to represent the interests of Class Members.  By Class Counsel's

6  estimates, each Class Representative contributed well over one hundred hours in

7  connection with their representation of Class Members.  (*See Low*, Dkt. No. 590-2,

8  Jensen Decl. ¶ 4; *Cohen*, Dkt. No. 295-2, Jensen Decl. ¶ 4.)  Plaintiffs cite cases in which

9  courts have approved comparable incentive awards for representatives who devoted less

10  time than the Class Representatives in the instant Actions.  *See, e.g.*, *Martin v.*

11  *AmeriPride Servs., Inc.*, No. 08CV440-MMA JMA, 2011 WL 2313604, at *9 (S.D. Cal.

12  June 9, 2011) (approving award of $18,500 where the representative "responded to

13  written discovery requests and assisted in the preparation of initial disclosures," and also

14  "traveled to San Diego twice at personal expense to participate in depositions and the full

15  day mediation"); *Singer v. Becton Dickinson & Co.*, No. 08-CV-821-IEG (BLM), 2010

16  WL 2196104, at *7 (S.D. Cal. June 1, 2010) (approving $25,000 incentive award where

17  the representative "protected the interests of the class and exerted considerable time and

18  effort in maintaining this action for the past two-and-a-half years, conducting extensive

19  informal discovery, and engaging in day-long settlement negotiations with a respected

20  mediator"); *Rippee v. Boston Mkt. Corp.*, No. 05-cv-1359 BTM(JMA), 2006 U.S. Dist.

21  LEXIS 101136, at *12–13 (S.D. Cal. Oct. 10, 2006) (approving $20,000 award where the

22  representative "took a very active role in the litigation" and spent about 200 hours

23  working on the case); *Van Vranken*, 901 F. Supp. at 299–300 (approving $50,000 award

24  where the representative participated in "years of litigation," including sitting for two

25  depositions, attending forty-nine telephone conferences, five meetings with class counsel,

26  and three pre-trial hearings, and testifying at trial).

27        Plaintiffs detail each Class Representative's specific contributions, as follows:

28  / / / /

**1. John Brown**

Brown took the initiative to foster relationships with, and encourage, the other Class Representatives, particularly as trial approached.  (*See Low*, Dkt. No. 590-1 at 11; *Cohen*, Dkt. No. 295-1 at 11.)  Brown provided a declaration in support of plaintiffs' motion for class certification, participated in meetings and calls with Class Counsel, reviewed pleadings, answered interrogatories, responded to requests for production, searched for and produced responsive documents, and sat for a full-day deposition.  (*See id.*)  He traveled across the country from New York City to San Diego for his full-day deposition in October 2012, for a mandatory settlement conference with Magistrate Judge Gallo in March 2015, and for multiple days of trial preparation with Class Counsel in November 2016.  (*Id.*)  Brown arranged to take time off from work in order to remain in San Diego for the duration of the trial.  (*See id.*)  Finally, Brown participated in the settlement process, reviewed and approved the draft Agreement before execution, and provided authorization for Class Counsel to enter into the Settlement terms on behalf of the Class.  (*See id.*)

**2. Art Cohen**

The sole named plaintiff in the *Cohen* Action, Cohen stayed in close contact with Class Counsel and reviewed pleadings and Court Orders to stay apprised of litigation developments.  (*Low*, Dkt. No. 590-1 at 12; *Cohen*, Dkt. No. 295-1 at 12.)  Cohen provided documents and information to guide crafting of the complaint.  (*See id.*)  Cohen participated in conference calls with Class Counsel to help them prepare for the telephonic Early Neutral Evaluation Conference ("ENE") hearing in April 2014, answered special interrogatories, responded to requests for production, and produced 720 pages of responsive documents to Defendants.  (*See id.*)  He submitted a declaration in support of his motion for class certification, and prepared for and sat for two depositions on May 29, 2014, and June 9, 2015.  (*See id.*)  Cohen also traveled from San Jose to San Diego to participate in two mandatory settlement conferences before Magistrate Judge Gallo in March 2015 and in March 2016.  (*See id.*)  In addition, although the *Cohen*

Action had not yet been set for trial, Cohen spent hours preparing to testify in *Low*. (*See id.*) Finally, Cohen actively monitored the settlement negotiations, reviewed the Agreement before it was executed, and authorized Class Counsel to agree to the Settlement terms on behalf of the Class. (*See id.*)

### 3. J.R. Everett

Everett stayed in close contact with Class Counsel and actively monitored the ongoing litigation. (*Low*, Dkt. No. 590-1 at 12–13; *Cohen*, Dkt. No. 295-1 at 12–13.) She reviewed pleadings, participated in numerous meetings and after-hours calls with Class Counsel, and provided her thoughts on the investigation of the class claims. (*See id.*) Everett participated in extensive discovery, motions practice, trial preparation, and settlement negotiations. (*See id.*) To illustrate, Everett answered two separate sets of special interrogatories, responded to requests for production, and produced 337 pages of responsive documents. (*See id.*) She also provided two declarations, one in support of plaintiffs' motion for class certification and one in opposition to Defendants' motions for summary judgment. (*See id.*) Everett traveled across the country from Florida to San Diego to prepare for and sit for a full-day deposition in October 2012, to participate in a mandatory settlement conference before Magistrate Judge Gallo in March 2015, and to prepare for trial with Class Counsel in November 2016. (*See id.*) Everett cleared her schedule to return to San Diego later in November to attend trial in *Low*. (*See id.*) Finally, Everett was actively involved with the settlement process, reviewed the draft Agreement, and authorized Class Counsel to enter into the Settlement terms on behalf of the Class. (*See id.*)

### 4. Sonny Low

According to Class Counsel, Low devoted hundreds of hours to representing the Class, in spite of his advanced age. (*Low*, Dkt. No. 590-1 at 13–14; *Cohen*, Dkt. No. 295-1 at 13–14.) Low made himself available to Class Counsel, provided a declaration in support of Plaintiffs' motion for class certification, reviewed pleadings, answered special interrogatories, responded to requests for production, and searched for and produced

1,357 pages of responsive documents.  (*See id.*)  He prepared extensively with Class Counsel and sat for two depositions in October 2012 and April 2016.  (*See id.*)  Low spent many hours with Class Counsel preparing for trial and also participated in a mock trial.  (*See id.*)  Finally, Low remained engaged throughout the settlement process, reviewed the draft Agreement before it was executed, and authorized Class Counsel to agree to the Settlement terms for the Class.  (*See id.*)

### 5. Tarla Makaeff

Makaeff, the first plaintiff to step forward in connection with the instant litigation, contributed hundreds of hours to prosecute her claims and represent the Class.  (*Low*, Dkt. No. 590-1 at 14; *Cohen*, Dkt. No. 295-1 at 14.)  She provided information to Class Counsel to formulate the allegations in the original complaint and guide their investigation.  (*See id.*)  She participated in extensive discovery, responding to six separate sets of requests for production and requests for admission, answering five separate sets of special interrogatories, and producing a total of 5,806 pages of responsive documents to defendants.  (*See id.*)  Makaeff prepared for, traveled to, and sat for four deposition sessions on January 30, 2012, January 31, 2012, April 13, 2012, and February 10, 2014.  She participated in the ENE in August 2011 and the mandatory settlement conference before Magistrate Judge Gallo in March 2015.  (*See id.*)  Makaeff submitted six separate declarations in *Low*, including two in opposition to TU's counterclaim, one in support of her anti-SLAPP motion to strike, two in support of Plaintiffs' motion for class certification, and one in support of her motion to withdraw.  (*See id.*)  In connection with her representation of Class Members, Makaeff endured significant publicity.  (*See Low*, Dkt. No. 590-2, Jensen Decl. ¶ 5; *Cohen*, Dkt. No. 295-2, Jensen Decl. ¶ 5.)

### D. Duration of the Litigation

*Low*, filed on April 30, 2010, has proceeded for nearly seven years, (*Low*, Dkt. No. 1), and *Cohen*, filed on October 18, 2013, (*Cohen*, Dkt. No. 1), has proceeded for nearly four years.  For *Low*, the Class Representatives participated in years of discovery, including document requests, written discovery, depositions, and discovery disputes, and

also participated in extensive motions practice, with over one hundred motions filed in *Low* alone.  (*See Low*, Dkt. No. 590-2, Jensen Decl. ¶¶ 6–7, 11; *Cohen*, Dkt. No. 295-2, Jensen Decl. ¶¶ 6–7, 11.)  For *Cohen*, the Class Representative also participated in extensive discovery, including providing documents and sitting for two depositions, and reviewed pleadings for many of the fifty motions filed in *Cohen*.  (*See Low*, Dkt. No. 590-2, Jensen Decl. ¶¶ 8–11; *Cohen*, Dkt. No. 295-2, Jensen Decl. ¶¶ 8–11.)

### E.  Personal Benefit, or Lack Thereof

Finally, Plaintiffs assert that any personal benefits enjoyed by the Class Representatives as a result of the litigation are outweighed by the risks of litigation. (*Low*, Dkt. No. 590-1 at 15; *Cohen*, Dkt. No. 295-1 at 15.)  Plaintiffs maintain that they have incurred risks and made sacrifices in order to achieve a significant result for Class Members, citing, as an example, the large amount of damages sought in TU's counterclaim.  (*Id.*)

Each Class Representative devoted significant amounts of time and energy to participating in the Actions, and each encountered risks and challenges as a consequence of representing the Class Members.  In sum, the Court concludes that the balance of the factors weighs in favor of awarding incentive awards of $15,000 to each Class Representative.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Parties' joint motion for final approval of the Settlement and **GRANTS** Plaintiffs' motion for approval of class representative incentive awards of $15,000 for Sonny Low, J.R. Everett, John Brown, Art Cohen, and Tarla Makaeff.

The Parties and the Settlement Administrator are directed to implement the Agreement according to its terms and conditions.  The Parties are authorized for purposes of implementing the Agreement, without further approval from the Court, to agree to and to adopt such non-substantive amendments, modifications, and expansions of the Agreement and the exhibits thereto that are consistent with this Final Approval Order and

the Court's Final Judgment and do not limit the rights of the Class Members under the Agreement.  Any substantive amendments, modifications, and/or expansions of the Agreement and the exhibits thereto shall require prior approval by the Court.

The Actions, including the individual claims of Plaintiffs and Class claims resolved therein, will be dismissed on the merits and with prejudice pursuant to the Court's separately-entered Final Judgment.

**IT IS SO ORDERED.**

Dated:  March 31, 2017

Hon. Gonzalo P. Curiel
United States District Judge