```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
    SONNY LOW, ET AL.,              .
 4                                  . Docket
                   Plaintiffs,      . No. 10-cv-0940-GPC(WVG)
 5                                  .
                        v.          .
 6                                  .
    TRUMP UNIVERSITY, LLC,          .
 7  ET AL.,                         .
                                    .
 8              Defendants.         .
    . . . . . . . . . . . . . .     .
 9  ART COHEN, Individually and     .
    on Behalf of All Others         .
10  Similarly Situated,            . Docket
                   Plaintiff,       . No. 13-cv-2519-GPC-WVG
11                                  .
                        v.          . March 30, 2017
12                                  . 1:00 p.m.
    DONALD J. TRUMP,                .
13              Defendant.          . San Diego, California
    . . . . . . . . . . . . . . .
14
              TRANSCRIPT OF FINAL APPROVAL HEARING
15         BEFORE THE HONORABLE GONZALO P. CURIEL
                UNITED STATES DISTRICT JUDGE
16

17                  A-P-P-E-A-R-A-N-C-E-S

18  For the Plaintiffs:    Robbins Geller Rudman & Dowd LLP
                           655 West Broadway, Suite 1900
19                         San Diego, California 92101
                           By:  JASON A. FORGE, ESQ.
20                              RACHEL L. JENSEN, ESQ.
                               PATRICK J. COUGHLIN, ESQ.
21                              DANIEL J. PFEFFERBAUM, ESQ.
                               BRIAN E. COCHRAN, ESQ.
22                              JEFFREY J. STEIN, ESQ.
                           - and -
23                         Zeldes Haeggquist & Eck, LLP
                           225 Broadway, Suite 2050
24                         San Diego, California 92101
                           By:  AMBER LEE ECK, ESQ.
25  ///
```

```
 1                A-P-P-E-A-R-A-N-C-E-S (CONTINUED)

 2   For the Defendants:     O'Melveny & Myers LLP
                             1999 Avenue of the Stars, Suite 700
 3                           Los Angeles, California 90067
                             By:  DANIEL M. PETROCELLI, ESQ.
 4                                DAVID L. KIRMAN, ESQ.
                             – and –
 5                           JILL ANN MARTIN, ESQ.
                             Trump National Golf Club, Los Angeles
 6                           One Trump National Drive
                             Rancho Palos Verdes, California 90275

 7

 8   For the Objector, SHERRI B. SIMPSON:
                             Friedman Law Group LLP
 9                           154 Grand Street, 5th Floor
                             New York, New York 10013
10                           By:  GARY B. FRIEDMAN, ESQ.
                             – and –
11                           Emery Celli Brinckerhoff & Abady LLP
                             600 Fifth Avenue, 10th Floor
12                           New York, New York 10020
                             By:  ILANN M. MAAZEL, ESQ.
13

14

15

16

17

18

19

20

21

22   Court Reporter:         Chari L. Bowery, RPR, CRR
                             333 West Broadway, Suite 420
23                           San Diego, California 92101
                             chari_bowery@casd.uscourts.gov
24   Reported by Stenotype, Transcribed by Computer

25
```

1          SAN DIEGO, CALIFORNIA; MARCH 30, 2017; 1:00 P.M.

2                              -o0o-

3          THE CLERK:  Calling items Numbers 8 and 9 on the

4    calendar, Case Numbers 10-cv-940 and 13-cv-2519, Low v. Trump

5    University and Cohen v. Trump, both on for final approval

6    hearings.

7          THE COURT:  Appearances, please.

8          MS. JENSEN:  Good afternoon, Your Honor.  Rachel

9    Jensen, on behalf of the plaintiffs and the class.

10         THE COURT:  Good afternoon.

11         MS. JENSEN:   I have with me here Patrick Coughlin;

12   Daniel Pfefferbaum; Jason Forge; Brian Cochran; Jeff Stein; and

13   two of our plaintiffs, Art Cohen and Sonny Low; and also Amber

14   Eck.

15         THE COURT:  Good afternoon to you all.

16         MR. PETROCELLI:  Daniel Petrocelli for President

17   Trump and Trump University.  With me is David Kirman and Jill

18   Martin.

19         THE COURT:  Good afternoon.

20     And I believe we have counsel here for the objector?

21         MR. FRIEDMAN:  Good afternoon, Your Honor.  Gary

22   Friedman for the objector, Sherri Simpson, along with

23   co-counsel, Ilann Maazel.

24         THE COURT:  Good afternoon to you all.

25     We are here for a final approval hearing in both the

1   Low v. Trump University case and the Cohen v. Trump case.  I

2   have reviewed the pleadings, documents that have been filed

3   with respect to these proceedings; that is, I have reviewed the

4   motion for final approval of class action settlement, the

5   motion for approval of class representative service awards, the

6   omnibus reply in further support of joint motion.  I have also

7   considered the motions filed by Mr. Friedman, the objections of

8   class member Sherri Simpson to proposed class settlement, the

9   memo of points and authorities in support thereof, the

10  supplemental declaration of Sherri Simpson -- that is, the one

11  previously filed on March 6 -- and then earlier today, there

12  was a response filed by plaintiffs to the most recent Simpson

13  declaration.

14      So let me begin by addressing the fairness,

15  reasonableness, and adequacy of the proposed settlement, and

16  then once I conclude with that, I will move into the objections

17  to the proposed settlement.  And at that point, then, I will

18  ask some questions to the parties with respect to their

19  positions on a couple of standing questions and questions

20  regarding paragraph 13 of the 2015 notice.

21      So, first of all, with respect to what brings us here,

22  Rule 23(e) requires that the Court approve a proposed

23  settlement only after a hearing and on a finding that it is

24  fair, reasonable, and adequate.  There are a number of

25  considerations that the Court takes into account in making this

1   determination.  The first is the strength of the plaintiffs'

2   case.

3        In this case, the Court has had the opportunity to preside

4   over the case for approximately four years.  During the course

5   of that time, the Court has been exposed to the strategies, the

6   positions, and the proofs of both sides.  The plaintiffs

7   survived substantive hurdles, including motions to dismiss,

8   motions for class certification, motion for summary judgment.

9   The defendants zealously litigated the actions, ultimately

10  obtaining an order decertifying the damages issues in the Low

11  case.

12       Ultimately, based upon a review of the strength of the

13  plaintiffs' case, the Court finds that this factor weighs in

14  favor of final approval of the settlement.

15       As to the risk, expense, complexity, and likely duration

16  of further litigation, and the risk of maintaining the class

17  action status throughout the trial, this is a case where the

18  parties have identified a number of challenges.  Plaintiffs'

19  counsel points to and acknowledges some of those challenges.

20  That includes obtaining a unanimous jury verdict on liability

21  against then President-Elect Trump, if the trial began as

22  scheduled, or against President Trump, if the trial were

23  continued; the challenge of prevailing in thousands of

24  individual damages proceedings; collecting judgment against

25  Trump University; prevailing in the lengthy appeal process;

1    recognizing that during the course of those proceedings, that

2    at any juncture, it could produce a conclusion adverse to that

3    of the class members, and so it could result in no recovery for

4    the plaintiffs.  These are significant risks.

5        In addition, in the Cohen case, as the parties were aware,

6    there was a motion to decertify the class in its entirety.

7    That was a motion that the Court spent countless hours

8    reviewing, reviewing Ninth Circuit authority under *Poulos* and

9    determining to what extent it would support or contradict the

10   certification of a RICO class.  So that was yet another risk

11   that was faced in the Cohen case.

12       So in light of these risks, these factors, the Court

13   concludes that the risk, expense, complexity, and likely

14   duration of the further litigation weighs in favor of final

15   approval.

16       As to the amount offered in settlement, at this point, the

17   latest report is that the amount of recovery for the eligible

18   class members is an estimated 80 percent, and potentially

19   higher, of the amounts that were paid by class members.  That

20   is an extraordinary amount that would be recovered by the class

21   members.  Recognizing that there have been cases where common

22   funds representing between 11 and 20 percent have been

23   approved, class settlements with a recovery of 3 percent of

24   gross settlement values have been approved, and 6 percent in

25   the *In Re Omnivision Techs* case.  So it's clear that a recovery

1   of 80 percent is -- if not spectacular, it is indeed a

2   significant amount.  And part of that is due to the fact that

3   plaintiffs' counsel will receive none of this settlement that

4   has been provided; that is, the $25 million.

5      The Court also considers the extent of discovery completed

6   in the stage of the proceedings.  As plaintiffs' counsel

7   pointed out, this is the second oldest case that I have on my

8   docket, and this is a case that I have spent four years with.

9   I had a succession of law clerks who helped me throughout that

10   time, and their strong work and support helped me make it to

11   this juncture, but yet and still, this is a case that has been

12   litigated -- if not fiercely, zealously throughout.

13      The parties know every weakness in their case and in the

14   other side's case.  This isn't a case where, after filing and a

15   month of mediation, that the parties have come to settle the

16   case.  It is the opposite.  We all know that very few class

17   actions actually go to trial.  We know that very few class

18   action trials even make it to motions in limine.  And we know

19   that because we took that upon ourselves to, in limine, address

20   a number of -- if not vexing, challenging issues.  We have done

21   that, so we know exactly what the other side is aiming to offer

22   at trial, and we know what the Court was prepared to do with

23   respect to admitting or excluding evidence.  So to that extent,

24   it is extraordinary in terms of the amount of work, the amount

25   of institutional knowledge, that all of us would have about

1    this case.

2          So in sum, given the extent of discovery, which includes

3    65 depositions, reviewing millions of pages of documents, the

4    Court finds that the extent of discovery and the stage of

5    proceedings weigh in favor of final approval of the settlement.

6          The Court also considers the experience and views of

7    counsel, and I don't need to make the observation that counsel

8    on both sides are extremely experienced, well-respected in

9    their respective field of representing defendants or plaintiffs

10   in class actions.  And certainly to the extent that all

11   counsel, and particularly plaintiffs' counsel, have concluded

12   that this is a fair, adequate, and reasonable settlement, that

13   is entitled to great weight, and the Court will find this

14   factor weighs in favor of final approval.

15         As to the reaction of the class members to the proposed

16   settlement, at this point, 4,000 or so claim forms have been

17   filed out of a possible pool of 8,200 class members.  There are

18   two individuals, Sherri Simpson and Harold Doe, who have

19   submitted objections.  That small number, which I believe

20   represents less than 1 percent of all of class members, would

21   support the settlement as being fair and adequate and

22   reasonable.

23         So it's clear that, on the face of this settlement

24   agreement and in terms of what is behind it, what it took to

25   arrive at the settlement, what it provides to the class

1   members, that it is fair.  It is reasonable.

2       However, there's an issue or two that have been raised by

3   the objector, Ms. Simpson, and it requires further inquiry by

4   this Court, and that is what I would like to move on to at this

5   juncture.  And at this point, I am prepared to ask some

6   questions to all regarding a number of issues that have been

7   raised.

8       First of all, with respect to standing, as I understand

9   the position of the parties, plaintiffs and defendants,

10  Ms. Simpson, on February 1st, 2007, logged into a website and

11  submitted a claim form wherein she would have waived any right

12  to sue the defendants.  In that document that she clicked onto

13  and accepted, she states, "I declare under penalty of perjury

14  that the information I provided on this form is true and

15  correct to the best of my recollection."  Then it goes on to

16  say, "I understand that I am bound by the terms of the judgment

17  in these actions and may not bring a separate lawsuit for these

18  claims."

19      As I understand the response of Ms. Simpson to this

20  language, she indicates that this was merely a placeholder and

21  it was preserving her rights in the event that her objection

22  were to fail.

23      So I guess my first question, to plaintiffs' counsel --

24  and who will speak on behalf of plaintiffs?

25          MR. COUGHLIN:  I will, Your Honor.  Mr. Coughlin.

1          THE COURT:  Is this clicking of the box to make this

2    claim, is that an enforceable contract before the settlement is

3    even approved or rejected?  How do you view that?

4          MR. COUGHLIN:  I don't really see it as a contract.

5    It is an agreement.  I guess somebody could put it in contract

6    terms.  It was basically there, again, to reinforce that you

7    were giving up your rights to sue or pursue a separate action

8    or additional action.  You know, we had the terms of settlement

9    set out there, so when you clicked on this and you put in your

10   information and you agreed to it, that you knew that you would

11   be asking for money and be bound.

12       She didn't put any qualifier in it.  She had been in

13   constant contact with us for years, over dozens and dozens of

14   times.  She is an attorney.  And so there was no reservation of

15   rights there.  She claims, in her most recent submission,

16   that -- in her most recent submission, that she would have --

17   that there was no place to make that reservation of rights.

18       She had no problem communicating with us throughout the

19   years and even after the settlement was announced.  And we

20   submitted the full e-mails today that she references in her

21   latest declaration and asking about the settlement.  And, you

22   know, we said, "Hey, we are going to get you the information

23   about the settlement so you can share."

24          THE COURT:  Are you aware of any case where, in a

25   similar situation -- that is, a class action settlement -- a

1    party has filed a claim to participate in a class settlement,

2    but prior to the settlement either being approved or

3    disapproved, there's been a question such as this as to whether

4    or not laying that claim produces a bar from even seeking to

5    opt out?

6         MR. COUGHLIN:  I have probably handled more class

7    actions than anybody in the country, and I am not aware of a

8    case that is right on point, that's just like that.  So I can't

9    say that -- there are cases where people have waived certain

10   rights by doing something or, in some cases, not doing

11   something, in a couple of cases, where they have then waived

12   their rights and given up those rights and those rights have

13   passed them by.

14        The real question here is whether the notice, from an

15   objective standard -- if we put her aside for a second, because

16   we have spent a lot of time on Ms. Simpson, and for good

17   reason -- but the question is whether the class -- the notice

18   that the class got, you know, was reasonable, before we get

19   even to the signing of the -- what we will call a waiver of the

20   rights.

21        THE COURT:  When you say "the notice," the 2015

22   notice or --

23        MR. COUGHLIN:  Both the mailed notice, in 2015, and

24   the long-form notice, that was on the website.

25        The mailed notice, in October of 2015, doesn't have any of

1    the qualifiers that Ms. Simpson is now -- or Ms. Simpson's

2    counsel is now pointing to.  She admits she got that mailed

3    notice, and that basically says, "Listen, if you don't do

4    anything now, you are going to be bound.  You have to get out

5    by November 16."

6         She got that mailed notice, so it was unequivocal about

7    what you had to do and when you had to do it.  Okay.

8         If you clicked onto the website to look at the long-form

9    notice, on the front page, the first two paragraphs basically

10   says, "Listen, you are going to be bound.  By doing nothing,

11   you keep the possibility of getting money or benefits that may

12   come from a trial or settlement, but you give up any rights to

13   sue Trump University and Trump separately about the same legal

14   claims in these lawsuits."  That's on the front page.

15        She goes back to paragraph 13 and pulls out a

16   parenthetical, and we don't think it can be read, in context or

17   in the context of both these notices, to give you another right

18   to opt out and sue.

19            THE COURT:  All right.  So let me ask you, then, to

20   interpret that parenthetical language.  What does it mean?

21   What does it provide?

22            MR. COUGHLIN:  Well, in the context that it was

23   written, it provides -- basically, we have a situation -- often

24   we have situations where we have a settlement, and for whatever

25   reason -- and we have one in this class -- who wrote us and

1    says, "Hey, I don't want to be a part of this lawsuit.  I don't

2    want any money.  I thought I got a benefit."  And we filed that

3    letter with the Court.

4         We didn't know at the time that we did these notices

5    whether we would -- if there was a settlement, whether we would

6    just mail out checks, because we had the list of the people and

7    the moneys that they had spent, and we didn't know what form

8    the relief might take.  Some people don't want to be -- to

9    receive a check like that.

10        That's the context that that was written or that's what we

11   wrote it for or what we intended it to convey because there are

12   numerous other instances where it basically says, "Listen, if

13   you don't do anything right now, you are going to be bound by a

14   settlement, the judgments of the Court, anything that happens

15   at trial, and you cannot sue."  And that's unequivocal language

16   throughout.

17        This language that they are pointing to doesn't say that.

18   It goes on to say that you are going to be bound, win or lose,

19   at trial.

20        So I think, from an objective standpoint, the notices that

21   the class received foreclose even -- let's assume

22   Ms. Simpson -- and all the indicia is to the opposite, that she

23   wasn't confused and she didn't not know what she was doing.

24   But let's assume that she had a subjective interpretation that

25   she could opt out.  Well, the cases are pretty clear, it is not

1    your subjective observation of what the notice did or didn't

2    say.  It's an objective viewpoint, what the reasonable person

3    would look at the notice and say.  And we think that it is

4    not -- a reasonable person could not look at this and come to a

5    different conclusion about having a second chance to exclude

6    yourself and -- "and" -- and then the right to sue.

7       And she's never said that she would opt out and sue.

8    She's never said she actually looked at the long form, though

9    she thinks it's typical she would have.  She didn't bring any

10   of these issues up until she was contacted by counsel.

11      The fact that there is only one objector here raising this

12   issue in a timely manner is indicia that, in fact, the class

13   understood it.

14      When this notice went out in 2015, 11 people timely opted

15   out, and then two more followed suit, and they were allowed to

16   opt out, too.  The Court allowed that chance to opt out because

17   they were just a little late.  Not a couple of years late, but

18   just a little late.

19      So to do this now I think indicates it's not being done

20   for some confusion, you know.

21      She points to a "People" magazine in her declaration, that

22   she had an interview in January, January 19, I believe, of this

23   year, saying that she was sorry the case settled, you know, and

24   basically she thought he should apologize.  But she doesn't say

25   in there that she wanted to opt out of the settlement and bring

1  her own lawsuit.  The first time she makes that claim is after

2  she is contacted by counsel.

3         THE COURT:  All right.

4      Let me ask Mr. Petrocelli, do you have anything else to

5  offer along these lines?  Because I was going to ask

6  Mr. Friedman to respond to the position regarding paragraph 13,

7  and specifically the parenthetical language.

8         MR. PETROCELLI:  We do not, Your Honor.

9         THE COURT:  Thank you.

10     Mr. Friedman?

11        MR. FRIEDMAN:  Thank you, Your Honor.

12        THE COURT:  Let me have you respond to Mr. Coughlin's

13 argument, his words, regarding paragraph 13.

14        MR. FRIEDMAN:  Sure.

15     So, at the outset, the language promises the class member

16 that the class member will have the opportunity to request

17 exclusion from any settlement.  From any settlement.  Not to

18 request to exclude oneself from being paid, but from a

19 settlement, the entire settlement.

20        THE COURT:  How do you respond to the notion that you

21 have to read this in context and you have to read it in the

22 context of the mail notice, the context of what is recited in

23 the first page, everything that surrounds paragraph 13, that

24 that would be a clear indication that what we are talking about

25 in 13 is not another opportunity to opt out?

1            MR. FRIEDMAN:  Sure.

2      So the mailed notice is very short.  It's about one and

3  three-quarters pages long.  And in boldface, on both of those

4  pages, on both of its pages, it directs the reader to go to the

5  case -- to the court-approved case website for further and more

6  detailed information, and then it repeats that also in the text

7  of the mailed notice.  So if there's one thing that the mailed

8  notice does emphatically is that it proposes the reader go to

9  the long-form notice.

10      The long-form notice makes clear that the class member

11  will have an opportunity to opt out from any settlement.  What

12  it says is --

13            THE COURT:  Does it say opportunity to opt out, or an

14  opportunity to ask to be excluded?

15            MR. FRIEDMAN:  So the -- so if you have the notice in

16  front of you, Your Honor, we are talking about paragraph 13.

17  If you look at paragraph 14, right in the middle of that

18  paragraph, the parties -- the notice itself explains to the

19  reader that requesting exclusion and opting out are in fact

20  synonyms.  They are the same thing.  The United States Supreme

21  Court, in the *Shutts* case, explains that requests for exclusion

22  and an opt-out notice are the same thing.  And probably, if we

23  were to look, there's more authority than that.  They are the

24  same thing.

25      Or if we want to keep the phrasing consistent, I would say

1    that paragraph 13 of the 2015 notice guarantees the class

2    member that she will have the opportunity to submit a request

3    for exclusion from the settlement; and now, fast-forward two

4    years, in 2017, the proposed settlement that is before Your

5    Honor says, in no uncertain terms, "No, you may not request

6    exclusion from the settlement."

7            THE COURT:  But what is the harm to the extent that

8    she has made this request for exclusion at this point?

9            MR. FRIEDMAN:  Pardon?  What is the harm?

10           THE COURT:  What is the harm?

11      She has at this time not only objected, but she's asked

12    for delivery of what you are asserting is in paragraph 13, a

13    right to ask to be excluded from any settlement.

14           MR. FRIEDMAN:  Oh, I don't think there's a basis -- I

15    haven't heard anybody suggest that if she submits a request for

16    exclusion that it could be denied.  It's just --

17           THE COURT:  How can that be?  Because what I am

18    looking at is 23(c) notice, and it provides very clearly that

19    the notice that's provided must advise the class member that

20    the Court will exclude from the class any member who requests

21    exclusion.  And that's at the time of certification.

22      Meanwhile, 23(e)(4) provides that if the class action was

23    previously certified under Rule 23(b)(3), which this case was,

24    the Court may refuse to approve a settlement unless it affords

25    a new opportunity to request exclusion to individual class

1    members who had an earlier opportunity to request exclusion but

2    did not do so.  So that's obviously discretionary, "the Court

3    may."

4         And so, to the extent that 23(e) is very precise in

5    affording the Court with that discretion, I am not clear how a

6    notice could divest the Court of its discretion by something as

7    ambiguous or as unclear as this parenthetical.

8              MR. FRIEDMAN:  So then I should clarify the basis of

9    the objection.  We are not -- we did have a sort of secondary

10   fallback argument, which I don't think it really makes sense to

11   focus on here today, which is our argument under Rule 23(e)(4).

12   You are 100 percent right; the Court has discretion whether to

13   allow a second opt-out under 23(e)(4).  This is not primarily

14   what we are here arguing.

15        We are arguing there is a due process right under *Wal-Mart*

16   *Stores v. Dukes*, under the *Shutts* case.  There's a due process

17   right to opt out, to have a meaningful opportunity to opt out,

18   and there's a due process right to have accurate notice of the

19   opportunity to opt out.  And if you say to somebody -- let me

20   put it this way.  If you say to somebody, "If you want to opt

21   out, you have to opt out by November 16; however, in the

22   future, if there's a settlement, you can -- in the future, you

23   can opt out then," and then you come to the point of settlement

24   and say, "No, we are not letting you opt out," that first

25   notice was false.  It's not constitutionally adequate notice.

1            THE COURT:  To the extent that one can construe

2    objectively that language in paragraph 13 as affording or

3    guaranteeing that right, correct?

4            MR. FRIEDMAN:  Right.  That's right.

5       So then let's go to the language and talk about what it

6    means.  And if I could, I have a demonstrative, if that's okay.

7    I have shown it to counsel.  It is just a paragraph.

8            THE COURT:  Any objection?

9            MR. COUGHLIN:  No objection.

10           MR. PETROCELLI:  No.

11           MR. FRIEDMAN:  I thought it might be a handy way to

12   walk through my reading of the paragraph.

13           THE COURT:  All right.

14           MR. FRIEDMAN:  Here is what the paragraph says.  If

15   you do nothing, if you stay in the class and the plaintiffs

16   obtain money either as a result of trial or settlement -- and

17   that's the key, trial or settlement -- no matter whether it's

18   trial or settlement, you will be notified about how to get a

19   share of the settlement.

20      Next, if it is a settlement, you will be notified about

21   how to submit a request for exclusion.

22      So the trial or settlement, you are notified about how to

23   obtain a share.  If it's a settlement, you will be notified

24   about how to ask to be excluded.

25      And if it's a trial, whether the plaintiffs win or lose,

1    you will not be able to sue Trump again.  And it doesn't say

2    "settlement"; it only says "trial."  And the reason for that is

3    because we don't know whether this class member will have

4    availed herself of the opportunity to opt out of the

5    settlement.  So you can't say, "In the event of a settlement,

6    you won't be able to sue Trump," because maybe you opted out

7    and maybe you didn't.

8         And it's all of a piece, and everybody understood that.

9    There was no other -- there was no other meaning for what this

10   paragraph was saying.  And frankly, I don't want to be

11   presumptuous, but I believe that the Court understood, had that

12   as sort of a background understanding, too, if I may.

13        When the settlement was announced, November 28th -- and I

14   was just looking at the transcript from that, and I saw it's on

15   the -- Document 580 from the Low case.  And Your Honor said

16   that -- you were making some sort of housekeeping/

17   administrative comments.  And you said, that, "Look, we have to

18   go through the process.  Any settlement has to go through the

19   process of being reviewed by the Court.  The class members have

20   to be given opportunity to object to the extent they have any

21   objection, and then issues regarding opt-outs have to be

22   addressed by the Court."

23        And that's -- that's right, and that's how it is.  And

24   that was the, sort of, general understanding.  And then what

25   happened after that --

```
 1              THE COURT:  That's 23(e)(4), isn't that, in terms of
 2    opt-outs, where the Court maintains the discretion under
 3    23(e)(4)?  Even as of this moment, I still have that
 4    discretion.
 5         But what you are saying is that this notice divested the
 6    Court of that discretion, and to the extent that's what you are
 7    saying --
 8              MR. FRIEDMAN:  Yeah.  Mm-hmm.  That's right.
 9              THE COURT:  -- then it seems to me the notice has to
10    be crystal clear to that effect.  And I don't see where it's
11    crystal clear that this Court was giving up, surrendering its
12    discretion under 23(e)(4).
13              MR. FRIEDMAN:  I think what is crystal clear is that
14    the class members were told that there was a promise that was
15    made, and it came from the Court at the behest of the parties
16    in the form of the 2015 class notice, that, in the event of a
17    settlement, they would have the opportunity to request
18    exclusion.  And I don't see anything less than crystal clarity
19    there, Your Honor, and I don't think that there is any
20    discretion.
21              THE COURT:  But that's because you, as a lawyer, have
22    a better understanding of what "exclusion" may mean, as being
23    coextensive with "opt-out."  So for you, that's how you are
24    interpreting it.  But for a layperson, who were to see this
25    language, how to ask to be excluded from any settlement -- to
```

1   me, a layperson wouldn't conclude, "Oh, at that point, I have

2   an absolute right to opt out."

3              MR. FRIEDMAN:  I think that's exactly what it is

4   saying, that you have a right to opt out of settlement.  And I

5   also actually think that was the intent.  I am not hearing --

6              THE COURT:  Why would you think that was the intent?

7              MR. FRIEDMAN:  Because I listened -- because I just

8   heard Mr. Coughlin suggest what a different intent might have

9   been, and it makes no sense, and let me explain why.

10      He said it might be that people were concerned about not

11  excluding themselves from the settlement -- when we said

12  exclude ourselves from the settlement, it doesn't mean -- if

13  you exclude yourself from a settlement, you are excluding

14  yourself from the whole shebang, including the release, not

15  just the part that gets paid.  I think it is an irrational

16  reading to say that "excluding from a settlement" means not

17  excluding from a settlement but only excluding from receipt of

18  the money.  I don't think that makes any sense.

19      But Mr. Coughlin says that's what that meant, and that

20  that's a legitimate concern because they were thinking about

21  doing an automatic distribution at that point and people might

22  be confused about how to absent themselves from some sort of

23  automatic push of funds out to the class members.

24      And it is true, in rare cases, they have automatic

25  distributions.  And you can have them in cases where there's an

1   ongoing financial relationship between all the class members

2   and the defendant, where everybody's credit card information,

3   for example, is on file.  Cases in the credit card industry,

4   for example, sometimes you can have that.

5       These people paid -- people like my client, they paid

6   seven years ago or more.  They could have paid with a check.

7   They could have paid with a credit card.  They don't have that

8   credit card anymore.  Or they could have paid with a debit

9   card.  This is not a remotely plausible candidate for an

10  automatic distribution.

11      The other thing is we are talking about a clause here that

12  says you could go obtain -- that you can request exclusion from

13  any settlement.  And if the concern is just people not wanting

14  to get paid, why wouldn't it equally be a concern to request

15  exclusion from getting paid after any settlement or after a

16  RICO trial?  Why settlement?

17      It makes no sense.  It is not what it meant.  It was never

18  the intent.

19          THE COURT:  Wasn't there something akin to what's

20  proposed by plaintiffs' counsel in the case of *Glasser v.*

21  *Volkswagen*, where there was a settlement reached, and you had

22  this individual, Murray, who expressly disclaimed recovery, and

23  so that he would have essentially said, "I don't want any part

24  of that settlement."  And on appeal, the Ninth Circuit said,

25  "You don't have standing at this juncture to pursue any further

1  arguments because at this juncture you are essentially saying

2  'I didn't suffer any injuries, and I am giving up any right to

3  recovery.'"

4      To the extent that Mr. Murray did that in *Glasser v.*

5  *Volkswagen*, perhaps that is what was contemplated in this

6  paragraph 13 parenthetical?

7          MR. FRIEDMAN:  I think that what happens in

8  *Glasser v. Volkswagen* and in the other case that the plaintiffs

9  relied upon, *Brown v. Hain Celestial Group*, is that you see --

10 and there are many, many, many other cases out there that say

11 this, across the country -- what you see is that you have

12 standing as an objector, if you are a class member and what you

13 are complaining of, the proposed changes that you are

14 proposing, might actually benefit you.  That's the question.

15     So as long as -- Ms. Simpson is asking for the right to

16 opt out.  That's the complaint.

17         THE COURT:  Let me ask you, since we are talking

18 about standing, what do you make of this claim being made and

19 the language that coincides with that claim, that you are

20 essentially forever barred from seeking any further -- pursuing

21 any further lawsuits?

22         MR. FRIEDMAN:  So that argument, whether you want to

23 call it waiver, standing, that is -- that doesn't help the

24 plaintiffs on our -- it is not a response to our -- that

25 doesn't solve our due process problem; it just creates a new

1    one, because now you are saying that, if you want to have an

2    objection of the type that Sherri Simpson has, that, as a price

3    tag for that, you have to forfeit any claim that you could have

4    to the settlement funds.  You have to -- you have to sign a

5    notice of claim.  You had to do it by the deadline, March 6, or

6    else you forfeited any claim to the money, forevermore.

7         And so that's -- in her case, right now, say it's 15- or

8    $20,000.  You have to be willing to sacrifice 15- or $20,000

9    for the privilege of exercising your constitutional right to

10   object.  All we have done here is create a new due process

11   problem if we go that way.

12        THE COURT:  So your position is that due process

13   would preclude the Court from finding that that claim and that

14   claim language in fact does deny her the right to pursue this

15   matter in another case?

16        MR. FRIEDMAN:  I am saying they can't insist on her

17   forfeiture of her economic interests as a pre-condition for her

18   being able to go ahead and prosecute an objection.

19        THE COURT:  So it is essentially unconscionable?  You

20   are saying it's essentially unconscionable?  She shouldn't be

21   held --

22        MR. FRIEDMAN:  We didn't go down this road, but I

23   think there's a lot of law about how you can't freight the

24   exercise of constitutional rights with all these sorts of

25   conditions.

1    This is no different than saying, "If you want to make an

2    objection in this case, you would have to write a $10,000 check

3    to the Clerk of the Court."  You can't do it.

4         THE COURT:  And you were talking about due process

5    and how due process affords your client this right at this

6    juncture.

7    At the same time, you do recognize *Officers for Justice v.*

8    *Civil Service Commission*, recognizing that there is a right to

9    due process, but the question is what process is due, and the

10   process due is one opt-out opportunity, not two.

11   So, as I understand your argument, it is that you are

12   saying, essentially, that first opt-out opportunity was denied

13   because of the form, the lack of clarity in the 2015 notice?

14   Is that what you are saying?

15        MR. FRIEDMAN:  Yes.  That's what I am saying.  I am

16   saying two things, but I think that that's a good way to put

17   it.  That is right.

18   Among the rights that are guaranteed by due process --

19   this is not controversial -- is the right to accurate, clear

20   information as to the options of the class member.

21   She got notice that said, "If there's a settlement in the

22   future, you will be able to request to be excluded from that

23   settlement" -- not from a payment; from that settlement.

24   If -- at best, I don't think there is any ambiguity.  I

25   believe the reading of this is crystal clear.  And I realize

1    that's pushing back against what is now folks' interests.  But

2    at best, if it's ambiguous, that doesn't really help with

3    defending against the due process claim either.  We are

4    entitled to unambiguous notice.

5            THE COURT:  The question is to what extent does the

6    surrounding language and the mailed notice provide the clarity

7    that would otherwise be able to offset any ambiguity on the one

8    parenthetical?

9            MR. FRIEDMAN:  Yeah.  I think that would be a real

10   mistake to go that way.  The mailed notice says, "You have to

11   opt out now, and for full information, look at the website."

12   And you go to the website, and it says, "Yeah.  You have to opt

13   out now.  You have to opt out by November 16."

14       But, it also says, "If there's a settlement later, you can

15   submit a request for exclusion then."  Those are the words.  I

16   am not monkeying with the words.  "You can request exclusion

17   from any settlement."  Those's nothing unclear about that.

18           THE COURT:  Are you aware of any case where the Court

19   has surrendered its 23(e)(4) discretion based upon this type of

20   language?

21           MR. FRIEDMAN:  I am not aware of any case where there

22   was a promise to allow folks to opt out and then that was

23   subsequently reneged on flatly, no.

24           THE COURT:  And let me ask you, otherwise, with

25   respect to the fairness of the settlement, I take it you don't

1    have any disputes with the fairness?

2              MR. FRIEDMAN:  None.  None, Your Honor.  None.

3         And I would be happy to address any of the -- I don't want

4    to address things that don't need to be addressed, but there

5    have been statements made about my reaching out to Ms. Simpson,

6    whether that's relevant.  I am happy to address it.

7              THE COURT:  All right.  You may.

8              MR. FRIEDMAN:  Okay.  It is not relevant.  She was

9    unhappy with the settlement.  She was unhappy that there was

10   not a right to opt out.  She had expected that she would have

11   the right to opt out of any settlement.  We don't know how many

12   other of the 7,000 class members would share that expectation.

13   Among other things, she had to put a lot at risk to send in --

14   strike that.  That's sort of -- I retract that.

15        But in terms of me calling her, the idea that that

16   violated some ethical rule is absolutely false.

17             THE COURT:  It's false that you called her, or it's

18   false that that would represent an ethical breach?

19             MR. FRIEDMAN:  It's false that that would represent

20   an ethical breach.

21        The New York rule, like any rule in any jurisdiction in

22   this country, for constitutional reasons, provides that it's

23   only unlawful solicitation if the attorney is acting for -- out

24   of his own pecuniary interests.  And I am not.

25             THE COURT:  So to the extent that at the time

1    Ms. Simpson made her claim and would have otherwise agreed to

2    waive any future lawsuits and at that point intended to be

3    bound by that, but it wasn't until a week or two later that you

4    may have called her and, as a result of that conversation, she

5    then ended up having a change of heart, does that have any play

6    in how the Court should treat this?

7        MR. FRIEDMAN:  I wouldn't characterize it that way,

8    Your Honor, with all respect.  I would say that she is unhappy

9    with the settlement, and we have some contemporaneous evidence

10   of that in the record.  She's unhappy with the settlement.  It

11   is not sitting well with her.  She expected this right to opt

12   out.  She is not sitting there consciously aware that she knew

13   clause such-and-so and paragraph such-and-so gave her this

14   right, and she was not aware of the due process path.

15       THE COURT:  If she is not aware of that, then how can

16   you say it is a crystal-clear promise?

17       MR. FRIEDMAN:  What I am saying to you, with no

18   uncertainty, is that she expected that she would have the right

19   to opt out.

20       And she -- so she is unhappy.  She sees the claim form.

21   "Submit it or forever waive your ability to get your $20,000."

22   So whatever happens, whether she comes up with a path to sort

23   of put together an objection here or not, you have got to get

24   the claim form in, in any event.  She does that.

25       Then she and I speak, and lo and behold, there is a clear

1  path to effectuate exactly what she was thinking, not, sort of,

2  rigging something up, but a path that she -- that she pursued.

3      And the only -- you know, and I hear the argument that

4  says you have to put in some sort of reservation.  And I don't

5  know what anybody in the world could expect her to do other

6  than what she did.  You couldn't put a reservation -- she did

7  file in writing, in our objection papers, by the deadline of

8  March 6, a statement that explains, "Yes.  I put in a claim

9  form.  I don't wish to forfeit my rights in the event that this

10 objection is overruled.  I don't want to walk away from

11 $20,000.  But I do want to pursue this objection."

12     And Mr. Coughlin said that still, to this day, we don't

13 have in the record unambiguously that she wishes to opt out of

14 this case.

15     Yes, you do.  I would have thought it was clear, anyway,

16 and I would have represented it to the Court.  But in the

17 supplemental declaration of Ms. Simpson -- I believe it is at

18 last paragraph on the signature page -- if given the

19 opportunity to opt out, she will opt out.

20         THE COURT:  All right.

21     Mr. Coughlin, would you like to respond?

22         MR. COUGHLIN:  Just briefly.

23     I think we just had an admission that she didn't see this

24 parenthetical and didn't rely on it, if I heard counsel right,

25 that she had some vague understanding that she would get

1   another chance to opt out.  That's what this counsel just

2   admitted here, that she is not really relying on that

3   parenthetical at all.  So, you know, with that admission, I

4   don't think we even have a question before the Court.

5       And as the Court noted, it actually says, and it's

6   modified -- it's right after "How to Obtain a Share" -- "How to

7   Ask to be Excluded from any Settlement."  And you are right, we

8   write these notices so that laypeople can read them.  And you

9   know, I am sure Mr. Friedman meant well, but he certainly

10  didn't know my intent when we put together this notice and sent

11  it out.

12      So we think that, in the context, that it would inform

13  class members that they either opt out now or be bound in 2015,

14  and that's what happened, and we had people do that.

15      And now we have one person, who expressed no confusion or

16  desire to opt out before she got called by the attorney, and

17  apparently did not know about this parenthetical that's at

18  issue now, which Mr. Friedman has just admitted to.  So I

19  think, with those admissions, we don't have an issue before

20  this Court.

21      We think the notice was fair and reasonable and gave

22  people notice of their right to opt out at a certain time.  And

23  now, at the settlement that actually is above 90 percent of a

24  return, we think it's more than fair and reasonable.  What she

25  is looking for is an apology, and you can't get that in

1    litigation.

2            THE COURT:  All right.

3            MR. FRIEDMAN:  Just on the last point first, there's

4    this notion that it's just irrational on an economic level to

5    want to opt out.  It is not.  Not taking anything away from

6    counsel's efforts or the settlement they reached, but it is

7    26.6 cents on the dollar of the claimed amount, which is

8    good --

9            THE COURT:  I am sorry?  It's 26 --

10           MR. FRIEDMAN:  26.6 cents on the dollar.  That's

11   correct, Your Honor.

12           THE COURT:  How did you arrive at that?

13           MR. FRIEDMAN:  Well, if it is indeed 80 cents on the

14   dollar of loss, and if our interest is pursuing that claim

15   under RICO, and if under RICO trebling of damages is mandatory

16   and not discretionary, then for every dollar of loss, there's

17   going to be three dollars of recovery.  So 80 cents over three

18   dollars is 26.6 cents on the dollar.  It makes no sense to talk

19   about this in terms of cents on the dollar lost --

20           THE COURT:  Keep in mind, as pointed out, the level

21   of risk even with respect to whether or not this Court was

22   going to decertify the RICO class, and then keeping in mind --

23           MR. FRIEDMAN:  Sure.

24           THE COURT:  -- the unanimity of the jury, there were

25   any number of hurdles.

1    And so I understand how you came up with it.

2        MR. FRIEDMAN:  That's a risk analysis that it is

3    Sherri Simpson's right to make, not anybody else's.  So if she

4    wants to pursue a claim for RICO against the defendant, that's

5    her right.  And she believes that she can do 340 percent or so

6    better, which is what she -- if she was getting -- at least, if

7    she was getting treble damages.

8        Look, I think that Mr. Coughlin said early on in his

9    remarks that what matters is what the -- what matters is what

10   the notice says, the objective language of the notice.  There's

11   no cogent theory that turns on her mental processes here,

12   whether she in fact relied.  That's not how this works.  Every

13   day objectors attack notices, and as class action lawyers, much

14   to our annoyance, the objectors come in and make these

15   objections.  And sometimes they have really good bases, and

16   they come in and say something is hopelessly confusing.

17       They weren't confused.  They figured it out, right?  It is

18   not about -- it is not about whether or not the individual

19   objector was confused by particular language.  It's not

20   relevant whether Sherri Simpson relied upon this language.

21       THE COURT:  But it does bear on the question of

22   whether or not it's crystal clear because that's your argument,

23   that this language is crystal clear in informing the reader

24   that they have an absolute right to opt out, and given what we

25   have read, and given that a layperson would be reading this,

1    it's hard to see how a layperson would read that, how to ask to

2    be excluded, as an absolute right for an opt-out.

3             MR. FRIEDMAN:  It's an absolute right to submit a

4    request for exclusion from the settlement, and the settlement

5    says, in no uncertain terms, you may not request exclusion from

6    the settlement.  Requesting exclusion from the settlement is

7    different from requesting exclusion from just money.

8             THE COURT:  So at this point, I believe I have asked

9    the questions that I had.

10         Mr. Petrocelli, do you have anything else to offer?

11            MR. PETROCELLI:  I do not.

12            MS. JENSEN:  Your Honor, if I could, I just wanted to

13   elaborate very quickly on something that Mr. Coughlin said,

14   which is that we do have some good news today, and that is that

15   we expect for the class members to get over 90 cents on the

16   dollar.

17         The reason why is that the New York Attorney General has

18   informed us that they will distribute over -- or at least

19   1.6 million to our class members, in addition to what we

20   already had.  So we think it will actually be higher than

21   90 percent, but just to be conservative, because that's what we

22   have been trying to do throughout, we will estimate 90 cents or

23   more on the dollar.

24            THE COURT:  All right.  Thank you.

25         And with that, that will conclude today's proceedings.

1    The Court will take the matter under submission.

2        Thank you, all.

3            MR. PETROCELLI:  Thank you, Your Honor.

4            MR. FRIEDMAN:  Thank you, Your Honor.

5            MS. JENSEN:  Thank you, Your Honor.

6        (End of proceedings at 1:51 p.m.)

7                        -o0o-

8            C-E-R-T-I-F-I-C-A-T-I-O-N

9

10           I hereby certify that I am a duly appointed,

11   qualified and acting official Court Reporter for the United

12   States District Court; that the foregoing is a true and correct

13   transcript of the proceedings had in the aforementioned cause;

14   that said transcript is a true and correct transcription of my

15   stenographic notes; and that the format used herein complies

16   with rules and requirements of the United States Judicial

17   Conference.

18           DATED:  April 4th, 2017, at San Diego, California.

19

20                   /s/  Chari L. Bowery
                     _____
21                   Chari L. Bowery
                     CSR No. 9944, RPR, CRR
22

23

24

25